1  GAY C. GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  MICHAEL FREEDMAN – 262850
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   BEN HOLSTON – 341439
4  ROSEN BIEN
   GALVAN & GRUNFELD LLP
5  101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
6  Telephone:    (415) 433-6830
   Facsimile:    (415) 433-7104
7  ggrunfeld@rbgg.com
   vswearingen@rbgg.com
8  mfreedman@rbgg.com
   eanderson@rbgg.com
9  hchartoff@rbgg.com
   bholston@rbgg.com
10
11 AARON J. FISCHER – 247391
   LAW OFFICE OF
   AARON J. FISCHER
12 1400 Shattuck Square Suite 12 - #344
   Berkeley, California  94709
13 Telephone:  (510) 806-7366
   Facsimile:    (510) 694-6314
14 ajf@aaronfischerlaw.com

15 Attorneys for Plaintiffs and the
   Certified Class and Subclasses

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

16

17             UNITED STATES DISTRICT COURT

18            SOUTHERN DISTRICT OF CALIFORNIA

19 DARRYL DUNSMORE, ANDREE
   ANDRADE, ERNEST ARCHULETA,
20 JAMES CLARK, ANTHONY EDWARDS,
   REANNA LEVY, JOSUE LOPEZ,
21 CHRISTOPHER NORWOOD, JESSE
   OLIVARES, GUSTAVO SEPULVEDA,
22 MICHAEL TAYLOR, and LAURA
   ZOERNER, on behalf of themselves and all
23 others similarly situated,

24             Plaintiffs,

               v.
25 SAN DIEGO COUNTY SHERIFF'S
   DEPARTMENT, COUNTY OF SAN
26 DIEGO, SAN DIEGO COUNTY
   PROBATION DEPARTMENT, and DOES
27 1 to 20, inclusive,

28             Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**EXHIBITS A-O TO
DECLARATION OF VAN
SWEARINGEN ISO
PLAINTIFFS' MOTION TO
EXCLUDE OPINIONS OF,
DEFENDANTS' EXPERTS -
VOLUME I**

Date:  March 6, 2025
Time:  2:00 p.m.
Crtrm: 4A

Judge:  Hon. Anthony J. Battaglia

[4620326.1]

# TABLE OF CONTENTS

## EXHIBITS TO DECLARATION OF VAN SWEARINGEN ISO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERTS

### VOLUME I

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Expert Report of Owen J. Murray, D.O. (Under Seal) | A | 1 |
| Expert Report of Joseph V. Penn, MD (Under Seal) | B | 153 |
| Expert Report of Scott E. Reinecke, D.D.S. (Under Seal) | C | 379 |
| Expert Report of Lenard Vare (Under Seal) | D | 396 |
| Declaration of Dr. Owen Murray, *Plata v. Newsom*, Case No. 01-1351-JST, Doc. 3059-5 (N.D. Cal.) | E | 552 |
| Email from Dr. Murray to S. Coleman; Re: Dunsmore (Aug. 22, 2024) | F | 560 |
| Cover Email and RBGG Circulated Notes re Fourth Court Ordered Meet and Confer dated March 7, 2024 | G | 562 |
| California State Auditor Report, "San Diego County Sheriff's Dept. It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in its Custody" (Feb. 3, 2022) | H | 567 |
| National Commission on Correctional Healthcare Technical Assistance Report re: San Diego Jail (2017) | I | 694 |
| Autopsy Reports of Lonnie Rupard, Keith Bach | J | 834 |
| Email from S. Coleman to Plaintiffs' Counsel, Re: Materials Relied Upon by Experts Per Court Order (Dkt. 718) (Sept. 23, 2024) | K | 873 |
| Excerpt from Expert Report of James Austin, Ph.D. | L | 878 |
| Excerpt from Expert Report of Kelly S. Ramsey, M.D. | M | 881 |
| Expert Report of Pablo Stewart, M.D. (Redacted) | N | 890 |

[4619272.1]

# TABLE OF CONTENTS

EXHIBITS TO DECLARATION OF VAN SWEARINGEN ISO PLAINTIFFS'
MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERTS

## VOLUME I

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Rebuttal Expert Report of Pablo Stewart, M.D. (Redacted) | O | 1056 |

[4619272.1]

# EXHIBIT A
# (Filed Under Seal)

Ex. A-1

# EXHIBIT B
# (Filed Under Seal)

Ex. B-153

# EXHIBIT C
## (Filed Under Seal)

Ex. C-379

# EXHIBIT D
# (Filed Under Seal)

Ex. D-396

# EXHIBIT E

1 | XAVIER BECERRA
Attorney General of California
2 | JAY C. RUSSELL
Supervising Deputy Attorney General
3 | MANEESH SHARMA - 280084
Deputy Attorney General
4 | 455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
5 | Telephone: (415) 703-5500
Facsimile: (415) 703-3035
6 | Maneesh.Sharma@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777--3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

7 | Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

MARCIANO PLATA, et al.,

Plaintiffs,

v.

EDMUND G. BROWN JR., et al.,

Defendants.

CASE NO. 01-1351 JST

**DECLARATION OF DR. OWEN MURRAY, D.O., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER REVERSING RECEIVER'S DELEGATION OF CALIFORNIA CORRECTIONAL CENTER**

Judge: Hon. Jon S. Tigar
Date: September 6, 2018
Time: 2:00 p.m.
Crtrm.: 9, 19th Floor

I, Owen Murray, D.O., MBA, hereby declare as follows:

1. I am board certified in family practice and I currently serve as the Vice President of Offender Care for the University of Texas Medical Branch (UTMB) Correctional Managed Care Program. The UTMB Correctional Managed Care Program provides health services for approximately 119,000 patients within the Texas Department of Criminal Justice (TDCJ). Additionally, UTMB operates the maximum security 110-bed tertiary care hospital located on the UTMB campus. I am also an assistant professor in the UTMB Department of Preventive Medicine and Community Health. I have more than 23 years of correctional medicine experience with previous practice in the Illinois Department of Corrections and the Cook County Jail in

14712433.1

DECL. DR. MURRAY SUPP. DEFS.' OPP'N TO PLTFS.' MOT. TO REVERSE DELEGATION OF CCC

**Ex. E-553**

1  Chicago, Illinois.

2       2.      In my role as Vice President of Offender Care for the UTMB Correctional

3  Managed Care program, I am responsible for program development, quality assurance, outcomes

4  management, formulary and disease management guideline development, utilization review, risk

5  management, offender correspondence, peer review, continuing medical education and staff

6  development, litigation coordination, facility financial management and business development.

7       3.      In addition to my position with the UTMB Correctional Managed Care Program, I

8  work in the capacity as an expert consultant for J. Allen and Associates, a veteran-owned small

9  business that provides correctional healthcare consulting and delivery services. Mr. Allen has

10  more than 20 years of management and consulting experience in the correctional healthcare field,

11  including 17 years with the UTMB Correctional Managed Care Program, serving as Chief

12  Operating Officer, Director of Operations, and Assistant Comptroller. J. Allen and Associates has

13  provided consulting services for both state and county correctional healthcare programs. Previous

14  clients include the Vermont Department of Corrections, the District of Columbia Department of

15  Corrections, and the Dougherty County Jail (Albany, Georgia).

16       4.      In my capacity as an expert consultant for J. Allen and Associates, I have

17  conducted hundreds of medical reviews of correctional healthcare systems, including reviewing

18  reports evaluating the adequacy of such systems and drafting such reports myself. I am well-

19  versed in the various methodologies employed by experts to review healthcare delivery systems.

20       5.      The State of California retained J. Allen and Associates as expert consultants in the

21  *Plata v. Brown* litigation. The expert consulting team for the *Plata* litigation consists of myself,

22  Dr. Jane Leonardson, M.D., and Dr. Olugbenga Ojo, M.D. Dr. Leonardson is board certified in

23  internal medicine, has more than 20 years of correctional medicine experience, and serves as the

24  Chief Medical Information Officer for the UTMB Correctional Managed Care Program. Dr. Ojo

25  is board certified in internal medicine and hospital medicine. Dr. Ojo serves as Medical Director

26  and Chief Physician Executive of the Correctional Managed Care Texas Department of Criminal

27  Justice prison hospital located at UTMB. Dr. Ojo is also an associate professor of medicine in the

28  UTMB Department of Internal Medicine. Dr. Ojo has more than 12 years of correctional

14712433.1

Ex. E-554

1  medicine experience.

2        6.    In addition to the medical team described above, I worked with Jacques

3  Baillargeon, PhD to review the methodology employed by the Court Experts in their review of

4  CCC. Dr. Baillargeon, who holds a PhD in epidemiology, is an expert consultant with J. Allen

5  and Associates and is currently the Director of Research, Division of Epidemiology and

6  Outcomes, for the UTMB Correctional Managed Care program. Dr. Baillargeon is also a

7  Professor of Epidemiology with tenure in Preventative Medicine and Community Health. Dr.

8  Baillargeon's research interests include cancer epidemiology, infectious disease epidemiology,

9  health services research, psychiatric epidemiology, correctional health care, and

10  pharmacoepidemiology. Dr. Baillargeon has taught several graduate courses focusing on

11  epidemiologic methods and has published in JAMA, JAMA Internal Medicine, the Lancet, The

12  American Journal of Public Health, Annals of Epidemiology, and the American Journal of

13  Psychiatry, among others. Dr. Baillargeon focuses his work in the areas of comparative

14  effectiveness research, cancer epidemiology, and health services research.

15        7.    My team was retained by the State of California to review the California

16  Correctional Center Evaluation prepared by the *Plata* Court medical experts. Specifically, Drs.

17  Leonardson and Ojo reviewed the medical records of five CCC patients whose records were also

18  reviewed by the Court Experts. I oversaw their review and discussed each patient with Drs.

19  Leonardson and Ojo. I am familiar with these patients and the specifics of the care provided to

20  them at CCC, as well as the Court Experts' criticisms of that care. Drs. Leonardson, Ojo, and I

21  observed errors in each of the Court Experts' findings, several of which are described below.

22        8.    With respect to Intrasystem Transfer Patient #20, the Court Experts stated that the

23  patient's labs showed he had "a significant drop in hemoglobin that was not addressed by the

24  [Physician Assistant]." Dr. Leonardson observed, and I agree, that the patient's drop in

25  hemoglobin was obviously related to being postoperative with his right total hip arthroplasty.

26  Because this is an obvious and expected observation for virtually every post-operative patient, it

27  does not bear mentioning in notes. The patient had no other indication of blood loss at all and was

28  a month out from a surgery during which blood loss is expected.

9. The Court Experts also criticized the care CCC provided to Hospital Patient #15[1] for hyperthyroidism. The Court Experts stated that "as of late January 2018 endocrinology has not seen the patient," but my team's review of this patient's medical record discovered that the patient was being followed by an endocrinologist, and when there was a delay in a follow-up appointment, the provider at CCC contacted the endocrinologist by phone to discuss the management of the patient and the endocrinologist's recommendations were implemented.

10. I also worked closely with Dr. Baillargeon to review the methodology employed by the Court Experts in their reviews of CDCR institutions. We familiarized ourselves with the Court Experts' reports evaluating health care at both CCC, San Quentin, and other CDCR facilities. Following our review of the Court Experts' CCC report, Dr. Baillargeon and I determined that the Court Experts do not use any known statistical model to select medical records for their review, and their methodology is inconsistent with contemporary correctional healthcare standards. The Court Experts provide no detail about the method they use to select medical records for review, simply stating that they "selected records" and ensured that a sample was taken from various housing units. Nor do the Court Experts provide any guidance as to what are acceptable outcome metrics for the processes they evaluate or cite applicable references for their care concerns.

11. The Court Experts initiate their review by selecting records of "medium to high-risk patients with chronic diseases and other serious medical conditions because these are the patients at risk of harm and who use the health care system most regularly." But this view – that the adequacy of the healthcare system can be determined by simply reviewing selected records from specific patients or a specific subset of patients – is not consistent with that of either of the two major correctional healthcare accreditation organizations (American Correctional Association and the National Commission on Correctional Healthcare). It is also inconsistent with most state correctional health systems' quality assurance indicators.

12. I understand that the Court Experts focus their review on medium and high risk

---

[1] This same patient is identified elsewhere in the Court Experts' CCC report as Intrasystem Transfer Patient #6.

14712433.1

1 patients because they access healthcare services more frequently than other groups. However, a

2 review targeting these patients is designed to lead to a greater chance of encountering imperfect

3 delivery of services. The Court Experts make no allowance for this fact – either by comparing the

4 frequencies of imperfect care between CDCR facilities and the community, or by including

5 healthier inmates in their review to ensure that their limited review is representative of CDCR's

6 population as a whole and thus capable of extrapolation.

7       13.     Further limiting the reliability and objectivity of the Court Experts' reports is the

8 fact that there is clear indication that their selection of medical records was based on purposive

9 nonprobability sampling rather than probability sampling. The distinction is important because

10 the sampling method is a major determinant of whether the sample (i.e., the selected medical

11 records) is representative of the entire population under study. Probability sampling – where

12 every member of the population has an equal chance of being selected – is preferred because it is

13 based on a random selection process so there is no bias in the selection process and any variation

14 between the characteristics of the sample and those of the population is only a matter of chance.

15 In nonprobability sampling, however, selection of the sample is arbitrary and there is no precise

16 way to measure the reliability of the sample. Thus, valid inferences about the larger group are

17 subject to bias.

18       14.     The Court Experts provide no guidance on what are acceptable outcome metrics for

19 the processes they evaluate and do not cite applicable references for their care concerns. The

20 Court Experts often discuss the "adequacy" of care provided, and state that certain care is a

21 "significant departure from the standard of care" but do not define their "adequate" standard, nor

22 do they provide a reference to the specific "standard of care" which they base their review upon.

23 Nor do the Court Experts provide any information as to what they believe to be an acceptable rate

24 for patient care problems, or if there even is one.

25       15.     It bears noting that there is no "adequate" standard or generally known "standard of

26 care" for all forms of medical care provided in a correctional setting. Rather, the standards that

27 should be referenced, and which should guide this type of subjective evaluation of patient care,

28 would be studies and/or recent medical publications specific to the particular issue reviewed. For

Case No. 01-1351 JST

DECL. DR. MURRAY SUPP. DEFS.' OPP'N PLTFS.' MOT. FOR REVERSAL OF DELEGATION OF CCC

14712433.1

**Ex. E-557**

1  instance, with respect to the treatment of Intrasystem Transfer Patient #20, my team relied upon

2  the following studies:

3      • Swedish Council on Health Technology Assessment. 2017. *Dyspepsia and Gastro-Oesophageal Reflux: A Systematic Review.* Stockholm: Swedish Council

4        on Health Technology Assessment (SBU).

5      • Fox, Mark, and Ian Forgacs. Gastro-oesophageal reflux disease. *BMJ.* 2006; 332:88-93.

6

7      • Wittich, Christopher M., Christopher M. Burkle, and William L. Lanier. 2014. "Medication errors: An overview for clinicians." *Mayo Clin. Proc.* 89 (8):1116-25.

8      16.     The type of subjective review of care provided to a particular patient that the Court

9  Experts employ is not a statistically valid or sound method of evaluating the overall quality of

10  correctional healthcare that is delivered at a specific institution or system. Rather, to properly

11  evaluate the quality of correctional healthcare that is delivered at a specific institution or system

12  wide, an objective process must be used where critical processes are identified along with an

13  expected outcome. To create a truly objective measure of the delivery of medical care throughout

14  CDCR, and how it compares to other large healthcare systems such as Kaiser, Medicare, and

15  Medicaid, measurable data like the Healthcare Effectiveness Data and Information Set (HEDIS)

16  guidelines should be compared. HEDIS guidelines were developed by the National Committee for

17  Quality Assurance for the specific purpose of improving healthcare quality by evaluating and

18  reporting on the quality of managed care and other healthcare organizations in the United States.

19  The use of HEDIS guidelines in the correctional setting is highly appropriate in that it eliminates

20  subjective clinical criticisms, standardizes for imperfect care, is targeted for patients with known

21  chronic disease, and is the quality evaluation tool used in the community. Achieving or surpassing

22  a HEDIS benchmark does not occur by chance, but rather, is reflective of a well-run, patient-

23  centered healthcare organization. Strong HEDIS results demonstrate quality chronic care

24  management. For these reasons, many other correctional healthcare systems use HEDIS guideline

25  comparisons in their quality assurance programs. The Court Experts' reliance on a subjective

26  approach, however, is designed to and does lead to a slanted report that (at best) identifies a

27  difference of opinion with another care provider.

28      I declare under penalty of perjury under the laws of the United States that the foregoing is

**Ex. E-558**

1 true and correct.  Executed in Conroe, Texas on August ___/___, 2018.

2

3 Owen Murray, D.O., MBA

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14712433.1

DECL. DR. MURRAY SUPP. DEFS.' OPP'N PLTFS.' MOT. FOR REVERSAL OF DELEGATION OF CCC

**Ex. E-559**

# EXHIBIT F

Ex. F-560

| | |
|---|---|
| **From:** | Murray, Owen J. |
| **To:** | Coleman, Susan E. |
| **Cc:** | Kathleen Al-Basit; Pappy, Elizabeth M. |
| **Subject:** | Re: Dunsmore |
| **Date:** | Thursday, August 22, 2024 11:05:34 AM |

[EXTERNAL]

It's like evaluating air travel safety by only examining planes that crashed
Ojm

> On Aug 22, 2024, at 12:56 PM, Coleman, Susan E. <SColeman@bwslaw.com>
> wrote:

**External Email Warning:** Do not click links or open attachments unless you
recognize the sender and expect the content. UTMB Email Phishing
Awareness

This is a lengthy report.  He seems to focus on deaths at the jail to judge the
healthcare, which doesn't seem like the best way to assess it.

**Susan E. Coleman** | Partner
501 West Broadway, Suite 1600 | San Diego, CA  92101
d - 619.814.5803 | t - 619.814.5800 | f - 619.814.6799
scoleman@bwslaw.com | vCard | bwslaw.com



The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

<FINAL Expert Report of Jeffrey Keller MD 08-21-2024 1730-01.pdf>

# EXHIBIT G

Ex. G-562

| | |
|---|---|
| **From:** | Van Swearingen |
| **To:** | Pappy, Elizabeth M.; Coleman, Susan E. |
| **Cc:** | Gay C. Grunfeld; Young, Christopher; Aaron Fischer; Hannah Chartoff |
| **Subject:** | Dunsmore: notes from 3/7/24 M&C [IMAN-DMS.FID77928] |
| **Date:** | Thursday, March 7, 2024 6:37:32 PM |
| **Attachments:** | RBGG Circulated Notes re Fourth Court-Ordered Meet and Confer 03-07-2024 1730(4451432.1).docx |

Hi Beth and Susan. Notes from today's M&C are attached. Thanks,

Van

Van Swearingen

ROSEN BIEN GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor

San Francisco, CA 94105

(415) 433-6830

VSwearingen@rbgg.com

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

**Ex. G-563**

***Dunsmore v. Cty. of San Diego*, Case No. 3:20-cv-00406 (S.D. Cal.)**
**Meet and Confer Pursuant to Dkt. 528**

**Date:** March 7, 2023

**Time:** 2:00 p.m.

**Duration:** 34 minutes

**Plaintiffs' Counsel:** Chris Young, Gay Grunfeld, Van Swearingen

**Defendants' Counsel:** Beth Pappy

**Note Taker:** Van Swearingen

**I.      Topics Covered**

      **A.**     Status of document productions on the March 5 chart

      **B.**     Status of Alternatives to Incarceration documents

      **C.**     Continued Discussion of Delayed Environmental Inspection issue

      **D.**     Defendants' Request that the JIMS inspection be limited to named plaintiffs and following DOJ requests

      **E.**     RFP Set 6

      **F.**     Interrogatory 25

      **G.**     PMK deposition schedule – order and date of topics and names of deponents

      **H.**     Defendants' Request to Interview Incarcerated People

      **I.**     Depositions of Named Plaintiffs

      **J.**     (added) Inviting Judge Leshner to Attend Inspection

      **K.**     (added) ADA Policies

**II.     Topics Tabled for Next Week**

      None.

**Ex. G-564**

### III.  Agreements Reached

    **A.**   <u>Environmental Inspection issue</u>.  Parties agree that Plaintiffs' remaining inspections will take place as the parties agreed in the stipulation that was circulated on March 4.  Following the anticipated scheduling order from Judge Leshner, the parties will file the stipulation and/or M&C, as necessary.

    **B.**   <u>Defendants' Request that the JIMS inspection be limited to named plaintiffs and following DOJ requests</u>.  Plaintiffs agree to comply with DOJ's requests, and will not take photos of JIMS data.  Plaintiffs will not specifically ask to see any individual's information other than named Plaintiffs.  Defendants agree that Plaintiffs may see individuals' information that is shown as a result of demonstrating the capabilities of the system, such as pulling up housing rosters, running reports, and creating lists of people with specific flags.  The JIMS/tablets inspection will take place from approximately 2:00-4:00 p.m. on March 25, following Plaintiffs' safety and security expert inspecting the Jail from approximately 9:00-1:00 (with an hour for lunch).

    **C.**   <u>PMK deposition schedule</u>.  The parties agreed to move the 30(b)(6) depositions to the weeks of April 15 and April 22 if the Court grants the request to move the close of fact discovery out by three weeks.  Defendants will send a revised proposed schedule to Plaintiffs.  Thereafter, Plaintiffs will send their proposed revisions to Defendants.  Parties will discuss again at the March 13 meet and confer.

    **D.**   <u>Defendants' Request to Interview Incarcerated People</u>.  The parties agreed that Defendants may request to interview incarcerated people during Defendants' inspection. Plaintiffs' counsel will attend the inspections and have an opportunity to confidentially meet with people prior to being interviewed by Defendants' experts.

    **E.**   <u>Miscellaneous</u>.  Plaintiffs' counsel may ask Judge Leshner to consider attending an upcoming inspection.  Plaintiffs' counsel will provide advance notice to Defendants' counsel if the invitation is for a specific inspection.

    **F.**   <u>Next M&C meeting</u>.  Will be held March 13 at 9:00 a.m.  Defendants excused Chris Young due to a deposition he is attending at the same time.

**Ex. G-565**

**IV.    Action Items**

    **A.**    <u>Document productions on the March 5 chart</u>.  Defendants to produce documents by March 22 except for custody records which will be produced by March 11.

    **B.**    <u>Alternatives to Incarceration documents</u>.  Defendants to produce documents by March 22.

    **C.**    <u>RFP Set 6</u>.  Plaintiffs' expert and the County's IP person will discuss data requested in RFP Set 6 (including DIA, 911 calls, use of force, and criminal incident report data) on March 13 at 1:30 p.m.

    **D.**    <u>Interrogatory 25</u>.  Defendants to produce documents by March 22.

    **E.**    <u>Depositions of Named Plaintiffs</u>.  Parties will work to complete depositions in timely manner.  Spouses of non-incarcerated persons can attend depositions; those will include a conference room video panel on the Zoom to include all persons in the room.

    **F.**    <u>ADA Settlement Discussions</u>.  Defendants will send Plaintiffs the draft effective communication policy.  Plaintiffs will send Defendants the list of ADA policies they are aware need to be revised.

**Ex. G-566**

# EXHIBIT H



# San Diego County Sheriff's Department

It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody

*February 2022*

**REPORT 2021-109**



SD 744691
Ex. H-568

 **CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814

 **916.445.0255** | TTY 916.445.0033

 For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* 

*For questions regarding the contents of this report, please contact our* Public Affairs Office *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternative format reports available upon request | Permission is granted to reproduce reports

**SD 744692**
**Ex. H-569**



Michael S. Tilden *Acting State Auditor*

February 3, 2022
*2021-109*

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office conducted an audit of the San Diego County Sheriff's Department (Sheriff's Department) to determine the reasons for in‑custody deaths of incarcerated individuals and identify the steps it took to address these deaths. The following report details our conclusion that the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody.

From 2006 through 2020, 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in‑custody deaths. These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody.

Furthermore, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in‑custody deaths have been insufficient and have not consistently led to significant corrective action. In addition, the Citizens' Law Enforcement Review Board (CLERB)—a citizen‑governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in‑custody deaths. CLERB also failed to investigate nearly one‑third of the deaths of incarcerated individuals in the past 15 years, which means that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

In light of the ongoing risk to inmate safety, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

SD 744693
Ex. H-570

iv | California State Auditor Report 2021-109
February 2022

## Selected Abbreviations Used in This Report

| ADP | average daily population |
|-----|--------------------------|
| BSCC | Board of State and Community Corrections |
| CDCR | California Department of Corrections and Rehabilitation |
| CLERB | Citizens' Law Enforcement Review Board |
| POBR | Public Safety Officers Procedural Bill of Rights |

SD 744694
Ex. H-571

# Contents

Summary                                                                                     1

Introduction                                                                                7

**Chapter 1**
The San Diego County Sheriff's Department Did Not Take Sufficient
Steps to Prevent the High Number of Deaths in Its Jails                                     13

**Chapter 2**
Neither the Sheriff's Department nor CLERB Has Taken Adequate
Action in Response to the Deaths of Incarcerated Individuals                                33

**Conclusions and Recommendations**                                                        53

**Appendix A**
In-Custody Deaths in California's 15 Largest Counties                                       59

**Appendix B**
Scope and Methodology                                                                       61

**Responses to the Audit**
Board of State and Community Corrections                                                    65

   California State Auditor's Comments on the Response From
   the Board of State and Community Corrections                                             71

Citizens' Law Enforcement Review Board                                                      75

   California State Auditor's Comments on the Response From
   the Citizens' Law Enforcement Review Board                                               79

California Department of Justice                                                            81

San Diego County Sheriff's Department                                                       83

   California State Auditor's Comments on the Response From
   the San Diego County Sheriff's Department                                                115

**SD 744695**
**Ex. H-572**

vi | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744696
Ex. H-573

# Summary

## Results in Brief

In accordance with federal constitutional law, the San Diego County Sheriff's Department (Sheriff's Department) has a responsibility to provide adequate medical care for individuals while they are in its custody. Nonetheless, from 2006 through 2020, a total of 185 people died in San Diego County's jails—more than in nearly any other county across the State. Some of these individuals were in custody for only a few days to a few months; others were waiting to be sentenced, set to be released, or about to be transferred to different facilities. Although any death is a tragedy, the high rate of deaths in San Diego County's jails compared to other counties raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices have undermined its ability to ensure the health and safety of the individuals in its custody.

Significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails. For example, studies on health care at correctional facilities have demonstrated that identifying individuals' medical and mental health needs at intake—the initial screening process—is critical to ensuring their safety in custody. Nonetheless, our review of 30 individuals' deaths from 2006 through 2020 found that some of these individuals had serious medical or mental health needs that the Sheriff's Department's health staff did not identify during the intake process. Some of these individuals died within four days of their arrest. Moreover, in one case we reviewed, an incident between two cellmates resulted in one's death. In this instance, the intake nurse did not identify that the perpetrator had a history of mental health issues. Had the perpetrator's mental health issues been identified properly at intake, the department's staff might have placed this individual in a different cell, leading to a different outcome.

When we evaluated the intake practices of three comparable counties, we found that the counties had procedures that are more comprehensive. For example, the San Diego Sheriff's Department relies on registered nurses to perform the mental health portion of its intake screening, even though these nurses may not specialize in mental health care. In contrast, the Riverside County Sheriff's Department's policy requires that a mental health clinician evaluate every individual at intake. Implementing similar policies could help the San Diego Sheriff's Department to more effectively identify mental health needs early.

*Audit Highlights . . .*

*Our audit of the San Diego County Sheriff's Department's response to deaths of individuals in its custody highlighted the following:*

» *Until the Sheriff's Department implements meaningful change to improve its provision of medical and mental health care in its detention facilities, it will continue to jeopardize the safety and lives of individuals in its custody.*

- *We found multiple instances of individuals who requested or required medical and mental health care and did not receive it at all or in a timely manner.*

- *In our review of deaths that occurred in the department's custody, deputies performed inadequate safety checks to ensure the well-being of those individuals.*

» *Some of the Sheriff's Department's policy deficiencies are the result of statewide corrections standards that are insufficient for maintaining the safety of incarcerated individuals.*

- *The Board of State and Community Corrections should require mental health evaluations to be performed by mental health professionals at intake, and it should clarify and improve procedures for safety checks.*

» *The entities responsible for investigating in-custody deaths are not doing so in a thorough, timely, or transparent manner.*

- *The department's Critical Incident Review Board should consistently review deaths by natural causes, increase public transparency, and take substantive steps to prevent similar future deaths.*

*continued on next page . . .*

**SD 744697**
**Ex. H-574**

**2**    California State Auditor Report 2021-109
February 2022

> • *CLERB should prioritize the investigations of all deaths that occur in the department's custody and complete those investigations within the one-year statutory limit.*

In addition, the Sheriff Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services. Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not always follow up consistently—such as poor policies and communication—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.

For example, one individual urgently requested mental health services shortly after entering the jail. However, the nurse had not identified any significant mental health issues at intake and determined that the individual did not qualify for an immediate appointment. The individual died by suicide two days later—only four days after entering the jail. Although the Sheriff's Department's policy indicates that a face-to-face appraisal with an incarcerated individual should take place within 24 hours of a mental health care request to determine the urgency of that request, the department has not always had this policy. Further, this policy only applies to mental health requests and not medical health care requests. Thus, the Sheriff's Department does not ensure that it provides prompt care for all types of needs.

In addition to providing adequate health care, performing safety checks is a key component of ensuring the well-being of individuals in detention facilities. Conducting these checks—which state law requires hourly through direct visual observation—is the Sheriff's Department's most consistent means of monitoring for medical distress and criminal activity. Nonetheless, in our review of 30 in-custody deaths, we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours. Although the Sheriff's Department's assistant sheriff of detentions indicated that the department has a process for periodically monitoring whether staff members adequately perform safety checks, it is not documented in policy. In contrast, the Riverside County Sheriff's Department has a formal policy that requires supervising staff to regularly review videos of safety checks being performed, and it is thus in a better position to assess the quality of safety checks.

The problems we identified with the Sheriff's Department's policies are in part the result of statewide corrections standards that are not sufficiently robust. The Board of State and Community Corrections

**SD 744698**
**Ex. H-575**

(BSCC) establishes in regulation the minimum standards that local detention facilities must follow. Every local jail system throughout the State uses these standards to create policies for inmate safety and care. However, some of the standards are insufficient for maintaining the safety of incarcerated individuals. For example, they do not explicitly require that mental health professionals perform the mental health screenings during the intake process. Further, they do not describe the actions that constitute an adequate safety check: rather, they simply state that safety checks must be conducted at least hourly through direct visual observation. Given that the annual number of incarcerated individuals' deaths in county jails across the State increased from 130 in 2006 to 156 in 2020, improving the statewide standards is essential to ensuring the health and safety of individuals in custody in all counties.

In addition to its failure to adequately prevent the deaths of individuals in its custody, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action related to preventing deaths. The Sheriff's Department's internal entity for reviewing critical incidents, such as in-custody deaths, and identifying corrective measures—the Critical Incident Review Board—has not always taken substantive steps to prevent similar future deaths in the cases we examined. The primary focus of this board is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals. Further, this board generally does not review deaths from natural causes, which represented nearly half of the deaths of individuals in the custody of the Sheriff's Department during the 15-year period of our review. We are concerned that the Sheriff's Department considers the Critical Incident Review Board's reviews to be confidential under the attorney-client privilege and does not have a process to report the results publicly. Consequently, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously and making every effort possible to prevent similar deaths in the future.

The Sheriff's Department has also not implemented certain key recommendations from external oversight entities. From 2006 through 2020, multiple external entities—including the San Diego County Grand Jury—have made recommendations to the Sheriff's Department in areas related to inmate safety. Although the Sheriff's Department implemented several of these recommendations, it did not take action on others, even though they were critical to improving the safety of individuals in its custody. For example, it did not implement recommendations that involved enhancing its safety checks and improving the way it communicates incarcerated individuals' mental health needs to its staff.

SD 744699
Ex. H-576

To restore public confidence in county law enforcement, San Diego County voters approved the Citizens' Law Enforcement Review Board (CLERB) in 1990, a citizen-governed board. CLERB is responsible for reviewing complaints of misconduct and investigating deaths arising in connection with the actions of officers employed by the Sheriff's Department or Probation Department. However, CLERB has failed to provide effective, independent oversight of in-custody deaths. In violation of its own rules and regulations, CLERB's investigations of the deaths of individuals in the Sheriff's Department's custody have not been independent, thorough, or timely. CLERB has not independently interviewed witnesses or visited the initial scenes of the deaths. Further, it has not consistently performed thorough investigations, and it relies largely on the reviews the Sheriff's Department conducts.

Moreover, CLERB failed to review dozens of deaths in the Sheriff's Department's jails. State law generally requires that CLERB's investigations be performed within a year of discovery of the death or misconduct. Because CLERB did not consistently prioritize its investigations of deaths over other complaints of misconduct, it did not review 13 cases involving deaths in the Sheriff's Department's jails within the required time limit. Further, CLERB did not investigate an additional 40 deaths because it did not believe its rules and regulations required it to review natural deaths. As a result, it did not identify any weaknesses in the Sheriff's Department's policies or processes that may have contributed to these deaths nor develop any recommendations to address these weaknesses. Although CLERB currently reviews natural deaths, it lacks specific language in its rules and regulations requiring it to do so, thus raising concerns about whether its staff could exclude those reviews in the future.

Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes. Until the Sheriff's Department makes such changes, the weaknesses in its policies and practices will continue to jeopardize the health and lives of the individuals in its custody.

**SD 744700**
**Ex. H-577**

**Summary of Key Recommendations**

### Legislature

The Legislature should amend state law to require the Sheriff's Department to revise its policies to align with best practices related to performing intake health evaluations (including requiring that mental health professionals perform mental health evaluations), providing follow-up medical and mental health care, conducting safety checks, and addressing the other deficiencies that we identify in this report.

The Legislature should amend state law to require BSCC to amend its regulations to ensure that county sheriff departments have mental health professionals perform incarcerated individuals' mental health evaluations at intake and have staff conduct safety checks that are sufficiently detailed to determine that incarcerated individuals are alive.

The Legislature should amend state law to require the Sheriff's Department's Critical Incident Review Board to review natural deaths and develop a process to make public the facts discovered and recommendations made in response to all in-custody deaths.

### CLERB

To ensure that it completes investigations of all deaths that occur in the Sheriff's Department's custody within the one-year time limit, CLERB should revise its rules and regulations by May 2022 to prioritize these investigations above all other investigations.

CLERB should revise its rules and regulations by May 2022 to include investigating natural deaths as part of its responsibilities.

**Agency Comments**

Although the Sheriff's Department generally agreed with our recommendations, it questioned our audit approach and disagreed with our findings and conclusions. BSCC disagreed with our findings and recommendations but indicated that it would discuss whether amendments to its regulations are warranted. The Department of Justice and CLERB agreed with our recommendations.

**SD 744701**

**Ex. H-578**

**6** | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744702
Ex. H-579

# Introduction

### Background

The mission of the San Diego County Sheriff's Department (Sheriff's Department) is to provide high-quality public safety services necessary to make San Diego the safest urban county in the nation. As the text box describes, the Sheriff's Department operates a system of seven detention facilities. It also operates patrol stations, a crime laboratory, and an array of support operations. The Sheriff's Department's fiscal year 2020–21 adopted budget includes more than 2,000 employees who work in its detention facilities, including correctional staff (sworn staff), medical and mental health care staff (health staff), and administrative staff. In this report, we refer to all of these staff members collectively as *detention staff*.

San Diego County residents elect a sheriff to a four-year term to serve as the chief executive of the Sheriff's Department. The current elected sheriff has been in office since 2009. Under the elected sheriff's guidance, the department must follow standards for jail conditions and treatment of incarcerated individuals set in regulation by the Board of State and Community Corrections (BSCC). The board also establishes local corrections training requirements and performs inspections of local detention facilities, to which the Sheriff's Department is subject.

Deaths can happen in detention facilities for various reasons. The California Department of Justice asks counties to classify in-custody deaths into seven main categories: natural death, homicide by law enforcement, homicide by other inmate, suicide, accidental death, pending investigation, or cannot be determined/other. Regardless of the category, different entities in San Diego County have responsibilities to prevent, respond to, and investigate deaths of incarcerated individuals, as we discuss below.

### The Sheriff's Department's Role in Preventing and Responding to the Deaths of Incarcerated Individuals

As Figure 1 shows, the incarceration process starts when a law enforcement officer arrests an individual in San Diego County and brings him or her to a jail for processing, which is also known as *booking*. One of the most important steps in the intake process that follows is the individual's health screening. This screening is the Sheriff's Department's first opportunity to identify an individual's

> **The Sheriff's Department's Detention Facilities**
>
> - The department operates a system of seven detention facilities throughout San Diego County.
>
> - Three of the detention facilities both process (book) individuals entering the jail system and house them.
>
> - The other four facilities house individuals who are transferred after being booked.
>
> - During our audit period from 2006 through 2020, the seven facilities collectively housed an average of about 5,200 individuals daily (average daily population) and booked an average of about 85,000 individuals annually.
>
> Source: Sheriff's Department documents and BSCC data.

---

**Examples of Housing Types in the Sheriff's Department's Facilities**

- **Safety Cell/Enhanced Observation Housing:** Temporary housing units constructed to maximize safety by removing physical features that could be used to inflict harm. These units are recommended for individuals who are actively self-harming, assaultive, or at risk of suicide. Staff closely monitor individuals at random intervals.

- **Medical Observation Beds:** Beds located close to a nursing station for individuals whose condition necessitates hourly monitoring by health staff.

- **Segregation Housing:** Housing areas where individuals are placed in cells isolated from the general population and receive services and activities apart from others. Staff may place individuals in this housing for their own safety, staff safety, facility security, or pending a disciplinary action hearing.

- **Mainline Housing:** Housing areas for individuals who are classified as general population and therefore do not need to be isolated from others for security reasons or for medical or mental health reasons.

Source: Sheriff's Department policies and state law.

---

medical and mental health needs. After this health screening, the next major step is classification, which determines an individual's housing assignment. As the text box shows, the Sheriff's Department has various types of housing in its facilities. An individual's housing assignment is critical to safety and care because it indicates to detention staff whether that individual has special needs or characteristics that warrant precaution.

To determine an initial housing assignment, sworn staff interview the individual; review the person's current booking information, complete criminal history, and past incidents in custody; and consider any information or instructions provided by health staff members regarding restrictions related to medical or mental health needs. The department may subsequently change an individual's housing assignment if circumstances require reclassification.

When individuals are in custody, the Sheriff's Department is responsible for providing basic health care services and for performing safety checks at least every hour to provide for their health and welfare. Incarcerated individuals may request medical or mental health attention, or dental care, as needs arise. Providing care on an ongoing basis and performing adequate safety checks are vital to ensuring the safety of incarcerated individuals.

When an individual dies in the custody of the Sheriff's Department, its homicide unit (homicide unit) investigates the death and assists the San Diego County Medical Examiner's Office (Medical Examiner's Office) by attending the autopsy and answering any questions surrounding the circumstances of the death. The Medical Examiner's Office, an agency independent of the Sheriff's Department, investigates all deaths of persons in custody. The Medical Examiner's Office's main function is to determine the manner of death—such as accidental—and the cause of the death—such as by drug overdose.

The Sheriff's Department also performs other internal reviews of in-custody deaths. For instance, within 30 days following a death, it must review the circumstances surrounding the incident and pertinent medical and mental health services and reports (30-day medical review). It must also complete a critical incident review for all deaths except natural deaths. Most of these reviews could result in the Sheriff's Department taking corrective action, such as

changing policies or initiating employee discipline. We discuss the Sheriff's Department's internal reviews in detail later in this report.

**Figure 1**
**The Sheriff's Department's Booking Process**



1 — After an individual is arrested, the arresting officer transports him or her to one of the Sheriff's Department's three booking facilities.

2 — A registered nurse performs a preliminary medical and mental health screening during the intake process to determine whether the individual is medically fit for booking and to identify whether there are any known illnesses and medications. If the individual is experiencing a medical or mental health emergency that cannot be managed by the Sheriff's Department, he or she may be sent to the hospital. Individuals in need of further evaluation or more urgent medical care will receive a secondary nurse assessment within a few hours of their first screening.

3 — Based on the intake assessment, a nurse can write a mental health referral or schedule a medical follow up with a doctor, as needed, at a later date.

4 — The individual proceeds to classification, which determines his or her housing assignment.

Source: Sheriff's Department policies and procedures.

**The Citizens' Law Enforcement Review Board's Responsibilities Related to the Deaths of Incarcerated Individuals**

The Citizens' Law Enforcement Review Board (CLERB) is a key county entity that provides external oversight when an incarcerated individual dies in San Diego County. San Diego County voters amended the county charter in 1990 to require the County Board of Supervisors (county board) to establish CLERB to investigate complaints against officers employed by the Sheriff's Department and Probation Department. CLERB's mission is to increase the accountability of and public confidence in peace officers employed by the San Diego County's Sheriff's Department and the Probation Department. As the text box describes, CLERB is responsible for achieving its mission by conducting independent, thorough, timely, and impartial reviews of complaints of misconduct, among other things. This audit focuses only on CLERB's investigations of deaths in the Sheriff's Department's jails. The San Diego County Charter establishes CLERB's power to subpoena, administer oaths, and require the attendance of witnesses and the production of books and papers pertinent to its investigations.

**CLERB's Responsibilities**

**Investigating complaints against peace officers that involve the following allegations:**

- Use of excessive force, discrimination, or sexual harassment towards members of the public.
- The improper discharge of a firearm.
- Illegal search or seizure.
- False arrest.
- False reporting.
- Criminal conduct or misconduct.

**Reviewing, investigating, and reporting on the following incidents, regardless of whether a citizen files a complaint:**

- The death of any individual arising out of or in connection with actions of peace officers.
- Incidents involving the discharge of a firearm.
- Use of force by peace officers resulting in great bodily injury.
- Use of force by peace officers at protests or other events protected by the First Amendment.

Source: CLERB rules and regulations.

CLERB currently consists of 11 board members nominated by San Diego County's chief administrative officer and appointed by the county board for three-year terms. Serving without compensation, CLERB members must be qualified electors of San Diego County, possess reputations for integrity and responsibility, and demonstrate an active interest in public affairs and service. County rules prohibit its employees or individuals employed as peace officers from serving. CLERB makes advisory findings on complaints and recommendations for policy and procedure changes to the sheriff, chief probation officer, and the county board. CLERB has also established rules and regulations to further facilitate its operations, which the county board has approved.

CLERB's staff support the CLERB members by conducting complaint investigations, preparing written reports with findings and recommended policy changes, and transmitting the final reports to the Sheriff's Department, Probation Department, and the county board. CLERB's staff currently includes five special investigators, one supervising special investigator, an administrative secretary, and an executive officer. CLERB members appoint its executive officer, to whom they have delegated most of their authority over the other staff.

SD 744706
Ex. H-583

CLERB's executive officer must possess a bachelor's degree and five years of management-level experience. CLERB's special investigators must have five years of experience performing investigations for a law enforcement agency, district attorney's office, or other governmental agency or organization.

**The Attorney General's and County Board's Oversight of the Sheriff's Department**

The county board is the governing body of San Diego County and is composed of an elected supervisor from each of the county's five districts. State law gives the county board the authority to supervise the official conduct of all county officers, as well as officers of all districts and other subdivisions of the county, including CLERB. However, the county board's oversight of the county sheriff has limitations, as Figure 2 shows. The California Constitution and state law provide that the county sheriff is an elected county official with certain independent functions and duties with which the county board cannot interfere. Nonetheless, state law establishes the county board's budgetary authority over the Sheriff's Department, and it also exercises some oversight—albeit minimal—through its establishment and oversight of CLERB.

Although the county board has limited oversight of the sheriff, the state constitution designates the State's attorney general as the chief law officer of the State. Specific statutes describe the attorney general's authority. For example, state law requires the Sheriff's Department to report to the attorney general all facts concerning the death of an individual while in its custody within 10 days of that death. To ensure uniform and adequate enforcement of the laws of the State, the attorney general may also call into conference all of the sheriffs, district attorneys, and chiefs of police in the State for the purpose of discussing the duties of their respective offices. Further, the attorney general may bring a civil action to eliminate the pattern or practice of conduct by law enforcement officers that deprives any person of rights protected by law or the constitution. Finally, when necessary for the public interest, the attorney general is authorized to direct sheriff activities related to the investigation or detection of crime within a county.

**Figure 2**
**The County and State Have Oversight of the Deaths of Incarcerated Individuals**



## COUNTY BOARD OF SUPERVISORS

State law gives the county board the authority to supervise the conduct of all county officers, including CLERB members.

However, the California Constitution and state law give the sheriff independent functions and duties with which the county board cannot interfere.

*State law provides the county board with authority to approve the Sheriff's Department's budget, but it otherwise has* ==limited authority== *over the Sheriff's Department.*



### CITIZENS' LAW ENFORCEMENT REVIEW BOARD

· Eleven member citizens' board established by voter approved proposition in 1990 (members appointed by county board).

· CLERB special investigators — who must have at least five years of investigative experience — review in custody deaths and complaints of misconduct by officers of the Sheriff's Department.

· CLERB makes **advisory** findings and recommendations related to death cases — however, the Sheriff's Department ultimately decides whether to take action.

· The board submits investigative reports to the county board and the Sheriff's Department.



### SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

The Sheriff's Department performs various internal reviews after an incarcerated individual's death.

· Its homicide unit investigates all types of deaths in jails.

· Its Critical Incident Review Board reviews suicides, homicides, and accidental deaths, but not natural deaths.

· Its medical staff performs an assessment of care provided before each death.

## THE STATE ALSO HAS OVERSIGHT ...





### ATTORNEY GENERAL

· The California Constitution designates the State's attorney general as the chief law officer of the State.

· The attorney general may bring a civil action to eliminate the pattern or practice of conduct by law enforcement officers that deprives any person of rights protected by law or the constitution.

· Sheriff's departments must report in custody deaths to the attorney general within 10 days. The California Department of Justice collects and posts to its website data pertaining to these in custody deaths.

Source: California Constitution, San Diego County charter, state law, CLERB's rules and regulations, and Sheriff's Department policies.

**SD 744708**
**Ex. H-585**

# Chapter 1

**THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT DID NOT TAKE SUFFICIENT STEPS TO PREVENT THE HIGH NUMBER OF DEATHS IN ITS JAILS**

**Chapter Summary**

From 2006 through 2020, a total of 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with the way the Sheriff's Department provides care for and protects incarcerated individuals that likely contributed to deaths in its jails. These deficiencies related to its provision of medical and mental health care, as well as its performance of checks to ensure the safety and health of individuals in its custody. When we evaluated the policies of three comparable counties, we found that some have adopted procedures that could address weaknesses we identified at the San Diego Sheriff's Department. That said, the problems we identified with the Sheriff's Department's policies are in part the result of certain statewide corrections standards that are not robust or specific enough, leaving the establishment of effective practices to the discretion of the individual counties. Given that the annual number of incarcerated individuals' deaths in county jails across the State increased from 130 in 2006 to 156 in 2020, improving the statewide standards is essential to ensuring the health and safety of incarcerated individuals in all counties.

**In the Past 15 Years, More Individuals Died While in the San Diego Sheriff's Department's Custody Than in the Custody of Nearly Any Comparable County in the State**

State data on deaths in custody at county jails show that San Diego County reported the second-highest number of in-custody deaths over the past 15 years.[1] It followed only Los Angeles County, which is significantly larger. Further, there continues to be a substantial number of deaths in San Diego County's jails, as Figure 3 shows. Many of the individuals who died were in the Sheriff's Department's

---

[1]  State law requires a law enforcement agency or an agency in charge of a correctional facility, including county sheriff's departments, to report any case in which a person dies in its custody to the Office of the Attorney General within 10 days after the death. We present an interactive dashboard for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

**SD 744709**
**Ex. H-586**

14    California State Auditor Report 2021-109
February 2022

custody for only a few days to a few months before their deaths. Some of these individuals were awaiting trial, or scheduled to be released or transferred to state hospitals.

**Figure 3**
**There Continues to Be a Substantial Number of Deaths in San Diego County's Jails**



TOTAL DEATHS
IN THE SHERIFF'S DEPARTMENT'S JAILS (2006–2021)

| Year | Average Daily Population |
|------|-------------------------|
| 2006 | 5,167 |
| 2007 | 5,117 |
| 2008 | 5,192 |
| 2009 | 4,996 |
| 2010 | 4,646 |
| 2011 | 4,629 |
| 2012 | 5,087 |
| 2013 | 5,559 |
| 2014 | 5,649 |
| 2015 | 4,984 |
| 2016 | 5,362 |
| 2017 | 5,687 |
| 2018 | 5,535 |
| 2019 | 5,630 |
| 2020 | 4,197 |
| 2021* | 3,927 |

Total Deaths

Source: California Department of Justice in-custody death data, BSCC data, and Sheriff's Department information.

* We use the Sheriff's Department's information on in-custody deaths in 2021 because it was not included in the California Department of Justice data, which is as of May 2021. We use ADP information from the Sheriff's Department for 2021 because BSCC did not have complete ADP data for 2021.

SD 744710
Ex. H-587

In comparison to similar counties, more individuals died in the San Diego Sheriff's Department's custody in the past 15 years as Figure 4 shows. We identified the Alameda County Sheriff's Office (Alameda Sheriff's Office), Orange County Sheriff's Department (Orange Sheriff's Department), and Riverside County Sheriff's Department (Riverside Sheriff's Department) as comparable considering their size, geographical location, and other factors. The text box shows the average daily population (ADP) and bookings from 2006 through 2020 for each of these four counties.[2] From 2006 through 2020, 185 incarcerated individuals died in the San Diego Sheriff's Department's jails, in comparison to 99 in the jails of the Alameda Sheriff's Office, 111 in Orange Sheriff's Department's jails, and 104 in Riverside Sheriff's Department's jails. More recently, from 2016 through 2020, 72 people died while in the care of the San Diego Sheriff's Department, whereas 25 people died in the care of the Alameda Sheriff's Office, 46 in Orange Sheriff's Department, and 37 in Riverside Sheriff's Department. Even when considering each of these counties' jail systems' ADP and number of bookings, the rate of deaths reported by the San Diego Sheriff's Department still exceeded that of the comparable counties. In fact, we reviewed data from the 15 largest counties in the State and found that the rate of deaths in San Diego County was among the highest.[3] Although any death is a tragedy, the high rate of deaths at San Diego County compared to other counties is particularly concerning.

**Average Annual ADP and Bookings From 2006 Through 2020**

|  | ADP | BOOKINGS |
|---|---|---|
| Alameda Sheriff's Office | 3,325 | 51,842 |
| Orange Sheriff's Department | 5,877 | 59,263 |
| Riverside Sheriff's Department | 3,668 | 54,025 |
| San Diego Sheriff's Department | 5,162 | 85,631 |

Source: BSCC data and San Diego Sheriff's Department bookings data.

When we reviewed the manner of death, the San Diego Sheriff's Department had a notably higher number of suicides and natural deaths than the comparable counties, as Table 1 shows.[4] Alarmingly, a total of 52 individuals in the San Diego Sheriff's Department's jails died by suicide over the past 15 years, which is more than twice the number in each of the comparable counties. Additionally, more individuals died of natural and accidental causes in the custody of the San Diego Sheriff's Department than in the custody of each of the comparable counties, raising concerns about its ability to provide adequate safety and medical care to those it incarcerates. Natural deaths can include deaths from pre-existing

---

[2]  The ADP represents the number of incarcerated individuals housed in a jail system for any given day over a period of time and is used to determine whether a jail is operating at or near capacity. Bookings represent the total number of individuals who were processed through the county jail system.

[3]  Appendix A provides the number and rate of deaths in the 15 largest counties in relation to their ADPs and bookings.

[4]  We present an interactive dashboard for viewing data on the age, race, and gender of the individuals who have died in each county detention facilities system at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

SD 744711
Ex. H-588

medical conditions and deaths resulting from inadequate care. After adjusting the comparisons based on each county's ADP, the San Diego Sheriff's Department still has historically had the highest rate of natural deaths and suicides.

**Figure 4**
**Over the Past 15 Years, More Individuals Died in San Diego County's Jails Than in Those of Comparable Counties**



TAKING INTO CONSIDERATION THE NUMBER OF BOOKINGS AND THE ADP AT EACH COUNTY JAIL SYSTEM, SAN DIEGO STILL HAD THE HIGHEST RATE OF DEATHS, BOTH IN THE PAST 15 YEARS AND IN THE MOST RECENT FIVE YEARS.

Source: California Department of Justice in-custody death data and BSCC data.

We present interactive dashboards for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

**SD 744712**
**Ex. H-589**

Based on data the Sheriff's Department provided, in the most recent three years—2018 through 2020—the percentage of deaths of Black individuals in the Sheriff's Department's custody was disproportionately higher than their overall composition of the jail population. White individuals died at proportionally higher rates in 2007, 2009 through 2014, 2016, 2017, and 2020. In 2006, 2008, and 2015, the percentage of deaths among Hispanic individuals exceeded their population percentage. Although racial bias was not the focus of this report, our review of the Sheriff's Department's policies and procedures identified widespread deficiencies in its policies and practices for ensuring the health and safety of the individuals of all races and ages in its care.

**Table 1**
**More Individuals in San Diego County's Jails Died by Suicide or Natural Causes Than Individuals in the Custody of Comparable Counties**

| MANNER OF DEATH | SAN DIEGO | ALAMEDA | ORANGE | RIVERSIDE |
|---|---|---|---|---|
| Total Deaths by County Sheriff's Department From 2006 Through 2020 | | | | |
| Accidental | 31 | 19 | 13 | 21 |
| Homicide (by law enforcement) | 4 | 0 | 1 | 2 |
| Homicide (by other inmate) | 8 | 4 | 4 | 6 |
| Natural | 88 | 52 | 77 | 51 |
| Suicide | 52 | 22 | 14 | 23 |
| Other | 2 | 2 | 2 | 1 |
| Totals | 185 | 99 | 111 | 104 |

Source: California Department of Justice in-custody death data.

We present interactive dashboards for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Note: In San Diego County, accidental deaths mainly included drug overdoses. The two deaths shown as other include one pending investigation and one undetermined manner of death.

We also found that sheriff's departments did not report some deaths that occurred after incidents in jails because the individuals were released before their deaths. For example, we found instances in which the coroner or medical examiner's offices described individuals dying in hospitals after incidents in the county jails, such as attempted suicide or medical emergencies. However, the respective counties did not report these deaths to the attorney general because the state law requiring reporting of in-custody deaths requires sheriff's departments to report only those individuals who died while in custody at the time of death and not individuals who died after having been released.[5]

---

[5] For example, state law allows sheriff's departments to compassionately release individuals from custody who would not reasonably pose a threat to public safety, and the incarcerated individual upon diagnosis by the examining physician, is deemed to have a life expectancy of six months or less.

SD 744713
Ex. H-590

**Example of a Death That State Law
Does Not Require to Be Reported**

**July 1**–An individual attempted suicide in a county jail but initially survived. The individual was transported to the hospital.

**July 10**–The sheriff's department compassionately released the individual from custody.

**July 15**–The individual later died in the hospital as a result of the injuries from the attempted suicide.

Source: Records from sheriff's departments.

The text box provides an example in which sheriff's departments would not need to report a death to the attorney general. Consequently, sheriff's departments may be underreporting to the attorney general and to the public the number of deaths occurring from incidents in the jails.

**The Sheriff's Department's Failure to Consistently Provide Adequate Care Likely Contributed to Its In-Custody Deaths**

We selected 30 individuals who died in the Sheriff's Department's jails from 2006 through 2020, weighted toward deaths that occurred in the last four years. Our selection included natural deaths, accidental deaths, suicides, and homicides.[6] Our review of the associated case files identified numerous problems with the Sheriff's Department's care of these individuals, starting with the inadequate health screenings it performed upon their initial arrivals through its insufficient responses to their medical emergencies, as Figure 5 shows. The deficiencies we identified in these areas for all types of deaths—including deaths classified as natural—suggest that the problems with the Sheriff's Department's care for incarcerated individuals are systemic.

The assistant sheriff of detentions at the Sheriff's Department asserted that the department is aware that its policies are not followed all of the time and recognizes that employees make mistakes, but it holds employees accountable when violations are discovered and makes every effort to provide additional training to prevent a recurrence. However, as the cases in our review show, failing to follow policies even in limited instances can result in the loss of life.

When we evaluated the policies at the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department, we identified instances in which these entities have procedures that are more robust than those of the San Diego Sheriff's Department. If the San Diego Sheriff's Department followed these procedures, it could better ensure the health and safety of the individuals in its custody.

---

[6]  To comply with audit standards, we did not select cases involved in active litigation, including cases related to COVID-19, in order to avoid interfering with ongoing legal proceedings. Although the Sheriff's Department had reported one death in 2020 and one death in 2021 that were related to COVID-19, it indicated that the manner of death has not yet been determined for 11 other cases in 2021, as of January 2022.

SD 744714
Ex. H-591

**Figure 5**
Significant Deficiencies in the Sheriff's Department's Policies and Procedures Likely Contributed to the Deaths of Individuals in Its Custody



**INSUFFICIENT HEALTH EVALUATIONS AT INTAKE**

Health staff did not always properly identify incarcerated individuals' medical and mental health needs at intake. Consequently, some of these individuals did not receive proper care, likely contributing to their deaths.

**INCONSISTENT FOLLOW-UP CARE**

Detentions staff did not consistently follow up after individuals received or requested medical or mental health services, even though they often had serious needs that, when unmet, may have contributed to their deaths.

**INADEQUATE SAFETY CHECKS**

Sworn staff did not always adequately check on incarcerated individuals. Some individuals were found hours after their deaths, negating the opportunity for lifesaving measures.

**UNNECESSARY DELAYS IN PERFORMING LIFESAVING MEASURES**

Sworn staff's and medical personnel's slow response time to administer aid during medical emergencies may have contributed to unnecessary delays in lifesaving measures.

Source: The Sheriff's Department's jail records, surveillance videos, medical records, medical examiner reports, and homicide investigation documents related to a selection of 30 deaths of incarcerated individuals.

*The Sheriff's Department Did Not Ensure That It Identified Individuals' Medical and Mental Health Needs at Intake*

Because the Sheriff's Department did not always properly identify the medical and mental health needs of individuals in our review at intake, some of them did not receive the care they required. Studies on health care at correctional facilities indicate that identifying individuals' health needs at intake is critical to ensuring their safety in custody. For example, one of the keys to identifying potential suicidal behavior is through inquiry during the intake screening.

**SD 744715**
Ex. H-592

In at least eight of the 30 cases we reviewed, individuals had serious medical or mental health needs that health staff did not identify or communicate to detention staff at intake. Five of these individuals died within four days of their arrest. For example, in one case, an intake nurse determined that an individual needed to have a secondary nurse evaluation because the individual exhibited possible symptoms of drug withdrawal. However, there is no evidence in the case records that the intake nurse communicated this conclusion to other staff. The case records and video surveillance indicate that the individual died 24 hours after completing booking from complications resulting from a drug overdose without having seen another health professional.

*In some cases, the Sheriff's Department did not promptly and properly identify individuals' mental health needs, because mental health professionals generally do not participate in its intake health screenings.*

In some of the cases we reviewed, the Sheriff's Department did not promptly and properly identify individuals' mental health needs because mental health professionals generally do not participate in its intake health screenings. Registered nurses perform the medical and mental health screenings at intake—asking both mental health and medical questions. These nurses are trained medically but do not necessarily specialize in mental health, which means that they may miss key signs of mental health needs. According to policy, if the registered nurse identifies an individual as having mental health needs at intake, the nurse refers the individual for further evaluation by a qualified mental health professional. However, even if the nurse identifies a need for a further mental health assessment, the Sheriff's Department's policy may not require the individual to receive that assessment sooner than 30 days after intake, depending on the severity of an individual's symptoms. We noted one county had adopted more robust intake screening practices. Unlike the San Diego Sheriff's Department, the Riverside Sheriff's Department policy requires that a mental health clinician evaluate every individual before being housed, which could help to more effectively identify mental health needs early.

The San Diego Sheriff's Department is currently advertising to hire additional mental health staff, and its director of mental health indicated that the Sheriff's Department is aiming to have a qualified mental health professional, such as a mental health clinician or a psychologist, complete the mental health evaluations at intake. The county board approved additional funding in June 2021 for the Sheriff's Department to hire a substantial number of additional nurses and mental health professionals.

In addition, the Sheriff's Department's intake nurses sometimes have not obtained complete medical and mental health history information on individuals. Although they may ask the individuals to sign a release of information that provides the department access to their medical and mental health records, individuals can refuse to sign. Historically, Sheriff's Department nurses have not had

SD 744716
Ex. H-593

immediate access to county health records, which could be key to identifying health needs at intake. For example, the text box describes a case involving two cellmates that resulted in one's death. In this instance, a different outcome might have resulted had staff identified the perpetrator's mental health history at intake.

The Sheriff's Department entered into an agreement in September 2021 with the county Health and Human Services Agency to share behavioral health and medical information. The assistant sheriff of detentions stated that the Sheriff's Department is in the process of getting access to this information. However, the Sheriff's Department does not currently plan to require its intake nurses to look up each individual in the system. We believe this should be a standard step in the intake process to better ensure that the Sheriff's Department has a more comprehensive health history for each individual who comes into its care. In fact, the Riverside Sheriff's Department's policy requires mental health staff to review Riverside County's electronic health record system to determine whether an incarcerated individual has a history of receiving behavioral health care in Riverside County.

> **In-Custody Death:** *Case Example 1*
>
> An intake nurse did not identify an individual's mental health needs and did not have access to the individual's mental health history. Once incarcerated, that individual killed their cellmate.
>
> After the cellmate's death, the Sheriff's Department discovered the perpetrator's history of mental illness. Had staff known about this history, they likely would have placed the perpetrator in a different cell, where they could better meet the individual's mental health needs and better ensure others' safety.
>
> **Source:** Records from the Sheriff's Department.

### The Sheriff's Department Did Not Consistently Follow Up With Individuals Who Needed Medical and Mental Health Services

Our case review found that Sheriff's Department staff did not always follow up after individuals previously received or requested medical or mental health services, even though these individuals often had serious needs that, when unmet, may have contributed to their deaths. Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not consistently follow up—such as poor policies and communication—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.

In some of the cases we reviewed, individuals reported to health staff that they were experiencing persistent symptoms, yet they did not receive timely evaluations from a physician. For example, in two cases involving natural deaths, individuals reported symptoms multiple times over the course of one to three weeks. Although these individuals were treated for a number of other medical and mental health issues, medical records show that they did not receive prompt attention from a physician for the symptoms that related to their deaths. Nurses originally assessed and treated

these individuals for these symptoms. However, these individuals' medical conditions worsened, and medical records show that they did not receive a physician's evaluation before dying. Guidelines from the National Commission on Correctional Health Care (National Commission)—an organization that establishes standards for health services in correctional facilities—state that generally if an incarcerated individual reports to the nurse for evaluation more than twice for the same complaint and has not seen a physician, the individual should be scheduled to do so. However, this did not happen in these two cases. The Sheriff's Department's handling of these cases raises concerns over its follow-up process for individuals experiencing persistent symptoms.

In other cases, potential deficiencies in the Sheriff's Department's policies related to mental and behavioral health treatment resulted in individuals not receiving services or needed follow-up. For example, in one case, an incarcerated individual who had previously threatened suicide was released from a safety cell placement and enhanced observation housing. Although placement in a safety cell indicates that individuals are a danger to themselves or others, the Sheriff Department's policy at that time did not specify time frames for ongoing follow-up after such placement. In this case, mental health staff followed up only once with the individual after release from enhanced observation housing, and they assessed that the individual was low-risk. Two weeks after the individual's discharge from enhanced observation housing and about 12 days after the individual's lone follow-up encounter with a mental health clinician, the individual died by suicide.

Subsequently, the Sheriff's Department revised its policy in 2019 for follow-up care after release from a safety cell, but studies suggest that its revised policy may still be inadequate. Its revised policy delineates the follow-up process for individuals after discharge from a safety cell or enhanced observation housing at a variety of intervals depending on certain conditions—every 24 hours, every three to seven days, and every seven to 14 days. Individuals may continue to receive follow-up care at one of these intervals if certain conditions are met, including if it is their first time in detention, if they have recently attempted suicide, or if they have been charged with certain types of crimes. Although these follow-ups can decrease in frequency, all of these individuals must have a follow-up at least every 90 days. However, all individuals who have been placed into a safety cell or enhanced observation housing have demonstrated that they have significant mental health needs. While this policy is an improvement over its past policy, the Sheriff's Department should reconsider the minimum ongoing follow-up required. Reports and studies related to mental health indicate that more frequent psychological follow-up, such as check-ins performed weekly rather than every 90 days, leads to faster recovery and is more effective.

*While the Sheriff's Department's revised policy for the follow-up process after an individual's discharge from a safety cell is an improvement over its past policy, the department should reconsider the minimum ongoing follow-up required.*

**SD 744718**
Ex. H-595

Moreover, although the Sheriff's Department's policy indicates that a nurse should conduct a face-to-face appraisal with an incarcerated individual within 24 hours of a mental health care request to determine the urgency of that request, it has not always had this policy. As the case example in the text box describes, in one of the cases we reviewed the department's weak policy likely contributed to the individual's death by suicide, and the department revised this policy several months later. However, the revised policy still only requires a 24-hour face-to-face appraisal for mental health requests, not medical health care requests. Therefore, inmates with urgent medical needs may not get prompt care. Best practices indicate that a face-to-face appraisal should apply to all nonemergency health care requests.

> **In-Custody Death: *Case Example 2***
>
> **Day 1:** At an intake screening, a nurse determined that an individual was mentally stable but initiated a referral for mental health services.
>
> **Day 2:** The individual urgently requested mental health services. Staff denied the request, stating that the individual would be seen as soon as their referral was processed.
>
> **Day 4:** The individual died by suicide without having seen a mental health professional.
>
> Source: Records from the Sheriff's Department.

When we evaluated the policies of other counties, we identified a number of improvements the Sheriff's Department should make to its policies and protocols related to following up on individuals' medical and mental health care needs. For instance, the Orange Sheriff's Department has a policy for assigning a behavioral health acuity level rating (acuity level rating) to each person who sees a mental health clinician during intake or whose mental health status alters during their stay in custody, necessitating a mental health assessment. This acuity level rating, which rates the severity of mental health needs, helps to inform housing location, the provision of mental health services, and discharge planning for when people leave custody. Such a system could help to identify mental health needs, track those needs, and communicate this information to appropriate staff to ensure that these needs are met, likely reducing the risk of death to the individual or others.

In addition, all three comparable counties have stronger policies for instances when incarcerated individuals refuse medical or mental health care. For some of the cases we reviewed, these refusals were frequent, despite the individual's need for consistent care. The San Diego Sheriff's Department and the three comparable counties have policies that require detention staff to witness and document an individual's refusal to accept medical treatment or care. However, the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department also require a health staff member to witness and sign the refusal. In contrast, San Diego allows a single sworn staff member to be the only signer if health staff are unavailable to serve as the second witness to the verbal refusal of care. Consequently, we identified several instances in which sworn staff were the only witnesses when incarcerated individuals refused to sign the refusals. Because follow-up care is important, it is critical that the desire to refuse care be shared with health staff who are in a better position

**SD 744719**
**Ex. H-596**

to ask appropriate questions, explain the adverse consequences to health that may occur as a result of the refusal, and assess whether an individual has critical health needs that should be addressed.

The chief medical officer of the Sheriff's Department asserted that many of the issues we identified through our review are case-specific and should not be used to draw generalizations about the department's provision of health care. He also stated that the Sheriff's Department has made a significant number of improvements to its health care system in recent years, such as adding an electronic medical record system and increasing physician and nursing support. He explained that the Sheriff's Department is in the process of obtaining accreditation from the National Commission. To attain accreditation, the Sheriff's Department must meet certain standards related to health care services and support, governance and administration, personnel and training, and other areas.

When the National Commission reviewed the Sheriff's Department's jails in 2017, it found that they did not meet many of its standards, particularly those related to mental health. The chief medical officer indicated that the Sheriff's Department plans to contract with an outside health care organization to consolidate current services and expand its capabilities for the provision of comprehensive health care services, which may help it meet the requirements for accreditation. He further stated that the Sheriff's Department is participating in a university research study that could lead to some facilities receiving accreditation sooner. Nonetheless, the department may be a couple of years away from obtaining full accreditation for all of its facilities.

*Although seeking accreditation from the National Commission may address some of the problems we identify in this report, the Sheriff's Department should not wait to implement key changes that would improve the safety of incarcerated individuals.*

Although seeking accreditation from the National Commission may address some of the problems we identify in this report, the Sheriff's Department should not wait to implement key changes that would improve the safety of incarcerated individuals. We are concerned that this trend will continue if the Sheriff's Department fails to quickly implement significant changes. In fact, the Sheriff's Department indicated that the number of in-custody deaths increased to 18 in 2021—the highest in 15 years.

### The Sheriff's Department Performed Insufficient Safety Checks

Performing safety checks is the Sheriff's Department's most consistent means of monitoring for medical distress and crime occurring in its jails. According to state law, local detention facilities must conduct safety checks at least hourly through direct visual observation of all incarcerated individuals. They must also have a written plan to document routine safety checks. Nonetheless, in our

**SD 744720**
**Ex. H-597**

review of 30 in-custody deaths, we found that sworn staff did not always perform safety checks adequately. As a result, they did not realize several individuals had died until hours afterward.

In fact, in several of the cases in our review for which the Sheriff's Department has video files of safety checks, we found instances when sworn staff performed checks inadequately for the purpose of ensuring the safety of the individuals involved. Department policy requires that staff who are conducting safety checks look for any obvious signs of medical distress, trauma, or criminal activity. Although some video files were unavailable or incomplete for the 30 cases we reviewed, we reviewed the safety check logs and available video surveillance footage of sworn staff conducting checks.

Based on our review of video surveillance footage, we observed multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked through the housing module, as we describe in the text box. Staff later discovered individuals unresponsive in their cells, some with signs of having died several hours earlier, as detention staff described some of these individuals as stiff and cold to the touch.

In another example, the Sheriff's Department's records indicate that a deputy did not perform a required safety check in a housing area, in part because of poor communication between this deputy and the station deputy. One hour after the deputy should have performed this check, sworn staff found an individual in this housing area unresponsive after attempting suicide. A physician pronounced this individual deceased at the scene after staff and paramedics were unsuccessful at saving the individual's life.

> **In-Custody Death: *Case Example 3***
>
> **2 a.m.** Deputy quickly walked past each cell and glanced twice into the individual's cell but moved on after the second glance.
>
> **3 a.m.** Deputy stopped briefly at the individual's cell, glancing through the window for a split second.
>
> **4 a.m.** Deputy walked quickly past the individual's cell without breaking stride, glancing through the window for less than a second.
>
> **5 a.m.** Deputies found the individual unresponsive in their cell during a safety check, with signs of having died several hours earlier.
>
> Source: Records from the Sheriff's Department.

Sworn staff conducted safety checks inadequately in part because of weaknesses in the Sheriff's Department's policy. Its safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest. We recognize that acquiring proof of life in some situations is difficult and that waking up incarcerated individuals every hour could be detrimental to their well-being. However, as described in the case example above, a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate.

The Sheriff's Department's assistant sheriff of detentions indicated that the department's policy is sufficient but that individual sworn staff members do not always follow it. The department's safety check policy requires supervisors to review logs to ensure safety checks

were logged and conducted at varying intervals within the required time periods, but it does not stipulate that this review should include examining video surveillance to confirm checks were conducted in a timely and appropriate manner. The assistant sheriff of detentions indicated that the department has an informal process for assessing the quality of safety checks, which can include watching video footage. However, the Sheriff's Department has not documented this assessment process in its policy, and establishing an informal practice does not ensure that each facility's management team will consistently verify the quality of safety checks.

The State and Orange Sheriff's Department have more robust policies or additional detail in their policies that may be more effective in ensuring that incarcerated individuals are alive and well. For example, the California Department of Corrections and Rehabilitation (CDCR) requires staff who perform hourly checks to count a living, breathing person whom they see in person. Further, the Orange Sheriff's Department requires staff who conduct safety checks to be close enough to each individual to ascertain the individual's presence and apparent physical condition. According to Orange Sheriff's Department's assistant sheriff of detentions, a safety check must be performed from a sufficiently close vantage point to determine the person's presence in their assigned location and whether the individual's visible physical condition indicates the need for medical treatment or signs of being in medical distress. The detail described in these requirements could provide clearer expectations to San Diego Sheriff's Department's sworn staff for what constitutes an adequate safety check, especially during the night.

In addition, the Riverside Sheriff's Department has a formal policy that requires regular video review of safety checks. For example, supervisors from each shift must randomly review two safety checks conducted during the prior shift. Establishing a similar process could help the San Diego Sheriff's Department to identify sworn staff who do not consistently conform to policy when conducting their checks so that it can designate them for further action, such as additional training or disciplinary measures. Until it strengthens its safety check policy and formalizes a process for ensuring that sworn staff adhere to this policy, the San Diego Sheriff's Department risks further instances of delayed responses to medical emergencies or other crises.

*Until it strengthens its safety check policy and formalizes its process, the San Diego Sheriff's Department risks further instances of delayed responses to medical emergencies.*

### The Sheriff's Department Did Not Always Provide Prompt Lifesaving Measures to Unresponsive Individuals

In slightly less than a third of the 30 cases we reviewed, issues with the response time of sworn staff or medical staff may have resulted in unnecessary delays in performing lifesaving measures. The early moments in a medical emergency are critical. A 2020 study found that

one of the top five predictors of survival in a cardiac arrest occurring away from a hospital was someone performing cardiopulmonary resuscitation (CPR) immediately.[7] In addition, a 2021 study found that for each five-minute delay in calling emergency medical services, the odds of surviving a cardiac arrest decreased by 41 percent.[8] Nonetheless, in some of the cases we reviewed, sworn staff failed to begin CPR immediately or before the arrival of medical staff, or were slow to respond to the scene of the medical emergency.

In a number of instances, sworn staff either did not perform or delayed lifesaving measures. Generally, Sheriff's Department's policy directs that sworn staff immediately provide basic life support, such as CPR, to an unresponsive individual, unless they observe certain obvious signs of death. In some of the cases we reviewed, Sheriff's Department sworn staff did not begin CPR because they thought the individual was dead. However, when department medical staff arrived minutes later, they began lifesaving measures, including CPR. This fact calls into question the ability of sworn staff to assess whether unresponsive individuals might benefit from such potentially lifesaving measures.

In contrast to the Sheriff's Department, CDCR requires its custodial staff to provide immediate life support to incarcerated individuals until medical staff arrive. It revised its policy in response to a 2005 California district court order requiring it to do so. The Sheriff's Department's chief medical officer acknowledged that sworn staff are trained to be first responders and agreed that they should begin CPR while waiting for health staff to arrive.

*The Sheriff's Department's chief medical officer agreed that sworn staff should begin CPR while waiting for health staff to arrive.*

In addition, in some of the cases we reviewed, we noted a delay in the response time of sworn and medical staff when an individual was in medical distress. Sheriff's Department policy requires that all detention staff are responsible for recognizing, reporting, and responding to an incarcerated individual's emergency medical needs. The policy specifically requires that if an individual's condition is believed to be life-threatening, sworn staff must immediately alert on-duty health staff, provide basic life support and first aid care, and place a 911 request for a paramedic emergency response. In one case we reviewed, the homicide unit's investigation reported that an incarcerated individual indicated to a deputy that they were experiencing shortness of breath. The individual had recently been seen by health staff several times for these symptoms. According to the investigation, the deputy was somewhat familiar with the individual's medical conditions but indicated he was not aware of certain treatment the individual

---

[7]   Study from the *Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine.*

[8]   Study from the *American Journal of Emergency Medicine.*

**In-Custody Death:** *Case Example 4*

**6:51 a.m.** After the individual informed deputy about experiencing shortness of breath, deputy escorted the individual to a different area instead of medical clinic and then left area.

**6:52 a.m.** Individual collapsed in that area.

**6:54 a.m.** Deputies entered area to check on the individual.

**7:00 a.m.** Medical staff arrived. They began lifesaving measures within a few minutes.

**7:10 a.m.** Emergency medical personnel arrived.

**7:33 a.m.** Paramedics transported the individual to the hospital, where a doctor pronounced the individual deceased.

Source: Records from the Sheriff's Department.

previously received related to shortness of breath. Nevertheless, the deputy indicated that he believed that the individual was experiencing anxiety and escorted the individual to a different area instead of the medical unit. Shortly afterward, the individual collapsed and sworn staff did not respond for a couple more minutes, as the case example in the text box describes. A health staff member finally arrived several minutes later and began lifesaving measures within a few minutes. The individual was pronounced deceased shortly after arrival to the hospital.

In another example, our review of video surveillance footage—in combination with the homicide unit's investigative report containing statements from involved staff and inmate witnesses—found that the first deputy did not arrive at the scene of the incarcerated individual in medical distress until about five minutes after another incarcerated individual went to alert staff. Sheriff's Department medical staff did not arrive until five minutes after that. Paramedics—who are trained in advanced cardiac life support measures—did not arrive for another five minutes—a total of approximately 15 minutes after sworn staff were first alerted. According to the chief medical officer, some type of communication shortcoming may have delayed the arrival of medical staff, but the exact cause is unknown. However, the initial delay followed by the slow response time of medical staff may have been detrimental to the individual's likelihood of survival. In the Sheriff's Department's interviews of witnesses, other incarcerated individuals commented on the slow response of department staff.

The last two examples we describe emphasize the need for the Sheriff's Department to take action to ensure that it promptly responds to emergencies. Specifically, sworn staff need additional training for immediately starting CPR and how to properly alert medical staff.

### The Sheriff's Department's Inadequate Policies Are in Part the Result of Weaknesses in Statewide Corrections Standards

As Figure 6 shows, weaknesses in statewide corrections standards likely contributed to the problems we identified with the Sheriff's Department's policies. The BSCC establishes in regulation the minimum standards for jail conditions and treatment of incarcerated individuals that local detention facilities must follow. Every local jail system in the State uses these standards as a basis to create policies for inmate safety and care, although counties may choose to make their policies more robust. However, some of these standards may not be adequate for ensuring incarcerated individuals' health and safety.

SD 744724
Ex. H-601

Further, BSCC's inconsistent continuing education requirements may not be sufficient to ensure that sworn staff adequately care for incarcerated individuals. Given the increase in the annual number of in-custody deaths across the State from 130 in 2006 to 156 in 2020, improving statewide standards related to health and safety and training requirements is essential to ensuring the health and safety of incarcerated individuals in all counties.

**Figure 6**
**Poor Statewide Standards Contributed to Inconsistencies in the Sheriff's Departments' Policies**



BSCC designs the standards for treatment of incarcerated individuals to be a minimum that all counties can achieve, regardless of variation in resources at the local level.

The San Diego Sheriff's Department and all other county sheriff's departments develop their own policies for jails that comply with BSCC's standards.

Because BSCC's standards are minimal, we found inconsistencies in the policies across the four counties we reviewed, with some policies going beyond the standard more than others, yet even these policies were still insufficient.

*For example:*



STANDARD: **Safety Checks**
(BSCC's standard requires only C to be included)

| Orange | San Diego | Alameda | Riverside |
|--------|-----------|---------|-----------|
| A B C | C D | C | C |

DESPITE VARIATION AMONG COUNTIES, NONE OF THE POLICIES NOR THE BSCC STANDARD SPECIFY THAT STAFF ARE REQUIRED TO CHECK FOR PROOF OF LIFE DURING SAFETY CHECKS.

Source: State regulations and policies at Alameda, Orange, Riverside, and San Diego sheriff's departments.

SD 744725
Ex. H-602

Although the Sheriff's Department's policies generally align with BSCC's standards related to health, safety, and personnel training, those standards are not specific enough in certain areas to ensure inmate safety. For example, BSCC's standards do not explicitly require that a mental health professional should perform mental health screenings. As a result, the San Diego Sheriff's Department's, Alameda Sheriff's Office's, and Orange Sheriff's Department's policies allow medical nurses and health clinicians rather than mental health professionals to perform mental health screenings at intake. In these counties, the health staff generally will refer an incarcerated individual for a mental health evaluation if they observe general signs necessitating the referral or if the individual self-reports mental health concerns. In contrast, the Riverside Sheriff's Department's policy requires a mental health professional to conduct the mental health screening in all instances, which is a best practice.

*The Riverside Sheriff's Department's policy requires a mental health professional to conduct the mental health screening in all instances, which is a best practice.*

In another example, BSCC's standards do not describe the actions that constitute an adequate safety check. Instead, the standards simply state that safety checks must be conducted at least hourly through direct visual observation of all inmates and that observation through a video camera alone is not sufficient. The four counties we reviewed based their policies on different interpretations of this standard, as Table 2 shows. The Alameda Sheriff's Office and Riverside Sheriff's Department require hourly direct visual observation of incarcerated individuals, but their policies do not expand much further on the standard. As we discuss previously, the San Diego Sheriff's Department's policy provides more detail, defining what staff should look for during the direct visual observation. The Orange Sheriff's Department's policy is more robust than the minimum standard: it directs sworn staff to be close enough to each individual to ascertain their presence and apparent physical condition. Moreover, CDCR requires its staff to count living, breathing individuals whom they see in person. This count is an hourly check that is the equivalent to what BSCC's standards refer to as a safety check. Although BSCC is currently revising the safety check standard, its proposed revision still does not specify that a safety check must include verifying that an individual is alive, which is essential to ensuring the safety of incarcerated individuals across the State.

Additionally, state law does not require that BSCC have medical or mental health professionals on its board, despite its responsibility for creating standards in these areas. The qualifications for almost all of the board member positions are related to law enforcement in a detention setting. State law requires BSCC to seek the advice of medical and mental health professionals when establishing minimum standards and when reviewing and making revisions every two years. However, because the standards have so much

impact on the lives of incarcerated individuals, we believe that having medical and mental health representation on the board is critical. Similar boards in other states, such as the New York City Board of Corrections and the Texas Commission on Jail Standards, have medical experts serving as members.

**Table 2**
**A Lack of Specificity in Statewide Standards Has Resulted in Inconsistencies Among Counties' Policies**

| ENTITY WITH POLICY | SAFETY CHECKS POLICY EXCERPT |
|---|---|
| BSCC | Safety checks shall be conducted at least hourly through **direct visual observation** of all incarcerated individuals. Observation through a video camera alone does not constitute a safety check. |
| Alameda Sheriff's Office | Supervision of all incarcerated individuals shall include **direct visual observation** of each incarcerated individual by a deputy at random times each hour. |
| Orange Sheriff's Department | A safety check is a **direct visual observation** of each incarcerated individual located in an area of responsibility every hour. **Safety checks must be conducted from a location which provides a clear, direct view of each incarcerated individual. Staff shall be close enough to each incarcerated individual to ascertain his or her presence and apparent physical condition.** |
| Riverside Sheriff's Department | Security checks shall be completed to ensure there is **direct visual supervision** of all incarcerated individuals housed within a jail facility every hour. |
| San Diego Sheriff's Department | Sworn staff will conduct safety checks of incarcerated individuals every hour through **direct visual observation** without the aid of audio and video equipment. Safety checks of incarcerated individuals consist of looking at the incarcerated individuals for **any obvious signs of medical distress, trauma, or criminal activity.** |

Source:  State law and policies from the Alameda, Orange, Riverside, and San Diego sheriff's departments.

In addition, BSCC's required training hours for sworn staff working in local detention facilities do not align with their standards for similar positions. BSCC's regulations require only 24 hours annually of continuing professional education training for adult correctional officers, supervisors, and managers, even though it requires 40 hours of continuing training for probation officers and juvenile correctional supervisors and managers. Requiring fewer hours for adult corrections personnel does not make sense when thousands of individuals are incarcerated in these facilities and the number of individuals who have died has increased over the past 15 years. Based on our review of how San Diego Sheriff's Department's sworn staff responded to medical, mental health, and safety needs, we recommend increasing the number of training hours to align with similar professions to allow sheriff's departments to better protect and keep incarcerated individuals safe. Further, BSCC

**SD 744727**
**Ex. H-604**

does not require that any of the 24 hours of training cover topics pertaining to mental health, even though best practices suggest staff should receive at least four hours of mental health training annually. Without such a requirement, law enforcement staff may not be sufficiently prepared to provide care to and properly monitor individuals with mental health needs.

In response to our concerns that some of its standards are not robust enough to ensure the safety of incarcerated individuals in local detention facilities across the State, BSCC's deputy director of Facilities Standards and Operations told us it is the responsibility of each individual county to establish policies that exceed the minimum standards, should they decide to do so. Further, she said that BSCC designs the standards to be a minimum that all counties can achieve, regardless of variation in resources at the local level. However, this approach enables counties that house large numbers of incarcerated individuals to provide lower levels of care. An alternative approach could be for BSCC to establish separate standards for counties with smaller incarcerated populations, and set higher standards for counties with larger incarcerated populations. For example, BSCC could create more stringent requirements for the larger counties in the State, such as those with ADPs of more than 1,000 individuals. This threshold would include the county jail systems housing more than 80 percent of the State's jail population in local detention facilities. Further, some solutions—such as more robust safety checks—do not require significant resources. Improving statewide standards and training requirements is essential to ensuring the health and safety of incarcerated individuals in all counties.

# Chapter 2

**NEITHER THE SHERIFF'S DEPARTMENT NOR CLERB HAS TAKEN ADEQUATE ACTION IN RESPONSE TO THE DEATHS OF INCARCERATED INDIVIDUALS**

### Chapter Summary

The Sheriff's Department has not consistently taken meaningful action in response when in-custody deaths have occurred. Specifically, its reviews of in-custody deaths have been insufficient and have lacked transparency. As a result, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously and making every effort possible to prevent similar deaths in the future. In addition, CLERB—a citizen-governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in-custody deaths. In violation of its own rules and regulations, CLERB's investigations of the deaths of individuals in the Sheriff's Department's custody have not been independent, thorough, or timely. Moreover, CLERB failed to investigate nearly a third of the deaths of incarcerated individuals in the past 15 years, meaning that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

### The Sheriff's Department Has Not Consistently Implemented the Meaningful Changes Necessary to Respond to the Deaths of Individuals in Its Custody

The Sheriff's Department has not responded to incarcerated individuals' deaths in a manner that demonstrates its commitment to improving health and safety at its detention facilities. Every death of an individual in its custody should require a thorough review to determine whether changes to its processes are warranted. Nonetheless, the department's reviews of deaths are insufficient and have not always led to meaningful corrective action. Further, although the Sheriff's Department has implemented some key recommendations provided by external entities, it did not implement others that are critical to improving the safety of incarcerated individuals. San Diego County has paid millions of dollars in settlements related to deaths in the Sheriff's Department's jails that highlighted many of the same problems we have identified related to inadequate safety checks and medical and mental health care.

*San Diego County has paid millions of dollars in settlements related to deaths in the Sheriff's Department's jails that related to inadequate safety checks and health care.*

**SD 744729**

Ex. H-606

### The Sheriff's Department's Processes for Investigating and Reviewing In-Custody Deaths are Ineffective, Structurally Problematic, and Lacking in Transparency

The Sheriff's Department has not performed adequate reviews or implemented sufficient changes in response to the deaths of incarcerated individuals. As we show in Figure 7, the department conducts up to four different reviews: a 30-day medical review, a Critical Incident Review Board review, a homicide death investigation, and an internal affairs investigation. However, because all of these reviews are generated from within the Sheriff's Department, they may be viewed by the public as lacking objectivity. Further, we identified deficiencies in certain reviews that call into question their ability to prompt meaningful change to prevent additional deaths.

One of the Sheriff's Department's reviews—the 30-day medical review—involves reviewing the circumstances surrounding the incident and pertinent medical and mental health services and reports. According to state law, the Sheriff's Department must review every in-custody death within 30 days to determine the appropriateness of clinical care; to assess whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study. To fulfill this requirement, Sheriff's Department policy states that the medical services administrator, in consultation with the chief medical officer, is responsible for reviewing all in-custody deaths within 30 days. In practice, the chief medical officer—who is a licensed physician—indicated that he currently conducts the reviews with input from other health staff regarding the individuals' clinical histories. Although the chief medical officer is also required to review suicide deaths, the department's policy has specified since late 2018 that the chief mental health officer will also present findings on suicides.

However, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given; identified whether any concerns required further study; or stated whether changes to policies, procedures, or practices were warranted. The documents we obtained for most of these 22 cases were either presentation slides or meeting agendas. Neither type of document included findings about the cases or recommended changes to policies, procedures, or practices. For some of the more recent cases in 2019 and 2020, the Sheriff's Department provided us with the chief medical officer's and medical staff members' typed notes, which included conclusions about the medical care its staff had provided to the incarcerated individuals, as well as some recommendations. However, most of these reviews did not document whether the recommendations led to the department taking action, or whether the recommendations had been implemented.

*Most of the Sheriff's Department's reviews of in-custody deaths did not document whether recommended changes to policies, procedures, or practices had been implemented or led to the department taking action.*

**Figure 7**
The Sheriff's Department's Internal Reviews Have Not Led to Meaningful Action in Response to Individuals' Deaths



Sheriff's Department's Reviews of In-Custody Deaths

**30-DAY MEDICAL REVIEW**
- Performed by Sheriff's Department medical staff within 30 days of the death as required by state law.
- For suicides, mental health staff also review the deaths.
- No requirement for a formally documented report.
- Does not consistently document findings and recommendations and does not document follow-up to any recommendations.

**CRITICAL INCIDENT REVIEW BOARD REVIEW**
- Entity within the Sheriff's Department, so it is not independent.
- Staff present facts of the cases to Sheriff's Department's management and legal counsel.
- All reports are considered attorney-client privileged and are nondiscloseable.
- Purpose of board is to assess legal liability.
- Has not consistently taken meaningful corrective action and does not review natural deaths.

**HOMICIDE INVESTIGATION**
- Investigations performed by Sheriff's Department staff.
- Presents facts of the case to the Critical Incident Review Board but is rarely involved in developing policy recommendations.

**INTERNAL AFFAIRS INVESTIGATION**
- Becomes involved generally based on complaints of alleged misconduct.
- Has reviewed very few cases involving in-custody deaths.

Source: Sheriff's Department's policies and procedures and other documentation related to these reviews.

We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow-up care before an individual's death, such as those we discuss in Chapter 1. The chief medical officer agreed that the reviews, if properly documented, could be useful as an educational and quality assurance tool. However, he indicated that he would

have reservations about formalizing these reports in a written format without some form of protection against using these documents as evidence in litigation. He stated that without such protection, staff members would be reluctant to point out any form of mistake or error, leading to lost learning opportunities. Regardless of the department's position, we believe the reviews should be formalized for internal use to help the department better track its identification of deficiencies and recommendations for improvements to its clinical care. Other counties we reviewed have policies for documenting these 30-day reviews.

In addition to the 30-day medical review, in-custody deaths—except natural deaths—are also subject to review by the Critical Incident Review Board, which is the Sheriff's Department's internal review committee. The board consists of three voting members—commanders from the Law Enforcement, Court Services, and Detention Services bureaus—and two nonvoting members—the chief legal advisor and a commander from the human resources bureau. The stated purpose of the board is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore, it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals.

Moreover, the board is an entity within the Sheriff's Department, so it is not independent. The Sheriff's Department's investigators present to the board the facts and circumstances related to an in-custody death. According to department policy, the board then carefully reviews the incident from multiple perspectives, including training, tactics, policies, and procedures. Its ultimate goal is identifying problem areas and recommending remedial actions—such as posting a training bulletin or changing a policy—so that potential liability can be avoided in the future. According to policy, if the board votes to determine that any policy violations exist, it will forward the case to Internal Affairs.

*After the Critical Incident Review Board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with policies and practices.*

However, after the board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices. Of the 18 cases we reviewed for which the department held a Critical Incident Review Board meeting, the board reported taking action related to 13. However, only six resulted in substantive actions, such as changes to policy and procedures or training, related to preventing inmate deaths. The remaining seven resulted predominantly in minor administrative actions or recommendations for training that would not have far-reaching effects on the welfare of individuals in custody.

Moreover, even though the board discussed critical issues in some meetings, it ultimately concluded them without making recommendations for addressing these issues. For example, in

SD 744732
Ex. H-609

six of the 18 cases, the board indicated that the events surrounding the deaths in question could merit changes to policy and procedures; however, it did not recommend any related actions. According to the assistant sheriff of detentions, the Sheriff's Department may make immediate changes to policies following a death if it identifies a need, so additional recommendations from the board are sometimes unnecessary. However, the minutes of the Critical Incident Review Board meetings do not always discuss these types of policy changes. We question why the review board did not discuss the need for changes in some instances or discuss whether any changes made address the problems identified.

Further, the Critical Incident Review Board generally does not review natural deaths. Instead, it primarily reviews suicides, homicides, and accidental in-custody deaths. According to the Sheriff's Department's chief legal advisor, the board does not review natural deaths in part because the risk of legal liability in those incidents is low. He further stated that because the Medical Examiner's Office has made a determination that an individual's death was from natural causes, it rules out other human factors. However, we found in our review of 30 case files that the Medical Examiner's Office typically reviews events preceding individuals' deaths and their medical records, but it does not make conclusions about the appropriateness of care provided by the Sheriff's Department. We find the Sheriff's Department's decision not to hold critical incident reviews for natural deaths concerning given that these deaths accounted for nearly 50 percent of all deaths in the department's facilities in the period of our review. Further, as we note in Chapter 1, we identified significant deficiencies in the Sheriff's Department's handling of care leading to all types of deaths, including natural deaths. By not requiring the Critical Incident Review Board to review these cases, the department is not doing everything it can to protect incarcerated individuals.

Finally, the Critical Incident Review Board is not transparent. It does not make its reports and investigations public. The board's reports are classified as attorney-client privileged, meaning that they are confidential and cannot be disclosed without the Sheriff's Department's consent. The purpose of attorney-client privilege is to ensure that clients can fully disclose information to their lawyer without fear that it will be revealed to others, enabling them to receive competent legal advice. Although we do not disagree with having a confidential forum to discuss potential litigation matters, we are concerned that the Sheriff's Department does not have a separate public process to demonstrate that it is addressing deficiencies in its policies, procedures, and practices after in-custody deaths occur. By keeping its findings and recommendations confidential, the department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.

*By keeping the findings and recommendations of the Critical Incident Review Board confidential, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.*

Although the Sheriff's Department's homicide unit is rarely involved in developing policy recommendations, it typically presents facts about in-custody deaths to the Critical Incident Review Board. The homicide unit investigates deaths that occur in custody by, in part, inspecting the scene of the incident, interviewing any witnesses and detention staff, and reviewing video surveillance and reports written by sworn staff. Even though the information that the homicide unit presents to the Critical Incident Review Board is a key component of the Sheriff's Department's review of in-custody deaths, the Critical Incident Review Board ultimately decides whether to take further action.

The Sheriff's Department's internal affairs unit may also investigate detention staff—including health staff—for alleged misconduct related to an in-custody death. The internal affairs unit receives complaints that are initiated by a member of the community or by the Sheriff's Department. The Critical Incident Review Board can also initiate an internal affairs investigation if it votes that a policy violation may have occurred.

*The Sheriff's Department's internal affairs unit indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.*

However, the Sheriff's Department has performed very few such investigations. Specifically, it reported to us that it conducted only four internal affairs investigations related to the 30 cases we reviewed, even though we identified a number of potential violations or concerns in some of the other 26 cases that could justify further investigation. Further, internal affairs indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.

Thus, the Sheriff's Department does not complete internal affairs investigations frequently enough for it to provide significant value. Although internal affairs indicates that its investigations are generally complaint-driven, the small number of investigations related to death cases—coupled with the lack of meaningful changes arising from the 30-day medical review and the Critical Incident Review Board meeting—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

### The Sheriff's Department Has Not Implemented Key Recommendations From External Entities Related to Incarcerated Individuals' Welfare and Safety

The Sheriff's Department has not implemented a number of key recommendations from external entities that are essential for ensuring the welfare and safety of incarcerated individuals, as Table 3 shows. We reviewed recommendations from 2006 through 2020 that the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention

**SD 744734**
**Ex. H-611**

consultant (consultant) made to the Sheriff's Department.[9] Many of these recommendations were in response either to a specific death or to the general health and safety conditions of the jails. When we looked at recommendations that pertained to the safety of incarcerated individuals, the Sheriff's Department had implemented a number of them. For example, it modified a use-of-force policy to prevent compromising an incarcerated individual's ability to breathe and revised its intake screening to include additional questions related to suicide prevention. However, some of the recommendations that the Sheriff's Department failed to fully implement are connected to problems we identify in this report.

**Table 3**
**The Sheriff's Department Has Not Implemented Certain Key Recommendations From External Entities**

| ENTITY PROVIDING RECOMMENDATION | EXAMPLE OF RECOMMENDATION | CURRENT IMPLEMENTATION STATUS |
|---|---|---|
| San Diego County Grand Jury–2014/2015 | The Sheriff's Department deputy detention staff has an imbalance in experience levels and facility assignments, such as too many inexperienced staff at one facility. Develop and implement a staff rotation policy for all detention facilities. | Not implemented |
| Consultant reviewing suicide prevention practices–2018 | Given the strong association between in-custody suicide and segregation housing and consistent with national correctional standards, it is strongly recommended that the Sheriff's Department give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals. | Not implemented |
| CLERB–2018 | Sheriff's Department staff did not have pertinent information about an incarcerated individual's previous suicide attempt and allowed that individual access to something that resulted in self-harm and ultimately suicide. The Sheriff's Department should revise its policy to use identifying wristbands to indicate a prior suicide attempt. | Not implemented |
| Disability Rights California–2018 | Revise policies to allow individuals in Enhanced Observation Housing to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs. | Not implemented |

Source: San Diego County Grand Jury reports from 2006 through 2019, a consultant's report on suicide prevention practices, CLERB investigations and recommendations from 2006 through 2020, and a Disability Rights California report.

Specifically, the Sheriff's Department did not implement recommendations related to safety checks, intake screenings, and suicide prevention efforts—the last of which is particularly concerning given the department's high rate of suicides compared to other counties. For example, in response to a specific death, CLERB recommended in 2020 that the Sheriff's Department require additional steps in safety checks of individuals residing in special mental health housing to ensure that they are alive and well, such as requiring nurses to accompany deputies on each round to ensure incarcerated individuals' safety. However, the department stated it would not implement this recommendation because it

---

[9]   We discuss CLERB's process for investigating deaths in the sections that follow.

believed that its current policies were adequate. Additionally, San Diego County contracted with a consultant in 2018 to assess suicide prevention practices within the Sheriff's Department's jail system. One of the consultant's recommendations was for the Sheriff's Department to consider increasing safety checks of individuals who are housed in isolated housing units from every 60 minutes to every 30 minutes, given the association between suicide and isolated housing placement. However, the department responded that making this change was not feasible because of the physical layout of its jail facilities, the number of inmates, and the required staffing.

The Sheriff's Department's justifications for choosing not to implement crucial recommendations have not always addressed the underlying issues involved and do not offer alternatives for addressing the concern. For example, following another death, CLERB recommended in 2018 that the Sheriff's Department provide identifying wristbands to individuals with prior suicide attempts. In its response, the department indicated it would not implement this recommendation because doing so would violate individuals' privacy and be contrary to best practices for suicide prevention. However, the Sheriff's Department did not address or offer an alternative solution to the underlying problem, which is that sworn staff may not be familiar with the mental health histories of the individuals they oversee. As we discuss in Chapter 1, another county has addressed this problem by assigning individuals with mental health needs an acuity level rating that could help communicate this information to sworn staff.

*Although the department's policies and procedures related to facility maintenance generally align with state standards, it has not yet replaced the surveillance system at its largest detention facility, even though its age is a major safety issue.*

Another key, recurring recommendation that the Sheriff's Department has not implemented for nearly a decade relates to updating equipment for monitoring the safety of incarcerated individuals. In 2014 the San Diego County Grand Jury recommended that the Sheriff's Department update the surveillance system for monitoring activity at its largest male detention facility, which is a maximum security jail. The San Diego County Grand Jury made a similar recommendation in 2017, but the department has yet to replace the system. Although the department's policies and procedures related to facility maintenance generally align with state standards, we find it concerning that it has not yet replaced the surveillance system, even though its age is a major safety issue. In 2021 the Sheriff's Department indicated that the replacement effort would likely not begin until the summer of 2022. According to the assistant sheriff of detentions, the department did not implement this recommendation sooner because of its prioritization of other projects, such as building a new detention facility. However, we believe that the Sheriff's Department should prioritize implementing or resolving all recommendations intended to keep individuals in its custody safe.

**SD 744736**

**Ex. H-613**

Lastly, many of the lawsuits we reviewed that San Diego County settled have highlighted some of the same problems at the Sheriff's Department that we have identified related to inadequate safety checks, mental health treatment, and medical care. From 2006 through 2020, there were 22 lawsuits filed related to the deaths of incarcerated individuals at the Sheriff's Department's detention facilities. San Diego County has settled 11 of these, for a total cost of $9.2 million.[10] Payments for these cases ranged from $10,000 to $3.5 million for an average of $838,000 per settlement. Table 4 compares San Diego County's settlements to those in the other three counties we reviewed. By not promptly addressing the underlying issues on which both litigation and external recommendations have focused, the San Diego Sheriff's Department continues to place the individuals in its custody at risk.

**Table 4**

**Settlements Related to In-Custody Deaths Varied Among the Comparable Counties**

| SETTLEMENTS RELATED TO IN-CUSTODY DEATHS (2006–2020) | ALAMEDA | ORANGE | RIVERSIDE | SAN DIEGO |
|---|---|---|---|---|
| Number of settlements | 15 | 9 | 7 | 11 |
| Settlement amount (total) | $17,863,000 | $7,799,000 | $3,871,000 | $9,223,000 |
| Settlement amount (average) | $1,116,000 | $867,000 | $553,000 | $838,000 |
| Range of settlements | $10,000 to $5 million | $200,000 to $2.75 million | $46,000 to $975,000 | $10,000 to $3.5 million |

Source: Court documents from each of the four counties.

**CLERB Has Failed to Provide Effective Oversight of the Deaths of Individuals in the Sheriff's Department's Custody**

Despite its mission to increase public confidence in county law enforcement officers, CLERB has failed to provide effective, independent oversight of the deaths of individuals in the Sheriff's Department's custody. In violation of its own rules and regulations, CLERB's investigations are not independent, timely, or thorough, as Figure 8 shows. Our review found that CLERB rarely independently interviews witnesses or visits the initial scenes of the deaths, has not consistently prioritized cases involving deaths, and has sometimes failed to thoroughly investigate or follow up on discrepancies it discovers in the course of its investigations of deaths. CLERB's failure to conduct adequate investigations has resulted in a lack of independent scrutiny of dozens of deaths of incarcerated individuals, calling into question its effectiveness as a key oversight body for San Diego County law enforcement.

---

[10] The other 11 lawsuits are either ongoing or have been appealed.

**Figure 8**
**CLERB Has Failed to Provide Adequate Oversight of the Deaths of Individuals in the Sheriff's Department's Custody**



CLERB's rules and regulations require it to be:

**INDEPENDENT** — Relies primarily on evidence provided by the Sheriff's Department, rather than independently interviewing witnesses or visiting the initial scene of the death.

**TIMELY** — Has not always prioritized conducting investigations of death cases.

**THOROUGH** — Does not always thoroughly investigate death cases or follow up on key discrepancies that arise during the investigation.

**ETHICAL** — We did not identify concerns with the investigations we reviewed being conducted in an unethical manner.

**FAIR/IMPARTIAL** — We did not identify concerns with the investigations we reviewed being unfair or biased.

Source: CLERB's rules and regulations, county policies, and analysis of CLERB investigations.

### CLERB Does Not Conduct Independent Investigations

San Diego County voters established CLERB to provide independent oversight of the county's law enforcement agencies. However, CLERB's investigations of in-custody deaths are not independent. In particular, it does not conduct interviews with Sheriff's Department sworn staff or visit the initial scene of the death. Rather, it relies almost entirely upon documents that the Sheriff's Department provides. The county charter—as well as its own rules and regulations—establishes CLERB's power to issue subpoenas, administer oaths, and require the attendance of witnesses and the production of books and papers pertinent

to its investigations. CLERB's rules and regulations further state that its investigations may include interviewing witnesses and subject officers, examining the scene, and reviewing and preserving other physical evidence. However, in practice, CLERB's investigations of in-custody deaths reflect neither its authority nor its stated processes.

*In practice, CLERB's investigations of in-custody deaths reflect neither its authority nor its stated processes.*

We reviewed a selection of six CLERB investigations of incarcerated individuals' deaths in the Sheriff's Department jails occurring from 2016 through 2019 that had investigations performed in 2017 through 2020. We found that for all of these cases—which, in total, included dozens of potential witnesses—CLERB investigators referenced conducting an interview of an incarcerated individual in only one instance. They did not independently interview staff from the Sheriff's Department in any of the six cases, although in a few limited instances, they used written questionnaires to obtain information from sworn staff about their involvement in an incident leading up to an incarcerated individual's death.

CLERB uses these questionnaires in lieu of performing in-person interviews as the result of an agreement it reached with the Sheriff's Department and the Deputy Sheriff's Association of San Diego County (labor organization). However, this agreement has hindered CLERB's independence and undermined voters' approval of CLERB's creation. As we show in Figure 9, the erosion of CLERB's independence began in the 1990s. According to its current executive officer, CLERB was concerned at that time that its investigations were one-sided and lacked legitimacy without participation by Sheriff's Department sworn staff. According to CLERB annual reports and internal documents, CLERB attempted to interview Sheriff's Department sworn staff in the course of its investigations to seek their perspective. Although both San Diego County's Administrative Code and CLERB's rules and regulations entitle CLERB to complete and prompt cooperation from the Sheriff's Department, the sworn staff members refused to participate in interviews with CLERB investigators. In response, CLERB exercised its power to subpoena and administer oaths by calling sworn staff members to testify in public hearings. However, CLERB documents indicate that the sworn staff continued to refuse to answer any questions, invoking their Fifth Amendment right against self-incrimination.

**Figure 9**
CLERB's Ability to Conduct Independent Investigations Has Been Eroded Over Time



**1990** — Voters approved Proposition A to create CLERB and give it power to subpoena and require attendance of witnesses and the production of books and papers pertinent to its investigations, as well as to administer oaths.

**1991–95** — Sworn staff involved in CLERB investigations refused to answer questions, citing their Fifth Amendment rights, and CLERB defended itself against litigation related to its authority to perform investigations.

**1998** — CLERB, the Sheriff's Department, and the labor organization agreed to a process for CLERB investigators to question sworn staff through interviews or written questionnaires.

**2003** — CLERB adopted a waiver form allowing sworn staff to opt out of in person interviews with its investigators.

**2021** — CLERB continues to not directly interview sworn staff involved in in custody deaths, compromising the independence and thoroughness of its investigations.

Source: Proposition voter materials, agreement documents, legal documentation, and CLERB's investigations documentation.

Faced with the prospect of more costly litigation and continued legal challenges, CLERB discussed a framework with the Sheriff's Department and the labor organization in 1998 that ultimately led to an agreed-upon process for CLERB investigators to question Sheriff's Department sworn staff through interviews or written questionnaires (1998 agreement). Further, in 2003, CLERB adopted a waiver form for sworn staff, allowing them to opt out of in-person interviews with CLERB investigators altogether (2003 waiver form).

The 1998 agreement and 2003 waiver form constitute CLERB's current process for involving Sheriff's Department sworn staff in its investigations. Consequently, CLERB investigators do not conduct independent interviews of sworn staff but rather request

responses from specific department employees through a written questionnaire. This approach has hindered CLERB's ability to perform independent investigations.

CLERB's executive officer acknowledged that having its investigators conduct independent interviews would be preferable but also asserted that they are generally able to obtain necessary information through the questionnaire process. However, we question this position. Although written responses may provide some pertinent information, they do not allow investigators to assess the credibility of a witness or to ask immediate follow-up or clarifying questions. In fact, CLERB's current process allows department staff up to 14 days to respond to the questionnaires. CLERB's executive officer indicated that investigators generally submit another questionnaire with the same turnaround time if they have any subsequent inquiries or clarifying questions to the responses from the initial questionnaire. Such protocol is counterintuitive to the nature of an investigation, which requires interactive communication and prompt responses.

Moreover, although the Sheriff's Department generally notifies CLERB of in-custody deaths, it does not do so until after various department entities have processed the scene. As a result, CLERB investigators are not able to be present at the initial scene of the death. Instead, shortly after receiving notification of an in-custody death, CLERB issues a subpoena to the Sheriff's Department for the homicide unit's investigation file. The Sheriff's Department forwards it to CLERB once it has completed its criminal investigation, usually about two to eight months after the death occurs. As a result, CLERB's investigators generally do not learn about potential witnesses or have the opportunity to visit the scene until months after the death of an incarcerated individual, severely limiting their ability to conduct an independent and thorough investigation. In fact, when we reviewed a selection of CLERB's investigations, we found that its investigators either did not visit the scenes of the deaths at all or did not do so until more than a year after the death occurred.

*CLERB's investigators generally do not learn about potential witnesses or have the opportunity to visit the scene until months after the death of an incarcerated individual.*

Without the ability to independently interview witnesses or the opportunity to visit the initial scenes of the deaths, CLERB must conduct its investigation based primarily on information that the Sheriff's Department's internal investigators provide, such as photographs and videos. For the cases we reviewed, CLERB's investigators' only other sources of evidence were statements from the decedents' families, reports from the medical examiner, and—in only one case—a direct interview with an incarcerated individual who was a witness.

*CLERB's nearly exclusive reliance on evidence provided by the Sheriff's Department precludes its investigators from reaching independent conclusions on in-custody deaths and providing truly external oversight of county law enforcement.*

San Diego County voters established CLERB in response to perceived inadequacies in the Sheriff's Department's internal investigations, yet CLERB's nearly exclusive reliance on evidence provided by the department precludes its investigators from reaching independent conclusions on in-custody deaths and providing truly external oversight of county law enforcement. For CLERB to carry out this function, its processes must change and the Sheriff's Department must fully cooperate.

CLERB's members and its executive officer are currently pursuing several policy changes to increase its independence, including issuing a policy recommendation in October 2021 to the Sheriff's Department requesting that it allow a CLERB staff member with extensive death investigation experience to be present at the initial scene of the death. However, CLERB's recommendations to the Sheriff's Department are advisory and require the Sheriff's Department's approval for implementation. CLERB's members and executive officer are also working with the county board to expand CLERB's authority to investigate complaints against non-sworn staff, including medical personnel. However, such an expansion of CLERB's authority requires approval by the county board. Furthermore, although these changes would increase the independence of CLERB's investigations, they would not enable CLERB's investigators to directly interview sworn staff, which we believe is critical.

### CLERB Failed to Investigate 57 In-Custody Deaths From 2006 to 2017

CLERB failed to investigate a significant number of deaths of individuals in Sheriff's Department custody. For example, CLERB failed to investigate 13 deaths of incarcerated individuals from 2011 through 2016 because it misinterpreted a state-mandated deadline for completing its investigations and did not properly prioritize its caseload. The Legislature established a one-year statute of limitations for investigations of law enforcement misconduct when it amended the Public Safety Officers Procedural Bill of Rights Act (POBR) in 1997. As the Introduction explains, CLERB is responsible for investigating complaints, as well as deaths arising out of or in connection with actions of peace officers, which can include deaths in custody. As a result of the amendment to POBR, CLERB must complete its investigations within one year after it receives a complaint against a peace officer or notification of an in-custody death.[11]

---

[11] POBR requires the investigation to be completed within one year of discovery of the alleged misconduct, and the one-year deadline may be suspended under certain circumstances, such as when the misconduct is the subject of a criminal investigation. Because the Sheriff's Department performs a criminal investigation of every in-custody death, CLERB's one-year time frame to complete its investigation does not start until after the Sheriff's Department completes its investigation.

**SD 744742**
**Ex. H-619**

Nevertheless, CLERB did not realize until 2010 that the one-year time frame applied to its investigations of complaints, at which time it started to dismiss cases for expiration of this time limit. In fact, from 2010 through 2016, CLERB reported that it had to dismiss nearly 100 complaints against county law enforcement members because it did not complete its investigations within the required time frame. Although CLERB did not report that any of these 100 complaints involved in-custody deaths, its failure to conduct these investigations demonstrates that it has struggled to effectively perform its duties in a timely manner.

Further, CLERB's records and San Diego County Grand Jury documents indicate that CLERB staff were not aware that the POBR statute of limitations also applied to its investigations of in-custody deaths until 2017. Consequently, it did not always prioritize these cases, and it reported that its backlog of open investigations of deaths steadily increased from seven cases in 2010 to 46 cases by 2016. After CLERB learned in 2017 that the one-year time limit also applied to investigations of deaths, it had to dismiss 22 of these cases because they had exceeded the time limit. Of these 22 deaths, 13 occurred while the individuals were in custody at Sheriff's Department detention facilities.[12] Because of CLERB's failure to investigate these 13 deaths, it did not have the opportunity to identify problems with the Sheriff's Department's policies and procedures and to make policy recommendations that could have helped prevent future in-custody deaths.

CLERB did not investigate an additional 40 in-custody deaths classified as natural from 2006 through 2016 because it was not conducting investigations of this type during that time. According to CLERB's current executive officer, it did not review deaths classified as natural during this period because its former executive officers generally interpreted its jurisdiction over in-custody deaths to exclude these types of deaths. In fact, CLERB's rules and regulations do not clearly specify whether CLERB should investigate natural deaths. However, the concerns we discuss with the Sheriff Department's inadequate prevention of natural deaths underscore the importance of CLERB providing external oversight of these cases. Since 2017 CLERB has been consistently reviewing natural deaths. However, the lack of specificity in its rules and regulations could result in CLERB reverting to its past practice in the future.

In addition, CLERB did not investigate four other in-custody deaths—two that were classified as accidental, one as homicide by law enforcement, and one as suicide—from 2009 through 2011. CLERB's executive officer said that it did not investigate these deaths because

*Since 2017 CLERB has been consistently reviewing natural deaths. However, the lack of specificity in its rules and regulations could result in CLERB reverting to its past practice of not reviewing natural deaths in the future.*

---

[12] The remaining nine deaths occurred in San Diego County law enforcement areas and probation facilities.

SD 744743

Ex. H-620

the Sheriff's Department failed to inform CLERB of their occurrence. Although the Sheriff's Department indicated that it did not have information on notifications for this period, we find the lack of review of these cases concerning. In 2011 CLERB made a policy recommendation requesting that the Sheriff's Department include it in all in-custody death notifications. Although the Sheriff's Department declined to modify its policies to include CLERB in its initial death notifications, which includes the county district attorney and Medical Examiner's Office, it did direct a specific unit to inform CLERB of all in-custody deaths, usually within a few days of their occurrence. However, as we discuss above, when the Sheriff's Department does not notify CLERB of deaths immediately, CLERB investigators do not have the opportunity to visit the initial scenes of the incidents shortly after the death occurred.

As we show in Figure 10, CLERB failed to investigate a total of 57 deaths of incarcerated individuals in Sheriff's Department jails from 2006 through 2017—nearly a third of all its in-custody deaths in the past 15 years. This is unacceptable given that CLERB is a key county entity outside of the Sheriff's Department that reviews in-custody deaths. Although CLERB recently added policies and procedures establishing its prioritization of death cases over all other cases, it did not do so until August 2021. Moreover, because policies can easily be changed when leadership changes, it is important that CLERB include requirements in its rules and regulations for how it prioritizes cases.

**Figure 10**
**CLERB Did Not Investigate Nearly a Third of All In-Custody Deaths in the Past 15 Years**



Source: California Department of Justice in-custody death data, CLERB list of investigations, and CLERB investigative reports.

Despite CLERB's efforts since 2017 to ensure that it appropriately prioritizes and fully investigates in-custody deaths, it has still struggled to complete its investigations in a timely manner. As we previously explained, CLERB investigators generally begin investigating an in-custody death after the Sheriff's Department's homicide unit has completed its own investigation and forwarded the homicide investigation file to CLERB. Upon receipt of the homicide investigation file, CLERB must complete its investigation within one year to meet the POBR time limit. However, our review of the six in-custody death investigations found that CLERB investigators did not begin their casework until an average of seven months after they received the homicide investigation file from the Sheriff's Department. As we note earlier, the Sheriff's Department usually does not provide the file to CLERB until two to eight months after the death of an incarcerated individual. Consequently, CLERB investigators did not complete their investigations of the cases we reviewed until an average of nearly a year and a half after the death occurred.

CLERB's executive officer indicated that CLERB staff have not historically prioritized beginning investigations of deaths, but he has made recent efforts to ensure that staff start their investigations as soon as they receive a homicide file. Although CLERB's policy does not provide instruction for how quickly the staff must start working on investigations of deaths, the executive officer told us that his goal is for these investigations to be complete within 90 days of CLERB receiving the homicide investigation file. To make relevant recommendations and hold individuals accountable for wrongdoing, CLERB must take steps to complete its investigations of in-custody deaths in a timely manner.

*To make relevant recommendations and hold individuals accountable for wrongdoing, CLERB must take steps to complete its investigations of in-custody deaths in a timely manner.*

### CLERB Did Not Always Thoroughly Investigate In-Custody Deaths

CLERB's rules and regulations require its investigations to be thorough. However, in some of the cases we selected, CLERB's investigators did not appear to consider all the circumstances leading up to the deaths, did not examine all the relevant Sheriff's Department policies, and did not follow up on discrepancies they discovered in the course of their investigations. For example, in one case, an altercation between two cellmates resulted in the death of one of the individuals. However, the investigator did not appear to scrutinize or independently verify evidence, such as the victim's mental health history, that might have affected their classification status. Without this information, the investigator could not sufficiently determine whether the Sheriff's Department had violated policies or procedures by housing these individuals in the same cell. Consequently, the investigator found that there was no evidence to support an allegation of a procedural violation, misconduct, or negligence on the part of the Sheriff's Department.

When failing to thoroughly examine all the evidence in a case, CLERB investigators may miss important opportunities to identify deficient policies and practices and to make recommendations to improve the safety of incarcerated individuals. CLERB's executive officer explained that because CLERB investigators are often working against the POBR statute of limitations, they do not consistently follow up on discrepancies they discover in the course of their investigations. However, we find this explanation problematic given the critical nature of the investigations. Further, as we previously discuss, investigators often failed to begin their investigations until months after receiving the homicide files. By starting their investigations sooner, they could increase the time available to them.

Although CLERB developed policies and procedures in August 2021 that outline specific documents—such as medical records—investigators should obtain in the course of an in-custody death investigation, we believe further action is necessary. Specifically, CLERB should develop a comprehensive training manual for its investigators that includes guidance for evaluating the circumstances leading up to the death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment. Such changes could help ensure that its investigations are complete and thorough.

*CLERB should develop a comprehensive training manual for its investigators that includes guidance for evaluating the circumstances leading up to the death.*

### Until Recently, the County Board Provided Insufficient Oversight of CLERB

The county board has a number of responsibilities related to CLERB. It appoints CLERB members and can remove individual members by a majority vote at any time. The county board also establishes CLERB's duties and approves its rules and regulations. However, despite its critical role in overseeing CLERB, the county board rarely discussed in-custody deaths or raised concerns about CLERB, based on its meeting minutes from 2006 through 2019, including after CLERB dismissed 22 death cases in 2017.

The county board has only recently begun to discuss in-custody deaths. Its current chair stated that the board's composition changed recently and that it now has an increased interest in addressing deaths in San Diego County jails. In 2020 the county board approved changes intended to strengthen CLERB's oversight of the Sheriff's Department and Probation Department, including increasing the number of investigative staff. It also approved a request for CLERB to revise its member nomination process to make it more transparent and better incorporate community input.

Although the current county board has recently been more engaged in monitoring in-custody deaths, CLERB has not effectively communicated the pressing issues related to deaths in county jails to the county board. The county charter requires CLERB to prepare an annual report for the county board, the sheriff, and the county probation officer that summarizes its activities and recommendations, including the tracking and identification of trends with respect to complaints received and investigated. Even though CLERB has included in its annual reports year-to-year comparisons of the number of new death cases and complaints, its reports lack critical information that would enhance their usefulness. For example, the reports summarize information on the causes of death and certain categories of allegations of misconduct but do not include any significant discussion or analysis that might point to deficiencies in the Sheriff's Department policies or practices. Further, they do not include any demographic information related to deaths that CLERB investigates.

Although CLERB's reporting and recommendation practices generally align with requirements in its rules and regulations, it could make its annual reports and recommendations more useful. Other law enforcement oversight entities in the State include more robust information in their annual reports, such as comprehensive analyses and discussions of overall trends in discrimination, misconduct, and excessive force allegations, as well as demographic information. Additionally, as an advisory board, CLERB's primary means of improving the safety of incarcerated individuals and providing oversight of in-custody deaths is the recommendations for policy or procedural changes that it makes to the Sheriff's Department based on the deficiencies it detects in the course of its investigations. However, CLERB generally makes recommendations based on individual cases rather than on trends it identifies through analysis of its investigations. Making recommendations based on trends could help resolve more systemic concerns at the Sheriff's Department.

CLERB's executive officer indicated that he would like to include more analyses of overall trends in the annual report but explained that he has prioritized other issues, such as resolving the case backlog and developing training materials for new investigators. As a key oversight entity for county law enforcement, CLERB must improve its reporting and analyses to better inform county leadership and the public. Even more importantly, it must make recommendations that address systemic issues to help prevent deaths of incarcerated individuals.

*CLERB must improve its reporting and analyses to better inform county leadership and the public.*

52 | **California State Auditor Report 2021-109**
**February 2022**

Blank page inserted for reproduction purposes only.

# Conclusions and Recommendations

The San Diego Sheriff's Department has a constitutional responsibility to provide adequate medical care to the individuals whom it incarcerates. Nonetheless, more people have died while in its custody over the past 15 years than in nearly any other county in the State—an average of about one death per month. Our audit found that deficiencies in the Sheriff's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies likely contributed to these deaths. The high rate of deaths in San Diego County jails compared to other counties' jails suggests that these systemic deficiencies have undermined the Sheriff's Department's ability to ensure the health and safety of the individuals in its custody. We are concerned about whether the Sheriff's Department will make meaningful changes to address these systemic problems. Although external entities—such as CLERB and the San Diego County Grand Jury—have made recommendations in the past to address some of the deficiencies we describe, the Sheriff's Department has not implemented a number of them.

No single entity has sufficient oversight authority over the Sheriff's Department to require it to make meaningful changes. Absent explicit legislative direction, neither the county board nor the State's attorney general is well positioned to compel the Sheriff's Department to implement the recommendations we include in this report. Given the ongoing risk to incarcerated individuals' safety, we believe that the Legislature should direct the Sheriff's Department to implement the changes we detail below.

**Recommendations**

**_Legislature—All Sheriff's Departments and the California Department of Justice_**

To ensure that all sheriff's departments accurately report deaths that occur from incidents or conditions in county jails, the Legislature should amend state law to require sheriff's departments to report to the attorney general individuals who are released from custody after being transported directly to a hospital or similar medical facility and subsequently die in the facility. It should also amend state law to require sheriff's departments to provide the attorney general with all facts concerning the death, such as the cause and manner. The California Department of Justice should annually publish this information on its website.

**SD 744749**

**Ex. H-626**

***Legislature—San Diego Sheriff's Department***

To ensure that the San Diego Sheriff's Department identifies individuals' medical and mental health needs at intake, the Legislature should require it to revise its policies to better align with best practices, as follows:

- Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them.

- Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.

To ensure that the Sheriff's Department provides the necessary medical and mental health care to individuals incarcerated in its facilities, the Legislature should require it to do the following:

- Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.

- Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request.

- Revise its policy to require more frequent psychological follow-up after release from the inmate safety program, including at least monthly check-ins.

- Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.

To ensure that sworn staff properly perform safety checks, the Legislature should require the Sheriff's Department to do the following:

- Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.

- Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff members perform.

To ensure that department staff promptly respond to unresponsive individuals, the Legislature should require the Sheriff's Department to revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow. The Legislature should also require that the Sheriff's Department provide sworn staff with additional training for starting CPR immediately and how to properly alert medical staff.

To ensure that the Sheriff's Department properly assesses the reasons for each in-custody death and makes prompt changes as necessary in response, the Legislature should require it to revise its policy to specify the following:

- Staff will provide a written report of each 30-day medical review to its management.

- When warranted, the report should specify recommendations for changes to prevent further deaths.

- The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and identify issues that require further study.

To improve oversight of in-custody deaths and encourage meaningful action to prevent future deaths, the Legislature should require the Sheriff's Department to revise its policy to require that the Critical Incident Review Board review natural deaths.

To increase the transparency of the Sheriff's Department's reviews of in-custody deaths, the Legislature should require the Sheriff's Department to either make public the facts it discusses and recommendations it decides upon in the relevant Critical Incident Review Board meetings or to establish a separate public process for internally reviewing deaths and making necessary changes.

To ensure that the Sheriff's Department provides complete and prompt assistance to CLERB's investigations, the Legislature should require the Sheriff's Department to do the following:

- Revise its policy to include CLERB in its immediate death notification process.

- Revise its policy to allow a CLERB investigator to be present at the initial death scene.

- Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.

The Legislature should implement the recommendations related to the Sheriff's Department described above in a manner consistent with the form of governance applicable to San Diego County.

### Legislature—BSCC

To ensure that standards of care for incarcerated individuals are adequate and consistent across the State, the Legislature should amend state law to require BSCC to amend certain regulations to address the following:

- County sheriff's departments with jails that have an average daily population of more than 1,000 must have a mental health professional perform mental health evaluations at intake.

- Safety checks must include a procedure for checking to see that each individual is alive.

To ensure the involvement of experts in the areas of medical and mental health care in approving BSCC's regulations and training standards related to the health and safety of incarcerated individuals, the Legislature should change the composition of BSCC to include a medical professional and a mental health professional.

To ensure that BSCC's regulations, guidance, and training align with medical and mental health care best practices, the Legislature should require BSCC to evaluate and update all of its regulations and training as needed once its composition includes a medical professional and a mental health professional.

To ensure that all local correctional officers in the State receive sufficient continuing professional education, the Legislature should require BSCC to amend its regulations to require that local correctional officers working in local detention systems with an

SD 744752
Ex. H-629

average daily population of more than 1,000, complete 40 hours of training annually and that at least four of those hours relate to mental and behavioral health.

### CLERB

To ensure its investigations are independent, timely, and thorough, CLERB should do the following by May 2022:

- Discuss and modify its current agreement with the Sheriff's Department and the labor organization to allow CLERB's investigators to conduct independent interviews of Sheriff's Department sworn staff.

- Develop a comprehensive training manual for its investigators that outlines standard procedures for investigations. The manual should include a specific section dedicated to investigations of in-custody deaths, including guidance for evaluating the circumstances leading up to an in-custody death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment.

- Create policies and procedures to require its investigators to finish casework on in-custody death investigations within three months of receiving the homicide investigation file. These policies and procedures should also require investigators to attempt to independently verify any information they receive from the Sheriff's Department, to thoroughly review deputy statements and reports from the homicide investigation file, and to request interviews with relevant detention staff and other witnesses in all instances in which they identify discrepancies or missing information.

To ensure that it fully investigates all in-custody deaths, CLERB should revise its rules and regulations by May 2022 to include the following:

- Prioritization criteria for investigating in-custody deaths above all other investigations.

- Clarification that its investigations of in-custody deaths includes those classified as natural deaths.

To ensure that it provides effective oversight of the deaths of individuals in the Sheriff's Department's custody, CLERB should perform an analysis of overall trends related to these deaths, including demographic information, and determine whether the trends suggest deficiencies in the Sheriff's Department's policies

and procedures. Based on these trends, it should also identify policy recommendations for improving the safety of the individuals in the Sheriff's Department's custody. To increase transparency, CLERB should include these trends and analyses in its annual reports starting with its 2021 report, which it should publish in 2022.

We conducted this performance audit in accordance with generally accepted government auditing standards and under the authority vested in the California State Auditor by Government Code sections 8543 et seq. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on the audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

February 3, 2022

# Appendix A

**In-Custody Deaths in California's 15 Largest Counties**

The Joint Legislative Audit Committee (Audit Committee) directed us to compare the in-custody death rate in San Diego County to the rates in other comparable California counties for the past 15 years—2006 through 2020. Table A.1 presents the rate of deaths per average daily population (ADP) in each of these county sheriff jail systems from 2006 through 2020. As we previously explain, the ADP represents the number of incarcerated individuals housed in a jail system on any given day over a period of time.

**Table A.1**
**In-Custody Deaths and ADPs From 2006 Through 2020**

| COUNTY SHERIFF'S DEPARTMENT | ADP 15-YEAR AVERAGE (2006–2020) | TOTAL DEATHS | AVERAGE DEATHS PER YEAR | AVERAGE DEATHS PER 1,000 ADP |
|---|---|---|---|---|
| San Diego | 5,162 | 185 | 12.33 | 2.39 |
| Fresno | 2,752 | 86 | 5.73 | 2.08 |
| Ventura | 1,537 | 47 | 3.13 | 2.04 |
| Kern | 2,266 | 69 | 4.60 | 2.03 |
| Alameda | 3,325 | 99 | 6.60 | 1.98 |
| Contra Costa | 1,446 | 43 | 2.87 | 1.98 |
| Riverside | 3,668 | 104 | 6.93 | 1.89 |
| San Francisco | 1,492 | 39 | 2.60 | 1.74 |
| San Joaquin | 1,367 | 34 | 2.27 | 1.66 |
| Los Angeles | 17,044 | 421 | 28.07 | 1.65 |
| San Bernardino | 5,490 | 124 | 8.27 | 1.51 |
| Santa Clara | 3,732 | 84 | 5.60 | 1.50 |
| Orange | 5,877 | 111 | 7.40 | 1.26 |
| Tulare | 1,510 | 26 | 1.73 | 1.15 |
| Sacramento | 4,008 | 62 | 4.13 | 1.03 |

Source: California Department of Justice in-custody death data and BSCC data.

We present information on additional counties in our interactive dashboards at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

| **California State Auditor Report 2021-109**
**February 2022**

Table A.2 presents the rate of deaths per the number of individuals booked in each county sheriff's jail system from 2006 through 2020. The number of bookings is the total number of individuals who were processed through the jail system.

**Table A.2**
**In-Custody Deaths and Bookings From 2006 Through 2020**

| COUNTY SHERIFF'S DEPARTMENT | TOTAL BOOKED | AVERAGE BOOKED PER YEAR | TOTAL DEATHS | TOTAL DEATHS PER 100,000 BOOKED |
|---|---|---|---|---|
| Los Angeles | 1,970,654 | 131,377 | 421 | 21.36 |
| Fresno | 551,624 | 36,775 | 86 | 15.59 |
| **San Diego** | **1,284,462** | **85,631** | **185** | **14.40** |
| Kern | 520,074 | 34,672 | 69 | 13.27 |
| Riverside | 810,376 | 54,025 | 104 | 12.83 |
| Alameda | 777,627 | 51,842 | 99 | 12.73 |
| Orange | 888,951 | 59,263 | 111 | 12.49 |
| Santa Clara | 682,010 | 45,467 | 84 | 12.32 |
| San Bernardino | 1,027,195 | 68,480 | 124 | 12.07 |
| Contra Costa | 370,299 | 24,687 | 43 | 11.61 |
| Ventura | 424,978 | 28,332 | 47 | 11.06 |
| San Francisco | 353,521 | 23,568 | 39 | 11.03 |
| San Joaquin | 392,895 | 26,193 | 34 | 8.65 |
| Sacramento | 733,275 | 48,885 | 62 | 8.46 |
| Tulare | 333,941 | 22,263 | 26 | 7.79 |

Source: California Department of Justice in-custody death data, BSCC data, and San Diego Sheriff's Department bookings data.

**SD 744756**
**Ex. H-633**

# Appendix B

**Scope and Methodology**

The Audit Committee directed the California State Auditor to conduct an audit of the San Diego Sheriff's Department to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps taken by the Sheriff's Department to address these deaths. The table below lists the objectives that the Audit Committee approved and the methods we used to address them.

**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | Reviewed and evaluated the laws, rules, and regulations related to detention facilities and significant to the audit objectives. |
| 2 | Evaluate the Sheriff's Department's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to incarcerated individuals. To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance. As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to incarcerated individuals. | • Interviewed staff and reviewed the Sheriff's Department's documented policies and procedures regarding personnel training, facility maintenance and safety, and the provision of health care to incarcerated individuals. Determined whether those policies and procedures meet the requirements established by BSCC and state law, including reviewing BSCC's biennial inspections. <br><br>• Reviewed the Sheriff's Department's policies and procedures, in combination with reviewing in-custody deaths under Objective 3, to determine whether its policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to incarcerated individuals. <br><br>• Reviewed BSCC's board composition and whether BSCC's standards are strong enough to ensure the safety of incarcerated individuals. <br><br>• Interviewed staff of BSCC regarding its review process to update and revise standards. |
| 3 | To the extent possible, for a selection of in-custody deaths from the past 15 years—including suicides, murders, and in-custody or in-transit deaths—determine the following: <br> a. The circumstances, such as the cause for each death. <br> b. Whether correctional facility staff followed applicable policies and procedures related to in-custody safety. <br> c. Whether the Sheriff's Department reviewed the circumstances of these deaths and took corrective action to improve in-custody safety. | • Using a complete list of in-custody deaths in the Sheriff's Department's jails, selected 30 deaths for review from 2006 through 2020 taking into consideration factors such as gender, race, age, location of death, type of death, and date of death. The Sheriff's Department did not report any in-transit deaths related to its jails. In accordance with audit standards, we did not select cases involved in active litigation in order to avoid interfering with ongoing legal proceedings. <br><br>• For the selection of 30 in-custody deaths, reviewed jail files, medical records, and other relevant reports to determine the circumstances around each death—including the cause of each death, such as suicide, homicide, or natural death. <br><br>• For the selection of 30 in-custody deaths, reviewed case file documentation to determine whether detention staff followed applicable policies and procedures related to the safety of and the provision of health care to incarcerated individuals. <br><br>• For the selection of 30 in-custody deaths, reviewed investigative reports from various entities and units to identify whether the Sheriff's Department reviewed the circumstances of each death. Evaluated whether it took appropriate corrective action to improve in-custody safety in response to the death. |

*continued on next page . . .*

**SD 744757**

**Ex. H-634**

| AUDIT OBJECTIVE | METHOD |
|---|---|
| 4   To the extent possible, evaluate available demographic information—including the race and age of the incarcerated individuals—and identify any relevant trends for all in-custody deaths from the past 15 years. Compare the in-custody death rate in San Diego County to the rates in other comparable California counties. | • Identified three comparable county sheriff's departments—the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department—considering relative size, geographical location, and other factors.<br><br>• Interviewed staff at each county's sheriff's department to understand its policies and practices as well as to identify challenges with ensuring the health and safety of incarcerated individuals.<br><br>• For comparative analysis to identify best practices, obtained and reviewed policies and procedures related to in-custody health care and detention facilities from the three comparable sheriff's departments, along with the policies at CDCR.<br><br>• For all deaths of incarcerated individuals from 2006 through 2020 at the San Diego Sheriff's Department and the three comparable county sheriff's departments, compared the number and types of deaths, and interviewed staff knowledgeable about the data.<br><br>• Obtained data from the California Department of Justice and BSCC, including race of incarcerated individuals, age of incarcerated individuals, and the frequency and cause of death. We used these data to create interactive dashboards that present this information. We present those interactive dashboards at https://www.auditor.ca.gov/reports/2021-109/supplemental.html. We did not identify any notable trends in the deaths of incarcerated individuals by age but include information about their ages in an interactive dashboard. |
| 5   Review allegations from the past 15 years that led to wrongful death suits and determine the number of settlements, the average settlement amount, and, to the extent possible, how settlement awards compare to similar settlements from other comparable counties in California. | • Obtained and reviewed documentation from San Diego County and each of the three comparable counties to identify all settlements related to deaths in detention facilities from 2006 through 2020. For all settlements, we determined the average settlement award and the type and circumstances of the death.<br><br>• Interviewed staff at the comparable counties regarding the total number of settlements in response to in-custody deaths.<br><br>• Compared the settlements in San Diego County to the three comparable counties. |
| 6   To the extent possible, determine which policies specified in settlement agreements or in grand jury recommendations have been implemented and which have not. As part of this determination, also identify whether the Sheriff's Department has suspended, revoked, or amended any such policies in a manner inconsistent with past settlement agreements or grand jury recommendations. | • Identified recommendations regarding policy changes from various entities, including the San Diego County Grand Jury, from 2006 through 2020. For key recommendations related to in-custody health and safety, we determined whether the Sheriff's Department implemented the recommendations. If it did not, we documented and evaluated its rationale.<br><br>• Reviewed current policies and determined that the Sheriff's Department has not suspended, revoked, or amended its policies in a manner inconsistent with past recommendations we reviewed.<br><br>• Determined that the county's settlement agreements generally did not include recommendations. |
| 7   Evaluate the extent to which CLERB has provided recommendations to the Sheriff's Department regarding in-custody safety and followed up to determine whether the Sheriff's Department has implemented those recommendations. | • Reviewed recommendations from CLERB to the Sheriff's Department from 2006 through 2020 and identified key recommendations related to the safety of incarcerated individuals.<br><br>• Reviewed policies and other relevant documents to determine whether the Sheriff's Department implemented key recommendations from CLERB. |

**SD 744758**

**Ex. H-635**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 8 | Evaluate CLERB's review of in-custody death cases in 2017 and assess whether CLERB had sufficient staff and resources to perform its oversight role appropriately. | • Obtained a complete list of death cases CLERB investigated from 2006 through 2020 and compared it to the lists of deaths from the Sheriff's Department and Medical Examiner's Office. Although we found that CLERB did not investigate 57 deaths during this period, as we discuss beginning on page 46, the list of investigations it did perform was sufficient for our purposes. Using the list, we selected six cases from 2016 through 2020 for review based on factors such as the year the investigation was performed, type of death, and result of investigation.

• For the six selected cases, reviewed the full investigative file to determine whether CLERB's staff followed its rules and regulations and other relevant standards when investigating the cases.

• CLERB's rules and regulations require its investigations to be ethical, fair, and impartial. CLERB follows the county's Conflict of Interest Code and Incompatible Activities Rules, which require its members and certain staff members to disclose certain income, employment, economic interests, and gifts. CLERB also has its staff members review and sign the county's code of ethics. We did not identify concerns with the ethics, fairness or impartiality of the CLERB investigations we reviewed.

• Interviewed staff and reviewed documentation to determine why CLERB summarily dismissed 22 death cases in 2017 and whether staff appropriately prioritized death cases.

• We did not evaluate CLERB's investigators' caseloads and staffing because we found issues with the thoroughness and prioritization of its investigations.

• Reviewed the county board's oversight of CLERB and whether it took action to increase oversight in response to increases in deaths of incarcerated individuals. |
| 9 | Review and assess any other issues that are significant to the audit. | None identified. |

Source: Audit workpapers.

### Assessment of Data Reliability

The U.S. Government Accountability Office, whose standards we are statutorily obligated to follow, requires us to assess the sufficiency and appropriateness of computer-processed information we use to support our findings, conclusions, and recommendations. In performing this audit, we relied on electronic data files that we obtained from the California Department of Justice related to in-custody deaths in jails of the San Diego Sheriff's Department, the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department from 2006 through 2020. To evaluate the data, we reviewed existing information about the data, interviewed staff knowledgeable about the data, and performed testing of the data. Specifically, we compared data from the counties and the California Department of Justice to data we obtained from the Medical Examiner's Office and coroner's office in each respective county.

Although the state law requiring reporting of in-custody deaths does not require sheriff's departments to report deaths after an individual is released from jail, as we discuss on page 17, we found

SD 744759

Ex. H-636

that the data supporting the number of in-custody deaths from the California Department of Justice related to the San Diego Sheriff's Department and the Orange Sheriff's Department to be sufficiently reliable for our audit purposes. We found some inaccuracies in the categorization of manner of death, but the inaccuracies do not change our conclusion, and therefore the data are sufficiently reliable for our audit purposes. We performed limited testing of the Alameda Sheriff's Office's and the Riverside Sheriff's Department's data and found them to be of undetermined reliability because of how the counties record and track the information. Although this determination may affect the precision of the numbers we present, there is sufficient evidence in total to support our findings, conclusions, and recommendations.

In addition, we obtained data from BSCC related to the ADPs and annual bookings of the San Diego Sheriff's Department, the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department. We used these data to identify and compare the number of in-custody deaths at each department, taking into consideration the number of individuals incarcerated in its jail facilities. We interviewed staff knowledgeable about the data and performed general testing of the data. We found the data to be of undetermined reliability because the data are self-reported from each county to BSCC. However, we found that the San Diego Sheriff's Department overreported to BSCC the bookings data for 2006 through 2010. Therefore, we obtained additional data from the Sheriff's Department to more accurately reflect bookings in our analyses. Although this determination may affect the precision of the numbers we present, there is sufficient evidence in total to support our findings, conclusions, and recommendations.

Lastly, we obtained statewide data from the California Department of Justice and BSCC related to in-custody deaths and ADP for presentation on our interactive dashboards. We found the data to be of undetermined reliability because the data are self-reported by each county. The dashboard is for informative purposes only; we do not present findings, conclusions, or recommendations on it.

 BOARD OF STATE AND COMMUNITY CORRECTIONS 

January 14, 2022

Honorable Michael S. Tilden[*]
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, California 95814

**SUBJECT: RESPONSE – SAN DIEGO COUNTY SHERIFF'S DEPARTMENT AUDIT REPORT 2021-109**

Dear Mr. Tilden,

The Board of State and Community Corrections is required to establish minimum standards for local detention facilities.  (Pen. Code, § 6030.)  Providing for safe and constitutional facilities is central to the Board's regulations, which are continuously examined and revised on a biennial basis.  The Audit of the San Diego County Sheriff's Department (Report 2021-109) focuses on deaths in custody, which is a topic of utmost concern that merits serious attention.  Having not been given an opportunity to review the findings in San Diego as part of this response, we are unable to comment on whether the deaths in custody in San Diego County were caused by the county adhering to BSCC regulations that were deficient or whether other operational or personnel issues may have contributed to the audit findings.  The Board will undertake a review once the unredacted findings are available to determine to what extent the Board's existing regulations merit revision.  However, we disagree with the Auditor's conclusions that the Board's existing training standards are inadequate and that the BSCC's regulations for the operation of adult local detention facilities that are proposed to be revised are insufficient for maintaining the safety of people who are incarcerated.

**Mental Health Screenings**  ①

The Auditor states the Board's standards are insufficient to maintaining the safety incarcerated individuals, specifically citing that the regulations "do not explicitly require that mental health professionals perform mental health screenings."  We assume the Auditor is referring to "intake screenings," where Section 1207 of Title 15 of the California Code of Regulations provides:

> With the exception of inmates transferred directly within a custody system with documented receiving screening, a screening shall be completed on all inmates at the time of intake. This screening shall be completed in accordance with written procedures and shall include but not be limited to medical and mental

_____

[*]  California State Auditor's comments begin on page 71.

**SD 744761**
**Ex. H-638**

Tilden, Michael
Page 2

health problems, developmental disabilities, tuberculosis and other communicable diseases. The screening shall be performed by licensed health personnel or trained facility staff, with documentation of staff training regarding site specific forms with appropriate disposition based on responses to questions and observations made at the time of screening. The training depends on the role staff are expected to play in the receiving screening process.

This regulation is aligned with National Commission on Correctional Health Care (NCCHC) J-E-02 which allows for "receiving screening to be conducted by health-trained correctional staff members when health staff are not on duty." NCCHC standards are nationally recognized as best practice.

In addition, Sections 1206 and 1209 of Title 15 of the California Code of Regulations detail requirements of additional mental health screenings that may occur after the initial screening at intake. These requirements do require licensed medical and mental health care professionals to conduct mental health screening and require facilities to provide care for persons with mental health needs.

The Auditor appears to recognize that it may be impractical or impossible for all local detention facilities to have mental health professionals on staff 24/7 for intake, so the report recommends that facilities with average daily populations of 1,000 be required to have these requirements because counties with smaller incarcerated populations have "less risk." While larger counties may be able to provide a higher level of service than other counties, establishing lesser standards for smaller counties is problematic and would create additional inequities within county criminal justice systems.

② **Safety Checks**

The Auditor argues that the current safety check regulation (and proposed revisions) are insufficient to protect the safety and welfare of inmates. The Auditor points to the fact that some counties' policies are more detailed than the Board's regulations. In addition, the Auditor notes the California Department of Corrections and Rehabilitation (CDCR) requires its staff to count "living, breathing" individuals. The fact that some counties may elect to explicitly detail what goes into a safety check in its policies does not mean the Board's minimum standards do not provide for adequate safety. The Board's regulations are designed to give counties flexibility to address their needs while adhering to constitutional standards. In addition, it is important to note that the requirements for counting individuals in the CDCR Department of Operations Manual (§§ 52020.5.5 and 52020.5) are not "safety checks." They are merely instructions on staff to ensure a proper population count.

Section 1027.5 of Title 15 of the California Code of Regulations requires a written plan at each facility that includes documentation of safety checks. Title 15 section 1006,

Tilden, Michael
Page 3

Definitions, provides detail for how safety checks must be conducted and defines both direct visual observation and safety checks:

"Direct visual observation" means direct personal view of the inmate in the context of his/her surroundings without the aid of audio/video equipment. Audio/video monitoring may supplement but not substitute for direct visual observation.

"Safety checks" means direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of inmates.

As part of the most recent regulation revisions adopted at the most recent BSCC board meeting, the Board revised section 1027.5 to require enhancements to safety checks, which, once approved by the Office of Administrative Law, will read, as follows:

§ 1027.5 Safety Checks.
The facility administrator shall develop and implement policy and procedures for conducting safety checks that include but are not limited to the following:
Safety checks will determine the safety and well-being of individuals and shall be conducted at least hourly through direct visual observation of all people held and housed in the facility.
(a) There shall be no more than a 60- minute lapse between safety checks.
(b) Safety checks for people in sobering cells, safety cells, and restraints shall occur more frequently as outlined in the relevant regulations.
(c) Safety checks shall occur at random or varied intervals.
(d) There shall be a written plan that includes the documentation of all safety checks. Documentation shall include:
(1) the actual time at which each individual safety check occurred;
(2) the location where each individual safety check occurred, such as a cell, module, or dormitory number; and,
(3) Initials or employee identification number of staff who completed the safety check(s).
(e) A documented process by which safety checks are reviewed at regular defined intervals by a supervisor or facility manager, including methods of mitigating patterns of inconsistent documentation, or untimely completion of, safety checks.

In this revision, the regulation will explicitly require that safety checks "determine the safety and well-being of individuals." The BSCC revised regulation exceeds many other states' safety check regulations, and is aligned with best practices for safety checks.

Tilden, Michael
Page 4

In short, safety checks allow for potential interventions when people are in distress, but it is also important to balance the needs of people who are incarcerated from overly intrusive and unnecessary checks.  Counties have been subject to litigation over allegations of failing to conduct adequate safety checks and also for unnecessarily interrupting sleep as part of rigorous safety check programs.  The Board's regulation and proposed revision strikes the appropriate balance in providing for the safety of people who are incarcerated and meeting county operational needs.

③ **Training Standards**

The Auditor states that the BSCC's training standards are insufficient for maintaining the safety of incarcerated individuals.  The Auditor solely relies on the total increase in the number of deaths in county jails from 2006 to 2020 to conclude training is insufficient.  Based on the information provided in the redacted report, the BSCC is unable to determine whether a lack of specific training caused any of the deaths examined in San Diego and to what extent additional training requirements would have been beneficial or prevented these situations.  Instead, the report states that "weaknesses in statewide corrections standards likely contributed to the problems we identified with (redacted) policies" without any specific detail.   Without a clear nexus between a deficiency in the training standards and a bad outcome such as a preventable death, it is incorrect to assume that higher standards will better ensure the health and safety of incarcerated individuals.

The Auditor states that the Board's continuing education requirements across job classifications (adult correctional officer, juvenile correctional officer, and probation officer) are inconsistent and recommends that the adult correctional officers should receive 40 hours of annual training on par with probation officers.  In addition, the Auditor recommends that agencies with average daily populations of 1,000 or more should require 4 hours of mental health training annually.

The characterization of the continuing education requirements as inconsistent is incorrect.  BSCC sets standards for adult corrections officers, juvenile corrections officers, and probations officers and their managers and supervisors.  Those jobs are not interchangeable nor are their training requirements.  The "inconsistencies" noted in the report are deliberate decisions based on the differences in positions.  Requiring the same number of hours across all classifications is arbitrary and not based on job-specific requirements.  Furthermore, the number of required hours for the adult corrections officer is on trend nationally and exceeds the number of continuing education hours required by the California Commission on Peace Officer Standards and Training for other peace officer positions.

The report recommends that continuing education include a minimum of 40 hours training annually and at least four hours of mental health training for adult corrections officers for agencies with an ADP of 1,000.  First, it should be noted that the BSCC standards already require 21 hours of Behavioral Health training for every officer upon

**SD 744764**

**Ex. H-641**

Tilden, Michael
Page 5

hire.  It includes training in suicide prevention, stigma and bias, trauma, emotional survival, interventions and resources, and recognizing signs and symptoms of mental illness and trauma.

Second, we question the premise that more hours of annual training, regardless of the topic or need, will always yield better results.  Continuing education hours are deliberately left to the discretion of the agency so that they can identify the specific training needs of an employee, including performance management, and to support organizational priorities or training gaps. Training is not a static need and it should remain flexible to ensure critical gaps are addressed.  Training is a critical tool that can improve employee performance and organizational success.  However, it is only effective when used appropriately.  Problems must be assessed to determine if training can be an effective part of the solution.  Culture, ineffective policies, and employees deliberately acting outside of policy are some examples of when training is not an appropriate solution.   The portions of the audit we were able to review do not provide an assessment that shows that what was at issue in San Diego was a training failure that will improve by mandating four hours of mental health training each year for all adult corrections officers.

Finally, as with the recommendation to have lesser screening standards for smaller counties, we also disagree with setting lesser training standards for correctional officers in smaller counties.

To be sure, the BSCC continually evaluates the need for entry-level training and annual training.  We will take the recommendation under advisement when evaluating the next revision of our training standards to determine whether adding annual mental health training would be beneficial.

In closing, the BSCC appreciates the Auditor's review of its standards and recommendations.  At the time of responding to the draft audit, the Board itself has not had the opportunity to meet and discuss.  We will discuss the final report with the Board upon release and whether amendments to the BSCC regulations are warranted.

Sincerely,

KATHLEEN T. HOWARD
Executive Director

SD 744765
Ex. H-642

70 | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744766
Ex. H-643

# Comments

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE BOARD OF STATE AND COMMUNITY CORRECTIONS

To provide clarity and perspective, we are commenting on the BSCC's response to our audit. The numbers below correspond to the numbers we have placed in the margin of its response. Rather than comment on all of the individual areas of its response that we believe are deficient or misleading, we have summarized our comments according to the respective sections in its response.

We stand by our recommendation that the Legislature should amend state law to require sheriff's departments with larger jail populations to have mental health professionals perform mental health evaluations at intake. We based this recommendation on the problems identified in our review of the San Diego Sheriff's Department and the variation of policies among the three comparable counties. As we state on page 20, in some of the cases we reviewed, the Sheriff's Department did not promptly and properly identify individuals' mental health needs because mental health professionals generally do not participate in its intake health screenings. In contrast, we noted that one county has adopted more robust intake screening practices, as we state on page 20. For example, Riverside Sheriff's Department policy requires that a mental health clinician evaluate every individual before being housed, which could help to more effectively identify mental health needs early.

Further, BSCC infers our recommendation is to establish lesser standards of mental health staffing for smaller counties. On the contrary, we did not propose any changes to these standards for smaller counties, but instead recommend that BSCC should raise the standard for the larger counties, as we describe on page 32.

BSCC suggests that counties electing to have more robust safety checks policies does not mean that its minimum standards are inadequate. We disagree. As we state on page 30, BSCC's standards do not describe the actions that constitute an adequate safety check. Instead, the standards simply state that safety checks must be conducted at least hourly through direct visual observation of all inmates and that observation through a video camera alone is not sufficient. Consequently, we found the four counties we reviewed based their policies on different interpretations of this standard. Further, as we state on page 25, based on our review of video of San Diego Sheriff's Department, we observed multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked

①

②

**SD 744767**

**Ex. H-644**

through the housing module. Staff later discovered individuals unresponsive in their cells, some with signs of having died several hours earlier.

Further, as we state on page 25, we concluded that sworn staff conducted safety checks inadequately in part because of weaknesses in the San Diego Sheriff's Department's policy. In particular, its safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest. We recognize that acquiring proof of life in some situations is difficult and that waking up incarcerated individuals every hour could be detrimental to their well-being. However, a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate.

Moreover, BSCC asserts that our report references a CDCR policy that merely serves as instructions for a proper population count. However, CDCR's policy is a requirement for an hourly check that is equivalent to what BSCC refers to as a safety check. We revised the report text on page 30 to be more explicit that the CDCR policy is for an hourly check of incarcerated individuals.

Finally, BSCC states that its proposed regulations exceed the standards in other states and are aligned with best practices. However, it falls short of the State's best practice. For example, as we state on page 30, CDCR requires its staff during its hourly checks to count a living, breathing individual whom they see in person. BSCC's proposed regulations are insufficient because, as we state on page 30, it fails to specify that a safety check must include verifying that an individual is alive, which is essential to ensuring the safety of incarcerated individuals across the State.

③  Our recommendation to increase the required number of continuing education hours for local correctional officers is based on concerns observed in our review of how San Diego Sheriff's Department sworn staff responded to medical, mental health, and safety needs. Further, as we state on page 29, given the increase in the annual number of in-custody deaths across the State from 130 in 2006 to 156 in 2020, improving statewide standards related to health and safety and training requirements is essential to ensuring the health and safety of incarcerated individuals.

BSCC's statement that its standards require 21 hours of behavioral health training is misleading because this training pertains only to initial hires. The point of continuing education is to provide local correctional officers with ongoing training to expand their

foundation of knowledge to promote health and safety within the jails and to stay up-to-date on new information that would help in that effort.

We stand by our conclusion that the continuing education requirements are inconsistent. As we state on page 31, BSCC's required training hours for sworn staff working in local detention facilities do not align with their standards for similar positions. Requiring fewer hours for adult corrections personnel does not make sense when thousands of individuals are incarcerated in these facilities and the number of individuals who have died has increased over the past 15 years. Further, BSCC does not require that any of the annual training cover topics pertaining to mental health, even though best practices suggest staff should receive at least four hours of mental health training annually. Increasing the number of training hours to align with similar professions, including mandating mental health training hours, could allow sheriff's departments to better protect and keep incarcerated individuals safe.

Similar to our recommendation for having mental health professionals perform mental health assessments at intake, BSCC should increase the required continuing education hours for counties that house the majority of individuals in the county jail systems. Moreover, contrary to BSCC's assertion, we did not propose any changes to these standards for smaller counties but instead recommend that it should raise the standard for the larger counties, as we describe on page 32.

74 | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744770
Ex. H-647



**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III

# *County of San Diego*
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD
555 W BEECH STREET, SUITE 220, SAN DIEGO, CA 92101-2938
TELEPHONE: (619) 238-6776      FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

January 14, 2022

Michael S. Tilden, CPA*
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

RE:    Response to California State Auditor's Draft Report 2021-109: San Diego County Sheriff's Department

Dear Mr. Tilden:

The Citizens' Law Enforcement Review Board (CLERB) welcomes the opportunity and has authorized me to respond to the California State Auditor's (CSA) draft report, titled, "San Diego County Sheriff's Department," in which analyses and recommendations about CLERB were documented.

CLERB's responses to your specific recommendations, of which the CSA proposes completion by May 2022, are set forth below:

- **Recommendation One: Discuss and modify its current agreement with the Sheriff's Department and the labor organization to allow CLERB's investigators to conduct independent interviews of Sheriff's Department sworn staff.**

  Agree. In the last quarter of 2021, the current CLERB Executive Officer (EO), the Deputy Sheriff's Association (DSA) President, DSA Counsel, and CLERB Outside Counsel met to discuss the agreement for the purpose of conducting in-person interviews with Sheriff's Department sworn staff. Additional discussions are forthcoming.

- **Recommendation Two: Develop a comprehensive training manual for its investigators that outlines standard procedures for investigations. The manual should include a specific section dedicated to investigations of in-custody deaths, including guidance for evaluating the circumstances leading up to an in-custody death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment.**

  Agree. While it is true that there does not exist a physical stand-alone comprehensive training manual, new CLERB Special Investigators are currently provided with copies of CLERB's internal documented policies and procedures (P&P), database user guide, investigative report templates, and a comprehensive resource manual containing the following materials:
  - County structure
  - CLERB historical perspective
  - County Charter, Section 606
  - County Administrative Code, Section 340
  - CLERB Rules and Regulations
  - Civil Service Commission Rule XV
  - Case Law Including and impacting CLERB

  ①

*"SERVING THE COMMUNITY AND THE JUSTICE SYSTEM"*

---
\*    California State Auditor's comments begin on page 79.

**SD 744771**
**Ex. H-648**

- o    Public Safety Officer Procedural Bill of Rights (POBOR)
- o    Statutes Pertaining to Peace Officer Records
- o    San Diego County Grand Jury Reports Pertaining to CLERB
- o    Ralph M. Brown Act
- o    San Diego County Operational Plan Pertaining to CLERB

The P&P, user guide, report templates, and topics contained within the resource manual are thoroughly discussed and reviewed with the trainee during his/her training program. These materials will be incorporated into the referenced stand-alone training manual, which will also include evaluations of a trainee's performance and documentation as to his/her progress, or lack thereof.

① The comprehensive training manual will also include a specific section dedicated to investigations of in-custody deaths. Despite the current absence of the stand-alone training manual, trainees are specifically instructed, during their training programs, to evaluate the circumstances leading up to an in-custody death, and to include a review of the decedent's mental health history and the appropriateness of the decedent's housing assignment. In addition to these critical topics, trainees are also instructed to evaluate the timeliness and thoroughness of welfare checks conducted on the decedent by deputies and assess whether deputies appropriately determined that a life-threatening emergency existed and responded accordingly.

- **Recommendation Three: Create policies and procedures to require its investigators to finish casework on in-custody death investigations within three months of receiving the homicide investigation file. These policies and procedures should also require investigators to attempt to independently verify any information they receive from the Sheriff's Department; to thoroughly review deputy statements and reports from the homicide investigation file; and to request interviews with relevant detentions staff and other witnesses in all instances where they identify discrepancies or missing information.**

② Agree. The current CLERB EO directed that the completion of in-custody death investigations within three months of receiving the homicide investigation file would take effect when CLERB filled its third and final CLERB Special Investigator vacancy. As that vacancy was filled on January 10, 2022, this mandate will now be incorporated into existing CLERB Policy #300.5, entitled, "Death Investigations." The independent verification of information received from the Sheriff's Department and the already existing practices of thoroughly reviewing deputy statements and reports from the homicide file and requesting interviews from witnesses, when contact information is known and time constraints do not exist, will be codified into P&P.

- **Recommendation Four: CLERB should revise its rules and regulations to include prioritization criteria for investigating in-custody deaths above all other investigations.**

③ Agree. The Policy Statement in CLERB Policy #300.5, entitled, "Death Investigations," issued by the current EO on August 27, 2021, indicates that it is the policy of CLERB "that death cases will take priority over any other CLERB case." During the current EO's previous tenure as EO from June 2017 to September 2018, he implemented this practice, and all death cases were made the highest priority. During his absence from September 2018 to November 2020, for unknown reasons, death cases were not handled as the highest priority. To ensure that the investigation of death cases remains the highest priority after any future executive management changes, a five-tiered case categorization system should be documented in the Rules and Regulations, with "Category I" being the highest priority and "Category V" being the lowest priority. Death investigations should be classified as "Category I."

- **Recommendation Five: CLERB should revise its rules and regulations to include clarification that its investigations of in-custody deaths includes those classified as natural deaths.**

Agree. During the current EO's previous tenure as EO from June 2017 to September 2018, he implemented the practice of invoking CLERB's jurisdiction on every in-custody-related death, to include

SD 744772
Ex. H-649

those that the Medical Examiner's Office determined to be due to natural causes. To ensure that the investigation of all in-custody-related deaths continue after any future executive management changes, CLERB's Rules and Regulations should not only be revised to clarify that in-custody natural deaths are within CLERB's jurisdiction, but that all deaths occurring in the custody of the Sheriff's Department or related to instances or occurrences within the Sheriff's Department detention facilities are within CLERB's jurisdiction. As these proposed Rules and Regulations changes may first require the amendment of the County Charter and/or the County Administrative Code, the CLERB EO will need to work with CLERB's legal counsel to pursue implementation of this recommendation.

- **Recommendation Six: CLERB should perform an analysis of overall trends related to these deaths, including demographic information, and determine whether the trends suggest deficiencies in the Sheriff's Department's policies and procedures. It should also identify policy recommendations for improving the safety of individuals in the Sheriff's Department's custody. CLERB should include these trends and analysis in its annual reports starting with its 2021 report.**

  Agree. The current EO has prioritized in-custody death investigations and the analysis of overall trends related to the deaths, to include demographic information. Upon his return to CLERB in late 2019, he authored CLERB's 2020 Annual Report and provided a detailed breakdown of the 18 death cases CLERB opened in 2019 and the 15 death cases CLERB opened in 2020 (this breakdown is documented on pages 10 and 11 of the Annual Report). In addition, he provided a list of all death cases opened by CLERB in 2019 and 2020 and closed by CLERB in 2019 and 2020. The list included the decedent's name, type of death, detention facility/patrol area, and cause of death (this list is documented on pages 28 thru 33 of the Annual Report). After the finalization of the 2020 Annual Report and its presentation to the Board of Supervisors, the current EO committed to expanding the reporting to include an analysis of overall trends related to deaths, including demographic information, in the 2021 Annual Report.

  CLERB has averaged 10 policy recommendations per calendar year over the past three years. The majority of the recommendations pertained to the Sheriff's Department's detention facilities. Finally, it should be noted that CLERB will, for the first time in its 30-plus year history, conduct detention facility inspections in 2022. The scope of the inspections will be specifically tailored to each detention facility based upon the complaints received from its inmates, great bodily injuries received from deputies' uses of force, and deaths occurring at or stemming from incarceration within it.

④

We look forward to updating the CSA on progress made within six months. Our commitment to continuing the proactivity started at the end of 2020 to improve upon the invaluable civilian oversight role we provide to the public, the Sheriff's Department, and the County is unwavering. The implementation of the CSA recommendations will assist with CLERB's provision of independent, timely, full, and thorough investigations into in-custody deaths which may, in turn, prevent future deaths.

Thank you for the opportunity to provide this response and for the professionalism and courtesy shown by your staff throughout this process.

Sincerely,

Paul R. Parker III
Executive Officer, CLERB

cc:    CLERB Members
       Shiri Hoffman and Aurelia Razo, Senior Deputies County Counsel
       James Sandler; Sandler, Lasry, Laube, Byer & Valdez LLP

*"SERVING THE COMMUNITY AND THE JUSTICE SYSTEM"*

**SD 744773**
**Ex. H-650**

78 | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744774
Ex. H-651

# Comments

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE CITIZENS' LAW ENFORCEMENT REVIEW BOARD

To provide clarity and perspective, we are commenting on CLERB's response to our audit. The numbers below correspond to the numbers we have placed in the margin of its response.

Although CLERB states that it provides various materials and training to its staff, we found some cases in which CLERB's investigators did not appear to consider all the circumstances leading up to the deaths, did not examine all the relevant Sheriff's Department policies, and did not follow up on discrepancies they discovered in the course of their investigations, as we discuss on page 49. Accordingly, our recommendation is for CLERB to develop a comprehensive training manual to ensure that its investigations are complete and thorough.

①

Contrary to its response, we found that CLERB did not always independently verify information from the Sheriff's Department. As we note in the example on page 49, when investigating an altercation between two cellmates resulted in the death of one of the individuals, we found the CLERB investigator did not appear to scrutinize or independently verify evidence that could have sufficiently determined whether the Sheriff's Department's actions violated policies or procedures. Further, we question CLERB's statement that it thoroughly verifies deputies' statements. As we state on page 43, CLERB did not independently interview staff from the Sheriff's Department in any of the six cases we reviewed.

②

As we state on page 48, although CLERB recently added policies and procedures establishing its prioritization of death cases over all other cases, it did not do so until August 2021. Moreover, because policies can easily be changed when leadership changes, it is important that CLERB include requirements in its rules and regulations for how it prioritizes cases.

③

CLERB's statement that it has averaged 10 policy recommendations per calendar year is primarily referring to the recommendations it makes based on individual cases. As we state on page 51, CLERB generally makes recommendations based on individual cases rather than on trends it identifies through analysis of its investigations. Making recommendations based on trends could help resolve more systemic concerns at the Sheriff's Department.

④

SD 744775

Ex. H-652

80 | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744776
Ex. H-653

*Rob Bonta*
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



1300 I STREET
SACRAMENTO, CA 95815-4524
Public: (916) 210-5000
Fax (916) 227-3079
Email: Joe.Dominic@doj.ca.gov

January 14, 2022

Michael S. Tilden, CPA
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

Re:     Draft Audit Report - California State Auditor Report 2021-109; San Diego County
         Sheriff's Department –Inmate Custody Death

Dear Mr. Tilden,

The Department of Justice (DOJ) appreciates the opportunity to review the above-mentioned draft audit report.

*The audit recommends that to ensure that all sheriff's departments accurately report deaths that occur from incidents or conditions in county jails, the Legislature should amend state law to require sheriff's departments to report to the attorney general individuals who are released from custody after being transported directly to a hospital or similar medical facility, and subsequently dies in the facility. It should also amend state law to require sheriff's departments to provide the attorney general with all facts concerning the death, such as the cause and manner."*

DOJ supports increased transparency of data reporting. As the audit notes, there is currently no statutory requirement in place to require sheriff's departments to report individuals released from custody after being transported directly to a medical facility who subsequently dies in the facility.  Express authority from the Legislature and funding is needed to implement this new data reporting recommendation.  Furthermore, should the Legislature implement the recommendation requiring sheriff's department disclose the cause and manner of the death, DOJ will work with the Legislature to ensure that any policies comply with all applicable confidentiality laws.

If you have any questions or concerns regarding this matter, you may contact me at the telephone number listed above.

Sincerely,

2022.01.14 16:46:08
-08'00'

Joe Dominic, Chief
California Justice Information Services Division

**SD 744777**
**Ex. H-654**

**82** | California State Auditor Report 2021-109
February 2022

January 14, 2022
California State Auditor Report 2021-109
Page 2


For    ROB BONTA
Attorney General


cc:  Venus D. Johnson, Chief Deputy Attorney General
Chris Prasad, CPA, Director, Office of Program Oversight and Accountability

**SD 744778**
**Ex. H-655**

 

## San Diego County Sheriff's Department

Post Office Box 939062    •    San Diego, California 92193-9062

### *William D. Gore, Sheriff*

January 14, 2022

Ms. Elaine M. Howle[*]
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, California 95814

State Auditor Howle:

Attached please find the response from the San Diego County Sheriff's Department in reference to your draft audit report on the San Diego County jails.

Sincerely,

William D. Gore, Sheriff

*Keeping the Peace Since 1850*

_____

* California State Auditor's comments begin on page 115.

**SD 744779**
**Ex. H-656**

**Preliminary Comment**

① **THE CALIFORNIA STATE AUDITOR DID NOT PROVIDE SUFFICIENT OPPORTUNITY FOR THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT TO REVIEW AND RESPOND TO THE AUDIT**

② ▮▮▮▮▮▮ the San Diego Sheriff's Department received a draft copy of the State Auditor's Report 2021-109 ▮▮▮▮▮▮ for the stated purpose of allowing the Department to review and respond to the audit. The Sheriff's Department was afforded less than five (5) days to review and respond to the draft report, as the audit was received late in the morning on Monday and the response was due back by 5:00 p.m. on Friday.

The 2018 revision of *Government Auditing Standards*, commonly referred to as generally accepted government auditing standards (GAGAS), is effective for performance audits beginning on or after July 1, 2019, such as the instant engagement. GAGAS section 9.50 provides that "Auditors should obtain and report the views of responsible officials of the audited entity concerning the findings, conclusions, and recommendations in the audit report, as well as any planned corrective actions." The highly redacted version of the draft report,
③ coupled with the short time afforded for review and response, and the lack of supporting documentation, makes it difficult for the Sheriff's Department, as the audited entity, to submit a meaningful, comprehensive response to the draft report.

Accordingly, the Sheriff's Department reserves the right to submit a more comprehensive
① response after the final report and any supporting documentation and information are published, as none of the supporting documentation and information was included with the draft report transmission.

SD 744780
Ex. H-657

## Introduction

The gravity and seriousness of in-custody deaths and the importance of identifying and improving deficiencies when they occur is not lost on the San Diego Sheriff's Department. We have been transparent in our response to the Joint Legislative Audit Committee's recommendation that the California State Auditor review in-custody deaths in San Diego County. During the audit, we cooperated fully and provided complete access to our records, facilities, and personnel.

The Sheriff's Department was pleased to see that the auditors' findings confirm that the ④ Department's policies and procedures align with the minimum standards established through state law and other applicable guidance. That said, while the Sheriff's Department appreciates the work and recommendations of the auditors, the Department maintains concerns regarding ⑤ the findings, as well as the conclusions and recommendations contained in the draft report and the way the audit was conducted.

### I.   THE AUDIT FAILED TO CONFORM WITH GENERALLY ACCEPTED GOVERNMENT    ⑥
### AUDITING STANDARDS

California Government Code section 8546.1(c) requires that the State Auditor "complete any audit in a timely manner and pursuant to the 'Government Auditing Standards' published by the Comptroller General of the United States." While the State Auditor recognizes that the instant engagement is undertaken pursuant to GAGAS, it failed to conform to the requisite standards.

#### A.  The auditors failed to comply with reporting standards for performance audits    ⑥

GAGAS section 9.03 provides, "[w]hen auditors comply with all applicable GAGAS requirements, they should use the following language, which represents an unmodified GAGAS compliance statement, in the audit report to indicate that they conducted the audit in accordance with GAGAS:

> We conducted this performance audit in accordance with generally accepted
> government auditing standards. Those standards require that we plan and perform the
> audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our
> findings and conclusions based on our audit objectives. We believe that the evidence
> obtained provides a reasonable basis for our findings and conclusions based on our
> audit objectives.

The section 9.03 compliance statement is notably absent from the draft report.

In the event auditors do not comply with all applicable GAGAS requirements, section 9.05 provides, "they should include a modified GAGAS compliance statement in the audit report. For performance audits, auditors should use a statement that includes either (1) the language in paragraph 9.03, modified to indicate the requirements that were not followed, or (2) language indicating that the auditors did not follow GAGAS."

Similarly, a section 9.05 alternate compliance statement is also absent from the draft report.

⑥    **B. The auditors have declined to adopt the GAGAS report quality elements of accurate, objective, complete, convincing, and timely in developing and writing the audit report**

Chapter 9 of the GAGAS addresses the reporting standards for performance audits such as the instant engagement. GAGAS section 9.17 provides that "[t]he auditor may use the report quality elements of accurate, objective, complete, convincing, clear, concise, and timely when developing and writing the audit report as the subject permits." For purposes of the instant engagement, the auditors failed to adopt the report quality elements of accurate, objective, complete, convincing and timely in developing and writing the audit report.

⑦            **a. Accuracy**

Section 9.17(a) regarding report quality element "Accurate" states, in pertinent part, "[a]n accurate report is supported by sufficient, appropriate evidence with key facts, figures, and findings being traceable to the audit evidence. Reports that are fact-based, with a clear statement of sources, methods, and assumptions so that report users can judge how much weight to give the evidence reported, assist in achieving accuracy."

Consistent with this standard, the Auditor makes recommendations to the legislature for policy revisions "to better align with best practices, as follows." There is no data or evidence cited to support the best practices recommendations. Data and evidence-based approaches to medical, mental health and correctional care policies are necessary to ensure the best health and safety outcomes for incarcerated individuals. In other sections, the auditor states "[r]eports and studies related to mental health indicate that…" There is no reference to which studies and reports are being relied upon for the assertions.

The audit states, "that deficiencies in the Sheriff's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies *likely contributed to these deaths*," the report is devoid of any evidence that the deaths were cause by a failure of the department's policies or practices.

**SD 744782**
**Ex. H-659**

While no death is acceptable, the Sheriff recognizes that some incarcerated individuals have pre-existing conditions, age or other maladies which lead to natural death. These deaths made up nearly half of all the deaths that occurred during the 15-year audit period. The report does not explain if a failure on the part of the department caused the death or if those individuals could have died in the community from the same pre-existing condition.

The Sheriff's Department has implemented extensive programs, training, and policies to prevent suicide in the jails. The jails disproportionately house individuals suffering from mental illness, and substance use disorder. The identification of individuals who wish to do themselves harm is one key to prevention and removing the ability to commit self-harm is the second. Individuals bent on harming themselves creates obstacles to identification and prevention. Similarly, substance use disorder is an enormous driver for behavior. It could be argued that in-custody individuals are even more driven to use substances to alleviate the strain and monotony of incarceration. The Sheriff's Department has created extensive layers and policies to interdict and prevent contraband from being smuggled into the jail system. We have instituted the use of naloxone to save lives when someone is successful in circumventing those interdiction efforts. While the Sheriff's Department can always do better, the audit does little to document or provide context for those efforts and the complexity of keeping individuals safe from themselves.

### b. Objectivity

⑥

Section 9.17(b) regarding report quality element "Objective" states, in pertinent part, "[o]bjective means that the presentation of the report is balanced in content and tone. A report's credibility is significantly enhanced when it presents evidence in an unbiased manner and in the proper context. This means presenting the audit results impartially and fairly. The tone of reports may encourage decision makers to act on the auditors' findings and recommendations. This balanced tone can be achieved when reports present sufficient, appropriate evidence to support conclusions **while refraining from using adjectives or adverbs that characterize evidence in a way that implies criticism or unsupported conclusions."** (Emphasis added).

Despite the fact that section 9.17(b) specifically counsels against using such adjectives and adverbs, the draft report is replete with such unsupported criticism (e.g. "*likely* contributed to the deaths," "*inadequate* response to deaths," "*might* have placed this individual," "lack of *effective* independent oversight," "*meaningful* changes," "*meaningful* corrective action," "few *substantive* steps," "have not consistently led to *significant* corrective action," "failure to *adequately* prevent the deaths," "*could* help," and "*could* be useful"). Use of such terms, in contravention of the GAGAS guidance, calls into question and undercuts the objectivity of the engagement and the resulting instant report.

Section 9.17(b) goes on to provide, "[a]udit reports are more objective when they demonstrate that the work has been performed by professional, unbiased, independent, and **knowledgeable** personnel." (Emphasis added). As discussed more fully below, the auditors lack the requisite knowledge, skills and abilities necessary to competently conduct the instant engagement.

⑥

### c.  Completeness

Section 9.17(c) regarding the report quality element "Complete" states, in pertinent part, "complete means that the report contains sufficient, appropriate evidence needed to satisfy the audit objectives and promote an understanding of the matters reported. **It also means the report states evidence** and findings **without omission of significant relevant information** related to the audit objectives. Providing report users with an understanding means providing perspective on the extent and significance of reported findings, such as the frequency of occurrence relative to the number of cases or transactions tested and the relationship of the findings to the entity's operations." (Emphasis added).

⑧

The auditors' summary of the event outlined in Case Example 4 illustrates the omission of significant relevant information in an effort to paint a picture that deputies stood idly by while CPR was medically indicated for the incarcerated individual.  Based on our review of Case Example 4, we believe the auditors are referring to Sheriff's case number

②



⑧



The auditors' description of the event depicted in the chart above misleads the reader, is an example of the lack of completeness and objectivity that is present in the draft report and fails to meet the report quality elements outlined in GAGAS sections 9.17(b) and 9.17(c).

### d. Convincing ⑥

Section 9.17(d) regarding report quality element "Convincing" states, in pertinent part, "convincing means that the audit results are responsive to the audit objectives, that the findings are presented persuasively, and that the conclusions and recommendations flow logically from the facts presented. **The validity of the findings, the reasonableness of the conclusions, and the benefit of implementing the recommendations are more convincing when supported by sufficient, appropriate evidence.**"

While the draft report speaks to best practices, the draft contains no such policies, best practices, or sample language, nor the jurisdiction(s) where such best practices were or are being implemented. As discussed in Section C. below, while good intentioned, best practices suggested by auditors without the requisite knowledge, skills, and abilities, may violate the constitutional rights of incarcerated individuals, cause harm to the mental health of incarcerated individuals and ultimately result in increased liability to the County. By not including copies of the best practices referenced throughout the draft report, it is difficult for the Sheriff's Department to ascertain whether the suggested best practices comport with state law, Title 15 regulations and the constitutional rights guaranteed to incarcerated individuals.

The draft report does contain one table (Table 2) with excerpts of safety check policies, however, while excerpts from the BSCC policy and the Sheriff's Department policy are unredacted, the policies and names of the three other entities are redacted in their entirety. ③

②



③

② **i. The Auditor Improperly Redacted Public Documents and Refused to Provide the Documents to the Sheriff's Department Necessary for the Department to Provide a Meaningful Response**



For purposes of an engagement under GAGAS, the terms "auditee" and "audited entity" are interchangeable. GAGAS section 1.27(e) defines an "audited entity" as "[t]he entity that is subject to a GAGAS engagement, whether that engagement is a financial audit, attestation engagement, review of financial statements, or performance audit."

The Joint Legislative Audit Committee (JLAC) charged the auditor with conducting an audit of the San Diego Sheriff's Department and the County of San Diego Citizens Law Enforcement Review Board (CLERB). The auditor confirmed the scope of its engagement in the document entitled 2021-109 Audit Scope and Objectives, identifying the audited entities as the San Diego County Sheriff's Department and the CLERB. No other agencies were identified as audited entities (or auditees).

⑨ Based upon the GAGAS standards, and the JLAC referral, Alameda, Orange County, and Riverside are not auditees. However, even if they were, the information relied upon should have been given to the Sheriff's Department, as the auditee, to respond to the draft report, because it is public information.

The Sheriff's Department must meet Title 15 standards for its detention facilities, as do other local detention facilities throughout the State of California. For the redacted policy excerpts to be relevant to the auditors' engagement, the redacted excerpts are presumably from other law enforcement agencies in the state.

Policies of a California law enforcement agency are public record. Senate Bill 978 (SB 978) added section 13650 to the Government Code, which requires "...each local law enforcement agency shall conspicuously post on their Internet Web sites all current standards, policies, practices, operating procedures, and education and training materials that would otherwise be available to the public if a request was made pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code)." As such, each California law enforcement agency is required to publicly post, on its website, all its policies and procedures, such as its detention facilities safety check policy.

It is well settled that a governmental agency cannot shield records that are subject to public disclosure simply by putting those publicly available records in a file it stamps "confidential." Therefore, the auditor should have provided the policies which it relied on in creating its report.  ⑩

Similarly, it was improper for the auditor to redact and withhold from disclosure settlement information it obtained, admittedly, from publicly available court documents regarding the three selected counties it designated as comparable counties.  ⑩

⑫



     e.  **Timeliness**

Section 9.17(g) regarding report quality element "Timely" states, in pertinent part, "[t]o be of maximum use, providing relevant evidence in time to respond to officials of the audited entity, legislative officials, and other users' legitimate needs is the auditors' goal. Likewise, **the evidence provided in the report is more helpful if it is current.**"

(11)

While it is certainly helpful from a historical perspective to discuss changes in policies or procedures, it is unclear whether the auditors' findings and conclusions are based on the policies and procedures as they existed at the time of the incident under review or present-day policies and procedures. For example, the draft report states, "...although the Sheriff's Department's policy indicates that a nurse should conduct a face-to-face appraisal with an incarcerated individual within 24 hours of a mental health care request to determine the urgency of that request, it has not always had this policy." The Sheriff's Department believes this change in policy was a positive step, but it is unclear whether the auditors' findings and recommendations are based on current policies and procedures, or policies and procedures that were in place at the time of the incident under review.

(6)

### C. The Auditors' Lack of Requisite Knowledge, Skills and Abilities Necessary to Conduct the Instant Engagement Raise Ethical and Competence Issues under the Generally Accepted Government Auditing Standards

Chapter 3 of the GAGAS sets forth fundamental ethical principles for auditors in the government environment.

Section 3.04 relating to ethical principles provides that "[p]erforming audit work in accordance with ethical principles is a matter of personal and organizational responsibility." The section goes on to clearly state that ethical principles apply in "taking on only work that the audit organization is competent to perform..."

To ensure that an audited entity is afforded a fair, unbiased and meaningful audit, Chapter 4 of the GAGAS requires that the auditors collectively possess the competence needed to address the engagement objectives and perform their work in accordance with GAGAS. The knowledge, skills, and abilities needed when conducting an engagement in accordance with GAGAS include the understanding necessary to proficiently apply a. GAGAS; b. standards, statutory requirements, regulations, criteria, and guidance applicable to auditing or the objectives for the engagement(s) being conducted; and c. *techniques, tools, and guidance related to professional expertise applicable to the work being performed.* (Emphasis added). (GAGAS section 4.07).

GAGAS section 4.08 provides, "[a]chieving the knowledge, skills, and abilities needed to conduct a GAGAS engagement may include: a. having prior experience in the subject matter or type of engagement; b. completing [continuing professional education] related to the subject matter or type of engagement; and c. obtaining degrees or certifications relevant to the subject matter or type of engagement."

The instant engagement requires knowledge, skills, and abilities regarding varied areas in the detentions or corrections environment including, but not limited to, detentions custodial operations, detentions medical services and detentions mental health functions.

This knowledge is so important that state law requires that a deputy complete an introductory training course by the Commission on Peace Officer Standards and Training, additional training by the Board of State and Community Corrections, and specialized training for custodial personnel of local detention facilities pursuant to Title 15 of the California Code of Regulations. In addition to this initial 16 weeks of academy training, deputies are next assigned to phase training where they are paired up with seasoned training officers before they can function on their own. After these initial academy and training phases, detentions deputies are required by state law to complete a minimum of 24 hours of annual training to maintain their proficiency and certification.

The professional qualifications necessary for detentions medical doctors, registered nurses, licensed vocational nurses, and mental health clinicians must satisfy not only the educational requirements of their field which often includes many years of studies, and successfully passing the tests required by their licensing authority, but also continuing professional education in order to maintain their license or certification.

Additionally, the field of corrections is a highly regulated field of law comprised of state and federal Constitutional standards and laws, as well as case law issued by the U.S. Supreme Court, federal, and state courts. Changes in department policies can impact an inmate's constitutional rights, and a lack of knowledge regarding correctional law can lead to flawed policies and constitutional violations.

②

The requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions custodial operations would be satisfied by either an auditor, or a specialist[1] engaged

---

[1] "Some engagements may necessitate the use of specialized techniques or methods that call for the skills of specialists. *Specialists do not include individuals with special skill or knowledge related to specialized areas within the field of accounting or auditing,* such as income taxation and information technology. *Such individuals are considered auditors.*" (Emphasis added). GAGAS section 4.13.

"The competence and qualifications of specialists significantly affect whether their work will be adequate for the engagement team's purposes and will meet GAGAS requirements. Competence of specialists relates to the nature and level of expertise. Qualifications of specialists relate to their professional certifications, reputations, and previous work in the subject matter. Other relevant factors include the ability of specialists to exercise competence in the circumstances of the engagement and the effects that bias, conflict of interest, or the influence of others may have on the specialists' professional judgment." GAGAS section 4.14.

"Sources that may inform the auditors' assessment of the competence and professional qualifications of a specialist include the following: *a. the professional certification, license, or other recognition of the competence of*

②    to assist the audit team, who was certified by the State of California, Bureau of State and Community Corrections (BSCC), Standards and Trainings for Corrections (STC). ███████ █████████████████████ it does not appear that any of the audit team members possess such training or certification.

It is further generally recognized that the function of providing medical services in the correctional setting is different than in a public setting.  According to the American Academy of Family Physicians, "[i]nmates in correctional facilities have significantly higher rates of disease than the general population, and ... tend[] to suffer in greater numbers from infectious disease, mental health problems, and substance use and addiction." The requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions medical services would be satisfied by either an auditor, or a specialist engaged to assist the audit team, who is, or was, a medical doctor or registered nurse in a detentions or corrections environment.  In our discussions with the auditors, it does not appear that any of the audit team members possess such training or experience.

Similarly, the requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions mental health functions would be satisfied by either an auditor, or a specialist engaged to assist the audit team, who is or was a qualified mental health provider
②    (QMHP) or mental health clinician (MHC) in a detentions or corrections environment. ██████ █████████████████████ it does not appear that any of the audit team members possess such training or experience.

By way of example, the Sheriff's Department was previously reviewed by subject matter experts who possessed the requisite knowledge, skills, and abilities necessary for the scope of their

---

*the specialist in his or her field, as appropriate*; b. the reputation and standing of the specialist in the views of peers and others familiar with the specialist's capability or performance; *c. the specialist's experience and previous work in the subject matter; d. the auditors' assessment of the specialist's knowledge and qualification based on prior experience in using the specialist's work; e. the specialist's knowledge of any technical performance standards or other professional or industry requirements in the specialist's field (for example, ethical standards and other membership requirements of a professional body or industry association, accreditation standards of a licensing body, or requirements imposed by law or regulation)*; f. the knowledge of the specialist with respect to relevant auditing standards; and g. the assessment of unexpected events, changes in conditions, or the evidence obtained from the results of engagement procedures that indicate it may be necessary to reconsider the initial evaluation of the competence and qualifications of a specialist as the engagement progresses." (Emphasis added).  GAGAS section 4.15.

SD 744790
Ex. H-667

engagement. One review was conducted by Mr. Lindsey Hayes[2], the other review was conducted by the National Commission on Correctional Health Care (NCCHC)[3].

②



---

[2] Lindsay M. Hayes is a Project Director of the National Center on Institutions and Alternatives (NCIA) and is nationally recognized as an expert in the field of suicide prevention within jails, prisons, and juvenile facilities. He has been a consultant to the U.S. Justice Department's Civil Rights Division in its investigations of conditions of confinement in both adult and juvenile correctional facilities throughout the country. He has also been appointed as a Federal Court Monitor in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction. He has served as an expert witness/consultant in litigation cases involving the suicide of incarcerated individuals, and his expertise has allowed him to conduct training seminars and assessments of adult and juvenile suicide prevention practices within correctional facilities throughout the country.

Hayes is a published author with over 60 publications in the area of suicide prevention within adult and juvenile correctional facilities and has conducted the only five national studies of jail, prison, and juvenile suicide (*And Darkness Closes In...National Study of Jail Suicides* in 1981, *National Study of Jail Suicides: Seven Years Later* in 1988, *Prison Suicide: An Overview and Guide to Prevention* in 1995, *Juvenile Suicide in Confinement: A National Survey* in 2004, and *National Study of Jail Suicide: 20 Years Later* in 2009).

Hayes has reviewed over 3,000 cases of suicide in jail, prison, and juvenile facilities throughout the country over the past 30 years. He was awarded the National Commission on Correctional Health Care's Award of Excellence in 2001, for his contribution in the field of suicide prevention in correctional facilities. His work has been cited in several state and national correctional health care standards, and numerous suicide prevention training curricula, including the National Institute of Correction (NIC).

[3] The National Commission on Correctional Health Care (NCCHC) is a non-profit 501(c)(3) organization whose mission is to improve the quality of health care in jails, prisons, and juvenile confinement facilities. The NCCHC establishes standards for health services in correctional facilities, produces resource publications, conducts educational conferences, offers a certification for correctional health professionals and a voluntary accreditation program for institutions that meet their standards. NCCHC is supported by numerous major national organizations in the fields of health, law, and corrections.

The NCCHC has a multidisciplinary governing structure, which addresses the complexities of correctional health care, and whose standards for health services in correctional facilities is widely recognized. NCCHC's standards address areas of care and treatment, health records, administration, personnel and medical-legal issues; and offer voluntary health services accreditation based on its standards. NCCHC also hold conferences with educational programs that address topics such as mental health and substance abuse services. The NCCHC publishes periodicals such as the *Journal of Correctional Health Care* and *CorrectCare*, which are the leading periodicals in this field. The NCCHC offers consultation and assistances to facilities with issues preparing for accreditation, developing policies and procedures, and assessing alternative solutions to problems.

SD 744791
Ex. H-668

In order to demonstrate that the auditors assigned to this engagement possessed the requisite knowledge, skills, and abilities in detentions custodial operations, detentions medical services and detentions mental health functions, as required by GAGAS, the Sheriff's Department requests that the State Auditor include in its final report the curricula vitae for each auditor and specialist assigned to the instant engagement, including any relevant continuing professional education regarding the subject matter of the engagement.

## II.   THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT HAS TAKEN APPROPRIATE AND REASONABLE MEASURES TO PREVENT AND RESPOND TO DEATHS OF INDIVIDUALS IN CUSTODY

⑦

### a.   The Auditor's Conclusion That the In-Custody Deaths Were the Result of Inadequate Medical Care is Misleading

While the first sentence of the draft report begins with the recognition that the Sheriff's Department is responsible for providing medical care to individuals in its custody, the next sentence goes on to state: "Nonetheless, from 2006 through 2020, 185 people died in San Diego County jails – more than in nearly any other county across the state." The transition from

⑦ the statement that the Sheriff's Department is responsible for providing adequate medical care to the statement that "nonetheless" 185 people died in San Diego County jails is misleading and implies that the deaths were the result of inadequate medical care.

The draft report does not identify which deaths were the result of "inadequate" medical care. Natural deaths comprise nearly half, the highest percentage, of in-custody deaths identified by

② the auditors. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ the draft report does not identify what medical care was inadequate, nor does it identify what medical care the Sheriff's Department should have provided that would have avoided individuals from dying of natural causes, such as heart disease, cancer, chronic lower respiratory disease (COPD, emphysema, chronic bronchitis), and stroke. Just as individuals with these conditions die from their conditions in the community setting, incarcerated individuals with these conditions often die from their conditions while in custody, not as the result of incarceration or the medical care they receive while incarcerated but as a natural and expected progression of their condition.

Similarly, while accidental deaths account for 31 of the total in-custody deaths during the audited period, the draft report does not identify any medical care that was "inadequate" resulting in an individual's death. As the auditors are aware, most of the accidental deaths were the result of individuals overdosing on drugs, not due to "inadequate" medical care. In response to the opioid epidemic, the San Diego Sheriff's Department was one of the first departments in the state to equip not only its detentions medical staff but also detentions

deputies with NARCAN® (naloxone HCL) nasal spray to combat the surge in opioid overdoses. To ensure immediate availability of this highly effective opioid antagonist, NARCAN is not only available in detentions medical areas and in deputy control stations but detentions deputies are also required to carry NARCAN on their person during their shifts. During calendar years 2020 and 2021 alone, Sheriff's Department employees in the jails responded to 314 incidents of suspected opioid overdose deploying 848 doses of NARCAN and saving countless lives. In conjunction with its community partners, the Sheriff's Department also makes this lifesaving drug available to incarcerated individuals upon their discharge from Sheriff's custody.

### b. The Number of In-Custody Deaths Experienced by the San Diego Sheriff's Department is Consistent with its Position of Having the Second Highest Number of Total Bookings and Overall Deaths in California Counties ⑫

The San Diego Sheriff's Department's position as having the second highest number of in-custody deaths of counties in the state is consistent with its position as having the second highest number of bookings of counties in the state. As demonstrated by Table 1 below, the trend is consistent for at least the top six counties, exhibiting that as the number of bookings goes up, so do the number of in-custody deaths. Additionally, as demonstrated by Table 2 below, as the second most populous county in the state, the County of San Diego also maintains the position as having the second highest number of deaths in the community.

#### i. Table B is intentionally misleading

The auditors chose to include a table in APPENDIX A which they identify as focusing on two primary categories, "In Custody Deaths and Bookings From 2006 Through 2020." In so doing, they state that the table "presents the rate of deaths per the number of individuals booked in each of the county sheriff's jail systems from 2006 through 2020." They go on to state that "[t]he number of bookings is the ***total number*** of individuals who were processed through the jail system." (Emphasis added). However, when the auditors sort the chart, they don't sort it by the column entitled "Total Booked", or even the "Total Deaths" column, both of which would clearly show the correlation between the two (see resorted Table 1 below), but instead they chose to sort by the "Total Deaths per 100,000 Booked" which makes the first three columns appear to have no correlation.

②



However, the exact same data sorted by the "Total Number of Bookings" column, *or* the "Total In-Custody Deaths," column **clearly** shows a correlation between bookings and the number of actual deaths for the six counties with the most bookings in the State of California.

⑬  **Table 1**



| | County Sheriff's Department | Total Number of Bookings | Average Bookings Per Year | Total In-Custody Deaths | Deaths per 100,000 Bookings |
|---|---|---|---|---|---|
| 1 | Los Angeles | 1,970,654 | 131,377 | 421 | 21.36 |
| 2 | San Diego | 1,284,462 | 85,631 | 185 | 14.40 |
| 3 | San Bernardino | 1,027,195 | 68,480 | 124 | 12.07 |
| 4 | Orange | 888,951 | 59,263 | 111 | 12.49 |
| 5 | Riverside | 810,376 | 54,025 | 104 | 12.83 |
| 6 | Alameda | 777,627 | 51,842 | 99 | 12.73 |
| 7 | Sacramento | 733,275 | 48,885 | 62 | 8.46 |
| 8 | Santa Clara | 682,010 | 45,467 | 84 | 12.32 |
| 9 | Fresno | 551,624 | 36,775 | 86 | 15.59 |
| 10 | Kern | 520,074 | 34,672 | 70 | 13.46 |
| 11 | Ventura | 424,978 | 28,332 | 47 | 11.06 |
| 12 | San Joaquin | 392,895 | 26,193 | 34 | 8.65 |
| 13 | Contra Costa | 370,299 | 24,687 | 43 | 11.61 |
| 14 | San Francisco | 353,521 | 23,568 | 39 | 11.03 |
| 15 | Tulare | 333,941 | 22,263 | 26 | 7.79 |

SD 744794
Ex. H-671

### ii. The top 5 counties with the most deaths countywide are also the same

As jails are a microcosm of the communities in which they are located, it should come as no surprise that as deaths in the community increase, deaths in-custody will increase as well. This is particularly true for in-custody deaths due to natural causes, suicide, and accidental deaths due to overdose. As greater numbers of individuals in a community are sick, experience suicidal ideations or are afflicted by substance use disorders, those increased numbers can be expected to replicate themselves in the detention systems serving those communities. As reflected in Table 1 above, the number of in-custody deaths experienced by the Sheriff's Department is not disproportionate to the number of deaths experienced in the San Diego County community regardless of custody status (See Table 2).

⑫

**Table 2**    ⑬

#### Deaths in California Counties From 2006 Through 2020

| | County | Est. County Population (2020) | Average County Population (2006-2020) | Total Deaths (2006-2020) | Average Deaths Per Year | Deaths per 100,000 Population |
|---|---|---|---|---|---|---|
| 1 | Los Angeles | 10,135,614 | 9,991,660 | 939,073 | 62,605 | 626.6 |
| 2 | San Diego | 3,331,279 | 3,181,752 | 320,562 | 21,371 | 671.7 |
| 3 | Orange | 3,180,491 | 3,084,349 | 292,178 | 19,479 | 631.5 |
| 4 | Riverside | 2,440,719 | 2,251,242 | 224,078 | 14,939 | 663.6 |
| 5 | San Bernardino | 2,175,424 | 2,079,014 | 206,764 | 13,784 | 663.0 |
| 6 | Sacramento | 1,553,157 | 1,457,469 | 170,958 | 11,397 | 782.0 |
| 7 | Santa Clara | 1,945,166 | 1,848,744 | 157,224 | 10,482 | 567.0 |
| 8 | Alameda | 1,663,114 | 1,568,059 | 144,734 | 9,649 | 615.3 |
| 9 | Fresno | 1,020,292 | 955,030 | 104,127 | 6,942 | 726.9 |

This data table reports the annual number of deaths that occurred in each County regardless of the place of residence (by occurrence).

### iii. The Comparator Counties Selected by the Auditors Do Not Accurately Reflect the Relevant Peer Group Departments    ⑭

Considering county size, geographic location and "other factors" the auditors selected the Alameda County Sheriff's Office, Orange County Sheriff's Department and Riverside County Sheriff's Department as comparator departments. From the report, it is unclear how geographic location factored into the selection of the Alameda Sheriff's Office as a comparator department as the county seats of San Diego County and Alameda County are approximately 490 miles from each other. Similarly, the auditors' selection of similar *counties*, based on what appears to be total county population, rather than similar *booking numbers* is inappropriate. It is unclear how total county population factored into the selection of the Alameda Sheriff's

SD 744795
Ex. H-672

Office as a comparator department when the County of Alameda has less than half the average county population of San Diego County.

The comparator peer group should be based on the total number of individuals encountered (booked) by each department rather than county population. As reflected in Table 3 below, an analysis of the departments, based on total number of bookings, reveals that the statistically relevant departments are the Los Angeles Sheriff's Department, San Bernardino Sheriff's Department and Orange County Sheriff's Department. The San Diego County Sheriff's Department's total bookings for the reviewed 15-year period are within 65% of what the Los Angeles County Sheriff's Department booked for the same period. Similarly, San Bernardino and Orange County Sheriff's Departments booked at least 65% of the total number of bookings that the San Diego County Sheriffs' Department booked.

However, the Riverside County Sheriff's Department and Alameda Sheriff's Office, each booked **less** than 65% of the total number of bookings that the San Diego County Sheriff's Department booked for the same time. By excluding the Los Angeles Sheriff's Department and San Bernardino Sheriff's Department, in favor of Riverside County and Alameda County, the auditors excluded the only other departments in the state that booked in excess of 1,000,000 individuals during the audit period. By excluding the Los Angeles Sheriff's Department and San Bernardino Sheriff's Department, the auditors also excluded the other two departments with the highest number of in-custody deaths in the state during the audit period in favor of departments having the fifth and sixth highest number of in-custody deaths.

⑬

**TABLE 3**



Top Three Counties With Total Bookings
Within 35 Percent of San Diego County Bookings

c. **The San Diego Sheriff's Department's Review of In-Custody Deaths Exceeds the**    ④
**Standards Set by the State of California**

The Auditor's stated purpose[4] for the instant engagement is, in pertinent part, to "[e]valuate
the San Diego Sheriff's policies and procedures on personnel training, facility maintenance and
safety, and the provision of health care to inmates. *To the extent possible, determine whether
these policies and procedures align with minimum standards established through state law and
any other applicable guidance.* As part of this evaluation, also determine whether any of these
policies delay or otherwise impair the ability of medical personnel to provide appropriate
medical care to inmates." (Emphasis added).

The auditors' findings confirm that the San Diego Sheriff's Department not only meets the
minimum standards established through state law and other applicable guidance but, in fact,
exceeds those requirements regarding its review of in-custody deaths.

i. **The Auditor's Conclusion that the Department's Review of In-Custody**    ⑮ ④
**Deaths has been Insufficient is Misplaced**

The auditors' findings confirm that the Sheriff's Department meets and exceeds the minimum
state standards for review of in-custody deaths.

As noted by the auditors, state law requires the Sheriff's Department to conduct a clinical care
review within thirty (30) days of every death. The Sheriff's Department meets this requirement
by conducting a Mortality/Morbidity Review. The auditors' findings did not reveal any failure
on the part of the Sheriff's Department to comply with applicable law with either the timeliness
or the substance of the Department's reviews.

Except in the case of a suspected homicide, no other review or investigation is required. In the
case of an in-custody death in which homicide is suspected, the Sheriff is statutorily required to

---

4

**2021-109 AUDIT SCOPE AND OBJECTIVES**
**San Diego County Sheriff's Department**

The audit by the California State Auditor will provide independently developed and verified
information related to the death of inmates in the custody of the San Diego County Sheriff's
Department (San Diego Sheriff). The audit's scope will include, but not be limited to, the following
activities:

1. Review and evaluate the laws, rules, and regulations significant to the audit objectives.

2. Evaluate the San Diego Sheriff's policies and procedures on personnel training, facility
maintenance and safety, and the provision of health care to inmates. To the extent possible,
determine whether these policies and procedures align with minimum standards established
through state law and any other applicable guidance. As part of this evaluation, also determine
whether any of these policies delay or otherwise impair the ability of medical personnel to provide
appropriate medical care to inmates.

investigate the death.  That investigation is conducted by the Sheriff's Homicide Unit.  The auditors' findings did not reveal any failure on the part of the Sheriff's Department to investigate any in-custody death in which homicide was suspected.

No other reviews by the Sheriff's Department are mandated by state law for in-custody deaths.

While no other reviews are mandated, the Sheriff's Department created and implemented its own multilayer review above and beyond the minimum state standards for review of in-custody deaths.

Although not required for in-custody deaths where homicide is not suspected, the Sheriff's Department, as a matter of practice, conducts an investigation by the Homicide Unit into every in-custody death, not just those deaths where homicide is suspected.

In addition to the Homicide Unit investigation, the Sheriff's Department created its own Critical Incident Review Board (CIRB).  The CIRB's role is not limited to reviews of in-custody deaths but includes the review of a variety of critical incidents including uses of force, pursuits, K-9 deployments, overdoses, and other significant events.  In-custody deaths due to natural causes are generally not reviewed by the CIRB, unless other issues are identified, as deaths due to natural causes are more appropriately reviewed by the statutorily mandated thirty (30) day Mortality/Morbidity Review conducted by the Department.  A further discussion regarding the recommendation that the CIRB review natural deaths is discussed below.

If the CIRB or any member of the Sheriff's Department believes an in-custody death implicates potential misconduct or a failure to meet standards on the part of an employee, the CIRB or any member of the Sheriff's Department can file a Department Generated Complaint requesting that Internal Affairs investigate the matter.

Penal Code section 832.5 requires every law enforcement agency in the state to establish a procedure to investigate complaints lodged *by members of the public* against personnel of the agency.  In addition to investigating complaints from members of the public, the Sheriff's Department investigates "department generated" complaints, which can be lodged by any member of the department, in the same manner as it investigates a complaint by a member of the public.  If there is potential misconduct or a failure to meet standards on the part of an employee related to an in-custody death, the Sheriff's Department does not wait for a member of the public to file a complaint but can and does initiate an Internal Affairs investigation based on a department generated complaint.

As the auditors' findings make clear, the reviews conducted by the Sheriff's Department not only meet the minimum standards established by the state, the multilayered approach adopted by the Sheriff's Department far exceeds those minimum standards.  Any deficiencies in the state's minimum standards regarding the review of in-custody deaths is most appropriately

addressed to the Legislature and/or the BSCC, not to the Sheriff's Department as the audited entity.

### ii.  The Critical Incident Review Board's Roles of Preventing Future Litigation and Improving the Health and Welfare of Incarcerated Individuals are Not Mutually Exclusive

(16)

The auditors stated there should be more transparency regarding the process and findings of the Sheriff's CIRB Board. The CIRB reviews occur within the confines of the attorney-client relationship and are not reported out publicly. Every governmental entity, even those such as the State Legislature or a Board of Supervisors, both of which are subject to the *Brown Act's* open meeting requirements, are afforded the opportunity to engage in candid conversations with its counsel within the confines of the attorney-client relationship.

Notwithstanding the auditors' particular concern regarding the existence of the attorney-client privilege, the CIRB's role of preventing future litigation compliments rather than undercuts the Department's goal of improving the health and welfare of incarcerated individuals entrusted to the care and custody of the Sheriff. As items of concern are identified during a critical incident, such as an in-custody death, the CIRB review is focused with an eye towards what changes have already been implemented by the chain of command to remedy any deficiencies before the matter made it to the CIRB for review, as well as any changes the chain of command may not have already identified and/or implemented to minimize the risk of a recurrence. If the CIRB identifies any best practices or changes not previously identified and implemented by the chain of command prior to its review, the CIRB is empowered to make such recommendations.

As it relates specifically to in custody deaths, the CIRB concentrates not only on the death itself, but also considers the handling of the inmate from the time the inmate was originally booked. The Board looks to determine whether any warning signs existed, whether appropriate and timely safety checks occurred, and whether there were any risk reduction lessons that could be derived from the incident.

While the focus of the CIRB may be risk management, the mechanism by which risk management is ultimately accomplished is clearly through the promotion of best practices and policies that improve the health and welfare of incarcerated individuals and holding staff accountable.

While the Auditor was "particularly concerned" that the Sheriff's Department does not publicly report out its CIRB discussions, all Sheriff's Department policies, procedures, training, and education materials are published on the Sheriff's Department's website. Any changes to Sheriff's policies, procedures, training, or education, whether recommended by the CIRB or implemented by management prior to or without the need for a CIRB review, are published and available for the public to access on the Sheriff's Department's website. In addition to the

SD 744799
Ex. H-676

attorney-client privileged nature of the CIRB discussions, the Sheriff's Department would also be prohibited by state statutory and constitutional privacy considerations from disclosing any discussions by the CIRB regarding employee misconduct or Internal Affairs investigations.

⑰

### d.  In Addition to Its Own Internal Reviews, the Sheriff's Department is Already Subject to Independent Oversight by Multiple External Organizations

Local detention facilities are subject to a myriad set of regulations and laws based on statutory law, constitutional guarantees, and case law.  In order to ensure county detention facilities, comply with these requirements, the BSCC promulgates regulations under Title 15 of the California Code of Regulations, establishing statewide standards for detention facilities.  In

④    order for facilities to maintain their certification to operate, counties are subject to bi-annual inspections by the BSCC.  The auditors' findings confirm that the Sheriff's Department meets the standards established by the BSCC under Title 15.

In addition to the bi-annual inspections by the BSCC, pursuant to its authority under Penal Code section 919, the San Diego County Grand Jury conducts an annual inspection of the Sheriff's Department detention facilities.

The San Diego County Citizens Law Enforcement Review Board, pursuant to its County Charter authority, is also empowered to, and does, investigate in-custody deaths.

⑰

### e.  In its continuing efforts to enhance medical and mental healthcare, and exceed the standards set by the State of California, the Sheriff's Department engaged reviews by multiple separate external entities specializing in correctional healthcare

The Sheriff's Department was reviewed by two entities in pursuit of enhancing system operations related to medical and mental health care.  These included a look at suicide prevention practices by nationally recognized expert, Mr. Lindsay Hayes, and a preliminary review by the National Commission on Correctional Healthcare (NCCHC).  Both entities produced reports for the Sheriff's Department that have been used to enhance policies and procedures to align with best practices and meet recommendations.  The reports are available on the Sheriff's Department public website at www.sdsheriff.gov.

SD 744800
Ex. H-677

## III.    RECONMENDATIONS    ⑤

### a.    Intake Screening

*CSA Recommendation:*

*Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity rating as it assigns to individuals to all detentions staff overseeing them.*

The Sheriff's Department concurs with the auditor's assessment that Qualified Mental Health Providers (QMHP) are the more appropriate staff to conduct the mental health screening portion of the intake process. The Medical Services Division (MSD) received funding for additional staffing in July 2021 and is currently in the process of recruiting and hiring from a limited pool of candidates. Additional staffing will allow us to provide a comprehensive screening process utilizing the electronic health record, in accordance with National Commission for Correctional Health Care (NCCHC) standards. Some identified QMHP staffing duties would be to conduct the Behavioral Health (BH) screening, complete a risk/needs assessment, to include substance use disorder (SUD). The assessment would determine a behavioral health acuity rating, schedule psychiatric appointments, schedule follow up QMHP appointments, assess for the need of placement into our Inmate Safety Program (ISP) and obtain Release of Information authorizations. QMHPs and nursing staff working in collaboration at the initial intake assessment and throughout a patient's incarceration promotes a comprehensive whole person model of care.

Ongoing effective communication between medical staff and sworn staff is paramount in ensuring the safety and wellbeing of our patients. Our plan is to implement bidirectional communication with our Jail Information Management System to ensure sworn staff are aware of the mental health recommendations. All staff are responsible for the appropriate and timely care of our patients. Further analysis will need to be done to evaluate the impact this acuity rating system would have on our system of jail classification and housing needs.

_CSA Recommendation:_

_Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process._

San Diego County does not have an interconnected health information exchange. Hospital centers and medical systems independently manage their data systems and may or may not voluntarily participate or contribute to a health information exchange.  Our health staff currently have access to the following county databases:

### i.  Health and Human Services Agency – Cerner Community Behavioral Health (CCBH)

Cerner Community Behavioral Health is a behavioral health-specific electronic health record that specializes in the delivery of community mental health, inpatient mental health, outpatient mental health, substance use disorder and developmental disabilities care. Although there may be some patients who are not in the database and do not have data entered, we continue to review and enter data referencing our patient encounters while in our care.

As of April 2021, all QMHPs (mental health clinicians, psychologists, psychiatrists, psychiatric technicians) have "read" access to Cerner Community Behavioral Health (CCBH). QMHPs can review records at any point in the patient's stay. The planned integration of a QMHP into the intake process for behavioral health screening will fulfill this recommendation.  In addition to having access to review community behavioral health records, the Sheriff's Detention Services Bureau contributes to this community database by recording and entering mental health care provided while the patient is in our custody as part of the county's continuum of care.  The Sheriff's Medical Services Division intends to adhere to the NCCHC standards for the referral process.

### ii.  Health and Human Services Agency – San Diego Immunization Registry

The San Diego Immunization Registry (SDIR) is a County system that offers Sheriff's Department health staff the ability to verify a patient's vaccination status. SDIR is limited to vaccinations given in San Diego County. If a patient receives an immunization outside of San Diego County or opts to "lock" their record, health staff will not have the ability to verify vaccination status. Currently we have sufficient access to SDIR.

### iii.  San Diego Health Connect

San Diego Health Connect was originally designed to allow for medical information to be exchanged between community clinics.  The database only covers medical (not mental

**SD 744802**
Ex. H-679

health/behavioral health issues) and each patient must consent to participate. Very few patients are registered in the system, and the system is undergoing restructuring.

### b. Medical & Mental Health Follow-Up

*CSA Recommendation:*

*Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.*

The Sheriff's Department concurs with the auditors' assessment that a revision is necessary to address the process for medical/mental health referral after two requests. The Sheriff's Medical Services Division intends to implement a health care requests and services process in accordance with NCCHC standards. Patients will be referred to a provider to be evaluated. When a patient presents for health care services more than two times with the same complaint and has not seen a provider, they will receive an appointment to do so. Some mental health patients need assistance with advocating for their medical care. Regular follow-up and ongoing engagement with QMHPs is essential to identifying patients who face these challenges.

*CSA Recommendation:*

*Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request. Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.*

The Sheriff's Department concurs a timely medical response to patient concerns is extremely important, and that repetitive patient refusals or an abject delay in follow-on scheduling of medical care are concerning issues and could potentially precipitate an adverse condition or event. We are committed to the health and well-being of our patients, and are developing safeguards to ensure a timely, efficient re-engagement of both medical and mental health services.

The Sheriff's Department is currently focused on a more nursing centric model. For health staff, we are in the process of embedding nursing staff at the ward level, assigning nursing staff to most housing units in support for the Primary Care nursing model. Nurses will be there to perform face-to-face assessments of their assigned patients (on the floors and during sick call)

SD 744803
Ex. H-680

and involved in counseling and advocacy efforts for every refusal. We have worked with our contracted medical providers to develop daily rounds in designated modules to address acute and ongoing assessments for specified patients. We continue to pursue accreditation from the NCCHC which requires a face-to-face assessment withing 24 hours of a medical request being filed (NCCHC Standards J-E-07).

### CSA Recommendation:

*Revise its policy to require more frequent psychological follow up after release from the inmate safety program to at least monthly check-ins.*

The Sheriff's Department will reevaluate our policies on psychological follow-up. Our current Inmate Safety Program policy reflects the recommendations from Mr. Lindsey Hayes regarding our follow up protocol. Mr. Hayes is nationally recognized as an expert in the field of suicide prevention within custodial settings and has served as a Federal Court Monitor. While placement into any of our Inmate Safety Program specialized housing requires a mental health response and establishes a basis for continued follow-up; the Sheriff's Department's current planned expansion and hiring of additional mental health professionals will allow for more frequent encounters and the investment of time necessary for higher quality mental health care.

⑱ Mr. Hayes specifically states, "it is recommended that the follow-up schedule be simplified and revised as follows: follow-up within 24 hours, again within 72 hours, again within 1 week, and then periodically as determined by the clinician until release from custody." As a nationally recognized expert, SDSD has adhered to Mr. Hayes' recommendation.

### c. **Safety Checks**

### CSA Recommendation:

*Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.*

The Sheriff's Department will reevaluate current policy and incorporate best practices. SDSD is exploring technologies to assist with monitoring a "proof of life" for all incarcerated individuals with minimal sleep interruption through staff contact. The Sheriff's Department is evaluating industry capabilities, and in the process of developing a more robust facility Wi-Fi system

SD 744804
Ex. H-681

capable of supporting technological advancements in monitoring the welfare of our population. The Sheriff's Department's planned integration of Bodyworn Cameras (BWC) into the custodial setting will greatly assist in showing the point of view each deputy has during the safety checks.

*CSA Recommendation:*

*Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff perform.*

Sheriff's Department line supervisors conduct electronic log reviews every shift. This review includes ensuring the timeliness of safety checks in accordance with established Policy & Procedures. The Sheriff's Department's current practice requires supervisors conduct video audits of random safety checks and will formalize this into policy.

### d. Sworn Discovery of Medical Emergency

*CSA Recommendation:*

*Revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow.*

Sworn staff does not require approval from medical to start CPR. Current DSB P&P M.5 I.B. states, "When the severity of the medical emergency requires it, and as soon as it is safe to do so (unless death is obvious, such as decapitation, obvious rigor mortis, etc.), deputies acting as first responders will provide basic life support and first aid. Upon arrival, facility health staff will assess the severity of the inmate's injury/distress, provide first-aid, and may assist or take over cardiopulmonary resuscitation (CPR) responsibilities as directed and/or needed." This policy in its current form has been in effect since January 2012.

(19)

The Sheriff's Detention Services Bureau In-Service Training Unit distributed a training bulletin on Signs of Medical Distress and Life-Threatening Emergencies on June 18, 2021. The purpose of the training bulletin was to familiarize staff with signs of death or near death and appropriate actions of sworn staff when observing such signs of medical distress. Per DSB Policy and

Procedure section M.6, "Any life-threatening medical emergency shall trigger a 911 request for a paramedic emergency response team. Sworn and health staff shall initiate emergency response and basic lifesaving measures until relieved by the paramedic emergency response team."

### e. In-Custody Death Follow-Up

*CSA Recommendation:*

*Staff will provide a written report of each 30-day medical review to its management.*

The Sheriff's Department concurs with this recommendation.

*CSA Recommendation:*

*When warranted, the report should specify recommendations for changes to prevent future deaths.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case.

*CSA Recommendation:*

*The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and to identify issued that require further study.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case. There are other processes currently in place to look for policy, training, or accountability issues following critical incidents.

SD 744806
Ex. H-683

### f.  Critical Incident Review Board

*CSA Recommendation:*

*Revise its policy to require that the Critical Incident Review Board review natural deaths.*

In July of 2021, the Division of Inspectional Services (DIS), Sheriff's Legal Affairs, and CIRB board members evaluated potential updates to policy and procedures section 4.23 – Department Committees and Review Boards. This assessment included reviewing in-custody deaths deemed natural by the Medical Examiner's Office, as the auditors recommend. This, along with other changes are anticipated to be in a pilot phase beginning February 2022. Historically, if a natural death is deemed to have potential issues of any nature it may be presented to CIRB at the discretion of the board members. Also, the Chief Medical Officer and appropriate medical staff conduct a mortality/morbidity review of each in-custody death for their determination of any changes that are needed related to medical care for incarcerated individuals.

*CSA Recommendation:*

*Require the Sheriff's Department to make public the facts it discusses and recommendations it decides upon in the Critical Incident Review Board meetings to establish a separate public process for reviewing deaths and making necessary changes.*

CIRB presentations allow the Sheriff's legal advisor and the various commands the ability to ⑯ review critical incidents to identify issues that should be addressed in various areas, including, but not limited to, training, policies, procedures, staffing, and equipment. The confidential environment provided by the CIRB is essential to the free exchange of ideas, and concerns, in anticipation of future litigation because of a given incident, and in order to avoid future litigation through implementation of best practices. Effectiveness and thoroughness of presentations would likely be diminished if the attorney-client privilege is removed, or information is required to be disclosed during pending, or anticipated litigation. Much of the information presented in CIRBs is intended for individuals who have a vast familiarity and understanding of law enforcement or detention operations, department policies, and state and federal laws, and may contain confidential information including criminal history, medical history, and peace officer personnel records.

SD 744807
Ex. H-684

### g.  Citizen's Law Enforcement Review Board Integration

*CSA Recommendation:*

*Revise its policy to include CLERB in its immediate death notification process.*

*Revise its policy to allow a CLERB investigator to be present at the initial death scene.*

The Sheriff's Department is currently evaluating a process to integrate the CLERB investigator into the initial notification and response to in-custody deaths, to include a scene walkthrough and incident brief.

*CSA Recommendation:*

*Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.*

The CLERB has subpoena powers for in person sworn staff interviews.  In 2003, the CLERB discontinued issuing Sheriff's Department sworn staff interview subpoenas and opted for written responses due to Public Safety Officers Procedural Bill of Rights (POBAR) conflicts where ultimately the interviews did not benefit the CLERB's investigations.  The CLERB continues to have subpoena powers.  This recommendation should be re-directed to the CLERB for its review to change its current practice and exercise its authority to issue subpoenas to Sheriff's sworn staff.

(20)

SD 744808
Ex. H-685

## IV.    CONCLUSION                                                                      ⑤

The Sheriff's Department takes seriously its responsibility to maintain a safe and healthy environment in the county jails.

The Sheriff's Department has welcomed and consistently made itself available for, and cooperated with, reviews by numerous entities including the Disability Rights California, Lindsay Hayes, the NCCHC, the San Diego County Grand Jury, and the Citizens Law Enforcement Review    ⑰
Board.  We did the same with the California State Audit.  After every review, the Department seriously considers every recommendation and implements those that are appropriate and possible, given existing laws, infrastructure, staffing limitations, and best practices.  During the 15-year audit period the Department has taken numerous steps towards providing the best care for those detained in the jail system.  To date, the following improvements have been made:

- Changing our pharmacy business processes
- Implementing a new electronic health record system
- The continuous review and updates to both Detentions Services and Medical Services policies and procedures.
- Increased medical service provider coverage
- Enhanced communication and collaboration between medical and sworn staff which includes the:
    - o  Implementation of a medical "scene manager" to ensure relevant communication during critical incidents
    - o  Issuance of facility communication equipment in the nursing stations to expedite response
    - o  Development of collaborative training between sworn and health staff related to health emergencies
- Developing and mandating an 8-hour suicide prevention training and a 2-hour refresher training
- Enhancing our suicide assessment and monitoring
- Enhancing the continuity of care for inmates removed from suicide precautions; and
- Enhancing the quality assurance process for intake screening related to suicide prevention

We recognize that we cannot rest on the things that we have done.  As the Sheriff's Department shared with the auditors, the Department is pursuing accreditation by the National Commission on Correctional Health Care (NCCHC).  The Sheriff's Department currently meets the standards established by the State of California, final accreditation by the NCCHC would add yet another layer of continuing, independent, external oversight.  However, our goal is to

SD 744809
Ex. H-686

exceed all standards. We strive to provide a better than community standard in the medical and mental health care of incarcerated individuals.

The San Diego Sheriff's Department recognizes that comparisons will be made among counties in California. We regularly confer with other counties in the state and across the country to identify best practices. We remain focused on what we can improve and are committed to do so. It is with this attitude that the San Diego County Sheriff's Department will go forward in assessing the recommendations made by the auditor in the draft report.

Sincerely,

William D. Gore, Sheriff

SD 744810
Ex. H-687

# Comments

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

To provide clarity and perspective, we are commenting on the Sheriff Department's response to our audit. The numbers below correspond to the numbers we have placed in the margin of the Sheriff's Department's response. In certain areas of its response, we have summarized our comments according to the respective sections in its response rather than comment on all of the individual areas of its response that we believe are deficient or misleading.

We provided the Sheriff's Department five business days to review and provide a formal response to the draft audit report, which is our standard practice for all audited entities. As part of our audit process and in accordance with generally accepted government auditing standards, we also met with the staff of the Sheriff's Department, including the Sheriff and other executive management personnel, on numerous occasions during the audit to ensure they were fully briefed on our findings, conclusions, and recommendations.  ①

We have redacted portions of the Sheriff's Department's response containing information that is deliberative in nature or reflects confidential discussions not used in support of the audit report. Additionally, some of the redacted text contains excerpts from the draft report. In accordance with Government Code sections 6254, 8545, and 8545.1, it was necessary for us to make these redactions to protect our confidential work and because the improper disclosure of draft audit documents is a misdemeanor.  ②

The Sheriff's Department states that the highly redacted version of the draft report made it difficult for it to submit a meaningful, comprehensive response. On the contrary, the report that we provided contained all findings, conclusions, and recommendations pertaining to the Sheriff's Department—all of which we had previously shared with its management on numerous occasions. The sections we redacted pertained to other audited entities, such as CLERB, which were not relevant for the Sheriff's Department's response. Further, because state law makes it a crime to improperly disclose ongoing audit information, when the California State Auditor's Office sends draft sections of an audit report to an audited agency for its comment, we redact from the draft those provisions that concern the other agencies being audited. Moreover, the Sheriff's Department misunderstands the purpose of an audit report, which is to summarize the results of our audit work that the Audit Committee directed us to perform. Our working  ③

**SD 744811**

**Ex. H-688**

papers contain the documentation and analyses that support the findings, conclusions, and recommendations in the audit report. Additionally, Government Code section 8545, prohibits the public release of any work papers pertaining to an audit that has not yet been completed. Until the audit report is published, we are required to hold any supporting work papers in strict confidence.

④ Although we concluded that the Sheriff's Department's policies generally align with BSCC standards, we found significant deficiencies that we discuss throughout the report. Moreover, as we state on page 32, BSCC designs the standards to be a minimum that all counties can achieve, regardless of variation in resources at the local level. However, we found that BSCC's approach enables counties that house large numbers of incarcerated individuals to provide lower levels of care. Therefore, to improve the level of care in local detention facilities, we made recommendations to address weaknesses in the Sheriff's Department's policies and procedures as well as in BSCC's standards.

⑤ The Sheriff's Department's concerns related to our findings and conclusions contradicts its agreement with our recommendations. Under generally accepted government auditing standards, which we are required to follow, the findings and conclusions of an audit form the basis for recommendations.

⑥ The Sheriff's Department incorrectly states that we do not comply with audit standards, which it asserts on pages 85 through 96. We conducted this audit in accordance with generally accepted government auditing standards, which we are required to follow, and the California State Auditor's thorough quality control process. In following audit standards, we are required to obtain sufficient and appropriate audit evidence to support our conclusions and recommendations. As with all of our audits, we engaged in extensive research and analysis for this audit to ensure that our report presented a thorough and accurate representation of the facts, and included all relevant information. We stand by the statements in our report, which are based on sufficient and appropriate evidence. Further, as with all of our audits, our public report includes the required statement indicating that we performed this audit in compliance with audit standards.

Moreover, as part of our adherence to audit standards, our staff possess the collective knowledge, skills, and abilities to conduct performance audits, including those of local law enforcement entities.

⑦ The Sheriff's Department's comments questioning the accuracy of our report are unfounded. As we state on page 13, the high rate of deaths in San Diego County's jails compared to other

SD 744812

Ex. H-689

counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. Throughout Chapter 1 we provide numerous examples of deficiencies in the department's policies and procedures that likely contributed to the deaths of some incarcerated individuals and how these policies and procedures do not align with certain best practices used by comparable counties and other entities. Specifically, in the examples on pages 21 through 24, we describe how the Sheriff's Department did not consistently follow up with individuals who needed medical and mental health services, and that lack of attention may have contributed to their deaths. Finally, although the Sheriff's Department indicates that our audit does little to document or provide context of its efforts to respond to deaths, we describe on page 39 the improvements the Sheriff's Department has made. Because we found that weaknesses continue to exist in the Sheriff's Department's policies and procedures, we made recommendations to address those weaknesses.

Because the Sheriff's Department's response included specific details about an in-custody death, such as the case number and a more detailed description of the incident, we redacted this text because it contained confidential information and to protect the privacy of the individuals involved. We clarified our report to make it clear that our concern in this case is related to timeliness of its response to the emergency and not the issue of who provided CPR.

⑧

The Sheriff's Department incorrectly states that it was not given information about the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department. The draft report that we sent to the San Diego Sheriff's Department contained primarily publicly available information for these counties to provide context for the Sheriff's Department's findings.

⑨

When multiple entities are examined in an audit, the California State Auditor's Office is required under state law to maintain confidentiality with each of those entities. Maintaining confidentiality among multiple subjects of an audit is essential to ensuring the integrity and quality of the evidence upon which the audit's conclusions are based. Moreover, based on its misunderstanding of state law, the Sheriff's Department wrongly asserts that our office was required to provide it with supporting documentation pertaining to other auditees because they are public records. Government Code section 8545 prohibits the public release of any work papers or documents pertaining to an audit that has not yet been completed. Until the audit report is published, any supporting documents are held in strict confidence.

⑩

⑪ The Sheriff's Department's concern regarding which version of policies and procedures we based our findings on is unfounded. Our analysis included identifying the policies applicable at the time of the incident we reviewed and determining whether they were subsequently updated to address our concerns. For example, as we state on page 23, we identified a weak policy for mental health services that contributed to an individual's death by suicide and determined that the Sheriff's Department subsequent revision to that policy did not fully address our concerns.

⑫ The Sheriff's Department's approach does not allow for a fair comparison between counties. In Table A.2 on page 60, we present the rate of in-custody deaths based on the relative size of 15 counties. We believe that this objective presentation allows a reader of the report to compare the counties in a more meaningful way. Nevertheless, in both presentations, the Sheriff's Department is among the highest in number and rate of deaths in its jails.

⑬ Table 1, Table 2, and Table 3 on pages 98 to 100 were created by the Sheriff's Department and are not part of our report. We do not attest to the accuracy of the information the Sheriff's Department presents.

⑭ We stand by our selection of the comparable counties referenced in our audit. As we state in the Scope and Methodology on page 62, we selected these counties considering relative size, geographical location, and other factors. We also used professional judgement in selecting a large county in a different region to obtain broad perspective. Our selection of counties satisfied the audit objectives and resulted in sufficient and appropriate evidence to support our findings, conclusions, and recommendations.

⑮ We stand by our conclusion that the Sheriff's Department's reviews of in-custody deaths are insufficient. As we state on page 34, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given, identified whether any concerns required further study, or stated whether changes to policies, procedures, or practices are warranted. We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow-up care before an individual's death, such as those we discuss in Chapter 1.

**SD 744814**
**Ex. H-691**

Further, as we discuss on page 38, the Sheriff's Department does not complete internal affairs investigations related to in-custody deaths frequently enough for it to provide significant value. The small number of these investigations related to deaths—coupled with the lack of meaningful changes arising from the Critical Incident Review Board meeting and the 30-day medical review—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

The Sheriff's Department mischaracterizes our point about its Critical Incident Review Board. To clarify, as we state on page 36, the stated purpose of the board is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore, it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals.

⑯

Further, after the board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices. Specifically, as we state on page 36, even though the board discussed critical issues in some meetings, it did not always make recommendations for addressing these issues.

Moreover, as we discuss on page 37, although we do not disagree with having a confidential forum to discuss potential litigation matters, we are concerned that the Sheriff's Department does not have a separate public process to demonstrate that it is addressing deficiencies in its policies, procedures, and practices after in-custody deaths occur. By keeping its findings and recommendations confidential, the department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents. Further, the Sheriff's Department is disingenuous in its response that it provides all changes to policies, procedures, training, or education on its website. The policies posted on its website do not communicate changes it made in response to in-custody deaths. Having its policies available online in their entirety without specifically identifying those changes that it made in response to in-custody deaths is not transparent in this respect.

Even though the Sheriff's Department was reviewed by external entities, we found it has failed to implement key recommendations from external entities, including recommendations from the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention consultant, as we describe on page 38. Some of the recommendations that the Sheriff's Department failed to implement are related to weaknesses in its policies and

⑰

SD 744815

Ex. H-692

procedures that we identify in this report. Accordingly, we are concerned about whether the Sheriff's Department will make meaningful changes to address these systemic weaknesses.

⑱ The timeframes that the Sheriff's Department refers to are unrelated to our recommendation. Our recommendation is for the Sheriff's Department to update the minimum ongoing follow-up in its policy from 90 days to at least monthly. As we state on page 22, reports and studies related to mental health indicate that more frequent psychological follow-up, such as check-ins performed weekly to rather than every 90 days, leads to faster recovery and is more effective for individuals with mental health needs.

⑲ Although the Sheriff's Department asserts that its current policy appropriately addresses safety concerns regarding sworn staff administering CPR to incarcerated individuals, we had concerns with this policy during our audit. As we state on page 27, in some instances, sworn staff did not perform lifesaving measures because they thought the individual was dead. However, when department medical staff arrived minutes later, they immediately began lifesaving measures on the individual, including CPR. This fact calls into question the ability of sworn staff to assess whether unresponsive individuals might benefit from such potentially lifesaving measures.

⑳ We explain on pages 42 through 45 our concerns with CLERB not directly interviewing sworn staff. Our recommendation to the Sheriff's Department to encourage its staff to cooperate with CLERB's investigations aligns with our recommendation on page 57 to CLERB.

# EXHIBIT I

Ex. I-694

# NCCHC Resources, Inc.

# Technical Assistance Report

# San Diego Sheriff's Department

*This report details findings from site visits to four (4) San Diego Sheriff's Department facilities and presents recommendations for quality improvement.*

Developed by NCCHC Resources, Inc.

*January 2017*

**Ex. I-695**



# TECHNICAL ASSISTANCE REPORT:
# SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

## CONTENTS

INTRODUCTION ................................................................................................ 2

TECHNICAL ASSISTANCE REPORTS

  San Diego Central Jail (SDCJ) ................................................................... 3

  George F. Bailey Detention Facility (GBC) ................................................37

  Las Colinas Detention and Re-Entry Faculty (LCDRF) ...........................70

  Vista Detention Center (VDF) .................................................................104

DISCLAIMER ................................................................................................138

ABOUT NCCHC RESOURCES, INC. ...........................................................138

**Ex. I-696**



# TECHNICAL ASSISTANCE REPORT:
## SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

### INTRODUCTION

**Origin of Project**

The San Diego County Sheriff's Department conducted a request for proposal and selected NCCHC Resources, Inc., to provide technical assistance to help San Diego County Sheriff's Department accomplish this goal. This report presents the results of the technical assistance.

**Plan of Action**

NRI provided a team of correctional health care experts to assess operational policies and practices for four selected jails within the San Diego County Sheriff's Department. The aim was for NRI to recommend how the county may deliver health care to inmates and improve their physical and behavioral health outcomes.

**Designated Facilities**

The NRI team scheduled site visits in 2017 and requested security clearances for the four (4) designated jails through the San Diego County Sheriff's Department. The site visit schedule was as follows:

- San Diego Central Jail (SDCJ)                              January 3-4, 2017
- George F. Bailey Detention Facility (GBCF)                 January 5, 2017
- Las Colinas Detention and Re-Entry Faculty (LCDRF)        January 6, 2017
- Vista Detention Center (VDF)                               January 7, 2017

Ex. I-697

San Diego Sheriff's Department
San Diego Central Jail (SDCJ)
Technical Assistance Report
January 3 & 4, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails*. On January 3-4, 2017, NRI conducted its review for the San Diego Central Jail (SDCJ). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 38 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 26 essential standards:

> Essential Standards
> J-A-01   Access to Care
> J-A-02   Responsible Health Authority
> J-A-05   Policies and Procedures
> J-A-06   Continuous Quality Improvement
> J-A-07   Emergency Response Plan
> J-B-01   Infection Prevention and Control Program
> J-C-04   Health Training for Correctional Officers
> J-C-05   Medication Administration Training
> J-D-01   Pharmaceutical Operations
> J-D-02   Medication Services
> J-E-01   Information on Health Services
> J-E-03   Transfer Screening
> J-E-04   Initial Health Assessment
> J-E-05   Mental Health Screening and Evaluation
> J-E-06   Oral Care
> J-E-07   Nonemergency Health Care Requests and Services

Ex. I-698

J-E-12  Continuity and Coordination of Care During Incarceration
J-E-13  Discharge Planning
J-G-01  Chronic Disease Services
J-G-03  Infirmary Care
J-G-04  Basic Mental Health Services
J-G-05  Suicide Prevention Program
J-G-06  Patient with Alcohol and Other Drug Problems
J-G-07  Intoxication and Withdrawal
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication

Essential Standard Not Applicable
J-G-09  Counseling and Care of the Pregnant Inmate
J-E-02  Receiving Screening

There are 27 important standards and 25 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09  Privacy of Care
J-A-10  Procedure in the Event of An Inmate Death
J-A-11  Grievance Mechanism for Health Complaints
J-B-02  Patient Safety
J-B-03  Staff Safety
J-C-02  Clinical Performance Enhancement
J-C-09  Orientation for Health Staff
J-D-04  Diagnostic Services
J-E-09  Segregated Inmates
J-E-10  Patient Escort
J-E-11  Nursing Assessment Protocols
J-F-01  Healthy Lifestyle Promotion
J-F-02  Medical Diets
J-G-11  Care For the Terminally Ill
J-H-04  Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08  Health Care Liaison
J-G-08  Contraception

Ex. I-699

**Evaluation Method**

We toured the clinic area, inmate housing areas, receiving area, medical observation areas, mental health and segregation. We reviewed 68 health records; policies and procedures; provider licenses; administrative, health staff, and continuous quality improvement (CQI) meetings; job descriptions; statistical and health services personnel and correctional officer (CO) training. We interviewed the jail commander, command staff with the sheriff, responsible physician, director of nursing, CQI nurse, infection control/training nurse, psychiatrist, psychologist, mental health clinicians, dentist, medical records clerk, 11 health staff, six COs, and 11 inmates selected at random.

**Facility Description**:

**Location:** Southwest
**Built:** 1998
**Security:** Maximum Security
**Supervision Style:** Indirect and Remote Supervision
**Bookings:** 122/ day   44,549 annually
**Layout:** Modular and Dormitory Housing
**Capacity:** 1159          **ADP:** 914
**Males:** 970              **Females:** none
**Custody Staff Total:** 222    **Shifts:** Days, Evenings, Nights

**Findings and Comments**

***Special Note:** A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an \* in front of the standard.*

## A.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. Some areas of the program are not timely such as the receiving screening and the face-to-face evaluation after a request for care is triaged. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. As this is a maximum security jail, patients are occasionally on "lock down" status, and the nurses and mental health clinicians do not have access to them. Patients are subsequently rescheduled for their appointments, and medication administration is delayed. Also, the provider has ordered four-times-a-day diabetic checks, with the night check being completed at 2:00 a.m.

---

**Ex. I-700**

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices (and rarely at the facilities). The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody and medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented, with action items, and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and procedure

**Ex. I-701**

meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization; these reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would be recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific.
It is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken; however, documentation is lacking. The identified studies are not documented, nor are the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and re-monitors performance after implementing improvement strategies.

**Ex. I-702**

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The same drill scenarios were used, but there was no documentation. The 2016 scenarios included an active shooter, use of the restraint chair in a medical emergency, hostage scenarios, and inmate disturbance. The scenarios are developed centrally and sent to the facility staff to conduct. The drills were critiqued and shared with staff via training bulletins and at weekly staff meetings.

An actual riot involving 33 inmates and staff, some of whom were treated at the emergency room, occurred. This was not documented, but could have been.

Man-down drills are planned to occur monthly or every other month. They do occur on each shift and are described as "man on the floor", "man down in video court", or cell extractions. They are also critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, much as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a

Ex. I-703

provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis. Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.

The facilities have a large numbers of cells assigned to segregation, so it is difficult to transfer segregated inmates to a clinic or interview room for care.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2 and # 3 require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA concerns and confidentiality.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There have been 13 deaths in the last two years; eight were reported to be of natural causes, one was a homicide, and four were suicides. The administrative and clinical mortality reviews were completed, but not in a timely manner, nor were psychological autopsies for the cases of suicide. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The three compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, and autopsies and sharing with staff would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

At this facility the numbers of health and mental health related grievances filed per month or year were not available.

Inmates may appeal, with a standard guideline of level one (seven days to respond) and level two (10 days to respond).

**Recommendations**: Compliance indictors # 1 and # 2 are met, however, we recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging the grievances in the central data base, health staff maintains its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends (either monthly or quarterly) for possible patient care issues.

**Ex. I-704**

## B. MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant. Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room (for total isolation). The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked: sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. Due to his man y assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA proactively implements programs to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus; knowing a woman's pregnancy status before administering medications is imperative.

Ex. I-705

**J-B-03  Staff Safety (I).** Health staff appears to work under safe and sanitary conditions. The jail is well lit, clean and well maintained for an older jail. The space for health is limited, but the health staff has made great efforts to keep it organized and to maximize the available space. It should be an on-going effort to keep areas free of clutter and prevent overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios or a call system to be notified in emergencies, or to call if in an emergency. Examination rooms do not have call buttons. Because of this, officer presence is essential for the safety of clinical staff.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail reported that this occurs very rarely.

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**Ex. I-706**

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility for providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits, and all were current in cardiopulmonary resuscitation (CPR) training. Additionally, there is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Ex. I-707**

**Recommendations:** CIs # 1 through # 3 describe the training program for health staff so they are appropriately trained in administering medications. This training is required to be approved by the responsible health authority, facility administrator and designated physician. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** This facility does not use inmate workers in the medical observation beds area or the clinical areas. Nurses clean these areas. There are no peer health-related programs. Nurses clean the clinic spaces and medical observation beds. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for this assignment, and earn their food handler certifications.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff are scheduled to work 10-hour shifts with every other weekend off at this facility. Full-time staffing consists of forty-six (46) RNs and eighteen (18) LPNs. Ten (10) RNs are scheduled for the day shift and eight (8) are scheduled on the night shift. Four (4) LPNs are scheduled for each shift. Actual working hours may vary depending on the work load or medication round schedule. The contract physicians hold clinic seven days a week, and are on call on a rotating schedule 24 hours a day. Mental health staff consists of three full-time clinicians.

At the time of our visit, vacancies consisted of two (2) RNs, two (2) LPNs, and the chief psychiatrist. One (1) newly hired nurse was scheduled for orientation. Temporary agency staff is employed to fill vacancies.

**There are no** recommendations regarding this standard. Timely staff response to patient needs requires continual monitoring and evaluation. The length of time of medication rounds, wait times for dentist or physician appointments, or time spent in booking for an evaluation, are all components that may determine the program's staffing needs. We noted there are very few mental health clinicians given the population.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two (2) weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six (6) weeks are spent in on-site orientation and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LPN Preceptor Toolkit which consists of check lists along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two (2) years by the responsible health authority. The current procedure was last revised in 2013.

**Ex. I-708**

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours services. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks, and once a year to inspect and inventory the medication rooms.

At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the eleven (11) compliance indicators in the standard along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers.  The room was furnished with a refrigerator and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs # 2, # 4, # 5, # 7, # 8, and # 10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

Ex. I-709

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Two other areas of concern were: 1) over-the-counter medications in the nursing protocols were all prescription doses and 2) incoming detainees wait three days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LPNs put doses of medication into labeled envelopes before taking the cart or basket to the housing areas for administration. Since this process is time-consuming, LPNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task. Automation or routine chart review schedules would help the providers schedule medication renewals.

Ex. I-710

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to lock-down status. Nurses are not able to see patients during lock-down periods. There is no written procedure to determine what medications are necessary during lock-down. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be verified. Likewise, audits will insure that medications are prescribed only when clinically indicated as stated in CI # 4.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them. There is no safety check for names or allergies or which medications are to be administered at that time. This is actually dispensing and only pharmacists and providers may dispense. This violation of nursing practice is serious and a violation of the Nurse Practice Act. A change to individual patient-specific or individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery) that are ordered, which medications are delivered, and when a medication container is empty.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two dental operatory chairs, a dentist's office, a medication room, a records room, space for telemedicine/laboratory services, a patient waiting room, a radiology/x-ray room, three dialysis chairs, the nurses' area, examination space for orthopedics and sick call, and storage space. Mental health staff stated they have some office space for patient counseling. The booking area also has some space for medical services. The "second floor" has space for patient evaluations and care delivery and a few housing areas had a nurse's exam room in the central hall for nurse sick call, diabetic care and emergencies.

Nurses (one going off duty and one coming on duty) count items subject to abuse on each shift. We verified these were accurate. The three emergency crash carts are checked each shift. We counted three automated external defibrillators (AED) strategically placed around the facility.

We noted that some storage areas, if re-organized, could become interview or exam rooms for staff use.

The clinic contained all the equipment necessary to take care of the patients.

**There are no** recommendations regarding this standard.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, and drug screen urine dipstick and multiple-test dipstick urinalysis. Pregnancy test kits are not necessary as the population at this facility is male.

**Ex. I-711**

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans, and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment, and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** An access-to-care sign was posted in the upstairs area of receiving. Inmates receive instructions on access to care, the fee structure, and grievances by watching an orientation video (available in English and Spanish) in each housing area. No written information is provided as, reportedly, the inmates used it to disrupt the plumbing. Inmates who speak other languages or have a hearing impairment can use an AT&T

**Ex. I-712**

language line and TTY, respectively, and a few staff members are also conversant in sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return, and others have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** When new admissions arrive directly from the community to the jail, the booking process consists of multiple steps. In the first stage, upon arrival, the inmate sees a nurse behind a privacy screen for "pre-booking or medical clearance" screening. The nurse takes vital signs and asks questions such as injuries, risk for suicide, medications, health problems, and recent hospitalizations. An arrestee who is semi-conscious, bleeding, or severely intoxicated will be sent to the emergency room for treatment, first. If the arrestee is stable, they are cleared for the next stage of booking.

"Fast booking" allows a person with identified health issues to advance through the booking process more quickly. There could be others who do not tell the nurse they have major health issues and could have a crisis when the normal process takes 12 or more hours.

The second stage occurs upstairs. This includes the custody booking process and a more extensive receiving screening by a nurse. The three (3) nurses assigned to booking interview arrestees as soon as possible for the screening. The full medical evaluation includes a body scan for contraband, a chest x-ray for tuberculosis, and housing in a sobering cell, if needed. Safety cells are used to observe for possible suicidal behavior. Our chart reviews and the interviews we conducted confirmed the booking process takes from eight (8) to twelve (12) hours (sometimes up to 30 hours) to complete before inmates go to housing. A nurse practitioner is assigned to this area to see patients and order medications. When there is no nurse practitioner, the nurses order medications based on nursing assessment protocols.

Under the current booking process, some of the compliance indicators are met. CI # 1 addresses the pre-screening, which occurs as soon as someone exits the vehicle. CI # 2 and CI # 3 are met. CI # 4 is not applicable, as this is a booking facility for men. CI # 5 refers to the timeliness of the booking process, which can take up to eight (8), twelve (12), and sometimes up to 30 hours to complete. CI # 6 and CI # 7 are not met because some of the questions and observations required in the standard are not part of the procedure. CI # 8 through CI # 11 are met. CI # 12 addresses the regular monitoring of receiving screening, but there was no evidence of reviews of the process.

**Recommendations:** After considering the length of time most detainees spend in the booking process without being evaluated by health staff, and a plan of care developed, we looked at the booking process closely. The goal is met in that a newly arriving person is seen by a nurse right away after arrival, but this is merely the first step.

Reportedly, another nurse's station was being planned for the stage 1 area, so that two nurses could complete the initial receiving screening. This will help with the backlog. This, combined with a fully complete questionnaire, would significantly reduce the backlog and improve

**Ex. I-713**

timeliness. If all the receiving screening was completed at the first stage, resources could be shifted from the second floor.

CI # 6 a-k addresses the elements needed on the receiving screening form. Most are on the form already and adding dietary needs and recent communicable diseases symptoms would meet compliance.

CI # 8 describes the disposition of the inmate. This is not part of the receiving form and should be added. It communicates whether the person would go to general housing, medical observation beds, sobering cells, safety sells, etc. This is important for the next health care person to know what was present in booking.

CI # 12 requires that health should regularly monitor the effectiveness and safety of the receiving screening process. This can be done in quality improvement committee meetings or in another fashion.

**J-E-03  Transfer Screening (E).** Reportedly, there are 50 to 100 transfers a day to this facility from others. A transfer review procedure was initiated three months ago with a goal of a nurse's review within twelve (12) hours. This procedure was not listed in the policy and procedure manual.

The nursing staff receives a list of transferring inmates from classification staff when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said, "cleared by RN and chart checked by MD," at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, they will be evaluated at the receiving facility in a timely manner. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

---

**Ex. I-714**

The full population health assessment is the most common, and with a "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week as documented by a very short note. If an initial health assessment was in place when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through CI # 4, and the individual health assessment requires compliance with CI # 5 through CI # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during stage 2 of receiving screening. There is no 14 day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first, and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place.

**Recommendations:** The mental health screening form requires revision to include all the required questions and observations. RNs should be trained by a mental health staff. When all the questions from the standard are incorporated into the forms, revisions would comply with the 14 day mental health screening. Part of compliance is documenting those seen and still to be seen in logs or lists, to assure no one misses their evaluation when a mental health problem is identified.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking although there is no inspection of the inmate's mouth. This could be added to the first stage as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12 month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site two days a month and sees patients upon a nurse's referral. They dentist completes extractions and provides fillings, albeit rarely. The dental list shows from the time of the appointment until the patient is seen varies from five (5) to ten (10) days to two (2) months.

CI # 4 through CI # 6 are in place.

**Recommendations**: CI # 1 and CI # 2 can be addressed by incorporating oral screening into the initial health assessment standard implementation. The dentist can train the nurses to

**Ex. I-715**

complete the oral screening. The oral hygiene handout can be given at this time as well. CI # 3 can be met by preparing a list of inmates who are going to be in the facility for twelve (12) months and scheduling them for a dental evaluation.

The initial health assessment, mental health screening and evaluation, and oral care may all be accomplished by having a trained nurse or qualified health care professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves slips each night and brings them to medical services where they are date stamped, triaged as to the nature of the complaint (health, dental, or mental health), and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day, or next day, to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two (2) to four (4) days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven (7) to fourteen (14) days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight (8)days to see the nurse and in some cases waits were twelve (12) to eighteen (18) days. For the physician, the lists were five (5) days out, with some at eight (8) to twelve (12) days.

At this facility all inmates have access to the locked boxes to place requests for care confidentiality except in the segregation area. These inmates remain in their room and are screened in for walk and/or shower time. They have to give their requests for care to an officer, so confidentiality is not guaranteed. CI # 2 through CI # 5 are met.

**Recommendations**: CI # 1 requires that a qualified health care professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a qualified health care professional to see the patient before assigning the plan of care or level of care needed. General examples of the risk of current practices could include what appears to be a tension headache for the patient could be a symptom of stroke and what appears to be constipation could in fact be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and make sure there are no backlogs of forms not triaged.

CI # 3 assures all inmates, no matter which housing area, have access to care and timely evaluations. Evaluating those in segregation with no access to confidentially submit a form should be investigated.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day. They can respond to emergencies in the facility. The emergency carts are stocked with suction, AED, and other emergency medications. 911 services are called, as needed, and the hospital is within 15 miles. CI # 1 through CI # 3 are met.

**There are no** recommendations regarding this standard.

Ex. I-716

**\*J-E-09  Segregated Inmates (I).** This facility has a significant number of segregation, administrative segregation, and personal protection cells. A nurse checks these inmates three (3) times a week and signs off on the list of inmates in that housing area. There are no notes as to their condition or if they are having a problem coping with isolation. Mental health staff also checks segregation inmates.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients are escorted to on-site and off-site clinical appointments in a timely manner. The segregation areas require numerous staff to escort patients and this can be a complication. Transporting officers are alerted to special accommodations (such as medication administration or communicable diseases) for their protection. Patients' health records are sealed in an envelope, and returned the same way. CI # 1 to CI # 3 are met.

**Recommendations:** Lack of deputies may delay escort from occurring or allowing mental health staff to see a patient and should be investigated to improve timeliness.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols (also known as standardized nursing procedures in this program) include prescription medications for emergency situations, as well as routine health conditions of alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format) with guidelines for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included protocols to diagnose and prescribe medications to

**Ex. I-717**

patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols (although those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering). CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered, and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. Since the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based, and implemented in a timely manner. CI # 1, CI # 3, CI # 4, CI # 6, and CI # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place; however, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs

---

**Ex. I-718**

for Naltrexone for extended-release injectable suspension ™, etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Instead, information is clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

Representatives of community programs come on-site for classes on HIV, hepatitis, parenting, and GED preparation. We observed a few posters in the housing areas about access to care, PREA, and smoking cessation. A closed-circuit television system is in place and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that the health record documents that patients receive individual health education and instruction in self-care for their health condition. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than ten (10) special medical diets offered.

At the time of our visit, approximately 166 special diets were ordered at this facility. A registered dietitian reviews the medical diet menus annually (in July). At the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference.

CI # 1, CI # 3, CI # 4 and CI # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months and whenever a substantial change in the menus is made. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

**Ex. I-719**

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard is that when someone with a chronic disease enters a corrections facility, he or she is identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component, with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications and "return to clinic" appointments as set.

This program has one chronic disease pathway for hypertension which was revised in 2014. It is in the procedure manual and guides the nurses' care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines," which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases and/or medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases which, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on. Forms should be developed for better documentation by providers and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test and the frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

---

**Ex. I-720**

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC offer treatment guidelines and forms that can be revised to fit a particular program.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to the frequency of follow-up for medical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens and, when appropriate, instructions about diet, exercise, adaptation to the correctional environment, and medication, is needed. A review of inmates with active medical instructions indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called Medical Observation Beds (MOB). Seventeen (17) or these beds are for medical patients and thirty (30) are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patients should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal, and directs the nurses to use the standard nursing protocols. The protocol instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients and felt some of them were at infirmary level of care, and required a physician directing the care plan and medications.

The responsible physician and RHA, should review the use of the MOB and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds and sheltered housing. The discussion section further explains what

**Ex. I-721**

infirmary care is and the alternatives. Some programs have a low level of care and have shelter housing beds where nurses may admit. Others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CI # 3 and CI # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define and distinguish admissions to the infirmary from observation and/or shelter beds from outside hospital admissions. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CI # 8 and CI # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use. This includes lab results, consent forms, and admission forms.

**\*J-G-04   Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and are referred to the onsite mental health program staff. A mental health clinician is in the stage 2 booking level daily to evaluate those inmates with mental health conditions. There are some safety cells (suicide watch or violence watch) if needed. There are also enhanced observation cells for special housing. The staffing included a position for a supervising psychiatrist (vacant at the time of our visit), and the chief clinician. Three mental health licensed clinicians respond to patients needs for evaluations. The psychiatric team is supplemented with contract psychiatrists who receive referrals and calls for evaluations and who order medications. The team provides some programming for patients, as well, to include the PET or puppies therapy sessions.

CI # 1, CI # 3, CI # 4, CI # 5, and CI # 6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five (5) areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05   Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor, and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or

**Ex. I-722**

medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program.

In the last two years, the facility has had thirteen (13) deaths, four (4) of which were suicides. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were completed for the cases of suicide but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit and was to continue until all health, mental health, and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health, and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings. During these meetings, special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CI # 1 and CI # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled. CI #  6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective, assessment, and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells (on the second floor, above booking), but does not address those inmates going through withdrawal in general housing, segregation, or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours (if not symptomatic in booking).

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care. The nurses manage the withdrawal using the protocol. When a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

**Ex. I-723**

This is a men's facility. The pregnant opiate patient discussed in CI # 7 is not applicable.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CI # 3, CI # 4, and CI # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring, and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension ™, and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** The population at this facility is all male. The standard is **not applicable.**

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** The population at this facility is all male. The standard is **not applicable**.

**J-G-10  Aids to Impairment (I).** During the visit, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs approximately six (6) to eight (8) times a year. There is no formal procedure. Staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program. If a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CI # 1, CI # 2, and CI # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

Ex. I-724

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and/or emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room which is accessible to the clerical staff who manage the records, and the electronic record is password-protected. Health and custody staff undergo annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two (2) senior medical records technicians, ten (10) technicians, one (1)  clerk and one (1) office assistant. Some of the staff are located in the central administrative office and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**There are no** recommendations regarding this standard. We recommended that you continue the purchase of an integrated, complete medical record.

**Ex. I-725**

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a written policy and defined procedures specify which health services staff have access to custody records and under what circumstances.

### I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one (1) hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four (4) hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four (4) hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every fifteen (15) minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Restraint is reportedly rarely applied. There are two restraint chairs in the facility and deputies carry TASERs™ and handcuffs. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CI # 1, CI # 2, and CI # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place.

---

**Ex. I-726**

According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every fifteen (15) minutes for four (4) hours when a medication is given to someone in an emergency.

There is a process in place, through the courts, for forced medications. The PSU had approximately six (6) to eight(8) patients on this program system-wide. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed, revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** It was reported that health staff does not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice, the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four (4) compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions, or living wills that an inmate arrives with, would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: In this standard, Inmates approaching the end of life are permitted to execute advance directives including living wills, health care proxies, and "do not resuscitate" (DNR) orders. CI # 1 through CI # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d. emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**Ex. I-727**

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research or a patient on a medical trial or participant in a research project.

# Mental Health Report:

**SAN DIEGO CENTRAL JAIL**

**Staffing:    3.0 FTE Psychiatrists**
**1.0 FTE Psychologist**
**3.0 FTE Mental Health Clinicians (includes system Mental Health Director)**

**Overview:** The mental health services at Central Jail are primarily provided by nurses, who complete the mental health screenings and determine the acuity of the mental health needs, and by the psychiatrists, who complete the 14-day assessment, and monitor medications. There is one psychologist, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has three mental health professionals (master's level, licensed at Marriage and Family Therapists) who primarily respond to crises and try to provide two, four-hour "mental health clinics" each per week, but these are often interrupted or not held due to facility needs or other issues, including lack of staff or lock-downs on individual housing modules.

Mental health staff members (including psychiatrists and the mental health professionals) respond to inmate requests for service, and see inmates who are scheduled by nursing staff in response to requests or referrals. It was reported, and noted in chart reviews, that 10% of scheduled appointments with mental health staff members are cancelled, and 60% of the charts we reviewed indicated at least one missed appointment. It was further reported that it takes at least one week for an inmate to be seen following a request or a referral, which is outside of the time frame required by NCCHC.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There was much confusion across facilities, and including at the Central Jail, about the requirements of the program and how to implement it. The expressed understanding of it at the Central Jail is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and his involvement in the Safety Program is his only duty. Staff members did not express an

**Ex. I-728**

understanding of the design of the Safety Program as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the program, however, is that inmates who are identified as high risk cannot be released prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute monitoring if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

A review of inmate charts indicated inappropriate assessment of suicide risk. It appears that the clinicians do not maintain an awareness of suicide risk over time, instead judging or evaluating each incident as being isolated from the individual's history within the facility and within the community. There are inconsistencies in designating the level of risk that do not follow from the current and historical data from inmates who are being assessed. This results in insufficient or inaccurate designations of suicide risk, and ultimately a higher risk of inmates attempting or completing suicide.

The sworn staff members reportedly are not trained in suicide prevention training. While an eight-hour class on mental health in the jail has been initiated, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate that is above the national average over the past two years; in 2015, it was 33:100,000, which is right at the national average, and in 2016, it was 99:100,000 in 2016, nearly three times the national average. The average for the last two years is 61:100,000, which is nearly double the national average of 36:100,000 in jails in the United States.

## Psychiatric Services:

Psychiatrists do a very good job assessing the mental health status and needs of inmates who are in the facility for at least 14 days. The 14-day assessments are thorough and completed in a timely manner. The documentation we reviewed indicated that they provide quality treatment to inmates, although as noted above, this is not always in a timely manner as a result of cancelled appointments and the heavy inmate/patient load.

Dr. Badre, who is responsible for the Psychiatric Security Unit, which is essentially an inpatient mental health unit, has reportedly done a great job reducing the length of stay in this unit, and has modified it so it functions very similarly to psychiatric hospitals in the community. In addition to the services provided on the PSU, there is a step-down unit on the sixth floor that serves to monitor and maintain inmates who are psychotic or gravely disabled and yet not in need of the highly acute services provided on the PSU. This is a very effective utilization of services, and meets the needs of those inmates who continue to be psychotic and gravely disabled. Additionally, the psychiatrists maintain data on the number of inmates in segregation who have psychotic disorders; as a result of diligent monitoring, this number has been consistently reduced, which is appropriate for those with severe mental illness.

Ex. I-729

It was reported that inmates who enter the Central Jail and are taking psychotropic medication frequently do not have that medication continued in a timely manner. This results in instability and risk for the inmate, for custody staff and for the facility. Additionally, it was reported that psychiatrists receive requested laboratory reports less than 50% of the time.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. Unfortunately, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia). The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**NCCHC STANDARDS RELATING TO MENTAL HEALTH:**

**J-A-01: Access to Care:**                                    **Not Met for Mental Health**
    Inmates do not have their requests or referrals for mental health services responded to in a timely manner.
**J-A-10: Procedure in the Event of an Inmate Death:**        **Not Met for Mental Health**
    There is no psychological autopsy for completed suicides.
**J-A-11: Grievance Mechanism for Health Complaints:  Not Met for Mental Health**
    There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.
**J-C-04: Health Training for Correctional Officers:**        **Not Met for Mental Health**
    Suicide Prevention training is not provided for "sworn" staff/correctional officers.
**J-E-05: Mental Health Screening and Evaluation:**          **Not Met for Mental Health**
    Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.
**JE-07: Nonemergency Health Care Requests and Services:  Not Met for Mental Health**
    Mental health does not respond to these requests within the time frames required by NCCHC.

---

**Ex. I-730**

**J-E-09:  Segregated Inmates:**                                  **Partially Met for Mental Health**
Segregation rounds are provided by nursing staff, which meets NCCHC standards.  Mental health staff are not reviewing inmate records prior to placement in segregation for any possible contraindications to placement in segregation.

**J-E-13:  Discharge Planning:**                                  **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:  Basic Mental Health Services:**                                  **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**JG-05:  Suicide Prevention Program:**                                  **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.


**<u>RECOMMENDATIONS:</u>**

1. It is recommended that the facility increase the number of mental health professionals to a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate.
2. It is recommended that the facility implement the CIWA and COWS protocols for alcohol and opiate withdrawal.
3. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
4. It is recommended that nursing staff that do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
5. It is recommended that mental health staff members see and address mental health grievances.
6. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
7. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

**Ex. I-731**

San Diego Sheriff's Department
George F. Bailey Detention Facility (GBCF)
Technical Assistance Report
January 5, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails.* On January 5, 2017, NRI conducted its review for the George F. Bailey Detention Facility (GBCF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 39 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 28 essential standards:

<u>Essential Standards</u>
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-02   Clinical Performance Enhancement
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care

Ex. I-732

J-E-07   Nonemergency Health Care Requests and Services
J-E-08   Emergency Services
J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patients With Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication

Essential Standard Not Applicable
J-G-09   Counseling and Care of the Pregnant Inmate

There are 27 important standards and 25 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure In the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-10   Patient Escort
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-11   Care For the Terminally Ill
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison
J-G-08   Contraception

Ex. I-733

**Evaluation Method**

We toured the clinic area, inmate housing areas, transfer area, mental health housing/PSU, segregation/administration segregation and MOB (medical observation area). We reviewed thirty-one (31) health records; policies and procedures; provider licenses; administrative, health staff, and continuous quality improvement (CQI) meeting minutes; statistical reports; and health services personnel training and licensure logs. We interviewed the day shift sergeant, contract physician, facility nursing supervisor, CQI nurse, psychiatrist, psychologist, dentist, eleven (11) health staff, five (5) COs, and nine (9) inmates selected at random.

**Facility Description**

**Location:** Southwest
**Built:** 1993
**Security:** Maximum
**Supervision Style:** Indirect Supervision
**Bookings/Transfers:** 50 to 75 transfers in per day
**Lay Out:** Modular
**Capacity:** 1852
**Males:** 1653   **Females:** none   **Juveniles:** none
**Custody Staff: Total:** 189 over three shifts

**Findings and Comments**
***Special Note:*** *A mental health report summary and comments about the standard related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard.*

## B.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

***J-A-01  Access to Care (E).*** Inmates have access to daily health care via written request slip or notifying officers. Patients see a qualified clinician and receive care for their serious medical, mental health, and dental needs. Physician and nurse sick call is held daily. As this is a maximum security jail, patients are occasionally on "lock down" status and the nurses and mental health clinicians do not have access to them. When this occurs, patients are subsequently rescheduled for their appointments, and medication administration is delayed. Approximately 20% to 30% of mental health appointments were not completed, based on our review.

**Ex. I-734**

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.
A back-up plan should also be developed for lock-down times to ensure critically ill patients receive their necessary care.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator who is normally in the administrative offices and rarely at the facilities. The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody, medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings (some system-wide and some facility-specific) which are all documented with action items and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI meeting, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and

**Ex. I-735**

procedure meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization; these reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise, and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas and discussion and action steps to be taken. Documentation in this area is lacking. The identified studies are not documented, nor are the effectiveness of the corrective action plans. The committee identifies

---

**Ex. I-736**

problems, establishes thresholds, designs monitoring activities, analyzes the results and remonitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2, and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities, and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.
This jail's staff expressed concern about the staffing allocation, especially in reflection of the backlog of medical requests for care. A CQI audit and study of the staffing, workload, overtime, turnover, rescheduling and work flow and access to the patients would assist in evaluating and recommending any staffing or procedural changes. Documenting the complete quality improvement process or outcome study alerts everyone as to the problem and how a solution or new process was reached. Quality improvement is a continuous process (Problem, Do, Study, Act) and when the procedure is re-audited, it is possible to determine if it has been successful, or further research is required.

**J-A-07   Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills were on the day shift, but there was no documentation. The 2016 drills were described as an active shooter, use of a restraint chair in a medical emergency, hostage scenarios, and inmate disturbance. The scenarios are developed centrally and sent to facility staff to conduct. The drills were critiqued and the results were shared with staff via the training bulletins and weekly staff meetings.

There was a real riot event that involved 33 inmates and staff, some of whom were sent to the emergency room. This was not written up as real disaster event, but could be an example of using actual events, and should be critiqued and the results shared with staff.

Man-down drills are planned to occur monthly or every other month. They do occur on each shift and the scenarios are described as "man on the floor," "man down in video court," and cell extraction. These have also been critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1g describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually where health staff are regularly assigned. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards.

**Ex. I-737**

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. There are exam rooms in each modular area of the jail so nursing staff may see patients in privacy with an officer stationed nearby. In the clinic exam rooms, they "try to do exams in private as much as possible." By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a provider, or nurse, from obtaining an inmate's full description of his or her problem to make a diagnosis. Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.

The facilities have a large numbers of cells assigned to segregation, so it is difficult to transfer segregated inmates to a clinic or interview room for care.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2, and # 3 require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA concerns and confidentiality.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There have been eight inmate deaths in this facility. Five (5) were reported to be of natural causes and three (3) by suicide (two by hanging and one inmate jumped from a top tier). The administrative and clinical mortality reviews were completed, but not in a timely manner, nor were psychological autopsies for the cases of suicide. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

**Ex. I-738**

It was estimated that the jails have around 15 to 25 complaints per week. We reviewed the handwritten grievance log at this facility for December 2016. Nineteen (19) grievances were recorded. If this log were to be maintained, it would facilitate identifying trends.

Inmates may appeal, with a standard guideline of level one (seven days to respond), and levels two (10 days to respond each).

**Recommendations**: Compliance indictors # 1 and # 2 are met. We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

> The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail or in the positive pressure room (for total isolation). The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked. Sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**Ex. I-739**

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** This jail has a small medical unit and the storage organization is poor. We observed boxes and carts in the halls that were used to hold doors open. The storage area is crammed and things could fall off hooks. Even though the area appeared clean and well lit, the clutter presents an injury risk. It is important to keep areas free of clutter and overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios, which were not available at the time of the visit, or implementing a call system in order to be notified of emergencies or to call if in an emergency. Exam rooms do not have call buttons. Officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail reported that this occurs very rarely.

**There are no** recommendations regarding this standard.

**Ex. I-740**

## C. PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff. Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits and all were current in cardiopulmonary resuscitation (CPR) training. There is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LVNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**Ex. I-741**

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LVNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3, describe the medication administration training program to be approved by the responsible health authority, facility administrator and designated physician. The pharmacist would be an important component for evaluating the knowledge level of the LVN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** This facility does not use inmate workers in the medical observation beds area or the clinical areas. Nurses clean these areas. There are no peer health-related programs. Nurses clean the clinic spaces and medical observation beds. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for this assignment, and earn their food handler certifications.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff work 10.5 hour shifts with every other weekend off at this facility. The nurses total 33 full-time RNs and 20 full-time LVNs. Nine (9) RNs are scheduled for the day shift and seven (7) on the night shift. Five (5) LVNs are scheduled for each shift. The actual work hours may be staggered to accommodate work load or medication round schedules. The contracted physicians hold clinic daily and two (2) are in the clinic on Thursdays. They are also on call. Mental health staff consisted of two (2) clinicians.

At the time of our visit, vacancies consisted of four (4) RNs, one (1) LVN, and the chief psychiatrist, although two (2) RN positions and the LVN position were pending hires. Temporary agency staff are employed to fill vacancies.

**There are no** recommendations regarding this standard. Timely staff response to patient needs requires continual monitoring and evaluation. The length of time of medication rounds, waiting lists for dentist or physician appointments, or time spent in booking for an evaluation, are all components that may determine staffing needs. We noted there are very few mental health clinicians given the population.

**Ex. I-742**

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two (2) weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six (6) weeks are spent in on-site orientation and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LVN Preceptor Toolkit which consists of check lists, along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two (2) years by the responsible health authority. The current procedure was last revised in 2013.

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

---

**Ex. I-743**

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LVNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LVNs put doses of medication into labeled envelopes before taking the cart or basket to

---

**Ex. I-744**

the housing areas for administration. Since this process is time-consuming, LVNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to "lock-down" status. Nurses are not able to see patients during lock-down periods. There is no procedure in place to evaluate who is on essential medications or how to work with custody staff for a solution. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be validated.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing, and only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery), or require reordering.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two (2) clinic exam rooms, a medication room, one (1) dental chair, a records room, a mental health interview room and a radiology/x-ray room in the transfer area (with additional services from an outside provider that comes on site twice a week). The nurses' area has five (5) stations. It is next to an open storage cubby area where the emergency response stretcher and other equipment, plus boxes of supplies, crutches, etc. are stored. This area had quite a lot of overspill during the visit. The nurse's station is also central to the MOB and mental health housing area. There are also offices for mental health staff, the charge nurse, nursing supervisor, and a clerical area for charts and files.

**Ex. I-745**

We counted the sharps and needles with staff and found them to be accurate.

The two (2) emergency crash carts are checked each shift and we counted three (3) automated external defibrillators (AED) strategically placed around the facility.

The clinic contained all the equipment necessary to take care of the patients.

**There are no** recommendations regarding this standard.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, and drug screen urine dipstick and multiple-test dipstick urinalysis. (Pregnancy test kits are not necessary as the population at this facility is male.)

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

Ex. I-746

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care and the various fees and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return and others have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** This facility is designated as a transfer facility as it only received detainees from other jails within the system. When the nurses complete the transfer screening, they should ensure the receiving screening is completed and if not, schedule the inmate appropriately.

The standard is **not applicable**.

**J-E-03  Transfer Screening (E).** This program has multiple jails so it is reported that there are 50 to 100 transfers a day from other facilities to this jail. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours. This procedure was not listed in the policy and procedure manual.

The nursing staff receives from classification staff a list of transferring inmates when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said "cleared by RN and chart checked by MD" at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, the receiving nurse schedules the inmate and sees that it is

Ex. I-747

completed in a timely manner. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4 and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The nurse at the booking facility completes the mental health screening, which a nurse at the transfer jail reviews upon the inmate's arrival. The 14-day evaluation program is not in place: however, the mental health team should have a mechanism in place to track positive mental health screenings so these patients are seen for their evaluation before 14 days. This second step of reviewing the screenings and making the evaluation appointments may be completed by a qualified health professional or a clinician. This review and referral would assure that some inmates with mental health problems and a referral were not missed by the intake nurse. The current, lengthy process does identify most mental health patients, however. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first and refer to a psychiatrist or psychologist. CIs # 3 through # 7 are in place and the policy and procedure revision may include all the questions needed and the evaluation.

**Recommendations:** The mental health screening form requires revision to include all the required questions and observations. RNs should be trained by a mental health staff. The referrals from booking to mental health could reflect a 14-day evaluation if that program was in place. If a formal program was in place, there would be a policy and procedure tracking logs/lists and staff assigned to complete the evaluations by the 14th day of incarceration. The

**Ex. I-748**

mental health team does complete many evaluations for those with positive screenings, although they are not tracked for timeliness.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening occurs at the second stage of booking before inmates are transferred to this facility. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications. The dentist was not on duty the day of the consultation

There is no twelve (12) month oral examination by a dentist. The standard states that a trained health care professional may complete the screening before fourteen (14) days. A procedure can be set up to complete the health, mental health, and dental screening at the same time. The dentist completes extractions and sometimes provides a filling.

There is no evidence of any handouts for the inmates regarding oral hygiene and preventive oral education. CIs # 4 through # 6 are in place.

**Recommendations**: CI # 1 and # 2 can be addressed by incorporating oral screening and education into the booking process. The dentist can train the nurses to conduct the screening. CI # 3 can be met by preparing a list of inmates who have been at the facility for eleven (11) months and scheduling them for a dental examination to occur before their anniversary. The initial health assessment, mental health screening and evaluation, and oral care may all be accomplished by having a trained nurse or qualified healthcare professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves them each night and brings them to medical services, where they are date stamped and triaged as to the nature of the complaint (health, dental, or mental health), and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day or next day to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two (2) to four (4) days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven (7) to fourteen (14) days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight (8) days to see the nurse and some were twelve (12) to eighteen (18) days. For the physician, the lists were five (5) days out, with some at eight (8) to twelve (12) days.

Segregated inmates at this facility can also deposit request slips in the box during their hour "out of cell."

CIs # 2 through # 5 are met.

Ex. I-749

**Recommendations**: Compliance indictor # 1 requires that a qualified health professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What seems a head ache for the patient could be a symptom of stroke. Constipation could actually be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

CI # 3 assures all inmates, no matter which housing area, have access to care and timely evaluations.

One serious issue we identified is the backlog of 300 medical request slips that have not been answered with a face-to-face evaluation. Some were assigned a triage level and rescheduled over and over. This situation should be investigated and resolved as patients' serious health care needs are being delayed. We reviewed eleven (11) medical requests for care and most were answered by a nurse in two (2) to three (3) days. The plan of care was appropriate, and there were two (2) in which the nurse started a prescription medication.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day. They can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called, as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** This facility has a significant number of segregation/administrative segregation and personal protection cells. A nurse checks these inmates three (3) times a week and signs off on the list of inmates in that housing area. There are no notes as to their condition or if they are having a problem coping with isolation. Mental health staff also checks segregation inmates.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

---

**Ex. I-750**

**J-E-10  Patient Escort (I).** Patients are usually escorted to on-site and off-site clinical appointments in a timely manner. Transporting officers are alerted to special accommodations (such as medication administration or communicable diseases) for their protection. Patients' health records are sealed in an envelope during transport and returned the same way. In this facility's general housing areas, patient escort seems to occur efficiently. CIs # 1 to # 3 are met.

**Recommendations:** One area to look at in this facility are the segregation areas where a lack of deputies may delay escorts from escorting a patient to the clinic or allowing mental health in to see a patient.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols (also known as standardized nursing procedures in this program) include prescription medications for emergency situations, well as routine health conditions, alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format), with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016; most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included diagnosing and prescribing medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations. CI # 3 addresses prescription medications that should not be present in the protocols except those for those used in emergency responses, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year. The last time was in 2013, but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no

**Ex. I-751**

evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place; however, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs for Naltrexone for extended-release injectable suspension ™, etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Information is instead clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

Representatives of community programs come on site for classes on HIV and hepatitis, parenting, and GED preparation. We observed a few posters in the housing areas about access to care, PREA, and smoking cessation. A closed-circuit television system is in place and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

Ex. I-752

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen, under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than ten (10) special medical diets offered.

At the time of our visit, approximately 166 special diets were ordered at this facility. A registered dietitian reviews the medical diet menus annually, in July, but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference.

CIs # 1, # 3, # 4, and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, they are identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care for the goal of stability. Some programs have a formal chronic disease component with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect where the physicians follow approved guidelines and order labs, treatment, medications, and "return to clinic" appointments as set.

This program has one chronic disease pathway for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines" which address areas like blood borne pathogens, suboxone, blood

**Ex. I-753**

pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard, and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers, and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory tests, frequency of orders, what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care, as reflected in the health record, appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with active medical instructions, according to need indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has 30 designated medical beds called "Medical Observation Beds (MOB) for those with medical needs or those who are handicapped. Eight (8)

**Ex. I-754**

are for low acuity medical patients and are located close to the nurses' station and twelve (12) enhanced observation beds are used for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patients should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal and directs the nurses to use the standard nursing protocols. The protocols instruct them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients and felt some of them were actually at infirmary level of care and required a physician directing the care plan and medications.

The responsible physician and RHA should review the use of the MOB and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds, and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds where nurses may admit, while others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The ten (10) compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation/shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use. These include lab results, consent forms, and admission forms.

**\*J-G-04   Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and are referred to the on-site mental health program staff. A mental health clinician is in the stage 2 booking level daily to evaluate those inmates with mental health conditions. There are some safety cells for suicide watch or violence watch, if needed. There are also enhanced observation cells for special housing. The staffing included a position for a supervising psychiatrist, which was vacant at the time of our visit, and the chief clinician. Three mental health licensed clinicians respond to patients' needs for evaluations. The psychiatric

Ex. I-755

team is supplemented with contract psychiatrists who receive referrals and calls for evaluations and who order medications. The team provides some programming for patients as well.

CIs # 1, # 3, # 4, # 5 # 6 are all met, with the caveat that there are three (3) clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five (5) areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee, and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor, and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program.

In the last two years, the facility has had 13 deaths, four of which were suicides. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were completed for the cases of suicide, but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit, and was to continue until all health, mental health and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards**.**

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings, where special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CIs # 1 and # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled.

**Ex. I-756**

CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective, assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells on the second floor, above booking, but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours, if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care. The nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This is a men's facility. The pregnant opiate patient discussed in CI # 7 is not applicable.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring, and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** The population at this facility is male. The standard is **not applicable.**

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** The population at this facility is male. The standard is **not applicable**.

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints, and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting and a list of patients using various appliances is maintained. It is also documented in the health record and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**Ex. I-757**

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs approximately six (6) to eight (8) times a year. There is no formal procedure. Staff explained that the first step, after diagnosing such a condition and that the patient can no longer care for himself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program. If a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the records and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although, a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room and are accessible to the clerical staff who manage the records. The electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two (2) senior medical records technicians, ten (10) technicians, one (1) clerk and one (1) office assistant. Some of the staff is located in the central administrative

Ex. I-758

office, and others are in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Recommendations:** We recommended continuing the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The CI requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LVN to monitor the patient's mental and psychological status at least every 15 minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, restraints are not often applied in this system. A chair and a gurney can be used when necessary for a short period of time. The day shift sergeant reported that, thanks to the excellent crisis intervention training they receive, there have been few situations that required

**Ex. I-759**

the use of restraints, and then only for a short period of time. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2 and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency.

There is a process in place, through the courts, for forced medications. The PSU had approximately six to eight patients on this program system-wide. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed, revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** The day shift sergeant reported that that health staff do not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions or living wills that an inmate arrives with would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or do not resuscitate order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign consent for treatment when they go through the booking process; this consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and

**Ex. I-760**

documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program, and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research, a patient on a medical trial, or a participant in a research project.

## Mental Health Report:

**GEORGE BAILEY CORRECTIONAL FACILITY**

**Staffing:**        1.2 FTE Psychiatrists
                 1.0 FTE Psychologist
                 2.0 FTE Mental Health Clinicians

**Overview:** The mental health services at George Bailey are primarily provided by the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. They hold mental health clinics during the week to provide individual counseling, but the clinics are often cancelled and are not sufficient to meet the need for mental health services. The number of mental health clinicians doubled recently, from 1.0 to 2.0 FTE, but this is still insufficient to meet the need for mental health treatment. There are two psychologists, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 1.2 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at George Bailey, about the requirements of the program and how to implement it. The expressed understanding of it at the Central Jail is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30

**Ex. I-761**

minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and involvement in the safety program is his only duty. Staff members did not express an understanding of the design of the safety program as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the safety program, however, is that inmates who are identified as high risk cannot be released from the program prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the safety program, which may not include even 15-minute observation status in a safety cell if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly are not trained on suicide prevention. While an eight-hour mental health class has been implemented, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate at George Bailey that is above the national average over the past two years: in 2015, it was 200:100,000, nearly six times the national average, and in 2016, it was 100:100,000, which is nearly three times the national average. Combined for the last two years, it average is 150:100,000 per year, which is nearly five times the national average of 36:100,000 in American jails.

## Psychiatric Services:
Psychiatrists effectively treat inmates who are on psychotropic medications. Unlike at the Central Jail, the mental health clinicians and nursing staff typically refer inmates to see the psychiatrist, rather than seeing them for the mental health assessment.

George Bailey only has 1.0 FTE psychiatrist staff, which appears to be insufficient to meet the population's needs. Reportedly, the waiting list consists of 150 people, and one to three weeks.

Reportedly, 10 - 20% of inmates at the facility do not have their medications continued in a timely manner. Although this is better than the reported 50% or more who do not have their medications continued at Central Jail, this is still inadequate and is not meeting the mental health needs of those incarcerated in this facility.

The system emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. Unfortunately, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Ex. I-762**

**Mental Health Professionals:**

There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness, such as bipolar disorder or schizophrenia. The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

Mental health professionals reported that they see approximately 100 inmates per week, although as noted above, most of these are "wellness checks" and not appropriate counseling or more comprehensive mental health services.

It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**Segregation:**

The mental health professionals reported that they conduct segregation rounds three times per week, which exceeds the NCCHC requirement. This is very positive, and should help to ensure that inmates do not decompensate while in segregation. Unfortunately, segregation at George Bailey is used not only for disciplinary infractions, but also for inmates who simply have a mental illness, on the grounds it keeps them safe.

**NCCHC STANDARDS RELATING TO MENTAL HEALTH:**

**J-A-01:**      **Access to Care:**      **Not Met for Mental Health**
Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10:**      **Procedure in the Event of an Inmate Death:**      **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**      **Grievance Mechanism for Health Complaints:**      **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**      **Health Training for Correctional Officers:**      **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**      **Mental Health Screening and Evaluation:**      **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**      **Nonemergency Health Care Requests Services: Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**      **Segregated Inmates:**      **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit. Additionally, security or classification staff members are placing inmates in segregation because they are mentally ill, not due to disciplinary infractions, which violates NCCHC standards.

Ex. I-763

**J-E-13:**      **Discharge Planning:**                **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**      **Basic Mental Health Services:**          **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**      **Suicide Prevention Program:**          **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

## RECOMMENDATIONS:

1. It is recommended that the facility increase the number of mental health professionals to a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate.
2. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
3. It is recommended that nursing staff who do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
4. It is recommended that mental health staff members see and address mental health grievances.
5. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
6. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

**Ex. I-764**

San Diego Sheriff's Department
Las Colinas Detention and Re-Entry Facility (LCDRF)
Technical Assistance Report
January 6, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails.* On January 6, 2017, NRI conducted its review for the Las Colinas Detention and Re-Entry Faculty (LCDRF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 40 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 28 essential standards:

<u>Essential Standards</u>
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services

Ex. I-765

J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patients with Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-G-08   Counseling and Care of the Pregnant Inmate
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication

Essential Standard Not Applicable
None

There are 27 important standards and 26 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure in the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-03   Clinic Space, Equipment and Supplies
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-08   Contraception
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison

Ex. I-766

**Evaluation Method**

We toured the clinic area, the many inmate housing areas, segregation/administrative segregation, intake/receiving area, administration, library, psychiatric security unit, MOB (medical observation housing), industries, reentry service building and their recreation building. We reviewed 25 health records; policies and procedures; provider & nursing licenses; administrative, health staff, continuous quality improvement (CQI) meeting minutes; and statistical reports. We interviewed the jails administrative lieutenant, physician, nursing supervisor, CQI nurse, psychiatrist, psychologist, dentist, medical records clerk, five correctional officers (COs), nine other health staff, and 15 inmates selected at random.

**Facility Description**

**Location:** West/Southwest
**Built:** 2014
**Security:** Six levels/ from minimum to maximum
**Supervision Style**: Direct supervision
**Bookings:** 46/day
**Lay Out:** Campus-style with 24 housing areas around the parameter, and many service buildings inside the parameter. Half the population is able to walk to medical services, dining hall, industries, etc. The higher security females are escorted.
**Capacity:** 1270   **ADP** 730   Few units closed
**Males:** none        **Females:** 731    **Juveniles:** none
**Custody staff:   Total:** 204 working 12 hour shifts    **Days:** 46      **Nights:** 45

**Findings and Comments**
**\*Special Note**: A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard.

### C.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. The staff at this jail complies with timeliness of receiving screening and transfers. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. Although this is a minimum-to-maximum security jail, "lock-down" and subsequent delays to care are not an issue here.

**Ex. I-767**

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** The staff at this facility responds in a timely manner to inmates who come to the clinic, and during medication rounds and other treatment. However, processing requests for care is problematic. The "hands-off" triage procedure used in this system results in many requests being scheduled further and further "out." The patient then submits more requests and the problem becomes compounded, with a backlog of 150 requests for care at the time of NRI's visit. A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices and rarely at the facilities. The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) #2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody and medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented, with action items, and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

**Ex. I-768**

Other meetings include the quarterly CQI, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and procedure meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization. These reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system, with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E)**. The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken, although documentation is lacking. The identified studies are not documented, nor is

**Ex. I-769**

the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and remonitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities, and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills were on the day shift, but there was no documentation. For this jail, the last four drills were scenarios of an active shooter, a hostage situation, an evacuation, and a fire drill. The scenarios are developed centrally and sent to facility staff to conduct. The drills were critiqued and the results were shared with staff via the training bulletins and weekly staff meetings.

Man-down drills are planned to occur monthly or every other month on each shift, but documentation was not available.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The on-site contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information in this facility provides the necessary privacy for patient care. The clinical area is large, with a nurse's station in the center. Curtains are pulled when exams are being conducted, while the officer waits near the nurse's station. Since most of the jail houses inmates of minimum to medium

**Ex. I-770**

security levels, patients can walk freely around the campus and go to medical and mental health appointments. If there are security concerns, however, the patient is escorted and the officer waits in the hall for the encounter to end.

Most of the housing areas also have an exam room for nurse sick call, and privacy is respected by closing the door.

In the open receiving/booking area, two nurses are located alongside custody staff. This provides an opportunity for custody staff to overhear the booking procedure.

**Recommendations:** CI # 1 discusses the need for patient care to occur in private, which is the case in the clinic, but not during the second stage of booking. If a privacy screen, or barrier to hearing patient's health information were to be installed in that area, compliance would be achieved. There is privacy during the first stage of booking. CIs # 2 through # 5 are met.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There has been one inmate death in the last two years (reportedly due to natural causes). The administrative review was completed, but not in a timely manner. There was no clinical mortality review, however. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days, and cases of suicide require a psychological autopsy in addition to the administrative and clinical mortality review. Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level and as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints and give the inmate a copy of the results. All grievances, health and custody-related, are logged into the central computer system.

At this facility, an average of 20 health-related grievances is filed per week. The charge nurse answers first, the nursing supervisor second, and the chief medical officer is the third level of appeal. As described in the policy and procedure, the time intervals for responding are seven days for level one, and 10 days for levels two and three.

**Recommendations**: CIs #1 and #2 are met, however, we recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

---

**Ex. I-771**

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room for total isolation. The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked: sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports. They are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

Ex. I-772

**J-B-03  Staff Safety (I).** Health staff appears to work under safe and sanitary conditions. The jail is well lit, clean and well maintained for an older jail. The space for health is limited, but the health staff makes great efforts to keep it organized and to maximize space.  It is important to keep areas free of clutter and overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios. They were not available at the time of the visit. The facility may consider implementing a call system in order to be notified of emergencies or to call if in an emergency. The exam rooms do not have call buttons. Officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented, and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail (which houses females) reported this has not occurred.

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. This includes the obstetrical/gynecological physician who comes to this facility. Copies of licenses are maintained

**Ex. I-773**

in the central administrative office and on site, with each nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits, and all were current in cardiopulmonary resuscitation (CPR) training. An annual training program, consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

**Ex. I-774**

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3 describe the training program to be approved by the responsible health authority, facility administrator and designated physician, for health staff so they are appropriately trained in administering medications. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects, and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** Inmates workers do not generally work in the MOB or clinic areas, although staff reported that they mop the floors and empty the trash under a nurse's supervision. Nurses clean the clinic tables and equipment. Inmate workers may also clean an empty bed after the patient has left. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for the assignment, and can earn their food handler certifications. This facility specializes in offering the inmates training in sewing, and other educational and vocational programming. There was no mention of any peer related programming.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** All the staff at this facility is full-time and is scheduled for 10-hour shifts, with every other weekend off. There are 40 RNs and 16 LPNs. Nine RNs are scheduled for the night shift and 11 for the day shift. Four LPNs are scheduled on each shift. Actual working hours may be staggered to accommodate work load or medication round schedules.

The contract physicians hold clinic seven days a week, and are on call on a rotating schedule 24 hours a day. Two OB/GYN physician clinics are held each week. On Tuesdays, only patients with gynecological problems are seen, and on Thursdays, only pregnant women are seen. Mental health staffing consists of three full-time clinicians. At the time of our visit, there were five RN vacancies (note the schedule shows five RN vacancies and the global report says five LPN vacancies). One nurse was waiting to begin orientation. Temporary agency staff is employed to fill vacancies.

**There are no** recommendations regarding this standard.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six weeks are spent in on-site orientation, and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LPN Preceptor Toolkit, which consists of check lists, along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Ex. I-775**

**Recommendations:** CIs # 2 requires that the orientation program policy and procedure be reviewed once every two years by the responsible health authority. The current procedure was last revised in 2013.

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

Ex. I-776

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services at this jail are provided in a timely, safe and sufficient manner. There are two methods of medication administration at this facility. More than half of the inmate population may walk to the pill call window at routine (morning, afternoon & evening) times during the day. The LPNs also go out to the PSU, segregation and school/work areas to deliver medications. The central pharmacy receives all orders and sends medication to the medication room in bulk or unit doses. In preparing medication rounds, LPNs label envelopes, into which they put the dose. The nurse takes a cart or a basket to the housing areas for administration. Pre-pouring is also the means of administering at the pill call window.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Two staff members count controlled medications on each shift, and we verified the accuracy during the visit.

**Ex. I-777**

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

CI # 2 is in met as there are no barriers to inmates receiving their medications. Lock-down is not a practice at this facility, and in receiving, the nurses have time to order prescriptions.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CI # 2 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of contract physicians' ordering practices, this cannot be validated. With regard to quality audits to assure safe practices, CI # 4 can be verified with audits.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing. Only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications order and delivery.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** This large, new clinic area includes three exam rooms, one room for emergencies, two dental chairs, six mental health offices, a medication room, a records room, a telemedicine area, a laboratory, and a room for biohazard storage. The large nursing station has six areas for nurses to work, and space for files and reference books. There are also five offices, a staff lounge, two storage areas, and bathrooms for inmates and staff. The booking area has an examination room, three sober and three safety cells, and a digital chest x-ray machine.

All of the housing areas except one have an exam room. In one program dormitory, the nurses use an interview room. All the exam rooms provide privacy.

There two emergency crash carts, one in the clinic, and one in receiving, are checked each shift. Eight automated external defibrillators (AED) were strategically place around the facility.

The clinic contained all the equipment necessary to take care of the patients.

Our inspection indicated that the counts of items subject to abuse, such as needles and scissors, were not accurate, however.

Ex. I-778

**Recommendations:** CI #7 requires those items of abuse to be inventoried and accounted for. The needle counts in both the dental and clinical areas were not accurate. A review of the policy and in service for staff may result in compliance with this indicator.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, pregnancy tests, drug screen urine dipstick and multiple-test dipstick urinalysis.

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking, and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

In addition to obstetrical/gynecological specialists who provide routine clinics on-site. Services are available in the community as needed. The clinic exam room includes an ultrasound machine for OB/GYN patients.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment, and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart, and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

Ex. I-779

## E. INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered. In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care and the various fees, and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return, and other have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).**  The receiving or booking process in this jail is very organized and timely. The booking style is open, where the individual sees a nurse as soon as she arrives and a decision is made to either accept her or refer her for emergency room care and clearance. After the detainee is cleared for acceptance, she waits to be called for the rest of the booking process. The same nurses complete the first part of the booking evaluation (pre-screening), and the second part (with a more thorough evaluation, recording of vital signs, development of a care plan, and follow-up appointments). The nurses said they have called the provider for orders, but they still initiate the standard nursing procedures when they are applicable and begin prescriptions on their own.

Safety and sobering cells are available if a detainee needs monitoring for intoxication or suicide risk.

Our chart reviews, and the results of interviews, indicated this process takes six to eight hours, which includes all the custody interviews, and the chest ray and contraband screenings. The nurses' screening is completed within an hour or two, depending on the number of arrivals. There are generally 45 to 60 bookings a day.

CIs # 1, through # 9, and # 13 are met in this jail. CI # 4 is met as there is routine pregnancy testing of incoming women.

CI# 11 is not applicable to this jail, as nurses complete the receiving screening.

**Ex. I-780**

**Recommendations:** CIs # 4, # 5, # 6, # 10 and # 12 are not met. The receiving screening procedure in this jail is reflective of the intent of this standard. The nurses complete the prescreening and rest of the screening in a timely manner.

When the screening forms are updated to reflect all the questions in CI# 6 and CI# 7, full compliance will be achieved.

During the tour, we observed nurses completing the receiving screening with three custody personnel completing their interviews. This represents a potential breach of confidentiality. Adding a privacy screen or Plexiglas barrier between the nursing desks would provide auditory privacy. The same receiving screening form is used in all the facilities, and should be compared to the standard to ensure it is complete. Because of the efficient use of space in this jail, the receiving screening could be completed in one step, or a quick check as they come off the bus or out of the police car for clearance, and then the full screening completed when they are inside.

**Special Note:** The use of resources for the booking process (stage 1 and stage 2) should be evaluated with consideration to the standards J-E-04 Initial Health Screening, J-E-05 Mental Health Screening and Evaluation, and J-E-06 Oral Care. When timeliness is not met for receiving screening, this affects other standards. When considering the use of a nurse practitioner's resources to start and continue medication during receiving, consideration should also be made for standard J-E-11 Nursing Assessment Protocols.

**J-E-03  Transfer Screening (E).** Reportedly, 50 to 100 transfers a day arrive at this facility from the others. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours. This procedure was not listed in the policy and procedure manual.

The nursing staff at this facility receives transfers from another jail that does house some females. The procedure is that the transferring inmate goes through receiving and the nurse reviews the electronic record for medications and any pending appointments. There was no supporting documentation that this occurred during chart reviews.

**Recommendations**: The receiving screening at this facility should be reviewed and staff retrained to ensure compliance with the procedures.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information, and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for

**Ex. I-781**

the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4, and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during the stage 2 of receiving screening. The nurse asks a few questions during stage 1. There is no 14-day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first, and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place. With the revision of the forms to include questions from CI# 1 and CI# 2, the standard would be met.

**Recommendations:** The mental health screening form requires revision to include all the required questions/observations. RNs should be trained by a mental health staff. If the receiving screening forms are revised to include the mental health screening questions, then the mental health screening is complete. With the referral of positive mental health problems to the mental health clinician, then the evaluation is complete.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking, although there is no inspection of the inmate's mouth. This could be added to the first stage, as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12-month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site one day a week, and sees patient upon a nurse's referral. They dentist completes extractions and provides the rare filling. The dental list shows from the time of the appointment until the patient is seen varies from five days to 10 days to two months.

CIs #4 through #6 are in place.

**Recommendations**: CIs #1 and #2 can be addressed by incorporating oral screening/education into the booking process, and the dentist can train the nurses to conduct the screening. CI # 3 can address met by preparing a list of inmates who have been at the facility for 11 months and scheduling them for a dental examination to occur before their anniversary. The initial health assessment, mental health screening and evaluation and oral care may all be accomplished by having a trained nurse/qualified healthcare professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**Ex. I-782**

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** A formal procedure is in place for the inmates to request care. There is a two copy form available in housing areas and from the nursing staff that the inmates fill out and place in a locked box on each housing area. Each night shift, a nurse picks up the forms and bring them to medical. They are date stamped in and triaged as to the complaint, dental or mental health. The nurse assigns a triage level to the complaint. Level 1 is urgent and schedule same day or next day to be seen. Triage Level 2 is semi-urgent and schedule two to four days out. Level 2 is non-urgent and schedule in seven to 14 days to see a provider. There are published guidelines for the nurses to decide which level to assign. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists it was an average of 4-8 days to see the nurse and those were the ones in triage 1 level.

At this facility all inmates have access to the locked boxes to place requests for care confidentially, even in segregation. CIs # 2 through # 5 are met.

**Recommendations**: CI # 1 requires that a qualified health professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What seems a head ache for the patient could be a symptom of stroke, or constipation could actually be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

**Note:** There was a backlog of 150 requests for care at this facility in which the patient has not seen a health care professional for an evaluation. The patient is assigned a triage level, however. When a patient is not seen after making a request, they repeat the process and the procedure falls out of control

**J-E-08  Emergency Services (E).** As nursing staff is on-duty 24 hours a day, they can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** There are 32 segregation cells at this facility, and on the day of the visit, 31 were occupied. The level of security is that of NCCHC's # 2.b., as the inmate has some contact with others and an hour out of their cell daily. A nurse checks these inmates three times a week, and dates and signs the list of inmates in that housing area. Mental health staff checks these inmates as well. There were, however, no notes as to their condition or if they were having issues coping with isolation.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

Ex. I-783

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients at this facility may self-escort to an appointment if they are classified as minimum or medium security. Maximum security-level patients are escorted by an officer. The health staff reported that the patients arrived for their appointments on time and were rarely refused. The custody staff is responsive to their health needs.

Escort to an off-site appointment is completed unless there is an emergency. The patients' paperwork is sealed in an envelope and returned the same way. Paperwork sent with a patient is in a sealed envelope and returned to medical in a sealed envelope for confidentiality.

**There are no** recommendations regarding this standard.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols, also known as standardized nursing procedures in this program, include prescription medications for emergency situations, well as routine health conditions, alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format), with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols/procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included to diagnose and prescribe medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols (although those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**Ex. I-784**

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** Because the female inmates are housed in one facility, the continuity of care is better, especially for the pregnant females and those with gynecological problems, who see the same provider. For women's general health issues, we confirmed care of episodic, as most appointments are made after a request for care has been submitted. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are few physician-ordered "return to clinic appointments" to evaluate the effectiveness a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered, and the samples are sent to a contracted laboratory. The results are faxed back to the facility, and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based, and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** This facility's re-entry program aims to facilitate inmates' return to society as smooth as possible. Almost all the activities emphasize personal responsibility, education, obeying orders, and life planning. Medical and mental health staff have input into the women's health care plans for their release. The infection control nurse works with representatives of the health department, STD and HIV clinics to arrange patient referrals. TB clinic staff is alerted as to who requires follow-up. Discharging inmates can receive assistance in applying for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place. However, there was no evidence of this in the medical records we reviewed. Since this facility focuses on re-entry to society, a procedure to document medical and mental health plans is important. Special programs such as those for Naltrexone for extended-release injectable suspension  or others should also be documented in the health record.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

---

**Ex. I-785**

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, educational handouts are not given as inmates have used them to damage the plumbing in the past. Instead, information is clearly posted. The health record includes a box for nurses to check that patient education has been provided, but no space to describe the subject. We saw no evidence of physician-provided education.

A variety of programs are offered at this jail, including educational and vocational programs, so some written reference material is in fact available. In some of the women's housing areas, there were posters that were not available in the men's institutions. We saw posters addressing access to care, PREA and smoking cessation. Representatives from community programs come on site to provide classes on HIV and hepatitis, parenting, and GED preparation. A closed-circuit television system is in place, and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen under the training and supervision of the dietary staff. They receive a food handler's card which can assist them obtaining employment when they are released. There are more than 10 special medical diets offered.

At this facility, more than half the inmate population can walk to the cafeteria and they choose their diets. Some of the inmates have their food brought to them on carts.

A registered dietitian reviews the medical diet menus annually in July, but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference. We were given an extensive list of special diets, although it did not include the number of medical diets for this jail. CIs # 1, # 3, # 4 and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

Ex. I-786

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, he is identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component, with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications and "return to clinic" appointments as set.

This program has one chronic disease pathway, for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines," which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard, and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI #1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers, and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test and the frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete

Ex. I-787

transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs, and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with active medical instructions (according to need) indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called "Medical Observation Beds (MOB)". Thirty are for medical patients and 26 are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patient should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal, and directs the nurses to use the standard nursing protocols, which instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. MOB patients have access to a call button-type system to summon nurses; the nurses' station is not within sight or sound of the patients.

This facility's observation beds have piped-in oxygen and suction with hospital beds and over-bed tables. There is a central nurse's station, so the nurses are within sight and sound of the patients. This MOB area could be an infirmary, as it is set up as one with medical beds, piped in oxygen and suction, and nurses within sight and sound. The procedure could reflect the care of sheltered housing or infirmary/skilled nursing care depending on the patients health needs.

If the acuity of the patients qualified as infirmary, then the compliance indicators would have to be met and a procedure be put in place, with physician oversight.

The responsible physician and RHA should review the use of the MOBs and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds, where nurses may admit; others have a high acuity infirmary. Some places use a matrix to for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

**Ex. I-788**

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation, shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician, and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use, such as lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and referred to the onsite mental health program staff. A mental health clinician will see them as soon after booking as possible. There are some safety cells, holding cells and sobering cells for patient needs in booking. In this jail, there are 26 beds designated as mental health or a psychiatric secure unit/PSU. This is a large area with day rooms, interview rooms, recreation/activities rooms. There are three levels of observations for patient safety.

Three mental health licensed clinicians respond to patients needs for evaluations. The psychiatric team is supplemented with contracted psychiatrists, who receive referrals and calls for evaluations, and who order medications. The team provides programming for patients, which includes several vocational and education opportunities for patients in these units.

CIs # 1, # 3, # 4, # 5 #6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all 5 areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee, and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each

**Ex. I-789**

facility has an assigned gatekeeper who oversees the care of patients in the safety program. At this jail, it is the psychiatric unit's charge nurse or mental health clinician.

In the last two years, there has been one inmate death which was not a suicide. While the risk is less with women, it still exists. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide.

**Recommendations**:
See the mental health report at the end of the standards for recommendations.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicate and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. Various re-entry programs are offered as well. CIs # 1, # 3, # 4, and # 5 are met.

**Recommendations:** CI # 2 recommends custody receives information on the effects of alcohol and drugs on the populations. This could be true for health and provider staff to receive more training so diagnosis and referral is accurate and differentiated from mental health.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective and objective assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells on the second floor, above booking, but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care; the nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This is a women's facility. The nurses reported that they conduct pregnancy testing on all substance abusing women and those on prescription drugs.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in

**Ex. I-790**

the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** There is no policy and procedure that guides the staff to continue women's prescription upon arrival, or if emergency contraception is available. It would be available in the community hospital, but this should be explained in a procedure for staff reference.

Since this jail has a re-entry program, it would be appropriate to address the women's contraception needs before they leave custody. With over 20 pregnant women in custody at any time, the need for contraception planning is necessary. There are community resources regarding pregnancy options and contraception, if needed.

**Recommendations:** CI # 4 requires a policy and procedure to guide staff in the contraceptive practices of the program and addresses the components of the standard. It should also include where emergency contraception is available.

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** Comprehensive counseling services are available to pregnant inmates through the services of contracted obstetrical/gynecological physicians who come on site weekly. Prenatal care, specialized obstetrical services when indicated, and postpartum care are available. Pregnant women deliver in the community hospital, and then return to jail to be observed until stable. The staff said restraints are not applied during labor. CIs # 1 through # 5 are met.

**Recommendation:** CI # 6 requires a policy and procedure to guide staff in the care of a pregnant woman and addresses the components of the standard**.**

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs occasionally. There is no formal procedure, although staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, the responsible physician or health administrator would advocate to the courts for a compassionate release. There is no formal hospice program, so if a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, and # 3 are met.

**Ex. I-791**

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

**H. HEALTH RECORDS**

> The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared basis among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room (accessible to the clerical staff who manage the records), and the electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two senior medical records technicians, 10 technicians, one clerk and one office assistant. Some of the staff is located in the central administrative office, and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Ex. I-792**

**Recommendations:** We recommended that the facility continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system, or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours, and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every 15 minutes, and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, custody-ordered restraints are rare. A restraint chair is available for a maximum of two hours, with 15-minute intervals of monitoring by nurses. The lieutenant reported that in booking, occasionally a distraught inmate is placed in a holding cell until they calm down.

Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2, and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of

**Ex. I-793**

restraints, and we would recommend re-examining the practice of a nurse removing restraints, or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency.

There is a process in place through the courts for forced medications. We could not determine if there was anyone in this program. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed and revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** The facility lieutenant reported that health staff do not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice, the CIs seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions or living wills that an inmate arrives with would be honored. The provider notes in the health record that such instructions exist; there are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or do not resuscitate order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to

**Ex. I-794**

counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at this facility. During the second step of the receiving screening, the nurse may discover a new arrival is on an experimental medication. The usual procedure is to notify the responsible physician to guide the staff and patient in this community program.

**Recommendations**: A policy and procedure should be developed for medical research in the program. Using the compliance indicators, decisions may be put in place so staff has a clear idea of how to handle any request for research, or if a patient arrives on a medical trial or as a participant in a research project.

# Mental Health Report:

**LAS COLINAS RE-ENTRY AND DETENTION FACILITY**

**Staffing:  2.0 FTE Psychiatrists**
              **1.0 FTE Psychologist**
              **2.0 Mental Health Clinicians**

**Overview:** The mental health services at Las Colinas are provided by the psychiatrists, who conduct the 14-day assessments, prescribe and monitor psychotropic medications, and the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. They hold mental health clinics during the week, which are intended for individual counseling, but are often cancelled and are not sufficient to meet the need for mental health services. There is one psychologist whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 2.0 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications, 14-day assessments, and managing and operating the Psychiatric Security Unit (PSU) for women.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at LCDRF, about the requirements of the Safety Program and how to implement it. The expressed understanding at the LCDRF is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and his only duty is involvement in the Safety Program. Staff members did not express an understanding of the design of the Safety Program, as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the Safety Program, however, is that inmates who are identified as high risk cannot be released from the Safety Program prior

**Ex. I-795**

to 48 hours, while those who identified as being at low risk can be released from the program in 24 hours.

Inmates who have attempted suicide are not automatically placed on one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute observation status in a safety cell if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly do not receive suicide prevention training. It is a positive sign that they have started to receive an eight-hour class on the topic of mental health in jail, but apparently this does not include any suicide prevention training. Additionally, the mental health clinicians dare not trained to assess and manage suicide risk in the jail.

Despite the lack of an appropriate suicide prevention program, there have been no suicides at LCDRF in the past two years. The suicide prevention program requires significant improvement if this is to continue.

**Psychiatric Services:**
Psychiatrists do a good job of assessing inmates, treating those on psychotropic medications, and managing the PSU.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. However, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There appears to be a sufficient number of mental health professionals in the facility to meet the needs of the mentally ill, but it appears there is no system to ensure that their time is utilized to appropriately meet the needs of the mentally ill. It was reported that they only sporadically receive inmate requests for services, and that at times, it can be weeks before they receive these requests.

LDCRF has an impressive facility, and an area that is ideally suited for providing mental health treatment. It provides the appropriate level of confidentiality for mental health services, unlike any other facility in the system. If the system for referrals and provision of services can be improved, there is good opportunity to appropriately meet the mental health needs of the women incarcerated at this facility.

**Segregation:**
The mental health professionals reported that they have just begun doing segregation rounds weekly. This is a good step, and should help to ensure that inmates are not decompensating while in segregation. The mental health staff does not, however, screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement.

**Ex. I-796**

**PSU:**

The services provided at the PSU are much like what would be provided at a residential treatment facility. The inmates have groups five hours per day, and the natural light and set-up of the unit is conducive to stabilizing and improving the mental health of the participants.

The physical structure of the unit provides an opportunity for a therapeutic community program for more stable women. They are often on the unit for several months or longer, and could benefit from the therapeutic community model.

## NCCHC STANDARDS RELATING TO MENTAL HEALTH:

**J-A-01:**   **Access to Care:**                              **Not Met for Mental Health**
Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10:**   **Procedure in the Event of an Inmate Death:**   **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**   **Grievance Mechanism for Health Complaints:**   **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**   **Health Training for Correctional Officers:**   **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**   **Mental Health Screening and Evaluation:**   **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**   **Nonemergency Health Care Requests/Services:** **Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**   **Segregated Inmates:**                          **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.

**J-E-13:**   **Discharge Planning:**                          **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**   **Basic Mental Health Services:**                **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**   **Suicide Prevention Program:**                  **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

**Ex. I-797**

**RECOMMENDATIONS:**

1. It is recommended that the system for providing mental health services be improved so that the adequate number of staff can meet the mental health needs of the inmates in this facility.
2. It is recommended that nursing staff who do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
3. It is recommended that mental health staff members see and address mental health grievances.
4. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
5. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.
6. It is recommended that the facility consider developing a therapeutic community program for inmates in the PSU.

**Ex. I-798**

San Diego Sheriff's Department
Vista Detention Facility (VDF)
Technical Assistance Report
January 7, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails*. On January 7, 2017, NRI conducted its review for the Vista Detention Center (VDF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 39 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 26 essential standards:

<u>Essential Standards</u>
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services
J-E-12   Continuity and Coordination of Care During Incarceration

Ex. I-799

J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patient With Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-I-01    Restraint and Seclusion
J-I-02    Emergency Psychotropic Medications


Essential Standard Not Applicable
J-C-09   Counseling and Care of the Pregnant Inmate


There are 27 important standards and 26 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 20 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure in the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-03   Clinic Space, Equipment, and Supplies
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-10   Patient Escort
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-11   Care for the Terminally Ill
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison

**Ex. I-800**

**Evaluation Method**

We toured the booking/receiving area, medical observation area, clinic area, dental area, indoor recreation area, inmate housing areas, mental health housing and segregation. We reviewed 17 health records; policies and procedures; administrative, health staff, and continuous quality improvement (CQI) meeting minutes; statistical and health services personnel and correctional officer (CO) training records. We interviewed the, day shift sergeant, physician, nursing supervisor, psychiatrist, psychologist, dentist, two COs, and eight inmates selected at random.

**Facility Description**

**Location:** Southwest
**Built:** 1978 and expanded in 1989
**Security:** Level 2 or medium
**Supervision Style:** Direct and Indirect Supervision
**Bookings:** 32 to 50 a day/male and female
**Lay Out:** Modular and Dormitory Housing
**Capacity:** 886 is the court ordered capacity
**Males:** 708    **Females:** 76    **Juveniles:** none
**Custody Staff:** Not available; staffed days, evenings and nights

**Findings and Comments:**
**Special Note:** A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard**.**

## D.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. Some areas are not timely, however, such as the receiving screening and the face-to-face evaluation after a request is triaged. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. This is a medium-security facility, and "lock-down" is used as needed, but health and custody staff works together regarding the inmates' health needs regardless.

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Ex. I-801**

**There are no** recommendations regarding this standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices (and rarely at the facilities). The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody, medical, and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented with action items and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers, public health meetings, monthly contractors, transportation meetings, policy and procedure meeting, site-specific weekly meetings of the patient care coordinating committee, and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization. These reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

---

**Ex. I-802**

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system, with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, and objective assessment plan organization. They note compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. A cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken, although documentation is lacking. The identified studies are not documented, nor is the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and monitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring and implementation. With the physician's guidance, the committee establishes monitoring activities and thresholds for studies, and completes those studies. CI # 4 explains process and outcome

**Ex. I-803**

studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills occurred on the day shift, but there was no documentation. The scenarios were described as an active shooter, use of the restraint chair in a medical emergency, hostage scenarios, and an inmate disturbance. The scenarios are developed centrally and sent to the facilities for staff to conduct. The drills were critiqued and shared with staff via the training bulletins and at the weekly staff meetings.

The facilities plan a monthly or every other month man-down drill. They do occur on each shift and are described as man on the floor, man down in video court, cell extraction. They are all drills, critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information is usually conducted in privacy. In this jail, the deputy escorts the patient to the clinic and remains in the hall during the appointment. Only when the patient is unstable, do officers remain in the room. Health encounters in the housing areas are as confidential as possible. At this jail, the mental health clinicians mentioned that they conduct many interviews through glass windows in the doors, which means staff or other inmates can overhear.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2 and # 3 require procedures to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA and confidentiality; however, facility practices do not allow for confidentiality to occur in all areas of the jail.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** For the last two years, 2015 and 2016, there have been eight inmate deaths, of which four were reported to be of natural causes,

**Ex. I-804**

and four by suicide. The administrative review and clinical mortality reviews were not completed in a timely manner. Also, there was no evidence that the results of the reviews, when completed, were shared with staff at the facility. The nursing supervisor attended the mortality review for the suicide that occurred in 2016 and shared the information with the staff.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

At this facility, an average of six health-related grievances, including mental health, are filed a day (more than 150 a month), which seems excessive. This would be a good topic for a CQI study in order to identify trends. The standard appeal procedure is seven days for level one and 10 days for levels two and three.

**Recommendations**: Compliance indictors # 1 and # 2 are met. We recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room (for total isolation). The negative airflow

**Ex. I-805**

isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff for review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked. Sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. The nursing supervisor at this jail reports that staff does report safety issues and discusses them in staff meetings. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** Health staff appear to work under safe and sanitary conditions. The jail is well lit, clean, and well maintained for an older jail. The space for health is limited, but the health staff has made great effort to keep it organized and to maximize space. The nurse's station is next to the clinics and the MOB area. The health staff work together to ensure assignments are completed when assistance is needed, which in turn ensures timeliness of care and safety for the nurses.

**Recommendations:** Staff may benefit from wearing radios (not available at the time of the visit), or implementing a call system in order to be notified of emergencies or to call if in an emergency. The exam rooms do not have call buttons. Because of this, officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We

**Ex. I-806**

observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. The nursing supervisor reported that there have not been any incidents in the jail for "a long time".

**There are no** recommendations regarding this standard.

**C.  PERSONNEL AND TRAINING**

> The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license. The nursing supervisor reported that copies of licenses for all licensed staff were in his office.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Ex. I-807**

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits and all were current in cardiopulmonary resuscitation (CPR) training. There is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses and LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years and specifies the required topics. Health staff should insure that all health related training is completed. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3, describe the training program to be approved by the responsible health authority, facility administrator, and designated physician, for health staff so they are appropriately trained in administering medications. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** Inmate workers are not employed in a health care delivery capacity, either in the MOB or clinical areas. They clean the floors and empty the trash. Nurses clean the clinic spaces. Inmate workers work in the kitchen and have been trained to do so by the kitchen supervisors. They can earn their food handler certification. There are no peer health-related programs at this facility.

**Ex. I-808**

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff is scheduled for 10-hour shifts with every other weekend off. Full-time staff includes 25 RNs and 12 LPNs. Seven RNs are scheduled for the day shift and five for the night shift. Three LPNs are scheduled for each shift. Actual working hours may vary to accommodate the work load or medication round schedules. The contract physicians hold clinic seven days a week from 8:00 am until 12:00 pm and are on call on a rotating schedule 24 hours a day. Mental health staff consists of two full-time clinicians, including a psychiatrist.

At the time of our visit, vacancies consisted of three RN positions. Two new hires were pending orientation. Temporary agency staff is also used to fill vacancies.

This jail is unique in that staff rotates assignments and cooperate particularly well to balance the work load. The nursing supervisor attributes their ability to keep up with requests for care, emergencies, and bookings to teamwork and good communication amongst the staff. He reported turnover is rare, and that the vacancies were recent.

**There are no** recommendations regarding this standard.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two weeks orientation at the central administrative offices. This includes personnel, benefits, medical records, emergency response, and readiness for onsite orientation. The next six weeks are spent in orientation at the facility of assignment, where new staff is assigned a preceptor. They review all aspects of the facility: security, inmate population, job description, and skills competencies. Each new hire, is given an RN or LPN Preceptor Toolkit that consists of check lists along with procedures and skills information. These check lists are reviewed before the orientation ends with the nursing supervisor in order to determine if more time is needed. All compliance indicators, except CI # 2 are met.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two years by the responsible health authority. The current procedure was last revised in 2013.

### D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once

**Ex. I-809**

a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

**Ex. I-810**

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LPNs put doses of medication into labeled envelopes before taking the cart or basket to the housing areas for administration. Since this process is time-consuming, LPNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to "lock-down" status. Nurses are not able to see patients during lock-down periods. There is no procedure in place to evaluate who is on essential medications or how to work with custody staff for a solution. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be validated.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure

**Ex. I-811**

does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing, and only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery), or require reordering.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two exam rooms, a dental chair, a medication room, a records room in the nurses' station, a lab area in a clinic room, a patient waiting room, a radiology/x-ray room (digital in the receiving area), a small nurse's station with records space, and a couple of supply rooms. The nursing supervisor reported that mental health clinicians have a private area to see patients and sometimes they go to the cell to evaluate a patient, especially when the patient is in segregation. The booking area also has some medical space, including sobering and safety cells, and two nursing areas.

Items subject to abuse are not counted each shift. Three emergency crash carts are checked each shift. Five automated external defibrillators (AED) were strategically placed around the facility.

The clinic contained all the equipment necessary to take care of the patients.

**Recommendations:** Compliance indicator # 7 requires that weekly inventories on items subject to abuse (syringes, needles, scissors etc.) This procedure should be put in place and maintained.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, pregnancy test kits, and drug screen urine dipstick and multiple-test dipstick urinalysis. Males and females are housed at this facility.

The AEDs are checked regularly. There is no manual of laboratory tests or equipment in the clinic area.

The dental operatory is fully equipped with everything except an oxygen tank, although one is nearby in the clinic. As there was no dental staff on site, we were unable to verify the dental sharps count.

A representative from an outside laboratory service retrieves samples regularly and returns the results by phone or fax. X-ray services can be provided in the booking area. A contracted technician comes daily. Panoramic dental x-rays can be taken in the clinic. Optometry, CAT scans, and ultrasound examinations are offered in the community. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections, and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Ex. I-812**

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care, and the various fees, and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return and other have it posted. Based on the results of inmate interviews,

Ex. I-813

surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** When new admissions arrive directly from the community two nurses complete the receiving screen immediately upon arrival. The pre-booking or "medical clearance" screening is accomplished as part of the complete screening. They complete the two forms at the same time. If the nurse feels an arrestee needs to go to the hospital, he/she works with custody staff and the arresting agency to arrange this.

Inmates of both genders are "booked" at this facility. Females are tested for pregnancy, and if positive and necessary, begin the opiate protocol. Pregnant females are transferred immediately to a facility that can meet their needs.

If someone arrives on methadone, an oral methadone bridge is used until a plan with a community clinic can be arranged.

The nurse takes vital signs and asks questions about injuries, suicide risk, medications, recent hospitalizations, and other health problems. If the arrestee is semi-conscious, bleeding or severely intoxicated, s/he will be sent to the emergency room. The nursing supervisor explained that there still is an issue with nurses completing pregnancy test and a urine drug screen before starting the inmate on prescriptions medications.

The full booking procedure at this facility takes from two to six hours. It includes contraband screening, a chest x-ray to rule out tuberculosis, and housing in a sobering cell if needed. Safety cells can also be used to monitor inmates for their behavior.

The nurses initiate the standard nursing procedures when identified and call the on-call physician for orders to continue medications after they have been verified.

CIs # 1 through # 9 and # 13 are met at this jail due to the timeliness of the complete screening. CI # 4 is met as the nurse completes pregnancy testing on the incoming females. Since CI # 11 references corrections officers completing the screening. It is not applicable as nurses do the screenings at this facility.

**Recommendations:** This jail complies closely to the intent of the standard. Two and sometimes three nurses complete the screening and follow up with a plan of care. Some areas of the form are not complete and need to be revised to include the mental health and dental questions. The receiving screening procedure at this jail assures timely screenings for each new arrival. As with the other reports, there were no access-to-care signs in the receiving area. When all the appropriate questions are added to the receiving screening, the facility will be in compliance.

CI # 6 (a) though (k) address the required elements for the receiving screening form. While most are included, adding dietary needs and recent communicable diseases symptoms, along with the mental health and dental questions, would meet the needs for compliance.

CI # 8 describes the disposition of the inmate. This is not part of the receiving form and should be added. It communicates whether the person would go to general housing, medical observation beds, or to sobering/safety cells. This is important for the next health care person to know what was present in booking.

CI # 12 requires that health staff should regularly monitor the effectiveness and safety of the receiving screening process. This can be done in quality improvement committee or in another format.

**Special Note:** The booking/receiving screening process at this jail may be used as an example for the quality study of a coordinated, timely, and thorough screening of incoming detainees. This is the safety net to ensure the health status of newly arrived inmates is known and to prevent crisis/death.

**J-E-03  Transfer Screening (E).** Reportedly, 50 to 100 transfers a day arrive at this facility from the others. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours.

The nursing staff receives from classification staff a list of transferring inmates when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said "cleared by RN and chart checked by MD" at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, the receiving nurse schedules the inmate and sees that it is completed. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a

**Ex. I-815**

nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4, and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during the stage 2 of receiving screening. (The nurse asks a few questions during stage 1.) There is no 14-day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place and the policy and procedure revision may include all the questions needed and the evaluation.

**Recommendations:** The mental health screening form requires revision to include all the required questions/observations. RNs should be trained by a mental health staff. The referrals from booking to mental health could reflect a 14-day evaluation if that program was in place. If a formal program was in place, there would be policy and procedure, tracking logs/lists, and staff assigned to complete the evaluations by the 14th day of incarceration. The mental health team does complete many evaluations for those with positive screenings, although they are not tracked for timeliness.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking, although there is no inspection of the inmate's mouth. This could be added to the first stage, as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12-month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site one day a week, and sees patient upon a nurse's referral. The dentist completes extractions and provides the rare filling. The dentist also may send complex patients to another jail with more dental time. The dental list shows there is no backlog of dental appointments and they are seen in a timely interval.

**Recommendations**: CI # 1 and # 2 can be met by incorporating oral screening/education into the upfront booking process and the dentist can train the nurses to conduct the screening. CI # 3 can be met by pulling a list of inmates in the facility for 11 months and schedule for a dental exam by 12 months. Since the timeliness of the oral screen is 14 days, and oral hygiene instructions are 30 days, the screening can be completed by the trained nurse during the initial health assessment. The initial health assessment, mental health screening and evaluation and oral care may all be accomplished by having a trained nurse complete the assessment.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves them

---

**Ex. I-816**

each night and brings them to medical services where they are date stamped and triaged as to the nature of the complaint (health, dental, or mental health) and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day or next to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two to four days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven to 14 days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight days to see the nurse and some were 12 to 18 days. For the physician, the lists were five days out, with some at eight to 12 days.

At this facility all inmates have access to the locked boxes for their requests to remain confidential. Also, there were no backlog of requests. The nurses pick up, triage, and see the patients as indicated in the procedure. While the procedure does not require a face-to-face assessment within 24 hours of triage, the inmates are seen by a nurse.  CIs # 2 through # 5 are met

**Recommendations**: Compliance indictor # 1 requires that a qualified health professional has a face to face encounter with the patient within 48 hours of receiving request that describe a clinical symptom. This is not completed. The nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What may be a headache to the patient may be a stroke symptom or constipation a symptom of an infected appendix. The intent of the standard is for those requesting care be evaluated first. The request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day and can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** There were approximately 235 inmates in segregation/administration segregation and protective housing cells. The mental health staff conducts weekly segregation checks, and they note on the list whether the patient has been seen and if they are on the mental health case load. There was no notation about their mental condition, hygiene, orientation, or how they were adjusting. The nursing supervisor reported that nurses go on segregation rounds three times a week, although there was no documentation to support this.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These

**Ex. I-817**

checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients are escorted to on-site and off-site clinical appointments in a timely manner. Custody staff was proud of their support for medical services, particularly regarding patient transport on-site and off-site). Transporting officers are alerted to special accommodations such as medication administration or communicable diseases. Paperwork is sealed in an envelope and returned to medical services the same way to protect confidentiality.

CIs # 1 to # 3 are met.

**There are** no recommendations regarding this standard.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols, also known as standardized nursing procedures in this program, include prescription medications for emergency situations, as well as routine health conditions: alcohol withdrawal, chronic care, and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format) with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included to diagnose and prescribe medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols except those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few

**Ex. I-818**

physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** Compliance indictor # 1 states that there is a discharge planning process in place. However, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs for Naltrexone for extended-release injectable suspension , etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

### F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Information is instead clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has

**Ex. I-819**

been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

In this jail, a variety of written literature, including books, are provided by the Veterans Program and the Incentive Housing Unit. The inmates also participate in day-long formal programming to prepare them for re-entry into society. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen, under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than 10 special medical diets offered.

At the time of our visit, approximately 82 special diets were ordered at this jail. A registered dietitian reviews the medical diet menus annually (in July), but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference. CIs # 1, # 3, # 4, and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, they are identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component with designated clinics for specific diseases and a nurse who coordinates appointments, labs, and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications, and "return to clinic" appointments as set.

**Ex. I-820**

This program has one chronic disease pathway, for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines" which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test, frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with

**Ex. I-821**

active medical instructions (according to need) indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called "Medical Observation Beds (MOB)". Twenty-seven are for medical patients (five negative pressure rooms, two safety cells, and 20 with intercom communication), and eight beds are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patient should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal and directs the nurses to use the standard nursing protocols, which instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients, and felt some of them were actually at infirmary level of care, and required a physician directing the care plan and medications.

The responsible physician and RHA, should review the use of the MOB, and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds, and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds where nurses may admit. Others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation/shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use, such as lab results, consent forms, and admission forms.

**Ex. I-822**

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and referred to the onsite mental health program staff. There are some safety cells (suicide watch or violence watch) if needed in that area. There are also enhanced observation cells available for special housing. Staffing included a vacant position for a supervising psychiatrist, and a chief clinician. Two mental health licensed clinicians respond to patients' needs for evaluation. The psychiatric team is supplemented with contract psychiatrists and psychologists, who receive referrals for evaluations and who order medications. The team provides some programming for patients.

CIs # 1, # 3, # 4, # 5 # 6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five areas are covered. Some group counseling sessions are ongoing.

**Recommendations:** See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program. At this jail, it is the psychiatric unit's charge nurse or mental health clinician.

In the last two years, there have been eight inmate deaths, four of which were due to suicide. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were conducted on the cases of suicide, but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit, and would continue until all health, mental health and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings, where special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the

**Ex. I-823**

corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CIs # 1 and # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled. CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells (on the second floor, above booking), but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care; the nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This facility houses males and females. A pregnant opiate patient receives a pregnancy test and a urine drug screen during receiving. If the female is on methadone upon arrival, the policy is to continue oral methadone as a bridge until a program can be arranged with a community methadone clinic. If the pregnant inmate goes to the emergency room for an evaluation and methadone is prescribed, the facility health staff will "bridge" with oral methadone until a program can be put in place to continue it. If anyone arrives in a state of severe intoxication or withdrawal, they are transferred immediately to a licensed, acute care hospital in the community. CIs # 3 , # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** There is no policy and procedure that guides the staff to continue the prescriptions of a woman who arrives at this facility or if emergency contraception is

**Ex. I-824**

available. It would be in the community hospital, but this should be explained in a procedure for staff reference.

Since this jail houses women, it would be appropriate to address the contraception needs before they leave custody. Pregnant women are transferred to the women's facility, where comprehensive services are available. There are community resources regarding pregnancy options and contraception if needed.

**Recommendations:** CI # 4 requires a policy and procedure to guide staff in the contraceptive practices of the program and addresses the components of the standard. It should also include where emergency contraception is available.

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** As soon as a woman tests positive for pregnancy, she is sent to the women's facility where comprehensive prenatal and counseling services are available through the services of contracted obstetrical/gynecological physicians who come into the clinic weekly. The standard is **not applicable** for this jail**.**

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it occasionally occurs. There is no formal procedure. Staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program, so if a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

### H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared basis among providers. At a minimum, a listing of current problems and medications should be common to all medical,

**Ex. I-825**

dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions; the paper records are locked in a secure room (accessible to the clerical staff who manage the records), and the electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two senior medical records technicians, 10 technicians, one clerk and one office assistant. Some of the staff is located in the central administrative office, and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Recommendations:** We recommended to continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

Ex. I-826

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every 15 minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, restraints are rarely applied. There is one restraint chair and deputies carry Tasers and handcuffs. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2 and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency. The nursing supervisor stated that this only occurs two to four times a year and usually the patient is transferred to a setting with more mental health resources.

There is a process through the courts for forced medications, and the nursing supervisor indicated that when someone is given forced medications, they are transferred to the PSU at another jail. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

---

**Ex. I-827**

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed and revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** It was reported that health staff does not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations, verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions, or living wills that an inmate arrives with, would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or a do not resuscitate (DNR) order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d. emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program, and decide on the plan while this person was in custody.

**Ex. I-828**

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research, a patient on a medical trial, or a participant in a research project.

## Mental Health Report:

**VISTA DETENTION FACILITY**

**Staffing:**    1.2 FTE Psychiatrists
1.0 FTE Psychologist
2.0 Mental Health Clinicians

**Overview:** The mental health services at Vista are primarily provided by the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. The mental health clinics are intended to provide individual counseling, but the clinics are often cancelled and are not sufficient to meet the need for mental health services. It is very positive that the number of mental health clinicians has doubled recently, from 1.0 to 2.0 FTE, but this is still insufficient to meet the population's needs. There is one psychologist, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 1.2 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at Vista, about the requirements of the Safety Program and how to implement it. The expressed understanding of it at Vista is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15-minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards and at other facilities across the country. The facility psychologist is the only one who can remove somebody from suicide watch, and his only duty is involvement in the Safety Program. Staff members did not express an understanding of the design of the Safety Program as described by the system medical director. Staff members are under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the Safety Program, however, is that inmates who are identified as high risk cannot be released prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute monitoring if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly are not trained on suicide prevention. Although an eight-hours class on mental health in jail has been initiated, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

**Ex. I-829**

The outcome of the inadequate suicide prevention program is a suicide rate at Vista that is above the national average over the past two years. The suicide rate in 2015 was 300:100,000, which is nearly nine times the national average, and 100:100,000 in 2016, which is nearly three times the national average. The average for the past two years is 200:100,000, which is more than five times the national average of 36:100,000 in jails in the United States.

**Psychiatric Services:**

Psychiatrists at this facility do a good job treating inmates who are on psychotropic medications. Unlike the Central Jail and LCDRF, the mental health clinicians and nursing staff typically refer inmates to see the psychiatrist, rather than seeing them for the mental health assessment as happens at the intake facilities.

Vista only has 1.2 FTE psychiatrist staffing time, which appears to be sufficient to meet the needs of the inmate population. Staff was not aware of a waiting list to see the psychiatrist, and believes inmates are able to see the psychiatrist regularly.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and does a good job managing them appropriately. However, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**

There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia). The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

Mental health professionals reported that they see approximately 50 inmates per week, although as noted above, most of these are "wellness checks," and not counseling or more comprehensive mental health services. It is probably not sufficient for them to see only 50 inmates per week, and it appears that one of the issues is there is no deputy assigned to bring inmates to see mental health staff members. This limits the number of people they are able to see, and means that inmate mental health needs are likely not being met appropriately. It was reported, and demonstrated in the chart reviews, that many appointments are cancelled, and that an inmate may go for weeks without being seen following a referral or scheduled appointment. It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**Segregation:**

The mental health professionals reported that they conduct segregation rounds three times per week, which exceeds the NCCHC requirement. This is very positive and should help to ensure that inmates do not decompensate while in segregation.

Ex. I-830

## NCCHC STANDARDS RELATING TO MENTAL HEALTH:

**J-A-10:**      **Procedure in the Event of an Inmate Death:**      **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**      **Grievance Mechanism for Health Complaints:**      **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**      **Health Training for Correctional Officers:**      **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**      **Mental Health Screening and Evaluation:**      **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**      **Nonemergency Health Care Requests/Services:**  **Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**      **Segregated Inmates:**                           **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.  Additionally, security or classification staff members are placing inmates in segregation because they are mentally ill, not due to disciplinary infractions, which violates NCCHC standards.

**J-E-13:**      **Discharge Planning:**                           **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**      **Basic Mental Health Services:**                 **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**      **Suicide Prevention Program:**                  **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

## RECOMMENDATIONS:

1.  It is recommended that the facility improve the system for inmates to see mental health, so that they can effectively use the staff members they have and provide individual counseling as appropriate.
2.  It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
3.  It is recommended that nursing staff that do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
4.  It is recommended that mental health staff members see and address mental health grievances.
5.  It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.

**Ex. I-831**

6. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

**Ex. I-832**



Disclaimer

## DISCLAIMER

Technical assistance by NCCHC Resources, Inc., is a professional activity that is completely separate from accreditation by the National Commission on Correctional Health Care and in no way guarantees accreditation, reaccreditation, or any other outcome of a survey.

## ABOUT NCCHC RESOURCES, INC.

Leveraging NCCHC's expertise in correctional health care, NCCHC Resources, Inc., provides customized education and training, preparation for accreditation and professional certification, performance improvement initiatives and technical assistance to correctional facilities interested in health care quality improvement. NRI will put together a team of experts – clinicians, educators, administrators or other thought leaders – to address any sized project or challenge. A nonprofit organization, NRI works to strengthen NCCHC's mission: to improve the quality of health care in prisons, jails and juvenile detention and confinement facilities.

For more information, contact us at info@ncchcresources.org or call (773) 880-1460.

Ex. I-833

# EXHIBIT J



# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | | AKA | | HIO | CASE NUMBER |
|---|---|---|---|---|---|
| **RUPARD, Lonnie** | | | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022        0132 | 3/18/2022            0209 | 3/18/2022        0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022        2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

| ADDRESS (STREET, CITY, STATE, ZIP) |
|---|
| 200 W Arbor Dr, San Diego, California, 92103 |

**SUMMARY**

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022        Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES  ☑ NO | | ☐ YES  ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATOR False | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES  ☐ NO | ☐ YES  ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| ███████ | Son | 3/18/2022 | |

**Ex. J-835**

| San Diego Medical Examiner | Case Number | : 2022-01007 |
|---|---|---|
| 5570 Overland Avenue, Suite#101 | Investigator | : Fernanda Sanchez |
| San Diego, CA 92123-1206 | Date of Death | : 03/17/2022 |
| (858) 694-2895 | Date Today | : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, ▮▮▮▮▮▮▮▮, and his ex-wife, ▮▮▮▮▮▮. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, ▮▮▮ with whom he had a son named ▮▮▮▮▮▮▮▮. The decedent also had a son with ▮▮▮ named ▮▮▮▮▮▮▮. He had a third child who was reported to have died in October 2018 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

**Ex. J-836**

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet. The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Ex. J-837**

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** _____

        **Fernanda Sanchez**
        **Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** _____

**Ex. J-838**



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

### MEDICAL EXAMINER'S DEPARTMENT

5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215

http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH:    PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing:    SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH:    HOMICIDE

AUTOPSY SUMMARY:

I.  History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
    A.  Malnutrition and dehydration.
        1.  Height 69 inches, weight 105 pounds with a body mass index of 15.5.
        2.  Subcutaneous fat thickness 0.1 cm.
        3.  Decreased skin turgor.
        4.  Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
    B.  Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
    C.  Superficial pressure sores of back and right foot.

II.  SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III.  Pulmonary emphysema, moderate.

Ex. J-839

AUTOPSY REPORT                     -2-                     LONNIE RUPARD 2022-1007


IV.     Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V.      Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI.     Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation
        Report FA-22-0000070.

VII.    Resuscitation-related injuries.
        A.      Anterior rib fractures.
        B.      Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of
                hemopericardium.


OPINION:  According to investigative information and review of records provided by the
San Diego County Sheriff's Department, on the early morning hours of December 19,
2021, this 46-year-old man was arrested by National City Police for a parole violation, and
directly booked into San Diego Central Jail.  The arresting officer reported the decedent
had a history of psychotic disorders with combative, assaultive, or hostile behavior.  During
intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165
pounds, respectively.  He answered "no" to all the general medical assessment questions,
mental health screening questions, suicide risk assessment, substance use assessments,
and miscellaneous assessments.  During intake medical examination by a staff nurse, his
vital signs were stable.  He was described as alert and oriented x2, disheveled in
appearance, and verbally abusive but directable.  He refused a COVID-19 test.  He was
placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric
illness on extensive medications, prior treatment at Patton State Hospital and maintenance
on mediations during previous incarceration.  Psychiatry was onsite but decedent refused
evaluation.  It was rescheduled for December 23, 2021; however, it was rescheduled
several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation.  The progress
note stated that he had a history of unspecified schizophrenia and other psychotic
disorders, ███████████████████████████████████████████████████████
████████████████████████████████████████████████  The evaluation
occurred cell-side.  The psychiatrist noted he had fair hygiene, was shirtless but wearing
pants, and was standing by the cell door.  During the interview, he was irritable and
uncooperative.  He yelled and was verbally aggressive.  His mood was unable to be
assessed due to lack of cooperation.  He was deemed in no apparent distress, with no
signs of being a danger to self or others.  The psychiatrist's plan was to offer/start previous

AUTOPSY REPORT                    -3-                    LONNIE RUPARD 2022-1007

psychiatric medications including Haldol, Cogentin, and Valproic acid.  Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests.  No signs requiring immediate psychiatric intervention were noted at the visit.  Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications.  Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued.  It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment.  The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips.  His breathing was even and unlabored.  He repeatedly stated "I don't need a medic.  Leave me alone, if you touch me, I'll kill you."  For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders.  Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional.  He was evaluated cell-side, standing at the front door.  He was uncooperative stating "I am fine, I don't want to talk to you."  He was unable to be fully assessed due to refusal and/or inability to cooperate.  His cell was clean with some debris.  Empty food trays were inside his cell.  He was free of any urine, feces, or flooding, and was moderately groomed.  He did not appear in any acute distress and there were no immediate safety concerns.  There was no threat to self or others and no distressing symptoms or major impairment.   The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist.  The visit occurred cell-side.  During that visit, multiple attempts were made to engage him in conversation, but he

AUTOPSY REPORT                           -4-                      LONNIE RUPARD 2022-1007

refused to answer questions, rambled incoherently, and became verbally aggressive.  The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell.  He appeared to be in no acute distress.  His cell room was "relatively clean, no flooding/gassing or smearing of feces."  The toilet was covered with a cloth and the content could not be visualized.  When he was again offered psychiatric medications, he continued to yell.  Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed.  He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours.  At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing.  The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered.  Medics arrived and attached the Lucas CPR assist device.  The decedent was in asystole and changed to ventricular tachycardia.  He was shocked a total of three times and then remained in pulseless electrical activity.  The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead.  Deputies noted his cell was soiled with feces.  Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial.  The psychiatrist noted the cell was dirty with trash throughout.  The toilet was full of excrement and the room was malodorous.  There was feces on the floor and food smeared on the walls.  The decedent was described as unkempt and dirty himself.  During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head.  The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records.  The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial.  He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

**Ex. J-842**

AUTOPSY REPORT                    -5-                    LONNIE RUPARD 2022-1007

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, ███████████

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Ex. J-843

AUTOPSY REPORT                    -6-                    LONNIE RUPARD 2022-1007


Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region.  There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens).  Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions.  Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death.  While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.


BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:


**Ex. J-844**

AUTOPSY REPORT                        -7-                    LONNIE RUPARD 2022-1007

IDENTIFICATION:   The body is received in a white body pouch sealed with tamper resistant read seal number "4950349."  The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993."  A yellow disposable tarp covers the body.  The body is resting on a green fitted sheet.  The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number.  A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened.  There are no evidence bags on the head, hands, and feet.  A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES:   I am assisted by Forensic Autopsy Specialist Stephen Hannum.  Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY:   The body is clad in a short-sleeve blue shirt with green tag.  There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:
1.      Blue stripped long-sleeve sweatshirt.
2.      Pair of brown and black boots.
3.      Disposable blue face mask.
4.      Blue pants.
5.      Gray tank top.
6.      Black briefs.
7.      White and yellow metal wristwatch.
8.      In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:
1.      An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2.      An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3.      A triangular defibrillator electrode is on the mid chest.  An oval defibrillator electrode is on the mid chest.  A rectangular defibrillator electrode is on the lateral left chest.

**Ex. J-845**

AUTOPSY REPORT                    -8-                    LONNIE RUPARD 2022-1007

A rectangular defibrillator electrode is adhered to the cut shirt.
4.      EKG electrodes are on the chest and abdomen.
5.      A pulse oximetry monitor is on the left index finger.
6.      Disposable blood pressure cuff is secured around the left upper arm.
7.      A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic.  The injuries of the head and neck will be described in the injury section below.  Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp.  The thin brown scalp hair varies in length.  It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline.  The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length.  Sparse 1/2 inch facial hairs are along the jawline.  There is prominence of the facial bones (orbital ridges and zygomatic arches).  The eyes are sunken.  The corneae are dull.  The irides are brown.  The conjunctivae have no hemorrhage, petechiae, or icterus.  The nose is normally formed, and the nares are unobstructed.  The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa.  The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest.  There are cardiopulmonary resuscitative marks on the mid chest.  There is prominence of the clavicles and ribs.  The abdomen is scaphoid.  The back is symmetrical.  Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities.  There is decreased skin turgor along the torso and extremities.  The upper extremities have no needle track marks or ventral wrist scars.  The fingernails are short.  A small amount of dry brown fecal material is on the thumbs and index fingers.  There is a chronic deformity of the nail of the left index finger.  The lower extremities show no edema, deformity, or amputations.  The toenails are short.  Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male.  The penis is circumcised.  The testes are palpable within the scrotum.  Dry brown fecal material is on the perineum and around the anus.  There is no trauma of the genitalia or anus.

SCARS:
1.      Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

**Ex. J-846**

AUTOPSY REPORT                    -9-                    LONNIE RUPARD 2022-1007

2.    A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3.    A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS:  Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES:  Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw.  Livor mortis is posterior, purple-red and nonblanching to pressure.  The body is cool (refrigeration).  There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula.  Just lateral to this are areas of pink-tan skin slippage.  Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch.  A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest.  A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region.  Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch.  A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region.  Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow.  The center of the lesion has tan fibrinous material.  A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow.  It is covered with a tan soft fibrinous material.

**INJURIES, EXTERNAL AND INTERNAL**

*There are blunt force injuries of the head, neck, torso, and extremities.  They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A.    BLUNT FORCE INJURY OF HEAD AND NECK:
      A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp.  A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline.  A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead.  A scabbed red-brown 1/16 inch

AUTOPSY REPORT                          -10-                    LONNIE RUPARD 2022-1007

diameter abrasion is on the mid forehead.  A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow.  A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow.  A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead.  A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead.  A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow.  A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum.  A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter.  A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek.  A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit.  A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek.  An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin.  A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage.  A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right.  A similar 1 cm in diameter defect is on the left frontal skull.  There is no defect on the inner table of the skull.  The bone of the skull is thickened.  There are no skull fractures.  There is no epidural or subdural hemorrhage.  The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter.  A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible.  A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch.  Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B.    <u>BLUNT FORCE INJURY OF TORSO</u>:
A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle.  A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle.  A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch.  Pink-red ecchymosis is on the mid chest.  Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter.  Two linear partially interrupted partially scabbed tan pink-red

Ex. J-848

AUTOPSY REPORT                    -11-                    LONNIE RUPARD 2022-1007

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back.  A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back.  Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs.  There is hemorrhage in the anterior mediastinal soft tissue.  There pericardial sac is lacerated.  The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration.  There is 75 mL of liquid blood in the pericardial sac.  These injuries are consistent with attempted cardiopulmonary resuscitation.

C.    <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow.  A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint.  A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint.  A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter.  A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint.  A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint.  There is loss of the distal aspect of the nail on the left 2nd finger.  There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches.  No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches.  A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus.  A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

**Ex. J-849**

AUTOPSY REPORT                    -12-                    LONNIE RUPARD 2022-1007

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES:  The organs are in their normal situs.  The diaphragm is intact.  The abdominal fat pannus measures 0.1 cm.  There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation.  There are no pericardial adhesions.  There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities.  There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM:  The heart weighs 280 grams.  There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations.  The remaining epicardial surface is smooth and glistening.  The heart has an overall normal shape.  The coronary arteries have a normal origin and follow a right dominant course.  They are widely patent.  There is no atherosclerotic stenosis.  The ventricles are not dilated.  The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively.  The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis.  The endocardial surfaces and four cardiac valves are unremarkable.  The coronary ostia are patent.

The aorta is elastic without atherosclerosis.  The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM:  The right lung weighs 480 grams, and the left weighs 1030 grams.  Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition.  Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe.  There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces.  The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM:  The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass.  The gallbladder contains 10 mL of green, viscid bile without calculi.  The mucosa is unremarkable.  The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM:  The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern.  There are

**Ex. J-850**

AUTOPSY REPORT                    -13-                    LONNIE RUPARD 2022-1007

no lymph node enlargements.  Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM:  The esophagus and gastroesophageal junction are unremarkable.  The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles.  There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus.  The ulcer base is tan-green with no hemorrhage.  The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine.  There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage.  The appendix is present.

GENITOURINARY SYSTEM:  The right kidney weighs 140 grams, and the left weighs 150 grams.  The capsules strip with ease from the smooth, red-brown subcapsular surfaces.  The corticomedullary architecture is unremarkable.  The pelves are not dilated.  The ureters maintain uniform caliber into an unremarkable urinary bladder.  The bladder contains 130 mL of dark yellow urine.  The prostate gland is symmetrical and unremarkable.  The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM:  The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts.  The adrenal glands have the usual golden cortical ribbon and unremarkable medullae.  The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM:  The skeletal system is normally developed.  The ribs are not brittle.  The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section.  The clavicles, sternum, vertebrae, and pelvis are without fracture.  The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD:  Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage.  Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone.  The skull is thickened on the cross section.  There is no epidural or subdural hemorrhage.  The skull is otherwise normally formed.  There are no skull fractures.

CENTRAL NERVOUS SYSTEM:  The unfixed brain weighs 1290 grams.  The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK:  There is an endotracheal tube in situ.  The trachea and larynx are patent and lined by smooth, tan mucosa.  The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture.  The anterior strap muscles and paratracheal soft tissues are without hemorrhage.  The cervical vertebrae are intact without hemorrhage or fracture.  The tongue has no bite mark or hemorrhage.

**Ex. J-851**

AUTOPSY REPORT                       -14-                       LONNIE RUPARD 2022-1007

## **<u>SPECIMENS</u>**

<u>TOXICOLOGY</u>:   The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

<u>MICROBIOLOGY</u>:   Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

<u>HISTOLOGY</u>:  Portions of tissues and major organs are retained in formalin.  Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

<u>PHOTOGRAPHS</u>:   Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

<u>X-RAYS</u>:  Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

**Ex. J-852**

AUTOPSY REPORT                          -15-                    LONNIE RUPARD 2022-1007

## MICROSCOPIC EXAMINATION

HEART (2 sections):  Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates.  There are few scattered chronic inflammatory cells in the epicardial adipose tissue.  The epicardial and myocardial vessels are unremarkable.

LIVER (1 section):  Section shows normal hepatic architecture.  There is sinusoidal congestion.  There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections):  Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis.  The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils.  Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung.  There is no hyaline membrane formation.  The airways of the right lung are unremarkable.  There are no chronic bronchial asthmatic changes.  The vessels are congested without thrombosis.  There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3).  Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4).  There is no significant fibrin deposition and no hyaline membrane formation.  Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli.  There is no foreign material noted in the areas of inflammation.  The large bronchi are unremarkable.  The vessels are congested and unremarkable.

KIDNEY (1 section):  Section shows rare senescent glomeruli.  The glomeruli are otherwise unremarkable.  The tubular epithelium is autolyzed.  There is no tubulointerstitial fibrosis or inflammation.  The vessels are congested and unremarkable.


BS:cmh
D:  3/19/22   T:  3/21/22
Rev.  2/27/23 cmh

**Ex. J-853**



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

### DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA  92123-1206
TEL: (858) 694-2895   FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| | | |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| | | |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| | | |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| | | |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: _____
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

### Final Diagnosis
1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

### Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

> Verified by: Jeremy Kieth Deisch
> Date: 25-JUL-22 08:35 (Electronically signed)

JKD

### Neuropathology Gross

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal |
| | Cerebellum: Parasagittal |
| | Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

---



**LOMA LINDA UNIVERSITY PATHOLOGY LABORATORY**
11370 Anderson Street, Suite 2950
Loma Linda, CA 92354
(909) 558-2392
PJ Wat MD, GW Saukel MD, JC Kerstetter MD, HL Rojas MD – Directors

| | | | |
|---|---|---|---|
| Name: | **RUPARD, LONNIE** | | |
| MR#: | 06555376 | | |
| Encounter: | | | |
| DOB/Age: | 10/1/1975 | 46 years | |
| Location: | LLU-FMO | Pathology Referrals | |
| Physician: | Physician,Default | | |
| CC: | | | |
| Order ID: | | | |
| Page: | Page 1 of 2 | | |

**Ex. J-855**

## Outside Brain Autopsy Final Reports

| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
|---|---|---|---|
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
|---|---|
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1:   Dura mater, pineal gland

A2:   Right orbitofrontal region with contusion

A3:   Right orbitofrontal region with contusion

A4:   Right hippocampus, mammillary bodies

A5:   Left hippocampus

A6:   Right frontal lobe parasagittal

A7:   Midbrain

A8:   Pons

A9:   Medulla, right cerebellar hemisphere

A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical
contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

| LOMA LINDA UNIVERSITY PATHOLOGY LABORATORY | **Name:** | **RUPARD, LONNIE** | |
|---|---|---|---|
| 11370 Anderson Street, Suite 2950 | MR#: | 06555376 | |
| Loma Linda CA 92354 | Encounter: | | |
| (909) 558-2392 | DOB/Age: | 10/1/1975 | 46 years |
| PJ Wat MD, GW Saukel MD, JC Kerstetter MD, HL Rojas MD – Directors | Location: | LLU-FMO | Pathology Referrals |
| | Physician: | Physician,Default | |
| | CC: | | |
| | Page: | Page 2 of 2 | **Ex. J-856** |



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

**JONATHAN R. LUCAS, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER

| CALL INFO | | | | | |
|---|---|---|---|---|---|
| NAME OF DECEASED<br>**BACH, Keith Galen** | | AKA | HIO ☐ | CASE NUMBER<br>**2023-03146** | |
| INVESTIGATOR<br>Sandra Joseph | REPORTED BY<br>Sgt. Wilson | REPORTING AGENCY<br>San Diego Central Jail | | PREVIOUS WAIVE # | |
| CALL DATE AND TIME<br>9/28/2023       0900 | ARRIVAL DATE AND TIME<br>9/28/2023              1006 | | RETURN DATE AND TIME | | |

| DECEDENT | | | | | |
|---|---|---|---|---|---|
| DATE AND TIME OF DEATH<br>9/28/2023         0409 | DATE OF BIRTH<br>4/21/1960 | AGE<br>63 Years | GENDER<br>Male | RACE<br>White | |
| RESIDENCE (STREET, CITY, STATE, ZIP)<br>Chula Vista, California, 91911 | | COUNTY<br>San Diego | | LAST SEEN ALIVE | |
| COUNTRY OF RESIDENCE<br>San Diego | OCCUPATION<br>HVAC Engineer | | | PAID AUTOPSY ☐ | |

| DEATH | |
|---|---|
| LOCATION OF DEATH<br>San Diego Central Jail | TYPE OF PLACE<br>Jail, Prison, Detention Facility |
| ADDRESS (STREET, CITY, STATE, ZIP)<br>1173 Front Street, San Diego, California, 92101 | |

SUMMARY

The decedent was a 63 year old, married, White male who resided in Chula Vista. On 9/25/2023, the decedent was in the custody of Chula Vista Police Department and taken to Scripps Mercy Hospital Chula Vista for medical clearance before booking into San Diego Central Jail. Records indicate the decedent had an elevated glucose and an insulin pump which was beeping and would need to be refilled. The decedent was booked into San Diego Central Jail and later that evening the decedent had a syncopal episode and was transported back to the hospital for evaluation. He was discharged back to the custody of law enforcement officers. San Diego Central jail records indicate the decedent refused medications including insulin. On the morning of 9/28/2023, deputies found the decedent unresponsive and began cardiopulmonary resuscitation. Medical staff was notified and 911 was called. Resuscitation continued to no avail and death was pronounced on 9/28/2023.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Sudden and unexpected death.

| INCIDENT | | | | | |
|---|---|---|---|---|---|
| LOCATION OF INCIDENT | | INCIDENT PLACE TYPE | AT WORK ☐ | AT RESIDENCE ☐ | |
| ADDRESS (STREET, CITY, STATE, ZIP) | | | COUNTY | | |
| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY<br>San Diego Sheriff | OFFICER<br>Hugh Davidson | BADGE # | REPORT #<br>23141349 | |
| DECEDENT WAS | BELTED<br>No | HELMETED<br>☐ YES ☑ NO | POSITION | ON PRIVATE PROPERTY<br>☐ YES ☐ NO | |
| VEHICLE | | LICENSE NUMBER | | STATE | |

| NOTIFICATION | | | |
|---|---|---|---|
| IDENTIFIED BY<br>Sandra Joseph | METHOD<br>Circumstances | DATE AND TIME<br>09/28/2023 | |
| FUNERAL HOME | PROPERTY<br>☑ YES ☐ NO | PUBLIC ADMINISTRATOR False<br>☐ YES ☑ NO | TYPE OF EXAM<br>Autopsy |
| NAME OF NOK OR OTHER | RELATIONSHIP<br>Wife | DATE NOTIFIED<br>9/28/2023 | NOTIFIED BY |

**Ex. J-857**

| San Diego Medical Examiner | Case Number | : 2023-03146 |
| 5570 Overland Avenue, Suite#101 | Investigator | : Sandra Joseph |
| San Diego, CA 92123-1206 | Date of Death | : 09/28/2023 |
| (858) 694-2895 | Date Today | : 02/10/2024 |

## INVESTIGATIVE NARRATIVE

**Decedent:** BACH, Keith

**Antemortem Events:**
On 9/28/2023, I obtained the following preliminary information from San Diego Sheriff Department Detective Hugh Davidson at San Diego Central Jail.  On 9/25/2023, the decedent was arrested by Chula Vista Police Department and taken to Scripps Mercy Hospital Chula Vista for medical clearance for his diabetes.  During booking into San Diego Central Jail, he became unresponsive and was transported to Scripps Mercy Hospital emergency room for evaluation.  The decedent was evaluated, and he returned to San Diego Central Jail on 9/26/2023 at an unknown time.  The decedent was last seen by nursing staff on 09/27/2023 and he received medications.  The decedent was seen alive by Deputies on 9/27/2023 at 2309 hours and 9/28/2023 at 0240 hours.  On the morning of 9/28/2023 at 0338 Deputies making a safety check found the decedent unresponsive and initiated cardiopulmonary resuscitation (CPR).  Resuscitation continued and Faulk paramedic #18 responded to the scene and continued resuscitation to no avail and death was pronounced at 0409 hours.

The following information was obtained from Scripps Mercy Hospital medical records.  On 9/25/2023 at approximately 1950 hours, the decedent was brought in by police for medical clearance for diabetes.  The decedent was alert and oriented and his insulin pump was beeping.  Fingerstick glucose was 265 and he was cleared for incarceration.  Under "Medical Decision Making" it was noted the insulin pump would need to be refilled.  He was discharged on 9/25/2023 at approximately 2030 hours diagnoses of acute hyperglycemia due to diabetes with medical clearance for incarceration.

The following information was obtained from Scripps Mercy Hospital medical records.  On 9/25/2023 at approximately 2200 hours, the decedent was brought in by police with a complaint of syncope.  The decedent was in custody of "CVPD" (Chula Vista Police Department) and had a witnessed syncopal episode at jail lasting approximately one minute.  No seizure activity was observed, and he was incontinent of urine.  On arrival to the emergency room the decedent was alert and oriented.  Prior medical history was insulin dependent diabetes mellitus, hyperlipidemia and hypertension.  Laboratory results were glucose of 141.  He was discharged from the emergency room on 9/26/2023 at approximately 0200 hours with a diagnosis of Syncope, unspecified syncope type.

The following information was received from San Diego Central Jail medical records.
"Statcare Intake Assessment and Orders" dated 9/26/2023 at 3:49:06 hours noted a medical history of insulin dependent diabetes mellitus.  Orders were to continue using the insulin pump, confirm metformin dose and add blood sugar checks.  Medications ordered were amlodipine, atorvastatin, ██████ losartan, ████████ and metformin.

"Addendum for:  Statcare Intake Assessment and Orders" dated 9/26/2023 5:49:06 hours noted the decedent was taking metformin and insulin pump.  Notes also indicated the decedent reported his medication by insulin pump would be consumed on 9/27/2023.

"Statcare Intake Assessment and Orders" dated 9/27/2023 at 1:37:15 hours noted the decedent refused insulin.

Records titled "EMAR" noted medications and times of administration.  Medications ordered were NovoLin R Insulin, Metformin, ████████████ Losartan Potassium, ████████ Atorvastatin, Amlodipine

**Ex. J-858**

Besylate and Famotidine.  Medications of Novolin, Metformin Levothyroxine, Losartan Potassium, Amlodipine and Famotidine were refused on 9/28/2023.

Per "Mandown Assessment" dated 9/28/2023 the medical team arrived on scene at 0340 hours with deputies performing cardiopulmonary resuscitation.  Nursing staff assumed resuscitation efforts and an Automated External Defibrillator (AED) was applied and no shock was advised.  It appears a blood sugar reading was taken with a note of "BS taken-Reading HI".  Paramedics arrived on scene at 0350 hours and assumed care.  Death was pronounced at 0409 hours.

**Past Medical, Surgical, and Social History:**
Per San Diego Sheriff Central Jail medical records, insulin dependent diabetes, ██████████

Of note decedent's property and home medications were provided to me by Detective Davidson.  The medications I collected were amlodipine, atorvastatin, █████████ insulin, losartan, ████████████

**Scene Description:**
On 9/28/2023 at 1006 I arrived at the scene, San Diego Central Jail, located at 1173 Front Street, San Diego CA with multiple San Diego Sheriff personnel present.  The incident location was module ██, Cell ████  At the time of my response to the scene, the decedent had been moved from the cell to the common area.

The Mini Medtronic pump had been removed from the cell prior to my arrival and was in a brown paper bag in the common area on a metal table.  The Mini Medtronic pump was beeping, and the screen display showed no message.  The insulin chamber of the machine appeared empty of liquid.  I was advised there was a message on the screen of the insulin pump prior to my arrival.  Deputies showed the image on their camera display.  I took a photo of the image digital display of the camera.  The image showed the insulin pump displaying "Auto Suspend 07:44  Insulin delivery suspended.  No buttons pressed within time set in Auto Suspend".

An Assure Prism glucometer on the same metal table displayed a reading of "HI" with a date time on the display of 09/28 and 0438 AM.

**Body Description:**
On 9/28/2023 I viewed the body of an obese, nude, White male lying supine on the concrete floor.  He was balding with gray hair, gray moustache with gray beard stubble.  The decedent was wearing a blue band on his left wrist with his name Bach, Keith Galen, date of birth 04/21/1960 and photo in the presence of numerous San Diego Sheriff Department personnel.

His head was turned to the right, left arm flexed at the elbow and left hand on his abdomen.  His right arm extended away from his torso.  His legs extended straight from his torso.  Articles of medical intervention on his body were oral airway, defibrillator pads and intraosseous line on his left lower leg.  The decedent's entire body was cold to the touch.  There was blanching purple mottled lividity on his face, sides of his torso and extremities.  Solid lividity was on his posterior surfaces.  Blanched areas were on his buttocks and posterior shoulders.  There was rigor of the jaw, neck, extremities and fingers.

There was no crepitus of his head or chest.  There appeared to be a small abrasion on the occipital scalp.  The decedent's eyes were blue and congested but without petechial hemorrhages.  Scant thin, blood-tinged fluid emanated from his mouth.  There appeared to be dried, brown emesis on his face.  No visible ligature marks.  There was no visible deformity of his extremities.  There were two large transparent dressings with plastic components on his left and right abdomen.  There was an abrasion on his sternum.  The decedent had old, well

**Ex. J-859**

healed scars on his upper anterior shoulders and lower arms and reddened patches of skin beneath the scars. There were numerous small, scabbed areas on his arms, lower legs and on his posterior thigh. There were dark purple contusions on both his upper arms and one possibly on his right mid back.

On 9/28/2023 at 1103 hours, 92M Transport personnel Charles Campbell and Patrick Garcia placed the decedent on a clean sheet. Clean paper protective bags on the decedent's head, on his left hand at 1103 hours, on his right hand at 1104 hours, on his right foot at 1105 hours and on his left foot at 1106 hours. The sheet was tied, and the decedent was placed in a clean, white pouch. Red tamper evident seal #4387485 was affixed for transport to the Medical Examiner office at 1107 hours.

**Special Requests:**
Please contact Det. Hugh Davidson with autopsy time.

**Identification:**
The decedent was visually identified by Detective Hugh Davidson and identity confirmed upon review of his property including California Driver License #C3978555.

**Antemortem Specimens:**
Not applicable.

**Public Administrator:**
Not referred, family resides in Chula Vista.

**Other Important Factors:**
The decedent's Mini Medtronic insulin pump with a marking of RF: M994838A001 was collected as evidence. The clothing worn by the decedent was collected by San Diego Sheriff prior to my arrival.

Signed: _Sandra Joseph_____
      **Sandra Joseph**
      **Medical Examiner Investigator**

Date Signed: **12/29/2023**

Approved by: _____

**Ex. J-860**

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER

**JONATHAN R. LUCAS, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER

**MEDICAL EXAMINER'S DEPARTMENT**

5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215

**TEL: (858) 694-2895**  http://www.sdcounty.ca.gov/me/  **FAX(858) 495-5956**

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | KEITH GALEN BACH | **ME#:** | 2023-3146 |
| **Place of death:** | San Diego Central Jail<br>1173 Frost Street<br>San Diego, CA 92101 | **Age:** | 63 Years |
| | | **Sex:** | Male |
| **Date of death:** | September 28, 2023; 0409 Hours | | |
| **Date of autopsy:** | September 29, 2023; 1005 Hours | | |

---

| | |
|---|---|
| <u>CAUSE OF DEATH</u>: | DIABETIC KETOACIDOSIS |
| Due to: | TYPE 1 DIABETES MELLITUS |
| Contributing: | HYPERTENSIVE AND ATHEROSCLEROTIC CARDIOVASCULAR DISEASE |
| <u>MANNER OF DEATH</u>: | HOMICIDE |

<u>AUTOPSY SUMMARY</u>:

I.  Diabetic ketoacidosis.
    A.  Hyperglycemia detected on vitreous chemistry.
    B.  Ketones detected in peripheral blood and vitreous.
    C.  Clinical history of type 1 diabetes mellitus.
        1.  Managed with continuous glucose monitor and insulin pump.
        2.  Hemoglobin A1C levels well controlled, average 6.4% for the last three years.
    D.  History of insufficient insulin administration while in custody.

II.  Hypertensive and atherosclerotic cardiovascular disease.
    A.  Cardiac hypertrophy, 500 grams, with biventricular dilatation.
    B.  Coronary atherosclerosis, multivessel, moderate to severe.
    C.  Nephrosclerosis.

**Ex. J-861**

AUTOPSY REPORT                          -2-                          KEITH BACH 2023-3146


III.    Pulmonary edema, combined weight: 1180 grams.

IV.    Minor scalp abrasion and scalp hematoma.

V.    Evidence of cardiopulmonary resuscitation.
    A.    Skin abrasions on mid chest.
    B.    Multiple rib fractures.


OPINION:  According to investigative information and medical records, Mr. Keith Bach was a 63-year-old man with history of type 1 diabetes mellitus complicated by diabetic neuropathy, ████████████████ and diabetic macular edema.  He managed his diabetes with a MiniMed™ continuous glucose monitor in combination with a MiniMed™ insulin pump to administer fast-acting insulin (lispro).  Review of laboratory records (May 2020 to September 2023), demonstrated hemoglobin A1C levels ranging from 6.1% to 6.9% (average 6.4%), indicating mostly well controlled blood glucose levels for the last three years.  Additional health history included hypertension (treated with amlodipine and losartan), hyperlipidemia on atorvastatin, ████████████████████ ████████████████████████████████████████ He had a social history notable for uncomplicated alcohol dependence and had stopped smoking over 15 years ago.  He was not known to use illicit drugs or have history of depression or self-harm.

On September 25, 2023, he was arrested by police and was brought to a local hospital for medical clearance given his chronic health conditions.  After medical evaluation, it was determined he was medically stable for transport and booking.  His blood glucose level at that time was 231 mg/dL.  During the intake process at the jail, he had a witnessed syncopal episode and was transported back to the hospital for a second evaluation.  He was evaluated in the emergency department and had a glucose level of 141 mg/dL.  He was diagnosed with syncope, not otherwise specified, and discharged with medical clearance to continue with the incarceration process.

According to medical records from the jail, it was well known and documented on multiple occasions, that Mr. Bach had type 1 diabetes mellitus and used the combination of a continuous glucose monitor and an insulin pump to administer his insulin.  On September 26, 2023, at approximately 0400 hours, Mr. Bach informed the nurse practitioner who performed his initial intake assessment that his insulin pump would be depleted of insulin in approximately 28 hours (approximately 0800 on September 27, 2024).  Later the same day, at approximately 1200 hours, Mr. Bach was evaluated by a second nurse practitioner, who placed an order for 10 units of insulin, three times a day, with plans to review the blood glucose trend and adjust the insulin dosages as necessary.

AUTOPSY REPORT                    -3-                    KEITH BACH 2023-3146

On September 26, from approximately 0100 hours to 2200 hours, Mr. Bach was cooperative with medical staff and allowed nurses to check his blood glucose levels six times. His glucose levels ranged from 123 – 161 mg/dL and he received 10 units of insulin at 1643 hours. On September 27, at 0117 hours, his blood glucose level was 322 mg/dL. In the medical records, it was documented Mr. Bach "refused" to take the prescribed 10 units of insulin and requested to receive 20 units. Mr. Bach was eventually administered 10 units of insulin at 0151 hours, and this was the last documentation of insulin administration. The nurse practitioner requested a new insulin order with increased dosage. Approval of the order was pending review. On September 27, 2023, from approximately 0200 hours to 2100 hours, Mr. Bach was not seen by medical staff as he was not permanently housed during those hours.

According to sheriff's investigation, he was reported to have asked multiple deputies on numerous occasions for insulin. During mealtimes, Mr. Bach gave his food to fellow inmates, as he did not want to eat if he did not have access to insulin. Additionally, other inmates were attempting to assist Mr. Bach in requesting insulin by pointing out to deputies that the alarm on Mr. Bach's insulin pump was sounding and that the pump was empty. It is unknown if any information was relayed to medical staff.

On September 28, 2023, Mr. Bach was found unresponsive and not breathing in his cell. His blood glucose level was measured, and the meter read "HI". (A "HI" reading, according to most glucose meters, indicate glucose levels greater than 500 ml/dL). Cardiopulmonary resuscitation was administered with no eventual return of spontaneous circulation. His death was pronounced at the scene. During the scene investigation, Mr. Bach's insulin pump was inspected. The pump was alarming audibly, and the insulin reservoir appeared empty.

The autopsy demonstrated subnuclear vacuoles in the kidney tubules, a finding consistent with diabetic ketoacidosis. The heart was enlarged (cardiac hypertrophy), the vessels supplying blood to the heart were narrowed (coronary atherosclerosis), and the kidneys were scarred (nephrosclerosis), findings that can be seen with long standing high blood pressure (hypertension). The lungs were fluid filled (pulmonary edema). Although a history of alcohol dependence was reported, the liver did not exhibit changes commonly seen with chronic use of alcohol.

A scalp abrasion and underling scalp hematoma were noted on the back of the head. Multiple healing irregular tan-red abrasions were on the upper and lower extremities. Injuries consistent with cardiopulmonary resuscitation included a skin abrasion on the mid chest and multiple rib fractures. No additional trauma was noted on the body.

Toxicological screening tests for alcohol and common drugs of abuse were negative. Acetone was detected in the peripheral blood (0.021%) and vitreous fluid (0.025%).

**Ex. J-863**

AUTOPSY REPORT                    -4-                    KEITH BACH 2023-3146

A vitreous chemistry panel showed a markedly elevated glucose level (663 mg/dL) and elevated VUN (53 mg/dL).  The combination of elevated glucose and detection of ketones is consistent with diabetic ketoacidosis.

Based on the autopsy findings and the circumstances surrounding the death, as currently understood, the cause of death is **diabetic ketoacidosis** due to **type 1 diabetes mellitus** with **hypertensive and atherosclerotic cardiovascular disease** as a contributing condition.  Review of outpatient medical records clearly indicates that Mr. Bach had demonstrable knowledge in managing his diabetes; however, as an inmate, he became reliant on the medical services provided by the jail for continued management of his condition. Following insufficient insulin administration while in custody, Mr. Bach developed diabetic ketoacidosis and died.  This occurred despite medical records containing documentation of his medical condition, insulin requirements, when his pump would be depleted of insulin, and multiple unanswered requests for insulin by Mr. Bach and fellow inmates.  The death is due to complications of a natural disease.  However considering the inaction (i.e., neglect) characterizing the events leading to inadequate care while incarcerated of Mr. Bach's health conditions and ultimately his death, the manner of death is classified as **homicide**.

Melanie F. Estrella
D.O.

Digitally signed by Melanie F.
Estrella D.O.
Date: 2024.09.16 06:13:24 -07'00'

*digital signature*
MELANIE ESTRELLA, D.O.
Deputy Medical Examiner

**Ex. J-864**

AUTOPSY REPORT                          -5-                    KEITH BACH 2023-3146

IDENTIFICATION:  When initially viewed, the body is in a white vinyl body pouch sealed with red tamper-evident tag number "4387485," cut at 1010 hours.  Attached to the zipper pull on the outside of the bag is a blue Medical Examiner's identification tag and manila hang tag bearing the name "Bach, Keith Galen," case number, and weight.  Upon opening the body bag, the body is wrapped in a purple sheet tied at the head and feet. The head, hands, and feet are covered with paper bags secured with tape.  Upon removal of the paper bags there is a yellow Medical Examiner's identification tag around the right ankle bearing the decedent's name and case number.  The blue tag is subsequently placed around the right ankle.  A  blue inmate identification band with the decedent's name, date of birth, image of the decedent's face, and identification number "23739381" is on the left wrist.

WITNESSES:  Assisting is Forensic Autopsy Specialist Shannon Nelson.  Attending the autopsy, representing the San Diego Sheriff's Office, is Detective M. Gibson and Forensic Evidence Technician M. Robison.

CLOTHING:  The body is unclad when initially viewed.  No clothing accompanies the body.

EVIDENCE OF MEDICAL THERAPY:
1.      Oropharyngeal airway in place.
2.      Empty defibrillator packaging.
3.      Unattached AED defibrillator pads.
4.      Intraosseous catheter in left tibial plateau with attached 1L back of normal saline (950 mL remaining).
5.      Home monitoring glucose sensor, Medtronic Model GL3, serial number: GT8766822M, is on the lateral right lower right quadrant of the abdomen, secured with adhesive dressing.
6.      Insulin pump infusion set on lateral left lower quadrant of the abdomen, secured with adhesive dressing.


**EXTERNAL EXAMINATION**

*Injuries are described in a separate section below.*

GENERAL:  The body is that of a normally developed and well-nourished, light-complexioned male appearing consistent with the listed age of 63 years.  The length is  71 inches, and the weight is 237 pounds as received.  The body is well preserved, cold, and has not been embalmed.  Rigidity is fully developed in the jaw and extremities.  Lividity is pink-purple, nonblanching, and in a posterior distribution.

Ex. J-865

AUTOPSY REPORT                    -6-                    KEITH BACH 2023-3146

HEAD:   See "EVIDENCE OF INJURY."   The scalp is covered with gray-white hair measuring up to 1 inch on the top of the head.  The facial hair consists of a gray-white beard and moustache.  The ears are normally formed and without drainage.  The earlobes are not pierced.  The irides are blue, the corneas are clear, and the bulbar and palpebral conjunctivae are free of petechiae.  The sclerae are white.  The nose is intact, and the nares are unobstructed.  The lips are normally formed.  The teeth are natural and in good condition.  Blood-tinged purge fluid emanates from the mouth.  Supraclavicular vascular congestion is present.

NECK:  The neck is symmetrical and without injury.

CHEST AND ABDOMEN:  See "EVIDENCE OF INJURY."  The chest is normally formed, symmetrical, and without palpable masses.

The abdomen is flat and soft.  No masses are palpable.

EXTERNAL GENITALIA:  The atraumatic external genitalia are those of a normal adult male with both testes palpable in the scrotum.

BACK:  The back is straight and symmetrical.  The anus is atraumatic.

ARMS:   See "EVIDENCE OF INJURY."   The arms are normally formed.   No non-therapeutic needle punctures, track marks, or ventral wrist scars are noted.   The fingernails are cut short and clean, and do not extend beyond the fingertips.

LEGS:   See "EVIDENCE OF INJURY."   The legs are normally formed and have no edema, amputations, or deformity.  The toenails are short, trim, and clean.

BODY MARKINGS (SCARS AND TATTOOS):
Scars:
1.      None identified.

Tattoos:
1.      None.

## EVIDENCE OF INJURY

A 1 x 1/2 inch tan-red abrasion is on the right paramidline posterior parietal scalp.  On the ventral upper right arm, dorsal proximal right forearm, ventral left upper arm, and ventral proximal left forearm are multiple oblong-shaped blue-purple contusions measuring 1 – 3 inches in greatest dimension.   Therapeutic-appearing puncture sites, some with associated ecchymoses, are in the right antecubital fossa, anterior proximal right arm, and

Ex. J-866

AUTOPSY REPORT                         -7-                    KEITH BACH 2023-3146

left antecubital fossa.  Multiple irregular tan-red abrasions ranging from 1/4 – 1/2 inch in greatest dimension are on the anterior right shoulder (1), dorsolateral mid upper right arm (2), anterior left shoulder (1), dorsolateral mid upper left arm (2) and mid dorsal left forearm (1), and lateral mid left thigh (1).

Injuries consistent with cardiopulmonary resuscitation include irregular dried tan-red to tan-yellow abrasion on the mid chest measuring 3 x 1 inches in greatest dimension, multiple small, dried tan-yellow to tan-red abrasions measuring 1/8 to 1/4 inch in greatest dimension are on the bridge of the nose, consistent with rubbing from an air mask, and multiple anterolateral rib fractures in the right and left 2nd – 6th ribs.

## **INTERNAL EXAMINATION**

BODY CAVITIES:  The abdominal fat layer measures up to 6 cm in thickness.  The body cavities have no hemorrhage or abnormal fluid.   The serosal surfaces are smooth, glistening, and without adhesions.  The organs are normally located.  The diaphragm is intact.  The body cavities have no internal injuries.

CARDIOVASCULAR SYSTEM:  The heart weighs 500 grams and is enlarged.  It has a mostly normal shape with a smooth, glistening epicardium.  The coronary arteries have a normal origin and distribution with right dominance.   The left anterior descending, left circumflex, and right coronary arteries have up to approximately 50% yellow, focally calcific atherosclerotic stenosis.

The myocardium is red-brown, firm, and uniform without focal fibrosis, softening, or hyperemia.   The right ventricle is dilated.   The right ventricle, left ventricle, and interventricular septum measure 0.3 cm, 1.2 cm, and 1.1 cm, respectively.

The endocardium is intact, smooth, and glistening.   The cardiac valve leaflets are of normal number, pliable, intact, and free of vegetations.  The atrial and ventricular septa are free of defects.

The aorta follows its usual course and has mild atherosclerotic changes.  There are no vascular anomalies or aneurysms.   The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM:   The right and left lungs weigh 610 and 570 grams, respectively, and have the usual lobation.  The pleurae are smooth and glistening; the lungs have a moderate amount of anthracotic pigment.   The lungs are overexpanded expanded and edematous.  The parenchyma is dark red and exudes moderate amounts of fluid.   The lungs have no consolidation, hemorrhage, infarct, tumor, gross fibrosis, or

**Ex. J-867**

AUTOPSY REPORT                          -8-                        KEITH BACH 2023-3146

enlargement of airspaces.  The bronchi contain no foreign material and have tan-pink unremarkable mucosa.

HEPATOBILIARY SYSTEM:  The liver weighs 1780 grams.  The intact capsule is smooth and glistening.  The parenchyma is red-brown to tan-yellow without mass or hemorrhage. Moderate palpable fibrosis is present.

The gallbladder contains an estimated 10 mL of bile and no stones.  Its mucosa is uniform, and the wall is not thickened.

The pancreas appears small in size with a normal shape and lobulated structure.  The parenchyma is pink-tan to tan-white, firm, and uniform.

HEMOLYMPHATIC SYSTEM:  The spleen weighs 190 grams.  The capsule is smooth and intact.  The parenchyma is maroon, firm, and uniform.

There is no enlargement of the lymph nodes in the neck, chest, or abdomen.

ENDOCRINE SYSTEM:  The thyroid gland is not enlarged, and the lobes are symmetrical. The parenchyma is uniform, firm, and red-brown.

The adrenal glands have the usual size and shape.  The cortices are thin, uniform and yellow, and there is no hemorrhage or tumor.  The pituitary gland is not enlarged.

GASTROINTESTINAL SYSTEM:  The esophagus and gastroesophageal junction are unremarkable.  The stomach contains approximately 150 mL of dark brown gastric fluid without visible pills or pill residue.  The gastric mucosa demonstrates numerous petechial hemorrhages. The duodenal mucosae are intact and unremarkable.  The small and large intestines and appendix are unremarkable to inspection and palpation.

GENITOURINARY SYSTEM:  The right and left kidneys weigh 180 and 220 grams, respectively, and have a normal shape and position.  The cortical surfaces are granular and focally pitted.  The kidneys have the usual corticomedullary structure without tumors or cysts.  The pelves and ureters are not dilated or thickened.  The bladder contains 100 mL of clear, yellow urine.  The mucosa is intact, and the bladder wall is not hypertrophied.

The prostate gland is of average size and grossly unremarkable.  The testes are not examined.

NECK:  The tongue, strap muscles, and other anterior neck soft tissues have no hemorrhage.  The hyoid bone and the cartilaginous structures of the larynx and trachea are normally formed and without fracture.  The airway is unobstructed, lined by smooth,

AUTOPSY REPORT                    -9-                    KEITH BACH 2023-3146

pink-tan mucosa, and contains no foreign material.  The cervical vertebrae have no displacement, hypermobility, or crepitus.

<u>MUSCULOSKELETAL SYSTEM</u>:  See "EVIDENCE OF INJURY."  The musculoskeletal system is well developed and free of deformity.  There are no fractures of the clavicles, sternum, vertebrae, or pelvis.  The ribs are not brittle.  The skeletal muscle is dark red and firm.

<u>HEAD</u>:  See "EVIDENCE OF INJURY."  The calvarium and base of the skull are normally configured and have no fractures.  The dura is intact, and there is no epidural or subdural hemorrhage.

<u>CENTRAL NERVOUS SYSTEM</u>:   The unfixed brain weighs 1220 grams.   The leptomeninges are glistening and transparent without underlying hemorrhage, exudate, or cortical contusions.  The hemispheres are symmetrical and have a normal gyral pattern.  Mild generalized atrophy is present. There is no flattening of the gyri, narrowing of the sulci, midline shift, or evidence of herniation.  The arteries at the base of brain have no atherosclerotic changes or aneurysms.

Sections through the cerebral hemispheres have a uniform, intact cortical ribbon and uniform white matter.   The basal ganglia, thalami, hippocampi, and other internal structures are symmetrical and without focal change.   The ventricles are moderately enlarged, and the linings are smooth and glistening.   Sections of the brainstem and cerebellum show an intact structure without focal lesions.

**Ex. J-869**

AUTOPSY REPORT                          -10-                          KEITH BACH 2023-3146

### **SPECIMENS RETAINED**

<u>TOXICOLOGY</u>:   Samples of central and peripheral blood, vitreous humor, gastric contents, urine, and liver are retained for toxicology.

<u>HISTOLOGY</u>:  Representative sections of organs and tissues are retained.  Sections are submitted for histology as follows:

Cassette summary:
Cassette 1:   Heart, left ventricle and interventricular septum
Cassette 2:   Duodenum, including area of superficial ulcer
Cassette 3:   Right and left kidneys and left anterior descending artery
Cassette 4:   Right lung
Cassette 5:   Liver and pancreas
Cassette 6:   Left lung

<u>PHOTOGRAPHS</u>:   Facial identification photographs, external overall photographs, and photographs of selected findings are taken.

<u>RADIOGRAPHS</u>:  None.

**Ex. J-870**

AUTOPSY REPORT                    -11-                    KEITH BACH 2023-3146


## MICROSCOPIC EXAMINATION

HEART:  Sections show orderly cardiomyocytes with many showing enlarged and hyperchromatic nuclei and yellow-brown, finely granular intracytoplasmic pigment. The myocardium has moderate interstitial fibrosis without areas of geographic fibrosis, inflammatory infiltrates, hemorrhage, or necrosis. The intramyocardial vessels are unremarkable.

LEFT ANTERIOR DESCENDING ARTERY:  A section shows a complete cross section of vessel with myointimal thickening and an atheromatous plaque with cholesterol clefting and calcifications causing moderate narrowing of the lumen.

LUNGS:  Sections show alveoli containing variable amounts of scattered pigmented and non-pigmented macrophages, red blood cells, and eosinophilic proteinaceous material. No significant collections of inflammatory infiltrates are seen.  Some of the bronchioles contain sloughed respiratory epithelium, without evidence of smooth muscle mucosal hyperplasia or basement membrane thickening.  There is no increased perivascular or peribronchiolar anthracotic pigment.  The vessels are markedly congested.

LIVER:  A section shows preserved hepatic architecture. Minimal centrilobular predominantly macrovesicular steatosis is present. No fibrosis, necrosis, or lobular inflammatory infiltrates are seen.  The portal areas have no increased chronic inflammation.  No interface inflammation is seen. The sinusoids are markedly congested.

KIDNEY:  A section shows preserved renal architecture.  The tubules have moderately autolyzed epithelium.  The tubules show subnuclear vacuoles.  There are several scattered sclerotic glomeruli.  No significant interstitial chronic inflammation is seen.  The arteries and arterioles show mild hyalinized-type thickening of the vessel walls.

PANCREAS:  A section shows predominantly autolyzed pancreatic parenchyma with retained lobular architecture without increased fibrosis, necrosis, or acute or chronic inflammatory infiltrates.  The ducts are unremarkable.


ME:lcb
D:  9/299/13/24 lcb/23      T:  9/29/23
Rev.  9/13/24 lcb

Ex. J-871



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

### DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA  92123-1206
TEL: (858) 694-2895   FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **BACH, Keith** |
| Medical Examiner Number: | **2023-03146** |
| Date of Death: | **09/28/2023** |
| Time of Death: | **04:09** |
| Pathologist: | **Melanie Estrella, D.O.** |
| Specimens Received: | **Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **09/29/2023** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| **Alcohol Analysis (GC/FID-Headspace)** | Peripheral Blood 2 | |
| **Acetone** | | **0.021 % (w/v)** |
| Alcohol (Ethanol), Isopropanol, Methanol | | Not Detected |
| | | |
| **Alcohol Analysis (GC/FID-Headspace)** | Vitreous | |
| **Acetone** | | **0.025 % (w/v)** |
| Alcohol (Ethanol), Isopropanol, Methanol | | Not Detected |
| | | |
| **Drugs of Abuse Screen (ELISA)** | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Methamphetamine | | Not Detected |
| Opiates | | Not Detected |
| Oxycodone | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| | | |
| **Vitreous Chem Panel (Cobas c111)** | Vitreous | |
| **Chloride** | | **118 mmol/L** |
| **Creatinine** | | **1.4 mg/dL** |
| **Glucose** | | **663 mg/dL** |
| **Potassium** | | **22.1 mmol/L** |
| **Sodium** | | **146 mmol/L** |
| **VUN** | | **53 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

**Comment:**

Approved and Signed:   _____
11/02/2023            Theresa Hippolyte, D-ABFT-FT
                      Forensic Toxicology Laboratory Manager

# EXHIBIT K

Ex. K-873

| From: | Coleman, Susan E. |
|---|---|
| To: | Gay C. Grunfeld; Eric Monek Anderson; Kedra Chan |
| Cc: | Pappy, Elizabeth M.; Rivard, Deann R.; Inman, Steven; Favela, Diana; Gonzalez, Lucy; van Daalen Wetters, Dee; Van Swearingen; Hannah Chartoff; Ben Holston; Aaron Fischer; Young, Christopher; Michael Freedman |
| Subject: | RE: Dunsmore et al. v San Diego County Sheriff's Dept. et al.: Materials Relied Upon by Experts per Court Order (Dkt. 718) [IMAN-DMS.FID55015] |
| Date: | Monday, September 23, 2024 2:29:57 PM |

**[EXTERNAL MESSAGE NOTICE]**

There are no records in Dr. Penn's possession regarding the person that Dr. Penn witnessed overdose. This was observed during his tour by Dr. Penn and myself (and county personnel), and no medical records were pulled.

**Susan E. Coleman** | Partner
*she, her, hers*

**Burke, Williams & Sorensen, LLP**
501 West Broadway, Suite 1600, San Diego, CA 92101
**D** 619.814.5803 | **O** 619.814.5800 | **F** 619.814.6799
scoleman@bwslaw.com | vCard | Bio | LinkedIn | bwslaw.com



The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Monday, September 23, 2024 1:12 PM
**To:** Eric Monek Anderson <EMonekAnderson@rbgg.com>; Kedra Chan <KChan@rbgg.com>
**Cc:** Coleman, Susan E. <SColeman@bwslaw.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Rivard, Deann R. <DRivard@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Favela, Diana <dfavela@bwslaw.com>; Gonzalez, Lucy <LGonzalez@bwslaw.com>; van Daalen Wetters, Dee <DWetters@bwslaw.com>; Van Swearingen <VSwearingen@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Ben Holston <BHolston@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Young, Christopher <Christopher.Young@us.dlapiper.com>; Michael Freedman <MFreedman@rbgg.com>
**Subject:** RE: Dunsmore et al. v San Diego County Sheriff's Dept. et al.: Materials Relied Upon by Experts per Court Order (Dkt. 718) [IMAN-DMS.FID55015]

**[EXTERNAL]**

Dear counsel,

We are continuing our review of the production of September 20, 2024.  Thus far, we have identified the following documents we believe are missing:

- Notes from Dr. Reinecke's "comprehensive[] tour" of all 7 jail facilities
- Notes from Dr. Reinecke's three interviews/conference calls with staff (including "local dentists" and NaphCare dental director)
- Notes from Dr. Murray facility inspections (and notes of other reviewers who joined for the tour)
- Notes from Dr.  Murray interviews (and notes of interviews conducted by any other reviewer)
- Inspection notes from Henrietta Peters.
- Letters or other records from the 5 MAT participants that Mr.  Vare described in his report. Mr. Vare named Ryan Kelsey, whose records we do not have, but did not name the other 4 MAT participants who purportedly wrote letters.
- No records regarding the person that Dr. Penn says he witnessed overdose on page 18 of his report.
- Mr. Joelson: Post-inspection communications
- Mr. Martinez: any notes from his 2023 Central Jail visit

We would appreciate an update on whether the documents listed above exist and if so when they will be produced.

Thank you, Gay Grunfeld

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

**From:** Eric Monek Anderson <EMonekAnderson@rbgg.com>
**Sent:** Friday, September 20, 2024 8:05 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Kedra Chan <KChan@rbgg.com>

**Ex. K-875**

**Cc:** Susan E. Coleman <scoleman@bwslaw.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Rivard, Deann R. <DRivard@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Favela, Diana <dfavela@bwslaw.com>; Gonzalez, Lucy <LGonzalez@bwslaw.com>; van Daalen Wetters, Dee <DWetters@bwslaw.com>; Van Swearingen <VSwearingen@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Ben Holston <BHolston@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Young, Christopher <Christopher.Young@us.dlapiper.com>; Michael Freedman <MFreedman@rbgg.com>
**Subject:** RE: Dunsmore et al. v San Diego County Sheriff's Dept. et al.: Materials Relied Upon by Experts per Court Order (Dkt. 718)

We see a new folder in the Sharefile with documents for Drs. Murray and Reinecke and will review.

---

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Friday, September 20, 2024 7:38 PM
**To:** Kedra Chan <KChan@rbgg.com>
**Cc:** Susan E. Coleman <scoleman@bwslaw.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Rivard, Deann R. <DRivard@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Favela, Diana <dfavela@bwslaw.com>; Gonzalez, Lucy <LGonzalez@bwslaw.com>; van Daalen Wetters, Dee <DWetters@bwslaw.com>; Van Swearingen <VSwearingen@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Ben Holston <BHolston@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Young, Christopher <Christopher.Young@us.dlapiper.com>; Michael Freedman <MFreedman@rbgg.com>
**Subject:** Re: Dunsmore et al. v San Diego County Sheriff's Dept. et al.: Materials Relied Upon by Experts per Court Order (Dkt. 718) [IMAN-DMS.FID55015]

Dear counsel,

We have downloaded the documents you produced this evening. We still do not have the 287 new medical records discussed in Court on September 17 and ordered to be produced today. Will it be possible to provide these medical records later this evening or tomorrow?

Thank you, Gay

**Gay Crosthwait Grunfeld**
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
ggrunfeld@rbgg.com <mailto:ggrunfeld@rbgg.com>

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender

at [rbgg@rbgg.com](mailto:rbgg@rbgg.com) <[mailto:rbgg@rbgg.com](mailto:rbgg@rbgg.com)>

IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

> On Sep 20, 2024, at 3:47 PM, Kedra Chan <[kchan@rbgg.com](mailto:kchan@rbgg.com)> wrote:
>
> Dear Counsel,
>
> Pursuant to Court Order (Doc. 718), we uploaded to a ShareFile folder materials not specifically identified by Bates number on the indices served August 21, 2024.  Please go to [https://rbgg.sharefile.com/d-s5d2bf87590e14e15b19c7d7a8d5108c8](https://rbgg.sharefile.com/d-s5d2bf87590e14e15b19c7d7a8d5108c8) and follow the prompts.   This link will expire after 30 days.
>
>
> Sincerely,
>
> **Kedra Chan** [she/her]
> Practice Assistant
>
> 
> **Rosen Bien Galvan & Grunfeld LLP**
> 101 Mission Street, Sixth Floor
> San Francisco, California  94105-1738
> T: (415) 433-6830  •  F: (415) 433-7104
> [kchan@rbgg.com](mailto:kchan@rbgg.com)
>
> The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at [kchan@rbgg.com](mailto:kchan@rbgg.com).

**Ex. K-877**

# EXHIBIT L

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:  (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:  (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXPERT REPORT OF JAMES AUSTIN, PH.D.**<br><br>Judge:      Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

[4542693.1]

EXPERT REPORT OF JAMES AUSTIN, PH.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. L-879**

| From: | Johns, Jesse [Jesse.Johns@sdsheriff.org] |
|---|---|
| Sent: | 9/1/2023 11:34:14 AM |
| To: | Adams, Theresa [Theresa.Adams@sdsheriff.org]; Bavencoff, Christina [Christina.Bavencoff@sdsheriff.org]; Jones, Kenneth [Kenneth.Jones@sdsheriff.org]; Buchanan, Christopher [Christopher.Buchanan@sdsheriff.org]; Soto-Meza, Gloria [Gloria.SotoMeza@sdsheriff.org] |
| Subject: | MOT non-compliance and below minimum staffing info |
| Attachments: | DSB Below Minimum Staffing 2404.xlsx; MOT Non-Compliance Report PP2404.xlsx |

Hello all,

Attached are the Below Minimum Staffing and MOT Non-compliance reports. This pay period we had 215 DSB deputies not meet the minimum MOT. The same trends exist with a fair amount of phase trainees, STC training and scheduled time off. In regard to the minimum staffing, we had a total of 346 vacant shift bureau-wide. 162 of those shift were Saturday and Sunday shifts. These numbers are all very similar for the past three pay periods. The change to the MOT directive regarding working "hard to fill shifts" does not seem to have a positive impact. If anything, it has caused SDCJ to have more vacancies during the weekdays as that is where a majority of CSB deputies were working before the change.

One notable anomaly was SBDF if overstaffed more than they are understaffed. The overstaffed 12 positions this deployment and were only short 4 positions. The positions were assigned as extra rovers and there was no hospital guard nexus. The facility may have redeployed to other facilities to assist but I am unable to see that through the deployments only.

Lastly, we have a MOT workgroup next Tuesday. If there is anything you would like me to bring up or propose during this meeting, please let me know.

Respectfully,



**Jesse Johns**
Lieutenant
*Detentions Support Division*
Email: jesse.johns@sdsheriff.org
Phone: 858-974-2023
Mobile: 619-629-2523
www.sdsheriff.net
**SAN DIEGO COUNTY**
**SHERIFF'S DEPARTMENT**



The lack of sufficient staff has a noticeable impact on the lack of presence and therefor supervision in the housing units. With the exception of some housing units in the female facility, it was clear that the only time the security staff had a credible presence in the housing units was when they were making their hourly safety cell checks. Generally, one would expect each housing unit to have an officer in the housing unit at all times when the IPs are scheduled to be out of their cells in the large day room areas during the day and evening hours. The inability

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. L-880**

# EXHIBIT M

1  GAY C. GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  ERIC MONEK ANDERSON – 320934
   HANNAH M. CHARTOFF – 324529
3  BEN HOLSTON – 341439
   ROSEN BIEN
4  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
5  San Francisco, California  94105-1738
   Telephone:  (415) 433-6830
6  Facsimile:   (415) 433-7104
   ggrunfeld@rbgg.com
7  vswearingen@rbgg.com
   eanderson@rbgg.com
8  hchartoff@rbgg.com
   bholston@rbgg.com
9
   AARON J. FISCHER – 247391
10 LAW OFFICE OF
   AARON J. FISCHER
11 1400 Shattuck Square Suite 12 - #344
   Berkeley, California  94709
12 Telephone:  (510) 806-7366
   Facsimile:   (510) 694-6314
13 ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

14 Attorneys for Plaintiffs and the
   Certified Class and Subclasses

15

16              UNITED STATES DISTRICT COURT

17            SOUTHERN DISTRICT OF CALIFORNIA

18 DARRYL DUNSMORE, ANDREE
   ANDRADE, ERNEST ARCHULETA,
19 JAMES CLARK, ANTHONY EDWARDS,
   REANNA LEVY, JOSUE LOPEZ,
20 CHRISTOPHER NORWOOD, JESSE
   OLIVARES, GUSTAVO SEPULVEDA,
21 MICHAEL TAYLOR, and LAURA
   ZOERNER, on behalf of themselves and all
22 others similarly situated,

23              Plaintiffs,

24       v.

   SAN DIEGO COUNTY SHERIFF'S
25 DEPARTMENT, COUNTY OF SAN
   DIEGO, SAN DIEGO COUNTY
26 PROBATION DEPARTMENT, and DOES
   1 to 20, inclusive,

27              Defendants.

28

Case No. 3:20-cv-00406-AJB-DDL

**EXPERT REPORT OF KELLY S. RAMSEY, M.D.**

Judge:      Hon. Anthony J. Battaglia
Magistrate: Hon. David D. Leshner

Trial Date: None Set

[4447331.33]

EXPERT REPORT OF KELLY S. RAMSEY, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. M-882**

# TABLE OF CONTENTS

**Page**

EDUCATION AND QUALIFICATIONS ................................................ 1

COMPENSATION ........................................................................ 3

METHODOLOGY ........................................................................ 3

SUMMARY OF OPINIONS ............................................................ 6

OPINIONS .................................................................................. 7

I.  The Sheriff's Department Fails to Adequately Treat Persons Experiencing Withdrawal ........................................................ 7

    A.  The Sheriff's Department Does Not Have a Coherent Acute Withdrawal Management Services Program, Which has Resulted in Harm to Persons Experiencing Withdrawal ........................ 9

    B.  The Sheriff's Department Does Not Adequately Screen Persons Entering the Jail at Risk of Withdrawal ................................ 15

    C.  The Sheriff's Department Does Not Adequately Assess Persons at Risk of Withdrawal ...................................................... 20

        1.  Health Care Staff are Not Adequately Trained to Assess Persons at Risk of Acute Withdrawal ............................ 24

        2.  Health Care Staff Do Not Use Withdrawal Assessments, including COWS, CIWA-Ar or CIWA-B, Appropriately or Frequently Enough, and Do Not Use PAWSS at All ........... 27

        3.  The Sheriff's Department Does Not Take Vital Signs for Persons Being Assessed for Withdrawal ......................... 29

    D.  The Sheriff's Department Fails to Ensure that Persons in Withdrawal are Housed Appropriately ................................ 30

    E.  The Sheriff's Department Fails to Deliver Adequate Treatment for Persons Experiencing Withdrawal ................................ 35

        1.  The Sheriff's Department Does Not Provide Persons in Withdrawal with Individualized Treatment ....................... 40

        2.  The Sheriff's Department Fails to Use Methadone Appropriately to Treat Withdrawal ................................ 50

        3.  The Sheriff's Department Fails to Provide Adequate Treatment to Pregnant Persons in Withdrawal ................ 53

        4.  The Sheriff's Department is Not Adequately Engaging in Innovation in Care. ................................................ 58

EXPERT REPORT OF KELLY S. RAMSEY, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. M-883**

II.   The Sheriff's Department Fails to Adequately Treat Persons with
      Substance Use Disorder.................................................................. 61

      A.   The Sheriff's Department's MAT Program Fails to Meet the
           Standard of Care for Persons with Opioid Use Disorder...................... 62

           1.   The Sheriff's Department's Process for Starting Persons
                with Opioid Use Disorder on MOUD is Inadequate ................ 64

           2.   The Sheriff's Department Limits Doses of Buprenorphine,
                Contrary to the Standard of Care................................................. 80

           3.   The Sheriff's Department Does Not Adequately Use
                Methadone to Treat Persons with OUD ...................................... 83

           4.   The Sheriff's Department Fails to Ensure Persons are Not
                Denied Medication for Suspected Diversion.............................. 86

           5.   The Sheriff's Department's Policies, Procedures, and
                Practices for Treating Pregnant Persons with Substance
                Use Disorder (SUD) Fall Below the Standard of Care ............. 92

      B.   The Sheriff's Department Lacks Policies and Procedures
           Focused on Treating Alcohol Use Disorder and Stimulant Use
           Disorder............................................................................................. 96

III.  The Sheriff's Department's Policies and Practices Regarding
      Overdoses Do Not Adequately Protect Persons at Risk of Overdose............. 98

IV.   The Sheriff's Department Has Inadequate Discharge Planning for
      Incarcerated Persons with SUD.................................................................... 110

V.    The Sheriff's Department's Policies and Procedures Stigmatize Persons
      with Substance Use or SUD Who are Incarcerated, Which Creates a
      Substantial Risk for Inadequate Care. ........................................................ 115

RECOMMENDATIONS........................................................................................ 120

I.    Regarding Withdrawal Management ............................................................ 120

II.   Regarding Substance Use Disorder Treatment ............................................ 122

III.  Regarding Overdose Response...................................................................... 123

IV.   Regarding Discharge Planning and Services ............................................... 123

V.    Regarding Stigmatization ............................................................................. 124

EXPERT REPORT OF KELLY S. RAMSEY, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. M-884**

I, Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM, declare:

1.     I am a physician licensed to practice medicine in the State of New York, and am board certified in both internal medicine and addiction medicine. A true and correct copy of my curriculum vitae is attached hereto as **Exhibit A**. My background and experiences relevant to my expert testimony in this proceeding are set forth there and below.

## EDUCATION AND QUALIFICATIONS

2.     In 1989, I received a Bachelor of Science in Foreign Service degree in International Politics, Law, and Diplomacy from the Georgetown University's School of Foreign Service in Washington, D.C. In 1999, I received a Master of Public Health degree in Epidemiology from the University of Illinois at Chicago School of Public Health. In 2003, I received my Medical Doctor degree from the Case Western Reserve University School of Medicine in Cleveland, Ohio. In 2004, I received a Master of Arts in Bioethics from the Case Western Reserve University School of Graduate Studies in Cleveland. From 2003 to 2004, I interned and began my Internal Medicine/Pediatrics residency at the University Hospitals Health Systems (affiliated with Case Western Reserve University) in Cleveland. I transferred in 2004 to Montefiore Medical Center in the Bronx, New York, where I completed my internal medicine social medicine residency in 2006.

3.     I have spent my career working in addiction medicine in a variety of settings, including an opioid treatment program ("OTP"), in a federally qualified health care setting ("FQHC") practicing addiction medicine, in an addiction policy and regulatory position as the Chief of Medical Services for the New York State Office of Addiction Services and Supports ("OASAS"), the single state agency overseeing the largest continuum of addiction services (prevention, harm reduction, treatment, and recovery) in the United States, and currently as an addiction medicine physician and an addiction medicine and harm reduction consultant.

4.     I am a subject matter expert in addiction medicine, harm reduction,

HIV, and hepatitis C and have served as a faculty member and advisor at several academic institutions and for the New York State Department of Health (DOH) for over 15 years.

5.    I have received several awards including the Laureate Award by the American College of Physicians ("ACP") in 2017, the New York State DOH Commissioner's Special Recognition Award for contributions to drug user health in 2018, the Distinguished Contributions to Behavioral Medicine Award by ACP in 2023, and the Case Western University School of Medicine Alumni Award in 2023. I am a Distinguished Fellow of the American Society of Addiction Medicine ("DFASAM") and a Fellow of the American College of Physicians ("FACP").

6.    I serve on the national Board of Directors of ASAM as the Region 1 Director representing New York State and am the Immediate Past President of the NY Chapter of the Society of Addiction Medicine ("NYSAM").

7.    I am the author of the following relevant publications:  Brief FAQ on Methadone Use to Treat Opioid Use Disorder (OUD) in Carceral Settings Using the Hospital/Clinic Designation, Johns Hopkins University Bloomberg School of Public Health, Health Policy & Management (2024) and the New York State DOH AIDS Institute Clinical Guidelines Program at Johns Hopkins University School of Medicine online Substance Use Disorder Treatment in Pregnant Adults (2021) (the revised guidelines are being reviewed currently).  I have been a co-author on the following relevant publications:  A protocol for a retrospective, longitudinal cohort study for addressing challenges in opioid treatment for transition-age adults (2024), Community-Based Cluster-Randomized Trial to Reduce Opioid Overdose Deaths (2024), Referral to and engagement in substance use disorder treatment within opioid intervention courts in New York:  a qualitative study of implementation barriers and facilitators (2024), The Ways That Stigma Hurts People Who Use Substances and How to Help (2023), ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-

EXPERT REPORT OF KELLY S. RAMSEY, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. M-886**

1 potency Synthetic Opioids (2023), Ethnoracial Disparities in Rates of Non-Natural

2 Causes of Death After the 2020 COVID-19 Outbreak in New York State (2023),

3 New York State Technical Working Group's Resuscitation Training in Naloxone

4 Provision Programs 2016 Report (2016).  I was a field reviewer for the Bureau of

5 Justice Assistance's ("BJA") Guidelines for Managing Substance Withdrawal in

6 Jails:  A Tool for Local Government Officials, Jail Administrators, Correctional

7 Officers, and Health Care Professionals (2023).

8         8.      In my previous role at New York State OASAS, I trained New York

9 State prison medical providers at the New York State Department of Corrections

10 Community Supervision ("DOCCS") and New York State juvenile justice center

11 medical providers through the New York State Office of Children's and Family

12 Services (OCFS) in addiction medicine and specifically how to utilize

13 buprenorphine in correctional settings.  My presentation entitled Treating Opioid

14 Use Disorder (OUD) in Correctional Settings:  Medication for Opioid Use Disorder

15 ("MOUD") Reduces Overdoses and Opioid-Related Morbidity has been viewed

16 over 2,500 times on You Tube.

**COMPENSATION**

18         9.      My rate of compensation for this matter is $300 per hour.

**METHODOLOGY**

20         10.     Plaintiffs' counsel asked me to render an opinion as to the adequacy of

21 substance use treatment in the San Diego County jails.

22         11.     In order to provide an opinion, I reviewed numerous documents

23 provided to me by Plaintiffs' counsel, including the Third Amended Complaint.

24 That document claims that the Sheriff's Department fails to provide adequate

25 medical care for incarcerated persons with substance use disorders, and those who

26 entered the jail under the influence of substances.  I also reviewed 25 sets of medical

27 records, records from substance-related deaths in the Jail, and additional

28 documentation relevant to substance use treatment.  A complete list of the materials

150.   The Sheriff's Department has not provided adequate treatment for persons with substance use and SUD during their incarceration and transition from incarceration, which creates a substantial risk of serious harm to incarcerated persons with substance use and SUD.

### A.   The Sheriff's Department's MAT Program Fails to Meet the Standard of Care for Persons with Opioid Use Disorder

151.   In the Third Amended Complaint, Plaintiffs allege that the Sheriff's Department "fails to provide adequate medical treatment for incarcerated people with substance use disorder," including by its "failure to implement a comprehensive MAT program," thereby placing "incarcerated people at risk of serious harm."  Dkt. 231 at ¶¶ 60, 62.  Based on my review of the evidence, I agree. Providing adequate treatment to persons experiencing acute withdrawal syndrome is critical to treating SUD, which, for the reasons explained above, the Sheriff's Department fails to do.  Persons with OUD require far more than just acute withdrawal management.  Incarcerated persons with OUD need medication for opioid use disorder ("MOUD") throughout their incarceration.  The Jail's efforts to provide that treatment through its Medication-Assisted Treatment ("MAT") program have been inadequate, leaving incarcerated persons with OUD at a substantial risk of serious harm.

152.   Persons who are incarcerated in the San Diego County Jails that have OUD are at risk of serious harm, including death, because the Jail's MAT program is inadequate.  The program is inadequate for several overarching reasons.  First, the written policies and procedures fail to ensure the program will be operated to the appropriate standard of care.  Second, in practice, the Jail's MAT program has operated outside of the standard of care.  Third, even though the Jail is shifting

---

https://legislativeanalysis.org/wp-content/uploads/2021/03/Model-Access-to-Medication-for-Addiction-Treatment-in-Correctional-Settings-Act-1.pdf.

1    primary responsibility for several areas of medical care away from NaphCare to

2    CHP, NaphCare is going to remain at the helm of the Jail's MAT program – despite

3    NaphCare's thoroughly documented inability to provide a quality program thus far

4    and their failure to safeguard the welfare of incarcerated persons with SUD.

5    Freedland Depo. Tr. at 152:10-17. Because NaphCare is retaining full control over

6    the MAT program, Dr. Montgomery's deposition testimony regarding purported

7    changes to the MAT program does not give me confidence that the Jail will run an

8    adequate MAT program going forward.

9       153.   These overall inadequacies are present in each of the key areas of the

10   MAT program, explained in more detail in the following sections. Those areas

11   include the process for starting persons on MAT, the provision of buprenorphine

12   and methadone, treatment for persons suspected of diversion, and treatment of

13   pregnant persons with OUD.

14      154.   But before getting into those specific areas, it is critical to emphasize

15   that the Jail's decision to leave NaphCare in charge of MAT is dangerous. Specific

16   evidence of NaphCare's failure to operate an effective MAT program in the Jails is

17   detailed in the sections below, but those failures are perhaps best summarized by

18   one section of Dr. Montgomery's deposition testimony:

19      **Q**. In those conversations [between the Jail and NaphCare] have any of
       them been discussions where you've raised problems with
20      [NaphCare's] execution of responsibilities as part of MAT or MOUD?

21      **A**. Yes. We've expressed our concerns about appropriate operations
       and functions since the contract started.

22
        **Q**. As it relates to the provision in MAT and MOUD, what operations
23      and programs are you referring to that you raised with NaphCare?

24      **A**. The provision of induction. It was a listed item in the contract. It
       was supposed to be completed within six months of [the] contract['s]
25      start. It was not. NaphCare was expected to conduct MAT processes,
       procedures, to actually build a MAT program. They did not. Their
26      health services administrator was supposed to be running the MAT
       program meetings, [but] they did not. They basically refrained from
27      running the meetings and we came up with additional processes
       instead.

28

# EXHIBIT N
# (Redacted)

Ex. N-890

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, <br><br> Defendants. | Case No. 3:20-cv-00406-AJB-DDL <br><br> **EXPERT REPORT OF PABLO STEWART, M.D.** <br><br> Judge:       Hon. Anthony J. Battaglia <br> Magistrate: Hon. David D. Leshner |

[4541606.8]

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. N-891**

**TABLE OF CONTENTS**

Page

EDUCATION AND QUALIFICATIONS ........................................................... 1

METHODOLOGY .......................................................................................... 5

FINDINGS ..................................................................................................... 8

I.    FINDING #1: THE SAN DIEGO COUNTY JAIL'S SYSTEM FAILS
      TO ADEQUATELY IDENTIFY AND TRACK INCARCERATED
      PEOPLE WITH SERIOUS MENTAL HEALTH CARE NEEDS .................. 8

      A.    The Jail's Mental Health Screening System Falls Short with
            Respect to Identifying and Addressing Suicide Risk. ........................... 8

      B.    The Jail's Mental Health Screening System Is Deficient and
            Ineffective in Identifying and Ensuring Treatment for *Non-
            Suicide-Related*—but Still Very Serious—Mental Health
            Treatment Needs. ................................................................................. 10

      C.    The Jail System Fails to Review and Consider Important
            Information—*Including what Is Maintained by the County
            Itself*—About Newly Arriving Patients. ................................................ 13

      D.    It Is a Further and Very Serious Problem that the Jail Lacks an
            Adequate Screening Tool to Assess Incarcerated People for
            Intellectual Disability and to Determine Related Treatment and
            Adaptive Support Needs. ..................................................................... 14

      E.    There Is Insufficient Confidentiality During the Mental Health
            Screening Process. .............................................................................. 15

      F.    Patient Examples of Deficient Intake Screening Practices Putting
            People at Substantial Risk of Serious Harm. ....................................... 16

II.   FINDING #2: THE JAIL'S SYSTEM FAILS TO TIMELY AND
      ADEQUATELY PROVIDE ESSENTIAL MEDICATIONS TO
      PEOPLE WITH MENTAL HEALTH TREATMENT NEEDS ................... 18

      A.    Psychiatric Prescribing Practices and Supervision in the San
            Diego County Jail System Fall Far Short of the Standard of Care,
            Resulting in Serious Treatment Failures and Putting Patients at
            Substantial Risk of Harm. ................................................................... 18

      B.    There Are Serious Systemic Failures to Continue Clinically
            Necessary Medication for People with Mental Health Treatment
            Needs *When They Arrive at the Jail.* ................................................... 21

      C.    There Are Serious Systemic Failures in Medication Management
            and Psychiatric Care *During the Period of a Patient's
            Incarceration* ...................................................................................... 23

      D.    The Jail System Fails to Ensure Adequate Medication Continuity

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY** **Ex. N-892**

for Patients *Who Are Being Released from Custody.* ..........................25

E.    Patient Examples of Deficient Psychiatric Practices Putting
      People at Substantial Risk of Serious Harm. ...........................26

III.  FINDING #3: THE SAN DIEGO COUNTY JAIL FAILS TO
      PROVIDE PEOPLE WITH SERIOUS MENTAL ILLNESS WITH
      TIMELY ACCESS TO ADEQUATE TREATMENT, CAUSING
      UNDUE SUFFERING AND PUTTING PEOPLE AT
      UNNECESSARY AND SUBSTANTIAL RISK OF HARM. ....................34

A.    The Jail's Lack of an Adequate Levels of Mental Health Care
      System and the Lack of Individualized Treatment Based on
      Clinical Needs Are Major Deficiencies. ..................................34

B.    The Jail System Fails to Provide Timely or Minimally Adequate
      Acute, Inpatient Mental Health Care (Psychiatric Services Unit). .......39

C.    The Jail System Fails to Provide Minimally Adequate Outpatient
      Level of Care to Patients, Resulting in Serious and Preventable
      Decompensation and Other Harms. ........................................48

D.    The Jail System Erects Improper Barriers for Patients to Timely
      Access Clinically Necessary Mental Health Care and Placement. .......57

IV.   FINDING #4: THE JAIL'S SYSTEM OF SOLITARY
      CONFINEMENT PUTS AN EXTRAORDINARILY HIGH NUMBER
      OF PEOPLE WITH MENTAL HEALTH NEEDS AT
      UNNECESSARY AND SERIOUS RISK OF HARM. ...........................62

A.    Conditions in San Diego County Jail's Administrative Separation
      Units Constitute Some of the Harshest, Most Restrictive Forms
      of Solitary Confinement I Have Ever Witnessed in a Jail System. .......65

      1.    Central Jail Administrative Separation ..........................66

      2.    George Bailey Administrative Separation ........................68

      3.    Las Colinas Administrative Separation ..........................75

B.    People with Serious Mental Illness Are Placed in Administrative
      Segregation Without Consideration of Mental Health Input,
      Putting Them at Substantial Risk of Serious Harm. ....................76

C.    The San Diego County Jail's System, Through Its Deficient
      Policies and Practices, Places a Disproportionately High Number
      of People with Serious Mental Illness in Administrative
      Separation, with Devastating Effects. ....................................83

D.    The San Diego County Jail's System of Administrative
      Separation and Solitary Confinement-Type Conditions Puts
      People with Mental Health Needs at a Substantial Risk of Death,
      Including by Suicide. ........................................................88

V.    FINDING #5: THE SAN DIEGO COUNTY JAIL'S SYSTEM FOR

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-893**

SUICIDE PREVENTION IS DEFICIENT, FAILS TO PROTECT PEOPLE WITH SERIOUS MENTAL HEALTH NEEDS, AND CAUSES SERIOUS HARM. .................................................................. 101

A.    The Jail's "Detention Safety Program" Is Inadequate and Dangerously Outside the Norm of Clinically Adequate Jail Systems for Suicide Prevention. .......................................... 102

B.    The San Diego County Jail's Detention Safety Program Placements for Patients in Psychiatric Crisis Are Harsh, Extraordinarily Restrictive, and Often Clinically Counterproductive. .......................................................... 106

    1.    The San Diego County Jail System's Use of "Safety Cells" Is Inhumane and Dangerous. ...................................... 106

    2.    The San Diego County Jail System's Use of Enhanced Observation Housing Cells Are Punitive, Clinically Counterproductive, and Dangerous. ......................... 109

    3.    Blanket Custodial Restrictions on Clothing, Bedding, Property, and Privileges for Patients on Suicide Precautions Does Not Meet the Standard of Care and Is Harmful. ......................................................... 113

C.    There Is a Dangerous Lack of Adequate Monitoring and Supervision for People at Heightened Risk of Suicide. .................. 115

    1.    Lack of Constant Observation for High-Risk Suicidal Patients When Clinically Indicated. ....................... 115

    2.    Jail Staff Continue to Conduct Inadequate Safety Checks in Solitary Confinement-Type Conditions, Putting People at Substantial Risk of Serious Harm. ...................... 117

D.    There Remain Grave Concerns about Dangerous "Attachment Points" that Can Be Used for Hanging in High-Risk Housing Areas. ..................................................................... 122

E.    The San Diego County Jail's Suicide and Mental Health-Related Death Review and Quality Improvement Processes Are Deficient. ................................................................. 124

VI.    FINDING #6: MENTAL HEALTH CARE STAFFING AND THE SYSTEM'S STAFFING STRUCTURE ARE INSUFFICIENT TO MEET THE MENTAL HEALTH TREATMENT NEEDS OF THE SAN DIEGO COUNTY JAIL'S INCARCERATED POPULATION. ........ 128

A.    There Is Inadequate Staffing to Meet the Mental Health Treatment Needs of the Jail Population. ............................. 128

B.    The Jail System's Mental Health Staffing Structure Is Dysfunctional and Fails to Ensure Adequate Mental Health Treatment Delivery for the Jail Population. ......................... 134

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-894**

VII.   FINDING #7: THE JAIL FAILS TO PROVIDE NECESSARY
       CONFIDENTIALITY FOR MENTAL HEALTH TREATMENT,
       UNDERMINING THE DELIVERY OF MENTAL HEALTH CARE........ 142

VIII.  FINDING #8: JAIL CUSTODY STAFF EXERT IMPROPER AND
       DANGEROUS CONTROL OVER CLINICAL MENTAL HEALTH
       CARE DECISIONS. .................................................................... 146

IX.    FINDING #9: THE JAIL'S SYSTEM IMPROPERLY AND
       DANGEROUSLY PUNISHES PEOPLE WITH SERIOUS MENTAL
       HEALTH TREATMENT NEEDS OR INTELLECTUAL
       DISABILITY............................................................................... 152

X.     FINDING #10: SAN DIEGO COUNTY JAIL OPERATES A
       SYSTEM THAT DISCRIMINATES AGAINST PEOPLE WITH
       MENTAL HEALTH AND INTELLECTUAL DISABILITIES. ................ 155

XI.    FINDING #11: THE JAIL'S SYSTEM FAILS TO PROVIDE
       ADEQUATE MENTAL HEALTH DISCHARGE PLANNING
       SERVICES, PUTTING PEOPLE AT RISK OF HARM AND
       REPEATED INCARCERATIONS................................................. 156

XII.   CONCLUSION ........................................................................... 160

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY** Ex. N-895

I, Pablo Stewart, M.D., declare:

1.    I am a board-certified Attending Psychiatrist and Clinical Professor at the University of Hawaii, John A. Burns School of Medicine.  A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit A**.  My background and experiences relevant to my expert testimony in this proceeding are set forth below.

## EDUCATION AND QUALIFICATIONS

2.    In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland.  In 1982, I received my Doctor of Medicine from the University of California San Francisco (UCSF), School of Medicine.  In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class of the UCSF, School of Medicine.  In 1985-1986, I served as the Chief Resident of the UCSF Department of Psychiatry at San Francisco General Hospital.

3.    Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illness in correctional and other institutional contexts.  In my work, I have specialized in community and correctional treatment programs for individuals with chronic and serious mental illness, as well as substance use and related disorders.

4.    I have extensive experience managing, monitoring, and reforming mental health systems in detention settings.  From 2016 to 2022, I served as the federal court-appointed monitor in *Rasho v. Baldwin* (C.D. Ill.), a class case involving the provision of mental health care to the incarcerated population of the Illinois Department of Corrections.  I have also been the federal court-appointed expert monitor in *Madrid v. Gomez* (N.D. Cal.) and *Gates v. Deukmejian* (E.D. Cal.), two cases that addressed the use of solitary confinement placements and treatment of people with mental health needs in California prison facilities.

5.    Between 1986 and 1990, I was the Senior Attending Psychiatrist for the

Forensic Unit of UCSF, which was located at San Francisco General Hospital.  In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco.  My duties in that position included advising the San Francisco City Attorney on issues pertaining to forensic psychiatry.

6.     Between July 1998 and February 2004, I served as a psychiatric consultant to the National Council on Crime and Delinquency (NCCD) and subsequently for the Institute on Crime, Justice and Corrections at Washington University (when it took over monitoring responsibilities from NCCD) in their efforts to monitor juvenile detention and treatment facilities operated by the State of Georgia.  In that case, I monitored an Agreement between the United States Department of Justice and the State of Georgia designed to improve the quality of care in its juvenile detention facilities.  The Agreement encompassed mental health care, medical care, educational services, and treatment programs.

7.     In 2007 and 2008, I prepared expert statements and testified before the court and the three-judge panel in the *Coleman*/*Plata* overcrowding litigation.  My expert report in that case was cited twice in the United States Supreme Court decision upholding the three-judge court's imposition of an order requiring California to reduce overcrowding to address constitutional violations.  *Brown v. Plata*, 563 U.S. 493, 519 n.6, 522 (2011).  I have served as an expert in several federal court class action cases regarding mental health care in jails and prisons, including *Hernandez, et al. v. County of Monterey* (N.D. Cal.), *Coleman v. Brown* (E.D. Cal.), *Parsons v. Ryan* (D. Ariz.), and *Graves v. Arpaio* (D. Ariz.).

8.     I have designed and taught courses in correctional psychiatry at UCSF. I have also designed and taught courses on the protocols for identifying and treating psychiatric patients and have supervised psychiatric residents in teaching hospitals. I have worked closely with local, state and federal governmental bodies to design and present educational programs about psychiatry, substance use, and preventative

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY** **Ex. N-897**

medicine.

9. I have presented numerous papers before mental health professionals, prosecuting and criminal defense attorneys, probation officers, and judges, and have published in professional and peer-reviewed journals on topics including prison mental health services, dual diagnosis, mental illness, alcohol and drug use, and the treatment of substance use disorders. These presentations and publications include: "Alcohol and Other Drugs and the Courts" (2010), "The Mentally-Ill Offender in Reentry Courts" (2010); "Mental Health Aspects of Diminished Capacity and Competency" (2007); "Methamphetamine-Induced Dual Diagnosis Issues" (2006); "Proper Assessment of Drug Court Clients" (2006); "Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices" (2004); "Cultural Considerations in Working with the Latino Patient" (2002); "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders" (2001); "Managing People of Different Pathologies in Mental Health Courts" (2000); "Model for Health Appraisal for Minors Entering Detention" (2000); "Co-Occurring Disorders: Substance Abuse and Mental Health" (2000); "The Dual-Diagnosed Client" (2000); "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering" (1999); "Working With the Substance Abuser in the Criminal Justice System" (1999); "Mental Illness and Drug Abuse" (1999); "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Criminal Justice and Substance Abuse" (1999); "Impulse Control Disorders" (1999); "Major Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder" (1999); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed" (1998); "Assessment and Treatment of the High Risk Offender" (1999); "Assessment of Substance Abuse" (1995); "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues" (1994); and "Psychiatry, Homelessness, and Serious Mental Illness" (1994).

10.     I have been asked to provide my opinion in this case regarding the policies and practices of San Diego County, the San Diego County Sheriff's Department, and their contractors and agents as they relate to the provision of mental health care and practices impacting incarcerated people with mental health needs in the San Diego County Jail system (the "Jail").

11.     I previously submitted expert declarations in this case on specific matters related to the delivery of mental health care and Jail policies and conditions impacting people with mental health and other conditions.  Dkt. 119-7, Dkt. 162-4. For those declarations, I reviewed numerous investigation and other reports, Jail policies and procedures, and several people's written testimony, among other things. My findings and opinions in those declarations are incorporated by reference into this declaration and, where appropriate, expanded upon based on the additional information I have gathered since.

12.     In the last four years, I have provided expert testimony at trial or by deposition in the following cases:

- *Parsons, et al v. Shin* (District Court, Phoenix, AZ, November 3, 2021)
- *Ashoor Rasho et al. v. Director John Baldwin* (District Court, Peoria, Illinois, February 1, 2022)
- *Joseph O'Malley v. Hawaii Department of Safety* (Superior Court, Honolulu, HI, February 3, 2022)
- *Barrientos v. Core Civic* (Deposition) (April 14, 2022)
- *State of Missouri v. Marvin Rice* (11DE-CR00590-2) (Superior Court, Clark County, MO, March 31, 2022)
- *United States v. Jason Solatario Brown* (District Court, Guam, January 6, 2023)
- *Daniels v. Jeffreys* (Deposition) (March 1, 2023)
- *Washington v. Essex, Banyas* (Deposition) (November 9, 2023)
- *State of Idaho v. John Cody Hart* (McCall, Idaho, December 4, 2023)

13.     I am charging $400 per hour for my time working on this matter.  For deposition or in-court testimony, I have a four-hour minimum with rate of $600 per

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY** **Ex. N-899**

1  hour and a full-day rate of $4,000.

2  **METHODOLOGY**

3       14.     I visited San Diego Jail facilities on February 6, 7 and 8, 2024.  During

4  the visit, I toured the San Diego Central Jail Facility (Central Jail), the George

5  Bailey Facility (George Bailey) and the Los Colinas Detention Facility (Las

6  Colinas) (collectively, the "Facilities," "Jail Facilities") along with other experts and

7  Plaintiffs' attorneys.  At these Facilities, I visited several housing units, intake areas,

8  health care clinic areas, health care staff work spaces, pharmacy areas, and other

9  locations inside these Jail Facilities.  During the three days, I was able to

10  communicate with scores of patients and spoke with County staff.  Health care

11  contractor staff (e.g., NaphCare) consistently refused to speak with me.  I also

12  reviewed several hundred photographs taken during the tour.  (The photographs are

13  date-stamped as February 2023, but they were taken during my site visit in February

14  2024.)

15       15.     Over my career, I estimate that I have conducted well over two hundred

16  inspections of detention facilities, including as a party's designated expert and a

17  court-appointed expert monitor.  My tour activities at San Diego County Jail

18  (hereinafter the "Jail") are generally consistent with the methodology I have used in

19  touring other detention facilities.

20       16.     After the tour, I reviewed dozens of patient health care charts chosen by

21  San Diego County as being representative of the following categories:

22           a.     People who submitted 3 or more sick call requests for mental

23  health care;

24           b.     People who requested confidential mental health encounters;

25           c.     People who were placed in a safety cell for 24 hours or longer;

26           d.     People who were placed in an EOH cell for 48 hours or longer;

27           e.     People who were assessed as suicidal at the time they were

28  booked into the jail;

**Ex. N-900**

1        f.      People who have been admitted for hospitalization outside of the

2    jail following a suicide attempt/incident of serious self-harm at the jail;

3        g.      People who were housed in the PSU at Central Jail for 48 hours

4    or longer;

5        h.      People who were housed in the PSU at Las Colinas Jail for 48

6    hours or longer;

7        i.      People who were housed in administrative segregation cells for

8    48 hours or longer on the fifth or sixth floors at Central Jail who have also spent

9    time in PSU;

10        j.      People who were housed in administrative segregation cells for

11    48 hours or longer on the fifth or sixth floors at Central Jail who have also spent

12    time in OPSD; and

13        k.      People with the following illnesses: 1) schizophrenia, 2) bipolar

14    disorder, 3) anxiety, and 4) depression.

15    17.    I also reviewed patient records from several incarcerated patients with

16    whom I interacted during my tour of the Jail Facilities.

17    18.    There were significant problems with the health care records I received

18    that made the process of reviewing them more tedious, difficult, and time-

19    consuming.  For example, in some patient records, certain letters were oddly

20    missing.  While I was generally able to discern what was being stated in the records,

21    this made it more difficult and time-consuming for me to complete my review.

22    Likewise, in several records, the file had been formatted in such a way that I could

23    not conduct text searches.  Again, I was generally able to complete my reviews and

24    find specific key records, but the review process was more difficult and time-

25    consuming than my usual expert review processes, where records are text-

26    searchable.

27    19.    In this case, given the enormity of the records, data, and materials to be

28    reviewed, I utilized the assistance of a psychiatrist colleague, who also has

Ex. N-901

1  experience in jail mental health care, to review records and case materials in this

2  matter.  The reviews conducted by this colleague were all done under my

3  supervision.  I frequently utilize this sort of assistance in conducting large detention

4  mental health care system assessments, as it is helpful to make my review process

5  more efficient and effective.  My analysis is ultimately done independently and all

6  findings contained in this report are my own.

7      20.     The materials I reviewed in preparing my opinions and findings are

8  listed in **Exhibit B**.

9      21.     In forming my opinions and findings, I look to the general (or

10  community) standard of care in the treatment of people with serious mental illness.

11  I also look to the National Commission on Correctional Health Care (NCCHC)

12  standards, which offer useful guidance for a jail health care system seeking to

13  provide appropriate care to patients in custody.  But a jail system's compliance with

14  NCCHC standards, including to warrant NCCHC accreditation, does not

15  automatically demonstrate a system that provides minimally adequate mental health

16  care nor compliance with constitutional requirements.  An expert evaluating

17  conditions, treatment, policies, procedures, and other essential aspects of a detention

18  facility would be remiss if they relied exclusively on NCCHC standards.

19      22.     It is notable, however, that, despite what I understand to be years of

20  discussion by San Diego County Jail leadership about earning NCCHC

21  accreditation, the San Diego County Jail has *not* secured such accreditation.  As

22  discussed in this report, multiple NCCHC recommendations—*dating back to*

23  *2017*—regarding how to fix deficiencies in the Jail's mental health care system have

24  still not been implemented.  This fact, to be sure, raises concern as to the adequacy

25  of this Jail's mental health care system.

26      23.     My opinions are informed by extensive data, information, and

27  observation, and have a reasonable degree of medical certainty based on the

28  evidence outlined above.  I reserve the right to modify my opinions in the light of

1    new additional information that is provided to me in the future.

2    **FINDINGS**

3    **I.    FINDING #1: THE SAN DIEGO COUNTY JAIL'S SYSTEM FAILS TO ADEQUATELY IDENTIFY AND TRACK INCARCERATED PEOPLE**

4    **WITH SERIOUS MENTAL HEALTH CARE NEEDS.**

5    24.    Based on my tour and review of policies, records, and other relevant

6    materials, it is clear that the Jail's current system fails to adequately identify and

7    track incarcerated people with serious mental health care needs.  This systemic

8    deficiency puts incarcerated people at substantial risk of serious harm.

9    25.    I toured the intake health care screening areas and procedures at Central

10    Jail and Las Colinas.  Several aspects raised great concern for me.  I observed a

11    screening process that was not designed to effectively triage and ensure timely,

12    adequate treatment for people with mental health needs.  There are also deficiencies

13    in the system that prevent adequate identification of mental health needs throughout

14    the period of incarcerated people's detention.

15    **A.    The Jail's Mental Health Screening System Falls Short with Respect to Identifying and Addressing Suicide Risk.**

16

17    26.    There are several deficient aspects of the Jail system's process for

18    identifying and addressing suicide risk.  During our site visit, intake nursing staff

19    shared that she did not know of a standardized suicide risk assessment tool she was

20    supposed to use.  Intake nursing staff noted a few self-populating questions on the

21    screen about suicide risk and suicide history, but they could not explain how the tool

22    is used to trigger a mental health referral.  Nor is there adequate guidance provided

23    to staff on how to use the risk assessment tool (including, when to make a referral)

24    in the San Diego County Sheriff's Department Medical Services Division policies,

25    including *Mental Health Screen and Evaluation* (MSD.E.5.1, SD_117427) and

26    *Suicide Prevention & Patient Safety Program* (MSD.S.10, SD_117715).

27    27.    In 2018, nationally recognized suicide prevention expert Lindsay Hayes

28    in fact "strongly recommended" that the County reconsider its use of the Columbia-

Suicide Severity Rating Scale (C-SSRS) during its intake screening process, noting that its "effectiveness remains questionable."  The Jail rejected this recommendation and continues to use the C-SSRS for its mental health intake screening.  San Diego County Response to Lindsay Hayes' Report at 3, DUNSMORE 0117148.  A few additional screening questions have been added, but the result is not an effective screening tool.  What the Jail system needs is a validated suicide risk assessment tool that is appropriately tailored to ensure accurate identification of suicide risk and to facilitate an appropriate response.

28.     Based on my tour and review of records and other relevant materials, and even beyond the problematic suicide risk assessment tool, the Jail's mental health screening process fails to ensure timely and adequate treatment for people at risk of suicide.  This failure manifests itself in several ways.  Most significantly, by policy and in the practices I can discern, the identification of a person's elevated suicide risk does *not* lead to any treatment planning or meaningful treatment services.  Remarkably, Medical Services Division policy S.10, *Suicide Prevention & Patient Safety Program*, which flows in large part from the mental health screening procedures, makes no mention of any treatment planning and only the most glancing of references to mental health treatment at all.  SD_117715.  (This issue is discussed further in Finding #5, below (Suicide Prevention Failures).)

29.     Also of great consequence, by policy and in practice, the mental health screening process is deeply ineffective in ensuring that a patient with serious mental health needs—including someone who may be at heightened risk of suicide— has timely access to psychiatric services (including medication) that are clinically necessary for their well-being.  (This issue is discussed further in Finding #2, below (Psychiatric Care Failures).)

30.     At the present time, the Jail system's mental health screening procedures fail to adequately identify and treat patients at risk of suicide, putting patients at substantial risk of serious harm.

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY** **Ex. N-904**

**B.    The Jail's Mental Health Screening System Is Deficient and Ineffective in Identifying and Ensuring Treatment for *Non*-Suicide-Related—but Still Very Serious—Mental Health Treatment Needs.**

31.    The San Diego County Jail system appears to place extreme focus on people who may be at risk of suicide.  This is in some respects understandable, given that San Diego County Jail has been found to have an exceedingly high rate and number of suicides as compared to other county jail systems, with a suicide rate of more than 1.5 times the national average from 2011 to 2020 (with nearly 40 suicides during that time period), and several more suicides since 2021.  Many outside groups have raised grave concerns about suicides in San Diego County Jail. *See* California State Auditor, *San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody*, Feb. 3, 2022 ("2022 California State Auditor Report"),  DUNSMORE0117710; Lindsay Hayes's *Report on Suicide Prevention Practices Within The San Diego County Jail System*, June 22, 2018 ("2018 Hayes Suicide Prevention Report" or "Hayes Report"), DUNSMORE0117148; Disability Rights, California's *Suicides in San Diego County Jail: A System Failing People with Mental Illness,* April 2018 ("2018 DRC Report" or "DRC Report"), DUNSMORE0124942.

32.    At the same time, based on my review, I have very serious concern about the Jail's system of identifying and providing timely assessment and treatment to patients with serious psychiatric problems but who are *not* a suicide risk.

33.    During my site visit, I asked Jail leadership and intake screening staff about this non-suicidal patient population.  I was informed that the intake mental health screening focuses on suicidality.  If the intake nurse determines that a person is at risk for suicide, they will refer that person to a "gatekeeper."  The "gatekeeper" is a mental health professional (except when it is a nurse because there is not a mental health clinician available) who is supposed to then conduct an initial suicide risk assessment, but *not* a comprehensive mental health assessment.  As confirmed with "gatekeeper" staff with whom I spoke, that initial suicide risk assessment, by

policy and in practice, serves to ensure only evaluation of a patient for placement on suicide precautions (*i.e.*, placement in a safety cell, Enhanced Observation Housing, or the Psychiatric Services Unit's observation cells), *not* for clinically necessary mental health treatment. The "gatekeeper" is, by policy, serving a limited function as crisis intervention specialist for suicidal behavior only. I am not aware of this sort of extremely limited "gatekeeper" role in any other detention system, and based on my review of this system, I find that its design leads to failures in mental health care delivery.

34. Under Medical Services Division policy E.5.1, patients "who yield positive mental health screenings" at intake "will be required to have a follow up with a [Qualified Mental health Professional] within 30 days when clinically indicated." SD_059881. This policy fails to comply with one of the most basic NCCHC standards—that is, that patients receive a comprehensive mental health intake within 14 days of booking. This deficiency was identified in 2017, but remains unremedied today. NCCHC Report at 20, 53, 87, 121, DUNSMORE0260618. By policy, when intake nursing staff determine at intake that an incarcerated person should be referred for further mental health evaluation, follow-up is only required within *30 days*. It is further a major problem that there is no directive for a much more expedited timeline for clinically urgent cases.

35. The consequences of the Jail's delays in *comprehensive* mental health screening can be deadly. The 2022 California State Auditor Report identified eight (8) recent in-custody deaths where the individual "had serious medical or mental health needs that health staff did not identify or communicate to detention staff at intake." 2022 California State Auditor Report at 20, DUNSMORE0117710. In one case, an intake nurse referred an arriving incarcerated person for mental health services, and the person made an urgent request for mental health services the next day. That request was denied because a referral was in process. Two days later, the person died by suicide, having never seen a mental health professional. *Id.* at 23.

36.     In my review of records, I observed case after case in which patients with serious and urgent mental health treatment needs did not receive a comprehensive mental health evaluation—and just as serious, did not receive an appropriate psychiatric assessment—for extended periods of time (*i.e.*, several weeks and even months).  This failure to timely address *urgent* non-suicide-related mental health needs when identified puts this Jail system at odds with other detention systems that provide more appropriate mental health care, and puts people in San Diego County Jails at substantial risk of serious harm.

37.     **Overall, I am very concerned about the insufficient and untimely involvement of mental health professionals in the mental health screening process.**  In 2022, the California State Auditor recommended that the Jail "revise its intake screening policy to require mental health professionals to perform its mental health evaluations.  These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody." *Id.* at 54.  This recommendation has gone unheeded.  In 2023, San Diego County published a *Progress Report: Update on State Audit*, in which it acknowledged that this recommendation had not been implemented.  The County noted that it was "moving toward providing 24-hour mental health care in the facilities, including the availability of mental health professionals during the intake process at the receiving facilities."  Progress Report at 5, SD_184479.  But initial mental health screening is still done by non-mental health staff, with referrals to prompt secondary assessment generally done only where the intake nurse identifies a possible suicide risk.  This is an inadequate mental health screening procedure.  It nearly assures that there will be delays in identification and treatment of serious mental health needs, and—based on my review—is causing serious ongoing harm through denials of clinically adequate and timely care.

38.     The Jail's mental health coordinator acknowledged that the Jail does not track or look at how many people actually receive the comprehensive mental

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-907**

1  health evaluation or on what timeline.  Quiroz PMK Dep. at 46-47.

2      39.    It consistently takes far too long for patients with serious psychiatric

3  medication needs to see a psychiatric prescriber, which is absolutely essential to

4  ensure that appropriate medication is continued or initiated, and that any medication

5  regimen that is implemented meets the patient's clinical situation. Significant

6  improvement is needed to ensure that people with mental health needs (including

7  those who are not current suicide risks) receive timely evaluation and treatment.

8      40.    County leadership appears to share my concern about untimely

9  assessments for newly incarcerated patients.  In May 2024, the Jail's mental health

10  coordinator, Ms. Quiroz, testified about how the County itself identified concerns

11  about the timeliness of psychiatry contacts for patients arriving at the Jail:

12      Q: [I]s your team concerned about timeliness of initial psychiatry
       contacts with patients?

13      …

14      A: We want them seen as soon as possible, and there's times we may
15      feel that it's not soon enough.

16  Quiroz PMK Dep. at 111.

17      **C.**    **The Jail System Fails to Review and Consider Important**
               **Information—*Including what Is Maintained by the County Itself*—**
18              **About Newly Arriving Patients.**

19      41.    The 2022 California State Auditor Report recommended that the

20  County "create a policy requiring health staff to review and consider each

21  individual's medical and mental health history from the county health system during

22  the intake screening process."  DUNSMORE0117710.  This recommendation has

23  gone unimplemented.

24      42.    In 2023, the County responded, "Unlike many other counties, San

25  Diego does not have a coordinated county health system or shared electronic health

26  care records system.  As a result, we cannot meet this recommendation as written."

27  Progress Report at 5, SD_184479.  The Progress Report notes that in April 2021,

28  nearly one year *prior to* the 2022 California State Auditor Report, certain Jail mental

1  health staff were granted "read-only" access to County health system records for Jail

2  patients. *Id.*

3      43.    Ms. Quiroz, the County's Person-Most-Knowledgeable on Jail Mental

4  Health Care issues, confirmed that there remains no policy or written expectation

5  that intake nurses review and consider patients' medical and mental health history

6  from the county health system during the intake screening process, and that it

7  appears that intake nurses continue to rely on self-reporting of mental health history.

8  Quiroz PMK Dep. at 98-99. (The lieutenant with us during my February 2024 site

9  visit stated that he thinks the County is "looking into" this issue, but no changes

10  were anticipated at that time.)

11      44.    Based on my professional experience, this response and the current

12  policy are inadequate.  The State Auditor's recommendation should be fully

13  implemented.  Specifically, to ensure adequate screening and continuity of mental

14  health care, all health care staff conducting intake screening at the Jail must have

15  access to an arriving patient's medical and mental health history that is available in

16  the County health system records, and must be required to review and consider that

17  information during the intake screening process.  Where the County may have

18  relevant treatment information about a patient (as in the County's behavioral health

19  system), it is not sufficient to rely on a patient's self-reporting, or to rely on

20  subsequent mental health staff interactions with a patient that may not timely occur.

21      **D.**     **It Is a Further and Very Serious Problem that the Jail Lacks an
        Adequate Screening Tool to Assess Incarcerated People for
22      Intellectual Disability and to Determine Related Treatment and
        Adaptive Support Needs.**
23

24      45.    The San Diego County Jail does not have an adequate system for

25  identifying people with an intellectual disability and related needs.

26      46.    The intake screening has a single question on the topic, asking: "Are

27  you a client of the regional center for the developmentally disabled, or have you

28  been in special educational classes in school?"  Quiroz Dep. Exhibit 2, Exhibit B at

12.  (The inquiry itself—which is a compound question—is ironically exactly the sort of question that is inadvisable and ineffective for a person with an intellectual disability.)  This screening is insufficient to identify people with intellectual disabilities and their individual treatment or adaptive support needs.

47.    I am aware of other California systems, including Orange County Jail, Sacramento County Jail, and California's state prisons, that have a far more thoughtful—and effective—screening procedure for intellectual disabilities.  This deficiency has existed in the San Diego County Jail for years, as the 2017 NCCHC Report found the Jail non-compliant with the NCCHC standard to have an adequate screening for intellectual disability.  NCCHC Report at 35, 136, DUNSMORE002016.  The 2023 death of Roselee Bartolacci, discussed later in this report, speaks directly to how failures in identifying and addressing intellectual disability needs leads to horrific, and preventable, results.

## E.    There Is Insufficient Confidentiality During the Mental Health Screening Process.

48.    In my observation of the intake process, I was concerned to see the lack confidentiality provided for the initial screening. At Central Jail, the health care intake booth requires the patient to sit on one side of a window, several feet from the intake nurse.  Several law enforcement staff from the community and the Jail stand approximately five (5) feet behind the patient.  While having law enforcement available to *visually* observe an individual during intake health screening makes sense for security, the Central Jail's health care intake screening arrangement fails to provide adequate *auditory* privacy, as law enforcement can hear the patient discuss sensitive health care information with the nurse.  This set-up undermines the sharing of important mental health information.  It is inconsistent with other detention settings that I am aware of, which provide adequate auditory privacy during the intake process while ensuring appropriate safety and security.  Based on my records review, interviews with staff and patients, and the testimony of Jail mental health

1    staff, clinical encounters, including mental health screening, are very frequently

2    conducted without adequate confidentiality such that the validity of the screening is

3    undermined.

4          49.    This deficiency was identified years ago, in the 2017 NCCHC

5    Technical Assistance Report for the San Diego County Jail at 8-9, 43, 109, which

6    found the Jail out of compliance with NCCHC patient confidentiality requirements:

> J-A-09 Privacy of Care (I). **Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis.**
>
> Recommendations: **The areas of privacy and confidentiality of care need to be addressed.** [NCCHC Compliance Indicators] require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met.

13   DUNSMORE0260618. The failure to provide adequate confidentiality for intake

14   mental health screening continues today.

**F.    Patient Examples of Deficient Intake Screening Practices Putting People at Substantial Risk of Serious Harm.**

17         50.    Deficiencies in the mental health intake screening system matter

18   greatly, and many patients at the San Diego County Jail have been put at substantial

19   risk of serious harm as a result. The recent in-custody suicide death of Pedro

20   Ornelas, who I review in more detail in Section II.E, below, is an egregious

21   example. Following his arrival at the Jail, he repeatedly requested to see a

22   psychiatrist to "get back on my medications"—requests that were *never* addressed

23   through initial screening or subsequent processes. I offer additional examples here:

24         51.    ███████████████████████████████████

25   ████████████████████████████████████████████████

26   ████████████████████████████████████████████████

27   ████████████████████████████████████████████████

28   ████████████████████████████████████████████████

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY** Ex. N-911

1 ███████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ██████████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ██████████████████████████████████  ████████████████

8 ██████████████████████████████████████████████████

9 ████████████████████████████

10    52.   ████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 ██████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ██████████████████████████████████████████████

17 ████████████████████████████████████████

18 ███████████████████  The standard of care requires that when such a

19 medication regimen is implemented, the patient should receive a follow-up

20 psychiatric assessment within one (1) week. ███████████████████████

21 ████████████████████████████████████████████████

22 ██████████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ██████████████████████████████████████████████

26 ██████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████████

This case illustrates the frequent deficiencies I observed with respect to screening people with mental illness at intake, excessive delays in mental health and psychiatric evaluations and care, delays in initiating clinically indicated psychiatric care, and untimely, poorly coordinated, and inadequate psychiatric follow-up care.

II.    **FINDING #2: THE JAIL'S SYSTEM FAILS TO TIMELY AND ADEQUATELY PROVIDE ESSENTIAL MEDICATIONS TO PEOPLE WITH MENTAL HEALTH TREATMENT NEEDS.**

53.    As a psychiatrist with experience working in and evaluating numerous detention systems, I am extremely concerned about the deficiencies I have observed with respect to the San Diego County Jail's system for provision of essential medications to people with mental health treatment needs. Failures and delays in the provision of medications and psychiatric care put patients in this Jail system at substantial risk of serious harm, including in the following ways.

A.    **Psychiatric Prescribing Practices and Supervision in the San Diego County Jail System Fall Far Short of the Standard of Care, Resulting in Serious Treatment Failures and Putting Patients at Substantial Risk of Harm.**

54.    In the San Diego County Jail system, psychiatrists, psychiatric nurse practitioners, and psychologists have for years been hired by private health care contracting companies. They are not County employees. In contrast, most or all mental health clinicians (master's level social workers or marriage/family therapists) are County employees. This odd breakdown—which is exceedingly rare in jail or prison mental health systems—is deeply problematic, as it tends to compromise care coordination across disciplines, cause dangerous disconnects in supervision and quality assurance, and lead to adverse systemic and individual patient outcomes. (This problem is discussed further in Finding #6.B.) I observed each of these sorts of problems in the San Diego County Jail system as it relates to psychiatric care.

55.    Jail mental health staff shared with me during my Jail site visits that psychiatric prescribers have little to no interaction with County-employed clinicians, with the possible exception being in the acute care Psychiatric Service Units. This

1   lack of coordination is an enormous problem.

2       56.     During my site visits, I requested to speak with a psychiatric prescriber

3   at each Jail facility.  Every time, the psychiatric prescribers refused to speak with

4   me.  County staff and legal counsel explained to me that because the psychiatric

5   prescribers were employed by a private health care contractor (NaphCare), the

6   County had no authority to have them speak with me.  This seems to me to be an

7   illustration of one aspect of the deficient mental health system at San Diego County

8   Jail—that is, the convoluted and disconnected staffing structure leads to convoluted,

9   disconnected, and ultimately deficient practices and harmful outcomes for patients.

10      57.     Based on my review of records and interviews with staff and patients, it

11  is beyond question that psychiatric prescribing practices at the San Diego County

12  Jail fall below the standard of care and put patients at substantial risk of serious

13  harm.  I include illustrative examples below; they are a few among many deficiency-

14  ridden cases that I reviewed for this case.

15      58.     Based on my review, the County is well aware of many deficiencies

16  with the system of psychiatric care at the Jail, which remain unresolved.  Examples

17  of deficits that have been identified in recent County documentation, *see* Quiroz

18  PMK Dep. at Exhibit 10, Sheriff's Department Corrective Action Notice, Dec. 1,

19  2023, include the following serious systemic failures that must be remedied:

20  - **Lack of participation by psychiatry in Continuous Quality Improvement (CQI) meetings and activities.**  CQI activities that consistently include psychiatry are an essential component of operating an adequate jail mental health care system.  Psychiatry providers do not participate meaningfully (and at times, do not participate at all) in CQI meetings and efforts.  This is a major and persistent deficit in this system, as the Jail mental health coordinator acknowledged.  *See* Quiroz PMK Dep. at 187 ("I don't know that it's been fully resolved, but it … [d]oes probably need to work towards improvement."); *id.* at 188 ("Q: Has there been a quarterly meeting where all the necessary NaphCare staff members are present? A. Not consistently.").

26  - **Lack of documented peer review process for psychiatric prescribers.**  I have observed pervasive deficiencies in patient record review with respect to psychiatric prescribing practices.  Given these deficiencies, it is unacceptable that there are not effective peer review processes in place for psychiatric prescribers.  The Jail Mental Health

Ex. N-914

coordinator confirms that the County has failed to take steps to ensure that this problem is addressed. *See* Quiroz PMK Dep. at 190-91 ("I can't be for certain that they're not doing peer reviews. It's nothing that they hand back to us. I mean, if they do the peer reviews it's something that they're keeping records of on their own."); *id.* at 100-01 (no County employee or entity responsible for determining whether NaphCare's peer review process is adequate).

- **Lack of clinical oversight of psychiatric prescribers (especially psychiatric nurse practitioners) working at the Jail.** I observed that a substantial proportion of the pervasive deficiencies in psychiatric practices were the result of sub-standard practice among psychiatric nurse practitioners at the Jail. The Jail mental health coordinator confirmed that, in leadership meetings, the Jail's chief medical officer (Dr. Montgomery) has shared concerns about adequacy of clinical oversight for psychiatric nurse practitioners at the Jail and the impact on medication management for the Jail's mental health population. *See* Quiroz PMK Dep. at 192 & 198 ("it's still a concern").

- **Inadequate psychiatric prescriber treatment practices.** Through my review, I observed time and again foundational deficiencies in psychiatric care practices: (1) the lack of appropriate confidentiality during psychiatric appointments, which undermines the exchange of sensitive information necessary to care; (2) untimely psychiatric evaluation; (3) untimely psychiatric follow-up consistent with the standard of care, including when medication is initiated, in cases of medication non-adherence, and when a patient's condition worsens; (4) improperly aggressive prescribing practices (*e.g.*, excessive starting doses, multiple concurrent medication changes, polypharmacy with inadequate attention to patient needs). These deficiencies are noted in my individual case reviews and other sections of this report.

59.     The 2017 NCCHC report criticized the San Diego County Jail's psychiatry care practices and failure to "manage … appropriately" patients who had serious needs but were not presently "psychotic and/or gravely disabled":

A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

NCCHC Report, DUNSMORE0260618 at 35.

60.     This finding, from 2017, is unfortunately consistent with practices that I observed at San Diego County Jail in 2024. I observed many patients with clear histories of serious mental illness and complex psychiatric care whose medication

needs were ignored or insufficiently monitored at the Jail.  These patients in many cases had active psychiatric symptoms but where not presenting as "psychotic and/or gravely disabled."  But after a period of delays and failures in psychiatric care at the Jail, many of them decompensated significantly, even to the point of *becoming* acutely psychotic, gravely disabled, and suicidal.

61.     My review reveals serious failures in psychiatric medication practices at all stages of a patient's detention—upon arrival, during their detention, and as part of discharge planning.  Each stage is discussed in turn below.

**B.     There Are Serious Systemic Failures to Continue Clinically Necessary Medication for People with Mental Health Treatment Needs *When They Arrive at the Jail*.**

62.     The Jail does not reliably or effectively continue necessary psychiatric medication for newly-detained patients who were receiving care in the community prior to their detention.  Any disruption of psychiatric medications can be dangerous for a number of reasons.  First, individuals who take prescribed medication to control their mental illness often decompensate if their medication is interrupted.  This can lead to worsening symptoms and risk of suicide.  Second, a disruption of prescribed psychiatric medication can actually exacerbate the underlying mental illness by altering brain physiology and causing an expansion of foci in the brain of the condition at issue.  This is called the "kindling phenomenon."  Finally, because disruption of medication can cause a worsening of the underlying condition, it can also make it more difficult to treat a patient's mental illness moving forward.

63.     The problem of medication discontinuity for newly arrived patients has been longstanding at San Diego County Jail.  The NCCHC report found, back in 2017, that incarcerated people who enter the Jail with active prescriptions for psychotropic medication "frequently" do not have their medication continued in a timely manner.  The NCCHC Report documents the concern that such failures "result[] in instability and risk for the inmate, for custody staff and for the facility." NCCHC Report at 35.

64.    To this day, patients who were taking prescribed psychiatric medication prior to their incarceration in this system are forced to wait several days, and even weeks, before they are restarted on their medication.  Some patients who are prescribed psychiatric medications at the Jail frequently wait far too long for those medications to arrive and actually be initiated.  Without their medication, incarcerated people decompensate, leading to psychosis, suicide attempts, and incidents of serious self-harm that are preventable.

65.    The County has been well aware of this serious deficiency for some time.  The issue was identified in a Corrective Action Notice (CAN) sent by the County to NaphCare, dated April 28, 2023, stating that NaphCare "failed to restart medications for patients reassigned from the California Department of State Hospital."  NAPHCARE034831.  In the County's March 4, 2024 Corrective Action Notice, no documented corrective action to remedy this deficiency is noted, yet the County states, without analysis: "NaphCare has appeared to resolve pharmacy … medication issues."  SD_1572610.  My records review and site inspection strongly indicate that the problem of failing to continue arriving patients on their medication persists on a wide scale.  Patients ███████████████████████████ ████, which I describe in this report, are all recent cases showing that deficiencies continue to put patients at unnecessary risk of harm.  SD_876917-877210.

66.    The standard of care calls for each person who was taking psychiatric medications in the community or with prescriptions during prior incarcerations to be automatically referred for evaluation by a prescriber, with that evaluation occurring in a timely manner, including on an urgent or emergent basis if clinically indicated.

67.    The failure to continue or timely start a person on clinically necessary psychiatric medications when they arrive at the Jail is exceedingly dangerous and must be remedied as soon as possible.  The 2023 suicides of Pedro Ornelas and Jonathan McDowell, each of which had unacceptable delays in the provision of medication upon arrival, demonstrate the dire consequences of such failures.

**C.**      **There Are Serious Systemic Failures in Medication Management and Psychiatric Care *During the Period of a Patient's Incarceration*.**

68.      I observed numerous examples that the Jail system fails to meet minimally adequate standards with respect to medication management and psychiatric care *during* a patient's period of incarceration, including excessive delays in follow-up by psychiatric prescribers, deficient prescribing practices, quality assurance failures, poor side effect management, and lack of follow-up for patients with poor medication adherence.

69.      The delays in psychiatric care for patients in detention at the Jail remain enormous.  The County is well aware of the problem.  A December 2023 Sheriff's Department Corrective Action Notice to NaphCare, the then-private contractor responsible for psychiatry, documented a persistent psychiatric sick call backlog, resulting in psychiatric care delays.  It noted that "periodic blitzes are done 3-4 months, with no solution to maintain the rising number of sick calls."  In April 2023, there were 785 pending psychiatry appointments.  Despite the corrective action notice issued at that time, there remained 530 psychiatric pending psychiatry appointments in November 2023, with an average wait time of 18 days.  Quiroz PMK Dep. at Exhibit 10, Sheriff's Department Corrective Action Notice, Dec. 1, 2023.

70.      The Jail mental health coordinator testified in May 2024 that delays in access to psychiatry care remain a "key deficiency area":

> Q. [F]rom mental health's side of things what are the key deficiency areas for [the contracted health care provider company]?
>
> A: Psychiatry sick call, that would be key.
>
> Q: Can you say more about what's deficient …?
>
> A: The volume of pending appointments.

Quiroz PMK Dep. at 186.

71.      I share the County's concern regarding the practice of

psychiatric/medication referrals being processed in such a way that a psychiatric prescriber will not timely see a patient when clinically necessary. Repeatedly in the records, I observed Jail patients requiring a psychiatric prescriber appointment, only for no appointment to be conducted—or scheduled—for weeks or even months at a time. In many cases, such a patient with urgent medication management needs will be scheduled only to see a mental health staff member who is not licensed to prescribe. This is a completely inappropriate and dangerous practice, as it means that urgent medication management needs are not timely addressed.

72.     The Jail's mental health coordinator states it more bluntly: "[W]e're seeing that they're not scheduling the psych si[ck] call for on-site provider to see them, whereas they schedule for a master's level clinician. And that's our concern, is that I [as a non-prescribing clinician] can't really do anything about the meds." Quiroz PMK Dep. at 114-15.

73.     Yet another policy and practice deficiency that urgently requires remediation is the Jail system's failure to act in cases of medication non-adherence—that is, when a patient refuses or misses psychiatric medication doses. Refusals and missed doses demand attention and intervention for people with serious mental illness. Missed medications *cannot* be ignored. Patients may refuse psychiatric medications due to concerns about side effects, efficacy, and a wide range of other reasons that require attention and resolution. Medication non-adherence may also indicate mental health decompensation and the need for other treatment interventions or a higher level of care.

74.     Through my patient records reviews and interviews of patients, I found numerous cases where people with serious mental illness missed multiple doses, often over an extended period of time, without adequate notice to and follow up by the psychiatric prescriber. This is a clinically inadequate and dangerous practice. And troublingly, it is a deficient practice that is *consistent* with the current deficient Jail health care policy. MSD Policy C.5.1 (Medication Administration) contains a

short, entirely inadequate section on "Missing Medications" (Section VIII). This section states "The medical provider is contacted if a patient misses any doses of the following medications for any reason." But the medication list contains only *one* psychiatric medication (Clozaril) for which a missed medication would trigger a referral to the prescriber. The standard of care requires that a psychiatric provider in a detention setting be alerted (and timely respond) when their patients refuse or miss a wide range of psychiatric medications (and all psychotropic medications)—not just Clozaril. SD_117401.

75.    The policy and practice at the San Diego County Jail must change. In a well-functioning jail mental health system, the policy and practice regarding missed psychiatric medications would be roughly as follows: "The psychiatric provider must be alerted if their patient misses three doses in a row and/or three doses over a seven-day period of *any* psychotropic medication [and other identified psychiatric medications]. The psychiatric provider shall immediately schedule an appointment with the patient to determine the reason behind these missing doses and implement a plan to ensure an appropriate medication regimen and medication adherence." Based on the policy and my assessment of practice through records review, San Diego County Jail does not come close to meeting this standard.

**D.    The Jail System Fails to Ensure Adequate Medication Continuity for Patients *Who Are Being Released from Custody*.**

76.    Medication continuity for patients being released is a critically important component of operating an adequate Jail mental health system. Patients leaving the jail must be provided with discharge planning adequate to ensure that they have access to the medications, linkages, and care they need to avoid gaps in medication and other psychiatric care.

77.    The NCCHC standards require that jail discharge planning include mental health staff taking necessary steps to "Arrange for a reasonable supply of current medications" (MH-E-10). In my records review, I observed cases of patients

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-920**

1  with serious psychiatric medication needs not receiving this sort of discharge

2  planning, and without documentation indicating that they were provided access to a

3  reasonable supply of their medications when released.

4        78.    The County is aware of the deficiency with respect to inadequate

5  discharge planning.  Ms. Quiroz, the County's Person-Most-Knowledgeable on Jail

6  Mental Health Care issues, testified in May 2024 that, with the Jail's current

7  discharge planning staff serving incarcerated persons – including the approximately

8  1,600 (or more) mental health caseload patients – "we do need more" staffing to

9  meet the need.  Troublingly, Ms. Quiroz stated that the County did not have

10  sufficient data to know how many discharge planners were necessary to meet patient

11  needs, noting only that "more is certainly better."  Quiroz PMK Dep. at 171-72.

12        79.    Angela Nix, the vice president of nursing for NaphCare, testified in

13  June 2024 that NaphCare is "developing" a role for discharge planning staff, but

14  things remain quite uncertain with respect to medication.  She stated that NaphCare

15  staff "wouldn't be the ones to call in the medication, and they wouldn't be the ones

16  to give the patient medicines in the jail before they leave. … They wouldn't be

17  responsible for handing off their medications."  She also said that she "do[es]n't

18  know what involvement the [County staff] nurses have to that."  Nix Dep. at 72, 77.

19  (Jail mental health coordinator Melissa Quiroz made no mention in her deposition as

20  to a County nursing role in discharge planning.)  The lack of coordination and the

21  lack of a clear procedure enhance my concern about the inadequate system for

22  discharge planning, particularly as to ensuring that patients have uninterrupted

23  access to their psychiatric medications.

24        80.    My concerns about inadequate discharge planning are discussed further

25  in Finding #11, below.

26      **E.**    **Patient Examples of Deficient Psychiatric Practices Putting People
   at Substantial Risk of Serious Harm.**

27

28        81.    Through my interviews with patients at the Jail and patient records

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. N-921**

1  review, I identified several examples illustrating what strongly appears to be

2  systemically deficient system with respect to medication management and

3  psychiatric care.  It is apparent to me that these patients were placed at very

4  substantial risk of harm, and in nearly every case was actually harmed by these

5  treatment failures.  For example:

6      82.    **Suicide of Pedro Ornelas (June 2023)**:  Mr. Ornelas was a 27-year-

7  old man who died by suicide while in custody at San Diego Central Jail, after

8  spending nearly two weeks without necessary attention paid to his obvious

9  psychiatric treatment needs or necessary monitoring.  ███████████████

10 ████████████████████████████████████████████

11 ███████████████████████████████████

12 ███████████████████████████████████████████

13 ████████████████.  Still, on June 17, 2023, Mr. Ornelas made two

14 separate requests to see a psychiatrist to "get back on my medications," a likely

15 reference to his being on ██████████████████████.  These

16 requests were *never* addressed: the staff portion of the forms were never completed,

17 and mental health staff never assessed him.

18     83.    Ten (10) days later, on June 27, 2023, Mr. Ornelas was found hanging

19 by a makeshift noose in his cell with no pulse.  Medical staff performed CPR and

20 transferred him to University of California San Diego Medical Center, where he was

21 found to have anoxic brain injury and passed away.

22     84.    Mr. Ornelas' death may have been preventable with access to mental

23 health services for proper evaluation of suicide risk factors and starting (or, more

24 likely, restarting) his clinically indicated psychotropic medications.  Furthermore,

25 records indicate that Central Jail Module ██ housed incarcerated persons in pre-

26 arraignment and "as a precaution, incarcerated persons are given the green safety

27 blankets upon being housed," indicating a concern for suicide risk.  Yet, there is no

28 indication that further individual screening for additional precautions or enhanced

1  monitoring was done, which would have been appropriate for someone like

2  Mr. Ornelas.

3          85.    In the post-death clinical review, NaphCare's "Recommendations for

4  Modifications in Protocol, Procedure, or Approach to Patient Health Care

5  Management Resulting from this Review," contains only the following phrase:

6  "Closer Psychiatric follow-up/care."  NAPHCARE041765-041767;

7  NAPHCARE041768-041772; NAPHCARE041773-041777.  For a case where there

8  was *zero* psychiatric care provided despite documented psychiatric history available

9  to Jail staff and multiple requests for such care, this finding is a gross

10 understatement.  Even more concerning, in other patient records covering the period

11 since this death, these sorts of deficiencies—failures to check a new patient's

12 history, failures to timely respond to requests for psychiatric care, inadequate

13 psychiatric follow-up, etc.—all persist with extreme frequency.

14         86.    ███████████████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████

19 ████████████

20    ████████████████████████████

21    ████████████████████████████

22    ████████████████████████████████

23 ████████████████████████████████████████

24 ████████████████████████████████████████

25 ████████████████████████████████████████

26 ████████████████████████████████████████

27 ████████████████████████████████████████

28 ██████████████████████████████

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**  **Ex. N-923**



SD_876917-877210.

87. *What follows illustrates some of the grave concerns I have about the psychiatric prescribing practices, and lack of supervision over psychiatric nurse practitioners at the Jail.*

. The standard of care under such circumstances calls for psychiatric

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. N-924**

1  follow-up in no more than one week.  The Jail violated that standard of care four

2  times over.

3        88.  

4

5

6

7

8

9

10

11

12

13

14

15

16                                                    .

17        89.

18

19

20

21

22

23

24

25                                                    s.

26        90.              :  This patient had recently returned from the state

27  psychiatric hospital when I evaluated him in February 2024.

28

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

**Ex. N-925**



1  ████████████████████████████████████████

2  ████████████████████████████████████████████

3  ████████████████████████████████████████

4  ████████████████████████  Of even greater concern, the psychiatric

5  progress notes from multiple appointments were verbatim identical, including what

6  purportedly occurred during the appointment, what the patient said, and how he

7  presented.  In my experience, this is evidence of a "cut and paste" note that ignores

8  the actual current clinical condition of the patient.  This is considered an

9  unacceptable and dangerous practice in detention settings where I work and also in

10  the community.  ████████████████████████████

11  ████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████

15  91.  ██████████████████████████████

16  ████████████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████

25  ██████████████████████████.

26  92.  ████████  ████████:  This patient expressed to me serious concerns

27  about the lack of mental health care he was receiving.  A major complaint was that

28  he is rarely seen by his psychiatric provider even though he is prescribed



1   psychotropic medications.  A review of his record confirms this fact. ███████

7   ███████. These gaps in care greatly exceed multiple standards of care in the jail

8   setting—including the maximum allowable time between *routine* psychiatric visits

9   being 30 days, and the maximum allowable time for psychiatric follow-up after

10  initiation of medication or dose adjustment being one (1) week.

11      93.

16  ███████. It is very troubling that the intake screening and mental

17  health tracking system failed to ensure that this high-needs patient would be timely

18  seen by a psychiatric prescriber.

19      94.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-927

1

2

3

4

5

6

7

8    95.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3   ████████████    . These failures further illustrate the lack of adequate supervision of

4   nurse practitioner prescribers at the Jail.

5   **III.    FINDING #3: THE SAN DIEGO COUNTY JAIL FAILS TO PROVIDE PEOPLE WITH SERIOUS MENTAL ILLNESS WITH TIMELY ACCESS TO ADEQUATE TREATMENT, CAUSING UNDUE SUFFERING AND PUTTING PEOPLE AT UNNECESSARY AND SUBSTANTIAL RISK OF HARM.**

8   96.    The San Diego County Jail mental health treatment system is deficient

9   in several significant ways that put patients at substantial risk of serious harm. As I

10  observed during my site visits and through review of records and other materials,

11  those harms are real, tangible, and ongoing for large numbers of people with mental

12  health needs who are incarcerated at the Jail.

13  **A.    The Jail's Lack of an Adequate Levels of Mental Health Care System and the Lack of Individualized Treatment Based on Clinical Needs Are Major Deficiencies.**

15  97.    Provision of an effective "levels of care" system, with clinically

16  indicated treatment and services provided for each level of care, is an essential

17  component to ensuring adequate mental health care to Jail patients with mental

18  health needs. A levels of care system is necessary to assess an incarcerated person's

19  treatment needs and then to provide clinical interventions that match those treatment

20  needs. Such a system requires the utilization of written, individualized treatment

21  plans for incarcerated patients requiring mental health care. It also requires the

22  provision of individualized medication management and sufficient, structured

23  therapy and counseling, in individual and group settings as clinically indicated.

24  98.    Multiple people and entities, inside and outside of the Jail system, have

25  made this clear to San Diego County. But to date, the Jail has failed to implement

26  an effective levels of care system, failed to provide clinically adequate treatment

27  planning, and failed to deliver clinically necessary treatment services to address

28

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. N-929**

1  patients' needs.

2      99.    The 2018 DRC Report was appropriately critical of the Jail's lack of

3  adequate structured mental health treatment services across the patient population,

4  noting that "only when [incarcerated people] reach the point of engaging in acts of

5  self-harm or having an acute breakdown do they receive an enhanced level of care.

6  Such a system is cruel and counterproductive[.]"  The DRC Report found that

7  incarcerated people "remain in harsh, non-therapeutic settings without adequate

8  treatment until their condition deteriorates."  DRC Report at 17,

9  DUNSMORE0124942-0125012.  The DRC Report recommended that Jail staff

10  prepare and follow a written, individualized treatment plan for each incarcerated

11  person requiring mental health care.  *Id.* at 27.  The DRC Report also found that

12  many people with mental health needs "expressed to us an interest in group or

13  individual out-of-cell therapeutic activities."  One patient asked to discontinue his

14  medication and try counseling, but instead "mental health staff increased his

15  medication dosage and ignored his request for counseling."  *Id.* at 23.

16      100.   The 2017 NCCHC Report similarly found that the Jail's mental health

17  system at the Jail reflects a "disproportionate focus on those with psychotic

18  disorders" and neglect of "other, less severely mentally ill inmates."  NCCHC

19  Report, DUNSMORE0260618 at 35, 67, 101.

20      101.   Dr. Homer Venters, the former medical director at Rikers Island in

21  New York City, recommended a levels of mental health care system to San Diego

22  County in 2020.  *See* Community Oriented Correctional Health Services (COCHS)

23  Report to Dorothy Thrush, Chief Operating Officer Office of Public Safety, San

24  Diego County (Mar. 30, 2020), DUNSMORE0115368-0115394.  Dr. Venters

25  recommended to that the Jail implement a levels of care system to meet the needs of

26  incarcerated people with mental illness:

27      [P]atients with serious mental illness in the jail setting benefit from
        engagement with  multiple types of therapy, including one-on-one talk
28      therapy, psychiatric care with medication management, nursing

support, group therapy, art and movement therapy. These approaches increase engagement in health services and decrease injuries from use of force incidents. Most large jails benefit from more than one level or type of enhanced mental health housing area, and the ability to deliver care on these units relies on clear distinctions about the profile of patients who will be housed on these units, and the training and roles of the health and security staff. For patients who require higher levels of care for mental health crisis, those who are psychotic or acutely suicidal, best practices include assessment for referral to hospital inpatient care. Within the jail setting, two levels of housing are beneficial for patients with signs and symptoms of serious mental illness. A high-level unit that replicates much of the features of inpatient settings, including use of psychiatric technicians, multiple modalities of mental health services (individual, group, art, movement) and nursing and medical support is beneficial for patients with the most serious concerns. A step-down unit that allows for increased support and structure for patients who are more stable, but not able to be safe in general population settings is also important. While these units may be comprised of cell or dorm housing units, neither of them is operated as a lock-in unit, meaning that patients are not to be confined to cells for most of the day. An important feature of these units is that when patients express suicidal thoughts or engage in self-harm, the primary response does not involve them being locked into a cell, whether the cell is labelled as a suicide watch or safety cell.

102.    In October 2018, clinical leadership employed at the Jail gave a presentation to Jail command staff proposing a levels of care system for mental health care. Dr. Christine Evans, the then-Jail Medical Director, spearheaded this effort. She rightly describes her "dismay and disappointment" that "the Jail's Command staff declined to implement the proposal I developed, or any other Mental Health and Medical levels-of-care system." Evans Decl. at 2, Dkt. 119-10.

103.    Based on my review of records and other relevant materials, the San Diego County Jail system still lacks an adequate levels of mental health care system, still lacks adequate treatment planning, and still lacks provision of clinically necessary care to patients consistent with individual treatment needs.

104.    The County's 2023 *Progress Report: Update on State Audit* responded to a similar recommendation from the State Auditor regarding utilization of a "mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody." The County deemed it "not feasible," with no indication that a levels of care system would be implemented.

1  Progress Report, SD_184479 at 5.  Ms. Quiroz, the County's mental health care

2  person-most-knowledgeable, testified that a levels of mental health care system had

3  been "considered" by Jail leadership, and that they were aware that other nearby

4  counties, including Orange and San Bernardino, have implemented such systems.

5  She stated that such a system "could be useful" but that, as of May 2024, there was

6  no "policy or expectation" for mental health staff to assign mental health acuity or

7  care level for patients.  Quiroz PMK Dep. at 87-88.

8      105.   One effect—and apparent *reason*—that the Jail has rejected this

9  repeatedly made recommendation for a levels of mental health care system is that

10  the system does not, and cannot, know the patient population's actual mental health

11  service needs and the Jail's deficit in meeting those needs.  Ms. Quiroz testified that

12  implementation of a mental health "acuity rating system will drastically impact [the

13  Jail Population Management Unit] and highlight the need for hundreds if not

14  thousands of mental health beds."  Quiroz PMK Dep. at 90.

15      106.   I have reviewed the Jail's "Mental Health Acuity Level" form.  The

16  form prompts mental health staff to assign the *MH Acuity Level* for a patient with

17  options of "acute," "severe," "moderately severe," "moderate," "mild," "minimal,"

18  or "none.  There is also a blank field where a clinician may provide clinical

19  recommendations.  The acuity level designations are not standard, not intuitive, and

20  confusing.  The Jail's policies fail to offer guidelines for mental health staff to

21  assign an appropriate *MH Acuity Level*.  The designations are of no apparent utility

22  in planning or providing mental health care.  In my review of individual patient

23  records, I observed great variability in how the form is used and even if it is

24  completed at all.  Quite frequently, no acuity level is marked.  In some cases, the

25  acuity level designation is obviously inappropriate.  In one case, a clinician marked

26  an MH Acuity Level of "minimal " for a patient identified as having symptoms of

27  florid psychosis.

28      107.   The lack of usefulness of the *MH Acuity Levels* form was confirmed by

**Ex. N-932**

the Jail's mental health coordinator, who testified that, in practice, "there is no [mental health] acuity rating scale right now."  Quiroz PMK Dep. at 84-85.  She went on:

> Q: Is there a policy or an expectation that those boxes indicating level of acuity level be checked by mental health providers?
>
> A: No.  That was something that was part of TechCare that kind of just came with the package.

Quiroz PMK Dep. at 87.

108.  Based on my professional experience, the Jail's failure to implement a functional mental health acuity and level of care system, and its failure to accurately assess mental health service needs, are a recipe for continued systemic failure in its mental health system.

109.  The lack of individualized treatment planning at the Jail is of similar and serious concern.  Jail mental health clinician Aseel Ross, who worked at George Bailey through late 2023, testified that "everybody should have a treatment plan." She described how mental health staff documents as best they can, things like "the way we rescheduled them, what we followed up on … you know, we are going to follow up on coping skills, or we are going to follow up on making sure he showers next time.  But we didn't have a specific document that said treatment plan."  Ross Dep. at 60-61.

110.  Ms. Ross, who was assigned to patients in Administrative Separation units, in fact proposed to Jail mental health leadership (including Ms. Quiroz) that structured individualized treatment plans be implemented for patients; she even submitted a template for such plans.  The Jail did *not* implement her proposal, or any other individualized treatment planning for Administrative Separation patients. Ms. Ross testified that, based on her clinical experience, individualized treatment plans should be provided to mental health patients at the Jail, including in Administrative Separation, Outpatient Stepdown Units, and the Psychiatric Services Units.  Ross Dep. at 60-65.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY Ex. N-933

111.   Ms. Quiroz, the Jail mental health care coordinator, testified that "it could be helpful" for mental health staff to use an "individualized treatment plan that is a freestanding document."  She stated that she had not seen examples from other Jail system that had implemented individualized treatment plans in mental health patients' records, but that "it would be useful to see one."  Quiroz PMK Dep. at 258.

112.   Based on my professional experience, the implementation of individualized treatment plans for the mental health population is a critical necessity for the provision of clinically adequate care to incarcerated patients at San Diego County Jail.

**B.     The Jail System Fails to Provide Timely or Minimally Adequate Acute, Inpatient Mental Health Care (Psychiatric Services Unit).**

113.   When a patient is experiencing acute psychiatric symptoms for which inpatient care is clinically indicated, it is essential that such care be provided timely, in a clinically appropriate setting, and with clinically indicated services.  The San Diego County Jail fails on each of these points.

114.   According to the Jail's policies, the Psychiatric Services Units at Central (for males) and Las Colinas (for females) are intended to provide an inpatient level of care to incarcerated people requiring the most intensive mental health care.

115.   Unlike other psychiatric hospitals in San Diego County (and across the state), the Jail's PSU facilities are *not* a licensed by the State as Section 5150 psychiatric facility; instead, they receive only a County "certification" to operate as they do.  Quiroz PMK Dep. at 74-75.  It is concerning that there is less State oversight and the absence of accountability through licensure for these PSU facilities, as compared to licensed inpatient psychiatric facilities that exist elsewhere.

116.   In any event, it is my assessment that the Jail's Psychiatric Service

Units fail to provide timely and clinically necessary care to incarcerated patients in need of acute mental health care.  Through my direct observations, interviews, and document review, I observed insufficient therapeutic treatment programming, concerning medication management practices, and practices in these units that fall below the standard of care.

117.    When we walked through the Central Jail Psychiatric Services Unit ("PSU") during the February 2024 site visit, the dayroom was empty and the unit at first looked completely devoid of staff. (Eventually, the recreation therapist appeared to speak with us.  She explained that she is the primary mental health staff member for PSU patients, and is only assigned to the unit four days per week.)

118.    The PSU at Central Jail does not resemble a psychiatric hospital in any manner.  The standard of care for a psychiatric hospital calls for patients to be seen *daily* by their psychiatrist and clinician. Patients in this PSU receive roughly weekly visits from a psychiatrist and a mental health clinician.  By contrast, in the Sacramento County Jail acute psychiatric unit, policy requires that all patients are provided a *daily out-of-cell* contact with a clinician (Licensed Clinical Social Worker) and a *daily out-of-cell* contact with attending psychiatric prescriber.  The treatment in the San Diego County Jail PSU falls below minimum standards.

119.    In the Central Jail PSU, there are two group therapy sessions (each about one hour) scheduled five days per week.  However, approximately half or more of the patients are not permitted to participate in group therapy at all.  For some, they are permitted just one hour out of their cell for unstructured time in the dayroom each day.  The cells for these patients were in some cases filled with trash and food detritus like empty milk cartons.

120.    For patients in one the four PSU "Observation Cells," they are essentially on 24/7 lockdown.  These patients receive no meaningful mental health treatment.  I observed the four patients in these Observation Cells, and they were all extremely decompensated.  The area reeked of urine and feces.  Staff in the unit told

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. N-935**

us that these patients were "too unstable" to receive treatment.  This complete lack of treatment concerns me greatly.



*Inside a Central Jail Psychiatric Services Unit Observation Cell, filled with food trash and debris from multiple meals, the patient lying on floor covered completely by a blanket (SD_983474)*

121.    The structured and group mental health programming in the PSU again falls below minimum standards.  By contrast, in the Sacramento County Jail acute psychiatric unit, policy requires that all patients are offered at least three (3) one-hour group therapy sessions per day, at least five (5) days per week, and at least ten (10) hours of structured out-of-cell activities per week.

122.    I am aware of the well-publicized case of Ivan Ortiz, who in 2019 died by suicide in a Central Jail PSU Observation Cell after a deputy, in violation of policy, left a plastic bag in Ortiz's cell.  Mr. Ortiz used the plastic bag to suffocate himself to death.  *San Diego County pays $1M to family in inmate death, pushing year's payouts past $14M*, *San Diego Union-Tribune*, June 12, 2021.  It is difficult to discern any enhancements to the delivery of mental health treatment for PSU Observation Cell patients that have been made in the five years since Mr. Ortiz died.

123.    The men in these PSU Observation Cells lie on the floor, nearly naked. (The below photograph shows a man deprived of his clothes in the PSU, using a roll

of toilet paper to rest his head on the floor.)



*Mental health patient lying on the floor in the inpatient Psychiatric Services Unit*

124. There are also serious issues regarding treatment in the Women's PSU at Las Colinas. Dr. Christine Evans, a psychiatrist who ran the Women's Psychiatric Services Unit (WPSU) at Las Colinas, testified about multiple deficiencies she encountered in that unit in 2021, with her efforts to remedy those deficiencies stymied by Jail leadership:

> I had routinely observed our daily Patient-to-Clinical Staff/Nursing ratios significantly exceed the maximum ratios per State regulations, due to staffing shortages. This problem resulted in our nursing staff being overloaded and increased the risk of critical clinical care oversights and errors. In addition to staffing shortages on WPSU, the rigid Classification and Housing policies at the Custody level restricted my options for providing safe and appropriate dispositions for my WPSU patients who no longer required inpatient care. As such, the WPSU unit routinely held more patients than the unit was staffed to safely manage. I communicated these concerns on multiple occasions to the Chief Clinician at Las Colinas Detention and Re-entry facility, and was informed that no action would be taken. As such, I determined that I could not continue to be the provider of record under these conditions and tendered my resignation.

Evans Decl. ¶ 11, Dkt. 119-10.

125. I observed these same sorts of deficiencies in the Women's PSU in 2024. In my discussion with the mental health clinician assigned to the Women's PSU unit, I found her to be organized, diligent, and well-meaning. She reported that

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-937

she "tries" to see the WPSU patients daily and "attempts" to have a daily group, but system challenges meant that she could not ensure that such clinical interactions occurred on a consistent basis.  She reported that time constraints meant that most of her individual clinical contacts with PSU patients are done non-confidentially at cell-side, and that the one group therapy session she tries to facilitate is often canceled due to custody staff shortages.  She also expressed concern about patients cycling in and out of the PSU, noting that many patients discharge directly to Administrative Separation, only to "get more symptomatic again" and have to return to the PSU. She also reported that custody staff in some cases overrule a clinical recommendation for a PSU patient to discharge to the Outpatient Stepdown (OPSD) unit, instead placing the person in Administrative Separation.

126.   Overall, the Jail system's PSUs provide nothing like the mental health treatment and therapeutic milieu that is provided to in an acute psychiatric hospital. Patients are not provided clinically necessary individual or group treatment, or sufficient and meaningful opportunities for socialization in a therapeutic milieu.

127.   Based on my records review and interactions with patients and staff, I was also troubled to observe that the more acute someone's mental health symptoms, the less treatment (and the more isolation) they seemed to get.

128.   There are further serious problems with the *timeliness* of access to inpatient PSU care in the Jail system.  On the day we toured, the Central PSU psychiatrist reported that there is "always a wait list" of acutely ill patients requiring PSU placement.  The County's Person-Most-Knowledgeable on Mental Health Care confirmed that it continues to be the case that people identified as requiring PSU placement have to wait for the "recommended clinical placement" because there is not capacity in the PSU. Quiroz PMK Dep. at 70-71.  George Bailey mental health clinician Aseel Ross testified that she was aware of patients waiting for a PSU placement **for more than one month**.  During that time, patients are not receiving mental health treatment; she described them as simply being "observed by nurses.

**Ex. N-938**

1    There is more frequent checkups." Ross Dep. at 89-90.  These are dangerous delays

2    in the provision of acute mental health care.

3         129.    San Diego County Jail incarcerated patients with acute or inpatient

4    *mental health* needs are, by policy and practice, treated with less seriousness and

5    less urgency compared with patients with acute or inpatient *medical* needs.  Jail staff

6    confirmed that there is a process for someone with unmet medical needs that require

7    inpatient care to be sent out to a hospital to get those medical needs addressed.  In

8    contrast, for someone with acute psychiatric symptoms, there is no option for Jail

9    mental health staff to send them out to a licensed inpatient psychiatric facility, to

10   ensure timely provision of care.  Such patients "will just wait until a PSU spot

11   opens" and "sometimes they remain in AdSep until we get availability for a bed."

12   Ross Dep. at 90-91, 163.

13        130.    Ms. Ross testified that, based on her experience as a clinician treating

14   mental health patients at George Bailey, she believes that the PSU referral process

15   requires improvement: "Whenever I place someone under a 5150 hold … they are

16   supposed to be sent to the PSU. I think it would be beneficial to have a faster track

17   to PSU, no wait to PSU, like a 5150 would be in a community setting."  Ross Dep.

18   at 160. I agree.

19        131.    The delays and waitlists for PSU placement, and the clinically

20   inadequate treatment and conditions in San Diego County Jail PSUs, are dangerous

21   and do not meet standards of mental health care both in the community and in

22   detention settings.

23        132.    The PSU deficiencies have direct and profoundly negative impact on

24   individual patient care and outcomes.  For example:

25   **Death of Roselee Bartolacci (May 2023)**

26        133.    The horrific and tragic death of Ms. Bartolacci last year illustrates

27   numerous systemic failures in the Jail's mental health system, including in the PSU,

28   which is supposed to provide care to people with acute treatment needs.  Although

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. N-939**

1

2

3

4

5

6

7

8          .

9    134.

10

11

12

13

14

15

16

17          .

18

19          .

20    135.

21

22

23

24

25

26          ."

27

28          .

1    136. ████████████████████████████████████

2    ████████████████████████████████████

3    ████████████████████████████████████████

4    ███████████████████████████████████

5    ████████████████████████████. Unfortunately,

6    without clinically necessary treatment at the Jail, Ms. Bartolacci did not make it to

7    her next court date.

8    137. ██████████████████████████████████

9    ███████████████████████████████████

10   ████████████████████████████████████

11   █████████████████████████████████████

12   ████████████████

13   ██████████████████████████████

14   ████████████████████████████████████

15   ████████████████████████████████████

16   ██████████

17   ██████████

18   ██████████████████████████████

19   ███████████████████████████████████

20   ███████████████████████████████████

21   ███████████████████████████████████

22   ███████████████████████████████████

23   ███████████████████████████████████████

24   ████████████████████████████████████

25   █████████████████████████████████

26   ████████████████████████████████████████

27   █████████████████████████████████████

28   ███████████████████████████████████

1    140.  ██████████████████████████████████████████

2    ████████████████████████████████████████████████

3    ████████████████████████████████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ███████████████████████████████████. This case

8    illustrates the inadequacy of the Jail's PSU to deliver clinically indicated and

9    necessary mental health care to patient with acute mental health needs.

10   ████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ██████████████████████████████████

20   ██████████████████████████████████████████

21   ███████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ███████████████████████████████████

25   ██████████████████████████████████████████

26   ████████████████████████████████████████

27   ████████████████████████████████████████████

28   ████████████████████████████████████████

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**  Ex. N-942

1  ███████████████████████████████████████████.

2       144.   When I encountered this patient, she was manifestly ill and in need of

3  acute level of care.  I shared my concerns with Jail staff who were with us during the

4  site visit.  This patient should have been receiving acute inpatient care, and should

5  have been seen far more frequently and in an appropriate, confidential setting.  The

6  Jail failed to provide treatment necessary to meet her mental health needs.

7       **C.    The Jail System Fails to Provide Minimally Adequate Outpatient
            Level of Care to Patients, Resulting in Serious and Preventable**

8       **Decompensation and Other Harms.**

9       145.   In my May 2, 2022 declaration, based on review of policies, reports,

10  and other documents, I found that San Diego County Jail lacks a structured mental

11  health treatment program that delivers an enhanced outpatient level of care, with

12  treatment modalities like confidential individual talk therapy, nursing support, group

13  therapy, art therapy, and recreation therapy, as Dr. Venters recommended to the

14  County in 2020.

15      146.   The recommendation for an effective outpatient mental health program

16  that meets the clinical needs of the incarcerated patient population goes back even

17  further, including to 2018, when Disability Rights California found:

18       The lack of access to mental health treatment activities and appropriate
         levels of care [in San Diego County Jails] violates minimum standards
19       of care for inmates with mental health needs.  The National
         Commission on Correctional Health Care has adopted a standard
20       requiring that "[r]egardless of facility size or type, basic on-site
         outpatient [mental health] services include, at a minimum, individual
21       counseling, group counseling and psychosocial/ psychoeducational
         programs" (citing NCCHC Standards for Health Services in Jails
22       (2014), Standard J-G-04.39).

23  DRC Report, DUNSMORE0124942 at 23.  The DRC Report, based on subject

24  matter expert findings and recommendations, urged San Diego County to implement

25  an effective outpatient mental health program:

26       Specifically, the DRC Experts recommend creation of an
         "intermediate" level of mental health care, with sufficient capacity to
27       ensure timely access for those individuals who need enhanced
         treatment programming.  The program would serve patients "stepping
28       down" from Safety Cell, EOH, or PSU admissions, as well as patients

with a mental health condition that makes it difficult for them to function in a general population jail setting. The program would require a substantial increase in mental health clinician staffing to provide a structured treatment program that includes individual and group therapy to meet the clinical needs of the inmate population.

…

DRC strongly encourages the County to implement an enhanced and structured outpatient treatment program. It would have enormous benefit with respect to the safety and well-being of inmates, jail operations, and reentry efforts. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.

DRC Report at 24-25.

147.   Today, six years later, the San Diego County operates a few Outpatient Step Down (OPSD) units. When I reviewed declarations and policies about these units in 2022, I discerned that the OPSD "does not appear to provide an adequate structured treatment program to patients." May 2, 2022 Stewart Decl. ¶ 54.

148.   I conducted site visits of the OPSD units at Central Jail and Las Colinas in February 2024. Having now conducted an in-person observation of the OPSD units, interacted with OPSD patients and staff, and reviewed additional records, it is even more clear to me that San Diego County Jail has failed to implement an enhanced and structured outpatient mental health treatment program with sufficient capacity or staffing to provide clinically necessary treatment to the mental health population. This failure puts an exceedingly large number of incarcerated patients at substantial risk of serious harm, including decompensation, worsening psychiatric symptoms, psychosis, self-harm, and suicide.

149.   In the OPSD units at Central Jail, the levels of acuity and treatment needs are staggeringly high, and the OPSD "program" is grossly insufficient to meet the clinical needs of the patient population.

150.   In Central Jail's ▮ OPSD unit, patients reportedly get more out-of-cell time in the dayroom than patients in the other two OPSD units at the Jail. They had recently started being provided two one-hour group therapy sessions on Fridays. I was informed that a psychiatric prescriber conducts monthly, generally non-

**Ex. N-944**

1    confidential cell-front visits with the OPSD patients. Patients and staff shared with

2    me that individual clinical appointments, especially confidential ones, are quite rare.

3         151.   In the ▮ OPSD unit, I interviewed approximately nine (9) patients.

4    All of them were very ill with major mental illnesses such as Schizophrenia, Bipolar

5    Disorder and Schizoaffective Disorder. Many of the patients showed symptoms of

6    acute psychosis. Each of them clearly needed a higher level of mental health than

7    what they were getting in this unit.

8         152.   In the ▮ OPSD unit, custody staff did not allow me to interview

9    patients in the dayroom, telling us that everyone was "too unstable." This was

10    inconsistent with how I have interacted with patients in other detention system's

11    outpatient mental health units, where I regularly meet with patients face-to-face,

12    unless individualized security concerns require otherwise. I attempted to engage and

13    observed several chronically mentally ill patients who were responding to internal

14    stimuli and showing overt signs of serious mental illness, including paranoia,

15    delusional thinking, and mood instability. Again, each of them clearly needed a

16    higher level of mental health care than what they were getting in this unit.

17         153.   During the OPSD ▮ unit visits, we spoke with a deputy who had

18    been assigned to the OPSD for the last few years. He seemed committed to helping

19    the OPSD patient population as best he could. He shared that he never received

20    specialized training on working with people with serious mental illness. He said, "I

21    just learn from watching, and talking to people like Jennifer Alonso," the clinician

22    who worked in OPSD until 2022 and has provided testimony in this case. The

23    deputy stated that he thought it would be good for OPSD deputies to get additional

24    specialized training to help them do their jobs in that unit. (This was concerning to

25    hear, including given that the Jail's mental health coordinator, Ms. Quiroz, claims

26    that deputies assigned to OPSD are supposed to receive additional specialized

27    mental health training. Quiroz PMK Dep. at 266.)

28         154.   Additional specialized mental health training for deputies assigned to

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY** Ex. N-945

mental health units is essential, and to my knowledge, relatively common practice in other Jail systems.  It should absolutely be done in in this Jail system, too.

155.   In the ■ OPSD unit, I was shocked to find one of the most acutely psychotic jail populations I have ever seen outside of an inpatient care unit; nearly everyone in the unit had manifest psychosis.  Staff and patients confirmed that there is no treatment programming in the unit, and that each patient is permitted out of his cell, by himself, for just one hour per day.

156.   The cells and the general unit areas of Central Jail OPSD units were filthy, unsanitary, and filled with debris.  The below photographs from Central Jail's OPSD, taken a few years ago, demonstrate how these cells are often covered in trash and not fit for human habitation, let alone for incarcerated people with grave mental health needs.



*Inside Cells from Outpatient Stepdown Unit for People with Serious Mental Illness*

157.   We took additional photographs of the same OPSD units during our February 2024 site visit, with conditions as bad as or worse as compared with the images from a few years earlier.



*The Central Jail Outpatient Stepdown Unit (Module ▮) floor outside of Jail cells, with trash and debris covering the floor (SC_983498)*



*Inside a filthy Jail cell in the Central Jail Mental Health Outpatient Stepdown Unit (Module ▮), with the patient-detainee completely under a blanket on the top bunk. The detainee has no personal items in his cell, which is completely barren except for some food trash.*



*Inside a Central Jail Mental Health Outpatient Stepdown Unit (Module ▇ ) cell with food trash and rolled up mattress. There is clothing or a towel in the toilet.*

158.   This is *not* a therapeutic mental health program unit—it operates as a solitary confinement unit specifically designated for people with serious and active mental illness.  I have previously discussed the now widely accepted fact that people with mental illness placed in solitary confinement-type conditions are distinctively vulnerable to deterioration and decompensation that worsen their mental health condition, intensify symptoms, and put them at substantial risk of psychosis, self-harm, and suicide. 5/2/22 Stewart Decl. Dkt. 119-7, ¶¶ 24-33. Such concerns strongly apply to these OPSD units.

159.   In all, the lack of meaningful treatment and harsh conditions of confinement in the male OPSD units at Central are shockingly bad—no better (and in some respects even worse) than the description of the unit provided by long-time OPSD clinician Jennifer Alonso in 2022:

> Many patients in OPSD experience hallucinations, delusions, and other symptoms of mental illness.…
>
> As a mental health clinician for the OPSD units at Central Jail, I carried a caseload of between approximately 140 and 160 patients.  This patient caseload was so large that it was impossible to deliver anything remotely close to adequate mental health care given the needs of this population.  Based on my experience and clinical knowledge, I believe a caseload of no more than approximately 60-70 patients would be appropriate for clinicians providing care to the OPSD population.

When I started as a mental health clinician for the OPSD units, I was told that I would have the opportunity to develop a program with multiple treatment modalities, including structured therapeutic group programs and individualized one-to-one therapy. However, given the overwhelming caseload, lack of resources, and lack of confidential treatment space, it was never possible for me, or any other clinician, to provide these sorts of care on a consistent basis or to meet the clinical needs of our patients.

. . . On April 23, 2022, I worked my last day as a mental health clinician at the Jail. My decision to stop working at the Jail was one of the hardest decisions of my life. I care deeply for my patients. I have observed my patients decompensate, suffer in what can only be described as filthy, inhumane conditions, and in some cases, die by suicide. My patients were subjected to terrible conditions and put at risk of great harm every day, and I felt powerless to give them the care they need and deserve.

Alonso Decl., Dkt. 119-11, ¶¶ 9-13.

160.   I also visited the female OPSD unit at Las Colinas, and was again troubled by the inadequate treatment provided there. The clinician on that unit was impressive both in her clinical skills and her commitment to her patients. She explained that the patients in the unit receive a weekly, non-confidential clinical visit, and that one group session is provided to a maximum of ten (10) patients. That meant that if there were more than ten (10) patients housed in the OPSD unit at Las Colinas, some women could not participate in the one weekly group session due to capacity limitations. Higher-security OPSD patients ("green banders") were not permitted to attend group sessions unless sufficient custody staff were available to provide security; the clinician shared that custody staff unavailability was a frequent problem that negatively impacted mental health care programming.

161.   I asked the OPSD clinician at Las Colinas if any improvements were needed with respect to her program. She responded, "We need more ways of bringing people in. . . I don't get many referrals." She shared that given what she knows about the female patient population's mental health needs, "we should have a full unit" (roughly 22 patients) all the time. This fact is concerning, both because it reflects the recognition that there are women who need placement in a structured

1  mental health program that are not in OPSD *and also* because the current OPSD

2  program is not equipped to provide structured mental health programming sufficient

3  to meet patient needs.

4       162.   More than six years after Disability Rights California recommended a

5  structured outpatient treatment program, with sufficient mental health staffing

6  resources for individual and group treatment, to meet the clinical needs of the Jail

7  patient population, San Diego County Jail has not implemented that

8  recommendation.  But it is essential to patient well-being, and it absolutely can be

9  done.

10       163.   In fact, Jail staff have a model they can use *from inside their own jail*

11  *facilities.*  The California Department of State Hospitals funds and oversees a Jail

12  Based Competency Treatment (JBCT) program for up to 30 people in the 6D unit at

13  the San Diego County's Central Jail.  I spoke extensively with the JBCT program

14  director.  Unlike the County's OPSD units, the DSH-funded and -overseen JBCT

15  program operates more like a true clinical outpatient mental health unit.  All the

16  patients in the unit are out of their cells engaging in normal socialization activities

17  during the day.  Tables had puzzles laid out, some of which the patients had

18  successfully completed together.  JBCT patients get approximately ten (10) hours of

19  programming *per day* (structured and unstructured), including four (4) hours of

20  structured group treatment.  There are 2.5 FTE psychiatrists assigned to the unit,

21  with confidential psychiatry appointments for all patients at least weekly.  Two

22  clinicians assigned to the unit (with caseloads less than one-quarter as compared to

23  the OPSD units) meet with every patient individually every day, with a structured

24  confidential session at least weekly.  Additional educators and psych nurse staffing

25  resources support the treatment program as well.  There are two assigned deputies

26  who have received specialized mental health training.  The JBCT program director

27  stated it to me simply: "The program works."  The County is well aware of the

28  positive results of the program, as mental health coordinator Melissa Quiroz

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**  **Ex. N-950**

testified:

> Q. Is it your impression that JBCT participation for some patients reduces suicidality?
>
> A. Addressing the mental health concerns, for sure.
>
> Q. And JBCT participation leads to improvement in patients' daily functioning and activities of daily living?
>
> A. Yes.
>
> …
>
> Q. [T]here's many aspects of that JBCT unit that is [] general mental health care-type activities?
>
> A. Yes. They have those.

Quiroz PMK Dep. at 238-39.

164. Sadly, staff at Central Jail were also aware that patients discharging from the JBCT program (as when the criminal court finds them "restored" and therefore competent to stand trial) return to other San Diego County Jail units—including OPSD units—where the treatment program is a tiny fraction of what is provided in the JBCT. Staff shared that it was not uncommon for patients recently "restored" in JBCT to decompensate in the OPSD or other Jail units, with a new onset of psychiatric symptoms and even a new finding that they are "incompetent to stand trial" (essentially *undoing* the success of the JBCT program).

165. Other jail and prison systems do far better in providing this necessary level of outpatient mental health care. For example, Sacramento County Jail implemented an "Intensive Outpatient Program" in 2017, which has expanded since that time to better meet the treatment needs of the Jail system's mental health population. The services provided in those programs include at least weekly one-to-one, out-of-cell clinical contacts, ten (10) hours per week of structured therapeutic activities, multi-disciplinary team meetings, care coordination with treatment partners, treatment planning, crisis intervention, psychiatric medication management, psychoeducation, and increased collaboration with custody to address

1  housing challenges, discipline and other issues.  Outcome studies to assess efficacy

2  of the program have been remarkable.  In one study looking at 100 patients served,

3  the County found that its Intensive Outpatient Program resulted in:

4          •    A 61% decrease in disciplinary write-ups

5          •    A 64% decrease in emergent referrals

6          •    A 67% decrease in Acute Inpatient admissions

7          166.   I am aware that other county jail systems have also implemented, or are

8  implementing, enhanced outpatient mental health programs with positive results.

9  Examples includes Alameda County, Orange County, and Santa Barbara County.

10 This sort of programming is long overdue—and desperately needed—in San Diego

11 County Jail.

12      **D.    The Jail System Erects Improper Barriers for Patients to Timely
             Access Clinically Necessary Mental Health Care and Placement.**

13

14         167.   One of the most basic principles with respect to the standards of care

15 for provision of mental health care, including in the Jail setting, is that a person

16 should be provided mental health care placement and treatment consistent with their

17 individual *clinical* needs.  The San Diego County Jail system fails terribly in

18 enacting this basic principle, in ways that are unsupportable, dangerous, and outside

19 the norms I have observed in other Jail systems.

20         168.   In my May 2022 declaration, I described my very serious concerns

21 about the Jail's custodial blanket ban policy against Outpatient Step Down Program

22 (OPSD) placement for people classified as "protective custody" with mental health

23 housing needs. 5/2/22 Stewart Decl., Dkt. 119-7, ¶¶ 51-65.  Jail mental health staff,

24 including Dr. Evans and Ms. Alonso, have raised urgent concerns about this Jail's

25 policy preventing people classified as "protective custody" from OPSD housing

26 units.  While the OPSD can and must provide more and better treatment for patients

27 who need enhanced outpatient treatment, such a blanket exclusion is unjustifiable

28 and unconscionable.

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY** **Ex. N-952**

169.   The 2022 death of Derek Baker is an example of how this policy causes the worst of harms, as Ms. Alonso describes:

> Mr. Baker had mental illness and was found clinically appropriate for OPSD housing.  However, because he was also deemed "Protective Custody," custody staff did not allow him to be housed in one of the OPSD housing units at the Jail.  Instead, he was put in a cell with another Protective Custody individual who did not have serious mental illness (that is, he did not meet OPSD clinical criteria) and was in custody based on allegations that he had assaulted and critically injured an elderly store clerk.  The cellmate violently assaulted Mr. Baker, who died from those injuries on March 29, 2022.

Alonso Decl., Dkt. 119-11, ¶¶ 38; *see also id.* ¶¶ 39-40 ("I, along with my mental health staff colleagues, had asked that Jail Command staff change their policy so that people like Mr. Baker could be placed in the OPSD unit, which is safer and clinically appropriate for them. …  At least one Command-level staff member stated that the circumstances leading up to Mr. Baker's death concerned him.  But the Command staff told me that they had no plan to change policy or practice on this issue.").

170.   Another incarcerated person who was in the unit when Mr. Baker was killed offers a chilling description of what happened to Mr. Baker.  Gustavo Sepulveda recalls in his declaration:

> I heard an altercation in cell 5 through the wall in my cell.  It sounded like the two guys were fighting.  A little while later, I heard someone in the cell next to me say "man down, man down" …. It was silent for a bit longer, and then I heard grunting and the sound of impact over and over again.  It sounded like a person's body or head being hit against an object like the ground or wall over and over again.  The sound was bone-chilling.  The sound stopped for a bit, and then resumed.  After a few more minutes, I heard [the man] call to another incarcerated person in the dayroom, and say something like, "go tell the cops that I killed my cellie."

171.   More than two years later, the policy remains unchanged, even as the Jail's mental health coordinator has found that such change in policy would be "useful" and "good."  Quiroz PMK Dep. at 64-65 (Quiroz: … "there is not an identified outpatient step-down PC mod per se.  There is not that."  Q: "Do you think that that sort of module would be useful to have?" A: "It would be useful."  Q:

**Ex. N-953**

And the objective of it would be to ensure that people who both need outpatient step-down and are designated as protective custody can get that level of service?" A: "That would be good."). Jail clinician Aseel Ross also has observed multiple protective custody patients who were excluded from the outpatient mental health unit, and stated that this was something that needs to change:

> Q. [T]he mental health unit identified someone who was protective custody and said that person will not be allowed to receive placement in the outpatient stepdown unit?
>
> A. Yes.
>
> Q. Do you have an example of your -- in your head of a patient who needed at least that level of care who didn't receive it as a result of that decision?
>
> A. Yes.
>
> Q. More than one?
>
> A. Yes.
>
> Q. Any other examples of policies and procedures related to the mental health system at the jail that, based on your experience, you think needed improvement?
>
> A. The same thing. Access to care for OP stepdown, PSU.

Ross Dep. at 172-73.

172. Based on my site visit and review of materials in this case, it is clear that there are numerous "Protective Custody"-designated incarcerated people for whom structured outpatient mental health programming is clinically necessary. I note here that many people with intellectual disabilities are commonly designated as Protective Custody. It is extremely concerning that these individuals are, by policy and practice, generally excluded from enhanced outpatient mental health treatment and placement. At least one patient with an intellectual disability shared with us during the Jail inspections that staff informed him that he was being held in Administrative Separation indefinitely because of his intellectual disability.

173. The Jail must revise its policies, procedures, practices, and training to ensure that mental health staff have primary authority in determining the placement

of an incarcerated person with mental illness in a mental health-designated program or housing unit, including Outpatient Step Down (OPSD), without any custodial blanket exclusions or other interference with clinical judgment.

174.   Another improper systemic barrier preventing patients from receiving clinically necessary mental health treatment is the Jail system's decision to exclude patients classified as Administrative Separation from accessing structured outpatient program placement, including OPSD.

175.   It bears emphasizing that Administrative Separation units in this Jail system are filled with people with serious mental illness and manifest psychiatric symptoms.  The clinical need for treatment among these individuals is overwhelming.  Meanwhile, the solitary confinement-type conditions contribute to further mental health deterioration and decompensation and put people with serious mental illness at substantial risk of psychosis, self-harm, and suicide.

176.   Making the problem even worse is that the Jail system essentially blocks access to structured outpatient mental health treatment for people designated as Administrative Separation.  Aseel Ross, the mental health clinician assigned to the George Bailey Administrative Separation units until late last year, recommended that structured treatment programming be provided in the Administrative Separation units, starting with at least two hours per day for each person.  She explained that the programmatic goals of this treatment program included to "reduce the risk of decompensation, "increase people's stability with respect to their mental health condition," "increase socialization opportunities," "help prepare patients to step down out of the AdSep setting," and "prepare patients for successful reentry upon release from the jail."  At the time she left her job at the Jail in late 2023, the proposal had gone nowhere.  Ross Dep. at 122-27.

177.   There remains almost no structured mental health programming in the Administrative Separation units, which based on my review, clearly do not have conditions conducive to a structured treatment housing unit.  When asked whether it

1    could be useful to create such a unit to serve this patient population, the mental

2    health coordinator testified that her team had explored the issue and determined that

3    it "is something that is worth doing."  Quiroz PMK Dep. at 68-69.

4    　　　　178.  During my jail visits, I learned that there is now a group session offered

5    about once per week to a very small group of incarcerated persons in Administrative

6    Separation at George Bailey, conducted with each participant placed alone in side-

7    by-side cages outside the housing unit.  At Las Colinas, a psychiatric technician

8    recently began providing a single treatment group to female incarcerated persons in

9    Administrative Separation at Las Colinas either weekly or biweekly, with

10   individuals remaining alone in their cells and forced to participate through an open

11   food port slot in the door.  These sessions do not meet the standard of care for the

12   patient population in Administrative Separation I observed, given (among other

13   things) the infrequency, the limited number of patients served, and the requirement

14   that participation be from inside a cell or cage, with no opportunity for normal social

15   interaction.

16   　　　　179.  In my review of individual patient cases and records, I found other

17   examples of improper barriers to the provision of clinically necessary care.  For

18   example, I encountered patients who reported that they were excluded from certain

19   placements, including OPSD, because they were deemed "jumper risks."  (The

20   men's OPSD units, for example, have two tiers.)  One man with serious mental

21   health needs was moved to a medical dorm after he stated a plan to jump from the

22   second tier (███████████).  Based on my assessment of his records and in-

23   person presentation, he required structured mental health treatment, which was not

24   available or provided to him in the medical dorm.

25   　　　　180.  Another patient, ███████████, had complex treatment needs

26   that can be met with clinically appropriate care, but that were quite clearly not being

27   met by the Jail's mental health system.  This transgender woman had a history of

28   self-harm and suicidal ideations associated with poor distress tolerance and

1  emotional dysregulation.  I have overseen treatment for patients with a similar

2  profile in jail settings.  Key elements of treating this sort of patient include setting

3  boundaries, developing a behavioral and/or safety plan, and structured

4  psychotherapy, carried out with a *consistent* treatment team.  ███████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████  These

12  behaviors can be addressed with clinically adequate care, which she did not receive.

13      181.   *Ultimately, these improper barriers to clinically necessary mental*

14  *health treatment do **not** allow for an effective or proactive treatment system, but*

15  *rather a **crisis-response system**,* where large numbers of patients are denied

16  essential care until they reach the point that they decompensate and become acutely

17  psychotic, suicidal, and/or gravely disabled.  Only then are mental health staff

18  provided the authority and resources to provide (at least in some cases) clinically

19  indicated treatment.  The result to incarcerated patients with unmet mental health

20  needs is serious and preventable harm to incarcerated patients, and the risk of such

21  harm constantly looming.

22  **IV.   FINDING #4: THE JAIL'S SYSTEM OF SOLITARY CONFINEMENT**
**PUTS AN EXTRAORDINARILY HIGH NUMBER OF PEOPLE WITH**

23  **MENTAL HEALTH NEEDS AT UNNECESSARY AND SERIOUS**
**RISK OF HARM.**

24

25      182.   In my previous declaration in this case, I described the now widely

26  accepted reality that people with mental illness placed in solitary confinement-type

27  conditions are exceedingly vulnerable to deterioration and decompensation of their

28  mental health condition, intensify their symptoms, and put them at substantial risk of

psychosis, self-harm, and suicide.  May 2, 2022 Stewart Decl., Dkt. 119-7, ¶¶ 24-33.

183.   I am informed that not long ago, the San Diego County Jail renamed its "Administrative Segregation" (or "Ad Seg") units to be called "Administrative Separation" (or "Ad Sep") units.  Other than changing the word "segregation" to "separation" in policy, I can discern no meaningful change in conditions or operations in these units since the name change.  Neither can mental health staff working in those units.  *See* Ross Dep. at 121 ("Q: And do you know the reason for the change in the name? … A: No, I don't.  Q: … Were you aware of any policy changes with respect to those units that went with the change of the name? A. No, not that I'm aware of.  No."); Alonso Decl. ¶ 19.  Accordingly, in this declaration, I use "Administrative Segregation" and "Administrative Separation" interchangeably.

184.   Having reviewed declarations, policies, reports, and other relevant documents provided to me, and also having visited several Administrative Separation housing units in the San Diego County Jails, I can confirm that these units constitute solitary confinement-type conditions, including as has been defined by the United States Department of Justice (U.S. DOJ).  *Report and Recommendations Concerning the Use of Restrictive Housing* at 3 (Jan. 2016), available at https://www.justice.gov/archives/dag/file/815551/download (restrictive housing-type segregation is characterized by (1) "Removal from the general inmate population, whether voluntary or involuntary"; (2) "Placement in a locked room or cell, whether alone or with another inmate"; and (3) "Inability to leave the room or cell for the vast majority of the day, typically 22 hours or more").

185.   Such conditions can cause serious psychological and other harms to any person, and they are exceedingly dangerous for people with mental health conditions.  The United States Department of Justice has recommended that "Generally, inmates with serious mental illness (SMI) should not be placed in restrictive housing."  *Id.* at 99-100.  It provides detailed guidance as to the rare circumstances under which a person with serious mental illness may be placed in

segregation-type housing:

- An inmate with SMI should not be placed in restrictive housing, unless:

  - The inmate presents such an immediate and serious danger that there is no reasonable alternative; or

  - A qualified mental health practitioner determines:

    - That such placement is not contraindicated;

    - That the inmate is not a suicide risk;

    - That the inmate does not have active psychotic symptoms; and

    - In disciplinary circumstances, that lack of responsibility for the misconduct due to mental illness or mitigating factors related to the mental illness do not contraindicate disciplinary segregation.

- Inmates with SMI who are diverted from restrictive housing should be placed in a clinically appropriate alternative form of housing, such as a secure mental health unit or other residential psychology treatment program.

*Id.* at 99-100.

186. The U.S. DOJ's guidance is consistent with the practices I have observed in well-functioning detention systems. Mental health staff in a functioning jail system are required by policy and practice to screen people in advance of a prospective placement in solitary confinement-type housing, to identify those people for whom such placement is clinically contraindicated, and to prevent such placement if such confinement is clinically contraindicated.

187. I am deeply troubled by San Diego County Jails' widespread use of solitary confinement-type housing for incarcerated persons with serious mental illness, with conditions that are extraordinarily restrictive, harsh, and damaging to a person's mental health—particularly for someone with preexisting serious mental illness. San Diego County Jail's system does not come close to complying with the guidance set forth by the U.S. DOJ, NCCHC standards, or recommendations that have been made repeatedly by parties inside and outside of the County. My inspection of the Jail system's solitary confinement-type units, my interactions with

**Ex. N-959**

1   incarcerated persons with serious mental illness in those units, and my review of

2   records and documents all point to the conclusion that the San Diego County Jail's

3   system of Administrative Separation has caused, and currently is causing, serious

4   and unjustified harm on a broad scale.

### A.    Conditions in San Diego County Jail's Administrative Separation Units Constitute Some of the Harshest, Most Restrictive Forms of Solitary Confinement I Have Ever Witnessed in a Jail System.

7   188.    I must begin with a description of the conditions I observed during my

8   recent in-person visit to the San Diego County Jail Administrative Separation units.

9   There was striking commonality in Administrative Separation units across all Jail

10  Facilities.  The conditions were consistently harsh and restrictive in ways that put

11  people with mental health needs at substantial risk of serious harm.  The units failed

12  to provide mental health treatment or supports that were urgently and clearly

13  necessary to meet the needs of what is a remarkably mentally ill population.  The

14  experience of people in these units was one of severe isolation, with inadequate

15  access to recreation, socialization, and out-of-cell time.

16  189.    With respect to out-of-cell time, the units I visited do not come close to

17  complying with California state law regulations regarding minimum out-of-cell

18  time.  State law regulations require that jails ensure "policies and procedures for a

19  minimum of 10 hours of out of cell time distributed over a period of seven days to

20  include: (1) an opportunity for three hours of exercise.  And (2) an opportunity for

21  seven hours of recreation."  Cal. Code Regs. tit. 15, § 1065. (The vast majority of

22  people in San Diego County Jails' Administrative Separation are placed there

23  indefinitely for "administrative" reasons, though some are there serving a

24  disciplinary sanction.)  San Diego County Jail Administrative Separation units I

25  observed do *not* meet this requirement.  It is important to note that even this

26  regulatory minimum constitutes solitary confinement-type conditions according to

27  U.S. DOJ and other standards.

28  190.    Other Jail systems provide significantly more out-of-cell opportunities

and other activities (such as electronic tablets with programming) that reduce the level of isolation. San Diego County Jail should provide more out-of-cell and other activities, including electronic tablets, across its system to provide some relief to the serious mental health risks associated with this level of isolation.

191.    For people with mental health needs in particular, the extreme level of isolation and restriction in San Diego County Jail solitary confinement units is exceedingly dangerous.

### 1.    Central Jail Administrative Separation

192.    At Central Jail, the Administrative Separation units I observed generally had no incarcerated person outside of their cells in the dayroom.  Every cell door was closed shut.  No staff were in the units to monitor or engage with the segregated population.  Due to the time constraints of our Central Jail visit, I was unable to interview individuals housed in these units.  Central Jail mental health clinician Jennifer Alonso has described the horrifically unsanitary, debris-filled cells in these units.  Such conditions strongly evidence that (a) individuals in these cells have a mental health condition and potentially other disabilities that prevent them from taking care of their own basic daily needs, and (b) neither Jail mental health staff or custody staff are providing necessary monitoring, treatment, and supports for these individuals.

**Ex. N-961**

1
2
3
4
5
6
7
8
9
10
11
12



*Filthy, trash-filled Central Jail Ad-Seg cell that housed patient with mental illness*

13
14
15
16
17
18
19
20
21
22
23
24
25
26



*Central Jail Ad-Seg cell holding patient with no property, trash strewn across floor*

27
28

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-962**

## 2.    George Bailey Administrative Separation

193.    At George Bailey, conditions in the Administrative Separation units were shocking. The units were filled with people with serious mental illness and active symptoms.  In Administrative Separation Module ▮, I met with approximately nine (9) detainees.  All of them were very ill with major mental illnesses such as Schizophrenia, Bipolar Disorder and Schizoaffective Disorder.  Many of the patients were acutely psychotic and very agitated.  They all required a higher level of mental health care than what was available in this unit.  I spoke with a deputy who explained that he has been working in the unit for a long time.  The detainees knew him well, and he knew several of them well.  When we asked him if he had observed people with mental health needs, he told us quite frankly, "people here are very sick."

194.    Through my conversations with individual detainees, the Administrative Separation deputy, and other staff, I learned that conditions in this unit (as in the other Administrative Separation units) were extraordinarily restrictive and isolating.  Individuals in this unit were allowed outside their cell once every other day—for a period of less than 60 minutes. (Most reported that, on the days they got out of their cell at all, it was for 45 minutes or less.)  Individuals have no normal human contact with any other person, even when they are allowed out of their cell.  In fact, the incarcerated people reported, and the unit deputy confirmed, that the Administrative Separation dayroom (*i.e.*, the large area with tables and seating inside the unit) is *not* used at all.  Each person comes out, by themselves, and is escorted (in handcuffs, as a blanket rule and regardless of their recent or current behavior) to a small caged area, about 12-feet-by-12-feet, that is adjacent and connected to a small shower area and another cell that is essentially identical to their own cell.  The caged area has a hands-free phone and is otherwise completely empty.  Because no one is allowed in the dayroom, a person cannot even converse with another incarcerated person through their cell door; the lack of human contact

is extreme.  To be sure, this level of restriction and isolation is outside the norms of even the most restrictive solitary confinement units I have seen in other systems.

195.   In my experience, this sort of arrangement, with the restrictive housing dayroom going essentially unused, and with a makeshift caged area being the only "out-of-cell" area in the housing unit, is exceedingly rare.  The below photographs, taken in February 2024, show this caged area and a portion of the Administrative Separation dayroom at George Bailey:



EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY** Ex. N-964



196.   Many people explained to me that they decline this "out-of-cell" time in the small caged area, as it offers no space or opportunity for exercise, socialization, or other meaningful activity.  For these people, this means that they are locked alone in their small cell 24 hours per day, every day.  Many people had not showered for extended periods.  Their mental health was suffering immensely.  People arrived in this unit with serious mental health needs that were not being met, and their conditions were worsening, with symptoms such as paranoia, delusional thinking, and mood instability.  Aseel Ross, the mental health clinician assigned to the George Bailey Administrative Separation units, confirmed seeing incarcerated persons decompensate due to these conditions.  Ross Dep. at 55, 58-59.

197.   Inside many Administrative Separation cells, there was food detritus and debris that had accumulated over several days.  In my experience, the accumulation of such debris indicates that a person's psychological and/or cognitive condition may be deteriorated and require clinical attention.  It also creates unsanitary living conditions, as food rots, for example.  Two illustrative photographs of George Bailey Administrative Separation cells are below:

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. N-965**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



27     198.   There are multiple Administrative Separation units at George Bailey

28   (including Modules ███████████).  I observed and learned about operations in

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

**Ex. N-966**

1  each of them.  Each unit had similar conditions, and each one was extraordinarily

2  harsh, restrictive, and isolating in ways that put people detained there at

3  unacceptable risk of harm.

4      199.   Access to "recreation" for people in the George Bailey Administrative

5  Separation units ranges from extremely limited to non-existent.  There is one

6  concrete recreation "yard" serving multiple Administrative Separation units housing

7  scores of people, with no more than ten (10) permitted to go there at a time.  And

8  when they do go there, they are each placed alone inside another cage, once again

9  preventing them from engaging in any sort of meaningful exercise and social

10 activity.  Photographs of the George Bailey Administrative Separation recreation

11 "yard" are below:



*George Bailey Administrative Separation recreation "yard" - Incarcerated people are not permitted in the central area, and are instead placed alone in individual cages along the perimeter, both for "recreation" and "group therapy."*

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16
17
18



*Inside an Administrative Separation Outdoor "Yard" Cell, where people are placed alone for "outdoor recreation" and "group therapy."*

19    200.   Only a fraction of people in the unit ever actually go to the recreation

20  "yard."  One man with serious mental illness had been placed in the Administrative

21  Separation unit following what was almost certainly a psychotic episode, during

22  which he flooded his living area and then ran around in circles in the dayroom.

23  When I met with him, he had been in Administrative Separation for three (3) weeks.

24  When I asked him if he had gotten to the recreation yard, he said: "I didn't even

25  know there was a rec yard for this housing unit."  He reported that he had had one

26  shower in the last three weeks.

27    201.   ████████    spoke cogently with me about his experience in the

28  Administrative Separation unit.  He said access to the recreation area was offered no

1  more than one or two times per week, and not at all some weeks (if there is rain, or a

2  custody staffing shortage, for example) He shared that he used to go to the yard, but

3  now mostly refuses because he hated the recreation yard cages.  He compared them

4  negatively to even the most restrictive settings in the California state prison system,

5  where he said that the caged yards allowed for access to sunlight.  Here, "you can't

6  even get the sun on you" because the cages are fully covered.  He saw no physical,

7  psychological, or other benefit to going from his small cell to a small covered cage

8  in the concrete "recreation yard" area.

9      202.  During my February 2024 visit, I learned that mental health treatment

10 was nearly non-existent in the George Bailey Administrative Separation units.

11 There are two clinicians assigned to the Administrative Separation units—a recent

12 increase from one clinician.  Policy requires that they conduct only a weekly cell-

13 front visit to each person for people in these units. (People returning from the state

14 psychiatric hospital get one additional clinical contact each week, I was told.)

15     203.  The mental health clinician assigned to the Administrative Separation

16 units explained to me that confidential, out-of-cell clinical contacts were rare.  She

17 estimated that she did about 5-7 out-of-cell clinical contacts per week, and that they

18 generally occur only if a patient requests it *and* the recreation yard is open *and* a

19 custody escort is available so that they can use one of the cages as the setting for the

20 appointment.  She explained that the vast majority of mental health contacts were at

21 cell-front, and entailed just a few questions about how a person was sleeping,

22 feeling, etc.—what she called "quick things."  She acknowledged that many people

23 were sick, and doing poorly, stating plainly that her "patients don't do well when

24 they are isolated."

25     204.  Structured treatment in the Administrative Separation units was

26 extremely minimal and, based on my observation of the population, does not come

27 close to meeting basic clinical needs.  I was told that, about six weeks before my

28 visit, a psychiatric technician had started doing one group therapy session every

other week in one of the Administrative Separation units, with each patient participating from inside their own cell, with the food slot open.  The mental health clinician reported that she conducts a group therapy session one day per week for another of the units, with each participating patient placed alone in a cage on the unit's recreation yard. (The session was cancelled the week of my visit.)  No more than ten (10) patients are permitted to participate.  Based on my experience with group therapy in the detentions setting, it is clear that this is a very clinically inadequate treatment setting.  The clinician must use a microphone so that patients can hear her from inside their individual cages.  There is no way that patients can hear each other speak from one cage to another or appreciate non-verbal cues, undermining the process of group therapy.  Most patients reported little benefit to attending the sessions.  In fact, the clinician acknowledged that they had reduced this group session offering from two cohorts to one cohort, with attendance usually no more than seven (7) patients.  She explained, "it's hard to motivate patients to come."  In my experience, such low participation reflects deficiencies in the treatment setting and structure.  In other jail systems with group treatment conducted in a more therapeutic milieu, participation is much higher.

### 3.    Las Colinas Administrative Separation

205.    Conditions for women in Las Colinas's Administrative Separation unit were similarly restrictive and problematic.  The unit is filled with people with mental illness, who receive little out-of-cell time and almost no treatment.  A psychiatric technician provides a weekly non-confidential, cell-side visit that entails only the most rudimentary check-in about the patient's symptoms, whether they are eating, whether they are showering, and/or how medications are working.

206.    Structured treatment is extremely limited in the Las Colinas Administrative Separation housing areas.  There is no regular clinical contacts with qualified mental health providers unless there is a specific mental health referral submitted.  I was informed that the psychiatric technician runs a weekly or biweekly

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. N-970**

group therapy session, with all Administrative Separation patients remaining in their own cells with food ports open, negatively affecting the opportunity for meaningful interaction during the sessions.  The psychiatric technician shared with us that it is "challenging" to have everyone in their cell for the sessions: "I have to yell pretty loud."  The photographs below show the Administrative Separation unit and the area where staff indicated these group therapy sessions occur.

**B.** **People with Serious Mental Illness Are Placed in Administrative Segregation Without Consideration of Mental Health Input, Putting Them at Substantial Risk of Serious Harm.**

207.   In my May 2022 declaration, I noted a major deficiency stemming from San Diego County Jail's written policies that give custody staff sole authority regarding placement of people in Administrative Segregation, a housing status where people are confined to their cells for nearly the entire day with conditions that constitute solitary confinement.  I found that the Jail's policy and practice was



*Women's Administrative Separation unit*
*Las Colinas*



*Women's Administrative Separation cell*
*with window of cell door shattered.*



*Inside an empty cell, Las Colinas*

"inconsistent with NCCHC and other modern correctional mental health standards in ways that put patients at substantial risk of serious harm." May 2022 Stewart Decl., Dkt. 119-7, ¶ 39.

208. The NCCHC Standards for Mental Health Services in Correctional Facilities' Standard MH-E-07 (Segregated Inmates) makes clear, for example, that for a patient being placed in segregation, it is necessary that "mental health staff reviews the inmate's mental health record to determine ***whether existing mental health needs contraindicate the placement*** [in segregation] or require accommodation" (emphasis added).

209. Since my May 2022 finding that San Diego County Jail's policy on this issue was "grossly deficient" (May 2022 Stewart Decl., Dkt. 119-7, ¶ 34), the San Diego County Sheriff's Department revised its Detention Services Bureau (DSB) Policy J.3 (Separation: Definition and Use) in November 2023, including to change all usages of "Segregation" to "Separation." (This, once again, is a cosmetic change, with no apparent substance behind it.) The policy revision does nothing meaningful to remedy the problem I identified. The policy still fails to require mental health clinical input to decide whether a person with mental illness or risk factors for suicide may safely be placed in Administrative Separation units. The

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

**Ex. N-972**

policy, then and now, states only:

> Upon placement of an inmate into administrative segregation housing or pre-disciplinary housing, sworn staff shall notify the facility charge nurse of the placement. A qualified health care professional will review the inmate's health record. If existing medical, dental or mental health needs require accommodation, sworn staff will be notified.

DSB Policy J.3 § II(E).

210.   It is worth noting that the policy specifically omits any reference to a mental health clinical determination as "whether existing mental health needs contraindicate the placement" in segregation, as specifically required by NCCHC standards.

211.   As I noted in May 2022, San Diego County Jail's "policy fails to protect people who would be placed at substantial risk of serious harm in Administrative Segregation housing, for several consequential reasons: (1) the policy fails to direct that the treating clinician (who knows the patient) provide input; (2) it fails to direct the patient's *current* mental health condition be considered (relying only on a record review); and most importantly, (3) it makes no mention of a clinical assessment as to whether Administrative Segregation is contraindicated or whether the patient would be at heightened risk of suicide or other harm in segregation. The clinician's role is extremely and inappropriately limited." May 2022 Stewart Decl., Dkt. 119-7, ¶ 34. "The decision about a person's Administrative Segregation placement lies exclusively with custody staff." *Id.*

212.   The November 2023 policy revision includes a passage that seems to acknowledge the grave risks that people with serious mental illness (and intellectual disabilities) face in these solitary confinement units:

> If after placement in separation, mental health or medical staff determine that an individual has serious mental illness or an intellectual disability, they shall be removed from disciplinary separation immediately upon this determination.

DSB Policy J.3 § II(G)

213.   But this passage does *not* address my concern or the grave risks that

1  people in San Diego County Jails face today.

2       214.  <u>First</u>, the standard of care is for such a clinical determination to be

3  made *before* someone is placed in solitary confinement-type housing.  This policy

4  amounts to a directive of "solitary confinement now, assessment for mental illness

5  later."

6       215.  <u>Second</u>, the passage covers only "disciplinary separation" for reasons I

7  cannot understand.  By policy, Administrative Separation is used for "incarcerated

8  persons who are classified for safety and/or security reasons, are pending

9  disciplinary action or for investigative purposes."  Only a small number of people I

10  observed in Administrative Separation were there for documented "disciplinary"

11  purposes.  Most were there indefinitely for vague "safety or security" reasons.

12  Again, the standard of care, including as recognized by the U.S. DOJ, is that, as a

13  general matter, *no* person with serious mental illness should be placed in these sorts

14  of units.

15       216.  <u>Third</u>, and most significantly, based on my visit to the Jail

16  Administrative Separation units and my related review, it is abundantly clear that

17  this policy has been implemented in a way that mental health and custody staff all

18  understand—and *expect*—that people with serious mental illness will be placed—

19  and *remain*—in these solitary confinement-type units.  As noted above, a custody

20  deputy assigned to the George Bailey Administrative Separation units shared with

21  me that "people here are very sick."  We asked the Chief Mental Health Clinician at

22  George Bailey if she had data showing how many people with serious mental illness

23  were currently housed in Administrative Separation.  She checked, and reported that

24  there were 19 people identified as having serious mental illness in Administrative

25  Separation that day.  (A clinician assigned to the units acknowledged that there were

26  still more people with "symptoms we need to watch.")  No staff member seemed to

27  believe that the Jail's policy required removal of people with identified serious

28  mental illness from Administrative Separation.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY  **Ex. N-974**

217.   During my February 2024 visit to several of the Jail's Administrative Separation units, I interviewed many people who were very sick and psychologically deteriorating.  My on-site interviews and subsequent review of patient records indicated that staff were not taking necessary action to help these individuals.  I spoke with one incarcerated person, ███████████, in Administrative Separation who shared with me that he was extremely suicidal.  I had to alert staff to his situation; this man was moved to Enhanced Observation Housing, where I saw him a few hours later.

218.   The Jail's Medical Services Division Policy G.2.1 (Segregated Inmates) was also updated since my May 2022 declaration criticized its content. The current version (revised November 2022) remains entirely deficient. SD_0117443-0117444.  The policy continues to direct that custody staff place people in the Administrative Separation units prior to any assessment by mental health staff.  Custody staff must only notify a nurse about such a placement, with health staff (not mental health staff, as NCCHC standards require) then performing a chart review to determine if the individual requires an "accommodation." SD_0117443.  This does not meet the standard of care and clinically appropriate practice in detention settings.  People with a history of mental illness or suicide risk should be evaluated by mental health staff *before* such placement, including with a *face-to-face* evaluation, to determine if their current condition and profile makes such a placement clinically contraindicated and dangerous.

219.   Even when a patient is actively deteriorating in Administrative Separation, the policy directs only that "Health staff will promptly identify and inform custody staff of inmates who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health."  SD_0117444.  As I have previously described, the most favorable reading of the policy is that clinical staff only take any action when a person is noticeably "deteriorating" and their health is "failing" to warrant an emergency acute mental health or medical

placement.  Without *preventative* protections, this is a dangerous and inappropriate jail mental health care practice: adequate Jail mental health care requires processes to *prevent* avoidable decompensation and other harms, not merely to respond to mental health crises that may have been caused by the isolation conditions.

220.   Jail Medical Policy G.2.1 ("Segregated Inmates") continues to contain a notation that it is "in compliance with" National Commission on Correctional Health Care (NCCHC) standards (citing NCCHC J-G-02).  This notation is misleading, as the policy fails to comply with NCCHC *Standard MH-E-07 (Essential): Segregated Inmates*, which requires that mental health staff take steps to "determine ***whether existing mental health needs contraindicate the placement*** [in segregation]."  That is to say, the Sheriff's Department health care policy (like its custody policy) does *not* meet NCCHC standards regarding consideration of a patient's mental health prior to solitary confinement placement.  The Jail's policy instead creates substantial risks of serious harm to vulnerable people, including those with mental health and intellectual disabilities.

221.   This deficiency was identified long ago.  In January 2017, the NCCHC's Technical Assistance Report for the San Diego County Sheriff's Department ("NCCHC Report") found that the Jail's "mental health staff does not [] screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement."  NCCHC Report, DUNSMORE0260618 at 101; *see also id.* at 36, 68, 102, 136.

222.   The 2018 Hayes Suicide Prevention Report also recommended that the Jail act to prevent the placement of people with mental health conditions in Segregation housing when clinically contraindicated.  Mr. Hayes wrote: "Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, ***it is strongly recommended that medical personnel review the medical section of [the Jail Information Management System] to determine whether existing medical***

**Ex. N-976**

1    ***and/or mental health needs contraindicate the placement*** or require

2    accommodation." 2018 Hayes Suicide Prevention Report, DUNSMORE0117148 at

3    70-71 (emphasis added). His report notes that this recommendation is consistent

4    with NCCHC Standards. *Id.* at 20.

5       223. The Sheriff's Department's public response to Mr. Hayes' report on

6    this topic was disappointing: "Business processes are being developed, and policies

7    are being updated, to provide for real time notification to Qualified Mental Health

8    Providers so assessments can be accomplished in a timely manner." *Id.* at 6. The

9    response completely ignores Mr. Hayes' recommendation (and the NCCHC

10   standard) that clinicians should provide input as to whether an Administrative

11   Segregation placement (or housing with similar restrictions) is contraindicated for a

12   patient due to mental health or other needs.

13       224. Ms. Alonso, who worked at the Jail for three years up until April 2022,

14   testified that the Jail's mental health co-coordinator made a "specific

15   recommendation to the Sheriff's Department to stop putting people with mental

16   illness in the solitary confinement-type Ad-Seg units," but that "Sheriff's

17   Department Command staff refused to implement this recommendation." Alonso

18   Decl., Dkt. 119-11, ¶ 21. She described how custody staff dictate solitary

19   confinement placement without consideration of a person's mental illness or

20   whether such placement is clinically contraindicated:

21         I received an email from custody staff about one of my patients who
          was experiencing significant psychiatric symptoms. The email stated

22         that the line custody staff thought my patient should be transferred to
          Ad-Seg housing. No reason was provided. The placement appeared

23         arbitrary and more for the custody staff's convenience than the security
          or well-being of anyone. No one asked me for my clinical input;

24         custody staff simply directed me to modify the patient's record
          (removing the patient's OPSD status) so that custody could move the

25         man into Ad-Seg. Similar incidents happen multiple times each month.
          My fellow mental health colleagues and I have been conditioned

26         through our interactions with custody staff not to question such custody
          directives.

27

28   Alonso Decl., Dkt. 119-11, ¶ 23.

[4541606.8]          82        Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY  Ex. N-977

1    225.   Likewise, Dr. Evans, the former Medical Director and Chief

2    Psychiatrist at the Jail, describes how clinical input was regularly ignored, and how

3    she "saw many people being placed into Administrative Segregation when clinicians

4    knew and made known that such a placement would be harmful."  Evans Decl. ¶ 20.

5    226.   It is clear that this dangerous practice, of placing—and retaining—

6    people in solitary confinement-type Administrative Separation units without

7    consideration of whether their current mental health condition and needs

8    contraindicate the placement, continues today.  *See* Quiroz PMK Depo. at 250-51

9    (noting there is still no mental health clinical assessment done for a person being

10   placed in Administrative Separation, with clinical issues something that can be

11   discussed at staff meetings that occur every two weeks); Ross Dep. at 43 ("Q: …

12   Have there been examples in your experience where you made a recommendation

13   that somebody be removed from AdSep based on their mental health where

14   classification says, no, they need to remain in AdSep and they so remain? A. Yes. Q.

15   Do you have any examples that come to mind? A. Yeah."). I strongly recommend

16   that this policy and practice be changed to align with modern standards.

17   **C.**    **The San Diego County Jail's System, Through Its Deficient Policies
     and Practices, Places a Disproportionately High Number of People
18   with Serious Mental Illness in Administrative Separation, with
     Devastating Effects.**

19

20   227.   While the above-described failure of the San Diego County Jail System

21   to prevent the dangerous placement of Administrative Separation placement when

22   clinically contraindicated is a grave concern, the systemic deficiency runs even

23   deeper.  In my review of policies, practices, and patients' actual experiences, I

24   observed a deeply disturbing trend of people with serious mental illness being

25   placed in Administrative Separation at a disproportionately high rate, with

26   devastating effects on their mental health, safety, and well-being.  Several policies

27   and systemic practices contribute to this problem.

28   228.   **People with serious mental illness are placed in Administrative**

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-978**

**Separation based on behaviors from the past (including manifestations of their mental illness), not based on their actual current behavior and profile.** This practice puts people at unnecessary risk of serious harm. For example:

███████████████

229.   During my February 2024 visit to the George Bailey Administrative Separation unit, I encountered a patient with serious mental illness who was in acute distress. He had been involved in a physical altercation during a previous jail detention, leading to an Administrative Separation placement until his release from custody in summer 2023. When he returned to custody in January 2024, he was automatically placed back in Administrative Separation. (This fact was confirmed by staff with us during the tour.)

230.   ████████████ had been in Administrative Separation unit for a few weeks when I met with him. The Jail had failed to continue him on psychiatric medications he was taking prior to his arrest. Based on my interactions with him, it was apparent that he had decompensated greatly in Administrative Separation, was in very acute distress, and was suicidal. I promptly informed staff with us on our tour about my observation and grave concern. Later that day, I again encountered ███████████, who had been moved to an Enhanced Observation Housing unit. Mr. ███████ begged not be put back in Administrative Separation, saying with desperation "I am going to be good from now on. I'm trying to be cool, be good. I miss my family. I can't be in Ad Sep anymore."

231.   A lieutenant with us on the tour intervened and told us that he would work to have ████████████ reclassified so that he would not be put back in Administrative Separation. The lieutenant confirmed that it is "not uncommon for initial placements to be in Ad Sep" based on Administrative Separation placements during past jail detentions, regardless of current behaviors or mental health needs. This was quite worrying to hear.

232.   ████████████████████████████████████████

[4541606.8]
EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**   **Ex. N-979**



1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮ This was

5 shocking and outrageous from a clinical perspective. ▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮

11

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮

18   234.   ▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This is

21 a striking demonstration of a Jail mental health system that ignores patients'

22 treatment needs and obvious risks of harm, including suicide.

23   235.   ▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮



238.   This patient was at an extreme risk of serious harm, including suicide, when I observed him during my visit.  Despite reassurance from Jail staff that the issue would be addressed (including through a more appropriate, *non-* Administrative Separation placement), it was not. ██████████████████ ████████████████████████████████████████████████████ The Jail system's policy and practices placed—and kept—this patient in a situation where he was at extraordinary and unjustifiable risk of harm. ████████

239.   I met with this patient with a history of serious mental illness who had been held in Administrative Separation for the approximately four months since he was booked at the Jail.  He was last at San Diego County Jail ten years earlier, in 2013.  That year, staff reportedly found him with something they considered to be a

weapon, and placed him in Administrative Segregation, where he remained for a few weeks before transferring to California state prison to serve a sentence of seven (7) years.  In state prison, Mr. █████ reportedly was housed in mainline general population.  He had been released and living in the community for about three years, until this detention began.  He was having a very difficult time coping in Administrative Separation, and was not getting psychiatric medications that he had long been taking by prescription.

240.   I can discern no legitimate justification for keeping this patient in Administrative Separation.  ████████████████████████████████████████ ███████████████████████████████████████████████.

241.   I encountered many people with serious mental illness who were placed directly into Administrative Separation after stays in a psychiatric hospital or the Jail's acute care Psychiatric Services Unit, even when they had a history of decompensation in Administrative Separation.  This deficient practice serves to undermine the treatment and stabilization provided to that patient in the hospital or acute care setting.  It commonly leads to a cycle of decompensation and puts people at substantial risk of serious harm.  For example:

████████████████████

242.   ███████████████████ has diagnosed serious mental illness for which she takes medication.  When she first came into custody, she was put in Administrative Separation at Las Colinas.  Her mental health worsened there, and she spent an extended period in the acute care Psychiatric Services Unit.  Having been deemed Incompetent to Stand Trial in her criminal case, she was then transferred to the state psychiatric hospital, where she received treatment in a therapeutic setting allowing her to interact with others and participate in structured treatment daily.  She described that she did well and "liked being able to talk to [hospital] staff and other patients," and her psychiatric condition improved.

243.   When I met with her, she had just a few days earlier been returned to

San Diego County Jail.  The Jail had placed her *back* in Administrative Separation, where she had previously decompensated and where she now was again feeling isolated and having a difficult time coping.  She was demonstrating active signs of psychosis.  Based on my review, the Administrative Separation placement was clinically contraindicated and likely to cause unnecessary harm to this patient.

244.    ████████  placement in Administrative Separation was similarly problematic.  She reported that she had spent the last approximately eight years in a state psychiatric hospital while designated as Not Guilty by Reason of Insanity in her criminal court case.  At the state psychiatric hospital, she was housed in a five-woman dorm setting, where she did well interacting with others, and her mental health condition was generally stable.

245.    She had recently been returned to San Diego County Jail for court proceedings, and was placed directly into Administration Separation.  She was being held in a severely isolated setting, confined to her cell all day except one hour when she was allowed out of her cell all alone.  Her condition seemed quite fragile and I had concern as to whether she was experiencing psychotic symptoms in this highly restrictive unit.  She described to me how difficult it was to be there, saying: "They are longer days here."

**D.    The San Diego County Jail's System of Administrative Separation and Solitary Confinement-Type Conditions Puts People with Mental Health Needs at a Substantial Risk of Death, Including by Suicide.**

246.    The enormously elevated risk of suicide for people—particularly, people with mental health needs—in solitary confinement units is well-established.  The San Diego County Jail's system of Administrative Separation and solitary confinement-type conditions is among the most dangerous examples I have ever seen.  The significant number of suicides and other deaths that have occurred in these units demonstrate the exceedingly high risk to which the Jail system exposes

people with mental health needs.  And it is important to note that those deaths represent just the *tip of the iceberg* in terms of the scope of the harms and risks of harm resulting from the Jail system's current policy and practices, as demonstrated by some of the case examples described above.

247.    Yet the issue of suicides and other deaths in San Diego County Jail Administrative Separation units demands attention and action.  The problem has been going on for years.

248.    The DRC Report found that at least six people killed themselves at the Jail between 2014 and 2016 while in segregation units.  The DRC Report described one person who committed suicide after spending six consecutive weeks in administrative segregation, and four months overall.  The person's medical record indicated that staff failed to notice the significant mental health issues the person developed while in segregation and took no action to address the risk.  Another person with mental illness committed suicide in administrative segregation after waiting days to see mental health staff and being denied out-of-cell time.  DRC called for the Jail "take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances."  DRC Report, DUNSMORE0124942 at 32.

249.    Suicide prevention expert Lindsay Hayes also noted "the strong association between inmate suicide and segregation housing" and urged the San Diego County Jail to ensure that mental health staff timely evaluate whether solitary confinement placements are contraindicated based on the person's individual mental health needs, and to act against such dangerous placements.

250.    In 2018, the DRC Report and the Hayes Suicide Prevention Report offered meaningful and important recommendations for how San Diego County Jail should address the large number of deaths in the solitary confinement units.  I would urge the County to implement those recommendations in full.  Having reviewed

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-984

policy and practices, patient records, and other materials in this case, it is beyond question that, as of now, a staggeringly high number of people with serious mental illness are being placed at unacceptable risk of suicide through imposition of the unnecessary and brutally harsh conditions in Administrative Separation.

251.   I provide a review here of only a small sample of deaths that have occurred in those Administrative Separation units.  Some of these deaths were deemed as suicides, but all of them illustrate the unacceptable risk of harm that these units create for people with mental illness.  These cases are particularly horrific in their outcomes, but the circumstances and Jail practices involved in these cases are pervasive in the San Diego County Jail system.

**Suicide of Matthew Settles, July 2023 (Administrative Separation)**

252.   Mr. Settles had long history of serious mental illness and died by suicide while in custody at San Diego County Jail, having been denied minimally adequate treatment of his psychosis and while housed under solitary confinement-type conditions in the Administrative Separation unit at George Bailey.  In that unit, Jail staff's monitoring of his condition and safety was entirely inadequate, which directly contributed to his death.  Mr. Settles' mental illness and instability were described by his mother, who said that he was the "kindest most gentle and helpful young man and then rapidly becomes very frightening," specifically when he was struggling with medication adherence.

253.

[4541606.8]

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. N-985**

Ex. N-986



1 

2 

3 

4 

5 

6 

7 

8 

9           He was placed in Administrative Separation

10 housing, where he remained until he died by suicide a few weeks later.

11      254.

12 

13 

14 

15 

16 

17 

18 .

19      255. As I discussed in my May 2022 declaration (at Paragraphs 85-105),

20 inadequate safety checks are a major deficiency in this Jail's system. The safety

21 checks on the day of Mr. Settles death (more than a year after my declaration) were

22 notably out-of-compliance even with the Jail's existing safety check protocols,

23 which Suicide Prevention expert Lindsay Hayes, the State Auditor, and Disability

24 Rights California had all found were themselves dangerously inadequate even when

25 followed. Mr. Settles was found with a shirt wrapped around his neck, hanging

26 from the top bunk of his cell.

27      256. It is hard to overstate just how deficient the Jail's mental health

28 treatment was or how dangerous the conditions were leading up to Mr. Settles'

1  suicide. ███████████████████████████████████████████████

2  ███████████████████████████████████████████████████████

3  ████████████████████████████████████. He should *not* have been housed

4  in the solitary confinement-type conditions of Administrative Separation.  The Jail

5  further failed to provide him clinically necessary psychiatric care, therapeutic

6  treatment, and monitoring for safety, culminating in his suicide.  This death was

7  foreseeable and preventable, and demonstrates both the mental health system

8  failures of San Diego County Jail and the extraordinary danger of its Administrative

9  Separation housing practices for people with serious mental illness.

10      257.   Just as concerning was the lack of post-suicide debriefing with the

11  mental health team or necessary corrective action after Mr. Settles' death.  George

12  Bailey mental health clinician Aseel Ross confirmed that no one from leadership

13  ever reached out to her to debrief the situation, that there were no corrective action

14  plans that she was aware of, and that there no revisions to the Administrative

15  Separation policies or procedures that resulted in the wake of Mr. Settles death.

16  Ross Dep. at 136-137.

17  **Suicide of Jonathan McDowell, July 2023 (Administrative Separation)**

18      258.   Mr. McDowell was found hanging in his cell in Administrative

19  Separation (George Bailey) on July 19, 2023, five months after he arrived at the Jail

20  on February 20, 2023.  He was found unresponsive and pulseless in his solitary

21  confinement cell; medical personnel revived him enough to send him out to a

22  community hospital, where was pronounced dead a few days later.  When he arrived

23  at the Jail, there were numerous identified indicators that he had serious mental

24  health treatment needs.  He had a history of a "mood disorder" for which he had

25  been receiving treatment in the community. ███████████████████████████

26  ███████████████████████████████████████.

27      259.  ███████████████████████████████████████████████

28  ██████████████████████████████████████████████████████████,

1 ███████████████████████████████████████████

2 ████████████████████████████████████████

3 █████████████████████████████████████████████

4 █████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ██████████████████████████████████████████████

8 █████████████████████████████████████████████

9 ████████████████████████████████

10 ██████████████████████████████████████████████

11 █████████████████████████████████████████. █

12 ██████████████████████████████████████████████

13 █████████████████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████████

16 ██████████████████████████████████████████████

17 █████████████████████████████████████████████

18 ██████████████████████████████████████████████

19 ███████████████████████████████.

20     261. ████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████  ███████████

23 █████████████████████████████████████████████

24 █████████████████████████████████████

25 █████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ██████████████████████████████████████████████

28 ███████████████████████████████████████████,

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. N-988**



1

2 .” He was seen by a mental health clinician just a few more

3 times over the next approximately six (6) weeks, including on the day he hanged

4 himself.

5 262.

6

7

8

9

10

11

12

13

14 263. Mr. McDowell was found hanging in his cell, with torn clothing tied

15 around his neck, later that July 19 morning.

16 264. This is a very egregious case. The patient had to wait for over three

17 months to be seen by a psychiatric provider despite clear and documented indicators

18 showing that this was an urgent case. I have grave concerns about the complex

19 medication combination that was prescribed, and even graver concerns that there

20 was no psychiatric follow-up to see how the patient was doing. He was doing very

21 poorly, with concerning side effects, continued symptoms, and problems with

22 medication adherence; nobody did anything about it. The patient was placed in a

23 dangerously restrictive solitary confinement setting, where he further deteriorated

24 and did not receive clinically necessary monitoring or treatment. Based on my

25 review, this was a preventable death where the mental health treatment fell below

26 the standard of care, and the solitary confinement conditions imposed an

27 unacceptable risk.

28 265. The post-death review of this suicide is deeply troubling, insofar as it

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. N-989

fails to identify, or seek to address, the many systemic failures involved in this case. For example, in the NaphCare clinical review of McDowell's death, under "Recommendations for Modifications in Protocol, Procedure, or Approach to Patient Health Care Management Resulting from this Review," it states only the following: "Closer Psychiatric follow-up/care."  I could find nothing in the post-death investigation by the County or NaphCare that suggested a recognition that the Administrative Separation placement for this man was dangerous or problematic, or that necessary corrective action would be taken.  These sorts of tragic outcomes will almost certainly continue to occur, unnecessarily, until the deficiencies I (and others) have identified are remedied.

**Death of Lonnie Rupard, March 2022 (Administrative Separation)**

266.    This 46 year old man with serious mental illness died a horrible death in a Central Jail Administrative Separation unit.  According to the findings of the Medical Examiner, the cause of death was pneumonia, malnutrition and dehydration in the context of **neglected schizophrenia**.  Quite notably, the manner of death is listed as **Homicide**.  This patient had a long history of a psychotic-level mental disorder which had a documented response to medications in the past.  The patient did not receive any psychiatric medications for the three months he spent at the Jail leading up to his death.

267.    Mr. Rupard was arrested on December 19, 2021.  The autopsy report stated that he was to be seen for a psychiatric sick call the next day, although I could not locate this note in the medical record.  The autopsy report, however, states "patient refused psychiatric evaluation."  This does not meet the standard of care for this sort of patient.  The psychiatric provider is still obligated to evaluate the patient whether the patient is cooperative or not.  (In fact, I found many clinical encounter records where mental health staff noted only "Unable to Assess.") A skilled psychiatrist or clinician can glean a lot of information about the patient by observation and through the nature of the patient's refusal.  They can (and should)

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY    Ex. N-990

1  observe the hygiene of the patient and the cell, as well as speak with custody and

2  nursing staff that have interacted with the patient.  Simply documenting "refusal" is

3  unacceptable. 

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18  .)

19  There is a troubling lack of urgency, even as the records indicate that this patient's

20  condition was greatly decompensated and worsening.

21      270.

22

23

24

25

26  .

27      271.  On March 17, 2022, Mr. Rupard was found unresponsive in his cell.

28  Resuscitation efforts were employed unsuccessfully.  The autopsy found that he had

1    lost fifty pounds during his three-month stay at the Jail.

2          272.   Jail clinician Jennifer Alonso testified as to how Mr. Rupard ended up

3    in solitary confinement ("Ad-Seg") housing despite her raising serious concerns

4    about his situation and well-being:

> Another patient who died after being moved to Ad-Seg by custody staff without input from myself or other mental health clinicians was Lonnie Rupard.  Mr. Rupard had a mental health condition that had made him psychotic and erratic.  He had been placed on my OPSD caseload. After he tried to sharpen an object to that could be used as a weapon, I told custody staff that I was concerned about the situation.  Custody staff then moved him into an Ad-Seg "overflow" unit at the Jail.  (Ad-Seg units are frequently filled to capacity, leading to custody staff operating other housing units as Ad-Seg "overflow" units.)  Although I did have concern about his remaining in the OPSD unit with my other OPSD patients, I did not believe that Ad-Seg was a clinically appropriate placement for him.  However, I knew that custody staff had exclusive authority regarding the Ad-Seg placement and that I could not advocate for another housing option.  Really, Mr. Rupard needed placement in a structured therapeutic outpatient setting that provided sufficient security; such a unit does not exist at Central Jail.

> Once he was in Ad-Seg, Mr. Rupard was no longer on my OPSD caseload.  I recall that the clinician assigned to the Ad-Seg unit was so overwhelmed with her caseload and other clinical duties that she was unable to see Mr. Rupard as frequently as was needed.  My understanding is that Mr. Rupard refused his medications and food while in Ad Seg.  Feces were present all over his cell and the toilet, and food trays and trash were strewn everywhere.

> Mr. Rupard died while still in Ad-Seg, having lost a significant amount of his body weight and in a medically compromised condition, about two months after he was placed there.  **Custody staff never consulted with me about whether solitary confinement would put Mr. Rupard at risk of harm.  I knew that, by policy and practice, I had no authority or avenue to recommend against his Ad-Seg placement.**

> Mr. Rupard's experience as a person with mental illness held in the Jail's Ad-Seg housing units is not unusual.  I have observed many people with mental illness decompensate in Ad-Seg.  They smear feces on the walls and cell door windows, and their cells become horrifically filthy.  Custody staff regularly stand by and watch this happen.

25   Alonso Decl., Dkt 119-11, ¶¶ 27-30.

26         273.   Instead of working to prevent placement of people with mental illness

27   or at risk of decompensation in Administrative Segregation (or Administrative

28   Separation) unless absolutely necessary, the Jail places patients like Mr. Rupard in

1  solitary confinement-type setting without regard to mental health-related risks and

2  without critically necessary treatment.  This practice is outside the accepted norms

3  of the correctional mental health care community, and places people at substantial

4  risk of serious harm.

5       274.   The lack of treatment provided to Mr. Rupard is staggering.  He was

6  placed in solitary confinement despite clear clinical contraindications and need for a

7  higher level of care.  He was never taken out of his cell for any of his mental health

8  or psychiatric contacts.  All encounters were done cell-side.  The psychiatric staff

9  never considered or took steps to use involuntary psychiatric medications while this

10  man was starving to death.  Based on my review, this was an avoidable death if

11  proper psychiatric care had been provided in an appropriate treatment setting.

12  **Suicide of Lester Marroquin, May 2021 (Administrative Separation)**

13       275.   Mr. Marroquin was a 35-year-old man with schizophrenia spectrum

14  disorder who died by suicide after drowning himself in the toilet of his Central Jail

15  Administrative Separation cell.  He struggled with severe auditory hallucinations

16  telling him that his mother was in danger.  Throughout his incarcerations, he was

17  frequently placed in safety cells and enhanced observation for self-harm and

18  aggression driven by these symptoms.

25       276.

279.

[4541606.8]    Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. N-994

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ██████████████████████████████ Given his recent active self-harming

7 behaviors, there was significantly high risk for suicide and these safety checks

8 should have been more frequent for him.  He was last noted alive at 3:05PM, then

9 found unconscious during the next safety check at 3:59PM. He died from water

10 intoxication likely caused by drowning in the toilet of his cell.

11         280.   Jail clinician Jennifer Alonso testified to her first-hand experience with

12 Mr. Marroquin and the circumstances of his death, which matches my assessment of

13 this case:

14          I have seen how these Ad-Seg placements, with no clinical input from
           mental health staff and no mechanism for clinicians like me to protect
15         our at-risk patients, have deadly consequences.

16         For example, my patient, Lester Marroquin, died by suicide in an Ad-
           Seg cell on May 30, 2021.  Mr. Marroquin had a significant history of
17         mental illness and had repeatedly attempted suicide and engaged in acts
           of serious self-harm.  He had decompensated while held in an Ad-Seg
18         placement to the point that staff placed him on suicide precautions in a
           psychiatric observation cell.  I was asked to meet with him while he
19         was being held in the psychiatric observation cell, which I did several
           times.  (Those clinical contacts were done at cell-front, with other
20         patients in cells just a few feet away.)  He was struggling a great deal.
           He had fears about being sent to prison, was hearing voices, was
21         smearing his own feces in his cell, and was sticking his head in the
           toilet.  On Sunday, May 30, a day I was not working, Mr. Marroquin
22         was removed from the psychiatric observation cell, and custody staff
           moved him back into Ad-Seg.  No one informed me about custody staff
23         moving Mr. Marroquin back into the Ad-Seg housing where he had
           previously decompensated, and I was not consulted about whether it
24         was clinically safe for him to be returned to Ad-Seg following his
           removal from psychiatric observation.  That same day, Mr. Marroquin
25         banged his head several times, placed his head in the toilet of his Ad-
           Seg cell, and finally died of acute water intoxication.  I still cry when I
26         think about what happened to Mr. Marroquin; he should not have died.

27 Alonso Decl. ¶¶ 27-30.

28         281.   Mr. Marroquin's death was manifestly foreseeable and, with

[4541606.8]                                    100                    Case No. 3:20-cv-00406-AJB-DDL

appropriate mental health treatment and placement in an appropriate, non-isolation treatment setting, his death could also have been prevented.  In my experience, this sort of egregious case would (and should) lead to a Jail system making significant changes to its policy and practices with respect to use of solitary confinement for people with serious mental illness or suicide risk.  I can discern no such significant changes in the San Diego County Jail system in the wake of, or any time since, Mr. Marroquin's death.

**Suicide of Matthew Godfrey, November 2019 (Administrative Separation)**

282.    Matthew Godfrey, a man with serious mental illness, died in a Central Jail Administrative Segregation cell that was filthy. He was found with torn clothing around his neck and a rope in his pants.  The harmful effects of isolation on Mr. Godfrey's mental health were manifest from the condition in which he died.  He was wearing five pairs of underwear and three pairs of socks.  Although Jail medical staff initially reported Godfrey's death as a suicide, the medical examiner determined he died from a heart condition.  According to the medical examiner's report, Godfrey's cell "was dirty and unkempt with paper waste and food debris strewn along the walls and floor."

283.    Whatever the true or official cause of death, there can be no doubt that the isolating and terribly harsh solitary confinement conditions combined with the lack of treatment played a significant and even determinative role in Mr. Godfrey's death.

**V.    FINDING #5: THE SAN DIEGO COUNTY JAIL'S SYSTEM FOR SUICIDE PREVENTION IS DEFICIENT, FAILS TO PROTECT PEOPLE WITH SERIOUS MENTAL HEALTH NEEDS, AND CAUSES SERIOUS HARM.**

284.    I am aware that San Diego County Jail has received much attention for the high number of suicides and mental health-related deaths over the last fifteen years, including from the California State Auditor in its February 2022 report, from Analytica Consulting for the San Diego Citizens' Law Enforcement Review Board

in its April 2022 report, from Disability Rights California in its April 2018 report, from national suicide prevention expert Lindsay Hayes in his 2018 report, from the San Diego Union-Tribune in its *Dying Behind Bars* reporting series in 2019, and more.

285.   I am aware of what is an extraordinarily high number of suicides and mental health-related deaths that have occurred in San Diego County Jail over the last several years.  My assessment for this case, however, does not rely on the quantity of such deaths, but rather the Jail's policies, practices, and procedures, including those that relate to suicide prevention.  It is my assessment that those policies, practices, and procedures are deficient in ways that have contributed to many in-custody deaths and that continue to put large numbers of incarcerated people at substantial and unnecessary risk of suicide.

286.   It must first be said that, until the deficiencies identified elsewhere in this report are remedied, these risks to incarcerated people will remain unacceptably high.  For instance, an adequate jail suicide prevention system requires: an effective mental health screening system (Finding #1), appropriate and timely psychiatric medication management practices (Finding #2), clinically appropriate inpatient and outpatient mental health treatment programming with system capacity to meet the needs of the population (Finding #3), and the elimination of the dangerous use of solitary confinement-type conditions that put people at risk of decompensation and suicide (Finding #4).

287.   Below I address additional suicide prevention-related deficiencies identified through my assessment of the San Diego County Jail system.

**A.     The Jail's "Detention Safety Program" Is Inadequate and Dangerously Outside the Norm of Clinically Adequate Jail Systems for Suicide Prevention.**

288.   In Finding #1, I describe deficiencies in the Jail's initial mental health screening system with respect to identifying and addressing suicide risk.  But even in cases where the general mental health screening or referral system do identify

1  potential suicide risk in a person in San Diego County Jail, there are significant

2  deficiencies in how that person is then treated.

3      289.  The Jail's "Detention Safety Program" (also referred to as "DSP" or

4  "Inmate Safety Program" or "ISP") begins with the use of a "gatekeeper," who is

5  (usually) a mental health professional charged with conducting an initial suicide risk

6  assessment for people that other staff identify as being a potential suicide risk.

7  During my Jail Facilities visit, I spoke with staff who serve in this "gatekeeper" role.

8  I learned that the "gatekeeper" evaluations are *not* comprehensive mental health

9  evaluations.  The "gatekeeper" assessment, by policy and practice, serves only to

10 evaluate a person for placement on suicide precautions, *not* to determine clinically

11 indicated mental health treatment.  It focuses on whether a patient is suicidal and

12 requires placement in a Detention Safety Program unit – specifically, a "safety cell,"

13 Enhanced Observation Housing (EOH), or a Psychiatric Services Unit Mental

14 Health Observation cell.  Notably, as discussed elsewhere in this report, meaningful

15 mental health treatment is not provided in *any* of these placements.  This is a serious

16 deficiency, as addressing suicidality effectively *requires* providing clinically

17 indicated treatment.

18     290.  The gatekeepers whom I interviewed acknowledged that they generally

19 play no role in identifying treatment and mental health program placement needs.

20 One clinician stated that he cannot provide a "direct route" to the Outpatient

21 Stepdown Unit unless the patient had previously been housed there.  Such a policy

22 is deeply undermining of the objective to keep people at risk of suicide safe.  A

23 person coming off of suicide precautions should be promptly transitioned to the

24 appropriate mental health placement and level of care.  But what I saw, time and

25 again, were patients who had become suicidal in a particular placement (commonly,

26 Administrative Separation), then spent a period of time on suicide precautions, only

27 to be discharged back to the same placement where they had become suicidal, with

28 no adjustment in their treatment plan or program.  This is a recipe for disaster for

1   people at elevated risk of decompensation, self-harm, or suicide.

2       291.   The "gatekeeper" assessment is meant to determine "Current Suicide

3   Risk Acuity"— using a "high" or "low" designation—which seems to carry great

4   weight in determining whether a particular suicide precautions placement is needed.

5   In my review of records, I found great variability in the extent to which

6   "gatekeeper" staff discussed the reasoning for a "Current Suicide Risk Acuity"

7   determination, and a lack of documentation sufficient to ensure consistency and

8   quality of these assessments.  My records review revealed that people were placed

9   on, or cleared from, suicide precautions in the Detention Safety Program without

10  sufficient clinical justification.

11      292.   A lack of guidance – or, more specifically, circular guidance – in the

12  Jail policy (MSD.S.10 – Suicide Prevention & Patient Safety Program) likely

13  contributes to this problem.  The policy states:

14      Suicide risk designation is defined as follows:

15          1. Acute low risk – the patient is currently deemed at low
        imminent risk of suicide ….
16
        2. Acute high risk – the patient is currently deemed at imminent
17      high risk for suicide …

18  MSD.S.10, SD_117715.

19      293.   Both the Hayes report and the DRC Report make important

20  recommendations on how to address deficiencies in this Detention Safety Program

21  system, including removal of the vague low/high risk designations and replacement

22  with a more appropriate observation system.  Many of those recommendations were

23  not implemented or only partially implemented by the San Diego County Jail

24  leadership.

25      294.   For example, Mr. Hayes recommended that a person's initiation or

26  continuation on suicide precautions should be based on *current* suicide risk

27  (Recommendation #23).  The Jail declined to implement this recommendation, and

28  policy and practice continue to require that a person receive "two consecutive low

**Ex. N-999**

1  risk designations," spaced out over as long as 24 hours, in order to be removed from
2  Detention Safety Program suicide precautions.  As discussed below, suicide
3  precaution placements in safety cells or Enhanced Observation Housing are
4  extremely restrictive. To keep a person in such placements beyond the period their
5  level of risk warrants is clinically problematic: doing so sends a message to a patient
6  that if they report suicidality, they will face restrictive conditions for extended
7  periods and in ways that seem punitive.  What I heard from patients again and again
8  is that they refrain from reporting suicidal thoughts for fear of punitive-feeling
9  restrictions and conditions in the Detention Safety Program.  This increases rather
10 than decreases suicide risk and detainee safety.

11      295.   It is also problematic that there is no policy expectation that
12 "gatekeeper" suicide risk assessments be done confidentially.  Quiroz PMK Dep. at
13 167 ("It does not specifically state in the policy that [the suicide risk assessment]
14 must occur in a confidential location.").  In reviewing the mental health records
15 system, I observed that there is no place on the "Gatekeeper" clinical form to
16 document whether a suicide risk assessment was done confidentially, and I generally
17 saw no such information documented.  To ensure an adequate suicide risk
18 assessment, it is essential that they be done confidentially, absent specific
19 circumstances where it is not possible based on current individualized security
20 concerns.

21      296.   Inadequate supervision and treatment after a patient is discharged from
22 suicide precautions is another major concern.  Again, the "gatekeeper" who removes
23 a person from suicide precautions generally plays no role in facilitating clinically
24 indicated supervision and treatment after that.  Clearance from suicide precautions
25 should come with a thorough clinical assessment to guide implementation of an
26 individualized treatment plan.  This San Diego County Jail's failure to do this, by
27 policy and practice, puts people at substantial risk of serious harm.

28      297.   Take the recent case of ███████████████████

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-1000**



.

**B.    The San Diego County Jail's Detention Safety Program Placements for Patients in Psychiatric Crisis Are Harsh, Extraordinarily Restrictive, and Often Clinically Counterproductive.**

**1.    The San Diego County Jail System's Use of "Safety Cells" Is Inhumane and Dangerous.**

298.    In 2018, Disability Rights California described the conditions and procedures of "safety cells" as follows:

> These Safety Cells are extraordinarily harsh settings.  They are small, windowless rooms with rubberized walls.  There is no furniture or bedding, leaving the individual to sit or lie on the floor.  Safety Cell doors contain a food slot and a small viewing window that faces a hallway.  Cells have a ceiling light that is illuminated 24/7, and a camera for remote observation by custody staff.

> The cells are completely barren, with no sink, toilet, or running water.  Inmates defecate and urinate in a grate on the ground.  In June 2017, a

Grand Jury evaluation of jail conditions found a "very strong" smell of urine surrounding the Safety Cells.

Inmates placed in these Safety Cells are stripped naked and given only a "safety smock" made from heavy tear-free material fastened with straps or Velcro. The garment is open at the bottom, and no underwear is provided. Inmates receive no books or any other personal property while in a Safety Cell.

Placements in a Safety Cell are approved by the Watch Commander, in consultation with medical staff. An initial medical assessment must be done within 30 minutes after medical staff is notified. Department policies require observation of inmates placed in Safety Cells by custody staff at least twice every 30-minute period and by medical staff every four (4) hours. The jail's policy is for a mental health consultation to occur within 12 hours of placement, and a medical evaluation every 24 hours.

There is no time limit for how long an inmate may be kept in a Safety Cell.

DRC Report at 19, DUNSMORE012942.

299. The DRC report recommended that the Jail "[g]reatly reduce the use of 'Safety Cells' for individuals with mental health needs. Inmates placed in Safety Cells as a result of behaviors related to mental health symptoms should not be housed there for longer than six (6) hours. At that point, if there is no less restrictive housing appropriate, they should be considered for placement in inpatient care (including the PSU)." *Id*. at 32. Mr. Hayes concurred in the six-hour time limit recommendation. Hayes Report at 71, DUNSMORE0117148. The County declined to implement this, or any other, time limit on safety cell placement.

300. Little has changed since 2018. Safety cell conditions appear the same. Although the County reports that safety cell use has decreased in recent years, I observed many cases of people being placed in safety cells, sometimes for extended periods of time. The policy on safety cell use has not meaningfully changed since the 2018 DRC Report. There is still no time limit. I strongly urge the Jail to implement the DRC and Hayes recommendation that no one be held in a safety cell beyond six (6) hours. If a patient is still an acute risk of suicide at that time, they should be moved to an inpatient placement where clinically indicated treatment and

[4541606.8]
EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1002

1  supervision are provided.

2      301.   Safety cell conditions remain very concerning.  During my site

3  inspection, I observed the safety cells at Central Jail.  In three cells, there was

4  standing water in the bottom of the grate in the floor (where people must defecate







*San Diego County Central Jail "Safety Cell"*
*for People at High-Risk of Suicide*

*Central Jail Safety Cell floor grate*
*(with standing liquid not drained),*
*where people in crisis must urinate and defecate*

19  and urinate); it appeared that they were not draining properly, creating a real

20  sanitation concern.  Photos taken from my observation are provided here.

21      302.   Conditions are so harsh in the safety cells that people deny having

22  suicidal thoughts to avoid being placed in them, or to get out of them.  The Jail

23  mental health coordinator stated that the safety cells "don't lend themselves well to

24  a therapeutic environment."  Quiroz PMK Dep. at 68.  I agree, and would add that

25  the conditions in these safety cells are in general *counter*-therapeutic.

26      303.   The recent case of ██████████████ illustrates how damaging and

27  counter-therapeutic a safety cell placement can be for a patient in San Diego County

28  Jail. ████████████████████████████████████████████████████████

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. N-1003**



**2.    The San Diego County Jail System's Use of Enhanced Observation Housing Cells Are Punitive, Clinically Counterproductive, and Dangerous.**

304.    Both Lindsay Hayes and DRC expressed concerns about the Enhanced

Outpatient Housing (EOH) units in San Diego County Jail in 2018.  The DRC

Report described these units in 2018 like this:

> Even though EOH inmates, in contrast to inmates in Safety Cells, generally have access to a toilet, they too endure conditions of extreme isolation and deprivation.

> We observed and met with several inmates in EOH units.  Consistent

**Ex. N-1004**

with County policy, all clothes and underwear are taken away, and inmates receive a safety smock, two blankets, and shower shoes. However, we reviewed multiple records documenting that EOH inmates were left naked, with no safety smock, and in some cases not even provided a blanket. Some are forced to sleep on a thin mat placed on the floor. Many inmates complained about being cold, even with the smock and blankets.

Inmates have no access to personal property, television, recreation yard time, or visits from family. Inmates in the EOH units eat from paper trays and a paper safety spoon, and in some cases are restricted to eating without any utensil.

Inmates in the EOH units with individual cells complained about extremely limited time outside their cell and excessive isolation.

Mental health staff appear to recognize the extreme conditions in the EOH units. In one inmate's chart we reviewed, a psychiatrist recommended that the facility "discontinue EOH as the isolation is inhumane and likely to compromise [this inmate] Women's EOH Cell in Medical Isolation (Las Colinas) psychologically." We learned that some inmates deny having suicidal thoughts so they can get out of the EOH unit, or avoid placement there, given the harsh conditions.

DRC Report at 21-22, DUNSMORE01249242-0125012.

305.   Little has changed in the EOH units since 2018. Conditions in these units remain defined by extreme isolation and deprivation. Everyone in the unit is stripped of their clothes and made to wear a safety smock, the heavy garment that is open at the bottom and provides little modesty. (Thankfully, we observed some people in the EOH units having access to a book, and we saw one man in EOH (photo below) who was permitted to use the phone to speak with his loved ones.) There was no sign that patients had any opportunity for normal human in-person interactions with others; they were completely isolated.

[4541606.8]

110                        Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1005



*Man in "Safety Smock" in Central Jail's Enhanced Observation Housing" Unit for People at Risk of
Suicide, Alone in the Dayroom, Sitting on the Floor and Talking to Loved One on the Phone.*

306.   Suicide prevention expert Lindsay Hayes criticized these conditions in 2018, calling them "overly restrictive and seemingly punitive" and "harsher than for those [people] on segregation status."  He stated that isolation "not only escalates the inmate's sense of alienation, but also further serves to remove the individual from proper staff supervision."  He noted "the real possibility that [EOH] measures were contributing to an inmate's debilitating mental illness."  He also observed that visits with mental health staff were non-confidential and cell-side. 2018 Hayes Report at 40-42, DUNSMORE0115368.

307.   On the day of our visit at Central Jail, there were four (4) patients in the EOH unit.  The floor staff told me that "several people were cleared" shortly before we arrived.  A deputy who worked regularly in the unit told me there is an average of 7-to-8 people in the EOH unit on a given day. He told me the EOH census reaches as high as 14 patients with some frequency.

308.   I spoke with two patients in the EOH unit.  Each man showed signs of very serious mental illness.  They reported that they were receiving medications but

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-1006**

1  no other forms of mental health treatment, which was clearly clinically indicated.

2  309.  My review of other individual cases with extended EOH placements

3  revealed significant concerns regarding access to necessary care. ███████████



This patient's

13  experience speaks strongly to the need to provide meaningful mental health

14  treatment, rather than further isolation and restriction as seen in the EOH units and

15  safety cells.

16  310.  Another man, ██████████████████████████████████████████

24  ██████████████████████████████████████████████████████.

25  311.  During my site visit, I met with ████████████████, a patient in an

26  EOH unit at Las Colinas. (Unlike the Central EOH unit's celled housing, this was a

27  small dorm setting, with a couple of women in the unit on the day I visited.)  She

28  reported how she was previously put in a safety cell, where she lay in a pool of her

own urine for a period of time.  She was upset about her highly restrictive and harsh EOH and safety cell placements, and also about not receiving psychiatric care despite her history of taking psychiatric medication. ███████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████ Yet the Jail's system imposed exceedingly harsh restrictions to prevent suicide while also *delaying* the psychiatric care necessary to actually treat her condition.

### 3. Blanket Custodial Restrictions on Clothing, Bedding, Property, and Privileges for Patients on Suicide Precautions Does Not Meet the Standard of Care and Is Harmful.

312.    Blanket custodial restrictions that harm people with serious mental health needs are pervasive in the San Diego County Jail system.  This is particularly true, and harmful, in the context of the Jail's suicide prevention-related policies and practices. I discuss this issue further in Finding #8, below.

313.    As the Jail mental health coordinator confirmed, the provision of regular clothing and bedding for people on suicide precautions is based entirely on custodial policy, with no consideration given to individualized clinical judgment. Quiroz PMK Dep. at 146, 153-54.  Ms. Quiroz confirmed that the denial of "routine privileges" like family visits, telephone calls, and recreation, are entirely the purview of custody staff.  Quiroz PMK Dep. at 156 ("That all happens outside of the clinical world. … [T]hat's in the very custody world if -- when somebody is allowed a visit, when somebody is allowed phone calls, recreation and how those

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1008

1  happen throughout the facility.").

2      314.   Remarkably, Jail leadership are well aware that the standard of care is

3  for these clothing, bedding, property, and privilege decisions *to be based on clinical*

4  *judgment*, not custodial directives.  A draft policy, dated June 2022, that Ms. Quiroz

5  described as an "attempt of merging a Naphcare policy with existing San Diego

6  policy," lays out a procedure on this topic that is generally consistent with the

7  standard of care for treatment of people at risk of suicide in the Jail setting.

8  (Ms. Quiroz stated that the policy "is not in place at this time" at the Jail, and that no

9  County staff have been trained on it.)  Quiroz PMK Dep. at 151-52.  Still, quoting

10  from this *unimplemented* policy here is useful, as it provides a starting point for San

11  Diego County Jail to remedy its deficient practices and to provide clinically

12  appropriate care and conditions to people placed on suicide precautions:

13      *Suicide Precautions:*

14      ...

15      **b) All clinical decisions regarding the removal of a patient's clothing,**
    **bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and**

16      **privileges shall be commensurate with the level of suicide risk as**
    **determined on a case-by-case basis by a qualified mental health**

17      **professional and documented in TechCare**.  *This does not apply to*
    *custody-ordered restrictions, only clinically ordered restrictions.*

18      **c) If a qualified mental health professional determines that a**
    **patient's clothing needs to be removed** *for reasons of safety, health*

19      *staff will not restrict the use of a safety smock and safety blanket.*

20          *1) Restoration of clothing and other items are clinically*

21          *assessed by the mental health professional* with each evaluation
        *completed at least every 24 hours.*

22

23  Quiroz PMK Dep. Ex. 8 (B-05 Suicide Prevention and Intervention) (emphases

24  added).

25      315.   A review of patient ██████████ records illustrate the harm

26  of custody-driven, blanket-restriction-based policies that fail to consider

27  individualized clinical information. ████████████████████████

28  ████████████████████████████████████████

[4541606.8]
EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-1009**

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ██████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████  While the basis for the medical

11 observation, safety cell, and EOH placements was to ensure this patient's safety, the

12 restrictions that came with these settings were counterproductive, as they led to

13 exacerbation of her suicidality and mental health symptoms.

14      316.   The provision of clothing, bedding, possessions, and privileges for

15 people on suicide precautions should be commensurate with their current condition

16 and suicide risk, as determined by individualized clinical judgment (with custodial

17 input as appropriate).  Suicide prevention expert Lindsay Hayes and Disability

18 Rights California each made detailed recommendations on this topic in their 2018

19 reports about San Diego County Jail.  Hayes Report Recommendations 17 & 18,

20 DUNSMORE0117148; DRC Report Recommendation 12, DUNSMORE0124942.

21 These recommendations, along with the other recommendations in those

22 comprehensive reports, should be *fully* implemented without delay to address the

23 very serious and harmful policies and practices that persist in the Jail to this day.

**C.   There Is a Dangerous Lack of Adequate Monitoring and Supervision for People at Heightened Risk of Suicide.**

**1.   Lack of Constant Observation for High-Risk Suicidal Patients When Clinically Indicated.**

27      317.   It is well established that some people at acute and high suicide risk

28 will require *constant* observation for a period of time to ensure their safety.  Suicide

[4541606.8]                    115                 Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. N-1010

1  prevention expert Lindsay Hayes "strongly recommended" that the San Diego

2  County Jail provide this level of observation whenever clinically indicated.  Hayes

3  Report Recommendation 20, DUNSMORE0117148.  The 2018 DRC Report found

4  that "the [San Diego County Sheriff's] Department's policies lack sufficient clarity

5  about the levels of risk and the levels of observation specified for each level of risk.

6  The policy should provide for **constant observation** of inmates at high risk

7  whenever clinically indicated."  DRC Report at Appx. A, p.17,

8  DUNSMORE0124942.  The 2017 NCCHC Report (at 100) also criticized the Jail's

9  system's "extremely limited use of one-on-one monitoring, or what is identified as

10  constant watch in NCCHC standards."  DUNSMORE0260618.

11      318.  Today, according to staff, constant observation for acutely suicidal

12  patients is available only in the Psychiatric Services Units observation cells at

13  Central Jail and Las Colinas.  And as one Central Jail psychiatrist shared with me,

14  there is "always" a waitlist for those observation cells.  This was also confirmed by

15  Jail mental health clinician Aseel Ross, who observed patients waiting as long as a

16  month after being referred for placement in the Psychiatric Services Unit.  Ross Dep

17  at 89-90.  The policy and practice in this Jail must be for constant observation to

18  readily and promptly provided for patients across the system whenever clinically

19  indicated.

20      319.  The risk of harm to incarcerated people with acute suicidality when

21  adequate monitoring and supervision are not provided is substantial.  In 2018, DRC

22  "observed video footage of one troubling suicide attempt in an Enhanced

23  Observation Housing (EOH) Unit … . Inmates are monitored by overhead video

24  camera and per Department policy, should receive in-person checks at least once

25  every 15 minutes.  The video shows the inmate standing naked on the cell's desk,

26  praying and preparing to jump, for over 14 minutes.  He then dove head-first onto

27  the floor.  Four more minutes passed before custody staff appeared and summoned

28  emergency medical care."  2018 DRC Report at 15, DUNSMORE0124942.

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
Ex. N-1011

**2. Jail Staff Continue to Conduct Inadequate Safety Checks in Solitary Confinement-Type Conditions, Putting People at Substantial Risk of Serious Harm.**

320.    In my May 2022 declaration (¶¶ 33-40), I described a key deficiency with respect to the provision of safety checks to monitor and ensure the safety and well-being of incarcerated people at heightened risk of harm, particularly in the Administrative Separation and other solitary confinement-type units.

321.    It is well established that, given the high incidence of suicide attempts and other medical or mental health emergencies in the jail setting, the practice of conducting appropriate "safety checks" is essential to protect human life.  Safety checks entail direct observation of each individual to ensure that they are alive and to check for signs of medical or psychiatric distress.

322.    The standard of care for safety checks is also well established, specifically for solitary confinement-type housing units like those I observed at San Diego County Jail Administrative Separation units.  In recognition of the risks posed to people in solitary confinement-type units, it is the standard that safety checks in such units occur twice every hour at intervals no longer than 30 minutes at unpredictable and intermittent times.  The American Correctional Association advises the practice that "[a]ll special management (segregation) inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule" Standard 4-ALDF-2A-52, American Correctional Association (2004), Performance-Based Standards for Adult Local Detention Facilities, 4th Edition, Lanham, MD.

323.    The San Diego County Jail has failed to implement this basic, common-sense practice that can save lives.  Pursuant to San Diego Sheriff's Department policy I.64, custody staff conduct safety checks in Administrative Separation just once every hour, the same frequency as occurs in general population housing units, and half as often as the recommended frequency.

324.    The San Diego County Jail policy for conducting safety checks in

1    Administrative Separation only hourly, rather than at least every 30 minutes at

2    staggered intervals, places people in great danger, especially people with mental

3    illness, at risk of suicide, or with risk factors for drug/alcohol withdrawal or

4    overdose.

5        325.    Having visited the Jail facilities and several Administrative Separation

6    units, my concerns have now multiplied.  First, these units are among the harshest,

7    most restrictive solitary confinement units I have ever observed.  *See* Finding #4,

8    above.  The suicides of Mr. McDowell and Mr. Settles demonstrate that these units

9    remain exceedingly dangerous.  Second, I observed several deputies conducting

10   their hourly (not twice-hourly) safety checks, and those checks were far too rapid,

11   cursory, and insufficient to serve their purpose – to meaningfully observe a person

12   to ensure they are alive and safe.  These checks must be frequent and they must be

13   done right.

14       326.    Other outside evaluators have, over and over and over again, found that

15   the safety check policies and practices in San Diego County Jail are out of

16   compliance with minimum standards, in ways that put people with serious mental

17   illness at substantial risk of serious harm.

18       327.    <u>First</u>, **Lindsay Hayes, national suicide prevention expert who**

19   **reviewed the Jail's system in 2018:** "Given the strong association between inmate

20   suicide and segregation housing and consistent with national correctional standards,

21   it is strongly recommended that [San Diego County Jail] DSB officials give strong

22   consideration to increasing deputy rounds of such housing units from 60-minute to

23   30- minute intervals."  Hayes Report, DUNSMORE0117148-0117247, at 57 (citing

24   American Correctional Association standard).  The Sheriff's Department rejected

25   the recommendation: "This recommendation has been implemented," it wrote, *but*

26   *only* insofar as the "Sheriff Department has given strong consideration to increasing

27   deputy rounds of restricted housing units from 60 minutes to 30 minute intervals.

28   However, given the challenges regarding the physical layout of jail facilities, the

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-1013**

1  numbers of inmates, and care necessary to properly conduct these checks, the

2  Department has determined that it would not be feasible at this time to make this

3  change." County Response to Hayes Report at 12.

4      328.    Second, **the California State Auditor, February 2022**: "Sworn staff

5  did not always adequately check on incarcerated individuals.  Some individuals

6  were found hours after their deaths, negating the opportunity for lifesaving

7  measures" California State Auditor Report at 19. "Based on our review of video

8  surveillance footage, we observed multiple instances of sworn staff who spent no

9  more than one second glancing into an individual's cell, sometimes without

10  breaking stride as they walked through the housing module …. Staff later

11  discovered individuals unresponsive in their cells, some with signs of having died

12  several hours earlier, as detention staff described some of these individuals as stiff

13  and cold to the touch. … In another example, the Sheriff's Department's records

14  indicate that a deputy did not perform a required safety check in a housing area, in

15  part because of poor communication between this deputy and the station deputy.

16  One hour after the deputy should have performed this check, sworn staff found an

17  individual in this housing area unresponsive after attempting suicide.  A physician

18  pronounced this individual deceased at the scene after staff and paramedics were

19  unsuccessful at saving the individual's life. …  [A] safety check that does not

20  involve any meaningful observation of an individual is ineffective and

21  inadequate. … The assistant sheriff of detentions indicated that the department has

22  an informal process for assessing the quality of safety checks, which can include

23  watching video footage.  However, the Sheriff's Department has not documented

24  this assessment process in its policy, and establishing an informal practice does not

25  ensure that each facility's management team will consistently verify the quality of

26  safety checks." *Id.* at 25-26.

27      329.    Third, the **San Diego County Citizens' Law Enforcement Review**

28  **Board (CLERB), regarding Death of Joseph Carroll Horsey, December 24,**

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-1014**

1   **2017:** CLERB's investigation revealed that, during the initial body examination at
2   the scene, Mr. Horsey's body had undergone postmortem changes that suggested
3   that he had been dead for hours before he was discovered. Resuscitative efforts
4   were impractical as rigor mortis and livor mortis had already set in when his body
5   was found by staff. In this case, a custody deputy documented that all safety checks
6   were logged. However, the jail surveillance video recordings showed sworn staff
7   and nursing personnel walking by the module, versus physically entering the unit to
8   observe each inmate for obvious signs of medical distress. Jail surveillance video
9   recordings did not reveal any deputy entering the module to conduct safety checks
10  as required.

11        330.   And again, the **San Diego County Citizens' Law Enforcement**
12  **Review Board (CLERB), regarding Death of Blake Edward Wilson, January**
13  **26, 2020**: CLERB reviewed jail surveillance video, and found that the custody
14  deputy looked into the cell of Mr. Wilson for approximately one second during a
15  safety check. CLERB found the safety check prior to Mr. Wilson's body being
16  discovered "was not sufficient or long enough" to adequately conduct a safety
17  check.

18        331.   Fourth, **Disability Rights California, April 2018**: DRC reviewed
19  video footage of individuals who died in custody. The DRC clinical experts
20  described their findings: "Inadequate security/welfare checks (also known as 'proof
21  of life checks') were observed via video review in a number of cases in which
22  inmates died by suicide. In at least one case, hourly safety checks were not
23  completed pursuant to Jail policy during the time period the inmate died by suicide.
24  In video and record reviews of at least three inmates who died, checks were
25  completed inadequately – either not completed timely or in manner that failed to
26  meaningfully assess the welfare of the inmate. For instance, in one case, the video
27  showed two deputies enter the housing unit and separate to allow one to check the
28  upper tier and one the lower. The deputies completed their checks of 40 cells in 17

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-1015**

1  seconds, far too quickly to complete meaningful checks.  The deputy checking the

2  upper tier did not stop except at the first cell and did not appear to take enough time

3  to establish that the inmates in each cell were alive and safe." DRC Report,

4  DUNSMORE0124942-0125012, Appendix A at 15-16.

5      332.  These findings by other entities were noted in my May 2022

6  declaration in this case.  And yet, the deficient policy and practices persist today.  In

7  August 2022, six months after the State Auditor Report's scathing findings on

8  inadequate safety checks, **Matthew Settles** – a man who was arrested at an inpatient

9  psychiatric hospital and soon thereafter placed in an Administrative Separation cell

10  at the Jail, where he severely decompensated – died by suicide, with the Jail's own

11  findings that at the time a deputy discovered his body hanging in his cell, it had been

12  *more than 1 hour and 15 minutes* since the last safety check (as confirmed by post-

13  mortem video surveillance review).  Emergency medical staff arrived too late to

14  conduct life-saving measures for Mr. Settles.

15      333.  I am aware that other county jail systems have committed to conducting

16  safety checks for all people in solitary confinement-type housing at least every 30

17  minutes, at staggered intervals, with timely documentation and regular auditing by

18  supervisory staff for quality assurance purposes.  Examples include Los Angeles

19  County, Sacramento County, Santa Barbara County, and Orange County, among

20  others.  California Department of Corrections and Rehabilitation (CDCR)

21  segregation housing has also implemented this practice.

22      334.  Quality assurance audits with appropriate accountability measures must

23  also be in place to ensure that Jail staff are conducting meaningful observation of

24  each incarcerated person.  The Jail must track when a unit's safety checks start and

25  when they are completed as part of its quality assurance protocols.

26      335.  San Diego County Jail's policy and practices relating to safety checks

27  remain deficient, people have died as a result, and more people will remain at risk of

28  death and other serious harm until this deficiency is remedied.

**D.    There Remain Grave Concerns about Dangerous "Attachment Points" that Can Be Used for Hanging in High-Risk Housing Areas.**

336.   As part of an adequate suicide prevention program in jail system, it is important to remove and address physical plant hazards that may facilitate a person's suicide, particularly in high-risk settings like solitary confinement units, acute and outpatient mental health units, and mental health observation units.  I understand that Lindsay Hayes and others have strongly encouraged San Diego County to address this issue, including by retrofitting housing areas to remove "attachment points" that a suicidal person can use to hang oneself.  During my site visits, I observed the product of several such retrofits to remove attachment points that can be used for self-hanging in certain housing areas.  This is a positive development.

337.   I did, however, observe high-risk housing areas that appear to have features that can be used as attachment points for hanging.  Often, this was due to uncompleted maintenance and the poor conditions of the facility.  Maybe most notably, I observed old metal panels on the ceiling of the safety cells at Central Jail that have become separated from the ceiling surface.  In my experience, these gaps can be – and have been – used by suicidal detainees trying to hang themselves.

338.   I strongly urge San Diego County to conduct an audit – including an update of any audits previously completed – to ensure that there are not dangerous attachment points in housing areas that can be used for hanging oneself, particularly in high-risk areas of the Jail facilities.  Suicide prevention expert Lindsay Hayes has developed guidance for completion of such an audit, which may be used as a starting point.

**Ex. N-1017**

1
2
3
4
5
6
7



*Panels separated from ceiling of Central Jail Safety Cell,*
*creating potential "attachment point" suicide hazards.*

8
9

10   339.   I further have concern that San Diego County Jail has not implemented

11   important recommendations from its own Critical Incident Review Board.  Take the

12   May 2020 death of **Joseph Morton**, a man who made suicidal statements on several

13   occasions after being taken into custody.  He was placed in the Enhanced

14   Observation Housing unit and was subsequently returned to general population

15   housing.  Five days later, he was found hanging in his cell, having used a blanket

16   that was tied around the upper bunk of his cell. ███████████████████

17   ████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████████

20   ███████████████████████████████████████

21   ████████████████████████████████████████

22   ███████████████████████████████████████

23   ████████████████████████████████████████

24   ████████████████████████████████████████

25   ██████████████████████████████████████

26   ██████████████████████

27   340.   While recognizing that a systemwide suicide prevention retrofit project

28   is substantial, this response is deeply concerning.  The response does nothing to

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-1018**

1 address the real (and, in Mr. Morton's case, realized) fatal risk of people discharging

2 from suicide precautions. ███████████████████

3 ████████████████████████████████

4 ████████████████████████████████████

5 █████████████████████████████████

6 ██████████████████████████████

7 ████████████████ "

**E.   The San Diego County Jail's Suicide and Mental Health-Related Death Review and Quality Improvement Processes Are Deficient.**

341.   A well-functioning jail mental health care system must have a quality improvement program designed to identify problems, implement and monitor corrective action, and study its effectiveness.  This includes meaningful and coordinated review of in-custody suicides and mental health-related deaths.  The death review process at San Diego County Jail, including for suicide and mental health-related deaths, has significant gaps and repeated failures in documentation and in substance.  This deficiency dates back several years, as noted in the 2018 DRC Report, which found that the Jail system "does not have a functioning quality improvement program. … there is a need for improved quality improvement processes regarding mental health/suicide risk screening, clinical assessments, individual suicide and suicide attempt reviews, and other aspects of a correctional mental health care and suicide prevention program."  DRC Report, DUNSMORE0124942-0125012  at Appx. A p.24.  Such deficiencies persist.

342.   Mr. Barkley, a NaphCare Person-Most-Knowledgeable witness, recently testified that autopsies are not always completed.  Barkley NaphCare Dep. at 23-24.  He acknowledged that portions of psychological autopsies that should have been filled out for recent San Diego County Jail suicides were left blank.  *Id.* at 20-47.  Such gaps in death review procedures are consistent with my findings in reviewing suicide and mental health-related death reviews.

343.   There is a lack of an effective quality improvement process relating to suicide prevention and other issues regarding in-custody deaths.  Assistant Sheriff Theresa Adams-Hydar confirmed as much:

> Q: Was there a specific discussion about bringing down the in-custody deaths and how to do that? Was there, for example, a task force or a committee designed to come up with that approach?

> A: A task force?  No.  A committee?  No.  Just we're running our bureau.  There wasn't any group focused specifically on in-custody deaths.

Adams-Hydar Dep. at 49.

344.   The mental health-related death of **Lonnie Rupard,** described earlier in this report, offers insight into the lack of commitment to sufficient quality improvement in the wake of in-custody deaths.  After his death, Jail leadership described implementing a "multidisciplinary" wellness check practice for high-risk detainees: "They go to – cell by cell by cell and, essentially, knock on the cell, talk to the incarcerated person:· 'Hey, how are you doing? How are you feeling? Do you -- would like to see a nurse today? Do you want to see a mental health professional? Is there anything that you have going on?'" Adams-Hydar Dep. at 47-48.  This practice has some promise, but has never made its way into Jail policy or quality assurance processes.  Adams-Hydar explained why the Jail leadership chose not to do so:

> Adams-Hydar: So it's not in policy.  It's something that was a directive and above and beyond.  It's not even a Title 15 requirement for the State.  It's something very unique to San Diego Sheriff's Department that we started to take care of our population.

> Q: Why was it not ensconced in a policy?

> A: Because it's above and beyond the requirement for what we need to do.

> …

> Q: Is there a log of wellness checks that's kept?

> A: As far as I know, they're putting them in our JIMS, or Jail Information Management System.  And I think the drop-down is "Wellness Check."

> Q: And are those being audited to ensure that the wellness checks are actually conducted?
>
> A: There's no need for an audit because they're not mandated by state law or policy and procedure.

Adams-Hydar Dep. at 83-84.  In my experience, this sort of remedial action—without policy or auditing to ensure implementation—is not an effective method to correct systemic deficiencies related to something as serious as the issue of suicide prevention.

345.   Nor does the independent Civilian Law Enforcement Review Board (CLERB) in-custody death review process effectively and comprehensively identify deficiencies for Jail suicides, and thus cannot be relied upon to facilitate necessary improvements.  This stems in substantial part from the limited jurisdiction of CLERB—most obviously, the fact that health care staff, operations, and records are all beyond CLERB's investigative jurisdiction.  CLERB's review, as designed, looks only at custody staff conduct and custodial operations.  What this means is that CLERB is, by its own design, missing half the story in every death.  Meaningful identification and remediation of systemic deficiencies behind in-custody suicides and other mental health-related deaths is therefore impossible.

346.   The recent suicide of Mr. Ornelas, discussed earlier in this report, illustrates this well.  In CLERB's investigative findings, it found that "there was no evidence to indicate that either Ornelas, nor his cellmates, nor anyone else had informed jail staff that Ornelas was suicidal.  It was unknown to jail staff that Ornelas was struggling with mental health issues … it did not appear that staff was aware of his current suicidal ideations." ████████████████████

████████████████████████████████████████

████████  Jail *health care* staff thus almost certainly knew, and certainly should have known, about Mr. Ornelas's mental health issues and struggles. ████████

████████████████████████████████████████

████████████████████████████████████

Ex. N-1021

1 ██████████████████████████████████████

2 ███████████████████████████████████████████

3 ██████████████████████████████████████

4 ████.

347.   I am not the first to recognize that CLERB oversight, in its current
design, is unable to identify and remediate serious problems at the Jail.  Following a
2020 CLERB investigation that found "no evidence" of custody staff misconduct in
the mental health-related death of Paul Silva, based on its very curtailed access to
relevant records and data, a federal judge found that "although [San Diego County]
has established a board to investigate the widely known problem of in-custody
deaths, it has also failed to enable the board to carry out its stated responsibilities."
Lawsuits prompt questions about civilian oversight of San Diego Sheriff's
Department, *San Diego Union-Tribune*, Apr. 11, 2021.  CLERB's long-time
executive director, Paul Parker, stated that CLERB's lack of jurisdiction over jail
health care operations made it "difficult for CLERB to thoroughly investigate deaths
and transparently report on deaths."  He stated publicly, "Our hands are tied."
Sheriff's Review Board Reverses Course, Finds Deputy Violated Policies in Inmate
Death, *San Diego Union-Tribune*, Feb. 11, 2021; Lawsuits prompt questions about
civilian oversight of San Diego Sheriff's Department, *San Diego Union-Tribune*,
Apr. 11, 2021.

348.   Maybe most concerning is that the San Diego County Jail mental health
leadership does *not* consider CLERB in-custody death reviews or findings.  *See*
Quiroz PMK Dep. at 124-25 ("Q: I'm just asking if county jail mental health
leadership have a practice of considering CLERB reviews of in-custody deaths? A:
No.").

349.   Based on my experience, a jail system without adequate death review
and quality improvement processes related to suicide prevention is destined to see
the same failures recur time and again, with more deaths and serious harms

[4541606.8]   Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1022

1  resulting.  The San Diego County Jail is currently one of those jail systems.

2      350.  Throughout this report, I provide my analysis of several in-custody

3  suicides and mental health-related deaths, including for Mr. Settles, Mr. Ornelas,

4  Mr. Marroquin, Mr. McDowell, Mr. Rupard, and Ms. Bartolacci, among others.

5  These deaths, and the many others that have been reviewed by outside experts and

6  organizations, demonstrate that the same deficiencies in suicide prevention are being

7  repeated in case after case.  I strongly recommend that San Diego County Jail fully

8  implement the expert recommendations that have been made over the years

9  regarding suicide prevention, and ensure that effective oversight and quality

10  improvement mechanisms are in place.

11  **VI.  FINDING #6: MENTAL HEALTH CARE STAFFING AND THE
SYSTEM'S STAFFING STRUCTURE ARE INSUFFICIENT TO**

12  **MEET THE MENTAL HEALTH TREATMENT NEEDS OF THE SAN
DIEGO COUNTY JAIL'S INCARCERATED POPULATION.**

13

14      351.  I have serious concerns about the lack of sufficient mental health care

15  staffing to meet the treatment needs of the San Diego County Jail population.  I have

16  further serious concerns about what strongly appears to be a dysfunctional and

17  ineffective staffing structure that serves to impede systemic improvements to the

18  mental health care delivery system.

19      **A.  There Is Inadequate Staffing to Meet the Mental Health Treatment
Needs of the Jail Population.**

20

21      352.  In a jail system like this one that is so lacking in adequate treatment

22  programming to meet the needs of the population, one nearly always sees severe

23  staffing deficits, both in custody staff and health care professional staff.  Such

24  staffing deficits in San Diego County Jail contribute greatly to the existing

25  deficiencies in mental health care delivery.

26      353.  Adequate custody staff is necessary to provide, for example, escorts of

27  patients to appropriate treatment spaces where they can receive confidential and

28  clinically indicated care.  In San Diego County Jail, my records reviews and

**Ex. N-1023**

1   discussions with patients and staff reveal that the exceedingly high rate of non-

2   confidential clinical contacts is substantially the result of inadequate custody staff

3   available for escorts.

4       354.   Adequate custody staff is also necessary to facilitate structured

5   treatment programming – such as group therapy and other recreational or

6   socialization activities.  I heard from mental health staff and patients about mental

7   health programming commonly being canceled or curtailed due to lack of available

8   custody staff as well. *See, e.g.*, Paragraph 125, above.

9       355.   There is further a very large deficit in mental health staff given the

10  number of incarcerated patients with serious treatment needs and the acuity of their

11  conditions in this system.

12      356.   Former Jail clinician Jennifer Alonso testified to the overwhelming

13  patient caseload she was required to carry, and how that prevented her from

14  providing adequate clinical contacts and the sort of structured treatment she knew

15  was needed for her patients:

16      As a mental health clinician for the OPSD units at Central Jail, I carried
        a caseload of between approximately 140 and 160 patients.  This
17      patient caseload was so large that it was impossible to deliver anything
        remotely close to adequate mental health care given the needs of this
18      population.  Based on my experience and clinical knowledge, I believe
        a caseload of no more than approximately 60-70 patients would be
19      appropriate for clinicians providing care to the OPSD population.

20      When I started as a mental health clinician for the OPSD units, I was
        told that I would have the opportunity to develop a program with
21      multiple treatment modalities, including structured therapeutic group
        programs and individualized one-to-one therapy.  However, given the
22      overwhelming caseload, lack of resources, and lack of confidential
        treatment space, it was never possible for me, or any other clinician, to
23      provide these sorts of care on a consistent basis or to meet the clinical
        needs of our patients.

24

25  Alonso Decl., Dkt. 119-11, ¶¶ 10-11.

26      357.   Administrative Separation clinician Aseel Ross explained that she

27  could provide individual clinical care to an absolute "max" of 13 patients on a given

28  day, and less than that if any of the patients had more acute mental health needs.

**Ex. N-1024**

Ross Dep. at 16-17.  Ms. Ross proposed to implement a treatment program in Administrative Separation units – specifically, two hours of structured therapeutic activity each day.  She spoke with supervisory staff about the program, including the need for additional mental health staffing resources for implementation.  *Id.* at 123-24.  While her supervisor supported the program and plan, it was not approved by leadership, and had not been implemented when she left her job at the Jail in late 2023.  *Id.* at 125-26 ("[T]he leadership is what we were waiting for . . . . I didn't get a response.").

358.    When I visited the Jail in February 2024, there remained a lack of clinically appropriate treatment programming across the system, including in the Administrative Separation units, the Outpatient Stepdown units, and the Psychiatric Services Units.  As discussed in Finding #3, above, I learned of a few hours of treatment programming that had very recently been added in outpatient units (*i.e.*, 1-2 hours *per week* for a small fraction of patients in certain units).  Staff repeatedly told me that they recognize the need to add more treatment programming to meet the needs of the patient population, something that could not happen without more staffing resources.

359.    The Department of State Hospitals-run Jail Based Competency Treatment (JBCT) Program at the Jail, discussed in Finding #3, offers a far more appropriately staffed program, delivering ten (10) hours of programming *per day* (structured and unstructured), including four (4) hours of structured group treatment.  That unit, with up to 30 patients, is covered by 2.5 full-time-equivalent psychiatrists, two clinicians (with caseloads less than one-quarter as compared to the OPSD units), additional educators and psychiatric nurse staffing resources two assigned duties who have received specialized mental health training.  As noted earlier, the JBCT program director told me that "the program works."  The contrast between this Department of State Hospitals-overseen JBCT program and the many other Jail housing units where I saw acutely (and essentially untreated) mentally ill patients,

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. N-1025**

was stark.  A key distinction was the level of staffing in JBCT as compared with everywhere else in the Jail system.  That is to say, San Diego County should be well aware of a staffing model for a mental health unit that can meet patient treatment needs; there is one in their own Jail Facilities.  It is true that this JBCT program is operated by the California Department of State Hospitals, but there is no reason that similar staffing and program resources cannot be provided to patients with mental illness across the Jail system – including in the Administrative Separation units, the Outpatient Stepdown units, and the Psychiatric Services Units.  In fact, based on my review, that sort of staffing and program resources is *essential* to providing adequate mental health care to the Jail population.

360.   I am far from the first to identify this deficiency.  In 2017, the NCCHC found that NCCHC Standard J-G-04 (Basic Mental Health Services) was not being met in the San Diego Jail system.  Its report explained: "Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment."  It went on: "There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia).  The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists."  2017 NCCHC Report, DUNSMORE0260618 at 35-36.

361.   In 2023, the San Diego County Grand Jury found that "[t]here is an insufficient number of mental health clinicians to provide appropriate basic on-site mental health services, as defined by NCCHC accreditation standards."  The Sheriff's Department "disagree[d] partially" with this finding, stating that "[i]t is a true statement that the San Diego Sheriff's Department does not currently meet accreditation standards as it applies to mental health" while stating that "this is not attributable to the fact that there is an insufficient number of staff providing

services." The Department did state that it "is seeking to hire more mental health professionals in order to streamline workloads and provide proactive mental health programs for our population." Quiroz Dep. Ex. 9, *2022/2023 Grand Jury Response - Crisis in Treatment Access for Incompetent to Stand Trail Incarcerated Persons in the County Jails* at 8-9, July 10, 2023.

362.    Yet another major issue area is the delays in responding to mental health care service requests. When a patient with mental illness feels their symptoms worsening or requiring additional treatment, they are told to submit a health care (or sick call) request form. Because they are incarcerated, they cannot simply go to a hospital or mental health clinic, or even call their treatment provider. They must rely on the Jail's "sick call" system to respond to their requests in a timely and adequate manner. In my records review and interviews, I found repeated examples of patients submitting mental health care service requests and receiving no response for weeks. I reviewed County records showing long wait times for patients to be seen for a mental health concern. Patients submit repeated, and increasingly desperate, requests for care. Patients are at risk of decompensation, and even suicide, when these sorts of delays occur.

363.    Jail mental health coordinator Ms. Quiroz wrote in July 2023 about how the sick call request backlog and treatment delays in the Jail's system, and she testified in May 2024 about how such delays "illustrate that we have an overwhelmed system and we need help." Quiroz PMK Dep. at 270-71 & Ex. 14. A Jail system like this one, which has chronic sick call request backlogs and treatment delays, may try to address such problems through a periodic "blitz" effort to reduce the backlog. In my experience, such "blitz" efforts, at best, only temporarily mitigate the problem. The San Diego County Jail system will continue to see backlogs for mental health care until staffing is commensurate with the Jail population's treatment needs.

364.    The resulting harms are significant, and appear in many of the case

Ex. N-1027

1  reviews provided in this report.  One example is Mr. Ornelas, who submitted

2  multiple written requests to see psychiatric staff and get back on his medications;

3  these requests were never processed or addressed.  Mr. Ornelas died by suicide

4  before mental health staff ever came to see him.

5      365.   Based on my review of the Jail's mental health population, current

6  conditions, and currently available treatment services, it is my strong opinion that

7  understaffing is a major contributor to dangerous failures to provide clinically

8  necessary mental health care to meet existing needs.

9      366.   Another major mental health staffing deficit is in psychiatry.  In

10  Finding #2, I discussed my grave concerns about deficiencies in psychiatric care and

11  medication management for incarcerated patients with mental illness.  A significant

12  contributor to these deficiencies is severe understaffing of psychiatric prescribers

13  (psychiatrists and psychiatric nurse practitioners) who, unlike the Jail's clinicians

14  (e.g., social workers and marriage family therapists (MFTs)), are hired and

15  employed by a private health care contractor (*i.e.*, NaphCare or Correctional

16  Healthcare Partners).

17     367.   Jail leadership has issued corrective action notices to the contractor

18  Naphcare regarding psychiatric care untimeliness, noting hundreds of pending

19  psychiatry appointments and wait times of several weeks.  Ms. Quiroz testified that

20  delays in access to psychiatry care remain a "key deficiency area," noting that the

21  "volume of pending appointments" is a problem.  Quiroz PMK Dep. at 186.

22     368.   Where patients face barriers to clinically necessary mental treatment, a

23  jail's mental health care system operates as a *crisis-response system.*  When – as is

24  the case in San Diego County Jail – there is insufficient staffing to provide clinically

25  indicated treatment services, to ensure timely responses to mental health requests

26  and referrals, and to provide timely psychiatric care, patients are placed at

27  substantial risk of preventable and serious harm.  Patients will often decompensate

28  and become acutely psychotic, suicidal, and/or gravely disabled.  At that point,

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1028

1    already-strapped staffing resources must be diverted to provide emergency

2    interventions.  This results in a kind of doom loop, where insufficient staffing and

3    resources to meet patient needs leads to higher acuity in the population and greater

4    treatment needs, which leads to further failure to deliver needed treatment.  And on

5    and on.

6        369.   Based on my assessment, I strongly recommend that San Diego County

7    Jail conduct an independent and comprehensive mental health treatment needs and

8    staffing assessment.  The assessment must be based on a service delivery model that

9    includes provision of clinically necessary treatment services and programming at all

10    levels of mental health care.

### B.    The Jail System's Mental Health Staffing Structure Is Dysfunctional and Fails to Ensure Adequate Mental Health Treatment Delivery for the Jail Population.

13        370.   A well-functioning jail mental health care system requires effective

14    coordination across all staff and health care disciplines.  San Diego County Jail is, in

15    several respects, uniquely dysfunctional in this regard.  I strongly recommend that

16    San Diego County take proactive steps to address this structural deficiency that is

17    negatively impacting patient care and creating impediments to important systemic

18    improvements.

19        371.   First, as I discussed in my previous declaration, the San Diego County

20    Jail's organizational chart reveals a foundational deficiency in the delivery of mental

21    health care (and health care more generally).  The organizational chart for Jail

22    operations makes clear that mental health (and medical) leadership report directly to

23    a Jail Captain and the Sheriff's Command team.  This organizational structure is

24    inconsistent with modern correctional psychiatric practices and is extremely

25    problematic.

26        372.   Clinical staff and leadership should have their own, separate chain of

27    supervision, allowing them to work *side-by-side* with custody staff and leadership.

28    The majority of medium-to-large California county jail systems of which I am aware

**Ex. N-1029**

have adopted a structure whereby mental health (and medical) staff do not report directly to custody leadership; rather, they report to medical and mental health leadership.  Such a structure is essential to operating an adequate jail mental health care system in which health care professionals have ultimate authority over health care policy, and can work collaboratively with sworn staff to ensure that patients' clinical needs are met.  As the chart below shows, San Diego County is an outlier with respect to its organizational structure by putting Sheriff's Command staff above (and not in partnership with) Mental Health Care staff.

**Examples of Health Care Agencies Operating the Jail Mental Health Care System Alongside the Sheriff's Department, Not as a Sheriff's Department "Medical Services Division" that Reports to Sheriff's Command Staff**

| County Jail System | Agency Overseeing Provision of Jail Mental Health Care |
|---|---|
| Contra Costa County | Contra Costa County Health Services |
| Los Angeles County | Department of Health Services |
| Orange County | Orange County Health Care Services |
| Riverside County | Public Health and Behavioral Health |
| Sacramento County | Department of Health Services |
| San Francisco County | Department of Public Health |
| Santa Clara County | County of Santa Clara Health System |
| San Diego County | *San Diego Sheriff's Department* (Medical Services Division) |

373.    Based on my review, it is apparent that the San Diego County Jail's structure with the Sheriff's Department employing, supervising, and directing mental health care staff, policies, and procedures has contributed to several of the systemic deficiencies I have identified.  This includes the custody-dominated Administrative Separation practices where large numbers of people with serious mental illness are being put at risk (Finding #4), the many ways that Jail custody

Ex. N-1030

1  staff exert improper control over clinical mental health care decisions (Findings #5,

2  #8), and the lack of mental health input in disciplinary procedures (Finding #9).

3      374.    Second, the San Diego County Jail's mental health staffing structure

4  itself creates bizarre and self-defeating barriers to operation of a functional mental

5  health care delivery system.  The Jail has an unusual staffing structure, where

6  disciplines like nurses and mental health clinicians (*e.g.*, social workers and

7  marriage family therapists (MFTs)) are employed by the Sheriff's Department,

8  while disciplines like psychologists, psychiatrists, and psychiatric nurse practitioners

9  are employed by an outside contractor (*e.g.*, NaphCare or Correctional Healthcare

10  Partners).  More significant than it being unusual, this structure is very problematic.

11      375.    Based on my interviews and review of records and policies, I am

12  extremely concerned about the lack of supervision and coordination in this Jail's

13  mental health care system.  For example, the County-employed clinicians (social

14  workers and MFTs) should be – but are not – supervised by higher-level mental

15  health care professionals like psychologists or psychiatrists.  Quiroz PMK Dep. at

16  26-27.  This is inconsistent with the standard of care for a mental health care system.

17      376.    One long-time Jail clinician told me during my Jail visit that clinicians'

18  interactions with psychiatrists and psychologists are extremely limited, with the

19  possible exception of in the Psychiatric Services Unit (PSU).  Clinicians are

20  generally supervised by other clinicians.  For example, the Las Colinas Chief Mental

21  Health Clinician who supervises all clinical staff is an MFT. The two chiefs at

22  Central Jail are an MFT and master's-level correctional counselor.  Ms. Quiroz, the

23  system's Jail mental health coordinator, is also an MFT.  In my conversations with

24  clinician staff, it was apparent that they have insufficient communications with

25  psychologists or psychiatric prescribers, including because those contracted staff

26  members operate outside County supervision. (The NaphCare staff uniformly

27  refused to speak with me during my Jail site visits.)  Again, this structure creates

28  significant gaps in supervision and coordination of care.  All mental health staff

should be working hand-in-hand to ensure appropriate treatment planning and delivery.  In this system, clinicians and prescribers are far too siloed, contributing to delayed care, inadequate care, and adverse patient outcomes like the many detailed in this report.

377.   With the artificial separation between, on the one hand, psychiatric prescribers and mental health clinicians (who, by licensure, cannot prescribe medications or do medication management), there are significant gaps in treatment. Staff shared with me, and Ms. Quiroz testified about (Quiroz PMK Dep. at 194-96), concerns regarding how patients needing medication management are being scheduled to see non-prescribing clinicians, which creates unnecessary work and dangerous delays in accessing psychiatric care.

378.   The structural division of mental health care staff across Sheriff's Department and private contractor staff also contributes to inconsistent training on policies and procedures.  This is a major problem: all mental health care staff should be required to receive the same training on a Jail's policies and procedures, to ensure consistency and coordination of care.  But NaphCare-employed psychologists, psychiatrists, and psychiatric nurse practitioners are not required to participate in mental health training that is provided to Sheriff's Department-employed mental health staff, as Ms. Quiroz explained:

> Q. Do the Naphcare staff that we've been talking about receive that eight-hour [Sheriff's Department mental health] training?
>
> A. I don't know that any have been completed for sure, but they are invited.  They are not excluded from those training.
>
> Q: Are they required to attend?
>
> …
>
> A: I don't know that Naphcare requires them to attend our training, but we offer it to them.  We want them to be there.  It's available to them.
>
> Q: It's available.  The county doesn't require it; the county makes it available.  Is that a correct statement?
>
> …

Ex. N-1032

1
A: Yeah.  I -- I don't have a way to – I don't supervise them, so I guess
the county does not – they'd probably have to write that into the
contract or something.  I don't know that it's written in the contract.

2

3
Quiroz PMK Dep. at 52-53.

4
379.   Correctional Healthcare Partners (CHP), which I understand contracts

5
with the County to provide additional health care staff at the Jail, do not provide

6
mental health care training to the Jail staff it employs.  The CHP president Peter

7
Freedland, testified that, under the current contract with the County, there were

8
plans to do further training of contractor medical staff, but when asked whether

9
there would be a mental health component to the training, he responded, "We don't

10
do mental illness.  So I would probably say no."  Freedland Dep. at 133-34.  Once

11
again, this shows how the fractured the San Diego County Jail system, with so many

12
different entities often working in siloes, contributes to a dysfunctional and

13
ineffective system of mental health care delivery.

14
380.   Even on something as consequential as suicide prevention procedures,

15
it appears that Sheriff's Department-employed mental health clinicians and

16
NaphCare-employed mental health providers are not trained to be on the same page:

17
Q: How are the Naphcare staff trained on the [San Diego County Jail's]
inmate safety program?

18

19
A: I believe they have their own suicide detection/prevention type of
courses within Naphcare University.  I personally have not seen that.  I
don't have access to that part.

20

21
Quiroz PMK Dep. at 48.

22
381.   A related major concern relates to coordination in mental health policy

23
and its implementation.  I understand that NaphCare was retained as a San Diego

24
County Jail contractor more than two years ago, in 2022.  I further understand that

25
there was an expectation that NaphCare and San Diego County would work to

26
coordinate and align and their policies as applied to San Diego County Jail's mental

27
health care system (and health care system more generally).  More than two years

28
later, this still has not occurred, as Ms. Quiroz explained:

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1033

> We were hoping that when we brought on Naphcare that they would have that for us, and they do have their policies, and they are written to the standards. The challenge becomes that we're a hybrid model because we have county employees and Naphcare employees. The policies don't interchange as seamlessly as we thought they might.

Quiroz PMK Dep. at 132. The County still has no "firm date" as to when policy alignment might be completed. *Id.*

382.   During my review, it was confusing to read the Sheriff's Department's mental health-related policies and also the NaphCare policies that the County produced. In some respects, the NaphCare policies, as written, better align with the standard of care for Jail mental health care – for example, as to suicide observation protocols (*see* Finding #5.B.3). My interviews with County-employed clinicians, however, clarified that they have received no training on the NaphCare policies. What remains deeply concerning is that it is unclear whether and how NaphCare-employed Jail mental health staff are trained. The Jail mental health coordinator's testimony added to my concern:

> Q: Is anybody trained on this [NaphCare] policy at the jail? Naphcare staff?
>
> [Defendants' counsel]: Calls for speculation as to Naphcare.
>
> A: Yeah. I don't know if they are.
>
> Q: Do any county employees get trained on this policy?
>
> A: No, no.
>
> …
>
> Q: Are any of these mental health-related policies from Naphcare in place[,] fully implemented at the jail?
>
> A: No.

Quiroz PMK Dep. at 152-53.

383.   It is absolutely essential that policies and training be consistent across all mental health care disciplines. The structural barriers between Sheriff's Department-employed mental health staff and contractor-employed mental health

1  staff must be addressed, with the objective of a coordinated system for mental health

2  delivery that aligns with the standard of care.

3      384.   Finally, I found the quality review and quality improvement processes

4  in San Diego County Jail's mental health system to be lacking.  The National

5  Commission on Correctional Health Care (NCCHC) provides a clear statement on

6  the importance of these processes:

7  **NCCHC Standard  MH-A-06 (essential) – Continuous Quality Improvement Program**

8  **Discussion:** The intent of this standard is to ensure that a facility uses a
9  structured process to find areas in the mental health care delivery
   system that need improvement, and that when such areas are found,
10 staff develop and implement strategies for improvement.  One of the
   benefits of a successful CQI program is that problems can be identified
11 early and strategies developed for their resolution before they worsen.
   All mental health care delivery systems, regardless of size, can benefit
12 from a well-designed CQI program.

13 One essential element of quality improvement is the monitoring of
   high-risk, high-volume, or problem-prone aspects of mental health care
14 provided to patients.

15 Areas to be studied can also be identified using the data that are
   regularly monitored (see MH-A-04 Administrative Meetings and
16 Reports) and patient safety systems (see MH-B-02 Patient Safety).
   Success in compliance with this standard is not measured by the
17 number of studies done but by the relevance of the studies and
   effectiveness of corrective action.

18
19 NCCHC Standards for Mental Health Services in Correction Facilities Standard

20 MH-A-6.

21     385.   The County's December 2023 Corrective Action Notice identifies

22 continuous quality improvement as a problem area as related to NaphCare and

23 mental health care at the Jail; it states simply: "No quarterly meetings have been set

24 or established."  SD120696.  The Jail mental health coordinator confirms that this

25 remains an issue that "need[s] work toward improvement."  Quiroz PMK Dep. 187-

26 88 (Quiroz: "As far as the – making sure that [NaphCare staff are] there, you know,

27 just making sure that they're present for the meeting to make sure that they're

28 engaging.  That would be, you know, the desire of the county.  We want to make

1  sure that they're engaging with us.  Q: Has there been a quarterly meeting where all

2  the necessary Naphcare staff members are present? A: Not consistently.").

3      386.   Relatedly, as described in Finding #2, above, there are serious problems

4  related to inadequate supervision of psychiatric nurse practitioners, and a lack of

5  quality improvement mechanisms to address deficient medication management

6  practices.  Many individual cases I reviewed strongly indicate that dangerously

7  inadequate prescribing practices recur again and again in this system.  Jail health

8  care leadership share this current and ongoing concern about insufficient  clinical

9  oversight.  Quiroz PMK Dep. at 192.

10     387.   It is also apparent that there is a problematic peer review process for

11 NaphCare-employed staff, with insufficient oversight by the County.  As

12 Ms. Quiroz explained:

13     Q: [W]hat is the status of peer review by Naphcare?

14     A: Yeah.  I can't be for certain that they're not doing peer reviews.· It's
       nothing that they hand back to us [the County]. I mean, if they do the
15     peer reviews it's something that they're keeping records of on their
       own.  No, it's not necessarily, here's what we did.
16

17 Quiroz PMK Dep. at 190; *see also* 12/1/23 Sheriff's Department Corrective Action

18 Notice to NaphCare, SD_120697 (Peer Reviews are "Not being done.").

19     388.   Ultimately, the structural and staffing deficiencies in the San Diego

20 County Jail mental health care system must be addressed in order to achieve an

21 adequate system of care.  Private contractors like NaphCare, Correctional

22 Healthcare Partners, or any other for-profit jail health care services company may

23 have a role in such a system, but this system will remain dangerously inadequate

24 until a coordinated structure with adequate, transparent oversight is implemented. In

25 short, without effective quality assurance procedures, the system will continue to

26 repeat its past failures and deficiencies.

27

28

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1036

## VII. FINDING #7: THE JAIL FAILS TO PROVIDE NECESSARY CONFIDENTIALITY FOR MENTAL HEALTH TREATMENT, UNDERMINING THE DELIVERY OF MENTAL HEALTH CARE.

389.   In my May 2022 declaration (¶¶ 77-84), I relied on staff and patient testimony, along with multiple external reports, in finding that the lack of confidentiality during the vast majority of clinical mental health contacts in the San Diego County Jail undermines mental health care for incarcerated patients in the system.  Having now conducted an extensive review of patient records and additional materials in this case, interviewed dozens of incarcerated people with serious mental illness at multiple San Diego County Jail facilities, and conducted my on-site observations of Jail operations, I am even more concerned about how this deficiency prevents the delivery of adequate mental health care and puts people at substantial risk of serious harm every day.

390.   As I have previously described, patient candor is an essential aspect of effective clinical interaction.  A patient cannot reasonably be expected to communicate openly when clinical interactions occur in a non-private, non-confidential setting where other people can hear what is being discussed.  Clinical contacts conducted in such a setting, including mental health assessments in which patients are asked to communicate sensitive and personal information to the mental health clinicians, are likely to be incomplete and inadequate because of the patient's understandable reluctance to speak candidly.  Many incarcerated patients I interviewed raised this very concern with me, and explained how they did not fully communicate with mental health staff about their symptoms, suicidality, medication side effects, and other clinical issues because they did not want custody staff or other incarcerated people to hear these things.

391.   Confidential mental health contacts are the standard of care, both in the community and in detention settings.  The failure to provide sufficient confidential treatment puts people at substantial risk of serious harm by hindering their ability to share information and to receive adequate treatment.  An adequate system of care in

1  the jail setting requires the provision of a private, confidential setting for patients to

2  communicate openly with their clinician or other care provider.

3      392.  A general policy and practice to provide private, confidential clinical

4  assessments and treatment does *not* mean compromising the safety of staff or

5  anyone else.  To be sure, the provision of adequate treatment of serious mental

6  illness (with appropriate confidentiality) will serve to *increase* safety: good care

7  serves to reduce psychosis-induced behaviors and to keep patients' conditions more

8  stable.  And in a jail system where confidential clinical contacts are the expectation,

9  there will be appropriate safeguards, including the use of *individualized* assessments

10  – based on both clinical and custodial input – to determine when a particular patient

11  cannot safely be seen in a confidential setting.  Such circumstances can, and must,

12  be appropriately documented, reviewed for quality assurance purposes, and inform

13  treatment planning and delivery moving forward.  In short, a jail system should not

14  choose between necessary confidentiality and safety.  They go hand in hand.

15      393.  As I noted in my May 2022 declaration, the Sheriff's Department has

16  been aware of this deficiency for years.  The January 2017 NCCHC Technical

17  Assistance Report for the San Diego County Sheriff's Department contains findings

18  on the lack of confidentiality in clinical encounters that are highly critical:

> J-A-09 Privacy of Care (I). **Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis.** Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. **Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.**
>
> …
>
> Recommendations: **The areas of privacy and confidentiality of care need to be addressed.** [NCCHC Compliance Indicators] require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met.

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. N-1038**

NCCHC Report, DUNSMORE0260618 at 8-9 (emphases added); *see also id.* at 43, 109.

394.   Based on my assessment, I am aware of no meaningful improvements in this area in the seven (7) years since the NCCHC issued its finding about inadequate confidentiality for mental health contacts at San Diego County Jail.

395.   In my review of patient records, I identified a very problematic policy and practice deficiency that makes this issue even worse – that is, the use of the label "Semi-Confidential."  I observed an area of the mental health care chart (called "Encounter Setting") where mental health staff are supposed to indicate whether a particular mental health appointment was done in a confidential setting.  One check box is "Confidential" and another is "Non-Confidential."  But there is also a third check box labeled "Semi-Confidential."

396.   "Semi-Confidential" is *not* a clinical term I am familiar with, and it is not consistent with the standard of care.  Yet, it appears frequently in Jail patient records.  Through my review of records and interviews of Jail mental health staff and patients, I learned that "Semi-Confidential" is often selected for clinical contacts conducted at cell-front (where a deputy and other detainees in neighboring units can overhear), or in areas where one or more deputies are standing a few steps away and able to hear the conversation.  Confidentiality is absolute; it either exists or it does not – there is no middle ground.  These so-called "Semi-Confidential" encounters breach patient privacy and are, in effect, *Non*-Confidential.

397.   I randomly selected a patient (███████████████████████████ ██████████████████████████████████ with whom I met in February 2024 while he was housed in an OPSD unit at Central Jail.  ████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1039



398.   Again, these encounters are in no way confidential clinical contacts. And they are not "Semi-Confidential" clinical contacts (a concept that does not exist in mental health practice standards).  These are *Non-Confidential* clinical contacts.

399.   The jail mental health coordinator's testimony confirms that the Jail system's leadership recognizes that "Semi-Confidentiality" is not an accepted, or acceptable, concept, yet it remains in the Jail's daily practices:

Q. … What does semi-confidential mean?

…

A.   Maybe the doors – I'm speculating. … There's no definition as what that means.

Q.   Is there any guidance provided to clinicians as to when to check the semi-confidential contact box [in the clinical note]?

A: No. …  So the clinicians sometimes check that I believe, but there's no definition that – it's really the determination of what they believe is semi-confidential.  There's not a definition.

Quiroz PMK Dep. at 249-250.

400.   The case of Patient ███████ offers a helpful illustration of how non-confidential clinical encounters harm patients. ████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1040



401.   To address this clinically deficient policy and practice, the Sheriff's Department must ensure that all mental health clinical contacts and intake interviews between incarcerated people and mental health professionals, including mental health clinicians, psychologists, and psychiatrists, are conducted in a confidential setting.

## VIII. FINDING #8: JAIL CUSTODY STAFF EXERT IMPROPER AND DANGEROUS CONTROL OVER CLINICAL MENTAL HEALTH CARE DECISIONS.

402.   In my May 2022 declaration, I identified multiple practices by which Jail custody staff improperly control and direct the placement and treatment of people with serious mental health needs, in ways that are inconsistent with the standard of care and that put people at substantial risk of serious harm.  May 2022 Decl., Dkt. 119-7, ¶¶ 17-76.  As discussed in this report, none of those issues have been remedied.  See, for example, Finding 3.D (continued improper custodial blanket ban policies preventing access to Outpatient Step Down Program (OPSD));

Finding 4.B (continued custody-driven placements in solitary confinement units without necessary consideration of mental health input). These policies and practices continue to put people with mental illness at substantial risk of serious harm.

403. As another example, the 2018 DRC Report found that custody staff "unilaterally place patients in the PSU's 'observation units,' which amount to a solitary confinement setting without access to the PSU's treatment programming"— even when mental health staff make contrary clinical recommendations. DRC Report, DUNSMORE0124942-0125012 at 20-21.

404. I found that custody staff in this Jail system improperly exercise control over a range of decisions for which clinical input is necessary but ignored. The continued placement of patient ███████████ in Administrative Separation, (*see* Finding 4) despite clear clinical contraindications, and the string of custody-controlled decisions on the placement and conditions of Lester Marroquin leading up to his horrible suicide in a solitary confinement cell (where he banged his head several times, placed his head in the toilet, and finally died of acute water intoxication) offer just two examples.

405. The use of restraints on people with serious mental illness offers another example of the improper control of custody staff where clinical input is needed. During my site visits, staff explained to me that a practice in this Jail system is to place an actively self-harming patient in a restraint chair that is located inside of a safety cell. I was shown where this occurs.

406. A restraint chair is a device in which a person is strapped down, with locking mechanisms on multiple parts of the body (*e.g*., wrists, ankles, torso, lap). While some detention systems use this sort of device, it is essential that it be used only with appropriate clinical input and in ways that minimize trauma to the patient and maximize preservation of the patient's dignity.

407. I was informed that, at San Diego County Jail, a patient's placement in

the restraint chair and their eventual removal from the restraint chair are exclusively "custody decisions." The Jail mental health coordinator confirmed that placement of psychiatric patients in a restraint chair is entirely a custody function, testifying to clinical staff's lack of a role in such processes:

> Quiroz: I mean, we've witnessed people in a restraint chair. We're not necessarily the ones determining when they're getting out of that chair. You know, we're not -- they're not calling us for that reason, to say, should this person be removed.
>
> [I]t's not common that we see somebody -- that we are going to assess somebody in a [restraint] chair. It is not common.
>
> Q: … [D]o you think it's important for clinicians to be involved when a restraint like a restraint chair is used on somebody who may be manifesting mental illness?
>
> A: Although I think it's important for a clinician, I think a psychiatrist should be -- I mean, if somebody's in a restraint chair I think we should probably get an M.D. level involved.
>
> …
>
> Q: You're not aware of any policy right now for an M.D. level staff member to get involved in a certain way when someone is placed in a restraint chair by custody?
>
> A: No.

Quiroz PMK Dep. at 72-74.

408.    The essentially complete control by custody staff over restraint chair placement and removal decisions, in policy and in practice, is a dangerous prospect for people with serious mental illness. The consequence is that custody staff are likely managing many urgent or emergent mental health cases through use of restraints and without appropriate clinical involvement. This is a problem that must be fixed, and that suggests a culture and policy of custody staff exerting improper control in mental health cases. (The March 2024 in-custody death of Abdul Kamara highlights the potentially deadly risks of custody-driven uses of restraints for people with serious medical and/or mental health needs. According to law enforcement reporting, Mr. Kamara, a 29-year old man, was found crawling around a parking lot

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1043

with no shirt and no shoes after leaving a hospitalization.  Sheriff's Department staff

placed him in a restraint device called the "WRAP" soon after his arrest, which was

followed by a sudden medical emergency that ended with Mr. Kamara's death.  *See*

News Release, Update on San Diego Sheriff In-Custody Death Investigation,

Mar. 11, 2024.)

409.    Through my review, it is clear that custody staff make all sorts of

decisions without clinical input – and in many cases, *in spite of* contrary clinical

input.  I spoke with mental health leadership and staff during my site visits, and

consistently heard that custody staff have complete control over decisions like

where a patient is housed after a period on suicide precautions or in the acute mental

health care unit.  One supervisory mental health clinician stated directly that mental

health staff play no role in such decisions, neither assessing nor sharing clinical

contraindications for certain housing like Administrative Separation.  One clinician

told me that she was aware of cases in which custody "overrule" clinical referrals of

her patients to mental health housing (*e.g.*, Outpatient Stepdown Unit).

410.    Mental health staff who spoke with me acknowledged that custody staff

commonly override clinical decisions, stating that they are left to do the best they

can to provide whatever treatment they can in such a setting.  Some were troubled

by this fact while others seemed resigned to it as an unchangeable reality.

411.    The inappropriate control of custody staff over placement and other

decisions impacting patients' health care needs showed up in several individual case

reviews.  For example:

1 ████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 █████████████████████████████████████████████████

5 █████████████████████████████████████████████████

6 ██████████████████████████████████████████████████

7 ██████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ███████████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████████.

12 Clinical input should have been gathered and utilized to ensure adequate treatment

13 of this patient's mental health condition; this did not occur.

14     413. ██████████████████████████████████

15 ███████████████████████████████████████████

16 █████████████████████████████████████████████

17 █████████████████████████████████████████████

18 █████████████████████████████████████████████

19 ███████████████████████████████████████████████████

20 ████████████████████████████████████

21 ███████████████████████████████████████████████████

22 ██████████████████████████████████████

23 ████████████████████████████████████████████

24 ███████████████████████████████████████████████.

25     414.   The inappropriate control of custody staff over what should be

26 clinically driven decisions in this Jail system extends to its suicide prevention

27 policies and practices. As suicide prevention expert Lindsay Hayes, Disability

28 Rights California, and others have urged, decisions about what property and

privileges can safely be provided to people identified as at risk of self-harm should be informed substantially by individualized *clinical* judgment.  *See* Finding #5.B.3. Yet San Diego County Jail persists in its policy and practice that anyone placed on suicide precautions in the Enhanced Outpatient Housing unit or a safety cell be, for example, denied all clothing and placed in safety smock.  Quiroz PMK Dep. at 145-50.  The Jail mental health coordinator, Ms. Quiroz, acknowledged that implementing an individualized clinical assessment regarding denial of clothing for a person at risk of suicide was something that does not occur in this system but "could be considered." *Id.*  She confirmed that other important privileges are also managed "outside of the clinical world" even for people at risk of suicide or self-harm:

> Q: For people in the safety program, in an EOH or safety cell, are they able to have family visits based on individualized clinical assessment that it's safe?
>
> A: That all happens outside of the clinical world. … [T]hat's in the very custody world if -- when somebody is allowed a visit, when somebody is allowed phone calls, recreation and how those happen throughout the facility.

Quiroz PMK Dep. at 156.

415.   Based on my experience and expertise, the Jail's policy and practice of custody controlling these decisions must change immediately, for several reasons, including: (1) patients are deterred from reporting suicidality if they know that they will face automatic punitive deprivations if they do; (2) good clinical care and basic human dignity require that patients be treated in the least restrictive setting appropriate to their needs, particularly when they are at heightened risk; and (3) a jail system where custodial policies subvert clinical judgment is one where people with mental health needs are placed at undue and substantial risk of serious harm.

416.   As just one example, the suicide of Mr. Marroquin, discussed above, demonstrates the extraordinary harm done when there are blanket custodial policies that apply to people with mental illness or at risk of suicide.  In that case, when

Ex. N-1046

Mr. Marroquin was placed on suicide precautions (safety cell or Enhanced Observation Housing), the basic provision of family phone calls were heavily restricted and even prohibited for him, due to the blanket custody protocols. But contact with his mother had well-documented clinical benefit, including to reduce suicidality. The custody-driven denial of family contact in this case illustrates why a jail's response to suicide risk should be clinically driven based on individualized assessments, not based on custody-dominated protocols. As Mr. Marroquin's mental health decompensated, the custody-driven restrictions served only to make things worse in the period leading up to his suicide.

417. A custodial blanket denial of property, privileges, or clothing – without individualized clinical assessment and input – has no place in a minimally adequate jail suicide prevention or mental health care system. Having custody staff make decisions about mental health care places incarcerated people at risk of serious harm. In this system, custody operations and administrative convenience trump the clinical judgment of mental health professionals in ways that are very dangerous.

## IX. FINDING #9: THE JAIL'S SYSTEM IMPROPERLY AND DANGEROUSLY PUNISHES PEOPLE WITH SERIOUS MENTAL HEALTH TREATMENT NEEDS OR INTELLECTUAL DISABILITY.

418. When I review a detention system's mental health-related policies and procedures, I pay careful attention as to whether and how the system imposes its disciplinary procedures on people with mental illness. There are many reasons why this is a critically important issue.

419. First, a person with mental illness and/or with an intellectual disability should not be punished for behaviors that are a manifestation of their mental illness or disability. For example, a person should not be punished for self-harming behavior when they are suicidal, nor for behaviors that technically violate jail rules when they are a product of the person's psychosis, paranoia, delusions, or other psychiatric symptoms. A person should not be punished for failing to follow directions or rules when such failure is related to their intellectual disability or

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. N-1047

cognitive limitations.  Such practices are unfair, clinically misguided, discriminatory, and ultimately harmful.

420.   Second, a person with mental illness and/or with an intellectual disability should not be subjected to punishments that are clinically contraindicated or potentially harmful based on their particular clinical or disability needs.  A person with mental illness should not be denied an activity that is an important aspect of their treatment.  For some, access to phone calls or visits from loved ones is clinically important to their coping or general mental health condition; such access should not be taken away as punishment, absent extraordinary circumstances.  For many, placement in isolating conditions can increase suicidality and do great harm to their mental health condition; such a placement should not be used for punishment where this is the case.

421.   It is important to note that these principles do *not* mean that incarcerated people with mental illness and/or an intellectual disability cannot be subject to disciplinary measures; they do not get a free pass, and safety need not be compromised.  What these principles do mean is that there must be appropriate clinical input gathered, documented, and meaningfully considered in situations where such a person may face discipline.

422.   Mental health clinicians must have meaningful and timely input into the disciplinary process.  A licensed mental health professional should evaluate a person with mental illness and/or an intellectual disability, or a person showing signs suggesting potential mental illness.  This must include a records review and a face-to-face assessment, as close to the incident as possible.  The role of the licensed mental health professional is to determine whether there are mental health- or disability-related factors contributing to the alleged misbehavior, the efficacy of disciplinary measures versus alternative interventions, whether certain punishments are clinically contraindicated, and whether adjustments to the person's treatment plan are necessary.  Many systems do this effectively, with a licensed mental health

1  professional documenting clinical input that classification or disciplinary staff

2  meaningfully consider.  Such input must be considered prior to any disciplinary

3  action being imposed.  There must also be appropriate accommodations and

4  assistance provided to a person with mental illness and/or an intellectual disability

5  during all disciplinary procedures that take place, to ensure their due process rights

6  and a meaningful opportunity to participate in those procedures.

7      423.   Based on my review of policy and other materials in this case, it is clear

8  that the San Diego County Jail has failed to implement policies and procedures to

9  ensure that clinical input is gathered, documented, and meaningfully considered in

10  disciplinary or classification procedures involving violations of jail rules.  The Jail

11  mental health coordinator confirmed that there is no such policy, practice, or

12  documentation system in place.  Quiroz PMK Dep. at 179.

13      424.   In systems that fail to implement such policies and procedures, it is

14  exceedingly common to see a high proportion of people with mental illness and/or

15  an intellectual disability end up in administrative segregation and other highly

16  restrictive settings.  This is consistent with what I have observed in the San Diego

17  County Jail system.  As discussed in Finding #4, such over-representation of this

18  population in Administrative Separation and isolation-type settings is dangerous and

19  deeply concerning.  The case of █████████ is illustrative of this systemic

20  deficiency in San Diego County Jail.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Case No. 3:20-cv-00406-AJB-DDL

Ex. N-1049



. This patient's behavior should have received a clinical response. Instead, it was met with custody-driven disciplinary action that was likely harmful and counterproductive given this patient's treatment needs.

426. On the matter of imposing discipline for people with mental health needs and/or intellectual disabilities, San Diego County Jail is far behind other jail and prison systems in California, including Alameda County Jail, Contra Costa County Jail, Orange County Jail, Sacramento County Jail, San Bernardino County Jail, Santa Barbara County Jail, Yuba County Jail, and the CDCR state prison system. The San Diego County Jail system should implement policies and procedures consistent with what is described above immediately.

## X. FINDING #10: SAN DIEGO COUNTY JAIL OPERATES A SYSTEM THAT DISCRIMINATES AGAINST PEOPLE WITH MENTAL HEALTH AND INTELLECTUAL DISABILITIES.

427. The San Diego County Jail operates a system that unfairly and harmfully discriminates against people with mental health and intellectual disabilities. I provide a few examples of this below.

428. As discussed in Finding #4, people with these disabilities are over-represented in Administrative Separation or other isolation settings, which raises very serious concerns that: (1) they are *not* being held in the least restrictive setting appropriate to their individual needs and circumstances; (2) they are held in more

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. N-1050**

restrictive setting *because of* their disability; and (3) they are being denied access to services, programs, and activities that similarly situated, non-disabled individuals receive – including classes, recreation, job opportunities, and more.

429.   As discussed in Finding #9, people with mental health and intellectual disabilities face unfair and discriminatory treatment in the disciplinary procedures at the Jail, in many resulting their being punished for behaviors that are a manifestation of their disability.  The disciplinary procedures and practices at the Jail also fail to provide necessary accommodations to people with mental health or intellectual disabilities, both during the disciplinary process and in the administration of punishments.

430.   Based on my review, including my Jail site visits and interviews with staff and incarcerated persons, I have found that people with mental health and intellectual disabilities are denied opportunities and meaningful access to a range of programs, services, and activities across the system.  People in Outpatient Stepdown units, for example, do not have access to program and work opportunities that they would if they did not have a mental health disability.  This restricted access is based on blanket rules (*e.g.*, restrictions in the OPSD units), not individualized assessments to ensure meaningful access to opportunities consistent with individual clinical and security needs.  I understand that the Jail system has recently begun to reform its disability accommodations system, and emphasize that any reforms must include people with mental health and intellectual disabilities.

**XI.    FINDING #11: THE JAIL'S SYSTEM FAILS TO PROVIDE ADEQUATE MENTAL HEALTH DISCHARGE PLANNING SERVICES, PUTTING PEOPLE AT RISK OF HARM AND REPEATED INCARCERATIONS.**

431.   In a functional jail mental health care system, there will be discharge planning staff and services sufficient to meet the needs of incarcerated people upon their release. Such discharge planning services must to ensure medication and treatment continuity, linkages to community-based service providers, and resources

1   to prevent people with mental health needs from a substantial risk of serious harm
2   upon release.

3       432.   As discussed in Finding #2.D, there are serious deficiencies in ensuring
4   adequate discharge planning for people with mental illness, specifically related to
5   ensuring adequate medication continuity.

6       433.   Deficiencies in the area of discharge planning go back years.  In 2017,
7   the NCCHC Technical Assistance Report found that NCCHC Discharge Planning
8   standards are "Not Met for Mental Health" at the San Diego County Jail.  The
9   NCCHC Report (at 23) stated that the "discharge planning process varies, depending
10  on the patient and the community services [that] are identified.  There is no formal
11  plan documented in the chart for prison inmates.  Mental health patients who need a
12  community referral are instructed to have the community pharmacy coordinate with
13  the jail so that the patient is provided with a 10-day prescription."  The NCCHC
14  Report recommended improvements to discharge planning, including that "Mental
15  health staff … should document their plans for discharge" (at 24).  The NCCHC
16  Report's finding (at 36) makes the deficiency plain: "Mental health does not provide
17  discharge planning and it was reported that there is insufficient discharge planning
18  for all inmates."

19      434.   As discussed earlier in this report, the County is well aware of this
20  deficiency, and it has not taken the necessary steps to fix the problem.  Ms. Quiroz,
21  the Jail mental health coordinator, acknowledged that the County needs more
22  staffing to meet the discharge planning needs for the mental health population at the
23  Jail.  She testified that the Jail has not done a "needs assessment to determine what
24  staffing resources are necessary people with these disabilities to meet discharge
25  planning needs of the [seriously mentally ill] population."  She stated that "we do
26  need more" mental health discharge planning staffing resources, but when asked
27  whether she was confident that the Jail's staffing plans will be sufficient to meet the
28  needs of the discharging mental health population, she responded that "it's

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

**Ex. N-1052**

1  challenging without the data to know," but "more is certainly better."  Quiroz PMK

2  Dep. at 171-72.

3      435.   This testimony, along with my review of policies, records, and other

4  relevant materials, make clear that the Jail has not allocated adequate resources or

5  attention to discharge planning for the Jail's incarcerated mental health population.

6  This failure means that patients being released from the Jail will reenter the

7  community without the services, medications, and other linkages they need, and thus

8  be put at substantial risk of serious harm.

9      436.   My review of patient records confirms that discharge planning remains

10  an area of serious deficiency.  While the mental health encounter forms do contain a

11  check box referencing "Discharge Planning/Resources" as an "intervention," and

12  have a few other discharge-related check boxes, the records I reviewed consistently

13  show that mental health staff are not providing or documenting substantial, or even

14  minimally adequate, discharge planning services.

15      437.   Take the case of ████████████████████████ patient

16  discussed earlier in this report. ████████████████████

17  ████████████████████████████████████

18  ████████████████████████████████████

19  ████████████████████████████████

20  ████████████████████████████

21  ████████████████████████████████████

22  ████████████████████████████████

23  ████████████████████████████████

24  ████████████████████████████████████

25  ████████████████████████████

26  ████████████████████████████████

27  ████████████████████████████████

28  ████████████████

[4541606.8]                                    Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. N-1053**

438. ) This case is one among the many I reviewed where adequate discharge planning was nowhere to be seen.

439.   As a mental health system, it is counterproductive, harmful, and dangerous to have insufficient discharge planning staff, services, and resources in place to meet the needs of the mental health population.  Other jail and prison systems have implemented far better discharge planning systems for their mental health population.  As one point of comparison, the California prison system has long provided people with a 30-day supply of medication and recently increased that to a 60-day supply of medication at release.  Other county jail systems provide coordinated discharge planning processes with steps to better ensure medication continuity and service linkages upon release.  San Diego County Jail must significantly improve this aspect of its mental health care system to meet basic patient needs.

//

//

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. N-1054**

## XII.  CONCLUSION

440.   In my more than 35 years evaluating and working in detention facilities, I have come across very few, if any, mental health care systems so lacking in effective systems and levels of care to meet the needs of the incarcerated mental health population and protect people from serious harm.  In light of the problems discussed above, concerted remedial action by the County is urgently needed.

441.   The information and opinions contained in this report are based on evidence, documentation, and/or observations available to me.  I reserve the right to modify or expand these opinions should additional information become available to me.  The information contained in this report and the accompanying exhibits are a fair and accurate representation of the subject of my anticipated testimony in this case.

Date: _AUGUST   19_ , 2024          Pablo Stewart, M.D.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. N-1055

# EXHIBIT O

# (Redacted)

1  GAY C. GRUNFELD – 121944          CHRISTOPHER M. YOUNG – 163319
   VAN SWEARINGEN – 259809           ISABELLA NEAL – 328323
2  MICHAEL FREEDMAN – 262850         OLIVER KIEFER – 332830
   ERIC MONEK ANDERSON – 320934      DLA PIPER LLP (US)
3  HANNAH M. CHARTOFF – 324529       4365 Executive Drive, Suite 1100
   BEN HOLSTON – 341439              San Diego, California  92121-2133
4  ROSEN BIEN                        Telephone:  (858) 677-1400
   GALVAN & GRUNFELD LLP             Facsimile:   (858) 677-1401
5  101 Mission Street, Sixth Floor   christopher.young@dlapiper.com
   San Francisco, California  94105-1738   isabella.neal@dlapiper.com
6  Telephone:  (415) 433-6830        oliver.kiefer@dlapiper.com
   Facsimile:   (415) 433-7104
7  ggrunfeld@rbgg.com
   vswearingen@rbgg.com
8  mfreedman@rbgg.com
   eanderson@rbgg.com
9  hchartoff@rbgg.com
   bholston@rbgg.com
10
   AARON J. FISCHER – 247391
11 LAW OFFICE OF
   AARON J. FISCHER
12 1400 Shattuck Square Suite 12 - #344
   Berkeley, California  94709
13 Telephone:  (510) 806-7366
   Facsimile:   (510) 694-6314
14 ajf@aaronfischerlaw.com

15 Attorneys for Plaintiffs and the
   Certified Class and Subclasses
16

17              UNITED STATES DISTRICT COURT

18            SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 19  DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, | Case No. 3:20-cv-00406-AJB-DDL |
| 20  JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, | **REBUTTAL EXPERT REPORT OF PABLO STEWART** |
| 21  CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPÚLVEDA, | |
| 22  MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all | Judge:      Hon. Anthony J. Battaglia |
| 23  others similarly situated, | Magistrate: Hon. David D. Leshner |
| 24        Plaintiffs, | Trial Date: None Set |
| 25  v. | |
| 26  SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY | |
| 27  PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, | |
| 28        Defendants. | |

[4571315.3]

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ..................................................................................... 1

II.     RESPONSE TO THE REPORT OF LENARD VARE ................................. 1

        A.    Mr. Vare's Opinion Suggesting that the Jail's Suicide Prevention
              Policies and Procedures Are Appropriate Is Incomplete and Ill-
              Informed. ................................................................................... 1

        B.    Mr. Vare's Opinion Dismissing Serious Concerns About
              Improper Custody Staff Interference with Mental Health Care
              Decisions Is Incomplete and Based on Irrelevant Analogies. ............... 5

        C.    Mr. Vare's Opinion that There are No Deficiencies with Respect
              to Safety Checks Ignores the Repeated Findings of Deficiencies
              by Multiple Independent Factfinders. ..................................... 10

        D.    Mr. Vare's Opinion Regarding the Outpatient Step-Down
              (OPSD) Program's Exclusion of Protective Custody Patients
              Misses the Point and Ignores County Leadership's Recognition
              of this Deficit. ........................................................................ 12

III.    RESPONSE TO THE REPORT OF JOSEPH PENN ............................... 14

        A.    Dr. Penn's Review Completely Ignores Jail Suicides and Mental
              Health-Related Deaths that Have Occurred in San Diego County
              Jail, which Is a Fundamental Flaw in His Methodology. ................. 15

        B.    Dr. Penn's Methodology, Findings, and Opinions Are Confusing
              and Unreliable Due to His Use of "Copy-and-Paste" Passages
              from His Reports from Other Cases and Correctional Mental
              Health Systems. ..................................................................... 17

        C.    Dr. Penn's Opinion that the Jails' Practices and Policies Ensure
              that Patients in Need of Mental Health Care Are Appropriately
              Identified and Tracked Is Not Supported By Facts. ......................... 20

        D.    Dr. Penn's Opinion that the San Diego County Jail System
              Maintains Adequate Mental Health Staff to Meet the
              Incarcerated Population's Needs Ignores Well-Established and
              Readily Acknowledged Facts that the System Does *Not* Have
              Sufficient Staffing Resources. ............................................... 25

        E.    Dr. Penn's Opinion that San Diego County Jail Custody Staff Do
              Not Interfere with Mental Health Care Staff's Clinical Decisions
              Is Not Supported by the Facts. ............................................... 30

        F.    Dr. Penn's Opinion that San Diego County Jail Has an Adequate
              Psychiatric Medication System to Meet Patient Needs Is Not
              Supported by the Facts, Including Those in His Own Report. ............ 34

G.   Dr. Penn's Opinion that San Diego County Jail Provides Patients with Timely Access to Mental Health Care and a "Robust Mental Health Delivery System" Ignores the Realities of this Extremely Inadequate System. ....................................................................... 42

    1.   There Are Serious Deficiencies with Respect to the Timeliness of Mental Health Care at the San Diego County Jail. ........................................................................... 42

    2.   There Are Serious Deficiencies with Respect to the Adequacy of Mental Health Care and Treatment Programming at the San Diego County Jail. ........................ 46

H.   Dr. Penn's Opinion that San Diego County Jail "Provides Opportunities for Confidential Mental Health Care Encounters in Adequate Physical Spaces" Is Contradicted by the Facts, Including Statements by the Sheriff Herself. ..................................... 51

I.   Dr. Penn's Opinion that San Diego County Jail Does Not House Patients at Risk of Suicide in Punitive Isolation and that "Strategies Are Employed to Avoid Unnecessary and Undue Risk of Decompensation and Harm" Is Not Supported by the Facts of the Jail's Operations. .................................................. 56

J.   Dr. Penn's Opinion that the San Diego County Jail System Has an Adequate Suicide Prevention System Is Inconsistent with the Facts, and His Analysis Omits Critical Information. ........................... 65

K.   Dr. Penn's Opinion that the Sheriff's Department Does Not Discriminate and Unfairly Punish People with Mental Illness Is Contradicted by the County's Own Staff and Its Own Experts. ........... 72

L.   Dr. Penn's Opinion that the "Sheriff's Department Provides IPs with Adequate Mental Health Discharge Planning and Resources" Is Not Supported by the Facts and Is Contradicted by the County's Own Jail Mental Health Coordinator. .............................. 73

IV.   CONCLUSION .................................................................... 75

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. O-1059**

# I.     INTRODUCTION

I, Pablo Stewart, declare:

1.     I was asked to review and analyze the opinions and conclusions expressed in the August 21, 2024, Expert Reports of Joseph Penn and Lenard Vare, and to opine whether those reports cause a change in my opinions or conclusions as set forth in my August 19, 2024 expert report in this matter (hereinafter "Stewart Report"), and to provide my opinions as to those reports.

2.     I have reviewed and analyzed the opinions in the expert reports noted above.  Neither the opinions nor conclusions outlined in those reports cause me to change any of the opinions or conclusions stated in my expert report dated August 19, 2024.

3.     The opinions expressed in this rebuttal report are based on information that has been made available to me.  Should new information become available to me in the future, I reserve the right to analyze that information and revise my opinions and/or conclusions.

# II.    RESPONSE TO THE REPORT OF LENARD VARE

4.     I reviewed Defendants' expert Lenard Vare's report, dated August 21, 2024.  As set forth below, I strongly disagree with many of the opinions Mr. Vare offers in his report (hereinafter "Vare Report").

### A.     Mr. Vare's Opinion Suggesting that the Jail's Suicide Prevention Policies and Procedures Are Appropriate Is Incomplete and Ill-Informed.

5.     Mr. Vare writes that the "suicide prevention policies as well as policies related to managing suicidal individuals at San Diego County jails are appropriate in identifying and addressing the concerns related to incarcerated persons."  Vare Report at 19-40 (Opinion 1). I strongly disagree with this opinion, and note a few important ways that Mr. Vare's analysis is incomplete and ill-informed.

6.     Mr. Vare's opinion does not mention, and appears not to be informed by, critically important sources of data—including the findings and

**Ex. O-1060**

1  recommendations of suicide prevention expert Lindsay Hayes and the findings and

2  recommendations of the clinical and investigative team that issued Disability Rights

3  California's report, *Suicides in San Diego County Jail: A System Failing People*

4  *with Mental Illness*, among other detailed reports on suicide prevention-related

5  deficiencies as I set forth in my report.  Stewart Report ¶¶ 284-350.

6      7.    Nor is Mr. Vare's assessment based on analysis of any of the

7  approximately 40-plus suicides that have occurred among incarcerated people at San

8  Diego County Jail in recent years.  In determining the adequacy of a jail system's

9  suicide prevention policies and practices, it is essential to look at individual critical

10  incidents – including completed suicides and serious suicide attempts – and to

11  explore whether and to what extent systemic deficiencies are in evidence.  I engaged

12  in such an assessment in my August 2024 report; Mr. Vare has not done so.

13      8.    I was surprised and troubled to see the statistical data that Mr. Vare

14  relies upon to support his opinion that the San Diego County Jail's suicide

15  prevention policies and practices are "appropriate."  Specifically, he includes this

16  chart (Vare Report at 27):

| Year | Total Self-Harm Incidents including Attempted Suicides | Attempted Suicides Only |
|------|------|------|
| 2021 | 299 | 56 |
| 2022 | 272 | 41 |
| 2023 | 286 | 22 |

23      9.    The County has stated to DRC that it began utilizing new definitions

24  for "Suicide Attempt" and "Non-Suicidal Self Injury" in 2017.  Under these

25  definitions, the County determined that just 10 of the 73 incidents reported as

26  "Suicide Attempts" were in fact suicide attempts under the new definition.  DRC

27  Report at 5.

28      10.   Mr. Vare writes that, during the 2021-2023 time period, there were five

**Ex. O-1061**

(5) completed suicides in San Diego County Jails.  He then contrasts that number with the "857 individuals" reflected in the above chart's "Total Self-Harm Incidents including Attempted Suicides" column who "were prevented from further harming themselves or completing their suicidal intent over the three-year period."  Vare Report at 27.  This statement is nonsensical and a misrepresentation of this data.

11.    To begin with, Mr. Vare's statement is factually incorrect.  There are individuals almost certainly reflected on this chart who in fact *did* further harm themselves and even committed suicide during this three-year period.  Take, for example, ███████████, whose May 2021 suicide I describe in detail in my report. Stewart Report ¶¶ 275-281.  ███████████████████████████
████████████████████████████████████████
████████████████████████████████████████.
Mr. Marroquin was then placed in a clinically inappropriate and dangerous solitary confinement cell, where he died by suicide.  His self-harm/suicide attempt incidents in 2021 are (or should be) reflected on Mr. Vare's chart.  Mr. Vare's claiming that those incidents are evidence of an adequate jail suicide prevention system is deeply wrong-headed.  Mr. Marroquin's death was a terrible failure with respect to both mental health treatment and suicide prevention.  His earlier suicide attempts and self-harm incidents do not demonstrate success; they underscore the system's deficiencies.

12.    Mr. McDowell's egregious case is another example of a suicide attempt in 2023 and was followed by his placement in solitary confinement without necessary psychiatric treatment for several weeks leading up to his suicide, is another example.  Stewart Report ¶¶ 258-265.  Mr. Vare's statement would have one consider Mr. McDowell's suicide attempt to be evidence of systemic success (notwithstanding that the Jail then put Mr. McDowell in even greater danger and denied him care, leading to his completed suicide).  It is in fact the opposite – evidence of a system that places people with serious mental illness at grave and

1   unacceptable risk.

2       13.    The goal of an adequate suicide prevention system is not merely to

3   prevent people who engage in self-harm or attempt suicide from dying.  The goal

4   must also be to proactively identify and treat serious mental illness and suicide risk,

5   to reduce suicidality, and to *prevent* self-harm and suicide attempt incidents.  In this

6   three-year span, in addition to the completed in-jail suicides, the chart shows that at

7   least 119 people attempted suicide, and at least 857 people engaged in self-harm,

8   including the suicide attempts.  **This finding of such a large number of**

9   **incarcerated people engaging in self-harming behavior in this Jail is very**

10  **significant, and serves only to increase my concern.**  These data highlight the

11  desperate need for improved psychiatric care and mental health treatment as well as

12  more clinically appropriate settings for people who are now clearly at great risk in

13  the San Diego County Jail.

14      14.    The numbers of attempted suicides in 2021, 2022, 2023, as reflected in

15  Mr. Vare's chart, are substantial, and appear to be significantly higher as compared

16  to a few years earlier – in 2017, another year for which the County has provided

17  suicide attempt data.  In Disability Rights California's 2018 report on suicides in

18  San Diego County Jail, the County reported that there were ten (10) incidents

19  meeting the Jail's definition of "Suicide Attempt" between January 2017 and mid-

20  September 2017 (8½ months), or about one per month.  DRC Report at 5.

21  Mr. Vare's data show that by 2021, there were 56 attempted suicides over a 12-

22  month period (almost 5 suicide attempts per month), a huge increase that continued

23  at least through 2022 (41 attempted suicides over a 12-month period, or 3½ suicide

24  attempts per month).

25      15.    Mr. Vare's discussion of the plaintiffs in this case offers no evidence

26  that the Jail's suicide prevention policies and practices are appropriate.  In fact,

27  Mr. Vare's own descriptions of the plaintiffs' experiences raise serious concern.  For

28  example, the case of Plaintiff Olivares is extremely alarming with respect to suicide

1   prevention protocols, as Mr. Vare recounts:

2   > Olivares decided to stop eating and go on a hunger strike in January
3   > 2022.  He was seen by a mental health professional and the mental
    > health staff determined that Olivares should be placed in the Inmate
    > Safety Program.  He was interviewed in a medical clinic room, and he
4   > informed mental health staff that he was not going to change his mind
    > about his decision.  He even reported that he had told his family and
5   > friends and made peace with them.  He was then placed in an EOH cell.
    > . . . Olivares was again placed into EOH in February 2022 after he
6   > informed staff that he was on his second hunger strike.

7   Vare Report at 35-36.

8   16.     The County's response to this patient's decision to go on a hunger

9   strike makes no sense.  In Enhanced Observation Housing (EOH), all patients are

10  denied clothing, placed in a safety smock, and denied various personal belongings

11  and activities (*e.g.*, family visits).  None of these deprivations address Mr. Olivares'

12  clinical needs related to an intended hunger strike.  (Removal of clothing and

13  placement in a safety smock is clinically indicated when a person demonstrates a

14  risk of hanging themselves of strangling themselves with their clothing.  A safety

15  smock is not indicated for a potential hunger strike.)  In my experience, placing

16  someone with serious mental health needs in a highly restrictive setting with such

17  deprivations in this kind of situation is clinically countertherapeutic and can feel

18  punitive.  It does not serve to treat or meaningfully address a patient's suicidality or

19  mental health needs.

20  17.     Nothing in Mr. Vare's discussion of suicide prevention policies and

21  practices directly addresses, or changes, the detailed findings of systemic

22  deficiencies in my August 2024 report.

23  **B.     Mr. Vare's Opinion Dismissing Serious Concerns About Improper
        Custody Staff Interference with Mental Health Care Decisions Is
24      Incomplete and Based on Irrelevant Analogies.**

25  18.     Mr. Vare writes that Plaintiffs' allegations that "custody staff

26  improperly controls clinical mental health care decisions" are "completely without

27  merit."  Vare Report at 40-43 (Opinion 2).  Mr. Vare's opinion is remarkably

28  incomplete and relies on irrelevant analogies regarding other government systems.

19.     Mr. Vare first dismisses the real and consequential structural deficiency in the Jail's organizational structure, whereby San Diego County Jail health care staff and leadership report directly to a Jail Captain and the Sheriff's Command team.  I describe in my report how San Diego County Jail's organizational structure is inconsistent with modern correctional psychiatric practices and is extremely problematic, especially when contrasted with the organizational structures that exist in other medium and large county jail systems in California where jail medical and mental health care staff are overseen by the county's respective health services agencies – including in the Counties of Los Angeles, Orange, Riverside, Sacramento, San Francisco, and Santa Clara.  *See* Stewart Report ¶¶ 370-388. Mr. Vare's dismissal of this concern is confusing and off-topic, as he states:

> In city governments, the elected mayor supervises the chief of police even though the mayor is not a peace officer.  In state governments, the governor is the commander of the state national guard even though the governor is not a member of the armed forces.  The governor's cabinet in California includes directors of Health and Human Services, and the mental health facilities operated by the Department of State Hospitals. Governor Gavin Newsom is neither a physician nor a psychiatrist, yet he is elected by the people of the state to provide leadership to numerous public agencies including those that provide medical and mental health services.

Vare Report at 40-41.

20.     These supposed analogies offer no insight on this important issue. Mr. Vare then offers his background as a former state prison warden, noting that the medical and mental health directors in the state prison system would "send me requests for vacation," among other things.  This analogy is also not relevant to a local jail system like San Diego County's, *where there are numerous examples of custody staff and leadership making policy and practice decisions that should be in the purview of mental health professionals and clinical leadership* – including as to improper custodial blanket ban policies preventing access to the Outpatient Step Down Program (OPSD) for patients when clinically indicated (Stewart Report Finding 3.D.) and improper custody-driven placements in solitary confinement

1  without consideration of mental health input (Stewart Report Finding 4.B).

2       21.    Mr. Vare then states that "there is no evidence that medical or mental

3  health personnel are not making medical and mental health decisions

4  independently." Vare Report at 42. But the County's own witnesses demonstrate

5  that it *is* the case that custody staff, by policy and practice, are making what should

6  be clinical determinations without clinicians' involvement.

7       22.    For example, take San Diego County Jail's policies and procedures

8  regarding placement of patients in a restraint chair inside a safety cell. The

9  placement and removal of a patient with mental illness in a restraint chair *should* be

10  based on clinical, not custody, determinations. But it was made very clear to me

11  that such decisions in this Jail system are exclusively "custody decisions." *See*

12  Stewart Report ¶¶ 405-408. The Jail's own mental health coordinator (Ms. Quiroz)

13  testified that she thinks it is important that mental health professionals be involved

14  in these uses of a restraint chair, and *that they are not:*

> Ms. Quiroz: I mean, we've witnessed people in a restraint chair. We're not necessarily the ones determining when they're getting out of that chair. You know, we're not -- they're not calling us for that reason, to say, should this person be removed.
>
> …
>
> [I]t's not common that we see somebody -- that we are going to assess somebody in a [restraint] chair. It is not common.
>
> Q: … [D]o you think it's important for clinicians to be involved when a restraint like a restraint chair is used on somebody who may be manifesting mental illness?
>
> A: Although I think it's important for a clinician, I think a psychiatrist should be -- I mean, if somebody's in a restraint chair I think we should probably get an M.D. level involved.
>
> …
>
> Q: You're not aware of any policy right now for an M.D. level staff member to get involved in a certain way when someone is placed in a restraint chair by custody?
>
> A: No.

Quiroz PMK Dep. at 72-74.

23.     As a second example, take the San Diego County Jail's failure to follow U.S. DOJ guidance making clear that a person with serious mental illness "should not be placed in restrictive housing [like the San Diego County Jail's Administrative Separation units], unless:

- The inmate presents such an immediate and serious danger that there is no reasonable alternative; or

- A qualified mental health practitioner determines:

- That such placement is not contraindicated;

- That the inmate is not a suicide risk;

- That the inmate does not have active psychotic symptoms; and

- In disciplinary circumstances, that lack of responsibility for the misconduct due to mental illness or mitigating factors related to the mental illness do not contraindicate disciplinary segregation."

Stewart Report ¶¶ 184-186 (quoting and discussing U.S. DOJ guidance); *see also* NCCHC Standards for Mental Health Services in Correctional Facilities' Standard MH-E-07 (Segregated Inmates) (For a patient being placed in segregation, it is necessary that "mental health staff reviews the inmate's mental health record to determine ***whether existing mental health needs contraindicate the placement*** [in segregation] or require accommodation" (emphasis added)).

24.     Based on my on-site observations, patient interviews, and review of individual records, it is beyond question that the dangerous practice of placing – and retaining – people in solitary confinement-type Administrative Separation units without consideration of whether their current mental health condition and needs contraindicate the placement, is pervasive in the San Diego County Jail system. Stewart Report ¶¶ 207-226. Jail leadership and staff testimony confirm that this is true. *See* Quiroz PMK Depo. at 250-51 (noting there is no mental health clinical assessment done for a person being placed in Administrative Separation, with clinical issues something that can be discussed late at staff meetings that occur every two weeks); Ross Dep. at 43 ("Q: … Have there been examples in your experience

where you made a recommendation that somebody be removed from AdSep based on their mental health where classification says, no, they need to remain in AdSep and they so remain?  A: Yes.  Q: Do you have any examples that come to mind?  A: Yeah.").

25.     A third example, also unaddressed by Mr. Vare in his report, is the blanket *custodial* restrictions on clothing, bedding, property, and privileges for patients on suicide precautions.  By policy and in practice, there is no clinical judgment or input that goes into making these decisions in the San Diego County Jail – a considerable deviation from modern correctional standards.  Stewart Report ¶¶ 312-316; *see also* Quiroz PMK Dep. at 156 ("That all happens outside of the clinical world. … [T]hat's in the very custody world.").

26.     On this topic, Mr. Vare in fact misrepresents the testimony of Jail mental health director Melissa Quiroz.  Mr. Vare writes that Ms. Quiroz testified that "[c]linicians also determine that the individuals must be placed in safety smocks" (p. 42).  This is *not* accurate.  *See* Quiroz PMK Depo. at 145 ("Q: You're confident that the practice is that ***there's no clinical judgment exercised as to whether a person is placed in a safety smock*** once they go into a safety cell or an EOH?  **A: Yeah**.")  (emphasis added).

27.     A draft policy that would help to remedy this serious deficiency was considered by Jail leadership more than two years ago, but the County has declined to implement it.  Stewart Report ¶ 314 (quoting draft policy and citing Ms. Quiroz's testimony that the policy "is not in place at this time").

28.     In my patient chart reviews and individual interviews, I found repeated instances where custody staff, by policy and in practice, improperly interfere with important clinical determinations regarding treatment, placement, and conditions for incarcerated people with serious mental illness in the San Diego County Jail.  *See, e.g.*, the alarming case of Patient ██████████, an illustrative but by no means outlier case.  Stewart Report ¶¶ 229-238.  Such instances put patients at substantial

1  risk of serious harm, including needless suffering and even death.

2      29.    I strongly disagree with Mr. Vare's opinion that there is no improper

3  custody staff interference with mental health clinical decisions in the San Diego

4  County Jail system.  His opinion is not rooted in fact, and it is at odds with Jail

5  leadership's own testimony and policies.  Nothing in Mr. Vare's report changes my

6  detailed findings and opinions on the Jail's systemic deficiencies in this area.

7      **C.    Mr. Vare's Opinion that There are No Deficiencies with Respect to
           Safety Checks Ignores the Repeated Findings of Deficiencies by
8          Multiple Independent Factfinders.**

9      30.    Mr. Vare writes that "safety checks are done appropriately" in the San

10  Diego County Jail system, and that "there is an adequate process for the safety

11  checks to be audited and lapses in checks are addressed appropriately."  Vare Report

12  at 89-94 (Opinion 8).  I strongly disagree.  Mr. Vare appears to ignore entirely the

13  repeated findings that inadequate safety checks are a major deficiency in this Jail's

14  system, by nationally recognized Suicide Prevention expert Lindsay Hayes, the

15  California State Auditor, Disability Rights California, and the San Diego County

16  Citizens' Law Enforcement Review Board (CLERB).  *See* Stewart Decl. ¶¶ 320-

17  335.

18      31.    It was puzzling to see that Mr. Vare found that the County's auditing

19  system for safety checks was "thorough and transparent" (Vare Report at 90) based

20  on review of "an Excel spreadsheet provided to me which showed several

21  supervisory audits that were conducted *during 2021*" (emphasis added).  It was in

22  2022 that the California State Auditor found terrible deficiencies both in the

23  observed safety check practices themselves ("Based on our review of video

24  surveillance footage, we observed multiple instances of sworn staff who spent no

25  more than one second glancing into an individual's cell, sometimes without

26  breaking stride as they walked through the housing module . . . .") and in the

27  adequacy of auditing those checks ("The assistant sheriff of detentions indicated that

28  the department has an *informal process* for assessing the quality of safety checks,

REBUTTAL EXPERT REPORT OF PABLO STEWART
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. 9

1  which can include watching video footage. However, the Sheriff's Department has

2  not documented this assessment process in its policy, and *establishing an informal*

3  *practice does not ensure that each facility's management team will consistently*

4  *verify the quality of safety checks*.") (emphases added). 2022 California State

5  Auditor Report at 25-26.

6      32.    Mr. Vare says nothing of the many in-custody deaths that have

7  occurred where subsequent findings revealed inadequate safety checks that very

8  likely contributed to the deaths (including Mr. Horsey (2017), Mr. Wilson (2020),

9  and Mr. Settles (2022)). *See* Stewart Report ¶¶ 329-332. In my experience working

10 in and monitoring jail and prison systems, a *single* in-custody death involving

11 deficient safety check procedures would lead to concerted corrective action to

12 ensure that such deficiencies do not recur. The San Diego County Jail system has

13 had *multiple* in-custody deaths with deficient safety check findings, along with

14 numerous outside experts and investigating bodies issuing strong recommendations

15 to address the issue. Yet the deficiencies persist. Mr. Vare's stamp of approval in

16 this area, without any reference to these facts, is disturbing and wrong.

17     33.    Mr. Vare also provides no opinion regarding another key deficit in the

18 San Diego County Jail's safety check policies and procedures – that is, the need to

19 align with the modern practice of 30-minute (rather than hourly) checks in

20 Administrate Separation-type housing units. *See* Stewart Decl. ¶ 322 (citing the

21 American Correctional Association's standard on this point), ¶ 327 (Suicide

22 Prevention expert consultant Lindsay Hayes "strongly recommended" that San

23 Diego County Jail implement 30-minute checks), ¶ 333 (citing other California jail

24 systems that have implement 30-minute checks in solitary confinement-type

25 housing), ¶ 279 (Marroquin suicide by water intoxication, body found after 54

26 minutes between Administrative Separation safety checks), ¶ 332 (███████████

27 ████████████████████████████████████████████████).

28     34.    My opinion remains that the Jail staff and system currently conduct

1   inadequate safety checks, and that the County continues (in policy and procedure) to

2   fail to conduct the appropriate 30-minute safety checks in Administrative

3   Separation, all of which place people at substantial risk of serious harm, including

4   death.

5       35.     Nothing in Mr. Vare's discussion of safety check policies and practices

6   directly addresses, or changes, my detailed findings of deficiencies on this topic.

7       **D.     Mr. Vare's Opinion Regarding the Outpatient Step-Down (OPSD)
            Program's Exclusion of Protective Custody Patients Misses the

8           Point and Ignores County Leadership's Recognition of this Deficit.**

9       36.     Mr. Vare writes that "Plaintiffs' allegation that the Sheriff's Office

10  excludes people designated as protective custody from housing in the Out-Patient

11  Step Down ('OPSD') unit lacks merit because it does not consider the complexity of

12  classification related issues in managing the safety and security of individuals in

13  protective custody."  Vare Report at 105-110 (Opinion 10).  Mr. Vare has missed

14  the point here entirely, and even ignores the County's own person-most-

15  knowledgeable (its Jail mental health coordinator) on this subject.

16      37.     It is a basic principle with respect to mental health standards of care,

17  including in the jail setting, that a person should be provided mental health care

18  placement and treatment consistent with their individual *clinical* needs.  In a

19  functioning jail mental health care system, a patient with serious mental illness is

20  not provided safety *or* adequate mental health care.  They are provided safety *and*

21  adequate mental health care.

22      38.     San Diego County Jail fails in this regard.  Through its blanket ban

23  policy, the Jail excludes people designated as Protective Custody from OPSD

24  placement, the *only* mental health program available across the Jail population

25  outside of the inpatient Psychiatric Services Unit, which is reserved for people who

26  are acutely psychotic and meet Section 5150 involuntary hospitalization criteria.

27      39.     It is a common practice for a jail system to override classification

28  designations like "General Population" or "Protective Custody" when a person

1  requires a mental health treatment bed.  (San Diego County itself appears to do this

2  once a person is so acutely ill that they require inpatient PSU level of care.)  In other

3  jail systems, custody staff continue to conduct appropriate housing assessments to

4  ensure against an unsafe placement, and they do so based on individualized security

5  assessments, not simply based on a patient's existing classification designation.  San

6  Diego County Jail does *not* follow this practice, which has the effect of preventing

7  Protective Custody-designated patients from accessing OPSD care.  This policy-

8  driven denial of care is dangerous and concerning.

9       40.    But even in a jail system where a re-classification to "mental health"

10  does not occur for patients with serious mental illness, enhanced mental health

11  outpatient placements can and must be provided to all patients who need them, both

12  among the General Population and the Protective Custody population.  This is

13  accomplished rather simply.  In San Diego County Jail, there would be enhanced

14  mental health units designated as OPSD-General Population, and separate enhanced

15  mental health units designated as OPSD-Protective Custody.  *There is, in short, no*

16  *excuse for a system that denies enhanced mental health program placement to all*

17  *Protective Custody patients.*

18       41.    Mr. Vare is also wrong to emphasize only the risk of placing a

19  Protective Custody patient in a mental health unit with General Population patients.

20  It is also unacceptably dangerous to *exclude* Protective Custody patients with

21  serious mental illness from the appropriate mental health placement, both because

22  they are denied clinically necessary treatment and also because they may be

23  vulnerable to harm and victimization being housed with people who do not have

24  mental illness.  The risks can be deadly, as I recount in my report regarding the

25  brutal death of **Derek Baker**, a man with serious mental illness who was found

26  clinically appropriate for OPSD housing in San Diego County Jail but excluded

27  because he was "Protective Custody."  He was then violently murdered by another

28  Protective Custody individual who did not have serious mental illness.  Stewart

1    Report ¶¶ 169-170.

2    　　42.    It is quite disturbing that Mr. Vare has no concern about this systemic

3    deficiency, even as the Jail system's own mental health coordinator has stated that

4    the creation of an OPSD-Protective Custody unit would be "useful" and "good."

5    Quiroz PMK Dep. at 64-65 (Quiroz: … "there is not an identified outpatient step-

6    down PC mod per se.  There is not that."  Q: "Do you think that that sort of module

7    would be useful to have?"  A: "It would be useful."  Q: "And the objective of it

8    would be to ensure that people who both need outpatient step-down and are

9    designated as protective custody can get that level of service?"  A: "That would be

10   good.").  This remains a systemic deficiency that is harming people with serious

11   mental illness, and it must be addressed.

12   **III.    RESPONSE TO THE REPORT OF JOSEPH PENN**

13   　　43.    I have reviewed the Defendants' expert Joseph Penn's report, undated

14   and unsigned, but produced on August 21, 2024 (hereinafter "Penn Report").

15   　　44.    In Dr. Penn's report, he states that a "random selection methodology"

16   was used to conduct a review of psychiatric and mental health records.  Penn Report

17   at 9.  He does not explain what this methodology was, and so I am not clear as to

18   how these patient records were selected.  He writes that he enlisted three practicing

19   correctional forensic psychiatrist consultants (Natasha Cervantes, M.D., Joseph

20   Baskin, M.D., and Ariana Nesbit Huselid, M.D.) to review these records.  *Id.*

21   Dr. Penn states that he reviewed their case summaries and incorporated their

22   evaluations into his analysis and opinions.  *See* Penn Report Appendix D (at 156-

23   205).

24   　　45.    These three designated reviewers provided summaries for more than 80

25   past or current San Diego County Jail patients.  Almost *none* of them were patients

26   whose records were provided to me for my previous report.  I am informed that the

27   records previously provided to me were chosen by San Diego County as being

28   representative of particular categories that I developed consistent with my

methodology in this case.  *See* Stewart Report ¶ 16.

46.     To complete my rebuttal report, it was important that I have the opportunity to conduct my own assessment of the case records that were reviewed by Dr. Penn's three designated reviewers.  The County did not produce, and I therefore did not receive, these records until approximately September 21, 2024, one month after the initial expert reports were produced in this case.

47.     These records are voluminous, and required extensive time and effort to review.  As with my previous report, I utilized the assistance of a psychiatrist colleague who has experience in jail mental health care, to review patient records.  The reviews conducted by this colleague were done under my supervision, as is my frequent practice when conducting large detention mental health care system assessments.  My analysis is ultimately done independently and all findings contained in this report are my own.

48.     I cannot discern how Dr. Penn incorporated the findings of his three designated reviewers (Appendix D) into his report.  He does not reference a single patient record review in his own report narrative.

49.     More importantly, as discussed throughout this report, I observed that many findings by Dr. Penn's three designated reviewers are in direct contradiction with Dr. Penn's opinions and conclusions.

50.     As set forth below, I disagree with the opinions that Dr. Penn has offered in his report.  Nothing in his report changes any of my findings or conclusions.  In many respects, his report only raises my concerns about the systemic failures and inadequacies of the San Diego County Jail's mental health care system.

A.     **Dr. Penn's Review Completely Ignores Jail Suicides and Mental Health-Related Deaths that Have Occurred in San Diego County Jail, which Is a Fundamental Flaw in His Methodology.**

51.     In my decades of experience evaluating correctional mental health care systems, a core component of my work is to look closely at sentinel events (*i.e.*,

incidents that result in death or severe harm to a patient) – most specifically, suicides and other mental health-related deaths. Such a review is foundational and essential to doing a proper assessment as to the adequacy of a correctional mental health care system.

52.    I was thus shocked to see that, as confirmed in Dr. Penn's Report Appendix C ("Materials Reviewed"), Dr. Penn did not review records from any suicides or other mental health-related deaths. Nor did his designated reviewers provide any mention or analysis of any of such deaths. This is a glaring omission in Dr. Penn's methodology as a mental health professional claiming to assess the functioning of a mental health system. This is especially relevant in this case, where San Diego County Jail has had scores of suicides and other mental health-related deaths in recent years. It is critical to examine those cases, to identify any individual deficiencies or recurring problems that indicate a need for systemic remedial action. Remarkably, Dr. Penn's assessment does not include a specific analysis of any completed suicide and other mental health-related death. The failure to do so falls below what I understand to be accepted practice for the evaluation of a jail's mental health care and suicide prevention system.

53.    Dr. Penn includes only a chart listing ten in-custody suicides at the Jail, dating from March 2019 to July 2023. Penn Report at 49-50. I reviewed the records and reports of several of those deaths, providing detailed analyses in my previous report. Dr. Penn did not provide analysis on a single one.

54.    I similarly found it puzzling and troubling that Dr. Penn gave a passing grade to the County and its health care contractor NaphCare on their suicide death review processes. Penn Report at 50 ("In the rare event of a suicide, SDSO conducts psychological autopsies, administrative suicide reviews, and morbidity and mortality reviews to assess contributing factors and enhance prevention practices. I confirmed that both the county and the contracted health NaphCare conduct independent suicide and medical, natural deaths, or substance use related death

reviews, morbidity and mortality reviews, and these are conducted in a timely

manner.").  Dr. Penn's "Materials Reviewed" list (Appendix C) does not appear to

contain a single psychological autopsy, administrative suicide review, or morbidity

and mortality review.  He does not discuss the details of any suicide death review in

his report.  I cannot tell how Dr. Penn reached his conclusion as to appropriate

timeliness, much less quality, of these death reviews.

55.    In contrast, my analysis included extensive records from many San

Diego County Jail suicides and mental health-related deaths.  I provide specific

examples of deficiencies in the post-death review processes.  *See, e.g.*, Stewart

Report ¶ 265 (McDowell suicide); *id.* ¶¶ 341-342 (NaphCare PMK witness

testimony that psychological autopsies are not always completed, with portions

often left completely blank); *id.* ¶ 348 (San Diego County Jail mental health care

leadership concedes that they do *not* consider CLERB in-custody death reviews or

findings at all).

56.    Reviewing sentinel events – such as deaths in custody – is not only

standard practice but also a vital step in evaluating a system's effectiveness in

ensuring the safety and welfare of both incarcerated people and staff.  This is why

my assessment includes a detailed review of these events – to gain insight into the

system's strengths and weaknesses.  In contrast, Dr. Penn listed a few such incidents

in a chart but does not address any of them further.  His omission raises serious

concerns about the depth of his analysis and the accuracy of his conclusions.

**B.    Dr. Penn's Methodology, Findings, and Opinions Are Confusing and Unreliable Due to His Use of "Copy-and-Paste" Passages from His Reports from Other Cases and Correctional Mental Health Systems.**

57.    As should be clear by the discussion below, my findings and opinions

are starkly different from those of Dr. Penn.  I emphasize that my findings and

opinions are based on a specific analysis of *this* San Diego County Jail system.

Upon close review, however, it is apparent that Dr. Penn's findings and opinions

1   may not be.  I am familiar with Dr. Penn's expert work from other litigations,

2   including in the statewide Arizona prisons class litigation (*Jensen v. Shinn*), where I

3   have served as plaintiffs' class expert and Dr. Penn served as defendants' expert.

4   My experience in that case provides me some insight regarding Dr. Penn's San

5   Diego County Jail report, which copy-and-pastes significant findings and opinions

6   from his Arizona report in ways that are inapplicable at best and, more often,

7   factually inaccurate.

8       58.     For example, I was confused to read this finding on involuntary

9   antipsychotic medications and clinical restraints from Dr. Penn's report:

10      During numerous interviews with nursing and mental health care staff
        across the state, and also as spelled out in NaphCare SDSO policy, I
11      learned that if and when there is a clinical question involving the
        clinical necessity, consideration of the clinical necessity and/or
12      appropriateness of forced antipsychotic medications, or the need to
        begin to pursue this process with due process protections for IP patients
13      who may be subjected to involuntary administration of psychotropic
        mediations (when clinically indicated as a means of treating psychiatric
14      illness or urgently reducing harm, dangerousness, or severe violence
        towards self or others), that the NaphCare treating psychiatrists who
15      have offices near the Psychiatric Stabilization Unit (PSU) are readily
        available to discuss by phone, or alternatively, an on call psychiatrist or
16      psychiatric provider is available 24 hours per day, 365 days per year,
        even afterhours and on weekends. **I understand this same process to**
17      **be in place for orders of emergency clinical seclusion or restraint.**

18  Penn Report at 41 (emphasis added).

19      59.     I was confused by Dr. Penn's factual finding that clinical restraints use

20  at the Jail entail significant involvement of clinical and psychiatric staff.  As I

21  learned during my tours and as was confirmed by Ms. Quiroz, this is not the case at

22  San Diego County Jail.  Quiroz PMK Dep. at 72-74 ("Ms. Quiroz:  I mean, we've

23  witnessed people in a restraint chair.  We're not necessarily the ones determining

24  when they're getting out of that chair.  You know, we're not -- they're not calling us

25  for that reason, to say, should this person be removed.  [I]t's not common that we

26  see somebody -- that we are going to assess somebody in a [restraint] chair.  It is not

27  common.  Q: … [D]o you think it's important for clinicians to be involved when a

28  restraint like a restraint chair is used on somebody who may be manifesting mental

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. O-1077**

1  illness?  A: Although I think it's important for a clinician, I think a psychiatrist

2  should be -- I mean, if somebody's in a restraint chair I think we should probably

3  get an M.D. level involved. … Q: You're not aware of any policy right now for an

4  M.D. level staff member to get involved in a certain way when someone is placed in

5  a restraint chair by custody?  A: No.").

6    60.    I notice that Dr. Penn's first sentence states that he based his opinions

7  on "numerous interviews with nursing and mental health care staff **across the**

8  **state**."  Penn Report at 41.  This "across the state" reference makes no sense in the

9  context of an expert assessment of San Diego *County* Jail.  I then looked back at

10  Dr. Penn's testimony in the Arizona statewide prisons case, and found that Dr. Penn

11  had made this exact factual finding, with the same wording (changing only the name

12  of the detention system and mental health system provider):

13    220. During numerous interviews with nursing and mental health care
   staff **across the state**, and also as spelled out in Centurion and Arizona
14    DOC policy, I learned that if and when there is a clinical question
   involving the clinical necessity, consideration of the clinical necessity
15    and/or appropriateness of PMRB, or the need to begin to pursue this
   process with due process protections for inmate patients who may be
16    subjected to involuntary administration of psychotropic mediations
   (when clinically indicated as a means of treating psychiatric illness or
17    urgently reducing harm, dangerousness, or severe violence towards self
   or others), that Dr. Carr (or his designee) are readily available to
18    discuss by phone, or alternatively, an on call psychiatrist is available 24
   hours per day, 365 days per year, even afterhours and on weekends.  **I**
19    **understand this same process to be in place for orders of seclusion**
   **or restraint.**

20

21  Joseph Penn Expert Report, *Jensen v. Shinn*, No. 2:12-cv-00601-ROS (D. Ariz.),

22  Dkt. 4172 at 76 (¶ 220) (emphasis added).  (Note that both passages also misspell

23  "medications" as "mediations.")  Dr. Penn's asserted finding in the context of the

24  San Diego County Jail system is inconsistent with the facts and evidence.

25    61.    This is not the only example of what appears to be Dr. Penn's "copy-

26  and-paste" from another report regarding a separate and very different correctional

27  mental health care system.  In Dr. Penn's report in this case, he states:

28    The following are examples of specific mental health policies,

procedures, and practices that I have observed and confirmed during my tours, interviews with staff, and review of existing policies, and additional verification with mental health leadership:

- mental healthcare
- mental healthcare staffing
- medical record organization
- medication system
- monitoring of prisoners taking psychotropic medication
- monitoring of psychotropic medication therapeutic levels and side effects
- access to medical and mental healthcare
- mental health programming
- inpatient care
- treatment plan
- **heat precaution**
- suicide prevention
- confinement of prisoners with mental illness
- **use of chemical agents with prisoners with mental illness**
- use of telepsychiatry
- monitoring and oversight
- overall access to mental health services

Penn Report at 51 (emphasis added).

62.     This list is *identical* to the list of areas he claimed to have reviewed in the Arizona state prisons litigation.  Joseph Penn Expert Report, *Jensen v. Shinn*, No. 2:12-cv-00601-ROS (D. Ariz.), Dkt. 4172 at 34-35 (¶ 103).  But this list makes little sense in the context of San Diego County Jail's system, where to my knowledge, there are no policies or procedures regarding topics like "heat precaution" or "use of chemical agents with prisoners with mental illness." Dr. Penn's "copy-and-paste" practice of presenting an expert's methodology and conclusions, across substantially different cases and correctional mental health systems, makes it difficult for one to know what in this report actually relates to San Diego County Jail and what has been mechanically copied from other cases.

63.     Nevertheless, I am able to critically assess Dr. Penn's opinions and conclusions, and present my strong disagreement with them, as set forth below.

**C.     Dr. Penn's Opinion that the Jails' Practices and Policies Ensure that Patients in Need of Mental Health Care Are Appropriately Identified and Tracked Is Not Supported By Facts.**

64.     Dr. Penn opines that any claim that the "Sheriff's department fails to

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. O-1079**

identify and track IPs in need of mental health care . . . is refuted by the established practices and policies at SDSO facilities, which I observed and corroborated through interviews with custody, nursing, medical, and mental health staff during my onsite tours." Penn Report at 13-14. He goes on to state that various staff members explained to him how things are supposed to work, including through intake screening, "gatekeeping," mental health "flags," and "trip sheets." None of his discussion changes my strong opinion that San Diego County Jail's system fails to adequately identify and track incarcerated people with serious mental health needs.

65. Remarkably, Dr. Penn states that he formed his opinion based only on his observations and staff interviews "during [his] onsite tours." Penn Report at 14. He makes no reference to considering any individual patient assessments or records review. The only individual patient mentioned in this entire section of the report is a man who he observed experiencing an apparent opioid overdose. *Id.* at 18.

66. In my report, I describe horrific examples of identification and tracking failures, some of which led to a patient's avoidable death. For example, take **Roselee Bartolacci**, whose intellectual disabilities were not identified, contributing to her May 2023 in-custody death after she was placed in solitary confinement and lost more than 40 pounds in just six (6) weeks, without appropriate intervention or treatment. Stewart Report ¶¶ 133-138. Or another example, the suicide of **Pedro Ornelas** in June 2023. Mr. Ornelas's initial screening inexplicably identified no mental health history, despite records from a previous incarceration at the Jail showing ████████████████████████████████████████████ ████████████████████████████ His requests to "get back on my medications" went unanswered, and he died by hanging ten days after he arrived at the Jail. These identification failures are staggering and demand systemic remedial action. Stewart Report ¶¶ 82-85.

67. Failures in *tracking* people with serious mental health treatment needs are also pervasive in the San Diego County Jail system. In my report, I describe one

**Ex. O-1080**

patient who was prescribed psychotropic medications and then not seen by a psychiatric provider *for nine (9) months*. When he was finally seen in May 2023, he was experiencing auditory hallucinations. This is a significant, consequential, and harmful failure in tracking and follow-up for a patient with serious mental illness. *See* Stewart Report ¶ 92. I found that, by policy and practice, the San Diego County Jail system consistently fails to meet the standard of care for tracking and follow-up with people requiring psychiatric treatment – including extreme violations of the maximum allowable time between *routine* psychiatric visits (30 days), and the maximum allowable time for psychiatric follow-up after initiation of medication or dose adjustment (one week). *See* Stewart Report ¶¶ 86-87, 91-92, 95, 260 (individual examples of such failures).

68.    I also examined records from the individual patients whose Dr. Penn's designated reviewers looked at, as he appends to his report (Appendix D). There are multiple examples in those patient records of very similar identification and tracking failures:

69.    ██████████    (Penn Report at 189-190): ██████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

70.    ████████    (Penn Report at 159): ████████████
███████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████



1    ███████████████████████████████████████████████

2    ██████████████████████████████████████████████

3    ██████████████████████████████████ All of these issues are systemic

4    in nature and place this patient and others at substantial risk of serious harm.

5        71.    ████████████ (Penn Report at 165-166): ████████████

6    ██████████████████████████████████████████

7    ████████████████████████████████████████████

8    ██████████████████████████████████████████████

9    █████████████████████████████████████████████

10   ███████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ███████████████████████████████████████████

13   ████████████████████████████████████████████

14   ███████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   █████████████████████████████████████████████████

18   █████████████████████████████████████ These are

19   gross failures of both identification *and* tracking that put this patient at enormous

20   risk of irreparable harm from medication-induced seizures.

21       72.    ████████████ (Penn Report at 170): ████████████

22   ████████████████████████████████████████████

23   ███████████████████████████████████████████

24   ████████████████████████████████████████████

25   ███████████████████████████████████████████████

26   █████████████████████████████████████████████████

27   ████████████████████████████████████████████████

28   ███████████████████████████████████████████████

**Ex. O-1082**

1    ████████████████████████████████████████████████████████

2    ████    These failures of identification and proper tracking led to care that fell well

3    below any acceptable standard of care, in ways that placed the patient at

4    extraordinary risks, including of a diabetic crisis and a myocardial infarction.  The

5    deficient care of this patient over nearly two years screams out for immediate

6    systemic intervention.

7    73.    Dr. Penn's report does not contain a specific analysis of the Jail's

8    mental health screening system or protocols.  My report provides detailed findings

9    that the screening policies and procedures are deficient in identifying patients'

10   mental health care needs.  Stewart Report ¶¶ 26-47.

11   74.    I am, of course, not the first person to identify alarming deficiencies in

12   this area.  The 2022 California State Auditor Report identified eight (8) recent in-

13   custody deaths where the individual "had serious medical or mental health needs

14   that health staff did not identify or communicate to detention staff at intake."  2022

15   California State Auditor Report at 20, DUNSMORE0117735.

16   75.    The County itself has acknowledged that its system falls short in this

17   area, and it is strange that Dr. Penn simply ignores that fact.  The 2022 California

18   State Auditor Report recommended, in order to address systemic problems with the

19   Jail's mental health need identification system, that the County "create a policy

20   requiring health staff to review and consider each individual's medical and mental

21   health history from the county health system during the intake screening process."

22   DUNSMORE0117769.  The County publicly confirmed in 2023 that this deficit

23   exists, and acknowledged that other county jail systems have taken the necessary

24   steps to implement such a practice, stating:  "*Unlike many other counties, San Diego*

25   *does not have a coordinated county health system or shared electronic health care*

26   *records system.  As a result, we cannot meet this recommendation as written*."

27   Progress Report at 5, SD_184479 (emphasis added); *see also* Quiroz PMK Dep. at

28   98-99 (noting that the County has no "policy or written expectation that intake

Ex. O-1083

1  nurses review the [County behavioral health] system as part of the intake process,

2  instead "relying on self-reporting by the new arrival").  The failure to address this

3  deficiency puts patients at risk of harm every day.

4      76.    Based on my personal observations, discussions with staff, review of

5  testimony, policies, and reports, and my review of individual patient records, it

6  remains my strong opinion that the Jail's system fails to adequately identify and

7  track incarcerated people with serious mental health care needs, in ways that are

8  systemic and that put incarcerated people at substantial risk of serious harm.

9      **D.    Dr. Penn's Opinion that the San Diego County Jail System Maintains Adequate Mental Health Staff to Meet the Incarcerated Population's Needs Ignores Well-Established and Readily Acknowledged Facts that the System Does *Not* Have Sufficient Staffing Resources.**

12      77.    Dr. Penn opines that "mental health and psychiatric provider staffing

13  levels at [San Diego Sheriff's Office] are sufficient and comport with the

14  correctional standard of care."  Penn Report at 26 (with narrative at 19-26).  I

15  strongly disagree with this opinion, which is contradicted by well-established and

16  readily acknowledged facts that the system does *not* have sufficient mental health

17  staffing resources.

18      78.    Even when Dr. Penn acknowledges staffing shortages, including 14

19  mental health clinician vacancies, he states blithely (and without analysis of the Jail

20  population's mental health service needs):  "Despite these staffing vacancies, there

21  were no discernible delays in care nor any identifiable impediments in SDSO IP

22  patients' access to and continuity of mental health care."  Penn Report at 21.  Given

23  the Jail's recent overall count of 26 mental health clinicians, *see* Quiroz PMK Dep.

24  at 30, the 14 unfilled positions amount to a vacancy rate of approximately 35%.

25  This is notable, consequential, and points to insufficient staffing to deliver necessary

26  mental health care.

27      79.    Instead of looking at what treatment programming is needed for the

28  population and what staffing is required to meet that need, Dr. Penn relies on

1    abstract and ephemeral language that is of little use in assessing whether the Jail

2    system has sufficient staffing resources to provide adequate mental health care for

3    its population.  He writes:

4        Staffing levels in correctional settings should be evaluated based on the
         clinical determination of whether adequate mental health services are
5        provided by the available staff.  This means that the adequacy of
         staffing is determined by whether the care meets established standards
6        rather than by adhering to a specific numerical ratio.  According to the
         NCCHC Standards for Health Services in Jails, 2018 Jail Standard, J-
7        C-07, page 60, "Staffing," is defined, the responsible health authority
         (RHA) ensures sufficient numbers and types of health staff to care for
8        the incarcerated person population.

9        There are no universally accepted or empirically validated staffing
         plans, ratios, or recommendations for mental health and psychiatric
10       staff within correctional settings.  Staffing decisions should be made
         based on the clinical needs of the population served, considering the
11       unique requirements of each facility, county, or state.

12    Penn Report at 20.

13        80.    In my report, I relied on San Diego County Jail *system-specific* findings

14    that point directly to staffing deficits that negatively impact the delivery of clinically

15    necessary mental health treatment for the San Diego County Jail's patient

16    population.  Stewart Report ¶¶ 351-388, 432-435.

17        81.    I agree with Dr. Penn that the Jail must come up with an adequate

18    staffing plan to meet the specific clinical needs of its mental health population and

19    unique requirements of its system.  However, as discussed in my report, the San

20    Diego County Jail has failed to conduct and implement an appropriate mental health

21    program needs assessment.  Given the Jail's mental health population, current

22    conditions, and currently available treatment services, it is my strong opinion that

23    understaffing is a major contributor to dangerous failures to provide clinically

24    necessary mental health care to meet existing treatment needs.

25        82.    There are still additional findings of mental health staffing deficiencies,

26    *confirmed by San Diego County itself*.  For example:

27    ➢    In 2023, the San Diego County Grand Jury found that "[t]here is an
          insufficient number of mental health clinicians to provide appropriate
28        basic on-site mental health services, as defined by NCCHC

accreditation standards." The Sheriff's Department "disagree[d] partially" with this finding, stating that "[i]t is a true statement that the San Diego Sheriff's Department does not currently meet accreditation standards as it applies to mental health" while stating that "this is not attributable to the fact that there is an insufficient number of staff providing services." The Department did state that it "is seeking to hire more mental health professionals in order to streamline workloads and provide proactive mental health programs for our population." Quiroz Dep. Ex. 9, *2022/2023 Grand Jury Response-Crisis in Treatment Access for Incompetent to Stand Trail Incarcerated Persons in the County Jails* at 8-9, July 10, 2023.

➤ A December 2023 Sheriff's Department Corrective Action Notice documented a persistent psychiatric sick call backlog, resulting in significant psychiatric care delays. It noted that "periodic blitzes are done 3-4 months, **with no solution to maintain the rising number of sick calls**." Quiroz PMK Dep. Ex. 10, at 17 (emphasis added).

➤ The Jail mental health coordinator Ms. Quiroz wrote in July 2023 about the sick call request backlog and treatment delays in the Jail's system, and she testified in May 2024 about how these things "illustrate that **we have an overwhelmed system and we all need help**." Quiroz PMK Dep. at 270-71 & Ex. 14 (emphasis added).

➤ Jail leadership have issued corrective action notices to the contractor NaphCare regarding psychiatric care untimeliness, noting hundreds of pending psychiatry appointments and wait times of several weeks. Ms. Quiroz testified just recently that **delays in access to psychiatry care remain a "key deficiency area," noting that the "volume of pending appointments" is a problem**. Quiroz PMK Dep. at 186.

➤ Ms. Quiroz testified that the Jail's current discharge planning staff does not meet the needs of the approximately 1,600 (or more) mental health caseload patients in the Jail system, noting **"we do need more" staffing resources** and that the County did not have sufficient data to know how many discharge planners were necessary to meet patient needs, noting only that "[m]ore is certainly better." Quiroz PMK Dep. at 171-72 (emphasis added).

83.    Dr. Penn's statement that he could find "no discernible delays in care nor any identifiable impediments in SDSO IP patients' access to and continuity of mental health care" (Penn Report at 21) is simply not supported by the facts, as set forth in my report. *See* Stewart Report ¶¶ 69-95 (discussion of clinically inappropriate delays in psychiatric care, including many examples), ¶ 254 (lengthy delay for initial psychiatric evaluation for **Mr. Settles**, who subsequently died by suicide in 2022); ¶ 259 (unacceptable delay in psychiatric care for **Mr. McDowell**, who subsequently died by suicide in 2023); ¶ 267

1  (**Mr. Rupard**'s ███████████████████████████████████

2  █████████████████████████████████████████

3  ████████████████████████ that ended with his starving to death without

4  Jail health care staff's intervention).

5      84.    Still more examples of insufficient mental health staffing having

6  serious negative impacts on mental health care delivery can be drawn from the

7  patient cases summarized by the designated reviewers in Dr. Penn's own report:

8      85.    ████████ (Penn Report at 191-192): ████████████████

9  ██████████████████████████████████████████████

10 ████████████████████████████████████

11 ███████████████████████████████████████

12 ██████████████████████████████████████████

13 ██████████████████████████████████████████

14 ██████████████████████████████████████████

15 ██████████████████████████████████████████

16 ██████████████████████████████████████████

17 ████████████  Based on my experience as a jail psychiatrist, this delay was

18 far more serious than "not ideal."  For this sort of patient with serious mental

19 health needs housed in an exceedingly high-risk Administrative Separation

20 setting, it is dangerous and unacceptable.  Based on my review in this case,

21 staffing shortages play a substantial role in these access-to-care delays, which

22 put patients at substantial risk of serious harm.

23      86.    There is a further and troubling staffing-related deficiency that comes

24 up repeatedly in the record reviews conducted by Dr. Penn's designees.  That is, the

25 lack of continuity of care with a treatment provider.  Dr. Baskin notes that this is an

26 issue in many cases.  Penn Report at 158 ("████████████████████

27 ████████████████████████████████████████████

28 ████████████████████████████████████████████,

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. O-1087**



87.   In my experience, a major contributing factor to this kind of inconsistency in mental health and psychiatric treatment for patients is staffing deficiencies – usually a combination of structural deficiencies and staffing shortages.  Both are clearly on display in San Diego County Jail's mental health care system.

88.   Dr. Penn makes an additional finding that is factually misleading (if not wholly incorrect) and warrants mention.  He found that the Jail system requires that all mental health professionals be licensed (Penn Report at 18, italics mine):

> With regard to licensing of mental health staff, all qualified mental health professionals (QMHP) serving as mental health clinicians must be fully independently licensed professionals according to California's licensing entities, such as the Board of Psychology, the Board of Marriage and Family Therapists, the Board of Professional Counselors, or the Board of Social Workers.  They cannot be pre-licensed or in a master's-level training phase.

89.   I am uncertain as to Dr. Penn's basis for this finding, but it is inaccurate based on my review.  The Jail mental health coordinator, Ms. Quiroz, recently testified that there are at least 10 mental health staff members who are "prelicensed" and working as "mental health clinical case managers."  When asked what these pre-licensed staff members' duties entail, Ms. Quiroz testified, "They're similar to a clinician."  Quiroz PMK Dep. at 30-

1   31; *see also id.* at 42 (noting that there is a pre-licensed psychologist working at

2   the intake screening at Las Colinas).  Dr. Penn's finding that mental health staff

3   "cannot be pre-licensed" in this Jail system is factually incorrect.

4         90.    It is strange that Dr. Penn finds that mental health clinicians

5   "cannot be pre-licensed or in a master's-level training phase" at the San Diego

6   County Jail  and subsequently contradicts himself in a nearby section of his

7   report, where he includes a mental health program description that specifically

8   mentions that a "pre-licensed MH clinician" is in charge of facilitating

9   treatment groups on the Fourth floor at the Central Jail.  Penn Report at 37.  His

10  assessment methodology and analysis of the facts here are quite problematic.

11        91.    While the use of pre-licensed mental health staff can be clinically

12  impactful in a Jail system, there must be adequate supervision and other

13  processes.  Dr. Penn clearly has not done the necessary analysis of how these

14  pre-licensed staff are utilized or supervised.  My report, however, raises

15  extremely serious concerns regarding the lack of supervision during delivery of

16  mental health care in this Jail system.  *See* Stewart Report ¶¶ 54-61 (inadequate

17  supervision of psychiatric nurse practitioner); *id.* ¶ 375 ("I am extremely

18  concerned about the lack of supervision and coordination in this Jail's mental

19  health care system.  For example, the County-employed clinicians (social

20  workers and MFTs) should be – but are not – supervised by higher-level mental

21  health care professionals like psychologists or psychiatrists. . . . This is

22  inconsistent with the standard of care for a mental health care system.").

23      **E.**    **Dr. Penn's Opinion that San Diego County Jail Custody Staff Do**

24  **Not Interfere with Mental Health Care Staff's Clinical Decisions Is Not Supported by the Facts.**

25        92.    Dr. Penn opines that the Jail's "custody staff does not control mental

26  health care staff's clinical decisions and it assists in the delivery of care by mental

27  health professionals."  Penn Report at 26.  He acknowledges that "there may have

28  been isolated cases in the past" where such interference occurred, *id.*, but brushes

1  off those cases without discussion.

2  93.    This section of Dr. Penn's report runs about half of a page, but it does

3  require a response.  He relies solely on custody staff interviews ("sworn officers,

4  captains, lieutenants, and JPMU personnel") to "confirm[] that custody staff do not

5  attempt to override or improperly control health care decisions."  Penn Report at 27.

6  While he mentions that "various mental health and nursing staff consistently denied

7  any instances where custody staff interfered with, impeded, or improperly controlled

8  clinical decision-making related to incarcerated persons with mental health needs"

9  (*id.* at 26), he does not indicate that he conducted interviews with mental health care

10  staff as he did with custody staff.  In fact, as discussed below, mental health care

11  staff and leadership consistently acknowledge such custodial interference.

12  94.    Dr. Penn's statement that he "verified that health care input is actively

13  included and considered in [1] classification, [2] disciplinary reviews, and

14  [3] SPFRT (safety cell placements)" is factually inaccurate and quite incomplete.

15  *See* Penn Report at 27.  I address each claim in turn.

16  95.    First, Dr. Penn ignores that nearly every Jail mental health staff

17  member who has provided testimony in this case reports that the practice of custody

18  staff overruling clinical staff regarding **housing and classification decisions** occurs

19  with frequency:

20  ➢    **Jail Clinician Aseel Ross (Dep. at 43):**

21  *Q: ... Have there been examples in your experience where you made a
   recommendation that somebody be removed from AdSep based on their
22  mental health where classification says, no, they need to remain in
   AdSep and they so remain?*

23  *A. Yes.*

24  *Q. Do you have any examples that come to mind?*

25  *A. Yeah.*

26  ➢    **Jail Psychiatrist and Medical Director Christine Evans (Decl. ¶ 20,
   Dkt. 119-10):**

28  *I saw many people being placed into Administrative Segregation when*

*clinicians knew and made known that such a placement would be harmful.*

➢ **Jail Clinician Jennifer Alonso (Decl. ¶¶ 21, 23, Dkt. 119-11)**

*[T]he Jail system's mental health co-coordinator (who hired me to work in the OPSD units) made a specific recommendation to the Sheriff's Department to stop putting people with mental illness in the solitary confinement-type Ad-Seg units, given the risks to their psychological and physical well-being there. My understanding is that the Sheriff's Department Command staff refused to implement this recommendation.*

*I received an email from custody staff about one of my patients who was experiencing significant psychiatric symptoms. The email stated that the line custody staff thought my patient should be transferred to Ad-Seg housing. No reason was provided. The placement appeared arbitrary and more for the custody staff's convenience than the security or well-being of anyone. No one asked me for my clinical input; custody staff simply directed me to modify the patient's record (removing the patient's OPSD status) so that custody could move the man into Ad-Seg. Similar incidents happen multiple times each month."*

➢ **Jail Mental Health Coordinator (and County's Person-Most-Knowledgeable) Melissa Quiroz (PMK Dep. at 59)**

*Q: [H]istorically has there been a problem in the San Diego County Jail for deputies to overrule clinicians on housing placements for people with mental illness?*

*A: I don't have the exact language, but I can think of times when there may have been some tension between, you know, a clinician trying to advocate for what they felt was recommended and a sworn staff member having a difference of opinion.*

*Q: Have clinicians come to you with those concerns?*

*A: Yes.*

*Q: Sounds like that's something that you care about deeply and want to have addressed, is that correct?*

*A: Yes, absolutely.*

96.     Further findings on custodial interference with housing and program placements for people with serious mental illness are discussed in my previous report. Stewart Report ¶¶ 167-181.

97.     Second, Dr. Penn is simply wrong that mental health staff provide input regarding **disciplinary reviews**. *See* Stewart Report ¶¶ 427-430. The Jail's own

person-most-knowledge confirmed that there are no policies or procedures at the Jail for mental health care staff to provide input regarding disciplinary processes. Quiroz PMK Dep. at 178-79 ("Q: Does mental health staff play any role in the administration of discipline for people with serious mental illness?  A:No, [they] do not.").  And another of the County's own experts who looked closely at this issue made a finding directly in contradiction to Dr. Penn's statement on this point:

> ***The SDCSO does not have a process for a clinician to provide his/her professional recommendations*** (e.g., whether the incarcerated person fully understood the nature of his/her actions at the time of the disciplinary charge and alleged actions) ***to the hearing official so they can give consideration to the recommendations prior to ruling on the charge and issuing any sanctions.***  The SDCSO should develop policies and a process for clinicians to provide their professional recommendations regarding the incarcerated persons understanding of their actions and for the hearing official to consider the clinical input of sanctions that should be avoided based on the clinician's assessment.

Defs.' Expert Report of Julian Martinez at 75 (emphasis added).

98.     Third, Dr. Penn is wrong that mental health staff provide input regarding critical aspects of **safety cell placements and suicide precaution processes.**  In fact, mental health staff fail to provide such clinical input on these matters in ways that are *not* consistent with the standard of care and represent a considerable deviation from modern correctional standards.  Stewart Report ¶¶ 312-316.  The Jail's mental health coordinator confirmed this fact.  Quiroz PMK Dep. at 156 (noting that restrictions clothing, bedding, property, and privileges for patients on suicide precautions "all happens outside of the clinical world. . . . [T]hat's in the very custody world.").

99.     Again, the patient cases discussed in Dr. Penn's own report contradict his own finding that custody practices do not interfere with the provision of mental health treatment.  For example, in my review of patient ███████ (discussed in Penn Report at 196-197), I found repeated instances when this patient was denied access to appropriate clinical care. ███████████████████████████

███████████████████████████████

1  ███████████████████████████████████████████

2  ██████████████████████████████████████████████

3  ███████████████████████████████████████

4  █████████████████████████████████████████████

5  █████████████████████████████████████████████

6  ████████████████████████████████████████████

7  █████████████████████████████████████████████

8  ███████████████████████████████████████████████

9  ████████████████████ Based on my review of this patient's experience and my other

10  observations in this system, it is very likely that blanket custodial policies and

11  practices caused these custodial interferences with the provision of necessary care.

12      100.  My opinion that Jail custody staff exert improper and dangerous control

13  over clinical mental health care decisions, as stated in Finding #8 in my report

14  (¶¶ 402-417) and in Section II.B., above, is unchanged.

15      **F.**    **Dr. Penn's Opinion that San Diego County Jail Has an Adequate**

16  **Psychiatric Medication System to Meet Patient Needs Is Not Supported by the Facts, Including Those in His Own Report.**

17      101.  Dr. Penn opines that the Jail "maintains an effective medication

18  management system across its facilities" and that its "systems for identifying

19  incarcerated persons who were recently prescribed psychotropic medications, as

20  well as for administering and distributing these medications, meet or exceed both

21  correctional health and community standards of care." Penn Report at 29-30. These

22  conclusions are inconsistent with the available evidence, including factual findings

23  and cases reviewed in Dr. Penn's own report.

24      102.  First, I take strong issue with Dr. Penn's statement that there is no

25  evidence of "delays in the prescribing or delivery of psychotropic medications, nor

26  in the provision of mental health treatment for new intake incarcerated persons at

27  SDSO." Penn Report at 29.

28      103.  In my review of patient records, I identified numerous cases where

1  psychiatric medications were delayed for newly arrived incarcerated patients, where

2  medications were interrupted due to systemic failures (and without exercise of

3  clinical judgment), and where there was inadequate follow-up by psychiatric

4  providers for people on medication.  I provide many individual case examples in

5  Finding #2 of my August 21, 2024 report.  Stewart Report ¶¶ 53-95.

6      104.   Dr. Penn does state:  "I acknowledge that occasional missed doses of

7  psychotropic medication can occur."  Penn Report at 29.  But his own expert

8  reviewer Dr. Huselid, determined that the issue was far more than "occasional,"

9  stating in Dr. Penn's report:  "I've seen many [] examples of expiring medications in

10  [patient] charts, **there does seem to be a systems issue."**  *Id.* at 189 (emphasis

11  added).

12      105.   The Sheriff's Department's Corrective Action Notices and other reports

13  from just this past year identify serious, pervasive, and persistent deficiencies with

14  respect to the Jail's system for provision of psychiatric medication to the

15  incarcerated population.  Ms. Quiroz, the Jail's mental health coordinator, has

16  confirmed that these deficiencies remain, including:

> ➢ **There is a persistent psychiatric sick call backlog, resulting in psychiatric care delays.**  The Sheriff's Department's Corrective Action Notice documented that "periodic blitzes are done 3-4 months, with no solution to maintain the rising number of sick calls."  Quiroz PMK Dep. Ex. 10 at 17 (Sheriff's Department Corrective Action Notice, Dec. 1, 2023); *see also* Quiroz PMK Dep. at 186 (as of May 2024, describing delays in access to psychiatry care as a "key deficiency area" given the high "volume of pending appointments).

> ➢ **Psychiatry providers do not participate meaningfully (or at all) in essential Continuous Quality Improvement (CQI) activities.**  Quiroz PMK Dep. at 187 ("I don't know that it's been fully resolved, but it … [d]oes probably need to work towards improvement.").

> ➢ **There is no documented peer review process for psychiatric prescribers.**  Quiroz PMK Dep. at 190-91 ("I can't be for certain that they're not doing peer reviews.  It's nothing that they hand back to us. I mean, if they do the peer reviews it's something that they're keeping records of on their own."); *id.* at 100-01 (there is no County employee or entity who is responsible for determining whether NaphCare's peer review process is adequate).

> ➢ **There is insufficient clinical oversight of psychiatric prescribers**

**Ex. O-1094**

**(especially psychiatric nurse practitioners).** Quiroz PMK Dep. at 192 & 198 (confirming that the Jail's chief medical officer, Dr. Montgomery, has shared concerns about adequacy of clinical oversight for psychiatric nurse practitioners at the Jail and the impact on medication management for the mental health population, and stating "it's still a concern").

➢ **The Jail regularly fails to provide *timely* psychiatric evaluations for newly incarcerated patients.** Quiroz PMK Dep. at 111 ("Q: [I]s your team concerned about timeliness of initial psychiatry contacts with patients? … A: We want them seen as soon as possible, and there's times we may feel that it's not soon enough.").

106. Second, I strongly disagree with Dr. Penn's statements that there is "no evidence indicating that any isolated incidents of missed psychotropic medication doses at SDSO led to immediate or delayed clinical decompensation or further issues" and that there are "no documented instances of undue delays resulting in self-harm, suicide attempts, completed suicides, or serious harm to incarcerated persons due to these medication delays." Penn Report at 29.

107. I have discussed in detail the horrific and preventable suicides of **Pedro Ornelas** and **Jonathan McDowell** in 2023. Stewart Report ¶¶ 82-85 (Mr. Ornelas, a man with an ███████████████████████ who twice submitted requests to see a psychiatrist to "get back on my medications" but was never seen or started on medications in the nearly two weeks leading up to his suicide); *id.* ¶¶ 258-265 (Mr. McDowell, a man with ███████████████████████, who reported that he feared he was having a "mental breakdown" and auditory hallucinations, yet was not started on his psychiatric medication for three and half months, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████ and was instead placed in solitary confinement and never again seen by a psychiatric prescriber over the next six weeks leading up to his suicide).

108. Even beyond the cases where people have died after being denied clinically necessary psychiatric treatment, it is my assessment that a very large

1  number of people are being made to suffer needlessly due to widespread delays and

2  failures in with respect to psychiatric medication practices in this Jail system. The

3  case of ████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████  Stewart Report

9  ¶¶ 86-87.

10      109.  Further remarkable is that individual cases in *in Dr. Penn's own report*

11  reveal systemic psychiatric treatment deficiencies that contradict Dr. Penn's

12  opinions. For example:

13      110.  ████████████████  (Penn Report at 186-187): ████████████████

14  ████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ██████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ██████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ██████████████████████████████████████████████████

28  ████████████████████████████████████████████████████

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. O-1096**

1 [REDACTED]

2 [REDACTED]

3 [REDACTED]

4 [REDACTED]

5 [REDACTED]

6 [REDACTED]

7 [REDACTED]

8 [REDACTED]

9 [REDACTED]

10 [REDACTED]

11 [REDACTED]    This case indicates not just poor clinical decisions by psychiatric

12 prescribers (who, as noted above, do not receive adequate supervision) but also a

13 dangerous failure to respond when dangerous side effects and clearly articulated

14 concerns are raised.  This case raises alarming systemic – and not just individual –

15 issues with treatment in this Jail system.

16    111.    [REDACTED]    (Penn Report at 205): [REDACTED]

17 [REDACTED]

18 [REDACTED]

19 [REDACTED]

20 [REDACTED]

21 [REDACTED]

22 [REDACTED]    This medication

23 failure stems from systemic tracking and follow-up deficiencies, and puts patients at

24 entirely unnecessary and inexcusable risk of harm.

25    112.    [REDACTED]    (Penn Report at 167-169): [REDACTED]

26 [REDACTED]

27 [REDACTED]

28 [REDACTED]

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Ex. O-1097

1  ███████████████████████████████████████

2  ███████████████████████████████████████████

3  ████████████████████████████  My review of this patient's records confirm

4  these failures and the serious risks to the patient.  When lab tests were done and

5  revealed abnormal results, there is no indication of medication review or

6  modification, indicating serious deficiencies in medication management and

7  psychiatric follow-up.  This patient's course of treatment did not meet the standard

8  of care.

9      113.  ████████  (Penn Report at 174):  ██████████████

10  ███████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████

13  ███████████████████████████████

14  ███████████████████████████████

15  ████████████████████████████████████

16  █████████████████This case is especially egregious insofar as this patient was

17  unnecessarily subjected to the potentially serious side effects of the antipsychotic

18  medication prescribed without clinical justification.

19      114.  ████████  (Penn Report at 160-161):  ████████████

20  ████████████████████████████████████

21  ████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████

24  ████████████████████████████████████

25  ████████████████████████████████████

26  ███████████████████I also reviewed this case, and I agree with the

27  concerns about the poor treatment provided.  I was in fact shocked by what I found.

28  This was a dangerous polypharmacological situation that does not come close to

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. O-1098**

1    meeting the standard of care. ███████████████████████

2    ████████████████████████████████████████████████

3    ████████████████████████████████████████████████

4    ████████████████████████████████████████████

5    ██████████████████████████ (This, of course, is another systemic

6    problem I have previously discussed and discuss further later in this report.)  In all, I

7    have not encountered anything like this case in my over 40 years of work as a

8    correctional psychiatrist.  This case is a giant red flag calling for systemic remedial

9    action.

10        115.    ███████████ (Penn Report at 171-172): ████████████████

11    ████████████████████████████████████████████

12    ███████████████████████████████████████████████

13    ███████████████████████████████████████████████

14    ██████████████████████████████████████████

15    ███████████████████████████████████████████████

16    ████████████████████████████████████████████

17    ████████████████████████████████████████████████

18    ████████████  ████████████████████████████████████

19    ██████████████████████████████████████████████

20    ████████████████████████████████████████████████

21    ███████████████.

22        116.    ███████████ (Penn Report at 187-188): ████████████████

23    ██████████████████████████████████████████████

24    ███████████████████████████████████████████████

25    ████████████████████████████████████████████

26    ████████████████████████████████████████████

27    █████████████████████████████████████████████████

28    ████████████████████████████████████████

1    117.

2

3                            :

4        ➢

5

6

7

8

9

10

11

12

13

14



15    118.    The number of cases with deficient psychiatric care that Dr. Penn's

16  own designated reviewers found in their record reviews, combined with the

17  pervasive deficiencies I found in my assessment, amount to unambiguous alarm

18  regarding the systemic failures in psychiatric care in the San Diego County Jail

19  system.  I simply cannot understand how Dr. Penn can opine that this Jail "maintains

20  an effective medication management system across its facilities" or that there are

21  "no documented instances of undue delays resulting in self-harm, suicide attempts,

22  completed suicides, or serious harm to incarcerated persons due to these medication

23  delays."  *See* Penn Report at 29.  **Again, Dr. Penn's *own* report states that there**

24  **are "many [] examples of expiring medications in [] charts" such that "there**

25  **does seem to be a systems issue."**  *Id.* at 189.

26    119.    Records directly contradict Dr. Penn's finding that there are "no

27  documented instances of undue delays" resulting in harm.  Take the case of

28  ██████████████████████████████████████████.

REBUTTAL EXPERT REPORT OF PABLO STEWART
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. O-1100**

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5 ▓▓▓▓▓▓    This is a clear and documented example of a patient denied clinically

6 appropriate medication management who suffered needlessly as a result.  Dr. Penn's

7 finding is troubling in its disregard of this case and many others like it.

8        120.    This is a systemic failure that demands action.  The preventable deaths

9 of Mr. Ornelas, Mr. McDowell, and Mr. Rupard, all of whom decompensated after

10 being denied clinically appropriate psychiatric care until they died by suicide

11 (Ornelas, McDowell) or starvation (Rupard), represent what I consider to be the tip

12 of the iceberg regarding the serious harm that patients at this Jail have faced and

13 continue to face.

14        **G.    Dr. Penn's Opinion that San Diego County Jail Provides Patients
              with Timely Access to Mental Health Care and a "Robust Mental
15            Health Delivery System" Ignores the Realities of this Extremely
              Inadequate System.**
16

17        121.    I strongly disagree with Dr. Penn's opinions that "incarcerated persons

18 presenting with current mental health needs are promptly referred to and receive

19 timely mental health services," and that the Jail provides a "robust mental health

20 delivery system and is able to provide timely access to care and mental health

21 treatment to [patients] with ongoing mental illness."  Penn Report at 30-43; *see also*

22 *id.* at 50-52 (Dr. Penn's opinion that "The Delivery of Mental Health Care Within

23 SDSO is not Systemically Deficient.").

24        **1.    There Are Serious Deficiencies with Respect to the
                 Timeliness of Mental Health Care at the San Diego County
25               Jail.**

26        122.    With respect to the ***timeliness*** of mental health services, Dr. Penn

27 simply ignores the extensive evidence, and the County's own documentation, that

28 the system is defined by large mental health care backlogs and unacceptable delays

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. O-1101**

1   in access to clinically necessary care.  Examples include the following:

2       123.   First, the County documented a **persistent psychiatric appointment**

3   **backlog**, resulting in psychiatric care delays.  The County noted that "periodic

4   blitzes are done 3-4 months, with no solution to maintain the rising number of sick

5   calls."  In April 2023, there were 785 pending psychiatry appointments.  Despite the

6   County's corrective action notice issued at that time, there remained 530 psychiatric

7   pending psychiatry appointments in November 2023, with an average wait time of

8   18 days.  Quiroz PMK Dep. Ex. 10 (Sheriff's Department Corrective Action Notice,

9   Dec. 1, 2023).  The Jail mental health coordinator identified this is as "key

10  deficiency area" as recently as May 2024.  Quiroz PMK Dep. at 186.

11      124.   Second, the County has documented **severe sick call request backlogs**

12  and treatment delays, with the Jail mental health coordinator explaining that such

13  delays "illustrate that we have an overwhelmed system and we all need help."

14  Quiroz PMK Dep. at 270-71 & Ex. 14.

15      125.   Third, Dr. Penn's *own* designated reviewers identify (again, as set forth

16  in his own expert report) a large number of cases with **unacceptable delays in the**

17  **provision of mental health and psychiatric care**.  *See, e.g.*:



    ➤  Penn Report at 190.

REBUTTAL EXPERT REPORT OF PABLO STEWART

CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

**Ex. O-1102**



➤    Penn Report at 203.

126.    Fourth, my report details the evidence of **dangerously untimely access to inpatient (PSU) mental health care** in the Jail system.  This deficiency was confirmed by a PSU psychiatrist, who told me during my site visit that there is "always a wait list" of acutely ill patients requiring PSU placement.  Stewart Report ¶ 128.  Ms. Quiroz also confirmed this fact.  Quiroz PMK Dep. at 70-71.  Aseel Ross, who served as an Administrative Separation clinician, testified that she was aware of patients waiting for a PSU placement *for more than one month*.  Ross Dep. at 89-90.  The lack of timely access to an inpatient level of care placement is well established, and it puts patients at substantial risk of serious harm, including further decompensation, self-harm, and suicide.

127.    My records review confirms the persistence of these extreme access-to-care delays for patients who need acute mental health placement and care.  As additional examples:

1

2

3

4

5

6

7

8 .

9 This is an enormous, harmful, and dangerous delay in the provision of a clinically

10 indicated acute mental health care placement.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  ████████████████████████████.  This is another example of an

2  unacceptable, harmful, and dangerous delay in the provision of a clinically indicated

3  acute care placement.

4         **2.      There Are Serious Deficiencies with Respect to the Adequacy
              of Mental Health Care and Treatment Programming at the**

5         **San Diego County Jail.**

6         132.   With respect to Dr. Penn's opinion that the San Diego County Jail has a

7  "robust mental health delivery system" that is "not systemically deficient," his

8  discussion is incomplete and does not in any way change my conclusion that this

9  system denies people with serious mental illness access to **adequate mental health**

10  **treatment**, causing undue suffering and putting people at unnecessary and

11  substantial risk of harm.  I provide examples of Dr. Penn's problematic findings

12  below.

13         133.   Dr. Penn's assessment that "Mental Health Group Therapies" and other

14  clinical activities are provided consistent with the treatment needs of the Jail

15  population ignores critical deficiencies, and is at odds with the assessments of the

16  Jail's mental health coordinator and the Sheriff herself.  Dr. Penn's report does

17  confirm that PSU clinicians provide as little as "one psycho educational group per

18  week" and just one clinical "meeting with every patient individually" each week.

19  Penn Report at 37.  This exceedingly limited amount of treatment is inadequate for

20  the needs of this population.

21         134.   I am also aware that approximately half or more of the patients in the

22  Central PSU are not permitted to participate in any group therapy *at all*, with several

23  patients essentially on 24/7 lockdown with no meaningful mental health treatment at

24  all.

25         135.   Dr. Penn's statement on PSU treatment ("The weekly schedules

26  provided reflect that IPs in the PSU are actively involved in creative and

27  recreational therapy, not merely confined to their cells" (Penn Report at 33)) does

28  not account for the reality that these activities are extremely limited, are not

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
                                                              **Ex. O-1105**

1  facilitated by clinicians (but rather a recreational therapist), and completely exclude

2  a substantial proportion of PSU patients who are in fact confined to their cells.

3    136. In contrast, Sacramento County Jail's acute inpatient psychiatric unit's

4  policy and program schedule is designed to provide what more closely approximates

5  clinically appropriate clinical care, with clinician-facilitated treatment group offered

6  for at least three (3) hours per day, along with a daily out-of-cell contact with a

7  clinician and a daily out-of-cell contact with a psychiatric prescriber. *See* Stewart

8  Report ¶ 118.

9    137. The same major deficiencies exist in the Outpatient Stepdown units,

10  which Dr. Penn's report acknowledges provide no more than two group treatment

11  hours per week (Penn Report at 37), though I was informed on my site visit that

12  some of these units do not receive any group treatment programming at all (and are

13  on nearly round-the-clock isolation lockdown).  Dr. Penn does not provide any

14  analysis that would support his finding that OPSD treatment is clinically adequate.

15    138. In my report, I discuss in detail how, given the staggeringly high levels

16  of acuity and treatment needs among the OPSD population, OPSD treatment

17  programming is grossly insufficient to meet the clinical needs of the patient

18  population. *See* Stewart Report ¶¶ 145-161.

19    139. In addition to the insufficient programming in OPSD units, there is also

20  terribly inadequate capacity – that is to say, there are not enough OPSD program

21  spots to meet the needs of the seriously mentally ill population.  Ms. Quiroz

22  estimated that, if an appropriate mental health acuity rating system was implemented

23  at the jail, it would "highlight the need for hundreds if not thousands of mental

24  health beds."  Quiroz PMK Dep. at 90-93 & Ex. 4.

25    140. San Diego County Sheriff Martinez also recently acknowledged the

26  deficits with respect to mental health treatment programming.  On October 2, 2024,

27  she presented at the San Diego County Citizens' Law Enforcement Review Board

28  meeting, stating:  "We also think that group therapy is useful in some instances and

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. O-1106**

some other things that we don't always have accommodations for currently in our structure."  Sheriff Martinez, CLERB Regular Meeting, Oct. 2, 2024 (video at 1:01:00, available at https://youtu.be/4vXcub2VXTc?t=3640).

141.   The San Diego County Jail's failure to provide adequate mental health treatment to patients with serious mental illness puts patients at risk and causes unnecessary harm.  One case assessed by Dr. Penn's designated reviewer offers considerable insight here.

As I discussed in my previous report, the JBCT unit has a mental health program with robust staffing and treatment programming, and it shows positive results.  The problem, as I stated, is that once a patient discharges from the DSH-run JBCT program and is placed in other San Diego County Jail units (where the treatment program is a tiny fraction of what is provided in the JBCT), patients are denied the care they need and decompensate as a result, with a new onset of psychiatric symptoms and even a new finding that they are "incompetent to stand trial" (essentially *undoing* the success of the JBCT program).  Stewart Report ¶¶ 163-164.

143.



144.

was managed in the DSH-operated JBCT program (with its daily mental health programming and frequent psychiatric care) and how he decompensated so severely in San Diego County Jail's system after discharging from JBCT makes plain the serious inadequacy of the Jail's mental health care system, and the harm such inadequacy causes.

145. The evidence of severe mental health programming deficits in this system, combined with the statements by Jail leadership and the Sheriff herself, directly contradict Dr. Penn's conclusion that there is "widespread availability of educational and therapeutic programming" in this system. Penn Report at 42. There is nothing close to enough mental health treatment beds and program capacity to meet the mental health population's treatment needs. It is troubling that Dr. Penn ignores all the evidence and statements pointing at this reality.

146. I further strongly disagree that this Jail system conducts adequate multidisciplinary treatment team meetings and provides "ongoing multidisciplinary,

1    individualized treatment planning." Penn Report at 32, 38-39. I discuss the basis

2    for my opinions on this subject in detail in my report. Stewart Report ¶¶ 97-112.

3        147.   Individual case records that I reviewed consistently demonstrate that

4    the Jail's mental health system fails to ensure that patients receive clinically

5    appropriate, individualized treatment planning that includes appropriate level of care

6    determinations, provision of individualized medication management, and structured

7    therapy and counseling as clinically indicated. In fact, mental health staff testimony

8    confirms that individualized treatment planning with an appropriate level of care or

9    acuity rating system does not exist. (Again, Ms. Quiroz testified that the County

10   was reluctant to do this because it would "highlight the need for hundreds if not

11   thousands of mental health beds." Quiroz PMK Dep. at 90.)

12       148.   Ms. Ross, the clinician assigned to patients in Administrative

13   Separation units, proposed to Jail leadership the implementation of a structured

14   individualized treatment planning process for patients; she testified that such a

15   practice "was not implemented." Ross Dep. at 64. Ms. Quiroz testified that "it

16   could be helpful" for mental health staff to use an "individualized treatment plan

17   that's a freestanding document" but such a practice was not in place. Quiroz PMK

18   Dep. at 258.

19       149.   It is curious that Dr. Penn concluded that the treatment planning

20   process in the San Diego County Jail system is adequate. His finding is quite

21   specific in its language, but it is in fact copied nearly verbatim from his Arizona

22   state prisons expert testimony (with only the name of the detention system changed).

23   Here is what he opined in his Arizona expert report:

24       **Treatment Plans & Timely Communication:** In preparation of this
         report, I reviewed numerous ADCRR inmate medical records. In my
25       view, ADCRR provides comprehensive treatment plans, timely
         communication, and multidisciplinary coordinated care between
26       psychiatric and mental health staff, nursing staff, medical providers,
         and custody staff. Such records are kept in accordance with the
27       correctional standard of care. This significantly reduces the risk of an
         inmate's risk of harm to self or others."

28

1    Joseph Penn Expert Report, *Jensen v. Shinn* (D. Ariz.), Dkt. 4172 at 55 (¶ 152).

2       150.    Here is what he opined in his San Diego County Jail expert report:

3    **Treatment Plans & Timely Communication.**

4    In preparing this report, I reviewed numerous medical records for
individuals in custody at SDSO. The records demonstrate that SDSO
5    provides comprehensive treatment plans, ensures timely
communication, and coordinates multidisciplinary care among
6    psychiatric and mental health staff, nursing staff, medical providers,
and custody staff. This level of care is consistent with correctional
7    standards and significantly mitigates the risk of harm to
individuals . . . .

9    Penn Report at 38.

10       151.    Nothing in Dr. Penn's analysis changes my opinion that the San Diego

11    County Jail's mental health system fails to provide timely, clinically adequate, or

12    appropriately individualized mental health treatment to patients with serious mental

13    illness.

14       **H.**      **Dr. Penn's Opinion that San Diego County Jail "Provides
Opportunities for Confidential Mental Health Care Encounters in
15            Adequate Physical Spaces" Is Contradicted by the Facts, Including
Statements by the Sheriff Herself.**

17       152.    Dr. Penn states that "[i]n my professional opinion, SDSO IPs are

18    provided private meeting spaces to maintain confidentiality during mental health

19    encounters." Penn Report at 43-44. As I have described, the lack of confidentiality

20    during clinical mental health contacts at the San Diego County Jail is pervasive and

21    undermines the provision of mental health care for patients. Nothing in Dr. Penn's

22    report changes my opinion.

23       153.    Dr. Penn's discussion on this topic is very short, and provides little

24    insight into how he reached his conclusion. More importantly, this opinion is

25    directly contradicted by (1) Dr. Penn's own designated reviewers, (2) the Jail's

26    mental health coordinator and person-most-knowledgeable on these topics, and

27    (3) the San Diego County Sheriff herself.

28       154.    First, Dr. Penn's designated reviewer, ███████████

**Ex. O-1110**

1  confidential clinical contacts are not provided at the San Diego County Jail *by*

2  *policy*.  She discusses this in some detail in the review of patient ████████████.

3  Penn Report at 196-97. ████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ██████████████████████████████████████████

9  ████████████████████████████████████████████████

10  ██████████████████████████████████████████████

11  ██████████████████████████████████  ████████████████████

12  ██████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████"  Penn Report at 197

15  (emphasis added).  I agree with Dr. Huselid's assessment and conclusion.

16       155.   I repeat here what I state in my previous report about how the provision

17  of appropriate confidentiality for mental health care does *not* mean compromising

18  the safety of staff or anyone else:

19       To be sure, the provision of adequate treatment of serious mental
         illness (with appropriate confidentiality) will serve to *increase* safety:
20       good care serves to reduce psychosis-induced behaviors and to keep
         patients' conditions more stable.  And in a jail system where
21       confidential clinical contacts are the expectation, there will be
         appropriate safeguards, including the use of *individualized* assessments
22       – based on both clinical and custodial input – to determine when a
         particular patient cannot safely be seen in a confidential setting.  Such
23       circumstances can, and must, be appropriately documented, reviewed
         for quality assurance purposes, and inform treatment planning and
24       delivery moving forward.  **In short, a jail system should not choose
         between necessary confidentiality and safety.  They go hand in**
25       **hand.**

26  Stewart Report ¶ 392 (bold emphasis added).

27       156.   My patient reviews confirm the very serious and consequential

28  deficiency of failing to provide adequate confidentiality for clinical contacts.

1  Stewart Report ¶¶ 397-401.  As a further example:

2  157.  

13  This is a glaring example of the failure to provide for

14  confidential mental health contacts, but it is by no means unusual in San Diego

15  County's Jail system.

16  158.  Dr. Penn's designated reviewers

21  *See, e.g.*, Penn Report at 171 (

**Ex. O-1112**

1

2

3

4     159.   Let me be clear:  the use of custody staff for translation for a patient's

5     mental health care contacts is strictly prohibited under the standard of care, absent

6     the most serious of emergencies.  This practice breaks the core principles of

7     confidentiality.  If the jail does not have mental health staff who can communicate

8     with a patient in their preferred language, then a confidential interpretation service

9     *must* be utilized.

10     160.   Second, Jail mental health coordinator Melissa Quiroz has agreed in her

11     testimony that maximizing auditory privacy for clinical contacts is an important

12     goal.  Quiroz PMK Dep. at 78.  And she acknowledged that clinicians working at

13     the Jail have "expressed concern about [the] lack of confidentiality with cell-front

14     interactions with their patients."  *Id.* at 77.  She further confirmed that it remains the

15     case to this day that clinical contacts occur at cell-front and in spaces where custody

16     deputies can overhear the conversation, while dismissing the concern because in her

17     "experience usually they're not interested."  *Id.* at 78-79.  She did, however, agree

18     that the patients could have concern about the presence of custody deputies when

19     they are meeting with a mental health staff member:

20         Q: [J]ust from the patient's standpoint do you think that they may still
           have the concern that a deputy is standing nearby and can overhear
21         what they're saying to their clinician?

22         …

23         A: I think a patient could possibly feel that way, but I don't know -- no
           patient has told me, hey, make that person go away.  I think that they
24         understand that that deputy can't go away.

25     *Id.* at 79.

26     161.   Ms. Quiroz also confirmed that additional space and staffing resources

27     to provide confidential clinical contacts would be helpful:

28         Q: If there were more space and staffing resources, would the jail

REBUTTAL EXPERT REPORT OF PABLO STEWART
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. O-1113

1   mental health [staff] be providing more one-to-one clinical contacts in
2   confidential settings?

3   A: Phrased in that way, having more deputy assistance and having
    more clinical space, we would definitely be utilizing it.

4   *Id.* at 80-81.

5   162.   Third, San Diego County Sheriff Martinez acknowledged that there is a

6   lack of confidential clinical space in the San Diego County Jail system, less than one

7   month ago.  On October 2, 2024, she presented at the San Diego County Citizens'

8   Law Enforcement Review Board (CLERB) meeting.  When asked about what

9   improvements the Jail needs to work on regarding people with mental health needs,

10  she stated:

11      One of the auditor recommendations which we agree with is that
        **there's not enough private spaces at intake for people to share**
12      **personal information or have those private conversations with a**
        **mental health professional**.  We've expanded that a little bit at the
13      Vista Jail that was where we had the largest problem and we hope with
        new construction and some of the other improvements to our facilities,
14      we can build spaces where there's more safe space and treatment areas
        for individuals who have, who have that need.
15
16      …

17      Where we're at now, what's left really of the implementation of the
        audit recommendations are infrastructure  … the one thing, the
        therapeutic space for mental health, a lot of that's going to take
18      infrastructure and funding for the construction work.

19  Sheriff Martinez, CLERB Regular Meeting, Oct. 2, 2024 (video at 1:01:00 and

20  1:09:00, available at https://www.youtube.com/watch?v=4vXcub2VXTc).

21  163.   Dr. Penn's opinion that the San Diego County Jail provides

22  confidential mental health care in adequate physical spaces is at odds with my

23  findings, his own designated reviewers' findings as stated in his report, the County's

24  Jail mental health coordinator's testimony, and the Sheriff herself.  This is a

25  systemic deficiency that must be remedied, through appropriate policies and

26  procedures, specific training, allocation of adequate clinical and custody/escort

27  staffing, and provision of adequate clinical space.

28  / / /

**I.      Dr. Penn's Opinion that San Diego County Jail Does Not House Patients at Risk of Suicide in Punitive Isolation and that "Strategies Are Employed to Avoid Unnecessary and Undue Risk of Decompensation and Harm" Is Not Supported by the Facts of the Jail's Operations.**

164.    Dr. Penn provides numerous statements about the Jail's systemic use of solitary confinement housing for people with mental illness.  Penn Report at 44-46. It is very difficult to tell what specific facts or information he relies on in reaching his opinions, as all are set forth in conclusory fashion.  For purposes of this rebuttal report, I provide examples where Dr. Penn's statements are factually incorrect and/or extremely misleading.

165.    First, Dr. Penn asserts:  "To mitigate risks while housed in Ad Sep, there are robust medical and mental health safeguards in place."  Penn Report at 45. He states that health care staff are asked to "to check for any medical or mental health contraindications for an IP being housed in Ad Sep. . . .  This ensures that all potential medical or mental health concerns are addressed promptly, contributing to the overall safety and appropriateness of housing decisions." *Id.*  This finding is inaccurate, both in terms of policy and actual practice.  *See* Stewart Report ¶¶ 207-226.

166.    The National Commission on Correctional Health Care (NCCHC) evaluated San Diego County Jail and specifically found that the Jail's "mental health staff does not [] screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement." *Id.* ¶ 221.  The Jail's policy continues to omit the practice standard required by the NCCHC, *id.* ¶ 210, and the Jail mental health coordinator confirmed that it remains the policy and practice that there is no mental health clinical assessment done for a person being placed in Administrative Separation to identify whether there are mental health contraindications for a person being housed in Administrative Separation.  Quiroz PMK Depo. at 250-251.  Dr. Penn's report is factually incorrect in this regard.

167.    Dr. Penn further ignores the many examples of people with serious

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. O-1115**

1    mental illness being placed and retained in Administrative Separation despite clear

2    evidence that such placement was clinically contraindicated and dangerous,

3    including several deaths that resulted. *See, e.g.*, Stewart Report ¶¶ 266-274 (Rupard

4    death, determined to be a "homicide" due to "neglected schizophrenia" after patient

5    was placed and retained in Administrative Separation despite clinical

6    contraindications), ¶¶ 275-281 (Marroquin death following re-placement in isolation

7    after suicide precautions, with no clinical input considered), ¶¶ 282-283 (Godfrey

8    death following manifest deterioration in isolation). I provide several additional

9    individual examples in my report, all of which entail enormous and undue harm to

10    patients. *Id.* ¶¶ 229-238 (██████), ¶¶ 239-241 (███), ¶¶ 242-243 (██████).

11      168.   Dr. Penn also provides a confusing discussion as to whether and when a

12    qualified mental health professional (QMHP) will see a patient placed in

13    Administrative Separation. He writes that the policy is for a QMHP to see the

14    patient "not longer than one week after placement into Ad Sep." Penn Report at 45.

15    He then states that Ms. Quiroz told him that the "average duration is within two

16    days." Without providing any data or case examples to confirm Ms. Quiroz's

17    statement, he then misrepresents the statement by concluding: "In summary, IP's

18    placed into Ad Sep are evaluated by a QMHP within 24-48 hours of any IPs'

19    placement into the unit." *Id.*

20      169.   To be clear, this makes no sense. The basis of this conclusion is a

21    general policy that states such an evaluation must occur within one week, and a staff

22    member's unverified statement that the "average" time is two days (meaning that,

23    for some number of people, the actual time is longer than two days). Dr. Penn's

24    conclusion then introduces a new "fact" that the evaluation is actually completed

25    "within 24-48 hours" of Administrative Separation placement.

26      170.   To be sure, even Dr. Penn's misrepresented "fact" about the San Diego

27    County Jail's practice (evaluation 24-48 hours after isolation placement) puts this

28    Jail system in a state of non-compliance with United States Department of Justice

standards and the generally accepted standard of care for a jail system's placement of people with serious mental illness in isolation, which require that a clinician assess a patient with serious mental illness **before** they are placed in Administrative Separation to prevent undue risk and actual harm.

171.   I have found repeated examples of patients placed in extraordinarily harsh, isolating, and punitive-feeling settings that harmed their mental health and resulted in serious harm, including suicides and other deaths.

**Administrative Separation**

172.   I have previously discussed the staggeringly high number of patients with serious mental illness being housed in the enormously restrictive and anti-therapeutic Administrative Separation.  *See* Stewart Report ¶¶ 182-283 (harmful conditions and consequences for patients in Administrative Separation/solitary confinement).  Here is yet another example, from Dr. Penn's own report.



174.

**Ex. O-1117**

1     175.



16     176.  It is very difficult to understand how Dr. Penn's report, which claims to

consider the experience of this person with serious mental illness, subjected to more

than four years in Administrative Separation without meaningful or clinically

necessary mental health treatment, can conclude that "it is my professional opinion

that SDSO effectively minimizes prolonged restrictive housing for IPs with mental

disorders." Penn Report at 46. I strongly disagree with Dr. Penn's finding, and

nothing in his report changes my opinions on this topic.

**"Wellness Rounds" in Administrative Separation**

177.  Dr. Penn describes the "Wellness Rounds" that the Jail has reportedly

begun to implement. These are described as a "weekly practice" by which "a

multidisciplinary team enters a specific Ad Sep restrictive housing pod" and "walks

individually to each IP's cell, engages with the IPs, and asks if they need any

assistance. They encourage the IPs to exit their cells if appropriate and oversee the

Ex. O-1118

cleaning of cells by trained IPs, performing additional cleaning as needed.  The team assesses the IP's cell condition, mental status, clinical functioning, and daily living activities."  Penn Report at 52.  It is my assessment that this reported practice does *not* address the very serious harms and risks of harm inflicted on people with serious mental illness who are housed in the Jail's Administrative Separation units.

178.   Dr. Penn states that the "Wellness Rounds" practice has been in place for two years, but it is oddly not memorialized or described in the Jail's health care policy regarding Administrative Separation patients (Medical Services Division MSD Policy G.2.1).  *See* Quiroz PMK Dep. at 259 (confirming that MSD Policy G.2.1 is the only "policy document[] or directive[] that [is] foundational to understanding MSD's policies for segregated inmates" and that no NaphCare policy regarding segregated inmates has been implemented).  Without any written policy or directive regarding Wellness Rounds, any such *ad hoc* practice gives me little confidence in its efficacy to ensure adequate evaluation, treatment, and supervision of people with serious mental illness in Administrative Separation units.

179.   I am glad to hear that Wellness Rounds, even as an unwritten practice, might be something happening in the San Diego County Jail system.  Given the extraordinary acuity of mental illness I observed among so many patients in the Administrative Separation units, the level of isolation there, and the overall lack of meaningful activity and treatment, *any* additional observation of and engagement with these patients is a good thing.

180.   But to be clear, these "Wellness Rounds" do *not* mitigate my grave concerns about the harmful conditions and lack of treatment in Administrative Separation units.  These "Wellness Rounds" do *not* provide for clinician-patient confidentiality, are *not* a meaningful clinical contact, are *extraordinarily limited* in their use as a mental health evaluation tool, and do *not* constitute meaningful treatment.  By their design and in their implementation, these Wellness Rounds do *not* provide the mental health treatment and clinical interventions that the patients

1   with serious mental illness so clearly need.

2       181.   Based on my in-person observations and review of records, Wellness

3   Rounds – to the extent they are occurring – are not achieving the stated goal of

4   ensuring appropriate cleanliness in people's cells.  I observed Administrative

5   Separation cells housing people with serious mental illness that were extremely

6   filthy and cluttered with trash in the cell.  Many cells reeked of urine and feces.

7   Two years of Wellness Rounds do not seem to have addressed this serious issue,

8   which is both inhumane and unacceptable from a basic sanitation perspective.

9       182.   In my review of patient records, I analyzed the documentation of

10   Wellness Rounds.  In the aggregate, the Wellness Rounds are superficial in the

11   issues that they address and clinically unhelpful.  I did not find evidence of

12   meaningful multidisciplinary collaboration.  There is also great variability in the

13   way Wellness Rounds are documented, which is a reflection of this being an *ad hoc*

14   practice. Attendance of different disciplines is quite variable.  Significantly, the

15   privately contracted (NaphCare) mental health staff (*i.e.*, psychologists, nurse

16   practitioners, psychiatrists) do not participate in these rounds – that is, the one

17   consistency that I do see is that psychiatry is not involved.

18       183.   The Wellness Rounds, as documented, provide no clinically significant

19   interventions.  Often, they are simply an opportunity for a patient to complain about

20   the long waits they are facing to be seen by a psychiatric provider, a reflection of the

21   very problematic backlogs for psychiatry appointments and mental health sick call

22   requests.  Patient records of the Wellness Rounds do not include meaningful

23   assessment or clinical interventions.

24       184.   Despite Dr. Penn's assertion that the Wellness Rounds team

25   "encourage[s] the IPs to exit their cells if appropriate and oversee the cleaning of

26   cells by trained IPs, performing additional cleaning as needed," I found that the

27   documentation consistently makes no reference to patients exiting their cells or

28   being assisted with necessary cell cleaning.

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. O-1120**

1     185.   As one example,



19     187.   In sum, it is my strong opinion that "Wellness Rounds" do not address

20   the harsh, dangerous, and countertherapeutic conditions in Administrative

21   Separation units that put large numbers of patients with serious mental illness at risk

22   every day.

23   **EOH, Safety Cells, and PSU Observation Cells**

24     188.   I have discussed at length the exceedingly harmful conditions and

25   clinically inappropriate use of Enhanced Observation Housing (EOH) cells, safety

26   cells, and PSU Observation Cells in the San Diego County Jail system.  Stewart

27   Report ¶¶ 288-316 (EOH and safety cells); *id.* ¶¶ 120-123 (PSU Observation Cells).

28     189.   Dr. Penn's report has very little to say regarding the exceedingly harsh

1   conditions in and practices around these extremely restrictive placements, other than

2   to conclude – without analysis – that "Watch cells and Enhanced Observation

3   Housing (EOH) are not punitive isolation units but are designed for short-term,

4   closely monitored care of IPs who are at imminent risk of self-harm or suicide.

5   Their use is strictly for maintaining safety and preventing severe harm, not for

6   punishment." Penn Report at 68. I strongly disagree with Dr. Penn's finding that

7   these exceedingly harsh and punitive-feeling placements are clinically appropriate,

8   much less effective at "preventing severe harm." Below are additional examples of

9   patients I reviewed who were placed at unacceptable risk and in fact harmed by

10  placement in these settings.

11  [redacted]

12  [redacted]

13  [redacted]

14  [redacted]

15  [redacted]

16  [redacted]

17  [redacted]

18  [redacted]

19  [redacted]

20  [redacted]

21  [redacted]

22  [redacted]

23  [redacted]

24  [redacted]

25          191.   In my professional opinion, more therapeutic treatment settings and the

26  provision of meaningful treatment would have been far more effective in treating

27  this patient's mental illness, addressing his self-harming behaviors and psychiatric

28  symptoms, and mitigating unnecessary distress and harm to him in the process.



visits

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. O-1123**



196.   These cases, and so many others I have reviewed, illustrate how the San Diego County Jail's system denies clinically appropriate care, imposes clinically contraindicated, punitive-feeling, unduly harsh conditions for people with serious mental illness, and imposes avoidable harm and risks of harm to patients' physical safety and psychological well-being.

**J.    Dr. Penn's Opinion that the San Diego County Jail System Has an Adequate Suicide Prevention System Is Inconsistent with the Facts, and His Analysis Omits Critical Information.**

197.   Dr. Penn opines that the "SDSO Sheriff's Office [sic] has adequate policies and procedures to identify, treat, track, and supervise IPs at risk for suicide and provides clinically appropriate mental health and psychiatric services to SDSO IPs who are potentially suicidal and/or engaging in self-harm." Penn Report at 46-50. I strongly disagree with this opinion and have grave concerns about Dr. Penn's analysis and methodology in reaching such an opinion.

198.   First, it must be reiterated that Dr. Penn did not review materials pertaining to *any* in-custody suicide or mental health-related death. His analysis is

limited to extremely general data that offers little insight into the adequacy of the suicide prevention system at the San Diego County Jail. Penn Report at 46 ("All individuals who completed suicides were male."; "Nine of these suicides were carried out by asphyxiation, while one was completed through water intoxication."; "The distribution of these incidents across facilities shows that two occurred at the George Bailey Detention Facility, two at the Vista Detention Facility, and six at the Central Jail.").

199.   Dr. Penn makes the factually inaccurate statement that "there has been no concentration of completed suicides at any particular SDSO Complex (or custody level)." Penn Report at 49. This appears to be another example of a direct copy-and-paste finding from Dr. Penn's Arizona prisons case expert testimony, where he stated: "There is no concentration of completed suicides at any particular ADCRR Complex (or custody level)." Joseph Penn Expert Report, *Jensen v. Shinn*, No. 2:12-cv-00601-ROS (D. Ariz.), Dkt. 4172 at 83 (¶ 233). His finding is identical in the two cases (with only the name of the detention system changed from "ADCRR" to "SDSO").

200.   This finding may have been accurate in the Arizona prison system, but it is *not* accurate in this case. Dr. Penn's own report (at 46, 49-50) indicates that, across San Diego County's 7 jail facilities, since 2019, **60% of completed suicides have occurred at Central Jail.** His data does not include still other horrific and most certainly mental health-related deaths at Central Jail during that time period. *See, e.g.*, Stewart Report ¶¶ 266-274 (Rupard death by pneumonia, malnutrition, and dehydration in the wake of extreme and untreated psychiatric decompensation at Central Jail, ruled a "homicide" due to "neglected schizophrenia"); *id.* ¶¶ 169-170 (Baker death by homicide at Central Jail, after he was excluded from clinically appropriate mental health placement and was instead housed in a cell with a violent cellmate without mental illness). Dr. Penn's finding here is inconsistent with the facts, and even his own data.

**Inadequate Suicide Risk Screening**

201.   I strongly disagree with Dr. Penn's finding that "the Sheriff's department adequately screens and identifies IPs at risk for suicide." Penn Report at 46. Here, it is notable that Dr. Penn does not consider the findings of deficiency that have been documented by other independent parties about San Diego County Jail's suicide prevention policies, procedures, and practices. Stewart Report ¶¶ 26-30 (describing my own findings of deficiency regarding suicide risk screening and findings made by nationally recognized jail suicide prevention expert Lindsay Hayes); DRC Report Appendix A at 6 ("Of the twelve (12) San Diego County Jail inmates who died by suicide from December 2014 through 2016, we identified a number of problems with the initial suicide risk screening and referral process. . . . One particularly troubling case stood out. The inmate had a diagnosis of bipolar disorder and was screened, but even though he demonstrated signs and symptoms of florid psychosis and mania, he was not referred for evaluation and admission to the Psychiatric Security Unit. He was placed in a Safety Cell, was later released to general population, and died on Day Six of his confinement while still floridly psychotic and manic, despite a request to custodial staff earlier in the day for safety cell placement. Jail staff did not complete a separate assessment of suicide risk despite this inmate's extreme mental state and need for evaluation and treatment.").

202.   Through my assessment, I considered these previous findings of deficiencies by other reviewers. I concluded that these deficiencies have not been remedied and remain prevalent in this Jail system.

203.   Dr. Penn does not consider these findings at all. Dr. Penn's designated reviewers *did* find deficiencies in suicide risk screening, a fact with which his report's findings and opinions do not engage. *See, e.g.*, Penn Report at 186 (Designated expert reviewer finding "I did not notice much difference among all the suicide risk assessments, suggesting a 'cut and paste' for much of the documentation.").

REBUTTAL EXPERT REPORT OF PABLO STEWART
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. O-1126

**Inadequate Monitoring of Patients at Risk of Suicide**

204.    I strongly disagree with Dr. Penn's opinion that "the Sheriff's Department adequately monitors IPs at risk of suicide." Penn Report at 47. The primary basis for this finding, according to Dr. Penn's discussion, appears to be that incarcerated people are "informed that they could alert custody staff of any developing suicidal ideation by pressing the intercom button in their cell" and are "encouraged to communicate any mental health concerns or urgent requests for mental health involvement by pressing the button, informing custody staff, or submitting a written sick call request." *Id.* These practices do not remotely constitute an adequate system of monitoring patients at high risk of suicide in a jail setting. Numerous case examples and systemic deficiencies inform my strong disagreement with Dr. Penn's conclusion.

205.    Here, Dr. Penn's choice not to review any of the suicides or mental health-related deaths that have occurred in the San Diego County Jail is notable. For example, take the horrific death of Ivan Ortiz, who died by suicide in a Central Jail PSU Observation Cell. In Mr. Ortiz's case, a deputy left a plastic bag in Ortiz's cell and staff failed to adequately monitor him despite his placement in what the Jail system considers to be its *most intensive* level of mental health observation. *See* Stewart Report ¶ 122.

206.    Deficiencies in the monitoring of high-risk suicidal patients persist to this day. The San Diego County Jail has refused to implement the repeatedly recommended practice of "constant observation" for high-risk suicidal patients. *See* Stewart Report ¶¶ 317-319 (describing how this practice was recommended by national suicide prevention expert Lindsay Hayes following his assessment of the Jail in 2018, Disability Rights California's similar recommendation to the Jail in 2018, and NCCHC's criticism of the Jail on this topic in 2017).

207.    Dr. Penn's opinion is also wrong insofar as it ignores the serious deficiencies in the Jail's system of "safety checks" for patients in settings known to

1  house patients at elevated risk of suicide.  These deficiencies have been documented

2  repeatedly by outside auditors, consultants, and investigating bodies, and have been

3  shown to have played a role in multiple suicides that have occurred in the San Diego

4  County Jail system.  Stewart Report ¶¶ 320-335.  This is a notable omission in

5  Dr. Penn's assessment.

6  **Inadequate Mental Health Follow-up for Patients at High Risk of Suicide**

7  208.  I strongly disagree with Dr. Penn's opinion that "the Sheriff's

8  Department provides adequate mental health follow-up care for IPs released from

9  suicide precautions."  Penn Report at 47.

10  209.  Here again, Dr. Penn's choice not to review any of the suicides or

11  mental health-related deaths that have occurred in the San Diego County Jail skews

12  his assessment.  There are multiple suicide deaths that strongly indicate deficiencies

13  with respect to mental health follow-up care.  *See e.g.*, Stewart Report ¶¶ 82-85

14  (Ornelas 2023 suicide where Jail health care contractor NaphCare's death review

15  asserts need for "Closer Psychiatric follow-up/care"); *id.* ¶¶ 258-265 (McDowell

16  2023 suicide in which patient reporting ██████████████████████████

17  ███████████████████████████████████████, with no follow-up

18  done in the six weeks leading up to his suicide Jail health care contractor

19  NaphCare's death review asserts need for "Closer Psychiatric follow-up/care"); *id.*

20  ¶ 297 (patient placed in Enhanced Observation Housing unit, cleared from suicide

21  precautions with recommendation for mental health follow-up within 24 hours, but

22  patient is not seen for two days, at which time he jumped off the top tier of his

23  housing module, fell an estimated 20 feet, landed on the cement floor, and was

24  found in a pool of his own blood, suffering pelvic, facial, and rib fractures, kidney,

25  liver, and lung lacerations, and traumatic brain injury).

26  210.  Patient cases reviewed by Dr. Penn's own designated reviewers

27  illustrate similar and further systemic deficiencies in the San Diego County Jail's

28  system for identifying, monitoring, treating, and conducting necessary follow-up for

1   patients at high risk of suicide.  For example:

2   ████████████████████████

3   ████████████████████████████████████████

4   ██████████████████████████████████████

5   █████████████████████████████████████

6   ████████████████████████████████████

7   ██████████████████████████████████████

8   ████████████████████████████████████

9   ███████████████████████.

10     212.  ██████████████████████████████

11  ██████████████████████████████████████

12  ████████████████████████████████████

13  ██████████████████████████████████████

14  ████████████████████████████████████████

15  █████████████████████████████████████

16  ███████████████████████████████████

17  ██████████████████████████████████████

18  ████████████████████████████████████████

19  ██████████████.  Timely follow-up for a person discharging from suicide

20  precautions in a jail setting is essential.  This is an example of an unacceptable and

21  dangerous delay for such follow-up.

22     213.  ████████████████████████████

23  ████████████████████████████████████

24  ██████████████████████████████████████

25  █████████████████████

26  ███████████  **(Penn Report at 196-197)**

27     214.  ██████████████████████████

28  ████████████████████████████████████████

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. O-1129**

1  

2

3

4

5

6

7  . This negatively impacts continuity of care and clinical

8  engagement, particularly for this kind of patient.

9  215.

10

11

12

13

14

15

16

17

18  . This is an unacceptable and dangerous failure to follow up with a

19  patient with a high suicide risk, and a case example where the Jail did not meet the

20  standard of care.

21  216.  Dr. Penn does not address the serious deficiencies in treatment and

22  suicide prevention in these patient cases, or in any other patient cases.  He fails to

23  review, and ignores altogether, critical incidents like in-custody suicide deaths and

24  serious suicide attempts.  This is a consequential and glaring omission, as the above

25  examples demonstrate.  Nothing in his report changes my opinion on this topic.  The

26  patient cases assessed by Dr. Penn's designated reviewers only elevate my concern

27  about the systemic suicide prevention-related failures in this Jail system.

28  / / /

Ex. O-1130

**K.      Dr. Penn's Opinion that the Sheriff's Department Does Not Discriminate and Unfairly Punish People with Mental Illness Is Contradicted by the County's Own Staff and Its Own Experts.**

217.    I strongly disagree with Dr. Penn's opinion that the "Sheriff's Department does not discriminate and unfairly punish IPs with mental illness in housing placements." Penn Report at 52. His analysis does not reference any data, records review, or other specific materials on which such an opinion should be based.

218.    As mentioned earlier in this report, Dr. Penn's opinion on this topic is directly contradicted by the Jail's own mental health leadership, who confirm that there are no policies or procedures at the Jail for mental health care staff to provide input regarding disciplinary processes. *Compare* Penn Report at 58 ("When an individual shows acute mental health deterioration, potentially linked to a disciplinary infraction, SDSO custody staff collaborate closely with mental health care staff" *with* Quiroz PMK Dep. at 178 ("Q: Does mental health staff play any role in the administration of discipline for people with serious mental illness? A:No").

219.    The involvement of mental health staff in disciplinary procedures for people with mental health needs is an essential practice for any jail system to avoid the wrongful discrimination and unfair (and potentially dangerous) punishment of people with mental illness for behaviors that are manifestation of their mental health disability. San Diego County Jail fails to have such a policy, procedure, or practice.

220.    As I have noted, the County's own expert on disability discrimination issues looked closely at this issue, and made a finding directly in contradiction to Dr. Penn's statement on this point:

> ***The SDCSO does not have a process for a clinician to provide his/her professional recommendations*** (e.g., whether the incarcerated person fully understood the nature of his/her actions at the time of the disciplinary charge and alleged actions) ***to the hearing official so they can give consideration to the recommendations prior to ruling on the charge and issuing any sanctions.*** The SDCSO should develop policies and a process for clinicians to provide their professional recommendations regarding the incarcerated persons understanding of their actions and for the hearing official to consider the clinical input of

1    sanctions that should be avoided based on the clinician's assessment.

2    Defs.' Expert Report of Julian Martinez at 75 (emphasis added).

3        221.   Nothing in Dr. Penn's report changes my strong opinion that the San

4    Diego County Jail improperly and dangerously punishes people with serious mental

5    health treatment needs or an intellectual disability.  Stewart Report ¶¶ 418-424.

6        222.   An additional note is warranted here.  During my on-site tours of the

7    San Diego County Jail facilities, I observed very clearly that the Administrative

8    Separation isolation units are filled, to an overwhelming extent, with people who

9    showed signs of serious mental illness.  My review of records strongly indicates that

10   people with serious mental illness are placed into Administrative Separation

11   isolation units for reasons directly related to their mental illness and the symptoms

12   of their illness.  This practice directly contravenes the standard of care, along with

13   the guidance of the United States Department of Justice on this topic.  Stewart

14   Report ¶¶ 184-186 (discussing DOJ guidance that an "inmate with [serious mental

15   illness] should not be placed in restrictive housing" except in specific exceptional

16   circumstances).

17   **L.    Dr. Penn's Opinion that the "Sheriff's Department Provides IPs
         with Adequate Mental Health Discharge Planning and Resources"
18       Is Not Supported by the Facts and Is Contradicted by the County's
         Own Jail Mental Health Coordinator.**
19

20       223.   Dr. Penn's opinion that the Jail has implemented adequate discharge

21   planning services is not supported by the facts in this case.  Penn Report at 53-54.

22   My report describes in some detail the deficiencies with respect to this aspect of the

23   Jail's inadequate mental health care system.  Stewart Report ¶¶ 431-439.

24       224.   Most significantly, the Jail's mental health coordinator agrees that "we

25   do need more" mental health discharge planning staffing resources to meet the needs

26   of the Jail mental health population.  She testified that the County has not done a

27   "needs assessment to determine what staffing resources are necessary" to meet

28   discharge planning needs of the seriously mentally ill population, and that while

1  "it's challenging without the data to know," she could say that "more [discharge

2  planning staff] is certainly better." Quiroz PMK Dep. at 171-172.

3      225.  My review of patient records revealed that discharge planning services

4  are extremely limited to the point that the basic clinical needs of the Jail's seriously

5  mentally ill population are not being met. There is insufficient discharge planning

6  to ensure that patients have continuity of psychiatric medications and mental health

7  services, with appropriate and effective linkages to community service providers –

8  which are essential to adequate discharge planning in a jail system.

9      226.  The example of patient ████████████ is an illustrative one. ███

10 ████████████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████████

13 ███████████████████████████████████████████████████

14 ██████████████████████████████████████████. This is

15 inadequate and constitutes a failure in the provision of care.

16     227.  I can discern no meaningful involvement of the County's Behavioral

17 Health Services or Public Health Services agencies in discharge planning of

18 incarcerated patients at San Diego County Jail. This is in stark contrast to

19 comparable and nearby County systems—like that of Orange County, Los Angeles

20 County, and Santa Barbara County—in which the county mental health and public

21 health agencies play a significantly more active role in discharge planning for

22 patients in jail detention. Effective coordination between a jail system and the

23 county mental health and public health agencies on the subject of discharge planning

24 for people with serious mental illness is a critically important practice, to ensure that

25 people have timely and meaningful access to the services they need when they are

26 released from detention. This is an area on which San Diego County must improve

27 through multi-agency collaboration and coordination.

28 / / /

## IV.    CONCLUSION

228.    The information and opinions contained in this report are based on evidence, documentation, and/or observations available to me.  I reserve the right to modify or expand these opinions should additional information become available to me.  The information contained in this report is a fair and accurate representation of the subject of my anticipated testimony in this case.


Dated:  October **31,** 2024

Pablo Stewart, M.D.

**Ex. O-1134**