GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPÚLVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, <br><br> Defendants. | Case No. 3:20-cv-00406-AJB-DDL <br><br> **EXHIBITS P-AA TO DECLARATION OF VAN SWEARINGEN ISO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF, DEFENDANTS' EXPERTS - VOLUME II** <br><br> Date:   March 6, 2025 <br> Time:   2:00 p.m. <br> Crtrm: 4A <br><br> Judge:  Hon. Anthony J. Battaglia |

[4620326.1]

# TABLE OF CONTENTS

## EXHIBITS TO DECLARATION OF VAN SWEARINGEN ISO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERTS

## VOLUME II

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Expert Report of Jeffrey E. Keller, M.D. (Redacted) | P | 1135 |
| Rebuttal Expert Report of Jeffrey E. Keller, M.D. (Redacted) | Q | 1390 |
| Excerpt from Expert Report of Jay D. Shulman | R | 1543 |
| Excerpt from Expert Report of Debra Graham | S | 1553 |
| Expert Report of Brian L. Withrow, Ph.D. (Under Seal) | T | 1558 |
| Expert Report of Henrietta L. Peters (Under Seal) | U | 1579 |
| Excerpt from Transcript of October 30, 2024 Deposition of Henrietta L. Peters | V | 1594 |
| Excerpt from Transcript of November 12, 2024 Deposition of Owen J. Murray (Redacted) | W | 1612 |
| Excerpts from Transcript of November 18, 2024 Deposition of Joseph V. Penn (Redacted) | X | 1660 |
| Excerpts from Transcript of November 8, 2024 Deposition of Scott Reinecke (Redacted) | Y | 1715 |
| Excerpts from Transcript of November 4, 2024 Deposition of Lenard Vare | Z | 1738 |
| Analytica Consulting Report, "San Diego County: In-Custody Death Study" (April 2022) | AA | 1751 |

# EXHIBIT P

# (Redacted)

Ex. P-1135

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXPERT REPORT OF JEFFREY E. KELLER, M.D.**<br><br>Judge: Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

[4448212.31]

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Ex. P-1136

# TABLE OF CONTENTS

**Page**

EDUCATION AND QUALIFICATIONS ................................................................. 1

SUMMARY OF OPINIONS ................................................................................ 3

METHODOLOGY .............................................................................................. 6

BACKGROUND ................................................................................................ 8

I.    Multiple Expert Entities Have Reported on the Inadequate Healthcare at the Jail .......................................................................................... 8

II.   The Sheriff's Department's Contracts with Multiple Private Companies to Provide Healthcare at the Jail ................................................... 17

    A.    Background on NaphCare ............................................................ 17

    B.    NaphCare's 2022 Contract with San Diego County ....................... 21

    C.    The Sheriff's Department Continued to Work With, and Pay, NaphCare, Despite Knowing That NaphCare Was Not Living Up to Its Contractual Obligations .................................................. 21

    D.    The Sheriff's Department Recently Contracted with Correctional Healthcare Partners to Provide Additional Health Care Staff ........... 24

OPINIONS ...................................................................................................... 25

I.    Inadequate Medical Care at the Jail Has Resulted in Preventable Deaths ...... 26

    A.    The Jail's Flawed Mortality Review Process ................................. 28

    B.    NaphCare's Flawed Mortality Review Process .............................. 30

    C.    Case Studies of Deaths at the Jail Demonstrate Substandard Care ...... 35

        1.    Patricia Adamson (████████), Died May 3, 2023 ................... 36

        2.    Raymond Dix (███████), Died September 13, 2022 .............. 42

        3.    Vianna Granillo (████████), Died July 13, 2022 .................. 45

        4.    Abdiel Sarabia (███████), Died July 22, 2022 .................... 48

        5.    Aaron Bonin (███████), Died November 1, 2022 ................. 51

        6.    Roselee Bartolacci (████████), Died May 29, 2023 .............. 54

        7.    Erica Wahlberg (███████), Died July 2, 2022 ....................... 60

    D.    Repeated Root Causes of Death in These Case Studies ................... 64

E.     Additional Deaths in the Jail ..................................................... 65

II.  The Sheriff's Department's Inadequate Screening and Intake Process Fails to Identify and Treat Medical Care Problems of Newly Arriving Incarcerated People, Placing Them at Substantial Risk of Significant Harm ................................................................................................ 69

A.     Step One:  Medical Clearance ................................................. 71

B.     Step Two:  Receiving Screening .............................................. 72

C.     Step Three:  Second Stage Nursing Evaluation .................... 73

D.     Step Four:  14-Day Health Assessment ................................ 74

III.  The Sheriff's Department Fails to Continue Medically Necessary Medications and Treatments for Incarcerated People Upon Their Arrival at the Jail or Transfer Between Jail Facilities, Placing Them at Substantial Risk of Serious Harm ................................................. 82

A.     Continuing Medical Necessary Medications After Booking ............... 82

B.     Continuing Medically Necessary Treatment After Booking ............... 89

IV.  The Sheriff's Department Does Not Provide Incarcerated People with a Reliable and Timely Way to Alert Health Care Staff of Their Medical Needs, Placing Them at Substantial Risk of Serious Harm ............................ 93

A.     The Sheriff's Department Lacks an Effective Process for Submission, Tracking, and Scheduling of Sick Calls ......................... 95

B.     Even When Medical Requests Received and Processed, They Are Often Not Timely or Adequately Addressed .............................. 101

C.     Grievances Are Often Ignored or Not Answered Satisfactorily ......... 105

D.     The Sheriff's Department Lacks an Effective Alert System for Medical Emergencies ........................................................ 108

E.     The Sheriff's Department Lacks a Working System for Ensuring that People with Mental Illness or Other Communication Difficulties Receive Medical Care ..................................................... 111

V.  The Sheriff's Department Improperly Documents "Refusals" of Medical Care, Resulting in the Denial of Care to Incarcerated People, and Placing Them at Substantial Risk of Serious Harm ............................ 113

VI.  The Sheriff's Department Routinely Attempts to Provide Medical Care Without Examining Patients or By Asking Medical Staff to Operate Outside Their Scope of Practice, Placing Incarcerated People at Substantial Risk of Serious Harm ................................................ 124

A.     The Jail Misuses STATCare, Employing Midlevel Practitioners in Remote Locations to Cover for, Supplement, and Replace On-Site Medical Practitioners. ................................................... 127

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Ex. P-1138

B.    Jail Medical Practitioners Provide Care to Incarcerated Patients Without Proper Examination. ...................................... 133

C.    Registered Nurses Operate Outside Their Scope of Practice at the Jail .............................................................................. 134

VII.   The Sheriff's Department Lacks Sufficient Contracts with Hospitals and Offsite Providers and Lacks Proper Referral Processes to Provide Adequate Medical Care to Incarcerated People, Placing Them at Substantial Risk of Serious Harm ............................................ 136

VIII.  The Sheriff's Department Fails to Provide Adequate Diagnostic and Chronic Care to Incarcerated People and Provides Inadequate Treatment for Several Common Medical Conditions, Placing Them at Substantial Risk of Serious Harm ........................................ 148

A.    Diagnostic Care ......................................................... 149

B.    Chronic Care ............................................................. 152

C.    Inadequate Treatment of Common Medical Conditions .......... 154

1.    Hepatitis C ("HCV") ......................................... 155

2.    Type 2 Diabetes .................................................. 160

3.    Hernias ............................................................... 168

4.    Latent Tuberculosis ("LTB") ................................ 175

5.    Sexually Transmitted Infections ("STIs") ............... 177

6.    Asthma ............................................................... 182

IX.    The Sheriff's Department Fails to Provide Medically Necessary Vision Care ................................................................................ 188

A.    The Sheriff's Department Fails to Screen or Evaluate People for Eye Diseases, Even Those Who Self-Identify as High Risk .......... 188

B.    The Sheriff's Department Fails to Timely and Adequately Address Incarcerated People's Visual Acuity Problems ........... 190

1.    There Are Numerous Barriers Preventing People From Timely Receiving Eye Glasses .................................... 190

2.    The Jail Lacks Adequate Policies and Procedures to Ensure IPs Have Access to Distance Glasses .................. 191

X.    Custody Staff Interfere with the Provision of Care by Health Care Staff in the Jail, Including by Compromising Patient Confidentiality, Which Puts Patients at Substantial Risk of Serious Harm .......................... 197

XI.    The Sheriff's Department Fails to Maintain Adequate, Accurate, and Complete Medical Records, Which Compromises the Delivery of Care ..... 203

XII.   The Sheriff's Department Fails to Provide Necessary or Adequate
       Follow-Up Medical Treatment to Incarcerated People ............................... 210

XIII.  The Sheriff's Department Fails to Provide Adequate Discharge
       Planning Services and Medication for Incarcerated People Being
       Released from the Jail ......................................................................... 216

       A.   Coordinating Ongoing Medical Care with Outside Agencies ........... 219

       B.   Discharge Medications ................................................................ 221

       C.   Patient Instructions .................................................................... 223

       D.   Documentation and Information Transfer. ..................................... 224

XIV.   The Sheriff's Department Fails to Maintain Adequate Quality
       Assurance/Quality Improvement Processes to Ensure Appropriate and
       Timely Medical Care ........................................................................... 225

       A.   The Jail's Policies Are Not Sufficiently Clear, Allowing Staff to
            Escape Accountability ................................................................. 228

       B.   The Sheriff's Department Does Not Provide Adequate Training,
            Meaning that Some Staff May Not Know the Governing Policy ....... 230

       C.   The Sheriff's Department Does Not Track or Analyze the Right
            Data to Ensure that Adequate Medical Care Is Provided ................. 231

       D.   The Sheriff's Department's Peer Review Process for Medical
            Staff Is Inadequate .................................................................... 233

XV.    The Sheriff's Department Systematically Fails to Maintain Sufficient
       Numbers of Health Care Professionals, Resulting in Deficient Care ........... 234

       A.   The Jail Has Experienced a Shortage of Healthcare Staff for
            Several Years .............................................................................. 234

       B.   The New Contract with CHP Will Not Solve the Jail's Problems ..... 240

            1.   Ongoing Nursing Shortage .................................................. 241

            2.   Instability Created by Private Correctional Healthcare
                 Providers .......................................................................... 242

            3.   Siloed Medical Care Between NaphCare and CHP ................. 246

            4.   Deficiencies in New CHP Contract ...................................... 247

CONCLUSION ............................................................................................... 249

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
Ex. P-1140

I, Jeffrey E. Keller, M.D., declare:

1.    I am a physician licensed to practice medicine in the State of Idaho, with a particular focus on correctional medicine. I am also a businessperson with significant knowledge about the private correctional healthcare industry. I am currently the President of the American College of Correctional Physicians ("ACCP"). The ACCP is the only international membership organization committed to the professional development and fellowship of doctors and mid-level practitioners who practice in the field of correctional medicine—*i.e.*, providing medical care to patients incarcerated or confined in jails, prisons, and juvenile facilities. A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit A**. My background and experiences relevant to my expert testimony in this proceeding are set forth below.

### EDUCATION AND QUALIFICATIONS

2.    I received my medical degree from the University of Utah in 1985. I began my career as a residency trained emergency physician. I practiced for 25 years at an Emergency Department in a busy Level-2 Trauma Center. The majority of my professional medical career has been focused on correctional healthcare, including both the clinical and business aspects of providing medical care to incarcerated persons confined in jail and prison facilities.

3.    I have significant business experience in the private correctional healthcare industry. When I use the term private correctional healthcare industry, I am referring to profit-seeking companies, like NaphCare, Inc. and its many competitors, whose business model centers on contracting with states, counties, and other municipalities to provide healthcare to incarcerated or confined citizens in return for money from which the companies endeavor to earn profits for their owners.

4.    From 1997 to 2021, I was the President and Medical Director of a company called Badger Medical PA. Badger Medical PA was a for-profit jail

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1141**

1 medical company that provided medical and mental health services to people

2 incarcerated in 17 Idaho jails and juvenile facilities. As CEO and Medical Director

3 of this company, I was responsible not only for overseeing medical care to

4 incarcerated people but also for overseeing all business components of the company,

5 including gaining and keeping contracts, making budgets, overseeing and

6 controlling costs, and running the company with the goal of maintaining a profitable

7 business while, at the same time, providing quality correctional healthcare that met

8 the company's contractual commitments. I also supervised all medical care, wrote

9 policies and procedures, oversaw quality improvement programs, and provided

10 direct clinical care to patients in jails until I retired from clinical practice in 2021.

11      5.     I am also the former Chief Medical Officer ("CMO") of a correctional

12 company called Centurion, LLC. I was CMO of Centurion from 2013 to 2018.

13 Centurion is one of the nation's largest for-profit correctional medical companies.

14 As CMO for Centurion, I supervised medical services for tens of thousands of

15 incarcerated people in Massachusetts, Tennessee, Minnesota, Mississippi, Vermont,

16 Florida, and New Mexico where Centurion had contracts. As CMO for Centurion, I

17 also supervised Centurion's Quality Assurance Program, wrote medical guidelines

18 for people incarcerated in prisons in states serviced by Centurion, and regularly

19 interacted with Centurion upper-level management about issues relating to

20 budgeting and other matters relating to Centurion's obligations to provide quality

21 correctional healthcare and fulfilling the company's contracts while, at the same

22 time, seeking to maintain profitable operations.

23      6.     I am currently a consultant in the correctional medical industry. I

24 consult with both public entities and private entities on issues that include setting

25 and maintaining realistic budgets for providing acceptable healthcare for

26 incarcerated people. Throughout my experience, up to and including the present

27 time, I have regularly interacted with upper managers of private correctional

28 healthcare companies. I am very familiar with the industry as a whole based on my

1    personal business experience and my regular interaction with leaders and managers

2    of these companies.

3        7.    The opinions set forth in this report are based on my own training,

4    research, and experience as a Board-Certified Emergency Medicine Physician and

5    as a long-standing correctional physician.

6        8.    I am Board Certified in Emergency Medicine through 2028.  I have

7    been elected to be a Fellow of the American College of Emergency Physicians.  I

8    have also been elected to be a Fellow of the American College of Correctional

9    Physicians.  As noted above, I currently serve as the President of ACCP.  I have

10   lectured and published frequently on the practice of Correctional Medicine,

11   including a book entitled *The Best of Jail Medicine:  An Introduction to*

12   *Correctional Medicine*.

**SUMMARY OF OPINIONS**

13

14       9.    It is my opinion, based on a reasonable degree of certainty, that

15   inadequate medical care at the Jail has resulted in preventable deaths and will

16   continue to result in preventable deaths, because the Jail does not have adequate

17   mortality and morbidity review procedures.

18       10.   It is my opinion, based on a reasonable degree of certainty, that the

19   Sheriff's Department's screening and intake process is inadequate and fails to

20   identify and treat medical care problems of newly arriving incarcerated people.  This

21   systemic failure, which in my opinion is a root cause of the Jail's high mortality and

22   morbidity rates, places incarcerated people at substantial risk of serious harm.

23       11.   It is my opinion, based on a reasonable degree of certainty, that the

24   Sheriff's Department fails to continue medically necessary medications and

25   treatments after people are booked into the Jail, placing incarcerated people at a

26   substantial risk of serious harm.  The Sheriff's Department also fails to ensure

27   continuity of care after patients return from off-site hospitalizations and medical

28   visits, placing incarcerated people at substantial risk of serious harm.  This systemic

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1143

1    failure is, in my opinion, a root cause of the Jail's high mortality and morbidity

2    rates.

3        12.    It is my opinion, based on a reasonable degree of certainty, that the

4    Sheriff's Department does not provide incarcerated people with a reliable and timely

5    way to alert health care staff of their medical needs—whether emergent, urgent, or

6    routine—placing incarcerated people at a substantial risk of serious harm.  This lack

7    of communication with incarcerated people in need of medical care is particularly

8    challenging and dangerous for people with serious mental illness and developmental

9    disabilities, who are more even more likely to have their medical needs neglected

10   and suffer serious harm, including death.  This systemic failure is, in my opinion, a

11   root cause of the Jail's high mortality and morbidity rates.

12       13.    It is my opinion, based on a reasonable degree of certainty, that the

13   Sheriff's Department improperly documents "refusals" of medical care, resulting in

14   the denial of care to incarcerated people and placing them at a substantial risk of

15   serious harm.  This systemic failure is, in my opinion, a root cause of the Jail's high

16   mortality and morbidity rates.

17       14.    It is my opinion, based on a reasonable degree of certainty, that the

18   Sheriff's Department does not provide adequate examination of patients before

19   prescribing treatments, either because the practitioners providing care are

20   exclusively remote (rather than on-site) or because on-site practitioners do not

21   perform physical examinations, placing incarcerated people at a substantial risk of

22   serious harm.  In addition, it is my opinion that the Sheriff's Department relies on

23   nurses to operate outside their scope of practice to provide care, also placing

24   incarcerated people at a substantial risk of serious harm.  This systemic failure is, in

25   my opinion, a root cause of the Jail's high mortality and morbidity rates.

26       15.    It is my opinion, based on a reasonable degree of certainty, that the

27   Sheriff's Department uses inappropriate processes to refer or deny outside medical

28   appointments and lacks sufficient contracts with outside providers for specialty

medical care, placing incarcerated people at a substantial risk of serious harm.

16.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department provides inadequate diagnostic and chronic care to incarcerated people and provides inappropriate care for a number of common medical conditions, placing incarcerated people at a substantial risk of serious harm. This systemic failure is, in my opinion, a root cause of the Jail's high mortality and morbidity rates.

17.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department fails to provide medically necessary vision care, placing incarcerated people at a substantial risk of serious harm.

18.     It is my opinion, based on a reasonable degree of certainty, that custody staff routinely interfere with the provision of healthcare, including by denying incarcerated people confidentiality in their interactions with healthcare providers, which places incarcerated people at a substantial risk of serious harm.

19.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department fails to maintain adequate, accurate, and complete medical records, compromising the delivery of healthcare and placing incarcerated people at a substantial risk of serious harm.

20.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department does not provide adequate discharge planning to people being released from custody, placing incarcerated people at a substantial risk of serious harm.

21.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department does not conduct adequate continuous quality improvement programs, meaning that critical errors (including but not limited to those described in this Report) go unaddressed, placing incarcerated people at a substantial risk of serious harm.

22.     It is my opinion, based on a reasonable degree of certainty, that the

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1145**

1  Sheriff's Department has failed to maintain adequate levels of healthcare staff

2  relative to the incarcerated population, placing incarcerated people at a substantial

3  risk of serious harm.  This systemic failure is, in my opinion, a root cause of the

4  Jail's high mortality and morbidity rates.

5                                    **METHODOLOGY**

6          23.    I was asked by the attorneys representing the Plaintiffs in this case to

7  render an opinion as to the health care system, the general medical conditions, and

8  the adequacy of the medical care offered to the people incarcerated at the San Diego

9  County Jail (the "Jail").

10         24.    Prior to visiting three of the Jail facilities, I reviewed documents

11  pertinent to my objective.  These included the sections of the Third Amended

12  Complaint dealing with medical care, previous audits and inspections done of the

13  jail since 2017, contracts negotiated by San Diego County dealing with medical

14  care, and various other reports dealing with CQI, contract compliance, etc.

15         25.    I visited the Jail on February 6 through 8, 2024.  During the visit, I

16  toured the Central Jail, George Bailey Detention Facility ("George Bailey"), and Las

17  Colinas Detention and Reentry Facility ("Las Colinas").  At these facilities, I visited

18  medical housing units, intake units, medical clinics, a pharmacy, lab and storage

19  areas, and other housing units.  During the three days, I was able to speak briefly

20  with approximately 50 patients.  I also reviewed over 500 photographs taken during

21  the tour.  However, I was unable to interview many of the medical staff members

22  that I would have liked to.  Three different nurses at the Jail told me that "I was told

23  by my supervisor not to answer any of your questions," or "I was told not to talk to

24  you."

25         26.    After the tour, I reviewed 80 patient charts chosen by Defendants as

26  being representative of the following medical categories:  patients with opioid use

27  disorder (5), patients on opioid withdrawal protocols (5), patients with alcohol

28  withdrawal protocols (5), patients with HIV (5), patients with Hepatitis C (5),

1  patients with Type 2 Diabetes(5), patients with hypertension(5), patients with cancer

2  (5), patients who received gynecological care (5), emergency room referrals (5),

3  patients who had submitted five or more requests for medical care (5), patients

4  housed in medical overflow segregation cells (5), patients on dialysis (5), patients

5  receiving orthopedic care (5), and optometry referrals (5).  I also reviewed seven

6  patient charts of individuals with whom I spoke during my inspection of the Jail.

7  Many of the charts I received had technical issues that made them difficult to read.

8  In particular, the records, which were in some cases thousands of pages long, were

9  not text searchable, even after attempts to OCR them.  In addition, the charts were

10  generally missing all lowercase letter Is and Ls.  I was unable to review a complete

11  set of grievances (and their associated responses) relating to medical care, though

12  some grievances were produced within the charts described above.

13      27.    A complete list of the materials I reviewed is attached hereto as

14  **Exhibit B**.

15      28.    I compared and contrasted my findings with accepted standards of

16  correctional medical care found in the following published guidelines and source

17  material:  the National Commission on Correctional Health Care ("NCCHC");

18  published guidelines from nationally recognized medical specialty groups, such as

19  The American Society of Addiction Medicine, the American Diabetic Association,

20  American Association for the Study of Liver Diseases, and the Infectious Diseases

21  Society of America; standard medical textbooks, such as *Uptodate*; and San Diego

22  specific reports, including the NCCHC "Technical Assistance Report" com-

23  missioned by the Jail in 2017 and Dr. Homer Venters' "Review of Best Practices for

24  Jail Operations for San Diego County" commissioned by the Jail in 2020.

25      29.    I also relied on my own training, research and experience.

26      30.    I am receiving compensation at a rate of $250.00 per hour plus

27  expenses for this work.

28      31.    My opinions have a reasonable degree of medical certainty based on

Ex. P-1147

1  the evidence outlined above.  The information contained in this report and the

2  accompanying exhibits are a fair and accurate representation of the subject of my

3  anticipated testimony in this case.  I reserve the right to modify my opinions in the

4  light of new, additional information.

5                              **BACKGROUND**

6  **I.    Multiple Expert Entities Have Reported on the Inadequate Healthcare at
        the Jail**

7

8        32.    The San Diego Sheriff's Department ("Sheriff's Department") has been

9  on notice for several years that people in its custody are not receiving adequate

10  healthcare.  Multiple reports issued by organizations with expertise in correctional

11  medicine have documented practices in the Jail which fall below accepted standards

12  and jeopardize the health and safety of incarcerated people.  I found the following

13  reports and findings to be especially significant.

14        33.    In January of 2017, the Sheriff's Department received a technical

15  assistance report from the NCCHC.  NCCHC Report, January 2017,

16  DUNSMORE0260620.  The NCCHC is a leading nonprofit organization that

17  publishes correctional healthcare standards and accredits jails or prisons that meet

18  those standards.  DUNSMORE0260621.  Jails and prisons often seek technical

19  assistance from the NCCHC as a preliminary step towards accreditation.  A team

20  from the NCCHC visited four Jail facilities in San Diego:  Central Jail, George

21  Bailey, Las Colinas, and Vista Detention Facility.  DUNSMORE0260620.  During

22  its audit, the NCCHC documented dozens of failures to meet what it describes as

23  "essential" or "important" standards for the delivery of medical care to incarcerated

24  people.  DUNSMORE0260621-22.  Seven years after this report, the Jail is still not

25  accredited by the NCCHC.  The most important NCCHC findings and

26  recommendations are described below.

27        34.    First, the NCCHC documented that people who arrived at a Jail facility

28  with significant health conditions were often not identified or treated in a timely

1  manner.  For example, individuals booked into Central Jail sometimes did not
2  receive a full medical screening for several hours, placing those with unidentified
3  conditions at risk of a health "crisis."  DUNSMORE0260636.  None of the facilities
4  conducted initial health assessments during the first two weeks of incarceration to
5  further identify individuals in need of treatment.  DUNSMORE0260637, 0260671,
6  0260704, 0260738.  And auditors found little evidence that medical staff were
7  reviewing the charts of incarcerated people transferred from one jail facility to
8  another to ensure continuity of care.  DUNSMORE0260637, 0260670, 0260704,
9  0260738.

10       35.    Second, incarcerated people who themselves requested medical
11  attention were not seen and treated in a timely matter.  The NCCHC described
12  understaffing at the Jail and a resulting "serious" backlog of hundreds of medical
13  requests which had not been answered with a face-to-face evaluation by a medical
14  professional.  DUNSMORE0260658, 0260672-73, 0260706.  Nurses attempted to
15  manage this backlog by assigning triage levels to patients based only on the
16  symptoms they reported on their sick call slips.  DUNSMORE0260639, 0260672-
17  73, 0260706, 0260739-40.  The NCCHC warned that this is a dangerous practice
18  because seemingly minor symptoms may signify an urgent condition which would
19  not be identified without a face-to-face assessment.  *Id.*  The average wait time for
20  such an assessment far exceeded the NCCHC standard of 48 hours.  *Id.*  Patients
21  were waiting an average of eight days to see a nurse (with some waiting 12-18 days)
22  and an average of five days to see a physician (with some waiting 8-12 days).  *Id.*
23  Further delays occurred in some instances when there were not enough deputies to
24  escort patients to appointments.  DUNSMORE0260640, 0260672-74.  And even
25  after patients were seen and treatments were prescribed, there were delays in
26  administering essential medications to those who were new to the facility or who
27  were on lockdown.  DUNSMORE0260623, 0260633-34, 0260657, 0260667-68,
28  0260700-01.

36.      Third, the NCCHC documented that care was too often delivered by nurses acting outside the scope of their license.  Nurses were called on to make diagnoses, create care plans, prescribe medications, and administer prescription-strength doses of over-the-counter medications without physician oversight.  *See, e.g.*, DUNSMORE0260634, 0260636, 0260640-41, 0260667, 0260678, 0260701, 0260707.  Nurses were even tasked with diagnosing and ordering medications for some chronic diseases, which the NCCHC described as "not an acceptable practice." DUNSMORE0260643.  The NCCHC also noted that the way nurses administered medications—by pulling the doses from larger stock bottles without pharmacist or provider oversight—was a "serious and a violation of the Nurse Practice Act." DUNSMORE0260634.

37.      Fourth, patients with both acute and chronic conditions received sporadic care, often only seeing medical staff for follow-up appointments and monitoring of their condition if they themselves initiated a visit. DUNSMORE0260641, 0260674, 0260708, 0260741-42.  This is problematic because providers—not incarcerated people—are in the best position to know when and how a chronic condition should be monitored.  There were no guidelines in place to ensure consistent and quality treatment of patients with any chronic disease besides hypertension.  DUNSMORE0260643, 0260676, 0260710, 0260743-44. And there was little to no documented discharge planning for individuals with known release dates to ensure that they understood how to receive the medical care they needed in the community.  DUNSMORE0260641-42, 0260675, 0260708, 0260742.

38.      Fifth, the Jail lacked systems which would allow medical staff to identify and correct deficiencies with individual providers or the system of care as a whole.  Medical grievances were mixed in with other grievances, making it difficult to identify trends in complaints.  DUNSMORE0260627, 0260661, 0260694, 0260728.  Health staff were not informed of the results of death reviews.

1    DUNSMORE0260627, 0260661, 0260694, 0260727-28.  And there was no peer

2    review process whereby the work of individual clinicians could be reviewed by

3    others trained in their field.  DUNSMORE0260630, 0260664, 0260697 0260730.

4        39.    Other deficiencies also resulted in incarcerated people receiving

5    substandard care.  Clinical encounters often occurred in non-confidential spaces,

6    which the NCCHC warned could lead to less thorough and accurate assessments.

7    DUNSMORE0260626-23, 0260661, 0260693-94, 0260727.  There was no policy

8    ensuring that healthcare staff were present for refusals of care so that they could

9    counsel patients appropriately about the consequences of not attending a medical

10   appointment.  DUNSMORE0260650, 0260684, 0260717-18, 0260751.  And nurses

11   did not adequately document the condition of incarcerated people whom they

12   checked on in segregation.  DUNSMORE0260640, 0260673, 0260706-07, 0260740-

13   41.

14       40.    In short, the NCCHC report made clear that the Sheriff's Department

15   failed to meet standards that were essential for accreditation and, more importantly,

16   for the provision of adequate healthcare to those in its custody.

17       41.    On March 20, 2020, three years after the NCCHC documented

18   significant issues with the healthcare system at the Jail, Darryl Dunsmore filed his

19   lawsuit, which he later amended to allege that the medical care he received at the

20   Jail was not constitutionally adequate.  *See Dunsmore v. California, et al.*, Case No.

21   3:20-cv-00406-AJB-WVG, Dkt. No. 19.  In his First Amended Complaint,

22   Mr. Dunsmore asserted that his medical diet and diabetic insulin injections had been

23   discontinued when he transferred to the Jail from the California Health Care

24   Facility.  *See id.* at 3.  Mr. Dunsmore's complaint as well as the ongoing high death

25   rate illustrated that many of the deficiencies which the NCCHC described had gone

26   uncorrected, placing the health and lives of incarcerated people at risk.

27       42.    On March 30, 2020, Dr. Homer Venters, then president of the nonprofit

28   technical assistance organization Community Oriented Correctional Health Services,

provided the County of San Diego (the "County") with further recommendations on ways to improve healthcare delivery at the Jail.  Venters Report, March 30, 2020, SD_215361.  This document was prepared at the County's request for the express purpose of "reduc[ing] the rate of mortality and morbidity in the San Diego Jail system."  SD_215379.  Dr. Venters conducted a literature review and met with staff at the jail before preparing his recommendations.  SD_215362.

43.    Dr. Venters' report reiterated the importance of several best practices, such as identifying health conditions early through a thorough intake, making immediate referrals to providers for further evaluation when an urgent issue is identified, SD_215369-72, and ensuring that medications are ordered by a physician or mid-level provider and delivered in a timely manner, SD_215374.  Other recommendations addressed the need for monitoring the effectiveness of the healthcare system.  Dr. Venters suggested using an electronic medical record to track and evaluate performance, reviewing "sentinel events" such as "deaths, injuries, and self-harm," "surveying staff and patients about their engagement with the correctional health service," including enforceable performance standards in contracts with vendors, and possibly enlisting independent agencies to further monitor performance.  SD_215364-67.

44.    As the Venters Report shows, the County was aware of a need to reduce morbidity and mortality and was advised four years ago of several ways to accomplish this goal.

45.    On February 3, 2022, the California State Auditor issued a report of its investigation into the alarming number of deaths that occurred in the Jail from 2006 to 2020.  California State Auditor Report ("State Audit"), February 2022, SD_174794.  The State Audit confirmed that the Jail had a higher rate of suicides and natural deaths (which can include deaths where deficient medical care is a factor) than jails in any other comparable county in the State.  SD_174812-13.  This remained true even taking into account adjustments based on jail population size and

number of bookings.  *Id.*  The State Audit showed that the Jail's mortality rate remained high even after the NCCHC's 2017 warning of serious deficiencies in the Jail's healthcare system.  SD_174811.

46.    The State Audit also included an in-depth review of 30 in-custody deaths, with an emphasis on cases that occurred between 2016 and 2020. SD_174815.  It concluded that "deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals" had "likely contributed to in-custody deaths" and that the Sheriff's Department had "not consistently taken meaningful action when such deaths have occurred."  SD_174794.  I discuss some of the more specific State Audit findings below.

47.    First, the State Audit found that "[i]n at least eight of the 30 cases … individuals had serious medical or mental health needs that heath staff did not identify or communicate to detention staff at intake."  SD_174816-17.  Possibly as a result, "[f]ive of these individuals died within four days of their arrest."  *Id.*

48.    Second, the State Audit found that medical staff failed to respond appropriately to some incarcerated persons' repeated requests for help during the weeks preceding their deaths.  SD_174818.  In two illustrative cases, individuals reported worsening symptoms "over the course of one to three weeks" but were only evaluated by a nurse and not a physician.  *Id.*  These individuals eventually died of the conditions that jail staff failed to adequately assess and treat.  *Id.*  The State Audit also observed that some individuals were not receiving essential care because they refused appointments.  SD_174820-21.  Like the NCCHC, it recommended that health staff be present for refusals so that they could counsel patients.  *Id.*

49.    Third, the State Audit identified cases where sworn and medical staff failed to appropriately respond to medical emergencies.  Deputies often conducted cursory safety checks on the jail population and therefore potentially missed signs of medical distress.  SD_174821-23.  Oftentimes, incarcerated people were dead for several hours before a deputy realized something was wrong.  *Id.*  In several

**Ex. P-1153**

1  instances where deputies did realize that a person was unresponsive or otherwise in

2  distress, they "did not perform or delayed lifesaving measures" like CPR.

3  SD_174824.  Medical staff also took too long to arrive and assist deputies.

4  SD_174824-25.  The State Audit emphasized that minutes can make a difference to

5  survival during a medical emergency, SD_174283-84, and noted that a fifteen

6  minute delay in one case was "detrimental to the individual's likelihood of

7  survival."  SD_174825.

8         50.     Finally, the State Audit found that following these deaths, "[t]he

9  Sheriff's Department has not responded … in a manner that demonstrates its

10  commitment to improving health and safety at its detention facilities."  SD_174830.

11  For example, although the Sheriff's Department had a policy requiring that its top

12  medical staff review all deaths "to determine the appropriateness of clinical care"

13  that the decedent had received, "the Sheriff's Department did not sufficiently

14  document the results or recommendations from its 30-day medical reviews."

15  SD_174831.  The Sheriff's Department's Critical Incident Review Board ("CIRB")

16  did not examine any deaths deemed "natural" by the medical examiner to determine

17  whether deficient medical care could have been a factor.  SD_174834.  And

18  although the internal affairs unit has the power to investigate both sworn and

19  medical staff, it looked into only four of the thirty cases the State Audit reviewed.

20  SD_174835.  This was despite "a number of potential violations or concerns in some

21  of the other 26 cases that could justify further investigation."  *Id.*  The lack of

22  internal review mechanisms was particularly concerning because the County's

23  Citizen Law Enforcement Review Board ("CLERB") has been stymied in its efforts

24  to independently gather evidence about deaths at the jail.  SD_174839-44.

25         51.     In response to the State Audit, the Sheriff's Department attacked the

26  report's death count methodology and claimed that there was no evidence its

27  policies or practices contributed to high mortality in its facilities.  San Diego

28  Sheriff's Preliminary Comment on State Audit, January 14, 2022, SD_174883-84,

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1154**

174893-97.  The Sheriff's Department implied that deaths were inevitable without acknowledging the role of longstanding issues highlighted by the State Audit, like the inappropriate use of nurses to direct patient care.  SD_174893-94.  The Sheriff's Department also disputed the qualifications of the auditors, comparing their expertise unfavorably to that of the NCCHC, while failing to mention that the NCCHC had raised similar concerns in its own audit five years earlier.  SD_174889-92.  After disputing the State Audit's findings, the Sheriff agreed that it should implement many of the Audit's key recommendations, but provided few details on when or how this would occur.  SD_174902-09.

52.    On February 9, 2022, Mr. Dunsmore was joined by seven other individuals in filing the Second Amended Class Action Complaint for Declaratory and Injunctive Relief ("SAC") in this case, Dkt. No. 81, converting the individual case into a class action.  The class action complaint asserted, among other things, that the Jail failed to provide adequate medical care in violation of the 8th and 14th Amendments of the United States Constitution and Article 1, Sections 7 and 17 of the California Constitution.  At the time the SAC was filed, Defendants were managing their healthcare system through Correctional Healthcare Partners, Inc. ("CHP") and Tri-City Medical Center.  The SAC alleged a number of deficiencies in the provision of medical care, including the failure to maintain sufficient numbers of adequately trained healthcare professionals, the ability of custody staff to interfere with and undermine the healthcare professionals, inadequate screening and intake processes, inadequate care of people with substance use disorders and those experiencing withdrawal, the failure to continue medically necessary medications and treatments upon arrival, the lack of any timely or reliable way to alert healthcare staff of medical needs, the failure to maintain adequate, accurate, and complete medical records, the lack of sufficient contracts with community providers for outside medical care, the lack of confidential spaces for medical care and adequate diagnostic care, the lack of referrals to outside specialists when necessary, the lack

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1155**

1  of medically necessary eyeglasses, inadequate follow-up healthcare, inadequate

2  discharge instructions and medication, and the failure to maintain an adequate

3  quality assurance and quality improvement process.  *See* SAC at pp. 29-65.  The

4  operative Third Amended Complaint, filed November 18, 2022, Dkt. No. 231, has

5  similar allegations to the SAC.  I understand that this case was later certified into a

6  class action on behalf of all adults who are or will be incarcerated in any of the San

7  Diego County Jail facilities.

8      53.    A few months after the SAC was filed, that the County entered into a

9  contract for Jail medical care with the private medical provider NaphCare.  I have

10  reviewed the June 2022 NaphCare contract and its February 2024 amendment as

11  part of my work in this case and discuss them later in this report.

12      54.    In February 2023, the Sheriff's Department released its Progress Report

13  Update on the State Audit.  The Sheriff's Department claimed to be making changes

14  in response to the State Audit's findings and recommendations.  Progress Report:

15  Update on State Jail Audit, February 2023, SD_184480-82.  But the Sheriff's

16  Department has in fact failed to implement many policies and practices which the

17  State Audit advised could reduce mortality in the jail.  For example, the Sheriff's

18  Department claimed that nurses were conducting face-to-face evaluations within 24

19  hours of receiving a request for medical services as of December 2022.  *Id.*

20  SD_184484.  The Sheriff's Department also claimed that it was requiring medical

21  staff to counsel patients who refused a medical appointment and sign off on the

22  refusal.  SD_184485.  However, as discussed elsewhere in this report, a review of

23  medical records produced by the Jail shows that staff are not implementing either of

24  these changes.

25      55.    In sum, multiple experts and entities—the NCCHC, Dr. Venters, and

26  the State Audit—have pointed out the systemic failures in the Jail's healthcare

27  system.  As explained throughout this Report, it is my opinion that those problems

28  and others persist.

## II.    The Sheriff's Department's Contracts with Multiple Private Companies to Provide Healthcare at the Jail

56.    In the face of the many deaths, the State Audit, and this class action, the County decided to change private healthcare providers.  On April 26, 2022, the County signed a contract with NaphCare to provide healthcare at its seven jail facilities.  County Contract No. 566117, April 26, 2022, NAPHCARE000001.  The contract is for five years with another five-year renewal term, for an amount not to exceed $620,778,261.65.  *See* NAPHCARE000023.

### A.    Background on NaphCare

57.    NaphCare signed its first contract to provide comprehensive health care services in Alabama in 2001.  NaphCare currently provides medical services to more than 100,000 incarcerated persons in 32 states.[1]  The company has more than $300 million in annual revenues and 2,000-plus employees.[2]

58.    In 2020, a Reuters investigation revealed that jails where NaphCare provided health care had the highest death rates in the nation over a three-year period.[3]  Since then, according to federal court records, NaphCare has been sued for medical neglect over 100 times.[4]  While some government entities have renewed

---

[1] *See* John Washington, *Pima County has docked NaphCare $3.1 million for jail medical deficiencies* ("Pima County Docking NaphCare"), ARIZONA LUMINARIA, Aug. 9, 2023, https://azluminaria.org/2023/08/09/jail-deaths-pima-county-docking-naphcare/.

[2] *See* Erica Wright, *Humble Beginnings for Local Firm that Offers Correctional Health Care*, THE BIRMINGHAM TIMES, May 28, 2020, https://www.birminghamtimes.com/2020/05/humble-beginnings-for-local-firm-that-offers-correctional-health-care/.

[3] *See* Jason Szep et al., *Special Report: U.S. Jails Are Outsourcing Medical Care— and the Death Toll Is Rising* ("Special Report"), REUTERS, Oct. 26, 2020, https://www.reuters.com/article/us-usa-jails-privatization-special-repor/special-report-u-s-jails-are-outsourcing-medical-care-and-the-death-toll-is-rising-idUSKBN27B1DH/

[4] Chamian Cruz, *Fulton Extends Contract with Jail's Medical Provider Amid Allegations of Medical Neglect* ("Fulton Extends Contract"), WABE, Jun. 28, 2023, https://www.wabe.org/fulton-extends-contract-with-jails-medical-provider-amid-allegations-of-medical-neglect/.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1157**

contracts with NaphCare despite the lawsuits and deaths, others have terminated their contracts.

59.    Alabama is one such example.  In 2001, when Alabama's correctional facilities healthcare provider raised the bill from $26 million per year to $38-$46 million per year, the state sought bids for another provider.  NaphCare won the contract with a bid of $30 million.  NaphCare had never before provided comprehensive care to a state prison system, so "[c]ritics immediately questioned how NaphCare could possibly provide adequate health care for 25,000 prisoners for $30 million and still make a profit."[5]

60.    Numerous lawsuits followed.  Incarcerated individuals at Alabama's Tutwiler Prison for Women named NaphCare as a defendant in a class action suit, alleging long delays in health care services, dangerous lapses in providing prescription medication, and a severe shortage of qualified medical personnel.  Another lawsuit challenged the medical care NaphCare provided to incarcerated persons with HIV at Alabama's Limestone facility, where the death rate among incarcerated persons with HIV was twice the national rate.  *Id*.  Another class action suit challenged the health care provided to individuals with serious mental illness; "[a]mong the most serious complaints in the suit include prisoners lying in beds unable to control their bowels that sometimes go for hours without being changed or cleaned."  *See* NaphCare in Alabama.

61.    In 2003, an Alabama state audit concluded that NaphCare was supplying "dangerous and extremely poor quality health care."  *Id*.  Amid the lawsuits, the audit, and $6.9 million in cost overruns caused by off-site medical visits, Alabama canceled NaphCare's contract in 2003.[6]

---

[5] *See* Lonnie Burton, *The Deadly Health Services of Naphcare in Alabama* ("NaphCare in Alabama"), PRISON LEGAL NEWS, October 15, 2023, https://www.prisonlegalnews.org/news/2003/oct/15/the-deadly-health-services-of-naphcare-in-alabama/; *see also* Special Report; Fulton Extends Contract.

[6] *See* Casey Turner, *Sick for a Decade: Alabama's Prison Health Care Continues to Face Scrutiny*, AL.COM, Nov. 22, 2014,

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1158

62.     A similarly dire outcome occurred in Gwinnett County Jail in Lawrenceville, Georgia.[7]  And in 2022, after at least three deaths in 15 months, the Onondaga County Jail decided not to renew its contract with NaphCare.[8]

63.     NaphCare is still providing health care to the Arizona prison system which has been the subject of extensive litigation and found to be unconstitutional. *See Jensen et al. v. Thornell et al.*, No. CV-12-00601-PHX-ROS, 2023 WL 2838040 (D. Ariz. April 7, 2023).  NaphCare has also been roundly criticized for its staffing shortages and medical request backlogs at the Pima County Jail in Arizona.  For example, a former NaphCare employee at Pima County jail said they were often behind in responding to "kites" (medical requests).  The employee said, "it got to the point where we were from 300 to 1,800 deep in the queue."[9]

64.     As described above, NaphCare got its first contract in Alabama correctional facilities by bidding ridiculously low.  Whereas the average state spent $2,500 to $3,000 per incarcerated individual per year in 2001, under the terms of NaphCare's bid, Alabama was going to spend a little over $1,000.  *See* NaphCare in Alabama.

65.     Relatedly, in 2015, weeks after winning the renewal bidding process for a contract with Suffolk County, NaphCare claimed it had underbid and wanted to

---

https://www.al.com/news/2014/11/sick_for_a_decade_alabamas_inm.html.

[7] *See* Randy Travis, *Lawsuit: Jail Medical Contractor Ignored Treatable Illness that Led to Inmate's Death*, FOX 5 ATLANTA, Apr. 17, 2023, https://www.fox5atlanta.com/news/deion-strayhon-gwinnett-county-jail-death-lawsuit.

[8] *See* Chris Libonati, *Onondaga county jail gets different health care provider after report finds 'serious' issues*, CENTRAL CURRENT, Dec. 21, 2022, https://centralcurrent.org/onondaga-county-gets-different-health-care-provider-after-report-finds-serious-issues/.

[9] John Washington, *Medical care in Pima County jail is dangerously delayed as pleas for help are ignored and mismanaged, say inmates and employees* ("Medical Care in Pima County Dangerously Delayed"), ARIZONA LUMINARIA, Apr. 19, 2023. https://azluminaria.org/2023/04/19/medical-care-in-pima-county-jail-is-dangerously-delayed-say-inmates-and-employees/.

1  renegotiate its contract—the sheriff's office denied the request.[10]

2      66.    In June 2021, NaphCare agreed to pay nearly $700,000 to settle a False

3  Claims Act case the United States government brought against NaphCare, alleging

4  that the company submitted inflated claims for evaluation and management services

5  at BOP's Terre Haute, Indiana, facility between January 2014 and June 2020.  The

6  United States alleged that when certain physicians did not indicate the type of

7  service performed on onsite visit sheets, NaphCare charged the government for

8  higher-level services than were provided.[11]

9      67.    The 2022 contract with Arizona allowed NaphCare a profit of $1.095 in

10  the prisoner per day cost.  "A 25,000 prisoner population would therefore generate

11  an annual profit for NaphCare of $9,991,875."[12]

12      68.    NaphCare has faced staffing shortages.  For example, in Pima County

13  from February 2022 to April 2023, NaphCare was understaffed for hundreds of

14  hours for medical care positions, including for Registered Nurse Supervisor (271

15  hours short), Licensed Practical Nurse (2,463 hours short), Psychiatric Nurse

16  Practitioner (114 hours short), and Psychiatric Registered Nurse (653 hours short).

17  *See* Pima County Docking NaphCare.

18      69.    Consistent with concerns about understaffing, I have also been made

19  aware of a number of claims that NaphCare provided substandard medical care.  For

20  example, in February 2022, Pima County's audits found that NaphCare had

---

[10] *See* Beth Healy and Christine Willmsen, *Pain And Profits: Sheriffs Hand Off Inmate Care To Private Health Companies* ("Jail Health Companies Profit"), WBUR, March 24, 2020, https://www.wbur.org/news/2020/03/24/jail-health-companies-profit-sheriffs-watch.

[11] *See* U.S. Department of Justice, *Prison Health Care Provider Naphcare Agrees to Settle False Claims Act Allegations*, June 25, 2023, https://www.justice.gov/opa/pr/prison-health-care-provider-naphcare-agrees-settle-false-claims-act-allegations.

[12] *See* Jimmy Jenkins, *Health Care Company Expects to Earn Nearly $10 Million in Annual Profits from AZ Prisons Contract*, ARIZONA REPUBLIC, June 2, 2022, https://www.azcentral.com/story/news/local/arizona-health/2022/06/02/correctional-health-care-company-expects-earn-nearly-10-million-annual-profits-arizona-prisons-contr/7491553001/.

1   "appropriately managed" only one of the 22 people who were undergoing

2   withdrawal.  That same month, the county gave NaphCare a score of 5%, or five on

3   a scale of 100, for dealing with withdrawals.  *See* Pima County Docking NaphCare.

4   One former staff member said "the NaphCare standard is to supply opioid addiction

5   medication for a maximum of three days, if it's given at all."  *See* Medical Care in

6   Pima County Dangerously Delayed.

**B.     NaphCare's 2022 Contract with San Diego County**

7

8       70.     Notwithstanding the problematic incentives of privatized correctional

9   medical care in general, San Diego chose NaphCare to provide comprehensive

10  healthcare services at the Jail.  *See* Contract No. 566117.  Under the contract,

11  NaphCare receives approximately $60 million per year and is supposed to provide

12  comprehensive mental and medical health care, medication assisted treatment

13  ("MAT"), dental care, discharge treatment training, specialty services and outside

14  referrals, and discharge planning to people incarcerated at the Jail.  NaphCare

15  subcontracted ████████████████████████████████████████████

16  ████████████████████████████.[13] █████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████.

**C.     The Sheriff's Department Continued to Work With, and Pay,
NaphCare, Despite Knowing That NaphCare Was Not Living Up
to Its Contractual Obligations**

19

20

21      71.     The underbidding, understaffing, and requests for more money that

22  have characterized NaphCare's operations elsewhere, as detailed above, have hurt

23  NaphCare's performance in San Diego as well.  Beginning in 2023, the Sheriff's

24

25  _____

[13] The history of private contractors at the Jail is complex.  For example, Coast
Correctional Management Group ("Coast") used to provide physicians and mid-

26  levels, followed by CHP, and then NaphCare—now this is done by a combination of
NaphCare and CHP plus County nurses.  When asked how many of the

27  approximately 30 prisons and jails NaphCare serves have a similarly hybrid model
in which nursing is separately managed, NaphCare representative Angela Nix

28  replied that only one other did.  Nix II Tr. at 74:11-15.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1161**

1  Department issued a series of Corrective Action Notices ("CANs") to NaphCare

2  pointing out multiple failures in its delivery of health care to incarcerated people.  In

3  total, I am aware of several CANs being issued and updated before discovery in this

4  case closed.  NaphCare responded to these, and CAN meetings were held in an

5  attempt to solve the problem.  Freedland Tr. at 156-160.  However, NaphCare's

6  Rule 30(b)(6) witness, Angela Nix, testified that the Sheriff's Department has never

7  approached NaphCare about a reduction in payment for its contractual violations,

8  Nix II Tr. at 62-63, notwithstanding that the contract allows the withholding of

9  funds for failure to perform.[14]

10    72. As far as I can tell, the CANs begin on April 28, 2023; as of that date

11  the County criticized NaphCare for having $9.3 million of unpaid bills due to

12  hospitals, with $4.6 million of that past the 30-day threshold.  *See, e.g.*, SD_120686.

13  According to the CAN, "Due to a lack of payment, some community providers do

14  not want to see or accept our patients."  Among the many other deficiencies noted

15  by the CANs are the following:  a lack of gynecologists at Las Colinas, failure to

16  provide MAT, relying on unlicensed staff, failing to replace or repair medical

17  equipment, understaffing of medical and dental providers, failure to create policies

18  and procedures that comply with NCCHC standards, and the lack of M&M and CQI

19  review.  *See* SD_1572154; *see also* Freedland Tr. at 161:4-169:10.  The lack of

20  adequate obstetrical and gynecological care at Las Colinas was of particular concern

21  to Dr. Montgomery.  *See* SD_120627.

22    73. Dr. Montgomery acknowledged in a May 26, 2023 email to Sheriff's

23  Department administrators that ██████████████████████████████████

24  ████████████████████████████████████████████████████

25

26  ――――――――――――――――――
[14] *See* NaphCare Contract § 4.1.7, NAPHCARE000007; *see also* Jeff McDonald,
27  *Repeated failures by San Diego County jail health provider prompt sheriff to order
it to fix deficiencies*, SAN DIEGO UNION-TRIBUNE, April 2, 2024,
28  https://www.sandiegouniontribune.com/2024/03/31/repeated-failures-by-san-diego-county-jail-health-provider-prompt-sheriff-to-order-it-to-fix-deficiencies/.

1    Dr. Montgomery further suggested that ████████████████████████

2    ████████ SD_227522.  He stated: ████████████████████████

3    ████████████████████████████████████████████

4    ████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████████

7    ████████████████████████  SD_227522.

8    Dr. Montgomery also said: ████████████████████████

9    ████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████  SD_227522.

12   74.    Dr. Montgomery further stated: ████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████  SD_227522.

18   75.    In these internal discussions and in CAN meetings with and notices to

19   NaphCare, the County expressed increasing frustration with its new contract.

20   Concerns included a lack of radiology staffing, sick-call backlogs associated with

21   CHP departures, and failures to get outside specialty care for patients.  By the end of

22   2023, the County decided to put out a new bid for medical services—even though it

23   had signed what should have been a comprehensive five-year contract with

24   NaphCare in April 2022.  Dr. Freedland testified that he was forced to provide a

25   physician at Rock Mountain without any pay for months.  Freedland Tr. at 115:17-

26   120:18.  He also testified that, in the summer or fall of 2023, many staff left his

27   employ due to stress.  *Id.* at 102:6-103:16.

28   76.    While the bids for the new medical services contract were pending,

**Ex. P-1163**

1  NaphCare negotiated an increase in funding for itself.  Contract, County of San

2  Diego – Department of Purchasing and Contracting, Amendment, Contract 566117

3  with NaphCare, Inc. Modification 01, February 1, 2024 (NAPHCARE040852-

4  040862).  This contract amendment added over $24 million in payments to

5  NaphCare.  Nix II Tr. at 59:25-61:5.  I discuss the cycle of bidding low and then

6  renegotiating more payments in more detail below.

7        **D.**     **The Sheriff's Department Recently Contracted with Correctional Healthcare Partners to Provide Additional Health Care Staff**

8

9        77.     In around April or May 2024, I learned that the County had awarded a

10  new medical services contract to CHP—the very entity that was subcontracting with

11  NaphCare for medical services.[15]  The new contract increases the County's annual

12  spending on physicians and nurse practitioners in the Jail from approximately $8.3

13  million to $22.6 million per year, though I understand that Dr. Freedland's bid asked

14  for $27 million worth of medical care providers.

15        78.     CHP was founded by Peter J. Freedland M.D., a former executive at

16  Coast Correctional Medical Group (sometimes referred to as "Coast").  Coast was

17  the County's previous medical provider.  Coast had been sued multiple times while

18  delivering healthcare services to the Jail, including in connection with the tragic

19  preventable deaths of Elisa Serna and Michael Wilson.  Coast was replaced by CHP

20  through a contract with the Sheriff in 2020—a $24 million deal that spanned three

21  years; this contract was later superseded by the NaphCare-CHP subcontract.  I have

22  some concerns that the very entity that has been providing substandard medical care

23  at the Jail for the last four years is somehow supposed to bring it into constitutional

24  compliance now.

25        79.     The contract that the Sheriff's Department recently negotiated with

26  CHP is specific in what its objective is:  "Contractor shall provide the services

27  _____

28  [15] I did not receive a copy of this contract, which states it is effective June 28, 2024, until July of this year.

1 described herein to accomplish the following goal: provide on-site Health Care

2 Providers for primary care and urgent care at specified County detention facilities."

3 *See* CHP 2024 Contract, p. 20.  The contract increased physician and midlevel

4 staffing at the Jail facilities by almost 300%.  For example, medical practitioner

5 staffing at the Central Facility increased from 124 hours a week to 336 hours a

6 week.  Las Colinas staffing increased from 84 hours a week to 242 hours per week.

7 And staffing at the George Bailey facility increased from 84 hours per week to 196

8 hours per week.  While this is good news for the incarcerated patients at the Jail, this

9 increase in staffing alone will not, in my opinion, be sufficient to solve the Jail's

10 medical problems.

11 **OPINIONS**

12     80.    Seven years after the NCCHC Report finding the Sheriff's Department

13 policies and practices put the health and lives of incarcerated people at risk, two

14 years after the State Audit concluded that the "Sheriff's Department has failed to

15 adequately prevent and respond to the deaths of individuals in its custody," and

16 scores of deaths and poor outcomes later, the Sheriff has failed to take sufficient

17 corrective action necessary to prevent further unnecessary suffering or death in its

18 jails.

19     81.    In light of the State Audit's damning conclusion, I would have

20 expected the Sheriff's Department to have done its own detailed internal medical

21 investigation into the excessive deaths in an attempt to find one or more other root

22 causes of this problem.  I have seen no evidence that the Sheriff's Department made

23 any such investigation or came to any conclusions about potential root causes.

24     82.    In fact, testimony from the medical contractors who provide healthcare

25 at the Jail indicates that the Sheriff's Department has not discussed with them any

26 need to reduce in-custody deaths or asked them their opinions about ways to reduce

27 in-custody deaths.  Dr. Peter Freedland, the Chief Executive Officer at CHP, which

28 staffs the onsite medical practitioners at the Jail, stated in his deposition:  "I've

Ex. P-1165

heard that there was an audit, but I have not read it."  Freedland Tr. at 47:11-12.
When asked, "Have you been asked to make any recommendations to the County
about how to lower the death rate, medically, at the jail?"  Dr. Freedland responded,
"No one has asked me specifically, how do we do this."  *Id.* at 74:2-3.  Similarly,
Angela Nix, testifying as a Rule 30(b)(6) witness on behalf of NaphCare, testified
that she had met with Sheriff Kelly Martinez on approximately three or four
occasions to discuss the NaphCare contract, but could not recall discussing the need
to reduce the high death rate at the Jail.  Nix II Tr. at 18:18-22.

83.     This is astounding to me.  Why would the Sheriff's Department not
immediately launch an "all hands on deck" investigation into the causes and
potential solutions of this critically important high death rate after the State Audit so
publicly pointed it out?  Why not publish the results of an extensive internal
investigation along with a detailed plan on how to reduce the death rate?

84.     In February of 2023, the Sheriff's Department did publish a response to
the State Audit entitled "Progress Report: Update on State Jail Audit."  In it, the
Sheriff's Department indicated that it disagreed with the conclusions of the Audit in
some respects but claimed to be attempting to implement the changes recommended
within the original Audit.

85.     In my opinion, the Sheriff's Department has failed to implement most
of the changes mentioned in their Progress Report, and it has failed to address the
many flaws in its healthcare delivery system that have been pointed out repeatedly
in the last several years, by the NCCHC and Dr. Venters, in addition to the State
Audit.  As a result, people incarcerated in the Jail have died preventable deaths, and
those still in the Jail are subjected to risk of serious harm from the denial of
appropriate healthcare.

## I.     Inadequate Medical Care at the Jail Has Resulted in Preventable Deaths

86.     It is my opinion, based on a reasonable degree of certainty, that
inadequate medical care at the Jail has resulted in preventative deaths and will

1  continue to result in preventative deaths, in part because the Jail does not have

2  adequate mortality and morbidity review procedures.

3      87.    It is important here not to "miss the forest because of the trees."  The

4  conclusion of the initial State Audit was that the San Diego Jail has an excessively

5  high death rate among its incarcerated population.  In determining how the Sheriff's

6  Department is doing in response to the State Audit report, we need to look at the

7  incarcerated death rate since the Audit was released.

8      88.    In fact, the death rate among people incarcerated at the San Diego jail

9  has significantly *increased* since the time period discussed in the report.  The State

10 Audit reviewed statistics from 2006 to 2020 and determined the overall death rate at

11 the Jail to be **2.39 deaths per 1,000 people**, with the rates in individual years

12 ranging of a low of 1.57 in 2012 to a high of 3.0 in 2014.  SD_174856.  Since then,

13 from January 2021 through December 2023, the Jail has reported 50 in-custody

14 deaths.[16]  The Jail reported an Average Daily Population ("ADP") of 3,984 during

15 these three years, which calculates to a death rate of **4.18 deaths per 1,000 per**

16 **year**.  Broken down by year, the death rate was **4.5 deaths per 1,000 in 2021** (18

17 deaths, with ADP 3,987), **4.75 deaths per 1,000 in 2022** (19 deaths, with ADP

18 4,055), and **3.27 deaths per 1,000 in 2023** (13 deaths, with ADP 3,971).

19     89.    In fact, all three years exceed not only the average for the years 2006 to

20 2020, but also exceed the death rate of the worst year, 2014, which was 3.0 deaths

21 per 1,000 ADP.

22     90.    Based on my review of documents, including but not limited to medical

23 records and mortality reviews, my inspections of Jail facilities, and interviews with

24 patients and providers, it is my opinion that the healthcare delivery system at the Jail

25 harms many patients and places all incarcerated people at a substantial risk of

26 serious harm.  The Sheriff's Department clearly has not taken significant steps to

27

28 [16] The ADP and in-custody death numbers are pulled from:
   https://www.sdsheriff.gov/resources/transparency-reports.

1  reduce the death rate; the Jail death rates have gotten worse since the State Audit.

2  The problems with the Jail's healthcare system have resulted in permanent harm to

3  patients, including avoidable deaths.

4      91.    The starting place in any attempt to reduce the Jail's astounding death

5  rate would be an analysis of *every* death to see if certain patterns emerge that point

6  to serious shortcomings in the Jail's healthcare system leading to excessive deaths

7  so that appropriate reforms of the system can be undertaken.  However, the Jail's

8  mortality review process is so flawed that no such reforms are likely to be

9  implemented.  And, unsurprisingly given these failures, people have continued to

10  die avoidable deaths in the San Diego County Jail.

11      **A.    The Jail's Flawed Mortality Review Process**

12      92.    All hospitals and most large medical practices have a mechanism for

13  review of deaths of patients in their care, known as Mortality and Morbidity

14  ("M&M") committees.  M&M committees investigate deaths (mortality) and also

15  investigate unexpected severe adverse events that do not lead to death but

16  nevertheless cause unexpected harm, suffering, and/or permanent problems

17  (morbidity).[17]

18      93.    The goal of an M&M program is to identify medical errors that led to

19  the adverse outcome, so that those errors can be avoided in the future.  In any

20  individual M&M review, the most important of these identified errors is termed the

21  "root cause."  The root cause can be either a human error, *e.g.*, when an individual

22  physician or nurse makes a significant medical mistake, or a systemic problem, *e.g.*,

23  technical problems in the medical record, lack of appropriate policies and

24  procedures, etc.  When human error is identified, an M&M committee can direct

25  that medical professionals be trained and incompetent performers dismissed.  When

26  systemic issues are identified, an M&M committee can direct that policies and

27  ────────────────

28  [17] These unexpected negative outcomes are also sometimes termed "Sentinel Events."

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1168**

1  procedures be updated and improved.  The overall goal, of course, is to learn from
2  past mistakes in order to prevent future bad patient outcomes.

3      94.    M&M reviews typically occur in two stages.  First, a standing
4  committee of physicians, nurses, and administrators identifies and analyzes all
5  deaths and adverse outcomes and prepares important cases, such as all unexpected
6  deaths, for presentation.  Second, a meeting occurs where the standing committee's
7  findings are discussed *with the medical staff who were involved in care of the*
8  *patient*.  M&M reviews usually result in some type of action plan to improve patient
9  care.

10     95.    The NCCHC Technical Assistance Report, Venters Report, and State
11 Audit each directed the Sheriff's Department to improve its M&M process.
12 NCCHC emphasized that "[t]reating and general health staff *must* be informed of
13 [mortality] review findings," which reportedly had not been occurring at the time of
14 their investigation.  DUNSMORE0260627.  Dr. Venters directed that:  "The review
15 of sentinel events including deaths, injuries and self-harm is also an important best
16 practice in reducing mortality and morbidity in jail settings, and these reviews and
17 their corrective action plans can be included in the service-wide quality meetings."
18 SD_215365.  And, the State Audit concluded that the Sheriff's Department's
19 "reviews of in-custody deaths have been insufficient and have not consistently led to
20 significant corrective action."  SD_174794.

21     96.    When Dr. Montgomery was asked in his deposition:  "So following an
22 in-custody death there's still some type of review done by medical, nursing, and
23 sworn.  Is that accurate?"  He answered "Yes."  Montgomery I Tr. at 16:4-7.  He
24 clarified that he himself does the medical review, the Director of Nursing (████
25 ████████████  at the time) does a separate nursing evaluation, and one of the jail
26 Lieutenants does a review of the actions of sworn staff.  *Id.* at 16:18-19:1.  Per
27 Dr. Montgomery, all of these are independent and uncoordinated.  They also are
28 informal, in that there is no written record that summarizes all of these reviews and

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1169**

1  what conclusions were reached.

2      97.    The Sheriff's Department does have a standing Critical Incident

3  Review Board ("CIRB") that reviews in-custody deaths, but these reviews are

4  prepared and presented by a non-medically trained security officer to the largely

5  non-medically trained people who sit on the committee. Based on the documents I

6  reviewed, it appears that no physician involved in the care of the patient is even in

7  attendance. There is no significant critique of the medical decision making and

8  identification of medical mistakes presented to the CIRB. And the CIRB does not

9  appear to make suggestions for improvement of the medical program at the Jail.

10      98.    As an example, the CIRB ███████████████████████

11  ████████████████████████████████████████████

12  ███████████████████████████    ███████████████

13  ███████████████████████████████████

14  ███████████████████████████████████

15  ████████████████████████████████████████████

16  ███████████████████████████████████████████

17  ████████████████████████████████████

18  ████████████████████████████████████

19  ███████████████████████████████████████████

20  ██████████████████████████████████████

21  ████████████████████████████." SD_1030410. Clearly, the

22  CIRB reviews, which lack any meaningful medical evidence or analysis, are not a

23  substitute for legitimate M&M.

24      **B.**    **NaphCare's Flawed Mortality Review Process**

25      99.    Instead, the Sheriff's Department has contracted the main responsibility

26

27  [18] As discussed in more detail later in this Report, the term "medical practitioner"

28  applies to doctors and nurse practitioners, but it does not include nurses, including
Director of Nursing Ms. Rognlien-Hood who did attend this meeting.

for M&M reviews to NaphCare.  NaphCare's contract requires NaphCare to conduct a "thorough clinical mortality review" for "[a]ll patient deaths," including "a review of the incident and preceding treatment, a root cause analysis, review of relevant procedures and documentation, pertinent service reports, and recommendations for corrective action."  County Contract No. 566117, §§ 2.3.47.4, 2.3.47.5, 2.3.47.7. The contract also calls for NaphCare to establish the process for identifying Sentinel events and performing a Root Cause Analysis for Sentinel Events.  *Id*., §§ 2.3.47.9, 2.3.47.10.  "The goal for critical incident analysis is to solve problems before they escalate and prevent future problems through promotion of a risk avoidance attitude among the healthcare staff."  *Id*., § 2.3.47.13.

100.   On their face, this contract complies with the recommendations of the State Auditor, the NCCHC, and Dr. Venters.  In addition, NaphCare has a policy, called A-09, Procedure in the Event of Patient Death.  NAPHCARE000735 *et seq*.

101.   However, it is my opinion that NaphCare does not fulfill those obligations in practice, based on my review of the NaphCare mortality reviews and minutes from the 2022 and 2023 M&M committee meetings.

102.   For one thing, death summaries, by contract, are supposed to be compiled by "[t]he advanced clinical provider in the patient's overall treatment." County Contract No. 566117, § 2.3.47.12.  However, the death summaries in the reviews I saw were prepared by CHP's medical director, Dr. Nas Rafi, and NaphCare's Health Services Administrator ("HSA"), Michael Farrier, neither of whom directly interacted with the majority of these patients.  The cases are then reviewed by Dr. Elliott Wade, NaphCare's Regional Medical Director of the Western States.  Dr. Wade is based in Las Vegas.  Dr. Wade's review and recommendations are then sent to the NaphCare Clinical Mortality Review Committee.

103.   The Clinical Mortality Reviews are held in Birmingham, Alabama by the NaphCare M&M Review Committee.  No members of NaphCare M&M Review

1   Committee are from the San Diego Jail.  The attendees instead are from NaphCare

2   corporate.  Dr. Freedland testified that he has never participated in the M&M

3   reviews for the San Diego Jail, although he would be a logical choice to be on such

4   a committee, as would the Sheriff's Department's Chief Medical Officer, Dr. Jon

5   Montgomery.  The CHP Medical Director of the Jail, Dr. Rafi, prepares death

6   summaries but otherwise does not participate in death reviews.  Freedland Tr. at 73.

7        104.   As one example, the NaphCare M&M committee that convened in

8   Birmingham, Alabama on October 16, 2023 consisted of the following NaphCare

9   employees:  Dr. ████████████, Physician/Ophthalmologist; ████████████,

10  Director of Utilization Management; ████████████, Chief Medical Officer;

11  ████████████, Chief Legal Officer; ████████████, Vice President of Psychiatric

12  Services; ████████████, Senior Vice President, Clinical Operations; ████████,

13  CEO NCF, Inc.; ████████████, Director of Pharmacy – 3rd Party Operations;

14  ████████████, Corporate Nephrologist; ████████████, Chief Pharmacist;

15  ████████████, Corporate Medical Director, Eastern States; ████████████,

16  Senior Corporate Counsel – Litigation; ████████████, Executive Director of

17  Behavioral Health Research; ████████████, Corporate Counsel; ████████████,

18  General Counsel – Litigation; ████████████, Chief Medical Officer, Behavioral

19  Health; ████████████, Corporate Medical Director, Western States; ████████████

20  ████, Legal Nurse; and ████████████, Corporate Counsel – Operations.

21  Based on my review of the documents, these attendees appear to be typical.  No one

22  from the Sheriff's Department or CHP attends.

23       105.   Notably, at each of these Committee meetings, the committee reviews

24  deaths from NaphCare contracts around the country.  San Diego cases are a small

25  fraction of those considered.  ████████████████████████████████████

26  ████████████████████████████████.  NAPHCARE041856-041859.

27       106.   When a San Diego case is considered, the M&M Committee usually

28  simply notes Dr. Wade's conclusions and does not review the death in detail.  This

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1172

1   may be a time consideration since they are reviewing cases from all over the

2   country.  Occasionally, the committee will review a San Diego death in detail.  In

3   these cases, a detailed timeline of the patient's medical and psychiatric care is

4   presented in a series of slides.  Based on my review of the documents, I am not sure

5   how these cases are chosen.  Notably, the cases reviewed in detail do not necessarily

6   include those in which Dr. Rafi or Dr. Wade made recommendations; some of the

7   detailed reviews are for cases where Dr. Wade has concluded that "[n]o action

8   recommended."

9       107.   By far the most common conclusion from the NaphCare M&M

10  committee on the San Diego deaths was "No action recommended."  This happens

11  even when Dr. Rafi has recommended something in her death summary.  The

12  NaphCare M&M committee routinely disregards Dr. Rafi's recommendations.  In

13  fact, based on my review of the documents, I am not sure they are aware of them.

14      108.   The case of Keith Galenbach, who died in the Jail on September 28,

15  2023, is informative in this regard.  Notably, the NaphCare M&M committee did not

16  do a detailed review (of the type I described above) of Mr. Galenbach's death.

17      109.



26      110.

[4448212.31]    EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1173



1    111.

2

3

4

5

6

7    112.

8

9

10

11

12

13

14        113.   Notably, I did not find any reference to updates in the NaphCare

15 Policies and Procedures, the County Operations Manuals, any Medical Directive

16 Bulletins, or any training for medical staff relating to ▮▮▮▮▮. This may be

17 because, when Dr. Wade recommends no further action, NaphCare does not share

18 its conclusions about San Diego deaths with the Jail. This was admitted in

19 deposition testimony by NaphCare's Chief Legal Officer Justin Barkley on

20 March 20, 2024. Barkley Tr. at 29:24-30:6.

21        114.   Nor does it appear that any of the internal analyses conducted by

22 Sheriff's Department staff such as those done by Dr. Montgomery and

23 Ms. ▮▮▮▮▮ were communicated to the NaphCare M&M Committee.

24        115.   While the M&M Committee meetings about deaths (mortality) at the

25 San Diego County Jail are inadequate, it is worth noting that the morbidity

26 analyses—*i.e.*, analyses of adverse outcomes or sentinel events—do not appear to be

27 happening *at all*. I also saw no tracking of sentinel events in CQI reports.

28        116.   Importantly, the only mention of M&M in the new contract that the

County negotiated with CHP occurs at section 7.5: "Contractor shall designate a Physician … to collaborate with the Sheriff's CMO, or Sheriff's designee, in the following areas: … 7.5.1.3.  Morbidity and Mortality (M&M)."  SD_1579723.  In other words, the M&M review process will continue to be managed by NaphCare, as the "Sheriff's designee."

117.    In summary, the Sheriff's Department—either on its own or through its contractor—is not performing M&M reviews in a manner that complies with the standard of care done in the community, or with the recommendations of the NCCHC, Dr. Venters, or the State Audit.

118.    A proper M&M review at the Jail would have the following characteristics:

- The Sheriff's Department would track Deaths but would also track other serious medical bad outcomes (Sentinel Events) via the CQI program.  This is not being done presently.

- Death summaries would be prepared within seven days by an "advanced clinical provider in the patient's overall treatment," as required in the NaphCare contract.

- Deaths and Sentinel morbidity events would be investigated by a multidisciplinary M&M committee based in San Diego and consisting of San Diego Jail practitioners, nurses and security staff.  There would be no need for separate uncoordinated investigations.

- Sheriff's Department M&M Committee conclusions would be shared with medical staff involved in the care of the patient in question.

- Sheriff's Department M&M Committee would make and carry out recommendations for improvements in Jail Policies and Procedures.

**C.    Case Studies of Deaths at the Jail Demonstrate Substandard Care**

119.    The below section of this report presents several case studies that show both how the Sheriff's Department's medical failures led to avoidable patient deaths and how the Jail's inadequate mortality review process failed to make needed changes following those deaths.

120.    I selected this particular subset of deaths to review because the NaphCare M&M Committee minutes for each of these cases reflect that a more

1  detailed review, *i.e.*, more than a single slide presentation, was conducted.[19]  I also

2  reviewed these cases to determine whether these deaths were preventable and, if so,

3  what the root cause(s) of these deaths were.  In this section, I compare my

4  impressions of these deaths with the official reports from the NaphCare M&M

5  Committee.

6                    **1.       Patricia Adamson (** ▓▓▓▓▓▓ **), Died May 3, 2023**

7                         **(a)       Events Preceding Death**



8       121.

13       122.

19  This report does not address deaths caused by homicide (*e.g.*, Raymond
Vogelman), overdose/withdrawal (*e.g.*, Joshua Fosbinder, Lazaro Alvarez, William
Schuck), or suicide (*e.g.*, Pedro Ornejas).  I leave these deaths to Plaintiffs' other
experts to address in their reports.  However, I note that I have overseen the care of
many patients with withdrawal in jails, and it is my opinion that no one should die
of withdrawal.

20

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1176



[4448212.31]   Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF JEFFREY E. KELLER, M.D.

CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1177

127. ████████████████████████████████

128. ████████████████████████████████

129. ████████████████████████████████

130. ████████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1178

1  ███████████████████████████████████████████████

2  ██████████████████████████████████████████

3  ███████████████████████████████████ I have not seen

4  an autopsy report for Ms. Adamson.

**(b)     Jail's Analysis of This Death**

6     131.  ████████████████████████████████████████

7  ███████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████

10  ██████████████████████████████████████████████

11  ██████████████████████████████████████

12  ████████████████████████████████████████████

13  █████████████████████████████████████████████

14  █████████████████████████████████████████████

15  █████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ██████████████████████████████████████████

18     132.  ██████████████████████████████████████████

19  █████████████████████████████████████████████████

20  ██████████████████████████████████████████████

21  ██████████████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████

25  ██████████████████████████████████████████

26  ████

27     133.  ████████████████████████████████████████

28

**Ex. P-1179**

1    .

2                    **(c)    My Analysis of This Death**

3        134.   I strongly disagree with the M&M Committee's assessment.  I find

4    Dr. Rafi's conclusion that the hospital did a poor job accurate;

5

6

7        135.

8

9

10

11

12

13        136.

14

15

16

17

18

19

20

21

22

23        137.

24

25

26

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1180



[4448212.31]

Case No. 3:20-cv-00406-AJB-DDL

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Ex. P-1181

1   142. ████████████████████████████

2  █████████████████████████████████████

3  ███████

4      **2.**     **Raymond Dix (**████████**), Died September 13, 2022**

5      **(a)**    **Events Preceding Death**

6   143. ████████████████████████████████

7  ████████████████████████████

8  ████████████████████████████████

9  ███████████████████████████

10  █████████████████

11   144. ██████████████████████████████

12  ██████████████████████████████

13  ███████████████████████████████

14  ███████████████████████

15   145. ██████████████████████████

16  ███████████████████████████████

17  █████████████████████████████████

18  █████████████████████████████████

19  ██████████████████████████████

20  ███████████████████████████████

21  ██████

22   146. ██████████████████████████

23  █████████████████████████████████

24   147. ███████████████████████████

25  ██████████████████████████████

26  ███████████████████████████████

27  ███████████████████████████████

28  ████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1182**

1 ███████████████████████████████

2    148.  ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 ██████████████████████████████████████

6 ███████████████████████████████

7    149.  ████████████████████████████████████████

8 ████████████████████████████████████████

9 ████████████████████████████████████████

10 ██████████████████████████████████████

11 ████████████████████████████████████████

12 █████████████████████████████████████████

13 █████████████████████████████████████████

14 ██████████████████████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ██████████████████████

18    150.  ████████████████████████████████████████

19 █████████████████████████████████████████

20 ████████████████████████████████

21 ██████████████████████████████████

22          **(b)    Jail's Analysis of This Death**

23    151.  I have not seen the death summary prepared by Dr. Rafi.  However, I

24 reviewed a summary prepared by Dr. Montgomery.  ████████████████████████

25 ████████████████████████████████████████

26

27 ――――――――――――――――――――

28 [21] I critique the Jail's approach to reported refusals in more detail later in this
Report.

1 ████████████████████████████████████

2 ████████████████████████████████████████

3 █████████████████████████████████████████

4 ████████████████████████████████████████████

5 ███████████████████████████████████

6     152.   As far as I can tell, Dr. Montgomery's observations were not shared

7 with the NaphCare M&M Committee. ██████████████████████████

8 ██████████████████████████████████. NAPHCARE041499-

9 041507.

### (c)     My Analysis of This Death

11     153.   To my review, Mr. Dix's death was preventable. There are four glaring

12 problems with the medical management that may have contributed to his death at

13 the Jail.

14     154.  ████████████████████████████████

15 ███████████████████████████████████████

16 ███████████████████████████████

17 ██████████████████████████████

18 ████████████████████████████████████

19 ███████████████████████████████████

20 ████████████████████████████████

21 █████████████████████████████████████

22 I also note that arbitrarily discontinuing those medications simply because they were

23 non-formulary violated NaphCare's contractual obligations: "the formulary shall

24 allow medical practitioners and psychiatrists to follow generally accepted clinical

25 practice patterns in their medical management of incarcerated individual patients,"

26 and, "[c]ontractor typically approves non-formulary orders." Contract § 2.3.30.35,

27 SD_125283.

28     155.  ████████████████████████████████████

**Ex. P-1184**

1

2

3

4

5

6     156.

7

8

9     157.

10

11

12

13

14

15

16

17

18

19     158.

20

**3.     Vianna Granillo (        ), Died July 13, 2022**

**(a)     Events Preceding Death**

23     159.

24

25

26

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1185



1

2

3

4

5        160.

6

7

8        161.    An autopsy performed July 4, 2022 concluded that Ms. Granillo died of

9  "septic shock, due to pneumoperitoneum with spillage of gastric/enteric contents

10  due to perforated prepyloric ulcer."  SD_061710.

11        162.    Gastric (stomach) ulcers are caused by stomach acid and bacteria eating

12  the lining of the stomach near where it connects to the intestines.  Most patients with

13  gastric ulcers have symptoms of "heartburn" and upper abdominal pain.  Untreated

14  gastric ulcers can sometimes erode through the entire thickness of the stomach and

15  perforate into the abdominal cavity.  This is a devastating complication because

16  stomach acid, bacteria, and other bowel contents spill into the pristine environment

17  of the abdominal cavity causing peritonitis (inflammation of the lining of the

18  abdominal cavity).  *Peritonitis is an intensely painful condition.*  Over time, the

19  peritonitis worsens, the gastrointestinal system stops functioning, and other organs,

20  such as the kidneys, fail.  Patients with bowel perforation and peritonitis typically

21  have severe pain.  Over time, as they get sicker, such patients can develop

22  abdominal infections and, eventually, low blood pressure and septic shock.

23        163.    There is always a period of time, usually days, between the rupture of

24  the ulcer into the abdominal cavity and death, during which the patient experiences

25  severe pain.

26              **(b)    The Jail's Analysis of This Death**

27        164.

28



165.   I do not know if the NaphCare M&M committee saw either of those reports and recommendations.  If they did, they discounted them.

**(c)     My Analysis of This Death**

166.

The M&M Committee did not mention this, despite the recommendation being in Dr. Rafi's death summary.  As with Mr. Galenbach's death review, I am again forced to wonder whether Dr. Rafi's recommendations were reviewed by the committee at all.

167.   Second, the NaphCare M&M Committee is supposed to reconsider death cases once the autopsy report is available if the autopsy sheds new light on the patient's death, such as in this case.  *See* Barkley Tr. at 24:23-25.  However, I have seen no record that the M&M committee reviewed Ms. Granillo's autopsy report.

168.   Since a rupture of a gastric ulcer invariably causes intense pain and since there is a length of time, usually days, between the rupture and the development of infection, septic shock and death, it is likely that Ms. Granillo knew that something catastrophic had happened to her.  Most likely, she would have attempted to notify staff of her distress.  However, as discussed later in this Report, the emergency intercom buttons in the Jail frequently do not work.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1187**

**4.     Abdiel Sarabia (█████████), Died July 22, 2022**

      **(a)     Events Preceding Death**

169.     █████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████

170.     ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████

171.     ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████████████████████

172.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[4448212.31]
EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1188



EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1189**

1    178.  █████████████████████████████████

2    ████████████████████████████████████████████

3    █████████████████████████████

4    179.   An autopsy concluded that Mr. Sarabia died of "Hypertensive

5 Cardiovascular disease" and that a contributing factor was "hypothyroidism."

6 SD_001362.

**(b)    The Jail's Analysis of This Death**

8    180.  ███████████████████████████████████

9    █████████████████████████████████████

10   ████████████████████████████████████████████

11   ██████████████████

**(c)    My Analysis of This Death**

13   181.   I disagree.  I believe that this was a potentially preventable death.

14 Potential contributing "root causes" include the following:

- ██████████████████████████████████████████████████████████████████████████████████████

- ███████████████████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████



182.   Most people who have a cardiac event like the one that killed Mr. Sarabia have severe crushing chest pain and shortness of breath for minutes or even hours before they succumb.  It is likely that Mr. Sarabia knew that he was having a medical crisis before he died but likely had no way to alert security or medical staff of this emergency because the emergency intercom buttons in the cells do not work.  I note that he was not found after his death until lividity had set in—a process that usually takes hours, indicating that no one checked on him for a prolonged period of time.

183.   In my opinion, more likely than not, had Mr. Sarabia received appropriate medical care while he was incarcerated in the Jail, he would not have died on July 22, 2022.

**5.     Aaron Bonin (████████), Died November 1, 2022**

**(a)     Events Preceding Death**

184.   ██████████████████████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1191

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████

4       185.  ██████████████████████████████████████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████

11      186.  ████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████

27      187.  Mr. Bonin's autopsy report concluded that Mr. Bonin had died of "End

28 stage renal disease" and "Hypertensive and atherosclerotic cardiovascular disease."

CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1192

1    However, the immediate cause of the initial cardiac arrest was clearly ██████

2    ████████████████████████████████████████████████████████

3    This fact was not mentioned in the autopsy.  SD_055144.

**(b)    The Jail's Analysis of This Death**

5    188.  ████████████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████████████

10   ████████████████████████████  I have not seen the review

11   completed by Dr. Rafi or the NaphCare Health Services Administrator Mr. Farrier.

12   189.  ████████████████████████████████

13   ██████████████████████████████████████

14   ██████████████████████████████████████

15   ██████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████.

**(c)    My Analysis of This Death**

19   190.  In my opinion, this was a preventable death.

20   191.  ████████████████████████████████████

21   ██████████████████████████████████████████

22   ████████████████████████████████████████

23   ████████████████████████████████

24   ██████████████████████████████████████████

25   ██████████

26   192.  The root causes of Mr. Bonin's preventable death included:

27   •    ████████████████████████████████████████

28       ████████████████████████████████████████

**Ex. P-1193**



1 ███████████████████████████████████
2 ████████████████████████████████████
3 ██████████████████████████████████
4
5 • ████████████████████████████
6 • ██████████████████████████████████
7 ████████████████████████████████████
8 ████████████████████████████████████
9 █████████████████████████████████████
10 • ██████████████████████████████████
11 ████████████████████████████████████
12 ██████████████████████████████████
13 • █████████████████████████████████████
14 █████████████████████████████████████
15 █████████████████████████████████
16 • █████████████████████████████████

17 **6.    Roselee Bartolacci (███████), Died May 29, 2023**

18 **(a)    Events Preceding Death**

19 193.    ██████████████████████████

20 █████████████████████████████████████████████
21 ██████████████████████████████████████████████
22 ██████████████████████████████████████████████
23 ███████████████████████████████████████████████
24 █████████████████████████████████████████████
25 █████████████████████████████████████████████
26 █████████████████████████████████████████████
27 ██████████████████████████████████████████████

28 194.    ███████████████████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1194**



[4448212.31]

Case No. 3:20-cv-00406-AJB-DDL

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1195**



[4448212.31]

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1196

1  ██████

2  206.  ████████████████████████████████████████

3  ████████████████████████████████████████████

4  ████████████████████████████████████████████

5  ████████████████████████

6  207.  On May 29, 2023, Ms. Bartolacci was found unresponsive and without

7  a pulse.  CPR and other resuscitation efforts failed, and she was declared dead.[22]

8  **(b)     The Jail's Analysis of This Death**

9  208.  On May 30, 2023, Dr. Rafi prepared a death summary but made no

10 recommendations.  NAPHCARE041734.  █████████████████████

11 ████████████████████████████████████████████

12 █████████████████████████████████

13 209.  ████████████████████████████████████

14 ██████████████████████████████████████████

15

16 _____

[22] An autopsy was done on Ms. Bartolacci by Debra Berry, MD on May 30, 2023.
Her death was determined to be "Complications of dilated cardiomyopathy" with
17 the contributing factor of "obesity."  The diagnosis of dilated cardiomyopathy was
based on "Dilatation of the right (5.6 cm) and left (5.5 cm) ventricles of the heart."
18 The term "obesity" was based on a weight at death of 210 pounds.  This is a
troubling autopsy result for a couple of reasons.
19

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ██████████████████████████████████

28 In my opinion, the autopsy result does not excuse the medical management errors
made by the Jail medical team, as I describe here.

**Ex. P-1197**

1 ████████████████████████████████████████████████

2 ██████████████

210.   The NaphCare M&M committee reviewed this case in detail on June 19, 2023.  NAPHCARE041703.  I do not know if they saw either death review; if they did, they did not mention it.  The only recommendation of the NaphCare M&M Committee was Quality Improvement Plan: "Seetal Tejura, Dr. Wade, and Dr. Kelly to participate in a meeting with HSA & possibly San Diego County corrections regarding documentation and monitoring of patients receiving ████████ ████████"  NAPHCARE041718.

211.   Although documentation and monitoring of patients receiving ████████ ████████ is important, I do not see how this was a Root Cause or even an important factor in Ms. Bartolacci's death.

### (c)    My Analysis of This Death

212.   In my opinion, Ms. Bartolacci's death was preventable.  In fact, I find Ms. Bartolacci's case to be is a particularly egregious case of medical neglect.  All the elements of collective neglect and inaction are present.

213.   ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████████

214.   ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████.

████████████████████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1198**

1 ██████████████████████████████████████

2 ██████████████████████████████████

3 ████████████████████████████████████

4 ████████████████████████████████████

5 ██████████████████████████████████

6 ███████████████████████████████████

7 ████████████████████████████████████

8 ████████████████████████

215. ████████████████████████████

10 █████████████████████████████████

11 ████████████████████████████████████

12 ███████████ . ██████████████████████████

13 ████████████████████████████████████

14 ██████████████████

216. ███████████████████ . ██████████████

16 █████████████████████████████████

17 ████████████████████████████████

18 ██████

217. ████████████ . ████████████████

20 ██████████████████████████████████████

21 ██████████████████████████████

22 ███████████████████████████████████

23 ████████████████████████████████████

24 ████████████████████████████████████

25 █████████████████████████████

218. █████████████████████████████████

27 ████████████████████████████████████

28 ████████████████████████████████

**Ex. P-1199**

1 ███████████

2      219.   Ms. Bartolacci's death is particularly disturbing in light of the

3 similarities to the death of another patient, Lonnie Rupard, who died at the San

4 Diego Central Jail on March 17, 2022.  *See* SD_025987-026008. ██████████

5 ███████████████████████████████████████████████

6 ████████████████████████████████████████

7 █████████████████████████████████████████████████

8 ██████████████████████ Mr. Rupard's weight at autopsy was 105 pounds and

9 the forensic pathologist described him as "cachectic," meaning affected by extreme

10 weight loss and muscle wasting. ████████████████████████████

11 ████████████████████████████ The medical examiner's

12 report also documents that malnutrition and dehydration in the setting of neglected

13 Schizophrenia as contributing factors in Mr. Rupard's death. ██████████████

14 ████████████████████████████████████████████████

15 ██████████████████████████████████████

16 █████████████████████████████████████████████

17 ████████████████████████████████████

18 ██████████████████████████████████████

19 ████████████████████████████████████████

20 ███████████████████ In the autopsy report the medical examiner wrote, "Ultimately this

21 decedent was dependent upon others for the care; therefore, the manner of death is

22 classified as homicide."

23      220.   Mr. Rupard's case is clearly very similar to Ms. Bartolacci's case.  Yet

24 the Jail apparently learned no lessons from Mr. Rupard's case—as they allowed

25 another patient, Ms. Bartolacci, to die under similar circumstances.

26          **7.      Erica Wahlberg (██████), Died July 2, 2022**

27              **(a)    Events Preceding Death**

28      221.   ██████████████████████████████████████████



EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1200**



222.

223.

224.

225.

226.

[4448212.31]

Case No. 3:20-cv-00406-AJB-DDL

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1201



1

2

3

4        227.

5

6

7

8        228.

9

10

11

12

13

14

15        229.

16

17

18        230.   Ms. Wahlberg's autopsy report listed the cause of death as "Acute

19   Fentanyl … and methamphetamine intoxication."  SD_050229.

20               **(b)      The Jail's Analysis of This Death**

21        231.

22

23

24                                    .

25               **(c)      My Analysis of This Death**

26        233.   In my opinion, Ms. Wahlberg's death was preventable.  Several

27   mistakes in medical management were made.  These mistakes should have been

28   identified by the M&M Review process and acted on to ensure that they would not

**Ex. P-1202**

1  be repeated in the future.

2      234.

3

4

5

6

7

8

9

10      235.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1203**

1

2     236.

3

4

5

6

7

8

9

10     237.

11

12

13

14

15

16



17     **D.     Repeated Root Causes of Death in These Case Studies**

18     238.   I identified several root causes that appear again and again in these

19   seven cases.  These include:

20          a.     Patients who were clearly ill were not ever examined by a

21   medical practitioner during their stay at the Jail.

22          b.     Practitioners do medical evaluations at the patient's housing cell

23   instead of seeing the patient in the medical clinic.  As a result, the practitioners do

24   inadequate evaluations.

25          c.     Practitioners order medications and diagnose medical conditions

26   without seeing or examining the patient.

27          d.     Reported refusals are a big problem in the Jail that leads to

28   inadequate medical care.  Nurses do not witness refusals when the patients allegedly

1  refuse to sign the refusal form.  They rely on security staff, in violation of Sheriff's

2  Department Policies and Procedures.  Medical staff accept refusals from patients

3  who are not competent to refuse necessary medical care and do not follow the Jail's

4  own policies and procedures regarding counselling patients who refuse necessary

5  medical care.

6      e.    Communication errors have resulted in unnecessary medical

7  deterioration of patients.  This includes communication errors between nurses and

8  practitioners, between practitioners and other practitioners, between medical and

9  mental health staff, between medical staff and security staff.

10      f.    When patients go to the hospital and return, the Jail medical staff

11  do not adequately review the hospital records, and do not create a care plan for the

12  returning patient based on the hospital findings and recommendations.

13      239.    Notably, many of these observations are not new.  For example, the

14  Jail's problem of inappropriately documenting refusals has been noted by multiple

15  experts and entities in reports since 2017.  However, the Jail still has not fixed this

16  problem, nor do they even appear to register it as a root cause of these deaths.  As a

17  result of the Jail's persistent failures to address these known problems, preventable

18  deaths continue to occur.

19      **E.    Additional Deaths in the Jail**

20      240.    In addition to the deaths I studied and described above, I am aware of a

21  number of deaths at the Jail reported in the press and to the Citizens Law

22  Enforcement Review Board.[23]

23      a.    In March 2023, **Hayden Schuck**, age 22, died in Central Jail

24  approximately five days after his booking.  Although his blood pressure and pulse

25  rate were abnormally high at intake, Mr. Schuck was placed in a temporary holding

26  cell for nearly five days without medical attention.  He was removed for his

27  ───────────────

28  [23] These summaries are based on the news articles cited herein, not on my own
analysis of the medical records.

1  arraignment, during which Mr. Schuck was unable to confirm his name or date of

2  birth and fell to the floor multiple times.  Nevertheless, upon return to the jail, he

3  was placed in a single occupancy cell and found unresponsive the following

4  morning.  Mr. Schuck's family has filed a lawsuit.[24]

5           b.    In February 2023, **Gilbert Gil** died in a holding cell at Vista

6  Detention Facility within 20 hours of intake.  Mr. Gil was arrested on suspicion of

7  being under the influence.  His family says early on-set dementia and diabetes

8  caused his erratic behavior.  At intake, Mr. Gil was unable to sign paperwork.  His

9  blood sugar was found to very high.  He was given insulin and placed in a holding

10  cell because the sobering cell was occupied.  No one checked on him in the fourteen

11  hours between when he was given the insulin and when he was found unresponsive

12  in his cell.  His daughters filed a wrongful death lawsuit in May 2023.[25]

13           c.    In April 2022, **Jarrell Lacy** died in Central Jail.  Mr. Lacy was

14  suffering shortness of breath in his cell for 30 to 45 minutes before deputies

15  responded.  A nurse was in the process of alerting medical staff of the need for an

16  emergency room transport, but Lacy was instead returned to his cell via wheelchair

17  and found unresponsive minutes later.[26]

18           d.    In July 2021, **Saxon Rodriguez**, age 22, died at Central Jail four

19

---

20  [24] Kelly Davis, *What happened before Hayden Schuck, 22, died in San Diego jail? Family's lawsuit says warning signs were missed*, SAN DIEGO UNION-TRIBUNE, May 4, 2023.  https://www.sandiegouniontribune.com/news/watchdog/story/2023-05-04/hayden-schuck-death-lawsuit-jail.

23  [25] Kelly Davis, *Despite known medical problems, 67-year-old was ignored for hours before he died in Vista jail, lawsuit argues*, SAN DIEGO UNION-TRIBUNE, May 19, 2023.  https://www.sandiegouniontribune.com/news/watchdog/story/2023-05-19/despite-known-medical-problems-67-year-old-was-ignored-for-hours-before-he-died-in-vista-jail-lawsuit-argues.

25  [26] Jeff McDonald, *Minutes before dying in jail, man was sent back to cell instead of ER, independent probe finds*, SAN DIEGO UNION-TRIBUNE, October 17, 2023.  https://www.sandiegouniontribune.com/2023/10/17/minutes-before-dying-in-jail-man-was-sent-back-to-cell-instead-of-er-independent-probe-finds/#:~:text=Minutes%20before%20dying%20in%20jail,jail%20in%20Downtown%20San%20Diego.&text=Minutes%20before%20dying%20in%20Jerrell%20Dwayne%20Lacy,the%20results%20of%20his%20electrocardiogram.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1206**

days after his arrest.  The CLERB report concluded "there is no doubt that Rodriguez, while as an incarcerated person in the custody and under the care of the Sheriff's Department, acquired and took fentanyl and methamphetamine, which resulted in his death."  One to two hours elapsed between when deputies last saw Mr. Rodriguez alive and when he has found unresponsive in his bunk.  According to the autopsy report, medical staff believed there was a chance he could have been revived.[27]

e.    In January 2021, **Omar Moreno Arroyo** died at Central Jail hours after his arrest.  During booking, Arroyo underwent a body scan to determine if he had ingested anything improper.  The results of the scan appeared to show an anomaly, but the deputy did not appear to review the results, nor did he order a secondary scan.  Had the material been identified as an illicit substance, Arroyo would have been placed under closer observation.  Instead, Arroyo was placed in a cell where more than an hour elapsed between when he collapsed and when deputies found him.  The autopsy revealed he died from an airway obstruction with acute methamphetamine intoxication as a contributing factor.  His family filed a wrongful death lawsuit.[28]

f.    In February 2019, 32-year-old **Michael Wilson** died in the custody of the San Diego Sheriff's Department.  Despite the Sheriff's Department's undisputed awareness of his medical condition, and Mr. Wilson's need for four necessary heart medications, Mr. Wilson died of congestive heart failure after Jail staff failed to administer the required medications to Mr. Wilson.  *See Estate of*

---

[27] Kelly Davis, *Oversight Board Blames Overdose Death on Sheriff's Department Failure to Keep Drugs out of Jails*, SAN DIEGO UNION-TRIBUNE,  Dec. 15, 2022. https://www.sandiegouniontribune.com/news/watchdog/story/2022-12-15/saxon-rodriguez-jail-death-drugs-clerb.

[28] Kelly Davis and Jeff McDonald, *Four sheriff's deputies faulted in San Diego County jail death*, SAN DIEGO UNION-TRIBUNE, March 8, 2022. https://www.sandiegouniontribune.com/news/watchdog/story/2022-03-08/four-sheriffs-deputies-faulted-in-san-diego-county-jail-death-l.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1207

1 | *Michael Wilson v. County of San Diego*, S.D. Cal. No. 3:20-cv-00457-RBGM-DEB.

2         g.      In November 2019, **Elisa Serna** died at Las Colinas Detention

3 Facility. Upon booking, Ms. Serna reported that she was addicted to heroin and

4 alcohol and that she had used drugs two hours prior. Initially, despite vomiting for

5 multiple consecutive days, Ms. Serna was not placed on withdrawal protocol. Four

6 days after booking, she was transferred to a medical observation bed and given

7 medication for her withdrawal. Two jail personnel watched as she suffered a

8 seizure, struck her head and fell unconscious onto the floor of her cell. They left the

9 cell without providing any medical treatment. Ms. Serna died shortly thereafter.

10         h.      Ms. Serna's death was the subject of two unsuccessful criminal

11 prosecutions. Her family's wrongful death lawsuit resulted in the largest wrongful

12 death settlement ever approved by the San Diego County Board of Supervisors, $15

13 million, plus promises by the County to change the way it addresses withdrawal.[29]

14      241. Multiple other lawsuits are still pending against the Jail seeking

15 damages for deliberate indifference, including by the families of Roselee Bartolacci,

16 Brandon Yates, Michael Wilson, and Lonnie Rupard.[30]

17      242. As these individual deaths illustrate, despite being the subject of

18 scrutiny for several years, the Jail's system for the delivery of medical care is still

19 broken.

20 / / /

21 / / /

22 / / /

23

---

24 [29] *See* Jeff McDonald, *San Diego County settles Elisa Serna jail death lawsuit for $15 million, and limited federal oversight*, SAN DIEGO UNION-TRIBUNE, July 2, 2024
25 https://www.sandiegouniontribune.com/2024/07/01/san-diego-county-settles-elisa-
26 serna-jail-death-lawsuit-for-15-million-and-limited-federal-oversight/.

27 [30] Jeff McDonald, *After record $15 million settlement, San Diego County still confronts a slew of other jail-death lawsuits*, SAN DIEGO UNION-TRIBUNE, July 7, 2024 https://www.sandiegouniontribune.com/2024/07/07/after-record-15-million-
28 settlement-san-diego-county-still-confronts-a-slew-of-other-jail-death-lawsuits/.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1208

**II.    The Sheriff's Department's Inadequate Screening and Intake Process Fails to Identify and Treat Medical Care Problems of Newly Arriving Incarcerated People, Placing Them at Substantial Risk of Significant Harm**

243.    It is my opinion that the Sheriff's Department fails to timely and adequately identify and treat the medical issues of newly arriving incarcerated people during the screening and intake process, and it fails to adequately train or supervise intake staff to do the same.

244.    The accepted *minimum* standard for the evaluation of the health needs of newly booked incarcerated people is laid out in the NCCHC's *Standards for Health Services in Jails*.

245.    These standards require first: a medical evaluation of patients at booking to establish whether they are medically able to be incarcerated and what urgent health care needs they have.  Second, a more thorough Health Assessment should be done within 14 days of incarceration at the latest.

246.    It is worth emphasizing that these are minimal standards designed for small jails that do not have medical personnel on site 24/7.  Large jails that have medical personnel onsite 24/7 should aspire to do more than the minimal standards designed for small jails.  In particular, it is my opinion that waiting 14 days to do a health assessment is not appropriate and constitutes substandard care in a jail with medical staff onsite 24/7.

247.    Unfortunately, the San Diego Jail has consistently failed to comply with even the bare minimal requirements of the Standard of Care.

248.    There are three sets of policies and procedures for intake screening and health assessments in the Jail: the MSD Operations Manual on "Receiving Screening" (No. E.2.1); the Sheriff's Department Detention Services Bureau policies and procedures on "Receiving Screening" (DSB P&P M.9); and NaphCare's policies and procedures on "Receiving Screening" and an "Initial

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1209**

1    Health Assessment." NaphCare P&P E-02, E-04.[31]

2        249.   The NaphCare Contract has similar provisions. Section 2.3.2.1 of that

3    contract states: "This Health Assessment will typically be completed during the

4    intake process for each patient and will always be completed within 14 days." But

5    based on my chart review, as discussed below, the Health Assessment is never

6    completed during the intake process and is regularly not completed within 14 days

7    around of the time. Section 2.3.2.4 of the contract refers to some patients having a

8    Health Assessment completed by a medical practitioner. This does not ever happen

9    per my review. The NaphCare contract, section 2.3.1.1, also states: "Patients with

10   chronic illnesses will be identified during the Receiving Screening and enrolled in a

11   chronic care clinic." This rarely happens based on my review of charts.

12       250.   As explained above, the fact that different policies and procedures

13   apply to different Jail staff, and that there is confusion as to whether or how these

14   policies and procedures conflict, contributes to significant dysfunction in the Jail's

15   health care system. For example, the Detention Services Bureau policy states that

16   "[c]ertain types of medications" that someone has with them at the time of their

17   arrest "may be allowed into the detention facility with prior approval from health

18   staff." DUNSMORE0039683. However, the Medical Services Division policy does

19   not provide *any* indication that medications in the arrestee's possession might be

20   allowed into the facility, or what standards healthcare staff should apply when

21   deciding whether to approve a medication; the policy states only: "An inventory of

22   the individual's prescription medication (if any) will be completed by the RN and

23   stored in the individual's property." MSD Operations Manual No. E.2.1, November

24   4, 2022, SD_027121. Similarly, although the NaphCare policy requires ███████

25   ████████████████████████████████████████████████████████████████

26

27   ───────────────
     [31] Some versions of NaphCare's "Health Care Policy & Procedure Manual,"
28   including the version as of August 30, 2023, omit Policy E-02 ("Receiving
     Screening").

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. P-1210**

1  ███████████████████████████████████████████████████

2  █████████████████████████████████████████████████, the Medical

3  Services Division policy requires "observation and a physical assessment" only "if

4  necessary."  MSD Operations Manual No. E.2.1, Section II.B, May 11, 2022,

5  SD_367461.

6      251.   The documents I reviewed show that the medical intake process at the

7  Jail in practice can be divided into four parts.  Three of the four have a

8  corresponding form in TechCare consisting mainly of check boxes.  I found

9  problems with the Sheriff's Department's practices at each step of the process.

10      **A.**    **Step One:  Medical Clearance**

11      252.   The first part of the intake process is "medical clearance," in which an

12  RN evaluates the incoming arrestee to see if they are medically able to be admitted

13  to the jail.  The Sheriff's Department Operations Manual Medical Services Division

14  defines "Medical Clearance" as "a documented clinical assessment of medical,

15  dental, and mental status before an individual is admitted into the facility."  MSD

16  Operations Manual, No. E.2.1, November 4, 2022, SD_000343.  The Operations

17  Manual lists several conditions and findings (such as abnormal vital signs) that must

18  be sent to the hospital emergency department before further evaluation is done.

19  SD_000344.  ██████████████████████████████████████

20  ████████████████████████.  NaphCare P&P, A-08, May 29, 2023,

21  NAPHCARE000715.  ████████████████████████████

22  ███████████████████████████████████████████████

23  ██████████████████████████████████████████████

24  ██████████████████████████████████

25      253.   The RN also has the option of referring the patient directly to a

26  sobering cell or to the Inmate Safety Program ("ISP") before the patient proceeds to

27  a receiving screening.  While there are written guidelines in the MSD Operations

28  Manual and the NaphCare policies and procedures about when to issue a "gate

refusal," I have seen no specific policies and procedures about the criteria that must be met for a patient to skip the receiving screen and go directly to a sobering cell or ISP. This, evidently, is left to the discretion of nursing.

## B.     Step Two:  Receiving Screening

254.   If the patient passes the medical clearance, the same RN who did the medical clearance performs a "receiving screening."  The receiving screening consists of more questions about the patient's medical history, mental health history, and medications.  The patient's answers are documented by checking boxes on the "receiving screening" form in the electronic medical record.  The receiving screening does not entail any significant physical examination.  At the end of the receiving screen, the RN can refer the patient for a "second stage nursing evaluation," send the patient to a sobering cell, or "clear to classification."  I have seen no specific policies and procedures about what triggers each of these outcomes; the decision appears to rely mostly on the RN's discretion.

255.   The reliance on nursing discretion in the first two steps of the intake process is problematic.  It is problematic because anything that is left solely to discretion without adequate training or guidance in written policy invariably leads different nurses to make different decisions.  This in turn leads to patients who should receive the same care instead receiving different care depending on who happens to see them.  It can harm patients when certain nurses exercise poor judgement, whether because they have not been adequately trained, have no guidance in written policy, or are just having a bad day.  In addition, I have seen no mechanism set forth in policies and procedures to track the performance or decisions of nursing staff.

256.   Further, the referral for a second stage nursing evaluation is made by simply checking a box on the "receiving screening" form.  I saw nothing on the form requiring nurses to identify exactly why a second stage evaluation had been ordered, which will lead to a lack of sufficient documented information for nurses

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1212

1  conducting second stage evaluations.  A haphazard system of communication like

2  this can lead to confusion about why the patient needs to be seen, and so lead to

3  poor medical care.

4  **C.    Step Three:  Second Stage Nursing Evaluation**

5  257.   After the receiving screen, some patients go through the "second stage

6  nursing evaluation."  This typically is conducted by a different RN than the one who

7  completed the medical clearance and receiving screen, and who is supposed to have

8  more time to ask follow up questions about positive answers to the receiving

9  screening, such as details about medications and medical problems.  The second

10 stage nurse *may* conduct a physical examination, but is not required that they do so.

11 The second stage nurses do not consistently document why a patient is referred for a

12 second stage evaluation, nor is there a TechCare form for RNs to complete at this

13 stage.  Rather, the nurse completing the second stage evaluation documents the

14 evaluation in a SOAP note.

15 258.   The "Second Stage Nursing Evaluation" is not mentioned by name in

16 the Sheriff's Department Operations Manual, but may be referenced in E.2.1.V

17 NURSE ASSESSMENT PROTOCOL.  MSD Operations Manual, No. E.2.1,

18 Section V, November 4, 2022, SD_000348.  However, the Nurse Assessment

19 Protocol requires that the nurse "[p]erform a focused physical assessment based on

20 the individual's clinical presentation," and this happens rarely in Second Stage

21 Nursing Evaluations.

22 259.   For example, my review of the records showed that RN ██████████

23 ██████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ██████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. P-1213**

260.   The second stage nurse is also responsible for communicating with a practitioner to get medications approved.  This is exclusively done electronically via STATCare using remote practitioners elsewhere in the country.  If contacted, the remote STATCare practitioner fills out a "STATCare Intake Assessment and Orders" form.  This form has dropdown menus with checkboxes for orders for various conditions.  At the end of the second stage evaluation, medical patients are sent to a sobering cell or other housing.  At this point, the nurse may schedule the patient on for a future evaluation by a practitioner (*e.g.*, a doctor, nurse practitioner or physician assistant), or not, at the nurse's discretion.

### D.  Step Four:  14-Day Health Assessment

261.   The fourth stage of the intake process is the "health assessment."  This evaluation is also done by an RN.  The minimal standard of care under the NCCHC standards requires that the Health Assessment be done within 14 days *at the latest*.  However, that 14-day grace period is meant for small jails without 24/7 medical personnel.  In my opinion, jails with 24/7 availability of medical personnel should not delay the full Health Assessment for 14 days.

262.   The NCCHC Technical Assistance Report recommended that the Jail take either a "full population assessment" approach, which requires a health assessment within 14 days, or an "individual population assessment" approach, which requires a health assessment within two days of the initial booking.  NCCHC Technical Assistance Report, DUNSMORE0260637-0638.  Dr. Homer Venters acknowledged that these two approaches were available, but noted that "jail systems that take a public health approach" conduct an assessment "routine[ly] for every newly admitted patient at the time of intake."  Venters Report, SD_214372.  He further explained that "wait[ing] up to 14 days" for this full assessment "generally results in at least half of all people admitted to the jail leaving without this encounter."  SD_215361.  I agree that performing an individual health assessment for every incarcerated person as part of the initial booking would be a far superior

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1214**

process to ensure adequate care for incarcerated people, who, as a group, are more likely to have medical issues that require provider intervention than the general population.

263.    When I was a jail medical director, we conducted the health assessment as soon as possible, usually within one to three days in the larger facilities and within seven days in the small facilities.

264.    Other jails comparable in size to the San Diego Jail do the health assessment at booking.  One example is the Salt Lake County jail in Salt Lake City, Utah.

265.    However, the Sheriff's Department has chosen not to take the "public health approach" outlined by Dr. Venters and instead to defer a full health assessments for 14 days.  This is not a best medical practice.  I cannot imagine a reasonable medical basis for the Sheriff's Department's decision to wait for 14 days (or longer) before doing a health assessment.  In my opinion, that decision more likely than not was not made for cost-saving reasons.

266.    Unfortunately, the Sheriff's Department has failed to adequately meet even this minimal 14-day standard.  The NCCHC Technical Assistance Report emphasized the importance of the timeliness of a full health assessment, stating that it "will typically be completed during the intake process and will *always* be completed within 14 days."  This sentence is repeated verbatim in the County's contract with NaphCare, NAPHCARE000567, and Dr. Montgomery confirmed it is a "great standard" that "provides great care for [] patients."  Montgomery II Tr. at 146:2-3.

267.    The Sheriff's Department has failed to implement this standard properly.  Although it is the Jail's "goal" to try to complete the health assessment within 14 days of booking, this is not set forth in any written policies and procedures.  Montgomery II Tr. at 145:15-146:9; Rognlien-Hood Tr. at 26:12-28:21. Further, health care staff frequently fail to perform a health assessment within 14

Ex. P-1215

1   days after a patient is booked in the Jail, and, of course, many patients are released

2   before they receive a full health assessment.  Ms. Rognlien-Hood testified that when

3   she became the Director of Nursing, she made it a priority to try to get the health

4   assessments done within 14 days.  This emphasis began, per her testimony, in March

5   of 2023.  Rognlien-Hood Tr. at 27:4-8  Dr. Montgomery confirmed that it "remains

6   to be seen" how frequently the Sheriff's Department is able to timely complete the

7   health assessments.  Montgomery II Tr. at 146:4-9.  Ms. Rognlien-Hood and

8   Dr. Montgomery could not provide clear estimates of how frequently the health

9   assessments in fact are completed within 14 days, but suggested the compliance rate

10  could be as low as 75 – 80 percent.  (Rognlien-Hood Tr. at 100:4-10; Montgomery

11  II Tr. at 146:10-25).

12       268.   This means many patients are being missed.  My review showed cases

13  where health assessments were completed after the 14-day mark, for example: ████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████, First,

17  ██████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ██████████████████████████.

20       269.   As with many aspects of the deficient health care in the Jail,

21  understaffing appears to be a significant reason for the failure to complete health

22  assessments within fourteen days.  ████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████.  ████████████████████████████████████████

27  ████████████████████████████████████████████████████.

28       270.   There are several problems with this multi-step intake process.  First,

1   even under the Sheriff's Department's "goal" program of completing a health

2   assessment within 14-days—which is not currently happening—at no point is every

3   incarcerated person examined by a practitioner as part of the intake process.  Rather,

4   at each step of the assessment described above, the examination is conducted by an

5   RN.  Almost all practitioner involvement in intake is done electronically through

6   STATCare.

7        271.    The NCCHC Technical Assistance Report recommended that nurses

8   complete the initial Health Assessment on all patients "soon after booking" as part

9   of the Second Stage Nursing evaluation.  SD_060170-71.  Dr. Venters similarly

10  recommended that all patients with a significant medical history (in other words, all

11  patients currently referred for a second stage evaluation) be seen in person by a

12  medical practitioner.  SD_215371-72.  I agree with this recommendation, but that is

13  not what the Jail does as a matter of policy or practice.  According to the County's

14  contract with NaphCare, patients are to be evaluated based on medical information

15  obtained during the receiving screening as to the medical necessity of conducting a

16  health assessment by a provider.  Contract No. 566117, § 2.3.2.4,

17  NAPHCARE000567-68.  In the approximately 80 charts I reviewed, I did not see a

18  single instance of a medical practitioner doing an in-person examination of a patient

19  during intake.  I also identified several patients who should have been seen face-to-

20  face by a medical practitioner based on their medical problems and complaints, but

21  were not seen.  One example is Raymond Dix (███████████████████████

22  ███████████████████████████████████████████████████████

23  ██████████████████████████████████████  He died in

24  custody on September 13, 2022.  █████████████████████████

25  ███████████████████████  A second example is ██████████

26  (█████████) ███████████████████████  ████████████████

27  ████████████████████████████████████████████████████████

28  ████████████████

1    272.   Rather, as explained, the only involvement of medical practitioners

2   during the intake process in the vast majority of cases is electronic, relying on

3   STATCare practitioners working elsewhere in the country.  Experts from the

4   NCCHC, Dr. Venters, and now I, agree that this intake system is sub-optimal.

5    273.   Medical practitioners who actually see and talk to incoming patients

6   with medical problems would be able to assess problems and prescribe appropriate

7   treatment and formulate a treatment plan with a degree of competency and thor-

8   oughness that is lacking in the current system.  Nurses do not have the training or

9   expertise to provide comprehensive care in this context, and the STATCare practi-

10  tioners elsewhere in the country cannot act with the required degree of competence

11  since they never talk to their patients or examine them.  They rely instead on drop-

12  down menus in TechCare that often are not a good fit for the individual patient

13  under consideration.  It is no wonder that so many mistakes are made that would not

14  be made if on-site practitioners talked to and personally examined their patients just

15  as is done everywhere in medical practice outside of the Jail.

16   274.   Second, although the second stage nurse evaluation is the *de facto* final

17  step in the intake process (given that the 14-day health assessment is not occurring

18  as planned, nor is it described in any policy), I did not identify anything in the Jail's

19  policies and procedures setting forth how the second stage evaluations should be

20  done.  These are treated like a Nurse Sick Call clinic visit.  But a second stage

21  evaluation is not a nurse sick call clinic, nor do the nurses treat it as such.  For

22  example, they do not typically fill out a Standardized Nursing Procedure Form.

23  Instead, the Second Stage Evaluation is an opportunity to take more time to delve

24  more deeply into a patient's medical history, by doing a more detailed history and

25  conducting a physical examination.  The fact that a patient can go through this entire

26  process and never have a physical examination done, no matter how significant their

27  medical problems are, is a significant lapse.  Dr. Venters gives an example of how a

28  patient with asthma should have an examination of the lungs and a peak flow test

done as part of the booking process.  SD_215361.  This is not done now as part of the Jail booking process.

275.  A Second Stage Nursing Evaluation should not be documented on a SOAP note.  Many patients referred for a Second Stage Evaluation have multiple medical issues that need to be evaluated.  A SOAP note is designed to document a response to one problem or complaint.  The Second Stage Evaluation should be guided by both a formal Policy and Procedure in the Sheriff's Department's MSD Operations Manual and a specific form that guides the evaluation process.  Neither exist at present.

276.  Third, in my review of presentations from CQI meetings, I did not identify any CQI data on Second Stage Evaluations.  This suggests to me that there is no significant training for or supervision over this important process.  Supervision is critical because Second Stage Evaluations, which are done on patients with significant health problems, are performed by nurses, not medical practitioners.  Since the Sheriff's Department chose to ignore Dr. Venters' advice to have these patients seen face-to-face by a practitioner, practitioners should supervise the process and CQI should closely follow the functionality of the Second Stage program, but neither occurs now.  It is important to note here that although STATCare practitioners sometimes participate in the Second Stage Evaluations, they do NOT supervise this process.

277.  The failure to timely complete these initial health assessments poses a significant risk of harm to incarcerated individuals and falls below the standard of care.  For example, the Sheriff's Department's substandard care at intake has resulted in deaths of incarcerated people and high costs for San Diego taxpayers.  As just one example, in May 2024, the family of Ronnie Sandoval was awarded $1.8 million from a federal jury that faulted Sheriff's Department's nursing staff for failing to prevent Mr. Sandoval from a fatal overdose in February 2014.  The jury found that Mr. Sandoval was sweating profusely through an hours long booking

1   process, but the Jail's nurses did not properly respond to his condition.  Jeff

2   McDonald, *Jury Awards $1.8 Million to Family of Man Who Died in San Diego*

3   *County Jail 10 Years Ago*, SAN DIEGO UNION-TRIBUNE, May 3, 2024.

4        278.   The practice of delaying a full Health Assessment to 14 days or longer

5   carries with it substantial risks of harm to incarcerated patients.  It is inevitable that

6   the cursory history and minimal physical exam done at the Receiving Screening will

7   miss substantial medical problems, both acute and chronic.  Some patients are then

8   referred for a Second Stage Evaluation, but this is unstandardized and sporadic.  At

9   its best, the Second Stage Evaluation will also miss or underestimate the presence of

10  medical problems that a thorough Health Evaluation would find.  Dr. Venters'

11  description of how asthma should be handled during the booking process is a great

12  example.  SD_215361.

13       279.   Medical problems missed by a substandard booking process and a

14  delayed full health assessment will inevitably get worse and only be realized later

15  when the patient's health deteriorates.

16       280.   Delaying a complete health assessment for 14 days would never happen

17  in any outside medical institution.  Patients newly admitted to a hospital, a nursing

18  home, or a psychiatric hospital do not have to wait 14 days (and longer) for a full

19  health assessment.  It is not hard to speculate on what would happen to their

20  mortality and morbidity statistics if these institutions did delay a full health

21  assessment for two weeks or longer!

22       281.   The only advantage to delaying the full health assessment for 14 days is

23  that the Sheriff's Department then must do fewer of them—*i.e.*, because "at least

24  half of all people admitted to jail leav[e] without" an assessment since they are

25  booked and released after fewer than 14 days—and therefore the Sheriff's

26  Department saves the time and money required to do a Health Assessment on these

27  patients.  *See* Venters' Report, SD_215372.  However, delaying the health

28  assessments saves little time or manpower in reality because the Sheriff's

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1220

1  Department already does an abbreviated health evaluation during the receiving
2  screen and the second stage evaluation.  To add the few extra questions and exam
3  required to complete a full health assessment would require less incremental
4  resources than the Sheriff's Department now expends on tracking and transporting
5  patients 14 days after intake, as well as the cost of "catching up" programs when the
6  County falls behind, and patients are missed.  There are also high medical costs of
7  missing potential diagnoses and treatments of short-term detainees.

8      282.   Moreover, many individuals return to the Jail repeatedly.  From a
9  medical perspective, not doing a full health assessment on individuals incarcerated
10 for even short periods of time is a missed opportunity to find and treat medical
11 problems before the patient returns to the Jail later with worse medical problems.  In
12 the long run, this missed opportunity will create more difficulty for the Sheriff's
13 Department when they must play catch-up later.  Even if not re-incarcerated, these
14 individuals are members of the San Diego community and may place demands on
15 community resources like emergency rooms and clinics if their health concerns are
16 not addressed sooner rather than later.

17     283.   In summary, the Sheriff's Department's does not currently have a
18 functioning system that ensures all incarcerated people receive a health assessment
19 within fourteen days.  And, even if the medical intake system were functioning as
20 the Sheriff's Department claims it should—*i.e.*, with an assessment conducted by an
21 RN within fourteen days, that system would still fall below the standard of care and
22 place incarcerated people at risk.  The Sheriff's "goal" for the system is insufficient
23 because the ideal time for an incoming patient to receive a full face-to-face medical
24 assessment by nurses and medical practitioners is during the booking process, not
25 later.  The NCCHC Technical Report and Homer Venters both emphasized this.

26     284.   This is important:  In my opinion and based on a reasonable degree of
27 certainty, if the Sheriff's Department instituted a health assessment at booking
28 utilizing nurses and medical practitioners as the NCCHC and Dr. Venters

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1221

1  recommended, the mortality and morbidity at the Jail would decrease.  The systemic

2  inadequacy of health assessments is, in my opinion, one Root Cause of the Jail's

3  high Mortality and Morbidity problem.

### III.    The Sheriff's Department Fails to Continue Medically Necessary Medications and Treatments for Incarcerated People Upon Their Arrival at the Jail or Transfer Between Jail Facilities, Placing Them at Substantial Risk of Serious Harm

7      285.   "Continuity of medical care" means that an incarcerated patient's

8  prescribed medications and treatments are continued without interruption at each

9  stage of that person's incarceration.  In particular, continuity of care requires that,

10  when a patient is booked into the jail, the medications and treatments they had been

11  receiving in the community should be continued.[32]

12      286.   Continuity of prescribed medications can be of critical importance to a

13  person's health.  Missing doses of essential medications can harm fragile patients.

14  As Dr. Venters stressed in his report, "[a]ccess to appropriate medications in a

15  clinically appropriate timeframe" helps "reduc[e] mortality and morbidity in jail

16  settings," and it is therefore a best practice to "provide several tools for ensuring

17  continuity of medications in jail," "start[ing] with … health staff who screen

18  patients before entry to the jail."  SD_215374.

19      287.   Plaintiffs have alleged in their Third Amended Complaint that the

20  Sheriff's Department fails to provide continuity of medical care to people after they

21  are booked into the Jail.  Dkt. 231 ¶ 58.  As explained in more detail below, I agree.

22      **A.    Continuing Medical Necessary Medications After Booking**

23      288.   The basic principle of continuity of prescribed medications is this:  All

24  medications that patients were receiving before their arrest and incarceration should

25  be continued at a minimum until they are seen face-to-face by a medical

---

[32] These principles also apply when a patient returns from the hospital to the jail and when a patient is discharged from the jail, so that they can receive medication and therapy in the community.  Those issues are discussed later in this Report.

1  practitioner.  These medications "bridge" the gap between a patient's arrival and the

2  first time they see a medical provider face-to-face and so are often called "bridge

3  medications."  Once a medical practitioner sees the patient face-to-face, the

4  prescribed medications can be changed as per the practitioner's medical judgment.

5  NaphCare's policy manual for San Diego acknowledges this principle: "██████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████

9  NAPHCARE000843.  But, as explained in more detail below, that does not appear

10  to happen in practice.

11      289.  The biggest problem many jails have during the process of continuing

12  medications is verifying what are (and are not) current prescriptions, because they

13  must contact outside pharmacies to request faxed copies of active prescriptions.

14      290.  The Jail does not have this problem due to the availability of

15  Surescripts.  Nurses at the Jail can instantly verify current prescriptions within the

16  state of California by accessing this database.  The Jail also has the advantage of

17  having an in-house pharmacy at its intake facilities so that most verified medications

18  can be dispensed immediately.

19      291.  In its contract with NaphCare, the Sheriff's Department laid out a

20  standard for continuing medication of a newly booked incarcerated person:

21  "Validated medications need to be restarted within 12 hours unless the use of

22  specialized pharmacies is required.  Any delay in starting medications should be due

23  to the validation process, not identifying/routing the request to a provider."  Contract

24  No, 566117, § 2.3.30.8, SD_125280-125281.  Since the Jail has Surescripts and an

25  in-house pharmacy, the 12-hour standard is generous.  For the vast majority of

26  patients and medications, it should take less than 12 hours to access a currently

27  prescribed medication list, send this list to the in-house pharmacy, and have the

28  medications filled and dispensed.

292.    In practice, based on my review of records, NaphCare mandates two additional steps between the verification of outside medications via Surescripts and the filling of those prescriptions by the in-house pharmacy: First, the prescriptions are sent to a STATCare practitioner for approval.  Second, if the patient has been taking medications not on the NaphCare formulary, these must be approved via the NaphCare non-formulary process before they are filled.

293.    These steps are not required by the NaphCare contract (which states only that this "validation" process must not delay the process of med continuity over 12 hours).  *Id*.  This extra step of requiring the review and approval of a STATCare practitioner and the non-formulary approval are also not mentioned in either the Sheriff's Department MSD Operations Manual or in NaphCare's Health Policies and Procedures for San Diego.

294.    However, these steps can be a problem if used inappropriately to enforce the NaphCare formulary and therefore deny people needed medications that fall outside the formulary.  A "formulary" is a list of medications that are preauthorized to be prescribed.  Formulary medications tend to be inexpensive. "Non-formulary" medications require authorization before they can be prescribed. Non-formulary medications tend to be expensive.  The process of seeking authorization for a non-formulary medication is similar to the Utilization Management process for seeking permission for an offsite consultation, discussed later in this Report.  In order for a patient to receive a non-formulary medication, the prescribing practitioner, including STATCare practitioners, must fill out a non-formulary medication authorization form and send it in for approval or denial.  The person who approves or denies authorization for non-formulary drugs can be a pharmacist, a physician, a midlevel practitioner, or even an RN.  The practitioner asking for approval for a non-formulary drug typically does not know who is making the yes-or-no decision.  The prescribing practitioner and the person approving or denying the request generally do not collaborate.  Evidently, this

1  approval process for non-formulary medications is enforced even for medications

2  the patient was taking prior to being booked.  In my experience, the number one

3  reason for a formulary in most medical systems is to save money.  Non-formulary

4  drugs are usually expensive drugs.

5      295.  Even if non-formulary meds are eventually approved, the verification

6  process can take days during which time the patients are not receiving these

7  medications.  This delay can and does harm patients.

8      296.  The Sheriff's Department, through its contract with NaphCare, requires

9  NaphCare to "maintain[] and enforc[e]" a drug formulary, which shall "allow[]

10  medical practitioners and psychiatrists to follow generally accepted clinical practice

11  patterns in their medical management of incarcerated individual patients." *Id.* at

12  §§2.3.30.32, 2.3.30.35, SD_125283.  The contract also requires that NaphCare

13  "typically approve[] non-formulary orders." *Id.* at § 2.3.30.35, SD_125283.

14  Finally, under the contract, "[r]ecords of non-formulary requests and responses shall

15  be maintained," *id.* at § 2.3.30.34, SD_125283, and reported in "Standard

16  Management Reports," *id.* at § 2.3.29.3, SD_125278.

17      297.  While there are legitimate reasons to substitute less expensive drugs for

18  more expensive drugs if the two drugs are therapeutically equivalent, jail drug

19  formularies should not prohibit the use of any legitimate medication simply based

20  on its cost.  Miraculous new medications that represent a huge improvement in

21  medical care are always expensive.  A good example are the new antiviral agents

22  used to treat hepatitis C.  They are miraculous—curing hepatitis C in greater than

23  95% of patients with minimal side effects in just a few weeks.  However, they are

24  expensive. ███████████████████████████████████████████

25  ███████████████    *See* NAPHCARE037047.  Expense cannot be a reason to deny

26  incarcerated patients medically indicated medications.

27      298.  Documents I reviewed reveal that, in practice (and likely because of

28  this formulary "extra step") the Sheriff's Department is not continuing incarcerated

1  people's medications in a timely manner and not continuing legitimately prescribed

2  medications.

3      299.   The Sheriff's Department knows this is a problem.  In fact, the

4  Sheriff's Department mentioned this very practice in the Corrective Action Notice

5  ("CAN") sent to NaphCare, dated April 28, 2023, which stated that NaphCare had

6  "failed to restart medications for patients reassigned from the California Department

7  of State Hospitals."  NAPHCARE034831.  However, as of the December 8, 2023

8  CAN response, NaphCare had still not provided any specific information regarding

9  medications for patients reassigned from the California Department of State

10 Hospitals.  SD_1572354.  As of the March 4, 2024 CAN response, the most recent

11 one I have seen, there is a general statement that "Naphcare has appeared to resolve

12 pharmacy and discharge medication issues," but no details about the Department of

13 State Hospitals patient issue.  SD_1572610.

14     300.   The documents I reviewed include examples of incarcerated patients

15 who were harmed by the Jail's failure to continue their medications after booking.

16 One example is Raymond Dix, who, as discussed in detail above, ███████████

17 ███████████████████ died on September 13, 2022.  ███████████████████

18 ███████████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████████

25 ███████████████████████████████████████████████████████████

26 ███████████████████████████████████████████████████████████

27 ███████████████████████████████████████████████████████████

28 ███████████████████████████████████████████  An autopsy showed that Mr. Dix

1 died on September 13, 2022 of "[a]therosclerotic and hypertensive cardiovascular

2 disease," SD_050219, also called a heart attack.

3      301. ██████████████████████████████████████

4 █████████████████████ I also note that arbitrarily discontinuing those

5 medications simply because they were non-formulary violated NaphCare's

6 contractual obligations: "the formulary shall allow medical practitioners and

7 psychiatrists to follow generally accepted clinical practice patterns in their medical

8 management of incarcerated individual patients," and "[c]ontractor typically

9 approves non-formulary orders."  Contract No. 566117, § 2.3.30.35, SD_125283.

10      302. ████████████████████████████████



EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1227**



Suffice it to say here that discontinuing a legitimate outside prescription without seeing the patient and without a medical indication violates continuity of care and is in violation of NaphCare's contract.

303. NaphCare's contract also states that any substitution of a formulary medication for a non-formulary medication shall "follow generally accepted clinical practice patterns in their medical management of incarcerated individual patients." *Id.* The wholesale discontinuation of long-acting

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
**Ex. P-1228**

1  insulins by substituting short acting insulin on a sliding scale is not a "generally

2  accepted clinical practice pattern." *See Diabetes Management in Detention*

3  *Facilities: A Statement of the American Diabetes Association*, 47 DIABETES CARE

4  544-555 (2024).

5       **B.    Continuing Medically Necessary Treatment After Booking**

6       304.   Besides medications, many newly booked patients have prescribed

7  medical therapies and treatments scheduled in the community, which also should be

8  honored during incarceration as part of continuity of care.  Examples include

9  dialysis, cancer chemotherapy, infusion therapy for autoimmune disease, previously

10 scheduled surgeries (even if they are elective), physical and occupational therapy,

11 and other previously scheduled follow-up appointments and consultations.

12      305.   All of these medical obligations should be honored by the jail medical

13 services.  One of the duties of the RNs who do the receiving screening is to find out

14 about these medical obligations.  Patients who have pending medical appointments

15 and therapies should then be quickly referred to a medical practitioner and to

16 scheduling to arrange for patient transportation to these appointments.  The care

17 plan to continue these off-site obligations should also be discussed with the patient

18 so she/he understands what is happening.

19      306.   While I understand that there are security requirements surrounding

20 these offsite visits, security concerns do not negate the Jail's obligations to

21 continuity of medical care.

22      307.   Unfortunately, this Jail abrogates its responsibility for this type of

23 continuity of care.

24      308.   ███████████████████████████████████████████

25 ███████████████████████████████████████████████████

26 ███████████████████████████████████████████████████

27 ███████████████████████████████████████████████████

28 ███████████



309.

[4448212.31]

Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1230



EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1231**

1    310. ███████████████████████

2    ████████████████████████████

3    █████████████████████████████

4    ██████████████████████████████

5    ████████████████████████████

6    ██████████████████████████

7    █████████████████████████████

8    ██████████████████████████████

9    ████████████████████████

10   ████████████████████████████

11   █████████████████████████████

12   █████████████████████████████

13   █████████████████████████████

14   ████████████████████████████

15   █████████████████████████████

16   ███████████████████████████

17   ████████████████████████████

18   ██████████████████████████████

19   █████████████████████████████

20   █████████████████████████████

21   █████████████████████████████

22   █████████████████████████████

23   ██████████████████████████████

24   ███████████  █████

25   311. ████████████████████

26

27   ────────────────────

27   [34] Jeff McDonald, *"'I'm in a little disbelief': Diagnose with a tumor just before*
28   *going to jail, La Mesa man fights for long-delayed surgery,"* SAN DIEGO UNION-
     TRIBUNE (July 23, 2023).

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1232**



312.

313.   In summary, the Jail fails to continue medically necessary medication and treatment for people after they are booked into the Jail, in violation of the standard of care.  This places incarcerated people at risk of harm, including death, (such as Raymond Dix) and unnecessary pain and suffering (such as ▮▮▮▮▮▮ ▮▮▮▮▮▮).

## IV.    The Sheriff's Department Does Not Provide Incarcerated People with a Reliable and Timely Way to Alert Health Care Staff of Their Medical Needs, Placing Them at Substantial Risk of Serious Harm

314.   It is my opinion that the Sheriff's Department lacks adequate policies and practices to reliably and timely respond to incarcerated people who alert health care staff of medical needs, which is a necessary component of any correctional

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1233**

1   medical system.  Absent such a functioning system, the Jail's medical system

2   inherently falls below the accepted standard of care.

3       315.  To meet standards of care in a jail system like this one, incarcerated

4   people must be able to communicate their medical needs to health care staff—

5   including routine, urgent, and emergent medical issues—and be assured that those

6   needs will be addressed in a timely manner.  Due to the size of the Jail population,

7   and therefore the expected volume of medical requests, the Sheriff's Department

8   must have robust, functioning systems for (a) collecting and triaging incarcerated

9   person medical requests; (b) conducting timely in-person nursing evaluations of

10  people requesting medical care; (c) reviewing and responding to grievances

11  incarcerated people submit about their medical care; (d) identifying and responding

12  to medical emergencies in the Jail; and (e) identifying and communicating with

13  people with mental illness who may be unable to advocate for their own medical

14  care.

15      316.  The Sheriff's Department's own policies and procedures regarding

16  "Access to Care" require that incarcerated people "have access to care for their

17  serious medical … needs."  MSD Operations Manual, A.1.1.  According to that

18  policy:  "*Access to care* means that, in a timely manner, a patient is seen by a

19  qualified health care professional, is rendered a clinical judgment, and receives care

20  that is ordered."  *Id*.  These procedures further provide examples of "unreasonable

21  barrier[s]" to care, including "[b]eing [an] understaffed or poorly organized system

22  whereby care cannot be provided in a timely manner" and "[h]aving a utilization

23  review process that inappropriately delays or denies specialty care."  *Id*.

24      317.  Based on my review of Jail policies and procedures, my review of

25  charts and other documents, and my conversations with incarcerated patients, it

26  appears that the Jail has four ways for patients to alert health care staff of their

27  medical needs:  (i) emergency buttons or intercoms; (ii) sick calls; (iii) grievances;

28  and (iv) face-to-face interactions with health care or custody staff.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1234

318.    In policy and practice, it is apparent to me that these do not function to respond to the needs of people incarcerated in the Jail.  My review of documents and my interviews with Jail staff and incarcerated patients during my inspection of the Jail showed many substantial problems with the Jail's system for requesting medical care.  This places incarcerated people at risk of serious harm.  Clearly, if an incarcerated patient is unable to effectively notify staff of a medical problem, that problem will not be addressed, or will be addressed belatedly, and the patient could suffer harm as a result.

### A.    The Sheriff's Department Lacks an Effective Process for Submission, Tracking, and Scheduling of Sick Calls

319.    Incarcerated people must be able to request medical care via requests that are processed, tracked, and scheduled for appointments in an organized and effective manner.

320.    In the community, people have multiple ways to seek medical attention for themselves or others.  If they think they have an emergency, they can call for an ambulance or go directly to a hospital emergency room.  If they have an urgent medical condition, they can go to an urgent care clinic or a walk-in clinic at a doctor's office that does not require an appointment.  If they have a non-urgent medical condition, they can make an appointment with a medical practitioner.[35]

321.    Jails should provide incarcerated patients with the same opportunities. Since incarcerated patients cannot go themselves to a hospital, call an ambulance, or make an appointment at an outside doctor's office, the standard of care requires that jails provide incarcerated patients the following functional mechanisms to alert staff

---

[35] People in the community may also be scheduled for regular check-ups even if they are feeling well, especially if they have chronic medical conditions such as diabetes or are elderly. Many screening lab tests and x-rays are done at such check-ups. People in the Jail with chronic medical problems should also receive scheduled check-ups where routine monitoring labs, x-rays, and examinations are performed and medication is renewed—even if the patient feels well. I discuss the standard of care for chronic care appointments and the Jail's failure to meet that standard later in this Report.

1  based on the urgency of their medical needs:

2    322.   First, when incarcerated patients have a medical emergency, such as a

3  seizure, a severe fall, a stroke or a heart attack, they must have a way to immediately

4  notify staff of this emergency.  This is usually accommodated by having an

5  emergency call button in each patient's cell or housing unit.  (I discuss the Jail's

6  emergency response system in more detail in a later subsection).

7    323.   Second, when incarcerated patients have acute medical issues, such as

8  rashes, vomiting, headache, etc., they must be able to notify medical staff of their

9  symptoms and the urgency of their medical need.  Jails commonly ask patients to fill

10  out a medical request form when they have non-emergency medical symptoms or

11  issues.  Since written medical requests include both urgent and nonurgent issues,

12  these must be triaged by medical staff in a timely manner and urgent complaints

13  evaluated in a timely manner (usually within 24 hours).[36]  Jail policies and

14  procedures must take into account the fact that many incarcerated patients have

15  difficulty or are unable to communicate their medical needs in writing, *e.g.*, those

16  with developmental or mental health disabilities or those who do not speak English

17  or Spanish, to communicate their medical needs.  This should include the ability to

18  verbally request medical care from custody or medical staff, who will then enter the

19  request into the medical system and initiate the 24 hour face-to-face evaluation.

20    324.   Third, custody and other jail staff, including mental health staff, must

21  be able to submit requests for medical care on behalf of patients they are concerned

22  about.  These should be entered into the system as if the patient had made the

23  request themselves, and should initiate a 24 hour face-to-face evaluation just like a

24  patient-generated medical request.  This is particularly important, for example, for

25

---

26  [36] Many jails now allow incarcerated people to submit such requests electronically,
   *e.g.*, through a tablet, which may be preferable because medical requests written on
27  paper can be easily lost or misplaced and it is harder to document when such a
   written request has been triaged or when the patient was seen for this particular
28  complaint by a medical practitioner.  Electronic submission of these requests
   automatically keeps track of all requests and when the requests were attended to.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1236

1    developmentally disabled patients, patients with dementia, and severely mentally ill

2    patients.  These patients, by nature of their illness, may have impaired reasoning,

3    diminished insight into their medical condition, and/or paranoia that leaves them

4    less able to communicate their medical needs.  Jails are likely to have many such

5    patients, they must therefore have systems in place to check on those individuals.

6        325.   Fourth, family members, attorneys, and other interested parties also

7    must be able to initiate medical evaluations of incarcerated people.  These requests

8    must be considered as equivalent of the patient herself submitting the request and so

9    also immediately trigger the 24 hour face-to-face evaluation.

10       326.   The San Diego County Sheriff's Department policies provide a

11   minimal description regarding the medical request process.  Medical Services

12   Division Operations Manual section MSD.S.3 first provides general guidance that

13   "[a]ny patient with a medical, dental, mental health or developmental disability may

14   be identified by self, deputy, medical staff, family, attorney or advocate referral."  In

15   terms of how a request is made, it states that:  "Patients shall request routine sick

16   call by completing one (1) Sick Call Request Form" which are then placed by the

17   patient into a "locked medical (red) box."  MSD.S.3 Procedure Part III.  These

18   forms are to be gathered "daily by designated health staff" and reviewed; each

19   patient is to be seen face-to-face by an RN within 24 hours "of receiving requests."

20   *Id.*

21       327.   Section MSD.S.3 further states that, "[i]n the event a RN refers a

22   patient to sick call, there will be documentation in the electronic medical record

23   substantiating the reasons for the referral."  *Id.*  However, there is no guidance

24   regarding how to document referrals by security staff, clergy, family, LVNs, and

25   any number of other people who may want to make such a referral.

26       328.   Regarding non-written requests for medical care, the MSD Operations

27   Manual explains that "[p]atients with an urgent medical complaint may be referred

28   to health staff at any time."  *Id.* at Part IV.  However, there is no guidance regarding

1  how patients who have difficulty in writing, *e.g.*, those with cognitive disabilities

2  and those with mental health issues, can submit non-urgent requests for medical

3  care.

4      329.   Detention Services Policy M.15 (for custody staff) is similar, it

5  explains that "[s]ick call requests are deposited by the incarcerated person into the

6  secure medical mailbox," and that "health staff is responsible for collecting the sick

7  call request … each night."  Notably, Policy M.15 does not include a 24-hour face-

8  to-face requirement.

9      330.   Based on my interviews with Sheriff's Department staff during my

10  inspection of the Jail, I understand that, in practice, the Sheriff's Department still

11  requires incarcerated people to submit all in writing.  Patients who report medical

12  problems are told to fill out a medical request form.  The incarcerated person must

13  fill out the medical request form (Form J-212) and place it in a box located in the

14  housing unit.  Of course, not all of them do so—perhaps because they struggle with

15  writing or have a mental health issue—meaning that opportunities to treat medical

16  problems are then lost.

17      331.   Once submitted, the requests are picked up by a medical staff member

18  (usually an LVN) and taken to the medical offices.  The requests are then reviewed

19  by a registered nurse, who time stamps them and sorts and triages them, to the

20  extent possible.  A nurse I interviewed during my inspection reported that

21  sometimes she was not able to complete her triage of all requests the same day

22  because there are so many.  The stack of that day's medical requests is then

23  transferred to the RN responsible for doing a Face-to-Face assessment with each

24  patient within 24 hours.  After seeing the patient, this nurse makes a follow-up

25  appointment for sick call, if the RN deems it necessary.

26      332.   This process has several problems and inefficiencies that make it

27  inadequate to provide incarcerated people with care that meets medical standards.

28      333.   First, many incarcerated people have difficulty with a system requiring

1  written requests.  This includes those who do not speak English or Spanish, those

2  with cognitive disabilities, mentally ill patients, and many others.  I was unable to

3  find this issue addressed (at all) in either the MSD Operations Manual or

4  NaphCare's Policies and Procedures.  Similarly, submission of a physical written

5  request form can be daunting for patients who are only allowed out of their cells for

6  a small amount of time daily.

7       334.  Documents I reviewed suggest that some staff refuse to accept requests

8  for medical care unless they are written.  For example, in July 2022, a ███████

9  ████████████████████████████████████████████████

10 ██████████████████████████████████████████████████

11 █████████████████████████████████████████████

12 ███████████████████████████████████████████

13 ███████████████████████████████████████████

14 ███████████████████████████████████████████████

15 ████████████████████████.  In my opinion, the limitation of requiring a

16 physical, written request is a major oversight, which could result in some

17 incarcerated people being unable to request medical care.

18      335.  Second, the MSD Operations Manual does not explain how medical

19 care referrals from custody staff or from others outside the Jail, *e.g.*, family

20 members or attorneys, should be documented and processed.  For example, if a

21 family member calls and states that a particular patient has an unmet health care

22 problem, how is this documented in the medical record?  Who takes this information

23 and enters it into the system as an official medical request that will trigger a face-to-

24 face evaluation?  The MSD Operations Manual is silent on this, and without a policy

25 on how a family concern turns into a formal request for medical care, family

26 member concerns can and are ignored, resulting in their frustration in trying to get

27 health care for their oved ones.  This also can result in harm to the patient, who does

28 not receive the necessary health care that the family is trying to arrange.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1239**

336.    According to patients I interviewed during my inspection of the Jail, incarcerated people sometimes attempt to inform the nurses who pass out medication about an urgent medical problem.  However, those patients report that, rather than promptly contacting the sick call nurses or physicians on duty, medication pass nurses often dismiss the person's request and instruct them to fill out a sick call request, which delays their access to care.  Similarly, I was told that when incarcerated people inform custody staff about a medical problem, custody staff again often dismiss the person's request and instruct them to fill out a sick call request rather than notifying medical immediately about an urgent problem.

337.    Third, the medical request process is not standardized across the various Jail facilities.  As an example, during my tour of the Jail, I learned that some facilities keep a copy of the medical requests in a binder whereas others do not.  This discrepancy in practices makes it difficult to track systemwide trends through CQI; medical requests that are kept organized are amenable to CQI review, while unorganized medical requests are not.  This lack of standardization across facilities would be remedied if the policies were more explicit.  Similarly, it appeared to me that there was confusion about when precisely in the triage process the medical request form was scanned and placed within the patient's chart.  Again, this lack of clarity may lead to errors, including the possibility of some sick call requests falling through the cracks.  For example, if a request is scanned into the chart too early, does that mean the appointment has already been completed?  If different staff have different expectations for when a request form is supposed to be scanned, this can lead to confusion.

338.    Fourth, according to the interviews I conducted during my tour of the Jail, some nurses doing triage eliminated sick call requests that they felt were redundant.  In other words, if the nurse believed that a patient had already submitted a request on a particular issue, they would simply eliminate that request.  This, again, creates a risk of health care needs slipping through the cracks, for example, if

the issue was not exactly the same as the prior request. Also, repeated written requests often indicate the urgency of the problem. The patient may be indicating, via repeated requests, that this is an urgent matter that should be dealt with promptly.

339. Fifth, according to my interviews, sometimes, nurses responded to the requests in writing at the bottom of the J-212 medical request form, returned the form to the patient, and that was the end of the matter. This results in no clinical encounter with the patient, which is what the patient asked for, and is outside of normal process of recording patient interactions in SOAP notes in the electronic medical record.

340. Finally, as noted above, my interviews of Jail staff indicated that it was common for there to be so many sick call requests that it was not possible to triage them in a single day, leading to backlogs. As of her deposition, Ms. Rognlien-Hood testified that there was a backlog of 300 medical requests. Rognlien-Hood Tr. at 196:16-23.

341. In summary, the Jail system for patients to request medical care works as intended only some of the time. Other times, the request is lost in the paper shuffle of hundreds of requests a day, is never acted on, is not entered into the system, etc. Many of the incarcerated patients I interviewed expressed frustration with the inefficiency of this system. And, depending on what complaint "falls through the cracks," this system certainly can cause medical harm.

### B. Even When Medical Requests Received and Processed, They Are Often Not Timely or Adequately Addressed

342. Once a request for medical care is received by the Jail, the person complaining of a medical problem should be seen face-to-face, so that health care staff can decide whether the patient has a medical issue that is urgent (for example, bladder or sinus infections or a painful rash like shingles) or not-urgent (for example, longstanding musculoskeletal pain or a non-painful skin lesion).

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1241

343.   At this face-to-face meeting, as in any medical encounter, vital signs should be taken.  They give vital information needed to properly triage "urgent" from "non-urgent" requests.  As an example, a patient complaining of a headache with a very high blood pressure of 190/120 should be triaged as urgent.  Without the blood pressure, a complaint of a headache may be triaged non-urgent.  Similarly, a patient complaining of back pain with a very high heart rate of 130 should be triaged as urgent.  Without the heart rate, a complaint of back pain may be triaged as non-urgent.  Vital signs take literally about a minute to perform, during which time the nurse could be conversing with the patient.

344.   In response to the State Audit's February 2022 conclusion that the "San Diego County Sheriff's Department … has failed to adequately prevent and respond to deaths of individuals in its custody," the Sheriff's Department announced that it was implementing a process of "doing face-to-face assessments (of patients) within 24-hours of receipt of a request for medical services at the (jail) facilities." SD_184484; Rognlien-Hood Tr. 87:6-10, 87:24-88:4.  Similarly, NaphCare recommended that when patients submit sick calls complaining of clinical symptoms, nursing staff see them face-to-face within 24 hours to triage the request. Rognlien-Hood Tr. 87:6-10, 87:24-88:4.

345.   The MSD Operations Manual requires that, as part of the triage process, patients who submitted sick calls should be seen face-to-face by an RN within 24 hours of the request being received.  MSD.S.3.

346.   However, in actual practice, the Jail gives the nurses 24 hours from the time of receipt to triage medical requests and another 24 hours to do the face-to-face evaluation from the time the request was triaged.  This timeline is laid out in a September 2023 CQI report conducted at Central Jail in which 10 charts were reviewed for the "following key indicators:" "1. The sick call slip is initialed and dated with the date that it was received. 2. Sick call is triaged within 24 hours of receipt. 3. A Face-to-Face assessment is conducted within 24 hours of triage. 4. A

1  referral is made for sick calls that require further evaluation." SD_729828. The

2  compliance for the face-to-face assessment in this study was 10%. The overall

3  compliance 50%.

4      347. Neither the MSD Operations Manual nor NaphCare's Policies and

5  Procedures define how face-to-face evaluations should be conducted, *e.g.*, whether

6  vital signs should be taken.

7      348. It should be noted that as of 2017 the NCCHC requirement was "that a

8  qualified health professional has a face-to-face encounter with the patient within 48

9  hours of receiving requests with a clinical symptom." DUNSMORE0260639.[37]

10 Thus, the Sheriff's Department set an ambitious standard for itself with its 24-hour

11 face-to-face requirement in its policies, but in actual practice, according to the CQI

12 indicator above, is trying to achieve a 48 hour standard.

13     349. However, the Sheriff's Department has not been able to meet either the

14 24-hour standard or 48-hour standard for face-to-face assessments. Rognlien-Hood

15 Tr. 87:11-14, 88:8-10, 90:15-92:18. Ms. Rognlien-Hood testified: "Q. And does

16 the 24 hour face to face for clinical symptoms always happen as a matter of

17 practice? A. No." *Id.* at 89:8-10.

18     350. This testimony is confirmed by documents I reviewed. A QA/QI report

19 from July 2023 stated that at George Bailey, with regard to the "[t]imeliness of 24

20 face to face," the Sheriff's Department was "averaging 45-50% of the threshold of

21 90%." SD_114412. Timeliness of sick call responses at Central Jail was no better,

22 with the Sheriff's Department reporting that "[c]ompliance indicators have slowly

23 been declining since implementation. Overall compliance has fallen from 76% to

24 50%." SD_114467. The Sheriff's Department was well-aware of the lack of timely

25 sick call responses, stating in that July 2023 QA/QI presentation that its corrective

26 action plan would include "continu[ing] to work on triaging sick call slips" and

27 ────────────────

28 [37] As of 2018, the NCCHC updated this guidance so that a 24 hour face-to-face is
required.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1243

1   "[a]nswer[ing] in a timely manner."  SD_114467.  Nevertheless, based on

2   Ms. Rognlien-Hood's testimony, it appears that the delays persisted.

3          351.   At least part of the problem appears to be the lack of sufficient nursing

4   staff to complete these face-to-face assessments.  Ms. Rognlien-Hood wrote in 2023

5   that ███████████████████████████████████████

6   ████████████████████████████████████████

7   SD_375922.

8          352.   After being seen by the nurse, incarcerated patients must then wait even

9   more to be seen by a medical practitioner.  The average wait to see a medical

10  practitioner is around 15 days according to Sheriff's Department data from July

11  2023.  SD_114495.  Notably, this is over twice as long as the NCCHC reported in

12  2017.  And, of course, half of all incarcerated people who need to see a practitioner

13  wait *longer* than 15 days, and sometimes much longer.  Patients I interviewed

14  commonly told me about waiting for weeks to be seen for serious medical concerns.

15  When they put in a second or third request raising their medical concerns again and

16  asking why the process is taking so long, they report that those requests are often

17  ignored by nurses.  This was confirmed by a nurse assigned face-to-face duty at

18  Central Jail, with whom I spoke during the inspection.  She stated that repetitious

19  medical requests were ignored, in an attempt to make the face-to-face task list more

20  manageable.  In my review of patient charts, I found many examples of requests for

21  medical care that were not triaged by a nurse for many days or, in some cases,

22  weeks. ████████████████████████████████████

23  ████████████████████████████████████████

24  ████████████████████████████████████████

25  ███████████████████████████████████

26  ██████████████████████████████ Delay always increases

27  the likelihood of some medical conditions getting worse and patients suffering as a

28  result.

353. NaphCare has exacerbated the Sheriff's Department's failures to respond to sick call. ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████ This is poor training.

354. In summary, the Jail set a standard for itself of having an RN see each patient within 24 hours of the receipt of a request for medical care. At some point, they began to allow 24 hours for triage of medical requests and another 24 hours for a face-to-face encounter. Either way, the Jail has not been able to meet its own standard. The Jail has attempted to cover this inadequacy with various questionable measures, such as not taking vital signs, but, in the end, the program does not work, leaving patients at risk of harm.

## C.    Grievances Are Often Ignored or Not Answered Satisfactorily

355. Unlike patients in the community, incarcerated patients are unable to choose a medical care provider on their own. Incarcerated patients similarly are unable to switch medical providers if they feel that their medical needs are not being met. Their only alternative is to make a formal complaint in the form of a grievance. The grievance process is an opportunity for the patient to point out what they perceive as deficiencies in their medical care and an opportunity for the jail medical staff to improve medical care by learning about problems that may have fallen through the cracks or been unaddressed due to deficiencies within the medical system.

356. For that reason, grievances are an essential part of medical care for the incarcerated. As the NCCHC Technical Assistance Report stated: "The goal [of the grievance program] is to solve patient complaints … as soon as they become

known." DUNSMORE0260627.  Grievances about medical care should, like simple medical requests, also usually be addressed with a face-to-face evaluation.  In fact, in my opinion, a face-to-face discussion of medical grievances is essential to a satisfactory resolution.

357.   The MSD Operations Manual has a lengthy section on "Grievance Procedures," which emphasizes that grievances should be responded to in writing within seven days.  MSD.G.1.  Under that policy:  "The staff member delivering the response to the inmate will have the inmate sign and date one copy of the response."  If the patient is not satisfied with the response, "the staff will be directed in writing by the patient through successive levels of command until resolution is obtained, or the Medical Administrator reviews the grievance."  Each of these levels must be completed within ten days.  "The decision of the administrator is final."

358.   The next section of the Grievance Procedures discusses how patient grievances may be administratively relabeled as "Personnel Complaints."  The Detention Services Bureau (custody-side) grievance policy, No. N.1, is similar, though it also lists further ways a grievance can be administratively relabeled, for example, as a "request."  Importantly, if a grievance is relabeled as a "request," "[n]o entry in JIMS is required."

359.   The Sheriff's Department's grievance forms also contain a box in the response area that states, "This is not a grievance."  Other than discussing the difference between a medical grievance and a personnel complaint or request, the Sheriff's Department's policies does not provide guidance for the frequent practice of relabeling a grievance as "not a grievance."  For example, Policy N.1 states that a grievance can address "Medical/Mental Health care," but does not explain in what circumstance a grievance about medical care should be relabeled as a request.  Since there is no written guidance on when to do this, it is left to the reviewing RNs judgment (or whim) as to when to do this.

360.   In practice, I understand that, in the Jail, grievances are often ignored or

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1246

not answered satisfactorily. During my inspection of the Jail, I interviewed many patients who told me that they have received no response to medical grievances they submitted. No response, of course, violates the MSD Operations Manual, which includes detailed instructions and timelines for grievances.

361. Further, the Sheriff's Department's CQI reports provide little meaningful information about grievances other than listing the ostensible number of grievances per quarter. *See, e.g.*, MSD QA/QI Meeting, July 18, 2023, SD_114475. CQI data on grievances should contain: (a) the average length of time before a response is issued to the patient; (b) how many grievances were answered late; (c) what percentage escalated to each level up to the Medical Administrator; and (d) what the resolution was for each grievance. But none of this information is contained in the Sheriff's Department CQI reports on grievances. *See id.*

362. There are several problems with the grievance system in both policy and practice. First, the Sheriff's Department Operations Manual Section MSD.G.1 requires no face-to-face interaction with the patient who wrote the grievance. Written grievances contain only a short summary of what the patient thinks the problem is. Seeing the patient in person allows the patient to voice their concerns in more detail. It also allows the person responding to explain medical issues that perhaps the patient does not understand.

363. Second, grievances should never be arbitrarily relabeled as something else except by the patients themselves. This also makes grievance statistics unreliable since it is not known how many were arbitrarily relabeled as not a grievance. Relabeling grievances is also potentially a mechanism to manipulate statistics to make them appear more favorable than they really are. Not allowing grievances to be relabeled removes this bias. In the Jail, however, patients often receive responses with the "this is not a grievance" box checked. Ms. Rognlien-Hood admitted that this happens in her deposition. Rognlien-Hood Tr. 206:12-24. While most grievances were not included in the patient records sent to me, several

1  were included and marked as "This is not a grievance." ██████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████    ████████████████████████

4  ████████████████████████████████████████████████████

5  █████████████ *Id.*

6      364.  This practice appears to artificially deflate the number of grievances

7  received the Jail.  As an example, the ████████████████████████████

8  █████████████████████████████████████████████████████

9  █████████████████████████████████████████████████

10  █████████████0.  NAPHCARE031601.  In my experience, this is not credible and

11  is more likely the result of arbitrarily relabeling grievances as something else.

12      365.  Third, the Jail's failure to analyze grievances substantively during the

13  CQI process means that the Jail does not know how many of the grievances were

14  justified and pointed out true deficiencies in medical care or Jail medical processes.

15  The grievance process should be viewed as an opportunity for improvement, not as a

16  nuisance to be swept under the rug.  It should allow patients to point out problems of

17  medical care that they see from their end.

18      366.  Finally, during my tour of Central Jail, a nursing supervisor there told

19  me that patient grievances are taken directly to the nursing supervisors.  The nurses

20  and the practitioners are not informed of them even if they are named.  In my

21  opinion, this is wrong.

22      367.  In summary, the Jail grievance system does not work as it should.

23  Some grievances are ignored, in violation of policy.  Many grievances are arbitrarily

24  relabeled as "not a grievance."  Grievances are not tracked in a meaningful manner

25  by the CQI process.

26  **D.    The Sheriff's Department Lacks an Effective Alert System for Medical Emergencies**

27

28      368.  Outside of jail, people who have a medical emergency can either call an

1  ambulance (which usually responds in minutes) or go themselves to a hospital

2  emergency department.  Incarcerated patients cannot do either.  Jails must have

3  some other system that allows incarcerated patients to get emergency medical care.

4  This involves two steps: (1) ensuring that incarcerated people can effectively notify

5  security staff that they are experiencing a medical emergency, and (2) ensuring that

6  the jail security and medical staff will respond in order to get emergency care to the

7  patient.

8      369.    Incarcerated people must have a reliable way to alert security and

9  medical staff when they experience medical emergencies, so that staff can respond

10  immediately.  Failure to provide an emergency alert mechanism—and to ensure that

11  staff respond immediately—can lead to preventable in-custody deaths.  As

12  explained above, the February 2022 State Audit identified cases in which where

13  deputies did realize that a person was unresponsive or otherwise in distress and

14  therefore "did not perform or delayed lifesaving measures" like CPR.  SD_174824-

15  25.

16      370.    I understand that Plaintiffs' other expert(s) will opine in greater detail

17  about emergency buttons and intercoms.  However, because this issue is critical to

18  the provision of medical care in the Jail, I also address it here, with a focus on the

19  medical perspective, in particular, the MSD Operations Manual regarding

20  emergency medical communications from patients using the intercom in their cells.

21      371.    Most correctional facilities I am aware of have emergency buttons and

22  intercom in the cells and housing units, which incarcerated people can use to alert

23  staff of medical emergencies.  Jail policies should also explain—for various types of

24  medical emergencies—exactly what response should occur, by whom, and within

25  what time frame.  Such common medical emergencies include:  "I think I'm having

26  a stroke!"; "I can't wake my cell mate up!"; "My cell mate fell and hit her head.  It

27  looks bad."; "I can't breathe!"; and "My cell mate is having a seizure!"

28      372.    Yet, the MSD Operations Manual does not contain any guidance

**Ex. P-1249**

1  regarding emergency medical communications from patients using the intercom in

2  their cells.  The Operations Manual does contain MSD.M.1 "Medical Emergencies."

3  Although MSD.M.1 contains much information about what security and medical

4  staff should do when notified of an emergency, it does not address how incarcerated

5  people notify staff of an emergency and nothing about the need for functional

6  emergency call buttons.

7        373.   In practice, the "emergency" buttons and intercoms in the cells at the

8  Jail also frequently do not work.  During my inspection of the Jail, three different

9  patients demonstrated this fact to me by pushing the buttons in their cells with no

10  effect.  I observed many other emergency buttons to be always fully depressed and

11  so clearly not in working order.  This is a serious issue in that a patient experiencing

12  an emergency medical condition cannot alert security or medical personnel, nor can

13  their cell or dorm mates.

14        374.   For example, the July 2022 death of Abdiel Sarabia, who, as noted

15  above, appears to have been dead for some time before his body was discovered in

16  the Jail, suggests that the Sheriff's Department is unable to identify people

17  experiencing a medical emergency.  It is probable that Mr. Sarabia and many others

18  knew that they were having a medical emergency for some time before they died but

19  were unable to notify staff because of non-functioning emergency buttons.

20        375.   Documents I reviewed suggest that the Sheriff's Department fails to

21  train staff properly regarding physician responses to emergencies.  ███████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  █████████████████████████████████████████████████████

25  █████████████████████████████████████████████████████

26  █████████████████████████████████████Confusion about

27  who should respond to an on-site emergency (seizures, trauma, unconsciousness)

28  can certainly harm incarcerated patients if an essential medical provider fails to

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1250

1   show up, thinking "STATCare has it!"  Examples include patients needing life-

2   saving airway placement or patients needing life-saving medications administered

3   immediately.

4        **E.**     **The Sheriff's Department Lacks a Working System for Ensuring**

5                  **that People with Mental Illness or Other Communication**
               **Difficulties Receive Medical Care.**

6        376.   The problems described above are even more significant for

7   incarcerated people with mental illness.  Mentally ill patients get the same medical

8   problems as anyone else.  Mentally ill patients have heart attacks.  Mentally ill

9   patients get cancer.  Mentally ill patients get infections.

10        377.   Mental illness and medical problems interact in important ways.  First,

11   because of difficulty with thought processes, paranoia, and other aspects of mental

12   health disability, mentally ill patients sometimes lack insight into their own medical

13   needs and also do not communicate well when they are having medical symptoms,

14   even severe symptoms.  More effort is often necessary to make medical diagnoses in

15   the mentally ill.

16        378.   A second way that mental illness can affect medical problems occurs

17   because psychiatric medications frequently have side effects that manifest as

18   significant medical problems.  For example, haloperidone frequently causes

19   disabling muscle stiffness; risperidone is notorious for occasionally causing

20   gynecomastia (breast growth in men); olanzapine increases the risk for diabetes.  All

21   incarcerated mentally ill patients should be followed by the medical team because

22   mental health professionals do not have the training or experience to recognize

23   significant medical side effects from psychiatric medications.

24        379.   Third, mental illness itself can lead to medical problems.  Severely

25   mentally ill patients may become sick from not eating or from eating inappropriate

26   things.  Mentally ill patients may harm themselves and cause injury.  Mentally ill

27   patients can develop skin lesions from lack of self-care.  These problems need to be

28   recognized and treated by the medical team.

380.   Finally, medical problems can mimic mental illness and vice versa.  For example, infections can cause a disordered mental state that can be confused with psychosis.  Sometimes it can be difficult to determine whether an incoherent patient is acutely psychotic or rather is delirious from an infection, meth intoxication, or substance withdrawal.  For all these reasons, it is impossible to totally separate medical issues from mental health issues.

381.   The medical standard of care requires that medical personnel and mental health personnel at a jail communicate with each other, to ensure that mentally ill patients do not have their other—*i.e.*, physical—medical problems neglected.  Specifically, **jails must have a clear plan for the addressing the healthcare needs incarcerated patients who are not fully able to communicate those needs on a formal medical request.**  A system to ensure medical care for patients such as these has three components.

382.   First, such patients must be identified.  This can be done by placing these patients on a "Chronic Care" or "Special Needs" list such as those used to identify other patients with chronic health needs (*e.g.*, diabetics or those with physical disabilities).

383.   Second, jails must have a policy or guideline in place that details what special care will be provided to these patients.  These guidelines must include "wellness checks" by both medical and mental health professionals.  Such patients should not be required to write their requests for medical care.  Referrals to the medical clinic can be made verbally, by any staff member who is concerned about the patient, and by family members.

384.   In fact, such patients must receive extra scrutiny and care at every stage of incarceration.  Since they sometimes cannot or will not give medical information at intake, information may need to be gathered from other sources, such as old records, outside providers, or family.  Since such patients sometimes do not care for themselves properly, custodial and medical staff need to be vigilant that these

patients bathe, eat, and sleep properly.  Since such patients often do not communicate well that they are having medical symptoms, medical staff must frequently check on them and specifically ask about their well-being.

385.    As a rule, patients who are unable or unwilling to advocate for themselves must receive **more** frequent medical checkups, not **fewer**.

386.    It is clear that this Jail does not provide sufficient medical checkups for people with mental illness and communication challenges.  One needs to look no further than the deaths of Lonnie Rupard and Roselee Bartolacci, described above, as evidence of this.  The Forensic Pathologist who performed the autopsy on Lonnie Rupard opined that he died due to medical neglect and ruled the death a homicide.  Ms. Bartolacci's case was strikingly similar to Mr. Rupard's.  Both patients had significant mental illness that impacted their ability to request and accept medical care.

**V.    The Sheriff's Department Improperly Documents "Refusals" of Medical Care, Resulting in the Denial of Care to Incarcerated People, and Placing Them at Substantial Risk of Serious Harm**

387.    It is my opinion that the Sheriff's Department does not appropriately document refusals of medical care by incarcerated people.  In fact, based on my review of documents in this case, it is my opinion that Sheriff's Department staff frequently record that a patient has "refused" to attend a medical appointment, even though the patient was never informed or offered the opportunity to attend the appointment in the first place.  This practice has the effect of denying medical care to incarcerated people and therefore places them at a risk of serious harm.

388.    In general, Jail patients have the right to refuse medical care.  However, such refusals must be appropriately documented.  As the NCCHC Technical Assistance Report explains:  "[t]he standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care.  A deputy can be the second witness signature when the inmate refuses to sign the refusal form."  DUNSMORE 0260650.

389.   Of course, it should go without saying that staff should not sign a form indicating that an incarcerated patient has refused a medical appointment unless and until the patient has been informed about their appointment, has been counseled on the possible risks of refusing care, and has affirmatively stated that they do not want to receive that care.

390.   The State Audit identified the Sheriff's Department policies on refusals as a potential factor in the extraordinarily high death rate at the Jail: "we identified several instances in which sworn staff were the only witnesses when incarcerated individuals refused to sign the refusals.  Because follow-up care is important, it is critical that the desire to refuse care be shared with health staff who are in a better position to ask appropriate questions, explain the adverse consequences to health that may occur as a result of the refusal, and assess whether an individual has critical health needs that should be addressed."  SD_174820-21.  The Audit recommended that the Sheriff's Department "[r]evise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care."  SD_174851.

391.   When the Sheriff's Department responded one year later, their Progress Report: Update on State Jail Audit stated that they were complying with the Auditor's recommendation about refusals: "In the event a patient refuses prescribed medication, the nurse will counsel them on the potential impact and try to convince them to take the prescribed medication."  SD_184485.  In the case of refusals of a medical appointment, "[t]he patient will be counseled by medical staff, which may include a provider or nurse, regarding the potential effects on their health of missing the appointment and try to convince them to attend."  *Id*.

392.   However, after reviewing medical records and hundreds of medication refusal forms, I can state confidently that the Sheriff's Department does not meet this standard in either policy or practice.

393.   MSD Operations Manual Policy D.1.1 states that a patient who refuses

1    either medication or treatment is required to "sign a refusal form … including the

2    medication/dose or treatment and witness signature."  However, "[i]f Patient refuses

3    to sign Refusal form, two (2) witnesses, i.e. licensed nursing personnel and Deputy

4    shall sign the Refusal form …."  *Id.*  And, "[a]fter three (3) consecutive refusals of

5    all other medication(s)/treatments, patients are counseled by licensed nursing

6    personnel and scheduled for provider chart check to determine if

7    medication/treatment will continue to be offered."  *Id.*  I note that this policy differs

8    from what the Sheriff's Department stated that they were doing in their Update to

9    the Audit.

10         394.   On its face, this procedure falls below the standard of care because it

11   does not require health care staff to be present until a patient has refused care three

12   consecutive times.  Instead, the policy would allow for any two witnesses—

13   including two deputies—to witness the patient's refusal.  Allowing a refusal to be

14   documented without a healthcare staff member present is problematic because it

15   means that the incarcerated patient does not receive an appropriate advisal of the

16   risks of refusal before refusing.  By requiring the patient to refuse three times before

17   receiving any counsel about the risk of refusals, incarcerated people may end up

18   refusing without full awareness of the benefits of the medication, and, as a result, be

19   delayed in receiving necessary medical care.

20         395.   Notably, there is a separate policy governing the refusal of offsite and

21   specialty clinic appointments, which *is* adequate.  Under MSD Operations Manual

22   Policy MSD.R.5, a patient who refuses an offsite or specialty clinic appoint is

23   provided a "risk and benefit counseling … by nursing staff as soon as possible

24   following notification of patient's refusal."  And, the refusing patient's physician is

25   instructed to "discuss" with the patient "the reason for the off-site referral and …

26   include the benefit to them versus the medical risk of not going to the appointment."

27   *Id.*

28         396.   If patients are not properly counseled regarding refusals of offsite care,

it can compromise medical care in several ways.  The Jail's health care staff should make referrals for offsite care only when clinically-indicated, and the failure to ensure the patient receives this care can and will have a detrimental effect on patient health.  Further, in my experience, cancelling appointments can strain the Jail's relationship with offsite specialists, who usually must make special arrangements for such visits and cannot see other patients in the time set aside for the patient who refuses.  It is in the best interest of current and future patients in the Jail that refusals are kept to a minimum.

397.   However, as explained in more detail below, this policy does not appear to be followed.  My review of documents indicates that, even if the Sheriff's Department's policies for refusals were appropriate, in practice, the Sheriff's Department does not appropriately document refusals.

398.   After reviewing hundreds of medication refusal forms, I can state confidently that custody staff alone are involved in almost all patient refusals of medications, lab draws, clinic visits, and off-site visits.  Nurses are rarely present for these interactions.  Rather, custody staff state that they have spoken to the patient, the patient refused care, and also has refused to sign the refusal form.  Then, a nurse and the custody officer (or two custody officers) sign the refusal form, even though the nurse did not personally witness the refusal.

399.



/ / /

/ / /

/ / /

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1256**

1



12

13      400.   Most of the refusal forms I reviewed looked like this—with the "per

14  deputy" notation indicating that a deputy had stated that the patient refused.  In my

15  experience, this is problematic.  Deputies are busy and sometimes infer that patients

16  are refusing their medications when in fact, they are not.

17      401.



28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1257

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15     402.

16

17

18

19

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1258**



*See* SD_815346.

403.   A string of refusals like this can adversely impact health care in the Jail simply by occupying time, both from health care and custody staff, who are supposed to fill out a refusal form after each refusal.  Further, insulin is an important medication.  If insulin is essential to this patient's health, health care staff must follow clinical standards of care, and visit with the patient often to see why he is refusing and to assess how he is doing medically despite the refusals.  If insulin is not essential to this patient's medical care (as was the case here), then a medical practitioner should have discontinued it and documented this appropriately.

404.   

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████

3     405. ███████████████████████████████

4 ████████████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████

8 ██████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ██████████████████

12     406.   Still another example is the tragic death of 32-year-old Michael Wilson

13 at the Jail.  According to documents I received regarding *Estate of Michael Wilson*

14 *v. County of San Diego*, Case No. 3:20-cv-0457 (RDR-BMD), Mr. Wilson died in

15 custody February 14, 2019 due to acute congestive heart failure, causing fluid to

16 accumulate in his body.  Mr. Wilson was on four medications for his heart condition

17 and was admitted to the Jail with a Court Order that medical staff pay special

18 attention to his medical needs.  Mr. Wilson also had a history of bipolar

19 schizophrenia.  Dr. Freedland in his deposition stated that the patient declined an

20 examination.  Given the patient's serious health conditions including his mental

21 illness, more should have been done to examine the patient and ensure he received

22 life-saving heart medications.

23     407.   In addition, the testimony of multiple named plaintiffs in this case

24 suggests that at least some of the refusals documented in patients' medical records

25 are inaccurate.  For example, named Plaintiff Ernest Archuleta, in response to a

26 question about the medication refusals in his medical records, stated: "[I]f you

27 weren't your cell and [medical staff] pass by, they would call that a refusal… I don't

28 remember ever signing anything to refuse my meds." Archuleta Tr. at 187:16-20;

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1260**

1  *see also id.* at 188:9-22 ("I wouldn't refuse [my medication]."). Similarly, named

2  Plaintiff Michael Taylor, when asked about a grievance response that purportedly

3  said he had "refused to go to an optometrist appointment," responded: "I would

4  never have denied to go to an optometrist appointment." Taylor Tr. at 210:10-16;

5  *see also id.* at 252:15-253:3 (Q: "Did you refuse visual acuity assessments during

6  housing rounds?" … A: "No … I would have never refused. … I would have never

7  refused an optometrist or any kind of vision anything.").

8       408.   Documents produced by the Sheriff's Department about offsite medical

9  appointments are similarly concerning in regards to refusals. A spreadsheet

10  reflecting offsite appointments between June 1, 2023 and November 29, 2023 listed

11  432 completed appointments and 95 "refused" appointments. *See*

12  NAPHCARE026024.

13       409.   In my experience, that almost 20 percent of all patients scheduled for

14  offsite medical appointments would refuse to go is astounding—and not credible. In

15  my 25-year career practicing medicine in jails, I cannot recall any patients who

16  refused to go to an offsite appointment—zero. Something is thus deeply wrong with

17  the Sheriff's Department statistics.

18       410.   The Sheriff's Department's policies and procedures require that each of

19  these patients who refuse offsite transport to be counseled face-to-face by a

20  physician. The Sheriff's Department said that they were doing counselling in such

21  cases in their Progress Report: Update on State Audit. SD_184485. However, I see

22  no documentation in the medical records I reviewed that such face-to-face physician

23  counseling occurred for most of these refusals. I also did not review any evidence

24  showing that the extremely high rate of refusals of offsite care was formally

25  investigated by the Sheriff's Department.

26       411.   Refusals of medical care are particularly concerning when the

27  incarcerated patient is someone with mental illness or an intellectual or

28  developmental disability. As explained above, mental illness can lead to people

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1261

1  lacking insight into their medical condition and also being unable to communicate

2  their medical needs.  Critically, because of paranoia and difficulty with

3  communication, mentally ill patients sometimes refuse appropriate and even

4  essential medical care.  When mentally ill patients do refuse necessary medical care,

5  serious efforts should be made to:

6       a.    Find out why the patient is refusing.  Sometimes, the reason for

7  the refusal is simple to deal with (for example, a patient who does not want to take a

8  medication in the morning because it makes him sleepy, but will take it willingly in

9  the evening).

10       b.    Determine whether the mentally ill patient is competent to make

11  the refusal.

12       c.    Plan for follow up.  Mentally ill patients are often ambivalent,

13  which means that if they refuse necessary medical care today, they may not refuse

14  tomorrow.

15      412.  The MSD Operations Manual does not adequately address the special

16  needs of patients with cognitive disabilities or mental health problems that might

17  impact their ability to withhold consent.  The NaphCare Policy and Procedure

18  Manual does mention this issue in general terms in D-02 Medication Services—

19  Refusal or Non-adherence:  "Patient refusal of medication and treatment requires

20  additional intervention and education by treating staff and take into account the

21  medical and mental health status of the individual patient."  This implies rather than

22  states the truth that patients with cognitive or mental health disabilities need *more*

23  care and attention, not *less*.

24      413.  In practice, the Jail does not ensure that patients with these kind of

25  mental health or developmental disabilities are in fact receiving care.  This failure

26  has led to preventable deaths, including the death of Roselee Bartolacci as described

27  above.  An additional example is Teresita Tuazon, ███████████████████

28  ███████████████.  SD_337258.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
Ex. P-1262

1 ██████████████████████████████████████████

2 █████████████████████. *See* CLERB Report, SD_050607.  She died on

3 September 28, 2021 from "complications of Diabetes Mellitus."  *See* Autopsy

4 report, SD_055072.  ███████████████████████████████████

5 ███████████████████████████████████████████████

6 ████████████████████████



19 *See* CLERB Report SD_050607.

20    414.   ██████████████████████████████████████

21 █████████████████████████████ This was a preventable

22 death.

23    415.   In conclusion, how the Sheriff's Department deals with refusals of

24 medical care in actual practice (1) violates their own Policies and Procedures, (2) is

25 different than what was promised in the 2023 Progress Report:  Update on State

26 Audit,  and (3) violates the medical standard of care.  The Sheriff's Department's

27 poor performance on patient refusals has led to patient harm and even deaths.  In my

28 opinion, the Sheriff's Department's flawed response to patient refusals of medical

care is one of the root causes of the exceptionally high death rate the Jail has.

**VI.    The Sheriff's Department Routinely Attempts to Provide Medical Care Without Examining Patients or By Asking Medical Staff to Operate Outside Their Scope of Practice, Placing Incarcerated People at Substantial Risk of Serious Harm**

416.    It is a basic principle of medicine that, before providing treatment, a physician must examine her patient.  In particular, a medical practitioner must conduct a physical examination of the patient including the area of complaint, checking the patient's vital signs, and, if appropriate, ordering lab tests and imaging studies.

417.    Without the physical examination or checking the vital signs, the practitioner is missing essential information needed to be accurate and provide appropriate treatment and is, essentially, "flying blind."  Inevitably, a practitioner who omits the patient's medical evaluation will make critical mistakes.  As an example, when a patient complains of shortness of breath, it makes a difference whether the practitioner finds wheezing or stridor (airway obstruction) or rales (fluid in the lungs) or if there is little air movement at all.  Each finding requires a different medical response.  Without an exam, practitioners can harm patients by assuming the wrong cause of a symptom and prescribing the wrong treatment.

418.    Based on that examination, labs, and patient history, the medical practitioner will make a diagnosis and care plan.

419.    Critically, the term "medical practitioner" means a physician, nurse practitioner ("NP"), or physician assistant ("PA").  PAs, while practitioners, still must be supervised by a physician licensed in the relevant state and must conduct only those tasks formally delegated by the supervising physician.

420.    Other medical staff, including registered nurses ("RNs"), licensed vocational nurses ("LVNs"), and medical assistants are not "practitioners."  Although they assist practitioners by gathering data (like histories, vital signs, etc.), they cannot make diagnoses, prescribe medication, or make ongoing treatment

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1264

1    plans.  Those activities are beyond their scope of practice.

2        421.    There are two special instances in the community where a practitioner

3    will not see or examine a patient in person during the medical encounter.  The first

4    is when practitioners are on-call.  The second is during a telehealth visit.  Both are

5    worth discussing in more detail.

6        422.    In the community, hospitals, nursing homes, and other residential

7    medical centers may not have medical practitioners on site 24/7.  When a

8    practitioner is not on site, there may be one on-call, whereby they receive phone

9    calls from nurses whenever patients experience medical problems that cannot wait

10   until the practitioner returns to the facility in the morning.  Calls to an on-call

11   practitioner are typically made via a telephone, and the case is discussed.  In these

12   instances, nurses should have a specific policy to rely on that states what

13   information to have available for the practitioner.  The nurse then asks the necessary

14   questions, and the practitioner answers the questions.  This exchange must then be

15   documented in the medical record.  In almost all cases, the practitioner will then see

16   the patient face-to-face when they are next in the facility again.

17       423.    Telehealth is another example of remote medical practice.  In

18   telemedicine, the patient and the practitioner interact with each other via video

19   conferencing, telephone, or other electronic method.  In a telehealth visit,

20   practitioners must meet the same standard of care that they would if they were

21   seeing the patient face-to-face in their office.  Generally, that means that an

22   appropriate prior examination would have occurred by a practitioner (even if not the

23   one meeting the patient via telehealth).  And, critically, during a telehealth

24   appointment, the patient and provider are able to communicate *directly* about the

25   patient's symptoms and concerns.  In other words, unlike the on-call practitioner

26   example, there is no nurse acting as an intermediary.  All practitioners of telehealth

27   should possess the necessary licenses required to practice medicine in the patient's

28   state.  This includes the appropriate medical license and a DEA license if the

1    practitioner prescribes controlled substances, like narcotics or benzodiazepines.

2    424.    In contrast to on-call and telehealth practices, which require a patient

3    examination, is the inappropriate practice of internet prescribing. This is when a

4    person who wants a certain medication (for example, Viagra) fills out a form online

5    which is then sent to a medical practitioner who writes the prescription. The

6    practitioner has never seen the patient, nor is there a direct conversation between the

7    patient and practitioner. The only interaction has been the electronic form that the

8    patient filled out. The patient does not even know who the practitioner authorizing

9    the prescription is. In this instance, there has been no "appropriate prior

10   examination."

11   425.    Nurses are often involved in both on-call practitioner and telehealth

12   encounters. It may be tempting for the remote practitioner to allow the nurse who is

13   physically present with the patient more latitude than he should have. As an

14   example, a nurse could contact the practitioner in a telehealth encounter and say,

15   "this patient has a UTI and should get a prescription for the antibiotic Bactrim." A

16   practitioner who simply says "OK" and writes the Bactrim prescription engages in

17   the practice of "delegation." The practitioner has inappropriately delegated to the

18   nurse her authority to diagnose and prescribe. This would be, in effect, the nurse

19   again acting outside the scope of practice.

20   426.    Based on my review of documents, it is my opinion that the Sheriff's

21   Office fails to uphold each of these principles. Medical care at the Jail is routinely

22   provided without sufficient examinations by practitioners located off-site who

23   cannot examine the patients themselves, or by nurses or other professionals acting

24   outside of the scope of their practice. The PAs who routinely conduct remote care at

25   the Jail via STATCare are not adequately supervised by a Jail physician. Each of

26   these practices places incarcerated people at a substantial risk of harm, and in fact

27   has harmed many.

28

**A.     The Jail Misuses STATCare, Employing Midlevel Practitioners in Remote Locations to Cover for, Supplement, and Replace On-Site Medical Practitioners.**

427.    "STATCare" is a NaphCare program in which nurses at the Jail communicate with and receive orders from a mid-level medical practitioner employed by NaphCare.  STATCare practitioners consist of NPs and PAs, but as far as I can tell, no physicians. *See* Barkley Tr. at 56:16-25.  STATCare practitioners never physically practice at the Jail (in contrast to an on-call physician at a hospital, for example, who practices in person during the week, but is on-call over the weekend).  Indeed, STATCare providers are usually not even physically present in California—they reside elsewhere in the country, *e.g.*, Nevada and Alabama. STATCare practitioners respond to medical questions from nurses at NaphCare facilities all over the country, not just the Jail.  In effect, STATCare attempts to fill the role of an on-call medical provider without ever appearing in person.

428.    ██████████████████████████████████ ████████████████████████████████████ ████████.  *See* NAPHCARE001541.  The MSD Operations Manual mentions STATCare only in relation to the treatment of patients experiencing alcohol withdrawal.  *See* § MSD.A.3.  Neither manual defines the appropriate (or inappropriate) use of STATCare practitioners, leaving unanswered questions like: When should Jail nurses call them?  When should they instead talk to practitioners physically present at the Jail?  As a general matter, the P&P manuals do not say. The absence of guidance in the P&P manuals is surprising given the ubiquitousness of STATCare in the medical records.  STATCare practitioners were involved in every medical chart I reviewed, usually multiple times.

429.    While nurses on the ground at the Jail can talk to a STATCare provider by phone, I understand that, in practice, nurses typically rely on instant messaging or email-like communications with STATCare providers via NaphCare's electronic medical record system, TechCare.  Ms. Rognlien-Hood described STATCare

1   interactions as basically "a messenger system." Rognlien-Hood Tr. at 62:10-12.

2       430.   Ms. Rognlien-Hood described STATCare's duties as including:

3   (1) ordering medications at intake for newly booked patients, and (2) addressing

4   urgent medical concerns, like an infection, that need to be started on antibiotics

5   immediately.  Rognlien-Hood Tr. at 233:13-34:2.  These are two typical functions

6   for any on-call medical provider.

7       431.   In practice, STATCare is actually used for many other medical

8   indications, as well, not typically handled by on-call practitioners.  These include:

9        a.    Reviewing patient medical records from a hospital visit.  ████

10  ████████████████████████████████

11        b.    ████████████████  █████████

12  ██████████████████.  Incident Review, Death of

13  Robert Vogelman, SD_055946.

14        c.    Determining if patients have type 1 or type 2 diabetes.

15  Montgomery II Tr. at 233:3-8.  (In fact, it is often difficult to determine whether

16  patients have type 1 or type 2 diabetes and a remote midlevel clinician certainly

17  does not have that ability.)

18        d.    Acting as gatekeepers to face-to-face evaluations with on-site

19  medical practitioners.  Montgomery II Tr. at 148:9-49:25, 230:14-32:5.

20        e.    Evaluating patients for HIV and sexually transmitted diseases

21  ████████████████████████████████████

22  ███

23        f.    Evaluating complaints of hernia and ordering a truss.  ████

24  ████████████████████████████████████

25        g.    Evaluating a complaint of hemorrhoids and ordering hemorrhoid

26  medication.  ████████████████████

27        h.    Deciding whether patients can be admitted to the MOB or

28  housed elsewhere.  ████████████████

[4448212.31]

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1268**

1      i.      Interpreting EKGs.  SD_754746, SD_754764. (EKG

2  interpretation is tricky even for a Board-certified emergency physician.  I do not

3  know what training, if any, STATCare midlevels have had on the subject or how

4  good they are at this skill.)

5      432.   Each of the above decisions made by a remote STATCare practitioner

6  is a medical evaluation, which instead should have been done by an on-site

7  practitioner.  It may be the case that this overreliance on STATCare is due to the

8  absence of P&P to guide appropriate use of STATCare.  However, documents I

9  reviewed suggest that the Sheriff's Department has a policy of pushing nurses to use

10  STATCare instead of turning to onsite practitioners.  A February 3, 2023 email and

11  attachment from Sheriff's Department staff member ███████████ to

12  ████████████████████████████████████████████

13  ████████████████████████████████████

14            SD_320376-320382.  ████████████████

15  ████████████████████████████████████████

16  ████████████████████████████████████

17  ██████████████████████████████████████

18  ████████████████████████████████████

19  ███████████████████████████████████████

20  ████████████████████████████████████

21  ███████████

22      433.   STATCare evaluations of Jail patients are necessarily limited compared

23  to what an on-site practitioner could do.  Because they are remote, STATCare

24  providers plainly cannot conduct a physical examination prior to providing

25  treatment.  Nor do they ever speak or communicate directly with the patient, unlike

26  in a telehealth visit.  STATCare providers have access to whatever Jail medical

27  records are present in TechCare, but little else.  Yet, the Sheriff's Department's

28  nurses use STATCare rather than calling the local on-call medical practitioner

1  employed by CHP.  In fact, the nurses contact the remote STATCare practitioners

2  even when there are medical practitioners present at the Jail.  Rognlien-Hood Tr. at

3  62:6-63:3, 76:17-77:19.

4      434.   Troublingly, not all of the STATCare practitioners who have provided

5  care to patients at the Jail had appropriate California and DEA licenses.  This

6  became an issue (of course) when this was discovered by the Sheriff's Department

7  administration at which time NaphCare was instructed to get appropriate licensure

8  for STATCare practitioners.  A May 26, 2023 email from Dr. Montgomery to

9  Christopher Miedico states:  "It is worth noting that SDSD initiated the conversation

10  regarding staffing, and inquired about the licensure and registry of NaphCare

11  employees.  We are relieved that NaphCare has followed through to ensure that their

12  employees are now registered with the State."  SD_227522.  Based on

13  Dr. Montgomery's email, it appears that there is ineffective Sheriff's Department

14  oversight of STATCare practitioners to ensure that they are correctly licensed; this

15  is left to NaphCare to do.

16      435.   Dr. Montgomery's email from May 2023 also mentions the fact that

17  Sheriff's Department administrators were unsure about who actually supervises

18  STATCare practitioners:  "there is some discussion about who would actually be

19  serving as their [STATCare's] supervisor."  *Id.*  It appears that there is no Sheriff's

20  Department oversight of the STATCare practitioners or STATCare activities.  ███

21  ████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████  *Id.*  The STATCare program is supervised overall by

25  NP Martha Burgess, the NaphCare Senior Vice President of Clinical Operations.

26  Freedland Tr. at 183:15-23.  Similarly, Dr. Freedland testified that CHP's new

27  contract with the county provides no oversight of the STATCare practitioners, even

28  by the CHP Medical Director at the Jail.  *Id.* at 178:5-7.

436.   Similarly, neither the Sheriff's Department nor CHP appear to have oversight of the medical policies and procedures that guide STATCare practitioners. Instead of providing guidance regarding how to address various medical conditions, they allow STATCare practitioners to rely on drop-down menus to see medical options for the various medical conditions, such as hypertension and diabetes. I discuss the guidelines in these drop down menus in more detail later, but suffice it to say here that they are questionable medically and certainly not in concordance with the medical practice of the CHP practitioners.

437.   STATCare activities are also not tracked in any meaningful way by the Sheriff's Department CQI monitoring. For example, how often were STATCare practitioners called about chronic care issues? How many labs did they order? How many times did STATCare review medical records of patients sent off site? Does anyone evaluate the accuracy of their EKG interpretation? Based on my review of CQI documents, these metrics (or any other STATCare metric) are not monitored and evaluated as part of the Sheriff's Department CQI program.

438.   Unless they need someone who can perform the normal functions of an on-call practitioner, *i.e.*, to be available when there is no practitioner present at the Jail, it makes little sense for a nurse to contact a STATCare midlevel practitioner who lives in, say, Alabama, about an acutely ill patient at the Jail, rather than call a practitioner (who may be a physician) who is physically present at the Jail. There is no way that a STATCare midlevel practitioner contacted electronically can be as effective as an on-site practitioner, because plainly a remote practitioner is completely unable to conduct a physical examination of the patient and must rely solely on the information transmitted via TechCare versus seeing and hearing the patient.

439.   Given these challenges, remote practitioners inevitably will make mistakes. Indeed, the problem of remote STATCare practitioners making medical mistakes comes up over and again in my review of medical charts. A particularly

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1271**

1  bad example is the deficient care that STATCare provided to ███████████.



16      440.   Because STATCare practitioners are not accountable to the Jail's

17  medical director, gross medical mistakes such as those that occurred with

18  ████████████ are not noticed, not addressed, and not corrected.  STATCare

19  practitioners who make such mistakes will continue to make them in the absence of

20  oversight and corrective action.

21      441.   In my opinion, the Sheriff's Department has likely embraced the use of

22  STATCare rather than onsite practitioners as a way to save on costs and to reduce

23  the work-load of onsite practitioners, who are overworked due to understaffing.

24  However, this practice has seriously compromised patient care.  Although the

25  Sheriff's Department has signed a new contract to expand the numbers of

26  practitioners available onsite, there is no indication that the Sheriff's Department

27  will cease its inappropriate use of STATCare.  As a result, there is no guarantee that

28  the Sheriff's Department will end this dangerous practice.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1272**

**B.    Jail Medical Practitioners Provide Care to Incarcerated Patients Without Proper Examination.**

442.    Even when patients are treated by on-site practitioners at the Jail, my review of the records indicates that there is no guarantee that on-site practitioners will see or examine the patient before providing treatment.  This practice falls below the standard of care.

443.    For example, my review of the records indicates that cell-side clinical encounters commonly omitted vital signs.  Examples abound in the records I reviewed.  Here are just a few: ███████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████.

444.    The practice of omitting vital signs during patient evaluations is so ubiquitous that one can pick any almost any patient chart, search for "MD note," "NP note," or "RN note," and the vital sign section of the encounter notes will often be blank.  This is poor medical practice that does not occur during patient encounters in the community.  Vital signs are called "vital" for a reason.  Vital sign abnormalities are often the earliest signs of a gravely ill patient.  Not taking vital signs does not save very much time, either.  It takes only around 60 second to obtain a set of vital signs during which time one can continue to converse with the patient.

445.    My review of the records indicates that practitioners also often fail to obtain a full patient history and fail to perform an adequate physical exam, for example of an abdomen or heart.  Such practices may save time, but fall below the standard of care and could lead to serious risks of harm.  Inevitably, the missing information can be critical to making a correct diagnosis and therefore providing correct treatments.  If the condition is life threatening, this omission could lead to an avoidable death.

446. ███████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
███████████████████████████████████
████████████████████████████████
████████████████████████████
████████████

447. ██████████████████████████
████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████
███████████████████████████████████████

**C.    Registered Nurses Operate Outside Their Scope of Practice at the Jail**

448.    In my review of the records, I found numerous examples of registered nurses performing outside the scope if their practice, *e.g.*, ordering labs or making diagnoses.  This is below the standard of care and may even be against the law.

449. ████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████
████████████████████████████████████
██████████████████████████████
█████████████████████████████

[4448212.31]
134
Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1274



450.

Ordering and interpreting diagnostics tests and making diagnoses are outside the scope of nurse's practice and therefore did not meet the medical standard of care.

Ex. P-1275

451.   In summary, the regular practices of the medical staff at the Jail include practices that do not conform to the medical standard of care and, over time, can and do lead to patient harm.  These include (1) using STATCare midlevel practitioners in roles that they are not suited to, since they are remote and cannot interact with patients; (2) allowing STATCare practitioners to practice separately from the rest of the Jail medical practitioners, utilizing different leadership, oversight and protocols; (3) failing to ensure that on-site jail practitioners take vital signs and perform complete examinations of patients; and (4) allowing nurses to practice above and outside of their scope of practice.  It is my opinion that these practices place incarcerated people at a substantial risk of serious harm.

## VII.   The Sheriff's Department Lacks Sufficient Contracts with Hospitals and Offsite Providers and Lacks Proper Referral Processes to Provide Adequate Medical Care to Incarcerated People, Placing Them at Substantial Risk of Serious Harm

452.   It is my opinion that the Sheriff's Department's entire system for providing incarcerated people with adequate offsite health care falls below medical standards.  Specifically, the Sheriff's Department also does not ensure that its contractors apply appropriate utilization management ("UM") processes to secure care for all patients who need it.  In addition, the Sheriff's Department fails to maintain sufficient contracts with community medical providers to allow Jail medical providers to refer incarcerated people with chronic and emergent medical needs to those community providers when the Jail medical units are full or do not have the resources to provide necessary treatment.

453.   Offsite medical treatment is essential to the healthcare of a large number of incarcerated patients with complex medical needs that cannot be met with onsite medical services.  The list of examples is large but broadly falls into four categories.

454.   **Surgery.**  Many incarcerated medical patients need surgical care. Incarcerated patients suffer from the same diseases and ailments requiring surgery

1   as patients in the outside community, ranging from complex brain surgeries to

2   simpler, but still necessary, hernia repairs, appendectomies, and orthopedic

3   procedures.  Surgeons must often be consulted to determine the proper role of

4   surgery in a particular patient's care.  Surgeons must be allowed to follow up after

5   surgery in a manner that they deem proper.

6       455.  **Medical specialties.**  Many patients have complex medical problems

7   that require the expertise of medical specialists such as oncologists, neurologists,

8   cardiologists, rheumatologists, and many others.  General practice physicians and

9   midlevel NPs and PAs simply do not have the training or practice expertise to be

10  able to, say, prescribe cancer chemotherapy or therapy for a myriad of other

11  complicated medical patients.[38]  Just as is done in outside medicine, referrals to the

12  specialist are essential to optimal medical care.  When the advice of a specialist is

13  sought, it is important that that advice be followed.

14      456.  **Diagnostics.**  The list of diagnostic procedures that must be done off-

15  site includes MRIs, cardiac stress tests, PET scans, and many others.

16      457.  **Medical therapies.**  Physical and occupational therapy are excellent

17  examples of the type of medical therapy that is often not available within a

18  correctional facility but is necessary to the medical well-being of a patient.  Other

19  examples include providing cancer chemotherapy, radiation therapy, and

20  rheumatological infusion therapy that must be done off-site.

21      458.  Before an incarcerated patient can be seen for any one of the above

22  outside appointments at the Jail, their request must be approved through NaphCare's

23  UM process.  UM arose in the context of Health Maintenance Organizations

24  ("HMOs") and health insurance companies (I term this "Corporate UM").  The

25

26  _____

    [38] Note that the category of prescribing specialty care is distinct from the actual
27  giving of specialty treatments.  For example, a patient with cancer may need to go to
    both an oncologist, who will prescribe the best chemotherapy, and to separate
28  appointments for the chemotherapy infusions.  Those are two distinct, but equally
    important, outside referrals.

1  purpose of Corporate UM is to control medical costs.  UM does this by requiring

2  pre-approval from the HMO or insurance company before they will pay for certain

3  expensive medical procedures or medications.  HMOs and insurance companies

4  approve or deny medical requests based on a set of evidence-based guidelines.[39]

5  HMOs and insurers most commonly use nurses to evaluate incoming medical

6  requests, who compare the requests to the company's guidelines, then either approve

7  or deny each request.

8      459.   Corporate UM has been criticized on the following grounds.

9          a.      HMOs and insurance companies have a financial incentive to

10  deny requests.  The UM department of an HMO or a medical insurance company is

11  a substantial part of the corporate structure with hundreds of employees and the

12  requisite offices, computers, technology, etc., meaning that it is very expensive to

13  administer.  It only makes sense to pay all of this money if the Corporate UM

14  program can deny or inhibit enough medical requests to make the endeavor

15  worthwhile.

16          b.      In many cases, Corporate UM creates barriers to good medical

17  care rather than encouraging good medical care.

18          c.      The UM process of submitting a request and waiting for a reply

19  is time-consuming.  Filling out the requisite paperwork to request permission for a

20  medical claim takes a great amount of time from the medical practitioner and her

21  staff.  Waiting for a reply can take literally weeks.  This process imposes a large

22  financial burden on the medical practices submitting these claims.

23          d.      Denials are often perceived as nonsensical.  And, once again, it

24  takes a great deal of time to submit a request to reconsider.

25          e.      The process is bureaucratic and opaque.  When a request is

26

27  [39] The most used sets of guidelines are propriety products called Interqual and the
28  Milliman Care Guidelines. Because they are propriety, they are not easily available
    for outside review.

1  denied, it is often hard for the requesting practitioner to know why.

2      460.   Correctional facilities, such as the Jail, do not belong to an HMO and

3  do not use traditional health insurance companies to pay for health care for their

4  incarcerated populations.  Nevertheless, many companies that provide medical

5  services to correctional facilities (like NaphCare) have adopted the system of

6  Corporate UM.  The ostensible reason is to control medical costs.  They often hire

7  nurses with experience in Corporate UM to set up correctional UM programs

8  modelled after a typical HMO.

9      461.   There are problems with this, though, because Corporate UM is

10  designed for a system and patients who are quite different from incarcerated

11  patients.  One important difference is that a patient in the free world with an

12  HMO—unlike an incarcerated patient—has the opportunity to seek the medical care

13  they need outside the HMO.  If the HMO denies, say an MRI or a particular

14  medication, the patient has the right to get the MRI or the medication anyway and

15  pay for it personally.  An incarcerated patient has no such option; if a jail's UM

16  process denies a patient a procedure or a medication, then the patient simply will not

17  get that care.

18      462.   Another important difference is the scale of operation.  HMOs and

19  health insurance companies may have millions of members and tens of thousands of

20  medical practitioners.  Communications in such a large system must be written and

21  formal.  For example, if a primary care practitioner (one of tens of thousands in the

22  program) wants to order an MRI for one of her patients, she must submit paperwork

23  to the patient's insurance company explaining the need for the procedure.  Days or

24  weeks later, someone—most likely a nurse—will review the request (along with

25  thousands of other requests that arrived at the same time) and either approve or deny

26  payment for the procedure based on the HMO's pre-established guidelines.

27  Critically, the medical practitioner and the UM reviewer do not know each other.

28  They are unable to discuss the request or collaborate in any way.  If the practitioner

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1279

1  does not understand the reason behind a denial, she is unable to ask the UM nurse

2  for clarification.  In fact, she will never know which of the many UM nurses

3  employed by the insurance company handled her request.  In the end, Corporate UM

4  processes are impersonal, anonymous, and bureaucratic.  The entire process can take

5  days or weeks.  It is expensive on both ends.  The practitioner submitting the request

6  must bear the cost of the time and salaries of her and her employees to write out,

7  submit and keep track of these UM requests.  The HMO or insurance company, on

8  their end, has to pay the salaries of all of their reviewers plus the necessary

9  technology.

10      463.   In contrast, the Jail only has approximately 4,000 patients, (relatively)

11  few medical practitioners, and only one Medical Director.  In such a small setting, it

12  makes little sense to use the bureaucratic, anonymous, opaque and expensive

13  Corporate UM model.  Instead, the UM process in a jail should be local and

14  collaborative, with the goal of ensuring that patients receive appropriate medical

15  treatment in a timely manner.  A primary care practitioner at the Jail who wants to

16  order an MRI for one of her patients should not have to fill out a formal request

17  form and send it to Alabama to be approved or denied by an anonymous reviewer.

18  Instead, requests for an MRI or anything else should be reviewed by a supervising

19  physician at the Jail who the ordering practitioner knows, such as the Jail's medical

20  director or a physician assigned to UM duty.  The ordering practitioner and the

21  reviewer at the Jail should be able to talk the case over.  If the UM reviewer at the

22  Jail thinks an MRI is not warranted, she should discuss the case with the ordering

23  practitioner, explain why, and jointly create a reasonable care plan for that patient.

24  In other words, the UM process at a correctional facility should be a collaboration

25  between colleagues to ensure that appropriate medical care is provided.

26      464.   The Sheriff's Department has instead chosen to use the bureaucratic

27  method of Corporate UM by sending requests for medical care to NaphCare's

28  Corporate UM Department.  In my opinion, this is time consuming, wasteful of

1  resources, and expensive, and it results in inappropriate denials of medical care that

2  harms patients.  MSD Operations Manual No. MSD.R.2 spells out how the UM

3  process works in the Jail:

4         a.     Site practitioners must complete an "Off-Site/Consult Request"

5  form.

6         b.     The requests are then reviewed for approval or denial by the

7  Managed Care Group  "and a disposition for appropriateness will be determined by

8  a physician reviewer utilizing evidence-based criteria."  (Although the Operations

9  Manual specifies that these reviews are done by a physician, my understanding is

10  that, like other corporate UM systems, nurses do the majority of the UM work, only

11  referring to a mid-level practitioners to authorize a denial.  Physicians are not a

12  regular part of the NaphCare UM Team, but may be consulted for "particular

13  patients."  Nix I Tr. at 223:5-24.

14         c.     And, whether the referral is approved or not "will be

15  communicated to the referring provider."

16    465.   This is a Corporate UM model.  It is anonymous, opaque, bureaucratic,

17  time consuming, expensive, wasteful, and unnecessary.  As Ms. Rognlien-Hood

18  described it:  "[W]e're at the mercy of whoever NaphCare has contracted with to

19  get" outside appointments.  Rognlien-Hood Tr. at 36:4-5.

20    466.   Based on my experience with similar programs, I anticipate that, as

21  with any Corporate UM program, NaphCare's program is resource intensive and

22  therefore expensive.  It only makes financial sense for NaphCare to run such a

23  program if they deny more medical treatments than the cost of running the program.

24  From the perspective of the Sheriff's Department, the cost of nurses and

25  practitioners submitting these forms and keeping track of hundreds of replies is also

26  time consuming and expensive.

27    467.   The MSD Operations Manual's explanation of the UM process is not

28  entirely consistent with the County's contract with NaphCare, which envisions a

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1281**

1   "discuss[ion]" of non-emergent service requests among the NaphCare onsite

2   medical director, designated site staff, the Chief Medical Officer or designee, and a

3   "dedicated utilization nurse," as well as "progress notes documented in TechCare."

4   County Contract No. 566117, § 2.3.16.5. The MSD Operations Manual does not

5   provide for any such "discuss[ion]," and I have seen no evidence of those meetings

6   in progress notes of the charts I reviewed.

7        468.   In my opinion, by utilizing a method of Corporate UM administered by

8   NaphCare, the Sheriff's Department's policy for referring patients to offsite

9   providers is inadequate to treat the needs of patients and therefore places

10  incarcerated people at risk of serious harm.

11       469.   This UM structure violates other directives of MSD Operations

12  Manual, in particular, No. A.1.1 ("Access to Care"), which prohibits "[h]aving a

13  utilization review process that inappropriately delays or denies specialty care" and

14  "[p]ermitting unreasonable delays before patients are seen by prescribing providers

15  or outside consultants to obtain necessary diagnostic work or treatment for their

16  serious health needs."

17       470.   In practice, the NaphCare UM program denies requests for offsite care

18  at an unacceptably high rate—so much so that the County began raising concerns

19  about the denial rate as early as late 2022. Rognlien-Hood Tr. at 158:6-22. For

20  example, Ms. Rognlien-Hood testified that people who need physical or

21  occupational therapy were frequently denied outside appointments and directed

22  instead "to do certain exercises." *Id.* at 160:4-13. However, she explained, it was

23  often not possible for the patient to complete those exercises while they were

24  incarcerated, both due to limitations in the facility and the lack of anyone "to teach

25  [the patient] these exercises." *Id.* This practice—denying an outside appointment

26  but failing to provide a feasible alternative plan—is not commensurate with the

27  standard of care.

28       471.   Even when outside referrals are approved by NaphCare, the inefficient

1  UM system creates delays in patients receiving care.  Rognlien-Hood Tr. at 115:20-

2  116:12.  As Ms. Rognlien-Hood testified, prior to contracting with NaphCare, if an

3  outside referral was recommended, "it happened.  It got approved."  *Id.* at 115:15-

4  16.  In contrast, the system now includes "a lot of steps that [Ms. Rognlien-Hood]

5  think[s] are unnecessary"; describing these many steps, Ms. Rognlien-Hood stated

6  that there is a lot of "approved, authorized, pending scheduling."  *Id.* at 115:16-19.

7  ███████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ███████████████████████████████████████████████

10 ██████████████████

11        472.   This concern was echoed by Physician ██████████, who I

12 interviewed while touring the Las Colinas facility.  When I asked Dr. ████, "if you

13 could make one change to improve healthcare [at the Jail], what would it be?"  She

14 replied, "more funding" so that the Jail could pay for therapy she would like to

15 provide to patients.  In her experience, "referrals take forever or are not approved."

16        473.   ██████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ██████████████████████████████████████████████████

20 █████████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████

23 █████████████████████████████████████████████████

24 ██████████████████████████████████████████████████

25 █████████████████████████████████████████████████

26 █████████████████████████████████████████████████

27 ██████████████████████████████████████████████████

28 ███████████████████████████████████████████████████

Ex. P-1283

1

2

3

4

5

6

7

8

9    474.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1284**

1   ███████████████████████████████████

2       475.   In addition to the delays in patient care from the UM system, it is

3   apparent from the documents that I reviewed that, since NaphCare began its

4   operations in the Jail and assumed responsibility for outside referrals, the Jail has

5   suffered a loss of medical contracts and strained relationships with outside medical

6   specialty groups and hospitals.  That strain on relationships with outside providers

7   poses a serious risk of harm to incarcerated people.  As Ms. Rognlien-Hood testi-

8   fied, the Sheriff's Department used to "have a good rapport with our local hospitals,

9   and then NaphCare did things a little different …."  Rognlien-Hood Tr. at 116:15-

10  17.  Those "hiccups"—as Ms. Rognlien-Hood put it—may harm patients, because

11  "community partners [may] get frustrated and not see our patients."  *Id.* at 117:4-7.

12      476.   Indeed, that is exactly what happened when NaphCare took over.  In its

13  Corrective Action Notice ("CAN") to NaphCare, the Sheriff's Department

14  explained:  "As of April 17, 2023, there are $9.3 million dollars of unpaid bills due

15  to hospitals.  Of the total outstanding claims, $4.6 million dollars are past due the

16  30-day threshold.  ***Due to lack of payment, some community providers do not want***

17  ***to see or accept our patients***, which include, but not limited to:  Podiatry (Oxford),

18  Alvarado, Vibra, Kindred."  SD_1572586 (emphasis added).

19      477.   ████████████████████████████████████████

20  ████████████████████████████████████████████

21  ██████████████████████████████████████████

22  ████████████████████████████████████████

23  ██████████████████████████████████

24  ██████████████████████████████████████████

25  ████████████████████████████████

26  ██████████████████████████████████████

27  ████████████████████████████████████████████

28  ██████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1285**

478.   Documents from late October 2023 suggest that the relationships with outside providers had not been fully repaired nearly six months later, despite assertions that the contracts had been fully paid, *see* Rognlien-Hood Tr. at 150:9-10.

479.   PEG tubes are feeding tubes that are surgically implanted so that the tube comes out of the abdomen.  They are used to feed patients who, for many possible reasons, cannot swallow or use their esophagus.  PEG tubes must receive regular maintenance to make sure that they remain clean and do not get clogged up with feeding liquids.  They must be replaced periodically.  Not performing appropriate care and not replacing PEG tubes when necessary can certainly harm patients who are dependent on their PEG tube for nutrition.

480.   Nor had these relationships been repaired by late November 2023. Email correspondence about another patient's referral to a gastroenterology clinic reveals substantial confusion about where the patient could be evaluated.



1  

2  

3  

4  

5  

6  

7  

8  

9  

10  

11   In her deposition, Ms. Rognlien-

12 Hood explained that the patient was brought to the emergency room to see a

13 different doctor, but that doctor "would not admit her," so the patient had to be

14 returned to the Jail.  Rognlien-Hood Tr. at 148:20-149:4.  The patient ultimately did

15 not receive treatment until either January or February of 2024—over a month later.

16 *Id.* at 149:5-8 (treatment was within 45 day of Ms. Rognlien-Hood's February 14,

17 2024 deposition).

18 

19     481.  It is also worth noting that the Sheriff's Department's CQI program

20 (discussed in more detail later in this Report) does not contain adequate information

21 about the progression and health of the off-site referral process.  When a CQI

22 program considers specialty consultations and off site medical care, the CQI reports

23 should contain analysis and information about gaps in current contracted off-site

24 specialists; the UM process, including the average time taken to get UM approval

25 and the percentage not approved, broken down by specialty; the average wait times

26 for appointments with each particular specialist; and problems encountered in

27 making and keeping these appointments, such as the reason for all missed or

28 rescheduled appointments.

482.   However, none of this information is contained in the Sheriff's Department CQI reports that I reviewed.  Instead, these reports give only bland statistics of how many off-site appointments were completed in a given month, and occasionally how many were cancelled due to refusals, discharges, etc.  These CQI statistics are gravely limited and suggest to me that the Sheriff's Department does not itself have a clear picture of the health of its offsite referral process and how it can be improved.

483.   To be sure, the off-site referral process is one of the more challenging aspects of carceral medical care, but it can also be of critical importance to patient health.  That is why CQI analysis is essential.  Without proper CQI, there is no opportunity to find and fix problems before they impact patient care and patients are harmed.

484.   In summary, the system of off-site referrals at the Jail is broken.  The UM process is wasteful and inefficient.  The essential relationships between the County and community health providers has been strained.  The Jail does not appropriately evaluate these problems in its CQI program.  And, as a result of these many systemic failures, incarcerated people's medical care is delayed and denied, placing them at risk of serious harm.

**VIII. The Sheriff's Department Fails to Provide Adequate Diagnostic and Chronic Care to Incarcerated People and Provides Inadequate Treatment for Several Common Medical Conditions, Placing Them at Substantial Risk of Serious Harm**

485.   In their Third Amended Complaint, Plaintiffs allege that the Sheriff's Department fails to order medically necessary diagnostic care in a timely manner, resulting in an unreasonable risk of harm to incarcerated people.  Dkt. 231 at ¶ 104.  Based on my review of the documents and as described in more detail below, I agree.  It is also my opinion that the Sheriff's Department does not have an adequate system for chronic care and provides inadequate care—including but not limited to diagnostic and chronic care—for several of the medical conditions that are most

1  common among the incarcerated population.

2  **A.    Diagnostic Care**

3  486.    Diagnostic care refers to those laboratory tests and imaging studies that

4  must be done to accurately diagnose and assess patient medical conditions.

5  Examples of commonly ordered laboratory tests are complete blood counts,

6  urinalyses, and comprehensive metabolic panels that include tests to measure

7  electrolytes (such as potassium and sodium), kidney function, liver function, and

8  nutritional status.  Examples of commonly ordered imaging studies are chest x-rays,

9  extremity x-rays, computerized tomography (CT) scans, and electrocardiograms

10  (EKG).

11  487.    Diagnostic tests are needed to accurately diagnose many acute medical

12  complaints, such as infections and heart problems.  Diagnostic tests are also needed

13  for chronic care, such as routine chronic care labs to check the status of diabetes or

14  the progression of kidney disease.  Diagnostic tests are critical to patient health.

15  They are often essential to making timely, accurate diagnoses and to monitoring the

16  progression of chronic diseases.

17  488.    The appropriate process of using diagnostic tests in the medical process

18  includes several steps, all of which should be documented in the medical record.

19  First, diagnostic tests must be ordered by a *medical practitioner*; this responsibility

20  should not be delegated to nurses.  Second, the test must be completed, *e.g.*, blood in

21  drawn, x-rays are run, etc.  Third, the test result must be interpreted by a medical

22  practitioner (preferably by the practitioner who ordered the test); again, this

23  responsibility should not be delegated to a nurse.  Fourth, the practitioner must

24  determine what changes, if any, will be made in the patient's overall care plan based

25  on the diagnostic test results.  Finally, the patient must be informed of the test

26  results and the changes in care, if any.

27  489.    Each of these steps is important.  If necessary diagnostic tests are not

28  ordered, findings and diagnoses will be missed and patients will be harmed.  If

1  diagnostic tests are ordered but not reviewed—or reviewed but the significance of

2  the labs are not noticed—again, findings and diagnoses will be missed and patients

3  will be harmed.

4  490.  The policies and procedures of the Jail should address the proper way

5  to order, interpret, and document the results of diagnostic tests.  The MSD

6  Operations Manual is silent on this subject except for addressing patient refusals of

7  lab tests.  *See* MSD Operations Manual No. MSD.R.5.VII (2022).  NaphCare's

8  Policy and Procedures ███████████████████████████

9  ████████████████████████████████████████████

10 ████████████████████████████████████

11 ██████████████████████████████████████████

12 ██████████████.  NAPHCARE 031275.  NaphCare's P&P Manual does not

13 discuss minimal standards for documentation.

14 491.  The NCCHC Technical Assistance Report found the Jail deficient in

15 reviewing diagnostic studies, recording them in the chart, and communicating

16 results with the patients.  DUNSMORE 0260641 (discussing lack of compliance

17 with NCCHC standard J-E-12).

18 492.  My review of patient records also shows that critical study results are

19 not reviewed. ████████████████████████████████

20 ████████████████████████████████████████

21 ████████████████████████████████████████

22 ████████████████████████████████████████

23 ██████████████████████████████████████

24 ████████████████████████████████████

25 ██████████████████████████████████████

26 ████████████████████████████████████████

27 ████████████████████████████████████████

28 ████████████████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1290**



1

2

3

4

5

6      493.   Another example is Abdiel Sarabia (███████), a patient who died on

7 July 22, 2022 of "Hypertensive cardiovascular disease," with hypothyroidism as a

8 contributing factor.  Autopsy Report, SD_001362. ████████████████

9

10

11

12

13

14

15      494.

16

17

18

19

20

21 ███████████████████████ Mr. Sarabia's abnormal thyroid levels—which

22 the autopsy determined were a contributing factor in his death—were never

23 addressed over the several months Mr. Sarabia was incarcerated.

24      495.

25

26

27

28      496.   The fact that lab reviews are not documented properly and discussed

with patients was corroborated by a CQI review, which reported, "This quality improvement study focuses on provider follow-up after ordering of labs, diagnostic studies or specialty consults/referrals to identify whether results are being reviewed by providers and discussed with patients.  In May [2023], SBDF achieved 28% overall compliance.  In June, compliance was 16%."  CQI Review PowerPoint, July 18, 2023, SD_114489.  This is an abysmally low compliance rate.

497.   The Sheriff's Department's failure to review diagnostic testing places incarcerated people at risk of serious harm, because it allows their medical conditions to worsen.  The consequences of this can include death, as it was for Mr. Sarabia.

## B.    Chronic Care

498.   Inside and outside the correctional setting, people have conditions that require regular medical visits, even if they are not experiencing any acute or urgent symptoms caused by the underlying medical condition.  One example is diabetes.  People with diabetes should be evaluated by a medical professional at regular intervals for a check-up in order to confirm that their condition is being managed appropriately.  These chronic care appointments are distinct from any urgent medical care a person might need if they begin to experience acute symptoms from their underlying condition.

499.   The medical standard of care for the frequency of chronic care appointments and what should happen at those appointments (*i.e.*, what labs should be checked) are set forth by well-recognized medical guidelines issued by medical specialist societies.[40]

500.   Even though a chronic care appointment does not necessarily treat an urgent or acute problem, it is nonetheless important to a patient's health, and failing

---

[40] As one example, *see* Daniel L. Larber et al., *Diabetes Management in Detention Facilities:  A Statement of the American Diabetes Association*, 47 DIABETES CARE 544 (2024).

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1292**

1  to provide such appointments can place a patient at a serious risk of harm.  These

2  clinics have the specific goal of monitoring a patient's condition over time.  Often,

3  even though a patient feels well, their condition has deteriorated in a way that

4  should be addressed with a new medical treatment plan.  For example, consider a

5  hypothetical patient with type 2 diabetes.  Although she feels well, she may be

6  suffering from diabetic retinal disease, which is asymptomatic at first, but could lead

7  to blindness, if untreated.  Absent a chronic care appointment, she would miss a

8  referral to an ophthalmologist for treatment.

9       501.  The Jail has a long history of failing to provide appropriate chronic care

10  for its patients.  The NCCHC Technical Assistance Report listed numerous

11  criticisms of aspects of chronic care.  The NCCHC noted that the Jail lacked chronic

12  care guidelines for several chronic diseases, including seizures, diabetes, asthma,

13  and many others.  DUNSMORE 0260643 (discussing lack of compliance with

14  NCCHC standard J-G-01).  They stated that "[c]hronic disease services must be

15  developed," and patients with chronic diseases "monitored according to [a]

16  protocol" developed based on accepted national standards.  *Id.*

17       502.  Perhaps in response to negative assessment, the 2022 contract that the

18  Sheriff's Department negotiated with NaphCare devoted an entire section of the

19  Statement of Work to a "Chronic Care Program" that required NaphCare to establish

20  chronic care protocols and chronic care clinics.   Contract No. 56117, § 2.3.11,

21  NAPHCARE000580-81.  These chronic care clinics must comply "with standards

22  established for the care and treatment of chronic illnesses."  *Id.* § 2.3.11.6.  These

23  clinics were to be scheduled for each patient with a chronic disease, at a minimum,

24  within "approximately one month" of admission.  *Id.* § 2.3.11.10.  In addition,

25  ███████████████████████████████████████████████████████

26  ████████████████.  *See* NAPHCARE034787-88.

27       503.  However, in practice, NaphCare has not met this obligation of their

28  contract as far as I can tell.  The Jail's provision of chronic care falls below the

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1293**

standard of care.  Testifying on behalf of the Sheriff's Department, Dr. Montgomery explained that as of the date of his deposition, there is no separate chronic care clinic.  Montgomery II Tr. at 119:15-18.  Instead, the Jail was "using an acute care setting to manage chronic appointment types."  *Id.* at 119:19-20.  According to Dr. Montgomery, this practice of "using chronic appointments in an acute-care setting would certainly be less efficient and could potentially reduce the speed or effect a delay in getting a patient aligned with the community."  *Id.* at 121:20-22.  It is my impression that some chronic care appointments are occurring, but many of the charts I reviewed show patients are not scheduled appropriately for chronic care.

504.   Dr. Montgomery also testified that one of the goals of the Sheriff's Department's new contract with CHP was to "create a separate chronic care clinic," which in turn would "allow for a longer time frame for the patient/physician encounter to accommodate all chronic-care needs and requests."  Montgomery II Tr. at 119:22-120:8.  However, this is not expressly laid out in the new CHP contract, which merely states, under the definition of "Clinic":  "Provisions are made for both scheduled appointments for addressing chronic care issues and same-day appointments for acute issues."  Contract No. 571418, Agreement With Correctional Healthcare Partners Inc § 5.5.8, SD_1579719.  For his part, Dr. Freedland stated in his deposition that he was "aware" of the NCCHC requirement for chronic care clinics but was unable (or unwilling) to state which national standards he would follow in developing chronic care guidelines.  Freedland Tr. at 171:9-15.

505.   From this testimony, and the relative lack of chronic care appointments in the charts I reviewed, it is my opinion that the chronic care system at the Jail remains inadequate, putting incarcerated people at risk of harm.

## C.    Inadequate Treatment of Common Medical Conditions

506.   My review of documents also revealed inadequacies in treatment of multiple conditions that are common in the incarcerated population:  hepatitis C, type 2 diabetes, hernias, latent tuberculosis, sexually transmitted infections, and

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1294**

1  asthma.

2  **1.    Hepatitis C ("HCV")**

3  507.   HCV is a virus that infects liver cells.  HCV is an infectious disease

4  spread blood-to-blood, most commonly by sharing needles between persons

5  injecting heroin, meth, or other drugs of abuse.  Up to 85% of people infected by

6  HCV develop chronic infections.  These people never clear the virus from their

7  blood and so are infectious to other people for the remainder of their lives or until

8  they are treated and cured.  Over time, HCV causes liver disease (termed fibrosis)

9  and the death of liver cells (termed cirrhosis); it can ultimately lead to liver cancer

10 (hepatocellular carcinoma), the need for liver transplant, or death.

11 508.   Although most patients with chronic HCV infection are asymptomatic

12 until their liver disease has progressed to a moderate-severe stage, those patients

13 remain infections and can transmit the virus to other individuals in the community.

14 Diagnosis of chronic HCV infection is made through simple lab tests.

15 509.   Chronic HCV can be treated with antiviral drugs, which will totally

16 eradicate HCV in over 95% of patients, essentially curing them of the disease

17 (although the liver damage they have already sustained may not be entirely

18 reversible).  HCV antiviral drugs are remarkable in that they are easy to administer

19 as pills taken once a day for 8-12 weeks, and they cause very few side effects.

20 There is no need for lab monitoring during therapy.  There is no need for

21 consultations with infectious disease specialists or liver specialists in most patients.

22 510.   The standard of care for HCV in correctional facilities includes the

23 following key points.[41]  First, jails should implement opt-out testing for HCV,

24

_____

25 [41] The standard of care for patients suffering from chronic HCV infection can be
   found in several places, including standard medical textbooks (such as the online
26 textbook Uptodate) and guidelines published by specialty organizations.  Probably
   the most cited and respected of these guidelines is *HCV Guidance:*
27 *Recommendations for Testing, Managing, and Treating Hepatitis C* published
   jointly by the American Association for the Study of Liver Diseases (AASLD) and
28 the Infectious Diseases Society of America (IDSA). This guideline contains a
   section that specifically addresses care for incarcerated patients: *HCV Testing and*

1  meaning that incarcerated people are automatically tested for HCV unless they

2  choose not to be.  The opposite is "opt-in" testing, in which people must request a

3  test.  Second, all people who test positive for HCV and are expected to be in the Jail

4  for at least 10 weeks should receive the (essentially curative) antiviral treatment

5  noted above.  Ideally, even people who may be released sooner than 10 weeks

6  should receive antiviral treatment and, if necessary, be connected to a community

7  healthcare provider who can continue the treatment after release.  In any case,

8  treatment should not be dependent on the patient's level of liver damage.  Finally,

9  people with HCV should receive counseling about the infection and be provided

10  linkage to follow-up community healthcare for evaluation of liver disease and

11  treatment upon release.

12    511.   However, my review of patient charts and my interviews of

13  incarcerated patients during my jail tour show that the Jail is not following this

14  guidance.

15    512.   The Jail does not do opt-out testing for HCV infection, despite having a

16  large percentage of patients with risk factors for HCV infection.  The Jail instead

17  does only opt-in HCV testing.  Opt-in testing is dependent on patients knowing that

18  they might have Hepatitis C and that they have the right to request the test.

19  However, the Jail does not adequately inform incarcerated patients that HCV testing

20  is available to anyone who wants it.  Of course, patients who do not know about

21  HCV testing will not request it.  Choosing to test patients for HCV infection only

22  when they request testing and failing to inform patients of their right to ask for this

23  test does not make any sense from a medical perspective.  It only makes sense as a

24  way of minimizing the number of HCV cases found in order to save money by not

25  having to treat them.  By choosing this method of screening, the Jail is missing

26  many patients who have chronic HCV infections that could be cured by treatment.

27

28  *Treatment in Correctional Settings* (Dec. 19, 2023)  [hereinafter *HCV Treatment in
Corrections*], https://www.hcvguidelines.org/unique-populations/correctional.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1296**

1   Since they were not discovered and not treated, these patients will continue to

2   deteriorate over time and continue to infect others.

3       513.   The Jail also denies treatment to many patients who they know are

4   suffering from HCV, based on the misguided principle that only patients with at

5   least moderate liver damage should receive treatment.  I understand that the Jail has

6   a document referred to in medical records as "Physician's Treatment Guide [PTG]

7   for Hepatitis C," also known as "PTG.H.9." ████████████████████████████

8   ████████████████████   Although I understand that Plaintiffs' counsel asked for all

9   Jail policies, including those governing medical care, I have not seen PTG.H.9 and

10  am not aware that the Sheriff's Department provided it.  In fact, the "PTG" is barely

11  referenced in the MSD Operations Manual, and it appears that at least some portion

12  of section H of the PTG has been "archived" since at least November 2022.  *See*

13  Policy MSD.H.14 (noting that PTG.H.3 has been archived).  Practitioners in the Jail

14  should not be providing care based on an archived treatment guide.

15      514.   However, in at least some cases, medical practitioners appear to rely on

16  this PTG and, consistent with that guidance, provide treatment for HCV only if

17  patients have at least a moderate to severe degree of liver damage.  ████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████████████

22  ████████████████████████   As far as I can tell, unless a patient has advanced liver

23  fibrosis, the Sheriff's Department will refuse to provide HCV treatment.

24      515.   This makes no sense medically.  Modern antiviral treatment for HCV

25  will cure greater than 95% of patients, does not take very long (8 weeks), has few

26  side effects, and requires minimal monitoring.  Treatment also does not usually

27  require consultation with a liver or infectious disease specialist.  Treatment is so

28  simple and so effective that the CDC encourages primary care doctors to treat most

1    HCV patients themselves rather than referring to a specialist. *See, e.g.*, Richard R.

2    Andrews, *Family Physicians Can Manage Adults with Hepatitis C*, 98 Am. Fam.

3    Physician 413, 413 (2018).

4        516.   Denying patients with chronic HCV infection a cure until they get

5    sicker (and can infect more people) unquestionably violates the standard of care,

6    which is to treat everybody who will be incarcerated for "sufficient time"

7    (approximately ten weeks or longer). *See HCV Treatment in Corrections*, *supra* at

8    2.  Denying infected patients a cure until their liver is more damaged only makes

9    sense if the goal is to save money by denying necessary medical care.

10       517.   I have also seen no evidence that the Jail meets the other standard of

11   care elements:  HCV patients not given counseling while they are in the Jail, nor are

12   they connected to community healthcare providers upon their release.  Ideally, the

13   Jail would have identified a specific community partner who has the funding and

14   resources to treat discharged Jail patients with HCV infection, including planning

15   for patients who are uninsured.  The Jail could and should work with San Deigo

16   County Health and Human Services to create a plan for HCV patients without

17   insurance who are discharged without treatment.  However, I have not seen any

18   evidence that such a community partner has been identified.

19       518.   Examples of patients who were denied medical treatment for chronic

20   HCV infection contrary to the medical standard of care include:

21       519.   ████████████████████████████████

22   ████████████████████████████████████

23   ████████████████████████████████

24   ████████████████████████████████████

25   ████████████████████████████████████

26   ████████████████████████████████████

27   ██████████████████████████████████████

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1298



524.    In essence, the Jail medical providers are telling these patients: "We have a medication that could cure you of your deadly HCV infection quickly and easily.  But we have decided that we will not give it to you until more of your liver is diseased and you are sicker."  It is important to keep in mind that each of these patients is infectious and can transmit this deadly disease to others.  In the end, the Sheriff's Department is deliberately withholding treatment for patients with a

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1299

1    serious medical illness that could be quickly and easily cured.

2        525.   This policy of denying treatment to patients who the Jail knows have a

3    serious progressive disease contrary to the medical standard of care, apparently

4    because they are not sick enough, places these patients at a risk of serious harm.

5                    **2.    Type 2 Diabetes**

6        526.   The Jail fails to provide patients with type 2 diabetes with care

7    consistent with national standards.

8        527.   Type 2 diabetes is a progressive disease in which patients develop

9    resistance to the effects of the hormone insulin that they produce.  In contrast to type

10   1 diabetes, in which patients produce no insulin and must be given insulin to

11   survive, patients with type 2 diabetes initially have plenty of insulin—their insulin

12   levels may indeed be abnormally high.  Their problem is insulin resistance, meaning

13   that their insulin does not work as effectively as it should.  The result of insulin

14   resistance is abnormally high blood sugars.  Over time, the elevated blood sugar

15   causes many serious health problems, including kidney failure, heart disease,

16   neuropathy (nerve damage), retinal disease, and many more.

17       528.   The treatment of type 2 diabetes differs considerably from that of type

18   1 diabetes.  Insulin is usually not used to treat type 2 diabetics early in their disease

19   for two reasons:  (1) patients with type 2 diabetes have plenty of their own insulin

20   (their insulin levels may even be high), and (2) they are insulin resistant, meaning

21   that giving them more insulin has little effect.  After about 20 years of having this

22   disease, type 2 diabetics' insulin levels tend to fall below normal levels and, at that

23   time, insulin therapy should begin.  Before that, there are many other medications

24   that can be used effectively to treat type 2 diabetes.  An appropriate diet is also

25   important in the management of type 2 diabetes.

26       529.   The standard of care for type 2 diabetes in correctional facilities

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1300**

includes the following key elements.[42]  First, type 2 diabetics should have a complete medical history taken, as well as a comprehensive intake physical examination, including a retinal exam, cardiac exam, peripheral pulses, foot exam, and neurological exam.  They should also have a number of labs taken as part of intake, including but not limited to a Hemoglobin AIC blood test ("A1C"), which is the most important diagnostic test to follow the progress and status of type 2 diabetes.  Second, as noted above, insulin is not the primary medication required for many adults with type 2 diabetes.  Insulin should generally be used only for people with an AIC of over 10%.  And, when insulin is necessary, so-called "sliding scale" insulin is expressly discouraged.  Finally, patients with type 2 diabetes should receive dietary and lifestyle counselling.

530.   My review of patient charts and my interviews of incarcerated patients during my inspection show that the Jail is not following this guidance and is, instead, providing poor medical care to diabetic patients.  In particular:  the Jail does not conduct recommended physical exams or labs in a timely manner; discontinues long-acting insulins as a matter of course and instead prescribes sliding scale insulin; changes patients' medications without consulting them; and provides minimal, if any, diabetic counselling to type 2 diabetic patients.

531.   One particularly troubling fact is that the Jail's formulary does not include (and therefore essentially prohibits the use of—see discussion of formularies earlier in this Report) some legitimate diabetic drugs and encourages irresponsible substitutions.  In particular, the Jail requires STATCare practitioners to irresponsibly

---

[42] The standard of medical care for patients suffering from Type 2 DM can be found in several places, including standard medical textbooks (such as the online textbook Uptodate), and guidelines published by specialty organizations. Probably the most cited and respected of these guidelines for DM is the American Diabetes Association, *Standards of Care in Diabetes* (2023) [hereinafter *ADA Standards of Care*], https://diabetesjournals.org/care/issue/46/Supplement_1. The American Diabetes Association recently released guidelines specific to management of diabetes in correctional settings. Larber, *Diabetes Management in Detention Facilities*, *supra*.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1301

1  discontinue long-acting insulins on newly admitted patients taking them. ██

2  ████████████████████████████████████████████████████████

3  ██████████████████████████████████████████████████████████

4  █████████████████████████████████████████████

5  ██████████.” *E.g.*, SD_790712.  Novolin N (a short acting insulin) is given

6  exclusively via a sliding scale. ████████████████████████████

7  ███████████████████████████████████████████████

8  ███████████████████████”

9      532.   All of this deviates so severely from the guidelines of the American

10 Diabetic Association, that, in my opinion, it constitutes medical malpractice.

11     533.   The records I reviewed suggest that the Sheriff's Department has good

12 reason to know that this guidance for treatment of diabetes is inadequate and

13 dangerous.  In September 2021, two people with type 2 diabetes died in the Jail:

14 John Wright, died September 16, 2021, Autopsy Report, SD_001427; and Teresita

15 Tuazon, died September 28, 2021, Autopsy Report, SD_055905.  Both Mr. Wright

16 and Ms. Tuazon died of type 2 diabetes complications that take days to develop,

17 meaning Jail staff should have noticed their abnormal blood sugar levels over that

18 period and intervened to save their lives.

19     534.   Those two preventable diabetic deaths within two weeks of each other

20 no doubt led ████████████████████████████████████

21 ████████████████████████████████████████████████

22 ███████████████ ████████████████████████████████

23 ██████████████████████████████████████████████

24 ███████████████████████████████████████

25 ████████████████████████████████████████

26 ██████████████████████████████████████████

27 ██████████████████████████████████████

28 ██████████████████████████████████████

Ex. P-1302

1 ██████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████     *Id.*

4     535.   In my opinion, each of these is excellent clinical practice that conforms

5 to the medical standard of care as set forth by the American Diabetic Association.

6     536.   However, nine months later, on August 16, 2022, ████████████

7 ██████████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ██████████████████████████████████████████

10 ████████████.

11     537.   With the stroke of a pen, in-person evaluations with on-site

12 practitioners were out and remote diabetic management by STATCare was in.

13 Sliding scales were again permitted for "ongoing clinical management."  Treatment

14 plans for diabetics were optional.  And (per the STATCare mandates noted above)

15 all long-acting insulins were to be discontinued at booking.  Further, the NaphCare

16 guidance cited in Directive 7A contains no information about proper management of

17 Type 2 Diabetes.  All of this was a departure from the American Diabetic

18 Association Guidelines and failed to meet the standard of care.

19     538.   In his deposition, Dr. Montgomery stated that the "reason" he rescinded

20 the excellent provisions in Medical Directive 7 "was due to NaphCare's arrival" and

21 the "introduction of StatCare," which is no excuse for abandoning the appropriate

22 standard of care.  Montgomery II Tr. at 229:16-21.

23     539.   The following cases exemplify the Jail's mismanagement of type 2

24 diabetes:

25     540.  ████████████████████████████

26 ██████████████████████████████████████████████████

27 ██████████████████████████████████████████████████

28 ████████████████████████████████████████████



EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1303

541.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1304

1

2

3     542.

4

5

6

7

8

9     543.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5        544.

6

7

8

9

10

11

12

13

14

15

16

17

18

19        545.

20

21

22

23

24

25

26        546.

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1306**



1

2

3

4

5

6

7     547.

8

9

10

11

12

13     548.   The Sheriff's Department also does not provide diabetic patients with

14 medically required retinal examinations.[43]  As noted above, patients with type 2

15 diabetes should be given a retinal examination.

16     549.   If annual exams show no evidence of retinopathy and blood glucose

17 levels are at goal, screenings can be done every 1–2 years.  However, if any level of

18 diabetic retinopathy is detected, yearly examinations are essential, and more

19 frequent exams are needed if retinopathy progresses or poses a threat to vision.

20     550.   My review of the charts of several diabetic patients shows that none of

21 this is being done.

22

23

24     551.   In conclusion, the care of type 2 diabetic patients in the Jail does not

25 meet the standard of care set forth by the American Diabetes Association.  Diabetics

26

27 [43] The standard of eye care for patients with type 2 diabetes is also laid out in the

28 American Diabetic Association Guidelines. *See* Larber, *Diabetes Management in Detention Facilities*, *supra.*

**EXPERT REPORT OF JEFFREY E. KELLER, M.D.**
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1307**

1  are not evaluated and examined by a health care practitioner at intake or during the

2  health assessment.  Prescribing is done, rather, by midlevel practitioners working

3  remotely who are contacted electronically.  This failure to meet the standard of care

4  has caused patient harm in the past and will continue to cause patient harm in the

5  future.

### 3. Hernias

7  552.  The Sheriff's Department routinely fails to diagnose and treat

8  incarcerated patients with inguinal (groin) hernias in compliance with the medical

9  standard of care and recognized published treatment guidelines.

10  553.  Inguinal hernias arise when the muscular wall of the abdomen weakens

11  and allows the underlying abdominal contents to bulge out.  When hernias are small,

12  only abdominal fat bulges out of the hernia.  However, without treatment, hernias

13  get larger over time.  As they get bigger, more abdominal tissue can bulge through

14  the opening, and it becomes harder to push the abdominal contents back into the

15  abdomen (called "reducing" the hernia).  Sometimes, abdominal contents cannot be

16  reduced.  This is termed "incarceration" of the hernia and is a surgical emergency,

17  because the bulging abdominal contents can be squeezed by the hernia opening so

18  tightly that the tissue dies, causing serious harm to the patient.  "Uncomplicated'

19  hernias are small and cause no significant problems for the patient.  "Complicated"

20  hernias do cause problems, such as debilitating pain or interference with daily life.

21  554.  The standard of care for hernia patients requires that patients be given

22  the option for surgical treatment of the hernia.[44]  Delaying a surgical repair is

_____

[44] The standard of medical care for patients with inguinal and/or umbilical hernias can be found in many places, including standard medical textbooks as well as guidelines published by surgical specialty organizations.  I referred to two such references as establishing the medical standard of care for hernias.  The first was HerniaSurge Grp.. *International Guidelines for Groin Hernia Management*, 22 HERNIA 1 (2018).  The second was the medical textbook UPTODATE. David C. Brooks, *Overview of Treatment for Inguinal and Femoral Hernia in Adults*, *in* UPTODATE (Michael Rosen et al eds), https://www.uptodate.com/contents/overview-of-treatment-for-inguinal-and-femoral-hernia-in-adults.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1308

appropriate *only* if (a) the hernia is asymptomatic or minimally symptomatic *and* the patient, after having been counseled of the risks of delaying surgery, choses to do so; or (b) the patient is pregnant.

555.    *Uptodate* provides the following flowchart:



556.    Although a truss, or hernia belt, may be helpful in certain situations, their use is generally discouraged, because there is insufficient evidence to prove their efficacy.  In addition, inappropriate use of a truss may harm abdominal contents in a hernia sac or complicate subsequent surgical repair.

557.    Neither the Sheriff's Department policies and procedures manual nor the NaphCare policy manual contains any guidance regarding the treatment of hernias.  *See MSD Operations Manual*, *supra*; NaphCare Policy & Procedure Manual, September 2022, NAPHCARE 031065-373.

558.    In practice, my review of patient charts and my interviews with incarcerated patients during my inspection of the Jail show that the Sheriff's

**Ex. P-1309**

1  Department is following none of the guidance outline above.  First, based on my

2  review of individual medical records, it is my opinion that the Jail has an unwritten

3  institutional policy to deny surgical treatment of hernias, even in severe cases.

4  Indeed, the records reflect that Sheriff's Department medical staff have told patients

5  that hernias are not repaired by policy on multiple occasions from 2017 to 2023.  It

6  is my understanding that surgery for hernias is never approved or even considered

7  unless the patient has a surgical emergency.  Even patients with persistent

8  debilitating pain from hernias are refused surgical repair of their hernias.  Second,

9  practitioners routinely diagnose and prescribe treatment for hernias without ever

10  examining the hernia.  Third, practitioners in the Jail frequently prescribe trusses for

11  patients with hernias without examining them and irrespective of whether the

12  patients find the trusses helpful.

13      559.   In fact, during my inspection of the Jail, I observed two patients with

14  hernias who stated the Jail medical staff refused to repair them.  One was ███████

15  ████████████████████.  Although sitting in a wheelchair, Mr. ██████ had a

16  basketball sized right inguinal hernia visible beneath his clothes.  Mr. ██████ stated

17  he had submitted multiple requests and grievances but "they're not helping me."

18  The second was ███████████████████████, who lifted up his shirt to show

19  me a grapefruit-sized umbilical hernia.  He said, "They won't repair that."  I later

20  learned that Mr. ████ was booked on ████████████, meaning that he had been in the

21  Jail for about seven months when I saw him.

22      560.   The following are examples of patients whose records I reviewed and

23  who were denied appropriate care for their hernias:

24      561.   **Michael Taylor** (17122758), a named plaintiff in this case, informed

25  the Jail medical staff that he has a right sided inguinal hernia when he was booked

26  on April 11, 2017.  Medical Record, DUNSMORE 0071323.  The next day, medical

27  staff noted, "IP with groin hernia for 1 month.  IP looking to have surgery ASAP."

28  DUNSMORE 0071347.  He was seen by a medical practitioner, on April 16, 2017

1  who noted that Mr. Taylor was already scheduled to have the hernia repaired at

2  Scripps Mercy Hospital.  DUNSMORE 0071348.  However, the medical plan was

3  for Mr. Taylor to "notify medical" if the hernia got worse.  *Id.*  Mr. Taylor told a

4  nurse that his hernia was "increasing in size and discomfort" on April 18, 2017.

5  DUNSMORE 0071350.  The nurse told him "this nurse would schedule pt to see

6  MD."  *Id.*  However, the MD did not see him, and instead asked to get his outside

7  medical records.  *Id.*  On May 25, 2017, Mr. Taylor reported that "[m]y hernia has

8  gotten so bad I can no longer poop."  DUNSMORE 0071358-59.  He was given an

9  "athletic supporter" and a prescription for a laxative.  *Id.*  Although he continued to

10  complain of hernia pain and associated constipation throughout his period of

11  incarceration, he was never offered surgical repair of his hernia.  This violated the

12  standard of care.

13  562.  ████████████████████████████████████████

14  ██████████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ██████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████

22  563.  ████████████████████████████████████████

23  ██████████████████████████████████████████████████

24  ██████████████████████████████████████████████████

25  ██████████████████████████████████████████████████

26  ██████████████████████████████████████████████████

27  ██████████████████████████████████████████████████

28  ██████████████████████████████████████████████████

[4448212.31]

Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1311

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ██████████████

4       564.   ████████████████████████████████████████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████

9  ██████████████████████████████████████████

10 █████████████████████████████████████████████████████

11 ██████████████████████████████████████

12      565.   ██████████████████████████████████████████████

13 █████████████████████████████████████████████

14 ██████████████████████

15      566.   ████████████████████████████████████████████████

16 █████████████████████████████████████████████

17 █████████████████████████████████████

18      567.   ████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████

21 ██████████████████████████████████████████

22 █████████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████

27      568.   Mr. ████████████████████████████████████████████

28 ███████████████████████████████████████████



[4448212.31]

Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1313**



575.

576.

577.

578.

579.    These four examples demonstrate patients who have hernias that met the medical standard for surgical intervention, but were not properly evaluated or treated in the Jail.  None of these patients (except Mr. Taylor in 2017) was examined by a medical practitioner.  All the patients' requests for surgery were denied.  The patients' complaints of pain and disability were ignored.  Hernia belts (trusses) were prescribed by practitioners who had never examined the patient.  Neither the Sheriff's Department nor NaphCare has any written guidelines or policy for hernia evaluation and treatment—at least, that I have seen.  However, there appears to be

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1314**

1  an unwritten policy that patients with hernias are not to be referred to a surgeon.

2  This violates the medical standard of care, and incarcerated patients have suffered as

3  a result.

4              **4.    Latent Tuberculosis ("LTB")**

5      580.   The Jail fails to provide appropriate screening and treatment for people

6  infected with LTB.

7      581.   Tuberculosis is an infection with a more complicated course than most

8  other infections.  Patients usually are exposed to tuberculosis by breathing the

9  infectious agent into their lungs.  After a brief illness like a chest cold, the

10  tuberculosis organism goes into a latent state.  After a period that can last years, the

11  tuberculosis organism reemerges and becomes an active infection.  Patients with

12  active tuberculosis are seriously ill and can infect others by coughing out

13  tuberculosis organisms that other people inhale into their lungs.  Tuberculosis is a

14  serious illness that can cause debilitation and death.

15      582.   The Jail has a program in place to find patients with *active* tuberculosis

16  infections by doing a chest x-ray, which will show typical tuberculosis lesions in

17  patients with active tuberculosis.  Patients then can be isolated and treated.

18      583.   However, the CDC recommends that jails should also have a program

19  in place to diagnose *latent* tuberculosis infection in patients at high risk for LTB,

20  such as injection drug users.  The goal is to find and treat patients with LTB and

21  cure them before the disease becomes active, causing serious illness and infecting

22  other people.

23      584.   Screening high risk patients for LTB is relatively simple.  Screening

24  can be done as a two-step skin test or a simple one-step blood test.

25      585.   In addition, the CDC recommends that jails should test for LTB

26  annually for all employees and for anyone incarcerated in the jail for greater than

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1315**

1    one year.[45]

2        586.   Dr. Venters recommended that the Jail begin testing for latent TB

3    infection in 2020.  SD_215390.

4        587.   The NaphCare contract requires NaphCare to provide "TB screening,

5    evaluation and treatment … in accordance with NCCHC and CDC

6    recommendations," which would include screening for LTB.  Contract No. 566117,

7    *supra* § 2.3.2.3.  My review of patient charts and my interviews of incarcerated

8    patients during my inspection show that the Jail is following neither of these

9    recommendations.

10       588.    I found no instance in the cases I reviewed where a high-risk patient

11   was tested or treated for LTB.  High risk patients include injection drug users, which

12   includes most patients treated by the Jail for opioid withdrawal.

13       589.   Per CDC guidelines, the Jail should do LTB testing in high risk

14   individuals at booking and every year thereafter.  However, the Jail, by policy, does

15   not even consider doing testing for LTB until the patient has been incarcerated for a

16   minimum of two years (*see* the TechCare Health Assessment, which states that LTB

17   screening frequency is "every two years.").

18       590.   It makes no sense medically to ignore the CDC guidelines for testing

19   high risk patients for LTB, especially since the test (especially the one-step blood

20   test) is quick and easy.  It only makes sense to ignore these CDC guidelines if the

21   goal is to save money by not providing appropriate medical care.

22

23   ───────────────

[45] The Standard of Care for the screening and treatment of tuberculosis in

24   incarcerated populations can be found in several places, including standard medical
     textbooks (such as the online textbook Uptodate), and guidelines published by

25   specialty organizations. Probably the most cited and respected of these guidelines
     for tuberculosis is Centers for Disease Control, *Prevention and Control of*

26   *Tuberculosis in Correctional and Detention Facilities:  Recommendations from*
     *CDC* (2006), (https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5509a1.htm.  This

27   guideline  has been endorsed by the National Commission on Correctional Health
     Care (NCCHC), the American Correctional Association, and the Advisory Council

28   for the Elimination of Tuberculosis.  According to this guideline, the San Diego Jail
     would be categorized by the CDC as a "nonminimal TB risk facility."

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1316

591.   When LTB is identified, the standard of care is to treat these patients with appropriate antibiotics to eradicate the infection.  However, according to its policy, the Jail does not do this.

592.   The MSD Operations Manual Tuberculosis (TB) Program states that treatment for LTB will be offered to patients only if "[e]xpected length of stay 6 months or greater."  MSD Operations Manual § MSD.T.3 VI(B).  The Manual does not state why the County would not treat everyone with a positive test for LTB.  *Id.* It makes no medical sense to not treat these patients who have a serious infection.  It only makes sense if the goal is to save money by not providing necessary medical care.

593.   MSD.T.3 allows patients who do have LTB to remain undiagnosed and untreated.  This policy violates the medical standard of care and has undoubtedly led to cases of active TB that could have been prevented had the Jail followed the CDC recommendations.

### 5.    Sexually Transmitted Infections ("STIs")

594.   It is my opinion that the Sheriff's Department fails to screen for STIs commensurate with national standards.

595.   It is important to screen and treat STIs.  STIs are communicable diseases that can easily spread from person to person through sexual contact.  Many jail patients do not have easy access to regular healthcare services outside of the jail. They also may not be aware that they are infected.  Undiagnosed and untreated STIs can lead to serious health complications, such as infertility, pelvic inflammatory disease, and HIV.  Screening and treating STIs in the jail would improve the overall health of patients.[46]

596.   As explained above in the section on HCV, jails can adopt either an

---

[46] Of course, the Sheriff's Department's screening and treating STIs in jail patients would have the additional benefit of preventing the spread of these infections in the broader San Diego community when patients are released.

"opt-out" screening program, in which all patients are automatically screened unless they refuse, and an "opt-in" screening program in which screening is performed only if the patient requests it. Although STI screening guidelines vary depending on gender and sexual activities, key recommendations include:[47]

597. **Syphilis.** Screen for syphilis in all patients (men and women) at increased risk (history of incarceration, transactional sex work, geography, race/ethnicity, methamphetamine use).

598. **HIV.** Screen annually if at risk. Test if patient is seeking evaluation and treatment for STIs.

599. **Hepatitis C.** Screen everyone at least once and repeat test for high-risk individuals. Screen all pregnant women.

600. **Chlamydia/Gonorrhea**. For men, conduct routine screening in correctional settings because they are high-prevalence settings. For women, screen annually if sexually active and under 25. For those over 25 screen if at increased risk (prior infection, more than one sexual partner in the past year, suspicion that a recent partner had concurrent partners, new sexual partner in past three months, illicit drug use, or transactional sex in the past year, among other factors). Rescreen for reinfection approximately three months after treatment.[48]

601. My review of documents, including patient charts and my interviews of incarcerated patients during my inspection of the Jail show that the Sheriff's

---

[47] The medical standard for screening for sexually transmitted diseases (STDs) can be found in several places, including standard medical textbooks (such as the online textbook UpToDate), and guidelines published by specialty organizations. The California Department of Public Health has published an excellent guideline that conforms with the U.S. Preventive Services Task Force, Infectious Disease Society of America, and California Department of Public Health (CDPH) Sexually Transmitted Diseases Control Branch (STDCB); *see also* Cal. Dep't of Pub. Health, *California Sexually Transmitted Infections*, CA.gov (Nov. 17, 2023), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/California-STI-Screening-Recommendations.aspx.

[48] *See California Sexually Transmitted Infections (STI) Screening Recommendations 2021*, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/California-STI-Screening-Recommendations.aspx.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1318

1    Department is not compliant with that standard of care.

2    602.    The Sheriff's Department conducts STI screening on an opt-in basis.

3    This is clear from the Preventative Screening section of the Health Assessment form

4    in TechCare states explicitly that STD screening is done "upon request" only.

5

6

7

8

9    603.    However, "opt-in" programs cannot be effective unless patients are

10   informed of their right to have STI screening done.  I have seen no evidence of any

11   effort to inform patients of this program.

12   604.    Choosing to only screen patients for STIs when they request screening

13   and then failing to inform patients of their right to request screening does not make

14   any sense from a medical perspective.  It only makes sense as a way of minimizing

15   the number of STI screens done in order to save money by not doing them.

16   605.    In addition, Jail practitioners do not do physical examinations of

17   patients requesting screening for STIs—even when patients request a physical

18   examination.  Without a physical examination, medical practitioners cannot find

19   critical evidence of STIs that can only be found by examination, such as herpes,

20   genital warts, trichomonas, syphilitic ulcers, discharge, swollen lymph glands,

21   ectoparasites (like pubic lice), and rashes.  Since the practitioners are not doing

22   these exams, they are not finding these infections.  As a result, not only are patients

23   being harmed by not being treated, other people are also at risk of being harmed by

24   being infected by these patients.  Not doing a physical examination of patients

25   complaining of STIs violates the medical standard of care and causes harm to

26   patients and others.

27   606.    Examples of this substandard care include:

28   607.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Ex. P-1319

608.

[4448212.31]

Case No. 3:20-cv-00406-AJB-DDL

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1320**

1

2

3    609.

4

5

6

7

8

9

10

11

12

13

14

15

16

17    610.

18

19

20

21

22

23

24

25    611.

26

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1321**

1 ████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████

612.   In conclusion, the Jail does not follow the standard of care set out by the California Department of Public Health for the screening of STIs.  Instead of the recommended opt-out screening, the Jail offers opt-in screening, but without informing patients of their right to request STI screening.  Positive screening results are sometimes ignored.  This violates the standard of care and harms patients.

### 6.   Asthma

613.   It is my opinion that the Sheriff's Department fails to treat asthma consistent with the standard of care, placing patients at a substantial risk of serious harm.

614.   Asthma is an episodic disease of the lungs in which an environmental trigger causes constriction of lung passages and increased production of mucous, both of which restrict air movement.  Asthma causes wheezing and shortness of breath, and it ranges in severity from mild and easy to treat to severe enough to cause death.[49]

615.   Providers can diagnose asthma through a combination of patient history, physical examination, and bedside tests, the simplest of which is a handheld peak flow meter.  A diagnosis of probable asthma can be made based upon history alone, provided the patient has typical symptoms that respond promptly and completely to therapy.  However, bedside handheld instruments for evaluating asthma complaints should be readily available at the Jail and should be used each and every time an asthma patient is evaluated by a Registered Nurse or a

---

[49] The standard of care for patients suffering from asthma can be found in several places, including standard medical textbooks (such as the online textbook Uptodate), and guidelines published by specialty organizations. For the sake of simplicity, I chose to refer to standards of care laid out by the medical textbook UPTODATE. *See Asthma*, UPTODATE, https://www.uptodate.com/contents/table-of-contents/allergy-and-immunology/asthma.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1322

practitioner. This was recommended by the NCCHC Technical Support document in 2017. DUNSMORE 0260635. Importantly, because of the episodic nature of asthma—*i.e.*, an asthmatic patient might not have symptoms all the time, but might still require medication—providers should not dismiss a diagnosis simply because a patient is asymptomatic at the time of examination.

616. The treatment of asthma depends on the severity of the patient's symptoms in the past and current examination and beside testing. The simplest treatment is a "rescue inhaler," usually albuterol, that patients use when they have an asthma attack. All patients with asthma should have immediate access to such an inhaler. When patients have many asthma attacks, other medications are added in stepwise fashion, including inhaled steroids, long-acting bronchodilators, and others. Well respected guidelines discuss the proper way to prescribe each of these therapies in a step-wise fashion along with guidance on when to refer to a pulmonologist, how frequently to schedule chronic care visits, etc.

617. Finally, effective asthma management requires a preventive approach, with regularly scheduled chronic care visits during which symptoms and pulmonary function are assessed, control of exposure to asthma triggers and impact of comorbid conditions reviewed, medications adjusted, and ongoing education provided.

618. Both the 2017 NCCHC Technical Assistance Report and Dr. Venters' 2020 Best Practices identified problems with asthma diagnosis and therapy provided to incarcerated patients at the Jail. The NCCHC noted: "Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients." DUNSMORE 0260635. NCCHC also found that besides for hypertension there were "no other chronic disease guidelines to guide providers," including no guidelines for asthma as would be required by the NCCHC. DUNSMORE 0260643. Dr. Venters recommended that during health assessments, patients should

1  "have some brief or focused physical examination also performed, such as

2  auscultation of lungs and peak flow testing for patients who report asthma."

3  SD_215371.

4      619.   Despite the recommendation from the NCCHC in 2017 that the Jail

5  have an asthma guideline for medical providers, it still to this date has no adequate

6  written asthma guideline for practitioners.  The Sheriff's Department does have a

7  guideline for nurses to assess patients reporting acute asthma attacks.  Sheriff's

8  Department, *Standardized Nursing Procedure* § SNP.A.6 (2020).  In the

9  community, patients reporting to an ER, urgent care center, or practitioner's office

10  complaining of difficulty breathing due to asthma would always be seen by a

11  medical practitioner.  However, SNP.A.6 allows nurses to decide who is sick

12  enough to refer to a practitioner and who is not.  They act as gatekeepers to

13  practitioner access.  For patients with "acute respiratory distress," SNP.A.6 allows

14  the nurses to administer an inhaled bronchodilator.  Nurses may call a practitioner if

15  they think the call is warranted.  Such calls are made more-or-less exclusively to

16  remote STATCare practitioners who are not able to examine the patient.

17      620.   STATCare practitioners have a dropdown menu of options they are

18  allowed to prescribe for asthma.  The STATCare treatment options are nebulized

19  albuterol or albuterol multi-dose inhaler.  However, besides the bronchodilator

20  albuterol, there are other essential therapies for asthma, including inhaled steroids,

21  long acting bronchodilators, and MAST cell stabilizing drugs.  These options are not

22  available to the STATCare practitioners, who cannot examine asthma patients

23  anyway since they live remotely.  STATCare practitioners may refer patients to be

24  seen by onsite medical practitioners.  STATCare practitioners also have the option

25  of discontinuing asthma treatments and even eliminating the diagnosis of asthma

26  entirely from a patient's medical record if they wish.

27      621.   I have seen no other guidelines for asthma care for medical

28  practitioners at the Jail, whether remote STATCare practitioners or onsite

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
Ex. P-1324

1  practitioners.  This is curious, because such guidelines are readily available in

2  medical textbooks like UpToDate and from specialty organizations whose guidance

3  is available online.[50]  This is a problem because asthma is a complicated disease and

4  most practitioners cannot remember the appropriate tests, treatments, and follow-up

5  recommendations for various patients.  Without guidelines, asthma patients tend to

6  be under evaluated, undertreated and many are harmed.

7       622.   In the end, my review of documents, including patient charts and my

8  interviews of incarcerated patients during my inspection of the Jail, show that the

9  Sheriff's Department does not comply with the standard of care for asthma therapy:

10      623.   ████████████████████████████████████████

11  ██████████████████████████████████████████

12  ██████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████

15  ██████████████████████████████████████████

16  ████████████████████████████████████████████

17  ██████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████

20  ████████████████     Asthma is an episodic disease and jail patients may not have had

21  easy access to medical care in the community.  To discontinue an inexpensive

22  rescue inhaler and further to eliminate the diagnosis from a patient's chart without

23  an examination or bedside pulmonary tests violated the standard of medical care.

24      624.   ████████████████████████████████████

25  ████████████████████████████████████████

26

27  ─────────────────────
[50] *See, e.g.*, Nat'l Heart, Lung, and Blood Inst., *Asthma Management: Updated
Guidelines from the National Heaty, Lung, and blood Institute*, 104 AM. FAM.
28  PHYSICIAN 531 (2021), https://www.aafp.org/pubs/afp/issues/2021/1100/p531.pdf.



625.

626.

627.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1326**



628.

629.   Each of these examples falls below the standard of care and places the patient a risk of harm.  Acute asthma attacks can be sudden and severe.  Sometime, patients do not have time to submit a medical request form.  Without appropriate therapy already prescribed, patients can be harmed and even die from untreated asthma attacks.

630.   The fact that three different practitioners (including the Jail Medical Director, Dr. Rafi), discontinued albuterol prescriptions on three different patients indicates to me that this was an unwritten practice of NaphCare to decrease the number of albuterol inhalers prescribed.  I suspect, but have no direct evidence, that these three practitioners were told not to authorize asthma treatment for patients who stated that they had asthma but had no current asthma prescriptions in the community.  This practice makes sense if the goal was to save NaphCare money, but it does not make sense medically.

631.   In conclusion, the Jail fails to provide appropriate asthma screening and treatment to their incarcerated patients, placing them at substantial risk of serious harm.  NaphCare appears to have inappropriately instructed practitioners not to prescribe asthma treatment for patients who stated that they had asthma but had no current asthma prescriptions in the community.  The Sheriff's Department has failed

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1327**

1  to create guidelines asthma chronic care.  The Sheriff's Department's guidelines for

2  acute asthma care (SNP.A.3) is inappropriate and does not meet the community

3  standard of care.

## IX.    The Sheriff's Department Fails to Provide Medically Necessary Vision Care

6  632.   In my opinion, the Sheriff's Department fails to: (1) screen and

7  evaluate patients for eye disease (even for patients at increased risk for eye disease);

8  and (2) timely provide incarcerated people with medically necessary eyecare and

9  prescribed eyeglasses.  These failures result in substandard care of those with vision

10  care needs.

### A.    The Sheriff's Department Fails to Screen or Evaluate People for Eye Diseases, Even Those Who Self-Identify as High Risk

13  633.   Many incarcerated patients have medical conditions of the eye that

14  require medical evaluations and care.[51]  Examples include cataracts, glaucoma,

15  keratoconus, and diabetic retinopathy.  The Jail has an obligation to evaluate and

16  treat eye diseases in accordance with national standards and with the standard of

17  care in the community.  However, the Jail appears to ignore the eye health of its

18  patients who have eye diseases or are at risk for eye disease.

19  634.   Glaucoma is the most common cause of irreversible blindness

20  worldwide.  Many patients with glaucoma are asymptomatic early in the course of

21  disease, given the often slowly progressive nature of the condition.  Therefore,

22  screening of higher-risk patients is essential to minimize vision loss and prevent

---

[51] A note about definitions:  Optometrists are eye doctors who evaluate and treat
most eye diseases.  Optometrists evaluate vision deficits and prescribe glasses to
correct those deficits.  Ophthalmologists are eye surgeons.  Ophthalmologists
usually do not prescribe eyeglasses; rather, they take care of more complex eye
problems.  At the Jail, almost all of the referrals for eye/vision evaluations should be
to an optometrist first, unless the patient has a known surgical problem.  I refer to
optometrists in this report except when it is clear that an ophthalmologist must be
involved.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1328

1  blindness.[52]  The standard of care for glaucoma screening is that people with

2  diabetes, a family history of glaucoma, or African American and/or Hispanic people

3  should be screened at age 40, and that all people age 55 and older should be

4  screened annually.[53]

5      635.   All people receive a screening eye exam to look for glaucoma,

6  cataracts, retinopathy and other eye diseases beginning at age forty and every 1 to 3

7  years after age 55.  People with known eye disease such as keratoconus or diabetic

8  retinopathy should continue any previously scheduled specialist appointments and

9  screening examinations that had been recommended by their outside vision

10  specialist before they became incarcerated.

11      636.   Unfortunately, the Jail does not provide any recommended eye

12  screening, even for patients who are at high risk of eye disease and request

13  screenings and/or exams.  There is no mention eye health in the MSD Operations

14  Manual or NaphCare's Policies and Procedures.  ████████████████████

15  ████████████████████████████████████

16  ████████████████████████.  However, there is

17  no reference to preventative or comprehensive eye exams based on age or other risk

18  factors as there should be per national standards.

19      637.   The Sheriff's Department fails to provide eye evaluations even to

20  patients who notified Jail staff about their glaucoma.  ████████████████

21  ████████████████████████████████████

22  ████████████████████████████████

23  ████████████████████████████████████

24

25  ─────────────────

26  [52] Elaine Han et al.. *Community Vision Screening*. Glaucoma Today 28. 28 (January 2019), https://assets.bmctoday.net/glaucomatoday/pdfs/0119GT_SF_Lee.pdf..

27  [53] *Primary open-angle glaucoma suspect PPP 2020*.  American Academy of Ophthalmology. (2021, October 6).  Retrieved August 15, 2024, from

28  https://www.aao.org/preferred-practice-pattern/primary-open-angle-glaucoma-suspect-ppp.

1 ████████████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████████████████████████

4 ███████

5     638.   And, as explained in the section above regarding diabetes care, the

6 Sheriff's Department also fails to provide diabetic patients with appropriate eye

7 exams.

8     **B.    The Sheriff's Department Fails to Timely and Adequately Address**
     **Incarcerated People's Visual Accuity Problems**

9

10     639.   Visual acuity problems are another area of deficiency within the Jail.

11 There are two type of visual acuity problems.  People with farsightedness

12 (hyperopia) can see distant objects well but have difficulty with close vision, *e.g.*,

13 reading.  People with nearsightedness (myopia) can see close objects but have

14 difficulty with more distant vision.  Many patients, especially the elderly, have both

15 problems.

16     **1.    There Are Numerous Barriers Preventing People From**
     **Timely Receiving Eye Glasses**

17

18     640.   Some vision acuity problems can be addressed with simple,

19 inexpensive reading glasses.  Reading glasses are important for incarcerated patients

20 so that they have the ability to read:  (1) legal documents; (2) the many forms and

21 signs that the Jail requires them to attend to; (3) educational materials that the Jail

22 provides, for example, the many handouts available in the medical department; and

23 (4) other materials for program participation, education, and recreation.  Reading

24 glasses improve the quality of incarcerated life for those who need them.

25     641.   In the community, people who need reading glasses do not have to see

26 a health care professional.  Anyone can buy reading glasses of various strengths at

27 any drug store or grocery store.  The proper reading glasses are those that make

28 reading most comfortable for the person.  In other words, the person needing

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1330**

1   reading glasses participates in choosing the correct strength for themselves.

2       642.   However, the Jail requires patients who need reading glasses to submit

3   a medical request.  Such patients are then scheduled to see a nurse, who acts as a

4   "gatekeeper" to decide who may receive reading glasses and who may not.  It may

5   take days or even weeks for this visit to occur.  I have not seen a policy or procedure

6   that lays out what should occur at this meeting, or what the criteria are for the nurse

7   to say approve or deny reading glasses or what strength reading glasses they

8   approve.  In practice, leaving these decisions to nurses' discretion leads to some

9   people waiting long periods to receive reading glasses, and other people receiving

10  the wrong level for their needs.

11      643.   ████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ███████████████████████

16      644.   Besides taking an unnecessarily long time for a patient who needs

17  reading glasses to get them, this system is a waste of the RNs time.  When RNs

18  cannot complete everything they are supposed to do in a shift (like complete all of

19  the 24 hour face-to-face assessments), why are they wasting time being gatekeepers

20  for reading glasses?  Reading glasses are quite inexpensive.  I suspect that if the Jail

21  performed a time-cost analysis they would find that the cost of a pair of reading

22  glasses is much less expensive than the cost of paying the nurses' salary to see a

23  patient who has requested reading glasses.

24          **2.      The Jail Lacks Adequate Policies and Procedures to Ensure
                     IPs Have Access to Distance Glasses**

25

26      645.   Glasses to improve distance vision are a different matter than simple

27  reading glasses because they require a prescription based on the evaluation of an

28  optometrist using sophisticated equipment to measure visual deficits and provide the

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1331**

1  right compensation in the glasses.  At every visit, optometrists should routinely

2  screen for all of the medical conditions mentioned earlier, such as glaucoma,

3  cataracts and retinal problems.

4     646.   Distance correction is important for many jail patients for many

5  reasons, including the ability to: (1) read the signs the Sheriff's Department posts on

6  the walls and expects incarcerated people to abide by; (2) see what is happening in a

7  dorm area or exercise area for safety and in order to avoid trouble; (3) see facial

8  expressions of fellow incarcerated people, security staff and medical personnel for

9  important non-verbal communication; and (4) see chalkboards, television programs,

10  and other far away media for recreation and education.  Distance vision glasses

11  dramatically improve the quality of incarcerated life for those who need them.

12     647.   On the outside, patients who need distance correction can themselves

13  make an appointment with an optometrist.

14     648.   There are several substantial problems in the system for providing

15  incarcerated patients with needed distance eyeglasses at the Jail.

16     649.   First, neither the Sheriff's Department nor NaphCare has any written

17  policies or procedures specifically related to vision complaints, eye complaints, how

18  and when to provide glasses, or when to refer a patient to an optometrist.  Neither

19  the MSD Operations Manual or the NaphCare P&P Manual give the nurses any

20  instructions on how they should evaluate these patients or what the criteria are for a

21  nurse to approve the referral to the optometrist.  Therefore, the nurses, who are

22  acting as gatekeepers, have no written guidance.  They also have no oversight.  No

23  one (as far as I could tell) ever reviews and critiques nursing eye assessments.  Eye

24  assessments are not followed in any meaningful way in the Jail CQI statistics.

25     650.   Second, the RN evaluation usually consists of the nurse administering a

26  Snellen test for distance vision.  Based on the Snellen results, the nurse can approve

27  the referral to an optometrist or deny it based on their own discretion or whim.

28  However, the Snellen test is not a good way to deny someone access to an

1   optometrist for the following reasons: (1) patients can artificially improve their

2   scores by squinting, leaning, or simply knowing the letters on the chart; (2) Snellen

3   results are also influenced by lighting, distance, and distractions (while patients may

4   have a good Snellen score because the lighting was perfect and there were no

5   distractions in the medical clinic, they may need glasses in their dimly lit housing

6   unit); (3) many patients with a perfect Snellen score (those over the age of 40, with

7   hypertension, or with diabetes) may still need to see an optometrist for a screening

8   exam; (4) penalizing patients for having a good Snellen score (*i.e.*, not allowing

9   them to see an optometrist) encourages patients to give unreliable Snellen results;

10  (5) failing to provide guidance to gatekeeper nurses ensures uneven results; and

11  (6) Snellen tests take nursing time that could be put to better use filling in other

12  yawning gaps in nursing performance, such as 24-hour face-to-face evaluations.  In

13  the end, nurses and even primary care medical providers do not have the expertise to

14  evaluate the validity of distance vision complaints.  Optometrists do.  Therefore, in

15  most cases, incarcerated people complaining of distance vision issues should be

16  referred to an optometrist without the need for this arbitrary gatekeeper screening

17  test.

18      651.   Third, there are substantial delays built into the process of obtaining

19  eyeglasses.  At the outset, when an incarcerated patient asks for glasses or asks to

20  see the optometrist, they are required to fill out a medical request form.  They are

21  then scheduled to see an RN.  This wait can be days or weeks based on my chart

22  review; the Jail does not track this specific statistic in their CQI reports.  Notably,

23  this does not happen in the community.  If the gatekeeper nurse does approve a visit

24  to the optometrist, the wait to see an optometrist is often several weeks, and

25  sometimes the referral is never completed.  Such waits were at times exacerbated by

26  the fact that NaphCare had problems contracting with an offsite optometry group.

27  As explained earlier in this Report, due to NaphCare's failure to pay outside

28  providers, the Jail's relationships with some outside providers were strained.

1    SD_1572585.

2        652.    Fourth, NaphCare required all referrals to an optometrist to go through

3    their UM review process, resulting in additional delays and irrational denials.  By

4    practice, all optometry referrals were sent to the UM nurses in Alabama, who either

5    approved the referral or denied it.  Many of the denials contained this as a reason for

6    denial:  "Patient is not in custody for a year.  Resubmit after a year."  Rognlien-

7    Hood Tr. at 158:25-159:11.  Where this requirement came from is a mystery to me.

8    In my opinion, if a patient has a medical or accommodation need for eyeglasses at

9    one year, they had that same need at day one.  NaphCare's Policy and Procedure

10   manual lists eyeglasses as an "Aid to Impairment" along with crutches and

11   wheelchairs.  NAPHCARE001877.  Yet when a patient needs a wheelchair,

12   NaphCare does not deny the request because "patient is not in custody for a year."

13   In order to work around this problem of optometry referrals being inappropriately

14   denied by NaphCare, the Sheriff's Department eventually hired its own optometrist

15   separate from its contracted services with NaphCare.  Rognlien-Hood Tr. at 156:2-5.

16   This program is new enough that I have no data on what impact this has had on the

17   problem of vison evaluations, vision care, and eyeglass prescription.

18       653.    Finally, there are additional and substantial delays between the

19   prescription of eyeglasses by an optometrist and the receipt of the eyeglasses by the

20   patient.  Most jails have a contractual relationship with a company that specializes in

21   providing glasses to incarcerated patients.  In my experience, such companies take

22   only a couple of weeks between the receipt of a prescription and the delivery of

23   eyeglasses.  I have seen nothing that indicates which entity the Sheriff's

24   Department/NaphCare has contracted with to actually create the prescribed

25   eyeglasses, or any timeline that they must abide by.  Notably, the Sheriff's

26   Department's CQI process does not track the average length of time between an

27   optometry appointment and the receipt of the prescribed eyeglasses, and makes no

28   effort to improve its performance.

1      654.   There is substantial evidence of delays in providing vision glasses to

2  patients who need them.  The Sheriff's Department contracted with NaphCare in

3  June 2022 for the provision of optometry services.  County Contract No. 566117,

4  § 2.3.19.2.  In its April 28, 2023 Corrective Action Notice, the Sheriff's Department

5  stated that NaphCare was out of compliance with this provision of the contract,

6  highlighting an "eye glass backlog," but for months, allowed the problem to go

7  unresolved.  ████████████████████████████

8  ████████████████████████████████

9  ██████████████████████████

10  ██████████████████████████████

11  ████████████████████████████████

12  ██████████████████████████

13  ██████████████████████████

14  ████████████████████████████████

15  ██████████████████████████████

16  ████████████████████████████

17      655.   Prescribed eyeglasses and/or contact lenses are a medical necessity for

18  many incarcerated people, which means the denial of such optometry services can

19  have a serious and widespread negative impact on incarcerated people in the Jail.  I

20  found many examples of this in the patient charts I reviewed.

21      656.  ██████████████████████████

22  ████████████████████████████████

23  ████████████████████████████████

24  ██████████████████████████████

25  ████████████████████████████

26  ██████████████████████████████

27  ████████████████████████████

28

[4448212.31]

195     Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1335

1  ████████████████████████████████████████

2  ██████████████████████████████████

3  ███████████████████████████████████████

4  ████████████████████████████████

5    657.   ████████████████████████

6  █████████████████████████████████████

7  ██████████████████████████████████████

8  ███████████████████████████████████

9  █████████████████████████████████████

10  █████████████████████████████████████

11  ██████████████████████████████████████

12  ███████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████

15  █████████████████████████████████████

16  ████████████████████████████████████

17  ██████████████████████████████████████

18  █████████████████████████████████████

19  ██████████████████████████████████████

20  ████████████████████████████████████

21  █████████████████████████████████████

22  ██████████████████████████████████████

23  ████████████████████████████████████████

24  ██████████████████████████████████

25  ████████

26    658.   In summary, the Jail program for giving necessary vison correction to

27  incarcerated patients is in disarray and the Jail fails in its duty to provide these

28  necessary services to its patients.  Several recommendations flow from this finding.

1   The Jail should have specific policies and procedures on how vision evaluation,

2   optometry referrals, and eyeglass prescriptions will happen. Nurses and corporate

3   UM officers should not be gatekeepers who deny patients access to vision care from

4   an optometrist based on bogus criteria. Patients must be able to see an optometrist

5   in a timely manner, and prescription glasses should be delivered in a timely manner.

6   **X.    Custody Staff Interfere with the Provision of Care by Health Care Staff**
        **in the Jail, Including by Compromising Patient Confidentiality, Which**
7       **Puts Patients at Substantial Risk of Serious Harm**

8   659.   The NCCHC requires that health care staff have "autonomy" from

9   custody staff when it comes to patient care. In particular, the NCCHC standard

10  requires health care staff and the institutional authority address any policies and

11  procedures that deny direct medical orders, including ones that interfere with the

12  delivery of, the access to, or the quality of health care services deemed necessary by

13  the Health Services Administrator and/or the advanced clinical provider. *Id.*

14  660.   It is my opinion that the Jail fails to meet this standard. In particular,

15  custody staff as a matter of course deny incarcerated people the opportunity to meet

16  confidentially with health care providers, either by requiring that patient meetings

17  take place outside the clinic or by requiring custody staff to be present during

18  clinical appointments.

19  661.   The Jail's policies and procedures provide that health care providers

20  must have "autonomy … in clinical decision making." MSD Operations Manual

21  No. A.3.1 Medical Autonomy. Qualified health care professionals are to

22  "collaborate with custody staff in implementing the plan of care safely and timely"

23  "[a]s needed," but the Jail's procedures are clear that "[u]ltimately, the qualified

24  health provider is responsible for the appropriate management of the patient." *Id*.

25  Custody staff must "support[] the implementation of clinical decisions and aid[] in

26  facilitating necessary housing transfers." *Id*.

27  662.   While these policies and procedures generally are appropriate, in

28  practice, custody staff regularly violate the Jail's policies and procedures requiring

Ex. P-1337

1  autonomy in clinical decision-making and patient access to health care.  Both

2  Dr. Montgomery and Ms. Rognlien-Hood confirmed that custody staff frequently

3  interfere with the provision of health care in the Jail.  Dr. Montgomery stated that he

4  "

11  . SD_120011, SD_120015.

12  Dr. Montgomery

15  SD_212920, SD_212921.  I agree with Dr. Montgomery that this practice is

16  problematic, because it results in a lack of proper evaluation, documentation, and

17  follow-up for patients who are at high risk of negative outcomes due to potential

18  abnormalities in their body scans.  *Id.*

19          663.   Ms. Rognlien-Hood provided testimony about custody staff interfering

20  in nursing staff's provision of care to incarcerated people, confirming that custody

21  staff at times deny health care staff to see particular patients who they deem too

22  dangerous.  Rognlien-Hood Tr. at 143:1-5.  This is problematic for several reasons.

23  First, patients deemed hostile and uncooperative commonly have medical or

24  psychiatric issues that are causing or exacerbating their behavior.  Examples from

25  my own experience include patients who are delirious from infections or

26  withdrawal; patients cranky due to pain, shortness of breath, or other medical

27  symptoms; and patients who have had strokes.  Second, hostile, uncooperative

28  patients become ill just like any other group of patients and may need medical

1   attention for important medical problems.  In my experience, patients sometimes are

2   hostile to custody staff but not to medical personnel who they perceive as wanting to

3   help them.  Often, a patient hostile to custody staff is cooperative when receiving

4   medical care.  Finally, there are ways of safely restraining uncooperative patients to

5   allow medical evaluation.  If custody staff think a patient is potentially dangerous to

6   medical staff, the proper course of action is to create an action plan for how to get

7   necessary medical care to the patient.

8        664.   Ms. Rognlien-Hood also was asked in her deposition whether any

9   health care staff had expressed having issues with the involvement of custody staff

10  in the health care administration or decision-making.  Ms. Rognlien-Hood answered

11  affirmatively and offered as an example that health care staff may want to put a

12  patient into the "detention safety program" and "sworn won't put them in there,"

13  and vice-versa.  *Id*. at 140:8-19.  Another example cited by Ms. Rognlien-Hood was

14  the process for "send outs," or when a patient is sent out of the Jail for medical care.

15  *Id*. at 141:17-24.  She testified that "[a] nurse will say 'I need this patient to go out,'

16  and sworn doesn't feel they need to go out." *Id.*  These examples impede patients'

17  access to care, placing them at risk.

18       665.   Custody staff's involvement in health care decisions at the Jail is

19  particularly pronounced when it comes to confidentiality of medical encounters.  It

20  is my opinion that the Sheriff's Department categorically do not provide

21  incarcerated people with adequate confidentiality during medical encounters.

22       666.   It is a tenant of the medical profession that patients have a right to

23  reasonable privacy and confidentiality during their encounters with health care

24  professionals.  This standard is important because it facilitates sharing of important

25  medical information between patients and providers regarding concerns, symptoms,

26  behaviors, diagnoses, and treatment—details that patients might be embarrassed or

27  unwilling to share if they were to be overheard by someone else.

28       667.   In the community, confidentiality is achieved by having medical

1  encounters occur in a room specifically designed for private medical encounters.

2  Another important way that medical professionals in the community ensure

3  confidentiality is by excluding any extraneous people from witnessing or

4  overhearing the medical encounter.

5        668.    Incarcerated patients are no different than patients on the outside, who

6  may be reluctant to discuss intimate details of their medical problems in front of

7  non-medical staff.  Indeed, the possibility that patients might be unwilling or

8  embarrassed to describe their medical concerns outside a confidential environment

9  is likely even higher in the correctional setting, where patients may have the

10  impression that, if other incarcerated people know about their medical concern, they

11  could be perceived as weak, subject to ridicule, or even at risk of violence or other

12  victimization.  In my experience, incarcerated patients may be at risk of violence if

13  other incarcerated people know that they have certain medical issues, such as HIV,

14  or issues perceived as being transmittable, such as infections and rashes.  They may

15  be at risk of victimization if they are perceived as weak or have private information

16  that they do not want shared with others.

17        669.    The NCCHC 2018 Standards for Health Services in Jails addresses

18  confidentiality and privacy in section J-A-07, Privacy of Care.  This standard

19  provides "[i]t is essential that in nonemergency situations all protected health

20  information be protected from discovery or access.  This means that no

21  conversations concerning a patient's health status, diagnosis, or treatment should be

22  conducted in areas where they can be overheard by other inmates, staff, or

23  visitors…. Health stuff must ensure that all encounters with exchanges of health

24  information, starting with the receiving screening, remain private and that a patient's

25  dignity is protected.  Such efforts foster necessary and candid conversation between

26  the patient and health staff."

27        670.    NCCHC's 2017 Technical Assistance Report regarding the Jail's

28  compliance with NCCHC's standards found that the Jail was not in compliance with

1  NCCHC's privacy and confidentiality standards: "The areas of privacy and

2  confidentiality of care need to be addressed. … procedures [must] be put in place to

3  assure confidentiality when health care is being delivered and discussed."

4  DUNSMORE0260627.

5      671.   Although the Sheriff's Department has a goal of complying with

6  NCCHC's standards, and assuring appropriate privacy and confidentiality of

7  incarcerated patients would seem to me to be "low hanging fruit" that would be

8  relatively easy to implement, as far as I can tell, the Jail has made no effort to

9  comply with the NCCHC's privacy standards.

10     672.   While the Sheriff's Department must consider security concerns related

11 to the administration of health care, the need for security does not take away the

12 obligation to ensure privacy and confidentiality for the patient.

13     673.   The San Diego Sheriff's Department routinely compromises the

14 confidentiality of incarcerated patients.  Based on my review of charts and

15 discussions with incarcerated people during my inspections of three Jail facilities, it

16 is evident that most clinical encounters take place in or near the patient's cell-front

17 rather than in private medical rooms designed for this purpose.  For example:

18     674.   ███████████████████████████████████████

19 ████████████████████████████████████████████

20 ██████████████████████████████████████████

21     675.   ████████████████████████████████████████

22 ███████████████████████████████

23     676.   ████████████████████████████████████

24 ███████████████████████████

25     677.   ████████████████████████████████████

26 ██████████████████████████████████

27     678.   █████████████████████████████████████

28 ██████████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1341**

1    679.    █████████████████████████████████

2    █████████████████████████████████████████

3    680.    I could go on and on.  The practice of doing most medical evaluations

4    in the patient's housing unit rather than in the medical suite is pervasive.

5    681.    Performing a medical evaluation at a patient's cell door means

6    numerous other people, including other incarcerated people and staff, can see and/or

7    hear the encounter.  Many patients will not feel comfortable speaking openly with

8    health care staff or participating in such necessary physical exams for fear of

9    embarrassment, abuse, or retaliation by those who can see and hear the encounter.

10    682.    According to the Sheriff's Department's policies, deputies are also

11    present "when incarcerated persons are being evaluated and/or treated by facility

12    health staff or contract providers."  DSB Policy M.15, II.C.  Email correspondence

13    ████████████████████████████████████████████

14    ████████████████████████████████████████████

15    ████████    SD_375953-375954.

16    683.    Deposition testimony also establishes that, even when incarcerated

17    people are escorted to the medical clinic for an appointment, custody staff are *in the*

18    *room* for the entire appointment.  Rognlien-Hood Tr. at 259:21-260:3.  She

19    confirmed that custody staff can see a patient while they are being treated and can

20    hear the substance of conversations during these appointments.  *Id.* at 259:21-260:7.

21    She also agreed that this can compromise patient privacy with respect to health care.

22    *Id.* at 260:8-261:1.  Similarly, Dr. Peter Freedland of CHP, with whom the County

23    just signed another contract for additional medical services, testified that "there's

24    always a deputy" present during medical appointments, even in the medical clinic.

25    Freedland Tr. at 113:1-3.

26    684.    In my opinion, there is no reason that appointments for *every* patient—

27    regardless of security classification level—must be attended by a deputy.  Many

28    other jails have privacy policies and procedures that protect incarcerated patient's

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1342

1    rights while also ensuring security.

2          685.   One common way that other jails ensure privacy is by having at all

3    times at least two medical professionals in the medical exam room with the patient,

4    such as a practitioner and a nurse, or an RN and an LVN.  Security is nearby but out

5    of earshot of normal volume conversations, so that they can respond quickly if staff

6    raises their voice to indicate there is a problem.  Jail policies and procedures can lay

7    out different security procedures for those patients who Jail staff have individually

8    identified as having special security issues warranting custody staff being within a

9    closer proximity to the medical encounter.

10         686.   In conclusion, the Sheriff's Department knows that they are not

11   complying with NCCHC or industry standards to preserve patient privacy and

12   confidentiality.  This can harm patients by making them fearful to disclose

13   potentially embarrassing medical complaints in front of security staff and other

14   incarcerated people.

15   **XI.   The Sheriff's Department Fails to Maintain Adequate, Accurate, and
          Complete Medical Records, Which Compromises the Delivery of Care**

16

17         687.   In my opinion, the Sheriff's Department lacks adequate recordkeeping

18   processes, which undermines care for incarcerated people.

19         688.   The standard of care requires that meticulous medical records be kept

20   on every patient and of every encounter with medical personnel.  Medical records

21   can be handwritten, but most medical systems now use electronic medical records

22   ("EMR").  The essential attributes of an EMR are (i) simplicity, (ii) efficiency,

23   (iii) confidentiality, (iv) searchability, and (v) report generation.  Of course, it is also

24   essential that information input into the EMR is both accurate and complete.

25         689.   The NCCHC 2018 Standards for Health Services in Jails discusses the

26   minimal standards for medical records in "Health Records" (J-A-08).

27         690.   The EMR serves an important function in any system that delivers

28   medical care.  Complete, accurate, easy to access medical records are a necessary

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1343**

component to ensure that an individual receives consistent care.  For example, it enables a practitioner who is seeing a patient for the first time to learn what care the Jail previously provided to the patient or why the patient was referred to the practitioner in the first place.  A functioning EMR also enables practitioners to monitor an individual patient's health trends overtime, *e.g.*, whether someone's blood pressure has increased since they were booked into the Jail.  The EMR is also a critical tool for tracking systemwide trends within the Jail.

691.   The Sheriff's Department maintains an EMR for incarcerated people using a system called "TechCare."  TechCare is a proprietary product of NaphCare, and the primary method for medical recordkeeping in the Jail.  I am aware that Plaintiffs' counsel sought for me to inspect TechCare, but I was not able to do so. Nevertheless, it is my opinion based on the documents I have reviewed that the system has many problems.

692.   Leaving aside the wisdom of using the technology of a company that recently lost a portion of its medical contract with the County, my review of records has shown serious deficiencies in TechCare's functionality.

693.   TechCare lacks simplicity and efficiency because, among other issues, it has no list of all medical events (including but not limited to sick calls, lab draws, etc.) by date and does not list discharge dates or many other important events related to an incarcerated person's health.  These features are important because they allow medical staff to quickly and easily know exactly what is going on with a particular patient, such as the patient had an x-ray but the reading has not returned or the practitioner saw the patient but not everything she ordered has been done yet, etc.

694.   TechCare also is lacking in searchability.  Ms. Rognlien-Hood testified that "sometimes finding … information [in TechCare] is not user friendly." Rognlien-Hood Tr. at 231:13.  Searchability is important because medical records can be long and dense, sometimes many thousands of pages long.  It may be important to know, for example, if a patient has had a certain vaccine, or what a test

done last month showed, or what the patient's weight was the last time they were in jail. Without a functioning search tool, it can take a lot of time to find very important information. If that important information cannot be found, medical care can suffer and patients can be harmed. As an example, if I cannot find out what a patient weighed the last time he was in jail, I might not realize that he has gained 75 pounds in 8 months, which should be investigated medically.

695. 

696.

697. Another example is the case of Erica Wahlberg, also discussed in detail above.

698. Further, TechCare's reporting capabilities also appear to be substandard. Ms. Rognlien-Hood admitted that some TechCare reports cannot be

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1345

1    run "easily … because of the way TechCare is set up." *Id*. at 89:8-90:7.  This

2    impacts the provision of care.  Ms. Rognlien-Hood testified that the frequency with

3    which she runs certain critical reports regarding health care operations depends on

4    her workload because running the reports is "very time consuming." *Id*. at 90:8-14.

5    When reports are run, they are often inaccurate, possibly because TechCare pulls

6    information from sources that are not being used by staff to document patient

7    information. *Id*. at 248:13-249:5.

8        699.   Dr. Freedland also testified that he is not a fan of TechCare: "I think

9    there's a lot of good medical EMRs out there that could potentially benefit the [Jail]

10   system more so than TechCare."  Freedland Tr. at 32:6-8.  Dr. Freedland stated "I'm

11   not sure how it [TechCare] was created.  There is a not a lot of ease of use." *Id.* at

12   32:11-13.

13       700.   The Sheriff's Department was aware of serious issues with TechCare

14   that would impede the provision of proper health care in the Jail, but these issues

15   went unresolved for months if not years.  The Sheriff's Department also raised

16   issues with NaphCare at various meetings.  For example, Sheriff's Department staff

17   raised questions about inaccuracies in TechCare reporting at Medical Audit

18   Committee meetings, and NaphCare representatives repeatedly stated that they

19   would get answers, but did not do so.  Rognlien-Hood Tr. at 244:10-246:1.

20   Additional TechCare issues were raised in the Corrective Action Notices issued to

21   NaphCare by the Sheriff's Department.  The Corrective Action Notice issued May

22   12, 2023 stated that NaphCare was "releasing new TechCare builds without

23   providing advanced notice of the changes or training to County Clinical Staff,"

24   resulting in some county staff being "faced with screens and cues they [know]

25   nothing about and have no idea how to complete."  NAPHCARE034756.  This,

26   according to the Sheriff's Department, "can lead to information being entered into

27   the system that is not followed up [on] creating potential liability to the county." *Id*.

28   I agree that this problem of information being entered into a medical record without

1  clear steps for follow up can have serious consequences for patient care, and should

2  have been addressed immediately.  Instead, the issue appeared in Correct Action

3  Notices for months, and the most recent one I have reviewed simply says NaphCare

4  is "responsive to all related IT concerns" without further detail.  SD_1572607.

5  701.  Similarly, I found multiple examples in the medical record of abnormal

6  study results being neglected by the Jail's healthcare staff.  The standard of care

7  when any study is ordered is for a medical practitioner (usually the one who ordered

8  the study) to interpret the results (normal/not normal), create a care plan based on

9  the interpretation (if necessary), and communicate the results and the new care plan

10  to the patient.  All three steps should be documented in the medical record.  And, in

11  a good medical recordkeeping tool, these follow-ups would be triggered

12  automatically.  However, it is clear these follow-ups are not occurring; the Sheriff's

13  Department did a CQI study to determine whether this standard of care was being

14  met and found abysmal compliance ranging from 16% to 36% between May 2023

15  and September 2023.  SD_114411.

16  702.  The discussion of diagnostic care earlier in this Report highlights

17  several examples of abnormal test results that were ignored, but which should have

18  been followed up on as a matter of course—and which a robust EMR would have

19  required such a review.

20  703.  In addition to the problems with TechCare's functionality—which the

21  Sheriff's Department has failed to correct despite knowing about them for months—

22  medical records and other documents produced by the Sheriff's Department suggest

23  that staff do not always provide complete documentation of encounters with

24  incarcerated people.

25  704.  For example, Aaron Bonin, whose in-custody death is discussed in

26  detail above, was an incarcerated patient ████████████████████████████████.

27  ████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1347

1   . The treatment for someone, like

2   Mr. Bonin, ████████████████████████████.  ████████████

3   ████████████████████████████████████████████

4   ████████████████████████████ Troublingly, the Jail's analysis of

5   Mr. Bonin's death, ████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████████████████████

8   ████████████████████████████████████████████

9   ████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ██████████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████. *See* SD_002075-76. ████████

15  ████████████████████████████████████████

16  ████████████████████████████████████

17  ██████████████████████████████████████████████

18  ██████████████████████████████████████████████

19  ██████████████████.

20          705.   As another example, which is alleged in the Third Amended

21  Complaint, Plaintiff Andree Andrade suffered multiple concussions while in the Jail,

22  both from falling out of his upper bunk and from being assaulted.  After an initial

23  fall from his bunk in June 2022, he was sent to the hospital and informed by medical

24  staff at the hospital that he sustained a concussion.  His discharge instructions also

25  include a highlighted section for "concussion" under "injury specific instructions."

26  DUNSMORE0065484-95.  However, Andrade's progress notes make no reference

27  to the concussion.  DUNSMORE0065226-28.  A concussion is a brain injury that is

28  not trivial.  It is very important that concussion patients be treated according to

1  standard concussion protocols whether they are high school football players or

2  patients in a jail.  What should have happened when Mr. Andrade returned from the

3  hospital was for a practitioner to have reviewed the hospital discharge diagnosis and

4  create a treatment plan.  A robust EMR would force this to happen.  Similarly, only

5  days after his first hospital visit, Mr. Andrade was assaulted and again taken to the

6  hospital, where hospital staff again noted that his chief complaint was

7  "concussion/head pain" and again provided him with specific discharge instructions

8  for "concussion."  DUNSMORE0065533-42.  Again, Mr. Andrade's progress notes

9  make no reference to the possible concussion.  DUNSMORE0065233-34.  Based on

10  my review of the records, it appears that no one properly reviewed the hospital notes

11  and no one created an ongoing treatment plan.  This was essential medical history

12  that was ignored.

13        706.   Complete and accurate reporting in TechCare is particularly important

14  for patients who are transferred between Jail facilities.  Both the MSD Operations

15  Manual and NaphCare's Policies and Procedures indicate that the Jail relies almost

16  exclusively on TechCare for continuity of care when an incarcerated person is

17  transferred between two facilities within the Jail.  *See* MSD Operations Manual

18  MSD.M.4, Part V (outlining procedures "[i]n the event that a paper record exists");

19  NaphCare P&P, E-03, ████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████

21  ████████████        And, based on the charts I have reviewed, in practice, transfer

22  summary forms are rarely filled out.

23        707.   As explained above, there are substantial flaws with TechCare and the

24  Sheriff's Department's completion of TechCare documentation, leading to likely

25  gaps in care.  Without appropriate documentation, when a patient moves to a new

26  facility, the new nurses and medical practitioners have to reconstruct the patient's

27  history by reading the patient's entire chart.  This takes time and effort, and

28  invariably, important things will be missed in some patients during the handoff.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1349

708.   Sheriff's Department ███████████████████████████

██████████████████████████████████████████████████████████

███████████████████   SD_213483.  Health care staff at intake facilities should initiate care at the time of screening, so that when patients are transferred to other facilities, which I understand can happen frequently and with little notice, the receiving facility can properly treat them.  Otherwise, the failure to initiate proper care at intake can have ripple effects and interfere with continuity of care.

## XII.   The Sheriff's Department Fails to Provide Necessary or Adequate Follow-Up Medical Treatment to Incarcerated People

709.   In my opinion, the Sheriff's Department fails to provide follow-up care to incarcerated people who are sent for medical care outside the Jail—either to the emergency room or for a specialist appointment—thus placing incarcerated people at a substantial risk of serious harm.

710.   Appropriate medical care often requires follow-up—in both the community and the correctional setting.  Jail patients are frequently sent for medical care and evaluation outside of the jail.  Examples include:  being admitted to the hospital; being sent to the emergency department for some type of urgent evaluation; being sent for a consultation with a medical specialist outside of the jail, such as an orthopedist, a cardiologist or a neurologist; being sent for some type of diagnostic study that cannot be done in the jail, such as an MRI, echocardiogram or EEG; or being sent for some type of treatment or therapy that cannot be done as the jail, such as physical therapy, infusions for autoimmune disease or radiation treatments for cancer.

711.   When jail patients return from any of these off-site appointments, the findings and recommendations made during the off-site appointment must be incorporated into the patient's medical record and the overall medical treatment plan at the jail.  This process is often termed "medical follow-up."  The following hypothetical cases are given as examples.

1        a.     A patient returns from the emergency department having been

2 diagnosed with a broken arm and the recommendation that the patient see an

3 orthopedist within two weeks so that proper healing of the fracture can be assessed.

4        b.     A patient returns after having an CT done, which showed a brain

5 mass. The radiologist recommends an MRI be done.

6        c.     A patient returns from being hospitalized for dehydration and

7 renal failure and is recommended to have follow-up labs and monitoring.

8        d.     A patient returns from an appointment with a rheumatologist,

9 who would like to see the patient again in one month.

10    712.   "Follow-up" means assuring that these recommendations are followed

11 and that necessary communications with the outside entity occur.

12    713.   The underlying principles and processes for follow-up care are similar

13 to intake and continuity of care issues, discussed earlier in this Report. Patients

14 return from outside medical visits with new diagnoses, new medications, and new

15 recommendations for medical treatment. Therefore, just as a jail must evaluate an

16 incarcerated person's medical condition at booking so that the jail can be sure the

17 patient's care is continued, the jail must ensure that all important findings,

18 diagnoses, and recommendations from off-site visits are entered into the medical

19 record and incorporated into the patient's health care plan.

20    714.   The first (and perhaps most essential) part of follow-up after an outside

21 medical visit is to review the medical records from the outside visit and summarize

22 the important findings into the patient's medical record. This is essential because

23 outside medical records may be hundreds of pages long and often not easily

24 assessed or read by other medical professionals at the jail. This review and

25 summary of outside medical records should contain the following basic information:

26        a.     Who reviewed the records (usually a medical practitioner).

27        b.     What were the discharge diagnoses and major findings.

28        c.     What studies were done and what did they show.

1    d.  Are any diagnostic studies or treatments recommended for the

2 future? Who will schedule these?

3    e.  When will the patient be seen by jail medical staff?

4   715. In addition, a jail medical professional should speak with the patient

5 face-to-face to ascertain their understanding of the important findings and what

6 should be scheduled in the future.

7   716. However, the MSD Operations Manual Medical Division says nothing

8 about the appropriate steps to take when patients return after receiving offsite care.

9 ██████████████████████████████████████

10 ██████████████████████████████████████

11 ████████████████████████████████.

12 NAPHCARE001577.

13   717. In my opinion, this lack of guidance on what is expected of Jail medical

14 staff when patients return from offsite care leads to inadequate documentation and

15 poor medical care that can (and does) harm patients.

16   718. In my review of medical records, I found that the basic principles of

17 documentation of outside medical records, continuity of care, and appropriate follow

18 up simply do not occur very often at the Jail.

19   719. Many times, no review of the outside medical records was recorded at

20 all. ████████████████████████████████

21 ██████████████████████████████████████

22 ████████████████████████████████

23   720. In other cases, the records were simply noted as "reviewed," but none

24 of the essential information outlined above was entered into the medical record.

25   721. The deaths of Patricia Adamson and Roselee Bartolacci, described in

26 more detail earlier in this Report, are tragic examples of these failings at the Jail.

27   722. ████████████████████████████████

28 ████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11    723.

12

13

14

15

16

17    724.

18

19

20

21

22    725.

23

24

25

26

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1353



[4448212.31]                                                  Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

Ex. P-1354



730.

731.   In summary, the Sheriff's Department has no Policy or Procedure for ensuring appropriate follow-up and continuity of care after Jail patients return from outside medical appointments.  Because of this, appropriate follow-up and continuity of care does not occur.  This leads to patient harm, including death.

### XIII. The Sheriff's Department Fails to Provide Adequate Discharge Planning Services and Medication for Incarcerated People Being Released from the Jail

732.    In my opinion, the Sheriff's Department lacks adequate discharge planning services to ensure the health care of individuals being released from the Jail.  Discharge planning from a jail is essential because these patients, who suddenly have no or limited options for medical care once released, are liable to have their health seriously deteriorate without that care.  Without care, many of these people will return to the Jail.  Without community resources for medical care, they will return to the Jail in worse shape than they were before.  From a public health perspective, these patients return to the larger San Diego community.  Their problems receiving proper health care will result in worsening community problems, ranging from transmission of communicable diseases that were not treated to overburdening first responder and emergency room resources in the community because they have nowhere else to go.  For those of us who have practiced jail medical care, the problem of slow deterioration of incarcerated and formerly incarcerated patient health over time due to lack of resources is a common experience.

733.    The standard of care for discharge planning in a jail is similar, if not identical, to the standard for discharge planning in the community.  In the community, there is a standard of care as to the responsibilities of the medical staff when a patient is being discharged from a hospital, a nursing home, or any other inpatient facility.  The medical staff has the responsibility to ensure *continuity of medical care* after the patient leaves the facility.  One can find the essentials of this standard of care in many places.  For the purposes of this report, I used the online medical textbook *Uptodate*, and specifically, the chapter "Hospital discharge and readmission" written by E. Alper, et al.  *Uptodate* states that "[d]ischarge planning is the development of an individualized discharge plan for the patient, prior to leaving the hospital, to ensure that patients are discharged … with provision of

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1356**

1  adequate post-discharge services." Based on my experience practicing medicine in

2  carceral settings, this is the appropriate standard of care in the Jail as well.

3      734.   Per *Uptodate*, elements of discharge planning include "[p]lanning and

4  coordinating with whatever entity will take over medical care after discharge." This

5  includes "communication between the [facility] and the clinic or medical

6  practitioner that will take over care after discharge"; ensuring the "clinic or medical

7  provider [] receive[s] the jail medical record"; considering whether the patient

8  "ha[s] a family or other sources of medical support"; "[m]edication reconciliation,

9  which includes determining what medications the patient is to take after discharge

10 and how the patient will get them"; and providing the patient with instructions about

11 their main medical problems, as well as what to do and who to see if these problems

12 arise. *Uptodate*, Hospital Discharge and Readmission, Alper, et al., Feb 3, 2023.

13 Based on my own knowledge and experience, this is an appropriate standard of care.

14     735.   The Jail has a poor track record with regard to discharge planning. In

15 2017, the NCCHC Technical Assistance Report concluded that "there was no

16 evidence of [discharge planning] in the medical records we reviewed [at the Jail]."

17 DUNSMORE0260675.

18     736.   The Jail's policies regarding discharge planning are minimal, providing

19 guidance only about providing medication upon release. NaphCare Policy &

20 Procedure Manual, E-10 Discharge Planning, June 1, 2022, SD_073589; MSD

21 Operations Manual D.1.1, Pharmaceutical Operations § IX. Discharge Medications.

22     737.   This lack of adequate policies and procedures relating to discharge

23 planning guarantees failure of the program. As with every other Department

24 function, the Sheriff's Department must lay out the standards of discharge planning

25 that they expect from their employees and contractors. Discharge pharmaceuticals

26 is just one part of the discharge process. Discharge planning must take into account,

27 for example, disabilities. Alarmingly, I understand the Sheriff's Department

28 released a person with a mobility disability from Central Jail at close to midnight on

1   May 31, 2024 without his wheelchair, underscoring the harm that can occur if

2   specific discharge planning policies are not in place.  Declaration of James Clark,

3   June 12, 2024.  Discharge planning must also consider ongoing medical treatments.

4   How will the patient continue cancer treatments after release?  If a patient is

5   released before receiving a scheduled surgery, what does that patient need to do

6   now? Having no policies about these and many other discharge considerations

7   means that Jail patients will inevitably be harmed when necessary medical and

8   social needs are not met.  The medication discharge policy is also insufficient, as

9   explained in more detail below.

10      738.   Rather, the Sheriff's Department attempted to rectify its poor

11  performance regarding discharge planning by hiring NaphCare as the primary

12  provider of health care services in June 2022.  Specifically, the County's contract

13  with NaphCare states that the County and NaphCare "shall implement a system of

14  discharge planning per the NCCHC standard."  Contract No. 566117, ,

15  NAPHCARE000568.  It also says the County and NaphCare must "ensure all

16  discharge planning activities are documented using Techcare," and moreover, the

17  "Release/Discharge Summary screen shall be used to provide medical information

18  to the patient, medical facility or another state prison system."

19  NAPHCARE000569.

20      739.   I understand that the Sheriff's Department is renegotiating much of its

21  contract with NaphCare, and, as of July 1, 2024, and contracted with CHP for

22  provision of on-site medical care, including "Discharge of Patients."  Contract No.

23  571418, SD_1579722.  However, Dr. Freedland testified that "We're [CHP] not

24  typically involved in the discharge process."  Freedland Tr. at 149:19-20.  It appears

25  that NaphCare will remain fully in charge of the discharge planning program.

26      740.   My review of documents has demonstrated that the Sheriff's

27  Department has not implemented a comprehensive system of discharge planning, it

28  failed to ensure that NaphCare implement such a system, and it has not taken

1  sufficient steps to remedy those flaws in its new contract with CHP.  The Sheriff's

2  Department thus fails to meet the standard of care regarding discharge planning.

3  ### A.    Coordinating Ongoing Medical Care with Outside Agencies

4  741.    The County is responsible for ensuring that there is a system in place to

5  plan and coordinate continued patient care with outside agencies.  As noted above,

6  however, there are no San Diego County policies requiring that any such

7  coordination occur.

8  742.    The County's contract with NaphCare provides that "[a]s part of

9  discharge planning, case managers, medical and mental healthcare professionals

10  shall help arrange follow-up appointments for the patient."  Country Contract No.

11  566117, NAPHCARE000569; *see also id.* ("Case managers and Contractor [will]

12  arrange an appointment prior to release."); NAPHCARE000568 ("[D]isposition

13  choices include referrals for case management[.]"); *id.* (requiring "[t]he

14  development of a plan to address key issues such as continued medical and mental

15  healthcare, housing, medical insurance, transportation, Social Security Disability,

16  and employment").

17  743.    NaphCare employs two discharge planners for the Jail, but the scope of

18  their duties had yet to be determined as of June 2024—two years after the contract

19  was signed.  In her June 7, 2024 deposition, Angela Nix, testifying on behalf of

20  NaphCare, stated that the job duties of the two discharge planners were "currently

21  [being] develop[ed]."  Nix II Tr. at 78:6-7.  In particular, "we are working with the

22  County to decide how those particular positions are going to function, if it's going to

23  be a clinical discharge planner, or someone that is more of a clerical or

24  administrative [sic]."  *Id.* at 77:18-22.  Ms. Rognlien-Hood similarly testified that

25  implementation of discharge planning in conjunction with NaphCare was "still a

26  work in progress."  Rognlien-Hood Tr. at 250:2-7.  Dr. Montgomery echoed these

27  sentiments, testifying, "I'm unclear what NaphCare's discharge planners are

28  actually doing."  Montgomery II Tr. at 265:25-266:1.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1359**

1    744.   To the extent that the NaphCare discharge planners' work—if they

2  have even started—is be governed by NaphCare's existing policies and procedures

3  regarding discharge planning, those fall far short of what is required in the contract.

4  Notably, the policies and procedures ████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████."

9  NaphCare Policy & Procedure Manual, E-10 Discharge Planning,

10 NAPHCARE000932.  The NaphCare policies and procedures also state ████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████  *Id.*  The term ████████████ seems to allow

14 NaphCare an excuse anytime they fail to provide appropriate discharge planning.

15 Given that there are only two discharge planners in comparison to thousands of

16 people that are discharged every month (the Jail's average daily population is

17 approximately 4,000 people, but the Jail regularly books that many people or more

18 each month), it is likely that it will frequently not be ████████ for the two

19 discharge planners to arrange continuity of care for everyone.

20    745.   The NaphCare policies and procedures fall short of the standard of

21 care.  There is no mention of any forward planning of continuity of medical or

22 mental health care for patients who need this upon release.  There is no plan to

23 coordinate medical care with community clinics that would be willing to see former

24 Jail patients.  There is no consideration of their obligations toward patients with

25 disabilities when these patients leave the Jail.  Instead, the Jail has put the onus on

26 the patient to inform the Jail staff that they would like help coordinating their

27 medical care after discharge.  No outside entity requires this.  No hospital will fail to

28 do discharge planning because the patient did not ask for it.  Again, requiring

1  patients to ask for discharge planning seems to be a subtle way to deny them this

2  service and to excuse the fact that NaphCare did not provide this service.

3      746.    Nor does it appear that CHP will be taking over the discharge planning

4  function at the Jails.  Although the new contract generally states that CHP will be

5  responsible for "Discharge of Patients," SD_1579722, there is no language in the

6  CHP contract requiring them to set up a discharge system, as there is in NaphCare's

7  contract.  And, as Dr. Freedland testified in his deposition, "we're not typically

8  involved in the discharge process."  Freedland Tr. at 149:19-20.  In other words,

9  CHP is unlikely to have an already developed discharge planning model that could

10  be implemented in San Diego.

11      747.    In practice, discharge planning is, in fact, not occurring at the Jail.

12  Dr. Montgomery confirmed this at his deposition, testifying that the Sheriff's

13  Department does not have policies or practices for systematically providing

14  incarcerated individuals with comprehensive discharge planning related to their

15  health care.  Montgomery II Tr. at 254:17-257:7.  Rather, such care—which

16  includes things like referring individuals to offsite clinics for continued care or

17  connecting individuals with community health resources—may occur on an ad hoc

18  basis if Dr. Montgomery or Ms. Rognlien-Hood happen to be notified by another

19  agency like the County's probation office.  *Id.* at 257:3-7.

20      **B.    Discharge Medications**

21      748.    With respect to discharge medication, the Sheriff's Department's

22  policies and procedures require that incarcerated people receive only a 10-day

23  supply of medication, and only for certain limited medications, defined vaguely as

24  "critical medications."  MSD D.1.1 § IX(A).  Although Dr. Montgomery testified

25  that the Jail provides individuals of 30-day supplies of all medications now, this is

26  not set forth in official policy.  Montgomery II Tr. at 259:22-24.

27      749.    The fact that there is no official policy requiring provision of 30-day

28  supply is important because the Sheriff's Department cannot hold people

1  responsible if they fail to adhere to it.  In addition, without a formal policy, actual

2  practice can eventually devolve to the discretion of whether the clinician that sends

3  the prescription personally thinks a certain medication is "critical."  NaphCare's

4  policies and procedures demonstrate the haphazard nature of the discharge

5  medication policy in the Jail, stating that ███████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ███████"  NaphCare P&P, E-10 Discharge Planning,  NAPHCARE000932.

9  Without written guidance as to what is or is not a "needed" medication, different

10  providers will inevitably make different decisions so that some patients will receive

11  certain medications upon discharge and others will not.  The language also indicates

12  that the provider only has to do this if the patient requests this in advance.

13      750.   As recently as December 29, 2023, the Sheriff's Department ███████

14  ████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ██████   MSD Leadership Meeting, Agenda, December 29, 2023,

17  NAPHCARE037026.

18      751.   The Sheriff's Department also had problems ensuring continuation of

19  Suboxone prescriptions for individuals receiving MAT upon discharge.  ██

20  ████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████

23  ██████████████████████████████████

24      752.   For patients requiring medication following release, these issues can be

25  very harmful.  ████████████████████████████████████

26  ████████████████████████████████████████████

27  ████████████████████████████████████████████████

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1362**

1 ██████████████████████████████████████████████████

2 ████████████████████████

3    753.   More importantly, real discharge planning would attempt to address the

4 problem of how patients will get their medications *after* 10 or 30 days.  If a patient

5 has no prescriber to reorder prescriptions and no insurance or money to pay for

6 prescriptions, giving them 10 or 30 days' worth of medications is just kicking the

7 can down the road.  Inclusive discharge planning thinks of what will happen later.

8 The Sheriff's Department does not come close to doing so with respect to discharge

9 medications.

10    **C.    Patient Instructions**

11    754.   The County is responsible for ensuring that NaphCare complies with its

12 contractual obligations to provide patients at discharge with "educational

13 information regarding their specific illness and the importance of follow-up

14 appointments and medication continuity, from a healthcare provider."

15 NAPHCARE000569.  The patient also should "receive[] a comprehensive packet

16 that contains essential community resources." *Id.*  However, NaphCare policies and

17 procedures state ████████████████████████████████████████

18 ████████████████████   NaphCare P&P, E-10 Discharge Planning,

19 NAPHCARE000932.

20    755.   In practice, judging by the lack of documentation in the dozens of

21 records I reviewed of individuals who had been discharged from the Jail at least

22 once, few patients receive any packet providing information about community

23 resources.  Even if they do, and the practice is just not documented, I am not aware

24 of any evidence regarding exactly how any patient can access these resources if they

25 lack money, insurance, the ability to travel, disabilities that would interfere with

26 reading the material, etc.  In the end, simply handing an information packet to some

27 (but not all) incarcerated people at discharge is not adequate discharge planning.

28

### D.    Documentation and Information Transfer.

756.   NaphCare's policies and procedures further state ███████████ ████████████████████████████████████████████████████████ ██████████████████" NaphCare P&P, E-10 Discharge Planning, NAPHCARE000933.  I found no record of any discharge planning in the patient records I reviewed.  This means that either no discharge planning occurred, or the Jail failed to comply with policies and procedures regarding documentation.

757.   With respect to information transfer, NaphCare's policies and procedures simply state ██████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████" NAPHCARE000933.  The County's contract with NaphCare goes further as to what is required, stating that the "Release/Discharge Summary screen shall be used to provide medical information to the patient, medical facility, or another state prison system."  County Contract No. 566117, NAPHCARE000569. I saw this screen completed in only a few (no more than 10 percent) of the charts I reviewed.  Where this summary screen was completed, there was no indication why it was generated in those cases but not others, or who the summary was sent to.  The County's contract with NaphCare states that the summary screen "shall be used to provide medical information to the patient," but there is no explanation as to how a departing patient requests a copy or how it is provided when requested.  *Id.*  There is also no mention in the policies and procedures of how an outside medical clinic should request a copy of this summary screen.

758.   The evidence I reviewed also shows a clear lack of training on how to prepare for discharge of incarcerated people with serious medical concerns so that such individuals can continue their medical care without dangerous interruption.  There is often complete confusion among staff leading up to a discharge.  ██████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████,

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1364



759.

760.   Discharge statistics are not tracked in the SDSD's CQI program as they should be.  As one example, I have seen no statistics on how many discharge prescriptions are actually picked up by the patient versus how many patients never pick up their discharge prescriptions.

\* \* \*

761.   The Jail's lack of adequate discharge planning policies and practices places incarcerated people at a substantial risk of harm.

**XIV.  The Sheriff's Department Fails to Maintain Adequate Quality Assurance/Quality Improvement Processes to Ensure Appropriate and Timely Medical Care**

762.   Continuous Quality Improvement ("CQI") is the process of ensuring that medical care within a particular system is adequate, appropriate, and meets the medical standard of care.

763.   A robust CQI program is critical to any healthcare institution—especially one with hundreds of staff working in tandem every day.  The point of CQI is to allow leadership in a large institution to ensure that all the different actors

**Ex. P-1365**

1 in the system are following policy and that those policies are working toward the

2 goal of providing appropriate medical care.  In a large institution, having adequate

3 policies is necessary to ensure that healthcare is provided consistent with the

4 standard of care; however, good policies are not sufficient to ensure good care.  In

5 addition, the institution must ensure that staff are trained on those policies.  It must

6 ensure that statistics are kept on whether those policies are being followed.  It must

7 analyze those statistics to understand where medical care has fallen short of the

8 standard.  And, it must implement changes, including by holding staff accountable,

9 when the standard of care is not met.

10        764.   All hospitals and other large outside medical programs, like HMOs,

11 have a CQI program.  Likewise, NCCHC considers a CQI Program "essential" for

12 their accreditation.  The NCCHC Standards for Health Services in Jails devotes five

13 full pages to CQI.  *See* J-A-06.  The 2017 NCCHC Technical Assistance Report was

14 critical of the Jail's CQI program.  They recommended establishing "monitoring

15 activities and thresholds for studies," completing both process and outcome studies

16 and evaluating the effectiveness of the CQI program annually.

17 DUNSMORE026025-26.  And, in 2020, Dr. Venters devoted an entire section of his

18 report on his recommendations for improving the Jail's CQI program.  SD_215363-

19 67.

20        765.   The contract that the Sheriff's Department signed with NaphCare in

21 April 2022 requires a CQI program and has a long list of requirements for that

22 program beginning at section 2.3.26.  See NAPHCARE000052.

23        766.   In my experience and in my opinion, CQI should include the following

24 elements:

25        767.   **Policies and Procedures.**  The first part of a CQI program is defining

26 standards for medical practice and what is minimal acceptable care.  This is usually

27 a manual of formal policies and procedures or less formal written guidelines.  The

28 manual should be updated at least yearly.  Clear and precise policies are critical

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1366

1  because, without them, it is impossible to hold staff accountable for failing to follow

2  the policy.

3      768.    **Training**.  Medical and security personnel must be trained so that they

4  know how the overall system works and what their role is.  There must be training

5  when the person is hired; periodic ongoing training that covers any changes in the

6  overall health delivery program (such as changes in policies and procedures); and

7  extra training in any weak areas as they are discovered.

8      769.    **Competency Review.**  The CQI program must evaluate the

9  performance of medical employees to ensure competency.  This is usually done by

10  the use of two types of performance reviews.  The first is a peer review.  A peer is

11  someone with the same training performing the same job as the person being

12  reviewed, *e.g.* a physician reviews a physician, a nurse practitioner reviews a nurse

13  practitioner, an LVN reviews an LVN, etc.  The peer reviews a random sampling of

14  patient charts (usually ten) and writes an evaluation of performance.  The second

15  performance review is that of a supervisor evaluating the performance of someone

16  they supervise, *e.g.* the Medical Director evaluates a physician's performance, a

17  Nursing Supervisor evaluates an RN's performance, and a Supervising Physician

18  evaluates a physician Assistant's performance.  Both types of performance reviews

19  should occur at least yearly.

20      770.    **Statistics.**  The CQI program must gather and disseminate meaningful

21  statistics.  These statistics should be reviewed and analyzed periodically (usually

22  monthly) to identify important trends and problems.

23      771.    **Studies.**  The CQI program should do periodic (usually quarterly) pre-

24  defined intensive studies of specific health care issues.  The NCCHC defines two

25  types of CQI studies: Process Studies, in which a health care process is evaluated for

26  efficacy and efficiency, and Outcome Studies, in which a health care outcome (*e.g.*,

27  normal blood pressures in a patient being treated for hypertension) are evaluated.

28      772.    **Investigations.**  Significant bad patient outcomes such as deaths should

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
                                                                    **Ex. P-1367**

1  be formally investigated to try to determine one or more root causes of the bad

2  event.  In a hospital, this is the role of the M&M Committee.  As discussed above,

3  the Jail likewise should have a committee to investigate deaths and sentinel events

4  to improve health care in the form of training, changes in programs, discipline, etc.

5      773.    My review of the CQI program at the Jail found significant problems.

6  **A.    The Jail's Policies Are Not Sufficiently Clear, Allowing Staff to Escape Accountability**

7

8      774.    There are multiple sets of policies that appear to govern health care at

9  the Jail:  the MSD Operations Manual, NaphCare's policies and procedures, plus the

10  dropdown menus in STATCare, just to name a few.  It should go without saying that

11  these dueling policies can cause confusion for the individual healthcare provider,

12  who may not know which guidance to follow in a particular situation.

13      775.    For example, the Sheriff's Department contract with NaphCare

14  requires "continuity for patients on pharmacologic therapy," NAPHCARE000039,

15  and states that "Contractor typically approves non-formulary orders,"

16  NAPHCARE00006.  However, NaphCare ██████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  *See, e.g.*, SD_790712.  These directives are contradictory and therefore confusing.

22      776.    In addition, the existence of multiple competing policies may also make

23  it difficult to hold a staff member accountable who is not following the right policy.

24  For example, if a STATCare practitioner chooses to continue a patient's long acting

25  insulin, in accordance with the Sheriff's Department's directive of continuity of

26  care, will they be subject to discipline from NaphCare for disobeying the directive

27  that "████████████████████████████████?"

28      777.    This potential for confusion—and inability to hold staff accountable—

1  is also the reason that an institution's policies need to be updated regularly to reflect

2  actual practice expectations.

3      778.  The Sheriff's Department, however, does not regularly issue formally

4  updated policies.  With the exception of two policy sections regarding pregnant

5  incarcerated people, to my knowledge, the MSD Operation Manual has not been

6  updated since 2022.  One example of a policy that appears not to have been updated

7  appropriately in the Operations Manual is MSD.W.2 Wound Care Management, last

8  updated on January 4, 2022.  This guideline states that "On site collaboration is key

9  to the success of the program and includes the facility physicians, registered nurse

10  practitioners (RNP), nursing supervisor, charge nurses and nursing staff."  *Id.*

11  However, from my review of patient charts, it appears that most wound management

12  decisions are made by remote STATCare practitioners based on photographs sent to

13  them.  This guideline does not mention STATCare and so is outdated, since

14  STATCare appears to have taken over most wound management.  Other medical

15  treatment guidelines have been referred to (and relied on) by Jail practitioners which

16  are not included in the copy of the Operations Manual sent to me, ███████████

17  ████████████████████████████████e.  SD_754905.

18      779.  As former-Commander of Operations Christina Ralph testified, the

19  Sheriff's Department knows that they need "to update all of the policies and

20  procedures to move towards the NCCHC accreditation."  Ralph II Tr. at 47:10-12.

21  Similarly, the NCCHC Technical Report was critical of the Jail for not having

22  chronic disease treatment guidelines.  DUNSMORE0260676-77.  The Sheriff's

23  Department contract with NaphCare required the development of these guidelines.

24  NAPHCARE000039.  Yet I understand that such guidelines are still not available at

25  the Jail.

26      780.  Instead of revising its Operations Manual, it is the norm for the

27  Sheriff's Department to issue a "training bulletin" (or similar informal

28  announcement) of a new policy.  In effect, the Sheriff's Department then expects

1  staff to know that what is written in the Operations Manual is incorrect and to rely

2  on the Training Bulletin instead.

3      781.   A good example of this is when, in response to two deaths from

4  complications of diabetes within two weeks, ███████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████.

8  SD_3759270.  Medical staff were expected to follow these medical directives even

9  though I see no indication that the underlying Operations Manual and Policies and

10 Procedures had changed.

11     **B.    The Sheriff's Department Does Not Provide Adequate Training,
           Meaning that Some Staff May Not Know the Governing Policy**

12

13     782.   Dr. Venters stated in his recommendations that:  "Appropriate training

14 of correctional health and security staff represents a best practice for reducing

15 mortality and morbidity among incarcerated people. … [O]ngoing, regular training

16 is also required for health and security staff."  SD_215373.  The NCCHC agrees.

17 Indeed, training was mentioned 166 times in the 2017 Technical Assistance Report

18 with several recommendations for improved training and documentation of training

19 for security and health staff.

20     783.   Despite this, essential training is still not being performed on a

21 consistent basis.  As part of its contract with the County, NaphCare was to provide

22 training to all staff, including County staff and even non-medical staff.  *See* § 2.5,

23 NAPHCARE000086-87.  While NaphCare has produced training materials as part

24 of this case, I do not have specific information showing that nurses, mid-levels, and

25 physicians are being trained regularly and on the correct topics.  *See* Nix II Tr. at

26 28:4-29:10, 37:7-47:4.  In fact, Angela Nix, NaphCare's 30(b)(6) witness, did not

27 "know what [the County's] timeline for training and education is for their staff."  *Id.*

28 at 28:1-2.

784.   Ms. Rognlien-Hood testified in her deposition that NaphCare's new employee orientation "didn't do an adequate job."  *See* Rognlien-Hood Tr. at 121:1-7.  She also stated ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████."  SD_375922.

785.   Dr. Freedland, who just won a bid to provide physicians and mid-level providers at the Jail through his company CHP, testified that he did not know if NaphCare's training included a requirement that physicians ask patients if they mind if a deputy is present during their care.  Freedland Tr. at 112:15-18.  Dr. Freedland also testified that once his new contract was in place, he would hire a "full-time trainer … to … make sure the staff was trained properly, and have them sign off they are trained properly."  *Id*. at 133:6-22.  Since the contract did not start until July, I do not have access to any new training that will be provided by the CHP trainer.  But Dr. Freedland said the new training would not include how to handle mentally ill patients who refuse treatment.  *Id*. at 134:2-15.  Given the cases I have seen in this Jail, including but not limited to those described in this Report, that omission is unfortunate.

## C.    The Sheriff's Department Does Not Track or Analyze the Right Data to Ensure that Adequate Medical Care Is Provided

786.   Statistics are powerful tools to improve the quality of medical care in a system—as long as the right statistics are tracked and the statistics are properly analyzed.  In some cases, the Sheriff's Department does not track the right statistics, as noted throughout this Report.  For example, the CQI evaluation of off-site specialty consultations and other off-site medical care, should contain information about current contracted off-site specialists; the average time taken to get UM approval and the percentage not approved (broken down by specialty); the average wait times for appointments with each particular specialist; and problems encountered in making and keeping these appointments, such as the reason for all

1  missed or rescheduled appointments.

2      787.   However, CQI reports about off-site appointments that I reviewed did

3  not contain this information.  I was able to read only how many off-site

4  appointments were completed in a given month, and occasionally how many were

5  cancelled due to refusals, or discharges, etc.  But, as explained earlier in this Report,

6  these CQI reports did not give me an accurate reading of the health of the off-site

7  program.

8      788.   Another example of a missing basic CQI statistic is the number (and

9  percentage) of patients who fail to pick up their prescriptions from the pharmacy

10  after discharge.

11      789.   The Sheriff's Department CQI program tracks in custody deaths, but as

12  I point out elsewhere in this Report, the Sheriff's Department CIRB process is

13  inadequate, and I have not seen any statistics presented about morbidity events (also

14  called sentinel events, *i.e.*, a serious bad patient outcome that does not result in

15  death).  A good example of a sentinel event that would be tracked at a hospital

16  would be Diabetic Ketoacidosis ("DKA").  DKA is caused by very high blood

17  sugars that cause the diabetic patient to lose water and become profoundly

18  dehydrated and also results in the patient's blood to become seriously acidotic.

19  DKA usually occurs over several days.  If a hospitalized diabetic patient develops

20  DKA, administrators at the hospital would ask themselves "How did this happen?

21  How did we miss this developing for days?"  The DKA is therefore a sentinel event

22  that triggers an investigation.  Similarly, any diabetic who becomes sick enough to

23  need to be admitted to the hospital should be classified as a sentinel event and

24  investigated.  However, I have seen no evidence that DKA or any other sentinel

25  event is tracked in the Jail.

26      790.   Also, the statistics the Jail does collect are not properly analyzed.  One

27  CQI report documented that almost 20 percent of all patients scheduled for offsite

28  medical appointments over a six month period refused to go to the appointment.

NAPHCARE026024.  As explained earlier in this Report, this statistic is not credible on its face, but the point here is that this striking statistic was not flagged for investigation.  The important question is:  why does the Sheriff's Department have a refusal rate of 20% for off-site medical care that the patients themselves supposedly want?  This would be an easy CQI study to do.  Simply pick a random sample of refusals and interview the patients.  But I do not see any evidence that this study has been done.

791.   NaphCare's 30(b)(6) witness Angela Nix stated that she did not "know specific CQI programs at the site level at San Diego."  *See* Nix II Tr. at 34:9-10.  Ms. Nix also did know if CQI is discussed at site level meetings.  *Id*. at 34:14-16.  Ms. Nix further testified that although she had attended 8 to 12 of San Diego's patient care coordination committee meetings, she could not recall any discussion of improvement or recommended changes.  *Id*. at 35:7-13.  Since the NaphCare contract calls for NaphCare to provide CQI and training, this testimony is worrisome.

### D.    The Sheriff's Department's Peer Review Process for Medical Staff Is Inadequate

792.   Peer reviews are an important component for ensuring that medical staff are performing competently.  As the NCCHC 2017 Technical Assistance audit pointed out in 2017, peer reviews should be completed yearly.  DUNSMORE0260697.

793.   Although peer reviews (as well as "Focused Professional Practice Evaluations" and "Ongoing Professional Practice Evaluations") were required by NaphCare's original contract, § 2.3.27.1, NAPHCARE000055, NaphCare has not been reliably completing them.  In a May 26, 2023, email, Dr. Montgomery implied not only that NaphCare had not been doing Peer Reviews as required by their contract, but also that NaphCare did not seem to understand what a Peer Review was.  SD_227522.

794.   Even as of October 17, 2023, it is not clear that NaphCare had implemented a full Peer Review program.  The Sheriff's Department had pointed this out in its Corrective Action Notice.  SD_1572597.

795.   In conclusion, none of the elements that I would expect to see in an adequate CQI program are present in the Jail's medical system at this time.  If CQI is inadequate, mistakes—particularly repeated systemic mistakes like those I have identified throughout this Report—are missed.  That places incarcerated people at risk of harm.

## XV.    The Sheriff's Department Systematically Fails to Maintain Sufficient Numbers of Health Care Professionals, Resulting in Deficient Care

796.   Plaintiffs' Third Amended Complaint alleges that the Sheriff's Department has an "insufficient number of health care professional to provide minimally adequate care to the approximately 4,000 incarcerated people in the Jail." Dkt. 231 at ¶ 42.  Based on my review of the records and inspection of Jail facilities, I agree, and it is my opinion that the Jail's inadequate health care staffing ratios is a major contributing factor to the many failures outlined earlier in this report.  The recently negotiated contract with CHP will not solve these problems.

### A.    The Jail Has Experienced a Shortage of Healthcare Staff for Several Years

797.   The Sheriff's Department's systemic failures to provide adequate medical care to incarcerated people are myriad:  initial health assessments for newly booked incarcerated people are delayed or missed entirely, *supra* at Part II; sick call requests are ignored or responded to days later, *supra* at Part IV; patients are documented as having "refused" appointments without being informed of the appointment or counseled about the risks of refusal, *supra* at Part V; vital signs and other physical examinations are not completed, *supra* at Part VI; and medical care is provided by remote providers or nurses acting outside the scope of their practice, *supra* at Part VI, to name a few.  Chronic understaffing contributes to all of these

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1374**

1  problems.

2    798.   My review of the records in this case shows that the Sheriff's

3  Department knows—and has known—that additional medical staff are necessary to

4  provide adequate care at the Jail.  This chronic staffing shortage persists at all levels:

5  nurses, mid-level practitioners, and physicians.

6    799.   According to Dr. Montgomery, as of March 30, 2021, ██████████

7  ████████████████████████████.''  SD_172496.  Indeed, a

8  ████████████████████████████████████████

9  ████████████████████████████████████████

10  ████████████████████████████████████████

11  ██████████████████████████████████

12  ████████████████████████.  FY 20-25 Five-Year Financial Forecast –

13  Priority List, August 9, 2019, SD_057768.  ██████████████████

14  ████████████████████████████████

15  ████████████████████████████████████████

16  ██████████████████  QA/QI Financials Presentation,

17  SD_395977.The Jail's contract with NaphCare in 2022 did not remedy the Jail's

18  persistent staffing problem.  As Dr. Montgomery stated in a May 26, 2023 email:

19  "It has been shown that far more staff members are needed than [NaphCare] initially

20  estimated."  SD_227522.

21    800.   Administrators for the Sheriff's Department and NaphCare have

22  admitted to these staffing inadequacies.  Ms. Rognlien-Hood spoke extensively in

23  her deposition of the problems the Jail has had with understaffing and shortages in

24  nursing staffing, including listing the many ways that Jail has been forced to try to

25  compensate for those shortfalls:   (1) overtime; (2) nursing supervisors working

26  clinical duties instead of their own supervisory work; (3) having "off-site" personnel

27  help with triage; (4) rotating nurses from facilities less understaffed to facilities

28  more understaffed; and (5) hiring Certified Nurse Assistants ("CNAs").  Rognlien-

Hood Tr. at 55:6-56:20, 67:19-69:5.  In the end, the Jail simply has been forced to try to get as much done as possible with fewer nurses.  Kenneth Jones also acknowledged understaffing among nurses, admitting that understaffing impacted care, including blood draws and other labs.  Jones Tr. at 129:17-133:7.  Despite acknowledging understaffing, Mr. Jones could not recall every commissioning a study to evaluate the extent of nursing understaffing.  *Id.*

801.   As just one example of medical staff shortages in the Jail, a schedule of shifts at Central Jail on July 1, 2023 showed 9 out of 20 nurses assigned to work were absent with "no replacement."  SD_726781.  The unfilled shifts included two of three RN sick call nurses and both MOB nurses.  SD_726781.  This was not an unusual situation.  On July 16, 2023, 10 of 21 nursing shifts at Central Jail were unfilled, including both receiving nurses, both RN sick call nurses, and both MOB nurses.  SD_726809.

802.   Ms. Rognlien-Hood also testified that the Jail had approximately 30 RN and 40 LVN vacancies as of February 14, 2024, Rognlien-Hood Tr. at 52:22-53:3,  and that historically, the number of vacant nursing staff positions had been in the "high 50s," *id.* at 53:16-22.  This testimony is at least consistent with, and may even downplay, the actual number of vacancies evidenced by the documents I reviewed.  For example, Sheriff's Department data shows as of November 1, 2023,

███████████████████████████████████████████████

██████. SD_114288. ████████████████████████████████

█████████████████████████████████████████

████████████████████████ SD_395975. ████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████.

SD_057768. ██████████████████████████████████████

████████████████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1376**

1    ████████████████████████████████████, SD_114288.

2        803.    Nor has the Jail been able to retain the medical staff that it does have.

3    ████████████████████████████████████████████████████

4    ██████████████████████████████████████████████

5    ███████████████.” SD_152275-152276.    ████████████████

6    ███████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    █████████████████████████████████████████████

9    ██████████████████████████████████.    Further

10   evidence of <u>excessive</u> turnover is found in CQI staffing reports, which show that the

11   number of nurses leaving employment at the jail exceeds the new hires.  See, for

12   example, SD_114481, which shows a net loss of 8 nurses for the three-month period

13   covered by the study.

14       804.    The Sheriff's Department has tried to compensate for being chronically

15   short staffed at the nursing position by requiring mandatory overtime.[54]  The current

16   system still relies heavily on overtime shifts to cover for being chronically short

17   staffed, as I noticed during my tour of the Central Jail on February 6, 2024.  On that

18   day, the nursing duty board showed around 50% of nursing positions filled with

19   overtime workers.  The habitual use of overtime, whether mandatory or not, is bad

20   in the long run because it eats into home life and can lead to increased anxiety,

21   depression, fatigue and sleeplessness.  In hospitals, nurses working too many hours

22   have been shown to have decreased short-term memory and make more medical

23   mistakes.[55]  Overtime has also been found to increase job dissatisfaction among

24

---

25   [54]  It eventually discontinued the use of the word "mandatory" overtime in order to
     "boost morale."  Rognlien-Hood Tr. at 57:11-17.

26

27   [55] T. Bell et. al. *Fatigue in nurses and medication administration errors: A scoping
     review.*  J. CLIN. NURS. 2023 Sep.;32(17-18):5445-5460.

28   M. Watanabe et al., *The effect of quality of overtime work on nurses' mental health
     and work engagement*, J. NURS. MANAG. 2018 Sep;26(6):679-688.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1377**

1  nurses and increase burn-out and turnover.  You can fill staffing shortages with

2  overtime in the short term, but in the long term, overtime will result in more nurses

3  burning out and leaving, which leaves you even shorter-staffed in the long term.

4      805.   The County also tries to compensate for work backlogs caused by short

5  staffing by having nurses in supervisory positions work clinical shifts.  Ms.

6  Rognlien-Hood herself has done this.  *E.g.*,  Health Assessment Form, █████

7  █████,  April 19, 2023, SD_781311.  This is not a good solution for being short

8  staffed.  If supervisors are working busy clinical shifts, they cannot perform their

9  supervisory jobs and supervisory tasks also do not get done.

10     806.   At one point, the Sheriff's Department even considered having sworn

11  staff fill medical positions to compensate for these staffing shortages.  In a

12  November 22, 2021 memoranda from a lieutenant in the Detention Support Division

13  to now-Sheriff, then-Undersheriff, Kelly Martinez, the Sheriff's Department set

14  forth its dangerous and misguided plan in the event the medical services division

15  suffered a "staffing loss that places services at risk," stating that it might "trigger

16  sworn staff being utilized for the distribution of medication."  SD_651265.  The fact

17  that the Sheriff's Department even felt like she needed to come up with a plan to

18  rescue the nursing staff is itself evidence of serious nursing staffing issues.

19  However, while well intentioned, this is a bad idea.  Officers are not trained, would

20  have no idea what they are doing and would inevitably make serious mistakes

21  resulting in medical harm to patients.  Such a plan would never be considered in a

22  hospital.  No hospital would ever allow any non-medical staff (like security or

23  housekeeping) to pass meds because they were short staffed on nurses.

24     807.   Ms. Rognlien-Hood noted in her deposition that the Sheriff's

25  Department began hiring CNAs around early 2023 in another attempt to ease the

26  burden of RN understaffing.  Rognlien-Hood Tr. at 55:23-56:2.  CNAs are not

27  nurses.  They have little training, and in hospitals and nursing homes, are used for

28  non-medical tasks such as transporting patients, feeding and bathing patients,

1    changing bedding, etc.  CNAs can indeed have a role in patient care, but they are not

2    qualified to do patient examinations or evaluations like RNs do.

3         808.   Ms. Rognlien-Hood envisioned CNAs doing jobs that nurses were

4    doing but that did not require nursing skills, such as picking up Medical Request

5    Forms from the lock-boxes.  Rognlien-Hood Tr. at 189:8-13.  However, it is evident

6    from my review that CNAs duties are creeping into duties that are inappropriate for

7    them.  ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████  Also, despite using CNAs

12   for various duties in lieu of nurses since early 2023, I have not seen any Sheriff's

13   Department job description for CNAs, nor any policy and procedure on what

14   specific duties the CNAs are taking over from the nurses, who supervises the CNAs,

15   and how using them affects the Staffing Matrix.

16        809.   In addition, like medical staff, custody staff is chronically short-staffed,

17   which negatively impacts medical operations.  Ms. Rognlien-Hood acknowledged

18   this issue in her deposition, stating that she receives reports from providers that

19   "[c]linic was slow [on a particular day] because they didn't have deputy staff to

20   bring everybody on the list to them."  Rognlien-Hood Tr. at 75:19-21.  Ms.

21   Rognlien-Hood also testified that due to a chronic lack of custody staff during the

22   day, health care staff were forced to change the times of blood draws to the

23   evenings, which is not the ideal time to draw blood.  *Id.* at 70:9-23.  Medical clinics

24   are sometimes outright cancelled due to "sworn availability."  Medical Services

25   Division QA QI Meeting, October 17, 2023, p. 20; *see also* SD_114467 (noting

26   "missed clinic appointments" due to "unavailability of escorts"); SD_278070 ████

27   ██████████████████████████████████").  The Sheriff's Department's

28   inability to transport incarcerated people to medical appointments due to staffing

1  shortages prevents health care staff from treating patients, which precludes

2  administration of care that meets medical standards.

3      810.    Dr. Montgomery discussed renegotiating NaphCare's contract to

4  increase staffing in February 2024.  Montgomery II Tr. at 285:7-13.  This was

5  apparently unsuccessful, as Dr. Freedland admitted in his deposition that physician

6  and midlevel staffing levels were too low, Freedland Tr. at 162:15-163-4.  I

7  understand that staffing issue to be  the main reason that the Sheriff's Department

8  negotiated a new contract with Dr. Freedland's company CHP to provide

9  significantly more onsite medical practitioner coverage.  As explained below, that

10  contract will not rectify the inadequacies of medical care at the Jail.

11      **B.    The New Contract with CHP Will Not Solve the Jail's Problems**

12      811.    The County's recent contract with CHP is designed to "provide on-site

13  Health Care Providers for primary care and urgent care at specified County

14  detention facilities."  SD_1578715.  Notably, the contract increased physician and

15  midlevel staffing at the Jail by almost 300%.  It also increased the County's annual

16  spending on physicians and nurse practitioners in the Jail from approximately $8.3

17  million to $22.6 million per year.

18      812.    This increase could be beneficial to the class members since it amounts

19  to an almost tripling of the previous annual spend.  It is also an acknowledgment

20  that the County was woefully underspending before and short-staffed previously.

21      813.    However, it is worth notable that that CHP's bid for the new contract

22  envisioned even *more* staff, which Dr. Freedland explained was the amount that he

23  thought would "work" "best."  Freedland Tr. at 126:2-3.  CHP's bid would have

24  added 41.2 full-time equivalent practitioner positions across the seven Jail facilities.

25  SD_1579755-1579760.  The ultimate contract added only 28.4 full-time equivalent

26  "personnel" positions and 2 administration positions.  SD_1579731.

27      814.    Even setting aside this disparity between what Dr. Freedland thought

28  would be enough to "work" and what the Sheriff's Department ultimately agreed to,

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1380**

based on my knowledge of this Jail and my experience in correctional medicine in general, I have doubts that this new contract will solve the Jail's problems for four reasons. First, the new contract does not address the nursing staff shortage. Second, the very nature of private correctional health contractors leaves them unstable. Third, this contract fractures medical care into silos, each apparently acting independently from each other. Fourth, even on its face, this contract leaves several deficiencies in the Jail's delivery of medical care in place and will accentuate other problems.

### 1.    Ongoing Nursing Shortage

815.   As explained above, it is indisputable that the Jail is facing a nursing shortage. But the new contract with CHP adds no nurses (nurses at the Jail are employed directly by the County), and therefore cannot solve this problem.

816.   Nurses are essential at every stage of a patient's interaction with medical services at the Jail—just as they are essential at every stage in every outside medical clinic, office and emergency department. In the Jail, Registered Nurses do the Receiving Screen and the Intake screen. RNs do the Second Stage Evaluation. RNs do withdrawal assessments. LVNs pass all medications. RNs triage medical requests and do the face-to-face evaluations. RNs are essential for the proper function of sick call. RNs do most of the work when patients are discharged. And I am only scratching the surface. There are few other categories of employees who can step in and assist the nurses with their work when they are short staffed. Security cannot do nursing work.

817.   These nursing shortages have already had serious consequences for patient care. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. P-1381**

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ██████████    The pressure of trying to maintain operations while short staffed is

7 very stressful on the health care staff who are working and trying to do the work of

8 two (or three) staff members day after day. Such stress inevitably contributes to

9 even more turnover.

818. I have seen no indication that additional nurses are being hired for the

Jail. Absent additional nurses, many of the Jail's health care problems will remain.

## 2. Instability Created by Private Correctional Healthcare Providers

819. As indicated in the section above and described in the Background section of this Report, the healthcare delivery at this Jail has been subject to multiple changing, and at times overlapping and confusing, contracts with private healthcare providers over the past several years.

820. It is my opinion that this kind of instability is a hallmark of the private correctional healthcare industry,[56] particularly in comparison to the business of providing medical care in the United States *outside* the jail or prison context. This instability has historically resulted in "revolving door" contracts, boom and bust cycles, and frequent corporate failures and bankruptcies. In my opinion, the only guaranteed way to avoid these revolving door contracts, which risk creating

---

[56] This industry includes a number of large correctional healthcare companies with multi-state operations, as well as mid-size companies with regional operations. These companies have included companies such as Corizon (until recently, one of the largest for-profit correctional healthcare companies) as well as companies known as Wellpath, TurnKey, NaphCare, Advanced Correctional Healthcare, Southern Health Partners, Centurion, and Wexford Health Services, among others. Many smaller companies also exist, whose operations are more geographically limited.

1  confusion and therefore gaps and potential harm to patients, is for correctional

2  medicine to be run directly by the government.

3      821.   Unlike healthcare delivery systems outside of prisons and jails, nearly

4  all correctional medical systems (which are run by state and local governments)

5  have a set dollar amount of money budgeted for medical care for incarcerated

6  people.  In order for a private correctional healthcare company to gain a contract

7  with a state or local government, the company must submit a bid, most often

8  through a competitive bidding process in response to a government Request for

9  Proposal, as both NaphCare and CHP did here.  Contracts are generally awarded to

10  the lowest or near-lowest bidder.  Once the contract is obtained, the amount of

11  money that can be charged for the duration of the contract is pre-set.

12      822.   In order to make a profit, therefore, a correctional healthcare company

13  must create a budget where its anticipated expenses are less than the contractual

14  payments.  The problem, however, is that these budgets are inherently difficult to

15  predict.  If the company's expenses unexpectedly rise  (*e.g.*, unanticipated increased

16  costs for attracting and retaining qualified medical professionals), the company

17  cannot automatically pass these unanticipated expenses on to the County.  It must

18  fulfill the terms of the contract for the contract's duration at a loss—unless it can

19  convince the County to re-negotiate the contract.   This model is unlike the business

20  of providing medical care outside the jail and prison context, where if a hospital has

21  to spend more than anticipated, it can bill that excess to its patients and recover the

22  unanticipated costs.

23      823.   To win a typical 5-10 year contract to provide medical services in

24  corrections, a company must parse its bid to the lowest feasible amount—and

25  sometimes even an unfeasible amount.  Otherwise, that company will never win any

26  bids.  However, the bidding process is risky.  Medical costs have historically risen

27  faster than inflation.  Unanticipated medical events like the COVID pandemic and

28  the opioid crisis can overwhelm a budget.  A company that tries to mitigate its risk

1  by bidding higher to fully account for the uncertain future will often lose the bid to

2  the company that did not plan for such events and so bid less.  A won contract can

3  easily turn into a long-term money loser for the company.

4      824.   Correctional healthcare companies also must compete for nurses,

5  physicians, and other medical staff with outside hospitals, clinics, and private

6  medical practices.  Correctional medicine is a more difficult job than working at

7  other outside practices and so should be compensated at a substantially higher rate.

8  However, this basic fact has not generally been acknowledged by correctional

9  medicine companies, with the result that they offer salaries too low to consistently

10  attract qualified medical professionals.  Working at an outside hospital or clinic

11  often offers better pay, better working conditions, and less stress.  As a result, most

12  correctional medical companies that I am aware of are seriously short staffed and

13  have high rates of turnover among their medical professionals.

14      825.   In addition, most jails and prisons also have significant staff shortages

15  of correctional officers, and this impacts medical costs.  If there are not enough

16  officers to transport incarcerated people, then medical appointments must be

17  rescheduled, which has significant costs.  Facility wide "lock-downs" similarly

18  impact the delivery of medical care.  Jail and prison overcrowding makes it more

19  difficult to provide medical care and thereby increases costs.  All of this also

20  increases stress and dissatisfaction among the health care staff and leads, again, to

21  turnover and short-staffing.

22      826.   A correctional medicine company that has bid a particular contract too

23  low to be profitable has three options:  invoke the termination clause of the contract

24  and simply walk away; ask for an increase in funding from the county or state; or

25  provide substandard medical care.  Since many (maybe even most, in my

26  experience) initial bids are too low, either from ignorance, bad luck or by design,

27  asking for more money before the end of the contract is very common.  And when

28  the for-profit company asks for more money than their original contract, the implicit

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. P-1384

1  threat of just walking away from the contract—leaving a prison or jail without *any*

2  healthcare system in place—hangs over the negotiations.

3      827.   Of course, once the company has been awarded enough money to make

4  the enterprise profitable, other correctional medicine companies will notice and will

5  promise to do the same job for less when given the opportunity.  And the cycle of

6  "bid low, ask for more money, get replaced by a new company" repeats itself.

7      828.   The result has been chronic instability in the for-profit correctional

8  medicine industry.  It is a rare jail or prison that has had a single contracted medical

9  provider for, say, twenty-plus years.  Stability like that is noticed and coveted.

10  There will be no shortage of companies offering to do the same job for less money.

11      829.   More commonly, local and state governments have a revolving door of

12  medical contractors over the years.  My home state of Idaho is a case in point.  Since

13  privatizing medical services in the state in 1996, five separate companies have held

14  the Idaho DOC contract.

15      830.   Instability has also been true at the Jail that is the subject of this case,

16  where, in just a few years, COAST held the medical contract, then CHP, then

17  NaphCare, and now CHP/NaphCare together.  To think that the CHP/NaphCare

18  hybrid will solve the Jail's myriad problems is naïve, in my view.  More likely, the

19  County will, in the future, fire one or both and turn to a different for-profit medical

20  provider, as have many other counties and states before them.

21      831.   This brings up the underlying question:  Why is the San Diego County

22  Sheriff's Department contracting with for-profit companies to provide medical

23  services at all?  Many jails, including large jails, have not privatized their medical

24  services.  The ostensible reason for privatization is this statement at the beginning of

25  both the NaphCare contract and the new CHP contract:  "The Chief Administrative

26  Officer made a determination that Contractor can perform the services more

27  economically and efficiently than the County, pursuant to Section 703.10 of the

28  County Charter."  NAPHCARE000001; SD_1579624.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. P-1385**

832.   I am highly skeptical of this statement.  I am not aware of any literature, research, or other evidence that shows that jails using for-profit medical companies operate "more economically and efficiently" than jails that do not.  If there is any written documentation of the Chief Administrative Officer's "determination," I would like to see the logic and research behind this decision.

833.   Although there are advantages and disadvantages of using for-profit correctional medicine companies versus keeping medical care within the County, I believe that, overall, the reverse is true.  The Sheriff's Department could operate the Jail medical program more economically and efficiently itself with the added benefit that medical operations would be more stable.

### 3.   Siloed Medical Care Between NaphCare and CHP

834.   Even setting aside my concerns with the instability of private correctional contractors, the truncated and siloed nature of healthcare delivery at the Jail under this system is likely to create confusion among staff and harm patients.

835.   A well-run healthcare system has clear lines of responsibility and centralized control of all elements of that system.  Clarifying who is in charge of healthcare is an essential step towards San Diego's creation of a healthcare system that provides adequate care for incarcerated persons.

836.   As I understand it, the Jail now has three independent "silos" of healthcare delivery in the Jail:  (1) CHP medical practitioners; (2) NaphCare practitioners (including mental health, dental, medication assisted treatment for opiate use disorder, STATCare) and training; and (3) Sheriff's Department employees, such as the nurses, and medical supervisors such as Dr. Montgomery.

837.   It is not immediately clear to me who is supposed to report to whom in this system.  According to an email from the Sheriff's Department to the *Union-Tribune* newspaper regarding this three-way responsibility:

> **Please explain the division of labor between NaphCare and CHP, and how will the medical director delineate two different contractors?  Who answers to whom, and is that a model any other**

**jail facilities use?**

> a.    NaphCare still has overall responsibility for healthcare of our incarcerated population.  CHP will be the exclusive provider for on-site clinical services and licensed healthcare practitioners, including doctors and nurse practitioners.  CHP will manage and direct the physicians and nurse practitioners and will be giving clinical direction to our internal nursing staff as part of the comprehensive healthcare model.  Naphcare will continue to manage and provide direction to all other services in the jail system.  CHP, NaphCare and SDSO staff will continue to work collaboratively to provide comprehensive healthcare services in our jail facilities.

838.    To me, this sounds like gobbledygook.  And it fails to resolve critical questions, particularly around the use of STATCare, which I understand will still be in place at the Jail, making diagnoses, ordering tests, and prescribing medications independently from the CHP practitioners.  *See* Freedland Tr. at 178:3-7 (CHP has no oversight over STATCare).  As explained earlier in this Report, documents I reviewed showed STATCare practitioners repeatedly failing to meet the standard of care for patients in the Jail.  The new CHP contract does not make clear how—or even if—CHP's practitioners can correct those errors.

839.    Indeed, some medical records I reviewed suggest that nurses in the Jail contact STATCare asking for *permission* to have an on-site practitioner see patients.
███████████████████████████████████████████████████████████

████████████████████████████    In effect, NaphCare providers working remotely will have the power to gatekeep patients from CHP practitioners on the ground in the Jail.  More clarity is needed for this to be a functioning healthcare system.

### 4.    Deficiencies in New CHP Contract

840.    The new CHP contract also leaves in place several concerning practices highlighted throughout this report.

841.    It does not make any changes to the deficient M&M process, which has thus far largely failed to address the root causes of the many deaths at the Jail, *see supra* at Part I.  The new contract does not require CHP to conduct any on-site

Ex. P-1387

1  M&M reviews at the Jail.  Freedland Tr. at 130:16-131:1.

2      842.   The contract does not address chronic care either, *see supra* at Part

3  VIII.  Chronic care is only mentioned once in the contract, in the definition of what

4  "clinic" means.  SD_1579719.   But CHP is specifically not responsible for

5  developing chronic care guidelines defining how often various chronic care clinics

6  should be held and what should be routinely done during chronic care clinic visits.

7  *Id.*  Presumably, NaphCare retains the obligation to develop and implement chronic

8  care guidelines.  Therefore, NaphCare will again decide who is scheduled for CHP

9  practitioners to see.

10      843.   Notably, although CHP is required to provide a full time "Specialty

11  Physician" at Central Jail under the contract, SD_1579716, it does not specify what

12  kind of specialist (endocrinologist? dermatologist? orthopedist?) or if multiple

13  specialists can work part time to fulfill the 40 your per week requirement. There is

14  also no indication  whether this unidentified "specialty physician" will provide a

15  solution for the Jail's persistent failure to provide meaningful chronic care.  *See id.*

16  And, it is not clear whether this specialist will have any authority over STATCare,

17  in order to correct, for example, STATCare's dangerous and substandard treatment

18  of type 2 diabetes.

19      844.   The contract also leaves NaphCare in charge of the medical formulary

20  and Utilization Management ("UM"), the flaws in which are described earlier in this

21  Report, *see supra* at Part VII.  CHP will continue to have no say in formulary and

22  UM processes, despite the fact that CHP practitioners have expressed dissatisfaction

23  with both processes.  *See, e.g.*, Freedland Tr. at 39:19-40:14; Dr. ███ interview

24  during Jail inspection.

25      845.   The contract is also silent about where the clinics will take place and

26  minimum requirements for what should happen at those clinic visits.  It  thus leaves

27  in place the current bad habits of practitioners doing "clinic visits" at the patient's

28  cell and not doing a physical examination or vital signs.  It similarly will not correct

1    the problem of practitioners making diagnoses and prescriptions without examining

2    the patient at all. *See supra* at Part VI.

3        846.   Finally, the contract requires CHP practitioners to attend certain

4    County sponsored training, *e.g.*, orientation, SD_1579722, but it does not require

5    CHP to provide any training to its own employees, nurses, or custody staff.

6        847.   In summary, the CHP contract does not attempt to correct or even

7    address several deficiencies in medical care at the Jail, as raised in this Report.

8                                    **CONCLUSION**

9        848.   Based on a reasonable degree of certainty, it is my opinion that the

10   healthcare delivery system in the Jail suffers from a number of systemic flaws,

11   which place incarcerated people at a substantial risk of serious harm. These flaws

12   are not new. The Sheriff's Department has been repeatedly informed of these issues

13   in reports from the NCCHC, Dr. Venters, and the State Audit, going back to at least

14   2017. The Sheriff's Department has nonetheless failed to correct these problems

15   and continually fails even to identify these errors in their M&M and CQI processes.

16   None of the changes the Sheriff's Department has made or claims to be making so

17   far are likely to solve these problems. Therefore, these failures will therefore likely

18   lead to more bad outcomes, including deaths of incarcerated people.

19       The information and opinions contained in this report are based on evidence,

20   documentation, and/or observations available to me. I reserve the right to modify or

21   expand these opinions should additional information become available to me. The

22   information contained in this report and the accompanying exhibits are a fair and

23   accurate representation of the subject of my anticipated testimony in this case.

24

25   Dated:  August 21, 2024    _____

26                                      Jeffrey E. Keller, M.D.

27

28

**Ex. P-1389**

# EXHIBIT Q
## (Redacted)

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, Plaintiffs, v. SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, Defendants. | Case No. 3:20-cv-00406-AJB-DDL **REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.** Judge:       Hon. Anthony J. Battaglia Magistrate: Hon. David D. Leshner Trial Date: None Set |

[4598005.1]

# TABLE OF CONTENTS

**Page**

I. Dr. Murray has limited experience working in jail settings and has not done so since the 1990s. ............................................................. 2

II. Dr. Murray offered opinions about the adequacy of the Jail medical system without speaking to incarcerated people. ................................. 3

III. Dr. Murray offered opinions about the adequacy of the Jail medical system without conducting a substantive review of any in-custody deaths. ......................................................................................... 4

    A. For the three 2024 deaths I reviewed, one was likely preventable, another may have been preventable, and I lack sufficient information to offer an opinion regarding the third. ......................... 7

        1. Chase Mitchell – ████████ ........................................ 8

        2. Liutoa Vili – ██████ .............................................. 11

        3. Majid Almajid – ███████ ....................................... 13

    B. Newly available documents regarding two other deaths at the Jail reflect serious problems with the care provided at the Jail and the Jail's reporting of in-custody deaths. ...................................... 17

        1. Keith Bach – ██████ ............................................. 17

            (a) Background Regarding Type 1 Diabetes ........................ 18

            (b) Summary of Medical Care ..................................... 19

            (c) Opinions ....................................................... 22

        2. Jose Cervantes Conejo ............................................ 26

IV. Dr. Murray's opinions regarding the death rate at the Jail are misleading and unsupported by evidence. ..................................... 28

V. The audit of chronic care that Dr. Murray's team performed is methodologically and substantively flawed. ................................... 31

VI. Dr. Murray's audit of intake and Health Assessments is methodologically and substantively flawed. ................................... 40

VII. Dr. Murray's audit of nursing sick calls is methodologically and substantively flawed. ................................................................. 44

VIII. Dr. Murray's analysis of the timeliness of lab, x-ray, and test results ignores the Jail's repeated and documented failures to timely review those results ......................................................................... 49

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1392**

IX.   Dr. Murray agrees with several criticisms of the medical system alleged in the *Dunsmore* complaint and found in my report. ...................................... 50

X.    Dr. Murray does not address the substantial problems in the Jail's medical system related to purported refusals of treatment by class members. .......................................................................................... 52

XI.   Dr. Murray admits that the County has many nursing vacancies, did not offer an opinion on whether the County has sufficient nursing staff, and ignored evidence that the County does not. ...................................... 53

XII.  Dr. Murray did not offer any opinion on the adequacy of provider/practitioner staffing .......................................................... 55

XIII. Dr. Murray acknowledges that some nurses working in the Jail do not receive new employee orientation .......................................... 56

XIV.  Dr. Murray does not address how the lack of adequate custody staff negatively impacts care for patients. .......................................... 56

XV.   Dr. Murray misrepresents the problems the Jail has with the continuity of medically-necessary medications and treatments. ...................... 57

XVI.  Dr. Murray's opinion that incarcerated patients have adequate means for alerting medical staff of their needs is not consistent with the evidence I have reviewed. .......................................................... 58

XVII. Dr. Murray's opinion that the Jail has an adequate system for diagnosing and treating infectious diseases is not consistent with the evidence I have reviewed. .......................................................... 59

XVIII.Dr. Murray's opinion that the Jail offers sufficient access to specialty care is not consistent with the evidence I have reviewed. ........................................... 60

XIX.  Dr. Murray's opinion that the Jail maintains confidentiality of patient medical encounters is not consistent with the evidence I have reviewed. ...... 61

XX.   Dr. Murray's opinion that "all" patients receive adequate follow up care is not consistent with the evidence I have reviewed. ...................... 62

XXI.  Dr. Murray's conclusion that the Jail provides adequate discharge planning is flawed .......................................................... 63

XXII. The faux-NCCHC evaluation performed by Dr. Murray and his team is suspect, does not include adequate explanation of the ratings, and is not consistent with the evidence I reviewed. .................................. 65

      A.   J-A-02 Responsible Health Authority – *Essential* Standard: The responsible health authority (RHA) ensures that the facility maintains a coordinated system for health care delivery. ................ 67

      B.   J-A-07 Privacy of Care – *Important* .................................. 68

      C.   J-A-9 Procedure in the Event of an Inmate Death – *Important* ............ 68

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1393**

1

D.    J-F-01 Patients with Chronic Disease and Other Special Needs –
*Essential* ................................................................................................ 68

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1394**

1.     I previously issued a Rule 26 Report, submitted on August 21, 2024.  I make this Rule 26 Rebuttal Report to address certain opinions set forth in the Expert Report of Owen J. Murray, DO, dated August 21, 2024 ("Murray Report").

2.     I am a physician with substantial experience in correctional medicine, both as a medical provider and as the Chief Medical Officer for Centurion, a correctional medical company.  A full description of my experience and my curriculum vitae are included in my initial report.

3.     According to Dr. Murray's report, the San Diego Sheriff's Office ("SDSO") retained Dr. Murray to prepare an expert witness report to evaluate the allegations in the *Dunsmore* class action lawsuit related to medical services at the San Diego County Jail ("Jail").  According to his report, Dr. Murray and a team of several other individuals reviewed medical records and data provided to them by defense counsel, visited seven Jail facilities, and interviewed Dr. Freedland, CEO and Chief Medical Officer of Correctional Health Partners ("CHP"), and Dr. Nas Rafi, Medical Director of CHP operations at the Jail.  Following his review, Dr. Murray opined that all of the Plaintiffs' allegations in *Dunsmore* regarding the problems with the medical system at the Jail are "false."  Murray Report at 41-44. He concluded that "[t]he current SDSO healthcare delivery system is neither indifferent nor insensitive to the medical needs of its [incarcerated person] patients." *Id.* at 44.

4.     As set forth below, I disagree with Dr. Murray's ultimate opinion regarding the adequacy of the medical care provided to incarcerated people in the Jail.  As I set forth in my initial report and as I explain below, the medical system at the Jail places incarcerated people at a substantial risk of serious harm.  Moreover, I disagree with many of the opinions Dr. Murray offered in his report regarding the adequacy of specific parts of the medical system at the Jail.

/ / /

/ / /

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1395**

**I.    Dr. Murray has limited experience working in jail settings and has not done so since the 1990s.**

5.    The ideal qualifications for someone performing a comprehensive survey of a county jail's medical program would be clinical and supervisory experience in a county jail setting.  According to his own description of his experience, Dr. Murray has not worked at a jail since he was an administrator at the Cook County Jail in the 1990s.[1]  Since 2009, Dr. Murray has been a senior administrator within the Texas prison system.  Similarly, none of the other three individuals with resumes included within Dr. Murray's report list jail experience in their resumes.  *See* Murray Report at 146-51.  Kirk Abbott has been a nursing administrator in the Texas Prison system since 2000.  Melanie Roberts has been a staff pharmacist in the Texas Prison system since 2001.  Kelly Coates appears to be an administrator for the medical system for the Texas state prison system, but has never worked in a jail and has no medical training.

6.    While prisons and jails are similar in some respects (both house incarcerated persons), they are also different in many significant ways.  Most patients arriving at a jail enter the jail directly from the community.  Many jail patients have not been receiving regular medical care in the community prior to arriving at a jail.  As a result, jails must evaluate incarcerated people quickly and accurately and be ready to provide immediate treatment for a wide variety of urgent,

---

[1] On his CV, Dr. Murray indicates that, in his role as the Senior Vice President for the Offender Health Services at the University of Texas Medical Branch Correctional Managed Care, he is "[r]esponsible for ensuring the provision of all medical, mental health, and dental services for approximately 100,000 adult offenders in Texas Department of Criminal Justice state jails and prisons."  Murray Report at 45.  My understanding is that the "state jails" to which Dr. Murray refers only confine "adult felony offenders who are sentenced" to those jails.  *See* Texas Department of Criminal Justice, *Prison and Jail Operations*, https://www.tdcj.texas.gov/divisions/cid/prison_jail_ops.html.  As such, though those facilities are referred to as "jails," they are different from the San Diego County Jail and other jails in which I have worked in that they do not confine unsentenced criminal detainees who are coming to the facility straight from the community.

1  acute, and chronic medical problems, such as withdrawal from alcohol, opiates, and

2  other substances, chronic diseases such as diabetes, infections, and many other

3  medical conditions.  On the other hand, most incarcerated people arriving at a prison

4  are not arriving from the community.  Most have been incarcerated in a jail for some

5  period of time before arriving at the prison.  This distinction is important in a few

6  respects.  First, because individuals arriving at prison have generally already been in

7  a jail, they usually have already had any medical conditions diagnosed and received

8  treatment for those conditions.  As a result, people arriving at prison are much less

9  likely to be suffering from out-of-control chronic or acute medical conditions.

10  Second, because drugs and alcohol are less available in jails than in the community,

11  individuals arriving at prison are much less likely to be experiencing withdrawal.

12      7.    Another important difference between jails and prisons is that patients

13  typically stay for a short period of time in a jail—on average around a month—

14  whereas patients in prison typically are incarcerated in a prison for at least a year

15  and usually much longer. Consequently, it is much more important for a jail to

16  maintain communication and continuity of care with outside medical practitioners

17  who were taking care of a patient before they came to jail and will be caring for

18  them again once they leave jail.

19  **II.    Dr. Murray offered opinions about the adequacy of the Jail medical
        system without speaking to incarcerated people.**

20

21      8.    Dr. Murray's report does not indicate that he spoke with any

22  incarcerated people in the Jail.  Plaintiffs' counsel has informed me that Plaintiffs

23  agreed that Defendants' experts, including Dr. Murray, could speak with

24  incarcerated people in the Jail so long as Plaintiffs' counsel was present for the

25  conversations.  The fact that Dr. Murray did not speak with any incarcerated people,

26  despite the opportunity to do so, undermines his opinions.  Such interviews are an

27  essential component of any review of a healthcare system because they provide an

28  understanding of the system from the perspective of patients.  For example, when

1   the National Commission on Correctional Health Care ("NCCHC") evaluates a

2   facility, it interviews a substantial number of incarcerated people.  NCCHC Report,

3   January 2017, DUNSMORE0260623.

**III.    Dr. Murray offered opinions about the adequacy of the Jail medical system without conducting a substantive review of any in-custody deaths.**

9.    As I discussed at length in my initial report, one of the most critical functions of any health care system, but especially a correctional health care system, is to carefully review any in-custody deaths "to identify medical errors that led to adverse outcomes ... so that those errors can be avoided in the future."  Keller Report ¶ 92.  This type of review is especially important for the Jail.  In recent years, the County been the subject of multiple, high profile wrongful death lawsuits and four reports critical of the healthcare system and/or high death rate in the Jail: one by Homer Venters, one by NCCHC, one by the State Auditor, and one by Analytica Consulting.  *See* NCCHC Report; Venters Report, March 2020, SD_215361; California State Auditor Report ("State Auditor's Report"), February 2022, SD_174794; Analytica Consulting Report ("Analytica Report"), DUNSMORE0116319.

10.    It is my opinion that any systematic review of a correctional health care system must closely review any in-custody deaths, as those adverse outcomes provide important information regarding the adequacy of care.  The existence of preventable deaths, especially multiple preventable deaths, is an important indicator that the health care system is not providing adequate care.  In my opinion, any review of a correctional medical system that does not examine in-custody deaths is foundationally flawed.

11.    In my report, I examined a number of deaths that occurred at the Jail and found that problems with the medical system contributed or caused many of the deaths.  Keller Report ¶¶ 86-242.  I discussed seven deaths from 2022 and 2023 at length.  *Id.* ¶¶ 119-237.  I then discussed how the problems I found with the medical

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**   **Ex. Q-1398**

1  care provided to the decedents reflected numerous systemic problems with the

2  healthcare system at the Jail, including that medical staff failed to examine very sick

3  people, conducted evaluations at cell front, ordered medications and diagnosed

4  patients without seeing them, failed to adequately communicate with each other, and

5  failed to continue care plans when people return from the hospital. *Id.* ¶¶ 238-39.

6  My findings related to these in-custody deaths formed one of the pillars of my

7  overall conclusion that the medical system at the Jail exposes incarcerated people to

8  a substantial risk of serious harm, including death.

9       12.    Dr. Murray did not offer any opinions regarding any in-custody deaths

10  in his report. Defendants provided Dr. Murray with medical records for five

11  individuals who died in 2024 while in custody at the Jail from non-homicide/non-

12  suicide causes. Murray Report at 39. Dr. Murray claims that "[t]hese medical

13  records were ... reviewed," though he does not indicate by whom. *Id.* at 39.

14  Dr. Murray attached as Appendix Q to his report short summaries for each of the

15  deaths. Notably, however, Dr. Murray did not provide any analysis regarding

16  whether the medical care provided to these five individuals before they died met the

17  standard of care. He also did not opine on whether the deaths were preventable,

18  whether any deficiencies in the Jail healthcare system were factors in the deaths, or

19  whether the Jail should have made any changes to its medical system in response to

20  the deaths.

21       13.    Dr. Murray did not mention, let alone review or analyze, any deaths

22  that occurred prior to 2024.[2] His Appendix B, which lists all of the materials he was

23  provided for review, also does not list any records for any of the individuals who

24  died in-custody prior to 2024.

25

---

26  [2] The only opinion that Dr. Murray offers related to mortality at the Jail is to
27  question whether the data regarding the Jail's mortality rate are accurate. My
    response to Dr. Murray's opinions regarding the mortality rate is below. *See*
28  Section IV, *infra*.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1399**

14.     Because Dr. Murray did not offer any opinions regarding in-custody deaths at the Jail, it is my opinion that his opinions regarding the adequacy of care in the system are fundamentally flawed and unreliable.  Put simply, any review of any medical system that does not consider whether the system performed adequately in situations where patients died is worthless or nearly so.  It is not possible to understand the strengths and weaknesses of a medical system without understanding what happened when patients being cared for in the system have died.  Dr. Murray's failure to review any of the in-custody deaths at the Jail is particularly egregious given that in-custody deaths are at the very core of the allegations and evidence in this case.  The words "death" and "deaths" appear over 100 times in the Third Amended Complaint.  The State Auditor's Report, which was cited extensively by Plaintiffs in the Third Amended Complaint, concluded, based on a review of 30 in-custody deaths, that "deficiencies with how the Sheriff's Department provides care for ... incarcerated individuals ... likely contributed to in-custody deaths." SD_174794.  Dr. Murray himself acknowledged that in-custody deaths are important, stating in his report that "[i]n-custody mortality is an important metric that should be reviewed in all jail healthcare systems."  Murray Report at 40. Though he wrote this statement in the context of a discussion of the mortality rate at the Jail rather than as part of an analysis of any specific deaths, it shows that he knows that in-custody deaths are central to this case and relevant to the evaluation of the adequacy of healthcare systems.

15.     The Joint Commission of Accreditation of Health Organizations ("Joint Commission"), an organization that evaluates hospitals, provides a model for how to perform investigations into whether poor or inadequate medical care contributed to a death and whether the death was preventable.  The Joint Commission has a guideline for evaluating deaths or other sentinel events called the Framework for Root Cause Analysis and Corrective Actions, which is available at

https://www.jointcommission.org/-/media/tjc/documents/resources/patient-safety-

topics/sentinel-event/rca_framework_101017.pdf.  The Joint Commission does not determine whether inadequate medical care contributed to a death by simply looking at hospital systems—for example, determining whether there is an emergency department, whether the inpatient floors are staffed with nurses, or what the average lab turnaround time is.  When investigating deaths, they look in detail at those specific cases to determine whether poor emergency department care, short staffing, lab problems, or any other system failures contributed to the deaths.  To this end, the Root Cause Analysis includes 24 questions, many of which include sub-questions, to determine whether the system contributed to the specific sentinel event, such as a death.

16.    It is my opinion that Dr. Murray and his team cannot opine that the Jail has no systemic problems without evaluating the medical care provided to patients who died while in the Jail.  To have not evaluated the deaths at all is a fatal flaw in Dr. Murray's methodology that negates his entire thesis.

**A.    For the three 2024 deaths I reviewed, one was likely preventable, another may have been preventable, and I lack sufficient information to offer an opinion regarding the third.**

17.    In or around September 21, 2024, Plaintiffs' counsel provided me with the medical records for the five deaths summarized in Appendix Q of Dr. Murray's report.  These records were not available to me at the time I wrote my initial report.  A full list of the materials I considered for this report (all of which I reviewed after the disclosure of my initial report on August 21, 2024) is attached hereto as Appendix C.

18.    My understanding is that Plaintiffs' expert on substance use disorders will be offering opinions regarding two of those deaths (the deaths of Eric Wolf and Richard Woodford); I therefore offer no opinion related to Mr. Wolf and Mr. Woodford's deaths.  For the remaining three deaths, I offer the following opinions, explained in more detail below.  First, it is my opinion that Chase Mitchell's death from ███ was potentially preventable.  Moreover, it is my

1  opinion that problems with the medical system that I identified in my initial report

2  caused, at least in part, his death.  Second, since I have not been provided with the

3  cause of death for Liutoa Vili, I am unable to opine regarding whether his death was

4  preventable.  That said, the care he received in the days preceding his death for a

5  ███████████ fell below the standard of care and it is therefore possible that

6  Mr. Vili's death was preventable and caused, at least in part, by the substandard

7  care.  Third, I am unable to offer an opinion regarding the death of Majid Almajid,

8  as his medical records do not include a cause of death.  I can opine, however, that

9  the care he received in the Jail for a ███████ did not meet the standard of care.

10  **1.  Chase Mitchell –** ████████

11  19.  █████████████████████████████

12  ████████████████████████████████████

13  ████████ In my opinion, Mr. Mitchell's death was likely preventable.

14  20.  ████████████████████████████

15  ███████████████████████ ████████████████

16  ████████████████████████████████████

17  ██████████████████████████████████

18  █████████████████████████████████████

19  ████████████████████████████████

20  ████████████████



21  _____

22  ³ For nearly all of the medical files that I reviewed that Defendants produced for Dr.

23  Murray's report, there was one medical file for each individual.  Throughout this
    report, I cite to the corresponding records using the person's last name.  The page
    numbers indicate the page number of the PDF.

24  ████████████████████████████████████

25  ████████████████████████████████████

26  ████████████████████████████████████

27  ████████████████████████████████████

28  ████████████████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. Q-1402**



[4598005.1]

Case No. 3:20-cv-00406-AJB-DDL

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1403**



1

2

3

4      28.

5

6

7      29.

8

9

10

11      30.      **In my opinion, Mr. Mitchell's death was likely preventable**.

12

13

14

15

16

17

18

19

20

21

22

23                                          That decision to treat Mr. Mitchell

24      without an evaluation did not meet the standard of care and likely contributed to his

25      death.

26      31.

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**      **Ex. Q-1404**

1　████████████████████████████████████████

2　███████████████████████████

3　　　**2.　Liutoa Vili –** ██████

4　　32.　███████████████████████████████████

5　██████████████████████████████████

6　████████████████████████████████████

7　█████████████████████████████████████

8　███████████████████████ Neither the paramedic

transport records nor the hospital records for this event are included in the records

provided to me.  I also do not have access to the autopsy report.

　　33.　Without knowing the autopsy results, including the cause of death, I

cannot say whether Mr. Vili's death was preventable.  I can, however, opine that

much of the care he received for a ████████████, including care in the days

leading up to his death, fell below the standard of care.  It is therefore possible that

Mr. Vili's death was preventable and caused by substandard care at the Jail.

　　34.　███████████████████████████

17　████████████████████████████████████

18　█████████████████████████████████████

19　█████████████████████████████████████

20　███████████████████████████████████

21　██████████████████████████████████████

22　██████████████████████████████████

23　█████████████████████████████████████

24　███████████████████████████████████████

25　█████████████████████████████████████

26　████████████████████████████████

27　█████████████████████████████████████

28　█████████████████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. Q-1405**



35.

36.

37.

38.

39.

[4598005.1]    Case No. 3:20-cv-00406-AJB-DDL

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1406**

1   ■■■■■■■■■■■■■■■■

2   ■■■■■■■■■■■■■■■■■

3   ■■■■■■■■■■■■■■■■■

4   ■■■■■■■■■■■■■■■■■■

5   ■■■■■■■■■■■■■■■■■

6   ■■■■■■■■■■■■■■■■■■

7   ■■■■■■■■■■■■■■■■■■

8   ■■■■■■■■■■■■■■■■■■

9   ■■■■■■■■■■■■■■■■■■

10   ■■■■■■■■■■■■■■■■

11   ■■■■■■■■■■

12   40.   ■■■■■■■■■■■■■■■

13   ■■■■■■■■

14   •   ■■■■■■■■■■■■■■

15   ■■■■■■■■■■■■■■■

16   ■■■■■■■■■■■■■■■■

17   ■■■■■■■■■■■■■■■■■

18   ■■■■■■■■■■■■■

19   ■■■■■■■■■■■■■■■

20   ■■■■■■■■■■■■■■■■■■

21   ■■

22   •   ■■■■■■■■■■■■■■■

23   ■■■■■■■■■■■■■■■■■■

24   ■■■■■■■■■■■■■■

25   ■■■■■■■■■■■■■■■■

26   ■■■■■■■■■■■■■

27   **3.**   **Majid Almajid –** ■■■

28   41.   ■■■■■■■■■■■■■■■■

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. Q-1407**

1 ████████████████████████████████████████████

2 █████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████████████████████████████████

5 █████████████████████████████████████████████

6 ██████████████████████

7      42.    Without knowing the autopsy results or the cause of Mr. Almajid's

8 death, I cannot say whether his death was preventable.

9      43.    From my review of his records, however, I can say that the treatment he

10 received for ████████████ fell below the standard of care.

11     44.    ██████████████████████████████████

12 ███████████████████████████████████████████

13 ███████████████████████████████████████████

14 ██████████████████████

15     45.    █████████████████████████████████

16 ██████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████

19     46.    ██████████████████████████████████

20 █████████████████████████████████████████████

21 ████████████████████████████████████████████

22     •    ████████████████████████████████████

23          █████████████████████████████████████

24          █████████████████████████████████████

25          ██████████████████████████████████████

26          █████████████████████████████████████

27          ██████████████████████████████████████

28          ██████████████████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**          **Ex. Q-1408**

1

2

3    •

4

5

6    47.

7

8

9

10

11

12

13

14

15    48.

16

17    49.

18

19

20

21

22

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1409**

1 ███████████████████████████████████████████

2    50.   ███████████████████████████████████

3 ███████████████████████████████████████████

4 ██████████████████████████████████████

5 ████████████████████████████████████████████

6 █████████████

7    51.   ███████████████████████████████████████

8 █████████████████████████████████████

9 ███████████████████████████████

10    52.   On May 5, 2024, Mr. Almajid died in the Jail, as described above.

11    53.   Collectively, the care provided to Mr. Almajid for his █████████ fell

12 below the standard of care. ███████████████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ██████████████████████████████████████████

17 ██████████████████████████████████████ All of

18 the following are examples of medical mismanagement in his case:

19    •   ███████████████████████████████████████

20        ███████████████████████████████████

21    •   ████████████████████████████████████████

22        ████

23    •   ██████████████████████████████████████

24        ██████████████████████████████████████

25        █████████████████

26    •   ████████████████████████████████████████

27        ████████████████████████████████████████

28        ███████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1410**

1  • ███████████████████████████

2  ████████████████████████████████

3  █████████████████████████████████████

4  ████████████████

5  • ████████████████████████████████████

6  █████████████████████████████████████

7  ██████████████████████████████

**B.    Newly available documents regarding two other deaths at the Jail reflect serious problems with the care provided at the Jail and the Jail's reporting of in-custody deaths.**

54.    Below, I provide opinions regarding two additional in-custody deaths. These two deaths, one of which I discussed in my initial report, both reveal extraordinarily serious problems with the medical system in the Jail. I am presenting opinions regarding these deaths now because documents relevant to these deaths have become available since I issued my initial report.

**1.    Keith Bach – ████████**

55.    Mr. Bach died on September 28, 2023. I previously discussed the death of Keith Bach in my initial report in the context of failures of the Jail's morbidity and mortality reviews. Keller Report ¶¶ 108-114. I opined that the death review conducted by NaphCare was deficient for multiple reasons. *Id.* At the time that I issued my initial report (August 21, 2024), the County had not yet completed its investigation into his death and therefore the autopsy report was not available to me. On September 18, 2024, the Coroner for San Diego County released the autopsy report. Thereafter, Plaintiffs provided it to me.

56.    The information contained in the coroner's report is shocking. As discussed in more detail below, the coroner's report includes information which establishes that Mr. Bach's death was 100 percent preventable. Even more troublingly, the coroner found that the care that the County provided to Mr. Bach was so deficient that the coroner classified the death as a homicide. Bach Coroner's

1    Report at PDF 5, 8. I offer no opinion on whether the death was, in fact, a

2    homicide. But, having now reviewed the medical records for Mr. Bach, I fully agree

3    that his death was preventable.

4    (a)    <b>Background Regarding Type 1 Diabetes</b>

5        57.    Mr. Bach died from complications related to his Type 1 diabetes. Type

6    1 diabetics make no insulin and so, unlike Type 2 diabetics, they need insulin to

7    survive. The Standard of Care for the treatment of Type 1 diabetics is found in

8    Diabetes Management in Detention Facilities: A Statement of the American

9    Diabetic Association.[6] Some of the relevant ADA standards pertinent to Mr. Bach's

10   case are:

11   •    Within 24 hours "[i]ndividuals diagnosed with diabetes should

12        promptly undergo a comprehensive medical history review and

13        physical examination by a health care professional" *Id.* at 545 (Intake

14        Screening).

15   •    Individuals with insulin pumps "should retain uninterrupted access to

16        these tools upon their introduction to the detention system." *Id.* Insulin

17        pumps work by infusing a steady supply of insulin all the time. This is

18        called the "basal" insulin, which Type 1 diabetics need for their basic

19        metabolism, even if they do not eat. Patients with an insulin pump can

20        then trigger the pump to give them additional boluses of insulin every

21        time they eat. This is called "prandial" insulin, meaning insulin needed

22        to metabolize their food.

23   •    If patients are not using an insulin pump, "[p]eople with type 1 diabetes

24        should be treated with a daily injection of long-acting basal insulin plus

25   _____

26   [6] Daniel L. Larber et al., *Diabetes Management in Detention Facilities: A Statement
     of the American Diabetes Association*, 47 Diabetes Care 544 (2024) ("Diabetes in
27   Detention"); American Diabetes Association, *Diabetes Management in Detention
     Facilities: Position Statement* (2021). The 2024 standards do not differ materially
28   from the 2021 standards as cited in this report.

1    rapid-acting prandial insulin at mealtimes." *Id.* at 548 (Medications).
2    Type 1 diabetics need long-acting basal insulin even if they do not eat.
3    (Examples of long-acting insulins are Lantus and Semglee. They are
4    usually dosed once a day). The short-acting prandial insulin is only
5    given at mealtimes. The amount of prandial insulin taken by a Type 1
6    diabetic for each meal varies depending on the amount of
7    carbohydrates in that particular meal. Type 1 diabetics are practiced in
8    calculating the number of carbohydrates in a particular meal and
9    calculating the units of insulin they need to metabolize those
10   carbohydrates. The correct dosage will vary with each meal and will
11   also vary if the patient decides not to eat the entire meal.

- "Insulin omission [in a type 1 diabetic] can lead to severe metabolic
  decompensation, including DKA [Diabetic Ketoacidosis]." *Id.* at 545
  (Intake Screening).

### (b)   Summary of Medical Care

58.   █████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████

59.   █████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████████████████
███████████████████   The Medical Examiner interprets this to mean that the
pump would be empty on September 27, 2023 at 8:00 a.m., but it makes more sense
to me if the pump was empty much earlier than this. I believe Mr. Bach meant that
his insulin pump would be empty that upcoming morning, September 26, 2023.

60. ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████
██████████████████████████████

61. ██████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████ "a daily injection of long-acting basal insulin
plus rapid-acting prandial insulin at mealtimes."  Diabetes in Detention at 548. ██

██████████████████████████████████████
██████████████████████████████████

62. ██████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████ Type 1 diabetics need short

acting insulin boluses when they eat based on the amount of carbohydrates in that

meal.  Type 1 diabetic patients need short acting insulin to cover their meals even if

their blood sugar is in the normal range.  As I discussed in my initial report, the Jail

does not have any Disease Management Guideline for Type 1 Diabetes that a nurse

or a NP could refer to in order to understand how to treat a Type 1 Diabetic.

63. 

64.

65.

66.

67.

after Mr. Bach had been declared dead at 4:09 a.m.  Bach Coroner's Report at PDF 3.  It therefore is very likely (if not certain) that the deputies completed this refusal form without actually witnessing Mr. Bach refuse care.  The other two refusals from earlier in the night are also

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1415**

1  suspicious.  During the very period that the first two refusals allegedly occurred,

2  "[a]ccording to sheriff's investigation, he (Mr. Bach) was reported to have asked

3  multiple deputies on numerous occasions for insulin.  During mealtimes, Mr. Bach

4  gave his food to fellow inmates, as he did not want to eat if he did not have access to

5  insulin.  Additionally, other inmates were attempting to assist Mr. Bach in

6  requesting insulin by pointing out to deputies that the alarm on Mr. Bach's insulin

7  pump was sounding and that the pump was empty."  Bach Coroner's Report at

8  PDF 7.  I therefore find that these refusal forms are not credible because it is

9  unlikely that Mr. Bach was attempting to get medical attention but also refusing his

10  medications.

11      68.  On September 28, 2023 at 3:40 a.m., Mr. Bach was found

12  unresponsive, not breathing and with no pulse.  *Id.* at PDF 3.  CPR and ACLS

13  resuscitation were attempted but Mr. Bach was pronounced dead at the scene at 4:09

14  a.m.  *Id.*

15      69.  An autopsy was performed on September 28, 2023 by Melanie Estrella,

16  DO, Deputy Medical Examiner.  *Id.* at PDF 2-4.  Nearly a year later, Dr. Estrella

17  concluded in the autopsy report that the cause of Mr. Bach's death was "Diabetic

18  Ketoacidosis" and the Manner of Death was "Homicide."  *Id.*at PDF 5, 8.

19              **(c)    Opinions**

20      70.  In my opinion, Mr. Bach's death was preventable.  Medical staff

21  violated the ADA standards of care for the treatment of Type 1 Diabetes on several

22  occasions.

23      71.  Mr. Bach never received "comprehensive medical history review and

24  physical examination by a health care professional." ████████████████

25  ████████████████████████████████████████

26  ████████████████████████████████████████

27  ███████  ██████████████████████████████

28  ████████████████████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. Q-1416**

1 ███████████████████████████████████████████████████████████.

2      72.    Mr. Bach was not allowed "uninterrupted access" to his insulin pump.

3 He informed the medical staff that his insulin pump was low and would soon run out

4 of insulin.  According to the Medical Examiner, he repeatedly attempted to notify

5 staff of his need for insulin, with no success.  The correct response would have been

6 to refill the pump with insulin.  This would have been easy to do.  Since it was not

7 done, the insulin pump ran out of insulin sometime before his blood sugar was

8 measured at 322 mg/dl. The pump running out of insulin was the most likely

9 explanation of why Mr. Bach's blood sugar spiked so dramatically.

10      73.    █████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ███████████████████████████████████████████████

16 ██████████████████████████████████████████████████

17 ███████████████████████████.

18      74.    ███████████████████████████████████████████

19 ██████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ██████████████████████████████████████████████

22 ██████████████████████████████████████  Mr. Bach

23 had historically done an excellent job of managing his own diabetes (Bach

24 Coroner's Report at 6), which the Jail practitioners would have known had they

25 obtained a "comprehensive medical history." ████████████████████

26 ████████████████████████████████████████████████████████

27 █████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**          **Ex. Q-1417**

1  ████████████████████████████████

2      75.    These missteps by the Jail—████████████████████

3  ████████████████████████████████████████████████

4  ██████████—resulted in "insulin omission" which led to "severe metabolic

5  decompensation, including" diabetic ketoacidosis.  Diabetes in Detention at 545.  In

6  Mr. Bach's case, the diabetic ketoacidosis resulted in his death.  Bach Coroner's

7  Report at 4.

8      76.    In my opinion, an important factor that contributed to Mr. Bach's death

9  was the fact that the Jail did not have any Disease Management Guideline for the

10  treatment of Type 1 Diabetes. Had they had such a guideline, the Jail practitioners

11  and the Jail nurses might have known how to appropriately manage Type 1 Diabetes

12  and not made the many mistakes that resulted in Mr. Bach's death.

13      77.    Had Mr. Bach received medical treatment conforming to the ADA

14  Standards, he, more likely than not, would not have died.

15      78.    In my opinion, the Jail medical practitioners showed gross

16  incompetence in the care of Mr. Bach and violated the medical standard of care.

17  Crucially, as confirmed by the coroner, their failures caused Mr. Bach's death:

18      Review of outpatient medical records clearly indicates that Mr. Bach
19      had demonstrable knowledge in managing his diabetes; however, as an
    inmate, he became reliant on the medical services provided by the jail
20      for continued management of his condition.  Following insufficient
    insulin administration while in custody, Mr. Bach developed diabetic
21      ketoacidosis and died.  This occurred despite medical records
    containing documentation of his medical condition, insulin
22      requirements, when his pump would be depleted of insulin, and
    multiple unanswered requests for insulin by Mr. Bach and fellow
23      inmates.  The death is due to complications of a natural disease.
    However considering the inaction (i.e., neglect) characterizing the
24      events leading to inadequate care while incarcerated of Mr. Bach's
    health conditions and ultimately his death, the manner of death is
25      classified as **homicide**.

26  Bach Coroner's Report at PDF 8.

27      79.    Though I express no opinion on whether his death was, in fact, a

28  homicide, I agree with the coroner's description regarding how the deficiencies in

1  care caused Mr. Bach's death.  Mr. Bach had a common medical condition.  Had he

2  received minimally adequate care—namely, being provided with insulin—he likely

3  would not have died.  No person in a correctional setting who is willing to comply

4  with care and to accept insulin should ever die from diabetic ketoacidosis.  That

5  Mr. Bach died, despite his efforts to notify medical staff of his need for insulin, is

6  shocking.  In my opinion, any system in which such a death occurred suffers from

7  serious, systemic problems that put incarcerated people at a substantial risk of

8  serious harm.

9      80.    In addition, the new information contained in the coroner's report

10  makes the problems with the morbidity and mortality reporting for Mr. Bach's

11  death, which I discussed in my initial report, even more concerning.  *See* Keller

12  Report ¶¶ 108-114.  Following Mr. Bach's death, the NaphCare M&M Committee

13  wrote:  "Though not related to this patient's death, it has come to the committee's

14  attention that specific policies on management of ███████ need to be

15  established by San Diego County and communicated to STATCare, so they can be

16  prepared to address patients with these medical devices."  NAPHCARE041858.

17  First, it is very troubling that the NaphCare M&M Committee, which should be

18  looking critically at all in-custody deaths in order to identify where staff made

19  mistakes (if any), concluded that Mr. Bach's death was not related to the

20  management of his ███████.  The coroner found the exact opposite.  This

21  failing of the M&M Committee suggests that it did not conduct a thorough

22  investigation.  Second, given the direct connection between the lack of chronic care

23  guidelines for Type 1 diabetes and Mr. Bach's death, the Jail should have created

24  such guidelines on an urgent basis.  Yet, as of the date of Dr. Murray's report

25  (August 21, 2024), nearly a year after Mr. Bach's death, the Jail still did not have in

26  place any chronic care or disease guidelines.  The County's failure in this respect

27  suggest that it does not take seriously its obligation to care for incarcerated people.

28  / / /

2.    **Jose Cervantes Conejo**

81.    I have also been provided with the outside medical records for Mr. Cervantes Conejo, who died at Palomar Medical Center on April 12, 2024 from facial and head trauma he experienced at the Jail approximately three hours after he was booked on March 29, 2024.[7]  These records were not available to me prior to the issuance of my initial report.  From the medical records provided to me, which do not include Mr. Cervantes Conejo's Jail medical records, it is not possible for me to opine regarding whether Mr. Cervantes Conejo's death was preventable.

82.    What is notable about Mr. Cervantes Conejo's death, however, is that it is not included on the SDSO website listing in-custody deaths.  *See* https://www.sdsheriff.gov/resources/transparency-reports (accessed on October 27, 2024).  The website lists seven in-custody deaths in SDSO facilities in 2024, but does not list Mr. Cervantes Conejo's death.

83.    The fact that Mr. Cervantes Conejo's death is not listed as an in-custody death is troubling and throws into question the Jail's reporting on in-custody deaths, an issue central to the *Dunsmore* lawsuit.  Mr. Cervantes Conejo died from injuries he suffered at the Jail while he was in the custody of the SDSO.  The federal Death in Custody Reporting Act, 34 U.S.C. § 60105, requires states to report to the U.S. Attorney General, "information regarding the death of any person who is detained, under arrest, or is in the process of being arrested, ... or is incarcerated at a municipal or county jail ...."  The Bureau of Justice Assistance of the U.S. Department of Justice has published a document entitled "Death in Custody

---

[7] *See, e.g.*, Cervantes Conejo Government Claim at PDF 62 ("Patient is a 44-year-old male brought from Vista jail where he was intoxicated and subsequently noticed on the ground with several episodes of nausea and vomiting."); *id.* at PDF 80 ("[Patient] presents to the ED as a trauma code activation from jail for evaluation of head injury with vomiting and altered mental status.  Per EMS, patient was intoxicated in his jail cell after being arrested.  He was reportedly verbal and responsive upon arrest.  Three hours into his arrest, police found the patient on the floor with altered mental status and was vomiting, prompting them to activate EMS.").

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1420**

1  Reporting Act: Reporting Guidance and Frequently Asked Questions," which was

2  revised in October 2024 and is available at https://bja.ojp.gov/funding/performance-

3  measures/DCRA-Reporting-Guidance-FAQs.pdf.  The Guidance includes the

4  following frequently asked question:  "If an inmate is transferred to a medical

5  facility and dies there, not in a correctional facility, is that reportable?  Yes.  If the

6  incarcerated person, absent the medical condition, would have been in prison at the

7  time of death, it counts as a reportable death.  Although the person was not

8  physically in a correctional facility at the time of death, the death is still one of an

9  incarcerated individual."  *Id.* at 7.  Accordingly, Mr. Cervantes Conejo's death

10  should be considered an in-custody death.

11      84.    The County's failure to count Mr. Cervantes Conejo's death as an in-

12  custody death is problematic in a number of respects.  First, it raises the question of

13  whether the County has failed to count other in-custody deaths when people were

14  injured or became ill at the Jail but did not die in the Jail.  Second, Dr. Murray

15  opines that the death rate at the Jail is trending in the right direction in 2024.  But

16  that rate would be higher if Mr. Cervantes Conejo's death was included in the count

17  of in-custody deaths.

18      85.    I also have some concerns about the care that Mr. Cervantes Conejo

19  received at the Jail in the few hours he was there.  Labs at the ER showed

20  Mr. Cervantes Conejo's blood alcohol to be very high, at 324 mg/dL.  Cervantes

21  Conejo Government Claim at PDF 109.  Imaging showed a skull fracture, an orbital

22  fracture, and both subarachnoid hemorrhage and subdural hemorrhages around the

23  brain.  This was described as a "high complexity comprehensive trauma."  *Id.* at 63.

24      86.    Mr. Cervantes Conejo was admitted to the ICU.  Several specialists

25  consulted on his care, including a trauma surgeon, a neurosurgeon, intensive care

26  specialist, and later, a palliative care specialist.  *Id.* at 65, 66.

27      87.    Despite intensive medical care, Mr. Cervantes Conejo died on April 12,

28  2024.  The Summary of his hospital care included this statement: "[p]er trauma and

neurosurgery assessment and documentation the extent of injury is not compatible with a simple fall and seemed more traumatic however the events leading to it are unclear" *Id.* at 65, 66.

88.    Mr. Cervantes Conejo's medical records from the hospital also raise serious questions about why the Jail accepted him in the first place.  Mr. Cervantes Conejo had a very high blood alcohol level (324 mg/dL) when he arrived at the hospital.  *Id.* at 109.  Blood alcohol levels that high typically indicate that a person may have alcohol poisoning, which is a potentially life-threatening condition. Notably, Mr. Cervantes Conejo's blood alcohol level was likely even higher at the time he was booked into the Jail, as his body processed some of the alcohol in his system in the time between when he was booked and when hospital staff drew his blood to run the test three hours later.  Nursing staff at the Jail also informed the hospital staff that Mr. Cervantes Conejo was "disoriented" when he was booked into the Jail.  *Id.* at 98.  Given this information, it seems to me that the Jail should have refused to accept Mr. Cervantes Conejo and transferred him immediately to the hospital.  Had the Jail done so, he may not have suffered the injuries that appear to have caused his death.

**IV.    Dr. Murray's opinions regarding the death rate at the Jail are misleading and unsupported by evidence.**

89.    On February 3, 2022, the California State Auditor issued a report of its investigation into the alarming number of deaths that occurred in the Jail from 2006 to 2020.  State Auditor's Report.  The State Auditor's Report confirmed that the Jail had a higher rate of suicides and natural deaths (which can include deaths where deficient medical care is a factor) than jails in any other comparable county in California.  SD_174812-13.  The average death rate at the Jail in those years was 2.39 deaths per 1,000 incarcerated persons.  SD_174856.

90.    Dr. Murray correctly points out that "[i]n 2022, the San Diego County Citizen's Law Enforcement Review Board ('CLERB') contracted with Analytica

Consulting ... to analyze in-custody death data over the prior ten years." Murray Report at 38. Dr. Murray does not discuss the findings of the Analytica report, which corroborated the State Auditor's Report. The findings of the report included that "total deaths in San Diego Jails surpass the deaths expected based on the county's mortality rates," DUNSMORE0116321; that "[t]he number of excess deaths resulting from the actual and expected death difference is the highest in San Diego County" than any other comparable county in California, *id.*; and that "San Diego County is the only county with a statistically significant number of excess deaths," DUNSMORE0116322.

91.    Dr. Murray suggests that the findings of the Analytica report may not be accurate because of "some significant potential confounders." Murray Report at 39. Nothing in Dr. Murray's description of his educational and professional background or his CV suggests that he has the expertise to analyze a complex data analysis like the one performed by Analytica. Even assuming he had that expertise, Dr. Murray's short criticisms of the Analytica study make little sense and/or have no basis.

92.    First, Dr. Murray states that "[i]t is not clear whether mortality was captured and assessed in a consistent way across all compared county jail systems." *Id.* at 39. The report, however, makes clear that the authors relied on data collected by the California Board of State and Community Corrections ("BSCC") and the California Department of Justice. DUNSMORE0116325, 116331. Dr. Murray has not identified any specific issues with the data collection. His criticism is therefore nothing more than conjecture.

93.    Second, Dr. Murray writes that "[i]t is not clear whether county jail population denominators were captured in a consistent way across all systems." Murray Report at 39. Dr. Murray does not identify to what "denominators" he is referring. And again, Dr. Murray's criticism is nothing more than conjecture, as he has not presented any evidence to support that the data was reported or collected

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1423**

1   inconsistently across counties.

2   94.   Third, Dr. Murray writes that "[i]t is not clear if expected rates for each

3   county jail (based on the county-wide mortality rates) were generated by applying

4   the age, race, gender structure of each county jail population." *Id.* at 39.  But it

5   appears that the Analytica authors did exactly that.  DUNSMORE0116331, 116339.

6   95.   Fourth, Dr. Murray writes that "[a]s the investigators note, data on

7   physical health, mental health, substance use disorder, homelessness were not

8   available.  It is possible that an increased differential (on any of these factors)

9   between the San Diego County jail and the San Diego general population could have

10   partially driven the increased excess deaths observed in San Diego County jail

11   population." Murray Report at 39.  Dr. Murray is correct that the Analytica authors

12   acknowledge these limitations.  DUNSMORE0116339.  But Dr. Murray has not

13   provided any evidence to suggest that those limitations actually impacted the results

14   of the study.  Moreover, those limitations existed for all of the counties that

15   Analytica evaluated.

16   96.   Lastly, Dr. Murray writes that "[i]n general, it is not clear whether the

17   observed excess deaths in the San Diego County jail system reflect a selection

18   process that resulted in a greater contrast in baseline poor health between the county

19   jail and the general population (compared to the other counties examined) or were

20   related to correctional health care." Murray Report at 39.  This criticism is accurate,

21   but misses the point and is not supported by any evidence.  The authors of the study

22   concede that they were not attempting to explain why there were disparities among

23   counties.  DUNSMORE0116339 ("While our research has delineated the differences

24   in deaths among county jails, we have yet to explain *why* they are different.").  It is

25   therefore possible, as I interpret Dr. Murray as suggesting, that the jail population in

26   San Diego County has a worse level of baseline health, compared to the population

27   in the community, than the jail populations in other counties.  But again, Dr. Murray

28   has not presented any evidence to support his conjecture.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**          **Ex. Q-1424**

97.     In my opinion, none of Dr. Murray's criticisms of the Analytica study undermine its conclusion that San Diego County was the only large county in California where the deaths in the jail exceeded expected deaths by a statistically significant amount.

98.     Later in his report, Dr. Murray writes that "[i]n-custody deaths reached a high in 2022 with 19 deaths as SDSO was emerging from the COVID-19 pandemic and have been declining since that time." Murray Report at 40.  This statement is misleading.  Though deaths in the Jail have declined in 2022 and 2023, they remain at extremely high levels.  As discussed above, the California State Auditor found that the Jail's death rate for 2006-2020 of 2.39 per 1,000 incarcerated people was very high.  SD_174856.  The death rates in the subsequent years have greatly exceeded that average:  4.5 deaths per 1,000 in 2021; 4.75 deaths per 1,000 in 2022; and 3.27 deaths per 1,000 in 2023.  Keller Report ¶ 88.  Dr. Murray discusses only the trend, not the quantity, which remains high.

99.     Dr. Murray also neglects to mention that the State Auditor's Report did not just examine the death rate.  The Auditor also reviewed 30 in-custody deaths, with an emphasis on cases that occurred between 2016 and 2020.  SD_174815.  It concluded that "deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals" had "likely contributed to in-custody deaths" and that the SDSO had "not consistently taken meaningful action when such deaths have occurred." SD_174794.  Accordingly, I disagree with Dr. Murray's opinion that the death rate in the Jail (a) has not been calculated correctly and (b) does not reflect problems with the healthcare system.

**V.    The audit of chronic care that Dr. Murray's team performed is methodologically and substantively flawed.**

100.   Dr. Murray's team reviewed 81 medical records for incarcerated people "with chronic care conditions ... to assess the quality of care being provided and to determine if the standard of care was met." Murray Report at 14-15.  From this

1    review, Dr. Murray concluded that "[o]verall, there was evidence of high-quality

2    care being provided to the IPs in the SDSO." *Id.* at 15.  He further concluded that

3    "[p]rovider chronic care was timely and consistent with a community standard of

4    care." *Id.* at 44.

5         101.   I did not receive the complete set of the 81 records reviewed by Dr.

6    Murray until September 21, 2024. They were quite voluminous and I began

7    reviewing them immediately.  The medical files I reviewed averaged many hundreds

8    of pages long and some files were over a thousand pages.  On average, each file

9    required at least half a day of work to review and write up my analysis.  I had hoped

10   to receive these records directly in TechCare, which I believe would have been more

11   efficient, but was informed I could not have access.  Under the circumstances, given

12   the November 1, 2024, deadline for rebuttal reports, I was able to review 19 of the

13   records.  As described below, this was sufficient to conclude that Dr. Murray's

14   opinions are flawed.

15        102.   In my opinion, Dr. Murray's medical record review of the care

16   provided to patients with chronic illnesses, who are the sickest and most difficult to

17   treat in the Jail, is at the center of his report.  As I explain below, Dr. Murray's

18   purported audit suffers from serious methodological problems.  Moreover, I disagree

19   substantively with the findings of the review that the care provided to 75 of 81 class

20   members (93%) met the standard of care.  Murray Report at 15 & Appendix J.  I

21   therefore also disagree with Dr. Murray's overarching conclusions about the quality

22   of the chronic care at the Jail.  *Id.* at 15, 44.

23        103.   Dr. Murray presents the findings from the review of each of the 81

24   records in Appendix J.  Dr. Murray does not appear to have reviewed the medical

25   files himself; each file includes the name for a "Reviewer" followed by the one of

26   five names:  Stephen Boone, MD. (Patients 1-25); Erin Freeman, PA-C (Patients 26-

27   44); Jennifer Humphreys, FNP (Patients 45-46); Jane Leonardson, MD (Patients 47-

28   60); and John Pulvino, PA (Patients 61-81).  *See Id.* at 164-224.  For each file, the

1    reviewer indicated whether the care provided by the County "Meets Standard of

2    Care," "Does Not Meet Standard of Care," or "Meets Standard of Care – with some

3    reservations."

4        104.  Even before I reviewed some of the 81 medical files, I had concerns

5    regarding the quality of the reviews conducted by the reviewers.

6        105.  First, Dr. Murray did not share the qualifications for the five reviewers

7    who conducted the audit.  It is therefore not apparent that they are generally

8    qualified to determine whether the care provided to a patient met the standard of

9    care or specifically qualified to offer such opinions regarding care provided in a

10   correctional environment.

11       106.  Second, Dr. Murray did not indicate how the 81 files were selected or

12   by whom or with what criteria.

13       107.  Third, it is not clear in all cases what "standard of care" the reviewers

14   used when evaluating the care.  Though some reviewers did include that information

15   for some patients, *see, e.g.*, Patients 30, 31, most of the reviewers did not include

16   reference to any specific standards of care.  The absence of reference to specific

17   standards of care is problematic in at least two respects.  First, the conclusions of the

18   reviewers are not tethered to a documented standard of care and therefore are liable

19   to vary from person to person.  Also, practitioners who are poorly educated or who

20   have not kept up with changes in medical knowledge may provide care outside of

21   recognized appropriate boundaries.  For example, for my report, the Standard of

22   Care for Type 2 Diabetes that I used was *Diabetes Management in Detention*

23   *Facilities: A Statement of the American Diabetes Association* (referred to elsewhere

24   as "Diabetes in Detention").  None of the reviewers stated what standard for diabetic

25   management they were using.  Second, if the reviewers were not using agreed-upon,

26   documented standards of care for their reviews, it becomes more likely that different

27   reviewers would reach different conclusions regarding the care provided to the same

28   patient.

108.    Fourth, since the SDSO does not have Disease Management Guidelines or Chronic Care templates, *see* Murray Report at 15; Keller Report ¶¶ 501-505, the reviewers could not determine whether the County followed its own policies for providing chronic care, as there were no policies to follow.  In my report, I explained why such policies are critical in a correctional environment.

109.    Sixth, it is not clear to me that Dr. Murray's reviewers understand the policies and processes for providing medical care at the Jail.  Accordingly, it is not clear that they evaluated whether the care the Jail provided was consistent with the Jail's policies and processes.

110.    Beyond these methodological problems, I found significant issues with Dr. Murray's reviewers' substantive conclusions regarding whether the care the Jail provided to class members met the standard of care.  I reviewed 19 of the 81 files which, in my opinion, was a sufficient sample to draw conclusions regarding the remaining reviews.  I used the following process to select the files for review.  First, at the time that Dr. Murray submitted his report on August 21, 2024, I already had partial medical files for ████████████ and ████████████ that covered their treatment through December 2023, so I reviewed those two files first.  After Defendants produced the 81 files to Plaintiffs, I first reviewed updated records for Mr. ████ and Mr. ██████ that extended through April 2024.  I then randomly selected one of the two files reviewed by Jennifer Humphreys, FNP (Patients 45-46).  I then selected 4 files for each of the other 4 reviewers, using a random number generator to determine which of the specific files I would review.

111.    My review of the medical files confirmed my pre-review concerns and revealed other serious problems.  In Appendix A, I have provided detailed analysis of the 19 medical records I reviewed.

112.    First, for nearly all of the files I reviewed, I disagreed with the ultimate conclusion drawn by Dr. Murray's reviewers.  The reviewers concluded that the care

1  the Jail provided met the standard of care for 18 of the class members.[8]  I only

2  agreed with Dr. Murray's reviewers with respect to the care provided to 2 of those

3  class members.  For the other 16 class members, I concluded that the care provided

4  by the Jail did not meet the standard of care.

5      113.   These failures by the County to meet the standard of care are very

6  concerning.  In some instances, they resulted in harm to incarcerated people.  The

7  most egregious of these cases include:



22  My detailed reviews of the medical files for these individuals are in Appendix A.

23      114.   Even the cases where the failures did not result in tangible, immediate

24  harm to class member reflect serious problems with the system.  Standards of care

25  exist to ensure that medical professionals provide appropriate treatment to patients

26  _____

27  [8]

28

1  and do not expose their patients to unnecessary risk.  A system that consistently

2  provides care to patients that falls below the standard of care, like the Jail's system,

3  necessarily exposes those patients to a substantial risk of serious harm.  Not every

4  failure to meet the standard will result in harm.  But each failure presents a real risk.

5  Accordingly, it is my opinion that the medical records that Dr. Murray's reviewers

6  reviewed reflect a system that places patients at a substantial risk of serious harm.

7       115.   Second, the reviews conducted by Dr. Murray's reviewers were

8  generally of poor quality, were superficial, and often contained factual errors. ▮

9  ▮

10

11

12

13

14

15

16

17

18

19

20       116.   Third, because I randomly selected which files to review, it is likely

21  that the same problems I identified—reviewers finding that the standard of care was

22  met when it was not, conducting superficial reviews, and making factual errors—

23  exist in many of the files I did not review.  It is therefore my opinion that the

24  chronic care audit that Dr. Murray included in his report—in which his reviewers

25  concluded that the care the Jail provided met the standard of care in 93% of the

26  cases—is unreliable.  It is therefore also my opinion that any conclusions that

27  Dr. Murray drew from the chronic care audit are also unreliable.

28       117.   Fourth, in reviewing the medical files, I identified problems with care

that were consistent with my findings offered in my initial report. Accordingly, these medical files provide additional evidence of the serious problems with medical care at the Jail. Specifically, the medical files revealed problems with:

- Failures to continue medications class members were taking in the community – *See* Appendix A, ██████████████████ ██████████████████████████. *See also* Keller Report ¶¶ 285-303. In nearly all of these cases, the Jail removed the class member from a medication he was taking in the community because it was not on the NaphCare formulary and then prescribed a less effective medication.

- Failures to continue treatments that class members were receiving in the community – *See* Appendix A, ██████████████ ████████████████████████ ████████████████████████ ████████████. *See also* Keller Report ¶¶ 304-312.

- Failures of the sick call process to address class members' medical concerns – *See* Appendix A, ██████████████ ████████████████████████ ██████████████. *See also* Keller Report ¶¶ 319-367.

- Alleged refusals of care, including refusals being witnessed only by custody staff and inadequate counseling of class members regarding the risks of refusals – *See* Appendix A, ████████████ ██████████████. *See also* Keller Report ¶¶ 387-415.

- Failures to conduct any or an adequate physical examinations of patients when necessary to provide them with appropriate treatment, including instances where no examination occurred because STATCare practitioners were providing care remotely – *See* Appendix A,

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1431**

1    ███████████████████████████████████████. *See also* Keller

2    Report ¶¶ 416-417, 433, 442-47, 541-42, 546-47.

3    • Nurses providing care outside of their scope of practice – *See* Appendix

4    A, ██████████. *See also* Keller Report ¶¶ 448-451.

5    • Failures to conduct diagnostic testing or to review the results of

6    diagnostic testing – *See* Appendix A, ████████████████. *See*

7    *also* Keller Report ¶¶ 486-497.

8    • Non-existent or incomplete discharge planning – *See* Appendix A,

9    ████. *See also* Keller Report ¶¶ 732-761.

10   • Inadequate custody staffing interfering with medical care – *See*

11   Appendix A, █████. *See also* Keller Report ¶¶ 659-664.

12   • Failures to perform Health Assessments within 14 days of booking and

13   after a year in the Jail – *See* Appendix A, ████████████████

14   ████████████. *See also* Keller Report ¶¶ 261-284.

15   • Lack of confidentiality in medical visits – *See* Appendix A,

16   ██████████. *See also* Keller Report ¶¶ 665-686.

17   • Failures to gather vitals signs at visits, including visits for hypertension

18   – *See* Appendix A, ████████████████████. *See also*

19   Keller Report ¶¶ 416-417, 443-44.

20   • Failures to conduct a face-to-face interview with a class member within

21   48 hours of submission of a health care request. *See* Appendix A,

22   ████████████████. *See also* Keller Report ¶¶ 342-354.

23   • Failures to provide appropriate follow-up care/chronic care – *See*

24   Appendix A, █████████████████████

25   ████████████████████████████████

26   ████████████████████████████████

27   ████████████████████████████████

28   ████████████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**     **Ex. Q-1432**

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████ .

3      *See also* Keller Report ¶¶ 709-731.

4      118.   In his report, Dr. Murray opined that in the cases where his reviewers

5 found the Jail had not met the standard of care, "there were minor deviations from

6 the standard of care."  Murray Report at 15.  I disagree with this opinion from Dr.

7 Murray.  The failures I noted above are serious problems, not "minor deviations

8 from the standard of care."

9      119.   The medical files also reflected serious substantive problems with the

10 care that the Jail provides to class members for many common chronic conditions,

11 including:

12     •   Hypertension – *See* Appendix A, ███████████████████

13 ████████████████████████████████████████████████ .

14        *See also* Keller Report ¶¶ 181, 235.

15     •   Diabetes – *See* Appendix A, ████████████████████

16        ██████ .  *See also* Keller Report ¶¶ 526-551.

17     •   Hernias – *See* Appendix A, ████████ .  *See also* Keller Report ¶¶ 552-

18        579.

19     •   Asthma – *See* Appendix A, ██████████████ .  *See also* Keller

20        Report ¶¶ 613-630.

21     •   Hepatitis-C screening – *See* Appendix A, ████████████

22        ██████ .  *See also* Keller Report ¶¶ 507-525.

23      120.   My detailed findings with respect to my review of the 19 medical files I

24 reviewed are contained in Appendix A to this report.

25      121.   In sum, it is my opinion that the medical files I reviewed serve as

26 strong evidence (in addition to evidence cited elsewhere in this report and in my

27 initial report) that, on a systemic basis, the Jail exposes class members with chronic

28 conditions to a substantial risk of serious harm.

## VI.    Dr. Murray's audit of intake and Health Assessments is methodologically and substantively flawed.

122.   In his report, Dr. Murray opined:

The intake screening process of newly incarcerated individuals upon arrival to a correctional facility holds significant importance in both clinical and operational contexts. This initial assessment serves as a critical opportunity to gather essential information about the incarcerated individual's medical history, mental health status, and any immediate healthcare needs.  It allows healthcare providers to identify and address acute medical conditions or emergencies promptly, ensuring the safety and well-being of the incarcerated population as well as that of the staff.  Moreover, intake screenings provide valuable insights into chronic health conditions, substance use disorders, and infectious diseases that may require ongoing management or treatment within the correctional facility.  Beyond medical considerations, these assessments also play a pivotal role in identifying mental health issues such as depression, anxiety, and or suicidal ideation, which require specialized care and intervention.  By conducting thorough intake screenings, correctional healthcare providers can establish a baseline for each incarcerated individual's health status, initiate appropriate plans of care, and facilitate continuity of care throughout their incarceration.  This proactive approach not only supports the health and safety of incarcerated individuals but also contributes to the overall management and efficiency of the healthcare delivery system within the correctional setting.

Murray Report at 9.  I agree with Dr. Murray about the critical importance of an adequate medical intake process at a jail.

123.   To evaluate the intake process at the Jail, Dr. Murray's team audited 75 patient charts to determine the time from booking to intake screening, whether patients were "appropriately referred and subsequent evaluations [were] completed," whether "Chronic care/critical meds [were] identified on screening and continued," and whether the Health Assessment was performed within 14 days.  *Id.* at 11-12 & Appendices G, I.  Results are given in a yes/no table with no explanations.

124.   Dr. Murray's audit is methodologically deficient in a number of respects.

125.   First, Dr. Murray did not provide any definition for how he determined whether a patient was, at intake, "appropriately referred and subsequent evaluations completed."

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1434**

126.   Second, he similarly did not provide a definition for how he determined "whether Chronic care/critical meds identified on screening and continued."  For example, would he consider a medication appropriately continued if, as the County frequently does, a STATCare midlevel practitioner substitutes formulary medications for non-formulary medications without an examination or discussion with the patient?  This is not, in my opinion, an appropriate process.  I identified cases in my report where non-formulary medications were inappropriately withheld pending approval through the non-formulary review process.  Keller Report ¶ 154 (discussing death of Raymond Dix).  I identified in my report cases where inappropriate substitutions of medications were made at booking, including the case of ███████ ; ███████████████ .  Keller Report ¶¶ 302, 543-45; *see also* Section V, *supra*.

127.   Third, all of the charts reviewed by Dr. Murray for Appendix G (intake) appear to be for people who were booked into the Jail on January 1, 2024.[9] For two separate reasons, it is my opinion that an audit looking only at people booked into the Jail on January 1, 2024 provides little, if any, information regarding whether the intake process functions properly at the Jail.  First, at a basic level, any such audit should examine how the intake process functioned on multiple days, not on a single day.  An audit that looks at a single day will only measure whether the system worked on that day, not whether the system works in general.  Second, in my experience working in jails, January 1 is a very poor day on which to conduct an audit because it is New Year's Day.  The people being booked into a jail on that day

---

[9] Appendix G does not indicate the date on which the 75 listed individuals were booked into the Jail.  Appendix H does, however, list the date on which the 75 listed individuals were booked into the Jail.  All of the people listed in Appendix H were booked into the Jail on January 1, 2024.  The list of people in Appendix H is identical to the list of people in Appendix G.  I therefore believe that the people listed in Appendix G, who are the same as the ones listed in Appendix H, were all booked into the Jail on January 1, 2024.

are not representative of typical days, as they tend to include a higher percentage of people arrested for misbehavior on New Year's Eve, including a higher percentage of people arrested for minor offenses.  In addition, because jails know that January 1 will be a day with a high volume of bookings, they tend to staff the jails accordingly.  As a result, a jail's success or failure processing intakes on January 1 of any year is not likely to be reflective of its success or failure at other times of the year.

128.    Fourth, it appears that very few of the people whose files Dr. Murray reviewed for the audit of intake screening remained in the Jail for any real period of time.  Thirty-six people were released on January 1, 2024, the same day that they were booked into the Jail; 20 were released on January 2, 2024, the day after they were booked into the Jail; and 5 were released on January 4, 2024.  Only 14 of the individuals whose records Dr. Murray reviewed remained in the Jail until January 5, 2024 or longer.  The short period of time that most of the individuals spent in the Jail undermines Dr. Murray's findings.  One of the items that Dr. Murray audited was whether "[a]ll positive screening findings [were] appropriately referred and subsequent evaluations completed."  Murray Report at 155.  Dr. Murray found that the Jail met this undefined standard for all but one of the 75 individuals.  But for the 36 individuals who were released on the same day they were booked and the additional 20 who were released the following day, it is extremely unlikely that any "subsequent evaluations were completed."  To conclude that this item was satisfied for these individuals is therefore misleading.

129.    Fifth, Appendix G and Appendix H both indicate that Dr. Murray selected 75 files to review out of a pool of 121 files.  Dr. Murray provides no explanation for how the 121 files were selected, how he determined to review only 75 files, or how those 75 files were selected.

130.    Sixth, in Appendix H, Dr. Murray concludes that the County met its obligation to conduct a Health Assessment within 14 days of booking in 73 of the 75

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**        **Ex. Q-1436**

1  case files he reviewed.  This analysis is misleading, as 64 of the individuals were

2  released **before** they spent 14 days in the Jail and therefore the 14-day Health

3  Assessment deadline was not triggered.  For the remaining 11, Dr. Murray

4  concludes that "all required initial health assessments were completed within this

5  time frame." *Id.* at 12.  His own report, however, indicates otherwise, as two of the

6  11 individuals never had a 14-day assessment. *Id.* at 160.  Also, five patients

7  reportedly refused to have a health assessment done (███████████████████████

8  ██████████████████).  Besides the overarching problem of refusals in the Jail in

9  general, it is inappropriate to count these five refusals as evidence that "all required

10  initial health assessments were completed within this time frame."

11       131.   I discussed in my report that both the 2017 NCCHC team and Homer

12  Venters encouraged the SDSO to do the full Health Assessment at booking.

13  Dr. Venters went further to recommend that any patient with a significant health

14  history be seen be a medical practitioner as part of the intake Health Assessment.

15  SD_215371.  No other resident health facility, such as hospitals or nursing homes,

16  delay doing an initial health assessment for 14 days.  The NCCHC requires prisons

17  to do their initial health assessments within six (6) days.  The fact that the SDSO has

18  chosen to ignore the advice of Dr. Venters is simply bad medical care.  Dr. Murray,

19  by accepting the 14-day deadline, should not excuse this.

20       132.   Seventh, Dr. Murray's results regarding the 14-day Health Assessment

21  are not consistent with medical files I reviewed for my initial report.  Following my

22  instructions, Plaintiffs' counsel entered information from the medical files regarding

23  64 bookings—all lasting at least 14 days—from dates throughout 2023 and 2024.[10]

24

---

25  [10] I instructed Plaintiffs' counsel to use the spreadsheet provided by Defendants at
     SD_1575334, which shows the booking and release dates of incarcerated people

26  whose records were produced to Plaintiffs.  I instructed them to look only at
     bookings between January 1, 2023 and January 15, 2024; the latter limitation is

27  because Plaintiffs initially received medical records only through the end of January
     2024.  After eliminating all bookings shorter than 14 days and those outside that

28  date range, 208 bookings remained.  I then instructed Plaintiffs' counsel to enter
     information for every third entry, excepting the six bookings for which I was unable

1    The results of this analysis are contained in Appendix B to this report.  Of those 64

2    bookings, only 38 (or 59%) were "compliant," meaning they received or were

3    documented as having refused an initial health assessment within fourteen days.  As

4    I stated in my initial report and in this rebuttal report, I have grave concerns about

5    the validity of the Jail's process for refusals.  However, even assuming that the 15

6    refusals in this sample of 64 were valid, the Jail is only in compliance with its 14-

7    day standard 59% of the time.  In addition to these findings, I also found instances

8    of non-compliance with the Health Assessment policy in my review of medical files

9    for class members with chronic illnesses.  *See* Section V, *supra*.

**VII.    Dr. Murray's audit of nursing sick calls is methodologically and substantively flawed.**

12    133.    Dr. Murray purported to conduct an audit to "verify the timely access to

13    care for nurse sick call requests" as well as "whether necessary referrals were made

14    based on clinical indications."  Murray Report at 13 & Appendix I.  The audit

15    results are given in a yes/no fashion regarding whether the triage was done within 24

16    hours, whether the face-to-face evaluation was done within an additional 24 hours,

17    and whether "all referrals [were] made as appropriate."  *Id.*, Appendix I.

18    Dr. Murray did not define the standards he used to decide whether a referral was

19    "appropriate."

20    134.    For his audit, Dr. Murray appears to have picked medical files for 25

21    individuals out of a pool of 120 files.  *Id.*, Appendix I.  Dr. Murray does not provide

22    any explanation for how he selected the 25 files for review.  For each of the 25 files

23    Dr. Murray selected, he then reviewed a single sick call slip and related follow up,

24    even though nearly all of the files contained more than one sick call slip.  *Id.*; *see* ¶¶

25    136-139, *infra*.  Dr. Murray does not provide any explanation for how he selected

---

to find medical records.  The end result was 64 individual bookings.  After I
received the information from Plaintiffs' counsel, I checked it for accuracy.

1 | which sick call slip and related follow up to review.  Dr. Murray found that the Jail

2 | met the review standards for all but one of the sick call slips he reviewed.  Murray

3 | Report, Appendix I.

4 |     135.   In my opinion, these methodological problems with Dr. Murray's

5 | review undermine the results of his audit of the sick call system.  In particular, the

6 | fact that he only reviewed one sick call slip for each file, without providing any

7 | explanation for his process for selecting the sick call slip, is very problematic.

8 | Without a pre-defined selection process, it is possible that Dr. Murray cherry-picked

9 | sick call slips for which the Jail was compliant with its own procedures.  As I

10 | discussed in my report, Ms. Rognlien-Hood, the Deputy Director who supervises the

11 | Directors of Nursing, testified in February 14, 2024 that the Jail routinely fails to

12 | meet the 24-hour face-to-face standard.  *See* Keller Report ¶ 349 (citing Rognlien-

13 | Hood Tr. 87:11-14, 88:8-10, 89:8-10, 90:15-92:18); *see also* Keller Report ¶ 351

14 | (citing SD_375922, ███████████████████

15 | ████████████████████████████████████

16 | ████████████ ).  Similarly, the County's own audit in July 2023 found only

17 | 45-50% compliance with face-to-face evaluation requirement.  *See* Keller Report

18 | ¶ 350 (citing SD_114412, SD_114467).  The regular failure to meet face-to-face

19 | within 24 hours was confirmed to me by a nurse at Central Jail during my

20 | inspection.

21 |     136.   Indeed, when I reviewed sick call slips and related follow up in the

22 | same files that Dr. Murray reviewed, I found substantial delays and non-compliance

23 | with the County's own policies.

24 |     137.   First, the vast majority of the 25 charts included in Dr. Murray's audit

25 | contain multiple sick call requests, not all of which were timely addressed. ███

26 | ███████████████████████████████████

27 | ████████████████████████████

28 | ██████████████████████████

45         Case No. 3:20-cv-00406-AJB-DDL
REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1439**



138.

139.

140.    Second, even as to the sick call requests that Dr. Murray did evaluate (one per class member listed on the chart), Appendix I is not accurate.  A review of the records cited in Appendix I shows that, in at least some examples, the sick call requests cited by Dr. Murray as having being triaged and seen face-to-face by a nurse within 24 hours (indicated by a "Yes" in Appendix I) were not actually triaged within 24 hours.  For example, in Row 9 of Appendix I,

11

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1440**

141. Finally, and most troublingly, there are multiple entries in these medical records that state that nursing staff "cancelled" sick call triage appointments simply because no face-to-face appointment had happened within 24 hours.

[4598005.1]                                                Case No. 3:20-cv-00406-AJB-DDL
REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. Q-1441

1  

2

3       142.

4

5

6

7

8

9

10      143.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27       144.   If, as these records suggest, the Jail is disregarding sick call requests if

28  medical staff fail to comply with policy for a face-to-face interview within 24 hours

1  of receipt, that would be extremely troubling.  All sick call requests should be

2  addressed.

3       145.   Lastly, I note one additional issue ignored by Dr. Murray.  He does not

4  mention that the MSD Operations Manual requires this face-to-face assessment

5  within 24 hours, not 48 hours.  SD_065584.  The SDSO reaffirmed this 24-hour

6  standard for a face-to-face assessment in its response to the California Audit.

7  SD_729828, SD_184484.

8  **VIII.  Dr. Murray's analysis of the timeliness of lab, x-ray, and test results
        ignores the Jail's repeated and documented failures to timely review
9        those results**

10      146.   Dr. Murray states that his review showed that "[t]he average time from

11  (lab) specimen submission to results returned to the medical record was 1.5 days."

12  Murray Report at 16 . Similarly, he reported that "[t]he average time from (x-ray)

13  study completion to report availability was approximately 23 hours." *Id.* at 17.

14  Dr. Murray opines that these timeframes suggest that the healthcare system is

15  working properly. *Id.*

16      147.   While I agree that those timeframes for obtaining results of labs and x-

17  rays are acceptable, Dr. Murray's analysis ignores another essential step in the

18  process for using diagnostics to treat patients.  Dr. Murray did not look at the

19  amount of time from the receipt of study results to the time that a practitioner

20  interpreted the results and then, if necessary, developed a treatment plan.

21  Dr. Murray also did not assess whether the reviews and interpretation were

22  appropriately documented in the medical record.  Finally, Dr. Murray did not assess

23  how long it took until the study results were communicated to the patients.

24      148.   In fact, the Jail's own internal documentation shows that the review,

25  documentation, and communication of study results has been particularly

26  problematic.  SD_114489.  Moreover, in my report, I discuss a number of cases in

27  which the lack of appropriate review, documentation, and communication of lab

28  results resulted in actual or a risk of serious harm to patients.  Keller Report ¶¶ 150-

1    152, 180, 207-208.  Lastly, my review of medical files for some of chronic care

2    patients discussed in Dr. Murray's report reveal failures to review test results.  *See*

3    paragraph 117, *supra*.

4    **IX.    Dr. Murray agrees with several criticisms of the medical system alleged**
      **in the *Dunsmore* complaint and found in my report.**

5

6        149.    Dr. Murray admits that SDSO has no Disease Management Guidelines,

7    including guidelines for Chronic Care.  Murray Report at 15.  Dr. Murray excuses

8    this lapse by saying that Dr. Freedland has promised that "CHP is in the process of

9    developing Disease Management Guidelines (DMG) to help standardize chronic

10   care management."  *Id.*  Additionally, according to Dr. Murray, Dr. Freedland said

11   that the EHR chronic care templates are "being considered for revision to facilitate

12   treatment goals."  *Id.*  This statement ignores the fact that the SDSO has known

13   about the lack of chronic disease guidelines since at least 2017, when the NCCHC

14   Report repeatedly pointed this out.  DUNSMORE0260643, 0260676, 0260710,

15   0260743-44.  Dr. Murray also does not mention that NaphCare's 2022 contract

16   required NaphCare to develop chronic disease management guidelines, which

17   NaphCare has failed to do.  DUNSMORE0117611-12 (County Contract 566117)

18   ("Naphcare Contract").  Dr. Murray also does not discuss that the contract with CHP

19   does not obligate CHP to create chronic disease management guidelines.

20   DUNSMORE0118502 (County Contract 563402) ("CHP Contract").  And even if

21   CHP does create chronic disease guidelines (and I am not aware of any evidence

22   that this has yet occurred), CHP has no way to enforce compliance with their

23   guidelines on the NaphCare practitioners, specifically the STATCare midlevel

24   practitioners who are providing remote care.  Also, Dr. Freedland's statement to Dr.

25   Murray that chronic disease templates are "being considered," Murray Report at 15,

26   is an admission that the SDSO does not have such templates now.  As I discussed in

27   my initial report, problems with chronic care treatment were widespread in the

28   medical records I reviewed.  Keller Report ¶¶ 506-631.  In addition, as I discussed

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY    Ex. Q-1444

1   above, the medical files regarding chronic care that Dr. Murray's contractors

2   reviewed, some of which I have now reviewed as well, reflect widespread failures to

3   treat the many common chronic conditions, including hypertension and diabetes.

4   *See* paragraph 119, *supra*.  As but one example, Mr. Bach's death may have been

5   prevented had the Jail had in place disease management guidelines for type 1

6   diabetes.  *See* Section III.B.1, *supra*.  In my opinion, the lack of chronic care

7   guidelines at the Jail is one reason why the Jail frequently fails to provide clinically-

8   appropriate chronic care treatment to incarcerated people in the Jail.  These failures

9   place incarcerated people at a substantial risk of serious harm.

10          150.   Dr. Murray notes that the NCCHC Standard J-A-05 requires that

11   "[h]ealthcare policies are reviewed annually by the medical and administrative

12   directors."  Murray Report at 26.  Dr. Murray claims that the SDSO "is in the

13   process of finishing a complete review of its current P&P manual" and that "[t]he

14   timeline for completion of the SDSO health services P&P manual is September

15   2024."  *Id.* at 27.  Dr. Murray states that "[o]nce all policies and applicable

16   procedures reviews are completed, they will remain on an annual review process."

17   *Id.*  Dr. Murray does not provide any basis for this speculation.  He also fails to

18   mention NaphCare's role in this revision, even though generating medical P&Ps is

19   part of their contractual requirements.  *See, e.g.*, DUNSMORE0116596  (NaphCare

20   Contract at 2.1.1), DUNSMORE0117598 (NaphCare Contract at 2.3.2.1).  And,

21   since any Policy and Procedure Manual must include Disease Management and

22   Chronic Care Guidelines, CHP should be involved in any effort to rewrite P&Ps.

23   But Dr. Murray does not mention CHP in this role.

24          151.   Dr. Murray admits that the SDSO CQI program is not compliant with

25   NCCHC requirements.  Murray Report at 32.  As an example, Dr. Murray notes no

26   CQI monitoring of the MOUD program.  *Id.* at 26.  I agree with this assessment.

27   Dr. Murray does not define in exactly what way he feels the CQI program is

28   deficient.  I discuss problems with the SDSO CQI processes in my report.  Keller

1    Report ¶¶ 762-795.

2        152.    Dr. Murray admits that the Receiving Screen being done at the Jail is

3    inadequate.  Murray Report at 35.  As I discuss at length in my initial report, I agree

4    with this assessment.  Keller Report ¶¶ 243-284.  Dr. Murray criticizes the current

5    Receiving Screening for lacking "the screener's personal observations" and

6    "additional process monitoring."  Murray Report at 35.

7        153.    Dr. Murray approvingly quotes Dr. Freedland that the current system of

8    death reviews will be improved because "with CHP ... directly contracting with

9    SDSO, all mortality reviews would be done on site."  *Id.* at 40.  He further quotes

10   Dr. Freedland as stating that "[t]hese on-site reviews will provide the opportunity

11   for better contextual understanding, examination of team dynamics, and immediate

12   access to necessary information," which, of course, implies that the current system

13   of doing death reviews lacks these features.  *Id.*  The problem with Dr. Freedland

14   and CHP fixing a broken Mortality and Morbidity Review system is that CHP's

15   contract does not mention any responsibility for death reviews.  *See generally*

16   SD_1579715-26 (no discussion of responsibility for implementing new M&M

17   review system).  As far as I am aware, NaphCare still has the responsibility for the

18   M&M process at the Jail, per its contract.  *See* DUNSMORE0117647-48 (Naphcare

19   Contract at 2.3.47.5).  Dr. Murray also does not discuss how this future CHP M&M

20   model would work.  I agree that the SDSO's current system of doing remote death

21   reviews is poor.  I discussed this in detail in my report.  Keller Report ¶ 30.

22   **X.    Dr. Murray does not address the substantial problems in the Jail's**
23       **medical system related to purported refusals of treatment by class**
         **members.**

24       154.    In my initial report, I wrote at length regarding serious problems at the

25   Jail regarding the policies and processes in place for when incarcerated people

26   refuse medical treatment.  As I explained, "it is my opinion that Sheriff's

27   Department staff frequently record that a patient has 'refused' to attend a medical

28   appointment, even though the patient was never informed or offered the opportunity

to attend the appointment in the first place.  This practice has the effect of denying medical care to incarcerated people and therefore places them at a risk of serious harm."  Keller Report ¶ 387.  I offered this opinion based, *inter alia*, on my review of refusal forms in medical files, nearly all of which were signed only by two custody officers with no indication that any medical personnel informed the class members of the risks of declining treatment and on reports from named plaintiffs and other class members that officers record refusals when class members have not refused treatment.  *Id.* ¶¶ 387-426.

155.    In the medical file for Mr. Bach, whose death I discuss in detail above, *see* Section III.B.1, ¶ 67 *supra*, I have now found what appears to be ironclad evidence that staff at the Jail record refusals of treatment when incarcerated people have not actually refused.  As I explained above, ████████████████████ ████████████████████████████████████████████ ████████████████████████    However, Mr. Bach was pronounced dead at 4:09 a.m., nearly 40 minutes before the officers completed this refusal form.  ██████████████████████████████ ██████████████████████████████████████████████ ████████████████.

156.    In his report, Dr. Murray does not address the refusal policy and its problematic implementation.  I find this troubling, as the chronic care files his reviewers examined contain many hundreds of refusals that should have been relevant to Dr. Murray's analysis because they have a substantial impact on medical care.

**XI.    Dr. Murray admits that the County has many nursing vacancies, did not offer an opinion on whether the County has sufficient nursing staff, and ignored evidence that the County does not.**

157.    Dr. Murray wrote:

When nurses are not overwhelmed by excessive workloads, they can provide comprehensive assessments, implement care plans effectively, and engage in patient education, all of which contribute to better patient

1
2
3
4
5

> outcomes and enhanced recovery.  Moreover, a well-staffed nursing team promotes continuity of care, reduces the risk of medical errors, and fosters a supportive environment where nurses can deliver compassionate, personalized care.  By investing in a substantial nursing staffing model, healthcare organizations not only prioritize patient safety and satisfaction but also support the professional growth and job satisfaction of their nursing staff, ultimately leading to improved overall healthcare quality and efficiency.

6

Murray Report at 6.  I agree with these statements.

7    158.   In evaluating the adequacy of staffing in a medical system, it is critical

8 to look at two components: (1) the number of authorized positions and (2) whether

9 those positions are filled.

10    159.   Nowhere in his report does Dr. Murray state that the number of

11 authorized nursing staff positions at the Jail are sufficient to ensure adequate care

12 for patients.  Dr. Murray did not conduct any staffing analysis or cite to any staffing

13 analyses conducted by the County.  As far as I am aware, no such analysis of the

14 current nursing staff needs exists—it is sorely needed.  In addition, Dr. Murray did

15 not independently address any of the evidence I cite in my report—including

16 deposition testimony and other evidence—about the inadequate quantity of

17 authorized nursing positions.  *See* Keller Report ¶¶ 799-800, 802, 810.

18    160.   The closest Dr. Murray gets to offering an opinion on whether the

19 County has sufficient authorized nursing positions is to state that, by using overtime

20 and contract nurses, the County "ensure[s] that IPs' care remains uninterrupted, and

21 that the nursing workforce is supported, particularly during periods of increased

22 demand or long-term staff vacancies."  Murray Report at 8.  But if the only way that

23 the Jail can provide adequate care is through overtime and contract nurses, the

24 system is not working properly.  Dr. Murray admits that nurses who are

25 "overwhelmed by excessive workloads"—which would include nurses required to

26 work substantial overtime—have difficulty providing adequate care.  *Id.* at 6.  When

27 staff are "overwhelmed," it results in disrupted and incomplete medical processes,

28 stress on both nursing staff and patients and ultimately, poor medical care, and

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

**Ex. Q-1448**

1  patient harm.

2      161.   Dr. Murray also admits that, "due to the complexity of the SDSO

3  medical program," the contract nurses are limited in the tasks they can perform. *Id.*

4  at 8 (the contract nurses "are assigned specific task-oriented roles to minimize

5  orientation time").  The contract nurses therefore cannot be a solution to the Jail's

6  failure to hire and retain adequate nursing staff.

7      162.   Meanwhile, Dr. Murray admits that the Jail has an "average nursing

8  vacancy rate of approximately 25%." *Id.* at 7.  I have not independently verified

9  Dr. Murray's calculations.  As I discuss in my report, however, the vacancy rates

10 have been higher in the recent past.  *See* Keller Report ¶¶ 799, 802 (█████████

11 ████████████████████████████████████████).  Dr. Murray

12 excuses the 25% nursing vacancy rate he calculated as "generally similar" to other

13 healthcare facilities in Southern California.  Murray Report at 7.  Even if true (and

14 Dr. Murray has not produced any citation to support this assertion), it is irrelevant.

15 A nursing vacancy rate of 25% negatively impacts patient care at the Jail and is a

16 problem that the SDSO could fix if it chose to do so.  Dr. Murray admits as much by

17 explaining that the Jail is required to resort to overtime and contract nurses to fill

18 shifts.

19     163.   It remains my opinion that SDSO has insufficient authorized nursing

20 positions, has too many vacancies in nursing positions, and relies too heavily on

21 overtime and contract staff to fill shifts.  Keller Report ¶¶ 815-18.

22 **XII.  Dr. Murray did not offer any opinion on the adequacy of
         provider/practitioner staffing.**
23

24     164.   In his report, Dr. Murray notes that the County has increased its

25 provider/practitioner staffing levels.  Murray Report at 8.  Though Dr. Murray

26 commented on the scope of the increase, Dr. Murray did not opine that these new

27 levels of provider/practitioner staffing are adequate or provide any detail regarding

28 when and where these staff are deployed or their level of licensure (e.g., physician

1  or nurse practitioner). Dr. Murray did not conduct any staffing analysis or cite to

2  any staffing analyses conducted by the County. As far as I am aware, no such

3  staffing analysis exists.

4  **XIII. Dr. Murray acknowledges that some nurses working in the Jail do not
   receive new employee orientation.**

5

6      165.   Dr. Murray opined that a "comprehensive" new employee orientation

7  "is crucial for correctional healthcare professionals particularly transitioning from

8  non-correctional settings to correctional healthcare positions." *Id.* at 8. According

9  to Dr. Murray, such a program is also important because it "equips healthcare

10 professionals with the knowledge of legal and ethical considerations inherent to

11 correctional healthcare" and "facilitates the integration of new employees into

12 interdisciplinary teams within correctional facilities." *Id.* I agree with Dr. Murray

13 about the importance of a strong new employee orientation program.

14     166.   Crucially, however, elsewhere in his report, he admits that at least some

15 health care staff help to treat patients without receiving the full new employee

16 orientation. As discussed above, it appears that the contract nurses from United

17 Nursing International Healthcare Recruiters ("UNI") do not receive some or all of

18 the new employee orientation. *Id.* at 8 (explaining that contract nurses only perform

19 certain tasks "to minimize orientation time"). Having health care staff treat patients

20 without receiving the orientation is concerning for all of the reasons that Dr. Murray

21 stated in his report.

22 **XIV. Dr. Murray does not address how the lack of adequate custody staff
   negatively impacts care for patients.**

23

24     167.   According to Dr. Murray, Plaintiffs alleged that "[t]he Sheriff's

25 Department's custody staff interfere with and undermine the delivery of care by

26 health care professionals." *Id.* at 41. In response, Dr. Murray wrote: "The security

27 and healthcare staff we spoke to indicated that there are occasions when it is

28 necessary for the medical and security departments to discuss the care and custody

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1450**

1  of a particular IP." *Id.*  This sentence is disingenuous because it implies (1) that

2  these discussions actually take place each and every time there is a conflict between

3  security concerns and medical concerns; (2) that these discussions resolve the

4  disagreement about in the delivery of health care; and (3) that medical has an equal

5  say in these discussions rather than being overruled by custody staff.  Moreover, it

6  does not address the evidence that I discuss in my initial report that shows that

7  custody staff routinely interfere with medical care in ways that cause harm to

8  incarcerated people.  Keller Report ¶¶ 659-86.  I found additional evidence of this

9  problem in the chronic care medical records discussed in Dr. Murray's report.  *See*

10  paragraph 117, *supra.*

11  **XV.  Dr. Murray misrepresents the problems the Jail has with the continuity
        of medically-necessary medications and treatments.**

12

13       168.   In his report, Dr. Murray discusses the benefits of the Surescripts

14  system, which allows the County to electronically verify class members'

15  prescription medications in the community.  Murray Report at 41.  Surescripts is a

16  valuable tool.  However, Dr. Murray does not address the fact that once medications

17  are verified through Surescripts, the Jail requires two additional steps before any

18  patient receives their medications: The medications must be approved by a

19  STATCare practitioner and then any nonformulary medications must go through the

20  nonformulary review process.  *See* Keller Report ¶¶ 292-303.  As I discussed in my

21  initial report, these unnecessary processes, which delay care, contributed to the

22  death of Raymond Dix.  Keller Report ¶ 154.  I also identified problems with

23  continuity of medication and, in particular, approval of non-formulary medications,

24  in my review of the chronic care files.  *See* paragraph 117, *supra.*

25       169.   In addition, Dr. Murray does not address another, equally important

26  component of continuity of care: continuity of medical treatments that patients were

27  undergoing prior to coming to jail.  Like requiring use of the non-formulary process

28  before allowing continuity of medications, the SDSO requires review by the

1  NaphCare Utilization Management (UM) process before allowing scheduled

2  medical treatments to take place.  DUNSMORE0117617 (NaphCare Contract at

3  2.3.16.4).  I discussed problems with this in my initial report.  Keller Report ¶¶ 309-

4  312, 458-484.  I also identified problems with continuity of medical treatment in my

5  review of the chronic care files.  *See* paragraph 117, *supra.*

6      170.  Finally, Dr. Murray did not review the process for continuity of care

7  after off-site medical visits.  This requires a practitioner to review the off-site

8  medical records and create a treatment plan incorporating the diagnoses, studies and

9  prescriptions from the off-site visit.  This does not happen at the Jail, as exemplified

10  by the case of ▮▮▮▮▮▮▮▮▮, which I discuss in my initial report.  Keller

11  Report ¶¶ 309-312.  Another example is ▮▮▮▮▮, discussed in Appendix A.

12  **XVI.  Dr. Murray's opinion that incarcerated patients have adequate means
    for alerting medical staff of their needs is not consistent with the evidence
13  I have reviewed.**

14      171.  Dr. Murray opines that SDSO provides incarcerated people with a

15  reliable and timely way to alert health care staff of their medical needs.  Murray

16  Report at 42.  I disagree with Dr. Murray's opinion, as the evidence I have reviewed

17  suggests that incarcerated people often cannot obtain timely attention for their

18  medical issues.

19      172.  First, as I explained in my report, incarcerated people must have a way

20  to communicate emergent medical needs, such as a heart attack, a stroke or severe

21  injuries.  This is done in many jails by having an emergency button in the housing

22  units.  However, as I detailed in my report, these intercoms at the Jail do not always

23  work, leaving incarcerated patients with no way of alerting staff of a medical

24  emergency.  Keller Report ¶¶ 370-374.  Dr. Murray does not address the problems

25  with these intercoms, which are discussed at length in Plaintiffs' Third Amended

26  Complaint.  Dkt. 231 ¶¶ 93, 330-32, 334.

27      173.  Second, as I discussed in my report, the Jail must have a mechanism for

28  patients with disabilities, mental illness and/or language barriers to request and

1  receive medical care.  Keller Report ¶ 323.  Such patients often cannot effectively

2  utilize a system of written requests.  There is ample evidence that the Jail has failed

3  these patients, as exemplified by the case of Roselee Bartolacci.  Keller Report ¶¶

4  193-218.  Dr. Murray does not address these failings of the system.

5     174.  Third, even the written medical request system used by the jail does not

6  function properly, as evidenced by the Jail's own statistics.  These written requests

7  are supposed to be triaged within 24 hours and then each patient is to be seen face-

8  to-face by a nurse within another 24 hours.  As I discussed in my report, this system

9  does not work, partly because of the chronic nursing shortage.  Keller Report

10  ¶¶ 349-50 (citing SD_114412, SD_114467, Rognlien-Hood Tr. 89:8-10).  In my

11  review of the chronic care medical records (which Dr. Murray's consultants

12  purported to review) and in my review of Dr. Murray's sick call audit, I identified

13  additional instances where the Jail failed to respond to sick call requests in a timely

14  manner.  *See* Sections VII, *supra.*

15     175.  Fourth, nurses act as gatekeepers to incarcerated patient access to

16  practitioners. If a patient wants to see a medical practitioner about a particular

17  complaint, and would see a medical practitioner in the outside world, the gatekeeper

18  nurse may make the decision to not allow the patient access to the practitioner.  I

19  discussed the problems with this system in my initial report.  *See* Keller Report ¶¶

20  430(d), 619.

21  **XVII. Dr. Murray's opinion that the Jail has an adequate system for diagnosing
       and treating infectious diseases is not consistent with the evidence I have
22     reviewed.**

23     176.  Dr. Murray states, "[a]s emphasized throughout this document,

24  particularly with their intake processes, the SDSO has implemented all the necessary

25  elements for a thorough and effective infectious and communicable disease

26  surveillance program."  Murray Report at 13.  Dr. Murray cites no statistics to show

27  that the system is effective.  In my report, I cited several infectious diseases for

28  which the SDSO is not screening and is not offering treatment in violation of the

1    standard of care.  These include:

2        177.    Chronic Hepatitis C Infection (Hep C).  The SDSO does not offer opt-

3    out screening for Hep C per national standards and as was recommended by

4    Dr. Venters.  Keller Report at ¶¶ 507-525.  I cite several cases in my initial report

5    where patients with known Hep C infections were denied treatment in violation of

6    national standards of care.  *Id.*

7        178.    Sexually Transmitted Infections (STIs).  As I discussed in my report,

8    NaphCare is required by their contract to have an STI clinic, but they have never set

9    this up.  Keller Report at ¶¶ 594-612.  This

10       179.    Latent Tuberculosis Infection (LTBI).  Dr. Murray opines that "all IPs

11   are screened and tested for tuberculosis (TB)."  Murray Report at 10.  National

12   standards require screening for LTBI in all at risk patients.  The SDSO does not

13   screen for LTBI until patients have been incarcerated for two years.  Then, if a

14   patient with LTBI is identified, the SDSO does not offer treatment unless the patient

15   will be incarcerated for six months.  This violates national standards requiring the

16   screening of at-risk individuals and treating patients identified as having LTBI when

17   found.  Keller Report ¶¶ 581-593.

18   **XVIII. Dr. Murray's opinion that the Jail offers sufficient access to specialty
         care is not consistent with the evidence I have reviewed.**

19

20       180.    In his report, Dr. Murray wrote: "[i]t is evident from the specialty care

21   data provided from the medical record reviews, and corroborated by Drs. ███ and

22   Freedland, that SDSO has enough contracted sub-specialty, diagnostic care

23   resources, and high acuity medical beds to provide adequate and timely access to

24   specialty care for IPs requiring those services."  Murray Report at 19.

25       181.    The evidence I have reviewed suggests that access to specialists is not

26   timely and adequate.  *See* Keller Report at ¶¶ 470-484.  ███████████████████

27   ████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████

██████████████████

## XIX. Dr. Murray's opinion that the Jail maintains confidentiality of patient medical encounters is not consistent with the evidence I have reviewed.

182.  Dr. Murray opines that the SDSO does provide confidential medical care to "the greatest extent possible." Murray Report at 43.  He identifies two circumstances—when staff speak with class members cell front because they refused an appointment and where the multi-disciplinary team conducts Wellness Rounds at cell front—to highlight how the County "attempts to balance the need for IP confidentiality and access to care." *Id.*  He further reports that if any class member expressed confidentiality concerns during those types of encounters, the County would see them in a confidential setting. *Id.*

183.  I disagree with Dr. Murray's opinion that the County properly protects the confidentiality of medical encounters.  Dr. Murray's opinion on this topic does not appear to have involved any review of patients' charts.  In my review of charts, I found most cell-side encounters did not record that the patient gave consent to a non-confidential encounter.  For example, none of the cases of cell-side encounters I mention in my report in paragraphs 675-679 contain any mention of the patient being asked for consent for the cell-side visit.  Moreover, in a system where it can be so difficult for incarcerated people to timely access care, incarcerated people likely feel tremendous pressure to accept non-confidential encounters rather than to lose their opportunity to receive care.  Patients should not be forced to choose between confidentiality and receiving care.

184.  My review of charts showed healthcare staff conducting visits for intimate, private medical concerns—such as sexually transmitted diseases, inguinal hernias and hemorrhoids—at patients' cell doors.  Keller Report ¶¶ 675-79.  Even if the patient consented, this is not appropriate.  One example is the case of ████ ████, which I discussed in my report.  Keller Report ¶¶ 567-72.  And my conversations with incarcerated people revealed that much of the healthcare being

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Ex. Q-1455

provided at the Jail occurs at cell front, which is not confidential.

## XX.    Dr. Murray's opinion that "all" patients receive adequate follow up care is not consistent with the evidence I have reviewed.

185.    Dr. Murray opines that "the medical record reviews for both nursing and providers indicated that IPs receive timely follow-up care." Murray Report at 43. As I described in my initial report and in my review of some of the chronic care patients' medical files that Dr. Murray reviewed, the County often fails to provide appropriate follow up care when people return from seeing outside specialists. Keller Report ¶ 304-313; *see* paragraph 117, *supra*. I therefore disagree with Dr. Murray that the medical records establish that the Jail provides adequate follow-up care.

186.    In what appear to be related findings, Dr. Murray explains that Dr. Freedland, according to Dr. Murray, stated that the County "ensures that all patients scheduled for providers are seen that day"; and that "StatCare is available to nursing staff 24/7 for all IPs that may require additional intervention." Murray Report at 43.

187.    It is unclear what Dr. Murray means with respect to his statement about Dr. Freedland or how it relates to follow-up care. Perhaps Dr. Murray is stating that all patients who see an outside medical specialist are seen by onsite staff on the same day after they return to the Jail. If so, the medical files do not reflect that this is occurring. Alternatively, if Dr. Murray is stating that all patients who are scheduled to see a provider at the Jail are seen by a provider on that same day, that has no bearing on whether the Jail provides adequate follow-up care. In addition, the Jail's own CQI has documented the wait to see a provider as greater than 14 days. SD_114495. Moreover, as I discussed in my report, CHP practitioners are not in charge of scheduling their own clinics. The Jail has gatekeepers in place who decide which patients get to see a practitioner and which do not. The STATCare midlevel practitioners are one level of such gatekeepers. Nurses contact STATCare

1  "for permission" for an on-site practitioner to see a patient.  *See* SD_754743;

2  Appendix A, ████████.  Another level of gatekeepers are the nurses themselves.

3  Dr. Murray admits this when he refers to the nurses seeing, diagnosing, and treating

4  patients in accordance with check-box protocols that NaphCare developed.  Murray

5  Report at 30.  Such patients are not scheduled to see a practitioner.

6      188.   The fact that STATCare is available 24/7 could, in theory, assist in

7  ensuring patients receive appropriate follow up care following off-site medical

8  appointments.  However, the medical files I reviewed contained serious problems

9  with follow-up care, notwithstanding the availability of STATCare.

10 **XXI.  Dr. Murray's conclusion that the Jail provides adequate discharge**
   **planning is flawed.**

11

12     189.   In my report, I discussed the importance of a functioning discharge

13 planning process and the serious problems with Defendants' system.  The many

14 problems include, but are not limited to: a lack of adequate policies regarding

15 discharge planning; the failure of NaphCare—which is obligated, pursuant to its

16 contract with the County, to implement a system of discharge planning that is

17 consistent with NCCHC standards—to actually implement a system more than two

18 years after the effective date of the contract; the failure to create a system that

19 arranges for follow-up appointments for patients; NaphCare's failure to set forth job

20 duties for the two people it has hired as discharge planners; the fact that, given the

21 census in the Jail, two discharge planners are not sufficient to conduct adequate

22 discharge planning; the fact that the system requires incarcerated people to request

23 discharge planning, rather than providing it as a matter of course; the fact that

24 discharge planning is not actually being provided to class members; the fact that the

25 Jail now claims to provide a 30-day supply of discharge medications to class

26 members, but has no official policy to enforce that practice; the failure to provide

27 the vast majority of class members with discharge instructions; and the failure of the

28 Jail to track any statistics regarding the provision of discharge services.

190.   In Dr. Murray's report, he similarly opined that "[m]edical and mental health discharge planning is critical in correctional settings because incarcerated individuals often have complex health needs, including chronic medical conditions, mental health disorders, and substance use issues." Murray Report at 21.  He then concluded that the County "ensure[s] that IPs can access social and medical services in the community in a timely manner." *Id.* at 22.

191.   Dr. Murray's opinion is flawed and contradicted by the evidence I reviewed.  Dr. Murray does not discuss any of the medical system policies (or lack thereof) related to discharge planning.  Instead, he focuses most of his discussion on the Sheriff's Office's Reentry Services Division.  But that Division is operated by custody staff and does not and could not perform any medical functions related to discharge planning.  He touts the 30-day supply of medication, but does not acknowledge that there are no policies formalizing that practice.  He notes that the County sometimes helps people who are receiving MAT or dialysis or have behavioral health needs.  But he ignores all of the other conditions that class members have that require effective discharge planning.  He does not mention the two discharge planners employed by NaphCare (who still do not have defined job duties), let alone opine regarding whether that staffing level is sufficient given the thousands of people who are discharged from the Jail each month.  And his opinion regarding the adequacy of the discharge planning system at the Jail does appear to rest upon the review of any medical records; in contrast, my opinions were based upon my review of many dozens of medical files, which reflected a near-total absence of discharge planning.

192.   In addition, I have been provided with a declaration from class member James Clark that is dated September 2, 2024.  In it, Mr. Clark states that on the two occasions he was released from custody at the Jail in 2024, the Jail released him without any prescription drugs or prescription card.  He states that, because he was not provided with a prescription medications or a prescription card, "I was unable to

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY    Ex. Q-1458

1    obtain the medications I need in the free world."  Clark Declaration ¶ 3.  This

2    declaration suggests that the Jail is not following its own policies regarding

3    providing individuals released from the Jail with access to prescription medications.

4    **XXII. The faux-NCCHC evaluation performed by Dr. Murray and his team is
     suspect, does not include adequate explanation of the ratings, and is not
5    consistent with the evidence I reviewed.**

6        193.    In his report, Dr. Murray stated that his "team, experienced with the

7    NCCHC accreditation process, thought it appropriate to evaluate SDSO's

8    compliance with the current NCCHC 2018 standards for Health Services in Jails."

9    Murray Report at 31.  Dr. Murray's team concluded that SDSO was "compliant with

10   93% (33[sic][12]/39) of the Essential and 100% (20/20) of the Important 2018

11   Standards."  *Id.*  Dr. Murray asserted that his team's findings were based on

12   "information obtained on facility inspections, medical record reviews, interviews

13   with SDSO healthcare and sworn staff, review of healthcare policy procedure,

14   institutional directives, training bulletins, and observation of health care delivery."

15   *Id.*

16       194.    As a starting point, however, Dr. Murray concedes that the Jail would

17   again fail an NCCHC survey, if it was done today, because the Jail did not meet

18   three essential standards.  I agree that the Jail would fail a real NCCHC assessment

19   if it was held right now.

20       195.    In addition, there are a number of serious problems with Dr. Murray's

21   "faux" NCCHC review.

22       196.    First, though he claims his team was "experienced with the NCCHC

23   accreditation process," the CVs for his three consultants do not mention any

24   experience with the NCCHC accreditation process.  Dr. Murray's CV states that he

25   was certified by the NCCHC as a "Correctional Health Professional" from 1996-

26   

[12] Dr. Murray, in the quoted portion, indicates that the Jail met 33 of 39 Essential
standards.  In his actual analysis, however, he determined that the Jail complied with
36 of 39 Essential standards.  Murray Report at 31-38.

1  2000, but he has no association with NCCHC listed since 2000.  Instead,

2  Dr. Murray's experience is with the ACA, the NCCHC's rival in the correctional

3  health care accreditation market.

4      197.   Second, Dr. Murray's review did not include a number of essential

5  components of an NCCHC accreditation survey.  He and his team did not interview

6  any incarcerated people, even though they had the opportunity to do so.  He and his

7  team did not interview the site Health Services Administrator (Angela Nix); the

8  SDSO medical director (Dr. Montgomery); the Deputy Director supervisor of the

9  Directors of Nursing (Serina Rognlien-Hood), or any of the Directors of Nursing

10  themselves.  In contrast, when NCCHC conducted its review in 2017 (and found

11  that the County was compliant with only 31% of Essential and 24% of Important

12  standards), it interviewed the staff members occupying those positions.

13  DUNSMORE0260623 (NCCHC Report at 6) ("We interviewed the jail commander,

14  command staff with the sheriff, responsible physician, director of nursing, CQI

15  nurse, infection control/training nurse, psychiatrist, psychologist, mental health

16  clinicians, dentist, medical records clerk, 11 health staff, six COs, and 11 inmates

17  selected at random.").

18      198.   Third, Dr. Murray's conclusions regarding each of the standards

19  includes no analysis.  He simply states for all but three of the essential standards that

20  the Jail complies with the standard because it meets all of the compliance indicators

21  for each of the standards.  But Dr. Murray does not list any of the compliance

22  indicators, nor his basis for concluding that the Jail met the indicators.  His

23  conclusions that the Jail complies with various standards are therefore completely

24  untethered from the actual NCCHC standards and the compliance indicators that

25  underlie them.  He and his team did not show any of their work, which makes it

26  impossible to determine the basis they had for deciding regarding compliance.

27      199.   Because Dr. Murray's faux-NCCHC review is so methodologically

28  flawed, I will not attempt to address each of his purported findings.  I can say,

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**     **Ex. Q-1460**

1   however, that some of his findings of compliance are surprising to me given the

2   evidence I have reviewed.  Examples include:

3      **A.    J-A-02 Responsible Health Authority – *Essential* Standard: The**
          **responsible health authority (RHA) ensures that the facility**
4         **maintains a coordinated system for health care delivery.**

5          200.    Dr. Murray concluded that the Jail met this standard.  I disagree.  Since

6   the NCCHC found in 2017 that the Jail had not complied with this standard, the

7   SDSO has fragmented health care to the point that there is no longer "a coordinated

8   system for health care delivery."  Instead, the Jail now has three independent "silos."

9   1. The SDSO nurses and medical administrators, including Dr. Montgomery, and

10  Serina Rognlien-Hood.  2. NaphCare, which supplies the STATCare midlevel

11  practitioners, the mental health personnel, and the MOUD practitioners.  NaphCare

12  also has responsibility for the medical Policies and Procedures, Chronic Care

13  Guidelines, enforcement of the non-formulary process and the Utilization

14  Management process, and Mortality and Morbidity committee, among others.  3.

15  Correctional Health Partners, which supplies the on-site physicians and midlevel

16  practitioners, including the Jail medical director.  There is now even less of a

17  "coordinated system for health care delivery" than in 2017 when the Jail failed to

18  meet this standard.

19         201.    From what I can tell, all three silos at the Jail overlap.  CHP

20  practitioners and NaphCare practitioners independently make diagnoses and

21  prescribe treatments to patients.  CHP has no authority to supervise NaphCare

22  practitioners and vice-versa.  In the case of a death, Dr. Montgomery, SDSO

23  security and the SDSO Director of Nursing conduct some kind of death reviews.

24  Separately, NaphCare, by contract, runs the formal Mortality and Morbidity

25  committee.  Dr. Freedland (per Dr. Murray's report) wants CHP to do their own on-

26  site death reviews, all of which are or will be uncoordinated.  Murray Report at 40.

27  As another example of fragmentation, Dr. Murray states that Dr. Freedland is

28  developing Disease Management Guidelines, *id.* at 15, but Dr. Freedland has no

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1461**

1  authority to enforce those guidelines on the NaphCare practitioners and this project

2  is not included in the scope of work for the CHP contract.

3  **B.   J-A-07 Privacy of Care –** *Important*

4     202.   Dr. Murray concludes that the Jail meets this standard, which requires

5  that "[h]ealth care encounters and exchanges of information remain in private." *Id.*

6  at 32.  However, the NCCHC Report in 2017 pointed out that "The areas of privacy

7  and confidentiality of care need to be addressed."  DUNSMORE0260627.  As far as

8  I am aware, the SDSO has not changed *any* of its privacy practices since then.  As I

9  discussed in my initial report and above, much of the care in the Jail is improperly

10  provided in non-confidential settings.

11  **C.   J-A-9 Procedure in the Event of an Inmate Death –** *Important*

12     203.   Dr. Murray concluded that the Jail "conducts a thorough review of all

13  deaths in custody in an effort to improve care and prevent future deaths."  Murray

14  Report at 32.  I have pointed out in my initial report that the death review process at

15  the SDSO is seriously flawed.  Keller Report ¶¶ 86-239.  My further discussion of

16  the death of Mr. Bach in this report reinforces my initial opinions; that the Jail took

17  no steps following his preventable death from diabetic ketoacidosis suggests that the

18  CQI process for death reviews at the Jail is profoundly broken.  *See* Section III.B.1,

19  *supra*; Keller Report ¶¶ 108-114.  Dr. Murray implicitly acknowledges problems

20  with the death review process by explaining that CHP will be doing on-site death

21  reviews in the future.  This change suggests that the County recognized that the

22  reviews conducted by NaphCare are not adequate.  I therefore find it not credible

23  that Dr. Murray concluded that the Jail satisfied this standard.

24  **D.   J-F-01 Patients with Chronic Disease and Other Special Needs –**
       ***Essential***

25

26     204.   Dr. Murray opined that the Jail met this standard, which requires that

27  "[p]atients with chronic disease, other significant health conditions, and disabilities

28  receive ongoing multidisciplinary care aligned with evidence-based standards."

1  Murray Report at 36.  However, the NCCHC criticized the Jail in 2017 for not

2  having chronic disease guidelines or policies and procedures for a chronic disease

3  program.  DUNSMORE0260643-0260644.  Dr. Murray admits in his report that the

4  SDSO still does not have these essential documents.  Murray Report at 15.  In my

5  initial report, I discussed serious inadequacies in how the Jail practitioners deal with

6  Asthma and Type 2 Diabetes.  Keller Report ¶¶ 526-551, 613-631.  I also identified

7  many problems with chronic care, including for asthma, diabetes, and hypertension,

8  in my review of the chronic care files, discussed above.

9         205.  The opinions contained in this rebuttal are based on the documents,

10  evidence, and/or observations made available to me to date.  I reserve the right to

11  revise or expand my opinions should additional information become available to me.

12  Together with my report disclosed on August 21, 2024, the information contained in

13  this report and the accompanying appendices are a fair and accurate representation

14  of the subject of my anticipated testimony in this case.

15

16

17  Dated:  November 1, 2024

18                                                  Jeffrey E. Keller, M.D.

19

20

21

22

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**                 Ex. Q-1463

# Appendix A

1

**APPENDIX A**

2

**Reviews of Chronic Care Medical Records**

3    **A.**    █████████████████████

4    1.    ████████████████████████████████

5    ██████████████████████████

6    ████████████████████████████████████

7    ████████████████████████████████████

8    ████████████████████████████████████

9    ████████████████████████████████████

10

11    ████████████████

12    2.    ████████████████████████████████

13    ██████████████████████████████

14    3.    ██████████████████████████████

15    ████████████████████████████████████████

16    ████████████ █ ████████████████████████

17    ████████████████████████████████████████

18    ███████████████████████████████████████

19    ████████████████████████████████████████

20    ████████████████████████████████████████

21    ████████████████████████████████████████

22    ████████████████████████████████████████

23    ████████████████████████████████████████

24

25    _____

[1] The patient number refers to the numbering used in Dr. Murray's Appendix J.  *See*

26    Murray Report at 164-223.

27    [2] Daniel L. Larber et al., *Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association*, 47 Diabetes Care 544 (2024) ("Diabetes in

28    Detention").



REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1466**



6. ███████ ██ The Diabetes Standards have several recommendations for adjunctive diabetes medications, but glipizide is not one of them. *See* Diabetes Standards at S166, S167. Instead, the Diabetes Standards recommend the addition of "combination therapy with a GLP-1 RA[.]" *Id.* at S1658.

8. ███████████

---

[3] American Diabetes Association Professional Practice Committee, *Pharmacologic Approaches to Glycemic Treatment*: Standards of Care in Diabetes–2024, 47 Diabetes Care S158 (2024) ("Diabetes Standards"); American Diabetes Association, *Standards of Medical Care in Diabetes – 2022 Abridged for Primary Care Providers*, 40 Clinical Diabetes 10 (2022). The 2024 standards do not differ materially from the 2022 standards as cited in this report.

9.    In addition to these deficiencies, the jail medical staff also failed to meet the standard of care as laid out by the American Diabetes Association in the following ways.  First, the ADA requires a physical examination by a medical practitioner within 2 weeks of admission.  *See* Diabetes in Detention at 545.

10.

11.    I discussed in my report the immense problems the SDSO has with

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1468**

1 | patient refusals of medical care and how these negatively impact medical care and

2 | harm patients. ███████████████████████████████████

3 | ██████████████████████████████████████████

4 | ███████████████

5 | 12. ████████████████████████████████

6 | ██████████████████████████████████████████

7 | ████████████████████████████████████████

8 | █████████████████████████████

9 | **B.** ████████████████████

10 | 13. ███████████████████████████████████████

11 | █████████████████████



12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 | ███████████████

21 | 14. ████████████████████████████████

22 | ████████████████████████████████

23 | 15. ████████████████████████████████████

24 | ██████████████████████████████████

25 | ███████████████████████████████████

26 |

27 | ███████████████████████████████

28 | ·

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. Q-1469**

1 ████████████████████████████████████

2 ████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████ █ ██████████████████████████

7 ███████████████████████████████████████████████

8 ██████████████████████████████████████████████

9 ██████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 ███████████████████████████████████████████████

12 ████████████████████████████████████████████

13 █████████████████

14    16.  ███████████████████████████████████████

15 ████████████████████████████████████████████

16 ██████████████████████████████████████████████

17 ██████████████████████

18     a.  ███████████████████████████████

19      ███████████████████████████████████████████

20      ███████████████████████████████████████████

21     ███

22     b.  ██████████████████████████████████

23      ██████████

24     c.  ████████████████████████████████████

25

26 ────────────────────

[5] ACC/AHA/AAPA/ABC/ACPM/AGS/APhA/ASH/ASPC/NMA/PCNA, *2017*

27 *Guideline for the Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults: Executive Summary*, Hypertension 1269 (2018)

28 ("AHA/ACC Guidelines").

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**  **Ex. Q-1470**

1   ██████████████████████████████████████████

2   ██████████████████████████████████

3   17.   ███████████████████████████████████████

4   ████████████████████████████████████████

5   ███████████████████

6   18.   ███████████████████████████████████████

7   ████████████████████████████████████

8   ████████████████████████████████████

9   ██████████████████████ ██████████████████

10  ████████

11  **C.**   ████████████████████

12  19.   ████████████████████████████████████████

13  ███████████████████████████████

14  ███████████████████████████████████████

15  ███████████████████████████████████████

16  ███████████████████████████████████████

17  ███████████████████████████████████████

18  ███████████████████████████████████

19

20  █████████████

21  20.   █████████████████████████████

22  ████████████████████████████████████████

23  ████████

24  21.   █████████████████████████████

25  ████████████████████████████████████████

26  ██████████████████████████████████

27  ───────────────────

28  [6] UpToDate, *Management of Rotator Cuff Tears*.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**   **Ex. Q-1471**



[4598679.1]     Case No. 3:20-cv-00406-AJB-DDL
REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY     Ex. Q-1472



1

2

3    25.    I wrote in my report that refusals of necessary medical care is a major

4    problem in the SDSO and that the failure of the refusal system causes patient harm.

5

6    **D.**

7    26.

8

9

10

11

12

13

14

15    27.

16

17

18    28.    *Type 2 Diabetes* – As mentioned above, the standard of care I am

19    applying is Diabetes in Detention.

20    29.

21

22

23

24

25

26    _____

27    7

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    Ex. Q-1473

1  strongly discouraged." Diabetes in Detention at 549. Instead, "[s]election of

2  medications for treatment of people with type 2 diabetes should be in accordance

3  with the current ADA Standards of Care." *Id.* at 548. The 2024 Abridged ADA

4  Standards of Care for Primary Care Professionals also state that "[t]reatment with a

5  glucagon-like peptide 1 (GLP-1) receptor agonist or a dual glucose-dependent

6  insulinotropic polypeptide (GIP)/ GLP-1 receptor agonist is preferred before insulin

7  therapy[.]"[8] However, none of these agents are available on the NaphCare

8  formulary. If insulin is going to be used for a patient such as ███████, it

9  should start with the use of a long-acting insulin. If this fails to achieve treatment

10  goals, short acting insulin can be added three times a day with meals. However,

11  NaphCare ████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ████████████████████████  ███████████████

16  ██.

17      30.  ████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████████████

24  ██████████████████████████████████████

25

26  _____

27  [8] American Diabetes Association Primary Care Advisory Group, *Section 9: Pharmacologic Approaches to Glycemic Treatment: Standards of Care in Diabetes—2024 Abridged for Primary Care Professionals*, 42 Clin. Diabetes 206 (2024) ("Abridged Diabetes Standards").

28



22   As I have pointed out in my initial report, the use of clonidine is

23   discouraged by the AHA/ACC Guidelines.  Keller Report ¶ 235 (citing Robert M.

24   Carey, *Guideline-Driven Management of Hypertension: An Evidence-Based Update*,

25   American Heart Ass'n (2022), at 44 ("AHA Guidelines Update")).  Also, by using

26   an *inappropriate* therapy for blood pressure control, the practitioners failed to use

27   the *appropriate* therapies as recommended in the American Heart Association.  The

28   "First Line " medications for hypertension are calcium channel blockers, thiazide

1  diuretics and ACE inhibitors/ARBs instead of short-term clonidine (which the

2  American Heart Association calls a "last-line" agent, the Jail practitioners should

3  have started one or even two of the first-line medications).  AHA Guidelines Update

4  at 44. 

5

6          37.

7

8

9

10

11         38.    As I wrote in my report, the standard of care treatment for an inguinal

12  hernia is 1.  To do a physical examination of the patient's hernia, and 2. Obtain a

13  surgical consultation to consider surgery to repair the hernia.  The use of a truss is

14  discouraged because there is no evidence that trusses are effective in the long term

15  and because they can damage the hernia sac.

16

17    **E.**

18         39.

19

20

21

22

23         40.

24

25         41.

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**   **Ex. Q-1476**



1.

JNC-8 and AHA Guidelines Update, however, both recommend that patients with very high blood pressures be treated with two drugs, such as HCTZ *plus* another agent. JNC-8 Guidelines at 1-2; AHA Guidelines Update at 45.

2.

But, as I discussed in my report, the use of clonidine is heavily discouraged by the AHA/ACC Guidelines because it is a poor blood pressure agent and can cause rebound hypertension. Keller Report ¶ 235; AHA/ACC Guidelines at 1289. JNC-8 and the AHA/ACC Guidelines both recommend that rather than prescribing clonidine, providers should increase the dosage of the medications a patient is already taking or add another agent. JNC-8 Guidelines at 1-2; AHA/ACC Guidelines at 1289. As I noted previously, JNC-8 and AHA guidelines both

---

[9] Carrie Armstrong, *JNC 8 Guidelines for the Management of Hypertension in Adults*, 90 American Family Physician (2014) ("JNC-8 Guidelines").

recommend that patients with very high blood pressures be treated with two drugs, such as HCTZ *plus* another agent.



[4598679.1]

Case No. 3:20-cv-00406-AJB-DDL

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1478**

1

2

3

4

5

6

7

8

9

10

7.    11

12

13

14

15

16

17

18

19

20

8.    21

22

23

24

9.    25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**  Ex. Q-1479

1

2

3

4

5

6    SD_760762.

7        10.

8

9

10

11

12        11.

13

14

15

16

17        42.

18

19

20

21        1.

22

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. Q-1480**



[4598679.1]

Case No. 3:20-cv-00406-AJB-DDL

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1481**

1 ███████████████████████████████████████

2 ████████████████████████████████████

3 **F.** █████████████████████████

4 43. ████████████████████████████████████

5 ███████████████████████████████████████████

6 ████████████████████████████████████████████

7 █████████████████████████████████████████████

8 █████████████████████████████████

9 44. ████████████████████████████████████

10 █████████████████████████████████████████

11 ████████████████████████████████████

12 45.     *Hypertension* - I am comparing the treatment provided to Ms. ██████

13 to the AHA/ACC Guidelines.  The treatment goal is a blood pressure less than

14 130/80.  I am attaching as a reference an easy-to-use hypertension treatment chart

15 published by the AHA ("AHA Treatment Algorithm").[10]

16 _____

17 [10]

18

**PHARMACOLOGICAL TREATMENT OF HYPERTENSION**

Agree (patient and clinician) on BP goal

First-line therapeutic classes
• CCB* and/or
• ACEI or ARB and/or
• Thiazide-like** or thiazide diuretic

Monthly visits until BP goal achieved

• Measure (minimum 2 readings in am & pm 3 d/week), record and report home BP readings at each office visit.
• Use fixed-dose drug combinations and 90-day prescription refills if possible
• If BP not at goal, assess for social barriers and non-adherence to treatment.
• Dose-titrate and/or add another first-line agent from a different class if needed to achieve goal.

Second-line therapeutic classes
• β-blocker (first-line only in IHD and HF)
• MRA (preferred in low renin states and resistant HT)
• α₁-antagonist
• Direct vasodilator (use with diuretic and β-blocker)
• K⁺-sparing diuretic (minimally effective in BP reduction)
• Loop diuretic (preferred in CKD with GFR < 30, in symptomatic HF and when using potent direct vasodilator minoxidil)
• Central α₂-agonist (last-line due to CNS effects and potential for hypertensive crisis on withdrawal)

Whelton PK et. al. *Hypertension*. 2018;71:e13-e115

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1482**

1    46.    

2

3

4

5

6

7

8

9    47.

10

11

12

13

14

15

16

17    48.

18

19

20

21

22

23    According to the

24    ACA/ACC Guidelines, clonidine is an inappropriate agent to be prescribed.

25    Clonidine is a "last line" agent.  AHA/ACC Guidelines at 1289; *see also* AHA

26    Treatment Algorithm.  An appropriate escalation of therapy would have been to add

27    a second first-line hypertensive agent, such as hydrochlorothiazide (HCTZ), to the

28    lisinopril prescription.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1483**

1    49. ███████████████████████████████████

2    ████████████████████████████████████████

3    ████████████████████████████████████████

4    ████████████████████████████████████████

5    ██████████████████████

6    50. ████████████████████████████████████

7    ████████████████████████████████████████

8    ███████████████████████████████████████

9    ██████████████████████████████████████

10   ██████████████████████████████████████

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

███████████████████████████████████████

27

28   51. ██████████████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**     **Ex. Q-1484**



[4598679.1]

Case No. 3:20-cv-00406-AJB-DDL

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1485**

1

2

3

4   57.

5

6

7   •

8

9   •

10

11

12

13   •

14

15   58.

16

17

18

19

20

21

22

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1486**



59.

G.

60.

61.

11

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1487**

1

2

3    62.

4

5

6

7

8

9

10

11

12    63.

13

14

15

16

17    64.

18

19

20

21

22

23

24    65.

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1488**

66.

67.

68.

69.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY    Ex. Q-1489



70.

- ▓▓▓▓
- ▓▓▓▓
- ▓▓▓▓
- ▓▓▓▓

71. ▓▓▓▓

▓▓▓▓ To discontinue an active KOP rescue inhaler prescription without an examination of the patient by a medical practitioner violated the standard of care. Asthma attacks can be sudden and severe enough that patients do not have the opportunity to alert nurses to their distress. Patients must have the ability to treat themselves in an emergency.

72. ▓▓▓▓

[4598679.1]
REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY
Case No. 3:20-cv-00406-AJB-DDL
Ex. Q-1490

1 ███████████████████████████████████████████

2 ████████████████████████████████

3  73.  ████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████████

6 ██████████████████████████████████████

7 ███████████████████████████████████████████

8 ███████████████████████████████████████████

9 ██████████████████████████████████████████

10 ███████████████████████████████████████

11 ████████████████████████████████████████

12 ███████████████████████████████████████████

13 ██████████████████████████████████████████

14 ████████████

15  74.  ███████████████████████████████████

16 █████████████████████████████

17  **H.**  ████████████████████████████

18  75.  ██████████████████████████████████

19 ████████████████████████████████████████████

20 ██████████

21 ███████████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ███████████████████████████████████████████

26 ███████████

27  76.  ████████████████████████████████████████

28 ████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1491**

1. ████████████████████████████████████████
   ████████████████████████████████████████████

2. ████████████████████████████████████████
   ████████████████████████████████████████████████
   ████████████████████████████████████████████
   ██████████████████████████████████████████
   █████████████████████████████████████████████
   █████████████████████

3. ████████████████████████████████████████████
   ██████████████████████████████████████████████
   ██████████████████████████████████████████████
   ███████████████████████████████████████████
   ████████████████████████  ██████  ████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   █████████████████████████████████████████
   █████████████████████████████████████████████
   ██████  █████████████████████████████████████████
   ███████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████

4. ███████████████████████████████████████
   ███████████████████████████████████████████████
   ██████████████████████████████████████████
   ████████████████████████████████████████████████
   █████████████████████████████████████████
   █████████████████████████████████████████████████



[4598679.1]
Case No. 3:20-cv-00406-AJB-DDL
REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.

CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

**Ex. Q-1493**

6. ███████████████████████████████

███████████████████████

███████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████

█

I.   ████████████████████

77.  ███████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████████████
████████████████████

78.  ██████████████████████████
████████████████████████

79.  ████████████████████████
████████████████████████████



[4598679.1]    Case No. 3:20-cv-00406-AJB-DDL
REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. Q-1494**

1

2

3

4     80.

5

6

7

8

9     81.

10

11

12

13

14

15

16

17

18

19     82.

20

21

22     83.

23

24

25     84.

26

27     **J.**

28     85.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**     **Ex. Q-1495**



REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1496**

1

2

3

4

5

6     89.

7

8

9     90.

10

11

12

13

14

15

16     91.

17

18

19

20

21

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**     **Ex. Q-1497**



92.

93.

94.     Levothyroxine is typically used to treat hypothyroidism.  It is, however, sometimes overprescribed.[12]  Levothyroxine can have a number of side effects, including, *inter alia*, chest pain, difficulty breathing, fatigue, fainting, fever, nausea, and tremors, though the dosage prescribed for Mr. ▇▇▇ was unlikely to cause serious side effects.  In any event, as with any medication, it should not be prescribed for a patient unless it is needed to treat a condition, the benefits of the drug outweigh the risks, and the patient provides informed consent.

---

[12] American Thyroid Association, *Hypothyroidism: Is Levothyroxine Therapy Overused?*, 12:4 Clinical Thyroidology for the Public (2019).

95. ███████████████████████████████████

████████████████████████████████

███████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

███████████████████████████████

█████████████████████████████████

███████████████████████████████████

██████████████████████

96. ██████████████████████████████████

███████████████████████████████████

██████████████████████████████

████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██ █ ████████████████████████████████

███████████████████████████████

█████████████████████████

_____

13 ███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

      ████████████████████████████████

14 █████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1499**

1   **L.** ███████████████████

2   97. █████████████████████████████

3   ████████████████████████████████

4   ████████████████████████████████

5   ████████████████████████████████

6   ████████████████████

7   98. █████████████████████████

8   ████████████████████████████████

9   ████████████████████████████████

10  ██████████████████████████████

11  ███████████████████████████████

12  ███████████████████████████████

13  █████████████████████████████

14  █████████████████████████████

15  ████████████████████████████

16  ████████████████████████████████

17  ███████████████████████████████

18  ███

19  **M.** ████████████████

20  99. ██████████████████████████

21  ███████████████████████████████

22  ███████████████████████████████

23  ███████████████████████████████

24  ████████████████████████████████

25  ████████████████████████████████

26  █████████████████████████████

27  _____

28  ████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**   **Ex. Q-1500**



[4598679.1]

Case No. 3:20-cv-00406-AJB-DDL
REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1501**



104.

105.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1502**

1    █████████████████████████████

2    ██████████████████████████████████

3    █████████████████████████████████

4    ███████████████████████████████████

5    ███████████████████████████████████

6    ████████████████████████████████

7    ██████████████████████████████████

8    106.   ██████████████████████████

9    ███████

10   107.   ████████████████████████████

11   ████████████████████████████

12   •   ██████████████████████████

13   ████████████████████

14   •   █████████████████████████

15   ███████████████████

16   •   ████████████████████████████

17   ██████████████

18   •   ███████████████████████████

19   ██████████████████████████

20   **N.**   █████████████████

21   108.   ███████████████████████████

22   ██████████████████████████████

23   █████████████████████████████

24   ███████████████████████████████

25   ██████████████████████████████

26   ███████████████████████████████████

27   ███

28   109.   ███████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**   **Ex. Q-1503**



110.

111.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1504**



112.

113.

114.

115.

O.

116.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. Q-1505**



117.

1.

2.

As I explain in my report, metformin, sliding scale insulin and glipizide are not direct substitutes for and do not have the same mechanisms for action as Mounjaro. Moreover, discontinuing a person's medication simply because it is not on the formulary and especially without evaluating the person is not consistent with the standard of care. Keller Report ¶ 302, 543.



REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1507**

1

2    123.

3

4    124.

5

6

7

8    125.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1508**



[4598679.1]    Case No. 3:20-cv-00406-AJB-DDL
REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY    Ex. Q-1509



131.

132.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1510**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**     **Ex. Q-1511**

1

2

3

4

5

6

7

8     133.

9

10

11

12

13     134.

14

15

16

17

18

19

20

21     **R.**

22     135.

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1512**



136.

137.

138.

139.

140.

141.

The ADA standards state, "[s]election of medications for treatment of people with type 2 diabetes should be in accordance with the current ADA Standards of Care (see Fig. 9.3 in Section 9, 'Pharmacologic Approaches to Glycemic Treatment).'" Diabetes in Detention at 548.  This standard recommends the introduction of insulin "when A1C or blood glucose levels are very high (i.e., A1C >10% [>85 mmol/mol] or blood glucose $\geq$ 300 mg/dL [$\geq$ 16.7 mmol/L])."

1    Diabetes Standards at S165. ███████████████████████

2    █████████████████████████████████████████████████████

3        142.    In addition, the ADA standards state, "[r]eliance on insulin sliding

4    scales is ineffective and potentially dangerous, and it is strongly discouraged."

5    ADA Detention Facilities at 549. ████████████████████████

6    ██████    Instead of insulin, the ADA recommendation for a patient such as

7    Mr. ███████ is as follows: "In adults with type 2 diabetes, a GLP-1 RA, including a

8    dual glucose-dependent insulintropic polypeptide (GIP) and GLP-1 RA, is preferred

9    to insulin[.]" Diabetes Standards at S165 (Pharmacologic Therapy for Adults with

10   Type 2 Diabetes, 9.23.).  Glucagon-like peptide 1 receptor agonists (GLP-1s)

11   include several brands, such as Byetta, Wegovy, Ozempic and others.  However,

12   none of these agents are on the NaphCare formulary (NAPHCARE037047 at 5).

13   Per ADA standards, "the use of medications with low potential for hypoglycemia

14   (biguanides, dipeptidyl peptidase 4 inhibitors, glucagon-like peptide 1 receptor

15   agonist, and SGLT2i) is recommended (before insulin)."  Diabetes in Detention at

16   548. █████████████████████████████████████████

17   ██████████████████████████████████████.  NAPHCARE037047

18   at 5.

19       143.  ████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████

25       144.  ████████████████████████████████████

26   █████████████████████

27   / / /

28   / / /



REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1515**

1    150. ███████████████████████████████

2    ███████████████████████████████████

3    ███████████████████████████

4    **S.**  ████████████████████

5    151. ████████████████████████████████

6    ██████████████████████████████████████

7    ███████████████████████

8    ████████████████████████████████

9    ██████████████████████████████████

10   █████████████████████████████████

11   ██████████████████████

12   ███████████████████

13   ████████████████████████████████████

14   ████████████████████████████████████

15   ██████████████████████████████████

16   ████████████████████████████████

17   █████████████████████████████████

18   ████████████████████████████████

19

20   152. ███████████████████████████████

21   ██████████████████████████████████

22   ██████████████████████████████████████

23   ████████████████████████████████████

24   ████████████████████████████████████

25   ███████████████████████████████████████

26   ████████████████████████████████████

27   ███████████████████████████████████████

28   ████████████████████████████████████

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1516**

[4598679.1]

Case No. 3:20-cv-00406-AJB-DDL

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1517**

# Appendix B

Ex. Q-1518

# APPENDIX B

## Analysis of 14-day Health Assessments from Medical Records

| JIMS | Booknum | Book date | Release date | Health Assessment | Compliant | Bates Number | Comments |
|---|---|---|---|---|---|---|---|
| | | 1/15/2024 | 3/5/2024 | None Found | No | SD_843430 | |
| | | 1/13/2024 | 2/9/2024 | | | | |
| | | 1/12/2024 | | | | | |
| | | 1/11/2024 | 2/20/2024 | None Found | No | SD_753161 | |
| | | 1/11/2024 | 4/5/2024 | | | | |
| | | 1/11/2024 | | | | | |
| | | 1/11/2024 | 3/13/2024 | 1/11/2024 | Yes | SD_939221 | Refused |
| | | 1/10/2024 | 3/26/2024 | | | | |
| | | 1/9/2024 | | | | | |
| | | 1/8/2024 | | 1/12/2024 | Yes | SD_1003418 | Refused |
| | | 1/8/2024 | 1/24/2024 | | | | |
| | | 1/8/2024 | | | | | |
| | | 1/6/2024 | | 1/12/2024 | Yes | SD_842274 | |
| | | 1/5/2024 | 4/3/2024 | | | | |
| | | 1/5/2024 | 4/9/2024 | | | | |
| | | 1/5/2024 | 2/20/2024 | None Found | No | SD_837236 | |
| | | 1/4/2024 | | | | | |
| | | 1/4/2024 | | | | | |
| | | 1/3/2024 | | 1/3/2024 | Yes | SD_876917 | Refused |
| | | 1/2/2024 | 3/1/2024 | | | | |
| | | 12/31/2023 | 2/14/2024 | | | | |
| | | 12/30/2023 | 3/20/2024 | None Found | No | SD_915237 | Refused in previous booking |
| | | 12/29/2023 | | | | | |
| | | 12/29/2023 | 2/15/2024 | | | | |
| | | 12/28/2023 | 3/18/2024 | None Found | No | SD_832302 | Assessed in previous booking |
| | | 12/26/2023 | 2/12/2024 | | | | |
| | | 12/25/2023 | | | | | |
| | | 12/24/2023 | | 1/4/2024 | Yes | SD_822321 | |
| | | 12/23/2023 | | | | | |
| | | 12/22/2023 | | | | | |
| | | 12/21/2023 | | 1/2/2024 | Yes | SD_1003727 | Refused |
| | | 12/18/2023 | 2/14/2024 | | | | |
| | | 12/17/2023 | 2/2/2024 | | | | |
| | | 12/16/2023 | 3/11/2024 | 12/16/2023 | Yes | SD_1025003 | Refused |
| | | 12/14/2023 | | | | | |
| | | 12/12/2023 | 1/25/2024 | | | | |
| | | 12/11/2023 | 3/13/2024 | 12/28/2023 | No | SD_827395 | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**     **Ex. Q-1519**

| | | | | | | |
|---|---|---|---|---|---|---|
| | 12/11/2023 | 2/14/2024 | | | | |
| | 12/10/2023 | | | | | |
| | 12/6/2023 | 1/28/2024 | None Found | No | SD_801436 | Assessed in previous booking |
| | 12/4/2023 | 2/14/2024 | | | | |
| | 12/3/2023 | 1/26/2024 | | | | |
| | 12/1/2023 | 3/12/2024 | None Found | No | SD_1011685 | Assessed in previous booking |
| | 11/29/2023 | 4/3/2024 | | | | |
| | 11/26/2023 | 1/24/2024 | | | | |
| | 11/25/2023 | 1/16/2024 | None Found | No | SD_899687 | |
| | 11/25/2023 | 12/12/2023 | | | | |
| | 11/22/2023 | | | | | |
| | 11/21/2023 | | 12/13/2023 | No | SD_875817 | |
| | 11/21/2023 | | | | | |
| | 11/21/2023 | 3/29/2024 | | | | |
| | 11/18/2023 | 3/2/2024 | 11/24/2023 | Yes | SD_749422 | |
| | 11/16/2023 | | | | | |
| | 11/13/2023 | 12/23/2023 | | | | |
| | 11/12/2023 | 1/31/2024 | 11/16/2023 | Yes | SD_770622 | Refused |
| | 11/9/2023 | 4/4/2024 | | | | |
| | 11/8/2023 | 3/12/2024 | | | | |
| | 11/7/2023 | 3/4/2024 | None Found | No | SD_953169 | Assessed in previous booking |
| | 11/6/2023 | 3/21/2024 | | | | |
| | 11/6/2023 | 1/26/2024 | | | | |
| | 11/4/2023 | 2/28/2024 | None Found | No | SD_979059 | Assessed in previous booking |
| | 11/1/2023 | 2/10/2024 | | | | |
| | 10/30/2023 | | | | | |
| | 10/28/2023 | 3/26/2024 | None Found | No | SD_947096 | Refused in previous booking |
| | 10/27/2023 | 12/18/2023 | | | | |
| | 10/25/2023 | 1/14/2024 | | | | |
| | 10/24/2023 | 4/4/2024 | None Found | No | SD_861201 | Refused in previous booking |
| | 10/11/2023 | | | | | |
| | 10/11/2023 | 12/19/2023 | | | | |
| | 10/10/2023 | 10/25/2023 | 10/24/2023 | Yes | SD_947096 | Refused |
| | 10/7/2023 | 2/6/2024 | | | | |
| | 9/27/2023 | 3/13/2024 | | | | |
| | 9/27/2023 | 3/9/2024 | 10/10/2023 | Yes | SD_827865 | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1520**

| | | | | | |
|---|---|---|---|---|---|
| 9/22/2023 | | | | | |
| 9/21/2023 | 11/21/2023 | | | | |
| 9/21/2023 | | 9/24/2023 | Yes | SD_777718 | |
| 9/15/2023 | 2/11/2024 | | | | |
| 9/14/2023 | 11/6/2023 | | | | |
| 9/13/2023 | 11/5/2023 | 9/23/2023 | Yes | SD_796574 | |
| 9/13/2023 | 10/23/2023 | | | | |
| 9/11/2023 | | | | | |
| 9/8/2023 | | 9/8/2023 | Yes | SD_784016 | |
| 9/7/2023 | 11/27/2023 | | | | |
| 9/5/2023 | 3/15/2024 | | | | |
| 9/5/2023 | 10/10/2023 | None Found | No | SD_1014113 | |
| 9/2/2023 | 2/21/2024 | | | | |
| 9/1/2023 | 9/28/2023 | | | | |
| 8/31/2023 | 10/19/2023 | 9/7/2023 | Yes | SD_899224 | |
| 8/31/2023 | | | | | |
| 8/30/2023 | | | | | |
| 8/30/2023 | 10/24/2023 | None Found | No | SD_970129 | Assessed in previous booking |
| 8/27/2023 | 2/7/2024 | | | | |
| 8/27/2023 | 3/13/2024 | | | | |
| 8/26/2023 | 3/20/2024 | 8/30/2023 | Yes | SD_840606 | Refused |
| 8/24/2023 | 10/25/2023 | | | | |
| 8/22/2023 | | | | | |
| 8/21/2023 | 9/27/2023 | 8/26/2023 | Yes | SD_924890 | |
| 8/19/2023 | 2/6/2024 | | | | |
| 8/16/2023 | 12/2/2023 | | | | |
| 8/13/2023 | 10/9/2023 | 11/22/2023 | No | SD_951075 | Refused |
| 8/13/2023 | 9/19/2023 | | | | |
| 8/9/2023 | 4/3/2024 | | | | |
| 8/9/2023 | 2/2/2024 | 8/16/2023 | Yes | SD_754819 | |
| 8/8/2023 | 11/8/2023 | | | | |
| 8/8/2023 | 2/3/2024 | | | | |
| 8/7/2023 | | | | NO MED REC FOUND | |
| 8/5/2023 | 10/27/2023 | | | | |
| 7/28/2023 | 9/16/2023 | | | | |
| 7/26/2023 | | 8/4/2023 | Yes | SD_779409 | |
| 7/24/2023 | 2/7/2024 | | | | |
| 7/22/2023 | 9/27/2023 | | | | |
| 7/20/2023 | | 7/28/2023 | Yes | SD_785857 | |
| 7/19/2023 | 10/19/2023 | | | | |
| 7/18/2023 | 12/8/2023 | | | | |
| 7/17/2023 | 11/6/2023 | 7/26/2023 | Yes | SD_955818 | |
| 7/17/2023 | 12/2/2023 | | | | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**   Ex. Q-1521

| | | | | | |
|---|---|---|---|---|---|
| 7/15/2023 | | | | | |
| 7/15/2023 | 11/29/2023 | 7/26/2023 | Yes | SD_939221 | |
| 7/12/2023 | 3/10/2024 | | | | |
| 7/11/2023 | 3/9/2024 | | | | |
| 7/11/2023 | 8/17/2023 | 7/20/2023 | Yes | SD_1018658 | Refused |
| 7/8/2023 | | | | | |
| 7/7/2023 | | | | | |
| 7/6/2023 | 1/18/2024 | 7/24/2023 | No | SD_843900 | |
| 7/4/2023 | 1/4/2024 | | | | |
| 7/4/2023 | | | | | |
| 7/1/2023 | 12/12/2023 | 7/12/2023 | Yes | SD_921916 | |
| 6/29/2023 | 9/19/2023 | | | | |
| 6/27/2023 | 8/19/2023 | | | | |
| 6/27/2023 | 12/8/2023 | 7/9/2023 | Yes | SD_823398 | Refused |
| 6/23/2023 | 3/28/2024 | | | | |
| 6/23/2023 | 10/11/2023 | | | | |
| 6/20/2023 | | 6/28/2023 | Yes | SD_930404 | |
| 6/20/2023 | 12/18/2023 | | | | |
| 6/13/2023 | 6/30/2023 | | | | |
| 6/9/2023 | 7/4/2023 | | | NO MED REC FOUND | |
| 6/6/2023 | 8/13/2023 | | | | |
| 6/6/2023 | 7/18/2023 | | | | |
| 6/6/2023 | 7/17/2023 | 6/11/2023 | Yes | SD_774452 | Refused |
| 5/31/2023 | | | | | |
| 5/29/2023 | 11/6/2023 | | | | |
| 5/28/2023 | 6/21/2023 | | | NO MED REC FOUND | |
| 5/27/2023 | 9/19/2023 | | | | |
| 5/19/2023 | 6/29/2023 | | | | |
| 5/17/2023 | 7/9/2023 | 5/23/2023 | Yes | SD_801436 | |
| 5/16/2023 | 7/4/2023 | | | | |
| 5/15/2023 | 7/9/2023 | | | | |
| 5/15/2023 | 11/14/2023 | 5/21/2023 | Yes | SD_923281 | |
| 5/10/2023 | | | | | |
| 5/9/2023 | 6/5/2023 | | | | |
| 5/6/2023 | 5/26/2023 | | | NO MED REC FOUND | |
| 5/4/2023 | 5/31/2023 | | | | |
| 5/3/2023 | 7/5/2023 | | | | |
| 4/20/2023 | | 5/1/2023 | Yes | SD_782303 | |
| 4/18/2023 | 8/15/2023 | | | | |
| 4/17/2023 | 3/12/2024 | | | | |
| 4/16/2023 | 8/18/2023 | | | NO MED REC FOUND | |
| 4/12/2023 | 1/25/2024 | | | | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**     **Ex. Q-1522**

| | | | | | | |
|---|---|---|---|---|---|---|
| | 4/6/2023 | 8/1/2023 | | | | |
| | 4/5/2023 | 5/22/2023 | 4/13/2023 | Yes | SD_914590 | |
| | 4/5/2023 | 4/27/2023 | | | | |
| | 4/4/2023 | 7/5/2023 | | | | |
| | 4/4/2023 | 10/5/2023 | 4/9/2023 | Yes | SD_887341 | Refused |
| | 3/30/2023 | 5/15/2023 | | | | |
| | 3/27/2023 | 8/15/2023 | | | | |
| | 3/26/2023 | 4/13/2023 | 4/6/2023 | Yes | SD_997358 | Refused |
| | 3/24/2023 | | | | | |
| | 3/23/2023 | 9/20/2023 | | | | |
| | 3/22/2023 | 9/5/2023 | 3/28/2023 | Yes | SD_999974 | |
| | 3/21/2023 | 4/4/2023 | | | | |
| | 3/20/2023 | 4/29/2023 | | | | |
| | 3/20/2023 | 4/3/2023 | 3/30/2023 | Yes | SD_1025003 | |
| | 3/19/2023 | 5/24/2023 | | | | |
| | 3/18/2023 | | | | | |
| | 3/18/2023 | 6/12/2023 | 4/1/2023 | Yes | SD_808906 | |
| | 3/16/2023 | 5/11/2023 | | | | |
| | 3/16/2023 | 4/30/2023 | | | | |
| | 3/16/2023 | 5/26/2023 | 3/28/2023 | Yes | SD_832302 | |
| | 3/16/2023 | 5/12/2023 | | | | |
| | 3/14/2023 | 5/6/2023 | | | | |
| | 3/11/2023 | 3/27/2023 | 3/21/2023 | Yes | SD_915237 | Refused |
| | 3/9/2023 | | | | | |
| | 3/8/2023 | 11/24/2023 | | | | |
| | 3/3/2023 | 8/1/2023 | None Found | No | SD_953169 | Assessed in prior booking |
| | 2/24/2023 | 4/23/2023 | | | | |
| | 2/23/2023 | 10/4/2023 | | | | |
| | 2/22/2023 | 3/15/2023 | 4/8/2023 | No | SD_1021371 | Assessed in future booking |
| | 2/18/2023 | 8/3/2023 | | | | |
| | 2/16/2023 | 3/15/2023 | | | | |
| | 2/13/2023 | 4/25/2023 | None Found | No | SD_897686 | Assessed in future booking |
| | 2/9/2023 | 3/9/2023 | | | | |
| | 2/8/2023 | | | | | |
| | 2/8/2023 | 7/11/2023 | None Found | No | SD_788688 | |
| | 2/6/2023 | 2/27/2023 | | | | |
| | 2/6/2023 | 3/18/2023 | | | | |
| | 2/5/2023 | 7/19/2023 | None Found | No | SD_931265 | |
| | 2/1/2023 | | | | | |
| | 1/28/2023 | 2/14/2023 | | | | |
| | 1/24/2023 | | 4/19/2023 | No | SD_781065 | |
| | 1/22/2023 | 4/21/2023 | | | | |
| | 1/22/2023 | 3/10/2023 | | | | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. Q-1523**

| | 1/18/2023 | 3/15/2023 | None Found | No | SD_1006475 | |
| | 1/17/2023 | 4/18/2023 | | | | |
| | 1/15/2023 | 2/24/2023 | | | | |
| | 1/10/2023 | 4/1/2023 | None Found | No | SD_840606 | Refused in future booking |
| | 1/5/2023 | 5/10/2023 | | | | |
| | 1/5/2023 | 3/16/2024 | | | | |
| | 1/4/2023 | 3/15/2023 | | | NO MED REC FOUND | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**     **Ex. Q-1524**

# Appendix C

Ex. Q-1525

**Index of Documents Reviewed by Jeffrey Keller Since August 21, 2024**

Claim against the County of San Diego by Guadalupe Conejo Ramirez, for the March 28, 2024 death of her son, Jose Ramon Cervantes Conejo, while incarcerated in Vista Detention Facility, includes: Medical Records from Palomar Medical Center and Death Certificate (issued April 25, 2024), September 19, 2024

County Contract Number 549675, Amended and Restated Agreement with Tri-City Medical Center for Hospital Inpatient and Outpatient Specialty Medical Services for Inmates, October 30, 2020

Declaration of James Clark, September 2, 2024

Defendants' Expert Disclosures, Expert Report of Owen J. Murray Attached as Exhibit E, August 21, 2024

███████████████████████████████████████████████

Email from Gay Grunfeld to Jeff Keller, Subject: Dunsmore; Mr. Conejo's Government Claim, October 3, 2024

Jeff McDonald, Kelly Davis, In 5 years since investigation, little progress in stopping deaths in San Diego County jails, *San Diego Union-Tribune*, September 29, 2024

Jeffrey Keller MD, Grievance Responses PLUS Sample Grievance Guideline, *Jail Medicine*, January 30, 2019, CONFIDENTIAL (SD_397332-397335)

Jennifer Sherman, Aaron Fischer, Opinion: Failure to provide insulin to inmate was reckless and deadly, *San Diego Union-Tribune*, October 8, 2024

Kelly Davis, Jeff McDonald, In unusual rebuke of sheriff, medical examiner rules diabetic man's jail death a homicide by neglect, *San Diego Union-Tribune*, September 19, 2024

Kelly Davis, Jeff McDonald, Sheriff introduces new jail safety efforts, and faces critics, in first oversight-board appearance and in-depth interview, *San Diego Union-Tribune*, October 6, 2024

Medical Examiner's Report, with Autopsy and Toxicology Reports, of Keith Bach

███████████████████████████████████

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1526**

[1] On September 20 and 26, 2024, Defendants produced certain medical records for the first time. None of these records were bates-stamped or marked Confidential under the Amended Protective Order in this case. Some of the medical records had San Diego County Sheriff's Department Health Information Management cover sheets stating that the information being disclosed contain confidential information. Those are indicated on this index as "Confidential," without prejudice to Plaintiffs' view that the content of these records may be disclosed if the names of the individuals and other identifying information are redacted.

2

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1527**



**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1528**



4

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1529**

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Ex. Q-1530



**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1531**

7

CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

[4556372.2]

Ex. Q-1532



8

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]



9

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1534**



10

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1535**



AL

AL

11
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Ex. Q-1536



12

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Ex. Q-1537

NTIAL

ENTIAL


ENTIAL

ENTIAL


IDENTIAL



IDENTIAL



IAL

NTIAL

IDENTIAL

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1538**



14

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

**Ex. Q-1539**



15

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1540**



Notes taken by Owen Murray re Deposition Transcript of Angela Nix

Notes taken by Owen Murray re Deposition Transcript of Serina Rognlien-Hood

Notes taken by Owen Murray re Deposition Transcript of Jon Montgomery, MD

16

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1541**

Notes taken by Owen Murray re Deposition Transcript of Dr. Peter Jay Freedland, CONFIDENTIAL

Notes taken by Owen Murray re Deposition Transcripts of Christine Evans, M.D. and Theresa Adams-Hydar

███████████████████████████████████

Spreadsheet of Intake Records Pull List

Spreadsheet of Nurse Sick Call Records Pull List

Spreadsheet of Review of 14-day Health Assessment Compliance

U.S. Department of Justice, Bureau of Justice Assistance, "Death in Custody Reporting Act: Reporting Guidance and Frequently Asked Questions," available at https://bja.ojp.gov/funding/performance-measures/DCRA-Reporting-Guidance-FAQs.pdf

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

**Ex. Q-1542**

# EXHIBIT R

## (Redacted)

Ex. R-1543

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:   (510) 806-7366
Facsimile:    (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:   (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, <br><br> Defendants. | Case No. 3:20-cv-00406-AJB-DDL <br><br> **EXPERT REPORT OF JAY D. SHULMAN** <br><br> Judge:        Hon. Anthony J. Battaglia <br> Magistrate: Hon. David D. Leshner |

[4472186.19]

**TABLE OF CONTENTS**

**Page**

EDUCATION AND QUALIFICATIONS .................................................................. 1

    A.    Clinical, Management, and Academic Experience ................................. 1

    B.    Correctional Dentistry Experience.......................................................... 2

BACKGROUND & SUMMARY OF OPINIONS ...................................................... 3

    A.    Inadequate Urgent Care ......................................................................... 4

    B.    Inadequate Routine Care ........................................................................ 5

    C.    Inadequate Dentist Staffing.................................................................... 5

    D.    Inadequate Program Monitoring ............................................................ 5

STANDARDS FOR CORRECTIONAL DENTAL CARE ........................................ 6

    A.    Correctional Organizations .................................................................... 6

    B.    Dental Organizations.............................................................................. 8

    C.    Regulatory Organizations / Institutions ................................................ 9

    D.    United States Department of Justice ("DOJ") .................................... 10

    E.    California Department of Corrections and Rehabilitation ("CDCR")................................................................................................ 11

    F.    Scientific and Correctional Literature.................................................. 12

METHODOLOGY ................................................................................................... 12

    A.    Site Visits ............................................................................................. 13

    B.    Chart Reviews ...................................................................................... 14

        1.    Selection of Dental Records ..................................................... 15

        2.    Calculation of Wait Times........................................................ 16

    C.    San Diego County Jail Population ........................................................ 21

OPINIONS................................................................................................................ 23

    A.    Untimely Urgent Care .......................................................................... 24

        1.    Untimely Onsite Treatment for Painful Conditions .................. 26

        2.    Untimely and Denied Offsite Treatment for Painful Conditions.................................................................................. 35

[4472186.19]                       i           Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF JAY D. SHULMAN
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY    **Ex. R-1545**

B.    Inadequate Routine Care ......................................................... 39

    1.    Inadequate Initial and Annual Examinations ............................ 41

    2.    Inadequate Diagnosis and Treatment of Dental Caries ............. 47

    3.    Inadequate Diagnosis and Treatment of Periodontal Disease .................................................................................... 51

    4.    Inadequate Preventative Care ..................................................... 53

    5.    Inadequate Endodontic Treatment .............................................. 54

C.    Inadequate Dentist Staffing .................................................... 56

D.    Inadequate Program Monitoring and Oversight ................... 61

    1.    Dental Charting .......................................................................... 62

    2.    Peer Review ................................................................................ 66

    3.    Dental Director ........................................................................... 69

    4.    Continuous Quality Improvement ("CQI") ................................ 69

CONCLUSION ................................................................................... 74

EXPERT REPORT OF JAY D. SHULMAN
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY     **Ex. R-1546**

1  members who sought dental care during their incarceration in the Jail.

2      54.   I also reviewed ten charts of incarcerated people based on interviews I

3  performed in the housing areas during the inspections.  I introduced myself and

4  asked if they would like to talk to me about any dental issues.  I asked those who

5  had issues if they would consent to my reviewing their dental chart.

6              **2.**      **Calculation of Wait Times**

7      55.   As explained in more detail below, the standard of care requires people

8  complaining of pain to be evaluated *by a dentist* within the following time frames:

9          a.   Incarcerated people complaining of a toothache should be **seen**

10  **by a dentist within 3 business days**, unless they have been started on antibiotics,

11  are experiencing severe pain, or their pain cannot be managed by analgesics, in

12  which case they should be **seen by a dentist the next business day**.

13          b.   Incarcerated people referred to an oral surgeon for the extraction

14  of infected teeth should have the teeth extracted **within three weeks**.

15      56.   For each dental record I reviewed, I calculated the number of days

16  between a person requesting dental care and being seen by the dentist.  My focus in

17  reviewing the records was therefore on sick call request slips regarding dental

18  issues, forms memorializing the outcome of dental examinations, progress notes and

19  sick call summary entries related to dental issues, and offsite consultants' treatment

20  plans and operative notes.  I assume that I have been provided with the complete set

21  of records for each individual, *i.e.*, that I was able to see all records that the

22  examining dentist had at the time of treatment.  I also reviewed all x-rays that were

23  present.[23]

24

25

---

26  [23] Only panoramic x-rays were present in the charts I reviewed.  The panoramic x-rays taken at the Jail did not have the dates on which they were taken.  Notably,

27  Defendants in this litigation represented that all x-rays taken had been produced to Plaintiffs' counsel.  Email from E. Pappy to H. Chartoff, May 17, 2024.  However, in at least one instance, there is reference to a bitewing x-ray taken by Dr. ███,

28  which is not present in the chart I reviewed.  SD 842916 – 842921.

[4472186.19]        16       Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF JAY D. SHULMAN
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**    **Ex. R-1547**

57.    In assessing timeliness, I started the "clock" on the date recorded by the incarcerated person on the sick call request slip describing the painful condition.  If that date was not legible, I used the date stamped by the Sheriff's Department as the day the sick call request was received.  If another part of the medical record, *e.g.*, the sick call summary or progress notes, indicated that the incarcerated person had a dental complaint related to pain and the sick call request was not in the chart, I used that date on the other record as the start date.

58.    I stopped the clock when the incarcerated person was seen by a dentist to assess the problem—irrespective of the treatment provided (if any)—the date on which the person was documented as having refused the dentist appointment, the date the incarcerated person was discharged, or the date on which the chart was pulled for production.[24]

59.    Notably, based on the documents I have reviewed, I have some skepticism that the Sheriff's Department is appropriately documenting refusals, *i.e.*, that incarcerated people are not refusing dental appointments, but are merely not being told that they had the appointment.  As noted throughout Exhibit C, nearly all the refusal forms I saw were not signed by the incarcerated person, or even signed by healthcare staff.  Rather, they were signed by deputies only.  In addition, Plaintiff Ernest Archuleta reported in his deposition that several of the "refusals" in his own medical record were not correct, and he had not actually refused medical care or treatment as his record reflected.  *See* Archuleta Tr. at 187:9-18.  It should go without saying that failing to alert incarcerated persons with a painful dental condition that they have an appointment with a dentist and therefore denying that person the opportunity for treatment falls below the standard of care.

---

[24] Most of the incarcerated persons who submitted sick call requests stating pain were triaged by nurses and provided with analgesics or referred to a nurse practitioner to evaluate a possible infection.  In many cases, the nurses did not make a referral to dental sick call.  However, a nurse appointment is not a substitute for evaluation by a *dentist*.

60.     However, for purposes of calculating the timeliness of the Jail's dental care, this report assumes that each of these refusals was valid.  As explained below and in Exhibit C, even with that assumption, urgent dental care appointments in the Jail are rarely timely.  To the extent that "refused" appointments were not truly refused by the patient, this report is therefore an **understatement** of the true wait time for dental care in the Jail.  Similarly, when an incarcerated individual was discharged with an open urgent care request, I used the individual's discharge date as the endpoint of the timeliness calculation.  As with refused appointments, these discharge dates **understate** the true wait time—had the person remained in the Jail's custody, the clock would have kept running until they received treatment.  Notably, 22 percent of all endpoints were calculated based on a discharge date, rather than a treatment date (*see* Table 1, Col. E).  In other words, a significant portion of the requests for urgent care made in these records were simply never answered by a dentist; the patient complaining of pain was simply released, after waiting in pain for far longer than the standard of care would dictate.

61.     To determine timeliness of offsite consultations, I calculated the time between when the referral was initiated and the surgery was completed.  However, when relevant, I also note the time when, in my opinion (based on reviewing the chart and x-rays), the referral should have been initiated.

62.     I report the median wait time because the median (rather than the mean) is a robust and resistant estimate of the population and is particularly useful when a distribution is not symmetrical as is this one, since there are more long wait times than short wait times.  The median is less influenced by these outliers than the mean.[25]

63.     I reviewed 55 charts; 45 selected by the Defendants' counsel, and 10

---

[25] Reigleman RK and Hirsch RP, 2nd ed. Studying a study and testing a test. How to read the medical literature. Little Brown & Company, 1989.

1  selected based on cellside interviews with incarcerated persons.

2      64.    The Table below summarizes my findings.

| Table 1. Summary of Chart Review - Urgent Care Provided Onsite | | | | | |
|---|---|---|---|---|---|
| Defendants' Selections | | | | My Selections | All Charts |
| | Offsite Referrals | Requested Services | All Defendants' Selections | | |
| | A | B | C | D | E |
| Number of Charts | 21 | 24 | 45 | 10 | 55 |
| Number of Urgent Care Wait Times Calculated | 85 | 74 | 159 | 21 | 199 |
| Median Wait Time (Days) | 22 | 25 | 24 | 23 | 24 |
| Number of Documented Refusals | 4 | 12 | 16 | 6 | 22 |
| Number of Imputed Endpoints | 13 | 23 | 36 | 8 | 44 |
| Imputed Endpoints (%) | 15.3 | 31.1 | 22.6 | 20.0 | 22.0 |
| Untimely (>3 Business Days) Wait Times | 71 | 67 | 138 | 38 | 176 |
| Untimely (> 3 Business Days Wait Times (%) | 83.5 | 90.5 | 86.8 | 95.0 | 88.4 |

EXPERT REPORT OF JAY D. SHULMAN
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY        Ex. R-1550

| Table 1. Summary of Chart Review - Urgent Care Provided Onsite | | | | |
|---|---|---|---|---|
| **Defendants' Selections** | | | **Mv Selections** | **All Charts** |
| | **Offsite Referrals** | **Requested Services** | **All Defendants' Selections** | | |
| Untimely (>7 Days) | 69 | 65 | 134 | 36 | 170 |
| Untimely (>7 Days) (%) | 81.2 | 87.8 | 84.3 | 90.0 | 85.4 |

65.    The 45 charts provided by the Defendants represent 159 dental visits for urgent care or open treatment requests that were pending when the incarcerated person was discharged or the chart was pulled,[26] of which 85 were from the referral group and 74 were from the requested dental services group.[27]  The median wait time for these urgent care dental visits was 24 days.  The median wait time for dental visits in the outside referral group was 22 days, while that of the patients who requested dental care was 25 days.  The 10 charts I selected represent 21 urgent dental visits, for which the median wait time was 23 days.  The median urgent care wait time for all 55 charts reviewed was 24 days, for 199 total appointments.

66.    Of the 199 onsite urgent care appointments (across all 55 charts) for which wait times were calculated, 176 (88.4%) were untimely; that is, outside the 3 business day window.  Even using the 7-day "standard" suggested by NaphCare, *see*

--------

[26] There were 36 (22.6%) such occurrences where the computed wait time represented underestimates.

[27] Several of the wait times were calculated using the date the chart was copied as the endpoint.

EXPERT REPORT OF JAY D. SHULMAN
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY    Ex. R-1551**

1   SD 1572589, 170 (85.4%) would be untimely.[28]

2   67.    Of the 21 charts in the offsite referral group, 15 documented completed

3   surgery, and 6 endpoints were imputed.  While most of the referrals were made by

4   dentists, four were made by physicians.  The median time to completion of surgery

5   was 94 days.[29]

6   **C.    San Diego County Jail Population**

7   68.    The *Criminal Justice Realignment Act of 2011* made significant

8   changes to the sentencing and supervision of persons convicted of felony offenses;

9   one the most significant changes being the place where the sentence for certain

10  crimes is to be served.  Couzens and Bigelow, p. 6.[30]  As a result, the populations of

11  county jails and the median sentence lengths have increased, turning transitory jails

12  into hybrid jail/prison facilities.  For example, I am aware of at least one individual

13  serving a fifteen-year sentence in the San Diego County Jail.[31]  The provision of

14  dental care in county jails has been substantially impacted since 2011 since the

15  longer sentences carry with them a responsibility for providing more comprehensive

16  care.

17  69.    Prior to realignment, it was not unusual for dental care provided to

18  people incarcerated in jails to be restricted to treating conditions associated with

19  pain (*i.e.*, urgent care), while treatment for non-painful conditions (*i.e.*, routine care)

20  was not provided.  However, people incarcerated for a longer stays require a larger

21  array of dental services.  Consequently, jails must be prepared to provide longer-

22

---

23  [28] It is notable that there is only a 3 percentage point difference in untimely urgent
24  care appointments between categories.

25  [29] It is notable that referrals made by the medical department led to more timely
    surgery because these referrals were generally to hospital emergency departments
26  which bypassed the cumbersome NaphCare utilization management process.

27  [30] Couzens, J. R., & Bigelow, T. A. (2017). *Felony sentencing after realignment*.
    Retrieved August 13, 2024 from
    *www.courts.ca.gov/partners/documents/felony_sentencing.pdf*.

28  [31] *See* San Diego Who's In Jail search of ██████████.

# EXHIBIT S

1   GAY C. GRUNFELD – 121944
    VAN SWEARINGEN – 259809
2   ERIC MONEK ANDERSON – 320934
    HANNAH M. CHARTOFF – 324529
3   BEN HOLSTON – 341439
    ROSEN BIEN
4   GALVAN & GRUNFELD LLP
    101 Mission Street, Sixth Floor
5   San Francisco, California  94105-1738
    Telephone:  (415) 433-6830
6   Facsimile:   (415) 433-7104
    ggrunfeld@rbgg.com
7   vswearingen@rbgg.com
    eanderson@rbgg.com
8   hchartoff@rbgg.com
    bholston@rbgg.com
9
    AARON J. FISCHER – 247391
10  LAW OFFICE OF
    AARON J. FISCHER
11  1400 Shattuck Square Suite 12 - #344
    Berkeley, California  94709
12  Telephone:  (510) 806-7366
    Facsimile:   (510) 694-6314
13  ajf@aaronfischerlaw.com

14  Attorneys for Plaintiffs and the
    Certified Class and Subclasses

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

15

16                   UNITED STATES DISTRICT COURT

17                 SOUTHERN DISTRICT OF CALIFORNIA

18  DARRYL DUNSMORE, ANDREE          Case No. 3:20-cv-00406-AJB-DDL
    ANDRADE, ERNEST ARCHULETA,
19  JAMES CLARK, ANTHONY EDWARDS,    **EXPERT REPORT OF DEBRA**
    REANNA LEVY, JOSUE LOPEZ,        **GRAHAM**
20  CHRISTOPHER NORWOOD, JESSE
    OLIVARES, GUSTAVO SEPULVEDA,     Judge:      Hon. Anthony J. Battaglia
21  MICHAEL TAYLOR, and LAURA        Magistrate: Hon. David D. Leshner
    ZOERNER, on behalf of themselves and all
22  others similarly situated,

23              Plaintiffs,

24          v.

    SAN DIEGO COUNTY SHERIFF'S
25  DEPARTMENT, COUNTY OF SAN
    DIEGO, SAN DIEGO COUNTY
26  PROBATION DEPARTMENT, and DOES
    1 to 20, inclusive,

27          Defendants.

28

[4452002.19]

EXPERT REPORT OF DEBRA GRAHAM
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

**Ex. S-1554**

1  Sheriff's Department jail facilities, visual observations, including photographs, and
2  environmental measurements.  The findings contained in this report are solely those
3  of the author.  The report cites specific examples and photographs of conditions
4  observed onsite during this particular review; however, they should not be
5  considered as all-inclusive of all conditions.  Photographs may depict a single issue
6  or multiple issues in one photograph.  Therefore, certain photographs may be
7  referenced more than one time in this report.  Consideration was given to
8  Performance Based Standards and Expected Practices for Adult Local Detention
9  Facilities, 5th Edition, published by the American Correctional Association (ACA);
10  State of California, Board of State and Community Corrections – Title 15 Minimum
11  Standards For Local Detention Facilities (Crime Prevention and Corrections) and
12  Title 24 Minimum Standards for Local Detention Facilities (Part One and Part
13  Two); the U.S. Food and Drug Administration (FDA) Food Code 2022 and the
14  California Department of Public Health, California Retail Food Code; Centers for
15  Disease Control and Prevention (CDC) Guidelines; Occupational Safety and Health
16  Administration (OSHA) Standards; and California Division of Occupational Safety
17  and Health (Cal/OSHA) Hazardous Communication (Hazcom) Regulation, Title 8,
18  Section 5194.  Many of these standards are designed to protect the health and safety
19  of incarcerated persons, and some of these standards are designed to protect the
20  health and safety of the general public, including incarcerated persons.

21  **VI.  STANDARDS**

22      11.  *American Correctional Association Performance-Based Standards for*
23  *Adult Local Detention Facilities*, 5th Edition.[1]  The ACA standards are nationally
24  recognized performance-based standards to guide operations in every area of the
25  facility or agency.  ACA standards have served to establish a fundamental
26  operational structure for facilities and agencies that have implemented them.  Secure

---

27
28  [1] https://www.aca.org/ACA_Member/ACA/ACA_Member/Standards_and_Accreditation/StandardsInfo_Home.aspx?hkey=7c1b31e5-95cf-4bde-b400-8b5bb32a2bad

EXPERT REPORT OF DEBRA GRAHAM
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. S-1555**

1    facilities such as jails and prisons must operate effectively as self-contained

2    communities in which all necessary goods and services are provided in a safe,

3    secure, and controlled manner.

4        12.    State of California, Board of State and Community Corrections (BSCC)

5    – Title 15 Minimum Standards For Local Detention Facilities (Crime Prevention

6    and Corrections)[2] and Title 24 Minimum Standards for Local Detention Facilities

7    (Part One and Part Two).[3] Title 15 Minimum Standards For Local Detention

8    Facilities is part of the California Code of Regulations. It outlines the minimum

9    standards governing the operation of correctional facilities in California and the

10   regulations for the safety of the local jail facility, staff, incarcerated people, and the

11   public. Title 24 Minimum Standards for Local Detention Facilities is also part of

12   the California Code of Regulations, which contains guidelines and standards

13   designed to promote the efficiency of operations, sustainability, energy

14   conservation, and safety of the local jail facility, staff, incarcerated people, and the

15   public.

16       13.    The Food and Drug Administration's (FDA) Food Code 2022 and the

17   California Department of Public Health, California Retail Food Code. The FDA

18   Food Code has been recognized since the 1930s and originated from the Federal

19   Food, Drug, and Cosmetic Act of 1938. The Food Code represents best practices

20   regarding safe food storage, handling, and preparation, and is the basis for state

21   and/or local food regulatory policy. California Title 15, Article 12, §1245 requires

22   compliance with the standards outlined in the Health and Safety Code, Division 104,

23   Part 7, Chapters 1-13 of the California Retail Food Code.[4] The California Retail

24

25   ────────────────

26   [2] https://www.bscc.ca.gov/wp-content/uploads/2024/06/Title-15-Adults-2024-Effective-7.1.2024.pdf

27   [3] https://www.bscc.ca.gov/wp-content/uploads/2024/07/Adult-Title-24-SOUL-Effective-07.01.2024-1.pdf

28   [4] https://www.cdph.ca.gov/Programs/CEH/DFDCS/Pages/FDBHSCodes.aspx

Food Code contains the structural, equipment, and operational requirements for all California retail food facilities.  The purpose of the California Retail Food Code is "to safeguard public health and provide to consumers food that is safe, unadulterated, and honestly presented through adoption of science-based standards." *Id.* at § 113703.

14.    The Centers for Disease Control and Prevention (CDC).  The CDC is the United States health protection agency, aimed at protecting people from health threats.  *See* CDC, "About CDC," https://www.cdc.gov/about/cdc/index.html.  The CDC provides information and guidelines and acceptable levels for promoting healthy and safe behaviors, communities, and the environment.

15.    The Office of Safety and Health Administration (OSHA) and California Division of Occupational Safety and Health (Cal/OSHA) Hazardous Communication (Hazcom) Regulation, Title 8, Section 5194.[5]  OSHA provides standards for healthful and safe working environments for men and women in the workforce. *See* Occupational Safety and Health Administration, "About OSHA," https://www.osha.gov/aboutosha.  Incarcerated persons work throughout the Sheriff's Department jail facilities, for example, in the kitchens, laundry, maintenance, and cleaning/sanitation.  The Cal-OSHA Hazcom Regulation is aligned with federal OSHA's 29 CFR 1910.1200 regulation designed to address providing and maintaining a safe and healthful workplace.

## VII.  INSPECTION PARTICIPANTS

16.    During all on-site inspections, I was accompanied by counsel for the Plaintiffs, counsel for the Defendants, and various Sheriff's Department representatives and jail staff.  In January 2024, I was also accompanied by a subject matter expert on the Americans with Disabilities Act and a subject matter expert on jail conditions of confinement—both of whom were also retained by Plaintiffs'

---

[5] https://www.dir.ca.gov/title8/5194.html

EXPERT REPORT OF DEBRA GRAHAM
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**
**Ex. S-1557**

# EXHIBIT T
# (Filed Under Seal)

Ex. T-1558

# EXHIBIT U
# (Filed Under Seal)

Ex. U-1579

# EXHIBIT V

Ex. V-1594

# Deposition Transcript

Case Number: 3:20-cv-00406-AJB-DDL

Date: October 30, 2024

In the matter of:

## DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, et al.

# Henrietta L. Peters

**CERTIFIED COPY**

Reported by:
Cherie J. Anderson



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

**Ex. V-1595**

```
 1              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2                 3:20-cv-00406-AJB-DDL

 3                      - - -

 4
     DARRYL DUNSMORE, ANDREE ANDRADE, :
 5   ERNEST ARCHULETA, JAMES CLARK,   :
     ANTHONY EDWARDS, REANNA LEVY,    :
 6   JOSUE LOPEZ, CHRISTOPHER NORWOOD,:
     JESSE OLIVARES, GUSTAVO          :
 7   SEPULVEDA, MICHAEL TAYLOR, and   :
     LAURA ZOERNER, on behalf of      :
 8   themselves and all others        :
     similarly situated,             :
 9                                    :
             Plaintiffs,              :
10                                    :
           vs.                        :
11                                    :
     SAN DIEGO COUNTY SHERIFF'S       :
12   DEPARTMENT, COUNTY OF SAN DIEGO, :
     SAN DIEGO COUNTY PROBATION       :
13   DEPARTMENT, and DOES 1 TO 20,    :
     inclusive,                       :
14                                    :
             Defendants.              :
15   _____

16       DEPOSITION OF HENRIETTA L. PETERS
     _____
17
     DATE TAKEN:      Wednesday, October 30, 2024
18
     TIME BEGAN:      9:03 a.m. Pacific
19
     TIME ENDED:      5:21 p.m. Pacific
20
     LOCATION:        Conducted via videoconference
21

22   REPORTED BY:     Cherie J. Anderson, RMR, RPR, CRR
                      Steno
23                    315 West 9th Street, Suite 807
                      Los Angeles, CA  90015
24                    (310) 573-8380
                      NV FIRM# 108F
25
```

Ex. V-1596

11:51:21   1    BY MR. HOLSTON:

11:51:21   2        Q    Okay.  Thank you.

11:51:22   3        A    All -- yes.

11:51:27   4        Q    Thank you.  So, Ms. Peters, you've discussed

11:51:30   5    already inspections that you did of the San Diego

11:51:34   6    County jail facilities, and is it correct that you

11:51:39   7    did those inspections between March 11th and

11:51:44   8    14th, 2024?

11:51:47   9        A    Yes.

11:51:47  10        Q    And how far in advance were those inspections

11:51:50  11    scheduled?

11:51:52  12        A    I believe two weeks.

11:51:55  13        Q    Okay.  And they were all scheduled at once,

11:52:03  14    like two weeks out?  You knew you were going to go to

11:52:06  15    all of the facilities that you ended up going to?

11:52:10  16        A    Yes.

11:52:19  17        Q    And then, just to save time, because I am

11:52:21  18    going to -- I have questions about each individual

11:52:24  19    inspection, but was there anyone who accompanied you

11:52:28  20    on all of those inspections?

11:52:31  21        A    Yes.

11:52:33  22        Q    Okay.  Who accompanied you on all of the

11:52:35  23    inspections that you did?

11:52:37  24        A    I don't want to say her name incorrectly.  It

11:52:39  25    was Amanda, which last name is --

**Ex. V-1597**

| | | |
|---|---|---|
| 11:52:45 | 1 | MS. PAPPY:  K-A-M-P-H-O-E, F as in Frank, |
| 11:52:50 | 2 | N-E-R. |
| 11:52:58 | 3 | Q   And then were you accompanied by correctional |
| 11:53:02 | 4 | staff during each inspection that you did? |
| 11:53:07 | 5 | A   Yes. |
| 11:53:09 | 6 | Q   Okay.  Were there any -- any of the counsel at |
| 11:53:12 | 7 | Burke Williams & Sorenson -- was there always one of |
| 11:53:15 | 8 | them with you during an inspection? |
| 11:53:17 | 9 | A   No. |
| 11:53:18 | 10 | Q   Okay.  Were they with you on any of the |
| 11:53:22 | 11 | inspections? |
| 11:53:22 | 12 | A   No. |
| 11:53:23 | 13 | Q   Okay.  And did you take notes in regard to |
| 11:53:27 | 14 | those inspections? |
| 11:53:29 | 15 | A   Yes. |
| 11:53:30 | 16 | Q   Okay.  So bear with me here.  This might be -- |
| 11:53:35 | 17 | make this as efficient as we can, but I'm going to go |
| 11:53:39 | 18 | through those notes right now to make sure I'm |
| 11:53:42 | 19 | identifying which set of notes is which and also just |
| 11:53:46 | 20 | to get some details on each inspection. |
| 11:53:48 | 21 | So I'm going to start by introducing |
| 11:53:55 | 22 | Exhibit 8, which I'm showing you now.  This exhibit |
| 11:54:06 | 23 | is titled Vista. |
| 11:54:09 | 24 | Ms. Peters, are these the notes that you took |
| 11:54:11 | 25 | in relation to your inspection of Vista detention |

**Ex. V-1598**

HENRIETTA L. PETERS
OCTOBER 30, 2024

JOB NO. 1258427

12:20:03  1    I do know I asked to look at different types of

12:20:06  2    housing.

12:20:17  3        Q   Did you speak with any incarcerated persons

12:20:20  4    during your inspections?

12:20:21  5        A   Yes.

12:20:22  6        Q   You did?

12:20:23  7        A   Yes.

12:20:28  8        Q   Okay.  At which facilities did you speak with

12:20:30  9    incarcerated persons?

12:20:31 10        A   All of them.

12:20:32 11        Q   Okay.  Do you have notes of those

12:20:33 12    conversations?

12:20:34 13        A   Yes.  Most of those were I spoke to an IP

12:20:37 14    worker that was cleaning -- Los Colinas was a good

12:20:44 15    example.  She was in the intake, and she was the

12:20:52 16    porter that cleaned or the IP that cleaned the area.

12:20:54 17    I would talk to -- if there was a barbershop, I would

12:20:57 18    talk to an offender barber -- IP barber.

12:21:09 19            But not long conversations other than, can you

12:21:11 20    explain to me what you're doing, what are the

12:21:18 21    procedures, but not asking questions other than

12:21:20 22    whatever job task they were assigned to.

12:21:24 23        Q   So, Ms. Peters, at the time you had these

12:21:26 24    conversations, you had been retained as an expert by

12:21:30 25    Burke Williams & Sorenson.  Is that correct?

Ex. V-1599

HENRIETTA L. PETERS
OCTOBER 30, 2024

JOB NO. 1258427

12:21:32  1     A    Yes.

12:21:33  2     Q    And you had been retained as an expert in

12:21:35  3   connection with this litigation.  Is that correct?

12:21:37  4     A    Yes.

12:21:38  5     Q    Were counsel for Plaintiffs present during any

12:21:40  6   of those conversations?

12:21:46  7     A    Counsel for Plaintiffs?  I don't know.  I

12:21:48  8   don't know.  I'm not aware.

12:21:50  9     Q    Was -- were you aware of any lawyer

12:21:53  10  representing that incarcerated person present for the

12:21:56  11  conversations you had with incarcerated people while

12:21:58  12  working for Burke Williams & Sorenson in this

12:22:02  13  litigation?

12:22:03  14    A    No, not that I know of.

12:22:04  15    Q    Okay.  Do you have any -- do you have written

12:22:12  16  notes identifying who you spoke with?

12:22:14  17    A    No.  And I do not have pictures of offenders,

12:22:18  18  either -- or IP.  I'm sorry.  We call them

12:22:23  19  "offenders" here.

12:22:26  20    Q    We call them "persons."  All right.  So you

12:22:30  21  have no notes, no pictures.

12:22:36  22         Did you base any of your conclusions on those

12:22:39  23  conversations?

12:22:47  24    A    For the barbershop, when I talked to the

12:22:49  25  barber IP workers, yes.  I -- yes, there are some

**Ex. V-1600**

HENRIETTA L. PETERS
OCTOBER 30, 2024

JOB NO. 1258427

12:22:53  1   documents of where I said that either -- yes, they

12:23:00  2   did this -- they were knowledgeable in whatever their

12:23:05  3   job description was.  Because I was only asking --

12:23:09  4   talking to them in reference to what they're doing as

12:23:13  5   position of their job.

12:23:15  6         So, if they were the IP barber or IP -- what

12:23:21  7   do they call them? -- HSAT worker, yes.

12:23:31  8     Q    Okay.  Let's focus on that.  So you spoke

12:23:35  9   with -- you spoke with -- did you say just one HSAT

12:23:41 10   worker or did you speak with multiple incarcerated

12:23:44 11   persons in the HSAT program?

12:23:54 12     A    Spoke to one at the Central Jail because

12:23:56 13   that's when I understood what the program was.

12:24:02 14     Q    And how did that conversation influence your

12:24:06 15   opinions regarding -- I'll spell it out -- the

12:24:10 16   healthcare services assistant training program?

12:24:21 17     A    Can you repeat the question one more time?

12:24:24 18     Q    Yeah.  So I'll just start it over.  So, in

12:24:28 19   your expert report, you write about the healthcare

12:24:33 20   services assistant training program.  Is that

12:24:36 21   correct?

12:24:36 22     A    Yes.

12:24:38 23     Q    So how did the conversation you had with the

12:24:44 24   incarcerated worker at Central who is in that program

12:24:46 25   influence what you wrote about that program in your

**Ex. V-1601**

12:24:49  1   report?

12:24:50  2      A   I don't think what I asked them questions

12:24:52  3   about influenced it; I think it was more of

12:24:55  4   understanding the program and the training that they

12:24:58  5   received as part of that program.

12:25:01  6      Q   Was -- was your basis for understanding the

12:25:06  7   training received as part of that program informed by

12:25:10  8   that incarcerated person?

12:25:11  9      A   No.  It was informed by the IP deputy that

12:25:15  10  explained the fullness of it, and I may have asked

12:25:21  11  the worker something about the cart that he had

12:25:28  12  there.  There were two carts in Central, and I was

12:25:35  13  asking because all of a sudden I see a cart and it

12:25:38  14  had all of the stuff in there and it was -- some of

12:25:41  15  them was not labeled -- some of the spray bottles

12:25:44  16  were or were not labeled.

12:25:46  17          And that's when they said, oh, this is part of

12:25:48  18  the -- and it was documented on the cart, HSAT.  So

12:25:52  19  then I started asking questions to the IP deputy,

12:25:55  20  hey, what is HSAT?

12:26:02  21     Q   Okay.  Let me just -- I think I have this

12:26:04  22  photo I can show you.

12:26:07  23          MS. PAPPY:  Ben, while you're pulling that

12:26:09  24     up, it is 12:30.

12:26:11  25          MR. HOLSTON:  Yeah.

**Ex. V-1602**

| | | |
|---|---|---|
| 12:26:12 | 1 | MS. PAPPY:  We've only taken one true break. |
| 12:26:15 | 2 | What do you want to do about lunch?  How long? |
| 12:26:18 | 3 | MR. HOLSTON:  Actually, I mean, do you want |
| 12:26:19 | 4 | to -- I would be fine if you-all are fine to take |
| 12:26:22 | 5 | lunch about now for an hour and come back at |
| 12:26:24 | 6 | 1:30 before I put in that other exhibit and start |
| 12:26:29 | 7 | talking about it. |
| 12:26:32 | 8 | MS. GRUNFELD:  Maybe we should do a little |
| 12:26:33 | 9 | bit shorter lunch.  Is that okay with everyone? |
| 12:26:35 | 10 | 45? |
| 12:26:42 | 11 | MS. PAPPY:  Cherie, is that okay with you? |
| 12:26:44 | 12 | THE COURT REPORTER:  Yes, that works for me. |
| 12:26:46 | 13 | MS. PAPPY:  And, Henrietta, 45 minutes, is |
| 12:26:49 | 14 | that okay with you? |
| 12:26:50 | 15 | THE WITNESS:  Uh-huh. |
| 12:26:51 | 16 | MR. HOLSTON:  Let's come back at 1:15 p.m.? |
| 12:26:53 | 17 | MS. PAPPY:  Yeah, that works.  And, |
| 12:26:53 | 18 | Henrietta, can you send me those typewritten notes |
| 12:26:56 | 19 | over the break?  And that invoice, whatever that |
| 12:26:59 | 20 | was, can you email that to me? |
| 12:27:00 | 21 | THE WITNESS:  Yes. |
| 12:27:00 | 22 | MR. HOLSTON:  And I'll also ask -- again, I |
| 12:27:02 | 23 | note that we asked about any emails -- you know, |
| 12:27:05 | 24 | any emails that Ms. Peters received with |
| 12:27:08 | 25 | identifying facts or data or assumptions that |

**Ex. V-1603**

HENRIETTA L. PETERS
OCTOBER 30, 2024

JOB NO. 1258427

12:27:12  1      she --

12:27:13  2           MS. PAPPY:  I know.  I know.  But I want to

12:27:15  3      get you what I can get you in a hurry over lunch.

12:27:18  4           MR. HOLSTON:  Okay.

12:27:19  5           MS. PAPPY:  And the emails is probably going

12:27:20  6      to take me longer to get them, look at them, and

12:27:22  7      then get them to you.  So I want to get you what I

12:27:25  8      can get.

12:27:26  9           MR. HOLSTON:  Okay.

12:27:27 10           MS. PAPPY:  All right.

12:27:28 11           MR. HOLSTON:  We can go off the record and

12:27:29 12      come back from lunch at 1:15?

12:27:34 13           MS. PAPPY:  Okay.  Great.  Thank you.

12:27:37 14           THE COURT REPORTER:  Thank you.

12:27:38 15           (A recess transpired.)

13:15:41 16           THE COURT REPORTER:  Back on the record.

13:15:43 17           MR. HOLSTON:  Thank you.

13:15:44 18   BY MR. HOLSTON:

13:15:44 19      Q    Okay.  Ms. Peters, when we left off, we were

13:15:47 20      discussing -- sorry.  You went off screen for a bit.

13:15:53 21           When we left off, we were discussing the

13:15:55 22      incarcerated persons that you spoke with during your

13:16:00 23      inspections from March 11th to 14th, 2024, and I

13:16:03 24      just want to clear up exactly who was spoken with.

13:16:12 25           So is it correct that you spoke with people

Ex. V-1604

13:16:19  1    that -- incarcerated persons that were barbers?

13:16:24  2        A    Yes.

13:16:24  3        Q    Okay.  And how many, I'll just call them

13:16:26  4    "barbers," did you speak with?

13:16:28  5        A    At least two.  I know one was at Central.  And

13:16:58  6    there was nobody at Rock Mountain, Vista.

13:17:10  7        Q    And, for those conversations with those

13:17:12  8    barbers you spoke about, what did you speak about?

13:17:16  9        A    The barbering sanitation procedures.

13:17:25  10       Q    Did you speak with either of them about

13:17:27  11   anything -- anything else besides barbering

13:17:29  12   sanitation procedures?

13:17:30  13       A    No.

13:17:31  14       Q    Okay.  And then you mentioned that you spoke

13:17:35  15   with an incarcerated worker at Central who was in the

13:17:39  16   HSAT program.  Is that correct?

13:17:42  17       A    Yes.

13:17:43  18       Q    Okay.  And what did you speak with -- with him

13:17:47  19   about?

13:17:48  20       A    About the HSAT cart.

13:17:56  21       Q    And what was -- what was the nature of that?

13:18:02  22   What about the cart did you talk about?

13:18:28  23       A    Evidently, it was just about the cart, who

13:18:30  24   puts it together, and the rest of the questions were

13:18:32  25   pretty much to the IP worker deputy and how the

**Ex. V-1605**

HENRIETTA L. PETERS
OCTOBER 30, 2024

JOB NO. 1258427

13:18:39  1   program works and how many workers he had, because he

13:18:47  2   informed me there was one instructor that taught,

13:18:50  3   there were 10 IP workers, and he was the IP worker

13:18:54  4   deputy.

13:18:58  5        Q   So you asked the -- you spoke with the

13:19:00  6   incarcerated person who put the cart together?

13:19:03  7        A   Yes.

13:19:03  8        Q   As in -- and what did they tell you about who

13:19:07  9   put the cart together?

13:19:09  10       A   There's a cart, and I asked how do they

13:19:11  11  operate the cart, pretty much is the -- who stocks,

13:19:16  12  who stores, who -- who works on this cart, how do

13:19:19  13  they -- whose cart is this.  The worker was there at

13:19:24  14  the time, and they were putting the carts, and I

13:19:26  15  believe there was two carts, and they were side by

13:19:28  16  side, and they put them back.

13:19:30  17       Q   Did the -- did the worker seem knowledgeable

13:19:34  18  about what was on that cart?

13:19:36  19       A   So that was the whole point of asking the

13:19:38  20  workers, because if they're doing the task, I can't

13:19:41  21  ask the officer how does the employee -- I mean, the

13:19:47  22  employee do his job and make sure that it's done

13:19:50  23  correctly.  So I asked the IP workers in these areas,

13:19:54  24  how do you perform your duties and your tasks?

13:20:00  25            And those were the questions.  Only those

**Ex. V-1606**

13:20:03  1    questions as related to that work assignment.

13:20:05  2        Q    Okay.  For that HSAT worker in particular, did

13:20:11  3    they have a good understanding of their duties and

13:20:13  4    tasks related to the HSAT program?

13:20:15  5        A    Yes.

13:20:16  6        Q    Okay.

13:20:16  7        A    And that is one of the suggestions that I

13:20:19  8    stated was, it appears that this program gives them

13:20:25  9    the knowledge on how to properly clean and sanitize.

13:20:28  10   As I moved through the facilities and I noticed

13:20:31  11   that -- and I was told that there were one -- one at

13:20:34  12   George Bailey where the actual program is part of

13:20:38  13   reentry and the Central Jail, then I went to

13:20:42  14   Los Colinas, and I assumed at that time it was there;

13:20:46  15   and they said, oh, no, it's only at these two

13:20:49  16   facilities; we don't have enough instructors to --

13:20:53  17   and I said, well, those two programs that you had was

13:20:57  18   a strong program; it would benefit, you know, for the

13:21:03  19   rest --

13:21:03  20       Q    It sounded like that worker -- it sounded

13:21:10  21   like, through that program, that worker had a good

13:21:12  22   knowledge of sanitation practices that -- important

13:21:20  23   sanitation practices.  Is that your understanding?

13:21:22  24       A    Yes, and PPE, because I also checked the carts

13:21:25  25   to make sure that they had the proper PPEs.

**Ex. V-1607**

13:21:28  1      Q    Okay.  Would you say you were impressed with

13:21:32  2    that worker's level of knowledge?

13:21:34  3      A    Yes.

13:21:34  4      Q    Okay.  And is that part of the reason that you

13:21:39  5    reached the conclusions that you did about the HSAT

13:21:43  6    program?

13:21:43  7      A    Yes.

13:21:43  8      Q    Thank you.  And then did you mention that you

13:21:47  9    had spoken with a porter at Los Colinas as well?

13:21:55 10      A    Yes.

13:21:55 11      Q    And can you just, again, describe that

13:21:57 12    conversation -- what that conversation was about.

13:22:01 13      A    I asked her if she had the proper PPE on the

13:22:05 14    cart.

13:22:10 15      Q    How did she respond?

13:22:14 16      A    When I looked at the cart, I didn't see the

13:22:16 17    proper PPE, and I was asking that.  And then she --

13:22:19 18    they got the PPE for her; but then that's when I

13:22:22 19    asked, do we have the program here?  And I was

13:22:27 20    informed that program was only for certain

13:22:30 21    facilities.

13:22:34 22      Q    Is there anything -- I mean, is there anything

13:22:37 23    that incarcerated person told you?  Was it just a yes

13:22:42 24    or no that she had said?  Did you have more -- other

13:22:44 25    conversations than that?

Ex. V-1608

HENRIETTA L. PETERS
OCTOBER 30, 2024
JOB NO. 1258427

13:22:46  1      A    No.   More of the conversation was with the
13:22:47  2   staff as I walked around and visit some other areas
13:22:50  3   in that -- because that was the intake area of
13:22:55  4   Los Colinas that we were in.
13:22:58  5      Q    Did that incarcerated -- I mean, did that
13:23:01  6   porter say anything to you other than yes or no?
13:23:03  7      A    No.
13:23:03  8      Q    Okay.   Did you speak with anyone else at
13:23:15  9   Los Colinas?
13:23:15  10     A    [Inaudible].
13:23:16  11     Q    Did you speak with any other incarcerated
13:23:17  12  people at Los Colinas?
13:23:18  13     A    No.   Most -- no.   No.   No.   I went to
13:23:24  14  Culinary.   I went to a dorm.   No.   No.
13:23:29  15     Q    Okay.   What about at Central?   Did you speak
13:23:31  16  to any of the incarcerated persons at Central besides
13:23:34  17  the barber?
13:23:34  18     A    No.   And I actually asked them to seek out if
13:23:38  19  they had a barber, can I speak to a barber, and then
13:23:42  20  they made those barbers available.
13:23:47  21     Q    So same question for Vista:   Did you speak
13:23:48  22  with any incarcerated people other than the barber
13:23:52  23  you spoke with?
13:23:55  24          I missed that.   Was that a no?
13:23:56  25     A    No.   No.

Ex. V-1609

13:24:05  1    Q    Okay.  And then did you speak with any other

13:24:07  2   incarcerated people besides those that we just went

13:24:10  3   through?

13:24:10  4    A    No.

13:24:13  5    Q    Okay.  So just to recap the -- it sounds like

13:24:15  6   you spoke with a total of four incarcerated persons:

13:24:18  7   one at Los Colinas, a barber at Central, an HSAT

13:24:21  8   worker at Central, and a barber at Vista?

13:24:24  9    A    Yes.

13:24:24 10    Q    Okay.  Thank you.  Let's talk about -- we did

13:24:36 11   receive some documents at lunch.  I'm not going to --

13:24:40 12   I doubt that I'll introduce all of them, but I want

13:24:42 13   to just introduce a couple at this time.  So just

13:24:45 14   give me one moment.

13:25:23 15        So I'm introducing as Exhibit 16 a document

13:25:26 16   titled San Diego Facilities Summary March 2024, and

13:25:33 17   I'm showing it to you now.

13:25:38 18        Does this document contain the typed-up notes

13:25:41 19   of your inspections that we were discussing earlier?

13:25:43 20    A    Yes.

13:25:48 21    Q    Okay.  I may come back to this document, but

13:25:50 22   just wanted to confirm that for now.

13:25:52 23        And then I'm introducing as Exhibit 17 a

13:26:00 24   document titled HP Retained Request Fee Schedule,

13:26:05 25   2024.

```
 1                   CERTIFICATE OF REPORTER

 2

 3           I, Cherie J. Anderson, Registered Merit
      Reporter, Registered Professional Reporter, Certified
 4    Realtime Reporter, and Notary Public for the State of
      North Carolina at Large, do hereby certify:
 5           That the foregoing deposition was taken
      remotely before me on the date and at the time and
 6    location stated on page 1 of this transcript; that the
      deponent was duly sworn to testify to the truth, the
 7    whole truth, and nothing but the truth; that the
      testimony of the deponent and all objections made at
 8    the time of the examination were recorded
      stenographically by me and were thereafter
 9    transcribed; that the foregoing deposition as typed is
      a true, accurate, and complete record of the testimony
10    of the deponent and of all objections made at the time
      of the examination to the best of my ability.
11           I further certify that I am neither related
      to nor counsel for any party to the cause pending or
12    interested in the events thereof.
             Witness my hand, I have hereunto affixed my
13    official seal on this 30th day of October 2024, at
      Wilmington, New Hanover County, North Carolina.
14

15

16

17

18

19

20

21

22    _____
      Cherie J. Anderson, RMR, CRR
23    My Commission expires
      December 22, 2026
24

25
```

Ex. V-1611

# EXHIBIT W
## (Redacted)

Ex. W-1612

# Deposition Transcript

Case Number: 3:20-CV-00406-AJB-DDL

Date: November 12, 2024

In the matter of:

## DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPT, et al.

# Owen J. Murray, D.O., MBA

**CERTIFIED COPY**

Reported by:
Cherie J. Anderson



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

Ex. W-1613

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2                3:20-CV-00406-AJB-DDL

 3                      -  -  -

 4

    DARRYL DUNSMORE, ANDREE ANDRADE, :
 5  ERNEST ARCHULETA, JAMES CLARK,    :
    ANTHONY EDWARDS, REANNA LEVY,     :
 6  JOSUE LOPEZ, CHRISTOPHER NORWOOD,:
    JESSE OLIVARES, GUSTAVO           :
 7  SEPULVEDA, MICHAEL TAYLOR, and    :
    LAURA ZOERNER, on behalf of       :
 8  themselves and all others         :
    similarly situated,               :
 9                                     :
            Plaintiffs,               :
10                                     :
            vs.                       :
11                                     :
    SAN DIEGO COUNTY SHERIFF'S        :
12  DEPARTMENT, COUNTY OF SAN DIEGO,  :
    SAN DIEGO COUNTY PROBATION        :
13  DEPARTMENT, and DOES 1 TO 20,     :
    inclusive,                        :
14                                     :
            Defendants.              :
15  _____

16    DEPOSITION OF OWEN J. MURRAY, D.O., MBA
    _____
17
    DATE TAKEN:       Tuesday, November 12, 2024
18
    TIME BEGAN:       9:12 a.m. Pacific
19
    TIME ENDED:       5:31 p.m. Pacific
20
    LOCATION:         Conducted via videoconference
21

22  REPORTED BY:      Cherie J. Anderson, RMR, RPR, CRR
                      Steno
23                    315 West 9th Street, Suite 807
                      Los Angeles, CA  90015
24                    (310) 573-8380
                      NV FIRM# 108F
25
```

Ex. W-1614

1    A    No.   That's me.

2    Q    What about Mortality Data?

3    A    Me.

4    Q    What about the section Response to Plaintiffs'

5    Referenced Citations?

6    A    That's me.

7    Q    And then section 7, Plaintiffs' Allegations?

8    A    That's me.

9    Q    And the Conclusion?

10    A    Mine.

11    Q    Okay.  Have you worked with -- is this the

12    first time that you've worked with these people in a

13    medical system review project like this?

14    A    I believe it's the first time I've worked with

15    Dr. Roberts on a project like this.  With Mr. Coates

16    and with Mr. Abbott, we worked on -- it wasn't

17    related to litigation, but we worked on a jail

18    project in Donohue/Raleigh/Durham at the Wake County

19    Jail.

20    Q    And, for the parts of the reports that you --

21    for the parts of the report that you indicated they

22    helped you with, did they write first drafts of those

23    sections?

24    A    They did.

25    Q    And then what process did you go through with

Ex. W-1615

 1  yourself?

 2     A   I did -- I reviewed them to see what format

 3  they were in and what they looked like.  I did not do

 4  a review of the record as -- as my -- the consultants

 5  did.

 6     Q   When you say -- I believe you said you

 7  reviewed them -- the format of them.  What do you

 8  mean by that?

 9     A   Just I wanted to see what they looked like and

10  what the consultants were actually getting so I had a

11  better understanding if they asked about a question

12  or -- so I just wanted to see what it is they would

13  be looking at.

14     Q   But you didn't substantively review the

15  records to determine the care provided -- sorry.

16         You didn't substantively review the records to

17  evaluate the care provided to the patients, did you?

18     A   I did not, no.

19     Q   And your report lists five individuals as

20  reviewers of the medical files.  Right?

21     A   Correct.

22     Q   Dr. Stephen Boone.  Right?

23     A   Correct.

24     Q   PAC Erin Freeman?

25     A   Correct.

Ex. W-1616

1    Q    FNP Jennifer Humphries?

2    A    Correct.

3    Q    Dr. Jane Leonardson?

4    A    Correct.

5    Q    And PA John Pulvino?

6    A    Correct.

7    Q    Who are those people?

8    A    Well, I'll start with Dr. Leonardson.

9    Dr. Leonardson has worked for Correctional Managed

10   Care.  She's a Board-certified internist who started

11   with me, actually, in the county jail in Chicago and

12   has worked in multiple TDCJ facilities.  Her current

13   role -- she's now since retired from CMC, but she was

14   our chief medical information officer when she left,

15   and she now is -- she has her own consulting business

16   and is involved in correctional healthcare activities

17   outside of CMC now.

18        John Pulvino:  He's a PA.  He's been here

19   30 years.  He's over -- he's the director of quality

20   and outcomes and has worked, as I said, in the TDCJ

21   and then started with Correctional Managed Care when

22   it began in September of '94.

23        Erin Freeman has been with Correctional

24   Managed Care for 15 years.  She's over our

25   utilization review department.

Ex. W-1617

1          And Stephen Boone is an ER physician, not

2    associated with CMC.  He's a Board-certified ER

3    guy -- doctor that works for UT Houston, and he's on

4    the faculty there.

5          And then Ms. Humphries is a nurse practitioner

6    who's been with CMC for the last few years, and she

7    has some experience in the past with doing legal

8    reviews in the nursing area, and she was just added

9    for this particular activity.

10    Q   And how did you -- did you choose those five

11   people to work with you?

12    A   I did, yes.

13    Q   And how did you choose those five to work with

14   you?

15    A   I've worked with them in the past on other

16   similar activities.

17    Q   And by "similar activities," you mean

18   reviewing medical files to determine whether care met

19   the standard of care?

20    A   Correct.

21    Q   Have they worked on [sic] you in other -- to

22   help you produce other expert litigation reports?

23    A   They have.

24    Q   You testified that you didn't review the

25   substance of the files.  Right?

Ex. W-1618

1    A    Correct.

2    Q    They are the ones who reviewed the substance

3    of the files.  Correct?

4    A    Correct.

5    Q    [Inaudible].

6         Who assigned them which medical files they

7    should review?

8    A    Erin Freeman did that.

9    Q    Was she the supervisor of this project?

10   A    She was my assistant in delegating and

11   distributing the workload.

12   Q    How did -- do you know how she decided to whom

13   to assign each medical file?

14   A    I think she just took the random assortment of

15   charts as they came in and assigned them that way.

16   Q    There was, as I saw it, an unequal assignment

17   of charts.  One of people reviewed as few as two, and

18   some others reviewed 25 or 26.  Do you know how that

19   happened?  Do you know how that happened?

20   A    It was just based on their time and

21   availability.

22   Q    Is that why FNP Humphries only reviewed two

23   files?

24   A    Correct.

25   Q    For each of the files, the reviewers wrote a

OWEN J. MURRAY, D.O., MBA                                      JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   summary.  Right?

 2      A    Correct.

 3      Q    And, for each file, they offered an opinion

 4   regarding whether the care the jail provided to the

 5   person met the standard of care.  Right?

 6      A    Correct.

 7      Q    When medical professionals use this term,

 8   "standard of care," what do they mean?

 9      A    Well, in this situation, the standard of care

10   is a care standard that -- that each individual has

11   based on their personal experience and their

12   professional education as to the entirety of the care

13   that was provided, because one of the reasons we

14   actually pull chronic care charts is those are

15   patients who have a high likelihood of having

16   multiple encounters with the healthcare system.

17          And so that's a good pool of population --

18   pool of patients to pull so that you can be able to

19   view not only the chronic care, but their episodic

20   care, their use of lab, their use of x-ray, their use

21   of subspecialty care.

22          So the standard of care is -- is a subjective

23   standard based on those individuals' experience and

24   professional background.

25      Q    So that sounds like that's the standard of
```

Ex. W-1620

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   care that they applied here.  I asked a slightly

 2   different question, which is, when medical

 3   professionals use the term "standard of care," what

 4   do they mean?

 5      A   I don't know.

 6          MS. COLEMAN:  Objection.  Vague.

 7      Q   Have you heard the term "standard of care"

 8   before?

 9      A   I've heard it.

10      Q   Is it -- is it frequently used in medicine?

11      A   It is.

12      Q   But you don't know what it means?

13      A   I don't.

14          MS. COLEMAN:  Objection.  Misstates his

15    testimony.  Vague.

16      A   Again, I think it's a term of art, but I don't

17   really know what people mean when they say it.

18      Q   Do you know what your five reviewers think the

19   term standard of review -- I'm sorry -- "standard of

20   care" means?

21      A   We discussed -- we discussed how we were going

22   to approach reviewing the records and what was going

23   to go into how they subjectively scored those

24   records.

25      Q   And what did you discuss?  What was the --
```

**Ex. W-1621**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   well, who -- who set forth the parameters for what

 2   the standard of care would be?

 3      A   Well, as I said, there is no standard of care

 4   as you're looking at the totality of services that

 5   we're looking at.  There's not a book that I can go

 6   to that's going to say that when I look at chronic

 7   care and their episodic care and their use of lab and

 8   their pharmaceutical choice and the delivery of all

 9   of that -- there's no book that says, this meets the

10   standard or it doesn't meet the standard.

11         So it really comes down to, based on your

12   professional experience and your background, did the

13   totality of that care, in your opinion, fall within a

14   reasonable level of care for -- in this situation,

15   for a patient of San Diego County -- San Diego Jail.

16      Q   You just said that the standard of care would

17   be based on a person's experience and background.  Is

18   that right?

19      A   Correct.

20      Q   People have different levels of experience.

21   Right?

22      A   Correct.

23      Q   And they have different backgrounds.  Right?

24      A   Correct.

25      Q   Does that mean the standard of care could be
```

Ex. W-1622

OWEN J. MURRAY, D.O., MBA                                        JOB NO. 1220572
NOVEMBER 12, 2024

1    different for the -- for different people?

2       A    I think it could.

3       Q    Do you think the standard of care was

4    different for your reviewers, given that they have

5    different backgrounds and experience?

6            MS. COLEMAN:  Objection.  Vague.  Compound.

7      Calls for speculation.

8       A    As I said, I don't -- again, there is no

9    standard of care.  When you're talking a standard, it

10   really is a subjective review of the record that

11   they're looking at.  So there is no standard to

12   compare it to.

13      Q    I guess we should be really precise here.

14   When you're saying the standard of care, are we

15   talking about the standard of care for treating a

16   specific condition or the standard of care more

17   generally for a person overall or something else?

18      A    I'm -- I -- I would object to the word

19   "standard" because that would imply I could go read

20   about it in some book and find out what that standard

21   is, and this -- this is not -- this is the art of

22   medicine.  It's -- you know, you have to take in the

23   totality of what goes on and did it meet a reasonable

24   level of care for that patient.

25      Q    Well, in your report, you're the one who used

**Ex. W-1623**

1    Q    But there are standards to determine whether

2    the care someone receives for a specific condition or

3    disease meets the standard of care.  Right?

4         MS. COLEMAN:  Objection.  Vague.  Compound.

5    A    For a specific disease, yes, there are many

6    standards.  Correct.

7    Q    And some of them are published.  Right?

8    A    Some are; correct.

9    Q    And some medical professionals use those

10   published standards to determine whether the care

11   someone received for those specific conditions met

12   the standard of care.  Right?

13   A    They might.

14   Q    And so, in that context, a published standard

15   of care provides a written objective standard by

16   which to measure someone's care.  Right?

17   A    A particular element.  It could.

18   Q    But that's not what your reviewers did.

19   Right?

20   A    Our reviewers did decide and did use some

21   references to standards where they thought were

22   appropriate; but, again, as I said, the review of

23   these records is unique, and I'm not aware, other

24   than what we might see here in our own system where

25   you didn't do a review of the entirety of the record

**Ex. W-1624**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1          And all of that went into the determination of

2     whether it met our standard or not.

3       Q    But -- I understand that's what they looked

4     at.   What was the standard?

5       A    Well, the standard --

6          MS. COLEMAN:   Objection.

7       A    The standard is a subjective standard.   Did

8     all of those things -- I guess my analogy would be

9     like a test score.   Like, there are 100 points.

10    If -- if you got 80 or above, then that met the

11    standard.   If you got less than 80, then it didn't.

12      Q    Well, but there isn't any scoring here.

13    Right?

14      A    The scoring is subjective.

15      Q    Okay.   So what I'm trying to understand is,

16    where was the line drawn?   How did you define the

17    line between 79 and 80 in your analogy?

18          MS. COLEMAN:   Compound.   Asked and answered.

19      A    Well, as I said, that -- that is the

20    subjective part of these reviews is that that was

21    left to the reviewer to determine whether or not it

22    was, you know, an 81 or a 79.

23      Q    And I think you previously testified that was

24    based on their experience.   Right?

25      A    Experience and their professional degree.

Ex. W-1625

OWEN J. MURRAY, D.O., MBA
NOVEMBER 12, 2024

JOB NO. 1220572

1    either meets the standard of care or doesn't meet the

2    standard of care.  Right?

3        A    That is correct.

4        Q    You said you did it in California.  In what

5    context?

6        A    I would have to look back.  I believe we

7    reviewed -- actually, I think we re-reviewed

8    Plaintiffs' records in regard to their complaints.  I

9    don't -- I don't think we did necessarily the same

10   thing we did here in California, other than reviewing

11   records that the plaintiffs had reviewed.

12       Q    So the instructions to the reviewers was to

13   look at the overall care.  Right?

14       A    Is that -- I thought -- yes.  Correct.

15       Q    Sorry.

16       A    So sorry.  I thought there was more.

17       Q    And to use their experience and background to

18   determine if the care met the standard of care.  Is

19   that right?

20       A    Met our standard.  Correct.

21       Q    And, again, I'm just having some trouble

22   understanding.  What is your standard of care?

23       A    As I said, it is a subjective -- and I just go

24   back to, it is -- it is not a standard, since I can't

25   point to anything.  It is, did they make a score of

**Ex. W-1626**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    Q   I have more questions about that.  Under the

2  standard of care, as you defined it, for the review,

3  if one area of care was terrible for a patient but

4  the other areas of care were adequate, would the care

5  meet the standard of care?

6    A   It could.

7    Q   Now, the opinions expressed in your -- sorry.

8  The opinions in your report are your opinions.

9  Right?

10    A   Correct.

11    Q   Are the opinions regarding whether the

12  standard of care was met for the individual patients

13  in Appendix J, are those your opinions as well?

14    A   Well, they're the individual reviewers', whose

15  opinions I trust.

16    Q   But, again, you didn't review the file

17  substantively to confirm whether you agree with their

18  conclusions that the standard of care was met.

19  Right?

20       MS. COLEMAN:  Asked and answered.

21    A   No.  I did not review the medical record

22  files.

23    Q   Is it possible that you might have disagreed

24  with one of the reviewers about whether the standard

25  of care had been met?

Ex. W-1627

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    Q    And, again, even if the diabetic care was
2    terrible, you said just now that it's possible that
3    the overall care met the standard of care.  Correct?
4    A    It is possible; yes.
5    Q    In that circumstance, where, let's say, one
6    type of care was very bad and the rest of the care
7    was adequate, how would you decide if the care met
8    the standard of care?
9         MS. COLEMAN:  Objection.  Incomplete
10    hypothetical.  Overly broad.  Calls for
11    speculation.
12    A    As I said, we would have to go through -- I
13    would have to review the chart that we would be
14    talking about and -- and come to my conclusion.  As I
15    said, this standard of care is a subjective standard.
16    Q    Is it possible that the -- I want to stick
17    with this hypothetical for a second.  Let's assume,
18    again, that there's -- one area of care was terrible,
19    but the other areas of care were adequate.  Is it
20    possible that the care may not have met the standard
21    of care in that case?
22         MS. COLEMAN:  Objection.  Vague.  Incomplete
23    hypothetical.  Lacks foundation.
24    A    Again, help me understand -- again, we're
25    using the term "standard," and I'm using the term the

Ex. W-1628

1    Q    Sure.

2         MS. COLEMAN:  Can you ask it in a

3    nonnegative?

4    Q    I'll move on.

5         Does it meet the standard of care not to

6    conduct a physical examination for someone being

7    evaluated for abdominal pain?

8         MS. COLEMAN:  Objection.  Vague.  Incomplete

9     hypothetical.

10    A    Again, it would depend on the particular

11   medical record being reviewed and the entire context

12   of the record.

13    Q    Does it meet the standard of care to evaluate

14   someone for abdominal pain without obtaining vital

15   signs?

16        MS. COLEMAN:  Objection.  Vague.  Incomplete

17     hypothetical.

18    A    Again, to the extent that that occurred and

19   the records reviewed, the reviewer would -- would

20   take that into consideration in their scoring.

21    Q    You mentioned scoring just now.  Right?

22    A    Correct.

23    Q    But, again, there was no scale here.  Right?

24   There's no score?

25    A    No.  I gave you the kind of anecdote, or the

**Ex. W-1629**

OWEN J. MURRAY, D.O., MBA
NOVEMBER 12, 2024

JOB NO. 1220572

1  example, of a test trying to look at a score of 80

2  and -- but it is subjective.

3      Q   Did you provide that instruction to the

4  reviewers that, you know, so long as the care

5  received a score of 80 or better, you should score it

6  as meeting the standard of care?

7      A   I gave them that analogy.

8      Q   That exact analogy?

9      A   Yeah.  As I said, kind of look at it as a

10  test; did they score above 80?  80 or above.

11      Q   And did you provide them with any guidance for

12  how they were supposed to score it, how they were

13  supposed to give it a number?

14      A   No.

15      Q   We touched on this briefly, but you know, you

16  said you reviewed Dr. Keller's rebuttal report and

17  the portion of his report where he discussed 19 of

18  the medical files that your reviewers reviewed.

19  Right?

20      A   Correct.  I did read that; yes.

21      Q   And a number of those -- for a number of those

22  medical files, your reviewer concluded that the care

23  met the standard of care.  Right?

24      A   Correct.  Met our standard.  Correct.

25      Q   And Dr. Keller concluded that the care

**Ex. W-1630**

1    Q    And, again, you said you read Dr. Keller's

2    rebuttal report.  Right?

3    A    I did.

4    Q    I can show this to you if you need it, but I'm

5    going to quote it to you accurately.  If it's

6    important for you to see it, I'll pull it up for you,

7    but on page 4 of his report he wrote, quote, "One of

8    the most critical functions of any healthcare system,

9    but especially a correctional healthcare system, is

10   to carefully review any in-custody deaths to identify

11   medical errors that led to adverse outcomes so that

12   those errors can be avoided in the future."

13        Do you agree with that statement?

14        MS. COLEMAN:  Objection.  Overly broad and

15     assumes the deaths are medical.

16   A    Yeah.  I mean, I agree that looking at

17   mortality in jails or prisons is part of what you

18   should do in a quality assurance program.  Yes.

19   Q    And why is that part of something that you

20   should do in a quality assurance program?

21   A    Because it's -- a death is a sentinel event,

22   and so looking at a sentinel event to look back to

23   see if there were some things that potentially could

24   be modified or changed -- I think, as I said, it's a

25   reasonable thing to do within the context of a

**Ex. W-1631**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    Q    Did you review any materials related to the

2    M&M committee?

3    A    I did not, no.

4    Q    Did anyone else on your team review materials

5    related to the M&M committee?

6    A    No.

7    Q    Why not?

8    A    We were told how it worked, and that was

9    sufficient.

10   Q    So you didn't see how it was working in

11   practice.  Right?

12   A    We didn't attend the meeting; no.

13   Q    You didn't look at any of the written reports.

14   Right?

15   A    No, we did not.

16   Q    You didn't look at whether it was making

17   appropriate conclusions with respect to whether

18   deaths were preventable or not, did you?

19   A    We didn't do that, no.

20   Q    You didn't review whether they were making

21   appropriate recommendations for changes to address

22   any problems they found in the deaths, did you?

23   A    No.

24   Q    You didn't review whether the County

25   implemented any of those recommendations, did you?

**Ex. W-1632**

```
 1      A    No.

 2      Q    In your report on -- on page 39, you indicated

 3   that there have been five non-homicide, non-suicide

 4   in-custody deaths in 2024.  Right?

 5      A    Correct.

 6      Q    And you further indicate that you received

 7   medical records for all five of those individuals.

 8   Right?

 9      A    We did.

10      Q    And you wrote on page 39 of your report -- and

11   let me take you there just so you can see it -- that

12   the five medical records were provided and reviewed.

13   Do you see that at the bottom?

14      A    Uh-huh.

15      Q    Did you review the files?

16      A    No.

17      Q    Who reviewed them?

18      A    Erin Freeman.

19      Q    Did you review any M&M committee materials for

20   those deaths?

21      A    No.

22      Q    Did you ask for any M&M materials for those

23   deaths?

24      A    No.

25      Q    Why not?
```

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    Q    And you said the reason you did not was

2    because it was not part of your review.  Is that

3    right?

4              MS. COLEMAN:  Asked and answered.

5    A    We wanted -- we wanted to ensure that there

6    was an M&M committee, and we were told, and verified,

7    that it was, and we did not do anything beyond that.

8    Q    Why not?

9    A    Because it wasn't part of our review.

10   Q    Why wasn't it part of your review?  That's

11   what I'm trying to understand.

12   A    Again, I didn't feel that -- all I want to do

13   is validate that it existed.  And, to the extent that

14   that actually played into our overall issue was -- is

15   there reasonable care being provided at the jail?

16   That was all I needed to find out was, they had an

17   M&M committee.

18   Q    And not whether the M&M committee was doing a

19   good job.  Is that right?

20              MS. COLEMAN:  Asked and answered.

21    Argumentative.

22   A    Yeah.  I wasn't there to debate the -- merits

23   of their particular M&M committee.

24   Q    Well, I believe you testified that an M&M

25   committee is an important part of an adequate medical

Ex. W-1634

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1  system -- sorry -- an adequate QI system.  Isn't that

2  right?

3      A    Correct.

4      Q    Does it not matter whether the M&M committee

5  is doing a good job?

6           MS. COLEMAN:  Objection.  Argumentative.

7      Asked and answered.

8      A    As I said, we were told it existed, and that

9  was sufficient for myself.

10     Q    Who told you that it existed?

11     A    I mean, Dr. Freedman.  We heard it from

12  several different sources that there was an M&M

13  committee as well as I think -- I certainly knew

14  there -- because there was obviously concern about

15  how the M&M committee was operating and where these

16  mortality death reviews were done, whether they were

17  on-site or not on-site.

18          And my only concern was, were they being done?

19  And the answer was, yes.

20     Q    Turning back to the summaries in Appendix Q,

21  none of those summaries include any analysis of

22  whether the deaths were preventable.  Right?

23     A    Correct.

24     Q    And none of those summaries include any

25  analysis of whether there were errors in medical

Ex. W-1635

1    care.  Right?

2       A    Correct.  They were simply the summaries and

3    the reviews.

4       Q    And none of those summaries included an

5    analysis of whether better care could have prolonged

6    the person's life.  Right?

7       A    No.  Correct.

8       Q    And none of the summaries include any

9    recommendations for changes to the medical system

10   that might be warranted in light of the -- what's

11   shown in the medical file, do they?

12      A    No.

13      Q    Did you review medical records for any other

14   in-custody deaths -- sorry -- for any in-custody

15   deaths other than the five from 2024?

16      A    That's it.

17      Q    Earlier today, Counsel for Defendants produced

18   an email from you to, I believe it's, Susan Coleman,

19   requesting on August 30th, after Dr. Keller's

20   report was produced, that you receive certain medical

21   files.

22          Do you remember writing that email?

23      A    Yes, I think I do.

24      Q    And do you recall that that email requested

25   medical records for seven individuals who Dr. Keller

**Ex. W-1636**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1     the record?
 2          MR. FREEDMAN:  Sure.  This is the rebuttal
 3     expert report of Jeffrey Keller from
 4     November 1st, 2024.
 5   BY MR. FREEDMAN:
 6     Q   Dr. Murray, have you seen this before?
 7     A   I have.
 8     Q   I'll blow it up a little bit for you.  Let me
 9   know if you need me to scroll down.
10     A   Keep going, please.  Okay.  Keep going.  Okay.
11   Keep going.  Okay.  Keep reading.  Okay.
12     Q   Again, Dr. Keller opined that Mr. Mitchell's
13   death ███████████  was likely preventable.
14          Do you agree with Dr. Keller's conclusion?
15     A   I can't agree or disagree.  I didn't review
16   the record.
17     Q   You said you -- I just want to make sure I
18   have this right:  You said you did not review
19   Dr. Ramsey's rebuttal report.  Is that correct?
20     A   Who?
21     Q   She's the substance use disorder expert for
22   Plaintiffs.
23     A   No.  I'm not a substance use disorder expert,
24   so no, I did not read -- review that.
25     Q   Did you review Dr. Keller's discussion of the
```

**Ex. W-1637**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    you see that at the bottom there?

2        A    I do.

3        Q    And this is Appendix H.  Right?

4        A    Correct.

5        Q    And this is the audit worksheet that I believe

6    you testified the NP who was working with you

7    completed regarding the 14-day health and physical.

8    Is that right?

9        A    No.  That was Mr. Abbott.

10       Q    Apologies.  And Mr. Abbott is an RN.  Did I

11   use the wrong acronym there?

12       A    He is an RN; correct.

13       Q    And Mr. Abbott is the one who reviewed the

14   files for this audit.  Right?

15       A    Correct.

16       Q    Did you give him instructions for how to

17   conduct the audit?

18       A    No.  He knows how to conduct this audit.

19       Q    And how do you know he knows how to conduct

20   this audit?

21       A    Because we did this audit in the jails that we

22   ran and Kirk was responsible for those jails.

23       Q    And, in looking at the appendix, did

24   Mr. Abbott collect the relevant data points in order

25   to be able to perform this audit?

**Ex. W-1638**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   audit?

 2      A   Correct.

 3      Q   Who selected the 75 medical files for the

 4   audit?

 5      A   Kirk did.

 6      Q   How did he select them?

 7      A   I believe he did the same thing:  kind of a

 8   random number.

 9      Q   Do you know that to be true or are you

10   speculating?

11      A   As I said, I believe that to be true.

12      Q   That doesn't quite answer the question.  Do

13   you know he did it that way or are you guessing?

14          MS. COLEMAN:  Objection.  Compound.  Asked

15    and answered.

16      A   Yeah.  As I said, I -- I can only say, I

17   believe that to be true.  I know that he was -- that

18   he would have applied his statistically appropriate

19   methodology to his selection.

20      Q   And why do you believe that to be the case?

21      A   Well, because I know that this form that he's

22   using is a form that we use in our jail audits; and I

23   know that Kirk knows how to perform these; and I know

24   that he knows that you have to do it in a

25   statistically correct manner.
```

**Ex. W-1639**

```
1          So, as I said, I have confidence.  I'm not
2     sure exactly what methodology he used, but I am
3     confident that Kirk used a statistically appropriate
4     methodology to determine the 75 charts he pulled from
5     the 121.
6     Q   Only 11 people in this audit remained in the
7     jail for 14 days.  Right?
8     A   Correct.
9     Q   I'm going to go back now to page 12 of your
10    report.  12.  And do you see the sentence I've
11    highlighted there?
12    A   Yes.
13    Q   It says, quote, "Of the 75 records audited,
14    only 11 involved stays of 14 days or longer, and all
15    required initial health assessments were completed
16    within this time frame."
17         Right?
18    A   Correct.
19    Q   All right.  Now I'm going to go back.  This is
20    still the audit here, Appendix H.  Do you see that?
21    A   I do.
22    Q   And then I'm going to point your attention to
23    Rows 50 and 58.
24    A   Okay.
25    Q   Do you see those?
```

**Ex. W-1640**

1      A    Right.

2      Q    And Row 50 shows someone who was in the jail

3    for 91 days.  Right?

4      A    Correct.

5      Q    And there were -- no 14-day health assessment

6    was found in his file.  Right?

7      A    Correct.

8      Q    And Row 58 shows someone who was in the jail

9    for 81 days.  Right?

10     A    Right.

11     Q    And, again, no health and physical in the

12    file.  Right?

13     A    It appears to say so, yes.

14     Q    So that -- would you agree that those are two

15    examples where the jail did not comply with its own

16    policies?

17     A    I don't know.  I would have to ask Kirk about

18    those two.  I don't know why he didn't explain those.

19     Q    Well, you said you had a lot of faith in

20    Mr. Abbott that he both knows how to do this and

21    enters the information correctly.  Right?

22     A    Correct.

23     Q    And he's entered information here indicating

24    that the jail did not comply with policy with respect

25    to these two individuals.  Right?

**Ex. W-1641**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

 1   whether the system was working during that very

 2   narrow time period in January 2024?

 3       A   I guess that would be the conclusion:  that it

 4   was working that day on that particular time.  It was

 5   a spot check.  Yes.

 6       Q   All right.  I'm going to switch over to

 7   discussing Appendix G, the intake -- the intake

 8   audit.

 9       A   Okay.

10       Q   Let's see.  Having a little trouble here.

11           I'm now on page 155 of your report.  Do you

12   see that, Dr. Murray?

13       A   I do.  Yeah.

14       Q   And this is Appendix G, Audit Worksheet Intake

15   Screening.  Right?

16       A   Uh-huh.

17       Q   And I think you testified before that

18   Mr. Abbott is the one who completed this audit.

19   Right?

20       A   Correct.

21       Q   And, again, that you did not review the

22   underlying medical records to determine whether the

23   information he put into the worksheet was accurate.

24   Right?

25       A   That is correct.

Ex. W-1642

OWEN J. MURRAY, D.O., MBA                                           JOB NO. 1220572
NOVEMBER 12, 2024

1    Q    The 75 files reviewed for Appendix G appear to

2    be identical to the files in Appendix H.  Is that

3    right?

4    A    You are correct.

5    Q    Appendix G did include the booking date for

6    the individuals, but Appendix -- sorry.  I think I

7    said that backwards.  Appendix H includes the booking

8    date for the individuals, but Appendix G does not.

9         Is the booking date that's reflected for the

10   individuals in Appendix H the same booking date as

11   the people in Appendix G?

12   A    Yes.

13   Q    This audit looked at three metrics.  Right?

14   A    Correct.

15   Q    The first metric is, quote, "Time lapse from

16   booking to receiving screening," end quote.  Right?

17   A    Correct.

18   Q    What is that metric looking at?

19   A    From when they're -- well, I mean, you know

20   the process.  So when they're brought into the jail,

21   accepted, to when they actually get their receiving

22   screening, that initial first step.

23   Q    The second metric is, quote, "All positive

24   screening findings appropriately referred and

25   subsequent evaluations completed," end quote.

**Ex. W-1643**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1          What is this metric measuring?

2      A   That means that if -- that if there was

3   anything in terms of mental health referrals or

4   emergent referrals that those were done -- that

5   they're appropriately referred and the evaluations

6   are completed.

7      Q   Did you provide Mr. Abbott any instructions

8   for how to determine whether this metric was

9   satisfied?

10     A   No.

11     Q   Did you set forth -- were you the one who

12  established this metric?

13     A   No.  Mr. Abbott established that metric.

14     Q   And do you know how Mr. Abbott determined

15  whether findings were appropriately referred?

16     A   He reviewed through the medical record.

17     Q   What does it mean for something to be -- for a

18  finding to be appropriately referred?

19     A   Like, say mental health:  that a mental health

20  screening was done.  So talked about suicide ideation

21  based on mental health.

22     Q   Got it.  So it means if something is

23  identified on the receiving screening that warrants

24  referral, a referral occurred.  Is that right?

25     A   Correct.

**Ex. W-1644**

OWEN J. MURRAY, D.O., MBA                                      JOB NO. 1220572
NOVEMBER 12, 2024

1   subsequent evaluations were completed?

2      A   Well, as I said, they probably weren't -- I

3   mean, I don't know what was -- what was ordered, but

4   if it was -- if the referral was made, then, as I

5   said, he checked to see that it was done.  Like the

6   mental health evaluation:  If they were suicidal,

7   then that would be in there.

8      Q   Did Mr. Abbott consider this metric satisfied

9   if a referral was made but the person was released

10  before the scheduled evaluation?

11     A   Well, as I said, I believe that if they were

12  released before the evaluation, within one day -- I

13  would have to talk with him about how he did that.

14     Q   So you don't know the answer to that about --

15     A   I don't know, as I said, how he handled -- how

16  he handled those.  I do -- as I said, I know that

17  when there was a referral made, then he did track

18  that through the medical record.  I didn't ask him

19  about -- I didn't ask him about how he managed those

20  patients who were gone and something was ordered and

21  they did not necessarily receive it, because I'm not

22  sure how they would get it if they weren't there.

23     Q   The third metric here is, Chronic

24  Care/Critical Meds Identified on Screening and

25  Continued.

**Ex. W-1645**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    Q    Is it important for a correctional medical

2    system to timely address sick-call requests?

3    A    Yes.

4    Q    Why?

5    A    Well, I mean, when a patient is requesting

6    care, there needs to be a time set so that that care

7    can be provided.  NCCHC and ACA both state when that

8    is, and so, as I said, I think it's important to be

9    able to see patients' routine healthcare in a timely

10   fashion and at least triage it from a nurse

11   perspective and then refer as necessary and have

12   standards around those processes.

13   Q    And is it also true that the sick-call-request

14   process provides a really important way for

15   incarcerated people to seek care.  Right?

16   A    Correct.  It is the cornerstone of access.

17   Q    Now, I think you testified previously, the

18   files that went into this audit -- Mr. Abbott

19   reviewed those.  Right?

20   A    He did.

21   Q    And you did not review those files to confirm

22   that the information that Mr. Abbott entered into

23   the -- entered into the worksheet here were accurate.

24   Right?

25   A    Correct.

Ex. W-1646

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1   complaint.

2       Q   Medical files for patients at the jail often

3   contain multiple sick-call requests, don't they?

4       A   Correct.

5       Q   It appears for this audit, though, that

6   Mr. Abbott only looked at one sick-call slip per

7   person.  Right?

8       A   True.

9       Q   Did you tell him to do that?

10      A   No.  As I said, he -- he did that on his own.

11  He discusses what we would do here in Texas.

12      Q   Do you know how he chose among multiple

13  sick-call requests in these medical files?

14      A   I would have to ask him which ones he chose.

15      Q   So you do not know.  Right?

16      A   I don't know, no.

17      Q   Is it possible that Mr. Abbott could have

18  cherry-picked sick-call slips where the jail

19  satisfied the metric?

20         MS. COLEMAN:  Objection.  Argumentative.

21    Assumes facts.

22      A   No.  He did not -- he did not cherry-pick

23  sick-call slips.

24      Q   How do you know that?

25      A   Because I know Kirk Abbott and that he

**Ex. W-1647**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

 1   would -- would not do that.  He wouldn't do that

 2   here.  He wouldn't do that there.  He has no interest

 3   in, one way or the other, how they do on the audit

 4   other than just doing the audit as he would normally

 5   do it.

 6          So I know Kirk Abbott to be aboveboard and

 7   would never cherry-pick to try to create a false

 8   impression of what's going on.

 9       Q   But, again, you have no idea how he chose

10   among multiple sick-call slips in the files.  Right?

11       A   I don't know.  I certainly can ask him and

12   find out for you.

13       Q   All right.  Take a look at Row 9 of this

14   appendix.  Do you see that?

15       A   I do.

16       Q   It indicates that the face-to-face assessment

17   occurred within 24 hours of triage.  Right?

18       A   Correct.

19       Q   And it cites to page 89 of the medical record

20   for the sick-call request.  Right?

21       A   Correct.

22       Q   And it cites to page 319 for proof of

23   compliance with the face-to-face requirement.  Right?

24       A   Correct.

25       Q   If you have a -- I'm going to put up a new

**Ex. W-1648**

```
 1    doesn't it?

 2        A    Was there another sick-call slip?

 3        Q    As far as I am aware, there are no other

 4    sick-call slips, and that one appears to match both

 5    the date of receipt and the date in the complaint as

 6    what we just looked at.  Doesn't it?

 7            MS. COLEMAN:  Counsel, assumes facts.  You're

 8        not showing us the one that says it was completed.

 9            MR. FREEDMAN:  Which one would you like me to

10        show, Susan?  I'm happy to show it.

11            MS. COLEMAN:  Well, right now you're showing

12        the sick call, but you're not showing the other

13        document that you referenced.

14            MR. FREEDMAN:  No.  I showed page 89, which

15        we confirmed showed that he had a complaint of

16        excessive skin or ingrown hair; and then we've

17        shown this document showing how it was resolved.

18            MS. COLEMAN:  You showed the grievance and

19        then the resolution.

20    BY MR. FREEDMAN:

21        Q    Well, Dr. Murray, let me ask you a question:

22    Do you think these documents reflect compliance with

23    the policy?

24            MS. COLEMAN:  Objection.  Vague.  Overly

25        broad.
```

**Ex. W-1649**

1    A    Yeah.  I don't know.  As I said, I don't -- I

2    go -- we're going back to Kirk Abbott's review of

3    this particular one and saying it's compliant.

4    Correct?

5    Q    He said it was compliant.  Right?

6    A    Correct.  And so, as I said, I would have to

7    discuss with him, was this the particular one he

8    looked at?  Because, if I'm looking at this, I would

9    agree; it does seem like there are two different sets

10   of dates there that would say it's not compliant.

11   Q    All right.  Let's take a look at Row -- I'm

12   going to stop sharing this file.  Let's take a look

13   at Row 11 of Appendix I.

14   A    What page have we got now?

15   Q    We are on page 162 of Appendix I.

16   A    Okay.

17   Q    You know what, I'm going to have to come back

18   to the Row 11 questions because I don't have the

19   Row 11 medical files at the ready, but we'll do it in

20   a bit.

21   A    Okay.  Is that Row 11, ███ --

22   Q    Booking number ███████.

23   A    Where -- and you're on page what?

24   Q    162.

25   A    -62.

**Ex. W-1650**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    Q   So do you think Row 11 is an error on the

2    worksheet?

3    A   I don't know.

4    Q   Well, we're looking at the source document

5    right here, so how can you not know whether it's an

6    error?

7            MS. COLEMAN:  Argumentative.

8    A   As I said, I don't know.  I mean, what I know

9    is that, as I said, I would need to get Kirk Abbott

10   to look at that to tell me how he came up with that

11   assessment.  Was he looking at the same thing?  I

12   don't know.

13   Q   He's pointing us to page 67 -- right -- in

14   his -- in his -- on Appendix I.  He said look at

15   page 67.  Right?

16   A   [Inaudible].

17   Q   Right?

18   A   Yeah.  Yeah.

19   Q   And it appears to show on its face

20   noncompliance with the policy.  Right?

21   A   Correct.  As I said, it would appear that way.

22   Q   If you were -- let me put it this way:  If you

23   were completing Row 11 on this chart, what -- would

24   you put yes or no in the 24-hour assessment column?

25   A   I guess I would -- if I'm looking at this, if

Ex. W-1651

OWEN J. MURRAY, D.O., MBA                                JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   I'm looking at what is on my screen right now,

 2   page 67.

 3       Q    And what would you put?  Would you put yes or

 4   no?

 5       A    It would seem like the answer would be no,

 6   so -- but, again, I know Kirk Abbott wouldn't make

 7   that mistake, so I'm not sure what Kirk Abbott was

 8   looking at, even though we're talking about this

 9   particular document right here.

10       Q    Well, he pointed us to two pages.  The other

11   one is 196.  Why don't we take a look at 196 to see

12   if that provides some different information?

13       A    I guess now I'm looking like, are we talking

14   about the exact same exhibits?  I mean, all the

15   paginations and everything else, are these the exact

16   same?  I don't know.

17       Q    Well, I can represent to you that this is what

18   was produced to us as one of the files that was

19   included in the sick-call audit.

20       A    Okay.  I don't know.  As I said, I don't know

21   how to explain how he came up with yes and this being

22   the source document.

23       Q    Okay.  Does the fact that we've identified two

24   of the rows on this chart where you're having trouble

25   understanding how Mr. Abbott -- how this source
```

**Ex. W-1652**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   your opinions overall in those areas.  So I think,

 2   with the intake process, you said your opinion that

 3   the intake process was functioning properly was based

 4   on the spot check, the chronic care files, and your

 5   conversations with staff.  Is that right?

 6      A   And our tour and review -- and review and

 7   discussion with staff there; correct.

 8      Q   Anything other than those sources of

 9   information?

10      A   No.  I think that was -- that's it.

11      Q   All right.  For the 14-day health assessment,

12   can you tell me what your conclusions that it is

13   working properly are based on?

14      A   The spot check and our discussions with --

15   with staff.

16      Q   Anything else?

17      A   No.  That's it.

18      Q   And then, for your conclusions regarding

19   whether the sick-call-request process is functioning

20   properly, can you tell me what the basis for your

21   opinion was there?

22      A   Again, the chronic -- the chart reviews, the

23   spot check, and our conversations with staff.

24      Q   Anything else?

25      A   That's it.
```

Ex. W-1653

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   face-to-face assessment didn't occur within 24 hours?

 2      A   I don't know if they specifically looked at

 3   the time frame; they were looking at the -- the

 4   referral, the treatment that was provided by the

 5   nurse.

 6      Q   And I don't think I asked this earlier:  With

 7   the chronic care reviewers, did you provide them with

 8   the policies -- medical policies of the jail?

 9      A   No.

10      Q   In your report, you also analyzed the

11   timeliness of lab x-ray and test results.  Right?

12      A   Correct.

13      Q   And you concluded that the jail was obtaining

14   results on timelines consistent with community and

15   industry standards.  Right?

16      A   Correct.

17      Q   Did you review the amount of time between when

18   the jail received results and when staff at the jail

19   reviewed those results?

20      A   We did not, no.

21      Q   Did you look at the amount of time between

22   when the jail received results and, if necessary,

23   took action in response to those results?

24      A   We did not in that -- we did not do a spot

25   audit of that, no.
```

**Ex. W-1654**

```
 1    Q   Did you review whether results were

 2  appropriately documented in the medical records?

 3    A   We did not do a spot check of that, although

 4  those were elements in the chronic care review as

 5  well.

 6    Q   What is a continuous quality improvement

 7  program?

 8    A   Well, it's a -- it's a multidisciplinary

 9  group.  I mean, you're talking about as it relates to

10  corrections or just in general?

11    Q   In general.

12    A   Again, it's typically a multidisciplinary

13  group that comes together to look at processes

14  primarily and to determine if the processes are

15  working, and, if they're not working, based on

16  whatever audit or review, then what might need to

17  occur to improve those processes and their outcomes.

18    Q   Is it an important feature of a correctional

19  healthcare system?

20    A   I would agree.

21    Q   You concluded on page 32 of your report that

22  the jail would not meet the NCCHC standard for

23  continuous quality improvement, which requires that a

24  facility have, quote, "a continuous quality

25  improvement program that monitors and improves
```

**Ex. W-1655**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    discussed with all of the relevant parties the

2    processes ongoing at the jail.

3        Q    And then also Appendix L -- right? -- formed a

4    basis for an opinion about the formulary?

5        A    About the non-formulary piece?  Yes.

6        Q    I'm sorry.  I misspoke.

7        A    Yes, about the non-formulary piece.

8        Q    Did you do anything to confirm the information

9    in this part of the report?

10       A    I mean, other than I was with her when she was

11   asking her questions in the pharmacy to the pharmacy

12   techs and how the process worked and we'd talk

13   about -- we talked about that.  So, I mean, I was

14   there during her questioning and kind of heard what

15   she had to say.  I was on a phone call with her with

16   the NaphCare pharmacist.

17            I don't know if I did anything else with her

18   in regard to this particular piece.

19       Q    Are the opinions offered on pages 22, 23, and

20   24 your opinions?

21       A    Yeah.

22       Q    Is it -- did you and your team look at

23   refusals of care as part of your review of the

24   medical system?

25       A    Only to the extent that they occurred in the

Ex. W-1656

OWEN J. MURRAY, D.O., MBA                                                JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   chart reviews, the chronic care reviews.
 2     Q    Did you look at the jail's policies with
 3   respect to refusals and the documentation of
 4   refusals?
 5     A    I looked at their old policies and -- but I
 6   have not seen their new policies.
 7     Q    Dr. Keller reported that the policy allows for
 8   documentation of refusals of care without any
 9   healthcare staff members present.  Is that concerning
10   to you?
11          MS. COLEMAN:  Objection.  Vague to
12     concerning.
13     A    Well, again, I guess it really depends on what
14   type of care is being refused.
15     Q    If it was a blanket policy that allows all
16   care to be refused without all healthcare staff
17   present, would that be problematic?
18     A    No, because I think that would not satisfy
19   NCCHC because I think NCCHC says the refusals for
20   patients with serious medical problems need to be
21   done in conjunction with healthcare.
22          So -- so, as I said, if it was some blanket
23   policy, you know, that -- I mean, if it -- if there
24   was -- there should be an exclusion for patients who
25   have serious medical problems.
```

**Ex. W-1657**

1    Q    Each NCCHC standard has one or more compliance

2    indicators.  Right?

3    A    Correct.

4    Q    In your analysis, you did not list out any of

5    the compliance indicators.  Right?

6    A    No.  As I said, this -- this was just a

7    general review of the standards based on what I lined

8    out there, what we had seen, what we had reviewed,

9    who we had talked to.  So, as I said, I mean, it

10   wasn't faux, but we didn't get into all of the

11   standards laying out all of the particulars of each

12   one.

13   Q    And you did not list the evidence that

14   supported your findings for specific indicators, did

15   you?

16   A    No, other than to the extent that it could be

17   generated out of what we've done.  But, no, it was

18   not -- we didn't lay out the evidence.

19   Q    Give me one moment.

20        All right.  I'm going to introduce a new

21   exhibit.  Dr. Murray, this is the report that you

22   brought with you today that your counsel later sent

23   to us during the deposition.

24        Do you have up on the screen the -- the final

25   report that we've been talking about today?

Ex. W-1658

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, Cherie J. Anderson, Registered Merit
    Reporter, Registered Professional Reporter, Certified
 4  Realtime Reporter, and Notary Public for the State of
    North Carolina at Large, do hereby certify:
 5          That the foregoing deposition was taken
    remotely before me on the date and at the time and
 6  location stated on page 1 of this transcript; that the
    deponent was duly sworn to testify to the truth, the
 7  whole truth, and nothing but the truth; that the
    testimony of the deponent and all objections made at
 8  the time of the examination were recorded
    stenographically by me and were thereafter
 9  transcribed; that the foregoing deposition as typed is
    a true, accurate, and complete record of the testimony
10  of the deponent and of all objections made at the time
    of the examination to the best of my ability.
11          I further certify that I am neither related
    to nor counsel for any party to the cause pending or
12  interested in the events thereof.
            Witness my hand, I have hereunto affixed my
13  official seal on this 12th day of November 2024, at
    Wilmington, New Hanover County, North Carolina.

14

15

16

17

18

19

20

21

22  _____
    Cherie J. Anderson, RMR, CRR
23  My Commission expires
    December 22, 2026
24

25
```

**Ex. W-1659**

# EXHIBIT X
## (Redacted)

Ex. X-1660

# Deposition Transcript

Case Number: 3:20-cv-00406-AJB-DDL
Date: November 18, 2024

In the matter of:

## DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, et al.

## Joseph V. Penn, M.D., CCHP-MH, LFAPA

**CERTIFIED COPY**

Reported by:
Michelle L. Goehring



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

Ex. X-1661

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3                      -  -  -
     DARRYL DUNSMORE, ANDREE    )
 4   ANDRADE, ERNEST            ) Case No.
     ARCHULETA, JAMES CLARK,    ) 3:20-cv-00406-AJB-DDL
 5   ANTHONY EDWARDS, TEANNA    )
     LEVY, JOSUE LOPEZ,         )
 6   CHRISTOPHER NORWOOD,       ) REMOTE VIDEOTAPED
     JESSE OLIVARES, GUSTAVO    ) DEPOSITION OF
 7   SEPULVEDA, MICHAEL         ) JOSEPH V. PENN, M.D.,
     TAYLOR, and LAURA          ) CCHP-MH, LFAPA
 8   ZOERNER, on behalf of      )
     themselves and others      ) Filed on Behalf of the
 9   similarly situated,        ) Plaintiffs
                                )
10                              ) Counsel of Record For
            Plaintiffs,         ) This Party:
11                              )
                                  Aaron J. Fischer, Esq.
12                                Law Offices of Aaron J.
                                  Fischer
13          -vs-                  1400 Shattuck Square
                                  Suite 12 - #344
14                                Berkeley, CA 94709

15
     SAN DIEGO COUNTY
16   SHERIFF'S DEPARTMENT,
     COUNTY OF SAN DIEGO,
17   SAN DIEGO COUNTY
     PROBATION DEPARTMENT,
18   and DOES 1 to 20,
     inclusive,
19

20          Defendants.

21

22

23                      -  -  -

24
        REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
25      WITHOUT AUTHORIZATION FROM THE CERTIFYING
        AGENCY
```

Ex. X-1662

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   that?

 2        A.    Yes.

 3        Q.    You have.  Okay.  Did you do a

 4   review like that to identify whether or not

 5   there are any issues with the mental health

 6   care provided in a patient's case for any of

 7   these in-custody deaths?

 8        A.    I didn't feel that this was my role

 9   in this particular matter.  I was looking at

10   more of a global or system-wide.  I have done

11   individual analyses, both for the plaintiff

12   and/or for the defense, in individual deaths,

13   either seclusion or restraint death or a

14   suicide death or a homicide death or other

15   death, medication-related death, in-custody.

16             But for the purposes of this

17   litigation and my role, I didn't believe that I

18   needed to go into that level of detail.  I was

19   more looking at the overall number of suicides

20   per year.  That's the methodology in which I

21   applied.

22        Q.    When you have done those reviews of

23   individual deaths in custody, do you sometimes

24   find that there were issues in the provision of

25   care for the individual who died?

**Ex. X-1663**

1      Q.      Okay.  Did you review any

2    psychological autopsies in your review of this

3    matter?

4      A.      No.  But I would be happy to.

5    Again, because of the time frame involved, I

6    think I did request copies of all of these

7    documents but I don't recall receiving them to

8    date.

9      Q.      Okay.  Did you review any

10   administrative suicide reviews in the course of

11   your review in this matter?

12     A.      Not to date, no.

13     Q.      Did you review any morbidity and

14   mortality reviews in the course of your

15   assessment in this matter?

16     A.      Not to date.  That is correct.

17     Q.      So when you say that SDSO conducts

18   any of these things, how do you know that?

19     A.      From interviewing several

20   individuals, both Melissa Quiroz, the mental

21   health director, interviewing the custody

22   staff, and I also interviewed the nursing

23   director -- I'm blanking on her name right now,

24   but I think she's listed in my report.

25     Q.      Okay.

Ex. X-1664

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1        A.    I also spoke with Mandy -- and I

2   can't pronounce her last name, but it's a

3   really long last name.  It began with a K.

4   Kamphoefner or something like that.

5              So I interviewed several individuals

6   and asked them specifically what do you do when

7   there's a suicide and what are the practices

8   and steps taken, and everyone basically

9   provided me that information and they referred

10  to their policies and procedures and also NCCHC

11  standards.

12       Q.    Were you able to reach an opinion as

13  to the adequacy of the psychological autopsies

14  that had been conducted by SDSO?

15       A.    I did not review any to date.  So I

16  don't have an opinion about the adequacy of the

17  psychological autopsies.

18       Q.    Same question for administrative

19  suicide reviews.  Do you have any opinion as to

20  the adequacy of those reviews?

21       A.    It would be the same response.  I

22  have not reviewed them to date and so I don't

23  have an opinion.

24       Q.    Okay.  And same question for the

25  morbidity and mortality reviews.  Were you able

**Ex. X-1665**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1  to reach any opinion as to the adequacy of

2  those reviews done by SDSO?

3       A.    No, because I had not reviewed them.

4  So I do not have an opinion.

5       Q.    Okay.  You also write -- I'm going

6  to try to get it to you in right spot on the

7  page -- oh, it's the next sentence.

8            It says, "I confirmed that both the

9  county and the contracted health NaphCare

10  conduct independent suicide and medical,

11  natural deaths, or substance use related death

12  reviews, morbidity and mortality reviews, and

13  these are conducted in a timely manner."

14            Do you see that there?

15       A.    Yes.

16       Q.    Why is it important that the health

17  care provider and NaphCare provide these

18  reviews?

19       A.    So what I would say is in any jail

20  or prison or other setting, correctional

21  setting or even an ICE facility setting, the

22  health care provider or vendor, you want them

23  reviewing their health care staff.

24            It would be inappropriate for

25  custody staff to be determining whether the

Ex. X-1666

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1  medical or nursing or mental health practices

 2  or policies or procedures were followed.

 3             So mental health would review mental

 4  health.  Nursing would review nursing.  Medical

 5  review medical.  Custody review custody.

 6             So it's entirely appropriate for the

 7  contracted health care provider, NaphCare,

 8  review their own health care staff's actions or

 9  inactions.

10        Q.    Okay.  Did you review any NaphCare

11  death reviews?  This is the term that you used

12  in your report.

13        A.    Not to date, no.

14        Q.    Okay.  Are you able to opine as to

15  the adequacy of the NaphCare death reviews?

16        A.    Without an opportunity to review

17  them, I don't have an opinion at this time.

18        Q.    Did you review any NaphCare

19  morbidity and mortality reviews?

20        A.    Not to date, no.

21        Q.    And are you able to opine as to the

22  adequacy of the morbidity and mortality reviews

23  conducted by NaphCare in the San Diego County

24  Jail?

25        A.    No, I'm not.  I don't have an

**Ex. X-1667**

1    opinion at this time.

2        Q.    You went on to say, "These are

3    conducted in a timely manner."

4              How do you know that they are

5    conducted in a timely manner?

6        A.    I'm sorry.  Where are you, please?

7        Q.    At the end of that same sentence.

8        A.    Oh, I see it.  Thank you.

9              Based on the information that

10   Melissa Quiroz and Amanda or Mandy Kamphoefner

11   and the other staff communicated to me.

12       Q.    Okay.  But you did not review any of

13   those reviews to confirm timeliness?

14       A.    That's correct.

15       Q.    How quickly did they tell you that

16   these reviews are completed?

17       A.    I don't recall.

18       Q.    How quickly would you expect them to

19   be completed to be considered timely?

20       A.    It would depend.  Part of the issue

21   with any autopsy is it could take several

22   months, up to six months or longer for the

23   toxicology results to come back.  So a coroner,

24   a pathologist can typically review an autopsy

25   within a few weeks.

Ex. X-1668

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                          JOB NO. 1220564
NOVEMBER 18, 2024

1   methodology before?

2        A.    So I started to use a methodology

3   when I was a part of the Coleman team, which is

4   to follow -- to better understand what the

5   questions were, who was asking the questions,

6   and to understand the existing team, if you

7   will.

8              And similarly with Arizona, I was

9   consulted by a private law firm that was

10  defending the state, TOC -- or it's ADCRR, I

11  think, is the correct acronym.

12             But, yes, I used the same type of

13  methodology of trying to, one, identify what

14  the questions were, can I answer the questions.

15  Two, what's the scope and time frame.  Three,

16  what facility tours would be necessary and for

17  how long.  Four, who at the facilities do I

18  want to talk to and where -- what parts of the

19  facility do I want to focus in on.  Five, the

20  opportunity to have a record review and

21  document review.

22             Six, in a perfect review I would be

23  able to interview or evaluate the plaintiffs.

24  But, as I understand, I was specifically

25  prohibited in this case from being able to

Ex. X-1669

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1   interview any or evaluate any of the -- either

2   the named Plaintiffs or the class of

3   individuals in the San Diego County Jail.

4           And then I would also have asked --

5   and I applied this methodology to be able to

6   have a statistically significant sample, a

7   random sample of inmate chats to review to look

8   at the quality of care.  And then based on all

9   of that, it's possible I would ask for

10  additional supplemental information.

11          But that's the same methodology that

12  I applied in the Arizona litigation as I

13  applied in this San Diego case.

14      Q.    Okay.  Are there -- who told you

15  that you were prohibited from speaking with

16  patients at the jail?

17      A.    I'm sorry.  When you say patients,

18  I'm not sure --

19      Q.    Incarcerated patients at the jail.

20      A.    So as I understand it, everyone in

21  the jail is an incarcerated individual.  But if

22  they're under care and treatment, they would

23  become a patient.  So that's -- sorry.

24          I don't mean to quibble.  I just

25  want to make sure I can answer your question

**Ex. X-1670**

1    a bad outcome or negative event.

2              But if there was an negative event,

3    then, obviously, someone could bring a claim,

4    either to state or federal court and either

5    say, you know, malpractice or it was deliberate

6    indifference or some other claim.

7         Q.    Are there any respects, when you use

8    the correctional standard of care there on 26,

9    that that correctional standard of care would

10   be below the community standard of care for San

11   Diego County?

12        A.    No, I think -- and to clarify my

13   response.  Again, I'm not an attorney, but what

14   I understand is that inmates or incarcerated

15   persons, they have a constitutional right to

16   adequate health care and, therefore, they're a

17   protected class.  And if you provide less than

18   a community standard of care, then there is a

19   risk of being sued in state or federal court.

20        Q.    Okay.  When analyzing whether a jail

21   health care system has sufficient staffing,

22   like this one in San Diego County, are you

23   looking at both the number of authorized

24   positions as well as filled positions?

25        A.    I did look at that and I also looked

**Ex. X-1671**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                          JOB NO. 1220564
NOVEMBER 18, 2024

 1   at other variables also.

 2       Q.    Okay.  When you were looking at any

 3   point in time whether a system has adequate

 4   staffing, as in this case, did you look at the

 5   number of authorized positions or filled

 6   positions?

 7       A.    I looked at both, and I also looked

 8   at many other variables.

 9       Q.    Okay.  Did you conduct a mental

10   health care staffing analysis for your report

11   in this case?

12       A.    No, I did not.  I was not asking to

13   do that nor did I feel it was necessary.  So,

14   no, I did not conduct a staffing analysis.

15       Q.    So on what basis did you find that

16   the mental health care staffing levels at SDSO

17   are sufficient and comport with the

18   correctional standard of care?

19       A.    So I based it on several variables.

20   One, my knowledge and awareness of the ACA

21   standards, the American Correctional

22   Association.

23            Two, the National Commission on

24   Correctional Health Care standards.  Actually

25   being accredited by the ACA, the American

Ex. X-1672

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1  Correctional Association in Texas.  My work 20

 2  plus years in jails, prisons, and correctional

 3  facilities.

 4            My education and training, and

 5  actually my consulting to NCCHC both as a

 6  physician surveyor, as a NCCHC-certified

 7  correctional health professional, and also as a

 8  consultant to the consulting arm of NCCHC NRI

 9  and additionally my expert work.

10            And, lastly, my work on the NCCHC

11  accreditation committee where we review

12  facilities that are applying for accreditation.

13       Q.    Okay.  That's great.

14            On what -- that's your expertise and

15  your background.  On what facts and data did

16  you rely to make your conclusion that the SDSO

17  system has adequate mental health staffing

18  levels to meet the standard of care?

19       A.    So I think I testified to this

20  earlier.  I reviewed all the medical charts

21  from the named Plaintiffs.  I looked at

22  sick-call requests.  I looked at the mental

23  health notes that were written, the mental

24  health evaluations, suicide precautions, the

25  totality of all of the medical record

**Ex. X-1673**

1    documentation.

2              I also interviewed numerous of the

3    staff, of custody and mental health staff, as

4    noted in my report.  And I frankly -- I pinged

5    the custody staff and I said, "Okay.  If you

6    have an issue, how quick can you get mental

7    health to see them?"  And they said,

8    "Instantaneous.  I'll either bring the patient

9    down to the clinic or I'll call them on my

10   walkie-talkie.  And if they are available,

11   they'll come right away.  If they are tied up

12   with something, they'll be down whenever they

13   can as soon as possible."

14             I also verified with Melissa Quiroz

15   that three of the intake facilities -- Vista,

16   Los Colinas, and the Central Jail -- have

17   24-hour onsite, 7 days a week onsite mental

18   health staff, in addition to after hours,

19   on-call, and weekend coverage.

20             I looked at -- the specific data

21   that I reviewed was the staffing reporting, the

22   vacancies.  I interviewed Melissa Quiroz and

23   asked her specifically, "How do you cross-cover

24   when you have vacancies?"  I also asked that of

25   each and every mental health chief that I

Ex. X-1674

1    interviewed, and it's detailed in my report.

2    "What do you do if you have staff out?  Who

3    covers?  What do you do?"

4              So based on that data of knowing the

5    full-time equivalence, both of the county

6    employees -- the county mental health employees

7    and the NaphCare employees, that's how I was

8    able to determine -- I'm sorry.

9              I also interviewed the NaphCare

10   mental health director.  I'm sorry.  I'm

11   blanking on her name.  It's in my report.  So

12   same thing, I asked specifically, "What do you

13   do when you're short on nurse practitioners or

14   psychologists or psychiatrists?"

15             So based on all of that data, that's

16   how I came to that opinion.

17      Q.    Okay.  With respect to the data,

18   numerical data on mental health staffing, fair

19   to say that you relied on the Mental Health

20   Master Staffing Plan?  I'll direct you to

21   Page 21 of your report.  It may help us.

22             That first full paragraph, it makes

23   reference to the Mental Health Master Staffing

24   Plan dated March 17, 2022, Appendix G.  And

25   most recently Mental Health Master Staffing

Ex. X-1675

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   Plan dated June 13, 2024, Appendix H.

 2              Did you rely on those two documents

 3   to assess the adequacy of mental health

 4   staffing?

 5        A.   Yes.

 6                   (Deposition Exhibit No. 3 was

 7   marked for identification.)

 8   BY ATTORNEY FISCHER:

 9        Q.   Okay.  I'm going to pull those

10   because I have a few questions.  You're welcome

11   to look at them in your report.  They're

12   Appendix G and H.  They're almost at the very

13   back.

14              I'm also going to introduce them as

15   separate exhibits just for some ease of

16   reference.  That is Exhibit 3.

17                   ATTORNEY FISCHER:

18   Ms. Coleman, do you have a copy in front of

19   you?  Do you want me to present?  What is

20   easiest for you?

21                   ATTORNEY COLEMAN:  Yeah.  That

22   would be easier.

23                   ATTORNEY FISCHER:  Present.

24   Okay.  And I promise to make it bigger.

25              How does that look to folks?

Ex. X-1676

1        ATTORNEY COLEMAN:  We can see

2    it, but we can't hear you now.

3    BY ATTORNEY FISCHER:

4        Q.    Okay.  It's a two-page document.

5    The first is Appendix G, Mental Health Master

6    Staffing Plan.  At the bottom of that, G, it

7    says "Revised March 17, 2022."

8             Do you see that, Dr. Penn?

9        A.    Yes.

10       Q.    And then Appendix H is Page 2 of the

11   exhibit, Mental Health Master Staffing Plan --

12   I'll scroll to the bottom -- it's dated

13   6/13/2024.

14       A.    Yes.

15       Q.    So I want to start in your report --

16   I'm sorry to have you toggle back and forth,

17   Dr. Penn.  Please bear with me -- it summarizes

18   in your report, in that same paragraph on

19   Page 21, "In 2022, they had 34 budgeted

20   full-time equivalent positions (FTE), and now

21   they have 79 budgeted FTE's."

22             Do you see that there?

23       A.    Yes.

24       Q.    Based on your review, do you have an

25   opinion as to whether the full-time equivalent

Ex. X-1677

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    mental health staffing in 2022 was adequate to

2    meet the needs of the mental health population?

3            A.    No, I don't have an opinion.  I

4    think I looked at -- as I testified to earlier,

5    I was trying to look here and now,

6    cross-sectionally, like a snapshot, a Polaroid.

7    So I didn't spend a lot of time looking at the

8    past.

9            Q.    Got it.

10           A.    I mean, I looked at that as a

11   variable, but I really focused on here and now,

12   is access to care being met, is continuity of

13   care being met, are individuals that are

14   suicidal or have any sick call requests, are

15   they being seen by mental health staff and are

16   psych providers evaluating, diagnosing, and

17   prescribing meds.  That's what I looked at here

18   and now.

19           Q.    Got it.

20           A.    So I don't really have -- I'm not

21   really prepared to testify if, yes or no, that

22   met the standard.

23                 I will say that it's almost a

24   doubling of their staffing, so that's

25   impressive.  That's great.

**Ex. X-1678**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                          JOB NO. 1220564
NOVEMBER 18, 2024

1  analysis, would you suggest that they include

2  psychiatric nurses in that analysis?

3       A.    I'm sorry.  When you say "they," who

4  are you referring to?

5       Q.    San Diego County.

6       A.    It couldn't hurt.  I mean, I think

7  that's actually not a bad move.  That would be

8  useful.

9       Q.    Also on here -- just scrolling back

10 up -- Ms. Coleman, you'll tell me to blow if up

11 if I need to -- the first line is SDCJ, which I

12 understand to be central jail.  And then it has

13 SDSO and NaphCare positions.  And then about

14 halfway down it has VDF, Vista Detention

15 Facility.  And then it lists SDSO and NaphCare

16 positions.  And then there's LCDRF, which I

17 understand to be Los Colinas Detention Reentry

18 Facility and it has some positions there.

19            I would have expected you to look at

20 all facility schedules and staffing plans, but

21 that's not included here.

22            Do you know whether you were able

23 to -- did you look at the entire systems mental

24 health staffing plan?

25       A.    I don't recall.  What I understand

**Ex. X-1679**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   is that some of the other facilities that I

 2   toured are more work release programs and

 3   different things.  One facility is closed.  I

 4   think the Mountain Canyon or Rock Canyon or

 5   something like that is closed or it's being

 6   remodeled.  I actually did tour where they are

 7   remodeling.

 8              So short answer to your question is

 9   this is what I reviewed based on where the

10   majority of individuals are that are on the

11   mental health caseload that have a mental

12   health diagnosis or are on medications.

13              I understand that there's a tracking

14   mechanism to identify individuals that might be

15   on a noncaseload unit that might need

16   counseling but are not necessarily on psych

17   meds.  So that's how I kind of interpreted

18   this.  That is the data with regard to the

19   mental health caseload at specific units.

20       Q.    Would it have been helpful to your

21   overall system assessment to have the mental

22   health staffing plan for all facilities?

23       A.    Sure.  It couldn't have hurt.

24       Q.    Yeah.  So, like, George Bailey, it

25   would have been helpful to have the mental

**Ex. X-1680**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

```
 1  health staffing plan for that facility to
 2  consider as part of your review?
 3       A.    Well, I think I went to George
 4  Bailey twice and I interviewed the custody
 5  staff and the mental health staff and the
 6  mental health chief, and I toured the facility
 7  and I watched rounds.
 8            And based on all of that in its
 9  totality, I was able to determine that there
10  was adequate mental health staff to meet the
11  mental health needs of the facility.
12       Q.    Would it have also been helpful to
13  have also seen the mental health staffing plan
14  for that facility?
15       A.    Sure.  For completeness sake, it
16  couldn't have hurt.
17                 (Deposition Exhibit No. 4 was
18  marked for identification.)
19  BY ATTORNEY FISCHER:
20       Q.    I'm going to -- stick right where
21  you are.  Just flip the page for me, Dr. Penn.
22  The final appendix in your report is
23  Appendix I.  I'm going to introduce that as
24  it's own exhibit.
25            You'll confirm that that's the case,
```

**Ex. X-1681**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1  | but that's what I'm going to be talking about

 2  | next.  I'm going to introduce it as Exhibit 4?

 3  |                    ATTORNEY FISCHER:

 4  | Ms. Coleman, before you object, I am going to

 5  | increase the size.

 6  |                    Does that look okay, Ms. Coleman?

 7  |                    ATTORNEY COLEMAN:  Thank you.

 8  | BY ATTORNEY FISCHER:

 9  |     Q.    So this, according to your report,

10  | is the San Diego County Sheriff's Mental Health

11  | Personnel Status Report.  And on Page 21 of

12  | your report, Dr. Penn, you indicate this is

13  | dated July 23, 2024.

14  |           Do I have that correct?

15  |     A.    I'm sorry.  What page of my report?

16  |     Q.    21.  It's not dated on the exhibit,

17  | unfortunately.

18  |     A.    That's right.  July 23, 2024.

19  |     Q.    Okay.  And you relied on this status

20  | report in reaching your conclusion; correct?

21  |     A.    It was one of the data points that I

22  | reviewed, yes.

23  |     Q.    And this only includes the county

24  | staffing mental health staff, not the NaphCare

25  | staffing; correct?

**Ex. X-1682**

1       A.      That's what I understand under the

2   contract, that's correct.  Mental health staff

3   are funded through and are employees of the

4   sheriff's office.

5       Q.      Would it have been helpful for you

6   to review the personnel staff report for

7   NaphCare mental health professionals?

8       A.      Sure.  I would be happy to review

9   it.

10      Q.      But you don't recall reviewing that

11  for purposes of this report?

12      A.      I remember interviewing the mental

13  health director -- I think it's referenced in

14  my report -- for NaphCare, ███████████

    ███████████.  I interviewed her.  I don't recall

16  the exact date.  I think it was maybe a few

17  days before my report was due.

18          I spoke to her as recently as mid to

19  late August.  I spoke with -- I interviewed her

20  directly and asked her about staffing and

21  vacancies.

22          So I agree.  I can see the point

23  that I don't have the actual data, but I did

24  speak directly with her and she's overseeing

25  all of that on a daily basis.

**Ex. X-1683**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1        Q.    Understood.  Would it be helpful to

2    have the personnel status report for the

3    NaphCare mental health staff, the psychiatrist

4    and the psychiatric nurse practitioners, in

5    forming your opinion?

6        A.    Certainly.

7        Q.    Okay.  Did you do any analysis of

8    the custody staffing as it applies to the

9    delivery of mental health care?

10       A.    No, I did not.

11       Q.    Is having adequate custody staff an

12   important component to the delivery of mental

13   health care in a jail system?

14       A.    It's possible it can be.

15       Q.    Okay.  Do you recall whether

16   Ms. Quiroz raised with you any concerns about

17   custody shortage impacting delivery of care?

18       A.    Yes, I vaguely recall.  I don't know

19   if I cited that in my report.  But I do recall

20   for certain almost every facility across the

21   country during COVID and immediately after

22   COVID struggled with correctional officer

23   shortages.  So that's kind of a ubiquitous

24   issue.

25       Q.    But do you recall Ms. Quiroz

Ex. X-1684

1    in a timely manner.

2              To the best of my ability of my

3    review, I did not identify any mental health

4    sequelae, such as a suicide or death or other

5    psychiatric harm or damage, from any of these

6    chart reviews.

7        Q.    Okay.  So let's just go over the

8    issues that you looked at in completing your

9    assessment of these 12 patient records.

10             You said that you looked at

11   responses to sick-call slips?

12       A.    No.  I looked at more than that.  I

13   looked at their medical charts.  I looked at

14   their allergies, their past medical history,

15   their past psychiatric history, their substance

16   abuse history, their social history, their

17   educational history.  I looked at kind of all

18   their psychosocial variables, their family

19   history.  Anything that was documented in the

20   chart, I reviewed.

21             And in particular, their psychiatric

22   diagnoses, their treatment in the community,

23   their medications.  The timeliness of them if

24   they came into the jail, either from the

25   CDCR -- many of them were in the CDCR

Ex. X-1685

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                           JOB NO. 1220564
NOVEMBER 18, 2024

 1   the medications reviewed and prescribed in a

 2   timely manner if and when clinically indicated.

 3   And then if they developed side effects or

 4   problems, were they seen by psychiatric

 5   providers in a timely manner and were the

 6   findings documented.

 7              And based on my review, in totality,

 8   my opinion is that the mental health evaluation

 9   and treatment rendered to the named Plaintiffs

10   met the correctional standard of care.

11        Q.    Did you look at whether people were

12   appropriately housed --

13        A.    No.

14        Q.    -- based on their mental health

15   needs?

16        A.    No.  The problem was the records

17   that I reviewed were medical and mental health.

18   They didn't include -- they weren't inclusive

19   of housing or custody placement.

20              Again, I don't consider myself to be

21   a custody expert.  So I think that I would be

22   very exhausted to try to identify what cell

23   housing area they were in.  So, no, I did not

24   conduct that type of analysis.

25              I only looked at the access to

**Ex. X-1686**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    mental health care and the continuity of care

2    of mental health care in particular.

3        Q.    Did you look at whether they were

4    appropriately housed based on their level of

5    care needs?

6        A.    So I'm not sure if you're trying to

7    ask me if I thought it was an appropriate -- if

8    somebody needed to be inpatient, the PSU, the

9    psychiatric stabilization unit or not, yes, I

10   think I did look at that.  If someone was

11   suicidal, were they in a safety cell or were

12   they in an advanced observation housing.  Yes.

13   And so I did look at those.

14              In my opinion, yes, whatever --

15   whatever situational variables arose to make

16   them suicidal or make them unsafe, they were

17   evaluated and managed in a safe manner and I

18   didn't find any evidence of bad outcomes.

19       Q.    Did you -- okay.  On No. 2 on the

20   page it says --

21                   ATTORNEY COLEMAN:  Can't hear

22   you again.

23   BY ATTORNEY FISCHER:

24       Q.    On No. 2 on the page, Page 9,

25   Dr. Penn, it says, "To expand the scope of the

Ex. X-1687

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

```
 1   mental health quality of care review beyond the

 2   named plaintiffs, I conducted an additional

 3   focused review of psychiatric and mental health

 4   records for current or former SDSO incarcerated

 5   persons."

 6              How many of those charts -- other

 7   chart reviews did you complete?

 8        A.    So that was the -- the ones -- the

 9   helpers.  I enlisted the help of three --

10   again, because of the timeline -- the dead

11   lines involved and the massive number of cases.

12   That's the additional focus review of the -- I

13   think it was a sample of 80.  And so that leads

14   to No. 3.  That's how -- that was that

15   particular review.

16        Q.    I see.  So you did not conduct the

17   additional focus reviews of any other records

18   beyond the 12 named Plaintiffs; correct?

19        A.    That's fair.

20        Q.    Okay.  Did you at any point review

21   the records -- strike that.

22                   ATTORNEY COLEMAN:  Can't hear

23   you again.

24   BY ATTORNEY FISCHER:

25        Q.    We'll talk about the three helpers
```

**Ex. X-1688**

 1   or the three reviewers that you enlisted to do

 2   these chart reviews.

 3              Did you review any records that they

 4   reviewed?

 5       A.    No.  I did not have enough time to

 6   do that.  If I had additional time, I would

 7   have done that.  I would have reviewed each and

 8   every case that they found an issue or concern

 9   with, but, frankly, I ran out of time so I did

10   not have time to do that.

11       Q.    Okay.  Fair to say that you relied

12   on their expertise to draw conclusions as to

13   those 80 or so patients?

14       A.    I did.  But I also made it a point

15   to reach out to each of them individually and I

16   queried them on their findings.

17              So I relied upon their written

18   summaries that they sent me, but I also made it

19   a point -- after Pablo Stewart wrote his

20   rebuttal report, I reached out to each of them,

21   Dr. Baskin, Dr. Huselid, and Dr. Cervantes, and

22   specifically asked them, one, did Dr. Pablo

23   Stewart accurately summarize or write your

24   quote or list your findings accurately.  And

25   pretty much 95 percent were correct.  There was

Ex. X-1689

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

```
 1   Exhibit 5.
 2              This is Exhibit 5.  Do you see that
 3   there, Dr. Penn?
 4        A.    Would you mind scrolling up a bit?
 5   Yes.  That's the document that I had Kathleen
 6   Al-Basit send to all of the psychiatric
 7   helpers.
 8        Q.    Got it.  Did you send any other
 9   written materials to the psychiatric helpers?
10        A.    No.
11        Q.    Okay.  Did you provide any other
12   written guidance to the psychiatric helpers as
13   to what they were supposed to review?
14        A.    No.
15        Q.    Did the psychiatric helpers tour any
16   of the facilities at San Diego County Jail?
17        A.    No.
18        Q.    Did the psychiatric helpers review
19   any policies and procedures in place at San
20   Diego County Jail?
21        A.    No.
22        Q.    Just -- on that one, the reviewers
23   were not able to determine whether policy was
24   followed in the cases they reviewed; is that
25   correct?
```

**Ex. X-1690**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

```
 1   me, please let me know that; okay?
 2        A.    Thank you.
 3        Q.    Did the three psychiatric helpers
 4   assist you with drafting any portion of your
 5   report?
 6        A.    No.
 7        Q.    Did they read your report?
 8        A.    No.
 9        Q.    Okay.  Did you review the summaries
10   from their patient reviews?
11        A.    Yes.
12        Q.    Did you make any edits to their
13   summaries?
14        A.    No.
15        Q.    Did you ask them to make any edits
16   to their summaries?
17        A.    No.
18        Q.    So the summaries that are in your
19   report by the psychiatric helpers are an exact
20   match to what was submitted by those
21   psychiatric helpers, as far as you know?
22        A.    That's correct.  Yes.
23        Q.    How many times did you speak with
24   the psychiatric helpers prior to submitting
25   your August 2024 report?
```

**Ex. X-1691**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1       A.     Once.   We had one meeting, a Teams

2   meeting where I showed them, via virtual share

3   screen, I showed them the document and reviewed

4   the task at hand and that was it.   It was

5   probably less than a 20-minute meeting.

6       Q.     Okay.   And you didn't speak with

7   them again after that meeting up until the date

8   you submitted your August 2024 report; is that

9   correct?

10      A.     So what happened was after the Pablo

11  Stewart rebuttal where Pablo Stewart had

12  included some of the helpers' notes, I reached

13  out to them as a group and asked them, one, if

14  Pablo Stewart's transcription of their findings

15  was accurate.

16             And then, two, to comment if it was

17  mischaracterized any way or taken out of

18  context.

19             And, three, if it was, in their

20  opinion, even taking into consideration that

21  there was a delay or problem or issue with the

22  patient or inmate seriously at risk or did they

23  experience harm.   And that was the only

24  communication I had with them.

25             One of them, Dr. Cervantes, reached

**Ex. X-1692**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1   out to me, asked me if she should review other

2   helpers, Dr. Huselid and Dr. Baskin.  And I

3   said no, just respond regarding your reviews.

4   So that was the only communication that I had

5   with them.

6        Q.    And that was -- other than that

7   first 20-minute call, that call to discuss

8   Dr. Stewart's rebuttal report, was the only

9   time you spoken with these three psychiatric

10  helpers about this case?

11       A.    Just to clarify, Dr. Cervantes had

12  reached out to me separately and asked, "Am I

13  supposed to review Dr. Huselid's and

14  Dr. Baskin's," so that was just a discussion --

15  a telephone discussion between her.  And I

16  said, "No.  Just stick to your review."

17       Q.    Understood.  So there was the first

18  initial 20-minute meeting when you gave them

19  the overview of the task, the group discussion

20  of the Pablo Stewart rebuttal report --

21       A.    No -- oh, I'm sorry.

22       Q.    -- I'm sorry.  Of the initial

23  report.  And then the rebuttal report.  I just

24  want to get the timeline down of when you spoke

25  with them.  Let's just go through it one by

**Ex. X-1693**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                        JOB NO. 1220564
NOVEMBER 18, 2024

 1   one.

 2              So you spoke with them for

 3   20 minutes to give the initial assignment;

 4   correct?

 5        A.    Correct.  Back in June, something

 6   like that.  June -- after I had done my tours.

 7   It was like early to mid June.

 8        Q.    And you didn't have any

 9   communication with them up to the date you

10   submitted your August 2024 report; is that

11   correct?

12        A.    That's correct.

13        Q.    And then Dr. Stewart submitted his

14   report in November and there was no

15   communication between August and September

16   between you and the psychiatric helpers?

17        A.    That's correct.

18        Q.    And then after Dr. Stewart submitted

19   his November report, you had that one phone

20   call with one of the psychiatric helpers, and

21   then a call with all three psychiatric helpers;

22   is that correct?

23        A.    No.  There was no follow-up call

24   with them.  The only meeting I had with them

25   was the initial call back in June.

**Ex. X-1694**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                              JOB NO. 1220564
NOVEMBER 18, 2024

```
 1        Q.    Okay.  But they -- so they responded

 2   in writing to those three questions that you

 3   asked?

 4        A.    They responded via e-mail.  That's

 5   fair.  And I think Susan Coleman is CC'd on all

 6   of those.

 7                   ATTORNEY FISCHER:  So we would

 8   request to be able to see those, Ms. Coleman.

 9                   ATTORNEY COLEMAN:  Those what?

10                   ATTORNEY FISCHER:  Those

11   e-mails from the three psychiatric helpers to

12   Dr. Penn, as just testified.

13   BY ATTORNEY FISCHER:

14        Q.    Dr. Penn, did you ever -- in that

15   initial 20-minute meeting, did you ever discuss

16   with the psychiatric helpers anything about the

17   standard of care that would be applied to their

18   reviews?

19        A.    No.  I mean, that form is basically

20   what I reviewed with them.  I explained it, you

21   know, just kind of discussing based on NCCHC

22   and they're all familiar with NCCHC.  So that

23   was pretty much it.

24        Q.    Got it.  Did you discuss with them,

25   during that call, whether to use community
```

**Ex. X-1695**

```
 1   standards of care or correctional standards of
 2   care?
 3        A.    No.  Like I testified earlier, I
 4   just had them review that document and say can
 5   you -- this is the only question being posed to
 6   you and I want you to be -- I was trying to
 7   strive for transparency.
 8             Do you think the care was
 9   appropriate and adequate, access to care and
10   continuity of care, and I didn't get into
11   standards of care or that sort of thing.
12        Q.    So I want to go back to that -- so
13   it sounds like that one-page exhibit,
14   Exhibit 5, is the entirety of the direction to
15   psychiatric helpers from you; is that fair to
16   say?
17        A.    Yes.
18        Q.    Okay.  Based on that direction, do
19   you believe that the access to care inquiry on
20   that form considers the adequacy of mental
21   health care provided to each patient?
22        A.    Yes.
23        Q.    Can you explain what you mean by
24   that, access to care and adequacy of care are
25   the same thing?
```

Ex. X-1696

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    not using custody staff, provided they have

2    appropriate training on confidentiality and

3    privacy of information.

4    BY ATTORNEY FISCHER:

5         Q.    Okay.  In the cases that were

6    identified by the psychiatric helper where

7    Spanish-speaking deputies were used to

8    translate for encounters with Spanish-speaking

9    patients, did you confirm that NCCHC standards

10   were followed?

11        A.    No.  Because the facility is not

12   NCCHC accredited, so it wouldn't be appropriate

13   to apply those standards.  No.

14        Q.    I see.  Did you confirm that they --

15   the deputies that were providing the

16   translation received the training on

17   confidentiality that you just described?

18        A.    No, I did not.

19        Q.    Did you do any follow-up to see if

20   the standard of care was adhered to in these

21   cases where deputies were used to translate for

22   the encounters of Spanish-speaking patients

23   with their clinicians?

24        A.    No, I did not.

25        Q.    Okay.  Do you recall one of the

**Ex. X-1697**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1   placement?

2        A.    I recall reading some allegation

3   about that, but I don't have -- I don't

4   consider myself to be an expert in custody or

5   classification or housing or placement.  And I

6   would defer to, you know, custody or custody

7   expert or custody leadership to make those

8   determinations.

9        Q.    Okay.  So you don't have an opinion

10  on that particular custodial exclusion?

11       A.    Well, what I would say is it would

12  be up to the mental health staff and the mental

13  health leadership.  If there's a patient that

14  they think would benefit from OPSD, outpatient

15  stepdown, but that person has a protective

16  custody indicator or -- again, everything is a

17  partnership behind bars.

18            So if they think clinically it's

19  indicated, they probably should go and meet

20  with the custody leadership and try to clarify

21  what they can do to advocate for that patient.

22            As we sit here today, I don't know

23  how many times that's occurred or if that's

24  something that occurs routinely.  But I did not

25  investigate that in my analysis.

**Ex. X-1698**

1            ATTORNEY COLEMAN:  You trailed

2    off at the end.

3            ATTORNEY FISCHER:  In any Ad

4    Sep units.

5            ATTORNEY COLEMAN:  Did you

6    hear him, Dr. Penn?

7            THE WITNESS:  Yes.  So, no, I

8    did not form any opinions.  I can say group

9    therapy in Ad Sep settings is inherently

10   challenging because the individuals that are in

11   Ad Sep are typically security threat groups and

12   gangs.  And so if there are confirmed enemies

13   of each other, putting them in a room together,

14   you really have to be -- and, again, I'm not

15   custody but I'm telling you from my

16   experience -- so I'm aware.  We've done a lot

17   in Texas to provide opportunity for group

18   therapy for restrictive housing for Ad Sep --

19   administrative separation inmates.  But, again,

20   we're comparing apples and oranges.  You're

21   talking about jail, pre-trial detainees versus

22   state prisoners that are post conviction and

23   are now sentenced for years in the prison

24   systems.

25            So the short answer to your question

**Ex. X-1699**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    is there are certainly opportunities to do

2    group therapy, but, at the end of the day, you

3    need to ensure safety for the staff and the

4    inmates.  So it's complicated, I guess, is my

5    short response.

6    BY ATTORNEY FISCHER:

7         Q.    Did you assess what percentage of

8    the restrictive housing population are gang

9    members in San Diego County Jail?

10        A.    No.

11        Q.    Did you ask for that data?

12        A.    No, I did not.

13                  ATTORNEY COLEMAN:  Assumes

14    facts that don't exist.

15    BY ATTORNEY FISCHER:

16        Q.    Did you review out-of-cell logs for

17    the restrictive housing units or Ad Sep units

18    in San Diego County Jail?

19        A.    I'm not a custody expert, so I

20    wouldn't routinely review that sort of

21    documentation as part of a mental health

22    psychiatric evaluation.  So, no, I did not do

23    that in this case.

24        Q.    Did you do any review as to the

25    proportion of restrictive housing detainees who

Ex. X-1700

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                      JOB NO. 1220564
NOVEMBER 18, 2024

1    Q.    You were not asked to evaluate the

2    practice of safety checks in restrictive

3    housing units in San Diego County Jail?

4        A.    As I testified to earlier, my job

5    was to look at the entire system with regard to

6    access to mental health care, psychiatric care,

7    and continuity of care and whatever mental

8    health precautions and treatment is afforded to

9    the jail inmates while they're incarcerated.

10            But, no, I did not undertake a

11   specific review of safety checks in Ad Sep.

12       Q.    Okay.  I believe you said that you

13   observed intake screening process while you

14   were on site at the jails; is that correct?

15       A.    At the intake -- as I understand it,

16   there's only three facilities that do

17   intakes -- I'm sorry.  Not intakes -- new

18   intakes.  I understand that inmates or

19   incarcerated persons can move from facility to

20   facility.  But as far as -- when you're saying

21   "intake screening," are you referring to

22   someone coming in from police or coming in from

23   another state hospital or another community

24   setting and they're coming into the facility?

25       Q.    Let's go to your report.

Ex. X-1701

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

```
1        A.    I observed mental health staff

2    performing a gatekeeper assessment or

3    evaluation of a new intake.  But I didn't

4    observe it in its entirety.

5              I just saw the mental health staff,

6    who had already previously been introduced, and

7    I watched her to begin the assessment.

8        Q.    Can you go to Page 31 of your

9    report, Dr. Penn?

10       A.    Page 31.

11       Q.    Okay.  Four paragraphs up from the

12   bottom, the paragraph starts with, "In my

13   professional opinion."

14             Do you see that there?

15       A.    Yes.

16       Q.    During the second sentence you

17   write, "The system ensures that every IP

18   receives a comprehensive evaluation upon entry,

19   with subsequent screenings and evaluations

20   conducted when an IP is transferred between

21   SDSO facilities."

22             Is that your opinion?

23       A.    Actually, that's a typo.  It should

24   be mental health assessment.  It should not

25   be -- because evaluation implies a
```

**Ex. X-1702**

1    comprehensive evaluation.

2           That actually should be a

3    comprehensive mental health assessment.

4      Q.    That's why I'm asking.  So that

5    statement, as written there, is not accurate;

6    is that correct?

7      A.    Correct.  It could be screening or

8    assessment or triage.  I mean, different

9    systems use different terminology.  Appraisal

10   is another term that we use in Texas.  But they

11   all refer to the same:  Screening, assessment,

12   appraisal, but they are differentiated between

13   an evaluation.  So that's actually a typo and I

14   apologize for that.

15     Q.    Based on your experience and

16   expertise, Dr. Penn, do you think it's

17   important that the new intake process at a jail

18   include a review of the patient's mental health

19   care history?

20     A.    When possible, yes.

21     Q.    Okay.  And why is that the case?

22     A.    Well, because some inmates or --

23   sorry -- incarcerated persons are not reliable.

24   Some incarcerated persons are under the

25   influence.  They're either intoxicated or under

Ex. X-1703

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1          A.    I don't recall that.

2          Q.    Okay.  Earlier today, Dr. Penn, you

3    indicated that you had not reviewed the report

4    of Plaintiffs' substance use expert of

5    Dr. Kelly Ramsey; do you recall that?

6          A.    That's correct.

7          Q.    Is there a reason why you did not

8    review her reports?

9          A.    You said Plaintiffs' expert?

10         Q.    Plaintiffs' expert on substance use.

11   Dr. Kelly Ramsey.

12                    ATTORNEY COLEMAN:  Assumes

13   facts that he was provided it.

14                    THE WITNESS:  Correct.  I was

15   not aware, first of all, that she was a

16   retained expert.  No. 2, I don't know who she

17   is.  Three, I would have gladly reviewed her

18   report if it would have been furnished me.  But

19   it was not furnished to me, so I didn't know to

20   ask because I didn't know that she was a

21   plaintiff's expert in this case.

22   BY ATTORNEY FISCHER:

23         Q.    Do you consider yourself an expert

24   on substance use issues in jail facilities?

25                    ATTORNEY COLEMAN:  Objection,

**Ex. X-1704**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   vague.

 2                   THE WITNESS:  I'm not sure I

 3   know what you mean by substance-abuse issues

 4   and then jail facilities.

 5   BY ATTORNEY FISCHER:

 6        Q.    I'll take --

 7                   ATTORNEY COLEMAN:  Counsel,

 8   are you referring to the MAT program?

 9   BY ATTORNEY FISCHER:

10        Q.    I'm referring to any aspects of

11   substance use treatment in jail facilities.

12   I'm not quite sure how to define jail

13   facilities, Doctor, and I'm sort of wracking my

14   brain.

15        A.    Sorry.  You asked me substance-abuse

16   issues.  I'm not sure I know what you mean by

17   that.

18        Q.    Substance use treatment issues in

19   jail facilities, do you consider yourself an

20   expert on that topic?

21        A.    So I can't answer that yes or no.

22   What I can say is as part of my training in

23   psychiatry, specifically general psychiatry,

24   four year in general psychiatry, I had to spend

25   several months doing rotations in alcohol,

**Ex. X-1705**

1   benzodiazepine, opioids and other substance

2   dependance and withdrawal.

3           And I actually have managed patients

4   who were going through withdrawal.  I've

5   treated patients who were substance involved

6   both inpatient and outpatient.  I did not

7   pursue a subsequent fellowship in addiction

8   psychiatry.  There's a specialty you can do.

9           So I have general familiarity with

10  the evaluation, diagnosis, and management of

11  various intoxication, dependence, withdrawal,

12  and general familiarity with things such as

13  M-A-T and M-O-U-D, and how to manage those

14  within a jail or prison or juvenile

15  correctional or ICE facility.

16          And in particular, during my work

17  with Operation Loan Star, we've been dealing

18  with a lot of opioid withdrawal and management

19  of that.

20          As we sit here today, I would not

21  call myself an expert in addiction psychiatry,

22  but I do have the requisite knowledge of the

23  evaluation, diagnosis, treatment of substance

24  use disorders in correctional settings.

25      Q.    Did you share with counsel for the

Ex. X-1706

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

1   county that you have this background in

2   substance use treatment in detention

3   facilities?

4        A.    Did I share that with counsel?  I

5   didn't understand the question.  Sorry.

6        Q.    Yes.  Did you share that information

7   with counsel for the county?

8        A.    I don't believe so.  I think this is

9   the first time it's come up.

10       Q.    Okay.  Was there any discussion

11  about substance use treatments -- strike that.

12            Did you read the third amended

13  complaint in the case?

14       A.    I don't recall.  I recall reading a

15  complaint, but I don't remember if I read all

16  the complaints.

17       Q.    Okay.  Do you know if you've read

18  the operative complaint that was filed in this

19  case?

20       A.    Again, I read a lot of things.  If

21  you could draw my attention, show me the

22  document, I would be happy to try to answer

23  your question.  But as we sit here, I don't

24  know what you're referring to as operative

25  complaint.

**Ex. X-1707**

```
 1        Q.    Let me ask it in a different way
 2   just to try -- did you review the allegations
 3   set forth by Plaintiffs in this case?
 4        A.    Yes.
 5        Q.    Okay.  And did you observe that
 6   there were some substance use-related
 7   allegations -- or substance use
 8   treatment-related allegations in this case?
 9        A.    Yes.
10        Q.    And did you share with county for
11   the counsel that you have expertise in that
12   area?
13                    ATTORNEY COLEMAN:  Asked and
14   answered.  Also you said county for the counsel
15   instead of counsel for the county.
16                    ATTORNEY FISCHER:  Thank you,
17   Ms. Coleman.
18   BY ATTORNEY FISCHER:
19        Q.    Did you share that with counsel for
20   the county?
21        A.    So I was never asked if I was a
22   substance-abuse expert or if I had knowledge or
23   background in that.
24              The way we define -- again, I
25   believe I've testified to this earlier.  I did
```

Ex. X-1708

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

```
 1   this as part of a multidisciplinary consulting
 2   group from John Allen and Associates.
 3              We have medical, nursing, pharmacy,
 4   psychiatry.  We had several different
 5   representatives.  I believe Dr. Murray was
 6   going to handle the medical and the substance
 7   use.  So I did not look into that in any great
 8   detail.  So, no, I don't have any opinions
 9   about that at this time.
10        Q.    Okay.  I do have one question just
11   to go a bit deeper on this.  Page 56 of your
12   report.  Near the top of Page 56, Dr. Penn, the
13   first paragraph, last sentence, it begins,
14   "Additionally."
15              It reads, "Additionally, individuals
16   with substance use histories are evaluated and
17   monitored using COWS/CIWA."  That's
18   C-O-W-S/C-I-W-A.
19              Do you see that there?
20        A.    Yes.
21        Q.    Is that your opinion in this case?
22        A.    Yes.
23        Q.    And first of all, what is your
24   understanding of the standard of care for the
25   appropriate frequency of COWS monitoring
```

**Ex. X-1709**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                              JOB NO. 1220564
NOVEMBER 18, 2024

 1    specifically?

 2        A.    So when you say "standard of care,"

 3    if you can clarify what you're referring to?

 4        Q.    I'm asking what your understanding

 5    of the standard of care for the appropriate

 6    frequency of COWS monitoring specifically is.

 7                   ATTORNEY COLEMAN:  Well,

 8    objection, vague.  For what category of

 9    persons?

10    BY ATTORNEY FISCHER:

11        Q.    Go ahead, Dr. Penn.

12        A.    So I would draw your attention in my

13    response to the NCCHC.  They have -- and I'm an

14    author in all of these in the jail and prison

15    standards -- sorry -- the jail standards, the

16    prison standards, opioid treatment facility

17    standards, juvenile standards, and the mental

18    health standards.

19                   In all of those there is a standard

20    with regard to an individual who comes in to a

21    correctional facility or carceral setting.

22    Should they be substance-dependent or be at

23    risk for substance-dependent, they should

24    undergo evaluation and monitoring depending on

25    what substance.

Ex. X-1710

1               If it's alcohol, then, obviously

2    CIWA, Clinical Institute Withdraw Assessment.

3    If it's opioids, then COWS or CINA is another

4    one that's often used, the Clinical Institute

5    Narcotic Assessment, or COWS, Clinical Opioid

6    Withdrawal Scale.  And symptomatic relief is

7    provided.

8               But I don't believe the NCCHC -- and

9    I have the standards here in front of me.  I'm

10   happy to look at them -- they don't have any

11   prescriptive thing to tell you the frequency.

12   They just say, "per clinical practice," or "as

13   clinically indicated."

14              So the NCCHC standards don't say

15   must be within an hour or you must put everyone

16   on M-A-T or M-O-U-D treatment.  It's more

17   permissive if it's individually determined by

18   the evaluating and treating health care staff.

19       Q.    Do you have any opinion, based on

20   your experience and expertise, as to what the

21   appropriate frequency of COWS monitoring

22   specifically would be?  Any guidance that you

23   can provide?

24       A.    So it would be up to the medical

25   leadership of the facility, based on their

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    direct clinical involvement with patients.

2              So there's different types of

3    opioids -- opioids and benzos and alcohol and

4    systems, so it would -- it would be clinically

5    determined by the facility staff and their

6    capabilities.

7              If they have the ability to monitor

8    someone in a medical infirmary or if

9    alternatively they just put them in a detox

10   room, like, a dorm setting, I would say all of

11   that is going to be dependent on custody,

12   staffing, nursing availability.  If you have

13   12-hour nursing or 24-hour nursing, it would --

14   it would all be clinically dependent on those

15   different safeguards in place that you have.

16             Some facilities won't do any kind of

17   detox.  They'll send everyone off site.  So it

18   really depends of the complexity of the

19   patient.  If they have a history of, say,

20   alcohol withdrawal seizures or they have

21   delirium tremens, DTs, then the facility might

22   elect to send them off site to an emergency

23   room.

24             So what I would say is there is no

25   absolute you should do it this way.  It's

**Ex. X-1712**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1  determined by the medical leadership of the

 2  facility.  That would be my opinion.

 3      Q.    Did you conduct any evaluation of

 4  the San Diego County Jails' housed monitoring

 5  policy and its implementation?

 6      A.    I asked the intake nursing staff of

 7  how they determined of who -- how they screened

 8  for substance abuse and dependence and how --

 9  where those individuals are housed and placed.

10  I also toured the medical facility.

11          But, no, I did not do a detailed,

12  deep dive into COWS and CIWA and detox

13  protocols for the jail.  I referred that to Dr.

14  Murray, my colleague.

15      Q.    Okay.  Page 59.

16              ATTORNEY COLEMAN:  What did

17  you say?

18              ATTORNEY FISCHER:  Page 59.

19  BY ATTORNEY FISCHER:

20      Q.    You say in the middle of the page,

21  Dr. Penn -- the third line of the middle

22  paragraph it states, "The SDSO supports

23  connections to community MAT programs and

24  provides comprehensive MAT treatment for IPs

25  with co-occurring mental health and substance

Ex. X-1713

```
 1   COMMONWEALTH OF PENNSYLVANIA          )
                                          ) SS
 2   COUNTY OF ALLEGHENY                   )

 3                    CERTIFICATE

 4        I, Michelle Goehring, a notary public in
     and for the Commonwealth of Pennsylvania, do
 5   hereby certify that the witness, DR. Joseph
     PENN, was by me first duly sworn to testify the
 6   truth, the whole truth, and nothing but the
     truth; that the foregoing deposition was taken
 7   at the time and place stated herein; and that
     the said deposition was recorded
 8   stenographically by me and then reduced to
     typewriting under my direction, and constitutes
 9   a true record of the testimony given by said
     witness.
10
          I further certify that I am not a
11   relative, employee or attorney of any of the
     parties, or a relative or employee of either
12   counsel, and that I am in no way interested
     directly or indirectly in this action.
13

14        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 4th day
15   of December, 2024.

16

17
          /S/Michelle L. Goehring, Notary Public
18   Court Reporter
     My Commission Expires: July 12, 2025
19   Commission No. 1317058.

20

21

22

23

24

25
```

Ex. X-1714

# EXHIBIT Y
## (Redacted)

# Deposition Transcript

Case Number: 3:20-cv-00406-AJB-DDL
Date: November 8, 2024

In the matter of:

# DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPT, et al.

# SCOTT E. REINECKE, DDS

**CERTIFIED COPY**

Reported by:
KATHERINE LENTI



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

Ex. Y-1716

```
 1                    UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF CALIFORNIA

 3   DARRYL DUNSMORE, ANDREE           )
     ANDRADE, ERNEST ARCHULETA,        )
 4   JAMES CLARK, ANTHONY EDWARDS,     )
     REANNA LEVY, JOSUE LOPEZ,         )
 5   CHRISTOPHER NORWOOD, JESSE        )
     OLIVARES, GUSTAVO SEPULVEDA,      )
 6   MICHAEL TAYLOR, and LAURA         )
     ZOERNER, on behalf of themselves  )
 7   And all others similarly situated,)
                                       )
 8                    Plaintiffs,      )
                                       )
 9        v.                           )
                                       )
10   SAN DIEGO COUNTY SHERIFF'S        )
     DEPARTMENT, COUNTY OF SAN         )
11   DIEGO, SAN DIEGO COUNTY           )
     PROBATION DEPARTMENT, and DOES    )
12   1 to 20, inclusive,              )
                                       )
13                    Defendants.      )

14   Case No. 3:20-cv-00406-AJB-DDL

15

16          DEPOSITION OF SCOTT E. REINECKE, DDS

17

18               DATE: November 8th, 2024

19                TIME: 9:00 a.m.

20         LOCATION: Via Zoom Video Conference

21

22

23

24

25
```

Ex. Y-1717

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1   missing.

2          THE COURT REPORTER:  Yeah, exactly.  That's

3   right.  Yeah.  I mean, I'll remind you so I have an

4   answer, you know?

5          All right.  Let me just get the last question

6   here.  One second.  Okay.

7                (Court reporter read back.)

8          THE COURT REPORTER:  Are those -- I'm sorry.

9          MS. CHARTOFF:  That's okay.  Why don't I -- I'll

10  just take it again.  Yeah, don't worry about it.

11  BY MS. CHARTOFF:

12         Q.   So, Dr. Reinecke, consistent with your

13  resume, your CV here, you've been a practicing dentist

14  in the community through 2023, is that correct?

15         A.   That is correct.

16         Q.   And do you have -- in the community, do you

17  have a standard of care or timeframe that you require

18  patients complaining of pain to be seen by a dentist?

19         A.   No.

20         Q.   Would -- if a patient called your office

21  complaining of pain, how quickly -- how quickly would

22  you try to make an appointment to see them?

23         A.   I would try to see them as soon as

24  possible.  It may not be same-day.

25         Q.   Would you wait 10 days to see a patient

**Ex. Y-1718**

1    assess?

2              A.    I really wasn't given specific guidance on

3    that.  I believe my perspective was to be as fresh as

4    possible.

5              Q.    Did you have any impression about dental

6    care at the San Diego County jails before you were

7    retained in this case?

8              A.    Absolutely not.

9              Q.    So we -- you said you visited facilities

10   and you reviewed charts.  Did you review policies or

11   procedures?

12             A.    I did not.

13             Q.    Why not?

14             A.    They were not provided to me.

15             Q.    Did you ask for them to be provided to you?

16             A.    I did.

17             Q.    Did you review any other documents?

18             A.    Besides charts, you mean?

19             Q.    Correct.  Besides charts.

20             A.    No.

21             Q.    You reviewed the dental schedule that was

22   sent this week that was produced to us earlier today, is

23   that right?

24             A.    Yes.

25             Q.    Is that the first dental schedule that

Ex. Y-1719

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

 1  guard.

 2        Q.   Did you -- who did you ask for the patient

 3  charts?

 4        A.   That's a good question.  I believe it was a

 5  response to a group email that may have had 10 or 12

 6  people on it.  So I didn't like, you know, point at

 7  somebody asking.

 8        Q.   And the people on that email, were they

 9  defense counsel who you understood you were asking the

10  charts for?

11        MS. COLEMAN:  Assumes facts.

12        THE WITNESS:  I feel certain it was my team.

13  So, in other words, the other expert witnesses', you

14  know, common email.  And then Susan may have been on

15  there.  A couple of other individuals may have been on

16  there.  I just don't recall.  This was months ago.

17  BY MS. CHARTOFF:

18        Q.   Did you email with anyone other than

19  defense counsel about this expert report?

20        A.   I believe the only person would have been

21  Dr. Murray.

22        Q.   If there are emails with Dr. Murray that do

23  not include counsel, we would like to see those.  So you

24  asked for -- you asked for 30 charts in particular when

25  you made this request?

**Ex. Y-1720**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

```
 1        A.   My answer is that that is the window that
 2   has been established.  I am not in a position to
 3   determine if that is acceptable, but that's the window
 4   that has been established.  It's based upon the number
 5   of people requesting care, the availability of staff,
 6   probably a handful of other variables.  I can't say if
 7   it's acceptable, though.
 8        Q.   So you're not in a position to opine on
 9   what the appropriate wait time is for someone to be seen
10   by a dentist?
11             MS. COLEMAN:  Objection, vague.
12             THE WITNESS:  Or a request of cleaning.  Oh,
13   sorry.
14             MS. COLEMAN:  Go ahead.
15             THE WITNESS:  If the request was cleaning, as
16   you have used as an example, no, I cannot opine on that
17   timeframe.
18   BY MS. CHARTOFF:
19        Q.   Can you opine on the appropriate timeframe
20   before someone needs to be seen by a dentist who is
21   complaining of pain?  The patient is complaining of
22   pain, to be clear.
23             MS. COLEMAN:  Objection, incomplete
24   hypothetical, vague as to the pain.
25             THE WITNESS:  As a healthcare provider, I would
```

**Ex. Y-1721**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1    prefer that that be sooner than later, without saying a

2    day.  So I can't say three days.  I can't say five days.

3    I would say somebody who is complaining of pain should

4    be seen sooner than someone who is not complaining of

5    pain.

6    BY MS. CHARTOFF:

7         Q.   But you do not actually have an opinion on

8    what the standard should be in terms of -- in that

9    regard?

10        A.   I would say my opinion, again, is sooner

11   than later without an established timeframe, because

12   every single circumstance has different variables.

13        So if I were to say for Clinic A in Malaysia, it

14   should be three days, and I don't know what happens on a

15   day-to-day basis, that would be unprofessional of me to

16   suggest that three days is appropriate.

17        If we were to compare that to a place where I

18   would physically work on a day-to-day basis, and I know

19   what the variables are, I could tell you with experience

20   and conviction what the delay should be because I know

21   what I could control and what I cannot.

22        So in this particular instance, I would have to

23   be onsite for two weeks at one place to kind of have a

24   feel for what could be controlled and what could not.

25   So I cannot say what's appropriate there as far as a

**Ex. Y-1722**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

 1  delay.

 2       Q.   So it's your testimony that you are unable

 3  to opine on what the appropriate timeframe is in San

 4  Diego for someone complaining of pain to be seen by a

 5  dentist?

 6       MS. COLEMAN:  Misstates his testimony,

 7  incomplete hypothetical.

 8       THE WITNESS:  That's correct.  I do not feel I

 9  am able to opine on that, because I do not have enough

10  information.

11  BY MS. CHARTOFF:

12       Q.   When you were reviewing the chart

13  reviews -- I want to turn to page four of your report.

14  This is in the top section above where it says, "Section

15  7, Summary of Findings."

16       A.   I don't know why I can't find that.

17  Summary of findings.  Let me close this.  Stand by a

18  moment.  Let me open up another one and see.  I think

19  this may have been a draft.

20       MS. CHARTOFF:  Okay.  You know, we've been going

21  for about a little over an hour now.  Why don't we get

22  back on at 1:20.

23       We'll go off the record, Dara, and take a break.

24       You can make sure you have the correct -- I want

25  you to have the correct document in front of you,

Ex. Y-1723

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1    THE WITNESS:  I would characterize it as trying

2    to view everything as a conglomeration of information

3    because I knew that there was a likelihood that there

4    would be differences in those.

5        Well, let me see here.  What are the three

6    categories?  Quality of documentation -- yeah.

7        So I knew going in that there was going to be

8    differences because I would expect that of any review.

9    You're not going to see the exact same thing every

10   single time across facilities and across providers.

11       So I was really looking at this to kind of get a

12   sense as to if there were timeframes that were for the

13   most part hit, even though I didn't expect 100 percent.

14   I wouldn't expect that with anybody.  So I hope that

15   characterizes what I was looking for.

16       Q.   Did you have a standard of care in mind

17   that you would expect to see in each of these charts?

18       MS. COLEMAN:  Objection, vague, compound.

19       THE WITNESS:  I would say, ideally, I would like

20   to see that once diagnosed, a condition that required

21   treatment was seen or addressed or referred within a

22   timeframe that was not grossly outside what a standard

23   would be.

24       And, again, the standard is in flux.  You know,

25   you have numbers, but we don't know all the variables on

**Ex. Y-1724**

 1  site.

 2  BY MS. CHARTOFF:

 3       Q.   Were you also looking to see whether a

 4  diagnosis was made in a timely manner?

 5       A.   Yes.

 6       Q.   And for each chart, did you document

 7  whether the care was in fact provided timely?

 8       A.   Did you say for each part?

 9       Q.   For each chart, excuse me.

10       A.   Oh, for each chart?  No.

11       Q.   So let's turn to Appendix C of your report,

12  which is the chart section.  It starts on page 95.

13       THE COURT REPORTER:  B, as in boy or D, as in

14  David?

15       MS. CHARTOFF:  C, as in cat.

16       THE COURT REPORTER:  Oh, C.  Okay.  Really off.

17  Thank you.  Sorry about that.

18       MS. CHARTOFF:  All good.

19       THE WITNESS:  Okay.  So, Hannah, I don't have

20  what you're referring to.  I don't have a document

21  that's that length.

22  BY MS. CHARTOFF:

23       Q.   You don't have the Appendix C portion of

24  your report in front of you?

25       MR. FISCHER:  Can you put it back up on screen,

Ex. Y-1725

1          A.    It's possible.

2          Q.    And at present, what is your opinion about

3     Mr. ██████' medical care?

4          MS. COLEMAN:  Asked and answered.

5          THE WITNESS:  My opinion is I don't have enough

6     information.

7     BY MS. CHARTOFF:

8          Q.    So if it were true that Mr. ██████ waited

9     four months between being seen by a nurse and being seen

10    by a dentist, what would your opinion about the quality

11    of care provided to him be?

12         MS. COLEMAN:  Asked and answered.

13         THE WITNESS:  He should have been -- okay.  Go

14    ahead.  I'm sorry, Susan.

15         MS. COLEMAN:  Incomplete hypothetical.

16         Go ahead.

17         THE WITNESS:  Based on the limited information

18    that I have, and if that is in fact the timeframe given

19    an option, I would like him to have been seen quicker

20    than four months.

21    BY MS. CHARTOFF:

22         Q.    So four months is not an acceptable wait in

23    your opinion?

24         A.    I cannot answer that with any certainty

25    because I feel I don't have enough information.

**Ex. Y-1726**

 1    literally, that person doing the assessment has not been

 2    present.

 3            MS. CHARTOFF:  Okay.  Let's take a break.  Let's

 4    go off the record.  It's 2:06, and why don't we come

 5    back on at 2:20.

 6            So that's 4:20 for you, Dr. Reinecke.

 7            THE COURT REPORTER:  How long are we taking?

 8            MS. CHARTOFF:  14 minutes, just to make it

 9    round.

10                      (Brief recess.)

11            MS. CHARTOFF:  So 2:21.  Okay.  All right.  Back

12    on the record.

13    BY MS. CHARTOFF:

14            Q.  All right.  Dr. Reinecke, I want to make

15    one last -- just to make sure I understand with these

16    chart reviews.  Your opinion is that based on the

17    information you have received to date and that you

18    reviewed, you are not able to opine on whether those 30

19    patients were treated within the standard of care?

20            MS. COLEMAN:  Objection, misstates his

21    testimony.  He said individually versus as a whole.

22            Go ahead.

23            THE WITNESS:  I would have to request for a more

24    clear understanding of standard of care because there's

25    variations depending on who you talk to.

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1    So which standard of care are you using as a

2    reference?  Because there is no policy and procedure

3    that I've seen.  So you have to give me an example of a

4    standard of care.

5    BY MS. CHARTOFF:

6        Q.    In your -- okay.  So, fair.  Your opinion

7    is that you haven't reviewed the policies and

8    procedures, so you are not able, based on the

9    information you have here today, to confirm whether the

10   treatment provided in these individual instances was

11   consistent with the policies and procedures at the San

12   Diego County Jail?

13       A.    That is true.

14       Q.    And you aren't able to opine on the quality

15   of care provided in each of these individual cases

16   because -- based on the information that you have

17   reviewed?

18       MS. COLEMAN:  Objection, compound, overly broad,

19   incomplete hypothetical.

20       THE WITNESS:  Okay.  So I would not say that the

21   question is entirely accurate.  I can opine.  I can

22   opine on anything, to be honest with you.

23       But the bottom line is, if, you know, everybody

24   can have an opinion, but for an opinion to have actual

25   value, you have to have something upon which it is based

**Ex. Y-1728**

1   and it has to be inside of a spectrum of knowns.

2          So, in this particular instance, I can opine my

3   personal belief on whether something was done within a

4   certain timeframe or done appropriately, et cetera, et

5   cetera.  But because I don't have intimate knowledge of

6   the variables and the impasses associated with the

7   information we're reviewing, my opinion, as well as

8   Dr. Schulman's, does not really carry a lot of weight.

9          I can opine, and I can opine, and I can opine.

10  I can only look at what I've got that's available to me.

11  So I'd like to say I'm an expert.  In fact, I know I'm

12  an expert.  That's not even a question.

13         But I can only add value when I have all the

14  information available to me.  So to say I can opine,

15  absolutely, I can.

16         Really, the question comes down to, do you want

17  just personal opinion?  That's one thing.  Or do you

18  want something based on fact?  And I think that, as we

19  all know, law is based in fact.

20         So, there's things missing for me to opine based

21  in fact.  So, all of these reviews, all the chart

22  reviews, are based on information I had available to me,

23  and there are definitely things missing.

24  BY MS. CHARTOFF:

25         Q.   And based on the information available to

Ex. Y-1729

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1  you, can you opine as to whether these individuals

2  received adequate care up to your standard of practice?

3          MS. COLEMAN:  Objection, compound.

4          THE WITNESS:  Again -- yeah, that's compound.

5  So, me, personally, I would say that on occasion, yes;

6  and on occasion, no.  I've seen examples of both within

7  these 30 charts.

8  BY MS. CHARTOFF:

9          Q.  I want to turn to what we were just looking

10  at as Exhibit 4, which is what you sent to us today as

11  your report.

12          In the conclusion section, starting on page 15,

13  it reads, "In my professional opinion, SDCJ has the

14  necessary physical plant infrastructure, staff, and

15  equipment to deliver minimally adequate dental care that

16  aligns with community standard."

17          Is that your opinion?

18          A.  Based on my visit, yes.

19          Q.  And this should have been included in your

20  final report?

21          A.  I'm sorry.  Say that again.

22          Q.  This sentence is correctly included in your

23  expert report?

24          A.  Yes, I wrote that.  Yes.

25          Q.  "All dental staff I spoke with were

Ex. Y-1730

1        Q.    So your understanding -- I know you're just

2    looking at this for the first time, but this 1.4

3    dentist -- excuse me -- FTEs, that's lower than the 1.8

4    dentist FTEs that we just spoke about as being

5    sufficient.  So does this change your opinion on whether

6    dentist staffing is sufficient at the San Diego County

7    Jail?

8        A.    No, it does not, because this is simply one

9    week in a given month.  So I would have to look at an

10   expanded window, at least one month, to determine an

11   actual FTE allocation.

12       Q.    Did you ask for staffing plans reflecting a

13   month?

14       A.    I did not.

15       Q.    And in your report -- just a moment.

16       In your opinion, I want to ask about the role of

17   dental assistants now.  So what does a dental assistant

18   do generally?

19       A.    That's going to add some time, so I'm going

20   to try to abbreviate as best as possible.

21       They do everything, with the exception of the

22   delivery of direct dental care, because legally they

23   cannot.  So some things -- they assist the dentist,

24   obviously; chairside procedures; take radiographs; set

25   up and take down instrumentation; sterilize instruments

Ex. Y-1731

1   outside -- did you rely on any industry standards in

2   assessing the adequacy of dental care in this case?

3            MS. COLEMAN:  Objection, vague.

4            THE WITNESS:  So, again, there has been

5   significant discussion on what actual industry standards

6   are in the field of dentistry.

7            Generally, it's going to be this subjective

8   analysis of where do we get a ratio, which we've already

9   talked about.  That's the big one, is what the ratio is.

10  And then another one is if you're presented with a

11  particular type of diagnosis, what should you do.

12           So I would like to say that, yes, there is

13  kind of that standard that floats around in your head,

14  where if you see something, you're like, okay, well,

15  that's within a realm of what I would consider

16  acceptable.

17           But there is significant discussion routinely.

18  I mean, I'm sure for years and years and years before I

19  was born, there has been discussion as to what is a true

20  standard.  And I believe with all of my being that there

21  is no one true standard that can be applied to the

22  dental profession.

23  BY MS. CHARTOFF:

24           Q.   Are there -- I understand that.  Are there

25  kind of main sources that you look to when -- even if

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1        Q.   And did you consider the NCCHC standards on

2   oral care services in drafting your report?

3        A.   I did not.  But I know Dr. Shulman is --

4   he's got that under his wing.  He believes very heavily

5   in NCCHC.

6        Q.   Why didn't you consider the NCCHC

7   standards?

8        A.   It's a guideline.  It cannot be applied

9   across all parameters.

10       Q.   You mentioned the American Dental

11  Association before.  Are you familiar with the ADA, the

12  CDT codes, I believe they're called?  Do you use them?

13       CDT, Dara.

14       Do you use them in your private -- did you use

15  them in private practice when you were in private

16  practice?

17       A.   Every dentist, unfortunately, must in order

18  to get paid by insurance companies.

19       Q.   So you're familiar with ADA code D0150?

20       A.   I believe that is a treatment plan code.

21       Q.   Initial examination and treatment plan?

22  Yeah, yeah.  Does the jail provide -- the San Diego

23  County Jail -- provide initial examinations within the

24  definition of ADA code D0150?

25       A.   I don't think I can answer that with

**Ex. Y-1733**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1    So I saw evidence of referrals and it may have not been

2    for crown and bridge.  It may have been for endo, which

3    is root canal or prosthodontics, which is dentures.  But

4    I did see evidence of referrals being entered and taking

5    place.

6            Q.    But you can't recall at this moment,

7    whether any of the referrals you reviewed were actually

8    for crown and bridge?

9            MS. COLEMAN:  Objection, vague.  Do you mean the

10   charts you reviewed?  Because you said referrals.

11   BY MS. CHARTOFF:

12           Q.    You can still answer, Doctor.

13           A.    So referrals, I don't recall.  No.

14           Q.    And did you do anything else to verify

15   Dr. Pandit's statement that those services are provided?

16           A.    Besides looking at charts?  No.

17           Q.    Okay.  Because you didn't look -- you

18   didn't have an opportunity to look at the policies and

19   procedures, right?

20           A.    Correct.

21           Q.    And did you see any evidence of periodontal

22   diagnosis being done at the jail?

23           A.    Yes.

24           Q.    What evidence did you see of that?

25           A.    I saw it in the charting in the odontogram

**Ex. Y-1734**

1    for me to comment.

2    BY MS. CHARTOFF:

3        Q.   So, based on this document, you're not able

4    to comment on whether the staffing -- dental staffing at

5    the jail, more broadly, is adequate?

6        A.   That is correct.

7        Q.   So I want to talk about quality assurance

8    now.  We spoke hours and hours ago now, it seems, about

9    the quality assurance processes that are employed at the

10   UTMB-CMC system.  Are those all necessary quality

11   assurance processes in your view?

12       A.   Yes.

13       Q.   And that's -- just to go back through them,

14   those are site audits and chart audits and peer review

15   and monthly reports on timeliness.  And is there

16   anything else I'm missing that you think is a necessary

17   quality assurance process?

18       A.   Okay.  So both questions, yes, I think that

19   that's necessary.  And second, I don't think there's

20   anything missing.

21       Q.   And turning to San Diego, your opinion is,

22   as I understand it, is that the quality monitoring at

23   the San Diego County Jail facilities is appropriate,

24   correct?

25       A.   My response was based on what Dr. ████

**Ex. Y-1735**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1  told me, because I did not see any evidence of that.  So

2  he reported he did annual reviews.  If that's true, then

3  that's a component.

4        And, again, you can't really compare what we do

5  here to what they do there, but that's a component.  So

6  if that's true, it could be considered adequate if it's

7  comprehensive enough.

8        Q.   And did you ask to see those documents?

9        A.   I did not.

10       Q.   And I want to talk about records management

11 also.  I'm looking for the section in the report, the

12 report you provided today to direct you to.  Is your

13 opinion -- so actually I'll just direct now I finally

14 found the page.  Thanks for bearing with me.  I'm on

15 page 13, PDF page 13.

16       A.   Okay.  I don't have a page 13, do I?  Do I

17 have a 13?  Oh, I do.  Okay.  Hold on.  13 -- 16.

18       Q.   The paragraph below, it says, "Summary of

19 Findings," right above "Section 4, Quality Assurance".

20       A.   Got it.

21       Q.   Start at the second sentence, which starts

22 at the very end of line 2.  "This may be a result of a

23 charting system that is not full spectrum, relies too

24 much on a check-the-box format, or is not user

25 friendly."

**Ex. Y-1736**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1          REPORTER'S CERTIFICATION

2          I, Katherine Lenti, Certified Shorthand Reporter and

3    Notary Public for the State of Illinois, do hereby certify

4    the following:

5          That the foregoing is a correct transcript of

6    the digitally-recorded audio of the deposition of

7    SCOTT REINECKE, DDS, in the above-entitled matter;

8          That the amount of time used by each party at the

9    deposition is as follows:

10         Ms. Hannah Chartoff      - 04:45
           Ms. Susan Coleman        - 00:00
11         Mr. Aaron Fischer        - 00:00

12         That pursuant to information given to the

13   deposition officer at the time said testimony was taken,

14   the following includes all parties of record.

15          I further certify that I am neither counsel for,

16   related to, nor employed by any of the parties or attorneys

17   in the action in which this proceeding was taken, and

18   further that I am not financially or otherwise interested

19   in the outcome of the action.

20          Certified to by me this 9th day of December, 2024.

21

22   _____
     KATHERINE LENTI
23   Illinois CSR 084.004958
     Expiration Date:  05/31/25
24   Steno Agency
     Concierge@steno.com
25   (888) 707-8366

Ex. Y-1737

# EXHIBIT Z

Ex. Z-1738

# Deposition Transcript

Case Number: 3:20-cv-00406-AJB-DDL

Date: November 4, 2024

In the matter of:

## DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPT, et al.

# Lenard Vare

**CERTIFIED COPY**

Reported by:
DARA SANOFF



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

Ex. Z-1739

JOB NO. 1262129

1              UNITED STATES DISTRICT COURT

2                        for the

3          SOUTHERN DISTRICT OF CALIFORNIA

4

5   Darryl Dunsmore, et al.     )Case No.:
                                )3:20-cv-00406-AJB-DDL
6                               )
            Plaintiffs,         )
7                               )
                                )
8   vs.                         )
                                )
9                               )
    San Diego County Sheriff's)
10  Department, et al.          )
                                )
11                              )
            Defendants.         )
12  _____)

13

14         VIRTUAL EXAMINATION BEFORE TRIAL of

15  LENARD VARE, an Expert Witness, retained by the

16  Defendant, taken by the Plaintiffs, pursuant to a

17  Subpoena commencing at 9:21 a.m. Pacific Time on

18  Monday, November 4th, 2024, before DARA SANOFF, a

19  Certified Court Reporter and Notary Public for and

20  within the State of New York.

21

22

23

24  STENO
    Concierge@Steno.com
25  (888)707-8366

Ex. Z-1740

| | |
|---|---|
| 1 | L. VARE |
| 2 | Q.    Is there any period of time that you |
| 3 | know the jail has been staffed at or above minimum |
| 4 | staffing levels including with the use of overtime? |
| 5 | A.    I don't know specific, but I -- I don't |
| 6 | know yes or no. |
| 7 | Q.    Okay.  Did you review any below minimum |
| 8 | staffing reports?  When I say "below minimum staffing |
| 9 | reports," below minimum and staffing are all |
| 10 | capitalized.  Did you review any below minimum |
| 11 | staffing reports produced in discovery? |
| 12 | A.    I don't recall.  I may have.  I don't |
| 13 | recall. |
| 14 | Q.    Did you ask to see any reports about |
| 15 | staffing levels with respect to minimum staffing |
| 16 | levels? |
| 17 | A.    I do not recall. |
| 18 | Q.    Is there a reason you don't recall |
| 19 | whether or not you -- strike that. |
| 20 | Did you review any data at all with respect to custody |
| 21 | level staffing? |
| 22 | A.    Not -- not -- not like day-by-day data. |
| 23 | Again, when I was doing my jail tours, I asked |
| 24 | about minimum staffing and what happens when there |
| 25 | aren't enough staff to cover the shift and I was |

Ex. Z-1741

```
 1                        L. VARE
 2    informed that they were using mandatory overtime to
 3    make up the deficiencies.
 4            Q.    And who told you that?
 5            A.    Various staff that -- that I toured with.
 6    I don't know the specific names of the one individual.
 7            Q.    Do you know any of their positions?
 8            A.    There were captains and lieutenants who
 9    knew about shifts.
10            Q.    I'm asking specifically of the person
11    who told you that the jail used overtime to fill
12    minimum staffing levels.  Do you know the position
13    of the person who told you that?
14            A.    I don't specifically know.
15            Q.    Did you do anything to independently
16    verify that?
17            A.    No.
18            Q.    Did you request any data to look at to
19    see whether or not shifts are being filled at or
20    above minimum staffing levels?
21            A.    No.
22            Q.    Why not?
23            A.    Because I have no reason to believe that a
24    facility when they're using mandatory overtime.  The
25    whole purpose of doing mandatory overtime is to bring
```

Ex. Z-1742

```
 1                      L. VARE

 2        A.    Yes.

 3        Q.    You believe that statement to be true?

 4        A.    Yes, based on the information that I

 5   gathered.

 6        Q.    How do you know that all those 857

 7   individuals were prevented from further harming

 8   themselves?

 9        A.    Those were just the attempted suicides,

10   not the -- not the completed suicides.  Those were

11   attempts that an intervention took place.

12        Q.    And how do you know that of those 857

13   attempts people didn't go on to further harm

14   themselves but not die?

15        A.    Well, we are talking about attempting

16   suicides and preventing suicides so very specifically

17   they saved 857 -- either possibly 857 individuals or

18   it could be the same individuals multiple times, so I

19   don't know that that number does not include someone

20   with a repeated attempts in that number.

21        Q.    Of the 857 individuals who engaged in

22   self-harm incidents who were captured by this figure

23   how many went on to have further self-harming

24   incidents?

25        A.    I don't know.  The -- the -- the -- I'm
```

```
 1                    L. VARE
 2   the medication and then mental health needs to come
 3   in and sort of help them sort of convince them to
 4   do what is in their best interest.
 5       Q.    At which of the seven jail facilities
 6   can people who require MAT receive MAT programs?
 7       A.    I -- I -- I believe I wrote it in my
 8   report.  There's -- there's some facilities that --
 9   that do have that available and I think there may
10   be some that don't.  I can't -- I cannot recall
11   which ones specifically.
12       Q.    Approximately how many IPs require MAT
13   treatment?  Let's say for, you know, currently.
14              MS. COLEMAN:  Calls for
15        speculation.  Asked and answered.
16       A.    I -- I -- I don't know approximately
17   how many.  I mean there could be -- there could be
18   a lot because just the number of people coming into
19   the jails is -- is quite large.
20       Q.    Approximately what percent of people who
21   require MAT treatment are provided MAT treatment at
22   the jails?
23       A.    That would be something that someone who
24   was doing a medical expert can look at and see what
25   percentage.  I did not look at the percentages to
```

**Ex. Z-1744**

LENARD VARE                                          JOB NO. 1262129
NOVEMBER 04, 2024

```
 1                      L. VARE
 2    know the answer to that.
 3         Q.    So you don't have an estimate?
 4         A.    I do not.
 5         Q.    Did you review any documents showing
 6    how many people at the jail require MAT treatment?
 7         A.    I -- I may have seen documents --
 8              MS. COLEMAN:  Objection, vague.
 9         Sorry.
10         A.    I may have seen documents related to
11    what type of treatments are provided, but I can't
12    recall specifics.
13         Q.    Did you receive or review any documents
14    concerning the number of people who were on MAT at
15    the jail?
16              MS. COLEMAN:  Vague as to time.
17         A.    Again, I might have seen documents related
18    to that.  I cannot recall.
19         Q.    Do you know if the number of people who
20    require or receive MAT treatment at the jail factored
21    into your opinion?
22         A.    No, other than knowing that there is a
23    process in place to address those kinds of needs.
24         Q.    Other than knowing there's a process in
25    place, do you have any other information on the
```

**Ex. Z-1745**

```
 1                        L. VARE

 2    adequacy of the MAT program at the jails?

 3         A.    I -- I'm not a medical expert so I

 4    don't know if I can speak to that.

 5         Q.    Does the jail currently provide MAT to

 6    people who had active prescriptions for MAT

 7    medications in the community?

 8         A.    I think in general if -- if someone is

 9    taking some sort of a medication in the community

10    and they are brought in to custody that information

11    is considered by medical staff and the doctors then

12    decide whether to continue it or not.  Again, that's

13    a medical decision.

14         Q.    You don't know what proportion of people

15    who had active MAT prescriptions currently receive

16    MAT in the jails?

17         A.    I do not know that.

18         Q.    Does the jail currently provide MAT to

19    all people who are identified as having opioid use

20    disorder?

21         A.    I -- I mean you could have a lot of

22    people that are identified with opioid use disorders,

23    but it varies specifically.  Part of its people that

24    are in the stages of withdrawal so I mean you'd have

25    to be in -- in -- in that COWS' protocol.  You would
```

**Ex. Z-1746**

LENARD VARE                                              JOB NO. 1262129
NOVEMBER 04, 2024

```
 1                        L. VARE
 2          speculation and compound.
 3          A.    I -- I have no idea.  The -- I know that
 4     people if they feel grateful about something that
 5     they had a good experience, you know, people tend
 6     to write letters about those kinds of things in --
 7     especially in jails is not uncommon.
 8          Q.    For whom were the letters written?
 9          A.    I mean I don't know for whom.  They were
10     just written and -- and I got them.  I don't know
11     anything else about it.
12          Q.    Did you obtain permission to use their
13     -- these IPs' letters in your report?
14          A.    I spoke with counsel about -- about using
15     them in my report.
16          Q.    Did anyone obtain the letter writers'
17     consent to use their letters in your report?
18          A.    No, because they sent it to staff and --
19          Q.    How do you --
20          A.    -- then --
21          Q.    How do you know the letter writers sent
22     the letters to staff?
23          A.    Because I --I -- I understand from speaking
24     with staff that individuals had written letters and
25     sent letters so I have no reason to believe that they
```

**Ex. Z-1747**

```
 1                    L. VARE
 2   wrote it without sending it to someone.
 3        Q.    And how were the five letters in your
 4   report selected?
 5        A.    I did not select them.  I asked for those
 6   letters from the conversations that there were, you
 7   know, people felt positively about the program, at
 8   least when I was doing the tour.  I asked about it
 9   and I think then the letters were just sent to me
10   through counsel.
11        Q.    Did you ask for any letters from people
12   who thought negatively about the program?
13        A.    I don't believe there were letters that
14   -- that I saw that were negative about the program.
15        Q.    Did you ask to see letters from people
16   who described the program in negative ways?
17        A.    Well, I think they're involving the
18   lawsuit so I don't -- I don't know if I was gonna
19   look for something to prove the opposite.  I mean I
20   got letters.  I used the letters because I thought
21   that that's what was -- I was looking at.
22        Q.    How many letters in total were written
23   by IPs about the MAT program?
24        A.    I -- I don't know.  Four or five letters I
25   think it was in my report.
```

Ex. Z-1748

```
 1                        L. VARE
 2        Q.    Not just in your report, but how many
 3   letters total were written by IPs about the MAT
 4   program?
 5        A.    I do not know.
 6        Q.    How were the ones that you obtained
 7   selected?
 8        A.    I don't know.
 9        Q.    Any concerns that they were cherry picked?
10        A.    No.
11              MS. COLEMAN:  Objection, vague.
12        Q.    Did you ask to see the larger universe
13   of letters from which this came, this subset came?
14              MS. COLEMAN:  Assumes facts.
15        A.    No.  I assumed that if the letters were
16   sent, they -- I asked for the letters.  They sent
17   me the letters.  I -- I didn't think anything more
18   than that.
19        Q.    Is the sample of letters that you
20   identified in your report representative of all
21   people who have written letters to jail staff about
22   the jails' MAT program?
23        A.    I don't know.
24        Q.    You wrote that beyond the five people who
25   wrote these letters there are many more successful
```

**Ex. Z-1749**

LENARD VARE                                         JOB NO. 1262129
NOVEMBER 04, 2024

```
 1                      L. VARE

 2               C E R T I F I C A T E

 3

 4   STATE OF NEW YORK       )
                             :  SS.:
 5   COUNTY OF RICHMOND      )

 6

 7        I, DARA SANOFF, a Notary Public for

 8   and within the State of New York, do hereby

 9   certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 7th day of December 2024.

21

22

23   _____

24             DARA SANOFF

25
```

Ex. Z-1750

# EXHIBIT AA

**2022**

## San Diego County
# In-Custody Death Study

Produced by Analytica Consulting for the San Diego Citizens' Law Enforcement Review Board

April 2022





**Ex. AA-1752**

SD_817750

# 2022 County of San Diego – In-Custody Death Study

The San Diego County Citizens' Law Enforcement Review Board (CLERB) contracted Analytica Consulting to conduct an independent analysis of in-custody death data over the last 10 years and provide a report of an "apples-to-apples" comparison of San Diego County Sherriff's Department (SDSD) to other California County Sheriff Departments. While the enclosed report contains a detailed analysis on the issue of in-custody deaths, it should be noted that **this report does not make any conclusions regarding any *specific* in-custody death.**

Analytica independently performed all analysis and authored this report. Input on the process, methods, and ultimate findings was provided by members of CLERB, the Sheriff's Department, and experts in academia; nevertheless, Analytica had the final say on the content of this report. Therefore, **any views expressed in this report are those of Analytica Consulting and do not reflect any official statement or policy of San Diego County or any of its employees.**

Analytica Consulting
San Diego, CA
April 2022

 **Michael Marks**

 **Mikael Pelz, PhD**

 **Jennifer De La Cruz**



# Executive Summary

In-custody deaths in California county jails have become an increasingly contentious topic. Reporting by journalists and advocacy organizations conclude that the risk of death is highest in San Diego County jails. Based on data from the California Department of Justice, one inmate dies about every month in San Diego jails; however, research has raised important questions on how to study these deaths. One of these concerns is how best to compare in-custody deaths across different counties. Given that jails primarily admit those from the immediate county, how do mortality rates among the county population influence the total deaths within county jails?

We address this question by applying countywide mortality rates to the in-custody population of the 12 most populous counties in California. Our countywide mortality rates encompass nearly 200 unique groups based on gender, race-ethnicity, and age characteristics and four manners of death. Using arrest and jail population data, we then estimate the distribution of these groups in county jails. This approach allows us to arrive at an expected number of in-custody deaths for each county jail. These expected total deaths provide a baseline for evaluating deaths in San Diego jails and other county jails.

Our final analysis compares the expected deaths to the actual deaths in county jails from 2010-2020. Because the focus of this study is San Diego, we scale each county jail's population to reflect what they would be if they had the same number of inmates as San Diego County (unscaled results can be found in Appendix H). Using this approach, we can identify which county jails have more or less deaths than is expected as well as compare San Diego's total deaths to that of other counties. The analysis and findings have also been peer-reviewed by leading experts in criminology and biostatistics (see Appendix E for these reviews). Our main findings are found below.

## Finding #1: Residents of San Diego County are no more likely to die than residents of other California counties.

Previous research has suggested that San Diego County's general population has unique mortality rates, which may explain the number of in-custody deaths in the county. Our comparison of mortality rates among the 12 most populous counties in California shows that San Diego County has similar death rates to other large counties in the state and metropolitan counties in the Western United States. This finding applies to all manners of death including suicides, overdose/accidental deaths, homicides, and natural deaths.



*Overall County Mortality Rates*
*(Deaths per 10k/year, Ages 18-59, 1999-2020)*

## Finding #2: After considering countywide mortality rates, San Diego jails have the highest number of unexplained deaths

When analyzing overall in-custody deaths, we find that total deaths in San Diego jails surpass the deaths expected based on the county's mortality rates. We compare San Diego to other counties by standardizing their jail population to the size of San Diego jails (approximately 5000 inmates). The number of excess deaths resulting from the actual and expected death difference is the highest in San Diego County.

Analytica
CONSULTING

Ex. AA-1754

SD_817752

Additionally, San Diego County is the only county with a statistically significant number of excess deaths.[1] Most other counties have generally fewer total deaths than what is projected by their county mortality rates. This finding corroborates previous reporting suggesting that in-custody deaths are the most acute in San Diego County.





## Finding #3: In San Diego County, Whites are more likely to *die* in jail; Blacks are more likely to *be* in jail.

When comparing the race of those who have died in-custody to the racial distribution of the jail population, deaths in San Diego occur disproportionately among Whites. The percentage of jail deaths among both Blacks and Hispanics is less than their percentage of the jail population. Given the large racial disparities between jail populations and county populations (Subramanian, Riley, and Mai 2018), the jail population is the most appropriate population to evaluate the racial proportionality of in-custody deaths.

Our analysis shows that racial disproportionality is introduced into the jail system through arrest rates. For example, the proportion of Black inmates in San Diego is three times higher than their proportion of the county population. However, the proportion of White, Hispanic, and other race inmates are all equal or less than their proportion of the county population.

*San Diego County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



---

[1] Statistical significance means that the observed result was unlikely to occur by chance and is likely attributable to some underlying cause. When we report that the difference between actual and expected deaths is statistically significant, we are stating that these differences are highly unlikely to be a matter of random chance.

**Analytica**

Ex. AA-1755

SD_817753

## Finding #4: The risk of overdose/accidental deaths is the greatest in San Diego jails





When comparing overdose/accidental death rates among the counties in our study, inmates in San Diego jails have the highest death rates.[2] An inmate in San Diego is two times more likely to die in this manner of death than what is expected based on county mortality rates. This discrepancy results in the highest number of excess deaths among all 12 counties in this study. The actual and expected overdose/accidental deaths for San Diego are also statistically different. The same cannot be said for the other counties that have more overdose/accidental deaths than what is anticipated.

---

[2] The California Department of Justice broadly refers to these deaths as accidental deaths. Most of these deaths involve overdoses. A much smaller number of these deaths involve other circumstances such as blunt force, falls, and choking. For a complete distribution of these deaths, see Appendix C.

**Analytica**
CONSULTING

**Ex. AA-1756**

SD_817754

## Finding #5: San Diego is one of many counties with high suicide rates in jails.

San Diego County has an elevated suicide rate that is not unlike several other counties in this study. Reported suicides are four times the expected suicides in many of these counties. All 12 counties have more suicides than what is projected, but the number of excess deaths varies from county to county. These findings confirm that suicide remains a severe risk for those in-custody in county jails, a pronounced trend among county jails nationally (Abderhalden 2022).



Expected number of **suicide** deaths from 2010-2020 in a sample of the county's general population comparable in size and demographics to the county's jail population (~5000 people)



Expected vs Actual
**Suicide** Jail Deaths, 2010-2020

Analytica
CONSULTING

Ex. AA-1757

SD_817755

## Finding #6: Elevated risk of death appears to be isolated to the unsentenced jail population

When comparing jail deaths between unsentenced and sentenced inmates, excess deaths only appear among those who have not yet been sentenced. This finding particularly applies to San Diego County, which had 51 excess deaths among unsentenced inmates and none among sentenced inmates. These results suggest that individuals are the most vulnerable to death when they enter the jail system and/or in the time between when they are convicted and when they are sentenced.



*Statistically significant difference between actual and expected deaths

## Finding #7: Public oversight of in-custody deaths lacks key information

This study would not have been possible without the diligent and comprehensive data collection efforts of the California Board of State and Community Corrections (BSCC) and the California Department of Justice. Nonetheless, we have found that this reporting lacks key information on the circumstances surrounding these deaths. Reporting could be expanded to include additional information about inmates and jail facilities such as:

- Processing dates of those who died in-custody including the date of the inmate's arrest, booking, conviction, and sentencing

- Name of facility where the death took place

- Average daily jail population by race-ethnicity and age

- Average daily population of city jails (the state discontinued collecting these data in 2020)

- Complete list of the manner of death without missing values

- Number and type of mental health staff at jail facilities

Ex. AA-1758

SD_817756

# 2022 San Diego County In-Custody Death Study

*Analytica Consulting*

Michael Marks, Mikael Pelz PhD, and Jennifer De La Cruz

April 2022

Executive Summary ............................................................................................................................... iii

Finding #1: Residents of San Diego County are no more likely to die than residents of other California counties. iii
Finding #2: After considering countywide mortality rates, San Diego jails have the highest number of unexplained deaths ...iii
Finding #3: In San Diego County, Whites are more likely to *die* in jail; Blacks are more likely to *be* in jail. .......... iv
Finding #4: The risk of overdose/accidental deaths is the greatest in San Diego jails ......................................... v
Finding #5: San Diego is one of many counties with high suicide rates in jails. .................................................... vi
Finding #6: Elevated risk of death appears to be isolated to the unsentenced jail population................................vii
Finding #7: Public oversight of in-custody deaths lacks key information ................................................................vii

1. Introduction ....................................................................................................................................2
2. In-Custody Deaths in California Jails.............................................................................................3
3. County Mortality Rates....................................................................................................................4
4. Who is in the Jails from the County Population?.............................................................................6
5. Expected vs Actual In-Custody Deaths ..........................................................................................7
6. Differences Between Unsentenced and Sentenced Inmates .......................................................11
7. Future Research ...........................................................................................................................14
References .........................................................................................................................................17

Appendix A: Selection of Counties .................................................................................................18
Appendix B: ADP vs. ARP...............................................................................................................19
Appendix C: A Closer Look at Overdose/Accidental Deaths...........................................................20
Appendix D: Estimated vs Actual San Diego Jail Population ..........................................................21
Appendix E: Peer-Review Letters ...................................................................................................22
Appendix F: Response from San Diego Sheriff's Department .........................................................25
Appendix G: Deaths in City Jails ....................................................................................................27
Appendix H: Detailed Results..........................................................................................................28

Expected vs Actual Statistical Test Results.....................................................................................28
Jail Profiles of Each County in The Study .......................................................................................31
Mortality Rates Over Time...............................................................................................................43
Comparisons of San Diego Inmate Population to Other California Counties ....................................44
County Demographics ......................................................................................................................45
Unstandardized Average Time between Deaths...............................................................................46

Appendix I: Email Correspondence with Dr. Elizabeth Carson (U.S. Bureau of Justice Statistics).............46
Appendix J: Data Inclusion Criteria ................................................................................................50
Appendix K: Relevant Policy Changes Provided by the San Diego Sheriff's Department (2014-2021)......51
List of Tables....................................................................................................................................55
List of Figures ..................................................................................................................................56

Analytica
CONSULTING

Ex. AA-1759

SD_817757

# 1. Introduction

The number of deaths in California's county jails has been a subject of increasing debate. This discussion has put sheriff's departments, who oversee these facilities, in sharp focus. Initial research on sheriff's departments has highlighted the apparent disparities in death rates among California county jails (Brannon 2020). San Diego County has received considerable scrutiny in these investigations. Reporting by local media and advocacy groups suggests the death rate in San Diego jails surpasses the death rates in all other large county jails in California (McDonald, Davis, and Schroeder 2019). Based on data from the California Department of Justice, about one inmate dies every month on average in San Diego jails.

Throughout this public debate, several important questions regarding how to evaluate county jail death rates have been raised. What population should these deaths be compared to when calculating jail mortality rates? Nearly all previous studies use the average daily jail population (ADP), which adds the daily count of inmates together for the month and then divides it by the number of days in that month.[3] Furthermore, what manners of deaths should be the focus of this research? Suicides have received the most attention in this work. Natural deaths and, to a smaller degree, homicides and accidental deaths also occur in jails. However, one of the primary questions on this topic is how best to compare in-custody deaths across different counties. For instance, some research has considered the racial proportions of counties when explaining these death rates (Kelly 2018). What other county factors should be incorporated into a comparison of jail death rates?

Given that jails primarily admit those from the immediate county, the particulars within a county will likely impact in-custody death rates. As the San Diego Sheriff's Department wrote in response to a recent state audit:

> "As jails are a microcosm of the communities in which they are located, it should come as no surprise that as deaths in the community increase, deaths in-custody will increase as well." (2022)(p.99)

We seek to understand this argument by exploring the relationship between county death rates and jail death rates. Counties have different populations, which exhibit varying levels of risk of death based on demographic profiles, associated behaviors, and the level of services available to residents in the county. Specifically, we seek to answer the following question: do differences in county mortality rates help explain the differences we see in county jail mortality rates?

To address this question, we establish an expected number of total deaths in jails by applying countywide mortality rates to the county's in-custody population. Our countywide mortality rates encompass nearly 200 unique groups based on gender, age, and race-ethnicity and four different manners of death. As such, they capture the distinctive health risks within a county. We then determine the distribution of these groups in county jails using a combination of arrest and jail population data. This step enables us to report the expected number of deaths for each county jail in our study. These expected values provide a county-level baseline for evaluating and comparing in-custody deaths across county jails.

---

[3] To fairly compare in-custody deaths across counties, we must account for the different number of inmates in each county's jail system. Nearly all studies utilize the Average Daily Population (ADP) for this calculation. We were able to find only two analyses that use the At-Risk Population (ARP) (Kelly 2018). For more discussion on ADP vs. ARP, see Appendix B.

Analytica

Ex. AA-1760

SD_817758

## 2. In-Custody Deaths in California Jails

To provide some initial context on in-custody deaths in California jails, we examine total deaths between 2010-2020 among the 12 most populous counties. These 12 counties were chosen for this study because they have an adequate sample size of in-custody deaths over time (see Appendix A for more discussion). The first chart in Figure 1 displays the total jail deaths. The number of deaths in these counties varies substantially.[4] San Francisco, Contra Costa, and Sacramento counties have relatively low numbers of total deaths. Los Angeles County has the highest total deaths at 290. San Diego County has the second highest total deaths at 141.



*Figure 1: Total Deaths in Various California County Jails (2010-2020) Compared to San Diego County.*

In order to fairly compare these numbers of deaths, we consider the size of the jail population in each county. We use the average daily population (ADP), which adds the daily inmate count for the month (typically taken around midnight each day) and then divides by the number of days in the month. The average ADP from 2010-2020 for each county is listed next to the county name in Figure 1. Another infrequently used measure, at-risk population (ARP), combines the January 1 count with the number of annual admissions. While neither measure offers individual-level information on inmates, the average daily population provides a unique number of the jail population without counting many who are re-admitted to jail. As such, the U.S. Bureau of Justice Statistics believes that ADP is "the best alternative" (Carson 2021) (see Appendix B and Appendix I for more discussion).

The second chart in Figure 1 factors the average daily population by displaying total deaths if jail populations were the same size as the San Diego jail population (5180 inmates). Viewing total deaths in this manner allows us to better compare other counties to San Diego. When we base in-custody deaths on a jail population of 5180 inmates, San Diego is now the county with the greatest number of deaths over the past decade. Fresno County has a comparable number of deaths at 140.

Measuring total deaths does not fully describe the nature and circumstances surrounding these deaths. To better compare in-custody deaths among these 12 counties, we break down these deaths by the manner of death. Table 1 presents the average time between deaths for the four major manners of death: natural deaths, suicides, overdose/accidental deaths, and homicides.[5,6] Comparing the average time between death accentuates the frequency of these death. For instance, deaths are more common if the length of

---

[4] Deaths exclude individuals in custody who died in transit or individuals who died in the process of being arrested. See Appendix J for full list of data inclusions.

[5] For homicides, we only include willful deaths committed by other inmates or law enforcement staff. Two other categories—undetermined and pending investigation—are nondescript and therefore not included in our analysis.

[6] An overwhelming majority of overdose/accidental deaths are drug-related. The remaining deaths in this category are associated with blunt force, choking, and medically-related circumstances. See Appendix C for a full breakdown of these deaths.

Analytica

**Ex. AA-1761**

SD_817759

time between deaths is only two months versus 2.1 years. The values on Table 1 are also based on the size of the San Diego jail population.

*Table 1: Average Standardized Time Between Deaths by Manner[7] (2010-2020)\**

| County | Natural | Suicide | Overdose/Accidental | Homicide |
|---|---|---|---|---|
| Alameda | 2 months | 4 months | 7 months | 2.1 years |
| Contra Costa | 5 months | 3 months | 3 years | |
| Fresno | 2 months | 4 months | 7 months | 1.1 years |
| Kern | 2 months | 4 months | 8 months | 2.4 years |
| Los Angeles | 3 months | 9 months | 9 months | 2.5 years |
| Orange | 3 months | 1.4 years | 1.2 years | 4.1 years |
| Riverside | 3 months | 5 months | 6 months | 1.3 years |
| Sacramento | 5 months | 10 months | 1.2 years | 1.2 years |
| San Bernardino | 3 months | 6 months | 1.4 years | 1.9 years |
| **San Diego** | **2 months** | **3 months** | **5 months** | **1.4 years** |
| San Francisco | 3 months | 4 months | 8 months | |
| Santa Clara | 2 months | 6 months | 2.4 years | 7.3 years |

*\*To enable an apples-to-apples comparison, all values are standardized to represent what the value would be if that county jail was the same size as the San Diego County jails. See Appendix H for unstandardized values*

The table above reveals that the shortest periods of time between deaths is among natural deaths. On average, there is a natural death in many county jails including San Diego every two months. Suicides also occur in jails with some frequency. Over half of these county jails have a suicide every three to four months. This table also suggests that overdose/accidental deaths and homicides are relatively rare in jails. Many counties go 8 to 12 months without an overdose/accidental death. However, both San Diego and Riverside report this type of death about every five months. Homicides are even rarer occurrences in jails, often happening every two years or more. In fact, two counties (Contra Costa and San Francisco) did not report a single homicide over this eleven-year period. San Diego had a homicide on average every 16 months.

Table 1 also puts in-custody deaths in San Diego County in clearer focus. Inmates die more frequently of natural and overdose/accidental causes in San Diego than in any other county. In addition, San Diego has the second fewest months between suicides and the fourth fewest months between homicides. Are these rates informed by the broader mortality rates among San Diego County's general population? We seek to answer this question by applying county mortality rates to the jail population of each county.

## 3. County Mortality Rates

An explanation for in-custody deaths may be the residents of the counties themselves. County populations exhibit varying levels of mortality risk based on demographic profiles, associated behaviors, and the level of services available to residents in the county. As a result, mortality rates among the county population may be a useful criterion for comparing in-custody deaths among these 12 counties. For instance, a county jail may experience a high number of suicides because of a high prevalence of suicide in the county at large.

If one looks at San Diego County, several notable demographic features may have implications for mortality rates in the county. San Diego County's White population is almost 10 percent higher than the average White population among the other counties in this study. Consequently, it has fewer Black and Hispanic residents by 2-3 percentage points than these other counties. (See Appendix H for complete comparisons of county demographics.)

---

[7] Out of the 990 total in-custody deaths in-scope for our study, 64 had a manner of death listed as *Pending Investigation*. Most of these came from three counties: San Bernardino (24), Los Angeles (18), and Santa Clara (9). To obtain missing manner of death values, we filed Public Records Act requests with the coroner/medical examiner of all the counties in our study. We then matched the data we received with the data from the California Department of Justice using death date, race, gender, and birth date as the matching fields. Using this method, we were able to identify the manner of death for 31 of the 64 listed as *Pending Investigation*.

Analytica

**Ex. AA-1762**

SD_817760

To systematically study different county mortality rates, we use data from the U.S. Centers for Disease Control and Prevention WONDER data base ("Underlying Cause of Death Data, 1999-2020" 2021) to calculate the mortality rates for each manner of death using gender, race-ethnicity, and age as our primary demographic characteristics. For example, one distinct stratum is Black males from age 18-29. Together, these strata form 48 distinct demographic groups which, when combined with our four manners of death, result in 192 different death rates for each county. To maximize the number of observations per stratum, we utilize data ranging from 1999-2020. Mortality rates are measured by counting the yearly number of deaths per 10,000 residents.

Figure 2 displays the general population mortality rates for the 12 counties in our study.[8] These figures also compare these county mortality rates to the Western United States metropolitan county average. The value of 17.5 for San Diego indicates that about 17 people per 10,000 residents die in the county each year on average. In general, the mortality rate for San Diego is between that of Orange County and Alameda County and below the Western United States metropolitan county average. Kern County has the highest overall mortality rate at 26.7 per 10,000 residents.



*Figure 2: Overall County Mortality Rates*
*(Deaths per 10k/year, Ages 18-59, 1999-2020)*



*Figure 3: Suicide, Homicide, and Accidental Death Rates*
*(Deaths per 10k/year, Ages 18-59, 1999-2020)*

To understand the differences in mortality rates by manner of death, Figure 3 displays the county mortality rates for overdose/accidental deaths, homicides, and suicides. Natural deaths are excluded from this figure because they skew heavily toward older populations and are included in the overall rates in Figure 2. This figure provides a more nuanced picture of mortality rates in San Diego County. Specifically, the County has higher mortality rates for overdose/accidental deaths and suicides than most of the other California counties in this study; however, it largely mirrors the broader Western metropolitan county average in these manners of death. San Diego has one of the lowest homicide rates, closely resembling the homicide rates of Santa Clara and Orange counties.

---

[8] We restrict these figures to ages 18-59 to focus the analysis on age groups that make up over 97% of jail populations. Additionally, the rates of death increase dramatically over the age of 60 and skew heavily towards natural death.

Analytica
ⅲCONSULTING

**Ex. AA-1763**

SD_817761

# 4. Who is in the Jails from the County Population?

For various reasons, county general populations and jail populations will likely vary, particularly on certain demographic attributes (Tonry 2011). To capture unique jail populations and estimate their mortality rates, we rely on arrest data from 2010-2020 obtained by California's Department of Justice OpenJustice portal. We first create the same demographic groupings used to measure county mortality rates.[9] Then, we calculate the percentage of felony and misdemeanor county arrests that occurred among each group. For example, our analysis estimates that White males and females aged 40-59 constituted nearly 18% of arrests in San Diego County.

However, these arrest rates need to be transformed into jail populations because not all those arrested will remain in-custody at county jails. By comparing each group's felony and misdemeanor arrest rates to the county's felony and misdemeanor average daily population (ADP), we can estimate the population of each group in county jails.[10] After we complete these steps, we estimate that White males and females aged 40-59 make up about 15% of the San Diego jail population.

Figure 4 compares the county population[11] and jail population in San Diego by race-ethnicity and age. Two general trends are clear from this figure. First, racial-ethnic minority groups are disproportionately represented in jail. The most glaring example of this is Blacks aged 18-39. This group makes up only 1.7% of the county population but constitutes about 12% of the jail population. Similar discrepancies exist for other minority strata. Second, the jail population skews younger than the county population. We find that nearly 69% of the jail population is between the ages of 18 and 39. This segment is only 32% of the general population in San Diego County.



Note: Jail population is estimated using arrest data and reported jail population from 2010-2020

*Figure 4: Comparing the Jail and General Population in San Diego County*

---

[9] To generate more accurate expected death rates, we weigh the arrest data age category of 40-69 into three distinct groups—40-49 (66%), 50-59 (26%), and 60-69 (8%). In the California general population, a 69 year old individual is about 15 times more likely to die of natural causes than a 40 year old. ("Underlying Cause of Death Data, 1999-2020" 2021). We would expect this 40-69 year old age group to skew much younger in the jail population. Nationwide, people over age 55 make up just 7.3% of inmates while those age 35-54 make up 38.9% of inmates. ("Jail Inmates in 2020 – Statistical Tables" 2021). We show a comparison of our resultant estimates to actual values for San Diego County in Appendix D.

[10] A variant of this method for estimating jail populations was also used in Kelly's analysis on suicides in San Diego County (Kelly 2018). Additionally, we used detailed booking data provided by SDSD to evaluate the accuracy of these estimates. See Appendix B for this comparison.

[11] All general population estimates come from averaging 2010-2020 population projections provided by the California Department of Finance. These are the estimates used by all State of California government entities.

Analytica

**Ex. AA-1764**

SD_817762

# 5. Expected vs Actual In-Custody Deaths

Our primary interest is to determine if countywide mortality rates can help explain total in-custody county deaths. Now that we have mortality rates for the different demographic groups in these counties and know what proportion of these groups are in jails, we can calculate the expected total jail deaths between 2010-2020.[12] We generate expected total deaths for each manner of death as well as overall total deaths. While these expected total deaths account for the underlying health conditions of the surrounding county population, they do not capture some of the unique problems among incarcerated individuals like substance abuse, poor mental health, and chronic/communicable diseases (Binswanger, Krueger, and Steiner 2009;Faze and Danesh 2002;Vaughn et al. 2014). Mortality rates for people with these types of conditions are not readily available.

These expected total deaths are then compared to the actual total deaths in jails. Both measures are based on the San Diego jail population size. If actual deaths are greater than expected deaths, we classify the difference between these two values as *excess deaths.* It is these deaths that are not explained by county mortality rates. We also conduct statistical tests to determine if expected values and actual values are statistically different.[13,14]

Figure 5 first displays the results for suicides. The bars on the left represent the expected total deaths for each county jail. One helpful way to think about what this bar represents for San Diego is to imagine a town in San Diego County of about 5,000 people, 4,000 of which are men under the age of sixty. Like any other town, death is a natural part of life there, so you'd expect a certain number of people to die between 2010 and 2020. For the other counties, the bars represent what this approximately 5000-person town would look like in each respective county if the town's demographics mirrored the demographics of the county's jails.

The bars on the right compare expected total deaths to actual total deaths. We also show the number of excess deaths on the far right if the expected and actual values are statistically different. Figure 5 illustrates that the number of suicides in jails eclipses the expected number of suicides in every county, indicating that suicides are a severe problem in county jails. The disparities between these two values varies by county. The expected total number of suicides for San Diego is nine while the actual total number of suicides was 40 over this period of time. This four-fold difference of 31 excess deaths is also statistically significant. Only Contra Costa has more excess deaths than San Diego at 32 when their jail population is scaled to match the size of San Diego's jail population.

---

[13] We used Byar's approximation to test the statistical difference between expected and actual in-custody deaths. This statistical test allows us to compare an expected mortality rate to an actual one to see if they are the same. The null hypotheses for this test is that the rates are the same.

[14] Some of our statistical tests point to negative excess deaths (i.e. actual deaths are statistically less than expected deaths). See Appendix H for the full results of our statistical tests. Negative excess deaths are generally associated with some type of intervention. For example, negative excess deaths during the COVID-19 pandemic have occurred in New Zealand because the country's widespread mask wearing and social distancing also reduced deaths from things like the flu. These types of interventions in the context of county jails are beyond the scope of this study.

Analytica

**Ex. AA-1765**

SD_817763



*Figure 5: Expected vs Actual Jail Suicides between 2010 and 2020*

Overdose/accidental deaths and homicides account for a small proportion of jail deaths. Given the small sample sizes for these manners of death, many of the differences between expected and actual total deaths are not statistically significant. Figure 6 displays the results for overdose/accidental deaths in jail. Here San Diego is one of the counties with a high number of excess deaths. In fact, it has the highest number of excess deaths at 14 out of all the counties in this study. The number of actual deaths is double the number of expected deaths and is the only difference that is statistically significant.



*Figure 6: Expected vs Actual Jail Accidental Deaths between 2010 and 2020*

Analytica
CONSULTING

**Ex. AA-1766**

SD_817764

It is clear from the bar graphs on the right in Figure 7 that homicides occur infrequently in county jails. For this manner of death, San Diego has the highest number of excess deaths at three although expected and actual values are not statistically different. No other county has more homicides than what is projected by their countywide mortality rates. Riverside County's actual deaths equal their expected deaths.



*Figure 7: Expected vs Actual Jail Homicides between 2010 and 2020*

Figure 8 displays the results for natural deaths. Based on the bars on the right, actual deaths are lower than expected deaths for every county. In other words, natural deaths in jails are lower than what we would expect based on each county's mortality rates over the past decade. For example, we projected that San Diego County would have 90 natural deaths between 2010-2020. The actual number of deaths was only 65. San Francisco and Contra Costa counties are considerably below their projected number of deaths. These differences may be explained by people with certain medical conditions being deemed not fit for jail, and therefore, not being booked; however, more research is required to better understand this phenomenon.



*Figure 8: Expected vs Actual Jail Natural Deaths between 2010 and 2020*

Analytica
CONSULTING

Ex. AA-1767

SD_817765

The last figure presents the overall total deaths. Based on Figure 9, San Diego County has the highest number of excess deaths out of all 12 counties. Specifically, 24 in-custody deaths cannot be explained by county mortality rates. When scaled to the size of San Diego's jail population, both Fresno County and Santa Clara County have the closest number of excess deaths at three. Unlike San Diego, the differences for these two counties are not statistically significant. The remaining counties on Figure 9 have fewer total deaths than what is projected by countywide mortality rates



*Figure 9: Overall Expected vs Actual Jail Deaths between 2010 and 2020*

Together, these figures suggest that those in-custody in San Diego County jails are at a greater risk of death than those in-custody in other California counties. Our analysis suggests that the number of deaths in San Diego jails easily surpasses the number of deaths one would expect based on the county's mortality rates. In other words, even after controlling for county mortality rates and jail population, San Diego still has the highest number of total deaths out of the 12 most populous counties in California.

That said, our analysis indicates the level of risk in San Diego jails varies among the different manners of death. This risk is the highest for overdose/accidental deaths. Inmates in San Diego jails may also be at greater hazard for homicides than in other county jails; however, the low sample sizes don't give us sufficient evidence to say with confidence. Finally, the risk for suicides in San Diego jails is high but not dissimilar to other counties in this study. San Diego is one of a handful of counties that report a large number of excessive suicides in their jails.

Analytica
CONSULTING

**Ex. AA-1768**

SD_817766

# 6. Differences Between Unsentenced and Sentenced Inmates

Up to this point, this study has examined deaths among the overall jail population without making any distinctions between inmates themselves. One important distinction we can measure and may impact death rates is whether an inmate has been sentenced for the crime(s) for which they have been charged. Generally, those sentenced have been in jail longer than those not yet sentenced. Unfortunately, arrest dates and booking dates are not collected by the state's reporting of in-custody deaths; however, the sentenced/unsentenced classification offers a rough approximation of who has been in jail for longer periods of time. To consider the length of time an inmate has been in jail, we conduct the same expected vs actual analysis comparing unsentenced and sentenced inmates.



*Figure 10: Overall Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced*

Figure 10 shows the extent to which the unsentenced/sentenced distinction matters to in-custody deaths. This figure summarizes overall deaths. The bar graphs for unsentenced inmates on the left reveal that San Diego jails had 51 excess deaths among this group. The difference between actual and expected total deaths are statistically significant for the county. Kern, Fresno, Santa Clara, and Orange county jails also have more actual deaths than expected deaths but these differences do not reach the level of statistical significance. The bar graphs on the right for sentenced inmates present a contradictory account. All county jails including San Diego have fewer deaths than what is expected based on county mortality rates.

We also conduct this same analysis for each manner of death. The disparities in excess deaths between unsentenced and sentenced inmates varies by the manner of death. On one hand, Figure 11 shows relatively small differences in natural deaths between these two groups. San Diego is the only county with actual natural deaths exceeding expected natural deaths. On the other hand, Figure 12 shows vast differences in suicides between the sentenced and unsentenced. This figure demonstrates how vulnerable the unsentenced are to suicide. Actual total deaths far exceed the expected total deaths in every county. San Diego is the most lopsided county in this regard. The number of actual suicides is nearly seven times the expected suicides. Only a few counties have excess suicides among the sentenced population.

Analytica

**Ex. AA-1769**

SD_817767



Figure 11: Natural Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced



Figure 12: Suicide Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced

The gaps in overdose/accidental deaths and homicides among the unsentenced and sentenced are more subtle. Figure 13 confirms excess overdose and accidental deaths occur for both unsentenced and sentenced in several counties although there are more overall deaths among those not sentenced. Riverside and San Diego jails have the highest numbers of excess deaths among the unsentenced. Finally, Figure 14 presents a mixed picture for homicides. Among inmates not sentenced, San Diego is the only county with actual total deaths exceeding expected total deaths. Among inmates sentenced, both Sacramento and Riverside counties have more actual deaths than what is expected.

Overall, these findings strongly suggest that those not yet sentenced and in jail less time are more at risk of death than those sentenced and in jail longer. Specifically, these unsentenced inmates are at greater risk of suicide and overdose/accidental deaths. From a policy perspective, these findings highlight the

Analytica
CONSULTING

Ex. AA-1770

SD_817768

importance of providing support for inmates at critical times during their jail incarceration, including when they first enter jail and when they are found guilty but not yet sentenced for a crime.



Figure 13: Overdose/Accidental Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced



Figure 14: Homicide Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced

Analytica
CONSULTING

Ex. AA-1771

SD_817769

# 7. Future Research

The focus of this project has been to consider countywide mortality rates in evaluating in-custody deaths in San Diego and other counties. Toward this end, we have collected and analyzed an extensive amount of data to examine the complex relationships between jail deaths and county mortality rates. As with any research project, this focus has certain limitations that we hope future research can meaningfully address.

First, the questions we could pursue in this study were limited by the data that was available. In estimating county mortality rates, we stratify county populations by several important demographic factors and manners of death. To obtain more precise county mortality rates, other factors should be included in these rates. For example, incorporating the impact of homelessness, mental illness, and other health-related conditions would add more granularity to these mortality rates. Currently, these data are not readily available.

In addition, this study was constrained by time and scope. While our research has delineated the differences in deaths among county jails, we have yet to explain *why* they are different. The latter necessitates analyzing the operations and specific policies of county jails, which are also likely to vary considerably from county to county. Throughout this project, we have amassed data to begin to measure this dimension including:

- Current and rated capacity of each detention facility
- Number of assaults on law enforcement
- Utilization of medical and mental health services among inmates
- Number of mental and health care staff in detention facilities
- Individual-level booking data with a record of admissions and releases

In particular, the data above could be utilized to generate a snapshot of a detention facility at a given moment in time. This snapshot could help county leadership and investigators understand what was happening in a facility at the time a death occurs. Below are sample visualizations of two of these factors that could potentially be part of an operational dashboard. Figure 15 graphs the actual ADP with the rated capacity over time for detention facilities in San Diego.

San Diego County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 15: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021)*

Analytica
CONSULTING

Ex. AA-1772

SD_817770

Figure 16 charts the average number of bookings and releases over the course of a day in San Diego jails. This figure shows spikes in the number of releases at 8 am and 8 pm. Dynamically tracking these types of changes would offer insights into the pressure points in the day-to-day operations of detention facilities, instances in which facilities may lack sufficient staffing or support.



*Figure 16: Average Number of Bookings and Releases by Hour of Day in San Diego County (2010-2020)*

Finally, this project does not touch upon the complex interactions between race and in-custody deaths. We have confirmed that arrest rates and jail populations are heavily skewed toward racial-ethnic minorities. But how does this disproportionality in jails impact the nature and events leading up to these deaths? Expanding the analysis to discern differences in these deaths based on the race of victims could introduce another set of overlooked factors into this body of research.

**Suggested Areas of Research for Future In-Custody Deaths Studies**

1.  When are inmates most vulnerable to the risk of death? Is it after they are first admitted to jail, after they are found guilty of the crime, or based on another important event?

2.  What are the in-custody death rates among inmates with a history of mental illness?

3.  What is the underlying relationship between mental health services in jails and in-custody deaths? Does having more available mental health services and related staff reduce in-custody deaths?

4.  What role do law enforcement staffing levels play in the number of in-custody deaths?

5.  What institutional stresses are associated with in-custody deaths including:

    a)  Overcapacity of a jail facility

    b)  Processing of new admissions and releases

    c)  Frequency of assaults on staff

    d)  Extraordinary events such as the COVID-19 pandemic

6.  Is there a relationship between re-admissions and in-custody deaths at both an individual and facility level?

7.  Are in-custody deaths more prevalent among those charged with a certain type of crime?

8.  Does the race, gender or age of an inmate play a role in the circumstances surrounding in-custody deaths and subsequent investigations?

9.  What has been the impact of new programs enacted by the San Diego Sheriff's Department on in-custody deaths over time?

10. Why is there a lag in reporting the manner of an in-custody death in several counties?

Analytica
CONSULTING

**Ex. AA-1773**

SD_817771

11. What is the role of county mental health services and other public services such as public housing on jail deaths?

12. How does the fact that San Diego is a border town impact in-custody deaths? Are these issues present in other border towns?

13. What are the in-custody death rates among inmates with a history of homelessness?

14. What is the impact of compassionate releases on the nature and number of in-custody deaths?

15. How has realignment in California in 2011 shaped in-custody deaths in county jails?

Analytica

Ex. AA-1774

SD_817772

# References

Abderhalden, Frances P. 2022. "Challenging Normal Science: An Interdisciplinary Approach to Jailed Individuals Self-Report of Lifetime and in-Jail Suicidal Ideations." *Crime &Amp; Delinquency.*

Binswanger, I A, P M Krueger, and J F Steiner. 2009. "Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the Usa Compared with the General Population." *Journal of Epidemiology and Community Health.* 63 (11): 912–19.

Bird, Mia, Magnus Lofstrom, Brandon Martin, Steven Raphael, and Viet Nguyen. 2018. *The Impact of Proposition 47 on Crime and Recidivism*. Public Policy Institute of California.

Brannon, Matt. 2020. "Analysis Reveals Disparities Among Death Rates in California County Jails." *Redding Record Searchlight*, October. https://eu.redding.com/in-depth/news/local/2020/10/02/california-jails-inmate-deaths-shasta-county-mental-health-care/5539531002/.

Carson, Elizabeth. 2021. *Your Feedback on Measures of Inmate Mortality Rates.*

Close, Melanie, Olive Lu, Shannon Tomascak, Preeti Chauhan, and Erica Bond. 2021. *Understanding Trends in Jail Populations, 2014 to 2019: A Multi-Site Analysis*. Data Collaborative for Justice. John Jay College of Criminal Justice.

California Department of Finance. 2021. "P-3: Complete State and County Projections Dataset." July. Accessed January 2022. https://dof.ca.gov/forecasting/demographics/projections/.

Faze, S, and J Danesh. 2002. "Serious Mental Disorder in 23000 Prisoners: A Systematic Review of 62 Surveys." *Lancet* 359 (9306): 545–50.

"Jail Inmates in 2020 – Statistical Tables." 2021. US Bureau of Justice Statistics. https://bjs.ojp.gov/content/pub/pdf/ji20st.pdf.

Kelly, Colleen. 2018. *REVIEW AND CRITIQUE OF THE DISABILITY RIGHTS CALIFORNIA'S REPORT.*

McDonald, Jeff, Kelly Davis, and Lauryn Schroeder. 2019. "Rate of Jail Inmate Deaths in San Diego County Far Exceeds Other Large California Counties." *The San Diego Union Tribune*, September. https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-behind-bars-san-diego-county-jail-deaths.

Subramanian, Ram, Kristine Riley, and Chris Mai. 2018. *Divided Justice: Trends in Black and White Jail Incarceration, 1990-2013*. Vera Institute of Justice.

Tonry, Michael H. 2011. *Punishing Race: A Continuing American Dilemma*. Oxford University Press.

"Underlying Cause of Death Data, 1999-2020." 2021. Centers for Disease Control; Prevention. https://wonder.cdc.gov/ucd-icd10.html.

Vaughn, Michael, Christopher P Salas-wright, Matt Delisi, and Alex R Piquero. 2014. "Health Associations of Drug-Involved and Criminal-Justice-Involved Adults in the United States." *Criminal Justice and Behavior* 41 (3): 318–36.

2022. *San Diego Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody*. California State Auditor.

Analytica

Ex. AA-1775

SD_817773

# Appendix A: Selection of Counties

Following the approach of other studies examining in-custody deaths in California, we compare San Diego County to other populous counties in the State. These counties include Kern, Fresno, Alameda, Sacramento, San Francisco, Orange, Los Angeles, San Bernardino, Riverside, Contra Costa, and Santa Clara.

We decided to choose these counties for this study because they have an adequate number of in-custody deaths between 2010-2020 for us to conduct a rigorous statistical analysis. The number of deaths in each of these counties roughly correspond to their ADP population. See the table below for select characteristics of the 20 most populous counties in California. Our selection of counties is in bold.

Our primary interest in using these counties is to explore the relationships between their in-custody deaths and countywide mortality rates. These mortality rates are the only areas of county variation we examine in relation to jail deaths in this study.

*Table 2*: Select Characteristics of Most Populous California Counties (2010-2020)

| County | Total Jail Deaths | Population | Avg Yearly Bookings | Avg Yearly ADP |
|---|---|---|---|---|
| **Los Angeles** | **290** | **11,026,820** | **115,514** | **16,504** |
| **San Diego** | **141** | **3,559,702** | **80,535** | **5,231** |
| **Orange** | **81** | **3,427,546** | **57,295** | **5,895** |
| **Riverside** | **78** | **2,553,899** | **52,013** | **3,735** |
| **San Bernardino** | **94** | **2,317,913** | **65,529** | **5,448** |
| **Santa Clara** | **65** | **2,081,267** | **41,058** | **3,428** |
| **Alameda** | **67** | **1,761,754** | **45,232** | **2,871** |
| **Sacramento** | **48** | **1,631,895** | **42,998** | **3,832** |
| **Contra Costa** | **28** | **1,216,381** | **23,424** | **1,383** |
| **Fresno** | **72** | **1,072,876** | **33,706** | **2,733** |
| **Kern** | **55** | **963,614** | **32,320** | **2,253** |
| **San Francisco** | **25** | **944,846** | **19,058** | **1,284** |
| Ventura | 38 | 919,196 | 27,762 | 1,496 |
| San Mateo | 12 | 828,364 | 14,723 | 954 |
| San Joaquin | 25 | 799,517 | 22,823 | 1,314 |
| Stanislaus | 40 | 588,189 | 19,177 | 1,150 |
| Sonoma | 24 | 540,923 | 16,878 | 1,005 |
| Tulare | 19 | 506,732 | 21,083 | 1,526 |
| Santa Barbara | 18 | 481,891 | 14,946 | 929 |
| Monterey | 25 | 472,944 | 12,185 | 941 |

Analytica

# Appendix B: ADP vs. ARP

Average daily Jail population (ADP) measures the average number of individuals in custody each day, typically reported on a monthly basis. According to the California Board of State and Community Corrections, this is calculated by taking the daily inmate count (usually at or near midnight), adding these daily counts together for the month and dividing by the number of days in that month. At-risk population (ARP) measures the number of individuals admitted to a detention facility.

**Table 3**: ADP vs. ARP by County (2011-2020)

| County | Avg Yearly ADP | Avg Yearly ARP | ARP/ADP Ratio |
|---|---|---|---|
| Alameda | 2,872 | 48,148 | 17 |
| Contra Costa | 1,383 | 24,802 | 18 |
| Fresno | 2,733 | 36,378 | 13 |
| Kern | 2,254 | 34,586 | 15 |
| Los Angeles | 16,505 | 131,953 | 8 |
| Orange | 5,896 | 63,156 | 11 |
| Riverside | 3,735 | 55,741 | 15 |
| Sacramento | 3,833 | 46,821 | 12 |
| San Bernardino | 5,448 | 70,901 | 13 |
| San Diego | 5,232 | 85,726 | 16 |
| San Francisco | 1,284 | | |
| Santa Clara | 3,428 | 48,124 | 14 |

This is typically calculated by adding the inmate count at the beginning of the year with the total bookings for each month. As a result, a county's ARP is much higher than their ADP. The vast difference between these two denominators would certainly impact the standardized in-custody death rate. See below (the dates of 2011-2020 were selected because San Diego County changed how they measured bookings in 2010).

ARP comes with the advantage of measuring new and potentially high-risk entrants into the jail system; however, it does not measure unique inmates in jails over time. A significant portion of those admitted to county jails will be re-booked within a short period of time. For example, Public Policy Institute of California found that the two-year rearrest rate was 70.8% for 12 California counties in 2011-2012 (Bird et al. 2018). Comparable studies on other counties in other states point to similar results (Close et al. 2021).

ADP addresses this shortcoming by measuring unique persons in-custody. Neither measure reflects inmates' length of stay, which would require individual-level data. Bereft of an individual-level data set that would allow of the calculation of unique person-days exposed, the U.S. Bureau of Justice Statistics believes "ADP is the best alternative." (Carson 2021) (See Appendix I for the correspondence between Analytica Consulting and the U.S. Bureau of Justice Statistics.)

While we use ADP per the BJS guidance, ADP data is not available by demographic group, which is a key dimension of our analysis. We therefore assume the makeup of arrestees fairly represents the jail population for a given year, and apply arrest proportions by demographic group to estimate ADP by group (see Appendix D).

Analytica

**Ex. AA-1777**

SD_817775

# Appendix C: A Closer Look at Overdose/Accidental Deaths

Overdose/accidental death is a manner of death that includes various types of circumstances. While we exclude transportation-related accidents from this category, there are still several distinct types of accidents. The tables below break down these deaths further.

It is clear from both tables that drug overdoses make up a substantial portion of these deaths. For example, drug overdoses are 89% of deaths in San Diego jails and 76% of deaths among San Diego's general population.

*Table 4: A Closer Look at Overdose/Accidental Jail Deaths, 2010-2020*

| County | Total Accidental Deaths | Drug Overdose | Choking / Asphyxiation | Medically Related | Other / Pending | Fall or Blunt Force |
|---|---|---|---|---|---|---|
| Alameda | 11 | 72.7% | 9.1% | 9.1% | 9.1% | – |
| Contra Costa | 1 | 100.0% | – | – | – | – |
| Fresno | 9 | 88.9% | – | – | 11.1% | – |
| Kern | 7 | 57.1% | – | – | 42.9% | – |
| Los Angeles | 47 | 66.0% | 2.1% | 8.5% | 14.9% | 8.5% |
| Orange | 10 | 80.0% | 10.0% | – | – | 10.0% |
| Riverside | 16 | 87.5% | – | 6.2% | – | 6.2% |
| Sacramento | 7 | 57.1% | – | 14.3% | 14.3% | 14.3% |
| San Bernardino | 8 | 12.5% | – | – | 87.5% | – |
| San Diego | 27 | 88.9% | – | – | 11.1% | – |
| San Francisco | 4 | 75.0% | – | – | 25.0% | – |
| Santa Clara | 3 | 66.7% | – | – | 33.3% | – |
| | 150 | 72.0% | 2.0% | 4.7% | 16.7% | 4.7% |

*Table 5: Countywide Accidental Death Breakdown (1999-2020)*

| County | Deaths per 10k/year | Drug Overdose | Choking / Asphyxiation | Medically Related | Other* | Fall or Blunt Force |
|---|---|---|---|---|---|---|
| Alameda | 1.7 | 75.1% | 2.8% | – | 15.0% | 7.0% |
| Contra Costa | 1.8 | 76.8% | 1.4% | – | 13.8% | 8.0% |
| Fresno | 2.2 | 75.7% | 1.0% | – | 17.0% | 6.3% |
| Kern | 3.2 | 83.7% | 1.3% | – | 10.1% | 5.0% |
| Los Angeles | 1.5 | 73.0% | 1.7% | – | 14.4% | 11.0% |
| Orange | 1.6 | 78.7% | 2.3% | – | 10.6% | 8.4% |
| Riverside | 2.2 | 78.4% | 1.5% | – | 13.0% | 7.1% |
| Sacramento | 2.3 | 75.3% | 2.1% | – | 16.3% | 6.3% |
| San Bernardino | 1.3 | 60.8% | 1.7% | – | 24.8% | 12.6% |
| San Diego | 2.0 | 76.4% | 1.6% | – | 12.8% | 9.2% |
| San Francisco | 3.0 | 84.8% | 1.6% | – | 7.1% | 6.5% |
| Santa Clara | 1.2 | 70.5% | 2.5% | – | 17.2% | 9.8% |
| | 1.8 | 75.4% | 1.8% | | 13.9% | 8.9% |

*Mostly consists of drownings, fire/smoke exposure, electrocution, firearm discharges, and poisoning (non-overdose)

Analytica

Ex. AA-1778

SD_817776

# Appendix D: Estimated vs Actual San Diego Jail Population

We estimate county jail populations using a combination of arrest and average daily jail population (ADP) data. To assess the accuracy of these estimates, we compared them with the actual San Diego average daily jail population (ADP). We calculated San Diego's actual ADP using detailed booking data from 2010-2022 provided by the San Diego Sheriff's Department (SDSD). To ensure our ADP calculations didn't exclude people booked before our data began in 2010 and who are still in jail, our estimates are for years 2014-2020. Additionally, the age groups in the data provided by SDSD did not exactly match the age groups in our data (e.g., 18-30 vs. 18-29).

This comparison was only used to validate our assumptions since we did not have detailed booking data for other counties. We still use our estimates for the analysis, so our approach is the same for each county in the study.

Below are these comparisons for the five different age groups in our data set.

**Table 6**: Actual vs Estimated San Diego ADP (Ages 18-29, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 18-30) | Estimated (Age 18-29) |
|---|---|---|---|
| M | Hispanic | 17.1% | 14.0% |
| M | White | 9.0% | 9.5% |
| M | Black | 6.7% | 5.7% |
| F | White | 2.7% | 3.7% |
| F | Hispanic | 2.2% | 3.2% |
| M | Other | 1.7% | 1.8% |
| F | Black | 1.0% | 1.6% |
| F | Other | 0.3% | 0.6% |
| Total | - | 40.6% | 40.1% |

**Table 7**: Actual vs Estimated San Diego ADP (Ages 30-39, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 31-40) | Estimated (Age 30-39) |
|---|---|---|---|
| M | Hispanic | 9.2% | 8.1% |
| M | White | 8.5% | 8.8% |
| M | Black | 4.3% | 3.7% |
| F | White | 2.4% | 3.1% |
| F | Hispanic | 1.6% | 2.0% |
| M | Other | 1.6% | 1.5% |
| F | Black | 0.8% | 1.0% |
| F | Other | 0.3% | 0.5% |
| Total | - | 28.7% | 28.8% |

**Table 8**: Actual vs Estimated San Diego ADP (Ages 40-49, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 41-50) | Estimated (Age 40-49) |
|---|---|---|---|
| M | White | 6.1% | 7.8% |
| M | Hispanic | 4.2% | 3.7% |
| M | Black | 3.1% | 3.4% |
| F | White | 1.7% | 2.4% |
| M | Other | 1.0% | 1.0% |
| F | Hispanic | 0.7% | 0.9% |
| F | Black | 0.5% | 0.7% |
| F | Other | 0.1% | 0.3% |
| Total | - | 17.5% | 20.2% |

**Table 9**: Actual vs Estimated San Diego ADP (Ages 50-59, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 51-60) | Estimated (Age 50-59) |
|---|---|---|---|
| M | White | 4.5% | 3.1% |
| M | Black | 2.5% | 1.4% |
| M | Hispanic | 1.9% | 1.5% |
| F | White | 0.8% | 0.9% |
| M | Other | 0.4% | 0.4% |
| F | Black | 0.3% | 0.3% |
| F | Hispanic | 0.2% | 0.4% |
| F | Other | 0.0% | 0.1% |
| Total | - | 10.6% | 8.0% |

**Table 10**: Actual vs Estimated San Diego ADP (Ages 60+, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 61+) | Estimated (Age 60+) |
|---|---|---|---|
| M | White | 1.2% | 1.2% |
| M | Black | 0.5% | 0.5% |
| M | Hispanic | 0.4% | 0.5% |
| F | White | 0.2% | 0.4% |
| M | Other | 0.1% | 0.2% |
| F | Hispanic | 0.1% | 0.1% |
| F | Black | 0.0% | 0.1% |
| F | Other | 0.0% | 0.0% |
| Total | - | 2.6% | 2.9% |

Analytica

**Ex. AA-1779**

SD_817777

# Appendix E: Peer-Review Letters



**UC San Diego**
HEALTH SCIENCES

March 18, 2022

To Whom It May Concern:

I am writing this letter to endorse the statistical methods used in the draft "In-Custody Death Study". This draft and supporting materials are authored by Analytica Consulting. This analysis uses county mortality rates to estimate the total number of expected jail deaths between 2010-2020 in San Diego and other large counties in California. It then statistically compares the values of expected jail deaths with the values of actual jail deaths.

My area of expertise is in biostatistics including statistical data interpretation and statistical modeling. I am a Professor of Biostatistics, Department of Family Medicine and Public Health, Director of Biostatistics at the Stein Institute for Research on Aging, and Co-Director of the UCSD CTRI Biostatistics Core, UCSD. I hold a master's and PhD in statistics and numerical analysis from Duke University and completed postdoctoral studies at Harvard School of Public Health. I have co-authored over 290 peer-reviewed publications, two textbooks and two edited volumes in the fields of U- statistics, categorical data analysis, clinical trials, and social network analysis. My research on statistical methodology includes a wide range of topics such as semiparametric models for longitudinal data with informative missing follow-up data, causal inference, and high throughput data.

I have peer-reviewed the draft "In-Custody Death Study" and the underlying statistical methods. Based on my thorough reading of these materials, I find that the statistical methods utilized are appropriate and sound. In particular, the authors' use of Byar's approximation to test the statistical difference between expected and actual death rates in county jails is the best methodological approach for comparing these values. This method produces results that are both valid and instructive.

Please contact me if you have any questions regarding this professional endorsement.

Sincerely,

Professor of Biostatistics
Division of Biostatistics and Bioinformatics
Herbert Wertheim School of Public Health and Human Longevity Science
UC San Diego Institute for Research on Aging
UC San Diego CTRI Biostatistics
UC San Diego Health Sciences
Naval Health Research Center
E-mail:  x2tu@health.ucsd.edu

Herbert Wertheim School of Public Health and Human Longevity Science
9500 Gilman Drive #0628, La Jolla, California 92093-0628 Tel: (858) 534-8363 Fax: (858) 534-7517

Analytica
CONSULTING

**Ex. AA-1780**

SD_817778



School of Criminal Justice and Criminalistics

March 25, 2022

To Whom it May Concern:

I was requested to ad hoc peer review the In-Custody Death Study from Analytica Consulting. My expertise on custody related deaths includes: 16 peer-reviewed publications, long term three-phase suicidal behaviors project with the Illinois Department of Corrections which includes Governor approval, partnership with three large urban jail facilities to evaluate risk on death in custody and self-reported information, expert witness consulting on high profile death by suicide cases within jails and prisons, consulting on national and international suicide prevention and intervention programs, grants, and scholarship. As such, I provided feedback, recommendations, and suggestions on the In-Custody Death Study.

Overall, my review finds that this report is well-done, appropriately analyzed, and to the same rigor and standard of much larger national reviews on death in custody. The findings align well within the empirical literature surrounding in-custody mortality rates, and suggest that the counties under study in this report are similar to national death records for incarcerated populations. However, the findings also suggest some insight into the particular populations held in Southern California jails, which provides a unique opportunity for policy recommendations related to public health, safety and security of facilities, and returning healthy citizens into the community.

Nationally, in a report by Carson (2021), between 2000 and 2019 there were 20,413 deaths in county jails in the United States, with an overall mortality rate of 142 per 100,000. By this metric, it would suggest that the counties reported in this report are consistent with deaths in custody to the national averages. In addition, nationally white non-Hispanic individuals accounted for 56% of the deaths in custody, which have a larger proportion of mortality, compared to the national level statistics (Carson, 2021). This finding is also supported in the report and the evaluation of the twelve counties in question. Interestingly, accidental deaths account for a significant number of deaths in San Diego jails, but I suggest this is simply a measurement and operationalization difference between the national level data which accounts drug overdoses as their own category, and does not consider them accidental.

The finding related to elevated suicide in San Diego, and throughout all twelve counties, is consistent with national level jail information surrounding death by suicide. While the numbers are concerning, the rate of death by suicide in the jail nationally is nearly four times as high (49 per 100,000) as the national general population rate of death by suicide (13 per 100,000) (Carson, 2021). This suggests that while suicide deaths are elevated in the twelve counties in the current report, the trend is in alignment with national reporting and not an outlier for elevated risk due to the counties themselves, rather that jail is nationally a risk factor for death by suicide. Suicide is the leading cause of death in jails annually at the national level, so this finding while extreme in first appearance with the excess deaths, is statistically, empirically, and clinically found across the board with jail incarcerated populations (Abderhalden, 2022a; 2022b).

Throughout the report, the references are appropriate and an accurate depiction of empirical evidence related to mortality in jails. The authors did a nice job incorporating the most up-to-date information in their analyses. I see no issues with how any of the information is relayed or interpreted. The analyses are strong and provide a valid and reliable approach to assessing mortality rates of expected and actual information.

In the future research section, I agree with the authors that one of the next steps for this project should be to assess *why* we see differences in death among these counties. In particular, using anecdotal evidence from some of my own ongoing work, we see

Analytica

Ex. AA-1781

SD_817779

the importance of mental and health care policies, including access to care and transitional care to be an important factor to create more protective factors related to death. In addition, shift changes and type of detention cell are important considerations to assess for the suicide deaths in custody, with relatively simple and effective policy changes, should shift times demonstrate a higher risk for death by suicide.

All of this to say, there are policy implications by the work in this report that could be considered to improve the safety and security of the facilities using health based information. In particular, policies that decrease the bodily fluid exposure of other incarcerated individuals to each other, or to correctional staff, can improve the environmental health and lead to a reduction in deaths in custody. In addition, the concern about public health is directly linked to the implications of mortality in custody, and something that this report does a nice job of capturing the differences in custody deaths compared to county mortality rates. Using this information there is a real opportunity for policy to be implemented to address this disparity and begin to work toward a lower mortality rate for incarcerated individuals.

Additionally, as the authors note, an evaluation of race and gender could be a beneficial avenue to further parse out just how these policies could be directly impactful for the specific jail populations within, and between, these twelve counties. In particular, by matching counties to each other to evaluate why San Diego has different rates of mortality compared to their counterparts, could be beneficial for resource allocation and policy recommendations in order to improve the overall health of the population.

In closing, it was a pleasure to review this empirically and statistically sound report. I have no hesitations in supporting the analyses and information provided in this report as being accurate and thorough. I would be happy to answer any further questions, or provide any additional insight, should there be any. Thank you for the opportunity to review.

Sincerely,

FRANCES P. ABDERHALDEN, PH.D.

Assistant Professor

School of Criminal Justice & Criminalistics

California State University, Los Angeles

5151 State University Drive, Los Angeles, CA 90032

E: fabderh@calstatela.edu

Office: 323.379.4698

Mobile: 630.641.9994

References

Abderhalden, F. P. (2022a). Challenging Normal Science: An Interdisciplinary Approach to Jailed Individuals Self-Report of Lifetime and in-Jail Suicidal Ideations. *Crime & Delinquency*, 00111287211072442.

Abderhalden, F. P. (2022b). Environmental and Psychological Correlates of Self-Injurious Thoughts and Behaviors among Jail Detainees. *Corrections*, 1-24.

Carson, E. A. (2021). Mortality in Local Jails, 2000-2019-Statistical Tables. *NCJ, 301368*.

Analytica

Ex. AA-1782

SD_817780

# Appendix F: Response from San Diego Sheriff's Department



## San Diego County Sheriff's Department

### William D. Gore, Sheriff



Kelly A. Martinez
Undersheriff

March 16, 2022

Michael Marks, Principal Data Scientist
Analytica Consulting
9810 Scripps Lake Dr., Suite F
San Diego, CA 92131

### ANALYTICA CONSULTING: IN-CUSTODY DEATH STUDY RESPONSE

Dear Mr. Marks,

Thank you for the statistical analysis on the San Diego Sheriff's Department's incarcerated population, specific to the number of in-custody deaths from 2010-2020. The Sheriff's Department appreciates the work of the auditors and takes this information to heart.

Acting Sheriff Martinez has made it her priority to implement best practices and to provide a safe and fully staffed work environment to care for individuals in our custody. Along those lines, she has begun to implement the recommendations from the California State Auditor's report.

The Sheriff's Department is currently working on a more rigorous health screening process upon intake as well as continued medical and mental health care for all individuals in our custody. Acting Sheriff Martinez has said and believes no one in our custody should be denied proper health care.

In addition to quality health services, high-quality safety and proof of life checks are necessary to provide incarcerated persons a safe environment. The Department is making every effort to ensure safety checks are conducted thoroughly and consistently by staff.

Already in 2022, the Sheriff's Department has implemented the following projects in our detention facilities:

- Medicated Assisted Treatment Program
- Body Worn Camera (BWC) Pilot-Program in Jail Facilities
- Upgrades to the Wireless Systems in all Jail Facilities
- Critical Incident Review Board (CIRB) also now reviewing all-natural deaths
- George Bailey Detention Facility Renovations scheduled to begin Summer 2022

*Keeping the Peace Since 1850*
Post Office Box 939062 · San Diego, California 92193-9062

Analytica
CONSULTING

**Ex. AA-1783**

SD_817781

ANALYTICA CONSULTING: IN-CUSTODY DEATH STUDY RESPONSE
Page 2
March 16, 2022

- SDSD and CLERB Memorandum of Understanding signed for CLERB Investigator to respond to in-custody death scenes and deputy involved shootings where death occurs
- Prioritizing hiring and retention of detention facilities employees

The Sheriff's Department is continuing to identify new technology, concepts, and procedures which will significantly reduce or remedy deaths occurring in detention facilities. We ask CLERB and the public to continue to work with us to make the positive changes that will shape the future of our detention facilities, and ultimately reduce the in-custody death rates.

Sincerely,

KELLY A. MARTINEZ, ACTING SHERIFF

Michelle Craig, Lieutenant
Office of the Sheriff
Division of Inspectional Services

KAM:mc

Analytica
CONSULTING

Ex. AA-1784

SD_817782

# Appendix G: Deaths in City Jails

In conducting this study, we discovered that over 100 deaths have occurred in city-run jails since 2005. These jails are classified as Type 1 facilities.[15] It is difficult to obtain current information on the inmate population of these facilities given that BSCC discontinued surveying these facilities in 2020. According to BSCC, the decision to discontinue this survey was due to several reasons including a lack of a statutory requirement to collect these data, little incentive for facilities to report these data, a poor response rate, questionable accuracy of these data, and a general lack of interest or requests for these data.

After contacting BSCC, we were able to obtain the data for Type 1 facilities from previous years of the survey (2010-2018). As the table below indicates, several counties have many of these facilities with a notably high ADP. Los Angeles County has the most facilities (62) and, on average, over 1,000 inmates in these facilities. Orange County has the second highest number of facilities (8) and over 100 inmates in these facilities at any given time. Moreover, a clear majority of the inmates in these facilities are unsentenced and thus are likely at greater risk of death.

***Table 9**: ADP and Bookings by Type 1 Facilities (2010-2018)*

| County | Type 1 Facilities | Avg ADP | Avg Unsentenced | Avg Sentenced | Avg Yearly Bookings |
|---|---|---|---|---|---|
| Alameda | 4 | 47 | 43 | 0 | 14,776 |
| Kern | 3 | 10 | 10 | 0 | 3,338 |
| Los Angeles | 62 | 1,170 | 918 | 186 | 258,917 |
| Orange | 8 | 104 | 77 | 9 | 28,550 |
| Riverside | 1 | 11 | 11 | 0 | 4,189 |
| San Bernardino | 4 | 84 | 63 | 13 | 23,997 |
| San Diego | 1 | 47 | 13 | 0 | 3,138 |

We also estimate the expected total deaths for these county Type 1 facilities. The table below compares the total expected deaths with the actual total deaths. It also reports whether the differences between these two values are statistically significant. Los Angeles, Orange, and Riverside counties all have higher total deaths than expected at statistically significant levels. These findings suggest that in-custody deaths are an issue of concern in certain county Type 1 facilities in addition to county jails.

***Table 10**: Deaths in Type 1 Facilities (2010-2020)*

| County | Actual Deaths | Expected Deaths | Mortality Ratio | 95% Conf Interval | p-value |
|---|---|---|---|---|---|
| Alameda | 2 | 1.6 | 1.28 | 0.21-4.22 | 0.67 |
| Kern | 0 | 0.3 | | | |
| Los Angeles | 48 | 30.8 | 1.56 | 1.15-2.07 | 0.00 |
| Orange | 12 | 1.8 | 6.72 | 3.47-11.73 | 0.00 |
| Riverside | 3 | 0.3 | 11.64 | 2.96-31.68 | 0.00 |
| San Bernardino | 1 | 2.3 | 0.44 | 0.02-2.18 | 0.44 |
| San Diego | 1 | 1.1 | 0.94 | 0.05-4.64 | 1.00 |

*Figure 17: County Expected vs Actual Jail Deaths Including City Jails*

---

[15] Type 1 facilities are used to detain individuals for not more than 96 hours. These facilities may also be used for short-term sentences.

Analytica
CONSULTING

Ex. AA-1785

SD_817783

# Appendix H: Detailed Results

## Expected vs Actual Statistical Test Results

Below are detailed results and confidence intervals for the statistical differences between expected and actual total in-custody deaths. Confidence intervals provide a range of values for these differences at a 95% confidence interval. Any value over one indicates that actual total deaths surpass expected total deaths in that specific county. We display confidence interval values for overall deaths, suicides, and overdose/accidental deaths.

*Table 11: Overall Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | Difference (95% Conf.) | Ratio (95% Conf.) | |
| San Diego | 141 | 117 | 24 (2 – 51) | 1.21 (1.02 – 1.43) | **0.029** |
| Santa Clara | 65 | 63 | 2 (-12 – 21) | 1.04 (0.81 – 1.33) | 0.770 |
| Fresno | 72 | 70 | 2 (-13 – 21) | 1.03 (0.82 – 1.31) | 0.786 |
| Riverside | 78 | 87 | -9 (-24 – 11) | 0.9 (0.72 – 1.13) | 0.376 |
| Kern | 55 | 63 | -8 (-21 – 9) | 0.88 (0.67 – 1.14) | 0.330 |
| Contra Costa | 28 | 39 | -11 (-16 – 10) | 0.87 (0.6 – 1.26) | 0.466 |
| Orange | 80 | 99 | -19 (-35 – 1) | 0.81 (0.64 – 1.01) | 0.059 |
| Alameda | 67 | 99 | -32 (-47 – -14) | 0.67 (0.53 – 0.86) | **0.001** |
| Los Angeles | 290 | 434 | -144 (-177 – -106) | 0.67 (0.59 – 0.75) | **<0.001** |
| San Bernardino | 94 | 147 | -53 (-70 – -31) | 0.64 (0.52 – 0.79) | **<0.001** |
| San Francisco | 25 | 59 | -34 (-41 – -19) | 0.45 (0.3 – 0.67) | **<0.001** |
| Sacramento | 48 | 117 | -69 (-81 – -53) | 0.41 (0.31 – 0.54) | **<0.001** |

*Table 12: Suicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | Difference (95% Conf.) | Ratio (95% Conf.) | |
| Contra Costa | 11 | 2 | 9 (4 – 18) | 4.77 (2.59 – 8.78) | **<0.001** |
| Alameda | 19 | 4 | 15 (8 – 26) | 4.53 (2.8 – 7.29) | **<0.001** |
| San Diego | 40 | 9 | 31 (19 – 47) | 4.44 (3.15 – 6.26) | **<0.001** |
| Fresno | 19 | 4 | 15 (7 – 26) | 4.33 (2.7 – 6.97) | **<0.001** |
| Kern | 16 | 4 | 12 (5 – 22) | 3.59 (2.16 – 5.98) | **<0.001** |
| Santa Clara | 14 | 4 | 10 (4 – 20) | 3.25 (1.88 – 5.67) | **<0.001** |
| San Francisco | 8 | 2 | 6 (1 – 13) | 3.21 (1.58 – 6.51) | **<0.001** |
| Riverside | 20 | 6 | 14 (6 – 26) | 3.2 (2.01 – 5.08) | **<0.001** |
| San Bernardino | 25 | 9 | 16 (7 – 29) | 2.69 (1.77 – 4.1) | **<0.001** |
| Los Angeles | 45 | 21 | 24 (11 – 42) | 2.14 (1.52 – 3) | **<0.001** |
| Sacramento | 10 | 8 | 2 (-2 – 11) | 1.31 (0.69 – 2.47) | 0.404 |
| Orange | 9 | 8 | 1 (-3 – 9) | 1.11 (0.57 – 2.18) | 0.756 |

Analytica
CONSULTING

Ex. AA-1786

SD_817784

*Table 13*: Overdose/Accidental Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
| | | | Difference (95% Conf.) | Ratio (95% Conf.) | |
|---|---|---|---|---|---|
| San Diego | 27 | 13 | 14 (5 – 27) | 2.09 (1.41 – 3.11) | **<0.001** |
| Riverside | 16 | 10 | 6 (-1 – 16) | 1.57 (0.95 – 2.6) | 0.076 |
| Los Angeles | 47 | 35 | 12 (0 – 30) | 1.36 (0.99 – 1.86) | 0.057 |
| Fresno | 9 | 7 | 2 (-2 – 11) | 1.29 (0.67 – 2.51) | 0.446 |
| Alameda | 11 | 9 | 2 (-3 – 11) | 1.21 (0.66 – 2.2) | 0.537 |
| San Bernardino | 8 | 9 | -1 (-5 – 7) | 0.85 (0.42 – 1.73) | 0.657 |
| Kern | 7 | 9 | -2 (-5 – 6) | 0.82 (0.39 – 1.72) | 0.592 |
| Orange | 10 | 13 | -3 (-7 – 6) | 0.79 (0.42 – 1.48) | 0.462 |
| Sacramento | 7 | 12 | -5 (-8 – 3) | 0.59 (0.28 – 1.25) | 0.167 |
| Santa Clara | 3 | 6 | -3 (-5 – 3) | 0.49 (0.16 – 1.55) | 0.218 |
| San Francisco | 4 | 8 | -4 (-7 – 1) | 0.44 (0.16 – 1.18) | 0.092 |
| Contra Costa | 1 | 4 | -3 (-4 – 3) | 0.27 (0.04 – 1.92) | 0.161 |

*Table 14*: Natural Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
| | | | Difference (95% Conf.) | Ratio (95% Conf.) | |
|---|---|---|---|---|---|
| Orange | 57 | 74 | -17 (-30 – 0) | 0.77 (0.59 – 1) | **0.048** |
| Santa Clara | 36 | 49 | -13 (-23 – 1) | 0.74 (0.53 – 1.03) | 0.073 |
| San Diego | 65 | 90 | -25 (-39 – -7) | 0.72 (0.56 – 0.93) | **0.010** |
| Fresno | 36 | 51 | -15 (-25 – -1) | 0.7 (0.51 – 0.98) | **0.036** |
| Kern | 25 | 44 | -19 (-27 – -7) | 0.57 (0.39 – 0.85) | **0.005** |
| Riverside | 36 | 64 | -28 (-38 – -14) | 0.56 (0.4 – 0.78) | **<0.001** |
| Los Angeles | 166 | 318 | -152 (-176 – -124) | 0.52 (0.45 – 0.61) | **<0.001** |
| Alameda | 33 | 69 | -36 (-45 – -22) | 0.48 (0.34 – 0.68) | **<0.001** |
| San Bernardino | 50 | 114 | -64 (-76 – -48) | 0.44 (0.33 – 0.58) | **<0.001** |
| San Francisco | 12 | 41 | -29 (-34 – -21) | 0.28 (0.16 – 0.49) | **<0.001** |
| Contra Costa | 7 | 26 | -19 (-23 – -11) | 0.27 (0.13 – 0.56) | **<0.001** |
| Sacramento | 21 | 87 | -66 (-73 – -54) | 0.24 (0.16 – 0.37) | **<0.001** |

*Table 15*: Homicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
| | | | Difference (95% Conf) | Ratio (95% Conf) | |
|---|---|---|---|---|---|
| San Diego | 8 | 5 | 3 (-1 – 12) | 1.66 (0.81 – 3.42) | 0.164 |
| Riverside | 6 | 6 | 0 (-3 – 8) | 1.06 (0.47 – 2.41) | 0.877 |
| Orange | 3 | 4 | -1 (-3 – 5) | 0.74 (0.24 – 2.37) | 0.620 |
| Sacramento | 7 | 10 | -3 (-7 – 5) | 0.7 (0.33 – 1.48) | 0.351 |
| Fresno | 5 | 7 | -2 (-5 – 5) | 0.69 (0.28 – 1.66) | 0.403 |
| San Bernardino | 6 | 13 | -7 (-11 – 0) | 0.45 (0.2 – 1.02) | **0.050** |
| Kern | 2 | 6 | -4 (-6 – 2) | 0.33 (0.08 – 1.32) | 0.098 |
| Santa Clara | 1 | 3 | -2 (-3 – 4) | 0.33 (0.05 – 2.36) | 0.244 |
| Los Angeles | 14 | 58 | -44 (-50 – -35) | 0.24 (0.14 – 0.41) | **<0.001** |
| Alameda | 3 | 17 | -14 (-16 – -8) | 0.18 (0.06 – 0.54) | **<0.001** |
| Contra Costa | 0 | 7 | – | – | – |
| San Francisco | 0 | 7 | – | – | – |

Analytica

**Ex. AA-1787**

SD_817785


**Overall Jail Deaths**
*Expected vs Actual Ratio*

**Overdose/Accidental Jail Deaths**
*Expected vs Actual Ratio*

**Suicide Jail Deaths**
*Expected vs Actual Ratio*

**Homicide Jail Deaths**
*Expected vs Actual Ratio*

*The line on either side of the point indicates the 95% confidence interval of the true value. When the 95% confidence interval does not include 1, we conclude that there is a statistically significant difference between actual and expected deaths.*

*Figure 18: Confidence Intervals of Standardized Mortality Ratios*

Analytica
CONSULTING

**Ex. AA-1788**

SD_817786

## Jail Profiles of Each County in The Study

### Alameda

*Table 16*: Top 15 Alameda County Jail Demographic Groups with Associated Death Rates

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Black | 18-29 | 14.6% | 29.7 | 4.9 | 2.3 | 2.0 | 20.4 |
| Male | Hispanic | 18-29 | 9.8% | 8.1 | 2.0 | 1.6 | 1.0 | 3.5 |
| Male | Black | 30-39 | 8.4% | 32.7 | 15.4 | 4.1 | 1.5 | 11.5 |
| Male | Black | 40-49 | 7.7% | 59.7 | 45.8 | 6.8 | 1.1 | 5.7 |
| Male | White | 18-29 | 5.8% | 6.9 | 2.1 | 2.2 | 1.8 | 0.7 |
| Male | Hispanic | 30-39 | 5.6% | 9.4 | 4.8 | 2.2 | 1.0 | 1.2 |
| Male | White | 30-39 | 4.5% | 10.4 | 5.4 | 2.4 | 2.0 | 0.5 |
| Male | White | 40-49 | 4.5% | 24.4 | 18.3 | 3.0 | 2.5 | 0.4 |
| Female | Black | 18-29 | 4.2% | 6.7 | 3.5 | 0.7 | 0.6 | 1.9 |
| Male | Other | 18-29 | 3.2% | 4.2 | 1.4 | 1.0 | 1.1 | 0.7 |
| Male | Black | 50-59 | 3.0% | 126.4 | 112.9 | 8.5 | 1.2 | 3.5 |
| Male | Hispanic | 40-49 | 2.7% | 21.1 | 16.1 | 3.0 | 0.9 | 0.9 |
| Female | Black | 30-39 | 2.5% | 15.6 | 12.0 | 2.1 | 0.5 | 0.9 |
| Male | Other | 30-39 | 2.3% | 5.8 | 3.8 | 0.7 | 0.8 | 0.4 |
| Female | White | 18-29 | 2.2% | 2.7 | 1.4 | 0.6 | 0.5 | †0.1 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



*Figure 19: Alameda County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 20: Rated Capacity vs ADP at Alameda County Detention Facilities (2010-2021)*

**Analytica**
CONSULTING

**Ex. AA-1789**

SD_817787

## Contra Costa

*Table 17*: Top 15 Contra Costa County Jail Demographic Groups with Associated Death Rates

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|-----------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Black | 18-29 | 11.4% | 30.9 | 4.4 | 2.3 | 1.5 | 22.5 |
| Male | Hispanic | 18-29 | 9.9% | 8.5 | 2.3 | 1.6 | 1.3 | 3.2 |
| Male | White | 18-29 | 9.7% | 9.0 | 2.8 | 2.9 | 2.2 | 0.9 |
| Male | White | 30-39 | 7.9% | 12.7 | 6.5 | 2.9 | 2.6 | 0.6 |
| Male | Black | 30-39 | 6.7% | 32.8 | 15.7 | 3.4 | 1.5 | 12.0 |
| Male | White | 40-49 | 6.7% | 23.6 | 17.2 | 3.3 | 2.5 | 0.5 |
| Male | Hispanic | 30-39 | 5.8% | 9.0 | 4.6 | 1.5 | 1.3 | 1.3 |
| Male | Black | 40-49 | 5.5% | 49.7 | 38.1 | 4.6 | 1.3 | 5.4 |
| Female | White | 18-29 | 3.5% | 3.7 | 1.9 | 0.9 | 0.5 | 0.3 |
| Female | Black | 18-29 | 3.3% | 7.4 | 3.6 | 1.0 | 0.7 | 2.0 |
| Female | White | 30-39 | 2.8% | 6.7 | 4.5 | 1.1 | 0.8 | 0.2 |
| Male | White | 50-59 | 2.6% | 52.4 | 45.8 | 3.4 | 2.8 | 0.2 |
| Male | Hispanic | 40-49 | 2.5% | 17.3 | 12.9 | 2.3 | 1.2 | 0.7 |
| Male | Black | 50-59 | 2.2% | 104.8 | 95.4 | 5.3 | 1.1 | 2.7 |
| Male | Other | 18-29 | 2.1% | 4.7 | 1.5 | 0.9 | 1.6 | 0.7 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



Figure 21: Contra Costa County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity

Contra Costa County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



Figure 22: Rated Capacity vs ADP at Contra Costa County Detention Facilities (2010-2021)

**Analytica**

**Ex. AA-1790**

SD_817788


**Fresno**

*Table 18*: Top 15 Fresno County Jail Demographic Groups with Associated Death Rates

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 21.9% | 8.4 | 2.8 | 1.2 | 1.4 | 2.9 |
| Male | Hispanic | 30-39 | 13.9% | 14.1 | 7.9 | 2.4 | 1.6 | 2.1 |
| Male | Hispanic | 40-49 | 6.6% | 31.6 | 24.8 | 3.8 | 1.3 | 1.5 |
| Male | White | 18-29 | 6.3% | 9.1 | 3.1 | 2.4 | 2.6 | 0.8 |
| Male | Black | 18-29 | 5.7% | 22.7 | 5.7 | 1.7 | 1.6 | 13.5 |
| Male | White | 30-39 | 5.2% | 16.6 | 9.3 | 3.7 | 2.7 | 0.6 |
| Female | Hispanic | 18-29 | 4.7% | 2.7 | 1.8 | 0.2 | 0.3 | 0.3 |
| Male | White | 40-49 | 4.2% | 34.8 | 26.0 | 5.1 | 2.8 | 0.7 |
| Female | Hispanic | 30-39 | 3.5% | 6.1 | 5.0 | 0.5 | 0.3 | 0.2 |
| Male | Black | 30-39 | 2.9% | 32.0 | 17.4 | 3.7 | 1.9 | 8.8 |
| Male | Hispanic | 50-59 | 2.6% | 72.2 | 65.8 | 4.5 | 1.0 | 0.9 |
| Female | White | 18-29 | 2.4% | 5.1 | 3.2 | 1.0 | 0.4 | 0.3 |
| Male | Other | 18-29 | 2.0% | 9.3 | 3.9 | 1.7 | 1.9 | 1.8 |
| Male | Black | 40-49 | 2.0% | 57.8 | 46.8 | 4.5 | †1.3 | 4.9 |
| Female | White | 30-39 | 1.9% | 9.4 | 6.4 | 1.9 | 0.7 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



*Figure 23: Fresno County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Fresno County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 24: Rated Capacity vs ADP at Fresno County Detention Facilities (2010-2021)*

**Analytica**
CONSULTING

**Ex. AA-1791**

SD_817789

**Kern**

*Table 19: Top 15 Kern County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 20.3% | 9.6 | 2.7 | 1.7 | 1.6 | 3.5 |
| Male | White | 18-29 | 11.0% | 12.8 | 4.3 | 4.5 | 2.8 | 1.0 |
| Male | Hispanic | 30-39 | 10.8% | 13.6 | 6.8 | 2.4 | 1.4 | 2.8 |
| Male | White | 30-39 | 7.9% | 19.9 | 9.5 | 5.7 | 3.1 | 1.5 |
| Male | White | 40-49 | 6.1% | 43.2 | 31.1 | 7.7 | 3.1 | 1.1 |
| Male | Black | 18-29 | 5.8% | 19.8 | 5.0 | 1.9 | 2.0 | 10.7 |
| Male | Hispanic | 40-49 | 4.3% | 26.4 | 19.9 | 3.5 | 1.4 | 1.5 |
| Female | White | 18-29 | 3.7% | 5.3 | 2.8 | 1.4 | 0.7 | 0.4 |
| Female | Hispanic | 18-29 | 3.7% | 3.2 | 2.1 | 0.4 | 0.2 | 0.4 |
| Female | White | 30-39 | 2.9% | 14.1 | 9.0 | 3.6 | 1.0 | 0.4 |
| Male | Black | 30-39 | 2.8% | 23.0 | 11.9 | 3.3 | †1.0 | 6.6 |
| Female | Hispanic | 30-39 | 2.5% | 6.4 | 5.1 | 0.6 | 0.2 | 0.5 |
| Male | White | 50-59 | 2.4% | 100.7 | 85.1 | 9.9 | 4.6 | 0.8 |
| Male | Black | 40-49 | 2.0% | 46.2 | 35.0 | 5.6 | †1.1 | 4.2 |
| Female | White | 40-49 | 1.8% | 31.3 | 24.5 | 4.8 | 1.5 | 0.3 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



*Figure 25: Kern County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Kern County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 26: Rated Capacity vs ADP at Kern County Detention Facilities (2010-2021)*

**Analytica**

**Ex. AA-1792**

SD_817790

## Los Angeles

*Table 20: Top 15 Los Angeles County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|-----------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 22.5% | 9.1 | 2.7 | 1.3 | 1.1 | 3.9 |
| Male | Hispanic | 30-39 | 11.6% | 11.9 | 7.1 | 1.9 | 1.0 | 1.8 |
| Male | Black | 18-29 | 8.4% | 22.1 | 5.2 | 1.4 | 1.5 | 13.9 |
| Male | Hispanic | 40-49 | 5.5% | 24.6 | 19.8 | 2.8 | 0.9 | 1.1 |
| Male | White | 18-29 | 4.9% | 7.1 | 2.3 | 2.4 | 1.5 | 0.8 |
| Female | Hispanic | 18-29 | 4.7% | 2.4 | 1.7 | 0.2 | 0.2 | 0.3 |
| Male | Black | 30-39 | 4.3% | 30.0 | 16.4 | 2.5 | 1.7 | 9.2 |
| Male | Black | 40-49 | 4.1% | 57.0 | 45.2 | 4.3 | 1.4 | 5.7 |
| Male | White | 40-49 | 3.8% | 28.8 | 21.6 | 3.8 | 2.7 | 0.5 |
| Male | White | 30-39 | 3.8% | 12.3 | 6.6 | 3.0 | 2.0 | 0.6 |
| Female | Hispanic | 30-39 | 2.6% | 5.0 | 4.2 | 0.3 | 0.2 | 0.3 |
| Female | Black | 18-29 | 2.4% | 6.0 | 4.0 | 0.4 | 0.3 | 1.2 |
| Male | Hispanic | 50-59 | 2.2% | 55.9 | 51.4 | 2.9 | 0.9 | 0.7 |
| Female | White | 18-29 | 1.8% | 2.8 | 1.5 | 0.7 | 0.4 | 0.2 |
| Male | Black | 50-59 | 1.6% | 124.0 | 113.3 | 6.0 | 1.3 | 3.3 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



*Figure 27: Los Angeles County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 28: Rated Capacity vs ADP at Los Angeles County Detention Facilities (2010-2021)*

Analytica

**Ex. AA-1793**

SD_817791

## Orange

*Table 21: Top 15 Orange County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 20.0% | 6.5 | 2.5 | 1.4 | 0.9 | 1.6 |
| Male | White | 18-29 | 11.8% | 8.1 | 2.6 | 3.2 | 1.8 | 0.3 |
| Male | Hispanic | 30-39 | 9.3% | 9.1 | 5.7 | 1.8 | 0.8 | 0.7 |
| Male | White | 30-39 | 7.5% | 11.9 | 6.1 | 3.2 | 2.2 | 0.2 |
| Male | White | 40-49 | 7.4% | 23.9 | 17.3 | 3.6 | 2.6 | 0.2 |
| Female | White | 18-29 | 4.7% | 3.1 | 1.5 | 0.9 | 0.5 | 0.1 |
| Female | Hispanic | 18-29 | 4.2% | 2.1 | 1.4 | 0.3 | 0.2 | 0.2 |
| Male | Hispanic | 40-49 | 4.1% | 18.6 | 15.0 | 2.2 | 0.8 | 0.5 |
| Female | White | 30-39 | 3.0% | 6.2 | 4.1 | 1.1 | 0.7 | 0.1 |
| Male | White | 50-59 | 2.9% | 54.0 | 46.5 | 3.8 | 3.2 | 0.2 |
| Male | Other | 18-29 | 2.7% | 3.8 | 1.4 | 0.9 | 1.0 | 0.4 |
| Male | Black | 18-29 | 2.4% | 8.2 | 3.0 | 1.8 | 1.8 | 1.5 |
| Female | White | 40-49 | 2.4% | 15.0 | 11.7 | 1.9 | 1.1 | 0.1 |
| Female | Hispanic | 30-39 | 2.2% | 4.1 | 3.3 | 0.4 | 0.2 | 0.1 |
| Male | Other | 30-39 | 1.8% | 6.1 | 4.0 | 0.8 | 1.0 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



*Figure 29: Orange County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Orange County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 30: Rated Capacity vs ADP at Orange County Detention Facilities (2010-2021)*

Analytica
CONSULTING

**Ex. AA-1794**

SD_817792

## Riverside

**Table 22**: *Top 15 Riverside County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 19.6% | 8.2 | 2.8 | 1.7 | 1.4 | 2.3 |
| Male | Hispanic | 30-39 | 11.0% | 11.4 | 6.4 | 2.3 | 1.2 | 1.4 |
| Male | White | 18-29 | 9.7% | 10.1 | 3.5 | 3.2 | 2.5 | 0.8 |
| Male | White | 30-39 | 6.7% | 16.1 | 8.8 | 3.8 | 2.7 | 0.7 |
| Male | White | 40-49 | 6.2% | 35.0 | 26.0 | 5.0 | 3.2 | 0.6 |
| Male | Black | 18-29 | 5.5% | 14.4 | 5.3 | 2.1 | 1.5 | 5.4 |
| Male | Hispanic | 40-49 | 5.0% | 22.2 | 17.2 | 3.1 | 1.0 | 0.8 |
| Female | Hispanic | 18-29 | 4.1% | 2.6 | 1.7 | 0.3 | 0.3 | 0.3 |
| Female | White | 18-29 | 3.6% | 4.2 | 2.2 | 1.1 | 0.6 | 0.2 |
| Male | Black | 30-39 | 2.9% | 20.0 | 11.8 | 2.3 | 1.3 | 4.4 |
| Female | Hispanic | 30-39 | 2.8% | 5.2 | 4.2 | 0.5 | 0.2 | 0.2 |
| Female | White | 30-39 | 2.6% | 9.5 | 6.6 | 1.8 | 0.8 | 0.3 |
| Male | White | 50-59 | 2.4% | 79.6 | 69.1 | 6.0 | 3.9 | 0.5 |
| Female | White | 40-49 | 2.1% | 21.9 | 17.7 | 2.6 | 1.2 | 0.3 |
| Male | Black | 40-49 | 2.0% | 38.3 | 31.6 | 2.9 | 1.2 | 2.3 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



*Figure 31: Riverside County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 32: Rated Capacity vs ADP at Riverside County Detention Facilities (2010-2021)*

## Sacramento

*Table 23*: *Top 15 Sacramento County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|------------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Black | 18-29 | 11.8% | 18.5 | 5.2 | 2.5 | 1.9 | 8.8 |
| Male | White | 18-29 | 10.7% | 9.2 | 3.3 | 2.3 | 2.3 | 1.0 |
| Male | White | 30-39 | 8.7% | 15.2 | 7.9 | 3.2 | 3.0 | 0.8 |
| Male | Hispanic | 18-29 | 7.4% | 8.3 | 2.1 | 1.7 | 1.3 | 3.1 |
| Male | White | 40-49 | 6.9% | 35.0 | 25.5 | 4.6 | 3.7 | 0.8 |
| Male | Black | 30-39 | 6.6% | 25.7 | 14.8 | 3.3 | 1.7 | 5.6 |
| Male | Black | 40-49 | 5.2% | 50.1 | 40.7 | 4.8 | 1.3 | 3.0 |
| Male | Hispanic | 30-39 | 4.3% | 11.3 | 6.2 | 2.1 | 1.4 | 1.3 |
| Female | White | 18-29 | 3.9% | 3.7 | 2.0 | 0.7 | 0.6 | 0.2 |
| Female | White | 30-39 | 3.2% | 8.3 | 5.7 | 1.4 | 0.8 | 0.3 |
| Female | Black | 18-29 | 3.1% | 7.0 | 4.7 | 0.5 | 0.4 | 1.3 |
| Male | White | 50-59 | 2.7% | 80.3 | 69.2 | 5.9 | 4.1 | 0.5 |
| Male | Other | 18-29 | 2.5% | 7.3 | 2.8 | 1.3 | 1.5 | 1.6 |
| Male | Hispanic | 40-49 | 2.4% | 24.8 | 18.9 | 3.3 | 1.6 | 0.8 |
| Female | White | 40-49 | 2.1% | 21.6 | 17.2 | 2.4 | 1.4 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



*Figure 33: Sacramento County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Sacramento County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 34: Rated Capacity vs ADP at Sacramento County Detention Facilities (2010-2021)*

Analytica
CONSULTING

Ex. AA-1796

SD_817794

## San Bernardino

***Table 24****: Top 15 San Bernardino County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 18.4% | 8.6 | 3.2 | 1.3 | 1.3 | 2.7 |
| Male | Hispanic | 30-39 | 10.6% | 12.0 | 7.8 | 1.3 | 1.2 | 1.7 |
| Male | White | 18-29 | 8.3% | 9.3 | 4.0 | 1.8 | 2.3 | 1.0 |
| Male | Black | 18-29 | 6.9% | 19.2 | 5.9 | 1.5 | 1.3 | 10.4 |
| Male | White | 30-39 | 5.9% | 17.9 | 11.0 | 2.5 | 3.3 | 1.0 |
| Male | White | 40-49 | 5.5% | 40.0 | 32.0 | 3.0 | 3.9 | 1.0 |
| Male | Hispanic | 40-49 | 5.1% | 25.2 | 20.9 | 1.7 | 1.3 | 1.2 |
| Female | Hispanic | 18-29 | 4.4% | 2.9 | 2.1 | 0.2 | 0.2 | 0.3 |
| Male | Black | 30-39 | 3.8% | 26.9 | 16.2 | 1.9 | 2.0 | 6.7 |
| Female | White | 18-29 | 3.1% | 4.5 | 2.9 | 0.7 | 0.5 | 0.4 |
| Female | Hispanic | 30-39 | 3.1% | 5.9 | 4.9 | 0.3 | 0.3 | 0.3 |
| Male | Black | 40-49 | 2.6% | 46.8 | 37.9 | 2.8 | 1.3 | 4.4 |
| Female | White | 30-39 | 2.4% | 11.0 | 8.7 | 0.9 | 0.9 | 0.3 |
| Female | Black | 18-29 | 2.2% | 7.5 | 5.6 | 0.4 | 0.4 | 1.0 |
| Male | White | 50-59 | 2.2% | 89.7 | 81.7 | 3.2 | 3.9 | 0.7 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



*Figure 35: San Bernardino County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

### San Bernardino Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 36: Rated Capacity vs ADP at San Bernardino County Detention Facilities (2010-2021)*

**Analytica**
CONSULTING

**Ex. AA-1797**

SD_817795

## San Diego

**Table 25**: Top 15 San Diego County Jail Demographic Groups with Associated Death Rates

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 13.8% | 6.0 | 2.2 | 1.2 | 1.2 | 1.3 |
| Male | White | 18-29 | 10.9% | 6.4 | 1.8 | 2.3 | 1.9 | 0.4 |
| Male | White | 30-39 | 8.1% | 11.7 | 5.8 | 3.2 | 2.3 | 0.3 |
| Male | White | 40-49 | 8.0% | 26.7 | 18.9 | 4.1 | 3.2 | 0.4 |
| Male | Hispanic | 30-39 | 7.3% | 9.5 | 5.4 | 2.2 | 1.1 | 0.7 |
| Male | Black | 18-29 | 5.8% | 10.1 | 3.0 | 1.3 | 1.8 | 3.7 |
| Female | White | 18-29 | 4.1% | 2.7 | 1.3 | 0.6 | 0.6 | 0.1 |
| Male | Hispanic | 40-49 | 3.5% | 20.7 | 16.5 | 2.6 | 1.0 | 0.5 |
| Male | Black | 30-39 | 3.4% | 16.2 | 9.2 | 2.3 | 2.0 | 2.5 |
| Male | Black | 40-49 | 3.4% | 39.7 | 31.7 | 4.0 | 1.8 | 1.9 |
| Female | Hispanic | 18-29 | 3.3% | 2.4 | 1.6 | 0.3 | 0.3 | 0.2 |
| Male | White | 50-59 | 3.1% | 62.8 | 53.2 | 5.3 | 3.8 | 0.4 |
| Female | White | 30-39 | 2.9% | 6.4 | 4.2 | 1.2 | 0.8 | 0.1 |
| Female | White | 40-49 | 2.5% | 17.3 | 13.4 | 2.3 | 1.3 | 0.2 |
| Male | Other | 18-29 | 2.0% | 4.2 | 1.3 | 0.7 | 1.5 | 0.6 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



Figure 37: San Diego County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity

San Diego County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



Figure 38: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021)

**Analytica**

**Ex. AA-1798**

SD_817796

## San Francisco

*Table 26*: Top 15 San Francisco County Jail Demographic Groups with Associated Death Rates

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|-----------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | White | 18-29 | 13.4% | 5.3 | 1.6 | 1.9 | 1.3 | 0.5 |
| Male | Black | 18-29 | 12.2% | 36.0 | 5.7 | 3.2 | 1.7 | 25.2 |
| Male | White | 30-39 | 11.3% | 10.8 | 5.4 | 3.5 | 1.4 | 0.3 |
| Male | Black | 40-49 | 9.5% | 96.7 | 68.1 | 18.0 | 2.7 | 6.4 |
| Male | Black | 30-39 | 8.1% | 43.3 | 22.5 | 7.2 | 2.7 | 10.7 |
| Male | White | 40-49 | 7.9% | 36.0 | 24.9 | 7.1 | 3.2 | 0.4 |
| Male | Other | 18-29 | 4.5% | 3.8 | 1.4 | 0.7 | 1.0 | 0.7 |
| Male | Black | 50-59 | 3.7% | 179.0 | 146.4 | 27.1 | 1.4 | 3.9 |
| Female | Black | 18-29 | 3.4% | 7.0 | 3.6 | 1.3 | †0.5 | 1.6 |
| Male | White | 50-59 | 3.1% | 76.1 | 62.4 | 8.9 | 3.7 | 0.6 |
| Male | Other | 30-39 | 3.1% | 6.7 | 4.0 | 1.2 | 0.9 | 0.5 |
| Female | White | 18-29 | 2.7% | 2.0 | 0.6 | 0.9 | 0.3 | †0.1 |
| Male | Other | 40-49 | 2.2% | 18.4 | 14.9 | 2.0 | 1.1 | 0.3 |
| Female | Black | 30-39 | 2.1% | 18.2 | 13.0 | 3.2 | †0.5 | 1.4 |
| Female | White | 30-39 | 2.0% | 4.4 | 2.4 | 1.1 | 0.7 | †0.1 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



*Figure 39: San Francisco County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

San Francisco County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 40: Rated Capacity vs ADP at San Francisco County Detention Facilities (2010-2021)*

Analytica
CONSULTING

**Ex. AA-1799**

SD_817797

## Santa Clara

*Table 27: Top 15 Santa Clara County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 19.3% | 6.0 | 2.1 | 1.0 | 1.0 | 1.8 |
| Male | Hispanic | 30-39 | 11.5% | 9.1 | 5.5 | 1.5 | 1.1 | 0.8 |
| Male | White | 18-29 | 6.5% | 5.9 | 2.0 | 1.7 | 1.7 | 0.4 |
| Male | Hispanic | 40-49 | 6.2% | 20.8 | 16.2 | 2.5 | 1.0 | 0.7 |
| Male | White | 40-49 | 5.4% | 21.6 | 16.0 | 2.8 | 2.3 | 0.3 |
| Male | White | 30-39 | 5.0% | 9.0 | 4.8 | 1.8 | 1.9 | 0.3 |
| Female | Hispanic | 18-29 | 4.2% | 2.0 | 1.2 | 0.3 | 0.2 | 0.2 |
| Male | Other | 18-29 | 3.7% | 3.2 | 1.3 | 0.5 | 0.9 | 0.5 |
| Male | Black | 18-29 | 3.6% | 7.2 | 2.0 | †0.8 | 2.2 | 2.1 |
| Male | Other | 30-39 | 3.0% | 4.3 | 2.7 | 0.5 | 0.8 | 0.2 |
| Female | Hispanic | 30-39 | 2.7% | 4.5 | 3.5 | 0.4 | 0.4 | 0.2 |
| Female | White | 18-29 | 2.5% | 2.6 | 1.3 | 0.5 | 0.6 | †0.1 |
| Male | Hispanic | 50-59 | 2.4% | 55.4 | 48.8 | 4.5 | 1.1 | 0.7 |
| Male | Black | 30-39 | 2.4% | 13.8 | 9.2 | 2.0 | †1.0 | 1.4 |
| Male | Other | 40-49 | 2.2% | 11.1 | 9.4 | 0.7 | 0.7 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.*



*Figure 41: Santa Clara County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 42: Rated Capacity vs ADP at Santa Clara County Detention Facilities (2010-2021)*

Ex. AA-1800

SD_817798

## Mortality Rates Over Time

This study measures county mortality rates between 1999-2020 to estimate total expected jail deaths. The focus of this study is to compare the total expected jail deaths in San Diego County to that of other counties in California. This approach largely assumes that mortality rates between San Diego and other California counties follow a similar pattern over time.

To test whether this is the case, we graph the mortality rates for each manner of death over time. Below are the figures for overdose/accidental deaths, homicides, natural deaths, and suicides. In general, these figures show that the morality rates for San Diego County and the other counties in this study have a similar trajectory over the past two decades. In other words, San Diego does not deviate from the trend lines of other counties. San Diego County consistently has a much lower homicide rate than the other counties. It also has a moderately higher suicide rate than the other counties.



Figure 43: Mortality Rates Over Time, San Diego vs California, Ages 18-59 (2000-2020)

Analytica
CONSULTING

**Ex. AA-1801**

SD_817799

## Comparisons of San Diego Inmate Population to Other California Counties

The jail population has generally higher needs than the general population. Attending to these needs may strain the limited capacity of county jails and, as a result, may be a contributing cause to in-custody deaths. We pursue this argument by comparing the mental health cases and violent proclivities of inmates in San Diego jails to that of other California counties between 2010-2020.

We first track reported mental health utilization using the average monthly mental health cases and the average new monthly mental health cases over time. Inmates in San Diego jails have considerably increased their usage of mental health services starting in 2019. This rate of growth is not as steep in other county jails. This increase in mental health services in San Diego is also reflected in the new mental health cases, which, after several years of declines, began to tick up in 2017. The increase in new mental health cases is not as large in other counties.

Violence among inmates is measure by the percent of violent felony arrests in a county and the average yearly assaults on law enforcement staff. San Diego County closely mirror the percent of violent felony arrests in other counties. All counties experienced a significant jump in these arrests in 2014. In terms of assaults on staff, San Diego has a moderate number of average assaults when compared to the other counties. Five counties have a higher average number of assaults than San Diego.









*Figure 44: Additional Inmate Comparison Measures, San Diego vs California*

Analytica
CONSULTING

**Ex. AA-1802**

SD_817800

## County Demographics

### Percent of County Population by Race/Ethnicity (2010-2020)



*Figure 45: Percent of Each County Population by Race/Ethnicity (2010-2020)*

### Percent of County Population by Age Group (2010-2020)



*Figure 46: Percent of Each County Population by Age Group (2010-2020)*

**Table 28**: *Percent of County Population by Gender (2010-2020)*

| County | Male | Female |
|---|---|---|
| Alameda | 49.2% | 50.8% |
| Contra Costa | 49% | 51% |
| Fresno | 50.1% | 49.9% |
| Kern | 51.4% | 48.6% |
| Los Angeles | 49.5% | 50.5% |
| Orange | 49.7% | 50.3% |
| Riverside | 49.8% | 50.2% |
| Sacramento | 49.2% | 50.8% |
| San Bernardino | 49.8% | 50.2% |
| San Diego | 50.3% | 49.7% |
| San Francisco | 50.7% | 49.3% |
| Santa Clara | 50.5% | 49.5% |

**Ex. AA-1803**

SD_817801

## Unstandardized Average Time between Deaths

*Table 29: Average Unstandardized Days between Deaths (2010-2020)*

| County | Natural Death | Suicide | Overdose/Accidental Death | Homicide |
|---|---|---|---|---|
| Alameda | 4 months | 7 months | 1 years | 3.7 years |
| Contra Costa | 1.6 years | 1 years | 11 years | |
| Fresno | 4 months | 7 months | 1.2 years | 2.2 years |
| Kern | 5 months | 8 months | 1.6 years | 5.5 years |
| Los Angeles | 1 months | 3 months | 3 months | 9 months |
| Orange | 2 months | 1.2 years | 1.1 years | 3.7 years |
| Riverside | 4 months | 7 months | 8 months | 1.8 years |
| Sacramento | 6 months | 1.1 years | 1.6 years | 1.6 years |
| San Bernardino | 3 months | 5 months | 1.4 years | 1.8 years |
| San Diego | 2 months | 3 months | 5 months | 1.4 years |
| San Francisco | 11 months | 1.4 years | 2.7 years | |
| Santa Clara | 4 months | 9 months | 3.7 years | 11 years |

# Appendix I: Email Correspondence with Dr. Elizabeth Carson (U.S. Bureau of Justice Statistics)

To better understand the advantages and disadvantages of different measures used to compare mortality rates among inmate populations, we corresponded with Dr. Elizabeth Carson via email. She is a statistician at the U.S. Bureau of Justice Statistics. Below is the content of this correspondence.

FROM: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

TO: Elizabeth Carson <elizabeth.carson@usdoj.gov>

DATE: 12/15/2021

SUBJECT: Your feedback on measures of inmate mortality rates

Dear Ms. Carson,

I am part of a research team at Analytica Consulting studying inmate deaths in California county jails. The goal of this study is to make apples-to-apples comparisons of inmate mortality rates across multiple counties. In our reading of the literature on this topic, we have found that researchers differ on how best to measure mortality rates among inmate populations.

Drawing upon your expertise on this topic, would you be able to provide your input on the three different measures below?

**Average Daily Population (ADP)**: Although most commonly used, some have criticized this measure for not accounting for differences in length of stay. How does this measure capture high turnover rates in jails, particularly if the unit of analysis is an inmate year?

**Total Admissions (or At-Risk Population):** An alternative measure is to use total admissions as the denominator for mortality rates in jails. In your opinion, what are the weaknesses of using this measure compared to ADP? Does this generate accurate mortality rates?

**Standardized Resident Death Rates:** A BJS Special Report from 2005 ("Suicide and Homicide in State Prisons and Local Jails.") outlines weighing subgroups who are at higher risk of suicide (i.e. gender, race, age) to calculate inmate mortality rates. We don't see this method being used very often. Do you know why researchers stopped utilizing this method? The California Department of Justice collects a wealth of crime statistics so we could stratify this type of measure in other ways too.

We would welcome any input you can provide on these three different measures as we design the scope of our study. Our first draft of the study is due *Jan. 28* so your timely response would be greatly appreciated.

Please feel free to reach out if you have any follow-up questions regarding this request.

**Analytica**
CONSULTING

**Ex. AA-1804**

SD_817802



Thanks again,

Mike

–

**Mike Pelz, PhD**

**Senior Data Consultant | Analytica Consulting**

<http://www.analyticaconsulting.com>

FROM: Carson, Elizabeth (OJP) <Elizabeth.Carson@usdoj.gov>

TO: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

DATE: 12/16/2021

SUBJECT: RE: [EXTERNAL] Your feedback on measures of inmate mortality rates

Dear Dr. Pelz,

Thank you for contacting the Bureau of Justice Statistics. BJS uses the ADP measure, since it is the only count we have of *unique* persons in jails. BJS is investigating whether to try to collect individual-level records for all jail admissions and releases, which would (theoretically) allow us to locate people who recidivate multiple times per year, and only count them once. That would give you the unique number of persons exposed to the jail setting in a given year, and probably the best mortality rate per persons exposed.

The problem with using admissions is that this does NOT measure unique individuals in the denominator. You have a small number of people returning time after time to jail, which drives the 11 million admissions/year. So I suppose if you wanted to calculate the rate for any exposure to the jail setting, with the understanding that a person can have multiple exposures per year, you could use admissions – a long as you recognize you're comparing unique deaths in the numerator to non-unique persons in the denominator. As with the ADP, this doesn't take length of stay into account.

The most accurate method would be to use individual-level records from everyone who was admitted in a given year, calculate the days of exposure to the jail setting (and sum the days for those who were in more than once), and get the rate per person-days exposed. Unfortunately, we're not there yet in terms of having the individual-level data for the nation's jails.

In terms of the resident population standardization, because prisons and jails differ so drastically from the U.S. resident population in terms of age, sex, and race/ethnicity, if you want to make a direct comparison between the two you have to standardize the U.S. residents to "look like" the prison or jail population to which you are comparing (it has nothing to do with which groups are more likely to commit suicide, but rather the demographic makeup of the whole population). This is actually very common in epidemiological analyses – it removes the affects of different age, sex, and race/ethnicity distributions on the death rate. We show this comparison in our annual reports on prison (Mortality in State and Federal Prisons, 2001–2019 – Statistical Tables | Bureau of Justice Statistics (ojp.gov)) and jail deaths (Mortality in Local Jails, 2000–2019 – Statistical Tables | Bureau of Justice Statistics (ojp.gov)).

Please let me know if you have any questions.

Thank you,

Ann

E. Ann Carson

Statistician, Corrections Statistics Unit

Bureau of Justice Statistics

U.S. Department of Justice

810 Seventh Street, NW

Analytica
CONSULTING

Ex. AA-1805

SD_817803

Washington, DC 20531

FROM: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

TO: Elizabeth Carson <Elizabeth.Carson@usdoj.gov>

DATE: 12/17/2021

SUBJECT: Re: [EXTERNAL] Your feedback on measures of inmate mortality rates

Hi Dr. Carson,

Thanks so much for your quick response and valuable insights on these different measures. It would be ideal to have individual-level data. If you don't mind, I have two follow-up questions that would help us substantiate which measure to use for our study.

In our study, we are looking to engage two arguments regarding ADP from a report by the San Diego County Sheriff's Department. You might be familiar with this report—it was conducted by another statistician by the name of Dr. Colleen Kelly. I have attached a copy of this report to this email.
Specifically, we would like to address two arguments found on page 3 of this report. First, she states that the number of inmates passing through San Diego's jails far exceeds ADP. If we wanted to quantify how many of these admissions had multiple exposures or arrests, could we just use recidivism rates for a given calendar year? If so, do you know if this statistic is typically tracked by sheriff's departments?

The second related argument regards ADP accounting for shorter lengths of stay. Dr. Kelly asserts that ADP "is flawed when making comparisons across jails with different lengths of stay." In your opinion, would you consider this to be a fair statement? Does ADP fail to address shorter lengths of stay?
Thanks again for lending us your expertise. We really appreciate it!

Best,

Mike

FROM: Elizabeth Carson <Elizabeth.Carson@usdoj.gov>

TO: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

DATE: 12/21/2021

SUBJECT: RE: [EXTERNAL] Your feedback on measures of inmate mortality rates

Dear Dr. Pelz,

We have no good estimates of the number of persons who cycle through jail in a given year – as I said, this would require individual-level records that could be linked to unique individuals. In the absence of a national estimate of within-year recidivism, if you have that value for San Diego, I would suggest you use that. Recidivism across years is *not* going to tell you how many of the 11 million admissions to jail within a given year are repeat offenders.

As far as the question of short stays, the risk of death in a jail actually depends on a number of factors. Chief among them is the question of exposure: do you have an increased risk of exposure simply by being in the jail for one hour? Or does a prolonged exposure increase your odds of death?

I would argue it depends on the cause of death – deaths by intoxication typically occur within the first 24 hours of custody because the inmate enters the jail in an intoxicated state – so staying 10 days or 10 weeks makes no difference. The same is not true for deaths by homicide or suicide – in 2015-2019, 25% of suicides occurred after the first month of custody. The median time served for homicides in local jails from 2000-2019 was 30 days. For these causes of death,

Analytica


time exposed to jail (being in custody) can have some effect on mortality. For illness deaths, depending on the level of health care provided by the jail, it could be argued that being in jail lends a protective effect by providing access to stable medical care and medicines.  Other factors include the size of the jail, the mix of persons held (do the police in a given jurisdiction place more or less priority on arresting people for particular crimes – like possessing small amounts of marijuana, public drunkenness, theft of small dollar amounts – compared to others?), the jurisdiction's policies on bond and bail, even the physical layout of the jail and the staff to inmate ratio.

Another way of thinking of this is to use an analogy to COVID infection rates in jails: the denominator for most COVID-infection rates in jail is the number of people exposed (the number of people who cycled through the jail over a given period of time, regardless of how long they stayed). For rates using this denominator, it is simply presence or absence in the jail that determines whether a person is counted in the denominator, and baked into this measure is the assumption that it doesn't matter whether you spent 6 hours or 6 months exposed – you have the same overall chance of catching COVID. Most epidemiologists, however, would argue that the amount of time exposed DOES matter for COVID – if you stay longer, you have a greater chance of catching the disease (and this is where the analogy with mortality breaks down, given what I said above regarding different times served for different causes of death). But other factors are at work as well – vaccination status of the inmates and staff, ability to social distance and use other protective equipment, overcrowding, cleanliness of the facility, etc. So even using a denominator that measures the total number of hours all inmates collectively were in custody wouldn't give you the whole picture of risk of catching COVID.

The same is true for mortality – simply being in jail (whether you measure the denominator as time served or just jail/no jail) doesn't confer the same risk of death for every inmate admitted. Basically, I'm saying that it's not an easy answer of ADP versus time in custody. As I said in my last email, you need individual-level records to calculate time served in jail, and we don't have those. In their absence, ADP is the best alternative in BJS's opinion.

Thank you,

Ann

Analytica
Ex. AA-1807
SD_817805

# Appendix J: Data Inclusion Criteria

The primary focus of this study is in-custody deaths within county jails. To ensure our data only captures these types of events, we made several exclusions from the original data sets obtained for this study.

California Department of Justice Inmate Deaths Data, 2005-2020 (n = 11,553)

- Reporting agency equals 'sheriff' (n = 2,719)

- Year equals 2010 through 2020 (n = 1,930)

- Custody status not equal to 'in transit' or 'process of arrest' (n = 1,481)

- Jurisdiction equals San Diego, Los Angeles, San Bernardino, Riverside, San Clara, Orange, Sacramento, Alameda, Fresno, Kern, Contra Costa, San Francisco (n = 1,069)

- Custody status not equal to 'other' and custodial responsibility at the time of death not equal to 'other' (n = 1,048)

- Manner of death not equal to 'Homicide Justified (Law Enforcement Staff) (n = 1,044)

- Manner of death not equal to 'Pending Investigation' (n = 990) (Note: Only excluded when analyzing by manner of death)

- Manner of death not equal to 'Undetermined' (n = 968) (Note: Only excluded when analyzing by manner of death)

California Board of State and Community Corrections Monthly Jail Survey, 2005-June 2021 (n = 11,730)

- Year equals 2010 through 2020 (n = 7,752)

- Jurisdiction equals San Diego, Los Angeles, San Bernardino, Riverside, San Clara, Orange, Sacramento, Alameda, Fresno, Kern, Contra Costa, San Francisco (n = 1,584)

California Department of Justice Arrest Disposition Data, 1980-2020 (n = 291,925)

- Arrest disposition code not equal to 'to other agency' (n = 189,914)

- Year equals 2010 through 2020 (n = 52,298)

- Jurisdiction equals San Diego, Los Angeles, San Bernardino, Riverside, San Clara, Orange, Sacramento, Alameda, Fresno, Kern, Contra Costa, San Francisco (n = 13,867)

Analytica

Ex. AA-1808

SD_817806

# Appendix K: Relevant Policy Changes Provided by the San Diego Sheriff's Department (2014-2021)

This list of major policy changes between 2014-2021 was provided to us by the San Diego Sheriff's Department. We utilized this list to understand policy changes in San Diego jails over time.

**2014**

- TRI-CITY MEDICAL CENTER. Entered into a contract with Tri-City Medical Center (TCMC). Contracts with both UCSD and TCMC provide the department with additional resources for inpatient hospitalization and specialty medical services.

- NALOXONE PROJECT. San Diego Sheriff's law enforcement deputies in patrol were one of the first law enforcement agencies to train deputies to administer naloxone, an opiate overdose antidote, to individuals who may have overdosed on opiates such as heroin. The department partnered with the County's Emergency Medical Services to launch this program.

- HOSPITAL GUARD UNIT. TCMC's contract provided the department with access to a 40-bed locked and secured medical ward in its facility. The ward is referred to as the Progressive Unit which the department shares with CDCR.

**2015**

- INMATE SAFETY PROGRAM (ISP). Designed an Inmate Safety Program to include standardized assessments for self-harm based on risk factors and designated housing units (i.e. Enhanced Observation Housing –EOH) where inmates are monitored in an environment that minimizes risk of self-harm. This program included structural modifications to the housing and the cells for patient safety.

- RESTORATION OF COMPETENCY (SAN BERNARDINO). Patients who needed to be restored to competency were sent to San Bernardino for restoration in addition to Patton State Hospital. This helped expedite the process for patients who were accepted to San Bernardino and needing restoration to competency.

- OPIATE REDUCTION. As part of the Hoarding and Cheeking Policy, evaluated the narcotic formulary and instituted ongoing education of onsite doctors on zero tolerance.

**2016**

- JAIL INTAKE SUICIDAL PILOT EXPANSION. Due to the ISP, the department began accepting arrestees into custody without outright rejection and directing the law enforcement officers to County Mental Hospital (CMH) for clearance.

- INTAKE PROCESS REDESIGN. Unlike other counties such as Orange County, Riverside, and Los Angeles County, San Diego had a two-stage medical intake process. Redesigned the medical intake process to condense both steps into one without compromising the quality of the medical and mental health assessments. Mental health questions were revised to reflect guidelines from the Columbia Suicide Severity Rating Scale (CSSRS).

- JAIL BASED COMPETENCY TREATMENT (JBCT) PROGRAM. The State Department of State Hospitals (DSH) contracted with the Sheriff's Department to have San Diego Central Jail serve as a JBCT site. The State contracted for 30-beds for male inmates who are 1368 and 1370s needing treatment.

- NALOXONE IN DETENTION FACILITIES. In response to the increasing incidents of heroin overdoses in jail, detention facilities were now equipped with Naloxone (Narcan) kits for deputies to use. Detentions Training Unit (DTU) developed a policy a training video and bulletin.

- MENTAL HEALTH MULTI-DISCIPLINARY GROUPS (MDG). MDG meetings are a forum where both sworn and clinical identify and discuss high risk mental health patients to get them the care and services they need in a timely manner. These meetings take place twice a month at each facility.

- LICENSED MENTAL HEALTH CLINICIAN POSITIONS. Six (6) FTE positions were added to the budget to improve the mental health services and assessments conducted in the jails.

Analytica

• MAIL PROCESSING CENTER. Creation of Mail Processing Center with special equipment and deputies trained in detecting drug-soaked letters, cards, and other contraband.

**2017**

• JAIL BASED COMPETENCY TREATMENT (JBCT) PROGRAM. Liberty Healthcare was also chosen as the subcontractor to establish a 30-bed JBCT program at SDCJ that will treat 1370s in custody in a more effective and expeditious manner. While it does not prevent patients from being admitted to Patton State Hospital, the program serves as an important adjunct in the spectrum of services that is provided to this population.

• NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE (NCCHC) TECHNICAL REVIEW. A panel of NCCHC surveyors conducted a one-week evaluation of the jails to help the department prepare for accreditation in the future. NCCHC visited all sites and made recommendations for change to assist the department with compliance with national correctional standards. The two top recommendations that required immediate attention was the acquisition of a new pharmacy business process and an electronic health record.

• DIAMOND PHARMACY. The department eliminated its pharmacy and practice of purchasing bulk medications and having LVNs prepare and administer medications to inmates which according to NCCHC was out of compliance with the LVN licensure. Under Diamond, medications were pre- packaged in unit-dose identifying the inmate's name. This process reduced errors for dispensing of medications when bulk medications are used

• PSYCHIATRIC STEP DOWN UNIT. A one-time funding from Public Safety Group was added to budget to develop a Psychiatric Step-Down Unit at SDCJ with 40 beds.

• PSYCHIATRIC EMERGENCY RESPONSE TRAINING (PERT). Nurses who were assigned to the Psychiatric Stabilization Units (PSU) at both SDCJ and LCDRF were sent to attend PERT classes. PERT served as another training to help staff deal effectively with individuals suffering from mental health conditions.

**2018**

• INMATE SAFETY PROGRAM (ISP) REVISION. The policy was revised to comply with NCCHC standards and Lindsay Hayes recommendations.

• SUICIDE PREVENTION TRAINING. The department developed an 8-hour training course that is patterned after Lindsay Hayes' training curriculum.

• SUICIDE PREVENTION FOCUSED RESPONSE TEAM. Creation of this workgroup. This workgroup consisting of representatives from sworn, medical, mental health, training, etc. meet once a month to discuss best evidence practices and implement strategies for reducing suicide in custody. This group also reviews suicide and/or suicide attempt incidents to evaluate for training opportunities and policy changes if needed.

• COMBINED & COMPREHENSIVE INTAKE SCREENING PLATFORM. The intake screening questions were further revised based on Lindsay Hayes' recommendation and still incorporates the Columbia Suicide Severity Rating Scale (CSSRS).

• LICENSED MENTAL HEALTH CLINICIANS. 15 (FTE) positions were added into the budget.

• SCENE MANAGER NURSING TRAINING. A program was developed to train a nurse to serve as a scene manager during emergency response and man-downs.

• ELECTRONIC HEALTH RECORD. The department procured a contract with Naphcare. TechCare is the name of the new electronic health record. Rollout is expected in 2019.

• CHIEF LICENSED MENTAL HEALTH CLINICIAN. A 1-FTE position was added to the budget and a second Chief Licensed Mental Health Clinician was appointed to manage the span of control of 27 licensed mental health positions.

• MENTAL HEALTH DEPUTIES. The department received 4 FTE deputy positions dedicated for mental health services.

• NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE (NCCHC) ACCREDITATION REVIEW. The department intends to pursue accreditation and has dedicated a project team to spearhead efforts for its preparation. A detentions captain and sergeant were embedded in Medical Services to assist with this effort.

Analytica

**Ex. AA-1810**

SD_817808

- IMPROVEMENTS TO HOUSING AREAS AND FACILITIES. Created and designed clinic areas at SDCJ, VDF, and GBDF to create a more therapeutic physical environment for clinicians and patients.

- MENTAL HEALTH ADVOCACY HOTLINE. A central phone line was established for use by criminal justice stakeholders and community partners for reporting.

- SUICIDE PREVENTION AND MENTAL AWARENESS POSTERS IN HOUSING AREAS. Posted in housing units, public lobbies, clinic areas and staff breakrooms/briefing rooms.

- CHIEF MENTAL HEALTH CLINICIAN. Addition of a 2nd Chief Mental Health Clinician, enhanced oversight of QMHP timely delivery of care

- REVIEW OF SELF HARM REPORTS. Chief Mental Health Clinicians review all NetRMS cases (Incident reports written by sworn staff) involving self-harm, determination of self-harm vs. suicide attempt being reviewed by a QMHP, allows for follow with QMHP staff for corrective action counseling if needed.

- WELLNESS CHECKS. SNP revised to mandate nurses completing wellness rounds in all Administrative Housing units 3x weekly for all patients

### 2019

- BODY SCANNERS. Upgraded six high tech x-ray body scanners

- ELECTRONIC HEALTH CARE. EHR goes live in September. EHR project was a strategic initiative to improve Medical and Mental Health care within our jails by moving medical care management from the 17-year-old integrated JIMS environment to a modern, agile software platform that incorporates better efficiency, care, and alignment with national standards like those of the National Commission on Correctional Health Standards.

- SOBERING CELL CHECKS. Standard Nursing Protocols (SNP) revised to include nurses taking vital signs of all sobering cell patients twice daily

- PRIVATE CLINIC SPACE. Construction project to expand privacy in intake screening areas for our patients during booking

- ISP POLICY REVISION. Policy state QMHP (non-sworn) staff admit and discharge from ISP only, only under extenuating circumstances shall sworn intervene in this decision. Follow-up appointment protocols were also revised.

- INTAKE SCREENING MODIFIED. Modified intake screening criteria Intake screening to improve acceptance/emergency transfer criteria relating to gate rejects

### 2020

- MENTAL HEALTH DIRECTOR. Selection of a Medical Director, Mental Health Services.

- WITHDRAWAL PROTOCALS. MSD revised standard nursing protocols related to alcohol and opioid withdrawal to prevent deaths associated with substance use disorders.

- TELEPSYCH. Expanded tele-psych to deal with the increased demand for mental health services and manage the COVID 19 pandemic

- CONTRACTED MEDICAL PROVIDER. MSD changed medical providers (Coastal to CHP) which increased the number of providers systemwide.

### 2021

- NALOXONE PROGRAM EXPANSION. All sworn members assigned to the detentions bureau were issued 2 naloxone kits to carry on their uniform belt.

- HEALTH AND HUMAN SERVICES AGENCY – CERNER COMMUNITY BEHAVIORAL HEALTH (CCBH). In April, QMHP's gained access to county mental health database CCBH, enhances continuity of care. Cerner Community Behavioral Health is behavioral health-specific electronic health record that specialize in the delivery of community mental health, inpatient mental health, outpatient mental health, substance use disorder

Analytica


and developmental disabilities care. Although there may be some patients who are not in the database and do not have data entered, we continue to review and enter data referencing our patient encounters while in our care.

- ADDITIONAL RN and MHC POSITIONS. Funding approved in July for 146 new Sheriff's health staff positions to support our on-going priority of building a robust medical and mental health system. With this additional staffing, our plan is to enhance overall care, by implementing a Primary Care Model, Medicated Assisted Treatment (MAT) program and ultimately achieving National Commission of Correctional Health Care (NCCHC) accreditation.

- MAT DEPUTY POSITIONS. 8 detention deputy positions funded in July

- COMPREHENSIVE HEALTHCARE CONTRACT. Sheriff's Department awarded a comprehensive contract to Naphcare on September 1, 2021. This contract will consolidate and expand workflows relating to primary and specialty health care services, oral care, mental health, and related ancillary services to all patients in custody. We are projecting the contract consolidation to be fully operational in fiscal year 2022.

- MOU with HHSA. In September, the sheriff signed a Memorandum of Understanding (MOU) to work collaboratively to expand Medication Assisted Treatment services to our population.

- ENHANCED COVID MONITORING. In December, MSD began utilizing better technology to treat patients in COVID-19 housing modules. This new device captures oxygen levels which will give nurses more accurate information to determine treatment.

- ENHANCED COVID TREATMENT. In December, MSD collaborated with HHSA to on a new treatment for select COVID-19 positive patients. Monoclonal antibody treatment is FDA approved (EUA) and intended to reduce serious side effects of COVID-19.

- CHRONIC CARE ENHANCEMENT. In December, MSD improved the management of diabetic patients in our system under a directive from the CMO.

**2022**

- MEDICATED ASSISTED TREATMENT PILOT PROGRAM. Will be starting a pilot project at LCDRF to expand MAT related services to our female population. MSD will expand MAT services to our remaining population once our comprehensive vendor is established in 2022.

Analytica

Ex. AA-1812

SD_817810

# List of Tables

**Table 1**: Average Standardized Time Between Deaths by Manner (2010-2020)*........................................4
**Table 2**: Select Characteristics of Most Populous California Counties (2010-2020)...................................18
**Table 3**: ADP vs. ARP by County (2011-2020) ..........................................................................................19
**Table 4**: A Closer Look at Overdose/Accidental Jail Deaths, 2010-2020....................................................20
**Table 5**: Countywide Accidental Death Breakdown (1999-2020)..................................................................20
**Table 6**: Actual vs Estimated San Diego ADP.............................................................................................21
**Table 7**: Actual vs Estimated San Diego ADP.............................................................................................21
**Table 8**: Actual vs Estimated San Diego ADP.............................................................................................21
**Table 9**: Actual vs Estimated San Diego ADP.............................................................................................21
**Table 10**: Actual vs Estimated San Diego ADP...........................................................................................21
**Table 11**: ADP and Bookings by Type 1 Facilities (2010-2018)..................................................................27
**Table 12**: Deaths in Type 1 Facilities (2010-2020).....................................................................................27
**Table 13**: Overall Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ......................................28
**Table 14**: Suicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 .....................................28
**Table 15**: Overdose/Accidental Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ................29
**Table 16**: Natural Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ......................................29
**Table 17**: Homicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ...................................29
**Table 18**: Top 15 Alameda County Jail Demographic Groups with Associated Death Rates.....................31
**Table 19**: Top 15 Contra Costa County Jail Demographic Groups with Associated Death Rates..............32
**Table 20**: Top 15 Fresno County Jail Demographic Groups with Associated Death Rates........................33
**Table 21**: Top 15 Kern County Jail Demographic Groups with Associated Death Rates ...........................34
**Table 22**: Top 15 Los Angeles County Jail Demographic Groups with Associated Death Rates ...............35
**Table 23**: Top 15 Orange County Jail Demographic Groups with Associated Death Rates........................36
**Table 24**: Top 15 Riverside County Jail Demographic Groups with Associated Death Rates.....................37
**Table 25**: Top 15 Sacramento County Jail Demographic Groups with Associated Death Rates ...............38
**Table 26**: Top 15 San Bernardino County Jail Demographic Groups with Associated Death Rates ..........39
**Table 27**: Top 15 San Diego County Jail Demographic Groups with Associated Death Rates ..................40
**Table 28**: Top 15 San Francisco County Jail Demographic Groups with Associated Death Rates ............41
**Table 29**: Top 15 Santa Clara County Jail Demographic Groups with Associated Death Rates................42
**Table 30**: Percent of County Population by Gender (2010-2020)................................................................45
**Table 31**: Average Unstandardized Days between Deaths (2010-2020)....................................................46

Analytica

# List of Figures

Figure 1: Total Deaths in Various California County Jails (2010-2020) Compared to San Diego County.....3
Figure 2: Overall County Mortality Rates...................................................................................................5
Figure 3: Suicide, Homicide, and Accidental Death Rates.........................................................................5
Figure 4: Comparing the Jail and General Population in San Diego County...............................................6
Figure 5: Expected vs Actual Jail Suicides between 2010 and 2020 .........................................................8
Figure 6: Expected vs Actual Jail Accidental Deaths between 2010 and 2020 ..........................................8
Figure 7: Expected vs Actual Jail Homicides between 2010 and 2020 ......................................................9
Figure 8: Expected vs Actual Jail Natural Deaths between 2010 and 2020 ...............................................9
Figure 9: Overall Expected vs Actual Jail Deaths between 2010 and 2020 ..............................................10
Figure 10: Overall Expected vs Actual Jail Deaths - Sentenced and Unsentenced ...................................11
Figure 11: Natural Expected vs Actual Jail Deaths - Sentenced and Unsentenced ...................................12
Figure 12: Suicide Expected vs Actual Jail Deaths - Sentenced and Unsentenced ...................................12
Figure 13: Overdose/Accidental Expected vs Actual Jail Deaths - Sentenced and Unsentenced ..............13
Figure 14: Homicide Expected vs Actual Jail Deaths - Sentenced and Unsentenced...............................13
Figure 15: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021) .......................14
Figure 16: Average Number of Bookings and Releases by Hour of Day in San Diego County ..................15
Figure 17: County Expected vs Actual Jail Deaths Including City Jails.....................................................27
Figure 18: Confidence Intervals of Standardized Mortality Ratios............................................................30
Figure 19: Alameda County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity..........31
Figure 20: Rated Capacity vs ADP at Alameda County Detention Facilities (2010-2021)..........................31
Figure 21: Contra Costa County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity ...32
Figure 22: Rated Capacity vs ADP at Contra Costa County Detention Facilities (2010-2021)...................32
Figure 23: Fresno County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity.............33
Figure 24: Rated Capacity vs ADP at Fresno County Detention Facilities (2010-2021).............................33
Figure 25: Kern County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity ................34
Figure 26: Rated Capacity vs ADP at Kern County Detention Facilities (2010-2021) ................................34
Figure 27: Los Angeles County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity ...35
Figure 28: Rated Capacity vs ADP at Los Angeles County Detention Facilities (2010-2021) ....................35
Figure 29: Orange County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity............36
Figure 30: Rated Capacity vs ADP at Orange County Detention Facilities (2010-2021)............................36
Figure 31: Riverside County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .........37
Figure 32: Rated Capacity vs ADP at Riverside County Detention Facilities (2010-2021).........................37
Figure 33: Sacramento County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity.....38
Figure 34: Rated Capacity vs ADP at Sacramento County Detention Facilities (2010-2021).....................38
Figure 35: San Bernardino County Population, Jail Pop, and In-Custody Deaths by Race/Ethnicity..........39
Figure 36: Rated Capacity vs ADP at San Bernardino County Detention Facilities (2010-2021) ...............39
Figure 37: San Diego County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .......40
Figure 38: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021) .......................40
Figure 39: San Francisco County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .41
Figure 40: Rated Capacity vs ADP at San Francisco County Detention Facilities (2010-2021) .................41
Figure 41: Santa Clara County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .....42
Figure 42: Rated Capacity vs ADP at Santa Clara County Detention Facilities (2010-2021).....................42
Figure 43: Mortality Rates Over Time, San Diego vs California, Ages 18-59 (2000-2020).........................43
Figure 44: Additional Inmate Comparison Measures, San Diego vs California .........................................44
Figure 45: Percent of Each County Population by Race/Ethnicity (2010-2020) ........................................45
Figure 46: Percent of Each County Population by Age Group (2010-2020)...............................................45

Analytica

Ex. AA-1814

SD_817812