Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
Deann Rivard (SBN 177482)
drivard@bwslaw.com
Martin Kosla (SBN 247224)
E-mail: mkosla@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA 92101-8474
Tel: 619.814.5800 Fax: 619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
Tel: 408.606.6300 Fax: 408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
DEPARTMENT

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED**

[Fed. R. Civ. P. 56]

[*Notice of Motion; Appendix of Evidence; and [Proposed] Order filed concurrently herewith*]

**Hearing**
Date: March 6, 2025
Time: 2:00 p.m.
Ctrm: 4A
Judge: Anthony J. Battaglia

Burke, Williams & Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3

Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................... 1

II.   STATEMENT OF FACTS ....................................................................... 1

    A.    1ST CLAIM FOR INADEQUATE MEDICAL CARE. ................... 1

        1.    Healthcare Contracts ................................................... 1

        1.    Staffing – Medical Providers ...................................... 2

        2.    Staffing – Nursing ....................................................... 2

        3.    Intake Screening .......................................................... 3

        4.    Record Management ..................................................... 3

        5.    Pharmacy / Medication ................................................ 3

        6.    MAT / MOUD Program ............................................... 4

        7.    Sub-Specialty Services ................................................ 4

        8.    Specialty Services – Optometry .................................. 5

        9.    "Wellness Rounds" Team ............................................ 5

        10.   Quality Management .................................................... 5

        11.   Chronic Care ................................................................ 6

        12.   Decreased Mortality Rates ........................................... 6

    B.    6TH CLAIM FOR INADEQUATE DENTAL CARE ..................... 7

        1.    Contract and Dental Staffing ....................................... 7

        2.    Dental Services ............................................................ 7

        3.    Access to Dental Care .................................................. 7

        4.    Quality Assurance and Record Management ............... 8

    C.    4TH CLAIM FOR INADEQUATE SANITATION. ....................... 8

    D.    FIFTH CLAIM FOR SAFETY AND SECURITY. ...................... 11

        1.    Classification of Incarcerated Persons ...................... 11

        2.    Drug Interdiction ....................................................... 12

        3.    Monitoring Safety with Video, Intercoms, and Elevators .......... 14

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                              i                    Case No. 3:20-cv-00406-AJB-DDL
                                                                   MPA RE PARTIAL MSJ

4.    Timely and Adequate Safety Checks...........................................15

5.    Training and Discipline of Custody Staff..................................16

6.    Oversight of the Jails ..................................................................16

E.    EIGHTH CAUSE OF ACTION FOR DENIAL OF ACCESS TO COURTS AND COUNSEL...................................................................17

F.    NINTH CLAIM FOR DISCRIMINATORY RACIAL IMPACT........20

III.    LEGAL ARGUMENT. ........................................................................21

A.    FIRST AND SIXTH CLAIMS FOR INADEQUATE MEDICAL AND DENTAL CARE .......................................................................21

B.    PLAINTIFFS' MEDICAL CLAIMS FAILS AGAINST DEFENDANTS ...................................................................................22

C.    PLAINTIFFS' DENTAL CLAIMS FAILS AGAINST DEFENDANTS ...................................................................................23

D.    FOURTH CLAIM CAUSE OF ACTION FOR FAILURE TO ENSURE ADEQUATE ENVIRONMENTAL CONDITIONS...........24

E.    FIFTH CLAIM FOR SAFETY AND SECURITY .............................26

F.    EIGHTH CLAIM FOR INTERFERENCE WITH ACCESS TO COUNSEL AND COURTS................................................................26

G.    LEGAL STANDARD RIGHT OF ACCESS TO COURTS AND COUNSEL ........................................................................................27

H.    NINTH CLAIM FOR DISCRIMINATORY RACIAL IMPACT........29

IV.    CONCLUSION ...................................................................................34

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3

ii

Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Federal Cases

*Allen v. Sakai,*
   48 F.3d 1082 (9th Cir. 1995) ............................................................28

*Bounds v. Smith,*
   430 U.S. 817 (1977) ...............................................................27, 28

*Bradley v. Hall,*
   64 F.3d 1276 (9th Cir. 1995) ............................................................29

*Ching v. Lewis,*
   895 F.2d 608 (9th Cir. 1990) (per curiam) ..........................................28

*Cornett v. Donovan,*
   51 F.3d 894 (9th Cir. 1995) ............................................................29

*Entler v. Gregoire,*
   872 F.3d 1031 (9th Cir. 2017) ..........................................................28

*Gary H. v. Hegstrom,*
   831 F.2d 1430 (9th Cir. 1987) ..........................................................22

*Hebbe v. Pliler,*
   627 F.3d 3383 (9th Cir. 2010) ..........................................................28

*Hiser v. Franklin,*
   94 F.3d 1287 (9th Cir. 1996) ............................................................28

*Lewis v. Casey,*
   518 U.S. 343 (1996) ...............................................................27, 28, 29

*Madrid v. Gomez,*
   190 F.3d 990 (9th Cir. 1998) ......................................................28, 29

*Mendiola-Martinez v. Arpaio,*
   836 F.3d 1239 (9th Cir. 2016) ..........................................................22

*Moreno v. Beard,*
   2014 U.S. Dist. LEXIS 20692 (C.D.Cal. Jan. 13, 2014) ..........................22

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                    iii                    Case No. 3:20-cv-00406-AJB-DDL
                                                            MPA RE PARTIAL MSJ

*Phillips v. Hurst*,
   588 F.3d 652 (9th Cir. 2009) ................................................................ 28

*Sanchez v. City of Fresno*,
   914 F. Supp. 2d 1079 (E.D. Cal. 2012) ............................................... 22

*Silva v. Di Vittorio*,
   658 F.3d 1090 (9th Cir. 2011) .............................................................. 28

*Simmons v. Sacramento Cty. Super. Ct.*,
   318 F.3d 1156 (9th Cir. 2003) .............................................................. 29

*Stone v. City of San Francisco*,
   968 F.2d 850 (9th Cir. 1992) ................................................................ 22

*Trueblood v. Washington State Dep't of Soc. & Health Servs.*,
   822 F.3d 1037 (9th Cir. 2016) .............................................................. 29

**State Cases**

*In re Alva*,
   33 Cal.4th 254 (2004) .......................................................................... 22

*Inmates of Riverside Cnty. Jail v. Clark*,
   144 Cal.App.3d 850 (1983) .................................................................. 22

*Ochoa v. Superior Ct.*,
   39 Cal.3d 149 (1985) ............................................................................ 22

*Serrano v. Priest*,
   18 Cal.3d 728 (1976) ............................................................................ 22

*Walgreen Co. v. City & County of San Francisco*,
   185 Cal.App.4th 424 (2010) ................................................................ 22

**Federal Statutes**

42 U.S.C. § 1983 ..................................................................................... 28

ADA ............................................................................................... 14, 15

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                    iv                    Case No. 3:20-cv-00406-AJB-DDL
                                                            MPA RE PARTIAL MSJ

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## State Statutes

Government Code

§ 11135 ...................................................................................1, 30, 31

§ 11135(a) ...........................................................................................30

§ 14027 ...............................................................................................30

§ 14027(b)(1) ......................................................................................30

§ 14027(b)(3) ......................................................................................30

§ 14029 ...............................................................................................30

§ 14029(a) ...........................................................................................30

§ 14029(b)(2) ......................................................................................33

§ 14029(c)(1) ......................................................................................33

Racial and Identity Policing Act ...........................................20, 21, 31, 32

## Regulations

California Code of Regulations, title 15 ....................................16, 18, 27

## Constitutional Provisions

First Amendment ....................................................................................28

Sixth Amendment ............................................................................. 1, 26

Eighth Amendment .......................................................................1, 22, 24

Fourteenth Amendment ...................................................................passim

## Other Authorities

California Constitution .............................................................................1

California Constitution Amendment and Art. I § 17 ..............................22

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

I.    **INTRODUCTION**

Plaintiffs' seek injunctive relief for alleged deliberate indifference to convicted and pre-trial Incarcerated Persons under the 8th and 14th Amendments for alleged inadequate medical (1st Claim) and dental care (6th Claim) and inadequate conditions of confinement including sanitation conditions (4th Claim) and safety and security (5th Claim), alleged lack of access to courts and counsel under the 6th and 14th Amendments (8th Claim), and disparate impact of alternatives to incarceration on the Black and Latinx jail population pursuant to Cal. Govt. Code ¶11135 (9th Claim).[1]   Plaintiffs also rely on the parallel provisions of the California Constitution for some of these claims.  The claims are meritless and there are no disputed issues of material fact as to each claim which is the subject of this motion as set forth below.

II.    **STATEMENT OF FACTS**

    A.    **1ST CLAIM FOR INADEQUATE MEDICAL CARE.**

        1.    **Healthcare Contracts**

The SDSO uses a mixed-staff or hybrid model of healthcare for incarcerated persons ("IPs") at the Jail.  (Appendix ("App") 1, ¶ 12; App.3, ¶ 8.)  Under this model, the SDSO is responsible for nurse staffing, as well as various ancillary support staff.  Pursuant to a contract with the County, NaphCare (a private correctional healthcare company) is responsible for dental and mental health staffing, the Medication-Assisted Treatment ("MAT") program, Utilization Review, and pharmacy operations.  Under a separate contract with the County, a second correctional healthcare company, Correctional Healthcare Partners, Inc. ("CHP"), is responsible for all on-site medical provider services at the Jail.  (App.1, ¶ 13; App.3,

---

[1] Defendants are not moving for relief as to the Second Claim regarding mental health care, the Seventh Cause of Action was dismissed per this Court's ruling on Defendants' Motion to Dismiss, and the Third Cause of Action is settled.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                    1                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1  ¶ 8.)

2  The contract with CHP was implemented on June 1, 2024, in an effort for the

3  SDSO to have more direct accountability for the on-site provider services at the Jail.

4  Previously, CHP (while supplying on-site medical provider services) was a sub-

5  contractor to NaphCare.  (App.1, ¶ 14; App.3, ¶ 10; App.4, ¶¶ 7-10.)

6  **1.    Staffing – Medical Providers**

7  Currently, pursuant to the new contract with CHP, there are 30.5 Full-Time

8  Employee (FTE) medical providers at the Jail.  (App. 1, ¶ 15; App.4, ¶ 11.) This

9  level of provider staffing is approximately 2.5 times more than the level in place

10  around the time this lawsuit was filed.  Based on the Jail's population of 3,859 (on

11  December 4, 2024), and given the current staffing of 30.5 FTE providers, this is a

12  ratio of 1 FTE provider for every 127 patients.  (App.1, ¶ 16; App.4, ¶ 12.) In fact,

13  this level of medical provider staffing increased since expert disclosures were being

14  made in August 2024.  At that time, there were 28.4 FTE providers, which was

15  already a very significant change from the 11.8 FTE providers employed at around

16  the time the lawsuit was filed.  It represented a greater than 100% increase in the

17  volume of provider coverage (from 472 to 1096 coverage hours per week).  (App.1,

18  ¶ 17.) The majority of the on-site medical providers are Board-Certified, as CHP

19  normally strives to hire Board-Certified medical providers.  (App.4, ¶ 13.)

20  **2.    Staffing – Nursing**

21  The SDSO utilizes a predominantly RN-based staffing model at the Jail, with

22  RNs leading teams that includes licensed vocational nurses ("LVN") and nursing

23  assistants. LVNs usually assist with tasks like medication administration. (App.1, ¶¶

24  18-25; App.5, ¶¶ 7-12.)  Frontline nursing supervision at each facility in the Jail is

25  provided by Supervising RNs.  (App.1, ¶ 26; App.5, ¶ 13.) Currently, there are 359

26  nursing positions, consisting of 265 RNs and 94 LVNs.  (App.1, ¶ 27; App.5, ¶ 14.)

27  During expert discovery in August 2024, nursing vacancy rates at the Jail

28  were analyzed for the period January to April 2024.   The average nursing vacancy

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3                    2                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

rate of approximately 25% was generally similar to or slightly lower than that of other healthcare facilities in Southern California (which typically range from 20% to 30%) during this timeframe.  (App.1, ¶¶ 28-29.)  The SDSO employs various staffing tools to combat nursing vacancies, including overtime and supplemental agency staffing resources.  (App.1, ¶¶ 29-34; App.5, ¶¶ 15-18.)

### 3.     Intake Screening

Intake screenings at the Jail are done by RNs, which includes assessing a booked IP's jail admission medical clearance eligibility or "Gate Refusal."  (App.1, ¶¶ 35-36, 39; App.5, ¶¶ 19-20, 23.) During the intake process at all three intake processing locations (VDF, SDCJ, and LCDRF), booked IPs are scanned with the TEK 84 Intercept body scanner (unless medically contraindicated such as pregnancy) to prevent the introduction of contraband into the Jail.  (App.1, ¶ 37-38; App.5, ¶¶ 21-22.) As part of the receiving process, IPs are also screened and tested for tuberculosis and females undergo pregnancy testing.  The screening process also evaluates the past and present substance use of IPs entering the Jail.  (App.1, ¶¶ 40-43; App.5, ¶¶ 24-25, 27.)

### 4.     Record Management

The SDSO uses TechCare at the Jail, which is a comprehensive Electronic Health Record ("EHR") or electronic medical record ("EMR") software system specifically to the needs of correctional facilities.  TechCare provides the SDSO with a platform for managing patient health information, facilitating clinical workflow and decision making, and promoting quality care.  (App.1, ¶¶ 44-45; App.3, ¶¶ 11-12; App.4, ¶¶ 11-16.)

### 5.     Pharmacy / Medication

The TechCare system at the Jail is interfaced with Surescripts.  This system securely connects to a patient's medication history stored in the databases of community pharmacies.  This allows staff at the Jail to verify a patient's medication history quickly and easily.   (App.1, ¶¶ 46-48; App.3, ¶¶ 13-14.)

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3                                    3                          Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

### 6.  MAT / MOUD Program

The SDSO now operates a dedicated MAT program at the Jail through NaphCare.  (App.1, ¶¶ 49, 58; App.3, ¶ 15.) The program combines medication treatment with behavioral therapies to provide a more comprehensive approach to treating substance use disorders.  (App.1, ¶¶ 50-51; App.3, ¶ 16.)

As part of the program, IPs are screened for Opioid Use Disorder ("OUD") at intake and considered for initiation or continuation of medication.  In addition, IPs are able to request an evaluation at any point during their incarceration.  IPs identified with OUD who have not been receiving treatment are able to receive medical management and therapy.  (App.1, ¶ 52; App.3, ¶ 17.)  IPs on medication for OUD are flagged in TechCare as "MOUD" (i.e., Medication for Opioid Use Disorder).  Those IPs who are desirous for counseling and therapy in addition to pharmaceutical support are flagged as "MAT."  (App.1, ¶ 53; App.3, ¶ 18.)

The SDSO (through NaphCare) has a total of seven providers dedicated to the MAT program, including two nurse practitioners and one physician who manage medication, and four mental health staff who provide therapy.  (App.1, ¶¶ 54-55; App.3, ¶ 19.)  If medically indicated, upon release, IPs can receive a 30-day supply of medication to help facilitate continuity of care and reduce the risk of relapse and overdose after release.  (App.1, ¶¶ 56-57; App.3, ¶¶ 20-21.)

### 7.  Sub-Specialty Services

The SDSO contracts with NaphCare for the management of sub-specialty and hospital services.  NaphCare utilizes contracts with the University of California San Diego ("UCSD"), as well as several independent practitioners to provide specialty services locally.  (App.1, ¶¶ 59-61; App.3, ¶¶ 22-24.)  Between March 2023 to April 2024, the SDSO completed over 2,500 sub-specialty referrals for the IPs being housed at the Jail.  (App.1, ¶¶ 62-64.)  The SDSO also has contracts for Hospital Guard Units ("HGU") with UCSD Health East Campus Medical Center (formerly known as Alvarado) and Tri-City Hospital to provide care to high acuity medical

Burke, Williams & Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3

4

Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

IPs.  (App.1, 65; App.3, ¶ 25.)

### 8.   Specialty Services – Optometry

The SDSO also provides on-site and off-site optometry care as part of the ancillary services offered at the Jail.  In particular, the SDSO contracts (through NaphCare) with multiple eye care specialists to ensure that the population at the Jail has access to necessary optometry services and corrective lenses.  (App.1, ¶ 66; App.3, ¶¶ 26-27.)  The SDSO now employs a full-time optometrist to ensure IPs have timely access to refractive services, including reading glasses.  (App.1, ¶ 67; App.3, ¶ 28.) The number of prescription eyeglasses provided to the Jail population increased from 234 in 2023 to 736 in 2024 (January to June).  (App.1, ¶ 68.)

### 9.   "Wellness Rounds" Team

The SDSO has created a leadership-driven multidisciplinary team that makes weekly "Wellness Rounds" in the Administrative Separation ("AdSep") unit of the Jail.  These rounds occur 52 weeks a year.  (App.1, ¶¶ 69-71; App.3, ¶ 31.)  This approach can lead to better overall health outcomes and safety.  (App.1, ¶ 72.)

### 10.   Quality Management

Since the filing of the lawsuit, the SDSO has been revising and/or updating the policies and procedure ("P&P") related to the provision of medical care at the Jail.  (App.1, ¶ 73-75; App.3, ¶ 32.)  For example, in June 2024, the SDSO released P&P No. A.1.3.  The purpose of this policy is to identify healthcare services generally available for IPs and define methods of access to care.  (App.3, ¶ 33; Ex. "A" to App.3.)  In July 2024, SDSO released P&P No. C.9.1, which outlines the procedure for providing orientation to new staff.  (App.3 ¶ 34; Ex. "B" to App.3.)

The SDSO has also been in the process of revising its quality assurance program.  In particular, to ensure that there is accountability, the SDSO has a Quality Assurance/Quality Improvement ("QA/QI") committee which meets quarterly and holds an annual meeting in January.  (App.1, ¶ 76-78; App.3 ¶ 35-36.)

### 11. Chronic Care

IPs entering the Jail are assessed for any known chronic medical conditions during the intake screening at the time of booking. Subsequent chronic care visits are conducted at regular intervals based on the level of disease control, and referrals are made for medical conditions that require specialized knowledge or treatment. (App.1, ¶¶ 79-80; App.3 ¶¶ 29-30.) During expert discovery in August 2024, a sample of over 80 medical charts that had been reviewed revealed that multiple specialty referrals had been made by medical staff at the Jail, including ENT referral for unilateral hearing loss; an ophthalmology referral to screen a patient for diabetic retinopathy; and a cardiology referral for a patient who reported a history of heart disease. (App.1, ¶ 81.) Further, annual optometry and foot exams are now being scheduled for all diabetics. Also, for these patients, when medically appropriate, the medical staff are now utilizing Lantus (a long-acting insulin). (App.1, ¶ 82.)

Since the filing of this lawsuit, CHP has been in the process of developing a set of Disease Management Guidelines ("DMGs") to help standardize chronic care management at the Jail. For example, these DMGs include practice standards for asthma, gout, HIV, hyperlipidemia, hypertension, and skin and soft tissue infections. (App.1, ¶ 83; App.4, ¶¶ 17-18; Ex. "A-1" to "A-6" to App.4.) CHP also started a provider triage pilot program at SDCJ (an intake facility) on November 1, 2024. This new pilot program allows IPs with chronic care needs to be evaluated by medical providers upfront upon acceptance into the Jail. (App.1, ¶ 84; App.4, ¶¶ 19-20.) CHP intends to expand the pilot program to the other two intake facilities (i.e., VDF and LCDRF) in the first quarter of 2025. (App.1, ¶¶ 85-86; App.4, ¶¶ 21-22.)

### 12. Decreased Mortality Rates

The mortality rate at the Jail has decreased significantly since the filing of the operative complaint in this lawsuit. (App.1, ¶ 88; App.4, ¶ 23.) In particular, in-custody deaths reached a high in 2022 with 19 deaths as the SDSO was emerging from the COVID-19 pandemic. In 2023, there were 13 deaths. However, in 2024,

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                    6                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1  there were only 7 in-custody deaths.  The mortality rate has therefore decreased by
2  almost 58% from 2022 (even using a controversial 8th death that Plaintiffs suggest
3  should be included in the total).  (App.1, ¶¶ 89-90.)  Notwithstanding, CHP intends
4  to participate in mortality reviews, which should further assist in decreasing the
5  mortality rate.  (App.1, ¶ 91; App.4, ¶ 24.) With regard to suicides occurring at the
6  Jail, the last suicide was in June 2023.  (App.1, ¶ 93.)

7        **B.    6TH CLAIM FOR INADEQUATE DENTAL CARE.**

8        **1.    Contract and Dental Staffing**

9        The provision of on-site dental care to IPs is provided by NaphCare pursuant
10 to a contract with the SDSO.  (App.2, ¶ 11.)  At the time this lawsuit was filed, the
11 dental staffing at the Jail was significantly lower.  However, since that time, the
12 SDSO has added additional dentists and hygienists to NaphCare's staffing matrix.
13 Currently, NaphCare has four dentists, two hygienists, and two dental assistants
14 providing dental care at the Jail.  NaphCare is also in the process of interviewing
15 another dentist to add to the dental staff providing services.  The current ratio of
16 dentist-to-patients at the Jail is therefore not significantly different than what is
17 common in the community at large.  (*Id.*, ¶¶ 12-15.)

18       **2.    Dental Services**

19       The dental care services provided by NaphCare at the Jail include oral
20 healthcare instruction, preventive services (gross scales and prophies), restorative
21 services (fillings and crowns), endodontics (root canals, which are referred to an off-
22 site provider), prosthodontics (dentures), and oral surgery (which is completed both
23 on site and via off-site).  (*Id.*, ¶ 16.) IPs now have access to annual teeth cleanings
24 (i.e., prophies).  (App.2, ¶¶ 17-18; App.14, Ex.E, pp. 30:15-22, 223:23-226:24.)

25       **3.    Access to Dental Care**

26       The Jail's dental clinic hours are 6:30 a.m. to 3:00 p.m., Monday through
27 Friday, with some dental staff also providing coverage on weekends.  (App.2, ¶ 19.)
28 A referral process is also in place for cases deemed outside the realm of standard

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                                    7                    Case No. 3:20-cv-00406-AJB-DDL
                                                                          MPA RE PARTIAL MSJ

1  dental services, with contracts in place for such referrals.  (*Id*., ¶¶ 20-21.)

2  ### 4.    Quality Assurance and Record Management

3  The SDSO also has a procedure for quality assurance monitoring of all the

4  staff who provide dental services that the Jail.  In particular, NaphCare's Dental

5  Director completes monthly chart reviews for each of the dentists and dental

6  hygienists.  The Dental Director also does an annual quality of care assessment.

7  Further, the SDSO has a weekly virtual meeting with all clinical staff.  (*Id*., ¶ 22.)

8  NaphCare also has dental P&Ps which are NCCHC compliant.  (*Id*., ¶ 23.)  The

9  SDSO uses TechCare to record and track dental healthcare encounters.  (*Id*., ¶ 24.)

10  ## C.    4TH CLAIM FOR INADEQUATE SANITATION.

11  SDSO has policies and procedures specific to environmental health and safety

12  covering all aspects of facility cleanliness from housing to laundry and food service,

13  in addition to facility specific procedures. (App.10, ¶¶25-27, Exs.K-Q) Given the

14  carceral setting, even if set times for cleanings are disrupted by security concerns,

15  the tasks are always completed as soon as possible.  (Id, ¶28) Facility commanders

16  or assistant facility commanders personally conduct inspections of the facility for,

17  among other things, health and hygiene problems and maintenance issues at least

18  once per pay period and shift watch commanders conduct the inspections at least

19  three times per pay period. (App.10, ¶29; App.14, Ex.L, p.130:2-7; pp.130:20-

20  131:3) Designated security/housing sergeants for each facility conduct inspections

21  of housing areas once per shift, verifying that maintenance request and other

22  requests for upkeep and repair have been documented, and to ensure cleanliness of

23  cells and common areas. (Id; App.14, Ex.L, pp.123:17-124:9; pp.125:25-128:1)

24  Different facilities have different programs for cleaning and disposing of hazardous

25  waste, including "HSAT", an educational cleaning program offered through reentry.

26  (App.14, Ex.L, p.131:7-132:3; App.10, ¶¶35,36; App. 13, ¶6). The County uses

27  "trustee workers" to clean the facilities and they are trained on which cleaning

28  agents to use to clean different areas. (App.14, Ex.L, pp.132:8-133:23) Trustee

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                    8                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1  workers do most of the cleaning but sworn staff clean when there is an assaultive or

2  combative IP who will not allow the trustees to clean a cell or living area and where

3  is simply not the opportunity to call trustee workers to come do needed cleaning.

4  (App.14, Ex.L, p.134:7-135:3)

5      Trash pickup occur at facility designated times and from housing areas and

6  medical at least twice a day. (App.10, ¶¶30, 31) There are trash cans available for

7  IP's in every dayroom and if there are IP's who do not want to dispose of their trash

8  or refuse to do so, it will be disposed of during hygiene inspection. (Id) The

9  covering of air vents by IP's in the facilities does occur. (App.10, ¶32) They place

10 these items over vents if they are cold or hot, to conceal contraband and to reduce

11 noise.  (Id; App.13, ¶17) Deputies tell Incarcerated Persons to remove the coverings

12 and discipline is used if IP's refuse to remove the coverings and/or replace them

13 once taken down. (App.10, ¶32)

14     Fresh laundry is provided on a schedule . (App.10, ¶26 as to policy L.1, ¶27;

15 Exs.K-Q (Green Sheets for Policy L.1) The laundry operations are good overall with

16 staff very responsive to suggested changes. (App.13, ¶¶28,29,33 & 34) If a person

17 soils their clothing because of incontinence or any other reasons, soiled laundry will

18 be exchanged for fresh laundry in addition to the schedule.  (App.14, Ex.K,

19 pp.11:25-12:12)

20     Maintenance issues are governed by a separate policy for the identification,

21 reporting and follow up on maintenance issues. (App.14, Ex. F) Maintenance staff

22 conduct follow-up inspections from maintenance requests to ensure they are done

23 and done properly. (App.14, Ex. G, pp.99:20-100:15) For example, areas that look

24 to have water damage are checked for leaks and repaired.  (Id, pp.71:12-72:10;

25 pp.72:11-73:9) The Sheriff's Office investigates and addresses any reports of

26 possible mildew or mold, specifically taking a cell "offline" because of

27 condensation issues creating growth of some type given the proximity of a freezer to

28 the cell combined with body heat from the individuals in the cell.  (Id, pp.79:25-

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3                          9                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

80:17, pp.82:18-83:10) There was no evidence was active mold growth during inspection. (App.13, ¶16) The Sheriff's Office has been extremely pro-active and responsive in addressing issues, including those Plaintiffs pointed out during inspection including trash and water leaks relating to pipe chases. (Id, p.98:7-99:11; App.10, ¶36)

Vermin control is covered by policy and preventative measures exist and are taken in order to prevent vermin inside or outside facilities.  (App.10, ¶34) Measures taken are apparent throughout the facilities with rodent bait stations observable and what is to be expected in facilities of like size. (App.13, ¶14) Trash, recycling, and grease are collected on regular schedules by outside services at each facility. (App.10, ¶36) Compactors, trash and recycling areas are cleaned on a regular basis by each facility. (Id) Facilities Ms. Peters suggested get sand to better capture grease spill off in the bins are looking into implementing the suggestion. (Id) There are daily cleanings throughout the dayrooms facilities and there are always cleaning supplies available to IP's. (Id) Showers are cleaned by trustees daily at every facility and drains are cleaned as needed, with maintenance called to address any sewer fly issues. (Id) Air filters are changed every three months in all facilities and the filters within a facility are changed on a staggered schedule. (Id) Fire sprinklers are cleaned as needed and if any are missed, they are cleaned when identified during yearly Fire Services inspections. (Id) Chemicals stored outside during Ms. Peters' inspection have been moved indoors and facilities that needed better labeling of cleaning chemicals have either addressed the labelling issue or are in process of doing so. (Id)

Food service at the seven facilities takes place primarily at the Central Production Center but each facilities does aspects of food service. (App.6, ¶2) The sanitation standards in the food service policies set forth the cleanliness and sanitation requirements. (Id.) The requirements of policy K.11 are enforced and followed for all Food Services workers in all facilities. (Id, ¶3) Policy K.25 tasks the

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3                                    10                          Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

supervisor and head cooks at each facility for training on safe working habits and operation of equipment, and training IP workers on food service sanitation, safe food handling, safe working habits, and safe methods for operation of equipment and cleaning of the equipment. (Id) K.29 sets forth all of the dress and grooming requirements for all food service personnel and all personnel are required to follow all of the policies. (Id)

Inspections are conducted at each food service facility once per week and includes a complete kitchen inspection for cleanliness of the kitchen area and equipment being used in food preparation. (App.6, ¶4) There are checks that all kitchen staff are properly dressed, using proper hand washing, gloves, utilization of hair nets, and other sanitation measures while cleaning, working in the kitchen generally, and specifically preparing food. (Id.) Sanitation procedures require wiping down food preparation counters, proper scrubbing of surfaces and equipment and proper sanitation of both. (App.6, ¶5) The floors are and must be swept and mopped including under equipment. (Id.) Employees scrub floors on their hands and knees with soap and water if there are stains that are not removed with mopping. (Id.) I have observed this numerous times. Cleaning processes include looking under equipment and other "hidden" areas for mouse droppings to ensure that there is no vermin intrusion into the food service areas. (Id.) There is a scullery which scrubs and washes all dishes and pots utilizing the proper sanitation methods. (App., ¶6) There are trash cans in the food services areas and trash is taken out regularly by non-Incarcerated Persons, who are not allowed to exit the facilities and carry out trash for security reasons and the trash areas are inspected. (App.6, ¶7)

**D.    FIFTH CLAIM FOR SAFETY AND SECURITY.**

**1.    Classification of Incarcerated Persons**

The Jail Population Management Unit (JPMU) is tasked with conducting classification assessments, assigning classifications, and determining housing for all

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3

11

Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1    IP's. (DSB Policy R.1[2].) The initial classification process considers factors such as

2    booking charges, criminal history, medical and psychiatric conditions, and

3    information gathered during interviews with the person. (*Id*.) Other applicable

4    policies available online for classification include R.3 (descriptor definitions), J.3

5    (Separation of persons), and R.11 (Incarcerated Person Facility Assignment

6    Criteria). The JPMU is responsible for classification and re-classification as soon as

7    an incident or event occurs. (App.14, Ex. A, (Diaz Depo) pp 46-48.)

8                    **2.    Drug Interdiction**

9            There have been significant changes in the last few years. Narcan units have

10   been installed in every holding cell, dayroom area, and recreation yard, with an

11   alarm sounding so that deputies and medical staff respond if someone accesses the

12   Narcan. [3] At the same time, the unit is searched for illegal drugs, often with K-9

13   assistance. (App.8, ¶17.) The Contraband Narcotics Interdiction Team (CNIT)

14   works together with the Detentions Investigations Unit (DIU) to interdict illegal

15   drugs from being introduced to the jail. through vigilant screening, investigations,

16   and proactive measures. (*Id*, ¶¶ 3-4). CNIT also uses information led policing to

17   help locate narcotics inside the jails and it takes measures to interdict and seize

18   drugs. (*Id.*, ¶ 9)

19           SDSO uses body scanners, X-ray machines, pat downs and strip searches, as

20   one method to try to detect drug smuggling into the jails.  (*Id*., ¶ 5) Body scanners

21   are used on each IP during intake to detect any foreign objects secreted and if

22

23   ---
     [2]

24   https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Det

25   entions%20Policy%20and%20Procedure%20Sections/Section%20R%20-
     %20CLASSIFICATION/r01.pdf

26
     [3]https://www.sdsheriff.gov/Home/Components/News/News/1321/#:~:text=The%20

27   Narcan%20kits%20are%20placed,medication%20during%20the%20booking%20pr

28   ocess.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3                                      12                      Case No. 3:20-cv-00406-AJB-DDL
                                                                                      MPA RE PARTIAL MSJ

detected, the person is asked to voluntarily produce the object or sent to the hospital for removal. (*Id*, ¶7) Body scanners are also be used on IP's when returning from court, a social or professional visit, or a doctor's appointment. (*Id,* ¶8) If the scan is refused by the IP, they are to be strip searched and/or put on contraband watch. (*Id*) In July 2024, SDSO began screening both sworn and professional staff, contractors, volunteers, and professional visitors. (App.10, ¶19) These screenings are randomized across facilities, with the locations, times and frequency not disclosed. (Id)

All mail is sent directly to the mail processing center (MPC) and six deputies are assigned to the MPC. (App. 8, ¶ 10.) All mail is opened and inspected unless it is identified as "legal mail." Non-legal mail is scanned for criminal communication, any violation of SDSO Policies, and for the presence of narcotics or contraband. (*Id*) Narcotic saturated mail is the most common contraband mail. (*Id*) If mail is deemed as being suspicious, then it is screened further with the use of investigative lighting, TruNarc, Narcotic Identified Kit (NIK), and potentially by K9s. (*Id*, ¶ 11).

In 2024 as compared to 2023, there has been a 35% increase in screenings. (*Id*.¶ 14) January to July 2024 showed a 24% increase in contraband seizure when compared to the same period in 2023. (*Id*.) There has also been an increase in narcotics seizures in the facilities and the number of overdose incidents has decreased more than 50% in 2024 as compared to 2023. (*Id*., also see Ex. B.)

Trained canine officers (K9) screen suspicious mail, there have been several successful identifications of drug tainted mail the K9s, and K9s are used in the facilities to complete sniffs of housing areas, common areas and holding cells. (*Id.*.¶ 15)  K9s also conduct sniffs on the exterior of the facility to identify persons, vehicles, and property that contain or possess narcotics. (Id.) There are 5 in service dogs and 2 currently in the academy. (*Id*.) The K9s are trained to detect odors of fentanyl, cocaine, meth, heroin and derivates. (*Id*)

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                                13                Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

### 3.    Monitoring Safety with Video, Intercoms, and Elevators

The process to upgrade surveillance video systems and intercoms at the Jail prior to the filing of the complaint in this matter in 2022. (App.7, ¶7). At the George Bailey Facility, a remodel is ongoing and is more than 50% completed, involving new intercoms with recording capabilities, new surveillance cameras, and new computers and control panels (touch screen), with a cloud-based recording system for longer retention of video. (App.7, ¶2) Four units will be done by February 2025 and the entire project in early 2026. (Id)

The elevator modernization program has been completed at SDCJ. (App.7, ¶ 3.) Funding has been allocated for new surveillance cameras, intercoms, and recording systems, and the project should begin in 6-7 months after approval of plans and procurement with an estimated completion date in 18 months. (*Id*, ¶3) Intercoms are checked at least weekly to ensure they are operational. If an intercom is reported or discovered to be out of order, the IP is removed from that cell. (App.10, ¶ 20) It is the practice of SDSO not to house any IPs in cells without an operational intercom. (*Id*.)

Rock Mountain already has new surveillance cameras and new intercoms installed. (App.7, ¶4) At East Mesa, infrastructure for Body Worn Cameras will be installed by February 2025. (*Id*., ¶ 5). Funding has been requested to install new surveillance cameras and intercoms at both East Mesa and Las Colinas. (*Id*.) At Vista, SDSO is in process of re-doing the interiors. the design process and procurement takes 6-8 months, and it will result in new surveillance cameras and intercoms, with cloud storage for surveillance video. (*Id*, ¶ 6)

Axon Body Worn Cameras (BWC) are fully deployed for all sworn staff at the Las Colinas, Central, Rock Mountain, Vista, and South Bay Jails. (App. 12,¶ 3). The following units also have BWC:  Detentions Canine Personnel, Sheriff's Transportation Unit, County Parole & Alternative Custody Unit, and ADA Unit. (*Id*.) SDSO has voluntarily exceeded the minimum suggestion for retention of non-

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3

14

Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1  evidentiary data. (*Id*, ¶ 4.)

2      BWC have been partially deployed at the George Bailey Detention Facility

3  with approximately 80 personnel having been recently trained and issued devices.

4  (*Id.,* ¶ 5) The current plan is to deploy to the remaining personnel pending

5  completion of a facility remodel of the medical area, which has the potential to

6  impact infrastructure servicing the room where these cameras are being docked. (*Id*,

7  ¶ 5)  East Mesa Reentry Facility is the only facility remaining for BWC use,

8  pending the installation of electrical and networking infrastructure to support the

9  docking stations required for personnel assigned there. (*Id.* ¶ 6) Staff also need to be

10  trained on use and backup of the BWC. (*Id.*) Sheriff's Department Policy 6.131 on

11  Body Worn Cameras, available online, governs their use as well as the  Detention

12  Services Bureau Policy I.20. (*Id.,* ¶ 8)

13      The iPhones selected for use with the Axon Body 3 BWC have RFID readers,

14  allowing future options such as having deputies scan RFID devices at various

15  locations such as at safety cells for safety checks to be logged. (*Id*.)

16  **4.    Timely and Adequate Safety Checks**

17      Counts are governed by Policy I.43, which states: "Sworn staff will physically

18  conduct counts of IPs. (App.10, ¶21) All counts require sworn staff to verify each

19  IP's well-being through "verbal or physical acknowledgment" from the IP and

20  looking for any obvious signs of medical or physical distress (*e.g.,* asthma attack,

21  chest pain, etc.), trauma (*e.g.,* bleeding, ligature marks, etc.), and/or criminal activity

22  (*e.g.,* drug usage, fighting, etc.)." (Id) Deputies are trained to verify each IP's well-

23  being through verbal or physical acknowledgment by the person, such as a "hi" (or

24  other words) and/or a nod of the head or hand wave.(Id, ¶ 22) Safety checks are

25  done in the same manner as counts, and the timing varies depending on the unit with

26  checks done more often for those with psychiatric, suicidal, or medical issues. (*Id.* ¶

27  23) Safety checks are governed by Policy I.64, which requires direct visual

28  observation of the IP. (*Id.)* Safety checks are audited by supervisors and if deputies

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3

15

Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1  are found to have violated the procedure, discipline is initiated; higher levels of

2  discipline apply if the failure was intentional. (*Id.* ¶ 24)

3              **5.      Training and Discipline of Custody Staff**

4              Custody staff in the Sheriff's Office are trained on Policies and Procedures

5  while in the Detentions Bureau Academy, and have ongoing training while working

6  in Detentions (formal, on the job, and via email regarding notifications of changes to

7  policy). Supervisors oversee the custody staff under their chain of command and

8  ensure they are following policy. Audits are also conducted, similar to those for

9  safety checks, by supervisory staff. If there is a suspicion or allegation of a policy

10  violation by sworn staff, Internal Affairs investigates the matter, and disciplinary

11  measures are taken if a staff has violated policy, using progressive discipline and in

12  consideration of the seriousness of the offense. (App. 10,. ¶ 24.)

13              **6.      Oversight of the Jails**

14              The County Board of Supervisors voted 4-0 last week to give CLERB greater

15  power to investigate in-custody deaths[4], allowing CLERB to "investigate any

16  employee or contractor" working under sheriff's or probation departments direction,

17  including contracted health care providers, but only in-custody death cases, and

18  requires the board to finish investigations within one year of discovering misconduct

19  allegations, prioritizing investigations involving death over all other investigations.

20  *See id.* The new policy also directs Chief Administrative Officer to find funding to

21  cover expanded CLERB jurisdiction costs.  (*Id*)

22              The Jails are also regularly inspected by the Board of State and Community

23  Corrections (BSCC) and the County's Grand Jury. The Facilities are governed by

24  the California Code of Regulations, Title 15 standards.

25

26

27  [4] https://www.nbcsandiego.com/news/local/san-diego-county-oversight-board-jail-

28  deaths/3697838/

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                                16                    Case No. 3:20-cv-00406-AJB-DDL
                                                                              MPA RE PARTIAL MSJ

## E.  <u>EIGHTH CAUSE OF ACTION FOR DENIAL OF ACCESS TO COURTS AND COUNSEL.</u>

Incarcerated persons ("IPs') have constitutionally adequate access to the courts and their counsel. For example, County jail policies permit IPs to have video visits with their public defenders scheduled in advance. (App.10, ¶ 2)  In-person private attorney visits, in rooms that have no cameras but only an intercom and a deputy stationed nearby for reasons of security, occur on-demand on a first-come, first-served basis at the facility, whether civil or criminal. (*Id.* ¶¶ 2-3[5])  IPs can complete a Legal Research Assistance ("LRA") form to request cases or research; additionally, all IPs will soon have access on the video monitors in the dayrooms of each unit to do research online. (App.10, ¶ 4) This system has been contracted for but not yet been activated. (*Id*)  When an attorney calls the Facility to speak to their client, the information clerk takes the message, which is relayed to the assigned deputy for the IP's housing unit to provide the name and number to the IP, who then returns the call using a dayroom phone for free. (*Id.,* ¶ 5)  If the attorney registers their number, it is saved in the Smart Communication system as an attorney number and it is not recorded. (*Id*)

The San Diego Sheriff's Office ("SDSO") Detention Services Bureau ("DSB") policies and procedures establish uniform procedures to ensure IPs timely access to courts, lawyers, research, and legal assistance. (App.14, Ex.10, ¶7, Exs. A-D) These policies and procedures are followed in every County detention facility. (*Id.*, ¶ 28) In addition, some policies have facility-specific "Green Sheets" which supplement the County-wide policies and procedures, including attorney callback procedures.[6] (App.14, Ex.10, ¶¶ 8-10, Exs. E-G). In the instances where callback or

---

[5] Deputies who work the control room with touchscreen access to intercoms in professional visit rooms are trained to turn off audio capability during attorney-client and other privileged professional visits. (App.14, Ex.C, pp. 28:1-30:18.

[6] Attorney callbacks are normally processed on the same day; however, there have

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3

17

Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1    other policies are not followed, staff who fail to follow policy receive additional

2    training to ensure compliance with that policy. (App.10, ¶39; App.14, Ex.C, pp.

3    38:5-40:24)  SDSO policies and procedures are in compliance with the California

4    Board of State and Community Corrections Title 15 Minimum Standards For Local

5    Detention Facilities, which are the standards correctional facilities located within the

6    State of California must follow. (App.10, ¶ 37)  All IPs housed in San Diego County

7    Jails watch an "Orientation" video providing information and guidance on a

8    multitude of topics including court appearances, legal mail, grievances, corrections

9    counselors and legal requests for assistance procedures, which is played in

10   dayrooms of units on a daily basis and in the Intake area holding cells. (*Id.*, ¶ 38)

11   The County is furthering efforts to ensure all IPs have access to communications

12   with counsel and research tools; to that end, it has acquired tablets from Smart

13   Communications, and has installed digital access points (WiFi) at East Mesa, which

14   will provide tablets to IPs. (*Id.*, ¶ 6)  All facilities will roll out thereafter, as soon as

15   the infrastructure is updated to permit WiFi and charging stations, and the plan is for

16   each IP to be assigned a tablet for use in research and outside contact. (*Id*)

17       All IPs can send and receive legal mail to ensure access to counsel and to the

18   courts; policies and procedures are in place to ensure that all IPs can do so, while

19   still ensuring the security and the safety of IPs and staff; custody staff are trained in

20   them and are required to follow them. (App. 10, ¶ 39; App.14, Ex. C, pp.42:14-48:6)

21       DSB policies ensure that each IP representing him or herself in criminal

22   proceedings has access to legal assistance and supplies related thereto. (App.14, Ex.

23   9, ¶ 4; App.14, Ex.D, pp.15:18-16:17) If a court grants the IP's request for a legal

24   runner or paralegal with the office of assigned counsel, the IP can communicate with

25

26   _____

27   been isolated incidents where a facility has been flooded with callback requests by
     Plaintiffs' counsel  to incarcerated persons with disabilities on the 7th and 8th floor of
28   the SDCJ on a single day, overwhelming the custody staff . App.14, ¶9

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                                    18                    Case No. 3:20-cv-00406-AJB-DDL
                                                                                  MPA RE PARTIAL MSJ

1  the assigned investigator/runner. (App. 9, ¶¶ 4,7(e).; App. 14, Ex. D, pp.16:18-18:6)

2       All male pro per IPs are housed at the Central Jail ("SDCJ") so that they have

3  access to the law library located at that facility. (App. 9, ¶2)  Each is provided a

4  minimum of three (3) hours per week legal research time with an average of six (6)

5  hours. (*Id.*)  The pro per has access to Lexis/Nexis research in the library, which is

6  staffed by a corrections counselor and a deputy, and is open Monday – Thursday,

7  between 7:00 a.m. to 3:00 p.m.. and can hold up to five (5) IPs at a given time.

8  (App. 9, ¶¶ 2, 4; App. 14, Ex.B, pp.7:12-15, 8:15-20; App.14, Ex. D, pp.13:19-14:6)

9  The County has a contract with an outside service, Legal Research Associates, to

10 provide up to five (5) items or 50 pages per month; a pro per can make one LRA

11 request per calendar month. (App. 9, ¶ 5; App. 14, Ex. B, p.6:12-25)

12      Female IPs representing themselves in criminal proceedings are housed at Las

13 Colinas Detention Facility, and are also provided three (3) hours minimum of

14 research, but may get more time depending on the demand; the law library at Las

15 Colinas is also open Monday through Thursday between the hours of 7:00 a.m. to

16 3:00 p.m., staffed by a deputy and a correctional counselor.  (App. 9, ¶ 3)

17      All IPs are entitled to pursue grievances regarding the conditions of his or her

18 confinement; the DBS policy regarding grievance procedures is uniform and an IP

19 has the opportunity for a formal administrative review of issues impacting

20 conditions of confinement which personally affect the IP. (App. 10, ¶7(b), Ex. B)

21      DSB policy for persons representing themselves in civil litigation related to

22 conditions of confinement requires that, following designation as such being

23 triggered by receipt of court documents through court partners designating the IP as

24 such, the pro per civil litigant is assigned to a correctional counselor at their housed

25 Facility, and are also supplies, and are permitted two (2) LRA requests per calendar

26 month, and are limited to a total of 50 pages per each request. (App. 9, ¶ 7; App. 14,

27 Ex. B, p.8:13-14, 21-9:1; App. 14, Ex. D, pp. 15:18-16:17, 19:12-20:1)

28

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                         19                Case No. 3:20-cv-00406-AJB-DDL
                                                            MPA RE PARTIAL MSJ

### F.    NINTH CLAIM FOR DISCRIMINATORY RACIAL IMPACT.

The data of incarceration of Black and Latinx individuals in SDSO jails shows very slight overrepresentation for SDSO arrests of Black and Latinx persons compared to the San Diego County's population makeup. (App.11, ¶8) There is no way to show this corresponds to racial bias given that the data does not show any intentional over-representation. (Id) Disparate impact on arrests only shows unintentional discrimination unless the deputies were aware of the person's race before the stop or call. (Id.) The analysis must include the race or ethnicity of the persons stopped or arrested in addition to numerous other independent variables before confirming a pattern and practice of racial discrimination. (Id, ¶ 10) Plaintiffs' expert, Matthew Ross relief upon CAD (Computer Aided Dispatch) and RIPA (Racial and Identity Policing Act) data to conclude that stops are disproportionately likely to occur in predominantly Black and Hispanic neighborhoods and that Hispanic individuals are 30% more likely to be arrested after a stop. (App.14, Ex. H, Ross Report) Ross did not run a correlation between socio-economics of a location and the crime rate associated with the location and agreed that poorer areas generally have more crime. (App.14, Ex. I, pp.17:18-18:8) Ross agreed there is a correlation between race and socioeconomic status. (Id, pp.18:5-18)

SDSO Booking Criteria specifies the crimes eligible for booking. (App.10,¶ 11) Nothing about a person's race or ethnicity is referenced on the booking criteria. (Id.) Numerous agencies present arrestees and parolees for booking at the County Jail, with the biggest contributors including the California Highway Patrol, Carlsbad Police Department, Chula Vista Police Department, El Cajon Police Department, Escondido Police Department, La Mesa Police Department, National City Police Department, Oceanside Police Department, San Diego Police Department. (Id, Ex. C.) San Diego Sheriff's Office bookings in the County Jail constitute only 25% of the bookings for 2024 to date, and 26% in the prior 3 years, from January 2022 to

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3                    20                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

present. (Id)

Some decisions about probation and other alternatives to incarceration occur early instead of incarceration. These include booking alternatives, sobering services, crisis stabilization units, juvenile diversion, and other programs.[7] Eligibility for release on Supervised Own Recognizance (SOR) uses the California Pretrial Assessment-Revised (CAPA-R) risk assessment to evaluate the client's risk to the community if released on SOR.[8]  Similarly, eligibility for probation and the appropriate level of supervision is determined by assessing risk based on factors such as criminal history, prior incarcerations, and commitment offense, attitudes/core values, substance abuse, employment status, and the company kept by the person.[9]

## III.    LEGAL ARGUMENT.

### A.    FIRST AND SIXTH CLAIMS FOR INADEQUATE MEDICAL AND DENTAL CARE

In their first cause of action, Plaintiffs allege that by "their policies, practices, and failures to train staff," Defendants subject Plaintiffs and other incarcerated individuals to a substantial risk of serious harm and injury from inadequate medical care at the Jail in violation of the Eight Amendment and the Fourteenth Amendment. In the sixth cause of action, Plaintiffs make similar allegations but with regard to the provision of dental care at the Jail.  (*Id*., ¶¶ 483-485.)

"[P]retrial detainees … possess greater constitutional rights than

---

[7] https://www.sandiegocounty.gov/content/dam/sdc/psg/docs/ATI-Investment-Handout-FINAL-05.21.2024.pdf

[8] https://www.sandiegocounty.gov/content/dam/sdc/probation/ Policies/418_ PretrialServicesAdultProcedure.pdf

[9] https://www.sandiegocounty.gov/content/dam/sdc/probation/Trainings/ Class14.1CasePlanningPowerPoint.pdf

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                    21                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1   prisoners." *Stone v. City of San Francisco*, 968 F.2d 850, 857 n.10 (9th Cir.

2   1992); *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir.

3   2016) ("Eighth Amendment protections apply only once a prisoner has been

4   convicted of a crime, while pretrial detainees are entitled to the potentially more

5   expansive protections of the Due Process Clause of the Fourteenth

6   Amendment."); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987).[10]

7   **B.   PLAINTIFFS' MEDICAL CLAIMS FAILS AGAINST**

8   **DEFENDANTS**

9   Here, the undisputed facts demonstrate that the SDSO does not have any

10  current "systemic policies and practices" which are causing IPs to suffer a

11  deprivation of their constitutional rights under the Eighth Amendment (deliberate

12  indifference) or Fourteenth Amendment (reckless disregard) with respect to the

13  provision of medical care at the Jail.

14  In particular, the SDSO has changed its health care contracts to have more

15  direct accountability for the on-site provider services at the Jail (Statement of Facts,

16  Section II.A.1 above); the level of medical providers at the Jail has increased

17  significantly since the filing of this lawsuit (Section II.A.2); the SDSO has 359

18  nursing positions at the Jail, including 265 RNs, and it employs various staffing

19

20  _____

21  [10] Essentially, the same standards will apply to Plaintiffs' claims under both the
    Eighth Amendment and Art. I § 17 of the California Constitution. *See Moreno v.*
    *Beard*, 2014 U.S. Dist. LEXIS 20692, *22 (C.D.Cal. Jan. 13, 2014); *In re Alva*, 33

22  Cal.4th 254, 294, 14 Cal.Rptr.3d 811, 92 P.3d 311 (2004); *Ochoa v. Superior Ct.*, 39

23  Cal.3d 149 (1985); *Inmates of Riverside Cnty. Jail v. Clark*, 144 Cal.App.3d 850,
    858–59, 192 Cal.Rptr. 823 (1983). Likewise, California Constitutional provisions

24  granting equal protection have been found "'substantially the equivalent' of the

25  equal protection clause of the Fourteenth Amendment to the federal Constitution."
    *Serrano v. Priest*, 18 Cal.3d 728, 763, 135 Cal.Rptr. 345, 557 P.2d 929 (1976)

26  supplemented, 20 Cal.3d 25, 141 Cal.Rptr. 315, (1977); *Walgreen Co. v. City &*

27  *County of San Francisco*, 185 Cal.App.4th 424, 434 n. 7, (2010); *Sanchez v. City of*
    *Fresno*, 914 F. Supp. 2d 1079, 1116 (E.D. Cal. 2012).

28

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                                22                    Case No. 3:20-cv-00406-AJB-DDL
                                                                       MPA RE PARTIAL MSJ

tools to combat nursing vacancies, which are very similar to those in the community (Section II.A.3); the intale screening process utilizes new technology like the TEK 84 Intercept body scanner to prevent the introduction of contraband into the Jail (Section II.A.4); TechCare, a software system tailored specifically to the needs of correctional facilities, is used at the Jail (Section II.A.5); TechCare is interfaced with Surescripts, which connects to local pharmacies to assist with medication management (Section II.A.6); the SDSO now operates a dedicated MAT program at the Jail (Section II.A.7); the SDSO contracts with NaphCare for the management of sub-specialty and hospital services (Section II.A.8), as well as optometry services (Section II.A.9); a leadership-driven multidisciplinary team makes weekly "Wellness Rounds" in the AdSep unit of the Jail (Section II.A.10); since the filing of the lawsuit, the SDSO has been revising and/or updating the P&Ps related to the provision of medical care at the Jail to improve with quality management (Section II.A.11); CHP has been in the process of developing a set of DMGs to help standardize chronic care management at the Jail, and the SDSO has started a provider triage pilot program (Section II.A.12); and the mortality rate at the Jail has decreased significantly since the filing of the operative complaint in this lawsuit (Section II.A.13).

Accordingly, the undisputed facts demonstrate that the SDSO does not have any current "systemic policies and practices" which are causing a deprivation of Ips' constitutional rights with regard to the provision of medical care.

## C.  **PLAINTIFFS' DENTAL CLAIMS FAILS AGAINST DEFENDANTS**

Similarly, the undisputed facts demonstrate that the SDSO does not have any current "systemic policies and practices" which are depriving IPs of their constitutional rights with respect to the provision of dental care.

First, at the time this lawsuit was filed, the dental staffing was significantly lower. However, since that time, additional dentists and hygienists have been added

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3                                    23                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1    to the staffing matrix of NaphCare.  Currently, NaphCare has four dentists, two

2    hygienists, and two dental assistants.  (*See*, Section II.B.1 above.)  Second, the

3    dental care services provided by NaphCare include oral healthcare instruction,

4    preventive services, restorative services, endodontics, prosthodontics, and oral

5    surgery.  As part of its preventive services, the SDSO now offers annual teeth

6    cleanings.  (*Id*.)  Third, dental services are offered through the Jail's dental clinic

7    during weekdays, and some dental staff even provide coverage on weekends.  For

8    cases deemed to be complex, two general practice groups and two oral surgery

9    groups are under contract for these referrals.  (*Id*.)  Finally, the SDSO has a

10   procedure for quality assurance monitoring of all the dental staff at the Jail,

11   including monthly chart reviews, annual quality of care assessments, weekly virtual

12   meetings with all clinical staff.  NaphCare also has dental P&Ps which are NCCHC

13   compliant, and TechCare is used to track dental health encounters at the Jail.  (*Id*.)

14       **D.**    **<u>FOURTH CLAIM CAUSE OF ACTION FOR FAILURE TO</u>**

15       **<u>ENSURE ADEQUATE ENVIRONMENTAL CONDITIONS</u>**

16         Plaintiffs assert that Defendants fail to ensure adequate environmental health

17   conditions in the Jails for sentenced and pretrial incarcerated persons under the 8th

18   and 14th Amendments. The claim is meritless.

19         The Fourth Claim of the TAC alleges that through "systemic policies and

20   practices", Defendants allow the jail to become filthy such that it foments the spread

21   of disease, refuse to remedy dangerous electrical and plumbing hazards, fail to

22   provide incarcerated people with clean clothes and linens, and "other"

23   constitutionally inadequate policies and procedures.  (TAC, ¶472)

24         The San Diego jails have robust and comprehensive policies and procedures

25   for each facility covering environmental health and safety addressing facility

26   cleanliness from housing to laundry and food service, in addition to facility specific

27   procedures. (App.10, ¶¶24-26, Ex.K-Q) There are set schedules for cleanliness

28   inspections throughout the chain of command and cleanings for each facility on a

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3                                   24                          Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1  frequent basis by County employees and trustee workers. (Id, ¶28; App.14, Ex.L,

2  p.130:2-7; pp.130:20-131:3; pp.132:8-133:23)

3       The sanitation standards in the food service policies set forth the cleanliness

4  and sanitation requirements. (App. 6, ¶2) Thorough inspections are conducted

5  weekly to check for compliance with all policies and procedures. (Id, ¶¶4, 5 and 6)

6       The existence of periodic environmental issues is not evidence of deliberate

7  indifference or reckless disregard as Plaintiffs believe. Plaintiffs expert witness has

8  no knowledge of the attitude of the Sheriff's Office staff regarding cleaning whereas

9  Ms. Peters found them to be receptive to suggestions and conscientious.  (App. 14,

10  Ex. J, p.27:9-15; App. 13, ¶3) Ms. Graham claimed a few toilets she photographed

11  showing unflushed sewage were evidence of substandard conditions and yet she

12  never bothered to try to flush the toilets to see if they worked and had no idea how

13  long the sewage had been in the toilet.  (App.14, Ex. J, pp.51:14-52:3) She claimed

14  a dirty urinal depicting cloth item(s) inside as being dirty and existing for "at least a

15  month" and when pressed on why she didn't ask the staff with her at the inspection,

16  she first claimed they were not helpful but then admitted she did not ask. (Id,

17  pp.57:16-59:9) She took photos of drain flies in a single shower drain (that exist in

18  high use showers with old pipes) to support her claim of substandard conditions but

19  admitted she did not know how long they had been there and had no idea what

20  system the facility had in place to address drain flies. (App.14, Ex. J, pp.61:15-

21  62:23) The point of Plaintiffs' expert witness was not to obtain information about

22  how often cleaning took place, how cleaning was performed or understand whether

23  in fact a toilet was "clogged" or simply unflushed. All of Plaintiffs' evidence is a

24  "moment in time" when their expert came through for tours without asking

25  questions that should have been asked to determine whether the daily state of the

26  facilities was substandard.  She took a snapshot in time to reach her conclusions and

27  this does not demonstrate deprivation of humane conditions of confinement,

28  deliberate indifference, or anything "akin to reckless disregard".

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                    25            Case No. 3:20-cv-00406-AJB-DDL
                                                   MPA RE PARTIAL MSJ

1    The declarations of Ms. Peters, who did ask questions, who did take the time
2    to understand policies and procedures, the policies and procedures themselves,
3    which demonstrate robust and thorough cleaning protocols, and the testimony
4    through declarations and depositions of jail staff about implementation of those
5    policies and procedures, demonstrate that there is no dispute of material fact to
6    demonstrate that the San Diego County jail facilities do not violate the constitutional
7    rights of Plaintiffs.

8    **E.    FIFTH CLAIM FOR SAFETY AND SECURITY**

9    Plaintiffs contend there are inadequate policies and practice to classify
10   incarcerated people; failure to monitor their safety including protecting them from
11   dangerous drugs; failure to maintain functioning video cameras, intercoms, and
12   elevators; failure to provide timely/ adequate safety checks; failure to prevent and
13   address misconduct by custody staff; and failure to ensure adequate independent
14   oversight. (TAC 146-168.) But Plaintiffs' TAC is woefully outdated, and fails to
15   address the myriad improvements within the Jails, as set forth in detail in the
16   Statement of Facts above.

17   **F.    EIGHTH CLAIM FOR INTERFERENCE WITH ACCESS TO**
18   **COUNSEL AND COURTS**

19   In their eighth cause of action, Plaintiffs are seeking injunctive relief against
20   Defendant San Diego County Sheriff's Office to address "systemic policies and
21   practices pertaining to access to courts and counsel." Plaintiffs allege violations of
22   incarcerated persons' Sixth Amendment right to effective assistance of counsel and
23   Fourteenth Amendment right to due process access to civil and criminal court
24   through unconstitutional policies and procedures, practices, and failure to train
25   correctional staff that: "interfere with" confidential communications between
26   incarcerated people and their attorneys by impeding and interfering with attorney
27   callback requests and attorney-client meetings; fail to ensure that in-person,
28   telephonic and mailed attorney-client communications are confidential; fail to

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                          26                    Case No. 3:20-cv-00406-AJB-DDL
                                                                 MPA RE PARTIAL MSJ

1  ensure that pro se civil and criminal incarcerated persons' legal materials are

2  protected; deny incarcerated persons access to their legal materials; fail to alert

3  incarcerated persons to the types of assistance they can receive; and deny

4  incarcerated persons unfettered access to attendance at court.  ECF 435, ¶¶ 496-

5  500.[11]

6      Plaintiffs' eighth claim effectively alleges *Monell* violation(s) without

7  reference thereto, perhaps because Plaintiffs cannot demonstrate either

8  unconstitutional policies, training, or a pattern and practice of unconstitutional

9  behavior sufficient to sustain such a *Monell*-based claim.  As is evidenced below,

10  Defendant Sheriff's Office's policies, procedures, training and practices are

11  constitutional as to both word and deed.  First, the policies, procedures and training

12  of staff ensure that incarcerated persons have reasonable access to court and

13  confidential communications with counsel via in-person meetings, phone calls, and

14  legal mail correspondence.  Second, policies, procedures and training ensure that

15  incarcerated persons representing themselves in both criminal proceedings and

16  conditions of confinement civil litigation have access to pro per supplies, legal

17  research and investigative tools, and to the court.

18   **G.    LEGAL STANDARD RIGHT OF ACCESS TO COURTS AND**

19   **COUNSEL**

20      Pre-trial and post-conviction incarcerated persons have a constitutional right

21  of access to the courts.  *See Lewis v. Casey*, 518 U.S. 343, 346 (1996); *Bounds v.*

22  *Smith*, 430 U.S. 817, 821 (1977), *limited in part on other grounds by Lewis*, 518

23  U.S. at 354; *Entler v. Gregoir*e, 872 F.3d 1031 (9th Cir. 2017); *Ching v. Lewis*, 895

24

---

25  [11] Plaintiffs also allege concurrent violations of California's Constitution, Article 1,

26  Section 15's right to effective assistance of counsel, and Section 7's right to due
    process (access to court), which require violation of California's Code of

27  Regulations Title 15, which governs correctional facilities located within the State

28  of California.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

1  F.2d 608, 609–10 (9th Cir. 1990) (per curiam) (holding that a prisoner's right of

2  access to the courts includes contact visitation with his counsel).

3       This right "requires prison authorities to assist inmates in the preparation and

4  filing of meaningful legal papers by providing prisoners with adequate law libraries

5  or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at

6  828; *see also Phillips v. Hurst*, 588 F.3d 652 (9th Cir. 2009); *Madrid v. Gomez*, 190

7  F.3d 990 (9th Cir. 1998) (explaining that the right is limited, and that prisoners need

8  only have the minimal help necessary to file legal claims).  The right, however,

9  "guarantees no particular methodology but rather the conferral of a capability – the

10 capability of bringing contemplated challenges to sentences or conditions of

11 confinement before the courts. … [It is this capability] rather than the capability of

12 turning pages in a law library, that is the touchstone" of the right of access to the

13 courts.  *Lewis*, 518 U.S. at 356–57.  Prison officials may select the best method to

14 ensure that prisoners will have the capability to file suit.  *See id*. at 356.  The Ninth

15 Circuit decisions that concluded that prisons have an obligation to provide

16 photocopies and ink pens, where such services and materials were necessary to

17 filing an action or appeal, are arguably still good law.  *See Hiser v. Franklin*, 94

18 F.3d 1287, 1294 n.6 (9th Cir. 1996); *Allen v. Sakai*, 48 F.3d 1082, 1089–90 (9th Cir.

19 1995).  *See also Hebbe v. Pliler*, 627 F.3d 338, 342–43 (9th Cir. 2010).

20      The Ninth Circuit has held that "prisoners have a right under the First and

21 Fourteenth Amendments to litigate claims challenging their sentences or the

22 conditions of their confinement to conclusion without *active interference* by prison

23 officials." *Silva v. Di Vittorio*, 658 F.3d 1090, 1103 (9th Cir. 2011) (discussing

24 requirements for an access-to-court claim premised on prison officials' alleged

25 interference with prisoner lawsuit), *overruled on other grounds Richey v. Dahne*,

26 807 F.3d 1202, 1209 n.6 (9th Cir. 2015).  The right of to the courts is limited to non-

27 frivolous direct criminal appeals, habeas corpus proceedings, and § 1983

28 actions.  *See Lewis*, 518 U.S. at 353 n.3, 354–55; *Simmons v. Sacramento Cty.*

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                              28                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1   *Super. Ct.*, 318 F.3d 1156, 1159–60 (9th Cir. 2003) (explaining that "a prisoner has

2   no constitutional right of access to the courts to litigate an unrelated civil

3   claim."); *Madrid*, 190 F.3d at 995.  The right of access to the courts is only a right to

4   bring complaints to the federal court and not a right to discover such claims or to

5   litigate them effectively once filed with a court.  *See Lewis*, 518 U.S. at 354–

6   55; *Madrid*, 190 F.3d at 995; *Cornett v. Donovan*, 51 F.3d 894, 898 (9th Cir.

7   1995) ("[W]e conclude the Supreme Court has clearly stated that the constitutional

8   right of access requires a state to provide a law library or legal assistance only

9   during the pleading stage of a habeas or civil rights action.").  The right of access to

10  courts also applies to prison grievance proceedings.  *See Bradley v. Hall*, 64 F.3d

11  1276, 1279 (9th Cir. 1995), *abrogated in part on other grounds by Shaw v. Murphy*,

12  532 U.S. 223 (2001).  "Pretrial detainees, whether or not they have been declared

13  unfit to proceed, have not been convicted of any crime. Therefore, constitutional

14  questions regarding the circumstances of their confinement are properly addressed

15  under the due process clause of the Fourteenth Amendment." *Trueblood v.*

16  *Washington State Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1043 (9th Cir.

17  2016) (internal quotation mark, alterations, and citations omitted).

### H.    NINTH CLAIM FOR DISCRIMINATORY RACIAL IMPACT

19      Plaintiffs assert that Black and Latinx persons are disproportionately

20  incarcerated in the jail as a result of Sheriff's Department policing practices that

21  disproportionately arrest Black and Latinx persons, and as a result of allegedly

22  discriminatory Probation Department criteria for alternatives to incarceration. The

23  claim is meritless.

24      Plaintiffs' class definition is :  "All adults who are now, or will be in the

25  future, incarcerated in any of the San Diego County Jail Facilities."  There is also a

26  sub-class of "All Black and Latinx adults who are now, or will be in the future,

27  incarcerated in any of the San Diego County Jail Facilities." Order [ECF 435] at 2.

28  The definition does not include persons who are stopped and/or arrested by Sheriff's

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                                29                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1   deputies – unless they are then incarcerated.

2          The Ninth Claim is based upon California Government Code §11135(a),

3   which provides that no personal shall be unlawfully denied full and equal access to

4   benefits or unlawfully subject to discrimination under an activity on the basis of race

5   or ethnicity. (Cal.Govt.Code §11135(a)) Section 14027 provides standards for

6   determining discrimination and unlawful denial of full and equal access. The first is

7   facial (express) discrimination, which is not alleged. (Cal. Govt Code § 14027(b)(1);

8   *cf.,* TAC at 223-224.) Plaintiffs instead rely on disparate impact, defined as

9   occurring, ". . . when a facially neutral act or practice, regardless of intent," has a

10  disproportionate impact on members of a protected class creates discrimination of

11  members of a protected class, or has the effect of violating any other prohibitions in

12  Article 9.5, subchapter 14027, or other implementing regulations. A practice with a

13  disparate impact is still lawful if supported by a legally sufficient justification, as set

14  out in §14029. (*See* Govt Code § 14027(b)(3).)

15         Evidence of disparate impact may include statistical or other evidence that, 1)

16  those outside the protected class receive better benefits of the program or are easier

17  to obtain, 2) program benefits were reduced, less effective, or more burdensome for

18  members of the protected class than in the past, 3) the program or activity creates,

19  increases, reinforces, or perpetuates segregation on the basis of membership in a

20  protected class, 4) a particular condition to receipt of the program benefits

21  disproportionately excludes members of the protected class, or (5) the objectives of

22  the program or activity were defeated or substantially impaired for members of the

23  protected class. (Cal. Govt Code § 14029(a).) Plaintiffs must show a disparate

24  impact on the protected class from arrests under section 11135 which led to

25  incarceration. Even if stops and arrests are disproportionate, Plaintiffs have no

26  standing or basis to sue unless those stops/arrests also led to incarceration.

27         In terms of policing and arrest, though the data shows *very slight*

28  overrepresentation in the SDSO arrest of Black and Latinx persons compared to the

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                              30                    Case No. 3:20-cv-00406-AJB-DDL
                                                                    MPA RE PARTIAL MSJ

1   County's population makeup, there is no way to show this data corresponds to racial

2   bias given that the data does not show any intentional over-representation. (App.11,

3   ¶ 8) A disparate impact on arrests shows only unintentional discrimination unless it

4   is known that the deputies were aware of the person's race <u>before</u> the stop or call. *Id.*

5   The only independent variable used in Plaintiffs' analyses is the race or ethnicity of

6   the persons stopped or arrested, but there are numerous other independent variables

7   that need to be considered before confirming a pattern and practice of racial

8   discrimination. (App.11, ¶ 10) Plaintiffs also do not take into account that persons

9   stopped and arrested may not be residents of the County, skewing the data about

10  population representation. Most importantly, persons arrested may end up being

11  cited and released, or booked and released, but not incarcerated. Plaintiffs have no

12  standing to complain about stops alone without a subsequent arrest and

13  incarceration.

14      Plaintiffs focus on patrol stops and arrests in their analysis, as evidenced by

15  their expert Matthew Ross's report, which concludes from CAD (Computer Aided

16  Dispatch) and RIPA (Racial and Identity Policing Act) data that stops are

17  disproportionately likely to occur in predominantly Black and Hispanic

18  neighborhoods and that Hispanic individuals are 30% more likely to be arrested

19  after a stop.  (App.14, Ex. H) Notably, Ross did not make the same conclusion about

20  Black individuals. Ross's conclusions are flawed. He acknowledged in deposition

21  that he did not run a correlation between socio-economics of a location and the

22  crime rate associated with the location, though he agreed that poorer areas generally

23  have more crime.  (Id, Ex. I, pp.17:18-18:8) Ross agreed there is a correlation

24  between race and socioeconomic status.  (Id, p.18:5-18) What if the socioeconomic

25  status of the area is a better predictor of stops, arrests, and even the crime rate?

26      Ross stated he would never rely on a comparison to the population makeup

27  because "[t]here's a number of different factors that go into why policing

28  enforcement activities might vary or show an overrepresentation relative to the

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                                31                        Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1  resident population that have nothing to do with disparities or racial profiling."

2  (App.14, Ex.B, p.119:19-5) Ross made conclusions about the frequency of stops "in

3  minority neighborhoods" using census data, and did not analyze the race of the

4  arrested persons as opposed to the neighborhood. (App.14, Ex.B, pp.170:23-173:10)

5  In other words, he found people were stopped more often in predominantly minority

6  neighborhoods – but he did not assess the actual race of the people stopped. Further,

7  his analysis about stops without more, has no bearing on the plaintiffs' class unless

8  they were arrested and incarcerated.

9      While Plaintiffs contend that Black and Latinx persons are disproportionately

10  incarcerated, there is no evidence to conclude it is due to arrests by the SDSO. In

11  fact, SDSO is responsible for only 26% of the bookings in the County jails over the

12  last three years and 74% are due to other agencies. Plaintiffs must establish disparate

13  impact based upon a causal connection between the arrests made by the SDSO and

14  the numbers of incarcerated persons in the protected class. They have not and cannot

15  do so.  Plaintiffs' expert Ross testified that he had no opinion when asked if he had

16  any opinions on the racial disproportionateness of people in the county jail. .

17  (App.14, Ex.B p.174:22-25) He acknowledged he doesn't know if the County jail

18  houses persons arrested by other agencies. (Id, p.175:11-17)

19      SDSO Jail Booking Criteria specifies the crimes eligible for booking.

20  (App.10, ¶11.  Nothing about a person's race or ethnicity is referenced on the

21  booking criteria. (Id) Numerous agencies present arrestees and parolees for booking

22  at the County Jail, with the biggest contributor being the California Highway Patrol

23  and other cities. (Id, Ex. C) SDSO bookings in the County Jail constitute only 25%

24  of the bookings for 2024 to date, and 26% in the prior 3 years, from January 2022 to

25  present. (Id)

26      In some instances, decisions about probation and other alternatives to

27  incarceration occur early including before incarceration. These include booking

28  alternatives, sobering services, crisis stabilization units, juvenile diversion, and other

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4900-6021-9143 v3                              32                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1   programs.[12] Plaintiffs as current and future incarcerated persons have standing to

2   challenge the access to these programs only if the access to alternatives to

3   incarceration post-incarceration is racially disproportionate. Plaintiffs did not

4   designate any expert on this theory. Moreover, even the post-incarceration

5   alternative programs make their decisions based on risk assessment and not race or

6   ethnicity. Eligibility for release on Supervised Own Recognizance (SOR) uses the

7   California Pretrial Assessment-Revised (CAPA-R) risk assessment to evaluate the

8   client's risk to the community if released on SOR. Similarly, eligibility for probation

9   and the appropriate level of supervision, is determined by assessing risk based on

10  factors such as criminal history, prior incarcerations, and commitment offense,

11  attitudes/core values, substance abuse, employment status, and the company kept by

12  the person.

13      Plaintiffs have not disclosed any expert to opine that the Probation

14  Department's or SDSO criteria for alternatives to incarceration programs post-

15  incarceration are racially biased. Even if the plaintiffs show the practice they are

16  challenging has a disparate impact, Defendants can avoid liability by showing that

17  the practice is justified despite the disparate impact. (Govt Code § 14029(b)(2).)  A

18  legally sufficient justification  of the practice "exists when the respondent proves

19  that the action or practice is necessary to achieve a substantial, legitimate, and

20  nondiscriminatory purpose sufficiently compelling to override the disparate impact,

21  and that the action or practice effectively carries out the purpose it is alleged to

22  serve." (Govt Code § 14029(c)(1).)

23      Here, basing eligibility for programs on risk factors such as the criminal

24  offense, prior offense history, and violence, uses neutral criteria and is aimed at

25  preventing violence and violent incidents. Similarly, while Plaintiffs may state

26

27  _____
    [12] https://www.sandiegocounty.gov/content/dam/sdc/psg/docs/ATI-Investment-
28  Handout-FINAL-05.21.2024.pdf

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                          33                    Case No. 3:20-cv-00406-AJB-DDL
                                                                         MPA RE PARTIAL MSJ

arrests are racially disproportionate, the same neutral criteria apply in that only certain crimes are "bookable" depending on a specific list of crimes, the severity of the crime and other factors such as violence.

## IV. CONCLUSION

For the foregoing reasons, Defendants are entitled to partial summary judgment or, in the alternative, an order treating the above facts as established. In particular, Defendants seek findings as follows:

1.     Defendants were not deliberately indifferent under the Eighth Amendment and the Fourteenth Amendment with respect to the provision of medical care to convicted and pre-trial incarcerated persons being housed in its jail facilities (First Cause of Action);

2.     Defendants were not deliberately indifferent under the Eighth Amendment and the Fourteenth Amendment with respect to the provision of dental care to these incarcerated persons (Sixth Cause of Action);

3.     Defendants did not provide these incarcerated persons with inadequate conditions of confinement such as sanitation conditions (Fourth Cause of Action);

4.     Defendants did not provide these incarcerated persons being housed in its jail facilities safety and security (Fifth Cause of Action);

5.     Defendants did not deny these incarcerated persons access to courts and counsel under the Sixth Amendment and the Fourteenth Amendment (Eight Cause of Action);

6.     Black and Latinx persons are not being disproportionately incarcerated in the jail facilities in violation of California Government Code §11135(a) (Ninth Cause of Action); and

///

///

///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                                            34                         Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

1    7.    Further, Plaintiffs are not entitled to any form of injunctive or

2  declaratory relief with regard to these causes of action.

3

4

Dated:  December 16, 2024              BURKE, WILLIAMS & SORENSEN, LLP

5

6

7                                By:  _____
                                      */s/ Susan E. Coleman*

8                                     Susan E. Coleman
                                      Elizabeth M. Pappy
9                                     Deann Rivard
                                      Martin Kosla
10                                    Attorneys for Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

# PROOF OF SERVICE

**Dunsmore, et al v. San Diego County Sheriff's Department, et al.**
**USDC Southern District Case No. 3:20-cv-00406-AJB-DDL**

**STATE OF CALIFORNIA, COUNTY OF VENTURA**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Ventura, State of California.  My business address is 2310 East Ponderosa Drive, Suite 25, Camarillo, CA 93010-4747.

On December 16, 2024, I served true copies of the following document(s) described as **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address dwetters@bwslaw.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 16, 2024, at Camarillo, California.

/s/ Kathleen van Daalen Wetters
Kathleen van Daalen Wetters

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4900-6021-9143 v3                        36                        Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ

# SERVICE LIST

### *Dunsmore, et al v. San Diego County Sheriff's Department, et al.*
### USDC Southern District Case No. 3:20-cv-00406-AJB-DDL

| | |
|---|---|
| Gay C. Grunfeld, Esq.<br>Van Swearingen, Esq.<br>Michael Freedman, Esq.<br>Eric Monek Anderson, Esq.<br>Hannah M. Chartoff, Esq.<br>Benjamin W. Holston, Esq.<br>Kedra Chan<br>Rosen Bien Galvan & Grunfeld LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, CA 94105-1738<br>Telephone: 415.433.6830<br>Facsimile: 415.433.7104<br>Email: ggrunfeld@rbgg.com<br>Email: vswearingen@rbgg.com<br>Email: mfreedman@rbgg.com<br>Email: eanderson@rbgg.com<br>Email: hcartoff@rbgg.com<br>Email: bholston@rbgg.com<br>Email: kchan@rbgg.com | *Attorneys for Plaintiffs and the Certified Class and Subclasses* |
| Aaron J. Fischer, Esq.<br>Law Office of Aaron J. Fischer<br>1400 Shattuck Square Suite 12 - #344<br>Berkeley, California 94709<br>Telephone: 510.806.7366<br>Facsimile: 510.94.6314<br>Email: ajf@aaronfischerlaw.com | *Attorneys for Plaintiffs and the Certified Class and Subclasses* |
| Christopher M. Young, Esq.<br>Isabella Neal, Esq.<br>Oliver Kiefer, Esq.<br>DLA Piper LLP<br>4365 Executive Drive, Suite 1100<br>San Diego, CA 92121<br>Telephone: 858.677.1400<br>Facsimile: 858.677.1401<br>Email: christopher.young@dlapiper.com<br>Email: isabella.neal@dlapiper.com<br>Email: oliver.kiefer@dlapiper.com | *Attorneys for Plaintiffs and the Certified Class and Subclasses* |

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4900-6021-9143 v3                    37                    Case No. 3:20-cv-00406-AJB-DDL
MPA RE PARTIAL MSJ