Susan E. Coleman (SBN 171832)
E-mail:  scoleman@bwslaw.com
Deann Rivard (SBN 177482)
drivard@bwslaw.com
Martin Kosla (SBN 247224)
E-mail:  mkosla@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA  92101-8474
Tel:  619.814.5800 Fax:  619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail:  epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA  95113-2336
Tel:  408.606.6300 Fax:  408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
DEPARTMENT

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**APPENDIX OF EVIDENCE IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED**<br><br>[Fed. R. Civ. P. 56]<br><br>[*Notice of Motion, Memorandum of Points and Authorities, Declarations and [Proposed] Order filed concurrently herewith*]<br><br>**Hearing**<br>Date:    March 6, 2025<br>Time:    2:00 p.m.<br>Ctrm:   4A<br><br>Judge: Anthony J. Battaglia |

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4899-9003-4179 v1

1

Case No. 3:20-cv-00406-AJB-DDL
APPENDIX OF EVID. RE PARTIAL MSJ

1    Defendants COUNTY OF SAN DIEGO, SAN DIEGO COUNTY

2  SHERIFF'S DEPARTMENT and SAN DIEGO COUNTY PROBATION

3  DEPARTMENT ("Defendants") hereby submit the following appendix of evidence

4  in support of their motion for partial summary judgment or, in the alternative, for an

5  order treating specified facts as established, as follows:

6                           **Declarations**

7    1.    Declaration of Owen J. Murray, D.O., Defense Medical Expert.

8    2.    Declaration of Scott E. Reinecke, D.D.S., Defense Dental Expert.

9    3.    Declaration of Jon Montgomery, D.O., Medical Director, Detention

10        Services Bureau, Medical Services Division, San Diego County

11        Sheriff's Office, together with the following exhibits:

12        A.    Policy and Procedure No. A.1.3 (Healthcare Services).

13        B.    Policy and Procedure No. C.9.1 (Orientation for Health Staff).

14    4.    Declaration of Peter J. Freedland, M.D., Chief Executive Officer,

15        Correctional Healthcare Partners, Inc., together with the following

16        exhibits:

17        A-1.  Disease Management Guidelines – Asthma.

18        A-2.  Disease Management Guidelines – Gout.

19        A-3.  Disease Management Guidelines – HIV.

20        A-4.  Disease Management Guidelines – Hyperlipidemia.

21        A-5.  Disease Management Guidelines – Hypertension.

22        A-6.  Disease Management Guidelines – Soft Tissue Infection.

23    5.    Declaration of Serina Roglien-Hood, Deputy Director of Residential

24        Inpatient Care Facilities, San Diego County Sheriff's Office.

25    6.    Declaration of Sergio Sanchez, Assistant Manager of Sheriff's Food

26        Service.

27    7.    Declaration of Scott Bennett, Project Manager, San Diego County

28        Sheriff's Department.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4899-9003-4179 v1                    2                    Case No. 3:20-cv-00406-AJB-DDL
APPENDIX OF EVID. RE PARTIAL MSJ

8.    Declaration of Francis Gardiner, Sergeant, Las Colinas Contraband Narcotics interdiction Team (CNIT), together with the following exhibits:

    A.    Flow chart showing process of screening and contraband.

    B.    PowerPoint presentation about CNIT.

9.    Declaration of Rebecca Cardenas, Program Coordinator, San Diego County Sheriff's Office, together with the following exhibits:

    D.    N.6 – conditions of confinement incarcerated persons.

    E.    N.7 – in propria persona status (pro per incarcerated persons).

    G.    T.3 – legal research area rules.

    H.    T.7 – legal assistance to incarcerated persons.

10.    Declaration of Mike Binsfield, Lieutenant, San Diego County Sherrif's Office, together with the following exhibits:

    A.    F.15 – contact with the duty judge.

    B.    N.1 – grievance procedure..

    C.    N.5 – access to courts/ attorneys/ legal advice.

    D.    P.15 – professional contact visits.

    E.    "Green Sheets" for specific jail facilities on P.15 professional contact visits P.15.M – (East Mesa); P.15.G – (George Bailey); P.15.L – (Las Colinas), P.15.R – (Rock Mountain): P.15.C.1 – (SDCJ); P.15.V – (Vista jail).

    F.    "Green Sheets" for specific jail facilities on N.1 grievances N.1.G – (George Bailey); N.1.L (Las Colinas), N.1.S (South Bay), and N.1.C.1 (SDCJ).

    G.    "Green Sheets" for specific jail facilities on N.5. access to court/attorneys/legal N.5.G – (George Bailey); N.5.L – (Las Colinas); N.5.R – (Rock Mountain); N.5.C.1. – (SDCJ).

    H.    Current booking criteria for the San Diego County jails.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4899-9003-4179 v1

3

Case No. 3:20-cv-00406-AJB-DDL
APPENDIX OF EVID. RE PARTIAL MSJ

I.   DSB arresting agencies list.

J.   Booking county by arresting agency from 2022 to 2024 for the SD County Jails.

K.   "Green Sheets" for subsections L.1 to L.7, L.9, L.11, L.13 and M.41– Las Colinas Detention and Reentry Facility.

L.   "Green Sheets" for subsections L.1 to L.7, L.9, L.11 and L.13– East Mesa Reentry Facility.

M.   "Green Sheets" for subsections L.1 to L.7, L.9, L.11, L.13 and M.41– George Bailey Detention Facility.

N.   "Green Sheets" for subsections L.1 to L.7, L.9, L.11, L.13 and M.41– Vista Detention Facility.

O.   "Green Sheets" for subsections L.1 to L.7, L.9, L.11 and L.13 – South Bay Detention Facility.

P.   "Green Sheets" for subsections L.1 to L.7, L.9, L.11, L.13 and M.41 – Rock Mountain Detention Facility.

Q.   "Green Sheets" for subsections L.1 to L.7, L.9, L.11, L.13 and M.41 – San Diego Central Jail.

R.   2021 DSB Inmate Orientation Video (SD 105823).

S.   2021 Inmate Orientation Video (SD 105824).

11.  Declaration of Brian Withrow, Ph.D., Defense Expert.

12.  Declaration of David Blackwell, Lieutenant, San Diego County Sheriff's Department.

13.  Declaration of Expert Henrietta Peters, together with the following exhibits:

A.   Curriculum Vitae.

B.   List of documents reviewed.

14.  Declaration of Susan E. Coleman, together with the following exhibits:

A.   Excerpts to the deposition of Rita Diaz.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4899-9003-4179 v1

4

Case No. 3:20-cv-00406-AJB-DDL
APPENDIX OF EVID. RE PARTIAL MSJ

1          B.     Excerpts to the deposition of Rebecca Cardenas.

2          C.     Excerpts to the deposition of Jesse Johns.

3          D.     Excerpts to the deposition of Eric S. Brown.

4          E.     Excerpts to the deposition of Theresa Adams-Hydar

5          F.     San Diego Sheriff's Office Detention Services Bureau

6                 Policy G.1, regarding Maintenance Procedures.

7          G.     Excerpts to the deposition of Scott Bennett.

8          H.     Excerpts of Plaintiffs' Expert Matthew Ross' Report

9          I.     Excerpts to the deposition of Plaintiffs' Expert Matthew Ross

10         J.     Excerpts to the deposition of Debra Graham.

11         K.     Excerpts to the deposition of Michelle Aguinaldo.

12         L.     Excerpts to the deposition if Issac Alvarado.

13

14

15   Dated:  December 16, 2024               BURKE, WILLIAMS & SORENSEN, LLP

16

17

18                                    By:    /s/ Susan E. Coleman
                                             Susan E. Coleman
19                                           Deann Rivard
                                             Elizabeth M. Pappy
20                                           Martin Kosla

21                                           Attorneys for Defendants
                                             COUNTY OF SAN DIEGO, SAN
22                                           DIEGO COUNTY SHERIFF'S
                                             DEPARTMENT and SAN DIEGO
23                                           COUNTY PROBATION
                                             DEPARTMENT
24

25

26

27

28

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4899-9003-4179 v1                           5              Case No. 3:20-cv-00406-AJB-DDL
                                                           APPENDIX OF EVID. RE PARTIAL MSJ

# 1.

# DECLARATION OF OWEN J. MURRAY, D.O.

Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
Martin Kosla (SBN 247224)
E-mail: mkosla@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA 92101-8474
Tel: 619.814.5800 Fax: 619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
Tel: 408.606.6300 Fax: 408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
DEPARTMENT

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF OWEN J. MURRAY, D.O., IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED**

**Hearing**
Date:    March 6, 2025
Time:    2:00 p.m.
Ctrm:    4A

Judge: Anthony J. Battaglia

Magistrate Judge: David D. Leshner

///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

I, OWEN J. MURRAY, D.O., declare as follows:

1.    I am competent to testify to the matters set forth in this declaration, and if called to do so, would and could so testify.

2.    I am a board-certified physician in the field of Family Practice.  I have considerable expertise in correctional healthcare with more than 29 years of experience in correctional medicine.  For the past 25 years, I have worked for the University of Texas Medical Branch ("UTMB") Offender Health Services Program. Currently, I serve as the Vice President of Offender Health Services in which capacity I am responsible for ensuring the provision of all medical, mental health, and dental services for approximately 100,000 adult offenders in the Texas Department of Criminal Justice ("TDCJ") state jails and prisons (approximately 80% of the state's correctional facility population), as well the delivery of such services to juvenile offenders in the Texas Juvenile Justice Department ("TJJD") facilities.  I oversee a staff of approximately 3,500 healthcare and clinical support employees located at more than 100 correctional facilities throughout the State of Texas.

3.    Before joining UTMB in 1995, I served as a Divisional Medical Director of Chicago's Cook County Jail and several correctional facilities operated by the Illinois Department of Corrections.  In addition, I have served as a healthcare consultant for several correctional systems, including the California and Arizona Departments of Corrections.  I currently serve as a Commissioner for Accreditation for the American Correctional Association ("ACA").

4.    In my role as Vice President of Offender Health Services for UTMB Correctional Managed Care ("CMC"), I have significant experience evaluating the management of infectious disease, to include COVID-19, in the correctional setting, consistent with standards and guidance promulgated by the American Correctional Association and the U.S. Centers for Disease Control and Prevention ("CDC").

///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4

2

Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

5.     I am familiar with the standard of care and skill ordinarily exercised by reputable members of the medical profession, including the standard for providing medical care in the correctional setting.

6.     I have reviewed the operative complaint filed by the plaintiffs ("Plaintiffs") in this lawsuit against Defendants COUNTY OF SAN DIEGO ("County"), SAN DIEGO COUNTY SHERIFF'S DEPARTMENT ("Sheriff's Office") and SAN DIEGO COUNTY PROBATION DEPARTMENT (collectively, "Defendants").

7.     I understand that Plaintiffs allege, among other things, that Defendants subject Plaintiffs and other incarcerated individuals to a substantial risk of serious harm and injury from inadequate medical care at Defendants' jail facilities in violation of the Eight Amendment and the Fourteenth Amendment as a result of their "their policies, practices, and failures to train staff."  Plaintiffs claim that these "systemic policies and practices" include failing to maintain sufficient numbers of adequately trained healthcare professionals, refusing to provide Medication-Assisted Treatment ("MAT") for incarcerated people with substance use disorders, having insufficient contracts with community providers, and failing to maintain adequate quality assurance and quality improvement processes.  (*See*, Third Amended Complaint, ¶¶ 444-445.)

8.     I have been asked by defense counsel to provide my opinion with regard to the medical care claim being addressed in Defendants' partial summary judgment, or in the alternative, for an order treating specified facts as established.

9.     I have reviewed the relevant records in this case, including the contracts and agreements related to provision of medical services, the various policies and procedures, deposition transcripts, organizational charts and staffing plans.  I also conducted staff interviews and reviewed a random selection of inmate/patient charts to assess the treatment for various medical conditions at the Jail.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4906-1870-3875 v4                                            3                          Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

10.     In March 2024, I toured all seven jail facilities maintained and operated by the Sheriff's Office, consisting of East Mesa Reentry Facility ("EMRF"), George Bailey Detention Facility ("GBDF"), Las Colinas Detention and Reentry Facility ("LCDRF"), Rock Mountain Detention Facility ("RMDF"), San Diego Central Jail ("SDCJ"), South Bay Detention Facility ("SBDF"), and Vista Detention Facility ("VDF") (collectively, the "Jail").

11.     I hereby provide my analysis and opinion with regard to the medical care being provided by Defendants at the Jail.

## Healthcare Contracts

12.     The Jail is designed to house individuals who have been arrested and are awaiting trial and sentencing or who are serving short-term state sentences.  The Sheriff's Office uses a hybrid model of healthcare delivery at the Jail for these individuals.

13.     Under this model, the Sheriff's Office is responsible for nurse staffing, as well as the ancillary support staff for Information Technology and case management.  Pursuant to a contract with the County, NaphCare (a private correctional healthcare company) is responsible for dental staffing, mental health staffing, the MAT program, Utilization Review ("UR"), and pharmacy operations. Under a separate contract with the County, a second correctional healthcare company, Correctional Healthcare Partners, Inc. ("CHP"), is responsible for all on-site medical provider services at the Jail.

14.     The contract with CHP (which had previously been a sub-contractor to NaphCare) was implemented at the behest of the County in an effort for the Sheriff's Office to have more direct accountability for the on-site provider services at the Jail.  This new and direct contract with CHP commenced on June 1, 2024.

## Staffing – Medical Providers

15.     Currently, pursuant to the new contract with CHP, there are 30.5 Full-Time Employee ("FTE") medical providers at the Jail.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4906-1870-3875 v4

4

Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

16.    This level of provider staffing is approximately 2.5 times more than the level in place around the time this lawsuit was filed.  Based on the Jail's population of 3,859 (on December 4, 2024), and given the current staffing of 30.5 FTE providers, this is a ratio of 1 FTE provider for every 127 patients.  This is unprecedented in jail health care delivery, and I am unaware of any jail having medical provider services at this level.

17.    In fact, the level of medical provider staffing at the Jail increased since I prepared my expert report in this lawsuit in August 2024.  At that time, there were 28.4 FTE providers.  This was already a monumental change from the 11.8 FTE providers employed at around the time the lawsuit was filed.  It represented a greater than 100% increase in the volume of provider coverage (from 472 to 1096 coverage hours per week) at the Jail.

### Staffing – Nursing

18.    The Sheriff's Office utilizes a predominantly Registered Nurse ("RN") based staffing model at the Jail, which is atypical for county jails.

19.    Due to their advanced education and training, RNs contribute significant clinical expertise, critical thinking skills, and holistic care approaches to the Jail's healthcare program.

20.    The Sheriff's Office does utilize licensed vocational nurses ("LVN") but in a restricted scope of practice.  LVNs primarily aid in medication administration and performing tasks that require lower-level nursing skills.  This staffing approach ensures that highly skilled RNs are at the forefront of patient care delivery.

21.    The model employed by the Sheriff's Office is a functional team nursing care delivery concept.  The team nursing model with assigned patient care areas is designed to ensure continuity and efficiency in healthcare delivery by organizing nursing teams around specific patient care areas.

22.    In this model, RNs lead a team that includes RNs, LVNs, and nursing

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4                    5                    Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

assistants ("NA").  Each team is responsible for a designated group of patients within a unit or area, allowing them to develop familiarity with a patient's needs, baselines, and care plans.  This approach facilitates personalized care and enhances patient outcomes by ensuring consistent nursing presence and continuity throughout the patient's stay.

23.    RNs oversee the coordination of care, delegate tasks according to each team member's capabilities, and collaborate closely with other healthcare disciplines to address complex patient needs comprehensively.

24.    By assigning specific patient care areas to nursing teams, the team nursing model promotes effective communication, shared accountability, and a supportive work environment where healthcare providers can collaborate efficiently to meet the diverse healthcare needs of their incarcerated population.

25.    Nursing coverage at the Jail is achieved with a hybrid shift matrix of 8-hour and 12-hour shifts.

26.    Nursing leadership at the Jail is provided under the direction of the Deputy Director of Residential Inpatient Care Facilities, Serina Roglien-Hood, who is a licensed RN.  Frontline nursing supervision at each facility in the Jail is provided by Supervising RNs.

27.    Currently, there are 359 nursing positions at the Jail, consisting of 265 RNs and 94 LVNs.  Based on my experience, this is more than adequate nursing staffing for the Jail.

28.    During the preparation of my expert report in this case in August 2024, I analyzed the nursing vacancy rates at Jail for the period January to April 2024. During this timeframe, the average nursing vacancy rate of approximately 25% at the Jail was generally similar to or slightly lower than that of other healthcare facilities in Southern California.  Those rates typically range from 20% to 30% depending on the location and type of facility.

29.    Historically, nursing vacancy rates in correctional healthcare settings

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4                                    6                     Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

tend to surpass those in the surrounding community healthcare settings.  However, the trending vacancy rates observed at Jail signify a comparatively healthy nurse staffing scenario.

30.     In order to address the vacancy rates, the Sheriff's Office employs various staffing tools, including overtime and supplemental agency staffing resources.

31.     In particular, when a staffing challenge arises, overtime is offered in advance as an incentive for coverage.

32.     For longer-term vacancies or regular interval coverage needs, the Sheriff's Office utilizes the services of United Nursing International Healthcare Recruiters to provide licensed agency nurses for critical positions.

33.     Due to the complexity of the medical program at the Jail, agency staff are assigned specific task-oriented roles to minimize orientation time and maximize their effectiveness. These measures ensure that patient care remains uninterrupted, and that the nursing workforce is supported, particularly during periods of increased demand or long-term staff vacancies.

34.     While Plaintiffs focus on the vacancy rates at the Jail, they fail to acknowledge that the nursing paradigm has changed in the US, as the use of nursing agencies and overtime is a customary industry norm required to bridge the nursing vacancy gap (a process which the Sheriff's Office uses).

### Intake Screening

35.     Intake screenings at the Jail are done by RNs.  In particular, the RN responsible for the intake processing initiates the triage assessment for all individuals brought in for booking by local law enforcement to ascertain their jail admission medical clearance eligibility or "Gate Refusal."  This process ensures that all individuals are medically stable before commencing the formal intake screening procedure.

36.     Individuals meeting the criteria for "Gate Refusal" are not admitted.

Burke, Williams & Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4

7

Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

Instead, they are directed to the Emergency Department to undergo evaluation and treatment if indicated to obtain medical clearance.

37.     During the intake process at all three intake processing locations (VDF, SDCJ, and LCDRF), individuals entering the Jail are scanned with the TEK 84 Intercept body scanner.  This is the latest body scanning technology system.  This advanced system is utilized to scan most individuals (unless medically contraindicated such as pregnancy) and their belongings to identify and prevent the introduction of contraband such as weapons, drugs, or other prohibited items into the Jail.

38.     Based on my experience and review of the records, the use of the TEK 84 in combination with drug dogs used by custody staff to screen individuals entering the Jail has led to a dramatic reduction in drug overdoses at the Jail.

39.     The intake RN at the Jail also functions as the "Gatekeeper" in the absence of an on-site Qualified Mental Health Provider ("QMHP"), a role designated by the sheriff's Office.  In this capacity, the RN's assessment findings address immediate medical needs, mental health concerns, and suicide risks, ensuring that individuals entering the Jail receive appropriate medical attention and are placed in safe housing based on their health status.

40.     As part of the receiving screening process, individuals are screened and tested for tuberculosis and females undergo pregnancy testing.  Additionally, COVID-19 and influenza vaccinations are offered to all individuals entering the Jail (as seasonally appropriate).

41.     The screening process also evaluates the past and present substance use of each individual entering the Jail.  Individuals identified with current substance use or with positive drug screen urinalysis results are promptly assessed utilizing the "Detox Screening Tool."  They are then referred for monitoring of withdrawal symptoms, as well as medical drug detoxification, as medically indicated.

42.     Withdrawal symptoms are assessed once daily (at a minimum) utilizing

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4                                    8                    Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

1  withdraw assessment tools such as the Clinical Institute Withdrawal Assessment

2  and/or the Clinical Opiate Withdrawal Scale.  RNs complete the appropriate

3  withdrawal assessment tool(s) and refer each assessment for review by the on-site

4  medical provider or on-call medical provider (StatCare).

5       43.     Upon completion of the intake process, all incarcerated individuals are

6  scheduled for an initial health assessment within 14 days.

7  **Record Management**

8       44.     With respect to record management, the Sheriff's Office uses the

9  TechCare system at the Jail.  TechCare is a comprehensive electronic health record

10  ("EHR") software system developed by NaphCare and tailored specifically to the

11  needs of correctional facilities.  The system was designed to provide a

12  comprehensive platform for managing patient health information, facilitating

13  clinical workflow and decision making, and promoting quality care.

14       45.     TechCare is certified by the Office of the National Coordinator for

15  Health Information Technology ("ONC") – Authorized Certification Bodies

16  ("ACB") and meets all functional requirements of an EHR, as well as privacy and

17  security standards set by ONC.  The system was implemented by the Sheriff's

18  Office at the Jail in September 2019.

19  **Pharmacy / Medication**

20       46.     The TechCare system at the Jail is interfaced with Surescripts, a health

21  information technology company which operates a nationwide health information

22  exchange network connecting pharmacies, healthcare providers, and benefit

23  managers.  Surescripts securely connects to a patient's medication history stored in

24  the databases of community pharmacies and pharmacy benefit managers. This

25  allows staff at the Jail to verify medication history quickly and easily.

26       47.     If Surescripts does not return any prescription findings for a patient but

27  the patient has reported that they are currently taking a medication, jail staff will

28  attempt to verify this information by contacting the patient's pharmacy or provider

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4          9          Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

directly.

48.     While it is true that Surescripts is not connected to *all* pharmacies in the nation (but only the ones in California), I have not seen any evidence presented by Plaintiffs that this has been a recurring and systematic issue at the Jail.

### MAT / MOUD Program

49.     The Sheriff's Office now operates a dedicated MAT program at the Jail through NaphCare.

50.     The MAT program combines medication treatment with counseling and behavioral therapies to provide a comprehensive approach to treating substance use disorder, particularly opioid addiction.  The program uses certain medications to help individuals manage withdrawal symptoms, reduce cravings, and prevent relapse.

51.     Incarcerated individuals at the Jail are offered a combination of pharmacologic and psychosocial treatment.  An individual's decision to refuse psychosocial treatment does not preclude them from receiving pharmacological treatment.  These individuals continue to receive medication management for Opioid Use Disorder ("OUD") as part of the Medication for Opioid Use Disorder ("MOUD") program.

52.     Individuals coming to the Jail are screened for OUD at intake and considered for initiation or continuation of medication based on findings.  In addition, individuals being housed at the Jail are able to request initiation of treatment at any point during their incarceration.  Individuals identified with OUD during their incarceration who have not been receiving treatment are offered induction therapy.

53.     To assist with identification and reporting purposes, incarcerated individuals on medication for OUD are flagged in TechCare as "MAT."

54.     The Sheriff's Office (through NaphCare) has a total of seven providers dedicated to the MAT program at the Jail.  The program has two nurse practitioners

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4906-1870-3875 v4                    10                    Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

1  and one physician who manage medication, and four mental health staff who

2  provide therapy.

3      55.    Mental health staff meet with MAT patients for individual therapy.

4  Group therapy is also available at several of the jail facilities, including VDF and

5  LCDRF.

6      56.    Incarcerated individuals receiving treatment for OUD at the time of

7  incarceration are offered continuation of their medication, often in partnership with

8  their Opioid Treatment Program ("OTP") in the community when possible.

9      57.    Maintenance treatment is continued throughout incarceration and upon

10  discharge.  If medically indicated, incarcerated individuals can a 30-day supply of

11  medication as well as a list of community resources to help facilitate continuity of

12  care and reduce the risk of relapse and overdose after release.

13      58.    It is true then when this lawsuit was filed, the Sheriff's Office did not

14  have a MAT program at the Jail.  Now, because the claim on this issue is moot,

15  Plaintiffs appear to be arguing that the MAT program is inadequate.  However,

16  based on my experience, the current MAT program is robust, expanding, and

17  consistent with good practice.  In fact, the MAT program contributed significantly to

18  reducing drug overdoses at the Jail.

19              **Sub-Specialty Services**

20      59.    It is not uncommon for many incarcerated individuals to enter a

21  correctional facility with untreated or poorly managed medical conditions, including

22  chronic diseases like diabetes, hypertension, and heart disease.  In such cases, the

23  medical care needs for these individuals extend beyond primary care management.

24  Their care needs require specialist intervention, including services such as

25  orthopedic surgery, cardiology, and gastroenterology.

26      60.    The Sheriff's Office therefore contracts with NaphCare for the

27  management of sub-specialty and hospital services.

28      61.    NaphCare utilizes contracts with the University of California San

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4                      11            Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

Diego, as well as several independent practitioners to provide specialty services locally.  NaphCare also provides telehealth specialty consultations in endocrinology, dermatology, cardiology, dentistry, infectious disease, orthopedics, and nephrology for clinically appropriate patients.

62.    Between March 2023 to April 2024, the Sheriff's Office completed over 2,500 sub-specialty referrals for the incarcerated individuals being housed at the Jail.

63.    The average time from consult origination to the completion for such sub-specialty referrals was approximately 25 days.  This time frame for sub-specialty access was comparable to what existed in the community in San Diego.

64.    I have not seen any evidence that the sub-specialty providers are currently not providing services due to delays in payment that might have previously existed.

65.    In addition to the sub-specialty care services, the Sheriff's Office has contracts for Hospital Guard Units ("HGU") with UCSD Health East Campus Medical Center (formerly known as Alvarado) and Tri-City Hospital.  HGUs are contained within these hospital facilities and are used specifically for incarcerated individuals.  They have designated Sheriff's Office correctional officers that provide security.  The HGU contracts ensure that appropriate clinical bed space is available for high acuity medical patients in the custody of the Sheriff's Office.

### Specialty Services – Optometry

66.    The Sheriff's Office also provides on-site and off-site optometry care as part of the ancillary services offered at the Jail.  In particular, the Sheriff's Office contracts (through NaphCare) with multiple eye care specialists to ensure that the population at the Jail has access to necessary optometry services and corrective lenses.  These specialty providers include Institutional Eye Care, LLC (vision services), National Eye Care Eye (care services), and Retina Center of San Diego Medical (surgical retina care).

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4

12

Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

67.   In addition to the off-site services, the Sheriff's Office now employs a full-time optometrist to ensure the Jail population has timely access to refractive services.  Incarcerated individuals who require reading glasses can obtain them through the sick call process and nursing staff can distribute reading glasses to all patients as clinically indicated.

68.   The number of prescription eyeglasses provided to the Jail population was reviewed for 2023 (total of 234 eyeglasses) and the period January to June 2024 (total of 736 eyeglasses).  This significant increase in prescription eyeglasses coincided with the addition of the full-time optometrist in February 2024.

### "Wellness Rounds" Team

69.   The Sheriff's Office has created a leadership-driven multidisciplinary team that makes weekly "Wellness Rounds" in the Administrative Separation ("AdSep") unit of the Jail.  These rounds occur 52 weeks a year.

70.   The "Wellness Rounds" team consists of the following individuals: mental health staff; medical staff (typically the jail facility nursing leadership); counselor staff; sworn custody staff; a designee from JPMU (jail population management unit) to address classification and housing issues; and 2-3 inmate/detainee trustees.

71.   This team individually walks to each AdSep cell, attempts to engage the incarcerated individual, asks them if they need anything, and encourages them to exit their cell.  The cell itself is assessed by custody and mental health staff.  The trained inmates/detainees clean the cell and remove refuse or food items, and perform additional cleaning as required.  The incarcerated individual's medical and mental status, clinical functioning, and activities of daily living are assessed by medical and mental health staff.  Counselors focus on helping the incarcerated individual obtain reading materials, answer any questions or concerns and assist with any court related issues or concerns, questions regarding discharge planning, and follow-up.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4                    13                    Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

72.    While Plaintiffs have expressed concerns that these rounds may not provide the highest degree of confidentiality, the practice can enhance an incarcerated individual's health by ensuring regular monitoring, early detection of issues, and more personalized care.  This proactive approach can lead to better overall health outcomes, increased safety, and reduced emergency situations.

## Quality Management

73.    Policy and Procedure ("P&Ps") are the foundation upon which healthcare organizations are built and quality of care is managed.  They streamline and standardize daily operational activities, allowing a healthcare organization to run efficiently.  P&P are unique to each organization and tailored to fit specific goals and outcomes.

74.    The Sheriff's Office has various P&Ps related to the provision of medical services at the Jail.  These P&Ps are readily available to staff via an electronic link and in hard copy binders.

75.    Further, since the filing of the lawsuit, the Sheriff's Office has been revising its P&Ps with regard to the provision of healthcare at the Jail.  For example, in June 2024, the Sheriff's Office released P&P No. A.1.3.  The purpose of this policy is to identify healthcare services generally available for incarcerated persons, define methods of access to care, ensure privacy of care, and define health staff's limited scope in disciplinary decisions.  In July 2024, Sheriff's Office released P&P No. C.9.1, which outlines the procedure for providing an orientation to all new health staff employees at the Jail.

76.    Quality Assurance ("QA") is also important in correctional healthcare for numerous reasons.  One such reason is that QA creates a framework for accountability, ensuring that healthcare providers meet their responsibilities and there is oversight of their performance.

77.    The Sheriff's Office has been in the process of revamping its QA program at the Jail.  The Sheriff's Office has a Quality Assurance/Quality

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4                    14                    Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

1  Improvement ("QA/QI") committee which meets quarterly and holds an annual

2  recap meeting in January.

3        78.    The committee is made up of the following members: Chief Medical

4  Officer; Director of Nursing; Medical Administrative Officer; Program Director,

5  Mental Health; Chief, Health Information Management; Captain, ADA;

6  Administrative Sergeant; Health Services Administrator, NaphCare; Mental Health

7  Program Director, NaphCare; Supervising Nurses, LCDRF, VDF, SDCJ, GBDF,

8  RMDF; Supervising Nurse, Infection Control; Supervising Nurse, Training;

9  Supervising Nurse Recruitment; Supervising Nurse, Advanced Medical Life

10 Support (AMLS) / Prehospital Trauma Life Support (PHTLS) Coordinator;

11 Supervising Nurse, ADA and Managed Care; Supervising Nurse, P&P and QI;

12 Infection Control; Chief Mental Health Clinicians, SDCJ, VDF, LCRDF,

13 GBDF;Chief Mental Health Clinician, MAT; and Administrative Analyst, MAT.

14 The membership of the QA/QI committee at the Jail is consistent with correctional

15 health care industry standards.

### Chronic Care

17       79.    Individuals entering the Jail are assessed for any known chronic

18 medical conditions during the intake screening at the time of booking.  At the

19 screening, current medications are identified through Surescripts.  A provider (either

20 one onsite or one available 24/7 through StatCare) then places orders to continue the

21 individual's medications for chronic conditions.  The intake provider also places

22 orders to monitor any chronic conditions, including blood pressure checks for

23 patients with hypertension and finger-stick checks for patients with diabetes.

24       80.    Subsequent chronic care visits are conducted at regular intervals based

25 on the level of disease control.  Suggested lab orders are included in the chronic care

26 template. Outside of scheduled chronic care visits, the providers review vital signs

27 and lab results, including finger-stick checks, and adjust the incarcerated patient's

28 individualized treatment plans as clinically indicated.  If the incarcerated individual

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4906-1870-3875 v4                          15                    Case No. 3:20-cv-00406-AJB-DDL
                                                                DR. MURRAY DECL. RE MSJ

has a medical condition that requires specialized knowledge or treatment beyond what can be provided by the medical staff at the Jail, the provider refers the individual to a specialist.

81.    During the preparation of my expert report in this case in August 2024, I reviewed a total of 81 medical records for incarcerated individuals with chronic care conditions in order to assess the quality of care being provided to them at the Jail and to determine if the standard of care was met.  These medical records contained multiple specialty referrals for patients requiring a higher level of care. Examples of these referrals included: an Ear, Nose, and Throat ("ENT") referral for unilateral hearing loss; an ophthalmology referral to screen a patient for diabetic retinopathy; and a cardiology referral for a patient who reported a history of heart disease.

82.    Further, annual optometry and foot exams are now being scheduled at the Jail for all incarcerated individuals with diabetes.  Also, for these patients, when medically appropriate, the medical staff are now utilizing Lantus, a long-acting insulin used to manage blood sugar levels in adults with diabetes.

83.    Additionally, CHP has been in the process of developing a set of Disease Management Guidelines ("DMGs") to help standardize chronic care management at the Jail.  The use of these DMGs will help to standardize care practices amongst providers at the Jail while still allowing for necessary changes based upon unique patient circumstances.

84.    CHP also started a provider triage pilot program at SDCJ (an intake facility) on November 1, 2024.  This new program was designed to ensure that higher risk individuals (e.g., with HIV, diabetics, homeless, etc.) and/or those with chronic care needs receive an evaluation by a medical provider almost immediately upon acceptance into the Jail.

85.    The current pilot program has been operating 14 hours per day and 7 days per week. Based upon the data being collected, providers are seeing

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4                16                Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

1    approximately 25 patients in the 14-hour period.

2        86.    CHP intends to expand the pilot program to the other two intake

3    facilities (i.e., VDF and LCDRF).

4        87.    The Jail also has a "0 No Show policy" which mandates that a provider

5    go to the patient.  This practice goes well beyond most jail healthcare practices to

6    ensure healthcare access for incarcerated individuals.

7                            **Decreased Mortality Rates**

8        88.    The mortality rate at the Jail has decreased significantly since the filing

9    of the operative complaint in this lawsuit.

10        89.    In particular, in-custody deaths reached a high in 2022 with 19 deaths

11    as the Sheriff's Office was emerging from the COVID-19 pandemic.  In 2023, there

12    were 13 deaths.  In 2024, there have been a total of 7 in-custody deaths (which

13    included five non-homicide, non-suicide in-custody deaths).

14        90.    The in-custody mortality rate has therefore decreased by almost 58%

15    from 2022 (even using a controversial 8th death that Plaintiffs suggest should be

16    included in the total).

17        91.    Further, CHP intends to participate in any mortality reviews, which

18    should further assist in decreasing the mortality rate at the Jail.

19        92.    In any event, the causes of these in-custody deaths have very little to do

20    with the health system delivery currently in place at the Jail.

21        93.    With regard to the number of suicides occurring at the Jail, the last

22    suicide on record is June 2023.  The mental health intake triaging and referral

23    program currently in place at the Jail has had a positive effect on reducing the

24    suicide rate.

25    ///

26    ///

27    ///

28    ///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4906-1870-3875 v4                                    17                        Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

1       I declare under penalty of perjury under the laws of California and the United

2  States of America that the foregoing is true and correct.

3       Executed on December __16__, 2024, at __Conroe_____[City],

4  __Texas_____ [State].

5

6

7           _Owen J. Murray_____

8               OWEN J. MURRAY, D.O.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4906-1870-3875 v4                18                Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MSJ

# 2.

# DECLARATION OF SCOTT E. REINECKE, D.D.S.

1 | Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
2 | Martin Kosla (SBN 247224)
E-mail: mkosla@bwslaw.com
3 | BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
4 | San Diego, CA 92101-8474
Tel: 619.814.5800 Fax: 619.814.6799
5 |
Elizabeth M. Pappy (SBN 157069)
6 | E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
7 | 60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
8 | Tel: 408.606.6300 Fax: 408.606.6333

9 | Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
10 | COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
11 | DEPARTMENT

12 | UNITED STATES DISTRICT COURT

13 | SOUTHERN DISTRICT OF CALIFORNIA

14 |

15 | DARRYL DUNSMORE, ANDREE
ANDRADE, ERNEST ARCHULETA,
16 | JAMES CLARK, ANTHONY
EDWARDS, LISA LANDERS,
17 | REANNA LEVY, JOSUE LOPEZ,
CHRISTOPHER NELSON,
18 | CHRISTOPHER NORWOOD, JESSE
OLIVARES, GUSTAVO
19 | SEPULVEDA, MICHAEL TAYLOR,
and LAURA ZOERNER, on behalf of
20 | themselves and all others similarly
situated,
21 |
Plaintiffs,
22 |
v.
23 |
SAN DIEGO COUNTY SHERIFF'S
24 | DEPARTMENT, COUNTY OF SAN
DIEGO, SAN DIEGO COUNTY
25 | PROBATION DEPARTMENT, and
DOES 1 to 20, inclusive,
26 |
Defendants.
27 |

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF SCOTT E.
REINECKE, D.D.S., IN SUPPORT
OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY
JUDGMENT, OR IN THE
ALTERNATIVE, FOR AN ORDER
TREATING SPECIFIED FACTS AS
ESTABLISHED**

**Hearing**
Date:    March 6, 2025
Time:    2:00 p.m.
Ctrm:    4A

Judge: Anthony J. Battaglia

Magistrate Judge: David D. Leshner

28 | ///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4934-3413-0179 v5                    1                    Case No. 3:20-cv-00406-AJB-DDL
DR. REINECKE DECL. RE MSJ.

1        I, SCOTT E. REINECKE, D.D.S., declare as follows:

2        1.    I am competent to testify to the matters set forth in this declaration, and

3    if called to do so, would and could so testify.

4        2.    I am a regionally licensed general dentist based in Texas.  I have

5    considerable expertise in correctional healthcare, with 30 total years of experience in

6    dentistry.  Specifically, for the past 26 years, I have worked for the University of

7    Texas Medical Branch ("UTMB") Offender Health Services Program.  I currently

8    serve as the Region IV Dental Director for Correctional Managed Care and the

9    Youth Health Services Dental Director for the Texas Juvenile Justice Department

10    ("TJJD").  I am responsible for ensuring the provision of all dental services for

11    approximately 18,000 adult incarcerated persons in the Texas Department of

12    Criminal Justice ("TDCJ") state jails and prisons, as well the delivery of such

13    services to juvenile offenders in TJJD facilities.  I oversee a staff of 50 employees

14    located at 18 correctional facilities throughout the state of Texas.

15        3.    Before joining UTMB in 1998, and through June 2023, I also owned

16    three private practices around San Antonio, served as a policy development

17    contributor with the Texas Oral Health Coalition, and lectured on dental diagnostics,

18    oral surgery, and pathology.

19        4.    I am familiar with the standard of care and skill ordinarily exercised by

20    reputable members of the dental profession, including the standard for providing

21    dental care in the correctional setting.

22        5.    I have reviewed the operative complaint filed by the plaintiffs

23    ("Plaintiffs") in this lawsuit against Defendants COUNTY OF SAN DIEGO

24    ("County"), SAN DIEGO COUNTY SHERIFF'S DEPARTMENT ("Sheriff's

25    Office") and SAN DIEGO COUNTY PROBATION DEPARTMENT (collectively,

26    "Defendants").

27    ///

28    ///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4934-3413-0179 v5                    2                    Case No. 3:20-cv-00406-AJB-DDL
DR. REINECKE DECL. RE MSJ

6.     I understand that Plaintiffs allege, among other things, that Defendants subject Plaintiffs and other incarcerated individuals to a substantial risk of serious harm and injury from inadequate dental care at Defendants' jail facilities in violation of the Eight Amendment and the Fourteenth Amendment due to their "their policies, practices, and failures to train staff." Plaintiffs claim that these "systemic policies and practices" include providing tooth extractions as the only option for dental care, failing to provide regular cleanings and check-ups, refusing to refer patients to external providers for needed dental care, and other constitutionally inadequate policies and procedures. (*See*, Third Amended Complaint, ¶¶ 483-485.)

7.     I have been asked by defense counsel to provide my opinion with regard to the dental care cause of action in support of Defendants' partial summary judgment, or in the alternative, for an order treating specified facts as established.

8.     I have reviewed the relevant records in this case, including the contracts and agreements related to provision of medical and dental services, the various policies and procedures, deposition transcripts, organizational charts and staffing plans. I also conducted staff interviews and reviewed thirty (30) selected inmate dental records to assess the treatment for various dental conditions.

9.     In March 2024, I toured all seven jail facilities maintained and operated by the Sheriff's Office, consisting of East Mesa Reentry Facility, George Bailey Detention Facility, Las Colinas Detention and Reentry Facility, Rock Mountain Detention Facility, San Diego Central Jail, South Bay Detention Facility, and Vista Detention Facility (collectively, the "Jail").

10.    I hereby provide my analysis and opinion with regard to dental care services being provided by Defendants at the Jail.

## Contract & Dental Staffing

11.    The provision of on-site dental care to incarcerated individuals at the Jail is provided by NaphCare (a correctional healthcare company) pursuant to a contract with the County.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4934-3413-0179 v5                                    3                    Case No. 3:20-cv-00406-AJB-DDL
DR. REINECKE DECL. RE MSJ

12.     Currently, NaphCare has four dentists, two hygienists, and two dental assistants in place to provide dental care to approximately 4,000 incarcerated individuals at the Jail.[1]  These dental professionals travel to the different facilities over the course of each week to provide the required dental care to patients at the Jail.

13.     At the time this lawsuit was filed, the dental staffing at the Jail was significantly lower.  However, since that time, the Sheriff's Office added additional dentists and hygienists to NaphCare's staffing matrix to ensure timely access to dental evaluations, cleanings, and follow-up care.

14.     Further, Plaintiffs' allegations are based on the National Commission on Correctional Health Care ("NCCHC") Technical Assistance Report from 2017.  However, this standard no longer bears any relevance in 2024.

15.     The current ratio of dentist-to-patients at the Jail is therefore not significantly different than what is common in the community at large.

### Dental Services

16.     The dental care services which are provided by NaphCare at the Jail include oral healthcare instruction, preventive services (gross scales and prophies), restorative services (fillings and crowns), endodontics (root canals, which are referred to an off-site provider), prosthodontics (dentures), and oral surgery (which is completed both on site and via off-site).

17.     With regard to annual teeth cleanings (i.e., prophies), this is not a dental service most jails routinely provide to incarcerated individuals due to the abbreviated time such individuals spend in a jail facility.

///

///

---

[1] I have been informed that NaphCare is in the process of interviewing another dentist to add to the dental staff providing services at the Jail.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4934-3413-0179 v5                                    4                    Case No. 3:20-cv-00406-AJB-DDL
DR. REINECKE DECL. RE MSJ

18.    However, in the case of the Sheriff's Office, after it was recognized that Assembly Bill 109 lengthened the incarceration time for a certain portion of the individuals at the Jail, the Sheriff's Office made staffing changes to ensure that those individuals had access to such dental services.  As such, the Sheriff's Office now provides the incarcerated individuals at its Jail with access to annual teeth cleanings.[2]

### Access to Dental Care

19.    With regard to access to care, dental clinic hours are 6:30 a.m. to 3:00 p.m., Monday through Friday, with some dental staff also providing coverage on weekends.

20.    Routine requests for care generally are seen within 7-14 days of sick call receipt.  Urgent and emergent requests are dispositioned within 24 hours by nursing staff and then routed for appropriate treatment.

21.    In cases that are deemed outside the realm of standard dental services, a referral process is in place to ensure that all necessary care is provided in a timely manner.  Two general practice groups and two oral surgery groups are under contract for such referrals.

### Quality Assurance & Record Management

22.    The Sheriff's Office also has an appropriate procedure for quality assurance monitoring of all the staff who provide dental services that the Jail.  In particular, NaphCare's Dental Director, Dr. Kuntal Pandit, completes monthly chart reviews (five patient charts per month) for each of the dentists and dental hygienists.  Dr. Pandit also does an annual quality of care assessment.  Further, every Friday, the Sheriff's Office has a Zoom meeting with all clinical staff.

///

---

[2] Assistant Sheriff T. Adams-Hydar testified about the provision of this specific dental service during her deposition in April 2024.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4934-3413-0179 v5                    5                    Case No. 3:20-cv-00406-AJB-DDL
DR. REINECKE DECL. RE MSJ

23. NaphCare also has Policies and Procedures ("P&Ps") which are NCCHC compliant. These P&Ps allow for the dentists to treat their patients based on their clinical judgment.

24. With respect to record management, the Sheriff's Office uses TechCare, a corrections-specific electronic health record, to record and track dental healthcare encounters at the Jail.

## **Other Factors**

25. Further, dental care at a correctional facility is somewhat dependent on its medical providers and nursing for screening purposes. The Sheriff's Office has increased the number of full-time providers to 30.5 at the Jail. This is a level of staffing at a correctional facility that exceeds expectations by a sizable margin. In my opinion, such a level of staffing will likely have a very positive impact on improving access to care for dental complaints at the Jail.

26. Accordingly, based on my review of the relevant materials in this case, I am of the opinion that the Sheriff's Office (through NaphCare) is providing dental services at the Jail which meet industry and community standards.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on December 13, 2024, at San Antonio [City], Texas [State].

Scott E. Reinecke DDS
_____
SCOTT E. REINECKE, D.D.S.

Burke, Williams & Sorensen, LLP
Attorneys at Law
Camarillo

4934-3413-0179 v5

6

Case No. 3:20-cv-00406-AJB-DDL
DR. REINECKE DECL. RE MSJ

# 3.

# DECLARATION OF JON MONTGOMERY, D.O.

1  Susan E. Coleman (SBN 171832)
   E-mail:  scoleman@bwslaw.com
2  Martin Kosla (SBN 247224)
   E-mail:  mkosla@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   501 West Broadway, Suite 1600,
4  San Diego, CA  92101-8474
   Tel:  619.814.5800 Fax:  619.814.6799
5
   Elizabeth M. Pappy (SBN 157069)
6  E-mail:  epappy@bwslaw.com
   BURKE, WILLIAMS & SORENSEN, LLP
7  60 South Market Street, Ste. 1000
   San Jose, CA  95113-2336
8  Tel:  408.606.6300 Fax:  408.606.6333
9  Attorneys for Defendants
   COUNTY OF SAN DIEGO, SAN DIEGO
10 COUNTY SHERIFF'S DEPARTMENT and
   SAN DIEGO COUNTY PROBATION
11 DEPARTMENT

12              UNITED STATES DISTRICT COURT

13           SOUTHERN DISTRICT OF CALIFORNIA

14

15 | DARRYL DUNSMORE, ANDREE | Case No. 3:20-cv-00406-AJB-DDL
   ANDRADE, ERNEST ARCHULETA,
16 JAMES CLARK, ANTHONY | **DECLARATION OF JON**
   EDWARDS, LISA LANDERS, | **MONTGOMERY, D.O., IN**
17 REANNA LEVY, JOSUE LOPEZ, | **SUPPORT OF DEFENDANTS'**
   CHRISTOPHER NELSON, | **MOTION FOR PARTIAL**
18 CHRISTOPHER NORWOOD, JESSE | **SUMMARY JUDGMENT, OR IN**
   OLIVARES, GUSTAVO | **THE ALTERNATIVE, FOR AN**
19 SEPULVEDA, MICHAEL TAYLOR, | **ORDER TREATING SPECIFIED**
   and LAURA ZOERNER, on behalf of | **FACTS AS ESTABLISHED**
20 themselves and all others similarly
   situated,

21              **Hearing**
              Plaintiffs, | Date:   March 6, 2025
22              | Time:   2:00 p.m.
        v.            | Ctrm:  4A
23
   SAN DIEGO COUNTY SHERIFF'S | Judge: Anthony J. Battaglia
24 DEPARTMENT, COUNTY OF SAN
   DIEGO, SAN DIEGO COUNTY | Magistrate Judge: David D. Leshner
25 PROBATION DEPARTMENT, and
   DOES 1 to 20, inclusive,
26
              Defendants.
27

28 ///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4931-5520-8707 v4                    1                Case No. 3:20-cv-00406-AJB-DDL
                                                      DR. MONTGOMERY DECL. RE MSJ

I, JON MONTGOMERY, D.O., declare as follows

1.      I am competent to testify to the matters set forth in this declaration, and if called to do so, would and could so testify.

2.      I am the Medical Director for the Detention Services Bureau, Medical Services Division, of the San Diego County Sheriff's Office ("Sheriff's Office").  I have worked for the Detention Services Bureau since 2009.  I am also licensed as a physician in the State of California.

3.      As the Medical Director, I oversee the medical services provided to the incarcerated individual being housed in the seven jail facilities maintained and operated by the Sheriff's Office.

4.      I am aware of the lawsuit filed by the plaintiffs ("Plaintiffs") against the Sheriff's Office, the County of San Diego ("County"), and the San Diego County Probation Department (collectively, "Defendants").

5.      I understand that Plaintiffs allege, among other things, that Defendants subject Plaintiffs and other incarcerated individuals to a substantial risk of serious harm and injury from inadequate medical care at Defendants' jail facilities in violation of the Eight Amendment and the Fourteenth Amendment as a result of their "their policies, practices, and failures to train staff."  Plaintiffs claim that these "systemic policies and practices" include failing to maintain sufficient numbers of adequately trained healthcare professionals, refusing to provide Medication-Assisted Treatment ("MAT") for incarcerated people with substance use disorders, having insufficient contracts with community providers, and failing to maintain adequate quality assurance and quality improvement processes.  I further understand that Plaintiffs make similar allegations with regard to the dental care being provided at the jail facilities.

## Jail Facilities

6.      The seven jail facilities maintained and operated by the Sheriff's Office consist of East Mesa Reentry Facility ("EMRF"), George Bailey Detention Facility

("GBDF"), Las Colinas Detention and Reentry Facility ("LCDRF"), Rock Mountain Detention Facility ("RMDF"), San Diego Central Jail ("SDCJ"), South Bay Detention Facility ("SBDF"), and Vista Detention Facility ("VDF") (collectively, the "Jail").

7.    The purpose of the Jail is to provide temporary housing for individuals involved with court processes or who are serving short term state sentences.

### Healthcare Contracts

8.    The Sheriff's Office uses a mixed-staff model of healthcare delivery at the Jail for the incarcerated individuals being housed there (i.e., employing both County employees as well as contracted/subcontracted professional staff members).

9.    Under this model, the Sheriff's Office is responsible for nurse staffing, as well as the ancillary support staff for Information Technology and case management.  Pursuant to a contract with the County, NaphCare (a private correctional healthcare company) is responsible for dental and mental health staffing, the Medication-Assisted Treatment ("MAT") program, Utilization Review, and pharmacy operations.  Under a separate contract with the County, a second correctional healthcare company, Correctional Healthcare Partners, Inc. ("CHP"), is responsible for all on-site medical provider services at the Jail.

10.    The contract with CHP was implemented at the behest of the County in an effort for the Sheriff's Office to have more direct accountability for the on-site provider services at the Jail.  Previously, CHP (while supplying on-site medical provider services) was a sub-contractor to NaphCare.  This new and direct contract between the County and CHP commenced on June 1, 2024.

### Record Management

11.    With respect to record management, the Sheriff's Office uses TechCare at the Jails.  TechCare is a comprehensive Electronic Health Record ("EHR") software system developed by NaphCare and tailored specifically to the needs of correctional facilities.  The system was implemented by the Sheriff's Office at the

1  Jail in September 2019.

2          12.     TechCare provides the Sheriff's Office with a comprehensive EHR

3  platform for managing patient health information, facilitating clinical workflow and

4  decision making, and promoting quality care.

5                        **Pharmacy / Medication**

6          13.     The TechCare system at the Jail is interfaced with Surescripts, a health

7  information technology company which operates a nationwide health information

8  exchange network connecting pharmacies, healthcare providers, and benefit

9  managers.

10          14.     Surescripts securely connects to a patient's medication history stored in

11  the databases of community pharmacies and pharmacy benefit managers. This

12  allows staff at the Jail to verify medication history quickly and easily.

13                        **MAT / MOUD Program**

14          15.     The Sheriff's Office now provides substance use disorder management

15  services throughout all jail facilities.

16          16.     The MAT program at the Jail combines medication treatment with

17  counseling and behavioral therapies to provide a more comprehensive approach to

18  treating substance use disorders, particularly opioid addiction.  The program uses

19  medications approved by the American Society of Addiction Medicine ("ASAM")

20  to assist individuals manage symptoms, reduce cravings and facilitate participation

21  with treatment.

22          17.     As part of the program, individuals coming to the Jail are screened for

23  Opioid Use Disorder ("OUD") at intake and considered for initiation or continuation

24  of medication based on findings.  In addition, individuals being housed at the Jail

25  are able to request medical care and evaluation at any point during their

26  incarceration.  Individuals identified with OUD during their incarceration who have

27  not been receiving treatment would be offered medical management and therapy.

28  ///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4931-5520-8707 v4

4

Case No. 3:20-cv-00406-AJB-DDL
DR. MONTGOMERY DECL. RE MSJ

18.  To assist with identification and reporting purposes, incarcerated individuals on medication for OUD are flagged in TechCare as "MOUD" (i.e., Medication for Opioid Use Disorder).  Those individuals who are desirous for counseling and therapy in addition to pharmaceutical support are flagged as "MAT."

19.  Mental health staff meet with MAT patients for individual therapy. Group therapy is also available at several of the jail facilities, including VDF and LCDRF Vista.

20.  Incarcerated individuals receiving treatment for OUD at the time of incarceration are offered continuation of their medication, often in partnership with their Opioid Treatment Program ("OTP") in the community when possible.

21.  Maintenance treatment is continued throughout incarceration and upon discharge.  If medically indicated, incarcerated individuals can receive a 30-day supply of medication to help facilitate continuity of care and reduce the risk of relapse and overdose after release.

### Sub-Specialty Services

22.  It is not uncommon for many incarcerated individuals to enter a correctional facility with untreated or poorly managed medical conditions, including chronic diseases like diabetes, hypertension, and heart disease.  In such cases, the medical care needs for these individuals extend beyond primary care management. Their care needs require specialist intervention, including services such as orthopedic surgery, cardiology, and gastroenterology.

23.  The Sheriff's Office therefore contracts with NaphCare for the management of sub-specialty and hospital services.

24.  NaphCare utilizes contracts with the University of California San Diego, as well as several independent practitioners to provide specialty services locally.

///

///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4931-5520-8707 v4                                    5                    Case No. 3:20-cv-00406-AJB-DDL
DR. MONTGOMERY DECL. RE MSJ

25.     In addition to the sub-specialty care services, the Sheriff's Office has contracts for Hospital Guard Units ("HGU") with UCSD Health East Campus Medical Center (formerly known as Alvarado) and Tri-City Hospital.  HGUs are contained within these hospital facilities and are used specifically for incarcerated individuals.  They have designated Sheriff's Office correctional officers that provide security.  The HGU contracts ensure that appropriate clinical bed space is available for high acuity medical patients in the custody of the Sheriff's Office.

### Specialty Services – Optometry

26.     The Sheriff's Office also provides on-site and off-site optometry care as part of the ancillary services offered at the Jail.  In particular, the Sheriff's Office contracts (through NaphCare) with multiple eye care specialists to ensure that the population at the Jail has access to necessary optometry services and corrective lenses.

27.     These specialty providers include Institutional Eye Care, LLC (vision services), National Eye Care Eye (care services), and Retina Center of San Diego Medical (surgical retina care).

28.     In addition to the off-site services, the Sheriff's Office now employs a full-time optometrist to ensure the Jail population has timely access to refractive services.  Incarcerated individuals who require reading glasses can obtain them through the sick call process and nursing staff can distribute reading glasses to all patients as clinically indicated.

### Chronic Care

29.     Individuals entering the Jail are assessed for any known chronic medical conditions during the intake screening at the time of booking.  At the screening, current medications are identified through Surescripts.  A provider (either one onsite or one available 24/7 through StatCare) then places orders to continue the individual's medications for chronic conditions.  The intake provider also places orders to monitor any chronic conditions, including blood pressure checks for

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4931-5520-8707 v4

6

Case No. 3:20-cv-00406-AJB-DDL
DR. MONTGOMERY DECL. RE MSJ

patients with hypertension and finger-stick checks for patients with diabetes.

30.     Subsequent chronic care visits are conducted at regular intervals based on the level of disease control.  Suggested lab orders are included in the chronic care template.  Outside of scheduled chronic care visits, the providers review vital signs and lab results, including finger-stick checks, and adjust the incarcerated patient's individualized treatment plans as clinically indicated.  If the incarcerated individual has a medical condition that requires specialized knowledge or treatment beyond what can be provided by the medical staff at the Jail, the provider refers the individual to a specialist.

### "Wellness Rounds" Team

31.     The Sheriff's Office has created a leadership-driven multidisciplinary team that makes weekly "Wellness Rounds" in the Administrative Separation ("AdSep") unit of the Jail.  These rounds occur 52 weeks a year.

### Quality Management

32.     The Sheriff's Office has various policies and procedure ("P&P") related to the provision of medical care at the Jail.  Since the filing of the lawsuit, the Sheriff's Office has been revising and/or updating the P&Ps.

33.     For example, in June 2024, the Sheriff's Office released P&P No. A.1.3.  The purpose of this policy is to identify healthcare services generally available for incarcerated persons, define methods of access to care, ensure privacy of care, and define health staff's limited scope in disciplinary decisions.  A true and correct copy of the policy is attached to this declaration as **Exhibt "A."**

34.     In July 2024, Sheriff's Office released P&P No. C.9.1, which outlines the procedure for providing an orientation to all new health staff employees at the Jail.  A true and correct copy of the policy is attached to this declaration as **Exhibt "B."**

///

///

1  35. The Sheriff's Office has also been in the process of revising its quality

2  assurance program at the Jail. The Sheriff's Office has a Quality Assurance/Quality

3  Improvement ("QA/QI") committee which meets quarterly and holds an annual

4  recap meeting in January.

5  36. The QA/QI committee is made up of the following members: Chief

6  Medical Officer; Director of Nursing; Medical Administrative Officer; Program

7  Director, Mental Health; Chief, Health Information Management; Captain, ADA;

8  Administrative Sergeant; Health Services Administrator, NaphCare; Mental Health

9  Program Director, NaphCare; Supervising Nurses, LCDRF, VDF, SDCJ, GBDF,

10 RMDF; Supervising Nurse, Infection Control; Supervising Nurse, Training;

11 Supervising Nurse Recruitment; Supervising Nurse, Advanced Medical Life

12 Support (AMLS) / Prehospital Trauma Life Support (PHTLS) Coordinator;

13 Supervising Nurse, ADA and Managed Care; Supervising Nurse, P&P and QI;

14 Infection Control; Chief Mental Health Clinicians, SDCJ, VDF, LCRDF,

15 GBDF;Chief Mental Health Clinician, MAT; and Administrative Analyst, MAT.

16  I declare under penalty of perjury under the laws of California and the United

17 States of America that the foregoing is true and correct.

18  Executed on December 13, 2024, at San Diego, California.

19

20

21

22  JON MONTGOMERY, D.O.

23

24

25

26

27

28

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4931-5520-8707 v4                    8                Case No. 3:20-cv-00406-AJB-DDL
DR. MONTGOMERY DECL. RE MSJ

# EXHIBIT A

# SAN DIEGO SHERIFF'S OFFICE
# MEDICAL SERVICES DIVISION

**POLICY AND PROCEDURE**

| | | | |
|---|---|---|---|
| SUBJECT: | HEALTHCARE SERVICES | DATE: | 06/06/24 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | A.1.3 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |

RELATED SECTIONS:   DSB P&P: Section M.1, M13, M48, I.59, I.95; MSD A.1.1
IN COMPLIANCE WITH:   CCR Title 15, Sections 1200, 1204, & 1206; NCCHC J-A01, J-A-07,
J-G-04, J-E-01; DSP P&P: P.11, M.39, & I.20 MSD E.2.1, J-B-03, J-D-03

POLICY

To identify healthcare services generally available for incarcerated persons, define methods of access to care, ensure privacy of care, and define health staff's limited scope in disciplinary decisions.

PROCEDURE

I.    Healthcare personnel
   A.    Medical care will be performed by personnel licensed in the State of California pursuant to their respective scope of licensure or certification.

   B.    All health staff will treat incarcerated persons in accordance with federally mandated training requirements outlined in the Prison Rape Elimination Act of 2003 pursuant to DSB Policy M.13

   C.    Clinical decisions in medical, psychiatric, and dental care are made by providers sufficiently knowledgeable in the subject matter.

   D.    Incarcerated persons are prohibited from engaging in direct patient care services, handling medical equipment or records, or accessing medications.

      1.    Incarcerated persons may access medications, like, commissary and Keep On Person (KOP).
      2.    Incarcerated persons may administer Naloxone to themselves or others in emergencies, pursuant to DSB M.48 Naloxone Issuance and Storage.

      3.    Incarcerated persons may request copies of their own medical records.

II.    Healthcare Services Information
   A.    Incarcerated persons can access medical care via request, observation, and/or referral at any time during their incarceration.

   B.    All information regarding healthcare services as outlined is available via incarcerated persons preferred method of communication pursuant to DSB Policy P.11 and M.39.

# SAN DIEGO SHERIFF'S OFFICE
# MEDICAL SERVICES DIVISION

**POLICY AND PROCEDURE**

| | | | |
|---|---|---|---|
| SUBJECT: | HEALTHCARE SERVICES | DATE: | 06/06/24 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | A.1.3 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 2 |

RELATED SECTIONS:   DSB P&P: Section M.1, M13, M48, I.59, I.95; MSD A.1.1
IN COMPLIANCE WITH:   CCR Title 15, Sections 1200, 1204, & 1206; NCCHC J-A01, J-A-07,
J-G-04, J-E-01; DSP P&P: P.11, M.39, & I.20 MSD E.2.1, J-B-03, J-D-03

C.    Education on how to access health services is provided to incarcerated persons in several ways.

    1.    At intake receiving screening, a copy of the medical clearance form which includes specific information regarding how to access medical care and the grievance process is available at all intake desks and is verbally reviewed during the screening process.

    2.    An orientation video played in housing modules. The orientation video includes information on accessing healthcare and the grievance process.

    3.    Staff, during ongoing interactions with medical, sworn, and professional staff.

    4.    Forms are available within housing modules and upon request.

III.    Healthcare Services

A.    Medical, mental health and dental care for incarcerated persons presenting with illness or injury will receive prompt examination and treatment by licensed healthcare providers.

B.    Preventative health assessments are done within 14 days of booking. Based on the content of the exam and according to the preventative services frequency schedule will allow early intervention and regular monitoring.

    1.    Preventative services are also considered from incarcerated person requests.

    2.    Frequency of preventative services can be adjusted based on risk factors determined by the provider.

    3.    The CMO or designee is responsible for determining the scope of preventative services that may be available and frequency of the screenings.

    4.    Immunizations are administered to incarcerated as clinically indicated.

| SAN DIEGO SHERIFF'S OFFICE | POLICY AND PROCEDURE |
|---|---|
| MEDICAL SERVICES DIVISION | |

| SUBJECT: | HEALTHCARE SERVICES | DATE: | 06/06/24 |
|---|---|---|---|
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | A.1.3 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 3 |

RELATED SECTIONS:  DSB P&P: Section M.1, M13, M48, I.59, I.95; MSD A.1.1
IN COMPLIANCE WITH:  CCR Title 15, Sections 1200, 1204, & 1206; NCCHC J-A01, J-A-07,
J-G-04, J-E-01; DSP P&P: P.11, M.39, & I.20 MSD E.2.1, J-B-03, J-D-03

C.    Specialty clinics, laboratory, and diagnostic services, depending on type and other variables may be available onsite or offsite.

D.    Emergency Referrals for arrestees and booked individuals requiring emergent healthcare not available onsite are referred to a hospital emergency department (ED).

E.    A physician and psychiatrist will be available on call 24 hours daily.

F.    Certified forensic personnel conduct blood alcohol sampling, body cavity searches, and other prosecutorial healthcare services pursuant to DSB I.95 Forced Blood Draws. SDSO are not certified forensic personnel and will not perform these services.

IV.    Screening/Receiving intake evaluations on all arrestees and booked individuals shall be conducted to determine their level of health care needs. Health staff shall screen all individuals and accept or deny acceptance to the detention facility pursuant to MSD E.2.1 Receiving Screening.

V.    Medical services will be conducted using suitable spaces, supplies, and equipment for medical, dental, and mental health encounters and treatment.

A.    The medical unit will maintain inventory of supplies and equipment to ensure availability.

B.    If an incarcerated person is waiting for more than a brief period of time, and therefore unaccompanied, a deputy will place the incarcerated person in temporary holding cells equipped with toilets, wash basins and drinking water.

VI.    Privacy

A.    All healthcare interactions and information exchanges will remain private. Ancillary and/or sworn staff present during these exchanges will uphold privacy standards pursuant to DSB I.20 Supplemental Guidelines for Detentions: Body Worn Cameras.

B.    Discussions of protected patient health information should occur in private areas to prevent being overheard by other incarcerated persons, staff, or visitors. Extra precautions are taken during cell side triage for safety and privacy.

# SAN DIEGO SHERIFF'S OFFICE
# MEDICAL SERVICES DIVISION

**POLICY AND PROCEDURE**

| | | | |
|---|---|---|---|
| SUBJECT: | HEALTHCARE SERVICES | DATE: | 06/06/24 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | A.1.3 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 4 |

RELATED SECTIONS:     DSB P&P: Section M.1, M13, M48, I.59, I.95; MSD A.1.1
IN COMPLIANCE WITH:   CCR Title 15, Sections 1200, 1204, & 1206; NCCHC J-A01, J-A-07,
                      J-G-04, J-E-01; DSP P&P: P.11, M.39, & I.20 MSD E.2.1, J-B-03, J-D-03

C.    Health records are securely stored to prevent unauthorized access.

D.    Privacy measures, such as curtains or screens, are provided during physical exams, especially for sensitive examinations.

VII.    Health staff will not participate in disciplinary decisions, beyond advocating for mitigating circumstances in cases of medical and mental health disorders.

A.    Health staff do not participate in disciplinary action. Health staff are not compelled to provide clinical information solely for the purposes of discipline.

B.    Treatments and medications are never withheld as a form of punishment.

C.    Separation and restraints are never clinically indicated as a form of punishment.

Implemented:        02/03/2020

Revised:            06/06/24

Reviewed:           08/11/2021, 11/04/2022, 11/27/2024

# EXHIBIT B

# SAN DIEGO SHERIFF'S OFFICE
# MEDICAL SERVICES DIVISION

**POLICY AND PROCEDURE**

| | | | |
|---|---|---|---|
| SUBJECT: | ORIENTATION FOR HEALTH STAFF | DATE: | 07/10/2024 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | C.9.1 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |

RELATED SECTIONS:
IN COMPLIANCE WITH:    NCCHC-J-C-09

POLICY
The Medical Services Division (MSD) will provide an orientation to all new health staff employees.

PROCEDURE

I.    All new MSD staff will attend a one-day basic MSD orientation prior to their first day of on-site service.

    A.    The   orientation   topics include the following:
        1.    Jail Population Management Unit
        2.    Jail Locations
        3.    Organization of Health Services
        4.    Services Provided
        5.    Standards and Safety
        6.    Prison Rape Elimination Act (PREA)
        7.    Health Insurance Portability & Accountability Act (HIPPA)
        8.    Information systems & electronic health record
        9.    Medical and Sworn staff working together.
        10.    Safety First
        11.    Dress Code
        12.    Personal Belongings
        13.    Social Media
        14.    Suicide Detection & Prevention
        15.    ADA

    B.    All new health staff employees will sign an orientation checklist stating they received training in the above areas and the signed form will be retained by the MSD Training Unit.

    C.    Required module training related to clinical practice may be assigned to new health staff employees  This training is accessed in the online training software.

**SAN DIEGO SHERIFF'S OFFICE**
**MEDICAL SERVICES DIVISION**

**POLICY AND PROCEDURE**

| | | | |
|---|---|---|---|
| SUBJECT: | ORIENTATION FOR HEALTH STAFF | DATE: | 07/10/2024 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | C.9.1 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 2 |

RELATED SECTIONS:
IN COMPLIANCE WITH:     NCCHC-J-C-09

II.     An additional in-depth orientation is completed within 90 days of employment for all new health staff employees covering their respective responsibilities/assignments and may include topics such as clinic processes, electronic health record (EHR) navigation, medication administration, medication safety, emergency medication, and primary/secondary survey for man down response, and care protocols.

     A.     A competency checklist is completed during the 90-day onsite orientation and returned to the MSD training unit upon completion.

     B.      Any competency not signed off will require the new employee to remediate until they can demonstrate competency.

III.     Nursing staff will receive an onsite orientation with a preceptor for up to six (6) weeks, or more if needed.

IV.     All orientation lesson plans are reviewed and updated by the MSD Training Unit at least annually. All changes or amendments are approved by the RHA and CMO.

Implemented:     02/11/2020

Revised:     07/10/2024

Reviewed:     01/19/2022,11/04/2022, 11/27/2024

# 4.

# DECLARATION OF PETER J. FREEDLAND, M.D.

Susan E. Coleman (SBN 171832)
E-mail:  scoleman@bwslaw.com
Martin Kosla (SBN 247224)
E-mail:  mkosla@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA  92101-8474
Tel:  619.814.5800 Fax:  619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail:  epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA  95113-2336
Tel:  408.606.6300 Fax:  408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
DEPARTMENT

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF PETER J. FREEDLAND, M.D., IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED**

**Hearing**
Date:    March 6, 2025
Time:    2:00 p.m.
Ctrm:    4A

Judge: Anthony J. Battaglia

Magistrate Judge: David D. Leshner

///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

4929-9904-9987 v4                    1                    Case No. 3:20-cv-00406-AJB-DDL
DR. FREEDLAND DECL. RE MSJ

1    I, PETER J. FREEDLAND, M.D., declare as follows:

2    1.    I am competent to testify to the matters set forth in this declaration, and

3    if called to do so, would and could so testify.

4    2.    I am the Chief Executive Officer of Correctional Healthcare Partners,

5    Inc. ("CHP").

6    3.    CHP is a private medical group that focuses on providing healthcare

7    services in the correctional setting.

8    4.    I am aware of the lawsuit that was filed by the plaintiffs ("Plaintiffs")

9    against the San Diego County Sheriff's Office ("Sheriff's Office"), the County of

10    San Diego ("County"), and the San Diego County Probation Department

11    (collectively, "Defendants").

12    5.    I understand that Plaintiffs allege, among other things, that Defendants

13    have been providing Plaintiffs and other incarcerated individuals with inadequate

14    medical care at Defendants' jail facilities at which CHP supplies on-site medical

15    provider services.

16    6.    These jail facilities consist of East Mesa Reentry Facility ("EMRF"),

17    George Bailey Detention Facility ("GBDF"), Las Colinas Detention and Reentry

18    Facility ("LCDRF"), Rock Mountain Detention Facility ("RMDF"), San Diego

19    Central Jail ("SDCJ"), South Bay Detention Facility ("SBDF"), and Vista Detention

20    Facility ("VDF") (collectively, the "Jail").

21    **Healthcare Contract**

22    7.    CHP supplies the Sheriff's Office with all on-site medical provider

23    services at the Jail pursuant to a direct contract with the County that commenced on

24    June 1, 2024.

25    8.    Other healthcare services at the Jail are provided by NaphCare and by

26    County employees.

27    9.    Previously, while supplying on-site medical provider services at the

28    Jail, CHP was a sub-contractor to NaphCare.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Camarillo

4929-9904-9987 v4                    2                Case No. 3:20-cv-00406-AJB-DDL
                                                     DR. FREEDLAND DECL. RE MSJ

10.    The new and direct contract between the County and CHP was implemented in an effort for the Sheriff's Office to have more direct accountability for the on-site provider services at the Jail.

### Staffing – Medical Providers

11.    Currently, pursuant to the new contract with CHP, there are 30.5 Full-Time Employee (FTE) medical providers at the Jail.

12.    This level of provider staffing is approximately 2.5 times more than the level in place around the time this lawsuit was filed.  Based on the Jail's population of 3,859 (on December 4, 2024), and given the current staffing of 30.5 FTE providers, this is a ratio of 1 FTE provider for every 127 patients.

13.    The majority of the on-site medical providers at the Jail are Board-Certified.  (CHP normally strives to hire Board-Certified medical providers.)

### Record Management

14.    With respect to record management, the Sheriff's Office uses the TechCare system as the platform for creating and maintaining an electronic health record ("EHR") or electronic medical record ("EMR") for patients at the Jail.

15.    It is true that the system is not perfect.  However, in my experience as a medical practitioner, a perfect EMR does not exist for managing patient health information.

16.    TechCare does provide the Sheriff's Office with the ability to make changes and updates rapidly.  This ability is paramount and of great value, especially in the correctional setting.

### Chronic Care

17.    Since the filing of this lawsuit, CHP has been in the process of developing a set of Disease Management Guidelines ("DMGs") to help standardize chronic care management at the Jail.  True and correct copies of a sample of the DMGs which have been developed and implemented by CHP are attached to this declaration as **Exhibits "A-1" to "A-6."**

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4929-9904-9987 v4                    3                    Case No. 3:20-cv-00406-AJB-DDL
DR. FREEDLAND DECL. RE MSJ

18.    These DMGs include practice standards for asthma (Exhibit "A-1"), gout (Exhibit "A-2"), HIV (Exhibit "A-3"), hyperlipidemia (Exhibit "A-4"), hypertension (Exhibit "A-5), and skin and soft tissue infection (Exhibit "A-6).

19.    CHP also started a provider triage pilot program at SDCJ (an intake facility) on November 1, 2024.  This new program was designed to ensure that individuals with chronic care needs receive an evaluation by a medical provider upon acceptance into the Jail.

20.    The pilot program allows individuals with chronic care needs and chronic disease to be evaluated by medical providers upfront and then scheduled for chronic care follow-up (in addition to any acute complaints).

21.    The current pilot program has been operating 14 hours per day, 7 days per week.  Based upon the data being collected, providers are seeing approximately 25 patients in the 14-hour period.

22.    CHP intends to expand the pilot program to the other two intake facilities (i.e., VDF and LCDRF) in the first quarter of 2025.

**<u>Decreased Mortality Rates</u>**

23.    The mortality rate at the Jail has decreased significantly since the filing of the operative complaint in this lawsuit.

24.    Notwithstanding, CHP intends to participate in any mortality reviews, which should further assist in decreasing the mortality rate at the Jail.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on December __16__, 2024, at _San Diego_____ [City], _California_____ [State].

_____
PETER J. FREEDLAND, M.D.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4929-9904-9987 v3                                                4                                    Case No. 3:20-cv-00406-AJB-DDL
                                                                                                            DR. FREEDLAND DECL. RE MSJ

# EXHIBIT A-1

**Asthma (Adults and Children ≥ 12 years)**

1

1. Obtain thorough history and perform physical exam.
2. Review history of symptoms witnessed or addressed by healthcare staff.
3. Document peak expiratory flow. Spirometry is suggested when available.
4. Consider transferring the patient to a 24-hour unit if the patient has a history of intubation.
5. Assess the patient's knowledge and skills for self-management.
6. Classify asthma severity to select the most appropriate therapy by assessing impairment and risk.

> The pathways do not replace sound clinical judgment nor are they intended to strictly apply to all patients.

2

| Components of Severity | | Classification | | | |
|---|---|---|---|---|---|
| | | **Intermittent** | **Persistent Mild** | **Persistent Moderate** | **Persistent Severe** |
| **Impairment**<br><br>Normal $FEV_1/FVC$:<br>8-19 yr = 85%<br>20-39 yr = 80%<br>40-59 yr = 75%<br>60-80 yr = 70% | Symptoms | ≤ 2 days/week | > 2 days/week but not daily | Daily | Throughout the day |
| | Nighttime awakenings | ≤ 2 times/month | 3-4 times/month | > 1 time/week but not nightly | Often 7 times/week |
| | SABA for symptom control (not prevention EIB) | ≤ 2 days/week | > 2 days/week but not > 1 time/day | Daily | Several times per day |
| | Interference with normal activity | None | Minor limitations | Some limitation | Extremely limited |
| | Lung function | • Normal $FEV_1$ between exacerbations<br>• $FEV_1$ > 80% predicted<br>• $FEV_1/FVC$ normal | • $FEV_1$ ≥ 80% predicted<br>• $FEV_1/FVC$ normal | • $FEV_1$ > 60% but < 80% predicted<br>• $FEV_1/FVC$ reduced 5% | • $FEV_1$ < 60% predicted<br>• $FEV_1/FVC$ reduced > 5% |
| **Risk** | Exacerbations requiring oral systemic corticosteroids | 0-1/year | ≥ 2/year | | |
| | | Consider severity and interval since last exacerbation. Frequency and severity may fluctuate over time for patients | | | |
| | | Relative annual risk of exacerbations may be related to $FEV_1$ | | | |
| **Treatment** | **Long-Term Control Medication**<br>(see table 4 for alternatives) | **STEP 1**<br><br>None | **STEP 2**<br>**Low dose ICS**<br><br>Fluticasone HFA 1 puff bid | **STEP 3**<br>**Low dose ICS + LABA†**<br><br>Fluticasone HFA 1 puff BID<br>**plus**<br>Salmeterol*<br>1 puff bid | **STEP 4**<br>**Medium dose ICS + LABA**<br><br>Non-formulary combination inhaler:<br>__UTMB__<br>Mometasone/formoterol (Dulera®)*<br>100 mcg / 5 mcg 2 puffs BID<br><br>__Texas Tech__<br>Fluticasone/salmeterol (Wixela®)* 250 mcg / 50 mcg<br>1 puff BID<br><br>**STEP 5**<br>**Consider:**<br>• Specialty referral<br>• Add Tiotropium 1 capsule inhaled daily * |
| | **Quick Relief Medication** | **SABA as needed for symptoms for all patients for all steps of therapy**<br>Albuterol HFA 2 puffs QID prn | | | |

SABA=short-acting beta2-agonist, LABA=long-acting beta2-agonist, ICS=inhaled corticosteroid, EIB=exercise-induced bronchospasm. * Non-formulary approval required. The Texas Tech sector may request non-formulary fluticasone/salmeterol (Wixela®) in Step 3.

3

Evaluate response to therapy in 2-6 weeks or as clinically indicated. Go to page 2 box #4



**Exacerbations and poor control should prompt review of treatment plan**

Asthma Page 2

Assess the patient to determine if asthma is well controlled
(based on the most severe symptoms during the previous 2-4 weeks and by spirometry or peak flow measures)

**5**

**Well Controlled**
• Symptoms: ≤ 2 days/week
• Nighttime awakenings: ≤ 2 x/month
• Limitations of activities: None
• Need for quick relief inhaler: ≤ 2 days/week
• FEV$_1$ or Peak Flow: >80% predicted/personal best
• Exacerbations requiring oral corticosteroids: 0-1/year

**6**

Continue current regimen.
• Follow up with peak flow to assess control.
• Consider step down if well controlled for at least 3 months.
• Once stable, follow up at least every 12 months.
• Obtain peak flow at each visit.
• Review medication technique, adherence, environmental control, comorbid conditions, and assess side effects during each visit.
• Review asthma action plan & revise as needed during each visit.
• Consider spirometry every 1-2 years.

**7**

**Not Well Controlled**
• Symptoms: > 2 days/week
• Nighttime awakenings: 1-3 x/week
• Limitations of activities: Some
• Need for quick relief inhaler: > 2 days/week
• FEV$_1$ or Peak Flow: 60% - 80% predicted/personal best
• Exacerbations requiring oral corticosteroids: ≥ 2/year

**8**

• Before stepping up therapy, review adherence to medication, inhaler technique, environmental control, comorbid conditions and assess side effects.
• Obtain peak flow.
• Step up 1 step.
• Review asthma action plan & revise as needed.
• Consider Respiratory Care referral.
• Follow up in 2-6 weeks or as clinically indicated.

**12**

**Very Poorly Controlled**
• Symptoms: Throughout the day
• Nighttime awakenings: ≥ 4 x/week
• Limitations of activities: Extremely limited
• Need for quick relief inhaler: Several times per day
• FEV$_1$ or Peak Flow: < 60% predicted/personal best
• Exacerbations requiring oral corticosteroids: ≥ 2/year

**13**

• Before stepping up therapy, review adherence to medication, inhaler technique, environmental control, comorbid conditions and assess side effects.
• Obtain peak flow.
• Step up 1 step.
• Consider short course oral systemic corticosteroids.
• Review asthma action plan & revise as needed.
• Consider Respiratory Care or Specialty Care referral.
• Follow up in 2 weeks or as clinically indicated.

**9** Asthma well controlled? — Yes → **10** Go to box # 6 ← Yes — **14** Asthma well controlled?

**No**

**11**

• Before stepping up therapy, review adherence to medication, inhaler technique, environmental control, comorbid conditions and assess side effects.
• Obtain peak flow.
• Step up 1 step.
• Review asthma action plan & revise as needed.
• Consider Respiratory Care or Specialty Care referral.
• Follow up in 2-6 weeks or as clinically indicated.

**No**

**15**

• Before stepping up therapy, review adherence to medication, inhaler technique, environmental control, comorbid conditions and assess side effects.
• Obtain peak flow.
• Consider short course oral systemic corticosteroids.
• Step up 1-2 steps.
• Review asthma action plan & revise as needed.
• Consider Specialty referral
• Follow up in 2 weeks or as clinically indicated.

Nurses: DMGs are to assist providers in making treatment decisions and are not to be confused with or viewed as Nursing Standing Delegated Orders (SDOs). As such, **treatment recommendations in DMGs cannot be implemented independently by nursing staff without an order from a provider.**

**I.    Definition**: Asthma is a heterogeneous disease, usually characterized by chronic airway inflammation. It is defined by the history of respiratory symptoms such as wheeze, shortness of breath, chest tightness and cough that vary over time and in intensity, together with variable expiratory airflow limitation.

**II.    Diagnosis is based on the following**:
  A.  History
    1.  Family history of asthma, allergy, sinusitis, rhinitis, eczema or nasal polyps
    2.  Age of onset and diagnosis
    3.  Recurrent symptoms such as wheeze, cough, chest tightness, shortness of breath, or difficulty breathing
    4.  Pattern of symptoms
        a.  Perennial, seasonal, or both
        b.  Continual, episodic, or both
    5.  Precipitating factors that cause symptoms to occur or worsen
        a.  Exercise
        b.  Allergen (e.g., mold, pollen, dust mites, animal fur)
        c.  Irritant (e.g., smoke, chemicals)
        d.  Viral infection
        e.  Changes in weather
        f.  Menstrual cycles
        g.  Strong emotional expression (e.g., stress, laughing or crying hard)
        h.  Drugs (e.g., aspirin, NSAIDs, or beta-blockers)
    6.  Symptoms occur or worsen at night and awaken the patient
    7.  History of exacerbations
        a.  Usual prodromal signs and symptoms
        b.  Rapidity of onset, duration & frequency
        c.  Severity (e.g., need for hospitalization) and life-threatening exacerbations (e.g., intubation)
        d.  Number and severity of exacerbations in last year
        e.  Usual management of exacerbations
    8.  Comorbid conditions that may aggravate asthma (e.g., rhinitis, GERD, obesity, obstructive sleep apnea)
  B.  Physical exam focusing on the upper respiratory tract, chest, and skin
    1.  Hyper-expansion of the chest
    2.  Expiratory wheezing (rhonchi) upon auscultation is the most common abnormality
    3.  Increased nasal secretion, mucosal swelling, and/or nasal polyps
    4.  Atopic dermatitis, eczema, or any other manifestations of an allergic skin condition
    5.  Note: Physical examination in patients with asthma is often normal. Lack of wheezing or normal chest examination does not exclude asthma
  C.  Airflow obstruction is at least partially reversible
    1.  Spirometry is used to demonstrate obstruction and assess reversibility
    2.  Considered reversible if either an increase in $FEV_1$ of ≥12 percent from baseline or by an increase ≥10 percent of predicted $FEV_1$ after inhalation of a short-acting bronchodilator
    3.  Spirometry typically measures the maximal volume of air forcibly exhaled from the point of maximal inhalation (FVC) and the volume of air exhaled during the first second of this maneuver ($FEV_1$)
  D.  Exclusion of other diagnoses
    1.  Adults – COPD, heart failure, pulmonary embolism, mechanical obstruction such as tumor, vocal cord dysfunction, cough secondary to medications such as ACE inhibitors, or pulmonary infiltration
    2.  Children – Vocal cord dysfunction, bronchiectasis, cystic fibrosis, congenital heart disease, alpha1-antitrypsin deficiency, inhaled foreign body, chronic upper airway cough syndrome

**III.    Classification of severity**

    A.    Classify asthma severity to select the most appropriate therapy by assessing impairment and risk.

        1.    Impairment: frequency and intensity of symptoms, and functional limitations

            a.    Nighttime awakenings

            b.    Need for short-acting beta agonist for quick relief of symptoms

            c.    School/workdays missed

            d.    Ability to engage in normal daily activities

            e.    Lung function measured by spirometry

        2.    Risk: likelihood of exacerbation, progressive loss of lung function, and risk of adverse effects from medications

            a.    Exacerbations requiring oral corticosteroids

            b.    Two or more emergency room visits or hospitalizations for asthma in last year

            c.    History of intubation or ICU admission especially in last 5 years

            d.    Patients report that they feel in danger or frightened by their asthma

            e.    Psychosocial factors (e.g., depression, stress)

            f.    Severe airflow obstruction by spirometry

            g.    Attitudes and beliefs about taking medications

    B.    Level of severity is determined by assessment of both impairment and risk. Assess impairment by patient's recall of symptoms in previous 2–4 weeks and spirometry. Assign severity to the most severe category in which any feature occurs (See Page 1, box 2)

    C.    Respiratory Care may be consulted to assist with asthma classification and patient education.

    D.    Once asthma is well controlled, classify asthma severity by the lowest level of treatment required to maintain control (See Table 1).

**Table 1.** Classification of Asthma Severity

|  | Intermittent | Persistent Mild | Persistent Moderate | Persistent Severe |
|---|---|---|---|---|
| Lowest level of treatment required to maintain control | Step 1 | Step 2 | Step 3 – 4 | Step 5 - 6 |

Adapted from Expert Panel Report 3: Guidelines for the Diagnosis and Management of Asthma

**IV.    Assessing asthma control**

    A.    Level of control is based on the most severe impairment or risk category (Table 2).

        1.    Impairment is assessed based on the patient's recall of events during the previous 2-4 weeks and by spirometry or peak flow measures.

        2.    Risk is assessed based on events over the last year.

    B.    Patients who have asthma that is well controlled at the time of a clinical assessment must be monitored over time and treatment should be adjusted accordingly, since asthma can vary in intensity over time.

    C.    Depending on level of asthma control, the patients is assigned to one of six treatment steps.

    D.    Therapy is stepped up or stepped down based on how well asthma is controlled and level of severity assessed for both impairment and risk.

    E.    Any exacerbation should prompt review of maintenance treatment.

    F.    <u>Note</u>: For treatment purposes, patients who had ≥2 exacerbations requiring oral systemic corticosteroids in the past year may be considered the same as patients who have not-well-controlled asthma, even in the absence of impairment levels consistent with not-well-controlled asthma.

**V.    Treatment Principles**

    A.    Gain control of asthma as soon as possible.

    B.    Evaluate causes of poor control <u>before</u> stepping up therapy and increasing doses or adding long-term control medications.

        1.    Poor patient inhaler technique

        2.    Poor medication adherence

        3.    Adverse effects to medications

        4.    Exposure to environmental triggers

        5.    Comorbidities that may aggravate asthma (e.g., rhinitis, GERD, obesity, obstructive sleep apnea)

   C.   Goals of therapy are to achieve asthma control by reducing impairment and risk

       1.   Reduce impairment
- a. Prevent symptoms
- b. Require infrequent use of quick relief medications (≤ 2 days per week)
- c. Maintain normal activity level
- d. Maintain normal or near normal lung function

       2.   Reduce risk
- a. Prevent exacerbations and minimize need for emergency department visits and hospitalizations
- b. Provide optimal treatment with minimal or no adverse effects
- c. Prevent progressive loss of lung function

## VI. Treatment

   A.   Non-pharmacologic
1. Avoidance of environmental triggers such as allergens or tobacco smoke.
2. Physical activity should be encouraged because of its general health benefits. Provide advice about exercise-induced bronchoconstriction (EIB).
3. Weight reduction if obese.
4. Possibility of occupational asthma should be considered, and sensitizers should be removed if possible.
5. Avoidance of medications that may worsen asthma (e.g., aspirin, NSAIDs, or nonselective beta-blockers). However, use of these medications are not absolutely contraindicated unless there is a history of previous reactions to them.

   B.   Pharmacologic
1. Annual influenza vaccination for patients with mild persistent to severe persistent asthma (i.e., requires chronic medication) OR patients with a history of hospitalization or emergency treatment for asthma. Refer to Infection Control Immunizations Policy B-14.07 for pneumococcal vaccine recommendations.
2. Consider treatment of comorbid conditions that aggravate asthma especially if asthma is poorly controlled.
3. Stepwise approach to therapy
   - a. Therapy is determined by asthma severity for initiating therapy and the level of asthma control for adjusting therapy
   - b. Six treatment steps stepped up or down based on how well asthma is controlled
     - i. Step up
       - Optimize dose of long-term control medication; evaluate causes of poor control first
       - Complete resistance to ICS is rare so consider trial of higher dose
       - Use sustained step up for at least 2-3 months if asthma poorly controlled
       - Use short-term step up for 1-2 weeks (e.g., with viral infection or allergen)
     - ii. Step down
       - Consider step down after good control is maintained for at least 3 months
       - Goal is to find the minimum effective dose that controls symptoms & prevents exacerbations
       - Complete cessation of inhaled corticosteroids is <u>not</u> advised in adults
   - **c. Single Maintenance And Reliever Therapy (SMART):** if recommended by the specialist, utilization of a single combination ICS/LABA inhaler (e.g., Dulera®) for maintenance and rescue treatment may be considered for patients with persistent moderate-severe asthma. SABA and/or single-entity LABA (e.g., salmeterol) should be discontinued in these patients. Nonformulary approval for Dulera® may be requested; separate EHR orders for maintenance and PRN regimens are required.

**Table 2.** Assessing Asthma Control and Adjusting Therapy

| Components of Severity | | Well Controlled | Not Well Controlled | Very Poorly Controlled |
|---|---|---|---|---|
| **Impairment** | Symptoms | ≤ 2 days/week | > 2 days/week | Throughout the day |
| | Nighttime awakenings | ≤ 2 times/month | 1-3 times/week | ≥ 4 times/week |
| | SABA for symptom control (not prevention of EIB) | ≤ 2 days/week | > 2 days/week | Several times per day |
| | Interference with normal activity | None | Some limitations | Extremely limited |
| | FEV$^1$ or peak flow | > 80% predicted/personal best | 60-80% predicted/ personal best | < 60% predicted/personal best |
| **Risk** | Exacerbations | 0-1/year | ≥ 2/year | |
| | | Consider severity & interval since last exacerbation. | | |
| | Treatment-related adverse effects | Not correlated to level of control but should be considered in assessment of therapy. | | |
| **Recommended Action** | | • Maintain current treatment step<br>• Follow up every 6-12 months as needed<br>• Consider step down if well controlled for at least 3 months | • Step up 1 step.<br>• Reevaluate in 2–6 weeks or as clinically indicated. | • Step up 1-2 steps.<br>• Consider short course of oral systemic corticosteroids<br>• Revaluate in 2 weeks or as clinically indicated |

Adapted from Expert Panel Report 3: Guidelines for the Diagnosis and Management of Asthma. SABA=short-acting beta2-agonist, EIB=exercise induced bronchospasm.

4.   Quick relief medications (Table 3)
  a.   Used to provide prompt relief of symptoms
  b.   Will <u>not</u> provide long-term asthma control and is prescribed for as needed use
  c.   Short-acting beta$_2$-agonist such as albuterol is preferred
  d.   If used > 2 days per week (except for exercise-induced asthma), the patient may need to start or increase long-term control medications

**Table 3.** Quick Relief Medications

| Drug | Type of Medication | Adult Dose | Child ≤ 11 Dose | Adverse Effects |
|---|---|---|---|---|
| Albuterol (Proventil HFA®) 90 mcg/puff<br><br>200 puffs/inhaler | Quick relief Short-acting beta$_2$-agonist | **Quick relief**: 2 puffs qid prn (up to 2 puffs every 4 hrs.)<br><br>**Exacerbation**: 4-8 puffs every 20 minutes for up to 4 hours then every 1-4 hours prn | **Quick relief**: 2 puffs qid prn (up to 2 puffs every 4 hrs.)<br><br>**Exacerbation**: 4-8 puffs every 20 minutes for 3 doses then every 1-4 hours prn | Tachycardia, tremor, headache |
| Prednisone (Deltasone®) 5 mg, 10 mg, 20 mg tablets | Quick relief – used short-term for establishing control when initiating therapy or during moderate to severe exacerbations<br>Oral corticosteroid | 40-60 mg/day in 1-2 divided doses x 3-10 days | 1-2 mg/kg/day divided in 2 doses (maximum 60 mg/day) x 3-10 days | Hyperglycemia, increased appetite, fluid retention, weight gain, facial flushing, mood alteration, hypertension, ulcer |

5. Long-term control medications (Table 4)
   a. Taken daily over a long period of time to maintain control of symptoms
   b. Not effective on an as needed (i.e., PRN) basis
   c. Should <u>not</u> be prescribed without a quick relief medication
   d. Used to reduce inflammation, relax airway muscles, and improve symptoms and lung function
   e. Types
      i. Inhaled corticosteroid (ICS) such as fluticasone
         • Most potent and effective
         • May cause systemic adverse effects at high dose
      ii. Long-acting beta2-agonist (LABA) such as salmeterol
         • Not used alone and must be used in combination with ICS
         • When long-term control combination therapy is warranted, preferred combination is ICS plus LABA
      iii. Leukotriene receptor antagonist (LTRA) such as montelukast
         • Do NOT use LTRA plus LABA as a substitute for combination therapy with ICS plus LABA
      iv. Oral corticosteroid (OCS) such as prednisone
         • Not recommended as a long-term control medication except at Step 6 of treatment due to potential for systemic side effects
         • Generally reserved as a short course (3-10 days) for moderate to severe exacerbations to gain prompt control
         • Tapering is not generally necessary if OCS is prescribed for less than 2 weeks
         • Factors that may be considered for a gradual discontinuation include patient frailty, comorbid illnesses and severely ill patients. If tapering, consider decreasing by increments of 10-20% every 1-2 weeks.
           Example: Patient is on > 40 mg of prednisone per day, decrease by 5 to 10 mg/day every 10 days.
6. Factors that cause non-adherence
   a. Medication Usage
      i. Difficulties using inhalers
      ii. Complex regimens
      iii. Adverse effects
   b. Non-Medication Factors
      i. Misunderstanding or lack of information
      ii. Poor communication
      iii. Fears about adverse effects
      iv. Inappropriate expectations
      v. Underestimation of severity
      vi. Attitudes about health
      vii. Cultural factors

**Table 4.** Long-term control Medications

| Drug | Type of Medication | Adult Dose | Child ≤ 11 Dose | Adverse Effects |
|---|---|---|---|---|
| Beclomethasone (Qvar redihaler®) 40 mcg/actuation 80 puffs/actuation<br><br>(non-formulary) *Recommended for HIV patients prescribed a protease inhibitor | Long-term control ICS | **Low dose:** 80 -240 mcg<br>• 160 mcg = 1 puff bid<br>**Medium dose:** > 240 -480 mcg<br>• 320 mcg = 2 puffs bid<br>• 480 mcg = 3 puffs bid<br>**High dose:** > 480 mcg<br>• 640 mcg = 4 puffs bid | **Low dose:** 80-160 mcg<br>• 160 mcg = 1 puff bid<br>**Medium dose:** >160-320 mcg<br>• 320 mcg = 2 puffs bid<br>**High dose:** > 320 mcg<br>• 480 mcg = 3 puffs bid | Cough, dysphoria, oral thrush<br><br>Systemic adverse effects may occur at high doses (see oral corticosteroids below for list) |
| Fluticasone HFA (Flovent®) 110 mcg/puff 120 puffs/inhaler<br><br>*220 mcg/puff is non-formulary for patients requiring a higher dose of 4 puffs bid | Long-term control ICS | **Low dose:** 88-264mcg<br>• 88 mcg = 1 puff (44mcg inhaler) bid<br>**Medium dose:**>264-440 mcg<br>• 440 mcg = 2 puffs (110 mcg inhaler) bid<br>**High dose:** >440 mcg<br>• 880 mcg = 2 puffs (220 mcg inhaler) bid | **Low dose:** 88-176 mcg<br>• 88 mcg = 1 puff (44 mcg inhaler) bid<br>**Medium dose:**>176-352mcg<br>• 220 mcg = 1 puff (110mcg inhaler) bid<br>**High dose:** >352 mcg<br>• 440 mcg = 1 puff (220 mcg inhaler) bid | Cough, dysphoria, oral thrush<br><br>Systemic adverse effects may occur at high doses (see oral corticosteroids below for list) |
| Salmeterol Diskus (Serevent®) 50 mcg/puff powder for inhalation 60 puffs/inhaler (non-formulary) | Long-term control LABA | 1 puff bid<br>• Must be used in combination with ICS<br>• Do NOT wash mouthpiece | 1 puff bid<br>• Must be used in combination with ICS<br>• Do NOT wash mouthpiece<br>• Child ≥ 4 years | Tachycardia, tremor, hypokalemia, QTc prolongation, diminished bronchoprotective effect may occur within 1 week<br><br>Uncommon, severe, life-threatening or fatal exacerbation |
| Tiotropium (Spiriva Handihaler®) 18mcg/ actuation (non-formulary) | Long-term control LAMA | 1 puff daily | **6-11 years:** 1 puff daily | Dry mouth, cough, bitter taste |
| Fluticasone/salmeterol (Wixela®) 100/50 mcg, 250/50 mcg, 500/50 mcg (non-formulary)<br><br>60 puffs/inhaler Note: Preferred ICS + LABA for Texas Tech sector | Long-term control combination ICS & LABA | **Low dose:**<br>• 1 puff (100/50 mcg inhaler) bid<br>**Medium dose:**<br>• 1 puff (250/50 mcg inhaler) bid<br>• Maximum 2 inhalations<br>**High dose:**<br>• 1 puff (500/50 mcg inhaler) bid<br>• Maximum 2 inhalations | **4-11 years:** 100/50 mcg 1 puff bid | See adverse effects for ICS and LABA<br><br>Note: Do NOT use in combination with another LABA such as formoterol. |
| Mometasone/formoterol (Dulera®) 100/5 mcg, 200/5 mcg (non-formulary)<br><br>120 puffs/inhaler Note: Preferred ICS + LABA for UTMB sector | Long-term control combination ICS & LABA | **Low dose:**<br>• 2 puffs (50/5 mcg inhaler) bid<br>**Medium dose:**<br>• 2 puffs (100/5 mcg inhaler) bid<br>• Maximum 4 inhalations<br>**High dose:**<br>• 2 puffs (200/5 mcg inhaler) BID<br>• Maximum 4 inhalations | Not approved for use in children ≤ 11 years | See adverse effects for ICS and LABA<br><br>Note: Do NOT use in combination with another LABA such as salmeterol. |
| Montelukast (Singulair®) 10 mg tablet, 5 mg chewable tablet (non-formulary) | Long-term control LTRA | **≥ 15 years - Adult:** 10mg orally once daily in the evening | **6-14 years:** 5mg chewable one daily in the evening | Headache, cough, upper respiratory infection, pharyngitis, abdominal pain<br>**Black Box Warning:** serious neuropsychiatric events |
| Prednisone (Deltasone®) 5 mg, 10 mg, 20 mg tablets | Long-term control OCS | 5-60 mg daily or every other day Note:<br>• Use lowest effective dose | 0.25-2 mg/kg daily or every other day Note:<br>• Use lowest effective dose | Short-term: Hyperglycemia, increased appetite, fluid retention, weight gain, facial flushing, mood alteration, hypertension, ulcer<br>Long-term: adrenal suppression, dermal thinning, hypertension, diabetes, Cushing's syndrome, cataracts, muscle weakness, osteoporosis, immunosuppression |

ICS=inhaled corticosteroid, LABA=long-acting beta₂-agonist, LTRA=leukotriene receptor antagonist, OCS=oral corticosteroid, LAMA=long-acting muscarinic antagonist

**Table 5.** Long-term control medication alternative treatment options

| Intermittent | Persistent | | | | |
|---|---|---|---|---|---|
| **STEP 1** | **STEP 2** | **STEP 3** | **STEP 4** | **STEP 5** | **STEP 6** |
| | **LTRA\*†**<br>Montelukast | **Low dose ICS + LTRA\*†**<br>Fluticasone HFA plus Montelukast\*<br><br>Or<br><br>**Medium dose ICS**<br>Fluticasone HFA | **Medium dose ICS + LTRA\***<br>Fluticasone HFA plus Montelukast\*<br><br>Or<br><br>**Medium dose ICS + LAMA\***<br>Fluticasone HFA plus tiotropium\* | **Refer to specialty** | **Refer to specialty** |

\* Non-formulary medication, † the FDA issued a black box warning for montelukast in March 2020 for serious neuropsychiatric events
SABA=short-acting beta$_2$ agonist, LABA=long-acting beta$_2$ agonist, ICS=inhaled corticosteroid, OCS=oral corticosteroid, LTRA=leukotriene receptor antagonist, LAMA= long-acting muscarinic antagonist, EIB=exercise induced bronchospasm

**Table 6.** Stepping Down Treatment

| Regimen | Action |
|---|---|
| Low dose ICS | Reduced dose by 25-50% at 3-month intervals |
| Medium dose or high dose ICS | Reduced dose by 25-50% at 3-month intervals |
| ICS + LABA | Reduce dose ICS by 50% and continue LABA<br>\*If patient remains controlled, reduce to low dose ICS;  may reduce ICS to once daily if controlled on low dose twice daily ICS. Continue LABA. |
| ICS + LABA + OCS | Continue ICS + LABA and reduce dose of OCS |

ICS=inhaled corticosteroid, OCS=oral corticosteroid, LABA=long-acting beta2 agonist

VII. **Follow-Up**
   A.   Patients with a diagnosis of asthma should be seen based on acuity and clinical judgment, but duration between visits may not exceed 12 months.
   B.   Consider the following for frequency of follow-up visits
      1.   Follow-up at 2–6-week intervals when initiating therapy or if asthma is not well controlled therapy
      2.   Follow-up at 2-week intervals if asthma is very poorly controlled
      3.   Follow-up at 3-month intervals when stepping down therapy
   C.   Assess asthma classification severity (Table 1) and asthma control (Table 2) during each chronic care visit
      1.   Daytime and nighttime signs and symptoms of asthma
      2.   Inability or difficulty performing normal activities due to asthma symptoms
      3.   Pulmonary function
         a.   Peak flow reading should be obtained at every chronic care visit. Consider more frequent peak flow monitoring for patients who:
            i.    Have moderate persistent and severe persistent asthma
            ii.   Have a history of severe exacerbations (e.g., required intubation)
            iii.  Poorly perceive airflow obstruction or worsening asthma
            iv.   Have poorly controlled asthma
         b.   Consider obtaining spirometry every 1-2 years.
      4.   Exacerbations since last visit
      5.   Frequency of use of quick relief medication - Monitor use of SABA at each chronic care visit as a measure of disease control. Asthma is not adequately controlled if the patient is using more than 2 times per week.

D. Review medication inhaler technique, adherence, and assess side effects during each chronic care visit
E. Reinforce education
    1. Review asthma action plan and revise as needed
    2. Proper inhaler technique
    3. Importance of adherence with long-term control medications

**VIII. Referrals**
    A. Consider respiratory care referral for a patient for the following purposes:
        1. To assist with asthma classification and patient education
        2. If the patient is not well controlled or is very poorly controlled
    B. Consider specialty referral for a patient experiencing any of the following conditions:
        1. Requires Step 5 care or higher and is not meeting goals of therapy
        2. Persistent uncontrolled asthma or frequent exacerbations
        3. Risk factors for asthma related death:
            a. Experienced a life-threatening or near-fatal exacerbation (e.g., ICU admission or mechanical ventilation)
            b. Anaphylaxis or confirmed food allergy with asthma
        4. Other conditions that complicate asthma or its diagnosis

**IX. Peak Flow Monitoring**
    A. The patient's personal best peak flow should be used as the reference value
    B. Personal best peak flow number is the highest peak flow number achieved over a 2-week period when asthma is well controlled
    C. Steps
        1. Move indicator to the bottom of the numbered scale
        2. Patient should be standing
        3. Patient should take a deep breath, filling their lungs completely
        4. Mouthpiece should be placed in mouth and lips should be closed around it. The tongue should not be placed inside the hole.
        5. Patient should exhale as hard and fast as possible in a single breath
    D. Interpretation of results
        1. Green Zone – 80% of personal best number signals good control
        2. Yellow Zone – 50% to < 80% of personal best number signals caution
        3. Red Zone – less than 50% of personal best number signals a medical alert

**X. Patient Education**
    A. Teach patients how to manage their asthma.
        1. Basic facts about the disease
            a. What is asthma
            b. Consequences of poor control
            c. What to expect during an asthma exacerbation
        2. Use of medication
            a. Difference between quick relief and long-term control medications and when to use them
            b. Proper inhaler technique (technique varies between inhalers)
            c. Importance of adherence for control
        3. Self-monitoring to assess level of asthma control and recognize signs of worsening asthma based on symptoms.
        4. Use of a written asthma action plan
            a. How to adjust medications in response to worsening asthma
            b. When to seek medical care if symptoms fail to respond to quick relief medication
        5. Avoidance of environmental triggers that worsen asthma

**Instructions for MDI Inhaler Use**
**Albuterol HFA (Proventil®, Ventolin®), Fluticasone HFA (Flovent®), Mometasone/Formoterol (Dulera®)**

**Below are general instructions for HFA inhaler use. Please refer to the specific inhaler package insert for complete directions as instructions may vary.**

**Priming HFA inhaler**
1. Shake the inhaler well.
2. Prime the inhaler before using for the first time by releasing 4 test sprays into the air away from face.
3. Repeat the above priming procedure before using only if the inhaler has not been used for more than 2 weeks.

**Cleaning HFA inhaler:**
1. Remove medication canister. Never get the canister wet.
2. Clean the plastic mouthpiece by running warm water through the top to the bottom for 30 seconds at least once a week.
3. Shake to remove excess water, then air dry thoroughly (such as overnight).

**Instructions for taking a dose from your HFA inhaler:**
1. Take the cap off the mouthpiece of the inhaler (plastic actuator) and **shake the inhaler well** before each spray.
2. Hold the inhaler upright with the mouthpiece down (see Figure 2). Breathe out through your mouth and push as much air from your lungs as you can. Put the mouthpiece in your mouth and close your lips around it.
3. Push the top of the canister all the way down while you breathe in deeply and slowly through your mouth (see Figure 3). Right after the spray comes out, take your finger off the canister. After you have breathed in all the way, take the inhaler out of your mouth and close your mouth.
4. Hold your breath as long as you can, up to 10 seconds, to allow the drug to reach deeply into your lungs. Then breathe normally.
5. If your provider has prescribed more sprays, wait 1 minute between sprays. Shake the inhaler again and repeat steps 2 through 4.
6. Put the cap back on the mouthpiece after every time you use the inhaler, and make sure it snaps firmly into place.

**Important points:**
1. Do <u>not</u> use the inhaler after the expiration date, which is on the outside packaging.
2. This technique does not work with dry powder capsule inhalers. It is important to close the mouth tightly around the mouthpiece of the inhaler and to inhale rapidly when using a dry powder inhaler.

Figure 1



Figure 2



Figure 3



**Tiotropium Handihaler (Spiriva®) Technique:**
1. Open the inhaler cap by pressing the green piercing button and pulling upwards and then open the mouthpiece.
2. Place 1 capsule in the center chamber.
3. Close the mouthpiece. You will hear a click when it is firmly closed.
4. Hold the inhaler with the mouthpiece upwards and press the piercing button in once. This makes a hole in the capsule and allows the medication inside the capsule to be released.
5. Breathe out completely away from the device.
6. Raise the inhaler to your mouth in a horizontal position and close your lips tightly around the mouthpiece. **Do not** block the air vents. Keep your head in an upright position and breathe in slowly and deeply at a rate sufficient to hear the capsule vibrate. Hold your breath as long as is comfortable.
7. To get your full daily dose, you must again breathe out completely (Picture 5) and for a second time, breathe in (Picture 6) from the same capsule. **Do not** press the green piercing button again.
8. After taking your daily dose, open the mouthpiece and turn the inhaler upside down to discard the capsule without touching it.
9. Close the mouthpiece and inhaler cap for storage.

**Notes:**
Do not store capsules in the inhaler.
Do not open capsule package until you are ready to use the inhaler.



**Inhaler parts:**
1. Dust cap
2. Mouthpiece
3. Base
4. Piercing button
5. Center chamber
6. Air intake vents










**Salmeterol (Serevent®) Diskus Technique:**

1. Open your Diskus: Hold the Diskus in your left hand and place the thumb of your right hand in the thumb grip. Push the thumb grip away from you as far as it will go until the mouthpiece shows and snaps into place (Picture A).
2. Slide the lever until you hear it click. Hold the Diskus in a level, flat position with the mouthpiece towards you. Slide the lever away from the mouthpiece as far as it will go until it clicks. The number on the counter will count down by 1. The Diskus is now ready for use (Picture B).
3. Inhale your medication. Before you breathe in your dose, breathe out as long as you can while you hold the Diskus level and away from your mouth. Do not breathe into the mouthpiece. Put the mouthpiece to your lips. Breathe in quickly and deeply through the Diskus. Do not breathe in through your nose. Remove the Diskus from your mouth and hold your breath for about 10 seconds, or for as long as is comfortable. Breathe out slowly as long as you can (Pictures C and D).
4. Close the Diskus. Place your thumb in the thumb grip and slide it back towards you as far as it will go. Make sure the Diskus clicks shut and you cannot see the mouthpiece. The Diskus is now ready for your next scheduled dose (Picture E).

**Important notes to avoid accidentally wasting a dose:**
- Do not close the Diskus
- Do not tilt the Diskus
- Do not move the lever on the Diskus



A



B



C



D



E



Outer Case

Counter

Mouthpiece

Thumb Grip

Lever

**Fluticasone / salmeterol (Wixela Inhub®) Technique:**

1. Remove the inhaler from the foil pouch. Open the inhaler by lowering the mouthpiece cover (figure 1).
2. Push down the yellow lever following the purple arrows (figure 2).
3. Breathe out completely away from the device. Raise the inhaler to your mouth in a vertical position and close your lips tightly around the mouthpiece. Keep your head in an upright position and breathe in quickly and deeply. Hold your breath for 10 seconds or as long as is comfortable (figure 3).
4. Breathe out slowly for as long as you can.
5. Close the inhaler by pushing the mouthpiece cover up to the closed position (figure 4).
6. Rinse your mouth with water after use. Spit out the water, do not swallow it (figure 5).

**Notes:**
Store Wixela Inhub® in the unopened foil pouch and only open when ready for use.
Safely throw away Wixela Inhub® in the trash 1 month after you open the foil pouch or when the counter reads **0**, whichever comes first.
Do not wash or rinse the mouthpiece.



**Beclomethasone (QVAR RediHaler®) Technique:**

The white cap must be closed to prepare the inhaler before each inhalation or you will not receive your medicine. Do not open the cap until you are ready to take your inhalation.

1.  Open the white cap that covers the mouthpiece of the inhaler. Do not open the cap unless you are taking a dose. Breathe out fully.

2.  Place the mouthpiece in your mouth and close your lips around it so you form a good seal. To avoid blocking airflow through the device, be sure that your hand doesn't cover the air vent on top of the inhaler. Hold the inhaler and mouthpiece upright as you take your inhalation. Inhale deeply to release the medicine. Remove the inhaler, hold your breath for 5 to 10 seconds, then breathe out slowly, away from the inhaler.



3.  Close the white cap after inhaling to prepare your next inhalation.

If your doctor has told you to take more than one inhalation per dose, make sure the white cap is closed and repeat steps 1-3. Do not take extra doses or stop taking QVAR RediHaler® without consulting your medical provider.

After taking your prescribed number of inhalations, rinse your mouth with water without swallowing to help reduce the risk of a fungal infection (thrush) in your mouth.

Be sure to use QVAR RediHaler® 2 times daily, as directed by your medical provider. It may take 3 to 4 weeks after starting QVAR RediHaler® to feel the benefits, although some people may notice a change in asthma symptoms within 24 hours.

Asthma Page 16

**Asthma Action Plan**

Patient Name: <insert>

Patient MRN: <insert>

Completed by: <insert>

Date: <insert>

| Long-term Control Medicines | How to Take | Other Instructions |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |

| Quick Relief Medicine | How to Take | Other Instructions |
|---|---|---|
| | | Take only if needed and in the yellow and red zones or before exercise. |

Special instructions when I feel 🟩 good, 🟨 not good, and 🟥 awful.

| | | | |
|---|---|---|---|
| **Green Zone** | **I feel good**.<br>• No cough, wheeze, chest tightness, or shortness of breath during the day or night<br>• Can do usual activities. | | **PREVENT asthma symptoms everyday**.<br>❑ Take my long-term control medicines every day.<br>❑ Before exercise, take ___ puffs of _____<br>❑ Avoid known triggers when possible |
| **Yellow Zone** | **I do not feel good**.<br>• Cough, wheeze, chest tightness, shortness of breath, or<br>• Waking at night due to asthma symptoms, or<br>• Can do some, but not all, usual activities. | | **CAUTION. I should continue taking my long-term control asthma medicines every day AND**:<br>❑ Take _____ puffs of quick relief medicine. If you still do not feel good within 20-30 minutes, you should take ___ puffs. If you do not feel better within one hour, go to the Red Zone. If you do feel better,<br>  ❑ Continue using quick relief medicine every 4 hours as needed for 24 hours.<br>❑ Increase_____<br>❑ Drop a sick call request. |
| **Red Zone** | **I feel awful**.<br>• Very short of breath, or<br>• Quick relief medicine has not helped, or<br>• Cannot sleep because of trouble breathing, or<br>• Cannot do usual activities because of trouble breathing | | **MEDICAL ALERT! Get help!**<br>❑ Take quick relief medicine. _____ puffs every _____ minutes<br>❑ Get help immediately if you are having difficulty walking or talking due to shortness of breath or lips or fingernails are gray or blue.<br>❑ Increase _____ |

# EXHIBIT A-2

# GOUT

The pathways do not replace sound clinical judgment nor are they intended to strictly apply to all patients



**1**

**Establish Diagnosis of Gout**

**Criteria for definitive diagnosis of gout:**
Presence of monosodium urate crystals in the synovial fluid (examined using polarized light microscopy)

**Criteria for clinical diagnosis of gout:**
In the <u>absence</u> of the means to identify urate crystals or in the presence of a negative polarized light microscopy, a provisional diagnosis of gout is made by a combination of clinical and historical criteria . There are no validated clinical diagnostic criteria. <u>Criteria that may be useful include:</u>
1. Serum uric acid level >7.0mg/dL
2. Maximum inflammation with symptoms of pain, swelling, redness, and warmth within 24 hours
3. History of one or more episodes of monoarticular arthritis followed by period(s) of completely free symptoms
4. Unilateral first metatarsophalangeal joint attack
5. Presence of a visible or palpable lesion, which by location or appearance is likely to be a tophus
6. Consider risk factors: family history, age, weight, male gender (**See Table 1**)

**2**     **Baseline Recommendations**
- Patient education, with initiation of diet and lifestyle recommendations. **See Section IV**
- Consider secondary causes of hyperuricemia ("Co-morbidity checklist"). **See Table 1**
- Consider elimination of non-essential prescription medications that induce hyperuricemia. **See Table 1**
- Clinically evaluate gout disease burden (palpable tophi, frequency and severity of acute and chronic symptoms and signs)

**3**     **Clinical Features**

**4**     Asymptomatic

**5**
- Sudden onset of pain
- Erythema
- Swelling involving joints

**6** Established diagnosis of gouty arthritis AND ≥ 1 of the following:
- **Tophus or tophi** by clinical exam or imaging study
- Evidence of radiographic damage attributable to gout
- **Frequent attacks** of acute gouty arthritis (≥2 attacks/year)
**OR**
First gout flare and ≥ 1 of the following:
- **CKD Stage 3 or worse** (Glomerular Filtration Rate (GFR) < 60 mL/min)
- **Recurrent urolithiasis**
- **Serum urate ≥ 9 mg/dl**

**7** Therapy not warranted in asymptomatic patients

**8** See **Acute Gout** (Page 2)

**9** Meets indication for **Chronic Gout Prophylaxis** (Page 3)

Nurses: DMGs are to assist providers in making treatment decisions and are not to be confused with or viewed as Nursing Standing Delegated Orders (SDOs). As such, **treatment recommendations in DMGs cannot be implemented independently by nursing staff without an order from a provider.**



10

- To provide optimal care, pharmacologic treatment should be **initiated within 24 hours of acute gout attack onset**, therefore treatment should preferably be prescribed as needed KOP in case of an acute gout attack.
- Ongoing pharmacologic prophylaxis treatment with urate lowering therapy agents (i.e., allopurinol) <u>should not be</u> interrupted during an acute gout attack.

11
Assess severity

12
Mild-Moderate pain , particularly for an attack affecting only 1 or a few small joints, or 1-2 large joints. **See Tables 2-4 and Figure 1**

13
Severe Pain, particularly for a polyarticular attack or an attack affecting multiple large joints. **See Tables 2-4 and Figure 1**

14
Initiate Monotherapy

15
**NSAIDs (First line):**
Naproxen 750 mg x 1 day, then reduce to 250 mg Q8H until attack resolved **or** Ibuprofen 800 mg three to four times daily until symptoms resolve
<u>Avoid NSAIDs in patients with Chronic Kidney Disease (CKD) whenever possible</u>

**Systemic Corticosteroids (Second line):**
<u>For patients with a contraindication to NSAIDS</u>
Prednisone 40-60 mg/day x 3 days, then decrease by 10-15 mg/day every 3 days until discontinued

**Colchicine (Third line):**
<u>For patients who are intolerant or have an absolute contraindication to NSAIDs and systemic corticosteroids</u>. Must <u>have non-formulary approval</u>. See **Table 6** for complete dosing.

**Monitoring Recommendations**: Patients should be assessed for improvement of pain symptoms after 24 hours of treatment with the selected agent. Typically the total duration for treatment of an acute attack is 5-7 days.

16
**Option:** Initial combination therapy. Acceptable combination therapy approaches include the initial simultaneous use of full doses (or, where appropriate, prophylaxis doses) of either: (1) Colchicine and Nonsteroidal Anti-Inflammatory Drugs (NSAIDs), (2) Oral Corticosteroids and Colchicine, or (3) Intra-Articular Steroids with any of the above agents. **Refer to Table 6**

17
Treatment outcomes

18
**Successful outcomes** defined as > 50% improvement in pain score at $\geq$ 24 hours

19
**Inadequate Response** defined as < 50% improvement in pain score at $\geq$ 24 hours

20
**Patient Education**: Including diet and lifestyle changes and prompt self-treatment of subsequent acute gout attacks; Consider Indications for chronic therapy. (**Box 6**)

21
Switch to Alternate Monotherapy

22
Option: Add-on combination therapy in individuals who have failed monotherapy with all options. **Refer to Box 16**

# Chronic Gout Prophylaxis

**23**

> **TREAT TO SERUM URATE TARGET**
> - The <u>minimum</u> serum urate target is **<6 mg/dl**
> - Serum urate lowering below 5 mg/dL may be needed to improve gout signs and symptoms

**24**

Initiate urate-lowering therapy (ULT) and acute gout prophylaxis.

1. **ULT – Allopurinol**.
   - **First Line: Allopurinol**
     - **Initial Dose**: 100 mg/day*
       *In Stage 4 or worse CKD (GFR $\leq$ 29): Start at 50 mg/day
     - **Maintenance Dose:**
       Titrate dose upward by 100 mg every 2-5 weeks to appropriate dose in order to treat to chosen serum uric acid target or max tolerated dose; Max dose: 800 mg daily, even with renal impairment. Monitor for drug toxicity **(See Table 7)**.
     - **Monitoring:**
       - Monitor serum urate concentration within 2 to 4 weeks of dose adjustments. Confirm serum urate level 3 months later.
       - Once serum urate target is achieved, monitor levels every 6 months.
   - **Alternatives: (See Table 7 for Dosing)**
     - **Second Line: Febuxostat** - Consider in patients who have a contraindication or are intolerant to allopurinol **(Non-formulary)**
     - **Third Line: Probenecid** - Consider in patients who have a contraindication or are intolerant to both allopurinol and febuxostat **(Non-formulary)**
2. **Acute gout prophylaxis**
   - Initiate acute prophylaxis with or just prior to initiating ULT **(See Table 6)**
   - **Duration:**
     - At least 6 months
       **OR**
     - 3 months after achieving target serum urate if no tophi detected on physical exam
     - 6 months after achieving target serum urate appropriate for the patient if one or more tophi detected on physical exam
   - **First line: Low dose NSAIDs** (e.g., Naproxen 250 mg twice daily)
     - <u>Avoid NSAIDs in patients with Chronic Kidney Disease (CKD) whenever possible</u>
     - Initiate with a proton pump inhibitor (PPI) for patients at high risk for GI toxicity (high risk patients include those with a history of ulcer disease, dyspepsia or gastroesophageal reflux disease (GERD) symptoms, age $\geq$ 60 years, and concomitant antiplatelet ,anticoagulation, or corticosteroid therapy).
   - **Second line: Low dose Prednisone** ($\leq$10mg/day)
   - **Third line: Low dose Colchicine:** 0.6 mg once or twice daily (non-formulary)



**25**

**TREAT TO TARGET**
Serum urate target achieved?

**No** →

**Yes** ↓

**27**
- Increase intensity of ULT and re-evaluate serum urate levels <u>every 2-4 weeks</u> during titration of dose until serum urate target achieved
- Consider specialty referral if:
  - Unclear etiology of hyperuricemia;
  - Refractory signs or symptoms of gout;
  - Difficulty in reaching target serum urate, particularly with renal impairment ; or
  - Multiple and/or serious adverse events from pharmacologic ULT
- **Go to Box 25**

**26**

**<u>Long-term management of gout</u>**
- Continue with ULT treatment indefinitely
- Regularly monitor serum urate <u>every 6 months</u> and monitor for ULT side effects
- After palpable tophi and all acute and chronic gout symptoms have resolved, continue with pharmacologic treatment and lifestyle /diet recommendations needed to maintain serum urate <6 mg/dL indefinitely

**I.    Risk Factors that promote hyperuricemia**

Table 1

| Risk Factors | |
|---|---|
| **Comorbidities** | • Hypertension<br>• Obesity<br>• Metabolic syndrome<br>• Type 2 Diabetes Mellitus<br>• Hyperlipidemia<br>• Chronic Kidney Disease |
| **Medications** | • Diuretics (Loop and Thiazides)<br>• Niacin<br>• Aspirin (75 to 325 mg/day)<br>• Pyrazinamide |
| **Diet** | • Excessive alcohol intake (particularly beer) (≥2 servings/day for a male and ≥ 1 serving/day for a female)<br>• Organ meats high in purine content (e.g., sweetbreads, liver, kidney)<br>• Beverages containing high fructose corn syrup<br>• Overeating |
| **Other** | • Adult males (often between the ages of 30-45)<br>• ≥65 years of age (regardless of gender) |

**II.   Acute Gout**

    A.    Define acute gouty arthritis attack features by classifying intensity of attack, duration of attack, and extent **(Tables 2 – 5)**.

**Table 2: Severity of Acute Gouty Arthritis Attack**

| Intensity of attack based on self-reported pain (0-10 visual analog scale) | |
|---|---|
| **Mild** | ≤4 |
| **Moderate** | 5-6 |
| **Severe** | ≥7 |

**Figure 1: Visual Analog Scale (VAS)**



**Table 3**

| Duration of the gouty arthritis attack since onset ||
|---|---|
| **Early** | <12 hours after attack onset |
| **Well-Established** | 12 to 36 hours after attack onset |
| **Late** | >36 hours after attack onset |

**Table 4**

| Extent of acute gouty arthritis attack<br>Based on number of active joints |
|---|
| **One or a few small joints** |
| **1 or 2 large\* joints**<br>**\****defined as: ankle, knee, wrist, elbow, hip, shoulder* |
| **Polyarticular**<br>• 4 or more joints, with arthritis involving more than 1 region◊<br>  ◊*Regions defined as: forefoot (metatarsophalangeal joints, toes), midfoot (tarsal joints), ankle/hindfoot, knee, hip, fingers, wrist, elbow, shoulder, other*<br>• Acute gout attack involving 3 separate large joints is considered as a form of polyarticular gout |

B.    Recommendations for combination therapy for acute gout treatment

**Table 5**

| Recommendations for Combination Therapy Approach to Acute Gouty Arthritis |
|---|
| • Initial combination therapy is an appropriate option for an acute, severe gout attack, particularly with involvement of multiple large organs or polyarticular arthritis.<br>• Acceptable combination therapy approaches include the initial simultaneous use of full doses (or, where appropriate, prophylaxis doses) of either:<br>    • (1) Colchicine and Nonsteroidal Anti-Inflammatory Drugs (NSAIDs);<br>    • (2) Oral Corticosteroids and Colchicine; or<br>    • (3) Intra-Articular Steroids with any of the above agents.<br>• For some patients not responding adequately to initial pharmacologic monotherapy, adding a second appropriate agent is an acceptable option. |

| Drug | Dosage Forms | Dosing | Side Effects/ Contraindications/Monitoring |
|---|---|---|---|
| **Colchicine** | | | |
| Colchicine (Colcrys®)<br><br>**Status: Non-formulary** | 0.6 mg tablet | **Initial:** 1.2 mg orally (two 0.6 mg tablets) followed by 0.6 mg in 1 hour (Max 1.8 mg over 1 hour)<br><br>**Prophylaxis:** 0.6 mg orally once or twice daily beginning 12 hours after initial dose; Max 1.2 mg/day<br><br>**If CrCl below 30 ml/min:** 0.3 mg/day (half-tablet) orally initially; may increase dose to a max of 1.2 mg/day with close monitoring for toxicity | **Common Side Effects:**<br>• Nausea, vomiting, abdominal pain, diarrhea (Approximately 80% of patients at high doses > 1.8 mg)<br>**Colchicine toxicity:**<br>• Myelosuppression,  rhabdomyolysis or myopathy, reversible peripheral neuropathy, liver failure, and death possible if overdosed<br>**Contraindications:**<br>• Do not repeat course more than once every 2 weeks in individuals with severe hepatic or renal impairment  (CrCl below 30 mL/min)<br>• Concomitant use of p-glycoprotein or strong CYP3A4 inhibitors in patients with hepatic or renal impairment (see Table 8) |
| **NSAIDs** | | | |
| Naproxen (Naprosyn®, others)<br>**Status: Formulary** | 250 mg,  500 mg tablet | 750 mg x 1 day, then reduce to 250 mg orally every 8 hours until attack resolved | **Common Side Effects:**<br>• Nausea, take with food<br>**Contraindications:**<br>• Allergic reaction following NSAIDs or aspirin use<br>**Precautions:**<br>• Avoid NSAIDs in patients with Chronic Kidney Disease (CKD) whenever possible<br>• Consider bleeding risk in patients being treated with anticoagulants or those with active peptic ulcer disease<br>• CVD risk (mostly with celecoxib)<br>• Indomethacin was 1st NSAID approved and is the traditional drug of choice; however, it is more toxic than ibuprofen (Increased risk for GI toxicity) and has risk of psychiatric side effects including confusion, depression, psychosis |
| Ibuprofen (Motrin®)<br>**Status: Formulary** | 200 mg, 400 mg, 600 mg, 800 mg tablet | 800 mg orally three to four times a day until symptoms resolve | |
| Meloxicam (Mobic®)<br>**Status: Formulary** | 7.5 mg, 15 mg | 7.5 mg orally once daily; max 15 mg once daily | |
| Indomethacin (Indocin®)<br>**Status: Non-Formulary** | 25 mg, 50 mg tablet | 50 mg orally three times a day until pain is tolerable,  then taper down to avoid risk of rebound attack | |
| Celecoxib (Celebrex®)<br>**Status: Non-Formulary** | 50 mg, 100 mg, 200 mg, 400 mg capsule | 800 mg orally immediately, followed by 400 mg 12 hours later, then 400 mg every 12 hours for 7 days | |
| Sulindac (Clinoril®)<br>**Status: Non-Formulary** | 150 mg, 200 mg tablet | 300-400mg orally once daily | |
| **Steroids: Can be given PO, IM, IV, intra-articular** | | | |
| Prednisone (orally)<br><br>**Status: Formulary** | 5 mg, 10 mg, 20 mg tablet | 40-60 mg/day x 3 days, then decrease by 10-15 mg/day every 3 days until discontinued | **Acute Steroid Use Side Effects:**  Increased blood glucose, elevated blood pressure, nervousness, insomnia, increased appetite, edema.<br><br>**Injection:** Slight risk of infection, risk of joint damage with repeat injections |
| Methylprednisolone sodium succinate (Solu-Medrol®)<br><br>**Status: Formulary** | 125 mg injection – 2 ml vial | Initial 10 to 40 mg IM; may be repeated as clinically indicated (Option in patients with active acute gout affecting 1 or 2 large joints defines as: ankle, knee, wrist, elbow, hip, shoulder) | |
| Triamcinolone Acetonide<br><br>**Status: Formulary** | 10 mg/ml- 5 mL vial<br>40 mg/mL- 1 mL vial | 60 mg IM, then oral prednisone as above | |

III. Chronic Gout

**Table 7. Chronic Gout Treatment**

| Drug | CMC Formulary Strengths | Dosing | Side Effects/Contraindications/Monitoring |
|------|------------------------|--------|-------------------------------------------|
| Allopurinol (Zyloprim®)<br><br>**Status: Formulary** | 100 mg, 300 mg tablet | Mild: 100-300 mg/day orally as a single or divided doses (2-3 times daily)<br><br>Moderate to severe: 400-600 mg/day orally in divided doses (2-3 times daily); Max dose 800 mg/day<br><br>Stage 4 or worse CKD (CrCl <29 mL/min): Start at 50 mg/day; gradually titrate up every 2-5 weeks to appropriate maintenance dose (refer to mild and moderate/severe maintenance doses) | **Common Side Effects**<br>• Precipitation of acute gout attacks<br>• Nausea<br>• Skin rash<br>**Precautions**<br>• Allopurinol hypersensitivity syndrome (AHS) - severe rash, fever, eosinophilla, hepatitis, and renal failure. Starting at lower doses can reduce the risk of AHS. Consider HLA-B*5801 screening in those populations at high risk for developing AHS: Koreans with Stage 3 or worse CKD (GFR < 59), those of Han Chinese or Thai descent, and African Americans.*<br>**Monitoring**<br>• Check LFTs at 2 and 4 months and periodically thereafter. |
| Febuxostat (Uloric®)<br><br>**Status: Non-formulary** | 40 mg, 80 mg tablet | <u>Initial</u>: 40 mg orally once daily<br><u>Maintenance</u>: May increase to 80 mg orally once daily in patients who do not achieve a serum uric acid level below 6 mg/dL after 2 weeks. | • May be safer in severe renal impairment and has decreased risk for hypersensitivity reactions but extremely costly.<br>**Black Box Warning:** Cardiovascular death<br>• Patients with established cardiovascular (CV) disease treated with febuxostat had a higher rate of CV death compared to those treated with allopurinol<br>**Common Side Effects**<br>• Precipitation of acute gout attacks<br>• Rash<br>• Nausea<br>**Monitoring**<br>• Liver enzyme elevations (requires LFT monitoring at 2 and 4 months, and then periodically thereafter) |
| Probenecid<br><br>**Status: Non-Formulary** | 500 mg tablet | 250 mg orally BID for one week, followed by 500 mg BID thereafter; If symptoms persist, may incrementally increase by 500 mg every 4 weeks as tolerated; MAX 2000 mg/day. | • Uricosurics require adequate renal function. They are not commonly used, but may be used in younger patients with good renal function (CrCl greater than 50 mL/min).<br>**Common Side Effects:**<br>• Precipitation of acute gout attacks<br>• Rash<br>• GI intolerance<br>• Uric acid stone formation<br>**Contraindications:**<br>• Renal impairment (CrCl below 50 mL/min)<br>• Kidney stones |

*To order an HLA-B*5801 genotype test, order a miscellaneous test and in the comments enter "X-Renal HLA-B* 5801 typing".

**Table 8**

| Drug Interactions | |
|---|---|
| **Allopurinol** | • Azathioprine, 6-mercaptopurine, cyclophosphamide, cyclosporine - Allopurinol may increase toxicity of these agents<br>• Ampicillin and amoxicillin  - Allopurinol may result in a  higher probability of rash associated with these agents<br>• Captopril and enalapril - May result in hypersensitivity reactions including Stevens-Johnson Syndrome in combination<br>• Pegloticase - May result in an increased risk of anaphylaxis and infusion reactions in combination<br>• Warfarin - Increased bleeding risk in combination |
| **Colchicine** | • Strong CYP3A4 inhibitors (increase colchicine concentrations): atazanavir, clarithromycin, indinavir, itraconazole, ketoconazole, nefazodone, nelfinavir, ritonavir, saquinavir, telithromycin, and other<br>• P-gp inhibitors (increase colchicine concentrations): vinca alkaloids, amiodarone, azole antifungals, clarithromycin, cyclosporine, diltiazem, erythromycin, quinidine, tacrolimus, verapamil, and others.<br>• Dose adjustments:<br>   • Strong CYP3A4 inhibitors; Gout flare: 1.2 mg oral for 1 dose, do not repeat dose earlier than 3 days.<br>   • P-gp inhibitors; Gout flare: 0.6 mg oral for 1 dose, do not repeat dose earlier than 3 days.<br>   • CYP3A4 or P-gp inhibitors; Gout Prophylaxis: Avoid use, but if unavoidable, consider reduction of daily dose of 0.3 mg orally  every other day to 0.3 mg orally once a day. |
| **Febuxostat** | • Azathioprine and 6-meracaptopurine - contraindicated; febuxostat may increase plasma concentrations |

IV. **Patient Education**

A. **Causes of Gout**
- Gout results from excessive uric acid in the body. Uric acid can build up and form crystals which may lead to kidney stones, joint pain, or deposits under the skin called tophi.

B. **Risk Factors**
- Certain risk factors increase the risk of developing gout including obesity, using medications that increase uric acid, consuming excessive amounts of alcohol (in particular beer), overeating, and disease states such as high blood pressure and chronic kidney disease (see Table 1).
- Certain characteristics increase the risk of gout flares in patients diagnosed with gout. These include meat, sugary drinks, excessive alcohol intake, and taking medications that increase uric acid .
  - Limit intake of meat, poultry, and fish to 4 to 6 ounces (113 to 170 grams daily).
  - Avoid or limit beverages and food containing high fructose corn syrup (soft drinks, juices, cereals, store-bought goods, ice cream, candy, processed foods at fast food restaurants).
  - For alcohol intake, limit to $\leq$ 2 servings/day for a male and $\leq$ 1 serving/day for a female.
  - Some examples of medications that affect blood levels of urate include aspirin (75 to 325 mg/day), diuretics, and niacin.

C. **Gout Attacks**
- Gout attacks are sudden with severe pain, burning, and swelling. If left untreated, the attacks may continue to develop. Gout attacks usually occur in the big toe but can occur in other joints.

D. **Treatment goals**
- The goal of treatment is to treat acute attacks, prevent future attacks, and reduce uric acid levels.

E. **Acute gout treatment**
- Pain and inflammation associated with acute gout attacks are treated using either an NSAID, colchicine, or steroids.
- The pain and inflammation of an acute gout attack usually reaches its peak of intensity within 12 to 24 hours and generally resolves completely within a few days to several weeks, even if untreated.
- Treat acute gout attacks within 24 hours of the onset of symptoms to receive the greatest benefit. Continue with treatment until symptoms resolve (usually within 5-7 days)
- NSAID counseling
  - Take with food to avoid upset stomach.
  - May cause bleeding in the stomach or intestine. Risk is higher in patients older than 60 years of age, history of stomach ulcer, using certain medications (steroids and blood thinners), individuals who smoke or drink regularly, or those with poor health.
  - May increase the risk of heart attack or stroke. Risk higher in patients with heart disease or long-term use of NSAIDs. Seek medical attention immediately if signs of a heart attack or stroke occur.
- Prednisone
  - May cause fluid retention, upset stomach (take with food), mood or behavior changes, increased appetite, weight gain, increase in blood glucose sugars, and high blood pressure.
  - Do not stop taking suddenly if using longer than 2 weeks. Must taper slowly to avoid withdrawal symptoms.
- Colchicine counseling
  - At the first sign of an attack take 2 tablets. Can take an additional tablet in one hour. Do not exceed more than 3 tablets in 24 hours.
  - Do not take 2nd dose if upset stomach, nausea, or diarrhea occurs.

F. **Chronic gout**

- Long term treatment with medications that lower urate acid levels, such as allopurinol, are used to prevent recurrent gout attacks.
- Therapy for chronic gout is lifelong. Patients should continue taking urate lowering medications even during an acute gout attack.
- Allopurinol counseling
  - Allopurinol decreases uric acid production. This reduces the chances of further gout attacks. It is important to take this medication daily (lifetime treatment).
  - Take once daily with a meal to reduce stomach upset.
  - It may take up to several weeks for this medication to have an effect . Acute gout attacks may occur for several months after starting this medicine while the body removes extra uric acid. If this occurs, treat with NSAIDs or another alternative agent such as colchicine and prednisone.
  - Notify provider if a rash develops. This rash can become serious.

G. **Discuss lifestyle and diet recommendations** (Tables 9 and 10)

**Table 9**

| Lifestyle Recommendations for gout patients | |
|---|---|
| **Exercise regularly** | Engage in moderate-intensity physical activities for at least 30 minutes most days of the week |
| **Maintain a healthy body weight** | Obese patients are four times as likely to develop gout than someone with ideal body weight. Encourage weight loss for obese patients to achieve BMI that promotes general health |
| **Stay well hydrated** | Many dietitians recommend consuming at least 64 ounces of water daily, and more if the patient is exercising |

**Table 10**

| Diet Recommendations for Gout Patients | | |
|---|---|---|
| **Avoid** | **Limit** | **Encourage** |
| • Organ meats high in purine content (e.g., sweetbreads, liver, kidney) | Serving size of:<br>• Beef, Lamb, Pork<br>• Seafood with high purine content (e.g., sardines, shellfish) | • Low-fat or non-fat dairy products |
| • High fructose corn syrup-sweetened sodas, other beverages, or foods | • Servings of naturally sweet fruit juices<br>• Table sugar, sweetened beverages and desserts<br>• Table salt, including in sauces and gravy | • Vegetables |
| • Alcohol overuse (Defined as more than 2 servings per day for a male and 1 serving per day for a female)<br>• Any alcohol use in gout during periods of frequent gout attacks, or advanced gout under poor control | • Alcohol (Particularly beer, but also wine and spirits) | |

# EXHIBIT A-3

HIV DISEASE MANAGEMENT

**1**

Initial evaluation of HIV+ patients to be done at the intake facility by facility provider:
1) Obtain medical history including sexual history, social history, medication history, & history of opportunistic infections.
2) Complete physical examination: vitals, weight, general exam, neurologic examination, and pelvic exam with PAP and GC/chlamydia tests.
3) Obtain baseline laboratories:  CBC with differential, Chemistry profile to include LFTs, serum creatinine, fasting blood sugar and lipid profile, Hepatitis serology (HbsAg, Anti-HBs, anti-HBc total antibody, anti-HCV and anti-HAV total antibody), Syphilis screen (RPR), Urinalysis, calculated estimate of glomerular filtration rate (GFR) (available in Tools on the CMC Web), CD4+ lymphocyte analysis, HIV RNA viral load, Varicella-Zoster Immune Status, Chest X-ray, PPD skin test.  Test for serum Cryptococcal Antigen (CrAg) in people with newly diagnosed HIV for patients whose CD4 counts are $\leq$100 cells/mm3.  A positive test generally should prompt CSF evaluation for CNS infection, particularly when the serum LFA titer is $\geq$1:160.
4) Screen patients for risk of chronic kidney disease by obtaining urinalysis, calculating GFR, and assessing risk. Risk factors include family history of renal disease, African American, CD4 <200 cells/mm³, VL > 4000 copies/ml, certain diseases (diabetes, HTN, hepatitis C co-infection), & concomitant use of nephrotoxic agents.  If 1+ proteinuria or calculated  GFR < 60 ml/min/1.73m², consider further evaluation.  If normal & high risk based on risk factors, reassess and recheck annually.  If normal & patient does not have risk factors, reassess annually in chronic care clinic (CCC).
5) Update vaccines: influenza vaccine annually; pneumococcal vaccine with single revaccination 5 years after the first dose; hepatitis A & B vaccine if not already immune; varicella vaccine if CD4 > 200 and patient born after 1979 with no history of disease, vaccination, or evidence of immunity.
6) Initiate prophylactic medication(s) for opportunistic infection(s) as indicated in box A page 3 & box B page 4.
7) Refer to dental for oral/periodontal evaluation within 30 days from initial chronic care visit.
8) Refer all HIV + patients regardless of CD4 count to the CMC Virology Clinic offered via DMS (UTMB sector) or designated  physician  (Texas Tech sector) for evaluation for antiretroviral treatment  (ART). If patient refuses, contact the CMC Virology Clinic (UTMB sector) or designated physician (Texas Tech sector) for drug therapy and ITP recommendations.
    a.   Expedited  referrals should be obtained for patients that are symptomatic or have a CD4 count < 200 cells/mm³. For patients on nonformulary treatment at intake, expedited referrals should be obtained within 2 weeks.

**2**

Follow-up for HIV+ Patients:
1) Evaluate in chronic care clinic at least every 6 months.
2) Refer patients with CD4 count < 100 cells/mm³ to Ophthalmology for a retinal examination to rule out HIV retinopathy & CMV retinitis.
3) Laboratories:
- CD4 count every 3 to 6 months if not on treatment. For patients beginning ART, CD4 count should be repeated as follows:
  - o   Every 3 months for the first 2 years of suppressive ART if CD4 counts <300 cells/mm3
  - o   Every 6 months if CD4 count is $\geq$300 cells/mm3
After 2 years of suppressive ART, CD4 count monitoring can be reduced as follows:
  - o   Every 6 months for patients whose CD4 counts remain at <300 cells/mm3
  - o   Every year for patients with CD4 counts between 300 cells/mm3 and 500 cells/mm3
  - o   Optional for those with CD4 counts >500 cells/mm3
- Viral load measurement should be repeated every 3 to 4 months or as clinically indicated to confirm continuous viral suppression. Clinicians may extend the interval to 6 months for adherent patients whose viral load has been suppressed for more than a year.
- Obtain CBC with differential when checking CD4 count or every 12 months when no longer checking CD4 count.
- Chemistries including LFTs, serum creatinine, blood sugar every 6 months.
- Lipids annually.
4) Consider discontinuing prophylactic medication(s) for opportunistic infection(s) as indicated in box A & B, pages 3-4.

**3**

1. Antiretroviral therapy (ART) is recommended for all individuals with HIV, regardless of CD4 T lymphocyte cell count, to reduce the morbidity and mortality associated with HIV infection.
2. Discuss pros & cons of drug therapy, adherence, resistance, administration, possible adverse effects & management.
3. If patient is committed, begin HAART.  Consider follow up in 2 to 4 weeks to assess medication tolerance.
4. If patient is poor candidate for drug therapy and/or does not want to start therapy, return to clinic every 3 to 6 months for follow-up.

**4**

Go to box #5 on page 2



Continued from box #4 on page 1

WHEN POSSIBLE, HIV-REFERRED THERAPIES (HIV MEDICATIONS AND LABORATORIES) ARE RE-ORDERED BY THE CMC VIROLOGY CLINIC (UTMB SECTOR) OR DESIGNATED PHYSICIAN (TT SECTOR).

6

Is adherence perceived to be ≥ 80% and is the patient tolerant?

Yes → Reinforce education. Return to clinic 1 month.

No

7

8

Verify that administration is correctly documented on the computer :
1) Counsel patient regarding the importance of adherence and warn patient noncompliance may lead to medication discontinuation.
2) Identify & treat adverse effects if present
3) Return to clinic in 1 month

9

Is adherence perceived to be ≥ 80%?

No

The pathways do not replace sound clinical judgment, nor are they intended to strictly apply to all patients

13

Verify administration is correctly documented on the computer or Notify unit administration:
1) Counsel patient regarding the importance of adherence and warn patient noncompliance may lead to med discontinuation.
2) Identify & treat adverse effects.
3) Return to clinic in 1 month.

Yes

10

Is adherence perceived to be ≥ 80%?

Yes → 12  Go To Box #15.

11

No

When adherence < 80% for 2 consecutive months:
1) Provide adherence counseling and education.  After 3 consecutive counseling attempts 1 month apart, can  consider discontinuation.
2) Obtain expedited referral for evaluation by CMC Virology Clinic (UTMB sector) or designated physician (Texas Tech sector) to determine subsequent management.
3) Consideration may be given to discontinuing therapy in patients that do not want to continue therapy, or are non-adherent to medications and clinic appointments, due to the possibility of developing resistance and to pause therapy to reflect on treatment options.
4) Follow up in CCC at least every 3-6 months.

14

No ← Is adherence perceived to be ≥ 80%?

Yes → 15  Obtain viral load.

16

Has viral load decreased  > 10-fold (1 log)?

Yes ← 

No

18

Repeat viral load in 1 month

17

Continue current drug therapy:
1) Return to CCC at least every 6 months and CMC Virology Clinic (UTMB sector) or designated physician (Texas Tech sector) as indicated.
2) Laboratories:  CD4 count every 3 to 6 months if not on treatment.
For patients beginning ART, CD4 count should be repeated as follows:
   o   Every 3 months for the first 2 years of ART if CD4 counts <300 cells/mm3
   o   Every 6 months if CD4 count is ≥300 cells/mm3
After 2 years of ART, CD4 count monitoring can be reduced as follows:
   o   Every 6 months for patients whose CD4 counts remain at <300 cells/mm3
   o   Every year with CD4 counts between 300 cells/mm3 and 500 cells/mm3
   o   Optional for those with CD4 counts >500 cells/mm3
Viral load measurement should be repeated every 3 to 4 months or as clinically indicated to confirm continuous viral suppression.
Clinicians may extend the interval to 6 months for adherent patients whose viral load has been suppressed for more than a year.
3) Reinforce education at each visit.
4) Goal of therapy is 10-fold (1 log) decrease in viral load at 8 weeks, non-detectable viral load at 4-6 months after starting drug therapy & increased CD4 count.
5) Obtain expedited referral to CMC Virology Clinic (UTMB sector) or designated physician (Texas Tech sector) to consider change in drug therapy if:  Goal viral load (non-detectable) not achieved within 4-6 months after starting drug therapy; Re-appearance of viremia after viral load is non-detectable (confirmed by at least 2 tests 4 weeks apart); Increase in viral load ≥ 3-fold from nadir (confirmed by at least 2 tests 4 weeks apart); Declining CD4 count (at least 2 tests); Severe, unusual, or life-threatening adverse effect suspected; or Patient wants to discontinue therapy

19

Has viral load decreased > 10-fold (1 log)?

Yes ← 

No

20

Continue current drug therapy so that reliable resistance testing may be obtained:
1) Refer patient to CMC Virology Clinic (UTMB sector)  or designated physician (Texas Tech sector) to evaluate patient for poor adherence, intolerance, versus resistance & to consider changing drug therapy.
2) Reinforce education at each visit.



| Box A: Primary Prophylaxis of Opportunistic Infections | | | | |
|---|---|---|---|---|
| Initiate based on CD4 count | Organism | Recommended Regimen | Alternative Regimen Or Directions | Discontinuation Criteria***** |
| All (regardless of CD4 count) | **M. tuberculosis PPD ≥ 5 mm** | INH 300 mg po qd plus pyridoxine 50mg po qd x 9 months | Rifampin 600 mg po qd x 4 months | |
| | **S. pneumoniae** | Pneumococcal vaccine (repeat one time only in 5 years) | | |
| | **Influenza virus** | Influenza vaccine (one dose annually) | | |
| | **Hepatitis A virus** | Hepatitis A vaccine to all susceptible HIV patients (2 dose series) | Assess antibody response in 1 or 2 months after series. If negative, revaccinate when CD4 > 200. | |
| | **Hepatitis B virus** | Double dose, three-dose series of recombinant hepatitis B vaccine to all susceptible HIV patients. | Assess antibody response in 1 or 2 months after series. If negative, revaccinate when CD4 > 200. | |
| < 200 Or start prophylaxis if have oropharyngeal candidiasis regardless of CD4 count | **Pneumocystis jirovecii** | TMP-SMX DS Once daily or three times weekly | Dapsone 100 mg qd or Atovaquone 1500 mg qd (nonformulary approval is required) | CD4 count > 200 for > 3 months Can consider when CD4 count 100-200 if HIV RNA remains below limit of detection for at least 3-6 months **(restart if CD4 count < 100 or 100-200 and HIV RNA above detection limit)** |
| *< 100 and antibody positive* | **Toxoplasma gondii** | TMP-SMX DS Once daily or three times weekly | Dapsone 100 mg qd + pyrimethamine 50 mg q week + leucovorin 25 mg q week | CD4 count > 200 for > 3 months Can consider when CD4 count 100-200 if HIV RNA remains below limit of detection for at least 3-6 months **(restart if CD4 count < 100 or 100-200 and HIV RNA above detection limit)** |
| *< 50* | M. avium complex****** | Azithromycin 1200 mg q week | Clarithromycin 500mg bid or rifabutin 300mg qd | CD4 count > 100 for ≥ 3 months **(restart if CD4 count < 50)** |

*****in response to ART and virally suppressed
****** only if not beginning antiretroviral treatment

Nurses: DMGs are to assist providers in making treatment decisions and are not to be confused with or viewed as Nursing Standing Delegated Orders (SDOs). As such, **treatment recommendations in DMGs cannot be implemented independently by nursing staff without an order from a provider.**

| Box B: Secondary Prophylaxis of Opportunistic Infections | | | | |
|---|---|---|---|---|
| Indication | Organism | Recommended Regimen | Alternative Regimen | Discontinuation Criteria**** |
| Prior PCP | Pneumocystis jirovecii | TMP-SMX DS qd | TMP-SMX DS three times weekly, Dapsone 100 mg qd or Atovaquone 1500 mg daily (Nonformulary approval required) | CD4 count > 200 for > 3 months Can consider when CD4 count 100-200 if HIV RNA remains below limit of detection for at least 3-6 months **(restart if CD4 count < 100 or 100-200 and HIV RNA above detection limit or PCP recurrence)** |
| Prior toxoplasmic encephalitis | Toxoplasma gondii | Sulfadiazine 1000 mg to 2000 mg po bid + Pyrimethamine 25-50 mg po qd + Leucovorin 10-25 mg qd | Clindamycin 600 mg po q 6 hr + Pyrimethamine 25-50 mg po qd + Leucovorin 10-25 mg po qd | CD4 count > 200 for > 6 months* **(restart if CD4 count < 200)** |
| Prior disseminated disease | M. avium complex | Clarithromycin 500mg po bid + Ethambutol 15 mg/kg po qd +/- Rifabutin 300 mg po qd | Azithromycin 500 mg po qd + Ethambutol 15 mg/kg po qd +/- Rifabutin 300 mg po qd | CD4 count > 100 for > 6 months* **(restart if CD4 count < 100)** |
| Prior end-organ disease | Cytomegalovirus (CMV) | Ganciclovir 5-6 mg/kg/day IV 5-7 days a week or for retinitis ganciclovir 1 gm po TID + SR implant q 6-9 months | Foscarnet IV 90 mg/kg/day , Cidofovir 5 mg/kg IV q 2 weeks, or Valganciclovir 900 mg po qd | CD4 count > 100 for > 3-6 months** **(restart if CD4 count < 100)** |
| Prior disease | Cryptococcus neoformans | Fluconazole 200 mg po qd | Itraconazole 200 mg po qd, or Amphotericin 0.6-1 mg/kg IV weekly – 3 times weekly | CD4 count ≥ 100 for > 3 months* **(restart if CD4 count < 100)** |
| Prior disease | Histoplasma capsulatum | Itraconazole 200 mg po bid | Amphotericin 1 mg/kg IV weekly or Fluconazole 800 mg qd | Histoplasma antigen and fungal culture undetectable , CD4 count > 150 for ≥ 6 months* **(restart CD4 count ≤ 150)** |
| Prior disease | Coccidioides immitis | Fluconazole 400 mg po qd | Itraconazole 200 mg po bid or Amphotericin 1 mg/kg IV weekly | |
| Bacteremia | Salmonella species | Ciprofloxacin 500 mg po bid x several months | | CD4 count > 200 |
| Frequent/ severe recurrences | Herpes simplex virus*** | Valacyclovir 400 mg po bid | Acyclovir 400 mg po bid or famciclovir 250 mg bid | |
| Frequent/ severe recurrences | Candida*** (oropharyngeal, vulvovaginal, esophageal) | Fluconazole 100-200 mg po qd | Itraconazole 200 mg po qd | |

*if completed ≥ 12 months of treatment and asymptomatic
**if initial treatment completed, asymptomatic, & regular ophthalmology exams
***recommended only if subsequent episodes are frequent or severe
****in response to ART and virally suppressed

**Patient and Provider Education**

I.   Who is educated?
   A. Health Services Personnel – updated on HIV so accurate and easy to understand information is
      provided to patients
   B. All inmates with HIV

II.  Who educates?
   A. Unit team will delegate educational responsibility - physicians and mid-level providers have the
      final responsibility to ensure education occurs
   B. Educator must document education in patient's chart

III. When does education take place?
   A. Upon identification of having HIV
   B. Individual education at clinic visit
   C. Group education if available

IV.  What is included in education?
   A. Health Services Personnel
      1. Pathophysiology & diagnostic criteria
      2. Monitoring parameters
      3. Pharmacologic treatments
      4. Adverse event monitoring & management
      5. Drug resistance & importance of adherence
      6. Opportunistic infections & prophylactic therapy
      7. Goals of therapy
   B. Patients
      1. Pathophysiology
      2. Routes of transmission
      3. Complications/risks of disease
      4. Pharmacologic treatments
      5. Monitoring parameters – frequency & importance
      6. Drug resistance & importance of adherence
      7. Individual treatment plan
      8. Dental hygiene to include daily brushing in the morning and evening and flossing once daily

Table 1: Combination Products

| Medication | Dosage | Drug Interactions* | Adverse Effect* |
|---|---|---|---|
| Atripla®** (emtricitabine 200 mg, tenofovir 300 mg, & efavirenz 600 mg) <br><br> Non-formulary | 1 tablet QD <br><br> Do not use if CrCl < 50 | Same as single entity drugs | Same as single entity drugs |
| Biktarvy® (bictegravir 50 mg, emtricitabine 200 mg, & tenofovir alafenamide 25 mg) <br><br> Non-formulary | 1 tablet QD <br><br> Do not use if CrCl < 30 | Same as single entity drugs | Headache, skin rash, diarrhea, nausea, increased LDL cholesterol |
| Cabenuva® (cabotegravir 400 mg & rilpivirine 600 mg) <br><br> Non-formulary | After initiation, monthly injection doses of 400-mg (2-mL) intramuscular injection of cabotegravir and 600-mg (2-mL) intramuscular injection of rilpivirine | Anticonvulsants: Carbamazepine, Oxcarbazepine, Phenobarbital, Phenytoin Antimycobacterials: Rifampin, Rifapentine, Rifabutin. Glucocorticoid (systemic): Dexamethasone | Injection site reactions (83%), Pyrexia, Fatigue, Headache, Musculoskeletal pain, Nausea. |
| Cimduo®** (lamivudine 300 mg, & tenofovir 300 mg) <br><br> Non-formulary | 1 tablet QD <br><br> Do not use if CrCl < 50 | Same as single entity drugs | Same as single entity drugs |
| Combivir®** (zidovudine 300 mg & lamivudine 150 mg) <br><br> Non-formulary | 1 tablet BID <br><br> Do not use if CrCl < 50 | Same as single entity drugs | Same as single entity drugs |
| Complera®** (emtricitabine 200 mg, tenofovir 300 mg, & rilpivirine 25 mg) <br><br> Non-formulary | 1 tablet QD with food <br><br> Do not use if CrCl < 50 | Rifampin, carbamazepine, primidone, phenobarbital, phenytoin, H2-antagonists (ranitidine), proton pump inhibitors (omeprazole), dexamethasone | Diarrhea, rash, headache, insomnia, hepatitis B exacerbation, renal insufficiency Lactic acidosis with hepatic steatosis. |
| Delstrigo®** (doravirine 100 mg, lamivudine 300 mg, & tenofovir 300 mg) <br><br> Non-formulary | 1 tablet QD <br><br> Do not use if CrCl < 50 | Carbamazepine, oxcarbazepine, phenobarbital, phenytoin, and rifampin | Sleep disturbance, dizziness, abnormal dreams, depression, skin rash, nausea, diarrhea, increased serum creatinine |
| Dovato®** (dolutegravir 50 mg & lamivudine 300 mg) <br><br> Non-formulary | 1 tablet taken orally once daily with or without food. <br><br> Not recommended with creatinine clearance less than 30 mL per minute. | Same as single entity drugs. | Same as single entity drugs. |

Table 1: Combination Products Continued

| Medication | Dosage | Drug Interactions* | Adverse Effect* |
|---|---|---|---|
| Epzicom®** (lamivudine 300 mg & abacavir 600 mg)<br><br>Non-formulary | 1 tablet QD<br><br>Do not use if CrCl < 50 | Same as single entity drugs | Same as single entity drugs |
| Genvoya® (emtricitabine 200 mg, tenofovir 300 mg, elvitegravir 150 mg, & cobicistat 150 mg)<br><br>Prior Authorization | 1 tablet QD with food<br><br>Do not use if CrCl < 30 | Ergotamine, rifampin, carbamazepine, primidone, midazolam, lovastatin, Maraviroc, triazolam | Nausea, diarrhea, headache, renal insufficiency, increased LDL cholesterol, decreased bone mineral density, lactic acidosis with hepatic steatosis. |
| Juluca®** (dolutegravir 50 mg, & rilpivirine 25 mg)<br><br>Non-formulary | 1 tablet QD | Same as single entity drugs | Same as single entity drugs |
| Stribild®** (emtricitabine 200 mg, tenofovir 300 mg, elvitegravir 150 mg, & cobicistat 150 mg)<br><br>Non-formulary | 1 tablet QD with food<br><br>Do not use if CrCl < 70 | Ergotamine, rifampin, cisapride, primidone, midazolam, lovastatin, Maraviroc, triazolam | Nausea, diarrhea, abnormal dreams, headache, insomnia, upper respiratory infection, renal insufficiency<br>Lactic acidosis with hepatic steatosis. |
| Symfi®** (efavirenz 600 mg, lamivudine 300 mg, & tenofovir 300 mg)<br><br>Symfi Lo®** (efavirenz 400 mg, lamivudine 300 mg, & tenofovir 300 mg)<br><br>Non-formulary | 1 tablet QD with food<br><br>Do not use if CrCl < 50 | Same as single entity drugs | Same as single entity drugs |
| Symtuza®** (darunavir 800 mg, cobicistat 150 mg, emtricitabine 200 mg, & tenofovir 10 mg)<br><br>Non-formulary | 1 tablet QD<br><br>Do not use if CrCl < 30 | Same as single entity drugs | Same as single entity drugs |
| Triumeq®** (dolutegravir 50 mg, abacavir 600 mg, & lamivudine 300 mg)<br><br>Non-formulary | 1 tablet QD with or without food.<br><br>Triumeq is not for people with known HIV resistance to abacavir, lamivudine or any of the approved integrase inhibitors. | Same as single entity drugs | Same as single entity drugs |

Table 1: Combination Products Continued

| Medication | Dosage | Drug Interactions* | Adverse Effect* |
|---|---|---|---|
| Trizivir®** (zidovudine 300 mg, lamivudine 150 mg, & abacavir 300 mg) Non-formulary | 1 tablet BID Do not use if CrCl <50 | Same as single entity drugs | Same as single entity drugs |
| Truvada®** (emtricitabine 200 mg & tenofovir 300 mg) Non-formulary | 1 tablet QD CrCl        Dose____ 30-49      1 tab q 48hr < 30        do not use | Same as single entity drugs | Same as single entity drugs |

**Key to Acronyms:** 3TC = lamivudine;  ABC = abacavir;  BID = twice  daily; cobi = cobicistat; EC = enteric coated; EFV = efavirenz;  EVG = elvitegravir; FTC = emtricitabine;  HSR = hypersensitivity reaction; MI = myocardial  infarction; RPV = rilpivirine; TDF = tenofovir ;  TID = three times a day; WHO = World Health Organization; ZDV = zidovudine
*not a complete list of drug interactions or adverse effects
**See "Nonformulary Conversion DMG" for formulary substitutions

Table 2: Nucleoside Reverse Transcriptase Inhibitors (NRTIs)

| Medication | Dosage | Drug Interactions* | Adverse Effects* |
|---|---|---|---|
| Abacavir (ABC, Ziagen®) | 300 mg BID or 600 mg QD | | Hypersensitivity reaction characterized by fever, nausea, vomiting, malaise, anorexia, respiratory symptoms, +/- rash. **Should not be restarted if occurs. Record in medical record as allergy.** Lactic acidosis with hepatic steatosis. |
| Emtricitabine (FTC, Emtriva®)  Non-formulary | 200 mg QD  CrCl          Dose____ 30-49        200 mg q 48 15-29        200 mg q 72 <15 or HD  200 mg q 96 | | Nausea, vomiting, diarrhea, headache, hyperpigmentation of palms & soles Lactic acidosis with hepatic steatosis. |
| Lamivudine (3TC, Epivir®) | 150 mg BID or 300 mg QD  CrCl          Dose____ 30-49        150 mg QD 15-29        100 mg QD 5-14          50 mg QD <5 or HD    25 mg QD | | Minimal effects Lactic acidosis with hepatic steatosis. |
| Tenofovir** (TDF, Viread®) | 300 mg QD best if taken with food  CrCl          Dose____ 30-49        300 mg q 48 10-29        300 mg twice a week HD            300 mg q 7 days | Didanosine, atazanavir | GI upset, flatulence, headache, asthenia, renal insufficiency Lactic acidosis with hepatic steatosis. |
| Zidovudine (AZT, ZDV, Retrovir®) | 300 mg BID  CrCl < 15 or HD 100 mg TID or 300 mg QD | Stavudine, ribavirin | Initial GI upset, headache, nail discoloration, fatigue, anemia, neutropenia, myopathy Lactic acidosis with hepatic steatosis. |

*not a complete list of drug interactions or adverse effects
**nucleotide reverse transcriptase inhibitor (NtRTI)
HD=hemodialysis

Table 3:  Protease Inhibitors (PIs)

| Medication | Dosage* | Drug Interactions** | Adverse Effects** |
|---|---|---|---|
| Atazanavir (ATV, Reyataz®) | 400 mg QD best if taken with food<br><br>Boosted or With Tenofovir or EFV<br>ATV 300 + RTV 100 QD | Clarithromycin, diltiazem, lovastatin, rifabutin, rifapentine, ergotamine, H2-antagonists (ranitidine), proton pump inhibitors (omeprazole), efavirenz, tenofovir | Diarrhea, nausea, prolongation of the PR interval, hyperbilirubinemia, jaundice<br>hyperglycemia, fat redistribution, increase bleeding in hemophilia |
| Darunavir (DRV, Prezista®) | Treatment Naïve patient<br>DRV 800 + RTV 100 QD<br>Treatment Experienced patient<br>DRV 600 + RTV 100 BID<br>(must be given with RTV) | | Skin rash, SJS, hepatotoxicity, diarrhea, nausea, headache, elevated transaminase<br><br>hyperglycemia, fat redistribution, increase bleeding in hemophilia |
| Fosamprenavir (FPV, Lexiva®) | 1400 mg BID<br>Boosted<br>f-APV 1400 + RTV 100-200 QD<br>f-APV 700 + RTV 100 BID<br>With EFV<br>f-APV 700 + RTV 100 BID<br>f-APV 1400 + RTV 300 QD | Lovastatin, rifampin, rifabutin, rifapentine, ergotamine | Diarrhea, nausea, vomiting, rash<br><br>hyperglycemia, fat redistribution, lipid abnormalities, increased bleeding in hemophilia |
| Lopinavir 200mg + Ritonavir 50mg (LPV/r, Kaletra®) | 2 tabs BID or 4 tabs QD<br><br>With EFV or NVP<br>3 tabs BID | Lovastatin, rifampin, rifabutin, rifapentine, ergotamine | Nausea, vomiting, diarrhea, asthenia, elevated LFTs<br><br>hyperglycemia, fat redistribution, lipid abnormalities, increased bleeding in hemophilia |
| Nelfinavir (NFV, Viracept®) | 1250 mg BID best if taken with meal or snack | Atorvastatin, lovastatin, rifampin, rifabutin, rifapentine, ergotamine | Diarrhea<br><br>hyperglycemia, fat redistribution, lipid abnormalities, increased bleeding in hemophilia |
| Ritonavir (RTV, Norvir®) | 600mg q 12 hr food may decrease GI upset<br>Usually given as 100 to 400 mg once or twice daily to boost effected drug levels | Lovastatin, amiodarone, quinidine, clozapine, rifabutin, rifapentine, ergotamine, desipramine, theophylline, cobicistat | Nausea, vomiting, diarrhea, paresthesias, pancreatitis, taste perversion, elevated LFTs<br><br>hyperglycemia, fat redistribution, lipid abnormalities, increased bleeding in hemophilia |
| Saquinavir (SQV, Invirase®) | SQV 1000 + RTV 100 BID<br>(must be given with RTV)<br>Take with meals or within<br>2 hours after a meal | Lovastatin, rifampin, rifabutin, rifapentine, ergotamine | Nausea, vomiting, diarrhea, rash, elevated LFTs<br><br>hyperglycemia, fat redistribution, lipid abnormalities, increased bleeding in hemophilia |
| Tipranavir (TPV, Aptivus®)<br><br>Non-formulary | 500mg + RTV 200mg BID<br>(must be given with RTV)<br>Best if taken with food. | Lovastatin, rifampin, amiodarone, quinidine, ergotamine, fluticasone | Hepatotoxicity, rash, hyperlipidemia<br><br>hyperglycemia, fat redistribution, lipid abnormalities, increased bleeding in hemophilia |

*dosage if used as the only PI in the drug regimen, dosages are often adjusted if used in combination with other agents
**not a complete list of drug interactions or adverse effects

Table 4: Non-Nucleoside Reverse Transcriptase Inhibitors (NNRTIs)

| Medication | Dosage | Drug Interactions* | Adverse Effects* |
|---|---|---|---|
| Doravirine (DOR, Pifeltro®) Non-formulary | 100 mg QD | Carbamazepine, oxcarbazepine, phenobarbital, phenytoin, and rifampin | Nausea, headache, fatigue, diarrhea, abdominal pain, dizziness, abnormal dreams |
| Efavirenz (EFV, Sustiva®) | 600 mg q HS best if taken on empty stomach | Rifampin, rifabutin, rifapentine, ergotamine, clarithromycin | Rash, CNS symptoms (e.g., dizziness, insomnia, vivid dreams), elevated LFTs, false positive cannabinoid test |
| Etravirine (ETR, Intelence®) Non-formulary | 200 mg BID best if taken with food | Phenytoin, carbamazepine, other NNRTIs, PI's (except DRV/RTV, SQV/RTV, and LPV/RTV with caution), clarithromycin, rifampin, warfarin | Rash, nausea |
| Nevirapine (NVP, Viramune®) | 200 mg QD x 14 days then 200 mg BID or 400 mg QD | Ketoconazole, rifampin, phenytoin, carbamazepine | Rash, elevated LFTs, hepatitis |
| Ripilvirine (RPV, Edurant®) Prior Authorization | 25 mg QD with a meal | Acid suppression therapy, rifampin, rifabutin, carbamazepine, primidone, phenobarbital, phenytoin | Rash, depression, insomnia, headache, hepatotoxicity |

Table 5: Integrase Inhibitors

| Medication | Dosage | Drug Interactions* | Adverse Effect* |
|---|---|---|---|
| Bictegravir (BIC, Only as Biktarvy®) Non-formulary | bictegravir 50 mg, emtricitabine 200 mg, & tenofovir alafenamide 25 mg 1 tablet QD Do not use if CrCl < 30 | Rifampin, phenytoin, carbamazepine | Headache, skin rash, diarrhea, nausea, increased LDL cholesterol |
| Dolutegravir (DTG, Tivicay®) | 50 mg QD <u>With certain resistance or drug interactions</u> 50 mg BID | Inducers (efavirenz, boosted fosamprenavir, boosted tipranavir, rifampin) | Nausea, headache, diarrhea Preliminary data suggests use before pregnancy and through conception may be associated with an increased risk of neural tube defects in the infant. |
| Elvitegravir (EVG) Only as Genvoya® (Prior Authorization) Or Stribild® (Non-formulary) | Genvoya® (emtricitabine 200mg, tenofovir 300 mg, elvitegravir 150 mg, & cobicistat 150 mg) Stribild® (emtricitabine 200 mg, tenofovir 300 mg, elvitegravir 150 mg, & cobicistat 150 mg) Tablet once daily with food | Ergotamine, rifampin, cisapride, primidone, midazolam, lovastatin, maraviroc, triazolam | Nausea, diarrhea, abnormal dreams, headache, insomnia, upper respiratory infection, renal insufficiency Lactic acidosis with hepatic steatosis. |
| Raltegravir (RAL, Isentress®) | 400 mg BID <u>With rifampin</u> 800 mg BID | rifampin | Nausea, headache, diarrhea, pyrexia, fatigue, elevated CPK |

Table 6: Entry Inhibitors

| Medication | Dosage | Drug Interactions* | Adverse Effect* |
|---|---|---|---|
| **CCR5 Antagonist** | | | |
| Maraviroc (MVC, Selzentry®)<br><br>Non-formulary | Tropism testing is required before use.<br><br>With Protease Inhibitors except tipranivir, delavirdine, itraconazole, ketoconazole, clarithromycin<br>150 mg BID<br>With all NRTI, Enfuvirtide, TPV, NVP<br>300 mg BID<br>With EFV, rifampin, carbamazepine, phenytoin<br>600 mg BID | Potent CYP3A inhibitors such as protease inhibitors, delavirdine, itraconazole, ketoconazole, clarithromycin<br><br>Potent CYP3A inducers such as efavirenz, rifampin, carbamazepine, phenytoin | Abdominal pain, cough, dizziness, musculoskeletal symptoms, pyrexia, rash, upper respiratory track infections, hepatotoxicity, orthostasis |
| **Fusion Inhibitor** | | | |
| Enfuvirtide (T20, Fuzeon®)<br><br>Non-formulary | 90 mg SQ BID | | Local injection site reaction (e.g., pain erythema, induration, nodules, cysts), increased rate of pneumonia, hypersensitivity reaction (rechallenge is not recommended) |
| **Anti-CD4 Monoclonal Antibody** | | | |
| Ibalizumab (IBA, Trogarzo®)<br><br>Non-Formulary | 2000 mg IV loading dose followed by 800 mg IV every 2 weeks | | Dizziness, skin rash, diarrhea, nausea, decreased neutrophils, leukopenia, increased serum creatinine |
| **HIV-1 GP120 Directed Attachment Inhibitor** | | | |
| Fostemsavir (FTR, Rukobia®)<br><br>Non-formulary | 600 mg orally twice daily with or without food | Based on drug interaction study results, the following drugs can be given with fostemsavir without a dose adjustment: atazanavir/ritonavir, buprenorphine/naloxone, cobicistat, darunavir/cobicistat, darunavir/ritonavir with and without etravirine, etravirine, famotidine, maraviroc, methadone, norethindrone, raltegravir, ritonavir, rifabutin with and without ritonavir, tenofovir disoproxil fumarate. | Nausea, diarrhea, headache, abdominal pain, indigestion/heartburn, fatigue, rash, sleep disturbance, immune reconstitution inflammatory syndrome, drowsiness, vomiting |

**Key to Acronyms:** 3TC = lamivudine;  ABC = abacavir;  BID = twice  daily; cobi = cobicistat;; EC = enteric coated; EFV = efavirenz;  EVG = elvitegravir; FTC = emtricitabine;  HSR = hypersensitivity reaction; MI = myocardial  infarction; RPV = rilpivirine; TDF = tenofovir ;
TID = three times a day; WHO = World Health Organization; ZDV = zidovudine
*not a complete list of drug interactions or adverse effects

Table 7: Capsid inhibitors

| Medication | Dosage | Drug Interactions* | Adverse Effect* |
|---|---|---|---|
| Blocking HIV-1 Virus Protein Shell (Capsid) | | | |
| Lenacapavir (GS-CA1, GS-6207, Sunlenca®)<br><br>Non-formulary | 927 mg (two 1.5-mL injections) subcutaneously every 6 months from the date of the last injections +/- 2 weeks. | Carbamazepine<br>Dexamethasone<br>Fosphenytoin<br>Phenobarbital<br>Phenytoin<br>Primidone<br>Rifampin<br>Rifabutin<br>St. John's wort | Reactions at the injection site and nausea |

Table 8: Pharmacokinetic Enhancer

| Medication | Dosage | Drug Interactions* | Adverse Effect* |
|---|---|---|---|
| CYP3A Inhibitor | | | |
| Cobicistat (COBI, Tybost®)<br><br>Non-formulary | 150 mg Once Daily | Complex or unknown mechanisms of drug interactions preclude extrapolation of ritonavir drug interactions to certain cobicistat interactions.<br><br>Protease inhibitors, itraconazole, ketoconazole, clarithromycin, rifampin and rifabutin, carbamazepine, phenytoin, fluticasone. | Jaundice (13%), Ocular icterus (15%), and Nausea (12%). |

*Not a complete list of drug interactions or adverse effects

I. Background
   A. More than 50% of people do not know they are HIV-infected until they become symptomatic
      (an indicator of advanced disease).
   B. Since the correctional setting is often an inmate's first interaction with the health care system, a thorough
      history of risk factors is important and HIV testing should be recommended to all new intakes.

II. Etiology
   A. HIV (human immunodeficiency virus)
      1. Member of the Lentivirus family of retroviruses.
      2. There are two serotypes: HIV-1 and HIV-2.  HIV-1 is the primary serotype in the U.S.  HIV-2 is the primary
         serotype in Africa and is molecularly and serologically distinct.  The two serotypes share only about 40%
         amino acid homology in their env surface glycoproteins.
      3. HIV is characterized by the presence of three main genes.  The **gag** gene encodes for structural proteins of the
         viral core, the **env** gene encodes for the surface proteins of the virus, and the **pol** gene encodes for functional
         proteins including reverse transcriptase, ribonuclease, integrase, and protease.
   B. AIDS (acquired immunodeficiency syndrome)
      1. Clinical syndrome characterized by profound immunologic deficits (CD4 count < 200 cells/mm$^3$),
         opportunistic infections, and malignant neoplasms seen with prolonged HIV infection.

III. Transmission
   A. All routes of transmission involve contact with contaminated blood or bodily fluids
   B. Parenteral
      1. Occupational exposure - needle sticks
      2. Intravenous drug use - sharing contaminated needles
      3. Blood transfusion
      4. Organ transplant
   C. Sexual
      1. Vaginal intercourse
      2. Anal intercourse
      3. Oral intercourse
   D. Perinatal

IV. Presentation
   A. Early
      1. Symptoms: fever, lymphadenopathy, pharyngitis, rash, myalgia, arthralgia, diarrhea, headache, nausea, vomiting,
         hepatosplenomegaly, weight loss
      2. Positive HIV antibody usually develops by 4-6 weeks following transmission, but rarely could be up to 12-24 weeks.
      3. Extremely high levels of HIV in the blood during acute infection is a hallmark of this disease stage
      4. Within days, HIV disseminates into  sanctuary sites (lymph nodes, central nervous system) where it "hides out"
         and remains dormant.
      5. HIV viral levels decrease over the first 4 months post-transmission until plateauing to a set point
         (varies person to person)
      6. Lower HIV viral set point = longer time it will take for an individual's disease to progress over time
   B. Intermediate
      1. T cell destruction by HIV begins to weaken the immune system over time (in contrast to the acute stage, where
         the immune system "keeps pace" by producing an equivalent amount of CD4 cells).
      2. In general if untreated, there is an 8–10-year period during which an HIV+ individual undergoes a gradual
         decline in immune function (monitored by laboratory testing of CD4 count) and increase in HIV viral load
         (monitored by laboratory testing of viral load).
      3. Often no symptoms exhibited during this stage
      4. Factors which influence how long individuals will remain in this stage before progressing to advanced disease:
         a. How high the viral load is at set point
         b. If and when antiretroviral treatment is initiated
   C. Late
      1. Untreated, the rapid replication of HIV will eventually deplete the immune system in most people to such an
         extent that the patient will lose critical body defenses and can succumb to infections, AIDS and ultimately death.
      2. Symptoms: opportunistic infections or malignancies, rashes, neuropathy, diarrhea, recurrent vaginal candidiasis,
         thrush, herpes zoster, recurrent infections, anemia, weight loss
      3. Actual diagnosis of AIDS  is made when the CD4 count falls below 200 cells/cm$^3$ or when an AIDS-defining
         condition is diagnosed.
      4. Once a diagnosis of AIDS has been made, it remains with the patient even if his/her CD4 count returns to above
         200 with antiretroviral therapy.

V. Diagnosis
  A. Laboratories should conduct initial testing for HIV with an FDA-approved antigen/antibody combination immunoassay that detects HIV-1 and HIV-2 antibodies and HIV-1 p24 antigen to screen for established infection with HIV-1 or HIV-2 and for acute HIV-1 infection. No further testing is required for specimens that are nonreactive on the initial immunoassay.
  B. Specimens with a reactive antigen/antibody combination immunoassay result (or repeatedly reactive, if repeat testing is recommended by the manufacturer or required by regulatory authorities) should be tested with an FDA-approved antibody immunoassay that differentiates HIV-1 antibodies from HIV-2 antibodies. Reactive results on the initial antigen/antibody combination immunoassay and the HIV-1/HIV-2 antibody differentiation immunoassay should be interpreted as positive for HIV-1 antibodies, HIV-2 antibodies, or HIV antibodies, undifferentiated.
  C. Specimens that are reactive on the initial antigen/antibody combination immunoassay and nonreactive or indeterminate on the HIV-1/HIV-2 antibody differentiation immunoassay should be tested with an FDA-approved HIV-1 nucleic acid test (NAT).

VI. Treatment
  A. Recommendations for ART therapy
    1. ART is recommended for all individuals with HIV, regardless of CD4 T lymphocyte cell count, to reduce the morbidity and mortality associated with HIV infection
    2. ART is also recommended for individuals with HIV to prevent HIV transmission
    3. Primary Care providers should refer patients to CMC Virology Clinic (UTMB Sector) or designated physician (Texas Tech Sector) for recommendations and initiation of therapy.

VII. Monitoring Therapy
  A. CD4 Count
    1. Indicator of immune system damage and risk for developing opportunistic infection, i.e., measure of immunological response
    2. Specifically, it is a measure of the peripheral pool of CD4 cells which only accounts for approximately 2% of total lymphocyte population in the body
    3. Together with viral load it is used to predict a patient's risk for disease progression
    4. Used to determine when to start or stop opportunistic infection prophylaxis
    5. Measurements can vary due to technical & biological variations and have diurnal variation. As a result, it is important to follow the trend in CD4 count versus single value.
    6. CD4 count should be monitored at baseline and every 3 to 12 months based on patient status.
    7. +/- 30% change is considered a significant change
  B. Viral Load
    1. Indicator of the magnitude of viral replication & response to drug therapy, i.e., virological response
    2. Specifically, it is a measure of viral replication and is reported as number of viral copies/mL of blood
    3. Used to monitor a patient's response to drug therapy
    4. Decisions should be based on 2 measurements obtained 1-2 weeks apart due to technical & biological variations
    5. Do not obtain within 4 weeks of intercurrent illness or immunization
    6. Monitor at baseline, 2-8 weeks after initiating or changing therapy, and every 3 to 6 months thereafter based on status
    7. > 0.5 log or 3-fold change in viral load is considered significant
    8. Should see 1 log (10-fold) decrease in viral load within 8 weeks (may take as long as 16 weeks if very high) of initiating drug therapy and should be undetectable within 4-6 months
  C. Resistance Testing
    1. Should be performed by experienced provider (e.g., Infectious Diseases Specialist) since requires expert interpretation
    2. Absence of resistance should be interpreted cautiously in conjunction with previous drug use history
    3. Should be performed at baseline, while on antiretroviral therapy or immediately (within 4 weeks) after discontinuation of therapy
    4. Drug-resistance testing is recommended in patients on combination ART with HIV-RNA levels confirmed >200 copies/mL. In patients with confirmed HIV-RNA levels between 201–500 copies/mL, testing may not be successful but may still be considered.

D.  HLA-B*5701 screening – Should be considered prior to prescribing abacavir.  Abacavir should not be prescribed if positive and an abacavir allergy should be recorded in the patient's medical record.

E.  Co-receptor tropism assay – Must be obtained prior to prescribing a CCR5 inhibitor.

F.  Response to Therapy

   1.  Generally see virologic, immunologic, and then clinical progression when a patient is failing therapy.  These stages may be separated by months to years and discordant responses are possible.

   2.  Virologic Failure

      a.  Incomplete virologic response: VL ≥ 200 copies/mL after 24 weeks of therapy

      b.  Virologic rebound is the confirmed detectable HIV RNA (to ≥ 200 copies/mL) after virologic suppression.  This excludes isolated episodes of viremia (i.e., single level 50-1000)

      c.  Low-level viremia: Confirmed detectable HIV RNA <200 copies/mL.

   3.  Immunologic Failure

      a.  Failure to increase CD4 count by 25-50 cells/mm$^3$ above baseline over 1 year

      b.  CD4 count decreases below baseline

      c.  Immunologic failure may not warrant drug therapy change if viral load is undetectable

      d.  In the setting of virologic suppression, there is no consensus on how to define or treat immunologic failure

   4.  Clinical Progression

      a.  Occurrence or recurrence of HIV-related illness after 3 months excluding immune reconstitution which is generally seen within first 3 months of starting therapy

      b.  Clinical progression may not warrant drug therapy change if viral load is undetectable

# EXHIBIT A-4

# HYPERLIPIDEMIA

The pathways do not replace sound clinical judgment nor are they intended to strictly apply to all patients

*****Clinical ASCVD defined as:** ACS, or a history of MI, angina, coronary or other arterial revascularization, stroke, TIA, or PAD presumed to be of atherosclerotic origin

******10 yr ASCVD risk defined as:** risk of developing 1st ASCVD event, including MI or stroke, fatal or nonfatal



**1** Does the patient meet criteria for dyslipidemia evaluation? Screen:
- All adults age ≥ 20 years. Use clinical judgment based on life expectancy when screening patients >75 years
- Patients at risk for familial dyslipidemia
- Patients that have diabetes (DM)
- History of clinical atherosclerotic cardiovascular disease (ASCVD)*

No → **2** Re-screen as clinically indicated

Yes

**3**
1. H&P: Rule out secondary causes due to diabetes mellitus, hypothyroidism, chronic renal disease, obstructive liver disease, drugs (e.g., progestins, anabolic steroids, corticosteroids, anti-hypertensives)
2. Baseline laboratories: urinalysis, thyroid function tests, lipid profile (fasting), comprehensive metabolic panel

**4** Does the patient fall into one of the following groups?
- Clinical ASCVD* or
- Low-density lipoprotein (LDL) ≥ 190 and ≥ 20yo

Yes →

**5**
1. Encourage heart-healthy lifestyle habits
2. Initiate high-intensity statin therapy†
   - Age >75 years: consider benefits vs. risk before initiating statin. Consider moderate vs. high intensity statin based on tolerability, drug-drug interactions, and patient frailty. It is reasonable to continue high-intensity statin if patient is tolerating and has a low risk of competing comorbidities.
3. Go to box 14

No

**6** Does the patient have diabetes?

Yes →

**7**
1. Encourage heart-healthy lifestyle habits
2. **Age 20-39 years with diabetes risk enhancers (Table 1):**
   - May consider moderate-intensity statin ‡. Discuss benefits vs. risk of statin.
3. **Age 40-75 years and LDL 70-189 mg/dl:**
   - Recommend moderate-intensity statin‡ if ≤ 1 risk enhancer
   - Recommend high-intensity statin† if multiple risk enhancers
4. **Age > 75 years:** consider benefits vs. risk before initiating statin. Consider moderate vs. high intensity statin based on tolerability, drug-drug interactions, duration of diabetes (Table 1), and patient frailty.
5. Go to box 14

No

**8** Go to Page 2, box 9

§**Low intensity statin**: pravastatin 10-20 mg
‡**Moderate intensity statin**: atorvastatin 10-20 mg, pravastatin 40-80 mg
†**High intensity statin**: atorvastatin 40-80 mg

**Moderate-intensity therapy should be used instead of high-intensity therapy if any of the following factors are present that are associated with increased risk of statin adverse effects:**
1. Multiple or serious co-morbidities, including impaired renal or hepatic function.
2. History statin intolerance or muscle disorders
3. Unexplained ALT elevations >3 times the upper limit of normal
4. Patient characteristics or concomitant use of drugs affecting statin metabolism

**Table 1: Diabetes-specific risk enhancers:**

- Long history of diabetes (≥ 10 years for Type 2 DM or ≥ 20 years for Type 1 DM)
- Albuminuria: Albumin-to-creatinine ratio ≥ 30 mcg/mg creatinine
- Estimated glomerular filtration rate (eGFR) < 60 mL/min/1.73 m²
- Retinopathy
- Neuropathy
- Ankle-brachial index (ABI) < 0.9

Table adapted from ACC/AHA

**Nurses: DMGs are guidelines to assist providers in making treatment decisions and are not to be confused with or viewed as Nursing Standing Delegated Orders (SDOs). As such, treatment recommendations in DMGs cannot be implemented independently by nursing staff without an order from a provider**

9 | Continued from box 8

10 | Is patient age 40 – 75 years and LDL 70-189 mg/dL?

**Yes** →

11 | Calculate estimated 10 year ASCVD risk** (ASCVD risk calculator found on CMC web Tools, EHR Note builder Guidelines tab and additional information provided on page 6)

**No** ↓

12 |
**Age 20-39 years:**
- Estimate lifetime risk and encourage lifestyle changes (ASCVD lifetime risk calculator found on CMC web Tools, EHR Note Builder Guidelines tab and additional information provided on page 6)
- Consider statin if family history of premature ASCVD (onset < 55 years in a first degree male relative or < 65 years in a first degree female relative) and LDL ≥ 160 mg/dL

**If a statin is not initiated:**
- A fasting lipid profile should be obtained as clinically indicated or every 5 years
- Recalculate estimated 10-year ASCVD risk every 5 years in individuals aged 40-75

**For hypertriglyceridemia see Page 4, Hypertriglyceridemia.**

13 |
Approach to treatment is based on estimated 10-yr ASCVD risk and presence of ASCVD risk enhancers (Table 2)
- **ASCVD risk <5% (Low Risk):**
  - Emphasize lifestyle changes
- **ASCVD risk 5% - < 7.5% (Borderline Risk) with ASCVD risk enhancers:**
  - Moderate-intensity statin ‡
- **ASCVD risk 7.5% - < 20% (Intermediate Risk) with ASCVD risk enhancers:**
  - Moderate- to high-intensity statin ‡ †
- **ASCVD risk ≥ 20% (High Risk):**
  - High-intensity statin †

Table 2: ASCVD Risk Enhancers for clinician-patient risk discussion:

- Family history of premature ASCVD (male < 55 y, female < 65 y)
- Persistently elevated LDL ≥ 160 mg/dL
- Chronic kidney disease (eGFR 15-59 mL/min/1.73 m² not treated with dialysis or kidney transplantation)
- Metabolic syndrome (increased waist circumference, TG > 175 mg/dL, elevated blood pressure, elevated glucose, and HDL <40 mg/dL in men or <50 mg/dL in women; tally of 3 makes the diagnosis)
- Premature menopause (before 40 years old), and history of pregnancy-associated conditions that increase later ASCVD risk such as preeclampsia
- Inflammatory diseases (especially rheumatoid arthritis, psoriasis, HIV)
- Ethnicity (e.g., South Asian ancestry)
- Persistently elevated triglycerides (≥ 175 mg/dL)

Table adapted from ACC/AHA

14 |
**If a statin is not initiated:**
- A fasting lipid profile should be obtained as clinically indicated or every 5 years
- Recalculate estimated 10-year ASCVD risk every 5 years in individuals aged 40-75

**Once statin is initiated:**
1. Enroll in Chronic Care Clinic.
2. Follow up in 4-12 weeks and repeat lipid profile to assess response and compliance with lifestyle modifications.
3. Monitor LFTs if symptoms suggest hepatotoxicity (e.g., unusual fatigue or weakness, loss of appetite, abdominal pain, dark colored urine, or yellowing of skin or sclera).
4. Monitor creatinine phosphokinase (CK) if patient has symptoms associated with myopathy (e.g., pain, tenderness, stiffness, cramping, weakness, or generalized fatigue).

15 |
Goal therapeutic response met?
- Low intensity statin§: LDL lowering of < 30%
- Moderate intensity statin‡: LDL lowering of 30% to 49%
- High intensity statin†: LDL lowering of ≥ 50%
If the patient belongs to high-risk groups, additional therapy may be needed **(Refer to Box 20).**

**No** ←

16 | Assess for intolerance to statin therapy. Reinforce medication adherence and lifestyle changes.

18 | Go to Page 3,  box 19

**Yes** ↓

17 |
Follow-up in 1 year
1. Reinforce continued adherence
2. Monitor lipid profile (TC, LDL, HDL, TG) **at least** every 12 months
3. Monitor LFT  and CK as clinically indicated (see box 14)
4. Continue Lifestyle Modifications and reinforce at follow up

§**Low intensity statin**: pravastatin 10-20mg
‡**Moderate intensity statin**: atorvastatin 10-20mg, pravastatin 40-80mg
†**High intensity statin**: atorvastatin 40-80mg



19

Continued from box 18

20

1. If the patient cannot tolerate statin, consider reducing statin dose or switch to a more hydrophilic statin (e.g., pravastatin) before considering a non-statin therapy. Statin intolerance is usually bilateral myalgias of proximal muscles with onset within weeks or months after initiation of statins and resolves after discontinuation of statin. Myopathy or rhabdomyolysis with increased CK is rare.
2. May consider increasing statin dose if not already on maximally tolerated statin.
3. If high risk patient on maximally tolerated statin has inadequate LDL lowering response, may consider addition of non-statin cholesterol lowering drug(s) if the ASCVD risk-reduction benefit outweighs potential risk for adverse effects.
   **High risk groups:**
   • Individuals with clinical ASCVD who are at very high risk for future ASCVD event (Table 3) and LDL remains ≥ 70 mg/dL
   • Individuals 20-75 years old with baseline LDL ≥190 mg/dL and follow up LDL remains ≥ 100 mg/dL
   Non-statin therapies to consider (non-formulary approval required):
   • Ezetimibe (Zetia®)
   • Bile acid sequestrant (e.g., cholestyramine (Questran®)) if TG < 300 mg/dL
   • Consider PCSK9 inhibitors (e.g., evolocumab (Repatha®) or alirocumab (Praluent®)) if recommended by Cardiology for:
     • Very high risk for ASCVD (Table 3) and LDL ≥70 mg/dL despite maximally tolerated statin and ezetimibe

   Follow up as clinically indicated or at least annually.

**Table 3: Very high-risk of future ASCVD events** (history of multiple major ASCVD events or 1 major ASCVD event and multiple high risk conditions):

**Major ASCVD Event:**
• Recent ACS (within the past 12 months)
• History of MI (other than recent ACS event listed above)
• History of ischemic stroke
• Symptomatic peripheral arterial disease (history of claudication with ABI <0.85, or previous revascularization or amputation)

**High-risk conditions:**
• Age ≥ 65 y
• Heterozygous familial hypercholesterolemia
• History of coronary artery bypass surgery or percutaneous coronary intervention outside of the major ASCVD event(s)
• Diabetes mellitus
• Chronic kidney disease (eGFR 15-59 mL/min/1.73m2)
• Current smoking
• LDL remains > 100 mg/dL despite maximally tolerated statin and ezetimibe
• History of congestive heart failure

Table adapted from ACC/AHA

§**Low intensity statin**: pravastatin 10-20mg
‡**Moderate intensity statin**: atorvastatin 10-20mg, pravastatin 40-80mg
†**High intensity statin**: atorvastatin 40-80mg

HYPERTRIGLYCERIDEMIA



1

Does the patient have hypertriglyceridemia (TG ≥ 175 mg/dL)?

Yes / No

2
Encourage intensive therapeutic lifestyle change (Table 4)
Consider and address secondary causes of elevated
triglycerides (TG). See Table 5.

3
Continue to monitor as clinically indicated or
every 5 years.

4
Is the patient already on maximally
tolerated statin?

No

6
Consider initiating or intensifying statin in patients 40-75
years old, with ASCVD risk ≥ 7.5% and TG ≥ 175 mg/dL
(ASCVD risk calculator found on CMC web Tools, EHR
Note builder Guidelines tab and additional information
provided on page 6)

Yes

5
If the patient has isolated hypertriglyceridemia, consider switching statin to fenofibrate for persistently elevated TG ≥ 500 mg/dL or history of TG-induced pancreatitis.

TG levels ≥ 500 mg/dL have been associated with pancreatitis. In those with a history of triglyceride-induced pancreatitis, it is especially important to keep triglyceride levels well controlled and this will require both lifestyle and pharmacological approaches.

Caution should be used with combination therapy with fenofibrate and statin due to an increased risk of rhabdomyolysis, hepatotoxicity and adverse effects.

Once therapy is initiated:
1.  Enroll in Chronic Care Clinic.
2.  Follow up in 4-12 weeks and repeat lipid profile to assess response and compliance with lifestyle modifications.
3.  Monitor LFTs if symptoms suggest hepatotoxicity (e.g., unusual fatigue or weakness, loss of appetite, abdominal pain, dark colored urine ,or yellowing of skin or sclera).
4.  Monitor creatinine phosphokinase if patient has symptoms associated with myopathy (e.g., pain, tenderness, stiffness, cramping, weakness, or generalized fatigue).
5.  Follow up as clinically indicated or at least annually.

Table 4: Dietary and Lifestyle Management of
  Hypertriglyceridemia

1.  Balance calorie intake and physical activity to achieve or maintain a healthy body weight (10-20% loss of body weight results in 20% reduction in TG level)
2.  Consume a diet rich in vegetables and fruits
3.  Choose whole-grain, high-fiber foods
4.  Consume fish (salmon, sardines, mackerel)
5.  Limit intake of saturated fat
    •  Choose lean meats and vegetables
    •  Select fat free or low-fat products
    •  Minimize margarine, vegetable shortening, packaged snacks, sweets, fried foods, coffee creamers

Table 5: Causes of Very High Triglycerides that May be
Associated with Pancreatitis

Genetic:
    Lipoprotein lipase deficiency
    Apolipoprotein CII or AV deficiency
    GPIHBP1 deficiency
    Marinesco-Sjogren syndrome
    Chylomicron retention disease
    Familial hypertriglyceridemia (in
    combination with acquired causes)

Acquired disorders of metabolism:
    Hypothyroidism
    Pregnancy
    Poorly controlled insulinopenic diabetes

Drugs:
    Alpha-interferon
    Atypical antipsychotics
    Beta-blockers
    Bile acid resins (cholestyramine)
    Estrogens, oral
    Protease inhibitors
    Raloxifen
    Sirolimus
    Steroids
    Tamoxifen
    Thiazides
    Isotretinoin

Diet:  High saturated fat diet

Diseases:
    Renal disease
    Chronic idiopathic urticaria

Table adapted from the American Heart Association



**Table 6: Formulary Statin Therapy as recommended by ACC/AHA**

| High-Intensity Statin Therapy | Moderate-Intensity Statin Therapy | Low-Intensity Statin Therapy |
|---|---|---|
| Daily dose lowers LDL on average by approximately ≥50% | Daily Dose lowers LDL on average by 30% to <50% | Daily dose lowers LDL on average by <30% |
| Atorvastatin 40-80 mg | Atorvastatin 10-20 mg<br>Pravastatin 40-80 mg | Pravastatin 10-20 mg |

- Atorvastatin is associated with drug interactions due to its effects on the cytochrome P450 enzymatic pathway; however, pravastatin is not metabolized extensively via this pathway and is associated with fewer drug interactions.
- Pravastatin is more hydrophilic than atorvastatin therefore it has less muscle penetration and less statin-associated muscle symptoms (SAMs). SAMs are usually bilateral myalgia of proximal muscles with onset within weeks or months after initiation of statins and resolve after discontinuation of statin. Muscle weakness (myopathy) associated with a significant increase in creatinine phosphokinase (CK) levels is rare. Rhabdomyolysis (CK>10 times upper normal limit with renal injury) is exceedingly rare and usually encountered in the setting of several predisposing comorbidities and concomitant high-risk medications.

**Table 7: Formulary Lipid-Lowering Agents**

| Drug Class | Starting Dose | Effect on Lipids | ADR | Contraindications |
|---|---|---|---|---|
| 1. **Statins** | | LDL ↓ 18-55% | myopathy | **absolute**: liver disease |
| Pravastatin | See page 1 ‡ | HDL ↑ 5-15% | ↑ LFT | **relative**: certain drugs† |
| Atorvastatin | See page 1 ‡ | TG ↓ 7-30% | | |
| | | | | |
| 2. **Fibric Acid** | | LDL ↓ 5-20% | dyspepsia | **absolute**: severe renal or |
| Fenofibrate | 48 – 145 mg | HDL ↑ 10-20% | ↑ LFT | liver disease |
| | | TG ↓ 20-50% | myopathy | |

‡ The starting dose is dependent upon statin indication
† cyclosporine, macrolide antibiotics, azole antifungals, protease inhibitors, cytochrome P450 inhibitors
(use fibrates with caution)

**Table 8: Key abbreviations**

TG: Triglyceride
TC: Total Cholesterol
HDL: High-density lipoprotein cholesterol
LDL: Low-density lipoprotein cholesterol

ASCVD: Atherosclerotic cardiovascular disease
CHD: Coronary heart disease
ACS: Acute coronary syndrome
MI: Myocardial infarction
TIA: Transient ischemic attack
PAD: Peripheral artery disease

**PATIENT EVALUATION**

A. Initial Clinical Evaluation
1. Age
2. Sex
3. Family History of lipid disorders, premature CHD, diabetes mellitus (DM)
4. Patient History of
   a. CHD
   b. Hypertension (HTN)
   c. DM
   d. Cerebrovascular disease (CVD)
   e. Peripheral vascular disease (PVD)
   f. Pancreatitis
   g. Peptic ulcer disease (PUD)
   h. Gout or hyperuricemia
   i. Thyroid disease
   j. Chronic renal insufficiency (CRI)
   k. Liver disease
   l. Tobacco and alcohol use
5. Diet History
6. Activity Level
7. Medication profile
8. Previous lipid levels
9. Physical Exam
   a. Height
   b. Weight
   c. Xanthomas
   d. Evidence of atherosclerosis
B. Risk Assessment :
1. Clinical ASCVD, defined as a ACS, or a history of MI, stable or unstable angina, coronary or other arterial revascularization, stroke, TIA, or PAD presumed to be of atherosclerotic origin
2. LDL ≥ 190 mg/dL and ≥ 20 years of age
3. Diabetes
   • Patient-clinician risk and benefit discussion may help identify specific risk factors and support decision to initiate or intensify statin therapy
4. Individuals with no diabetes 40–75 years of age and LDL-C 70–189 mg/dL with estimated 10-year ASCVD risk ≥ 5%
   • ASCVD risk score should not determine whether statin should be intensified but rather it should begin a discussion with the patient about the potential benefits vs. risks with a high-intensity statin
5. Additional factors influencing ASCVD risk are listed in Tables 1, 2, and 3
6. ASCVD Risk Calculator (Text adapted from The American Heart Association and the American College of Cardiology )
   a. Calculator enables health care providers and patients to estimate 10-year and lifetime risks for ASCVD, defined as coronary death or nonfatal myocardial infarction, or fatal or nonfatal stroke based on the Pooled Cohort Equations and the work of Lloyd-Jones, et al., respectively. The information required to estimate ASCVD risk includes age, sex, race, total cholesterol, HDL cholesterol, systolic blood pressure, blood pressure lowering medication use, diabetes status, and smoking status.
   b. Estimates of 10-year risk for ASCVD are based on data from multiple community-based populations and are applicable to African-American and non-Hispanic white men and women 40 through 79 years of age. For other ethnic groups, the American Heart Association recommends use of the equations for non-Hispanic whites, though these estimates may underestimate the risk for persons from some race/ethnic groups, especially American Indians, some Asian Americans (e.g., of south Asian ancestry), and some Hispanics (e.g., Puerto Ricans), and may overestimate the risk for others, including some Asian Americans (e.g., of east Asian ancestry) and some Hispanics (e.g., Mexican Americans). The calculator may not be used to calculate a risk score if age <40 or >79 years, total cholesterol is <130 or >320 mg/dL, HDL < 20 or > 100 mg/dL, or systolic blood pressure < 90 or > 200 mmHg.
   c. Estimates of lifetime risk for ASCVD are provided for adults 20 through 59 years of age and are shown as the lifetime risk for ASCVD for a 50-year-old without ASCVD who has the risk factor values entered into the spreadsheet. The estimates of lifetime risk are most directly applicable to non-Hispanic whites. We recommend the use of these values for other race/ethnic groups, though as mentioned above, these estimates may represent under- and overestimates for persons of various ethnic groups. Because the primary use of these lifetime risk estimates is to facilitate the very important discussion regarding risk reduction through lifestyle change, the imprecision introduced is small enough to justify proceeding with lifestyle change counseling informed by these results.
   d. The ASCVD risk calculator evaluates smoking status prior to estimating risk.  This question is a "yes" or "no" answer which should be selected based upon current smoking status.

C.  Who To Test
1.  Initial Screening:

| PATIENTS | INITIAL SCREENING |
|---|---|
| Males and females ≥ 20 years | TC, HDL, LDL, TG |
| > 75 years | Use clinical judgment based on life expectancy, TC, HDL, LDL, TG |

Patients should be screened with a fasting lipid profile (TC, HDL, LDL, TG).

D.  Secondary Causes of Lipid Abnormalities
1.  Drugs:
    a.  Alpha-agonists & antagonists- decrease TC & TG, increase HDL cholesterol
    b.  Alpha-interferon – increase TG
    c.  Amiodarone – increase LDL
    d.  Anabolic steroids – increase TG
    e.  Atypical antipsychotics – increase TG
    f.  Beta-blockers- increase TG; decrease HDL-cholesterol
    g.  Bile acid resins – increase TG
    h.  Cyclosporine- increase LDL-cholesterol
    i.  Ethanol- increase TG
    j.  Glucocorticoids- increase TC & TG
    k.  Isotretinoin- increase TC & TG; decrease HDL-cholesterol
    l.  Oral contraceptives- increase TC, TG & HDL-cholesterol
    m.  Protease inhibitors – increase TG
    n.  Raloxifen – increase TG
    o.  Sirolimus – increase TG
    p.  Tamoxifen – increase TG
    q.  Thiazide diuretics- increase TC, TG & HDL-cholesterol

2.  Effects of Various Conditions

| Secondary Cause | Elevated LDL–C | Elevated Triglycerides |
|---|---|---|
| Diet | Saturated or trans fats, weight gain, anorexia | Weight gain, very low-fat diets, high intake of refined carbohydrates, excessive alcohol intake |
| Diseases | Biliary obstruction, nephrotic syndrome | Nephrotic syndrome, chronic renal failure, lipodystrophies |
| Disorders and altered states of metabolism | Hypothyroidism, obesity, pregnancy* | Diabetes (poorly controlled), hypothyroidism, obesity; pregnancy* |

*Treatment with statins, niacin, and ezetimibe are contraindicated during pregnancy and lactation.
Table adapted from ACC/AHA

E.  Factors That Alter Lipid Levels
1.  Fasting: TC levels and HDL-cholesterol can be measured in the non-fasting patient. TG concentrations, however, are affected by recent food intake, and will affect the calculation of LDL-cholesterol by the Friedewald equation:  LDL = [TC] – [HDL] – [TG/5]. Therefore, patients should be fasting for at least 12 hours prior to having blood drawn for lipid profile testing.
2.  Elevated TG: If the TG concentration is > 400 mg/dl, a calculated LDL may be inaccurate. In this instance, a direct LDL measurement may be appropriate.
3.  Illness: Recent myocardial infarction, stroke, surgery, trauma, or infection may transiently lower cholesterol.

**MANAGEMENT**

A.   General Approach: Clinical decisions should be based on 2 lipid profiles, performed 1 to 8 weeks apart.
B.   Non-Pharmacologic Therapy
   1.   Diet
   2.   Exercise
   3.   Weight reduction in obese patients
   4.   Stop smoking
   5.   Decrease alcohol consumption
C.   Pharmacotherapy
   1.   Dietary changes and exercise should be attempted prior to initiation of drug therapy in select patients where ASCVD prevention benefit of statin therapy may be less clear. In patients who are at particularly high risk, diet therapy and drug therapy may be initiated concurrently.
   2.   The first-line agents to treat hyperlipidemia are the HMG-COA Reductase Inhibitors ("Statins"). The statins on formulary including pravastatin and atorvastatin, are usually well tolerated and convenient to take.
   3.   Other agents to treat hyperlipidemia require nonformulary approval:
      a.   Ezetimibe may be used as add-on or monotherapy in patients who cannot tolerate statin or who do not achieve goal LDL lowering while on maximally tolerated statin.
      b.   Bile acid sequestrant (cholestyramine) can be added on for patients who do not achieve goal LDL lowering while on statin and/or ezetimibe. Cholestyramine should be not be considered in patients with TG > 300 mg/dL.
      c.   PCSK9 inhibitors such as evolucumab (Repatha®) or alirocumab (Praluent®) may be considered if recommended by Cardiology for very high-risk patients whose LDL remains > 70 mg/dl despite maximally tolerated statin and ezetimibe. They can be administered every 2 weeks or once monthly subcutaneously.
   4.   Isolated hypertriglyceridemia may be treated with fenofibrate (see table 7 for a comparison of lipid lowering agents and refer to Page 4, Hypertriglyceridemia). Triglyceride (TG) levels ≥ 500 mg/dL have been associated with pancreatitis.
D.   Follow-up
   1.   History
      a.   Diet Compliance
      b.   Compliance with exercise program
      c.   Medication compliance and presence of symptoms suggesting adverse drug reactions (if indicated)
      d.   Current medications or pertinent changes in other drug therapy
      e.   Re-evaluation of the modifiable risk factors
      f.   Presence of muscle aches in large muscle groups
   2.   Physical Examination
      a.   Weight
      b.   Blood Pressure
   3.   Laboratory tests
      a.   Fasting lipid profile
      b.   LFTs as clinically indicated for patients on statins
      c.   Creatinine kinase (CK) if symptoms of myositis
   4.   Adverse event monitoring (including but not limited to)
      a.   Significant elevations of liver enzymes (>3 times the upper limit of normal) while on statins
      b.   Symptoms of myositis while on statin therapy alone or in combination with other drugs


**PATIENT EDUCATION**
**HYPERLIPIDEMIA CLINIC**

Hyperlipidemia (hyper = high levels, lipidemia = fats in the blood) may be caused by high levels of cholesterol, high levels of triglycerides, or a combination of the two. In the hyperlipidemia clinic, we will discuss your lipid disorder as well as a plan of treatment for you. The treatment plan will depend on several factors such as your current risk for heart disease, your current disease states, how high your lipids are, what medications you are taking, as well as other factors. You should read the information contained in this handout carefully. If any of the information that you are told is unclear, please do not hesitate to ask for clarification.

## HIGH CHOLESTEROL
Many studies have shown that high cholesterol levels in the blood are a major risk factor for developing coronary heart disease (CHD). Some cholesterol in the blood is necessary. However, excess cholesterol in the blood may lead to fatty deposits in the walls of the arteries. These deposits can build up in the blood making blood flow to the heart more difficult. This process is known as atherosclerosis or "hardening of the arteries." This can lead to a heart attack and/or other heart diseases. If the deposits build up in the carotid arteries in the neck, this could lead to a stroke. Lowering of elevated cholesterol levels has been proven to decrease your risk of death from CHD, decrease the incidence of atherosclerosis and stroke. Cholesterol is a waxy compound that the body needs and uses for many important functions. The liver makes some of the cholesterol from fat in the diet. The fat in the diet comes from meat, eggs and dairy products. There are two types of cholesterol  LDL cholesterol (which has been called "bad cholesterol") and HDL cholesterol (which has been called "good cholesterol"). The LDL-cholesterol is the type of cholesterol that is associated with atherosclerosis and heart disease. The HDL-cholesterol seems to protect the body from developing heart disease. A simple blood test can determine what a person's cholesterol level is. Changes in diet are often the most effective way to lower or maintain a healthy cholesterol level. One of the most important changes to make is to lower the amount of fat in the diet. Food packages, from the commissary, now have the percentage of fat and grams of fat on the label, which makes it easier to keep track of the amount of fat in the diet. Weight loss, even in the slightly overweight patient, can make a big difference in cholesterol level. The Diet for Health, when followed properly, should help with weight loss. A routine exercise program not only helps with weight loss, but also helps to lower overall risk of heart disease. Drug therapy is not a substitute for diet and exercise but should be considered to be an extension of the therapy. In some patients who are at high risk, diet, exercise and drug therapy may need to be started at the same time.

## HIGH TRIGLYCERIDES
Studies have shown that elevated levels of triglycerides are associated with cardiovascular disease.  Many, but not all, patients with high triglyceride levels also have high LDL-cholesterol levels and/or low HDL-cholesterol levels. Very high triglyceride levels (greater than 500) have been associated with inflammation of the pancreas (pancreatitis). High levels of triglycerides can sometimes cause the blood to thicken causing a problem with clotting. High triglyceride levels usually respond well to non-drug therapy, such as changes in diet and increased exercise. Triglyceride is ingested in the diet from fats and sugars, is also made in the body in the liver and is important in the body for energy and fuel storage. High triglyceride levels may be caused by overproduction in the liver or decreased removal by the body. Triglyceride levels  have been shown to be increased in certain disease states, in times of extreme stress, and by certain drugs.

## Reducing other risks of cardiovascular disease
A healthy diet, regular exercise, and weight loss in overweight people can improve overall health and decrease the risk of heart disease as well as lowering lipid levels. In addition to hyperlipidemia, there are other risk factors for heart disease that should be controlled:

1. Control high blood pressure
2. Control high blood sugar
3. Stop smoking
4. Limit alcohol intake
5. Reduce stress

# EXHIBIT A-5

## HYPERTENSION URGENCY & EMERGENCY

**1** Blood pressure (BP) > 180 mm Hg systolic and/or >120 mm diastolic ?

The pathways do not replace sound clinical judgment nor are they intended to strictly apply to all patients

Yes

**2**

**Obtain History and Perform Physical Exam**

- Obtain BP both arms
- Evaluate heart, lungs, and neck veins for evidence of CHF
- Examine optic fundi for hemorrhages, exudates or papilledema;
- Determine all pulses especially if aortic dissection is suspected;
- Perform abdominal exam for bruits / renal artery stenosis
- **Perform neurological exam**
- **Elevate head at 45° angle**
- **Establish intravenous line if indicated**
- **Obtain EKG**
- **Obtain labs:** CMP, CBC, Urinalysis

*\*Signs of target organ damage: hypertensive encephalopathy, intracranial hemorrhage, unstable angina pectoris, acute myocardial infarction, acute left ventricular (LV) failure with pulmonary edema, dissecting aortic aneurysm, acute renal failure or eclampsia.*

**3** Is there target organ damage\* or optic disc edema?

Yes                    No

**4**

**Hypertension Emergency**

**Transfer to nearest Emergency Room**
Call 911 and follow unit protocol.  For UTMB, if ambulance is not immediately available, call 911.

**Call Utilization Review/Utilization Management**

**5**

**Markedly Elevated BP/ Hypertension Urgency**
(patient may experience symptoms of headache, shortness of breath, anxiety, or epistaxis)

- Address causes of elevated BP such as anxiety, pain, drug-induced, edema, etc. Refer to Table 4 in Hypertension disease management guideline (HTN DMG) for secondary causes of HTN.
- Check compliance to antihypertensives

**6**

- Counsel patients with poor compliance.
- Consider increasing the dose of existing antihypertensive medications, reinstituting previous medications which may have expired, or adding a new antihypertensive medication
- If the patient has not been previously diagnosed with hypertension, refer to HTN DMG.

**7**

**Follow-Up:**
- Counsel the patient to return to medical if any symptoms develop
- Check BP three times weekly
- Schedule follow-up within 1-2 weeks

**Nurses: DMGs are guidelines to assist providers in making treatment decisions and are not to be confused with or viewed as Nursing Standing Delegated Orders (SDOs). As such, treatment recommendations in DMGs cannot be implemented independently by nursing staff without an order from a provider.**

**PROVIDER EDUCATION**

**I.  Hypertension emergencies:**
  A. Defined as severe elevations in blood pressure (BP), >180/120 mm Hg, complicated by evidence of impending or progressive target organ damage.
  B. Patient should be transferred to the nearest Emergency Department (ED) as immediate blood pressure reduction is required to limit target organ damage.
  C. Blood pressure does not need to reach the normal range immediately.

**II.  Hypertension urgencies**
  A.  Defined as severe elevations in BP (>180/120) **WITHOUT** progressive target organ damage.
  B.  Does not require emergency therapy. Many of these patients have withdrawn from or are noncompliant with antihypertensive therapy.
  C. Conditions such as withdrawal syndrome, anxiety, pain, nausea, edema, etc. that may lead to significant elevation in BP should be addressed.
  D. Rationale for not using short-acting antihypertensives (such as clonidine) to lower BP over hours:
    1. While the JNC7 guidelines suggested that some patients may benefit from treatment with an oral, short- acting agent (captopril, labetalol, or clonidine) followed by hours of observation, the guidelines also found no evidence that failure to aggressively lower BP in the emergency room was associated with any increased short -term risk, and that the term "urgency" has led to overly aggressive management of many patients with severe, uncomplicated hypertension.
    2. The 2017 ACC/AHA HTN guidelines recommended reinstitution or intensification of antihypertensives and treatment of anxiety as applicable. There is no indication for referral to the ED, immediate reduction in BP in the ED, or hospitalizations.
    3. The landmark 1967 Veteran Affairs Cooperative Trial demonstrated the long-term benefits of treating patients with chronic hypertensive urgency, which accrued over a period of months to years, not hours.
    4. In a large retrospective cohort study of over 50,000 patients diagnosed with HTN urgency at outpatient clinics, only 0.7% were referred to the hospital for BP management. The referred patients were younger, were more likely African American, had higher BP values, and were more likely to have history of HTN and chronic kidney disease. When comparing 852 patients who were sent home to 426 patients who were sent to the hospital in a propensity-matched analysis, no significant difference in major adverse cardiac events were found at 7 days, 8 to 30 days, or 6 months. Sixty percent of patients at the hospital received a one-time dose antihypertensive, most commonly with labetalol or clonidine (Patel et al, JAMA 2016).
  E. Role of furosemide in HTN urgencies:
    1. Ensure the patient has no signs or symptoms of HTN emergency such as acute LV failure with pulmonary edema; otherwise, this is considered HTN emergency and the patient should be transferred to the nearest ED.
    2. The antihypertensive effect of furosemide in HTN urgencies has not been well documented.
    3. Furosemide is useful in patients with volume overload, but the risk of volume depletion in patients with reduced or normal volume status should be considered.
    4. For edema, the initial oral dose is usually 20-40 mg once daily, then titrating as needed to an effective dose.

# HYPERTENSION (HTN)



Nurses: DMGs are guidelines to assist providers in making treatment decisions and are not to be confused with or viewed as Nursing Standing Delegated Orders (SDOs). As such, treatment recommendations in DMGs cannot be implemented independently by nursing staff without an order from a provider

1  Adults 18-85 years of age with HTN. Refer to **Table 1** for HTN classification.

The pathways do not replace sound clinical judgement nor are they intended to strictly apply to all patients

2  Implement lifestyle interventions, discontinue or minimize interfering drugs or substances, and screen for secondary causes of high blood pressure (**Table 4**).

3  Does the patient have one of the following conditions: History of cardiovascular disease (stroke, heart failure, or myocardial infarction), diabetes (DM), Albuminuria (Albumin/ Creatinine ratio >30 mg/g creatinine), or chronic kidney disease (CKD) (excluding end stage renal disease and renal transplant)?

*Atherosclerotic cardiovascular disease (ASCVD) risk calculator found on CMC web Tools & EHR Note builder Guidelines tab

No

Yes

4  Calculate 10-yr ASCVD risk*

ASCVD risk <10% or cannot be calculated

ASCVD risk ≥10%

5  Is the patient ≥ 65 years with high burden of comorbidity, limited life expectancy, and dependency in activities of daily living?

No

Yes

6  **Target BP <140/90**

7  **Target BP < 130/80**

8  Assess risk vs benefits and consider patient preference before initiating medications. Treat based on tolerability.

9  Initiate first line antihypertensive if not at target. Refer to **Table 2 & 3** for compelling indications.
- Lisinopril: recommended in CKD and albuminuria
- HCTZ and CCB: preferred first lines in black patients

10  **Schedule follow-up in:**
- Nonpharmacological therapy only: follow up in 3-6 months
- Pharmacological therapy initiated: follow up in 1 month, obtain BP readings weekly

11  **At follow-up visit, is patient at BP goal?**

No

Yes

12  **Patient is compliant:** increase dose or add another drug (HCTZ, lisinopril or CCB). Follow-up based on box 10.

**Patient is noncompliant**: Counsel patient regarding IMPORTANCE of compliance and consider changing status of medications to NONKOP. Follow-up based on box 10.

If adverse effects are present, change drug class or add drug from another class and reduce dose of offending agent.

13
- Continue current drug regimen
- Continue to encourage lifestyle modifications
- Obtain annual laboratories (Appendix A)
- Order microalbumin annually if patient is not on an ACEI or ARB (angiotensin receptor blocker)
- Follow-up in chronic care clinic at least annually

14  **If still not at BP goal, may consider:**                **If at BP goal: Refer to box 13**
- Intense individualized counseling
- DOT for a short period
- Obtaining a pharmacotherapy consult
- Additional BP agents (e.g., beta-blocker, aldosterone antagonist, or others). See **Table 3.**
Follow-up based on box 10 or as clinically indicated.

**Table 1: Classification of Hypertension**

| BP Classification | SBP mmHg[1] | DBP mmHg[2] | Lifestyle Modification | Initial Therapy |
|---|---|---|---|---|
| Normal | <120 | **and** <80 | Encourage | No antihypertensive indicated |
| Elevated | 120-129 | **and** <80 | Yes | No antihypertensive indicated |
| Stage 1 Hypertension | 130-139 | 80-89 | Yes | See algorithm on page 1 |
| Stage 2 Hypertension | ≥140 | ≥90 | Yes | Antihypertensive therapy indicated |

1. SBP = systolic blood pressure    2. DBP = diastolic blood pressure

**Table 2: Drug Selection in Patients with or Without Compelling Conditions**

| Patient Type | Initial Drug |
|---|---|
| A.  When hypertension is the main condition: | |
| • Black patients | • CCB or HCTZ |
| • Non-black patients | • Lisinopril, CCB, or HCTZ |
| B.  When hypertension is associated with other conditions: | |
| • Hypertension and diabetes<br>• Black patients | • CCB or HCTZ |
| • Non-black patients | • Lisinopril, CCB or HCTZ |
| • Hypertension and albuminuria | • Lisinopril |
| • Hypertension and CKD | • Lisinopril |
| • Hypertension and clinical coronary artery disease | • Beta blocker plus lisinopril |
| • Hypertension and stroke history | • Lisinopril and/or hydrochlorothiazide |
| • Hypertension and symptomatic heart failure | • Lisinopril + carvedilol + diuretic + spironolactone[†] |

Abbreviations:
CCB = calcium channel blocker
CKD = chronic kidney disease
HCTZ = hydrochlorothiazide
†NYHA II-IV and who have LVEF of 35% or less provided Crcl >30 mL/min and K+<5.0 mEq/dL

Table 3: Formulary Oral Antihypertensive Agents

| Drug Class | Formulary agents | Comments |
|---|---|---|
| **First-line agents** | | |
| Thiazide diuretics | • HCTZ 12.5-50 mg<br>• Triamterene/HCTZ 37.5 mg/ 25 mg<br>• Metolazone 5 mg | • Recommended in history of stroke/ TIA, with or without lisinopril<br>• Avoid in gout unless patient is on gout medications<br>• Monitor for hyponatremia, hypokalemia, hypercalcemia, and uric acid levels |
| ACE inhibitor | Lisinopril 2.5-40 mg | • Recommended in CKD and albuminuria<br>• Recommended in history of stroke/ TIA with or without a thiazide diuretic<br>• Monitor potassium and renal function, especially in CKD patients or in those on potassium supplements or potassium-sparing drugs<br>• Do not use in pregnancy or patients with history of angioedema with ACE-I<br>• Do not combine with angiotensin II receptor blocker (losartan) |
| Dihydropyridine CCB | Amlodipine 5-10 mg | • Associated with dose-related pedal edema<br>• Can use in patients with HFrEF |
| Non-dihydropyridine CCB | • Diltiazem XR 180-240 mg<br>• Verapamil SR 180-240 mg | • Avoid use with beta-blockers due to increased risk of bradycardia/ heart block.<br>• Avoid in patients with HFrEF |
| **Second-line agents** | | |
| Loop diuretic | Furosemide 20-40 mg | Preferred diuretics in symptomatic HF and preferred over thiazides in moderate–severe CKD (GFR <30 mL/min) |
| Aldosterone antagonists | Spironolactone 25 mg | • Preferred agents in aldosteronism and resistant hypertension<br>• Avoid use with potassium supplements, potassium-sparing diuretics, or significant renal dysfunction<br>• Associated with risk of gynecomastia and impotence |
| Beta blockers | • Atenolol 25-50 mg<br>• Carvedilol 3.125-25 mg<br>• Metoprolol tartrate 25-100 mg<br>• Propranolol 10-40 mg | • Not recommended as first-line unless the patient has IHD or HF<br>• Atenolol and metoprolol tartrate are preferred in patients with bronchospastic airway disease requiring a beta blocker<br>• Carvedilol is preferred beta-blocker in patients with HFrEF<br>• Avoid propranolol in patients with reactive airway disease<br>• Avoid use with non-dihydropyridine CCB due to increased risk of bradycardia/heart block<br>• Avoid abrupt cessation<br>• Contraindicated in bradycardia and heart block |
| Alpha-1 blocker | Terazosin 1-10 mg | • May be used second-line in patients with concomitant BPH<br>• Associated with orthostatic hypotension, especially in older adults |
| Direct vasodilators | • Hydralazine 25-50 mg<br>• Minoxidil 2.5-10 mg | • Use with a diuretic due to retention of sodium and water<br>• Use with a beta blocker due to reflex tachycardia<br>• Hydralazine is associated with lupus-like syndrome at high doses<br>• Minoxidil is associated with hirsutism and requires a loop diuretic. Minoxidil can induce pericardial effusion. |
| Alpha-2 agonists | Guanfacine 1-2 mg | • Reserved as last-line due to significant CNS adverse effects, especially in older adults<br>• Avoid abrupt cessation |

**Abbreviations**:
ACE-I = angiotensin converting enzyme inhibitor
BPH = benign prostatic hyperplasia
CCB = calcium channel blocker
CKD = chronic kidney disease
CNS = central nervous system

GFR = glomerular filtration rate
HCTZ = hydrochlorothiazide
HF = Heart failure
HFrEF = Heart failure with reduced ejection fraction
IHD = Ischemic Heart Disease
TIA = Transient Ischemic Attack

Table 4: Secondary Causes of Hypertension (HTN)

| Drugs and Substances | Comments |
|---|---|
| • Alcohol<br>• Recreational drugs (e.g., cocaine, methamphetamine, etc.) | • Limit alcohol to ≤1 drink daily for women and ≤2 drinks for men<br>• Discontinue use of recreational drugs |
| Caffeine | • Associated with acute increase in blood pressure<br>• Limit caffeine to <300 mg/day (less than four cups of coffee)<br>• Avoid caffeine in patients with uncontrolled hypertension |
| Non-steroidal anti-inflammatory drugs (NSAIDs) | • Avoid systemic NSAIDs when possible<br>• Consider alternative analgesics (e.g., acetaminophen) depending on indication |
| Decongestants (e.g., phenylephrine) | • Use for the shortest duration possible, and avoid in severe or uncontrolled hypertension<br>• Consider alternative therapies (e.g., nasal saline, intranasal corticosteroids, antihistamines) |
| Antidepressants (e.g., venlafaxine, duloxetine) | Monitor blood pressure, adjust antihypertensives, or consider alternative agents (e.g., Selective Serotonin Reuptake Inhibitors – sertraline, fluoxetine, paroxetine) depending on indication |
| Atypical antipsychotics (e.g., clozapine, olanzapine) | • Discontinue or limit use when appropriate<br>• Consider alternative agents associated with lower risk of weight gain, diabetes mellitus, and dyslipidemia (e.g., aripiprazole, ziprasidone) |
| Oral contraceptives | • Use low-dose ethinyl estradiol (e.g., Low-ogestrel) agents<br>• Avoid use in uncontrolled hypertension |
| Systemic corticosteroids (e.g., prednisone) | • Avoid or limit use when possible<br>• Consider alternative modes of administration (e.g., inhaled, topical) when feasible |
| • Angiogenesis inhibitor (e.g., bevacizumab)<br>• Tyrosine kinase inhibitors (e.g., sunitinib, sorafenib) | Initiate or intensify antihypertensive therapy |
| **Medical Conditions** | **Consider in Resistant Hypertension** |
| • Primary aldosteronism (prevalent in up to 20% of resistant HTN cases, and 5-10% in general HTN population) | • Symptoms include muscle cramps or weakness<br>• Patients may also present with arrythmias (and hypokalemia)<br>• Consider an oral sodium loading test for diagnosis |
| • Sleep apnea (prevalent in ≥80% of resistant HTN cases) | • Symptoms include snoring, breathing pauses during sleep, daytime sleepiness<br>• Most common in obese patients<br>• Consider a sleep study referral |
| • Renovascular disease (prevalent in 5-34% of patients with HTN) | • This is suspected in patients with hypertension of abrupt onset or worsening or increasingly difficult to control hypertension<br>• Consider specialist referral for a bilateral selective renal intra arterial angiography for diagnosis. |
| • Other secondary causes (less common): coarctation of the aorta, mineralocorticoid excess states, Cushing's Syndrome, pheochromocytoma, thyroid or parathyroid disease, congenital adrenal hyperplasia, acromegaly, renal parenchymal disease. | |

Appendix X    HYPERTENSION DISEASE MANAGEMENT GUIDELINE    Page 4 of 11

**Detection and Confirmation:**

Patients should be seated in a chair with their backs supported, and their arms bared and supported at heart level. Patient should sit with feet flat on the floor and legs uncrossed.

- Patients should have emptied their bladder and refrained from smoking, exercising, or ingesting caffeine during the 30 minutes prior to the reading.
- Blood pressure (BP) measurement should begin after the patient has been at rest for at least 5 minutes.
- Patient should not talk immediately before or during the blood pressure measurement.
- Appropriate cuff size must be used to ensure accurate readings. The bladder within the cuff should encircle at least 80% of the arm. A large adult cuff should be kept in all clinics.
- Measurement of BP with a mercury sphygmomanometer is the preferred method. However, a recently calibrated aneroid manometer or a validated electronic device can be used.
- Systolic BP and diastolic BP should be recorded.
- Two or more readings separated by 2 minutes should be obtained and averaged for proper confirmation. Verification in the contralateral arm is recommended (if values are different, the higher value should be used). If these two readings differ by more than 5 mm Hg, additional readings should be obtained two weeks apart.
- In some cases, supine BP may be measured. Older persons may present with neurogenic orthostatic hypotension associated with supine hypertension.

---

### Recommendation for Follow-up Based on Initial Blood Pressure Readings

Initial Blood Pressure (mm Hg)*

| Systolic | Diastolic | Follow-up Recommended** |
|---|---|---|
| <120 | <80 | Recheck as clinically indicated |
| 120-129 | <80 | Reassess in 3-6 months |
| 130-139 | 80-89 | • 10-yr ASCVD risk <10%: Nonpharmacological therapy only. Reassess in 3-6 months<br>• High risk condition or 10-y ASCVD risk ≥ 10%: Initiate pharmacological therapy. Check BP weekly and reassess in 1 month. |
| ≥140 | ≥90 | • Reassess in 1 month after initiating antihypertensives and checking BP weekly.<br>• For those with higher pressures (e.g., 180/120 mm Hg), evaluate and treat per Hypertensive Emergency/Urgency pathway. |

---

*If systolic and diastolic categories are different, follow up should be for the shorter time (e.g., 145/79 mm Hg should be evaluated within one month).

** Modify the schedule for follow up according to reliable information about past blood pressure measurements, other cardiovascular risk factors, or target organ disease. Provide advice on therapeutic lifestyle modifications.

**Physical Exam:**

- Measurement of weight, height, and waist circumference.
- Fundoscopic examination for hypertensive retinopathy (i.e., arteriolar narrowing, focal arteriolar constrictions, arteriovenous crossing changes, hemorrhages and exudates, disc edema).
- Examination for the neck for carotid bruits, distended veins, or enlarged thyroid gland.
- Examination of the heart for abnormalities in the rate and rhythm, increased size, precordial heave, clicks, murmurs and third and fourth heart sounds.
- Examination of the lungs for rales and evidence for bronchospasm.
- Examination of the abdomen for bruits, enlarged kidney, masses and abnormal aortic pulsation.
- Examinations of the extremities for diminished or absent peripheral arterial pulsations, bruits, and edema.
- Neurological assessment.

**Medical History:**

- Known duration and levels of elevated blood pressure.
- Patient history or symptoms of coronary heart disease (CHD), heart failure, cerebrovascular disease, peripheral vascular disease, renal disease, diabetes mellitus, dyslipidemia, gout, or sexual dysfunction.
- Family history of high blood pressure, premature CHD, stroke, diabetes, dyslipidemia, or renal disease.
- Symptoms suggestive of hypertension (headache, nose bleeds, dizziness, abnormal physical exam).
- History of recent changes in weight, leisure time physical activity, and smoking or tobacco use.
- Dietary assessment including intake of sodium, alcohol, saturated fat and caffeine.
- History of all prescribed and over-the-counter medications, herbal remedies, and illicit drugs.
- Results and adverse effects of past antihypertensive therapy.
- Psychosocial and environmental factors that may influence hypertensive control.

**Baseline and Annual Laboratory Tests:**

Routine laboratory tests recommended prior to initiating therapy and annually to determine end organ damage and other risk factors include:

- CBC
- Chemistry profile to include LFTs, serum creatinine, fasting blood sugar and fasting lipid profile
- TSH (baseline)
- Urinalysis
- Microalbumin to test for albumin to creatinine ratio (annually if not on ACE inhibitor or angiotensin receptor blocker)
- EKG

**Cardiovascular Risk Factors:**

- Hypertension
- Obesity (Body Mass Index $\geq$ 30 kg/m$^2$)
- Physical Inactivity
- Dyslipidemia
- Diabetes Mellitus
- Microalbuminuria (Albumin/ Creatinine ratio >30 mg/g creatinine) or estimated GFR < 60 mL/min
- Older age
- Family history of premature cardiovascular disease (male < 55 or females < 65)
- **10 yr. ASCVD (atherosclerotic cardiovascular disease) risk defined as:** risk of developing 1st ASCVD event, including MI (myocardial infarction) or stroke, fatal or nonfatal.
  - Risk estimates are based on data from multiple community-based populations.
  - Applicable to African-American and non-Hispanic white men and women 40 - 79 years of age. For other ethnic groups, the American Heart Association (AHA) recommends use of the equations for non-Hispanic whites, though these estimates may underestimate the risk for persons from some race/ethnic groups, especially American Indians, some Asian Americans (e.g., of south Asian ancestry), and some Hispanics (e.g., Puerto Ricans), and may overestimate the risk for others, including some Asian Americans (e.g., of east Asian ancestry) and some Hispanics (e.g., Mexican Americans).
  - The calculator may not be used for total cholesterol <130 or >320 mg/dL, HDL < 20 or > 100 mg/dL, or systolic blood pressure < 90 or > 200 mmHg.

**Determining a Blood Pressure Goal:**

- <u>Adults with known cardiovascular disease (CVD) or 10-yr ASCVD risk of $\geq$ 10%:</u> a stricter BP goal <130/80 mmHg is strongly recommended by the 2017 American Heart Association/ American College of Cardiology (AHA/ACC) guidelines.
- <u>Adults with diabetes mellitus (DM):</u> There is limited quality evidence to determine a precise BP target in adults with DM. The 2017 ACC/AHA guideline assumes that most adults with DM have a 10-year ASCVD risk >10%, placing them in a high-risk category and therefore should have a BP goal <130/80 mmHg.
- <u>Adults with albuminuria, or chronic kidney disease (CKD)</u> (excluding end stage renal disease or renal transplant): The 2017 guideline assumes that most CKD patients have a 10-yr ASCVD risk >10%, placing them in a high-risk category and therefore should have a BP goal <130/80 mmHg.
- <u>Adults **without** elevated risk:</u> treatment of HTN has been systematically understudied. The clinical trial evidence is strongest for a target BP of 140/90 mmHg in this population.
- <u>Adults $\geq$ 65:</u> the 2017 ACC/AHA guidelines recommend a systolic BP goal of 130 mmHg for those who are noninstitutionalized ambulatory community-dwelling older adults. When evaluating these patients, it is important to consider their preference, comorbidities, life expectancy, and tolerability of antihypertensives to determine an appropriate regimen and BP goal. Those who have limited life expectancy or require assistance in daily activities may not be able to tolerate an intensive BP goal.

**Background:**

The 2017 ACC/AHA HTN guidelines reclassified BP into 4 new categories: normal, elevated, stage 1, and stage 2 (see Table 1, page 2). This change was due to data from various studies showing a higher risk of stroke and coronary heart disease (CHD) in patients with systolic blood pressure (SBP)/diastolic blood pressure (DBP) >120/80:

- Framingham Heart Study found that 55-year old adults (who were then normotensive in the study) have a **90% probability of developing HTN in their lifetime** and a 60% probability of receiving anti-HTN meds.
- Framingham Heart Study found that individuals with blood pressure values in the range of 130-139/85-89 mmHg have a **2-fold** increased risk of cardiovascular disease (CVD) versus a person with BP <120/80.
- Meta-analysis of 61 studies indicated that risk of death from CVD and stroke increases linearly with increasing BP beginning as low as 115/75 mmHg and for each increment of 20/10 mmHg the risk of CVD **DOUBLES.**
- **Risk was lowest with SBP 90-115 mmHg and was significantly lower than the risk for SBP 115-129 mmHg. Modest increases in either systolic or diastolic blood pressure above 130/85 mmHg were associated with large increases in hazard ratios, especially for coronary death, heart failure, ischemic stroke, intracerebral hemorrhage, and peripheral arterial disease (Rapsomaniki E et al; Lancet 2014)**

**Management of Patient with Elevated Blood Pressure (SBP 120-129; DBP<80):**

The main purpose of the *elevated* blood pressure category is to identify persons who are at risk of developing hypertension and hypertension-related long-term complications in the future.  It is important that healthcare providers identify patients with elevated blood pressure early and manage their condition.  **EDUCATION IS THE KEY HERE! This is the opportunity to counsel patients on the serious complications of HTN and to promote healthy habits and lifestyle changes so that an actual diagnosis of HTN may be avoided.**

**Therapeutic Lifestyle Modifications**:**

Lifestyle modifications are currently the gold standard in the management of patients with elevated BP.  Suggested modifications and the extent of systolic blood pressure reduction are as follows:

| Modification | Recommendation | Approximate SBP Reduction |
|---|---|---|
| Weight reduction | Encourage patient to maintain normal body weight (BMI 18-24.9) | 1 mmHg/1 kg weight loss |
| Diet | Consider Diet for Health and encourage adherence. Encourage consumption of fruits, vegetables, whole grains, and low-fat products. | 3-11 mmHg |
| Dietary sodium restriction | Discourage adding extra salt to food and commissary foods with high sodium content (e.g., instant noodle soup, chips). | 5-6 mmHg |
| Physical activity | Encourage patient to engage in aerobic physical activity and resistance training to lower BP: 3 to 5 sessions a week, lasting  on average 30 minutes per session, and involving moderate physical activity. | 4-8 mmHg |

**Set realistic goals for your patients and discuss the value of self-rewarding and goal setting.  Encourage patients to make gradual changes to their lifestyle, as they are more likely to comply with one change at a time.

# EXHIBIT A-6



# SKIN AND SOFT TISSUE INFECTION

**1** Patient presents with symptoms of skin & soft tissue infection.

**2** Does patient have symptoms of systemic illness such as fever tachycardia, or hypotension? — **Yes** → **3** Refer for Acute Care Management

**No**

**4** Is cellulitis or impetigo present *without* abscess or other draining skin lesion? — **Yes** → **5** Treat empirically with combination therapy for both strepococci and staphylococci. Re-evaluate if not improving clinically.
- Bactrim DS 1 tab BID + Amoxicillin 500 mg TID X ≥7 days **OR**
- Minocycline 100 mg BID + Amoxicillin 500 mg TID X ≥7 days
- Extend treatment several days beyond resolution

**No**

**6** Immunosuppressive condition (Diabetes, Hepatitis B, Hepatitis C, HIV) present or trauma such as bites? — **Yes** → **7**
- The underlying condition should be controlled as well as possible.
- Obtain culture and sensitivity (C&S) using Levine method (page 2)
- If fluctuant, perform incision and drainage (I&D)
- If <u>not</u> fluctuant, treat with warm compresses for 20 minutes 2 to 3 times per day until resolved.
- Start antibiotics (page 2)
- **Proceed to box 15**.

**No**

**8** Assess for recurrence: Has the patient had > 3 clinical or culture-proven infections in a six-month period? — **Yes** → **9**
- Obtain C&S using Levine method (page 2)
- If fluctuant, perform I&D
- If <u>not</u> fluctuant, treat with warm compresses for 20 minutes 2 - 3 times per day until resolved.
- Start antibiotics (page 2)
- May consider staph decolonization protocol: non-formulary mupirocin 2% ointment applied to both nostrils BID for 5 days
  - Refer to Infection Control Manual Policy B-14.16, section V.D.4
- **Proceed to box 15**.

**No**

**10** Is the lesion fluctuant? — **No** → **11**
- Treat with warm compresses for 20 minutes 2 - 3 times per day until resolved.
- **Proceed to box 15**.

**Yes**

**12** Fluctuant and area of redness & swelling < 5cm? — **No** → **13**
- Obtain C&S using Levine method (page 2)
- Treat with I&D
- Start antibiotics (page 2)
- **Proceed to box 15**.

**Yes**

**14**
- May be treated with I&D alone
- **Proceed to box 15**.

**15**
- Boil Patient Education Sheet available on the CED web page under Publications -> Inmate Education Leaflets
- Return to clinic (RTC) if infection worsens, if not improving in 3 days, or if not healed in 2 weeks

The pathways do not replace sound clinical judgment nor are they intended to strictly apply to all patients

Nurses: DMGs are to assist providers in making treatment decisions and are not to be confused with or viewed as Nursing Standing Delegated Orders (SDOs). As such, **treatment recommendations in DMGs cannot be implemented independently by nursing staff without an order from a provider.**

**Culture Using the Levine Method**
- Cleanse the wound with sterile water or normal saline to wash away any slough, necrotic tissue or dried exudate.
- Moisten the culture tip. If the wound is moist, a sterile swab can be used straight from the packaging. If the wound is dry, then the swab tip should be moistened with sterile water to increase the chances of recovering organisms from the site.
- Collect in a zig-zag motion – the swab should be moved across the wound surface in a zig-zag motion, at the same time, being rotated between the fingers.
- Send to lab – immediately following the collection, the swab should be returned to its container (placed into the transport medium) and accurately labeled.


**Antibiotic Selection**
- If possible, begin after C&S results available. May treat with soaks or dressing changes pending results.
- If empiric therapy must be started, begin empiric therapy with Bactrim DS.
- If allergic or failure on treatment, consider referral to higher level of care for recommendations.
- Antibiotic therapy **should be guided by C&S** results once available. All cases of methicillin sensitive Staphylococcus aureus (MSSA) and methicillin resistant Staphylococcus aureus (MRSA) must be reported to the Office of Public Health by the facility Infection Control Nurse (ICN). Refer to the Infection Control Policy Manual (B-14.16 Attachment B).
- Duration generally at least 7 days and should extend several days past clinical resolution.
- Empiric therapy to avoid: rifampin alone, flouroquinolone, cephalosporin, clindamycin, or erythromycin.

# 5.

# DECLARATION OF SERINA ROGLIEN-HOOD

Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
Martin Kosla (SBN 247224)
E-mail: mkosla@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA 92101-8474
Tel: 619.814.5800 Fax: 619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
Tel: 408.606.6300 Fax: 408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
DEPARTMENT

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF SERINA ROGLIEN-HOOD IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED**<br><br>**Hearing**<br>Date: March 6, 2025<br>Time: 2:00 p.m.<br>Ctrm: 4A<br><br>Judge: Anthony J. Battaglia<br><br>Magistrate Judge: David D. Leshner |

///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4901-9987-6355 v2

1

Case No. 3:20-cv-00406-AJB-DDL
ROGLIEN-HOOD DECL. RE MSJ

I, SERINA ROGLIEN-HOOD, declare as follows

1.    I am competent to testify to the matters set forth in this declaration, and if called to do so, would and could so testify.

2.    I am the Deputy Director of Residential Inpatient Care Facilities at the San Diego County Sheriff's Office ("Sheriff's Office").  I have held this title since December 2023.  Prior to this, I was the Director of Nursing for all the jail facilities maintained and operated by the Sheriff's Office.

3.    In my current role, I supervise the Directors of Nursing of each jail facility operated by the Sheriff's Office.  I am also licensed as a Registered Nurse ("RN") in the State of California.

4.    I am aware of the lawsuit filed by the plaintiffs ("Plaintiffs") against the Sheriff's Office, the County of San Diego ("County") and the San Diego County Probation Department (collectively, "Defendants").

5.    I understand that Plaintiffs allege, among other things, that Defendants subject Plaintiffs and other incarcerated individuals to a substantial risk of serious harm and injury from inadequate medical care at Defendants' jail facilities in violation of the Eight Amendment and the Fourteenth Amendment as a result of their "their policies, practices, and failures to train staff."  Plaintiffs claim that these "systemic policies and practices" include failing to maintain sufficient numbers of adequately trained healthcare professionals, refusing to provide Medication-Assisted Treatment ("MAT") for incarcerated people with substance use disorders, having insufficient contracts with community providers, and failing to maintain adequate quality assurance and quality improvement processes.

## Jail Facilities

6.    The seven jail facilities maintained and operated by the Sheriff's Office, and which I oversee with regard to the provision of nursing services, consist of East Mesa Reentry Facility ("EMRF"), George Bailey Detention Facility ("GBDF"), Las Colinas Detention and Reentry Facility ("LCDRF"), Rock Mountain

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4901-9987-6355 v2                                  2                    Case No. 3:20-cv-00406-AJB-DDL
ROGLIEN-HOOD DECL. RE MSJ

1 Detention Facility ("RMDF"), San Diego Central Jail ("SDCJ"), South Bay

2 Detention Facility ("SBDF"), and Vista Detention Facility ("VDF") (collectively,

3 the "Jail").

### Staffing – Nursing

5     7.    The Sheriff's Office utilizes a predominantly RN-based staffing model

6 at the Jail.

7     8.    Due to their advanced education and training, RNs contribute

8 significant clinical expertise, critical thinking skills, and holistic care approaches to

9 the Jail's healthcare program.

10    9.    The Sheriff's Office also utilizes licensed vocational nurses ("LVN")

11 but in a restricted scope of practice.

12    10.   LVNs primarily aid in medication administration and performing tasks

13 that require lower-level nursing skills.  This staffing approach ensures that highly

14 skilled RNs are at the forefront of patient care delivery.

15    11.   In the nursing model employed by the Sheriff's Office, RNs lead a

16 team that includes RNs, LVNs, and nursing assistants ("NA").  Each team is

17 responsible for a designated group of patients within a unit or area, allowing them to

18 develop familiarity with a patient's needs, baselines, and care plans.  This approach

19 facilitates personalized care and enhances patient outcomes by ensuring consistent

20 nursing presence and continuity throughout the patient's stay.

21    12.   Nursing coverage at the Jail is achieved with a hybrid shift matrix of 8-

22 hour and 12-hour shifts.

23    13.   Frontline nursing supervision at each facility in the Jail is provided by

24 Supervising RNs.  The Supervising RN at each facility then reports to the Director

25 of Nursing at that facility (who then report to me).

26    14.   Currently, there are 359 nursing positions at the Jail, consisting of 265

27 RNs and 94 LVNs.

28 ///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4901-9987-6355 v2                                   3                    Case No. 3:20-cv-00406-AJB-DDL
ROGLIEN-HOOD DECL. RE MSJ

15.     With regard to nursing vacancy rates, the Sheriff's Office employs various staffing tools to address vacancies, including overtime and supplemental agency staffing resources.

16.     In particular, when a staffing challenge arises, overtime is offered in advance as an incentive for coverage.

17.     For longer-term vacancies or regular interval coverage needs, the Sheriff's Office utilizes the services of United Nursing International Healthcare Recruiters to provide licensed agency nurses for critical positions.

18.     Due to the complexity of the medical program at the Jail, agency staff are assigned specific task-oriented roles to minimize orientation time and maximize their effectiveness.  These measures ensure that patient care remains uninterrupted, and that the nursing workforce is supported, particularly during periods of increased demand or long-term staff vacancies.

## **Intake Screening**

19.     Intake screenings at the Jail are done by RNs.  In particular, the RN responsible for the intake processing initiates the triage assessment for all individuals brought in for booking by local law enforcement to ascertain their jail admission medical clearance eligibility or "Gate Refusal."  This process ensures that all individuals are medically stable before commencing the formal intake screening procedure.

20.     Individuals meeting the criteria for "Gate Refusal" are not admitted. Instead, they are directed to the Emergency Department to undergo evaluation and treatment if indicated to obtain medical clearance.

21.     During the intake process at all three intake processing locations (VDF, SDCJ, and LCDRF), individuals entering the Jail are scanned with the TEK 84 Intercept body scanner.

///

///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4901-9987-6355 v2

4

Case No. 3:20-cv-00406-AJB-DDL
ROGLIEN-HOOD DECL. RE MSJ

22. The TEK 84 system is utilized to scan most individuals (unless medically contraindicated such as pregnancy) and their belongings to identify and prevent the introduction of contraband such as weapons, drugs, or other prohibited items into the Jail.

23. The intake RN at the Jail also functions as the "Gatekeeper" in the absence of an on-site Qualified Mental Health Provider. In this capacity, the RN's assessment findings address immediate medical needs, mental health concerns, and suicide risks.

24. As part of the receiving screening process, individuals are screened and tested for tuberculosis (TB) and females undergo pregnancy testing. Additionally, COVID-19 and influenza vaccinations are offered to all individuals entering the Jail (as seasonally appropriate).

25. The screening process also evaluates the past and present substance use of each individual entering the Jail. Individuals identified with current substance use or with positive drug screen urinalysis results are promptly assessed utilizing the "Detox Screening Tool." They are then referred for monitoring of withdrawal symptoms, as well as medical drug detoxification, as medically indicated.

26. Withdrawal symptoms are assessed once daily (at a minimum) utilizing withdraw assessment tools such as the Clinical Institute Withdrawal Assessment (CIWA) and/or the Clinical Opiate Withdrawal Scale (COWS). RNs complete the appropriate withdrawal assessment tool(s) and refer each assessment for review by the on-site medical provider or on-call medical provider (StatCare).

27. After the completion of the intake process, incarcerated individuals receive an initial health assessment. This is normally done within 14 days.

///

///

///

///

1     I declare under penalty of perjury under the laws of California and the United

2   States of America that the foregoing is true and correct.

3       Executed on December 16, 2024, at San Diego, California.

4

5

6

7                                   SERINA ROGLIEN-HOOD

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

# 6.

# DECLARATION OF SERGIO SANCHEZ

1  Susan E. Coleman (SBN 171832)
   E-mail: scoleman@bwslaw.com
2  Martin Kosla (SBN 247224)
   E-mail: mkosla@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   501 West Broadway, Suite 1600,
4  San Diego, CA 92101-8474
   Tel: 619.814.5800     Fax: 619.814.6799
5
   Elizabeth M. Pappy (SBN 157069)
6  E-mail: epappy@bwslaw.com
   BURKE, WILLIAMS & SORENSEN, LLP
7  60 South Market Street, Suite 1000
   San Jose, California 95113-2336
8  Tel: 408.606.6300     Fax: 408.606.6333
9
   Attorneys for Defendants
10 COUNTY OF SAN DIEGO (Also
   erroneously sued herein as SAN DIEGO
11 COUNTY SHERIFF'S DEPARTMENT, and
   SAN DIEGO COUNTY PROBATION
12 DEPARTMENT)

13                 UNITED STATES DISTRICT COURT

14               SOUTHERN DISTRICT OF CALIFORNIA

15

16 DARRYL DUNSMORE, ANDREE          Case No.  3:20-cv-00406-AJB-DDL
17 ANDRADE, ERNEST ARCHULETA,
   JAMES CLARK, ANTHONY            **DECLARATION OF SERGIO**
18 EDWARDS, LISA LANDERS,          **SANCHEZ IN SUPPORT OF**
   REANNA LEVY, JOSUE LOPEZ,       **DEFENDANTS' MOTION FOR**
19 CHRISTOPHER NELSON,             **SUMMARY JUDGMENT**
   CHRISTOPHER NORWOOD, JESSE
20 OLIVARES, GUSTAVO               **Hearing**
   SEPULVEDA, MICHAEL TAYLOR,      Date:    March 6, 2025
21 and LAURA ZOERNER, on behalf of  Time:    2:00 p.m.
   themselves and all others similarly  Ctrm:   4A
22 situated,
                                   Judge: Anthony J. Battaglia
23           Plaintiffs,
                                   Magistrate Judge: David D. Leshner
24      v.

25 SAN DIEGO COUNTY SHERIFF'S
   DEPARTMENT, COUNTY OF SAN
26 DIEGO, SAN DIEGO COUNTY
   PROBATION DEPARTMENT, and
27 DOES 1 to 20, inclusive,

28           Defendants.

Burke, Williams &
Sorensen, LLP
Attorneys At Law
San Diego

4924-6911-7703 v1                    - 1 -                3:20-CV-00406-AJB-DDL
                                              SANCHEZ DECLARATION ISO MSJ

I, SERGIO SANCHEZ, declare as follows:

1.    I have personal knowledge of the matters herein and would competently testify to them if called to do so. I am the Assistant Manager of Sheriff's Food Service. I have worked in Food Service for the Sheriff's Office for 29 years.

2.    I work at the Central Processing Center adjacent to the East Mesa Reentry Facility. My job duties cover all food services at the seven San Diego County Sheriff's Office detention facilities.  I am familiar with and comply with/enforce compliance with the Food Service policies set forth in the Detention Services Bureau – Manual of Policies and Procedures, Section K. The specific subsections that relate to health and safety of food include K.11: Compliance with Health Laws, K.19: Food Control, K.23: Monthly Inspections of Food Services Areas, K.25: Safety and Protection Standards and K.29: Dress and Grooming Requirements for Food Services Division Employees. These policies are also available online at https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Detentions%20Policy%20and%20Procedure%20Sections/.

3.    The sanitation standards in K.11 requiring hand washing, wearing of hair nets, disposable gloves, wearing clean white washable clothing changed daily, and prohibition of any work by individuals with open cuts or sores, or communicable diseases, are enforced and followed for all Food Services workers in all facilities. Policy K.25 tasks the supervisor and head cooks at each facility for training on safe working habits and operation of equipment, and training IP workers on food service sanitation, safe food handling, safe working habits, and safe methods for operation of equipment and cleaning of the equipment. K.29 sets forth all of the dress and grooming requirements for all food service personnel and all personnel are required to follow all of the policies.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4924-6911-7703 v1                    - 2 -                    3:20-CV-00406-AJB-DDL
SANCHEZ DECLARATION ISO MSJ

4.     I personally conduct inspections at each of the seven facilities once per week.  I walk the entire kitchen to inspect for cleanliness of the kitchen area and equipment being used in food preparation.  I ensure that all kitchen staff are properly dressed, using proper hand washing, gloves, utilization of hair nets, and other sanitation measures while cleaning, working in the kitchen generally, and specifically preparing food.

5.     Sanitation procedures require wiping down food preparation counters, proper scrubbing of surfaces and equipment and proper sanitation of both.  The floors are and must be swept and mopped including under equipment.  Employees scrub floors on their hands and knees with soap and water if there are stains that are not removed with mopping.  I have observed this numerous times. Cleaning processes include looking under equipment and other "hidden" areas for mouse droppings to ensure that there is no vermin intrusion into the food service areas.

6.     There is a scullery which scrubs and washes all dishes and pots utilizing the proper sanitation methods.

7.     There are trash cans in the food services areas and trash is taken out regularly by non-Incarcerated Persons, who are not allowed to exit the facilities and carry out trash for security reasons. I inspect the trash areas for general cleanliness.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on December 16, 2024, at San Diego, California.

SERGIO SANCHEZ

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4924-6911-7703 v1                    - 3 -                    3:20-CV-00406-AJB-DDL
SANCHEZ DECLARATION ISO MSJ

# 7.

# DECLARATION OF SCOTT BENNETT

Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
Martin Kosla (SBN 247224)
E-mail: mkosla@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA 92101-8474
Tel: 619.814.5800 Fax: 619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Suite 1000
San Jose, California 95113-2336
Tel: 408.606.6300 Fax: 408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO (Also erroneously
sued herein as SAN DIEGO COUNTY
SHERIFF'S DEPARTMENT, and SAN
DIEGO COUNTY PROBATION
DEPARTMENT)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00406-AJB-DDL **DECLARATION OF DARREN SCOTT BENNETT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | **Hearing**<br>Date: March 6, 2025<br>Time: 2:00 p.m.<br>Ctrm: 4A |
| v. | |
| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, et.al., | Judge: Anthony J. Battaglia |
| Defendants. | Magistrate Judge: David D. Leshner |

I, DARREN SCOTT BENNETT, declare as follows:

1.      I have personal knowledge of the matters herein and would

competently testify to them if called to do so.  I am Project Manager for the San Diego County Sheriff's Department.  I started with the County in 1986 and moved to the Sheriff's Department in 2006.  As Project Manager, I am responsible to oversee maintenance including 5 direct report staff and supervision of 75 dedicated maintenance people, construction projects for all aspects of construction at the jail facilities including maintenance issues and addressing requested upgrades as part of construction projects which are issued by different divisions within the Sheriff's Department.  I am the asbestos and lead coordinator for all Sheriff facilities and the Contract Operations Representative for 5 different County contracts for the jails including security, epoxy, detention equipment (locks, etc.), audio and video equipment and liquid waste removal.  I am responsible to ensure that all contractors are fulfilling their contract requirements with the Sheriff's Department contracts and complying with applicable Board of State and Community Corrections standards.

2.    At the George Bailey Facility, a remodel is ongoing and is more than 50% completed. The remodel involves removing triple bunks and replacing them with double bunks, cleaning ducts, and painting.  It also includes new intercoms, new surveillance cameras, new computers and control panels (touch screen), with a cloud-based recording system for longer retention of video. Intercom calls are also able to be recorded with the new system.  Units 7 and 9 are completed, 5 is nearly completed, and 8 will be done by February 2025. The entire remodel is estimated to be completed in early 2026.

3.    At the Central Jail, the elevator modernization program has been completed and the elevators now function well.  Funding has been allocated for new surveillance cameras (higher quality as well as more camera locations), new intercoms, and recording systems, and the project should begin in 6-7 months (after approval of plans and procurement) with an estimated completion date in 18 months.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

- 2 -

3:20-CV-00406-AJB-DDL
BENNETT DECLARATION ISO MSJ

4.      At Rock Mountain, the Facility already has new surveillance cameras and new intercoms installed.

5.      At East Mesa, infrastructure for Body Worn Cameras will be installed by February 2025. Funding has been requested to install new surveillance cameras and new intercoms at both East Mesa and Las Colinas.

6.      At the Vista Jail, the County is in process of re-doing the interiors. The design process and procurement takes 6-8 months.  This will result in new surveillance cameras and intercoms, with cloud storage for surveillance video.

7.      The goal of the above projects is to improve safety and security by improving our technology in the jails with more and better surveillance cameras, infrastructure for Body Worn Cameras, new and better intercom systems, more storage for video and other media, and new computers and monitors to operate the technology.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on December 16, 2024, at San Diego, California.

DARREN SCOTT BENNETT

Burke, Williams &
Sorensen, LLP
Attorneys At Law
san diego

- 3 -

3:20-CV-00406-AJB-DDL
BENNETT DECLARATION ISO MSJ

# 8.

# DECLARATION OF FRANCIS GARDINER

Susan E. Coleman (SBN 171832)
E-mail:  scoleman@bwslaw.com
Martin Kosla (SBN 247224)
E-mail:  mkosla@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA  92101-8474
Tel:  619.814.5800      Fax:  619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail:  epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA  95113-2336
Tel:  408.606.6300      Fax:  408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
DEPARTMENT

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No.  3:20-cv-00406-AJB-DDL

**DECLARATION OF F. GARDINER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Hearing**
Date:   March 6, 2025
Time:   2:00 p.m.
Ctrm:   4A

Judge: Anthony J. Battaglia

Magistrate Judge: David D. Leshner

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

4864-1535-5170 v5                              - 1 -                    3:20-CV-00406-AJB-DDL
                                                                        GARDINER DECL. ISO MSJ

1    I, F. GARDINER declare as follows:

2        1.    I am a Sergeant in the Las Colinas Contraband Narcotics Interdiction

3    Team (CNIT) of the Detention Services Bureau of the San Diego County Sheriff's

4    Office. I have been employed with the San Diego County Sheriff's Office for more

5    than 17 years.

6        2.    I have personal knowledge of the matters set forth herein, except as to

7    those matters stated on information and belief, and would competently testify

8    thereto if called and sworn as a witness.

9        3.    CNIT, of which I am a member, tries to keep the jails free of drugs and

10   contraband through information-led policing and technology screening. We work

11   collaboratively with DIU (Detention Investigations Unit) to interdict narcotics

12   being introduced to the jail by new arrestees and being sent through the mail.

13       4.    There are CNIT teams stationed at each intake facility (Central Jail,

14   Las Colinas, and Vista). The mission statement of CNIT is as follows: "The San

15   Diego County Sheriff's Office Contraband and Narcotics Interdiction Team is

16   dedicated to preventing illegal drugs and contraband from entering our jail facilities

17   through vigilant screening, preliminary investigations, and proactive measures."

18       5.    San Diego county jails use body scanners, X-ray machines, pat downs

19   and strip searches, as one method to try to detect drug smuggling.

20       6.    Narcotics are a huge problem in county jails and state prisons because

21   the value of drugs increases in custody, where supply is scarcer, and there may be

22   people in withdrawal who are desperate to obtain narcotics. Additionally, many of

23   the incoming incarcerated persons are arrested and booked for narcotics-related

24   offenses (use, sale, or crimes related to drugs such as thefts/burglaries to obtain

25   money to buy narcotics) and/or have narcotics addictions.

26       7.    Body scanners are used on each incarcerated person during the intake

27   process after they arrive at the jail, to detect any foreign objects they may have

28   secreted inside a body cavity. These can include narcotics or sometimes a weapon.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4864-1535-5170 v5    - 2 -    3:20-CV-00406-AJB-DDL
GARDINER DECL. ISO MSJ

If a foreign object is detected, the person is asked to voluntarily produce the object or is sent to the hospital for removal of the object if they refuse. Policy I.50 governs use of the body scanner and X-rays.[1]

8.   Body scanners may also be used on incarcerated persons when they return from places like court, a social or professional contact visit, or a doctor's appointment, where they may have interacted with someone and/or received contraband. If a body scan is refused by the incarcerated person, they are to be strip searched and/or put on contraband watch. Attached as Exhibit A is a true and correct copy of a flow chart showing the process for screening of contraband.

9.   We also use information led policing to help locate narcotics inside the jails and in the community, and we take measures in both arenas to interdict and seize drugs.

10.   All mail is sent directly to the mail processing center (MPC) located at the Las Colins Detention and Reentry Facility. Six deputies are assigned to the MPC.  All mail is opened and inspected unless it is identified as "legal mail." The non-legal mail is scanned for criminal communication, any violation of SDSO Policies, and is also screened for the presence of narcotics or contraband. This is done with personal protective equipment donned and using a filtered downdraft table to limit exposure of harmful substances. Narcotic saturated mail (*i.e.* paper soaked with fentanyl) is the most common contraband mail that is identified.

11.  Incoming mail is inspected for suspicious indicators. If mail is deemed as being suspicious, then it is screened further with the use of investigative lighting, TruNarc, Narcotic Identified Kit (NIK), and potentially by K9s.

12.   If legal mail is identified as being suspicious, the attorney or law firm is contacted to verify that it is the sender. If they deny sending the document, the

---

[1] This policy is available online at :
https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Detentions%20Policy%20and%20Procedure%20Sections/Section%20I%20-%20SECURITY%20AND%20CONTROL/i50.pdf

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4864-1535-5170 v5                    - 3 -                    3:20-CV-00406-AJB-DDL
GARDINER DECL. ISO MSJ

mail is inspected. If they confirm having sent the mail, it is forwarded to the incarcerated person. All legal mail is sent to the Facility for distribution after being processed.

13.    Once mail is inspected and cleared of contraband, it is forwarded to the incarcerated party.

14.    Attached as Exhibit B is a true and correct copy of a PowerPoint presentation about CNIT that was given to the grand jury.  The information and data contained therein is true and accurate. In 2024 as compared to 2023, there has been a 35% increase in screenings. On average, approximately 11% of all screenings in 2023 and 2024 have resulted in the seizure of drugs, weapons, or other miscellaneous contraband. January to July 2024 showed a 24% increase in contraband seizure when compared to the same period in 2023. There has also been an increase in narcotics seizures in the facilities. Not coincidentally, the number of overdose incidents has decreased more than 50% in 2024 as compared to 2023.

15.    Trained canine officers (K9) are used to screen suspicious mail. There have been several successful identifications of drug tainted mail with the use of Sheriff's K9s. Additionally, K9s are used withing the facilities to complete sniffs of housing areas, common areas and holding cells. The K9s have countless times given an indication or alert to an area where drugs have been discovered and identified. When an incarcerated person pulls a Narcan unit out of the box (available in each day room and holding/intake rooms), it sounds an alarm that triggers a search of the unit typically with use of a K9.  K9s are also used to conduct sniffs on the exterior of the facility to identify persons, vehicles, and property that contain or possess narcotics. In the Detentions K9 unit, there are 5 in service dogs and 2 currently in the academy. The K9s are trained to detect odors of fentanyl, cocaine, meth, heroin and derivates.  K9s are subjected to a call out schedule and typically always utilized for searches being conducted in the jails.
///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4864-1535-5170 v5                          - 4 -                          3:20-CV-00406-AJB-DDL
GARDINER DECL. ISO MSJ

16.    We are concerned about the safety of incarcerated persons, particularly with the advent several years ago of fentanyl, which is lethal in micro-doses, and the Sheriff's Office (including DIU and CNIT) are actively working to prevent the introduction of narcotics into the jails.  However, despite our best efforts to prevent drugs from coming into prisons and jails, incoming arrestees/inmates/parolees are creative at finding new ways to bring in drugs and to try to avoid detection. We are actively working with the Detention Investigations Unit (DIU) to locate and seize any drugs that do make it into the County jails.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on December 12, 2024, at San Diego, California.

F. GARDINER, SGT.

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

4864-1535-5170 v5

- 5 -

3:20-CV-00406-AJB-DDL
GARDINER DECL. ISO MSJ

# EXHIBIT A



**"High Risk" Booking**
- Warrant Self-Surrender
- Flash Incarceration
- Probation Remand
- Drug Court Remand
- US/Mexico POE Arrest
- Transportation/Drug Sales/4573 PC

Abnormal Body Scan or Refuses Scan

Contacted by DIU or "PDI"/"DSR" JIMS Hazard

Obvious Abnormality or Self-Admission of Body Carrying

Claims to Have Ingested Narcotics

**Considerations for Secondary Screening:** Possession/Paraphernalia Charges (H&S), Evading, Delayed Arrest, Conversation with AO/10-16, prior contraband watch/naloxone deployment/suspect of a search, ETC.

**Begin Secondary Screening:** Strip Search, Pelvic X-Ray, Additional Body Scan, Supervised Bowel Movement, Safety Questions, Segregate Pending Results

Additional Screening Indicates Contraband?

Attempt to Have IP Remove Willingly, Obtain Medical Evaluation, Contact DIU/CNIT Sgt. and Prepare for Emergency Department Send Out (P&P J.8) with J-206 & J-207

Yes

No

Continue Booking Process or Return to Housing

IP should be admonished regarding 4573 PC and the dangers of drug smuggling at each point in the process. (Capture on BWC)

Rejection or Medical Emergency

With J-206 & J-207

Facility Medical Evaluation and Transport to the nearest Emergency Department

DIU notifications should be made through the Communications Center 858-565-5025

# EXHIBIT B



**SAN DIEGO COUNTY SHERIFF'S OFFICE**

**Detention Investigations Unit**

**Contraband and Narcotics Interdiction Team**

**Lieutenant Aaron Meleen**






# CNIT Facilities





Las Colinas Detention
and Reentry Facility
Sgt. Francis Gardiner

Vista Detention Facility
Sgt. Ryan Lovelace



San Diego Central Jail
Sgt. Jessica Applebaum

# CNIT | Process



Research History



Pat down



Body Scan






# CNIT | Process



Body Scan





X-Ray




# CNIT | Enhanced Screening Process

**CNIT Overall Screenings | Per Facility**
2023 (Jan-Dec) & 2024 (Jan-Jul)

| Facility | 2023 | 2024 YTD | Total |
|---|---|---|---|
| SDCJ | 4542 | 2351 | 6893 |
| LCDRF | 342 | 845 | 1187 |
| VDF | 279 | 548 | 827 |
| **Grand Total** | **5163** | **3744** | **8907** |



- In 2023, there were a total of 5,163 Screenings (January – December)

- So far in 2024, there have been a total of 3,744 screenings from January – July.

- Approximately 77% of all screenings occur at SDCJ, 14% at LCDRF, and 9% at VDF

- Comparing overall screenings for the first seven months of 2023 (2,781) versus the same timeframe for 2024 (3,744), there has been a **35% increase** in screening in 2024




# CNIT | Enhanced Screening Process

Total Screenings 2023: 5,163, 2024 YTD: 3,744

| Screening Outcome | 2023 | 2024 YTD |
|---|---|---|
| Rejected | 247 | 96 |
| Sent to Secondary | 4,293 | 3,389 |
| Contraband Seized (at any point) | 587 | 376 |

| Contraband Identified | 2023 | 2024 YTD |
|---|---|---|
| Pat-down | 442 | 141 |
| Scanner | 191 | 136 |
| Strip Search | 66 | 42 |
| X-Ray | 94 | 27 |

- Approximately 5% of all screenings in 2023 and 3% in 2024YTD were Rejected
- Approximately 83% of all screenings in 2023 and 91% in 2024YTD were Sent to Secondary Screening
- Approximately 11% of all screening in 2023 and 10% in 2024YTD resulted in Contraband seizure

o Approximately 9% of all screenings in 2023 and 4% in 2024YTD led to contraband seizures during Pat-down.

o Approximately 4% of all screenings in 2023 and 2024YTD led to contraband seizure by Scanner anomaly detection.

o Approximately 1% of all screenings in 2023 and 2024YTD led to contraband seizure during Strip Search

o Approximately 2% in 2023 and 1% in 2024YTD led to contraband seizure by X-Ray anomaly detection






# CNIT | Seized Contraband

### Overall Screenings with Contraband Seizures
2023 (Jan-Dec) & 2024 (Jan-Jul)

| Type of Contraband | 2023 | 2024 YTD | Total |
|---|---|---|---|
| Contraband Seized | 587 | 376 | 963 |
| *Drug* | *495* | *331* | *826* |
| *Drug & Weapon* | *4* | *7* | *11* |
| *Weapon* | *34* | *12* | *46* |
| *Other* | *54* | *26* | *80* |
| No Contraband Seized | 4576 | 3368 | 7944 |
| **Grand Total** | **5163** | **3744** | **8907** |




- On average, approximately 11% of all screenings have resulted in the seizure of Drugs, Weapons, or other miscellaneous contraband (lighters, cigarettes, money, etc.)



SCREENINGS WITH CONTRABAND SEIZURE
2023 VS 2024 (JAN-JUL)

- 2023 (304)
- 2024 (376)

| | Drug | Other | Weapon | Drug & Weapon |
|---|---|---|---|---|
| 2023 | 256 | 33 | 13 | 2 |
| 2024 | 331 | 26 | 12 | 7 |



- 2024 (Jan-Jul) has seen an overall increase of 24% in contraband seizure when compared to 2023 (Jan-Jul)




# CNIT SEIZURES

(Once Inside the Facility)

**CNIT-Related Incident Counts | All Facilities**

| Incident Type | 2023 (Jan-Jul) | 2024 (Jan-Jul) |
|---|---|---|
| Drug | 36 | 89 |
| Paraphernalia | 3 | 2 |
| Weapon | 2 | 6 |
| Grand Total | 41 | 97 |

❖ Total 740.9 grams seized in 2024 equals to approximately 1.6 pounds of narcotics seized

**CNIT-Related Seizures | All Facilities**

| Drug Type (Grams) | 2023 (Jan-Jul) | 2024 (Jan-Jul) |
|---|---|---|
| Fentanyl (Powder & Pill) | 180.2 | 331.6 |
| Meth | 130.1 | 247.5 |
| Marijuana | 17.6 | 23.0 |
| Heroin | 38.4 | 23.3 |
| Cocaine | 1.0 | 10.3 |
| Controlled Pills in Grams | | 79.4 |
| Unk Substance | | 3.6 |
| Other Controlled | 0.7 | 21.1 |
| Suboxone | 1.0 | 1.1 |
| Grand Total | 369.1 | 740.9 |



**CNIT Drug Seizures (in Grams)**
2024 YTD (Jan-Jul)

| Fentanyl | Meth | Heroin | Cocaine |
|---|---|---|---|
| 331.6 | 247.5 | 23.3 | 10.3 |



# CNIT – SEIZURE HIGHLIGHTS



CNIT Deputy identified anomalies during an X-ray.  Three packages were seized containing a total of 54.15 grams of Fentanyl and 15.05 grams of Methamphetamine



CNIT Deputy conducted a body scan on a subject and discovered an anomaly in the lower pelvic region.  Deputies seized four bindles containing a total of 102.14 grams of Methamphetamine and a bundle containing 10.05 grams of Fentanyl



CNIT Deputy identified anomalies during an X-ray.  The subject was found in possession of two packages.  The packages seized contained a total of 72.18 grams of Fentanyl





# OVERDOSE CASES | 2023 vs 2024 (Jan-Jul)

| Month | 2023 Overdoses | 2024 Overdoses |
|-------|----------------|----------------|
| January | 14 | 4 |
| February | 9 | 4 |
| March | 8 | 1 |
| April | 6 | 2 |
| May | 3 | 5 |
| June | 8 | 2 |
| July | 8 | 2 |
| August | 10 | |
| September | 3 | |
| October | 3 | |
| November | 5 | |
| December | 6 | |
| Gand Total | 83 | 20 |



❖ 2023: 56 overdose cases between January – July

❖ 2024: 20 overdose cases between January – July

❖ Overall decrease of **64%** in 2024

❖ The total number of overdose incidents are expected to be ~ 34 incidents for all of 2024, should the trend continue

*The incidents displayed in this report were determined, upon medical review, to be a result of or related to a drug overdose based on the primary medical diagnosis presented by the treating emergency room.

# 9.

# DECLARATION OF REBECCA CARDENAS

1  Susan E. Coleman (SBN 171832)
   E-mail: scoleman@bwslaw.com
2  Martin Kosla (SBN 247224)
   E-mail: mkosla@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   501 West Broadway, Suite 1600,
4  San Diego, CA 92101-8474
   Tel: 619.814.5800    Fax: 619.814.6799
5
   Elizabeth M. Pappy (SBN 157069)
6  E-mail: epappy@bwslaw.com
   BURKE, WILLIAMS & SORENSEN, LLP
7  60 South Market Street, Ste. 1000
   San Jose, CA 95113-2336
8  Tel: 408.606.6300    Fax: 408.606.6333

9  Attorneys for Defendants
   COUNTY OF SAN DIEGO (Also
10 erroneously sued herein as SAN DIEGO
   COUNTY SHERIFF'S DEPARTMENT,
11 and SAN DIEGO COUNTY
   PROBATION DEPARTMENT)

12                UNITED STATES DISTRICT COURT

13              SOUTHERN DISTRICT OF CALIFORNIA

14

15 DARRYL DUNSMORE, ANDREE          Case No. 3:20-cv-00406-AJB-DDL
   ANDRADE, ERNEST ARCHULETA,
16 JAMES CLARK, ANTHONY             **DECLARATION OF REBECCA**
   EDWARDS, LISA LANDERS,           **CARDENAS IN SUPPORT OF**
17 REANNA LEVY, JOSUE LOPEZ,        **DEFENDANTS' MOTION FOR**
   CHRISTOPHER NELSON,              **SUMMARY JUDGMENT**
18 CHRISTOPHER NORWOOD, JESSE
   OLIVARES, GUSTAVO
19 SEPULVEDA, MICHAEL TAYLOR,
   and LAURA ZOERNER, on behalf of  **Hearing**
20 themselves and all others similarly  Date:    March 6, 2025
   situated,                        Time:    2:00 p.m.
21                                  Ctrm:    4A
               Plaintiffs,
22                                  Judge: Anthony J. Battaglia
           v.
23                                  Magistrate Judge: David D. Leshner
   SAN DIEGO COUNTY SHERIFF'S
24 DEPARTMENT, COUNTY OF SAN
   DIEGO, SAN DIEGO COUNTY
25 PROBATION DEPARTMENT, and
   DOES 1 to 20, inclusive,
26
               Defendants.
27

28

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4912-2618-0101 v2                         1                    3:20-cv-00406-AJB-DDL
                                                                    CARDENAS DECL.

I, REBECCA CARDENAS declare as follows:

1.      I have personal knowledge of the matters herein and would competently testify to them if called to do so.  I am the Program Coordinator in the Reentry Services Division of the San Diego County Sheriff's Office.  I have worked for the Sheriff's Office for 13 years.

2.      All pro per male incarcerated persons (those representing themselves in criminal cases) are housed at the San Diego Central Jail (except in the case of special housing requirements for a particular person). They are provided a minimum of 3 hours per week research time with an average of 6 hours (it fluctuates depending on the demand). The law library is open from 7 am to 3 pm, Monday to Thursdays, and 5 persons at a time are permitted in the library.  The library is staffed by a correctional counselor and one deputy.

3.      All pro per female incarcerated persons (those representing themselves in criminal cases) are housed at the Las Colinas Jail.  They are provided a minimum of 3 hours per week research time (they may get more time depending on the demand).  The law library is open from 7 am to 3 pm, Monday to Thursdays, and is staffed by a correctional counselor and one deputy.

4.      All pro per incarcerated persons are given weekly supplies including papers, pencils, erasers, and envelopes.  If an assistant is needed, such as to file papers with the court, it is granted by the court and the library correctional counselor emails the documents to their appointed assistant. The pro per persons have access to Lexis/Nexis research in the library.

5.      The County has a contract with an outside service (Legal Research Associates) to provide pro per incarcerated persons in criminal cases with up to 5 items or 50 pages per month, using the LRA request form.  They can make one request per calendar month.

6.      For persons who are representing themselves in civil lawsuits, they are governed by the conditions of confinement policy (N.6). Designation of this status is

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4912-2618-0101 v2

2

3:20-cv-00406-AJB-DDL
CARDENAS DECL.

1    done based on receipt of court documents. They are assigned to a correctional

2    counselor at their housed Facility, and they are also given supplies. These persons

3    can have 2 LRA requests per month limited to 50 pages per request.

4         7.    The following Sheriff's Office Detention Services Bureau policies

5    govern incarcerated persons' access to courts, lawyers, research, and legal

6    assistance:

7         (b) N.6 – conditions of confinement incarcerated persons. The purpose

8    of this policy is to establish uniform procedures for the treatment of self-

9    represented incarcerated persons(s) in "conditions of confinement" lawsuits.

10   A true and correct copy of this policy is attached hereto as Exhibit D.

11        (c) N.7 – in propria persona status (pro per incarcerated persons). The

12   purpose of this policy is to establish uniform procedures for the treatment of

13   incarcerated persons granted in propria persona (Pro Per) status by the courts.

14   A true and correct copy of this policy is attached hereto as Exhibit E.

15        (d) T.3 – legal research area rules.  The purpose of this policy is to

16   establish rules and procedures by which In Propria Persona (Pro Per)

17   incarcerated persons shall abide by using the Legal Research Areas.  A true

18   and correct copy of this policy is attached hereto as Exhibit G.

19        (e) T.7 – legal assistance to incarcerated persons. This policy outlines

20   what a Sheriff's Department employee, working within a detention facility,

21   may and may not do to assist an incarcerated person with legal matters. A true

22   and correct copy of this policy is attached hereto as Exhibit H.

23   I declare under penalty of perjury under the laws of the United States of

24   America that the foregoing is true and correct to the best of my knowledge.

25   Executed on December 11, 2024, at San Diego, California.

26

27

28

REBECCA CARDENAS

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4912-2618-0101 v2

3

3:20-cv-00406-AJB-DDL
CARDENAS DECL.

# EXHIBIT D

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| **DATE:** | MAY 13, 2022 |
| **NUMBER:** | N.6 |
| **SUBJECT:** | CONDITIONS OF CONFINEMENT INCARCERATED PERSONS |
| **RELATED SECTIONS:** | I.41, P.3 |

PURPOSE

To establish uniform procedures for the treatment of self-represented  incarcerated person(s) in "conditions of confinement" lawsuits.

POLICY

All facilities will provide fair and equitable treatment for self-represented  incarcerated person(s) involved in "conditions of confinement" actions. Conditions of confinement  incarcerated person(s) are not considered "Pro-Per" incarcerated person(s) for the purpose of Detention Services Bureau Policies and Procedures (DSB P&P) section N.7 with actions against the county.

PROCEDURE

I.      CONDITIONS OF CONFINEMENT STATUS

A.      County counsel will send a copy of the first page of the court filing which will identify the plaintiff ( incarcerated person) to the supervising correctional counselor (SCC) at the San Diego Central Jail (SDCJ) of any  incarcerated person that has been granted self-representation by the court.

B.      The SCC at SDCJ will notify the Jail Population Management Unit (JPMU) sergeant of the status change. The JPMU sergeant will enter the "Conditions of Confinement  Incarcerated Person" (CCI) hazard into the Jail Information Management System (JIMS).

C.      The SCC at the facility where the conditions of confinement  incarcerated person is housed will be notified of the status change, so they may start providing the accommodations described in this section.

D.      The watch commander is authorized to suspend for cause any of the conditions of confinement accommodations herein ordered.

E.      The  incarcerated person may appeal by filing a grievance to the facility commander.

II.      CONDITIONS OF CONFINEMENT SUPPLIES

A.      The following items may be purchased from commissary and may be possessed by conditions of confinement  incarcerated people in reasonable quantities:

1.      Ruled legal pad

2.      Standard legal-size envelopes

     3.     Golf pencils, lead black

     4.     Erasers

B.     Indigent conditions of confinement incarcerated people will be given a supply of the above items by the correctional counselor, which will be paid for by the incarcerated person welfare fund. Replacement of any of the items listed above shall be accomplished through a written request to the correctional counselor. The correctional counselor will determine the validity of the request and furnish the appropriate supplies.

C.     The correctional counselor will provide one copy of an incarcerated person's final legal conditions of confinement case work product upon their request.

III.     COMMUNICATION

A.     Telephone

Conditions of confinement incarcerated people may use the phones in their housing areas to place calls concerning their cases. Abuse of the telephone may result in the loss of telephone privileges.

B.     Mail

     1.     Conditions of confinement incarcerated people are authorized to mail all correspondence necessary for their lawsuit, at their own expense. Only that correspondence which meets the confidential/legal mail definition will be handled as such. All other mail will be subject to the general provisions (refer to DSB P&P section P.3 regarding incarcerated person mail).

     2.     Indigent conditions of confinement incarcerated people may submit their legal correspondence to the correctional counselor who will affix the needed postage or mail it through county messenger mail.

IV.     ACCESS TO LEGAL RESOURCES

Conditions of confinement incarcerated people will access legal resources through the Legal Research Associates (LRA) request. Conditions of confinement incarcerated people will be allowed two LRA requests per month. The requests and responses will be logged by the correctional counselors.

V.     HOUSING AND MISCELLANEOUS

A.     Conditions of confinement incarcerated people shall be housed in areas that are compatible with their classification status.

B.     The correctional counselor will keep a log for each conditions of confinement incarcerated person. The log will have a list of supplies furnished (if determined to be indigent), LRA requests and responses, and special requests approved.

C.    Incarcerated person request forms from conditions of confinement  incarcerated peoplerequesting additional items will be forwarded to the correctional counselor for review.

VI.    CELL/PROPERTY SEARCHES

Cell or property searches of conditions of confinement  incarcerated person's"legal" materials will be carried out in compliance with DSB P&P section I.41 regarding privileged communication.

# EXHIBIT E

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| **DATE:** | MAY 13, 2022 |
| **NUMBER:** | N.7 |
| **SUBJECT:** | IN PROPRIA PERSONA STATUS (PRO PER INCARCERATED PERSONS) |
| **RELATED SECTIONS:** | N.3, N.5, P.3, T.7 |

PURPOSE

To establish uniform procedures for the treatment of incarcerated people granted in propria persona (Pro Per) status.

POLICY

All facilities will provide fair and equitable treatment for incarcerated persons with Pro Per status.

PROCEDURE

I.    IN PROPRIA PERSONA (PRO PER) STATUS

    A.    An incarcerated person who is granted Pro Per status by court order in a current criminal case shall receive the privileges described in this section.

    B.    Pro Per privileges are granted for criminal cases only. Civil, juvenile and family law cases are not eligible for Pro Per privileges but may be granted Pro Per status by the court.

    C.    Pro Per privileges will terminate upon sentencing or the conclusion of their conditions of confinement case in the trial court.

    D.    The detention processing technician (DPT) receiving the court order will make three copies of the order and distribute one to the facility correctional counselor, one to the watch commander and one to a Jail Population Management Unit (JPMU) sergeant at the San Diego Central Jail (SDCJ). JPMU will enter the Pro Per status into the Jail Information Management System (JIMS). The watch commander is authorized to suspend any of the Pro Per rights herein ordered for cause.

        1.    The Sheriff or designee shall immediately notify the court of any suspension or limitation of any of the described privileges.

        2.    The incarcerated person may appeal to the facility commander. If not satisfied, the incarcerated person may petition the court, which may in turn order a hearing to determine if the suspended privileges shall be restored.

II.    PRO PER SUPPLIES

    A.    The following items will be furnished by the Sheriff's Department or appointed legal assistants at the discretion of the correctional counselor. Regardless of their origin, any supplies given to a Pro Per incarcerated person shall be distributed and accounted for by the correctional counselor. These items may be possessed by the Pro Per incarcerated person in reasonable quantities.

1.      Pleading paper, 8 ½ x 11 (up to ½ ream at any one time)

2.      Ruled legal pads

3.      Standard legal-size envelopes

4.      Golf pencils, lead black

5.      Erasers

6.      One legal size accordion file

7.      9 x 12 manila envelopes (for prepared mailings only)

8.      Access to the legal research area

B.      Replacement of any of the items listed above shall be accomplished through a written request to the correctional counselor. The correctional counselor will determine the validity of the request and furnish the appropriate supplies. Supplies provided by legal assistants will be received and distributed by the correctional counselor. All supplies given to the incarcerated person will be logged by the correctional counselor in a Pro Per file. Any supplies that are in addition to what is supplied by the Sheriff's Department must be accompanied by a court order and supplied by Office of Assigned Counsel (OAC).

C.      Access to ball point pens will be provided through the correctional counselor for signature purposes only. The correctional counselor will provide the pen and supervise its use. The pen will be returned to the correctional counselor immediately after all the necessary ink signatures are completed.

D.      The correctional counselor will duplicate one copy of an incarcerated person's final legal (criminal case) work product when ready to mail. If the incarcerated person needs additional copies made, the incarcerated person will arrange for a legal assistant to have it completed for them.  Incarcerated people may purchase their own legal books to assist them in researching their case (refer to Detention Services Bureau Policies and Procedures section P.3 for additional information regarding personal books). Personal books must be marked with the incarcerated person's name and booking number. Any books not authorized to be in the incarcerated person's possession in their cell or housing module will be stored in the correctional counselor's office and can be checked out for use during regular legal research area hours.

III.    LEGAL RUNNERS, INVESTIGATORS, AND/OR LEGAL RESEARCH AIDS

A.      Each Pro Per incarcerated person in a criminal case may be authorized a legal runner/paralegal, investigator and/or a person authorized to aid them, none of which shall be at the expense of the Sheriff's Department, and each of whom is subject to approval by the court. All appointed assistants, except the legal runner/paralegal, should be named specifically in the Pro Per court order.

B.    Procedures for visiting with a Pro Per incarcerated person.

    1.    Visits will be conducted utilizing the social visit phone system. Contact visits may be approved by the watch commander for special circumstances (this does not include attorneys).

    2.    Each appointed assistant is subject to security clearance by the Sheriff's Department.

    3.    All combined appointed assistants shall be authorized not more than one visit each day between the hours of 0730-2100 hours.

    4.    Additional visits per day may be approved by the watch commander by submitting an incarcerated person request form to the watch commander prior to the visit.

    5.    Visits shall be reasonable length (one hour maximum).

    6.    It is the Pro Per incarcerated person's responsibility to plan and coordinate which assistant will visit on a particular day. The detention facility will process assistants on a first come, first served basis.

C.    Materials brought to the detention facility by the legal runner will be examined by Sheriff's personnel for security reasons and shall be routed through the correctional counselor for logging and distribution.

    1.    The supplies shall be examined by a deputy insofar as it is necessary to determine that it is authorized and not a security concern.

    2.    All reference materials and texts delivered to the Pro Per incarcerated person will be logged by the correctional counselor in the incarcerated person's Pro Per file.

IV.    COMMUNICATION, TELEPHONE, MAIL, AND SUBPOENA PRIVILEGES

A.    Telephone

    1.    Pro Per incarcerated people may use the phones in their housing areas to place calls concerning their cases.

    2.    Calls to the OAC can be made at no cost utilizing the speed dial number on the housing unit incarcerated person telephone. All other calls will be made using collect or debit telephone calling options at the called party's or incarcerated person's expense. Abuse of the telephone may result in the loss of telephone privileges.

B.    Mail

    1.    Pro Per incarcerated people are authorized to mail all correspondence necessary for their defense, at their own expense. The housing deputy or Pro Per deputy will examine the mail in the same manner as regular legal mail.

2.    Legal mail must be clearly identified by the incarcerated person as "legal mail" or "confidential." Correspondence with the state or federal courts, any member of the State Bar or holder of public office, Citizens Law Enforcement Review Board (CLERB), Internal Affairs, Office of the Sheriff, the Board of State and Community Corrections (BSCC), and Prison Rape Elimination Act (PREA) auditors are considered confidential/legal mail.

3.    Indigent Pro Per incarcerated people may send legal mail to the courts or their attorney at no cost by submitting it to the correctional counselor.

4.    Certain mail for other county offices may be sent via inter-office county mail without postage.

C.    Subpoenas and Habeas Corpus forms

1.    Subpoenas and habeas corpus forms shall be supplied to the Pro Per incarcerated person by the correctional counselor following the Pro Per rules and regulations guidelines.

2.    Other legal forms may be obtained by the Pro Per incarcerated person by writing to the appropriate court.

3.    Legal forms filled out by the incarcerated person shall be forwarded to the trial court via the legal runner.

V.    LEGAL RESEARCH AREA

Legal research area operational hours should be utilized to ensure maximum access for Pro Per incarcerated people but also supportive of detention facility security needs. This legal research area time will allow access to the computers and research kiosks and available materials for legal research purposes only.

A.    Assigned or Designated Male Pro Per incarcerated people

1.    Assigned or Designated Male Pro Per incarcerated people will generally be housed at SDCJ giving them access to the legal research area.

2.    Monday through Thursday, mainline Pro Per incarcerated people will be afforded between forty-five minutes and two hours of legal research area time depending upon the number of Pro Per incarcerated population.

3.    Pro Per incarcerated people will generally be given three hours per week of legal research area time, subject to reduction if increases in the Pro Per incarcerated person population require that the hours be reduced in order to accommodate the increased population.

4.    Pro Per incarcerated people assigned to protective custody or administrative separation housing will be provided access to the legal research area with only those limitations to ensure for the incarcerated person's safety and need to be isolated from other incarcerated population.

B.     Assigned or Designated Female Pro Per incarcerated people

    1.     Assigned or Designated Female Pro Per incarcerated people will be housed at the Las Colinas Detention and Reentry Facility (LCDRF).

    2.     LCDRF has one designated legal research area and one research kiosk. This legal research area is located in the library building. Incarcerated people assigned to housing units that are allowed to walk unescorted throughout the facility will have access to the legal research area located in the library. Incarcerated people assigned to housing units requiring escort throughout the facility will use one of the assigned rooms located within their housing unit. Counseling staff will consult with the watch commander to establish which of the rooms within the housing unit should be utilized as the legal research area.

    3.     Pro Per incarcerated people will be given a minimum of three hours per week access to the legal research area. A schedule for usage of the legal research area will be made by the counseling staff based off of the number of Pro Per population in the facility.

VI.     HOUSING AND MISCELLANEOUS

A.     Pro Per incarcerated people shall be housed in regular housing that is compatible with their classification status.

B.     The correctional counselor will keep a log for each Pro Per incarcerated person. The log will have a copy of the court order and will list supplies furnished, phone calls completed, special requests approved, etc. Incarcerated person request forms from Pro Per incarcerated people requesting additional items will be forwarded to the correctional counselor for review. The Pro Per deputy will review the request for safety and security issues.

# EXHIBIT G

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| **DATE:** | MAY 13, 2022 |
| **NUMBER:** | N.7 |
| **SUBJECT:** | IN PROPRIA PERSONA STATUS (PRO PER INCARCERATED PERSONS) |
| **RELATED SECTIONS:** | N.3, N.5, P.3, T.7 |

PURPOSE

To establish uniform procedures for the treatment of incarcerated people granted in propria persona (Pro Per) status.

POLICY

All facilities will provide fair and equitable treatment for incarcerated persons with Pro Per status.

PROCEDURE

I.     IN PROPRIA PERSONA (PRO PER) STATUS

    A.     An incarcerated person who is granted Pro Per status by court order in a current criminal case shall receive the privileges described in this section.

    B.     Pro Per privileges are granted for criminal cases only. Civil, juvenile and family law cases are not eligible for Pro Per privileges but may be granted Pro Per status by the court.

    C.     Pro Per privileges will terminate upon sentencing or the conclusion of their conditions of confinement case in the trial court.

    D.     The detention processing technician (DPT) receiving the court order will make three copies of the order and distribute one to the facility correctional counselor, one to the watch commander and one to a Jail Population Management Unit (JPMU) sergeant at the San Diego Central Jail (SDCJ). JPMU will enter the Pro Per status into the Jail Information Management System (JIMS). The watch commander is authorized to suspend any of the Pro Per rights herein ordered for cause.

        1.     The Sheriff or designee shall immediately notify the court of any suspension or limitation of any of the described privileges.

        2.     The incarcerated person may appeal to the facility commander. If not satisfied, the incarcerated person may petition the court, which may in turn order a hearing to determine if the suspended privileges shall be restored.

II.     PRO PER SUPPLIES

    A.     The following items will be furnished by the Sheriff's Department or appointed legal assistants at the discretion of the correctional counselor. Regardless of their origin, any supplies given to a Pro Per incarcerated person shall be distributed and accounted for by the correctional counselor. These items may be possessed by the Pro Per incarcerated person in reasonable quantities.

# EXHIBIT H

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| **DATE:** | MAY 18, 2022 |
| **NUMBER:** | T.7 |
| **SUBJECT:** | LEGAL ASSISTANCE TO INCARCERATED PERSONS |
| **RELATED SECTIONS:** | N.3, N.5, N.7, P.15 |

PURPOSE

To outline what a Sheriff's Department employee, working within a detention facility, may and may not do to assist an incarcerated person with legal matters.

POLICY

All requests for legal assistance shall be referred to those organizations established and properly equipped to handle such matters. No legal advice is to be given to an incarcerated person by any staff member. No encouragement is to be given to an incarcerated person pursuing a legal claim against any branch of government or its' employees. No attorney or group of attorneys is to be recommended by a staff member to any incarcerated person.

PROCEDURE

I.      When a request is received from an incarcerated person for legal assistance, the request should be given to the facility correctional counselor. The counselor may:

    A.      Explain to the incarcerated person the availability, rules and protocol for accessing the off-site legal research service.

    B.      Ensure the appropriate and timely use of the off-site legal research service, include documentation and delivery of responses.

    C.      Refer the incarcerated person to the San Diego County Bar Association Lawyer Referral and Information Service.

    D.      Refer the incarcerated person to any other appropriate legal service that does not violate this policy.

# 10.

# DECLARATION OF MIKE BINSFIELD

1  Susan E. Coleman (SBN 171832)
   E-mail: scoleman@bwslaw.com
2  Martin Kosla (SBN 247224)
   E-mail: mkosla@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   501 West Broadway, Suite 1600,
4  San Diego, CA 92101-8474
   Tel: 619.814.5800 Fax: 619.814.6799
5
   Elizabeth M. Pappy (SBN 157069)
6  E-mail: epappy@bwslaw.com
   BURKE, WILLIAMS & SORENSEN, LLP
7  60 South Market Street, Suite 1000
   San Jose, California 95113-2336
8  Tel: 408.606.6300 Fax: 408.606.6333
9
   Attorneys for Defendant
10 COUNTY OF SAN DIEGO (Also
   erroneously sued herein as SAN DIEGO
11 COUNTY SHERIFF'S DEPARTMENT, and
   SAN DIEGO COUNTY PROBATION
12 DEPARTMENT)

13                  UNITED STATES DISTRICT COURT

14                SOUTHERN DISTRICT OF CALIFORNIA

15

16 DARRYL DUNSMORE, ANDREE            Case No. 3:20-cv-00406-AJB-DDL
   ANDRADE, ERNEST ARCHULETA,
17 JAMES CLARK, ANTHONY              **DECLARATION OF LIEUTENANT**
   EDWARDS, LISA LANDERS,           **MIKE BINSFIELD IN SUPPORT OF**
18 REANNA LEVY, JOSUE LOPEZ,        **DEFENDANTS' MOTION FOR**
   CHRISTOPHER NELSON,              **SUMMARY JUDGMENT**
19 CHRISTOPHER NORWOOD, JESSE
   OLIVARES, GUSTAVO
20 SEPULVEDA, MICHAEL TAYLOR,       **Hearing**
   and LAURA ZOERNER, on behalf of  Date:        March 6, 2025
21 themselves and all others similarly  Time:        2:00 p.m.
   situated,                         Ctrm:   4A
22
                  Plaintiffs,        Judge: Anthony J. Battaglia
23
          v.                         Magistrate Judge: David D. Leshner
24
   SAN DIEGO COUNTY SHERIFF'S
25 DEPARTMENT, et al.,
26                Defendants.
27         I, MIKE BINSFIELD, declare as follows:
28         1.     I have personal knowledge of the matters herein and would

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4938-9369-2933 v4                  - 1 -            3:20-CV-00406-AJB-DDL
                                                   BINSFIELD DECL. ISO MSJ

1  competently testify to them if called to do so. I am a Lieutenant in the Detention

2  Support Division of the San Diego County Sheriff's Office. I have worked for the

3  Sheriff's Office for 18 years.

4      2.    The County jails permit incarcerated persons to have video visits with

5  their public defenders, and these can be scheduled in advance. For in person

6  attorney visits (whether civil or criminal), access to their clients (incarcerated

7  persons) occurs on demand on a first come, first served basis at the facility.

8      3.    Professional visits are conducted in separate rooms with no cameras,

9  for privacy. A deputy is stationed nearby for reasons of security but does not listen

10  to the conversations.

11      4.    In addition to using the Legal Research Associations (LRA) form to

12  request cases or research, all incarcerated persons will soon have access on the

13  video monitors in the dayrooms of each unit and individually assigned tablets to do

14  research online. This system has been contracted for with the Smart

15  Communications (using a proprietary research program) but it has not yet been

16  activated.

17      5.    When an attorney calls the Facility to speak to their client, the

18  information clerk takes the message, and it is relayed to the assigned deputy for the

19  incarcerated person's housing unit to provide the name and number of the attorney

20  to the incarcerated person, who then is given the opportunity to call their attorney

21  using a dayroom phone. These phones are free to use for incarcerated persons. If

22  the attorney registers their number, it is saved in the Smart Communication system

23  as an attorney number and it is not recorded (unlike other phone calls made in the

24  jails).

25      6.    The County has acquired tablets from Smart Communications, and has

26  begun to install digital access points (WiFi) at all the Sheriff's detention facilities.

27  East Mesa will be the first facility to roll these tablets out to incarcerated persons.

28  All facilities will roll out thereafter, as soon as the infrastructure is updated to

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4938-9369-2933 v4          - 2 -          3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

1   permit WiFi and charging stations, and the plan is for each incarcerated person to

2   be assigned a tablet. Each tablet (similar to an iPad) will have access to games,

3   videos, emails, and messages.

4       7.    The following Sheriff's Office Detention Services Bureau policies

5   govern incarcerated persons' access to courts, lawyers, research, and legal

6   assistance:

7       (a) F.15 – contact with the duty judge. This policy is designed to

8   ensure access to the duty judge for the reduction or enhancement of bail, or

9   for own recognizance (O.R.) release after court hours. A true and correct

10  copy of this policy is attached hereto as Exhibit A.

11      (b) N.1 – grievance procedure.  This policy is designed to establish

12  uniform procedures by which an incarcerated person has the opportunity for

13  a formal administrative review of issues impacting conditions of confinement

14  which personally affect the incarcerated person, and to comply with a U.S.

15  District Court order in *Amstrong v. Schwarzenegger*. A true and correct copy

16  of this policy is attached hereto as Exhibit B.

17      (c)  N.5 – access to courts/ attorneys/ legal advice. This policy is

18  designed to establish uniform procedures facilitating incarcerated population

19  timely access to the courts, attorneys, and legal advice. A true and correct

20  copy of this policy is attached hereto as Exhibit C.

21      (d)  P.15 – professional contact visits. This policy was established to

22  set guidelines for the efficient processing of attorney and professional visits

23  for incarcerated persons housed at all Sheriff's detention facilities. A true and

24  correct copy of this policy is attached hereto as Exhibit D.

25      8.    Some policies also have corresponding "green sheets," which set forth

26  the procedures at a specific jail facility. For example, P.15 on professional contact

27  visits has green sheets (P.15.M – East Mesa; P.15.G – George Bailey; P.15.L – Las

28  Colinas, P.15.R – Rock Mountain: P.15.C.1 – SDCJ; P.15.V – Vista jail), true and

Burke, Williams &
Sorensen, LLP
Attorneys At Law
San Diego

4938-9369-2933 v4    - 3 -    3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

1  correct copies of which are collectively attached as Exhibit E.

2      9.    Policy N.1 on grievances also has green sheets (N.1.G – George

3  Bailey; N.1.L (Las Colinas), N.1.S (South Bay), and N.1.C.1 (SDCJ)), true and

4  correct copies of which are collectively attached as Exhibit F.

5      10.    Policy N.5 on access to courts/ attorneys/legal has green sheets (N.5.G

6  – George Bailey; N.5.L – Las Colinas; N.5.R – Rock Mountain; N.5.C.1. – SDCJ),

7  true and correct copies of which are collectively attached as Exhibit G.

8      11.    Attached as Exhibit H is a true and correct copy of the current booking

9  criteria for the San Diego County jails. As the booking acceptance criteria specify,

10 only an arrest for certain specific crimes permit a person to be booked into the

11 County jails. This includes: a field arrest on any felony charge; a field arrest on

12 certain specific misdemeanor charges; arrests as a result of any felony warrants; and

13 arrests as a result of certain other warrants.

14     12.    Warrants are issued by a court of competent jurisdiction after review

15 and a decision by a judge that there is probable cause to arrest a person for the

16 crime specified.

17     13.    Booking is permitted for all felony warrants; domestic violence

18 warrants; elder, neglect or dependent abuse-related charges; commitment warrants;

19 juvenile court warrants if a court order to house in an adult facility, SDPD and SD

20 Harbor Patrol misdemeanor warrants (book & release); Fugitive Task Force; Drug

21 Court warrants with certain bail amounts; Prop 36 warrants with certain bail

22 amounts; 1209 CCP warrants (contempt of court); 290 PC warrants (sex/ narcotic

23 registrant); HS 120280 warrants (public health), DEA and US Marshal if the MCC

24 is closed; State Parole warrants; CYA warrants; all 1551.1 PC fugitive warrants,

25 U.S. Military deserter/AWOL felony warrants; and certain out of county warrants.

26     14.    As is reflected on the County's booking criteria, there are numerous

27 agencies that may present arrestees and parolees for booking at the County jails.

28 These include but are not limited to: the San Diego Police Department, San Diego

Burke, Williams &
Sorensen, LLP
Attorneys At Law
San Diego

4938-9369-2933 v4                       - 4 -                3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

1  Harbor Patrol, the Fugitive Task Force, the Drug Enforcement Administration, the

2  U.S. Marshal's Service, the State of California Parole Department, the California

3  Youth Authority, and the U.S. Military. There are other agencies that also book

4  arrestees at the County jails including the U.S. Border Patrol.

5      15.    A true and correct copy of the DSB arresting agencies list is attached

6  as Exhibit I. This 4-page list is not exhaustive but covers the standard agencies that

7  book at the San Diego County Jails.  At times, agencies outside the County also

8  may book at the San Diego County Jails.

9      16.    The County jails also accept people for booking who have violated

10  their bail bonds ("Bail Bond Surrenders"), are indicted by the grand jury, and/or

11  California military and veterans (AWOL).

12     17.    Many areas of the County of San Diego are patrolled by other

13  agencies, who may also bring arrestees to the County jails. These agencies in the

14  County include but are not limited to: San Diego Police Department, Oceanside

15  Police Department, Carlsbad Police Department, Chula Vista Police Department, El

16  Cajon Police Department, Escondido Police Department, La Mesa Police

17  Department, National City Police Department, and the Coronado Police

18  Department.  A more complete list of the standard booking agencies is attached as

19  Exhibit B.

20     18.    In the last 3 years (January 2022 to 2024 year to date), there have been

21  148,909 bookings into the San Diego County Jails.  **Only 26%** of these bookings

22  were made by San Diego County Sheriff's Office personnel. A true and correct

23  copy of the booking county by arresting agency from 2022 to 2024 for the SD

24  County Jails is attached as Exhibit J.

25     19.    In July 2024, a new SDSO initiative was implemented to screen

26  Sheriff's personnel, both sworn and professional staff, as well as contractors,

27  volunteers, and professional visitors.  The scope of the screening may include the

28  following: drug detection canine search of persons, property, or vehicles; x-ray and

Burke, Williams &
Sorensen, LLP
Attorneys At Law
San Diego

4938-9369-2933 v4                          - 5 -                    3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

physical or visual screening of belongings; and a metal detector. These screenings are randomized across facilities, with the locations, times and frequency not disclosed.

20.    Each facility checks their intercom systems in each cell at least weekly to ensure they are operational.  If an intercom is reported or discovered inoperable, maintenance staff is notified.  If the cell intercom cannot be quickly repaired, the cell will be taken out of service. At a minimum, if the cell intercom can alert the deputy station, the cell will remain in service.  In these situations, the deputies are directed to physically and visually check the status of the incarcerated person in the cell.  It is the practice of SDSO not to house any incarcerated persons in cells without a minimally operational intercom.

21.    Counts are governed by Policy I.43, which states: "Sworn staff will physically conduct counts of incarcerated persons. All counts require sworn staff to verify each incarcerated person's well-being through "verbal or physical acknowledgment" from the incarcerated person. In addition, sworn staff will look for any obvious signs of medical or physical distress (*e.g.,* asthma attack, chest pain, etc.), trauma (*e.g.,* bleeding, ligature marks, etc.) and/or criminal activity (*e.g.,* drug usage, fighting, etc.)."

22.    During each count, sworn staff (deputies) are trained to verify each incarcerated person's well being through verbal or physical acknowledgment by the person.

23.    Safety checks are done in accordance with California Board of State and Community Corrections (BSCC) Title 15.  The timing varies depending on the housing area, with checks done more often for those with psychiatric and medical isolation or observation housing. Safety checks are governed by Policy I.64, which requires direct visual observation of the incarcerated person. The policy states: Safety checks of incarcerated persons consist of looking at the incarcerated persons for any obvious signs of medical distress, trauma or criminal activity. Safety checks shall be conducted at least once within every 60-minute time period. Safety checks of Medical Observation Beds (MOB) and in Psychiatric Stabilization Units (WPSU/PSU) shall be conducted at least once within every 30-minute time period. The intervals of the safety checks, within the 60 or 30 minute time period, shall vary and must be logged in the Jail

Burke, Williams &
Sorensen, LLP
Attorneys At Law
san diego

4938-9369-2933 v4                     - 6 -                     3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

Information Management System (JIMS). In addition to observing the safety and welfare of incarcerated persons, sworn staff shall also be attentive to security and maintenance issues as well as environmental factors (*e.g.,* temperature, odors, cleanliness) while conducting safety checks.

24.    Safety checks are audited regularly by supervisors. This is done by checking logs and watching surveillance video to determine if the deputy went to each cell front and looked in the window – as opposed to not being in the area or hurrying by without looking in. (*See* I.64, section IV. Compliance Reviews.) If deputies are found to have violated the count and/or safety check procedure, they are subject to progressive discipline; higher levels of discipline apply if the failure was intentional.

25.    The Detention Services Bureau for the County jails has robust policies and procedures specific to environmental health and safety including Sections B-Fiscal Management, I – Security & Control, K- Food Service, L – Sanitation and Hygiene, and M – Medical and Health Care Services, of the San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures.

26.    The specific subsections under each of the above-referenced sections applicable to environmental and hygiene matters are as follows:

- B.38:  Facility Inspections
- I.23:  Facility Inspection by Supervisory/Administrative Staff
- K.11: Compliance with Health Laws
- K.19: Food Control
- K.23: Monthly Inspections of Food Services Areas
- K.25: Safety and Protection Standards
- K.29: Dress and Grooming Requirements for Food Services Division Employees
- L.1:  Laundry Schedule

1 • L.2: Sanitation and Hygiene Inspections

2 • L.3: Inmate Mattresses

3 • L.4: Housekeeping Plan

4 • L.5: Trash Removal

5 • L.6: Hazardous Waste Business Plan

6 • L.7: Razors

7 • L.9: Haircuts/Haircare

8 • L.11: Personal Hygiene

9 • L.13: Pest and Vermin Control

10 • L.15: Control of Parasites on Inmates and in Their Personal Clothing

11 • M.41: Infection Control: Medical Waste

12 These policies are available online at

13 https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Det

14 entions%20Policy%20and%20Procedure%20Sections/.

15     27.   In addition to the policies set forth above, there are "Green Sheets" for

16 subsections L.1 to L.7, L.9, L.11, L.13 and M.41. "Green Sheets" are specific to

17 one of the San Diego County jail facilities and designed to provide specific

18 practices unique to the facility to which they apply. True and correct copies of these

19 green sheets are attached as follows: Exhibit K - Las Colinas; Exhibit L - East

20 Mesa; Exhibit M - George Bailey; Exhibit N - Vista; Exhibit O - South Bay;

21 Exhibit P - Rock Mountain; Exhibit Q - Central Jail)

22     28.   These policies and procedures ("P&P") are followed in every facility

23 and the facility specific Green Sheets supplement the P&P's and are followed by

24 the applicable facility staff. There certainly may be instances where a cleaning

25 procedure on a set schedule may have to be modified because of a security issue

26 elsewhere in a facility or in the specific area where the cleaning is to take place.

27 Even if the process called for by a policy or Green Sheet is delayed, it is generally

28 completed once the situation which delayed it is resolved and it is safe to resume.

Burke, Williams &
Sorensen, LLP
Attorneys At Law
San Diego

4938-9369-2933 v4           - 8 -          3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

1    Because the jails are a carceral setting with many levels of security and specific

2    safety issues that cannot always be anticipated, staff must always address security

3    and safety issues first and return to normal cleaning and procedures once the risk is

4    abated.

5        29.    Pursuant to Policy I.23, Facility Commanders or Assistant Facility

6    Commanders personally conduct inspections of the facility for, among other things,

7    health and hygiene problems and maintenance issues at least once per pay period

8    (every two weeks).  Each facility has four shifts, each with a watch commander.

9    Each watch commander performs an inspection of housing and operational areas at

10   least three times per pay period. Each shift sergeant conducts inspections of their

11   assigned housing or operational areas once per shift, verifying that maintenance

12   request, grievances and other requests for upkeep and repair have been documented,

13   and to ensure cleanliness of cells and common areas.

14       30.    Policy L.5 specifically addresses trash. The general policy provides

15   that trash pickup will occur at facility-designated times and from housing areas and

16   medical at least twice a day. There are trash cans available for incarcerated persons

17   in every dayroom for their use. During dayroom access, incarcerated persons can

18   remove all trash they do not want in their cells and deposit it in the large dayroom

19   trash cans. Hygiene inspections are done weekly by deputies in housing areas. If

20   there are incarcerated persons who do not dispose of their trash or refuse to dispose

21   of trash, it will be disposed of by staff during the hygiene inspection.

22       31.    There are times when holding cells have trash strewn on the floors

23   where a group of incarcerated persons are being held pending their housing

24   assignments. This captures a moment in time and is not a long term condition in

25   holding cells. Meals are handed out at the same time each day, and thus there will

26   be trash from all the individuals in the holding cell collected at one time. There are

27   no trash receptacles in the holding cells for security reasons. Generally, after a

28   meal, trash is collected from these cells. These cells are cleaned as often as possible

Burke, Williams &
Sorensen, LLP
Attorneys At Law
San Diego

4938-9369-2933 v4                - 9 -                3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

1  and generally consists of sweeping, mopping and wiping surfaces with disinfectant.

2      32.    Incarcerated persons do place towels and toilet paper over air vents, in

3  order to control or prevent the air duct flow if they are cold or hot, to conceal

4  contraband, and/or to reduce noise.  Deputies instruct incarcerated persons to

5  remove the vent coverings, and if they refuse or remove the covering and replace it,

6  they may be subject to disciplinary action. Blocking of vents, might result in

7  discipline; however, discipline to Incarcerated Persons is not taken lightly and must

8  be weighed against the person's individual well-being and the well-being of others.

9      33.    There are situations that arise where incarcerated persons smear feces

10  on walls and other areas in their cells. Based upon my experience, these occur in

11  circumstances where the individual has mental health issues or is utilizing drugs or

12  alcohol, which in some instances prevents staff from entering into a cell

13  immediately upon becoming aware of the sanitation issue. As soon as one of these

14  situations is identified, trustees who have been trained in the cleaning of such cells

15  are called. The individuals cleaning the cell must be wearing the proper protective

16  hazardous material equipment. These situations are cleaned as soon as it is safe for

17  the occupant of the cell and those who will be involved in the cleaning. Under no

18  circumstances are the situations ignored nor are there delays in contacting the

19  appropriate personnel to address the situation.

20      34.    Vermin control is covered by policy and preventative measures exist

21  and are taken in order to prevent any vermin (such as rodents or insects) inside

22  facilities or even outside the facilities in enclosed areas such as cement recreation

23  yards. These measures include regular and as needed vector control by the San

24  Diego County Department of Agriculture pest control technicians.

25      35.    Each facility has a designated staff member as the hazardous material

26  coordinator.  It is the duty of this coordinator to develop and maintain training,

27  application and records regarding storage, use and disposal of hazardous materials.

28      36.    Trash, recycling and grease are collected on regular schedules by

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4938-9369-2933 v4                    - 10 -                    3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

1  outside services at each facility. Compactors, trash and recycling areas are cleaned

2  on a regular basis by each facility. I am informed that Ms. Peters suggested that

3  facilities use sand to better capture grease spill off in bins and that the facilities are

4  looking into implementing the suggestion. There are daily cleanings throughout the

5  dayrooms facilities and there are cleaning supplies available to incarcerated

6  persons. Showers are cleaned by incarcerated persons daily at every facility and

7  drains are cleaned as needed, with maintenance called to address any sewer fly

8  issues. Air filters are changed every three months in all facilities and the filters

9  within a facility are changed on a staggered schedule. Fire sprinklers are cleaned as

10  needed and if any are missed, they are cleaned when identified during yearly Fire

11  Services inspections. I am informed that chemicals that were stored outside during

12  Ms. Peters' inspections have been moved indoors and that facilities that needed

13  better labeling of cleaning chemicals have either addressed the labeling issue or are

14  in the process of doing so.

15      37.    San Diego County Sheriff's Office policies and procedures are in

16  compliance with the State of California Board of State and Community Corrections

17  Title 15 Minimum Standards for Local Detention Facilities, which are the standards

18  correctional facilities located within the State of California must follow. BSCC

19  conducts routine inspections at the County Jails.

20      38.    All San Diego County Jails are required to play an "Orientation"

21  video, which is played on the dayroom floors of the units on a daily basis and in the

22  holding cells in the Intake area on a rotating basis. Attached as Exhibit R is a true

23  and correct copy of the 2021 Inmate Orientation Video for male incarcerated

24  persons (Bates No. SD 105823). Attached as Exhibit S is a true and correct copy of

25  the 2021 version of the Inmate Orientation (Bates No. SD 105824).

26      39. Sworn staff in the Sheriff's Office are trained on Policies and Procedures

27  while in the Detentions Bureau Academy, and have ongoing training while working

28  in Detentions (formal, on the job, and via email regarding notifications of changes

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4938-9369-2933 v4    - 11 -    3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

1    to policy). Supervisors oversee the sworn staff under their chain of command and

2    ensure they are following policy. If there is a suspicion or allegation of a policy

3    violation by sworn staff, Internal Affairs investigates the matter, and staff are

4    subject to progressive discipline if a policy violation is identified.

5        I declare under penalty of perjury that the foregoing is true and correct.

6    Executed on December 16, 2024, at San Diego, California.

7

8

9                    LT. MICHAEL BINSFIELD

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Burke, Williams &
Sorensen, LLP
Attorneys At Law
San Diego
4938-9369-2933 v4
- 12 -
3:20-CV-00406-AJB-WVG
BINSFIELD DECL. ISO MSJ

# EXHIBIT A

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| DATE: | FEBRUARY 3, 2022 |
| NUMBER: | F.15 |
| SUBJECT: | CONTACT WITH THE DUTY JUDGE |
| RELATED SECTIONS: | PC 810; Duty Judge Manual |

PURPOSE

To ensure access to the duty judge is facilitated for the reduction or enhancement of bail, or for own recognizance (O.R.) release after court hours.

POLICY

All requests for bail enhancement, bail reduction or O.R. releases made by attorneys and/or arresting officers/deputies during court hours shall be instructed to go to the courthouse to process their request.

When a request is made to the watch commander or designee to contact the duty judge for the purposes of bail reduction, enhancement or O.R. release after court hours, the watch commander or designee will contact the duty judge by leaving a phone message on the duty judge line. The request can be made by the arresting officer/deputy, an incarcerated person or the incarcerated person's attorney of record pursuant to Penal Code 810.

Accurate telephone numbers for the following shall be posted prominently in the watch commander's office in every detention facility:

> On duty judge
> Sheriff's Warrants Unit
> On duty district attorney
> On duty city attorney

It is the responsibility of the Sheriff's Warrants Unit to ensure that current working phone numbers are provided to the watch commanders.

PROCEDURE

I.      CONTACTING THE DUTY JUDGE AFTER COURT HOURS

        A.      Requests by an arresting officer/deputy

                1.      Watch commander or designee calls the duty judge to inform them of a request for enhancement or reduction in bail by an arresting agency.

                2.      The arresting officer/deputy will provide justification to the duty judge for the bail enhancement or reduction.

                3.      If the request is approved by the duty judge, the watch commander or designee will ensure the Bail Setting Request (J-107) form is properly filled out and submitted to the detention processing supervisor (DPS).

    4.    If the request is denied by the duty judge, the watch commander or designee does nothing.

B.    Requests by an incarcerated person or an incarcerated person's attorney.

    1.    When an attorney of an incarcerated person requests the duty judge for the purpose of bail enhancement, reduction or O.R. release, the watch commander or designee shall obtain the attorney's contact information and bar card number.

    2.    The watch commander or designee shall leave a message with the duty judge by calling the duty judge telephone number. The watch commander shall inform the duty judge of the request and provide the duty judge with the attorney's information, as well as the watch commander's telephone number.

    3.    The watch commander shall inform the attorney of the following:

        a.    If the duty judge does not wish to entertain the request, no further action will be taken.

        b.    If the duty judge wants to entertain the motion on the merits, the Sheriff's Department will be in contact with the attorney.

    4.    If the duty judge decides to entertain the motion, the duty judge will contact the Sheriff's Warrants Unit and provide the responding employee with the attorney's telephone number, as well as a callback number for the court so that the hearing can be recorded. The Sheriff's Warrants Unit will set up a conference call between the requesting attorney, and the on-duty prosecutor (either from the district attorney's office or the city attorney's office). The last number called will be the court's callback number. Once the conference call is set up on the court's recording line, the Sheriff's Warrants Unit employee will put down the receiver and not participate further nor listen to the call.

    5.    If the duty judge decides to reduce bail, they will contact the watch commander. Upon receiving such a call, the watch commander shall contact the Sheriff's Warrants Unit via conference call and have the Sheriff's Warrants Unit verify the person on the other line purporting to be the duty judge is, in fact, the same person who contacted the Sheriff's Warrants Unit.

    6.    If the request is made by an incarcerated person, the same procedures as above shall be followed, except the watch commander's message for the duty judge shall inform them the request is being made by the incarcerated person. The contact telephone number given to the duty judge, instead of the attorney's telephone number, will be the watch commander's telephone number.

    7.    If the request is approved by the duty judge, the watch commander or designee will ensure the J-107 form is properly filled out and submitted to the DPS. If the request is denied by the duty judge, the watch commander or designee shall make a log entry in the incarcerated person's Jail Information Management System (JIMS) history.

8.      The telephone numbers used in this process shall <u>not</u> be disclosed to the attorney or the incarcerated person, unless specifically directed to do so by the duty judge.

# EXHIBIT B

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| **DATE:** | NOVEMBER 7, 2023 |
| **NUMBER:** | N.1 |
| **SUBJECT:** | GRIEVANCE PROCEDURE |
| **RELATED SECTIONS:** | O.1; O.3; N.3; Prison Rape Elimination Act (2003) |

PURPOSE

To establish uniform procedures by which an incarcerated person has the opportunity for a formal administrative review of issues impacting conditions of confinement which personally affect the incarcerated person, and to comply with a U.S. District Court order in *Armstrong v. Schwarzenegger*.

POLICY

Each facility shall attempt to resolve grievances from incarcerated persons in compliance with the California Code of Regulations, Title 15, Section 1073 and the Prison Rape Elimination Act of 2003, Section 115-52. Informal resolution of an issue is both desirable and recommended. Furthermore, written grievances can often be resolved without the intervention of a supervisor, and every effort should be made by a deputy or staff member who receives a grievance to handle it at their level. Incarcerated persons are required to exhaust the grievance process prior to filing a lawsuit [42 U.S. Code section 1997e(a)]. Grievances alleging that an incarcerated person is subject to a substantial risk of imminent sexual abuse shall be referred to as an "Emergency Grievance" and immediately forwarded to the watch commander or designee.

PROCEDURE

I.      GRIEVANCES

A.      The incarcerated person grievance procedure is designed to address incarcerated person complaints related to any aspect of condition of confinement that directly and personally affects the incarcerated person grievant, including, but not limited to:

1.      Medical/Mental Health care
2.      Classification actions
3.      Disciplinary actions
4.      Program participation
5.      Telephone, mail and visitation procedures
6.      Food, clothing and bedding
7.      Conditions that cause an incarcerated person to believe they are at a substantial risk of sexual abuse.

B.      The following are not grievable under this policy section:

1.      Actions of the Governor or State Legislature, laws and regulations
2.      Judicial proceedings or decisions of the Courts
3.      Parole/Probation Board actions and/or decisions
4.      Requests under the Freedom of Information Act and Health Insurance Portability and Accountability Act (HIPAA)

5. Final decisions on grievances after all appeals
6. Rejected mail [see Detention Services Bureau Policies and Procedures (DSB P&P) section P.3 for mail appeal process]
7. Claims seeking monetary compensation
8. Medical diagnosis, medication or treatment/care provided by a private/contract community hospital
9. Staff discipline, assignment, duties and/or training
10. Any issue not within the authority and control of the Sheriff's Department

C. Pursuant to the Prison Litigation Reform Act of 1996 and 42 U.S. Code section 1997e(a), incarcerated person(s) shall completely exhaust the Department's internal grievance and administrative processes prior to filing any complaint with any state board or federal court.

D. Incarcerated person(s) may utilize the grievance procedure regardless of their disciplinary status, housing location or classification.

E. Appropriate provisions shall be made at each facility to ensure incarcerated person(s) who are not fluent in English, persons with disabilities, person(s) with low literacy levels, the elderly and the mentally ill have access to the incarcerated person grievance procedure.

F. Facility Commanders shall ensure there are no barriers for incarcerated person access to Incarcerated Person Grievance (J-22) forms and incarcerated person(s) can file grievances and appeals in a timely and confidential manner.

G. Incarcerated person(s) shall place a single complaint on one J-22 form. Grievances containing multiple, unrelated issues will be rejected and returned to the grievant. The grievant may resubmit the grievances on separate J-22 forms.

H. Staff shall not handle grievance reviews or investigations if they are the subject of the grievance.

II. COMPLAINT RESOLUTION

A. Incarcerated person(s) may submit their grievances on a J-22 form or any other writing material. The reverse side of the J-22 form describes the grievance procedure in English and Spanish. J-22 forms shall be available and accessible to all incarcerated persons.

B. Incarcerated person(s) may submit written grievances directly to deputies or other employees at any time when they are in a place, they have permission to be. Absent exigent circumstances, any deputy or other staff member who is presented with a written grievance will accept it.

C. The deputy or other employee who initially receives a grievance will print their name, ARJIS number, date and time on the J-22 form. The second page of the J-22 form will immediately be given to the incarcerated person as a signed receipt for the grievance.

D. As an alternate means for submitting grievances, secured boxes may be provided for incarcerated person(s) to deposit their grievances into.

1.    A sergeant or designee will collect grievances from the grievance boxes at least once per shift. The collection of grievances will be logged in the Area Activity Log of the Jail Information Management System (JIMS) utilizing the "Grievances Collected" drop-down.

2.    Any grievance retrieved from one of these dedicated grievance boxes will be signed by the sergeant or designee who collected it, and the signed second page of the J-22 form will be returned to the corresponding incarcerated person as soon as practical.

E.    The deputy or other staff member who receives and signs for a grievance will be responsible for entering it into JIMS

1.    The incarcerated person(s) will be linked to the grievance report.

2.    When completing the "Summary" in JIMS, the incarcerated person's grievance may be summarized, but must clearly articulate the nature of the grievance.

3.    The JIMS generated grievance number will be entered on the J-22 form, along with the date and time that the grievance is entered into JIMS.

4.    Medical grievances shall be given directly to health staff without first being entered into JIMS.

F.    Anonymous or group grievances in which no primary grievant can be identified will be reviewed by the watch commander and forwarded to the Facility Commander for review. Anonymous or group grievances will not be entered into JIMS. They will serve as a tool for management oversight only. The Facility Commander or designee will maintain a file containing anonymous and group grievances, along with a description of any action taken.

G.    A grievance in which the primary grievant can be identified will be handled as a normal grievance, even if other incarcerated people sign the form. The incarcerated person completing the J-22 form by including their name, booking number, and signature in the appropriate spaces, will be considered the primary grievant. In these cases, only the primary grievant will be linked to the grievance.

H.    The deputy or staff member who responds to the grievance shall determine if the grievance alleges the incarcerated person's health or safety is being threatened by a condition of confinement, or a condition of confinement has prevented the incarcerated person's effective communication/participation in any court or administrative hearing. If any of the above are alleged, check the corresponding box on the J-22 form and respond within the time frame outlined in paragraph III.B.1.

I.    If the grievance must be routed to another individual or unit for resolution (e.g. the shift sergeant, food services, commissary.), the person who initially received the grievance will make an entry into the "action taken" area of the grievance in JIMS. This entry will include the name of the person the grievance is being forwarded to, and the date and time it was forwarded.

J.     After investigating the nature of the grievance, a written response to the incarcerated person will be drafted on a Grievance Response (J-10) form and also entered in the "Narrative" section of the grievance in JIMS. Two copies of the J-10 form shall be printed. The action officer will deliver the response to the incarcerated person. The incarcerated person will sign and date one copy of the J-10 form. The signed copy will serve as an acknowledgement that a written response was delivered to the incarcerated person. In the event the incarcerated person refuses to sign the response, the action officer and a witness will notate the refusal on the copy of the J-10 form.

K.     There may be instances that will prevent the action officer from delivering a grievance response to an incarcerated person (e.g., the action officer is assigned to another division, facility, etc.). In those situations, the action officer may request assistance or designate someone to deliver the response to the inmate.

L.     After a grievance has been resolved, it must be closed out appropriately.

    1.     The original copy of the J-22, along with the signed copy of the J-10 form, shall be filed in the inmate's custody record.

    2.     The grievance must also be closed out in JIMS. The staff member resolving the grievance must complete the grievance detail section in JIMS by entering:

        a.     Their name as the "action officer;"

        b.     The "action date" of the resolution; and

        c.     The "action taken" that resolved the grievance

        d.     Unless these three fields are completed with the appropriate information, JIMS will not remove the grievance from the pending grievance queue.

M.    All grievances entered into JIMS will be reviewed daily by the Facility Commander or designee.

III.   GRIEVANCE REVIEW

A.     A grievance not resolved to the incarcerated person's satisfaction may be appealed by the incarcerated person in writing through successive levels of command until a resolution is obtained, or until the Facility Commander reviews the grievance.

    1.     The reviewing command staff member at any level can affect a resolution of the grievance.

    2.     At each subsequent level of review of the grievance, a written response containing the details of the resolution or the reasons for denial will be documented in JIMS, and a JIMSWeb "Inmate Grievance Report" will be provided to the incarcerated person.

B.    The level of review time frames for grievances are as follows:

    1.    First level – A deputy, sergeant or other staff member at the lowest appropriate level will investigate the grievance, resolve the issue, and direct a written response to the incarcerated person within seven calendar days of the receipt of the grievance.

       When a grievance alleges the incarcerated person's health or safety is being threatened by a condition of their confinement or that the conditions of confinement prevent their effective communication or participation in a court or administrative proceeding (including a CDCR parole revocation hearing), the period for response shall be reduced to four calendar days.

    2.    Second level – The grievance review officer has 10 calendar days to respond.

    3.    Third level – The Facility Commander has 10 calendar days to respond.  The decision of the Facility Commander is final.

## IV.    APPEALS OF DISCIPLINE

Appeals of discipline will be processed in accordance with DSB P&P section O.1. They will not be processed as grievances.

## V.    EMERGENCY GRIEVANCES

When an emergency grievance is received alleging that an incarcerated person is subject to substantial risk of imminent sexual abuse, the deputy shall immediately forward the grievance (or any portion thereof that alleges the substantial risk of imminent sexual abuse) to the watch commander or designee, at which time immediate corrective action (separate the alleged victim) shall be taken. The watch commander or designee shall provide an initial written response, via JIMS using the PREA dropdown, within 48 hours, and shall issue a final decision/response within 5 calendar days. The initial response and final decision/response shall document the determination whether the incarcerated person is in substantial risk of imminent sexual abuse, and the action taken in response to the emergency grievance.

## VI.    FRIVOLOUS GRIEVANCES

A.    No grievance will be deemed frivolous if it directly pertains to an incarcerated person's health or safety.

B.    A grievance may be deemed frivolous by the Facility Commander if it clearly falls into any of the categories below:

    1.    The grievance concerns a matter that is trivial or minor.

    2.    The grievance addresses an issue that has previously been brought to the attention of detention facility staff by the same incarcerated person.

3.   The grievance alleges a single instance of non-compliance with policy by staff, and such non-compliance does not affect the fundamental rights of the incarcerated person.

4.   The grievance concerns an established policy or practice of the Sheriff's Department that the incarcerated person claims violate their rights, when no good faith legal argument exists that the policy or practice amounts to violation of the incarcerated person's statutory or constitutional rights.

C.   If the Facility Commander finds a grievance to be frivolous, they shall state so in the response to the grievance and enter it into JIMS in the normal manner.

1.   In the narrative section, the Facility Commander will note their finding and justification for determining the grievance is frivolous.

2.   The Facility Commander will direct that the incarcerated person receives a copy of this policy and procedure section.

## VII.   VEXATIOUS GRIEVANCE WRITER

A.   An incarcerated person may be considered a vexatious grievance writer if they have filed repetitive grievances that are frivolous in nature or concern an established policy or practice of the Sheriff's Department that the incarcerated person claims violates their rights, when no good faith legal argument exists that the policy or practice amounts to a violation of the incarcerated person's statutory or constitutional rights.

1.   Only the Facility Commander can determine when an incarcerated person will be classified as a vexatious grievance writer. If so determined, the incarcerated person shall be considered a vexatious grievance writer for a period of 90 days.

2.   A JIMS incident report will be written documenting the determination of a vexatious grievant and establish the 90-day timeline.

3.   The incarcerated person will be given a copy of this policy and procedure section.

4.   A Jail Population Management Unit deputy will add "VEX" to the incarcerated person's hazard alerts in JIMS, via the classification evaluation update screen, thus identifying the incarcerated person as a vexatious grievance writer.

B.   A vexatious grievant shall continue to have the right to file grievances; however, their grievance(s) may, at the discretion of the Facility Commander, be denied without a hearing or any right of appeal.

1.   The Facility Commander will note at the bottom of the grievance form: "This is a frivolous grievance," return the second page to the incarcerated person and place original copy in the incarcerated person's custody record. The grievance will be entered into JIMS. In the "actions" area, the staff member will indicate the Facility Commander has determined the grievance to be frivolous, and the incarcerated person has been classified as a vexatious grievance writer.

    2.     If a grievance filed by a vexatious grievant is deemed frivolous, the vexatious grievant shall have their 90-day period reset and a new 90-day period shall commence. This will be documented in a JIMS incident report.

## VIII.   GRIEVANCE AS DISTINGUISHED FROM A PERSONNEL COMPLAINT

A.    Some grievances submitted by incarcerated person are actually complaints about employee misconduct. Conversely, some allegations of employee misconduct are grievances about detention facility conditions and practices. The procedures described in this policy section apply only to grievances. Supervisors must be able to effectively distinguish between grievances that are truly grievances, and grievances that are complaints alleging misconduct by staff.

B.    If the incarcerated person is alleging that a particular practice is unfair or unlawful, this is a grievance. If the incarcerated person is alleging that an employee's actions violated policy, this is a personnel complaint.

C.    If a grievance addresses the actions of a specific deputy or staff member, the deputy or staff member who receives and signs for the grievance will:

    1.     Return the second page to the incarcerated person

    2.     Give the J-22 form to a supervisor for review.

    3.     The supervisor will enter the grievance into JIMS, omitting the name(s) of the subject employee(s).

    4.     Using the criteria described below, the supervisor will determine whether it is a grievance about detention facility conditions/practices, or a complaint about an employee.

    5.     If it is determined to be a grievance about facility conditions, the supervisor will handle it as a grievance pursuant to this policy section.

    6.     If it is to be handled as a complaint against staff, the supervisor will contact the complainant to obtain a detailed statement about the allegation(s) and document it on the J-22 form, omitting the name(s) of the subject employee.

        a.     The corresponding box on the form will be checked and the grievance will be closed in JIMS.

        b.     The supervisor will give the J-22 form to their watch commander for review and determination of the appropriate action. If immediate action is not required, the J-22 form will be forwarded to the immediate supervisor of the employee named in the complaint to determine if a formal investigation is warranted.

c.   If a formal investigation is recommended, the supervisor will complete the Complaint Form (IA-1) and forward it to Internal Affairs who will determine if the personnel complaint should be handled at the facility level or Internal Affairs.

D.   Naming a specific deputy or other employee does not automatically turn the grievance into a personnel complaint. Often, incarcerated person(s) will file complaints against a deputy for enforcing a DSB P&P section that the incarcerated person believes is unlawful or unfair. Such complaints are grievances rather than personnel complaints because the incarcerated person's issue is with the policy itself, not the deputy who enforced the policy.

## IX.   GRIEVANCES DETERMINED TO BE A REQUEST

A.   Grievances received may not meet the criteria for grievances as described in section I of this policy.

B.   If a grievance is determined to be a request:

1.   Check the two corresponding boxes, "This is not a grievance," and, "This is a request" on the J-22 form.

2.   Give the second page of the J-22 form to the incarcerated person as a signed receipt.

3.   Provide a Request (J-21) form to the incarcerated person and advise the incarcerated person to submit the request on the appropriate form.

4.   No entry in JIMS is required.

5.   File the original copy of the J-22 form in the incarcerated person's custody record.

6.   Resolve the incarcerated person's request according to DSB P&P section N.3.

# EXHIBIT C

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| **DATE:** | MAY 13, 2022 |
| **NUMBER:** | N.5 |
| **SUBJECT:** | ACCESS TO COURTS/ ATTORNEYS/ LEGAL ADVICE |
| **RELATED SECTIONS:** | N.3, N.7, P.15, T.7 |

PURPOSE

To establish uniform procedures facilitating  incarcerated population timely access to the courts, attorneys, and legal advice.

POLICY

Personnel shall ensure incarcerated person(s) have access to courts and legal counsel including confidential correspondence with courts and any member of the State Bar, and confidential consultation with attorneys. Incarcerated person(s) in the custody of the Sheriff will be delivered to any court upon legal demand of that court.

PROCEDURE

I.      REQUEST FOR COURT APPEARANCE

      A.      Incarcerated person(s) shall complete an Incarcerated Person Request for Court Appearance (J-70) form when requesting to appear in court on a local matter for which they are not in custody.  Completed J-70 forms will be forwarded to the Court Services Bureau who will make all necessary arrangements.

      B.      Incarcerated person(s) sentenced to more than 90 days may request to be brought to trial on other matters outside San Diego County under Penal Code Section 1381.

II.     TELEPHONES

All  incarcerated people have the availability of unlimited collect telephone use for communication with their attorneys.

III.    REQUEST FOR LEGAL ASSISTANCE

When a request is received from an  incarcerated person for legal assistance, the request should be given to the facility correctional counselor.

# EXHIBIT D

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| **DATE**: | MAY 4, 2022 |
| **NUMBER:** | P.15 |
| **SUBJECT**: | PROFESSIONAL CONTACT VISITS |
| **RELATED SECTIONS**: | |

PURPOSE

To establish guidelines for the efficient processing of attorney and professional visits for incarcerated persons housed at all Sheriff's detention facilities.

POLICY

Professional contact visits with incarcerated persons are permitted when such visits are necessary to the administration of justice.

PROCEDURE

I.     SECURITY GUIDELINES

A.     Clearance shall entail checking the reason and authority for entry and verifying the visitor's identity by photographic identification and a professional identification card.

B.     Each facility shall maintain a professional visit log.  Professional contact visits will be logged on the Professional Visitor Log (J-4) form. Detentions Processing Division (DPD) staff will enter the necessary information into the Jail Information Management System (JIMS) and assign a personal identification number (PIN).

C.     The visitor's picture identification will be exchanged for a Sheriff's visitor identification card.  Sheriff's department employees on official business are not required to surrender their department identification for a visitor identification card.  However, the employee will be required to provide their identification to document their visit on the J-4 form. Visitors, with the exception of Sheriff's employees, are required to sign the PREA Acknowledgement Sign-In Sheet (J-315) form. Upon entrance to the facility, their department identification must be visible on their person.

D.     Upon completion of the visit, the visitor will be logged out on the J-4 form and exchange their Sheriff's visitor identification for their picture identification. Positive identification of the visitor will be made by viewing the picture identification before allowing them to leave.  (Note:  At the conclusion of a professional contact visit, the deputy will conduct a search of the incarcerated person and the professional visit area.)

E.     Professional contact visit requests made after hours will not be denied with the understanding all safety and security criteria outlined in this section are met.  In the event a professional contact visit is requested after hours at a detention facility that does not staff 24-hour DPD staff, watch commander approval is required.

F. The professional contact visit will be limited to a reasonable length of time. The amount of time allotted will be based on facility operations and security needs and may not be arbitrary or capricious in the application. The complexity of the case and individual case situations may also be considered.

G. Any person attempting to visit relatives in custody will not be denied access based solely on their relationship with the person in custody. If there is a question as to whether the visit is social or professional, the watch commander shall make the determination. If the contact visit is not allowed, a social visit may be arranged.

H. Professional contact visits shall not be permitted when, in the judgment of the watch commander, a contact visit would pose an unacceptable security risk. If a contact visit is not permitted, a social visit may be permitted.

I. An exception to the above procedures will be made for visits with incarcerated persons facing the death penalty or, for any other reason, are housed in a high-security cell. Due to much greater security concerns, these incarcerated persons must be restrained by the use of leg chains, waist chains or handcuffs, and deputies are required to remain with them during visits. Due to this additional risk and burden, if a legal assistant from Legal Aid seeks a contact visit with this category of incarcerated person, the legal assistant will be advised the incarcerated person is under strict security confinement. Such a visit will normally be non-contact. If a contact visit is deemed necessary, the supervising attorney shall telephone the watch commander and request a contact visit by the legal assistant. If approved, the watch commander will arrange the contact visit between the legal assistant and the incarcerated person.

J. Any incident involving attorneys or professional visitors will be documented and referred to the facility commander for review. Attorneys or professional visitors who violate the law, detention facility rules or disobey staff direction may be denied future professional contact visits.

II. PROPERTY BROUGHT INTO DETENTION FACILITIES

A. All briefcases and parcels entering the facilities are subject to search.

B. Professional visitors requesting to bring mobile electronic devices into a detention facility must sign a Mobile Electronic Device Authorization (J-310) form annually before entry into the facility. A DIA will archive the J-310 form at the professional visits window for one year and make a JIMS log entry in the Professional Visitations Navigator, under the "address detail" tab ("Notes/expected testimony" section) documenting the signed form was received. Use of such devices must be for necessary and relevant business. Violation of these use restrictions may result in a revocation of the ability to bring mobile electronic devices into any Sheriff's detention facilities. The watch commander will be notified of any violation and will review any alleged misuse to determine whether future authorization will be denied. If the watch commander determines authorization will be denied, they will ensure a JIMS log entry is made in the Professional Visitations Navigator, under the "address detail" tab ("Notes/expected testimony" section). The log entry will include the watch commander's name, ARJIS, date and a brief reason for denying the use of a mobile electronic device.

III.   AUTHORIZED PERSONNEL

   A.   LAW ENFORCEMENT OFFICERS:  Any local, state, or federal law enforcement officer.

   B.   ATTORNEYS:  Attorneys must present a State Bar Admission card or other verification of attorney status, plus a current, valid driver's license or picture identification card to verify identity. The presumption should be that the attorney is visiting a client for legitimate purposes of representation. This includes any attorney employed with the attorney of record's law firm or office. Prior to scheduling the visit, custody information personnel shall ascertain whether the visit is professional or social and schedule accordingly.

   C.   INVESTIGATORS EMPLOYED OR RETAINED BY THE ATTORNEY OF RECORD:  Including any licensed private investigator, public defender investigator or alternate public defender investigator.  The investigator must present proof of their professional affiliation with counsel of record.  In the case of public defender investigators and alternate public defender investigators, valid county identification cards will suffice as proof of their professional affiliation.  Licensed private investigators with or without a court order shall be subject to a criminal records clearance check prior to entering a detention facility. The watch commander or designee will conduct a criminal clearance check prior to allowing licensed private investigators a professional visit.  If an individual fails the records check, they will be afforded a professional social visit with the respective incarcerated person.  Private investigators in possession of a valid county identification are exempt.

   D.   INVESTIGATORS EMPLOYED OR RETAINED BY THE CITIZENS LAW ENFORCEMENT REVIEW BOARD: Shall be allowed to visit incarcerated persons if they have valid agency identification.

   E.   PROBATION OFFICERS AND PAROLE OFFICERS:  Shall be allowed to visit incarcerated persons if they have valid agency identification.

   F.   IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) AGENTS:  ICE agents shall be allowed to visit incarcerated persons for the purpose of conducting interviews. In order to secure an interview, the ICE agent must fill out a Consent Form for Interview with ICE (J-330) form and obtain the incarcerated person's consent to be interviewed [see Detention Services Bureau Policy and Procedure (DSB P&P) section Q.4]. ICE agents will also be required to complete a Request to Interview Prisoner (J-47) card for each incarcerated person that consents to be interviewed. All J-47 cards and J-330 forms will be forwarded to the Detention Processing Supervisor for processing and storage.

   G.   GRAND JURY MEMBERS:  Current members of the Grand Jury shall have unlimited access to the entire detention facility at any time.  The watch commander or designee shall accompany members at all times during their tour of the detention facility.

   H.   MILITARY PERSONNEL:  Legal officers, when necessary for signature (not routine counseling).

I.    COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES EMPLOYEES:

    1.    For the purpose of conducting a court-ordered interview.

    2.    For the purpose of investigating public health issues.

J.    MEDICAL, PSYCHIATRIC AND MENTAL HEALTH PERSONNEL:

    1.    Military physicians approved by the watch commander to perform discharge physicals. Such visits should be by appointment.

    2.    Private physicians retained by the incarcerated person shall be permitted entry by court order.

    3.    Contract physicians authorized by the medical administrator or designee.

    4.    Department of Public Health Communicable Disease investigators.

    5.    Private physicians/psychiatrists/psychologists/other mental health professionals retained by the Department of the Public Defender (including Primary, Alternate, and Multiple Conflicts Office) shall be permitted entry with a letter of authorization from the Public Defender's Office. In the case of mental health clinicians employed by the public defender or the alternate public defender, valid county identification cards will suffice as proof of their professional affiliation.

    6.    LabCorp nurses, on behalf of the Department of Child Support Services, shall be permitted to take a photo of the incarcerated person and obtain a buccal swab sample.

K.    LAB TECHNICIANS:  For the purpose of lawfully obtaining a blood or urine sample from an incarcerated person.

L.    INTERPRETERS:  All interpreters must be accompanied by an attorney, law enforcement officer, probation officer or other justice or medical personnel.  If not accompanied by a law enforcement officer, the interpreter must be a county employee, a licensed court interpreter or designated as an interpreter by court order.

M.    POLYGRAPH OPERATORS: Pursuant to a letter provided by an incarcerated person's defense attorney.

N.    CERTIFIED LAW CLERK:  A certified law clerk is a law student authorized by the State Board to perform certain functions if employed by an attorney. The certified law clerk may enter the detention facility unaccompanied by an attorney if they are in possession of a "Letter of Authorization" from the employing attorney. This authorization letter shall be placed in the incarcerated person's custody record.

O.    STUDENTS/INTERNS/TRAINEES:  Law student interns working for an attorney may enter the detention facility unaccompanied by an attorney if they are in possession of a "Letter of Authorization" from the employing attorney. This authorization letter shall be

placed into the incarcerated person's custody record (24-hour advance notice will be required to complete a security clearance request by the facility).

Law student interns/volunteers employed by the public defender or the alternate public defender need only show their county identification and a "Letter of Authorization" to be allowed professional contact visits.

P.    LEGAL AID ASSISTANTS:  Assistants from the Legal Aid Society of San Diego will be granted professional contact visits for the purpose of providing assistance to in pro per incarcerated persons.  Assistants shall be designated by an attorney from Legal Aid who will be accountable for the assistant's conduct.  Assistants must pass a background security check in order to be allowed contact visits.  Each detention facility shall keep a current list of authorized legal aid assistants.

Q.    PARALEGALS:  Paralegals are persons with legal business with bona fide clients of attorneys who employ the paralegal. Paralegals shall possess a "Letter of Authorization" from the employing attorney. This authorization letter shall be placed in the incarcerated person's custody record.

R.    DIPLOMATIC AND CONSULAR OFFICIALS:  To comply with the Vienna Convention on Consular Relations – Article 36, when a foreign national is in the custody of the Sheriff, and they are represented by a diplomatic or consular official, they shall be entitled to the same professional visit rights as a legal attorney.  All reasonable efforts should be made to accommodate these visits.  Diplomatic and consular officials are required to present proper identification issued by the Department of the State.  If there is any doubt about the authenticity of the identification card, the State Department's Office of Protocol can verify the identity and status of the official.  Call (202) 647-1985 (0900 to 1700 PST) or (571) 345-3146 during all other hours. Should any additional questions or issues arise, contact the Communication Center's watch commander to reach the on-call International Liaison Deputy.

S.    CLERGY:  A pastor, minister, rabbi, military chaplain, or priest associated with a church, mosque, or synagogue in the community, shall be allowed access to facilities in accordance with DSB P&P section W.3.

T.    OTHER AUTHORIZED PROFESSIONALS:  Those whom the facility commander has approved a contact visit for a rehabilitative activity or any other purpose

# EXHIBIT E

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

| |
|---|
| Date: 06-26-2020 |
| Number: P.15.M |
| Subject: PROFESSIONAL CONTACT VISITS |
| Related Sections: |

PROCEDURE:

All professional contact visits shall be conducted in a location that provides adequate privacy and security.  Professional contact visits for inmates housed in Dorms A-D will be conducted in the interview rooms located in Building 9.  Professional contact visits for inmates housed in Houses 3 and 4 will be conducted in the House 3 or House 4 interview rooms.

The video visitation room in Houses 3 & 4 may be utilized for professional visits, when the professional visit room is occupied, as long as there is no confliction with scheduled video visits at the time of the requested visit.  If the video and professional visit rooms are occupied in House 3 & 4, with Watch Commander approval building 9 professional visit rooms may be utilized.

**SDSO Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 19, 2024** |
| **NUMBER:** | **P.15.G** |
| **SUBJECT:** | **PROFESSIONAL CONTACT VISITS** |

<u>PROCEDURE</u>

The George Bailey Detention Facility has two professional visit rooms in each of the six main housing units. An additional professional visit room is located in the medical visiting area. One of the rooms in each house is designated for video conferencing, which is considered a professional visit. If available, this room can be utilized for professional contact visits, however, priority will be given to scheduled video conferences. The medical visitation area does not have video conference capability, and thus video conferences will be conducted in House 5.(Area: M). The visit deputy or designee will check in the professional visitors and complete a bag check to ensure no contraband is going into the facility.

I.   VIDEO CONFERENCES

A.  Video conferences are remotely scheduled in the Jail Information Management System (JIMS) by the Probation Department and the Public Defender's Office. Scheduling will be done at least one day in advance, with visiting hours running from 0800-2200. Generally, the video conference will be scheduled for one hour, but could be longer or shorter given special circumstances.

B.  Parties scheduling video conferences will need to carefully review those which have already been scheduled for the date and time requested. The JIMS system notates the date and time when a schedule is set. In the event of two video conferences scheduled for the same room at the same time, the last to be scheduled will be cancelled.

C.  Housing control deputies and information staff will print the video conference list at the beginning of their shift via JIMS. At this point, scheduling for the day will be considered final. In the event a video conference needs to be added on, the Central Sergeant will need to be contacted at (619)661-2656. Same day add-ons should be rare, and should be based on special court requests, or unexpected staff needs. The central sergeant, or in their absence the watch commander, will evaluate the time frame and the circumstances surrounding the request. The Central Sergeant or Watch Commander will determine if the add on is possible and will notify the housing area if approved. Similar notifications will be made in the event of a cancellation or delay in a scheduled video conference. If no visitor has arrived within 15 minutes of the scheduled start time, the video conference will be considered cancelled. The incarcerated person will be returned to the housing unit, and a same day reschedule will not be allowed.

D.  If the visitor shows up in person for what was scheduled to be a video conference, they will have to wait for the professional visit room to be available. They will not be allowed to have a contact visit in the video conference room.

E.  When the incarcerated person is sent to and from the video conference room, the control deputy will log the movement in the incarcerated person's JIMS history using the Operations Status Board (OSB) drop down options VCON and IN. It is important that the movement of

incarcerated persons to and from the video conference room is timely, as any delay could extend across the entire days schedule. Extensions of video conferences are possible, but only if it does not interfere with the next regularly scheduled video conference. Video conferences which run long and are incomplete will be terminated if it is necessary to start the next scheduled conference on time.

II.   Notary public services will be treated as a professional visit for signing of documents only. The Visit Deputy or designee will escort the Notary to the specified housing area.

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | FEBRUARY 28, 2024 |
| **NUMBER:** | P.15.L |
| **SUBJECT:** | PROFESSIONAL CONTACT VISITS |

PROCEDURE

I.      PROFESSIONAL CONTACT VISITS ADMINISTRATION (ADMIN) BUILDING

    A.    All incarcerated persons housed within the facility will conduct their professional contact visits in the administration building.  Professional visitors will check-in with the detentions information assistants (DIA) and wait for the visit deputy in the lobby area.  Refer to Detentions Policy and Procedures section P.15 on appropriate professional visit procedures.  The DIA will notify the housing deputy to send or escort the incarcerated person to the appropriate professional visiting room.  The visit deputy will verify the professional visitor's information and escort the professional visitor to the professional visit contact room.  The incarcerated person will be escorted from the incarcerated person waiting area to their professional visitation room.

    B.    After the professional contact visit is complete, the deputy will verify the identity of the professional visitor and escort them back to the visit lobby to check-out with the DIA.  A strip search will be conducted on all incarcerated persons prior to being sent back to housing.  The visit deputy should check the room for trash or contraband after the visit is completed.

    C.    If the incarcerated person is a high security risk, "green banded" or administrative separation, a deputy should have a visual on the visitor and incarcerated person for the duration of the visit.

II.      PROFESSIONAL CONTACT VISITS INTAKE

    A.    If an incarcerated person is still in the booking process, the professional contact visit should be conducted in the intake professional visit room.  The professional visitor will check-in at the visit lobby in the administration building.  The DIA will notify the intake control deputy that a professional visitor will be driving around to intake. Intake control will work with central control on allowing the professional visitor into the intake area.  When the professional visitor arrives, an intake deputy will verify the visitor's information and escort the incarcerated person to the professional visit room in intake.

    B.    After the visit is complete, the intake deputy will conduct a custodial pat down search of the incarcerated person prior to allowing the incarcerated person to return to the booking area.

III.    PROFESSIONAL VIDEO VISITATION OPTION

At the discretion of the professional visitor, high level and special management incarcerated persons may have their professional visits via video visitation.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JANUARY 30, 2024 |
| **NUMBER:** | P.15.R |
| **SUBJECT:** | PROFESSIONAL CONTACT VISITS |

<u>PROCEDURE</u>

The Rock Mountain Detention Facility has two professional visit rooms in Houses 1-5. One of the rooms in each house is designated for video conferencing, which is considered a professional visit. If available, this room can be utilized for professional contact visits, however, priority will be given to scheduled video conferences.

There is an additional professional visit room in the Medical Visitation area. This room can be utilized for incarcerated persons housed in Medical or House 7. The medical visitation area does not have video conference capability, and thus video conferences are not possible for incarcerated persons housed in Medical.

House 6 does not have any accessible professional contact visit rooms or video conference capability. Therefore, it is not possible for incarcerated persons housed in House 6 to have professional contact visits or video conferences.

I.    VIDEO CONFERENCES

    A.    Video conferences are remotely scheduled in the Jail Information Management System (JIMS) by the Probation Department and the Public Defender's Office. Scheduling will be done at least one day in advance, with visiting hours running from 0800-2200. Generally, the video conference will be scheduled for one hour, but could be longer or shorter given special circumstances.

    B.    Parties scheduling video conferences will need to carefully review those which have already been scheduled for the date and time requested. The JIMS system notates the date and time when a schedule is set. In the event of two video conferences scheduled for the same room at the same time, the last to be scheduled will be cancelled.

    C.    Housing control deputies and information staff will print the video conference list at the beginning of their shift via JIMS. At this point, scheduling for the day will be considered final. In the event a video conference needs to be added on, the Central Sergeant will need to be contacted. Same day add-ons should be rare, and should be based on special court requests, or unexpected staff needs. The Central Sergeant, or in their absence the Watch Commander, will evaluate the time frame and the circumstances surrounding the request to determine if the add on is possible and will notify the housing area if approved. Similar notifications will be made in the event of a cancellation or delay in a scheduled video conference. If no visitor has arrived within 15 minutes of the scheduled start time, the video conference will be considered cancelled. The incarcerated person will be returned to the housing unit, and a same day reschedule will not be allowed.

D.     If the visitor shows up in person for what was scheduled to be a video conference, they will have to wait for the professional visit room to be available.  They will not be allowed to have a contact visit in the video conference room.

E.     When the incarcerated person is sent to and from the video conference room, the control deputy will log the movement in the incarcerated person's JIMS history using the Operations Status Board (OSB) drop down options VCON and IN.  It is important that the movement of incarcerated persons to and from the video conference room is timely, as any delay could extend across the entire days schedule.  Extensions of video conferences are possible, but only if it does not interfere with the next regularly scheduled video conference.  Video conferences which run long and are incomplete will be terminated if it is necessary to start the next scheduled conference on time.

II.    Notary public services will be treated as a professional visit for signing of documents only. The visitation itself will be through the social visit window.

### SDSD Detention Services Bureau—San Diego Central Jail Green Sheet

| | |
|---|---|
| **DATE:** | **March 03, 2024** |
| **NUMBER:** | **P.15. C.1** |
| **SUBJECT:** | **PROFESSIONAL CONTACT VISITS** |

PROCEDURE

The Detentions Information Assistant (DIA) will maintain a "Professional Visit Room Occupied" board, which will ensure the professional visitors do not exceed the amount of space available on each floor.

The DIA will notify the respective housing floor of all professional visitors. If the visit deputy is not available, the DIA will notify the processing sergeant.

Professional visits will be conducted in the professional visit area of each housing unit. Incarcerated persons housed in the Medical Observation Housing and Psychiatric Stabilization Unit shall visit in the 2nd Floor professional visit room. Events may arise that require a professional visit in the "Interview Room" located on the 9th Floor. If that should occur, the incarcerated person will be handcuffed, and leg chained or waist and leg chained for security purposes and one deputy will remain within close proximity to the incarcerated person at all times. The deputy will be responsible for seeing that the incarcerated person is returned to his housing unit at the end of the visit.

Professional visit requests made after 2100 hours must be approved by the watch commander. The incarcerated person may refuse the visit.

Incarcerated person attending contact professional visits will be searched by the housing deputies prior to and after the contact visit.

SDSO Detention Services Bureau—Vista Detention Facility Green Sheet

| | |
|---|---|
| **DATE:** | **July 8, 2024** |
| **NUMBER:** | **P.15.V** |
| **SUBJECT:** | **PROFESSIONAL CONTACT VISITS** |

PROCEDURE

I.    CONTACT VISITS

    A.   There are six rooms in the Male Intake and Female Intake areas which are designated for confidential communications between an incarcerated person (IP) and professional visitors. There are four rooms along the Male Release Corridor labeled Pro Visit-1 through Pro Visit-4.  There are two rooms along the Female Release Corridor labeled Pro Visit-1 and Pro Visit-2. Additionally, for IPs who are Greenbanders (of any classification), Protective Custody (PC), and Administratively Separated (Ad-Sep), there are two rooms adjacent to Control which are designated for confidential communications between an IP and professional visitors. These rooms are labeled Booth 1 and Booth 3.

    B.   In order to provide IPs with a confidential area to converse with their professional visitor (i.e. attorney, clergy, doctor, psychiatrist, law enforcement personnel, etc.), the following procedure will be followed:

        1.   After the visit has been cleared through the Detentions Information Assistant (DIA), the DIA shall assign contact visitors one of the above room numbers.

        2.   They will be directed, via the release ramp, to the professional contact visit area.

        3.   The DIA will send a notification via the Jail Information Management System (JIMS) when notifying the housing unit of: professional visits, attorney callbacks, notaries, etc.

        4.   A deputy will escort the IP to the appropriate room.

        5.   Prior to placing an IP inside the professional contact room, the escorting deputy will ensure the IP and the visit room has been thoroughly searched for contraband.

        6.   In the event a visit room is unavailable or a professional contact visit is not authorized, the Watch Commander may approve a regular phone visit.

        7.   At the conclusion of the visit, a deputy will conduct a search of the IP for contraband.

        8.   A deputy shall escort the IP back to their assigned housing area.

    C.   In order to provide security and safety for the professional visitor, handcuffs will be used in all the professional visitation booths to secure every IP (including ad-seg and greenbander IPs). Preferably the non-writing hand of the IP will be secured during the duration of the visit.

II.    NON-CONTACT VISITS

PROFESSIONAL CONTACT VISITS                                                                                   Page 1 of 2

A.  There is one non-contact visit room in the Control Corridor used for teleconferencing with probation, parole, public defender etc.

   1.  The video teleconference room near Control is the facility's designated video teleconferencing room.

   2.  The scheduling of a video teleconference will be entered into the JIMS system at the probation or public defenders' remote locations.

   3.  The Control Deputy will run the inmate teleconferencing schedule at 0700 hours to determine if any teleconferences are scheduled for the day. If teleconferences have been scheduled, the Control Deputy will notify the appropriate housing unit(s).

   4.  Housing unit deputies will make it a priority to ensure IPs are delivered to the teleconferencing room on time for a scheduled video visit. The IP will be secured to the handcuff provided in the cell to prevent tampering with video equipment.

   5.  The Control Deputy is responsible for the operation of the teleconferencing room. This includes the staging of IPs awaiting the next scheduled conference, their return to housing, or termination of any conference extending into the next scheduled video conference.

   6.  The Watch Commander can suspend this program when the facility is operating under other than normal conditions. Per program protocol, when suspended, a notification sign stating "Teleconferencing temporarily suspended by Watch Commander" will be posted in front of the video camera.

# EXHIBIT F

**SDSO Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 19, 2024** |
| **NUMBER:** | **N.1.G** |
| **SUBJECT:** | **GRIEVANCE PROCEDURE** |

<u>PROCEDURE</u>

Grievances will be addressed in accordance with DSB Policy and Procedures Section N.1.

I.      RETRIEVAL OF INCARCERATED PERSONS GRIEVANCES

It will be the responsibility of the assigned area Sergeant once per shift, to retrieve all incarcerated person grievances from the locked boxes located inside the housing modules at the George Bailey Detention Facility (GBDF).

II.     PENDING GRIEVANCES

A.      At the beginning of each shift, the Central Control deputy will print the "Pending Inmate Grievance" JIMS Web report and provide it to the Watch Commander for review.

B.      The Watch Commander will make entries into the Watch Commander Log indicating what follow up action was taken for each pending grievance.

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JUNE 25, 2024 |
| **NUMBER:** | N.1.L |
| **SUBJECT:** | GRIEVANCE PROCEDURE |

PROCEDURE

Grievances will be addressed in accordance with DSB Policy and Procedures Section N.1.

I.   INCARCERATED PERSONS GRIEVANCES

At least once per shift, it will be the responsibility of the assigned area Sergeant, to retrieve all incarcerated person grievances from the designated grievance boxes.

II.   ADA RELATED GRIEVANCES

ADA related grievances will be scanned, emailed, and interoffice mailed to the ADA Unit within one business day.

**SDSO Detention Services Bureau—South Bay Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | March 14, 2024 |
| **NUMBER:** | N.1.S |
| **SUBJECT:** | GRIEVANCE PROCEDURE |

POLICY

Grievances will be addressed in accordance with DSB Policy and Procedures Section N.1.


PROCEDURE

I.    RETRIEVAL OF INCARCERATED INDIVIDUAL GRIEVANCES

A.  It will be the responsibility of the assigned Sergeant/Watch Commander or designee to once per shift, retrieve all incarcerated individual grievances from the locked boxes located inside the housing modules at the South Bay Detention Facility (SBDF).

II.    PENDING GRIVANCES

A.  At the beginning of each shift the Control deputy will print the "Pending Incarcerated Individual Grievance" JIMS Web report and provide it to the Watch Commander for review.

B.  The Watch Commander will make entries into the Watch Commander Log indicating what follow up action was taken for each pending grievance.

**SDSD Detention Services Bureau—San Diego Central Jail Green Sheet**

| | |
|---|---|
| **DATE:** | **March 1, 2024** |
| **NUMBER:** | **N.1.C.1** |
| **SUBJECT:** | **GRIEVANCE PROCEDURE** |

PROCEDURE

At least once each shift, the movement and security sergeants will retrieve all Incarcerated person grievances from the designated receptacles located inside the housing modules at the San Diego Central Jail (SDCJ).

The following procedures will be adhered to when processing incarcerated person grievances:

- Individuals may deposit a grievance into the box in the housing module labeled "INCARCERATED PERSON GRIEVANCES".  The designated sergeant will collect the grievances from these boxes. Individuals may also give a grievance directly to any deputy.

- The watch commander and the processing sergeant will review the pending grievance report in the Jail Information Management System (JIMS) each shift.

- The watch commander and the processing sergeant will ensure any stale grievances are resolved by the responsible party.

# EXHIBIT G

**SDSO Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 19, 2024** |
| **NUMBER:** | **N.5.G** |
| **SUBJECT:** | **ACCESS TO COURTS/ATTORNEYS/LEGAL** |

<u>PROCEDURE</u>

Attorneys often call the facility and request an incarcerated person to return their call.  These requests normally come through the Detentions Information Area.  If received in another area of the facility, the call shall be forwarded to the Detentions Information Assistant (DIA) for proper clearance through JIMS.

The DIA shall call the appropriate housing unit and notify the Control Deputy of the request. Once the incarcerated person is notified of the attorney call back, the House Control Deputy shall log the event under the incarcerated person's history.

The entry will be logged under the "ATTORNEY CALLBACK" dropdown. An entry in the "Comments" section should include the attorney's name and phone number. The log shall also notate if the incarcerated person was provided the opportunity to complete the call back, or the reason the incarcerated person call back could not be completed (e.g., facility wide lockdown).

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | MARCH 19, 2023 |
| **NUMBER:** | N.5.L |
| **SUBJECT:** | ACCESS TO COURTS/ATTORNEYS/LEGAL ADVICE |

PROCEDURE

I.    Telephone messages from attorneys will be relayed to the incarcerated person as soon as practical.  If the attorney requests a "call back" from the incarcerated person, the incarcerated person will be notified and offered telephone access to return the call.  This will be done while taking facility security needs into account at the time.

II.   Once the information is relayed to the incarcerated person, the attorney "call back" information will be logged into the incarcerated person's personal history in JIMS.  If an incarcerated person requests a legal telephone call and the telephone call is granted, the deputy will make the log entry following the same procedure.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JANUARY 12, 2024 |
| **NUMBER:** | N.5.R |
| **SUBJECT:** | ACCESS TO COURTS/ATTORNEYS/LEGAL ADVICE |

<u>PROCEDURE</u>

Upon notification of an attorney call back request, the Detentions Information Assistant (DIA) shall call the appropriate housing unit and notify the Control Deputy. Once the incarcerated person is notified of the attorney call back, the Control Deputy shall log the event under the incarcerated person's history. The information shall be relayed to the IP as soon as practical.

The entry will be logged under the "ATTORNEY CALLBACK" dropdown. An entry in the "Comments" section should include the attorney's name and phone number. The log shall also notate if the incarcerated person was provided the opportunity to complete the call back, or the reason the incarcerated person call back could not be completed.  IP requested attorney calls that are granted shall be logged in the same manner.

**SDSD Detention Services Bureau—San Diego Central Jail Green Sheet**

| | |
|---|---|
| **DATE:** | **March 6, 2024** |
| **NUMBER:** | **N.5.C.1** |
| **SUBJECT:** | **ACCESS TO COURTS/ATTORNEYS/LEGAL ADVICE** |

PROCEDURE

Requests made for an incarcerated person to call their attorney normally come through the Detentions Information Area. If received in another area of the facility, the call shall be forwarded to a Detentions Information Assistant (DIA) for proper clearance through JIMS.

The DIA shall call the appropriate housing floor or send an attorney call back slip to the designated Control Deputy.

Upon the individual being notified of the attorney's request to call back, the floor Control Deputy shall make an entry into their history in JIMS, documenting the delivery of the call back request to the individual. The log shall include if the incarcerated person was provided the opportunity to complete the call back, or the reason the incarcerated persons call back could not be completed, e.g. facility wide lockdown etc.

# EXHIBIT H

## SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
### EMERGENCY BOOKING ACCEPTANCE CRITERIA - Page 1  COVID-19 PRECAUTION

**Effective June 1, 2022 at 1200 A.M.**

**AUTHORIZATION:** ASSISTANT SHERIFF THERESA ADAMS-HYDAR

| FIELD ARREST | WARRANT |
|---|---|

### FIELD ARREST

**FELONY**

1. Felony Field Charges (New Arrests)

**MISDEMEANOR**

1. 23152(a) - (g) VC: Driving under the influence alcohol/drugs
2. 21200.5 VC: Ride Bike under the influence alcohol/drugs
3. 11550(a) HS: Under the Influence
4. 647 (f) PC: Disorderly Conduct/Drunk In Public
5. 655(b) HN: Operate Boat/Vessel under the influence

6. Violent Misdemeanors
   17500 PC               26100 PC            25850(a) PC
   25400(a)(1) PC         25400(a)(2) or (a)(3) PC

7. Watch Commander's Discretionary booking

8. Any misdemeanor arrest related to domestic violence

9. Additional Misdemeanors:
   192(c)(2) PC           1203.2 PC           368(c) PC
   290 PC                 243.4 PC
   647.6 (A) PC           646.9 PC

10. All Subsections of the following misdemeanors will be accepted.
    136.1 PC              288.4 PC             530.5 PC
    166 PC               311.2 PC             25400 PC
    272 PC               311.3 PC             25850 PC
    273.5 PC             314 PC               26100 PC
    273.6 PC             417 PC               23153 VC
                                              2800.1 VC

11. City Incarcerated Persons:
- Arrested by San Diego Police Department (SDPD), San Diego Harbor Patrol (SDHP)
- Misdemeanor charges not meeting the Booking Acceptance Criteria will be processed as a Book and Release

**OTHER**

1. Bail Bond Surrenders: 24 hours a day

2. Grand Jury Indictments

3. California Military and Veterans Code Section 450: AWOL Sentencing

### WARRANT

1. All Felony Warrants - Even though charge may be misdemeanor

2. All Domestic Violence Warrants

3. ALL elder, neglect or dependent adult abuse related charges

4. 192(c)(2) PC Warrants (Vehicular Manslaughter)

5. Commitment Warrants

6. Juvenile Court Warrants
- We accept adults on juvenile court warrants if 25 years or over
- If under 25, we will accept for booking only if there is a court order to house in an adult facility
- If under 25, we will accept for booking if additional arrests do not originate from juvenile court

7. **City Incarcerated Persons:**
- All San Diego County Misdemeanor Warrants will be accepted from SDPD/SDHP and processed as a B&R
- Misdemeanor Warrants where SDPD/SDHP was the originating agency will be accepted by any arresting agency and processed as a B&R

8. Misdemeanor warrants from the Fugitive Task Force (FTF)

9. Drug Court Warrants with bail amounts of $55,555, $27,777, No Bail

10. Prop 36 Warrants with bail amounts of $2,777 and $27,777

11. 1209 CCP Warrants: Civil Contempt of Court, including Out-of-County

12. 290 PC Warrants: Sex/Narcotic Registrant

13. HS 120280 Warrants - Public Health

14. Drug Enforcement Administration (DEA) and United States Marshal (USM) Federal warrants will ONLY be accepted DURING the close of Metropolitan Correctional Center (MCC) business hours. MCC Hours of operation: Monday through Friday, 0800-1700 / Saturday through Sunday, 0800-1130 Must be Picked up After the following business day

15. State Parole 3056 PC, 3151 WI and 5054.1 PC Warrants

16. California Youth Authority (CYA) warrants

17. All 1551.1 PC Fugitive Warrants

18. United States Military Deserter/AWOL felony warrants

19. **"Out-of-County" warrants:**
- Felony: Acceptable
- 1209 CCP Warrants: Acceptable
- Misdemeanor (including DV): NOT Acceptable

**NOTE: Only misdemeanor warrants that meet the booking acceptance criteria will be accepted, booked and assigned the specified bail.**

**EFF 06/01/2022**

**SAN DIEGO COUNTY SHERIFF'S DEPARTMENT**
**EMERGENCY BOOKING ACCEPTANCE CRITERIA - Page 2  COVID-19 PRECAUTION**

**AUTHORIZATION:** ASSISTANT SHERIFF THERESA ADAMS-HYDAR

### Human Trafficking - Acceptable Misdemeanor Charges - Field Arrest

|  | Code Section | Charge Description | Bail |
|---|---|---|---|
| 1. | 647(b)(1) PC | Solicit/Engage in Prostitution | $2,000.00 |
|  | 647(b)(2) PC | Solicit/Engage in Prostitution (Provide Compensation for) | $2,000.00 |
|  | 647(b)(3) PC | Solicit/Engage in Prostitution (Provide Compensation to minor under 18) | $5,000.00 |
| 2. | 647(m) PC | Soliciting Minor for Prostitution | $10,000.00 |
| 3. | 653.22 PC | Loitering for the purpose of engaging in prostitution | $2,000.00 |
|  | • | 2nd Offense | $5,000.00 |
|  | • | 3rd Offense | $10,000.00 |
| 4. | 653.23 PC | Supervising or otherwise aiding prostitute | $5,000.00 |
|  | • | 2nd Offense | $10,000.00 |
|  | • | 3rd Offense | $15,000.00 |
| 5. | 315 PC | Keeping or residing in a house of ILL-Fame | $500.00 |
| 6. | 316 PC | Keeping a disorderly or assignation house | $2,000.00 |

### PROP 47 Non-Bookable Charges

|  | Code Section | Charge Description | Bail |
|---|---|---|---|
| 1. | 11350(a) HS | Possess Narcotic/Controlled Substance | $2,000.00 |
| 2. | 11377(a) HS | Possess Controlled Substance | $2,000.00 |
| 3. | 487(d)(1),(2) PC <950.00 | Grand Theft Firearm | $12,500.00 |
| 4. | 470(a) PC <950.00 | Forgery | $5,000.00 |
| 5. | 470(d) PC <950.00 | Forgery | $5,000.00 |
| 6. | 475(a) PC <950.00 | Possess Forged Paper w/Intent to Defraud/Pass | $5,000.00 |
| 7. | 475(b) PC <950.00 | Possess Incomplete Check/etc. w/Intent to Defraud/Complete | $5,000.00 |
| 8. | 476 PC <950.00 | Make Fictitious Check | $5,000.00 |
| 9. | 484e(a) PC | Sell/etc. Access Card Fraud/etc. | $10,000.00 |
| 10. | 484e(b) PC | Grand Theft Access Card 4+ Person | $10,000.00 |
| 11. | 484e(d) PC | Acquire Access Card Account Information/Defraud | $10,000.00 |
| 12. | 459.5 PC | Misdemeanor Shoplift | $2,000.00 |

**NOTE:  PROP 47 charges are to be processed as  "Cite and Release" in the field and ONLY accepted with 1) Watch Commander approval, OR 2) Comes in with additional bookable field arrest charges, OR 3) An approved Request for Bail Increase**

### PROP 64 Non-Bookable Charges

|  | Code Section | Charge Description | Bail |
|---|---|---|---|
| 1. | 11360 (a) (2) HS | Transport Marijuana 18 and Over | $500.00 |
| 2. | 11359 (b) HS | Possession of Marijuana for Sale Over 18 | $500.00 |
| 3. | 11358 (c) HS | Plant/Cultivate/Etc. More Than 6 Marijuana Plants Over 18 | $500.00 |
| 4. | 11357(b)(2) HS | Possession of more than 28.5 Grams of Marijuana 18-21 Years Old | $500.00 |
| 5. | 11357 (c) HS | Possession of less than 28.5 Grams of Marijuana During K-12 School | $250.00 |
|  | • | 2nd Offense | $500.00 |
| 6. | 853.6 (i) PC | Discretionary Booking | $500.00 |

**NOTE:  PROP 64 charges are to be processed as  "Cite and Release" in the field and ONLY accepted with 1) Watch Commander approval, OR 2) Comes in with additional bookable field arrest charges, OR 3) An approved Request for Bail Increase**

**EFF 06/01/2022**

# EXHIBIT I

## Arresting Agencies

| ABC | Alcohol Beverage Control |
|-----|--------------------------|
| ATF | Alcohol, Tobacco & Firearm |
| BBRA | Bail Bond Recover Agent |
| BFG | Bureau Of Fish and Game |
| BNE | Bureau Of Narcotics Enforce |
| CDF | CA Division of Forestry |
| CHP | CA Highway Patrol |
| SUPD | CA State University Police |
| CYA | CA Youth Authority |
| CSSM | Cal State San Marcos PD |
| STPA | California State Parole |
| CASP | California State Police |
| CBPD | Carlsbad Police Department |
| CGRP | Carrizo Gorge Railway Police |
| CVPD | Chula Vista Police Dept. |
| CVJA | Chula Vista Police Jail |
| COPD | Coronado Police Department |
| DMV | Dept. Of Motor Vehicles |
| DEA | Drug Enforcement Admin. |
| ECPD | El Cajon Police Department |

| ESPD | Escondido Police Department |
|------|------------------------------|
| FPS | Family Protective Services |
| FBI | Federal Bureau of Invest. |
| FTF | Fugitive Task Force |
| CATC | High Tech Crime Task Force |
| HIS | Homeland Security Investig. |
| ICE | Immigration/Customs Enforce |
| JUD | Judge – Unified Drug & Gang |
| LMPD | La Mesa Police Department |
| MTDB | Metro Transit Develop. Bd. |
| MDU | Military Desertion Unit |
| MCCP | Mira Costa College Police |
| MBHP | Mission Bay Harbor Patrol |
| NTF | Narcotics Task Force |
| NCPD | National City Police Dept. |
| NIS | Naval Investigative Service |
| NGTF | North County Gang Task Force |
| GTF | Oceanside Gang Task Force |
| OPD | Oceanside Police Dept. |
| OTH | Other |
| GCPD | PD Grossmont Cuyamaca |
| PROB | Probation Dept. |
| RAT | Regional Auto Theft TF |

| CSPD | San Diego City Schools PD |
|------|---------------------------|
| CSD | San Diego County |
| SDDA | San Diego District Attorney |
| SDFD | San Diego Fire Department |
| SDFM | San Diego Fire Marshall |
| SDHP | San Diego Harbor Police |
| SDPD | San Diego Police Department |
| SDSO | San Diego Sheriff Office |
| SDSP | San Diego State University |
| SPTP | San Pasqual Tribal Police |
| RRPD | Santa Fe Railroad Police |
| CCPD | SD Community College PD |
| SODM | SD Sheriff – Del Mar |
| SOEN | SD Sheriff – Encinitas |
| SOGC | SD Sheriff – Grossmont |
| SOIB | SD Sheriff – Imperial Beach |
| SOLG | SD Sheriff – Lemon Grove |
| SOPO | SD Sheriff – Poway |
| SOSM | SD Sheriff – San Marcos |
| SOSA | SD Sheriff – Santee |
| SOSB | SD Sheriff – Solana Beach |
| SOVI | SD Sheriff – Vista |

| SDMO | SD Sheriff Court Services |
| SELF | Self-Surrender |
| SCPD | Southwestern College Police |
| DI | State Dept. Of Insurance |
| DOJ | State Dept. Of Justice |
| SPR | State Parks & Recreation |
| SPTP | San Pasqual Tribal Police |
| STPD | Sycuan Tribal PD |
| USDJ | U.S. Dept. Of Justice |
| USBP | United State Border Patrol |
| USM | United State Marshall |
| UCPD | University Of Ca Police |
| UNK | Unknown |
| BLM | U.S. Bureau Land Management |
| USPS | U.S. Postal Service |
| USSS | U.S. Secret Service |
| VAPD | Veterans Affairs PD |
| VCT | Violent Crimes Task Force |

# EXHIBIT J

**San Diego County Sheriff's Office**
**Detention Services Bureau**

The followng table reflects a count of bookings by arresting agency. A single booking may consist of multiple arrests. Each arrest may have a different arrest reason (field arrest, warrant, remand, etc.), a different arresting agency, have occurred at/on different dates/times- both in custody and out of custody, and can have different judicial outcomes. For the purpose of this request, only the primary arresting agency is displayed. That is, the arresting agency listed on the first arrest on the booking (Arrest #1). This is not indicative of any type of ranking or hierachy of arrests.

### Bookings by Arresting Agency

| Arresting Agency/Arrest #1 | 2022 | 2023 | 2024 YTD | Total |
|---|---|---|---|---|
| Alabama | | 2 | | 2 |
| Alcohol Beverage Control | 2 | 3 | 3 | 8 |
| Alcohol, Tobacco& Firearm | 8 | 4 | 6 | 18 |
| Bail Bond Recover Agent | 156 | 85 | 84 | 325 |
| Broward Sheriff Office | 1 | | | 1 |
| Bureau of Fish and Game | 4 | 2 | 4 | 10 |
| CA Dept. of Corrections | 108 | 116 | 114 | 338 |
| CA Division of Forestry | 6 | 4 | 5 | 15 |
| CA Highway Patrol | 3,036 | 2,839 | 2,853 | 8,728 |
| CA State University Police | 57 | 46 | 44 | 147 |
| Cal State San Marcos PD | 34 | 43 | 32 | 109 |
| CALFIRE | 2 | 3 | | 5 |
| California State Parole | 89 | 109 | 111 | 309 |
| California State Police | 11 | 8 | 5 | 24 |
| Carlsbad Police Department | 1,203 | 1,172 | 1,049 | 3,424 |
| Chula Vista Police Dept. | 1,995 | 2,126 | 2,365 | 6,486 |
| Chula Vista Police Jail | | 1 | | 1 |
| Coronado Police Department | 296 | 273 | 171 | 740 |
| Del Norte County | 5 | 5 | 2 | 12 |
| Dept. of Defense | 1 | | | 1 |
| Dept. of Motor Vehicles | 9 | 6 | 3 | 18 |
| Drug Enforcement Admin. | 95 | 83 | 67 | 245 |
| El Cajon Police Department | 1,947 | 1,777 | 1,809 | 5,533 |
| El Dorado County | 1 | | | 1 |
| Escondido Police Dept. | 3,712 | 3,459 | 3,206 | 10,377 |
| Family Foundations Program | 1 | 1 | | 2 |
| Family Protective Services | 5 | | 1 | 6 |
| Federal Bureau of Invest. | 23 | 6 | 6 | 35 |
| Fugitive Task Force | 210 | 210 | 280 | 700 |
| Homeland Security Investig | 91 | 77 | 68 | 236 |

| Immigration/Customs Enforce | 668 | 912 | 733 | 2,313 |
| Imperial County | | 1 | | 1 |
| JUDGE - Unified Drug & Gang | 1 | | | 1 |
| La Mesa Police Department | 855 | 1,191 | 1,166 | 3,212 |
| Madera County | | 1 | | 1 |
| Miami Dade police | 1 | | | 1 |
| Mira Costa College Police | 6 | 3 | 3 | 12 |
| Mission Bay Harbor Patrol | | | 1 | 1 |
| Napa County | 1 | | 2 | 3 |
| Narcotics Task Force | 19 | 19 | 12 | 50 |
| National City Police Dept. | 938 | 994 | 912 | 2,844 |
| Naval Investigative Service | 1 | 4 | | 5 |
| North County Gang Task Forc | | | 1 | 1 |
| Oceanside Gang Task Force | 1 | | | 1 |
| Oceanside Police Dept. | 2,501 | 2,421 | 2,068 | 6,990 |
| Orange County | 12 | 6 | 14 | 32 |
| Other | 77 | 109 | 85 | 271 |
| Palomar College Police | 3 | 10 | 10 | 23 |
| Parole | 1 | | | 1 |
| Probation Dept | 746 | 740 | 502 | 1,988 |
| Regional Auto Theft TF | 59 | 34 | 52 | 145 |
| Sacramento County | 5 | 8 | 7 | 20 |
| San Diego City Schools PD | 24 | 13 | 12 | 49 |
| San Diego County | | | 1 | 1 |
| San Diego District Attorney | 50 | 66 | 59 | 175 |
| San Diego Harbor Police | 514 | 625 | 692 | 1,831 |
| San Diego Humane Society | 2 | | | 2 |
| San Diego Police Department | 14,853 | 14,768 | 14,634 | 44,255 |
| San Diego Sheriff | 13,070 | 12,958 | 12,042 | 38,070 |
| San Diego State University | 120 | 93 | 98 | 311 |
| San Francisco County | | 2 | | 2 |
| San Pasqual Tribal Police | 50 | 75 | 47 | 172 |
| SD Community College PD | 183 | 108 | 105 | 396 |
| Self Surrender | 1,817 | 1,709 | 1,669 | 5,195 |
| Southwestern College Police | 9 | 5 | 4 | 18 |
| State Dept. of Insurance | | | 2 | 2 |
| State Dept. of Justice | 2 | 7 | 5 | 14 |
| State Parks & Recreation | 118 | 118 | 83 | 319 |
| Sycuan Tribal PD | 115 | 112 | 97 | 324 |
| United States Border Patrol | 595 | 365 | 346 | 1,306 |
| United States Marshall | 52 | 36 | 29 | 117 |
| University of CA Police | 97 | 161 | 238 | 496 |
| US Bureau Land Management | | 1 | 1 | 2 |
| US Customs | 22 | 24 | | 46 |

| | | | | |
|---|---|---|---|---|
| US Postal Service | 3 | | 4 | 7 |
| Valley State Prison | | 1 | | 1 |
| Veterans Affairs PD | 5 | 9 | 11 | 25 |
| West Valley Detention Center | 1 | | | 1 |
| **Total Bookings** | **50,705** | **50,169** | **48,035** | **148,909** |

*Data as of 12/4/24 0800. Excludes NFFJ bookings.*

| | | | | |
|---|---|---|---|---|
| % San Diego County Sheriff | 26% | 26% | 25% | 26% |

# EXHIBIT K

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| DATE: | FEBRUARY 28, 2024 |
|---|---|
| NUMBER: | L.1.L |
| SUBJECT: | LAUNDRY SCHEDULE |

PROCEDURE

I.    TYPES AND FREQUENCY OF EXCHANGES

Each housing unit will have laundry workers conduct laundry exchange in their unit once per week. The exceptions will be:

1.  House 1 (incarcerated workers) will have the means to conduct laundry exchange on their work days, generally at the end of their work shift.

2.  Blanket exchange will occur on the 1st and 3rd week of each month on the following schedule:



3.  Religious Items:

1.  A JIMS "Laundry Exchange" log entry will be made to record each exchange of religious items.
2.  Assigned religious items are tracked in JIMS under "special conditions."
3.  Religious items will be exchanged according to the facility housing schedules within the following guidelines:

Prayer rugs – once per month
Religious headwear (e.g. Hijab, Kufi) – once per week

II.    LAUNDRY EXCHANGE PROCESS

A.    ADMINISTRATIVE SEPARATION

1.  An available House 5 deputy will escort the laundry incarcerated workers throughout the housing unit. Laundry exchange will be conducted cell to cell. The deputy will ensure each incarcerated person receives appropriately sized clothing.  Clothing shall not be excessively baggy or tight.

2.  The housing deputy will open the food access port at each cell, one at a time and laundry exchange will be conducted.  Each incarcerated person housed in House 5

should place their dirty laundry through the food access port, which will be collected by one of the laundry incarcerated workers. The clean laundry will be passed through the open food access port to the incarcerated person and the food access port will be closed.

3. A log entry shall be made into JIMS Area Activity that laundry exchange has been completed and include the type of laundry or clothing exchanged.

B.    HIGH LEVEL MAINLINE

1. An available House 4 deputy will stand by with the laundry incarcerated workers and instruct the House 4 control deputy to open 2-3 cells at a time. The deputy will ensure each incarcerated person receives appropriately sized clothing. Clothing shall not be excessively baggy or tight.

2. The incarcerated persons whose cells were opened will be called into the dayroom with their dirty laundry. They will exchange their laundry and return to their assigned cell.

3. A log entry shall be made into the JIMS Area Activity that laundry exchange has been completed and include the type of clothing or laundry exchanged.

C.    MEDICAL OBSERVATION

1. An available medical observation (MOB) deputy will escort the laundry workers throughout the unit. Laundry exchange for IPs in the medical isolation cells will be conducted cell to cell. Laundry exchange for IPs in the medical wards will be conducted one ward at a time. The deputy will ensure each incarcerated person receives appropriately sized clothing. Clothing shall not be excessively baggy or tight.

2.  A log entry shall be made into the JIMS Area Activity that laundry exchange has been completed and include the type of clothing or laundry exchanged.

D.    HOUSE 3

1. The housing deputy will stand by with the laundry incarcerated workers and call out a manageable number of cells/cubicles (deputy's discretion) into the dayroom. Each incarcerated person will exchange their laundry and return to their cell. Once an incarcerated person has exchanged their laundry, they should remain inside their cell until laundry exchange has been completed. The deputy will ensure each incarcerated person receives appropriately sized clothing. Clothing shall not be excessively baggy or tight.

2. A log entry shall be made into JIMS Area Activity that laundry exchange has been completed and the type of clothing or laundry exchanged.

E.    INCARCERATED WORKERS

1. Incarcerated workers will conduct their own laundry exchange on a daily basis.

2. Each unit in House 1 will have a room within the housing area which will store laundry for incarcerated workers. There will be specific incarcerated workers assigned as laundry leads who will handle the laundry exchange for the incarcerated workers in House 1. As part of their daily duties, they will need to take all dirty laundry to laundry and bring back clean laundry, ensuring they always have a stock of clean laundry on hand.

III.    LAUNDRY SCHEDULE

GC 7922.000 - Safety/Security Interest

IV.    LAUNDRY SCHEDULE FOR INCARCERATED WORKERS

GC 7922.000 - Safety/Security Interest

# GC 7922.000 - Safety/Security Interest

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | FEBRUARY 28, 2024 |
| **NUMBER:** | L.2.L |
| **SUBJECT:** | SANITATION AND HYGIENE INSPECTIONS |

PROCEDURE

I.   SCHEDULE

A.   Absent exigent circumstances, weekly sanitation and hygiene inspections will be conducted throughout the facility on Friday nights, with the exception of House 1, House 5 and PSU. Cleaning supplies will be made available to mainline incarcerated persons daily. Incarcerated persons will be afforded an opportunity to turn over any contraband and/or extra laundry to the deputies, without sanction, prior to inspection; with the exception of items subject to criminal charges (i.e., pruno, weapons, etc.).

B.   Hygiene inspection for incarcerated workers will be conducted on Friday during dayshift by the Incarcerated Worker Deputy.

C.   Hygiene inspection for Administrative Separation and Out-Patient Step Down Unit will be conducted on Friday during dayshift.

D.   Incarcerated persons housed in PSU will clean their housing unit under the supervision of PSU sworn and professional staff.  Hygiene inspections will be conducted on Saturday during dayshift.

E.   On Fridays, the South Sergeant will review the hygiene inspection log to ensure all cells were inspected during the week and document the completion in JIMS under the event type "INSPECTION".

F.   If deputies are unable to enter the cell to complete a hygiene inspection due to an incarcerated person's refusal to exit, the incarcerated person may be extracted at the direction of the watch commander.

G.   During hygiene inspection, deputies will ensure the cleanliness, safety and security, and maintenance of the cell/cubicle and housing area.

II.   DOCUMENTATION

Hygiene inspection forms can be found on the LCDRF website in a link on the left-hand side and in the LCDRF V: drive under "Hygiene Inspection Forms."

Inspection forms will be completed for each module inspection performed. Completed PDF forms will be e-mailed to the housing unit's sergeant. The watch

commander will place all of the completed forms into the LCDRF V: Team Logs & Forms > Hygiene Inspection > Completed Forms.

A. Dayroom

    1. Dayroom cleanliness is the responsibility of all incarcerated persons. Failing two or more areas (i.e., walls and windows, shower area, or mop sink and floors) will result in a 24-hour loss of module television privileges.

    2. During hygiene inspection, deputies shall perform a check of all intercoms in their respective areas to ensure the intercoms are functioning properly.

B. Cells

    1. All incarcerated persons are responsible for the cleanliness of their assigned cell/cubicle.

    2. For all malfunctioning intercoms, the inspecting deputies shall notify a supervisor and enter a facility maintenance request.

    3. Major violations (i.e., razors, contraband hidden on incarcerated person, excessive medications) may also result in a rule violation report or crime report in addition to the loss of dayroom privileges.

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | FEBRUARY 28, 2024 |
| **NUMBER:** | L.3.L |
| **SUBJECT:** | MATTRESSES FOR INCARCERATED PERSONS |

<u>PROCEDURE</u>

I.      DISINFECTING

All incarcerated persons shall be given the opportunity to disinfect their mattress:

    A.  Upon arrival to their assigned housing unit.

    B. Prior to the weekly housing unit health/hygiene inspection.

II.     EXTRA MATTRESS

    A.  Incarcerated persons who have written authorization from health staff will be issued an extra mattress.

    B.  Incarcerated workers and participants in incentive-based housing will be issued a thicker mattress.

    C.  Extra mattresses are located in the warehouse.

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | APRIL 29, 2024 |
| **NUMBER:** | L.4.L |
| **SUBJECT:** | HOUSEKEEPING PLAN |

## PROCEDURE

The entire facility will be cleaned on a regular basis by incarcerated workers under the direct supervision of facility custodians, an incarcerated worker deputy or any sworn staff member. Facility computers will be turned off for the duration of the cleaning if incarcerated persons are present.

I.    CLEANING OF FACILITY ENTRANCES, EXITS, HALLWAYS, PROFESSIONAL STAFF AREAS, AND THE LOBBY

    A.    The LCDRF administrative offices will be cleaned by the custodians only. In the absence of a custodian, the incarcerated worker deputy will facilitate cleaning LCDRF administrative offices with incarcerated workers.  The DPD custody records office, staff booking area, staff medical area, pre-intake area and facility entrance areas will be cleaned by the incarcerated workers under the supervision of a custodian or sworn staff.

    B.    The kitchen/search deputy will supervise the intake IP worker during nightly cleaning.  Nightly cleaning will consist of the following tasks:

        •    Trash Run:  Admin sally port, clinic area & intake

    C.    Prior to returning to housing, the intake IP worker will be strip searched ██████ SO 7922.000 - Safety/Security Inter ████████████████████

    D.    A "Nightly Cleaning" checklist must be filled out by the assigned deputy and signed by the intake sergeant to verify the nightly cleaning has been completed. The "Nightly Cleaning" checklist can be found under LCDRF DOCUMENTS, FORMS on the LCDRF SharePoint website. The assigned deputy will scan the signed document and save it to the LCDRF "V" drive under the "Nightly Cleaning Logs" folder. The document will be saved using the current date.

    E.    Assigned incarcerated workers, under the general supervision of a food service employee, will clean the kitchen and staff dining areas after every meal period.

II.    CLEANING OF INCARCERATED PERSON HOUSING AREAS AND DEPUTY STATIONS

    A.    All housing units will be assigned incarcerated/module workers for cleaning by the incarcerated worker deputy.  The housing unit deputy will supervise the assigned incarcerated module workers during cleaning. At no time should mainline incarcerated persons clean alongside incarcerated workers.  All housing units will have a dedicated janitor closet on site.

        Each janitor closet will contain the following:

       (1)  Mop bucket with wringer
       (1)  Mop
       (1)  Broom
       (1)  Dustpan
       (1)  Scrub brush
       (3)  Squirt bottles
       (1)  Chemical dispenser in various locations (containing disinfectant, all-purpose cleaner and bathroom cleaner)

B.    Incarcerated/module workers will clean after each meal. At a minimum, the incarcerated/module workers will be given cleaning solution and clean rags to clean the tables. After the dinner meal, the incarcerated/module workers will utilize the supplies in the janitor closet to clean the dayroom and shower areas to include: multipurpose rooms, telephones, tables, chairs, stair railings, door handles etc. During this time, the incarcerated/module workers will utilize the bleach solution or Virex disinfectant to clean and disinfect all surfaces. Incarcerated workers utilizing the bleach solution must wear personal protective equipment.

C.    The janitor closet must be inspected before and after each use by the housing deputy to ensure all supplies are accounted for. The janitor closet door shall remain secured at all times when not in use. Any incident of damage or vandalism shall be documented.

D.    The incarcerated worker deputy shall develop a schedule for the incarcerated/module worker cleaning crews that allow for no fewer than three daily cleaning rounds. They may also be called on as needed, at any time.

E.    Deputy stations in House 3, House 4, House 5 and PSU will be cleaned in accordance with the custodial schedule by the custodian.  All other deputy stations and restrooms will be cleaned by incarcerated workers under the supervision of sworn staff.

F.    Central control shall only be cleaned by a custodian in accordance with their custodial schedule.


III.    CLEANING OF MEDICAL HOUSING, STAFF AREAS, AND EXAM ROOMS

A.    Medical wards will be cleaned and disinfected daily by the intake incarcerated workers under the general supervision of the MOB deputy.

B.    Negative and positive air pressure and isolation cells will have supplies dedicated to the sole purpose of cleaning and disinfecting that area. Intake incarcerated workers will clean the cells daily.  These cells will be thoroughly cleaned and disinfected each time an incarcerated person is moved out and prior to a new incarcerated person being housed.

C.    The medical exam rooms, lobby, nurse's station, and offices shall be cleaned and disinfected nightly by the intake incarcerated workers under the supervision of a facility rover and by the custodian in accordance with the custodial schedule.

IV.    MANDATORY DAILY CLEANING BY INTAKE INCARCERATED WORKERS

L.4.L HOUSEKEEPING PLAN

An intake deputy will supervise the intake incarcerated workers during the A and B shift cleaning duties. The MOB deputy and a House 5 Housing deputy will supervise the intake incarcerated person workers during the C shift cleaning duties. If either deputy is not available, intake control will assign another deputy to supervise the cleaning. Once the cleaning has been completed, the watch commander will be notified.

The A-Shift (0700-1500) intake incarcerated workers will complete the following duties daily:

- Intake control/Booking: Remove trash, sweep & mop, disinfect all surfaces with Virex disinfectant or bleach solution.
- Medical/Pro-Visit Room: Remove trash, sweep & mop, disinfect all surfaces with Virex disinfectant or bleach solution.
- Break Room: Remove trash, sweep & mop
- Intake/Supervisor Restrooms: Clean, sweep, mop & restock supplies
- Supervisor Office: Remove Trash

The B-Shift (1500-2300) intake incarcerated workers will complete the following duties daily:

- Vehicle Sally-Port: Remove trash
- Pre-intake Area: Clean, sweep, mop & restock supplies, disinfect all surfaces with Virex disinfectant or bleach solution.
- Open Booking/Holding Cells/Hallways: Clean, sweep, mop & restock supplies, disinfect all surfaces with Virex disinfectant or bleach solution.

The C-Shift (2300-0700) intake incarcerated workers will complete the following duties daily:

- MOB: Clean, sweep, mop dayroom & showers & restock supplies, disinfect all surfaces with Virex disinfectant or bleach solution.
- House 5: Clean, sweep, mop dayrooms & showers, disinfect all surfaces with Virex disinfectant or bleach solution.
- Clinic: Clean & disinfect, sweep, mop & remove trash from waiting room, nurse's station, exam rooms, restrooms and offices. Disinfect all surfaces with Virex disinfectant or bleach solution.

V.    MODULE CLEANERS

Module cleaners may be assigned to mainline housing units. The incarcerated worker deputy will be responsible for the assignments and incentives for the module cleaners.

VI.    SUPPLIES

The storekeeper is responsible for maintaining the facility inventory and purchasing janitorial items/equipment. Under the supervision of the storekeeper, the stock clerk will distribute cleaning supplies to all housing units on a weekly basis.

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | FEBRUARY 28, 2024 |
| **NUMBER:** | L.5.L |
| **SUBJECT:** | TRASH REMOVAL |

PROCEDURE

HOUSING UNIT TRASH AND SECURITY TRASH:

A.  Trash runs will be conducted after each meal and once after night count. Incarcerated workers will gather the "regular trash" bins from the housing units and "security trash" bins from the administrative building sally port, clinics, House 2B, and intake area. The incarcerated workers will meet the designated trash run deputy at the intake building and push the trash carts down the court hallway to the trash run door at the end of the hall. The incarcerated workers will give their incarcerated worker identification badges to the deputy conducting the trash run. GC 7922.000 - Safety/Security Interest

B.  GC 7922.000 - Safety/Security Interest

The incarcerated workers will return the trash carts to the housing units and designated areas.

C.  Each shift will be responsible for removing security trash from their assigned area prior to the end of shift. The security trash will be placed into the appropriate security trash bin located outside the administrative building sally port, clinics, or intake area.

D.  On Sunday, after completing the AM trash run, trash runners will leave the empty trash bins lined up outside the kitchen sally port. Before the AM kitchen workers are returned to housing, the designated trash run deputy, or an available rover will be responsible for having the AM kitchen workers clean the trash bins in the designated wash station located inside the kitchen.

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | FEBRUARY 28, 2024 |
| **NUMBER:** | L.6.L |
| **SUBJECT:** | HAZARDOUS WASTE BUSINESS PLAN |

PROCEDURE

The operations deputy will be responsible for ensuring hazardous waste is maintained, stored, and disposed of properly. The training coordinator will conduct training to ensure all persons know how to use and dispose of hazardous materials in a safe and appropriate manner.

I.      HAZARDOUS MATERIALS

        Will be stored in the proper cabinets or work location.

        1.      Within the housing units, cleaning materials will be stored in the janitorial closets.

        2.      All paint, solvents, and cleaning compounds will be stored in a locked storage area.

        3.      Biohazardous and biomedical waste will be disposed of according to Green Sheet M.41.L.

        4.      The operations deputy will maintain a record of hazardous waste disposal for the facility. This record will include the date of disposal, quantity, location sent, and description of the hazardous waste. This record will ne retained for one year.

II.     GUIDELINES FOR BATTERY DISPOSAL

        Batteries are considered universal waste and cannot be thrown into the trash.

        1.      Used batteries will be placed in the universal waste battery buckets, located in the administration and the information area. When batteries are placed in the bucket, the terminals must be covered with clear tape.

        2.      The universal waste battery bucket will be clearly labeled with the date the bucket was placed out for use and instructions to contact the operations deputy when the bucket is full. The bucket will be scheduled for pick-up on an annual basis.

        3.      If the universal waste battery bucket is full before the pick-up date, the operations deputy will be responsible for removing the bucket and obtaining a replacement from facility maintenance personnel.

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | FEBRUARY 28, 2024 |
| **NUMBER:** | L.7.L |
| **SUBJECT:** | RAZORS |

<u>PROCEDURE</u>

I.     RAZOR DISTRIBUTION

A. During dayroom time, the housing deputy will instruct the incarcerated persons to line up at the deputy station for razor distribution; each incarcerated person wanting to use a razor will show the deputy their wristband. Using the Jail Information Management System (JIMS) floor count sheet, the deputy will issue each incarcerated person a razor and note it on the count sheet. Each incarcerated person will be allowed to use the razor during the allotted time.

B. Incarcerated persons on razor restriction should be removed to a secure area within the module to ensure they do not have access to a razor via other incarcerated persons. The following areas should be utilized as secure areas to monitor incarcerated persons on razor restriction in cell housing and dorm housing:

  1. Multipurpose room
  2. Recreation yard
  3. Interview room (use in dorm housing)

C. When the permitted time is up, each incarcerated person will return their razor to the deputy. The deputy will inspect the razor making sure it's intact and verify the incarcerated person's identity, via their wristband, and note the return of the razor on the JIMS floor count sheet.

D. Used razors will be considered security trash and shall be disposed of in the provided containers for the safety of all staff and incarcerated persons.

E. Incarcerated persons housed in the Psychiatric Stabilization Unit (PSU) will use razors under the supervision of PSU staff.

F. Incarcerated persons housed in Administrative Separation housing (Ad-Sep) will be issued a razor during showers. Incarcerated persons housed in Ad-Sep who are on razor restriction will be allowed to use the electric razor under the following conditions:

  1. The electric razor will be offered during the incarcerated persons dayroom time on Mondays, Wednesdays, and Fridays.

2. The electric razor may be used in the incarcerated persons cell under the supervision of a deputy based on search preference.

3. The incarcerated person is allowed to shave their legs, underarms and face only.

4. The electric razor shall be soaked in Barbicide solution for 15 to 20 minutes prior to and in between each incarcerated persons use.

G. Electric razors are located in PSU, House 5 and the House 1A barber's cosmo cart.

II.    RAZOR RESTRICTIONS

Sworn staff will be responsible for completing an Informational Status Report (ISR) in JIMS documenting the placement of an incarcerated person on the Razor Restriction List as ordered by the Qualified Mental Health Provider (QMHP). They will notify the watch commander when completed for approval.

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| | |
|---|---|
| **DATE:** | FEBRUARY 28, 2024 |
| **NUMBER:** | L.9.L |
| **SUBJECT:** | HAIRCUTS/HAIR CARE |

PROCEDURE

I.   HAIRCUTS

    A.  Hairstylists will be limited to those approved by the incarcerated worker deputy. The equipment will be inventoried by the housing deputy prior to the worker entering and exiting the housing unit. No other services will be provided by the incarcerated worker stylists.

    B.  Haircutting and grooming equipment are to be used under the direct supervision of sworn staff and in a secure area. The equipment shall be used in close proximity to the deputy's station.

        1.  Combs, hair clippers, and scissors shall be disinfected with Barbicide solution in between each incarcerated person's use.

        2.  Incarcerated persons in Administrative Separation and the Psychiatric Stabilization Unit must be screened by the housing deputy for possible security risks prior to receiving hair care or grooming items. All cosmos will be conducted in their cells.

    C.  Any unusual haircuts that do not match the style the incarcerated person came into custody with, such as shaven heads, mohawks, or cuts that signify gang activity are forbidden.

    D.  Incarcerated persons arriving in custody with very short (shaven) hairstyles will be limited to a #1, #2, or #3 clipper cut with no combinations.

    E.  Haircuts will not be given to incarcerated persons with open sores on or around the head area, unless directed by health staff.

II.  NAIL CLIPPERS/EMERY BOARDS

    A.  Nail clippers and Emery boards will be available for use during day shift on Sundays. Incarcerated persons will be offered nail clippers and Emery boards during their dayroom time.

    B.  Nail clippers and Emery boards will be kept in the deputy station or in a nearby storage closet. Nail clippers and Emery boards will be inventoried by the supervising deputy upon issuing and receiving. Nail clippers will be

sanitized after each use.

C.    The incarcerated worker deputy will be notified of any damaged nail clippers needing replacement.

III.    WEEKLY HAIRCUT SCHEDULE

A.    Haircuts will be conducted once a month on Saturdays and Sundays on a rotating basis. If an incarcerated person is interested in receiving a haircut, they must submit a request to the incarcerated worker deputy.

B.    Haircut times are scheduled for either 0700-1000 hours or 1300-1500 hours and are to be offered to the incarcerated persons based on current dayroom schedule.



GC 7922.00-Safety/Security Interest

**SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet**

| DATE: | FEBRUARY 28, 2024 |
|---|---|
| **NUMBER:** | L.11.L |
| **SUBJECT:** | PERSONAL HYGIENE |

PROCEDURE

I.    SHOWERS

    A.    Incarcerated persons housed in an Administrative Separation (Ad-Sep) housing unit shall have the opportunity to shower during their dayroom time.

    B.    Incarcerated persons in disciplinary separation will be given the opportunity to shower at least every 48 hours.

    C.    Incarcerated persons in mainline housing and the medical housing unit will be allowed daily access to the showers during their dayroom time.

    D.    Psychiatric Stabilization Unit's health staff will offer and coordinate showers. Health staff will log showers in the incarcerated person's medical chart. Housing deputies will log showers in JIMS.

    E.    Offers to shower will be logged in JIMS in housing units where access to the showers is restricted.

II.    TOILET PAPER

    A.    Incoming incarcerated persons who will be housed in cell housing will be given their own roll of toilet paper along with their bed roll.

    B.    Incarcerated persons in dorm style housing will have access to the common area restrooms. Toilet paper will be stocked in this area on a daily basis by the unit worker.

<u>SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet</u>

| | |
|---|---|
| **DATE:** | February 28, 2024 |
| **NUMBER:** | M.41.L |
| **SUBJECT:** | INFECTION CONTROL: MEDICAL WASTE |

<u>PROCEDURE</u>

BIOHAZARDOUS WASTE: HANDLING AND DISPOSAL

A.  The Las Colinas Detention and Reentry Facility (LCDRF) maintains a biohazard cart with appropriate Personal Protective Equipment (PPE) for the cleaning of all areas and surfaces which have been contaminated with blood or other bodily fluids. Details on the location and management of the biohazard cart can be located in LCDRF green sheet M.37.L STANDARD PRECAUTIONS AND INFECTIOUS AGENTS/ COMMUNICABLE DISEASE CONTROL.

B.  Sworn staff handling or cleaning biohazardous waste, or supervising incarcerated workers in the handling or cleaning of biohazardous waste, shall adhere to the following disposal procedures at the conclusion of the cleaning:

1.  Any soiled paper towels, sponges, mops, and latex gloves contaminated with blood or other bodily fluids will be placed in a clear plastic bag. The clear bag will be tied securely and placed in a red biohazard bag. To prevent leakage or loss of wastes during storage, handling, or transport, the red bag will be tied securely and placed in the red biohazardous waste trashcan located alongside the biohazard cart. The trashcan can then be wheeled by sworn staff to an appropriate biohazard storage room for disposal. Biohazardous waste shall be taken to the biohazard storage room as soon as practical and should not be left in the red biohazard trashcan for extended periods of time.

2.  LCDRF has two biohazard storage rooms; GC 7922.000 -Safety/Security Interest ███████ Each biohazard room has several storage bins for the placement of contaminated items. Sworn staff shall ask health staff to open the biohazard storage room and safely dispose of the contaminated items in the designated bins.

3.  Any incarcerated person's clothing or linens contaminated with blood or other bodily fluids will be placed in a blue bag and sent to laundry.

4.  Deputy's clothing contaminated with blood or other bodily fluids should be removed as soon as possible and separated from other clothing until properly laundered.

# EXHIBIT L

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

> Date: 03-23-23
> Number: L.1.M
> Subject: LAUNDRY SCHEDULE

PROCEDURE:

LAUNDRY SCHEDULE

**DORMS A-D**

Laundry exchange for incarcerated persons (IPs) in Dorms A-D will take place at the conclusion of their workday. All garments (tans, t-shirts, socks and underwear) and towels will be exchanged.

Workers in the Central Production Center (CPC) will have their laundry exchanged by the Main Kitchen and/or Laundry Deputies at the Main Laundry storage area.  Laundry exchange for all other work crews or workers assigned to vocational positions within the camp (i.e., Dorm Workers, Barbers, and Classroom Assistants) will have their laundry exchanged in Processing.  Deputies responsible for the individual work crews will conduct the laundry exchange with the assistance of the Transportation Deputy.  The Main Kitchen, Laundry and Processing deputies will make the required entries in their JIMS area activity log at the conclusion of all laundry exchanges.

One blanket (formerly the sheet) exchange will take place on Monday during nightshift, in conjunction with weekly hygiene inspection.  At the completion of blanket exchange, the Dorm Deputies will log under the drop down entry LAUNDRY EXCHANGE, "one blanket exchanged or offered to each incarcerated person" in the description area of JIMS area activity for Dorms A, B, C, D. If the scheduled laundry does not occur for some reason, a JIMS notation shall be made.


**INCENTIVE BASED HOUSING (IBH)**

The IBH population will have their garments (tans, shorts, t-shirts, socks and underwear) pillowcases and towels exchanged on Fridays during dayshift.  At the completion of the exchanges, the IBH Deputies will make the required entries in their JIMS area activity log.

Kitchen workers and the IBH population will keep their extra clothing folded and, on their beds, or in their bins at all times.


**HOUSES 3 & 4**

Laundry exchange and hygiene inspection for IPs in House 3 will be conducted on Tuesdays during nightshift. Laundry exchange and hygiene inspection for IPs in House 4 will be conducted on Thursdays during nightshift.

All garments (blues, t-shirts, socks, and underwear), one blanket of the IPs choice, and towels will be exchanged.  At the completion of laundry exchange, the Housing Control Deputies will enter the laundry

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

> Date: 03-23-23
> Number: L.1.M
> Subject: LAUNDRY SCHEDULE

exchanged as required in the description area of the JIMS area activity log, see example below:

Blue shirts, blue pants, 2 t-shirts, 2 pairs of socks, 2 under wear, 2 towels and 1 blanket exchanged to all incarcerated persons

**EXTRA BLANKETS AND SWEATSHIRTS DURING SEASONAL PERIODS**

Extra blankets and sweatshirts are generally issued to IPs during cold months, or as directed by the Facility Commander and Main Laundry Supervisor. Extra blankets and sweatshirt exchange for Dorms A-D will be conducted on the first Tuesday of the month. Extra blanket and sweatshirt exchange for Houses 3 & 4 will be conducted on the first Thursday of the month.

**LAUNDRY TO BE ISSUED**

Religious items are tracked in JIMS under "special conditions" which is monitored and conducted by the EMRF Programs Deputy on Mondays for the items below.

   Religious items will be exchanged within the following guidelines:

- Prayer Rugs – monthly
- Religious headwear (e.g., Hijab, Kufi) – weekly

A JIMS "Laundry Exchange" log entry will be made to record each exchange of religious items, which is assigned to the EMRF Programs Deputy.

**Incarcerated Persons in Houses 3 & 4 will be issued the following items:**

- One set of outer garments (a pair of blue pants and blue shirt)
- Two sets of under garments and towels (2 towels, t-shirts, 2 pairs of socks, and 2 underwear).
- One pair of shower shoes
- Two blankets

   ***One extra blanket and sweatshirt to be issued as outlined above

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

> Date: 03-23-23
> Number: L.1.M
> Subject: LAUNDRY SCHEDULE

Incarcerated Persons in Dorms A-D will be issued the following items**:**

- One set of outer garments (a pair of tan pants and tan shirt)
- One set of under garments and towel (towel, t-shirt, pair of socks, underwear)
- One pair of shower shoes
- One pair of incarcerated worker tennis shoes
- Two blankets
- ***One extra blanket and sweatshirt to be issued as outlined above

Inside Kitchen workers will be issued the following additional items:

- One set of kitchen whites outer garments (pair of white pants and white shirt)

The IBH population will be issued the following additional items**:**

- One additional set of outer garments (a pair of tan pants and tan shirt)
- One additional set of under garments (t-shirt, socks, underwear) and towel
- One pair of shorts
- One pillowcase

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.2.M
Subject: SANITATION AND HYGIENE INSPECTIONS

PROCEDURE:

Watch Commanders are responsible for the cleanliness and sanitation of the facility during their shift. Deputies are responsible for ensuring the incarcerated person (IP) housing areas are clean and sanitary at all times.

Weekly dorm inspections shall be conducted to ensure compliance with local, state and federal health and safety codes. All common bunk areas will be inspected for cleanliness and sanitation. Any contraband will be removed including items affixed to vents, walls, bunks or windows. All areas will be inspected for damage. Items requiring maintenance or repair will be documented and reported.

Sanitation and hygiene inspection for IPs housed in Dorms A-D will be conducted every Monday during nightshift, in conjunction with weekly blanket exchange. Deputies will allow dorm workers access to the janitor's closet to obtain the following: mop bucket, mop, broom, scrub brush, dustpan, foxtail broom and cleaning solution. Deputies will give dorm workers ample time to clean and prepare for inspection.

Sanitation and hygiene inspection for Houses 3 and 4 will be conducted in conjunction with the laundry schedule during nightshift. Deputies assigned to Houses 3 and 4 will give IPs access to cleaning carts. Cleaning carts will be stocked with the following: mop bucket, mop, broom scrub brush, dustpan, foxtail broom and cleaning solution. Deputies will give IPs ample time to clean and prepare for inspection. Deputies will inventory the cleaning carts prior to and after each use. Cleaning carts will be stored in the housing unit's storage closet.

A point-deduction rating system will be used to determine the overall grade of each dormitory. The grading for the weekly inspections is listed below:

- 90-100        Extra hour of dayroom on Saturday night
- 70-89         Pass Only
- 60-69         Loss of Televisions – 24 hours
- Below 60      Loss of Televisions – 48 hours

The highest graded dorm (A-D) will have the ability to select movies, to be played throughout the facility, the week after the inspection. The highest scoring dorm above 90% will earn a cake the following Wednesday.

Inspection Sheets shall be forwarded to the team watch commander for review. The watch commander will make an entry in the watch commander's log as to which dorm earned the incentive for the week. The watch commander will forward the forms to the Captain's Secretary to digitally archive.

SDSD Detention Services Bureau- East Mesa Reentry Facility

Date: 01-15-22
Number: L.3.M
Subject:MATTRESSR
elated Sections:

**PROCEDURE:**

Incarcerated persons who are being released or transferred from Dorms A-D will remove their mattress from their bunk. They will then drop off the mattress in the designated area located in the corridor next to the release gate. The incarcerated worker assigned to worker operations will clean all dirty mattresses and stock the mattresses in the processing area. Worker deputies will ensure this task is completed. Incoming transfers of incarcerated persons that will be housed in Dorms A-D will be issued a mattress in the processing area.

Incarcerated persons being housed in House 3 and 4 will be provided a mattress at their assigned housing unit. Incarcerated persons transferring out of House 3 and 4 will remove their mattress from their bunk and place it outside of their module. The housing deputy will ensure the mattresses are cleaned and disinfected by the incarcerated worker assigned to house custodial duties. The mattresses will then be stored in the housing unit's storage closet. Housing deputies will be responsible for ensuring this task is completed.

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.4.M
Subject: HOUSEKEEPING PLAN

PROCEDURE:

SENIOR CUSTODIAN

General areas of responsibility but not limited to the following:

- Supervise an incarcerated cleaning crew Monday-Friday
- Visit Lobby (No incarcerated persons (IPs))
- Locker Rooms
- Briefing Room
- Control Building
- Medical
- Probation
- Classrooms
- House 3 (e.g. Dep Station, Control, med exam room, Pro-visit offices)
- House 4 (e.g. Dep. Station, Control, med exam room, Pro-visit offices, Sgt. office)
- Admin Building
- Warehouse (No IPs)
- Deputy Stations

CENTRAL ROVER

General areas of responsibility but not limited to the following:

- Supervise an incarcerated cleaning crew 7 days a week
- Release area
- Processing building
- All staff restrooms will be cleaned and stocked
- All trash will be emptied.

CPC DEPUTIES

Supervise an incarcerated worker crew and clean the following areas:

- Lobby Floors
- Breezeways
- Power wash showers in all housing areas

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.4.M
Subject: HOUSEKEEPING PLAN

CLEANING OF IP HOUSING AREAS

All housing units will be cleaned by incarcerated workers under the supervision of housing unit staff.  In addition to daily cleaning, access to the entire cleaning cart before the weekly inspection must be allowed.

House 3 and House 4 will be cleaned by assigned module workers under the supervision of the housing unit staff. The module workers' areas of responsibility include, but are not limited to the following:

- Serve each meal and cleanup afterwards.
- At minimum, incarcerated persons must be given cleaning solution and rags to clean the tables after the breakfast meal.
- After lunch and dinner meal, and after 2200 hard count a fully stocked cleaning cart will be placed into the module.
- The cleaning cart must be inspected before and after it exits the module. The inspection should include ensuring proper supplies and equipment are available and no damage or vandalism has occurred.
- Other areas of responsibility may include cleaning staging areas, Control, Dep. Station, classrooms, restrooms, holding cells, DI cells, recreation yards, etc.
- All trash will be emptied

CLEANING SUPPLY STORAGE

Cleaning carts and supplies are stored in the following Janitor Closet areas:

- Visit Area
- Processing Building
- Control Building
- Administration Building
- House 3 and 4 supply rooms

These closets will be kept supplied by the facility storekeeper.

Facility inspections are completed by the Facility Commander as well as the EMRF supervisory staff.

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.5.M
Subject: TRASH REMOVAL

PROCEDURE:

TRASH COLLECTION

All trash will be placed in appropriate receptacles or placed directly into a dumpster. Gray dumpsters for trash and blue dumpsters for recyclables are located in the gated area adjacent to the "Inside Kitchen."

HOUSE 3 AND 4

A trash run will be completed after each meal. Collected trash will be placed in the housing sallyport for pick up and disposal into dumpsters.

DORMS A-D

Trash removal will be supervised, as needed by the housing deputy, so that it is not left sitting in the housing unit.

NON-HOUSING AREAS (E.G. MEDICAL, ADMIN, COUNSELING OFFICES, ETC.)

The senior custodian will be responsible for supervising an incarcerated worker crew who will handle trash disposal.

TRASH RUN TIMES

Trash runs will commence after each meal. Times are approximate as the kitchen workers collect the trash bins in conjunction with retrieving the brown meal carts delivered to House 3 and House 4. Approximate collection times are as follows: 0500, 1300, and 1700 hours. Additionally, trash will be collected and removed as part of the "Field Day" responsibilities of nightshift.

SECURITY TRASH

All security trash will be placed into receptacles in secured areas. Staff members or supervised incarcerated workers will empty the security trash into appropriate dumpsters.

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.5.M
Subject: TRASH REMOVAL

RECYCLING

LOCATION OF RECEPTACLES

Blue recycling bins are located in Dorms A through D, House 3 and 4 modules, the Inside Kitchen area, Central Control and the Central Control break room areas.  Five blue dumpsters are located in the gated area adjacent to the "Inside Kitchen."

RESPONSIBILITY OF STAFF/INCARCERATED WORKERS

Incarcerated Worker Deputies are responsible to make sure incarcerated workers assigned to dorms, housing or incarcerated crews which conduct trash removal and trash runs are aware of their responsibility as it pertains to recycling.

Housing Deputies are responsible for making sure incarcerated persons (IPs) in House 3 and 4 Modules are separating recyclable items from trash items after meals and/or inspections.

Dorm/House incarcerated workers will separate the trash from the recyclables.  They need to separate bottles from recyclable items and place into a separate bag and stored in the House 3 Trash Closet to later be recycled at a Recycling Center.

The Kitchen Deputy is responsible for making sure kitchen workers are separating trash and recyclables, ensure hot trays are collected after each meal and conduct trash and recycle "runs" to the blue and gray dumpsters during the course of their shifts.

PROCESS OF COLLECTION

HOUSE 3 AND 4

Incarcerated workers assigned to House 3 and 4 will be responsible for the separation of recyclable and non-recyclable items during the course of their daily cleaning responsibilities.

Under the supervision of the Kitchen Deputy, kitchen workers will retrieve the trash/recyclables after each meal from House 3 and 4 and ensure all items are discarded into the appropriate dumpsters.

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.5.M
Subject: TRASH REMOVAL

DORMS A-D

Incarcerated workers assigned to the dorms will separate and bag the recyclable items from trash and place the bags outside their dorms. The IPs assigned to the Field Day cleaning crew will pick up the bags each night and dispose into appropriate dumpsters under the supervision of the deputy.

SWORN/PROFESSIONAL STAFF AREAS

Central Control, Briefing Room and Break Rooms will be the responsibility of the deputy assigned to the Field Day crew. The Field Day crew will remove all recycled items from the recycling receptacles and discard into appropriate dumpster.

MOST COMMON ITEMS APPROPRIATE TO PLACE INTO BLUE RECYCLE BINS

- Newspapers
- Cans
- Bottles
- Cardboard
- Plastic containers
- Empty meal trays
- Paper

Laminated posters by the EDCO Disposal Company displaying recyclable items have been placed in areas where recycled bins are located.

STORAGE OF BOTTLES AND CANS

The storage area for all bottles and cans for recycling will be located at House 3 in the outside storage room, room with double doors, and east of the staff entry door. The Administrative Deputy assigned to recycle the bottles and cans will retrieve the bags from the storage room and recycle them at the Recycling Center.

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.6.M
Subject: HAZARDOUS WASTE BUSINESS PLAN

PROCEDURE:

The East Mesa Reentry Facility (EMRF) generates hazardous and universal waste.  EMRF has implemented guidelines established by the Hazardous Waste Business Plan (HWBP) for the maintenance, storage, disposal and training of hazardous waste products.

STORAGE OF HAZARDOUS WASTES:

Hazardous waste must be stored utilizing the following criteria:

- Stored in non-leaking, non-dented containers in with a tight-fitting lid.
- Containers will be kept closed when wastes are not being added or removed.
- Labels on containers will be waterproof. The labels will specify "Hazardous Waste;" and will clearly display if the product is (flammable, reactive, etc.)
- An additional waterproof label will be added to display the date the waste in a container started accumulation.
- Waste will be kept in an area that would minimize the chance of a spill that could affect the environment.
- Waste that could combust next to another product will require separation.
- Ignitable or reactive waste: Stored at least 15 meters or 50 ft. from property lines.
- Time limits prescribed for storage will be adhered to by the (HWBP) regulations.

All EMRF hazardous waste material will be stored in the EMRF grounds area. All materials will be stored in a locked metal ventilated storage cabinet.

MATERIAL TYPES: This list includes, but are not limited to;

- Paint
- Paint Thinner
- Gasoline
- Solvents
- Cleaning Components
- Adhesives
- Acids

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.6.M
Subject: HAZARDOUS WASTE BUSINESS PLAN

DISPOSAL:

Disposing of hazardous materials will be conducted in the manner outlined in Department Policy and Procedure Manual Section 6.114.


EMERGENCY PROCEDURES

In the event of a hazardous waste spill, fire or an explosion report as follows.

Notify your local fire department or dial 911.

All situations involving the threat of human health or the environment will require a notification to the California Emergency Management Agency ▮▮▮▮▮ and provide the following information:

- Name and telephone number of person reporting
- Name and address of facility.
- Time and type of incident.
- Name and quantity of hazardous material(s) involved
- Extent of injuries
- Possible hazard to human health and the environment outside the facility.

During an active emergency, you must take all reasonable measures to ensure that fires, explosions, and chemical releases do not spread. These measures include:

- Stopping Facility or area operations.
- Collecting and containing released waste.
- Removing or isolating chemical containers.

In compliance with the Hazardous Materials Business Plan, quarterly briefing training will be conducted covering the discussed storage of hazardous wastes and basic emergency procedures. The training will include evacuation plans (Reference Detention Policy H.3)

The EMRF Operations Deputy is assigned as the Hazardous Material Coordinator. The Operations Deputy will be responsible for conducting annual audits of hazardous waste stored within the facility.

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.7.M
Subject: RAZORS

PROCEDURE:

The nightshift deputies are responsible for providing razors to Incarcerated Persons (IPs) daily. ████████████████████████████████████████████ Razors will be inspected, prior to distribution. Broken and damaged razors will not be distributed and shall be placed in the security trash.

IPs with the clipper shave and/or razor restriction chrono will be offered the electric razor during the same time razors are offered to the rest of the module. The use of the electric razor will be under the supervision of sworn staff. The electric razor must be disinfected with "Barbicide" or an equivalent solution and set aside for at least 10 minutes. During this time, a second electric razor will be utilized. The electric razor must be sterilized accordingly after each use.

The IP with a clipper shave and/or razor restriction chrono shall be given the opportunity to shave with an electric razor. The electric razor for Houses 3 and 4 will be in the haircut bins stored in House 3. During regular razor exchange, IPs with an active medical approved clipper shave exemption in Houses 3 and 4 will be escorted to the housing unit holding cell to shave.

The electric razor for Dorms A-C will be stored in the barber shop. Incarcerated Workers housed in Dorms A-C will be escorted to the barber shop GC 7922.000 - Safety/Security Interest ███████████████████

Prior to distributing razors, the deputy will verify the IPs identity via his wristband and make a notation on the floor sheet to document the IP receiving a razor. IP will be given ample time to use the razor.

A JIMS log entry will be made using the area activity drop-down menu "Razors Distributed" to document the number of razors distributed and the number of razors collected. The offering of soap bars during razor exchange will be included in the notes that soap was offered.

A plastic bucket has been placed in all housing areas to dispose of razors. A magnet is attached to the top of the bucket lid. The razor blade will be slid over the magnet to verify it is still attached to the razor. Once filled, deputies will dispose of the plastic container containing the razor blades in the security trash bin located at the Inside Kitchen loading dock.

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.9.M
Subject: HAIRCUTS

PROCEDURE:

Only the Incarcerated Worker(s) assigned to barber duties will provide haircuts.

A sworn staff member shall inventory hair cutting equipment on a daily basis. All scissors, clippers and ancillary hair care equipment shall be accounted for at the start and end of the barber's workday.

The barber(s) must disinfect or sterilize any comb, brush, clipper or shears prior to use.

The use of disinfectant solution and barber procedures shall be in accordance with methods approved by the State Board of Barber Examiners to meet the requirements of Section 6586.5(h) of the Business and Professions Code. Adherence to PC 4020 shall be followed as stipulated.

Incarcerated persons (IPs) assigned to Dorms A, B and C will be offered haircuts during scheduled afternoon recreation yard time on weekends.

IPs assigned to Incentive Based Housing (IBH) units will be allowed to utilize hair care equipment provided to them in their housing units on a daily basis. This equipment will be stored in the IBH unit deputy station in a plastic container with a complete inventory of its contents when not in use. The IBH deputy (or the deputy assigned to the unit for the shift) will inventory the equipment before issuing and receiving the hair care equipment to and from IPs. All haircuts will be conducted in the dayroom. The hair care equipment is to be turned in to the deputy upon completion of haircuts. All IBH hair care equipment will be collected prior to the end of each shift to ensure all items are accounted for.

Haircuts offered for Houses 3 and 4 will be conducted in the secured recreation yards on Tuesdays and Wednesdays from 0700 to 0930 hours. The Incarcerated Worker Deputy(s) will ensure Barbers arrive to work on time with necessary equipment.

Haircuts will consist of a #1, #2, or #3 ½ clipper cut only, with no combinations. Facial haircuts will be prohibited unless the incarcerated person has medical authorization (clipper shave) or is a newly hired worker. The housing deputies are responsible for printing the clipper shaves JIMS web report.

Barbers shall be trained in the proper sterilization of the clipper cutting blades. After each haircut, the blades and clipper must be sprayed with, "Barbicide" or an equivalent solution and set aside for 10 minutes. During this time, a second set of blades and clipper will be used. Clipper blades must be sterilized accordingly after each use.

NAIL CLIPPERS

Nail clippers are available for use during regularly scheduled haircut times. Nail clippers are kept in the same locations as hair care equipment and will be inventoried upon issuing and receiving by the deputy supervising haircuts. Any damaged nail clippers will be given to the Incarcerated Worker Deputy for replacement Nail clippers will be sanitized after each use with "Barbicide" or an equivalent solution.

**SDSD Detention Services Bureau- East Mesa Reentry Facility**

Date: 03-24-23
Number: L.13.M
Subject: PEST AND VERMIN CONTROL

PROCEDURE:

DISCOVERY OF PEST OR VERMIN (FACILITY)

Upon discovery of any vermin, the Watch Commander, or designee will be immediately notified. The Watch Commander will notify the Administrative Sergeant who will notify the Operations Deputy (Integrated Pest Management Coordinator) IPMC. A maintenance request will also be completed by the Operations Deputy (IPMC).

The Operations Deputy (IPMC) will notify the Pest Management Division to remedy the problem.

MONTHLY INSPECTIONS

The facility will have monthly facility and Inside Kitchen inspections conducted by licensed pest control professionals. The Inside Kitchen inspections are conducted on a Saturday evening. The kitchen personnel will be notified of this inspection one week prior.  Main Kitchen (CPC) schedules this inspection. The pest control personnel will be escorted by a deputy into the Inside Kitchen area.

The Facility monthly inspections are conducted weekdays by the pest control professional and Operations Deputy (IPMC).

It is the responsibility of the Operations Deputy (IPMC) to ensure the monthly facility inspections are accomplished and to maintain the records of service.

# EXHIBIT M

**SDSD Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| DATE: | JUNE 1, 2023 |
|---|---|
| NUMBER: | L.1.G |
| SUBJECT: | LAUNDRY SCHEDULE |

<u>PROCEDURE</u>

To ensure incarcerated persons are provided the opportunity to exchange bedding and clothing regularly.

I.      LAUNDRY EXCHANGE SCHEDULE

      A.      Outer color-coded garments and two sets of Whites:



      B.      Blanket exchange:

           Incarcerated persons will be issued two blankets upon transfer to housing. One of the blankets is issued in lieu of a bed sheet. Blankets will be exchanged on the 1st and 3rd week of each month. The blanket exchanges will occur during the housing units regularly scheduled laundry exchange.



Once laundry has been distributed to a module, the control deputy will resume dayroom for that module. The dayroom can remain locked down for security reasons or if another task is actively being conducted in the module.

II.     AD-SEP, MEDICAL EOH CLOTHING, AND GREEN SAFETY BLANKET

L.1.G LAUNDRY SCHEDULE

A.  In all AD-SEP and Medical EOH housing units, incarcerated persons will receive a total of two green safety blankets. One green safety blanket to be used as a sheet, and the other will be used as a blanket. The schedule for these housing areas will be as follows:

    1.  Medical EOH blanket exchange conducted bi-weekly.
    2.  House 5 blanket exchange conducted bi-weekly.
    3.  House 6A blanket exchange conducted bi-weekly.
    4.  See section I. B.

B.  Green safety blankets will be exchanged on a one-for-one basis. Deputies will inspect the exchanged blankets for rips, tears, and other damages.

C.  GC 7922.000 - Safety/Security Interest

## III.  CONTROL DEPUTIES

JIMS Laundry Exchange log entry will be made to record each exchange. The type of exchange (e.g., blankets, blues, and white rolls.) will be noted in the description field of JIMS. The notes section of the log shall record the incarcerated person(s) receiving the exchange if specific incarcerated persons are receiving the exchange rather than an entire module.

## IV.  REMOVAL OF DIRTY LAUNDRY

GC 7922.000 - Safety/Security Interest

L.1.G LAUNDRY SCHEDULE

**SDSD Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | April 30, 2023 |
| **NUMBER:** | L.2.G |
| **SUBJECT:** | SANITATION AND HYGIENE INSPECTIONS |

<u>PROCEDURE</u>

Weekly sanitation and hygiene inspections are to ensure the cleanliness, sanitation, and overall operational effectiveness of the facility. This includes identifying and addressing all maintenance issues (e.g., damaged or inoperable equipment to include plumbing) throughout the facility. Sanitation and hygiene inspections shall be conducted on day shift (apart from Administrative Separation Inspections) according to the following schedule.

I.   GENERAL HOUSING

   A. Hygiene inspections for Houses 1, 2, 3, will be conducted on Saturdays and Houses 4, 6 (including Module 6A), and Medical will be conducted on Sundays.

   B. Incarcerated Persons shall be provided access to cleaning supplies prior to the hygiene inspection, except for those housed in Administrative Separation. Verbal direction shall be given to the incarcerated persons from the floor deputies as to their expectations regarding the cleanliness of the areas (e.g., sweep and mop the floors, clean the windows, surrender all unauthorized contraband, food, excess clothing, etc.)

   C. Nightshift deputies will prepare the cleaning carts prior to the end of shift on inspection days.

   D. The following guidelines will be observed:

      1. All common and living areas will be inspected for cleanliness, and sanitation.

      2. All reported maintenance issues will be documented with proper notifications for repairs.

   E. Cancellation of hygiene inspections will be at the discretion of the Watch Commander.  An entry will be made in the Watch Commander's log and the Jail Information Management System (JIMS) articulating the affected area and reason for the cancellation.

Dayrooms and common areas will be cleaned daily before each dayroom session occurs. Incarcerated Persons will be supplied with cleaning supplies as needed or upon request.

The Utilities Deputy will maintain a schedule that allows for consistent deep cleaning of each housing unit and areas of the facility. All cleaning will be logged into the JIMS Area Activity Log under the "COVID CLEAN/DISINFCT" dropdown notating what was completed.

II.   DOCUMENTATION

   A. The GBDF Module Inspection Rating Sheet will be completed for each housing area by deputies and submitted to the housing area supervisor for approval. The Trustee Operations (T-Ops) Deputy will complete Hygiene Inspection for Incarcerated Person Workers in Module 2C.

B. A copy of the approved GBDF Module Inspection Rating Sheet will be posted in each module. Once the inspection sheets are approved, it will be the responsibility of the Central Control Deputy to collect, scan and file in the GBDF MONTHLY ARCHIVE folder located in the GBDF V: drive. The hardcopy will be filed accordingly in Central Control for a period of 30 days. After 30 days, they will be collected by the Administrative Deputy for archiving.

C. A JIMS entry will be made under the event type "INSPECTION" documenting the completion of the hygiene inspection and results.

D. The Module Inspection Rating Sheets can be found in the GBDF V-drive at: "George Bailey/Housing Hygiene inspection sheets." Individual rule violations or group sanctions related to the failure of inspection will be completed per Detentions Policy and Procedure Section O.1.

E. Refer to individual Module Inspection Rating Sheets for specific instructions and scoring. Major security or law violations shall be documented in the appropriate manner.

III.  ADMINSTRATIVE SEPARATION

A. Administrative Separation housing hygiene inspections (House 5) will be conducted Friday nights. All incarcerated persons shall be handcuffed one at a time and positioned nearby. Deputies will enter the cell and remove visual contraband. Incarcerated Person Workers will remove any trash from the cell. A Hygiene Inspection Log will be filled out by the Administrative Separation deputies noting cleanliness of the cell and any maintenance issues. The log will be submitted to the Administrative Separation Sergeant who will maintain the logs in their office for a period of 30 days. After 30 days, the logs will be collected by the Administrative Deputy for archiving.

B. The completion of sanitation and hygiene inspections will be documented in the incarcerated person's JIMS history using the event type – "CISP – Cell Inspection". The JIMS event type entry shall reflect any items that necessitate documentation (i.e., maintenance issues).

C. On Friday's, the Administrative Separation Sergeant (or Southside Sergeant in their absence) will review the Hygiene Inspection Log to ensure all cells were inspected and document the completion in the JIMS Area Activity Log under the event type "INSPECTION." The Administrative Separation Hygiene Inspection Log will be archived by the Administrative Separation Sergeant.

D. If deputies are unable to enter a cell to complete a hygiene inspection due to an incarcerated person's refusal to exit, the incarcerated person may be extracted at the direction of the Watch Commander.

**SDSO Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 19, 2024** |
| **NUMBER:** | **L.3.G** |
| **SUBJECT:** | **MATTRESSES FOR INCARCERATED PERSONS** |

PROCEDURE

In all houses, clean and dirty mattresses will be stored on a bunk in the storage shed. Clean mattresses will be placed on the top bunk and dirty mattresses needing to be cleaned will be placed on the bottom bunk.  Once an incarcerated person transfers out of a module, the dirty mattress may not be reused until cleaned and disinfected per Detentions Policy and Procedure Section L.3.

Incarcerated person being transferred to another location will bring their issued mattress with them when they leave the module. This mattress will be placed in the storage shed on the bottom bunk to be disinfected. Housing deputies will issue incoming incarcerated persons a clean mattress from the house storage shed (top bunk). Housing deputies will need to keep sufficient stock of clean mattresses for incoming incarcerated persons.

Incarcerated person may be issued an extra mattress with medical staff's authorization. Authorization for an extra mattress can be verified, via JIMS Web under Inmates with Active Medical Instruction.

During routine safety checks, deputies should be looking for incarcerated persons who have double mattresses but do not have a medical authorization for an extra mattress.

The facility stock clerk will clean all dirty mattresses and rotate them into the clean mattress stock, on the top bunk. The facility stock clerk will be responsible for ensuring this task is completed.

Deputies are to place damaged mattresses on the loading dock and advise the facility stock clerk for disposal per Detentions P&P L.3.

Contaminated mattresses, which cannot be thoroughly disinfected, shall be disposed of per Detentions P&P L.3. The key to the Biohazard container and Biohazard waste bags can be obtained from GBDF Medical Staff.

Replacement of soiled and or damaged mattresses will be on a one for one basis. If an exchange cannot be done, the request must come through the Administrative Sergeant during normal business hours.

Example: If 10 more mattresses are requested, then 10 dirty mattresses should be returned to incarcerated person services as well.

**SDSO Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| DATE: | September 19, 2024 |
|---|---|
| NUMBER: | L.4.G |
| SUBJECT: | HOUSEKEEPING PLAN |

PROCEDURE

 Facility staff shall maintain a daily cleaning schedule to ensure all areas of the facility are disinfected. Deputies shall supervise in-custody workers, ensuring the cleaning is completed in a timely manner. Housing deputies are responsible for maintaining the cleanliness of the following areas: corridors, walkways, holding cells, multipurpose room, medical exam room, medical holding cell, hair care, recreation yard, janitor closet, and storage areas.  Facility custodians will clean deputy stations and deputy station restrooms.

The following cleaning schedules shall be followed in order to ensure facility cleanliness.

I.    RESPONSIBILITIES OF THE LINE STAFF/CUSTODIANS

| AREA | AM | PM |
|---|---|---|
| Visit Lobby and bathrooms | Custodian | Visit Deputy |
| Upstairs Visitor Area and hallways | Custodian | Visit Deputy (Weekends) |
| Admin | Custodian | Visit Deputy (Weekends) |
| Conference Room | Custodian | Visit Deputy (Weekends) |
| Briefing Room | Custodian | Visit Deputy (Weekends) |
| Locker Rooms | Custodian | Visit Deputy (Weekends) |
| Central Control | Custodian | Support Services |
| Booking | Custodian | Support Services |
| Medical Visiting Area | Custodian | Support Services |
| Release Corridor/Cells | Custodian | Support Services |
| Medical Offices | Custodian | Medical Staff |
| Medical Corridor | Custodian | Support Services |
| Medical Bathroom | Custodian | Support Services |
| Medical Exam Rooms | Custodian | Medical Staff |
| Safety Cells | Medical/SIM Rover (after every use) | Medical/SIM Rover (after every use) |
| Medical Horseshoe | Medical/SIM Rover | Support Services |
| Medical Corridor Bathroom | Custodian | Support Services |
| Smoking section | Custodian | Support Services |
| North/South Breezeway | Custodian | Support Services |

Medical/SIM Rover shall be responsible for cleaning safety cells and isolation cells after every use with hospital grade disinfectant and once every 24-hour period when occupied.  In the event any of the above areas are occupied on a continuous basis for a period of 24 hours or more, the area shall be observed for unsanitary conditions and cleaned to maintain the health and safety of the in-custody individual occupying the area.

In-custody individuals in the Medical Observation and Special In-custody Individual Module (SIM), who are physically able, shall maintain a clean and safe environment in their cell/room areas. In-custody individuals who are extremely ill or physically unable to manage their cell/ room environment, shall be assisted by deputies and/or nursing staff as needed.

An in-custody individual work crew supervised by the Support Services or Medical Rover shall do all general cleaning, as described under In-custody Worker Duties.

II.    VISIT DEPUTY'S GENERAL CLEANING OF VISIT LOBBY AND VISIT CORRIDOR (WEEKENDS/HOLIDAYS)

A.    The visit deputy shall ensure the visit lobby is cleaned and disinfected on weekends and holidays. The visit deputy may pick up in-custody workers to perform the cleaning as tasked above.

General cleaning shall include but is not limited to:

1.    Sweeping and mopping of visit lobby and corridors.
2.    Mopping and cleaning of all bathrooms.
3.    Emptying all trash receptacles in the visit lobby and corridors.
4.    Restocking supplies in bathrooms.

III.    CUSTODIAL STAFF WEEKLY WORK SCHEDULE

A.    Deputy Stations: facility custodians shall be allowed to enter the deputy stations to clean on a weekly basis. Facility custodians shall utilize cleaning carts with supplies designated solely for the purpose of cleaning staff areas. This cleaning is mandatory and facility custodians shall only be delayed or turned away under exigent circumstances. The cleaning of the control stations shall include, but is not limited to:

1.    Empty all trash
2.    Sweep and mop floor with disinfectant
3.    Clean all glass surfaces
4.    Dust all surfaces
5.    Clean and disinfect sink
6.    Clean and disinfect toilet
7.    Wax Floor as needed

B.    Gym: The gym will be cleaned daily by custodial staff/in-custody Worker Deputy. The gym will be cleaned and disinfected daily. The gym will also be deep cleaned three days a week. Hand sanitizer wipes and sprays shall be provided in the gym and replenished by custodial staff.

IV.    IN-CUSTODY WORKER ASSIGNED TO HOUSE CUSTODIAL DUTIES

A.    Housing Units 1 through 6:

1.    House Medical Exam Room and Holding cell:

a.    Sweep and mop floor with disinfectant
b.    Clean and disinfect sink and countertop

    c.     Empty trash can
    d.     Clean any graffiti off the walls

2.     Multi-Purpose Room:

    a.     Sweep and mop floor
    b.     Empty trash
    c.     Disinfect, straighten, and organize tables and seating area.

3.     Hair Care Room:

    a.     Sweep and mop
    b.     Clean sink

4.     House walkways:

    a.     Sweep, scrub, and/or power wash walkways from module gates to the house corridor gate.

5.     Recreation Yard:

    a.     Pick up all debris from yard area
    b.     Clean any graffiti off the walls
    c.     Sweep yard area
    d.     Wash down yard area
    e.     Clean and disinfect toilet and sink
    f.     Restock toilet paper

6.     Storage Shed:

    a.     Pick up all trash
    b.     Sweep and scrub floor
    c.     Disinfect used mattresses on "Used Mattress Shelf"
    d.     Store clean mattresses on "Clean Mattress Shelf"
    e.     Stock cleaning carts

7.     Janitor's Closet:

    a.     Clean shelf unit
    b.     Scrub floor-sink
    c.     Wipe down cleaning fluid dispenser
    d.     Sweep and mop floor

8.     Security Trash:

    a.     Collect security trash from deputy station and deposit in security trash bins (only) at the corridor gates under the direct supervision of sworn staff.

V.     HOUSING UNIT SHOWERS

    A.     The Utilities deputy shall supervise an in-custody work crew to ensure housing unit showers are cleaned as needed per the Administrative Sergeant.

VI.    CLEANING CARTS FOR HOUSING UNITS

    A.     All housing units within the facility shall have access to a cleaning cart and cleaning supplies.

        1. Housing units 1 through 6 (Except House 5):  Each Housing module shall  have a complete cleaning cart assigned to its area.  Each cart shall have the following supplies:

            1- Broom
            1- Mop
            1- Scrub brush w/handle
            1- Fox tail brush
            1- Dustpan
            2- Spray bottles
            1- Mop bucket w/wringer
            1- Sponge
            1- Pair of gloves

        2. House 5:  If necessary and deemed safe (classification and in-custody behavior), in-custody individuals assigned to House 5 shall have a modified cleaning cart to clean their cells with the following supplies:

            1- Fox tail brush
            1- Dustpan
            2- Spray bottles
            1- Mop and bucket w/wringer
            1- Sponge

        3.     Medical/SIMS (101, 102 and 103): Shall have access to a complete cleaning cart as needed.

    B.     If any of these items become damaged or needing replacement, the storekeeper shall be notified for replacement.

    C.     If it is necessary but deemed unsafe to provide cleaning materials to the in-custody individuals, the in-custody individuals shall be placed in the secured dayroom enclosure and in-custody workers shall be utilized to clean the cell.

    D.     Sworn staff will ensure all cleaning materials are accounted for prior to and when each in-custody individual is done cleaning. ONLY in-custody workers assigned to clean House 5 shall have access to a complete cleaning cart to clean the dayrooms under direct supervision of sworn staff.

**MRSA Precautions and Cleaning**

Whenever an in-custody individual infected with the MRSA virus comes in to contact with jail property such as holding cells, mattresses, vehicles if transported, and clothing; adequate cleaning and disinfecting measures shall be adhered to.

Ensure that equipment used and rooms of patients with MRSA are prioritized for cleaning and disinfecting with focus on frequently touched surfaces.  Dedicate cleaning equipment exclusively for MRSA cleaning.

Quat- 64 is the cleaning solution used by the county.  Quat-64 is effective against MRSA.  In-custody individuals transferring out of the MRSA ward (Isolation Cell) should shower, be issued new bed rolls, jail clothing, footwear, and hygiene kits prior to transferring to mainline housing.

**SDSD Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | APRIL 20,2023 |
| **NUMBER:** | L.5.G |
| **SUBJECT:** | TRASH REMOVAL |

PROCEDURE

I.      NON-HOUSING AREAS

      The facility custodian or incarcerated person worker crew under the supervision of the Visit Deputy or Facility Rover, will pick up trash from the administrative area. The trash will be placed in the dumpster located in the loading dock.

II.      HOUSING UNITS

      After each meal, all trash will be removed with the meal carts utilizing a trash cart. Incarcerated person workers will move trash and the meal carts to the kitchen area. Incarcerated person workers, under the supervision of a deputy, will move all the trash to the dumpster located in the loading dock.

III.      SECURITY TRASH

      All security trash accumulated inside the facility will be picked up at the end of shift by the incarcerated person worker deputies. The deputy will ensure all locked security trash containers located at the end of the North/South Corridors are emptied and all security trash is placed into the trash compactor in the loading dock.

**SDSO Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 19, 2024** |
| **NUMBER:** | **L.6.G** |
| **SUBJECT:** | **HAZARDOUS WASTE BUSINESS PLAN** |

PROCEDURE

The George Bailey Detention Facility (GBDF) is a generator of hazardous and universal wastes and must follow certain Federal and State laws to ensure these wastes will be properly managed to protect public health and the environment.  A Hazardous Waste Business Plan (HWBP) needs to be implemented at any facility that generates hazardous and universal waste. The HWBP will provide guidelines for the maintenance, use, storage, disposal and training which are documented to show that all persons, both staff and incarcerated persons know how to use hazardous materials in a safe and appropriate manner.

Hazardous and universal wastes may not be disposed of in the regular trash, onto the surface of the ground, into storm drains or into the sewer system.  All hazardous wastes must be disposed of at State permitted treatment, storage or disposal facility.

STORAGE OF HAZARDOUS WASTES:

At a minimum, hazardous and universal waste must be stored using the following criteria:

- Stored in non-leaking tank or containers in good condition with tight-fitting lids

- Are kept closed when wastes are not being added or removed

- Accurately labeled with water-proof stickers.  Labels must specify the words "Hazardous Waste"; the composition and physical state of the waste; the hazardous properties of the waste (e.g., flammable, reactive, etc.); and the name and address of the generator

- Labeled with the date that the waste accumulation began on each tank or container

- Managed in a way that minimizes the possibility of spills and escape of waste into the environment

- Incompatible waste not stored in a common storage area without proper separation

- Ignitable or reactive waste: Stored at least 15 meters (50 ft.) from property lines

- Stored onsite according to storage time limits prescribed in the regulations

All GBDF hazardous materials and waste will be stored at the GBDF Operations Shed, located behind House 1.

1. STORAGE

    When not in use all hazardous materials will be locked in the storage shed.  These include, but are not limited to;

    A. Paint
    B. Paint Thinner

    C. Gasoline
    D. Solvents
    E. Cleaning Compounds
    F. Adhesives
    G. Acids

2. DISPOSAL

Disposing of hazardous materials and wastes will be conducted in the manner outlined in the Departmental Policy and Procedure Manual Section 6.114.

EMERGENCY PROCEDURES:

In the event of a hazardous waste spill, release, fire or explosion, the release must be reported as follows:

1. Notify your local fire department (911) and the Hazardous Materials Division at (619) 338-2284

2. Additionally in every situation which threatens human health or the environment, a notification must be made to the California Emergency Management Agency 1-800-852-7550, and provide the following information:

    - Name and telephone number of person reporting;

    - Name and address of facility;

    - Time and type of incident;

    - Name and quantity of hazardous material(s) involved;

    - Extent of injuries;

    - Possible hazard to human health and the environment outside the facility.

During the emergency, you must take all reasonable measures to ensure that fires, explosions, and chemical releases do not spread. These measures may include:

    - Stopping operations;

    - Collecting and containing released waste; and

    - Removing or isolating chemical containers.

To be in compliance with the Hazardous Materials Business Plan, quarterly briefing training will be conducted covering the discussed storage of hazardous wastes and basic emergency procedures. Training is to include a brief discussion of locations of emergency equipment and shut-off valves.  In addition, the training will include possible evacuation plans (reference Detention Policy H.3).

A copy of the training roster will remain on file with the Facility Training Coordinator and the Hazardous Material Coordinator.

The GBDF Operations Deputy is assigned the Hazardous Material Coordinator as part of operations duties and will be responsible for conducting annual audits of hazardous wastes stored within the facility.

**SDSD Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | AUGUST 24, 2021 |
| **NUMBER:** | L.7.G |
| **SUBJECT:** | RAZORS |

<u>PROCEDURE</u>

I.      STORAGE

    A.  All razors will be stored in the storage shed or locked closet. Razors are disposable and are for one-time use. Razors are not to be shared by in-custody individuals.

II.     DISTRIBUTION

    A.  In-custody individuals not currently on "Razor Restriction", must be given access to a razor daily. To ensure all in-custody individuals are given access to a razor, except for in-custody individuals with active "Razor Restrictions", deputies will utilize on of the following methods below:

        1.      Distribute razors after the in-custody individuals have been locked down for night count.

        2.      Prior to night count, deputies may use their discretion to distribute razors from the appropriate service window to the tier that is out for dayroom. After night count, the deputies will then distribute razors to the tier that was not scheduled for dayroom.

        3.      Deputies may alternatively choose to distribute razors to each quad/cell prior to the start of their dayroom time.

    B.  Prior to razor distribution, deputies shall review the JIMS Web Report, "Active Inmates with Selected Hazards: Razor Restriction". Any in-custody individuals found on this list will not be offered a razor. The facility commander or his/her designee may also suspend razor distribution to any in-custody individual considered to be a danger to themselves or others. Once reviewed, deputies shall make an entry in the JIMS Area Activity Log using the event type, "Razor Restriction List Reviewed." If razors are to be distributed during dayroom time, those in-custody individuals with "Razor Restriction" shall be removed from the module until razors are collected.

    C.  ▮▮GC 7922.000 - Safety/Security Interest▮▮
      ▮▮▮▮▮▮▮▮▮▮

    D.  The floor deputy will advise the housing control deputy of the number of razors distributed into each module. The housing control deputy will make a notation in the Jail Information Management System (JIMS) Area Activity documenting the number of razors distributed.

III.    COLLECTION

A. Deputies will collect razors prior to the next safety check, ensuring in-custody individuals received at least a minimum of 15 minutes to shave. The deputies will inspect each razor to ensure the blade is intact and the razor has not been altered in any way. GC 7922.000 - Safety/Security Interest

B. The floor deputy will advise the housing control deputy of the number of razors collected from each module. The housing control deputy will make a notation in the JIMS Area Activity documenting the number of razors collected.

C. In-custody individuals not returning or altering their razor will be subject to disciplinary action.

D. Any time a razor comes up, "missing" or is not returned to the deputies, the watch commander and the  area sergeant will be notified immediately and will determine the proper course of action (i.e. search or other means of collecting the razor.) All missing razors will be logged in a JIMS entry under the affected housing unit, as well as an entered into the watch commander's log.

## IV.   DISPOSAL OF USED RAZORS


GC 7922.000 - Safety/Security Interest

Deputies collecting razors shall take universal precautions while collecting razors to avoid encountering bodily fluids.

## V.   RAZOR RESTRICTION REMOVAL PROCESS

In-custody individuals on Razor Restriction for any reason, other than mental health concerns (in-custody individuals who do not have a medical instruction for "no razor"), may request to be removed from the razor restriction list by notifying the watch commander. In-custody individuals on the razor restriction list due to a prior suicide attempt with a razor, knife or similar implement will remain on the razor restriction list for their entire time in custody. In-custody individuals with a razor restriction may request a clipper shave during scheduled barber days.

**SDSO Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 19, 2024** |
| **NUMBER:** | **L.9.G** |
| **SUBJECT:** | **HAIRCUTS/HAIR CARE** |

PROCEDURE

After soft count is completed, incarcerated worker barbers will be escorted from House 2 Module C by the Incarcerated Worker Deputy or any available deputy and escorted to the house scheduled for haircuts.  Every incarcerated person in each module will be afforded an opportunity to receive a haircut.

I.      INCARCERATED PERSON HAIRCUTS:

        A.      Schedule:

                Monday- House 1
                Tuesday- House 2
                Wednesday- House 3
                Thursday- House 4
                Friday- House 6
                Saturday- House 5
                Sunday- Medical

        B.      Except for the lunch hard count, the barbers shall be available the entire shift to ensure all incarcerated persons have an opportunity to receive a haircut. Refer to Section I.43.G for incarcerated worker count procedures. Deputies should use the full time available, if needed, to ensure all incarcerated persons in each module are given the opportunity to receive a haircut. Upon completion, Housing Control deputies must log which areas were offered haircuts. If barbers are returned before mealtime, worker meals will not be necessary.

        C.      Haircuts will consist of a #1, #2, or #3 clipper cut only, with no combinations.  Facial haircuts will be prohibited unless the incarcerated person has a medical authorization indicating a clipper cut has been approved.

        D.      Haircuts will be done in the house recreation yard, weather permitting.  In inclement weather, they will be postponed.

        E.      No more than 25 incarcerated persons will be allowed on the recreation yard at one time. Incarcerated persons will be instructed to stay away from the barbers and their haircutting equipment, giving the barbers at least 10 feet of distance.  Direct supervision will be conducted to monitor the activities in these houses.

        F.      In House 5 and House 6 Module "A" (Administrative Separation/Disciplinary Isolation) haircuts will be allowed to only one incarcerated person at a time for every available barber.

II.     INVENTORY AND SANITATION

A.      Housing deputies will visually account for the barber's equipment and complete a barber equipment checklist. The checklist will be provided to the barbers by the Incarcerated Worker deputy.

B.      The Incarcerated Worker deputy will be responsible for collecting the checklist from the barbers and replacing damaged or missing items. Each of the barber bags will have the following equipment: 5 nail clippers and 4 detachable blades (# 000, #1, #2, and #3 blades). The barbers will have one multiple outlet extension cord and one longer single outlet extension cord.

C.      Barbers are trained in the proper sterilization of the clipper cutting blades.  After each haircut, the blades and clipper must be sprayed with "Clippercide" and set aside for 10 minutes. During this time, a second set of blades and clipper will be used.  Clipper blades must be sterilized accordingly after each use.

III.    NAIL CLIPPERS

Nail clippers will be made available to the incarcerated persons while haircuts are being given. When all haircuts are complete, the housing deputy shall inventory and inspect all the returned, nail clippers. Particular attention should be given to assure that there are no damaged or missing parts.

**SDSO Detention Services Bureau – George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 16, 2024** |
| **NUMBER:** | **L.11.G** |
| **SUBJECT:** | **PERSONAL HYGIENE** |

<u>PROCEDURE</u>

I.  HYGIENE KIT

Newly transferred incarcerated persons will be issued a hygiene kit prior to entering their newly assigned housing unit. The hygiene kits are located inside the bedrolls.

II. WELFARE PACKS

Welfare packs will be supplied to indigent incarcerated persons as defined in department policy. Incarcerated persons welfare packs will be distributed with the commissary delivery.

III. TOILET PAPER

A.  Incarcerated Persons will receive toilet paper upon request.

B.  During Weekly Hygiene Inspection, the deputy will ensure that each cell/bunk has toilet paper to accommodate the number of incarcerated person in that module. If      there is an excessive amount of toilet paper, the deputy will remove the excess for redistribution at another time.

**SDSO Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 19, 2024** |
| **NUMBER:** | **L.13.G** |
| **SUBJECT:** | **PEST AND VERMIN CONTROL** |

PROCEDURE

The GBDF Operations Deputy will serve as the Integrated Pest Management Coordinator (IMPC).  The County Integrated Pest Management technician will inspect the buildings and grounds of GBDF for any pest and/or vermin infestation monthly.  The technician will submit a written report to the Operations Deputy detailing any infestations discovered during the monthly inspection.  Between inspections the IMPC will investigate any infestation reported by staff as soon as practical.

The Operations Deputy will be responsible to contact the Department of Agriculture and Pest Management office and the County Integrated Pest Management office if necessary.

**SDSO Detention Services Bureau—George Bailey Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 19, 2024** |
| **NUMBER:** | **M.41.G** |
| **SUBJECT:** | **INFECTION CONTROL: MEDICAL WASTE** |

<u>PROCEDURE</u>

It will be the responsibility of sworn personnel to ensure the proper handling of infectious materials and the proper disposal of regulated waste that may be encountered in the course of their duties is discarded.

When handling infectious waste, it is recommended that the Healthcare Services Assistant Training (HSAT) incarcerated person (IP) workers from House 2C are utilized to clean and handle biohazardous waste. HSAT supplies are located in the House 2 Multi-Purpose Room storage closet. Refer to the HSAT schedules posted on the GBDF intranet website.

I.      SWORN STAFF HANDLING BIOHAZARDOUS WASTE

      A.      When handling biohazardous waste, the following universal precautions will be used:

            1.      Latex gloves must be worn when handling items or surfaces possibly or obviously contaminated with blood, bodily fluids, or other potentially infectious materials.

            2.      After removing latex gloves, hands should be washed immediately with water and antiseptic cleanser.

            3.      Deputy clothing contaminated with blood or other bodily fluids should be removed as soon as possible and separated from other clothing until properly laundered.

            4.      All surfaces and equipment contaminated with infectious material should be cleaned immediately with a bleach solution (1:10 dilution of household bleach to water).

      B.      Soiled paper towels, sponges, mops, and latex gloves will be placed in a clear plastic bag. The clear bag will be tied securely and placed in a red biohazard bag. The red bag will be tied securely to prevent leakage or loss of wastes during storage, handling, or transport. Contaminated laundry will be disposed of in the same manner. The sworn staff on scene will be responsible for disposal of the red biohazardous bag. The key or combination to the locked biohazardous materials dumpster will be obtained from the medical staff.

      C.      The items necessary for proper handling of biohazardous waste (bodily fluids) and regulated waste material (medical supply waste) are as follows:

            1.      Latex gloves

2. Bloodborne pathogen clean up kit (located in the Medical Supply Room)

3. Clear plastic trash bags(s)

4. Red biohazard bag(s) (located in the Medical Supply Room)

5. Locked Biohazardous waste dumpster (located in the Vehicle Sally Port)

D. Once hazardous items have been bagged and sealed in a red biohazardous waste bag, they will be taken to the biohazardous waste dumpster and disposed of. These red bags are to be taken directly to the dumpster by the sworn staff responsible for the cleanup or a designee and are not to be left in any location inside the facility.

# EXHIBIT N

**SDSD Detention Services Bureau—Vista Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **June 6, 2023** |
| **NUMBER:** | **L.1.V** |
| **SUBJECT:** | **LAUNDRY SCHEDULE** |

<u>PROCEDURE</u>

I.    LAUNDRY SCHEDULE

    A.    All modules shall follow the laundry schedule whereby bedding, clothing, and religious items will be exchanged regularly.  The schedule is available on the Vista Detention Facility (VDF) SharePoint website.

    B.    Programs, visits, and church services will not be cancelled to conduct laundry exchange unless authorized by the Watch Commander.

    C.    VDF laundry workers will provide religious items to housing unit deputies to distribute to qualified incarcerated persons.

        1.    Prayer Rugs will be exchanged on the first day of clothing exchange every month.

        2.    Religious headwear will be exchanged weekly during clothing exchange.

II.    STANDARD BEDDING

    A.    The Veteran's Moving Forward (VMF) Program will have a laundry cart containing white shorts and undergarments to accommodate extra recreational yard and other programming.

    B.    Advanced age incarcerated persons housed in South House Module 4 and those participants housed in the Medication Assisted Treatment module will be issued a sweatshirt and an extra blanket.

LAUNDRY SCHEDULE

**SDSD Detention Services Bureau—Vista Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **September 14, 2023** |
| **NUMBER:** | **L.2.V** |
| **SUBJECT:** | **SANITATION AND  HYGIENE INSPECTIONS** |

PROCEDURE

I.    HYGIENE INSPECTIONS

Sanitation and hygiene inspections will be conducted regularly to ensure the Vista Detention Facility (VDF) is kept clean and sanitary. This procedure shall be followed to ensure the inspections are completed and deficiencies are corrected.

A.    Each module will be inspected weekly during dayshift. The results of the inspection will be documented on a VDF Module Inspection Rating Sheet GC 7922.000 - Safety/Security Interest ▮▮▮▮▮▮▮▮▮▮ The Security Sergeant and Watch Commander will review completed inspection sheets and copy them to the VDF shared drive archives folder.

B.    Housing Deputies will inspect housing modules. The Incarcerated person Worker Deputy will inspect Incarcerated workers modules. The Medical Deputy will inspect medical housing modules.

C.    Incarcerated persons in administrative separation and/or disciplinary separation will be secured in handcuffs or waist chains prior to exiting their cell for inspections.

D.    Incarcerated persons will be afforded the opportunity to clean and remedy violations prior to the inspection. Examples of minor violations include extra clothing, blankets, and mattresses, trash, graffiti, covered vents, covered intercom and excess food. Examples of major violations include razors, tattoo kits, hidden contraband, excess medication, and unready cells.

E.    A deputy shall visually and physically inspect the functionality of cell intercoms, toilet and water fixtures. If not properly functioning the inspecting deputies shall notify a supervisor and enter a facility maintenance request. Baring exigent circumstances, if a cell intercom is found to be out of service, that cell shall be placed out of service until the intercom is repaired.

F.    Each module with cells and dorm style housing will be inspected for cleanliness, maintenance, and security issues. The grading is a PASS or FAIL system. To receive a passing grade, incarcerated persons cells and dorm sleeping areas must be clean with no excess trash, food, bedding, etc.

Individual cells that PASS will be awarded an extra hour of dayroom time which will occur on GC 7922.000 - Safety/Security Interest Housing modules operating on a tier program shall allow one tier an extra hour of dayroom time on Saturday night and the opposite tier shall receive an extra hour of dayroom time on Sunday night.

II.     MODULE CLEANLINESS INSPECTION SCHEDULE

A.  North House Modules 1-3 will be completed on Saturday. North House Modules 4-6 will be completed on Sunday.

B.  Upper West House Modules 1-3 will be completed on Saturday. Upper West Modules 4-6 will be completed on Sunday.

C.  Lower West House Modules 1-2 will be completed on Saturday. Lower West 4-6 will be completed on Sunday. Lower West 3 will be completed by the Veteran's Programming Liaison (VPL) Deputy on Friday.

D.  East House Modules 1-3 will be completed on Saturday. East House Modules 4-6 will be completed on Sunday.

E.  South House Modules 1, 4, 5, and 6 will be completed on Saturday. South House Modules 2 and 3 will be completed on Saturday or Sunday at the discretion of the incarcerated person Worker Deputy.

F.  Medical Housing Modules will be completed on Sunday.

**SDSD Detention Services Bureau—Vista Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **July 20, 2023** |
| **NUMBER:** | **L.3.V** |
| **SUBJECT:** | **MATTRESSES FOR INCARCERATED PERSONS** |

<u>PROCEDURE</u>

MATTRESS CLEANING

A.  An incarcerated workers cleaning crew will be responsible for cleaning soiled mattresses stored in each housing unit. The crew will be sent out to perform this task between ▮GC 7922.000 - Safety/Security Interest▮ ▮▮▮▮▮▮▮▮▮▮ or as needed by each housing unit. The crew will have all necessary equipment to properly clean the mattresses.

B.  The cleaning entails a wipe-down of both sides of the mattress with disinfectant. The length of this process will vary depending on the number of soiled mattresses.

C.  To prevent clean mattresses from being mixed with soiled mattresses, soiled mattresses will be stacked on the floor next to the mattress rack. Once the mattresses are clean and dry, they will be placed on the mattress rack.

D.  The 4-inch mattresses are only authorized for the Medical Isolation cells, Medical Ward 2, Medical Ward 3, I/W modules, MAT program module, Veterans Moving Forward module, and the advanced age module.

**SDSD Detention Services Bureau—Vista Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **October 20, 2023** |
| **NUMBER:** | **L.4.V** |
| **SUBJECT:** | **HOUSEKEEPING PLAN** |

<u>PROCEDURE</u>

The facility will be cleaned regularly by incarcerated worker crews under the direct supervision of the facility custodian, the Incarcerated Person Worker Deputy or a sworn staff member. Facility computers on which any program/application which shows sensitive or personal information, shall have the screen locked or program/application minimized for the duration of cleaning if incarcerated persons are present.

I.  ENTRANCES, EXITS, HALLWAYS, PROFESSIONAL STAFF AREAS AND LOBBY

   A.  The VDF administrative offices, staff booking area, staff medical area, information lobby and facility entrance areas will be cleaned Monday through Friday by the custodian.

   B.  GC 7922.000 - Safety/Security Interest

   C.  Assigned incarcerated workers, under the general supervision of a food service employee, will clean the kitchen and staff dining areas after every meal period.

II.  INCARCERATED PERSONS HOUSING AREAS AND DEPUTY STATIONS

   A.  All housing units will be cleaned by the incarcerated persons housed in each area under the supervision of the Housing Rover. Lower West, Upper West, North, East, and South will have dedicated cleaning carts on site. In addition to the daily cleaning, access to the cleaning cart before the weekly inspection must be allowed. Administrative Separation dayrooms will be cleaned daily by incarcerated workers. IP Workers shall be escorted and observed while cleaning the Administrative Separation Modules. All cleaning carts shall be inspected by a Housing Rover prior to being given to the incarcerated persons for use and after each use.

   B.
       North House Module 1 (Admistrative Separtation IPs) shall be afforded the opportunity to use a cleaning cart and its contents to clean N1. The opportunity to clean the module will be on a rotating basis where one cell per day has the opportunity to clean the module. If an IP refuses the opportunity to clean, the next cell will be afforded the opportunity to clean. This should be done at the conclusion of the dayrooms for each day.

       1.  Each cleaning cart will contain the following:

           a.  One mop bucket with wringer
           b.  One mop
           c.  One broom
           d.  One dustpan
           e.  One scrub brush
           f.  Three squirt bottles (one containing disinfectant, one containing degreaser, and one containing window cleaner).

2.  The incarcerated worker cleaning cart will contain the following items:

    a.  One mop bucket
    b.  One mop
    c.  One broom
    d.  One scrub brush
    e.  One squeegee

    f.  One toilet brush
    g.  One toilet plunger
    h.  Three squirt bottles (one disinfectant, one degreaser, and one window cleaner)

C.  Two incarcerated persons will be given the opportunity to clean after each meal. A fully stocked cleaning cart with clean mop water will be placed into the module and the incarcerated persons will be given the opportunity to clean.

D.  The cleaning cart must be inspected before it enters the module and after it exits the module. The cart must be inspected for proper supplies and any evidence of damage or vandalism. Any incident of damage or vandalism shall be documented.

E.  Incarcerated workers house cleaning crews shall restock and clean the contents of the carts. Additionally, they shall clean the vestibules, recreation yards, and visit areas. The Incarcerated PersonDeputy shall develop a schedule for the incarcerated person worker cleaning crews that allows for daily cleaning rounds.

F.  During dayshift, the deputy's stations will be cleaned Monday through Friday by the custodian.

## III.  MEDICAL HOUSING, STAFF AREAS AND EXAM ROOMS

A.  Medical Ward 2 and the isolation cells will be cleaned daily by the incarcerated persons housed in each area, under the supervision of the Medical Rover. This will be done daily as outlined in Sections II-B and C.

B.  Medical Ward 1 (EOH) shall be cleaned daily as outlined below.

1.  The Medical Rover will coordinate with the South House Deputies to send the incarcerated workers cleaning crew.

C.  Medical Ward 3 will be provided a cleaning cart with supplies for the incarcerated persons to clean the module themselves.

D.  The Medical Exam Rooms shall be cleaned once a day and as needed. The Clinics Deputy will supervise an incarcerated worker for the daily cleaning.

## IV.  DAILY & NIGHTLY CLEANING DUTIES

A.  The following areas will be cleaned by the Visit Deputy: visit areas, public lobby and public entrance. The Incarcerated Person Worker Deputy will clean the Vehicle Sally Port. The

Incarcerated Worker Deputy will also adhere to the schedule below and have each area cleaned to include the inner and outer vestibule areas.

B. The Incarcerated Worker Deputy will develop a schedule to have a floor crew sent out after night count to clean and polish all areas of the facility.

GC 7922.000 - Safety/Security

Lower West Deputy Station
Lower West Recreation Yard
Intake Common Break Area

GC 7922.000 - Safety/Security

Upper West Deputy Station
Upper West Recreation Yard
Intake Common Break Area

GC 7922.000 - Safety/Security Interest

North House Deputy Station
North House Recreation Yard
Intake Common Break Area

GC 7922.000 - Safety/Security Interest

East House Deputy Station
Control Recreation Yard
Intake Common Break Area

GC 7922.000 - Safety/Se

Medical Deputy Station
Intake Common Break Area

GC 7922.000 - Safety/Security Interest

South House Deputy Station
Intake Common Break Area
Facility Restrooms

GC 7922.000 - Safety/Secur

Control Deputy Station
Intake Common Break Area
Male/Female Intake Holding Cells
Restrooms

*All intercoms, toilets and water fountains will be checked for maintenance issues. If a maintenance issue is discovered, maintenance will be notified at GC 7922.000 - Privacy Interest

HOUSEKEEPING PLAN                                                    Page 3 of 3

**SDSD Detention Services Bureau—Vista Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **June 21, 2023** |
| **NUMBER:** | **L.5.V** |
| **SUBJECT:** | **TRASH REMOVAL** |

<u>PROCEDURE</u>

I.    REMOVAL OF NON-SECURITY TRASH FROM HOUSING UNITS

A module trash run will be conducted after every incarcerated person meal. Module trash will be placed on the chow carts and returned to the kitchen after each meal. The trash will be placed in the bins GC 7922.000 - Safety/Security Interest  It will be the responsibility of the South Housing Deputy or South/East Rover Deputy to coordinate the trash run GC 7922.000 - Safety/Security Interest

II.    REMOVAL OF SECURITY TRASH

It will be the responsibility of sworn staff to remove the security trash from the facility.
GC 7922.000 - Safety/Security Interest

III.    REMOVAL OF KITCHEN TRASH

It will be the responsibility of the Food Services Division (FSD) staff to remove any trash accumulated in the area of the kitchen and dining area. GC 7922.000 - Safety/Security Interest

IV.    ADMINISTRATIVE AND DISCIPLINARY SEPARATION CELLS

Housing Deputies shall collect trash from administrative and disciplinary separation cells at minimum after the breakfast and dinner meals.

SDSD Detention Services Bureau—Vista Detention Facility Green Sheet

| | |
|---|---|
| **DATE:** | **July 19, 2023** |
| **NUMBER:** | **L.7.V** |
| **SUBJECT:** | **RAZORS** |

PROCEDURE

I.    RAZOR DISTRIBUTION

A.  Razors will be distributed on night shift before 2200 hours to all modules. For mainline incarcerated persons, razors will be exchanged only on night shift.

B.  Incarcerated persons with a "razor restriction" hazard will be removed from the module if razors are distributed and escorted to a holding area/recreation yard where they do not have razor access.

C.  Incarcerated persons with a clipper shave chrono and/or on razor restriction shall be given the opportunity to shave with a cordless electric razor.

   i.   Cordless electric razors are in the deputy stations of Medical, East, South, North, Upper West, and Lower West houses. Each house is responsible for ensuring the electric razor is charged when not in use.
   ii.  These incarcerated persons will be afforded the opportunity to use the cordless electric razor if requested during night shift razor exchange.  The use of the electric razor will be under the supervision of sworn staff or alone inside a secured cell.
   iii. The cordless electric razor must be disinfected in between each use. The deputy will place the Electric Razor inside of the cup of solution and turn it on for approximately 5 seconds. This practice should take place before the next use of the electric razor.
   iv.  The cordless electric razor in each house will be accounted for each shift utilizing the JIMS area checklist.

D.  The deputy distributing razors will check the incarcerated person's wristband and make a notation on the Jail Information Management System (JIMS) Floor Count Sheet, noting the incarcerated person received a razor.

E.  Incarcerated workers will be permitted to shave twice daily. Incarcerated workers will be issued razors using the JIMS floor count sheet in accordance with the mainline incarcerated person.

F.  GC 7922.000 - Safety/Security Interest ███████████████████ can be given razors inside their cells or at the time of their shower, unless otherwise documented and/or at the discretion of the housing deputy.

G.  GC 7922.000 - Safety/Security Interest ███████████████████████████ will be provided a razor during night shift at the completion of the last scheduled dayroom time.  The razor is to be used within the incarcerated person's cell only.

II.     RAZOR COLLECTION

    A.  The deputy will verify the incarcerated person's identity, via their wristband and document the return of the razor on the JIMS Floor Count Sheet. GC 7922.000 - Safety/Security Interest ███████████████████████████████████████████████████

███████

    B.  Once all the outstanding razors have been accounted for, the JIMS Floor Count Sheet shall be discarded.

III.    DISPOSAL

GC 7922.000 - Safety/Security Interest ████████████████████████████
████████████████████████

**SDSD Detention Services Bureau—Vista Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **July 14, 2023** |
| **NUMBER:** | **L.9.V** |
| **SUBJECT:** | **HAIRCUTS/HAIR CARE** |

PROCEDURE

VDF offers hair and nail care to each housing unit for several days once per month, following the Barber Schedule on the VDF SharePoint site. Incarcerated persons out to court during the scheduled hair and nail care day will be given access to hair and nail care upon their return. This is necessary due to the hair and nail care only be offered once a month.

I.      HOURS AND SCHEDULE

The hours to complete this procedure will be flexible to accommodate the daily tasks of the housing operation. The Barber Schedule will be posted on the VDF SharePoint site.

II.     INVENTORY AND LOG ENTRIES

A.     An inventory list for transgender individual barber/cosmetic items will be kept with the cosmetic box in East House. An inventory list for the barber cart will be kept in South House. Items on the list shall be accounted for before and after use. The following procedure will be adhered to:

1.     Four nail clippers and Barbicide will remain in the cart at all times. A deputy must stand by while an incarcerated barber sanitizes the clippers between each use.

2.     One hairbrush, two combs, and one pair of hair scissors will remain in the cosmetic box in East House. These items are to be used by the barbers for haircuts of transgender individuals only. A deputy must stand by while an incarcerated worker sanitizes all items between each use.

a.     GC 7922.000 - Safety/Security Interest

b.     The hair scissors will only be used under the direct supervision of a deputy.

B.     Each individual housing unit will make a log entry in JIMS under the BARBER drop-down. In the notes section, the housing deputy will indicate the number of nail clippers on the cart when it arrives to the housing unit.

C.     At the conclusion, the housing deputy will make a second entry in JIMS under the BARBER drop-down. The notes section will state the number of nail clippers leaving the housing unit.

**SDSD Detention Services Bureau—Vista Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **June 6, 2023** |
| **NUMBER:** | **L.11.V** |
| **SUBJECT:** | **PERSONAL HYGIENE** |

PROCEDURE

I.   SHOWER

Incarcerated persons with no access to a dayroom (i.e., disciplinary separation, Receiving Female 9, Medical Isolation, and South House Module 6) shall have a Jail Information Management System (JIMS) entry in their history under event type "SHWR."

II.   WELFARE PACKS

Welfare Packs for indigent incarcerated persons will be distributed on the day they are delivered to the facility by Sheriff's Commissary.

**SDSD Detention Services Bureau—Vista Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | **June 6, 2023** |
| **NUMBER:** | **L.13.V** |
| **SUBJECT:** | **PEST AND VERMIN CONTROL** |

<u>PROCEDURE</u>

Monthly vermin and pest control inspections will be conducted by licensed professionals. Any identified conditions, including the presence of insects, rodents, and/or vermin shall be eradicated under the direction of the Integrated Pest Control Program with the Department of Agriculture, Weights and Measures. All requests for pest control service outside of the monthly inspections will be submitted to the Administrative Sergeant and Operations Deputy. The Operations Deputy will make notifications and coordinate any additional services.

SDSD Detention Services Bureau—Vista Detention Facility Green Sheet

| | |
|---|---|
| **DATE:** | **June 6, 2023** |
| **NUMBER:** | **M.41.V** |
| **SUBJECT:** | **INFECTION CONTROL, MEDICAL WASTE** |

PROCEDURE

I.     SWORN STAFF HANDLING BIOHAZARDOUS WASTE

    A. When handling biohazardous waste, the following universal precautions will be used:

        1.  Protective gloves (latex/nitrile etc.) must be worn when handling items or contacting surfaces obviously contaminated with blood, bodily fluids or other potentially infectious materials.

        2.  After removing protective gloves, hands should be washed immediately with hot water and an antiseptic cleanser.

        3.  Deputy clothing that has been contaminated with blood or other bodily fluids should be removed as soon as possible and separated from other clothing until properly laundered.

        4.  All surfaces and equipment contaminated with infectious materials will be cleaned immediately with a bleach solution (one and two thirds cup of household bleach to one gallon of water). Only pre-authorized personnel shall handle the mixing of the bleach solution. Pre-authorized personnel include the storekeeper and custodian. The Incarcerated Person Worker Deputies and the Operations Deputy are authorized to prepare the solution in the absence of the storekeeper and/or custodian.

    B. Soiled paper towels, sponges, mops, and protective gloves will be placed in a clear plastic bag. The clear bag will be tied securely and placed in a red biohazard bag. The red biohazard bag will be tied securely to prevent leakage or loss of waste during storage, handling or transport. Contaminated laundry will be disposed of in the same manner. The sworn staff on scene will be responsible for disposal of the red biohazard bag. GC 7922.000 - Safety/Security Interest

    C. The items necessary for proper handling of biohazardous waste (bodily fluids) and regulated waste and material (medical supply waste) are as follows:

        1. Protective gloves
        2. Bloodborne pathogen clean up kit
        3. Clear plastic bags
        4. Red biohazard bags

II.     INCARCERATED PERSON WORKER REQUIRED PERSONAL PROTECTIVE
      EQUIPMENT (PPE)

A. When cleaning or handling biohazard waste, the following PPE items will be used by the incarcerated person workers:

1. Protective gloves
2. Safety glasses/goggles
3. Protective mask
4. Shoe/boot covers
5. Coveralls/fluid resistant material (protective paper suits)

B. PPE for the incarcerated person workers will be stored in the biohazard cart. The biohazard cart will be GC 7922.000 - Safety/Security Interest    If the biohazard cart is needed, a deputy will retrieve the cart GC 7922.000 - Safety/Security Interest for the incarcerated person workers.

III.  BIOHAZARD CART

A. Biohazard cart will be stocked with all necessary PPE for cleaning crew and biohazard cleaning supplies. This cart can be used to facilitate the cleanup of high-risk spills due to the presence of bodily fluids or medical waste. The storekeeper will monitor and re-supply the biohazard cart on a weekly basis.

B. The following items will be maintained on the "Biohazard Cart":

1. Protective gloves
2. Reusable safety glasses/goggles
3. Protective face masks (additional masks located in watch commander office)
4. Face shield
5. Shoe/boot covers
6. Yellow gowns
7. Coveralls/fluid resistant material (protective paper suits)
8. Clear trash bags
9. Red biohazard bags
10. Biohazard labels (facility name and address)
11. Hard surface spill encapsulate
12. Disinfectant wipes
13. Disinfectant spray
14. Non-sterile basic spill cleanup kit:

   a. 1- germicidal disposable wipe
   b. 1- scoop and scraper
   c. 1- waste bag w/tie
   d. 1- towel/drape
   e. 1- pair of gloves
   f. 1- absorbent powder
   g. 1- antiseptic towelette

# EXHIBIT O

SDSD Detention Services Bureau – Manual of Policies and Procedures South Bay Detention Facility

| DATE: | August 4, 2023 |
|---|---|
| NUMBER: | L.1.S |
| SUBJECT: | LAUNDRY SCHEDULE |

PROCEDURE

I.    LAUNDRY EXCHANGE

   A.  Laundry exchange will be conducted during GC 7922.000 - Safety/Security.
   B.  Laundry exchange with be conducted in conjunction with hygiene inspection.



| _DAYS_ | GC 7922.000 - Safety/Security Interest |
|---|---|
| MONDAY | |
| TUESDAY | |
| WEDNESDAY | |
| THURSDAY | |
| FRIDAY | |
| EVERYDAY | |

II.   INCARCERATED WORKER CLOTHING EXCHANGE

   A.  Each incarcerated worker will be allowed to have two (2) sets of clothing according to their assigned job. Kitchen workers will have one (1) set of white and one (1) set of tan uniforms and two (2) white rolls. Non-kitchen workers will have two (2) tan uniforms and two (2) white rolls.

B. Sweatshirts will be exchanged in Module 3B (seasonal). Each incarcerated worker will be required to turn in their sweatshirt. They will be laundered and returned on Friday.

C. At no time will the room storing laundry items/clothes be unlocked without a deputy present. This is to prevent excess laundry within the module.

III.    PROTECTIVE CUSTODY LAUNDRY EXCHANGE

GC 7922.000 - Safety/Security Interest

IV.    RELIGIOUS ITEMS

In conjunction with blanket exchange, any prayer rug will be available for exchange as well. The religious headwear (ex. Hijabs) will be available for exchange weekly on Wednesdays.

<u>SDSD Detention Services Bureau – Manual of Policies and Procedures South Bay Detention Facility</u>

| | |
|---|---|
| **DATE:** | August 9, 2023 |
| **NUMBER:** | L.2.S |
| **SUBJECT:** | SANITATION AND HYGIENE INSPECTIONS |

<u>PROCEDURE</u>

Absent exigent circumstances, weekly sanitation and hygiene inspections will be conducted throughout the facility according to a set schedule. This set schedule will be in conjunction with laundry exchange. This procedure shall be followed to ensure the inspections are satisfactorily completed on a routine basis.

I.      DAYSHIFT STATION DEPUTIES

    A.   Station deputies will place cleaning supplies into the module being inspected immediately after the incarcerated individual's dinner meal. The station deputies will allow adequate time for the incarcerated individuals to prepare for the weekly hygiene inspection.

II.     NIGHT SHIFT STATION DEPUTIES

    A.   The station deputies will print out the appropriate inspection sheets. The inspection forms can be found in SBDF team forms folder.

    B.   Sanitation and hygiene inspections will be conducted one cell at a time for deputy safety and facility security.

    C.   The deputy conducting the inspection will enter every cell and ensure the intercom, toilet and sink are working properly. All maintenance issues should be noted and processed according to SBDF maintenance protocol.

    D.   Cells are rated individually on a point system. A cell can score a maximum of 3 points and a low of 0 points. A score of 2 or 3 is passing. A score of "1" will result in loss of dayroom privileges for a period of 24 hours or less. A score of "0" will result in a rule violation report and the incarcerated individual(s) placed in disciplinary separation pending a hearing for the rule violation. Any lockdown greater than 24 hours will require a rule violation report.

        1.   Rule Violation Reports can be written for more serious rule violations and law violations.

        2.   Crime reports shall be written for all law violations.

        3.   No documentation is needed to administer a 24-hour loss of dayroom privileges.

E.  The incarcerated individuals assigned as module workers are responsible for all common areas within the module. An overall failing score in these areas will result in the module workers being removed from worker status.

F.  The inspection results will be logged into JIMS using the Area Activity "Inspection" dropdown with the outcome documented in the description or notes field of the activity. (ex. Cell #1 - 24 hours lockdown, Cell #5 – 48 hours lockdown.) The station deputies will notify the incarcerated individuals on the outcome of the hygiene inspections.

G.  After the inspection is completed the inspection sheets will be sent to the watch commander for review and approval. The inspection sheet will then be placed in the administrative deputy's mailbox for archiving.

III.  HYGIENE INSPECTION SCHEDULE

| *NIGHTS* | *MODULES* |
|---|---|
| MONDAY | **1A/1B** |
| TUESDAY | **2A/2B, 3B**<br><br>***3B BY INCARCERATED WORKER DEPUTY*** |
| WEDNESDAY | |
| THURSDAY | **4A/4B, Area 5** |
| FRIDAY | **3A** |

After night count is completed, the Module 3B deputy will have the buffing crew utilize the rotary floor scrubber/polisher and clean the dayroom floors. The dayroom floors will be cleaned weekly after each inspection.

SDSO Detention Services Bureau – Manual of Policies and Procedures South Bay Detention Facility

| | |
|---|---|
| **DATE:** | March 30, 2024 |
| **NUMBER:** | L.3.S |
| **SUBJECT:** | MATTRESSES |

PROCEDURE

A.    Incarcerated persons transferring from a housing module will bring their mattress into the dayroom and place it over the shower wall. The mattress will remain off the floor and unobtrusive until it is appropriate for the module workers to clean and disinfect them. The mattresses will be towel dried and stacked unfolded on the rack inside the mattress storage room after being cleaned. Only new or cleaned mattresses will be issued.

B.    Only incarcerated workers assigned to Module 3B and mainline workers are allowed to have one (1) newly designed mattress that is thicker in width. Damaged mattresses will be collected by the administrative/operations deputy and placed on the loading dock pending disposal at the East Mesa Reentry Facility's central production center.

C.    Contaminated mattresses that cannot be thoroughly disinfected shall be bagged using a biohazard waste bag obtained from the SBDF health staff. The bag shall be immediately disposed of in the biohazard waste container located in the vehicle sally port. The key to the container can be obtained from the health staff.

| | |
|---|---|
| **DATE:** | August 9, 2023 |
| **NUMBER:** | L.4.S |
| **SUBJECT:** | HOUSEKEEPING PLAN |

PROCEDURE

I.   FACILITY CLEANING

The facility will be cleaned on a regular basis by incarcerated workers under the direct supervision of facility custodians, an incarcerated worker deputy or any sworn staff member. Cleaning will consist of the following task:

A.   MONDAY thru SUNDAY (2300 to 0100)

1.   Control
     Empty trash (Sergeant's office, control, booking, DPD, final release, and information)
     Sweep and mop (Including sally port)
     Check supplies (Sanitizer and trash liners)
     Control holding cells (Trash pick-up, sweep and mop)

2.   Sergeant's Bathroom
     Re-stock (Toilet paper, paper towels, and soap)
     Disinfect
     Empty trash
     Clean sink & toilet

3.   Professional and Social Visit Area
     Empty trash, sweep and mop

4.   Administration Hallway and Locker Rooms
     Empty trash, sweep and mop
     Vacuum
     Check supplies
     Disinfect urinals, toilets and sinks

5.   Medical and Medical Holding Cells
     Empty trash
     Sweep and mop (Including area 5A hallway and cells)
     Bathroom and break room cleaning

6.   Gym and Gym Office
     Empty trash

Sweep and mop
Vacuum

    7. Court Holding cells (Upper & Lower detention)
      Trash pick-up, sweep and mop (Sweep/mop daily @ 1330 hours by court deputy)
      Distribute bars of soap as needed by court deputy

    8. Deputy Stations (Upper & Lower detention) Empty trash sweep and mop clean
      restrooms Check supplies.

B.  SATURDAY  (2300 to 0100)

    Court Holding and Medical Holding cells.
    Trash pick-up, sweep and mop.
    Clean cells with diluted bleach solution.

C.  It will be the responsibility of the nightshift Station Three deputies to supervise the janitorial crew to accomplish the evening cleaning schedule of the facility.

D.  The incarcerated workers assigned as kitchen crew will clean the kitchen area while under the direct supervision of food service staff. The kitchen will be inspected daily for cleanliness by the senior cook. A weekly health inspection will be conducted by a member of the health staff.

E.  Mop, janitorial and storage room doors will not be left open without a deputy physically present at the room. Incarcerated individuals will not be left unattended inside these rooms, and a deputy must be physically present at the room in order to effectively supervise the incarcerated individual's activities inside.

F.  The incarcerated worker deputy is responsible for the ordering, purchasing, and storage of supplies for the janitorial closets on upper and lower detentions. Incarcerated worker janitorial crews are responsible for cleanliness and contents of the janitorial closets and carts.

II.  <u>DAYROOM AND CELL CLEANING</u>

A.  Daily, after each meal and at night count, the module will be locked down. The assigned module workers will sweep, mop and clean module tables in the dayroom. Module workers will also use a diluted bleach solution to disinfect all common areas (i.e. tables, phones, handrails, etc.).

B.  Weekly cleaning in preparation for module inspection is done by all module workers. Individual cells are cleaned by its assigned occupants. The common areas are cleaned by

the module workers, and a supplement of additional incarcerated individuals, if necessary, to complete the cleaning in a timely manner.

C.  Housekeeping by incarcerated individuals is supervised by a deputy both from the deputy station and during routine safety checks. Weekly cleaning inspections are conducted by the module deputy.

D.  Cleaning equipment and cleaning products are distributed to the module workers during clean up time. Module workers will offer a diluted bleach solution to every cell on a daily basis. These items are stored in the mop rooms.

E.  All cleaning supplies will be delivered on Thursday to the deputy stations by the Training coordinator deputy.

F.  Station deputies are responsible for ensuring that necessary cleaning equipment and products are available to the incarcerated individuals. If items are not in the deputy station, they are obtained from the supply room and janitorial room located in lower detentions.

G.  Station deputies will ensure that all equipment and products are used safely and for their intended purpose.

H.  The night shift watch commander will check for general cleanliness throughout the facility during their shift.

SDSO Detention Services Bureau – Manual of Policies and Procedures South Bay Detention Facility

| | |
|---|---|
| **DATE:** | March 30, 2024 |
| **NUMBER:** | L.5.S |
| **SUBJECT:** | SECURITY/DISPENSARY TRASH REMOVAL |

PROCEDURE

I.  SECURITY TRASH REMOVAL

Regular trash runs will be conducted towards the end of each shift and/or after meals by the Station Three deputies. Security trash will be removed from the control area and deputy stations during this time. Only incarcerated workers with WHITE Identification Cards are eligible to make trash runs and work outside the facility with limited supervision by authorized staff.

II.  MEDICAL TRASH REMOVAL

A.  Station Three deputies and the janitorial crew will be responsible for removing trash and emptying solid medical waste from the dispensary.

B.  Trash that is considered biohazard will be removed on an "as needed" basis. Biohazard trash will be secured in red trash liners by health personnel and deposited by health personnel in the biohazard trash bin located next to the gun cleaning area of the underground parking structure. Health personnel should wear protective gloves when handling biohazard trash.

C.  Any trash from the medical dispensary, that is not biohazard, is to be considered security trash. Incarcerated workers will remove security trash from the dispensary and bring it directly to the loading dock while being escorted by a Station Three deputy.

**SDSD Detention Services Bureau – Manual of Policies and Procedures South Bay Detention Facility**

| | |
|---|---|
| **DATE:** | August 10, 2023 |
| **NUMBER:** | L.6.S |
| **SUBJECT:** | HAZARDOUS WASTE BUSINESS PLAN |

PROCEDURE

The South Bay Detention Facility (SBDF) is a generator of hazardous and universal wastes and must follow certain federal and state laws to ensure these wastes will be properly managed to protect public health and the environment. A Hazardous Waste Business Plan (HWBP) needs to be implemented at any facility that generates hazardous and universal waste. The HWBP will provide guidelines for the maintenance, use, storage, disposal, and training which are documented to show that all persons, both staff and incarcerated individuals know how to use hazardous materials in a safe and appropriate manner.

Hazardous and universal wastes may not be disposed of in the regular trash, onto the surface of the ground, into storm drains or into the sewer system. All hazardous wastes must be disposed of at a state permitted treatment, storage, or disposal facilities.

I.   STORAGE AND DISPOSAL OF HAZARDOUS WASTES:

    A. All SBDF hazardous materials and waste will be stored at the operations shed, located on the loading dock. At a minimum, hazardous and universal waste must be stored using the following criteria:

        1. Stored in non-leaking tank or containers in good condition with tight-fitting lids.
        2. Are kept closed when wastes are not being added or removed.
        3. Accurately labeled with water-proof stickers. Labels must specify the words "Hazardous Waste"; the composition and physical state of the waste; the hazardous properties of the waste (e.g., flammable, reactive, etc.); and the name and address of the generator.
        4. Labeled with the date that the waste accumulation began on each tank or container.
        5. Managed in a way that minimizes the possibility of spills and escape of waste into the environment.
        6. Incompatible waste not stored in a common storage area without proper separation.
        7. Ignitable or reactive waste: Stored at least 50 ft. from property lines.
        8. Stored onsite according to storage time limits prescribed in the regulations.

    B. When not in use all hazardous materials will be locked in the storage shed. These include but are not limited to.

        1. Paint
        2. Paint Thinner

3. Gasoline
4. Solvents
5. Cleaning Compounds

6. Adhesives
7. Acids

C. Disposing of hazardous materials and wastes will be conducted in the manner outlined in the Departmental Policy and Procedures manual Section 6.114.

## II.   EMERGENCY PROCEDURES:

In the event of a hazardous waste spill, release, fire or explosion, the release must be reported as follows:

A. Notify your local fire department (911) and the Hazardous Materials Division at  ▇▇▇ .

B. Additionally, in every situation which threatens human health or the environment, a notification must be made to the California Emergency Management Agency ▇▇▇▇▇▇ ▇▇▇ , and provide the following information:

1. Name and telephone number of people reporting
2. Name and address of facility
3. Time and type of incident
4. Name and quantity of hazardous material(s) involved
5. Extent of injuries
6. Possible hazard to human health and the environment outside the facility.

C. During the emergency, you must take all reasonable measures to ensure that fires, explosions, and chemical releases do not spread. These measures may include:

1. Stopping operations
2. Collecting and containing released waste; and
3. Removing or isolating chemical containers.

## III.   TRAINING AND RESPONSIBILITIES:

A. To be in compliance with the Hazardous Materials Business Plan, quarterly briefing training will be conducted covering the discussed storage of hazardous wastes and basic emergency procedures.

B. Training is to include a brief discussion of locations of emergency equipment and shut-off valves. In addition, the training will include possible evacuation plans (reference Detention Policy H.3).

L.6.S HAZARDOUS WASTE BUSINESS PLAN

C.  A copy of the training roster will remain on file with the facility training coordinator and the Hazardous Material Coordinator. The operations deputy is assigned the Hazardous Material Coordinator as part of operations duties and will be responsible for conducting annual audits of hazardous wastes stored within the facility.

SDSO Detention Services Bureau – Manual of Policies and Procedures South Bay Detention Facility

| | |
|---|---|
| **DATE:** | May 2024 |
| **NUMBER:** | L.7.S |
| **SUBJECT:** | RAZORS |

PROCEDURES

I.  RAZOR DISRIBUTION

A.  Razors will be distributed daily during night shift. Incarcerated persons will be given a reasonable amount of time to use the razor. Each housing deputy will check for razor restrictions in JIMS Web, under "Active Inmates with selected Hazards" as well as "Incident Query Report" for any incarcerated persons with a razor restriction. The housing deputy will make a JIMS log entry utilizing event type "RAZOR RESTR. REVIEW" of the incarcerated persons name and booking number.

1.  A housing unit roster, listing by name or area, will be used to check off the incarcerated persons who have been issued a razor. Razors will not be shared by incarcerated persons.

2.  An announcement will be made to the incarcerated persons via the intercom system that razor exchange will be conducted. The incarcerated persons will exit their cells and secure the door behind them (except for the incarcerated worker module). Once all doors are secured, the station deputy will issue the razors.

3.  The television and phones will be off until all razors are returned and accounted for (except for the incarcerated worker module).

4.  Another announcement will be made via the intercom to return the razors. The incarcerated person's name will then be crossed off the list, documenting the person returned the razor.

5.  Deputies collecting the razors shall take universal precautions collecting razors to avoid coming in contact with bodily fluids. Deputies will utilize the razor collection buckets to test the razors being turned in against the magnet on the collection bucket's lid to ensure that the razor blade has not been removed.

6.  Any incarcerated person with a razor restriction will be removed from the module and placed in the closest available holding cell until razors are completed and collected.

7.  The station deputy will dispose of used razors in the security trash can in the deputy station.

8. Incarcerated workers who work during the razor exchange will be provided a razor upon return to the module. Incarcerated worker razors will be disposed of in the same manner as in any other housing module.

**SDSD Detention Services Bureau – Manual of Policies and Procedures South Bay Detention Facility**

| | |
|---|---|
| **DATE:** | August 9, 2023 |
| **NUMBER:** | L.9.S |
| **SUBJECT:** | HAIRCUTS/HAIRCARE |

PROCEDURES

I.  Incarcerated individual haircuts will be the primary responsibility of the deputy assigned to monitor the incarcerated individuals in the gym. In general, haircuts will be performed in coordination with the module's exercise and recreation schedule.

    A.  Haircuts will be performed in the open area of the gymnasium, near the office. Exceptions are when the gym is closed for maintenance or other circumstances that affect its use. The incarcerated worker deputy will maintain/update the barber's working schedule.

    B.  Protective custody haircuts will be performed by a protective custody incarcerated individual.

        1.  The station deputy will screen and select a protective custody incarcerated individual for the barber position for the protective custody individuals.

        2.  The barber equipment for protective custody incarcerated individuals will be secured in the gymnasium office when not being utilized. The protective custody barber equipment will be inventoried and logged by the monitoring deputy in the gymnasium office.

    C.  The mainline barber equipment will be secured in Station Three when not being utilized by the barber. The trimmer for mainline incarcerated individuals will be secured in the gymnasium office.

    D.  No barber service other than haircuts (1, 2's, and 3's) will be provided by the incarcerated worker assigned to barber duties, unless an individual has a medical instruction for a clipper shave. The control deputy will print out the clipper shaves report for the entire facility from JIMS Web. All clipper shaves will be completed at the beginning of each module's exercise and recreation allotted scheduled time. Once all clipper shaves have completed, the monitoring deputy in the gymnasium will collect and store the trimmers in the gym office. The barber will then complete all other haircuts. Incarcerated individuals with an active "Razor Restriction" will be given a clipper shave by the incarcerated worker during their assigned recreation yard time.

E.  Haircut equipment will be inventoried by the Station 3B deputy. All clippers and accessory hair equipment will be accounted for at the beginning and end of the barber using the equipment.

   1.  The incarcerated worker deputy will be notified of any damaged equipment and will replace them accordingly.

   2.  The barber must disinfect or sterilize any comb, brush or clippers prior to use.

SDSO Detention Services Bureau – Manual of Policies and Procedures South Bay Detention Facility

| | |
|---|---|
| **DATE:** | March 29, 2024 |
| **NUMBER:** | L.13.S |
| **SUBJECT:** | PEST AND VERMIN CONTROL |

PROCEDURE

I.    The administrative/operations deputy will conduct monthly inspections to locate and identify areas of infestation. Any identified conditions including the presence of insects, rodents, or other vermin shall be eradicated by the County of San Diego Department of Agricultures, Weights and Measures, Pest Detection Program. All requests for pest control outside of the monthly inspections will be submitted to the training coordinator/operations deputy. The training coordinator/operations deputy will make notifications and coordinate the service.

# EXHIBIT P

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JANUARY 10, 2023 |
| **NUMBER:** | L.1.R |
| **SUBJECT:** | LAUNDRY SCHEDULE |

PROCEDURE

To ensure Incarcerated persons are allowed to exchange bedding and clothing regularly.

I.     CLOTHING EXCHANGE SCHEDULE

    A.     Outer color-coded garments and two sets of Whites:

GC 7922.000 - Safety/Security Interest

    B.     GC 7922.000 - Safety/Security Interest

.   Once laundry exchange is complete, normal operations will resume.

Floor deputies and any other available deputies may release up to half of a tier at a time for laundry distribution in the dayroom. All laundry will be exchanged on a one-for-one basis. To minimize any contraband, excess clothing, and food, deputies may enter each cell to look for contraband.

If it is unsafe for laundry exchange to be conducted in the dayroom, deputies will have the discretion to conduct laundry exchange at each cell door.

Incarcerated workers may be utilized to assist deputies during laundry exchange.

GC 7922.000 - Safety/Security Interest

Incarcerated persons will be issued two blankets upon transfer to housing. One of the blankets is issued in lieu of a bed sheet. Blankets will be exchanged on the 1st and 3rd week of each month. The blanket exchanges will occur at the same scheduled time as the outer garments and whites are exchanged.

II.    AD-SEP, MEDICAL EOH CLOTHING, AND GREEN SAFETY BLANKET EXCHANGE

    A.    In all ADSEP and Medical EOH housing units, incarcerated persons will receive a total of two green safety blankets, one green safety blanket to be used as a sheet, and one green safety blanket to be used as a blanket. The schedule for these housing areas will be as follows:

        1.    Medical EOH and House 7 blanket exchange will be conducted bi-weekly.

    B.    Green safety blankets will be exchanged on a one-for-one basis. Deputies will inspect the exchanged blankets for rips, tears, and other damages.

III.    CONTROL DEPUTIES

    A.    JIMS Laundry Exchange log entry will be made to record each exchange. The type of exchange (e.g., blankets, blues, white rolls.) will be noted in the description field of JIMS. The notes section of the log shall record the inmate(s) receiving the exchange if specific Incarcerated persons are receiving the exchange rather than an entire module.

IV.    REMOVAL OF DIRTY LAUNDRY

    A.    GC 7922.000 - Safety/Security Interest

SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet

| | |
|---|---|
| **DATE:** | JANUARY 09, 2024 |
| **NUMBER:** | L.2.R |
| **SUBJECT:** | SANITATION AND HYGIENE INSPECTIONS |

<u>PROCEDURE</u>

Weekly sanitation and hygiene inspections are to ensure the cleanliness, sanitation, and overall operational effectiveness of the facility. This includes identifying and addressing all maintenance issues (e.g., damaged or inoperable equipment to include plumbing) throughout the facility. Sanitation and hygiene inspections shall be conducted on day shift according to the following schedule.

I.      GENERAL HOUSING

      A.      Hygiene inspections for Houses 1, 2, 3 and Medical, will be conducted on Saturdays and House 4, 5, 6 and 7 will be conducted on Sundays.

      B.      Incarcerated persons shall be provided access to cleaning supplies prior to the hygiene inspection. Verbal direction shall be given to the incarcerated persons from the floor deputies as to their expectations regarding the cleanliness of the areas (e.g., sweep and mop the floors, clean the windows, surrender all unauthorized contraband, food, excess clothing, etc.)

      C.      Nightshift deputies will prepare the cleaning carts prior to the end of shift on inspection days.

      D.      The following guidelines will be observed:

            1.      All common and living areas will be inspected for cleanliness, and sanitation.

            2.      All reported maintenance issues will be documented with proper notifications for repairs.

      E.      Cancellation of hygiene inspections will be at the discretion of the watch commander. An entry will be made in the Jail Information Management System (JIMS) articulating the affected area and reason for the cancellation.

      F.      If deputies are unable to enter a cell to complete a hygiene inspection due to an incarcerated person's refusal to exit, the incarcerated person may be extracted at the direction of the watch commander.

II.      DOCUMENTATION

      A.      The Module Inspection Rating Sheets can be found in the RMDF V-drive at: "Rock Mountain/Housing Hygiene inspection sheets." Individual rule violations or group sanctions related to the failure of inspection will be completed per Detentions Policy and Procedure Section O.1.

B.    Refer to individual Module Inspection Rating Sheets for specific instructions and scoring. Major security or law violations shall be documented in the appropriate manner.

C.    The RMDF Module Inspection Rating Sheet will be completed for each area and submitted to area supervisors for approval

D.    A copy of the approved RMDF Module Inspection Rating Sheet will be posted in each module. The RMDF Module Inspection Rating Sheet will be approved by the area supervisor. Once the inspection sheets are approved, it will be the responsibility of the area sergeant to deliver the hardcopy to the Administrative Deputy for electronic archiving. The hardcopy will be filed for a period of 30 days.

E.    A JIMS entry will be made under the event type "INSPECTION" documenting the completion of the hygiene inspection and results.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JANUARY 17, 2023 |
| **NUMBER:** | L.3.R |
| **SUBJECT:** | MATTRESSES FOR INCARCERATED PERSONS |

<u>PROCEDURE</u>

I.   MATTRESS STORAGE

    A. Houses 1, 2, 3, 4, & 5

        1. Clean and dirty mattresses will be stored in the vestibule area of the house. Clean mattresses will be placed on a bunk next to the Staging 1 slider and dirty mattresses will be placed on a bunk next to the Staging 2 slider.

    B. House 6

        1. Clean and dirty mattresses will be stored in the storage shed. Clean mattresses will be separated from dirty mattresses.

    C. House 7 & Medical

        1. Clean and dirty mattresses will be stored in the Medical Deputy Storage area.

II.  MATTRESS CLEANING

    A. Once an incarcerated person transfers out of a module, the dirty mattress should not be reused until cleaned and disinfected per Detentions Policy and Procedure Section L.3.

    B. Incarcerated persons (IP) being transferred to another facility will bring their issued mattress with them when they leave the module. This mattress will be placed in the storage shed or on the dirty mattress bunk to be disinfected. Housing deputies will issue incoming incarcerated persons a clean mattress from the house storage shed or clean mattress bunk.

    C. The facility stock clerk will be responsible for the cleaning of all dirty mattresses and rotating them into the clean mattress stock. In their absence, and IP worker may perform these duties.  With the assistance of the facility stock clerk, housing deputies will maintain sufficient stock of clean mattresses for incoming incarcerated persons.

Incarcerated persons may be issued an extra mattress by medical staff. Authorization for an extra mattress can be verified, via JIMS Web under <u>Inmates with Active Medical Instruction.</u>

During hygiene inspections and the course of their regular duties, deputies should collect any unauthorized extra mattress.

Damaged mattresses should be placed on the loading dock and advise the facility stock clerk for disposal or replacement per Detentions P&P L.3.  Contaminated mattresses, which cannot be thoroughly disinfected, shall be disposed of per Detentions P&P L.3.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JANUARY 08, 2024 |
| **NUMBER:** | L.4.R |
| **SUBJECT:** | HOUSEKEEPING PLAN |

PROCEDURE

Daily, deputies shall maintain a regular cleaning schedule. Deputies shall supervise incarcerated workers (IWs) ensuring cleaning is completed in a timely manner. Deputies are responsible for maintaining the cleanliness of their assigned housing or work area. Facility custodians may also utilize IWs to clean. IWs will remain under constant direct supervision.

I.    RESPONSIBILITIES OF THE LINE STAFF/CUSTODIANS

    A.    Medical and Processing Rovers shall be responsible for cleaning safety cells and isolation cells in their assigned area after every use with hospital grade disinfectant and not less than once every 24-hour period when occupied. In the event any of the above areas are occupied on a continuous basis for a period of 24 hours or more, the area shall be cleaned as appropriate to maintain the health and safety of the incarcerated person (IP) occupying the area.

    B.    IPs who are able, shall maintain a clean and safe environment in their living areas. IPs who are unable to manage their living area shall be assisted by staff as needed.

    C.    An IW crew supervised by sworn or janitorial staff shall do all general cleaning, as described under IW Duties.

II.    VISIT DEPUTY'S GENERAL CLEANING OF VISIT LOBBY AND VISIT CORRIDOR

    A.    The Visit Deputy shall ensure the visit lobby is clean. The Visit Deputy may pick up IWs to perform the cleaning as tasked above.

    B.    General cleaning shall include but is not limited to:

        1.    Sweeping and mopping of visitors' lobby, corridors and bathrooms.

        2.    Emptying all trash receptacles in the visitor lobby and corridors.

        3.    Restocking supplies in bathrooms.

III.    JANITORIAL STAFF WEEKLY WORK SCHEDULE

Incarcerated workers shall be assigned to work with the janitorial staff daily, (Monday through Friday) as designated by the Administrative Sergeant. The IW Deputy shall assign IWs to janitorial staff. The facility janitors and IWs shall be allowed to enter the deputy stations to clean. Prior to IWs entering a control or deputy work area, all sensitive material shall be properly secured or concealed.

L.4.R HOUSEKEEPING PLAN                                                                                    Page 1 of 2

A.   Assigned IWs shall clean all control stations on a weekly basis. They shall utilize cleaning carts with supplies designated solely for the purpose of cleaning staff areas. This cleaning is mandatory.  IW crews shall only be delayed or turned away under exigent circumstances. In these situations, it is the responsibility of the Control Deputy to clean the station.  The cleaning of the control stations shall include, but not be limited to:

1.   Sweep and mop floor with disinfectant

2.   Clean all glass surfaces

3.   Dust all surfaces and empty all trash

4.   Clean and disinfect sink and toilets

5.   Wax Floor as needed

B.   The gym will be cleaned and disinfected daily by janitorial staff or IW Deputy.  Hand sanitizer wipes and sprays shall be provided in the gym and replenished by janitorial staff.  IWs shall not enter any locker rooms.

IV.   IWS ASSIGNED TO HOUSE JANITORIAL DUTIES

A.   Housing Units 1 thru 6 (all areas).

1.   Sweep and mop floor with disinfectant

2.   Clean and disinfect sink, toilets, and countertop

3.   Empty trash

4.   Clean any graffiti off the walls

B.   Deputies shall collect security trash from deputy station and deposit in security trash bins.

V.   HOUSING UNIT SHOWERS

The IW Deputy shall supervise IW crews to ensure showers are cleaned as needed per the Administrative Sergeant.

VI.   CLEANING CARTS FOR HOUSING UNITS

All housing units within the facility shall have an assigned cleaning cart and cleaning supplies. Each cart shall have the following supplies:

1.   1- Broom

2.   1- Mop

3.   1- Scrub brush w/handle

4.   1-Fox tail brush

4.   1-Dustpan

5.   2-Spray bottles

6.   1-Sponge

7.   1- Pair of gloves

If any of these items become damaged or needing replacement, the Storekeeper shall be notified.  Deputies will ensure all cleaning materials are accounted for prior to and after cleaning.

Medical IPs shall have access to a complete cleaning cart as needed.

Administrative Separation IPs shall not have access to a cleaning cart.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JANUARY 17, 2023 |
| **NUMBER:** | L.5.R |
| **SUBJECT:** | TRASH REMOVAL |

PROCEDURE

I.     NON-HOUSING AREAS

    A.     On a daily basis the facility janitor, or incarcerated person (IP) worker crew under the supervision of the Visit Deputy or Facility Rover, will pick up trash from the administrative area. The trash will be placed in the dumpster located on the loading dock.

II.    HOUSING UNITS

    A.     After each meal, all trash will be removed with the chow carts, utilizing a trash cart. IPs will move trash and the chow carts to the kitchen area. IP workers, under the supervision of a deputy, will move all the trash to the dumpster located on the loading dock.

III.   SECURITY TRASH

    A.     All security trash accumulated inside the facility will be picked up once a shift by the Facility Rover Deputy. The deputy will ensure all locked security trash containers located at the end of the North/South Corridors are emptied and all security trash is placed into the trash compactor on the loading dock.

SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet

| | |
|---|---|
| **DATE:** | MAY 3, 2022 |
| **NUMBER:** | L.6.R |
| **SUBJECT:** | HAZARDOUS WASTE BUSINESS PLAN |

PROCEDURE

The Rock Mountain Detention Facility (RMDF) is a generator of hazardous and universal wastes. RMDF must follow certain Federal and State laws to ensure these wastes are properly managed to protect public health and the environment. A Hazardous Waste Business Plan (HWBP) needs to be implemented at any facility that generates hazardous and universal waste. The HWBP will provide guidelines for the maintenance, use, storage, disposal, and training which are documented to show that all persons, both staff and incarcerated persons know how to use hazardous materials in a safe and appropriate manner.

Hazardous and universal wastes may not be disposed of in the regular trash, onto the surface of the ground, into storm drains or into the sewer system. All hazardous wastes must be disposed of at State permitted treatment, storage or disposal facilities.

I.    STORAGE OF HAZARDOUS WASTES:

    A.    At a minimum, hazardous and universal waste must be stored using the following criteria:

        1.    Stored in non-leaking tank or containers in good condition with tight-fitting lids. Containers are to be kept closed when wastes are not being added or removed.

        2.    Accurately labeled with water-proof stickers. Labels must specify the words "Hazardous Waste", the composition and physical state of the waste, the hazardous properties of the waste (e.g., flammable, reactive, etc.), and the name and address of the generator.

        3.    Labeled with the date that the waste accumulation began on each tank or container

        4.    Managed in a way that minimizes the possibility of spills and escape of waste into the environment

        5.    Incompatible waste not stored in a common storage area without proper separation

        6.    Ignitable or reactive waste: Stored at least 15 meters (50 ft.) from property lines

        7.    Stored onsite according to storage time limits prescribed in the regulations

II.    All RMDF hazardous materials and waste will be stored in designated RMDF storage locations at the facility.

    A.    STORAGE

        1.    When not in use all hazardous materials will be locked in the storage shed. These include, but are not limited to:

            a.    Paint
            b.    Paint Thinner
            c.    Gasoline
            d.    Solvents

    e.    Cleaning Compounds
    f.    Adhesives
    g.    Acids

B.    DISPOSAL

    1.    Disposing of hazardous materials and wastes will be conducted in the manner outlined in the Departmental Policy and Procedure Manual Section 6.114

III.    EMERGENCY PROCEDURES

A.    Hazardous waste spill, releases, fire or explosion must be reported as follows:

    1.    Notify the local fire department (911) and the Hazardous Materials Division at [GC 7922.000 - Privacy Interest]

    2.    Additionally in every situation which threatens human health or the environment, a notification must be made to the California Emergency Management Agency 1-[GC 7922.000 - Privacy Interest], and provide the following information:

        a.    Name and telephone number of person reporting

        b.    Name and address of facility

        c.    Time and type of incident

        d.    Name and quantity of hazardous material(s) involved

        e.    Extent of injuries

        f.    Possible hazard to human health and the environment outside the facility.

B.    During the emergency, you must take all reasonable measures to ensure that fires, explosions, and chemical releases do not spread. These measures may include:

    1.    Stopping operations

    2.    Collecting and containing released waste

    3.    Removing or isolating chemical containers

To follow the Hazardous Materials Business Plan, quarterly briefing training will be conducted covering the discussed storage of hazardous wastes and basic emergency procedures. Training is to include a brief discussion of locations of emergency equipment and shut-off valves. In addition, the training will include possible evacuation plans (reference Detention Policy H.3).

A copy of the training roster will remain on file with the Facility Training Coordinator and the Hazardous Material Coordinator.

The RMDF Operations Deputy is assigned the Hazardous Material Coordinator as part of operations duties and will be responsible for conducting annual audits of hazardous wastes stored within the facility.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | MAY 3, 2022 |
| **NUMBER:** | L.6.R |
| **SUBJECT:** | HAZARDOUS WASTE BUSINESS PLAN |

PROCEDURE

The Rock Mountain Detention Facility (RMDF) is a generator of hazardous and universal wastes. RMDF must follow certain Federal and State laws to ensure these wastes are properly managed to protect public health and the environment. A Hazardous Waste Business Plan (HWBP) needs to be implemented at any facility that generates hazardous and universal waste. The HWBP will provide guidelines for the maintenance, use, storage, disposal, and training which are documented to show that all persons, both staff and incarcerated persons know how to use hazardous materials in a safe and appropriate manner.

Hazardous and universal wastes may not be disposed of in the regular trash, onto the surface of the ground, into storm drains or into the sewer system. All hazardous wastes must be disposed of at State permitted treatment, storage or disposal facilities.

I.      STORAGE OF HAZARDOUS WASTES:

   A.      At a minimum, hazardous and universal waste must be stored using the following criteria:

      1.      Stored in non-leaking tank or containers in good condition with tight-fitting lids. Containers are to be kept closed when wastes are not being added or removed.

      2.      Accurately labeled with water-proof stickers. Labels must specify the words "Hazardous Waste", the composition and physical state of the waste, the hazardous properties of the waste (e.g., flammable, reactive, etc.), and the name and address of the generator.

      3.      Labeled with the date that the waste accumulation began on each tank or container

      4.      Managed in a way that minimizes the possibility of spills and escape of waste into the environment

      5.      Incompatible waste not stored in a common storage area without proper separation

      6.      Ignitable or reactive waste: Stored at least 15 meters (50 ft.) from property lines

      7.      Stored onsite according to storage time limits prescribed in the regulations

II.      All RMDF hazardous materials and waste will be stored in designated RMDF storage locations at the facility.

   A.      STORAGE

      1.      When not in use all hazardous materials will be locked in the storage shed. These include, but are not limited to:

         a.      Paint
         b.      Paint Thinner
         c.      Gasoline
         d.      Solvents

  e. Cleaning Compounds
  f. Adhesives
  g. Acids

**B. DISPOSAL**

  1. Disposing of hazardous materials and wastes will be conducted in the manner outlined in the Departmental Policy and Procedure Manual Section 6.114

**III. EMERGENCY PROCEDURES**

 **A.** Hazardous waste spill, releases, fire or explosion must be reported as follows:

  1. Notify the local fire department (911) and the Hazardous Materials Division at ███████ GC 7922.000 - Privacy Interest

  2. Additionally in every situation which threatens human health or the environment, a notification must be made to the California Emergency Management Agency 1-███████ GC 7922.000 - Privacy Interest, and provide the following information:

   a. Name and telephone number of person reporting

   b. Name and address of facility

   c. Time and type of incident

   d. Name and quantity of hazardous material(s) involved

   e. Extent of injuries

   f. Possible hazard to human health and the environment outside the facility.

 **B.** During the emergency, you must take all reasonable measures to ensure that fires, explosions, and chemical releases do not spread. These measures may include:

  1. Stopping operations

  2. Collecting and containing released waste

  3. Removing or isolating chemical containers

To follow the Hazardous Materials Business Plan, quarterly briefing training will be conducted covering the discussed storage of hazardous wastes and basic emergency procedures. Training is to include a brief discussion of locations of emergency equipment and shut-off valves. In addition, the training will include possible evacuation plans (reference Detention Policy H.3).

A copy of the training roster will remain on file with the Facility Training Coordinator and the Hazardous Material Coordinator.

The RMDF Operations Deputy is assigned the Hazardous Material Coordinator as part of operations duties and will be responsible for conducting annual audits of hazardous wastes stored within the facility.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JANUARY 8, 2024 |
| **NUMBER:** | L.7.R |
| **SUBJECT:** | RAZORS |

PROCEDURE

I.    STORAGE

    A.    GC 7922.000 - Safety/Security Interest ████████. Razors are disposable and shall be one-time use. Razors shall not be shared by incarcerated persons (IPs).

II.    DISTRIBUTION AND COLLECTION

    A.    Daily, deputies shall ensure each eligible IP is provided a razor.

    B.    Prior to razor distribution, deputies shall review the JIMS Web Report, "Active Inmates with Selected Hazards: Razor Restriction". Any IPs found on this list will not be offered a razor. Once reviewed, deputies shall make an entry in the JIMS Area Activity Log using the event type, "Razor Restriction List Reviewed."

        1.    If razors are to be distributed during dayroom time, those IPs with "Razor Restriction" shall be removed from the module until razors are collected.

        2.    The facility commander or his/her designee may suspend razor distribution to any IP considered to be a danger to themselves or others.

    C.    GC 7922.000 - Safety/Security Interest ████████████████ Deputies will provide at least a minimum of 15 minutes to shave before collecting razors. The deputies will inspect each razor to ensure the blade is intact and the razor has not been altered in any way. GC 7922.000 - Safety/Security Interest ██████████████████████

    D.    The number of razors distributed and collected from a module shall be logged in JIMS. IPs who do not return, or who return an altered razor will be subject to disciplinary action. The area Sergeant will be immediately notified if a razor is not returned. The Watch Commander or designee will determine the appropriate course of action. All missing or unreturned razors will be logged in a JIMS entry under the affected housing unit, as well as an entry in the watch commander's log.

III.    DISPOSAL OF USED RAZORS

GC 7922.000 - Safety/Security Interest ██████████████████████████

Deputies collecting razors shall take universal precautions while collecting razors, to avoid encountering bodily fluids.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JANUARY 8, 2024 |
| **NUMBER:** | L.9.R |
| **SUBJECT:** | HAIRCUTS / HAIR CARE |

PROCEDURE

After opening count is completed, the incarcerated barbers will be escorted to the housing unit scheduled for haircuts. The haircut schedule for RMDF is the following.

I.    INCARCERATED PERSON (IP) HAIRCUT SCHEDULE

    A.    Friday – House 1

II.    DISINFECTION PROCEDURES

    A.    All barbers shall be trained in the disinfecting process by the IP worker Deputy.  Barbers shall clean or disinfect all non-porous surfaces, furniture and equipment prior to each haircut session.

III.    HAIRCUTS

    A.    Haircuts will be conducted in the housing unit area.
    B.    All haircut offerings will be logged in JIMS.  If haircuts are postponed, the area supervisor shall be notified, and a Jail Information Management System entry shall be made in the area activity log.
    C.    Direct supervision will be conducted during haircuts.
    D.    All equipment shall be accounted for prior to returning incarcerated persons to their housing units.
    E.    Administrative Separation and Disciplinary Isolation haircuts will be provided to only one incarcerated person at a time.
    F.    Barbers shall be available for a reasonable amount of time to ensure all IP's have an opportunity to receive a haircut.
    G.    Haircuts will consist of a 1, 2, or 3 clippers cut only, with no combinations.
    H.    Facial haircuts will be prohibited unless the IP has a medical authorization indicating a clipper cut or clipper shave has been approved.
    I.    If lice or other parasites are discovered, Medical must be informed.

IV.    NAIL CLIPPERS

    A.    Nail clippers will be made available to the IP while haircuts are being conducted.
    B.    Germicide solution shall be used to soak nail clippers in between each use.
    C.    When all haircuts are complete, the housing deputy shall inventory and inspect all the returned nail clippers.
    D.    If a damaged nail clipper is discovered, the nail clipper will be removed from the Recreation Yard and the IP Worker Deputy shall be notified immediately.  If a nail clipper gets returned and it's missing any components, every effort shall be made to

L.9.R HAIRCUTS / HAIR CARE

recover the missing piece as soon as possible. If the missing nail clipper piece is not immediately located, notify the area supervisor immediately.

V.     ACCOUNTABILITY

A.     A checklist will be provided to the barbers by the IP Worker Deputy.

B.     The IP Worker deputy will be responsible for collecting the checklist from the barbers and replacing damaged or missing items.

C.     The barbers will have one multiple outlet extension cord and one longer single outlet extension cord.

D.     Each barber will have their "barber bag" with them containing the following equipment:

     1.     Five nail clippers

     2.     Four detachable blades

**SDSD Detention Services Bureau –Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | ~~May 1, 2023~~JANUARY 17, 2024 |
| **NUMBER:** | L.11.R |
| **SUBJECT:** | PERSONAL HYGIENE |

PROCEDURE:

Incarcerated persons (IP) will receive toilet paper upon request.  IPs shall only have one roll at a time per IP.  During Weekly Hygiene Inspection, the deputy will ensure that each cell/bunk has toilet paper to accommodate the number of incarcerated persons in that module. If there is an  excessive amount of toilet paper, the deputy will remove the excess for redistribution.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | JANUARY 17, 2023 |
| **NUMBER:** | L.13.R |
| **SUBJECT:** | PEST AND VERMIN CONTROL |

<u>PROCEDURE</u>

The Rock Mountain Detention Facility Operations Deputy will serve as the Integrated Pest Management Coordinator (IMPC).  The County Integrated Pest Management technician will inspect the buildings and grounds of RMDF for any pest and/or vermin infestation monthly.  The technician will submit a written report to the Operations Deputy detailing any infestations discovered during the monthly inspection.  Between inspections the IMPC will investigate any infestation reported by staff as soon as practical.

The Operations Deputy will be responsible to contact the Department of Agriculture and Pest Management office and the County Integrated Pest Management office if necessary.

**SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet**

| | |
|---|---|
| **DATE:** | MAY 3, 2023 |
| **NUMBER:** | M.41.R |
| **SUBJECT:** | INFECTION CONTROL: MEDICAL WASTE |

<u>PROCEDURE</u>

It will be the responsibility of sworn personnel to ensure the proper handling of infectious materials and the proper disposal of regulated waste that may be encountered in the course of their duties. The necessary equipment for the handling of these materials will be in specified areas of each housing unit.

I.    HANDLING OF INFECTIOUS WASTE

When handling infectious waste, the following universal precautions will be used:

1.    When available, it is recommended that the facility Healthcare Services Assistance Training (HSAT) Team be notified to clean-up any blood and body fluid spills within the facility.

2.    All surfaces and equipment that become contaminated with infectious material should be cleaned immediately with a bleach solution (1:10 dilution of household bleach to water).

3.    Soiled paper towels, sponges, mops and gloves will be placed in a clear plastic bag. The clear bag will be tied securely and placed in a red biohazard bag. The red bag will be tied securely to prevent leakage or loss of waste during storage, handling or transport.

4.    Contaminated laundry (not being processed as evidence) will be disposed of in the same manner.

II.    DISPOSAL

A.    The sworn staff on scene will be responsible for disposal of any red bags. The red bags will be placed in the biohazardous waste dumpster located GC 7922.000 - Safety/Security Interest

1.    Red biohazard bags are located GC 7922.000 - Safety/Security Interest

B.    GC 7922.000 - Safety/Security Interest

1.    GC 7922.000 - Safety/Security Interest

2.    The deputy shall ensure the dumpster is locked.

# EXHIBIT Q

SDSD Detention Services Bureau—San Diego Central Jail Green Sheet

| | |
|---|---|
| **DATE:** | **September 21, 2023** |
| **NUMBER:** | **L.1.C.1** |
| **SUBJECT:** | **LAUNDRY SCHEDULE** |

## PROCEDURE

Laundry exchange should be conducted through food access ports at individual cells or at the module gate.

Facility Workers will be issued and allowed to possess the following items:

    a.  2 sets of tans exchanged daily
    b.  2 sets of kitchen whites exchanged daily (if assigned to the kitchen)
    c.  2 complete white rolls exchanged daily
    d.  2 blankets
    e.  1 pair of tennis shoes
    f.  1 pair of shower sandals
    g.  1 pair of black rubber boots

GC 7922.000 - Safety/Security Interest

**\*\*Upon request, transgender and intersex incarcerated persons will be given jail issued clothing that matches with their gender identity (e.g. female undergarments/bra for a transgender female). Requests will need to be coordinated with the SDCJ laundry staff.

## SAFETY LINEN EXCHANGE:

Incarcerated persons housed in Administrative Separation (Ad/Sep), and the Psychiatric Stabilization Unit (PSU) will be issued two green safety blankets.

Incarcerated persons issued safety blankets shall be given the opportunity to exchange ONE of the blankets every other week during the timeframe designated for exchange. A JIMS laundry exchange log entry will be made to record each exchange. The type of exchange (e.g. "Green Safety Blanket") shall be noted in the description field of JIMS.

Laundry Schedule                                                    Page 1 of 2

LAUNDRY SCHEDULE



3RD FLOOR BLUES & DOUBLE WHITE ROLLS/RELIGIOUS HEAD WEAR

8TH FLOOR BLUES & DOUBLE WHITE ROLLS/RELIGIOUS HEAD WEAR

5TH FLOOR BLUES & DOUBLE WHITE ROLLS/RELIGIOUS HEAD WEAR



7TH FLOOR BLUES & DOUBLE WHITE ROLLS /RELIGIOUS HEAD WEAR



4TH FLOOR BLUES & DOUBLE WHITE ROLLS/RELIGIOUS HEAD WEAR

6TH FLOOR BLUES & DOUBLE WHITE ROLLS/RELIGIOUS HEAD WEAR

<u>BLANKET EXCHANGE EVERY 2 WEEKS</u>

<u>RELIGIOUS PRAYER RUG EXCHANGE ONCE A MONTH</u>

* Housing Floor Deputies will gather the necessary clothing and linen for incarcerated persons housed in 4F. At the conclusion of laundry exchange for the other modules, deputies will perform laundry exchange in this unit without the use of facility workers.

SDSD Detention Services Bureau—San Diego Central Jail Green Sheet

| | |
|---|---|
| **DATE:** | **January 04, 2024** |
| **NUMBER:** | **L.2.C.1** |
| **SUBJECT:** | **SANITATION AND HYGIENE INSPECTIONS** |

<u>PROCEDURE</u>

**AN INSPECTION SHOULD NOT RESULT IN THE HOUSING UNIT BEING LEFT IN DISARRAY BY THE INSPECTING DEPUTIES.**

Cancellation of hygiene inspections shall be at the discretion of the watch commander. An entry shall be made in the watch commander's log and in JIMS articulating the affected area and reason for the cancellation.

<u>GENERAL HOUSING</u>

Hygiene inspections for floors 4 through 8 shall be conducted on Saturdays by the assigned dayshift teams, except for facility worker modules, high risk security level housing and Jail Based Competency Treatment (JBCT) modules. Module 6D shall be inspected by the JBCT deputies on Fridays. Modules 8A/8B shall be inspected by the facility worker deputy. A supervisor shall be present at all OP Step Down inspections and Ad Seg Inspections. High risk security level housing shall follow the inspection procedure outlined below.

Deputies shall provide cleaning supplies to incarcerated persons prior to the hygiene inspection. Deputies shall give the incarcerated persons verbal directions regarding cleaning and emphasize the areas that will be inspected. (e.g., sweep and mop the floors, clean the windows, surrender all unauthorized contraband, food, excess clothing, etc.)  All incarcerated persons will exit their cell during inspection. Clothing and linen will be exchanged if deemed soiled or unsuitable for the incarcerated person. This exchange will be completed as soon as practical.

The Psychiatric Stabilization Unit (PSU) and Medical Observation Bed (MOB) housing areas shall be inspected on Saturdays. Due to the medical and psychiatric conditions of incarcerated persons housed in PSU and MOB, facility workers shall clean these housing areas.

SDCJ health staff will be notified of any incarcerated persons exhibiting extremely poor hygiene, self-neglect, or the inability to take care for oneself. A health exam should be conducted by health staff to check on the individual's wellbeing. An ISR will be written documenting who conducted the evaluation, their ARJIS and the outcome.
 The following guidelines will be observed:

1. All common and personal areas shall be inspected for cleanliness, maintenance, and security issues.

2. All reported maintenance issues shall be documented with proper notifications for repairs.

3. The SDCJ Module Inspection Rating Sheet shall be completed for each area and submitted to supervisors for approval.

4. A copy of the approved SDCJ Module Inspection Rating Sheet shall be posted in each module and the original signed documents shall be sent to the operations deputy for archiving.

5. A JIMS entry will be made under the event type "INSPECTION" documenting the completion of the hygiene inspection.

The Module Inspection Rating Sheets can be attached to this green sheet. Individual rule violations relating to the hygiene inspection shall be completed per Detentions Policy and Procedure Section O.1. (Refer to individual SDCJ Module Inspection Rating Sheet for specific instructions and scoring.)  Major security or law violations should be documented in the appropriate manner.

An inmate's mental health should be taken into consideration when deciding on disciplinary sanctions.

<u>HIGH RISK SECURITY LEVEL HOUSING (ADMINISTRATIVE SEGREGATION)</u>

High risk security level housing hygiene inspections (AD-SEP modules) shall be conducted throughout the week and finalized by the Saturday nightshift team. Facility workers shall be utilized to clean common areas and cells in all high-risk security level housing modules.

Both dayshift and nightshift teams should inspect high risk security level housing cells throughout the week when incarcerated persons are not present (e.g., rec yard time, medical, court, empty cells, etc...). Incarcerated persons identified as AD-SEP will have their cell inspected during the allotted inspection period. The Sunday dayshift housing control deputies shall begin a SDCJ Module Inspection Rating Sheet and record when high risk security level housing cells are inspected during the week. This rating sheet shall remain in the control area during the inspection cycle and the Saturday nightshift team shall be responsible for inspecting all cells not inspected during the week.

At the end of each shift, the housing control deputy shall make a JIMS log entry in the Area Activity under the event type, "INSPECTION" and list the cell number(s) of each high-risk security level housing cells inspected.

Every Saturday night, the key control deputy shall review the JIMS Area Activity under "INSPECTION" and notify the watch commander of any high-risk security level housing cells that were not inspected. Once all high-risk security level housing cells are inspected, the SDCJ Module Inspection Sheet shall be sent to the team supervisors for their review and signatures and the form shall be sent to the administrative deputy for archiving.

<u>INTERCOM INSPECTION</u>

Each week during hygiene inspection, deputies on floors 1 through 8 shall perform a check of all intercoms on their respective floors to ensure the intercoms are functioning, cleared of obstructions, and confirmed with control that the intercom is in working order. Deputies shall complete a SDCJ Module Inspection Rating Sheet and document the status of every intercom. For all malfunctioning intercoms, the inspecting deputy shall notify the operations deputy.

<u>SDCJ MODULE INSPECTION RATING SHEET</u>

Each module with cells and dorm style housing will be inspected for cleanliness, maintenance, and security issues. The grading is a PASS or FAIL system. To receive a passing grade, incarcerated persons cells and dorm sleeping areas must be clean with no excess trash, food, bedding, etc.

Individual cells that PASS will be awarded an extra hour of dayroom time which will occur on Saturdays from 2300 to 0001 hours. Housing modules operating on the tier program shall allow one tier an extra hour of dayroom time on Saturday night, and the opposite tier shall receive an extra hour of dayroom time on Sunday night. The extra dayroom time on Sunday will be given from 2200 to 2300 hours.

**SDCJ Module Inspection Rating Sheet**

**DATE&TIME:** 4/26/2022 1:51 PM          **MODULE:** Choose an item.

INSPECTING DEPUTY(s): _____

AREA SERGEANT: _____   Signature _____

WATCH COMMANDER: _____   Signature_____

**SECTION 1- DAY ROOM:** Dayroom cleanliness is the responsibility of all inmates. Major contraband items found in the dayroom will result in failure. Note all repairs in comment section

| AREA | SCORE | COMMENTS |
|---|---|---|
| Wall and Windows | Pass / Fail | _____ |
| Floors and Stairs | Pass / Fail | _____ |
| Contraband | Pass / Fail | _____ |

| Circle an item in need of maintenance: | Phones  /  Water Fountain  /  Sink  / Tables & Floor / Televisions  /  Lights  /  Showers  / Intercoms  /  Windows  /  Cross – Over Doors  /  Module Gate |
|---|---|

**Maintenance Notes:** _____

**SECTION 2- CELL:** During each hygiene inspection an intercom check will be conducted for all intercoms in the housing module. If an intercom is malfunctioning, state the issue and notify the facility Operations Deputy.

| CELL# | INTERCOM STATUS | NOTES |
|---|---|---|
| 01   PASS / FAIL | ☐ Ok    ☐Failed | |
| 02   PASS / FAIL | ☐ Ok    ☐Failed | |
| 03   PASS / FAIL | ☐ Ok    ☐Failed | |
| 04   PASS / FAIL | ☐ Ok    ☐Failed | |
| 05   PASS / FAIL | ☐ Ok    ☐Failed | |
| 06   PASS / FAIL | ☐ Ok    ☐Failed | |
| 07   PASS / FAIL | ☐ Ok    ☐Failed | |
| 08   PASS / FAIL | ☐ Ok    ☐Failed | |
| 09   PASS / FAIL | ☐ Ok    ☐Failed | |
| 10   PASS / FAIL | ☐ Ok    ☐Failed | |
| 11   PASS / FAIL | ☐ Ok    ☐Failed | |
| 12   PASS / FAIL | ☐ Ok    ☐Failed | |
| 13   PASS / FAIL | ☐ Ok    ☐Failed | |
| 14   PASS / FAIL | ☐ Ok    ☐Failed | |
| 15   PASS / FAIL | ☐ Ok    ☐Failed | |
| 16   PASS / FAIL | ☐ Ok    ☐Failed | |
| 17   PASS / FAIL | ☐ Ok    ☐Failed | |
| 18   PASS / FAIL | ☐ Ok    ☐Failed | |
| 19   PASS / FAIL | ☐ Ok    ☐Failed | |
| 20   PASS / FAIL | ☐ Ok    ☐Failed | |

Individual cells with a *"PASS"* score will be awarded an extra hour of day room time. Extra dayroom time should be shared. Extra day room time will be given after night count and collection of razors on Saturday for those who passed inspections. Housing modules in tier programs will come out one tier on Saturday and the opposite tier on Sunday.

**SDCJ 1st Floor Intercom Inspection**

DATE_____    TIME _____    MODULE _____

INSPECTING DEPUTIES_____    WATCH COMMANDER_____

Cell                          Notes: *Annotate if intercom is operational. If intercom is malfunctioning state issue and who was notified.*

| GC 7922.000 - Safety/Security Interest | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Submit to 10th Floor Admin Operations Deputy.

SANITATION AND HYGIENE INSPECTIONS                          Page 4 of 6

## SDCJ 2nd Floor Intercom Inspection

DATE: _____        TIME _____

INSPECTING DEPUTIES: _____

WATCH COMMANDER: _____

**Cell:**              **Notes:** Annotate if intercom is operational. If an intercom is malfunctioning,
GC 7922.000 - Safety/Security Interest  state the issue and who was notified.

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

GC 7922.000 - Safety/Security Interest

*"Alert Only"*

Submit to Admin Deputy.

**SDSD Detention Services Bureau—San Diego Central Jail Green Sheet**

| | |
|---|---|
| **DATE:** | **February 22, 2022** |
| **NUMBER:** | **L.4.C.1** |
| **SUBJECT:** | **HOUSEKEEPING PLAN** |

## PROCEDURE

SDCJ will be cleaned on a regular basis.

The facility worker deputy will provide a crew of facility workers to accomplish the daily cleaning schedule of the facility. The crew will be scheduled to work in conjunction with the deputy's work schedule.

**Facility Worker Deputy**

Administrative/Reception area

Remove trash and clean restrooms daily, dust, vacuum and clean all windows in the Administrative offices.

**GC 7922.000 - Safety/Security Interest**

Remove trash, sweep and mop men's and women's locker rooms. The shower areas will be cleaned daily. The gym will be swept, and equipment wiped down. Sweep and mop ▮▮▮ hallways and break room. Wipe down all sinks, countertops and remove trash from break room. The ▮▮▮ will be swept, and trash removed daily.



Remove trash and clean restrooms, training room, and briefing room.

Elevators

Elevators ▮▮▮ will be cleaned as needed or by order of the administrative sergeant. Elevators ▮▮▮ will be cleaned daily. The elevators will be stripped and waxed in conjunction with the team shift change schedule.

Kitchen Deputy Cleaning Responsibilities

The kitchen area ▮▮▮ ▮▮▮ will be cleaned by facility workers assigned to the kitchen while under the direct supervision of the kitchen deputy or civilian cooks. The kitchen will be inspected daily for cleanliness by the on-duty cooks along with the kitchen deputy.

**SDCJ Custodial Work Assignments**

The administrative sergeant will be responsible for maintaining custodial schedules as described below.



Custodial staff is responsible for requisitioning supplies and maintaining the contents of the janitorial closets and cleaning carts on GC 7922.000 - Safety/Security Interest

Training for new custodial staff will be the responsibility of the administrative sergeant. The training shall cover, at a minimum, the safe operation of all cleaning equipment, efficient ways to clean the jail, and cost-efficient ways to utilize cleaning materials. This training will also cover the maintenance of all flooring in the jail and the proper storage of all cleaning materials, especially caustic or hazardous materials.

**2nd Floor Facility Worker Detail Crew**



**Housing Deputies**

It is the housing deputy's responsibility to ensure a clean workstation. Housing deputies will call facility workers to the floor to clean as needed.

**Module Power Washing**

Housing floor modules will be power washed on an as needed basis or by order of the administrative sergeant. The power washing will include the dayroom, showers, and cells/bunk areas in each module. Prior to power washing, the housing floor deputies will need to remove all the incarcerated persons from the tier/module that is to be cleaned. Incarcerated persons will need to remove their mattresses, linens, and module property. The cleaning will be conducted by a facility worker crew and supervised by a deputy.

Once the power washing is complete, the housing floor deputies may return the incarcerated persons to the module. The cleaning may be considered the "Weekly Hygiene Inspection" for that tier/module in that week.

SDSD Detention Services Bureau—San Diego Central Jail Green Sheet

| | |
|---|---|
| **DATE:** | **February 22, 2022** |
| **NUMBER:** | **L.4. C.2** |
| **SUBJECT:** | **HOUSEKEEPING PLAN - MODULE CLEANING CARTS** |

<u>PROCEDURE</u>

A fully stocked cleaning cart will be placed into all mainline incarcerated person housing modules during the restricted movement time between 1100 and 1300 hours and during the lockdown time after night count. Prior to placing the cleaning carts into the modules, all incarcerated persons will be locked down. This will limit the number of incarcerated persons exposed to the cleaning cart items.

Cleaning should take no longer than 30 minutes. Green band incarcerated persons shall not be designated as module cleaners due to the higher security risk they pose. After the dayroom has been cleaned, the cleaning carts shall be made available to individuals requesting to clean their cells.

The cleaning carts should also be made available to mainline incarcerated persons prior to the weekly hygiene inspections. Incarcerated persons will be given an opportunity to clean their respective cells as well as the dayrooms and showers. If an incarcerated person is unwilling, unable or if security reasons are documented prohibiting the incarcerated person from having access to the cleaning supplies to clean their cells, the incarcerated person shall be removed from the cell and facility workers will be utilized to clean the cell.

The housing deputies will inventory the cleaning carts before they are placed into the module.

All cleaning carts should be supplied with the following items:

1 push broom
1 mop & mop bucket
1 shower brush
1 dust pan
1 hand broom (fox tail)
1 toilet brush
1 towel (green cleaning towels from laundry preferred)
2 bottles containing premixed cleaning solution

If the cleaning carts lack an item from the above inventory, or if any item is damaged or worn, it will be the responsibility of the housing deputy to requisition the items from the stock room so that all available cleaning carts contain all necessary items.

Incarcerated persons housed in high risk security level housing modules throughout the facility will be allowed to utilize the cleaning items to clean their cells during their respective dayroom time on Saturdays. Housing deputies will be responsible for having facility workers report to the housing floors once night count has been cleared or when all dayroom time has been completed to conduct dayroom cleaning of the high risk security level housing modules.

The housing deputy will account for all items on the cleaning cart after it is removed from the module. Failure to account for all cleaning cart items at the conclusion of the cleaning will result in subsequent investigation and search for those items.

The housing deputies will inspect the modules after each cleanup and supervisors will inspect each module during their regular housing checks to ensure the modules have been adequately cleaned. At the discretion of the housing deputy, any module can be cleaned utilizing facility workers if it is determined that the dayroom and/or showers are not being cleaned adequately by the module cleaners.

Diluted bleach solution should be available on all housing floors for incarcerated persons worker use when cleaning heavily soiled areas. This solution should not be given to mainline incarcerated persons for general cleaning because of the risk of the bleach solution being misused. If an area of a housing module requires bleach solution to be adequately cleaned, facility workers should be called to the floor to clean that area.

**<u>At no time and under no circumstance will facility workers or mainline incarcerated persons be given straight undiluted bleach solution for cleaning due the risk of injury to themselves as well as other incarcerated persons and staff.</u>**

SDSD Detention Services Bureau—San Diego Central Jail Green Sheet

| | |
|---|---|
| **DATE:** | **February 22, 2022** |
| **NUMBER:** | **L.4.C.3** |
| **SUBJECT:** | **HOUSEKEEPING PLAN: DISTRIBUTION OF TOILET PAPER** |

PROCEDURE

Toilet paper will be distributed as needed. Each incarcerated person is to receive only one roll of toilet paper per toilet paper exchange.

During the weekly hygiene inspection, the housing deputy will ensure that each cell/bunk has toilet paper to accommodate the number of incarcerated persons in that cell. If there is an excess of toilet paper, the deputy will retrieve the excess toilet paper for redistribution.

**SDSD Detention Services Bureau—San Diego Central Jail Green Sheet**

| | |
|---|---|
| **DATE:** | **February 22, 2022** |
| **NUMBER:** | **L.5.C.1** |
| **SUBJECT:** | **TRASH REMOVAL** |

<u>PROCEDURE</u>

I.   Non-Housing Floors:

The facility worker crew, under the supervision of the facility worker deputy or custodial staff, will pick up trash daily from the administrative areas. The trash will be placed in the dumpster located on the loading dock.

The kitchen deputy will coordinate the disposal of the kitchen trash after the meal carts are delivered at each meal.  The kitchen deputy will directly supervise the facility workers while the trash is emptied into the dumpster/compactor.  The kitchen trash bins will be cleaned and sanitized each time they are emptied. The kitchen deputy will also ensure all trash on the loading dock, vehicle ramp, and drainage grates, be collected and disposed of in the trash compactor.

II.   1st and 2nd Floor

Deputies assigned to the 1st and 2nd Floor will be responsible for supervising the cleaning of holding cells and work area after every incarcerated person meal distribution. The kitchen deputy will be responsible for emptying the trash bins located near the incarcerated person elevators. The kitchen deputy will inspect the bins prior to removal.

Facility workers will be assigned to the 2nd floor and will be utilized to clean areas on both the 1st and 2nd floors at the deputies' discretion.

III.   Housing Floors:

The housing deputy will collect all trash from every cell, dorm area, and dayroom after every meal. The trash will be placed into trash bins and the housing deputy will inspect the trash bins before they are removed from the floor.

At least once per shift (additional as needed), the kitchen deputy will use facility workers with white or yellow badges to conduct a facility trash run. The facility workers will remove the trash bins from every housing floor to be emptied in the trash compactor located on the loading dock. The kitchen deputy will directly supervise the facility workers while the trash is emptied.

On Saturdays, the nightshift kitchen deputy will be responsible for ensuring every trash bin is washed out by facility workers.

IV.    Security Trash:

The nightshift kitchen deputy will coordinate the collection of the security trash bins.  The housing deputies will ensure all locked red trash containers are placed into the incarcerated person elevator well.  Facility workers will collect the security trash containers and deliver them to the loading dock.  The kitchen deputy will open the containers and ensure all security trash is placed into the trash compactor.

SDSD Detention Services Bureau—San Diego Central Jail Green Sheet

| | |
|---|---|
| **DATE:** | **February 22, 2022** |
| **NUMBER:** | **L.6.C.1** |
| **SUBJECT:** | **HAZARDOUS WASTE BUSINESS PLAN** |

## PROCEDURE

The San Diego Central Jail (SDCJ) Hazardous Waste Business Plan (HWBP) will provide guidelines for the maintenance, use, storage, disposal and training of all persons, both staff and incarcerated persons. The guidelines will ensure all personnel know how to use hazardous materials in a safe and appropriate manner.

## STORAGE OF HAZARDOUS MATERIALS:

1. When not in use, all cleaning chemicals, solvents, solutions and sprays will be appropriately labeled and stored in the janitorial closets (locked) or in the basement stockroom cages (locked). All chemical items will be stored in a spill proof container. The storage areas will be marked with a "Hazardous Materials" sticker.

2. Other forms of hazardous materials including but not limited to paints, paint thinner, flammable liquids and solids, petroleum-based products such as motor oil or gasoline, adhesives and acids may be kept in the facility by maintenance personnel. The use, storage, disposal and training for these items and personnel are under the direction of the Department of General Services (DGS).

3. On floors 1 through 10, Material Safety Data Sheets (MSDS) will be placed in areas where hazardous chemicals are kept. The operations deputy will be responsible for updating the MSDS in areas where hazardous materials are kept.

## STORAGE OF HAZARDOUS WASTES:

1. At a minimum, hazardous and universal waste must be stored using the following criteria:

   a. Stored in non-leaking tanks or containers in good condition with tight-fitting lids.
   b. Kept closed when wastes are not being added or removed.
   c. Accurately labeled with waterproof stickers. Labels must specify the words "Hazardous Waste," the composition and physical state of the waste, the hazardous properties of the waste (e.g. flammable, reactive, etc.) and the name of the generator.
   d. Labeled with the date the waste accumulation began on each tank or container.
   e. Managed in a way that minimizes the possibility of spills or escape of waste into the environment.
   f. Incompatible waste will not be stored in a common storage area without proper segregation. Proper segregation ensures separation of incompatible chemicals that have the potential to produce heat, pressure, fire, explosion, violent reaction, toxic dust, mist, irritating/toxic vapor or gas. Waste segregation also ensures that spill response is not

HAZARDOUS WASTE BUSINESS PLAN                                                           Page 1 of 3

complicated by unintended chemical reactions between stored wastes that may endanger responders or impair clean up.

g.  Stored onsite according to storage time limits prescribed in the regulations.

2.  All cleaning material waste will be stored in sealed containers on the loading dock.  These areas will be marked with a "Hazardous Materials" sticker.

## DISPOSAL OF HAZARDOUS MATERIALS AND WASTES:

1.  Disposing of hazardous materials and wastes shall be done in accordance with the manufacturer's recommendation and the MSDS.

2.  Biohazardous and biomedical waste will be disposed of in compliance with SDCJ Green Sheet M.41.C.1.

3.  Hazardous and universal wastes may not be disposed of in drains, sinks, dumpsters, onto the surface of the ground, into storm drains or into the sewer system.  All hazardous wastes must be disposed of at state permitted treatment, storage or disposal facilities.

4.  Household hazardous waste from private homes cannot be turned into SDCJ for disposal.

## DISPOSAL OF BATTERIES:

1.  Batteries are considered universal waste and therefore cannot be thrown into the trash.

2.  Used batteries will be placed in the universal waste battery bucket.  The buckets are located in key control and the operation deputy's office.  When batteries are placed in the bucket, the terminals must be covered with clear tape.

3.  The universal waste battery bucket will be clearly labeled with the date the bucket was placed in service and instructions on contacting the operations deputy when the bucket is full. The bucket will be scheduled for pick-up on an annual basis

4.  If the universal waste battery bucket is full before the pick-up date, the operations deputy will remove the bucket and place a replacement bucket in service.

## EMERGENCY PROCEDURES:

In the event of a hazardous waste spill, release, fire or explosion, emergency procedures/response should be initiated.  These procedures may include, but are not limited to:

1.  Notify the local fire department (911) and the Hazardous Materials Division at ▮▮▮▮ ▮▮▮▮

2.  In every situation that threatens human health or the environment, a notification must be made to the California Emergency Management Agency at ▮▮▮▮  The following information must be provided:

HAZARDOUS WASTE BUSINESS PLAN                                   Page 2 of 3

     a.  Name and phone number of the person reporting
     b.  Name and address of the facility
     c.  Time and type of incident
     d.  Name and quantity of hazardous material(s) involved
     e.  Extent of any injuries
     f.  Possible hazard to human health and the environment outside the facility

3.  During the emergency, you must take all reasonable measures to ensure that fires, explosions and chemical releases do not spread.  These measures may include:

    1.  Stopping all operations
    2.  Collecting and containing released waste
    3.  Removing or isolating chemical containers

4.  Evacuate the affected area in accordance with DSB Policy and Procedure H.3

5.  Responding deputies should don a Self-Contained Breathing Apparatus (SCBA) to avoid exposure to noxious fumes/gasses.

6.  Utilize communications systems (radio, phone, stenophone) to notify facility staff of the type of hazard, location of the hazard and that the area is off-limits until it is deemed safe by responding emergency personnel.

## TRAINING:

To be in compliance with the HWBP, training will be conducted covering the storage of hazardous wastes and basic emergency procedures.  The training for staff is provided annually via the Learning Management System.  In addition, each team will provide additional training that will include emergency procedures such as fire response and evacuations.  Copies of the training rosters will remain on file with the facility training coordinator.

All facility workers will be trained at the time of hire on the use and storage of hazardous materials, emergency procedures and the use of protective equipment by the facility worker deputies.  The facility workers will sign a contract or contract attachment (available in English and Spanish) acknowledging their understanding of hazardous materials handling and disposal procedures.

## DOCUMENTATION:

The SDCJ operations deputy is assigned as the Hazardous Material Coordinator as part of the operations duties and will be responsible for conducting annual audits of hazardous wastes stored within the facility.  The operations deputy will also maintain a record of any hazardous waste that is sent for disposal for SDCJ.  This record will include the date of disposal, description of the hazardous waste, quantity and the disposal location.  This record will be retained for one year after the disposal date.

SDSD Detention Services Bureau—San Diego Central Jail Green Sheet

| | |
|---|---|
| **DATE:** | **February 22, 2022** |
| **NUMBER:** | **L.7.C.1** |
| **SUBJECT:** | **RAZOR EXCHANGE** |

<u>PROCEDURE</u>

Razor distribution will be conducted immediately after night count. Incarcerated persons in dorm housing can come to the module gate to receive their razors. If razors are not distributed during the shift, a JIMS entry will be made stating the reasoning.

I.  **DISTRIBUTION**

   A. Each incarcerated person wishing to use a razor will show the deputy his wristband. GC 7922.000 - Safety/Security Interest

   B. Each incarcerated person will be allowed 20 minutes to use the razor.

II. **COLLECTION**

   A. When an incarcerated person is finished with the razor or his allotted 20 minutes are up, the housing deputy will collect the razor.

   B. The housing deputy will verify the incarcerated persons identity and note the return of the razor on the count sheet.

   C. The housing deputy will discard the razor(s) in the security trash.

III. **INMATE WORKERS**

   A. Facility workers are not authorized to keep their razors.   Kitchen workers will be given razors prior to starting their kitchen work shift. Kitchen worker razor distributions are 0900 hours (B Shift) and 0100 hours (A Shift).

IV. **PSYCHIATRIC STABILAZITION UNIT (PSU)**

   A. Incarcerated persons housed in the PSU will not be issued razors containing a straight razor blade.  PSU clinical staff will offer the use of an electric razor to the PSU incarcerated persons.  The electric razor will be sanitized by the PSU clinical staff after each use.

**SDSD Detention Services Bureau—San Diego Central Jail Green Sheet**

| | |
|---|---|
| **DATE:** | **June 29, 2023** |
| **NUMBER:** | **L.9.C.1** |
| **SUBJECT:** | **HAIRCUTS/HAIR CARE** |

PROCEDURE

I. HAIRCUT SCHEDULE

| | |
|---|---|
| Sunday | 6th Floor |
| Monday | 4th Floor |
| Tuesday | Facility Workers |
| Wednesday | 7th Floor |
| Thursday | 5th Floor |
| Friday | 8th Floor |
| Saturday | 3rd Floor |

Haircuts will consist of a #1, #2, or #3 clipper cut only, with no combinations.

Where possible, haircuts will be conducted in the recreation yard of the respective housing floor. This will allow direct visual supervision of the barbers and the incarcerated persons receiving haircuts. On the 4th floor, the haircuts may be conducted in the multi-purpose room with a deputy standing by for security. 3rd floor haircuts are conducted in the PSU dayroom with direct supervision. At no time will the barber(s) be locked inside any room with another incarcerated person while unsupervised.

Incarcerated persons are not authorized to cut their own hair.

Each of the barber boxes will have the following equipment: 2 pairs of purple Oster 76 clippers, 6 detachable blades (2 each of - #1, #2, and #3 blades) and a pair of clippers for incarcerated persons prescribed a clipper shave Krono by health staff. The barbers will have one multiple outlet extension cord and one longer single outlet extension cord.

The barber boxes will also contain brushes, combs, capes, clipper lubricants and sanitizing spray.

Barbers are trained in the proper sterilization of the clipper cutting blades. After each haircut, the blades and clipper must be sprayed with sanitizing spray and set aside for 10 minutes. During this time, a second set of blades and clipper will be used. Clipper blades must be sterilized accordingly after each use.

NAIL CLIPPERS

The nail clippers will be kept in the facility worker deputy's office. On the scheduled haircut day for each housing floor, the facility worker deputy will provide the barbers with four nail clippers. The nail clippers, along with the barber's supplies, will be taken to the designated

housing floor.  The nail clippers will be made available to the incarcerated persons while haircuts are being given.  The nail clippers will be sanitized after each use.

Prior to incarcerated persons returning to their housing module, the housing deputy shall inventory and inspect all the nail clippers.  Particular attention should be given to ensure that there are no damaged or missing parts.  If a nail clipper is missing, a search of all persons with access to the nail clippers will be conducted until the missing nail clipper is found.

When the barbers are returned to the 8th floor, the housing deputy will notify the facility worker deputy of any damaged nail clippers.  The nail clippers that are damaged or no longer functional will be replaced by the facility worker deputy.

**SDSD Detention Services Bureau—San Diego Central Jail Green Sheet**

| | |
|---|---|
| **DATE:** | **March 4, 2022** |
| **NUMBER:** | **L.13.C.1** |
| **SUBJECT:** | **PEST AND VERMIN CONTROL** |

<u>PROCEDURE</u>

Monthly vermin and pest control inspections will be conducted by licensed (County/Contracted) professionals or appropriately trained staff.  Any identified conditions, including the presence of insects, rodents, or vermin, shall be eradicated under the direction of the Integrated Pest Control Program with the Department of Agriculture, Weights and Measures. All requests for pest control service outside of the monthly inspections will be submitted to the operations deputy.  The operations deputy will make notifications and coordinate any additional services.

**SDSD Detention Services Bureau—San Diego Central Jail Green Sheet**

| | |
|---|---|
| **DATE:** | **March 4, 2022** |
| **NUMBER:** | **L.13.C.2** |
| **SUBJECT:** | **PEST AND VERMIN CONTROL – LICE, SCABIES AND OTHER INFESTATIONS** |

PROCEDURE

When an incarcerated person is suspected of having lice, scabies, or other infestation, the deputy will notify medical staff. The incarcerated person will be given an opportunity to bathe and will be given appropriate medical treatment. Health staff will determine the nature of the infestation and direct the deputies to begin proper treatment of clothing and bedding.

If an incarcerated person is wearing personal clothing, the items will be placed into a blue medical plastic bag, labeled "CONTAMINATED" and placed into property. When the incarcerated person leaves custody, he will be dressed in other clothing. This will consist of either personal clothing that has been brought in, or clothing from the grab bag. The contaminated bag will not be opened in the facility.

If jail clothing is infested, it will be placed into a blue medical plastic bag, labeled "CONTAMINATED" and sent to the laundry.

Blue medical plastic bags can be obtained from the main medical desk on the 3rd floor. At that time, health staff may or may not have tags they can provide to make labeling easier.

Lice, scabies and other infestations should be considered a public health issue. As such, if an incarcerated person refuses medical treatment for the infestation, the incarcerated person will be escorted through the booking process and placed in a medical isolation cell in the Medical Observation Housing (MOB) unit. Appropriate signage will be placed on the door of the MOB cell notifying those entering the cell that the incarcerated person has an infestation. Upon the discharge of the incarcerated person from custody, the cell will be appropriately treated and sanitized.

**SDSD Detention Services Bureau—San Diego Central Jail Green Sheet**

| | |
|---|---|
| **DATE:** | **February 28, 2024** |
| **NUMBER:** | **M.41.C.1** |
| **SUBJECT:** | **INFECTION CONTROL: MEDICAL WASTE** |

<u>PROCEDURE</u>

It will be the responsibility of sworn personnel to ensure the proper handling of infectious materials and the proper disposal of regulated waste that may be encountered in the course of their duties. The necessary equipment for the handling of these materials will be in specified areas on each floor.

When handling infectious waste, the following universal precautions will be used:

- When available, it is recommended that the facility Healthcare Services Assistance Training (HSAT) Team should be notified to clean-up any blood and body fluid spills within the facility.

- All surfaces and equipment that become contaminated with infectious material should be cleaned immediately with a bleach solution (1:10 dilution of household bleach to water).

- Soiled paper towels, sponges, mops and gloves will be placed in a clear plastic bag. The clear bag will be tied securely and placed in a red biohazard bag. These red biohazard bags can be found at the 3rd floor main medical desk. The medical main desk has a stamp and a tag to be tied to the bag. The red bag will be tied securely to prevent leakage or loss of wastes during storage, handling or transport.

- Contaminated laundry (not being processed as evidence) will be disposed of in the same manner.

The sworn staff on scene will be responsible for disposal of any red bags. The key to the locked biohazardous materials dumpster will be obtained from the main medical desk. The red bag will be placed in the biohazardous waste dumpster located on the loading dock. The deputy will ensure the dumpster is locked prior to leaving the area.

# EXHIBIT R (VIDEO)
# LODGED WITH COURT

# EXHIBIT S (VIDEO)
# LODGED WITH COURT

# 11.

# DECLARATION OF BRIAN WITHROW, PH.D.

1  Susan E. Coleman (SBN 171832)
   E-mail: scoleman@bwslaw.com
2  Martin Kosla (SBN 247224)
   E-mail: mkosla@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   501 West Broadway, Suite 1600
4  San Diego, California 92101-8474
   Tel: 619.814.5800 Fax: 619.814.6799
5
   Elizabeth M. Pappy (SBN 157069)
6  E-mail: epappy@bwslaw.com
   BURKE, WILLIAMS & SORENSEN, LLP
7  60 South Market Street, Suite 1000
   San Jose, California 95113-2336
8  Tel: 408.606.6300 Fax: 408.606.6333

9  Attorneys for Defendant
   COUNTY OF SAN DIEGO (Also
10 erroneously sued herein as SAN DIEGO
   COUNTY SHERIFF'S DEPARTMENT
11 and SAN DIEGO COUNTY
   PROBATION DEPARTMENT
12
                  UNITED STATES DISTRICT COURT
13
                SOUTHERN DISTRICT OF CALIFORNIA
14
15 DARRYL DUNSMORE, ERNEST          Case No. 3:20-cv-00406-AJB-DDL
   ARCHULETA, ANTHONY
16 EDWARDS, REANNA LEVY, JOSUE      **DECLARATION OF BRIAN
   LOPEZ, CHRISTOPHER NELSON,       WITHROW, Ph.D IN SUPPORT OF
16 CHRISTOPHER NORWOOD, and         DEFENDANTS' MOTION FOR
   LAURA ZOERNER, on behalf of      SUMMARY JUDGMENT**
17 themselves and all others similarly
   situated,
18
19            Plaintiffs,
20       v.                         **Hearing**
                                    Date:    March 6, 2025
21 SAN DIEGO COUNTY SHERIFF'S       Time:    2:00 p.m.
   DEPARTMENT, COUNTY OF SAN        Ctrm:    4A
22 DIEGO, CORRECTIONAL
   HEALTHCARE PARTNERS, INC.,       Judge: Anthony J. Battaglia
23 TRI-CITY MEDICAL CENTER,
   LIBERTY HEALTHCARE, INC.,        Magistrate Judge: David D. Leshner
24 MID-AMERICA HEALTH, INC.,
   LOGAN HAAK, M.D., INC., SAN
25 DIEGO COUNTY PROBATION
   DEPARTMENT, and DOES 1 TO 20,
26 inclusive,

27            Defendants.

28

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4913-1917-7477 v2                        1              3:20-cv-00406-AJB-DDL
                                                  WITHROW DECL. ISO DEFTS' MSJ

I, BRIAN WITHROW, declare as follows:

1. I have personal knowledge of the matters herein and would competently testify to them if called to do so. I am a Professor in the School of Criminal Justice and Criminology at Texas State University in San Marcos, Texas. For the past 43 years I have been actively engaged in the criminal justice field as either a practitioner (18 years) or as a scholar (25 years). The primary focus of my research agenda is racial profiling and police systems and practices. I have authored three books, many scholarly articles and numerous technical reports on the issue of racial profiling. I am often asked to advise police agencies on how to evaluate the potential for racial discrimination in routine police operations. I hold an earned Doctorate of Philosophy degree in Criminal Justice from Sam Houston State University, a Masters of Public Administration from Texas State University and a Bachelors of Criminal Justice from Stephen F. Austin State University in Nacogdoches, Texas. I am also the author of a widely used textbook on Research Methods in Crime and Justice and a coauthor of a textbook on Police Ethics.

2. I have reviewed the report of Plaintiffs' expert witness Brian Ross, as well as analyzed the CAD, RIPA, and other data available regarding patrol activities in San Diego County.

3. Plaintiffs in this case allege that the San Diego Sheriff's Office (SDSO) engages in a pattern or practice of racial discrimination within their routine enforcement activities. Specifically, plaintiffs allege that Black and Latinx individuals in San Diego County are stopped or arrested by the SDSO at disproportionately higher rates than their representation in the population of the County.

4. The SDSO provided two distinct data sets for this case. The first is based on data collected by San Diego Sheriff's Office employees and maintained locally by the San Diego Sheriff's Office. Generally, these data are part of the department's internal information system (*i.e.* computer assisted dispatch or CAD),

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4913-1917-7477 v2                                          2                    3:20-cv-00406-AJB-DDL
                                                                    WITHROW DECL. ISO DEFTS' MSJ

1   with which they evaluate various aspects of its performance.

2       5.      The second data set is collected by employees of the San Diego

3   Sheriff's Office in compliance with the Racial and Identity Profiling Act of 2015

4   (RIPA). This data is submitted to the California Department of Justice for analysis

5   and eventually becomes part of a statewide report on racial and identity profiling.

6       6.      Importantly, there are differences in how these two data sets are

7   constructed. The local CAD system primarily contains records of arrests, whereas

8   the RIPA dataset contains a broader measure of enforcement activity, *i.e.* contacts

9   between individuals and SDSO deputies. It is not possible to combine these into a

10  single measure of the enforcement activities of the SDSO.

11      7.      My analysis of the local (CAD) dataset reveals the following:

12  • Black and Hispanic individuals may be overrepresented in arrests when

13    compared to their proportions within the residential population.

14  • Black individuals are overrepresented in cases disposed as felonies and

15    underrepresented in cases disposed as misdemeanors.

16  • Hispanic individuals are slightly overrepresented in cases disposed as felonies

17    and misdemeanors.

18  However, the above analysis cannot confirm an overrepresentation of arrests is

19  present inside particular beats or that the overrepresentation is intentional.

20      8.      My analysis of the RIPA data set reveals the following:

21  • Black individuals are slightly overrepresented in contacts when compared to

22    their proportion within the residential population.

23  • Hispanic individuals are slightly underrepresented in contacts when compared

24    to their proportion within the residential population.

25  • Black individuals represent the highest proportions of contacts predicted by

26    reasonable suspicion.

27  • Native American and Black individuals represent the highest proportion of

28    contacts ending in no action.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4913-1917-7477 v2                3                3:20-cv-00406-AJB-DDL
                                                  WITHROW DECL. ISO DEFTS' MSJ

- • Native American and Black individuals represent the highest proportions of contacts ending in an arrest with an outstanding warrant. For Native American individuals, this overrepresentation is likely explained by the relatively low number of stops involving Native American individuals.  Black individuals are only slightly overrepresented.
- • There is no consistent pattern or practice of racial bias with respect to the bases (reasons) for a search.

Again, the above analysis cannot confirm that any overrepresentation is intentional. A disparate impact only shows unintentional discrimination unless it is known that the deputies were aware of the person's race before the stop or call.

9.    There are important limitations affecting both of these analyses that must be considered. First, the State of California defines racial profiling as; "the consideration of, or reliance on, to any degree, actual or perceived race, color, ethnicity, national origin, age, religion, gender identity or expression, sexual orientation, or mental or physical disability in deciding which persons to subject to a stop or in deciding upon the scope or substance of law enforcement activities following a stop."  This means, at the very least, <u>prior knowledge of an individual's race or ethnicity by the police officer is necessary to sustain an accusation of racial discrimination</u> (*i.e.* profiling). There is no evidence in either of the datasets on when -- or even whether -- SDSO deputies became aware of an individual's race or ethnicity before the contact. This limitation is particularly relevant with respect to stops and other forms of contacts.

10.    Second, the only independent variable (*i.e.* cause) used in most of the plaintiffs' analyses is the race or ethnicity of individuals stopped or arrested.  One would anticipate some preliminary evidence of over- or under-representation when using a single variable (*i.e.* race/ethnicity) upon which to base comparisons. However, there are numerous other independent variables that need to be considered before confirming a pattern and practice of racial discrimination.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4913-1917-7477 v2

4

3:20-cv-00406-AJB-DDL
WITHROW DECL. ISO DEFTS' MSJ

11.    Glaringly absent in these data sets are any variables that are known to affect the outcome of a police/citizen interaction. For example, neither of these analyses can measure the differential levels of police activity between patrol districts, beats or neighborhoods. Often police resources (*e.g.* patrol officers) are assigned to work in areas wherein there is a demand for their services (*e.g.* higher number of calls for service). Sometimes these areas are principally populated by racial and ethnic minorities. As a result, the individuals that live in these neighborhoods are inadvertently subjected to higher levels of routine police observation.

12.    Contract cities (which contract with the Sheriff's Office for service) may also ask for additional officers to be assigned in areas with more crime and/or calls for service. This, in turn, may result in a disproportionately higher probability for a contact and eventually the issuance of a citation or an arrest.

13.    Related to the previous limitation, neither of the datasets provide sufficient contextual information that could be used to further explain the outcome of a contact. For example, neither dataset provides a measure of the relative severity for the alleged offense, or reason for the contact or arrest. While general arrest titles are provided in the data, they cannot be used to differentiate between the severity of the alleged offenses within the public safety context of a contact. For example a stop based on a speeding violation could occur on a remote highway or within the boundaries of an active school zone.  Both violations are coded as speeding, yet one is much more of an immediate threat to public safety and would explain why a SDSO deputy initiated that particular stop.  Within the CAD dataset there is some evidence that Black and Latino individuals may be arrested for more severe violations, as follows:

- Black individuals represent 10.1 percent of all persons arrested by the SDSD and 11.7 percent of all felony dispositions.

///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4913-1917-7477 v2                    5                    3:20-cv-00406-AJB-DDL
WITHROW DECL. ISO DEFTS' MSJ

1    • Hispanic individuals represent 38.3 percent of all persons arrested by the
2      SDSD and 41.2 percent of all felony dispositions.

3    14.    Criminological research consistently identifies other factors that affect
4    the outcome of a police/citizen contact. These include:

5    • The evidence available to the officer in the field;

6    • The complainant's preference for police action;

7    • The social relationship between the complainant and the suspect;

8    • The suspect's degree of deference toward the police;

9    • The manner in which the police come to handle the situation (*e.g.* was it a call
10     for service or did the police officer initiate the contact); and

11   • Whether or not the arrest is mandatory per state law or department regulation.
12   Unfortunately, neither dataset contains these important variables.

13   15.    Finally, Plaintiffs' analysis (as discussed by their expert Ross) of the
14   datasets is fundamentally flawed. They rely on various econometric models that
15   only include control variables. These variables are used by researchers primarily to
16   evaluate the consistency of a statistical model. Control variables, unlike independent
17   variables, do not directly measure actual effects of various factors on an outcome.
18   As a result, it is not possible using these analyses to measure the effect of factors
19   that likely influence the outcome of a police/citizen contact. These factors, for
20   example, might include:

21   • The relative level of police presence;

22   • The crime rate;

23   • The population density;

24   • How property is used (commercial, residential, entertainment, etc.); and

25   • Transportation and related infrastructure resources.

26   16.    To adequately assess RIPA data, non-discretionary contacts (such as
27   calls for service) must be excluded. The failure to remove these inflates the
28   percentage of contacts that involve racial and ethnic minorities in some years. For

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4913-1917-7477 v2                         6                    3:20-cv-00406-AJB-DDL
                                                      WITHROW DECL. ISO DEFTS' MSJ

example, the 2024 RIPA report analyzed contacts occurring in 2022 and found 12.7 percent of all contacts involving Black individuals were based on a call for service, 8.6 percent of all contacts involving Hispanic individuals were based on a call for service; 10.2 percent of all contacts involving Multiracial individuals were based on a call for service; and 10.2 percent of all contacts involving White individuals were based on a call for service. Plaintiffs' expert Mr. Ross also includes arrest warrants as discretionary, which is inaccurate.

17.     As a result of all of the above, it is not possible to conclude that the data showing overrepresentation in some areas is anything other than unintentional. Without information and data about whether race was known to the deputy <u>before</u> the contact, a finding of racially discriminate policing is not possible. Even Plaintiffs' expert Mr. Ross agreed with the causal model, to wit, temporal order. If one alleges that the police are stopping individuals on the basis of their race or ethnicity, then it is essential, at the very least, that you first prove that the police officers have some knowledge, even if it turns out to be wrong, of the race or ethnicity of the driver.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on December 11, 2024 at Medicine Lodge, Kansas.


*Brian C. Withrow*
BRIAN WITHROW, Ph.D

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4913-1917-7477 v2                                      7                         3:20-cv-00406-AJB-DDL
WITHROW DECL. ISO DEFTS' MSJ

# 12.

# DECLARATION OF DAVID BLACKWELL

1 | Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
2 | Martin Kosla (SBN 247224)
E-mail: mkosla@bwslaw.com
3 | BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
4 | San Diego, CA 92101-8474
Tel: 619.814.5800    Fax: 619.814.6799
5 |
Elizabeth M. Pappy (SBN 157069)
6 | E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
7 | 60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
8 | Tel: 408.606.6300    Fax: 408.606.6333

9 | Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
10 | COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
11 | DEPARTMENT

12 | UNITED STATES DISTRICT COURT

13 | SOUTHERN DISTRICT OF CALIFORNIA

14 |

15 | DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, | Case No. 3:20-cv-00406-AJB-DDL
16 | JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, | **DECLARATION OF D. BLACKWELL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
17 | REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,
18 | CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO | **Hearing**
19 | SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of | Date:    March 6, 2025
Time:    2:00 p.m.
20 | themselves and all others similarly situated, | Ctrm:    4A
21 | | Judge: Anthony J. Battaglia
Plaintiffs,
22 | | Magistrate Judge: David D. Leshner
v.
23 |
SAN DIEGO COUNTY SHERIFF'S
24 | DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY
25 | PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,
26 |
Defendants.
27 |
Defendants.
28 |

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -

3:20-CV-00406-AJB-DDL
BLACKWELL DECL. ISO MSJ

I, D. BLACKWELL, declare as follows:

1.      I am a Lieutenant in the Detention Services Unit of the San Diego County Sheriff's Department, where I have worked since April 2021.  I have worked for the Sheriff's Department since January 2008.

2.      I have personal knowledge of the matters set forth herein, except as to those matters stated on information and belief, and would competently testify thereto if called and sworn as a witness.

3.      Axon Body Worn Cameras (BWC) are fully deployed for all sworn staff at the Las Colinas, Central, Rock Mountain, Vista, and South Bay Jails. The following units also have BWC:  Detentions Canine Personnel, Sheriff's Transportation Unit, County Parole & Alternative Custody Unit, and ADA Unit.

4.      The Axon Body 3 cameras have full integration with Axon Evidence, for storage and retention of video.  Deputies use their BWC paired with an off-line mobile unit (iPhone SE) in order to categorize the video before docking the BWC and saving footage. During a shift, there may be 5-7 hours of video footage taken, and Penal Code 832.18 suggests retention of footage for a minimum of 60 days as a consideration of best practice. We have voluntarily exceeded the minimum suggestion for retention of non-evidentiary data.

5.      BWC have been partially deployed at the George Bailey Detention Facility with approximately 80 personnel having been recently trained and issued devices.  The current plan is to deploy to the remaining personnel pending completion of a facility remodel of the medical area, which has the potential to impact infrastructure servicing the room where these cameras are being docked.

6.      The East Mesa Reentry Facility is the only facility remaining for BWC use, pending the installation of electrical and networking infrastructure to support the docking stations required for personnel assigned there.  In order to implement full deployment of BWC for all detention services deputies, each facility requires a dedicated secure location to store and dock the BWC, in addition to wiring the

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

3:20-CV-00406-AJB-DDL
BLACKWELL DECL. ISO MSJ

facilities for WiFi, and setting up intranet to connect to a central data center. Staff also need to be trained on use and backup of the BWC.

7.     The upgrades in cable/fiber and WiFi in the facilities provide many opportunities for future multifaceted technological upgrades. For example, we anticipate upgrading the surveillance cameras in the housing units, safety cells, and intake cells. Further, the iPhones selected for use with the Axon Body 3 BWC have RFID readers, which will allow future options such as having deputies scan RFID devices at various locations such as at safety cells for safety checks to be logged.

8.     Sheriff's Department Policy 6.131 on Body Worn Cameras, available online, governs their use as well as the  Detention Services Bureau Policy I.20.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on December 16, 2024, at San Diego, California.

12/16/2024

D. Blackwell

_____
D. BLACKWELL

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

# 13.

# DECLARATION OF HENRIETTA PETERS

1  Susan E. Coleman (SBN 171832)
   E-mail:  scoleman@bwslaw.com
2  Martin Kosla (SBN 247224)
   E-mail:  mkosla@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   501 West Broadway, Suite 1600,
4  San Diego, CA  92101-8474
   Tel:  619.814.5800 Fax:  619.814.6799
5
   Elizabeth M. Pappy (SBN 157069)
6  E-mail:  epappy@bwslaw.com
   BURKE, WILLIAMS & SORENSEN, LLP
7  60 South Market Street, Ste. 1000
   San Jose, CA  95113-2336
8  Tel:  408.606.6300 Fax:  408.606.6333

9  Attorneys for Defendants
   COUNTY OF SAN DIEGO, SAN DIEGO
10 COUNTY SHERIFF'S DEPARTMENT and
   SAN DIEGO COUNTY PROBATION
11 DEPARTMENT

12              UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14

15 | DARRYL DUNSMORE, ANDREE | Case No. 3:20-cv-00406-AJB-DDL
16 | ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY | **DECLARATION OF HENRIETTA PETERS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
17 | EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, |
18 | CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO | **Hearing**
19 | SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of | Date:   March 6, 2025<br>Time:   2:00 p.m.
20 | themselves and all others similarly situated, | Ctrm:   4A
21 |                Plaintiffs, | Judge:   Anthony J. Battaglia
22 |           v. | Magistrate Judge David D. Leshner
23 | SAN DIEGO COUNTY SHERIFF'S |
24 | DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY |
25 | PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, |
26 |                Defendants. |
27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4896-6280-8583 v1                    1                Case No. 3:20-cv-00406-AJB-DDL
                                                      DECL. OF HENRIETTA PETERS ISO
                                                            DEFENDANTS' MSJ

1    I, Henrietta Peters, declare as follows:

2    1.    I have personal knowledge of the matters herein and would

3    competently testify to them if called to do so. I am an Environmental Health and

4    Safety Compliance Officer currently employed by the Nevada State

5    Department of Corrections.  I previously worked for the Alabama State Department

6    of Corrections as an Environmental Manager.  My CV is attached hereto as Exhibit

7    A.

8    2.    I was retained by Defendants in this matter to inspect the San Diego

9    County jail facilities regarding environmental and safety conditions at the jail. I

10    conducted in person inspections on March 11-14, 2024. I was given access to all

11    areas I requested to see, and I was able to ask all questions I had of staff. I reviewed

12    the documents listed in Exhibit B hereto.

13    3.    The San Diego County Sheriff's Office Detention Facilities are of

14    average or above average condition for adult local detention facilities in the areas of

15    environmental health and safety. There are issues that can be corrected with

16    additional training but based upon my observations and discussions with staff, the

17    existing policies and practices provide a solid foundation. It is important to note that

18    staff at each detention facility have made significant efforts to enhance sanitation

19    across the county since the initial date of the complaint in this matter, taking very

20    seriously from my observation, areas that needed improvement. I found no evidence

21    that the County or its jail staff are deliberately indifferent to the health or safety of

22    incarcerated persons, with respect to the cleanliness and sanitation of the facilities,

23    and to the contrary, I found them to be responsive, open and accepting of best

24    practices.

25    4.    I inspected each type of housing unit including Safety Cell/Enhanced

26    Observation Housing, Medical Observation Beds, Single Occupancy Housing, and

27    Mainline Housing.

28    ///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4896-6280-8583 v1                    2                    Case No. 3:20-cv-00406-AJB-DDL
DECL. OF HENRIETTA PETERS ISO
DEFENDANTS' MSJ

5.      Overall, all of the facilities were clean, with only minor incidents observed during the site visits. There was no evidence of active rodents or pests. Birds were seen in the outside courtyard areas and inside fenced walkways which is normal, but none were observed inside the housing areas.

6.      The HSAT (Healthcare Service Assistant Training) Program is a very thorough training initiative provided by the San Diego County Sheriff's Office. This program offers extensive training to Incarcerated Person (IP) workers in bio-hazard cleaning and sanitation. At Central Jail, the HSAT program includes one instructor, ten IP workers, and one IP worker deputy. At George Bailey, the program includes six IP workers and one IP worker deputy. The current Healthcare Service Assistant Training (HSAT) program is an excellent program that covers custodial maintenance equipment and techniques to maintain the cleanliness of healthcare facilities and meet regulatory standards. The two detention facilities with this program exhibit a higher level of cleanliness and the training should be extended to the remaining facilities to assist with enhanced bio-hazard cleaning and sanitation. The remaining facilities are overall clean and in good condition but instituting the HSAT program at all facilities would benefit staff and IP's.

7.      During my site visits, Clean Harbors provided cleaning services for the Central Jail. However, since the initial draft of this report, Captain Jesse Johns informed me that starting the week of August 26, 2024, Clean Harbors' services will only be retained for large incidents or specialized cleanings due to extraordinary circumstances. Going forward, daily cleanings will be handled by IP workers, some of whom have received training or are currently participating in the HSAT program. After reviewing the contract, I find the contracted services appropriate, and I consider the new cleaning plans to be equally or even more effective than the work previously done by Clean Harbors. Clean Harbors services remain available for all detention facilities, by request.

///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4896-6280-8583 v1                    3                    Case No. 3:20-cv-00406-AJB-DDL
DECL. OF HENRIETTA PETERS ISO
DEFENDANTS' MSJ

8.     The garbage compactor areas should receive a more detailed cleaning. Although some cleaning is evident, I recommend a more thorough regimen. I suggest incorporating a weekly cleaning assignment for the garbage compactors when they are removed for disposal. This practice helps eliminate collected trash underneath, reducing rodents, pests, and other public health nuisances.

9.     Recyclable products are transported to outside disposal areas, but I recommend a more frequent removal schedule to avoid attracting pests. All recyclables should be stored away from the building to prevent creating harborage for pests.

10.    I observed grease bins (outside tallow containers) that require more frequent cleaning to prevent pests attracted by wasted grease. I also recommend creating a containment area for all grease bins using sand to absorb any wasted grease. The sand mixture can then be properly disposed of as solid waste.

11.    Bio-hazard clean-up kits are readily available throughout the department. Based upon my questioning, staff members are well-informed about their proper usage to prevent the spread of disease. These single-use kits include necessary personal protective equipment (PPE), solidifiers, and waste disposal containers, all of which comply with the requirements set by the Occupational Safety and Health Administration (OSHA).

12.    All the facilities have designated hygiene days, typically on weekends, which require thorough inspections of all living areas and cells/dorms. For example, Central Jail schedules hygiene days on Saturdays, Las Colinas on Fridays and Saturdays, and Vista on Saturdays and Sundays. The facilities were overall hygienic and appropriately sanitized, but I do recommend general surface cleaning be performed daily when areas are empty, with a focus on highly soiled areas such as toilet areas.

///

///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4896-6280-8583 v1

4

Case No. 3:20-cv-00406-AJB-DDL
DECL. OF HENRIETTA PETERS ISO
DEFENDANTS' MSJ

13.    I found the facilities to be fairly clean and for the most part free of vermin and insects. Birds have access to inner walkways, including segregation recreation yards. To reduce bird entry and prevent roosting, it is important to discourage the feeding of birds, whether intentional by Incarcerated Persons (IPs) or unintentional due to food waste around the facility. It is important to note that in the State of California, it is generally illegal to remove or destroy active bird nests, as they are protected under both federal and state laws. Therefore, the Sherriff's Office can consider additional methods to include using netting, spikes, and audio deterrents such as noise makers or sparrow/crow distress calls.

14.    During site visits, pest management rodent bait stations were observed and opened for my verification of activity. The rodent bait stations are placed throughout all areas, and the vendor notes in their technical report if additional boxes are suggested due to increased activity. The placement of rodent bait stations is normal in facilities of similar size, to prevent vermin from outside fields from entering.

15.    The presence of sewer flies in the shower area of Vista Detention Facility suggests a need for drain cleaning, such as enzyme removal or high-power jetting. Regular maintenance is crucial to prevent infestations, especially in older buildings with excessive organic material buildup.

16.    In shower areas, during the inspection no active mold growth was observed, indicated by the absence of outward growth on surfaces such as walls and cellulose ceiling tiles. Occasional water damage, possibly from leaks or HVAC condensation, was noted. It is recommended that these issues be addressed through remediation efforts, including leak repairs, to prevent mold spore spread.

17.    Evidence of IPs covering vents with paper items was observed in several areas and can be identified as a contributing cause to any ventilation issues within the facility. This practice can impede air circulation and should be discouraged to maintain proper airflow and cleaned on a regular basis. I didn't

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4896-6280-8583 v1                                    5                    Case No. 3:20-cv-00406-AJB-DDL
DECL. OF HENRIETTA PETERS ISO
DEFENDANTS' MSJ

1   observe any specific issues as a result of IP's covering air vents, but air flow must

2   be maintained to mitigate the spread of infectious disease.

3       18.    Overall, the filters, sprinkler heads, and other areas prone to dust

4   collection were free of dust. However, I did notice some filters and sprinkler heads

5   with excessive dust, which can pose health and fire hazards. To maintain cleanliness

6   and functionality, the existing proper and regular cleaning methods should be used

7   to clean the dust on all these surfaces.

8       19.    During the site visit, the maintenance supervisor and his team at each

9   facility demonstrated both knowledge and responsiveness. They promptly took

10  corrective actions when areas were identified or arranged repair calls, often

11  addressing issues immediately.

12      20.    Chemical container labeling is crucial for safety. I found some

13  secondary containers used by the Incarcerated Population (IP) for chemicals in

14  living areas that were improperly labeled. Ensuring proper labeling of chemicals

15  within the facilities, particularly secondary container labels as mandated by OSHA,

16  is essential. I discussed this with the staff during my inspections, and they were open

17  and receptive to making the necessary changes to ensure proper labeling.

18      21.    I reviewed with the staff that containers for chemicals must be

19  specifically designed for chemicals, cleanable, and properly labeled. This

20  information was received openly, with a positive intent to make the necessary

21  corrections.

22      22.    The facilities have Safety Data Sheets (SDS) which are adequate, but

23  they should be updated to the Global Harmonized System (GHS). SDS books were

24  available, but they should be placed in areas where chemicals are stored, mixed, and

25  dispensed for easier access than presently exists. Copies of SDS should also be

26  available in the medical area and shift office for emergencies.

27      23.    I observed that some chemicals at a few facilities were stored in outside

28  storage areas. While this is not uncommon, it's important to note that extreme

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4896-6280-8583 v1                    6                    Case No. 3:20-cv-00406-AJB-DDL
DECL. OF HENRIETTA PETERS ISO
DEFENDANTS' MSJ

1    temperature conditions can compromise the effectiveness of chemicals stored

2    outdoors. To maintain their efficacy, it is recommended to store these chemicals in

3    temperature-controlled environments. I shared these recommendations with the

4    staff, who were open and receptive, and they expressed their intent to implement

5    these changes.

6          24.    The facilities have a chemical inventory management system, which is

7    essential, but I recommend making it more robust. This includes that chemicals must

8    be marked with their purchase date to prioritize the use of older supplies before

9    newer ones, following the First-in, First-out method. It is important to adhere to the

10   manufacturer's suggested shelf life, which is generally up to two years. These

11   recommendations were again discussed with and well received by staff.

12         25.    I observed some diluted chemicals with no indication of creation date.

13   The effectiveness of diluted chemicals generally lasts 24 hours. Therefore,

14   chemicals at dilution stations should be mixed daily to maintain their effectiveness.

15   These recommendations were met with openness and an intent to implement.

16         26.    The plumbing and electrical systems at each of the facilities were not

17   contributing to any health or safety issues based upon my observations. I observed

18   the use of one extension cord in one facility, which I was advised was temporary.

19   Regulations typically require that extension cords be used safely and not as a

20   permanent solution; minimum of 90 days and there was no indication that this cord

21   was being used on anything other than a temporary basis. I did not observe any

22   exposed, energized wiring in any of the facilities.

23         27.    Otherwise, toilets and shower facilities appeared to be in working

24   order, with no insects or other indicia of problems and I did not observe any backed

25   up toilets or otherwise non-functioning plumbing.

26         28.    Laundry operations are managed by the Central Production Center,

27   which provides laundry services for all male facilities with a one-to-one clothing

28   exchange system. Las Colinas handles the laundry for all female clothing items, also

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego
4896-6280-8583 v1          7          Case No. 3:20-cv-00406-AJB-DDL
DECL. OF HENRIETTA PETERS ISO
DEFENDANTS' MSJ

1  utilizing a one-to-one clothing exchange. The laundry operations are good overall

2  with the need for some additional cleaning procedures for laundry carts.

3      29.    Laundry cart maintenance is an important aspect of operations. My

4  understanding is that laundry carts are cleaned after each use, but my observation of

5  stains and grime indicates the need for a more thorough cleaning with soap, water,

6  and sanitizer. Las Colinas addresses this issue effectively by using an automatic cart

7  washing machine that can deep clean and sanitize the carts. I discussed my concerns

8  with the staff, who were open and receptive to implementing a better cleaning

9  process at the other facilities.

10     30.    Facility upgrades are underway at Central Jail, where the laundry area

11 is being enhanced with the installation of three new washers and three new dryers.

12 These additions are intended to supplement the laundry services provided by the

13 Central Production Center. The new laundry area was not operational at the time of

14 inspection.

15     31.    Footwear issuance includes both new and recycled plastic footwear,

16 which are cleaned and laundered before being redistributed to the general

17 population, following proper procedures. Additionally, proper protocols are in place

18 for handling laundry contaminated with bloodborne pathogens and vectors such as

19 scabies, ensuring hygiene and safety.

20     32.    Property storage involves placing items in paper bags inside black

21 zipped laundry storage bags. If there is a suspicion of lice, scabies, or biohazard

22 contamination, the items are placed in plastic bags within the black zipped bags and

23 tagged externally for identification. This system ensures proper handling of property

24 storage.

25     33.    The clothing allotment for incarcerated persons (IPs) includes two sets

26 of color- coded uniforms (one worn) and two sets of undergarments, referred to as

27 "White Rolls." For males, this includes a towel, socks, underwear, and a t-shirt. For

28 ///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4896-6280-8583 v1

8

Case No. 3:20-cv-00406-AJB-DDL
DECL. OF HENRIETTA PETERS ISO
DEFENDANTS' MSJ

females, it includes a towel, bra, socks, underwear, a gown, and a t-shirt. IP workers receive the same clothing allotment as the general population, with laundering services provided daily. The number of items distributed, and the frequency of laundering is all appropriate.

34.    During my inspections, the laundry staff members were knowledgeable and eager to provide information. I discussed with the laundry manager at CPC the possibility of using the automatic laundry cart washer for all county-wide carts. This would help prevent cross-contamination between soiled carts and clean linen and, if not too burdensome in terms of transport, would be the best cleaning option. If this is not feasible, hand cleaning, as previously mentioned, is the next best option. The CPC manager expressed openness to presenting this idea to County Leadership for review.

35.    According to my review, as discussed in this report, I believe that the San Diego County Sheriff's Office Detention Facilities perform at an average level compared to other adult local detention facilities in terms of environmental health and safety. There are no systemic issues which demonstrate a callous or indifferent attitude toward creating a clean and health environment for Incarcerated Persons. To the contrary, San Diego County Sheriff's Office leadership and staff members have taken an active role in improving the sanitation, which is visible at each facility and were very receptive to my questions, commentary and suggestions during my inspections and after. By actively addressing the observations outlined in this report, I am confident that ongoing improvements will yield successful results.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on December 16, 2024, at Las Vegas, Nevada.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4896-6280-8583 v1    9    Case No. 3:20-cv-00406-AJB-DDL
DECL. OF HENRIETTA PETERS ISO
DEFENDANTS' MSJ

1

HENRIETTA PETERS

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Burke, Williams &
Sorensen, LLP
Attorneys At Law
San Diego

# EXHIBIT A

# Henrietta L. Peters

## CONTACT



7271 Golden Star Ave
Las Vegas, NV 89130



256.283.7558



henriettalpetersmpa@gmail.com

## EDUCATION

**Tuskegee University**
*Tuskegee, Alabama*
Bachelors of Science in Biology

**Jacksonville State University,**
*Jacksonville, Alabama*
Masters of Public Administration
*(Concentration in Environmental Science Management)*

## PROFESSIONAL SUMMARY

Highly skilled Environmental Health and Safety Compliance Officer, leveraging over two decades of diverse expertise in Public Health, Environmental Regulation and military service.  With a proven track record of ensuring adherence to regulatory standards and promoting a culture of safety within a diverse organizational setting.  Experience in developing and implementing safety protocols, training programs, conducting risk assessments, overseeing compliance with OSHA, EPA, ADA and other regulatory requirements.

## WORK EXPERIENCE

**JULY 2021 – PRESENT**
**Supervisory, Compliance Enforcement Investigator | NV Dept of Corrections | Las Vegas, NV**
Key Achievements

- Served as the ADA Statewide Coordinator, conducting 47 comprehensive training sessions on ADA compliance specifically tailored to the context of prisons, reaching over 2000 NDOC employees as part of USDOJ Settlement Agreement
- Revitalized and reinitiated the Safety and Security audit program in compliance with National Institute of Corrections
- Managed and supervised the thorough cleaning of outdoor firing ranges, ensuring the safety protocols for officers were rigorously maintained

Core Responsibilities

- Chief Subject Matter Expert overseeing Environmental Health and Safety, Hazardous Communication, Worker's Compensation Injuries, Food Safety, Fire/Life Safety, and Americans with Disabilities Act compliance across 16 state correctional facilities. Ensures alignment of Administrative Regulations and Operational Procedures with stringent adherence to State, Federal, and local regulations
- Oversaw all investigative activities, including the assignment of cases to subordinate investigators, providing guidance, and supervising the investigative process. Monitored and directed investigative staff, ensuring adherence to procedures and implementing appropriate courses of action in alignment with established protocols
- Developed and delivered comprehensive training programs on Environmental Health and Safety tailored for new employees, cadets in the Academy, facility Safety Officers and offenders. Provided specialized instruction aimed at fostering understanding and adherence to safety protocols and regulatory standards

**OCT 2010 – JULY 2021**
**Environmental Manager | AL Dept of Corrections | Montgomery, AL**
Key Achievements

- Substantially managed 29 State correctional facilities and served as an interdepartmental liaison to assure that all procedures complied with state, federal, and local environmental regulations
- Efficiently created spill kits and emergency plans for the facility's emergency generator by using underground storage tank to minimize hazardous risks to a feasible extent
- Successfully directed training sessions for national food safety accreditation course (ServSafe®) for all food service personnel as required by recent Food and Drug Administration mandates.
- Accurately developed and implemented 12 policies and Departmental Administrative Regulations in the areas of environmental sanitization, composting practices, chemical and fire safety, food sanitization and universal waste.
- Managed numerous environmental clean-up projects in the areas of leaking underground storage tanks, vector and mold remediation

## CORE COMPETENCIES

- Training and Development
- Strategic and Tactical Planning
- Interpersonal Communication Skills
- Team Building and Quality Assurance
- Problem Resolution and Decision Making
- Tasks Delegation and Performance Management
- Risk, Conflict, Operations, and Safety Management
- Resource Allocation, Time Management, and Interpersonal Skills
- Hazardous Waste Management, Sustainability, and Environmental Services

## REFERENCES

Jeffery Williams
Deputy Commissioner,
Alabama Dept. of Corrections
(334)-546-5943
williams-ja59@hotmail.com
jeff.williams@doc.alabama.gov

Brian E. Williams, Sr.
Deputy Director of Operations,
Nevada Dept. of Corrections
(725) 216-6000
bewilliams@doc.nv.gov

Rodney Crenshaw
Business Owner
(334) 313-1912
mafitness2017@gmail.com

Core Responsibilities

- Competently practiced action plans for decommissioning sewage lagoon systems while providing information to EPA and ADEM related to land application of dredged sewage items
- Administered environmental initiatives in the department to promote energy cost reduction, inspected all environmental complaints about indoor air, food safety, solid waste, water quality, and similar issues to provide tailored solutions
- Actively oversee correctional facilities' holding NPDES permits for sewage treatment while supporting environmental policy aspects for barbering/beauty shop and scabies within the health service division
- Effectively direct reviews in correctional facilities for ecological health and safety concerns such as environmental compliance, food safety, and maintenance to enhance operational success
- Precisely execute water sampling while reviewing water quality reports when MCL's are stated from municipalities with formation of new standards for dewatering solid waste from food service areas

**AUG 2000 – OCT 2010**

**Public Health Senior Environmentalist | AL Dept of Public Health | Various Counties, AL**

Core Responsibilities

- Ensure adherence to state and federal environmental health regulations by conducting inspections, assessments, and audits of various facilities such as restaurants, body art facilities, hotels, school, daycare centers and hospitals.
- Conduct comprehensive evaluations and investigations to identify potential health hazards and risks within communities, focusing on air and water quality, sanitation, waste management, and food safety.
- Engage in educational outreach efforts to raise awareness about environmental health issues, disseminating information and advocating best practices to community members and stakeholders. Participated in Statewide grant providing free Septic Tank Pumping vouchers to homeowners who participated in training program.
- Provided expertise and support during environmental health emergencies or crises, contributing to emergency response strategies and recovery efforts.
- Maintained accurate records of inspections, assessments, investigations, and other relevant activities in accordance with departmental protocols and standards. Consistently upheld compliance with State standards by sustaining an audit score exceeding 95%.
- Successfully trained new employees as per EPA, FDA and State regulations.

## TRAINING & CERTIFICATIONS

| | |
|---|---|
| **Americans with Disability Act State-wide Coordinator for NDOC,** ADA National Network | |
| **Safety and Health Practitioner Certificate** Sept 2023 - NV OSHA, Safety Consultation and Training Section | |
| **Certified Environmental Safety and Compliance Officer** (Reg. # 476706524), National Registry of Environmental Professionals | Expiry: July 2024 |
| **OSHA 30 Hour General Industry** | April 2022 |
| **ServSafe® Instructor/Proctor (Certificate # 4002905),** National Restaurant Association | |
| **Radiation Safety Officer (Certificate # 1487018941009)** Nevada Technical Associates, Inc. | 2017 |
| **ISO 14001 Environmental Management Systems Internal Audit (Certificate # 15-097-04),** Alabama Safe State, The University of Alabama | 2015 |
| **Class A & B Operator Training, Underground Storage Tanks,** API WorkSafe | Feb 2012 |
| **Lock Out/ Tag Out** | 2019 |
| **UST Installation, Repair & Closure Training,** AL Petroleum Equipment Contractors, | 2014 |
| **Confined Space Training** | 2019 |

# Henrietta L. Peters

## CONTACT



7271 Golden Star Ave
Las Vegas, NV 89130



256.283.7558



henriettalpetersmpa@gmail.com

## FEE SCHEDULE

| | |
|---|---|
| Independent consultant rate | $75/hour |
| Case Review/Expert witness | $150/hour |
| Trial testimony | $200/hour |
| **FY 2024 GSA Per Diem Rates for California** | |
| Lodging | $194/day |
| Meals & Incidentals | $74/day |

**Plus additional travel expenses** (flight/rental/ect)

# EXHIBIT B

### DOCUMENTS REVIEWED IN CONNECTION WITH
*Darryl Dunsmore et al v. San Diego County, et al.*

- San Diego County Sheriff's Department Medical Services Division, Operations Manual MSD.V.1, Vermin Control
- San Diego County Sheriff's Department TechCare Lice Protocol
- San Diego County Fire Inspection Reports; 2022-2023, All facilities
- Office of the State Fire Marshal, Fire and Life Safety Inspection Reports; 2023
- City of Chula Vista, Fire Safety Inspection Report; 2022
- San Diego County Sheriff's Department Laundry Services; shower shoes protocol
- San Diego County Department of Agriculture, Weights and Measures; Integrated Pest Control documents
- Grease Interceptor disposal records to include maintenance frequency log
- San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures; Incarcerated Persons Identification Wristbands and Clothing; I.47
- San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures; Laundry Schedule – L.1
- SDSD Detention Services Bureau—San Diego Central Jail Green Sheet; Laundry Schedule – L.1.C.1
- SDSD Detention Services Bureau—George Bailey Detention Facility Green Sheet; Laundry Schedule – L.1.G
- SDSD Detention Services Bureau- East Mesa Reentry Facility; Laundry Schedule – L.1.M
- SDSD Detention Services Bureau – Manual of Policies and Procedures South Bay Detention Facility; Laundry Schedule – L.1.S
- SDSD Detention Services Bureau—Vista Detention Facility Green Sheet; Laundry Schedule – L.1.V
- SDSD Detention Services Bureau—Las Colinas Detention and Reentry Facility Green Sheet; Laundry – L.1.L
- SDSD Detention Services Bureau—Rock Mountain Detention Facility Green Sheet; Laundry – L.1.R

# 14.

# DECLARATION OF SUSAN E. COLEMAN

Susan E. Coleman (SBN 171832)
E-mail:  scoleman@bwslaw.com
Martin Kosla (SBN 247224)
E-mail:  mkosla@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA  92101-8474
Tel:  619.814.5800 Fax:  619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail:  epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA  95113-2336
Tel:  408.606.6300 Fax:  408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
DEPARTMENT

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00406-AJB-DDL  **DECLARATION OF SUSAN E. COLEMAN IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED** |
| Plaintiffs, | **Hearing** |
| v. | Date:    March 6, 2025 |
| | Time:    2:00 p.m. |
| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, | Ctrm:    4A  Judge: Anthony J. Battaglia  Magistrate Judge: David D. Leshner |
| Defendants. | |

///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4898-1609-5751 v1                                    1                        Case No. 3:20-cv-00406-AJB-DDL
COLEMAN DECL RE MSJ

I, SUSAN E. COLEMAN, declare as follows

1.    I am competent to testify to the matters set forth in this declaration, and if called to do so, would and could so testify.

2.    I am an attorney at law licensed to practice before this Court and all the courts of the State of California.   I am a partner in the law firm of Burke, Williams & Sorensen, LLP, attorneys of record for Defendants COUNTY OF SAN DIEGO, SAN DIEGO COUNTY SHERIFF'S DEPARTMENT and SAN DIEGO COUNTY PROBATION DEPARTMENT ("Defendants").

3.    I make this declaration in support of the motion of Defendants for partial summary judgment, or in the alternative, for an order treating specified facts as established.

4.    Attached as Exhibit "A" are true and correct copies of excerpts from the transcript of Rita Diaz taken on May 3, 2024.

5.    Attached as Exhibit "B" are true and correct copies of excerpts from the deposition transcript of Rebecca Cardenas taken on May 30, 2024.

6.    Attached as Exhibit "C" are true and correct copies of excerpts from the deposition transcript of Jesse Johns taken on April 24, 2024.

7.    Attached as Exhibit "D" are true and correct copies of excerpts from the deposition transcript of Eric S. Brown taken on May 30, 2024.

8.    Attached as Exhibit "E" are true and correct copies of excerpts from the deposition transcript of Theresa Adams-Hydar taken on April 17, 2024.

9.    Attached as Exhibit "F" is a true and correct copy of the San Diego Sheriff's Office Detention Services Bureau Policy G.1, regarding Maintenance Procedures. It was produced to Plaintiffs' counsel in this litigation, was last updated in May 2022, and it is also available online at the following link:

https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Detentions%20Policy%20and%20Procedure%20Sections/Section%20G%20-%20PHYSICAL%20PLANT/g01.pdf

10. Attached as Exhibit "G" are true and correct copies of excerpts from the deposition transcript of Scott Bennett taken on May 1, 2024.

11. Attached as Exhibit "H" are true and correct excerpts of Plaintiffs' Expert Matthew Ross' report.

12. Attached as Exhibit "I" are true and correct copies of excerpts from the deposition transcript of Plaintiffs' Expert Matthew Ross taken on October 17, 2024.

13. Attached as Exhibit "J" are true and correct copies of excerpts from the deposition transcript of Debra Graham taken on November 1, 2024.

14. Attached as Exhibit "K" are true and correct copies of excerpts from the deposition transcript of Michelle Aguinaldo taken on May 1, 2024.

15. Attached as Exhibit "L" are true and correct copies of excerpts from the deposition transcript of Issac Alvarado taken on May 3, 2024.

Attorney callbacks are normally processed on the same day; however, there have been a few isolated incidents where a particular dorm unit at SDCJ has been flooded with callback requests by Plaintiffs' counsel Rosen Bien Galvan & Grunfeld to incarcerated persons with disabilities on the 7th and 8th floor of the SDCJ on a single day, overwhelming the custody staff. I recall one or two days on which the custody staff reported having over 20-30 callbacks to incarcerated persons in the same unit (8C).

///
///
///
///
///
///
///
///
///

16.    On December 5, 2024, Elizabeth Pappy and I met and conferred with Plaintiffs' counsel about Defendants' partial motion for summary judgment and about Plaintiffs' Daubert motions.  However, the parties were unable to resolve the matter.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on December 16, 2024, at San Diego, California.


_Susan E. Coleman_
SUSAN E. COLEMAN

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4898-1609-5751 v1

4

Case No. 3:20-cv-00406-AJB-DDL
COLEMAN DECL RE MSJ

# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3          CASE NO. 3:20-CV-00406-AJB-DDL

4

5    DARRYL DUNSMORE, ANDREE ANDRADE,      )
     ERNEST ARCHULETA, JAMES CLARK,        )
6    ANTHONY EDWARDS, LISA LANDERS,        )
     REANNA LEVY, JOSUE LOPEZ,             )
7    CHRISTOPHER NELSON, CHRISTOPHER       )
     NORWOOD, JESSE OLIVARES, GUSTAVO      )
8    SEPULVEDA, MICHAEL TAYLOR, and        )
     LAURA ZOERNER, on behalf of           )
9    themselves and all others similarly   )
     situated,                             )
10                                         )
               Plaintiffs,                 )
11                                         )
                    vs.                    )
12                                         )
     SAN DIEGO COUNTY SHERIFF'S            )
13   DEPARTMENT, COUNTY OF SAN DIEGO,      )
     SAN DIEGO COUNTY PROBATION            )
14   DEPARTMENT, and DOES 1 to 20,         )
     inclusive,                            )
15                                         )
               Defendants.                 )
16                                         )
     _____)

17

18

19                DEPOSITION OF RITA DIAZ

20      PERSON MOST KNOWLEDGEABLE for 30(B)(6)

21            San Diego, California
                  May 3, 2024

22          Pages 1 through 85, inclusive

23

24        Reported by Adriana S. Angulo, CSR
               Certificate No. 13824

25

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3            CASE NO. 3:20-CV-00406-AJB-DDL

 4

 5    DARRYL DUNSMORE, ANDREE ANDRADE,      )
      ERNEST ARCHULETA, JAMES CLARK,        )
 6    ANTHONY EDWARDS, LISA LANDERS,        )
      REANNA LEVY, JOSUE LOPEZ,             )
 7    CHRISTOPHER NELSON, CHRISTOPHER       )
      NORWOOD, JESSE OLIVARES, GUSTAVO      )
 8    SEPULVEDA, MICHAEL TAYLOR, and        )
      LAURA ZOERNER, on behalf of           )
 9    themselves and all others similarly   )
      situated,                             )
10                                          )
                 Plaintiffs,                )
11                                          )
                     vs.                    )
12                                          )
      SAN DIEGO COUNTY SHERIFF'S            )
13    DEPARTMENT, COUNTY OF SAN DIEGO,      )
      SAN DIEGO COUNTY PROBATION            )
14    DEPARTMENT, and DOES 1 to 20,         )
      inclusive,                            )
15                                          )
                 Defendants.                )
16    _____)

17

18

19

20    DEPOSITION RITA DIAZ, Person Most Knowledgeable for

21    30(B)(6), was taken pursuant to Notice at 501 West

22    Broadway, Suite 1600, San Diego, California, on Friday,

23    May 3, 2024, commencing at 2:35 p.m., before Adriana S.

24    Angulo  CSR No. 13824, a Certified Shorthand Reporter in

25    and for the State of California.
```

```
 1              A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4         GALVAN & GRUNFELD, LLP

 5         BY:  VAN SWEARINGEN, ESQ.

 6         101 Mission Street, Sixth Floor

 7         San Francisco, California 94105

 8         (415) 433-6830

 9         vswearingen@rbgg.com

10

11    For the Defendants:

12         BURKE WILLIAMS & SORENSEN, LLP

13         BY:  SUSAN E. COLEMAN, ESQ.

14         501 West Broadway, Suite 1600

15         San Diego, California 92101

16         (619) 814-5803

17         scoleman@bwslaw.com

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3

 4        Witness:  Rita Diaz

 5

 6        Examination by:                           PAGE

 7            Mr. Swearingen                           5

 8

 9

10                      E X H I B I T S

11     EXHIBITS                                      PAGE

12    Exhibit 1    San Diego County Sheriff's         15

13                 Department Emergency Booking

14                 Acceptance Criteria

15    Exhibit 2    Policy and Procedure R.1           22

16    Exhibit 3    Email Re:  JPMU - SDCJ Housing     70

17

18

19

20

21

22

23

24

25
```

RITA DIAZ - PMK - 30(B)(6)                                    JOB NO. 950102
MAY 03, 2024

```
1        Q.  It's important to give complete answers.
2            And let me know if at any point you have
3    additional information that you want to add in response to
4    an earlier question.
5        A.  Okay.
6        Q.  I may ask you questions that require a response
7    in terms of numbers.  If you do not know the exact answer,
8    please say so.  However, I may ask you for your best
9    estimate, and I am entitled to that.
10           Does that make sense?
11       A.  Yes.
12       Q.  If you need a break, please let me know.
13           And is there anything that would affect your
14   ability to testify truthfully and completely today?
15       A.  No.
16       Q.  What is your current job title?
17       A.  I am a sergeant for the jail population
18   management unit, short JPMU.
19       Q.  How long have you been in this position?
20       A.  I've been there for a year.
21           Prior to being assigned as a sergeant for JPMU, I
22   worked as a JPMU deputy for four years before I promoted
23   as a sergeant.
24       Q.  Your current position, is that within a specific
25   jail facility?
```

1    A.  We are assigned at Central Jail.  That's where

2   our main office is.  But we are responsible for all seven

3   facilities in our county.

4    Q.  Understood.

5        And prior to being a deputy in the JPMU unit for

6   four years, were you working with the sheriff's

7   department?

8    A.  Yes.

9    Q.  In what capacity?

10    A.  I was the incarcerated population deputy at

11   Las Colinas.  I did that for about two years.  I was

12   responsible for about 200 incarcerated workers.

13        Prior to that, I was on team two at Las Colinas

14   as a deputy, a trainer.  I was a training officer.

15    Q.  And when were you first employed with the

16   sheriff's department?

17    A.  In 2008, May.

18    Q.  And have you worked in detentions the entire

19   time?

20    A.  Yes.

21    Q.  As a deputy in the JPMU unit, what were your

22   responsibilities?

23    A.  I came as a deputy.  I was there maybe for, I

24   would say, two years before I became a training officer

25   with the unit.  So I did that for two years total.  In the

1  unit, four.  Two as a deputy and two as a training

2  officer.

3        Q.  And what were your primary responsibilities?

4        A.  I was responsible for training the new deputies

5  that were selected for the unit.  The assignment is only a

6  four-year assignment.  So we often -- whenever our time is

7  up, we select new people.

8           And so, I've been training in JPMU procedures.

9        Q.  As a deputy, what were your -- not as a trainer,

10  but as deputy, what were your --

11        A.  I was a JPMU deputy classified basically in

12  addition -- a training officer, you do the JPMU job in

13  addition to training the new person.  Just as a JPMU

14  deputy, you do all that entails and classification, minus

15  the training.

16        Q.  So your primary responsibility is to classify

17  people who are incarcerated at the jails?

18        A.  Correct.

19        Q.  Is there any other major responsibility with the

20  position of deputy in the JPMU unit?

21        A.  No.

22        Q.  And as sergeant, how have your job

23  responsibilities exchanged, if at all?

24        A.  It's a different than a deputy.  Now, we

25  supervise a unit of 27 JPMU deputies.  Our responsibility

1    is to review all their reports that they write for

2    throughout, again, all seven jails.

3             We supervise.  We approve any modifications that

4    would need to apply to their classification.  We have to

5    review them and approve them.  In addition to

6    administrative duties.

7         Q.  And what do you mean by administrative duties?

8         A.  Just making sure that all the JPMU spots on all

9    the seven facilities are covered.

10            I'm the scheduling sergeant.  My partner is a

11   training sergeant.  So I'm responsible for making sure

12   we're staffed at the other jails, sending people.

13            Again, my partner is a training sergeant, but we

14   both take responsibility of sending our staff to training

15   that would benefit them, any changes.

16            In addition to some of my other responsibilities

17   is we have to monitor the population throughout our seven

18   facilities to make sure that we are transferring

19   individuals to other facilities to open up space at our

20   intake facilities.

21            It's a lot.  It's a summary.

22        Q.  Is that aspect of your job a lot, to move people

23   around to make sure that you have space for them?

24        A.  The line staff -- sorry, our JPMU deputies are

25   responsible for doing that.  They screen.  By screening, I

1  mean they look at people's history, why are they there.

2  And then we send lists to medical to make sure that

3  they're clear for other facilities that we're going to

4  transfer them to.

5        And then on day shift, they transfer them to

6  whatever facility they were approved to on the medical and

7  the classification side.  We just make sure that we're --

8  we just monitor that.  We're making sure that's happening.

9  We're looking at our facility population, stuff like that.

10       Q.  Got it.

11       MS. COLEMAN:  The court reporter might ask you to

12  slow down.  She has to type everything.

13  BY MR. SWEARINGEN:

14       Q.  How many total sworn staff work in JPMU?

15       A.  We have 27 deputies.  One is currently on

16  administrative leave at George Bailey.  So working in

17  JPMU, we have 26.

18       Q.  And how many sergeant?

19       A.  Two.

20       Q.  So a total of 29, with one on leave?

21       A.  Uh-huh.

22       No, it would be 28.  We have 27.  One is on

23  leave.  And then the two sergeants.  So 28.

24       Q.  Who do you report to?

25       A.  We just were assigned a new lieutenant,

1       Q.   What is it?

2       A.   Incarcerated persons classification R1.

3       Q.   This is the policy and procedures within the

4    sheriff's department detentions manual?

5       A.   Yes.

6       Q.   Do you know if this version is current?

7       A.   Yes.

8       Q.   Meaning, yes, it is?

9       A.   Yes, it is.

10      Q.   And it says it was -- the date on the top says

11   May 11, 2022.

12           I assume that's the last date it was updated?

13      A.   Uh-huh.

14           MS. COLEMAN:  Yes?

15           THE WITNESS:  Yes.

16   BY MR. SWEARINGEN:

17      Q.   And based on your prior testimony, I understand

18   that the last iteration of the updates was nonsubstantive

19   and minor changes?

20      A.   That I recall, yes.

21      Q.   So what is the purpose of classifying

22   incarcerated people at the jail?

23      A.   Well, the purpose is going to be able to

24   determine the predatory from the nonpredatory.  Be able to

25   classify someone -- classify individuals according their

1  criminal history, their current charges, any medical or

2  mental health need they may have.

3          Ultimately, that's the goal, is to house

4  everybody appropriately.

5      Q.  And is that for the safety and security of people

6  who are incarcerated at the jail?

7      A.  Correct.

8      Q.  Under the second heading policy, the second

9  sentence states that:  An incarcerated person's initial

10  classification is determined by their original booking

11  charges, criminal history information, medical and

12  psychiatric issues, or additional special considerations

13  and information obtained from the incarcerated person

14  interview.

15          MS. COLEMAN:  It said conditions, not

16  considerations.

17          MR. SWEARINGEN:  Thank you.

18  BY MR. SWEARINGEN:

19      Q.  Are there any other determinations that go into

20  an incarcerated person's initial classification besides

21  the ones listed in that sentence?

22      A.  No.  We classify individuals utilizing

23  considering all these steps here that you just read.

24      Q.  The term additional special conditions, what does

25  that mean?

1      A.  That could be maybe the individual -- it could

2    mean a lot of things.  It's -- we take -- we class

3    everybody -- you know, even though we utilize all these

4    tools, it really is a very individualized process.  And

5    so, it just depends.  It could be various things.

6           For example, like, if someone has a high profile

7    case, it's all over the news, that would be a special

8    consideration that we would have to take into

9    consideration for proper classification.

10          But the list is endless.

11     Q.  Is there a written list of what that phrase

12   additional special conditions means?

13     A.  No.

14     Q.  Then how do JPMU staff know how to interpret

15   that?

16     A.  We take the totality of the circumstances.  We

17   read the probable cause.  We look at the details of the

18   arrest.  And make a decision to take into consideration

19   any special conditions.

20          If the JPMU deputies have any questions or need

21   some guidance, then they will come to the sergeants.  And

22   as well ourselves, if we need some guidance, if it's,

23   again, a special condition that we need to maybe talk to

24   our lieutenant, then we'll talk to a lieutenant.

25          Sometimes classification decisions aren't just

1    one person's decision, because it takes a lot.  We have to

2    take a lot into consideration.  So --

3         Q.  Does the sheriff's department look to see whether

4    someone who is being booked into the facilities was

5    previously incarcerated in San Diego County Jails?

6         A.  Ask that again.  Can you ask that question again.

7         Q.  In classifying individuals, does the sheriff's

8    department look at whether somebody has previously been

9    incarcerated at the jail?

10        A.  Yes, we would know if they were previously

11   incarcerated in our county.

12        Q.  Does JPMU take into consideration in classifying

13   individuals a person's past institutional behavior at the

14   San Diego County Jail?

15        A.  Yes.

16        Q.  So if they had bad behavior and maybe tried to

17   escape, that would be included in the classification?

18        A.  Yes.  It depends on the time from -- again, it

19   takes a lot that we have to take into consideration.  It

20   depends on the last time the individual was in custody.

21   Was it recent?  Was it a few years ago?  Was it ten years

22   ago?

23             There's certain criteria that we won't -- we will

24   keep in consideration.  If it's an assaultive individual,

25   we will assess their assaultiveness.  If it was ten years

 1  ago, potentially we could remove them as a -- (inaudible.)

 2          THE COURT REPORTER:  We could remove from a?

 3          THE WITNESS:  From being a green bander, and

 4  identify it as assaultive.

 5          We'll take into consideration their charges.  Are

 6  they coming in for assaultive, violent charges?

 7          It's just a lot that takes into consideration.

 8  BY MR. SWEARINGEN:

 9      Q.  And if, for example, a person had been

10  incarcerated five times before and had shown good

11  behavior, had not been written up or received any

12  discipline, would that be taken into account as well?

13      A.  Yes.

14      Q.  How would that play out into the classification

15  analysis?

16      A.  Again, it just depends on the scenario.  If it's

17  someone that was classified institutional behavior --

18  excuse me, institutional behavior problem and that bumped

19  their classification code higher, if they haven't been in

20  our custody in a while and they've only been five times,

21  we could potentially bump them down to a lower level where

22  now they would be considered a Level 3, which is a low

23  level.

24          But as well vice-versa on negative behavior.

25      Q.  Towards the bottom of this page, under Section 2,

1      Q.  And how many questions comprise that decision

2  tree?

3      A.  About five or six.

4      Q.  And who came up with those five or six questions

5  in the decision tree?

6      A.  I don't know who came up with those questions.

7  They were there when I started in the unit.

8      Q.  Do you know if a company provided them to

9  San Diego?

10         MS. COLEMAN:  Calls for speculation.  Lack of

11  foundation.

12         THE WITNESS:  I don't know.

13  BY MR. SWEARINGEN:

14      Q.  What are those five or six questions?

15      A.  Let's see.  If they have escape history, if they

16  are sentenced or unsentenced, if they paroled.

17         Which were the other ones?

18         I might be missing two or three.

19      Q.  Assaultive behavior, is that one of them?

20      A.  Correct, assaultive behavior.

21         Institutional behavior.  I don't know if I

22  already said that.

23      Q.  You did not.

24         What do you mean by institutional behavior?

25      A.  That's either going to be dictated by the

1  individual's -- that the incarcerated population's

2  behavior in custody, or information, let's say, they've

3  been arrested in another county, in another state, we'll

4  take that into consideration as well.  Or information we

5  obtain if they've been to state prison.

6      Q.  So besides from escape history, whether they're

7  sentenced or unsentenced, they've paroled, whether there's

8  assaultive behavior, and the person's individual

9  institutional behavior, is there any other factor that

10  goes into the decision tree?

11      A.  I don't recall if I'm missing any of the ones

12  that are in the decision tree.

13      But the way we answer those questions is by

14  gathering all this information.  Their current charges,

15  their prior criminal history, the PCD, the mental health,

16  any medical health, and the interview we have with the

17  individual.  And any other information would have gathered

18  from other counties, other states.

19      Q.  Is gang affiliation one of the decision tree

20  items?

21      A.  No.

22      Q.  So if someone was affiliated with a gang, it may

23  nevertheless affect the way that JPMU uses that score to

24  classify someone; is that correct?

25      A.  Yes.

1    Q.  Can you say more about that.

2    A.  So if someone is a street gang member, we would

3   document it in JIMS during the classification interview.

4   We would also take pictures.  That's at the street level

5   gang member.

6        If someone is from a validated state prison gang

7   member, whether it's the Mexican Mafia, Aryan Brotherhood,

8   we're going to take that into consideration for their

9   classification, and they will be placed in administrative

10   separation.

11    Q.  Those five or six questions that make up the

12   definition tree, are they binary questions, yes-or-no

13   questions?

14    A.  Yes.

15    Q.  So escape history is just a yes/no, either they

16   have an escape history, yes or no, they don't?

17    A.  Uh-huh.

18    Q.  And each of those question that goes into the

19   decision tree is a yes or a no question?

20    A.  I believe so.

21    Q.  So if, for example, someone had assaultive

22   behavior, that would be a yes-or-no question if that was

23   in their record of assaultive behavior?

24    A.  For the decision tree, yes.

25    Q.  And it wouldn't matter whether or not that

RITA DIAZ - PMK - 30(B)(6)                                        JOB NO. 950102
MAY 03, 2024

```
 1   assaultive behavior was one year ago or, say, five years

 2   ago or ten years ago?

 3       A.  It would matter, yes.

 4       Q.  I'm sorry?

 5       A.  It would matter, yes.

 6       Q.  For the purposes of the decision tree?

 7       A.  Yes.

 8       Q.  How so?

 9       A.  Well, one of the questions for the purpose of --

10   it depends on the -- how can I explain it?

11           It depends on the assault, the severity, the

12   time, how long ago.  For example, let's say it was

13   20 years ago they were in our custody and they had an

14   assault, assaultive charge.  We put them in green, as a

15   green bander assaultive.  But he hasn't been in our

16   custody in 20 years.

17           He came in for a misdemeanor charge.  When we

18   talked to the individual and we're doing our

19   classification interview, he's cooperative.  He answers

20   all our questions.  He doesn't have anything significant

21   from the time he left our custody.  We would potentially

22   consider removing him from green bander assaultive.

23       Q.  Got it.

24       A.  And that would be documented in JIMS.  Therefore,

25   having a flag it in the decision tree would not be
```

 1   why we're making that discretion.  And my partner and

 2   myself would review that discretion.

 3       Q.  Under section three on page 2, it says that Level

 4   6 people will be incarcerated in ad sep housing?

 5       A.  That is our highest custody level.  Yes.

 6       Q.  Does anyone else besides Level 6 people get

 7   placed in ad sep?

 8       A.  Yes.

 9       Q.  And who would that be?

10       A.  That would be anybody that is pending a hearing

11   on a rule violation or an investigation on a criminal act.

12   Someone that has been unable to maintain in general

13   population or has shown the unwillingness to conform.

14           Someone that's expected to return to a similar

15   housing if they were to return to prison.  Whether that's

16   the SHU, the security housing area.

17           THE COURT REPORTER:  Whether that's the?

18           THE WITNESS:  SHU, S-H-U.  Security housing unit.

19           Or administrative segregation, ASU.

20           If they've been sentenced to death, anybody

21   that's either a high profile case or an extreme act of

22   violence that would jeopardize the safety of the public.

23   Someone that has demonstrated power and authority over

24   other individuals.  Suspected juvenile.

25       Q.  The last section states that people who are

 1  sentenced to over 30 days must be classified for custody

 2  and treatment purposes.

 3          Is that a new classification that takes place on

 4  top of the existing classification?

 5      A.  We don't -- that's the correctional counselors

 6  that would identify those individuals to assess for

 7  program.

 8      Q.  That's not a JPMU task?

 9      A.  No.

10      Q.  Is the race of the incarcerated person taken into

11  consideration by JPMU?

12      A.  Not for classification purposes, no.

13      Q.  Is it noted by JPMU?

14      A.  It's not by us.  It's noted in the face card.

15  Everybody's race is noted in the face card, as well as any

16  descriptors for that individual.

17      Q.  How is that race of the incarcerated person

18  identified?

19          Is it self-identification or is it perceived?

20      A.  At the time of booking?

21      Q.  Yes.

22      A.  At the time of booking, the booking staff will

23  enter that information in JIMS.  And when the face card is

24  printed, they pull that information that was entered at

25  the time of booking.

1    validating the classification tool?

2          A.   I don't know.

3          Q.   Has the department ever conducted studies to

4    measure whether or not the infraction rates of those

5    identified by the classification instrument are

6    commensurate with their classification levels?

7          A.   I don't know.

8          Q.   Has the department ever studied or evaluated the

9    effectiveness of the classification tool?

10         A.   I don't know.

11         Q.   When do reclassifications occur?

12         A.   We have a report that generates four times a day.

13   Twice on day shift and twice on night shift.

14              We also -- we also check everybody's

15   classification every 45 days.  We run a report.

16         Q.   What does it mean a report is generated four

17   times a day regarding classification?

18         A.   So that report is going to generate if someone,

19   well, they either dropped a charge, added a charge, got

20   sentenced to local time or prison time, institutional

21   behavioral problem.

22              So if an individual has one of those criteria,

23   they would -- it would be on that report.  It's in JIMS.

24   And it comes up twice every shift.

25         Q.   And does that report automatically reclassify

1   people?

2       A.  No.  We would have to go into the individual's

3   file and see what was the change and then reclassify

4   accordingly, either upward or downward, depending on the

5   situation.

6       Q.  And when does that occur in relation to the four

7   times a day report?

8       A.  Like time?

9       Q.  Uh-huh.

10      A.  I think in the daytime, it's around 7:00 and

11  11:00.  And on night shift, it's around 7:00 p.m. and 11

12  at night.

13      Q.  That's what time the reports are run or what time

14  --

15      A.  No, that's the time the report shows in JIMS.

16      Q.  Okay.  And let's say someone has had six of seven

17  charges dropped, and only remaining charge is a relatively

18  benign nonassaultive, nonviolent, nonsex charge.

19          When does that person who shows up on that list

20  that's generated get reclassified?

21      A.  As soon as that person comes up on the list,

22  which is those times that -- around those times I told

23  you.  We all -- where -- whoever, whatever jail it is,

24  it's created in all the jails.  We would go into that

25  individuals name in JIMS and we would reclassify him there

1  and then.

2        Q.  That same day?

3        A.  That moment, that same day, yes.  At that time.

4            And if it requires a custody level change, then

5  we would do that.  We would -- the example that you said,

6  six out of seven, let's say the six were assaultive

7  felonies, that would have potentially made that individual

8  Level 4.

9            Now, they've only left one, which is a

10  nonassaultive felony.  That would require reclassification

11  to a Level 3.  And we would have to make a note saying all

12  these assaultive felonies were dismissed.  And we would

13  reclassify them to a Level 3.  Call the housing unit to

14  move him, because now he's in high level housing.  Has to

15  move to low level housing.

16            So it's all just one after another.

17        Q.  And it happens within a day of receiving the

18  report?

19        A.  No, that same moment.  The report generates at

20  7:00, we're reclassifying him at 7:00.

21        Q.  And that's within one day?

22            MS. COLEMAN:  Objection.  Vague.

23            Within one day of what?

24  BY MR. SWEARINGEN:

25        Q.  I'm saying that -- you're saying, it sounds like,

 1  it happens near instantaneously?

 2       A.  Correct.

 3       Q.  And I'm saying that's commensurate within

 4  24 hours that's taking place?

 5       A.  From the time of what?

 6       Q.  I think -- I'm not trying to play a trick here.

 7            I was just asking, does it take place within a

 8  day.

 9            And it sounds like your answer is yes, it takes

10  place actually within minutes?

11       A.  Yes, correct.

12       Q.  Does it ever take longer than a day?

13       A.  Not for the recalcs.

14       Q.  The recalcs, you mean a reclassification based on

15  these four times a day reports?

16       A.  Correct.

17       Q.  That's super helpful.  Thank you.

18            You said that people are also recalculated or

19  reclassified every 45 days?

20       A.  Yes.

21       Q.  And how does the sheriff's department know when

22  the 45-day clock has expired for any given person?

23       A.  There is a report in the JIMS web that we run

24  daily.  And that would generate a list with the names of

25  the people that last time they were classified was

1   45 days.  So it's a daily task.

2        Q.   And is it the case that -- let me rephrase that.

3             What's a reasonable amount of people that you

4   would expect on that list?

5        A.   It varies.  It could be anywhere from -- anywhere

6   from like 20 to 30 people.  It just varies.

7        Q.   Let's say the list has 25 people on it.

8             In what amount of time do those people, those 25

9   people on the 45-day list, get reclassified?

10       A.   Immediately as well.

11       Q.   So everyone would be reclassified within 24 hours

12  of popping up on the 45-day list?

13       A.   Correct.

14       Q.   Or at least they have their classification

15  evaluated for purposes of reclassification?

16       A.   Correct.

17       Q.   Their classification level may stay the same?

18       A.   Yes.

19       Q.   Or it may change?

20       A.   Yes.

21       Q.   What factors would lead it to change?

22       A.   If we see there's a long history of negative

23  behavior documented in their JIMS history, we would talk

24  to the, you know, maybe there was a use of force and

25  nobody informed classification.  That would be something

1    that we would want to know.

2           And so, we would look at the severity of the

3    incident and maybe now this individual has to be

4    identified as assaultive.  That could be a scenario.

5        Q.  And that would increase their classification

6    level?

7        A.  Correct, yes.

8           What other -- just anything we see that needs our

9    attention.

10       Q.  And is there a policy regarding how to reclassify

11   individuals?

12       A.  It's in our training manual for the

13   reclassification.  I believe it's in one of our policies,

14   if it's in our training manual.

15       Q.  Is that a training manual specific to JPMU or --

16       A.  Yes.

17       Q.  Is there any Detention Services Bureau policy and

18   procedure regarding classification?

19       A.  It's in one of the sections.  There's not a

20   specific section that says reclassification.

21       Q.  Do you know which policy that it's mentioned in?

22       A.  At the top of my head, no.

23       Q.  Is there a formal reclassification instrument?

24       A.  We would utilize the same one, the decision tree.

25       Q.  So you might use your discretion to adjust

1    assaultive behavior from no to yes, for example?

2         A.  If it's indicated in -- if we note it during the

3    45-day or even the reclassification, the rebooks, the four

4    times a day, yes.

5         Q.  Does anyone who's supposed to be classified on

6    the 45-day reclassification schedule ever not get

7    evaluated for a reclassification within 45 days?

8         A.  No.

9         Q.  Can people of any classification level be placed

10   in protective custody?

11        A.  Yes.

12        Q.  Including Level 6?

13        A.  Yes.  But they would be housed by themselves.  So

14   it would be administrative separation protective custody

15   classification.

16        Q.  Does Central have a specific protective custody

17   housing unit?

18        A.  We have two housing units at San Diego Central

19   Jail for just protective custody.

20        Q.  And are all those celled housing?

21        A.  Yes.  At SDCJ, yes.

22        Q.  Are there any PC dorms in the sheriff's

23   department facilities?

24        A.  Yes.

25        Q.  Where are those?

1        A.   George Bailey.

2        Q.   And can people of all classification levels mix

3   in that PC unit at George Bailey?

4        A.   Yes.   Except Level 6.

5        Q.   The department policy says that incarcerated

6   people with custody Levels 1, 2, and 3 can be housed

7   together, and 4 and 5 can be housed together.

8             Is it normally the case that people classified at

9   Levels 4 and 5 cannot be housed with Levels 1, 2, and/or

10  3?

11       A.   Ask that again, please.

12       Q.   Can people who are classified at Level 4 or 5 be

13  housed with people who are classified as Level 1, 2, or 3?

14       A.   Not if they're in general population.   But they

15  can potentially be if, again, protective custody,

16  administrative separation, any acute housing, psychiatric

17  housing we might have, which is PSU at SDCJ.   And JBCT at

18  SDCJ as well.   And at the female facility, WPSU.

19       Q.   Why does the department allow mixing of Levels 1

20  through 3 with 4 through 6 in protective custody housing,

21  but not in other general population housing?

22       A.   That is a decision that was made prior to me

23  being assigned to JPMU.   So I don't know why that would be

24  the case.

25       Q.   Do you know why the sheriff's department permits

1                    REPORTER'S CERTIFICATE

2          I, Adriana S. Angulo, Certified Shorthand Reporter in

3     and for the State of California, do hereby certify:

4          That the witness in the foregoing deposition was by

5     me first duly sworn to tell the truth, the whole truth,

6     and nothing but the truth in the foregoing cause; that the

7     deposition was then taken before me at the time and place

8     therein named; that said deposition was reported by me in

9     shorthand and later transcribed under my direction, and

10    the preceding pages contain a true record of the testimony

11    of the witness; and I do further certify that I am a

12    disinterested person and am in no way interested in the

13    outcome of said action, or connected with or related to

14    any of the parties in said action, or to their respective

15    counsel.

16          The dismantling, unsealing, or unbinding of the

17    original transcript will render the Reporter's

18    Certification null and void.

19          IN WITNESS WHEREOF, I have hereunto set my hand

20    this 16th day of May 2024.

21

22

23    _____
      Adriana S. Angulo

24    Certificate No. 13824

25

1    Job No. 950102

2    Date: May 03, 2024

3    Witness Name: RITA DIAZ - PMK - 30(B)(6)

4    Case Caption: DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, et al.

5

6        DECLARATION UNDER PENALTY OF PERJURY

7        I declare under penalty of perjury

8    that I have read the entire transcript of

9    my Deposition taken in the captioned matter

10   or the same has been read to me, and

11   the same is true and accurate, save and

12   except for changes and/or corrections, if

13   any, as indicated by me on the DEPOSITION

14   ERRATA SHEET hereof, with the understanding

15   that I offer these changes as if still under

16   oath.

17       Signed on the *12th* day of

18   *June*, 20*24*.

19

20   _____

21    Signature  RITA DIAZ - PMK - 30(B)(6)

22

23

24

25        PAGE 1 OF 3

RITA DIAZ - PMK - 30(B)(6)                                    JOB NO. 950102
MAY 03, 2024

1          DEPOSITION ERRATA SHEET

2    Page No. 11 Line No. 4 Change to: Kopchak

3    _____

4    Reason for change: name spelled incorrectly

5    Page No. 11 Line No. 7 Change to: Kopchak

6    _____

7    Reason for change: name spelled incorrectly

8    Page No. 11 Line No. 8 Change to: Ofelia

9    _____

10   Reason for change: name spelled incorrectly

11   Page No. 11 Line No. 14 Change to: Ofelia

12   _____

13   Reason for change: name spelled incorrectly

14   Page No. 70 Line No. 9 Change to: Ofelia

15   _____

16   Reason for change: name spelled incorrectly

17   Page No. 70 Line No. 11 Change to: Ofelia

18   _____

19   Reason for change: name spelled incorrectly

20   Page No._____ Line No._____ Change to:_____

21   _____

22   Reason for change:_____

23

24

25          PAGE 2 OF 3

RITA DIAZ - PMK - 30(B)(6)                                               JOB NO. 950102
MAY 03, 2024

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20            Signed on the _____ day of
21    _____, 20_____.
22
23    SIGNATURE:_____DATE:_____
24            RITA DIAZ - PMK - 30(B)(6)
25                 PAGE 3 OF 3
```

1                    DECLARATION UNDER PENALTY OF PERJURY

2

3          I, RITA DIAZ, hereby declare under penalty of perjury

4     that I have read the foregoing deposition and that the

5     testimony contained therein is a true and correct

6     transcription of my testimony given at said time and

7     place.

8

9          Dated this _12th_ day of _June_

10    2024, at _San Diego_ , _California_ .
                    (City)              (State)

11

12

13

14

15         RITA DIAZ

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF CALIFORNIA
 2   ----------------------------------------X
     DARRYL LEE DUNSMORE,CDCR # AD-6237,
 3
                              PLAINTIFF,
 4
                 -against-        Index No.:
 5                                3:20-cv-00406
                                  AJB-DDL
 6
     SAN DIEGO COUNTY SHERIFF'S DEPT, CITY OF
 7   SAN DIEGO, WILLIAM B. KOLENDER, BILL GORE,

 8                              DEFENDANTS.
     ----------------------------------------X
 9

10                       DATE: May 30, 2024

11                       TIME: 4:25 P.M. PST

12

13

14            EXAMINATION BEFORE TRIAL of

15   the Third-Party Witness, REBECCA CARDENAS,

16   taken by the Plaintiff, pursuant to a

17   Court Order, held via Zoom conference

18   before ToniAnn Lucatorto, a Notary Public

19   of the State of New York.

20

21

22

23

24

25
```

REBECCA CARDENAS                                                    JOB NO. 1006838
MAY 30, 2024

```
 1   A P P E A R A N C E S:

 2

 3    ROSEN, BIEN, GALVAN & GRUNFELD, LLP
          Attorneys for the Plaintiff
 4        101 Mission Street, 6th FLoor
          San Francisco, California  94105
 5        BY: VAN SWEARINGEN, ESQ.

 6

 7    BURKE, WILLIAMS & SORENSEN, LLP
          Attorneys for the Defendants
 8        444 S. Flower Street
          Los Angeles, California 90071
 9        BY: SUSAN COLEMAN, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

REBECCA CARDENAS                                    JOB NO. 1006838
MAY 30, 2024

R. Cardenas

1  R E B E C C A   C A R D E N A S, the

2  witness herein, having been first duly

3  sworn by a Notary Public of the State of

4  New York, was examined and testified as

5  follows:

6  EXAMINATION BY

7  MR. SWEARINGEN:

8      Q.    Ms. Cardenas, you understand

9  that your testimony is under penalty of

10 perjury today?

11     A.    Yes, sir.

12     Q.    Okay, thank you.  How can non

13 pro per individuals do legal research when

14 they're incarcerated in the jail?

15     A.    We have a contract provider with

16 the county who provides any information

17 they request.  They have to request it in

18 writing and they have up to five items, up

19 to 50 pages 25 pages double sided to

20 request from the contracts provider.  And

21 they provide -- we send the form in of the

22 request from the IP's then we receive it

23 via mail and we hand deliver to the IP

24 requesting the information at the

25 facilities.

REBECCA CARDENAS
MAY 30, 2024

JOB NO. 1006838

R. Cardenas

1      Q.      Why is there a limit of five

2    items and 50 pages per month?

3      A.      There is one hazard for how

4    many, whatever they can have on -- in

5    their cell and contractually that was what

6    was agreed upon.

7      Q.      So if somebody asks for more

8    than 50 pages in a month, they won't

9    receive the pages over 50; is that

10   correct?

11     A.      That is correct.

12     Q.      And they used LRA request form

13   to make the request for legal research

14   assistance; is that correct?

15     A.      That is correct.

16     Q.      The responses to their request,

17   in addition to being limited to  pages,

18   they're limited to one request per

19   calendar month?

20     A.      One request per calendar month.

21     Q.      Why is that a limitation? Is

22   that because of a contractual arrangement

23   as well?

24     A.      That is correct.

25     Q.      So if a person makes more than

R. Cardenas

1    one request in a month, that subsequent

2    request will not be honored; is that

3    correct?

4         A.    That is correct.  They are

5    informed that they need to wait, that we

6    have on record that they have already

7    requested one, and that they will have to

8    wait until the following month.

9         Q.    Those limitations are for people

10   that are identified as conditions of

11   confinement status; is that correct?

12        A.    No, sir.  That is not correct.

13   So for conditions of confinement, they get

14   two requests per month.

15        Q.    Okay.  And what about for pro

16   per individuals?

17        A.    I believe the pro per

18   individuals have one request per month, as

19   anyone else, because they have access to

20   the Nexus.

21        Q.    And for the people on conditions

22   of confinement, they get two requests per

23   month but they're still limited to the 50

24   pages; is that correct?

25        A.    They're limited to the 50 pages

R. Cardenas

1   per request.

2        Q.    Got it.

3             Is there any other category of

4        individual, besides conditions of

5        confinement status individuals, who

6        with obtain more than one request per

7        month?

8        A.    Not that I'm aware of, sir.

9        Q.    How do people become identified

10   as conditions of confinement status?

11       A.    That is through we receive court

12   documents.

13       Q.    So someone has to file a case

14   and be recognized by the Court in order to

15   obtain conditions of confinement status?

16       A.    That is my understanding.  For

17   our division, we get notification that

18   they are conditions of confinement from

19   our partners.  And that's what -- and then

20   we begin working with those folks.

21       Q.    On average, how long does it

22   take for LRA requests to be responded to

23   by LRA?

24       A.    7 to 10 business days.

25       Q.    So it could take up to, say, two

R. Cardenas

1    calendar weeks for someone to submit the

2    forms and get the responsive materials

3    back?

4        A.    That's correct.

5        Q.    Is there a required timeframe

6    for responses to be delivered?

7        A.    I believe -- that is what is

8    stipulated in the contract, yes.  7 to 10

9    business days.

10       Q.    How do people get access to the

11   legal request forms, the LRA form?

12       A.    Anyone can request an LRA at any

13   given time at any of the facility.

14       Q.    By what means?

15       A.    Through an incarcerated person

16   written request form to the counseling

17   office.

18       Q.    How do they know to submit that

19   form to get an LRA form?

20       A.    That, I don't know that.  I know

21   that we get the request and that we move

22   forward with the request.  I don't know if

23   there are any postings in the module

24   currently, but I would have to confirm

25   that there isn't any postings in the

REBECCA CARDENAS                                           JOB NO. 1006838
MAY 30, 2024

1                    C E R T I F I C A T E

2

3            I, TONIANN LUCATORTO, hereby

4    certify that the Examination Before Trial

5    of REBECCA CARDENAS was held before me on

6    the 30th day of May, 2024; that said

7    witness was duly sworn before the

8    commencement of their testimony; that the

9    testimony was taken stenographically by

10   myself and then transcribed by myself;

11   that the party was represented by counsel

12   as appears herein; That the within

13   transcript is a true record of the

14   Examination Before Trial of said witness;

15           That I am not connected by blood

16   or marriage with any of the parties; that

17   I am not interested directly or indirectly

18   in the outcome of this matter; that I am

19   not in the employ of any of the counsel.

20           IN WITNESS WHEREOF, I have

21   hereunto set my hand this 30th day of May,

22   2024.

23

24                    *[signature]*

25           TONIANN LUCATORTO

# ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing __17__ pages of my deposition testimony, taken on __MAY 30, 2024__ at __4:25 PM PST VIA ZOOM__, __SAN DIEGO__, California and that the same is a true record of the testimony given by me at the time and place hereinabove set forth, with the following exceptions:

| Page | Line | Should read: |
|------|------|--------------|
| 8 | 20 | LEXIS NEXIS |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |

Date: 6/21/2024

_____
Signature of Witness

REBECCA CARDENAS
_____
Name Typed or Printed

# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3                      ---o0o---

 4   DARRYL DUNSMORE, ANDREE        )Case No.
     ANDRADE, ERNEST ARCHULETA,     )3:20-cv-00406-AJB-DDL
 5   JAMES CLARK, ANTHONY EDWARDS,  )
     LISA LANDERS, REANNA LEVY,     )
 6   JOSUE LOPEZ, CHRISTOPHER       )
     NELSON, CHRISTOPHER NORWOOD,   )
 7   JESSE OLIVARES, GUSTAVO        )
     SEPULVEDA, MICHAEL TAYLOR, and )
 8   LAURA ZOERNER, on behalf of    )
     themselves and all others      )
 9   similarly situated,            )
                                    )
10                  Plaintiffs,     )
                    vs.             )
11                                  )
                                    )
12   SAN DIEGO COUNTY SHERIFF'S     )
     DEPARTMENT, COUNTY OF SAN      )
13   DIEGO, SAN DIEGO COUNTY        )
     PROBATION DEPARTMENT, and DOES )
14   1 to 20, inclusive,           )
                                    )
15                  Defendants.     )
     _____ )
16

17

18        Deposition of Jesse Johns, PMK, taken at 501 West

19   Broadway, Suite 1600, San Diego, California, commencing

20   at 9:03 a.m. PST on Wednesday, April 24, 2024, before

21   NICOLE O'NEIL, Certified Shorthand Reporter 10774, in and

22   for the State of California.

23

24   STENO
     Concierge@Steno.com
25   (888)707-8366 APPEARANCES VIA STENO CONNECT
```

```
 1    FOR THE PLAINTIFFS:

 2                    ROSEN BIEN GALVAN & GRUNFELD LLP
                      BY:  VAN SWEARINGEN
 3                    101 MISSION STREET
                      SIXTH FLOOR
 4                    SAN FRANCISCO, CALIFORNIA  94105
                      415-433-6830
 5                    VSWEARINGEN@RBGG.COM

 6    FOR THE DEFENDANTS:

 7                    BURKE, WILLIAMS & SORENSEN LLP
                      BY:  SUSAN E. COLEMAN
 8                    501 WEST BROADWAY
                      SUITE 1600
 9                    SAN DIEGO, CALIFORNIA 92101
                      619-814-5800
10                    SCOLEMAN@BWSLAW.COM

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              MR. SWEARINGEN:  Well, use proper objections.
2    BY MR. SWEARINGEN:
3       Q.   I understand there's no visual or other way of
4    understanding whether or not that line of communication
5    remains open.
6       A.   There's no visual lights or anything on that
7    intercom system that would suggest that, that line is
8    open.
9       Q.   Do staff who work the control room intercoms --
10   the interface with the professional visiting rooms,
11   receive training on when to turn on and off the
12   intercoms?
13      A.   Yes.  It's part of their phase training.  It
14   depends on -- there's two different instances that you
15   are discussing right now.  There's the central control
16   room, which -- and I will give San Diego Central Jail as
17   an example.
18           If a professional visit is going to the second
19   floor for a new arrestee or someone that hasn't been
20   housed yet, those professional visiting rooms are
21   monitored by the central control center deputy.  Those
22   deputies receive additional training, because that's a
23   specialized -- somewhat specialized position, because
24   they monitor touchscreens for the entire facility.  If a
25   person is in housing -- if an incarcerated person is
```

1    already in housing and an attorney comes to visit the

2    incarcerated person in housing, that professional

3    visiting room is monitored by the control tower deputy of

4    that specific floor, not the entire facility.  The amount

5    of training that they receive for housing deputy in a

6    control area is the same across the board, and it's part

7    of the phased-training process.

8        Q.   What training does the sheriff's department

9    provide to staff who controlled the line of communication

10   to professional visiting rooms with respect to when to

11   turn the line of communication on or make it open and

12   when to close it?

13       A.   It's part of the phased-training process.

14       Q.   What training do they receive, specifically?

15       A.   It's on-the-job training.  Their training

16   officer, who is familiar with the system, trains them on

17   how to manipulate the buttons on the touchscreen.  They

18   explain what -- all the touchscreen icons control whether

19   it be a door, or whether it be an audio intercom, whether

20   it be a camera.  But it's all done by the training

21   officers for the trainee.  The training officers are

22   trained by their training officers.

23       Q.   What specific training does the department

24   provide as to what to listen to in the professional

25   visiting rooms?

1      A.    Can you be more specific on what -- what type of

2  training does the --

3      Q.    Sheriff's department.

4      A.    Train people to listen?

5      Q.    When to turn off the line of communication, to

6  stop listening to what's being said inside the

7  professional visiting room?

8      A.    Professional visits are considered confidential.

9  Once the request has been complete -- so if a deputy is

10  being prompted to answer the intercom of a professional

11  visit, they ask what the inquiry is for.  "Hey, my

12  professional visit is done," or "Hey, my incarcerated

13  person said he has to use the restroom."

14          That deputy will either facilitate that restroom

15  break or facilitate ending that confidential meeting, and

16  then the intercom comes off.  Because the trainees are

17  trained that, that setting is confidential they don't

18  leave that communication line open.

19      Q.    Where is that documented?

20      A.    It's not.  It's written somewhere in the policy

21  saying it's a confidential area.

22      Q.    Which policy?

23      A.    It's littered throughout the professional

24  contact visit whenever it is saying that is anything

25  confidential, whether it be confidential mail or

1    the SmartCom system.  I'm not the person most

2    knowledgeable of that SmartCom system to know if it's

3    recording or not recording in those areas.

4    BY MR. SWEARINGEN:

5         Q.    Are you familiar with the attorney callbacks?

6         A.    Yes.

7         Q.    What are attorney callbacks?

8         A.    Attorney callbacks are requests coming from

9    attorneys that are given to our detentions processing

10   division that are relayed to the incarcerated person so

11   that when they have access to the phones, they can call

12   their attorney.

13        Q.    Is an attorney callback originated by the

14   attorney asking to talk to their client?

15        A.    Yes.

16        Q.    And jail staff then relay that request to the

17   client who is incarcerated?

18        A.    Yes.

19        Q.    Is that logged anywhere?

20        A.    I believe it's logged into JIMS.

21        Q.    Do all jail facilities track callback requests

22   placed by attorneys?

23        A.    Yes.

24        Q.    And how does the sheriff's department ensure

25   that all callback requests are logged?

JESSE JOHNS - PMK                                          JOB NO. 950091
APRIL 24, 2024

1      A.    So the request is given -- would you like me to

2   walk down the practice of this protocol?

3      Q.    My question is:  Are all callback requests

4   logged?

5      A.    They should be, yes.

6      Q.    What percent of attorney callback requests are

7   logged?

8      A.    There's no tracking mechanism for giving you a

9   percentage of how many are logged.  They are supposed to

10  be logged every time they do it.  Every time they receive

11  an attorney callback and provide it to the IP, that is

12  supposed to be logged.

13     Q.    What does the department do to ensure that

14  callback requests are actually relayed to incarcerated

15  people?

16     A.    That's the logging mechanism that we're talking

17  about.  That's what the department is doing to ensure

18  it's happening or to track.  If it doesn't happen for one

19  reason, then that person is out of compliance with what

20  we've laid forward.

21     Q.    Your earlier testimony was the department

22  doesn't track attorney callbacks.

23         MS. COLEMAN:  Objection.  Misstates his

24  testimony.

25  ///

1    BY MR. SWEARINGEN:

2        Q.    Does the department track attorney callbacks?

3        A.    It logs the attorney callbacks that are given to

4    the IPs.

5        Q.    What percentage of attorney callbacks are

6    actually relayed to their clients in the jail?

7        A.    I should be 100 percent.

8        Q.    What is it in actuality?

9        A.    I don't know.  I don't work every single jail

10   every single time.

11       Q.    Is there a way to determine that?

12       A.    There's currently no tracking mechanism for

13   attorney callback compliance.

14       Q.    Is the department aware of incidents where

15   attorney callbacks have not been completed?

16       A.    Yes.

17       Q.    Is the department doing anything to address

18   that?

19       A.    When that issue happens, training is provided to

20   the person who failed to follow the policy the way that

21   it's laid out.  If there's been an error on the deputies

22   end to where he didn't get back to JIMS and log that,

23   then it's discussed informally with that staff member in

24   order to better prepare them to log that next time.

25       Q.    And other than individual talks with -- and/or

1    phone.

2        Q.    Is it the case that most callback requests are

3    completed in the dayroom?

4        A.    Yes.

5        Q.    And that's with other people in the dayroom next

6    to them?

7        A.    Not always.

8        Q.    But sometimes?

9        A.    I would say sometimes.

10       Q.    Has the sheriff's department considered

11   providing a confidential space to people to complete

12   their attorney callbacks?

13       A.    No.

14       Q.    Regarding legal mail, are you familiar with DSB

15   Policy P.3?

16       A.    Yes.

17       Q.    Where is incoming legal mail received and

18   screened?

19       A.    It's -- it can be received in multiple places.

20   Currently, all of our mail runs through the mail

21   processing center.  Some attorneys that are familiar with

22   our process will mail that directly to the mail

23   processing system at the Las Colinas Detention Facility

24   and others will just drop it off at the front door.  When

25   I say, "the front door," I'm referring to the information

1    lobby, whatever specific facility that it's at.

2            From that point -- the current practice is to

3    facilitate that back to the mail-processing center to

4    ensure that there's no narcotics laced on like, the

5    outside of the envelope and to do some very basic vetting

6    of the validity of like, the law office that's sending in

7    the information.

8        Q.    And what vetting does the central mail

9    processing center conduct?

10       A.    Well, if there's -- for example, if the mail

11   processing center received something that says, "legal

12   confidential," all over it, but it's tattered, the

13   writing is not legible, there's no use of a return

14   address stamp on it, and it's -- they will look at the

15   address, for example, and if it's a Walmart in Oklahoma,

16   instead of actually being a legitimate law office, it

17   might trigger red flags to where this might not be

18   legitimate legal mail.  They might put it to the side and

19   track it for -- they have machines that basically detect

20   narcotics to make sure that it's safe to open whenever it

21   does get to its designation.  It doesn't mean they open

22   it right there.  They still do it in the presence of the

23   IP, but they take more caution with that.

24       Q.    Once that vetting process is completed at the

25   mail processing center, what happens to legal mail?

1     A.   Legal mail gets put in a secured like, canvas or

2   burlap bag that has a lock on it.  It gets distributed

3   back to the facilities of where the IP is housed and then

4   it's given -- the processing sergeant opens that lock.

5   They get the legal mail.  They delegate that to whatever

6   deputy is on that floor.  And that deputy is tasked with

7   opening that legal mail in the presence of the IP and

8   scanning for anything inside that might be nefarious,

9   laced envelopes with methamphetamines or sharp objects or

10  whatever it could be, but they do that in the presence of

11  the IP.

12     Q.   How long does it take from receipt of legal mail

13  by the jail to ultimate delivery to the incarcerated

14  person?

15     A.   To give you an exact date, it wouldn't be fair.

16  I did contact -- I've been in contact with the MPC for

17  other various issues, and I've had that question.  They

18  say, generally, two to three days.

19     Q.   You say MPS --

20     A.   Mail processing center.

21     Q.   Is the amount of time from receipt to delivery

22  to the incarcerated person logged or tracked anywhere?

23     A.   It's tracked through the MPC, so MPC has their

24  own tracking mechanism, which I'm unfamiliar with, but

25  they do log the receipt of the legal mail and then when

JESSE JOHNS - PMK                                    JOB NO. 950091
APRIL 24, 2024

 1    it goes out.  I'm not familiar with the terminals that

 2    they use.

 3         Q.   Is it the case that once a custody officer

 4    delivers the mail to the incarcerated person that that is

 5    also logged?

 6         A.   I do not believe so.  I believe the last logging

 7    mechanism is at MPC.

 8         Q.   You said that the incoming legal mail should be

 9    opened pursuant to policy in front of the incarcerated

10    person; is that correct?

11         A.   Correct.

12         Q.   What kind of review of the legal papers do

13    custody staff perform in opening the mail in front of the

14    incarcerated person?

15         A.   It's not a review of the papers or the documents

16    themselves.  It's simply looking for security-type

17    threats, so soaked papers, papers that look like they've

18    been -- they have water damage, or things like that.  A

19    big giant letter in there that's written in crayon, that

20    would obviously not be legal mail.

21              On face value they open it.  They are just

22    simply scanning through all of the papers.  There's

23    generally a lot of documents in legal mail.  They are

24    just looking through to make sure there's none of those

25    red flags for contraband.

1          MR. SWEARINGEN:  I will hand to you what's

2    marked as Plaintiff's Exhibit 5.

3          (Exhibit 5 was marked for identification.)

4    BY MR. SWEARINGEN:

5       Q.   I will represent this is an e-mail from Brenden

6    Bourgeois, dated March 23rd, 2023 to all sworn staff.

7    Subject matter is "Legal Mail and Drugs."

8          Who is Brenden Bourgeois?

9       A.   Brenden Bourgeois is currently lieutenant, but

10   at the time of this e-mail, he was assigned as the

11   sergeant managing and overseeing the contraband and

12   narcotics interdiction team, which is a pilot project,

13   focusing on limiting the amount of contraband and

14   narcotics that come into the facility.

15      Q.   Is he the person who is responsible for

16   providing guidance for legal mail?

17      A.   I wouldn't say he's the person responsible.  I

18   think that's pretty much laid out in policy on the way

19   that we handle legal mail.

20      Q.   Do you know why he would send this e-mail?

21      A.   What he is saying in this e-mail is that one of

22   the popular or most effective ways of getting narcotics

23   into the facility -- which is a safety issue -- is to

24   soak it or somehow disguise it in legal mail, because,

25   generally, deputies won't -- once they realize something

 1  is legal mail, they won't take as much time in checking

 2  for Suboxone strips, as he said here in the e-mail, or

 3  stamps that might be stoked with narcotics.  He's

 4  basically providing information that he might have

 5  received about tactics that people are using to try to

 6  get narcotics into the jail.

 7      Q.    Does this description conform with jail policy?

 8      A.    Yes.

 9      Q.    And are deputies allowed to do more than just

10  skim the pages of legal papers?

11      A.    What's your definition of "skim"?

12      Q.    To look at the text of legal papers.

13            MS. COLEMAN:  Objection.  Vague and misstates

14  the document.

15            THE WITNESS:  Are you saying to interpret the

16  text of the document or the papers?

17  BY MR. SWEARINGEN:

18      Q.    To look at the words.

19            MS. COLEMAN:  You mean read it?

20            THE WITNESS:  Yeah.  In this e-mail he's saying

21  you are not reading it.  And he's basically

22  say -- telling the deputies, your job is not to interpret

23  the legal confidential matters that are in the documents,

24  but it's important to properly observe the papers for

25  some of these things that he lists in here, so for the

1    Suboxone strips.

2         If there's 500 papers that are put in one

3    envelope, the likelihood that we could just do a real

4    quick skim of 500 papers and say that was a good search

5    or inspection of potential narcotics coming into the

6    facility is unreasonable.

7    BY MR. SWEARINGEN:

8         Q.   I just want to note for the record that the

9    witness put air quotes over the word "reading" when

10   describing "you are not reading it."

11        A.   That's the way it's written inside this item.

12   It's in quotes.  "Reading" is in quotes.

13        Q.   I agree with that.  I was just noting for the

14   record what -- your gestures.  They can't be understood

15   unless they are marked on the record.

16        Are deputies permitted to read the text of legal

17   papers?

18        A.   No.

19        Q.   Do you think that Mr. Bourgeois's e-mail was

20   sufficiently clear when he said it's okay not to just

21   skim through the pages?

22        A.   Again, I would say it depends on the definition

23   of "skim."  What he's alluding to and the way I'm reading

24   it, he's saying don't overlook some of the potential

25   threats that could be on these pages.  I think that's

1          CERTIFICATE OF REPORTER

2                  ---o0o---

3          I, the undersigned, a Certified Shorthand

4   Reporter, Licensed by the State of California, being

5   empowered to administer oaths and affirmations do hereby

6   certify:

7          That the foregoing proceedings were taken at the

8   time and place herein set forth; that any witness in the

9   foregoing proceedings, prior to testifying, were placed

10  under oath; that a verbatim record of the proceedings was

11  made by me using machine shorthand which was thereafter

12  transcribed under my direction; further, that the

13  foregoing is an accurate transcription thereof.

14         I further certify that I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney or any of the parties.

17         Before completion of the deposition, review of

18  the transcript [  ] was [ X ] was not requested.  If

19  requested, any changes made by the deponent (and provided

20  to the reporter) during the period allowed, are appended

21  hereto. (Fed. R. Civ. P. 30(e)).

22         IN WITNESS WHEREOF, I have this date subscribed

23  my name.

24  DATED: 2nd of May, 2024.

25                         Nicole O'Neil, CSR No. 10774

Message

| | |
|---|---|
| **From:** | Bourgeois, Brenden [Brenden.Bourgeois@sdsheriff.org] |
| **Sent:** | 3/23/2023 4:18:14 PM |
| **To:** | SDCJ, All Sworn [SDCJAllSworn@sdsheriff.org] |
| **Subject:** | Legal Mail and Drugs |

Good afternoon,

Just wanted to remind everybody to search and inspect legal mail prior to giving it to an incarcerated person. It's ok to go through everything and not just skim through the pages. You can take the papers out of the envelope. You're not "reading" it. You're inspecting the contents for drugs and contraband. Recently news channels ran a story on our mail processing unit. People that would attempt criminal acts also saw that story, and realized that their best chance to get drugs into jail would be through fake legal mail. I spoke to deputies who work the mail processing unit and they've had cases recently where all the addresses, stamps, and information is correct, but the lawyers did not send the mail. They've seen an increase in suboxone strips, meth soaked paper, and fentanyl laced paper. So don't let an incarcerated person who is Pro-Per intimidate you into thinking you can't go into their cell or inspect their paperwork. It's a tactic to rush you and make you not look closely. Take your time and really inspect their mail. If something looks/feels suspicious or weird, remove it and test it. Just make sure to do it in front of them. Check the package the mail arrives in too, they're pretty creative.

"3. All incoming U.S. mail within the purview of confidential/legal mail shall be opened and inspected for contraband in the presence of the individual it is addressed to. Absent any security concerns, the mail shall then be given directly to the individual."

You suspecting a paper is laced with narcotics would be considered a security concern. So its okay to test it before giving it to them. Just make sure you document that to protect yourself.

Respectfully,



**Brenden Bourgeois**
Intake Sergeant
San Diego Central Jail
Email: brenden.bourgeois@sdsheriff.org
Phone: 619-615-2430 (Desk)
619-952-0474 (Cell)
www.sdsheriff.net
**SAN DIEGO COUNTY**
**SHERIFF'S DEPARTMENT**

EXHIBIT
5
J. Johns

SD_640255

# EXHIBIT D

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF CALIFORNIA
 2   ----------------------------------------X
     DARRYL LEE DUNSMORE,CDCR # AD-6237,
 3
                               PLAINTIFF,
 4
                -against-      Index No.:
 5                             3:20-cv-00406
                               AJB-DDL
 6
     SAN DIEGO COUNTY SHERIFF'S DEPT, CITY OF
 7   SAN DIEGO, WILLIAM B. KOLENDER, BILL GORE,

 8                             DEFENDANTS.
     ----------------------------------------X
 9

10                     DATE: May 30, 2024

11                     TIME: 4:00 P.M. PST

12

13

14            EXAMINATION BEFORE TRIAL of

15   the Third-Party Witness, ERIC STEPHEN

16   BROWN, taken by the Plaintiff, pursuant to

17   a Court Order, held via Zoom conference

18   before ToniAnn Lucatorto, a Notary Public

19   of the State of New York.

20

21

22

23

24

25
```

ERIC STEPHEN BROWN                                              JOB NO. 1006837
MAY 30, 2024

```
 1    A P P E A R A N C E S:

 2

 3    ROSEN, BIEN, GALVAN & GRUNFELD, LLP
           Attorneys for the Plaintiff
 4         101 Mission Street, 6th FLoor
           San Francisco, California  94105
 5         BY: VAN SWEARINGEN, ESQ.

 6

 7    BURKE, WILLIAMS & SORENSEN, LLP
           Attorneys for the Defendants
 8         444 S. Flower Street
           Los Angeles, California 90071
 9         BY: SUSAN COLEMAN, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ERIC STEPHEN BROWN                                          JOB NO. 1006837
MAY 30, 2024

                              E. BROWN
1    incarcerated people?

2         A.    To the best of my ability, yes.

3         Q.    Did you do anything to prepare

4    for this deposition?

5         A.    Reviewed my policies that we had

6    set in place.

7         Q.    Did you meet with anyone and

8    talk about this?

9         A.    The counselor.

10        Q.    About how long did you meet with

11   your attorney?

12        A.    Probably 30 minutes or so.

13        Q.    Did you do anything else to

14   prepare for this deposition?

15        A.    No.

16        Q.    Starting with attorney

17   visitations, does the Sheriff's Department

18   allow video visits between attorneys and

19   the public defenders office and

20   incarcerated people?

21        A.    Video visits?

22        Q.    Yes.

23        A.    I believe they do.

24        Q.    And these visits can be

25   scheduled in advance?

```
                          E. BROWN
 1        A.      I believe so.

 2        Q.      And the video visits are

 3    conducted remotely through using video and

 4    audio through Microsoft Teams interface?

 5        A.      I'm not sure of the program, but

 6    there is a video visit that they do

 7    conduct.

 8        Q.      When you say they conduct, it's

 9    the public defenders office with

10    incarcerated people?

11        A.      Yes.

12        Q.      Does the Sheriff's Department

13    allow for similar video visits with other

14    lawyers who are not affiliated with the

15    public defenders office?

16        A.      Not that I'm aware of.

17        Q.      Why not?

18        A.      I don't know --

19              MS. COLEMAN:  Speculation.  Lack

20        of foundation.

21        Q.      I'm sorry, Mr. Brown, you can

22    continue on why the Sheriff's Department

23    doesn't permit lawyers, other than public

24    defenders to meet with incarcerated people

25    over video visits?
```

ERIC STEPHEN BROWN                                    JOB NO. 1006837
MAY 30, 2024

                              E. BROWN
1        A.    I wouldn't have that answer.

2        Q.    Who would?

3        A.    Maybe the Sheriff's legal

4   department.

5        Q.    Are you familiar with

6   professional visiting at the facility?

7        A.    Not at the visiting detention

8   facility.

9        Q.    Do you know whether attorneys

10  can make appointments for in-person visits

11  at Vista?

12       A.    I would not have that answer.

13       Q.    Are you aware that some

14  incarcerated individuals in the San Diego

15  County jail system are pro per?

16       A.    Yes.

17       Q.    What does pro per mean?

18       A.    They're their own attorney.

19       Q.    How many male pro per people are

20  currently incarcerated in the jails?

21       A.    I don't have that number.  That

22  fluctuates.

23       Q.    What's your best estimate?

24       A.    I don't know about the other

25  facilities, but the facility I'm at is

ERIC STEPHEN BROWN                                          JOB NO. 1006837
MAY 30, 2024

```
                              E. BROWN
 1   incarcerated people?

 2        A.    To the best of my ability, yes.

 3        Q.    Did you do anything to prepare

 4   for this deposition?

 5        A.    Reviewed my policies that we had

 6   set in place.

 7        Q.    Did you meet with anyone and

 8   talk about this?

 9        A.    The counselor.

10        Q.    About how long did you meet with

11   your attorney?

12        A.    Probably 30 minutes or so.

13        Q.    Did you do anything else to

14   prepare for this deposition?

15        A.    No.

16        Q.    Starting with attorney

17   visitations, does the Sheriff's Department

18   allow video visits between attorneys and

19   the public defenders office and

20   incarcerated people?

21        A.    Video visits?

22        Q.    Yes.

23        A.    I believe they do.

24        Q.    And these visits can be

25   scheduled in advance?
```

ERIC STEPHEN BROWN                                          JOB NO. 1006837
MAY 30, 2024

                              E. BROWN
1          A.      I believe so.

2          Q.      And the video visits are

3   conducted remotely through using video and

4   audio through Microsoft Teams interface?

5          A.      I'm not sure of the program, but

6   there is a video visit that they do

7   conduct.

8          Q.      When you say they conduct, it's

9   the public defenders office with

10  incarcerated people?

11         A.      Yes.

12         Q.      Does the Sheriff's Department

13  allow for similar video visits with other

14  lawyers who are not affiliated with the

15  public defenders office?

16         A.      Not that I'm aware of.

17         Q.      Why not?

18         A.      I don't know --

19                 MS. COLEMAN:  Speculation.  Lack

20      of foundation.

21         Q.      I'm sorry, Mr. Brown, you can

22  continue on why the Sheriff's Department

23  doesn't permit lawyers, other than public

24  defenders to meet with incarcerated people

25  over video visits?

ERIC STEPHEN BROWN                                    JOB NO. 1006837
MAY 30, 2024

                              E. BROWN
1        A.    I wouldn't have that answer.

2        Q.    Who would?

3        A.    Maybe the Sheriff's legal

4   department.

5        Q.    Are you familiar with

6   professional visiting at the facility?

7        A.    Not at the visiting detention

8   facility.

9        Q.    Do you know whether attorneys

10  can make appointments for in-person visits

11  at Vista?

12       A.    I would not have that answer.

13       Q.    Are you aware that some

14  incarcerated individuals in the San Diego

15  County jail system are pro per?

16       A.    Yes.

17       Q.    What does pro per mean?

18       A.    They're their own attorney.

19       Q.    How many male pro per people are

20  currently incarcerated in the jails?

21       A.    I don't have that number.  That

22  fluctuates.

23       Q.    What's your best estimate?

24       A.    I don't know about the other

25  facilities, but the facility I'm at is

ERIC STEPHEN BROWN                                          JOB NO. 1006837
MAY 30, 2024

```
                          E. BROWN
 1   roughly over 800.

 2        Q.    When you say the facility that

 3   you're at, which facility is that?

 4        A.    I'm at the downtown jail.

 5        Q.    Is that known as central jail?

 6        A.    Yes.

 7        Q.    And my question was:  How many

 8   of these people in central jail are pro

 9   per?

10        A.    Again, that fluctuates.

11   Currently right now we have 18.

12        Q.    Are all male pro per individuals

13   in the county jail system housed at the

14   central jail?

15        A.    Yes.

16        Q.    None are housed at George

17   Bailey?

18        A.    No.

19        Q.    And how many hours of legal

20   research area time do male pro per

21   individuals receive each week?

22        A.    They're required to have a

23   minimum of three hours per week.

24        Q.    And how many hours do pro per

25   individuals average per week?
```

ERIC STEPHEN BROWN                                    JOB NO. 1006837
MAY 30, 2024

```
                          E. BROWN
 1        A.     It's -- it fluctuates with the

 2   amount of people.  Currently, right now,

 3   we're at six hours.  A week.  But it could

 4   change tomorrow.

 5        Q.    What do you mean by it

 6   fluctuates by the number of people?

 7        A.    The law library is only sized

 8   for a certain amount of individuals at any

 9   given time.  So like, everybody has to

10   have an equal amount of time.  So if

11   there's more people and we have to do more

12   groups, then the time has to go down.

13        Q.    How many people does the law

14   library -- how many incarcerated people

15   does the law library fit?

16        A.    Five.

17        Q.    And what are the hours that the

18   law library is open each day?

19        A.    7:00 to 3:00.

20        Q.    Is that seven days per week?

21        A.    No.  That is Monday through

22   Thursday.

23        Q.    Is it closed Friday through

24   Sunday?

25        A.    Yes.
```

ERIC STEPHEN BROWN
MAY 30, 2024

JOB NO. 1006837

E. BROWN

1      Q.      Is it always staffed when it's

2    open?

3      A.      Yes.

4      Q.      By whom?

5      A.      Myself and a correctional

6    counselor.

7      Q.      And who is the correctional

8    counselor that staffs it?

9      A.      Francis.

10     Q.      Last name?

11     A.      Ablos.

12     Q.      Are all female pro per

13   individuals housed at Las Colinas?

14     A.      Yes.

15     Q.      None are housed at Vista?

16     A.      No.

17     Q.      How many hours of legal research

18   area time do female pro per individuals

19   receive each week?

20     A.      The same as the males; three

21   hours minimum.

22     Q.      What are the law library hours

23   at Las Colinas?

24     A.      They're the same as they are

25   here.  Monday through Thursday.  From 7:00

ERIC STEPHEN BROWN                                    JOB NO. 1006837
MAY 30, 2024

E. BROWN

1    to 3:00.

2        Q.    Are you familiar with policy N7;

3    pro per incarcerated persons?

4        A.    Yes.

5        Q.    Pursuant to that police, pro per

6    privileges are granted for criminal cases

7    only.  Why is that?

8        A.    That is what the department has

9    established.

10       Q.    Why are pro per privileges not

11   available for civil law cases?

12            MS. COLEMAN:  Calls for

13       speculation, lack of foundation.

14       Q.    You may answer.

15            MS. COLEMAN:  If you know.

16       A.    You would have to ask the

17   sheriff's legal department on that.

18       Q.    The policies states that certain

19   items will be furnished by the Sheriff's

20   Department or appointed legal assistance

21   at the discretion of the correctional

22   counselor.

23            How do correctional counselors

24       use their discretion to decide whether

25       or not to furnish things like legal

ERIC STEPHEN BROWN                                    JOB NO. 1006837
MAY 30, 2024

                              E.  BROWN

1          pads, pencils, and pleated paper to

2          incarcerated people?

3               MS. COLEMAN:  Compound and calls

4          for speculation.  You can answer if

5          you know.

6          A.    Our policy says that they're

7     allowed -- it states in our police what

8     they're given.  They're given that once --

9     they're given that weekly.  Paper, legal

10    20 line paper, the pencils, the erasers,

11    and the envelopes.  They're given that

12    weekly.

13         Q.    All pro per people are always

14    given that on a weekly basis?

15         A.    Yes.  They're offered it.  They

16    don't always take it, but it is offered to

17    them every week.

18         Q.    Thank you.

19               The same policy states that each

20    pro per incarcerated person in a criminal

21    case may be authorized a legal runner or

22    paralegal.  That they may also be

23    authorized an investigator or person to

24    aid them.

25               How is that authorization

ERIC STEPHEN BROWN
MAY 30, 2024

JOB NO. 1006837

E. BROWN

1   determined for those assistance for pro

2   per individuals?

3       A.     Those are granted by the Court.

4       Q.     How do incarcerated people

5   contact those, I'll call them legal

6   assistants, that are authorized by the

7   Court?

8       A.     Through the office of assigned

9   counsel.

10      Q.     What is that?

11      A.     It is a -- let me see a way to

12  explain that.  The office of assigned

13  counsel is who is their legal runner.  So

14  when they submit any paperwork that they

15  want to submit to the Court, they submit

16  it to the office of assigned counsel and

17  the office of assigned counsel submits it

18  to the Court.

19      Q.     And how do incarcerated people

20  contact and communicate with the office of

21  assigned counsel?

22      A.     Via the phone inside the module.

23  They can make a call or they can submit a

24  request through the law library's personal

25  counselor, and she will e-mail it over to

ERIC STEPHEN BROWN                                    JOB NO. 1006837
MAY 30, 2024

                           E.  BROWN
1   them.
2        Q.    When you say e-mail it to them,
3   you mean e-mail the request from the
4   incarcerated person to the office of
5   assigned counsel?
6        A.    Yes.
7        Q.    Are you familiar with policy N6
8   which is the conditions of confinement,
9   incarcerated person policy?
10       A.    Yes.
11       Q.    How many people are currently on
12  conditions of confinement status?
13       A.    I don't know.
14       Q.    What's your best guess or best
15  estimate?
16       A.    I don't know because, as of
17  right now, I don't know of anybody at SDCJ
18  that's in that.
19       Q.    What's the -- what is the range
20  of people who could be on conditions of
21  confinement status at any time?
22       A.    What do you mean by that?
23            MS. COLEMAN:  Vague as to overly
24       broad.
25       Q.    Minimum and maximum number of

ERIC STEPHEN BROWN
MAY 30, 2024

JOB NO. 1006837

E. BROWN

1  people.  Say, between 5 and 10 people at

2  any given time are on conditions of

3  confinement status could be an example of

4  a response.

5      A.    I couldn't say.  It would

6  fluctuate with whatever that individual's

7  wanting to do.

8      Q.    How do individuals get

9  conditions of confinement status?

10     A.    I don't know how they get that

11  condition of confinement.

12     Q.    The policy N6, I'll represent,

13  states that County counsel will send a

14  copy of the first page of the court

15  filing, which will identify the plaintiff

16  to the supervising correctional counselor

17  at the central jail of any incarcerated

18  person that's been granted

19  self-representation by the Court.

20          To me, that suggests that the

21      person must file a lawsuit to be

22      granted conditions of confinement

23      status.  Is that an accurate

24      understanding?

25      A.    I would agree that the Court is

E. BROWN

1    the one that grants that access.

2        Q.    And a person must file a lawsuit

3    to be granted that access by the Court; is

4    that correct?

5        A.    I don't know how that starts.

6        Q.    The policy provides for fewer

7    items to be provided to conditions of

8    confinement status individuals and pro per

9    items.

10           Do you know why that is?

11        A.    That this would be something

12    that the sheriff's legal established.

13        Q.    Do you know the purpose behind

14    that policy difference?

15        A.    I do not.

16        Q.    Are you familiar with legal

17    research associates or LRA requests?

18        A.    The form, yes.

19        Q.    The policy for conditions of

20    confinement status states that they're

21    limited to a certain number of legal

22    research associate requests per month.

23    Why are they limited to a number of legal

24    research requests per month?

25        A.    That would be a Sheriff's legal

ERIC STEPHEN BROWN                                    JOB NO. 1006837
MAY 30, 2024

                          E. BROWN
1        A.      Same thing.   That would have

2    been something they would have

3    established.

4        Q.      So if a person requests more

5    than a total of 50 single sided pages,

6    they're not going to get those additional

7    pages if it's in the same calendar month?

8        A.      From my understanding it would

9    be -- no, they wouldn't get it.

10       Q.      Thank you.

11               Regarding professional visits.

12   Professional visits take place in separate

13   professional visit rooms in which

14   attorneys can meet with their clients; is

15   that correct?

16       A.      Yes.

17       Q.      Are there cameras in the

18   professional visiting rooms?

19       A.      No.

20       Q.      Are you certain that none of the

21   professional visiting rooms in any of the

22   facilities have cameras?

23       A.      I can't speak of the other

24   facilities, but the central one does not.

25       Q.      So you're not familiar with the

ERIC STEPHEN BROWN                                    JOB NO. 1006837
MAY 30, 2024

                              E.  BROWN
1    professional visiting rooms in Las

2    Colinas, for example?

3         A.     No.

4         Q.     Nor Vista or George Bailey?

5         A.     No.

6         Q.     So it's your testimony there are

7    no cameras in the central jail

8    professional visiting rooms?

9         A.     Yes.

10        Q.     How do -- going back to the

11   legal research assistance information

12   form.  How do incarcerated people obtain

13   that form?

14        A.     They request it from the

15   counseling staff.

16        Q.     Oh, do you mean correctional

17   counselors who are employed by the

18   re-entry services division?

19        A.     Yes.

20        Q.     Are those -- are correctional

21   counselors in the housing units?

22        A.     What do you mean?

23        Q.     Like, can people who are

24   incarcerated in a housing unit, say, Mod

25   8C, at central jail, request a legal

                        E. BROWN
1    research form from a correctional

2    counselor inside of 8C?

3        A.    So they can fill out an

4    incarcerated person's request form

5    requesting a form directed towards the

6    counselors and they would deliver that to

7    that person.

8        Q.    Who would deliver the form to

9    the person?

10        A.    The counselors.

11        Q.    How do incarcerated people know

12    to fill out an incarcerated person's

13    request form or a legal research

14    assistance form?

15        A.    They can -- I don't know how to

16    do that.  I'm not really familiar with

17    what you're asking on that.

18        Q.    How do incarcerated people know

19    to use a request form to ask for a legal

20    research form?  Is it word of mouth, is it

21    written somewhere?  How would an

22    incarcerated person know about legal

23    research assistance form?

24            MS. COLEMAN:  Compound and calls

25        for legal speculation.  You can

ERIC STEPHEN BROWN                                          JOB NO. 1006837
MAY 30, 2024

```
                          E. BROWN
 1            MS. COLEMAN:  Which one?

 2       Q.     You're not aware whether the

 3    Sheriff's Department does anything to

 4    inform people about this service; are you?

 5       A.     I'm not aware of it, but people

 6    are -- people do know about it.  So I

 7    don't know if it's because there's a video

 8    that plays that informs them.  Or if it's

 9    a word of mouth.

10       Q.     How long, on average, does it

11    take for LRA to respond to a request?

12            MS. COLEMAN:  May call for

13        speculation.  You can answer if you

14        know.

15       A.     I don't know off the top of my

16    head.  I know on the form it says how many

17    days.

18       Q.     But in practice, you don't know

19    how long it actually takes?

20       A.     No, because I don't know when it

21    gets put in the system versus when it gets

22    delivered.

23       Q.     Are legal assistance forms

24    logged once submitted by an incarcerated

25    person?
```

1              C E R T I F I C A T E

2

3              I, TONIANN LUCATORTO, hereby

4    certify that the Examination Before Trial

5    of ERIC STEPHEN BROWN was held before me

6    on the 30th day of May, 2024; that said

7    witness was duly sworn before the

8    commencement of their testimony; that the

9    testimony was taken stenographically by

10   myself and then transcribed by myself;

11   that the party was represented by counsel

12   as appears herein; That the within

13   transcript is a true record of the

14   Examination Before Trial of said witness;

15              That I am not connected by blood

16   or marriage with any of the parties; that

17   I am not interested directly or indirectly

18   in the outcome of this matter; that I am

19   not in the employ of any of the counsel.

20              IN WITNESS WHEREOF, I have

21   hereunto set my hand this 30th day of May,

22   2024.

23

24

25              TONIANN LUCATORTO

# EXHIBIT E

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3

    DARRYL DUNSMORE, ANDREE
 4  ANDRADE, ERNEST ARCHULETA,
    JAMES CLARK, ANTHONY EDWARDS,
 5  LISA LANDERS, REANNA LEVY,
    JOSUE LOPEZ, CHRISTOPHER
 6  NELSON, CHRISTOPHER NORWOOD,
    JESSE OLIVARES, GUSTAVO            CASE NO.
 7  SEPULVEDA, MICHAEL TAYLOR, and
    LAURA ZOERNER, on behalf of        3:20-cv-00406-AJB-DDL
 8  themselves and all others
    similarly situated,
 9
              Plaintiffs,
10       v.

11  SAN DIEGO COUNTY SHERIFF'S
    DEPARTMENT, COUNTY OF SAN
12  DIEGO, SAN DIEGO COUNTY
    PROBATION DEPARTMENT, and DOES
13  1 to 20, inclusive,

14            Defendants.
    _____
15

16

17

18        DEPOSITION OF THERESA ADAMS-HYDAR

19             SAN DIEGO, CALIFORNIA

20           WEDNESDAY, APRIL 17, 2024

21

22

23  REPORTED BY:  JULIA LENNAN
                  CSR NO. 12843
24
    JOB NO. 944969
25
```

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3

    DARRYL DUNSMORE, ANDREE
 4  ANDRADE, ERNEST ARCHULETA,
    JAMES CLARK, ANTHONY EDWARDS,
 5  LISA LANDERS, REANNA LEVY,
    JOSUE LOPEZ, CHRISTOPHER
 6  NELSON, CHRISTOPHER NORWOOD,
    JESSE OLIVARES, GUSTAVO              CASE NO.
 7  SEPULVEDA, MICHAEL TAYLOR, and
    LAURA ZOERNER, on behalf of          3:20-cv-00406-AJB-DDL
 8  themselves and all others
    similarly situated,
 9
                Plaintiffs,
10        v.

11  SAN DIEGO COUNTY SHERIFF'S
    DEPARTMENT, COUNTY OF SAN
12  DIEGO, SAN DIEGO COUNTY
    PROBATION DEPARTMENT, and DOES
13  1 to 20, inclusive,

14              Defendants.
    _____
15

16

17

18

19

20

21         DEPOSITION OF THERESA ADAMS-HYDAR,

22  taken on behalf of Plaintiffs, on Wednesday, APRIL 17,

23  2024, at 9:12 a.m., at 501 West Broadway, Suite 1600,

24  San Diego, California, before Julia Lennan, California

25  certified stenographic reporter, License No. 12843.
```

THERESA ADAMS-HYDAR
APRIL 17, 2024

JOB NO. 944969

```
 1    APPEARANCES:

 2    For Plaintiffs:

 3            Galvan & Grunfeld LLP
              By:  Van Swearingen
 4            101 Mission Street, Sixth Floor
              San Francisco, California  94105-1738
 5            415.433.6830
              vswearingen@rbgg.com

 6

 7    For Defendants County of San Diego, San Diego County
          Sheriff's Department, and San Diego County Probation
 8        Department:

 9            Burke, Williams & Sorensen, LLP
              By:  Elizabeth M. Pappy
10            60 South Market Street, Suite 1000
              San Jose, California  95113-2336
11            408.606.6300
              epappy@bwslaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THERESA ADAMS-HYDAR
APRIL 17, 2024

JOB NO. 944969

```
1                      I N D E X

2   WITNESS:  Theresa Adams-Hydar

3   EXAMINATION                                    PAGE

4   By Attorney Swearingen                            6

5

6                    E X H I B I T S

7   NUMBER                DESCRIPTION            MARKED

8   Exhibit 1    Email thread from Darren Bennett to    61
                 Christopher Thibodeaux, et al.,
9                7.22.22, 7 pages

10  Exhibit 2    Email thread from Theresa Adams to     67
                 Christina Bavencoff, et al., 4.11.22,
11               1 page

12  Exhibit 3    Email thread from Media Relations to   89
                 Theresa Adams, et al., 7.25.22,
13               2 pages

14  Exhibit 4    Email thread from Holly Porter to     116
                 Rosemarie Degracia, et al., 8.9.22,
15               2 pages

16  Exhibit 5    Email from Derek Williamson to        143
                 Christina Bavencoff, et al., 1.19.23,
17               2 pages

18  Exhibit 6    Email from Jesse Johns to Christopher 152
                 Buchanan, et al., 7.20.23, 1 page
19
    Exhibit 7    Email from Jesse Johns to Theresa     157
20               Adams, et al., 9.1.23, 1 page

21  Exhibit 8    Facility Shifts Above/Below Minimum   157
                 Staffing spreadsheet, 1 page
22
    Exhibit 9    Email thread from Charles Cinnamo to  173
23               Theresa Adams, 8.11.2, 3 pages

24  Exhibit 10   Email thread from Theresa Adams to    178
                 Charles Cinnamo, 6.2.22, 3 pages
25
```

THERESA ADAMS-HYDAR                                          JOB NO. 944969
APRIL 17, 2024

```
 1              E X H I B I T S (Continued)

 2    NUMBER              DESCRIPTION              MARKED

 3    Exhibit 11    Email from Dane Gapuz to Theresa      189
                    Adams, 5.30.23, 2 pages
 4
      Exhibit 12    Memo from Frank Motley to John M.     205
 5                  Pellegrino, 9.12.23, 1 pages

 6    Exhibit 13    Corrective Action Notice, 3.4.24,     219
                    27 pages
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THERESA ADAMS-HYDAR                                          JOB NO. 944969
APRIL 17, 2024

```
 1                    SAN DIEGO, CALIFORNIA
 2            APRIL 17, 2024, APRIL 17, 2024; 9:12 A.M.
 3
 4                    THERESA ADAMS-HYDAR,
 5      having been first duly sworn, testifies as follows:
 6
 7                         EXAMINATION
 8    BY ATTORNEY SWEARINGEN:
 9         Q    Good morning.
10         A    Good morning.
11         Q    My name is Van Swearingen.  I represent the
12    plaintiffs.
13              Can you state and spell your name for the
14    record, please.
15         A    Theresa Adams-Hydar.  T-h-e-r-e-s-a, A-d-a-m-s
16    - H-y-d-a-r.
17         Q    Have you ever provided testimony in court
18    before?
19         A    Yes.
20         Q    Have you ever been deposed before --
21         A    Yes.
22         Q    -- in connection with your sheriff's duties?
23         A    Yes.
24         Q    Can you tell me a little bit about the times
25    you've been -- you've provided testimony?
```

THERESA ADAMS-HYDAR                                          JOB NO. 944969
APRIL 17, 2024

1       A    The most recent one that I recall was a

2   deposition, and I served as a PMK for a lawsuit.  I

3   think it was 2016, 2017, but it didn't go for a couple

4   of years.  It was my expert opinion on traffic laws and

5   use of certain horns and the like for stopping traffic,

6   freedom to assemble, and that type of thing, so.

7       Q    Okay.  Have you provided testimony with respect

8   to conditions in the jail before?

9       A    In a deposition, no.

10      Q    Or in court?

11      A    It's probably been years, from when I was a

12  deputy sheriff.  So maybe 26, -7 years ago.  It's been

13  quite some time.

14      Q    Okay.  And what was that case about?

15      A    I wouldn't even begin to remember.  And it was

16  probably, most likely, just in custody as a result of an

17  arrest.

18      Q    So I'll go over some ground rules of the

19  deposition.

20           Do you understand that your oath is under

21  penalty of perjury today?

22      A    Yes.

23      Q    The court reporter cannot take down gestures.

24           Can you respond to my questions orally?

25      A    Yes.

 1   allegations regarding medical care in the jail?

 2       A    I don't agree with the medical care aspect.  I

 3   think we do provide quality medical care to our

 4   population, to the best of our ability.

 5       Q    And what about mental health care?

 6       A    Mental health care, I know we definitely -- we

 7   provide quality mental health care.

 8            I think, like many agencies, we do struggle

 9   with just hiring individuals.  So I think that our area

10   of improvement, like many jails and just many groups out

11   there -- I think the expediency, maybe, of getting

12   someone seen.  You know, I think I would like to see

13   that improve.  And we definitely worked on that, and we

14   had made great strides in that.

15       Q    And what about dental care?

16       A    Dental care, I believed, and what I pushed for

17   when I was there, is that if somebody is in custody for

18   more than a year, they should be getting cleanings,

19   teeth cleanings.  And I really pushed for that, and I

20   know that we weren't doing that at that time.  And we

21   pushed for that.  So I think there were improvements

22   that we could do for that.

23       Q    There are a lot of allegations about drugs in

24   the jail and the Sheriff's Department not doing enough

25   to interdict the drugs.

1       Q      -- people into a locked unit?

2       A      Yes.  They'd accept them, by all means, but

3   they wouldn't be in a locked unit, which is -- it's --

4   that's an efficiency for us.  If I can have a locked

5   unit, I need two people for five incarcerated people,

6   which is better for us.  It's better for the community.

7   It's better for everybody.  As soon as they pull them

8   out, then it -- there's no longer that economy of

9   efficiencies, for lack of a better term.

10      Q      Did the Sheriff's Department continue to send

11  patients to Alvarado --

12      A      Yes.

13      Q      -- when they did not operate a locked floor?

14      A      Yes.  It -- people are going to go to a

15  hospital -- no hospital is going to refuse you for

16  emergent care.  They can't.  They're going to treat you

17  because they're a hospital.  So at no time was anyone

18  ever turning down our population for care and treatment.

19      Q      On oral care services --

20      A      What page are you on?  Sorry.

21      Q      I'm on page 4 now.

22      A      Okay.

23      Q      -- the "Corrective Action Notice" stated that

24  the contractor NaphCare "does not provide timely

25  response to requests regarding annual cleanings."

THERESA ADAMS-HYDAR
APRIL 17, 2024

JOB NO. 944969

```
 1          Do you know if that -- do you know for how long
 2    that issue persisted?
 3      A    I don't think they were doing cleanings for
 4    anybody.  And I think this really came to light when --
 5    it wasn't really an issue within a county jail setting
 6    because people didn't spend a lot of time in County
 7    Jail.  You spend a year in county jail at max, if you
 8    were sentenced.
 9          And if you were sentenced to prison, you left.
10    And it -- unless you were in there for a long-term
11    trial, there was really no need for that annual cleaning
12    we all go to once or twice a year.  So this kind of just
13    developed at the same time.  And we brought NaphCare on,
14    and we looked at it and -- when we looked at NCCHC
15    standards.
16          And just overall health care of an incarcerated
17    person, if they're going to be in for longer periods of
18    time, which they are now because of state laws and
19    AB109 -- they're just doing a lot longer in custody.  We
20    looked at it said we need to make sure that we're
21    providing that quality of service, and that includes a
22    cleaning for someone who's in for longer than a year.
23          So when we brought them on, that wasn't
24    something we saw that they were doing, and we said we
25    need to give them hygienic -- whatever, teeth cleaning.
```

THERESA ADAMS-HYDAR                                        JOB NO. 944969
APRIL 17, 2024

1    And, well, what we didn't contract with were hygienists.

2    So I think that we realized, Well, that was silly.  Why

3    did we not contract for a hygienist?

4            The dentist should not be doing that.  A

5    hygienist can do that, and the dentist does the dentist

6    work.  So that's when we realized, Well, we really need

7    to contract for a hygienist.

8        Q    And when did that occur?

9        A    We looked at it earlier, I think, the hygienist

10   thing, didn't we?  I don't know.  Last -- the end of

11   summer last year, and I think we finally got it the end

12   of the year, maybe.  2023, I think.  I don't know.  I

13   don't remember, but we got it.  We have a hygienist now.

14       Q    Okay.  The corrective Action Notice also states

15   that NaphCare is not authorizing root canals.

16       A    Yes.  They were not.

17       Q    Did that change?

18       A    Yes.

19       Q    When did that change?

20       A    It changed because we said a root canal is not

21   an elective surgery.  A root canal is something that is

22   basic preventative care.  And if a person has -- needs a

23   root canal, you need to save that tooth, unless the

24   tooth is completely, you know, beyond repair.  Then,

25   yeah, we understand.  But the go-to should not be

1    extraction.  Root canals should be provided.

2              And we did go back and forth on that one with

3    them, and I think they saw it our way, and I believe

4    that is what they are doing now.

5       Q    Do you know when they started performing root

6    canals, instead of making it an elective procedure?

7       A    We had one example where an individual wanted a

8    root canal, and he was going to go to prison.  And I

9    said, "I don't care if he's going to prison.  We're

10   giving him a root canal."  I don't remember when that

11   was.  Last summer, maybe.

12      Q    But definitely after -- sometime after the

13   Corrective Action Notice was --

14      A    Yeah, because --

15      Q    -- issued.

16      A    -- that's why it was in there.

17             And as a note on that, just so you know,

18   standards of care have changed within correctional

19   facilities.  So root canals, once upon a time, weren't

20   something you would do in a jail.  But standards have

21   changed over time.  So we're making sure as a

22   department, we're meeting those standards.  So what they

23   might have done three years ago is not what we're doing

24   now.

25      Q    And the Corrective Action Notice, as of

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3         I hereby declare under penalty of perjury that

 4    the foregoing is my deposition under oath; that it is

 5    true and correct; that I have read my deposition and

 6    have made the corrections, additions, or changes to my

 7    answers that I deem necessary.

 8

 9

10         Executed this _____ day of _____

11    2023, at _____, _____.
                        (City)                      (State)
12

13

14

15

16

17

18                           _____

19                                  THERESA ADAMS-HYDAR

20

21

22

23

24

25
```

THERESA ADAMS-HYDAR                                              JOB NO. 944969
APRIL 17, 2024

```
 1                          ERRATA SHEET

 2

 3          I, Theresa Adams-Hydar, do hereby certify that

 4   I have read the foregoing statement and that, to the

 5   best of my knowledge, said statement is true and

 6   accurate with the exception of the following changes:

 7

 8   PAGE    LINE    CHANGE TESTIMONY TO READ AS FOLLOWS:

 9   _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22

23   _____   _____

24   THERESA ADAMS-HYDAR                             DATE

25
```

```
 1                  REPORTER'S CERTIFICATE

 2

 3          I, Julia Lennan, Certified Shorthand Reporter,

 4  CSR No. 12843, certify:

 5          That the foregoing proceedings were taken

 6  before me at the time and place herein set forth, at

 7  which time the witness was put under oath by me; that

 8  the proceedings were recorded stenographically by me and

 9  were thereafter transcribed into typewriting; that a

10  review of the transcript by the deponent was not

11  requested; and that the foregoing is a true and correct

12  transcript of the proceedings.

13          I do further certify that I am in no way

14  interested in the outcome of this action or connected

15  with or related to any of the parties in this action or

16  to their respective counsel.

17          The dismantling, unsealing, or unbinding of the

18  original transcript, other than by order of the Court,

19  renders this reporter's certificate null and void.

20          In witness whereof I have subscribed my name

21  this 28th day of April 2024.

22

23          _____

24                  JULIA LENNAN,CSR NO. 12843

25
```

# EXHIBIT F

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| **DATE:** | MAY 2, 2022 |
| **NUMBER:** | G.1 |
| **SUBJECT:** | MAINTENANCE PROCEDURES |
| **RELATED SECTIONS:** | 15 CCR § 1280 |

PURPOSE:

To establish guidelines for expeditious handling of maintenance requests.

POLICY:

Each facility will ensure the timely completion of routine, urgent and/or emergency maintenance.

PROCEDURE:

I.    Each facility will be routinely inspected by health supervisory, security and line staff for compliance with applicable health, safety and security laws, guidelines, etc.

II.   Maintenance requirements noted during such inspections and during normal operations are to be promptly logged to ensure deficiencies are corrected.

III.  Routine maintenance is performed by the Department of General Services, Facilities Maintenance, Monday through Friday (except holidays) during business hours. At the discretion of the watch commander, an emergency maintenance "Call-out" may be initiated for those repairs, which, if not performed would significantly impair the operation of the facility or the safety of the staff or incarcerated persons.

IV.   Each facility will establish a procedure for the handling of routine maintenance requests. This procedure will include, but is not limited to, the following:

   A.    Documenting needed repairs.

   B.    Notification of maintenance personnel.

   C.    Follow-up on requested repairs.

# EXHIBIT G

1          UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF CALIFORNIA

3         CASE NO. 3:20-CV-00406-AJB-DDL

4

5   DARRYL DUNSMORE, ANDREE ANDRADE,      )
    ERNEST ARCHULETA, JAMES CLARK,        )
6   ANTHONY EDWARDS, LISA LANDERS,        )
    REANNA LEVY, JOSUE LOPEZ,             )
7   CHRISTOPHER NELSON, CHRISTOPHER       )
    NORWOOD, JESSE OLIVARES, GUSTAVO      )
8   SEPULVEDA, MICHAEL TAYLOR, and        )
    LAURA ZOERNER, on behalf of           )
9   themselves and all others similarly  )
    situated,                             )
10                                        )
            Plaintiffs,                   )
11                                        )
                vs.                       )
12                                        )
    SAN DIEGO COUNTY SHERIFF'S            )
13  DEPARTMENT, COUNTY OF SAN DIEGO,      )
    SAN DIEGO COUNTY PROBATION            )
14  DEPARTMENT, and DOES 1 to 20,         )
    inclusive,                            )
15                                        )
            Defendants.                   )
16                                        )
    _____)
17

18

19      DEPOSITION OF DARREN SCOTT BENNETT

20           San Diego, California
                 May 1, 2024
21

22      Pages 1 through 108, inclusive

23

24      Reported by Adriana S. Angulo, CSR
             Certificate No. 13824
25

DARREN SCOTT BENNETT - PMK - 30(B)(6)                    JOB NO. 950098
MAY 01, 2024

```
 1                 UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF CALIFORNIA

 3               CASE NO. 3:20-CV-00406-AJB-DDL

 4

 5     DARRYL DUNSMORE, ANDREE ANDRADE,      )
       ERNEST ARCHULETA, JAMES CLARK,        )
 6     ANTHONY EDWARDS, LISA LANDERS,        )
       REANNA LEVY, JOSUE LOPEZ,             )
 7     CHRISTOPHER NELSON, CHRISTOPHER       )
       NORWOOD, JESSE OLIVARES, GUSTAVO      )
 8     SEPULVEDA, MICHAEL TAYLOR, and        )
       LAURA ZOERNER, on behalf of           )
 9     themselves and all others similarly )
       situated,                             )
10                                           )
                   Plaintiffs,               )
11                                           )
                        vs.                  )
12                                           )
       SAN DIEGO COUNTY SHERIFF'S            )
13     DEPARTMENT, COUNTY OF SAN DIEGO,      )
       SAN DIEGO COUNTY PROBATION            )
14     DEPARTMENT, and DOES 1 to 20,         )
       inclusive,                            )
15                                           )
                   Defendants.               )
16                                           )
       _____)
17

18

19     DEPOSITION DARREN SCOTT BENNETT, Person Most Knowledgeable

20     for 30(B)(6), was taken pursuant to Notice at Burke

21     Williams & Sorensen, 501 West Broadway, Suite 1600,

22     San Diego, California, on Wednesday, May 1, 2024,

23     commencing at 1:58 p.m., before Adriana S. Angulo,

24     CSR No. 13824, a Certified Shorthand Reporter in and for

25     the State of California.
```

DARREN SCOTT BENNETT - PMK - 30(B)(6)                                    JOB NO. 950098
MAY 01, 2024

```
 1               A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4        ROSEN BIEN GALVAN & GRUNFELD, LLP

 5        BY:  GAY C. GRUNFELD, ESQ.

 6        101 Mission Street, 6th Floor

 7        San Francisco, California 94105

 8        (415) 433-6830

 9        ggrunfeld@rbgg.com

10

11    For the Defendants:

12        BURKE WILLIAMS & SORENSEN, LLP

13        BY:  SUSAN COLEMAN, ESQ.

14        501 West Broadway, Suite 1600

15        San Diego, California 92101

16        (619) 814-5800

17        scoleman@bwslaw.com

18

19

20

21

22

23

24

25
```

DARREN SCOTT BENNETT - PMK - 30(B)(6)                    JOB NO. 950098
MAY 01, 2024

```
1        Q.  How are you aware of them after hours?
2        A.  Because there's a callback sheet.  So when
3   someone gets called in after hours, they put it on a
4   report, and that report goes out.
5        Q.  Do you have any standards or rules about how
6   quickly a maintenance request must be addressed?
7        A.  A common practice is four-hour minimum response
8   time.
9        Q.  Is that written down anywhere?
10       A.  I don't recall.
11       Q.  Are you able to meet the four-hour standard that
12   you -- --
13       A.  Yes.
14       Q.  -- set?
15       A.  Sorry.
16           Yes.
17       Q.  And how do you know you're meeting that?
18           Is that logged somewhere?
19       A.  It's logged in the employees' time.
20       Q.  And do you conduct any audits of that?
21       A.  Only if there would be a complaint.  And I've had
22   no complaints.
23       Q.  Who would complain?
24       A.  The captain, lieutenant, staff facility.
25       Q.  So you're talking now about George Bailey and the
```

DARREN SCOTT BENNETT - PMK - 30(B)(6)                    JOB NO. 950098
MAY 01, 2024

1    One was at Vista, and one was at George Bailey.

2          Q.   And what were those incidents?

3          A.   Where the water didn't run long enough to become

4    hot.

5          Q.   And was that logged somewhere?

6          A.   That was the resolution that gets logged in the

7    TRIRIGA report.   I did not go back to follow up.

8          Q.   Do you know if there are leaks at Vista?

9          A.   Yes.

10         (Exhibit 22 marked for identification.)

11   BY MS. GRUNFELD:

12         Q.   I'd like to show you and mark as Exhibit 22 in

13   this deposition a photo taken during the January 17, 2024,

14   inspection of Vista.

15         Were you there on January 17th?

16         A.   I believe so.   I don't recall.

17         Q.   Did you see this leak?

18         MS. COLEMAN:   Objection.   Assumes facts that

19   there's a water leak here.

20         THE WITNESS:   I see no water leak in that

21   picture.

22   BY MS. GRUNFELD:

23         Q.   Do you see water damage?

24         A.   Yes.

25         Q.   And would that water damage have been caused by a

DARREN SCOTT BENNETT - PMK - 30(B)(6)                    JOB NO. 950098
MAY 01, 2024

```
 1    leak?

 2         A.   No.

 3         Q.   What would it have been caused by?

 4         A.   Inmates' lack of use or poor use of the faucet

 5    that's in the picture.

 6         Q.   Can you explain how the incarcerated people

 7    caused this, which is what I understand you to be saying.

 8         A.   They turn the spigot on, they let it run, and it

 9    just goes all over the floor until it gets extremely hot

10    that they can use for their soups.

11         Q.   Are you doing anything to repair this wall?

12         A.   Quite often.

13         Q.   What do you mean by that?

14         A.   As the painter has time.  There's one painter

15    assigned to each facility.  As they have time to do tasks,

16    that's a task.

17         Q.   I see.

18              So your solution is that you paint the walls?

19         A.   Properly.

20              I mean, do you want me to go through the whole

21    process?

22         Q.   Well, I'm trying to understand.  This photo was

23    taken, and I'm trying to understand what the issue is.

24              And you're here to talk about plumbing and so --

25         A.   You asked me how often this gets cleaned or this
```

DARREN SCOTT BENNETT - PMK - 30(B)(6)                    JOB NO. 950098
MAY 01, 2024

```
 1   gets taken care of.
 2          I can't tell you a timeline.  It takes a lot of
 3   coordination to get into this module, pressure wash,
 4   clean, patch, prime, paint two coats of finish, times how
 5   many ever modules there are at Vista.
 6        Q.  Do you know whether that's done monthly?  Weekly?
 7   Yearly?
 8          Is there a schedule?
 9        A.  It depends on the other needs of the facility.
10        Q.  So there's no set schedule for maintenance at
11   this time; is that right?
12        A.  Correct.
13          MS. COLEMAN:  Objection.  Misstates his
14   testimony.
15          Is that correct?
16          THE WITNESS:  Correct.
17   BY MS. GRUNFELD:
18        Q.  I've shown you one photo from the inspection.
19          Did you look at any of the others?
20        A.  From?
21        Q.  From the inspections?
22          They are in the custody of the sheriff's
23   department.
24          Have you asked to see them?
25        A.  They weren't provided to me.
```

DARREN SCOTT BENNETT - PMK - 30(B)(6)                                    JOB NO. 950098
MAY 01, 2024

 1        A.  I don't recall.

 2             MS. COLEMAN:  Wait for her.

 3             THE WITNESS:  Sorry.

 4   BY MS. GRUNFELD:

 5        Q.  -- 23?

 6             You don't recall?

 7        A.  I don't recall.

 8        Q.  Can you place it in the last five years?

 9        A.  Yes.

10        Q.  And were you involved in that investigation?

11        A.  To a certain extent, yes.

12        Q.  To what extent?

13        A.  Cleaning it up.  The cells have been isolated for

14   nonuse.

15        Q.  When were those isolated for nonuse?

16        A.  I don't recall.  It's been a while.  I don't

17   know.

18        Q.  And that's because the sheriff's association

19   complained about mold?

20        A.  Yes.  Well, I'm sorry.  That's not true.

21             I don't know at what point this particular thing

22   fits into -- this particular conversation fits into the

23   correspondence of this cell, these two cells, or this

24   area.

25        Q.  But there is an area that is off limits due to a

DARREN SCOTT BENNETT - PMK - 30(B)(6)                    JOB NO. 950098
MAY 01, 2024

```
 1    complaint of mold; is that right?

 2        A.  It's not off limits.  They can't use it for

 3    incarcerated persons.

 4            An incarcerated person goes in there, their body

 5    heat creates heat.  The freezer is above the floor.  It

 6    condenses and it drips and it starts -- and then it dries

 7    up and then it drips and then it dries up.  That can be a

 8    conducive subject to mold.

 9        Q.  But I thought you said earlier that you didn't

10    believe it was mold?

11        A.  I didn't say that.  I said I'm not authorized to

12    tell you it was mold.  I have no knowledge if it was mold

13    spores, mildew.  I can't tell you what it was.  I don't

14    know.

15        Q.  But there was some problem --

16        A.  There's something that's starting to grow.

17            Sorry.

18            MS. COLEMAN:  Wait for her.

19    BY MS. GRUNFELD:

20        Q.  The next text from Mr. Thibodeaux says, quote,

21    they want to keep correspondence off of email.  But if you

22    have some history about mold issues, documentation,

23    et cetera, start to gather.  And we may have a discussion

24    soon, closed quote.

25            What does he mean they want to keep
```

1   mentioned in this text exchange in 2023?

2        A.   No.   I recall something about that conversation,

3   but I don't remember the specific 2008 email.

4        Q.   Other than the two cells at Central that are not

5   being used due to something that we don't know what it is,

6   are you aware of any other complaints of mold in any

7   facility?

8        A.   From time to time.

9        Q.   How often does that come up?

10       A.   Once a year.

11       Q.   Is there a particular facility that struggles

12   with that issue?

13            MS. COLEMAN:   Assumes facts that there is an

14   issue versus complaints.

15            You can answer.

16            THE WITNESS:   No specific areas, just random.

17   BY MS. GRUNFELD:

18       Q.   Is there an issue with mold at any facility?

19            Has there been during your time?

20            MS. COLEMAN:   Compound.   Calls for speculation.

21            THE WITNESS:   Can be.   Depends on the situation.

22   Again, it's not necessarily mold.

23   BY MS. GRUNFELD:

24       Q.   Could be fungus?

25       A.   Mildew spores.

DARREN SCOTT BENNETT - PMK - 30(B)(6)                    JOB NO. 950098
MAY 01, 2024

1      Q.  Can you recall a complaint about any of those

2   issues in the last year?

3      A.  Vista.  I don't specifically remember what cells.

4      Q.  How did that come to your attention?

5      A.  The supervisor notified me.

6      Q.  What steps were taken to address that?

7      A.  The cell was -- the IP was removed from the cell.

8   The painters went in to clean it up in protective gear and

9   repaint the cell after investigating that there was no

10  moisture leak.

11     Q.  If you could just turn to the next page.

12         At the top of the page, there's a text to you

13  from someone named Robert Sunga.

14         You know who that is?

15     A.  Yes.

16     Q.  Who is that?

17     A.  It's BME at Central Jail.

18     Q.  What does BME mean?

19     A.  Building maintenance engineer.

20     Q.  And Mr. Sunga says to you, quote, FYI, if you

21  have a chance, please take a look at this intercom problem

22  on eight floor, closed quote.

23         Do you see that?

24     A.  Yes.

25     Q.  And around March 29, 2023, were you made aware

DARREN SCOTT BENNETT - PMK - 30(B)(6)                    JOB NO. 950098
MAY 01, 2024

```
 1            MS. GRUNFELD:  If we can please go off the record
 2    for just a moment.
 3            (A recess is taken.)
 4            MS. GRUNFELD:  Okay.  Let's go back on the
 5    record.
 6    BY MS. GRUNFELD:
 7        Q.  We were talking a little while ago about the
 8    inspections that plaintiff's counsel conducted earlier
 9    this year, and you were there as well for some of them.
10            There was some pipe chases inspected.
11            Do you recall anything about the pipe chases?
12        A.  Yes.
13        Q.  Were there problems at some of them?
14        A.  Yes.
15        Q.  And what were those issues?
16        A.  Trash.  Leaking.
17        Q.  Leaking?
18        A.  Water.
19        Q.  Leaking water and trash?
20            Did you take any steps after the inspections to
21    deal with that?
22        A.  Yes.
23        Q.  And what did you do?
24        A.  For the trash was the deputies at George Bailey
25    pulling the hooks, which is a toilet hook that pulls out
```

DARREN SCOTT BENNETT - PMK - 30(B)(6)                    JOB NO. 950098
MAY 01, 2024

1    the clothes, and leaving it inside the pipe chase.

2            Deputies don't generally have access to those

3    pipe chases.  So I talked to the admin and told them that

4    they need to keep those locked.  And when they are

5    clogged, they are to call us.  So we don't have that

6    situation.

7            The lieutenant that was walking with us at the

8    time was there as well, and he agreed.

9        Q.  And since you were there in January, do you think

10   the situation has improved?

11       A.  Yes.

12       Q.  Do you have an annual budget for plumbing

13   maintenance?

14       A.  I just have an annual budget per facility.

15   Doesn't mean I can't go over it sometimes.  It's just a

16   budget.

17       Q.  Do you feel it's sufficient to deal with these

18   plumbing issues?

19       A.  Yes.

20       Q.  Do the maintenance staff we've been talking

21   about, the 67 employees, do they conduct any facility

22   inspections themselves?

23       A.  I require the supervisor to do follow-up

24   inspections.

25       Q.  Follow-up from what?

DARREN SCOTT BENNETT - PMK - 30(B)(6)                        JOB NO. 950098
MAY 01, 2024

 1        A.  From the TRIRIGA request.

 2        Q.  So if there's a request in TRIRIGA, they go out

 3   and look and see if it's fixed?

 4        A.  The TRIRIGA request is taken by the BMS.  He'll

 5   pick certain ones, depending on what the issue is, and

 6   issue them to the building maintenance engineer assigned

 7   to the house or the area.

 8            Some facilities do it different, where it's just

 9   whoever goes wherever, some assigned facility.  He can

10   choose to go.

11            Let me know when that's done.  I want to see it

12   afterwards.

13        Q.  And so, in your view, that's the inspection?

14        A.  That would be an inspection from -- on the

15   supervisor's part.  He gets to choose which ones he wants.

16        Q.  And does the supervisor write a report of any

17   kind or?

18        A.  Not unless there's a problem.

19        Q.  Are you aware of any discipline being imposed for

20   failure to comply with maintenance standards?

21            How is accountability achieved?

22            MS. COLEMAN:  Compound.

23            THE WITNESS:  That's one avenue of -- compound --

24   recurring issues would be another of the same issue.

25            Employees' failure to even complete a task would



EXHIBIT 22

D. BENNETT
May 1, 2024

Adriana S. Angulo, CSR 13824

SD743505:  Vista - January 17, 2024 Inspection

DARREN SCOTT BENNETT - PMK - 30(B)(6)                                    JOB NO. 950098
MAY 01, 2024

```
 1              REPORTER'S CERTIFICATE

 2        I, Adriana S. Angulo, Certified Shorthand Reporter in

 3   and for the State of California, do hereby certify:

 4        That the witness in the foregoing deposition was by

 5   me first duly sworn to tell the truth, the whole truth,

 6   and nothing but the truth in the foregoing cause; that the

 7   deposition was then taken before me at the time and place

 8   therein named; that said deposition was reported by me in

 9   shorthand and later transcribed under my direction, and

10   the preceding pages contain a true record of the testimony

11   of the witness; and I do further certify that I am a

12   disinterested person and am in no way interested in the

13   outcome of said action, or connected with or related to

14   any of the parties in said action, or to their respective

15   counsel.

16          The dismantling, unsealing, or unbinding of the

17   original transcript will render the Reporter's

18   Certification null and void.

19          IN WITNESS WHEREOF, I have hereunto set my hand

20   this 11th day of May 2024.

21

22

23   _____
     Adriana S. Angulo
24   Certificate No. 13824

25
```

# EXHIBIT H

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>      v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>        Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXPERT REPORT OF MATTHEW B. ROSS, PH.D.**<br><br>Judge:     Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

EXPERT REPORT OF MATTHEW B. ROSS, PH.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

I, Matthew B. Ross, Ph.D., declare:

1.    A true and correct copy of my expert report is attached hereto as **Exhibit A**.

### PROFESSIONAL BACKGROUND AND QUALIFICATIONS

2.    I am an Associate Professor of Economics and Public Policy at Northeastern University and serve as an independent consultant for the U.S. Department of Justice Civil Rights Division and the New Jersey Office of the Attorney General.  I also work as an independent consultant and subject matter expert for both the U.S. Department of Justice Civil Rights Division and the New Jersey Office of the Attorney General.  I am recognized as a national expert in analyzing policing data for discrimination.  I developed the "Connecticut Model" for identifying and mitigating racial and ethnic disparities in police traffic stops.  This model has been adopted by numerous states and endorsed by national advocacy organizations.  The U.S. Department of Justice has integrated my framework into its enforcement activities and has invited me to serve as a subject matter expert.  My scholarly work on testing for discrimination in policing data has been published in highly ranked academic journals.  My research has been funded by the National Science Foundation, the Russell Sage Foundation, Arnold Ventures, and the U.S. Department of Transportation.  A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit B**.

3.    I authored or co-authored the following publications that have been published in journals, conference proceedings, or books over the past ten years:

- Yu, H., Marschke, G., Ross, M.B. et al. Publish or Perish: Selective Attrition as a Unifying Explanation for Patterns in Innovation over the Career. *Journal of Human Resources* 59-1 (2024)

- Kalinowski, J.J., Ross, S.L., Ross, M.B. Endogenous Driving Behavior in Tests of Racial Profiling. *Journal of Human Resources* 59-2 (2023).

- Ross, M.B., Glennon, B.M., Murciano-Goroff, R. et al. Women are credited less in science than men. *Nature* 608, 135–145 (2022).

- Ross, M.B., Kalinowski, J.J., Barone, K. Testing for Disparities in Traffic

Stops: Best Practices from the Connecticut Model. *Criminology & Public Policy* 19-4 (2020).

- Chevalier, G. Chomienne, C. Jeanrenaud, N.G., Lane, J.I., Ross, M.B. A New Approach for Estimating Research Impact: An Application to French Cancer Research. *Quantitative Science Studies* 1-4 (2020).

- Ross, M.B. The Effect of Intensive Margin Changes to Task Content on Employment Dynamics over the Business Cycle. *Industrial and Labor Relations Review* 74-4 (2020).

- Kalinowski, J.J., Ross, S.L., Ross, M.B. Now You See Me, Now You Don't: The Geography of Police Stops. *American Economic Review Papers and Proceedings* 109 (2019).

- Couch, K.A., Ross, M.B., Vavrek, J. Career Pathways and Integrated Instruction: A National program Review of I-Best Implementations. *Journal of Labor Research* 39 (2018).

- Kehoe, A.K., Vetle, T.I., Ross, M.B., Smalheiser, N.R. Predicting MeSH Beyond MEDLINE. Association of Computing Machinery (ACM): *Proceedings of Workshop on Scholarly Web Mining* (2018).

- Ross, M.B. Routine-Biased Technical Change: Panel Evidence of Task Orientation and Wage Effects. *Labour Economics* 48 (2017).

- Ross, M.B. Ikudo, A., Lane, J.I. The Food Safety Research Workforce and Economic Outcomes. *Measuring the Economic Value of Research: The Case of Food Safety*, c. 6 pp. 100- 112, Cambridge University Press (2017).

- King, J.L. Johnson, S.R., Ross, M.B. Assessing the Effects of Food Safety Research on Early Career Outcomes. *Measuring the Economic Value of Research: The Case of Food Safety*, c. 8 pp. 100- 112, Cambridge University Press (2017).

4.    In the past four years, I have testified in one case: *NOPD Consent Decree, USA v. City of New Orleans*, Case No. 12-cv-1024 (E.D. La.) (June 5, 2024 testimony).

5.    I am being compensated at a rate of $160 per hour for work on this expert report, and $200 per hour for depositions and trial testimony.

## SCOPE OF EXPERT REPORT

6.    The plaintiffs in the case Dunsmore v. State of California et al. (Case No. 3:20-cv-00406-AJB-DDL) allege that the San Diego County Sheriff's Department disproportionately targets and incarcerates members of Black and Latino(a) communities using state funds.  They cite a 2021 study by the Center for

Policing Equity, which reports that in 2020, 16% of all arrestees and 11% of non-traffic stop subjects were Black/AA, despite Black/AA residents comprising only 5% of San Diego County's population.  A 2022 study by Catalyst California and the ACLU of Southern California indicates that Black/AA residents were 2.2 times more likely than White residents to be stopped by the San Diego County Sheriff's Department.

7.      This expert report evaluates these and other claims in Plaintiffs' Third Amended Complaint using the Sheriff's Department administrative data obtained during discovery, as well as public and unreleased traffic stop data, employing advanced empirical techniques to confirm that the data reveal significant disparities affecting Black/AA and Latino(a) individuals consistent with disparate treatment.

8.      This report addresses two core questions from the plaintiffs' complaint: (1) Does the data support the claim that the San Diego County Sheriff's Department disproportionately targets Black/AA and Hispanic/Latino(a) communities with discretionary stops? (2) Does the data support the claim that these communities are disproportionately more likely to be detained and arrested?

## DATA SUMMARY

9.      The analysis in this report is based on two distinct datasets: computer-aided dispatch (CAD) records, which are linked to arrest and other administrative records, and data from the Racial and Identity Profiling Act (RIPA) on stops reported to the State of California by the San Diego County Sheriff's Department. The CAD dataset comprises 1,970,623 events from 2021 to 2023, with 1,460,946 involving an officer responding on the scene and 184,187 categorized as traffic or subject stops.  Under California law, one would expect the RIPA dataset to reflect a similar number of stops.  However, the RIPA data documented only 67,658 stops during the same period.  Notably, stops recorded in the CAD system but absent from the RIPA dataset are disproportionately likely to have occurred in predominantly Black/African American or Hispanic/Latino(a) neighborhoods.  While the CAD data

EXPERT REPORT OF MATTHEW B. ROSS, PH.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  appears to encompass the full scope of stops, it lacks race or ethnicity information

2  for the individuals involved.  Consequently, this analysis conducts separate

3  evaluations for each dataset, though it is significantly constrained by the limitations

4  inherent in both sources.  While I cannot definitively conclude that the Sheriff's

5  department has intentionally underreported data to RIPA or that it has strategically

6  chosen not to collect race/ethnicity in CAD, these two factors have resulted in a

7  significant barrier to obtaining estimates of the full extent of disparate treatment

8  within the agency.

9       10.    The information and opinions contained in this report are based on

10  evidence, documentation, and/or observations available to me.  The Sheriff's

11  Department administrative data analyzed in this report and other materials I have

12  reviewed in connection with this report are identified in the index attached hereto as

13  **Exhibit C**.  I reserve the right to modify or expand these opinions should additional

14  information become available to me.

**ANALYTICAL METHODS**

16       11.    This report employs advanced econometric techniques and quasi-

17  experimental tests to analyze the data.  Multivariate regression analysis is used to

18  control for various circumstantial factors influencing stops and arrests.  Despite the

19  limitations of the Sheriff's Department data and the conservative nature of my

20  analytical approach, the findings consistently show significant disparities in the

21  likelihood of stops and arrests for Black/AA and Hispanic/Latino(a) individuals

22  compared to their White counterparts.

**SUMMARY OF OPINIONS**

24       12.    The findings from this expert report provide compelling evidence that

25  the San Diego County Sheriff's Department engages in practices that

26  disproportionately target and arrest Black/AA and Hispanic/Latino(a) individuals.

27  My key opinions, formed from my analysis of the Sheriff's Department data

28  include:

EXPERT REPORT OF MATTHEW B. ROSS, PH.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

## I.    Opinion One:  The Sheriff's Department Systematically Underreports Stops, Particularly in Black and Hispanic Neighborhoods

13.    The CAD data shows 163,012 stops, but only 67,658 are reported in RIPA, with pronounced underreporting in Black/AA and Hispanic/Latino(a) neighborhoods.  This discrepancy indicates systemic issues in data reporting, leading to potential sample selection bias and undermining efforts to assess racial profiling.

## II.    Opinion Two:  The Sheriff's Department Stops Black People Nearly 30% More than White People in Daylight

14.    RIPA data shows stops of Black/AA individuals are 29.2% more likely in daylight when race is more visible as compared to White non-Hispanic motorists.

## III.    Opinion Three:  The Sheriff's Department Is Less Likely to Stop People in White, Non-Hispanic Neighborhoods and More Likely to Stop People in Hispanic Neighborhoods in Daylight

15.    CAD data indicates stops are less likely to occur in White non-Hispanic dominant neighborhoods during daylight relative to darkness, and more likely to occur in Hispanic/Latino(a) neighborhoods during daylight hours.

## IV.    Opinion Four:  Hispanic Individuals Are Nearly 30% More Likely to Be Arrested After a Stop by the Sheriff's Department than White, Non-Hispanic Individuals

16.    Hispanic/Latino(a) stops are 28.6% more likely to end in arrest, and stops in their neighborhoods are 32.9% more likely to result in arrest.

## V.    Opinion Five:  Hispanic Individuals Are Nearly 20% More Likely to Be Asked to Exit Their Vehicle After a Stop by the Sheriff's Department than White, Non-Hispanic Individuals

17.    Hispanic/Latino(a) motorists are 19.6% more likely to be asked to exit their vehicle and 30.5% more likely to be searched.  Black/AA motorists show similar trends, though only marginally statistically significant.

## VI.    Opinion Six:  The Data Show a Pattern of Disparate Treatment by the Sheriff's Department Towards Black and Hispanic People

18.    Collectively, the results demonstrate a pattern of disparate treatment

EXPERT REPORT OF MATTHEW B. ROSS, PH.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

# EXHIBIT I

CERTIFIED COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DARRYL DUNSMORE, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:20-cv-00406-AJB-DDL |
| | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| | ) | |
| SAN DIEGO COUNTY SHERIFF'S | ) | |
| DEPARTMENT, COUNTY OF SAN | ) | |
| DIEGO, SAN DIEGO COUNTY | ) | |
| PROBATION DEPARTMENT, and | ) | |
| DOES 1 to 20, inclusive, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

DEPOSITION OF MATTHEW B. ROSS

TAKEN ON

THURSDAY, OCTOBER 17, 2024

DONNA TIERNEY, CSR NO. 13159

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4      DARRYL DUNSMORE, et al.,      )
                                     )
5                Plaintiffs,         )   Case No. 3:20-cv-
                                     )   00406-AJB-DDL
6                                    )
                                     )
7         VS.                        )
                                     )
8                                    )
       SAN DIEGO COUNTY SHERIFF'S    )
9      DEPARTMENT, COUNTY OF SAN     )
       DIEGO, SAN DIEGO COUNTY       )
10     PROBATION DEPARTMENT, and     )
       DOES 1 to 20, inclusive,      )
11                                   )
                                     )
12               Defendants.         )
       _____)

13

14

15

16         Deposition of MATTHEW B. ROSS, taken on behalf of

17     the Defendants, utilizing ZOOM Cloud platform to host

18     all participants from their respective locations,

19     commencing at 9:00 A.M., on Thursday, October 17, 2024,

20     before DONNA TIERNEY, CSR No. 13159, for the State of

21     California, pursuant to Notice.

22

23                        --oOo--

24

25

                                                            2

1    Appearances:

2

3

4    FOR THE PLAINTIFF:

5          ROSEN BIEN GALVAN & GRUNFELD LLP
           BY:  VAN SWEARINGEN, ESQ.
6          101 Mission Street
           Sixth Floor
7          San Francisco, California 94105
           (415) 433-6830
8          Email: Vsearingen@rbgg.com

9

     FOR THE DEFENDANT:

10

           BURKE WILLIAMS & SORENSEN LLP
11         BY:  SUSAN E. COLEMAN, ESQ.
           501 West Broadway
12         Suite 1600
           San Diego, California 92101
13         (619) 814-5800
           Email: Scoleman@bwslaw.com

14

15    ALSO PRESENT:

16            Dr. Brian L. Withrow

17

     ZOOM HOST:

18

              Norman Schall & Associates

19

20

21

22

23

24

25

                                                  3

1   the economic status of the residents?

2       A.   Of which area?  What location are you talking

3   about?  Are you just talking about generally in the

4   United States?

5       Q.   Yeah, generally.  I mean, in San -- I mean, I

6   could -- I don't know if you've been to San Diego, which

7   was subject constitute of your report in this case.

8            Have you been to San Diego?

9       A.   I have.

10      Q.   Okay.  So, for example, La Jolla is one of the

11  more affluent areas in San Diego; right?

12      A.   Yes.

13      Q.   Okay.  And then there are some areas, maybe

14  San Ysidro or National City, which are close to the

15  border, that are less affluent areas or poorer areas;

16  right?

17      A.   Yes.

18      Q.   Okay.  Have you looked at whether it's actually

19  tied -- whether the socioeconomic status of the area has

20  anything to do with the crime rate?

21      A.   If you're asking whether I ran a correlation

22  between the socioeconomics of a particular location and

23  the crime rate associated with that location in

24  San Diego, the answer is no.

25            However, if you're asking whether I controlled

                                                        17

1    for the fact that -- in my report whether I controlled

2    for the fact that there are differences in both crime

3    rates and socioeconomic status across different areas,

4    the answer is yes.

5        Q.    Is it generally true that poorer areas have

6    more crime?

7        A.    I would say that -- that is it generally true,

8    yes.

9        Q.    And have you -- is there any correlation based

10   on your studies and your research and experience between

11   predominantly minority areas and the economic status of

12   the area?  In other words, whether it's more poor, more

13   affluent, is there any relationship between those?

14       A.    You know, I don't study the income distribution

15   and demography, but, yeah, I've read, you know, numerous

16   other studies that show that there's a correlation

17   between race and socioeconomic status.  So, yeah, I

18   think that's a generally known fact.

19       Q.    For example, maybe La Jolla's less diverse in

20   its racial makeup than -- and somewhere like that we

21   talked about San Ysidro or Chula Vista areas near the

22   border, National City, having more minorities in those

23   areas that also happen to be less affluent; right?

24       A.    Yes.

25       Q.    In your CV, you have two publications related

18

1    2020, 16 percent of all arrestees and 11 percent of non-

2    traffic stops subjects were black or African-American

3    despite black African-American residents comprising only

4    5 percent of San Diego county's population; right?  You

5    cite that in your report?

6        A.   Yes.  I don't know if I cite that in my report.

7    I know it's cited in the complaint.  I can't recall if I

8    mentioned that as a motivating factor in my report for

9    why this analysis was taking place.  I may have done

10   that, yes.

11            Yeah, I don't know that I'm citing that in the

12   portion that you're highlighting.  I'm referencing the

13   complaint citing that.

14       Q.   And then the complaint also cites that ACLU

15   study that seems to compare stops to residents; correct?

16       A.   Correct.  The complaint does, and I'm

17   referencing that as motivation for my analysis.  That's

18   correct.

19       Q.   Okay.  But you would never compare to

20   residents; right?

21       A.   I would never compare to the residential

22   population.

23       Q.   Why is that?

24       A.   I've never done that in any of my analyses.

25       Q.   Why wouldn't you compare to residents?

                                                        119

1    night and dayshifts for officers in San Diego County?

2        A.  I don't know the exact shift rotation of

3    officers at different times of day as it relates to

4    San Diego County, no.

5        Q.  And since you said the CAD data didn't have the

6    data -- didn't have the race and ethnic data that the

7    RIPA data showed, is it -- are you saying that in the

8    CAD data you actually don't know the race or the

9    ethnicity of the individual arrested?

10       A.  No, incorrect.  In the CAD data, you don't know

11   the race and ethnicity of the individual involved in the

12   incident.  If that incident escalates to an arrest, you

13   know the race.

14           In my rebuttal as -- you know, as I explained

15   in his rebuttal report to your expert's report, there

16   was a confusion between the CAD data and the arrest

17   data.  Those two things are not the same dataset.  So

18   you know the race of arrested individuals which you can

19   link to CAD, but CAD incidents that don't end in arrest,

20   you only know a -- I know a precise geographic location

21   where the incident occurred, but I don't know the race

22   of the person.

23       Q.  Did you assess whether people arrested, whether

24   that matched the predicted race that you developed from

25   the area they were arrested?

                                                      170

1          In other words, if someone was arrested in a

2    predominantly Hispanic neighborhood, so you presumed

3    based on the lack of CAD data that they were also

4    Hispanic, then track to the arrest data to determine if

5    that was true.

6          MR. SWEARINGEN:  Objection.  Misstates

7    testimony.  Compound.

8          THE WITNESS:  I did not -- I made no such

9    assumption that an incident in a Hispanic neighborhood

10   definitively involved a Hispanic individual.  I did not

11   make that assumption.

12    BY MS. COLEMAN:

13        Q.   Well, when you said there wasn't data but you

14   took the information from the area where they were

15   stopped or arrested, how did you use that information?

16        A.   To look at patterns of arrest and patterns of

17   stop in different neighborhoods.

18        Q.   And what was your conclusion about that?

19        A.   That there are more stops of minority -- there

20   are more stops in minority neighborhoods during daylight

21   in the veil of darkness setting and that stops in

22   minority neighborhoods even conditional on all the

23   circumstances available -- circumstantial data available

24   in the CAD data, they were more likely to end in arrest

25   in minority neighborhoods.

                                                        171

1    Q.   Did you assess whether more officers are

2    assigned to that area than other areas?

3    A.   It shouldn't matter.  I controlled for the

4    census block, which implicitly controls for things like

5    that.

6    Q.   Is it your opinion, then, that the Sheriff's

7    department assigns officers to different beats based on

8    census data?

9    A.   I have no opinion on that.

10    Q.   Well, you said the population shouldn't matter.

11    A.   No, that's not what I said.  I said I put in a

12    control, a series of indicator controls -- I don't

13    remember how many.  They're listed in the report -- for

14    everyone single census block.

15         So if you're telling me that the county, you

16    know, assigns officers differently across different

17    locations, then those controls account for that.

18         They also account for a million other reasons

19    why different locations might be different, you know,

20    might vary.  A call for service volume, crime incidents,

21    location to the beach, location to the border, all of

22    that stuff is why I included to the census tract level

23    controls.

24    Q.   So for any of your analyses using CAD data,

25    other than arrests, you don't actually know the race of

172

1    the individual?

2        A.   I don't -- I didn't use the race of arrested

3    individuals because the race of arrested individuals is

4    not relevant to the question.  The question is whether

5    minority individuals are disproportionately likely to be

6    subjected to arrest, not whether the composition of

7    those arrested is more likely to be minority.

8            Those are two different questions and two

9    different statistics.  One is not relevant to a question

10   of disparity and one is.

11       Q.   What is the difference between someone

12   subjected to an arrest and someone arrested?

13       A.   One is the probability of being arrested

14   conditional on interacting with police.  That is a

15   different probability than the probability of someone's

16   race conditional on being arrested.  Those two things

17   are not the same thing.

18       Q.   I don't think that's what I asked.

19           MR. SWEARINGEN:  Objection.  Argumentative.

20           MS. COLEMAN:  Again, that wasn't a question.

21           Ms. Tierney, could possibly read back my last

22   question.

23           (The record was read as follows:

24           "QUESTION: What is the difference

25           "between someone subjected to an

                                                            173

1    night and dayshifts for officers in San Diego County?

2        A.    I don't know the exact shift rotation of

3    officers at different times of day as it relates to

4    San Diego County, no.

5        Q.    And since you said the CAD data didn't have the

6    data -- didn't have the race and ethnic data that the

7    RIPA data showed, is it -- are you saying that in the

8    CAD data you actually don't know the race or the

9    ethnicity of the individual arrested?

10       A.    No, incorrect.  In the CAD data, you don't know

11   the race and ethnicity of the individual involved in the

12   incident.  If that incident escalates to an arrest, you

13   know the race.

14           In my rebuttal as -- you know, as I explained

15   in his rebuttal report to your expert's report, there

16   was a confusion between the CAD data and the arrest

17   data.  Those two things are not the same dataset.  So

18   you know the race of arrested individuals which you can

19   link to CAD, but CAD incidents that don't end in arrest,

20   you only know a -- I know a precise geographic location

21   where the incident occurred, but I don't know the race

22   of the person.

23       Q.    Did you assess whether people arrested, whether

24   that matched the predicted race that you developed from

25   the area they were arrested?

                                                    170

1           In other words, if someone was arrested in a

2    predominantly Hispanic neighborhood, so you presumed

3    based on the lack of CAD data that they were also

4    Hispanic, then track to the arrest data to determine if

5    that was true.

6           MR. SWEARINGEN:  Objection.  Misstates

7    testimony.  Compound.

8           THE WITNESS:  I did not -- I made no such

9    assumption that an incident in a Hispanic neighborhood

10   definitively involved a Hispanic individual.  I did not

11   make that assumption.

12   BY MS. COLEMAN:

13       Q.  Well, when you said there wasn't data but you

14   took the information from the area where they were

15   stopped or arrested, how did you use that information?

16       A.  To look at patterns of arrest and patterns of

17   stop in different neighborhoods.

18       Q.  And what was your conclusion about that?

19       A.  That there are more stops of minority -- there

20   are more stops in minority neighborhoods during daylight

21   in the veil of darkness setting and that stops in

22   minority neighborhoods even conditional on all the

23   circumstances available -- circumstantial data available

24   in the CAD data, they were more likely to end in arrest

25   in minority neighborhoods.

171

1    Q.   Did you assess whether more officers are

2    assigned to that area than other areas?

3    A.   It shouldn't matter.  I controlled for the

4    census block, which implicitly controls for things like

5    that.

6    Q.   Is it your opinion, then, that the Sheriff's

7    department assigns officers to different beats based on

8    census data?

9    A.   I have no opinion on that.

10   Q.   Well, you said the population shouldn't matter.

11   A.   No, that's not what I said.  I said I put in a

12   control, a series of indicator controls -- I don't

13   remember how many.  They're listed in the report -- for

14   everyone single census block.

15        So if you're telling me that the county, you

16   know, assigns officers differently across different

17   locations, then those controls account for that.

18        They also account for a million other reasons

19   why different locations might be different, you know,

20   might vary.  A call for service volume, crime incidents,

21   location to the beach, location to the border, all of

22   that stuff is why I included to the census tract level

23   controls.

24   Q.   So for any of your analyses using CAD data,

25   other than arrests, you don't actually know the race of

172

1          "arrest and someone arrested?")

2          THE WITNESS:  I think that my answer did answer

3     that question, Ms. Coleman.

4      BY MS. COLEMAN:

5          Q.  Well, you used different words than I did; so I

6     don't understand your answer.

7          So what is the difference between someone

8     subjected to arrest versus someone arrested?

9          A.  One is the probability that someone is

10     arrested, the first.  Someone subjected to arrest is

11     about assessing the probability that someone is arrested

12     conditional on the race and the circumstantial factors

13     that are involved in the interaction with police.  That

14     is what I focused on.

15          The second is the probability that someone is

16     black or Hispanic conditional on them already having

17     been arrested.  That probability is not related to

18     disparities.

19          At issue in this case is differential treatment

20     in terms of the decision to arrest an individual, which

21     is the probability, the first one is what I analyzed.

22          Q.  Do you have any opinions based -- do you have

23     any opinions about racial disproportionateness of people

24     in the county jail?

25          A.  I have no opinion on that.

                                                    174

1

2        Q.   You understand that the people who are in the

3   San Diego County jail are not just arrested by the

4   Sheriff's office; right?

5        A.   My charge was to analyze differential treatment

6   in the decision to arrest and the decision to stop

7   individuals.  The proportion of people that are in the

8   county jail is not the relevant statistic to answering

9   that question.  So I did not analyze that, and I have no

10  opinion on it.

11       Q.   And you understand that the Sheriff's office --

12  that the county jail houses more people -- houses people

13  that are arrested by agencies other than the San Diego

14  County Sheriff's Office; correct?

15       A.   If that -- I'll take your word for it, but I

16  don't know that for a fact, and I don't think that was

17  relevant to my analysis.

18       Q.   Your analysis didn't get beyond the arrest

19  point?

20       A.   No.

21       Q.   Is that correct?

22       A.   No.  I focussed on the decision to stop and the

23  decision to arrest.

24       Q.   Okay.  So I'm correct that your analysis did

25  not progress beyond that actual arrest?

                                                    175

1      I, DONNA TIERNEY, a Certified Shorthand Reporter

2  for the State of California, do hereby certify:

3      That the foregoing proceedings were taken before me

4  at the time and place herein set forth; that any witness

5  in the foregoing proceedings, prior to testifying, was

6  administered an oath; that a record of the proceedings

7  was made by me using machine shorthand which was

8  thereafter transcribed under my direction; that the

9  foregoing transcript is a true record of the testimony

10  given.

11      Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of the proceedings, review of the

14  transcript was requested.

15      I further certify that I am neither financially

16  interested in the action nor a relative or employee of

17  any attorney or any party to this action.

18      IN WITNESS WHEREOF, I have this date subscribed my

19  name.

20  Dated: November 1, 2024

21

22

23

24  _____

    DONNA TIERNEY

25  CSR NUMBER 13159

233

# EXHIBIT J

1          **UNITED STATES DISTRICT COURT**

2          **SOUTHERN DISTRICT OF CALIFORNIA**

3

4

5

6
   DARRYL DUNSMORE, ANDREE         )
7  ANDRADE, ERNEST ARCHULETA,      )
   JAMES CLARK, ANTHONY            )
8  EDWARDS, LISA LANDERS,          )
   REANNA LEVY, JOSUE LOPEZ,       ) CASE NO.
9  CHRISTOPHER NELSON,             ) 3:20-cv-00406-AJB-DDL
   CHRISTOPHER NORWOOD, JESSE      )
10 OLIVARES, GUSTAVO               )
   SEPULVEDA, MICHAEL TAYLOR,      )
11 And LAURA ZOERNER, on behalf    )
   of themselves and all others   )
12 similarly situated,            )
                                  )
13              Plaintiffs,       )
                                  )
14       vs.                      )
                                  )
15 SAN DIEGO COUNTY SHERIFF'S      )
   DEPARTMENT, COUNTY OF SAN       )
16 DIEGO, SAN DIEGO COUNTY         )
   PROBATION DEPARTMENT, and       )
17 DOES 1 to 20, inclusive,        )
                                  )
18              Defendants.       )
   _____)

19

20

21     **ZOOM CONFERENCE DEPOSITION OF DEBRA GRAHAM**

22        **FRIDAY, NOVEMBER 1, 2024**

23

24

25     ROBIN E. KIBBE
       CSR No. 7507

1          **UNITED STATES DISTRICT COURT**

2          **SOUTHERN DISTRICT OF CALIFORNIA**

3

4

5

6    DARRYL DUNSMORE, ANDREE          )
     ANDRADE, ERNEST ARCHULETA,       )
7    JAMES CLARK, ANTHONY             )
     EDWARDS, LISA LANDERS,           )
8    REANNA LEVY, JOSUE LOPEZ,        ) CASE NO.
     CHRISTOPHER NELSON,              ) 3:20-cv-00406-AJB-DDL
9    CHRISTOPHER NORWOOD, JESSE       )
     OLIVARES, GUSTAVO                )
10   SEPULVEDA, MICHAEL TAYLOR,       )
     And LAURA ZOERNER, on behalf     )
11   of themselves and all others    )
     similarly situated,             )
12                                    )
                    Plaintiffs,       )
13                                    )
            vs.                       )
14                                    )
     SAN DIEGO COUNTY SHERIFF'S       )
15   DEPARTMENT, COUNTY OF SAN        )
     DIEGO, SAN DIEGO COUNTY          )
16   PROBATION DEPARTMENT, and        )
     DOES 1 to 20, inclusive,        )
17                                    )
                                      )
18                                    )
                    Defendants.       )
19   _____)

20

21

22

23

24    ////                           ////

25    ////                           ////

1

2

3

4                    ZOOM CONFERENCE DEPOSITION OF

5       DEBRA GRAHAM, taken by the Defendant,

6       SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY

7       OF SAN DIEGO, SAN DIEGO COUNTY PROBATION

8       DEPARTMENT, and DOES 1 to 20 inclusive,

9       utilizing ZOOM platform to host all

10      participants from their respective locations,

11      commencing at 7:59 a.m., Friday,

12      November 1, 2024, before Robin E. Kibbe,

13      Certified Shorthand Reporter, License No. 7507,

14      for the State of California, pursuant to

15      Notice.

16

17

18

19

20                        ---oOo---

21

22

23

24

25

1    APPEARANCES OF COUNSEL:

2

3

4    For the Plaintiffs, DARRYL DUNSMORE, ANDREE
     ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY
5    EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE
     LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD,
6    JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL
     TAYLOR, and LAURA ZOERNER, on behalf of
7    themselves and all others similarly situated:

8

9
            ROSEN BIEN GALVAN & GRUNFELD LLP
10          BY:  BEN HOLSTON, ESQ.
                 GAY GRUNFELD, ESQ.
11          101 Mission Street
            Sixth Floor
12          San Francisco, CA 94105-1738
            hchartoff@rbgg.com
13          (APPEARING via ZOOM conference)

14

15
     For the Defendant, SAN DIEGO COUNTY SHERIFF'S
16   DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO
     COUNTY PROBATION DEPARTMENT, and DOES 1 to 20,
17   inclusive:

18

19
            BURKE, WILLIAMS & SORENSEN, LLP
20          BY:  ELIZABETH M. PAPPY, ESQ.
            60 South Market Street
21          Suite 1000
            San Jose, CA 95113-2336
22          epappy@bwslaw.com
            (APPEARING via ZOOM conference)

23

24

25

1                So I don't think that's really fair

2       for me to even comment on that.

3                    I'd have to be around them and have

4       to ask for things to be done and corrected

00:-45  5       before I could say that somebody was having an

6       attitude or refusing or rejecting what I'm

7       saying or whatever.

8       BY MS. PAPPY:

9           Q.    Okay.  So it's fair to say that you

00:-45  10      don't know what the attitude of the San Diego

11      corrections staff is to -- to cleaning issues

12      that you may have raised in your report because

13      you just don't know them well enough; correct?

14                    MR. HOLSTON:  Objection.  Vague.

00:-44  15                    THE WITNESS:  Correct.

16                    MR. HOLSTON:  Misstates testimony.

17      Calls for speculation.

18                    Debbie, let me finish the objection

19      before you respond.

00:-44  20                    THE WITNESS:  Okay.  Sorry.

21                    MR. HOLSTON:  Now go ahead.

22                    THE WITNESS:  Can you please repeat

23      the question?  Because the correct may not be

24      the entire answer.

00:-43  25                    MS. PAPPY:  I don't need to repeat

1          MS. PAPPY:  Okay.  Ben, do you see

2     the report in front of you?

3          MR. HOLSTON:  Yeah.  I'm seeing

4     Page 10 of her initial report.

5          MS. PAPPY:  Okay.  All right.

6          Q.    So I am on Page 10 of your original

7     report.

8          A.    Yes.

9          Q.    And as soon as you get there, let

10    me know.

11         A.    I got it.

12         Q.    Okay.

13         A.    I'm there.

14         Q.    Okay.  So the first picture top

15    left, it looks like a clogged toilet.

16             Did you try to flush that?

17         A.    No.

18         Q.    And how long had the stuff in the

19    toilet been sitting there before you got there?

20         A.    I wouldn't know that.

21         Q.    And in terms of -- was there

22    anything about the -- strike that.

23             Did you talk to anybody to

24    determine whether this toilet shown in the

25    picture on the left is functional?

1       A.      Not -- probably not that particular

2    toilet.  There was one that I did ask, and they

3    said, "We don't use it anymore."

4               Q.      The picture to the right --

5               A.      Yes.

6               Q.      -- the top right of Page 10, this

7    is a different toilet.

8               Why did you take a picture of this

9    toilet?

10              A.      Because it's filthy.

11              Q.      And what about it's filthy?

12              A.      The bowl needs to be -- in this

13   picture, it's hard to see inside of the report.

14              The actual picture is much clearer.

15              But the toilet bowel is in serious

16   need of cleaning.

17              Q.      What type of grime is inside the

18   toilet?

19              A.      Who knows?  Everything.

20              Q.      And so there -- I can't see.

21              Are there feces in there?

22              A.      In that particular picture, I can't

23   tell you.

24              Q.      Is there rust from the fact that

25   it's a stainless steel toilet?

1          A.     No.  But I've had experience to --

2     I've had enough experience to be able to tell

3     you.

4                 Just like you're experienced in

5     your job, some things, you just know it.

6                 So I will tell you that that wall

7     is dirty.

8          Q.     Okay.  Okay.  You say so.

9                 Let's see.  Page 13.

10         A.     Excuse me?  I'm sorry?

11         Q.     Page 13 --

12         A.     Okay.

13         Q.     -- two pictures in the middle of

14    the page.

15         A.     Okay.  Uh-huh.

16         Q.     What's being depicted in the

17    picture to the left?

18                Other than the sink, where is this

19    thing?

20         A.     That is the inside of a filthy

21    urinal.

22         Q.     How long had this urinal been in

23    this state before you took the picture?

24         A.     I don't know that.

25                But by the contents that is in

1    there, it's been a while.

2         Q.    Define "a while."

3         A.    I would probably say more than a

4    month.

00:-11    5         Q.    And -- I mean, what in particular

6    about the stuff in there tells you that it has

7    been there a month?

8              Is it the amount or the type?

9         A.    The amount and the way that the

00:-10    10    grime looks on the inside, the walls of the

11    urinal.

12              Just the whole thing.  You just

13    know that it didn't happen yesterday.

14         Q.    Did you ask any of the staff

00:-10    15    present when the last time it was cleaned?

16         A.    No.

17         Q.    Why not?

18         A.    Basically because they weren't very

19    helpful.

00:-10    20              They really didn't want me asking

21    them -- first of all, I couldn't ask any

22    questions unless the attorneys were standing

23    right there.

24              But then they weren't -- they

00:-10    25    weren't overly helpful to me.

1      Q.      Okay.  I don't understand.

2              Did you ask the deputies that were

3      there when the last time was that this was

4      cleaned?

5              Whether you had to ask through the

6      lawyers and they were unhelpful or not, did you

7      ask?

8      A.      I did not ask the deputies the last

9      time it had been cleaned.

10     Q.      Okay.  And you didn't ask the

11     lawyers to ask the deputies the last time it

12     had been cleaned; correct?

13     A.      No.

14     Q.      Okay.

15     A.      No, I didn't.

16     Q.      Okay.  All right.

17             And what about the picture on the

18     right on Page 13?

19             What is that showing us?

20     A.      That's a picture of a bathroom.

21             What I am talking about, I'd have

22     to -- I'm probably talking about the disrepair

23     of the floor with the mat covering it up.

24     Q.      And that is a cleanliness issue?

25     A.      Sure.  Yes.

1          Q.    So they need to fix all the floors?

2                MR. HOLSTON:  Objection.  Vague.

3     Misstates prior testimony.

4                THE WITNESS:  They need to correct

5     where the floors are in disrepair.

6     BY MS. PAPPY:

7          Q.    Meaning they'd have to fix it;

8     right?

9          A.    Well, yeah.  That's what "correct"

10    means.  Yes.  They would need to fix it.

11         Q.    Okay.

12         A.    How they do that, there are many

13    ways to do that.

14         Q.    Okay.  All right.

15                The top of Page 14 there are two

16    pictures.  Picture on the left is a drain.

17                What am I looking at there?

18         A.    The drain is dirty, and that's the

19    drain that has drain flies.

20         Q.    Is the picture to the right the

21    same drain but pictures of the flies circled?

22         A.    Yes, it is.

23         Q.    How common are drain flies in old

24    buildings such as George Bailey?

25                MR. HOLSTON:  Objection.  Vague.

1           THE WITNESS:  They can be very
2    common if you don't keep your drains clean.
3           If you have a system in place to
4    clean your drains, they're not that common.
5    BY MS. PAPPY:
6        Q.    So are you telling me that the
7    drain flies just -- if they're -- if you have
8    the system there, they're never going to come?
9        A.    No.  I didn't say that.
10       Q.    Okay.  So is it fair to say that
11   you should have a system in place because
12   they're going to come when you have, you know,
13   old pipes in a facility like George Bailey
14   where people take showers all the time;
15   correct?
16       A.    That's a fair statement.
17       Q.    Okay.  How long had the drain flies
18   on Page 14 been there, the ones that you saw?
19       A.    I wouldn't know that.
20       Q.    What system does the facility --
21   that facility in particular, George Bailey,
22   have in place to deal with drain flies?
23       A.    I don't know.
24       Q.    Let's scroll to Page 19.  There are
25   two photos at the top of the page.

```
1    STATE   OF   CALIFORNIA      )
                                  ) ss.
2    COUNTY OF SAN BERNARDINO     )

3     I, ROBIN E. KIBBE, Certified Shorthand

4    Reporter, License No. 7507, for the State of

5    California, do hereby certify:

6     That, prior to being examined, the witness

7    named in the foregoing deposition, to wit,

8    DEBBIE GRAHAM, was by me duly sworn to testify

9    the truth, the whole truth and nothing but the

10   truth;

11    That said deposition was taken down by me in

12   shorthand at the time and place therein named

13   and thereafter reduced to computer-aided

14   transcription under my direction.

15    That the foregoing transcript, as typed, is a

16   true record of the said proceedings.

17    I further certify that I am not interested in

18   the event of the action.

19

20    WITNESS my hand this ___24TH____ day of

21   _____November_____, 2024.

22

23

24

25
            ROBIN E. KIBBE, C.S.R. NO. 7507
```

# EXHIBIT K

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3          CASE NO. 3:20-CV-00406-AJB-DDL

4

5  DARRYL DUNSMORE, ANDREE ANDRADE,      )
   ERNEST ARCHULETA, JAMES CLARK,        )
6  ANTHONY EDWARDS, LISA LANDERS,        )
   REANNA LEVY, JOSUE LOPEZ,             )
7  CHRISTOPHER NELSON, CHRISTOPHER       )
   NORWOOD, JESSE OLIVARES, GUSTAVO      )
8  SEPULVEDA, MICHAEL TAYLOR, and        )
   LAURA ZOERNER, on behalf of           )
9  themselves and all others similarly   )
   situated,                             )
10                                       )
            Plaintiffs,                  )
11                                       )
               vs.                       )
12                                       )
   SAN DIEGO COUNTY SHERIFF'S            )
13 DEPARTMENT, COUNTY OF SAN DIEGO,      )
   SAN DIEGO COUNTY PROBATION            )
14 DEPARTMENT, and DOES 1 to 20,         )
   inclusive,                            )
15                                       )
            Defendants.                  )
16                                       )
   _____)

17

18

19          DEPOSITION OF MICHELLE AGUINALDO

20       PERSON MOST KNOWLEDGEABLE FOR 30(B)(6)

21            San Diego, California
                  May 1, 2024
22
            Pages 1 through 16, inclusive
23

24       Reported by Adriana S. Angulo, CSR
               Certificate No. 13824
25

```
 1                  UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF CALIFORNIA

 3                 CASE NO. 3:20-CV-00406-AJB-DDL

 4

 5    DARRYL DUNSMORE, ANDREE ANDRADE,     )
      ERNEST ARCHULETA, JAMES CLARK,       )
 6    ANTHONY EDWARDS, LISA LANDERS,       )
      REANNA LEVY, JOSUE LOPEZ,            )
 7    CHRISTOPHER NELSON, CHRISTOPHER      )
      NORWOOD, JESSE OLIVARES, GUSTAVO     )
 8    SEPULVEDA, MICHAEL TAYLOR, and       )
      LAURA ZOERNER, on behalf of          )
 9    themselves and all others similarly )
      situated,                            )
10                                         )
                Plaintiffs,                )
11                                         )
                    vs.                    )
12                                         )
      SAN DIEGO COUNTY SHERIFF'S           )
13    DEPARTMENT, COUNTY OF SAN DIEGO,     )
      SAN DIEGO COUNTY PROBATION           )
14    DEPARTMENT, and DOES 1 to 20,        )
      inclusive,                           )
15                                         )
                Defendants.                )
16    _____ )

17

18

19    DEPOSITION MICHELLE AGUINALDO, Person Most Knowledgeable

20    for 30(B)(6), was taken pursuant to Notice at Burke

21    Williams & Sorensen, 501 West Broadway, Suite 1600,

22    San Diego, California, on Wednesday, May 1, 2024,

23    commencing at 3:42 p.m., before Adriana S. Angulo,

24    CSR No. 13824, a Certified Shorthand Reporter in and for

25    the State of California.
```

MICHELLE AGUINALDO - PMK - 30(B)(6)                    JOB NO. 950099
MAY 01, 2024

```
 1              A P P E A R A N C E S

 2

 3   For the Plaintiffs:

 4        ROSEN BIEN GALVAN & GRUNFELD, LLP

 5        BY:  GAY C. GRUNFELD, ESQ.

 6        101 Mission Street, 6th Floor

 7        San Francisco, California 94105

 8        (415) 433-6830

 9        ggrunfeld@rbgg.com

10

11   For the Defendants:

12        BURKE WILLIAMS & SORENSEN, LLP

13        BY:  SUSAN COLEMAN, ESQ.

14        501 West Broadway, Suite 1600

15        San Diego, California 92101

16        (619) 814-5800

17        scoleman@bwslaw.com

18

19

20

21

22

23

24

25
```

MICHELLE AGUINALDO - PMK - 30(B)(6)                    JOB NO. 950099
MAY 01, 2024

```
 1    far.

 2              THE COURT REPORTER:  Can you repeat that.

 3              MS. COLEMAN:  You've used seven minutes so far.

 4    BY MS. GRUNFELD:

 5       Q.  Are you aware -- have you ever read the third

 6    amended complaint in this case?

 7       A.  No.

 8       Q.  Are you aware that incarcerated people claim that

 9    they are not receiving sufficient clean linens?

10       A.  Yes.

11       Q.  How are you aware of that?

12       A.  I -- just that some -- in general conversation.

13    Nothing specific to this particular suit.

14              I think generally, over my experience, I have

15    heard there been complaints, and they would cause us to

16    make sure that our chemicals are used properly and that we

17    follow the proper protocols to launder the bedding or the

18    clothing.

19       Q.  So when did you make those changes?

20       A.  Just over -- I mean, that would be in the course

21    of my time here at reentry services.

22              So specifically, in the last five years, I don't

23    think that we've made any specific changes to how we

24    launder our clothing.

25       Q.  Do people who soil themselves because they're
```

MICHELLE AGUINALDO - PMK - 30(B)(6)                                JOB NO. 950099
MAY 01, 2024

1   incontinent have a right to fresh clothing?

2        A.   Yes.

3        Q.   Where is that enshrined in policy?

4             MS. COLEMAN:  Objection.  Vague as to enshrined.

5             You can answer, if you know where that is in the

6   policy.

7             THE WITNESS:  I don't know where it is in policy.

8             There is a laundry exchange schedule, but there

9   is an exception that if laundry needs to be exchanged in

10  addition to the required schedule, as needed, for whatever

11  reason, then, yes, laundry will be -- fresh laundry will

12  be given.

13       Q.   Is that written down anywhere?

14       A.   I believe it is.

15       Q.   Where?

16       A.   I can't tell you right now.  I can look it up and

17  I can find out.

18       Q.   Okay.  We'll be finishing this now.  Thank you.

19            MS. GRUNFELD:  Thanks for coming in.

20            THE WITNESS:  Okay.

21            MS. COLEMAN:  So you don't want to know anything

22  about actual laundry, how it's done, how often, anything?

23            MS. GRUNFELD:  I only have 30 minutes on this

24  topic.

25            And how much time did I use?

MICHELLE AGUINALDO - PMK - 30(B)(6)                                JOB NO. 950099
MAY 01, 2024

1                        REPORTER'S CERTIFICATE

2          I, Adriana S. Angulo, Certified Shorthand Reporter in

3      and for the State of California, do hereby certify:

4          That the witness in the foregoing deposition was by

5      me first duly sworn to tell the truth, the whole truth,

6      and nothing but the truth in the foregoing cause; that the

7      deposition was then taken before me at the time and place

8      therein named; that said deposition was reported by me in

9      shorthand and later transcribed under my direction, and

10     the preceding pages contain a true record of the testimony

11     of the witness; and I do further certify that I am a

12     disinterested person and am in no way interested in the

13     outcome of said action, or connected with or related to

14     any of the parties in said action, or to their respective

15     counsel.

16          The dismantling, unsealing, or unbinding of the

17     original transcript will render the Reporter's

18     Certification null and void.

19          IN WITNESS WHEREOF, I have hereunto set my hand

20     this 11th day of May 2024.

21

22

23     _____
       Adriana S. Angulo
24     Certificate No. 13824

25

MICHELLE AGUINALDO - PMK - 30(B)(6)                    JOB NO. 950099
MAY 01, 2024

1              DECLARATION UNDER PENALTY OF PERJURY

2

3        I, MICHELLE AGUINALDO, hereby declare under penalty

4    of perjury that I have read the foregoing deposition and

5    that the testimony contained therein is a true and correct

6    transcription of my testimony given at said time and

7    place.

8

9        Dated this __21st__ day of ____JUNE_____

10   2024, at __SAN DIEGO_____, ____CA_____.
                    (City)                (State)

11

12

13

14                   _Michelle Aguinaldo_____

15                   MICHELLE AGUINALDO

16

17

18

19

20

21

22

23

24

25

# EXHIBIT L

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3            CASE NO. 3:20-CV-00406-AJB-DDL

4

5

6   DARRYL DUNSMORE, ANDREE ANDRADE,      )
    ERNEST ARCHULETA, JAMES CLARK,        )
7   ANTHONY EDWARDS, LISA LANDERS,        )
    REANNA LEVY, JOSUE LOPEZ,             )
8   CHRISTOPHER NELSON, CHRISTOPHER       )
    NORWOOD, JESSE OLIVARES, GUSTAVO      )
9   SEPULVEDA, MICHAEL TAYLOR, and        )
    LAURA ZOERNER, on behalf of           )
10  themselves and all others similarly  )
    situated,                             )
11                                        )
           Plaintiffs,                    )
12                                        )
                vs.                       )
13                                        )
    SAN DIEGO COUNTY SHERIFF'S            )
14  DEPARTMENT, COUNTY OF SAN DIEGO,      )
    SAN DIEGO COUNTY PROBATION            )
15  DEPARTMENT, and DOES 1 to 20,         )
    inclusive,                            )
16                                        )
           Defendants.                    )
17                                        )
    _____)

18

19          DEPOSITION OF ISAAC ALVARADO

20      PERSON MOST KNOWLEDGEABLE for 30(B)(6)

21

22            San Diego, California
                May 3, 2024

23          Pages 1 through 140, inclusive

24

25        Reported by Adriana S. Angulo, CSR
              Certificate No. 13824

1            UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3          CASE NO. 3:20-CV-00406-AJB-DDL

4

5

6    DARRYL DUNSMORE, ANDREE ANDRADE,      )
     ERNEST ARCHULETA, JAMES CLARK,        )
7    ANTHONY EDWARDS, LISA LANDERS,        )
     REANNA LEVY, JOSUE LOPEZ,             )
8    CHRISTOPHER NELSON, CHRISTOPHER       )
     NORWOOD, JESSE OLIVARES, GUSTAVO      )
9    SEPULVEDA, MICHAEL TAYLOR, and        )
     LAURA ZOERNER, on behalf of           )
10   themselves and all others similarly  )
     situated,                             )
11                                         )
             Plaintiffs,                   )
12                                         )
                 vs.                       )
13                                         )
     SAN DIEGO COUNTY SHERIFF'S            )
14   DEPARTMENT, COUNTY OF SAN DIEGO,      )
     SAN DIEGO COUNTY PROBATION            )
15   DEPARTMENT, and DOES 1 to 20,         )
     inclusive,                            )
16                                         )
             Defendants.                   )
17   _____)

18

19

20   DEPOSITION ISAAC ALVARADO, Person Most Knowledgeable for

21   30(B)(6), was taken pursuant to Notice at 501 West

22   Broadway, Suite 1600, San Diego, California, on Friday,

23   May 3, 2024, commencing at 8:58 a.m., before Adriana S.

24   Angulo, CSR No. 13824, a Certified Shorthand Reporter in

25   and for the State of California.

1   them?

2        A.  So the reason why it's -- every facility, again,

3   has different green sheets corresponding to that facility.

4            In the case of San Diego Central Jail, they're

5   required to have them as they're required to have a key

6   set while on duty.  They're attached to a key set at, for

7   example, George Bailey Detention Facility, they wouldn't

8   have them on the key sets.  However, they would have them

9   readily available on the housing floor if they needed

10  access to it.

11       Q.  So there's no policy requiring all sworn staff to

12  carry them on their body?

13       A.  No.

14       Q.  We've gone a tad bit over three hours with you.

15           Mr. Alvarado, I'd like to switch topics to

16  environmental conditions.

17           Have you attended any of the environmental

18  inspections with plaintiff's counsel and their experts?

19       A.  I have not, no, sir.

20       Q.  Why not?

21       A.  It was not part of my job duty at the time, sir.

22       Q.  Did you discuss those inspections with anyone?

23       A.  No, sir.

24       Q.  Did the sheriff's department require cleaning of

25  the facilities before plaintiff's inspections?

ISAAC ALVARADO - PMK - 30(B)(6)                                    JOB NO. 950101
MAY 03, 2024

```
 1              MS. COLEMAN:  Calls for speculation.

 2              THE WITNESS:  I would say not specifically for

 3     inspections, no, sir.

 4     BY MR. SWEARINGEN:

 5         Q.  Do you know that for a fact or are you

 6     speculating?

 7         A.  I would say no only because there's daily

 8     cleanings that happen at every facility.  Unknown if it

 9     was specific for this inspection or not.

10         Q.  So you don't know for plaintiff's inspections

11     whether there was a directive to clean the facilities in a

12     certain way before plaintiff's inspections?

13              MS. COLEMAN:  Calls for speculation.

14              THE WITNESS:  Not to my knowledge, no.

15              MR. SWEARINGEN:  I'm going to object to you

16     again, but we'll carry through with other questions.

17     BY MR. SWEARINGEN:

18         Q.  Have you personally inspected any of the

19     facilities for cleanliness?

20         A.  In what regard, sir?

21         Q.  In regards to carrying out your work activities.

22         A.  During every supervisor's inspection or, you

23     know, security checks and inspection of each floor.

24              For example, at San Diego Central Jail, they're

25     supposed to be inspecting that as well as part of their
```

ISAAC ALVARADO - PMK - 30(B)(6)                                    JOB NO. 950101
MAY 03, 2024

```
 1    duties.
 2         Q.  I'm asking if you ever personally inspected any
 3    of the facilities for cleanliness?
 4         A.  Specifically for cleanliness, no.
 5         Q.  Why not?
 6         A.  Not part of my job duty, sir.
 7         Q.  Is it part of anyone's job duties who work for
 8    the sheriff's department?
 9              MS. COLEMAN:  May call for speculation.  Lack of
10    foundation.
11              THE WITNESS:  Again, to specifically inspect for
12    cleanliness, it should be every supervisor's job to do
13    that when on duty.
14    BY MR. SWEARINGEN:
15         Q.  But it's never been your job duty?
16         A.  As role of supervisor, sure.  But not
17    specifically in my role at DSD, no.
18         Q.  I'm totally confused by your testimony.
19              Have you ever inspected the jail for cleanliness?
20              MS. COLEMAN:  Asked and answered.
21    BY MR. SWEARINGEN:
22         Q.  You said no, but then you said it's part of every
23    supervisor's duty, and that you're a supervisor.
24         A.  Correct.
25         Q.  So you've not complied with your duties as a
```

ISAAC ALVARADO - PMK - 30(B)(6)                                    JOB NO. 950101
MAY 03, 2024

1    supervisor to inspect for cleanliness?

2              MS. COLEMAN:  Objection.  Argumentative.

3              THE WITNESS:  So as I understood the question,

4    sir, you're asking if I inspected specifically for that.

5              Supervisor inspections are specifically for that.

6    They're to inspect the floors and conduct safety checks.

7    In addition to that, they also should be checking for

8    environmental or cleanliness items on the floors.

9    BY MR. SWEARINGEN:

10        Q.  But you've never done that?

11             MS. COLEMAN:  Misstates testimony.

12             THE WITNESS:  I have done that.

13   BY MR. SWEARINGEN:

14        Q.  Okay.  I thought you said you never inspected the

15   jail for cleanliness.

16        A.  Specifically for cleanliness, no, as stated

17   before.

18        Q.  I am again confused.

19        A.  Sure.  You asked me if I inspected the jails

20   specifically for cleanliness.  As a supervisor, again, the

21   duties are to conduct safety checks and ensure all things

22   that we went through on I.64, as well as inspect it for

23   cleanliness.

24             So not specifically for cleanliness, but it was

25   part of what I was inspecting as a supervisor and doing my

ISAAC ALVARADO - PMK - 30(B)(6)                                    JOB NO. 950101
MAY 03, 2024

1    checks.  If that makes sense.

2        Q.  It makes no sense.  It really doesn't.

3        A.  Okay.  So you asked the question if I

4    specifically inspected each facility in regards to

5    cleanliness, correct?

6        Q.  I don't think I used the word specifically, no.

7        A.  I think I asked specifically.  I mean, it's on

8    the record.  But --

9        Q.  I asked whether you have inspected any of the

10   facilities for cleanliness.

11       A.  Right.

12           And then I asked, specifically for cleanliness?

13           And I believe you said yes, or am I misstating?

14           MS. COLEMAN:  Anyway, he's saying he's generally

15   looked at it during his supervisory review, but not

16   specifically only for cleanliness.

17           THE WITNESS:  Correct.

18           MS. COLEMAN:  Just to speed it up.

19   BY MR. SWEARINGEN:

20       Q.  Okay.  In your opinion, are the jails currently

21   clean and hygienic?

22           MS. COLEMAN:  Objection.  Vague as to hygienic.

23           This witness can talk about the cleaning

24   schedules and the cleaning crews that come through and

25   what they do.

ISAAC ALVARADO - PMK - 30(B)(6)                                JOB NO. 950101
MAY 03, 2024

 1            MR. SWEARINGEN:  I'll let him answer the
 2   question.
 3            THE WITNESS:  Can you repeat the question, sir.
 4   BY MR. SWEARINGEN:
 5       Q.  In your opinion, are the jails currently clean
 6   and hygienic?
 7            MS. COLEMAN:  Compound.  Overly broad.  Vague.
 8            THE WITNESS:  Can you define hygienic, sir,
 9   please.
10   BY MR. SWEARINGEN:
11       Q.  Sure.
12            Clean to the point that people are not likely to
13   contract diseases or illnesses from their conditions?
14       A.  To that point, I would say yes, sir.
15            MR. SWEARINGEN:  I'm sorry.  I'm going to stop
16   the record for a second.  I'm a little confused about the
17   ordering of my exhibits.
18            (A recess is taken.)
19   BY MR. SWEARINGEN:
20       Q.  Mr. Alvarado, in terms of the jail facilities
21   being clean and hygienic, would you say that the jails are
22   currently free of dirt, mold, insects, and vermin?
23            MS. COLEMAN:  Compound.  Overly broad.
24            THE WITNESS:  The -- what were they, dirt and
25   what else?

ISAAC ALVARADO - PMK - 30(B)(6)                                    JOB NO. 950101
MAY 03, 2024

```
1            THE WITNESS:  Some vents are dirty at times.
2    BY MR. SWEARINGEN:
3         Q.  How often are hygiene inspections conducted in
4    the jails?
5         A.  Hygiene inspections should be conducted weekly.
6         Q.  At all jail facilities?
7         A.  Yes.
8         Q.  How often does the facility commander personally
9    inspect jail facilities?
10        A.  I believe that would vary on the facility
11   commander.
12        Q.  Does the facility commander inspect the jails for
13   cleanliness and sanitation?
14            MS. COLEMAN:  Calls for speculation as to what
15   the facility commander does.
16            THE WITNESS:  They may, absolutely.
17   BY MR. SWEARINGEN:
18        Q.  Is it a requirement that they do so?
19        A.  Not to my knowledge, no.
20        Q.  What is inspected regarding cleanliness and
21   sanitation as part of the weekly checks?
22        A.  The common area or day room of the modules should
23   be free of trash.  The common areas should be in good
24   working order.  As part of that, hygiene inspection,
25   something is not in working order, work orders to fix or
```

ISAAC ALVARADO - PMK - 30(B)(6)                                    JOB NO. 950101
MAY 03, 2024

1    replace said items should be noted.

2              While inspecting cells, you want to make sure

3    everything is in proper working order inside the cells.

4         Q.  What if there's blood on the walls, should that

5    be cleaned?

6         A.  Absolutely.

7         Q.  By who?

8         A.  So different facilities offer different programs.

9    I know San Diego Central Jail, we offer what's called

10   HSAT.  They are taught on how to properly clean and

11   dispose of hazardous waste.

12             In addition to that, San Diego Central Jail has a

13   contracted cleaner, which is Clean Harbors, that comes in

14   twice a week to assist in that cleaning.

15        Q.  What is HSAT?

16        A.  I would have to get back to you on the acronym

17   names for that.

18        Q.  What is it generally, without studying what the

19   acronym stands for?

20        A.  Sure.  It's a class that's offered as a reentry

21   services to the IPs.  They go through a couple of courses

22   on how to properly and effectively get rid of hazardous

23   material or waste.  Along with one of the colleges we

24   contract with, they teach them how to properly do that.

25        Q.  Are all the people who are inmate workers at

1  Central Jail who clean the cells HSAT graduates?

2      A.  The IPs that would be cleaning said cell with

3  blood would be HSAT.  Yes, sir.

4      Q.  What about the IPs that just generally clean, not

5  specifically for that, but are all IPs who clean cells in

6  Central Jail HSAT graduates?

7      A.  Not necessarily, no.

8      Q.  The jails use trustee workers to conduct

9  cleanings; is that correct?

10     A.  Yes.

11     Q.  Aside from Clean Harbors' work in Central Jail,

12 is there any other contracted-for entity that cleans jail

13 facilities throughout the San Diego County Jail System?

14     A.  Specific to cleaning, I would say it is Clean

15 Harbors only at this time.

16     Q.  At Central Jail only?

17     A.  And other facilities, as needed, if they request

18 it.  They have been to, I think, every facility at this

19 point.

20     Q.  Okay.  Approximately how often?

21     A.  As requested at other facilities.

22         I know San Diego Central Jail, they are there

23 twice a week.

24     Q.  What about the other facilities?

25     A.  As requested.  So however often they request

ISAAC ALVARADO - PMK - 30(B)(6)                                    JOB NO. 950101
MAY 03, 2024

1    them, they'll go.

2          Q.   Do they go in and clean inside housing units?

3          A.   They do.

4          Q.   Do they clean inside individual cells in housing

5    units?

6          A.   They do.

7          Q.   Are all IPs who clean at the jails trained in

8    handling chemicals and cleaning agents?

9          A.   Cleaning agents or chemicals?

10         Q.   Both?  Either?

11         A.   We do have cleaning agents that we utilize.  I am

12   not sure on if they'd be considered chemicals, to be

13   honest with you.

14         Q.   Do the inmate workers receive any training on how

15   to use the cleaning agents?

16         A.   Generally, yes, they do.

17         Q.   Where is that documented?

18         A.   I do not know where it would be documented.

19         Q.   What training do they receive?

20         A.   Specifically what cleaning agents would be used

21   for what different purposes, if you will.  One cleaning

22   agent for floors.  I know another one would be for the

23   stainless steel toilets and sinks that we provide the IPs.

24         Q.   Other than the purpose for which the cleaning

25   agents are used, is there any other component to that

ISAAC ALVARADO - PMK - 30(B)(6)                    JOB NO. 950101
MAY 03, 2024

1   training?

2        A.  Not to my knowledge, sir.

3        Q.  Is there any policy or written document outlining

4   what to clean, when to clean, and what agents to use for

5   incarcerated workers?

6        A.  Not specifically to that point, no, sir.

7        Q.  Do sworn staff -- are sworn staff required to

8   clean housing units as part of their job duties?

9        A.  Not specifically, no.

10           Does it happen, yes.

11       Q.  Under what circumstances does it happen?

12       A.  If there is a -- if there is an assaultive or

13  combative IP who would not allow for trusties to enter

14  their cell or living area, sworn would obviously not allow

15  the incarcerated workers to go in there.

16           So they would take it upon themselves to either

17  sweep out trash on the flooring or, you know, tidy up as

18  best as possible.  Remove an IP or the incarcerated

19  workers due to that assaultive risk of that IP inside the

20  cell.

21       Q.  Aside from those assaultive situations, are sworn

22  staff required to or do they, in practice, clean housing

23  units or IP cells?

24       A.  In common practice, it does happen very often.

25  There's times where they're not afforded the opportunity

1   to call for incarcerated workers to come to the floors.

2   So they take it upon themselves to help and clean those

3   cells.

4        Q.  So is there a departmental policy that requires

5   that?

6        A.  No, sir.

7        Q.  By policy, is it only the incarcerated workers

8   who are required to clean cells and housing units?

9        A.  I don't believe we have a policy dictating that

10  so specifically, no.

11       Q.  So there's no policy as to who should clean the

12  jail?

13       A.  No.  The answer was to your previous question.

14            To this question, is there a specific policy on

15  when to clean the jail?

16       Q.  On who should clean the jail.

17       A.  Who should clean the jail.

18            In the hygiene inspection green sheet, I believe

19  it lays out that a cleaning cart with the proper tools to

20  clean the modules be given to the incarcerated persons

21  housed in said modules to clean in preparation for said

22  inspection.

23       Q.  So the only written materials or policies

24  regarding who is responsible for cleaning the jail

25  facilities states that incarcerated people are responsible

ISAAC ALVARADO - PMK - 30(B)(6)                                    JOB NO. 950101
MAY 03, 2024

```
 1                    REPORTER'S CERTIFICATE

 2          I, Adriana S. Angulo, Certified Shorthand Reporter in

 3     and for the State of California, do hereby certify:

 4          That the witness in the foregoing deposition was by

 5     me first duly sworn to tell the truth, the whole truth,

 6     and nothing but the truth in the foregoing cause; that the

 7     deposition was then taken before me at the time and place

 8     therein named; that said deposition was reported by me in

 9     shorthand and later transcribed under my direction, and

10     the preceding pages contain a true record of the testimony

11     of the witness; and I do further certify that I am a

12     disinterested person and am in no way interested in the

13     outcome of said action, or connected with or related to

14     any of the parties in said action, or to their respective

15     counsel.

16          The dismantling, unsealing, or unbinding of the

17     original transcript will render the Reporter's

18     Certification null and void.

19          IN WITNESS WHEREOF, I have hereunto set my hand

20     this 16th day of May 2024.

21

22

23     _____
       Adriana S. Angulo
24     Certificate No. 13824

25
```

1   Job No. 950101

2   Date: May 03, 2024

3   Witness Name: ISAAC ALVARADO - PMK - 30(B)(6)

4   Case Caption: DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, et al.

5

6     DECLARATION UNDER PENALTY OF PERJURY

7      I declare under penalty of perjury

8   that I have read the entire transcript of

9   my Deposition taken in the captioned matter

10  or the same has been read to me, and

11  the same is true and accurate, save and

12  except for changes and/or corrections, if

13  any, as indicated by me on the DEPOSITION

14  ERRATA SHEET hereof, with the understanding

15  that I offer these changes as if still under

16  oath.

17      Signed on the _21_ day of

18  _JUNE_ , 20 24 .

19

20  _____

21  Signature  ISAAC ALVARADO - PMK - 30(B)(6)

22

23

24

25        PAGE 1 OF 3

# <u>PROOF OF SERVICE</u>

**Dunsmore, et al v. San Diego County Sheriff's Department, et al.
USDC Southern District Case No. 3:20-cv-00406-AJB-DDL**

**STATE OF CALIFORNIA, COUNTY OF VENTURA**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Ventura, State of California.  My business address is 2310 East Ponderosa Drive, Suite 25, Camarillo, CA 93010-4747.

On December 16, 2024, I served true copies of the following document(s) described as **APPENDIX OF EVIDENCE IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address dwetters@bwslaw.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 16, 2024, at Camarillo, California.

/s/ Kathleen van Daalen Wetters
Kathleen van Daalen Wetters

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4899-9003-4179 v1

6

Case No. 3:20-cv-00406-AJB-DDL
APPENDIX OF EVID. RE PARTIAL MSJ

# SERVICE LIST

*Dunsmore, et al v. San Diego County Sheriff's Department, et al.*
**USDC Southern District Case No. 3:20-cv-00406-AJB-DDL**

| | |
|---|---|
| Gay C. Grunfeld, Esq.<br>Van Swearingen, Esq.<br>Michael Freedman, Esq.<br>Eric Monek Anderson, Esq.<br>Hannah M. Chartoff, Esq.<br>Benjamin W. Holston, Esq.<br>Kedra Chan<br>Rosen Bien Galvan & Grunfeld LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, CA 94105-1738<br>Telephone: 415.433.6830<br>Facsimile: 415.433.7104<br>Email: ggrunfeld@rbgg.com<br>Email: vswearingen@rbgg.com<br>Email: mfreedman@rbgg.com<br>Email: eanderson@rbgg.com<br>Email: hcartoff@rbgg.com<br>Email: bholston@rbgg.com<br>Email: kchan@rbgg.com | *Attorneys for Plaintiffs and the Certified Class and Subclasses* |
| Aaron J. Fischer, Esq.<br>Law Office of Aaron J. Fischer<br>1400 Shattuck Square Suite 12 - #344<br>Berkeley, California 94709<br>Telephone: 510.806.7366<br>Facsimile: 510.94.6314<br>Email: ajf@aaronfischerlaw.com | *Attorneys for Plaintiffs and the Certified Class and Subclasses* |
| Christopher M. Young, Esq.<br>Isabella Neal, Esq.<br>Oliver Kiefer, Esq.<br>DLA Piper LLP<br>4365 Executive Drive, Suite 1100<br>San Diego, CA 92121<br>Telephone: 858.677.1400<br>Facsimile: 858.677.1401<br>Email: christopher.young@dlapiper.com<br>Email: isabella.neal@dlapiper.com<br>Email: oliver.kiefer@dlapiper.com | *Attorneys for Plaintiffs and the Certified Class and Subclasses* |

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4899-9003-4179 v1

7

Case No. 3:20-cv-00406-AJB-DDL
APPENDIX OF EVID. RE PARTIAL MSJ