1 | GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
2 | MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
3 | HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
4 | ROSEN BIEN
GALVAN & GRUNFELD LLP
5 | 101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
6 | Telephone: (415) 433-6830
Facsimile: (415) 433-7104
7 | ggrunfeld@rbgg.com
vswearingen@rbgg.com
8 | mfreedman@rbgg.com
eanderson@rbgg.com
9 | hchartoff@rbgg.com
bholston@rbgg.com
10 |
11 | AARON J. FISCHER – 247391
LAW OFFICE OF
12 | AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
13 | Berkeley, California 94709
Telephone: (510) 806-7366
14 | Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

16 |

17 | UNITED STATES DISTRICT COURT

18 | SOUTHERN DISTRICT OF CALIFORNIA

19 | DARRYL DUNSMORE, ANDREE
ANDRADE, ERNEST ARCHULETA,
20 | JAMES CLARK, ANTHONY EDWARDS,
REANNA LEVY, JOSUE LOPEZ,
21 | CHRISTOPHER NORWOOD, JESSE
OLIVARES, GUSTAVO SEPULVEDA,
22 | MICHAEL TAYLOR, and LAURA
ZOERNER, on behalf of themselves and all
23 | others similarly situated,

Plaintiffs,

24 |

v.

25 | SAN DIEGO COUNTY SHERIFF'S
DEPARTMENT, COUNTY OF SAN
26 | DIEGO, SAN DIEGO COUNTY
PROBATION DEPARTMENT, and DOES
27 | 1 to 20, inclusive,

Defendants.

28 |

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF GAY C. GRUNFELD IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT RE: THIRD CLAIM FOR RELIEF AND PLAINTIFFS' MOTION FOR APPROVAL OF DISTRIBUTION METHOD FOR CLASS NOTICE**

Judge: Hon. Anthony J. Battaglia

Date: March 6, 2025
Time: 2:00 p.m.
Crtrm.: 4A

[4620756.3]

I, Gay Crosthwait Grunfeld, declare:

1.    I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs and the Certified Class and Subclasses.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration based in support of Declaration of Gay Crosthwait Grunfeld in Support of Joint Motion for Preliminary Approval of Settlement Agreement Re: Third Claim For Relief and Plaintiffs' Motion for Approval of Distribution Method for Class Notice.

2.    Attached hereto as **Exhibit A** is a true and correct copy of the parties' December 11, 2024 Joint Motion and Order Re Remaining ADA Issues and Resolving Third Claim for Relief ("ADA Settlement Agreement"), filed as ECF No. 776, and entered by the District Court on December 12, 2024 as ECF No. 777.

3.    Plaintiff Darryl Dunsmore filed this case as an individual action, including claims for disability accommodations.  Dkt. 1.  On February 3, 2022, Mr. Dunsmore and several other Plaintiffs, now represented by my firm and our co-counsel, filed the Second Amended Complaint raising class claims.  Dkt. 81.  On November 11, 2022, Plaintiffs filed the Third Amended Complaint ("TAC").  Dkt. 231.  The Third Claim for Relief in the TAC seeks relief under the Americans with Disabilities Act, Rehabilitation Act, and California Government Code § 11135 (collectively, "ADA").

4.    On June 21, 2023, the District Court entered the parties' Joint Motion Re Accessibility at Central Jail, Effective Communication Policy and Practice, and Provisional Class Certification ("2023 ADA Order"), Dkt. No. 355.  The 2023 ADA Order resolved portions of Plaintiffs' Third Claim for Relief and is incorporated by reference into and attached to the ADA Settlement Agreement.

5.    On November 3, 2023, the Court certified a class and subclasses in this case.  Dkt. 435.  As relevant to this Joint Motion, the Court certified the Incarcerated

People with Disabilities Subclass, defined as: "All adults who have a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities." *Id.* at 10.  The Court also appointed my firm, the Law Office of Aaron J. Fischer, and DLA Piper LLP (US) as Class Counsel. *Id.* at 10-11.

6.    Consistent with the 2023 ADA Order, Class Counsel has been monitoring its implementation.  We have also continued to litigate the remainder of the Third Claim for Relief through extensive fact and expert discovery.  The parties exchanged document productions in the thousands of pages and took multiple fact depositions related to the ADA, beginning with expedited discovery in February 2023 and continuing through the close of fact discovery on May 7, 2024.  Plaintiffs' retained accessibility expert, Syroun Sanossian, conducted full-day inspections of six jail facilities and wrote lengthy reports on each inspection:  San Diego Central Jail, Rock Mountain Detention Facility, George Bailey Detention Facility, Vista Detention Facility, Las Colinas Detention and Reentry Facility, and East Mesa Reentry Facility.  Plaintiffs' expert did not inspect the South Bay facility because Defendants stipulated it is not accessible.  On August 21, 2024, the parties disclosed expert reports, consisting of hundreds of pages, on ADA compliance by the Sheriff's Office, incarcerated people's access to programs, services and activities, and the physical accessibility of the jail facilities.

7.    My firm and I have substantial experience litigating complex class actions, including class actions regarding injunctive relief for people incarcerated in jails and prisons for violations of constitutional and statutory rights.  From its formation in 1990, RBGG has been nationally recognized for its civil rights, consumer, and antitrust class action litigation and employment cases.  Michael Bien and I have repeatedly been named to the Daily Journal's list of Top 100 Lawyers in California. All of the firm's partners have been repeatedly named SuperLawyers, and many of

the firm's associates and senior counsel were named Rising Stars by SuperLawyers in 2024. All partners are AV-rated by Martindale-Hubbell.

8. My colleagues and I regularly represent incarcerated people in large-scale civil rights class actions and individual cases in federal court. For example, the firm is currently lead or co-lead counsel in the following class actions regarding prisoners' rights: *Coleman v. Newsom*, E.D. Cal. No. 2:90-cv-00520-KJM-DB; *Armstrong v. Newsom*, N.D. Cal. No. C 94-2307 CW; *Hernandez et al. v. County of Monterey et al.*, N.D. Cal. No. 5:13-cv-02354-BLF-NMC; *Cole et al. v. County of Santa Clara et al.*, N.D. Cal. No. 5:16-cv-06594-LHK; *Babu, et al. v. County of Alameda, et al.*, N.D. Cal. No. 5:18-cv-07677-NC; and *California Coalition for Women Prisoners v. United States of America Federal Bureau of Prisons*, N.D. Cal. No. 4:23-cv-04155-YGR.

9. I currently serve as one of the lead counsel in *Armstrong v. Newsom* (N.D. Cal. No. C 94-2307 CW), an ADA, Rehabilitation Act, and due process class action against the California Department of Corrections and Rehabilitation ("CDCR") on behalf of approximately 10,000 incarcerated people and parolees with mobility, hearing, vision, learning, kidney, and developmental disabilities; *Hedrick v. Grant* (E.D. Cal. No. 2:76-CV-00162-GEBEFB), a class action on behalf of all persons incarcerated at the Yuba County Jail; and *Stiner v. Brookdale Senior Living, Inc.* (N.D. Cal. No. 4:17-cv-03962-HSG (LB)), a class and individual action seeking relief under the ADA and consumer protection statutes on behalf of senior citizens living in assisted living facilities. I have been appointed class counsel in a number of other cases, such as *Ramirez et al. v. Ghilotti Bros., Inc.* (N.D. Cal. No. 3:12-cv-04590-CRB), a class action on behalf of workers denied pay for all hours worked and meal and rest breaks; and *L.H. v. Brown* (E.D. Cal. No. CIV. S-06-2042 LKK/GGH), a due process and ADA class action on behalf of juvenile parolees.

10. In the *Armstrong* case, I have led a team of attorneys at my firm responsible for monitoring compliance with remedial plans and orders designed to

1  bring CDCR into compliance with the ADA at its 34 prisons and in its parole

2  system.  My colleagues and I have extensive experience interviewing incarcerated

3  people with disabilities and prison and jail staff regarding access to programs,

4  services and activities.  I also have extensive experience reviewing documents

5  related to ADA compliance such as grievances, sign language interpretation logs

6  and documentation of effective communication in due process and medical settings.

7  Since 2012, I have monitored compliance with CDCR's County Jail Plan, which

8  requires CDCR to inform county jails like San Diego of the disability needs of

9  parolees and out to court individuals housed there, and to provide an ADA grievance

10  procedure.  I have also litigated the ADA rights of people incarcerated at Monterey

11  and Santa Clara County Jails and monitored ADA compliance at the Yuba County

12  Jail.

13      11.    In my opinion, based on my experience litigating and monitoring these

14  issues, the ADA Settlement Agreement is an excellent result for the Incarcerated

15  People with Disabilities Subclass.  The ADA Settlement Agreement ensures that

16  Defendants will implement a significant number of measures to protect the rights of

17  the Subclass.  For example, the ADA Settlement Agreement requires Defendants to

18  maintain policies, procedures, and practices to identify, track, and provide accom-

19  modations to all members of the Subclass.  Ex. A at ¶¶ 24-33.  The ADA Settlement

20  Agreement also requires the County to provide members of the Subclass with equal

21  access to programs, services, and activities, which is a critical outcome to ensure

22  that Subclass members have access to the programs that can equip them for reentry

23  into the San Diego County community.  In addition, the ADA Settlement Agreement

24  provides that within four years of December 11, 2024, every person with a disability

25  will be housed accessibly.  *Id.* at ¶ 45.  To help achieve that goal, the ADA Settle-

26  ment Agreement requires the County to make construction alterations at multiple

27  jail facilities, including substantial remediation at Las Colinas, the only facility that

28  houses women.  *Id.* at ¶ 44, 47-74.  The ADA Settlement Agreement also requires

1  that the County, within 18 months, evaluate whether further measures are necessary

2  to provide accessible housing for all Subclass members.  *Id.* at ¶ 46.  The ADA

3  Settlement Agreement provides for appointment of two separate third party neutral

4  experts—one regarding policies, procedures, and practices, and the other regarding

5  physical alterations—with appropriate professional expertise.  These neutral experts

6  will provide twice-yearly reports on the County's progress in implementing the

7  Settlement Agreement.  *Id.* at ¶¶ 132-43.  Class Counsel will monitor enforcement

8  of these reforms.  *Id.* at ¶¶ 136-39, 142.  Finally, the ADA Settlement Agreement

9  also provides for Court enforcement of the agreement as necessary.  *Id.* at ¶¶ 156-

10  59.

11        12.    Although the Settlement Agreement represents a compromise, it is an

12  excellent result for the class is light of the significant risks and challenges for the

13  Subclass entailed in further litigation.  For example, Plaintiffs sought alterations to

14  provide accessible housing for people with mobility disabilities at East Mesa

15  Reentry Facility, which is a lower security facility that houses multiple vocational

16  programs.  Defendants vigorously contested whether alterations were feasible given

17  East Mesa's topography.  Had Plaintiffs sought such alterations through litigation,

18  there was a risk that the Court could deny relief altogether.  Instead, the parties

19  negotiated a compromise that does not include alterations at East Mesa, but requires

20  the County to develop a plan to provide access to the programs at East Mesa to

21  people with mobility disabilities who are otherwise qualified for those programs.

22  *See* Ex. A, ¶ 81.  In addition, the County will evaluate in 18 months whether

23  additional alterations at jail facilities are necessary.  *Id.* at ¶ 46.

24        13.    As another example, Plaintiffs sought alterations to Vista Detention

25  Facility, which houses the Veterans Moving Forward program for veterans in

26  custody but is currently not accessible to all people with mobility disabilities.

27  Defendants contested whether such alterations were feasible or practical, in light of

28  Defendants' ongoing consideration of whether to replace and rebuild Vista entirely.

1   Instead, the parties negotiated a compromise, whereby Defendants will provide

2   access to the Veterans Moving Forward program to people who are otherwise

3   unable to be housed at Vista due to their disability within six months of the ADA

4   Settlement Agreement.  Ex. A at ¶ 80.  During the settlement negotiations, Plaintiffs

5   also sought additional accessible housing at Rock Mountain Detention Facility, a

6   newly renovated facility with capacity for ADA accessible housing.  However,

7   Defendants contended that fully opening Rock Mountain in the near future is not

8   possible due to staffing shortages.  The parties thus negotiated a compromise

9   whereby Defendants agree to bring on ten new accessible beds within three years.

10  *Id.* at ¶ 71.  For both facilities, there was a risk that the Court could deny any relief

11  altogether, or order more limited relief than achieved in the ADA Settlement

12  Agreement.

13       14.    Even a fully successful result in litigation would delay relief to the

14  Subclass, with trial not yet scheduled in this case and injunctive relief unlikely to

15  issue until many months after trial.  Under the ADA Settlement Agreement,

16  construction and remediation can begin sooner.  For example, we are informed that

17  a plan has already been developed for the long-overdue work at Las Colinas.

18  Overall, in light of the risks of litigating this and other issues, the ADA Settlement

19  Agreement represents an outstanding result for the Subclass.

20       15.    Further litigation and trial of the Third Claim for Relief would also

21  have involved expenditure of extensive time and resources for both parties, which

22  the County can now spend on implementation of the ADA Settlement Agreement

23  and Plaintiffs can spend on ensuring that the County complies with the ADA

24  Settlement Agreement.

25       16.    The parties engaged in extensive, arms-length settlement discussions,

26  overseen by Magistrate Judge David D. Leshner.  As the Settlement Agreement sets

27  forth, the parties engaged in seventeen separate settlement conferences with Judge

28  Leshner beginning in 2023 and culminating on November 20, 2024, after which the

Settlement Agreement was considered and approved by the San Diego County Board of Supervisors on December 11, 2024.  Many of the settlement sessions were full-day conferences in San Diego with counsel and representatives from the Sheriff's Office.  The parties also engaged in several Zoom settlement discussions outside the presence of Judge Leshner.  I estimate that the parties spent nearly one hundred hours negotiating the agreement.  Outside of face-to-face negotiations, the parties exchanged multiple drafts of the agreement from May to November 2024.

17.    Attached hereto as **Exhibit B** is a true and correct copy of the proposed notice to be provided to the Incarcerated People with Disabilities Subclass regarding the Settlement Agreement.  It is in 16-point font.

18.    We are requesting that notice be:  (1) posted throughout all jail intake areas, housing units and medical clinics on white paper in a minimum of 16-point font, laminated; (2) provided on double-sided white paper in English and Spanish in a minimum of 16-point font at intake to each person who enters a jail facility; (3) provided on the video kiosks in the housing units in all jail facilities; and (4) read to incarcerated people who have a disability that may affect their ability to read the notice.  Plaintiffs' proposed notice plan is consistent with what I have observed in other cases and will be likely to inform Subclass members of the ADA Settlement Agreement and their rights, including to object to it.

19.    Specificity in the notice plan is needed due to concerns Class Counsel raised about the legibility and availability of the notices posted in the Jail regarding the Court's class certification order of November 2023.  Attached hereto as **Exhibit C** is a true and correct copy of an April 2, 2024 letter from me to Defendants' counsel (without its enclosures) raising our objections to class notice after observing our notices and other notices on inspections of the jail facilities.

20.    For example, on March 25, 2024, I attended an inspection of Central Jail with Plaintiffs' expert and Defendants' counsel.  Initially, I did not observe any class notices.  I was then showed what appeared to be a very small print version of

the notice on transparent paper. This notice was placed on the glass wall of holding cells and housing units and subject to glare from the lights, making it impossible to read.  Attached hereto as **Exhibit D** are true and correct copies of photographs of the notice on display at Central Jail the day of the inspection.  I was unable to read these notices in units 6A, 6B, 6C, 6D, 7A and 7B.  The issue was even more difficult in unit 6D where I observed the notices posted six or seven feet above ground, making them impossible to read for wheelchair users.  Although the date stamp on these and the other inspection photographs is 2023, they were taken a year later in 2024.

21.    I am informed and believed that my law partner Van Swearingen observed similar issues at the South Bay inspection of March 26, 2024.  Attached here to as **Exhibit E** is a true and correct copy of a photograph of the illegible class notice observed during the South Bay inspection.

22.    Class Counsel also became aware of a notice issue during the February 6, 2024 inspection of George Bailey Unit 5C.  In that housing unit at that facility, the notices were printed on white paper but the font size was small and the notices were taped to tables, making them unreadable by those housed in the unit. Attached hereto as **Exhibit F** are true and correct copies of the class notice observed during the inspection of George Bailey Unit 5C.

23.    During my 2024 inspections with experts, I was present for interviews of incarcerated people.  Many of these individuals informed us that they were unaware of the existence of the *Dunsmore* class action.

24.    Also, during my 2024 inspections of jail facilities, I observed notices involving other cases and matters on the walls of housing units and elsewhere that— unlike the *Dunsmore* class action notices—were in larger font and on white paper. Attached hereto as **Exhibit G** are true and correct copies of photographs taken at South Bay and Central Jail of notices, including regarding how to contact the ADA Unit, posted by the San Diego Sheriff's Office on white paper with larger font.

25.    Defendants propose putting notice of the ADA Settlement on the kiosks

1  that have been installed in many housing units at the jails.  This is a good idea for

2  those who regularly access the kiosks.  However, based on my observation of the

3  kiosks and communications I have received from incarcerated people, not everyone

4  who is at the jails can always access the kiosks, which are used for legal research

5  and for video calls, including using Video Relay Services for deaf signers.

6      26.    Attached hereto as **Exhibit H** is a true and correct copy of the Federal

7  Judicial Center's "Judges' Class Action Notice and Claims Process Checklist and

8  Plain Language Guide," which is available on the Federal Judicial Center's website

9  at:  https://www.fjc.gov/content/301350/illustrative-forms-class-action-notices-

10  notice-checklist-and-plain-language-guide.

11     27.    Attached hereto as **Exhibit I** is a true and correct copy of the United

12  States District Court for the Northern District of California's "Procedural Guidance

13  for Class Action Settlements," which is available on the Northern District's website

14  at: https://cand.uscourts.gov/forms/procedural-guidance-for-class-action-

15  settlements/.

16     28.    Attached hereto as **Exhibit J** is a true and correct copy of the

17  Honorable George H. Wu's June 29, 2018 Order Approving Class Notice in *Murray*

18  *v. County of Santa Barbara*, Case No. CV-8805-GW (JPRx) (C.D. Cal.).

19     I declare under penalty of perjury under the laws of the United States of

20  America that the foregoing is true and correct, and that this declaration is executed

21  at San Francisco, California this 10th day of January, 2025.

22

23                        */s/ Gay Crosthwait Grunfeld*
                          Gay Crosthwait Grunfeld
24

25

26

27

28

# TABLE OF CONTENTS

**EXHIBITS TO DECLARATION OF GAY C. GRUNFELD IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT RE: THIRD CLAIM FOR RELIEF AND PLAINTIFFS' MOTION FOR APPROVAL OF DISTRIBUTION METHOD FOR CLASS NOTICE**

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Joint Motion and Order Re Remaining ADA Issues and Resolving Third Claim (ADA Settlement Agreement) | A | 1 |
| Proposed Notice to Class of ADA Settlement | B | 75 |
| Letter from Gay Grunfeld to Defendants' Counsel, Re: Defendants Failure to Make Class Notice Accessible (dated April 2, 2024) | C | 78 |
| Photographs: *Dunsmore* Class Certification Notices at San Diego Central Jail | D | 82 |
| Photograph: *Dunsmore* Class Certification Notice at South Bay Detention Facility | E | 89 |
| Photographs:  Dunsmore Class Certification Notices at George Bailey Detention Facility | F | 91 |
| Photographs:  Non-Dunsmore Notices at South Bay Detention Facility and San Diego County Jail | G | 97 |
| Federal Judicial Center, Judge's Class Action Notice and Claims Process Checklist | H | 105 |
| United States District Court for the Northern District of California, Procedural Guidance for Class Action Settlements | I | 116 |
| Order Approving Class Notice (Dkt. 43), *Murray v. County of Santa Barbara*, Case No. CV-17-8805-GW (JPRx) | J | 125 |

# EXHIBIT A

1  GAY C. GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  MICHAEL FREEDMAN – 262850
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   BEN HOLSTON – 341439
4  ROSEN BIEN
   GALVAN & GRUNFELD LLP
5  101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
6  Telephone:  (415) 433-6830
   Facsimile:   (415) 433-7104
7  ggrunfeld@rbgg.com
   vswearingen@rbgg.com
8  mfreedman@rbgg.com
   eanderson@rbgg.com
9  hchartoff@rbgg.com
   bholston@rbgg.com
10
11 AARON J. FISCHER – 247391
   LAW OFFICE OF
   AARON J. FISCHER
12 1400 Shattuck Square Suite 12 - #344
   Berkeley, California  94709
13 Telephone:  (510) 806-7366
   Facsimile:   (510) 694-6314
14 ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

15  Attorneys for Plaintiffs and the
    Certified Class and Subclasses
16
    (*defense counsel on following page*)
17
             UNITED STATES DISTRICT COURT
18
           SOUTHERN DISTRICT OF CALIFORNIA
19

| | |
|---|---|
| 20 DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, <br><br>      Plaintiffs, <br><br>   v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, <br><br>      Defendants. | Case No. 3:20-cv-00406-AJB-DDL <br><br> **JOINT MOTION AND ORDER RE: REMAINING ADA ISSUES AND RESOLVING THIRD CLAIM FOR RELIEF** <br><br> Judge:    Hon. Anthony J. Battaglia <br> Magistrate: Hon. David D. Leshner |

[4618672.1]

1  *(counsel continued from preceding page)*

2  Susan E. Coleman (SBN 171832)
   E-mail:  scoleman@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   501 West Broadway, Suite 1600,
4  San Diego, CA  92101-8474
   Tel:  619.814.5800 Fax:  619.814.6799

5
   Elizabeth M. Pappy (SBN 157069)
6  E-mail:  epappy@bwslaw.com
   BURKE, WILLIAMS & SORENSEN, LLP
7  60 South Market Street, Ste. 1000
   San Jose, CA  95113-2336
8  Tel:  408.606.6300 Fax:  408.606.6333

9  Attorneys for Defendants
   COUNTY OF SAN DIEGO, SAN DIEGO
10 COUNTY SHERIFF'S OFFICE and SAN DIEGO COUNTY PROBATION
   DEPARTMENT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      PROCEDURAL HISTORY ................................................................ 1

II.     FINDINGS ....................................................................................... 2

III.    ADA REMEDIAL ACTIONS ......................................................... 4

        A.      ADA Unit ............................................................................... 4

        B.      ADA Notices and Orientation ............................................... 6

        C.      ADA Policies, Procedures, and Training ............................... 7

        D.      Identification and Tracking of Incarcerated Persons with
                Disabilities ............................................................................ 8

        E.      Housing Assignments for People with Disabilities ............ 11

        F.      Facility Alterations ............................................................. 13

                1.      Las Colinas Detention and Reentry Facility ("Las
                        Colinas") ................................................................... 14

                2.      George Bailey Detention Facility ("George Bailey") ......... 18

                3.      East Mesa Reentry Facility ....................................... 19

                4.      Vista Detention Facility ("Vista") ............................ 19

                5.      Rock Mountain Detention Facility ("Rock Mountain") ......... 20

                6.      South Bay Detention Facility ("South Bay") ............. 20

        G.      Transition Plan ................................................................... 20

        H.      Program Access ................................................................... 21

        I.      Requests for Disability Accommodations and Grievances ................. 22

        J.      Effective Communication .................................................... 24

        K.      Assistive Devices, Health Care Appliances, and Durable Medical
                Equipment ............................................................................ 25

        L.      Emergency Situations and Use of Force .............................. 27

        M.      People with Learning, Intellectual, and Developmental
                Disabilities .......................................................................... 28

        N.      Searches and Restraints ...................................................... 29

        O.      Transportation ..................................................................... 30

P.  Accommodations for People with Substance Use Disorder ................. 31

Q.  People with Mental Health Disabilities ................................................. 31

R.  Quality Assurance and Auditing............................................................. 32

S.  Non-Retaliation and Non-Interference .................................................. 32

IV.  COMPLIANCE ................................................................................................ 33

A.  Neutral Experts..................................................................................... 33

B.  Dispute Resolution ................................................................................ 37

V.  MISCELLANEOUS RELIEF ......................................................................... 38

VI.  DURATION AND TERMINATION................................................................ 38

VII.  AMENDMENTS ............................................................................................. 39

VIII.  JURISDICTION AND ENFORCEMENT ...................................................... 40

A.  Court Approval ..................................................................................... 40

B.  Court Jurisdiction ................................................................................. 40

IX.  ATTORNEYS' FEES AND COSTS ............................................................... 41

[PROPOSED] ORDER............................................................................................. 43

Case No. 3:20-cv-00406-AJB-DDL

JOINT MOTION AND ORDER RE: REMAINING ADA ISSUES AND RESOLVING
THIRD CLAIM FOR RELIEF

**Ex. A - 5**

1.     Plaintiffs Darryl Dunsmore, Andree Andrade, Ernest Archuleta, James Clark, Anthony Edwards, Reanna Levy, Josue Lopez, Christopher Norwood, Jesse Olivares, Gustavo Sepulveda, Michael Taylor, and Laura Zoerner (collectively, "Plaintiffs"), on behalf of themselves and the Certified Disabilities Subclass, and Defendants San Diego County and San Diego County Sheriff's Office (formerly known as "Sheriff's Department") (collectively, "the County") jointly seek entry of an Order approving the parties' settlement of all remaining issues regarding Plaintiffs' Third Claim for Relief, as set forth in detail below.

## I.     PROCEDURAL HISTORY

2.     On June 21, 2023, the District Court entered the parties' Joint Motion Re Accessibility at Central Jail, Effective Communication Policy and Practice, and Provisional Class Certification ("2023 ADA Order"), Dkt. No. 355, a copy of which is attached hereto as **Exhibit A** and incorporated herein by reference.  The 2023 ADA Order resolved portions of Plaintiffs' Third Claim for Relief under the Americans with Disabilities Act, Rehabilitation Act, and California Government Code § 11135 (collectively, "ADA").

3.     On November 3, 2023, the District Court entered an Order Granting Joint Motion for Class Certification and Approval of Proposed Class Action Notice Plan, Dkt. No. 435, a copy of which is attached hereto as **Exhibit B** and incorporated herein by reference.  This Order certified a subclass of "All adults who have a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ('Incarcerated People with Disabilities Subclass')."  Ex. B at 10.  The Order approved Rosen Bien Galvan & Grunfeld LLP, Law Office of Aaron Fischer, and DLA Piper LLP (US) as Class Counsel.  *Id.* at 10-11.

4.     On August 25, 2023, September 1, 2023, September 29, 2023, November 6, 2023, March 6, 2024, April 19, 2024, June 3, 2024, July 3, 2024,

July 10, 2024, July 29, 2024, October 9, 2024, October 18, 2024, October 28, 2024, November 4, 2024, November 6, 2024, November 13, 2024, and November 20, 2024, the parties conducted settlement conferences under the supervision of the Honorable David Leshner, Magistrate Judge of the United States District Court for the Southern District of California. The parties also conducted settlement discussions without the involvement of Judge Leshner. As a result of these discussions, the parties have reached the following agreements regarding the remainder of the ADA claim.

## II.    FINDINGS

5.    The parties agree that Title II of the Americans with Disabilities Act, as well as the Rehabilitation Act and California Government Code § 11135, require the County to provide reasonable accommodations and equal access to jail programs, services, and activities to incarcerated people with disabilities, and prohibit the County from discriminating against incarcerated people with disabilities.

6.    On March 2, 2020, Plaintiff Darryl Dunsmore filed this case as an individual action, including claims for disability accommodations. Dkt. 1. On February 9, 2022, Plaintiff Dunsmore, joined by additional named plaintiffs, filed the Second Amended Complaint raising class claims. Dkt. 81. On May 2, 2022, Plaintiffs filed a motion for preliminary injunction seeking, among other things, changes to jail facilities and to ADA policies and procedures to remedy program access issues for people with mobility disabilities. Dkt. 119-1 at 16. The Court denied that motion. Dkt. 203. Plaintiffs filed their Third Amended Complaint, Dkt. 231, on November 18, 2022.

7.    The parties started discussing the potential for settlement of issues related to the ADA in January of 2023. On April 25, 2023, after obtaining expedited discovery specific to ADA issues, *see* Dkt. 258, Plaintiffs filed renewed motions for preliminary injunction and provisional class certification. Dkt. 281. The preliminary injunction motion sought to ensure the provision of sign language

JOINT MOTION AND ORDER RE: REMAINING ADA ISSUES AND RESOLVING
THIRD CLAIM FOR RELIEF                                    **Ex. A - 7**

interpretation to people with hearing disabilities and to ensure the provision of safe, accessible housing to people with mobility disabilities. *Id.* at 1. The County opposed the motion while the parties continued settlement discussions. Dkt. 311. After settlement discussions with the assistance of Judge Leshner, the parties reached the 2023 ADA Order discussed above. *See* Dkt. 355. Pursuant to that Order, the County filed a proposed ADA Plan on October 5, 2023. Dkt. 409. Plaintiffs filed objections to the ADA Plan, Dkt. 416, which the Court addressed on April 24, 2024. Dkt. 620. The parties resolved their disputes regarding the ADA Plan, filed a joint motion, and the Court approved the final Amended ADA Plan on August 23, 2024. Dkt. 696.

8.    Discovery has taken place, including six on-site facility inspections by Plaintiffs' qualified ADA expert, several Rule 30(b)(6) depositions, document production, and exchange of expert reports. The parties are fully informed regarding the ADA issues raised by Plaintiffs' Third Amended Complaint.

9.    The County has taken significant and consequential steps to better serve incarcerated persons with disabilities, including development of an ADA Unit, issuance of new ADA policies, and issuance of training on those new policies, procedures, and implementation thereof, with further training continuing to occur. *See* Defendants' Amended Court-Ordered Status Report, Dkt. 667 at 2. All jail staff, including custody staff, professional staff, health care staff, and contractors, are required to follow the new policies and procedures. The ADA Unit has developed a process for interviewing incarcerated persons with certain disabilities within seven days of them being identified as having a disability, and at particular intervals thereafter.

10.    These changes represent important steps toward full compliance with the ADA, but the parties agree that additional changes to the County's policies, procedures, and implementation thereof, are necessary to ensure that incarcerated persons with disabilities are accommodated at the jail facilities and have equal

1    access to programs, services, and activities at the jail facilities.

2    　　　11.    The Sheriff's Office and County are committed to improving the

3    physical accessibility of their jail facilities and to ensuring meaningful access to jail

4    facility programs, services, and activities for incarcerated people with disabilities.

5    As part of the 2023 ADA Order, the County has made ADA modifications to San

6    Diego Central Jail and continues to make further ADA modifications at that facility,

7    which are scheduled to be complete in 2026.

8    　　　12.    The parties agree that it is necessary to provide additional accessible

9    housing for incarcerated people with disabilities in the jail facilities.  As part of this

10   agreement, the County has agreed to make modifications to jail facilities to provide

11   additional accessible housing in order to meet the disability-related needs of the

12   incarcerated population.

13   **III.    ADA REMEDIAL ACTIONS**

14   　　　13.    The Sheriff's Office and County agree to implement additional

15   remedial measures, as specified below in this Joint Motion and Order (henceforth,

16   "ADA Settlement Agreement and Order"):

17   　　　**A.    ADA Unit**

18   　　　14.    The County created an ADA Unit, effective June 2023.  The County

19   shall develop and implement policies, procedures, and training regarding the ADA

20   Unit to ensure its effectiveness in facilitating the jail system's compliance with

21   ADA requirements and the provisions set forth herein.  The County shall ensure the

22   ADA Unit has staffing, resources, and authority sufficient to carry out its duties,

23   which include but are not limited to: coordinating and ensuring staff training related

24   to ADA policies and requirements; ensuring provision of reasonable

25   accommodations to incarcerated persons with identified disabilities; assisting staff,

26   including facilities and health care staff, with identifying and accommodating

27   incarcerated persons with disabilities; ensuring all complaints of alleged

28   discrimination on the basis of disability in the San Diego County jail facilities that

4

1  are received by the County are investigated and properly resolved in a timely

2  manner; reviewing ADA-related requests and ensuring they are properly resolved in

3  a timely manner; and reviewing and responding to ADA-related grievances in a

4  timely fashion.

5      15.    The ADA Unit shall conduct face-to-face interviews of people with

6  "ADA Mobility," "ADA Hearing," or "ADA Vision" flags within seven (7) days of

7  the initial flag placement, sixty (60) days after the first ADA interview, and every

8  six (6) months thereafter.  The ADA Unit shall also conduct a face-to-face meeting

9  with an incarcerated person with an identified disability upon the incarcerated

10  person's request.  As part of the ADA Unit interview, the ADA Unit shall

11  effectively communicate to the incarcerated person information about the auxiliary

12  aids and accommodations at the jail facilities that may meet that person's needs, as

13  well as the process for requesting reasonable accommodations.  The ADA Unit shall

14  document this interview, including what was communicated and the provision of

15  effective communication.

16      16.    The ADA Unit currently consists of three deputies, one sergeant, one

17  lieutenant, and one nurse.  The Unit reports to a Captain, who reports to a

18  Commander.  Additionally, the Unit is supported by an attorney and a supervisory

19  nurse.  A designated mental health clinician supports the ADA Unit for individuals

20  with mental health or intellectual disabilities to ensure that reasonable accommoda-

21  tions and equal, meaningful program access are provided.  The custody, medical,

22  and mental health staff members within and supporting the ADA Unit shall have

23  staffing, resources, and authority necessary to ensure that incarcerated people with

24  disabilities timely receive reasonable accommodation and equal, meaningful access

25  to programs, services, and activities.  The designated ADA deputies currently

26  function as liaisons for each facility with their primary office located with the ADA

27  Unit.  Each facility shall also have at least one staff member who is designated to

28  liaison with the ADA Unit as needed along with their other assigned duties.  The

County shall maintain an ADA Unit and ensure that the contact information for the ADA Unit and the name and contact information for the ADA Coordinator are clearly posted and accessible in the intake area, in every jail facility housing unit, and in the public lobby of each facility.

### B.  ADA Notices and Orientation

17.  The Sheriff's Office shall ensure that people with disabilities are informed of their rights under the ADA via the ADA Notice, IP Handbook and/or ADA/Disability information brochures.  This includes the process for requesting a reasonable accommodation and how and where to file grievances.  This ADA Settlement Agreement and Order and the 2023 ADA Order shall be made available to incarcerated people through video kiosks and in hard copy upon request.

18.  The County shall ensure that any orientation materials it provides (including written and video materials) are accessible to all people with disabilities, including but not limited to individuals with vision disabilities, intellectual or cognitive disabilities, hearing disabilities, or any other disabilities that may affect communication.  The orientation materials shall include information on ADA rights; the process for requesting a reasonable accommodation; the ADA request and grievance processes, including the location of forms, how to submit them, and how to obtain assistance completing them; and information about the ADA Unit and how to contact them.  The orientation video shall be available in closed captioning and Spanish.  The video shall be provided in sign language consistent with effective communication requirements, including as set forth in the 2023 ADA Order.

19.  At all stages of the booking and orientation process, the County shall continue to provide reasonable accommodations and support to incarcerated persons with disabilities affecting communication, such as those who have developmental or intellectual disabilities, are blind, low-vision, or hard of hearing, as necessary to ensure effective communication of booking or orientation information that is being shared.  Incarcerated persons with hearing disabilities who use sign language are

1  covered in the 2023 ADA Order and shall receive effective communication as

2  previously agreed to and as required by current Detentions Services Bureau Policy

3  P.11.

4  **C.    ADA Policies, Procedures, and Training**

5  20.    The County shall revise and implement systemwide Detention Services

6  Bureau policies and procedures and facility specific-policies and procedures, and

7  training as necessary to ensure compliance with the ADA, related federal and state

8  disability laws, the ADA's implementing regulations, and the requirements set forth

9  herein.

10  21.    The County shall revise and implement Medical Services Division

11  policies as necessary to ensure compliance with the ADA, related federal and state

12  disability laws, the ADA's implementing regulations, and the requirements set forth

13  herein.

14  22.    The County shall ensure that all current and future jail staff receive

15  annual ADA training appropriate to their position.  This requirement includes

16  County and contracted staff (custody, health care, programs, administrative, etc.),

17  who must follow the Sheriff's Office's Detention Services Bureau's and/or Medical

18  Services Division's policies and procedures.  The ADA training may include, but is

19  not limited to, training bulletin, in-classroom, real-time virtual, and/or interactive

20  virtual training for staff.  Trainers will have subject matter expertise or be provided

21  training-for-trainers instruction by the ADA Unit.  All new jail staff shall also

22  receive ADA training appropriate to their position.  The initial training provided to

23  staff and contractors will cover all topics addressed in section III, ADA Remedial

24  Actions, of this ADA Settlement Agreement and Order, as relevant to their

25  respective positions and job duties.

26  23.    The County shall provide draft revisions of the aforementioned

27  policies, procedures, and trainings to the neutral expert for prompt review and

28  comment.  Any documents, including draft revisions of the aforementioned policies,

procedures, and trainings, that either side provides to the neutral expert shall be shared with counsel for the other side as noted in paragraph 137 of this ADA Settlement Agreement and Order.

### D. Identification and Tracking of Incarcerated Persons with Disabilities

24.     The County shall develop and implement policies, procedures, and training to ensure that the jail system, including all relevant custody, health care, administrative, and program staff, identifies and tracks all incarcerated persons with disabilities who report and/or have been identified to require accommodations throughout a person's time in custody.

25.     The County shall ensure that the jail facility ADA screening process includes, at minimum, consideration of the individual's own claim to have a disability, documentation of a disability in the County's health record, staff observation that the person may have a disability, communications regarding a person's disabilities provided by the California Department of Corrections and Rehabilitation or other law enforcement agencies, and any information from a third party, such as a friend or family, about a person's disability-related conditions and needs.

26.     All incarcerated persons shall be screened by health care staff who have received the training specified in Paragraph 22 during the intake process to identify disabilities and reasonable accommodations.  If an incarcerated person is identified to have a disability that requires accommodation, health care staff will update the person's health record and collaborate with sworn staff as needed to ensure the person is appropriately accommodated through the booking and classification process.  For incarcerated persons who health care staff have preliminarily screened and identified to have a disability, health care staff shall conduct an effective ADA Functional Performance assessment during the booking process.  Health care staff shall document any housing accessibility features and accommodations required by

an incarcerated person during their time in custody in the person's health record, and that information will be reflected in the disability tracking system. Health care staff conducting the intake shall be responsible for documenting the person's disability and any accommodations the person requires in the person's health record, and that information will be reflected in the disability tracking system.

27. The intake screening shall assess all incarcerated persons for whether they have a disability that affects communication. Health care staff shall identify the accommodations necessary to achieve effective communication with an incarcerated person determined to have a communication-related disability, and document them in the person's health record. That information will be reflected in the disability tracking system. Health care staff shall give primary consideration to the preference of the person with a disability as to the method of communication and accommodation.

28. "Disability tracking system" refers to the manner by which ADA disability and accommodation needs information is maintained and utilized across disciplines (custody, health care, reentry services, etc.). The County shall track individuals who have disabilities that require accommodations, other than medical or mental health treatment only, using 6 medical flags: ADA Vision, ADA Hearing, ADA Medical, ADA Mobility, ADA Cognitive/Learning, and ADA Speech. If health care staff add one of these flags into a person's health record, that flag and the accompanying accommodation notes populate into other systems and reports that can be accessed without seeing the rest of the health record. The information cannot be modified outside of the health system.

29. The County shall maintain a process for conducting disability evaluations for persons after the medical intake screening, when warranted by individual circumstances. The identification of disabilities or requests for reasonable accommodations may occur at any time during an individual's incarceration (e.g., staff observation, incarcerated person request, reported by third

parties such as family, etc.).  Health care staff shall then conduct an ADA
Functional Performance assessment.  Health care staff conducting the assessment
shall be responsible for documenting the person's disability and any new or
modified accommodation needs in the person's health record, and that information
will be reflected in the disability tracking system.  Health care staff shall notify the
Jail Population Management Unit ("JPMU") immediately of any impact to the
person's housing needs.

30.     During the booking and intake process, persons with mobility
disabilities who require accessible accommodations, including but not limited to
those who use a wheelchair in housing, shall be placed in accessible holding cells.
Such persons shall be permitted to retain and have access to the assistive device(s)
they need to accommodate their disability unless there is a specific safety risk (see
Assistive Devices section, below).

31.     The County shall maintain an electronic disability tracking system to
identify, based on an individualized assessment, all incarcerated persons with
disabilities who require accommodations and the accommodations they require.

32.     The disability tracking system shall identify any barriers to
communication, including but not limited to whether the person has a speech,
hearing, vision, learning, intellectual, or developmental disability.  The disability
tracking system shall adequately identify, based on an individualized assessment,
the specific accommodations required to achieve effective communication with that
person.

33.     The disability tracking system shall identify any other accommodations
a person needs, including but not limited to housing, classification, transportation,
health care appliances, durable medical equipment, and assistive devices.  Staff shall
utilize the disability tracking system as necessary to ensure timely provision of
accommodations.

### E.     Housing Assignments for People with Disabilities

34.     The County shall ensure that incarcerated persons with disabilities are properly placed in housing that is safe and appropriate for their disability, and consistent with their security classification and the requirements set forth in 28 C.F.R. § 35.152.  Such housing must also allow for an incarcerated person's ADA reasonable accommodations to be provided/accessible, e.g., auxiliary aids/services, effective communication as otherwise required by this ADA Settlement Agreement and Order or the 2023 ADA Order, and required adaptive supports.

35.     The County shall not house incarcerated persons with identified disabilities in different security classifications simply because no ADA-accessible placements are available.  The County shall not place incarcerated persons with identified disabilities in medical cells or medical dorms unless the person is currently receiving medical care or treatment that necessitates housing in a medical setting.  The parties acknowledge that full compliance with the previous sentence will not be achieved until completion of ADA-related construction.  The County shall inform the neutral expert and copy Class Counsel on the communication when ADA-related construction is occurring, what housing units are affected, and what interim accommodations are being provided.

36.     Any health-related or disability-related housing requirements shall be determined by health care staff based on individualized assessment and notated in the person's health record.  Disability-related housing accommodations shall also be notated in the disability tracking system.

37.     Incarcerated people who are assigned wheelchairs in housing shall in all cases be assigned to a lower tier and an accessible lower bunk.  The parties acknowledge that full compliance with an accessible lower bunk will not be achieved until completion of ADA-related construction.

38.     No incarcerated person with a mobility disability shall be assigned to the top of a triple bunk.  Health staff shall specifically evaluate an incarcerated

person with an identified mobility disability to determine if they require a lower bunk and/or lower tier and whether the person can access the bottom or middle bunk of a triple bunk.  In addition, health staff shall specifically evaluate such persons to determine if they require access to an accessible shower, including a fold-down shower seat, shower chair, reduced shower curb or lip, high/low shower heads, and grab bars in the shower.

a.    The County agrees that any provided shower chair will have at least 350 pounds of weight capacity and non-slip feet.

b.    The County agrees that ADA Showers will comply with 2010 ADA Standards and California Building Code, including high/low shower heads with horizontal and vertical swivel adjustments, as long as the shower heads also meet BSCC anti-ligature requirements.

39.    Sworn staff shall document incidents where disability-related housing accessibility accommodations cannot be provided, and shall promptly notify an appropriate supervisor about the issue.  The Sheriff's Office shall expeditiously move people who are inappropriately housed in an inaccessible placement to an accessible placement.  The ADA Unit shall conduct a quality assurance audit process to assess whether incarcerated persons with documented reasonable accommodations are appropriately housed.  The ADA Unit shall assess, as part of the audit process, whether additional training and/or policy changes are necessary.

40.    The Sheriff's Office shall conduct a check during night hard count to ensure that incarcerated persons with mobility disabilities are occupying their assigned beds in accordance with Detentions Services Bureau Policy I.43.

41.    The Sheriff's Office shall train sworn staff to address incarcerated persons with mobility disabilities who are found sleeping on the floor, and confirm that they have an assigned bed and are aware of their assignment.

42.    At each facility, during ADA-related construction at the facilities as described below, the County shall maintain interim measures to ensure that

incarcerated persons with mobility disabilities are accommodated to the greatest extent possible during the booking and intake process, and to the greatest extent possible placed in safe and accessible housing locations throughout the process.

**F.    Facility Alterations**

43.    The 2023 ADA Order requires modifications to San Diego Central Jail, some of which have been completed and some of which are ongoing.

44.    The County agrees to the following to remedy physical plant features and ensure ADA accessibility elsewhere in the jail system.  As part of these modifications, the County shall ensure sufficient accessible bed space for individuals in different housing classifications (e.g., mainline, protective custody, and administrative separation).

45.    Within four years of the signing of this ADA Settlement Agreement and Order, the County shall ensure that every person with a mobility disability who uses a wheelchair in housing is housed in a bed that accommodates their accommodation needs and that every person with a disability is housed with access to any appropriate accessibility features related to their bed, toilet, and shower, as individually determined by health care staff.  A person's disability-related housing accommodation needs shall be documented in their health record and the disability tracking system.

46.    Within 18 months of this Order, the County will complete a comprehensive assessment of the accessible housing needs of the disability subclass member population (the "Accessibility Bed Needs Assessment") in consultation with both neutral experts, as appropriate.  The Accessibility Bed Needs Assessment will be informed by relevant jail population data regarding incarcerated people with a disability requiring housing accessibility accommodation needs and if the assessment determines that additional housing or other measures are necessary, it will include identification of the additional construction or other measures that will occur and a reasonable timeline for implementation.  The Accessibility Bed Needs

13

1  Assessment will consider population data based on sex and classification levels,

2  including at a minimum security level and health/mental health care housing needs.

3  The neutral experts will review and approve the Accessibility Bed Needs

4  Assessment.

5          **1.**    **Las Colinas Detention and Reentry Facility ("Las Colinas")**

6      47.    Las Colinas is the primary booking and housing facility for women

7  incarcerated in the County.  The Sheriff's Office shall make the following changes

8  at Las Colinas to bring the facility into compliance with the 2010 ADA Standards

9  and California Building Code ("CBC"):

10      48.    *Intake/Booking*:

11  - Incarcerated person bathroom in Pre-Screening Processing: modify bathroom to 2010 ADA Standards and CBC requirements.

12

13  - Counter in Open Booking (1 of 5 windows):  provide forward approach, including 19" deep countertop free of obstructions.

14  - Incarcerated person bathroom in Open Booking: remove privacy wall; add window film; lower soap dispenser to 40" AFF to push button.

15

16  - Holding Cell 1: remove current bench and add 48"x24" bench; relocate grab bar; modify toilet to 2010 ADA Standards requirements; lower soap dispenser to 40" AFF to push button.

17

18  - Sobering Cell 2: modify toilet and sink to 2010 ADA Standards requirements.  Modify threshold to comply.

19  - Holding Cell 5: modify grab bar to 2010 ADA Standards requirements; relocate privacy wall; lower soap dispenser to 40" AFF to push button.

20

21  - Change out/Search room shower: modify shower to 2010 ADA Standards and CBC requirements.

22  - Add accessible bench to change out/search room.

23  - Add wheelchair-accessible weighing scale.

24      49.    *Housing*: The County currently houses incarcerated persons in housing

25  modules 1A-B, 3B-H, 4A-B, 5A-B, PSU, and Medical.  The County agrees to alter

26  3% of beds in these modules to comply with the 2010 ADA Standards.  This

27  includes modifying the bed and the bed's associated toilet, sink, desk, drinking

28  fountain, and shower.  The County will modify additional housing modules if

14    Case No. 3:20-cv-00406-AJB-DDL
JOINT MOTION AND ORDER RE: REMAINING ADA ISSUES AND RESOLVING
THIRD CLAIM FOR RELIEF    **Ex. A - 19**

additional housing modules are repopulated.  The specific changes to the existing housing units are as follows:

- 1A-B (IP workers) (dormitory)
  - A: 48 beds
  - B: 48 beds
  - Will modify 3 beds (A1, A15, B15)
- 3A (currently unoccupied) (cells with 2 beds)
  - 28 cells, 56 beds
  - Will modify 2 beds (A14)
  - Dayroom:  provide dayroom table that complies with 2010 ADA Standards and provides minimum two wheelchair-accessible seats. Provide detectable warning for drop boxes, utility sink counter, and medical (Narcan) cabinet.
- 3B (PC Level 1-5; no ADSEP or Green band) (cells with 2 beds)
  - 28 cells, 56 beds
  - Will modify 2 beds (B14)
  - Dayroom:  provide dayroom table that complies with 2010 ADA Standards and provides minimum two wheelchair-accessible seats. Provide detectable warning for drop boxes, utility sink counter, and medical (Narcan) cabinet.
- 3C-D (mainline low level 1-3) (cells with 2 beds)
  - C: 28 cells, 56 beds
  - D: 28 cells, 56 beds
  - Will modify 4 beds (C14, D14)
  - Dayroom:  provide dayroom table that complies with 2010 ADA Standards and provides minimum two wheelchair-accessible seats. Provide detectable warning for drop boxes, utility sink counter, and medical (Narcan) cabinet.
- 3E-F (mainline high level 4) (cells with 2 beds)
  - E: 28 cells, 56 beds
  - F: 28 cells, 56 beds
  - Will modify 4 beds (E14, F14)

- Dayroom:  provide dayroom table that complies with 2010 ADA Standards and provides minimum two wheelchair-accessible seats. Provide detectable warning for drop boxes, utility sink counter, and medical (Narcan) cabinet.

- 3G (mainline low level 1-3; can't roam) (cells with 2 beds)

  - 28 cells, 56 beds

  - Will modify 2 beds (G14)

  - Dayroom:  provide dayroom table that complies with 2010 ADA Standards and provides minimum two wheelchair-accessible seats. Provide detectable warning for drop boxes, utility sink counter, and medical (Narcan) cabinet.

- 3H (mainline low level 1-3; can't roam; COWS/CIWA) (cells with 2 beds)

  - 28 cells, 56 beds

  - Will modify 2 beds (H14)

  - Dayroom:  provide dayroom table that complies with 2010 ADA Standards and provides minimum two wheelchair-accessible seats. Provide detectable warning for drop boxes, utility sink counter, and medical (Narcan) cabinet.

- 4A-B (mainline high levels 4-5; can't roam) (cells with 1 bed)

  - A: 64 cells

  - B: 64 cells

  - Will modify 4 beds (A1, A30, B1, B30)

  - Dayroom (4B):  remove and replace minimum four seats for wheelchair clear floor space and knee clearance.  Provide detectable warning for drop boxes and medical (Narcan) cabinet.

- 5A (Administrative Separation) (cells with 1 bed)

  - 32 cells

  - Will modify 1 bed (A32)

  - Dayroom:  remove and replace one seat for wheelchair clear floor space and knee clearance.  Provide detectable warning for drop boxes and medical (Narcan) cabinet.

- 5B (OP Stepdown) (cells with 1 bed)

  - 32 cells

  - Will modify 1 bed (B32)

- • Dayroom: remove one seat for wheelchair clear floor space and knee clearance. Provide detectable warning for drop boxes and medical (Narcan) cabinet.
- • PSU
  - • A: 11 cells, single beds
  - • B: 11 cells, single beds
  - • Close Watch: 2 cells with single beds, 2 cells with double beds
  - • Will modify 3 beds (11, 14, 23)
  - • Dayroom: remove at least three seats. Provide detectable warning for drop boxes and medical (Narcan) cabinet.
  - • Video phone: remove fixed stool to comply with 2010 ADA Standards for wheelchair clear floor space and knee clearance.
- • Medical
  - • 3 Wards with 6 beds each (Ward 1 is EOH)
  - • 10 cells with 1 bed each (1 positive pressure, 5 negative pressure)
  - • Will modify 4 beds (1 bed in Ward 1, 1 bed in Ward 3, 1 positive pressure cell (Cell 1), and 1 negative pressure cell (Cell 2)

50.  *Medical Clinics*:

- • Clinic waiting area bathroom: modify bathroom to 2010 ADA Standards
- • Clinic bathroom: modify bathroom to 2010 ADA Standards
- • Add adjustable exam table to one medical exam room.

51.  *Visitation*:

- • Visits Search: modify privacy partitions to 86.5" from wall; modify floor slope to ¼" max slope
- • Non-Contact Visit: modify 1 of the 6 non-contact visitation rooms to have a 19" deep countertop and 40" phone.

52.  *Release*:

- • Release bathroom: modify bathroom to 2010 ADA Standards and CBC.

53.  *Classrooms*:

- • At least one compliant work space in each classroom.

17

- Modify classroom bathroom to 2010 ADA Standards and CBC.

54.  The foregoing housing alterations shall occur no later than three years from the signing of this ADA Settlement Agreement and Order.

## 2.  George Bailey Detention Facility ("George Bailey")

55.  George Bailey is the largest jail facility in the County by population. It houses only men and is not a booking facility. The County houses people with mobility disabilities at George Bailey, although the County does not currently house any individuals who use wheelchairs in housing at George Bailey. George Bailey is currently undergoing construction to remove all triple bunks.

56.  The County shall make the following changes at George Bailey to provide access to individuals with disabilities housed there:

57.  The County shall modify one holding cell to have toilet grab bars. The side grab bar will be as close to 42 inches long and 33-36 inches above the floor as possible based on wall length. The rear grab bar will be as close to 36 inches long and 33-36 inches above the floor as possible based on wall length and toilet height.

58.  As part of the County's obligation to provide accessible housing to all individuals requiring such housing, the County shall modify at least 3 dormitory bathrooms (in three different dormitories) to have a toilet with grab bars and a shower with grab bars. The toilet side grab bar will be as close to 42 inches long and 33-36 inches above the floor as possible based on wall length. The toilet rear grab bar will be as close to 36 inches long and 33-36 inches above the floor as possible based on wall length and toilet height. The accompanying shower for these beds will have grab bars. The shower grab bars will be as close to 16 inches long and 48 inches long as possible based on wall length. The County will provide portable shower chairs in these units.

59.  The County will prioritize, subject to classification and security needs, housing people with mobility disabilities who require lower bunk and lower tier housing in the dormitory units that have been modified.

JOINT MOTION AND ORDER RE: REMAINING ADA ISSUES AND RESOLVING
THIRD CLAIM FOR RELIEF

60.    Dayrooms:  detectable warnings at drop boxes, counters, drinking fountains, stairways, and video phones.

61.    Medical Unit:

    a.    Adjustable exam table.

    b.    Remove saloon-style shower door and provide curtain for shower serving medical observation dorms.

62.    These modifications shall be complete within 2 years of all counsel signing this ADA Settlement Agreement and Order.

### 3.    East Mesa Reentry Facility

63.    East Mesa is a jail facility that consists of dorm housing for men.  East Mesa is currently home to vocational programming not available to incarcerated men at any other facilities.  The County does not currently house any individuals who use wheelchairs in housing at East Mesa.

### 4.    Vista Detention Facility ("Vista")

64.    Vista serves North County and is the oldest jail facility in the County.  Vista is a booking facility for men and women and houses only men.

65.    No individual requiring a wheelchair in a housing module will be booked or housed at Vista.

66.    The County are studying whether to renovate Vista or to replace it with a new jail facility.  Any new facility to replace Vista shall be constructed in accordance with all applicable construction requirements under the ADA, Rehabilitation Act, and California Government Code 11135 in effect at the time of construction.

67.    In the interim, the County shall modify one holding cell to have toilet grab bars.  The side grab bar will be as close to 42 inches long and 33-36 inches above the floor as possible based on wall length.  The rear grab bar will be as close to 36 inches long and 33-36 inches above the floor as possible based on wall length and toilet height.

68.     These modifications shall be complete within 1 year of all counsel signing this ADA Settlement Agreement and Order.

### 5.    Rock Mountain Detention Facility ("Rock Mountain")

69.     Rock Mountain is a jail facility adjacent to George Bailey.  It houses only men and is not a booking facility.  The County has been altering Rock Mountain to comply with the 2010 ADA Standards.  Any additional housing brought online shall provide for at least 3% of housing beds complying with the 2010 ADA Standards for physical accessibility.

70.     For any additional housing brought online, the County shall make renovations to comply with the 2010 ADA Standards to any new housing (including beds, toilets, and showers) brought online.  The County shall also modify other spaces for programs, services, and activities, including holding areas, program spaces, dayrooms, exercise yards, and medical areas.

71.     The County shall bring online 10 additional beds that comply with the 2010 ADA Standards within three years of all counsel signing this ADA Settlement Agreement and Order.

72.     The County shall ensure that the sallyport ramp at Rock Mountain is accessible.

### 6.    South Bay Detention Facility ("South Bay")

73.     South Bay is a jail facility in Chula Vista.  It houses only men and is not a booking facility.  The facility is not and will not be used to house individuals who use wheelchairs in housing.

74.     The County shall make the following changes:  Alteration of Holding Cell LD 1 to meet the 2010 ADA Standards.  This cell will only be used to hold 2 incarcerated persons in wheelchairs for Court appearances.  This alteration will be complete by June 1, 2026.

### G.    Transition Plan

75.     If the County creates an ADA transition plan, it will reflect the relevant

20

portions of this ADA Settlement Agreement and Order.

### H.     Program Access

76.     The County shall ensure that no qualified incarcerated person with a disability, who meets all essential eligibility requirements, shall be excluded from participation in or denied the benefits of any in-custody program, service, or activity based upon their disability.  The County shall provide the reasonable accommodations needed for incarcerated persons with an identified disability to have an equal opportunity to participate in and benefit from the County's programs, services, and activities.

77.     The programs, services, and activities at the facilities, which must be provided on an equivalent basis to incarcerated persons with identified disabilities to the extent they meet all essential eligibility requirements, include dayroom, out-of-cell time, outdoor recreation and exercise equipment, showers, telephones, videophones, television, tablets (when available), reading materials, library, writing materials, religious services, substance use programs, reentry services, clinical services, family and public visiting, and attorney visiting.

78.     Incarcerated persons with an identified disability shall have equal, meaningful access to educational programs, vocational programs, and job assignments at the jail facilities.  The County shall provide reasonable accommodations as necessary for qualified individuals with an identified disability to participate in and have meaningful access to educational programs.  For vocational programs and job assignments, the County will provide equal opportunities and reasonable accommodations to qualified individuals with an identified disability who can perform the essential functions with or without reasonable accommodations.

79.     All incarcerated persons with disabilities shall be housed in a manner which allows for access to programs, services, and activities that they are qualified to participate in, with or without reasonable accommodation, in accordance with

1    their security/custody level.

2        80.    Within six months of the signing of this ADA Settlement Agreement

3    and Order, the County shall ensure that any otherwise qualified individual with a

4    mobility disability who cannot be housed at Vista due to housing accommodations

5    for their disability is able to access the programs and services available in the

6    Veterans Moving Forward module, through individual and/or virtual means.  The

7    County is committed to providing access to the Veterans Moving Forward module

8    to ensure full participation of qualified individuals with mobility disabilities in this

9    program in the future, including housing in the program, to the extent possible based

10   upon future construction, other than as identified in Paragraphs 45 and 46 above,

11   and programmatic constraints.

12       81.    Within six months of the signing of this ADA Settlement Agreement

13   and Order, the County shall develop a plan to provide access to the vocational

14   programs available at East Mesa to all qualified individuals with mobility

15   disabilities who can perform the essential functions with or without accommodation

16   and who must be housed at other facilities due to their disabilities.

17   **I.**    **Requests for Disability Accommodations and Grievances**

18       82.    The County shall maintain policies, procedures, and training regarding

19   incarcerated person requests for disability accommodations and grievances

20   regarding disability accommodations.

21       83.    Incarcerated persons can submit requests for new reasonable

22   accommodations via the Healthcare Request form and process.  The County shall

23   timely respond to Healthcare Request forms requesting reasonable accommodations

24   and shall track all such Healthcare Request forms and their resolutions.

25       84.    An incarcerated person with a disability may contact the ADA Unit

26   regarding the provision of their reasonable accommodations to access programs,

27   services, and activities by using the Incarcerated Person Request form.  The ADA

28   Unit shall timely respond to Incarcerated Person Requests regarding reasonable

22    Case No. 3:20-cv-00406-AJB-DDL
JOINT MOTION AND ORDER RE: REMAINING ADA ISSUES AND RESOLVING
THIRD CLAIM FOR RELIEF    **Ex. A - 27**

accommodations and shall track all such Incarcerated Person Requests and their resolutions.

85.    An incarcerated person with a disability may grieve alleged discrimination due to a disability or dispute decisions related to accommodations by using the Incarcerated Person Grievance form.

86.    Within 6 months of all counsel signing this ADA Settlement Agreement and Order, the County will amend the Grievance form to include a clear means for a person to identify that their grievance is an "ADA" grievance.  The County shall track all such "ADA" grievances and their resolutions.

87.    Blank grievance forms shall be available in every housing unit and in health care areas, and shall be provided to incarcerated persons upon request at any time.

88.    The County shall provide assistance completing grievances, Incarcerated Person Requests, and Healthcare Request forms to those incarcerated persons with disabilities who require reasonable accommodations to complete the forms.

89.    ADA grievances shall receive a response to the grievance within seven (7) calendar days or sooner based upon the nature of the request and well-being of the grievant.  In response to an ADA grievance alleging the incarcerated person's health or safety is being threatened by a condition of their confinement or that the conditions of confinement prevent their effective communication or participation in a court or administrative proceeding, the ADA Unit will respond within four (4) calendar days.  The ADA Unit or their designee in collaboration with health staff will provide an interim accommodation when warranted, pending a final response to the grievance.

90.    As part of the ADA Unit's quality assurance processes, the ADA Unit shall track all ADA grievances for quality assurance and take corrective action as necessary to address issues.

23

**J.    Effective Communication**

91.    The County shall ensure that incarcerated persons with identified disabilities receive accommodations and services necessary for effective communication, and are able to equally and fully access jail facility programs, services, and activities, including as part of the 2023 ADA Order.  Staff shall give primary consideration to a person's preferred method of communication.

92.    Staff shall use the incarcerated person's documented preferred method of communication for all due process events, health care encounters, and structured programming.  The provision of effective communication shall be documented for health care encounters and structured programming.  The provision of effective communication shall be documented for due process events when an auxiliary aid or contracted service is used.  The neutral expert for policies, procedures, and implementation thereof shall conduct audits of compliance with the effective communication requirements in this section, including through documentation review, body worn camera footage review, and in-person observations, as the neutral deems appropriate, and include their findings in their twice-yearly reports.

93.    "Due process" refers to requirements for judicial, non-judicial, and administrative proceedings that protect an incarcerated person's life, liberty, or property interests.  This includes, but is not limited to, notices of new charges, notice to appear, booking, discipline, grievance, classification, investigative, probation, and release processes.

94.    "Health care encounter" refers to an interaction between a patient and health care staff (to include medical, mental health, dental, and vision care) that involves an assessment, examination, treatment, counseling, and/or exchange of protected health information.  This includes, but is not limited to, health screenings, sick calls, informed consent or refusal of health care, explanation of medication, treatment, or discharge instructions.

95.    "Structured programming" refers to in-custody and reentry programs

and services that are managed by the Sheriff's Office Reentry Services Division ("RSD") (e.g., education, self-help, AA/NA, vocational, work positions, or religious programs, discharge planning, services, or activities).  This includes communications between incarcerated workers and their supervisors that are outside general day-to-day communication (e.g., training, performance evaluations, discipline).

96.     Providing effective communication may require the use of auxiliary aids and services, such as qualified sign language interpreters, certified deaf interpreters, sound amplification devices, hearing aids, captioned telephones, captioned televisions, video relay services ("VRS"), video relay interpretation ("VRI"), electronic and other magnifiers, Braille materials, screen reading software, large-print materials, audio recordings, writing materials, and written notes.

97.     For individuals who use sign language to communicate, they shall not be cuffed or shackled by their hands while signing or when using any auxiliary aid (such as VRI or VRS) to communicate with their hands, unless there is a safety and security concern.  If this occurs, staff will document the specific individualized safety and security concern, which will be reviewed by a supervisor to ensure it meets criteria for the action.

98.     For individuals who use sign language to communicate and/or who are Deaf, the County shall ensure that deputies promptly respond in-person when those individuals push the intercom button in their cell and/or housing unit.

**K.     Assistive Devices, Health Care Appliances, and Durable Medical Equipment**

99.     The County shall ensure that incarcerated persons with a disability requiring an assistive device, health care appliance, or durable medical equipment (including prosthetics) (henceforth, "HCA/AD/DME") will have access to such a reasonable accommodation(s).  Incarcerated persons with personal assistive devices shall be permitted to keep their devices during the booking process and throughout

their time in custody unless the device poses a direct threat or safety and security
risk, as determined based on an individualized assessment with supervisory review
and approval.  If such a risk is identified, an equivalent County device will be issued
instead of the personal assistive device if there is an alternative that does not pose a
direct threat or safety and security risk.  Any HCA/AD/DME provided by the
County to replace an individual's personal HCA/AD/DME shall be sufficient to
provide the person with safe access to the jail facility's programs, services, and
activities.  The County will store the personal HCA/AD/DME and return it upon
release from custody.

100.   If an incarcerated person with a disability needs a reasonable
accommodation in the form of an assistive device but does not have one, the County
will provide it.  An incarcerated person's insurance if applicable may be billed for
personal devices; billing will not delay the provision of the assistive device.  The
County shall maintain a sufficient supply, as determined by the County health staff,
of all HCA/AD/DME that is regularly used to assist persons with disabilities at each
jail facility, in working order, to ensure timely provision of such items to
incarcerated persons with disabilities.

101.   If an assistive device is removed for safety or security reasons, after
supervisory review, the decision and reasons for removal shall be documented,
receive supervisory review, and be reviewed with medical staff within 24 hours to
determine an appropriate alternative device and/or accommodation.  The ADA Unit
will be promptly notified and shall assist as necessary to appropriately resolve the
issue.

102.   If an individual's personal HCA/AD/DME becomes unusable, the
County will provide the person with a replacement HCA/AD/DME.  An
incarcerated person's insurance if applicable may be billed for personal devices;
billing will not delay the provision of the assistive device.

103.   The County shall not automatically remove HCA/AD/DME when

1  incarcerated persons are placed in temporary holding, sobering, or observation cells,

2  and shall remove HCA/AD/DME only based on individualized security factors and

3  for the minimum time necessary.

4      104.   Upon release, if an incarcerated person does not have personal

5  HCA/AD/DME or came to the jail with HCA/AD/DME that is not adequate for the

6  person's needs, the County shall permit the person to retain any HCA/AD/DME

7  provided to the person while in custody, or the County shall provide a comparable

8  device.  An incarcerated person's insurance if applicable may be billed for personal

9  devices; billing will not delay the provision of the assistive device upon release from

10  the jail.  The County may alternatively coordinate with the incarcerated person, the

11  person's family or friends, and/or other County agencies to secure HCA/AD/DME

12  for the person prior to release so long as the incarcerated person has the device at the

13  time of release.  The provision of HCA/AD/DME, return of personal devices, and/or

14  coordination with external parties shall be documented in a manner that can be

15  audited for quality assurance.

16      **L.      Emergency Situations and Use of Force**

17      105.   The County shall develop and implement policies, procedures, and

18  training to ensure that incarcerated persons with disabilities are accommodated

19  during evacuations and other emergencies at the jail.  The Sheriff's Office's "green

20  sheets" (facility-specific policies and procedures) for each facility shall include

21  specific information about evacuation procedures for incarcerated persons with

22  disabilities to be accommodated during an emergency, identifying the devices on

23  hand to carry people with mobility disabilities downstairs when necessary, and

24  identifying the specific ways that staff at that facility must accommodate people

25  with disabilities in a facility emergency, given the unique characteristics of each jail

26  facility.  The County shall revise these green sheets by no later than six months from

27  the date of the signing of this ADA Settlement Agreement and Order by all counsel.

28  The County shall provide drafts of the green sheets to the neutral expert for review

and prompt comment.  The County shall ensure that they have sufficient devices to carry people with mobility disabilities downstairs for emergencies when elevators do not work or cannot be used.

106.   The County shall conduct training on disability awareness and de-escalation related to use of force on incarcerated persons with identified disabilities. The County shall comply with its use of force policies and take into account an incarcerated person's documented physical disability, mental health disability, or intellectual disability (including relevant accommodation and adaptive support needs), before pre-planned cell extractions and coordinated tactical responses to incidents involving multiple incarcerated persons and incarcerated persons not participating in the incident.

**M.   People with Learning, Intellectual, and Developmental Disabilities**

107.   The County shall ensure that health care staff who have received the training specified in Paragraph 22 conduct a screening of incarcerated persons for intellectual, learning, and developmental disabilities.  For any person suspected of having a learning, intellectual, or developmental disability, the County shall provide a secondary screening by a qualified mental health professional ("QMHP") within seven (7) business days.  The QMHP shall be responsible for documenting any identified learning, intellectual, or developmental disabilities and necessary accommodations in the person's health record.  This includes identifying and documenting 1) adaptive support needs, 2) safety, vulnerability, and victimization concerns; and 3) programming, housing, and accommodation needs.

108.   If the person has been a client of a Regional Center through the California Office of Developmental Services, the County shall contact the Regional Center to obtain the person's Individualized Program Plan, subject to the person's authorization.

109.   The County shall ensure provision of adequate supports for any person with a learning, intellectual, or developmental disability as determined by medical

and mental health care staff as appropriate.  Incarcerated persons with a learning, intellectual, or developmental disability may not be housed in Administrative Separation or any similarly restrictive setting (which does not include protective custody) based on victimization or safety concerns arising from their disabilities.

110.   The County shall provide identified accommodations and adaptive supports to people with learning, intellectual, or developmental disabilities, including but not limited to effective communication, such as providing more time to respond to and act in accordance with directions (except when there is an immediate safety and security issue), assistance completing forms, and supports as necessary with activities of daily living.

111.   Mental Health Services will take appropriate steps to ensure implementation of each person's individualized plan, in coordination with the ADA Unit as appropriate.

112.   The County shall implement training for staff, including contractors, on learning, intellectual, and developmental disabilities, including on the needs of incarcerated persons with such disabilities and staff's responsibilities to provide for such needs and to monitor for and address any safety, vulnerability, or victimization concerns.

113.   People with learning, intellectual, and developmental disabilities shall have equal access to books, magazines, and any future electronic tablet programs, consistent with their reading and cognitive abilities.

114.   The County shall provide discharge planning tailored to the needs of people with learning, intellectual, or developmental disabilities, including appropriate and effective linkages to housing assistance and community-based service providers.

### N.    Searches and Restraints

115.   The County shall ensure that incarcerated persons with disabilities receive reasonable accommodations with respect to searches and during counts.

(For example, search procedures may require modification for a person with a mobility disability affecting their ability to stand or maintain a certain body position.)

116.   The County shall ensure that incarcerated persons with disabilities receive appropriate reasonable accommodations with respect to application of restraint equipment.

### O.    Transportation

117.   The County shall ensure that incarcerated persons with disabilities are reasonably accommodated when in transit, such as between facilities, out to court, or to and from outside health care services.  The County shall ensure that they maintain an adequate fleet of functional wheelchair accessible vehicles and shall ensure appropriate compliance for safe transport of wheelchair riders.

118.   The County shall ensure that whether a person requires accessible transportation is documented in the disability tracking system, and that staff have access to this information as necessary to ensure provision of appropriate accommodations during transportation.

119.   The County shall ensure that prescribed assistive devices for people with disabilities are available to them at all times during the transport process, when the incarcerated person is moving, boarding on and off the vehicle and moving to their seat within the vehicle, absent a safety concern.  If this occurs, staff will document the specific individualized safety and security concern which will be reviewed by a supervisor to ensure it meets criteria for the action.  This includes in temporary holding cells.

120.   The County shall ensure that staff provide assistance to people with mobility or other disabilities where necessary to ensure safe access on and off of transport vehicles.  The County shall provide restraint-related accommodations to ensure that people with mobility disabilities are restrained in ways that maintain their safety during transport.

121.    The County shall develop and implement processes to inspect the accessible transportation vehicles on a regular basis to ensure that they are in safe working condition, and take prompt steps to address vehicle maintenance issues.

**P.    Accommodations for People with Substance Use Disorder**

122.    The County shall ensure that people with substance use disorders are not subject to discrimination on the basis of disability.

123.     Plaintiffs do not waive any claims regarding the provision of medical care, including medication assisted treatment, for incarcerated people with substance use disorders, as set forth in the first claim for relief of the Third Amended Complaint, and those claims are explicitly reserved.

**Q.    People with Mental Health Disabilities**

124.    The Sheriff's Office shall ensure that people with mental health disabilities are not subject to discrimination on the basis of disability and have equal and meaningful access to programs, services, and activities while incarcerated, unless there is a specific clinical or valid safety reason based on individualized assessment.  This provision covers access to, for example, worker opportunities, classes, vocations and rehabilitation programs, and religious programs.

125.    The County shall ensure that incarcerated persons with (a) mental health disabilities or (b) intellectual disabilities (as identified through the process set forth in Section III.M) will not face discrimination in the use of disciplinary procedures or sanctions. The procedures set forth in Paragraph 126 will apply in cases where:

(1) the incarcerated person:

(a) has been identified as having an intellectual disability through the process set forth in Section III.M; or

(b) meets clinical criteria for placement in PSU, OPSD, EASS, or JBCT; or

(c) is housed in OPSD, PSU, JBCT, EASS, or is PC 1368/1370, or is

31

1    conserved;

2    and

3    (2) the incarcerated person faces placement in restrictive housing or lockdown

4    or a denial of property or privileges as a potential disciplinary sanction.

5    126.   A Qualified Mental Health Professional shall assess the person and provide written findings as to (a) whether or not the reported behavior was related to mental illness, adaptive functioning deficits, or other mental health or intellectual disability; and (b) whether certain sanctions should be avoided in light of the person's mental health or intellectual disability, treatment plan, or adaptive support needs.  Custody staff shall meaningfully consider the Qualified Mental Health Professional's findings when deciding what, if any, disciplinary action should be imposed.  If custody staff do not follow the mental health input, staff shall document why it was not followed.

127.   Incarcerated persons shall not be subjected to discipline in any manner that prevents the delivery of mental health treatment or adaptive support needs.

128.   Incarcerated persons shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

129.   The County shall provide the individual's reasonable accommodations during the disciplinary process.

**R.**    **Quality Assurance and Auditing**

130.   The Sheriff's Office's ADA Unit shall develop a quality assurance and auditing program to ensure ADA compliance within one year of all counsel signing this ADA Settlement Agreement and Order.

**S.**    **Non-Retaliation and Non-Interference**

131.   The County shall not retaliate, discriminate against, coerce, intimidate, threaten, or interfere with any incarcerated person in the exercise or enjoyment of, or an account of his or her having exercised or enjoyed, or on account of his or her

32    Case No. 3:20-cv-00406-AJB-DDL
JOINT MOTION AND ORDER RE: REMAINING ADA ISSUES AND RESOLVING
THIRD CLAIM FOR RELIEF    **Ex. A - 37**

having aided or encouraged any other incarcerated person in the exercise or enjoyment of any ADA right while incarcerated.

## IV.    COMPLIANCE

### A.    Neutral Experts

132.    The parties agree that there will be a CASp neutral expert retained to ensure compliance with this ADA Settlement Agreement and Order who shall be the same individual agreed upon regarding the 2023 ADA Order.  The parties agree that there will be an additional neutral expert retained regarding policies, practices, procedures, and training relating to this ADA Settlement Agreement and Order.

133.    The parties shall meet and confer on the process for selecting the ADA neutral expert for policies, procedures and practices relating to this ADA Settlement Agreement and Order.  If the expert is not selected within 30 days of Court approval of this ADA Settlement Agreement and Order, the parties shall submit names to the Magistrate Judge for selection.  The County shall sign a contract with the chosen neutral expert within 30 days of their selection.

134.    If any of the neutral experts become unavailable, the parties will meet and confer, and assign a new expert.  The parties may agree at any time to remove and replace a neutral expert.  If the parties do not agree on removal, either party may refer the matter to the Magistrate Judge, and, if necessary, to the Court to determine whether the neutral expert should be retained or removed.

135.    The neutral experts will work with the County to ensure timely and appropriate implementation of this ADA Settlement Agreement and Order.

136.    Plaintiffs' expert accompanied by Class Counsel may inspect each altered facility (other than San Diego Central Jail, which shall be inspected according to the 2023 ADA Order) one time within two months of completion of all the alterations at the specific facility.  No more than one class counsel shall join Plaintiffs' expert on their inspections.  One month prior to such inspections, Class Counsel shall receive copies of any architectural plans and specifications for the

alterations.

137.    The neutral experts may engage in *ex parte* communications with the parties.  All of the neutral experts' findings and recommendations shall be set forth in writing in their reports.

138.    The neutral experts, accompanied by Class Counsel and the County's counsel, shall have access to all jail facilities upon reasonable notice.  All site visits shall take place on consecutive days.  There shall be two (2) site visits, per expert, in each year that the ADA Settlement Agreement and Order is in effect, unless otherwise agreed by the parties. No more than one class counsel shall join the neutral expert on their site visits.

a.    The neutral experts shall have reasonable access to meet and interview personnel whose duties pertain to the provision of services and/or who work with incarcerated persons in the area of the expert's expertise.

b.    The neutral experts shall have a reasonable opportunity to conduct interviews of incarcerated persons to assess whether the County is in compliance with the terms of this ADA Settlement Agreement and Order.  Class Counsel shall be able to advise these class members at the time of the proposed interviews to ensure informed consent to participate.

c.    With the informed consent of class members, the neutral experts shall have reasonable access to observe the evaluation and assessment of ADA needs and services, including at ADA verifications and functional assessment meetings.

d.    The neutral experts shall have access to the County's disability tracking system during site visits.

139.    The neutral experts may request to review County documents, except those documents protected by attorney-client or work product privileges, or by state or federal law, to assess the County's compliance with the terms of this ADA Settlement Agreement and Order as the neutral deems appropriate.  If these

documents are requested in conjunction with a site visit, the County will provide these documents to the extent feasible within ten (10) days prior to the visit. All materials produced to the neutral expert must be shared with counsel for Plaintiffs and the County. At a minimum, the County must, on a monthly basis, produce to the neutral expert and Class Counsel a housing roster from the first day of the month, identifying and reflecting the disability needs of every person incarcerated in a County jail facility who has been identified as having a mobility, hearing, vision, speech, or developmental disability, including information regarding the category or categories of disabilities, any disability-related housing restrictions, and whether the person's cell or housing unit has 2010 ADA Standards-compliant bed, toilet, or shower, or non-compliant shower or toilet grab bars. Housing does not include intake and holding. These rosters will be provided monthly for the twelve months following all counsel signing this ADA Settlement Agreement and Order, and quarterly thereafter until Substantial Compliance with this ADA Settlement Agreement and Order is achieved.

140.     The neutral experts shall each issue a report following the inspection(s) which take place as provided in Paragraph 136 addressing the County's progress toward implementation of the requirements set forth in this ADA Settlement Agreement and Order. Draft reports shall be provided to the Parties within 30 days of the later of the expert's site inspection and the expert's receipt of all requested documents and information, and in no case later than 45 days after the inspection. Each report shall contain a determination of whether the County is "substantially complying" with each provision of the ADA Settlement Agreement and Order. If a neutral expert concludes that the County is not substantially in compliance with the terms of any provision or provisions of this ADA Settlement Agreement and Order, the neutral expert shall make recommendations as to actions the County should take to comply with the terms of the provision or provisions. Either party may submit comments within 15 days for review by the neutral expert,

who shall thereafter issue the report in final form.  The neutral experts shall ensure that individual incarcerated person or staff names are not included (or are properly redacted) in the reports.  Counsel for both sides will review to determine and implement any additional necessary redactions, including for safety and security reasons.  With such proper redactions, the final reports will be public documents. Reports will not be filed with the district court unless attached to a motion seeking relief under this Settlement Agreement and Order or the 2023 ADA Order, or by order of the court.  The County will pay reasonable fees for work performed by the neutral experts to fulfill his or her obligations under this agreement.  If the County believes that Class Counsel is requiring the neutral experts to expend excessive and unwarranted time on the matter, the parties shall first meet and confer; if there remain disputes, the issue may be brought to Judge Leshner pursuant to the Dispute Resolution process below.

141.   The neutral experts shall also issue respective reports upon determining the County has achieved substantial compliance with the terms of this ADA Settlement Agreement and Order as substantial compliance with respect to each provision of this ADA Settlement Agreement and Order is achieved.

142.   The neutral expert for policies, procedures, and implementation therefor shall be permitted to attend trainings as the neutral expert deems appropriate.  If the neutral expert attends, the training will be videotaped and made available to Class Counsel.  The faces and/or names of attendees will be redacted as necessary to protect employee anonymity.

143.   The neutral experts shall be provided with and agree to be bound by any protective or Court orders entered in this case to protect the confidentiality of incarcerated persons' records and security-sensitive information.

144.   To facilitate Class Counsel's ability to communicate with their clients, the County agrees to facilitate one day of interviews at a single facility every four months between Class Counsel and the disability subclass members.  Class Counsel

JOINT MOTION AND ORDER RE: REMAINING ADA ISSUES AND RESOLVING
THIRD CLAIM FOR RELIEF

**Ex. A - 41**

shall, at least 10 days before the interview, identify the facility and provide the County a list of no more than 20 subclass members housed at that facility to interview so that the County can facilitate the interviews.  The County shall provide a confidential room at the requested jail facility where Class Counsel can interview the subclass members.  The County will produce the previously identified subclass members who are housed at the facility in an expeditious manner, as reasonably possible.  The County also agrees to explore options to facilitate the above interviews over Microsoft Teams or a similar platform.  This provision terminates once the County has achieved Substantial Compliance.

## B.    Dispute Resolution

145.   Any disputes between the parties about a matter governed by this ADA Settlement Agreement and Order shall be subject to these dispute resolution procedures and those set forth above regarding neutral experts.  This provision along with Paragraphs 147-148 are the sole and exclusive means to address disputes, and shall cover any dispute prior to issuance of a Substantial Compliance report, and any dispute regarding alleged failure of the County to maintain compliance with the terms of this ADA Settlement Agreement and Order following a finding of Substantial Compliance, other than seeking relief from the District Court.  A party may initiate the dispute resolution process with respect to any matter covered by this ADA Settlement Agreement and Order by providing written notice of a dispute ("Dispute Notice") to the other party within 10 days of becoming aware of any such dispute.  Following service of the Dispute Notice, the parties shall undertake good faith negotiations in person or via video conference at such times and places as they deem sufficient in an effort to resolve the dispute informally between them.

146.   If, within 30 days after service of the Dispute Notice, the parties have failed to resolve the dispute, the parties shall next seek the assistance of Magistrate Judge David Leshner.  Any party may request that a settlement conference be scheduled within 30 days of requesting the Magistrate Judge's assistance, unless the

1  parties mutually agree upon an alternative schedule or the Court schedule does not
2  allow for presentation of the issue to Magistrate Judge Leshner within 30 days.  The
3  content of the settlement conference discussions shall not be offered in evidence in
4  any subsequent judicial proceeding in this case.

5      147.   If a dispute cannot be resolved after conducting a settlement conference
6  with Magistrate Judge Leshner or his designee, either party may seek the assistance
7  of the District Court through the filing of a motion for relief.

8      148.   In cases of particular urgency or irreparable harm related to provisions
9  in this ADA Settlement Agreement and Order, a party may opt to bring disputes
10 directly to the District Court, or both parties may consent to bypass the Magistrate
11 Judge if the parties agree the issue should be briefed to the Court, with prior notice
12 to the Magistrate Judge.

13 **V.     MISCELLANEOUS RELIEF**

14     149.   Class counsel may bring concerns in writing about individual
15 incarcerated persons with disability accommodation or access concerns to the
16 attention of the ADA Unit.  The ADA Unit will investigate and respond to Class
17 counsel within 10 business days of receipt.  This process is not meant to replace or
18 circumvent the existing processes for requesting disability-related accommodations
19 or assistance, or following the existing request and grievance processes in the Jail.
20 Incarcerated persons in the Jail will be encouraged to make use of those processes.

21     150.   Before contacting the ADA Unit, Class Counsel will attempt to verify
22 that the concerns of individual class members are accurate, substantive, and not
23 frivolous.

24 **VI.    DURATION AND TERMINATION**

25     151.   The duration of this ADA Settlement Agreement and Order is until
26 such time that the County have achieved Substantial Compliance as to any Facility
27 Alterations provisions set forth herein (Section F) and have demonstrated
28 Substantial Compliance for a period of at least twelve months for any other

1  provision set forth herein.

2      152.   Consistent with the foregoing paragraph, the County may move for

3  termination of any portion of this ADA Settlement Agreement and Order pursuant to

4  18 U.S.C. section 3626(b)(1)(A)(i) after a finding of Substantial Compliance at any

5  point after the Court's approval of this ADA Settlement Agreement and Order, after

6  conferring with Plaintiffs' counsel to attempt to reach agreement on whether

7  substantial compliance has been achieved up to and including full and complete

8  compliance of the entire Settlement Agreement and Order.  Unless otherwise

9  ordered by the Court, such a finding will result in a termination of the relevant

10  neutral's work as to the particular area of Substantial Compliance or, upon full

11  compliance, as to the entire scope of the relevant neutral's work and retention of that

12  neutral.

13      153.   If Plaintiffs form the good faith belief prior to final termination of the

14  entire Settlement Agreement and Order, that the County is no longer in substantial

15  compliance with any component(s) of this ADA Settlement Agreement and Order

16  previously found to be in substantial compliance and as to which the neutral's work

17  has concluded as set forth in Paragraph 150, Plaintiffs shall promptly so notify the

18  County in writing.  Within 30 days, the County shall serve a written response stating

19  whether they agree or disagree.  In the event the County disagrees, the parties will

20  proceed with the Dispute Resolution process set forth in Section IV.B.

21      154.   Nothing in this ADA Settlement Agreement and Order shall limit the

22  parties' rights to challenge or appeal any finding as to whether the County is or is

23  not in substantial compliance with this ADA Settlement Agreement and Order or

24  consequent orders entered by the District Court.

25  **VII.   AMENDMENTS**

26      155.   By mutual agreement, the parties may change the terms of this ADA

27  Settlement Agreement and Order, including, but not limited to, the timetables for

28  taking specific actions, provided that such mutual agreement is memorialized in

1  writing, signed by the parties, and approved by the Court.

2  **VIII. JURISDICTION AND ENFORCEMENT**

3      **A.**    **Court Approval**

4      156.   This Joint Motion will be subject to approval by the District Court,

5  pursuant to Federal Rule of Civil Procedure 23, with notice to the Disability

6  Subclass and a Fairness Hearing; the parties shall file a joint motion for preliminary

7  approval within 30 days of all counsel signing this ADA Settlement Agreement and

8  Order.

9      **B.**    **Court Jurisdiction**

10      157.   For the purposes of jurisdiction and enforcement of this ADA

11  Settlement Agreement and Order only, the parties jointly request that the Court find

12  this ADA Settlement Agreement and Order satisfies the requirements of 18 U.S.C.

13  § 3626(a)(1)(A) in that it is narrowly drawn, extends no further than necessary to

14  correct the violation of the Federal right, and is the least intrusive means to correct

15  the violation of the Federal right of the Plaintiffs and the Disability Subclass.  In the

16  event the Court finds that the County has not substantially complied with the ADA

17  Settlement Agreement and Order, it shall in the first instance require the County to

18  submit a plan for approval by the Court to remedy the deficiencies identified by the

19  Court.  In the event the Court subsequently determines that the County's plan did

20  not remedy the deficiencies, the Court shall retain the power to enforce this ADA

21  Settlement Agreement and Order through all remedies provided by law and equity.

22      158.   The Court retains jurisdiction to enforce the terms of this ADA

23  Settlement Agreement and Order during the duration of the ADA Settlement

24  Agreement and Order, as set forth in Paragraphs 151-154.

25      159.   The Court shall be the sole forum for enforcement of this ADA

26  Settlement Agreement and Order.  Any order to achieve substantial compliance with

27  the provisions of this ADA Settlement Agreement and Order shall be subject to the

28  applicable provisions of the Prison Litigation Reform Act, 18 U.S.C. Section 3626.

40    Case No. 3:20-cv-00406-AJB-DDL
JOINT MOTION AND ORDER RE: REMAINING ADA ISSUES AND RESOLVING
THIRD CLAIM FOR RELIEF    **Ex. A - 45**

## IX.    ATTORNEYS' FEES AND COSTS

160.    The parties agree that Plaintiffs and the disability subclass are entitled to reasonable attorneys' fees and costs on all issues covered by the Third Claim for Relief in Plaintiffs' Third Amended Complaint, including the 2023 ADA Order and this ADA Settlement and Order.  Class Counsel may move for an award of reasonable attorneys' fees, litigation expenses, and costs for obtaining relief for the Plaintiff subclass pursuant to the ADA, 42 U.S.C. § 12205, the Rehabilitation Act, Gov't Code § 11135, Cal. Code. Civ. Proc. § 1021.5 or any other applicable law.

161.    The parties further agree that Class Counsel are entitled to reasonable attorneys' fees, litigation expenses, and costs for post-settlement date work performed in conjunction with the Third Claim for Relief in Plaintiffs' Third Amended Complaint including the 2023 ADA Order and this ADA Settlement and Order.  Class Counsel's bills shall be reviewed and approved by the County on a quarterly basis.

162.    Class Counsel agrees to reduce their hourly rates by 10% for all post-settlement date work.  The benchmark for Class Counsel's post-settlement date work (other than work preparing for and filing enforcement motions or otherwise engaging in litigation) shall be $75,000.00 per quarter (including fees and costs).  For any quarter in which attorneys' fees and costs exceed the benchmark, either party may request a settlement conference before Magistrate Judge Leshner.  If the parties are unable to resolve any such dispute before Judge Leshner, Class Counsel may apply to the Court for the additional reasonable attorneys' fees, litigation expenses, and the County may oppose such a request.  Class Counsel's work preparing for and filing enforcement motions or otherwise engaging in litigation shall not be subject to the above-referenced benchmark, nor to the rate reduction in the paragraph above.

163.    For all travel costs in connection with post-settlement date work, Class Counsel shall be limited to the California State travel reimbursement rates in effect

1  on the date of travel. The current rates are described here:

2  https://www.calhr.ca.gov/employees/pages/travel-reimbursements.aspx.

3

4          IT IS SO STIPULATED.

5

6                                          Respectfully submitted,

7  DATED:  November 22, 2024          ROSEN BIEN GALVAN & GRUNFELD LLP

8                                          By:  */s/ Gay Crosthwait Grunfeld*

9                                               Gay Crosthwait Grunfeld

10                                         Attorneys for Plaintiffs and the
11                                         Certified Subclass

12

13  DATED:  December 11, 2024          BURKE, WILLIAMS & SORENSEN, LLP

14                                         By:  */s/ Susan E. Coleman*

15                                              Susan E. Coleman
                                               Elizabeth M. Pappy
16                                         Attorneys for Defendants

17

18

19                      **SIGNATURE CERTIFICATION**

20          Pursuant to the Court's Electronic Case Filing Procedures Manual Section

21  2(f)(4), I certify that I have obtained the consent of all signatories to the electronic

22  filing of the foregoing document.

23  DATED:  December 12, 2024          ROSEN BIEN GALVAN & GRUNFELD LLP

24                                         By:  */s/ Gay Crosthwait Grunfeld*

25                                              Gay Crosthwait Grunfeld

26                                         Attorneys for Plaintiffs and the
27                                         Certified Subclass

28

                                    42                    Case No. 3:20-cv-00406-AJB-DDL

## [PROPOSED] ORDER

The Court, having reviewed the above Joint Motion of the parties, as well as the record in this case, and good cause appearing, hereby issues the following order:

1.      The remedies and actions described above are all consistent with the Prison Litigation Reform Act's requirement that the Court's orders be narrowly drawn, extend no further than necessary to correct the violation of a federal right, and be the least intrusive means necessary to correct the violation. *See* 18 U.S.C. § 3626(a)(1)(A).

2.      The Court certified a Subclass of all qualified individuals with disabilities, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (i), and who are now, or will be in the future, incarcerated in all San Diego County Jail facilities.  The Court appointed Plaintiffs as the class representatives for the Subclass.  The Court appointed Plaintiffs' counsel—Gay Crosthwait Grunfeld and Van Swearingen of Rosen Bien Galvan & Grunfeld LLP, Aaron J. Fischer of the Law Office of Aaron J. Fischer, and Christopher M. Young of DLA Piper LLP (US)—as class counsel.  Fed. R. Civ. P. 23(g)(1) and (4).  *See* Order, Dkt. No. 435.

3.      This Order shall apply to the County, their agents, contractors, employees, successors in office, and all persons with knowledge of it.  No person who has notice of this order shall fail to comply with it, nor shall any person subvert the order by any sham, indirection, or other artifice.

4.      The bond requirement is waived.

5.      The Court shall retain jurisdiction to enforce the terms of this ADA Settlement Agreement and Order, including through specific performance and all other remedies permitted by law or equity.

6.      Within 30 days of entry of this order, the parties shall jointly move for preliminary approval of the ADA Settlement Agreement and Order and Notice to the Subclass.  A fairness hearing shall occur within 30 days of the Subclass being

1  notified of the terms of the ADA Settlement Agreement and Order.

2

3  DATED: _____, 2024

4                                                  _____
                                                   Honorable Anthony J. Battaglia
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT

8 SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 9 DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, | Case No. 3:20-cv-00406-AJB-DDL |
| 10 JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, | **JOINT MOTION AND ORDER RE ACCESSIBILITY AT** |
| 11 JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, | **CENTRAL JAIL, EFFECTIVE COMMUNICATION POLICY** |
| 12 JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and | **AND PRACTICE, AND PROVISIONAL CLASS** |
| 13 LAURA ZOERNER, on behalf of themselves and all others similarly situated, | **CERTIFICATION** |
| 14 Plaintiffs, | |
| 15 v. | (Doc. No. 349) |
| 16 SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN | |
| 17 DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES | |
| 18 1 to 20, inclusive, | |
| 19 Defendants. | |

20

21

22

23

24

25

26

27

28

JOINT MOTION AND ORDER RE ACCESSIBILITY AT CENTRAL JAIL, EFFECTIVE COMMUNICATION
POLICY AND PRACTICE, AND PROVISIONAL CLASS CERTIFICATION **Ex. A - 51**

On April 25, 2023, Plaintiffs filed Motions for Preliminary Injunction and Provisional Class Certification ("the Motions") seeking to ensure that Defendants County of San Diego and the San Diego County Sheriff's Department ("Defendants") :  (1) provide incarcerated people with hearing disabilities effective communication through sign language interpretation; and (2) house incarcerated people with mobility disabilities in accessible locations, where they can safely access sleeping, toileting, and showering facilities, in compliance with the Americans with Disabilities Act, the Rehabilitation Act, and California Government Code Section 11135 ("ADA").  On May 17, 2023, the County of San Diego opposed the motions, on the grounds that many of the factual allegations were incorrect and because the County was already in the process of renovating its policies and facilities.

On May 22, 2023, the parties and their experts (hereinafter the "Parties' Experts") met and conferred via Zoom for two hours.  On May 24, 2023, the parties and their experts conducted an Early Neutral Evaluation before the Honorable David Leshner at the United States District Court for the Southern District of California in San Diego.  On June 5, 8, 15, and 16, 2023, the parties conducted further settlement discussions via Zoom with Judge Leshner.

As a result of these discussions, the parties have reached the following agreements:

1.     Plaintiffs' motion for provisional class certification should be granted for settlement purposes only, per the terms of this Stipulation and [Proposed] Order, with certification of the Incarcerated People with Hearing and/or Mobility Disabilities subclass defined as "all qualified individuals with a hearing and/or mobility disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in the Jail."

2.     Showers:  The parties agree that some of the showers at Central Jail need

to be modified to comply with the ADA. The Parties' Experts agree that compliant showers must be constructed within some of the housing modules. Defendants have agreed to continue to explore an interim solution of portable accessible showers, but Plaintiffs acknowledge there may be no viable portable shower solution and that shower chairs may be the best interim solution.

3. Toilets: The Parties' Experts agree that some of the existing cells in *celled* housing units at Central Jail are too small to accommodate the required clear floor spaces required for turning, bed transfer and/or toilet transfer required by the ADA. The Parties' Experts agree that the toilets in the *dormitory* housing units require relatively minor modifications to comply with the ADA.

4. Beds: The Parties' Experts agree that triple bunks should not be used for housing of individuals with mobility disabilities. Plaintiffs acknowledge that Defendants' policy for bed assignments for people with mobility disabilities will be amended such that an existing middle bunk does not qualify as a lower bunk and clarifying that lower bunk/lower tier placement is required rather than recommended in certain situations. The parties have agreed that more information from the Sheriff's Department about the population of incarcerated people will be needed to determine the correct number of accessible cells and dorm beds needed for the population with mobility disabilities.

5. Intake: The parties agree that remedial measures are necessary to ensure accessibility for incarcerated people with mobility disabilities during intake screening and other intake processes, consistent with the ADA. The parties have agreed that more information from the Sheriff's Department about the use of holding cells, intake and Jail population data, and intake/housing procedures would inform consideration of appropriate remedial measures for intake.

6. Sign Language Interpreters: The Parties' Experts agree that Defendants must revise and are in the process of revising their disability policies, and develop and implement processes to evaluate, document, and track incarcerated people with

3

JOINT MOTION AND ORDER RE ACCESSIBILITY AT CENTRAL JAIL, EFFECTIVE COMMUNICATION
POLICY AND PRACTICE, AND PROVISIONAL CLASS CERTIFICATION      **Ex. A - 53**

1   disabilities' primary method of communication as well as to provide effective

2   communication to incarcerated people whose primary method of communication is

3   Sign Language, consistent with the requirements of the ADA.

4          7.      Within sixty days of the Court approving this Stipulation and [Proposed]

5   Order, Defendants shall develop and provide to Plaintiffs a plan to remedy the

6   accessibility and effective communication issues identified in Plaintiffs' Motions,

7   which shall include, at a minimum, the following elements:

8          a.      For incarcerated people with hearing disabilities at San Diego

9   County jail facilities:

10              i.      Defendants will provide Sign Language Interpretation via

11  in person (or remote technology as appropriate) to all incarcerated people with

12  hearing disabilities who use Sign Language Interpretation as their primary means of

13  communication for all medical and mental health encounters, booking, classification

14  proceedings, available structured programming (e.g., classes, religious services,

15  etc.), investigative purposes, and disciplinary proceedings.

16              ii.     During booking, Defendants will evaluate every person to

17  determine whether they have a hearing or speaking disability and, if so, the person's

18  primary method of communication (*e.g.*, sign language, written notes, hearing aids,

19  etc.).  In determining a person's primary method of communication, Defendants

20  must ensure that the incarcerated person is assessed by a nurse and must give

21  deference to the preference of the incarcerated person.  Defendants will then

22  document that method of communication and require that their staff and contractors

23  use that method as appropriate when interacting with the incarcerated person during

24  all medical and mental health encounters, booking, classification proceedings,

25  available structured programming (e.g., classes, religious services, etc.),

26  investigative processes, and disciplinary proceedings.

27              iii.    Defendants will provide access to Sign Language

28  Interpretation services at all San Diego County jail facilities that house people with

4

Case No. 3:20-cv-00406-AJB-DDL

hearing disabilities who use Sign Language Interpretation as their primary means of communication, including with a telecommunication service provider, videophones, VRS technology, and in-person Sign Language Interpretation, as appropriate to ensure effective communication;

        iv.    Defendants will track disability-related effective communication needs, including as to Sign Language Interpretation, through its San Diego County jail management systems; and

        v.    These changes will be incorporated into policy and Defendants will train all deputies, health care staff, and other relevant staff to follow the policy.

    b.    For incarcerated people with mobility disabilities at San Diego Central Jail:

        i.    Defendants will ensure that incarcerated people with mobility disabilities are housed in accessible facilities, based on their accessibility needs, including:

        (1)    No person with a mobility disability using a wheelchair will be assigned to any bed in a triple bunk;

        (2)    No person with a mobility disability will be assigned to the top bed of a triple bunk;

        (3)    Anyone assigned by medical to a lower bunk/lower tier will be assigned to a single or bottom bunk;

        (4)    People with mobility disabilities will be assigned to accessible housing, based on their accessibility needs, which may include accessible beds and clearance space;

        (5)    People with mobility disabilities will be provided accessible toileting, based on their accessibility needs, which if appropriate shall have 2010 ADAS-compliant grab bars and other features; and

5

JOINT MOTION AND ORDER RE ACCESSIBILITY AT CENTRAL JAIL, EFFECTIVE COMMUNICATION POLICY AND PRACTICE, AND PROVISIONAL CLASS CERTIFICATION    **Ex. A - 55**

1        (6)    People with mobility disabilities will be provided

2               accessible showers, based on their accessibility needs

3               which if appropriate shall have 2010 ADAS-compliant

4               grab bars and shower chairs.

5       ii.    Defendants' remedial plan will identify each element in

6 each housing unit that they will renovate and any other remedial measures to be

7 taken, as well as the maximum number of incarcerated people with disabilities that

8 can be safely housed in each unit.  This portion of Defendants' plan will include

9 staged deadlines for completion of renovations, with at least 25 accessible beds and

10 toileting, which may be located in dormitory housing, becoming available as soon as

11 possible and no later than 90 days from the date of this Stipulation and [Proposed]

12 Order. As noted above, shower chairs will be provided as an interim solution.  All

13 renovations and changes required to make accessible housing available to all

14 incarcerated people with mobility disabilities that require ADA compliant housing

15 shall be completed within eighteen (18) months of the date of this Stipulation and

16 [Proposed] Order. This does not include modifications to MOB, PSU, OP Step

17 Down and JBCT as identified below.

18       iii.    Defendants' plan must include accessible and safe housing

19 for people with mobility disabilities throughout their incarceration, including

20 accessible cells during the intake and booking process within eighteen (18) months

21 of the date of this Stipulation and [Proposed] Order.   The plan to achieve

22 compliance in PSU, OP Step Down and JBCT must include sufficient accessible and

23 safe housing for people with mobility disabilities throughout their incarceration as

24 soon as possible and not later than three years of the date of this Stipulation and

25 [Proposed] Order.  Defendants' plan must include interim accommodations made as

26 accessible as feasible for those in these specialized units. The 3% Defendants plan to

27 provide will be determined at the time that construction begins on this second phase.

28       iv.    Defendants' plan will ensure that during booking, and at

6

Case No. 3:20-cv-00406-AJB-DDL

1    the request of any incarcerated person, Defendants will evaluate every person to

2    determine whether they have a mobility disability and, if so, what accessibility

3    features and accommodations each person requires.  Defendants must then

4    document those accommodations and ensure that the incarcerated person is housed

5    accessibly with their accommodations.

6                    v.    These changes will be incorporated into policy and

7    Defendants will train all deputies, health care staff, and other relevant staff to follow

8    the policy.

9                    c.    To the extent that any necessary remedial measures regarding

10    physical plant changes will require an extended period of time (e.g., more than 6

11    months), Defendants' plan will include interim measures that mitigate significant

12    safety issues for incarcerated people with disabilities as related to beds, showers,

13    and toilets/lavatories, along with the plan for achieving full compliance.

14        8.    Within fifteen (15) days of Plaintiffs' receipt of Defendants' proposed

15    plan, Plaintiffs will provide feedback (if any) to the proposed plan as to necessary

16    modifications.  Within fifteen (15) days of Defendants' receipt of Plaintiffs'

17    feedback, the parties and the Parties' Experts will confer to address any concerns or

18    disputes.

19        9.    Within fifteen (15) days of the above-mentioned meet and confer,

20    Defendants will submit their plan (with any modifications) to the Court.  Plaintiffs

21    will submit to the Court objections (if any) to the proposed plan as to necessary

22    modifications within fifteen (15) days of Defendants' submission.

23        10.    The Court thereafter shall enter an Order adopting the plan, as revised

24    (if at all) by the Court, in consideration of Plaintiffs' objections.

25        11.    Within fifteen (15) days after the Court issues the Order adopting the

26    plan, the parties will agree on a qualified independent expert (or experts).  The

27    independent expert(s) will work with Defendants to ensure timely and appropriate

28    implementation of the plan.  The independent expert(s) will issue a quarterly report

1   to counsel for Plaintiffs and Defendants addressing Defendants' progress toward

2   implementation of the plan.  Defendants will pay reasonable fees for work

3   performed by the independent expert(s) at Defendants' request and as required to

4   confirm compliance.  If Plaintiffs expect to require the independent expert to expend

5   time that would be in excess of $1000 per quarter they shall first meet and confer

6   with defendants and the issue may be brought to Judge Leshner.

7        12.    After the Court issues the Order adopting the plan, Plaintiffs shall be

8   allowed access to relevant documents and records in Defendants' custody and

9   control relevant to the provision of Sign Language Interpretation to incarcerated

10   people with hearing disabilities.

11        13.    Within ninety (90) days of this Order, and for the twelve months

12   following entry of the Order adopting Defendants' plan, Defendants must, on a

13   monthly basis, provide daily housing rosters for the preceding month to the Court

14   and Plaintiffs and marked as Attorney's Eyes Only, reflecting the disability needs of

15   every person incarcerated at Central Jail who have been identified as having a

16   mobility or hearing disability, including information sufficient to describe their

17   mobility disability (if any), hearing disability (if any), effective communication

18   needs (if any), housing unit, bed assignment (including top, middle, or lower bunk),

19   and whether the person's cell or housing unit has 2010 ADAS-compliant toilet grab

20   bars, shower grab bars, and shower seat. Housing does not include intake and

21   holding.

22        14.    Four months after the Court issues the Order adopting the plan,

23   Plaintiffs shall be allowed to inspect with their experts any renovations completed

24   by Defendants at the Central Jail to ascertain whether Defendants have adequately

25   modified their housing for people with mobility disabilities per this order.  Plaintiffs

26   may conduct a second inspection of the Central Jail eighteen (18) months after the

27   Court issues the Order adopting the plan.

28        15.    Eighteen (18) months after the Court issues the Order adopting the

8

1   plan, the independent expert(s) will assess whether Defendants have implemented
2   their plan adequately to address the deficiencies identified by the Parties' Experts as
3   part of the eighteen (18) month plan.  All components of Defendants' plan
4   determined to be adequately implemented will not be subject to further inspection
5   by Plaintiffs or the independent expert(s).  Inspections may, however, continue if
6   and as necessary for determining whether Defendants have adequately implemented
7   any other components of this or any other Court-ordered remedial plan.

8       16.     If, following a finding by the independent expert(s) that one or more
9   components of Defendants' plan has been adequately implemented, Plaintiffs form
10   the good faith belief that Defendants are no longer adequately implementing the
11   component(s) of the plan, Plaintiffs will promptly so notify Defendants in writing
12   and present a summary of the evidence upon which such a belief is based.  Within
13   30 days thereafter, Defendants shall serve a written response stating whether they
14   agree or disagree with Plaintiffs' position.  In the event that Defendants agree,
15   monitoring by the qualified independent expert(s) and Plaintiffs shall resume until
16   adequate implementation is again established.  In the event Defendants disagree, the
17   parties shall present their positions in writing to the qualified independent expert(s).
18   The qualified independent expert(s) will, within 30 days, issue a written decision
19   regarding whether to resume monitoring of the remedial plan component(s) at issue.

20                                **Dispute Resolution**

21      17.     Any party may initiate the dispute resolution process with respect to
22   any matter covered by this Stipulation and [Proposed] Order by providing written
23   notice of a dispute ("Dispute Notice").

24      18.     Following service of the Dispute Notice, the parties shall undertake
25   good faith negotiations at such times and places as they deem sufficient in an effort
26   to resolve the dispute informally between them.  If, within 30 days after service of
27   the Dispute Notice, the parties have failed to resolve the dispute, either party may
28   request that the qualified independent expert(s) most knowledgeable in the subject

matter of the dispute be permitted to evaluate the issue in dispute and prepare a report. The qualified independent expert(s) must provide the report regarding the area of disagreement to the parties within 30 days of the request.

19. In the event the parties' good faith attempt to resolve the dispute informally proves unsuccessful, the parties shall next seek the assistance, advice, and/or guidance of Magistrate Judge David Leshner. Any party may request that a settlement conference be scheduled within 30 days of the Dispute Notice, unless the parties mutually agree upon an alternative schedule.

20. With the exception of any report prepared by the expert(s), as described above, and any notice that negotiations are concluded, nothing said and no document prepared in connection with the Dispute Resolution proceedings shall be offered in evidence in any subsequent judicial proceeding in this case.

21. This Stipulation and [Proposed] Order will resolve only the issues raised in Plaintiffs' Motions. Plaintiffs expressly reserve all rights to pursue the legal claims and any necessary relief as to all other issues in the operative complaint.

IT IS SO STIPULATED.

Respectfully submitted,

DATED: June 20, 2023        ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Gay C. Grunfeld*
Gay C. Grunfeld

Attorneys for Plaintiffs

DATED: June 20, 2023        BURKE, WILLIAMS & SORENSEN, LLP

By: */s/ Elizabeth M. Pappy*
Elizabeth M. Pappy

Attorneys for Defendants

10

Case No. 3:20-cv-00406-AJB-DDL

JOINT MOTION AND ORDER RE ACCESSIBILITY AT CENTRAL JAIL, EFFECTIVE COMMUNICATION POLICY AND PRACTICE, AND PROVISIONAL CLASS CERTIFICATION

**Ex. A - 60**

The Court, having reviewed the above Stipulation of the parties, as well as the pleadings in support and opposition to Plaintiffs' Motions, and good cause appearing, hereby issues the following Order:

1. Defendants shall take the actions described above in the timeframes listed above. The Court further adopts the findings above and directs the parties to follow the procedures and timelines set forth above.

2. These remedies are all consistent with the Prison Litigation Reform Act's requirement that the Court's orders be narrowly drawn, extend no further than necessary to correct the violation of a federal right, and be the least intrusive means necessary to correct the violation. *See* 18 U.S.C. § 3626(a)(1)(A).

3. The Court provisionally certifies a Subclass of all qualified individuals with a hearing and/or mobility disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (i), and who are now, or will be in the future, incarcerated in all San Diego County Jail facilities. The Court appoints Plaintiffs as the provisional class representatives for the Subclass. The Court appoints Plaintiffs' counsel—Gay Grunfeld and Van Swearingen of Rosen Bien Galvan & Grunfeld LLP, Aaron Fischer of Law Office of Aaron J. Fischer, and Christopher Young of DLA Piper LLP—as provisional class counsel. Fed. R. Civ. P. 23(g)(1) and (4).

4. This Order shall apply to Defendants, their agents, contractors, employees, successors in office, and all persons with knowledge of it. No person who has notice of this injunction shall fail to comply with it, nor shall any person subvert the injunction by any sham, indirection, or other artifice.

/ / /
/ / /
/ / /
/ / /
/ / /

1        5.      The bond requirement is waived.

2        6.      The Court shall retain jurisdiction to enforce the terms of this Order.

3       IT IS SO ORDERED.

4

5  Dated:  June 21, 2023

6                                 Hon. Anthony J. Battaglia

7                                 United States District Judge

12

Case No. 3:20-cv-00406-AJB-DDL

JOINT MOTION AND ORDER RE ACCESSIBILITY AT CENTRAL JAIL, EFFECTIVE COMMUNICATION
POLICY AND PRACTICE, AND PROVISIONAL CLASS CERTIFICATION   **Ex. A - 62**

# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>                                    Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>                                    Defendants. | Case No.: 20-cv-00406-AJB-DDL<br><br>**ORDER GRANTING JOINT MOTION FOR CLASS CERTIFICATION AND APPROVAL OF PROPOSED CLASS ACTION NOTICE PLAN**<br><br>**(Doc. No. 423)** |

Presently pending before the Court is Plaintiffs Darryl Dunsmore, Andree Andrade, Ernest Archuleta, James Clark, Anthony Edwards, Lisa Landers, Reanna Levy, Josue Lopez, Christopher Nelson, Christopher Norwood, Jesse Olivares, Gustavo Sepulveda,

1

**Ex. A - 64**

20-cv-00406-AJB-DDL

Michael Taylor, and Laura Zoerner (collectively, "Plaintiffs") and Defendants San Diego County Sheriff's Department, County of San Diego, and San Diego County Probation Department (collectively, "Defendants") joint motion for class certification and for approval of their proposed class notice plan. (Doc. No. 423.) For the reasons set forth below, the motion is **GRANTED**.

# I.    BACKGROUND

The facts of this case have been recited in previous orders. (*See* Doc. No. 219.) Plaintiffs are current or former inmates of San Diego County Jail facilities (the "Jail"), operated by Defendants San Diego County Sheriff's Department and the County of San Diego. Plaintiffs bring this action on behalf of "themselves and the approximately 4,000 incarcerated people who are similarly situated on any given day" to "remedy the dangerous, discriminatory, and unconstitutional conditions in the Jail." (Third Amended Complaint ("TAC"), Doc. No. 231, ¶ 4.) Specifically, Plaintiffs contend Defendants' policies and practices contribute to the high death rates in the Jail, which "has for years exceeded the rates nationally and in other large California jails, [and] it reached chilling heights in 2021 when 18 people died, amounting to a death rate of 458 incarcerated people per 100,000." (*Id.* ¶ 1.)

The Parties now jointly seek class certification pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. (Doc. No. 423.) In particular, the parties seek to certify the following class of individuals pursuant to Federal Rule of Civil Procedure 23(b)(2):

> All adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated People Class").

(*Id.* at 9.) The Parties also seek certification of three subclasses under Federal Rule of Civil Procedure 23(b)(2), specifically:

> All adults who have a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated People with Disabilities Subclass");

2

**Ex. A - 65**

20-cv-00406-AJB-DDL

All adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities and have private counsel or are pursuing state or federal claims on a pro per basis ("Incarcerated People with Private Counsel or Pro Per Claims Subclass"); and

All Black and Latinx adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated Black and Latinx Persons Subclass").

(*Id.*)

The Parties also propose a class notice plan to ensure that all members of the class and subclasses are individually identified. (*Id.* at 24.) The Parties have agreed to the form and substance of the notice, and request the Court to order copies of the notice to be posted throughout the Jails in English and Spanish, and that Defendant Sheriff's Department read the Class Notice to individuals who are illiterate or have a disability that may affect their ability to read the Notice. (*Id.*) In addition, the Parties stipulate and ask the Court to order that copies of the TAC be provided by Defendant Sheriff's Department to class members upon request. (*Id.*)

## II. LEGAL STANDARD

Class actions are the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To depart from this rule, the "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation and internal quotation marks omitted). The proponent of class treatment, usually the plaintiff, bears the burden of demonstrating the propriety of class certification. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014). This burden requires the plaintiff to provide sufficient facts to satisfy the four requirements of Rule 23(a) and at least one subsection of Rule 23(b) of the Federal Rules of Civil Procedure. *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

**Ex. A - 66**

20-cv-00406-AJB-DDL

Under Rule 23(a), a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy. "If the court finds the action meets the requirements of Rule 23(a), the court then considers whether the class is maintainable under Rule 23(b)." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 451 (S.D. Cal. 2014).

In the instant matter, Plaintiffs seek certification pursuant to Rule 23(b)(2) for injunctive and declaratory relief classes. Rule 23(b)(2) permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

When entertaining a class certification motion, the court is obligated to conduct a rigorous analysis of whether the requirements of Rule 23 are satisfied. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). While the court must not go on a freewheeling inquiry into the merits of the plaintiff's claims, "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Falcon*, 457 U.S. at 160). Accordingly, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The court must therefore limit its inquiry "to those aspects relevant to making the certification decision on an informed basis." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 499 (S.D. Cal. 2013).

III.   **DISCUSSION**

    **A.**   **Rule 23(a) Requirements**

4

Case 3:20-cv-00406-AJB-DDL   Document 785   Filed 11/03/25   Page 1 of 11
Case 3:20-cv-00406-AJB-DDL   Document 792-11   Filed 03/10/25   PageID.16787   Page 79 of 143
Page 79 of 143

The Court will first start with an analysis of whether the Parties have satisfied the Rule 23(a) elements of numerosity, commonality, typicality, and adequacy.

### 1. Numerosity

Under Rule 23(a)(1), a lawsuit may only proceed via a class if the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the Parties stipulate that between October 1, 2022 and September 30, 2023, the average daily population of the Jails was 3,946 individuals. (Joint Stipulation of Facts ("Stip."), Doc. No. 423-1, ¶ 1.) During this timeframe, an average of 1,363 of those individuals received psychotropic medication for mental health disabilities. (*Id.*) Additionally, over 60% of the incarcerated individuals at the Jails were Black or Latinx. (*Id.*) Accordingly, the Court finds this requirement has been satisfied. *See Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763, at *6 (S.D. Cal. Sept. 5, 2013) (finding the numerosity requirement satisfied where the class was "indisputably in the thousands" and the defendants stipulated to the numerosity requirement).

### 2. Commonality

The commonality factor "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 157). The "claims must depend upon a common contention" and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution . . . ." *Id.* For purposes of Rule 23(a)(2), even a single common question will suffice. *Id.* at 359.

In a civil-rights suit, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005). "In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Id.*

The Parties assert commonality is satisfied because all putative class members are

**Ex. A - 68**

20-cv-00406-AJB-DDL

subject to the same policies and practices and suffered the same injuries. (Doc. No. 423 at 17–18.) Specifically, the Parties contend the proposed class and subclasses share, at minimum, the following common questions:

- Whether Defendants fail to provide minimally adequate medical care to incarcerated people in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to provide minimally adequate mental health care to incarcerated people in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to make their programs, services, and activities available to persons with disabilities, and otherwise discriminating against persons with disabilities, in violation of the ADA, 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and California Government Code Section 11135;

- Whether Defendants impose filthy, unhealthy, and dangerous conditions of confinement on incarcerated people in violation of the Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to protect incarcerated people from violence and injury in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to provide minimally adequate dental care to incarcerated people in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to ensure incarcerated people have access to counsel and the courts in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 15 of the California Constitution; and

- Whether Defendants disproportionately incarcerate people based on race, ethnicity,

**Ex. A - 69**

20-cv-00406-AJB-DDL

and/or national original in violation of California Government Code Section 11135. (*Id.*)

The Court agrees with the Parties that there are questions of law and fact common to the proposed class members. Accordingly, the Court finds Rule 23(a)(2) satisfied.

### 3. Typicality

Rule 23(a)(3)'s typicality requirement provides that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (quoting *E. Tex. Motor Freight Sys.*, 431 U.S. at 403) (internal quotation marks omitted). The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "[T]he typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (internal citations omitted). However, a court should not certify a class if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508 (internal quotation marks and citation omitted).

The Court finds that Plaintiffs' claims are typical of the class and subclasses. Plaintiffs each allege they have experienced the same or similar harm, rely on the same legal theories, and seek the same injunctive relief that is broadly applicable to all members of the proposed class and subclasses. (*See* Doc. No. 423 at 19–21.) All of the Named Plaintiffs have been or are currently incarcerated in the Jails. As to the Plaintiffs who have been transferred or released from the Jails, the record contains compelling evidence they likely will be reincarcerated at the Jails, particularly through being rearrested, or, if they are currently incarcerated in state prison, housed at the Jails while out-to-court from prison for resentencing, habeas petitions, or to testify in another case. (*Id.* at 19.) Accordingly, the Court finds the Parties have satisfied typicality.

### 4. Adequacy

Rule 23(a)(4) requires the class representative to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing this requirement, courts within the Ninth Circuit apply a two-part test, asking the following questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members? and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

The Parties assert Plaintiffs and their counsel do not have any conflicts with the class or subclasses, and agree to protect the rights of all proposed class members. (Doc. No. 423 at 22.) Additionally, Plaintiffs' counsel ensure they will fairly and adequately protect the interests of the class and subclasses, as they have performed extensive work investigating the claims in this action and are well-versed in prisoners' rights, disability law, and class actions. (*Id.* at 22–23.) Based on the foregoing, the Court finds Plaintiffs and their counsel are adequate class representatives.

## B.     Rule 23(b)(2) Requirements

If a proposed class satisfies Rule 23(a)'s requirements, then the proposed class must also qualify as one of the types of class actions Rule 23(b) identifies. Fed. R. Civ. P. 23(b); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). Plaintiffs seek certification of the class and subclasses pursuant to Rule 23(b)(2). (Doc. No. 423 at 23.)

Rule 23(b)(2) permits class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Ninth Circuit has held that "'it is sufficient' to meet the requirements of Rule 23(b)(2) [when] 'class members complain of a pattern or practice that is generally applicable to the class as a whole.'" *Rodriguez*, 591 F.3d at 1125 (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)). "The rule does not require [the Court] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Id.*; *see also Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible

**Ex. A - 71**

20-cv-00406-AJB-DDL

nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (internal quotation marks omitted).

The Court finds that Rule 23(b)(2)'s requirements are plainly met. Plaintiffs seek broad declaratory and injunctive relief—system-wide improvements in Defendants' policies, procedures, and programs in the Jails—on behalf of a large class and subclasses of incarcerated individuals. (TAC ¶¶ 425, 433.) All members of the classes are allegedly exposed to a substantial risk of harm due to Defendants' alleged policies and practices. The requested relief would benefit the Named Plaintiffs as well as all members of the proposed class and subclasses in the same manner in a single stroke. *See Parsons v. Ryan*, 754 F.3d 657, 689 (9th Cir. 2014) ("[E]very inmate in the proposed class is allegedly suffering the same (or at least a similar) injury and that injury can be alleviated for every class member by uniform changes in . . . policy and practice.").

### C.    Approval of Proposed Class Notice Plan

"[I]n a Rule 23(b)(2) class action, notice may be given but is not required, and there is no requirement that a class member be given an opportunity to exclude himself or herself from the lawsuit." *Lyon v. U.S. Immigr. & Customs Enf't*, 300 F.R.D. 628, 635 (N.D. Cal. 2014). When certifying a class under Rule 23(b)(2), "the court may direct appropriate notice to the class." Fed. R. Civ. P. 23(c)(2)(A). Notice should be given to class members in the "best" form "that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

Here, the Parties have agreed to the form and substance of the notice to all members of the class and subclass, attached as Exhibit F to the Grunfeld Declaration, (Doc. No. 423-2 at 41–42). To ensure that all members of the class be individually identified, the Parties ask the Court to order that copies of the notice be posted throughout the Jails in English and Spanish, and that Defendant Sheriff's Department shall read the Class Notice to individuals who are illiterate or have a disability that may affect their ability to read the

**Ex. A - 72**

20-cv-00406-AJB-DDL

Notice. In addition, the Parties ask the Court to order that copies of the TAC shall be provided by Defendant Sheriff's Department to class members upon request.

Because 23(b)(2) classes are being certified, notice to the classes are not required but is appropriate here. *See* Fed. R. Civ. P. 23(c)(2) (providing that, "[f]or any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class"). The Parties have reached an agreement that notice should be given, what the terms of that notice should be, and how the notice should be distributed to the classes. As such, the Parties' request for approval of proposed class notice plan is **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby:

1. **GRANTS** the Parties' joint motion for class certification. The Court certifies a class consisting of:

> All adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated People Class").

The Court also certifies the following three subclasses:

> All adults who have a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated People with Disabilities Subclass");

> All adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities and have private counsel or are pursuing state or federal claims on a pro per basis ("Incarcerated People with Private Counsel or Pro Per Claims Subclass"); and

> All Black and Latinx adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated Black and Latinx Persons Subclass").

2. **GRANTS** the Parties' request to appoint Named Plaintiffs as class representatives;

3. **GRANTS** the Parties' request to appoint Rosen Bien Galvan & Grunfeld

10

**Ex. A - 73**

20-cv-00406-AJB-DDL

LLP, the Law Office of Aaron J. Fischer, and DLA Piper LLP (US) as class counsel; and

    4.     **GRANTS** the Parties' request for approval of the proposed class notice plan. The Court **ORDERS** the following:

- Copies of the notice shall be posted throughout the Jails in English and Spanish;
- Defendant Sheriff's Department shall read the Class Notice to individuals who are illiterate or have a disability that may affect their ability to read the Notice
- Copies of the Third Amended Complaint shall be provided by Defendant Sheriff's Department to class members upon request.

    **IT IS SO ORDERED.**

Dated: November 3, 2023

Hon. Anthony J. Battaglia
United States District Judge

# EXHIBIT B

## <u>NOTICE OF ADA SETTLEMENT AGREEMENT</u>

### *Darryl Dunsmore et al. v. San Diego County Sheriff's Department, et al.*; S.D. Cal. No. 3:20-cv-00406-AJB-DDL

The *Dunsmore* case is a federal class action about the conditions in the San Diego County Jail.  This notice discusses the settlement of the ADA claim in that case ("**ADA Settlement Agreement**").

Plaintiffs filed this lawsuit seeking certain changes at the Jail related to eight different claims for relief, including a claim under the Americans with Disabilities Act ("ADA").  In 2023, the district court certified a subclass called the Incarcerated People with Disabilities Subclass.  The Subclass includes anyone who is held at the Jail and has a disability.

Defendants are the County of San Diego and the Sheriff's Office.  They have agreed to settle Plaintiffs' ADA claim in the case.  The ADA Settlement Agreement relates only to this one claim about conditions for people with disabilities.  Plaintiffs' other seven claims in the case are still being litigated in court.

**This notice explains the ADA Settlement Agreement, where you can find the ADA Settlement Agreement, and how you can tell the Court whether you think the ADA Settlement Agreement is fair.**

The ADA Settlement Agreement requires the County and Sheriff's Office to make certain changes at the Jail, including:  (1) have an ADA Unit; (2) track people with disabilities and the accommodations they need; (3) provide reasonable accommodations to people with disabilities, including those with intellectual and mental health disabilities; (4) make physical changes to jail facilities to provide more accessible housing; (5) update ADA policies and training for staff; (6) provide equal access to programs and services for people with disabilities; (7) provide canes, walkers, wheelchairs, and other medical devices that people need; and (8) provide reasonable accommodations during transport.  The ADA Settlement Agreement also requires the County to hire two neutral experts who will confirm whether the County is complying with the ADA Settlement Agreement.

Copies of the ADA Settlement Agreement will be made available to you upon request to the ADA Unit, which can be contacted by using the

**Ex. B - 76**

incarcerated person request form or calling (858) 974-5841.  You can also write to Plaintiffs' counsel at the address below to ask for a copy of the ADA Settlement Agreement.

The Court will have jurisdiction to enforce the ADA Settlement Agreement. The Court will hold a hearing on the fairness of the ADA Settlement Agreement at 2:00 p.m. on [**DATE**], at the United States Courthouse in San Diego, Courtroom 4A.

The ADA Settlement Agreement does not involve monetary damages and none will be awarded.

The ADA Settlement Agreement allows Plaintiffs' counsel to ask the Court to have Defendants pay for their attorneys' fees and costs in obtaining the ADA Settlement Agreement.  Plaintiffs' counsel will file a motion on January 24, 2025 that can be found on the Court's docket.  The Court will decide the amount of the fees and expenses.

Any person in the Jail with a disability can write to the Court about whether the settlement is fair and whether they object to the settlement or to Class Counsel's request for reasonable attorneys' fees and costs.  Comments MUST include at the top of the page the case name and number:  *Dunsmore v. San Diego County Sheriff's Dept.*, No. 3:20-cv-00406-AJB-DDL. Comments MUST be postmarked no later than [***DATE***], and sent to:

Clerk of the Court
United States District Court - Southern District of California
333 West Broadway, Suite 420
San Diego, CA 92101

For more information about the ADA Settlement Agreement or the *Dunsmore case*, you may contact attorneys for the Plaintiff Class and the Subclass via LEGAL MAIL:

**Rosen Bien Galvan & Grunfeld LLP**
**Post Office Box 390**
**San Francisco, CA  94104-0390**

Or by phone at: **(415) 433-6830**

# EXHIBIT C



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email:  ggrunfeld@rbgg.com

April 2, 2024

VIA ELECTRONIC MAIL ONLY

Susan E. Coleman
Burke Williams & Sorensen, LLP
501 West Broadway, Suite 1600
San Diego, California 92101-8474
scoleman@bwslaw.com

Elizabeth M. Pappy
Burke, Williams & Sorensen, LLP
60 South Market Street, Suite 1000
San Jose, California 95113-2336
epappy@bwslaw.com

Re:    Defendants' Failure to Provide Adequate Access to Class Notice
       *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
       S.D. Cal. No. 3:20-cv-00406-AJB-DDL
       Our File No. 1730-01

Dear Counsel:

We write to meet and confer regarding Defendants' decision to post the Class Notice in small print on transparent plastic on the glass walls of the housing units.  The Notices as posted are difficult to read, and in many cases illegible.  The Court's Order of November 3, 2023, Dkt. No. 435, requires the Class Notice to be "posted throughout the Jails in English and Spanish[] …." *Id.* at 11.  Implicit in that Order is a requirement that the Notice be legible.

During the March 25, 2024 inspection of Central Jail, I did not initially observe any Class Notices.  Susan Coleman then showed me what appeared to be a very small print version of the Notice on transparent paper.  In Units 6A, 6B, 6C, 6D, 7A and 7B, I could not read the Notices due to the glare from the glass walls on the transparent paper and the small print.  Also, in Unit 6D the Notices were posted 6 or 7 feet above ground, making them even harder to read, especially for wheelchair users.  Van Swearingen observed similar problems at the South Bay Inspection on March 26, 2024.  Photographs of the Notices we observed are enclosed.

During the tour, you indicated this approach is necessary, claiming that incarcerated people tear posters and notices down.  However, in many housing units the ADA and other Department notices were posted on white paper and had larger print, making them legible.  The ACLU lawsuit notice was also on white paper posted on a wall

[4461019.3]

**Ex. C - 79**

Susan E. Coleman
Elizabeth M. Pappy
April 2, 2024
Page 2

and there were extra copies of that notice in one of the housing units.  Photographs of these legible notices we observed are also enclosed.

During the February 6, 2024 inspection of George Bailey, we became aware of another legibility problem.  As the enclosed photographs show, in the 5C unit of that facility, the Notices are taped to tables.  Although it is good that those Notices are printed on white paper, they cannot be viewed by class members, who are not permitted to access those tables. The individuals in the 5C unit are placed inside small, caged areas adjacent to the tables.  The cage's exterior provides for extremely limited visibility into the dayroom, such that class members cannot view or read the notices attached to the dayroom tables, as the enclosed photographs illustrate.  Please let us know what alternative posting method you will use for this unit and similar ones where class members are not permitted in the dayroom during their out-of-cell time.

You suggested that the Notice be included on the videophones in the units.  We agree that is a good idea, although it is unclear how incarcerated people access these videophones.  Please provide more information on which housing units in which facilities have the videophones and identify what Defendants propose for housing units that do not have videophones.

We also request that you post the Class Action Notices legibly on white paper with a minimum of 14-point font in each housing unit.

We attempted to discuss these issues with you during the March 27, 2024 Court ordered meet-and-confer, and you requested that we pursue these issues outside of those meetings.  Our understanding based upon that March 27 discussion is that the same illegible format is currently in use at all jail facilities.  We also understand the County's position to be that we must choose between that format and "kiosks."  It is not clear whether the kiosks are the same or different than the videophones.  Regardless, the County is apparently not willing to do both paper Notices and kiosks or videophones.

As the Advisory Committee Notes to Federal Rule 23 teach, "[t]he direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members ….  It is difficult to provide information about most class actions that is both accurate and easily understood by class members who are not themselves lawyers. Factual uncertainty, legal complexity, and the complication of class-action procedure raise the barriers high." *Id.*  Communicating with class members cannot be accomplished at all if, as in the Jail facilities, the Notices cannot be read.  Class notice is a matter of due process.  *See generally*, *Hansberry v. Lee*, 311 U.S. 32 (1940); *Mullane v. Central*

**Ex. C - 80**

Susan E. Coleman
Elizabeth M. Pappy
April 2, 2024
Page 3

*Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).  At a minimum, to meet due process, class action notices should be accessible and legible.

The Federal Judicial Center has issued a Notice Checklist and Plain Language Guide, which we enclose here, which warns against small print of the type the County has used.  *See* p. 6.  The illegibility of this small print is greatly exacerbated by the transparency and glare we observed where the notices are placed at Central and South Bay.

Separately, the Court ordered that the Notice must be read to individuals who are illiterate or have a disability that may affect their ability to read the Notice.  Dkt. 435 at 11.  For deaf signers who are illiterate or unable to read the Notice themselves, the Notice must be provided using effective communication, including through sign language interpretation as appropriate.  Please confirm that you are keeping a log of these requests, as well as requests for copies of the Third Amended Complaint.  *Id.*  We asked about this issue several months ago and do not believe we received a response.

Please let us know within five business days whether (1) you will respond to our inquiries regarding tracking alternative forms of notice (for those who cannot read and for those who are in cages), and (2) agree to post our Class Notices on white paper with larger font in all housing units.  If Defendants cannot improve the posting of the Notices consistent with the Court's Order and Rule 23 standards, we may seek the assistance of the Court.

Thank you for your ongoing courtesy and cooperation in this matter.

Very truly yours,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Gay Crosthwait Grunfeld*

By:   Gay Crosthwait Grunfeld

GCG:cg
Enclosures
cc:      Co-Counsel

[4461019.3]

**Ex. C - 81**

# EXHIBIT D



**03/25/2024 San Diego Central Jail Inspection – Dunsmore Notice**



**03/25/2024 San Diego Central Jail Inspection – Dunsmore Notice**



**03/25/2024 San Diego Central Jail Inspection – Dunsmore Notice**



**03/25/2024 San Diego Central Jail Inspection – Dunsmore Notice**



**03/25/24 San Diego Central Jail Inspection – Dunsmore Notice**

**Ex. D - 87**



**03/25/2024 San Diego Central Jail Inspection – Dunsmore Notice**

# EXHIBIT E



**3/26/2024 South Bay Detention Facility Inspection – Dunsmore Notice**

Ex. E - 90

# EXHIBIT F



**George Bailey 5C**



**George Bailey 5C**



**George Bailey 5C**



**George Bailey 5C**



**George Bailey 5C**

# EXHIBIT G



**03/26/2024 South Bay Detention Facility Inspection – Non-Dunsmore Notice**



**03/26/2024 South Bay Detention Facility Inspection – Non-Dunsmore Notice**



**03/25/2024 San Diego Central Jail Inspection – Non-Dunsmore Notice**

**Ex. G - 100**



**03/25/2024 San Diego Central Jail Inspection – Non-Dunsmore Notice**

Ex. G - 101



**03/25/2024 San Diego Central Jail Inspection – Non-Dunsmore Notice**

**Ex. G - 102**



**03/25/2024 San Diego Central Jail Inspection – ACLU Lawsuit Notice**



**03/25/2024 San Diego Central Jail Inspection – Non-Dunsmore Notice**

**Ex. G - 104**

# EXHIBIT H

# Judges' Class Action Notice and Claims Process Checklist
## and Plain Language Guide | 2010

## Major Checkpoints

❑ **Will notice effectively reach the class?**
The percentage of the class that will be exposed to a notice based on a proposed notice plan can always be calculated by experts. A high percentage (e.g., between 70–95%) can often reasonably be reached by a notice campaign.

❑ **Will the notices come to the attention of the class?**
Notices should be designed using page-layout techniques (e.g., headlines) to command class members' attention when the notices arrive in the mail or appear on the Internet or in printed media.

❑ **Are the notices informative and easy to understand?**
Notices should carry all of the information required by Rule 23 and should be written in clear, concise, easily understood language.

❑ **Are all of the rights and options easy to act upon?**
There should be no unnecessary hurdles that make it difficult for class members to exercise their rights to opt out, object, submit a claim, or make an appearance.

## Before Certification/Preliminary Settlement Approval

❑ **Can any manageability problems from notice issues be overcome?**
Consider potential problems in reaching and communicating with class members—e.g., language barriers, class size, geographic scope—and whether a notice plan will be able to overcome such problems.

❑ **Can a high percentage of the proposed class be reached (i.e., exposed to a notice)?**
Consider the breakdown of known and unknown class members, the age of any mailing lists, and the parties' willingness to spend necessary funds to fully reach the class.

❑ **Is it economically viable to adequately notify the class?**
If the cost to reach and inform a high percentage of the class is not justified by a proposed settlement, an opt-out class may not be appropriate. Inability to support proper notice may also be evidence that the settlement is weak.

❑ **Will unknown class members understand that they are included?**
If a well-written notice will leave class members in doubt as to whether they are included, consider whether the class definition, or the class certification, is appropriate.

## Upon Certification/Preliminary Settlement Approval

❑ **Do you have a "best practicable" notice plan from a qualified professional?**
A proper notice plan should spell out how notice will be accomplished, and why the proposed methods were selected. If individual notice will not be used to reach everyone, be careful to obtain a first-hand detailed report explaining why not. See "Notice Plan" section below.

# Judges' Class Action Notice and Claims Process Checklist
## and Plain Language Guide | **2010**

❑ ***Do you have unbiased evidence supporting the plan's adequacy?***
Be careful if the notice plan was developed by a vendor who submitted a low bid and might have incentives to cut corners or cover up any gaps in the notice program. In order to find the "best practicable" notice as Rule 23 requires, your own expert report may be advisable. This is especially true in the diminished adversarial posture in which settlement places the parties. It is also true at preliminary approval, before outsiders are aware of the proposed notice plan, which itself may limit the parties' awareness, in turn impacting your final approval decision.

❑ ***Have plain language forms of notice been created?***
Draft forms of the notices should be developed, in the shape, size, and form in which they will actually be disseminated, for your approval before authorizing notice to the class. See "Notice Documents" below.

❑ ***Will a qualified firm disseminate notice and administer response handling?***
There are many experienced firms that compete for administration of notice dissemination and claims and response handling. Appointing a qualified firm is important because errors may require re-notification, drain funds, delay the process, and threaten recognition of your final judgment.

## Notice Plan

❑ ***Is the notice plan conducive to reaching the demographics of the class?***
The notice plan should include an analysis of the makeup of the class. There may be more women than men; it may skew older; it may be less educated than average. Each audience can be matched with the most efficient and effective methods of notice for reaching those people.

❑ ***Is the geographic coverage of the notice plan sufficient?***
Notice for a class action should take steps to reach people wherever they may be located, and also take into account where most class members reside.

○ ***Is the coverage broad and fair? Does the plan account for mobility?***
Class members choose to live in small towns as well as large cities. Be careful with notice exclusively targeted to large metropolitan newspapers. Class members move frequently (14–17% per year according to the U.S. Census Bureau), so purchasers in one state may now reside in another.

○ ***Is there an extra effort where the class is highly concentrated?***
Evidence may show that a very large portion of class members reside in a certain state or region, and notice can be focused there, while providing effective, but not as strong, notice elsewhere.

❑ ***Does the plan include individual notice?***
If names and addresses are reasonably identifiable, Rule 23(c)(2) requires individual notice. Be careful to look closely at assertions that mailings are not feasible.

○ ***Did you receive reliable information on whether and how much individual notice can be given?***
Consider an expert review of the information you have been provided regarding the parties' ability to give individual notice. The parties may have agreed to submit a plan that does not provide sufficient individual notice in spite of the rule.

# Judges' Class Action Notice and Claims Process Checklist
## and Plain Language Guide | **2010**

○ ***Will the parties search for and use all names and addresses they have in their files?***
If the parties suggest that mailings are impracticable, look to distinguish between truly unreasonable searches (e.g., the defendant has nuggets of data that could be matched with third-party lists by a new computer program and several man-years) and situations where a search would be difficult but not unreasonably burdensome (e.g., lists reside directly in the defendant's records but are outdated or expensive to mail to because of the volume). Rule 23 generally requires the latter.

○ ***Will outdated addresses be updated before mailing?***
The plan should detail steps to update addresses before mailing, including postal service change-of-address records, and third-party address databases if the list is very old. Watch out for potentially ineffective "last known address" mailings.

○ ***Has the accuracy of the mailing list been estimated after updating efforts?***
Look for information that indicates how accurate the mailing addresses will be after the planned address updating effort.

○ ***Has the percentage of the class to be reached by mail been calculated?***
The parties should be able to indicate how great a percentage of the overall class will be reached by individual notice, so that the extent of any necessary additional notice can be determined.

○ ***Are there plans to re-mail notices that are returned as undeliverable?***
Even after updating addresses before mailing, mail will be returned as undeliverable. Further lookup tactics and sources are often available, and it is reasonable to re-mail these notices.

○ ***Will e-mailed notice be used instead of postal mailings?***
If available, parties should use postal mailing addresses, which are generally more effective than e-mail in reaching class members: mail-forwarding services reach movers, and the influx of "SPAM" e-mail messages can cause valid e-mails to go unread. If e-mail will be used—e.g., to active e-mail addresses the defendant currently uses to communicate with class members—be careful to require sophisticated design of the subject line, the sender, and the body of the message, to overcome SPAM filters and ensure readership.

❑ ***Will publication efforts combined with mailings reach a high percentage of the class?***
The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%. A study of recent published decisions showed that the median reach calculation on approved notice plans was 87%.

❑ ***Are the reach calculations based on accepted methodology?***
An affiant's qualifications are important here. Reach calculation methodology is commonly practiced in advertising and media-planning disciplines. Claims administrators are often accountants by training and may lack personal knowledge or the training to conduct reach analyses.

○ ***Is the net reach calculation thorough, conservative, and not inflated?***
Circulation figures for separate dissemination methods cannot simply be added to determine reach. Total audience must be calculated for each publication and the net must be calculated for a combination of publications. Be sure the reach calculation removes overlap between those people exposed to two or more dissemination methods (e.g., a person who receives a mailing may also be exposed to the notice in a publication).

Judges' Class Action Notice and Claims Process Checklist
and Plain Language Guide | **2010**

○ ***Do the reach calculations omit speculative reach that only might occur?***
Watch for estimated reach calculations that are based in part on speculative notice that
might occur, e.g., news coverage about the lawsuit or settlement. Often, these news articles
do not ultimately explain class members' rights, and the content is not in the court's control.

○ ***Is any Internet advertising being measured properly?***
Audiences of Internet websites are measured by "impressions." Total, or "gross,"
impressions of the entire website do not reveal how many people will view the notice "ad"
appearing periodically on a particular page. Inflated audience data via Internet ads is
common. It is very expensive to reach a significant percentage of a mass audience with
Internet banner ads. Watch for suggestions that Internet ads and social network usage can
replace all other methods. Reach, awareness, and claims will likely be very low when such a
program is complete.

❏ ***Is non-English notice necessary?***
Consider the demographics of the class to determine whether notice is necessary in Spanish or
another language. The number of class members whose native language is not English should
guide you on whether to actively disseminate notice in other languages, or to simply make foreign
language notices available at a website.

❏ ***Does the notice plan allow enough time to act on rights after notice exposure?***
Class members need time to receive a notice by mail or in a publication. A minimum of 30 days is
necessary from completed dissemination before deadlines, with 60–90 days preferred. This
allows for re-mailings, fulfillment of requests for more information, and consideration of rights
and options.

❏ ***Will key documents be available at a neutral website?***
Class members should have access to information beyond the notice. Besides the summary notice
and detailed notice (following the FJC examples at www.fjc.gov), it is reasonable to post the
following documents at a neutral administrator's website dedicated to the case: the plaintiffs'
complaint, the defendants' answer, your class-certification decision (in the event of a class
certified for trial), and the settlement agreement and claim form (in the event of a settlement).
Other orders, such as your rulings on motions to dismiss or for summary judgment, should
ordinarily be made available as well.

❏ ***Can the class get answers from a trained administrator or from class counsel?***
Even the best notice will generate questions from class members. A toll-free number call center,
an interactive website staffed by trained administrators, and class counsel who are accessible to
the people they represent are reasonable steps to help class members make informed decisions.

## Notice Documents *(also see Plain Language Notice Guide, below)*

❏ ***Have you approved all of the forms of the notices?***
Before authorizing the parties to begin disseminating notices, you should ask for and approve all
forms of notice that will be used. This includes a detailed notice; a summary notice; and
information that will appear at the website and in any other form, such as an Internet banner, TV
notice, and radio notice. See www.fjc.gov for illustrative notice forms for various cases. It is best
to see and approve the forms of notice the way they will be disseminated, in their actual sizes and
designs.

# Judges' Class Action Notice and Claims Process Checklist
## and Plain Language Guide | **2010**

❑ *Are the notices designed to come to the attention of the class?*
The FJC's illustrative notices, as also described in the accompanying "*Plain Language Notice Guide*," explain how to be sure the notices are "noticed" by the casual-reading class member. With "junk mail" on the rise, and the clutter of advertising in publications, legal notices must stand out with design features long-known to communications pros.

    ❍ *Does the outside of the mailing avoid a "junk mail" appearance?*
Notices can be discarded unopened by class members who think the notices are junk mail. A good notice starts with the envelope design, examples of which are at www.fjc.gov.

    ❍ *Do the notices stand out as important, relevant, and reader-friendly?*
It is important to capture attention with a prominent headline (like a newspaper article does). This signals who should read the notice and why it is important. The overall layout of the notice will dictate whether busy class members will take time to read the notice and learn of their rights.

❑ *Are the notices written in clear, concise, easily understood language?*
Required by Rule 23 since 2003, it is also simply good practice to recognize that communicating legal information to laypeople is hard to do.

❑ *Do the notices contain sufficient information for a class member to make an informed decision?*
Consider the amount of information provided in the notice. Watch for omission of information that the lawyers may wish to obscure (such as the fee request) but that affects class members nonetheless.

❑ *Do the notices include the Rule 23 elements? Even the summary notice?*
Summary notices, whether mailed or published, encourage readership, and the FJC illustrative notices show that even summary notices can include all elements required by Rule 23(c)(2)(B). But an overly short summary notice, one that mostly points interested readers to a detailed notice, can result in most class members (who read only the summary notice) being unaware of basic rights.

❑ *Have the parties used or considered using graphics in the notices?*
Depending on the class definition or the claims in the case, a picture or diagram may help class self-identify as members, or otherwise determine whether they are included.

❑ *Does the notice avoid redundancy and avoid details that only lawyers care about?*
It is tempting to include "everything but the kitchen sink" in the detailed notice. Although dense notices may appear to provide a stronger binding effect by disclosing all possible information, they may actually reduce effectiveness. When excess information is included, reader burnout results, the information is not communicated at all, and claims are largely deterred.

❑ *Is the notice in "Q&A" format? Are key topics included in logical order?*
The FJC illustrative notices take the form of answers to common questions that class members have in class action cases. This format, and a logical ordering of the important topics (taking care to include all relevant topics) makes for a better communication with the class.

❑ *Are there no burdensome hurdles in the way of responding and exercising rights?*
Watch for notice language that restricts the free exercise of rights, such as onerous requirements to submit a "satisfactory" objection or opt-out request.

# Judges' Class Action Notice and Claims Process Checklist
## and Plain Language Guide | 2010

❏ *Is the size of the notice sufficient?*
Consider the balance between cost efficiency and effectiveness. A smaller publication notice will save money, but too small and it will not afford room for a noticeable headline, will not fit necessary information, and will not be readable if using fine print.

## Claims Process

❏ *Is a claims process actually necessary?*
In too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members. When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms.

❏ *Does the claims process avoid steps that deliberately filter valid claims?*
Close attention to the nature of a necessary claims process may help eliminate onerous features that reduce claims by making claiming more inconvenient.

❏ *Are the claim form questions reasonable, and are the proofs sought readily available to the class member?*
Watch for situations where class members are required to produce documents or proof that they are unlikely to have access to or to have retained. A low claims rate resulting from such unreasonable requirements may mean that your eventual fairness decision will overstate the value of the settlement to the class and give plaintiff attorneys credit for a greater class benefit than actually achieved.

❏ *Is the claim form as short as possible?*
A long, daunting claim form is more likely to be discarded or put aside and forgotten by recipients. Avoid replicating notice language or injecting legalistic terminology into the claim form which will deter response and confuse class members.

❏ *Is the claim form well-designed with clear and prominent information?*
Consider whether the claim form has simple, clearly worded instructions and questions, all presented in an inviting design. The deadlines and phone numbers for questions should be prominent.

❏ *Have you considered adding an online submission option to increase claims?*
As with many things, convenience is of utmost importance when it comes to claims rates. Today, many class members expect the convenience of one-click submission of claims. Technology allows it, even including an electronic signature. Claim forms should also be sent with the notice, or published in a notice, because many will find immediate response more convenient than going to a website.

❏ *Have you appointed a qualified firm to process the claims?*
You will want to be sure that the claims administrator will perform all "best practice" functions and has not sacrificed quality in order to provide a low price to win the administration business.

# Judges' Class Action Notice and Claims Process Checklist
## and Plain Language Guide | 2010

❑ ***Are there sufficient safeguards in place to deter waste, fraud, and/or abuse?***
The claims process, the claim form itself, and the claims administrator all play roles in ensuring that approved claims are valid claims, so that payments go to class members who meet the criteria. Closely monitoring the process, perhaps through a special master—or at least by requiring the parties to file full reports of claims made—is a good idea.

## After Notice/Before Trial or Final Settlement Approval

❑ ***Did the notice plan achieve what it promised?***
Look for evidence that the notice plan reached the class members as well as anticipated.

❑ ***What is the reaction of the class?***
You will want to look at the number and nature of any objections, as well as the number of opt-outs and claims. Special note: waiting for the claims deadline to expire before deciding on final approval ensures that you can look at a full picture of the fairness of the settlement. By so doing you will be able to judge the actual value of the settlement to the class and calculate attorney fees in relation to that value.

❑ ***Have you made sufficient findings in the record?***
Consider, based on the evidence, making detailed findings so as to inhibit appellate review or to withstand a subsequent collateral review of your judgment.

❑ ***Is any subsequent claims-only notice necessary?***
If you find the settlement fair, reasonable, and adequate, but the number of claims is low, you may consider additional notice to the class after final approval.

## Federal Judicial Center Plain Language Notice Guide
*"Thumbnail" representations of illustrative notices at www.fjc.gov (click on "Class Action Notices Page")*

### *Detailed Notice—First Page*

• Page one is an overall summary of the notice. The objective is to use the fewest words to say the most. It is a snapshot of the case, of the reasons for the notice, and of the rights that class members have.

• The court's name at the top conveys the importance of the notice.

• A headline in a large font captures attention. It conveys what the notice is about and who is included, and it suggests a benefit to reading the entire notice.

• The words in italics below the headline communicate the official nature of the notice and provide a contrast from a lawyer's solicitation. Be sure to avoid a traditional legalistic case caption.

• Short bullet points highlight the nature of the case and the purpose of the notice. Bullet points also communicate who is included, the benefits available (if it is a settlement), and steps to be taken—identifying deadlines to observe.  The first page should pique class members' interest and encourage them to read the entire notice.

• The table of rights explains the options available. These are deliberately blunt. Be careful to avoid redundancy with the information inside the notice.

• The first page should prominently display a phone number, e-mail address, or website where the class can obtain answers to questions.

• If appropriate for the class, include a non-English (e.g., Spanish) language note about the availability of a copy of the notice in that language.

### *Detailed Notice—Table of Contents*

• Organize the topics into different sections and place the information in a logical order.

• A "Q&A" or "Answers to Common Questions" format helps class members find the information that is important to their decision-making process.

• Customize the topics to the facts of the case, but keep the overall notice short:  8–11 pages should be plenty even for complex matters.

• Don't avoid obvious questions (or answers) that class members will have.

**Ex. H - 113**

## Federal Judicial Center Plain Language Notice Guide

*"Thumbnail" representations of illustrative notices at www.fjc.gov (click on "Class Action Notices Page")*



### Detailed Notice—Inside Content

• Short answers are best. Be sure that the text answers the question being asked and does not "spin" the information in a way to achieve a desired result—e.g., do not use language that encourages class members to accept a proposed settlement.

• Watch for redundant and lengthy information, but also substantive omissions. Be frank and open for better reader comprehension and, as a result, a stronger binding effect.

• Every detail does not belong in the notice, but all rights and options do. Explain settlement benefits and state the fees that the lawyers will seek. Watch for burdensome requirements that might inhibit objections, opt outs, or claims.

• Use plain language. You may closely follow the illustrative models at www.fjc.gov.

### Summary Notice

• The summary notice should be short but comprehensive. Refer to all of the requirements of Rule 23 in a simple and clear summary fashion. Follow the FJC models wherever possible.

• The "Legal Notice" banner at the top helps stop a publisher from typesetting the word "advertisement" at the top, which would create a perception that the notice is a solicitation. Do not use the legal case caption style.

• The headline in large font captures the attention of readers who glance at the page. It flags what the notice is about, who is included, and it signals a benefit to be derived by reading the notice.

• The initial paragraphs provide a snapshot of all key information.

• Be sure to explain class membership in a simple way. Consider a graphic to help readers understand that they are included.

• Make a brief but clear reference to the substance of the case and the claims involved.

• Identify clearly what class members could get and how they would get it. These are the most common questions from class members.

• Be sure to include clear references to opt out, objection, and appearance rights. State the amount of the lawyers' fee request.

• Include a prominent reference to the call center and website.

### Federal Judicial Center Plain Language Notice Guide

*"Thumbnail" representations of illustrative notices at www.fjc.gov (click on "Class Action Notices Page")*

#### Outside of Mailing

•  Design the notice to make it distinguishable from "junk mail."

•  A reference to the court's name (at the administrator's address) ensures that the class recognizes the notice's legitimacy.

•  "Call-outs" on the front and back encourage the recipient to open and read the notice when it arrives with other mail.

> Notice Administrator for U.S. District Court
> P.O. Box 00000
> City, ST 00000-0000
>
> **Notice to those who bought XYZ Corp. Stock in 1999.**
>
> Jane Q. Class Member
> 123 Anywhere Street
> Anytown, ST 12345-1234

•  The call-out on the front (shown on example above) identifies what the notice is about and who is affected. On the back you may highlight the settlement benefits, or the rights involved.

•  Use these techniques even if the mailed notice is designed as a self-mailer, i.e., a foldover with no envelope.

> **Notice Administrator for U.S. District Court**
>
> John Q. Investor                    Month 00, 0000
> P.O. Box 0000
> City, ST 00000-0000
>
> Dear Mr. Investor:
>
> You are listed as an investor in XYZ Corp. stock.  Enclosed is a notice about the settlement of a class action lawsuit called *North v. XYZ Corp.*, No. CV 00-5678.  You may be eligible to claim a payment from the settlement, or you may want to act on other legal rights.  Important facts are highlighted below and explained in the notice:
>
> **XYZ Corp. Securities Class Action Settlement**
>
> •  **Security:**  XYZ Corp. common stock  (CUSIP: 12345X678)
> •  **Time Period:**  XYZ Corp. stock bought in 1999
> •  **Settlement Amount:**  $6,990,000 for investors (17½ cents per share if claims are submitted for each share).
> •  **Reasons for Settlement:**  Avoids costs and risks from continuing the lawsuit; pays

#### Cover Letter (when compliance with PSLRA is needed)

•  Identify the court's administrator as the sender—this conveys legitimacy.

•  The content should be very short. Remember that this is not the notice.

•  A reference in bold type to the security involved flags the relevance of the letter.

•  The bullet points track each PSLRA cover letter requirement. Avoid lengthy explanations that are redundant with the notice. Be blunt for clarity.

•  The content in the FJC's PSLRA cover letter can simply be customized for the case at hand. The design encourages interest, reading, and action.

**Ex. H - 115**

# EXHIBIT I

# Procedural Guidance for Class Action Settlements

*Published November 1, 2018; modified December 5, 2018, August 4, 2022, and September 5, 2024*

---

> **NOTE:** *Even though the guidance is highly recommended, the parties must comply in the first instance with the specific orders of the presiding judge.*

---

Parties submitting class action settlements for preliminary and final approval in the Northern District of California should review and follow these guidelines to the extent they do not conflict with a specific judicial order in an individual case. Failure to address the issues discussed below may result in unnecessary delay or denial of approval. Parties and mediators should consider this guidance during settlement negotiations and when drafting settlement agreements and exhibits, including class notices. In cases litigated under the Private Securities Litigation Reform Act of 1995 and the Fair Labor Standards Act, follow the statute and case law requirements that apply to such cases, such as regarding reasonable costs and expenses awards to representative plaintiffs, and this procedural guidance to the extent applicable.

## Preliminary Approval

1) INFORMATION ABOUT THE SETTLEMENT—The motion for preliminary approval should state, where applicable:

   a. Any differences between the settlement class and the class proposed in the operative complaint (or, if a class has been certified, the certified class) and an explanation as to why the differences are appropriate.

   b. Any differences between the claims to be released and the claims in the operative complaint (or, if a class has been certified, the claims certified for class treatment) and an explanation as to why the differences are appropriate.

   c. The class recovery under the settlement (including details about and the value of injunctive relief), the potential class recovery if plaintiffs had fully prevailed on each of their claims, claim by claim, and a justification of the discount applied to the claims.

**Ex. I - 117**

d. Any other cases that will be affected by the settlement, an explanation of what claims will be released in those cases if the settlement is approved, the class definitions in those cases, their procedural posture, whether plaintiffs' counsel in those cases participated in the settlement negotiations, a brief history of plaintiffs' counsel's discussions with counsel for plaintiffs in those other cases before and during the settlement negotiations, an explanation of the level of coordination between the two groups of plaintiffs' counsel, and an explanation of the significance of those factors on settlement approval. If there are no such cases, counsel should so state.

e. The proposed allocation plan for the settlement fund.

f. If there is a claim form, an estimate of the expected claim rate in light of the experience of the selected claims administrator and/or counsel based on comparable settlements, the identity of the examples used for the estimate, and the reason for the selection of those examples.

g. In light of Ninth Circuit case law disfavoring reversions, whether and under what circumstances money originally designated for class recovery will revert to any defendant, the expected and potential amount of any such reversion, and an explanation as to why a reversion is appropriate.

2) SETTLEMENT ADMINISTRATION—The parties are expected to get multiple competing bids from potential settlement administrators. In the motion for preliminary approval, the parties should:

a. Identify the proposed settlement administrator, the settlement administrator selection process, how many settlement administrators submitted proposals, what methods of notice and claims payment were proposed, and the lead class counsel's firms' history of engagements with the settlement administrator over the last two years.

b. Address the settlement administrator's procedures for securely handling class member data (including technical, administrative, and physical controls; retention; destruction; audits; crisis response; etc.), the settlement administrator's acceptance of responsibility and maintenance of insurance in case of errors, the anticipated administrative costs, the reasonableness of those costs in relation to the value of the settlement, and who will pay the costs.

The court may not approve the amount of the cost award to the settlement administrator until the final approval hearing. The Court encourages the parties to address the items listed in the checklist linked [here](#) in formulating their response.

Ex. I - 118

3) NOTICE—The parties should ensure that the class notice is easily understandable, in light of the class members' communication patterns, education levels, and language needs. The notice should include the following information:

    a. Contact information for class counsel to answer questions.

    b. The address for a website, maintained by the claims administrator or class counsel, that lists key deadlines and has links to the notice, claim form (if any), preliminary approval order, motions for preliminary and final approval and for attorneys' fees, and any other important documents in the case.

    c. Instructions on how to access the case docket via PACER or in person at any of the court's locations.

    d. The date and time of the final approval hearing, clearly stating that the date may change without further notice to the class.

    e. A note to advise class members to check the settlement website or the Court's PACER site to confirm that the date has not been changed.

The parties should explain how the notice distribution plan is effective. Class counsel should consider the following ways to increase notice to class members: identification of potential class members through third-party data sources; use of text messages and social media to provide notice to class members; hiring a marketing specialist; providing a settlement website that estimates claim amounts for each specific class member and updating the website periodically to provide accurate claim amounts based on the number of participating class members; and distributions to class members via direct deposit.

The notice distribution plan should rely on U.S. mail, email, and/or social media as appropriate to achieve the best notice that is practicable under the circumstances, consistent with Federal Rule of Civil Procedure 23(c)(2). If U.S. mail is part of the notice distribution plan, the notice envelope should be designed to enhance the chance that it will be opened.

Below is suggested language for inclusion in class notices:

This notice summarizes the proposed settlement. For the precise terms of the settlement, please see the settlement agreement available at www._____.com, by contacting class counsel at _____, by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, or by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, [insert appropriate

**Ex. I - 119**

Court location here], between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS.

4)  OPT-OUTS—The notice should instruct class members who wish to opt out of the settlement to send a letter, setting forth their name and information needed to be properly identified and to opt out of the settlement, to the settlement administrator and/or the person or entity designated to receive opt outs. It should require only the information needed to opt out of the settlement and no extraneous information or hurdles. The notice should clearly advise class members of the deadline, methods to opt out, and the consequences of opting out.

5)  OBJECTIONS—Objections must comply with Federal Rule of Civil Procedure 23(e)(5). The notice should instruct class members who wish to object to the settlement to send their written objections only to the court. All objections will be scanned into the electronic case docket, and the parties will receive electronic notices of filings. The notice should make clear that the court can only approve or deny the settlement and cannot change the terms of the settlement. The notice should clearly advise class members of the deadline for submission of any objections.

Below is suggested language for inclusion in class notices:

"You can ask the Court to deny approval by filing an objection. You can't ask the Court to order a different settlement; the Court can only approve or reject the settlement. If the Court denies approval, no settlement payments will be sent out, and the lawsuit will continue. If that is what you want to happen, you should object.

Any objection to the proposed settlement must be in writing. If you file a timely written objection, you may, but are not required to, appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney. All written objections and supporting papers must (a) clearly identify the case name and number ( _____ v. _____, Case No. _____ ), (b) be submitted to the Court either by filing them electronically or in person at any location of the United States District Court for the Northern District of California or by mailing them to the Class Action Clerk, United States District Court for the Northern District of California, [insert appropriate Court location here], and (c) be filed or postmarked on or before _____."

6)  ATTORNEYS' FEES AND COSTS—Although attorneys' fee requests will not be approved until the final approval hearing, class counsel should include information about the fees and costs (including expert fees) they intend to request, their lodestar

**Ex. I - 120**

1/10/25, 1:02 PM · Procedural Guidance for Class Action Settlements | United States District Court, Northern District of California

Case 3:20-cv-00406-AJB-DDL   Document 792-2   Filed 04/10/25   PageID.38849
Page 132 of 143

calculation (including total hours), and resulting multiplier in the motion for preliminary approval. In a common fund case, the parties should include information about the relationship between the amount of the common fund, the requested fee, and the lodestar. To the extent counsel base their fee request on having obtained injunctive relief and/or other non-monetary relief for the class, counsel should discuss the benefit conferred on the class.

7) SERVICE AWARDS—Judges in this district have different perspectives on extra payments to named plaintiffs or class representatives that are not made available to other class members. Counsel seeking approval of service awards should consult relevant prior orders by the judge reviewing the request. Although service award requests will not be approved until the final approval hearing, the parties should include information about the service awards they intend to request as well as a summary of the evidence supporting the awards in the motion for preliminary approval. The parties should ensure that neither the size nor any conditions placed on the incentive awards undermine the adequacy of the named plaintiffs or class representatives. In general, unused funds allocated to incentive awards should be distributed to the class pro rata or awarded to cy pres recipients.

8) CY PRES AWARDEES—If the settlement contemplates a cy pres award, the parties should identify their chosen cy pres recipients, if any, and how those recipients are related to the subject matter of the lawsuit and the class members' claims. The parties should also identify any relationship they or their counsel have with the proposed cy pres recipients. In general, unused funds allocated to attorneys' fees, service awards, settlement administration costs, and class member payments should be distributed to the class pro rata if feasible, or else awarded to cy pres recipients or to the relevant government authorities.

9) TIMELINE—The parties should ensure that class members have at least thirty-five days to opt out or object to the settlement and the motion for attorney's fees and costs.

10) CLASS ACTION FAIRNESS ACT (CAFA) AND SIMILAR REQUIREMENTS—The parties should address whether CAFA notice is required and, if so, when it will be given. In addition, the parties should address substantive compliance with CAFA. For example, if the settlement includes coupons, the parties should explain how the settlement complies with 28 U.S.C. § 1712. In addition, the parties should address whether any other required notices to government entities or others have been provided, such as notice to the Labor & Workforce Development Agency (LWDA) pursuant to the Private Attorneys General Act (PAGA).

11) COMPARABLE OUTCOMES—Lead class counsel should provide information about comparable cases, including settlements and litigation outcomes.  Lead class

Ex. I - 121

1/10/25, 1:02 PM Procedural Guidance for Class Action Settlements | United States District Court, Northern District of California

Case 3:20-cv-00406-AJB-DDL Document 792-2 Filed 01/10/25 PageID.38850 Page 133 of 143

counsel should provide the following information for as many as feasible (and at least one) comparable class settlements (i.e., settlements involving the same or similar claims, parties, issues):

   a. The claims being released, the total settlement fund, the total number of class members, the total number of class members to whom notice was sent, the method(s) of notice, the number and percentage of claim forms submitted, the average recovery per class member or claimant, the amounts distributed to cy pres recipients, the administrative costs, the attorneys' fees and costs, the total exposure if the plaintiffs had prevailed on every claim.

   b. Where class members are entitled to non-monetary relief, such as discount coupons or debit cards or similar instruments, the number of class members availing themselves of such relief and the aggregate value redeemed by the class members and/or by any assignees or transferees of the class members' interests.

   c. Where injunctive and/or other non-monetary relief has been obtained, discuss the benefit conferred on the class.

Counsel should summarize this information in easy-to-read charts that allow for quick comparisons with other cases, supported by analysis in the text of the motion.

12) ELECTRONIC VERSIONS—Electronic versions (Microsoft Word or WordPerfect) of all proposed orders and notices should be submitted to the presiding judge's Proposed Order (PO) email address when filed. Most judges in this district use Microsoft Word, but counsel should check with the individual judge's Courtroom Deputy.

13) OVERLAPPING CASES—Within one day of filing of the preliminary approval motion, the defendants should serve a copy on counsel for any plaintiffs with pending litigation, whether at the trial court or appellate court level, whether active or stayed, asserting claims on a representative (e.g., class, collective, PAGA, etc.) basis that defendants believe may be released by virtue of the settlement.

## Final Approval

1) CLASS MEMBERS' RESPONSE—The motion for final approval briefing should include information about the number of undeliverable class notices and claim packets, the number of class members who submitted valid claims, the number of class members who opted out, and the number of class members who objected to or commented on the settlement. In addition, the motion for final approval should respond to any objections.

**Ex. I - 122**

1/10/25, 1:02 PM    Procedural Guidance for Class Action Settlements | United States District Court, Northern District of California

Case 3:20-cv-00406-AJB-DDL    Document 792-2    Filed 01/10/25    PageID.38854
Page 134 of 143

2)  ATTORNEYS' FEES—All requests for approval of attorneys' fees must include detailed lodestar information, even if the requested amount is based on a percentage of the settlement fund. Declarations of class counsel as to the number of hours spent on various categories of activities related to the action by each biller, together with hourly billing rate information may be sufficient, provided that the declarations are adequately detailed. Counsel should be prepared to submit copies of detailed billing records if the court orders.

Regardless of when they are filed, requests for attorneys' fees must be noticed for the same date as the final approval hearing. If the plaintiffs choose to file two separate motions, they should not repeat the case history and background facts in both motions. The motion for attorneys' fees should refer to the history and facts set out in the motion for final approval.

3)  SERVICE AWARDS—All requests for service awards must be supported by evidence of the value provided by the proposed awardees, the risks they undertook in participating, the time they spent on the litigation, and any other justifications for the awards.

4)  ELECTRONIC VERSIONS—Electronic versions (Microsoft Word or Word Perfect) of all proposed orders and judgments should be submitted to the presiding judge's Proposed Order (PO) email address at the time they are filed.

## Post-Distribution Accounting

1)  Within 21 days after the settlement checks become stale (or, if no checks are issued, all funds have been paid to class members, cy pres beneficiaries, and others pursuant to the settlement agreement), the parties should file a Post-Distribution Accounting (and post it on the settlement website), which provides the following information:

a. The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average, median, maximum, and minimum recovery per claimant, the method(s) of notice and the method(s) of payment to class members, the percentage of success for each method of notice and payment (if known), the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, plaintiffs' counsel's updated lodestar total, and the lodestar multiplier.

1/10/25, 1:02 PM    Procedural Guidance for Class Action Settlements | United States District Court, Northern District of California

Case 3:20-cv-00406-AGJ-DDL    Document 792-2    Filed 01/10/25    PageID.38852
Page 135 of 143

b. Where class members are entitled to non-monetary relief, such as discount coupons, debit cards, or similar instruments, the number of class members availing themselves of such relief and the aggregate value redeemed by the class members and/or by any assignees or transferees of the class members' interests.

c. Where injunctive and/or other non-monetary relief has been obtained, discuss the benefit conferred on the class.
Counsel should provide this information using the Court's Post-Distribution Accounting Form (available at /forms/civil-forms/) and file it as ECF event "Post-Distribution Accounting" under Civil Events > Other Filings > Other Documents.

2) The Court may hold a hearing following submission of the parties' Post-Distribution Accounting.

# EXHIBIT J

AARON J. FISCHER (SBN 247391)
  aaron.fischer@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone:  (510) 267-1200
Facsimile:   (510) 267-1201

RICHARD DIAZ (SBN 285459)
  richard.diaz@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
350 South Bixel Street, Suite 290
Los Angeles, CA 90017
Telephone:  (213) 213-8000
Facsimile:   (213) 213-8001

Attorneys for Plaintiffs

[Additional Counsel Listed On Second Page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAY MURRAY, DAVID FRANCO, SHAREEN WINKLE, MARIA TRACY, ERICK BROWN, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>COUNTY OF SANTA BARBARA, and SANTA BARBARA COUNTY SHERIFF'S OFFICE,<br><br>        Defendants. | Case No.  CV 17-8805-GW(JPRx)<br><br>**CLASS ACTION**<br><br>**ORDER APPROVING CLASS NOTICE**<br><br>Judge: Hon. George H. Wu |

JULIA E. ROMANO (SBN 260857)
  jromano@kslaw.com
JENNIFER T. STEWART (SBN 298798)
  jstewart@kslaw.com
STACY L. FOSTER (SBN 285544)
  sfoster@kslaw.com
KING & SPALDING LLP
633 W Fifth Street, Suite 1700
Los Angeles, CA  900781
Telephone:   (213) 443-4355
Facsimile:   (213) 443-4310

DON SPECTER (SBN 83925)
  dspecter@prisonlaw.com
CORENE KENDRICK (SBN 226642)
  ckendrick@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA  94710
Telephone:   (510) 280-2621
Facsimile:    (510) 280-2704

DONALD F. ZIMMER, JR. (SBN 112279)
  fzimmer@kslaw.com
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone:   (415) 318-1220
Facsimile:   (415) 318-1300

JOSHUA C. TOLL (Admitted *Pro Hac Vice)*
  jtoll@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington DC 20036
Telephone:   (202) 737-8616
Facsimile:    (202) 626-3727

[PROPOSED] ORDER APPROVING CLASS NOTICE CASE NO. 2:17-cv-08805-GW-JPR

**Ex. J - 127**

On May 31, 2018, this Court entered an Order in the above-captioned action certifying a Class of all people who are now, or in the future will be, incarcerated in the Santa Barbara County Jail, and further certifying a subclass of all people who are now, or in the future will be, incarcerated in the Santa Barbara County Jail and who are qualified individuals with disabilities, as that term is defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Pursuant to the Court's Order and Fed. R. Civ. P. 23(c)(2)(A), the parties have submitted to the Court a Notice of Class Certification ("Class Notice"), attached hereto as Exhibit A, as well as a proposed order regarding the distribution of the Class Notice.

Accordingly, good cause appearing, IT IS ORDERED AS FOLLOWS:

1. The Court approves the substance, form, and manner of the Class Notice filed by the parties on June 27, 2018 and finds that the proposed method of disseminating the Class Notice meets all due process and other legal requirements and is the best notice practicable under the circumstances.

2. Within forty-five days of this Order, the County is directed to post the Class Notice in English and Spanish in all housing and intake units in such a manner as to make the Class Notice visible to all prisoners. The County will provide translation of the Class Notice into other languages upon request. Additionally, the County shall hand deliver an English and Spanish copy of the Class Notice to each prisoner within the jail.

3. The County shall provide all arriving prisoners an English and Spanish copy of the Class Notice as part of or in conjunction with the Jail's orientation manual during the intake process.

4. The County shall provide assistance reviewing the Class Notice to individuals who are illiterate or have a disability that may affect their ability to read or understand the Class Notice.

[PROPOSED] ORDER APPROVING CLASS NOTICE CASE NO. 2:17-cv-08805-GW-JPR

**Ex. J - 128**

Case 2:20-cv-00406-AB-DDL   Document 792-2   Filed 01/10/25   Page 4 of 7   Page ID #:38857
Case 2:17-cv-08805-GW-JPR   Document 43   Filed 06/29/18   Page 4 of 7   Page ID #:662
Page 140 of 143

1        5. The County shall file and serve on Plaintiffs' counsel a declaration

2   affirming that Class Notice is distributed, consistent with this Order.

3        6. The County will make a copy of the Complaint in this case (Dkt. 1)

4   available upon request to individuals detained in all housing units at the Jail.

5   **IT IS SO ORDERED.**

6

Dated: June 29, 2018

7                                 Hon. George H. Wu

8                                 United States District Judge

# Exhibit A

# IMPORTANT NOTICE

## CLASS ACTION REGARDING
## SANTA BARBARA COUNTY JAIL:
### Mental Health Care, Medical Care, Disabilities, Restrictive/Segregation Housing

*Murray, et al. v. County of Santa Barbara*,
C.D. Cal. No. 2:17-cv-08805-GW-JPR

*Murray v. County of Santa Barbara* is a federal class action lawsuit challenging certain conditions at the Santa Barbara County Jail. The conditions addressed in the lawsuit include mental health care, medical care (including dental care), disability access and accommodations, and use of restrictive/segregation housing.

The lawsuit claims that:

1. Prisoners in the jail are being deprived of their rights under the Eighth and Fourteenth Amendments to the United States Constitution; and

2. The County does not comply with federal and state disability law, including the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and California Government Code Section 11135 at the County Jail.

The Court has issued an order that all people incarcerated in the Santa Barbara County Jail are covered by the lawsuit ("the Class"). You are a member of this main Class if you are incarcerated in Santa Barbara County Jail. The Court also certified a Subclass of people with disabilities who are incarcerated in the Santa Barbara County Jail.

1

**Ex. J - 131**

You are not required to do anything at this time. The Court will decide whether or not to issue an order regarding the conditions in the jail facilities after a trial or, if there is a settlement, after determining whether to approve that settlement.

Any settlement or final judgment entered in this case will be binding on all people in the Class and Subclass. The Court has appointed attorneys to represent the Class and the Subclass.

This action does *not* seek money damages for inmates and none will be awarded.

This action does not involve any claim for individual relief, and attorneys for the class offer no opinion as to any inmate's ability to pursue a case for money damages or other relief.

The parties have agreed to obtain reports from subject matter experts based on their independent analysis of the jail's mental health care, medical care, disability access and disability accommodations system, and custody operations. The parties will be meeting to discuss a possible settlement.

**You can view the class action complaint by requesting it from jail staff.**

**If you would like more information about this case, or if you have any information that you wish to communicate to the Class attorneys, you may contact:**

**Disability Rights California**
**Attn: Santa Barbara Jail Class Action Team**
**350 South Bixel Street, Suite 290**
**Los Angeles, CA 90017**
