Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
Martin Kosla (SBN 247224)
E-mail: mkosla@bwslaw.com
Deann R. Rivard (SBN 177482)
E-mail: drivard@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA 92101-8474
Tel: 619.814.5800 Fax: 619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
Tel: 408.606.6300 Fax: 408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
DEPARTMENT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE
ANDRADE, ERNEST ARCHULETA,
JAMES CLARK, ANTHONY
EDWARDS, LISA LANDERS,
REANNA LEVY, JOSUE LOPEZ,
CHRISTOPHER NELSON,
CHRISTOPHER NORWOOD, JESSE
OLIVARES, GUSTAVO
SEPULVEDA, MICHAEL TAYLOR,
and LAURA ZOERNER, on behalf of
themselves and all others similarly
situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S
DEPARTMENT, COUNTY OF SAN
DIEGO, SAN DIEGO COUNTY
PROBATION DEPARTMENT, and
DOES 1 to 20, inclusive,

Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF OWEN J. MURRAY, D.O., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERTS**

**Hearing**
Date:    March 6, 2025
Time:    2:00 p.m.
Ctrm:    4A

Judge: Anthony J. Battaglia

Magistrate Judge: David D. Leshner

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

4935-9393-2817 v1

1

Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MOTION TO
EXCLUDE

\\

I, OWEN J. MURRAY, D.O., declare as follows:

1.    I am competent to testify to the matters set forth in this declaration, and if called to do so, would and could so testify.

2.    I am a board-certified physician in the field of Family Practice.  I have considerable expertise in correctional healthcare with more than 29 years of experience in correctional medicine.  For the past 25 years, I have worked for the University of Texas Medical Branch ("UTMB") Offender Health Services Program.  Currently, I serve as the Vice President of Offender Health Services in which capacity I am responsible for ensuring the provision of all medical, mental health, and dental services for approximately 100,000 adult offenders in the Texas Department of Criminal Justice ("TDCJ") state jails and prisons (approximately 80% of the state's correctional facility population), as well the delivery of such services to juvenile offenders in the Texas Juvenile Justice Department ("TJJD") facilities.  I oversee a staff of approximately 3,500 healthcare and clinical support employees located at more than 100 correctional facilities throughout the State of Texas.

3.    Before joining UTMB in 1995, I served as a Divisional Medical Director of Chicago's Cook County Jail and several correctional facilities operated by the Illinois Department of Corrections.  In addition, I have served as a healthcare consultant for several correctional systems, including the California and Arizona Departments of Corrections.  I currently serve as a Commissioner for Accreditation for the American Correctional Association ("ACA").

4.    In my role as Vice President of Offender Health Services for UTMB Correctional Managed Care ("CMC"), I have significant experience evaluating the management of infectious disease, to include COVID-19, in the correctional setting, consistent with standards and guidance promulgated by the American Correctional Association and the U.S. Centers for Disease Control and Prevention ("CDC").

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4935-9393-2817 v1                    2                    Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MOTION TO
EXCLUDE

1        5.     As I have previously stated in declarations and in my deposition

2    testimony, during the preparation of my expert report in this case in August 2024, I

3    reviewed a total of 81 medical records for incarcerated individuals with chronic care

4    conditions in order to assess the quality of care being provided to them at the Jail

5    and to determine if the standard of care was met. I specifically reviewed summaries

6    prepared by qualified individuals I identify in my report and in my deposition

7    testimony.  Plaintiffs have attached a portion of the pertinent testimony to their

8    motion. I have attached all of the pertinent testimony hereto as Exhibit A.

9        6.     I made clear that I did not personally review the records themselves in

10   detail but rather for format, and I discussed the qualifications of each of the

11   reviewers at pages 73:25 – 78:6. I also testified about the discussion I had with the

12   reviewers to discuss the task and a back and forth with Plaintiffs' counsel about his

13   and my understanding of the phrase "standard of care" at pages 79:7 – 82:16.

14       7.     I understand that Plaintiffs claim in their motion that I did not do

15   anything to confirm that I agreed with the reviewer determinations of "standard of

16   care" as evidenced in Appendix J to my report.  This is untrue and not what I

17   testified to in my deposition.  Plaintiffs cut out portions of my testimony relevant to

18   this topic, and did not ask me specifically whether I independently reviewed the

19   summaries of medical records or whether I agreed with their conclusions.  I did

20   conduct such a review. Plaintiffs' attorney asked me whether I reviewed the records

21   themselves and I testified truthfully that I did not.  The attorney then asked me

22   whether it was possible that I might have disagreed with the reviewers about

23   whether the standard of care had been met. My answer was cut out of the court

24   submission. I specifically stated,

25         "I don't believe so, after reviewing their – the work that they produced.  And,

26         if anyone had a question, they certainly could have reached out.  So, no, I

27         don't believe I would have reviewed them in a different fashion".

28   Plaintiffs' counsel did not follow up in any way and clearly I am talking about the

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4935-9393-2817 v1                  3              Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MOTION TO
EXCLUDE

Signature: ~~Owen J Murray~~
Dr. Murray (Jan 21, 2025 17:34 CST)

Email: ojmsm@earthlink.net

1  reviewer "review process" and conclusions when I said that I reviewed "the work

2  that they produced." (Pages 101–102).  To be clear, as a result of my independent

3  review of both the summaries of care and opinions of standard of care espoused by

4  each reviewer as to each medical chart reviewed, I agreed with each reviewer's

5  opinions regarding standard of care provided to the incarcerated patient.

6       I declare under penalty of perjury under the laws of California and the United

7  States of America that the foregoing is true and correct.

8       Executed on January 21, 2024, at _____Houston_____[City], __Texas__

9  [State].

10

11

12       ___Owen J Murray_____

13            OWEN J. MURRAY, D.O.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
CAMARILLO

4935-9393-2817 v1

4

Case No. 3:20-cv-00406-AJB-DDL
DR. MURRAY DECL. RE MOTION TO
EXCLUDE

# EXHIBIT A

# Deposition Transcript

Case Number: 3:20-CV-00406-AJB-DDL

Date: November 12, 2024

In the matter of:

# DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPT, et al.

# Owen J. Murray, D.O., MBA



**CERTIFIED COPY**

Reported by:
Cherie J. Anderson

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

1              UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

2             3:20-CV-00406-AJB-DDL

3                 - - -

4

   DARRYL DUNSMORE, ANDREE ANDRADE, :

5  ERNEST ARCHULETA, JAMES CLARK,   :
   ANTHONY EDWARDS, REANNA LEVY,    :

6  JOSUE LOPEZ, CHRISTOPHER NORWOOD,:
   JESSE OLIVARES, GUSTAVO         :

7  SEPULVEDA, MICHAEL TAYLOR, and   :
   LAURA ZOERNER, on behalf of     :

8  themselves and all others      :
   similarly situated,          :

9                      :
         Plaintiffs,        :

10                     :
       vs.            :

11                     :
   SAN DIEGO COUNTY SHERIFF'S     :

12  DEPARTMENT, COUNTY OF SAN DIEGO, :
   SAN DIEGO COUNTY PROBATION    :

13  DEPARTMENT, and DOES 1 TO 20,   :
   inclusive,              :

14                     :
        Defendants.        :

15  _____

16    DEPOSITION OF OWEN J. MURRAY, D.O., MBA
    _____

17

   DATE TAKEN:      Tuesday, November 12, 2024

18

   TIME BEGAN:      9:12 a.m. Pacific

19

   TIME ENDED:      5:31 p.m. Pacific

20

   LOCATION:        Conducted via videoconference

21

22  REPORTED BY:     Cherie J. Anderson, RMR, RPR, CRR
                  Steno

23                315 West 9th Street, Suite 807
                  Los Angeles, CA  90015

24                (310) 573-8380
                  NV FIRM# 108F

25

OWEN J. MURRAY, D.O., MBA                                      JOB NO. 1220572
NOVEMBER 12, 2024

```
 1    APPEARANCES:

 2

              ROSEN BIEN GALVAN & GRUNFELD LLP
 3            BY:  MICHAEL FREEDMAN, ESQUIRE
                  HANNAH CHARTOFF, ESQUIRE
 4            101 Mission Street, Sixth Floor
              San Francisco, California  94105
 5            (415) 433-6830
              mfreedman@rbgg.com/hchartoff@rbgg.com
 6            (Appearing via videoconference)
              Representing the Plaintiffs
 7

 8
              BURKE WILLIAMS & SORENSEN, LLP
 9            BY:  SUSAN E. COLEMAN, ESQUIRE
              444 South Flower Street, Suite 2400
10            Los Angeles, California  90071
              (213) 236-0600
11            scoleman@bwslaw.com
              (Appearing via videoconference)
12            Representing the Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          So it's based on my experience of doing this

2     in the past how the list actually works best.

3        Q    What I'm hearing from you -- and correct me if

4     I'm wrong -- is that you selected this list of

5     conditions to identify the people with chronic

6     conditions in the jail who were sick.  Is that right?

7        A    No.  They -- to the extent -- when you say

8     "sick," what do you mean?

9        Q    I didn't ask that very well.  You mentioned a

10    moment ago how you picked the conditions to hopefully

11    cover the whole gamut of chronic conditions.  Isn't

12    that right?

13       A    Correct.  I did.

14       Q    When did you receive the 81 files?

15       A    I don't remember the exact date.

16       Q    Was it in late April?

17            MS. COLEMAN:  Calls for speculation.

18    [inaudible].

19            THE WITNESS:  I -- I'm sorry.

20       Q    Well, you said you ran out of time to review

21    all of them, so you must have been aware of the time

22    from when you got them until when the report was due,

23    at least to some extent.  Right?

24       A    Yeah.  I would say sometime in April.

25       Q    Okay.  Did you review any of the 81 files

1    yourself?

2        A    I did -- I reviewed them to see what format

3    they were in and what they looked like.  I did not do

4    a review of the record as -- as my -- the consultants

5    did.

6        Q    When you say -- I believe you said you

7    reviewed them -- the format of them.  What do you

8    mean by that?

9        A    Just I wanted to see what they looked like and

10   what the consultants were actually getting so I had a

11   better understanding if they asked about a question

12   or -- so I just wanted to see what it is they would

13   be looking at.

14       Q    But you didn't substantively review the

15   records to determine the care provided -- sorry.

16            You didn't substantively review the records to

17   evaluate the care provided to the patients, did you?

18       A    I did not, no.

19       Q    And your report lists five individuals as

20   reviewers of the medical files.  Right?

21       A    Correct.

22       Q    Dr. Stephen Boone.  Right?

23       A    Correct.

24       Q    PAC Erin Freeman?

25       A    Correct.

OWEN J. MURRAY, D.O., MBA                                          JOB NO. 1220572
NOVEMBER 12, 2024

```
 1        Q    FNP Jennifer Humphries?

 2        A    Correct.

 3        Q    Dr. Jane Leonardson?

 4        A    Correct.

 5        Q    And PA John Pulvino?

 6        A    Correct.

 7        Q    Who are those people?

 8        A    Well, I'll start with Dr. Leonardson.

 9   Dr. Leonardson has worked for Correctional Managed

10   Care.  She's a Board-certified internist who started

11   with me, actually, in the county jail in Chicago and

12   has worked in multiple TDCJ facilities.  Her current

13   role -- she's now since retired from CMC, but she was

14   our chief medical information officer when she left,

15   and she now is -- she has her own consulting business

16   and is involved in correctional healthcare activities

17   outside of CMC now.

18             John Pulvino:  He's a PA.  He's been here

19   30 years.  He's over -- he's the director of quality

20   and outcomes and has worked, as I said, in the TDCJ

21   and then started with Correctional Managed Care when

22   it began in September of '94.

23             Erin Freeman has been with Correctional

24   Managed Care for 15 years.  She's over our

25   utilization review department.
```

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1          And Stephen Boone is an ER physician, not

2   associated with CMC.  He's a Board-certified ER

3   guy -- doctor that works for UT Houston, and he's on

4   the faculty there.

5          And then Ms. Humphries is a nurse practitioner

6   who's been with CMC for the last few years, and she

7   has some experience in the past with doing legal

8   reviews in the nursing area, and she was just added

9   for this particular activity.

10    Q   And how did you -- did you choose those five

11  people to work with you?

12    A   I did, yes.

13    Q   And how did you choose those five to work with

14  you?

15    A   I've worked with them in the past on other

16  similar activities.

17    Q   And by "similar activities," you mean

18  reviewing medical files to determine whether care met

19  the standard of care?

20    A   Correct.

21    Q   Have they worked on [sic] you in other -- to

22  help you produce other expert litigation reports?

23    A   They have.

24    Q   You testified that you didn't review the

25  substance of the files.  Right?

OWEN J. MURRAY, D.O., MBA                                JOB NO. 1220572
NOVEMBER 12, 2024

```
 1      A    Correct.

 2      Q    They are the ones who reviewed the substance

 3   of the files.  Correct?

 4      A    Correct.

 5      Q    [Inaudible].

 6           Who assigned them which medical files they

 7   should review?

 8      A    Erin Freeman did that.

 9      Q    Was she the supervisor of this project?

10      A    She was my assistant in delegating and

11   distributing the workload.

12      Q    How did -- do you know how she decided to whom

13   to assign each medical file?

14      A    I think she just took the random assortment of

15   charts as they came in and assigned them that way.

16      Q    There was, as I saw it, an unequal assignment

17   of charts.  One of people reviewed as few as two, and

18   some others reviewed 25 or 26.  Do you know how that

19   happened?  Do you know how that happened?

20      A    It was just based on their time and

21   availability.

22      Q    Is that why FNP Humphries only reviewed two

23   files?

24      A    Correct.

25      Q    For each of the files, the reviewers wrote a
```

1    summary.  Right?

2        A    Correct.

3        Q    And, for each file, they offered an opinion

4    regarding whether the care the jail provided to the

5    person met the standard of care.  Right?

6        A    Correct.

7        Q    When medical professionals use this term,

8    "standard of care," what do they mean?

9        A    Well, in this situation, the standard of care

10   is a care standard that -- that each individual has

11   based on their personal experience and their

12   professional education as to the entirety of the care

13   that was provided, because one of the reasons we

14   actually pull chronic care charts is those are

15   patients who have a high likelihood of having

16   multiple encounters with the healthcare system.

17          And so that's a good pool of population --

18   pool of patients to pull so that you can be able to

19   view not only the chronic care, but their episodic

20   care, their use of lab, their use of x-ray, their use

21   of subspecialty care.

22          So the standard of care is -- is a subjective

23   standard based on those individuals' experience and

24   professional background.

25       Q    So that sounds like that's the standard of

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1  care that they applied here.  I asked a slightly

2  different question, which is, when medical

3  professionals use the term "standard of care," what

4  do they mean?

5      A    I don't know.

6          MS. COLEMAN:  Objection.  Vague.

7      Q    Have you heard the term "standard of care"

8  before?

9      A    I've heard it.

10     Q    Is it -- is it frequently used in medicine?

11     A    It is.

12     Q    But you don't know what it means?

13     A    I don't.

14         MS. COLEMAN:  Objection.  Misstates his

15  testimony.  Vague.

16     A    Again, I think it's a term of art, but I don't

17  really know what people mean when they say it.

18     Q    Do you know what your five reviewers think the

19  term standard of review -- I'm sorry -- "standard of

20  care" means?

21     A    We discussed -- we discussed how we were going

22  to approach reviewing the records and what was going

23  to go into how they subjectively scored those

24  records.

25     Q    And what did you discuss?  What was the --

1    well, who -- who set forth the parameters for what

2    the standard of care would be?

3        A    Well, as I said, there is no standard of care

4    as you're looking at the totality of services that

5    we're looking at.  There's not a book that I can go

6    to that's going to say that when I look at chronic

7    care and their episodic care and their use of lab and

8    their pharmaceutical choice and the delivery of all

9    of that -- there's no book that says, this meets the

10   standard or it doesn't meet the standard.

11             So it really comes down to, based on your

12   professional experience and your background, did the

13   totality of that care, in your opinion, fall within a

14   reasonable level of care for -- in this situation,

15   for a patient of San Diego County -- San Diego Jail.

16       Q    You just said that the standard of care would

17   be based on a person's experience and background.  Is

18   that right?

19       A    Correct.

20       Q    People have different levels of experience.

21   Right?

22       A    Correct.

23       Q    And they have different backgrounds.  Right?

24       A    Correct.

25       Q    Does that mean the standard of care could be

OWEN J. MURRAY, D.O., MBA                                              JOB NO. 1220572
NOVEMBER 12, 2024

```
 1    different for the -- for different people?

 2       A   I think it could.

 3       Q   Do you think the standard of care was

 4    different for your reviewers, given that they have

 5    different backgrounds and experience?

 6            MS. COLEMAN:  Objection.  Vague.  Compound.

 7       Calls for speculation.

 8       A   As I said, I don't -- again, there is no

 9    standard of care.  When you're talking a standard, it

10    really is a subjective review of the record that

11    they're looking at.  So there is no standard to

12    compare it to.

13       Q   I guess we should be really precise here.

14    When you're saying the standard of care, are we

15    talking about the standard of care for treating a

16    specific condition or the standard of care more

17    generally for a person overall or something else?

18       A   I'm -- I -- I would object to the word

19    "standard" because that would imply I could go read

20    about it in some book and find out what that standard

21    is, and this -- this is not -- this is the art of

22    medicine.  It's -- you know, you have to take in the

23    totality of what goes on and did it meet a reasonable

24    level of care for that patient.

25       Q   Well, in your report, you're the one who used
```

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    the phrase "standard of care," so I'm trying to

2    understand it as best I can.

3            And so I find it a little bit confusing that

4    you said you object to the word "standard."

5        A    Well, I don't --

6        Q    [Inaudible].

7            MS. COLEMAN:  One at a time.

8            THE WITNESS:  Yeah.  Sorry.

9        Q    Go ahead, Dr. Murray.

10       A    No.  No.  As I said, I guess I was objecting

11   to what standards, as if you are picking out

12   particular standards.  What I'm saying is, we use a

13   standard of care that was for the totality of the

14   care provided and did that reach the standard that we

15   thought was -- it was above the standard or below the

16   standard.

17       Q    All right.  I'm going to introduce as

18   Exhibit 3 a document here.  I'll blow this up a

19   little bit here, Dr. Murray.

20       A    Yes.

21       Q    Dr. Murray, do you recognize this document?

22       A    No.

23       Q    Did you ever submit a declaration in the Plata

24   v. Newsom litigation?

25       A    I might have.

OWEN J. MURRAY, D.O., MBA                                          JOB NO. 1220572
NOVEMBER 12, 2024

1     Q    I have more questions about that.  Under the

2  standard of care, as you defined it, for the review,

3  if one area of care was terrible for a patient but

4  the other areas of care were adequate, would the care

5  meet the standard of care?

6     A    It could.

7     Q    Now, the opinions expressed in your -- sorry.

8  The opinions in your report are your opinions.

9  Right?

10    A    Correct.

11    Q    Are the opinions regarding whether the

12  standard of care was met for the individual patients

13  in Appendix J, are those your opinions as well?

14    A    Well, they're the individual reviewers', whose

15  opinions I trust.

16    Q    But, again, you didn't review the file

17  substantively to confirm whether you agree with their

18  conclusions that the standard of care was met.

19  Right?

20         MS. COLEMAN:  Asked and answered.

21    A    No.  I did not review the medical record

22  files.

23    Q    Is it possible that you might have disagreed

24  with one of the reviewers about whether the standard

25  of care had been met?

OWEN J. MURRAY, D.O., MBA                                          JOB NO. 1220572
NOVEMBER 12, 2024

```
 1              MS. COLEMAN:   Objection.   Incomplete
 2       hypothetical.   Compound.   Calls for speculation.
 3       A    I don't believe so, after reviewing their --
 4    the work that they produced.   And, if anyone had a
 5    question, they certainly could have reached out.   So,
 6    no, I don't believe I would have reviewed them in a
 7    different fashion.
 8       Q    You said you reviewed Dr. Keller's rebuttal
 9    report.   Right?
10       A    Correct.
11       Q    And did you review the part of his report
12    where he reviewed 19 of the files that your chronic
13    care reviewers reviewed?
14       A    Correct.
15       Q    Did anything in Dr. Keller's report change
16    your opinion about whether the standard of care had
17    been met for any of those patients?
18       A    No.
19       Q    So, even where Dr. Keller showed that, let's
20    say, the care for someone's diabetes was not
21    consistent with the diabetes guidelines, you believe
22    that that care still met the standard of care?
23       A    Again, the review was in the totality of the
24    care being provided, not necessarily specifically
25    that diabetic care.
```

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1                        CERTIFICATE OF REPORTER

2

3           I, Cherie J. Anderson, Registered Merit
    Reporter, Registered Professional Reporter, Certified
4   Realtime Reporter, and Notary Public for the State of
    North Carolina at Large, do hereby certify:
5           That the foregoing deposition was taken
    remotely before me on the date and at the time and
6   location stated on page 1 of this transcript; that the
    deponent was duly sworn to testify to the truth, the
7   whole truth, and nothing but the truth; that the
    testimony of the deponent and all objections made at
8   the time of the examination were recorded
    stenographically by me and were thereafter
9   transcribed; that the foregoing deposition as typed is
    a true, accurate, and complete record of the testimony
10  of the deponent and of all objections made at the time
    of the examination to the best of my ability.
11          I further certify that I am neither related
    to nor counsel for any party to the cause pending or
12  interested in the events thereof.
            Witness my hand, I have hereunto affixed my
13  official seal on this 12th day of November 2024, at
    Wilmington, New Hanover County, North Carolina.

14

15

16

17

18

19

20

21

22          _____
            Cherie J. Anderson, RMR, CRR
23          My Commission expires
            December 22, 2026

24

25