GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>        Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:    Hon. Anthony J. Battaglia<br><br>Date:     March 6, 2025<br>Time:    2:00 p.m.<br>Crtrm.:   4A |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

PROCEDURAL BACKGROUND .............................................................................. 2

LEGAL STANDARDS ............................................................................................... 2

ARGUMENT .............................................................................................................. 3

I.     THE COURT SHOULD STRIKE DEFENDANTS' UNTIMELY
EXPERT DECLARATIONS AND DENY THE PORTIONS OF
DEFENDANTS' MOTION THAT RELY ON THEM ..................................... 3

II.    THE COURT SHOULD DENY DEFENDANTS' MOTION
REGARDING MEDICAL CARE ................................................................... 7

    A.    Legal Standard Regarding Correctional Medical Care ........................ 8

    B.    Material Disputes of Fact Exist Regarding the Constitutionality
of Defendants' Medical System ......................................................... 9

III.   THE COURT SHOULD DENY DEFENDANTS' MOTION
REGARDING DENTAL CARE ..................................................................... 17

    A.    Legal Standard Regarding Correctional Dental Care ......................... 17

    B.    Material Disputes of Fact Exist Regarding the Constitutionality
of Defendants' Dental System ........................................................... 18

IV.   THE COURT SHOULD DENY DEFENDANTS' MOTION
REGARDING ENVIRONMENTAL CONDITIONS .................................... 20

    A.    Legal Standard Regarding Environmental Conditions ....................... 20

    B.    Material Disputes of Fact Exist Regarding the Constitutionality
of Environmental Conditions in the Jail ............................................ 21

V.    THE COURT SHOULD DENY DEFENDANTS' MOTION
REGARDING SAFETY AND SECURITY CLAIM ..................................... 24

    A.    Legal Standard Regarding Safety and Security .................................. 25

    B.    Material Disputes of Fact Exist Regarding the Constitutionality
of Defendants' Safety and Security Policies and Practices ................ 25

VI.   THE COURT SHOULD DENY DEFENDANTS' MOTION
REGARDING ACCESS TO COUNSEL AND COURTS ............................. 29

    A.    Legal Standard Regarding Access to Counsel and Courts ................. 29

    B.    Material Disputes of Fact Exist Regarding Whether Defendants
Violate Class Members' Right to Access Counsel .............................. 30

C.    Material Disputes of Fact Exist Regarding Whether Defendants
Deny Class Members Access to the Courts ............................................ 31

VII.    THE COURT SHOULD DENY DEFENDANTS' MOTION
REGARDING DISPARATE RACIAL IMPACT ......................................... 32

A.    Legal Standard Regarding Section 11135 ............................................. 32

B.    Material Disputes of Fact Exist Regarding Whether the Sheriff's
Office's Patrol Activities Result in Disproportionate Arrests and
Overincarceration of Black and Latinx People ..................................... 33

C.    Material Disputes of Fact Exist Regarding Defendants'
Alternatives to Incarceration Programs ................................................. 35

CONCLUSION ................................................................................................................ 35

1

# TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) ................................................................................... 3

*Anderson v. Cty. of Kern*,
   45 F.3d 1310 (9th Cir. 1995) ................................................................... 23

*Armstrong v. Newsom*,
   58 F.4th 1283 (9th Cir. 2023) .................................................. 4, 15, 17, 26

*Barnard v. Gibbons*,
   2011 WL 13213599 (C.D. Cal. 2011) ...................................................... 27

*Barnes v. Healy*,
   980 F.2d 572 (9th Cir. 1992) ............................................................... 4, 14

*Baughman v. Garcia*,
   254 F. Supp. 3d 848 (S.D. Tex. 2017) .................................................... 20

*Benjamin v. Fraser*,
   264 F.3d 175, 179-81 (2d Cir. 2001) ...................................................... 32

*C.B. v. Moreno Valley Unified Sch. Dist.*,
   544 F. Supp. 3d 973 (C.D. Cal. 2021) ........................................... 36, 37, 39

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................. 2

*Colwell v. Bannister*,
   763 F.3d 1060 (9th Cir. 2014) ................................................................... 9

*Criswell v. Boudreaux*,
   2020 WL 5235675 (E.D. Cal. Sept. 2, 2020) .......................................... 33

*Disability Rights Mont., Inc. v. Batista*,
   930 F.3d 1090 (9th Cir. 2019) ................................................................... 9

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ................................................................................. 9

*Finley v. Parker*,
   253 F. App'x 634 (9th Cir. 2007) ............................................................ 19

*Frary v. Cty. of Marin*,
   81 F. Supp. 3d 811 (N.D. Cal. 2015) ...................................................... 28

*Gordon v. Cty. of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ................................................................... 9

*Greer v. Cty. of San Diego,*
    726 F. Supp. 3d 1058 (S.D. Cal. 2023) ................................................................ 28

*Hernandez v. Spacelabs Med. Inc.,*
    343 F.3d 1107 (9th Cir. 2003) ............................................................................... 3

*Hoptowit v. Spellman,*
    753 F.2d 779 (9th Cir. 1985) ............................................................................... 23

*Hunt v. Dental Dep't,*
    865 F.2d 198 (9th Cir. 1989) ............................................................................... 19

*Inmates of the Riverside Cty. Jail v. Clark,*
    144 Cal. App. 3d 850 (1983) ............................................................................... 10

*Johnson-El v. Schoemehl,*
    878 F.2d 1043 (8th Cir. 1989) ............................................................................. 32

*Jones v. City & Cty. of San Francisco,*
    976 F. Supp. 896 (N.D. Cal. 1997) ..................................................................... 33

*Kiehlmeier-Stratton v. Wexford Health Sources, Inc.,*
    2023 WL 2384142 (W.D. Pa. Mar. 6, 2023) ...................................................... 19

*Lancaster v. Tilton,*
    2008 WL 449844 (N.D. Cal. Feb. 15, 2008) ...................................................... 23

*Luke v. Emergency Rooms, P.S.,*
    2008 WL 410672 (W.D. Wash. Feb. 12, 2008) .................................................... 8

*Luke v. Fam. Care & Urgent Med. Clinics,*
    323 F. App'x 496 (9th Cir. Mar. 30, 2009) .......................................................... 7

*LVRC Holdings LLC v. Brekka,*
    581 F.3d 1127 (9th Cir. 2009) ............................................................................... 3

*Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.,*
    210 F.3d 1099 (9th Cir. 2000) ............................................................................... 2

*Nordstrom v. Ryan,*
    762 F.3d 903 (9th Cir. 2014) ............................................................................... 32

*People v. Avila,*
    57 Cal. App. 5th 1134 (2020) ............................................................................. 10

*Perry v. Leeke,*
    488 U.S. 272 (1989) ............................................................................................ 33

*Quevedo v. Trans-Pacific Shipping, Inc.,*
    143 F.3d 1255 (9th Cir. 1998) ............................................................................... 7

*Quintanilla v. Bryson,*
    730 F. App'x 738 (11th Cir. 2018) ...................................................................... 23

*Ramos v. Lamm*,
    639 F.2d 559 (10th Cir. 1980)........................................................................23

*Shorter v. Baca*,
    101 F. Supp. 3d 876 (C.D. Cal. 2015)...........................................................19

*Silva v. Di Vittorio*,
    658 F.3d 1090 (9th Cir. 2011).......................................................................33

*Steeped, Inc. v. Nuzee, Inc.*,
    2020 WL 6891832 (N.D. Cal. Nov. 24, 2020)................................................3

*Taylor v. List*,
    880 F.2d 1040 (9th Cir. 1989).......................................................................33

*Turner v. Cook Cty. Sheriff's Office ex rel. Dart*,
    2020 WL 1166186 (N.D. Ill. Mar. 11, 2020).................................................27

*United States v. Janis*,
    820 F. Supp. 512 (S.D. Cal 1992).................................................................33

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001).........................................................................5

**STATUTES**

Cal. Gov. Code § 11135 ....................................................................................32

**RULES**

Fed. R. Civ. P. 26..............................................................................................6

Fed. R. Civ. P. 37..............................................................................................4

Fed. R. Civ. P. 56.......................................................................................2, 3, 6

## INTRODUCTION

In this certified class action, Plaintiffs challenge the dangerous, deadly, and unlawful conditions in the San Diego County Jail ("the Jail").  For years, multiple independent third-parties have sounded the alarm about the hazards in the Jail, including the extraordinarily high death rate.  In this litigation, Plaintiffs' experts—none of whom Defendants have sought to exclude—offered comprehensive reports identifying Defendants' systemic failures to remedy the conditions that endanger class members' health and safety.  Collectively, these reports describe a system plagued by preventable deaths, substandard healthcare, widespread drug contraband, violence, environmental hazards, inadequate access to lawyers and courts, and overincarceration of Black and Latinx individuals.

Notwithstanding this evidence, Defendants have moved for summary judgment on Plaintiffs' medical, dental, environmental, safety and security, access to courts/counsel, and racial discrimination causes of action ("Motion").  The Court should deny Defendants' Motion for at least three independent reasons.

*First*, the challenges to Plaintiffs' medical, dental, environmental, and racial discrimination claims rest on untimely expert declarations that include substantial new opinions.  Those declarations should be stricken, and the portions of the Motion that rely on them should be denied.  *Second*, Defendants have not met their burden on summary judgment.  Defendants' meager evidence consists primarily of incomplete descriptions of Jail policies and practices, representations regarding immaterial, insufficient, and impermanent changes, and promises of future action.  Defendants have neither negated an element of Plaintiffs' claims, nor established that Plaintiffs cannot prove their claims.  *Third*, Defendants do not acknowledge, let alone address, the mountains of evidence in support of each of Plaintiffs' claims.  Viewed in the light most favorable to Plaintiffs, this evidence establishes genuine disputes of material fact with respect to all of the causes of action at issue in the Motion.  Plaintiffs respectfully request that the Motion be denied.

1

## PROCEDURAL BACKGROUND

2   Plaintiffs' operative Third Amended Complaint ("TAC") seeks to remedy
3 illegal conditions at the Jail related to medical, mental health, and dental care,
4 disability access, safety and security, environmental hazards, access to counsel and
5 courts, and racial disparities in incarceration.  Dkt. 231.  The TAC names as
6 Defendants the County of San Diego ("the County"), San Diego County Sheriff's
7 Department (now called the Sheriff's Office) ("SDSO"), and San Diego County
8 Probation Department (collectively "Defendants").  This Court certified a Class and
9 Subclasses in November 2023.  Dkt. 435.  Fact discovery closed in May 2024, *see*
10 Dkts. 479, 635, 654, while expert discovery closed in November 2024, *see* Dkt. 721.
11 In December 2024, the parties settled Plaintiffs' Third Claim (ADA).  Dkts. 776,
12 777, 792.  On December 17, 2024, Defendants filed their Motion as to all but one of
13 Plaintiffs' remaining claims (mental health care).  Dkt. 782.

14

## LEGAL STANDARDS

15   Summary judgment is appropriate only "if the movant shows that there is no
16 genuine dispute as to any material fact and the movant is entitled to judgment as a
17 matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of
18 establishing the absence of any genuine issues of material fact.  *Nissan Fire &*
19 *Marine Ins. Co. v. Fritz Cos. Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Celotex*
20 *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party can satisfy this
21 burden: (1) by presenting evidence to negate an essential element of the nonmoving
22 party's case; or (2) by demonstrating that the nonmoving party failed to make a
23 showing sufficient to establish an element of their claim.  *See Celotex*, 477 U.S. at
24 322–23.  If the moving party fails to discharge this initial burden, summary
25 judgment should be denied without further inquiry.  *See Adickes v. S.H. Kress &*
26 *Co.*, 398 U.S. 144, 159–60 (1970).  If the moving party satisfies its initial burden,
27 the burden shifts to the nonmoving party to produce "evidence that is significantly
28 probative or more than 'merely colorable' that a genuine issue of material fact exists

for trial." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009). If the opposing party carries this burden, summary judgment should be denied. *See* Fed. R. Civ. P. 56(a). Courts "review the record as a whole" and are required to "draw all reasonable inferences in favor of" the nonmoving party. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

If a court denies a summary judgment motion, the Court has discretion to "decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute." Fed. R. Civ. P. 56(g) Advisory Committee's note to 2010 amendment; *see Steeped, Inc. v. Nuzee, Inc.*, 2020 WL 6891832, at *2 (N.D. Cal. Nov. 24, 2020) ("the Court has broad discretion to refrain from granting the requested relief under Rule 56(g)"). Here, it is unclear what facts Defendants claim should be "established" for trial. Regardless, the Court should not treat any fact advanced by Defendants as established given that none of Defendants' asserted facts are undisputed.

"Voluntary cessation of an illegal course of conduct" renders a claim for injunctive relief moot only if "(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992). "[M]arginal improvements" do not moot a claim. *Armstrong v. Newsom*, 58 F.4th 1283, 1298 (9th Cir. 2023). "The court's power to grant injunctive relief survives discontinuance of the illegal conduct." *Barnes*, 980 F.2d at 580. "The burden of demonstrating mootness is a heavy one." *Id.*

## ARGUMENT

### I.     THE COURT SHOULD STRIKE DEFENDANTS' UNTIMELY EXPERT DECLARATIONS AND DENY THE PORTIONS OF DEFENDANTS' MOTION THAT RELY ON THEM

In arguing for summary judgment on Plaintiffs' medical, dental, environmental, and racial discrimination claims, Defendants rely heavily upon declarations, prepared for summary judgment, from four retained experts. Each of

1   these experts previously submitted expert reports by the August 2024 expert

2   disclosure deadline and were deposed by Plaintiffs.  Instead of relying on their

3   experts' reports or deposition testimony, Defendants submitted four new

4   declarations from these experts in support of their Motion.  These new declarations

5   were filed well after the close of expert discovery, include a substantial number of

6   new opinions not previously disclosed in this case, and lack any disclosure of the

7   materials upon which the experts relied.  Plaintiffs object to these untimely expert

8   declarations.  Pursuant to Federal Rule of Civil Procedure 37, a district court can, as

9   an "automatic" sanction, strike an untimely expert declaration, unless the offering

10  party can show the failure was "substantially justified or harmless."  *See Yeti by*

11  *Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (citing

12  Fed. R. Civ. P. 37).  As discussed below, these declarations should be stricken in

13  their entirety, as they are unjustified and prejudicial,[1] and the Court should deny the

14  portions of Defendants' motion that rest on the declarations.

15      These four experts for Defendants—Dr. Murray (medical), Dr. Reinecke

16  (dental), Ms. Peters (environmental), and Dr. Withrow (racial discrimination)—

17  disclosed reports in August 2024.  Decl. of Van Swearingen ("Swearingen Decl."),

18  filed herewith, ¶ 3.  None of them submitted a rebuttal report by the relevant Court-

19  ordered deadlines.  *Id.* ¶¶ 4–5.  In October and November 2024, Plaintiffs deposed

20  all four.  *Id.* ¶¶ 22, 24–25.  None of the experts submitted supplemental reports prior

21  to the close of expert discovery on November 22, 2024.  *Id.* ¶ 6.

22      Defendants have no justification for these four experts' untimely declarations.

23  All four new declarations include new opinions that could have offered before the

24  close of expert discovery and that are directly relevant to issues in this case.[2]  New

25

26  _____
    [1] In accordance with the Court's Civil Case Procedures § II.A, Plaintiffs have
27  included their objection to and request to strike these declarations in this brief, rather
    than in a separate motion.

28  [2] The newly-filed declarations also include some testimony that copies or
    paraphrases statements from their timely-disclosed expert reports.

opinions in Dr. Murray's declaration include, but are not limited to:  (1) "in-custody deaths have very little to do with the health system delivery currently in place at the Jail," Dkt. 782-2, App'x 1, ¶ 92, despite the fact that Dr. Murray did not review any records related to or offer any opinions regarding in-custody deaths in his disclosed expert report, *see* Dkt. 779-1 at 5 (citing report and testimony); (2) "TEK 84" body scanners and "drug dogs" "ha[ve] led to a dramatic reduction in drug overdoses at the jail," Dkt. 782-2, App'x 1, ¶ 38; (3) the Jail's medication assisted treatment ("MAT") program is "robust, expanding, and consistent with good practice" and "contributed significantly to reducing drug overdoses at the Jail," *id.* ¶ 58; (4) the Jail's current staffing of providers (doctors, nurse practitioners, and physician's assistants) is "unprecedented in jail health care delivery," *id.* ¶ 16; (5) "the use of nursing agencies and overtime is a customary industry norm required to bridge the nursing vacancy gap," *id.* ¶ 34; (6) the "wellness rounds" conducted in the Administrative Separation unit ("AdSep") are valuable even though they are not confidential, *id.* ¶¶ 70–72; and (7) "[t]he mental health intake triaging and referral program currently in place at the Jail has had a positive effect on reducing the suicide rate," *id.* ¶ 93.

Dr. Withrow's new declaration attempts to rebut the opinions of Plaintiffs' expert, Dr. Ross.  *See* Dkt. 782-2, App'x 11, ¶ 10 (criticizing Dr. Ross's purported focus on race as an independent variable); *id.* ¶¶ 11, 13–14 (criticizing the data sets analyzed by Dr. Ross); *id.* ¶¶ 15–17 (other criticisms of Dr. Ross's opinions).  These opinions could have been, but were not, submitted in a timely rebuttal report before Plaintiffs deposed Dr. Withrow.

Dr. Reinecke's new declaration states that Jail dental policies and procedures are compliant with National Commission on Correctional Health Care ("NCCHC") standards, Dkt. 782-2, App'x 2, ¶¶ 8, 23, which inform his opinion that "dental services at the Jail ... meet industry and community standards," *id.* ¶ 26.  At his November 8, 2024 deposition, however, he swore that he had not reviewed any of

the Jail's dental care policies. *See* Dkt. 779-1 at 27 (citing testimony).

Ms. Peters includes information about a change, effective the week of August 26, 2024, in how the Jail contracts for third-party cleaning services, Dkt. 782-2, App'x 13, ¶ 7. Ms. Peters could have, but did not, include this information in a supplemental report prior to the close of expert discovery in November 2024.

Defendants' new expert declarations violate Federal Rule of Civil Procedure 26(a)(2)(D) and prejudice Plaintiffs. The declarations do not disclose the documents or other facts upon which the new opinions rest. Nor have Plaintiffs had an opportunity test these new opinions through discovery.[3] Defendants cannot offer a justification for the belated reports given that they did not submit rebuttal and/or supplemental reports by the Court's deadlines. Under these circumstances, courts regularly strike untimely expert declarations filed with summary judgment briefs. *See Luke v. Fam. Care & Urgent Med. Clinics*, 323 F. App'x 496, 498–99 (9th Cir. Mar. 30, 2009); *Quevedo v. Trans-Pacific Shipping, Inc.*, 143 F.3d 1255, 1257 (9th Cir. 1998). Accordingly, Plaintiffs respectfully request that the Court strike the declarations of Drs. Murray, Reinecke, and Withrow, and Ms. Peters.

If the Court strikes the declarations, the Court should also deny Defendants' Motion with respect to the medical, dental, environmental, and racial discrimination claims. The declarations are the primary evidence Defendants submitted in support of their Motion on those claims. *See* Mot. 1–7 (Murray Declaration is cited 39 times in the medical care section); *id.* 7–8 (Reinecke Declaration is the only evidence, other than one citation to a deposition excerpt, cited for dental claim); *id.* 20, 31–32 (multiple citations to Withrow Declaration); *id.* 8–11, 25 (multiple citations to Peters Declaration). Without these improper declarations, the Motion necessarily

---

[3] Should the Court be inclined to grant summary judgment based on these declarations or other newly-introduced facts that post-date the close of fact discovery, *see* Swearingen Decl., ¶ 8, Plaintiffs respectfully request that the Court permit Plaintiffs to conduct limited discovery pursuant to Fed. R. Civ. P. 56(d).

1  fails on these claims.[4]  *See Luke v. Emergency Rooms, P.S.*, 2008 WL 410672, at *5

2  (W.D. Wash. Feb. 12, 2008) (holding, after excluding untimely expert report, that

3  party failed to satisfy burden on summary judgment).[5]

4  **II.    THE COURT SHOULD DENY DEFENDANTS' MOTION
        REGARDING MEDICAL CARE**

5

6          Even if the Court does not strike the Defendants' expert declarations, the

7  Court should deny Defendants' Motion.  The evidence, when viewed in the light

8  most favorable to Plaintiffs, is more than sufficient to show that Defendants are

9  deliberately indifferent to the medical needs of class members.

10          Over the past eight years, multiple independent third-parties—including the

11  NCCHC, the California State Auditor, the San Diego County Medical Examiner,

12  and consultants hired by the County—have identified profound harm, including

13  preventable deaths, caused by serious problems with the Jail's medical system.

14  Plaintiffs' experts—Dr. Jeffrey Keller[6] and Dr. Kelly Ramsey[7]—reached the same

15  conclusion, finding that long-standing medical problems at the Jail have resulted and

16  will continue to result in preventable deaths and other serious harm.  *See generally*

17  Decl. of Jeffrey Keller ("Keller Decl."), filed herewith, Ex. 1 ("Keller Rpt."), Ex. 2

18  ("Keller Rebuttal"); Decl. of Kelly Ramsey, filed herewith, Ex. 1 ("Ramsey Rpt."),

19

20  _____

21  [4] A decision to grant Plaintiffs' pending *Daubert* motion, Dkt. 779-1, as to
    Drs. Murray, Reinecke, and Withrow, and Ms. Peters, would provide additional
    bases for denying Defendants' motion for summary judgment.

22  [5] Plaintiffs have submitted declarations from their experts in support of their
23  opposition to the Motion.  The limited purposes of those declarations are (1) to
    authenticate their timely-submitted expert and rebuttal reports; (2) to respond to new
24  opinions from Defendants' experts; and (3) to respond to new facts in the Motion.

25  [6] Dr. Keller is board-certified in emergency medicine, provided care to incarcerated
    people for decades, operated a private correctional health care company, and is the
    current President of the American College of Correctional Physicians.  Keller Rpt.
26  1–3.  Defendants have not moved to exclude any of Dr. Keller's opinions.

27  [7] Dr. Ramsey is board-certified in addiction medicine, a member of the board of  the
    American Society of Addiction Medicine, and helped the federal government
    develop guidelines for managing substance withdrawal in jails.  Ramsey Rpt. 1–3.
28  Defendants have not moved to exclude any of Dr. Ramsey's opinions.

Ex. 2 ("Ramsey Rebuttal").  Defendants do not acknowledge, let alone address, any of the findings from the third parties, Dr. Keller, or Dr. Ramsey.  And, in any event, all of the facts that Defendants claim justify summary judgment are disputed.

### A.    Legal Standard Regarding Correctional Medical Care

Correctional officials violate the Eighth Amendment when incarcerated people "face a substantial risk of serious harm" from an inadequate medical system and that risk "is met with deliberate indifference." *Disability Rights Mont., Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019).  For systemic challenges, "[t]he first, objective, prong requires that the plaintiff show that the conditions of the prison pose a substantial risk of serious harm," which a Plaintiff can do by establishing they might suffer "further significant injury" or experience the "unnecessary and wanton infliction of pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).  "The second, subjective, prong requires that the plaintiff[s] show that a prison official was deliberately indifferent by being 'aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' and 'also draw[ing] the inference.'" *Disability Rights Mont.*, 930 F.3d at 1101 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 846 (1994)).  Though the analyses under the Fourteenth Amendment, which governs claims for pretrial detainees, and the Eighth Amendment are similar, pretrial detainees need only establish "more than negligence but less than subjective intent—something akin to reckless disregard." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018).[8]

---

[8] Plaintiffs asserted violations of both the U.S. and California Constitutions for the majority of their claims for relief,  Defendants' Motion does not address Plaintiffs' California-specific claims and should be denied as to the California constitutional claims for the same reasons explained in this brief. *See Inmates of the Riverside Cty. Jail v. Clark*, 144 Cal. App. 3d 850, 859–60 (1983); *People v. Avila*, 57 Cal. App. 5th 1134, 1145 n.13 (2020) ("The distinction in wording between the federal and state Constitutions is substantive and not merely semantic.").

**B.    Material Disputes of Fact Exist Regarding the Constitutionality of Defendants' Medical System**

Plaintiffs have submitted substantial evidence that Defendants' medical system exposes class members to a substantial risk of serious harm about which Defendants have been deliberately indifferent.  After conducting systemic reviews of Defendants' medical system, Dr. Keller and Dr. Ramsey concluded that the inadequate and untimely medical care places class members at the Jail at great risk and results in preventable deaths and non-fatal harm.  Specifically, Plaintiffs' experts opined that: (1) the Jail's inadequate mortality and morbidity review procedures fail to adequately identify—and therefore to prevent—the root causes of its high mortality and morbidity rates, Keller Rpt. 26–68, Keller Rebuttal 4–31; (2) Defendants do not adequately screen newly-arriving incarcerated people to identify medical issues, Keller Rpt. 69–82, Keller Rebuttal 40–44; (3) Defendants fail to continue incarcerated people on medically-necessary medications and treatments they were receiving in the community, Keller Rpt. 82–93, Keller Rebuttal 57–58; (4) Defendants lack a reliable and timely method for incarcerated people to request medical care, Keller Rpt. 93–113, Keller Rebuttal 44–49; (5) Defendants improperly document "refusals" of medical care, including one instance in which staff recorded that an incarcerated person "refused" care 40 minutes after that person had been pronounced dead, Keller Rpt. 113–24, Keller Rebuttal 21–22; (6) providers fail to conduct adequate examinations before prescribing care, Keller Rpt. 124–36; (7) Defendants fail to provide timely, and in some cases any, access to offsite specialty care, *id.* 136–48, 188–97, Keller Rebuttal 60–61; (8) Defendants fail to provide necessary diagnostic services, Keller Rpt. 149–52; (9) Defendants do not provide adequate care for common chronic and episodic medical conditions, including hepatitis C, type 2 diabetes, hernias, latent tuberculosis, sexually transmitted infections, and asthma, *id.* 152–88, Keller Rebuttal 31–39 & App'x A; (10) Defendants fail to adequately treat people with substance use disorder or who

are experiencing withdrawal, Ramsey Rpt. 7–96; (11) Defendants fail to adequately protect people at risk of overdose, *id.* 98–110; (12) Defendants deny incarcerated people the opportunity to see healthcare providers in confidential settings, Keller Rpt. 197–203, Keller Rebuttal 61–62; (13) Defendants do not maintain adequate, accurate, and complete medical records, Keller Rpt. 203–10; (14) incarcerated people often do not receive *any*—and at best, inadequate—discharge planning prior to their release from custody, *id.* 210–25, Keller Rebuttal 63–65, Ramsey Rpt. 110–15; (15) these problems were caused, at least in part, by inadequate healthcare staffing, Keller Rpt. 234–49, Keller Rebuttal 53–57; and (16) these problems are made worse by an inadequate quality assurance program, Keller Rpt. 225–34.

These critical problems with Defendants' system have caused substantial harm to class members, including a number of preventable deaths. The San Diego County Medical Examiner classified two in-custody deaths as *homicides* because the medical treatment was so deficient—one in 2022 when Defendants failed to provide adequate care to a person who lost 60 pounds of body weight over three months, and another in 2023 when Defendants failed to refill a Type-1 diabetic's insulin pump, notwithstanding his and other incarcerated people's repeated pleas for this basic, life-saving medicine. Swearingen Decl. Ex. E-370, E-390; Keller Rpt. 60; Keller Rebuttal 17–25. In addition, Dr. Keller opined that at least 7 of the 10 in-custody deaths that he reviewed were preventable. Keller Rpt. 35–64; Keller Rebuttal 7–17. Those preventable deaths included the September 2022 death of Raymond Dix, whom Defendants failed to provide prescribed heart and lung medications for six days immediately following his booking into the Jail, Keller Rpt. 44–45; the November 2022 death of Aaron Bonin, a mentally-ill person to whom Defendants failed to provide consistent dialysis treatment, *id.* 53–54; the May 2023 death of Patricia Adamson, whom Defendants' medical practitioners did not physically examine after she returned from the hospital because she had been vomiting blood, *id.* 40–42; and the July 2024 death of Chase Mitchell, who Defendants' practitioners

did not physically examine or send out for emergency treatment even though he lost 25 pounds in the single month, Keller Rebuttal 8–11.  Dr. Ramsey opined that "stunning failures in withdrawal management … likely" caused the June 2024 death of Robert Woodford.  Ramsey Rebuttal 24–27.

In addition to preventable deaths, class members suffer grave harms because of the Jail's inadequate medical system, including pain and medical deterioration. Recent examples include class representative James Clark, who spent over five months in 2024 in pain awaiting surgery for a condition that caused him to require diapers due to incontinence, and another incarcerated person whose undiagnosed cancer grew substantially in 2024 and 2025 while Defendants delayed four months in sending her to a specialist for a biopsy.  Decl. of James Clark ("Clark Decl."), filed herewith, ¶¶ 2–4; Decl. of Amie Stanley ("Stanley Decl."), filed herewith, ¶¶ 3–10; *see also, e.g.*, Decl. of Miguel Rosales, filed herewith, ¶¶ 3–7; Keller Rpt. 90–93, 158–59, 163–67, 170–74; Keller Rebuttal 31–40 & App'x A.

Defendants have long known about these dangerous deficiencies in the Jail's medical system.  In 2017, NCCHC issued a report noting critical problems with the Jail's delivery of medical care, including failures in timely screening and treating people for significant health conditions during booking and delays in triaging and examining those who request medical care.  Swearingen Decl. Ex. B; *see also* Keller Rpt. 8–11.  In 2020, the County retained Dr. Homer Venters to recommend practices to reduce the death rate at the Jail; Dr. Venters offered numerous recommendations that have not been implemented.  Swearingen Decl. Ex. D-335; *see also* Keller Rpt. 11–12.  In 2022, the California State Auditor found that "deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals" had "likely contributed to in-custody deaths" and that the Sheriff's Department had "not consistently taken meaningful action when such deaths have occurred."  Swearingen Decl. Ex. A-4; *see also* Keller Rpt. 13–15.  Later that year, a consultant hired by the County found that San Diego "is the only [large] county [in California] with a

1   statistically significant number of excess deaths."  Swearingen Decl. Ex. C-272.

2   Last month, the Urban Institute reported that women in the Jail face "significant

3   barriers in requesting ... and lengthy delays in receiving" reproductive health care.

4   *Id.* Ex. I-596–97.  Meanwhile, Defendants have paid millions of dollars in wrongful

5   death lawsuits alleging inadequate medical care, with many other such cases still

6   pending.  *See, e.g.*, Keller Rpt. 65–68 (discussing one $15 million settlement).

7           Defendants do not discuss *any* of Plaintiffs' evidence, which is more than

8   sufficient to establish Eighth and Fourteenth Amendment violations.  Instead,

9   Defendants contend that they are entitled to summary judgment based on their

10  assertions that they have hired more staff and that in-custody deaths have allegedly

11  decreased.  Defendants do not provide new policies or procedures documenting

12  many changes they claim to have implemented.  And they fail to produce sufficient

13  (and in most cases any) evidence, such as quality assurance documents, that the

14  purported changes have made resulted in medical care that does not expose class

15  members to a substantial risk of serious harm.  Defendants' evidence is insufficient

16  to carry their burden on summary judgment or to establish that there is "no

17  reasonable expectation" that evident harms will be repeated.  *See Barnes*, 980 F.2d

18  at 580.  In any event, as discussed below, Defendants' evidence is disputed.

19          **Staffing.**  Defendants contend that they now employ 30.5 Full Time

20  Equivalent ("FTE") of medical providers (doctors, nurse practitioners, and physician

21  assistants), an increase from prior provider staffing levels. Mot. 2–3.  However,

22  Defendants have not provided *any* showing (*e.g.*, a staffing analysis) establishing

23  that the number of medical practitioners at the Jail is sufficient to provide adequate

24  care.  Keller Decl. ¶ 5; *see also* Keller Rebuttal 55–56.  Nor have Defendants

25  provided any evidence that their current staffing model is able to provide

26  constitutionally adequate care.  Defendants admit they have a 25% average nursing

27  vacancy rate, but assert (without citing data) that such a level of vacancies is

28  "generally similar to or slightly lower than that of other healthcare facilities in

Southern California." Mot. 2–3. Even if true, a 25% vacancy rate does not mean that patients are not harmed by the vacancies. Keller Rebuttal 55.

Moreover, Defendants present no evidence to rebut Dr. Keller's opinion that the Jail's convoluted staffing system endangers class members. Keller Rpt. 131–32, 228–30, 246–47. Three distinct entities provide healthcare at the Jail. Correctional Healthcare Partners ("CHP") is a private company that contracts with the County to provide on-site medical practitioners. Dkt. 782-2, App'x 3, ¶ 9. NaphCare, another private company, contracts with the County to provide MAT, offsite referral authorizations, "pharmacy operations," and remote assistance through StatCare. *Id.*; Keller Rpt. 127–32. Lastly, the County provides nursing staffing. Dkt. 782-2, App'x 3, ¶ 9. Dr. Keller opined that this complex, multi-party system places incarcerated people at risk because it is unclear who reports to whom and whose policies govern—in particular, whether the providers employed by NaphCare report to the on-site practitioners employed by CHP or, conversely, whether the NaphCare providers gatekeep patients from seeing CHP practitioners. Keller Rpt. 131–32, 246–47; *see also* Swearingen Decl. Ex. Q at 242:17–245:22; *id.* Ex. P at 178:3–7. Plaintiffs' expert, Pablo Stewart, found a "foundational deficiency" in the system, as health care leadership must report directly to a Jail Captain and the Sheriff's Command team, which he explains is inconsistent with modern correctional practices, is extremely problematic, and makes Defendants' system an "outlier" among large California county jail systems. Decl. of Pablo Stewart ("Stewart Decl."), filed herewith, Ex. 1 ("Stewart Rpt.") 134–40.

***Intake Screening.*** Defendants make several representations about intake screening. Mot. 3. But, as Dr. Keller opined, Defendants' system places incarcerated people at risk, given that screenings are cursory and reliant on nursing staff, resulting in missed and/or untreated conditions. Keller Rpt. 69–82. Defendants do not conduct an "initial health assessment" until 14 days after booking. *Id.* As Defendants admit and Dr. Keller found, Defendants often fail to

meet the 14-day requirement. Dkt. 782-2, App'x 5, ¶ 27 ("normally done within 14 days"); Swearingen Decl. Ex. T at 26:12–28:21, 100:4–10; *id.* Ex. U at 145:15–146:25; Keller Rebuttal 40–44 & App'x B. Defendants further assert that as of November 1, 2024 a "pilot program" exists at just one intake facility, through which class members "with chronic care needs" are evaluated by "medical providers upfront upon acceptance to the Jail." Mot. 6. Defendants, however, have not produced any written evidence of this program and concede that the program has not been implemented at two of the Jail's three intake facilities. *See id.* In any event, that program is exactly the type of "marginal improvement" that courts have held insufficient to moot a claim for injunctive relief. *See Armstrong*, 58 F.4th at 1295.

***Records Management.*** Defendants assert that TechCare, the medical record system used during years of high in-custody death rates, promotes quality care. Mot. 3. However, Defendants' employees and contractors admitted that, because TechCare is difficult to use, there is a significant risk that information is "not followed up [on] creating potential liability to the county." Swearingen Decl. Ex. K-695; *see also id.* Ex. T at 89:8–90:14, 231:13, 244:10–246:1; *id.* Ex. P at 32:6–13; Dkt. 782-2, App'x 4, ¶ 15. Dr. Keller identified multiple examples in which Jail providers could not find important information in records. Keller Rpt. 204–07. Dr. Keller explained that, in at least some cases, including the death of Aaron Bonin, Jail medical staff fail to adequately document patients' medical care. *Id.* 207–08.

***Pharmacy/Medication.*** Defendants assert that the SureScripts system "allows staff at the Jail to verify a patient's medication history quickly and easily." Mot. 3. But Defendants do not address Plaintiffs' evidence of substantial delays in the provision of "non-formulary" medications, including delays that resulted in an in-custody death in 2022. Keller Rpt. 82–89. Separately, Defendants claim that "medical staff are now utilizing" a long-acting insulin. Dkt. 782-2, App'x 1, ¶ 82; *see also* Keller Rpt. 87–89; Keller Decl. ¶ 7. Defendants have not, however, produced an updated policy ensuring patient access in appropriate situations.

***MAT Program.***   Defendants assert that they "now" have a MAT program to treat people with opioid use disorder ("OUD").  Mot. 4.  OUD is one of many substance use disorders ("SUD"), none of which Defendants treat adequately, in part because Defendants have no policies for treating SUDs other than OUD (*e.g.*, alcohol or stimulant use disorder).  Ramsey Rpt. 96–98; Ramsey Rebuttal 41–42. Defendants also fail to adequately diagnose OUD, Ramsey Rebuttal 29–33, and, even when they do diagnose OUD, fail to provide adequate medication for OUD, including by underdosing and improperly discontinuing medication, Ramsey Rpt. 62–92; Ramsey Rebuttal 28–41.  Defendants include no evidence to counter Dr. Ramsey's findings, including that Defendants' fail to adequately treat people experiencing withdrawal or at risk of overdose.  *See, e.g.*, Ramsey Rpt. 7–62.

***Sub-Specialty Services.***   Defendants claim they have contracts for sub-specialty services and cite to numbers of referrals over a 13-month period.  Mot. 4–5.  Those numbers do not establish that incarcerated people actually receive the specialty care they need.  Keller Decl. ¶ 8.  The Jail's own staff have admitted that Defendants improperly deny class members access to specialty care.  *See* Keller Rpt. 142–48; Swearingen Decl. Ex. T at 158:6–22, 160:4–13.  Similarly, Defendants do not have contracts for all necessary sub-specialties, including but not limited to rheumatology and physical therapy.  Keller Decl. ¶ 8.  Defendants do not address the substantial delays in completion of referrals when they do occur.  Keller Rpt. 142–48.  For example, class representative James Clark recently spent over five months in the Jail waiting for surgery that he still has not received, despite notes indicating that the procedure should be "expedited."  Clark Decl. ¶¶ 2–4; Swearingen Decl. Ex. M-703; *see* Stanley Decl. ¶¶ 3–10; Keller Rebuttal 38–39.

***"Wellness Rounds."***   Defendants claim that a "Wellness Rounds" team in AdSep "can lead to better overall health outcomes."  Mot. 5.  However, as explained by Plaintiffs' expert, Dr. Stewart, there is no written policy reflecting this practice and, in any event, it is insufficient, as it provides no confidentiality and no

1   meaningful clinical evaluation or treatment.  Stewart Decl., Ex. 2 ("Stewart

2   Rebuttal") 59–62.  Two years after Defendants started Wellness Rounds, conditions

3   remain horrific.  *Id.* (AdSep cells housing people with serious mental illness are

4   filthy, cluttered with trash, and reeking of urine and feces, and Wellness Rounds

5   consistently lack psychiatry staff and fail to result in needed clinical interventions).

6       ***Quality Management.***  Defendants assert that they have "been in the process

7   of revising [the Jail's] quality assurance program" and that the quality assurance

8   committee "meets quarterly and holds an annual meeting."  Mot. 5.  In essence,

9   Defendants concede that necessary improvements have not been implemented.  In

10  any event, marginal improvements cannot moot Plaintiffs' claim, *see Armstrong*, 58

11  F.4th at 1295, especially given the importance of a functioning quality assurance

12  program and the profound flaws identified by Dr. Keller.  Keller Rpt. 225–34.

13      ***Chronic Care.***  Defendants selectively describe various parts of their chronic

14  care system.  Mot. 6.  But Dr. Keller observed systemic problems, including failing

15  to conduct or review diagnostic test results, failing to take vital signs, failing to

16  ensure nurses do not provide care outside the their scope of practice, and failing to

17  follow up after medication changes.  Keller Rebuttal 31–40 & App'x A.  Defendants

18  acknowledge that Disease Management Guidelines ("DMGs") are still in

19  development.  Mot. 6.  Defendants have not developed and provide no evidence of

20  developing DMGs for many of the conditions for which Dr. Keller identified the

21  most serious problems with treatment, including hepatitis C, type 2 diabetes,

22  hernias, and latent tuberculosis.  Keller Rpt. 155–77; Keller Rebuttal 39, 59–60.

23  And the DMGs that Defendants have developed risk introducing additional

24  confusion, given that *three separate* sets of policies now govern medical care at the

25  Jail:  the County's, NaphCare's, and the CHP DMGs.  *See* Keller Rpt. 228–30;

26  Keller Decl. ¶ 9; *see also* Stewart Rpt. 137–40 ("major problem" of inconsistent

27  training on policies and procedures across County, NaphCare, and CHP staff).

28      ***Decreased Mortality Rates.***  Defendants claim that the "mortality rate … has

decreased significantly" since 2022.  Mot. 6–7.  However, Defendants' reporting of in-custody deaths in 2024—which, according to Defendants' own website, totaled nine in 2024, not "only 7" as stated in the Motion, *compare* Swearingen Decl. Ex. W (SDSO website), *with* Mot. 7—is disputed, with multiple deaths improperly excluded from Defendants' statistics.  *See* Keller Rebuttal 26–29; Swearingen Decl. Exs. J, X.  The 2023 and 2024 death rates remain higher than the alarming average rate for 2006–2020 identified by the State Auditor in its 2022 report, and the Jail's 2024 death rate is higher than the national average.  Keller Rpt. 28–31; Decl. of James Austin ("Austin Decl."), filed herewith, ¶ 5.  Defendants do not address Plaintiffs' evidence of numerous, recent preventable deaths.  *See supra* at p. 10. That fewer people died at the Jail in 2024 than in 2023 does not change the fact that poor medical care continues to harm class members.  Already, in 2025, one class member "exhibiting signs of medical distress" died.  Swearingen Decl. Ex. L.

## III.    THE COURT SHOULD DENY DEFENDANTS' MOTION REGARDING DENTAL CARE

Plaintiffs' dental expert, Dr. Jay Shulman,[9] opined that delays in care, understaffing, inadequate dental policies, and a non-existent quality assurance program place class members at risk of unnecessary and serious dental pain and preventable progressive dental problems.  *See generally* Decl. of Jay D. Shulman, filed herewith, Ex. 1 ("Shulman Rpt."), Ex. 2 ("Shulman Rebuttal").  Defendants do not acknowledge, let alone address, any of Dr. Shulman's opinions.  And all of the facts that Defendants claim justify summary judgment are disputed.

### A.    Legal Standard Regarding Correctional Dental Care

Plaintiffs may prevail on their dental claim by showing that staff exposed them to a substantial risk of serious harm, which can be done by, *inter alia*, showing

---

[9] Dr. Shulman is a board-certified dentist, has served as court expert in class action settlements covering correctional dental care in the California and Ohio, and has served as a dental expert for the U.S. Department of Justice.  Shulman Rpt. 1–3. Defendants have not moved to exclude any of Dr. Shulman's opinions.

that correctional officials knowingly delayed dental treatment to incarcerated people suffering from "severe pain" or failed to provide fillings and instead provide only extractions. *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989); *Finley v. Parker*, 253 F. App'x 634, 635 (9th Cir. 2007); *Shorter v. Baca*, 101 F. Supp. 3d 876, 902 (C.D. Cal. 2015), *rev'd in part on other grounds*; *Kiehlmeier-Stratton v. Wexford Health Sources, Inc.*, 2023 WL 2384142, at *5–7 (W.D. Pa. Mar. 6, 2023); *Baughman v. Garcia*, 254 F. Supp. 3d 848, 878 (S.D. Tex. 2017).

### B.    Material Disputes of Fact Exist Regarding the Constitutionality of Defendants' Dental System

After conducting a systemic review of Defendants' dental system, Dr. Shulman opined that: (1) incarcerated people routinely wait many weeks to see a dentist after notifying the Jail of painful conditions, Shulman Rpt. 16–21, 26–35, Shulman Rebuttal 8–10; (2) incarcerated people either cannot access offsite dental care or face long delays, Shulman Rpt. 16–21, 35–38; (3) delays or failures to provide routine dental care—including periodontal exams, intraoral x-rays, and charting and treatment plans for teeth—result in delayed diagnoses and the need to extract teeth that could have been saved, *id.* 41–56; (4) these problems are caused, at least in part, by inadequate dental staffing, *id.* 56–61; and (5) all of these problems are made worse by the lack of an adequate dental quality assurance program, *id.* 69–74.  The serious problems with Defendants' system have caused substantial harm to many class members, including long delays in addressing pain and serious dental conditions and unnecessary extractions of teeth caused by inadequate routine care. Shulman Rpt. Ex. C at 24–25 (84-day delay in treatment for painful condition); *id.* 6 (75-day delay in treatment for "very painful" tooth); *id.* 104–05 (85-day delay in treatment for person tasting "blood in [his] mouth all day"); *see also* Shulman Rpt. 48–49 ("textbook case of a *de facto* extraction only policy").

Defendants do not discuss *any* of Plaintiffs' evidence.  And, Defendants' evidence is insufficient for Defendants to carry their burden.  Regardless, all of

1    Defendants' evidence is disputed.

2        ***Staffing.***  Defendants assert that they have hired new dental staff and that four

3    dentists work in the Jail (though do not specify the number of hours those dentists

4    work).  *See* Mot. 7.  Defendants' expert admitted that, per the only staffing plan he

5    reviewed, dated October 2024, those four dentists provided only 1.4 FTE of dentist

6    time.  Swearingen Decl. Ex. O at 94:23–96:5, 153:16–154:14; *see also id.* Ex. H-

7    583–89; Shulman Rpt. 58–59.  Plaintiffs' expert opined that, pursuant to

8    correctional standards, the Jail should have at least 4.0 FTE dentists.  *Id.* 56–61.

9        ***Dental Services/Access to Dental Care.***  Defendants misleadingly claim that

10   the dental clinic is open "6:30 a.m. to 3:00 p.m., Monday through Friday."  Mot. 13.

11   In reality, on any day, only one of the Jail's seven facilities may have an open dental

12   clinic during those hours; as explained in Dr. Shulman's report, the dental clinic at

13   some facilities is open only two days per month, further contributing to delays in

14   class members receiving dental care.  Shulman Rpt. 59–60 (describing sign at

15   Central Jail stating dental clinic only open twice per month).

16       Defendants claim they provide certain dental services.  *See* Mot. 7.  But

17   Dr. Shulman opined that Defendants do not have any policies about the scope of

18   available services and that, from his review of dental charts, Defendants fail to

19   regularly provide these services.  Shulman Rpt. 39–56 & Ex. C.  Dr. Reinecke,

20   Defendants' expert, reported that dentists at the Jail wanted an "expanded" policy

21   manual, which he agreed would be helpful.  Swearingen Decl. Ex. O at 175:1–2; *id.*

22   Ex. V.  Absent a policy requiring specific dental services, many incarcerated people

23   will not receive the care they require.  *E.g.*, Shulman Rpt. Ex. C at 13 (patient noted

24   as requiring root canal, but offered only extraction and not scheduled for root canal).

25       ***Quality Assurance and Records Management.***  Defendants do little more

26   than describe their dental quality assurance system.  Mot. 8, 24.  Defendants' expert,

27   Dr. Reinecke, admitted that he "did not see any evidence of" specific quality

28   assurance processes occurring.  Swearingen Decl. Ex. O at 170:21–171:3.

1   Dr. Shulman, Plaintiffs' expert, found that the meager quality assurance efforts are

2   deficient in many respects, including that they do not track basic information (*e.g.*,

3   average wait times for dental sick call), lack information about the quality of dental

4   care, and fail to include recommendations for improving care.  Shulman Rpt. 66–73.

5       Both Plaintiffs' and Defendants' experts identified substantial flaws with the

6   TechCare system for dental records.  *Id.* 62–66; Swearingen Decl. Ex. N-706;

7   Shulman Rebuttal 13–18 (TechCare is "below the accepted professional standard for

8   providing routine care.").  Defendants' own expert testified that the Jail needed an

9   "onsite director," who should would institute a "policy manual to make sure that

10  everything was addressed and that there was essentially policy and procedures in

11  place so that everybody could easily follow along, maintain the quality assurance

12  program."  Swearingen Decl. Ex. O at 176:16–177:3.

13  **IV.    THE COURT SHOULD DENY DEFENDANTS' MOTION
        REGARDING ENVIRONMENTAL CONDITIONS**

14

15      Plaintiffs' environmental expert, Debra Graham,[10] found that Defendants

16  subject class members "to inhumane conditions that posed a severe risk of harm to

17  their health, safety, and well-being."  Decl. of Debra Graham ("Graham Decl."),

18  filed herewith, Ex. 1 ("Graham Rpt.") 9; *see generally id.*, Ex. 2 ("Graham

19  Rebuttal").  Defendants barely acknowledge this evidence.  Because Plaintiffs have

20  produced sufficient evidence to establish a systematic Eighth Amendment violation

21  and because all of the evidence presented by Defendants is disputed, the Court

22  should deny Defendants' Motion with respect to environmental conditions.

23      **A.    Legal Standard Regarding Environmental Conditions**

24      Environmental conditions violate the Eighth and Fourteenth Amendments

25

26  ---
    [10] Ms. Graham worked for Miami-Dade Corrections and Rehabilitation for over 30

27  years, rising to the level of Chief Compliance Officer.  Her extensive credentials
    include being a Certified Jail Manager and a Registered Environmental Health

28  Specialist/Registered Sanitarian.  *See* Graham Rpt., Ex. A.  Defendants have not
    moved to exclude any of Ms. Graham's opinions.

1  when they "constitute an infliction of pain or a deprivation of the basic human

2  needs, such as adequate food, clothing, shelter, sanitation, and medical care," and

3  prison officials acted with deliberate indifference. *Anderson v. Cty. of Kern*, 45 F.3d

4  1310, 1312–13 (9th Cir. 1995). Various types of environmental conditions violate

5  the Constitution. *See Hoptowit v. Spellman*, 753 F.2d 779, 783–84 (9th Cir. 1985)

6  (broken plumbing, extremely dirty cells with inadequate cell cleaning supplies);

7  *Quintanilla v. Bryson*, 730 F. App'x 738, 747 (11th Cir. 2018) (vermin, "decrepit"

8  "flooded" showers); *Lancaster v. Tilton*, 2008 WL 449844, at *25 (N.D. Cal.

9  Feb. 15, 2008) ("excessive levels of rodents, vermin, birds, and filth"); *Ramos v.*

10 *Lamm*, 639 F.2d 559, 569–70 (10th Cir. 1980) ("[i]nadequate ventilation, especially

11 in the cells and shower areas," "[t]rash ... [and] decayed food").

12   **B.    Material Disputes of Fact Exist Regarding the Constitutionality of
        Environmental Conditions in the Jail**

13

14   Plaintiffs' environmental expert found that Defendants have inadequate

15 policies and procedures to maintain a safe and healthy environment for incarcerated

16 people; fail to provide clean and sanitary conditions; fail to maintain safe plumbing,

17 electrical, lighting, and ventilation systems; and fail to ensure that chemicals are

18 safely controlled. *See* Graham Rpt. 6–8; Graham Rebuttal 3–11. Ms. Graham

19 concluded that these environmental failures deprive class members of access to

20 basic human needs. *Id.* 6. Her findings included (1) showers across Jail facilities

21 that were extraordinarily dirty, covered in soap scum, contained mold, and, in some

22 cases, were infested by insects, *id*. 9–11; (2) birds "flying around in housing units,"

23 including bird feces in a housing unit and on food service equipment, Graham Rpt.

24 16, 65; and (3) unsafe plumbing, sinks and toilets with continuous leaks, and poorly-

25 or non-functioning toilets at multiple facilities, including one incident where two

26 cellmates "were forced to scrape waste [feces] out of the toilet themselves in order

27 to dispose of it," *id.* 76–78. *See also* Dkt. 119-22 ¶ 6 (black mold); Dkt. 119-24 ¶ 3

28 (standing water, insects); Dkt. 119-26 ¶ 9 (mold, insects, lack of access to laundry).

Plaintiffs' mental health expert, Dr. Stewart, also documented filthy, deeply
unsanitary conditions in multiple housing areas.  Stewart Rpt. 40–41, 45, 51–54, 66–
67, 70–71, 97, 101, 108–09.

All of the facts that Defendants claim justify summary judgment are disputed.

***Policies and Procedures*.**  Defendants' expert reviewed 11 SDSO policy
documents covering 3 areas (vermin control, lice, and laundry/clothing) and
concluded that Defendants' policies were adequate.  Dkt. 782-2, App'x 13, ¶¶ 2–3 &
Ex. B.  Plaintiffs' expert reviewed more than 80 SDSO policy documents—all of
those reviewed by Defendants' expert plus policies on infection control, medical
waste, sanitation and hygiene inspections, mattresses, housekeeping, trash removal,
hazardous waste, and other relevant issues—and found that SDSO's policies lacked
necessary specificity.  *See* Graham Decl. ¶ 6; Graham Rpt. 90–92.  Moreover, the
extensive evidence of unclean and unsanitary conditions described in Plaintiffs'
expert's reports demonstrated that these policies were not being followed.  *See, e.g.*,
*id.* 74.  Defendants filed a handful of new policies in connection with their Motion,
which Ms. Graham reviewed and concluded were not "materially different" to the
deficient policies she previously reviewed.  Graham Decl. ¶ 6.

***Cleanliness and Sanitation*.**  Defendants assert that Jail facilities are kept
sanitary through cleanings by trustee workers and staff, along with regular
inspections.  Mot. 8–9.  But Ms. Graham found substantial evidence of improper
sanitation and profoundly unclean facilities.  *See generally* Graham Rpt. 8–76.  For
example, her report contains 59 photographs of toilets taken during her tours of the
Jail, 47 of which were unclean (nearly 80%).  Graham Decl. ¶ 7.  She also made
findings regarding the uncleanliness of food service areas, Graham Rpt. 54–70; the
lack of availability of cleaning supplies for incarcerated people, *id.* 12, 17, 33, 88–
89, 92, 94; the accumulation of trash in housing areas, *id.* 31–33; the filthiness of
holding cells, *id.* 9, 18–22; the existence of mold, *id.* 9, 13, 17, 20, 23–27, 30, 66–
67; and the uncleanliness of shower areas, *id.* 9–11, 13–15, 19, 23–24, 27–29.

1   These conditions remain present, with an incarcerated person reporting mold growth

2   in a cell as of August 2024, Decl. of Jaxen Dolan ("Dolan Decl."), filed herewith,

3   ¶ 3, as well as clogged drains in shower areas, *id.* ¶ 8, bird feces on food bags, *id.*

4   ¶ 9, and laundry practices resulting in the provision of dirty clothing, *id.* ¶¶ 5–6.

5       ***Pest Control.***  Defendants assert that their policies and practices regarding

6   pest control are adequate.  Mot. 10–11.  But, both experts found drain flies.  Graham

7   Rpt. 11–14, 28; Dkt. 782-2, App'x 13, ¶ 15.  As discussed above, Ms. Graham

8   found substantial evidence of birds, rodents, and droppings in the food service area.

9   *See, e.g.*, Graham Rpt. 57.  She also found Defendants' pest control policies and

10  practices inadequate.  *Id*. 91–92.

11      ***Chemical Control.***  Both Plaintiffs' and Defendants' experts observed unsafe

12  chemical control practices during their respective inspections of the Jail facilities.

13  Graham Rpt. 86–90; Dkt. 782-2, App'x 13, ¶¶ 20–25; Swearingen Decl. Ex. R at

14  79:13–80:11,157:7–11, 200:3–202:21, 252:2–12.   Defendants claim that certain

15  unsafe chemical control practices have been remedied.  Dkt. 782-2, App'x 10, ¶ 36;

16  *id.*, App'x 13, ¶¶ 20–25.  However, Defendants' declarant relies on hearsay

17  evidence assertions from staff, and Defendants provide no actual evidence that

18  problematic practices have been eliminated.  Plaintiffs, on the other hand, have filed

19  evidence indicating that incarcerated people continue to use unlabeled chemical

20  bottles to clean their cells.  Dolan Decl. ¶ 7.  Even assuming Defendants have made

21  these changes, this voluntary cessation of conduct that violates the Constitution is

22  not sufficient to moot Plaintiffs' claims, as Defendants have not established there is

23  no expectation they could return to their prior practices.  *Armstrong*, 58 F.4th at

24  1298.

25      ***Maintenance of the physical plant.***  Defendants' assertion that their

26  maintenance policies and practices are adequate, Mot. 9–10, is in conflict with

27  Ms. Graham's findings of poorly maintained facilities, including improperly

28  maintained air vents, Graham Rpt. 81–85; water leaks, *id.* 29–30, 76–77; and

1    inadequate maintenance policies, *id.* 70–74.

2        ***Existence of periodic environmental issues.*** Defendants contend that "[a]ll

3    of Plaintiffs' evidence is a 'moment in time' when their expert" inspected the Jail's

4    facilities, and on that basis, cannot support Plaintiffs' claim of deliberate

5    indifference. Mot. 25. Defendants are incorrect. Ms. Graham conducted a

6    systematic review across multiple facilities and evaluated policies and practices and

7    found widespread and consistent environmental hazards. Graham Rpt. 2–3. In fact,

8    filthy and unsanitary conditions were observed and documented during multiple

9    inspections, including those conducted separately by Dr. Stewart, and show up

10   repeatedly in patient records and in investigative findings related to in-custody

11   deaths. Stewart Report 40–41, 45, 51–54, 66–67, 70–71, 97, 101, 108–09. This

12   evidence is sufficient to support Plaintiffs' claims.

13   **V.    THE COURT SHOULD DENY DEFENDANTS' MOTION REGARDING SAFETY AND SECURITY CLAIM**

14

15       Plaintiffs' safety and security experts James Austin[11] and Gary Raney,[12] along

16   with Plaintiffs' non-retained expert Paul Parker,[13] found that the Jail's flawed

17   classification system, inadequate drug contraband practices, outdated video and

18   intercom systems, untimely safety checks and responses to emergencies, inadequate

19   training and oversight of staff place class members at risk of death and physical

20   ────────────────

21   [11] Dr. Austin has served as the Director of the Institute of Crime, Justice, and Corrections at George Washington University as well as the Executive Vice President for the National Council on Crime and Delinquency. Decl. of James

22   Austin ("Austin Decl."), filed herewith, Ex. 1 ("Austin Rpt.") ¶ 1. Defendants have

23   not moved to exclude any of Dr. Austin's opinions.

24   [12] Mr. Raney has served as Sheriff of Ada County, Idaho, and is the federal court appointed Independent Compliance Director for the Miami-Dade Corrections and Rehabilitation Department. Decl. of Gary Raney ("Raney Decl."), filed herewith,

25   Ex. 1 ("Raney Rpt.") ¶ 2. Defendants have not moved to exclude any of Mr. Raney's opinions.

26   [13] Mr. Parker was the former Executive Officer of San Diego County's Citizen Law

27   Enforcement Review Board ("CLERB") and has worked for years in law enforcement and as a medical examiner conducting death investigations. Decl. of Paul Parker ("Parker Decl."), filed herewith, Ex. 1 ("Parker Decl.") ¶¶ 2–5.

28   Defendants have not moved to exclude any of Mr. Parker's opinions.

harm.  Defendants do not acknowledge any of these experts' opinions.  All of the facts that Defendants claim justify summary judgment are disputed.

### A.    Legal Standard Regarding Safety and Security

Plaintiffs can establish that Defendants' safety and security policies and practices violate the Eighth and Fourteenth Amendment by, *inter alia*, showing that the Jail classified individuals in a manner that placed them at risk of harm, *Barnard v. Gibbons*, 2011 WL 13213599, at *4 (C.D. Cal. Aug. 5, 2011); failed to enact policies and practices to protect incarcerated people from overdose deaths, *Turner v. Cook Cty. Sheriff's Office ex rel. Dart*, 2020 WL 1166186, at *4 (N.D. Ill. Mar. 11, 2020); failed to maintain the intercom system and respond to emergencies, *Greer v. Cty. of San Diego*, 726 F. Supp. 3d 1058, 1078–79 (S.D. Cal. 2023); and failed to perform adequate safety checks, *Frary v. Cty. of Marin*, 81 F. Supp. 3d. 811, 835–38 (N.D. Cal. 2015).

### B.    Material Disputes of Fact Exist Regarding the Constitutionality of Defendants' Safety and Security Policies and Practices

Plaintiffs' experts found that the Jail:  (1) uses a deficient classification system that overclassifies incarcerated people, resulting in unnecessary and dangerous restrictions, Austin Rpt. 3–9; (2) fails to conduct confidential classification interviews, *id.* 7–8; (3) racially segregates class members, *id.* 11–17; (4) lacks a mental health assessment process or specific placement criteria for AdSep, *id.* 18–21; (5) provides insufficient out-of-cell time for class members, especially in restricted housing units, *id.* 21–22; (6) fails to ensure adequate custody staffing, *id.* 21–24; (7) fails to screen all incarcerated people who return to the Jail for drug contraband, Raney Rpt. 10, 20–23; (8) lacks high-volume mail scanning technology to detect drug contraband, *id.* 11–13, 24; (9) has inadequate video and intercom systems to deter violence and respond to emergencies, *id.* 40–56; (10) fails to respond to intercom calls, *id.* 41–42, 46–48; (11) does not require "proof of life" checks nor conduct timely safety checks, *id.* 26–29, 32–40; (12) lacks adequate

1  oversight from outside entities, Parker Discl. 3–10; and (13) has an in-custody death

2  rate that is two to three times the national in-custody death rate, Austin Rpt. 24–29.

3        These deficiencies in Defendants' policies and practices have contributed to

4  preventable deaths and serious harm to class members.  SDSO's in-custody

5  mortality rate is among the highest in California. *Id.* 25, 28.  An April 2022 report

6  commissioned by San Diego County's Citizen Law Enforcement Review Board

7  ("CLERB") found that the risk of dying from overdose is higher at the Jail than at

8  any other jail in the state's 12 most populous counties.  Swearingen Decl. Ex. C-

9  273, C-285.  Plaintiffs' experts concluded that, for the period from January 2020 to

10  April 2023, problems with Defendants' safety and security practices—including

11  improper classification, missed safety checks, failed drug interdiction, poor video

12  surveillance, and broken intercoms—were present in at least 21 deaths at the Jail.

13  *See* Austin Rpt. 31–33; Raney Rpt. 17–18, 35–38, 46–47, 55.

14        Defendants do not discuss *any* of Plaintiffs' evidence.  Defendants' evidence

15  is not sufficient for Defendants to carry their burden, and all of it is disputed.

16        ***Classification.***  Defendants present no evidence that SDSO properly classifies

17  incarcerated people.  Dr. Austin identified numerous deficient classification policies

18  and practices, including overclassification, delays, failures to provide confidential

19  classification interviews, racial segregation of incarcerated people, solitary

20  conditions in AdSep, and lack of proper evaluation for incarcerated people in

21  AdSep.  Austin Rpt. 3–24.  Plaintiffs' experts found classification errors in three

22  recent in-custody homicides.  *Id.* 31–33.

23        ***Drug Interdiction.***  Defendants claim "significant changes" to their drug

24  interdiction practices.  Mot. 12.  Plaintiffs' expert Gary Raney found these changes

25  to be vague and insufficient to protect incarcerated people from substantial risk of

26  serious harm.  Raney Decl. ¶ 4–4(d).  Mr. Raney found that:  (1) the overdose rate at

27  the Jail remains "very high," Raney Decl. ¶ 4(d) (contrasting Miami-Dade's zero

28  overdoses in 2024 to SDSO's projected 34 overdoses in 2024); (2) the Jail's new

policy to randomly screen staff, contractors, vendors, and visitors is inadequate, Raney Rpt. 23, Raney Decl. ¶ 4(c) (there have only been six screens in six months); (3) the Jail lacks high-volume drug contraband scanning equipment, Raney Rpt. 11–13, 24; (4) Defendants do not scan all incarcerated people when returning from court or other appointments, *id.* 10, 17–23 (discussing at least three deaths resulting from lack of scanning); (5) the dogs used for drug interdiction are insufficient to address the crisis at the seven Jail facilities, *id.* 23–24; and (6) Defendants have not updated their drug interdiction policies since March 2023, *id*. 13–16, 19–20, *see, e.g.*, Dkt. 782-2, App'x 8, ¶ 7 (discussing Policy I.50, which is not updated).

*Video, Intercoms, and Elevators.*  Defendants admit that only one of seven Jail facilities has new intercoms and video cameras (Rock Mountain); updates to George Bailey are partially complete; and the remaining facilities still have intercom and video systems in need of updating.  Mot. 14; Raney Rpt. 47-48, 55-56. Defendants fail to address *any* of Plaintiffs' evidence that staff ignore and mute intercom calls and that the intercoms are obsolete.  Raney Rpt. 41–48 (suicide that occurred after staff muted intercom); *see also* Dkt. 119-26 at ¶ 8 (ignored/broken intercoms dating back to 2021).  Plaintiffs' evidence demonstrates that the Jail's cameras are aging, unreliable, and lack coverage.  Raney Rpt. 49–56.  Defendants state that deployment of body-worn cameras ("BWCs") is partially complete.  Mot. 14–15.  But BWCs are insufficient to deter violence because staff are generally not posted to work in housing units and enter only on occasion.[14]  Raney Decl. ¶ 8; Austin Decl., Ex. 2 ("Austin Rebuttal") 4.

*Safety Checks.*  Defendants state that counts of incarcerated people require "verbal or physical acknowledgment" but then falsely contend that "[s]afety checks are done in the same manner as counts[.]"  Mot. 15; Raney Decl. ¶ 9.  By policy and

---

[14] Defendants have previously failed to activate body-worn cameras at Central Jail during use-of-force incidents against class members, even though Defendants claim that they are "fully deployed" at the facility.  *See* Decl. of Tyler Hamilton ("Hamilton Decl."), filed herewith, ¶ 5; Mot. 14.

practice, Defendants do not ensure verbal or physical acknowledgment during safety checks; moreover, staff regularly fail to conduct individual checks at required intervals. Raney Rpt. 25–29, 32–40. In fact, Defendants' own audits from late-2023 showed that only *35%* of safety checks complied with their *own written policy*. *Id.* 32–34. Inadequate safety checks were an issue in numerous recent deaths at the Jail. *Id.* 35–38; Stewart Rpt. 117–22; Stewart Rebuttal 10–12.

*Staff Training and Discipline.* Defendants assert in broad strokes that they train custody staff, investigate suspected policy violations, and impose progressive discipline. Mot. 16. However, Defendants' failure to train custody staff on routine policies and practices has contributed to the deaths of incarcerated people, including one person who died in a holding cell after staff failed to properly assess his body scan results. Raney Rpt. 17; *see also id.* 8–9, 22–23, 27. Staff engaged in and continue to engage in misconduct; for example, in October 2024, staff at Central Jail assaulted a transgender woman, hitting the person 10–15 times while insulting their transgender identity. Hamilton Decl. ¶ 4. Defendants fail to address *any* of Plaintiffs' evidence that custody staffing shortages, as confirmed by their own reports and testimony, contribute to the Jail's high assault rates. Austin Rpt. 21–24.

*Independent Oversight.* Defendants incorrectly contend that the County Board of Supervisors recently voted to give CLERB greater power to investigate in-custody deaths. Mot. 16. The Board *did not* expand CLERB jurisdiction; rather, it voted to take initial steps that *may*, upon further Board vote, result in expansion of CLERB jurisdiction over time. Parker Decl. ¶¶ 4–9. Further, Defendants continue to ignore numerous other oversight problems, such as CLERB's: history of underfunding and vacancies, Parker Discl. 5; inability to inspect the Jail without advance notification, *id.* 6; inability to make anonymous (including systemic) findings of misconduct, *id.*; inability to ensure its recommendations become policy, *id.* 7; inability to hold employees accountable for misconduct, *id.*; and inability to conduct independent monitoring of and reporting about the Jail, *id.* 9.

## VI.   THE COURT SHOULD DENY DEFENDANTS' MOTION REGARDING ACCESS TO COUNSEL AND COURTS

Plaintiffs' expert Karen Snell[15] found that Defendants deny incarcerated people (a) access to counsel by failing to provide any reliable and confidential mechanism for attorneys to speak to their clients and (b) access to courts for those defending themselves in their criminal cases or litigating an individual conditions of confinement case *pro per*.  *See generally* Decl. of Karen L. Snell ("Snell Decl."), filed herewith, Ex. 1 ("Snell Rpt."), Ex. 2 ("Snell Rebuttal").  Defendants do not acknowledge, let alone address, any of Plaintiffs' expert's opinions on this topic. All of the facts that Defendants claim justify summary judgment are disputed.

### A.   Legal Standard Regarding Access to Counsel and Courts

The Sixth Amendment "right to privately confer with counsel is nearly sacrosanct." *Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014).  Jail policies and practices can constructively deny access to counsel in violation of the Sixth Amendment. *See, e.g.*, *id.* at 910–11; *Benjamin v. Fraser*, 264 F.3d 175, 179–81, 186–88 (2d Cir. 2001) (45–120 minute delays when attorneys attempted to visit clients); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052–53 (8th Cir. 1989) (policy requiring attorney calls to be conducted "in the open" and lack of private attorney meeting rooms); *Jones v. City & Cty. of San Francisco*, 976 F. Supp. 896, 913 (N.D. Cal. 1997) ("[s]erious deficiencies … with regard to privacy in attorney-client consultations, due to the lack of space and the absence of sound barriers"); *Criswell v. Boudreaux*, 2020 WL 5235675, at *21–22 (E.D. Cal. Sept. 2, 2020) (policy that made it difficult to schedule prospective client visits).[16]

---

[15] Ms. Snell is an experienced and well-regarded criminal defense and civil rights attorney, a trial practice lecturer at Stanford, Berkeley, and other law schools, and a former Chairman of the Board of Directors of the Habeas Corpus Resource Center. Defendants have not moved to exclude any of Ms. Snell's opinions.

[16] When alleging an "actual or constructive denial of the assistance of counsel altogether," a criminal defendant need not show prejudice by that denial to succeed on a Sixth Amendment claim.  *Perry v. Leeke*, 488 U.S. 272, 280 (1989).

For incarcerated people representing themselves in a criminal proceeding, the "right to self-representation … includes a right of access to law books, witnesses, and other tools necessary to prepare a defense." *Taylor v. List*, 880 F.2d 1040, 1047 (9th Cir. 1989); *see also United States v. Janis*, 820 F. Supp. 512, 515–18 (S.D. Cal 1992). Incarcerated people pursuing civil cases about conditions of confinement also have the right to "affirmative assistance"—*i.e.*, access to legal research—and to "litigate without active interference." *Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011), *overruled in part on other grounds*.

**B.    Material Disputes of Fact Exist Regarding Whether Defendants Violate Class Members' Right to Access Counsel**

Defendants claim, without citation to a single case regarding the Sixth Amendment, that they are entitled to summary judgment because they have "policies, procedures and training of staff [to] ensure that incarcerated persons have reasonable access to ... confidential communications with counsel via in-person meetings, phone calls, and legal mail correspondence." Mot. 27; *see id.* 26–29. Defendants then proceed to list certain policies and practices. *Id.* 17–19. Viewed through the proper legal standard, the record is filled with material disputes of fact.

Plaintiffs' expert, Ms. Snell, opined that there is *no* reliable and confidential method of attorney-client communication. Snell Rpt. 35–73; Snell Rebuttal 1–8. In-person visits suffer from extreme delays, sometimes requiring attorneys to leave without seeing their clients, and are not confidential. Snell Rpt. 35–55; Snell Rebuttal 5–7; Decl. of Arameh Vartomian, filed herewith, ¶ 2. Phone calls with attorneys are also not confidential because the Jail requires that they take place in occupied dayrooms. Snell Rpt. 61–67; Snell Rebuttal 1–5; Mot. 17 (admitting attorney-client calls occur in dayrooms). The Jail frequently fails to tell incarcerated people that their attorneys have called. Snell Rpt. 55–61; Snell Rebuttal 7–8.[17]

---

[17] Plaintiffs object to testimony from defense counsel that "[a]ttorney callbacks are

1   Legal mail is slow and not confidential. Snell Rpt. 67–72 (instructions for staff to

2   "not just skim" legal mail); Dkt. 119-31 at ¶¶ 9–10. This evidence is sufficient to

3   establish an access-to-counsel violation of the Sixth Amendment.

4          The facts identified by Defendants are also disputed. Attorney visiting rooms

5   are *not* confidential because they are not enclosed and soundproof, contain video

6   cameras, and include live microphones. *Compare id.* 38–53, *with* Mot. 17.

7   Attorney callback requests are still frequently not communicated to incarcerated

8   people, even since Plaintiffs' expert report was disclosed. *Compare* Swearingen

9   Decl. ¶ 7, Clark Decl. ¶ 5, *with* Mot. 17–18; *see also* Dkt. 119-26 at ¶ 10.

10  **C.    Material Disputes of Fact Exist Regarding Whether Defendants
11          Deny Class Members Access to the Courts**

12         Defendants contend that they are entitled to summary judgment because they

13  have a legal research service, a law library for people representing themselves in

14  criminal cases, and because they provide some writing supplies. Mot. 17–19.

15  Defendants' evidence is both insufficient to carry Defendants' burden on summary

16  judgment and is disputed. Ms. Snell opined that, even if legal research opportunities

17  exist in theory, Defendants do not provide adequate *access* to legal research or the

18  courts to incarcerated people litigating criminal or civil cases *pro per.* Snell Rpt.

19  73–89. In particular, the legal research assistance provided to incarcerated people is

20  overly restrictive, making it impossible for incarcerated people even to file and

21  respond to pleadings. *Id.* 80–84. Even Defendants' own expert opined that the legal

22  research assistance program should be improved. Dkt. 779-2, Ex. D at 119.

23  Defendants do not discuss *any* of this evidence, which is more than sufficient to

24  establish denial of access to the courts. Though Defendants have promised to

25  expand access to legal research through video monitors in dayrooms, that program

26  has not yet been implemented. Mot. 17; *see Barnes*, 980 F.2d at 580.

27  _____

28  normally processed on the same day," Dkt. 782-2, App'x 14, ¶ 15, for lack of
    personal knowledge, as defense counsel does not process such requests.

1   ## VII.  THE COURT SHOULD DENY DEFENDANTS' MOTION
2            REGARDING DISPARATE RACIAL IMPACT

3           Defendants contend that they are entitled to summary judgment on Plaintiffs'

4   claims under California Government Code § 11135 ("Section 11135").  Mot. 29–34.

5   Plaintiffs have put forward substantial evidence showing that Defendants violate the

6   statute.  As explained by Plaintiffs' statistical expert, Dr. Matthew Ross,[18] the

7   Sheriff's Office's patrol practices result in disproportionately high stops and arrests

8   of Black and Latinx people, leading to disproportionately high rates of incarceration.

9   *See generally* Decl. of Matthew Ross ("Ross Decl."), filed herewith, Ex. 1 ("Ross

10  Rpt."), Ex. 2 ("Ross Rebuttal").  As shown by Professor Christine Scott-Hayward,[19]

11  Black and Latinx people are denied equal access to alternatives to incarceration,

12  including pre-trial custody, early release, and re-entry programs, due to their over-

13  incarceration based on race, as well as Defendants' use of racially-biased risk

14  assessment tools.  *See generally* Decl. of Christine Scott-Hayward ("Scott-Hayward

15  Decl."), filed herewith, Ex. 1 ("Scott-Hayward Rpt."), Ex. 2 ("Scott-Hayward

16  Rebuttal").  Disputes of fact preclude summary judgment.

17      ### A.    Legal Standard Regarding Section 11135

18          Section 11135 prohibits Defendants from denying "full and equal access" or

19  otherwise discriminating against people on account of their race.  To prevail on their

20  disparate impact claim, Plaintiffs first "must show defendants' facially neutral

21  practice causes a disproportionate adverse impact on a protected class."  *C.B. v.*

22

---

23  [18] Dr. Ross is an Associate Professor of Economics and Public Policy at
24  Northeastern University, a nationally recognized expert on analyzing policing data
    for discrimination, and a consultant for both the U.S. Department of Justice Civil
25  Rights Division and the New Jersey Office of the Attorney General.  Ross Rpt. 1.
    Defendants have not moved to exclude any of Dr. Ross's opinions.

26  [19] Professor Scott-Hayward is the director of and a professor at the School of
27  Criminology, Criminal Justice, and Emergency Management at California State
    University, Long Beach, whose recent work focuses on pretrial justice and
28  sentencing.  Scott-Hayward Rpt. 1 & Ex. A.  Defendants have not moved to exclude
    any of Professor Scott-Hayward's opinions.

1  *Moreno Valley Unified Sch. Dist.*, 544 F. Supp. 3d 973, 993 (C.D. Cal. 2021)

2  (quotation marks and citation omitted).  The burden then shifts to Defendants, who

3  "must justify the challenged practice."  *Id.*  If Defendants meet their burden,

4  Plaintiffs "may still prevail by establishing a less discriminatory alternative."  *Id.*

**B.    Material Disputes of Fact Exist Regarding Whether the Sheriff's Office's Patrol Activities Result in Disproportionate Arrests and Overincarceration of Black and Latinx People**

7  Plaintiffs' evidence is sufficient to meet their initial burden.  *Both* Plaintiffs' *and*

8  Defendants' experts found that the Sheriff's Office disproportionately arrests Black and

9  Latinx individuals.  Using multivariate models and quasi-experimental designs,

10  Plaintiffs' expert, Dr. Ross, found that Latinx and Black people were, respectively,

11  28.6% and 16.2% more likely to be arrested than non-Latinx white people.  Ross Rpt.

12  Ex. A at 8.  Using population-based benchmarks, Defendants' expert, Dr. Brian

13  Withrow, found that both Black and Hispanic individuals were "overrepresented in

14  arrests when compared to the residential population estimates."  Dkt. 782-2, App'x 11,

15  ¶¶ 7–8; Mot. 30–31 (conceding the same).  Because people are incarcerated in the Jail

16  only if they are arrested, the disproportionate arrest rate for Black and Latinx

17  individuals contributes to those groups being incarcerated in the Jail at disproportionate

18  rates.

19  Defendants present several unavailing arguments for why these disparities do

20  not amount to racial discrimination.  Defendants state that Plaintiffs lack evidence of

21  intentional discrimination, Mot. 30–31; however, intent is not an element of a

22  Section 11135 disparate impact claim.  *See C.B.*, 544 F. Supp. 3d at 993.  Defend-

23  ants speculate that the inclusion of non-residents in the data may somehow have

24  skewed the results, Mot. 31; however, this is a critique of Defendants' own expert's

25  analysis, as Dr. Withrow used population-based benchmarks—"one of the most

26  outdated and criticized approaches in the field."  Ross Rebuttal Ex. A at 7.  In

27  contrast, Plaintiffs' expert, Dr. Ross, "utilize[d] more advanced techniques, such as

28

1    multivariate models and dynamic benchmarks" to show disparate impact; such tests

2    do not require reliance on residency to find evidence of discrimination. *Id.*

3        Defendants assert that "persons arrested may end up being cited and released,

4    or booked and released, but not incarcerated." Mot. 31. Defendants, however,

5    present no evidence that people are "cited and released" *after* being arrested, and

6    people who are "booked and released" are necessarily incarcerated. Defendants

7    state that 26% of bookings are from SDSO arrests, while other arresting agencies are

8    responsible for the remaining 74%. *Id.* 32. Even if true, that would not exonerate the

9    SDSO if, as the data shows, it disproportionately arrests Black and Hispanic people,

10    which in turn results in their disproportionate incarceration in the Jail.

11        Defendants erroneously contend that Dr. Ross did not make any findings about

12    disproportionate arrests of Black individuals. *Id.* 31. But both Dr. Ross and

13    Dr. Withrow found that Black individuals are overrepresented in arrests. Ross Rpt.

14    Ex. A at 8; Dkt. 782-2, App'x 11, ¶¶ 7–8. Defendants make a number of criticisms of

15    Dr. Ross's methodology, though they did not seek to exclude his opinions. Mot. 31–

16    32. In any event, their criticisms all miss the mark.[20] Defendants fail to explain their

17    confusing argument that SDSO's discriminatory arrest practice are justified by the use

18    of race-neutral booking criteria. *Id.* 32. Race neutral booking criteria would simply

19    perpetuate the racial disparities that exist in the discriminatory arrests.

20

21

22

23    [20] Defendants incorrectly claim "Dr. Ross did not assess the actual race of the people
      stopped." *Compare* Mot. 32 *with* Ross Rpt. Ex. A at 6–11, Ross Decl. ¶ 9.
24    Defendants, relying on a misinterpretation of Dr. Ross's deposition testimony, claim
      Dr. Ross failed to take into account the socioeconomic status of arrestees. Mot. 31.
      That is false and is irrelevant to Dr. Ross's conclusions. *See* Swearingen Decl. Ex.
25    S at 17:18–18:4; Ross Decl. ¶ 13. Defendants claim Dr. Ross used only one
      independent variable, Mot. 31, when his analyses used many, Ross Decl. ¶ 9;
26    Swearingen Decl. Ex. S at 189:10–25. In the factual background section of their
      brief, Defendants raise a number of irrelevant issues related to calls for service,
27    causal models on temporal ordering, neighborhood- and beat-level data, and census
      data. Mot. 20–21. Defendants do not present any argument related to these
28    allegations. Plaintiffs therefore have not responded to them here.

1    **C.    Material Disputes of Fact Exist Regarding Defendants'
2          Alternatives to Incarceration Programs**

3          Plaintiffs have also produced evidence to show that Defendants deny Black

4    and Latinx individuals equal access to alternative to custody programs.  Plaintiffs'

5    expert, Professor Scott-Hayward, opined that Black and Latinx individuals are

6    overrepresented in the Jail.  Scott-Hayward Rpt. 15–16  (Black people made up 17%

7    of arrestees, but 21–22% of Jail population; Hispanic people made up 41% of

8    arrests, but 43–45% of Jail population).  She discussed how risk assessment tools

9    and eligibility criteria that the SDSO uses to evaluate individuals for alternatives to

10   incarceration programs have a racially disparate impact.  *See id.* 26–31; *id.* 20–21,

11   29 (risk assessment tools are racially biased).

12         Defendants ignore this evidence, contending incorrectly that Plaintiffs have

13   no expert on this topic.  Mot. 33.  Defendants state that the tools used to evaluate

14   people for release are race-neutral and focus on "risk factors," *id.*, which, at the first

15   step of the Section 11135 analysis, is no answer to evidence of disparate impact.

16   *C.B.*, 544 F. Supp. 3d at 993.  Perhaps because Plaintiffs met their initial burden,

17   Defendants attempt to justify the disparate impact with their purported need to

18   consider risk factors when deciding who is eligible for alternatives to incarceration.

19   Mot. 33.  Defendants, however, ignore that Professor Scott-Hayward opines that

20   Defendants could incarcerate fewer people and alter eligibility criteria without

21   negatively impacting public safety.  Scott-Hayward Rpt. 18–31.  Because Plaintiffs

22   have produced evidence of a disparate impact and of potentially less-discriminatory

23   alternatives to Defendants' practices, summary judgment must be denied.

24                                    **CONCLUSION**

25         For the aforementioned reasons, Plaintiffs respectfully request that the Court

26   strike the untimely expert declarations of Drs. Murray, Reinecke, and Withrow and

27   Ms. Peters, Dkt. 782-2, App'x 1, 2, 11, 13, and deny Defendants' Motion, Dkt. 782.

28

1    DATED:  January 21, 2025           Respectfully submitted,

2                                       ROSEN BIEN GALVAN & GRUNFELD LLP

3

4                                       By: */s/ Van Swearingen*
                                           Van Swearingen
5

6                                       Attorneys for Plaintiffs and the Certified Class
                                       and Subclasses
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28