1  GAY C. GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  MICHAEL FREEDMAN – 262850
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   BEN HOLSTON – 341439
4  ROSEN BIEN
   GALVAN & GRUNFELD LLP
5  101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
6  Telephone:   (415) 433-6830
   Facsimile:    (415) 433-7104
7  ggrunfeld@rbgg.com
   vswearingen@rbgg.com
8  mfreedman@rbgg.com
   eanderson@rbgg.com
9  hchartoff@rbgg.com
   bholston@rbgg.com
10
   AARON J. FISCHER – 247391
11 LAW OFFICE OF
   AARON J. FISCHER
12 1400 Shattuck Square Suite 12 - #344
   Berkeley, California  94709
13 Telephone:  (510) 806-7366
   Facsimile:   (510) 694-6314
14 ajf@aaronfischerlaw.com

15 Attorneys for Plaintiffs and the
   Certified Class and Subclasses
16

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

17              UNITED STATES DISTRICT COURT

18            SOUTHERN DISTRICT OF CALIFORNIA

19 DARRYL DUNSMORE, ANDREE
   ANDRADE, ERNEST ARCHULETA,
20 JAMES CLARK, ANTHONY EDWARDS,
   REANNA LEVY, JOSUE LOPEZ,
21 CHRISTOPHER NORWOOD, JESSE
   OLIVARES, GUSTAVO SEPULVEDA,
22 MICHAEL TAYLOR, and LAURA
   ZOERNER, on behalf of themselves and all
23 others similarly situated,

24              Plaintiffs,

            v.
25
   SAN DIEGO COUNTY SHERIFF'S
26 DEPARTMENT, COUNTY OF SAN
   DIEGO, SAN DIEGO COUNTY
27 PROBATION DEPARTMENT, and DOES
   1 to 20, inclusive,
28
              Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Judge:   Hon. Anthony J. Battaglia

Date:    March 6, 2025
Time:    2:00 p.m.
Crtrm.:  4A

[4634723.4]

I, Van Swearingen, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs and the Certified Class and Subclasses.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment.

2.      On May 30, 2023, the Court issued a scheduling order, which set deadlines for expert discovery, including the submission of expert reports and rebuttal reports.  Dkt. 324.  The Court extended the pretrial deadlines several times, including the deadlines for the parties to serve expert reports and rebuttal expert reports.  On July 15, 2024, the Court extended the expert discovery deadlines to (1) August 21, 2024, to serve expert disclosures, (2) October 2, 2024, to serve rebuttal expert reports, and (3) November 1, 2024, to complete expert discovery. Dkt. 682 at 1-2.

3.      On August 21, 2024, Defendants served eight expert reports, including reports from Dr. Owen Murray, Dr. Scott Reinecke, Dr. Brian Withrow, and Ms. Henrietta Peters.

4.      Because the reports of Dr. Murray, Dr. Reinecke, and another of Defendants' experts relied on medical records never provided to Plaintiffs, the parties requested an extension of time for the parties to submit rebuttal reports and complete expert discovery for Dr. Murray, Dr. Reinecke, and other experts, which the Court granted.  Dkts. 720, 721.  That order extended the deadline for those experts to submit any rebuttal reports to November 1, 2024 and extended the dead-line to complete the depositions of those experts to November 22, 2024.  Dkt. 721.

5.      Defendants served no rebuttal reports for any of their experts, whether by the October 2, 2024 deadline applicable to Ms. Peters and Dr. Withrow, or the November 1, 2024 deadline applicable to Dr. Murray and Dr. Reinecke.  Nor did

any of Defendants' experts serve supplemental expert reports before the November 22, 2024 expert discovery cutoff.

6.     Defendants did not disclose to Plaintiffs the declarations of Dr. Murray, Dr. Reinecke, Dr. Withrow, and Ms. Peters attached to Defendants' Motion for Partial Summary Judgment at any time prior to filing the motion on December 16, 2024.

7.     A person from an attorney's office must call the jail facility to place a "callback" request in order for an attorney to speak on the phone to an incarcerated person at the Jail.  I am informed that between November 26, 2024 and December 18, 2024, staff from my law firm placed nine separate callback requests to speak with class representative James Clark, who was then incarcerated at Central Jail. Our firm did not receive a return call from Mr. Clark after any of those requests. Mr. Clark also informed an attorney from my office that he did not receive any of those callback notifications, until December 18, 2024.

8.     Defendants attached new evidence, never previously disclosed to Plaintiffs, to their December 16, 2024 brief.  The new evidence includes claims that: (1) Defendants are now providing more medical providers, Dkt. 782-2, Appx. 1, ¶ 16, (2) Defendants are now providing certain medications to people with diabetes, *id.* ¶ 82, (3) Disease Management Guidelines are being developed by Defendants' contractor CHP, *id.* ¶ 83; Appx. 4 ¶ 17 & Exs. A-1-A-6 , (4) Defendants initiated a pilot program at one jail for medical providers to assist with intake screening, Appx. 1 ¶ 84, and (5) Defendants maintain a "0 No Show Policy" for providers at the Jail.  *Id.* ¶ 87.  Plaintiffs did not have the opportunity to conduct discovery on any of Defendants' new evidence, as fact discovery closed months ago.

9.     Attached hereto as **Exhibit A** is a true and correct copy of the California State Auditor's February 3, 2022 Report "San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody."  The report was produced in this litigation as

1   SD_744691.

2        10.    Attached hereto as **Exhibit B** is a true and correct copy of the National

3   Commission on Correctional Healthcare's 2017 Report on the San Diego County

4   Jail system.  The report was produced in this case as DUNSMORE0260618.

5        11.    Attached hereto as **Exhibit C** is a true and correct copy of Analytica

6   Consulting's April 2022 Report "San Diego County: In-Custody Death Study,"

7   which Analytica prepared for the San Diego County Citizens' Law Enforcement

8   Review Board ("CLERB").  The report was produced in this litigation as

9   SD_817750.

10       12.    Attached hereto as **Exhibit D** is a true and correct copy of Community

11  Oriented Correctional Health Services's March 30, 2020 "Best Practices Review" of

12  the San Diego County jail system.  The report was produced in this litigation as

13  DUNSMORE0115368.

14       13.    Attached hereto as **Exhibit E** are true and correct copies of the San

15  Diego County Medical Examiner's reports on the deaths at the Jail of Lonnie

16  Rupard and Keith Galen Bach, which are publicly available records.  In each report,

17  the Medical Examiner classified the deaths as homicide by neglect.

18       14.    Attached hereto as **Exhibit F** is a true and correct copy of San Diego

19  County's June 28, 2024 contract with Correctional Healthcare Partners to provide

20  certain medical care in the jail system.  The contract was produced in this litigation

21  as SD_1579694.

22       15.    Attached hereto as **Exhibit G** is a true and correct copy of San Diego

23  County's April 26, 2022 contract with NaphCare, Inc. to provide certain medical

24  care in the jail system.  The contract is available on the County's public database of

25  contracts: https://www.sandiegocounty.gov/content/sdc/purchasing/documentum-

26  contract-search.html.

27       16.    Attached hereto as **Exhibit H** is a true and correct copy of a Feb. 5,

28  2024 amendment to San Diego County's contract with NaphCare, Inc. to provide

1  certain medical care in the jail system.  The contract is available on the County's

2  public database of contracts:

3  https://www.sandiegocounty.gov/content/sdc/purchasing/documentum-contract-

4  search.html.

5       17.    Attached hereto as **Exhibit I** is a true and correct copy of the Urban

6  Institute's December 19, 2024 report "Incarcerated People's Perceptions of

7  Reproductive Health Care in a San Diego County Women's Jail."  The report is

8  available at the Urban Institute's website:

9  https://www.urban.org/research/publication/incarcerated-peoples-perceptions-

10  reproductive-health-care-san-diego-county.

11       18.    Attached hereto as **Exhibit J** is a true and correct copy of a

12  December 22, 2024 article in the San Diego Union-Tribune titled, "Despite years of

13  warnings, local jails confined mentally ill men together.  One unreported death

14  highlights the risks."  The article is available online at:

15  https://www.sandiegouniontribune.com/2024/12/22/despite-years-of-warnings-

16  local-jails-confined-mentally-ill-men-together-one-recent-unreported-death-

17  highlights-the-risks/.

18       19.    Attached hereto as **Exhibit K** is a true and correct copy of a May 12,

19  2023 Corrective Action Notice from the San Diego County Sheriff's Department to

20  NaphCare, Inc.  The document was produced in this litigation as

21  NAPHCARE034745.

22       20.    Attached hereto as **Exhibit L** is a true and correct copy of a January 10,

23  2025 news release from the San Diego County Sheriff's office, which states that a

24  person at Central Jail died on January 10, 2025 after "exhibiting signs of medical

25  distress."  The release is available on the Sheriff's Office's public website at:

26  https://www.sdsheriff.gov/Home/Components/News/News/3149/514.

27       21.    Attached hereto as **Exhibit M** is a true and correct copy of an excerpt

28  from the medical records of class representative James Clark, which the Sheriff's

1    Office provided to Plaintiffs in December 2024.

2         22.    Attached hereto as **Exhibit N** is a true and correct copy of an excerpt

3    from the report of Defendants' dental expert Dr. Scott Reinecke disclosed on

4    August 21, 2024.

5         23.    Attached hereto as **Exhibit O** is a true and correct copy of excerpts

6    from the transcript of the November 8, 2024 deposition of Dr. Reinecke.

7         24.    Attached hereto as **Exhibit P** is a true and correct copy of excerpts

8    from the transcript of the June 12, 2024 deposition of Dr. Peter Freedland, Chief

9    Executive Officer of Correctional Healthcare Partners, Inc.

10        25.    Attached hereto as **Exhibit Q** is a true and correct copy of excerpts

11   from the transcript of the November 12, 2024 deposition of Defendants' medical

12   expert Dr. Owen Murray.

13        26.    Attached hereto as **Exhibit R** is a true and correct copy of excerpts

14   from the transcript of the October 30, 2024 deposition of Defendants' environmental

15   conditions expert Henrietta Peters.

16        27.    Attached hereto as **Exhibit S** is a true and correct copy of excerpts

17   from the transcript of the October 17, 2024 deposition of Plaintiffs' statistical expert

18   Dr. Matthew Ross.

19        28.    Attached hereto as **Exhibit T** is a true and correct copy of excerpts

20   from the transcript of the February 14, 2024 deposition of Serina Rognlien-Hood,

21   Federal Rule of Civil Procedure 30(b)(6) witness for the Sheriff's Department.

22        29.    Attached hereto as **Exhibit U** is a true and correct copy of excerpts

23   from the transcript of the April 26, 2024 deposition of Dr. Jon Montgomery, Federal

24   Rule of Civil Procedure 30(b)(6) witness for the Sheriff's Department.

25        30.    Attached hereto as **Exhibit V** is a true and correct copy of

26   Dr. Reinecke's notes from his inspections of Jail facilities, which Defendants

27   produced to Plaintiffs during Dr. Reinecke's November 8, 2024 deposition.

28        31.    Attached hereto as **Exhibit W** is a true and correct copy of a screenshot

1  of an in-custody deaths table from the Sheriff's Office's website, taken January 21,

2  2025, which shows that the Sheriff's Office reported nine in-custody deaths in 2024.

3  The table is available online at: https://www.sdsheriff.gov/resources/transparency-

4  reports.

5      32.    Attached hereto as **Exhibit X** is a true and correct copy of a

6  December 31, 2024 article from San Diego's NPR and PBS station, KPBS, titled

7  "Advocates claim Sheriff's Office underreported jail deaths in 2024." The article is

8  available online at: https://www.kpbs.org/news/racial-justice-social-

9  equity/2024/12/31/advocates-claim-san-diego-county-sheriffs-office-underreported-

10 jail-deaths-2024.

11     I declare under penalty of perjury under the laws of the United States of

12 America that the foregoing is true and correct, and that this declaration is executed

13 at San Francisco, California this 21st day of January, 2025.

14

15                                    */s/ Van Swearingen*
                                      Van Swearingen
16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

**EXHIBITS TO DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| California State Auditor Report, "San Diego County Sheriff's Dept. It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in its Custody" (Feb. 3, 2022), SD_744691 | A | 1 |
| National Commission on Correctional Healthcare Technical Assistance Report re: San Diego Jail (2017), DUNSMORE0260618 | B | 128 |
| Analytica Consulting Report, "San Diego County: In-Custody Death Study" (April 2022), SD_817750 | C | 268 |
| Community Oriented Correctional Health Services (COCHS) Best Practices Review of San Diego County (March 30, 2020), DUNSMORE0115368 | D | 332 |
| San Diego County Medical Examiner Autopsy Reports of Lonnie Rupard, Keith Bach | E | 360 |
| San Diego County, Contract With Correctional HealthCare Partners, Inc. For On-Site Clinical Services SD 1579694 | F | 399 |
| San Diego County, Contract With NaphCare, Inc. for Sheriff's Department Consolidated Health Care Delivery (April 26, 2022) | G | 440 |
| San Diego County, Amendment to Contract with NaphCare, Inc. (Feb. 5, 2024) | H | 578 |
| Urban Instititute, "Incarcerated People's Perceptions of Reproductive Health Care in a San Diego County Women's Jail" (Dec. 19, 2024) | I | 590 |

# TABLE OF CONTENTS

**EXHIBITS TO DECLARATION OF VAN SWEARINGEN IN SUPPORT
OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Kelly Davis, *San Diego Union-Tribune*, "Despite years of warnings, local jails confine mentally ill men together. One recent unreported death highlights the risks." (Dec. 22, 2024) | J | 674 |
| San Diego County Corrective Action Notice to NaphCare (May 12, 2023), NAPHCARE034745 | K | 683 |
| San Diego County Sheriff's Office News Release, "Death Investigation" (Jan. 10, 2025) | L | 699 |
| Excerpt from Medical Records of James Clark | M | 702 |
| Excerpt from Report of Dr. Scott Reinecke, served August 21, 2024 | N | 704 |
| Excerpts from Transcript of November 8, 2024 Deposition of Dr. Scott Reinecke | O | 707 |
| Excerpts from Transcript of June 12, 2024 Deposition of Dr. Peter Freedland | P | 724 |
| Excerpts from Transcript of November 12, 2024 Deposition of Dr. Owen Murray | Q | 729 |
| Excerpts from Transcript of October 30, 2024 Deposition of Henrietta Peters | R | 736 |
| Excerpts from Transcript of October 17, 2024 Deposition of Dr. Matthew Ross | S | 772 |
| Excerpts from Transcript of February 14, 2024 Deposition of Serina Rognlien-Hood | T | 779 |
| Excerpts from Transcript of April 26, 2024 Deposition of Dr. Jon Montgomery | U | 794 |

[4634529.1]

# TABLE OF CONTENTS

**EXHIBITS TO DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Notes from Dr. Scott Reinecke's Jail Inspections | V | 799 |
| Screenshot, San Diego County Sheriff's Office website, Table of In-Custody Deaths | W | 801 |
| Katie Hyson, *KPBS*, "Advocates claim Sheriff's Office underreported jail deaths in 2024" (Dec. 31, 2024) | X | 804 |

[4634529.1]

# EXHIBIT A



# *San Diego County Sheriff's Department*

It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody

*February 2022*



REPORT 2021-109

SD 744691

Ex. A - 2

 **CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814

 **916.445.0255** | TTY 916.445.0033

 For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* 

*For questions regarding the contents of this report, please contact our* Public Affairs Office *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternative format reports available upon request | Permission is granted to reproduce reports

**SD 744692**
**Ex. A - 3**

Michael S. Tilden *Acting State Auditor*



February 3, 2022
*2021-109*

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office conducted an audit of the San Diego County Sheriff's Department (Sheriff's Department) to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps it took to address these deaths. The following report details our conclusion that the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody.

From 2006 through 2020, 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody.

Furthermore, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action. In addition, the Citizens' Law Enforcement Review Board (CLERB)—a citizen-governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in-custody deaths. CLERB also failed to investigate nearly one-third of the deaths of incarcerated individuals in the past 15 years, which means that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

In light of the ongoing risk to inmate safety, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

**SD 744693**

**Ex. A - 4**

iv | California State Auditor Report 2021-109
February 2022

## Selected Abbreviations Used in This Report

| ADP | average daily population |
|-----|--------------------------|
| BSCC | Board of State and Community Corrections |
| CDCR | California Department of Corrections and Rehabilitation |
| CLERB | Citizens' Law Enforcement Review Board |
| POBR | Public Safety Officers Procedural Bill of Rights |

SD 744694
Ex. A - 5

# Contents

Summary                                                                                      1

Introduction                                                                                 7

**Chapter 1**
The San Diego County Sheriff's Department Did Not Take Sufficient
Steps to Prevent the High Number of Deaths in Its Jails                13

**Chapter 2**
Neither the Sheriff's Department nor CLERB Has Taken Adequate
Action in Response to the Deaths of Incarcerated Individuals           33

**Conclusions and Recommendations**                                          53

**Appendix A**
In-Custody Deaths in California's 15 Largest Counties                   59

**Appendix B**
Scope and Methodology                                                            61

**Responses to the Audit**
Board of State and Community Corrections                                66     65

   California State Auditor's Comments on the Response From
   the Board of State and Community Corrections                             71

Citizens' Law Enforcement Review Board                                       75

   California State Auditor's Comments on the Response From
   the Citizens' Law Enforcement Review Board                               79

California Department of Justice                                              81

San Diego County Sheriff's Department                                        83

   California State Auditor's Comments on the Response From
   the San Diego County Sheriff's Department                               115

SD 744695

Ex. A - 6

vi | **California State Auditor Report 2021-109**
    | **February 2022**

Blank page inserted for reproduction purposes only.

# Summary

### Results in Brief

In accordance with federal constitutional law, the San Diego County Sheriff's Department (Sheriff's Department) has a responsibility to provide adequate medical care for individuals while they are in its custody. Nonetheless, from 2006 through 2020, a total of 185 people died in San Diego County's jails—more than in nearly any other county across the State. Some of these individuals were in custody for only a few days to a few months; others were waiting to be sentenced, set to be released, or about to be transferred to different facilities. Although any death is a tragedy, the high rate of deaths in San Diego County's jails compared to other counties raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices have undermined its ability to ensure the health and safety of the individuals in its custody.

Significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails. For example, studies on health care at correctional facilities have demonstrated that identifying individuals' medical and mental health needs at intake—the initial screening process—is critical to ensuring their safety in custody. Nonetheless, our review of 30 individuals' deaths from 2006 through 2020 found that some of these individuals had serious medical or mental health needs that the Sheriff's Department's health staff did not identify during the intake process. Some of these individuals died within four days of their arrest. Moreover, in one case we reviewed, an incident between two cellmates resulted in one's death. In this instance, the intake nurse did not identify that the perpetrator had a history of mental health issues. Had the perpetrator's mental health issues been identified properly at intake, the department's staff might have placed this individual in a different cell, leading to a different outcome.

When we evaluated the intake practices of three comparable counties, we found that the counties had procedures that are more comprehensive. For example, the San Diego Sheriff's Department relies on registered nurses to perform the mental health portion of its intake screening, even though these nurses may not specialize in mental health care. In contrast, the Riverside County Sheriff's Department's policy requires that a mental health clinician evaluate every individual at intake. Implementing similar policies could help the San Diego Sheriff's Department to more effectively identify mental health needs early.

*Audit Highlights . . .*

*Our audit of the San Diego County Sheriff's Department's response to deaths of individuals in its custody highlighted the following:*

» *Until the Sheriff's Department implements meaningful change to improve its provision of medical and mental health care in its detention facilities, it will continue to jeopardize the safety and lives of individuals in its custody.*

  • *We found multiple instances of individuals who requested or required medical and mental health care and did not receive it at all or in a timely manner.*

  • *In our review of deaths that occurred in the department's custody, deputies performed inadequate safety checks to ensure the well-being of those individuals.*

» *Some of the Sheriff's Department's policy deficiencies are the result of statewide corrections standards that are insufficient for maintaining the safety of incarcerated individuals.*

  • *The Board of State and Community Corrections should require mental health evaluations to be performed by mental health professionals at intake, and it should clarify and improve procedures for safety checks.*

» *The entities responsible for investigating in-custody deaths are not doing so in a thorough, timely, or transparent manner.*

  • *The department's Critical Incident Review Board should consistently review deaths by natural causes, increase public transparency, and take substantive steps to prevent similar future deaths.*

*continued on next page . . .*

SD 744697

Ex. A - 8

- *CLERB should prioritize the investigations of all deaths that occur in the department's custody and complete those investigations within the one-year statutory limit.*

In addition, the Sheriff Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services. Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not always follow up consistently—such as poor policies and communication—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.

For example, one individual urgently requested mental health services shortly after entering the jail. However, the nurse had not identified any significant mental health issues at intake and determined that the individual did not qualify for an immediate appointment. The individual died by suicide two days later—only four days after entering the jail. Although the Sheriff's Department's policy indicates that a face-to-face appraisal with an incarcerated individual should take place within 24 hours of a mental health care request to determine the urgency of that request, the department has not always had this policy. Further, this policy only applies to mental health requests and not medical health care requests. Thus, the Sheriff's Department does not ensure that it provides prompt care for all types of needs.

In addition to providing adequate health care, performing safety checks is a key component of ensuring the well-being of individuals in detention facilities. Conducting these checks—which state law requires hourly through direct visual observation—is the Sheriff's Department's most consistent means of monitoring for medical distress and criminal activity. Nonetheless, in our review of 30 in-custody deaths, we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours. Although the Sheriff's Department's assistant sheriff of detentions indicated that the department has a process for periodically monitoring whether staff members adequately perform safety checks, it is not documented in policy. In contrast, the Riverside County Sheriff's Department has a formal policy that requires supervising staff to regularly review videos of safety checks being performed, and it is thus in a better position to assess the quality of safety checks.

The problems we identified with the Sheriff's Department's policies are in part the result of statewide corrections standards that are not sufficiently robust. The Board of State and Community Corrections

(BSCC) establishes in regulation the minimum standards that local detention facilities must follow. Every local jail system throughout the State uses these standards to create policies for inmate safety and care. However, some of the standards are insufficient for maintaining the safety of incarcerated individuals. For example, they do not explicitly require that mental health professionals perform the mental health screenings during the intake process. Further, they do not describe the actions that constitute an adequate safety check: rather, they simply state that safety checks must be conducted at least hourly through direct visual observation. Given that the annual number of incarcerated individuals' deaths in county jails across the State increased from 130 in 2006 to 156 in 2020, improving the statewide standards is essential to ensuring the health and safety of individuals in custody in all counties.

In addition to its failure to adequately prevent the deaths of individuals in its custody, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action related to preventing deaths. The Sheriff's Department's internal entity for reviewing critical incidents, such as in-custody deaths, and identifying corrective measures—the Critical Incident Review Board—has not always taken substantive steps to prevent similar future deaths in the cases we examined. The primary focus of this board is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals. Further, this board generally does not review deaths from natural causes, which represented nearly half of the deaths of individuals in the custody of the Sheriff's Department during the 15-year period of our review. We are concerned that the Sheriff's Department considers the Critical Incident Review Board's reviews to be confidential under the attorney-client privilege and does not have a process to report the results publicly. Consequently, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously and making every effort possible to prevent similar deaths in the future.

The Sheriff's Department has also not implemented certain key recommendations from external oversight entities. From 2006 through 2020, multiple external entities—including the San Diego County Grand Jury—have made recommendations to the Sheriff's Department in areas related to inmate safety. Although the Sheriff's Department implemented several of these recommendations, it did not take action on others, even though they were critical to improving the safety of individuals in its custody. For example, it did not implement recommendations that involved enhancing its safety checks and improving the way it communicates incarcerated individuals' mental health needs to its staff.

SD 744699

Ex. A - 10

To restore public confidence in county law enforcement, San Diego County voters approved the Citizens' Law Enforcement Review Board (CLERB) in 1990, a citizen-governed board. CLERB is responsible for reviewing complaints of misconduct and investigating deaths arising in connection with the actions of officers employed by the Sheriff's Department or Probation Department. However, CLERB has failed to provide effective, independent oversight of in-custody deaths. In violation of its own rules and regulations, CLERB's investigations of the deaths of individuals in the Sheriff's Department's custody have not been independent, thorough, or timely. CLERB has not independently interviewed witnesses or visited the initial scenes of the deaths. Further, it has not consistently performed thorough investigations, and it relies largely on the reviews the Sheriff's Department conducts.

Moreover, CLERB failed to review dozens of deaths in the Sheriff's Department's jails. State law generally requires that CLERB's investigations be performed within a year of discovery of the death or misconduct. Because CLERB did not consistently prioritize its investigations of deaths over other complaints of misconduct, it did not review 13 cases involving deaths in the Sheriff's Department's jails within the required time limit. Further, CLERB did not investigate an additional 40 deaths because it did not believe its rules and regulations required it to review natural deaths. As a result, it did not identify any weaknesses in the Sheriff's Department's policies or processes that may have contributed to these deaths nor develop any recommendations to address these weaknesses. Although CLERB currently reviews natural deaths, it lacks specific language in its rules and regulations requiring it to do so, thus raising concerns about whether its staff could exclude those reviews in the future.

Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes. Until the Sheriff's Department makes such changes, the weaknesses in its policies and practices will continue to jeopardize the health and lives of the individuals in its custody.

**Summary of Key Recommendations**

*Legislature*

The Legislature should amend state law to require the Sheriff's Department to revise its policies to align with best practices related to performing intake health evaluations (including requiring that mental health professionals perform mental health evaluations), providing follow-up medical and mental health care, conducting safety checks, and addressing the other deficiencies that we identify in this report.

The Legislature should amend state law to require BSCC to amend its regulations to ensure that county sheriff departments have mental health professionals perform incarcerated individuals' mental health evaluations at intake and have staff conduct safety checks that are sufficiently detailed to determine that incarcerated individuals are alive.

The Legislature should amend state law to require the Sheriff's Department's Critical Incident Review Board to review natural deaths and develop a process to make public the facts discovered and recommendations made in response to all in-custody deaths.

*CLERB*

To ensure that it completes investigations of all deaths that occur in the Sheriff's Department's custody within the one-year time limit, CLERB should revise its rules and regulations by May 2022 to prioritize these investigations above all other investigations.

CLERB should revise its rules and regulations by May 2022 to include investigating natural deaths as part of its responsibilities.

**Agency Comments**

Although the Sheriff's Department generally agreed with our recommendations, it questioned our audit approach and disagreed with our findings and conclusions. BSCC disagreed with our findings and recommendations but indicated that it would discuss whether amendments to its regulations are warranted. The Department of Justice and CLERB agreed with our recommendations.

**SD 744701**

Ex. A - 12

6 | **California State Auditor Report 2021-109**
**February 2022**

Blank page inserted for reproduction purposes only.

SD 744702
Ex. A - 13

# Introduction

## Background

The mission of the San Diego County Sheriff's Department (Sheriff's Department) is to provide high-quality public safety services necessary to make San Diego the safest urban county in the nation. As the text box describes, the Sheriff's Department operates a system of seven detention facilities. It also operates patrol stations, a crime laboratory, and an array of support operations. The Sheriff's Department's fiscal year 2020–21 adopted budget includes more than 2,000 employees who work in its detention facilities, including correctional staff (sworn staff), medical and mental health care staff (health staff), and administrative staff. In this report, we refer to all of these staff members collectively as *detention staff*.

> **The Sheriff's Department's Detention Facilities**
>
> - The department operates a system of seven detention facilities throughout San Diego County.
>
> - Three of the detention facilities both process (book) individuals entering the jail system and house them.
>
> - The other four facilities house individuals who are transferred after being booked.
>
> - During our audit period from 2006 through 2020, the seven facilities collectively housed an average of about 5,200 individuals daily (average daily population) and booked an average of about 85,000 individuals annually.
>
> Source: Sheriff's Department documents and BSCC data.

San Diego County residents elect a sheriff to a four-year term to serve as the chief executive of the Sheriff's Department. The current elected sheriff has been in office since 2009. Under the elected sheriff's guidance, the department must follow standards for jail conditions and treatment of incarcerated individuals set in regulation by the Board of State and Community Corrections (BSCC). The board also establishes local corrections training requirements and performs inspections of local detention facilities, to which the Sheriff's Department is subject.

Deaths can happen in detention facilities for various reasons. The California Department of Justice asks counties to classify in-custody deaths into seven main categories: natural death, homicide by law enforcement, homicide by other inmate, suicide, accidental death, pending investigation, or cannot be determined/other. Regardless of the category, different entities in San Diego County have responsibilities to prevent, respond to, and investigate deaths of incarcerated individuals, as we discuss below.

## The Sheriff's Department's Role in Preventing and Responding to the Deaths of Incarcerated Individuals

As Figure 1 shows, the incarceration process starts when a law enforcement officer arrests an individual in San Diego County and brings him or her to a jail for processing, which is also known as *booking*. One of the most important steps in the intake process that follows is the individual's health screening. This screening is the Sheriff's Department's first opportunity to identify an individual's

SD 744703
Ex. A - 14

---

**Examples of Housing Types in the Sheriff's Department's Facilities**

- **Safety Cell/Enhanced Observation Housing:** Temporary housing units constructed to maximize safety by removing physical features that could be used to inflict harm. These units are recommended for individuals who are actively self-harming, assaultive, or at risk of suicide. Staff closely monitor individuals at random intervals.

- **Medical Observation Beds:** Beds located close to a nursing station for individuals whose condition necessitates hourly monitoring by health staff.

- **Segregation Housing:** Housing areas where individuals are placed in cells isolated from the general population and receive services and activities apart from others. Staff may place individuals in this housing for their own safety, staff safety, facility security, or pending a disciplinary action hearing.

- **Mainline Housing:** Housing areas for individuals who are classified as general population and therefore do not need to be isolated from others for security reasons or for medical or mental health reasons.

Source: Sheriff's Department policies and state law.

---

medical and mental health needs. After this health screening, the next major step is classification, which determines an individual's housing assignment. As the text box shows, the Sheriff's Department has various types of housing in its facilities. An individual's housing assignment is critical to safety and care because it indicates to detention staff whether that individual has special needs or characteristics that warrant precaution.

To determine an initial housing assignment, sworn staff interview the individual; review the person's current booking information, complete criminal history, and past incidents in custody; and consider any information or instructions provided by health staff members regarding restrictions related to medical or mental health needs. The department may subsequently change an individual's housing assignment if circumstances require reclassification.

When individuals are in custody, the Sheriff's Department is responsible for providing basic health care services and for performing safety checks at least every hour to provide for their health and welfare. Incarcerated individuals may request medical or mental health attention, or dental care, as needs arise. Providing care on an ongoing basis and performing adequate safety checks are vital to ensuring the safety of incarcerated individuals.

When an individual dies in the custody of the Sheriff's Department, its homicide unit (homicide unit) investigates the death and assists the San Diego County Medical Examiner's Office (Medical Examiner's Office) by attending the autopsy and answering any questions surrounding the circumstances of the death. The Medical Examiner's Office, an agency independent of the Sheriff's Department, investigates all deaths of persons in custody. The Medical Examiner's Office's main function is to determine the manner of death—such as accidental—and the cause of the death—such as by drug overdose.

The Sheriff's Department also performs other internal reviews of in-custody deaths. For instance, within 30 days following a death, it must review the circumstances surrounding the incident and pertinent medical and mental health services and reports (30-day medical review). It must also complete a critical incident review for all deaths except natural deaths. Most of these reviews could result in the Sheriff's Department taking corrective action, such as

changing policies or initiating employee discipline. We discuss
the Sheriff's Department's internal reviews in detail later in
this report.

**Figure 1**
**The Sheriff's Department's Booking Process**



1. After an individual is arrested, the arresting officer transports him or her to one of the Sheriff's Department's three booking facilities.

2. A registered nurse performs a preliminary medical and mental health screening during the intake process to determine whether the individual is medically fit for booking and to identify whether there are any known illnesses and medications. If the individual is experiencing a medical or mental health emergency that cannot be managed by the Sheriff's Department, he or she may be sent to the hospital. Individuals in need of further evaluation or more urgent medical care will receive a secondary nurse assessment within a few hours of their first screening.

3. Based on the intake assessment, a nurse can write a mental health referral or schedule a medical follow up with a doctor, as needed, at a later date.

4. The individual proceeds to classification, which determines his or her housing assignment.

Source: Sheriff's Department policies and procedures.

### The Citizens' Law Enforcement Review Board's Responsibilities Related to the Deaths of Incarcerated Individuals

The Citizens' Law Enforcement Review Board (CLERB) is a key county entity that provides external oversight when an incarcerated individual dies in San Diego County. San Diego County voters amended the county charter in 1990 to require the County Board of Supervisors (county board) to establish CLERB to investigate complaints against officers employed by the Sheriff's Department and Probation Department. CLERB's mission is to increase the accountability of and public confidence in peace officers employed by the San Diego County's Sheriff's Department and the Probation Department. As the text box describes, CLERB is responsible for achieving its mission by conducting independent, thorough, timely, and impartial reviews of complaints of misconduct, among other things. This audit focuses only on CLERB's investigations of deaths in the Sheriff's Department's jails. The San Diego County Charter establishes CLERB's power to subpoena, administer oaths, and require the attendance of witnesses and the production of books and papers pertinent to its investigations.

CLERB currently consists of 11 board members nominated by San Diego County's chief administrative officer and appointed by the county board for three-year terms. Serving without compensation, CLERB members must be qualified electors of San Diego County, possess reputations for integrity and responsibility, and demonstrate an active interest in public affairs and service. County rules prohibit its employees or individuals employed as peace officers from serving. CLERB makes advisory findings on complaints and recommendations for policy and procedure changes to the sheriff, chief probation officer, and the county board. CLERB has also established rules and regulations to further facilitate its operations, which the county board has approved.

---

**CLERB's Responsibilities**

**Investigating complaints against peace officers that involve the following allegations:**

- Use of excessive force, discrimination, or sexual harassment towards members of the public.

- The improper discharge of a firearm.

- Illegal search or seizure.

- False arrest.

- False reporting.

- Criminal conduct or misconduct.

**Reviewing, investigating, and reporting on the following incidents, regardless of whether a citizen files a complaint:**

- The death of any individual arising out of or in connection with actions of peace officers.

- Incidents involving the discharge of a firearm.

- Use of force by peace officers resulting in great bodily injury.

- Use of force by peace officers at protests or other events protected by the First Amendment.

Source: CLERB rules and regulations.

---

CLERB's staff support the CLERB members by conducting complaint investigations, preparing written reports with findings and recommended policy changes, and transmitting the final reports to the Sheriff's Department, Probation Department, and the county board. CLERB's staff currently includes five special investigators, one supervising special investigator, an administrative secretary, and an executive officer. CLERB members appoint its executive officer, to whom they have delegated most of their authority over the other staff.

SD 744706
Ex. A - 17

CLERB's executive officer must possess a bachelor's degree and five years of management-level experience. CLERB's special investigators must have five years of experience performing investigations for a law enforcement agency, district attorney's office, or other governmental agency or organization.

**The Attorney General's and County Board's Oversight of the Sheriff's Department**

The county board is the governing body of San Diego County and is composed of an elected supervisor from each of the county's five districts. State law gives the county board the authority to supervise the official conduct of all county officers, as well as officers of all districts and other subdivisions of the county, including CLERB. However, the county board's oversight of the county sheriff has limitations, as Figure 2 shows. The California Constitution and state law provide that the county sheriff is an elected county official with certain independent functions and duties with which the county board cannot interfere. Nonetheless, state law establishes the county board's budgetary authority over the Sheriff's Department, and it also exercises some oversight—albeit minimal—through its establishment and oversight of CLERB.

Although the county board has limited oversight of the sheriff, the state constitution designates the State's attorney general as the chief law officer of the State. Specific statutes describe the attorney general's authority. For example, state law requires the Sheriff's Department to report to the attorney general all facts concerning the death of an individual while in its custody within 10 days of that death. To ensure uniform and adequate enforcement of the laws of the State, the attorney general may also call into conference all of the sheriffs, district attorneys, and chiefs of police in the State for the purpose of discussing the duties of their respective offices. Further, the attorney general may bring a civil action to eliminate the pattern or practice of conduct by law enforcement officers that deprives any person of rights protected by law or the constitution. Finally, when necessary for the public interest, the attorney general is authorized to direct sheriff activities related to the investigation or detection of crime within a county.

**Figure 2**
**The County and State Have Oversight of the Deaths of Incarcerated Individuals**



# COUNTY BOARD OF SUPERVISORS

State law gives the county board the authority to supervise the conduct of all county officers, including CLERB members.

However, the California Constitution and state law give the sheriff independent functions and duties with which the county board cannot interfere.

State law provides the county board with authority to approve the Sheriff's Department's budget, but it otherwise has limited authority over the Sheriff's Department.



### CITIZENS' LAW ENFORCEMENT REVIEW BOARD

- Eleven member citizens' board established by voter approved proposition in 1990 (members appointed by county board).

- CLERB special investigators — who must have at least five years of investigative experience — review in custody deaths and complaints of misconduct by officers of the Sheriff's Department.

- CLERB makes **advisory** findings and recommendations related to death cases — however, the Sheriff's Department ultimately decides whether to take action.

- The board submits investigative reports to the county board and the Sheriff's Department.



### SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

The Sheriff's Department performs various internal reviews after an incarcerated individual's death.

- Its homicide unit investigates all types of deaths in jails.

- Its Critical Incident Review Board reviews suicides, homicides, and accidental deaths, but not natural deaths.

- Its medical staff performs an assessment of care provided before each death.

# THE STATE ALSO HAS OVERSIGHT ...



### ATTORNEY GENERAL

- The California Constitution designates the State's attorney general as the chief law officer of the State.

- The attorney general may bring a civil action to eliminate the pattern or practice of conduct by law enforcement officers that deprives any person of rights protected by law or the constitution.

- Sheriff's departments must report in custody deaths to the attorney general within 10 days. The California Department of Justice collects and posts to its website data pertaining to these in custody deaths.



Source:  California Constitution, San Diego County charter, state law, CLERB's rules and regulations, and Sheriff's Department policies.

SD 744708
Ex. A - 19

# Chapter 1

**THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT DID NOT TAKE SUFFICIENT STEPS TO PREVENT THE HIGH NUMBER OF DEATHS IN ITS JAILS**

**Chapter Summary**

From 2006 through 2020, a total of 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with the way the Sheriff's Department provides care for and protects incarcerated individuals that likely contributed to deaths in its jails. These deficiencies related to its provision of medical and mental health care, as well as its performance of checks to ensure the safety and health of individuals in its custody. When we evaluated the policies of three comparable counties, we found that some have adopted procedures that could address weaknesses we identified at the San Diego Sheriff's Department. That said, the problems we identified with the Sheriff's Department's policies are in part the result of certain statewide corrections standards that are not robust or specific enough, leaving the establishment of effective practices to the discretion of the individual counties. Given that the annual number of incarcerated individuals' deaths in county jails across the State increased from 130 in 2006 to 156 in 2020, improving the statewide standards is essential to ensuring the health and safety of incarcerated individuals in all counties.

**In the Past 15 Years, More Individuals Died While in the San Diego Sheriff's Department's Custody Than in the Custody of Nearly Any Comparable County in the State**

State data on deaths in custody at county jails show that San Diego County reported the second-highest number of in-custody deaths over the past 15 years.[1] It followed only Los Angeles County, which is significantly larger. Further, there continues to be a substantial number of deaths in San Diego County's jails, as Figure 3 shows. Many of the individuals who died were in the Sheriff's Department's

---

[1]  State law requires a law enforcement agency or an agency in charge of a correctional facility, including county sheriff's departments, to report any case in which a person dies in its custody to the Office of the Attorney General within 10 days after the death. We present an interactive dashboard for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

SD 744709

Ex. A - 20

custody for only a few days to a few months before their deaths. Some of these individuals were awaiting trial, or scheduled to be released or transferred to state hospitals.

**Figure 3**
**There Continues to Be a Substantial Number of Deaths in San Diego County's Jails**



TOTAL DEATHS
IN THE SHERIFF'S DEPARTMENT'S JAILS (2006-2021)

| Year | Average Daily Population |
|------|--------------------------|
| 2006 | 5,167 |
| 2007 | 5,117 |
| 2008 | 5,192 |
| 2009 | 4,996 |
| 2010 | 4,646 |
| 2011 | 4,629 |
| 2012 | 5,087 |
| 2013 | 5,559 |
| 2014 | 5,649 |
| 2015 | 4,984 |
| 2016 | 5,362 |
| 2017 | 5,687 |
| 2018 | 5,535 |
| 2019 | 5,630 |
| 2020 | 4,197 |
| 2021* | 3,927 |

Total Deaths

Source:  California Department of Justice in-custody death data, BSCC data, and Sheriff's Department information.

\*  We use the Sheriff's Department's information on in-custody deaths in 2021 because it was not included in the California Department of Justice data, which is as of May 2021. We use ADP information from the Sheriff's Department for 2021 because BSCC did not have complete ADP data for 2021.

SD 744710
Ex. A - 21

In comparison to similar counties, more individuals died in the San Diego Sheriff's Department's custody in the past 15 years as Figure 4 shows. We identified the Alameda County Sheriff's Office (Alameda Sheriff's Office), Orange County Sheriff's Department (Orange Sheriff's Department), and Riverside County Sheriff's Department (Riverside Sheriff's Department) as comparable considering their size, geographical location, and other factors. The text box shows the average daily population (ADP) and bookings from 2006 through 2020 for each of these four counties.[2] From 2006 through 2020, 185 incarcerated individuals died in the San Diego Sheriff's Department's jails, in comparison to 99 in the jails of the Alameda Sheriff's Office, 111 in Orange Sheriff's Department's jails, and 104 in Riverside Sheriff's Department's jails. More recently, from 2016 through 2020, 72 people died while in the care of the San Diego Sheriff's Department, whereas 25 people died in the care of the Alameda Sheriff's Office, 46 in Orange Sheriff's Department, and 37 in Riverside Sheriff's Department. Even when considering each of these counties' jail systems' ADP and number of bookings, the rate of deaths reported by the San Diego Sheriff's Department still exceeded that of the comparable counties. In fact, we reviewed data from the 15 largest counties in the State and found that the rate of deaths in San Diego County was among the highest.[3] Although any death is a tragedy, the high rate of deaths at San Diego County compared to other counties is particularly concerning.

**Average Annual ADP and Bookings From 2006 Through 2020**

|  | ADP | BOOKINGS |
|---|---|---|
| Alameda Sheriff's Office | 3,325 | 51,842 |
| Orange Sheriff's Department | 5,877 | 59,263 |
| Riverside Sheriff's Department | 3,668 | 54,025 |
| San Diego Sheriff's Department | 5,162 | 85,631 |

Source:  BSCC data and San Diego Sheriff's Department bookings data.

When we reviewed the manner of death, the San Diego Sheriff's Department had a notably higher number of suicides and natural deaths than the comparable counties, as Table 1 shows.[4] Alarmingly, a total of 52 individuals in the San Diego Sheriff's Department's jails died by suicide over the past 15 years, which is more than twice the number in each of the comparable counties. Additionally, more individuals died of natural and accidental causes in the custody of the San Diego Sheriff's Department than in the custody of each of the comparable counties, raising concerns about its ability to provide adequate safety and medical care to those it incarcerates. Natural deaths can include deaths from pre-existing

---

[2]  The ADP represents the number of incarcerated individuals housed in a jail system for any given day over a period of time and is used to determine whether a jail is operating at or near capacity. Bookings represent the total number of individuals who were processed through the county jail system.

[3]  Appendix A provides the number and rate of deaths in the 15 largest counties in relation to their ADPs and bookings.

[4]  We present an interactive dashboard for viewing data on the age, race, and gender of the individuals who have died in each county detention facilities system at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

SD 744711
Ex. A - 22

**16**   California State Auditor Report 2021-109
February 2022

medical conditions and deaths resulting from inadequate care. After adjusting the comparisons based on each county's ADP, the San Diego Sheriff's Department still has historically had the highest rate of natural deaths and suicides.

**Figure 4**
**Over the Past 15 Years, More Individuals Died in San Diego County's Jails Than in Those of Comparable Counties**



TAKING INTO CONSIDERATION THE NUMBER OF BOOKINGS AND THE ADP AT EACH COUNTY JAIL SYSTEM, SAN DIEGO STILL HAD THE HIGHEST RATE OF DEATHS, BOTH IN THE PAST 15 YEARS AND IN THE MOST RECENT FIVE YEARS.

Source:  California Department of Justice in-custody death data and BSCC data.

We present interactive dashboards for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Based on data the Sheriff's Department provided, in the most recent three years—2018 through 2020—the percentage of deaths of Black individuals in the Sheriff's Department's custody was disproportionately higher than their overall composition of the jail population. White individuals died at proportionally higher rates in 2007, 2009 through 2014, 2016, 2017, and 2020. In 2006, 2008, and 2015, the percentage of deaths among Hispanic individuals exceeded their population percentage. Although racial bias was not the focus of this report, our review of the Sheriff's Department's policies and procedures identified widespread deficiencies in its policies and practices for ensuring the health and safety of the individuals of all races and ages in its care.

**Table 1**

**More Individuals in San Diego County's Jails Died by Suicide or Natural Causes Than Individuals in the Custody of Comparable Counties**

| MANNER OF DEATH | SAN DIEGO | ALAMEDA | ORANGE | RIVERSIDE |
|---|---|---|---|---|
| Total Deaths by County Sheriff's Department From 2006 Through 2020 | | | | |
| Accidental | 31 | 19 | 13 | 21 |
| Homicide (by law enforcement) | 4 | 0 | 1 | 2 |
| Homicide (by other inmate) | 8 | 4 | 4 | 6 |
| Natural | 88 | 52 | 77 | 51 |
| Suicide | 52 | 22 | 14 | 23 |
| Other | 2 | 2 | 2 | 1 |
| **Totals** | **185** | **99** | **111** | **104** |

Source: California Department of Justice in-custody death data.

We present interactive dashboards for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Note: In San Diego County, accidental deaths mainly included drug overdoses. The two deaths shown as other include one pending investigation and one undetermined manner of death.

We also found that sheriff's departments did not report some deaths that occurred after incidents in jails because the individuals were released before their deaths. For example, we found instances in which the coroner or medical examiner's offices described individuals dying in hospitals after incidents in the county jails, such as attempted suicide or medical emergencies. However, the respective counties did not report these deaths to the attorney general because the state law requiring reporting of in-custody deaths requires sheriff's departments to report only those individuals who died while in custody at the time of death and not individuals who died after having been released.[5]

---

[5]    For example, state law allows sheriff's departments to compassionately release individuals from custody who would not reasonably pose a threat to public safety, and the incarcerated individual upon diagnosis by the examining physician, is deemed to have a life expectancy of six months or less.

SD 744713
Ex. A - 24

---

**Example of a Death That State Law
Does Not Require to Be Reported**

**July 1**–An individual attempted suicide in a county jail
but initially survived. The individual was transported to
the hospital.

**July 10**–The sheriff's department compassionately released
the individual from custody.

**July 15**–The individual later died in the hospital as a result
of the injuries from the attempted suicide.

Source:  Records from sheriff's departments.

---

The text box provides an example in which
sheriff's departments would not need to report a
death to the attorney general. Consequently,
sheriff's departments may be underreporting to
the attorney general and to the public the number
of deaths occurring from incidents in the jails.

### The Sheriff's Department's Failure to Consistently Provide Adequate Care Likely Contributed to Its In-Custody Deaths

We selected 30 individuals who died in the
Sheriff's Department's jails from 2006 through
2020, weighted toward deaths that occurred in the
last four years. Our selection included natural deaths,
accidental deaths, suicides, and homicides.[6] Our review of the associated case
files identified numerous problems with the Sheriff's Department's
care of these individuals, starting with the inadequate health
screenings it performed upon their initial arrivals through its
insufficient responses to their medical emergencies, as Figure 5
shows. The deficiencies we identified in these areas for all types of
deaths—including deaths classified as natural—suggest that the
problems with the Sheriff's Department's care for incarcerated
individuals are systemic.

The assistant sheriff of detentions at the Sheriff's Department
asserted that the department is aware that its policies are not
followed all of the time and recognizes that employees make
mistakes, but it holds employees accountable when violations are
discovered and makes every effort to provide additional training
to prevent a recurrence. However, as the cases in our review show,
failing to follow policies even in limited instances can result in the
loss of life.

When we evaluated the policies at the Alameda Sheriff's Office,
Orange Sheriff's Department, and Riverside Sheriff's Department,
we identified instances in which these entities have procedures that
are more robust than those of the San Diego Sheriff's Department.
If the San Diego Sheriff's Department followed these procedures,
it could better ensure the health and safety of the individuals in
its custody.

---

[6]  To comply with audit standards, we did not select cases involved in active litigation, including
cases related to COVID-19, in order to avoid interfering with ongoing legal proceedings. Although
the Sheriff's Department had reported one death in 2020 and one death in 2021 that were related
to COVID-19, it indicated that the manner of death has not yet been determined for 11 other cases
in 2021, as of January 2022.

SD 744714

Ex. A - 25

**Figure 5**
Significant Deficiencies in the Sheriff's Department's Policies and Procedures Likely Contributed to the Deaths of Individuals in Its Custody



| | | |
|---|---|---|
| | **INSUFFICIENT HEALTH EVALUATIONS AT INTAKE** | Health staff did not always properly identify incarcerated individuals' medical and mental health needs at intake. Consequently, some of these individuals did not receive proper care, likely contributing to their deaths. |
| | **INCONSISTENT FOLLOW-UP CARE** | Detentions staff did not consistently follow up after individuals received or requested medical or mental health services, even though they often had serious needs that, when unmet, may have contributed to their deaths. |
| | **INADEQUATE SAFETY CHECKS** | Sworn staff did not always adequately check on incarcerated individuals. Some individuals were found hours after their deaths, negating the opportunity for lifesaving measures. |
| | **UNNECESSARY DELAYS IN PERFORMING LIFESAVING MEASURES** | Sworn staff's and medical personnel's slow response time to administer aid during medical emergencies may have contributed to unnecessary delays in lifesaving measures. |

Source: The Sheriff's Department's jail records, surveillance videos, medical records, medical examiner reports, and homicide investigation documents related to a selection of 30 deaths of incarcerated individuals.

**The Sheriff's Department Did Not Ensure That It Identified Individuals' Medical and Mental Health Needs at Intake**

Because the Sheriff's Department did not always properly identify the medical and mental health needs of individuals in our review at intake, some of them did not receive the care they required. Studies on health care at correctional facilities indicate that identifying individuals' health needs at intake is critical to ensuring their safety in custody. For example, one of the keys to identifying potential suicidal behavior is through inquiry during the intake screening.

**SD 744715**
**Ex. A - 26**

In at least eight of the 30 cases we reviewed, individuals had serious medical or mental health needs that health staff did not identify or communicate to detention staff at intake. Five of these individuals died within four days of their arrest. For example, in one case, an intake nurse determined that an individual needed to have a secondary nurse evaluation because the individual exhibited possible symptoms of drug withdrawal. However, there is no evidence in the case records that the intake nurse communicated this conclusion to other staff. The case records and video surveillance indicate that the individual died 24 hours after completing booking from complications resulting from a drug overdose without having seen another health professional.

*In some cases, the Sheriff's Department did not promptly and properly identify individuals' mental health needs, because mental health professionals generally do not participate in its intake health screenings.*

In some of the cases we reviewed, the Sheriff's Department did not promptly and properly identify individuals' mental health needs because mental health professionals generally do not participate in its intake health screenings. Registered nurses perform the medical and mental health screenings at intake—asking both mental health and medical questions. These nurses are trained medically but do not necessarily specialize in mental health, which means that they may miss key signs of mental health needs. According to policy, if the registered nurse identifies an individual as having mental health needs at intake, the nurse refers the individual for further evaluation by a qualified mental health professional. However, even if the nurse identifies a need for a further mental health assessment, the Sheriff's Department's policy may not require the individual to receive that assessment sooner than 30 days after intake, depending on the severity of an individual's symptoms. We noted one county had adopted more robust intake screening practices. Unlike the San Diego Sheriff's Department, the Riverside Sheriff's Department policy requires that a mental health clinician evaluate every individual before being housed, which could help to more effectively identify mental health needs early.

The San Diego Sheriff's Department is currently advertising to hire additional mental health staff, and its director of mental health indicated that the Sheriff's Department is aiming to have a qualified mental health professional, such as a mental health clinician or a psychologist, complete the mental health evaluations at intake. The county board approved additional funding in June 2021 for the Sheriff's Department to hire a substantial number of additional nurses and mental health professionals.

In addition, the Sheriff's Department's intake nurses sometimes have not obtained complete medical and mental health history information on individuals. Although they may ask the individuals to sign a release of information that provides the department access to their medical and mental health records, individuals can refuse to sign. Historically, Sheriff's Department nurses have not had

immediate access to county health records, which could be key to identifying health needs at intake. For example, the text box describes a case involving two cellmates that resulted in one's death. In this instance, a different outcome might have resulted had staff identified the perpetrator's mental health history at intake.

The Sheriff's Department entered into an agreement in September 2021 with the county Health and Human Services Agency to share behavioral health and medical information. The assistant sheriff of detentions stated that the Sheriff's Department is in the process of getting access to this information. However, the Sheriff's Department does not currently plan to require its intake nurses to look up each individual in the system. We believe this should be a standard step in the intake process to better ensure that the Sheriff's Department has a more comprehensive health history for each individual who comes into its care. In fact, the Riverside Sheriff's Department's policy requires mental health staff to review Riverside County's electronic health record system to determine whether an incarcerated individual has a history of receiving behavioral health care in Riverside County.

> **In-Custody Death:** *Case Example 1*
>
> An intake nurse did not identify an individual's mental health needs and did not have access to the individual's mental health history. Once incarcerated, that individual killed their cellmate.
>
> After the cellmate's death, the Sheriff's Department discovered the perpetrator's history of mental illness. Had staff known about this history, they likely would have placed the perpetrator in a different cell, where they could better meet the individual's mental health needs and better ensure others' safety.
>
> Source: Records from the Sheriff's Department.

### The Sheriff's Department Did Not Consistently Follow Up With Individuals Who Needed Medical and Mental Health Services

Our case review found that Sheriff's Department staff did not always follow up after individuals previously received or requested medical or mental health services, even though these individuals often had serious needs that, when unmet, may have contributed to their deaths. Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not consistently follow up—such as poor policies and communication—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.

In some of the cases we reviewed, individuals reported to health staff that they were experiencing persistent symptoms, yet they did not receive timely evaluations from a physician. For example, in two cases involving natural deaths, individuals reported symptoms multiple times over the course of one to three weeks. Although these individuals were treated for a number of other medical and mental health issues, medical records show that they did not receive prompt attention from a physician for the symptoms that related to their deaths. Nurses originally assessed and treated

SD 744717
Ex. A - 28

these individuals for these symptoms. However, these individuals' medical conditions worsened, and medical records show that they did not receive a physician's evaluation before dying. Guidelines from the National Commission on Correctional Health Care (National Commission)—an organization that establishes standards for health services in correctional facilities—state that generally if an incarcerated individual reports to the nurse for evaluation more than twice for the same complaint and has not seen a physician, the individual should be scheduled to do so. However, this did not happen in these two cases. The Sheriff's Department's handling of these cases raises concerns over its follow-up process for individuals experiencing persistent symptoms.

In other cases, potential deficiencies in the Sheriff's Department's policies related to mental and behavioral health treatment resulted in individuals not receiving services or needed follow-up. For example, in one case, an incarcerated individual who had previously threatened suicide was released from a safety cell placement and enhanced observation housing. Although placement in a safety cell indicates that individuals are a danger to themselves or others, the Sheriff Department's policy at that time did not specify time frames for ongoing follow-up after such placement. In this case, mental health staff followed up only once with the individual after release from enhanced observation housing, and they assessed that the individual was low-risk. Two weeks after the individual's discharge from enhanced observation housing and about 12 days after the individual's lone follow-up encounter with a mental health clinician, the individual died by suicide.

Subsequently, the Sheriff's Department revised its policy in 2019 for follow-up care after release from a safety cell, but studies suggest that its revised policy may still be inadequate. Its revised policy delineates the follow-up process for individuals after discharge from a safety cell or enhanced observation housing at a variety of intervals depending on certain conditions—every 24 hours, every three to seven days, and every seven to 14 days. Individuals may continue to receive follow-up care at one of these intervals if certain conditions are met, including if it is their first time in detention, if they have recently attempted suicide, or if they have been charged with certain types of crimes. Although these follow-ups can decrease in frequency, all of these individuals must have a follow-up at least every 90 days. However, all individuals who have been placed into a safety cell or enhanced observation housing have demonstrated that they have significant mental health needs. While this policy is an improvement over its past policy, the Sheriff's Department should reconsider the minimum ongoing follow-up required. Reports and studies related to mental health indicate that more frequent psychological follow-up, such as check-ins performed weekly rather than every 90 days, leads to faster recovery and is more effective.

*While the Sheriff's Department's revised policy for the follow-up process after an individual's discharge from a safety cell is an improvement over its past policy, the department should reconsider the minimum ongoing follow-up required.*

**SD 744718**

Ex. A - 29

Moreover, although the Sheriff's Department's policy indicates that a nurse should conduct a face-to-face appraisal with an incarcerated individual within 24 hours of a mental health care request to determine the urgency of that request, it has not always had this policy. As the case example in the text box describes, in one of the cases we reviewed the department's weak policy likely contributed to the individual's death by suicide, and the department revised this policy several months later. However, the revised policy still only requires a 24-hour face-to-face appraisal for mental health requests, not medical health care requests. Therefore, inmates with urgent medical needs may not get prompt care. Best practices indicate that a face-to-face appraisal should apply to all nonemergency health care requests.

> **In-Custody Death: *Case Example 2***
>
> **Day 1:** At an intake screening, a nurse determined that an individual was mentally stable but initiated a referral for mental health services.
>
> **Day 2:** The individual urgently requested mental health services. Staff denied the request, stating that the individual would be seen as soon as their referral was processed.
>
> **Day 4:** The individual died by suicide without having seen a mental health professional.
>
> Source: Records from the Sheriff's Department.

When we evaluated the policies of other counties, we identified a number of improvements the Sheriff's Department should make to its policies and protocols related to following up on individuals' medical and mental health care needs. For instance, the Orange Sheriff's Department has a policy for assigning a behavioral health acuity level rating (acuity level rating) to each person who sees a mental health clinician during intake or whose mental health status alters during their stay in custody, necessitating a mental health assessment. This acuity level rating, which rates the severity of mental health needs, helps to inform housing location, the provision of mental health services, and discharge planning for when people leave custody. Such a system could help to identify mental health needs, track those needs, and communicate this information to appropriate staff to ensure that these needs are met, likely reducing the risk of death to the individual or others.

In addition, all three comparable counties have stronger policies for instances when incarcerated individuals refuse medical or mental health care. For some of the cases we reviewed, these refusals were frequent, despite the individual's need for consistent care. The San Diego Sheriff's Department and the three comparable counties have policies that require detention staff to witness and document an individual's refusal to accept medical treatment or care. However, the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department also require a health staff member to witness and sign the refusal. In contrast, San Diego allows a single sworn staff member to be the only signer if health staff are unavailable to serve as the second witness to the verbal refusal of care. Consequently, we identified several instances in which sworn staff were the only witnesses when incarcerated individuals refused to sign the refusals. Because follow-up care is important, it is critical that the desire to refuse care be shared with health staff who are in a better position

to ask appropriate questions, explain the adverse consequences to health that may occur as a result of the refusal, and assess whether an individual has critical health needs that should be addressed.

The chief medical officer of the Sheriff's Department asserted that many of the issues we identified through our review are case-specific and should not be used to draw generalizations about the department's provision of health care. He also stated that the Sheriff's Department has made a significant number of improvements to its health care system in recent years, such as adding an electronic medical record system and increasing physician and nursing support. He explained that the Sheriff's Department is in the process of obtaining accreditation from the National Commission. To attain accreditation, the Sheriff's Department must meet certain standards related to health care services and support, governance and administration, personnel and training, and other areas.

When the National Commission reviewed the Sheriff's Department's jails in 2017, it found that they did not meet many of its standards, particularly those related to mental health. The chief medical officer indicated that the Sheriff's Department plans to contract with an outside health care organization to consolidate current services and expand its capabilities for the provision of comprehensive health care services, which may help it meet the requirements for accreditation. He further stated that the Sheriff's Department is participating in a university research study that could lead to some facilities receiving accreditation sooner. Nonetheless, the department may be a couple of years away from obtaining full accreditation for all of its facilities.

*Although seeking accreditation from the National Commission may address some of the problems we identify in this report, the Sheriff's Department should not wait to implement key changes that would improve the safety of incarcerated individuals.*

Although seeking accreditation from the National Commission may address some of the problems we identify in this report, the Sheriff's Department should not wait to implement key changes that would improve the safety of incarcerated individuals. We are concerned that this trend will continue if the Sheriff's Department fails to quickly implement significant changes. In fact, the Sheriff's Department indicated that the number of in-custody deaths increased to 18 in 2021—the highest in 15 years.

### The Sheriff's Department Performed Insufficient Safety Checks

Performing safety checks is the Sheriff's Department's most consistent means of monitoring for medical distress and crime occurring in its jails. According to state law, local detention facilities must conduct safety checks at least hourly through direct visual observation of all incarcerated individuals. They must also have a written plan to document routine safety checks. Nonetheless, in our

**SD 744720**

Ex. A - 31

review of 30 in-custody deaths, we found that sworn staff did not always perform safety checks adequately. As a result, they did not realize several individuals had died until hours afterward.

In fact, in several of the cases in our review for which the Sheriff's Department has video files of safety checks, we found instances when sworn staff performed checks inadequately for the purpose of ensuring the safety of the individuals involved. Department policy requires that staff who are conducting safety checks look for any obvious signs of medical distress, trauma, or criminal activity. Although some video files were unavailable or incomplete for the 30 cases we reviewed, we reviewed the safety check logs and available video surveillance footage of sworn staff conducting checks.

Based on our review of video surveillance footage, we observed multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked through the housing module, as we describe in the text box. Staff later discovered individuals unresponsive in their cells, some with signs of having died several hours earlier, as detention staff described some of these individuals as stiff and cold to the touch.

In another example, the Sheriff's Department's records indicate that a deputy did not perform a required safety check in a housing area, in part because of poor communication between this deputy and the station deputy. One hour after the deputy should have performed this check, sworn staff found an individual in this housing area unresponsive after attempting suicide. A physician pronounced this individual deceased at the scene after staff and paramedics were unsuccessful at saving the individual's life.

> **In-Custody Death: *Case Example 3***
>
> **2 a.m.** Deputy quickly walked past each cell and glanced twice into the individual's cell but moved on after the second glance.
>
> **3 a.m.** Deputy stopped briefly at the individual's cell, glancing through the window for a split second.
>
> **4 a.m.** Deputy walked quickly past the individual's cell without breaking stride, glancing through the window for less than a second.
>
> **5 a.m.** Deputies found the individual unresponsive in their cell during a safety check, with signs of having died several hours earlier.
>
> Source:  Records from the Sheriff's Department.

Sworn staff conducted safety checks inadequately in part because of weaknesses in the Sheriff's Department's policy. Its safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest. We recognize that acquiring proof of life in some situations is difficult and that waking up incarcerated individuals every hour could be detrimental to their well-being. However, as described in the case example above, a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate.

The Sheriff's Department's assistant sheriff of detentions indicated that the department's policy is sufficient but that individual sworn staff members do not always follow it. The department's safety check policy requires supervisors to review logs to ensure safety checks

were logged and conducted at varying intervals within the required time periods, but it does not stipulate that this review should include examining video surveillance to confirm checks were conducted in a timely and appropriate manner. The assistant sheriff of detentions indicated that the department has an informal process for assessing the quality of safety checks, which can include watching video footage. However, the Sheriff's Department has not documented this assessment process in its policy, and establishing an informal practice does not ensure that each facility's management team will consistently verify the quality of safety checks.

The State and Orange Sheriff's Department have more robust policies or additional detail in their policies that may be more effective in ensuring that incarcerated individuals are alive and well. For example, the California Department of Corrections and Rehabilitation (CDCR) requires staff who perform hourly checks to count a living, breathing person whom they see in person. Further, the Orange Sheriff's Department requires staff who conduct safety checks to be close enough to each individual to ascertain the individual's presence and apparent physical condition. According to Orange Sheriff's Department's assistant sheriff of detentions, a safety check must be performed from a sufficiently close vantage point to determine the person's presence in their assigned location and whether the individual's visible physical condition indicates the need for medical treatment or signs of being in medical distress. The detail described in these requirements could provide clearer expectations to San Diego Sheriff's Department's sworn staff for what constitutes an adequate safety check, especially during the night.

In addition, the Riverside Sheriff's Department has a formal policy that requires regular video review of safety checks. For example, supervisors from each shift must randomly review two safety checks conducted during the prior shift. Establishing a similar process could help the San Diego Sheriff's Department to identify sworn staff who do not consistently conform to policy when conducting their checks so that it can designate them for further action, such as additional training or disciplinary measures. Until it strengthens its safety check policy and formalizes a process for ensuring that sworn staff adhere to this policy, the San Diego Sheriff's Department risks further instances of delayed responses to medical emergencies or other crises.

*Until it strengthens its safety check policy and formalizes its process, the San Diego Sheriff's Department risks further instances of delayed responses to medical emergencies.*

### The Sheriff's Department Did Not Always Provide Prompt Lifesaving Measures to Unresponsive Individuals

In slightly less than a third of the 30 cases we reviewed, issues with the response time of sworn staff or medical staff may have resulted in unnecessary delays in performing lifesaving measures. The early moments in a medical emergency are critical. A 2020 study found that

one of the top five predictors of survival in a cardiac arrest occurring away from a hospital was someone performing cardiopulmonary resuscitation (CPR) immediately.[7] In addition, a 2021 study found that for each five-minute delay in calling emergency medical services, the odds of surviving a cardiac arrest decreased by 41 percent.[8] Nonetheless, in some of the cases we reviewed, sworn staff failed to begin CPR immediately or before the arrival of medical staff, or were slow to respond to the scene of the medical emergency.

In a number of instances, sworn staff either did not perform or delayed lifesaving measures. Generally, Sheriff's Department's policy directs that sworn staff immediately provide basic life support, such as CPR, to an unresponsive individual, unless they observe certain obvious signs of death. In some of the cases we reviewed, Sheriff's Department sworn staff did not begin CPR because they thought the individual was dead. However, when department medical staff arrived minutes later, they began lifesaving measures, including CPR. This fact calls into question the ability of sworn staff to assess whether unresponsive individuals might benefit from such potentially lifesaving measures.

In contrast to the Sheriff's Department, CDCR requires its custodial staff to provide immediate life support to incarcerated individuals until medical staff arrive. It revised its policy in response to a 2005 California district court order requiring it to do so. The Sheriff's Department's chief medical officer acknowledged that sworn staff are trained to be first responders and agreed that they should begin CPR while waiting for health staff to arrive.

*The Sheriff's Department's chief medical officer agreed that sworn staff should begin CPR while waiting for health staff to arrive.*

In addition, in some of the cases we reviewed, we noted a delay in the response time of sworn and medical staff when an individual was in medical distress. Sheriff's Department policy requires that all detention staff are responsible for recognizing, reporting, and responding to an incarcerated individual's emergency medical needs. The policy specifically requires that if an individual's condition is believed to be life-threatening, sworn staff must immediately alert on-duty health staff, provide basic life support and first aid care, and place a 911 request for a paramedic emergency response. In one case we reviewed, the homicide unit's investigation reported that an incarcerated individual indicated to a deputy that they were experiencing shortness of breath. The individual had recently been seen by health staff several times for these symptoms. According to the investigation, the deputy was somewhat familiar with the individual's medical conditions but indicated he was not aware of certain treatment the individual

---

[7]   Study from the *Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine*.

[8]   Study from the *American Journal of Emergency Medicine*.

**In-Custody Death: *Case Example 4***

**6:51 a.m.** After the individual informed deputy about experiencing shortness of breath, deputy escorted the individual to a different area instead of medical clinic and then left area.

**6:52 a.m.** Individual collapsed in that area.

**6:54 a.m.** Deputies entered area to check on the individual.

**7:00 a.m.** Medical staff arrived. They began lifesaving measures within a few minutes.

**7:10 a.m.** Emergency medical personnel arrived.

**7:33 a.m.** Paramedics transported the individual to the hospital, where a doctor pronounced the individual deceased.

Source: Records from the Sheriff's Department.

previously received related to shortness of breath. Nevertheless, the deputy indicated that he believed that the individual was experiencing anxiety and escorted the individual to a different area instead of the medical unit. Shortly afterward, the individual collapsed and sworn staff did not respond for a couple more minutes, as the case example in the text box describes. A health staff member finally arrived several minutes later and began lifesaving measures within a few minutes. The individual was pronounced deceased shortly after arrival to the hospital.

In another example, our review of video surveillance footage—in combination with the homicide unit's investigative report containing statements from involved staff and inmate witnesses—found that the first deputy did not arrive at the scene of the incarcerated individual in medical distress until about five minutes after another incarcerated individual went to alert staff. Sheriff's Department medical staff did not arrive until five minutes after that. Paramedics—who are trained in advanced cardiac life support measures—did not arrive for another five minutes—a total of approximately 15 minutes after sworn staff were first alerted. According to the chief medical officer, some type of communication shortcoming may have delayed the arrival of medical staff, but the exact cause is unknown. However, the initial delay followed by the slow response time of medical staff may have been detrimental to the individual's likelihood of survival. In the Sheriff's Department's interviews of witnesses, other incarcerated individuals commented on the slow response of department staff.

The last two examples we describe emphasize the need for the Sheriff's Department to take action to ensure that it promptly responds to emergencies. Specifically, sworn staff need additional training for immediately starting CPR and how to properly alert medical staff.

### The Sheriff's Department's Inadequate Policies Are in Part the Result of Weaknesses in Statewide Corrections Standards

As Figure 6 shows, weaknesses in statewide corrections standards likely contributed to the problems we identified with the Sheriff's Department's policies. The BSCC establishes in regulation the minimum standards for jail conditions and treatment of incarcerated individuals that local detention facilities must follow. Every local jail system in the State uses these standards as a basis to create policies for inmate safety and care, although counties may choose to make their policies more robust. However, some of these standards may not be adequate for ensuring incarcerated individuals' health and safety.

Further, BSCC's inconsistent continuing education requirements may not be sufficient to ensure that sworn staff adequately care for incarcerated individuals. Given the increase in the annual number of in-custody deaths across the State from 130 in 2006 to 156 in 2020, improving statewide standards related to health and safety and training requirements is essential to ensuring the health and safety of incarcerated individuals in all counties.

**Figure 6**
**Poor Statewide Standards Contributed to Inconsistencies in the Sheriff's Departments' Policies**



BSCC designs the standards for treatment of incarcerated individuals to be a minimum that all counties can achieve, regardless of variation in resources at the local level.

The San Diego Sheriff's Department and all other county sheriff's departments develop their own policies for jails that comply with BSCC's standards.

Because BSCC's standards are minimal, we found inconsistencies in the policies across the four counties we reviewed, with some policies going beyond the standard more than others, yet even these policies were still insufficient.

*For example:*



STANDARD: **Safety Checks**
*(BSCC's standard requires only C to be included)*

Orange | San Diego | Alameda | Riverside
A B C | C D | C | C

**DESPITE VARIATION AMONG COUNTIES, NONE OF THE POLICIES NOR THE BSCC STANDARD SPECIFY THAT STAFF ARE REQUIRED TO CHECK FOR PROOF OF LIFE DURING SAFETY CHECKS.**

Source:  State regulations and policies at Alameda, Orange, Riverside, and San Diego sheriff's departments.

Although the Sheriff's Department's policies generally align with BSCC's standards related to health, safety, and personnel training, those standards are not specific enough in certain areas to ensure inmate safety. For example, BSCC's standards do not explicitly require that a mental health professional should perform mental health screenings. As a result, the San Diego Sheriff's Department's, Alameda Sheriff's Office's, and Orange Sheriff's Department's policies allow medical nurses and health clinicians rather than mental health professionals to perform mental health screenings at intake. In these counties, the health staff generally will refer an incarcerated individual for a mental health evaluation if they observe general signs necessitating the referral or if the individual self-reports mental health concerns. In contrast, the Riverside Sheriff's Department's policy requires a mental health professional to conduct the mental health screening in all instances, which is a best practice.

*The Riverside Sheriff's Department's policy requires a mental health professional to conduct the mental health screening in all instances, which is a best practice.*

In another example, BSCC's standards do not describe the actions that constitute an adequate safety check. Instead, the standards simply state that safety checks must be conducted at least hourly through direct visual observation of all inmates and that observation through a video camera alone is not sufficient. The four counties we reviewed based their policies on different interpretations of this standard, as Table 2 shows. The Alameda Sheriff's Office and Riverside Sheriff's Department require hourly direct visual observation of incarcerated individuals, but their policies do not expand much further on the standard. As we discuss previously, the San Diego Sheriff's Department's policy provides more detail, defining what staff should look for during the direct visual observation. The Orange Sheriff's Department's policy is more robust than the minimum standard: it directs sworn staff to be close enough to each individual to ascertain their presence and apparent physical condition. Moreover, CDCR requires its staff to count living, breathing individuals whom they see in person. This count is an hourly check that is the equivalent to what BSCC's standards refer to as a safety check. Although BSCC is currently revising the safety check standard, its proposed revision still does not specify that a safety check must include verifying that an individual is alive, which is essential to ensuring the safety of incarcerated individuals across the State.

Additionally, state law does not require that BSCC have medical or mental health professionals on its board, despite its responsibility for creating standards in these areas. The qualifications for almost all of the board member positions are related to law enforcement in a detention setting. State law requires BSCC to seek the advice of medical and mental health professionals when establishing minimum standards and when reviewing and making revisions every two years. However, because the standards have so much

impact on the lives of incarcerated individuals, we believe that having medical and mental health representation on the board is critical. Similar boards in other states, such as the New York City Board of Corrections and the Texas Commission on Jail Standards, have medical experts serving as members.

**Table 2**
**A Lack of Specificity in Statewide Standards Has Resulted in Inconsistencies Among Counties' Policies**

| ENTITY WITH POLICY | SAFETY CHECKS POLICY EXCERPT |
|---|---|
| BSCC | Safety checks shall be conducted at least hourly through **direct visual observation** of all incarcerated individuals. Observation through a video camera alone does not constitute a safety check. |
| Alameda Sheriff's Office | Supervision of all incarcerated individuals shall include **direct visual observation** of each incarcerated individual by a deputy at random times each hour. |
| Orange Sheriff's Department | A safety check is a **direct visual observation** of each incarcerated individual located in an area of responsibility every hour. **Safety checks must be conducted from a location which provides a clear, direct view of each incarcerated individual. Staff shall be close enough to each incarcerated individual to ascertain his or her presence and apparent physical condition.** |
| Riverside Sheriff's Department | Security checks shall be completed to ensure there is **direct visual supervision** of all incarcerated individuals housed within a jail facility every hour. |
| San Diego Sheriff's Department | Sworn staff will conduct safety checks of incarcerated individuals every hour through **direct visual observation** without the aid of audio and video equipment. Safety checks of incarcerated individuals consist of looking at the incarcerated individuals for **any obvious signs of medical distress, trauma, or criminal activity.** |

Source: State law and policies from the Alameda, Orange, Riverside, and San Diego sheriff's departments.

In addition, BSCC's required training hours for sworn staff working in local detention facilities do not align with their standards for similar positions. BSCC's regulations require only 24 hours annually of continuing professional education training for adult correctional officers, supervisors, and managers, even though it requires 40 hours of continuing training for probation officers and juvenile correctional supervisors and managers. Requiring fewer hours for adult corrections personnel does not make sense when thousands of individuals are incarcerated in these facilities and the number of individuals who have died has increased over the past 15 years. Based on our review of how San Diego Sheriff's Department's sworn staff responded to medical, mental health, and safety needs, we recommend increasing the number of training hours to align with similar professions to allow sheriff's departments to better protect and keep incarcerated individuals safe. Further, BSCC

does not require that any of the 24 hours of training cover topics pertaining to mental health, even though best practices suggest staff should receive at least four hours of mental health training annually. Without such a requirement, law enforcement staff may not be sufficiently prepared to provide care to and properly monitor individuals with mental health needs.

In response to our concerns that some of its standards are not robust enough to ensure the safety of incarcerated individuals in local detention facilities across the State, BSCC's deputy director of Facilities Standards and Operations told us it is the responsibility of each individual county to establish policies that exceed the minimum standards, should they decide to do so. Further, she said that BSCC designs the standards to be a minimum that all counties can achieve, regardless of variation in resources at the local level. However, this approach enables counties that house large numbers of incarcerated individuals to provide lower levels of care. An alternative approach could be for BSCC to establish separate standards for counties with smaller incarcerated populations, and set higher standards for counties with larger incarcerated populations. For example, BSCC could create more stringent requirements for the larger counties in the State, such as those with ADPs of more than 1,000 individuals. This threshold would include the county jail systems housing more than 80 percent of the State's jail population in local detention facilities. Further, some solutions—such as more robust safety checks—do not require significant resources. Improving statewide standards and training requirements is essential to ensuring the health and safety of incarcerated individuals in all counties.

# Chapter 2

**NEITHER THE SHERIFF'S DEPARTMENT NOR CLERB HAS TAKEN ADEQUATE ACTION IN RESPONSE TO THE DEATHS OF INCARCERATED INDIVIDUALS**

### Chapter Summary

The Sheriff's Department has not consistently taken meaningful action in response when in-custody deaths have occurred. Specifically, its reviews of in-custody deaths have been insufficient and have lacked transparency. As a result, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously and making every effort possible to prevent similar deaths in the future. In addition, CLERB—a citizen-governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in-custody deaths. In violation of its own rules and regulations, CLERB's investigations of the deaths of individuals in the Sheriff's Department's custody have not been independent, thorough, or timely. Moreover, CLERB failed to investigate nearly a third of the deaths of incarcerated individuals in the past 15 years, meaning that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

### The Sheriff's Department Has Not Consistently Implemented the Meaningful Changes Necessary to Respond to the Deaths of Individuals in Its Custody

The Sheriff's Department has not responded to incarcerated individuals' deaths in a manner that demonstrates its commitment to improving health and safety at its detention facilities. Every death of an individual in its custody should require a thorough review to determine whether changes to its processes are warranted. Nonetheless, the department's reviews of deaths are insufficient and have not always led to meaningful corrective action. Further, although the Sheriff's Department has implemented some key recommendations provided by external entities, it did not implement others that are critical to improving the safety of incarcerated individuals. San Diego County has paid millions of dollars in settlements related to deaths in the Sheriff's Department's jails that highlighted many of the same problems we have identified related to inadequate safety checks and medical and mental health care.

*San Diego County has paid millions of dollars in settlements related to deaths in the Sheriff's Department's jails that related to inadequate safety checks and health care.*

**SD 744729**

Ex. A - 40

***The Sheriff's Department's Processes for Investigating and Reviewing In-Custody Deaths are Ineffective, Structurally Problematic, and Lacking in Transparency***

The Sheriff's Department has not performed adequate reviews or implemented sufficient changes in response to the deaths of incarcerated individuals. As we show in Figure 7, the department conducts up to four different reviews: a 30-day medical review, a Critical Incident Review Board review, a homicide death investigation, and an internal affairs investigation. However, because all of these reviews are generated from within the Sheriff's Department, they may be viewed by the public as lacking objectivity. Further, we identified deficiencies in certain reviews that call into question their ability to prompt meaningful change to prevent additional deaths.

One of the Sheriff's Department's reviews—the 30-day medical review—involves reviewing the circumstances surrounding the incident and pertinent medical and mental health services and reports. According to state law, the Sheriff's Department must review every in-custody death within 30 days to determine the appropriateness of clinical care; to assess whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study. To fulfill this requirement, Sheriff's Department policy states that the medical services administrator, in consultation with the chief medical officer, is responsible for reviewing all in-custody deaths within 30 days. In practice, the chief medical officer—who is a licensed physician—indicated that he currently conducts the reviews with input from other health staff regarding the individuals' clinical histories. Although the chief medical officer is also required to review suicide deaths, the department's policy has specified since late 2018 that the chief mental health officer will also present findings on suicides.

However, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given; identified whether any concerns required further study; or stated whether changes to policies, procedures, or practices were warranted. The documents we obtained for most of these 22 cases were either presentation slides or meeting agendas. Neither type of document included findings about the cases or recommended changes to policies, procedures, or practices. For some of the more recent cases in 2019 and 2020, the Sheriff's Department provided us with the chief medical officer's and medical staff members' typed notes, which included conclusions about the medical care its staff had provided to the incarcerated individuals, as well as some recommendations. However, most of these reviews did not document whether the recommendations led to the department taking action, or whether the recommendations had been implemented.

*Most of the Sheriff's Department's reviews of in-custody deaths did not document whether recommended changes to policies, procedures, or practices had been implemented or led to the department taking action.*

**Figure 7**

The Sheriff's Department's Internal Reviews Have Not Led to Meaningful Action in Response to Individuals' Deaths

**Sheriff's Department's Reviews of In-Custody Deaths**

**30-DAY MEDICAL REVIEW**

- Performed by Sheriff's Department medical staff within 30 days of the death as required by state law.
- For suicides, mental health staff also review the deaths.
- No requirement for a formally documented report.
- Does not consistently document findings and recommendations and does not document follow-up to any recommendations.

**CRITICAL INCIDENT REVIEW BOARD REVIEW**

- Entity within the Sheriff's Department, so it is not independent.
- Staff present facts of the cases to Sheriff's Department's management and legal counsel.
- All reports are considered attorney-client privileged and are nondiscloseable.
- Purpose of board is to assess legal liability.
- Has not consistently taken meaningful corrective action and does not review natural deaths.

**HOMICIDE INVESTIGATION**

- Investigations performed by Sheriff's Department staff.
- Presents facts of the case to the Critical Incident Review Board but is rarely involved in developing policy recommendations.

**INTERNAL AFFAIRS INVESTIGATION**

- Becomes involved generally based on complaints of alleged misconduct.
- Has reviewed very few cases involving in-custody deaths.

Source: Sheriff's Department's policies and procedures and other documentation related to these reviews.

We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow-up care before an individual's death, such as those we discuss in Chapter 1. The chief medical officer agreed that the reviews, if properly documented, could be useful as an educational and quality assurance tool. However, he indicated that he would

have reservations about formalizing these reports in a written format without some form of protection against using these documents as evidence in litigation. He stated that without such protection, staff members would be reluctant to point out any form of mistake or error, leading to lost learning opportunities. Regardless of the department's position, we believe the reviews should be formalized for internal use to help the department better track its identification of deficiencies and recommendations for improvements to its clinical care. Other counties we reviewed have policies for documenting these 30-day reviews.

In addition to the 30-day medical review, in-custody deaths—except natural deaths—are also subject to review by the Critical Incident Review Board, which is the Sheriff's Department's internal review committee. The board consists of three voting members—commanders from the Law Enforcement, Court Services, and Detention Services bureaus—and two nonvoting members—the chief legal advisor and a commander from the human resources bureau. The stated purpose of the board is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore, it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals.

Moreover, the board is an entity within the Sheriff's Department, so it is not independent. The Sheriff's Department's investigators present to the board the facts and circumstances related to an in-custody death. According to department policy, the board then carefully reviews the incident from multiple perspectives, including training, tactics, policies, and procedures. Its ultimate goal is identifying problem areas and recommending remedial actions—such as posting a training bulletin or changing a policy—so that potential liability can be avoided in the future. According to policy, if the board votes to determine that any policy violations exist, it will forward the case to Internal Affairs.

*After the Critical Incident Review Board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with policies and practices.*

However, after the board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices. Of the 18 cases we reviewed for which the department held a Critical Incident Review Board meeting, the board reported taking action related to 13. However, only six resulted in substantive actions, such as changes to policy and procedures or training, related to preventing inmate deaths. The remaining seven resulted predominantly in minor administrative actions or recommendations for training that would not have far-reaching effects on the welfare of individuals in custody.

Moreover, even though the board discussed critical issues in some meetings, it ultimately concluded them without making recommendations for addressing these issues. For example, in

six of the 18 cases, the board indicated that the events surrounding the deaths in question could merit changes to policy and procedures; however, it did not recommend any related actions. According to the assistant sheriff of detentions, the Sheriff's Department may make immediate changes to policies following a death if it identifies a need, so additional recommendations from the board are sometimes unnecessary. However, the minutes of the Critical Incident Review Board meetings do not always discuss these types of policy changes. We question why the review board did not discuss the need for changes in some instances or discuss whether any changes made address the problems identified.

Further, the Critical Incident Review Board generally does not review natural deaths. Instead, it primarily reviews suicides, homicides, and accidental in-custody deaths. According to the Sheriff's Department's chief legal advisor, the board does not review natural deaths in part because the risk of legal liability in those incidents is low. He further stated that because the Medical Examiner's Office has made a determination that an individual's death was from natural causes, it rules out other human factors. However, we found in our review of 30 case files that the Medical Examiner's Office typically reviews events preceding individuals' deaths and their medical records, but it does not make conclusions about the appropriateness of care provided by the Sheriff's Department. We find the Sheriff's Department's decision not to hold critical incident reviews for natural deaths concerning given that these deaths accounted for nearly 50 percent of all deaths in the department's facilities in the period of our review. Further, as we note in Chapter 1, we identified significant deficiencies in the Sheriff's Department's handling of care leading to all types of deaths, including natural deaths. By not requiring the Critical Incident Review Board to review these cases, the department is not doing everything it can to protect incarcerated individuals.

Finally, the Critical Incident Review Board is not transparent. It does not make its reports and investigations public. The board's reports are classified as attorney-client privileged, meaning that they are confidential and cannot be disclosed without the Sheriff's Department's consent. The purpose of attorney-client privilege is to ensure that clients can fully disclose information to their lawyer without fear that it will be revealed to others, enabling them to receive competent legal advice. Although we do not disagree with having a confidential forum to discuss potential litigation matters, we are concerned that the Sheriff's Department does not have a separate public process to demonstrate that it is addressing deficiencies in its policies, procedures, and practices after in-custody deaths occur. By keeping its findings and recommendations confidential, the department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.

*By keeping the findings and recommendations of the Critical Incident Review Board confidential, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.*

**SD 744733**

**Ex. A - 44**

Although the Sheriff's Department's homicide unit is rarely involved in developing policy recommendations, it typically presents facts about in-custody deaths to the Critical Incident Review Board. The homicide unit investigates deaths that occur in custody by, in part, inspecting the scene of the incident, interviewing any witnesses and detention staff, and reviewing video surveillance and reports written by sworn staff. Even though the information that the homicide unit presents to the Critical Incident Review Board is a key component of the Sheriff's Department's review of in-custody deaths, the Critical Incident Review Board ultimately decides whether to take further action.

The Sheriff's Department's internal affairs unit may also investigate detention staff—including health staff—for alleged misconduct related to an in-custody death. The internal affairs unit receives complaints that are initiated by a member of the community or by the Sheriff's Department. The Critical Incident Review Board can also initiate an internal affairs investigation if it votes that a policy violation may have occurred.

*The Sheriff's Department's internal affairs unit indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.*

However, the Sheriff's Department has performed very few such investigations. Specifically, it reported to us that it conducted only four internal affairs investigations related to the 30 cases we reviewed, even though we identified a number of potential violations or concerns in some of the other 26 cases that could justify further investigation. Further, internal affairs indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.

Thus, the Sheriff's Department does not complete internal affairs investigations frequently enough for it to provide significant value. Although internal affairs indicates that its investigations are generally complaint-driven, the small number of investigations related to death cases—coupled with the lack of meaningful changes arising from the 30-day medical review and the Critical Incident Review Board meeting—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

### The Sheriff's Department Has Not Implemented Key Recommendations From External Entities Related to Incarcerated Individuals' Welfare and Safety

The Sheriff's Department has not implemented a number of key recommendations from external entities that are essential for ensuring the welfare and safety of incarcerated individuals, as Table 3 shows. We reviewed recommendations from 2006 through 2020 that the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention

SD 744734
Ex. A - 45

consultant (consultant) made to the Sheriff's Department.[9] Many of these recommendations were in response either to a specific death or to the general health and safety conditions of the jails. When we looked at recommendations that pertained to the safety of incarcerated individuals, the Sheriff's Department had implemented a number of them. For example, it modified a use-of-force policy to prevent compromising an incarcerated individual's ability to breathe and revised its intake screening to include additional questions related to suicide prevention. However, some of the recommendations that the Sheriff's Department failed to fully implement are connected to problems we identify in this report.

**Table 3**

**The Sheriff's Department Has Not Implemented Certain Key Recommendations From External Entities**

| ENTITY PROVIDING RECOMMENDATION | EXAMPLE OF RECOMMENDATION | CURRENT IMPLEMENTATION STATUS |
|---|---|---|
| San Diego County Grand Jury–2014/2015 | The Sheriff's Department deputy detention staff has an imbalance in experience levels and facility assignments, such as too many inexperienced staff at one facility. Develop and implement a staff rotation policy for all detention facilities. | Not implemented |
| Consultant reviewing suicide prevention practices–2018 | Given the strong association between in-custody suicide and segregation housing and consistent with national correctional standards, it is strongly recommended that the Sheriff's Department give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals. | Not implemented |
| CLERB–2018 | Sheriff's Department staff did not have pertinent information about an incarcerated individual's previous suicide attempt and allowed that individual access to something that resulted in self-harm and ultimately suicide. The Sheriff's Department should revise its policy to use identifying wristbands to indicate a prior suicide attempt. | Not implemented |
| Disability Rights California–2018 | Revise policies to allow individuals in Enhanced Observation Housing to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs. | Not implemented |

Source: San Diego County Grand Jury reports from 2006 through 2019, a consultant's report on suicide prevention practices, CLERB investigations and recommendations from 2006 through 2020, and a Disability Rights California report.

Specifically, the Sheriff's Department did not implement recommendations related to safety checks, intake screenings, and suicide prevention efforts—the last of which is particularly concerning given the department's high rate of suicides compared to other counties. For example, in response to a specific death, CLERB recommended in 2020 that the Sheriff's Department require additional steps in safety checks of individuals residing in special mental health housing to ensure that they are alive and well, such as requiring nurses to accompany deputies on each round to ensure incarcerated individuals' safety. However, the department stated it would not implement this recommendation because it

---

[9]  We discuss CLERB's process for investigating deaths in the sections that follow.

believed that its current policies were adequate. Additionally, San Diego County contracted with a consultant in 2018 to assess suicide prevention practices within the Sheriff's Department's jail system. One of the consultant's recommendations was for the Sheriff's Department to consider increasing safety checks of individuals who are housed in isolated housing units from every 60 minutes to every 30 minutes, given the association between suicide and isolated housing placement. However, the department responded that making this change was not feasible because of the physical layout of its jail facilities, the number of inmates, and the required staffing.

The Sheriff's Department's justifications for choosing not to implement crucial recommendations have not always addressed the underlying issues involved and do not offer alternatives for addressing the concern. For example, following another death, CLERB recommended in 2018 that the Sheriff's Department provide identifying wristbands to individuals with prior suicide attempts. In its response, the department indicated it would not implement this recommendation because doing so would violate individuals' privacy and be contrary to best practices for suicide prevention. However, the Sheriff's Department did not address or offer an alternative solution to the underlying problem, which is that sworn staff may not be familiar with the mental health histories of the individuals they oversee. As we discuss in Chapter 1, another county has addressed this problem by assigning individuals with mental health needs an acuity level rating that could help communicate this information to sworn staff.

Another key, recurring recommendation that the Sheriff's Department has not implemented for nearly a decade relates to updating equipment for monitoring the safety of incarcerated individuals. In 2014 the San Diego County Grand Jury recommended that the Sheriff's Department update the surveillance system for monitoring activity at its largest male detention facility, which is a maximum security jail. The San Diego County Grand Jury made a similar recommendation in 2017, but the department has yet to replace the system. Although the department's policies and procedures related to facility maintenance generally align with state standards, we find it concerning that it has not yet replaced the surveillance system, even though its age is a major safety issue. In 2021 the Sheriff's Department indicated that the replacement effort would likely not begin until the summer of 2022. According to the assistant sheriff of detentions, the department did not implement this recommendation sooner because of its prioritization of other projects, such as building a new detention facility. However, we believe that the Sheriff's Department should prioritize implementing or resolving all recommendations intended to keep individuals in its custody safe.

*Although the department's policies and procedures related to facility maintenance generally align with state standards, it has not yet replaced the surveillance system at its largest detention facility, even though its age is a major safety issue.*

Lastly, many of the lawsuits we reviewed that San Diego County settled have highlighted some of the same problems at the Sheriff's Department that we have identified related to inadequate safety checks, mental health treatment, and medical care. From 2006 through 2020, there were 22 lawsuits filed related to the deaths of incarcerated individuals at the Sheriff's Department's detention facilities. San Diego County has settled 11 of these, for a total cost of $9.2 million.[10] Payments for these cases ranged from $10,000 to $3.5 million for an average of $838,000 per settlement. Table 4 compares San Diego County's settlements to those in the other three counties we reviewed. By not promptly addressing the underlying issues on which both litigation and external recommendations have focused, the San Diego Sheriff's Department continues to place the individuals in its custody at risk.

**Table 4**

**Settlements Related to In-Custody Deaths Varied Among the Comparable Counties**

| SETTLEMENTS RELATED TO IN-CUSTODY DEATHS (2006–2020) | ALAMEDA | ORANGE | RIVERSIDE | SAN DIEGO |
|---|---|---|---|---|
| Number of settlements | 15 | 9 | 7 | 11 |
| Settlement amount (total) | $17,863,000 | $7,799,000 | $3,871,000 | $9,223,000 |
| Settlement amount (average) | $1,116,000 | $867,000 | $553,000 | $838,000 |
| Range of settlements | $10,000 to $5 million | $200,000 to $2.75 million | $46,000 to $975,000 | $10,000 to $3.5 million |

Source: Court documents from each of the four counties.

### CLERB Has Failed to Provide Effective Oversight of the Deaths of Individuals in the Sheriff's Department's Custody

Despite its mission to increase public confidence in county law enforcement officers, CLERB has failed to provide effective, independent oversight of the deaths of individuals in the Sheriff's Department's custody. In violation of its own rules and regulations, CLERB's investigations are not independent, timely, or thorough, as Figure 8 shows. Our review found that CLERB rarely independently interviews witnesses or visits the initial scenes of the deaths, has not consistently prioritized cases involving deaths, and has sometimes failed to thoroughly investigate or follow up on discrepancies it discovers in the course of its investigations of deaths. CLERB's failure to conduct adequate investigations has resulted in a lack of independent scrutiny of dozens of deaths of incarcerated individuals, calling into question its effectiveness as a key oversight body for San Diego County law enforcement.

---

[10] The other 11 lawsuits are either ongoing or have been appealed.

**Figure 8**
**CLERB Has Failed to Provide Adequate Oversight of the Deaths of Individuals in the Sheriff's Department's Custody**



CLERB's rules and regulations require it to be:

**INDEPENDENT** ⊗ — Relies primarily on evidence provided by the Sheriff's Department, rather than independently interviewing witnesses or visiting the initial scene of the death.

**TIMELY** ⊗ — Has not always prioritized conducting investigations of death cases.

**THOROUGH** ⊗ — Does not always thoroughly investigate death cases or follow up on key discrepancies that arise during the investigation.

**ETHICAL** ✓ — We did not identify concerns with the investigations we reviewed being conducted in an unethical manner.

**FAIR/IMPARTIAL** ✓ — We did not identify concerns with the investigations we reviewed being unfair or biased.

Source: CLERB's rules and regulations, county policies, and analysis of CLERB investigations.

### CLERB Does Not Conduct Independent Investigations

San Diego County voters established CLERB to provide independent oversight of the county's law enforcement agencies. However, CLERB's investigations of in-custody deaths are not independent. In particular, it does not conduct interviews with Sheriff's Department sworn staff or visit the initial scene of the death. Rather, it relies almost entirely upon documents that the Sheriff's Department provides. The county charter—as well as its own rules and regulations—establishes CLERB's power to issue subpoenas, administer oaths, and require the attendance of witnesses and the production of books and papers pertinent

to its investigations. CLERB's rules and regulations further state that its investigations may include interviewing witnesses and subject officers, examining the scene, and reviewing and preserving other physical evidence. However, in practice, CLERB's investigations of in-custody deaths reflect neither its authority nor its stated processes.

*In practice, CLERB's investigations of in-custody deaths reflect neither its authority nor its stated processes.*

We reviewed a selection of six CLERB investigations of incarcerated individuals' deaths in the Sheriff's Department jails occurring from 2016 through 2019 that had investigations performed in 2017 through 2020. We found that for all of these cases—which, in total, included dozens of potential witnesses—CLERB investigators referenced conducting an interview of an incarcerated individual in only one instance. They did not independently interview staff from the Sheriff's Department in any of the six cases, although in a few limited instances, they used written questionnaires to obtain information from sworn staff about their involvement in an incident leading up to an incarcerated individual's death.

CLERB uses these questionnaires in lieu of performing in-person interviews as the result of an agreement it reached with the Sheriff's Department and the Deputy Sheriff's Association of San Diego County (labor organization). However, this agreement has hindered CLERB's independence and undermined voters' approval of CLERB's creation. As we show in Figure 9, the erosion of CLERB's independence began in the 1990s. According to its current executive officer, CLERB was concerned at that time that its investigations were one-sided and lacked legitimacy without participation by Sheriff's Department sworn staff. According to CLERB annual reports and internal documents, CLERB attempted to interview Sheriff's Department sworn staff in the course of its investigations to seek their perspective. Although both San Diego County's Administrative Code and CLERB's rules and regulations entitle CLERB to complete and prompt cooperation from the Sheriff's Department, the sworn staff members refused to participate in interviews with CLERB investigators. In response, CLERB exercised its power to subpoena and administer oaths by calling sworn staff members to testify in public hearings. However, CLERB documents indicate that the sworn staff continued to refuse to answer any questions, invoking their Fifth Amendment right against self-incrimination.

**Figure 9**
CLERB's Ability to Conduct Independent Investigations Has Been Eroded Over Time



Source:  Proposition voter materials, agreement documents, legal documentation, and CLERB's investigations documentation.

Faced with the prospect of more costly litigation and continued legal challenges, CLERB discussed a framework with the Sheriff's Department and the labor organization in 1998 that ultimately led to an agreed-upon process for CLERB investigators to question Sheriff's Department sworn staff through interviews or written questionnaires (1998 agreement). Further, in 2003, CLERB adopted a waiver form for sworn staff, allowing them to opt out of in-person interviews with CLERB investigators altogether (2003 waiver form).

The 1998 agreement and 2003 waiver form constitute CLERB's current process for involving Sheriff's Department sworn staff in its investigations. Consequently, CLERB investigators do not conduct independent interviews of sworn staff but rather request

SD 744740
**Ex. A - 51**

responses from specific department employees through a written questionnaire. This approach has hindered CLERB's ability to perform independent investigations.

CLERB's executive officer acknowledged that having its investigators conduct independent interviews would be preferable but also asserted that they are generally able to obtain necessary information through the questionnaire process. However, we question this position. Although written responses may provide some pertinent information, they do not allow investigators to assess the credibility of a witness or to ask immediate follow-up or clarifying questions. In fact, CLERB's current process allows department staff up to 14 days to respond to the questionnaires. CLERB's executive officer indicated that investigators generally submit another questionnaire with the same turnaround time if they have any subsequent inquiries or clarifying questions to the responses from the initial questionnaire. Such protocol is counterintuitive to the nature of an investigation, which requires interactive communication and prompt responses.

Moreover, although the Sheriff's Department generally notifies CLERB of in-custody deaths, it does not do so until after various department entities have processed the scene. As a result, CLERB investigators are not able to be present at the initial scene of the death. Instead, shortly after receiving notification of an in-custody death, CLERB issues a subpoena to the Sheriff's Department for the homicide unit's investigation file. The Sheriff's Department forwards it to CLERB once it has completed its criminal investigation, usually about two to eight months after the death occurs. As a result, CLERB's investigators generally do not learn about potential witnesses or have the opportunity to visit the scene until months after the death of an incarcerated individual, severely limiting their ability to conduct an independent and thorough investigation. In fact, when we reviewed a selection of CLERB's investigations, we found that its investigators either did not visit the scenes of the deaths at all or did not do so until more than a year after the death occurred.

*CLERB's investigators generally do not learn about potential witnesses or have the opportunity to visit the scene until months after the death of an incarcerated individual.*

Without the ability to independently interview witnesses or the opportunity to visit the initial scenes of the deaths, CLERB must conduct its investigation based primarily on information that the Sheriff's Department's internal investigators provide, such as photographs and videos. For the cases we reviewed, CLERB's investigators' only other sources of evidence were statements from the decedents' families, reports from the medical examiner, and—in only one case—a direct interview with an incarcerated individual who was a witness.

*CLERB's nearly exclusive reliance on evidence provided by the Sheriff's Department precludes its investigators from reaching independent conclusions on in-custody deaths and providing truly external oversight of county law enforcement.*

San Diego County voters established CLERB in response to perceived inadequacies in the Sheriff's Department's internal investigations, yet CLERB's nearly exclusive reliance on evidence provided by the department precludes its investigators from reaching independent conclusions on in-custody deaths and providing truly external oversight of county law enforcement. For CLERB to carry out this function, its processes must change and the Sheriff's Department must fully cooperate.

CLERB's members and its executive officer are currently pursuing several policy changes to increase its independence, including issuing a policy recommendation in October 2021 to the Sheriff's Department requesting that it allow a CLERB staff member with extensive death investigation experience to be present at the initial scene of the death. However, CLERB's recommendations to the Sheriff's Department are advisory and require the Sheriff's Department's approval for implementation. CLERB's members and executive officer are also working with the county board to expand CLERB's authority to investigate complaints against non-sworn staff, including medical personnel. However, such an expansion of CLERB's authority requires approval by the county board. Furthermore, although these changes would increase the independence of CLERB's investigations, they would not enable CLERB's investigators to directly interview sworn staff, which we believe is critical.

### CLERB Failed to Investigate 57 In-Custody Deaths From 2006 to 2017

CLERB failed to investigate a significant number of deaths of individuals in Sheriff's Department custody. For example, CLERB failed to investigate 13 deaths of incarcerated individuals from 2011 through 2016 because it misinterpreted a state-mandated deadline for completing its investigations and did not properly prioritize its caseload. The Legislature established a one-year statute of limitations for investigations of law enforcement misconduct when it amended the Public Safety Officers Procedural Bill of Rights Act (POBR) in 1997. As the Introduction explains, CLERB is responsible for investigating complaints, as well as deaths arising out of or in connection with actions of peace officers, which can include deaths in custody. As a result of the amendment to POBR, CLERB must complete its investigations within one year after it receives a complaint against a peace officer or notification of an in-custody death.[11]

---

[11] POBR requires the investigation to be completed within one year of discovery of the alleged misconduct, and the one-year deadline may be suspended under certain circumstances, such as when the misconduct is the subject of a criminal investigation. Because the Sheriff's Department performs a criminal investigation of every in-custody death, CLERB's one-year time frame to complete its investigation does not start until after the Sheriff's Department completes its investigation.

Nevertheless, CLERB did not realize until 2010 that the one-year time frame applied to its investigations of complaints, at which time it started to dismiss cases for expiration of this time limit. In fact, from 2010 through 2016, CLERB reported that it had to dismiss nearly 100 complaints against county law enforcement members because it did not complete its investigations within the required time frame. Although CLERB did not report that any of these 100 complaints involved in-custody deaths, its failure to conduct these investigations demonstrates that it has struggled to effectively perform its duties in a timely manner.

Further, CLERB's records and San Diego County Grand Jury documents indicate that CLERB staff were not aware that the POBR statute of limitations also applied to its investigations of in-custody deaths until 2017. Consequently, it did not always prioritize these cases, and it reported that its backlog of open investigations of deaths steadily increased from seven cases in 2010 to 46 cases by 2016. After CLERB learned in 2017 that the one-year time limit also applied to investigations of deaths, it had to dismiss 22 of these cases because they had exceeded the time limit. Of these 22 deaths, 13 occurred while the individuals were in custody at Sheriff's Department detention facilities.[12] Because of CLERB's failure to investigate these 13 deaths, it did not have the opportunity to identify problems with the Sheriff's Department's policies and procedures and to make policy recommendations that could have helped prevent future in-custody deaths.

CLERB did not investigate an additional 40 in-custody deaths classified as natural from 2006 through 2016 because it was not conducting investigations of this type during that time. According to CLERB's current executive officer, it did not review deaths classified as natural during this period because its former executive officers generally interpreted its jurisdiction over in-custody deaths to exclude these types of deaths. In fact, CLERB's rules and regulations do not clearly specify whether CLERB should investigate natural deaths. However, the concerns we discuss with the Sheriff Department's inadequate prevention of natural deaths underscore the importance of CLERB providing external oversight of these cases. Since 2017 CLERB has been consistently reviewing natural deaths. However, the lack of specificity in its rules and regulations could result in CLERB reverting to its past practice in the future.

In addition, CLERB did not investigate four other in-custody deaths—two that were classified as accidental, one as homicide by law enforcement, and one as suicide—from 2009 through 2011. CLERB's executive officer said that it did not investigate these deaths because

*Since 2017 CLERB has been consistently reviewing natural deaths. However, the lack of specificity in its rules and regulations could result in CLERB reverting to its past practice of not reviewing natural deaths in the future.*

---

[12] The remaining nine deaths occurred in San Diego County law enforcement areas and probation facilities.

the Sheriff's Department failed to inform CLERB of their occurrence. Although the Sheriff's Department indicated that it did not have information on notifications for this period, we find the lack of review of these cases concerning. In 2011 CLERB made a policy recommendation requesting that the Sheriff's Department include it in all in-custody death notifications. Although the Sheriff's Department declined to modify its policies to include CLERB in its initial death notifications, which includes the county district attorney and Medical Examiner's Office, it did direct a specific unit to inform CLERB of all in-custody deaths, usually within a few days of their occurrence. However, as we discuss above, when the Sheriff's Department does not notify CLERB of deaths immediately, CLERB investigators do not have the opportunity to visit the initial scenes of the incidents shortly after the death occurred.

As we show in Figure 10, CLERB failed to investigate a total of 57 deaths of incarcerated individuals in Sheriff's Department jails from 2006 through 2017—nearly a third of all its in-custody deaths in the past 15 years. This is unacceptable given that CLERB is a key county entity outside of the Sheriff's Department that reviews in-custody deaths. Although CLERB recently added policies and procedures establishing its prioritization of death cases over all other cases, it did not do so until August 2021. Moreover, because policies can easily be changed when leadership changes, it is important that CLERB include requirements in its rules and regulations for how it prioritizes cases.

**Figure 10**
CLERB Did Not Investigate Nearly a Third of All In-Custody Deaths in the Past 15 Years



Source: California Department of Justice in-custody death data, CLERB list of investigations, and CLERB investigative reports.

Despite CLERB's efforts since 2017 to ensure that it appropriately prioritizes and fully investigates in-custody deaths, it has still struggled to complete its investigations in a timely manner. As we previously explained, CLERB investigators generally begin investigating an in-custody death after the Sheriff's Department's homicide unit has completed its own investigation and forwarded the homicide investigation file to CLERB. Upon receipt of the homicide investigation file, CLERB must complete its investigation within one year to meet the POBR time limit. However, our review of the six in-custody death investigations found that CLERB investigators did not begin their casework until an average of seven months after they received the homicide investigation file from the Sheriff's Department. As we note earlier, the Sheriff's Department usually does not provide the file to CLERB until two to eight months after the death of an incarcerated individual. Consequently, CLERB investigators did not complete their investigations of the cases we reviewed until an average of nearly a year and a half after the death occurred.

CLERB's executive officer indicated that CLERB staff have not historically prioritized beginning investigations of deaths, but he has made recent efforts to ensure that staff start their investigations as soon as they receive a homicide file. Although CLERB's policy does not provide instruction for how quickly the staff must start working on investigations of deaths, the executive officer told us that his goal is for these investigations to be complete within 90 days of CLERB receiving the homicide investigation file. To make relevant recommendations and hold individuals accountable for wrongdoing, CLERB must take steps to complete its investigations of in-custody deaths in a timely manner.

*To make relevant recommendations and hold individuals accountable for wrongdoing, CLERB must take steps to complete its investigations of in-custody deaths in a timely manner.*

### CLERB Did Not Always Thoroughly Investigate In-Custody Deaths

CLERB's rules and regulations require its investigations to be thorough. However, in some of the cases we selected, CLERB's investigators did not appear to consider all the circumstances leading up to the deaths, did not examine all the relevant Sheriff's Department policies, and did not follow up on discrepancies they discovered in the course of their investigations. For example, in one case, an altercation between two cellmates resulted in the death of one of the individuals. However, the investigator did not appear to scrutinize or independently verify evidence, such as the victim's mental health history, that might have affected their classification status. Without this information, the investigator could not sufficiently determine whether the Sheriff's Department had violated policies or procedures by housing these individuals in the same cell. Consequently, the investigator found that there was no evidence to support an allegation of a procedural violation, misconduct, or negligence on the part of the Sheriff's Department.

**SD 744745**

When failing to thoroughly examine all the evidence in a case, CLERB investigators may miss important opportunities to identify deficient policies and practices and to make recommendations to improve the safety of incarcerated individuals. CLERB's executive officer explained that because CLERB investigators are often working against the POBR statute of limitations, they do not consistently follow up on discrepancies they discover in the course of their investigations. However, we find this explanation problematic given the critical nature of the investigations. Further, as we previously discuss, investigators often failed to begin their investigations until months after receiving the homicide files. By starting their investigations sooner, they could increase the time available to them.

*CLERB should develop a comprehensive training manual for its investigators that includes guidance for evaluating the circumstances leading up to the death.*

Although CLERB developed policies and procedures in August 2021 that outline specific documents—such as medical records—investigators should obtain in the course of an in-custody death investigation, we believe further action is necessary. Specifically, CLERB should develop a comprehensive training manual for its investigators that includes guidance for evaluating the circumstances leading up to the death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment. Such changes could help ensure that its investigations are complete and thorough.

### Until Recently, the County Board Provided Insufficient Oversight of CLERB

The county board has a number of responsibilities related to CLERB. It appoints CLERB members and can remove individual members by a majority vote at any time. The county board also establishes CLERB's duties and approves its rules and regulations. However, despite its critical role in overseeing CLERB, the county board rarely discussed in-custody deaths or raised concerns about CLERB, based on its meeting minutes from 2006 through 2019, including after CLERB dismissed 22 death cases in 2017.

The county board has only recently begun to discuss in-custody deaths. Its current chair stated that the board's composition changed recently and that it now has an increased interest in addressing deaths in San Diego County jails. In 2020 the county board approved changes intended to strengthen CLERB's oversight of the Sheriff's Department and Probation Department, including increasing the number of investigative staff. It also approved a request for CLERB to revise its member nomination process to make it more transparent and better incorporate community input.

Although the current county board has recently been more engaged in monitoring in-custody deaths, CLERB has not effectively communicated the pressing issues related to deaths in county jails to the county board. The county charter requires CLERB to prepare an annual report for the county board, the sheriff, and the county probation officer that summarizes its activities and recommendations, including the tracking and identification of trends with respect to complaints received and investigated. Even though CLERB has included in its annual reports year-to-year comparisons of the number of new death cases and complaints, its reports lack critical information that would enhance their usefulness. For example, the reports summarize information on the causes of death and certain categories of allegations of misconduct but do not include any significant discussion or analysis that might point to deficiencies in the Sheriff's Department policies or practices. Further, they do not include any demographic information related to deaths that CLERB investigates.

Although CLERB's reporting and recommendation practices generally align with requirements in its rules and regulations, it could make its annual reports and recommendations more useful. Other law enforcement oversight entities in the State include more robust information in their annual reports, such as comprehensive analyses and discussions of overall trends in discrimination, misconduct, and excessive force allegations, as well as demographic information. Additionally, as an advisory board, CLERB's primary means of improving the safety of incarcerated individuals and providing oversight of in-custody deaths is the recommendations for policy or procedural changes that it makes to the Sheriff's Department based on the deficiencies it detects in the course of its investigations. However, CLERB generally makes recommendations based on individual cases rather than on trends it identifies through analysis of its investigations. Making recommendations based on trends could help resolve more systemic concerns at the Sheriff's Department.

CLERB's executive officer indicated that he would like to include more analyses of overall trends in the annual report but explained that he has prioritized other issues, such as resolving the case backlog and developing training materials for new investigators. As a key oversight entity for county law enforcement, CLERB must improve its reporting and analyses to better inform county leadership and the public. Even more importantly, it must make recommendations that address systemic issues to help prevent deaths of incarcerated individuals.

*CLERB must improve its reporting and analyses to better inform county leadership and the public.*

**52** | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744748
Ex. A - 59

# Conclusions and Recommendations

The San Diego Sheriff's Department has a constitutional responsibility to provide adequate medical care to the individuals whom it incarcerates. Nonetheless, more people have died while in its custody over the past 15 years than in nearly any other county in the State—an average of about one death per month. Our audit found that deficiencies in the Sheriff's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies likely contributed to these deaths. The high rate of deaths in San Diego County jails compared to other counties' jails suggests that these systemic deficiencies have undermined the Sheriff's Department's ability to ensure the health and safety of the individuals in its custody. We are concerned about whether the Sheriff's Department will make meaningful changes to address these systemic problems. Although external entities—such as CLERB and the San Diego County Grand Jury—have made recommendations in the past to address some of the deficiencies we describe, the Sheriff's Department has not implemented a number of them.

No single entity has sufficient oversight authority over the Sheriff's Department to require it to make meaningful changes. Absent explicit legislative direction, neither the county board nor the State's attorney general is well positioned to compel the Sheriff's Department to implement the recommendations we include in this report. Given the ongoing risk to incarcerated individuals' safety, we believe that the Legislature should direct the Sheriff's Department to implement the changes we detail below.

**Recommendations**

***Legislature—All Sheriff's Departments and the California Department of Justice***

To ensure that all sheriff's departments accurately report deaths that occur from incidents or conditions in county jails, the Legislature should amend state law to require sheriff's departments to report to the attorney general individuals who are released from custody after being transported directly to a hospital or similar medical facility and subsequently die in the facility. It should also amend state law to require sheriff's departments to provide the attorney general with all facts concerning the death, such as the cause and manner. The California Department of Justice should annually publish this information on its website.

*Legislature—San Diego Sheriff's Department*

To ensure that the San Diego Sheriff's Department identifies individuals' medical and mental health needs at intake, the Legislature should require it to revise its policies to better align with best practices, as follows:

- Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them.

- Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.

To ensure that the Sheriff's Department provides the necessary medical and mental health care to individuals incarcerated in its facilities, the Legislature should require it to do the following:

- Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.

- Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request.

- Revise its policy to require more frequent psychological follow-up after release from the inmate safety program, including at least monthly check-ins.

- Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.

To ensure that sworn staff properly perform safety checks, the Legislature should require the Sheriff's Department to do the following:

- Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.

- Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff members perform.

To ensure that department staff promptly respond to unresponsive individuals, the Legislature should require the Sheriff's Department to revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow. The Legislature should also require that the Sheriff's Department provide sworn staff with additional training for starting CPR immediately and how to properly alert medical staff.

To ensure that the Sheriff's Department properly assesses the reasons for each in-custody death and makes prompt changes as necessary in response, the Legislature should require it to revise its policy to specify the following:

- Staff will provide a written report of each 30-day medical review to its management.

- When warranted, the report should specify recommendations for changes to prevent further deaths.

- The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and identify issues that require further study.

To improve oversight of in-custody deaths and encourage meaningful action to prevent future deaths, the Legislature should require the Sheriff's Department to revise its policy to require that the Critical Incident Review Board review natural deaths.

To increase the transparency of the Sheriff's Department's reviews of in-custody deaths, the Legislature should require the Sheriff's Department to either make public the facts it discusses and recommendations it decides upon in the relevant Critical Incident Review Board meetings or to establish a separate public process for internally reviewing deaths and making necessary changes.

To ensure that the Sheriff's Department provides complete and prompt assistance to CLERB's investigations, the Legislature should require the Sheriff's Department to do the following:

- Revise its policy to include CLERB in its immediate death notification process.

- Revise its policy to allow a CLERB investigator to be present at the initial death scene.

- Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.

The Legislature should implement the recommendations related to the Sheriff's Department described above in a manner consistent with the form of governance applicable to San Diego County.

### Legislature—BSCC

To ensure that standards of care for incarcerated individuals are adequate and consistent across the State, the Legislature should amend state law to require BSCC to amend certain regulations to address the following:

- County sheriff's departments with jails that have an average daily population of more than 1,000 must have a mental health professional perform mental health evaluations at intake.

- Safety checks must include a procedure for checking to see that each individual is alive.

To ensure the involvement of experts in the areas of medical and mental health care in approving BSCC's regulations and training standards related to the health and safety of incarcerated individuals, the Legislature should change the composition of BSCC to include a medical professional and a mental health professional.

To ensure that BSCC's regulations, guidance, and training align with medical and mental health care best practices, the Legislature should require BSCC to evaluate and update all of its regulations and training as needed once its composition includes a medical professional and a mental health professional.

To ensure that all local correctional officers in the State receive sufficient continuing professional education, the Legislature should require BSCC to amend its regulations to require that local correctional officers working in local detention systems with an

average daily population of more than 1,000, complete 40 hours of training annually and that at least four of those hours relate to mental and behavioral health.

### CLERB

To ensure its investigations are independent, timely, and thorough, CLERB should do the following by May 2022:

- Discuss and modify its current agreement with the Sheriff's Department and the labor organization to allow CLERB's investigators to conduct independent interviews of Sheriff's Department sworn staff.

- Develop a comprehensive training manual for its investigators that outlines standard procedures for investigations. The manual should include a specific section dedicated to investigations of in-custody deaths, including guidance for evaluating the circumstances leading up to an in-custody death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment.

- Create policies and procedures to require its investigators to finish casework on in-custody death investigations within three months of receiving the homicide investigation file. These policies and procedures should also require investigators to attempt to independently verify any information they receive from the Sheriff's Department, to thoroughly review deputy statements and reports from the homicide investigation file, and to request interviews with relevant detention staff and other witnesses in all instances in which they identify discrepancies or missing information.

To ensure that it fully investigates all in-custody deaths, CLERB should revise its rules and regulations by May 2022 to include the following:

- Prioritization criteria for investigating in-custody deaths above all other investigations.

- Clarification that its investigations of in-custody deaths includes those classified as natural deaths.

To ensure that it provides effective oversight of the deaths of individuals in the Sheriff's Department's custody, CLERB should perform an analysis of overall trends related to these deaths, including demographic information, and determine whether the trends suggest deficiencies in the Sheriff's Department's policies

SD 744753

Ex. A - 64

and procedures. Based on these trends, it should also identify policy recommendations for improving the safety of the individuals in the Sheriff's Department's custody. To increase transparency, CLERB should include these trends and analyses in its annual reports starting with its 2021 report, which it should publish in 2022.

We conducted this performance audit in accordance with generally accepted government auditing standards and under the authority vested in the California State Auditor by Government Code sections 8543 et seq. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on the audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

February 3, 2022

# Appendix A

### In-Custody Deaths in California's 15 Largest Counties

The Joint Legislative Audit Committee (Audit Committee) directed us to compare the in-custody death rate in San Diego County to the rates in other comparable California counties for the past 15 years—2006 through 2020. Table A.1 presents the rate of deaths per average daily population (ADP) in each of these county sheriff jail systems from 2006 through 2020. As we previously explain, the ADP represents the number of incarcerated individuals housed in a jail system on any given day over a period of time.

**Table A.1**
**In-Custody Deaths and ADPs From 2006 Through 2020**

| COUNTY SHERIFF'S DEPARTMENT | ADP 15-YEAR AVERAGE (2006–2020) | TOTAL DEATHS | AVERAGE DEATHS PER YEAR | AVERAGE DEATHS PER 1,000 ADP |
|---|---|---|---|---|
| San Diego | 5,162 | 185 | 12.33 | 2.39 |
| Fresno | 2,752 | 86 | 5.73 | 2.08 |
| Ventura | 1,537 | 47 | 3.13 | 2.04 |
| Kern | 2,266 | 69 | 4.60 | 2.03 |
| Alameda | 3,325 | 99 | 6.60 | 1.98 |
| Contra Costa | 1,446 | 43 | 2.87 | 1.98 |
| Riverside | 3,668 | 104 | 6.93 | 1.89 |
| San Francisco | 1,492 | 39 | 2.60 | 1.74 |
| San Joaquin | 1,367 | 34 | 2.27 | 1.66 |
| Los Angeles | 17,044 | 421 | 28.07 | 1.65 |
| San Bernardino | 5,490 | 124 | 8.27 | 1.51 |
| Santa Clara | 3,732 | 84 | 5.60 | 1.50 |
| Orange | 5,877 | 111 | 7.40 | 1.26 |
| Tulare | 1,510 | 26 | 1.73 | 1.15 |
| Sacramento | 4,008 | 62 | 4.13 | 1.03 |

Source: California Department of Justice in-custody death data and BSCC data.

We present information on additional counties in our interactive dashboards at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Table A.2 presents the rate of deaths per the number of individuals booked in each county sheriff's jail system from 2006 through 2020. The number of bookings is the total number of individuals who were processed through the jail system.

**Table A.2**

**In-Custody Deaths and Bookings From 2006 Through 2020**

| COUNTY SHERIFF'S DEPARTMENT | TOTAL BOOKED | AVERAGE BOOKED PER YEAR | TOTAL DEATHS | TOTAL DEATHS PER 100,000 BOOKED |
|---|---|---|---|---|
| Los Angeles | 1,970,654 | 131,377 | 421 | 21.36 |
| Fresno | 551,624 | 36,775 | 86 | 15.59 |
| San Diego | 1,284,462 | 85,631 | 185 | 14.40 |
| Kern | 520,074 | 34,672 | 69 | 13.27 |
| Riverside | 810,376 | 54,025 | 104 | 12.83 |
| Alameda | 777,627 | 51,842 | 99 | 12.73 |
| Orange | 888,951 | 59,263 | 111 | 12.49 |
| Santa Clara | 682,010 | 45,467 | 84 | 12.32 |
| San Bernardino | 1,027,195 | 68,480 | 124 | 12.07 |
| Contra Costa | 370,299 | 24,687 | 43 | 11.61 |
| Ventura | 424,978 | 28,332 | 47 | 11.06 |
| San Francisco | 353,521 | 23,568 | 39 | 11.03 |
| San Joaquin | 392,895 | 26,193 | 34 | 8.65 |
| Sacramento | 733,275 | 48,885 | 62 | 8.46 |
| Tulare | 333,941 | 22,263 | 26 | 7.79 |

Source: California Department of Justice in-custody death data, BSCC data, and San Diego Sheriff's Department bookings data.

# Appendix B

**Scope and Methodology**

The Audit Committee directed the California State Auditor to conduct an audit of the San Diego Sheriff's Department to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps taken by the Sheriff's Department to address these deaths. The table below lists the objectives that the Audit Committee approved and the methods we used to address them.

**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | Reviewed and evaluated the laws, rules, and regulations related to detention facilities and significant to the audit objectives. |
| 2 | Evaluate the Sheriff's Department's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to incarcerated individuals. To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance. As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to incarcerated individuals. | • Interviewed staff and reviewed the Sheriff's Department's documented policies and procedures regarding personnel training, facility maintenance and safety, and the provision of health care to incarcerated individuals. Determined whether those policies and procedures meet the requirements established by BSCC and state law, including reviewing BSCC's biennial inspections.<br><br>• Reviewed the Sheriff's Department's policies and procedures, in combination with reviewing in-custody deaths under Objective 3, to determine whether its policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to incarcerated individuals.<br><br>• Reviewed BSCC's board composition and whether BSCC's standards are strong enough to ensure the safety of incarcerated individuals.<br><br>• Interviewed staff of BSCC regarding its review process to update and revise standards. |
| 3 | To the extent possible, for a selection of in-custody deaths from the past 15 years—including suicides, murders, and in-custody or in-transit deaths—determine the following:<br><br>a. The circumstances, such as the cause for each death.<br><br>b. Whether correctional facility staff followed applicable policies and procedures related to in-custody safety.<br><br>c. Whether the Sheriff's Department reviewed the circumstances of these deaths and took corrective action to improve in-custody safety. | • Using a complete list of in-custody deaths in the Sheriff's Department's jails, selected 30 deaths for review from 2006 through 2020 taking into consideration factors such as gender, race, age, location of death, type of death, and date of death. The Sheriff's Department did not report any in-transit deaths related to its jails. In accordance with audit standards, we did not select cases involved in active litigation in order to avoid interfering with ongoing legal proceedings.<br><br>• For the selection of 30 in-custody deaths, reviewed jail files, medical records, and other relevant reports to determine the circumstances around each death—including the cause of each death, such as suicide, homicide, or natural death.<br><br>• For the selection of 30 in-custody deaths, reviewed case file documentation to determine whether detention staff followed applicable policies and procedures related to the safety of and the provision of health care to incarcerated individuals.<br><br>• For the selection of 30 in-custody deaths, reviewed investigative reports from various entities and units to identify whether the Sheriff's Department reviewed the circumstances of each death. Evaluated whether it took appropriate corrective action to improve in-custody safety in response to the death. |

*continued on next page …*

| AUDIT OBJECTIVE | METHOD |
|---|---|
| 4  To the extent possible, evaluate available demographic information—including the race and age of the incarcerated individuals—and identify any relevant trends for all in-custody deaths from the past 15 years. Compare the in-custody death rate in San Diego County to the rates in other comparable California counties. | • Identified three comparable county sheriff's departments—the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department—considering relative size, geographical location, and other factors.<br><br>• Interviewed staff at each county's sheriff's department to understand its policies and practices as well as to identify challenges with ensuring the health and safety of incarcerated individuals.<br><br>• For comparative analysis to identify best practices, obtained and reviewed policies and procedures related to in-custody health care and detention facilities from the three comparable sheriff's departments, along with the policies at CDCR.<br><br>• For all deaths of incarcerated individuals from 2006 through 2020 at the San Diego Sheriff's Department and the three comparable county sheriff's departments, compared the number and types of deaths, and interviewed staff knowledgeable about the data.<br><br>• Obtained data from the California Department of Justice and BSCC, including race of incarcerated individuals, age of incarcerated individuals, and the frequency and cause of death. We used these data to create interactive dashboards that present this information. We present those interactive dashboards at https://www.auditor.ca.gov/reports/2021-109/supplemental.html. We did not identify any notable trends in the deaths of incarcerated individuals by age but include information about their ages in an interactive dashboard. |
| 5  Review allegations from the past 15 years that led to wrongful death suits and determine the number of settlements, the average settlement amount, and, to the extent possible, how settlement awards compare to similar settlements from other comparable counties in California. | • Obtained and reviewed documentation from San Diego County and each of the three comparable counties to identify all settlements related to deaths in detention facilities from 2006 through 2020. For all settlements, we determined the average settlement award and the type and circumstances of the death.<br><br>• Interviewed staff at the comparable counties regarding the total number of settlements in response to in-custody deaths.<br><br>• Compared the settlements in San Diego County to the three comparable counties. |
| 6  To the extent possible, determine which policies specified in settlement agreements or in grand jury recommendations have been implemented and which have not. As part of this determination, also identify whether the Sheriff's Department has suspended, revoked, or amended any such policies in a manner inconsistent with past settlement agreements or grand jury recommendations. | • Identified recommendations regarding policy changes from various entities, including the San Diego County Grand Jury, from 2006 through 2020. For key recommendations related to in-custody health and safety, we determined whether the Sheriff's Department implemented the recommendations. If it did not, we documented and evaluated its rationale.<br><br>• Reviewed current policies and determined that the Sheriff's Department has not suspended, revoked, or amended its policies in a manner inconsistent with past recommendations we reviewed.<br><br>• Determined that the county's settlement agreements generally did not include recommendations. |
| 7  Evaluate the extent to which CLERB has provided recommendations to the Sheriff's Department regarding in-custody safety and followed up to determine whether the Sheriff's Department has implemented those recommendations. | • Reviewed recommendations from CLERB to the Sheriff's Department from 2006 through 2020 and identified key recommendations related to the safety of incarcerated individuals.<br><br>• Reviewed policies and other relevant documents to determine whether the Sheriff's Department implemented key recommendations from CLERB. |

| AUDIT OBJECTIVE | METHOD |
|---|---|
| 8  Evaluate CLERB's review of in-custody death cases in 2017 and assess whether CLERB had sufficient staff and resources to perform its oversight role appropriately. | • Obtained a complete list of death cases CLERB investigated from 2006 through 2020 and compared it to the lists of deaths from the Sheriff's Department and Medical Examiner's Office. Although we found that CLERB did not investigate 57 deaths during this period, as we discuss beginning on page 46, the list of investigations it did perform was sufficient for our purposes. Using the list, we selected six cases from 2016 through 2020 for review based on factors such as the year the investigation was performed, type of death, and result of investigation. |
| | • For the six selected cases, reviewed the full investigative file to determine whether CLERB's staff followed its rules and regulations and other relevant standards when investigating the cases. |
| | • CLERB's rules and regulations require its investigations to be ethical, fair, and impartial. CLERB follows the county's Conflict of Interest Code and Incompatible Activities Rules, which require its members and certain staff members to disclose certain income, employment, economic interests, and gifts. CLERB also has its staff members review and sign the county's code of ethics. We did not identify concerns with the ethics, fairness or impartiality of the CLERB investigations we reviewed. |
| | • Interviewed staff and reviewed documentation to determine why CLERB summarily dismissed 22 death cases in 2017 and whether staff appropriately prioritized death cases. |
| | • We did not evaluate CLERB's investigators' caseloads and staffing because we found issues with the thoroughness and prioritization of its investigations. |
| | • Reviewed the county board's oversight of CLERB and whether it took action to increase oversight in response to increases in deaths of incarcerated individuals. |
| 9  Review and assess any other issues that are significant to the audit. | None identified. |

Source: Audit workpapers.

### Assessment of Data Reliability

The U.S. Government Accountability Office, whose standards we are statutorily obligated to follow, requires us to assess the sufficiency and appropriateness of computer-processed information we use to support our findings, conclusions, and recommendations. In performing this audit, we relied on electronic data files that we obtained from the California Department of Justice related to in-custody deaths in jails of the San Diego Sheriff's Department, the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department from 2006 through 2020. To evaluate the data, we reviewed existing information about the data, interviewed staff knowledgeable about the data, and performed testing of the data. Specifically, we compared data from the counties and the California Department of Justice to data we obtained from the Medical Examiner's Office and coroner's office in each respective county.

Although the state law requiring reporting of in-custody deaths does not require sheriff's departments to report deaths after an individual is released from jail, as we discuss on page 17, we found

that the data supporting the number of in-custody deaths from the California Department of Justice related to the San Diego Sheriff's Department and the Orange Sheriff's Department to be sufficiently reliable for our audit purposes. We found some inaccuracies in the categorization of manner of death, but the inaccuracies do not change our conclusion, and therefore the data are sufficiently reliable for our audit purposes. We performed limited testing of the Alameda Sheriff's Office's and the Riverside Sheriff's Department's data and found them to be of undetermined reliability because of how the counties record and track the information. Although this determination may affect the precision of the numbers we present, there is sufficient evidence in total to support our findings, conclusions, and recommendations.

In addition, we obtained data from BSCC related to the ADPs and annual bookings of the San Diego Sheriff's Department, the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department. We used these data to identify and compare the number of in-custody deaths at each department, taking into consideration the number of individuals incarcerated in its jail facilities. We interviewed staff knowledgeable about the data and performed general testing of the data. We found the data to be of undetermined reliability because the data are self-reported from each county to BSCC. However, we found that the San Diego Sheriff's Department overreported to BSCC the bookings data for 2006 through 2010. Therefore, we obtained additional data from the Sheriff's Department to more accurately reflect bookings in our analyses. Although this determination may affect the precision of the numbers we present, there is sufficient evidence in total to support our findings, conclusions, and recommendations.

Lastly, we obtained statewide data from the California Department of Justice and BSCC related to in-custody deaths and ADP for presentation on our interactive dashboards. We found the data to be of undetermined reliability because the data are self-reported by each county. The dashboard is for informative purposes only; we do not present findings, conclusions, or recommendations on it.




**BSCC** BOARD OF STATE AND COMMUNITY CORRECTIONS

January 14, 2022

Honorable Michael S. Tilden*
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, California 95814

**SUBJECT: RESPONSE – SAN DIEGO COUNTY SHERIFF'S DEPARTMENT AUDIT REPORT 2021-109**

Dear Mr. Tilden,

The Board of State and Community Corrections is required to establish minimum standards for local detention facilities. (Pen. Code, § 6030.) Providing for safe and constitutional facilities is central to the Board's regulations, which are continuously examined and revised on a biennial basis. The Audit of the San Diego County Sheriff's Department (Report 2021-109) focuses on deaths in custody, which is a topic of utmost concern that merits serious attention. Having not been given an opportunity to review the findings in San Diego as part of this response, we are unable to comment on whether the deaths in custody in San Diego County were caused by the county adhering to BSCC regulations that were deficient or whether other operational or personnel issues may have contributed to the audit findings. The Board will undertake a review once the unredacted findings are available to determine to what extent the Board's existing regulations merit revision. However, we disagree with the Auditor's conclusions that the Board's existing training standards are inadequate and that the BSCC's regulations for the operation of adult local detention facilities that are proposed to be revised are insufficient for maintaining the safety of people who are incarcerated.

**Mental Health Screenings** ①

The Auditor states the Board's standards are insufficient to maintaining the safety incarcerated individuals, specifically citing that the regulations "do not explicitly require that mental health professionals perform mental health screenings." We assume the Auditor is referring to "intake screenings," where Section 1207 of Title 15 of the California Code of Regulations provides:

> With the exception of inmates transferred directly within a custody system with documented receiving screening, a screening shall be completed on all inmates at the time of intake. This screening shall be completed in accordance with written procedures and shall include but not be limited to medical and mental

---

Linda M. Penner, Chair
Kathleen T. Howard, Executive Director

WWW.BSCC.CA.GOV

Gavin Newsom
California Governor

---

* California State Auditor's comments begin on page 71.

SD 744761
Ex. A - 72

Tilden, Michael
Page 2

health problems, developmental disabilities, tuberculosis and other communicable diseases. The screening shall be performed by licensed health personnel or trained facility staff, with documentation of staff training regarding site specific forms with appropriate disposition based on responses to questions and observations made at the time of screening. The training depends on the role staff are expected to play in the receiving screening process.

This regulation is aligned with National Commission on Correctional Health Care (NCCHC) J-E-02 which allows for "receiving screening to be conducted by health-trained correctional staff members when health staff are not on duty." NCCHC standards are nationally recognized as best practice.

In addition, Sections 1206 and 1209 of Title 15 of the California Code of Regulations detail requirements of additional mental health screenings that may occur after the initial screening at intake. These requirements do require licensed medical and mental health care professionals to conduct mental health screening and require facilities to provide care for persons with mental health needs.

The Auditor appears to recognize that it may be impractical or impossible for all local detention facilities to have mental health professionals on staff 24/7 for intake, so the report recommends that facilities with average daily populations of 1,000 be required to have these requirements because counties with smaller incarcerated populations have "less risk." While larger counties may be able to provide a higher level of service than other counties, establishing lesser standards for smaller counties is problematic and would create additional inequities within county criminal justice systems.

② **Safety Checks**

The Auditor argues that the current safety check regulation (and proposed revisions) are insufficient to protect the safety and welfare of inmates. The Auditor points to the fact that some counties' policies are more detailed than the Board's regulations. In addition, the Auditor notes the California Department of Corrections and Rehabilitation (CDCR) requires its staff to count "living, breathing" individuals. The fact that some counties may elect to explicitly detail what goes into a safety check in its policies does not mean the Board's minimum standards do not provide for adequate safety. The Board's regulations are designed to give counties flexibility to address their needs while adhering to constitutional standards. In addition, it is important to note that the requirements for counting individuals in the CDCR Department of Operations Manual (§§ 52020.5.5 and 52020.5) are not "safety checks." They are merely instructions on staff to ensure a proper population count.

Section 1027.5 of Title 15 of the California Code of Regulations requires a written plan at each facility that includes documentation of safety checks. Title 15 section 1006,

SD 744762
Ex. A - 73

Tilden, Michael
Page 3

Definitions, provides detail for how safety checks must be conducted and defines both direct visual observation and safety checks:

"Direct visual observation" means direct personal view of the inmate in the context of his/her surroundings without the aid of audio/video equipment. Audio/video monitoring may supplement but not substitute for direct visual observation.

"Safety checks" means direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of inmates.

As part of the most recent regulation revisions adopted at the most recent BSCC board meeting, the Board revised section 1027.5 to require enhancements to safety checks, which, once approved by the Office of Administrative Law, will read, as follows:

§ 1027.5 Safety Checks.
The facility administrator shall develop and implement policy and procedures for conducting safety checks that include but are not limited to the following:
Safety checks will determine the safety and well-being of individuals and shall be conducted at least hourly through direct visual observation of all people held and housed in the facility.
(a) There shall be no more than a 60- minute lapse between safety checks.
(b) Safety checks for people in sobering cells, safety cells, and restraints shall occur more frequently as outlined in the relevant regulations.
(c) Safety checks shall occur at random or varied intervals.
(d) There shall be a written plan that includes the documentation of all safety checks. Documentation shall include:
(1) the actual time at which each individual safety check occurred;
(2) the location where each individual safety check occurred, such as a cell, module, or dormitory number; and,
(3) Initials or employee identification number of staff who completed the safety check(s).
(e) A documented process by which safety checks are reviewed at regular defined intervals by a supervisor or facility manager, including methods of mitigating patterns of inconsistent documentation, or untimely completion of, safety checks.

In this revision, the regulation will explicitly require that safety checks "determine the safety and well-being of individuals." The BSCC revised regulation exceeds many other states' safety check regulations, and is aligned with best practices for safety checks.

SD 744763
Ex. A - 74

Tilden, Michael
Page 4

In short, safety checks allow for potential interventions when people are in distress, but it is also important to balance the needs of people who are incarcerated from overly intrusive and unnecessary checks. Counties have been subject to litigation over allegations of failing to conduct adequate safety checks and also for unnecessarily interrupting sleep as part of rigorous safety check programs. The Board's regulation and proposed revision strikes the appropriate balance in providing for the safety of people who are incarcerated and meeting county operational needs.

③ **Training Standards**

The Auditor states that the BSCC's training standards are insufficient for maintaining the safety of incarcerated individuals. The Auditor solely relies on the total increase in the number of deaths in county jails from 2006 to 2020 to conclude training is insufficient. Based on the information provided in the redacted report, the BSCC is unable to determine whether a lack of specific training caused any of the deaths examined in San Diego and to what extent additional training requirements would have been beneficial or prevented these situations. Instead, the report states that "weaknesses in statewide corrections standards likely contributed to the problems we identified with (redacted) policies" without any specific detail. Without a clear nexus between a deficiency in the training standards and a bad outcome such as a preventable death, it is incorrect to assume that higher standards will better ensure the health and safety of incarcerated individuals.

The Auditor states that the Board's continuing education requirements across job classifications (adult correctional officer, juvenile correctional officer, and probation officer) are inconsistent and recommends that the adult correctional officers should receive 40 hours of annual training on par with probation officers. In addition, the Auditor recommends that agencies with average daily populations of 1,000 or more should require 4 hours of mental health training annually.

The characterization of the continuing education requirements as inconsistent is incorrect. BSCC sets standards for adult corrections officers, juvenile corrections officers, and probations officers and their managers and supervisors. Those jobs are not interchangeable nor are their training requirements. The "inconsistencies" noted in the report are deliberate decisions based on the differences in positions. Requiring the same number of hours across all classifications is arbitrary and not based on job-specific requirements. Furthermore, the number of required hours for the adult corrections officer is on trend nationally and exceeds the number of continuing education hours required by the California Commission on Peace Officer Standards and Training for other peace officer positions.

The report recommends that continuing education include a minimum of 40 hours training annually and at least four hours of mental health training for adult corrections officers for agencies with an ADP of 1,000. First, it should be noted that the BSCC standards already require 21 hours of Behavioral Health training for every officer upon

Tilden, Michael
Page 5

hire. It includes training in suicide prevention, stigma and bias, trauma, emotional survival, interventions and resources, and recognizing signs and symptoms of mental illness and trauma.

Second, we question the premise that more hours of annual training, regardless of the topic or need, will always yield better results. Continuing education hours are deliberately left to the discretion of the agency so that they can identify the specific training needs of an employee, including performance management, and to support organizational priorities or training gaps. Training is not a static need and it should remain flexible to ensure critical gaps are addressed. Training is a critical tool that can improve employee performance and organizational success. However, it is only effective when used appropriately. Problems must be assessed to determine if training can be an effective part of the solution. Culture, ineffective policies, and employees deliberately acting outside of policy are some examples of when training is not an appropriate solution. The portions of the audit we were able to review do not provide an assessment that shows that what was at issue in San Diego was a training failure that will improve by mandating four hours of mental health training each year for all adult corrections officers.

Finally, as with the recommendation to have lesser screening standards for smaller counties, we also disagree with setting lesser training standards for correctional officers in smaller counties.

To be sure, the BSCC continually evaluates the need for entry-level training and annual training. We will take the recommendation under advisement when evaluating the next revision of our training standards to determine whether adding annual mental health training would be beneficial.

In closing, the BSCC appreciates the Auditor's review of its standards and recommendations. At the time of responding to the draft audit, the Board itself has not had the opportunity to meet and discuss. We will discuss the final report with the Board upon release and whether amendments to the BSCC regulations are warranted.

Sincerely,

KATHLEEN T. HOWARD
Executive Director

70 | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744766

Ex. A - 77

# Comments

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE BOARD OF STATE AND COMMUNITY CORRECTIONS

To provide clarity and perspective, we are commenting on the BSCC's response to our audit. The numbers below correspond to the numbers we have placed in the margin of its response. Rather than comment on all of the individual areas of its response that we believe are deficient or misleading, we have summarized our comments according to the respective sections in its response.

We stand by our recommendation that the Legislature should amend state law to require sheriff's departments with larger jail populations to have mental health professionals perform mental health evaluations at intake. We based this recommendation on the problems identified in our review of the San Diego Sheriff's Department and the variation of policies among the three comparable counties. As we state on page 20, in some of the cases we reviewed, the Sheriff's Department did not promptly and properly identify individuals' mental health needs because mental health professionals generally do not participate in its intake health screenings. In contrast, we noted that one county has adopted more robust intake screening practices, as we state on page 20. For example, Riverside Sheriff's Department policy requires that a mental health clinician evaluate every individual before being housed, which could help to more effectively identify mental health needs early.

Further, BSCC infers our recommendation is to establish lesser standards of mental health staffing for smaller counties. On the contrary, we did not propose any changes to these standards for smaller counties, but instead recommend that BSCC should raise the standard for the larger counties, as we describe on page 32.

BSCC suggests that counties electing to have more robust safety checks policies does not mean that its minimum standards are inadequate. We disagree. As we state on page 30, BSCC's standards do not describe the actions that constitute an adequate safety check. Instead, the standards simply state that safety checks must be conducted at least hourly through direct visual observation of all inmates and that observation through a video camera alone is not sufficient. Consequently, we found the four counties we reviewed based their policies on different interpretations of this standard. Further, as we state on page 25, based on our review of video of San Diego Sheriff's Department, we observed multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked

① 

②

SD 744767

Ex. A - 78

through the housing module. Staff later discovered individuals unresponsive in their cells, some with signs of having died several hours earlier.

Further, as we state on page 25, we concluded that sworn staff conducted safety checks inadequately in part because of weaknesses in the San Diego Sheriff's Department's policy. In particular, its safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest. We recognize that acquiring proof of life in some situations is difficult and that waking up incarcerated individuals every hour could be detrimental to their well-being. However, a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate.

Moreover, BSCC asserts that our report references a CDCR policy that merely serves as instructions for a proper population count. However, CDCR's policy is a requirement for an hourly check that is equivalent to what BSCC refers to as a safety check. We revised the report text on page 30 to be more explicit that the CDCR policy is for an hourly check of incarcerated individuals.

Finally, BSCC states that its proposed regulations exceed the standards in other states and are aligned with best practices. However, it falls short of the State's best practice. For example, as we state on page 30, CDCR requires its staff during its hourly checks to count a living, breathing individual whom they see in person. BSCC's proposed regulations are insufficient because, as we state on page 30, it fails to specify that a safety check must include verifying that an individual is alive, which is essential to ensuring the safety of incarcerated individuals across the State.

③  Our recommendation to increase the required number of continuing education hours for local correctional officers is based on concerns observed in our review of how San Diego Sheriff's Department sworn staff responded to medical, mental health, and safety needs. Further, as we state on page 29, given the increase in the annual number of in-custody deaths across the State from 130 in 2006 to 156 in 2020, improving statewide standards related to health and safety and training requirements is essential to ensuring the health and safety of incarcerated individuals.

BSCC's statement that its standards require 21 hours of behavioral health training is misleading because this training pertains only to initial hires. The point of continuing education is to provide local correctional officers with ongoing training to expand their

foundation of knowledge to promote health and safety within the jails and to stay up-to-date on new information that would help in that effort.

We stand by our conclusion that the continuing education requirements are inconsistent. As we state on page 31, BSCC's required training hours for sworn staff working in local detention facilities do not align with their standards for similar positions. Requiring fewer hours for adult corrections personnel does not make sense when thousands of individuals are incarcerated in these facilities and the number of individuals who have died has increased over the past 15 years. Further, BSCC does not require that any of the annual training cover topics pertaining to mental health, even though best practices suggest staff should receive at least four hours of mental health training annually. Increasing the number of training hours to align with similar professions, including mandating mental health training hours, could allow sheriff's departments to better protect and keep incarcerated individuals safe.

Similar to our recommendation for having mental health professionals perform mental health assessments at intake, BSCC should increase the required continuing education hours for counties that house the majority of individuals in the county jail systems. Moreover, contrary to BSCC's assertion, we did not propose any changes to these standards for smaller counties but instead recommend that it should raise the standard for the larger counties, as we describe on page 32.

SD 744769

Ex. A - 80

74 | **California State Auditor Report 2021-109**
**February 2022**

Blank page inserted for reproduction purposes only.



**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III

# County of San Diego
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA  92101-2938
TELEPHONE: (619) 238-6776      FAX: (619) 238-6775
**www.sdcounty.ca.gov/clerb**

January 14, 2022

Michael S. Tilden, CPA*
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

RE:    Response to California State Auditor's Draft Report 2021-109: San Diego County Sheriff's Department

Dear Mr. Tilden:

The Citizens' Law Enforcement Review Board (CLERB) welcomes the opportunity and has authorized me to respond to the California State Auditor's (CSA) draft report, titled, "San Diego County Sheriff's Department," in which analyses and recommendations about CLERB were documented.

CLERB's responses to your specific recommendations, of which the CSA proposes completion by May 2022, are set forth below:

- **Recommendation One: Discuss and modify its current agreement with the Sheriff's Department and the labor organization to allow CLERB's investigators to conduct independent interviews of Sheriff's Department sworn staff.**

  Agree. In the last quarter of 2021, the current CLERB Executive Officer (EO), the Deputy Sheriff's Association (DSA) President, DSA Counsel, and CLERB Outside Counsel met to discuss the agreement for the purpose of conducting in-person interviews with Sheriff's Department sworn staff. Additional discussions are forthcoming.

- **Recommendation Two: Develop a comprehensive training manual for its investigators that outlines standard procedures for investigations. The manual should include a specific section dedicated to investigations of in-custody deaths, including guidance for evaluating the circumstances leading up to an in-custody death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment.**

  Agree. While it is true that there does not exist a physical stand-alone comprehensive training manual, new CLERB Special Investigators are currently provided with copies of CLERB's internal documented policies and procedures (P&P), database user guide, investigative report templates, and a comprehensive resource manual containing the following materials:
  - County structure
  - CLERB historical perspective
  - County Charter, Section 606
  - County Administrative Code, Section 340
  - CLERB Rules and Regulations
  - Civil Service Commission Rule XV
  - Case Law Including and impacting CLERB

①

*"SERVING THE COMMUNITY AND THE JUSTICE SYSTEM"*

---

*    California State Auditor's comments begin on page 79.

    o  Public Safety Officer Procedural Bill of Rights (POBOR)
    o  Statutes Pertaining to Peace Officer Records
    o  San Diego County Grand Jury Reports Pertaining to CLERB
    o  Ralph M. Brown Act
    o  San Diego County Operational Plan Pertaining to CLERB

The P&P, user guide, report templates, and topics contained within the resource manual are thoroughly discussed and reviewed with the trainee during his/her training program. These materials will be incorporated into the referenced stand-alone training manual, which will also include evaluations of a trainee's performance and documentation as to his/her progress, or lack thereof.

① The comprehensive training manual will also include a specific section dedicated to investigations of in-custody deaths. Despite the current absence of the stand-alone training manual, trainees are specifically instructed, during their training programs, to evaluate the circumstances leading up to an in-custody death, and to include a review of the decedent's mental health history and the appropriateness of the decedent's housing assignment. In addition to these critical topics, trainees are also instructed to evaluate the timeliness and thoroughness of welfare checks conducted on the decedent by deputies and assess whether deputies appropriately determined that a life-threatening emergency existed and responded accordingly.

- **Recommendation Three: Create policies and procedures to require its investigators to finish casework on in-custody death investigations within three months of receiving the homicide investigation file. These policies and procedures should also require investigators to attempt to independently verify any information they receive from the Sheriff's Department; to thoroughly review deputy statements and reports from the homicide investigation file; and to request interviews with relevant detentions staff and other witnesses in all instances where they identify discrepancies or missing information.**

② Agree. The current CLERB EO directed that the completion of in-custody death investigations within three months of receiving the homicide investigation file would take effect when CLERB filled its third and final CLERB Special Investigator vacancy. As that vacancy was filled on January 10, 2022, this mandate will now be incorporated into existing CLERB Policy #300.5, entitled, "Death Investigations." The independent verification of information received from the Sheriff's Department and the already existing practices of thoroughly reviewing deputy statements and reports from the homicide file and requesting interviews from witnesses, when contact information is known and time constraints do not exist, will be codified into P&P.

- **Recommendation Four: CLERB should revise its rules and regulations to include prioritization criteria for investigating in-custody deaths above all other investigations.**

③ Agree. The Policy Statement in CLERB Policy #300.5, entitled, "Death Investigations," issued by the current EO on August 27, 2021, indicates that it is the policy of CLERB "that death cases will take priority over any other CLERB case." During the current EO's previous tenure as EO from June 2017 to September 2018, he implemented this practice, and all death cases were made the highest priority. During his absence from September 2018 to November 2020, for unknown reasons, death cases were not handled as the highest priority. To ensure that the investigation of death cases remains the highest priority after any future executive management changes, a five-tiered case categorization system should be documented in the Rules and Regulations, with "Category I" being the highest priority and "Category V" being the lowest priority. Death investigations should be classified as "Category I."

- **Recommendation Five: CLERB should revise its rules and regulations to include clarification that its investigations of in-custody deaths includes those classified as natural deaths.**

Agree. During the current EO's previous tenure as EO from June 2017 to September 2018, he implemented the practice of invoking CLERB's jurisdiction on every in-custody-related death, to include

those that the Medical Examiner's Office determined to be due to natural causes. To ensure that the investigation of all in-custody-related deaths continue after any future executive management changes, CLERB's Rules and Regulations should not only be revised to clarify that in-custody natural deaths are within CLERB's jurisdiction, but that all deaths occurring in the custody of the Sheriff's Department or related to instances or occurrences within the Sheriff's Department detention facilities are within CLERB's jurisdiction. As these proposed Rules and Regulations changes may first require the amendment of the County Charter and/or the County Administrative Code, the CLERB EO will need to work with CLERB's legal counsel to pursue implementation of this recommendation.

- **Recommendation Six: CLERB should perform an analysis of overall trends related to these deaths, including demographic information, and determine whether the trends suggest deficiencies in the Sheriff's Department's policies and procedures. It should also identify policy recommendations for improving the safety of individuals in the Sheriff's Department's custody. CLERB should include these trends and analysis in its annual reports starting with its 2021 report.**

  Agree. The current EO has prioritized in-custody death investigations and the analysis of overall trends related to the deaths, to include demographic information. Upon his return to CLERB in late 2019, he authored CLERB's 2020 Annual Report and provided a detailed breakdown of the 18 death cases CLERB opened in 2019 and the 15 death cases CLERB opened in 2020 (this breakdown is documented on pages 10 and 11 of the Annual Report). In addition, he provided a list of all death cases opened by CLERB in 2019 and 2020 and closed by CLERB in 2019 and 2020. The list included the decedent's name, type of death, detention facility/patrol area, and cause of death (this list is documented on pages 28 thru 33 of the Annual Report). After the finalization of the 2020 Annual Report and its presentation to the Board of Supervisors, the current EO committed to expanding the reporting to include an analysis of overall trends related to deaths, including demographic information, in the 2021 Annual Report.

  CLERB has averaged 10 policy recommendations per calendar year over the past three years. The majority of the recommendations pertained to the Sheriff's Department's detention facilities. Finally, it should be noted that CLERB will, for the first time in its 30-plus year history, conduct detention facility inspections in 2022. The scope of the inspections will be specifically tailored to each detention facility based upon the complaints received from its inmates, great bodily injuries received from deputies' uses of force, and deaths occurring at or stemming from incarceration within it.    ④

We look forward to updating the CSA on progress made within six months. Our commitment to continuing the proactivity started at the end of 2020 to improve upon the invaluable civilian oversight role we provide to the public, the Sheriff's Department, and the County is unwavering. The implementation of the CSA recommendations will assist with CLERB's provision of independent, timely, full, and thorough investigations into in-custody deaths which may, in turn, prevent future deaths.

Thank you for the opportunity to provide this response and for the professionalism and courtesy shown by your staff throughout this process.

Sincerely,

Paul R. Parker III
Executive Officer, CLERB

cc:    CLERB Members
       Shiri Hoffman and Aurelia Razo, Senior Deputies County Counsel
       James Sandler; Sandler, Lasry, Laube, Byer & Valdez LLP

*"SERVING THE COMMUNITY AND THE JUSTICE SYSTEM"*

**SD 744773**
**Ex. A - 84**

78 | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744774
Ex. A - 85

# Comments

**CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE CITIZENS' LAW ENFORCEMENT REVIEW BOARD**

To provide clarity and perspective, we are commenting on CLERB's response to our audit. The numbers below correspond to the numbers we have placed in the margin of its response.

Although CLERB states that it provides various materials and training to its staff, we found some cases in which CLERB's investigators did not appear to consider all the circumstances leading up to the deaths, did not examine all the relevant Sheriff's Department policies, and did not follow up on discrepancies they discovered in the course of their investigations, as we discuss on page 49. Accordingly, our recommendation is for CLERB to develop a comprehensive training manual to ensure that its investigations are complete and thorough.

①

Contrary to its response, we found that CLERB did not always independently verify information from the Sheriff's Department. As we note in the example on page 49, when investigating an altercation between two cellmates resulted in the death of one of the individuals, we found the CLERB investigator did not appear to scrutinize or independently verify evidence that could have sufficiently determined whether the Sheriff's Department's actions violated policies or procedures. Further, we question CLERB's statement that it thoroughly verifies deputies' statements. As we state on page 43, CLERB did not independently interview staff from the Sheriff's Department in any of the six cases we reviewed.

②

As we state on page 48, although CLERB recently added policies and procedures establishing its prioritization of death cases over all other cases, it did not do so until August 2021. Moreover, because policies can easily be changed when leadership changes, it is important that CLERB include requirements in its rules and regulations for how it prioritizes cases.

③

CLERB's statement that it has averaged 10 policy recommendations per calendar year is primarily referring to the recommendations it makes based on individual cases. As we state on page 51, CLERB generally makes recommendations based on individual cases rather than on trends it identifies through analysis of its investigations. Making recommendations based on trends could help resolve more systemic concerns at the Sheriff's Department.

④

80 | California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

SD 744776
Ex. A - 87

**Rob Bonta**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



1300 I STREET
SACRAMENTO, CA 95815-4524
Public: (916) 210-5000
Fax (916) 227-3079
Email: Joe.Dominic@doj.ca.gov

January 14, 2022

Michael S. Tilden, CPA
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

Re:    Draft Audit Report - California State Auditor Report 2021-109; San Diego County
       Sheriff's Department –Inmate Custody Death

Dear Mr. Tilden,

The Department of Justice (DOJ) appreciates the opportunity to review the above-mentioned
draft audit report.

*The audit recommends that to ensure that all sheriff's departments accurately report deaths that
occur from incidents or conditions in county jails, the Legislature should amend state law to
require sheriff's departments to report to the attorney general individuals who are released from
custody after being transported directly to a hospital or similar medical facility, and
subsequently dies in the facility. It should also amend state law to require sheriff's departments
to provide the attorney general with all facts concerning the death, such as the cause and
manner."*

DOJ supports increased transparency of data reporting. As the audit notes, there is currently no
statutory requirement in place to require sheriff's departments to report individuals released from
custody after being transported directly to a medical facility who subsequently dies in the
facility. Express authority from the Legislature and funding is needed to implement this new
data reporting recommendation. Furthermore, should the Legislature implement the
recommendation requiring sheriff's department disclose the cause and manner of the death, DOJ
will work with the Legislature to ensure that any policies comply with all applicable
confidentiality laws.

If you have any questions or concerns regarding this matter, you may contact me at the
telephone number listed above.

Sincerely,



2022.01.14 16:46:08
-08'00'

Joe Dominic, Chief
California Justice Information Services Division

**SD 744777**
**Ex. A - 88**

82 | California State Auditor Report 2021-109
February 2022

January 14, 2022
California State Auditor Report 2021-109
Page 2

For    ROB BONTA
       Attorney General

cc:  Venus D. Johnson, Chief Deputy Attorney General
     Chris Prasad, CPA, Director, Office of Program Oversight and Accountability



# San Diego County Sheriff's Department

Post Office Box 939062   •   San Diego, California 92193-9062

### *William D. Gore, Sheriff*



January 14, 2022

Ms. Elaine M. Howle[*]
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, California 95814

State Auditor Howle:

Attached please find the response from the San Diego County Sheriff's Department in reference to your draft audit report on the San Diego County jails.

Sincerely,

William W Gore

William D. Gore, Sheriff

*Keeping the Peace Since 1850*

---

[*]   California State Auditor's comments begin on page 115.

**SD 744779**
**Ex. A - 90**

**Preliminary Comment**

① **THE CALIFORNIA STATE AUDITOR DID NOT PROVIDE SUFFICIENT OPPORTUNITY FOR THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT TO REVIEW AND RESPOND TO THE AUDIT**

② ⬛⬛⬛⬛⬛⬛ the San Diego Sheriff's Department received a draft copy of the State Auditor's Report 2021-109 ⬛⬛⬛⬛⬛ for the stated purpose of allowing the Department to review and respond to the audit. The Sheriff's Department was afforded less than five (5) days to review and respond to the draft report, as the audit was received late in the morning on Monday and the response was due back by 5:00 p.m. on Friday.

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

The 2018 revision of *Government Auditing Standards*, commonly referred to as generally accepted government auditing standards (GAGAS), is effective for performance audits beginning on or after July 1, 2019, such as the instant engagement. GAGAS section 9.50 provides that "Auditors should obtain and report the views of responsible officials of the audited entity concerning the findings, conclusions, and recommendations in the audit report, as well as any planned corrective actions." The highly redacted version of the draft report,

③ coupled with the short time afforded for review and response, and the lack of supporting documentation, makes it difficult for the Sheriff's Department, as the audited entity, to submit a meaningful, comprehensive response to the draft report.

① Accordingly, the Sheriff's Department reserves the right to submit a more comprehensive response after the final report and any supporting documentation and information are published, as none of the supporting documentation and information was included with the draft report transmission.

## Introduction

The gravity and seriousness of in-custody deaths and the importance of identifying and improving deficiencies when they occur is not lost on the San Diego Sheriff's Department. We have been transparent in our response to the Joint Legislative Audit Committee's recommendation that the California State Auditor review in-custody deaths in San Diego County. During the audit, we cooperated fully and provided complete access to our records, facilities, and personnel.

The Sheriff's Department was pleased to see that the auditors' findings confirm that the Department's policies and procedures align with the minimum standards established through state law and other applicable guidance. That said, while the Sheriff's Department appreciates the work and recommendations of the auditors, the Department maintains concerns regarding the findings, as well as the conclusions and recommendations contained in the draft report and the way the audit was conducted.

④

⑤

### I.  THE AUDIT FAILED TO CONFORM WITH GENERALLY ACCEPTED GOVERNMENT AUDITING STANDARDS

⑥

California Government Code section 8546.1(c) requires that the State Auditor "complete any audit in a timely manner and pursuant to the 'Government Auditing Standards' published by the Comptroller General of the United States." While the State Auditor recognizes that the instant engagement is undertaken pursuant to GAGAS, it failed to conform to the requisite standards.

#### A. The auditors failed to comply with reporting standards for performance audits

⑥

GAGAS section 9.03 provides, "[w]hen auditors comply with all applicable GAGAS requirements, they should use the following language, which represents an unmodified GAGAS compliance statement, in the audit report to indicate that they conducted the audit in accordance with GAGAS:

> We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

The section 9.03 compliance statement is notably absent from the draft report.

86    California State Auditor Report 2021-109
February 2022

In the event auditors do not comply with all applicable GAGAS requirements, section 9.05 provides, "they should include a modified GAGAS compliance statement in the audit report. For performance audits, auditors should use a statement that includes either (1) the language in paragraph 9.03, modified to indicate the requirements that were not followed, or (2) language indicating that the auditors did not follow GAGAS."

Similarly, a section 9.05 alternate compliance statement is also absent from the draft report.

⑥

**B. The auditors have declined to adopt the GAGAS report quality elements of accurate, objective, complete, convincing, and timely in developing and writing the audit report**

Chapter 9 of the GAGAS addresses the reporting standards for performance audits such as the instant engagement. GAGAS section 9.17 provides that "[t]he auditor may use the report quality elements of accurate, objective, complete, convincing, clear, concise, and timely when developing and writing the audit report as the subject permits." For purposes of the instant engagement, the auditors failed to adopt the report quality elements of accurate, objective, complete, convincing and timely in developing and writing the audit report.

⑦

**a. Accuracy**

Section 9.17(a) regarding report quality element "Accurate" states, in pertinent part, "[a]n accurate report is supported by sufficient, appropriate evidence with key facts, figures, and findings being traceable to the audit evidence. Reports that are fact-based, with a clear statement of sources, methods, and assumptions so that report users can judge how much weight to give the evidence reported, assist in achieving accuracy."

Consistent with this standard, the Auditor makes recommendations to the legislature for policy revisions "to better align with best practices, as follows." There is no data or evidence cited to support the best practices recommendations. Data and evidence-based approaches to medical, mental health and correctional care policies are necessary to ensure the best health and safety outcomes for incarcerated individuals. In other sections, the auditor states "[r]eports and studies related to mental health indicate that…" There is no reference to which studies and reports are being relied upon for the assertions.

The audit states, "that deficiencies in the Sheriff's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies *likely contributed to these deaths*," the report is devoid of any evidence that the deaths were cause by a failure of the department's policies or practices.

Page 3 of 31

SD 744782
Ex. A - 93

While no death is acceptable, the Sheriff recognizes that some incarcerated individuals have pre-existing conditions, age or other maladies which lead to natural death. These deaths made up nearly half of all the deaths that occurred during the 15-year audit period. The report does not explain if a failure on the part of the department caused the death or if those individuals could have died in the community from the same pre-existing condition.

The Sheriff's Department has implemented extensive programs, training, and policies to prevent suicide in the jails. The jails disproportionately house individuals suffering from mental illness, and substance use disorder. The identification of individuals who wish to do themselves harm is one key to prevention and removing the ability to commit self-harm is the second. Individuals bent on harming themselves creates obstacles to identification and prevention. Similarly, substance use disorder is an enormous driver for behavior. It could be argued that in-custody individuals are even more driven to use substances to alleviate the strain and monotony of incarceration. The Sheriff's Department has created extensive layers and policies to interdict and prevent contraband from being smuggled into the jail system. We have instituted the use of naloxone to save lives when someone is successful in circumventing those interdiction efforts. While the Sheriff's Department can always do better, the audit does little to document or provide context for those efforts and the complexity of keeping individuals safe from themselves.

### b. Objectivity     ⑥

Section 9.17(b) regarding report quality element "Objective" states, in pertinent part, "[o]bjective means that the presentation of the report is balanced in content and tone. A report's credibility is significantly enhanced when it presents evidence in an unbiased manner and in the proper context. This means presenting the audit results impartially and fairly. The tone of reports may encourage decision makers to act on the auditors' findings and recommendations. This balanced tone can be achieved when reports present sufficient, appropriate evidence to support conclusions **while refraining from using adjectives or adverbs that characterize evidence in a way that implies criticism or unsupported conclusions.**" (Emphasis added).

Despite the fact that section 9.17(b) specifically counsels against using such adjectives and adverbs, the draft report is replete with such unsupported criticism (e.g. "*likely* contributed to the deaths," "*inadequate* response to deaths," "*might* have placed this individual," "lack of *effective* independent oversight," "*meaningful* changes," "*meaningful* corrective action," "few *substantive* steps," "have not consistently led to *significant* corrective action," "failure to *adequately* prevent the deaths," "*could* help," and "*could* be useful"). Use of such terms, in contravention of the GAGAS guidance, calls into question and undercuts the objectivity of the engagement and the resulting instant report.

Section 9.17(b) goes on to provide, "[a]udit reports are more objective when they demonstrate that the work has been performed by professional, unbiased, independent, and **knowledgeable** personnel." (Emphasis added). As discussed more fully below, the auditors lack the requisite knowledge, skills and abilities necessary to competently conduct the instant engagement.

⑥              c.   **Completeness**

Section 9.17(c) regarding the report quality element "Complete" states, in pertinent part, "complete means that the report contains sufficient, appropriate evidence needed to satisfy the audit objectives and promote an understanding of the matters reported. **It also means the report states evidence** and findings **without omission of significant relevant information** related to the audit objectives. Providing report users with an understanding means providing perspective on the extent and significance of reported findings, such as the frequency of occurrence relative to the number of cases or transactions tested and the relationship of the findings to the entity's operations." (Emphasis added).

⑧   The auditors' summary of the event outlined in Case Example 4 illustrates the omission of significant relevant information in an effort to paint a picture that deputies stood idly by while CPR was medically indicated for the incarcerated individual.  Based on our review of Case Example 4, we believe the auditors are referring to Sheriff's case number

②



⑧



SD 744784

Ex. A - 95

The auditors' description of the event depicted in the chart above misleads the reader, is an example of the lack of completeness and objectivity that is present in the draft report and fails to meet the report quality elements outlined in GAGAS sections 9.17(b) and 9.17(c).

### d. Convincing    ⑥

Section 9.17(d) regarding report quality element "Convincing" states, in pertinent part, "convincing means that the audit results are responsive to the audit objectives, that the findings are presented persuasively, and that the conclusions and recommendations flow logically from the facts presented. **The validity of the findings, the reasonableness of the conclusions, and the benefit of implementing the recommendations are more convincing when supported by sufficient, appropriate evidence.**"

While the draft report speaks to best practices, the draft contains no such policies, best practices, or sample language, nor the jurisdiction(s) where such best practices were or are being implemented. As discussed in Section C. below, while good intentioned, best practices suggested by auditors without the requisite knowledge, skills, and abilities, may violate the constitutional rights of incarcerated individuals, cause harm to the mental health of incarcerated individuals and ultimately result in increased liability to the County. By not including copies of the best practices referenced throughout the draft report, it is difficult for the Sheriff's Department to ascertain whether the suggested best practices comport with state law, Title 15 regulations and the constitutional rights guaranteed to incarcerated individuals.

The draft report does contain one table (Table 2) with excerpts of safety check policies, however, while excerpts from the BSCC policy and the Sheriff's Department policy are unredacted, the policies and names of the three other entities are redacted in their entirety.    ③

②



③

&#9313;

i.    **The Auditor Improperly Redacted Public Documents and Refused to Provide the Documents to the Sheriff's Department Necessary for the Department to Provide a Meaningful Response**



For purposes of an engagement under GAGAS, the terms "auditee" and "audited entity" are interchangeable. GAGAS section 1.27(e) defines an "audited entity" as "[t]he entity that is subject to a GAGAS engagement, whether that engagement is a financial audit, attestation engagement, review of financial statements, or performance audit."

The Joint Legislative Audit Committee (JLAC) charged the auditor with conducting an audit of the San Diego Sheriff's Department and the County of San Diego Citizens Law Enforcement Review Board (CLERB). The auditor confirmed the scope of its engagement in the document entitled 2021-109 Audit Scope and Objectives, identifying the audited entities as the San Diego County Sheriff's Department and the CLERB. No other agencies were identified as audited entities (or auditees).

⑨

Based upon the GAGAS standards, and the JLAC referral, Alameda, Orange County, and Riverside are not auditees. However, even if they were, the information relied upon should have been given to the Sheriff's Department, as the auditee, to respond to the draft report, because it is public information.

The Sheriff's Department must meet Title 15 standards for its detention facilities, as do other local detention facilities throughout the State of California.  For the redacted policy excerpts to be relevant to the auditors' engagement, the redacted excerpts are presumably from other law enforcement agencies in the state.

Policies of a California law enforcement agency are public record.  Senate Bill 978 (SB 978) added section 13650 to the Government Code, which requires "...each local law enforcement agency shall conspicuously post on their Internet Web sites all current standards, policies, practices, operating procedures, and education and training materials that would otherwise be available to the public if a request was made pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code)." As such, each California law enforcement agency is required to publicly post, on its website, all its policies and procedures, such as its detention facilities safety check policy.

It is well settled that a governmental agency cannot shield records that are subject to public disclosure simply by putting those publicly available records in a file it stamps "confidential."        ⑩
Therefore, the auditor should have provided the policies which it relied on in creating its report.

Similarly, it was improper for the auditor to redact and withhold from disclosure settlement
information it obtained, admittedly, from publicly available court documents regarding the        ⑩
three selected counties it designated as comparable counties.

�②



    e.   **Timeliness**

Section 9.17(g) regarding report quality element "Timely" states, in pertinent part, "[t]o be of maximum use, providing relevant evidence in time to respond to officials of the audited entity, legislative officials, and other users' legitimate needs is the auditors' goal. Likewise, **the evidence provided in the report is more helpful if it is current.**"

While it is certainly helpful from a historical perspective to discuss changes in policies or procedures, it is unclear whether the auditors' findings and conclusions are based on the policies and procedures as they existed at the time of the incident under review or present-day policies and procedures.  For example, the draft report states, "...although the Sheriff's Department's policy indicates that a nurse should conduct a face-to-face appraisal with an incarcerated individual within 24 hours of a mental health care request to determine the urgency of that request, it has not always had this policy."  The Sheriff's Department believes this change in policy was a positive step, but it is unclear whether the auditors' findings and recommendations are based on current policies and procedures, or policies and procedures that were in place at the time of the incident under review.

### C. The Auditors' Lack of Requisite Knowledge, Skills and Abilities Necessary to Conduct the Instant Engagement Raise Ethical and Competence Issues under the Generally Accepted Government Auditing Standards

Chapter 3 of the GAGAS sets forth fundamental ethical principles for auditors in the government environment.

Section 3.04 relating to ethical principles provides that "[p]erforming audit work in accordance with ethical principles is a matter of personal and organizational responsibility."  The section goes on to clearly state that ethical principles apply in "taking on only work that the audit organization is competent to perform..."

To ensure that an audited entity is afforded a fair, unbiased and meaningful audit, Chapter 4 of the GAGAS requires that the auditors collectively possess the competence needed to address the engagement objectives and perform their work in accordance with GAGAS.  The knowledge, skills, and abilities needed when conducting an engagement in accordance with GAGAS include the understanding necessary to proficiently apply a. GAGAS; b. standards, statutory requirements, regulations, criteria, and guidance applicable to auditing or the objectives for the engagement(s) being conducted; and c. **_techniques, tools, and guidance related to professional expertise applicable to the work being performed_**.  (Emphasis added).  (GAGAS section 4.07).

GAGAS section 4.08 provides, "[a]chieving the knowledge, skills, and abilities needed to conduct a GAGAS engagement may include: a. having prior experience in the subject matter or type of engagement; b. completing [continuing professional education] related to the subject matter or type of engagement; and c. obtaining degrees or certifications relevant to the subject matter or type of engagement."

The instant engagement requires knowledge, skills, and abilities regarding varied areas in the detentions or corrections environment including, but not limited to, detentions custodial operations, detentions medical services and detentions mental health functions.

SD 744788
Ex. A - 99

This knowledge is so important that state law requires that a deputy complete an introductory training course by the Commission on Peace Officer Standards and Training, additional training by the Board of State and Community Corrections, and specialized training for custodial personnel of local detention facilities pursuant to Title 15 of the California Code of Regulations. In addition to this initial 16 weeks of academy training, deputies are next assigned to phase training where they are paired up with seasoned training officers before they can function on their own. After these initial academy and training phases, detentions deputies are required by state law to complete a minimum of 24 hours of annual training to maintain their proficiency and certification.

The professional qualifications necessary for detentions medical doctors, registered nurses, licensed vocational nurses, and mental health clinicians must satisfy not only the educational requirements of their field which often includes many years of studies, and successfully passing the tests required by their licensing authority, but also continuing professional education in order to maintain their license or certification.

Additionally, the field of corrections is a highly regulated field of law comprised of state and federal Constitutional standards and laws, as well as case law issued by the U.S. Supreme Court, federal, and state courts. Changes in department policies can impact an inmate's constitutional rights, and a lack of knowledge regarding correctional law can lead to flawed policies and constitutional violations.

②

The requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions custodial operations would be satisfied by either an auditor, or a specialist[1] engaged

---

[1] "Some engagements may necessitate the use of specialized techniques or methods that call for the skills of specialists. *Specialists do not include individuals with special skill or knowledge related to specialized areas within the field of accounting or auditing,* such as income taxation and information technology. *Such individuals are considered auditors.*" (Emphasis added). GAGAS section 4.13.

"The competence and qualifications of specialists significantly affect whether their work will be adequate for the engagement team's purposes and will meet GAGAS requirements. Competence of specialists relates to the nature and level of expertise. Qualifications of specialists relate to their professional certifications, reputations, and previous work in the subject matter. Other relevant factors include the ability of specialists to exercise competence in the circumstances of the engagement and the effects that bias, conflict of interest, or the influence of others may have on the specialists' professional judgment." GAGAS section 4.14.

"Sources that may inform the auditors' assessment of the competence and professional qualifications of a specialist include the following: *a. the professional certification, license, or other recognition of the competence of*

SD 744789
Ex. A - 100

to assist the audit team, who was certified by the State of California, Bureau of State and Community Corrections (BSCC), Standards and Trainings for Corrections (STC). ███████ ██████████████████████ it does not appear that any of the audit team members possess such training or certification.

It is further generally recognized that the function of providing medical services in the correctional setting is different than in a public setting. According to the American Academy of Family Physicians, "[i]nmates in correctional facilities have significantly higher rates of disease than the general population, and … tend[] to suffer in greater numbers from infectious disease, mental health problems, and substance use and addiction." The requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions medical services would be satisfied by either an auditor, or a specialist engaged to assist the audit team, who is, or was, a medical doctor or registered nurse in a detentions or corrections environment. In our discussions with the auditors, it does not appear that any of the audit team members possess such training or experience.

Similarly, the requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions mental health functions would be satisfied by either an auditor, or a specialist engaged to assist the audit team, who is or was a qualified mental health provider (QMHP) or mental health clinician (MHC) in a detentions or corrections environment. ███████ ████████████████████████ it does not appear that any of the audit team members possess such training or experience.

By way of example, the Sheriff's Department was previously reviewed by subject matter experts who possessed the requisite knowledge, skills, and abilities necessary for the scope of their

---

the specialist in his or her field, as appropriate; b. the reputation and standing of the specialist in the views of peers and others familiar with the specialist's capability or performance; c. the specialist's experience and previous work in the subject matter; d. the auditors' assessment of the specialist's knowledge and qualification based on prior experience in using the specialist's work; e. the specialist's knowledge of any technical performance standards or other professional or industry requirements in the specialist's field (for example, ethical standards and other membership requirements of a professional body or industry association, accreditation standards of a licensing body, or requirements imposed by law or regulation); f. the knowledge of the specialist with respect to relevant auditing standards; and g. the assessment of unexpected events, changes in conditions, or the evidence obtained from the results of engagement procedures that indicate it may be necessary to reconsider the initial evaluation of the competence and qualifications of a specialist as the engagement progresses." (Emphasis added). GAGAS section 4.15.

engagement. One review was conducted by Mr. Lindsey Hayes[2], the other review was conducted by the National Commission on Correctional Health Care (NCCHC)[3].



---

[2] Lindsay M. Hayes is a Project Director of the National Center on Institutions and Alternatives (NCIA) and is nationally recognized as an expert in the field of suicide prevention within jails, prisons, and juvenile facilities. He has been a consultant to the U.S. Justice Department's Civil Rights Division in its investigations of conditions of confinement in both adult and juvenile correctional facilities throughout the country. He has also been appointed as a Federal Court Monitor in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction. He has served as an expert witness/consultant in litigation cases involving the suicide of incarcerated individuals, and his expertise has allowed him to conduct training seminars and assessments of adult and juvenile suicide prevention practices within correctional facilities throughout the country.

Hayes is a published author with over 60 publications in the area of suicide prevention within adult and juvenile correctional facilities and has conducted the only five national studies of jail, prison, and juvenile suicide (*And Darkness Closes In...National Study of Jail Suicides* in 1981, *National Study of Jail Suicides: Seven Years Later* in 1988, *Prison Suicide: An Overview and Guide to Prevention* in 1995, *Juvenile Suicide in Confinement: A National Survey* in 2004, and *National Study of Jail Suicide: 20 Years Later* in 2009).

Hayes has reviewed over 3,000 cases of suicide in jail, prison, and juvenile facilities throughout the country over the past 30 years. He was awarded the National Commission on Correctional Health Care's Award of Excellence in 2001, for his contribution in the field of suicide prevention in correctional facilities. His work has been cited in several state and national correctional health care standards, and numerous suicide prevention training curricula, including the National Institute of Correction (NIC).

[3] The National Commission on Correctional Health Care (NCCHC) is a non-profit 501(c)(3) organization whose mission is to improve the quality of health care in jails, prisons, and juvenile confinement facilities. The NCCHC establishes standards for health services in correctional facilities, produces resource publications, conducts educational conferences, offers a certification for correctional health professionals and a voluntary accreditation program for institutions that meet their standards. The NCCHC is supported by numerous major national organizations in the fields of health, law, and corrections.

The NCCHC has a multidisciplinary governing structure, which addresses the complexities of correctional health care, and whose standards for health services in correctional facilities is widely recognized. NCCHC's standards address areas of care and treatment, health records, administration, personnel and medical-legal issues; and offer voluntary health services accreditation based on its standards. NCCHC also hold conferences with educational programs that address topics such as mental health and substance abuse services. The NCCHC publishes periodicals such as the *Journal of Correctional Health Care* and *CorrectCare*, which are the leading periodicals in this field. The NCCHC offers consultation and assistances to facilities with issues preparing for accreditation, developing policies and procedures, and assessing alternative solutions to problems.

SD 744791
Ex. A - 102

In order to demonstrate that the auditors assigned to this engagement possessed the requisite knowledge, skills, and abilities in detentions custodial operations, detentions medical services and detentions mental health functions, as required by GAGAS, the Sheriff's Department requests that the State Auditor include in its final report the curricula vitae for each auditor and specialist assigned to the instant engagement, including any relevant continuing professional education regarding the subject matter of the engagement.

II.    **THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT HAS TAKEN APPROPRIATE AND REASONABLE MEASURES TO PREVENT AND RESPOND TO DEATHS OF INDIVIDUALS IN CUSTODY**

⑦

a.    **The Auditor's Conclusion That the In-Custody Deaths Were the Result of Inadequate Medical Care is Misleading**

While the first sentence of the draft report begins with the recognition that the Sheriff's Department is responsible for providing medical care to individuals in its custody, the next sentence goes on to state: "Nonetheless, from 2006 through 2020, 185 people died in San Diego County jails – more than in nearly any other county across the state." The transition from the statement that the Sheriff's Department is responsible for providing adequate medical care to the statement that "nonetheless" 185 people died in San Diego County jails is misleading and implies that the deaths were the result of inadequate medical care.

⑦

The draft report does not identify which deaths were the result of "inadequate" medical care. Natural deaths comprise nearly half, the highest percentage, of in-custody deaths identified by the auditors. ████████████████████

②

████████ the draft report does not identify what medical care was inadequate, nor does it identify what medical care the Sheriff's Department should have provided that would have avoided individuals from dying of natural causes, such as heart disease, cancer, chronic lower respiratory disease (COPD, emphysema, chronic bronchitis), and stroke. Just as individuals with these conditions die from their conditions in the community setting, incarcerated individuals with these conditions often die from their conditions while in custody, not as the result of incarceration or the medical care they receive while incarcerated but as a natural and expected progression of their condition.

Similarly, while accidental deaths account for 31 of the total in-custody deaths during the audited period, the draft report does not identify any medical care that was "inadequate" resulting in an individual's death. As the auditors are aware, most of the accidental deaths were the result of individuals overdosing on drugs, not due to "inadequate" medical care. In response to the opioid epidemic, the San Diego Sheriff's Department was one of the first departments in the state to equip not only its detentions medical staff but also detentions

SD 744792
Ex. A - 103

deputies with NARCAN® (naloxone HCL) nasal spray to combat the surge in opioid overdoses. To ensure immediate availability of this highly effective opioid antagonist, NARCAN is not only available in detentions medical areas and in deputy control stations but detentions deputies are also required to carry NARCAN on their person during their shifts. During calendar years 2020 and 2021 alone, Sheriff's Department employees in the jails responded to 314 incidents of suspected opioid overdose deploying 848 doses of NARCAN and saving countless lives. In conjunction with its community partners, the Sheriff's Department also makes this lifesaving drug available to incarcerated individuals upon their discharge from Sheriff's custody.

### b.  The Number of In-Custody Deaths Experienced by the San Diego Sheriff's Department is Consistent with its Position of Having the Second Highest Number of Total Bookings and Overall Deaths in California Counties    ⑫

The San Diego Sheriff's Department's position as having the second highest number of in-custody deaths of counties in the state is consistent with its position as having the second highest number of bookings of counties in the state. As demonstrated by Table 1 below, the trend is consistent for at least the top six counties, exhibiting that as the number of bookings goes up, so do the number of in-custody deaths. Additionally, as demonstrated by Table 2 below, as the second most populous county in the state, the County of San Diego also maintains the position as having the second highest number of deaths in the community.

#### i.  Table B is intentionally misleading

The auditors chose to include a table in APPENDIX A which they identify as focusing on two primary categories, "In Custody Deaths and Bookings From 2006 Through 2020." In so doing, they state that the table "presents the rate of deaths per the number of individuals booked in each of the county sheriff's jail systems from 2006 through 2020." They go on to state that "[t]he number of bookings is the ***total number*** of individuals who were processed through the jail system." (Emphasis added). However, when the auditors sort the chart, they don't sort it by the column entitled "Total Booked", or even the "Total Deaths" column, both of which would clearly show the correlation between the two (see resorted Table 1 below), but instead they chose to sort by the "Total Deaths per 100,000 Booked" which makes the first three columns appear to have no correlation.

② 

However, the exact same data sorted by the "Total Number of Bookings" column, *or* the "Total In-Custody Deaths," column __clearly__ shows a correlation between bookings and the number of actual deaths for the six counties with the most bookings in the State of California.

⑬ **Table 1**



| | County Sheriff's Department | Total Number of Bookings | Average Bookings Per Year | Total In-Custody Deaths | Deaths per 100,000 Bookings |
|---|---|---|---|---|---|
| 1 | Los Angeles | 1,970,654 | 131,377 | 421 | 21.36 |
| 2 | San Diego | 1,284,462 | 85,631 | 185 | 14.40 |
| 3 | San Bernardino | 1,027,195 | 68,480 | 124 | 12.07 |
| 4 | Orange | 888,951 | 59,263 | 111 | 12.49 |
| 5 | Riverside | 810,376 | 54,025 | 104 | 12.83 |
| 6 | Alameda | 777,627 | 51,842 | 99 | 12.73 |
| 7 | Sacramento | 733,275 | 48,885 | 62 | 8.46 |
| 8 | Santa Clara | 682,010 | 45,467 | 84 | 12.32 |
| 9 | Fresno | 551,624 | 36,775 | 86 | 15.59 |
| 10 | Kern | 520,074 | 34,672 | 70 | 13.46 |
| 11 | Ventura | 424,978 | 28,332 | 47 | 11.06 |
| 12 | San Joaquin | 392,895 | 26,193 | 34 | 8.65 |
| 13 | Contra Costa | 370,299 | 24,687 | 43 | 11.61 |
| 14 | San Francisco | 353,521 | 23,568 | 39 | 11.03 |
| 15 | Tulare | 333,941 | 22,263 | 26 | 7.79 |

#### ii. The top 5 counties with the most deaths countywide are also the same

As jails are a microcosm of the communities in which they are located, it should come as no surprise that as deaths in the community increase, deaths in-custody will increase as well. This is particularly true for in-custody deaths due to natural causes, suicide, and accidental deaths due to overdose. As greater numbers of individuals in a community are sick, experience suicidal ideations or are afflicted by substance use disorders, those increased numbers can be expected to replicate themselves in the detention systems serving those communities. As reflected in Table 1 above, the number of in-custody deaths experienced by the Sheriff's Department is not disproportionate to the number of deaths experienced in the San Diego County community regardless of custody status (See Table 2).

⑫

**Table 2**    ⑬

#### Deaths in California Counties From 2006 Through 2020

| | County | Est. County Population (2020) | Average County Population (2006-2020) | Total Deaths (2006-2020) | Average Deaths Per Year | Deaths per 100,000 Population |
|---|---|---|---|---|---|---|
| 1 | Los Angeles | 10,135,614 | 9,991,660 | 939,073 | 62,605 | 626.6 |
| 2 | San Diego | 3,331,279 | 3,181,752 | 320,562 | 21,371 | 671.7 |
| 3 | Orange | 3,180,491 | 3,084,349 | 292,178 | 19,479 | 631.5 |
| 4 | Riverside | 2,440,719 | 2,251,242 | 224,078 | 14,939 | 663.6 |
| 5 | San Bernardino | 2,175,424 | 2,079,014 | 206,764 | 13,784 | 663.0 |
| 6 | Sacramento | 1,553,157 | 1,457,469 | 170,958 | 11,397 | 782.0 |
| 7 | Santa Clara | 1,945,166 | 1,848,744 | 157,224 | 10,482 | 567.0 |
| 8 | Alameda | 1,663,114 | 1,568,059 | 144,734 | 9,649 | 615.3 |
| 9 | Fresno | 1,020,292 | 955,030 | 104,127 | 6,942 | 726.9 |

This data table reports the annual number of deaths that occurred in each County regardless of the place of residence (by occurrence).

#### iii. The Comparator Counties Selected by the Auditors Do Not Accurately Reflect the Relevant Peer Group Departments    ⑭

Considering county size, geographic location and "other factors" the auditors selected the Alameda County Sheriff's Office, Orange County Sheriff's Department and Riverside County Sheriff's Department as comparator departments. From the report, it is unclear how geographic location factored into the selection of the Alameda Sheriff's Office as a comparator department as the county seats of San Diego County and Alameda County are approximately 490 miles from each other. Similarly, the auditors' selection of similar *counties*, based on what appears to be total county population, rather than similar *booking numbers* is inappropriate. It is unclear how total county population factored into the selection of the Alameda Sheriff's

Office as a comparator department when the County of Alameda has less than half the average county population of San Diego County.

The comparator peer group should be based on the total number of individuals encountered (booked) by each department rather than county population. As reflected in Table 3 below, an analysis of the departments, based on total number of bookings, reveals that the statistically relevant departments are the Los Angeles Sheriff's Department, San Bernardino Sheriff's Department and Orange County Sheriff's Department. The San Diego County Sheriff's Department's total bookings for the reviewed 15-year period are within 65% of what the Los Angeles County Sheriff's Department booked for the same period. Similarly, San Bernardino and Orange County Sheriff's Departments booked at least 65% of the total number of bookings that the San Diego County Sheriffs' Department booked.

However, the Riverside County Sheriff's Department and Alameda Sheriff's Office, each booked **less** than 65% of the total number of bookings that the San Diego County Sheriff's Department booked for the same time. By excluding the Los Angeles Sheriff's Department and San Bernardino Sheriff's Department, in favor of Riverside County and Alameda County, the auditors excluded the only other departments in the state that booked in excess of 1,000,000 individuals during the audit period. By excluding the Los Angeles Sheriff's Department and San Bernardino Sheriff's Department, the auditors also excluded the other two departments with the highest number of in-custody deaths in the state during the audit period in favor of departments having the fifth and sixth highest number of in-custody deaths.

⑬

**TABLE 3**

**Top Three Counties With Total Bookings
Within 35 Percent of San Diego County Bookings**



c.  **The San Diego Sheriff's Department's Review of In-Custody Deaths Exceeds the Standards Set by the State of California**    ④

The Auditor's stated purpose[4] for the instant engagement is, in pertinent part, to "[e]valuate the San Diego Sheriff's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to inmates. *To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance.* As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to inmates." (Emphasis added).

The auditors' findings confirm that the San Diego Sheriff's Department not only meets the minimum standards established through state law and other applicable guidance but, in fact, exceeds those requirements regarding its review of in-custody deaths.

i.  **The Auditor's Conclusion that the Department's Review of In-Custody Deaths has been Insufficient is Misplaced**    ⑮④

The auditors' findings confirm that the Sheriff's Department meets and exceeds the minimum state standards for review of in-custody deaths.

As noted by the auditors, state law requires the Sheriff's Department to conduct a clinical care review within thirty (30) days of every death. The Sheriff's Department meets this requirement by conducting a Mortality/Morbidity Review. The auditors' findings did not reveal any failure on the part of the Sheriff's Department to comply with applicable law with either the timeliness or the substance of the Department's reviews.

Except in the case of a suspected homicide, no other review or investigation is required. In the case of an in-custody death in which homicide is suspected, the Sheriff is statutorily required to

---

4    **2021-109 AUDIT SCOPE AND OBJECTIVES**
     **San Diego County Sheriff's Department**

     The audit by the California State Auditor will provide independently developed and verified information related to the death of inmates in the custody of the San Diego County Sheriff's Department (San Diego Sheriff). The audit's scope will include, but not be limited to, the following activities:

     1.  Review and evaluate the laws, rules, and regulations significant to the audit objectives.

     2.  Evaluate the San Diego Sheriff's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to inmates. To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance. As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to inmates.

investigate the death. That investigation is conducted by the Sheriff's Homicide Unit. The auditors' findings did not reveal any failure on the part of the Sheriff's Department to investigate any in-custody death in which homicide was suspected.

No other reviews by the Sheriff's Department are mandated by state law for in-custody deaths.

While no other reviews are mandated, the Sheriff's Department created and implemented its own multilayer review above and beyond the minimum state standards for review of in-custody deaths.

Although not required for in-custody deaths where homicide is not suspected, the Sheriff's Department, as a matter of practice, conducts an investigation by the Homicide Unit into every in-custody death, not just those deaths where homicide is suspected.

In addition to the Homicide Unit investigation, the Sheriff's Department created its own Critical Incident Review Board (CIRB). The CIRB's role is not limited to reviews of in-custody deaths but includes the review of a variety of critical incidents including uses of force, pursuits, K-9 deployments, overdoses, and other significant events. In-custody deaths due to natural causes are generally not reviewed by the CIRB, unless other issues are identified, as deaths due to natural causes are more appropriately reviewed by the statutorily mandated thirty (30) day Mortality/Morbidity Review conducted by the Department. A further discussion regarding the recommendation that the CIRB review natural deaths is discussed below.

If the CIRB or any member of the Sheriff's Department believes an in-custody death implicates potential misconduct or a failure to meet standards on the part of an employee, the CIRB or any member of the Sheriff's Department can file a Department Generated Complaint requesting that Internal Affairs investigate the matter.

Penal Code section 832.5 requires every law enforcement agency in the state to establish a procedure to investigate complaints lodged *by members of the public* against personnel of the agency. In addition to investigating complaints from members of the public, the Sheriff's Department investigates "department generated" complaints, which can be lodged by any member of the department, in the same manner as it investigates a complaint by a member of the public. If there is potential misconduct or a failure to meet standards on the part of an employee related to an in-custody death, the Sheriff's Department does not wait for a member of the public to file a complaint but can and does initiate an Internal Affairs investigation based on a department generated complaint.

As the auditors' findings make clear, the reviews conducted by the Sheriff's Department not only meet the minimum standards established by the state, the multilayered approach adopted by the Sheriff's Department far exceeds those minimum standards. Any deficiencies in the state's minimum standards regarding the review of in-custody deaths is most appropriately

SD 744798
Ex. A - 109

addressed to the Legislature and/or the BSCC, not to the Sheriff's Department as the audited entity.

### ii. The Critical Incident Review Board's Roles of Preventing Future Litigation and Improving the Health and Welfare of Incarcerated Individuals are Not Mutually Exclusive

⑯

The auditors stated there should be more transparency regarding the process and findings of the Sheriff's CIRB Board. The CIRB reviews occur within the confines of the attorney-client relationship and are not reported out publicly. Every governmental entity, even those such as the State Legislature or a Board of Supervisors, both of which are subject to the *Brown Act's* open meeting requirements, are afforded the opportunity to engage in candid conversations with its counsel within the confines of the attorney-client relationship.

Notwithstanding the auditors' particular concern regarding the existence of the attorney-client privilege, the CIRB's role of preventing future litigation compliments rather than undercuts the Department's goal of improving the health and welfare of incarcerated individuals entrusted to the care and custody of the Sheriff. As items of concern are identified during a critical incident, such as an in-custody death, the CIRB review is focused with an eye towards what changes have already been implemented by the chain of command to remedy any deficiencies before the matter made it to the CIRB for review, as well as any changes the chain of command may not have already identified and/or implemented to minimize the risk of a recurrence. If the CIRB identifies any best practices or changes not previously identified and implemented by the chain of command prior to its review, the CIRB is empowered to make such recommendations.

As it relates specifically to in custody deaths, the CIRB concentrates not only on the death itself, but also considers the handling of the inmate from the time the inmate was originally booked. The Board looks to determine whether any warning signs existed, whether appropriate and timely safety checks occurred, and whether there were any risk reduction lessons that could be derived from the incident.

While the focus of the CIRB may be risk management, the mechanism by which risk management is ultimately accomplished is clearly through the promotion of best practices and policies that improve the health and welfare of incarcerated individuals and holding staff accountable.

While the Auditor was "particularly concerned" that the Sheriff's Department does not publicly report out its CIRB discussions, all Sheriff's Department policies, procedures, training, and education materials are published on the Sheriff's Department's website. Any changes to Sheriff's policies, procedures, training, or education, whether recommended by the CIRB or implemented by management prior to or without the need for a CIRB review, are published and available for the public to access on the Sheriff's Department's website. In addition to the

SD 744799
Ex. A - 110

attorney-client privileged nature of the CIRB discussions, the Sheriff's Department would also be prohibited by state statutory and constitutional privacy considerations from disclosing any discussions by the CIRB regarding employee misconduct or Internal Affairs investigations.

(17)

### d. In Addition to Its Own Internal Reviews, the Sheriff's Department is Already Subject to Independent Oversight by Multiple External Organizations

Local detention facilities are subject to a myriad set of regulations and laws based on statutory law, constitutional guarantees, and case law. In order to ensure county detention facilities, comply with these requirements, the BSCC promulgates regulations under Title 15 of the California Code of Regulations, establishing statewide standards for detention facilities. In

(4)

order for facilities to maintain their certification to operate, counties are subject to bi-annual inspections by the BSCC. The auditors' findings confirm that the Sheriff's Department meets the standards established by the BSCC under Title 15.

In addition to the bi-annual inspections by the BSCC, pursuant to its authority under Penal Code section 919, the San Diego County Grand Jury conducts an annual inspection of the Sheriff's Department detention facilities.

The San Diego County Citizens Law Enforcement Review Board, pursuant to its County Charter authority, is also empowered to, and does, investigate in-custody deaths.

(17)

### e. In its continuing efforts to enhance medical and mental healthcare, and exceed the standards set by the State of California, the Sheriff's Department engaged reviews by multiple separate external entities specializing in correctional healthcare

The Sheriff's Department was reviewed by two entities in pursuit of enhancing system operations related to medical and mental health care. These included a look at suicide prevention practices by nationally recognized expert, Mr. Lindsay Hayes, and a preliminary review by the National Commission on Correctional Healthcare (NCCHC). Both entities produced reports for the Sheriff's Department that have been used to enhance policies and procedures to align with best practices and meet recommendations. The reports are available on the Sheriff's Department public website at www.sdsheriff.gov.

SD 744800
Ex. A - 111

## III.    RECOMMENDATIONS                                          ⑤

### a.    Intake Screening

*CSA Recommendation:*

*Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity rating as it assigns to individuals to all detentions staff overseeing them.*

The Sheriff's Department concurs with the auditor's assessment that Qualified Mental Health Providers (QMHP) are the more appropriate staff to conduct the mental health screening portion of the intake process. The Medical Services Division (MSD) received funding for additional staffing in July 2021 and is currently in the process of recruiting and hiring from a limited pool of candidates. Additional staffing will allow us to provide a comprehensive screening process utilizing the electronic health record, in accordance with National Commission for Correctional Health Care (NCCHC) standards. Some identified QMHP staffing duties would be to conduct the Behavioral Health (BH) screening, complete a risk/needs assessment, to include substance use disorder (SUD). The assessment would determine a behavioral health acuity rating, schedule psychiatric appointments, schedule follow up QMHP appointments, assess for the need of placement into our Inmate Safety Program (ISP) and obtain Release of Information authorizations. QMHPs and nursing staff working in collaboration at the initial intake assessment and throughout a patient's incarceration promotes a comprehensive whole person model of care.

Ongoing effective communication between medical staff and sworn staff is paramount in ensuring the safety and wellbeing of our patients. Our plan is to implement bidirectional communication with our Jail Information Management System to ensure sworn staff are aware of the mental health recommendations. All staff are responsible for the appropriate and timely care of our patients. Further analysis will need to be done to evaluate the impact this acuity rating system would have on our system of jail classification and housing needs.

SD 744801
Ex. A - 112

*CSA Recommendation:*

*Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.*

San Diego County does not have an interconnected health information exchange. Hospital centers and medical systems independently manage their data systems and may or may not voluntarily participate or contribute to a health information exchange. Our health staff currently have access to the following county databases:

### i. Health and Human Services Agency – Cerner Community Behavioral Health (CCBH)

Cerner Community Behavioral Health is a behavioral health-specific electronic health record that specializes in the delivery of community mental health, inpatient mental health, outpatient mental health, substance use disorder and developmental disabilities care. Although there may be some patients who are not in the database and do not have data entered, we continue to review and enter data referencing our patient encounters while in our care.

As of April 2021, all QMHPs (mental health clinicians, psychologists, psychiatrists, psychiatric technicians) have "read" access to Cerner Community Behavioral Health (CCBH). QMHPs can review records at any point in the patient's stay. The planned integration of a QMHP into the intake process for behavioral health screening will fulfill this recommendation. In addition to having access to review community behavioral health records, the Sheriff's Detention Services Bureau contributes to this community database by recording and entering mental health care provided while the patient is in our custody as part of the county's continuum of care. The Sheriff's Medical Services Division intends to adhere to the NCCHC standards for the referral process.

### ii. Health and Human Services Agency – San Diego Immunization Registry

The San Diego Immunization Registry (SDIR) is a County system that offers Sheriff's Department health staff the ability to verify a patient's vaccination status. SDIR is limited to vaccinations given in San Diego County. If a patient receives an immunization outside of San Diego County or opts to "lock" their record, health staff will not have the ability to verify vaccination status. Currently we have sufficient access to SDIR.

### iii. San Diego Health Connect

San Diego Health Connect was originally designed to allow for medical information to be exchanged between community clinics. The database only covers medical (not mental

**SD 744802**
**Ex. A - 113**

health/behavioral health issues) and each patient must consent to participate. Very few patients are registered in the system, and the system is undergoing restructuring.

### b. Medical & Mental Health Follow-Up

*CSA Recommendation:*

*Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.*

The Sheriff's Department concurs with the auditors' assessment that a revision is necessary to address the process for medical/mental health referral after two requests. The Sheriff's Medical Services Division intends to implement a health care requests and services process in accordance with NCCHC standards. Patients will be referred to a provider to be evaluated. When a patient presents for health care services more than two times with the same complaint and has not seen a provider, they will receive an appointment to do so. Some mental health patients need assistance with advocating for their medical care. Regular follow-up and ongoing engagement with QMHPs is essential to identifying patients who face these challenges.

*CSA Recommendation:*

*Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request. Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.*

The Sheriff's Department concurs a timely medical response to patient concerns is extremely important, and that repetitive patient refusals or an abject delay in follow-on scheduling of medical care are concerning issues and could potentially precipitate an adverse condition or event. We are committed to the health and well-being of our patients, and are developing safeguards to ensure a timely, efficient re-engagement of both medical and mental health services.

The Sheriff's Department is currently focused on a more nursing centric model. For health staff, we are in the process of embedding nursing staff at the ward level, assigning nursing staff to most housing units in support for the Primary Care nursing model. Nurses will be there to perform face-to-face assessments of their assigned patients (on the floors and during sick call)

SD 744803
Ex. A - 114

and involved in counseling and advocacy efforts for every refusal. We have worked with our contracted medical providers to develop daily rounds in designated modules to address acute and ongoing assessments for specified patients. We continue to pursue accreditation from the NCCHC which requires a face-to-face assessment withing 24 hours of a medical request being filed (NCCHC Standards J-E-07).

*CSA Recommendation:*

*Revise its policy to require more frequent psychological follow up after release from the inmate safety program to at least monthly check-ins.*

The Sheriff's Department will reevaluate our policies on psychological follow-up. Our current Inmate Safety Program policy reflects the recommendations from Mr. Lindsey Hayes regarding our follow up protocol. Mr. Hayes is nationally recognized as an expert in the field of suicide prevention within custodial settings and has served as a Federal Court Monitor. While placement into any of our Inmate Safety Program specialized housing requires a mental health response and establishes a basis for continued follow-up; the Sheriff's Department's current planned expansion and hiring of additional mental health professionals will allow for more frequent encounters and the investment of time necessary for higher quality mental health care.

⑱  Mr. Hayes specifically states, "it is recommended that the follow-up schedule be simplified and revised as follows: follow-up within 24 hours, again within 72 hours, again within 1 week, and then periodically as determined by the clinician until release from custody." As a nationally recognized expert, SDSD has adhered to Mr. Hayes' recommendation.

### c. **Safety Checks**

*CSA Recommendation:*

*Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.*

The Sheriff's Department will reevaluate current policy and incorporate best practices. SDSD is exploring technologies to assist with monitoring a "proof of life" for all incarcerated individuals with minimal sleep interruption through staff contact. The Sheriff's Department is evaluating industry capabilities, and in the process of developing a more robust facility Wi-Fi system

SD 744804
Ex. A - 115

capable of supporting technological advancements in monitoring the welfare of our population. The Sheriff's Department's planned integration of Bodyworn Cameras (BWC) into the custodial setting will greatly assist in showing the point of view each deputy has during the safety checks.

*CSA Recommendation:*

*Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff perform.*

Sheriff's Department line supervisors conduct electronic log reviews every shift. This review includes ensuring the timeliness of safety checks in accordance with established Policy & Procedures. The Sheriff's Department's current practice requires supervisors conduct video audits of random safety checks and will formalize this into policy.

### d. Sworn Discovery of Medical Emergency

*CSA Recommendation:*

*Revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow.*

Sworn staff does not require approval from medical to start CPR. Current DSB P&P M.5 I.B. states, "When the severity of the medical emergency requires it, and as soon as it is safe to do so (unless death is obvious, such as decapitation, obvious rigor mortis, etc.), deputies acting as first responders will provide basic life support and first aid. Upon arrival, facility health staff will assess the severity of the inmate's injury/distress, provide first-aid, and may assist or take over cardiopulmonary resuscitation (CPR) responsibilities as directed and/or needed." This policy in its current form has been in effect since January 2012.  ⑲

The Sheriff's Detention Services Bureau In-Service Training Unit distributed a training bulletin on Signs of Medical Distress and Life-Threatening Emergencies on June 18, 2021. The purpose of the training bulletin was to familiarize staff with signs of death or near death and appropriate actions of sworn staff when observing such signs of medical distress. Per DSB Policy and

SD 744805
Ex. A - 116

Procedure section M.6, "Any life-threatening medical emergency shall trigger a 911 request for a paramedic emergency response team. Sworn and health staff shall initiate emergency response and basic lifesaving measures until relieved by the paramedic emergency response team."

### e. In-Custody Death Follow-Up

*CSA Recommendation:*

*Staff will provide a written report of each 30-day medical review to its management.*

The Sheriff's Department concurs with this recommendation.

*CSA Recommendation:*

*When warranted, the report should specify recommendations for changes to prevent future deaths.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case.

*CSA Recommendation:*

*The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and to identify issued that require further study.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case. There are other processes currently in place to look for policy, training, or accountability issues following critical incidents.

### f.   Critical Incident Review Board

*CSA Recommendation:*

*Revise its policy to require that the Critical Incident Review Board review natural deaths.*

In July of 2021, the Division of Inspectional Services (DIS), Sheriff's Legal Affairs, and CIRB board members evaluated potential updates to policy and procedures section 4.23 – Department Committees and Review Boards. This assessment included reviewing in-custody deaths deemed natural by the Medical Examiner's Office, as the auditors recommend. This, along with other changes are anticipated to be in a pilot phase beginning February 2022. Historically, if a natural death is deemed to have potential issues of any nature it may be presented to CIRB at the discretion of the board members. Also, the Chief Medical Officer and appropriate medical staff conduct a mortality/morbidity review of each in-custody death for their determination of any changes that are needed related to medical care for incarcerated individuals.

*CSA Recommendation:*

*Require the Sheriff's Department to make public the facts it discusses and recommendations it decides upon in the Critical Incident Review Board meetings to establish a separate public process for reviewing deaths and making necessary changes.*

CIRB presentations allow the Sheriff's legal advisor and the various commands the ability to review critical incidents to identify issues that should be addressed in various areas, including, but not limited to, training, policies, procedures, staffing, and equipment. The confidential environment provided by the CIRB is essential to the free exchange of ideas, and concerns, in anticipation of future litigation because of a given incident, and in order to avoid future litigation through implementation of best practices. Effectiveness and thoroughness of presentations would likely be diminished if the attorney-client privilege is removed, or information is required to be disclosed during pending, or anticipated litigation. Much of the information presented in CIRBs is intended for individuals who have a vast familiarity and understanding of law enforcement or detention operations, department policies, and state and federal laws, and may contain confidential information including criminal history, medical history, and peace officer personnel records.

⑯

Page 28 of 31

### g. Citizen's Law Enforcement Review Board Integration

_CSA Recommendation:_

_Revise its policy to include CLERB in its immediate death notification process._

_Revise its policy to allow a CLERB investigator to be present at the initial death scene._

The Sheriff's Department is currently evaluating a process to integrate the CLERB investigator into the initial notification and response to in-custody deaths, to include a scene walkthrough and incident brief.

_CSA Recommendation:_

_Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators._

The CLERB has subpoena powers for in person sworn staff interviews.  In 2003, the CLERB discontinued issuing Sheriff's Department sworn staff interview subpoenas and opted for written responses due to Public Safety Officers Procedural Bill of Rights (POBAR) conflicts where ultimately the interviews did not benefit the CLERB's investigations.  The CLERB continues to have subpoena powers.  This recommendation should be re-directed to the CLERB for its review to change its current practice and exercise its authority to issue subpoenas to Sheriff's sworn staff.

20

SD 744808
Ex. A - 119

## IV.    CONCLUSION    ⑤

The Sheriff's Department takes seriously its responsibility to maintain a safe and healthy environment in the county jails.

The Sheriff's Department has welcomed and consistently made itself available for, and cooperated with, reviews by numerous entities including the Disability Rights California, Lindsay Hayes, the NCCHC, the San Diego County Grand Jury, and the Citizens Law Enforcement Review ⑰ Board. We did the same with the California State Audit. After every review, the Department seriously considers every recommendation and implements those that are appropriate and possible, given existing laws, infrastructure, staffing limitations, and best practices. During the 15-year audit period the Department has taken numerous steps towards providing the best care for those detained in the jail system. To date, the following improvements have been made:

- Changing our pharmacy business processes
- Implementing a new electronic health record system
- The continuous review and updates to both Detentions Services and Medical Services policies and procedures.
- Increased medical service provider coverage
- Enhanced communication and collaboration between medical and sworn staff which includes the:
    o Implementation of a medical "scene manager" to ensure relevant communication during critical incidents
    o Issuance of facility communication equipment in the nursing stations to expedite response
    o Development of collaborative training between sworn and health staff related to health emergencies
- Developing and mandating an 8-hour suicide prevention training and a 2-hour refresher training
- Enhancing our suicide assessment and monitoring
- Enhancing the continuity of care for inmates removed from suicide precautions; and
- Enhancing the quality assurance process for intake screening related to suicide prevention

We recognize that we cannot rest on the things that we have done. As the Sheriff's Department shared with the auditors, the Department is pursuing accreditation by the National Commission on Correctional Health Care (NCCHC). The Sheriff's Department currently meets the standards established by the State of California, final accreditation by the NCCHC would add yet another layer of continuing, independent, external oversight. However, our goal is to

SD 744809
Ex. A - 120

exceed all standards. We strive to provide a better than community standard in the medical and mental health care of incarcerated individuals.

The San Diego Sheriff's Department recognizes that comparisons will be made among counties in California. We regularly confer with other counties in the state and across the country to identify best practices. We remain focused on what we can improve and are committed to do so. It is with this attitude that the San Diego County Sheriff's Department will go forward in assessing the recommendations made by the auditor in the draft report.

Sincerely,

William D. Gore, Sheriff

SD 744810
Ex. A - 121

# Comments

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

To provide clarity and perspective, we are commenting on the Sheriff Department's response to our audit. The numbers below correspond to the numbers we have placed in the margin of the Sheriff's Department's response. In certain areas of its response, we have summarized our comments according to the respective sections in its response rather than comment on all of the individual areas of its response that we believe are deficient or misleading.

We provided the Sheriff's Department five business days to review and provide a formal response to the draft audit report, which is our standard practice for all audited entities. As part of our audit process and in accordance with generally accepted government auditing standards, we also met with the staff of the Sheriff's Department, including the Sheriff and other executive management personnel, on numerous occasions during the audit to ensure they were fully briefed on our findings, conclusions, and recommendations.

①

We have redacted portions of the Sheriff's Department's response containing information that is deliberative in nature or reflects confidential discussions not used in support of the audit report. Additionally, some of the redacted text contains excerpts from the draft report. In accordance with Government Code sections 6254, 8545, and 8545.1, it was necessary for us to make these redactions to protect our confidential work and because the improper disclosure of draft audit documents is a misdemeanor.

②

The Sheriff's Department states that the highly redacted version of the draft report made it difficult for it to submit a meaningful, comprehensive response. On the contrary, the report that we provided contained all findings, conclusions, and recommendations pertaining to the Sheriff's Department—all of which we had previously shared with its management on numerous occasions. The sections we redacted pertained to other audited entities, such as CLERB, which were not relevant for the Sheriff's Department's response. Further, because state law makes it a crime to improperly disclose ongoing audit information, when the California State Auditor's Office sends draft sections of an audit report to an audited agency for its comment, we redact from the draft those provisions that concern the other agencies being audited. Moreover, the Sheriff's Department misunderstands the purpose of an audit report, which is to summarize the results of our audit work that the Audit Committee directed us to perform. Our working

③

SD 744811

Ex. A - 122

papers contain the documentation and analyses that support the findings, conclusions, and recommendations in the audit report. Additionally, Government Code section 8545, prohibits the public release of any work papers pertaining to an audit that has not yet been completed. Until the audit report is published, we are required to hold any supporting work papers in strict confidence.

④ Although we concluded that the Sheriff's Department's policies generally align with BSCC standards, we found significant deficiencies that we discuss throughout the report. Moreover, as we state on page 32, BSCC designs the standards to be a minimum that all counties can achieve, regardless of variation in resources at the local level. However, we found that BSCC's approach enables counties that house large numbers of incarcerated individuals to provide lower levels of care. Therefore, to improve the level of care in local detention facilities, we made recommendations to address weaknesses in the Sheriff's Department's policies and procedures as well as in BSCC's standards.

⑤ The Sheriff's Department's concerns related to our findings and conclusions contradicts its agreement with our recommendations. Under generally accepted government auditing standards, which we are required to follow, the findings and conclusions of an audit form the basis for recommendations.

⑥ The Sheriff's Department incorrectly states that we do not comply with audit standards, which it asserts on pages 85 through 96. We conducted this audit in accordance with generally accepted government auditing standards, which we are required to follow, and the California State Auditor's thorough quality control process. In following audit standards, we are required to obtain sufficient and appropriate audit evidence to support our conclusions and recommendations. As with all of our audits, we engaged in extensive research and analysis for this audit to ensure that our report presented a thorough and accurate representation of the facts, and included all relevant information. We stand by the statements in our report, which are based on sufficient and appropriate evidence. Further, as with all of our audits, our public report includes the required statement indicating that we performed this audit in compliance with audit standards.

Moreover, as part of our adherence to audit standards, our staff possess the collective knowledge, skills, and abilities to conduct performance audits, including those of local law enforcement entities.

⑦ The Sheriff's Department's comments questioning the accuracy of our report are unfounded. As we state on page 13, the high rate of deaths in San Diego County's jails compared to other

counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. Throughout Chapter 1 we provide numerous examples of deficiencies in the department's policies and procedures that likely contributed to the deaths of some incarcerated individuals and how these policies and procedures do not align with certain best practices used by comparable counties and other entities. Specifically, in the examples on pages 21 through 24, we describe how the Sheriff's Department did not consistently follow up with individuals who needed medical and mental health services, and that lack of attention may have contributed to their deaths. Finally, although the Sheriff's Department indicates that our audit does little to document or provide context of its efforts to respond to deaths, we describe on page 39 the improvements the Sheriff's Department has made. Because we found that weaknesses continue to exist in the Sheriff's Department's policies and procedures, we made recommendations to address those weaknesses.

Because the Sheriff's Department's response included specific details about an in-custody death, such as the case number and a more detailed description of the incident, we redacted this text because it contained confidential information and to protect the privacy of the individuals involved. We clarified our report to make it clear that our concern in this case is related to timeliness of its response to the emergency and not the issue of who provided CPR. ⑧

The Sheriff's Department incorrectly states that it was not given information about the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department. The draft report that we sent to the San Diego Sheriff's Department contained primarily publicly available information for these counties to provide context for the Sheriff's Department's findings. ⑨

When multiple entities are examined in an audit, the California State Auditor's Office is required under state law to maintain confidentiality with each of those entities. Maintaining confidentiality among multiple subjects of an audit is essential to ensuring the integrity and quality of the evidence upon which the audit's conclusions are based. Moreover, based on its misunderstanding of state law, the Sheriff's Department wrongly asserts that our office was required to provide it with supporting documentation pertaining to other auditees because they are public records. Government Code section 8545 prohibits the public release of any work papers or documents pertaining to an audit that has not yet been completed. Until the audit report is published, any supporting documents are held in strict confidence. ⑩

SD 744813

Ex. A - 124

⑪ The Sheriff's Department's concern regarding which version of policies and procedures we based our findings on is unfounded. Our analysis included identifying the policies applicable at the time of the incident we reviewed and determining whether they were subsequently updated to address our concerns. For example, as we state on page 23, we identified a weak policy for mental health services that contributed to an individual's death by suicide and determined that the Sheriff's Department subsequent revision to that policy did not fully address our concerns.

⑫ The Sheriff's Department's approach does not allow for a fair comparison between counties. In Table A.2 on page 60, we present the rate of in-custody deaths based on the relative size of 15 counties. We believe that this objective presentation allows a reader of the report to compare the counties in a more meaningful way. Nevertheless, in both presentations, the Sheriff's Department is among the highest in number and rate of deaths in its jails.

⑬ Table 1, Table 2, and Table 3 on pages 98 to 100 were created by the Sheriff's Department and are not part of our report. We do not attest to the accuracy of the information the Sheriff's Department presents.

⑭ We stand by our selection of the comparable counties referenced in our audit. As we state in the Scope and Methodology on page 62, we selected these counties considering relative size, geographical location, and other factors. We also used professional judgement in selecting a large county in a different region to obtain broad perspective. Our selection of counties satisfied the audit objectives and resulted in sufficient and appropriate evidence to support our findings, conclusions, and recommendations.

⑮ We stand by our conclusion that the Sheriff's Department's reviews of in-custody deaths are insufficient. As we state on page 34, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given, identified whether any concerns required further study, or stated whether changes to policies, procedures, or practices are warranted. We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow-up care before an individual's death, such as those we discuss in Chapter 1.

Further, as we discuss on page 38, the Sheriff's Department does not complete internal affairs investigations related to in-custody deaths frequently enough for it to provide significant value. The small number of these investigations related to deaths—coupled with the lack of meaningful changes arising from the Critical Incident Review Board meeting and the 30-day medical review—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

The Sheriff's Department mischaracterizes our point about its Critical Incident Review Board. To clarify, as we state on page 36, the stated purpose of the board is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore, it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals.

⑯

Further, after the board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices. Specifically, as we state on page 36, even though the board discussed critical issues in some meetings, it did not always make recommendations for addressing these issues.

Moreover, as we discuss on page 37, although we do not disagree with having a confidential forum to discuss potential litigation matters, we are concerned that the Sheriff's Department does not have a separate public process to demonstrate that it is addressing deficiencies in its policies, procedures, and practices after in-custody deaths occur. By keeping its findings and recommendations confidential, the department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents. Further, the Sheriff's Department is disingenuous in its response that it provides all changes to policies, procedures, training, or education on its website. The policies posted on its website do not communicate changes it made in response to in-custody deaths. Having its policies available online in their entirety without specifically identifying those changes that it made in response to in-custody deaths is not transparent in this respect.

Even though the Sheriff's Department was reviewed by external entities, we found it has failed to implement key recommendations from external entities, including recommendations from the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention consultant, as we describe on page 38. Some of the recommendations that the Sheriff's Department failed to implement are related to weaknesses in its policies and

⑰

procedures that we identify in this report. Accordingly, we are concerned about whether the Sheriff's Department will make meaningful changes to address these systemic weaknesses.

⑱    The timeframes that the Sheriff's Department refers to are unrelated to our recommendation. Our recommendation is for the Sheriff's Department to update the minimum ongoing follow-up in its policy from 90 days to at least monthly. As we state on page 22, reports and studies related to mental health indicate that more frequent psychological follow-up, such as check-ins performed weekly to rather than every 90 days, leads to faster recovery and is more effective for individuals with mental health needs.

⑲    Although the Sheriff's Department asserts that its current policy appropriately addresses safety concerns regarding sworn staff administering CPR to incarcerated individuals, we had concerns with this policy during our audit. As we state on page 27, in some instances, sworn staff did not perform lifesaving measures because they thought the individual was dead. However, when department medical staff arrived minutes later, they immediately began lifesaving measures on the individual, including CPR. This fact calls into question the ability of sworn staff to assess whether unresponsive individuals might benefit from such potentially lifesaving measures.

⑳    We explain on pages 42 through 45 our concerns with CLERB not directly interviewing sworn staff. Our recommendation to the Sheriff's Department to encourage its staff to cooperate with CLERB's investigations aligns with our recommendation on page 57 to CLERB.

# EXHIBIT B



# NCCHC Resources, Inc.

™

# Technical Assistance Report

# San Diego Sheriff's Department

*This report details findings from site visits to four (4) San Diego Sheriff's Department facilities and presents recommendations for quality improvement.*

Developed by NCCHC Resources, Inc.

*January 2017*

**Ex. B - 129**

DUNSMORE0260618



# TECHNICAL ASSISTANCE REPORT:
## SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

## CONTENTS

INTRODUCTION ................................................................................................. 2

TECHNICAL ASSISTANCE REPORTS
    San Diego Central Jail (SDCJ) ................................................................... 3
    George F. Bailey Detention Facility (GBC) ...........................................37
    Las Colinas Detention and Re-Entry Faculty (LCDRF) ........................70
    Vista Detention Center (VDF) ............................................................104

DISCLAIMER ...............................................................................................138

ABOUT NCCHC RESOURCES, INC. ...........................................................138

**Ex. B - 130**

DUNSMORE0260619

 Resources, Inc.

# TECHNICAL ASSISTANCE REPORT:
## SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

### INTRODUCTION

**Origin of Project**

The San Diego County Sheriff's Department conducted a request for proposal and selected NCCHC Resources, Inc., to provide technical assistance to help San Diego County Sheriff's Department accomplish this goal. This report presents the results of the technical assistance.

**Plan of Action**

NRI provided a team of correctional health care experts to assess operational policies and practices for four selected jails within the San Diego County Sheriff's Department. The aim was for NRI to recommend how the county may deliver health care to inmates and improve their physical and behavioral health outcomes.

**Designated Facilities**

The NRI team scheduled site visits in 2017 and requested security clearances for the four (4) designated jails through the San Diego County Sheriff's Department. The site visit schedule was as follows:

- San Diego Central Jail (SDCJ)                             January 3-4, 2017
- George F. Bailey Detention Facility (GBCF)                January 5, 2017
- Las Colinas Detention and Re-Entry Faculty (LCDRF)        January 6, 2017
- Vista Detention Center (VDF)                              January 7, 2017

**Ex. B - 131**

DUNSMORE0260620

San Diego Sheriff's Department
San Diego Central Jail (SDCJ)
Technical Assistance Report
January 3 & 4, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails*. On January 3-4, 2017, NRI conducted its review for the San Diego Central Jail (SDCJ). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 38 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 26 essential standards:

<u>Essential Standards</u>
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services

**Ex. B - 132**

DUNSMORE0260621

J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patient with Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication


Essential Standard Not Applicable
J-G-09   Counseling and Care of the Pregnant Inmate
J-E-02   Receiving Screening


There are 27 important standards and 25 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure in the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-10   Patient Escort
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-11   Care For the Terminally Ill
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison
J-G-08   Contraception

---

**Ex. B - 133**

DUNSMORE0260622

**Evaluation Method**

We toured the clinic area, inmate housing areas, receiving area, medical observation areas, mental health and segregation. We reviewed 68 health records; policies and procedures; provider licenses; administrative, health staff, and continuous quality improvement (CQI) meetings; job descriptions; statistical and health services personnel and correctional officer (CO) training. We interviewed the jail commander, command staff with the sheriff, responsible physician, director of nursing, CQI nurse, infection control/training nurse, psychiatrist, psychologist, mental health clinicians, dentist, medical records clerk, 11 health staff, six COs, and 11 inmates selected at random.

**Facility Description**:

**Location:** Southwest
**Built:** 1998
**Security:** Maximum Security
**Supervision Style:** Indirect and Remote Supervision
**Bookings:** 122/ day   44,549 annually
**Layout:** Modular and Dormitory Housing
**Capacity:** 1159          **ADP:** 914
**Males:** 970             **Females:** none
**Custody Staff Total:** 222   **Shifts:** Days, Evenings, Nights

**Findings and Comments**

*__Special Note:__ A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard.*

## A.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

*J-A-01  **Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. Some areas of the program are not timely such as the receiving screening and the face-to-face evaluation after a request for care is triaged. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. As this is a maximum security jail, patients are occasionally on "lock down" status, and the nurses and mental health clinicians do not have access to them. Patients are subsequently rescheduled for their appointments, and medication administration is delayed. Also, the provider has ordered four-times-a-day diabetic checks, with the night check being completed at 2:00 a.m.

---

**Ex. B - 134**

DUNSMORE0260623

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices (and rarely at the facilities). The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody and medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented, with action items, and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and procedure

---

**Ex. B - 135**

DUNSMORE0260624

meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization; these reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific.
It is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken; however, documentation is lacking. The identified studies are not documented, nor are the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and re-monitors performance after implementing improvement strategies.

---

**Ex. B - 136**

DUNSMORE0260625

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The same drill scenarios were used, but there was no documentation. The 2016 scenarios included an active shooter, use of the restraint chair in a medical emergency, hostage scenarios, and inmate disturbance. The scenarios are developed centrally and sent to the facility staff to conduct. The drills were critiqued and shared with staff via training bulletins and at weekly staff meetings.

An actual riot involving 33 inmates and staff, some of whom were treated at the emergency room, occurred. This was not documented, but could have been.

Man-down drills are planned to occur monthly or every other month. They do occur on each shift and are described as "man on the floor", "man down in video court", or cell extractions. They are also critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, much as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a

**Ex. B - 137**

DUNSMORE0260626

provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis. Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.

The facilities have a large numbers of cells assigned to segregation, so it is difficult to transfer segregated inmates to a clinic or interview room for care.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2 and # 3 require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA concerns and confidentiality.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There have been 13 deaths in the last two years; eight were reported to be of natural causes, one was a homicide, and four were suicides. The administrative and clinical mortality reviews were completed, but not in a timely manner, nor were psychological autopsies for the cases of suicide. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The three compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, and autopsies and sharing with staff would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

At this facility the numbers of health and mental health related grievances filed per month or year were not available.

Inmates may appeal, with a standard guideline of level one (seven days to respond) and level two (10 days to respond).

**Recommendations**: Compliance indictors # 1 and # 2 are met, however, we recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging the grievances in the central data base, health staff maintains its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends (either monthly or quarterly) for possible patient care issues.

**Ex. B - 138**

DUNSMORE0260627

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room (for total isolation). The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked: sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. Due to his man y assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA proactively implements programs to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus; knowing a woman's pregnancy status before administering medications is imperative.

---

**Ex. B - 139**

DUNSMORE0260628

**J-B-03  Staff Safety (I).** Health staff appears to work under safe and sanitary conditions. The jail is well lit, clean and well maintained for an older jail. The space for health is limited, but the health staff has made great efforts to keep it organized and to maximize the available space. It should be an on-going effort to keep areas free of clutter and prevent overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios or a call system to be notified in emergencies, or to call if in an emergency. Examination rooms do not have call buttons. Because of this, officer presence is essential for the safety of clinical staff.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail reported that this occurs very rarely.

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

---

**Ex. B - 140**

DUNSMORE0260629

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility for providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits, and all were current in cardiopulmonary resuscitation (CPR) training. Additionally, there is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Ex. B - 141**

DUNSMORE0260630

**Recommendations:** CIs # 1 through # 3 describe the training program for health staff so they are appropriately trained in administering medications. This training is required to be approved by the responsible health authority, facility administrator and designated physician. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** This facility does not use inmate workers in the medical observation beds area or the clinical areas. Nurses clean these areas. There are no peer health-related programs. Nurses clean the clinic spaces and medical observation beds. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for this assignment, and earn their food handler certifications.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff are scheduled to work 10-hour shifts with every other weekend off at this facility. Full-time staffing consists of forty-six (46) RNs and eighteen (18) LPNs. Ten (10) RNs are scheduled for the day shift and eight (8) are scheduled on the night shift. Four (4) LPNs are scheduled for each shift. Actual working hours may vary depending on the work load or medication round schedule. The contract physicians hold clinic seven days a week, and are on call on a rotating schedule 24 hours a day. Mental health staff consists of three full-time clinicians.

At the time of our visit, vacancies consisted of two (2) RNs, two (2) LPNs, and the chief psychiatrist. One (1) newly hired nurse was scheduled for orientation. Temporary agency staff is employed to fill vacancies.

**There are no** recommendations regarding this standard. Timely staff response to patient needs requires continual monitoring and evaluation. The length of time of medication rounds, wait times for dentist or physician appointments, or time spent in booking for an evaluation, are all components that may determine the program's staffing needs. We noted there are very few mental health clinicians given the population.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two (2) weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six (6) weeks are spent in on-site orientation and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LPN Preceptor Toolkit which consists of check lists along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two (2) years by the responsible health authority. The current procedure was last revised in 2013.

---

**Ex. B - 142**

DUNSMORE0260631

## D. HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours services. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks, and once a year to inspect and inventory the medication rooms.

At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the eleven (11) compliance indicators in the standard along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers.  The room was furnished with a refrigerator and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs # 2, # 4, # 5, # 7, # 8, and # 10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

**Ex. B - 143**

DUNSMORE0260632

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Two other areas of concern were: 1) over-the-counter medications in the nursing protocols were all prescription doses and 2) incoming detainees wait three days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LPNs put doses of medication into labeled envelopes before taking the cart or basket to the housing areas for administration. Since this process is time-consuming, LPNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task. Automation or routine chart review schedules would help the providers schedule medication renewals.

---

**Ex. B - 144**

DUNSMORE0260633

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to lock-down status. Nurses are not able to see patients during lock-down periods. There is no written procedure to determine what medications are necessary during lock-down. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be verified. Likewise, audits will insure that medications are prescribed only when clinically indicated as stated in CI # 4.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them. There is no safety check for names or allergies or which medications are to be administered at that time. This is actually dispensing and only pharmacists and providers may dispense. This violation of nursing practice is serious and a violation of the Nurse Practice Act. A change to individual patient-specific or individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery) that are ordered, which medications are delivered, and when a medication container is empty.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two dental operatory chairs, a dentist's office, a medication room, a records room, space for telemedicine/laboratory services, a patient waiting room, a radiology/x-ray room, three dialysis chairs, the nurses' area, examination space for orthopedics and sick call, and storage space. Mental health staff stated they have some office space for patient counseling. The booking area also has some space for medical services. The "second floor" has space for patient evaluations and care delivery and a few housing areas had a nurse's exam room in the central hall for nurse sick call, diabetic care and emergencies.

Nurses (one going off duty and one coming on duty) count items subject to abuse on each shift. We verified these were accurate. The three emergency crash carts are checked each shift. We counted three automated external defibrillators (AED) strategically placed around the facility.

We noted that some storage areas, if re-organized, could become interview or exam rooms for staff use.

The clinic contained all the equipment necessary to take care of the patients.

**There are no** recommendations regarding this standard.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, and drug screen urine dipstick and multiple-test dipstick urinalysis. Pregnancy test kits are not necessary as the population at this facility is male.

**Ex. B - 145**

DUNSMORE0260634

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans, and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment, and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** An access-to-care sign was posted in the upstairs area of receiving. Inmates receive instructions on access to care, the fee structure, and grievances by watching an orientation video (available in English and Spanish) in each housing area. No written information is provided as, reportedly, the inmates used it to disrupt the plumbing. Inmates who speak other languages or have a hearing impairment can use an AT&T

Ex. B - 146

DUNSMORE0260635

language line and TTY, respectively, and a few staff members are also conversant in sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return, and others have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** When new admissions arrive directly from the community to the jail, the booking process consists of multiple steps. In the first stage, upon arrival, the inmate sees a nurse behind a privacy screen for "pre-booking or medical clearance" screening. The nurse takes vital signs and asks questions such as injuries, risk for suicide, medications, health problems, and recent hospitalizations. An arrestee who is semi-conscious, bleeding, or severely intoxicated will be sent to the emergency room for treatment, first. If the arrestee is stable, they are cleared for the next stage of booking.

"Fast booking" allows a person with identified health issues to advance through the booking process more quickly. There could be others who do not tell the nurse they have major health issues and could have a crisis when the normal process takes 12 or more hours.

The second stage occurs upstairs. This includes the custody booking process and a more extensive receiving screening by a nurse. The three (3) nurses assigned to booking interview arrestees as soon as possible for the screening. The full medical evaluation includes a body scan for contraband, a chest x-ray for tuberculosis, and housing in a sobering cell, if needed. Safety cells are used to observe for possible suicidal behavior. Our chart reviews and the interviews we conducted confirmed the booking process takes from eight (8) to twelve (12) hours (sometimes up to 30 hours) to complete before inmates go to housing. A nurse practitioner is assigned to this area to see patients and order medications. When there is no nurse practitioner, the nurses order medications based on nursing assessment protocols.

Under the current booking process, some of the compliance indicators are met. CI # 1 addresses the pre-screening, which occurs as soon as someone exits the vehicle. CI # 2 and CI # 3 are met. CI # 4 is not applicable, as this is a booking facility for men. CI # 5 refers to the timeliness of the booking process, which can take up to eight (8), twelve (12), and sometimes up to 30 hours to complete. CI # 6 and CI # 7 are not met because some of the questions and observations required in the standard are not part of the procedure. CI # 8 through CI # 11 are met. CI # 12 addresses the regular monitoring of receiving screening, but there was no evidence of reviews of the process.

**Recommendations:** After considering the length of time most detainees spend in the booking process without being evaluated by health staff, and a plan of care developed, we looked at the booking process closely**.** The goal is met in that a newly arriving person is seen by a nurse right away after arrival, but this is merely the first step.

Reportedly, another nurse's station was being planned for the stage 1 area, so that two nurses could complete the initial receiving screening. This will help with the backlog. This, combined with a fully complete questionnaire, would significantly reduce the backlog and improve

---

**Ex. B - 147**

DUNSMORE0260636

timeliness. If all the receiving screening was completed at the first stage, resources could be shifted from the second floor.

CI # 6 a-k addresses the elements needed on the receiving screening form. Most are on the form already and adding dietary needs and recent communicable diseases symptoms would meet compliance.

CI # 8 describes the disposition of the inmate. This is not part of the receiving form and should be added. It communicates whether the person would go to general housing, medical observation beds, sobering cells, safety sells, etc. This is important for the next health care person to know what was present in booking.

CI # 12 requires that health should regularly monitor the effectiveness and safety of the receiving screening process. This can be done in quality improvement committee meetings or in another fashion.

**J-E-03  Transfer Screening (E).** Reportedly, there are 50 to 100 transfers a day to this facility from others. A transfer review procedure was initiated three months ago with a goal of a nurse's review within twelve (12) hours. This procedure was not listed in the policy and procedure manual.

The nursing staff receives a list of transferring inmates from classification staff when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said, "cleared by RN and chart checked by MD," at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, they will be evaluated at the receiving facility in a timely manner. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

---

**Ex. B - 148**

DUNSMORE0260637

The full population health assessment is the most common, and with a "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week as documented by a very short note. If an initial health assessment was in place a time when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through CI # 4, and the individual health assessment requires compliance with CI # 5 through CI # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during stage 2 of receiving screening. There is no 14 day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first, and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place.

**Recommendations:** The mental health screening form requires revision to include all the required questions and observations. RNs should be trained by a mental health staff. When all the questions from the standard are incorporated into the forms, revisions would comply with the 14 day mental health screening. Part of compliance is documenting those seen and still to be seen in logs or lists, to assure no one misses their evaluation when a mental health problem is identified.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking although there is no inspection of the inmate's mouth. This could be added to the first stage as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12 month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site two days a month and sees patients upon a nurse's referral. They dentist completes extractions and provides fillings, albeit rarely. The dental list shows from the time of the appointment until the patient is seen varies from five (5) to ten (10) days to two (2) months.

CI # 4 through CI # 6 are in place.

**Recommendations**: CI # 1 and CI # 2 can be addressed by incorporating oral screening into the initial health assessment standard implementation. The dentist can train the nurses to

---

DUNSMORE0260638

complete the oral screening. The oral hygiene handout can be given at this time as well. CI # 3 can be met by preparing a list of inmates who are going to be in the facility for twelve (12) months and scheduling them for a dental evaluation.

The initial health assessment, mental health screening and evaluation, and oral care may all be accomplished by having a trained nurse or qualified health care professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves slips each night and brings them to medical services where they are date stamped, triaged as to the nature of the complaint (health, dental, or mental health), and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day, or next day, to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two (2) to four (4) days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven (7) to fourteen (14) days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight (8)days to see the nurse and in some cases waits were twelve (12) to eighteen (18) days. For the physician, the lists were five (5) days out, with some at eight (8) to twelve (12) days.

At this facility all inmates have access to the locked boxes to place requests for care confidentiality except in the segregation area. These inmates remain in their room and are screened in for walk and/or shower time. They have to give their requests for care to an officer, so confidentiality is not guaranteed. CI # 2 through CI # 5 are met.

**Recommendations**: CI # 1 requires that a qualified health care professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a qualified health care professional to see the patient before assigning the plan of care or level of care needed. General examples of the risk of current practices could include what appears to be a tension headache for the patient could be a symptom of stroke and what appears to be constipation could in fact be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and make sure there are no backlogs of forms not triaged.

CI # 3 assures all inmates, no matter which housing area, have access to care and timely evaluations. Evaluating those in segregation with no access to confidentially submit a form should be investigated.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day. They can respond to emergencies in the facility. The emergency carts are stocked with suction, AED, and other emergency medications. 911 services are called, as needed, and the hospital is within 15 miles. CI # 1 through CI # 3 are met.

**There are no** recommendations regarding this standard.

**Ex. B - 150**

DUNSMORE0260639

**\*J-E-09  Segregated Inmates (I).** This facility has a significant number of segregation, administrative segregation, and personal protection cells. A nurse checks these inmates three (3) times a week and signs off on the list of inmates in that housing area. There are no notes as to their condition or if they are having a problem coping with isolation. Mental health staff also checks segregation inmates.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients are escorted to on-site and off-site clinical appointments in a timely manner. The segregation areas require numerous staff to escort patients and this can be a complication. Transporting officers are alerted to special accommodations (such as medication administration or communicable diseases) for their protection. Patients' health records are sealed in an envelope, and returned the same way. CI # 1 to CI # 3 are met.

**Recommendations:** Lack of deputies may delay escort from occurring or allowing mental health staff to see a patient and should be investigated to improve timeliness.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols (also known as standardized nursing procedures in this program) include prescription medications for emergency situations, as well as routine health conditions of alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format) with guidelines for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included protocols to diagnose and prescribe medications to

Ex. B - 151

DUNSMORE0260640

patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols (although those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering). CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered, and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. Since the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based, and implemented in a timely manner. CI # 1, CI # 3, CI # 4, CI # 6, and CI # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place; however, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs

**Ex. B - 152**

DUNSMORE0260641

for Naltrexone for extended-release injectable suspension ™, etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Instead, information is clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

Representatives of community programs come on-site for classes on HIV, hepatitis, parenting, and GED preparation. We observed a few posters in the housing areas about access to care, PREA, and smoking cessation. A closed-circuit television system is in place and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that the health record documents that patients receive individual health education and instruction in self-care for their health condition. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than ten (10) special medical diets offered.

At the time of our visit, approximately 166 special diets were ordered at this facility. A registered dietitian reviews the medical diet menus annually (in July). At the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference.

CI # 1, CI # 3, CI # 4 and CI # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months and whenever a substantial change in the menus is made. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

**Ex. B - 153**

DUNSMORE0260642

## G. SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment. These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard is that when someone with a chronic disease enters a corrections facility, he or she is identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component, with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications and "return to clinic" appointments as set.

This program has one chronic disease pathway for hypertension which was revised in 2014. It is in the procedure manual and guides the nurses' care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines," which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases and/or medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases which, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on. Forms should be developed for better documentation by providers and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test and the frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

**Ex. B - 154**

DUNSMORE0260643

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC offer treatment guidelines and forms that can be revised to fit a particular program.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to the frequency of follow-up for medical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens and, when appropriate, instructions about diet, exercise, adaptation to the correctional environment, and medication, is needed. A review of inmates with active medical instructions indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called Medical Observation Beds (MOB). Seventeen (17) or these beds are for medical patients and thirty (30) are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patients should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal, and directs the nurses to use the standard nursing protocols. The protocol instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients and felt some of them were at infirmary level of care, and required a physician directing the care plan and medications.

The responsible physician and RHA, should review the use of the MOB and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds and sheltered housing. The discussion section further explains what

---

**Ex. B - 155**

DUNSMORE0260644

infirmary care is and the alternatives. Some programs have a low level of care and have shelter housing beds where nurses may admit. Others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CI # 3 and CI # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define and distinguish admissions to the infirmary from observation and/or shelter beds from outside hospital admissions. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CI # 8 and CI # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use. This includes lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and are referred to the onsite mental health program staff. A mental health clinician is in the stage 2 booking level daily to evaluate those inmates with mental health conditions. There are some safety cells (suicide watch or violence watch) if needed. There are also enhanced observation cells for special housing. The staffing included a position for a supervising psychiatrist (vacant at the time of our visit), and the chief clinician. Three mental health licensed clinicians respond to patients needs for evaluations. The psychiatric team is supplemented with contract psychiatrists who receive referrals and calls for evaluations and who order medications. The team provides some programming for patients, as well, to include the PET or puppies therapy sessions.

CI # 1, CI # 3, CI # 4, CI # 5, and CI # 6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five (5) areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor, and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or

**Ex. B - 156**

DUNSMORE0260645

medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program.

In the last two years, the facility has had thirteen (13) deaths, four (4) of which were suicides. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were completed for the cases of suicide but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit and was to continue until all health, mental health, and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health, and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings. During these meetings, special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CI # 1 and CI # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled. CI #  6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective, assessment, and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells (on the second floor, above booking), but does not address those inmates going through withdrawal in general housing, segregation, or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours (if not symptomatic in booking).

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care. The nurses manage the withdrawal using the protocol. When a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

**Ex. B - 157**

DUNSMORE0260646

This is a men's facility. The pregnant opiate patient discussed in CI # 7 is not applicable.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CI # 3, CI # 4, and CI # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring, and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension ™, and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** The population at this facility is all male. The standard is **not applicable.**

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** The population at this facility is all male. The standard is **not applicable**.

**J-G-10  Aids to Impairment (I).** During the visit, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs approximately six (6) to eight (8) times a year. There is no formal procedure. Staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program. If a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CI # 1, CI # 2, and CI # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

**Ex. B - 158**

DUNSMORE0260647

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and/or emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room which is accessible to the clerical staff who manage the records, and the electronic record is password-protected. Health and custody staff undergo annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two (2) senior medical records technicians, ten (10) technicians, one (1)  clerk and one (1) office assistant. Some of the staff are located in the central administrative office and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**There are no** recommendations regarding this standard. We recommended that you continue the purchase of an integrated, complete medical record.

**Ex. B - 159**

DUNSMORE0260648

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a written policy and defined procedures specify which health services staff have access to custody records and under what circumstances.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one (1) hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four (4) hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four (4) hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every fifteen (15) minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Restraint is reportedly rarely applied. There are two restraint chairs in the facility and deputies carry TASERs™ and handcuffs. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CI # 1, CI # 2, and CI # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place.

---

**Ex. B - 160**

DUNSMORE0260649

According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every fifteen (15) minutes for four (4) hours when a medication is given to someone in an emergency.

There is a process in place, through the courts, for forced medications. The PSU had approximately six (6) to eight(8) patients on this program system-wide. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed, revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** It was reported that health staff does not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice, the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four (4) compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions, or living wills that an inmate arrives with, would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: In this standard, Inmates approaching the end of life are permitted to execute advance directives including living wills, health care proxies, and "do not resuscitate" (DNR) orders. CI # 1 through CI # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d. emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**Ex. B - 161**

DUNSMORE0260650

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research or a patient on a medical trial or participant in a research project.


# Mental Health Report:

**SAN DIEGO CENTRAL JAIL**

**Staffing:**    **3.0 FTE Psychiatrists**
                 **1.0 FTE Psychologist**
                 **3.0 FTE Mental Health Clinicians (includes system Mental Health Director)**

**Overview:** The mental health services at Central Jail are primarily provided by nurses, who complete the mental health screenings and determine the acuity of the mental health needs, and by the psychiatrists, who complete the 14-day assessment, and monitor medications. There is one psychologist, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has three mental health professionals (master's level, licensed at Marriage and Family Therapists) who primarily respond to crises and try to provide two, four-hour "mental health clinics" each per week, but these are often interrupted or not held due to facility needs or other issues, including lack of staff or lock-downs on individual housing modules.

Mental health staff members (including psychiatrists and the mental health professionals) respond to inmate requests for service, and see inmates who are scheduled by nursing staff in response to requests or referrals. It was reported, and noted in chart reviews, that 10% of scheduled appointments with mental health staff members are cancelled, and 60% of the charts we reviewed indicated at least one missed appointment. It was further reported that it takes at least one week for an inmate to be seen following a request or a referral, which is outside of the time frame required by NCCHC.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There was much confusion across facilities, and including at the Central Jail, about the requirements of the program and how to implement it. The expressed understanding of it at the Central Jail is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and his involvement in the Safety Program is his only duty. Staff members did not express an

**Ex. B - 162**

DUNSMORE0260651

understanding of the design of the Safety Program as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the program, however, is that inmates who are identified as high risk cannot be released prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute monitoring if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

A review of inmate charts indicated inappropriate assessment of suicide risk. It appears that the clinicians do not maintain an awareness of suicide risk over time, instead judging or evaluating each incident as being isolated from the individual's history within the facility and within the community. There are inconsistencies in designating the level of risk that do not follow from the current and historical data from inmates who are being assessed. This results in insufficient or inaccurate designations of suicide risk, and ultimately a higher risk of inmates attempting or completing suicide.

The sworn staff members reportedly are not trained in suicide prevention training. While an eight-hour class on mental health in the jail has been initiated, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate that is above the national average over the past two years; in 2015, it was 33:100,000, which is right at the national average, and in 2016, it was 99:100,000 in 2016, nearly three times the national average. The average for the last two years is 61:100,000, which is nearly double the national average of 36:100,000 in jails in the United States.

**Psychiatric Services:**
Psychiatrists do a very good job assessing the mental health status and needs of inmates who are in the facility for at least 14 days. The 14-day assessments are thorough and completed in a timely manner. The documentation we reviewed indicated that they provide quality treatment to inmates, although as noted above, this is not always in a timely manner as a result of cancelled appointments and the heavy inmate/patient load.

Dr. Badre, who is responsible for the Psychiatric Security Unit, which is essentially an inpatient mental health unit, has reportedly done a great job reducing the length of stay in this unit, and has modified it so it functions very similarly to psychiatric hospitals in the community. In addition to the services provided on the PSU, there is a step-down unit on the sixth floor that serves to monitor and maintain inmates who are psychotic or gravely disabled and yet not in need of the highly acute services provided on the PSU. This is a very effective utilization of services, and meets the needs of those inmates who continue to be psychotic and gravely disabled. Additionally, the psychiatrists maintain data on the number of inmates in segregation who have psychotic disorders; as a result of diligent monitoring, this number has been consistently reduced, which is appropriate for those with severe mental illness.

---

Ex. B - 163

DUNSMORE0260652

It was reported that inmates who enter the Central Jail and are taking psychotropic medication frequently do not have that medication continued in a timely manner. This results in instability and risk for the inmate, for custody staff and for the facility. Additionally, it was reported that psychiatrists receive requested laboratory reports less than 50% of the time.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. Unfortunately, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia). The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**NCCHC STANDARDS RELATING TO MENTAL HEALTH:**

**J-A-01: Access to Care:**                                          Not Met for Mental Health
    Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10: Procedure in the Event of an Inmate Death:**       Not Met for Mental Health
    There is no psychological autopsy for completed suicides.

**J-A-11: Grievance Mechanism for Health Complaints:** Not Met for Mental Health
    There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04: Health Training for Correctional Officers:**       Not Met for Mental Health
    Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05: Mental Health Screening and Evaluation:**          Not Met for Mental Health
    Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**JE-07: Nonemergency Health Care Requests and Services:** Not Met for Mental Health
    Mental health does not respond to these requests within the time frames required by NCCHC.

---

**Ex. B - 164**

DUNSMORE0260653

**J-E-09:  Segregated Inmates:**                                    **Partially Met for Mental Health**
    Segregation rounds are provided by nursing staff, which meets NCCHC
    standards.  Mental health staff are not reviewing inmate records prior to
    placement in segregation for any possible contraindications to placement in
    segregation.

**J-E-13:  Discharge Planning:**                                   **Not Met for Mental Health**
    Mental health does not provide discharge planning and it was reported that there
    is insufficient discharge planning for all inmates.

**J-G-04:  Basic Mental Health Services:**                         **Not Met for Mental Health**
    Mental health does not provide adequate individual counseling or group
    counseling, and does not coordinate mental health, medical and substance
    abuse treatment.

**JG-05:  Suicide Prevention Program:**                            **Not Met for Mental Health**
    There is inadequate training, evaluation, monitoring, review and debriefing in the
    Suicide Prevention Program.

## RECOMMENDATIONS:

1. It is recommended that the facility increase the number of mental health professionals to a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate.
2. It is recommended that the facility implement the CIWA and COWS protocols for alcohol and opiate withdrawal.
3. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
4. It is recommended that nursing staff that do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
5. It is recommended that mental health staff members see and address mental health grievances.
6. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
7. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

**Ex. B - 165**

DUNSMORE0260654

San Diego Sheriff's Department
George F. Bailey Detention Facility (GBCF)
Technical Assistance Report
January 5, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails*. On January 5, 2017, NRI conducted its review for the George F. Bailey Detention Facility (GBCF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 39 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 28 essential standards:

>           Essential Standards
> J-A-01   Access to Care
> J-A-02   Responsible Health Authority
> J-A-05   Policies and Procedures
> J-A-06   Continuous Quality Improvement Program
> J-A-07   Emergency Response Plan
> J-B-01   Infection Prevention and Control Program
> J-C-02   Clinical Performance Enhancement
> J-C-04   Health Training for Correctional Officers
> J-C-05   Medication Administration Training
> J-D-01   Pharmaceutical Operations
> J-D-02   Medication Services
> J-E-01   Information on Health Services
> J-E-02   Receiving Screening
> J-E-03   Transfer Screening
> J-E-04   Initial Health Assessment
> J-E-05   Mental Health Screening and Evaluation
> J-E-06   Oral Care

---

**Ex. B - 166**

DUNSMORE0260655

J-E-07   Nonemergency Health Care Requests and Services
J-E-08   Emergency Services
J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patients With Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication

Essential Standard Not Applicable
J-G-09   Counseling and Care of the Pregnant Inmate

There are 27 important standards and 25 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure In the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-10   Patient Escort
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-11   Care For the Terminally Ill
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison
J-G-08   Contraception

Ex. B - 167

DUNSMORE0260656

**Evaluation Method**

We toured the clinic area, inmate housing areas, transfer area, mental health housing/PSU, segregation/administration segregation and MOB (medical observation area). We reviewed thirty-one (31) health records; policies and procedures; provider licenses; administrative, health staff, and continuous quality improvement (CQI) meeting minutes; statistical reports; and health services personnel training and licensure logs. We interviewed the day shift sergeant, contract physician, facility nursing supervisor, CQI nurse, psychiatrist, psychologist, dentist, eleven (11) health staff, five (5) COs, and nine (9) inmates selected at random.

**Facility Description**

**Location:** Southwest
**Built:** 1993
**Security:** Maximum
**Supervision Style:** Indirect Supervision
**Bookings/Transfers:** 50 to 75 transfers in per day
**Lay Out:** Modular
**Capacity:** 1852
**Males:** 1653   **Females:** none   **Juveniles:** none
**Custody Staff: Total:** 189 over three shifts

**Findings and Comments**
***Special Note:** A mental health report summary and comments about the standard related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard.*

## B.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

***J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip or notifying officers. Patients see a qualified clinician and receive care for their serious medical, mental health, and dental needs. Physician and nurse sick call is held daily. As this is a maximum security jail, patients are occasionally on "lock down" status and the nurses and mental health clinicians do not have access to them. When this occurs, patients are subsequently rescheduled for their appointments, and medication administration is delayed. Approximately 20% to 30% of mental health appointments were not completed, based on our review.

**Ex. B - 168**

DUNSMORE0260657

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.
A back-up plan should also be developed for lock-down times to ensure critically ill patients receive their necessary care.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator who is normally in the administrative offices and rarely at the facilities. The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody, medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings (some system-wide and some facility-specific) which are all documented with action items and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI meeting, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and

**Ex. B - 169**

DUNSMORE0260658

procedure meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization; these reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise, and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas and discussion and action steps to be taken. Documentation in this area is lacking. The identified studies are not documented, nor are the effectiveness of the corrective action plans. The committee identifies

**Ex. B - 170**

DUNSMORE0260659

problems, establishes thresholds, designs monitoring activities, analyzes the results and remonitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2, and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities, and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.
This jail's staff expressed concern about the staffing allocation, especially in reflection of the backlog of medical requests for care. A CQI audit and study of the staffing, workload, overtime, turnover, rescheduling and work flow and access to the patients would assist in evaluating and recommending any staffing or procedural changes. Documenting the complete quality improvement process or outcome study alerts everyone as to the problem and how a solution or new process was reached. Quality improvement is a continuous process (Problem, Do, Study, Act) and when the procedure is re-audited, it is possible to determine if it has been successful, or further research is required.

 **J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills were on the day shift, but there was no documentation. The 2016 drills were described as an active shooter, use of a restraint chair in a medical emergency, hostage scenarios, and inmate disturbance. The scenarios are developed centrally and sent to facility staff to conduct. The drills were critiqued and the results were shared with staff via the training bulletins and weekly staff meetings.

There was a real riot event that involved 33 inmates and staff, some of whom were sent to the emergency room. This was not written up as real disaster event, but could be an example of using actual events, and should be critiqued and the results shared with staff.

Man-down drills are planned to occur monthly or every other month. They do occur on each shift and the scenarios are described as "man on the floor," "man down in video court," and cell extraction. These have also been critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1g describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually where health staff are regularly assigned. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards.

**Ex. B - 171**

DUNSMORE0260660

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. There are exam rooms in each modular area of the jail so nursing staff may see patients in privacy with an officer stationed nearby. In the clinic exam rooms, they "try to do exams in private as much as possible." By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a provider, or nurse, from obtaining an inmate's full description of his or her problem to make a diagnosis. Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.

The facilities have a large numbers of cells assigned to segregation, so it is difficult to transfer segregated inmates to a clinic or interview room for care.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2, and # 3 require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA concerns and confidentiality.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There have been eight inmate deaths in this facility. Five (5) were reported to be of natural causes and three (3) by suicide (two by hanging and one inmate jumped from a top tier). The administrative and clinical mortality reviews were completed, but not in a timely manner, nor were psychological autopsies for the cases of suicide. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

**Ex. B - 172**

DUNSMORE0260661

It was estimated that the jails have around 15 to 25 complaints per week. We reviewed the handwritten grievance log at this facility for December 2016. Nineteen (19) grievances were recorded. If this log were to be maintained, it would facilitate identifying trends.

Inmates may appeal, with a standard guideline of level one (seven days to respond), and levels two (10 days to respond each).

**Recommendations**: Compliance indictors # 1 and # 2 are met. We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail or in the positive pressure room (for total isolation). The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked. Sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**Ex. B - 173**

DUNSMORE0260662

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** This jail has a small medical unit and the storage organization is poor. We observed boxes and carts in the halls that were used to hold doors open. The storage area is crammed and things could fall off hooks. Even though the area appeared clean and well lit, the clutter presents an injury risk. It is important to keep areas free of clutter and overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios, which were not available at the time of the visit, or implementing a call system in order to be notified of emergencies or to call if in an emergency. Exam rooms do not have call buttons. Officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail reported that this occurs very rarely.

**There are no** recommendations regarding this standard.

Ex. B - 174

DUNSMORE0260663

## C. PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff. Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits and all were current in cardiopulmonary resuscitation (CPR) training. There is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LVNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**Ex. B - 175**

DUNSMORE0260664

There are no recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LVNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3, describe the medication administration training program to be approved by the responsible health authority, facility administrator and designated physician. The pharmacist would be an important component for evaluating the knowledge level of the LVN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** This facility does not use inmate workers in the medical observation beds area or the clinical areas. Nurses clean these areas. There are no peer health-related programs. Nurses clean the clinic spaces and medical observation beds. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for this assignment, and earn their food handler certifications.

There are no recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff work 10.5 hour shifts with every other weekend off at this facility. The nurses total 33 full-time RNs and 20 full-time LVNs. Nine (9) RNs are scheduled for the day shift and seven (7) on the night shift. Five (5) LVNs are scheduled for each shift. The actual work hours may be staggered to accommodate work load or medication round schedules. The contracted physicians hold clinic daily and two (2) are in the clinic on Thursdays. They are also on call. Mental health staff consisted of two (2) clinicians.

At the time of our visit, vacancies consisted of four (4) RNs, one (1) LVN, and the chief psychiatrist, although two (2) RN positions and the LVN position were pending hires. Temporary agency staff are employed to fill vacancies.

There are no recommendations regarding this standard. Timely staff response to patient needs requires continual monitoring and evaluation. The length of time of medication rounds, waiting lists for dentist or physician appointments, or time spent in booking for an evaluation, are all components that may determine staffing needs. We noted there are very few mental health clinicians given the population.

**Ex. B - 176**

DUNSMORE0260665

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two (2) weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six (6) weeks are spent in on-site orientation and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LVN Preceptor Toolkit which consists of check lists, along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two (2) years by the responsible health authority. The current procedure was last revised in 2013.

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

**Ex. B - 177**

DUNSMORE0260666

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LVNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LVNs put doses of medication into labeled envelopes before taking the cart or basket to

---

**Ex. B - 178**

DUNSMORE0260667

the housing areas for administration. Since this process is time-consuming, LVNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to "lock-down" status. Nurses are not able to see patients during lock-down periods. There is no procedure in place to evaluate who is on essential medications or how to work with custody staff for a solution. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be validated.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing, and only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery), or require reordering.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two (2) clinic exam rooms, a medication room, one (1) dental chair, a records room, a mental health interview room and a radiology/x-ray room in the transfer area (with additional services from an outside provider that comes on site twice a week). The nurses' area has five (5) stations. It is next to an open storage cubby area where the emergency response stretcher and other equipment, plus boxes of supplies, crutches, etc. are stored. This area had quite a lot of overspill during the visit. The nurse's station is also central to the MOB and mental health housing area. There are also offices for mental health staff, the charge nurse, nursing supervisor, and a clerical area for charts and files.

**Ex. B - 179**

DUNSMORE0260668

We counted the sharps and needles with staff and found them to be accurate.

The two (2) emergency crash carts are checked each shift and we counted three (3) automated external defibrillators (AED) strategically placed around the facility.

The clinic contained all the equipment necessary to take care of the patients.

**There are no** recommendations regarding this standard.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, and drug screen urine dipstick and multiple-test dipstick urinalysis. (Pregnancy test kits are not necessary as the population at this facility is male.)

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

**Ex. B - 180**

DUNSMORE0260669

## E. INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered. In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care and the various fees and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return and others have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02 Receiving Screening (E).** This facility is designated as a transfer facility as it only received detainees from other jails within the system. When the nurses complete the transfer screening, they should ensure the receiving screening is completed and if not, schedule the inmate appropriately.

The standard is **not applicable**.

**J-E-03 Transfer Screening (E).** This program has multiple jails so it is reported that there are 50 to 100 transfers a day from other facilities to this jail. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours. This procedure was not listed in the policy and procedure manual.

The nursing staff receives from classification staff a list of transferring inmates when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said "cleared by RN and chart checked by MD" at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, the receiving nurse schedules the inmate and sees that it is

Ex. B - 181

DUNSMORE0260670

completed in a timely manner. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4 and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The nurse at the booking facility completes the mental health screening, which a nurse at the transfer jail reviews upon the inmate's arrival. The 14-day evaluation program is not in place: however, the mental health team should have a mechanism in place to track positive mental health screenings so these patients are seen for their evaluation before 14 days. This second step of reviewing the screenings and making the evaluation appointments may be completed by a qualified health professional or a clinician. This review and referral would assure that some inmates with mental health problems and a referral were not missed by the intake nurse. The current, lengthy process does identify most mental health patients, however. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first and refer to a psychiatrist or psychologist. CIs # 3 through # 7 are in place and the policy and procedure revision may include all the questions needed and the evaluation.

**Recommendations:** The mental health screening form requires revision to include all the required questions and observations. RNs should be trained by a mental health staff. The referrals from booking to mental health could reflect a 14-day evaluation if that program was in place. If a formal program was in place, there would be a policy and procedure tracking logs/lists and staff assigned to complete the evaluations by the 14th day of incarceration. The

Ex. B - 182

DUNSMORE0260671

mental health team does complete many evaluations for those with positive screenings, although they are not tracked for timeliness.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening occurs at the second stage of booking before inmates are transferred to this facility. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications. The dentist was not on duty the day of the consultation

There is no twelve (12) month oral examination by a dentist. The standard states that a trained health care professional may complete the screening before fourteen (14) days. A procedure can be set up to complete the health, mental health, and dental screening at the same time. The dentist completes extractions and sometimes provides a filling.

There is no evidence of any handouts for the inmates regarding oral hygiene and preventive oral education. CIs # 4 through # 6 are in place.

**Recommendations**: CI # 1 and # 2 can be addressed by incorporating oral screening and education into the booking process. The dentist can train the nurses to conduct the screening. CI # 3 can be met by preparing a list of inmates who have been at the facility for eleven (11) months and scheduling them for a dental examination to occur before their anniversary. The initial health assessment, mental health screening and evaluation, and oral care may all be accomplished by having a trained nurse or qualified healthcare professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves them each night and brings them to medical services, where they are date stamped and triaged as to the nature of the complaint (health, dental, or mental health), and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day or next day to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two (2) to four (4) days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven (7) to fourteen (14) days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight (8) days to see the nurse and some were twelve (12) to eighteen (18) days. For the physician, the lists were five (5) days out, with some at eight (8) to twelve (12) days.

Segregated inmates at this facility can also deposit request slips in the box during their hour "out of cell."

CIs # 2 through # 5 are met.

DUNSMORE0260672

**Recommendations**: Compliance indictor # 1 requires that a qualified health professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What seems a head ache for the patient could be a symptom of stroke. Constipation could actually be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

CI # 3 assures all inmates, no matter which housing area, have access to care and timely evaluations.

One serious issue we identified is the backlog of 300 medical request slips that have not been answered with a face-to-face evaluation. Some were assigned a triage level and rescheduled over and over. This situation should be investigated and resolved as patients' serious health care needs are being delayed. We reviewed eleven (11) medical requests for care and most were answered by a nurse in two (2) to three (3) days. The plan of care was appropriate, and there were two (2) in which the nurse started a prescription medication.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day. They can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called, as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** This facility has a significant number of segregation/administrative segregation and personal protection cells. A nurse checks these inmates three (3) times a week and signs off on the list of inmates in that housing area. There are no notes as to their condition or if they are having a problem coping with isolation. Mental health staff also checks segregation inmates.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

---

Ex. B - 184

DUNSMORE0260673

**J-E-10  Patient Escort (I).** Patients are usually escorted to on-site and off-site clinical appointments in a timely manner. Transporting officers are alerted to special accommodations (such as medication administration or communicable diseases) for their protection. Patients' health records are sealed in an envelope during transport and returned the same way. In this facility's general housing areas, patient escort seems to occur efficiently. CIs # 1 to # 3 are met.

**Recommendations:** One area to look at in this facility are the segregation areas where a lack of deputies may delay escorts from escorting a patient to the clinic or allowing mental health in to see a patient.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols (also known as standardized nursing procedures in this program) include prescription medications for emergency situations, well as routine health conditions, alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format), with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016; most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included diagnosing and prescribing medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations. CI # 3 addresses prescription medications that should not be present in the protocols except those for those used in emergency responses, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year. The last time was in 2013, but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no

---

**Ex. B - 185**

DUNSMORE0260674

evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place; however, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs for Naltrexone for extended-release injectable suspension ™, etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

> The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Information is instead clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

Representatives of community programs come on site for classes on HIV and hepatitis, parenting, and GED preparation. We observed a few posters in the housing areas about access to care, PREA, and smoking cessation. A closed-circuit television system is in place and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

---

**Ex. B - 186**

DUNSMORE0260675

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen, under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than ten (10) special medical diets offered.

At the time of our visit, approximately 166 special diets were ordered at this facility. A registered dietitian reviews the medical diet menus annually, in July, but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference.

CIs # 1, # 3, # 4, and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, they are identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care for the goal of stability. Some programs have a formal chronic disease component with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect where the physicians follow approved guidelines and order labs, treatment, medications, and "return to clinic" appointments as set.

This program has one chronic disease pathway for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines" which address areas like blood borne pathogens, suboxone, blood

**Ex. B - 187**

DUNSMORE0260676

pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard, and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers, and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory tests, frequency of orders, what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care, as reflected in the health record, appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with active medical instructions, according to need indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has 30 designated medical beds called "Medical Observation Beds (MOB) for those with medical needs or those who are handicapped. Eight (8)

---

**Ex. B - 188**

DUNSMORE0260677

are for low acuity medical patients and are located close to the nurses' station and twelve (12) enhanced observation beds are used for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patients should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal and directs the nurses to use the standard nursing protocols. The protocols instruct them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients and felt some of them were actually at infirmary level of care and required a physician directing the care plan and medications.

The responsible physician and RHA should review the use of the MOB and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds, and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds where nurses may admit, while others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The ten (10) compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation/shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use. These include lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and are referred to the on-site mental health program staff. A mental health clinician is in the stage 2 booking level daily to evaluate those inmates with mental health conditions. There are some safety cells for suicide watch or violence watch, if needed. There are also enhanced observation cells for special housing. The staffing included a position for a supervising psychiatrist, which was vacant at the time of our visit, and the chief clinician. Three mental health licensed clinicians respond to patients' needs for evaluations. The psychiatric

---

**Ex. B - 189**

DUNSMORE0260678

team is supplemented with contract psychiatrists who receive referrals and calls for evaluations and who order medications. The team provides some programming for patients as well.

CIs # 1, # 3, # 4, # 5 # 6 are all met, with the caveat that there are three (3) clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five (5) areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee, and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor, and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program.

In the last two years, the facility has had 13 deaths, four of which were suicides. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were completed for the cases of suicide, but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit, and was to continue until all health, mental health and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings, where special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CIs # 1 and # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled.

**Ex. B - 190**

DUNSMORE0260679

CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective, assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells on the second floor, above booking, but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours, if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care. The nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This is a men's facility. The pregnant opiate patient discussed in CI # 7 is not applicable.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring, and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** The population at this facility is male. The standard is **not applicable.**

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** The population at this facility is male. The standard is **not applicable**.

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints, and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting and a list of patients using various appliances is maintained. It is also documented in the health record and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**Ex. B - 191**

DUNSMORE0260680

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs approximately six (6) to eight (8) times a year. There is no formal procedure. Staff explained that the first step, after diagnosing such a condition and that the patient can no longer care for himself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program. If a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the records and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although, a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room and are accessible to the clerical staff who manage the records. The electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two (2) senior medical records technicians, ten (10) technicians, one (1) clerk and one (1) office assistant. Some of the staff is located in the central administrative

---

**Ex. B - 192**

DUNSMORE0260681

office, and others are in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Recommendations:** We recommended continuing the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The CI requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LVN to monitor the patient's mental and psychological status at least every 15 minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, restraints are not often applied in this system. A chair and a gurney can be used when necessary for a short period of time. The day shift sergeant reported that, thanks to the excellent crisis intervention training they receive, there have been few situations that required

Ex. B - 193

DUNSMORE0260682

the use of restraints, and then only for a short period of time. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2 and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency.

There is a process in place, through the courts, for forced medications. The PSU had approximately six to eight patients on this program system-wide. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed, revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** The day shift sergeant reported that that health staff do not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions or living wills that an inmate arrives with would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or do not resuscitate order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign consent for treatment when they go through the booking process; this consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and

---

**Ex. B - 194**

DUNSMORE0260683

documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program, and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research, a patient on a medical trial, or a participant in a research project.

## Mental Health Report:

**GEORGE BAILEY CORRECTIONAL FACILITY**

**Staffing:**         **1.2 FTE Psychiatrists**
              **1.0 FTE Psychologist**
              **2.0 FTE Mental Health Clinicians**

**Overview:** The mental health services at George Bailey are primarily provided by the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. They hold mental health clinics during the week to provide individual counseling, but the clinics are often cancelled and are not sufficient to meet the need for mental health services. The number of mental health clinicians doubled recently, from 1.0 to 2.0 FTE, but this is still insufficient to meet the need for mental health treatment. There are two psychologists, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 1.2 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at George Bailey, about the requirements of the program and how to implement it. The expressed understanding of it at the Central Jail is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30

**Ex. B - 195**

DUNSMORE0260684

minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and involvement in the safety program is his only duty. Staff members did not express an understanding of the design of the safety program as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the safety program, however, is that inmates who are identified as high risk cannot be released from the program prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the safety program, which may not include even 15-minute observation status in a safety cell if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly are not trained on suicide prevention. While an eight-hour mental health class has been implemented, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate at George Bailey that is above the national average over the past two years: in 2015, it was 200:100,000, nearly six times the national average, and in 2016, it was 100:100,000, which is nearly three times the national average. Combined for the last two years, it average is 150:100,000 per year, which is nearly five times the national average of 36:100,000 in American jails.

### Psychiatric Services:
Psychiatrists effectively treat inmates who are on psychotropic medications. Unlike at the Central Jail, the mental health clinicians and nursing staff typically refer inmates to see the psychiatrist, rather than seeing them for the mental health assessment.

George Bailey only has 1.0 FTE psychiatrist staff, which appears to be insufficient to meet the population's needs. Reportedly, the waiting list consists of 150 people, and one to three weeks.

Reportedly, 10 - 20% of inmates at the facility do not have their medications continued in a timely manner. Although this is better than the reported 50% or more who do not have their medications continued at Central Jail, this is still inadequate and is not meeting the mental health needs of those incarcerated in this facility.

The system emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. Unfortunately, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Ex. B - 196**

DUNSMORE0260685

**Mental Health Professionals:**
There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness, such as bipolar disorder or schizophrenia. The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

Mental health professionals reported that they see approximately 100 inmates per week, although as noted above, most of these are "wellness checks" and not appropriate counseling or more comprehensive mental health services.

It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**Segregation:**
The mental health professionals reported that they conduct segregation rounds three times per week, which exceeds the NCCHC requirement. This is very positive, and should help to ensure that inmates do not decompensate while in segregation. Unfortunately, segregation at George Bailey is used not only for disciplinary infractions, but also for inmates who simply have a mental illness, on the grounds it keeps them safe.

## NCCHC STANDARDS RELATING TO MENTAL HEALTH:

**J-A-01:**   **Access to Care:**                    **Not Met for Mental Health**
Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10:**   **Procedure in the Event of an Inmate Death:**   **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**   **Grievance Mechanism for Health Complaints:**   **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**   **Health Training for Correctional Officers:**   **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**   **Mental Health Screening and Evaluation:**   **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**   **Nonemergency Health Care Requests Services: Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**   **Segregated Inmates:**                   **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.  Additionally, security or classification staff members are placing inmates in segregation because they are mentally ill, not due to disciplinary infractions, which violates NCCHC standards.

---

**Ex. B - 197**

DUNSMORE0260686

**J-E-13:**   **Discharge Planning:**                  **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**   **Basic Mental Health Services:**              **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**   **Suicide Prevention Program:**              **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

## RECOMMENDATIONS:

1. It is recommended that the facility increase the number of mental health professionals to a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate.
2. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
3. It is recommended that nursing staff who do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
4. It is recommended that mental health staff members see and address mental health grievances.
5. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
6. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

**Ex. B - 198**

DUNSMORE0260687

San Diego Sheriff's Department
Las Colinas Detention and Re-Entry Facility (LCDRF)
Technical Assistance Report
January 6, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails*. On January 6, 2017, NRI conducted its review for the Las Colinas Detention and Re-Entry Faculty (LCDRF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 40 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 28 essential standards:

<u>Essential Standards</u>
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services

Ex. B - 199

DUNSMORE0260688

J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patients with Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-G-08   Counseling and Care of the Pregnant Inmate
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication

Essential Standard Not Applicable
None

There are 27 important standards and 26 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure in the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-03   Clinic Space, Equipment and Supplies
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-08   Contraception
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison

Ex. B - 200

DUNSMORE0260689

**Evaluation Method**

We toured the clinic area, the many inmate housing areas, segregation/administrative segregation, intake/receiving area, administration, library, psychiatric security unit, MOB (medical observation housing), industries, reentry service building and their recreation building. We reviewed 25 health records; policies and procedures; provider & nursing licenses; administrative, health staff, continuous quality improvement (CQI) meeting minutes; and statistical reports. We interviewed the jails administrative lieutenant, physician, nursing supervisor, CQI nurse, psychiatrist, psychologist, dentist, medical records clerk, five correctional officers (COs), nine other health staff, and 15 inmates selected at random.

**Facility Description**

**Location:** West/Southwest
**Built:** 2014
**Security:** Six levels/ from minimum to maximum
**Supervision Style**: Direct supervision
**Bookings:** 46/day
**Lay Out:** Campus-style with 24 housing areas around the parameter, and many service buildings inside the parameter. Half the population is able to walk to medical services, dining hall, industries, etc. The higher security females are escorted.
**Capacity:** 1270   **ADP** 730   Few units closed
**Males:**  none       **Females:**  731   **Juveniles:** none
**Custody staff:   Total:** 204 working 12 hour shifts   **Days:** 46     **Nights:** 45

**Findings and Comments**
**\*Special Note**: A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an \* in front of the standard.

### C.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. The staff at this jail complies with timeliness of receiving screening and transfers. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. Although this is a minimum-to-maximum security jail, "lock-down" and subsequent delays to care are not an issue here.

**Ex. B - 201**

DUNSMORE0260690

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** The staff at this facility responds in a timely manner to inmates who come to the clinic, and during medication rounds and other treatment. However, processing requests for care is problematic. The "hands-off" triage procedure used in this system results in many requests being scheduled further and further "out." The patient then submits more requests and the problem becomes compounded, with a backlog of 150 requests for care at the time of NRI's visit. A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices and rarely at the facilities. The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) #2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody and medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented, with action items, and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

---

**Ex. B - 202**

DUNSMORE0260691

Other meetings include the quarterly CQI, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and procedure meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization. These reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system, with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken, although documentation is lacking. The identified studies are not documented, nor is

---

**Ex. B - 203**

DUNSMORE0260692

the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and remonitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities, and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills were on the day shift, but there was no documentation. For this jail, the last four drills were scenarios of an active shooter, a hostage situation, an evacuation, and a fire drill. The scenarios are developed centrally and sent to facility staff to conduct. The drills were critiqued and the results were shared with staff via the training bulletins and weekly staff meetings.

Man-down drills are planned to occur monthly or every other month on each shift, but documentation was not available.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan.CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The on-site contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information in this facility provides the necessary privacy for patient care. The clinical area is large, with a nurse's station in the center. Curtains are pulled when exams are being conducted, while the officer waits near the nurse's station. Since most of the jail houses inmates of minimum to medium

Ex. B - 204

DUNSMORE0260693

security levels, patients can walk freely around the campus and go to medical and mental health appointments. If there are security concerns, however, the patient is escorted and the officer waits in the hall for the encounter to end.

Most of the housing areas also have an exam room for nurse sick call, and privacy is respected by closing the door.

In the open receiving/booking area, two nurses are located alongside custody staff. This provides an opportunity for custody staff to overhear the booking procedure.

**Recommendations:** CI # 1 discusses the need for patient care to occur in private, which is the case in the clinic, but not during the second stage of booking. If a privacy screen, or barrier to hearing patient's health information were to be installed in that area, compliance would be achieved. There is privacy during the first stage of booking. CIs # 2 through # 5 are met.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There has been one inmate death in the last two years (reportedly due to natural causes). The administrative review was completed, but not in a timely manner. There was no clinical mortality review, however. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days, and cases of suicide require a psychological autopsy in addition to the administrative and clinical mortality review. Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level and as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints and give the inmate a copy of the results. All grievances, health and custody-related, are logged into the central computer system.

At this facility, an average of 20 health-related grievances is filed per week. The charge nurse answers first, the nursing supervisor second, and the chief medical officer is the third level of appeal. As described in the policy and procedure, the time intervals for responding are seven days for level one, and 10 days for levels two and three.

**Recommendations**: CIs #1 and #2 are met, however, we recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

**Ex. B - 205**

DUNSMORE0260694

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room for total isolation. The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked: sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports. They are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

---

**Ex. B - 206**

DUNSMORE0260695

**J-B-03  Staff Safety (I).** Health staff appears to work under safe and sanitary conditions. The jail is well lit, clean and well maintained for an older jail. The space for health is limited, but the health staff makes great efforts to keep it organized and to maximize space.  It is important to keep areas free of clutter and overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios. They were not available at the time of the visit. The facility may consider implementing a call system in order to be notified of emergencies or to call if in an emergency. The exam rooms do not have call buttons. Officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented, and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail (which houses females) reported this has not occurred.

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. This includes the obstetrical/gynecological physician who comes to this facility. Copies of licenses are maintained

**Ex. B - 207**

DUNSMORE0260696

in the central administrative office and on site, with each nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits, and all were current in cardiopulmonary resuscitation (CPR) training. An annual training program, consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

---

Technical Assistance Report: San Diego County Sheriff's Department                                    79

DUNSMORE0260697

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3 describe the training program to be approved by the responsible health authority, facility administrator and designated physician, for health staff so they are appropriately trained in administering medications. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects, and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** Inmates workers do not generally work in the MOB or clinic areas, although staff reported that they mop the floors and empty the trash under a nurse's supervision. Nurses clean the clinic tables and equipment. Inmate workers may also clean an empty bed after the patient has left. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for the assignment, and can earn their food handler certifications. This facility specializes in offering the inmates training in sewing, and other educational and vocational programming. There was no mention of any peer related programming.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** All the staff at this facility is full-time and is scheduled for 10-hour shifts, with every other weekend off. There are 40 RNs and 16 LPNs. Nine RNs are scheduled for the night shift and 11 for the day shift. Four LPNs are scheduled on each shift. Actual working hours may be staggered to accommodate work load or medication round schedules.

The contract physicians hold clinic seven days a week, and are on call on a rotating schedule 24 hours a day. Two OB/GYN physician clinics are held each week. On Tuesdays, only patients with gynecological problems are seen, and on Thursdays, only pregnant women are seen. Mental health staffing consists of three full-time clinicians. At the time of our visit, there were five RN vacancies (note the schedule shows five RN vacancies and the global report says five LPN vacancies). One nurse was waiting to begin orientation. Temporary agency staff is employed to fill vacancies.

**There are no** recommendations regarding this standard.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six weeks are spent in on-site orientation, and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LPN Preceptor Toolkit, which consists of check lists, along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

---

**Ex. B - 209**

DUNSMORE0260698

**Recommendations:** CIs # 2 requires that the orientation program policy and procedure be reviewed once every two years by the responsible health authority. The current procedure was last revised in 2013.

### D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

---

DUNSMORE0260699

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services at this jail are provided in a timely, safe and sufficient manner. There are two methods of medication administration at this facility. More than half of the inmate population may walk to the pill call window at routine (morning, afternoon & evening) times during the day. The LPNs also go out to the PSU, segregation and school/work areas to deliver medications. The central pharmacy receives all orders and sends medication to the medication room in bulk or unit doses. In preparing medication rounds, LPNs label envelopes, into which they put the dose. The nurse takes a cart or a basket to the housing areas for administration. Pre-pouring is also the means of administering at the pill call window.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Two staff members count controlled medications on each shift, and we verified the accuracy during the visit.

---

**Ex. B - 211**

DUNSMORE0260700

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

CI # 2 is in met as there are no barriers to inmates receiving their medications. Lock-down is not a practice at this facility, and in receiving, the nurses have time to order prescriptions.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CI # 2 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of contract physicians' ordering practices, this cannot be validated. With regard to quality audits to assure safe practices, CI # 4 can be verified with audits.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing. Only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications order and delivery.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** This large, new clinic area includes three exam rooms, one room for emergencies, two dental chairs, six mental health offices, a medication room, a records room, a telemedicine area, a laboratory, and a room for biohazard storage. The large nursing station has six areas for nurses to work, and space for files and reference books. There are also five offices, a staff lounge, two storage areas, and bathrooms for inmates and staff. The booking area has an examination room, three sober and three safety cells, and a digital chest x-ray machine.

All of the housing areas except one have an exam room. In one program dormitory, the nurses use an interview room. All the exam rooms provide privacy.

There two emergency crash carts, one in the clinic, and one in receiving, are checked each shift. Eight automated external defibrillators (AED) were strategically place around the facility.

The clinic contained all the equipment necessary to take care of the patients.

Our inspection indicated that the counts of items subject to abuse, such as needles and scissors, were not accurate, however.

---

**Ex. B - 212**

DUNSMORE0260701

**Recommendations:** CI #7 requires those items of abuse to be inventoried and accounted for. The needle counts in both the dental and clinical areas were not accurate. A review of the policy and in service for staff may result in compliance with this indicator.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, pregnancy tests, drug screen urine dipstick and multiple-test dipstick urinalysis.

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking, and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

In addition to obstetrical/gynecological specialists who provide routine clinics on-site. Services are available in the community as needed. The clinic exam room includes an ultrasound machine for OB/GYN patients.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment, and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart, and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

**Ex. B - 213**

DUNSMORE0260702

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care and the various fees, and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return, and other have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).**  The receiving or booking process in this jail is very organized and timely. The booking style is open, where the individual sees a nurse as soon as she arrives and a decision is made to either accept her or refer her for emergency room care and clearance. After the detainee is cleared for acceptance, she waits to be called for the rest of the booking process. The same nurses complete the first part of the booking evaluation (pre-screening), and the second part (with a more thorough evaluation, recording of vital signs, development of a care plan, and follow-up appointments). The nurses said they have called the provider for orders, but they still initiate the standard nursing procedures when they are applicable and begin prescriptions on their own.

Safety and sobering cells are available if a detainee needs monitoring for intoxication or suicide risk.

Our chart reviews, and the results of interviews, indicated this process takes six to eight hours, which includes all the custody interviews, and the chest ray and contraband screenings. The nurses' screening is completed within an hour or two, depending on the number of arrivals. There are generally 45 to 60 bookings a day.

CIs # 1, through # 9, and # 13 are met in this jail. CI # 4 is met as there is routine pregnancy testing of incoming women.

CI# 11 is not applicable to this jail, as nurses complete the receiving screening.

**Ex. B - 214**

DUNSMORE0260703

**Recommendations:** CIs # 4, # 5, # 6, # 10 and # 12 are not met. The receiving screening procedure in this jail is reflective of the intent of this standard. The nurses complete the prescreening and rest of the screening in a timely manner.

When the screening forms are updated to reflect all the questions in CI# 6 and CI# 7, full compliance will be achieved.

During the tour, we observed nurses completing the receiving screening with three custody personnel completing their interviews. This represents a potential breach of confidentiality. Adding a privacy screen or Plexiglas barrier between the nursing desks would provide auditory privacy. The same receiving screening form is used in all the facilities, and should be compared to the standard to ensure it is complete. Because of the efficient use of space in this jail, the receiving screening could be completed in one step, or a quick check as they come off the bus or out of the police car for clearance, and then the full screening completed when they are inside.

**Special Note:** The use of resources for the booking process (stage 1 and stage 2) should be evaluated with consideration to the standards J-E-04 Initial Health Screening, J-E-05 Mental Health Screening and Evaluation, and J-E-06 Oral Care. When timeliness is not met for receiving screening, this affects other standards. When considering the use of a nurse practitioner's resources to start and continue medication during receiving, consideration should also be made for standard J-E-11 Nursing Assessment Protocols.

**J-E-03  Transfer Screening (E).** Reportedly, 50 to 100 transfers a day arrive at this facility from the others. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours. This procedure was not listed in the policy and procedure manual.

The nursing staff at this facility receives transfers from another jail that does house some females. The procedure is that the transferring inmate goes through receiving and the nurse reviews the electronic record for medications and any pending appointments. There was no supporting documentation that this occurred during chart reviews.

**Recommendations**: The receiving screening at this facility should be reviewed and staff retrained to ensure compliance with the procedures.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information, and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for

---

**Ex. B - 215**

DUNSMORE0260704

the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4, and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during the stage 2 of receiving screening. The nurse asks a few questions during stage 1. There is no 14-day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first, and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place. With the revision of the forms to include questions from CI# 1 and CI# 2, the standard would be met.

**Recommendations:** The mental health screening form requires revision to include all the required questions/observations. RNs should be trained by a mental health staff. If the receiving screening forms are revised to include the mental health screening questions, then the mental health screening is complete. With the referral of positive mental health problems to the mental health clinician, then the evaluation is complete.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking, although there is no inspection of the inmate's mouth. This could be added to the first stage, as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12-month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site one day a week, and sees patient upon a nurse's referral. They dentist completes extractions and provides the rare filling. The dental list shows from the time of the appointment until the patient is seen varies from five days to 10 days to two months.

CIs #4 through #6 are in place.

**Recommendations**: CIs #1 and #2 can be addressed by incorporating oral screening/education into the booking process, and the dentist can train the nurses to conduct the screening. CI # 3 can address met by preparing a list of inmates who have been at the facility for 11 months and scheduling them for a dental examination to occur before their anniversary. The initial health assessment, mental health screening and evaluation and oral care may all be accomplished by having a trained nurse/qualified healthcare professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**Ex. B - 216**

DUNSMORE0260705

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** A formal procedure is in place for the inmates to request care. There is a two copy form available in housing areas and from the nursing staff that the inmates fill out and place in a locked box on each housing area. Each night shift, a nurse picks up the forms and bring them to medical. They are date stamped in and triaged as to the complaint, dental or mental health. The nurse assigns a triage level to the complaint. Level 1 is urgent and schedule same day or next day to be seen. Triage Level 2 is semi-urgent and schedule two to four days out. Level 2 is non-urgent and schedule in seven to 14 days to see a provider. There are published guidelines for the nurses to decide which level to assign. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists it was an average of 4-8 days to see the nurse and those were the ones in triage 1 level.

At this facility all inmates have access to the locked boxes to place requests for care confidentially, even in segregation. CIs # 2 through # 5 are met.

**Recommendations**: CI # 1 requires that a qualified health professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What seems a head ache for the patient could be a symptom of stroke, or constipation could actually be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

**Note:** There was a backlog of 150 requests for care at this facility in which the patient has not seen a health care professional for an evaluation. The patient is assigned a triage level, however. When a patient is not seen after making a request, they repeat the process and the procedure falls out of control

**J-E-08  Emergency Services (E).** As nursing staff is on-duty 24 hours a day, they can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** There are 32 segregation cells at this facility, and on the day of the visit, 31 were occupied. The level of security is that of NCCHC's # 2.b., as the inmate has some contact with others and an hour out of their cell daily. A nurse checks these inmates three times a week, and dates and signs the list of inmates in that housing area. Mental health staff checks these inmates as well. There were, however, no notes as to their condition or if they were having issues coping with isolation.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

DUNSMORE0260706

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients at this facility may self-escort to an appointment if they are classified as minimum or medium security. Maximum security-level patients are escorted by an officer. The health staff reported that the patients arrived for their appointments on time and were rarely refused. The custody staff is responsive to their health needs.

Escort to an off-site appointment is completed unless there is an emergency. The patients' paperwork is sealed in an envelope and returned the same way. Paperwork sent with a patient is in a sealed envelope and returned to medical in a sealed envelope for confidentiality.

**There are no** recommendations regarding this standard.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols, also known as standardized nursing procedures in this program, include prescription medications for emergency situations, well as routine health conditions, alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format), with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills visit.

**Recommendations:** CI # 1 assures that the protocols/procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included to diagnose and prescribe medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols (although those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

Ex. B - 218

DUNSMORE0260707

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** Because the female inmates are housed in one facility, the continuity of care is better, especially for the pregnant females and those with gynecological problems, who see the same provider. For women's general health issues, we confirmed care of episodic, as most appointments are made after a request for care has been submitted. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are few physician-ordered "return to clinic appointments" to evaluate the effectiveness a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered, and the samples are sent to a contracted laboratory. The results are faxed back to the facility, and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based, and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** This facility's re-entry program aims to facilitate inmates' return to society as smooth as possible. Almost all the activities emphasize personal responsibility, education, obeying orders, and life planning. Medical and mental health staff have input into the women's health care plans for their release. The infection control nurse works with representatives of the health department, STD and HIV clinics to arrange patient referrals. TB clinic staff is alerted as to who requires follow-up. Discharging inmates can receive assistance in applying for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place. However, there was no evidence of this in the medical records we reviewed. Since this facility focuses on re-entry to society, a procedure to document medical and mental health plans is important. Special programs such as those for Naltrexone for extended-release injectable suspension  or others should also be documented in the health record.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Ex. B - 219**

DUNSMORE0260708

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, educational handouts are not given as inmates have used them to damage the plumbing in the past. Instead, information is clearly posted. The health record includes a box for nurses to check that patient education has been provided, but no space to describe the subject. We saw no evidence of physician-provided education.

A variety of programs are offered at this jail, including educational and vocational programs, so some written reference material is in fact available. In some of the women's housing areas, there were posters that were not available in the men's institutions. We saw posters addressing access to care, PREA and smoking cessation. Representatives from community programs come on site to provide classes on HIV and hepatitis, parenting, and GED preparation. A closed-circuit television system is in place, and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen under the training and supervision of the dietary staff. They receive a food handler's card which can assist them obtaining employment when they are released. There are more than 10 special medical diets offered.

At this facility, more than half the inmate population can walk to the cafeteria and they choose their diets. Some of the inmates have their food brought to them on carts.

A registered dietitian reviews the medical diet menus annually in July, but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference. We were given an extensive list of special diets, although it did not include the number of medical diets for this jail. CIs # 1, # 3, # 4 and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

---

**Ex. B - 220**

DUNSMORE0260709

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, he is identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component, with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications and "return to clinic" appointments as set.

This program has one chronic disease pathway, for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines," which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard, and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI #1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers, and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test and the frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete

---

**Ex. B - 221**

DUNSMORE0260710

transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs, and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with active medical instructions (according to need) indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called "Medical Observation Beds (MOB)". Thirty are for medical patients and 26 are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patient should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal, and directs the nurses to use the standard nursing protocols, which instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. MOB patients have access to a call button-type system to summon nurses; the nurses' station is not within sight or sound of the patients.

This facility's observation beds have piped-in oxygen and suction with hospital beds and over-bed tables. There is a central nurse's station, so the nurses are within sight and sound of the patients. This MOB area could be an infirmary, as it is set up as one with medical beds, piped in oxygen and suction, and nurses within sight and sound. The procedure could reflect the care of sheltered housing or infirmary/skilled nursing care depending on the patients health needs.

If the acuity of the patients qualified as infirmary, then the compliance indicators would have to be met and a procedure be put in place, with physician oversight.

The responsible physician and RHA should review the use of the MOBs and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds, where nurses may admit; others have a high acuity infirmary. Some places use a matrix to for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

---

**Ex. B - 222**

DUNSMORE0260711

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation, shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician, and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use, such as lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and referred to the onsite mental health program staff. A mental health clinician will see them as soon after booking as possible. There are some safety cells, holding cells and sobering cells for patient needs in booking. In this jail, there are 26 beds designated as mental health or a psychiatric secure unit/PSU. This is a large area with day rooms, interview rooms, recreation/activities rooms. There are three levels of observations for patient safety.

Three mental health licensed clinicians respond to patients needs for evaluations. The psychiatric team is supplemented with contracted psychiatrists, who receive referrals and calls for evaluations, and who order medications. The team provides programming for patients, which includes several vocational and education opportunities for patients in these units.

CIs # 1, # 3, # 4, # 5 #6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all 5 areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee, and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each

Ex. B - 223

DUNSMORE0260712

facility has an assigned gatekeeper who oversees the care of patients in the safety program. At this jail, it is the psychiatric unit's charge nurse or mental health clinician.

In the last two years, there has been one inmate death which was not a suicide. While the risk is less with women, it still exists. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide.

**Recommendations**:
See the mental health report at the end of the standards for recommendations.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicate and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. Various re-entry programs are offered as well. CIs # 1, # 3, # 4, and # 5 are met.

**Recommendations:** CI # 2 recommends custody receives information on the effects of alcohol and drugs on the populations. This could be true for health and provider staff to receive more training so diagnosis and referral is accurate and differentiated from mental health.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective and objective assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells on the second floor, above booking, but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care; the nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This is a women's facility. The nurses reported that they conduct pregnancy testing on all substance abusing women and those on prescription drugs.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in

**Ex. B - 224**

DUNSMORE0260713

the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** There is no policy and procedure that guides the staff to continue women's prescription upon arrival, or if emergency contraception is available. It would be available in the community hospital, but this should be explained in a procedure for staff reference.

Since this jail has a re-entry program, it would be appropriate to address the women's contraception needs before they leave custody. With over 20 pregnant women in custody at any time, the need for contraception planning is necessary. There are community resources regarding pregnancy options and contraception, if needed.

**Recommendations:** CI # 4 requires a policy and procedure to guide staff in the contraceptive practices of the program and addresses the components of the standard. It should also include where emergency contraception is available.

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** Comprehensive counseling services are available to pregnant inmates through the services of contracted obstetrical/gynecological physicians who come on site weekly. Prenatal care, specialized obstetrical services when indicated, and postpartum care are available. Pregnant women deliver in the community hospital, and then return to jail to be observed until stable. The staff said restraints are not applied during labor. CIs # 1 through # 5 are met.

**Recommendation:** CI # 6 requires a policy and procedure to guide staff in the care of a pregnant woman and addresses the components of the standard.

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs occasionally. There is no formal procedure, although staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, the responsible physician or health administrator would advocate to the courts for a compassionate release. There is no formal hospice program, so if a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, and # 3 are met.

---

**Ex. B - 225**

DUNSMORE0260714

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared basis among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room (accessible to the clerical staff who manage the records), and the electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two senior medical records technicians, 10 technicians, one clerk and one office assistant. Some of the staff is located in the central administrative office, and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Ex. B - 226**

DUNSMORE0260715

**Recommendations:** We recommended that the facility continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system, or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours, and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every 15 minutes, and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, custody-ordered restraints are rare. A restraint chair is available for a maximum of two hours, with 15-minute intervals of monitoring by nurses. The lieutenant reported that in booking, occasionally a distraught inmate is placed in a holding cell until they calm down.

Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2, and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of

---

**Ex. B - 227**

DUNSMORE0260716

restraints, and we would recommend re-examining the practice of a nurse removing restraints, or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency.

There is a process in place through the courts for forced medications. We could not determine if there was anyone in this program. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed and revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** The facility lieutenant reported that health staff do not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice, the CIs seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions or living wills that an inmate arrives with would be honored. The provider notes in the health record that such instructions exist; there are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or do not resuscitate order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to

DUNSMORE0260717

counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at this facility. During the second step of the receiving screening, the nurse may discover a new arrival is on an experimental medication. The usual procedure is to notify the responsible physician to guide the staff and patient in this community program.

**Recommendations**: A policy and procedure should be developed for medical research in the program. Using the compliance indicators, decisions may be put in place so staff has a clear idea of how to handle any request for research, or if a patient arrives on a medical trial or as a participant in a research project.

## Mental Health Report:

**LAS COLINAS RE-ENTRY AND DETENTION FACILITY**

**Staffing:  2.0 FTE Psychiatrists**
**1.0 FTE Psychologist**
**2.0 Mental Health Clinicians**

**Overview:** The mental health services at Las Colinas are provided by the psychiatrists, who conduct the 14-day assessments, prescribe and monitor psychotropic medications, and the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. They hold mental health clinics during the week, which are intended for individual counseling, but are often cancelled and are not sufficient to meet the need for mental health services. There is one psychologist whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 2.0 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications, 14-day assessments, and managing and operating the Psychiatric Security Unit (PSU) for women.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at LCDRF, about the requirements of the Safety Program and how to implement it. The expressed understanding at the LCDRF is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and his only duty is involvement in the Safety Program. Staff members did not express an understanding of the design of the Safety Program, as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the Safety Program, however, is that inmates who are identified as high risk cannot be released from the Safety Program prior

DUNSMORE0260718

to 48 hours, while those who identified as being at low risk can be released from the program in 24 hours.

Inmates who have attempted suicide are not automatically placed on one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute observation status in a safety cell if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly do not receive suicide prevention training. It is a positive sign that they have started to receive an eight-hour class on the topic of mental health in jail, but apparently this does not include any suicide prevention training. Additionally, the mental health clinicians dare not trained to assess and manage suicide risk in the jail.

Despite the lack of an appropriate suicide prevention program, there have been no suicides at LCDRF in the past two years. The suicide prevention program requires significant improvement if this is to continue.

**Psychiatric Services:**
Psychiatrists do a good job of assessing inmates, treating those on psychotropic medications, and managing the PSU.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. However, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There appears to be a sufficient number of mental health professionals in the facility to meet the needs of the mentally ill, but it appears there is no system to ensure that their time is utilized to appropriately meet the needs of the mentally ill. It was reported that they only sporadically receive inmate requests for services, and that at times, it can be weeks before they receive these requests.

LDCRF has an impressive facility, and an area that is ideally suited for providing mental health treatment. It provides the appropriate level of confidentiality for mental health services, unlike any other facility in the system. If the system for referrals and provision of services can be improved, there is good opportunity to appropriately meet the mental health needs of the women incarcerated at this facility.

**Segregation:**
The mental health professionals reported that they have just begun doing segregation rounds weekly. This is a good step, and should help to ensure that inmates are not decompensating while in segregation. The mental health staff does not, however, screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement.

**Ex. B - 230**

DUNSMORE0260719

**PSU:**

The services provided at the PSU are much like what would be provided at a residential treatment facility. The inmates have groups five hours per day, and the natural light and set-up of the unit is conducive to stabilizing and improving the mental health of the participants.

The physical structure of the unit provides an opportunity for a therapeutic community program for more stable women. They are often on the unit for several months or longer, and could benefit from the therapeutic community model.

## NCCHC STANDARDS RELATING TO MENTAL HEALTH:

**J-A-01:**    **Access to Care:**                    **Not Met for Mental Health**
Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10:**    **Procedure in the Event of an Inmate Death:**    **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**    **Grievance Mechanism for Health Complaints:**    **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**    **Health Training for Correctional Officers:**    **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**    **Mental Health Screening and Evaluation:**    **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**    **Nonemergency Health Care Requests/Services: Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**    **Segregated Inmates:**                **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.

**J-E-13:**    **Discharge Planning:**                **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**    **Basic Mental Health Services:**            **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**    **Suicide Prevention Program:**            **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

Ex. B - 231

DUNSMORE0260720

**RECOMMENDATIONS:**

1. It is recommended that the system for providing mental health services be improved so that the adequate number of staff can meet the mental health needs of the inmates in this facility.
2. It is recommended that nursing staff who do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
3. It is recommended that mental health staff members see and address mental health grievances.
4. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
5. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.
6. It is recommended that the facility consider developing a therapeutic community program for inmates in the PSU.

**Ex. B - 232**

DUNSMORE0260721

San Diego Sheriff's Department
Vista Detention Facility (VDF)
Technical Assistance Report
January 7, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails*. On January 7, 2017, NRI conducted its review for the Vista Detention Center (VDF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 39 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 26 essential standards:

Essential Standards
J-A-02  Responsible Health Authority
J-A-05  Policies and Procedures
J-A-06  Continuous Quality Improvement Program
J-A-07  Emergency Response Plan
J-B-01  Infection Prevention and Control Program
J-C-04  Health Training for Correctional Officers
J-C-05  Medication Administration Training
J-D-01  Pharmaceutical Operations
J-D-02  Medication Services
J-E-01  Information on Health Services
J-E-02  Receiving Screening
J-E-03  Transfer Screening
J-E-04  Initial Health Assessment
J-E-05  Mental Health Screening and Evaluation
J-E-06  Oral Care
J-E-07  Nonemergency Health Care Requests and Services
J-E-12  Continuity and Coordination of Care During Incarceration

Ex. B - 233

DUNSMORE0260722

J-E-13  Discharge Planning
J-G-01  Chronic Disease Services
J-G-03  Infirmary Care
J-G-04  Basic Mental Health Services
J-G-05  Suicide Prevention Program
J-G-06  Patient With Alcohol and Other Drug Problems
J-G-07  Intoxication and Withdrawal
J-I-01  Restraint and Seclusion
J-I-02  Emergency Psychotropic Medications


Essential Standard Not Applicable
J-C-09  Counseling and Care of the Pregnant Inmate


There are 27 important standards and 26 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 20 important standards:

Important Standards
J-A-09  Privacy of Care
J-A-10  Procedure in the Event of An Inmate Death
J-A-11  Grievance Mechanism for Health Complaints
J-B-02  Patient Safety
J-B-03  Staff Safety
J-C-02  Clinical Performance Enhancement
J-C-09  Orientation for Health Staff
J-D-03  Clinic Space, Equipment, and Supplies
J-D-04  Diagnostic Services
J-E-09  Segregated Inmates
J-E-10  Patient Escort
J-E-11  Nursing Assessment Protocols
J-F-01  Healthy Lifestyle Promotion
J-F-02  Medical Diets
J-G-11  Care for the Terminally Ill
J-H-04  Access to Custody Information
J-I-03  Forensic Information
J-I-04  End-of-Life Decision Making
J-I-05  Informed Consent and Right to Refuse
J-I-06  Medical and Other Research

Important Standards Not Applicable
J-C-08  Health Care Liaison

Ex. B - 234

DUNSMORE0260723

**Evaluation Method**

We toured the booking/receiving area, medical observation area, clinic area, dental area, indoor recreation area, inmate housing areas, mental health housing and segregation. We reviewed 17 health records; policies and procedures; administrative, health staff, and continuous quality improvement (CQI) meeting minutes; statistical and health services personnel and correctional officer (CO) training records. We interviewed the, day shift sergeant, physician, nursing supervisor, psychiatrist, psychologist, dentist, two COs, and eight inmates selected at random.

**Facility Description**

**Location:** Southwest
**Built:** 1978 and expanded in 1989
**Security:** Level 2 or medium
**Supervision Style:** Direct and Indirect Supervision
**Bookings:** 32 to 50 a day/male and female
**Lay Out:** Modular and Dormitory Housing
**Capacity:** 886 is the court ordered capacity
**Males:** 708    **Females:** 76    **Juveniles:** none
**Custody Staff:** Not available; staffed days, evenings and nights

**Findings and Comments:**
**Special Note:** A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard.

## D.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. Some areas are not timely, however, such as the receiving screening and the face-to-face evaluation after a request is triaged. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. This is a medium-security facility, and "lock-down" is used as needed, but health and custody staff works together regarding the inmates' health needs regardless.

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

Ex. B - 235

DUNSMORE0260724

There are no recommendations regarding this standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices (and rarely at the facilities). The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody, medical, and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

There are no recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented with action items and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers, public health meetings, monthly contractors, transportation meetings, policy and procedure meeting, site-specific weekly meetings of the patient care coordinating committee, and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization. These reports are used to monitor trends in the delivery of health care.

There are no recommendations regarding this standard.

**Ex. B - 236**

DUNSMORE0260725

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system, with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, and objective assessment plan organization. They note compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. A cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken, although documentation is lacking. The identified studies are not documented, nor is the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and monitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring and implementation. With the physician's guidance, the committee establishes monitoring activities and thresholds for studies, and completes those studies. CI # 4 explains process and outcome

**Ex. B - 237**

DUNSMORE0260726

studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills occurred on the day shift, but there was no documentation. The scenarios were described as an active shooter, use of the restraint chair in a medical emergency, hostage scenarios, and an inmate disturbance. The scenarios are developed centrally and sent to the facilities for staff to conduct. The drills were critiqued and shared with staff via the training bulletins and at the weekly staff meetings.

The facilities plan a monthly or every other month man-down drill. They do occur on each shift and are described as man on the floor, man down in video court, cell extraction. They are all drills, critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information is usually conducted in privacy. In this jail, the deputy escorts the patient to the clinic and remains in the hall during the appointment. Only when the patient is unstable, do officers remain in the room. Health encounters in the housing areas are as confidential as possible. At this jail, the mental health clinicians mentioned that they conduct many interviews through glass windows in the doors, which means staff or other inmates can overhear.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2 and # 3 require procedures to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA and confidentiality; however, facility practices do not allow for confidentiality to occur in all areas of the jail.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** For the last two years, 2015 and 2016, there have been eight inmate deaths, of which four were reported to be of natural causes,

**Ex. B - 238**

DUNSMORE0260727

and four by suicide. The administrative review and clinical mortality reviews were not completed in a timely manner. Also, there was no evidence that the results of the reviews, when completed, were shared with staff at the facility. The nursing supervisor attended the mortality review for the suicide that occurred in 2016 and shared the information with the staff.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

At this facility, an average of six health-related grievances, including mental health, are filed a day (more than 150 a month), which seems excessive. This would be a good topic for a CQI study in order to identify trends. The standard appeal procedure is seven days for level one and 10 days for levels two and three.

**Recommendations**: Compliance indictors # 1 and # 2 are met. We recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B. MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room (for total isolation). The negative airflow

**Ex. B - 239**

DUNSMORE0260728

isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff for review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked. Sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. The nursing supervisor at this jail reports that staff does report safety issues and discusses them in staff meetings. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** Health staff appear to work under safe and sanitary conditions. The jail is well lit, clean, and well maintained for an older jail. The space for health is limited, but the health staff has made great effort to keep it organized and to maximize space. The nurse's station is next to the clinics and the MOB area. The health staff work together to ensure assignments are completed when assistance is needed, which in turn ensures timeliness of care and safety for the nurses.

**Recommendations:** Staff may benefit from wearing radios (not available at the time of the visit), or implementing a call system in order to be notified of emergencies or to call if in an emergency. The exam rooms do not have call buttons. Because of this, officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We

---

**Ex. B - 240**

DUNSMORE0260729

observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. The nursing supervisor reported that there have not been any incidents in the jail for "a long time".

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license. The nursing supervisor reported that copies of licenses for all licensed staff were in his office.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

DUNSMORE0260730

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits and all were current in cardiopulmonary resuscitation (CPR) training. There is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses and LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years and specifies the required topics. Health staff should insure that all health related training is completed. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3, describe the training program to be approved by the responsible health authority, facility administrator, and designated physician, for health staff so they are appropriately trained in administering medications. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** Inmate workers are not employed in a health care delivery capacity, either in the MOB or clinical areas. They clean the floors and empty the trash. Nurses clean the clinic spaces. Inmate workers work in the kitchen and have been trained to do so by the kitchen supervisors. They can earn their food handler certification. There are no peer health-related programs at this facility.

---

**Ex. B - 242**

DUNSMORE0260731

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff is scheduled for 10-hour shifts with every other weekend off. Full-time staff includes 25 RNs and 12 LPNs. Seven RNs are scheduled for the day shift and five for the night shift. Three LPNs are scheduled for each shift. Actual working hours may vary to accommodate the work load or medication round schedules. The contract physicians hold clinic seven days a week from 8:00 am until 12:00 pm and are on call on a rotating schedule 24 hours a day. Mental health staff consists of two full-time clinicians, including a psychiatrist.

At the time of our visit, vacancies consisted of three RN positions. Two new hires were pending orientation. Temporary agency staff is also used to fill vacancies.

This jail is unique in that staff rotates assignments and cooperate particularly well to balance the work load. The nursing supervisor attributes their ability to keep up with requests for care, emergencies, and bookings to teamwork and good communication amongst the staff. He reported turnover is rare, and that the vacancies were recent.

**There are no** recommendations regarding this standard.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two weeks orientation at the central administrative offices. This includes personnel, benefits, medical records, emergency response, and readiness for onsite orientation. The next six weeks are spent in orientation at the facility of assignment, where new staff is assigned a preceptor. They review all aspects of the facility: security, inmate population, job description, and skills competencies. Each new hire, is given an RN or LPN Preceptor Toolkit that consists of check lists along with procedures and skills information. These check lists are reviewed before the orientation ends with the nursing supervisor in order to determine if more time is needed. All compliance indicators, except CI # 2 are met.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two years by the responsible health authority. The current procedure was last revised in 2013.

### D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once

**Ex. B - 243**

DUNSMORE0260732

a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

---

**Ex. B - 244**

DUNSMORE0260733

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LPNs put doses of medication into labeled envelopes before taking the cart or basket to the housing areas for administration. Since this process is time-consuming, LPNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to "lock-down" status. Nurses are not able to see patients during lock-down periods. There is no procedure in place to evaluate who is on essential medications or how to work with custody staff for a solution. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be validated.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure

---

**Ex. B - 245**

DUNSMORE0260734

does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing, and only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery), or require reordering.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two exam rooms, a dental chair, a medication room, a records room in the nurses' station, a lab area in a clinic room, a patient waiting room, a radiology/x-ray room (digital in the receiving area), a small nurse's station with records space, and a couple of supply rooms. The nursing supervisor reported that mental health clinicians have a private area to see patients and sometimes they go to the cell to evaluate a patient, especially when the patient is in segregation. The booking area also has some medical space, including sobering and safety cells, and two nursing areas.

Items subject to abuse are not counted each shift. Three emergency crash carts are checked each shift. Five automated external defibrillators (AED) were strategically placed around the facility.

The clinic contained all the equipment necessary to take care of the patients.

**Recommendations:** Compliance indicator # 7 requires that weekly inventories on items subject to abuse (syringes, needles, scissors etc.) This procedure should be put in place and maintained.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, pregnancy test kits, and drug screen urine dipstick and multiple-test dipstick urinalysis. Males and females are housed at this facility.

The AEDs are checked regularly. There is no manual of laboratory tests or equipment in the clinic area.

The dental operatory is fully equipped with everything except an oxygen tank, although one is nearby in the clinic. As there was no dental staff on site, we were unable to verify the dental sharps count.

A representative from an outside laboratory service retrieves samples regularly and returns the results by phone or fax. X-ray services can be provided in the booking area. A contracted technician comes daily. Panoramic dental x-rays can be taken in the clinic. Optometry, CAT scans, and ultrasound examinations are offered in the community. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections, and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

---

**Ex. B - 246**

DUNSMORE0260735

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care, and the various fees, and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return and other have it posted. Based on the results of inmate interviews,

**Ex. B - 247**

DUNSMORE0260736

surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** When new admissions arrive directly from the community two nurses complete the receiving screen immediately upon arrival. The pre-booking or "medical clearance" screening is accomplished as part of the complete screening. They complete the two forms at the same time. If the nurse feels an arrestee needs to go to the hospital, he/she works with custody staff and the arresting agency to arrange this.

Inmates of both genders are "booked" at this facility. Females are tested for pregnancy, and if positive and necessary, begin the opiate protocol. Pregnant females are transferred immediately to a facility that can meet their needs.

If someone arrives on methadone, an oral methadone bridge is used until a plan with a community clinic can be arranged.

The nurse takes vital signs and asks questions about injuries, suicide risk, medications, recent hospitalizations, and other health problems. If the arrestee is semi-conscious, bleeding or severely intoxicated, s/he will be sent to the emergency room. The nursing supervisor explained that there still is an issue with nurses completing pregnancy test and a urine drug screen before starting the inmate on prescriptions medications.

The full booking procedure at this facility takes from two to six hours. It includes contraband screening, a chest x-ray to rule out tuberculosis, and housing in a sobering cell if needed. Safety cells can also be used to monitor inmates for their behavior.

The nurses initiate the standard nursing procedures when identified and call the on-call physician for orders to continue medications after they have been verified.

CIs # 1 through # 9 and # 13 are met at this jail due to the timeliness of the complete screening. CI # 4 is met as the nurse completes pregnancy testing on the incoming females. Since CI # 11 references corrections officers completing the screening. It is not applicable as nurses do the screenings at this facility.

**Recommendations:** This jail complies closely to the intent of the standard. Two and sometimes three nurses complete the screening and follow up with a plan of care. Some areas of the form are not complete and need to be revised to include the mental health and dental questions. The receiving screening procedure at this jail assures timely screenings for each new arrival. As with the other reports, there were no access-to-care signs in the receiving area. When all the appropriate questions are added to the receiving screening, the facility will be in compliance.

CI # 6 (a) though (k) address the required elements for the receiving screening form. While most are included, adding dietary needs and recent communicable diseases symptoms, along with the mental health and dental questions, would meet the needs for compliance.

CI # 8 describes the disposition of the inmate. This is not part of the receiving form and should be added. It communicates whether the person would go to general housing, medical observation beds, or to sobering/safety cells. This is important for the next health care person to know what was present in booking.

---

**Ex. B - 248**

DUNSMORE0260737

CI # 12 requires that health staff should regularly monitor the effectiveness and safety of the receiving screening process. This can be done in quality improvement committee or in another format.

**Special Note:** The booking/receiving screening process at this jail may be used as an example for the quality study of a coordinated, timely, and thorough screening of incoming detainees. This is the safety net to ensure the health status of newly arrived inmates is known and to prevent crisis/death.

**J-E-03  Transfer Screening (E).** Reportedly, 50 to 100 transfers a day arrive at this facility from the others. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours.

The nursing staff receives from classification staff a list of transferring inmates when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said "cleared by RN and chart checked by MD" at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, the receiving nurse schedules the inmate and sees that it is completed. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a

DUNSMORE0260738

nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4, and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during the stage 2 of receiving screening. (The nurse asks a few questions during stage 1.) There is no 14-day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place and the policy and procedure revision may include all the questions needed and the evaluation.

**Recommendations:** The mental health screening form requires revision to include all the required questions/observations. RNs should be trained by a mental health staff. The referrals from booking to mental health could reflect a 14-day evaluation if that program was in place. If a formal program was in place, there would be policy and procedure, tracking logs/lists, and staff assigned to complete the evaluations by the 14th day of incarceration. The mental health team does complete many evaluations for those with positive screenings, although they are not tracked for timeliness.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking, although there is no inspection of the inmate's mouth. This could be added to the first stage, as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12-month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site one day a week, and sees patient upon a nurse's referral. The dentist completes extractions and provides the rare filling. The dentist also may send complex patients to another jail with more dental time. The dental list shows there is no backlog of dental appointments and they are seen in a timely interval.

**Recommendations**: CI # 1 and # 2 can be met by incorporating oral screening/education into the upfront booking process and the dentist can train the nurses to conduct the screening. CI # 3 can be met by pulling a list of inmates in the facility for 11 months and schedule for a dental exam by 12 months. Since the timeliness of the oral screen is 14 days, and oral hygiene instructions are 30 days, the screening can be completed by the trained nurse during the initial health assessment. The initial health assessment, mental health screening and evaluation and oral care may all be accomplished by having a trained nurse complete the assessment.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves them

**Ex. B - 250**

DUNSMORE0260739

each night and brings them to medical services where they are date stamped and triaged as to the nature of the complaint (health, dental, or mental health) and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day or next to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two to four days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven to 14 days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight days to see the nurse and some were 12 to 18 days. For the physician, the lists were five days out, with some at eight to 12 days.

At this facility all inmates have access to the locked boxes for their requests to remain confidential. Also, there were no backlog of requests. The nurses pick up, triage, and see the patients as indicated in the procedure. While the procedure does not require a face-to-face assessment within 24 hours of triage, the inmates are seen by a nurse.  CIs # 2 through # 5 are met

**Recommendations**: Compliance indictor # 1 requires that a qualified health professional has a face to face encounter with the patient within 48 hours of receiving request that describe a clinical symptom. This is not completed. The nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What may be a headache to the patient may be a stroke symptom or constipation a symptom of an infected appendix. The intent of the standard is for those requesting care be evaluated first. The request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day and can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** There were approximately 235 inmates in segregation/administration segregation and protective housing cells. The mental health staff conducts weekly segregation checks, and they note on the list whether the patient has been seen and if they are on the mental health case load. There was no notation about their mental condition, hygiene, orientation, or how they were adjusting. The nursing supervisor reported that nurses go on segregation rounds three times a week, although there was no documentation to support this.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These

---

**Ex. B - 251**

DUNSMORE0260740

checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients are escorted to on-site and off-site clinical appointments in a timely manner. Custody staff was proud of their support for medical services, particularly regarding patient transport on-site and off-site). Transporting officers are alerted to special accommodations such as medication administration or communicable diseases. Paperwork is sealed in an envelope and returned to medical services the same way to protect confidentiality.

CIs # 1 to # 3 are met.

**There are** no recommendations regarding this standard.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols, also known as standardized nursing procedures in this program, include prescription medications for emergency situations, as well as routine health conditions: alcohol withdrawal, chronic care, and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format) with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included to diagnose and prescribe medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols except those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few

**Ex. B - 252**

DUNSMORE0260741

physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** Compliance indictor # 1 states that there is a discharge planning process in place. However, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs for Naltrexone for extended-release injectable suspension , etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Information is instead clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has

Ex. B - 253

DUNSMORE0260742

been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

In this jail, a variety of written literature, including books, are provided by the Veterans Program and the Incentive Housing Unit. The inmates also participate in day-long formal programming to prepare them for re-entry into society. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen, under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than 10 special medical diets offered.

At the time of our visit, approximately 82 special diets were ordered at this jail. A registered dietitian reviews the medical diet menus annually (in July), but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference. CIs # 1, # 3, # 4, and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03   Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

> The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, they are identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component with designated clinics for specific diseases and a nurse who coordinates appointments, labs, and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications, and "return to clinic" appointments as set.

**Ex. B - 254**

DUNSMORE0260743

This program has one chronic disease pathway, for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines" which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test, frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with

---

**Ex. B - 255**

DUNSMORE0260744

active medical instructions (according to need) indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called "Medical Observation Beds (MOB)". Twenty-seven are for medical patients (five negative pressure rooms, two safety cells, and 20 with intercom communication), and eight beds are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patient should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal and directs the nurses to use the standard nursing protocols, which instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients, and felt some of them were actually at infirmary level of care, and required a physician directing the care plan and medications.

The responsible physician and RHA, should review the use of the MOB, and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds, and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds where nurses may admit. Others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation/shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use, such as lab results, consent forms, and admission forms.

**Ex. B - 256**

DUNSMORE0260745

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and referred to the onsite mental health program staff. There are some safety cells (suicide watch or violence watch) if needed in that area. There are also enhanced observation cells available for special housing. Staffing included a vacant position for a supervising psychiatrist, and a chief clinician. Two mental health licensed clinicians respond to patients' needs for evaluation. The psychiatric team is supplemented with contract psychiatrists and psychologists, who receive referrals for evaluations and who order medications. The team provides some programming for patients.

CIs # 1, # 3, # 4, # 5 # 6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five areas are covered. Some group counseling sessions are ongoing.

**Recommendations:** See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program. At this jail, it is the psychiatric unit's charge nurse or mental health clinician.

In the last two years, there have been eight inmate deaths, four of which were due to suicide. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were conducted on the cases of suicide, but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit, and would continue until all health, mental health and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings, where special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the

**Ex. B - 257**

DUNSMORE0260746

corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CIs # 1 and # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled. CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells (on the second floor, above booking), but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care; the nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This facility houses males and females. A pregnant opiate patient receives a pregnancy test and a urine drug screen during receiving. If the female is on methadone upon arrival, the policy is to continue oral methadone as a bridge until a program can be arranged with a community methadone clinic. If the pregnant inmate goes to the emergency room for an evaluation and methadone is prescribed, the facility health staff will "bridge" with oral methadone until a program can be put in place to continue it. If anyone arrives in a state of severe intoxication or withdrawal, they are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** There is no policy and procedure that guides the staff to continue the prescriptions of a woman who arrives at this facility or if emergency contraception is

---

DUNSMORE0260747

available. It would be in the community hospital, but this should be explained in a procedure for staff reference.

Since this jail houses women, it would be appropriate to address the contraception needs before they leave custody. Pregnant women are transferred to the women's facility, where comprehensive services are available. There are community resources regarding pregnancy options and contraception if needed.

**Recommendations:** CI # 4 requires a policy and procedure to guide staff in the contraceptive practices of the program and addresses the components of the standard. It should also include where emergency contraception is available.

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** As soon as a woman tests positive for pregnancy, she is sent to the women's facility where comprehensive prenatal and counseling services are available through the services of contracted obstetrical/gynecological physicians who come into the clinic weekly. The standard is **not applicable** for this jail**.**

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it occasionally occurs. There is no formal procedure. Staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program, so if a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared basis among providers. At a minimum, a listing of current problems and medications should be common to all medical,

**Ex. B - 259**

DUNSMORE0260748

dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions; the paper records are locked in a secure room (accessible to the clerical staff who manage the records), and the electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two senior medical records technicians, 10 technicians, one clerk and one office assistant. Some of the staff is located in the central administrative office, and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Recommendations:** We recommended to continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

**Ex. B - 260**

DUNSMORE0260749

## I. MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every 15 minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, restraints are rarely applied. There is one restraint chair and deputies carry Tasers and handcuffs. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2 and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency. The nursing supervisor stated that this only occurs two to four times a year and usually the patient is transferred to a setting with more mental health resources.

There is a process through the courts for forced medications, and the nursing supervisor indicated that when someone is given forced medications, they are transferred to the PSU at another jail. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

---

**Ex. B - 261**

DUNSMORE0260750

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed and revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** It was reported that health staff does not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations, verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions, or living wills that an inmate arrives with, would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or a do not resuscitate (DNR) order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d. emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program, and decide on the plan while this person was in custody.

**Ex. B - 262**

DUNSMORE0260751

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research, a patient on a medical trial, or a participant in a research project.

## Mental Health Report:

**VISTA DETENTION FACILITY**

**Staffing:**      1.2 FTE Psychiatrists
1.0 FTE Psychologist
2.0 Mental Health Clinicians

**Overview:** The mental health services at Vista are primarily provided by the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. The mental health clinics are intended to provide individual counseling, but the clinics are often cancelled and are not sufficient to meet the need for mental health services. It is very positive that the number of mental health clinicians has doubled recently, from 1.0 to 2.0 FTE, but this is still insufficient to meet the population's needs. There is one psychologist, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 1.2 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at Vista, about the requirements of the Safety Program and how to implement it. The expressed understanding of it at Vista is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15-minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards and at other facilities across the country. The facility psychologist is the only one who can remove somebody from suicide watch, and his only duty is  involvement in the Safety Program. Staff members did not express an understanding of the design of the Safety Program as described by the system medical director. Staff members are under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the Safety Program, however, is that inmates who are identified as high risk cannot be released prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute monitoring if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly are not trained on suicide prevention. Although an eight-hours class on mental health in jail has been initiated, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

**Ex. B - 263**

DUNSMORE0260752

The outcome of the inadequate suicide prevention program is a suicide rate at Vista that is above the national average over the past two years. The suicide rate in 2015 was 300:100,000, which is nearly nine times the national average, and 100:100,000 in 2016, which is nearly three times the national average. The average for the past two years is 200:100,000, which is more than five times the national average of 36:100,000 in jails in the United States.

**Psychiatric Services:**
Psychiatrists at this facility do a good job treating inmates who are on psychotropic medications. Unlike the Central Jail and LCDRF, the mental health clinicians and nursing staff typically refer inmates to see the psychiatrist, rather than seeing them for the mental health assessment as happens at the intake facilities.

Vista only has 1.2 FTE psychiatrist staffing time, which appears to be sufficient to meet the needs of the inmate population. Staff was not aware of a waiting list to see the psychiatrist, and believes inmates are able to see the psychiatrist regularly.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and does a good job managing them appropriately. However, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia). The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

Mental health professionals reported that they see approximately 50 inmates per week, although as noted above, most of these are "wellness checks," and not counseling or more comprehensive mental health services. It is probably not sufficient for them to see only 50 inmates per week, and it appears that one of the issues is there is no deputy assigned to bring inmates to see mental health staff members. This limits the number of people they are able to see, and means that inmate mental health needs are likely not being met appropriately. It was reported, and demonstrated in the chart reviews, that many appointments are cancelled, and that an inmate may go for weeks without being seen following a referral or scheduled appointment. It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**Segregation:**
The mental health professionals reported that they conduct segregation rounds three times per week, which exceeds the NCCHC requirement. This is very positive and should help to ensure that inmates do not decompensate while in segregation.

**Ex. B - 264**

DUNSMORE0260753

## NCCHC STANDARDS RELATING TO MENTAL HEALTH:

**J-A-10:**  **Procedure in the Event of an Inmate Death:**     **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**  **Grievance Mechanism for Health Complaints:**    **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**  **Health Training for Correctional Officers:**     **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**  **Mental Health Screening and Evaluation:**     **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**  **Nonemergency Health Care Requests/Services: Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**  **Segregated Inmates:**                 **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.  Additionally, security or classification staff members are placing inmates in segregation because they are mentally ill, not due to disciplinary infractions, which violates NCCHC standards.

**J-E-13:**  **Discharge Planning:**                 **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**  **Basic Mental Health Services:**             **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**  **Suicide Prevention Program:**             **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

## RECOMMENDATIONS:

1. It is recommended that the facility improve the system for inmates to see mental health, so that they can effectively use the staff members they have and provide individual counseling as appropriate.
2. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
3. It is recommended that nursing staff that do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
4. It is recommended that mental health staff members see and address mental health grievances.
5. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.

---

**Ex. B - 265**

DUNSMORE0260754

6. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

**Ex. B - 266**

DUNSMORE0260755



## DISCLAIMER

Technical assistance by NCCHC Resources, Inc., is a professional activity that is completely separate from accreditation by the National Commission on Correctional Health Care and in no way guarantees accreditation, reaccreditation, or any other outcome of a survey.

## ABOUT NCCHC RESOURCES, INC.

Leveraging NCCHC's expertise in correctional health care, NCCHC Resources, Inc., provides customized education and training, preparation for accreditation and professional certification, performance improvement initiatives and technical assistance to correctional facilities interested in health care quality improvement. NRI will put together a team of experts – clinicians, educators, administrators or other thought leaders – to address any sized project or challenge. A nonprofit organization, NRI works to strengthen NCCHC's mission: to improve the quality of health care in prisons, jails and juvenile detention and confinement facilities.

For more information, contact us at info@ncchcresources.org or call (773) 880-1460.

---

**Ex. B - 267**

DUNSMORE0260756