GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:    (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>     v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>            Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXHIBITS C-X TO DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT – VOLUME II**<br><br>Judge:  Hon. Anthony J. Battaglia<br><br>Date:    March 6, 2025<br>Time:    2:00 p.m.<br>Crtrm.:  4A |

[4620326.1]

# TABLE OF CONTENTS

## EXHIBITS TO DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| California State Auditor Report, "San Diego County Sheriff's Dept. It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in its Custody" (Feb. 3, 2022), SD_744691 | A | 1 |
| National Commission on Correctional Healthcare Technical Assistance Report re: San Diego Jail (2017), DUNSMORE0260618 | B | 128 |
| Analytica Consulting Report, "San Diego County: In-Custody Death Study" (April 2022), SD_817750 | C | 268 |
| Community Oriented Correctional Health Services (COCHS) Best Practices Review of San Diego County (March 30, 2020), DUNSMORE0115368 | D | 332 |
| San Diego County Medical Examiner Autopsy Reports of Lonnie Rupard, Keith Bach | E | 360 |
| San Diego County, Contract With Correctional HealthCare Partners, Inc. For On-Site Clinical Services SD 1579694 | F | 399 |
| San Diego County, Contract With NaphCare, Inc. for Sheriff's Department Consolidated Health Care Delivery (April 26, 2022) | G | 440 |
| San Diego County, Amendment to Contract with NaphCare, Inc. (Feb. 5, 2024) | H | 578 |
| Urban Instititue, "Incarcerated People's Perceptions of Reproductive Health Care in a San Diego County Women's Jail" (Dec. 19, 2024) | I | 590 |

[4634529.1]

# TABLE OF CONTENTS

## EXHIBITS TO DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Kelly Davis, *San Diego Union-Tribune*, "Despite years of warnings, local jails confine mentally ill men together. One recent unreported death highlights the risks." (Dec. 22, 2024) | J | 674 |
| San Diego County Corrective Action Notice to NaphCare (May 12, 2023), NAPHCARE034745 | K | 683 |
| San Diego County Sheriff's Office News Release, "Death Investigation" (Jan. 10, 2025) | L | 699 |
| Excerpt from Medical Records of James Clark | M | 702 |
| Excerpt from Report of Dr. Scott Reinecke, served August 21, 2024 | N | 704 |
| Excerpts from Transcript of November 8, 2024 Deposition of Dr. Scott Reinecke | O | 707 |
| Excerpts from Transcript of June 12, 2024 Deposition of Dr. Peter Freedland | P | 724 |
| Excerpts from Transcript of November 12, 2024 Deposition of Dr. Owen Murray | Q | 729 |
| Excerpts from Transcript of October 30, 2024 Deposition of Henrietta Peters | R | 736 |
| Excerpts from Transcript of October 17, 2024 Deposition of Dr. Matthew Ross | S | 772 |
| Excerpts from Transcript of February 14, 2024 Deposition of Serina Rognlien-Hood | T | 779 |
| Excerpts from Transcript of April 26, 2024 Deposition of Dr. Jon Montgomery | U | 794 |

[4634529.1]

## TABLE OF CONTENTS

**EXHIBITS TO DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Notes from Dr. Scott Reinecke's Jail Inspections | V | 799 |
| Screenshot, San Diego County Sheriff's Office website, Table of In-Custody Deaths | W | 801 |
| Katie Hyson, *KPBS*, "Advocates claim Sheriff's Office underreported jail deaths in 2024" (Dec. 31, 2024) | X | 804 |

[4634529.1]

# EXHIBIT C

# 2022

## San Diego County
# In-Custody Death Study

Produced by Analytica Consulting for the San Diego Citizens' Law Enforcement Review Board

April 2022





**Ex. C - 269**

SD_817750

# 2022 County of San Diego – In-Custody Death Study

The San Diego County Citizens' Law Enforcement Review Board (CLERB) contracted Analytica Consulting to conduct an independent analysis of in-custody death data over the last 10 years and provide a report of an "apples-to-apples" comparison of San Diego County Sherriff's Department (SDSD) to other California County Sheriff Departments. While the enclosed report contains a detailed analysis on the issue of in-custody deaths, it should be noted that **this report does not make any conclusions regarding any *specific* in-custody death.**

Analytica independently performed all analysis and authored this report. Input on the process, methods, and ultimate findings was provided by members of CLERB, the Sheriff's Department, and experts in academia; nevertheless, Analytica had the final say on the content of this report. Therefore, **any views expressed in this report are those of Analytica Consulting and do not reflect any official statement or policy of San Diego County or any of its employees.**

Analytica Consulting
San Diego, CA
April 2022

 **Michael Marks**

 **Mikael Pelz, PhD**

 **Jennifer De La Cruz**



# Executive Summary

In-custody deaths in California county jails have become an increasingly contentious topic. Reporting by journalists and advocacy organizations conclude that the risk of death is highest in San Diego County jails. Based on data from the California Department of Justice, one inmate dies about every month in San Diego jails; however, research has raised important questions on how to study these deaths. One of these concerns is how best to compare in-custody deaths across different counties. Given that jails primarily admit those from the immediate county, how do mortality rates among the county population influence the total deaths within county jails?

We address this question by applying countywide mortality rates to the in-custody population of the 12 most populous counties in California. Our countywide mortality rates encompass nearly 200 unique groups based on gender, race-ethnicity, and age characteristics and four manners of death. Using arrest and jail population data, we then estimate the distribution of these groups in county jails. This approach allows us to arrive at an expected number of in-custody deaths for each county jail. These expected total deaths provide a baseline for evaluating deaths in San Diego jails and other county jails.

Our final analysis compares the expected deaths to the actual deaths in county jails from 2010-2020. Because the focus of this study is San Diego, we scale each county jail's population to reflect what they would be if they had the same number of inmates as San Diego County (unscaled results can be found in Appendix H). Using this approach, we can identify which county jails have more or less deaths than is expected as well as compare San Diego's total deaths to that of other counties. The analysis and findings have also been peer-reviewed by leading experts in criminology and biostatistics (see Appendix E for these reviews). Our main findings are found below.

## Finding #1: Residents of San Diego County are no more likely to die than residents of other California counties.

Previous research has suggested that San Diego County's general population has unique mortality rates, which may explain the number of in-custody deaths in the county. Our comparison of mortality rates among the 12 most populous counties in California shows that San Diego County has similar death rates to other large counties in the state and metropolitan counties in the Western United States. This finding applies to all manners of death including suicides, overdose/accidental deaths, homicides, and natural deaths.



*Overall County Mortality Rates*
*(Deaths per 10k/year, Ages 18-59, 1999-2020)*

## Finding #2: After considering countywide mortality rates, San Diego jails have the highest number of unexplained deaths

When analyzing overall in-custody deaths, we find that total deaths in San Diego jails surpass the deaths expected based on the county's mortality rates. We compare San Diego to other counties by standardizing their jail population to the size of San Diego jails (approximately 5000 inmates). The number of excess deaths resulting from the actual and expected death difference is the highest in San Diego County.

Analytica
Ex. C - 271
SD_817752

Additionally, San Diego County is the only county with a statistically significant number of excess deaths.[1] Most other counties have generally fewer total deaths than what is projected by their county mortality rates. This corroborates previous reporting suggesting that in-custody deaths are the most acute in San Diego County.



Expected number of **overall** deaths from 2010-2020 in a sample of the county's general population comparable in size and demographics to the county's jail population (~5000 people)



Expected vs Actual
**Overall** Jail Deaths, 2010-2020

## Finding #3: In San Diego County, Whites are more likely to *die* in jail; Blacks are more likely to *be* in jail.

When comparing the race of those who have died in-custody to the racial distribution of the jail population, deaths in San Diego occur disproportionately among Whites. The percentage of jail deaths among both Blacks and Hispanics is less than their percentage of the jail population. Given the large racial disparities between jail populations and county populations (Subramanian, Riley, and Mai 2018), the jail population is the most appropriate population to evaluate the racial proportionality of in-custody deaths.

Our analysis shows that racial disproportionality is introduced into the jail system through arrest rates. For example, the proportion of Black inmates in San Diego is three times higher than their proportion of the county population. However, the proportion of White, Hispanic, and other race inmates are all equal or less than their proportion of the county population.



*San Diego County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



---

[1] Statistical significance means that the observed result was unlikely to occur by chance and is likely attributable to some underlying cause. When we report that the difference between actual and expected deaths is statistically significant, we are stating that these differences are highly unlikely to be a matter of random chance.

Analytica

Ex. C - 272

## Finding #4: The risk of overdose/accidental deaths is the greatest in San Diego jails





When comparing overdose/accidental death rates among the counties in our study, inmates in San Diego jails have the highest death rates.[2] An inmate in San Diego is two times more likely to die in this manner of death than what is expected based on county mortality rates. This discrepancy results in the highest number of excess deaths among all 12 counties in this study. The actual and expected overdose/accidental deaths for San Diego are also statistically different. The same cannot be said for the other counties that have more overdose/accidental deaths than what is anticipated.

---

[2] The California Department of Justice broadly refers to these deaths as accidental deaths. Most of these deaths involve overdoses. A much smaller number of these deaths involve other circumstances such as blunt force, falls, and choking. For a complete distribution of these deaths, see Appendix C.

Analytica
Ex. C - 273

SD_817754

## Finding #5: San Diego is one of many counties with high suicide rates in jails.

San Diego County has an elevated suicide rate that is not unlike several other counties in this study. Reported suicides are four times the expected suicides in many of these counties. All 12 counties have more suicides than what is projected, but the number of excess deaths varies from county to county. These findings confirm that suicide remains a severe risk for those in-custody in county jails, a pronounced trend among county jails nationally (Abderhalden 2022).





Analytica

Ex. C - 274

SD_817755

## Finding #6: Elevated risk of death appears to be isolated to the unsentenced jail population

When comparing jail deaths between unsentenced and sentenced inmates, excess deaths only appear among those who have not yet been sentenced. This finding particularly applies to San Diego County, which had 51 excess deaths among unsentenced inmates and none among sentenced inmates. These results suggest that individuals are the most vulnerable to death when they enter the jail system and/or in the time between when they are convicted and when they are sentenced.



## Finding #7: Public oversight of in-custody deaths lacks key information

This study would not have been possible without the diligent and comprehensive data collection efforts of the California Board of State and Community Corrections (BSCC) and the California Department of Justice. Nonetheless, we have found that this reporting lacks key information on the circumstances surrounding these deaths. Reporting could be expanded to include additional information about inmates and jail facilities such as:

- Processing dates of those who died in-custody including the date of the inmate's arrest, booking, conviction, and sentencing

- Name of facility where the death took place

- Average daily jail population by race-ethnicity and age

- Average daily population of city jails (the state discontinued collecting these data in 2020)

- Complete list of the manner of death without missing values

- Number and type of mental health staff at jail facilities

Analytica
CONSULTING

Ex. C - 275

SD_817756

# 2022 San Diego County In-Custody Death Study

*Analytica Consulting*

Michael Marks, Mikael Pelz PhD, and Jennifer De La Cruz

April 2022

Executive Summary ........................................................................................................................ iii

Finding #1: Residents of San Diego County are no more likely to die than residents of other California counties. iii
Finding #2: After considering countywide mortality rates, San Diego jails have the highest number of unexplained deaths ...iii
Finding #3: In San Diego County, Whites are more likely to *die* in jail; Blacks are more likely to *be* in jail. ........... iv
Finding #4: The risk of overdose/accidental deaths is the greatest in San Diego jails ........................................ v
Finding #5: San Diego is one of many counties with high suicide rates in jails. ................................................... vi
Finding #6: Elevated risk of death appears to be isolated to the unsentenced jail population................................vii
Finding #7: Public oversight of in-custody deaths lacks key information ...............................................................vii

1. Introduction ................................................................................................................................2
2. In-Custody Deaths in California Jails ..........................................................................................3
3. County Mortality Rates ...............................................................................................................4
4. Who is in the Jails from the County Population?.........................................................................6
5. Expected vs Actual In-Custody Deaths ......................................................................................7
6. Differences Between Unsentenced and Sentenced Inmates .....................................................11
7. Future Research ........................................................................................................................14
References ....................................................................................................................................17

Appendix A: Selection of Counties ...............................................................................................18
Appendix B: ADP vs. ARP............................................................................................................19
Appendix C: A Closer Look at Overdose/Accidental Deaths........................................................20
Appendix D: Estimated vs Actual San Diego Jail Population .......................................................21
Appendix E: Peer-Review Letters.................................................................................................22
Appendix F: Response from San Diego Sheriff's Department .....................................................25
Appendix G: Deaths in City Jails .................................................................................................27
Appendix H: Detailed Results.......................................................................................................28

Expected vs Actual Statistical Test Results..................................................................................28
Jail Profiles of Each County in The Study ....................................................................................31
Mortality Rates Over Time ............................................................................................................43
Comparisons of San Diego Inmate Population to Other California Counties.................................44
County Demographics ...................................................................................................................45
Unstandardized Average Time between Deaths ...........................................................................46

Appendix I: Email Correspondence with Dr. Elizabeth Carson (U.S. Bureau of Justice Statistics)............46
Appendix J: Data Inclusion Criteria .............................................................................................50
Appendix K: Relevant Policy Changes Provided by the San Diego Sheriff's Department (2014-2021)......51
List of Tables ................................................................................................................................55
List of Figures ..............................................................................................................................56

Analytica
CONSULTING
Ex. C - 276

SD_817757

# 1. Introduction

The number of deaths in California's county jails has been a subject of increasing debate. This discussion has put sheriff's departments, who oversee these facilities, in sharp focus. Initial research on sheriff's departments has highlighted the apparent disparities in death rates among California county jails (Brannon 2020). San Diego County has received considerable scrutiny in these investigations. Reporting by local media and advocacy groups suggests the death rate in San Diego jails surpasses the death rates in all other large county jails in California (McDonald, Davis, and Schroeder 2019). Based on data from the California Department of Justice, about one inmate dies every month on average in San Diego jails.

Throughout this public debate, several important questions regarding how to evaluate county jail death rates have been raised. What population should these deaths be compared to when calculating jail mortality rates? Nearly all previous studies use the average daily jail population (ADP), which adds the daily count of inmates together for the month and then divides it by the number of days in that month.[3] Furthermore, what manners of deaths should be the focus of this research? Suicides have received the most attention in this work. Natural deaths and, to a smaller degree, homicides and accidental deaths also occur in jails. However, one of the primary questions on this topic is how best to compare in-custody deaths across different counties. For instance, some research has considered the racial proportions of counties when explaining these death rates (Kelly 2018). What other county factors should be incorporated into a comparison of jail death rates?

Given that jails primarily admit those from the immediate county, the particulars within a county will likely impact in-custody death rates. As the San Diego Sheriff's Department wrote in response to a recent state audit:

> "As jails are a microcosm of the communities in which they are located, it should come as no surprise that as deaths in the community increase, deaths in-custody will increase as well." (2022)(p.99)

We seek to understand this argument by exploring the relationship between county death rates and jail death rates. Counties have different populations, which exhibit varying levels of risk of death based on demographic profiles, associated behaviors, and the level of services available to residents in the county. Specifically, we seek to answer the following question: do differences in county mortality rates help explain the differences we see in county jail mortality rates?

To address this question, we establish an expected number of total deaths in jails by applying countywide mortality rates to the county's in-custody population. Our countywide mortality rates encompass nearly 200 unique groups based on gender, age, and race-ethnicity and four different manners of death. As such, they capture the distinctive health risks within a county. We then determine the distribution of these groups in county jails using a combination of arrest and jail population data. This step enables us to report the expected number of deaths for each county jail in our study. These expected values provide a county-level baseline for evaluating and comparing in-custody deaths across county jails.

---

[3] To fairly compare in-custody deaths across counties, we must account for the different number of inmates in each county's jail system. Nearly all studies utilize the Average Daily Population (ADP) for this calculation. We were able to find only two analyses that use the At-Risk Population (ARP) (Kelly 2018). For more discussion on ADP vs. ARP, see Appendix B.

Analytica
Ex. C - 277
SD_817758

## 2. In-Custody Deaths in California Jails

To provide some initial context on in-custody deaths in California jails, we examine total deaths between 2010-2020 among the 12 most populous counties. These 12 counties were chosen for this study because they have an adequate sample size of in-custody deaths over time (see Appendix A for more discussion). The first chart in Figure 1 displays the total jail deaths. The number of deaths in these counties varies substantially.[4] San Francisco, Contra Costa, and Sacramento counties have relatively low numbers of total deaths. Los Angeles County has the highest total deaths at 290. San Diego County has the second highest total deaths at 141.



*Figure 1: Total Deaths in Various California County Jails (2010-2020) Compared to San Diego County.*

In order to fairly compare these numbers of deaths, we consider the size of the jail population in each county. We use the average daily population (ADP), which adds the daily inmate count for the month (typically taken around midnight each day) and then divides by the number of days in the month. The average ADP from 2010-2020 for each county is listed next to the county name in Figure 1. Another infrequently used measure, at-risk population (ARP), combines the January 1 count with the number of annual admissions. While neither measure offers individual-level information on inmates, the average daily population provides a unique number of the jail population without counting many who are re-admitted to jail. As such, the U.S. Bureau of Justice Statistics believes that ADP is "the best alternative" (Carson 2021) (see Appendix B and Appendix I for more discussion).

The second chart in Figure 1 factors the average daily population by displaying total deaths if jail populations were the same size as the San Diego jail population (5180 inmates). Viewing total deaths in this manner allows us to better compare other counties to San Diego. When we base in-custody deaths on a jail population of 5180 inmates, San Diego is now the county with the greatest number of deaths over the past decade. Fresno County has a comparable number of deaths at 140.

Measuring total deaths does not fully describe the nature and circumstances surrounding these deaths. To better compare in-custody deaths among these 12 counties, we break down these deaths by the manner of death. Table 1 presents the average time between deaths for the four major manners of death: natural deaths, suicides, overdose/accidental deaths, and homicides.[5,6] Comparing the average time between death accentuates the frequency of these death. For instance, deaths are more common if the length of

---

[4] Deaths exclude individuals in custody who died in transit or individuals who died in the process of being arrested. See Appendix J for full list of data inclusions.

[5] For homicides, we only include willful deaths committed by other inmates or law enforcement staff. Two other categories—undetermined and pending investigation—are nondescript and therefore not included in our analysis.

[6] An overwhelming majority of overdose/accidental deaths are drug-related. The remaining deaths in this category are associated with blunt force, choking, and medically-related circumstances. See Appendix C for a full breakdown of these deaths.

Analytica

Ex. C - 278

time between deaths is only two months versus 2.1 years. The values on Table 1 are also based on the size of the San Diego jail population.

**Table 1**: Average Standardized Time Between Deaths by Manner[7] (2010-2020)*

| County | Natural | Suicide | Overdose/Accidental | Homicide |
|--------|---------|---------|---------------------|----------|
| Alameda | 2 months | 4 months | 7 months | 2.1 years |
| Contra Costa | 5 months | 3 months | 3 years | |
| Fresno | 2 months | 4 months | 7 months | 1.1 years |
| Kern | 2 months | 4 months | 8 months | 2.4 years |
| Los Angeles | 3 months | 9 months | 9 months | 2.5 years |
| Orange | 3 months | 1.4 years | 1.2 years | 4.1 years |
| Riverside | 3 months | 5 months | 6 months | 1.3 years |
| Sacramento | 5 months | 10 months | 1.2 years | 1.2 years |
| San Bernardino | 3 months | 6 months | 1.4 years | 1.9 years |
| **San Diego** | **2 months** | **3 months** | **5 months** | **1.4 years** |
| San Francisco | 3 months | 4 months | 8 months | |
| Santa Clara | 2 months | 6 months | 2.4 years | 7.3 years |

*To enable an apples-to-apples comparison, all values are standardized to represent what the
value would be if that county jail was the same size as the San Diego County jails. See
Appendix H for unstandardized values

The table above reveals that the shortest periods of time between deaths is among natural deaths. On average, there is a natural death in many county jails including San Diego every two months. Suicides also occur in jails with some frequency. Over half of these county jails have a suicide every three to four months. This table also suggests that overdose/accidental deaths and homicides are relatively rare in jails. Many counties go 8 to 12 months without an overdose/accidental death. However, both San Diego and Riverside report this type of death about every five months. Homicides are even rarer occurrences in jails, often happening every two years or more. In fact, two counties (Contra Costa and San Francisco) did not report a single homicide over this eleven-year period. San Diego had a homicide on average every 16 months.

Table 1 also puts in-custody deaths in San Diego County in clearer focus. Inmates die more frequently of natural and overdose/accidental causes in San Diego than in any other county. In addition, San Diego has the second fewest months between suicides and the fourth fewest months between homicides. Are these rates informed by the broader mortality rates among San Diego County's general population? We seek to answer this question by applying county mortality rates to the jail population of each county.

## 3. County Mortality Rates

An explanation for in-custody deaths may be the residents of the counties themselves. County populations exhibit varying levels of mortality risk based on demographic profiles, associated behaviors, and the level of services available to residents in the county. As a result, mortality rates among the county population may be a useful criterion for comparing in-custody deaths among these 12 counties. For instance, a county jail may experience a high number of suicides because of a high prevalence of suicide in the county at large.

If one looks at San Diego County, several notable demographic features may have implications for mortality rates in the county. San Diego County's White population is almost 10 percent higher than the average White population among the other counties in this study. Consequently, it has fewer Black and Hispanic residents by 2-3 percentage points than these other counties. (See Appendix H for complete comparisons of county demographics.)

---

[7] Out of the 990 total in-custody deaths in-scope for our study, 64 had a manner of death listed as *Pending Investigation*. Most of these came from three counties: San Bernardino (24), Los Angeles (18), and Santa Clara (9). To obtain missing manner of death values, we filed Public Records Act requests with the coroner/medical examiner of all the counties in our study. We then matched the data we received with the data from the California Department of Justice using death date, race, gender, and birth date as the matching fields. Using this method, we were able to identify the manner of death for 31 of the 64 listed as *Pending Investigation*.

Analytica
Ex. C - 279

To systematically study different county mortality rates, we use data from the U.S. Centers for Disease Control and Prevention WONDER data base ("Underlying Cause of Death Data, 1999-2020" 2021) to calculate the mortality rates for each manner of death using gender, race-ethnicity, and age as our primary demographic characteristics. For example, one distinct stratum is Black males from age 18-29. Together, these strata form 48 distinct demographic groups which, when combined with our four manners of death, result in 192 different death rates for each county. To maximize the number of observations per stratum, we utilize data ranging from 1999-2020. Mortality rates are measured by counting the yearly number of deaths per 10,000 residents.

Figure 2 displays the general population mortality rates for the 12 counties in our study.[8] These figures also compare these county mortality rates to the Western United States metropolitan county average. The value of 17.5 for San Diego indicates that about 17 people per 10,000 residents die in the county each year on average. In general, the mortality rate for San Diego is between that of Orange County and Alameda County and below the Western United States metropolitan county average. Kern County has the highest overall mortality rate at 26.7 per 10,000 residents.



*Figure 2: Overall County Mortality Rates*
*(Deaths per 10k/year, Ages 18-59, 1999-2020)*



To understand the differences in mortality rates by manner of death, Figure 3 displays the county mortality rates for overdose/accidental deaths, homicides, and suicides. Natural deaths are excluded from this figure because they skew heavily toward older populations and are included in the overall rates in Figure 2. This figure provides a more nuanced picture of mortality rates in San Diego County. Specifically, the County has higher mortality rates for overdose/accidental deaths and suicides than most of the other California counties in this study; however, it largely mirrors the broader Western metropolitan county average in these manners of death. San Diego has one of the lowest homicide rates, closely resembling the homicide rates of Santa Clara and Orange counties.

*Figure 3: Suicide, Homicide, and Accidental Death Rates*
*(Deaths per 10k/year, Ages 18-59, 1999-2020)*

---

[8] We restrict these figures to ages 18-59 to focus the analysis on age groups that make up over 97% of jail populations. Additionally, the rates of death increase dramatically over the age of 60 and skew heavily towards natural death.

Analytica
Ex. C - 280
SD_817761

## 4. Who is in the Jails from the County Population?

For various reasons, county general populations and jail populations will likely vary, particularly on certain demographic attributes (Tonry 2011). To capture unique jail populations and estimate their mortality rates, we rely on arrest data from 2010-2020 obtained by California's Department of Justice OpenJustice portal. We first create the same demographic groupings used to measure county mortality rates.[9] Then, we calculate the percentage of felony and misdemeanor county arrests that occurred among each group. For example, our analysis estimates that White males and females aged 40-59 constituted nearly 18% of arrests in San Diego County.

However, these arrest rates need to be transformed into jail populations because not all those arrested will remain in-custody at county jails. By comparing each group's felony and misdemeanor arrest rates to the county's felony and misdemeanor average daily population (ADP), we can estimate the population of each group in county jails.[10] After we complete these steps, we estimate that White males and females aged 40-59 make up about 15% of the San Diego jail population.

Figure 4 compares the county population[11] and jail population in San Diego by race-ethnicity and age. Two general trends are clear from this figure. First, racial-ethnic minority groups are disproportionately represented in jail. The most glaring example of this is Blacks aged 18-39. This group makes up only 1.7% of the county population but constitutes about 12% of the jail population. Similar discrepancies exist for other minority strata. Second, the jail population skews younger than the county population. We find that nearly 69% of the jail population is between the ages of 18 and 39. This segment is only 32% of the general population in San Diego County.



Note: Jail population is estimated using arrest data and reported jail population from 2010-2020

*Figure 4: Comparing the Jail and General Population in San Diego County*

---

[9] To generate more accurate expected death rates, we weigh the arrest data age category of 40-69 into three distinct groups—40-49 (66%), 50-59 (26%), and 60-69 (8%). In the California general population, a 69 year old individual is about 15 times more likely to die of natural causes than a 40 year old.("Underlying Cause of Death Data, 1999-2020" 2021). We would expect this 40-69 year old age group to skew much younger in the jail population. Nationwide, people over age 55 make up just 7.3% of inmates while those age 35-54 make up 38.9% of inmates.("Jail Inmates in 2020 – Statistical Tables" 2021). We show a comparison of our resultant estimates to actual values for San Diego County in Appendix D.

[10] A variant of this method for estimating jail populations was also used in Kelly's analysis on suicides in San Diego County (Kelly 2018). Additionally, we used detailed booking data provided by SDSD to evaluate the accuracy of these estimates. See Appendix B for this comparison.

[11] All general population estimates come from averaging 2010-2020 population projections provided by the California Department of Finance. These are the estimates used by all State of California government entities.

Analytica
Ex. C - 281
SD_817762

# 5. Expected vs Actual In-Custody Deaths

Our primary interest is to determine if countywide mortality rates can help explain total in-custody county deaths. Now that we have mortality rates for the different demographic groups in these counties and know what proportion of these groups are in jails, we can calculate the expected total jail deaths between 2010-2020.[12] We generate expected total deaths for each manner of death as well as overall total deaths. While these expected total deaths account for the underlying health conditions of the surrounding county population, they do not capture some of the unique problems among incarcerated individuals like substance abuse, poor mental health, and chronic/communicable diseases (Binswanger, Krueger, and Steiner 2009;Faze and Danesh 2002;Vaughn et al. 2014). Mortality rates for people with these types of conditions are not readily available.

These expected total deaths are then compared to the actual total deaths in jails. Both measures are based on the San Diego jail population size. If actual deaths are greater than expected deaths, we classify the difference between these two values as *excess deaths*. It is these deaths that are not explained by county mortality rates. We also conduct statistical tests to determine if expected values and actual values are statistically different.[13,14]

Figure 5 first displays the results for suicides. The bars on the left represent the expected total deaths for each county jail. One helpful way to think about what this bar represents for San Diego is to imagine a town in San Diego County of about 5,000 people, 4,000 of which are men under the age of sixty. Like any other town, death is a natural part of life there, so you'd expect a certain number of people to die between 2010 and 2020. For the other counties, the bars represent what this approximately 5000-person town would look like in each respective county if the town's demographics mirrored the demographics of the county's jails.

The bars on the right compare expected total deaths to actual total deaths. We also show the number of excess deaths on the far right if the expected and actual values are statistically different. Figure 5 illustrates that the number of suicides in jails eclipses the expected number of suicides in every county, indicating that suicides are a severe problem in county jails. The disparities between these two values varies by county. The expected total number of suicides for San Diego is nine while the actual total number of suicides was 40 over this period of time. This four-fold difference of 31 excess deaths is also statistically significant. Only Contra Costa has more excess deaths than San Diego at 32 when their jail population is scaled to match the size of San Diego's jail population.

---

[13] We used Byar's approximation to test the statistical difference between expected and actual in-custody deaths. This statistical test allows us to compare an expected mortality rate to an actual one to see if they are the same. The null hypotheses for this test is that the rates are the same.

[14] Some of our statistical tests point to negative excess deaths (i.e. actual deaths are statistically less than expected deaths). See Appendix H for the full results of our statistical tests. Negative excess deaths are generally associated with some type of intervention. For example, negative excess deaths during the COVID-19 pandemic have occurred in New Zealand because the country's widespread mask wearing and social distancing also reduced deaths from things like the flu. These types of interventions in the context of county jails are beyond the scope of this study.

Analytica
Ex. C - 282

SD_817763



Figure 5: Expected vs Actual Jail Suicides between 2010 and 2020

Overdose/accidental deaths and homicides account for a small proportion of jail deaths. Given the small sample sizes for these manners of death, many of the differences between expected and actual total deaths are not statistically significant. Figure 6 displays the results for overdose/accidental deaths in jail. Here San Diego is one of the counties with a high number of excess deaths. In fact, it has the highest number of excess deaths at 14 out of all the counties in this study. The number of actual deaths is double the number of expected deaths and is the only difference that is statistically significant.



Figure 6: Expected vs Actual Jail Accidental Deaths between 2010 and 2020

Analytica
CONSULTING

Ex. C - 283

SD_817764

It is clear from the bar graphs on the right in Figure 7 that homicides occur infrequently in county jails. For this manner of death, San Diego has the highest number of excess deaths at three although expected and actual values are not statistically different. No other county has more homicides than what is projected by their countywide mortality rates. Riverside County's actual deaths equal their expected deaths.



Figure 7: Expected vs Actual Jail Homicides between 2010 and 2020

Figure 8 displays the results for natural deaths. Based on the bars on the right, actual deaths are lower than expected deaths for every county. In other words, natural deaths in jails are lower than what we would expect based on each county's mortality rates over the past decade. For example, we projected that San Diego County would have 90 natural deaths between 2010-2020. The actual number of deaths was only 65. San Francisco and Contra Costa counties are considerably below their projected number of deaths. These differences may be explained by people with certain medical conditions being deemed not fit for jail, and therefore, not being booked; however, more research is required to better understand this phenomenon.



Figure 8: Expected vs Actual Jail Natural Deaths between 2010 and 2020

Analytica

Ex. C - 284

SD_817765

The last figure presents the overall total deaths. Based on Figure 9, San Diego County has the highest number of excess deaths out of all 12 counties. Specifically, 24 in-custody deaths cannot be explained by county mortality rates. When scaled to the size of San Diego's jail population, both Fresno County and Santa Clara County have the closest number of excess deaths at three. Unlike San Diego, the differences for these two counties are not statistically significant. The remaining counties on Figure 9 have fewer total deaths than what is projected by countywide mortality rates



*Figure 9: Overall Expected vs Actual Jail Deaths between 2010 and 2020*

Together, these figures suggest that those in-custody in San Diego County jails are at a greater risk of death than those in-custody in other California counties. Our analysis suggests that the number of deaths in San Diego jails easily surpasses the number of deaths one would expect based on the county's mortality rates. In other words, even after controlling for county mortality rates and jail population, San Diego still has the highest number of total deaths out of the 12 most populous counties in California.

That said, our analysis indicates the level of risk in San Diego jails varies among the different manners of death. This risk is the highest for overdose/accidental deaths. Inmates in San Diego jails may also be at greater hazard for homicides than in other county jails; however, the low sample sizes don't give us sufficient evidence to say with confidence. Finally, the risk for suicides in San Diego jails is high but not dissimilar to other counties in this study. San Diego is one of a handful of counties that report a large number of excessive suicides in their jails.

Analytica

Ex. C - 285

SD_817766

# 6. Differences Between Unsentenced and Sentenced Inmates

Up to this point, this study has examined deaths among the overall jail population without making any distinctions between inmates themselves. One important distinction we can measure and may impact death rates is whether an inmate has been sentenced for the crime(s) for which they have been charged. Generally, those sentenced have been in jail longer than those not yet sentenced. Unfortunately, arrest dates and booking dates are not collected by the state's reporting of in-custody deaths; however, the sentenced/unsentenced classification offers a rough approximation of who has been in jail for longer periods of time. To consider the length of time an inmate has been in jail, we conduct the same expected vs actual analysis comparing unsentenced and sentenced inmates.



*Figure 10: Overall Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced*

Figure 10 shows the extent to which the unsentenced/sentenced distinction matters to in-custody deaths. This figure summarizes overall deaths. The bar graphs for unsentenced inmates on the left reveal that San Diego jails had 51 excess deaths among this group. The difference between actual and expected total deaths are statistically significant for the county. Kern, Fresno, Santa Clara, and Orange county jails also have more actual deaths than expected deaths but these differences do not reach the level of statistical significance. The bar graphs on the right for sentenced inmates present a contradictory account. All county jails including San Diego have fewer deaths than what is expected based on county mortality rates.

We also conduct this same analysis for each manner of death. The disparities in excess deaths between unsentenced and sentenced inmates varies by the manner of death. On one hand, Figure 11 shows relatively small differences in natural deaths between these two groups. San Diego is the only county with actual natural deaths exceeding expected natural deaths. On the other hand, Figure 12 shows vast differences in suicides between the sentenced and unsentenced. This figure demonstrates how vulnerable the unsentenced are to suicide. Actual total deaths far exceed the expected total deaths in every county. San Diego is the most lopsided county in this regard. The number of actual suicides is nearly seven times the expected suicides. Only a few counties have excess suicides among the sentenced population.



*Figure 11: Natural Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced*



*Figure 12: Suicide Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced*

The gaps in overdose/accidental deaths and homicides among the unsentenced and sentenced are more subtle. Figure 13 confirms excess overdose and accidental deaths occur for both unsentenced and sentenced in several counties although there are more overall deaths among those not sentenced. Riverside and San Diego jails have the highest numbers of excess deaths among the unsentenced. Finally, Figure 14 presents a mixed picture for homicides. Among inmates not sentenced, San Diego is the only county with actual total deaths exceeding expected total deaths. Among inmates sentenced, both Sacramento and Riverside counties have more actual deaths than what is expected.

Overall, these findings strongly suggest that those not yet sentenced and in jail less time are more at risk of death than those sentenced and in jail longer. Specifically, these unsentenced inmates are at greater risk of suicide and overdose/accidental deaths. From a policy perspective, these findings highlight the

importance of providing support for inmates at critical times during their jail incarceration, including when they first enter jail and when they are found guilty but not yet sentenced for a crime.



Figure 13: Overdose/Accidental Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced



Figure 14: Homicide Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced

Analytica

Ex. C - 288

SD_817769

# 7. Future Research

The focus of this project has been to consider countywide mortality rates in evaluating in-custody deaths in San Diego and other counties. Toward this end, we have collected and analyzed an extensive amount of data to examine the complex relationships between jail deaths and county mortality rates. As with any research project, this focus has certain limitations that we hope future research can meaningfully address.

First, the questions we could pursue in this study were limited by the data that was available. In estimating county mortality rates, we stratify county populations by several important demographic factors and manners of death. To obtain more precise county mortality rates, other factors should be included in these rates. For example, incorporating the impact of homelessness, mental illness, and other health-related conditions would add more granularity to these mortality rates. Currently, these data are not readily available.

In addition, this study was constrained by time and scope. While our research has delineated the differences in deaths among county jails, we have yet to explain *why* they are different. The latter necessitates analyzing the operations and specific policies of county jails, which are also likely to vary considerably from county to county. Throughout this project, we have amassed data to begin to measure this dimension including:

- Current and rated capacity of each detention facility

- Number of assaults on law enforcement

- Utilization of medical and mental health services among inmates

- Number of mental and health care staff in detention facilities

- Individual-level booking data with a record of admissions and releases

In particular, the data above could be utilized to generate a snapshot of a detention facility at a given moment in time. This snapshot could help county leadership and investigators understand what was happening in a facility at the time a death occurs. Below are sample visualizations of two of these factors that could potentially be part of an operational dashboard. Figure 15 graphs the actual ADP with the rated capacity over time for detention facilities in San Diego.

### San Diego County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 15: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021)*

Analytica
Ex. C - 289
SD_817770

Figure 16 charts the average number of bookings and releases over the course of a day in San Diego jails. This figure shows spikes in the number of releases at 8 am and 8 pm. Dynamically tracking these types of changes would offer insights into the pressure points in the day-to-day operations of detention facilities, instances in which facilities may lack sufficient staffing or support.



*Figure 16: Average Number of Bookings and Releases by Hour of Day in San Diego County (2010-2020)*

Finally, this project does not touch upon the complex interactions between race and in-custody deaths. We have confirmed that arrest rates and jail populations are heavily skewed toward racial-ethnic minorities. But how does this disproportionality in jails impact the nature and events leading up to these deaths? Expanding the analysis to discern differences in these deaths based on the race of victims could introduce another set of overlooked factors into this body of research.

**Suggested Areas of Research for Future In-Custody Deaths Studies**

1.  When are inmates most vulnerable to the risk of death? Is it after they are first admitted to jail, after they are found guilty of the crime, or based on another important event?

2.  What are the in-custody death rates among inmates with a history of mental illness?

3.  What is the underlying relationship between mental health services in jails and in-custody deaths? Does having more available mental health services and related staff reduce in-custody deaths?

4.  What role do law enforcement staffing levels play in the number of in-custody deaths?

5.  What institutional stresses are associated with in-custody deaths including:

    a)  Overcapacity of a jail facility

    b)  Processing of new admissions and releases

    c)  Frequency of assaults on staff

    d)  Extraordinary events such as the COVID-19 pandemic

6.  Is there a relationship between re-admissions and in-custody deaths at both an individual and facility level?

7.  Are in-custody deaths more prevalent among those charged with a certain type of crime?

8.  Does the race, gender or age of an inmate play a role in the circumstances surrounding in-custody deaths and subsequent investigations?

9.  What has been the impact of new programs enacted by the San Diego Sheriff's Department on in-custody deaths over time?

10. Why is there a lag in reporting the manner of an in-custody death in several counties?

11. What is the role of county mental health services and other public services such as public housing on jail deaths?

12. How does the fact that San Diego is a border town impact in-custody deaths? Are these issues present in other border towns?

13. What are the in-custody death rates among inmates with a history of homelessness?

14. What is the impact of compassionate releases on the nature and number of in-custody deaths?

15. How has realignment in California in 2011 shaped in-custody deaths in county jails?

SD_817772

# References

Abderhalden, Frances P. 2022. "Challenging Normal Science: An Interdisciplinary Approach to Jailed Individuals Self-Report of Lifetime and in-Jail Suicidal Ideations." *Crime &Amp; Delinquency*.

Binswanger, I A, P M Krueger, and J F Steiner. 2009. "Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the Usa Compared with the General Population." *Journal of Epidemiology and Community Health.* 63 (11): 912–19.

Bird, Mia, Magnus Lofstrom, Brandon Martin, Steven Raphael, and Viet Nguyen. 2018. *The Impact of Proposition 47 on Crime and Recidivism*. Public Policy Institute of California.

Brannon, Matt. 2020. "Analysis Reveals Disparities Among Death Rates in California County Jails." *Redding Record Searchlight*, October. https://eu.redding.com/in-depth/news/local/2020/10/02/california-jails-inmate-deaths-shasta-county-mental-health-care/5539531002/.

Carson, Elizabeth. 2021. *Your Feedback on Measures of Inmate Mortality Rates*.

Close, Melanie, Olive Lu, Shannon Tomascak, Preeti Chauhan, and Erica Bond. 2021. *Understanding Trends in Jail Populations, 2014 to 2019: A Multi-Site Analysis*. Data Collaborative for Justice. John Jay College of Criminal Justice.

California Department of Finance. 2021. "P-3: Complete State and County Projections Dataset." July. Accessed January 2022. https://dof.ca.gov/forecasting/demographics/projections/.

Faze, S, and J Danesh. 2002. "Serious Mental Disorder in 23000 Prisoners: A Systematic Review of 62 Surveys." *Lancet* 359 (9306): 545–50.

"Jail Inmates in 2020 – Statistical Tables." 2021. US Bureau of Justice Statistics. https://bjs.ojp.gov/content/pub/pdf/ji20st.pdf.

Kelly, Colleen. 2018. *REVIEW AND CRITIQUE OF THE DISABILITY RIGHTS CALIFORNIA'S REPORT*.

McDonald, Jeff, Kelly Davis, and Lauryn Schroeder. 2019. "Rate of Jail Inmate Deaths in San Diego County Far Exceeds Other Large California Counties." *The San Diego Union Tribune*, September. https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-behind-bars-san-diego-county-jail-deaths.

Subramanian, Ram, Kristine Riley, and Chris Mai. 2018. *Divided Justice: Trends in Black and White Jail Incarceration, 1990-2013*. Vera Institute of Justice.

Tonry, Michael H. 2011. *Punishing Race: A Continuing American Dilemma.* Oxford University Press.

"Underlying Cause of Death Data, 1999-2020." 2021. Centers for Disease Control; Prevention. https://wonder.cdc.gov/ucd-icd10.html.

Vaughn, Michael, Christopher P Salas-wright, Matt Delisi, and Alex R Piquero. 2014. "Health Associations of Drug-Involved and Criminal-Justice-Involved Adults in the United States." *Criminal Justice and Behavior* 41 (3): 318–36.

2022. *San Diego Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody*. California State Auditor.

Analytica

Ex. C -292

SD_817773

# Appendix A: Selection of Counties

Following the approach of other studies examining in-custody deaths in California, we compare San Diego County to other populous counties in the State. These counties include Kern, Fresno, Alameda, Sacramento, San Francisco, Orange, Los Angeles, San Bernardino, Riverside, Contra Costa, and Santa Clara.

We decided to choose these counties for this study because they have an adequate number of in-custody deaths between 2010-2020 for us to conduct a rigorous statistical analysis. The number of deaths in each of these counties roughly correspond to their ADP population. See the table below for select characteristics of the 20 most populous counties in California. Our selection of counties is in bold.

Our primary interest in using these counties is to explore the relationships between their in-custody deaths and countywide mortality rates. These mortality rates are the only areas of county variation we examine in relation to jail deaths in this study.

*Table 2: Select Characteristics of Most Populous California Counties (2010-2020)*

| County | Total Jail Deaths | Population | Avg Yearly Bookings | Avg Yearly ADP |
|---|---|---|---|---|
| **Los Angeles** | **290** | **11,026,820** | **115,514** | **16,504** |
| **San Diego** | **141** | **3,559,702** | **80,535** | **5,231** |
| **Orange** | **81** | **3,427,546** | **57,295** | **5,895** |
| **Riverside** | **78** | **2,553,899** | **52,013** | **3,735** |
| **San Bernardino** | **94** | **2,317,913** | **65,529** | **5,448** |
| **Santa Clara** | **65** | **2,081,267** | **41,058** | **3,428** |
| **Alameda** | **67** | **1,761,754** | **45,232** | **2,871** |
| **Sacramento** | **48** | **1,631,895** | **42,998** | **3,832** |
| **Contra Costa** | **28** | **1,216,381** | **23,424** | **1,383** |
| **Fresno** | **72** | **1,072,876** | **33,706** | **2,733** |
| **Kern** | **55** | **963,614** | **32,320** | **2,253** |
| **San Francisco** | **25** | **944,846** | **19,058** | **1,284** |
| Ventura | 38 | 919,196 | 27,762 | 1,496 |
| San Mateo | 12 | 828,364 | 14,723 | 954 |
| San Joaquin | 25 | 799,517 | 22,823 | 1,314 |
| Stanislaus | 40 | 588,189 | 19,177 | 1,150 |
| Sonoma | 24 | 540,923 | 16,878 | 1,005 |
| Tulare | 19 | 506,732 | 21,083 | 1,526 |
| Santa Barbara | 18 | 481,891 | 14,946 | 929 |
| Monterey | 25 | 472,944 | 12,185 | 941 |

Analytica
Ex. C - 293
SD_817774

# Appendix B: ADP vs. ARP

Average daily Jail population (ADP) measures the average number of individuals in custody each day, typically reported on a monthly basis. According to the California Board of State and Community Corrections, this is calculated by taking the daily inmate count (usually at or near midnight), adding these daily counts together for the month and dividing by the number of days in that month. At-risk population (ARP) measures the number of individuals admitted to a detention facility.

**Table 3**: ADP vs. ARP by County (2011-2020)

| County | Avg Yearly ADP | Avg Yearly ARP | ARP/ADP Ratio |
|---|---|---|---|
| Alameda | 2,872 | 48,148 | 17 |
| Contra Costa | 1,383 | 24,802 | 18 |
| Fresno | 2,733 | 36,378 | 13 |
| Kern | 2,254 | 34,586 | 15 |
| Los Angeles | 16,505 | 131,953 | 8 |
| Orange | 5,896 | 63,156 | 11 |
| Riverside | 3,735 | 55,741 | 15 |
| Sacramento | 3,833 | 46,821 | 12 |
| San Bernardino | 5,448 | 70,901 | 13 |
| San Diego | 5,232 | 85,726 | 16 |
| San Francisco | 1,284 | | |
| Santa Clara | 3,428 | 48,124 | 14 |

This is typically calculated by adding the inmate count at the beginning of the year with the total bookings for each month. As a result, a county's ARP is much higher than their ADP. The vast difference between these two denominators would certainly impact the standardized in-custody death rate. See below (the dates of 2011-2020 were selected because San Diego County changed how they measured bookings in 2010).

ARP comes with the advantage of measuring new and potentially high-risk entrants into the jail system; however, it does not measure unique inmates in jails over time. A significant portion of those admitted to county jails will be re-booked within a short period of time. For example, Public Policy Institute of California found that the two-year rearrest rate was 70.8% for 12 California counties in 2011-2012 (Bird et al. 2018). Comparable studies on other counties in other states point to similar results (Close et al. 2021).

ADP addresses this shortcoming by measuring unique persons in-custody. Neither measure reflects inmates' length of stay, which would require individual-level data. Bereft of an individual-level data set that would allow of the calculation of unique person-days exposed, the U.S. Bureau of Justice Statistics believes "ADP is the best alternative." (Carson 2021) (See Appendix I for the correspondence between Analytica Consulting and the U.S. Bureau of Justice Statistics.)

While we use ADP per the BJS guidance, ADP data is not available by demographic group, which is a key dimension of our analysis. We therefore assume the makeup of arrestees fairly represents the jail population for a given year, and apply arrest proportions by demographic group to estimate ADP by group (see Appendix D).

Analytica

Ex. C - 294

SD_817775

# Appendix C: A Closer Look at Overdose/Accidental Deaths

Overdose/accidental death is a manner of death that includes various types of circumstances. While we exclude transportation-related accidents from this category, there are still several distinct types of accidents. The tables below break down these deaths further.

It is clear from both tables that drug overdoses make up a substantial portion of these deaths. For example, drug overdoses are 89% of deaths in San Diego jails and 76% of deaths among San Diego's general population.

*Table 4*: A Closer Look at Overdose/Accidental Jail Deaths, 2010-2020

| County | Total Accidental Deaths | Drug Overdose | Choking / Asphyxiation | Medically Related | Other / Pending | Fall or Blunt Force |
|---|---|---|---|---|---|---|
| Alameda | 11 | 72.7% | 9.1% | 9.1% | 9.1% | – |
| Contra Costa | 1 | 100.0% | – | – | – | – |
| Fresno | 9 | 88.9% | – | – | 11.1% | – |
| Kern | 7 | 57.1% | – | – | 42.9% | – |
| Los Angeles | 47 | 66.0% | 2.1% | 8.5% | 14.9% | 8.5% |
| Orange | 10 | 80.0% | 10.0% | – | – | 10.0% |
| Riverside | 16 | 87.5% | – | 6.2% | – | 6.2% |
| Sacramento | 7 | 57.1% | – | 14.3% | 14.3% | 14.3% |
| San Bernardino | 8 | 12.5% | – | – | 87.5% | – |
| San Diego | 27 | 88.9% | – | – | 11.1% | – |
| San Francisco | 4 | 75.0% | – | – | 25.0% | – |
| Santa Clara | 3 | 66.7% | – | – | 33.3% | – |
| | 150 | 72.0% | 2.0% | 4.7% | 16.7% | 4.7% |

*Table 5*: Countywide Accidental Death Breakdown (1999-2020)

| County | Deaths per 10k/year | Drug Overdose | Choking / Asphyxiation | Medically Related | Other* | Fall or Blunt Force |
|---|---|---|---|---|---|---|
| Alameda | 1.7 | 75.1% | 2.8% | – | 15.0% | 7.0% |
| Contra Costa | 1.8 | 76.8% | 1.4% | – | 13.8% | 8.0% |
| Fresno | 2.2 | 75.7% | 1.0% | – | 17.0% | 6.3% |
| Kern | 3.2 | 83.7% | 1.3% | – | 10.1% | 5.0% |
| Los Angeles | 1.5 | 73.0% | 1.7% | – | 14.4% | 11.0% |
| Orange | 1.6 | 78.7% | 2.3% | – | 10.6% | 8.4% |
| Riverside | 2.2 | 78.4% | 1.5% | – | 13.0% | 7.1% |
| Sacramento | 2.3 | 75.3% | 2.1% | – | 16.3% | 6.3% |
| San Bernardino | 1.3 | 60.8% | 1.7% | – | 24.8% | 12.6% |
| San Diego | 2.0 | 76.4% | 1.6% | – | 12.8% | 9.2% |
| San Francisco | 3.0 | 84.8% | 1.6% | – | 7.1% | 6.5% |
| Santa Clara | 1.2 | 70.5% | 2.5% | – | 17.2% | 9.8% |
| | 1.8 | 75.4% | 1.8% | – | 13.9% | 8.9% |

*Mostly consists of drownings, fire/smoke exposure, electrocution, firearm discharges, and poisoning (non-overdose)

Analytica

Ex. C - 295

SD_817776

# Appendix D: Estimated vs Actual San Diego Jail Population

We estimate county jail populations using a combination of arrest and average daily jail population (ADP) data. To assess the accuracy of these estimates, we compared them with the actual San Diego average daily jail population (ADP). We calculated San Diego's actual ADP using detailed booking data from 2010-2022 provided by the San Diego Sheriff's Department (SDSD). To ensure our ADP calculations didn't exclude people booked before our data began in 2010 and who are still in jail, our estimates are for years 2014-2020. Additionally, the age groups in the data provided by SDSD did not exactly match the age groups in our data (e.g., 18-30 vs. 18-29).

This comparison was only used to validate our assumptions since we did not have detailed booking data for other counties. We still use our estimates for the analysis, so our approach is the same for each county in the study.

Below are these comparisons for the five different age groups in our data set.

**Table 6**: Actual vs Estimated San Diego ADP
(Ages 18-29, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 18-30) | Estimated (Age 18-29) |
|--------|---------------|--------|-----------|
| M | Hispanic | 17.1% | 14.0% |
| M | White | 9.0% | 9.5% |
| M | Black | 6.7% | 5.7% |
| F | White | 2.7% | 3.7% |
| F | Hispanic | 2.2% | 3.2% |
| M | Other | 1.7% | 1.8% |
| F | Black | 1.0% | 1.6% |
| F | Other | 0.3% | 0.6% |
| Total | - | 40.6% | 40.1% |

**Table 7**: Actual vs Estimated San Diego ADP
(Ages 30-39, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 31-40) | Estimated (Age 30-39) |
|--------|---------------|--------|-----------|
| M | Hispanic | 9.2% | 8.1% |
| M | White | 8.5% | 8.8% |
| M | Black | 4.3% | 3.7% |
| F | White | 2.4% | 3.1% |
| F | Hispanic | 1.6% | 2.0% |
| M | Other | 1.6% | 1.5% |
| F | Black | 0.8% | 1.0% |
| F | Other | 0.3% | 0.5% |
| Total | - | 28.7% | 28.8% |

**Table 8**: Actual vs Estimated San Diego ADP
(Ages 40-49, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 41-50) | Estimated (Age 40-49) |
|--------|---------------|--------|-----------|
| M | White | 6.1% | 7.8% |
| M | Hispanic | 4.2% | 3.7% |
| M | Black | 3.1% | 3.4% |
| F | White | 1.7% | 2.4% |
| M | Other | 1.0% | 1.0% |
| F | Hispanic | 0.7% | 0.9% |
| F | Black | 0.5% | 0.7% |
| F | Other | 0.1% | 0.3% |
| Total | - | 17.5% | 20.2% |

**Table 9**: Actual vs Estimated San Diego ADP
(Ages 50-59, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 51-60) | Estimated (Age 50-59) |
|--------|---------------|--------|-----------|
| M | White | 4.5% | 3.1% |
| M | Black | 2.5% | 1.4% |
| M | Hispanic | 1.9% | 1.5% |
| F | White | 0.8% | 0.9% |
| M | Other | 0.4% | 0.4% |
| F | Black | 0.3% | 0.3% |
| F | Hispanic | 0.2% | 0.4% |
| F | Other | 0.0% | 0.1% |
| Total | - | 10.6% | 8.0% |

**Table 10**: Actual vs Estimated San Diego ADP
(Ages 60+, 2014-2020)

| Gender | Race/Ethnicity | Actual (Age 61+) | Estimated (Age 60+) |
|--------|---------------|--------|-----------|
| M | White | 1.2% | 1.2% |
| M | Black | 0.5% | 0.5% |
| M | Hispanic | 0.4% | 0.5% |
| F | White | 0.2% | 0.4% |
| M | Other | 0.1% | 0.2% |
| F | Hispanic | 0.1% | 0.1% |
| F | Black | 0.0% | 0.1% |
| F | Other | 0.0% | 0.0% |
| Total | - | 2.6% | 2.9% |

Analytica

Ex. C - 296

SD_817777

# Appendix E: Peer-Review Letters



March 18, 2022

To Whom It May Concern:

I am writing this letter to endorse the statistical methods used in the draft "In-Custody Death Study". This draft and supporting materials are authored by Analytica Consulting. This analysis uses county mortality rates to estimate the total number of expected jail deaths between 2010-2020 in San Diego and other large counties in California. It then statistically compares the values of expected jail deaths with the values of actual jail deaths.

My area of expertise is in biostatistics including statistical data interpretation and statistical modeling. I am a Professor of Biostatistics, Department of Family Medicine and Public Health, Director of Biostatistics at the Stein Institute for Research on Aging, and Co-Director of the UCSD CTRI Biostatistics Core, UCSD. I hold a master's and PhD in statistics and numerical analysis from Duke University and completed postdoctoral studies at Harvard School of Public Health. I have co-authored over 290 peer-reviewed publications, two textbooks and two edited volumes in the fields of U- statistics, categorical data analysis, clinical trials, and social network analysis. My research on statistical methodology includes a wide range of topics such as semiparametric models for longitudinal data with informative missing follow-up data, causal inference, and high throughput data.

I have peer-reviewed the draft "In-Custody Death Study" and the underlying statistical methods. Based on my thorough reading of these materials, I find that the statistical methods utilized are appropriate and sound. In particular, the authors' use of Byar's approximation to test the statistical difference between expected and actual death rates in county jails is the best methodological approach for comparing these values. This method produces results that are both valid and instructive.

Please contact me if you have any questions regarding this professional endorsement.

Sincerely,

Professor of Biostatistics
Division of Biostatistics and Bioinformatics
Herbert Wertheim School of Public Health and Human Longevity Science
UC San Diego Institute for Research on Aging
UC San Diego CTRI Biostatistics
UC San Diego Health Sciences
Naval Health Research Center
E-mail: x2tu@health.ucsd.edu

Herbert Wertheim School of Public Health and Human Longevity Science
9500 Gilman Drive #0628, La Jolla, California 92093-0628 Tel: (858) 534-8363 Fax: (858) 534-7517



School of Criminal Justice and Criminalistics

March 25, 2022

To Whom it May Concern:

I was requested to ad hoc peer review the In-Custody Death Study from Analytica Consulting. My expertise on custody related deaths includes: 16 peer-reviewed publications, long term three-phase suicidal behaviors project with the Illinois Department of Corrections which includes Governor approval, partnership with three large urban jail facilities to evaluate risk on death in custody and self-reported information, expert witness consulting on high profile death by suicide cases within jails and prisons, consulting on national and international suicide prevention and intervention programs, grants, and scholarship. As such, I provided feedback, recommendations, and suggestions on the In-Custody Death Study.

Overall, my review finds that this report is well-done, appropriately analyzed, and to the same rigor and standard of much larger national reviews on death in custody. The findings align well within the empirical literature surrounding in-custody mortality rates, and suggest that the counties under study in this report are similar to national death records for incarcerated populations. However, the findings also suggest some insight into the particular populations held in Southern California jails, which provides a unique opportunity for policy recommendations related to public health, safety and security of facilities, and returning healthy citizens into the community.

Nationally, in a report by Carson (2021), between 2000 and 2019 there were 20,413 deaths in county jails in the United States, with an overall mortality rate of 142 per 100,000. By this metric, it would suggest that the counties reported in this report are consistent with deaths in custody to the national averages. In addition, nationally white non-Hispanic individuals accounted for 56% of the deaths in custody, which have a larger proportion of mortality, compared to the national level statistics (Carson, 2021). This finding is also supported in the report and the evaluation of the twelve counties in question. Interestingly, accidental deaths account for a significant number of deaths in San Diego jails, but I suggest this is simply a measurement and operationalization difference between the national level data which accounts drug overdoses as their own category, and does not consider them accidental.

The finding related to elevated suicide in San Diego, and throughout all twelve counties, is consistent with national level jail information surrounding death by suicide. While the numbers are concerning, the rate of death by suicide in the jail nationally is nearly four times as high (49 per 100,000) as the national general population rate of death by suicide (13 per 100,000) (Carson, 2021). This suggests that while suicide deaths are elevated in the twelve counties in the current report, the trend is in alignment with national reporting and not an outlier for elevated risk due to the counties themselves, rather that jail is nationally a risk factor for death by suicide. Suicide is the leading cause of death in jails annually at the national level, so this finding while extreme in first appearance with the excess deaths, is statistically, empirically, and clinically found across the board with jail incarcerated populations (Abderhalden, 2022a; 2022b).

Throughout the report, the references are appropriate and an accurate depiction of empirical evidence related to mortality in jails. The authors did a nice job incorporating the most up-to-date information in their analyses. I see no issues with how any of the information is relayed or interpreted. The analyses are strong and provide a valid and reliable approach to assessing mortality rates of expected and actual information.

In the future research section, I agree with the authors that one of the next steps for this project should be to assess *why* we see differences in death among these counties. In particular, using anecdotal evidence from some of my own ongoing work, we see

Analytica
**Ex. C -298**

SD_817779

the importance of mental and health care policies, including access to care and transitional care to be an important factor to create more protective factors related to death. In addition, shift changes and type of detention cell are important considerations to assess for the suicide deaths in custody, with relatively simple and effective policy changes, should shift times demonstrate a higher risk for death by suicide.

All of this to say, there are policy implications by the work in this report that could be considered to improve the safety and security of the facilities using health based information. In particular, policies that decrease the bodily fluid exposure of other incarcerated individuals to each other, or to correctional staff, can improve the environmental health and lead to a reduction in deaths in custody. In addition, the concern about public health is directly linked to the implications of mortality in custody, and something that this report does a nice job of capturing the differences in custody deaths compared to county mortality rates. Using this information there is a real opportunity for policy to be implemented to address this disparity and begin to work toward a lower mortality rate for incarcerated individuals.

Additionally, as the authors note, an evaluation of race and gender could be a beneficial avenue to further parse out just how these policies could be directly impactful for the specific jail populations within, and between, these twelve counties. In particular, by matching counties to each other to evaluate why San Diego has different rates of mortality compared to their counterparts, could be beneficial for resource allocation and policy recommendations in order to improve the overall health of the population.

In closing, it was a pleasure to review this empirically and statistically sound report. I have no hesitations in supporting the analyses and information provided in this report as being accurate and thorough. I would be happy to answer any further questions, or provide any additional insight, should there be any. Thank you for the opportunity to review.

Sincerely,

*Frances Stele Abderhalden*

FRANCES P. ABDERHALDEN, PH.D.

Assistant Professor

School of Criminal Justice & Criminalistics

California State University, Los Angeles

5151 State University Drive, Los Angeles, CA 90032

E: fabderh@calstatela.edu

Office: 323.379.4698

Mobile: 630.641.9994

References

Abderhalden, F. P. (2022a). Challenging Normal Science: An Interdisciplinary Approach to Jailed Individuals Self-Report of Lifetime and in-Jail Suicidal Ideations. *Crime & Delinquency*, 00111287211072442.

Abderhalden, F. P. (2022b). Environmental and Psychological Correlates of Self-Injurious Thoughts and Behaviors among Jail Detainees. *Corrections*, 1-24.

Carson, E. A. (2021). Mortality in Local Jails, 2000-2019-Statistical Tables. *NCJ, 301368.*

**Analytica**
**Ex. C - 299**

SD_817780

# Appendix F: Response from San Diego Sheriff's Department



## San Diego County Sheriff's Department

### William D. Gore, Sheriff



Kelly A. Martinez
Undersheriff

March 16, 2022

Michael Marks, Principal Data Scientist
Analytica Consulting
9810 Scripps Lake Dr., Suite F
San Diego, CA 92131

### ANALYTICA CONSULTING: IN-CUSTODY DEATH STUDY RESPONSE

Dear Mr. Marks,

Thank you for the statistical analysis on the San Diego Sheriff's Department's incarcerated population, specific to the number of in-custody deaths from 2010-2020. The Sheriff's Department appreciates the work of the auditors and takes this information to heart.

Acting Sheriff Martinez has made it her priority to implement best practices and to provide a safe and fully staffed work environment to care for individuals in our custody. Along those lines, she has begun to implement the recommendations from the California State Auditor's report.

The Sheriff's Department is currently working on a more rigorous health screening process upon intake as well as continued medical and mental health care for all individuals in our custody. Acting Sheriff Martinez has said and believes no one in our custody should be denied proper health care.

In addition to quality health services, high-quality safety and proof of life checks are necessary to provide incarcerated persons a safe environment. The Department is making every effort to ensure safety checks are conducted thoroughly and consistently by staff.

Already in 2022, the Sheriff's Department has implemented the following projects in our detention facilities:

- Medicated Assisted Treatment Program
- Body Worn Camera (BWC) Pilot-Program in Jail Facilities
- Upgrades to the Wireless Systems in all Jail Facilities
- Critical Incident Review Board (CIRB) also now reviewing all-natural deaths
- George Bailey Detention Facility Renovations scheduled to begin Summer 2022

*Keeping the Peace Since 1850*
Post Office Box 939062 • San Diego, California 92193-9062

ANALYTICA CONSULTING: IN-CUSTODY DEATH STUDY RESPONSE
Page 2
March 16, 2022

- SDSD and CLERB Memorandum of Understanding signed for CLERB Investigator to respond to in-custody death scenes and deputy involved shootings where death occurs
- Prioritizing hiring and retention of detention facilities employees

The Sheriff's Department is continuing to identify new technology, concepts, and procedures which will significantly reduce or remedy deaths occurring in detention facilities. We ask CLERB and the public to continue to work with us to make the positive changes that will shape the future of our detention facilities, and ultimately reduce the in-custody death rates.

Sincerely,

KELLY A. MARTINEZ, ACTING SHERIFF

Michelle Craig, Lieutenant
Office of the Sheriff
Division of Inspectional Services

KAM:mc

Analytica
Ex. C - 301 CONSULTING
SD_817782

# Appendix G: Deaths in City Jails

In conducting this study, we discovered that over 100 deaths have occurred in city-run jails since 2005. These jails are classified as Type 1 facilities.[15] It is difficult to obtain current information on the inmate population of these facilities given that BSCC discontinued surveying these facilities in 2020. According to BSCC, the decision to discontinue this survey was due to several reasons including a lack of a statutory requirement to collect these data, little incentive for facilities to report these data, a poor response rate, questionable accuracy of these data, and a general lack of interest or requests for these data.

After contacting BSCC, we were able to obtain the data for Type 1 facilities from previous years of the survey (2010-2018). As the table below indicates, several counties have many of these facilities with a notably high ADP. Los Angeles County has the most facilities (62) and, on average, over 1,000 inmates in these facilities. Orange County has the second highest number of facilities (8) and over 100 inmates in these facilities at any given time. Moreover, a clear majority of the inmates in these facilities are unsentenced and thus are likely at greater risk of death.

*Table 9: ADP and Bookings by Type 1 Facilities (2010-2018)*

| County | Type 1 Facilities | Avg ADP | Avg Unsentenced | Avg Sentenced | Avg Yearly Bookings |
|---|---|---|---|---|---|
| Alameda | 4 | 47 | 43 | 0 | 14,776 |
| Kern | 3 | 10 | 10 | 0 | 3,338 |
| Los Angeles | 62 | 1,170 | 918 | 186 | 258,917 |
| Orange | 8 | 104 | 77 | 9 | 28,550 |
| Riverside | 1 | 11 | 11 | 0 | 4,189 |
| San Bernardino | 4 | 84 | 63 | 13 | 23,997 |
| San Diego | 1 | 47 | 13 | 0 | 3,138 |

We also estimate the expected total deaths for these county Type 1 facilities. The table below compares the total expected deaths with the actual total deaths. It also reports whether the differences between these two values are statistically significant. Los Angeles, Orange, and Riverside counties all have higher total deaths than expected at statistically significant levels. These findings suggest that in-custody deaths are an issue of concern in certain county Type 1 facilities in addition to county jails.

*Table 10: Deaths in Type 1 Facilities (2010-2020)*

| County | Actual Deaths | Expected Deaths | Mortality Ratio | 95% Conf Interval | p-value |
|---|---|---|---|---|---|
| Alameda | 2 | 1.6 | 1.28 | 0.21-4.22 | 0.67 |
| Kern | 0 | 0.3 | | | |
| Los Angeles | 48 | 30.8 | 1.56 | 1.15-2.07 | 0.00 |
| Orange | 12 | 1.8 | 6.72 | 3.47-11.73 | 0.00 |
| Riverside | 3 | 0.3 | 11.64 | 2.96-31.68 | 0.00 |
| San Bernardino | 1 | 2.3 | 0.44 | 0.02-2.18 | 0.44 |
| San Diego | 1 | 1.1 | 0.94 | 0.05-4.64 | 1.00 |



*Figure 17: County Expected vs Actual Jail Deaths Including City Jails*

---

[15] Type 1 facilities are used to detain individuals for not more than 96 hours. These facilities may also be used for short-term sentences.

Analytica

Ex. C - 302

# Appendix H: Detailed Results

## Expected vs Actual Statistical Test Results

Below are detailed results and confidence intervals for the statistical differences between expected and actual total in-custody deaths. Confidence intervals provide a range of values for these differences at a 95% confidence interval. Any value over one indicates that actual total deaths surpass expected total deaths in that specific county. We display confidence interval values for overall deaths, suicides, and overdose/accidental deaths.

*Table 11: Overall Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | Difference (95% Conf.) | Ratio (95% Conf.) | |
| San Diego | 141 | 117 | 24 (2 – 51) | 1.21 (1.02 – 1.43) | **0.029** |
| Santa Clara | 65 | 63 | 2 (-12 – 21) | 1.04 (0.81 – 1.33) | 0.770 |
| Fresno | 72 | 70 | 2 (-13 – 21) | 1.03 (0.82 – 1.31) | 0.786 |
| Riverside | 78 | 87 | -9 (-24 – 11) | 0.9 (0.72 – 1.13) | 0.376 |
| Kern | 55 | 63 | -8 (-21 – 9) | 0.88 (0.67 – 1.14) | 0.330 |
| Contra Costa | 28 | 39 | -11 (-16 – 10) | 0.87 (0.6 – 1.26) | 0.468 |
| Orange | 80 | 99 | -19 (-35 – 1) | 0.81 (0.64 – 1.01) | 0.059 |
| Alameda | 67 | 99 | -32 (-47 – -14) | 0.67 (0.53 – 0.86) | **0.001** |
| Los Angeles | 290 | 434 | -144 (-177 – -106) | 0.67 (0.59 – 0.75) | **<0.001** |
| San Bernardino | 94 | 147 | -53 (-70 – -31) | 0.64 (0.52 – 0.79) | **<0.001** |
| San Francisco | 25 | 59 | -34 (-41 – -19) | 0.45 (0.3 – 0.67) | **<0.001** |
| Sacramento | 48 | 117 | -69 (-81 – -53) | 0.41 (0.31 – 0.54) | **<0.001** |

*Table 12: Suicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | Difference (95% Conf.) | Ratio (95% Conf.) | |
| Contra Costa | 11 | 2 | 9 (4 – 18) | 4.77 (2.59 – 8.78) | **<0.001** |
| Alameda | 19 | 4 | 15 (8 – 26) | 4.53 (2.8 – 7.29) | **<0.001** |
| San Diego | 40 | 9 | 31 (19 – 47) | 4.44 (3.15 – 6.26) | **<0.001** |
| Fresno | 19 | 4 | 15 (7 – 26) | 4.33 (2.7 – 6.97) | **<0.001** |
| Kern | 16 | 4 | 12 (5 – 22) | 3.59 (2.16 – 5.98) | **<0.001** |
| Santa Clara | 14 | 4 | 10 (4 – 20) | 3.25 (1.88 – 5.67) | **<0.001** |
| San Francisco | 8 | 2 | 6 (1 – 13) | 3.21 (1.58 – 6.51) | **<0.001** |
| Riverside | 20 | 6 | 14 (6 – 26) | 3.2 (2.01 – 5.08) | **<0.001** |
| San Bernardino | 25 | 9 | 16 (7 – 29) | 2.69 (1.77 – 4.1) | **<0.001** |
| Los Angeles | 45 | 21 | 24 (11 – 42) | 2.14 (1.52 – 3) | **<0.001** |
| Sacramento | 10 | 8 | 2 (-2 – 11) | 1.31 (0.69 – 2.47) | 0.404 |
| Orange | 9 | 8 | 1 (-3 – 9) | 1.11 (0.57 – 2.18) | 0.756 |

Analytica CONSULTING
Ex. C - 303
SD_817784

**Table 13**: *Overdose/Accidental Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | Difference (95% Conf.) | Ratio (95% Conf.) | |
| San Diego | 27 | 13 | 14 (5 – 27) | 2.09 (1.41 – 3.11) | **<0.001** |
| Riverside | 16 | 10 | 6 (-1 – 16) | 1.57 (0.95 – 2.6) | 0.076 |
| Los Angeles | 47 | 35 | 12 (0 – 30) | 1.36 (0.99 – 1.86) | 0.057 |
| Fresno | 9 | 7 | 2 (-2 – 11) | 1.29 (0.67 – 2.51) | 0.446 |
| Alameda | 11 | 9 | 2 (-3 – 11) | 1.21 (0.66 – 2.2) | 0.537 |
| San Bernardino | 8 | 9 | -1 (-5 – 7) | 0.85 (0.42 – 1.73) | 0.657 |
| Kern | 7 | 9 | -2 (-5 – 6) | 0.82 (0.39 – 1.72) | 0.592 |
| Orange | 10 | 13 | -3 (-7 – 6) | 0.79 (0.42 – 1.48) | 0.452 |
| Sacramento | 7 | 12 | -5 (-8 – 3) | 0.59 (0.28 – 1.25) | 0.167 |
| Santa Clara | 3 | 6 | -3 (-5 – 3) | 0.49 (0.16 – 1.55) | 0.218 |
| San Francisco | 4 | 8 | -4 (-7 – 1) | 0.44 (0.16 – 1.18) | 0.092 |
| Contra Costa | 1 | 4 | -3 (-4 – 3) | 0.27 (0.04 – 1.92) | 0.161 |

**Table 14**: *Natural Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | Difference (95% Conf.) | Ratio (95% Conf.) | |
| Orange | 57 | 74 | -17 (-30 – 0) | 0.77 (0.59 – 1) | **0.048** |
| Santa Clara | 36 | 49 | -13 (-23 – 1) | 0.74 (0.53 – 1.03) | 0.073 |
| San Diego | 65 | 90 | -25 (-39 – -7) | 0.72 (0.56 – 0.93) | **0.010** |
| Fresno | 36 | 51 | -15 (-25 – -1) | 0.7 (0.51 – 0.98) | **0.036** |
| Kern | 25 | 44 | -19 (-27 – -7) | 0.57 (0.39 – 0.85) | **0.005** |
| Riverside | 36 | 64 | -28 (-38 – -14) | 0.56 (0.4 – 0.78) | **<0.001** |
| Los Angeles | 166 | 318 | -152 (-176 – -124) | 0.52 (0.45 – 0.61) | **<0.001** |
| Alameda | 33 | 69 | -36 (-45 – -22) | 0.48 (0.34 – 0.68) | **<0.001** |
| San Bernardino | 50 | 114 | -64 (-76 – -48) | 0.44 (0.33 – 0.58) | **<0.001** |
| San Francisco | 12 | 41 | -29 (-34 – -21) | 0.28 (0.16 – 0.49) | **<0.001** |
| Contra Costa | 7 | 26 | -19 (-23 – -11) | 0.27 (0.13 – 0.56) | **<0.001** |
| Sacramento | 21 | 87 | -66 (-73 – -54) | 0.24 (0.16 – 0.37) | **<0.001** |

**Table 15**: *Homicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | Difference (95% Conf) | Ratio (95% Conf) | |
| San Diego | 8 | 5 | 3 (-1 – 12) | 1.66 (0.81 – 3.42) | 0.164 |
| Riverside | 6 | 6 | 0 (-3 – 8) | 1.06 (0.47 – 2.41) | 0.877 |
| Orange | 3 | 4 | -1 (-3 – 5) | 0.74 (0.24 – 2.37) | 0.620 |
| Sacramento | 7 | 10 | -3 (-7 – 5) | 0.7 (0.33 – 1.48) | 0.351 |
| Fresno | 5 | 7 | -2 (-5 – 5) | 0.69 (0.28 – 1.66) | 0.403 |
| San Bernardino | 6 | 13 | -7 (-11 – 0) | 0.45 (0.2 – 1.02) | **0.050** |
| Kern | 2 | 6 | -4 (-6 – 2) | 0.33 (0.08 – 1.32) | 0.098 |
| Santa Clara | 1 | 3 | -2 (-3 – 4) | 0.33 (0.05 – 2.36) | 0.244 |
| Los Angeles | 14 | 58 | -44 (-50 – -35) | 0.24 (0.14 – 0.41) | **<0.001** |
| Alameda | 3 | 17 | -14 (-16 – -8) | 0.18 (0.06 – 0.54) | **<0.001** |
| Contra Costa | 0 | 7 | – | – | – |
| San Francisco | 0 | 7 | – | – | – |

Analytica
Ex. C - 304

SD_817785





*The line on either side of the point indicates the 95% confidence interval of the true value. When the 95% confidence interval does not include 1, we conclude that there is a statistically significant difference between actual and expected deaths.*

*Figure 18: Confidence Intervals of Standardized Mortality Ratios*

Analytica
**Ex. C - 305**

SD_817786

## Jail Profiles of Each County in The Study

### Alameda

*Table 16: Top 15 Alameda County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|-----------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Black | 18-29 | 14.6% | 29.7 | 4.9 | 2.3 | 2.0 | 20.4 |
| Male | Hispanic | 18-29 | 9.8% | 8.1 | 2.0 | 1.6 | 1.0 | 3.5 |
| Male | Black | 30-39 | 8.4% | 32.7 | 15.4 | 4.1 | 1.5 | 11.5 |
| Male | Black | 40-49 | 7.7% | 59.7 | 45.8 | 6.8 | 1.1 | 5.7 |
| Male | White | 18-29 | 5.8% | 6.9 | 2.1 | 2.2 | 1.8 | 0.7 |
| Male | Hispanic | 30-39 | 5.6% | 9.4 | 4.8 | 2.2 | 1.0 | 1.2 |
| Male | White | 30-39 | 4.5% | 10.4 | 5.4 | 2.4 | 2.0 | 0.5 |
| Male | White | 40-49 | 4.5% | 24.4 | 18.3 | 3.0 | 2.5 | 0.4 |
| Female | Black | 18-29 | 4.2% | 6.7 | 3.5 | 0.7 | 0.6 | 1.9 |
| Male | Other | 18-29 | 3.2% | 4.2 | 1.4 | 1.0 | 1.1 | 0.7 |
| Male | Black | 50-59 | 3.0% | 126.4 | 112.9 | 8.5 | 1.2 | 3.5 |
| Male | Hispanic | 40-49 | 2.7% | 21.1 | 16.1 | 3.0 | 0.9 | 0.9 |
| Female | Black | 30-39 | 2.5% | 15.6 | 12.0 | 2.1 | 0.5 | 0.9 |
| Male | Other | 30-39 | 2.3% | 5.8 | 3.8 | 0.7 | 0.8 | 0.4 |
| Female | White | 18-29 | 2.2% | 2.7 | 1.4 | 0.6 | 0.5 | †0.1 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



*Figure 19: Alameda County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 20: Rated Capacity vs ADP at Alameda County Detention Facilities (2010-2021)*

**Contra Costa**

*Table 17: Top 15 Contra Costa County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|------------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Black | 18-29 | 11.4% | 30.9 | 4.4 | 2.3 | 1.5 | 22.5 |
| Male | Hispanic | 18-29 | 9.9% | 8.5 | 2.3 | 1.6 | 1.3 | 3.2 |
| Male | White | 18-29 | 9.7% | 9.0 | 2.8 | 2.9 | 2.2 | 0.9 |
| Male | White | 30-39 | 7.9% | 12.7 | 6.5 | 2.9 | 2.6 | 0.6 |
| Male | Black | 30-39 | 6.7% | 32.8 | 15.7 | 3.4 | 1.5 | 12.0 |
| Male | White | 40-49 | 6.7% | 23.6 | 17.2 | 3.3 | 2.5 | 0.5 |
| Male | Hispanic | 30-39 | 5.8% | 9.0 | 4.6 | 1.5 | 1.3 | 1.3 |
| Male | Black | 40-49 | 5.5% | 49.7 | 38.1 | 4.6 | 1.3 | 5.4 |
| Female | White | 18-29 | 3.5% | 3.7 | 1.9 | 0.9 | 0.5 | 0.3 |
| Female | Black | 18-29 | 3.3% | 7.4 | 3.6 | 1.0 | 0.7 | 2.0 |
| Female | White | 30-39 | 2.8% | 6.7 | 4.5 | 1.1 | 0.8 | 0.2 |
| Male | White | 50-59 | 2.6% | 52.4 | 45.8 | 3.4 | 2.8 | 0.2 |
| Male | Hispanic | 40-49 | 2.5% | 17.3 | 12.9 | 2.3 | 1.2 | 0.7 |
| Male | Black | 50-59 | 2.2% | 104.8 | 95.4 | 5.3 | 1.1 | 2.7 |
| Male | Other | 18-29 | 2.1% | 4.7 | 1.5 | 0.9 | 1.6 | 0.7 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 21: Contra Costa County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Contra Costa County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 22: Rated Capacity vs ADP at Contra Costa County Detention Facilities (2010-2021)*

Analytica
Ex. C - 307

SD_817788

## Fresno

*Table 18*: *Top 15 Fresno County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|-----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 21.9% | 8.4 | 2.8 | 1.2 | 1.4 | 2.9 |
| Male | Hispanic | 30-39 | 13.9% | 14.1 | 7.9 | 2.4 | 1.6 | 2.1 |
| Male | Hispanic | 40-49 | 6.6% | 31.6 | 24.8 | 3.8 | 1.3 | 1.5 |
| Male | White | 18-29 | 6.3% | 9.1 | 3.1 | 2.4 | 2.6 | 0.8 |
| Male | Black | 18-29 | 5.7% | 22.7 | 5.7 | 1.7 | 1.6 | 13.5 |
| Male | White | 30-39 | 5.2% | 16.6 | 9.3 | 3.7 | 2.7 | 0.6 |
| Female | Hispanic | 18-29 | 4.7% | 2.7 | 1.8 | 0.2 | 0.3 | 0.3 |
| Male | White | 40-49 | 4.2% | 34.8 | 26.0 | 5.1 | 2.8 | 0.7 |
| Female | Hispanic | 30-39 | 3.5% | 6.1 | 5.0 | 0.5 | 0.3 | 0.2 |
| Male | Black | 30-39 | 2.9% | 32.0 | 17.4 | 3.7 | 1.9 | 8.8 |
| Male | Hispanic | 50-59 | 2.6% | 72.2 | 65.8 | 4.5 | 1.0 | 0.9 |
| Female | White | 18-29 | 2.4% | 5.1 | 3.2 | 1.0 | 0.4 | 0.3 |
| Male | Other | 18-29 | 2.0% | 9.3 | 3.9 | 1.7 | 1.9 | 1.8 |
| Male | Black | 40-49 | 2.0% | 57.8 | 46.8 | 4.5 | †1.3 | 4.9 |
| Female | White | 30-39 | 1.9% | 9.4 | 6.4 | 1.9 | 0.7 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



*Figure 23: Fresno County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Fresno County Jail Facilities – Average Daily Population vs Rated Capacity (2010-2021)



*Figure 24: Rated Capacity vs ADP at Fresno County Detention Facilities (2010-2021)*

Analytica

Ex. C - 308

SD_817789

## Kern

*Table 19: Top 15 Kern County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 20.3% | 9.6 | 2.7 | 1.7 | 1.6 | 3.5 |
| Male | White | 18-29 | 11.0% | 12.8 | 4.3 | 4.5 | 2.8 | 1.0 |
| Male | Hispanic | 30-39 | 10.8% | 13.6 | 6.8 | 2.4 | 1.4 | 2.8 |
| Male | White | 30-39 | 7.9% | 19.9 | 9.5 | 5.7 | 3.1 | 1.5 |
| Male | White | 40-49 | 6.1% | 43.2 | 31.1 | 7.7 | 3.1 | 1.1 |
| Male | Black | 18-29 | 5.8% | 19.8 | 5.0 | 1.9 | 2.0 | 10.7 |
| Male | Hispanic | 40-49 | 4.3% | 26.4 | 19.9 | 3.5 | 1.4 | 1.5 |
| Female | White | 18-29 | 3.7% | 5.3 | 2.8 | 1.4 | 0.7 | 0.4 |
| Female | Hispanic | 18-29 | 3.7% | 3.2 | 2.1 | 0.4 | 0.2 | 0.4 |
| Female | White | 30-39 | 2.9% | 14.1 | 9.0 | 3.6 | 1.0 | 0.4 |
| Male | Black | 30-39 | 2.8% | 23.0 | 11.9 | 3.3 | †1.0 | 6.6 |
| Female | Hispanic | 30-39 | 2.5% | 6.4 | 5.1 | 0.6 | 0.2 | 0.5 |
| Male | White | 50-59 | 2.4% | 100.7 | 85.1 | 9.9 | 4.6 | 0.8 |
| Male | Black | 40-49 | 2.0% | 46.2 | 35.0 | 5.6 | †1.1 | 4.2 |
| Female | White | 40-49 | 1.8% | 31.3 | 24.5 | 4.8 | 1.5 | 0.3 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*
*†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.*



*Figure 25: Kern County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

### Kern County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 26: Rated Capacity vs ADP at Kern County Detention Facilities (2010-2021)*

Analytica
Ex. C - 309

SD_817790

## Los Angeles

*Table 20: Top 15 Los Angeles County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 22.5% | 9.1 | 2.7 | 1.3 | 1.1 | 3.9 |
| Male | Hispanic | 30-39 | 11.6% | 11.9 | 7.1 | 1.9 | 1.0 | 1.8 |
| Male | Black | 18-29 | 8.4% | 22.1 | 5.2 | 1.4 | 1.5 | 13.9 |
| Male | Hispanic | 40-49 | 5.5% | 24.6 | 19.8 | 2.8 | 0.9 | 1.1 |
| Male | White | 18-29 | 4.9% | 7.1 | 2.3 | 2.4 | 1.5 | 0.8 |
| Female | Hispanic | 18-29 | 4.7% | 2.4 | 1.7 | 0.2 | 0.2 | 0.3 |
| Male | Black | 30-39 | 4.3% | 30.0 | 16.4 | 2.5 | 1.7 | 9.2 |
| Male | Black | 40-49 | 4.1% | 57.0 | 45.2 | 4.3 | 1.4 | 5.7 |
| Male | White | 40-49 | 3.8% | 28.8 | 21.6 | 3.8 | 2.7 | 0.5 |
| Male | White | 30-39 | 3.8% | 12.3 | 6.6 | 3.0 | 2.0 | 0.6 |
| Female | Hispanic | 30-39 | 2.6% | 5.0 | 4.2 | 0.3 | 0.2 | 0.3 |
| Female | Black | 18-29 | 2.4% | 6.0 | 4.0 | 0.4 | 0.3 | 1.2 |
| Male | Hispanic | 50-59 | 2.2% | 55.9 | 51.4 | 2.9 | 0.9 | 0.7 |
| Female | White | 18-29 | 1.8% | 2.8 | 1.5 | 0.7 | 0.4 | 0.2 |
| Male | Black | 50-59 | 1.6% | 124.0 | 113.3 | 6.0 | 1.3 | 3.3 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 27: Los Angeles County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Los Angeles County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 28: Rated Capacity vs ADP at Los Angeles County Detention Facilities (2010-2021)*

## Orange

**Table 21**: *Top 15 Orange County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 20.0% | 6.5 | 2.5 | 1.4 | 0.9 | 1.6 |
| Male | White | 18-29 | 11.8% | 8.1 | 2.6 | 3.2 | 1.8 | 0.3 |
| Male | Hispanic | 30-39 | 9.3% | 9.1 | 5.7 | 1.8 | 0.8 | 0.7 |
| Male | White | 30-39 | 7.5% | 11.9 | 6.1 | 3.2 | 2.2 | 0.2 |
| Male | White | 40-49 | 7.4% | 23.9 | 17.3 | 3.6 | 2.6 | 0.2 |
| Female | White | 18-29 | 4.7% | 3.1 | 1.5 | 0.9 | 0.5 | 0.1 |
| Female | Hispanic | 18-29 | 4.2% | 2.1 | 1.4 | 0.3 | 0.2 | 0.2 |
| Male | Hispanic | 40-49 | 4.1% | 18.6 | 15.0 | 2.2 | 0.8 | 0.5 |
| Female | White | 30-39 | 3.0% | 6.2 | 4.1 | 1.1 | 0.7 | 0.1 |
| Male | White | 50-59 | 2.9% | 54.0 | 46.5 | 3.8 | 3.2 | 0.2 |
| Male | Other | 18-29 | 2.7% | 3.8 | 1.4 | 0.9 | 1.0 | 0.4 |
| Male | Black | 18-29 | 2.4% | 8.2 | 3.0 | 1.8 | 1.8 | 1.5 |
| Female | White | 40-49 | 2.4% | 15.0 | 11.7 | 1.9 | 1.1 | 0.1 |
| Female | Hispanic | 30-39 | 2.2% | 4.1 | 3.3 | 0.4 | 0.2 | 0.1 |
| Male | Other | 30-39 | 1.8% | 6.1 | 4.0 | 0.8 | 1.0 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 29: Orange County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

### Orange County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)

*Intake Release Center*

839
408    407
315
2010    2015    2020

*James A Musick Facilities*

1273
713    449
0
2010    2015    2020

*Orange County Mens Jail*

1356
1219    1219
461
0
2010    2015    2020

*Orange County Women's Jail*

373
270
0
2010    2015    2020

*Theo Lacy*

3316
2464    2080
1778
0
2010    2015    2020

*Figure 30: Rated Capacity vs ADP at Orange County Detention Facilities (2010-2021)*

Analytica

Ex. C - 311

SD_817792

## Riverside

***Table 22****: Top 15 Riverside County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|------------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 19.6% | 8.2 | 2.8 | 1.7 | 1.4 | 2.3 |
| Male | Hispanic | 30-39 | 11.0% | 11.4 | 6.4 | 2.3 | 1.2 | 1.4 |
| Male | White | 18-29 | 9.7% | 10.1 | 3.5 | 3.2 | 2.5 | 0.8 |
| Male | White | 30-39 | 6.7% | 16.1 | 8.8 | 3.8 | 2.7 | 0.7 |
| Male | White | 40-49 | 6.2% | 35.0 | 26.0 | 5.0 | 3.2 | 0.6 |
| Male | Black | 18-29 | 5.5% | 14.4 | 5.3 | 2.1 | 1.5 | 5.4 |
| Male | Hispanic | 40-49 | 5.0% | 22.2 | 17.2 | 3.1 | 1.0 | 0.8 |
| Female | Hispanic | 18-29 | 4.1% | 2.6 | 1.7 | 0.3 | 0.3 | 0.3 |
| Female | White | 18-29 | 3.6% | 4.2 | 2.2 | 1.1 | 0.6 | 0.2 |
| Male | Black | 30-39 | 2.9% | 20.0 | 11.8 | 2.3 | 1.3 | 4.4 |
| Female | Hispanic | 30-39 | 2.8% | 5.2 | 4.2 | 0.5 | 0.2 | 0.2 |
| Female | White | 30-39 | 2.6% | 9.5 | 6.6 | 1.8 | 0.8 | 0.3 |
| Male | White | 50-59 | 2.4% | 79.6 | 69.1 | 6.0 | 3.9 | 0.5 |
| Female | White | 40-49 | 2.1% | 21.9 | 17.7 | 2.6 | 1.2 | 0.3 |
| Male | Black | 40-49 | 2.0% | 38.3 | 31.6 | 2.9 | 1.2 | 2.3 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



*Figure 31: Riverside County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Riverside County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 32: Rated Capacity vs ADP at Riverside County Detention Facilities (2010-2021)*

Analytica

Ex. C - 312

## Sacramento

*Table 23: Top 15 Sacramento County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|-----------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Black | 18-29 | 11.8% | 18.5 | 5.2 | 2.5 | 1.9 | 8.8 |
| Male | White | 18-29 | 10.7% | 9.2 | 3.3 | 2.3 | 2.3 | 1.0 |
| Male | White | 30-39 | 8.7% | 15.2 | 7.9 | 3.2 | 3.0 | 0.8 |
| Male | Hispanic | 18-29 | 7.4% | 8.3 | 2.1 | 1.7 | 1.3 | 3.1 |
| Male | White | 40-49 | 6.9% | 35.0 | 25.5 | 4.6 | 3.7 | 0.8 |
| Male | Black | 30-39 | 6.6% | 25.7 | 14.8 | 3.3 | 1.7 | 5.6 |
| Male | Black | 40-49 | 5.2% | 50.1 | 40.7 | 4.8 | 1.3 | 3.0 |
| Male | Hispanic | 30-39 | 4.3% | 11.3 | 6.2 | 2.1 | 1.4 | 1.3 |
| Female | White | 18-29 | 3.9% | 3.7 | 2.0 | 0.7 | 0.6 | 0.2 |
| Female | White | 30-39 | 3.2% | 8.3 | 5.7 | 1.4 | 0.8 | 0.3 |
| Female | Black | 18-29 | 3.1% | 7.0 | 4.7 | 0.5 | 0.4 | 1.3 |
| Male | White | 50-59 | 2.7% | 80.3 | 69.2 | 5.9 | 4.1 | 0.5 |
| Male | Other | 18-29 | 2.5% | 7.3 | 2.8 | 1.3 | 1.5 | 1.6 |
| Male | Hispanic | 40-49 | 2.4% | 24.8 | 18.9 | 3.3 | 1.6 | 0.8 |
| Female | White | 40-49 | 2.1% | 21.6 | 17.2 | 2.4 | 1.4 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 33: Sacramento County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 34: Rated Capacity vs ADP at Sacramento County Detention Facilities (2010-2021)*

Analytica

Ex. C - 313

SD_817794

## San Bernardino

***Table 24****: Top 15 San Bernardino County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|-----------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 18.4% | 8.6 | 3.2 | 1.3 | 1.3 | 2.7 |
| Male | Hispanic | 30-39 | 10.6% | 12.0 | 7.8 | 1.3 | 1.2 | 1.7 |
| Male | White | 18-29 | 8.3% | 9.3 | 4.0 | 1.8 | 2.3 | 1.0 |
| Male | Black | 18-29 | 6.9% | 19.2 | 5.9 | 1.5 | 1.3 | 10.4 |
| Male | White | 30-39 | 5.9% | 17.9 | 11.0 | 2.5 | 3.3 | 1.0 |
| Male | White | 40-49 | 5.5% | 40.0 | 32.0 | 3.0 | 3.9 | 1.0 |
| Male | Hispanic | 40-49 | 5.1% | 25.2 | 20.9 | 1.7 | 1.3 | 1.2 |
| Female | Hispanic | 18-29 | 4.4% | 2.9 | 2.1 | 0.2 | 0.2 | 0.3 |
| Male | Black | 30-39 | 3.8% | 26.9 | 16.2 | 1.9 | 2.0 | 6.7 |
| Female | White | 18-29 | 3.1% | 4.5 | 2.9 | 0.7 | 0.5 | 0.4 |
| Female | Hispanic | 30-39 | 3.1% | 5.9 | 4.9 | 0.3 | 0.3 | 0.3 |
| Male | Black | 40-49 | 2.6% | 46.8 | 37.9 | 2.8 | 1.3 | 4.4 |
| Female | White | 30-39 | 2.4% | 11.0 | 8.7 | 0.9 | 0.9 | 0.3 |
| Female | Black | 18-29 | 2.2% | 7.5 | 5.6 | 0.4 | 0.4 | 1.0 |
| Male | White | 50-59 | 2.2% | 89.7 | 81.7 | 3.2 | 3.9 | 0.7 |

*\*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 35: San Bernardino County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 36: Rated Capacity vs ADP at San Bernardino County Detention Facilities (2010-2021)*

Analytica
Ex. C - 314

SD_817795

## San Diego

*Table 25: Top 15 San Diego County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|------------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 13.8% | 6.0 | 2.2 | 1.2 | 1.2 | 1.3 |
| Male | White | 18-29 | 10.9% | 6.4 | 1.8 | 2.3 | 1.9 | 0.4 |
| Male | White | 30-39 | 8.1% | 11.7 | 5.8 | 3.2 | 2.3 | 0.3 |
| Male | White | 40-49 | 8.0% | 26.7 | 18.9 | 4.1 | 3.2 | 0.4 |
| Male | Hispanic | 30-39 | 7.3% | 9.5 | 5.4 | 2.2 | 1.1 | 0.7 |
| Male | Black | 18-29 | 5.8% | 10.1 | 3.0 | 1.3 | 1.8 | 3.7 |
| Female | White | 18-29 | 4.1% | 2.7 | 1.3 | 0.6 | 0.6 | 0.1 |
| Male | Hispanic | 40-49 | 3.5% | 20.7 | 16.5 | 2.6 | 1.0 | 0.5 |
| Male | Black | 30-39 | 3.4% | 16.2 | 9.2 | 2.3 | 2.0 | 2.5 |
| Male | Black | 40-49 | 3.4% | 39.7 | 31.7 | 4.0 | 1.8 | 1.9 |
| Female | Hispanic | 18-29 | 3.3% | 2.4 | 1.6 | 0.3 | 0.3 | 0.2 |
| Male | White | 50-59 | 3.1% | 62.8 | 53.2 | 5.3 | 3.8 | 0.4 |
| Female | White | 30-39 | 2.9% | 6.4 | 4.2 | 1.2 | 0.8 | 0.1 |
| Female | White | 40-49 | 2.5% | 17.3 | 13.4 | 2.3 | 1.3 | 0.2 |
| Male | Other | 18-29 | 2.0% | 4.2 | 1.3 | 0.7 | 1.5 | 0.6 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



*Figure 37: San Diego County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 38: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021)*

## San Francisco

*Table 26: Top 15 San Francisco County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | White | 18-29 | 13.4% | 5.3 | 1.6 | 1.9 | 1.3 | 0.5 |
| Male | Black | 18-29 | 12.2% | 36.0 | 5.7 | 3.2 | 1.7 | 25.2 |
| Male | White | 30-39 | 11.3% | 10.8 | 5.4 | 3.5 | 1.4 | 0.3 |
| Male | Black | 40-49 | 9.5% | 96.7 | 68.1 | 18.0 | 2.7 | 6.4 |
| Male | Black | 30-39 | 8.1% | 43.3 | 22.5 | 7.2 | 2.7 | 10.7 |
| Male | White | 40-49 | 7.9% | 36.0 | 24.9 | 7.1 | 3.2 | 0.4 |
| Male | Other | 18-29 | 4.5% | 3.8 | 1.4 | 0.7 | 1.0 | 0.7 |
| Male | Black | 50-59 | 3.7% | 179.0 | 146.4 | 27.1 | 1.4 | 3.9 |
| Female | Black | 18-29 | 3.4% | 7.0 | 3.6 | 1.3 | †0.5 | 1.6 |
| Male | White | 50-59 | 3.1% | 76.1 | 62.4 | 8.9 | 3.7 | 0.6 |
| Male | Other | 30-39 | 3.1% | 6.7 | 4.0 | 1.2 | 0.9 | 0.5 |
| Female | White | 18-29 | 2.7% | 2.0 | 0.6 | 0.9 | 0.3 | †0.1 |
| Male | Other | 40-49 | 2.2% | 18.4 | 14.9 | 2.0 | 1.1 | 0.3 |
| Female | Black | 30-39 | 2.1% | 18.2 | 13.0 | 3.2 | †0.5 | 1.4 |
| Female | White | 30-39 | 2.0% | 4.4 | 2.4 | 1.1 | 0.7 | †0.1 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*
*†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.*



*Figure 39: San Francisco County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

San Francisco County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 40: Rated Capacity vs ADP at San Francisco County Detention Facilities (2010-2021)*

Analytica
Ex. C - 316

SD_817797

## Santa Clara

*Table 27: Top 15 Santa Clara County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|-----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 19.3% | 6.0 | 2.1 | 1.0 | 1.0 | 1.8 |
| Male | Hispanic | 30-39 | 11.5% | 9.1 | 5.5 | 1.5 | 1.1 | 0.8 |
| Male | White | 18-29 | 6.5% | 5.9 | 2.0 | 1.7 | 1.7 | 0.4 |
| Male | Hispanic | 40-49 | 6.2% | 20.8 | 16.2 | 2.5 | 1.0 | 0.7 |
| Male | White | 40-49 | 5.4% | 21.6 | 16.0 | 2.8 | 2.3 | 0.3 |
| Male | White | 30-39 | 5.0% | 9.0 | 4.8 | 1.8 | 1.9 | 0.3 |
| Female | Hispanic | 18-29 | 4.2% | 2.0 | 1.2 | 0.3 | 0.2 | 0.2 |
| Male | Other | 18-29 | 3.7% | 3.2 | 1.3 | 0.5 | 0.9 | 0.5 |
| Male | Black | 18-29 | 3.6% | 7.2 | 2.0 | †0.8 | 2.2 | 2.1 |
| Male | Other | 30-39 | 3.0% | 4.3 | 2.7 | 0.5 | 0.8 | 0.2 |
| Female | Hispanic | 30-39 | 2.7% | 4.5 | 3.5 | 0.4 | 0.4 | 0.2 |
| Female | White | 18-29 | 2.5% | 2.6 | 1.3 | 0.5 | 0.6 | †0.1 |
| Male | Hispanic | 50-59 | 2.4% | 55.4 | 48.8 | 4.5 | 1.1 | 0.7 |
| Male | Black | 30-39 | 2.4% | 13.8 | 9.2 | 2.0 | †1.0 | 1.4 |
| Male | Other | 40-49 | 2.2% | 11.1 | 9.4 | 0.7 | 0.7 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



*Figure 41: Santa Clara County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Santa Clara County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 42: Rated Capacity vs ADP at Santa Clara County Detention Facilities (2010-2021)*

Analytica
Ex. C - 317
SD_817798

## Mortality Rates Over Time

This study measures county mortality rates between 1999-2020 to estimate total expected jail deaths. The focus of this study is to compare the total expected jail deaths in San Diego County to that of other counties in California. This approach largely assumes that mortality rates between San Diego and other California counties follow a similar pattern over time.

To test whether this is the case, we graph the mortality rates for each manner of death over time. Below are the figures for overdose/accidental deaths, homicides, natural deaths, and suicides. In general, these figures show that the morality rates for San Diego County and the other counties in this study have a similar trajectory over the past two decades. In other words, San Diego does not deviate from the trend lines of other counties. San Diego County consistently has a much lower homicide rate than the other counties. It also has a moderately higher suicide rate than the other counties.



*Figure 43: Mortality Rates Over Time, San Diego vs California, Ages 18-59 (2000-2020)*

Analytica

Ex. C - 318

SD_817799

## Comparisons of San Diego Inmate Population to Other California Counties

The jail population has generally higher needs than the general population. Attending to these needs may strain the limited capacity of county jails and, as a result, may be a contributing cause to in-custody deaths. We pursue this argument by comparing the mental health cases and violent proclivities of inmates in San Diego jails to that of other California counties between 2010-2020.

We first track reported mental health utilization using the average monthly mental health cases and the average new monthly mental health cases over time. Inmates in San Diego jails have considerably increased their usage of mental health services starting in 2019. This rate of growth is not as steep in other county jails. This increase in mental health services in San Diego is also reflected in the new mental health cases, which, after several years of declines, began to tick up in 2017. The increase in new mental health cases is not as large in other counties.

Violence among inmates is measure by the percent of violent felony arrests in a county and the average yearly assaults on law enforcement staff. San Diego County closely mirror the percent of violent felony arrests in other counties. All counties experienced a significant jump in these arrests in 2014. In terms of assaults on staff, San Diego has a moderate number of average assaults when compared to the other counties. Five counties have a higher average number of assaults than San Diego.









Figure 44: Additional Inmate Comparison Measures, San Diego vs California

Analytica
Ex. C - 319

SD_817800

## County Demographics

### Percent of County Population by Race/Ethnicity (2010-2020)



*Figure 45: Percent of Each County Population by Race/Ethnicity (2010-2020)*

### Percent of County Population by Age Group (2010-2020)



*Figure 46: Percent of Each County Population by Age Group (2010-2020)*

**Table 28**: *Percent of County Population by Gender (2010-2020)*

| County | Male | Female |
|---|---|---|
| Alameda | 49.2% | 50.8% |
| Contra Costa | 49% | 51% |
| Fresno | 50.1% | 49.9% |
| Kern | 51.4% | 48.6% |
| Los Angeles | 49.5% | 50.5% |
| Orange | 49.7% | 50.3% |
| Riverside | 49.8% | 50.2% |
| Sacramento | 49.2% | 50.8% |
| San Bernardino | 49.8% | 50.2% |
| San Diego | 50.3% | 49.7% |
| San Francisco | 50.7% | 49.3% |
| Santa Clara | 50.5% | 49.5% |

Analytica
CONSULTING
Ex. C - 320
SD_817801

## Unstandardized Average Time between Deaths

*Table 29: Average Unstandardized Days between Deaths (2010-2020)*

| County | Natural Death | Suicide | Overdose/Accidental Death | Homicide |
|---|---|---|---|---|
| Alameda | 4 months | 7 months | 1 years | 3.7 years |
| Contra Costa | 1.6 years | 1 years | 11 years | |
| Fresno | 4 months | 7 months | 1.2 years | 2.2 years |
| Kern | 5 months | 8 months | 1.6 years | 5.5 years |
| Los Angeles | 1 months | 3 months | 3 months | 9 months |
| Orange | 2 months | 1.2 years | 1.1 years | 3.7 years |
| Riverside | 4 months | 7 months | 8 months | 1.8 years |
| Sacramento | 6 months | 1.1 years | 1.6 years | 1.6 years |
| San Bernardino | 3 months | 5 months | 1.4 years | 1.8 years |
| San Diego | 2 months | 3 months | 5 months | 1.4 years |
| San Francisco | 11 months | 1.4 years | 2.7 years | |
| Santa Clara | 4 months | 9 months | 3.7 years | 11 years |

# Appendix I: Email Correspondence with Dr. Elizabeth Carson (U.S. Bureau of Justice Statistics)

To better understand the advantages and disadvantages of different measures used to compare mortality rates among inmate populations, we corresponded with Dr. Elizabeth Carson via email. She is a statistician at the U.S. Bureau of Justice Statistics. Below is the content of this correspondence.

FROM: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

TO: Elizabeth Carson <elizabeth.carson@usdoj.gov>

DATE: 12/15/2021

SUBJECT: Your feedback on measures of inmate mortality rates

Dear Ms. Carson,

I am part of a research team at Analytica Consulting studying inmate deaths in California county jails. The goal of this study is to make apples-to-apples comparisons of inmate mortality rates across multiple counties. In our reading of the literature on this topic, we have found that researchers differ on how best to measure mortality rates among inmate populations.

Drawing upon your expertise on this topic, would you be able to provide your input on the three different measures below?

**Average Daily Population (ADP)**: Although most commonly used, some have criticized this measure for not accounting for differences in length of stay. How does this measure capture high turnover rates in jails, particularly if the unit of analysis is an inmate year?

**Total Admissions (or At-Risk Population):** An alternative measure is to use total admissions as the denominator for mortality rates in jails. In your opinion, what are the weaknesses of using this measure compared to ADP? Does this generate accurate mortality rates?

**Standardized Resident Death Rates:** A BJS Special Report from 2005 ("Suicide and Homicide in State Prisons and Local Jails.") outlines weighing subgroups who are at higher risk of suicide (i.e. gender, race, age) to calculate inmate mortality rates. We don't see this method being used very often. Do you know why researchers stopped utilizing this method? The California Department of Justice collects a wealth of crime statistics so we could stratify this type of measure in other ways too.

We would welcome any input you can provide on these three different measures as we design the scope of our study. Our first draft of the study is due *Jan. 28* so your timely response would be greatly appreciated.

Please feel free to reach out if you have any follow-up questions regarding this request.


Thanks again,

Mike

–

**Mike Pelz, PhD**

**Senior Data Consultant | Analytica Consulting**

<http://www.analyticaconsulting.com>

FROM: Carson, Elizabeth (OJP) <Elizabeth.Carson@usdoj.gov>

TO: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

DATE: 12/16/2021

SUBJECT: RE: [EXTERNAL] Your feedback on measures of inmate mortality rates

Dear Dr. Pelz,

Thank you for contacting the Bureau of Justice Statistics. BJS uses the ADP measure, since it is the only count we have of *unique* persons in jails. BJS is investigating whether to try to collect individual-level records for all jail admissions and releases, which would (theoretically) allow us to locate people who recidivate multiple times per year, and only count them once. That would give you the unique number of persons exposed to the jail setting in a given year, and probably the best mortality rate per persons exposed.

The problem with using admissions is that this does NOT measure unique individuals in the denominator. You have a small number of people returning time after time to jail, which drives the 11 million admissions/year. So I suppose if you wanted to calculate the rate for any exposure to the jail setting, with the understanding that a person can have multiple exposures per year, you could use admissions – a long as you recognize you're comparing unique deaths in the numerator to non-unique persons in the denominator. As with the ADP, this doesn't take length of stay into account.

The most accurate method would be to use individual-level records from everyone who was admitted in a given year, calculate the days of exposure to the jail setting (and sum the days for those who were in more than once), and get the rate per person-days exposed. Unfortunately, we're not there yet in terms of having the individual-level data for the nation's jails.

In terms of the resident population standardization, because prisons and jails differ so drastically from the U.S. resident population in terms of age, sex, and race/ethnicity, if you want to make a direct comparison between the two you have to standardize the U.S. residents to "look like" the prison or jail population to which you are comparing (it has nothing to do with which groups are more likely to commit suicide, but rather the demographic makeup of the whole population). This is actually very common in epidemiological analyses – it removes the affects of different age, sex, and race/ethnicity distributions on the death rate. We show this comparison in our annual reports on prison (Mortality in State and Federal Prisons, 2001–2019 – Statistical Tables | Bureau of Justice Statistics (ojp.gov)) and jail deaths (Mortality in Local Jails, 2000–2019 – Statistical Tables | Bureau of Justice Statistics (ojp.gov)).

Please let me know if you have any questions.

Thank you,

Ann

E. Ann Carson

Statistician, Corrections Statistics Unit

Bureau of Justice Statistics

U.S. Department of Justice

810 Seventh Street, NW

Analytica
Ex. C - 322
SD_817803


Washington, DC 20531

FROM: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

TO: Elizabeth Carson <Elizabeth.Carson@usdoj.gov>

DATE: 12/17/2021

SUBJECT: Re: [EXTERNAL] Your feedback on measures of inmate mortality rates

Hi Dr. Carson,

Thanks so much for your quick response and valuable insights on these different measures. It would be ideal to have individual-level data. If you don't mind, I have two follow-up questions that would help us substantiate which measure to use for our study.

In our study, we are looking to engage two arguments regarding ADP from a report by the San Diego County Sheriff's Department. You might be familiar with this report—it was conducted by another statistician by the name of Dr. Colleen Kelly. I have attached a copy of this report to this email.
Specifically, we would like to address two arguments found on page 3 of this report. First, she states that the number of inmates passing through San Diego's jails far exceeds ADP. If we wanted to quantify how many of these admissions had multiple exposures or arrests, could we just use recidivism rates for a given calendar year? If so, do you know if this statistic is typically tracked by sheriff's departments?

The second related argument regards ADP accounting for shorter lengths of stay. Dr. Kelly asserts that ADP "is flawed when making comparisons across jails with different lengths of stay." In your opinion, would you consider this to be a fair statement? Does ADP fail to address shorter lengths of stay?
Thanks again for lending us your expertise. We really appreciate it!

Best,

Mike

FROM: Elizabeth Carson <Elizabeth.Carson@usdoj.gov>

TO: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

DATE: 12/21/2021

SUBJECT: RE: [EXTERNAL] Your feedback on measures of inmate mortality rates

Dear Dr. Pelz,

We have no good estimates of the number of persons who cycle through jail in a given year – as I said, this would require individual-level records that could be linked to unique individuals. In the absence of a national estimate of within-year recidivism, if you have that value for San Diego, I would suggest you use that. Recidivism across years is *not* going to tell you how many of the 11 million admissions to jail within a given year are repeat offenders.

As far as the question of short stays, the risk of death in a jail actually depends on a number of factors. Chief among them is the question of exposure: do you have an increased risk of exposure simply by being in the jail for one hour? Or does a prolonged exposure increase your odds of death?

I would argue it depends on the cause of death – deaths by intoxication typically occur within the first 24 hours of custody because the inmate enters the jail in an intoxicated state – so staying 10 days or 10 weeks makes no difference. The same is not true for deaths by homicide or suicide – in 2015-2019, 25% of suicides occurred after the first month of custody. The median time served for homicides in local jails from 2000-2019 was 30 days. For these causes of death,

Analytica
CONSULTING
Ex. C - 323
SD_817804

time exposed to jail (being in custody) can have some effect on mortality. For illness deaths, depending on the level of health care provided by the jail, it could be argued that being in jail lends a protective effect by providing access to stable medical care and medicines. Other factors include the size of the jail, the mix of persons held (do the police in a given jurisdiction place more or less priority on arresting people for particular crimes – like possessing small amounts of marijuana, public drunkenness, theft of small dollar amounts – compared to others?), the jurisdiction's policies on bond and bail, even the physical layout of the jail and the staff to inmate ratio.

Another way of thinking of this is to use an analogy to COVID infection rates in jails: the denominator for most COVID-infection rates in jail is the number of people exposed (the number of people who cycled through the jail over a given period of time, regardless of how long they stayed). For rates using this denominator, it is simply presence or absence in the jail that determines whether a person is counted in the denominator, and baked into this measure is the assumption that it doesn't matter whether you spent 6 hours or 6 months exposed – you have the same overall chance of catching COVID. Most epidemiologists, however, would argue that the amount of time exposed DOES matter for COVID – if you stay longer, you have a greater chance of catching the disease (and this is where the analogy with mortality breaks down, given what I said above regarding different times served for different causes of death). But other factors are at work as well – vaccination status of the inmates and staff, ability to social distance and use other protective equipment, overcrowding, cleanliness of the facility, etc. So even using a denominator that measures the total number of hours all inmates collectively were in custody wouldn't give you the whole picture of risk of catching COVID.

The same is true for mortality – simply being in jail (whether you measure the denominator as time served or just jail/no jail) doesn't confer the same risk of death for every inmate admitted. Basically, I'm saying that it's not an easy answer of ADP versus time in custody. As I said in my last email, you need individual-level records to calculate time served in jail, and we don't have those. In their absence, ADP is the best alternative in BJS's opinion.

Thank you,

Ann

# Appendix J: Data Inclusion Criteria

The primary focus of this study is in-custody deaths within county jails. To ensure our data only captures these types of events, we made several exclusions from the original data sets obtained for this study.

California Department of Justice Inmate Deaths Data, 2005-2020 (n = 11,553)

- Reporting agency equals 'sheriff' (n = 2,719)

- Year equals 2010 through 2020 (n = 1,930)

- Custody status not equal to 'in transit' or 'process of arrest' (n = 1,481)

- Jurisdiction equals San Diego, Los Angeles, San Bernardino, Riverside, San Clara, Orange, Sacramento, Alameda, Fresno, Kern, Contra Costa, San Francisco (n = 1,069)

- Custody status not equal to 'other' and custodial responsibility at the time of death not equal to 'other' (n = 1,048)

- Manner of death not equal to 'Homicide Justified (Law Enforcement Staff) (n = 1,044)

- Manner of death not equal to 'Pending Investigation' (n = 990) (Note: Only excluded when analyzing by manner of death)

- Manner of death not equal to 'Undetermined' (n = 968) (Note: Only excluded when analyzing by manner of death)

California Board of State and Community Corrections Monthly Jail Survey, 2005-June 2021 (n = 11,730)

- Year equals 2010 through 2020 (n = 7,752)

- Jurisdiction equals San Diego, Los Angeles, San Bernardino, Riverside, San Clara, Orange, Sacramento, Alameda, Fresno, Kern, Contra Costa, San Francisco (n = 1,584)

California Department of Justice Arrest Disposition Data, 1980-2020 (n = 291,925)

- Arrest disposition code not equal to 'to other agency' (n = 189,914)

- Year equals 2010 through 2020 (n = 52,298)

- Jurisdiction equals San Diego, Los Angeles, San Bernardino, Riverside, San Clara, Orange, Sacramento, Alameda, Fresno, Kern, Contra Costa, San Francisco (n = 13,867)

Analytica

Ex. C - 325

SD_817806

# Appendix K: Relevant Policy Changes Provided by the San Diego Sheriff's Department (2014-2021)

This list of major policy changes between 2014-2021 was provided to us by the San Diego Sheriff's Department. We utilized this list to understand policy changes in San Diego jails over time.

**2014**

- TRI-CITY MEDICAL CENTER. Entered into a contract with Tri-City Medical Center (TCMC). Contracts with both UCSD and TCMC provide the department with additional resources for inpatient hospitalization and specialty medical services.

- NALOXONE PROJECT. San Diego Sheriff's law enforcement deputies in patrol were one of the first law enforcement agencies to train deputies to administer naloxone, an opiate overdose antidote, to individuals who may have overdosed on opiates such as heroin. The department partnered with the County's Emergency Medical Services to launch this program.

- HOSPITAL GUARD UNIT. TCMC's contract provided the department with access to a 40-bed locked and secured medical ward in its facility. The ward is referred to as the Progressive Unit which the department shares with CDCR.

**2015**

- INMATE SAFETY PROGRAM (ISP). Designed an Inmate Safety Program to include standardized assessments for self-harm based on risk factors and designated housing units (i.e. Enhanced Observation Housing –EOH) where inmates are monitored in an environment that minimizes risk of self-harm. This program included structural modifications to the housing and the cells for patient safety.

- RESTORATION OF COMPETENCY (SAN BERNARDINO). Patients who needed to be restored to competency were sent to San Bernardino for restoration in addition to Patton State Hospital. This helped expedite the process for patients who were accepted to San Bernardino and needing restoration to competency.

- OPIATE REDUCTION. As part of the Hoarding and Cheeking Policy, evaluated the narcotic formulary and instituted ongoing education of onsite doctors on zero tolerance.

**2016**

- JAIL INTAKE SUICIDAL PILOT EXPANSION. Due to the ISP, the department began accepting arrestees into custody without outright rejection and directing the law enforcement officers to County Mental Hospital (CMH) for clearance.

- INTAKE PROCESS REDESIGN. Unlike other counties such as Orange County, Riverside, and Los Angeles County, San Diego had a two-stage medical intake process. Redesigned the medical intake process to condense both steps into one without compromising the quality of the medical and mental health assessments. Mental health questions were revised to reflect guidelines from the Columbia Suicide Severity Rating Scale (CSSRS).

- JAIL BASED COMPETENCY TREATMENT (JBCT) PROGRAM. The State Department of State Hospitals (DSH) contracted with the Sheriff's Department to have San Diego Central Jail serve as a JBCT site. The State contracted for 30-beds for male inmates who are 1368 and 1370s needing treatment.

- NALOXONE IN DETENTION FACILITIES. In response to the increasing incidents of heroin overdoses in jail, detention facilities were now equipped with Naloxone (Narcan) kits for deputies to use. Detentions Training Unit (DTU) developed a policy a training video and bulletin.

- MENTAL HEALTH MULTI-DISCIPLINARY GROUPS (MDG). MDG meetings are a forum where both sworn and clinical identify and discuss high risk mental health patients to get them the care and services they need in a timely manner. These meetings take place twice a month at each facility.

- LICENSED MENTAL HEALTH CLINICIAN POSITIONS. Six (6) FTE positions were added to the budget to improve the mental health services and assessments conducted in the jails.

Analytica

**Ex. C -326**

- MAIL PROCESSING CENTER. Creation of Mail Processing Center with special equipment and deputies trained in detecting drug-soaked letters, cards, and other contraband.

**2017**

- JAIL BASED COMPETENCY TREATMENT (JBCT) PROGRAM. Liberty Healthcare was also chosen as the subcontractor to establish a 30-bed JBCT program at SDCJ that will treat 1370s in custody in a more effective and expeditious manner. While it does not prevent patients from being admitted to Patton State Hospital, the program serves as an important adjunct in the spectrum of services that is provided to this population.

- NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE (NCCHC) TECHNICAL REVIEW. A panel of NCCHC surveyors conducted a one-week evaluation of the jails to help the department prepare for accreditation in the future. NCCHC visited all sites and made recommendations for change to assist the department with compliance with national correctional standards. The two top recommendations that required immediate attention was the acquisition of a new pharmacy business process and an electronic health record.

- DIAMOND PHARMACY. The department eliminated its pharmacy and practice of purchasing bulk medications and having LVNs prepare and administer medications to inmates which according to NCCHC was out of compliance with the LVN licensure. Under Diamond, medications were pre- packaged in unit-dose identifying the inmate's name. This process reduced errors for dispensing of medications when bulk medications are used

- PSYCHIATRIC STEP DOWN UNIT. A one-time funding from Public Safety Group was added to budget to develop a Psychiatric Step-Down Unit at SDCJ with 40 beds.

- PSYCHIATRIC EMERGENCY RESPONSE TRAINING (PERT). Nurses who were assigned to the Psychiatric Stabilization Units (PSU) at both SDCJ and LCDRF were sent to attend PERT classes. PERT served as another training to help staff deal effectively with individuals suffering from mental health conditions.

**2018**

- INMATE SAFETY PROGRAM (ISP) REVISION. The policy was revised to comply with NCCHC standards and Lindsay Hayes recommendations.

- SUICIDE PREVENTION TRAINING. The department developed an 8-hour training course that is patterned after Lindsay Hayes' training curriculum.

- SUICIDE PREVENTION FOCUSED RESPONSE TEAM. Creation of this workgroup. This workgroup consisting of representatives from sworn, medical, mental health, training, etc. meet once a month to discuss best evidence practices and implement strategies for reducing suicide in custody. This group also reviews suicide and/or suicide attempt incidents to evaluate for training opportunities and policy changes if needed.

- COMBINED & COMPREHENSIVE INTAKE SCREENING PLATFORM. The intake screening questions were further revised based on Lindsay Hayes' recommendation and still incorporates the Columbia Suicide Severity Rating Scale (CSSRS).

- LICENSED MENTAL HEALTH CLINICIANS. 15 (FTE) positions were added into the budget.

- SCENE MANAGER NURSING TRAINING. A program was developed to train a nurse to serve as a scene manager during emergency response and man-downs.

- ELECTRONIC HEALTH RECORD. The department procured a contract with Naphcare. TechCare is the name of the new electronic health record. Rollout is expected in 2019.

- CHIEF LICENSED MENTAL HEALTH CLINICIAN. A 1-FTE position was added to the budget and a second Chief Licensed Mental Health Clinician was appointed to manage the span of control of 27 licensed mental health positions.

- MENTAL HEALTH DEPUTIES. The department received 4 FTE deputy positions dedicated for mental health services.

- NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE (NCCHC) ACCREDITATION REVIEW. The department intends to pursue accreditation and has dedicated a project team to spearhead efforts for its preparation. A detentions captain and sergeant were embedded in Medical Services to assist with this effort.

Analytica
**Ex. C - 327** AUDITING

SD_817808

- IMPROVEMENTS TO HOUSING AREAS AND FACILITIES. Created and designed clinic areas at SDCJ, VDF, and GBDF to create a more therapeutic physical environment for clinicians and patients.

- MENTAL HEALTH ADVOCACY HOTLINE. A central phone line was established for use by criminal justice stakeholders and community partners for reporting.

- SUICIDE PREVENTION AND MENTAL AWARENESS POSTERS IN HOUSING AREAS. Posted in housing units, public lobbies, clinic areas and staff breakrooms/briefing rooms.

- CHIEF MENTAL HEALTH CLINICIAN. Addition of a 2nd Chief Mental Health Clinician, enhanced oversight of QMHP timely delivery of care

- REVIEW OF SELF HARM REPORTS. Chief Mental Health Clinicians review all NetRMS cases (Incident reports written by sworn staff) involving self-harm, determination of self-harm vs. suicide attempt being reviewed by a QMHP, allows for follow with QMHP staff for corrective action counseling if needed.

- WELLNESS CHECKS. SNP revised to mandate nurses completing wellness rounds in all Administrative Housing units 3x weekly for all patients

**2019**

- BODY SCANNERS. Upgraded six high tech x-ray body scanners

- ELECTRONIC HEALTH CARE. EHR goes live in September. EHR project was a strategic initiative to improve Medical and Mental Health care within our jails by moving medical care management from the 17-year-old integrated JIMS environment to a modern, agile software platform that incorporates better efficiency, care, and alignment with national standards like those of the National Commission on Correctional Health Standards.

- SOBERING CELL CHECKS. Standard Nursing Protocols (SNP) revised to include nurses taking vital signs of all sobering cell patients twice daily

- PRIVATE CLINIC SPACE. Construction project to expand privacy in intake screening areas for our patients during booking

- ISP POLICY REVISION. Policy state QMHP (non-sworn) staff admit and discharge from ISP only, only under extenuating circumstances shall sworn intervene in this decision. Follow-up appointment protocols were also revised.

- INTAKE SCREENING MODIFIED. Modified intake screening criteria Intake screening to improve acceptance/emergency transfer criteria relating to gate rejects

**2020**

- MENTAL HEALTH DIRECTOR. Selection of a Medical Director, Mental Health Services.

- WITHDRAWAL PROTOCALS. MSD revised standard nursing protocols related to alcohol and opioid withdrawal to prevent deaths associated with substance use disorders.

- TELEPSYCH. Expanded tele-psych to deal with the increased demand for mental health services and manage the COVID 19 pandemic

- CONTRACTED MEDICAL PROVIDER. MSD changed medical providers (Coastal to CHP) which increased the number of providers systemwide.

**2021**

- NALOXONE PROGRAM EXPANSION. All sworn members assigned to the detentions bureau were issued 2 naloxone kits to carry on their uniform belt.

- HEALTH AND HUMAN SERVICES AGENCY – CERNER COMMUNITY BEHAVIORAL HEALTH (CCBH). In April, QMHP's gained access to county mental health database CCBH, enhances continuity of care. Cerner Community Behavioral Health is behavioral health-specific electronic health record that specialize in the delivery of community mental health, inpatient mental health, outpatient mental health, substance use disorder

Analytica
**Ex. C - 328**

SD_817809

and developmental disabilities care. Although there may be some patients who are not in the database and do not have data entered, we continue to review and enter data referencing our patient encounters while in our care.

- ADDITIONAL RN and MHC POSITIONS. Funding approved in July for 146 new Sheriff's health staff positions to support our on-going priority of building a robust medical and mental health system. With this additional staffing, our plan is to enhance overall care, by implementing a Primary Care Model, Medicated Assisted Treatment (MAT) program and ultimately achieving National Commission of Correctional Health Care (NCCHC) accreditation.

- MAT DEPUTY POSITIONS. 8 detention deputy positions funded in July

- COMPREHENSIVE HEALTHCARE CONTRACT. Sheriff's Department awarded a comprehensive contract to Naphcare on September 1, 2021. This contract will consolidate and expand workflows relating to primary and specialty health care services, oral care, mental health, and related ancillary services to all patients in custody. We are projecting the contract consolidation to be fully operational in fiscal year 2022.

- MOU with HHSA. In September, the sheriff signed a Memorandum of Understanding (MOU) to work collaboratively to expand Medication Assisted Treatment services to our population.

- ENHANCED COVID MONITORING. In December, MSD began utilizing better technology to treat patients in COVID-19 housing modules. This new device captures oxygen levels which will give nurses more accurate information to determine treatment.

- ENHANCED COVID TREATMENT. In December, MSD collaborated with HHSA to on a new treatment for select COVID-19 positive patients. Monoclonal antibody treatment is FDA approved (EUA) and intended to reduce serious side effects of COVID-19.

- CHRONIC CARE ENHANCEMENT. In December, MSD improved the management of diabetic patients in our system under a directive from the CMO.

**2022**

- MEDICATED ASSISTED TREATMENT PILOT PROGRAM. Will be starting a pilot project at LCDRF to expand MAT related services to our female population. MSD will expand MAT services to our remaining population once our comprehensive vendor is established in 2022.

Analytica
Ex. C - 329

SD_817810

# List of Tables

**Table 1**: Average Standardized Time Between Deaths by Manner (2010-2020)*.......................................4

**Table 2**: Select Characteristics of Most Populous California Counties (2010-2020).................................18

**Table 3**: ADP vs. ARP by County (2011-2020) .......................................................................................19

**Table 4**: A Closer Look at Overdose/Accidental Jail Deaths, 2010-2020.................................................20

**Table 5**: Countywide Accidental Death Breakdown (1999-2020)..............................................................20

**Table 6**: Actual vs Estimated San Diego ADP..........................................................................................21

**Table 7**: Actual vs Estimated San Diego ADP..........................................................................................21

**Table 8**: Actual vs Estimated San Diego ADP..........................................................................................21

**Table 9**: Actual vs Estimated San Diego ADP..........................................................................................21

**Table 10**: Actual vs Estimated San Diego ADP........................................................................................21

**Table 11**: ADP and Bookings by Type 1 Facilities (2010-2018)................................................................27

**Table 12**: Deaths in Type 1 Facilities (2010-2020)...................................................................................27

**Table 13**: Overall Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ...................................28

**Table 14**: Suicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ...................................28

**Table 15**: Overdose/Accidental Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ...............29

**Table 16**: Natural Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ...................................29

**Table 17**: Homicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020.................................29

**Table 18**: Top 15 Alameda County Jail Demographic Groups with Associated Death Rates....................31

**Table 19**: Top 15 Contra Costa County Jail Demographic Groups with Associated Death Rates.............32

**Table 20**: Top 15 Fresno County Jail Demographic Groups with Associated Death Rates........................33

**Table 21**: Top 15 Kern County Jail Demographic Groups with Associated Death Rates ...........................34

**Table 22**: Top 15 Los Angeles County Jail Demographic Groups with Associated Death Rates ...............35

**Table 23**: Top 15 Orange County Jail Demographic Groups with Associated Death Rates.......................36

**Table 24**: Top 15 Riverside County Jail Demographic Groups with Associated Death Rates....................37

**Table 25**: Top 15 Sacramento County Jail Demographic Groups with Associated Death Rates ...............38

**Table 26**: Top 15 San Bernardino County Jail Demographic Groups with Associated Death Rates ..........39

**Table 27**: Top 15 San Diego County Jail Demographic Groups with Associated Death Rates .................40

**Table 28**: Top 15 San Francisco County Jail Demographic Groups with Associated Death Rates............41

**Table 29**: Top 15 Santa Clara County Jail Demographic Groups with Associated Death Rates................42

**Table 30**: Percent of County Population by Gender (2010-2020)...............................................................45

**Table 31**: Average Unstandardized Days between Deaths (2010-2020).....................................................46

Analytica

Ex. C - 330

SD_817811

# List of Figures

Figure 1: Total Deaths in Various California County Jails (2010-2020) Compared to San Diego County.....3
Figure 2: Overall County Mortality Rates...................................................................................................5
Figure 3: Suicide, Homicide, and Accidental Death Rates.........................................................................5
Figure 4: Comparing the Jail and General Population in San Diego County...............................................6
Figure 5: Expected vs Actual Jail Suicides between 2010 and 2020 ..........................................................8
Figure 6: Expected vs Actual Jail Accidental Deaths between 2010 and 2020 ...........................................8
Figure 7: Expected vs Actual Jail Homicides between 2010 and 2020 .......................................................9
Figure 8: Expected vs Actual Jail Natural Deaths between 2010 and 2020 ................................................9
Figure 9: Overall Expected vs Actual Jail Deaths between 2010 and 2020 ..............................................10
Figure 10: Overall Expected vs Actual Jail Deaths - Sentenced and Unsentenced ...................................11
Figure 11: Natural Expected vs Actual Jail Deaths - Sentenced and Unsentenced ...................................12
Figure 12: Suicide Expected vs Actual Jail Deaths - Sentenced and Unsentenced ...................................12
Figure 13: Overdose/Accidental Expected vs Actual Jail Deaths - Sentenced and Unsentenced ..............13
Figure 14: Homicide Expected vs Actual Jail Deaths - Sentenced and Unsentenced ................................13
Figure 15: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021) .......................14
Figure 16: Average Number of Bookings and Releases by Hour of Day in San Diego County .................15
Figure 17: County Expected vs Actual Jail Deaths Including City Jails .....................................................27
Figure 18: Confidence Intervals of Standardized Mortality Ratios............................................................30
Figure 19: Alameda County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity..........31
Figure 20: Rated Capacity vs ADP at Alameda County Detention Facilities (2010-2021)..........................31
Figure 21: Contra Costa County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity ...32
Figure 22: Rated Capacity vs ADP at Contra Costa County Detention Facilities (2010-2021)....................32
Figure 23: Fresno County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity..............33
Figure 24: Rated Capacity vs ADP at Fresno County Detention Facilities (2010-2021).............................33
Figure 25: Kern County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity ................34
Figure 26: Rated Capacity vs ADP at Kern County Detention Facilities (2010-2021) ................................34
Figure 27: Los Angeles County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity ....35
Figure 28: Rated Capacity vs ADP at Los Angeles County Detention Facilities (2010-2021) ....................35
Figure 29: Orange County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity............36
Figure 30: Rated Capacity vs ADP at Orange County Detention Facilities (2010-2021)............................36
Figure 31: Riverside County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .........37
Figure 32: Rated Capacity vs ADP at Riverside County Detention Facilities (2010-2021).........................37
Figure 33: Sacramento County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity.....38
Figure 34: Rated Capacity vs ADP at Sacramento County Detention Facilities (2010-2021).....................38
Figure 35: San Bernardino County Population, Jail Pop, and In-Custody Deaths by Race/Ethnicity..........39
Figure 36: Rated Capacity vs ADP at San Bernardino County Detention Facilities (2010-2021) ...............39
Figure 37: San Diego County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .......40
Figure 38: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021) .......................40
Figure 39: San Francisco County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .41
Figure 40: Rated Capacity vs ADP at San Francisco County Detention Facilities (2010-2021) .................41
Figure 41: Santa Clara County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .....42
Figure 42: Rated Capacity vs ADP at Santa Clara County Detention Facilities (2010-2021).....................42
Figure 43: Mortality Rates Over Time, San Diego vs California, Ages 18-59 (2000-2020).........................43
Figure 44: Additional Inmate Comparison Measures, San Diego vs California ..........................................44
Figure 45: Percent of Each County Population by Race/Ethnicity (2010-2020) .........................................45
Figure 46: Percent of Each County Population by Age Group (2010-2020)................................................45

Analytica
Ex. C - 331

SD_817812

# EXHIBIT D

Community Oriented Correctional Health Services

To: Dorothy Thrush, Chief Operating Officer Office of Public Safety, San Diego County

From: Community Oriented Correctional Health Services (COCHS)

Date: 3/30/2020

Subject: Best Practices Review

Dear Ms. Thrush;

Please find below our review of best practices for jail operations for San Diego County. This review was conducted in response to contract 561562 and involved a review of best practices from existing literature, and well as a site visit to the San Diego jail and discussions with security and health staff. The scope of this review is based on the framework of the initial RFQ 9947 and subsequent discussions with County representatives. Thank you for the opportunity to conduct this work on behalf of San Diego County.

Sincerely,

Homer Venters MD, MS

President, COCHS

1

**Ex. D - 333**

DUNSMORE0115368

Community Oriented Correctional Health Services

A Review of Best Practices for Jail Operations for San Diego County

A. <u>Introduction and methods</u>

The purpose of this assessment by Community Oriented Correctional Health Services (COCHS) is to provide a literature review and report the best practices for jail administration in large counties (at least 500,000 people) that are associated with improvements in morbidity and mortality. The scope and format of this report is responsive to the requirements of San Diego County and the terms of work outlined in Contract 561562. As detailed in the initial RFQ 9947 scope of services, COCHS staff have drawn information from several publicly available reports in preparation of this best practices review, and have also conducted a two-day series of meetings and process reviews in San Diego, including observation of several areas of two of the current jail facilities. Discussions with San Diego County representatives has identified five domains of best practice for this review;

- Quality promotion and oversight
- Initial Intake screening and assessment
- Staff training
- Medication management
- Housing inmates with various health needs

Best practices included in this review reflect evidence-based approaches to health care delivery or health promotion that have been successfully implemented in multiple correctional settings. Citations are provided throughout the report to note the support and evidence behind these practices. Databases utilized to conduct this best practices review include the guidelines of the National Commission on Correctional Health Care, the United States National Library of

2

**Ex. D - 334**

DUNSMORE0115369

Medicine and the National Institute of Corrections. These best practices are presented for consideration of the San Diego jail as it works to reduce rates of mortality and morbidity.

B. Quality Promotion and Oversight

Selecting the best practices for promotion of quality metrics depends upon the perspective taken by the jurisdiction. The perspective of correctional health care which views its goal as providing short-term, acute, triage-based care does not lend itself to easy adoption of a comprehensive set of community health quality metrics. A jail that views itself as a part of the continuum of care will face a different set of decisions regarding its best practices. While a community health facility can expect to spend years developing a relationship with patients that would lead to better health outcomes, as well as the opportunity for follow-up visits and warm hand offs, jails have played the function of a warehouse for some of our highest need individuals, they remain bounded by that function. Best practices in promoting quality in correctional health services, however, share many elements of evidence-based quality promotion practices in community health settings.[1] The sheer number of evidence-based quality approaches, together with the complexity of adapting them to a correctional setting, has resulted in a slow uptake of many best practices in the community into jail health care.[2] A central question at the heart of best practices in jail settings is whether the lens of health is limited to reducing mortality and morbidity during the time and place of incarceration, or extends beyond the walls of the jail to the community. This determination can guide which best practices are applicable to a correctional setting.

---

[1] Dzau, V. Improving the Safety and Quality of Healthcare. National Academy of Medicine, 09/2016. Available at https://www.ahrq.gov/sites/default/files/wysiwyg/news/events/ahrq-research-summit/dzau-summit2016.pdf.
[2] Stern M, Greifinger R, Mellow J, Patient Safety: Moving the Bar in Prison Health Care Standards. Am J Pub Health. 11/2010. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2951964/.

3

Ex. D - 335
DUNSMORE0115370

Community Oriented Correctional Health Services

Promoting quality in correctional health services requires that several areas of jail policy and workflow be designed to support and complement each other, both in daily practice and in response to sentinel events such as death and serious illness. By linking evidence-based policies and procedures to measurable process and health outcomes, and referring poorly performing outcomes to quality improvement projects and sentinel event analysis, community health systems have made significant gains in reducing death and illness in numerous domains, including preventable hospital deaths, maternal illness and death and nursing home patient safety.[3] Conversely, when policies and procedures are not directly linked to regular performance monitoring and other basic elements of quality promotion, jail administrators and other stakeholders cannot have confidence that these policies and procedures are appropriate to the stated mission, or that they are being implemented.

For correctional health services, best practices in quality promotion require clear policies and procedures that guide all types of staff in their work.[4,5] Correctional health services commonly rely on performance metrics that can be measured monthly to determine whether these policies and procedures are being followed. These metrics often include monitoring of access/timeliness as well as quality of care across medical, nursing, mental health, substance use and pharmacy

---

[3] National Initiative Aimed at Reducing Maternal Deaths Shows Early Signs of Improvement in Severe Maternal Morbidity. American College of Obstetrics and Gynecology. 02/2018, Available at https://www.acog.org/About-ACOG/News-Room/News-Releases/2017/National-Initiative-Aimed-at-Reducing-Maternal-Deaths?IsMobileSet=false.
and
Reducing Preventable Inpatient Mortality. The Joint Commission, Journal on Quality and Patient Safety, 09/2013. Available at https://www.jcrinc.com/-/media/deprecated-unorganized/imported-assets/jcr/default-folders/items/journal_sample_articlepdf.pdf?db=web&hash=37FBE6328F9862C8C2E3B9E6AD565A74.
and
Improving Patient Safety in Nursing Homes. Agency for Healthcare Research and Quality (AHRQ), 02/2016. Available at https://www.ahrq.gov/sites/default/files/wysiwyg/professionals/quality-patient-safety/patientsafetyculture/nursing-home/resources/nhimpptsaf.pdf.
[4] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-05.
[5] Implementing Evidence-Based Practice in Community Corrections: Quality Assurance Manual Accession Number: 021258 2005. National Institute of Corrections. Available at https://nicic.gov/implementing-evidence-based-practice-community-corrections-quality-assurance-manual-0.

Ex. D - 336
DUNSMORE0115371

services. These metrics also measure whether expectations are met for discrete types of health encounter, including the medication administration, intake assessments, nursing and medical sick call encounters, as well as chronic care, emergency, mental health and substance use encounters. For areas that merit new or altered workflows or process changes, quality improvement projects, based on retrospective analysis of relevant data, and designed with outcomes measurements are utilized to make improvements to areas of concern.[6] Each branch of the health service may have multiple individual quality metrics as well as several shared metrics that reflect their intersection with other parts of the health services, all of which are generally reviewed and approved in a monthly or quarterly service-wide quality committee. The review of sentinel events including deaths, injuries and self-harm is also an important best practice in reducing mortality and morbidity in jail settings, and these reviews and their corrective action plans can be included in the service-wide quality meetings.[7,8] An additional area of best practice involves actively surveying staff and patients about their engagement with the correctional health service.[9]

---

[6] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-06.

[7] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-09.

[8] Sentinel Events Approach to Addressing Suicide and Self Harm in Jail. Vera Institute of Justice, Available at https://www.vera.org/projects/a-sentinel-events-approach-to-addressing-suicide-and-self-harm-in-jail/learn-more

[9] Spinaris C, Denhof M, Countering Staff Stress. Impact of Trauma Exposure. National Jail Exchange, National Institute of Corrections. 2015. Available at https://info.nicic.gov/virt/sites/info.nicic.gov.virt/files/06Impact_of_Traumatic_Exposure.pdf.
And

Jacobs LA, Giordano SNJ. "It's Not Like Therapy": Patient-Inmate Perspectives on Jail Psychiatric Services. Adm Policy Ment Health. 04/2018 Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5811330/.
And

Tanguay S, Trestman R, Weiskopf C. Patient health satisfaction survey in Connecticut correctional facilities. J Correct Health Care. 04/2014  Available athttps://www.ncbi.nlm.nih.gov/pubmed/24659759.
And

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, Venters H. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. J Correct Health Care. 10/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/27742860.
And

Sauter J, Vogel J, Seewald K, Hausam J, Dahle KP. Occupational Factors and their Correlates to Prison Climate and Inmates' Attitudes Towards Treatment. Front Psychiatry, 10/2019. Available at https://www.ncbi.nlm.nih.gov/pubmed/31736801.
And

Ex. D - 337

DUNSMORE0115372

Community Oriented Correctional Health Services

Promoting quality in jail health services relies on accountability of the health service for delivery and outcomes of care. This best practice can be achieved with several mechanisms. One approach to ensuring accountability of the health service involves reporting of performance measures to a health authority outside the correctional health service. In New York City, Seattle, Chicago and Los Angeles, select core metrics of health service delivery are aggregated by the correctional health services and integrated in county or city-wide review of health care.[10]
Another option for correctional health accountability involves an independent monitoring system that actively conducts reviews of health services and health care quality. This approach is utilized in multiple jail settings including the Health Officer Inspection reports of California jails and the NYC Board of Correction.[11] A third approach to promoting accountability of correctional health services involves creating contract language for proprietary staffing vendors that clearly delineates the expected performance measurements that will be employed and includes liquidated financial penalties for poor performance.[12]


These best practices in correctional health quality promotion require robust data systems. The core of these data systems is a certified electronic health record (EHR) that can be tailored to produce aggregate reports on the monthly performance measures for each branch of the health

---

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. LGBT Health. 04/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/26745813.
[10] Cook County Performance by Office, Star Report. 01/2011. Available at https://www.ccachicago.org/wp-content/uploads/2015/08/STAR_Performance_by_Office_110701.pdf.
And
New York City Health and Hospitals, Board of Directors Meeting Minutes, p53. 10/2016. Available at https://www.nychealthandhospitals.org/wp-content/uploads/2016/10/201610-board.pdf.

[11] Health Officer Inspection Report, Alameda County Jail. 11/8/2018. Available at http://www.acgov.org/board/bos_calendar/documents/DocsAgendaReg_11_8_18/PUBLIC%20PROTECTION/Regular%20Calendar/Health_officer_jail_inspection_reports_11_8_18.pdf.
And
Access to Health and Mental Health Care (January-December 2018) 06/2019, NYC Board of Correction. Available at https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/Health_Access/4b_Access%20Report%202018%20Review_Final_June%202019.pdf.
[12] Jails: Inadvertent Healthcare Providers. Report from The Pew Charitable Trust. 01/2018. Available at https://www.pewtrusts.org/en/research-and-analysis/reports/2018/01/jails-inadvertent-health-care-providers.

**Ex. D - 338**

DUNSMORE0115373

Community Oriented Correctional Health Services

service, medical, nursing, mental health, substance use and pharmacy. In community settings,

harnessing the EHR to promote quality has been extensively detailed, and is central to two of

the 'Key Drivers' of quality identified by the Agency for Healthcare Research and Quality.[13]

Inside a correctional setting, the EHR is crucial to monitoring monthly performance measures as

well as implementing recommendations from quality improvement projects and review of

sentinel events including mortality reviews.[14] When an EHR is used effectively, individual

performance measures can be automatically extracted and based on the entire sample of

relevant health encounters, instead of a traditional practice of compiling a representative sample

with a sufficiently high confidence level to serve in the place of the entire sample.


An EHR also provides the foundation for connecting health information inside jail with the care

in the community, through health information exchange.[15] The EHR further allows for matching

of jail-based data to community records to identify trends in health and social service outcomes

after release that bear on mortality.[16] Additional information systems are required to track

---

[13] Agency for Healthcare Research and Quality Key Drivers 2 (Data-driven quality improvement) and 3 (Optimize health information systems to drive data-driven practice). Available at https://www.ahrq.gov/evidencenow/tools/ehr-data-quality.html.

[14] MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, Venters H. Feasibility of Treating Hepatitis C in a Transient Jail Population. Open Forum Infect Dis. 07/2017.Available at https://www.ncbi.nlm.nih.gov/pubmed/28852680.
And
Abe CM, Aguwa M, Zhao M, Sullivan J, Porsa E, Nijhawan AE. Public Health Rep. Hepatitis C Virus Infection in the Dallas County Jail: Implications for Screening, Prevention, and Linkage to Care. Available at https://www.ncbi.nlm.nih.gov/pubmed/31530093.

[15] Hinchman A, Hodges S, Backus J Jr, Warholak T Implementation of Health Information Exchange at the Pima County Adult Detention Complex: Lessons Learned J Correct Health Care. 04/2018.
Available at https://www.ncbi.nlm.nih.gov/pubmed/29661107.
And
Butler B. Health Information Exchange between Jails and their Communities. Perspectives in Health Information Management. Winter 2013. Available at http://bok.ahima.org/doc?oid=301194#.XjQ9WGhKg2w.

[16] Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, Venters H, MacDonald R. Death After Jail Release.
J Correct Health Care. 01/2017. Available at https://www.ncbi.nlm.nih.gov/pubmed/28040993.
And
Seijeoung K,  et. al. Deaths in the Cook County Jail: 10-Year Report, 1995–2004. *Journal of Urban Health. 04/2007.*
Available at https://link.springer.com/article/10.1007%2Fs11524-006-9115-9.
And
Brittain J[1], Axelrod G, Venters H. Deaths in New York City jails, 2001-2009. Am J Public Health. 02/2013. Available

7

**Ex. D - 339**

DUNSMORE0115374

Community Oriented Correctional Health Services

responses and substantiation of patient medical grievances as well as medication profiling for quality assurance and improvement efforts.

Promotion of health service quality and reducing mortality and morbidity inside jail settings are also impacted by the model of correctional health. Many large jail settings have developed a public health model that places correctional health within the local health department or other health authority. This model is in place in multiple large jail settings, including Los Angeles, Chicago, New York City and Seattle. A primary virtue of this model is the ability to integrate the jail health services with other community-based initiatives that focus on reducing recidivism, promoting stable housing, community mental health services and ultimately, reducing reliance on jails as a site of custody for people who are struggling with serious mental illness, substance use disorders and housing concerns. In this model, the scope of health being promoted is that of the entire community, so that efforts to address chronic medical problems and behavioral health concerns are a priority and linked to community care. This approach is also helpful for coordinating local responses to community-wide infectious and communicable disease initiatives, including influenza, active and latent tuberculosis, gonorrhea, chlamydia and hepatitis.

Another model of jail health services involves the correctional health service being part of sheriff's office or correctional department. For jail health services, this model generally relies on individual health staffing vendors to be selected by security staff, as is the case with the Philadelphia jail system.[17] This model requires that the security authority hire sufficient staff to monitor and improve the quality of care and is often implemented when the focus is health outcomes limited to the time and place of incarceration. In this model, health and security staff

at https://www.ncbi.nlm.nih.gov/pubmed/23409900.
[17] Annual report to Budget Committee from Philadelphia Department of Prisons. 5/1/2018. Available at http://phlcouncil.com/wp-content/uploads/2018/04/FY19-Testimony_Prisons_submitted-to-Council-4.27.pdf.

**Ex. D - 340**

DUNSMORE0115375

Community Oriented Correctional Health Services

may be more integrated in their daily operations as the health staff often report to security leadership at some level.

Numerous hybrids of these two models exist, with a mixture of public and proprietary staffing vendors utilized in the same site. Particular areas of care that are often provided by an outside vendor in either model include dental care, dialysis, telehealth specialty care and pharmacy packaging. In Alameda County, California, responsibility for provision of physical and mental health services is split between a proprietary vendor and county health staff. As medication assisted treatment for opiate use disorder becomes more prevalent in county jail settings, this is another area of subcontracting. As jail systems integrate proprietary vendors and public staffing models, they can integrate all providers of care via their policies, procedures and performance measures.

C.  Initial Intake screening and assessment

The process of identifying the health needs of patients arriving into a jail setting is critical to lowering mortality and morbidity. There are two basic steps to the intake screening and assessment during jail admission, a pre-admission health screening, an initial intake health assessment. While the completion of a comprehensive intake screening and assessment represents a best practice in jail settings, this objective can be met by combining these steps in different workflows. The lens of mortality and morbidity reduction may be limited to the time and place of incarceration and can inform the type and timing of work conducted during the intake process. Because many people entering a jail setting leave within 24-48 hours, and because this period represents an extremely high-risk time for death from physical and behavioral health problems, the intake process represents one of the jail's most important opportunities to reduce mortality and morbidity among patients. The strength of the intake screening and assessment steps relies not only on the performance of standardized encounters, but the flow of information

9

Ex. D - 341

DUNSMORE0115376

Community Oriented Correctional Health Services

from one encounter to the next, and from sources of information outside the jail into these encounters, including hospitalizations, community prescriptions, medical observations from the courts and police, and the state or county health information exchange.

The pre-admission health screening encounter (also referred to a 'safe to detain' and 'receiving screening' encounter) occurs before a person enters the jail custody and serves the purpose of identifying high risk patients who merit direct referral to a higher level of care outside the jail before admission, or who can be expedited for subsequent intake care after admission.[18] This process focuses on using a standardized screening  tool to collect information about current medications recent injury, acute illness and any serious medical or behavioral health problems, including withdrawal-related concerns. Screenings that occur before entry to the jail, also represent the first spot on the intake workflow for health staff to access prior medical records, community pharmacy records, and the State's health information exchange to obtain information that would inform hospital transfer, expediting of subsequent care, or diversion to community-based treatment and enrollment with Medicaid.[19] Reducing in-jail mortality at this point requires the ability to refer high-risk patients to appropriate settings, including Emergency Departments. An emerging best practice includes the diversion of people with the sole problem of intoxication to recovery centers that can provide medical monitoring, connection to treatment and other support in a manner that is safer and more cost effective than the jail intake process.[20]

---

[18] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JE-02.
[19] Arraignment Screening Unit. Vera Justice Institute. 2/2017. Available at https://www.vera.org/publications/the-enhanced-pre-arraignment-screening-unit.
And
The Patient Protection Act and Jail Intake Enrollment. National Association of Pretrial Services. 2/2016. Available at http://www2.centerforhealthandjustice.org/sites/www2.centerforhealthandjustice.org/files/publications/ACA%20and%20the%20Pretrial%20System%20(Appendix%20A-%20Cook%20County)%20-%20NAPSA%202014%20(1).pdf
[20] Jarvis S. et. al. Public Intoxication: Sobering Centers as an Alternative to Incarceration, Houston 2010-2017. 4/2019. Available at https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2018.304907
And
Kaplan T, New Twist on Drunk Tank to Open in San Jose. Mercury News. 8/8/17. Available at https://www.mercurynews.com/2017/07/31/new-twist-on-drunk-tank-to-open-in-san-jose/

Ex. D - 342

DUNSMORE0115377

Community Oriented Correctional Health Services

The next step in the intake and screening assessment is the initial health assessment. This encounter is the first contact between correctional health staff and a patient who has been admitted into the jail. This encounter is generally protocol-driven, conducted by nursing staff, and occurs before a patient is housed in the facility, with a focus on finding acute and chronic medical issues, ensuring timely access to medications, and referral to physician evaluation and other assessments or care that are urgent. Patients are generally asked standardized questions about physical and behavioral health history during these encounters, have their vital signs checked, and may have some brief or focused physical examination also performed, such as auscultation of lungs and peak flow testing for patients who report asthma. This also represents the point in time when initial withdrawal screening tools are conducted to initiate symptom surveillance. Patients who present with abnormal vital signs or who meet pre-defined criteria in nursing protocols are referred for immediate evaluation by a physician or mid-level provider, while patients with low risk profiles are cleared for housing. Patients who present without any abnormal vital signs or other concerning signs and symptoms, but who report chronic medical or mental health concerns during this encounter are referred for chronic care clinic or mental health encounters, and nursing protocols guide the urgency of these referrals.[21]

For patients who meet criteria for higher level assessment based on abnormal vital signs and history or symptoms of acute and chronic health problems, nursing staff refer patients for evaluation by physicians or mid-level providers including physician assistants and nurse practitioners. These encounters involve obtaining a complete medical, surgical, oral health and behavioral health history from each patient, conducting a comprehensive physical examination,

And
Information regarding the HIE in CA is available at https://www.ca-hie.org/initiatives/hie-in-ca/

[21] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JE-04.

Ex. D - 343

DUNSMORE0115378

Community Oriented Correctional Health Services

obtaining vital signs and laboratory tests, and making referrals for chronic care, specialty care and other needed treatment. In jail systems that take a public health approach, this  higher-level encounter can be routine for every newly admitted patient at the time of intake. This approach requires a greater investment in physician and mid-level staffing, but is used when the lens of mortality and morbidity reduction extends beyond the time and place of incarceration. Another approach is to wait up to 14 days for a higher-level assessment, which generally results in at least half of all people admitted to jail leaving without this encounter. This promotes cost savings for the jail health services, but misses the opportunity to identify and address serious health problems after release (by facilitating initiation of care or continuity of care). Conducting a more comprehensive assessment during the initial intake time also allows for more accurate identification of complex or co-morbid health problems, including very commonly overlapping issues from mental health crises, substance use intoxication and withdrawal and medical problems from liver disease, epilepsy, diabetes and cardiovascular disease.

The ability of these processes to identify high-risk patients and lower their risk of death or disability relies not only on the integrity of the individual encounters, but the system of information transfer that ensures information is integrated between encounters and results in appropriate action. For example, encounters with a patient may elicit a concerning medical history, abnormal vital signs, and prior medical health crisis documented in the medical record. If these elements are detected at different encounters, there must be a process whereby each encounter includes review of the prior records, and failure to conduct this review is knowable by quality assurance staff. Use of a standardized template in the electronic medical record allows for this type of review and can also include a dedicated question for staff about whether they reviewed prior/relevant records during each encounter. This approach, combined with policies about the timeframes and completeness of these encounters that are linked to monthly

**Ex. D - 344**

DUNSMORE0115379

Community Oriented Correctional Health Services

measurement of performance on these metrics, is critical to ensuring the quality of the intake process.

D. Staff training

Appropriate training of correctional health and security staff represents a best practice for reducing mortality and morbidity among incarcerated people.[22] Training of staff is essential during the initial orientation period, but ongoing, regular training is also required for health and security staff. Many of the basic elements of health staff training that are routine in community settings are also critical in correctional settings, including infection control and patient safety. Health staff require training on the expectations of their roles, and how their roles intersect with other parts of the health service, as well as the security service.

Many elements of staff training are most effective when security and health staff train together. One of the most critical areas of training for all uniform and civilian staff in a jail is suicide prevention.[23] Suicide is the leading cause of death in U.S. jails, and a best practice is for all jail staff to be trained on suicide prevention. For staff who often respond to patients in mental health crisis, implementation of crisis intervention teams (CIT) that involve co-response by security and health staff is an important tool for reducing morbidity and mortality. Other standard areas of staff training that support mortality and morbidity reduction include sexual abuse training (that meets Prison Rape Elimination Act standards) and training on disability accommodation.

For staff who respond to medical emergencies, the use of 'man down' drills help ensure a timely and appropriate response to medical emergencies. These unannounced drills generally include medical, nursing and security staff, the same team that would respond to an actual medical

---

[22] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JC-01-09.

[23] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2015, MH-01-08.

**Ex. D - 345**

DUNSMORE0115380

emergency. Health staff also benefit from structured training on medical ethics that identifies the issues of abuse, neglect and dual loyalty that contribute to patient mortality and morbidity in correctional settings.[24] This training can be integrated or stand-alone from the training also required for prevention and reporting of sexual abuse, much of which is detailed in the Prison Rape Elimination Act.

Prior to the initiation of initial hiring, and during ongoing annual review, a best practice involves the review of the credentials of all health staff to ensure compliance with mandated laws, professional requirements and policies and procedures.[25]

E.  Medication management

Access to appropriate medications in a clinically appropriate timeframe represents a best practice in reducing mortality and morbidity in jail settings.[26] Medication management starts with the first contact between health staff who screen patients before entry to the jail, and includes medical, nursing and pharmacy staff throughout their incarceration. Basic elements of medication management include prescribing by physicians and mid-level providers, review and profiling of prescriptions by pharmacy staff, and administration/dispensing/education about medications to patients by nursing and pharmacy staff. Best practices provide several tools for ensuring continuity of medications in jail. One option employed by some settings is to contract with community services that can verify the current and recent medication prescription for incoming patients. Another method involves use of an electronic medication administration

---

[24] Correctional Health Professionals' Response to Inmate Abuse. NCCHC Position Statement. 10/2007. Available at https://www.ncchc.org/correctional-health-care-professionals%E2%80%99-response-to-inmate-abuse.
And
Glowa Kollisch S. et. al. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Health of Vulnerable Patients in Jail. HHR. 7/2015. Available at https://www.hhrjournal.org/2015/03/data-driven-human-rights-using-dual-loyalty-trainings-to-promote-the-care-of-vulnerable-patients-in-jail/.
[25] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JC-01.
[26] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JD-01,02

14

Ex. D - 346

DUNSMORE0115381

Community Oriented Correctional Health Services

record inside the jail that triggers a clinical encounter when medications are missed or refused.

Another approach to this best practice involves establishing a clear policy for intake providers

on how and when to prescribe bridge medications when a patient arrives in jail but has not yet

been seen by mental health, substance use disorder or specialty providers. Another strategy to

promoting medication management involves a 'keep on person' approach that allows many

patients to pick up their medications once a week and take their medications on their own, as

prescribed.[27] This approach is particularly common for patients with chronic medical problems

who take daily medications and serves to increase engagement of patients in their own care.

This approach is often matched to the panel of patients who are seen in the chronic jail care

clinic, but can also be utilized for short term medication needs, such as pain relief after minor

injuries. For patients who require more support around medications, daily administration with

nursing or pharmacy staff may be preferable, including patients with uncontrolled symptoms of

medical and mental health problems. In addition, DEA controlled substances or medications that

are commonly diverted, such as suboxone, methadone, opiate based pain medicines, are

generally administered with nursing contact.


A pharmacy committee comprised of members from all disciplines of the health service,

including medical, nursing, mental health and addiction is part of medication management and

works to establish the overall program and review the drug formulary, policies and procedures,

performance measures and sentinel events relevant to pharmacy and medication concerns.

Performance measures of medication management often include the timeliness of medication

administration and adequacy of missed medication documentation. In the San Francisco jail, the

Pharmacy and Therapeutics Committee is a multidisciplinary group that meets quarterly to

review availability of medications, the formulary and data concerning medication access,

---

[27] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JD-01,02

**Ex. D - 347**

DUNSMORE0115382

utilization and outcomes.[28] One aspect of this work that relates to whether the focus of the
correctional health service is limited to the time and place of incarceration is how and when
community medications are continued inside jail. This area of work can include the use of bridge
orders and verification of community prescriptions to promote continuity of medications.

F.   Housing inmates with various health needs

Best practices in jail settings often includes several types of health-related housing programs. In
general, creation and staffing of dedicated jail housing units for patients with medical, mental
health and substance use concerns allows for provision of higher levels of care and increased
surveillance and monitoring. These housing areas are designed to increase contact,
surveillance and engagement between health staff and their patients and  the general approach
with these units is to increase health engagement and decrease isolation of patients.

Best practices for specialized housing relating to mental health care may include more than one
type of housing area.[29] For example, patients with serious mental illness in the jail setting
benefit from engagement with multiple types of therapy, including one-on-one talk therapy,
psychiatric care with medication management, nursing support, group therapy, art and
movement therapy. These approaches increase engagement in health services and decrease
injuries from use of force incidents.[30] Most large jails benefit from more than one level or type of
enhanced mental health housing area, and the ability to deliver care on these units relies on
clear distinctions about the profile of patients who will be housed on these units, and the training

---

[28] Introduction to JHS of San Francisco. 2011. Available at
https://www.sfdph.org/dph/hc/HCAgen/HCAgen2011/February%201/feburary%201%20jhs%20Overview%204-
10.pdf.
[29] NCCHC Suicide Prevention Resource Guide. 2020. Available at
https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf.
[30] Glowa-Kollisch S, et. al. From Punishment to Treatment; Clinical Alternatives to Punitive Segregation. Int J Pub
Hlth Res. 2/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/26848667.

Ex. D - 348

DUNSMORE0115383

Community Oriented Correctional Health Services

and roles of the health and security staff.[31] For patients who require higher levels of care for mental health crisis, those who are psychotic or acutely suicidal, best practices include assessment for referral to hospital inpatient care. Within the jail setting, two levels of housing are beneficial for patients with signs and symptoms of serious mental illness. A high-level unit that replicates much of the features of inpatient settings, including use of psychiatric technicians, multiple modalities of mental health services (individual, group, art, movement) and nursing and medical support is beneficial for patients with the most serious concerns. A step-down unit that allows for increased support and structure for patients who are more stable, but not able to be safe in general population settings is also important. While these units may be comprised of cell or dorm housing units, neither of them is operated as a lock-in unit, meaning that patients are not to be confined to cells for most of the day. An important feature of these units is that when patients express suicidal thoughts or engage in self-harm, the primary response does not involve  them being locked into a cell, whether the cell is labelled as a suicide watch or safety cell.[32,33]

Patients with higher levels of medical concerns are often held in a jail infirmary. This type of unit does not replace or provide a hospital level of care, but provides a place where 24-hour nursing and medical coverage can ensure safe return from hospital admission, as well as care for patients who are too ill to be in other settings.[34] Medical infirmaries also provide a setting where patients who need intravenous antibiotics, regular medical monitoring, wound care, or other higher levels of care can be more safely housed than general population housing areas. Admission to and discharge from medical infirmaries are clinical decisions, and fidelity to the

---

[31] NCCHC Suicide Prevention Resource Guide. 2020. Available at https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf.
[32] NCCHC Suicide Prevention Resource Guide. 2020. https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf
[33] Hayes L. Report on Suicide Prevention. 6/2018 Available at https://www.sdsheriff.net/documents/hayesreport.pdf.
[34] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JF-02.

**Ex. D - 349**

DUNSMORE0115384

clinical guidelines is important to ensure that patients who need this level of care are able to receive it. Major concerns in medical infirmaries include adequacy/level of staffing, infection control and potential interruption of care that is not delivered on the unit, such as mental health and substance use disorder treatment.

Dedicated housing areas are often utilized in jails for identification and treatment of both substance use withdrawal and substance use disorders. Prevention and treatment of withdrawal represents a high-risk area of care, since withdrawal from alcohol, benzodiazepine and opiates can be fatal and treatment of withdrawal requires a highly protocolized approach, administered under physician supervision, and with clear expectations about when patients will be transferred to the hospital.[35] In general, jail health services employ symptom severity tools such for patients in dedicated housing areas who are being treated for withdrawal. These units often have full time or at least regular nursing presence, as well as correctional staff with specialized training on the signs and symptoms of withdrawal. For patients receiving treatment for substance use disorder, the use of dedicated housing areas may be beneficial but is not essential. Specialized housing areas for people with co-occurring mental health and substance use diagnoses are often utilized, as is the case in the San Francisco jail.[36]

Best practices also include a clear plan for cohorting high-risk patients during influenza season or other communicable and infectious disease responses.[37] A best practice involves review of these plans before the start of every flu season with the local health authority as well as in response to novel threats, including the novel coronavirus, given the reality that the jail is part

---

[35] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JG-06.
[36] Introduction to JHS of San Francisco. 2011. Available at https://www.sfdph.org/dph/hc/HCAgen/HCAgen2011/February%201/feburary%201%20jhs%20Overview%204-10.pdf.
[37] Maruschak L. et.al. Pandemic Influenza and Jail Facilities and Populations. Am J Pub Hlth. 10/2009. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4504367/

Ex. D - 350

DUNSMORE0115385

Community Oriented Correctional Health Services

of, and impacted by outbreaks in the community. An important element to these plans involves use of the electronic medical records to identify high-risk patients and how they will be transferred and subject to increased medical surveillance, as well as what physical and staffing resources would be needed per housing area of cohorting.

Additional housing area cohorts may be developed that include women who are pregnant, jail-based nurseries for women and their infant children, persons with disabilities and sheltered housing for older or infirm patients.

The success of any of these specialized health-related housing approaches is based on cooperation and communication between health and security staff. While legitimate issues  exist about protecting the rights of patients to confidentiality, these concerns are addressable when all staff who work on the units undergo joint training based on clear policies about roles and responsibilities and also conduct regular unit team meetings.

G. Summary and recommendations

These recommendations reflect COCHS effort to collect and promulgate the best practices for large jail systems that may reduce the rate of mortality and morbidity in the San Diego jail system. COCHS has not conducted a financial analysis of the costs of these recommendations and has not analyzed which services could be eligible for alternative funding. We recommend that the policy makers of San Diego County determine the following in order to apply these best practices:

1. Determine whether it is the policy of the Board of Supervisors and the Sheriff to limit health services delivery to use the place and point of incarceration or is it the policy to use the place at point of incarceration as an opportunity to improve overall public health and the health status of incarcerated individuals?

19

**Ex. D - 351**

DUNSMORE0115386

Community Oriented Correctional Health Services

2. Determine based on the broad policy above, how San Diego can design policies to meet the goals limited to place and point of incarceration or policies to use incarceration as one point in a continuum of health services for justice-involved individuals, i.e., is the policy goal to embed a robust clinical quality improvement program with the performance metrics in all areas identified above?

3. Determine whether and how the policies of the Board of Supervisors and the Sheriff allow for clear hierarchy development and for the funding of capital and operational needs in order to implement best practices based on the broader policy issues, because integrating best practices into a correctional setting requires both capital and operational investments.

As the policy makers in San Diego address these three elements, the appropriate model of care can be designed, with best practices tailored to the model. Consideration of a single concern, infectious disease, can exemplify how different standards would apply depending on interpretation of the questions above. If health concerns are limited solely to the time and place of incarceration, jail health services would generally confine their work to identification of active pulmonary tuberculosis, active HIV, Hepatitis as well as symptomatic sexually transmitted infections including chlamydia and gonorrhea and syphilis. This would focus correctional health services on detecting and treating health problems most likely to create short term morbidity and mortality. For example, this approach might include reliance on a PPD skin test for tuberculosis screening only after the first week of incarceration, to avoid testing patients who leave quickly, and to focus care only on patients who have a positive PPD followed by an x-ray raising concerns for pulmonary tuberculosis, not for patients with latent tuberculosis infection. If these questions were determined in to include health concerns beyond the time and place of incarceration, then the jail health service would screen for latent tuberculosis infection and likely switch to a blood test so that people can have their results recorded and integrated into care even if they leave the jail. Screening and treatment for Hepatitis C and asymptomatic sexually

20

Ex. D - 352

DUNSMORE0115387

Community Oriented Correctional Health Services

transmitted infections would also become a priority in a broader model, and people identified with these concerns would be connected to care upon release, and their results shared with their providers.

The covid19 Pandemic underscores the challenges that San Diego county faces in the absence of having set an implicit or explicit policy about the role of correctional health services within the overall healthcare delivery system of San Diego county

If the jail health services are limited to a point of time and place, the strategic investments The County would make in reference to the pandemic are different than the investments that the county would make if they perceive the jail as part of the overall healthcare delivery system in The County. For example, is the overall strategic goal in reference to the pandemic and corrections to limit the spread of covid19 within the jail versus an overall strategic goal to make sure that individuals who are infected and released from the jail don't spread the infection to the community?

The scope of COCHS Engagement did not enable us to determine which model is actually operational in the jail nor to determine the extent to which the procedures and processes were conforming to policies that had been implicitly or explicitly selected by either the board or the San Diego County Sheriff.

**Ex. D - 353**

DUNSMORE0115388

Community Oriented Correctional Health Services

**Examples of Best Practices that are Cited or Referred to in this Report**

The following represent examples of best practices that may be relevant to the San Diego Jail system. Because of the large number of possible best practices, the first step towards determining which of these, and other standards are relevant requires that the County first determine the answers to the questions posed in the summary section. That will allow for design of a model of care, and determination of which best practices should apply.

Quality Promotion and Oversight
*Community quality assurance and improvement.* Dzau, V. Improving the Safety and Quality of Healthcare. National Academy of Medicine, 09/2016. Available at https://www.ahrq.gov/sites/default/files/wysiwyg/news/events/ahrq-research-summit/dzau-summit2016.pdf.

*Correctional quality assurance and improvement.* Stern M, Greifinger R, Mellow J, Patient Safety: Moving the Bar in Prison Health Care Standards. Am J Pub Health. 11/2010. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2951964/.

*Community quality assurance and improvement.* National Initiative Aimed at Reducing Maternal Deaths Shows Early Signs of Improvement in Severe Maternal Morbidity. American College of Obstetrics and Gynecology. 02/2018, Available at https://www.acog.org/About-ACOG/News-Room/News-Releases/2017/National-Initiative-Aimed-at-Reducing-Maternal-Deaths?IsMobileSet=false.

*Community quality assurance and improvement.* Reducing Preventable Inpatient Mortality. The Joint Commission, Journal on Quality and Patient Safety, 09/2013. Available at https://www.jcrinc.com/-/media/deprecated-unorganized/imported-assets/jcr/default-folders/items/journal_sample_articlepdf.pdf?db=web&hash=37FBE6328F9862C8C2E3B9E6AD565A74.

*Community quality assurance and improvement.* Improving Patient Safety in Nursing Homes. Agency for Healthcare Research and Quality (AHRQ), 02/2016. Available at https://www.ahrq.gov/sites/default/files/wysiwyg/professionals/quality-patient-safety/patientsafetyculture/nursing-home/resources/nhimpptsaf.pdf.

*Correctional quality assurance and improvement.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-05.

*Correctional quality assurance and improvement.* Implementing Evidence-Based Practice in Community Corrections: Quality Assurance Manual
Accession Number: 021258 2005. National Institute of Corrections. Available at https://nicic.gov/implementing-evidence-based-practice-community-corrections-quality-assurance-manual-0.

**Ex. D - 354**

DUNSMORE0115389

Community Oriented Correctional Health Services

*Correctional quality assurance and improvement.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-06.

*Correctional quality assurance and improvement.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-09.

*Correctional quality assurance and improvement.* Sentinel Events Approach to Addressing Suicide and Self Harm in Jail. Vera Institute of Justice, Available at https://www.vera.org/projects/a-sentinel-events-approach-to-addressing-suicide-and-self-harm-in-jail/learn-more

*Correctional quality assurance and improvement.* Spinaris C, Denhof M, Countering Staff Stress. Impact of Trauma Exposure. National Jail Exchange, National Institute of Corrections. 2015. Available at https://i nfo.nicic.gov/virt/sites/info.nicic.gov.virt/files/06Impact_of_Traumatic_Exposure.pdf.

*Correctional quality assurance and improvement.* Jacobs LA, Giordano SNJ. "It's Not Like Therapy": Patient-Inmate Perspectives on Jail Psychiatric Services. Adm Policy Ment Health. 04/2018 Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5811330/.

*Correctional quality assurance and improvement.* Tanguay S, Trestman R, Weiskopf C. Patient health satisfaction survey in Connecticut correctional facilities. J Correct Health Care. 04/2014  Available athttps://www.ncbi.nlm.nih.gov/pubmed/24659759.

*Correctional quality assurance and improvement.* Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, Venters H. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. J Correct Health Care. 10/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/27742860.

*Correctional quality assurance and improvement.* Sauter J, Vogel J, Seewald K, Hausam J, Dahle KP. Occupational Factors and their Correlates to Prison Climate and Inmates' Attitudes Towards Treatment. Front Psychiatry, 10/2019. Available at https://www.ncbi.nlm.nih.gov/pubmed/31736801.

*Correctional quality assurance and improvement.* Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. LGBT Health. 04/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/26745813.

*Correctional oversight.* Cook County Performance by Office, Star Report. 01/2011. Available at https://www.ccachicago.org/wp-content/uploads/2015/08/STAR_Performance_by_Office_110701.pdf.

23

**Ex. D - 355**

DUNSMORE0115390

Community Oriented Correctional Health Services

*Correctional oversight.* New York City Health and Hospitals, Board of Directors Meeting Minutes, p53. 10/2016. Available at https://www.nychealthandhospitals.org/wp-content/uploads/2016/10/201610-board.pdf.

*Correctional oversight.* Health Officer Inspection Report, Alameda County Jail. 11/8/2018. Available at http://www.acgov.org/board/bos_calendar/documents/DocsAgendaReg_11_8_18/PUBLIC%20P ROTECTION/Regular%20Calendar/Health_officer_jail_inspection_reports_11_8_18.pdf.

*Correctional oversight.* Access to Health and Mental Health Care (January-December 2018) 06/2019, NYC Board of Correction. Available at https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/Health_Access/4b_Access%20Report%202018%20Review_Final_June%202019.pdf.

Initial Intake Screening and Assessment
*Jail health services and structure.* Jails: Inadvertent Healthcare Providers. Report from The Pew Charitable Trust. 01/2018. Available at https://www.pewtrusts.org/en/research-and-analysis/reports/2018/01/jails-inadvertent-health-care-providers.

*Community health quality metrics.* Agency for Healthcare Research and Quality Key Drivers 2 (Data-driven quality improvement) and 3 (Optimize health information systems to drive data-driven practice). Available at https://www.ahrq.gov/evidencenow/tools/ehr-data-quality.html.

*Jail health services and structure.* MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, Venters H. Feasibility of Treating Hepatitis C in a Transient Jail Population. Open Forum Infect Dis. 07/2017.Available at https://www.ncbi.nlm.nih.gov/pubmed/28852680.

*Jail health services and structure.* Abe CM, Aguwa M, Zhao M, Sullivan J, Porsa E, Nijhawan AE. Public Health Rep. Hepatitis C Virus Infection in the Dallas County Jail: Implications for Screening, Prevention, and Linkage to Care. Available at https://www.ncbi.nlm.nih.gov/pubmed/31530093.

*Jail health services and structure.* Hinchman A, Hodges S, Backus J Jr, Warholak T Implementation of Health Information Exchange at the Pima County Adult Detention Complex: Lessons Learned J Correct Health Care. 04/2018. Available at https://www.ncbi.nlm.nih.gov/pubmed/29661107.

*Jail health information systems.* Butler B. Health Information Exchange between Jails and their Communities. Perspectives in Health Information Management. Winter 2013. Available at http://bok.ahima.org/doc?oid=301194#.XjQ9WGhKg2w.

*Jail mortality.* Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, Venters H, MacDonald R. Death After Jail Release.

24

**Ex. D - 356**

DUNSMORE0115391

Community Oriented Correctional Health Services

J Correct Health Care. 01/2017. Available at https://www.ncbi.nlm.nih.gov/pubmed/28040993.

*Jail mortality.* Seijeoung K,  et. al. Deaths in the Cook County Jail: 10-Year Report, 1995–2004. *Journal of Urban Health. 04/2007.* Available at https://link.springer.com/article/10.1007%2Fs11524-006-9115-9.

*Jail mortality.* Brittain J[1], Axelrod G, Venters H. Deaths in New York City jails, 2001-2009. Am J Public Health. 02/2013. Available at https://www.ncbi.nlm.nih.gov/pubmed/23409900.

*Jail health services and structure.* Annual report to Budget Committee from Philadelphia Department of Prisons. 5/1/2018. Available at http://phlcouncil.com/wp-content/uploads/2018/04/FY19-Testimony_Prisons_submitted-to-Council-4.27.pdf.National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JE-02.

*Jail health services and structure.* Arraignment Screening Unit. Vera Justice Institute. 2/2017. Available at https://www.vera.org/publications/the-enhanced-pre-arraignment-screening-unit.

*Jail health services and structure.* The Patient Protection Act and Jail Intake Enrollment. National Association of Pretrial Services. 2/2016. Available at http://www2.centerforhealthandjustice.org/sites/www2.centerforhealthandjustice.org/files/publications/ACA%20and%20the%20Pretrial%20System%20(Appendix%20A-%20Cook%20County)%20-%20NAPSA%202014%20(1).pdf

*Jail health services and structure.* Jarvis S. et. al. Public Intoxication: Sobering Centers as an Alternative to Incarceration, Houston 2010-2017. 4/2019. Available at https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2018.304907

*Jail health services and structure.* Kaplan T, New Twist on Drunk Tank to Open in San Jose. Mercury News. 8/8/17. Available at https://www.mercurynews.com/2017/07/31/new-twist-on-drunk-tank-to-open-in-san-jose/

*Jail health information systems.* Information regarding the HIE in CA is available at https://www.ca-hie.org/initiatives/hie-in-ca/

*Jail health services and structure.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JE-04.

Staff Training
*Correctional training.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JC-01-09.

*Correctional training.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2015, MH-01-08.

**Ex. D - 357**

DUNSMORE0115392

*Abuse reporting and mitigation.* Correctional Health Professionals' Response to Inmate Abuse. NCCHC Position Statement. 10/2007. Available at https://www.ncchc.org/correctional-health-care-professionals%E2%80%99-response-to-inmate-abuse.

*Abuse reporting and mitigation.* Glowa Kollisch S. et. al. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Health of Vulnerable Patients in Jail. HHR. 7/2015. Available at https://www.hhrjournal.org/2015/03/data-driven-human-rights-using-dual-loyalty-trainings-to-promote-the-care-of-vulnerable-patients-in-jail/.

Medication Management
*Pharmacy and medication ordering.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JC-01.

*Pharmacy and medication ordering.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JD-01,02

*Jail health structure and services.* Introduction to JHS of San Francisco. 2011. Available at https://www.sfdph.org/dph/hc/HCAgen/HCAgen2011/February%201/feburary%201%20jhs%20Overview%204-10.pdf.

Housing Inmates with Various Health Needs
*Self-harm and suicide prevention.* NCCHC Suicide Prevention Resource Guide. 2020. Available at https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf.

*Self-harm and suicide prevention.* Glowa-Kollisch S, et. al. From Punishment to Treatment; Clinical Alternatives to Punitive Segregation. Int J Pub Hlth Res. 2/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/26848667.

*Self-harm and suicide prevention.* NCCHC Suicide Prevention Resource Guide. 2020. Available at https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf.

*Self-harm and suicide prevention.* Hayes L. Report on Suicide Prevention. 6/2018 Available at https://www.sdsheriff.net/documents/hayesreport.pdf.

*Medical housing.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JF-02.

*Medical housing.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JG-06.

*Medical housing.* Introduction to JHS of San Francisco. 2011. Available at https://www.sfdph.org/dph/hc/HCAgen/HCAgen2011/February%201/feburary%201%20jhs%20Overview%204-10.pdf.

**Ex. D - 358**

DUNSMORE0115393

Community Oriented Correctional Health Services

*Outbreak response.* Maruschak L. et.al. Pandemic Influenza and Jail Facilities and Populations. Am J Pub Hlth. 10/2009. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4504367/

**Ex. D - 359**

DUNSMORE0115394

# EXHIBIT E



# County of San Diego

| GLENN N. WAGNER, D.O. | MEDICAL EXAMINER'S DEPARTMENT | STEVEN C. CAMPMAN, M.D. |
| --- | --- | --- |
| CHIEF MEDICAL EXAMINER | 5570 OVERLAND AVE. STE 101. SAN DIEGO. CA 92123-1215 | CHIEF DEPUTY MEDICAL EXAMINER |
| (858) 694-2895 | http://www.sandiegocounty.gov/me | (858) 694-2895 |

## CALL INFO

| NAME OF DECEASED **RUPARD, Lonnie** | | AKA | HIO ☐ | CASE NUMBER 2022-01007 |
| --- | --- | --- | --- | --- |
| INVESTIGATOR Fernanda Sanchez | REPORTED BY Dr. Allen | REPORT NG AGENCY UCSD Medical Center | | PREVIOUS WAIVE # |
| CALL DATE AND TIME 3/18/2022      0132 | ARRIVAL DATE AND TIME 3/18/2022            0209 | | RETURN DATE AND T ME 3/18/2022            0252 | |

## DECEDENT

| DATE AND T ME OF DEATH 3/17/2022      2351 | DATE OF BIRTH 10/1/1975 | AGE 46 Years | GENDER Male | RACE Filipino, White |
| --- | --- | --- | --- | --- |
| RESIDENCE (STREET, CITY, STATE, ZIP) | | COUNTY | | LAST SEEN ALIVE 03/17/2022 |
| COUNTRY OF RESIDENCE | OCCUPATION | | | PA D AUTOPSY ☐ |

## DEATH

| LOCATION OF DEATH UCSD Medical Center | TYPE OF PLACE Hospital |
| --- | --- |
| ADDRESS (STREET, CITY, STATE, Z P) 200 W Arbor Dr, San Diego, California, 92103 | |

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INC DENT | INC DENT PLACE TYPE Jail, Prison, Detention Facility | AT WORK ☐ | AT RESIDENCE ☐ |
| --- | --- | --- | --- |
| ADDRESS (STREET, CITY, STATE, ZIP) 1173 Front Street, San Diego, California, 92101 | COUNTY San Diego | | |
| DATE AND TIME OF INC DENT 03/17/2022      Unk | INVESTIGAT NG AGENCY San Diego Sheriff | OFFICER Blumenshine | BADGE # 2137 | REPORT # 21-011838 |
| DECEDENT WAS | BELTED No | HELMETED ☐ YES ☒ NO | POSITION | ON PRIVATE PROPERTY ☐ YES ☐ NO |
| VEHICLE | LICENSE NUMBER | | STATE | |

## NOTIFICATION

| IDENTIFIED BY Dep. Costelow | METHOD Visually | DATE AND TIME 03/17/2022 |
| --- | --- | --- |
| FUNERAL HOME | PROPERTY ☒ YES ☐ NO | PUBLIC ADMINISTRATOR False ☐ YES ☒ NO | TYPE OF EXAM Autopsy |
| NAME OF NOK OR OTHER ▓▓▓▓▓▓ | RELATIONSH P Son | DATE NOT FIED 3/18/2022 | NOTIF ED BY |

Ex. E - 361

| | |
|---|---|
| **San Diego Medical Examiner**<br>**5570 Overland Avenue, Suite#101**<br>**San Diego, CA 92123-1206**<br>**(858) 694-2895** | **Case Number**  : 2022-01007<br>**Investigator**   : Fernanda Sanchez<br>**Date of Death**  : 03/17/2022<br>**Date Today**     : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

### Antemortem Events:

On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

### Past Medical, Surgical, and Social History:

On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, ▇▇▇▇▇▇▇▇, and his ex-wife, ▇▇▇▇▇▇▇. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named ▇▇▇▇ with whom he had a son named ▇▇▇▇▇▇▇. The decedent also had a son with ▇▇▇▇ named ▇▇▇▇▇▇▇. He had a third child who was reported to have died in October 2018 ▇▇▇▇▇ The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

### Scene Description:

On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

### Body Description:

I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

**Ex. E - 362**

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet. The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

Ex. E - 363

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.


Signed: _____

Fernanda Sanchez
Medical Examiner Investigator

**Date Signed:** 03/19/2022

**Approved by:** _____

Ex. E - 364



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

### MEDICAL EXAMINER'S DEPARTMENT

5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215

http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH:     PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

    Contributing:     SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH:     HOMICIDE

AUTOPSY SUMMARY:

I.    History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
    A.    Malnutrition and dehydration.
        1.    Height 69 inches, weight 105 pounds with a body mass index of 15.5.
        2.    Subcutaneous fat thickness 0.1 cm.
        3.    Decreased skin turgor.
        4.    Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
    B.    Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
    C.    Superficial pressure sores of back and right foot.

II.    SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III.    Pulmonary emphysema, moderate.

**Ex. E - 365**

AUTOPSY REPORT                        -2-                    LONNIE RUPARD 2022-1007


IV.    Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V.     Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI.    Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation
       Report FA-22-0000070.

VII.   Resuscitation-related injuries.
       A.    Anterior rib fractures.
       B.    Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of
             hemopericardium.


OPINION:  According to investigative information and review of records provided by the
San Diego County Sheriff's Department, on the early morning hours of December 19,
2021, this 46-year-old man was arrested by National City Police for a parole violation, and
directly booked into San Diego Central Jail.  The arresting officer reported the decedent
had a history of psychotic disorders with combative, assaultive, or hostile behavior.  During
intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165
pounds, respectively.  He answered "no" to all the general medical assessment questions,
mental health screening questions, suicide risk assessment, substance use assessments,
and miscellaneous assessments.  During intake medical examination by a staff nurse, his
vital signs were stable.   He was described as alert and oriented x2, disheveled in
appearance, and verbally abusive but directable.  He refused a COVID-19 test.  He was
placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric
illness on extensive medications, prior treatment at Patton State Hospital and maintenance
on mediations during previous incarceration.  Psychiatry was onsite but decedent refused
evaluation.   It was rescheduled for December 23, 2021; however, it was rescheduled
several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation.  The progress
note stated that he had a history of unspecified schizophrenia and other psychotic
disorders, ███████████████████████████████████████████████████████
███████████████████████████████████████████████████  The evaluation
occurred cell-side.  The psychiatrist noted he had fair hygiene, was shirtless but wearing
pants, and was standing by the cell door.  During the interview, he was irritable and
uncooperative.  He yelled and was verbally aggressive.  His mood was unable to be
assessed due to lack of cooperation.  He was deemed in no apparent distress, with no
signs of being a danger to self or others.  The psychiatrist's plan was to offer/start previous

AUTOPSY REPORT                    -3-                    LONNIE RUPARD 2022-1007

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

AUTOPSY REPORT                      -4-                    LONNIE RUPARD 2022-1007

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

AUTOPSY REPORT                              -5-                          LONNIE RUPARD 2022-1007

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, ███████████████████████████████████████
███████████████

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

AUTOPSY REPORT                    -6-                    LONNIE RUPARD 2022-1007

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

Ex. E - 370

AUTOPSY REPORT                           -7-                    LONNIE RUPARD 2022-1007

IDENTIFICATION:   The body is received in a white body pouch sealed with tamper resistant read seal number "4950349."  The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993."  A yellow disposable tarp covers the body.  The body is resting on a green fitted sheet.  The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number.  A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened.  There are no evidence bags on the head, hands, and feet.  A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES:   I am assisted by Forensic Autopsy Specialist Stephen Hannum.  Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY:   The body is clad in a short-sleeve blue shirt with green tag.  There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:
1.    Blue stripped long-sleeve sweatshirt.
2.    Pair of brown and black boots.
3.    Disposable blue face mask.
4.    Blue pants.
5.    Gray tank top.
6.    Black briefs.
7.    White and yellow metal wristwatch.
8.    In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:
1.    An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2.    An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3.    A triangular defibrillator electrode is on the mid chest.  An oval defibrillator electrode is on the mid chest.  A rectangular defibrillator electrode is on the lateral left chest.

AUTOPSY REPORT                          -8-                          LONNIE RUPARD 2022-1007

       A rectangular defibrillator electrode is adhered to the cut shirt.
4.     EKG electrodes are on the chest and abdomen.
5.     A pulse oximetry monitor is on the left index finger.
6.     Disposable blood pressure cuff is secured around the left upper arm.
7.     A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1.     Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

Ex. E - 372

AUTOPSY REPORT                          -9-                      LONNIE RUPARD 2022-1007

2.    A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3.    A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the
      vermillion border.

TATTOOS:  Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES:  Rigor mortis is overcome with minimal force in the upper
and lower extremities, neck, and jaw.    Livor mortis is posterior, purple-red and
nonblanching to pressure.    The body is cool (refrigeration).    There is early green
putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is
on the lateral left back overlying the lateral edge of the scapula.  Just lateral to this are
areas of pink-tan skin slippage.  Similar appearing ulcerated pink-tan lesions covered with
tan fibrinous material are on the lateral right back and posterior right shoulder ranging from
3/16 x 1/8 inch up to 3/4 x 1/2 inch.    A pink-red 1 x 1/2 inch lesion without central
ulceration is on the right posterior superior iliac crest.    A pink-red superficial ulcerated
lesion 5/16 x 1/8 inch is on the superior left sacral region.  Two areas of central intact skin
surrounded by erythematous skin without definitive central ulceration are on the superior
sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4
inch.    A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral
region.  Punctate and coalescing ulcerated lesions with peripheral erythema and central
tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the
lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow.  The
center of the lesion has tan fibrinous material.  A healing ulcerated lesion 1/2 x 1/4 inch is
on the dorsal left forearm just below the elbow.  It is covered with a tan soft fibrinous
material.

**INJURIES, EXTERNAL AND INTERNAL**

*There are blunt force injuries of the head, neck, torso, and extremities.  They are
described by body region and labeled "A" through "C" for descriptive purposes only; no
sequence is implied.*

A.    BLUNT FORCE INJURY OF HEAD AND NECK:
      A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal
      scalp.    A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal
      scalp just within the receding hairline.    A curvilinear 1/2 x 1/16 inch pink-red
      abrasion is on the superior right forehead.    A scabbed red-brown 1/16 inch

AUTOPSY REPORT                    -10-                    LONNIE RUPARD 2022-1007

diameter abrasion is on the mid forehead.  A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow.  A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow.  A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead.  A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow.  A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum.  A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter.  A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek.  A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit.  A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek.  An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin.  A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage.  A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right.  A similar 1 cm in diameter defect is on the left frontal skull.  There is no defect on the inner table of the skull.  The bone of the skull is thickened.  There are no skull fractures.  There is no epidural or subdural hemorrhage.  The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter.  A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch.  Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B.    BLUNT FORCE INJURY OF TORSO:
A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle.  A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle.  A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch.  Pink-red ecchymosis is on the mid chest.  Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter.  Two linear partially interrupted partially scabbed tan pink-red

**Ex. E - 374**

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C.    BLUNT FORCE INJURY OF EXTREMITIES:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

AUTOPSY REPORT                    -12-                    LONNIE RUPARD 2022-1007

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES:  The organs are in their normal situs.  The diaphragm is intact.  The abdominal fat pannus measures 0.1 cm.  There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation.  There are no pericardial adhesions.  There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities.  There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM:  The heart weighs 280 grams.  There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations.  The remaining epicardial surface is smooth and glistening.  The heart has an overall normal shape.  The coronary arteries have a normal origin and follow a right dominant course.  They are widely patent.  There is no atherosclerotic stenosis.  The ventricles are not dilated.  The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively.  The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis.  The endocardial surfaces and four cardiac valves are unremarkable.  The coronary ostia are patent.

The aorta is elastic without atherosclerosis.  The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM:  The right lung weighs 480 grams, and the left weighs 1030 grams.  Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe.  There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces.  The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM:  The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass.  The gallbladder contains 10 mL of green, viscid bile without calculi.  The mucosa is unremarkable.  The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM:  The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern.  There are

Ex. E - 376

AUTOPSY REPORT                    -13-                    LONNIE RUPARD 2022-1007

no lymph node enlargements.  Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM:  The esophagus and gastroesophageal junction are unremarkable.  The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles.  There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus.  The ulcer base is tan-green with no hemorrhage.  The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine.  There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage.  The appendix is present.

GENITOURINARY SYSTEM:  The right kidney weighs 140 grams, and the left weighs 150 grams.  The capsules strip with ease from the smooth, red-brown subcapsular surfaces.  The corticomedullary architecture is unremarkable.  The pelves are not dilated.  The ureters maintain uniform caliber into an unremarkable urinary bladder.  The bladder contains 130 mL of dark yellow urine.  The prostate gland is symmetrical and unremarkable.  The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM:  The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts.  The adrenal glands have the usual golden cortical ribbon and unremarkable medullae.  The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM:  The skeletal system is normally developed.  The ribs are not brittle.  The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section.  The clavicles, sternum, vertebrae, and pelvis are without fracture.  The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD:  Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage.  Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone.  The skull is thickened on the cross section.  There is no epidural or subdural hemorrhage.  The skull is otherwise normally formed.  There are no skull fractures.

CENTRAL NERVOUS SYSTEM:  The unfixed brain weighs 1290 grams.  The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK:  There is an endotracheal tube in situ.  The trachea and larynx are patent and lined by smooth, tan mucosa.  The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture.  The anterior strap muscles and paratracheal soft tissues are without hemorrhage.  The cervical vertebrae are intact without hemorrhage or fracture.  The tongue has no bite mark or hemorrhage.

AUTOPSY REPORT                     -14-                LONNIE RUPARD 2022-1007

## **SPECIMENS**

<u>TOXICOLOGY:</u>   The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

<u>MICROBIOLOGY:</u>   Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

<u>HISTOLOGY:</u>  Portions of tissues and major organs are retained in formalin.  Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

<u>PHOTOGRAPHS:</u>   Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

<u>X-RAYS:</u>  Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

Ex. E - 378

AUTOPSY REPORT                    -15-                    LONNIE RUPARD 2022-1007

## MICROSCOPIC EXAMINATION

<u>HEART (2 sections)</u>:  Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates.  There are few scattered chronic inflammatory cells in the epicardial adipose tissue.  The epicardial and myocardial vessels are unremarkable.

<u>LIVER (1 section)</u>:  Section shows normal hepatic architecture.  There is sinusoidal congestion.  There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

<u>LUNGS (5 sections)</u>:  Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis.  The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils.  Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung.  There is no hyaline membrane formation.  The airways of the right lung are unremarkable.  There are no chronic bronchial asthmatic changes.  The vessels are congested without thrombosis.  There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3).  Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4).  There is no significant fibrin deposition and no hyaline membrane formation.  Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli.  There is no foreign material noted in the areas of inflammation.  The large bronchi are unremarkable. The vessels are congested and unremarkable.

<u>KIDNEY (1 section)</u>:  Section shows rare senescent glomeruli.  The glomeruli are otherwise unremarkable.  The tubular epithelium is autolyzed.  There is no tubulointerstitial fibrosis or inflammation.  The vessels are congested and unremarkable.

BS:cmh
D:  3/19/22    T:  3/21/22
Rev.  2/27/23 cmh



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

### DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA  92123-1206
TEL: (858) 694-2895   FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| **Alcohol Analysis (GC/FID-Headspace)** | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| | | |
| **Drugs of Abuse Screen (ELISA)** | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| | | |
| **Base Screen (GC/MS)** | Peripheral Blood 1 | Not Detected |
| | | |
| **Acid/Neutral Screen (HPLC/DAD)** | Peripheral Blood 1 | Not Detected |
| | | |
| **Vitreous Chem Panel (Cobas c111)** | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: _____
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

**Ex. E - 380**

| *Outside Brain Autopsy Final Reports* |
|---|

| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
|---|---|---|---|
| | | Date Received: | 3/19/2022 09:35 PDT |

## Final Diagnosis

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| Outside Case Number: | 2022-01007 |
|---|---|
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*
*JKD*

## Neuropathology Gross

| Brain weight: | 1290 grams (fresh) |
|---|---|
| Plane of section: | Cerebrum: Coronal |
| | Cerebellum: Parasagittal |
| | Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

**LOMA LINDA UNIVERSITY PATHOLOGY LABORATORY**
11370 Anderson Street, Suite 2950
Loma Linda, CA 92354
(909) 558-2392
PJ Wat MD, GW Saukel MD, JC Kerstetter MD, HL Rojas MD – Directors

| Name: | **RUPARD, LONNIE** |
|---|---|
| MR#: | 06555376 |
| Encounter: | |
| DOB/Age: | 10/1/1975    46 years |
| Location: | LLU-FMO    Pathology Referrals |
| Physician: | Physician,Default |
| CC: | |
| Order ID: | |
| Page: | Page 1 of 2 |

**Ex. E - 381**

FIRST PAGE

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1:   Dura mater, pineal gland

A2:   Right orbitofrontal region with contusion

A3:   Right orbitofrontal region with contusion

A4:   Right hippocampus, mammillary bodies

A5:   Left hippocampus

A6:   Right frontal lobe parasagittal

A7:   Midbrain

A8:   Pons

A9:   Medulla, right cerebellar hemisphere

A10:  Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

**LOMA LINDA UNIVERSITY PATHOLOGY LABORATORY**
11370 Anderson Street, Suite 2950
Loma Linda CA 92354
(909) 558-2392
PJ Wat MD, GW Saukel MD, JC Kerstetter MD, HL Rojas MD – Directors

| | |
|---|---|
| Name: | **RUPARD, LONNIE** |
| MR#: | 06555376 |
| Encounter: | |
| DOB/Age: | 10/1/1975    46 years |
| Location: | LLU-FMO    Pathology Referrals |
| Physician: | Physician,Default |
| CC: | |
| Page: | Page 2 of 2 |

**Ex. E - 382**



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

**JONATHAN R. LUCAS, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| BACH, Keith Galen | | ☐ | 2023-03146 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Sandra Joseph | Sgt. Wilson | San Diego Central Jail | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 9/28/2023    0900 | 9/28/2023    1006 | |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 9/28/2023    0409 | 4/21/1960 | 63 Years | Male | White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| Chula Vista, California, 91911 | San Diego | |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| San Diego | HVAC Engineer | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| San Diego Central Jail | Jail, Prison, Detention Facility |

| ADDRESS (STREET, CITY, STATE, ZIP) |
|---|
| 1173 Front Street, San Diego, California, 92101 |

**SUMMARY**

The decedent was a 63 year old, married, White male who resided in Chula Vista.  On 9/25/2023, the decedent was in the custody of Chula Vista Police Department and taken to Scripps Mercy Hospital Chula Vista for medical clearance before booking into San Diego Central Jail.  Records indicate the decedent had an elevated glucose and an insulin pump which was beeping and would need to be refilled.  The decedent was booked into San Diego Central Jail and later that evening the decedent had a syncopal episode and was transported back to the hospital for evaluation.  He was discharged back to the custody of law enforcement officers.  San Diego Central jail records indicate the decedent refused medications including insulin.  On the morning of 9/28/2023, deputies found the decedent unresponsive and began cardiopulmonary resuscitation.  Medical staff was notified and 911 was called.  Resuscitation continued to no avail and death was pronounced on 9/28/2023.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Sudden and unexpected death.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| | |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| | San Diego Sheriff | Hugh Davidson | | 23141349 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☒ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Sandra Joseph | Circumstances | 09/28/2023 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATOR False | TYPE OF EXAM |
|---|---|---|---|
| | ☒ YES ☐ NO | ☐ YES ☒ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| ▇▇▇▇ | Wife | 9/28/2023 | |

Ex. E - 383

| San Diego Medical Examiner | Case Number | : 2023-03146 |
| 5570 Overland Avenue, Suite#101 | Investigator | : Sandra Joseph |
| San Diego, CA 92123-1206 | Date of Death | : 09/28/2023 |
| (858) 694-2895 | Date Today | : 02/10/2024 |

## INVESTIGATIVE NARRATIVE

**Decedent:** BACH, Keith

**Antemortem Events:**
On 9/28/2023, I obtained the following preliminary information from San Diego Sheriff Department Detective Hugh Davidson at San Diego Central Jail. On 9/25/2023, the decedent was arrested by Chula Vista Police Department and taken to Scripps Mercy Hospital Chula Vista for medical clearance for his diabetes. During booking into San Diego Central Jail, he became unresponsive and was transported to Scripps Mercy Hospital emergency room for evaluation. The decedent was evaluated, and he returned to San Diego Central Jail on 9/26/2023 at an unknown time. The decedent was last seen by nursing staff on 09/27/2023 and he received medications. The decedent was seen alive by Deputies on 9/27/2023 at 2309 hours and 9/28/2023 at 0240 hours. On the morning of 9/28/2023 at 0338 Deputies making a safety check found the decedent unresponsive and initiated cardiopulmonary resuscitation (CPR). Resuscitation continued and Faulk paramedic #18 responded to the scene and continued resuscitation to no avail and death was pronounced at 0409 hours.

The following information was obtained from Scripps Mercy Hospital medical records. On 9/25/2023 at approximately 1950 hours, the decedent was brought in by police for medical clearance for diabetes. The decedent was alert and oriented and his insulin pump was beeping. Fingerstick glucose was 265 and he was cleared for incarceration. Under "Medical Decision Making" it was noted the insulin pump would need to be refilled. He was discharged on 9/25/2023 at approximately 2030 hours diagnoses of acute hyperglycemia due to diabetes with medical clearance for incarceration.

The following information was obtained from Scripps Mercy Hospital medical records. On 9/25/2023 at approximately 2200 hours, the decedent was brought in by police with a complaint of syncope. The decedent was in custody of "CVPD" (Chula Vista Police Department) and had a witnessed syncopal episode at jail lasting approximately one minute. No seizure activity was observed, and he was incontinent of urine. On arrival to the emergency room the decedent was alert and oriented. Prior medical history was insulin dependent diabetes mellitus, hyperlipidemia and hypertension. Laboratory results were glucose of 141. He was discharged from the emergency room on 9/26/2023 at approximately 0200 hours with a diagnosis of Syncope, unspecified syncope type.

The following information was received from San Diego Central Jail medical records.
"Statcare Intake Assessment and Orders" dated 9/26/2023 at 3:49:06 hours noted a medical history of insulin dependent diabetes mellitus. Orders were to continue using the insulin pump, confirm metformin dose and add blood sugar checks. Medications ordered were amlodipine, atorvastatin, ▆▆▆▆ losartan, ▆▆▆▆▆▆ and metformin.

"Addendum for: Statcare Intake Assessment and Orders" dated 9/26/2023 5:49:06 hours noted the decedent was taking metformin and insulin pump. Notes also indicated the decedent reported his medication by insulin pump would be consumed on 9/27/2023.

"Statcare Intake Assessment and Orders" dated 9/27/2023 at 1:37:15 hours noted the decedent refused insulin.

Records titled "EMAR" noted medications and times of administration. Medications ordered were NovoLin R Insulin, Metformin, ▆▆▆▆▆▆▆▆ Losartan Potassium, ▆▆▆▆▆ Atorvastatin, Amlodipine

**Ex. E - 384**

Besylate and Famotidine.  Medications of Novolin, Metformin Levothyroxine, Losartan Potassium, Amlodipine and Famotidine were refused on 9/28/2023.

Per "Mandown Assessment" dated 9/28/2023 the medical team arrived on scene at 0340 hours with deputies performing cardiopulmonary resuscitation.  Nursing staff assumed resuscitation efforts and an Automated External Defibrillator (AED) was applied and no shock was advised.  It appears a blood sugar reading was taken with a note of "BS taken-Reading HI".  Paramedics arrived on scene at 0350 hours and assumed care.  Death was pronounced at 0409 hours.

**Past Medical, Surgical, and Social History:**
Per San Diego Sheriff Central Jail medical records, insulin dependent diabetes, ███████████

Of note decedent's property and home medications were provided to me by Detective Davidson.  The medications I collected were amlodipine, atorvastatin, ███████ insulin, losartan, ███████████

**Scene Description:**
On 9/28/2023 at 1006 I arrived at the scene, San Diego Central Jail, located at 1173 Front Street, San Diego CA with multiple San Diego Sheriff personnel present.  The incident location was module ██, Cell ████  At the time of my response to the scene, the decedent had been moved from the cell to the common area.

The Mini Medtronic pump had been removed from the cell prior to my arrival and was in a brown paper bag in the common area on a metal table.  The Mini Medtronic pump was beeping, and the screen display showed no message.  The insulin chamber of the machine appeared empty of liquid.   I was advised there was a message on the screen of the insulin pump prior to my arrival.  Deputies showed the image on their camera display.  I took a photo of the image digital display of the camera.   The image showed the insulin pump displaying "Auto Suspend 07:44  Insulin delivery suspended.  No buttons pressed within time set in Auto Suspend".

An Assure Prism glucometer on the same metal table displayed a reading of "HI" with a date time on the display of 09/28 and 0438 AM.

**Body Description:**
On 9/28/2023 I viewed the body of an obese, nude, White male lying supine on the concrete floor.  He was balding with gray hair, gray moustache with gray beard stubble.  The decedent was wearing a blue band on his left wrist with his name Bach, Keith Galen, date of birth 04/21/1960 and photo in the presence of numerous San Diego Sheriff Department personnel.

His head was turned to the right, left arm flexed at the elbow and left hand on his abdomen.  His right arm extended away from his torso.  His legs extended straight from his torso.  Articles of medical intervention on his body were oral airway, defibrillator pads and intraosseous line on his left lower leg.  The decedent's entire body was cold to the touch.   There was blanching purple mottled lividity on his face, sides of his torso and extremities.  Solid lividity was on his posterior surfaces.  Blanched areas were on his buttocks and posterior shoulders.  There was rigor of the jaw, neck, extremities and fingers.

There was no crepitus of his head or chest.  There appeared to be a small abrasion on the occipital scalp.  The decedent's eyes were blue and congested but without petechial hemorrhages.  Scant thin, blood-tinged fluid emanated from his mouth.  There appeared to be dried, brown emesis on his face.  No visible ligature marks.  There was no visible deformity of his extremities.  There were two large transparent dressings with plastic components on his left and right abdomen.  There was an abrasion on his sternum.  The decedent had old, well

**Ex. E - 385**

healed scars on his upper anterior shoulders and lower arms and reddened patches of skin beneath the scars. There were numerous small, scabbed areas on his arms, lower legs and on his posterior thigh. There were dark purple contusions on both his upper arms and one possibly on his right mid back.

On 9/28/2023 at 1103 hours, 92M Transport personnel Charles Campbell and Patrick Garcia placed the decedent on a clean sheet. Clean paper protective bags on the decedent's head, on his left hand at 1103 hours, on his right hand at 1104 hours, on his right foot at 1105 hours and on his left foot at 1106 hours. The sheet was tied, and the decedent was placed in a clean, white pouch. Red tamper evident seal #4387485 was affixed for transport to the Medical Examiner office at 1107 hours.

**Special Requests:**
Please contact Det. Hugh Davidson with autopsy time.

**Identification:**
The decedent was visually identified by Detective Hugh Davidson and identity confirmed upon review of his property including California Driver License #C3978555.

**Antemortem Specimens:**
Not applicable.

**Public Administrator:**
Not referred, family resides in Chula Vista.

**Other Important Factors:**
The decedent's Mini Medtronic insulin pump with a marking of RF: M994838A001 was collected as evidence. The clothing worn by the decedent was collected by San Diego Sheriff prior to my arrival.

Signed: _Joseph_____
          **Sandra Joseph**
          **Medical Examiner Investigator**

Date Signed: **12/29/2023**

Approved by: _____

**Ex. E - 386**

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER

**JONATHAN R. LUCAS, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER

### MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
**TEL: (858) 694-2895**  http://www.sdcounty.ca.gov/me/  **FAX(858) 495-5956**

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | KEITH GALEN BACH | **ME#:** | 2023-3146 |
| **Place of death:** | San Diego Central Jail 1173 Frost Street San Diego, CA 92101 | **Age:** | 63 Years |
| | | **Sex:** | Male |
| **Date of death:** | September 28, 2023; 0409 Hours | | |
| **Date of autopsy:** | September 29, 2023; 1005 Hours | | |

---

| | |
|---|---|
| <u>CAUSE OF DEATH:</u> | DIABETIC KETOACIDOSIS |
| Due to: | TYPE 1 DIABETES MELLITUS |
| Contributing: | HYPERTENSIVE AND ATHEROSCLEROTIC CARDIOVASCULAR DISEASE |
| <u>MANNER OF DEATH:</u> | HOMICIDE |

<u>AUTOPSY SUMMARY:</u>

I.     Diabetic ketoacidosis.
   A.   Hyperglycemia detected on vitreous chemistry.
   B.   Ketones detected in peripheral blood and vitreous.
   C.   Clinical history of type 1 diabetes mellitus.
       1.   Managed with continuous glucose monitor and insulin pump.
       2.   Hemoglobin A1C levels well controlled, average 6.4% for the last three years.
   D.   History of insufficient insulin administration while in custody.

II.    Hypertensive and atherosclerotic cardiovascular disease.
   A.   Cardiac hypertrophy, 500 grams, with biventricular dilatation.
   B.   Coronary atherosclerosis, multivessel, moderate to severe.
   C.   Nephrosclerosis.

Ex. E - 387

AUTOPSY REPORT                          -2-                          KEITH BACH 2023-3146


III.    Pulmonary edema, combined weight: 1180 grams.

IV.    Minor scalp abrasion and scalp hematoma.

V.    Evidence of cardiopulmonary resuscitation.
    A.    Skin abrasions on mid chest.
    B.    Multiple rib fractures.


OPINION:  According to investigative information and medical records, Mr. Keith Bach was a 63-year-old man with history of type 1 diabetes mellitus complicated by diabetic neuropathy, ████████████ and diabetic macular edema.  He managed his diabetes with a MiniMed™ continuous glucose monitor in combination with a MiniMed™ insulin pump to administer fast-acting insulin (lispro).  Review of laboratory records (May 2020 to September 2023), demonstrated hemoglobin A1C levels ranging from 6.1% to 6.9% (average 6.4%), indicating mostly well controlled blood glucose levels for the last three years.  Additional health history included hypertension (treated with amlodipine and losartan), hyperlipidemia on atorvastatin, ████████████ He had a social history notable for uncomplicated alcohol dependence and had stopped smoking over 15 years ago.  He was not known to use illicit drugs or have history of depression or self-harm.

On September 25, 2023, he was arrested by police and was brought to a local hospital for medical clearance given his chronic health conditions.  After medical evaluation, it was determined he was medically stable for transport and booking.  His blood glucose level at that time was 231 mg/dL.  During the intake process at the jail, he had a witnessed syncopal episode and was transported back to the hospital for a second evaluation.  He was evaluated in the emergency department and had a glucose level of 141 mg/dL.  He was diagnosed with syncope, not otherwise specified, and discharged with medical clearance to continue with the incarceration process.

According to medical records from the jail, it was well known and documented on multiple occasions, that Mr. Bach had type 1 diabetes mellitus and used the combination of a continuous glucose monitor and an insulin pump to administer his insulin.  On September 26, 2023, at approximately 0400 hours, Mr. Bach informed the nurse practitioner who performed his initial intake assessment that his insulin pump would be depleted of insulin in approximately 28 hours (approximately 0800 on September 27, 2024).  Later the same day, at approximately 1200 hours, Mr. Bach was evaluated by a second nurse practitioner, who placed an order for 10 units of insulin, three times a day, with plans to review the blood glucose trend and adjust the insulin dosages as necessary.

**Ex. E - 388**

AUTOPSY REPORT                              -3-                        KEITH BACH 2023-3146

On September 26, from approximately 0100 hours to 2200 hours, Mr. Bach was cooperative with medical staff and allowed nurses to check his blood glucose levels six times.  His glucose levels ranged from 123 – 161 mg/dL and he received 10 units of insulin at 1643 hours.  On September 27, at 0117 hours, his blood glucose level was 322 mg/dL.  In the medical records, it was documented Mr. Bach "refused" to take the prescribed 10 units of insulin and requested to receive 20 units.  Mr. Bach was eventually administered 10 units of insulin at 0151 hours, and this was the last documentation of insulin administration. The nurse practitioner requested a new insulin order with increased dosage.  Approval of the order was pending review.  On September 27, 2023, from approximately 0200 hours to 2100 hours, Mr. Bach was not seen by medical staff as he was not permanently housed during those hours.

According to sheriff's investigation, he was reported to have asked multiple deputies on numerous occasions for insulin.  During mealtimes, Mr. Bach gave his food to fellow inmates, as he did not want to eat if he did not have access to insulin.  Additionally, other inmates were attempting to assist Mr. Bach in requesting insulin by pointing out to deputies that the alarm on Mr. Bach's insulin pump was sounding and that the pump was empty.  It is unknown if any information was relayed to medical staff.

On September 28, 2023, Mr. Bach was found unresponsive and not breathing in his cell.  His blood glucose level was measured, and the meter read "HI".  (A "HI" reading, according to most glucose meters, indicate glucose levels greater than 500 ml/dL).  Cardiopulmonary resuscitation was administered with no eventual return of spontaneous circulation.  His death was pronounced at the scene.  During the scene investigation, Mr. Bach's insulin pump was inspected.  The pump was alarming audibly, and the insulin reservoir appeared empty.

The autopsy demonstrated subnuclear vacuoles in the kidney tubules, a finding consistent with diabetic ketoacidosis.  The heart was enlarged (cardiac hypertrophy), the vessels supplying blood to the heart were narrowed (coronary atherosclerosis), and the kidneys were scarred (nephrosclerosis), findings that can be seen with long standing high blood pressure (hypertension).  The lungs were fluid filled (pulmonary edema).  Although a history of alcohol dependence was reported, the liver did not exhibit changes commonly seen with chronic use of alcohol.

A scalp abrasion and underling scalp hematoma were noted on the back of the head.  Multiple healing irregular tan-red abrasions were on the upper and lower extremities.  Injuries consistent with cardiopulmonary resuscitation included a skin abrasion on the mid chest and multiple rib fractures.  No additional trauma was noted on the body.

Toxicological screening tests for alcohol and common drugs of abuse were negative.  Acetone was detected in the peripheral blood (0.021%) and vitreous fluid (0.025%).

AUTOPSY REPORT                    -4-                    KEITH BACH 2023-3146

A vitreous chemistry panel showed a markedly elevated glucose level (663 mg/dL) and elevated VUN (53 mg/dL).  The combination of elevated glucose and detection of ketones is consistent with diabetic ketoacidosis.

Based on the autopsy findings and the circumstances surrounding the death, as currently understood, the cause of death is **diabetic ketoacidosis** due to **type 1 diabetes mellitus** with **hypertensive and atherosclerotic cardiovascular disease** as a contributing condition.  Review of outpatient medical records clearly indicates that Mr. Bach had demonstrable knowledge in managing his diabetes; however, as an inmate, he became reliant on the medical services provided by the jail for continued management of his condition. Following insufficient insulin administration while in custody, Mr. Bach developed diabetic ketoacidosis and died.  This occurred despite medical records containing documentation of his medical condition, insulin requirements, when his pump would be depleted of insulin, and multiple unanswered requests for insulin by Mr. Bach and fellow inmates.  The death is due to complications of a natural disease.  However considering the inaction (i.e., neglect) characterizing the events leading to inadequate care while incarcerated of Mr. Bach's health conditions and ultimately his death, the manner of death is classified as **homicide**.

Melanie F. Estrella D.O.    Digitally signed by Melanie F. Estrella D.O.
Date: 2024.09.16 06:13:24 -07'00'

*digital signature*
MELANIE ESTRELLA, D.O.
Deputy Medical Examiner

**Ex. E - 390**

AUTOPSY REPORT                          -5-                          KEITH BACH 2023-3146


<u>IDENTIFICATION:</u>  When initially viewed, the body is in a white vinyl body pouch sealed with red tamper-evident tag number "4387485," cut at 1010 hours.  Attached to the zipper pull on the outside of the bag is a blue Medical Examiner's identification tag and manila hang tag bearing the name "Bach, Keith Galen," case number, and weight.  Upon opening the body bag, the body is wrapped in a purple sheet tied at the head and feet. The head, hands, and feet are covered with paper bags secured with tape.  Upon removal of the paper bags there is a yellow Medical Examiner's identification tag around the right ankle bearing the decedent's name and case number.  The blue tag is subsequently placed around the right ankle.  A  blue inmate identification band with the decedent's name, date of birth, image of the decedent's face, and identification number "23739381" is on the left wrist.

<u>WITNESSES:</u>  Assisting is Forensic Autopsy Specialist Shannon Nelson.  Attending the autopsy, representing the San Diego Sheriff's Office, is Detective M. Gibson and Forensic Evidence Technician M. Robison.

<u>CLOTHING:</u>  The body is unclad when initially viewed.  No clothing accompanies the body.

<u>EVIDENCE OF MEDICAL THERAPY:</u>
1.      Oropharyngeal airway in place.
2.      Empty defibrillator packaging.
3.      Unattached AED defibrillator pads.
4.      Intraosseous catheter in left tibial plateau with attached 1L back of normal saline (950 mL remaining).
5.      Home monitoring glucose sensor, Medtronic Model GL3, serial number: GT8766822M, is on the lateral right lower right quadrant of the abdomen, secured with adhesive dressing.
6.      Insulin pump infusion set on lateral left lower quadrant of the abdomen, secured with adhesive dressing.


## **EXTERNAL EXAMINATION**

*Injuries are described in a separate section below.*

<u>GENERAL:</u>   The body is that of a normally developed and well-nourished, light-complexioned male appearing consistent with the listed age of 63 years.  The length is  71 inches, and the weight is 237 pounds as received.  The body is well preserved, cold, and has not been embalmed.  Rigidity is fully developed in the jaw and extremities.  Lividity is pink-purple, nonblanching, and in a posterior distribution.

AUTOPSY REPORT                          -6-                          KEITH BACH 2023-3146

<u>HEAD:</u>   See "EVIDENCE OF INJURY."   The scalp is covered with gray-white hair measuring up to 1 inch on the top of the head.  The facial hair consists of a gray-white beard and moustache.  The ears are normally formed and without drainage.  The earlobes are not pierced.  The irides are blue, the corneas are clear, and the bulbar and palpebral conjunctivae are free of petechiae.  The sclerae are white.  The nose is intact, and the nares are unobstructed.  The lips are normally formed.  The teeth are natural and in good condition.  Blood-tinged purge fluid emanates from the mouth.  Supraclavicular vascular congestion is present.

<u>NECK:</u>  The neck is symmetrical and without injury.

<u>CHEST AND ABDOMEN:</u>  See "EVIDENCE OF INJURY."  The chest is normally formed, symmetrical, and without palpable masses.

The abdomen is flat and soft.  No masses are palpable.

<u>EXTERNAL GENITALIA:</u>  The atraumatic external genitalia are those of a normal adult male with both testes palpable in the scrotum.

<u>BACK:</u>  The back is straight and symmetrical.  The anus is atraumatic.

<u>ARMS:</u>   See "EVIDENCE OF INJURY."   The arms are normally formed.   No non-therapeutic needle punctures, track marks, or ventral wrist scars are noted.   The fingernails are cut short and clean, and do not extend beyond the fingertips.

<u>LEGS:</u>   See "EVIDENCE OF INJURY."   The legs are normally formed and have no edema, amputations, or deformity.  The toenails are short, trim, and clean.

<u>BODY MARKINGS (SCARS AND TATTOOS):</u>
Scars:
1.      None identified.

Tattoos:
1.      None.

## EVIDENCE OF INJURY

A 1 x 1/2 inch tan-red abrasion is on the right paramidline posterior parietal scalp.  On the ventral upper right arm, dorsal proximal right forearm, ventral left upper arm, and ventral proximal left forearm are multiple oblong-shaped blue-purple contusions measuring 1 – 3 inches in greatest dimension.   Therapeutic-appearing puncture sites, some with associated ecchymoses, are in the right antecubital fossa, anterior proximal right arm, and

AUTOPSY REPORT                          -7-                          KEITH BACH 2023-3146

left antecubital fossa.  Multiple irregular tan-red abrasions ranging from 1/4 – 1/2 inch in greatest dimension are on the anterior right shoulder (1), dorsolateral mid upper right arm (2), anterior left shoulder (1), dorsolateral mid upper left arm (2) and mid dorsal left forearm (1), and lateral mid left thigh (1).

Injuries consistent with cardiopulmonary resuscitation include irregular dried tan-red to tan-yellow abrasion on the mid chest measuring 3 x 1 inches in greatest dimension, multiple small, dried tan-yellow to tan-red abrasions measuring 1/8 to 1/4 inch in greatest dimension are on the bridge of the nose, consistent with rubbing from an air mask, and multiple anterolateral rib fractures in the right and left 2nd – 6th ribs.

## INTERNAL EXAMINATION

BODY CAVITIES:  The abdominal fat layer measures up to 6 cm in thickness.  The body cavities have no hemorrhage or abnormal fluid.   The serosal surfaces are smooth, glistening, and without adhesions.  The organs are normally located.  The diaphragm is intact.  The body cavities have no internal injuries.

CARDIOVASCULAR SYSTEM:  The heart weighs 500 grams and is enlarged.  It has a mostly normal shape with a smooth, glistening epicardium.  The coronary arteries have a normal origin and distribution with right dominance.   The left anterior descending, left circumflex, and right coronary arteries have up to approximately 50% yellow, focally calcific atherosclerotic stenosis.

The myocardium is red-brown, firm, and uniform without focal fibrosis, softening, or hyperemia.   The right ventricle is dilated.   The right ventricle, left ventricle, and interventricular septum measure 0.3 cm, 1.2 cm, and 1.1 cm, respectively.

The endocardium is intact, smooth, and glistening.   The cardiac valve leaflets are of normal number, pliable, intact, and free of vegetations.  The atrial and ventricular septa are free of defects.

The aorta follows its usual course and has mild atherosclerotic changes.  There are no vascular anomalies or aneurysms.  The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM:   The right and left lungs weigh 610 and 570 grams, respectively, and have the usual lobation.  The pleurae are smooth and glistening; the lungs have a moderate amount of anthracotic pigment.  The lungs are overexpanded expanded and edematous.  The parenchyma is dark red and exudes moderate amounts of fluid.  The lungs have no consolidation, hemorrhage, infarct, tumor, gross fibrosis, or

AUTOPSY REPORT                    -8-                    KEITH BACH 2023-3146

enlargement of airspaces.   The bronchi contain no foreign material and have tan-pink unremarkable mucosa.

HEPATOBILIARY SYSTEM:   The liver weighs 1780 grams.   The intact capsule is smooth and glistening.   The parenchyma is red-brown to tan-yellow without mass or hemorrhage. Moderate palpable fibrosis is present.

The gallbladder contains an estimated 10 mL of bile and no stones.   Its mucosa is uniform, and the wall is not thickened.

The pancreas appears small in size with a normal shape and lobulated structure.   The parenchyma is pink-tan to tan-white, firm, and uniform.

HEMOLYMPHATIC SYSTEM:   The spleen weighs 190 grams.   The capsule is smooth and intact.   The parenchyma is maroon, firm, and uniform.

There is no enlargement of the lymph nodes in the neck, chest, or abdomen.

ENDOCRINE SYSTEM:   The thyroid gland is not enlarged, and the lobes are symmetrical. The parenchyma is uniform, firm, and red-brown.

The adrenal glands have the usual size and shape.   The cortices are thin, uniform and yellow, and there is no hemorrhage or tumor.   The pituitary gland is not enlarged.

GASTROINTESTINAL SYSTEM:    The esophagus and gastroesophageal junction are unremarkable.   The stomach contains approximately 150 mL of dark brown gastric fluid without visible pills or pill residue.   The gastric mucosa demonstrates numerous petechial hemorrhages. The duodenal mucosae are intact and unremarkable.   The small and large intestines and appendix are unremarkable to inspection and palpation.

GENITOURINARY SYSTEM:    The right and left kidneys weigh 180 and 220 grams, respectively, and have a normal shape and position.   The cortical surfaces are granular and focally pitted.   The kidneys have the usual corticomedullary structure without tumors or cysts.   The pelves and ureters are not dilated or thickened.   The bladder contains 100 mL of clear, yellow urine.   The mucosa is intact, and the bladder wall is not hypertrophied.

The prostate gland is of average size and grossly unremarkable.   The testes are not examined.

NECK:    The tongue, strap muscles, and other anterior neck soft tissues have no hemorrhage.   The hyoid bone and the cartilaginous structures of the larynx and trachea are normally formed and without fracture.   The airway is unobstructed, lined by smooth,

AUTOPSY REPORT                        -9-                        KEITH BACH 2023-3146

pink-tan mucosa, and contains no foreign material.  The cervical vertebrae have no displacement, hypermobility, or crepitus.

MUSCULOSKELETAL SYSTEM:  See "EVIDENCE OF INJURY."  The musculoskeletal system is well developed and free of deformity.  There are no fractures of the clavicles, sternum, vertebrae, or pelvis.  The ribs are not brittle.  The skeletal muscle is dark red and firm.

HEAD:  See "EVIDENCE OF INJURY."  The calvarium and base of the skull are normally configured and have no fractures.  The dura is intact, and there is no epidural or subdural hemorrhage.

CENTRAL NERVOUS SYSTEM:    The unfixed brain weighs 1220 grams.    The leptomeninges are glistening and transparent without underlying hemorrhage, exudate, or cortical contusions.  The hemispheres are symmetrical and have a normal gyral pattern. Mild generalized atrophy is present. There is no flattening of the gyri, narrowing of the sulci, midline shift, or evidence of herniation.  The arteries at the base of brain have no atherosclerotic changes or aneurysms.

Sections through the cerebral hemispheres have a uniform, intact cortical ribbon and uniform white matter.    The basal ganglia, thalami, hippocampi, and other internal structures are symmetrical and without focal change.   The ventricles are moderately enlarged, and the linings are smooth and glistening.   Sections of the brainstem and cerebellum show an intact structure without focal lesions.

**Ex. E - 395**

AUTOPSY REPORT                         -10-                    KEITH BACH 2023-3146


## SPECIMENS RETAINED

<u>TOXICOLOGY:</u>    Samples of central and peripheral blood, vitreous humor, gastric contents, urine, and liver are retained for toxicology.

<u>HISTOLOGY:</u>  Representative sections of organs and tissues are retained.  Sections are submitted for histology as follows:

Cassette summary:
Cassette 1:   Heart, left ventricle and interventricular septum
Cassette 2:   Duodenum, including area of superficial ulcer
Cassette 3:   Right and left kidneys and left anterior descending artery
Cassette 4:   Right lung
Cassette 5:   Liver and pancreas
Cassette 6:   Left lung

<u>PHOTOGRAPHS:</u>   Facial identification photographs, external overall photographs, and photographs of selected findings are taken.

<u>RADIOGRAPHS:</u>  None.

AUTOPSY REPORT                          -11-                          KEITH BACH 2023-3146

## MICROSCOPIC EXAMINATION

HEART:  Sections show orderly cardiomyocytes with many showing enlarged and hyperchromatic nuclei and yellow-brown, finely granular intracytoplasmic pigment. The myocardium has moderate interstitial fibrosis without areas of geographic fibrosis, inflammatory infiltrates, hemorrhage, or necrosis. The intramyocardial vessels are unremarkable.

LEFT ANTERIOR DESCENDING ARTERY:  A section shows a complete cross section of vessel with myointimal thickening and an atheromatous plaque with cholesterol clefting and calcifications causing moderate narrowing of the lumen.

LUNGS:  Sections show alveoli containing variable amounts of scattered pigmented and non-pigmented macrophages, red blood cells, and eosinophilic proteinaceous material. No significant collections of inflammatory infiltrates are seen.  Some of the bronchioles contain sloughed respiratory epithelium, without evidence of smooth muscle mucosal hyperplasia or basement membrane thickening.  There is no increased perivascular or peribronchiolar anthracotic pigment.  The vessels are markedly congested.

LIVER:  A section shows preserved hepatic architecture. Minimal centrilobular predominantly macrovesicular steatosis is present. No fibrosis, necrosis, or lobular inflammatory infiltrates are seen.  The portal areas have no increased chronic inflammation.  No interface inflammation is seen. The sinusoids are markedly congested.

KIDNEY:  A section shows preserved renal architecture.  The tubules have moderately autolyzed epithelium.  The tubules show subnuclear vacuoles.  There are several scattered sclerotic glomeruli.  No significant interstitial chronic inflammation is seen.  The arteries and arterioles show mild hyalinized-type thickening of the vessel walls.

PANCREAS:  A section shows predominantly autolyzed pancreatic parenchyma with retained lobular architecture without increased fibrosis, necrosis, or acute or chronic inflammatory infiltrates.  The ducts are unremarkable.

ME:lcb
D:  9/299/13/24 lcb/23          T:  9/29/23
Rev.  9/13/24 lcb

Ex. E - 397



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA  92123-1206
TEL: (858) 694-2895   FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **BACH, Keith** |
| Medical Examiner Number: | **2023-03146** |
| Date of Death: | **09/28/2023** |
| Time of Death: | **04:09** |
| Pathologist: | **Melanie Estrella, D.O.** |
| Specimens Received: | **Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **09/29/2023** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| **Alcohol Analysis (GC/FID-Headspace)** | Peripheral Blood 2 | |
| **Acetone** | | **0.021 % (w/v)** |
| Alcohol (Ethanol), Isopropanol, Methanol | | Not Detected |
| | | |
| **Alcohol Analysis (GC/FID-Headspace)** | Vitreous | |
| **Acetone** | | **0.025 % (w/v)** |
| Alcohol (Ethanol), Isopropanol, Methanol | | Not Detected |
| | | |
| **Drugs of Abuse Screen (ELISA)** | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Methamphetamine | | Not Detected |
| Opiates | | Not Detected |
| Oxycodone | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| | | |
| **Vitreous Chem Panel (Cobas c111)** | Vitreous | |
| **Chloride** | | **118 mmol/L** |
| **Creatinine** | | **1.4 mg/dL** |
| **Glucose** | | **663 mg/dL** |
| **Potassium** | | **22.1 mmol/L** |
| **Sodium** | | **146 mmol/L** |
| **VUN** | | **53 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

**Comment:**

Approved and Signed:
11/02/2023

Theresa Hippolyte, D-ABFT-FT
Forensic Toxicology Laboratory Manager

**Ex. E - 398**

# EXHIBIT F

**COUNTY CONTRACT NUMBER 571418**
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

This agreement ("Agreement") is made and entered into effective as of the date of the last signature on the signature page by and between the County of San Diego, a political subdivision of the State of California ("County") and **Correctional Healthcare Partners, Inc., 402 W. Broadway #400, San Diego, CA 92101** ("Contractor"), with reference to the following facts:

## RECITALS

A.    The County, by action of the Board of Supervisors September 12, 2023 Minute Order No. 2 authorized the Director of Purchasing and Contracting, to award a contract for on-site clinical services at detention facilities.

B.    Contractor is specially trained and possesses certain skills, experience, education, and competency to perform these services.

C.    The Chief Administrative Officer made a determination that Contractor can perform the services more economically and efficiently than the County, pursuant to section 703.10 of the County Charter.

D.    The Agreement shall consist of this document, Exhibit A Statement of Work, Exhibit A-1, Exhibit B Insurance Requirements, and Exhibit C Payment Schedule.  In the event of a conflict between any provisions of this Agreement, the following order of precedence shall govern: First (1st) this document; Second (2nd) Exhibit B; Third (3rd) Exhibit A; Fourth (4th) Exhibit C; and fifth (5th) Exhibit A-1.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## PERFORMANCE OF WORK

1.1    <u>Standard of Performance</u>. Contractor shall, in good and workmanlike manner and in accordance with the highest professional standards, at its own cost and expense, furnish all of the labor, technical, administrative, professional and all other personnel, all supplies and materials, equipment, printing, transportation, training, facilities, and all other means whatsoever, except as herein otherwise expressly specified to be furnished by County, necessary or proper to perform and complete the work and provide the services required of Contractor by this Agreement.

1.2    <u>Contractor's Representative</u>. The person identified on the signature page ("Contractor's Representative") shall ensure that Contractor's duties under this Agreement shall be performed on behalf of the Contractor by qualified personnel; Contractor represents and warrants that (1) Contractor has fulfilled all applicable requirements of the laws of the State of California to perform the services under this Agreement and (2) Contractor's Representative has full authority to act for Contractor hereunder. Contractor and County recognize that the services to be provided by Contractor's Representative pursuant to this Agreement are unique: accordingly, Contractor's Representative shall not be changed during the Term of the Agreement without County's written consent. County reserves the right to terminate this Agreement pursuant to section 7.1 "Termination for Default" if Contractor's Representative should leave Contractor's employ, or if, in County's judgment, the work hereunder is not being performed by Contractor's Representative.

1.3    <u>Contractor as Independent Contractor</u>. Contractor is, for all purposes of this Agreement, an independent contractor, and neither Contractor nor Contractor's employees or subcontractors shall be deemed to be employees of the County. Contractor shall perform its obligations under this Agreement according to the Contractor's own means and methods of work, which shall be in the exclusive charge and under the control of the Contractor, and which shall not be subject to control or supervision by County except as to the results of the work. County hereby delegates to Contractor any and all responsibility for the safety of Contractor's employees, which shall include inspection of property to identify potential hazards. Neither Contractor nor Contractor's employees or subcontractors shall be entitled to any benefits to which County employees are entitled, including without limitation, overtime, retirement benefits, workers' compensation benefits and injury leave.

1.4    <u>Contractor's Agents and Employees or Subcontractors</u>.

Contractor shall obtain, at Contractor's expense, all agents, employees, subcontractors, and consultants required for Contractor to perform its duties under this Agreement, and all such services shall be performed by Contractor's Representative, or under Contractor's Representatives' supervision, by persons authorized by law to perform such services. Retention by Contractor of any agent, employee, subcontractor, or consultant shall be at Contractor's sole cost and expense, and County shall have no obligation to pay Contractor's agents, employees subcontractors, or consultants; to support any such person's or entity's claim against the Contractor; or to defend Contractor against any such claim.

In the event any subcontractor or consultant is utilized by Contractor for any portion of the project, Contractor retains the prime responsibility for carrying out all the terms of this Agreement, including the responsibility for performance and ensuring the availability and retention of records of subcontractors and consultants in accordance with this Agreement.

1.4.1    "Related Subcontract" means an agreement to furnish, or the furnishing of, supplies, materials, equipment, or services of any kind to Contractor or any higher tier subcontractor in the performance of some or all of the work in this Agreement. Related Subcontracts includes consultant agreements, which are defined as agreements for services rendered, or the rendering of services, by persons who are members of a particular profession or possess as special

**SD 1579694**
**Ex. F - 400**

**COUNTY CONTRACT NUMBER 571418**
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

skill and who are not officers or employees of the Contractor. Examples include those services acquired by Contractor or a subcontractor in order to enhance their legal, economic, financial, or technical positions. Professional and consultant services are generally acquired to obtain information, advice, opinions, alternatives, conclusions, recommendations, training, or direct assistance, such as studies, analyses, evaluations, liaison with government officials, or other forms or representation. Related Subcontracts shall not include agreements for ancillary goods or services, or consulting services intended to support Contractor in a general manner not specific to the work performed under this Agreement. "Related Subcontractor" means an individual or entity holding or performing a Related Subcontract.

1.4.2    Required Subcontract Provisions:  Contractor shall notify all Related Subcontractors of Contractor's relationship to County. Contractor shall include in its Related Subcontracts and require Related Subcontractors' compliance with the provisions of Articles 3, 7, 8, 9, 10, 11, 13, 14 and 16, and section 4.6.1 of Article 4, hereunder except altered as necessary for proper identification of the contracting parties.

1.4.3    Contractor shall provide COR with copies of all Related Subcontracts entered into by Contractor within thirty (30) days after the effective date of the Related Subcontract, or within thirty (30) days of the effective date of this Agreement if such Related Subcontract is already in existence at that time.

1.4.4    County Approval:  Any Related Subcontract that is in excess of fifty thousand dollars ($50,000) or twenty five percent (25%) of the value of this Agreement, whichever is less; or a combination of Related Subcontracts to the same individual or firm for the Agreement period, the aggregate of which exceeds fifty thousand dollars ($50,000) or twenty five percent (25%) of the value of this Agreement, whichever is less; or any Related Subcontract for professional medical or mental health services, regardless of value, must have prior concurrence of the COR.

1.5    <u>Offshore Prohibition</u>. Except where Contractor obtains the County's prior written approval, Contractor shall perform the work of this Agreement only from or at locations within the United States. Any County approval for the performance of work outside of the United States shall be limited to the specific instance and scope of such written approval, including the types of work and locations involved. Notwithstanding the foregoing, this section shall not restrict the country or countries of origin of any assets purchased to provide the work hereunder; provided that when such assets are used to provide the work, such assets shall be used only from or at locations within the geographic boundaries of the United States.

1.6    <u>DVB Participation</u>. If this Agreement resulted from a solicitation containing Disabled Veteran Business ("DVB") requirements and forms, such requirements and Contractor's submitted forms are incorporated herein by reference to the extent not included as an Exhibit to this Agreement. Contractor shall make all commercially reasonable efforts to comply with all such DVB requirements, including meeting the DVB Percent of Utilization on Contractor's DVB Subcontractor Participation Plan. Contractor shall maintain a rate of DVB utilization throughout the term of this Agreement that is reasonably in alignment with the progress of the Agreement (e.g., term, utilization, deliverables). Contractor shall provide to County, upon request, documentation sufficient to verify Contractor's compliance with such requirements.

If in County's determination, Contractor is not in compliance with all DVB requirements, County may take corrective action, which may include (i) requiring Contractor to submit a corrective action plan acceptable to County detailing actions the Contractor will take to fulfill its DVB requirements and/or (ii) withholding of payments to Contractor equivalent to the amount of DVB underutilization. Such corrective actions shall be in addition to any other remedies the County may have under this Agreement or at law or equity.

1.7    <u>Preferred Vendor</u>. If this Agreement resulted from a solicitation where Contractor claimed Preferred Vendor status in its response per section 405 of the San Diego County Administrative Code, Contractor shall perform a commercially useful function (as that term is defined in California Military and Veterans Code § 999 or successor statute) throughout the term of this Agreement.

**ARTICLE 2**
**SCOPE OF WORK**

2.1    <u>Statement of Work</u>. Contractor shall perform the work described in the "Statement of Work" attached as Exhibit A to this Agreement, and by this reference incorporated herein, except for any work therein designated to be performed by County.

2.1.1    <u>Evaluation Studies</u>. Contractor shall participate as requested by the County in research and/or evaluative studies designed to show the effectiveness and/or efficiency of Contractor services or to provide information about Contractor's project.

2.1.2    <u>Health Insurance</u>. If Contractor provides direct services to the public under this Agreement, Contractor shall ask if clients and any minor(s) for whom clients are responsible have health insurance coverage. If the response is "no" for client or minor(s) the Contractor shall refer the client to Covered California at https://www.coveredca.com/ or to 1-800-300-1506.

2.2    <u>Right to Acquire Equipment and Services</u>. Nothing in this Agreement shall prohibit the County from acquiring the same type or equivalent equipment and/or service from other sources, when deemed by the County to be in its best interest.

**SD 1579695**
**Ex. F - 401**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

2.3  <u>Responsibility for Equipment</u>. County shall not be responsible nor be held liable for any damage to persons or property consequent upon the use, misuse, or failure of any equipment used by Contractor or any of Contractor's employees, even though such equipment may be furnished, rented, or loaned to Contractor by County. The acceptance or use of any such equipment by Contractor or Contractor's employees shall be construed to mean that Contractor accepts full responsibility for and agrees to exonerate, indemnify, and hold harmless County from and against any and all claims for any damage whatsoever resulting from the use, misuse, or failure of such equipment, whether such damage be to the employee or property of Contractor, other Contractors, County, or other persons. Equipment includes, but is not limited to material, computer hardware and software, tools, or other things.

    2.3.1  Contractor shall repair or replace, at Contractor's expense, all County equipment or fixed assets that are damaged or lost as a result of Contractor negligence.

2.4  <u>Non-Expendable Property Acquisition</u>. County retains title to all non-expendable property provided to Contractor by County, or which Contractor may acquire with funds from this Agreement if payment is on a cost reimbursement basis, including property acquired by lease purchase Agreement. Contractor may not expend funds under this Agreement for the acquisition of non-expendable property having a unit cost of $5,000 or more and a normal life expectancy of more than one year without the prior written approval of COR. Contractor shall maintain an inventory of non-expendable equipment, including dates of purchase and disposition of the property. Inventory records on non-expendable equipment shall be retained, and shall be made available to the County upon request, for at least three years following date of disposition. Non-expendable property that has value at the end of the Agreement (e.g. has not been depreciated so that its value is zero), and to which the County may retain title under this paragraph, shall be disposed of at the end of the Agreement as follows: At County's option, it may: 1) have Contractor deliver to another County contractor or have another County contractor pick up the non-expendable property; 2) allow Contractor to retain the non-expendable property provided that Contractor submits to the County a written statement in the format directed by the County of how the non-expendable property will be used for the public good; or 3) direct the Contractor to return to the County the non-expendable property.

**ARTICLE 3**
**DISENTANGLEMENT**

3.1  <u>General Obligations</u>.

Upon the expiration or termination of all or a portion of the services provided hereunder ("Transitioning Services,"), the County may elect to have such services, substantially similar services, or follow-on services ("Disentangled Services") performed by County or one or more separate contractors ("Replacement Provider"). Contractor shall take all actions necessary to accomplish a complete and timely transition of the Disentangled Services ("Disentanglement") without any material impact on the services. Contractor shall cooperate with County and otherwise take all steps reasonably required to assist County in effecting a complete and timely Disentanglement. Contractor shall provide Replacement Provider with all information regarding the services and any other information needed for Disentanglement.

Contractor shall provide for the prompt and orderly conclusion of all work required under this Agreement, as County may direct, including completion or partial completion of projects, documentation of work in process, and other measures to assure an orderly Disentanglement.

3.2  <u>Disentanglement Process</u>.

Contractor and County shall discuss in good faith a plan for Contractor's Disentanglement that shall not lessen in any respect Contractor's Disentanglement obligations.

If County requires the provision of Transitioning Services after expiration or termination of the Agreement or Disentanglement work not otherwise required under this Agreement, for which additional compensation will be due, such services shall be compensated at: (i) the applicable rates in Agreement or a reasonable pro-rata of those prices, or (ii) if no applicable rates apply, no more than Contractor's costs. Such work must be approved in writing by County approval of a written Disentanglement plan or separately in writing and is subject to the Compensation clause on the signature page.

Contractor's obligation to provide Disentanglement services shall not cease until all Disentanglement obligations are completed to County's reasonable satisfaction, including the performance by Contractor of all Specific Obligations of Contractor. County shall not require Contractor to perform Transitioning Services beyond 12 months after expiration or termination, provided that Contractor meets all Disentanglement obligations and other obligations under Agreement.

3.3  <u>Specific Obligations</u>.

The Disentanglement shall include the performance of the following specific obligations ("Specific Obligations"):

    3.3.1  <u>No Interruption or Adverse Impact</u>

**SD 1579696**
**Ex. F - 402**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

Contractor shall cooperate with County and Replacement Provider to ensure a smooth Disentanglement, with no interruption of or adverse impact to Disentangled Services, Transitioning Services, other work required under the Agreement, or services provided by third parties.

3.3.2   Client Authorizations.

Contractor shall obtain from clients served by Contractor all client consents or authorizations legally necessary to transfer client data to Replacement Provider.

3.3.3   Leases, Licenses, and Third-Party Agreements.

Contractor shall procure at no charge to County all authorizations necessary to grant Replacement Provider the use and benefit of any third-party agreements pending their conveyance or assignment to Replacement Provider.

Contractor, at its expense, shall convey or assign to Replacement Provider leases, licenses, and other third-party agreements procured under this Agreement, subject to written approval of the Replacement Provider (and County, if Replacement Provider is other than County).

Without limiting any other provision of this Agreement, Contractor shall reimburse County for any losses resulting from Contractor's failure to comply with any terms of any third-party agreements prior to the date of conveyance or assignment.

3.3.4   Return, Transfer, and Removal of Assets.

Contractor shall return to County all County assets in Contractor's possession, pursuant to section 2.4 of this Agreement.

County shall be entitled to purchase at net book value Contractor assets used primarily for the provision of Disentangled Services to or for County, other than those assets expressly identified as not being subject to this provision. Contractor shall promptly remove from County's site any Contractor assets that County, or its designee, chooses not to purchase under this provision.

3.3.5   Delivery of Documentation.

Notwithstanding section 13.5 of this Agreement, and without limiting Contractor's obligations thereunder, Contractor shall deliver to Replacement Provider (and/or County, if Replacement Provider is other than County), all documentation and data necessary for Disentanglement.

3.3.6   Reserved.

## ARTICLE 4
## COMPENSATION

County will pay Contractor in accordance with Exhibit C Payment Schedule and this Article 4, for the work specified in Exhibit A Statement of Work (SOW), not to exceed the maximum compensation as set forth on signature page. Contractor shall employ and maintain an accounting and financial system to effectively monitor and control costs and assure accurate invoicing and performance under this Agreement.

4.1   General Principles. Contractor shall comply with generally accepted accounting principles, good business practices, San Diego County Code of Administrative Ordinances section 472, and the cost principles published by the federal Office of Management and Budget (OMB), including 2 CFR 200 - UNIFORM ADMINISTRATIVE REQUIREMENTS, COST PRINCIPLES, AND AUDIT REQUIREMENTS FOR FEDERAL AWARDS "The Uniform Guidance," which can be viewed at https://www.ecfr.gov/cgi-bin/text-idx?tpl=/ecfrbrowse/Title02/2cfr200_main_02.tpl. Contractor shall comply with all applicable federal, State, and other funding source requirements, Contractor shall, at its own expense, furnish all cost items associated with this Agreement except as specifically stated herein to be furnished by County.

4.1.1   Fiscal Year. The County's fiscal year runs from July 1 through June 30 ("County Fiscal Year").

4.2   Compensation.

4.2.1   Contractor shall be entitled to compensation only upon completion and acceptance of a deliverable or portion of work as described in the Payment Schedule ("Services"). Services shall include any additional or as-needed services specified in the SOW and Pricing Schedule and pre-approved in writing by COR or authorized by County task order issued in accordance with this Agreement ("As-Needed Services").

4.2.1.1   Contractor shall be entitled to reimbursement for incidental expenses associated with any such portions of the work only when specifically allowed for in the SOW and Pricing Schedule ("Reimbursable Expenses"), and only upon completion and acceptance of the Services for which they were incurred unless earlier reimbursement is otherwise authorized under this Agreement. Compensation for Reimbursable Expenses shall be at cost.

SD 1579697
Ex. F - 403

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

4.2.1.2    Where travel, lodging, or meal expenses ("Travel Expenses") are allowable Reimbursable Expenses, rates must not exceed County-authorized rates set forth in San Diego County Administrative Code section 472. Should Contractor incur Travel Expenses greater than the County-authorized rates, Contractor shall not be entitled to reimbursement for the difference between the County-authorized rate for each category and the actual cost.

4.3    <u>Invoices</u>.

4.3.1    Contractor shall invoice monthly for completed and accepted Services performed in the prior month.

4.3.2    Contractor shall submit invoices to the COR that are completed and submitted in accordance with written COR instructions and are in compliance with all Agreement terms.

4.3.2.1    Contractor shall provide accurate invoices with sufficient detail and supporting documentation for County verification. Invoices must reference the Agreement number (and task order, if applicable), contain a detailed listing of each deliverable or portion of work, including the pay point, target, accomplishment, unit price, percentage completion, and appropriate calculations where applicable.

4.3.2.2    Contractor invoices shall include the following language:

I certify, under penalty of perjury under the laws of the State of California, that the deliverables and/or services invoiced were delivered and/or performed specifically for this Agreement in accordance with and compliance to all terms and conditions set forth therein.

4.3.3    Contractor requests for payment of authorized Reimbursable Expenses must be included in the invoice for the associated Services, unless previously invoiced in accordance with this Agreement.

4.4    <u>Payments</u>. Contractor shall be entitled to payment only upon County approval of a correct and substantiated invoice. Payment terms are, unless otherwise specified by County, thirty (30) days from the later of: (i) performance of work under the Agreement entitling Contractor to payment, (ii) County receipt of a correct and substantiated invoice, and (iii) County receipt of all substantiating information. The County at its sole discretion may issue partial payment where only a portion of an invoice is correct and substantiated. Payment shall be deemed to have been made on the date that County submits electronic payment or mails a warrant or check. The County is precluded from making payments prior to receipt of services (advance payments).

4.5    <u>Full Compensation</u>. The compensation set forth in this Agreement shall constitute the full and complete payment for Contractor's performance of the services set forth herein. Contractor shall not be entitled to any additional payment for services rendered. Contractor shall not be entitled to any compensation, reimbursement, ancillary benefits, or other consideration for services rendered beyond that specified in Agreement.

4.6    <u>Prompt Payment for Vendors and Subcontractors</u>

4.6.1    Unless otherwise set forth in this section 4.6, Contractor shall promptly pay Related Subcontractors for satisfactory performance of work required by this Agreement. Such prompt payment shall be no later than thirty (30) days after Contractor receives payment for such services from County, and Contractor shall apply such payments to the payment of the Related Subcontractor(s) that performed the work.

4.6.2    If Contractor determines that any payment otherwise due such Related Subcontractor is subject to withholding in accordance with a Related Subcontract, Contractor shall:

4.6.2.1    Provide written notice to the Related Subcontractor and COR within three (3) business days of such withholding stating the amount to be withheld, the basis for the withholding, and, if applicable, the cure required of the Related Subcontractor in order to receive payment of the amounts withheld; and

4.6.2.2    Reduce the Related Subcontractor's payment by an amount not to exceed the amount specified in the notice furnished under paragraph 4.6.2.1 above.

4.6.3    Contractor shall not include in any invoice to the County amounts that the Contractor has withheld or intends to withhold from a Related Subcontractor for failure to satisfactorily perform work in a manner required by this Agreement. If such withholding determination is made after submitting an invoice to the County, Contractor shall submit to County a revised invoice omitting or crediting such amount. Contractor shall not include such amounts in any subsequent invoices unless the Related Subcontractor has cured the basis for withholding.

4.7    <u>Partial Payment</u>. Contractor shall be paid only for work performed in accordance with this Agreement. If Contractor fails to perform a portion of the work or fails to perform some or all of the work in accordance with this Agreement, County, at its sole discretion, may provide partial payment to Contractor to reflect the reasonable value of work properly performed.

4.8    <u>Withholding of Payment</u>. Without limiting any other provision of this Agreement, County may withhold payment, in whole or in part, if any of the following exist:

4.8.1    Missing Information. Contractor has not provided to County any reports, data, audits, or other information required for Agreement administration, for reporting or auditing purposes, or by State, federal, or other funding source.

**SD 1579698**
**Ex. F - 404**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

4.8.2    Misrepresentation. Contractor, with or without knowledge, made any misrepresentation of a substantial and material nature with respect to any information furnished to County

4.8.3    Unauthorized Actions by Contractor. Contractor took any action under this Agreement that required County approval without having first received such approval.

4.8.4    Breach. In the County's determination, Contractor is, or at the time of performance was, in breach of any of the terms of this Agreement.

4.8.5    Wage Theft. Contractor has a judgment rendered against it by the California Division of Labor Standards Enforcement (DLSE), other state labor compliance body, or the United States Department of Labor that is unsatisfied. In such event, County may withhold payment from Contractor in the amount of such unsatisfied judgment until such judgment has been discharged.

4.9    Disallowance. County may disallow payment at any time if it determines that the basis for the payment is or was not eligible for compensation under this Agreement. If County makes payment to Contractor that is later disallowed by the County, State or federal government, or other funding source, County shall be entitled to prompt recovery of funds in accordance with Article 12.

4.10    Maximum Price. During the performance period of this Agreement, the maximum price for the same or similar items and/or services shall not exceed the lowest price at which Contractor then offers the items and/or services to its most favored customer.

4.11    Overpayments. If Contractor becomes aware of a duplicate contract financing or invoice payment or that County has otherwise overpaid on a contract financing or invoice payment, Contractor shall immediately notify the COR and County shall be entitled to prompt recovery of funds in accordance with Article 12.

4.12    Availability of Funding. The County's obligation for payment under this Agreement is contingent upon the availability of funding from which payment can be made. No legal liability on the part of the County shall arise for payment beyond the end of the County Fiscal Year for which funds are designated by the County. In the event that federal, State, or County funding ceases or is reduced, the County shall, in its sole discretion and without limiting any other provision of this Agreement, have the right to terminate or suspend this Agreement, or to reduce compensation and service levels proportionately.

4.13    Rate of Expense. Contractor shall control its rate of expense throughout the term of this Agreement such that it is reasonably in alignment with the progress of the Agreement, inclusive of term, achievement towards objectives, anticipated revenue, deliverables, and other applicable factors. Contractor shall provide to County, upon request, documentation sufficient to verify Contractor's compliance with such requirements.

4.13.1    Contractor shall promptly inform the COR if its rate of expense exceeds, or is anticipated to exceed, the progress of this Agreement or would result in expenses that exceed the maximum Agreement amount or budget. In no event, however, shall Contractor's invoiced amounts exceed the maximum Agreement amount or budget.

4.13.2    If the Agreement term, Initial Term, or any Option Period originates in one County Fiscal Year and ends in another County Fiscal Year, Contractor shall not exceed the amounts reasonably allocated to each of the County Fiscal Years based on the monthly budget or other rate of expense.

**ARTICLE 5**
**AGREEMENT ADMINISTRATION**

5.1    The Director of the Department of Purchasing and Contracting or designated Department of Purchasing and Contracting official is the contracting officer for this Agreement ("Contracting Officer").

5.2    County's Agreement Administrator. The County has designated the individual identified on the signature page as the Contracting Officer's Representative ("COR"), The COR will coordinate the County's administration of this Agreement.

5.2.1    The COR is designated to receive and approve Contractor invoices for payment, audit and inspect records, inspect Contractor services, and provide other technical guidance as required.

5.2.2    The COR is not authorized to make Changes to this Agreement, except for administrative adjustments, such as line-item budget changes or adjustments to the service requirements. that do not change the purpose or intent of the Statement of Work, the Terms and Conditions, the Agreement Term, or the total Agreement price ("Administrative Adjustments"). Each Administrative Adjustment shall be in writing and signed by COR and Contractor.

5.3    Agreement Progress Meeting. The COR and other County personnel, as appropriate, will meet periodically with the Contractor to review the Agreement performance, with the COR serving as meeting chair. At these meetings the COR will apprise the Contractor of how the County views the Contractor's performance and the Contractor will apprise the County of problems, if any, being experienced. The Contractor shall also notify the Contracting Officer (in writing) of any work being performed, if any, that the Contractor considers being over and above the requirements of the Agreement. Appropriate action shall be taken to resolve outstanding issues. The minutes of these meetings will be reduced to writing and signed by the COR and the Contractor. Should

**SD 1579699**
**Ex. F - 405**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

the Contractor not concur with the minutes, the Contractor shall set out in writing any area of disagreement within 10 days. Appropriate action will be taken to resolve any areas of disagreement.

## ARTICLE 6
## CHANGES

6.1 <u>Changes</u>. Changes to this Agreement may only be made by Administrative Adjustment, Change Order, or amendment, in accordance with this Article 6. No other modification of this Agreement shall be valid.

6.1.1 <u>Administrative Adjustment</u>. Changes that do not change the purpose or intent of the Statement of Work, the Terms and Conditions, the Agreement Term, or the total Agreement price of the Agreement, such as line-item budget changes or adjustments to the service requirements, ("Administrative Adjustments") may be made if in writing and signed by COR and Contractor

6.1.2 <u>Change Order</u>. The County may at any time, by written order, make Changes within the general scope of this Agreement ("Change Order"). If any Change Order causes an increase or decrease in the cost or time required for the performance of the work under this Agreement, an equitable adjustment shall be made to the price, delivery schedule, or both.

6.1.2.1 Contractor must assert any claim for equitable adjustment within thirty (30) days from the date of receipt by the Contractor of the Change Order; however, the Contracting Officer may receive and act upon any such claim asserted at any time prior to final payment under this Agreement where the facts justify such action. Where the cost of property made obsolete or excess as a result of a Change Order is included in the Contractor's claim for equitable adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of such property. Failure to agree to any equitable adjustment shall be a dispute concerning a question of fact within the meaning of Article 15 "Disputes". However, nothing in this section shall excuse the Contractor from proceeding with this Agreement as changed.

6.1.3 <u>Amendment</u>. The County and Contractor may modify this Agreement by written amendment signed by the Contracting Officer and Contractor.

## ARTICLE 7
## SUSPENSION, DELAY, AND TERMINATION

7.1 <u>Termination for Default</u>. In the event of Contractor's breach of this Agreement, County shall have the right to terminate this Agreement in whole or in part.

7.1.2 Prior to termination for default, Contracting Officer will send Contractor written notice specifying the default. Contractor shall have ten (10) days from issuance (unless a different time is given in the notice) to respond to the notice as directed by County to acknowledge the default or show cause as to why Contractor is not in default. Such notice may provide Contractor the opportunity to cure the default or to demonstrate progress towards curing the default. If Contractor fails to respond, or if Contractor's response is not satisfactory to the County, County may terminate this Agreement for default upon written notice from Contracting Officer.

7.1.3 If County determines that the default contributes to the curtailment of an essential service; poses an immediate threat to life, health, or property; or constitutes fraud or other serious misconduct, County may terminate this Agreement for default by written notice from the Contracting Officer without the notice described in section 7.1.2 above.

7.1.4 In the event of termination for default, all finished or unfinished documents, and other materials, prepared by Contractor under this Agreement shall become the sole and exclusive property of County.

7.1.5 If, after termination for default, it is determined for any reason that Contractor was not in default under this Agreement, the rights and obligations of the parties shall be the same as if terminated for convenience under section 7.5 "Termination for Convenience."

7.2 <u>RESERVED</u>

7.3 <u>Failure to Perform</u>. Contractor shall immediately notify the COR upon learning that it has, or that it is reasonably foreseeable that it will, fail to perform or timely perform its obligations under this Agreement for any reason, including, but not limited to, a labor dispute, emergency, epidemic, pandemic, or supply chain shortage. In such event, Contractor shall, upon request, prepare and deliver to the COR a written mitigation plan. Nothing in this section relieves the Contractor of its obligations under this Agreement.

7.4 <u>Reduction in Funding</u>. In the event there is a reduction of funds made available by County to Contractor under this or subsequent agreements, the County of San Diego and its departments, officers and employees shall incur no liability to Contractor and shall be held harmless from any and all claims, demands, losses, damages, injuries, or liabilities arising directly or from such action.

SD 1579700
Ex. F - 406

**COUNTY CONTRACT NUMBER 571418**
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

7.5   Termination for Convenience. The County may, by written notice from Contracting Officer, terminate this Agreement for convenience, in whole or in part, at any time. Upon receipt of such notice, Contractor shall promptly report to County all undelivered or unaccepted work performed in accordance with this Agreement prior to termination ("Incomplete Work"). Contractor may, at County's option, be required to complete some or all Incomplete Work during Disentanglement.

    7.5.1   The County shall pay Contractor as full compensation for work performed and costs of termination:

        7.5.1.1   The unit or pro rata price for any delivered and accepted portion of the work.

        7.5.1.2   Actual and reasonable Contractor costs for Incomplete Work not mitigable or otherwise recoverable by Contractor. Such compensation shall not exceed the unit or pro rata price due to Contractor had the work been completed.

    7.5.2   In no event shall the County be liable for any loss of profits or any other consequential damages.

    7.5.3   County's termination of this Agreement for convenience shall not preclude it from changing the termination to a default, as set forth in section 7.1 of this Agreement, nor from taking any action in law or equity against Contractor for:

        7.5.3.1   Fraud, waste, or abuse of Agreement funds, or

        7.5.3.2   Improperly submitted claims, or

        7.5.3.3   Any failure to perform the work in accordance with the Statement of Work, or

        7.5.3.4   Any breach of any term or condition of the Agreement, or

        7.5.3.5   Any actions under any warranty, express or implied, or

        7.5.3.6   Any claim of professional negligence, or

        7.5.3.7   Any other matter arising from or related to this Agreement, whether known, knowable, or unknown before, during, or after the date of termination.

7.5   Suspension of Work. The Contracting Officer may order Contractor, in writing, to suspend, delay, or interrupt all or part of the work of this Agreement for the period of time that the Contracting Officer determines appropriate. County reserves the right to prohibit, without prior notice, Contractor or Contractor's employees, directors, officers, agents, subcontractors, vendors, consultants, or volunteers from 1) accessing County data systems and County owned software applications, including websites, domain names, platforms, physical files, 2) treating County's patients, clients, or facility residents, or 3) providing any other services under this Agreement.

**ARTICLE 8**
**COMPLIANCE WITH LAWS AND REGULATIONS**

8.1   Compliance with Laws and Regulations. Contractor shall at all times perform its obligations hereunder in compliance with all applicable federal, State, County, and local laws, rules, and regulations, current and hereinafter enacted, including facility and professional licensing and/or certification laws and keep in effect any and all licenses, permits, notices and certificates as are required. Contractor shall further comply with all laws applicable to wages and hours of employment, occupational safety, and to fire safety, health, and sanitation.

8.2   Contractor Permits and License. Contractor certifies that it possesses and shall continue to maintain or shall cause to be obtained and maintained, at no cost to the County, all approvals, permissions, permits, licenses, and other forms of documentation required for it and its employees to comply with all existing foreign or domestic statutes, ordinances, and regulations, or other laws, that may be applicable to performance of services hereunder. The County reserves the right to reasonably request and review all such applications, permits, and licenses prior to the commencement of any services hereunder.

8.3   Equal Opportunity. Contractor shall comply with federal and State equal employment opportunity laws, including, but not limited to, the provisions of Title VII of the Civil Rights Act of 1964 in that it will not discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment nor shall Contractor discriminate in any way that would deprive or intend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee because of such individual's race, color, religion, sex, national origin, age, handicap, medical condition, sexual orientation or marital status.

8.4   Affirmative Action. Each Contractor of services and supplies employing fifteen (15) or more full-time permanent employees, shall comply with the Affirmative Action Program for Vendors as set forth in Article IIIk (commencing at section 84) of the San Diego County Administrative Code, which program is incorporated herein by reference. A copy of this Affirmative Action Program will be furnished upon request by COR or from the County of San Diego Internet website (www.sandiegocounty.gov).

SD 1579701
Ex. F - 407

**COUNTY CONTRACT NUMBER 571418**
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

8.5   Non-Discrimination. Contractor shall ensure that services and facilities are provided without regard to ethnic group identification, race, color, nation origin, creed, religion, age, sex, physical or mental disability, political affiliation or marital status in accordance with applicable laws, including, but not limited to, Title VI of the Civil Rights Act of 1964 (42 U.S.C 2000d), section 162 (a) of the Federal-Aid Highway Act of 1973 (23 U.S.C 324), section 504 of the Rehabilitation Act of 1973, The Civil Rights Restoration Act of 1987 (P.L. 100-209), Executive Order 12898 (February 11, 1994), Executive Order 13166 (August 16, 2000), Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000-e), the Age Discrimination Act of 1975 (42 U.S.C. 6101), Article 9.5, Chapter 1, Part 1, Division 2, Title 2 (section 11135, et seq.) of the California Government Code, Title 9, Division 4, Chapter 6 (section 10800, et seq.) of the CCR and California Dept of Social Services Manual of Policies and Procedures (CDSS MPP) Division 21.

8.6   AIDS Discrimination. Contractor shall not deny any person the full and equal enjoyment of, or impose less advantageous terms, or restrict the availability of, the use of any County facility or participation in any County funded or supported service or program on the grounds that such person has Human Immunodeficiency Virus (HIV) or Acquired Immune Deficiency Syndrome (AIDS) as those terms are defined in Title 3, Division 2, Chapter 8, section 32.803, of the San Diego County Code of Regulatory Ordinances.

8.7   American with Disabilities Act (ADA) 1990. Contractor shall not discriminate against qualified people with disabilities in employment, public services, transportation, public accommodations, and telecommunications services in compliance with the Americans with Disabilities Act (ADA), the California Fair Employment and Housing Act (FEHA), and California Administrative Code Title 24.

8.8   Political Activities Prohibited. None of the funds, provided directly or indirectly, under this Agreement shall be used for any political activities or to further the election or defeat of any candidate for public office. Contractor shall not utilize or allow its name to be utilized in any endorsement of any candidate for elected office. Neither this Agreement nor any funds provided hereunder shall be utilized in support of any partisan political activities, or activities for or against the election of a candidate for an elected office.

8.9   Lobbying. Contractor agrees to comply with the lobbying ordinances of the County and to assure that its officers and employees comply before any appearance before the County Board of Supervisors. Except as required by this Agreement, none of the funds provided under this Agreement shall be used for publicity or propaganda purposes designed to support or defeat any legislation pending before State and federal Legislatures, the Board of Supervisors of the County, or before any other local governmental entity. This provision shall not preclude Contractor from seeking necessary permits, licenses and the like necessary for it to comply with the terms of this Agreement.

8.10   Religious Activity Prohibited. There shall be no religious worship, instructions or proselytization as part of or in connection with the performance of this Agreement.

8.11   Audit Requirement.

8.11.1   Contractor shall annually engage a Licensed Certified Public Accountant licensed to perform audits and attests in the State of California to conduct an annual financial audit of the organization. Contractors that expend $750,000 or more of federal grant funds per year shall also have an audit conducted in compliance with Government Auditing Standards, which includes Single Audit Act Amendments and the Compliance Supplement (2 CFR part 200 App. XI). Contractors that are commercial organizations (for-profit) are required to have a non-federal audit if, during its fiscal year, it expended a total of $750,000 or more under one or more HHS awards. 45 CFR part 74.26(d) incorporates the threshold and deadlines of the Compliance Supplement but provides for-profit organizations two options regarding the type of audit that will satisfy the audit requirements. Contractor shall include a clause in any agreement entered into with an audit firm, or notify the audit firm in writing prior to the audit firm commencing its work for Contractor, that the audit firm shall, pursuant to 31 U.S.C. 7503, and to the extent otherwise required by law, provide access by the federal government or other legally required entity to the independent auditor's working papers that were part of the independent auditor's audit of Contractor.  Contractor shall submit two (2) copies of the annual audit report, the audit performed in accordance with the Compliance Supplement, and the management letter to the County fifteen (15) days after receipt from the independent Certified Public Accountant but no later than nine (9) months after the Contractor's fiscal year end.

8.11.2   Contractor shall immediately notify County upon learning that Contractor's independent Certified Public Accountant may or will issue a disclaimer of opinion due to substantial doubt of Contractor's ability to continue as a going concern.

8.12   Board of Supervisors' Policies. Contractor represents that it is familiar, and shall use its best efforts to comply, with the following policies of the Board of Supervisors, available on the County of San Diego website:

8.12.1   Board Policy B-67, which encourages the County's Contractors to offer products made with recycled materials, reusable products, and products designed to be recycled to the County in response to the County's requirements; and

**SD 1579702**
**Ex. F - 408**

COUNTY CONTRACT NUMBER 571418
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES

8.12.2    Board Policies B-53 and B-39a, which encourage the participation of small and veteran owned businesses in County procurements; and

8.12.3    Zero Tolerance for Fraudulent Conduct in County Services. Contractor shall comply with County of San Diego Board of Supervisors Policy A-120 "Zero Tolerance for Fraudulent Conduct in County Services." There shall be "Zero Tolerance" for fraud committed by contractors in the administration of County programs and the provision of County services. Upon proven instances of fraud committed by contractors in connection with their performance under the Agreement, said contractor shall be subject to corrective action up to and including termination of the Agreement; and

8.12.4    Interlocking Directorate. Per Board Policy A-79, if Contractor is a non-profit corporation, Contractor shall not subcontract any work under this Agreement with a related for-profit subcontractor where an interlocking directorate, management, or ownership relationship exists, unless specifically authorized by the Board of Supervisors; and

8.12.5    Drug and Alcohol-Free Work Environment. The County of San Diego, in recognition of its responsibility to provide a safe, healthy, and productive work environment and perform services as safely, effectively, and efficiently as possible, has adopted a requirement for a work environment not adversely affected or impaired in any way by the use or presence of alcohol or drugs in Board Policy C-25 County of San Diego Drug and Alcohol Use Policy.

8.12.5.1    As a material condition of this Agreement, the Contractor agrees that Contractor and Contractor's employees, while performing services or using County equipment pursuant to Agreement:

8.12.5.1.1    Shall not be in any way impaired because of being under the influence of alcohol or a drug.

8.12.5.1.2    Shall not possess, consume, or be under the influence of alcohol and/or an illegal drug.

8.12.5.1.3    Shall not sell, offer, or provide alcohol or an illegal drug to another person; provided, however, that the foregoing restriction shall not be applicable to a Contractor or Contractor employee who as part of the performance of normal job duties and responsibilities prescribes or administers medically prescribed drugs.

8.12.5.2    Contractor shall inform all employees who are performing applicable services of the County's Board Policy C-25 and the above prohibitions.

8.13    Cartwright Act. Following receipt of final payment under the Agreement, Contractor assigns to the County all rights, title, and interest in and to all causes of action it may have under section 4 of the Clayton Act (15 U.S.C. Sec. 15) or under the Cartwright act (Chapter 2) (commencing with section 16700) of Part 2 of Division 7 of the Business and Professions Code), arising from purchases of goods, materials, or services by the Contractor for sale to the County under this Agreement.

8.14    Hazardous Materials. Contractor shall comply with all Environmental Laws and all other laws, rules, regulations, and requirements regarding Hazardous Materials, health and safety, notices, and training. Contractor agrees that it will not store any Hazardous Materials at any County facility for periods in excess of ninety (90) days or in violation of the applicable site storage limitations imposed by Environmental Law. Contractor agrees to take, at its expense, all actions necessary to protect third parties, including, without limitation, employees, and agents of the County, from any exposure to Hazardous Materials generated or utilized in its performance under this Agreement. Contractor agrees to report to the appropriate governmental agencies all discharges, releases, and spills of Hazardous Materials that are required to be reported by any Environmental Law and to immediately notify the County of it. Contractor shall not be liable to the County for the County's failure to comply with, or violation of, any Environmental Law. As used in this section, the term "Environmental Laws" means any and all federal, state, or local laws or ordinances, rules, decrees, orders, regulations, or court decisions (including the so-called "common law"), including, but not limited to, the Resource Conservation and Recovery Act, relating to hazardous substances, hazardous materials, hazardous waste, toxic substances, environmental conditions or other similar substances or conditions. As used in this section the term "Hazardous Materials" means any chemical, compound, material, substance or other matter that: (a) is a flammable, explosive, asbestos, radioactive nuclear medicine, vaccine, bacteria, virus, hazardous waste, toxic, overtly injurious or potentially injurious material, whether injurious or potentially injurious by itself or in combination with other materials; (b) is controlled, referred to, designated in or governed by any Environmental Laws; (c) gives rise to any reporting, notice or publication requirements under any Environmental Laws, or (d) is any other material or substance giving rise to any liability, responsibility or duty upon the County or Contractor with respect to any third person under any Environmental Laws.

8.15    Clean Air Act and Federal Water Pollution Control Act.

8.15.1    Contractor shall comply with all applicable standards, orders, or regulations issued pursuant to the Clean Air Act, as amended, (42 U.S.C. §§ 7401 et seq.) and the Federal Water Pollution Control Act, as amended, (33 U.S.C. §§ 1251 et seq.). Contractor shall report each violation to the USDA and the appropriate EPA Regional Office as required.

8.16    Debarment, Exclusion, Suspension, and Ineligibility.

**SD 1579703**
**Ex. F - 409**

**COUNTY CONTRACT NUMBER 571418**
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

8.16.1 Contractor certifies that, to the best of its knowledge, and except as disclosed to County and acknowledged in writing by County prior to the execution of this Agreement, Contractor, its employees, directors, officers, agents, subcontractors, vendors, consultants, and volunteers:

8.16.1.1 Are not presently debarred, excluded, suspended, declared ineligible, voluntarily excluded, or proposed for debarment, exclusion, suspension, or ineligibility by any federal, state, or local department or agency; and

8.16.1.2 Have not within a 3-year period preceding this Agreement been convicted of, or had a civil or administrative judgment rendered against them for, the commission of fraud or a criminal offense or civil action in connection with obtaining, attempting to obtain, or performing a public (federal, State, or local) transaction; violation of federal or State anti-trust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, receiving stolen property; physical, financial or sexual abuse or misconduct with a patient or client, or medical negligence or malpractice;

8.16.1.3 Are not presently indicted or otherwise criminally, civilly, or administratively charged by a government entity (federal, State, or local) with commission of any of the offenses enumerated in the paragraph above; and

8.16.1.4 Are not presently the target or subject of any investigation, accusation, or charge related to the conduct of business by any federal, state, or local agency or law enforcement, licensing, certification, labor standards, occupational safety, ethics, or compliance body.

8.16.1.5 Are not proposed for debarment by any state, local, or federal department or agency.

8.16.1.6 Do not have a judgment rendered against them by a body described in 8.16.1.5 that is unsatisfied.

8.16.1.7 Have not within a three (3) year period preceding this Agreement (i) been found in violation or had a judgment rendered against them resulting from the type of investigation, accusation, or charge described in 8.16.1.5 or (ii) had one or more public transactions (federal, state, or local) terminated for cause or default.

8.16.2 Contractor shall have an ongoing duty during the term of this Agreement to disclose to the County any occurrence that would prevent Contractor from making the certifications contained in this section 8.16 on an ongoing basis. Such disclosure shall be made in writing to the COR and the County Office of Ethics and Compliance within five (5) business days of when Contractor discovers or reasonably believes there is a likelihood of such occurrence.

8.17 <u>Display of Fraud Hotline Poster(s)</u>. As a material term and condition of this Agreement, Contractor shall:

8.17.1 Prominently display in common work areas within all business segments performing work under this Agreement County of San Diego Office of Ethics and Compliance Ethics Hotline posters;

8.17.2 Posters may be downloaded from the County Office of Ethics and Compliance website at: http://www.sandiegocounty.gov/content/sdc/cao/oec.html. Additionally, if Contractor maintains a company website as a method of providing information to employees, the Contractor shall display an electronic version of the poster(s) at the website;

8.17.3 If Contractor has implemented a business ethics and conduct awareness program, including a reporting mechanism, the Contractor need not display the County poster.

8.18 <u>False Claims Act Training</u>. Contractor shall, not less than annually, provide training on the Federal False Claims Act (31 USC 3729, et seq. or successor statutes) and State False Claims Act (California Government Code 12650, et seq. or successor statutes) to all employees, directors, officers, agents, Related Subcontractors, or volunteers providing services under this Agreement. Contractor shall maintain verification of this training. Contractor shall retain verifications in accordance with the Agreement requirement for retention of records

8.19 <u>Code of Ethics</u>. As a material term and condition of this Agreement, Contractor shall develop and implement a Code of Ethics or similar document and maintain it during the term of this Agreement. Additionally, Contractor shall train all employees and volunteers on the Code of Ethics, and all employees, volunteers, directors, officers, and agents shall certify that they have received training and have been provided an opportunity to ask questions of their employer regarding the Code of Ethics. Contractor shall retain these certifications in accordance with the Agreement's provision regarding retention of records

8.20 <u>Compliance Program</u>. Contractors with an agreement that exceeds more than $250,000 in value annually shall establish, and maintain for the duration of this Agreement, a compliance program that meets the standards of Federal Sentencing Guidelines section 8B2.1 and 42 CFR 438.608, regardless of funding source or services.

8.21 <u>Investigations</u>. Unless prohibited by an investigating government authority, Contractor shall cooperate and participate fully in any investigation initiated by County relative to this Agreement. Upon County's request, Contractor shall promptly provide

**SD 1579704**
**Ex. F - 410**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

to County any and all documents, including any and all communications or information stored digitally, and make available for interviews any employee(s) of Contractor identified by County. Contractor further agrees to immediately notify County if any employee, director, officer, agent, subcontractor, vendor, consultant, or volunteer of Contractor comes under investigation by any federal, State, or local government entity with law enforcement or oversight authority over the Agreement or its funding for conduct arising out of, or related to, performance under this Agreement.

Contractor shall promptly make available to County all internal investigative results, findings, conclusions, recommendations, and corrective action plans pertaining to the investigation in its possession as requested by the County, unless otherwise protected by applicable law or privilege.

**ARTICLE 9**
**CONFLICTS OF INTEREST; CONTRACTOR'S CONDUCT**

9.1    <u>Conflicts of Interest</u>. Contractor presently has no interest, including but not limited to other projects or independent agreements, and shall not acquire any such interest, direct or indirect, which would conflict in any manner or degree with the performance of services required to be performed under this Agreement. The Contractor shall not employ any person having any such interest in the performance of this Agreement. Contractor shall not hire County's employees to perform any portion of the work or services provided for herein including secretarial, clerical, and similar incidental services except upon the written approval of County. Without such written approval, performance of services under this Agreement by associates or employees of County shall not relieve Contractor from any responsibility under this Agreement.

    9.1.1    <u>California Political Reform Act and Government Code Section 1090 Et Seq</u>. Contractor acknowledges that the California Political Reform Act ("Act"), Government Code section 81000 et seq., provides that Contractors hired by a public agency, such as County, may be deemed to be a "public official" subject to the Act if the Contractor advises the agency on decisions or actions to be taken by the agency. The Act requires such public officials to disqualify themselves from participating in any way in such decisions if they have any one of several specified "conflicts of interest" relating to the decision. To the extent the Act applies to Contractor, Contractor shall abide by the Act. In addition, Contractor acknowledges and shall abide by the conflict-of-interest restrictions imposed on public officials by Government Code section 1090 et seq.

9.2    <u>Conduct of Contractor</u>.

    9.2.1    Contractor shall inform the County of all Contractor's interests, if any, that are, or that Contractor believes to be, incompatible with any interests of the County.

    9.2.2    Contractor shall not, under circumstances that might reasonably be interpreted as an attempt to influence the recipient in the conduct of his duties, accept any gratuity or special favor from individuals or organizations with whom the Contractor is doing business or proposing to do business, in accomplishing the work under this Agreement.

    9.2.3    Contractor shall not use for personal gain or make other improper use of confidential information acquired in connection with this Agreement. In this connection, the term "confidential information" includes, but is not limited to, unpublished information relating to technological and scientific development; medical, personnel, or security records of individuals; anticipated materials requirements or pricing actions; and knowledge of selections of Contractors or subcontractors in advance of official announcement.

    9.2.4    Contractor, its employees, directors, officers, agents, subcontractors, vendors, consultants, and volunteers shall not offer, directly or indirectly, any unlawful gift, gratuity, favor, entertainment, or other item(s) of monetary value to an employee or official of the County.

    9.2.5    <u>Referrals</u>. Contractor further covenants that no referrals of clients through Contractor's intake or referral process shall be made to the private practice of any person(s) employed by the Contractor.

9.3    <u>Prohibited Agreements</u>. As required by section 67 of the San Diego County Administrative Code, Contractor certifies that it is not in violation of the provisions of section 67, and that Contractor is not, and will not subcontract with, any of the following:

    9.3.1.    Persons employed by County or of public agencies for which the Board of Supervisors is the governing body;

    9.3.2.    Profit-making firms or businesses in which employees described in sub-section 9.3.1, above, serve as officers, principals, partners, or major shareholders;

    9.3.3.    Persons who, within the immediately preceding twelve (12) months came within the provisions of the above sub-sections and who (1) were employed in positions of substantial responsibility in the area of service to be performed by the Agreement, or (2) participated in any way in developing the Agreement or its service specifications; and

    9.3.4.    Profit-making firms or businesses, in which the former employees described in sub-section 9.3.3 above, serve as officers, principals, partners, or major shareholders.

**SD 1579705**
**Ex. F - 411**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

9.4 <u>Limitation of Future Agreements or Grants</u>. It is agreed by the parties to the Agreement that Contractor shall be restricted in its future contracting with the County to the manner described below. Except as specifically provided in this section, Contractor shall be free to compete for business on an equal basis with other companies.

9.4.1 If Contractor, under the terms of the Agreement, or through the performance of tasks pursuant to this Agreement, is required to develop specifications or statements of work and such specifications or statements of work are to be incorporated into a solicitation, Contractor shall be ineligible to perform the work described within that solicitation as a prime or subcontractor under an ensuing County agreement. It is further agreed, however, that County will not, as additional work, unilaterally require Contractor to prepare such specifications or statements of work under this Agreement.

9.4.2 Contractor may not apply for nor accept additional payments for the same services contained in the Statement of Work.

**ARTICLE 10**
**INDEMNITY AND INSURANCE**

10.1 <u>Indemnity</u>. County shall not be liable for, and Contractor shall defend and indemnify County and the employees and agents of County (collectively "County Parties"), against any and all claims, demands, liability, judgments, awards, fines, mechanics' liens or other liens, labor disputes, losses, damages, expenses, charges or costs of any kind or character, including attorneys' fees and court costs (hereinafter collectively referred to as "Claims"), related to this Agreement or the work covered by this Agreement and arising either directly or indirectly from any act, error, omission or negligence of Contractor or its Contractors, licensees, agents, servants or employees, including, without limitation, Claims caused by the sole passive negligent act or the concurrent negligent act, error or omission, whether active or passive, of County Parties. Contractor shall have no obligation, however, to defend or indemnify County Parties from a Claim if it is determined by a court of competent jurisdiction that such Claim was caused by the sole negligence or willful misconduct of County Parties.

Without limiting the foregoing, Contractor's defense and indemnity obligations under this section shall specifically apply to any claim, suit, proceeding, demand, liability, loss, damage, or expense (including but not limited to attorneys' fees) arising from or relating to a claim that any work performed pursuant to this Agreement infringes a patent, copyright, moral right, trademark, trade secret, or other intellectual property right of a third party. Without limiting the generality of the foregoing, if any portion of any of the same or County's use of the same is, or in Contractor's or County's opinion is likely to be, held to infringe the rights of any third party, Contractor shall at its expense either (i) procure the right for County to use the infringing item free of any liability or expense to County to the full extent contemplated by this Agreement; or (ii) replace it with a non-infringing equivalent reasonably satisfactory to County. Without limiting the County's other rights and Contractor's obligations under this section, County shall have the right to employ counsel at its own expense for, and participate in the defense of, any claim.

10.2 <u>Insurance</u>. Contractor shall, at its own cost and expense, obtain and keep in force and effect during the term of this Agreement, including all extensions, the insurance specified in Exhibit B Insurance Requirements. Evidence of insurance and any other documents or notices required to be provided to County pursuant to Exhibit B shall be submitted to the COR or as instructed by the COR. The provisions of section 10.1 are independent of, and shall in no way limit, Contractor's and its insurer's requirements under this section 10.2 and Exhibit B.

**ARTICLE 11**
**AUDIT AND INSPECTION**

11.1 <u>Audit and Inspection</u>.

11.1.1 Authorized federal, State and County representatives and their designated inspectors shall each have the following rights ("Audit and Inspection"):

11.1.1.1 to monitor, assess, and evaluate Contractor's performance under this Agreement;

11.1.1.2 to conduct audits, inspections, reviews of reports, and interviews of staff and participants involved with the services provided under this Agreement; and

11.1.1.3 to inspect the premises, services, materials, supplies, and equipment furnished or utilized in the performance of this Agreement and the workmanship of the work performed under this Agreement.

11.1.2 Contractor shall fully cooperate with any Audit and Inspection. County shall perform Audits and Inspections in a manner so as not to unduly interfere with Contractor's performance.

11.1.3 At any time during normal business hours and as often as County may deem necessary, Contractor shall make available to County, State or federal officials for examination all of its records with respect to all matters covered by this Agreement and will permit County, State or federal officials to examine and make excerpts or transcripts from

**SD 1579706**

**Ex. F - 412**

**COUNTY CONTRACT NUMBER 571418**
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

such records, and to make audits of all invoices, materials, payrolls, records of personnel, information regarding clients receiving services, and other data relating to all matters covered by this Agreement.

11.1.4 If an audit is conducted, it will be done in accordance with generally accepted government auditing standards as described in "Government Auditing Standards," published for the United States General Accountability Office or the institute of Internal Auditors International Standards for the Professional Practice of Internal Auditing.

11.2 <u>External Audits</u>. Contractor shall provide the following to the COR:

11.2.1 a copy of all notifications of audits or pending audits by federal or State representatives regarding contracted services identified in this Agreement within three (3) business days of Contractor receiving notice of the audit.

11.2.2 a copy of the draft and final State or federal audit reports within twenty-four (24) hours of receiving them.

11.2.3 a copy of Contractor's response to the draft and final State or federal audit reports at the same time the response is provided to the State or federal representatives.

11.2.4 a copy of all responses made by a federal or State representative to a Contractor's audit response no later than three (3) business days after receiving it, unless prohibited by the government agency conducting the audit. This shall continue until the federal or State auditors have accepted and closed the audit.

11.3 <u>Availability of Records</u>. Contractor shall maintain and/or make available within San Diego County accurate books, accounting records, and other records related to Contractor's performance under this Agreement, including all records of costs charged to this Agreement during the term of this agreement and for the longer of: (i) a period of five (5) years after the date of final payment under this Agreement, (ii) for records that relate to appeals under Article 15 "Disputes," or litigation or the settlement of claims arising out of the performance of this Agreement, three (3) years after such appeals, litigation, or claims have been disposed of, and (iii) any retention period required by the funding source(s) of this Agreement. Contractor shall provide any requested records to County within two (2) business days of request. Contractor assertions of confidentiality shall not be a bar to full access to the records. County shall keep the materials described above confidential unless otherwise required by law.

11.3.1 Contractor shall maintain, and the records referred to in section 11.3 shall include, records sufficient to establish the reasonableness accuracy, completeness and currency of all cost or pricing data submitted to County in connection with this Agreement, including records of adequate price competition, negotiations, and cost or price analysis.

11.4 <u>Outcome-Based Measures</u>. Where outcome-based measures are set forth in the Statement of Work, Contractor shall maintain, and provide to County upon County's request as often as County deems necessary, complete, and accurate data documenting such outcome measures under this Agreement. Such data may include, but is not limited to, statistics on outcomes, rates of success, and completion rate of deliverables.

11.5 <u>Full Cost Recovery</u>. Contractor shall reimburse County for all direct and indirect expenditures incurred in conducting an audit, investigation, or inspection when Contractor is subsequently found to have violated terms of this Agreement.

11.6 <u>Corrective Actions</u>. If any services performed hereunder are found to have not been in conformity with the specifications and requirements of this Agreement, County shall have the right to (1) require the Contractor to perform the services in conformity with said specifications and requirements at no additional increase in total Agreement amount, (2) require Contractor immediately to take all necessary steps to ensure future performance of the services in conformity with requirements of the Agreement, (3) reduce payment to Contractor in accordance with Article 4, (4) have the services performed, by agreement or otherwise, in conformance with the specifications of this Agreement and recover from Contractor any costs incurred by County that are directly related to the performance of such services, and/or (5) pursue any other rights or remedies available to County under this Agreement.

**ARTICLE 12**
**RECOVERY OF FUNDS**

Where Contractor is required to reimburse County under any provision of this Agreement, or where County is otherwise owed funds from Contractor, County may, at its sole discretion and subject to funding source restrictions and State and federal law: (1) withhold such amounts from any amounts due to Contractor pursuant to the payment terms of this Agreement, (2) withhold such amounts from any other amounts due to Contractor from County, and/or (3) require Contractor to make payment to County for the total amount due (or a lesser amount specified by County) within thirty (30) days of request by County. Notwithstanding the foregoing, County may allow Contractor to repay any such amounts owed in installments pursuant to a written repayment plan.

**ARTICLE 13**
**USE OF DOCUMENTS AND REPORTS**

13.1 <u>Findings Confidential</u>. Any reports, records, data, or other information given to or prepared or assembled by Contractor under this Agreement that the County requests to be kept confidential shall not be made available to any individual or organization

**SD 1579707**
**Ex. F - 413**

**COUNTY CONTRACT NUMBER 571418**
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

by the Contractor without the prior written approval of the County except as may be required by law. Contractor shall not disclose to any individual or organization any reports, records, data, or other information received, prepared, or assembled by Contractor under this Agreement

13.2 <u>Ownership, Publication, Reproduction and Use of Material</u>. All reports, studies, information, data, statistics, forms, designs, plans, procedures, systems, and any other material or properties produced under this Agreement shall be the sole and exclusive property of County. No such materials or properties produced in whole or in part under this Agreement shall be subject to private use, copyright, or patent right by Contractor in the United States or in any other country without the express written consent of County. County shall have unrestricted authority to publish, disclose, distribute and otherwise use, copyright or patent, in whole or in part, any such reports, studies, data, statistics, forms or other materials or properties produced under this Agreement.

13.3 <u>Confidentiality</u>. Contractor agrees to maintain the confidentiality of and take industry appropriate and legally required measures to prevent the unlawful disclosure of any information that is legally required to be kept confidential. Except as otherwise allowed by local, State, or federal law or regulation and pursuant to this section 13.3, Contractor agrees to only disclose confidential records where the holder of the privilege, whether the County, or a third party, provides written permission authorizing the disclosure.

13.4 <u>Public Records Act</u>. The California Public Records Act ("CPRA") requires County to disclose "public records" in its actual or constructive possession unless a statutory exemption applies. This generally includes contracts and related documents. If County receives a CPRA request for records relating to the Agreement, County may, at its sole discretion, either determine its response to the request without notifying Contractor or notify Contractor of the request. If County determines its response to the request without notifying Contractor, Contractor shall hold County harmless for such determination. If County notifies Contractor of the request, Contractor may request that County withhold or redact records responsive to the request by submitting to County a written request within five (5) business days after receipt of the County's notice. Contractor's request must identify specific records to be withheld or redacted and applicable exemptions. Upon timely receipt of Contractor's request, County will review the request and at its sole discretion withhold and/or redact the records identified by Contractor. Contractor shall hold County harmless for County's decision whether to withhold and/or redact pursuant to Contractor's written request. Contractor further agrees that its defense and indemnification obligations set forth in section 10.1 of this Agreement extend to any Claim (as defined in section 10.1) against the County Parties (as defined in section 10.1) arising out of County's withholding and/or redacting of records pursuant to Contractor's request. Nothing in this section shall preclude Contractor from bringing a "reverse CPRA action" to prevent disclosure of records. Nothing in this section shall prevent the County or its agents or any other governmental entity from accessing any records for the purpose of audits or program reviews if that access is legally permissible under the applicable local, State, or federal laws or regulations. Similarly, County or its agent or designee may take possession of the record(s) where legally authorized to do so.

13.5 <u>Custody of Records</u>. Contractor shall deliver to County or its designee, at County's request, all documentation and data related to Contractor's work under this Agreement, including, but not limited to, County data and client files held by Contractor, at no charge to County. County, at its option, may take custody of Contractor's client records upon Agreement termination, expiration, or at such other time as County may deem necessary. County agrees that such custody will conform to applicable confidentiality provisions of State and federal law and that retained records shall be available to Contractor for examination and inspection in accordance with applicable law. Contractor shall destroy records not turned over to County in accordance with applicable retention requirements and this Agreement. Notwithstanding the foregoing, Contractor may retain one (1) copy of the documentation and data for archival purposes or warranty support, and Contractor may maintain records that it is legally required to maintain.

13.6 <u>Reports</u>. Contractor shall submit reports required in Exhibit A and additional reports as may be requested by the COR and agreed to by the Contractor. Format for the content of such reports may be developed by County. The timely submission of these reports is a necessary and material term and condition of this Agreement and Contractor agrees that failure to meet specified deadlines will be sufficient cause to withhold payment. Contractor shall submit to County within thirty (30) days of the termination of this Agreement a report detailing all work done pursuant to this Agreement by Contractor.

**ARTICLE 14**

14.1 <u>Recitals</u>. This Article is intended to protect the privacy and security of County information that Contractor may create, receive, access, store, transmit, and/or destroy under this Agreement. In addition to the below Responsibilities, contractor shall be in compliance with the following rules, regulations, and agreements, ***as applicable***:

14.1.1 Health Insurance Portability and Accountability Act, specifically, Public Law 104-191, the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005, 42USC section 17921 et seq., and 45CFR Parts 160 and 164, collectively referred to as "HIPAA;"

14.1.2 County agreements with the State of California, collectively referred to as "State Agreements" and posted on the County's website at: <u>www.cosdcompliance.org</u>, including:

**SD 1579708**
**Ex. F - 414**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

14.1.2.1   The Medi-Cal Privacy and Security Agreement Between the California Department of Health Care Services (DHCS) and the County;

14.1.2.2   The Medi-Cal Behavioral Health Services Performance Agreement between DHCS and the County;

14.1.2.3   The San Diego County Alcohol and Drug Program Administrator Agreement between DHCS and the County

14.1.2.4   The Refugee Health Agreement between the California Department of Public Health (CDPH) and the County;

14.1.2.5   The HIV/AIDS Case Reporting System Data Use Agreement between CDPH and the County;

14.1.2.6   The Childhood Lead Poisoning Prevention Program between CDPH and the County;

14.1.2.7   The Standard Agreement between the County and the California Department of Aging; and

14.1.2.8   The Agreement for Whole Person Care Pilot Program for San Diego County with DHCS.

14.1.3   Title 42 Code of Federal Regulations, Chapter 1, Subchapter A, Part 2.

14.1.4   California Civil Code 1798;

14.1.5   California Senate Bill 1386.

14.2   <u>Definitions</u>.  Terms used, but not otherwise defined, in this Article shall have the same meaning as defined by HIPAA.

14.2.1   "Breach" of Protected Health Information (PHI) shall have the same meaning given to the term "breach" under HIPAA and "breach" of Personal Information (PI)/Personally Identifiable Information (PII) shall have the same meaning as given to it under the State Agreements.

14.2.2   "Business Associate," when applicable, shall mean the Contractor.

14.2.3   "County PHI" shall have the same meaning as PHI under HIPAA, specific to PHI under this Agreement.

14.2.4   "County PI/PII" shall have the same meaning as PI/PII under the State Agreements, specific to PI/PII under this Agreement.

14.2.5   "Covered Entity," when applicable, shall mean the County.

14.2.6   "Security incident" shall have the same meaning as defined by the State Agreements.

14.3   <u>Responsibilities of Contractor</u>.

14.3.1   <u>Use and Disclosure of County PHI/PI/PII</u>. Contractor shall use the minimum County PHI/PI/PII required to accomplish the requirements of this Agreement or as required by Law.  Contractor may not use or disclose County PHI/PI/PII in a manner that would violate HIPAA or the State Agreements if done by the County.

14.3.2   <u>Safeguards</u>. Contractor shall develop and maintain a HIPAA-compliant information privacy and security program to prevent use or disclosure of County PHI/PI/PII, other than as required by this Agreement.

14.3.3   <u>Mitigation</u>. Contractor shall mitigate, to the extent practicable, any harmful effects caused by violation of the requirements of this Article, as directed by the County.

14.3.4   <u>Subcontractors</u>. Contractor shall ensure that any agent, including a subcontractor, to whom it provides County PHI/PI/PII, imposes the same conditions on such agents that apply to Contractor under this Article.

14.3.5   <u>Cooperation with County</u>.

14.3.5.1   Contractor shall provide access to County PHI/PI/PII, as well as internal practices and records related to County PHI/PI/PII, at the written request of County within ten (10) calendar days.

14.3.5.2   Contractor will assist County regarding individual's access, copy, amendment, accounting of disclosure, and other such requests for County PHI/PI/PII in the time and manner designated by County.

14.3.6   <u>Breach Reporting</u>. Contractor shall report breaches and suspected security incidents to County, to include:

14.3.6.1   <u>Initial Report</u>.

14.3.1.1.1   Contractor shall email County Contracting Officer's Representative (COR) and County Chief Compliance and Privacy Officer (CCPO) immediately upon the discovery of a suspected security incident that involves data provided to County by the Social Security Administration, as per the State Agreements.

**SD 1579709**

**Ex. F - 415**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

14.3.1.1.2   Contractor shall email COR and CCPO immediately of breaches and suspected privacy incidents involving 500 or more individuals.

14.3.6.2   <u>Investigation Report</u>. Contractor shall immediately investigate such suspected security incident or breach and provide the County a complete report of the investigation within seven (7) working days.

14.3.6.3   <u>Notification</u>. Contractor will comply with County's request to notify individuals and/or media and shall pay any costs of such notifications, as well as any costs associated with the breach. County shall approve the time, manner and content of any such notifications before notifications are made.

14.3.7   <u>Designation of Individuals</u>. Contractor shall designate a Privacy Official and a Security Official to oversee its privacy and security requirements herein.

14.3.8   <u>Data Security</u>. Contractor shall comply with, as applicable, data privacy and security requirements specified by <u>HIPAA</u> and the State Agreements, which may include, but are not limited to:

14.3.8.1   Workforce members, including employees, interns, volunteers, subcontractors, etc., with access to applicable County PHI/PI/PII shall:

14.3.1.1.3   Complete privacy and security training to include a signed certification within thirty (30) days of hire, and at least annually thereafter; and

14.3.1.1.4   Sign a confidentiality statement, prior to access to such PHI/PI/PII; and

14.3.8.2   Computer warning banners for all systems containing applicable County PHI/PI/PII

14.3.8.3   Comprehensive, annual security risk assessments

14.3.8.4   Policies and internal controls to ensure secure transport and storage of County PHI/PI/PII in cars, airplanes, trains, and buses.

14.3.8.5   Sufficient administrative, physical, and technical controls in place to protect County PHI/PI/PII

14.3.9   <u>Termination</u>. Upon termination of the Agreement for any reason, Contractor shall return or destroy all County PHI/PII/PI, except County PHI/PII/PI necessary for Contractor to continue its proper management and administration or to carry out its legal responsibilities, as mutually agreed upon by the Parties.  If the Parties mutually agree that return or destruction of County PHI/PII/PI is infeasible, Contractor shall extend the protections of this Article to such County PHI/PII/PI for so long as Contractor maintains such County PHI/PII/PI.

**ARTICLE 15**
**DISPUTES**

Notwithstanding any provision of this Agreement to the contrary, the Contracting Officer shall decide any dispute concerning a question of fact arising out of this Agreement that is not otherwise disposed of by the parties within a reasonable period of time. The decision of the Contracting Officer shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith. Contractor shall proceed diligently with its performance hereunder pending resolution by the Contracting Officer of any such dispute. Nothing herein shall be construed as granting the Contracting Officer or any other administrative official, representative or board authority to decide questions of law, or issues regarding the medical necessity of treatment or to pre-empt any medical practitioners' judgment regarding the medical necessity of treatment of patients in their care. The foregoing does not change the County's ability to refuse to pay for services rendered if County disputes the medical necessity of care.

**ARTICLE 16**
**GENERAL PROVISIONS**

16.1   <u>Change of Control</u>. Contractor shall notify County in writing of any change in majority ownership of Contractor (or all or substantially all of Contractor's assets) through a transaction or series of transactions including, without limitation, an acquisition, sale, reorganization, merger, or consolidation ("Change of Control") at least one hundred eighty (180) days prior to the effective date of a Change of Control or as soon as practicable thereafter if notice cannot legally be provided to County within such timeframe.

16.1.1   Without limiting any other rights or remedies of County, in the event of a pending or actual Change of Control, County may terminate this Agreement in accordance with section 7.5, Termination for Convenience, except that Contractor shall not be entitled to costs of termination set forth in section 7.5.2.

16.2   <u>Assignment and Delegation</u>. Contractor shall not assign any of its rights or delegate any of its obligations hereunder without the prior written consent of County, which shall not be unreasonably withheld; provided, however, that Contractor may assign or delegate its rights or obligations under this Agreement to the entity becoming a majority owner of Contractor's assets

**SD 1579710**
**Ex. F - 416**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

during a Change of Control, provided that notice is given in accordance with section 16.1 above. Any purported assignment or delegation in violation of this section shall be null and void

16.3  Entire Agreement. This Agreement, together with all Exhibits attached hereto and other agreements expressly referred to herein, constitute the entire agreement between the parties with respect to the subject matter contained herein. All prior or contemporaneous agreements, understandings, representations, warranties, and statements, oral or written, including any proposals from Contractor and requests for proposals from County, are superseded.

16.4  Remedies Not Exclusive. The rights and remedies of County provided in this Agreement shall not be exclusive and are in addition to any other rights and remedies provided by law, equity, or under resulting order.

16.5  Sections and Exhibits. All recitals, sections, and exhibits referred to in this Agreement are incorporated herein by reference.

16.6  Further Assurances. Parties agree to perform such further acts and to execute and deliver such additional documents and instruments as may be reasonably required in order to carry out the provisions of this Agreement and the intentions of the parties.

16.7  Governing Law. This Agreement shall be governed, interpreted, construed, and enforced in accordance with the laws of the State of California.

16.8  Headings. The article and section headings used in this Agreement are inserted for convenience of reference only and are not intended to define, limit, or affect the construction or interpretation of any term or provision hereof.

16.9  Neither Party Considered Drafter. Despite the possibility that one party may have prepared the initial draft of this Agreement or played the greater role in the physical preparation of subsequent drafts, neither party shall be deemed the drafter of this Agreement and that, in construing this Agreement in case of any claim that any provision hereof may be ambiguous, no such provision shall be construed in favor of one party on the ground that such provision was drafted by the other.

16.10  No Other Inducement. The making, execution, and delivery of this Agreement by the parties hereto has been induced by no representations, statements, warranties, or agreements other than those expressed herein.

16.11  Notices. Notice to either party shall be in writing and personally delivered; sent by certified mail, postage prepaid, return receipt requested; or emailed to the County's or Contractor's designated representative (or such party's authorized representative). Any such notice shall be deemed received by the party (or such party's authorized representative) on the earliest of the date of personal delivery, three (3) business days after deposit in the U.S. Mail, or upon sending of an email from which an acknowledgement of receipt has been received other than an out of office, unavailable, or undeliverable reply.

16.12  Severability. If any term, provision, covenant, or condition of this Agreement is held to be invalid, void or otherwise unenforceable, to any extent, by any court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby, and each term, provision, covenant, or condition of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

16.13  Successors. Subject to the limitations set forth in sections 16.1 and 16.2 above, all terms of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective heirs, legal representatives, successors, and assigns.

16.14  Time. Time is of the essence for each provision of this Agreement.

16.15  Time Period Computation. All periods of time referred to in this Agreement shall be calendar days, unless the period of time specifies business days. Calendar days shall include all days of the week, including holidays. Business days shall be Monday through Friday, excluding County observed holidays.

16.16  Waiver. The waiver by one party of the performance of any term, provision, covenant, or condition shall not invalidate this Agreement, nor shall it be considered as a waiver by such party of any other term, provision, covenant, or condition. Delay by any party in pursuing any remedy or in insisting upon full performance for any breach or failure of any term, provision, covenant, or condition shall not prevent such party from later pursuing remedies or insisting upon full performance for the same or any similar breach or failure.

16.17  Third Party Beneficiaries Excluded. This Agreement is intended solely for the benefit of the County and its Contractor. Any benefit to any third party is incidental and does not confer on any third party to this Agreement any rights whatsoever regarding the performance of this Agreement. Any attempt to enforce provisions of this Agreement by third parties is specifically prohibited.

16.18  Publicity Announcements and Materials. All public announcements, including those issued on Contractor letterhead, and materials distributed to the community shall identify the County of San Diego as the funding source for contracted programs identified in this Agreement. Copies of publicity materials related to contracted programs identified in this Agreement shall be filed with the COR. County shall be advised at least twenty-four (24) hours in advance of all locally generated press releases and media events regarding contracted services identified in this Agreement. Alcohol and Drug Prevention Services

**SD 1579711**
**Ex. F - 417**

COUNTY CONTRACT NUMBER 571418
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

Contractors shall notify COR or designee at least five (5) business days in advance of all Contractor generated media releases and media events regarding contracted services identified in this Agreement.

16.19 <u>Critical Incidents</u>. Contractor shall have written plans or protocols and provide employee training for handling critical incidents involving: external or internal instances of violence or threat of violence directed toward staff or clients; loss, theft or unlawful accessing of confidential client, patient or facility resident Personal Information (PI), Personally Identifiable Information (PII) and/or Personal Health Information (PHI); fraud, waste and/or abuse of Agreement funds; unethical conduct; or violation of any portion of San Diego County Board of Supervisors Policy C-25 "Drug and Alcohol Use Policy" while performing under this Agreement. Contractor shall report all such incidents to the COR within one business day of their occurrence. However, if this Agreement includes Article 14, Contractor must adhere to the timelines and processes contained in Article 14.

16.20 <u>Responsiveness to Community Concerns</u>. Contractor shall notify County within one business day of receipt of any material complaints submitted to Contractor orally or in writing related to Contractor's performance of work under this Agreement ("Complaints"), unless prohibited by applicable State, federal, or local law. Complaints include, but are not limited to, issues of abuse or quality of care*,* or issues regarding a program or facility applicable to this Agreement. Contractor shall take appropriate steps to acknowledge receipt of Complaint(s) from individuals or organizations and to address or resolve all Complaints. Contractor shall promptly notify the County of the status and disposition of all complaints and provide additional information or documentation upon request. Nothing in this provision shall be interpreted to preclude Contractor from engaging in any legally authorized use of its facility, property, or business as approved, permitted or licensed by the applicable authority.

16.21 <u>Criminal Background Check Requirements</u>. Contractor shall ensure that criminal background checks are required and completed prior to employment or placement of any employee, director, officer, agent, subcontractor, consultant, or volunteer who will be providing any services, accessing County or client data, or receiving compensation under this Agreement. Background checks shall be in compliance with any licensing, certification, funding, or Agreement requirements, including the Statement of Work, which may be higher than the minimum standards described herein. Furthermore, for any individuals identified above who will be assigned to sensitive positions funded by this Agreement, background checks shall be in compliance with Board of Supervisors Policy C-28, available on the County of San Diego website. Sensitive positions are those that: (1) physically supervise minors or vulnerable adults; (2) have unsupervised physical contact with minors or vulnerable adults; and/or (3) have a fiduciary responsibility to any County client, or direct access to, or control over, bank accounts or accounts with financial institutions of any client. If this Agreement includes Article 14, Contractor must also adhere to requirements contained in Article 14.

Contractor shall have a documented process for reviewing the information and determine if criminal history demonstrates behavior that could create an increased risk of harm to clients or risk to services to be performed under Agreement. Contractor shall document review of criminal background findings and consideration of criminal history in the selection of such persons listed above in this section.

16.21.1 Contractor shall utilize a subsequent arrest notification service or perform a criminal background check annually during the term of this Agreement for any employee, director, officer, agent, subcontractor, consultant, or volunteer who will be providing any services under this Agreement. Contractor shall keep the documentation of their review and consideration of the individual's criminal history on file in accordance with paragraph 11.4 "Maintenance of Records."

16.21.2 <u>Definitions</u>

16.21.2.1 <u>Minor</u>:  Individuals under the age of eighteen (18) years old.

16.21.2.2 <u>Vulnerable Adult</u>: (1) Individuals age eighteen (18) years or older, who require assistance with activities of daily living and who may be put at risk of abuse during service provision; (2) Individuals age eighteen (18) years or older who have a permanent or temporary limited physical and/or mental capacity that may put them at risk of abuse during service provision because it renders them: unable to make decisions for themselves, unable to physically defend themselves, or unaware of physical abuse or other harm that could be perpetrated against them.   Activities of daily living are defined as the basic tasks of everyday life, such as eating, bathing, dressing, toileting, and transferring.

16.21.2.3 <u>Volunteer</u>:  A person who performs a service willingly and without pay.

16.22 <u>Survival</u>. The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement. Without limiting the foregoing, the following sections and articles of this Agreement shall survive the expiration or earlier termination of this Agreement: sections 8.1, 8.21, 10.1, 16.4, 16.7, and Articles 3, 4, 7, 11, 12, and 13.

**SD 1579712**
**Ex. F - 418**

**COUNTY CONTRACT NUMBER 571418**
**AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES**

/
/
/

**SD 1579713**
**Ex. F - 419**

COUNTY CONTRACT NUMBER 571418
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR ON-SITE CLINICAL SERVICES

## SIGNATURE PAGE

**AGREEMENT TERM.** The initial term of this Agreement shall begin on June 1, 2024 and end on May 31, 2025 ("Initial Term").

**OPTION TO EXTEND.** The County shall have the option to extend the term of this Agreement for nine (9) increments of one (1) year (each an "Option Period"), for a total of nine (9) years beyond the expiration of the Initial Term, not to exceed May 31, 2034. This option shall be automatically exercised unless County notifies Contractor in writing not less than thirty (30) days prior to an Option Period that the County does not intend to extend the Agreement.

Options to Extend for One to Six Additional Months at End of Agreement. County shall also have the option to extend the term of this Agreement, in one or more increments, for a total of no less than one (1) and no more than six (6) calendar months ("Incremental Options"). The County may exercise each Incremental Option by providing written notice to Contractor no fewer than fifteen (15) calendar days prior to expiration of this Agreement. The rates in effect at the time an Incremental Option is exercised shall apply during the term of the Incremental Option.

**COMPENSATION**: Pursuant to Exhibit C, Article 4, and other applicable provisions of this Agreement, County agrees to pay Contractor a sum not to exceed **two hundred fifty-eight million nine hundred sixty-nine thousand thirty-three dollars ($258,969,033)** ("Maximum Agreement Amount"). Furthermore, compensation for the Initial Term and any Option Periods shall not exceed the amounts shown for the Initial Term or that Option Period shown in Exhibit C.

**COR.** The County designates the following individual as the Contracting Officer's Representative ("COR")

Jorge Morales, Sheriff's Program Coordinator
5530 Overland Ave, Suite 370
San Diego, CA 92123
Phone (858) 974-5994 and email: Jorge.Morales@sdsheriff.org

**CONTRACTOR'S REPRESENTATIVE.** Contractor designates the following individual as the Contractor's Representative.

Peter J. Freedland, Chief Executive Officer
402 W. Broadway #400
San Diego, CA 92101
Phone (954) 299-9225 and email: ceo@corrwayhealth.com

IN WITNESS WHEREOF, County and Contractor execute this Agreement effective as of the date of the last signature below. The person(s) signing this Agreement for Contractor represent(s) and warrant(s) that they are duly authorized to bind Contractor and have the legal capacity to execute and deliver this Agreement.

**CONTRACTOR:**                                          **COUNTY OF SAN DIEGO:**

JOHN M. PELLEGRINO, Director
Department of Purchasing and Contracting

By: _____                              By: _____
Peter Freedland (May 15, 2024 12:45 PDT)
Name: Peter Freedland                                    Name: Jack Pellegrino
Title: CEO                                               Title: Director
Email: ceo@corrwayhealth.com                             Date: Jun 28, 2024
Date: May 15, 2024

By electronically signing this document, all parties accept the use of electronic signatures.

Adobe Acrobat Sign Transaction Number: CBJCHBCAABAAqGQLou|HQ vpSVD6KisDqLPe0gt0Y7Q

SD 1579714

Ex. F - 420

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

## 1. SCOPE OF WORK

Contractor shall provide qualified administrative, management, and medical professional staffing required in the performance of all on-site clinical service requirements in consonance with Sheriff's Department staff and vendors on site at the various County detention facilities.

## 2. BACKGROUND INFORMATION

The San Diego County Sheriff's Department provides comprehensive primary and specialty health care services to Incarcerated Persons at various detention facilities throughout the County. Hospital services and associated emergency health care services are also utilized for Incarcerated Persons when services or treatment cannot be provided within the Detention Facility.

The Sheriff's Department operates a Medical Services Division that is responsible for providing services at all detention facilities. There are seven detention facilities located throughout the County. These facilities are San Diego Central Jail (SDCJ), Las Colinas Detention and Reentry Facility (LCDRF), George Bailey Detention Facility (GBDF), East Mesa Reentry Facility (EMRF), South Bay Detention Facility (SBDF), Vista Detention Facility (VDF), and Rock Mountain Detention Facility (RMDF). The Average Daily Population (ADP) total for all detention facilities from July 1, 2022, to June 30, 2023, was 4,100.

Incarcerated Persons are seen and treated within each Detention Facility by contracted providers and Sheriff health care staff. Those Incarcerated Persons with conditions that cannot be treated on-site are referred to and transferred to one of Sheriff's Contract Healthcare Facilities for the required services.

## 3. GOAL AND OUTCOMES

3.1. Goal: Contractor shall provide the services described herein to accomplish the following goal: provide on-site Health Care Providers for primary care and urgent care at specified County detention facilities.

3.2. Objectives: Contractor shall achieve the following objectives:

3.2.1. Contractor shall provide on-site medical professional staffing at seven (7) County detention facilities.

## 4. FOCUS POPULATION AND GEOGRAPHIC AREA

4.1. Focus Population: Contractor shall provide the medical professional staffing described herein to persons incarcerated in County detention facilities.

4.2. Geographical/Regional Service Area: Contractor shall provide on-site clinical medical professional staffing at the following detention facilities.

4.2.1. San Diego Central Jail (SDCJ)
1173 Front Street
San Diego, CA 92101
(619) 615-2454

Weekly Clinic Hours: 174
Annual Average Daily Population: 745
Annual Average Medical Appointments: 9,358

SD 1579715
Ex. F - 421

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A   STATEMENT OF WORK

Facility Schedule: 7.30 FTE

| Position Title | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | |
| Medical Director | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | | | 40.00 | 1.00 |
| Physician (MD/DO) | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |
| Nurse Practitioner | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |
| Nurse Practitioner - Intake | | | | | | | | 0.00 | 0.00 |
| Specialty Physician (MD/DO) | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | | | 40.00 | 1.00 |
| Provider Trainer | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | | | 40.00 | 1.00 |
| **Middle Shift** | | | | | | | | | |
| Physician (MD/DO) | | | | | | | | 0.00 | 0.00 |
| Nurse Practitioner - Intake/Rover | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |
| **Evening/Night Shift** | | | | | | | | | |
| Physician (MD/DO) | | | | | | | | 0.00 | 0.00 |
| Nurse Practitioner | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |

4.2.2. Las Colinas Detention and Reentry Facility (LCDRF)
451 Riverview Parkway
Santee, CA 92071
(619) 258-3200

Weekly Clinic Hours: 134
Annual Average Daily Population: 500
Annual Average Medical Appointments: 11,288

Facility Schedule: 5.10 FTE

| Position Title | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | |
| Physician (MD/DO) | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |
| Nurse Practitioner | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |
| Nurse Practitioner - Intake/Rover | | | | | | | | 0.00 | 0.00 |
| **Middle Shift** | | | | | | | | | |
| Physician (MD/DO) | | | | | | | | 0.00 | 0.00 |
| Nurse Practitioner - Intake/Rover | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |
| **Evening/Night Shift** | | | | | | | | | |
| Physician (MD/DO) | | | | | | | | 0.00 | 0.00 |
| Nurse Practitioner | | | | | | | | 0.00 | 0.00 |

SD 1579716
Ex. F - 422

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

4.2.3.  George Bailey Detention Facility (GBDF)
446 Alta Rd., Suite 5300
San Diego, CA 92158
(619) 661-2789

Weekly Clinic Hours: 92
Annual Average Daily Population: 1,371
Annual Average Medical Appointments: 10,040

Facility Schedule: 4.20 FTE

| Position Title | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | |
| Physician (MD/DO) | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |
| Nurse Practitioner | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 56.00 | 1.40 |
| **Middle Shift** | | | | | | | | | |
| Physician (MD/DO) | | | | | | | | 0.00 | 0.00 |
| Nurse Practitioner | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 56.00 | 1.40 |
| **Evening/Night Shift** | | | | | | | | | |
| Physician (MD/DO) | | | | | | | | 0.00 | 0.00 |
| Nurse Practitioner | | | | | | | | 0.00 | 0.00 |

4.2.4.  South Bay Detention Facility (SBDF)
500 Third Ave
Chula Vista, CA 91910
(619) 691-4746

Weekly Clinic Hours: 8
Annual Average Daily Population: 356
Annual Average Medical Appointments: 1,201

Facility Schedule: 0.40 FTE

| Position Title | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | |
| Physician (MD/DO) | 8.00 | | | 8.00 | | | | 16.00 | 0.40 |
| Nurse Practitioner | | | | | | | | 0.00 | 0.00 |

4.2.5.  East Mesa Reentry Facility (EMRF)
446 Alta Rd., Suite 5200
San Diego, CA 92158
(619) 661-2681

Weekly Clinic Hours: 16
Annual Average Daily Population: 387
Annual Average Medical Appointments: 1,847

SD 1579717
Ex. F - 423

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A   STATEMENT OF WORK

Facility Schedule: 0.40 FTE

| Position Title | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | |
| Physician (MD/DO) | | 8.00 | | | 8.00 | | | 16.00 | 0.40 |
| Nurse Practitioner | | | | | | | | 0.00 | 0.00 |

4.2.6.    Vista Detention Facility (VDF)
325 South Melrose Dr.
Vista, CA 92083
(760) 940-4492

Weekly Clinic Hours: 86
Annual Average Daily Population: 565
Annual Average Medical Appointments: 5,282

Facility Schedule: FTE 4.85

| Position Title | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | |
| Physician (MD/DO) | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |
| Nurse Practitioner | | | | | | | | 0.00 | 0.00 |
| Nurse Practitioner - Intake | | | | | | | | 0.00 | 0.00 |
| **Middle Shift** | | | | | | | | | |
| Physician (MD/DO) | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | | | 40.00 | 1.00 |
| Nurse Practitioner - Intake/Rover | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 84.00 | 2.10 |
| **Evening/Night Shift** | | | | | | | | | |
| Physician (MD/DO) | | | | | | | | 0.00 | 0.00 |
| Nurse Practitioner | | | | | | | | 0.00 | 0.00 |

4.2.7.    Rock Mountain Detention Facility (RMDF)
446 Alta Rd., Suite 5400
San Diego, CA 92158
(619) 671-2299

Total Estimated Weekly Clinic Hours: 56
Annual Estimated Average Daily Population: 565
Annual Estimated Average Medical Appointments: 5,282

Facility Schedule: 1.40 FTE

| Position Title | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | |
| Physician (MD/DO) | 8.00 | 8.00 | 8.00 | 8.00 | | | | 32.00 | 0.80 |
| Nurse Practitioner | | | | 10.00 | 10.00 | 10.00 | 10.00 | 40.00 | 1.00 |

SD 1579718
Ex. F - 424

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

4.3.   Hours of Operation: regular hourly schedules for each facility will be determined by Sheriff's Department staff and are subject to change when deemed necessary at the discretion of Sheriff's Chief Medical Officer (CMO), or Sheriff's designee, and will be coordinated with jail staff and the Contractor. Contractor staff may be required to float between facilities based on operational needs as determined by the Sheriff's Department.

4.4.   Total aggregate number of scheduled hours at each facility is estimated and may vary based on the actual need of the facilities and is dependent on the number of Incarcerated Person/Patient referrals for on-site medical care. An increase or decrease in hours may result due to these changes and Contractor shall be provided reasonable notice of such changes.

## 5. DEFINITIONS

5.1.   <u>Contract Healthcare Facility</u> - Refers to external community or hospital facility with which the Sheriff's Department, or Contractor, has a contractual agreement for hospital and associated health care services for inpatient, outpatient, and specialty care.

5.2.   <u>Detention Facility</u>   Also known as jails.

5.3.   <u>Incarcerated Person</u>   A person who has been booked or committed to jail by the court and placed into the physical custody of the Sheriff.

5.4.   <u>Incarcerated Patient</u>   An incarcerated individual who requests or receives medical attention from the Contractor.

5.5.   <u>Sheriff's Managed Care Group (MCG)</u>   Group within the Sheriff's Medical Services Division (MSD) responsible for review of all outpatient referrals and management of inpatient hospitalizations.

5.6.   <u>Health Care Provider</u> - Any individual that provides, or assists in the provision of, health care, including but not limited to a physician (either M.D. or D.O.), licensed healthcare practitioner, or mid-level provider (Nurse Practitioner, NP).

5.7.   <u>On-Call Services</u>   Any type of services outlined in this statement of work which is performed outside of regularly scheduled times.

5.8.   <u>Clinic</u>   The system whereby Health Care Providers see incarcerated patients during scheduled times in an outpatient clinic setting at detention facilities to assess, treat, or refer incarcerated persons to an off-site treatment facility. Provisions are made for both scheduled appointments for addressing chronic care issues and same-day appointments for acute issues. Health Care Providers see and treat incarcerated persons with a full spectrum of illnesses and injuries on a daily basis. If an incarcerated patient cannot be adequately treated at a clinic, or if an emergency arises, the incarcerated patient will be sent to a local area healthcare facility for emergency inpatient or outpatient services.

5.9.   <u>Oversight</u>   All licensed mid-level practitioners must be supervised by a licensed physician (either M.D. or D.O.). The supervising physician (either M.D. or D.O.) will oversee the activities of and accepts responsibility for the medical services rendered by any licensed mid-level practitioner.

5.10.   The supervising physician (either M.D. or D.O.) is required to adhere to the following mechanisms to provide supervision:

5.10.1.   Adherence to adequate supervision as agreed to in a practice agreement that meets the requirements of Business and Professions Code section 3502.3.

SD 1579719
Ex. F - 425

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

5.10.2. The physician (either M.D. or D.O.) must be available by telephone or other electronic communication method at the time the mid-level practitioner examines the patient.

5.11. <u>Attending Physician</u> - Physician (either M.D. or D.O.) chiefly responsible for the medical treatment of patients at a facility and provides supervision, collaboration, and oversight to mid-level providers (NP) providing healthcare services at the respective facility.

5.12. <u>Standard Management Reports</u>: record of the status of workload, productivity, and/or patient activity in each facility (e.g., consults, procedures, services, classification, recommendations, etc.)

## 6.  GENERAL REQUIREMENTS FOR SERVICE DELIVERY

6.1. Contractor shall provide the Health Care Providers for primary care and urgent care during the regularly scheduled hours.

6.1.1. Contractor shall provide Oversight for any licensed mid-level practitioners.

6.1.2. Contractor shall provide On-Call Services to Incarcerated Patients during periods outside of regularly scheduled on-site hours for consultation. After-hour calls will be initiated by Sheriff's medical staff.

6.2. On-site clinical service requirements

6.2.1. Contractor shall provide qualified administrative, management, and medical professional staffing required in the performance of all on-site clinical service requirements.

6.2.2. Contractor shall provide designated primary and urgent care Health Care Providers for each facility to cover at least the minimum number of required hours of coverage based on the regularly scheduled hours. Each facility shall have an assigned Attending Physician.

6.2.3. Contractor shall ensure all scheduled Clinics have Health Care Provider coverage and be appropriately staffed to avoid Clinic rescheduling and cancellations.

6.2.4. Contractor shall provide the Health Care Provider schedules of coverage to the Sheriff's Department administrative staff at least thirty (30) days in advance including changes or modifications to already published schedules.

6.2.4.1. A consistent group of full-time Health Care Providers are required for the contracted staff to be well versed on the Sheriff's Medical Services Policies and Procedures (P&P), to ensure a seamless workflow with Sheriff's nursing staff, maintain quality assurance, and provide consistent messaging to Incarcerated Patients about their medical care.

6.2.5. Contractor shall provide Health Care Providers to assist and support all regularly scheduled Clinics. Such staff members will be a certified or accredited professional.

6.2.6. Health Care Providers will be allowed to work under this agreement subject to the approval of the Sheriff's CMO, or Sheriff's designee. Health Care Providers may be used in general practice Clinics, depending on the extent of training, the provisions of their specialty college, and their associated regulatory body. Supervisory requirements and Oversight are to be conducted in accordance with their associated regulatory body.

6.2.7. Contractor shall provide an adequate number of qualified staff, with Contractor's own personnel, and/or arrangements, with other subcontractors at Contractor's expense, to provide minimum coverage of all regularly scheduled hours, which consist of

**SD 1579720**
**Ex. F - 426**

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

primary/urgent care services. Clinic hours shall be scheduled throughout the day and may include evening, weekend, and holiday hours.

6.2.8.  Contractor shall not sustain patient care backlogs.

6.2.9.  Contractor shall see patients at their scheduled appointment times.  The Electronic Medical Record (EMR) will be used according to policy when scheduling, cancelling, and completing patient medical appointments.

6.2.10. Clinic hours will vary depending on the number of Incarcerated Patients to be seen and in accordance with facility needs. Clinic hours may be outside of the regularly scheduled hours.

6.2.11. Contractor's Health Care Providers shall conduct in-person Clinics in the Detention Facilities during scheduled Clinic hours to assess, treat, or, refer Incarcerated Patients to an off-site Contract Healthcare Facility in coordination with Sheriff's MCG, or Sheriff's designee.

6.2.12. Any requests, by Sheriff or Contractor, for additional Clinics shall be made with at least 24 hours of advanced notice. The 24-hour advanced notice requirement may be waived in the event of a clinical and/or operational necessity or emergency.

6.2.13. Any changes to the regularly scheduled hours shall be at the discretion of the Sheriff's CMO, or Sheriff's designee. Once the Sheriff's CMO, or Sheriff's designee, authorizes the change, it will be the responsibility of the facility medical staff to coordinate with the jail facility staff and the Contractor.

6.2.14. Health Care Providers shall log in electronically, via the EMR, at the beginning of their assigned Clinic hours and log out at the end of their assigned Clinic Hours.

6.2.15. Patient care queues in the EMR will be monitored and redressed by Contractor's Health Care Providers.

6.3.  Licensure and certification of professional personnel

6.3.1.  Contractor shall obtain all licenses or permits that are/or shall become, necessary to the performance of this contract and keep such licenses and permits current for the duration of the contract.

6.3.2.  Contractor shall ensure that all staff have current, valid, unrestricted licenses and certificates to provide care within the scope of practice described by each particular license or certificate.

6.3.3.  Contractor shall notify the Sheriff's CMO, or Sheriff's designee immediately if contractor recognizes any of its staff's applicable licenses and/or certificates become invalid or restricted for any reason.

6.3.4.  All Health Care Providers shall be currently licensed to practice medicine and other applicable medical service specialties in the State of California in accordance with all current directives.

6.3.5.  Contractor shall ensure that no Health Care Providers are excluded or debarred in accordance with contract clause Article 8.

6.3.6.  Contractor shall oversee and monitor the focused and ongoing professional performance evaluation (FPPE/OPPE/M&M) components to ensure appropriate clinical skills and privileging are in compliance.

SD 1579721
Ex. F - 427

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

6.4.  County furnished supplies, equipment, and facilities

6.4.1.  The County will provide equipment, supplies, and nursing staff for services performed at the detention facilities. If the County does not have the equipment necessary for a particular treatment, the Incarcerated Patient will be referred to a Contract Healthcare Facility for treatment.  Referrals shall be coordinated with Sheriff's MCG and must be approved by the MCG, or Sheriff's designee.

6.4.2.  The County will provide supplies and equipment for the contractor to perform the required services of this contract for on-site clinical services at the detention facilities. Any request for additional or special types of supplies and equipment shall be subject to the County's approval.

6.5.  Training

6.5.1.  Contractor shall appoint a staff member to be a training coordinator and liaison between the Contractor and the Sheriff's Department. Contractor's appointed training coordinator is required to ensure all Contractor's staff and Sheriff's medical staff are kept abreast of EHR system updates and any updates to health care standards.

6.5.2.  Contractor shall arrange for Contractor's staff to be available for initial on-site orientation given by County on medical and security procedures.

6.5.3.  Contractor shall arrange for Contractor's staff to be available for ongoing in-service training by the County, if necessary, as changes in protocols and procedures are made.

6.5.4.  Contractor shall maintain Contractor's staff training files. Copies of training verification documents shall be provided to the Contracting Officer's Representative (COR) upon request.

6.5.5.  The Sheriff's CMO, or Sheriff's designee shall approve all programs of instruction concerning the detention facilities.

## 7.  SPECIFIC REQUIREMENTS FOR SERVICE DELIVERY

7.1.  Contractor shall provide Health Care Providers at the Sheriff's facilities SDCJ, LCDRF, and VDF for the intake process.

7.2.  Contractor shall provide Health Care Providers to provide coverage at each facility to address medical necessities outside of the scheduled Clinics. Medical necessities may include, but not limited to, the following:

7.2.1.  Emergencies

7.2.2.  Chart Checks and Chart Reviews

7.2.3.  Medication Reviews and Renewals

7.2.4.  Patient Assessments and Evaluations

7.2.5.  Patient Rounding

7.2.6.  Discharge of Patients

7.2.7.  Intake Assessments and Evaluations (e.g., History & Physicals)

7.2.8.  Specialty Care (e.g., Endocrinology)

7.2.8.1. The Sheriff's CMO, or Sheriff's designee, shall have the ability to request the Contractor to provide for specific specialties based on operational needs.

SD 1579722
Ex. F - 428

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

7.3.   Contractor shall remain in compliance with all local, State, or Federal law, and/or rules and regulations. Contractor shall work closely with the Sheriff's Medical Services staff to ensure that acceptable standards for on-site medical care to the Incarcerated Patients in Sheriff's custody are in accordance with, but not limited to the standards set forth in Title 15 of the California Administrative Code and other standards.

7.4.   Compliance with the following standards, most recent version, is required in performance of the work requirements. The list is not inclusive. Copies of these documents will be available for review at any time during the term of the contract in the Office of the Medical Services Administrator, Sheriff's Detention Medical Services at 5530 Overland Ave., Suite 370, San Diego, CA 92123. Latest edition of these standards is available on the respective agencies' websites.

   7.4.1.   National Commission on Correctional Health Care (NCCHC) standards.

   7.4.2.   Title 15 of the California Administrative Code (administered by the California Board of Corrections)

   7.4.3.   Sheriff's Department Policies and Procedures (P&P)

   7.4.4.   Sheriff's Department Medical Services Division P&P

   7.4.5.   State of California, Department of Consumer Affairs, Board of Medical Quality Assurance Guidelines and Regulations

   7.4.6.   Institute for Medical Quality Manual

   7.4.7.   California Penal Code

   7.4.8.   Americans with Disabilities Act (ADA)

7.5.   Medical Director/Administrative Support: Contractor shall designate a physician (either M.D. or D.O.), as a Medical Director, to collaborate with the Sheriff's CMO, or Sheriff's designee, in the following areas:

   7.5.1.   Peer Review

          7.5.1.1.   Focused Professional Performance Evaluation [FPPE]

          7.5.1.2.   Ongoing Professional Performance Evaluation [OPPE]

          7.5.1.3.   Morbidity and Mortality [M&M]

   7.5.2.   Quality Assurance (QA)

   7.5.3.   Quality Improvement (QI)

   7.5.4.   Utilization Management Review

   7.5.5.   Clinical Policy and Procedure Development and Implementation (e.g., protocols).

   7.5.6.   Contractor's Medical Director shall also serve as liaison between Sheriff's CMO, or Sheriff's designee, and off-site health care facilities, on an on-going basis, regarding inpatient admissions, treatment, and discharges.

   7.5.7.   Contractor shall designate an administrative liaison who shall be responsible for Oversight of all Health Care Providers providing services under this contract, including giving the Sheriff's Department a schedule of personnel assigned to Clinics and ensuring that all Contractor's medical staff maintain and remain in good standing with licenses, certifications, and registrations required by the State of California.

SD 1579723
Ex. F - 429

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

7.5.8.   The assigned administrative liaison shall be the main point of contact for all personnel matters regarding, but not limited to, Health Care Providers' schedules, communicating any changes in staffing, administrative issues, and human resources matters.

7.5.9.   The Medical Director and assigned administrative liaison shall work with the Sheriff's Medical Services Administrator (MSA), or Sheriff's designee to address administrative issues and concerns identified by the Sheriff's medical staff.

7.5.10.  The Contractor shall provide contact information (phone numbers, email addresses, physical mailing address), for its assigned administrative liaison.

7.6.   Contractor's designated Medical Director(s), or authorized representative, and its appointed physicians (either M.D. or D.O.) shall meet with the Sheriff's CMO, or designee, once quarterly, or as needed, for quality assurance and review of Sheriff's Medical Services P&P.

7.7.   The Sheriff's CMO, or Sheriff's designee, is responsible for establishing, modifying, and maintaining Clinic schedules at all detention facilities. Contractor shall provide personnel to meet work requirements for schedules.

7.8.   Contractor shall collaborate with Sheriff's CMO, or Sheriff's designee. The Sheriff's CMO, or Sheriff's designee shall oversee all medical and clinical issues and will work closely with Contractor on utilization review matters.

7.9.   Contractor's Health Care Providers shall make referrals for off-site consultations, tests, and procedures as needed when the Contractor's Health Care Providers are unable to provide the needed care or testing.

7.10.  Medical records documentation

7.10.1.  Contractor and its staff shall ensure that all its medical personnel comprehensively document treatment, diagnoses, and findings in the EMR in an accurate, timely manner, and in compliance with the Sheriff's Medical Services Division's P&P.

7.10.2.  Contractor and its staff shall ensure all patient care is documented in the EMR. If requested by Sheriff's medical staff to document on paper, all entries shall be legible and signed by the author, giving their name, title and County provided ID number.

7.10.3.  Verbal orders given by Contractor pertaining to the general medical care of Incarcerated Patients shall be written and signed within 24 hours by the respective Contractor's Health Care Providers.

7.10.4.  Confidentiality of medical record information is essential and is required under the Health Insurance Portability and Accounting Act of 1996, Public Law 104-191 (HIPAA). The Contractor is not allowed to release any identifiable health information.

7.10.5.  Contractor shall comply with the provisions of the Health Information Technology for Economic and Clinical Health Act (HITECH) in the handling of electronic records including the reporting of breaches as defined in 45 Code of Federal Regulations (CFR), §164.402.

7.10.6.  Contractor shall comply with the language provisions for a Business Associate as prescribed by the Standards for Privacy and Individual Identifiable Health Information as set forth in 45 Code of Federal Regulations Part 160 and Part 164.

SD 1579724

Ex. F - 430

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

7.11. Patient medical grievances

7.11.1. Contractor shall cooperate with Sheriff's CMO, or Sheriff's designee in resolving any Incarcerated Persons' grievances related to the Contractor's services provided under this agreement.

7.11.2. The Sheriff's CMO, or Sheriff's designee shall bring to the attention of assigned Contractor's Medical Director all Incarcerated Person patient complaints involving Contractor's Health Care Providers. Contractor shall, within five (5) calendar days, and in accordance with its regular procedure, investigate such complaints and use its best efforts to resolve them in a fair and equitable manner.

7.11.2.1. The Contractor shall be required to prepare a written response and the resolution shall be treated and processed in conjunction with the Sheriff's Department's Medical Services Division P&P.

7.11.3. Contractor shall notify the Sheriff's CMO, or Sheriff's designee within the five (5) days as required above of any action taken or proposed with respect to the resolution of such complaints.

## 8. DATA COLLECTION AND REPORTING REQUIREMENTS

8.1. Contractor shall submit Standard Management Reports to both the Sheriff's CMO, or Sheriff's designee, and COR, as requested or specified; including reports required by the Sheriff's Department.

8.1.1. Contractor will ensure the Standard Management Reports can be viewed on a dashboard within the EMR and/or sent securely to the management team via email on a scheduled basis. Reporting is to be in alignment with metrics and key performance indicators as developed by the Sheriff's Department. The information gathered and stored as part of these Standard Management Reports shall be aggregated to form monthly, quarterly, and/or annual reports that clearly show trends and drive decision making. This reporting will be presented quarterly in the QA and QI meetings.

8.2. Contractor shall provide a monthly progress report of Incarcerated Patients treated and referred to off-site health care facilities to the Sheriff's CMO, or Sheriff's designee, in a format to be provided by the CMO.

8.3. Contractor shall provide a report detailing services rendered within a given month. The report will include, but not limited to: Clinic hours, emergency responses, and assessments made outside of scheduled Clinic hours.

8.4. Contractor shall provide a monthly time detail report of all Contractor's staff to the Sheriff's MSA, or Sheriff's designee for productivity and audit purposes. The required format will be provided by the Sheriff's MSA, or Sheriff's designee.

## 9. SECURITY REQUIREMENTS

9.1. Contractor and all Contractor's staff, who perform services at any Sheriff's detention facilities, including future employees hired during the term of this contract, shall be required to undergo background checks with favorable results before they can perform such services.

9.2. Background checks may also include a polygraph/Computerized Voice Stress Analysis (CVSA) test to allow Level I clearance for unescorted facility access. The County shall pay costs associated with these checks and tests.

SD 1579725
Ex. F - 431

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT A    STATEMENT OF WORK

9.3. Contractors shall be issued temporary ID cards subject to renewal each year. All temporary ID cards issued by the Sheriff's Department to the Contractor and Contractor's staff shall be surrendered at the termination of contract, or when any individual staff is terminated, prior to termination of the contract.

9.4. The Sheriff's CMO, or Sheriff's designee reserves the right to reject any Health Care Providers from working in the detention facilities regardless of satisfactory CVSA test results. The Sheriff's CMO, or Sheriff's designee may remove any Health Care Providers for violating Sheriff's Department P&P or for not meeting Sheriff's Department standards and expectations.

9.5. Contractor shall adopt and comply with the Prison Rape Elimination Act of 2003, 42 U.S.C. 15601 et seq. (PREA), any applicable PREA standards (including 28 C.F.R. 115 et seq.), and any related County ordinances or Sheriff's Department policies regarding PREA for preventing, detecting, monitoring, investigating and eradicating any form of sexual abuse. Such PREA standards require that all volunteers, officers, employees, agents and subcontractors who have contact with Incarcerated Persons under this contract receive training pursuant to 28 C.F.R. 115.232.

9.5.1. Contractor shall provide the Sheriff's Department with documentation confirming that all volunteers, officers, employees, agents, and subcontractors understand the training they have received. Contractor acknowledges that the County will monitor Contractor's compliance with PREA, any applicable PREA standards, and County ordinances or Sheriff's Department policies relating to sexual abuse and may conduct announced and/or unannounced compliance monitoring to include "on-site" monitoring.

9.6. Contractor agrees that it will pay any, and all, evaluation and treatment costs arising from sexual abuse of offenders as a result of any act or omission by Contractor, as required by applicable laws and regulations including, but not limited to, Title 28 of the Code of Federal Regulations, sections 115.282 and 115.283.

SD 1579726
Ex. F - 432

COUNTY CONTRACT NUMBER (INSERT NUMBER)
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT B    INSURANCE REQUIREMENTS

## INSURANCE REQUIREMENTS FOR CONTRACTORS

Without limiting Contractor's indemnification obligations to County, Contractor shall provide at its sole expense and maintain for the duration of this contract, or as may be further required herein, insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the work hereunder and the results of the work by the Contractor, his agents, representatives, employees or subcontractors.

**1. Minimum Scope and Limit of Insurance**

Coverage shall be at least as broad as:

A. **Commercial General Liability (CGL)**:  Insurance Services Office Form CG 00 01 covering CGL on an "occurrence" basis, including products and completed operations, property damage, bodily injury and personal & advertising injury with limits no less than $2,000,000 per occurrence. If a general aggregate limit applies, either the general aggregate limit shall apply separately to this project/location (ISO CG 25 03 or 25 04) or the general aggregate limit shall be twice the required occurrence limit ($4,000,000).

B. **Automobile Liability** covering all owned, non owned, hired auto Insurance Services Office form CA0001, with limit no less than $1,000,000 each accident for bodily injury and property damage.

C. **Workers' Compensation**, as required by State of California and Employer's Liability Insurance, with limits no less than $1,000,000 each accident for bodily injury or disease. Coverage shall include waiver of subrogation endorsement in favor of County of San Diego.

D. **Professional Liability (Errors & Omissions)** appropriate to the professional services provided by Contractor under this contract, with limit no less than $2,000,000 per occurrence or claim, $2,000,000 aggregate.

E. **Cyber/Information Security Liability** $2,000,000 per claim with an aggregate limit of not less than $2,000,000. Coverage shall be sufficiently broad to respond to the duties and obligations as is undertaken by Contractor in this agreement and shall include, but not be limited to, claims involving security breach, system failure, data recovery, business interruption, cyber extortion, social engineering, infringement of intellectual property, including but not limited to infringement of copyright, trademark, trade dress, invasion of privacy violations, information theft, damage to or destruction of electronic information, release of private information, and alteration of electronic information. or provide unauthorized access of either electronic or non-electronic data, including publicizing confidential electronic or non-electronic data; transfer of computer virus, Trojan horse, worms or any other type of malicious or damaging code; and for Third-Party Liability encompassing judgments or settlement and defense costs arising out of litigation due to a data breach and data breach response costs for customer notification and credit monitoring service fees.

F. **Sexual Abuse or Molestation (SAM) Liability**: If the CGL policy referenced above is not endorsed to include affirmative coverage for sexual abuse or molestation, Contractor shall obtain and maintain a policy covering Sexual Abuse and Molestation with a limit no less than $1,000,000 per occurrence or claim with an aggregate limit of not less than $2,000,000. Coverage to include actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of the insured or as a result of the negligent employment, investigation, hiring & supervision or the reporting or failure to report to proper authorities of a person for whom any insured is or ever was legally responsible.

If the contractor maintains broader coverage and/or higher limits than the minimums shown above, the County requires and shall be entitled to the broader coverage and/or higher limits maintained by the Contractor. Any available insurance proceeds in excess of the specified minimum limits and coverage stated above, shall also be available to the County of San Diego.

**2. Self-Insured Retentions**

Self-insured retentions must be declared to and approved County Risk Management. County may require the Contractor to purchase coverage with a lower retention or provide proof of ability to pay losses and related investigations, claim administration, and defense expenses within the retention. The policy language shall provide, or be endorsed to provide, that the self-insured retention may be satisfied by either the named insured or County..

**SD 1579727**
**Ex. F - 433**

COUNTY CONTRACT NUMBER (INSERT NUMBER)
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT B    INSURANCE REQUIREMENTS

Any and all deductibles and SIRs shall be the sole responsibility of Contractor or subcontractor who procured such insurance and shall not apply to the Indemnified Additional Insured Parties. County may deduct from any amounts otherwise due Contractor to fund the SIR/deductible. Policies shall NOT contain any self-insured retention (SIR) provision that limits the satisfaction of the SIR to the Named. The policy must also provide that Defense costs, including the Allocated Loss Adjustment Expenses, will satisfy the SIR or deductible. County reserves the right to obtain a copy of any policies and endorsements for verification.

**3. Other Insurance Provisions**

The insurance policies are to contain, or be endorsed to contain, the following provisions:

A. <u>Additional Insured Endorsement</u>

The County of San Diego, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers of the County, individually and collectively are to be covered as additional insureds on the General Liability and Sexual Molestation policy with respect to liability arising out of work or operations performed by or on behalf of the Contractor including materials, parts, or equipment furnished in connection with such work or operations. General Liability coverage can be provided in the form of an endorsement to the Contractor's insurance (at least as broad as ISO from CG 2010 11 85 or **both** CG 2010, CG 2026, CG 2033, or CG 2038; **and** CG 2037 forms if later revisions used).

B. <u>Primary Insurance Endorsement</u>

For any claims related to this Contract, Contractor's insurance coverage, including any excess liability policies, shall be primary and non-contributory at least as broad as ISO CG 20 01 04 13 as respects the County, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers of the County, individually and collectively. Any insurance or self-insurance maintained by the County, its officers, employees, or volunteers shall be excess of the Contractor's insurance and shall not contribute with it.

C. <u>Notice of Cancellation</u>

Each insurance policy required above shall state that coverage shall not be canceled, except with notice to the County.

**General Provisions**

**4. Qualifying Insurers**

All required policies of insurance shall be issued by companies which have been approved to do business in the State of California by the State Department of Insurance, and which hold a current policy holder's alphabetic and financial size category rating of not less than A, VII according to the current Best's Key Rating guide, or a company of equal financial stability that is approved in writing by County Risk Management.

**5. Umbrella or Excess Policy**

Contractor may use Umbrella or Excess Policies to provide the liability limits as required in this agreement. This form of insurance will be acceptable provided that all of the Primary and Umbrella or Excess Policies shall provide all of the insurance coverages herein required, including, but not limited to, primary and non-contributory, additional insured, Self-Insured Retentions (SIRs), indemnity, and defense requirements. The Umbrella or Excess policies shall be provided on a true "following form" or broader coverage basis, with coverage at least as broad as provided on the underlying Commercial General Liability insurance. No insurance policies maintained by the Additional Insureds, whether primary or excess, and which also apply to a loss covered hereunder, shall be called upon to contribute to a loss until the Contractor's primary and excess liability policies are exhausted.

**6. Evidence of Insurance**

Prior to commencement of this Contract, but in no event later than the effective date of the Contract, Contractor shall furnish the County with a copy of the policy declaration and endorsement pages along with the certificates of insurance and amendatory endorsements effecting coverage required by this clause. Policy declaration and endorsement pages shall be included with renewal certificates and amendatory endorsements submissions and shall

SD 1579728
Ex. F - 434

COUNTY CONTRACT NUMBER (INSERT NUMBER)
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT B    INSURANCE REQUIREMENTS

be furnished to County within thirty days of the expiration of the term of any required policy. Contractor shall permit County at all reasonable times to inspect any required policies of insurance. The Contract/Project Number should be noted in the "Description of Operations" box located near the bottom of the form. Additionally, the "Certificate Holder" box should designate the address of the responsible department or department representative to ensure the documents are received by the appropriate party.

**7. Failure to Obtain or Maintain Insurance; County's Remedies**

Contractor's failure to provide insurance specified or failure to furnish certificates of insurance and amendatory endorsements or failure to make premium payments required by such insurance shall constitute a material breach of the Contract, and County may, at its option, terminate the Contract for any such default by Contractor.

**8. No Limitation of Obligations**

The foregoing insurance requirements as to the types and limits of insurance coverage to be maintained by Contractor, and any approval of said insurance by the County are not intended to and shall not in any manner limit or qualify the liabilities and obligations otherwise assumed by Contractor pursuant to the Contract, including, but not limited to, the provisions concerning indemnification.

**9. Review of Coverage**

County retains the right at any time to review the coverage, form and amount of insurance required herein and may require Contractor to obtain insurance reasonably sufficient in coverage, form and amount to provide adequate protection against the kind and extent of risk which exists at the time a change in insurance is required.

**10. Self-Insurance**

Contractor may, with the prior <u>written</u> consent of County Risk Management, fulfill some or all of the insurance requirements contained in this Contract under a plan of self-insurance. Contractor shall only be permitted to utilize such self-insurance if in the opinion of County Risk Management, Contractor's (i) net worth, and (ii) reserves for payment of claims of liability against Contractor, are sufficient to adequately compensate for the lack of other insurance coverage required by this Contract. Contractor's utilization of self-insurance shall not in any way limit liabilities assumed by Contractor under the Contract.

**11. Claims Made Coverage**

If coverage is written on a "claims made" basis, the Certificate of Insurance shall clearly so state. In addition to the coverage requirements specified above, such policy shall provide that:

A. The policy retroactive date coincides with or precedes Contractor's commencement of work under the Contract (including subsequent policies purchased as renewals or replacements).

B. Insurance must be maintained, and evidence of insurance must be provided for at least five (5) years after completion of the contract of work.

C. If insurance is terminated for any reason, and not replaced with another claims-made policy form with a Retroactive Date prior to the contract effective date, the Contractor must purchase "extended reporting" coverage for a minimum of five (5) years after completion of work.

D. The policy allows for reporting of circumstances or incidents that might give rise to future claims.

**12. Subcontractors' Insurance**

Contractor shall require and verify that all subcontractors maintain insurance meeting all requirements stated herein, and Contractor shall ensure that Entity is an additional insured on insurance required from subcontractors. For CGL coverage, subcontractors shall provide coverage with a form at least as broad as CG 20 38 04 13. If any sub contractor's coverage does not comply with the foregoing provisions, Contractor shall defend and indemnify the County from any damage, loss, cost, or expense, including attorneys' fees, incurred by County as a result of subcontractor's failure to maintain required coverage.

SD 1579729
Ex. F - 435

COUNTY CONTRACT NUMBER (INSERT NUMBER)
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT B    INSURANCE REQUIREMENTS

**13. Waiver of Subrogation**

Contractor hereby grants to County a waiver of their rights of subrogation which any insurer of Contractor may acquire against County by virtue of the payment of any loss. Contractor agrees to obtain any endorsement that may be necessary to affect this waiver of subrogation, but this provision applies regardless of whether or not the County has received a waiver of subrogation endorsement from the insurer.

**SD 1579730**
**Ex. F - 436**

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT C – PRICING SCHEDULE

1.  **Invoicing**

    1.1.  Contractor shall submit invoices monthly in an acceptable format. Charges shall be in accordance with the rate as proposed and agreed upon in the approved pricing schedule.

    1.2.  Contractor shall forward invoices monthly in appropriate formats along with backup documentation for the services provided to Incarcerated Persons. Invoices shall be sent for payment processing to the Sheriff's Department Medical Services Admin/Claims Unit at the following address:

    San Diego Sheriff's Department
    Medical Services Division Administrative Support Unit
    5530 Overland Ave, Suite 370
    San Diego, CA 92123

    1.3.  Monthly payment shall be computed based upon a fixed rate.

    1.4.  Contractor and the Sheriff shall agree to the following reimbursement schedule for overtime rendered:

    1.4.1.  Payable in hourly basis at 1.5 (one point five) times per hour for the time that exceeds the regularly scheduled hours.

## TOTAL ESTIMATED COSTS (ALL FACILITIES)

| Initial Term: June 1, 2024 through May 31, 2025 | | | |
|---|---|---|---|
| **Position** | **Hours Per Week** | **FTE** | **Total Costs** |
| Personnel | 1096 | 28.4 | $21,890,000 |
| Administration | 80 | 2 | $700,000 |
| **Total** | **1176** | **30.4** | **$22,590,000** |

| Option Period 1: June 1, 2025 through May 31, 2026 | | | |
|---|---|---|---|
| **Position** | **Hours Per Week** | **FTE** | **Total Costs** |
| Personnel | 1096 | 28.4 | $22,546,700 |
| Administration | 80 | 2 | $721,000 |
| **Total** | **1176** | **30.4** | **$23,267,700** |

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT C – PRICING SCHEDULE

| Option Period 2: June 1, 2026 through May 31, 2027 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $23,223,101 |
| Administration | 80 | 2 | $742,630 |
| **Total** | **1176** | **30.4** | **$23,965,731** |

| Option Period 3: June 1, 2027 through May 31, 2028 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $23,919,794 |
| Administration | 80 | 2 | $764,909 |
| **Total** | **1176** | **30.4** | **$24,684,703** |

| Option Period 4: June 1, 2028 through May 31, 2029 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $24,637,338 |
| Administration | 80 | 2 | $787,856 |
| **Total** | **1176** | **30.4** | **$25,425,244** |

| Option Period 5: June 1, 2029 through May 31, 2030 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $25,376,509 |
| Administration | 80 | 2 | $811,492 |
| **Total** | **1176** | **30.4** | **$26,188,001** |

**SD 1579732**
**Ex. F - 438**

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT C – PRICING SCHEDULE

| Option Period 6: June 1, 2030 through May 31, 2031 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $26,137,805 |
| Administration | 80 | 2 | $835,837 |
| **Total** | **1176** | **30.4** | **$26,973,641** |

| Option Period 7: June 1, 2031 through May 31, 2032 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $26,921,939 |
| Administration | 80 | 2 | $860,912 |
| **Total** | **1176** | **30.4** | **$27,782,851** |

| Option Period 8: June 1, 2032 through May 31, 2033 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $27,729,597 |
| Administration | 80 | 2 | $886,739 |
| **Total** | **1176** | **30.4** | **$28,616,336** |

| Option Period 9: June 1, 2033 through May 31, 2034 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $28,561,485 |
| Administration | 80 | 2 | $913,341 |
| **Total** | **1176** | **30.4** | **$29,474,826** |

# EXHIBIT G

# COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

This agreement ("Agreement") is made and entered into effective as of the date of the last signature on the signature page by and between the County of San Diego, a political subdivision of the State of California ("County") and **NaphCare, Inc. and NaphCare of San Diego, LLC located at 2090 Columbiana Road, Suite 4000, Birmingham, AL 35216** *(*"Contractor"), with reference to the following facts:

### RECITALS

A.  The County, by action of the Board of Supervisors August 4, 2020 Minute Order No. 1 authorized the Director of Purchasing and Contracting to award a contract for Sheriff's Department Comprehensive Health Care Delivery.

B.  Contractor is specially trained and possesses certain skills, experience, education and competency to perform these services.

C.  The Chief Administrative Officer made a determination that Contractor can perform the services more economically and efficiently than the County, pursuant to Section 703.10 of the County Charter.

D.  The Agreement shall consist of this document, Exhibit A Statement of Work, Exhibit A-1 Jail Based Competency Treatment Program, Exhibit B Insurance Requirements, Exhibit C, Payment Schedule, Exhibit D, CORI/CLETS Requirements, and Exhibit E, Transition Plan. In the event that any provision of the Agreement or its Exhibits, A, A-1, B or C, conflicts with any other term or condition, precedence shall be: First (1st) the Agreement; Second (2nd) Exhibit B; Third (3rd) Exhibit A; Fourth (4th) Exhibit D; fifth (5th) Exhibit C, and sixth (6th) Exhibit A-1.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### ARTICLE 1
### PERFORMANCE OF WORK

1.1   Standard of Performance.  Contractor shall, in good and workmanlike manner and in accordance with the highest professional standards, at its own cost and expense, furnish all of the labor, technical, administrative, professional and all other personnel, all supplies and materials, equipment, printing, transportation, training, facilities, and all other means whatsoever, except as herein otherwise expressly specified to be furnished by County, necessary or proper to perform and complete the work and provide the services required of Contractor by this Agreement.

1.2   Contractor's Representative.  The person identified on the signature page ("Contractor's Representative") shall ensure that Contractor's duties under this Agreement shall be performed on behalf of the Contractor by qualified personnel; Contractor represents and warrants that (1) Contractor has fulfilled all applicable requirements of the laws of the State of California to perform the services under this Agreement and (2) Contractor's Representative has full authority to act for Contractor hereunder. Contractor and County recognize that the services to be provided by Contractor's Representative pursuant to this Agreement are unique: accordingly, Contractor's Representative shall not be changed during the Term of the Agreement without County's written consent. County reserves the right to terminate this Agreement pursuant to Clause 7.1 "Termination for Default", if Contractor's Representative should leave Contractor's employ, or if, in County's judgment, the work hereunder is not being performed by Contractor's Representative.

1.3   Contractor as Independent Contractor.  Contractor is, for all purposes of this Agreement, an independent contractor, and neither Contractor nor Contractor's employees or subcontractors shall be deemed to be employees of the County. Contractor shall perform its obligations under this Agreement according to the Contractor's own means and methods of work, which shall be in the exclusive charge and under the control of the Contractor, and which shall not be subject to control or supervision by County except as to the results of the work. County hereby delegates to Contractor any and all responsibility for the safety of Contractor's employees, which shall include inspection of property to identify potential hazards. Neither Contractor nor Contractor's employees or subcontractors shall be entitled to any benefits to which County employees are entitled, including without limitation, overtime, retirement benefits, workers' compensation benefits and injury leave.

1.4   Contractor's Agents and Employees or Subcontractors.  Contractor shall obtain, at Contractor's expense, all agents, employees, subcontractors, and consultants required for Contractor to perform its duties under this Agreement, and all such services shall be performed by Contractor's Representative, or under Contractor's Representatives' supervision, by persons authorized by law to perform such services. Retention by Contractor of any agent, employee, subcontractor or consultant shall be at Contractor's sole cost and expense, and County shall have no obligation to pay Contractor's agents, employees subcontractors, or consultants; to support any such person's or entity's claim against the Contractor; or to defend Contractor against any such claim.

**Ex. G - 441**

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

In the event any subcontractor or consultant is utilized by Contractor for any portion of the project, Contractor retains the prime responsibility for carrying out all the terms of this Agreement, including the responsibility for performance and ensuring the availability and retention of records of subcontractors and consultants in accordance with this Agreement.

1.4.1 "Related Subcontract" means an agreement to furnish, or the furnishing of, supplies, materials, equipment, or services of any kind to Contractor or any higher tier subcontractor in the performance of some or all of the work in this Agreement. Related Subcontracts includes consultant agreements, which are defined as agreements for services rendered, or the rendering of services, by persons who are members of a particular profession or possess as special skill and who are not officers or employees of the Contractor. Examples include those services acquired by Contractor or a subcontractor in order to enhance their legal, economic, financial, or technical positions. Professional and consultant services are generally acquired to obtain information, advice, opinions, alternatives, conclusions, recommendations, training or direct assistance, such as studies, analyses, evaluations, liaison with government officials, or other forms or representation. Related Subcontracts shall not include agreements for ancillary goods or services, or consulting services intended to support Contractor in a general manner not specific to the work performed under this Agreement.

1.4.2 Mandated Clause: Contractor shall notify all Related Subcontractors of Contractor's relationship to County. Contractor shall include in its Related Subcontracts and ensure compliance with the Standard Terms and Conditions required of Contractor in Articles 3, 7, 8, 9, 10, 11, 12, 13, 14 and 16 herein.

1.4.3 Contractor shall provide Contracting Officer Representative with copies of all Related Subcontracts entered into by Contractor within thirty (30) days after the effective date of the Related Subcontract, or within thirty (30) days of the effective date of this Agreement if such Related Subcontract is already in existence at that time.

1.4.4 County Approval: Any Related Subcontract that is in excess of fifty thousand dollars ($50,000) or twenty five percent (25%) of the value of this Agreement, whichever is less; or a combination of Related Subcontracts to the same individual or firm for the Agreement period, the aggregate of which exceeds fifty thousand dollars ($50,000) or twenty five percent (25%) of the value of this Agreement, whichever is less; or any Related Subcontract for health care services including mental health services, regardless of value, must have prior written concurrence of the Contracting Officer's Representative ("COR"). Such subcontractors of Contractor shall be notified of Contractor's relationship to County.

1.5 <u>Offshore Prohibition</u>. Except where Contractor obtains the County's prior written approval, Contractor shall perform the work of this Agreement only from or at locations within the United States. Any County approval for the performance of work outside of the United States shall be limited to the specific instance and scope of such written approval, including the types of work and locations involved. Notwithstanding the foregoing, this Section shall not restrict the country or countries of origin of any assets purchased to provide the work hereunder; provided that when such assets are used to provide the work, such assets shall be used only from or at locations within the geographic boundaries of the United States.

## ARTICLE 2
## SCOPE OF WORK

2.1 <u>Statement of Work</u>. Contractor shall perform the work described in the "Statement of Work" attached as Exhibit "A" to this Agreement, and by this reference incorporated herein, except for any work therein designated to be performed by County.

2.2 <u>Right to Acquire Equipment and Services</u>. Nothing in this Agreement shall prohibit the County from acquiring the same type or equivalent equipment and/or service from other sources, when deemed by the County to be in its best interest.

2.3 <u>Responsibility for Equipment</u>. For cost reimbursement agreements, County shall not be responsible nor be held liable for any damage to persons or property consequent upon the use, misuse, or failure of any equipment used by Contractor or any of Contractor's employees, even though such equipment may be furnished, rented, or loaned to Contractor by County. The acceptance or use of any such equipment by Contractor or Contractor's employees shall be construed to mean that Contractor accepts full responsibility for and agrees to exonerate, indemnify and hold harmless County from and against any and all claims for any damage whatsoever resulting from the use, misuse, or failure of such equipment, whether such damage be to the employee or property of Contractor, other Contractors, County, or other persons. Equipment includes, but is not limited to material, computer hardware and software, tools, or other things.

2.3.1 Contractor shall repair or replace, at Contractor's expense, all County equipment or fixed assets that are damaged or lost as a result of Contractor negligence.

**Ex. G - 442**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

2.4   Non-Expendable Property Acquisition. County retains title to all non-expendable property provided to Contractor by County, or which Contractor may acquire with funds from this Agreement if payment is on a cost reimbursement basis, including property acquired by lease purchase Agreement. Contractor may not expend funds under this Agreement for the acquisition of non-expendable property having a unit cost of $5,000 or more and a normal life expectancy of more than one year without the prior written approval of Contracting Officer Representative. Contractor shall maintain an inventory of non-expendable equipment, including dates of purchase and disposition of the property. Inventory records on non-expendable equipment shall be retained, and shall be made available to the County upon request, for at least three years following date of disposition. Non-expendable property that has value at the end of the Agreement (e.g. has not been depreciated so that its value is zero), and to which the County may retain title under this paragraph, shall be disposed of at the end of the Agreement as follows: At County's option, it may: 1) have Contractor deliver to another County contractor or have another County contractor pick up the non-expendable property; 2) allow the contractor to retain the non-expendable property provided that the contractor submits to the County a written statement in the format directed by the County of how the non-expendable property will be used for the public good; or 3) direct the Contractor to return to the County the non-expendable property.

2.5   Transition Services. The Services shall include the transparent, seamless, orderly, and uninterrupted transition from the manner in which the County receives or performs the Services prior to the Effective Date to the provision of all of such Services to the County by Contractor (the "Transition"). Such Transition shall include the complete and timely performance by Contractor of all requirements set forth in the Transition Plan, attached as Exhibit E, in accordance with the due dates specified therein and shall be accomplished by Contractor in such a manner as to have no adverse effect upon the County, any agency, subdivision or department thereof, nor upon the quality or continuity of the services being provided at County detention facilities. From and after the completion of Transition, Contractor shall ensure that there is no material adverse effect on the quality of the services being provided at County detention facilities that would not have otherwise occurred had the Transition contemplated by this Agreement not taken place.

2.5.1   Milestones for Transition. The County and Contractor recognize and agree that time is of the essence for a successful Transition and they have designated certain actions and projects in the Transition Plan as Transition Milestones. If Contractor fails to meet any such Transition Milestone by the date corresponding thereto in the Transition Plan, Contractor shall be subject to Fee Reductions pursuant to Article 4 hereof. In the event that Contractor anticipates that action or inaction by the County could impact a Transition Milestone, Contractor may request an extension on such Transition Milestone, approval of which shall not be unreasonably withheld by the County. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, if Contractor fails to complete the Transition of all Services within one year from the Effective Date, the County may terminate this Agreement for cause without requirement of notice or opportunity for cure.

2.5.2   Progress Reports. Contractor shall provide to the COR a written update as to progress of the Transition Plan at least weekly until such plan and each of Contractor's responsibilities thereunder have been met.

2.5.3   Effects of Transition Services. In the event that the County determines, in its sole discretion, at any time during the Transition, that the County, any agency, department or subdivision of the County, or the quality or continuity of the Services has been materially and adversely affected in any way, or that any such material and adverse effect seems reasonably likely to occur, then the County may direct Contractor to stop and proceed no further with Transition or portion thereof until such time as Contractor shall have: (i) analyzed the cause of such effect; (ii) developed a reasonable plan for resuming Transition in such a manner as to eliminate or avoid such effect (and any other negative or adverse consequences of Transition); and (iii) received the County's approval to proceed with Transition, which approval shall not be unreasonably withheld. Following any resumption of the Transition of the Services to Contractor, if the County again determines that a material and adverse effect has occurred, then the process described above in this Section 2.5.3 shall be repeated. Nothing in this Section 2.5.3, nor the County's exercise of its rights, as described above, pursuant to this Section 2.5.3, shall in any way reduce, limit, or obviate any obligation of Contractor to meet a Transition Milestone or any other schedule, target, completion schedule, or other commitment specified in the Transition Plan or this Agreement. In addition, the County's exercise of its rights as set forth in this Section 2.5.3 shall not trigger any additional charges or fees from the Contractor.

ARTICLE 3
DISENTANGLEMENT

3.1   General Obligations.

Ex. G - 443

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

At County's discretion, Contractor shall accomplish a complete transition of the services as set forth in Exhibit A to this Agreement (for purposes of this Article 3.1, these shall be referred to as the "Disentangled Services") being terminated from Contractor and the Subcontractors to County, or to any replacement provider designated by County, without any interruption of or adverse impact on the Disentangled Services or any other services provided by third parties. This process shall be referred to as the Disentanglement. Contractor shall fully cooperate with County and any new service provider and otherwise promptly take all steps, including, but not limited to providing to County or any new service provider all requested information or documentation, required to assist County in effecting a complete Disentanglement. Contractor shall provide all information or documentation regarding the Disentangled Services or as otherwise needed for Disentanglement, including, but not limited to, data conversion, client files, interface specifications, training staff assuming responsibility, and related professional services. Contractor shall provide for the prompt and orderly conclusion of all work required under the Agreement, as County may direct, including completion or partial completion of projects, documentation of work in process, and other measures to assure an orderly transition to County or the County's designee of the Disentangled Services. All Contractor work done as part of the Disentanglement shall be performed by Contractor and will be reimbursed by the County at no more than Contractor's costs, up to the total amount of this Agreement. Contractor shall not receive any additional or different compensation for the work otherwise required by the Agreement. Contractor's obligation to provide the Services shall not cease until the earlier of the following: 1) The Disentanglement is satisfactory to County, including the performance by Contractor of all asset-transfers and other obligations of Contractor provided in this Paragraph, has been completed to the County's reasonable satisfaction or 2) twelve (12) months after the Expiration Date of the Agreement.

3.2     Disentanglement Process.

The Disentanglement process shall begin on any of the following dates: (i) the date County notifies Contractor that no funds or insufficient funds have been appropriated so that the Term shall be terminated pursuant to the Agreement, Article 7; (ii) the date designated by County not earlier than sixty (60) days prior to the end of any initial or extended term that County has not elected to extend pursuant to the Agreement's, Signature Page, Agreement Term; or (iii) the date any Termination Notice is delivered, if County elects to terminate any or all of the Services pursuant to the Agreement, Article 7. Subject to Exhibit A Contractor's obligation to perform Disentangled Services, and County's obligation to pay for Disentangled Services, shall expire: (A) when funds appropriated for payment under this Agreement are exhausted, as provided in this Agreement, Article 7; (B) at the end of the initial or extended term set forth in this Agreement's, Signature Page, Agreement Term; or (C) on the Termination Date, pursuant to this Agreement, Article 7 (with the applicable date on which Contractor's obligation to perform the Services expires being referred to herein as the "Expiration Date"). Contractor and County shall discuss in good faith a plan for determining the nature and extent of Contractor's Disentanglement obligations and for the transfer of the Disentangled Services in process provided, however, that Contractor's obligation under this Agreement to provide all Disentangled Services shall not be lessened in any respect.

3.3     Specific Obligations.

The Disentanglement shall include the performance of the following specific obligations:

3.3.1    No Interruption or Adverse Impact

Contractor shall cooperate with County and all of the County's other service providers to ensure a smooth transition at the time of Disentanglement, with no interruption of Disentangled Services or other work required under the Agreement, no adverse impact on the provision of Disentangled Services or other work required under the Agreement or County's activities, no interruption of any services provided by third parties, and no adverse impact on the provision of services provided by third parties.

3.3.2    Third-Party Authorizations.

Without limiting the obligations of Contractor pursuant to any other clause in Exhibit A herein, Contractor shall, subject to the terms of any third-party agreements, procure at no charge to County any third-party authorizations necessary to grant County the use and benefit of any third-party agreements between Contractor and third-party contractors used to provide the Disentangled Services, pending their assignment to County. Similarly, at County's direction, Contractor shall obtain all legally necessary client consents or authorizations legally necessary to transfer client data to County or any new service provider.

3.3.3    Licenses to Proprietary Software.

For any software programs developed for use under this Agreement, Contractor shall provide a nonexclusive, nontransferable, fully-paid, perpetual, irrevocable, royalty-free worldwide license to the County (or other service provider, as the case may be), at no charge to County, to use, copy, and modify, all Contractor Underlying Works

Ex. G - 444

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

and Contractor Derivatives that would be needed in order to allow County to continue to perform for itself, or obtain from other providers, the Services as the same might exist at the time of Disentanglement. Contractor shall also provide County with a copy of each such program, in such media as requested by County, together with object code, source code, and appropriate documentation. Contractor shall also offer to County the right to receive maintenance (including all enhancements and upgrades) and support with respect to such Contractor Underlying Works and Contractor Derivatives for so long as County requires, at the best rates Contractor is offering to other major customers for services of a similar nature and scope.

3.3.4 <u>Return, Transfer and Removal of Assets</u>.

    3.3.4.1 Contractor shall return to County all County assets in Contractor's possession, pursuant to Paragraph 2.4 of the Agreement.

    3.3.4.2 County shall be entitled to purchase at net book value those Contractor assets used for the provision of Disentangled Services to or for County, other than those assets expressly identified by the Parties as not being subject to this provision. Contractor shall promptly remove from County's premises, or the site of the work being performed by Contractor for County, any Contractor assets that County, or its designee, chooses not to purchase under this provision.

3.3.5 <u>Transfer of Leases, Licenses, and Agreements</u>.

    Contractor, at its expense, shall convey or assign to County or its designee such fully-paid leases, licenses, and other agreements used by Contractor, County, or any other Person in connection with the Disentangled Services, as County may select, when such leases, licenses, and other agreements have no other use by Contractor. Contractor's obligation described herein, shall include Contractor's performance of all obligations under such leases, licenses, and other agreements to be performed by it with respect to periods prior to the date of conveyance or assignment and Contractor shall reimburse County for any losses resulting from any claim that Contractor did not perform any such obligations.

3.3.6 <u>Delivery of Documentation</u>.

    Contractor shall deliver to County or its designee, at County's request, all documentation and data related to County, including, but not limited to, the County Data and client files, held by Contractor, and Contractor shall destroy all copies thereof not turned over to County, all at no charge to County. Notwithstanding the foregoing, Contractor may retain one (1) copy of the documentation and data, excluding County Data, for archival purposes or warranty support, and Contractor may maintain records that it is legally required to maintain.

3.4 <u>Findings Confidential</u>. Any reports, information, data, etc., given to or prepared or assembled by Contractor under this Agreement that the County requests to be kept as confidential shall not be made available to any individual or organization by the Contractor without the prior written approval of the County.

3.5 <u>Publication, Reproduction or Use of Materials</u>. No material produced, in whole or in part, under this Agreement shall be subject to copyright in the United States or in any other country. The County shall have unrestricted authority to publish, disclose, distribute and otherwise use, in whole or in part, any reports, data or other materials prepared under this Agreement. All reports, data and other materials prepared under this Agreement shall be the property of the County upon completion of this Agreement.

**ARTICLE 4**
**COMPENSATION**

The Payment Schedule, and/or budget are in Exhibit C and the compensation is on the Signature page. County will pay Contractor the agreed upon price(s), pursuant to Exhibit C for the work specified in Exhibit A, Statement of Work. The County is precluded from making payments prior to receipt of services (advance payments). Contractor shall provide and maintain an accounting and financial support system to monitor and control costs to assure the Agreements completion. Invoices are subject to the requirements below.

4.1 <u>Fiscal for Fixed Pricing</u> (Rev. 2/10/21)

    4.1.1 <u>General Principles</u>. Contractor shall, comply with generally accepted accounting principles and good business practices, including all applicable cost principles published by the Federal Office of Management and Budget (OMB), including 2 CFR 200 - UNIFORM ADMINISTRATIVE REQUIREMENTS, COST PRINCIPLES, AND AUDIT REQUIREMENTS FOR FEDERAL AWARDS "The Uniform Guidance", which can be viewed at https://www.ecfr.gov/cgi-bin/text-idx?tpl=/ecfrbrowse/Title02/2cfr200_main_02.tpl . Contractor shall comply with all federal, State, and other funding source requirements. Contractor shall, at its own expense, furnish all cost items

**Ex. G - 445**

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

associated with this Agreement except as herein otherwise specified in the budget or elsewhere to be furnished by County. Contractor shall submit annually to the County a cost allocation plan in accordance with The Uniform Guidance.

4.1.2 <u>Invoices.</u> Payment for the services performed under this Agreement shall be in accordance with Exhibit C, unless other payment methodologies are negotiated and agreed to by both Contractor and County. Contractor shall submit approved invoices monthly to the Contracting Officer's Representative ("COR") for work performed in the monthly period, accordingly. Contractor's monthly invoices shall be completed and submitted in accordance with written COR instructions and in compliance with all Agreement terms.

4.1.3 <u>Payments.</u> County agrees to pay Contractor in arrears only after receipt and approval by COR of properly submitted, detailed and itemized original invoice referencing the Agreement number and a detailed listing of each pay point target, accomplishment, unit price and/or percentages, and showing the appropriate calculation for each, a progress report documenting the status and accomplishments of Contractor during the billing period pursuant to Exhibit C. Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

4.1.4 <u>Full Compensation.</u> Pending any adjustments by the COR, each invoice approved and paid shall constitute full and complete compensation to the Contractor for all work completed during the billing period pursuant to Exhibit A and Exhibit C. Contractor shall be entitled only to compensation, benefits, reimbursements or ancillary services specified in this Agreement. Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

4.1.5 <u>Prompt Payment for Vendors and Subcontractors</u>

    4.1.5.1 Prompt payment for vendors and subcontractors.

        4.1.5.1.1. Unless otherwise set forth in this paragraph, Contractor shall promptly pay its vendors and subcontractor(s) for satisfactory performance under its subcontract(s) to this Agreement. Such prompt payment shall be no later than thirty (30) days after Contractor receives payment for such services from County and shall be paid out of such amounts as are paid to Contractor under this Agreement.

        4.1.5.1.2 Contractor shall include a payment clause conforming to the standards set forth in Paragraph 4.1.5.2.3 of this Agreement in each of its subcontracts, and shall require each of its subcontractors to include such a clause in their subcontracts with each lower-tier subcontractor or supplier.

    4.1.5.2 If Contractor, after submitting a claim for payment to County but before making a payment to a vendor or subcontractor for the goods or performance covered by the claim, discovers that all or a portion of the payment otherwise due such vendor or subcontractor is subject to withholding from the vendor or subcontractor in accordance with the vendor or subcontract agreement, then the Contractor shall:

        4.1.5.2.1 Furnish to the vendor or subcontractor and the COR within three (3) business days of withholding funds from its vendor or subcontractor a notice stating the amount to be withheld, the specific causes for the withholding under the terms of the subcontract or vendor agreement; and the remedial actions to be taken by the vendor or subcontractor in order to receive payment of the amounts withheld.

        4.1.5.2.2 Contractor shall reduce the subcontractor's progress payment by an amount not to exceed the amount specified in the notice of withholding furnished under paragraph 4.1.5.2.1 of this Agreement and Contractor may not claim from the County this amount until its subcontractor has cured the cause of Contractor withholding funds;

        4.1.5.2.3 Upon the vendor's or subcontractor's cure of the cause of withholding funds, Contractor shall pay the vendor or subcontractor as soon as practicable, and in no circumstances later than ten (10) days after the Contractor claims and receives such funds from County.

    4.1.5.3 Contractor shall not claim from County all of or that portion of a payment otherwise due to a vendor or subcontractor that Contractor is withholding from the vendor or subcontractor in accordance with the subcontract agreement where Contractor withholds the money before submitting a claim to County. Contractor shall provide its vendor or subcontractor and the COR with the notice set forth in Paragraph 4.1.5.2.1 of this Agreement and shall follow Paragraph 4.1.5.2.3 of this Agreement when vendor or subcontractor cures the cause of Contractor withholding its vendors or subcontractor's funds.

    4.1.5.4 Overpayments. If Contractor becomes aware of a duplicate contract financing or invoice payment or that County has otherwise overpaid on a contract financing or invoice payment, Contractor shall immediately notify the COR and request instructions for disposition of the overpayment.

Ex. G - 446

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

4.1.6    Conditions Prerequisite to Payments. County may elect not to make a particular payment if any of the following exists:

    4.1.6.1    Misrepresentation. Contractor, with or without knowledge, made any misrepresentation of substantial and material nature with respect to any information furnished to County.

    4.1.6.2    Unauthorized Actions by Contractor.  Contractor took any action pertaining to this Agreement, which required County approval, without having first received said County approval.

    4.1.6.3    Default. Contractor was in default under any terms and conditions of this Agreement.

4.1.7    Withholding of Payment. County may withhold payment until reports, data, audits, or other information required for Agreement administration or to meet County or State reporting or auditing requirements are received and approved by COR or designee. The County may also withhold payment if, in the County's determination, Contractor is in non-compliance with this Agreement.

4.1.8    Availability of Funding. The County's obligation for payment of any Agreement beyond the current fiscal year is contingent upon the availability of funding from which payment can be made. No legal liability on the part of the County shall arise for payment beyond June 30 of the calendar year unless funds are designated by the County and are made available for such performance.

County shall, in its sole discretion, have the right to terminate or suspend Agreement or reduce compensation and service levels proportionately upon thirty (30) days' written notice to Contractor in the event that Federal, State or County funding for this Agreement ceases or is reduced prior to the ordinary expiration of the term of this Agreement. In the event of reduction of funding for the Agreement, County and Contractor shall meet within ten (10) days of written notice to renegotiate this Agreement based upon the modified level of funding. In this case if no agreement is reached between County and Contractor within 10 days of the first meeting, either party shall have the right to terminate this Agreement within ten (10) days written notice of termination.

In the event of termination of this Agreement in accordance with the terms of this Section, Contractor shall be entitled to retain all sums paid as of the effective date of such termination, subject to any payment offset to which County may be entitled, for damages or otherwise, under the terms of this Agreement. In the event of termination of this Agreement pursuant to this Section, in no event shall Contractor be entitled to any loss of profits on the portion of this Agreement so terminated, or to other compensation, benefits, reimbursements or ancillary services other than as herein expressly provided.

4.1.9    Disallowance. In the event the Contractor receives payment for services under this Agreement which is later disallowed by the County, Contractor shall promptly refund the disallowed amount to County on request, or at its option, County may offset the amount disallowed from any payment due or to become due to Contractor under any Agreement with the County.

4.1.10   Maximum Price. During the performance period of this Agreement, the maximum price for the same or similar items and/or services shall not exceed the lowest price at which Contractor then offers the items and/or services to its most favored customer.

**ARTICLE 5**
**AGREEMENT ADMINISTRATION**

5.1   County's Agreement Administrator. The Director of Purchasing and Contracting is designated as the Contracting officer ("Contracting Officer") and is the only County official authorized to make any Changes to this Agreement. The County has designated the individual identified on the signature page as the Contracting Officer's Representative ("COR")

    5.1.1    County's COR will chair Contractor progress meetings and will coordinate County's Agreement administrative functions.  The COR is designated to receive and approve Contractor invoices for payment, audit and inspect records, inspect Contractor services, and provide other technical guidance as required.  The COR is not authorized to change any terms and conditions of this Agreement.  Only the Contracting Officer, by issuing a properly executed amendment to this Agreement, may make changes to the scope of work or total price.

    5.1.2    Notwithstanding any provision of this Agreement to the contrary, County's COR may make Administrative Adjustments ("AA") to the Agreement, such as line item budget changes or adjustments to the service requirements that do not change the purpose or intent of the Statement of Work, the Terms and Conditions, the Agreement Term or the total Agreement price. Each AA shall be in writing and signed by COR and Contractor. All inquiries about such AA will be referred directly to the COR.

**Ex. G - 447**

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

5.2 Agreement Progress Meeting. The COR and other County personnel, as appropriate, will meet periodically with the Contractor to review the Agreement performance. At these meetings the COR will apprise the Contractor of how the County views the Contractor's performance and the Contractor will apprise the County of problems, if any, being experienced. The Contractor shall also notify the Contracting Officer (in writing) of any work being performed, if any, that the Contractor considers being over and above the requirements of the Agreement. Appropriate action shall be taken to resolve outstanding issues. The minutes of these meetings will be reduced to writing and signed by the COR and the Contractor. Should the Contractor not concur with the minutes, the Contractor shall set out in writing any area of disagreement. Appropriate action will be taken to resolve any areas of disagreement.

**ARTICLE 6**
**CHANGES**

6.1 Contracting Officer. The Contracting Officer may at any time, by a written order, make changes ("Changes"), within the general scope of this Agreement, in the definition of services to be performed, and the time (i.e.) hours of the day, days of the week, etc. and place of performance thereof. If any such Change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this Agreement, whether changed or not changed by such an order, an equitable adjustment shall be made in the Agreement price or delivery schedule, or both, and the Agreement shall be modified in writing accordingly. Such changes may require Board of Supervisors approval.

    6.1.1 In the event that Contractor experiences unanticipated or unaccounted for changes in the health care systems or methods of required delivery, Contractor will provide the Contracting Officer with impact information and documentation. The Contracting Officer will consider any appropriate changes to the contract. Any such changes will be at the county's discretion.

6.2 Claims. Contractor must assert any claim for adjustment under this clause within thirty (30) days from the date of receipt by the Contractor of the notification of Change; provided, however, that the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this Agreement. Where the cost of property made obsolete or excess as a result of a change is included in the Contractor's claim for adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of such property. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this Agreement entitled "Disputes" (Article 15). However, nothing in this clause shall excuse the Contractor from proceeding with this Agreement as changed.

**ARTICLE 7**
**SUSPENSION, DELAY AND TERMINATION**

7.1 Termination for Default. Upon Contractor's breach of this Agreement, County shall have the right to terminate this Agreement, in whole or part. Prior to termination for default, County will send Contractor written notice specifying the cause. The notice will give Contractor ten (10) days from the date the notice is issued to cure the default or make progress satisfactory to County in curing the default, unless a different time is given in the notice. If County determines that the default contributes to the curtailment of an essential service or poses an immediate threat to life, health or property, County may terminate this Agreement immediately upon issuing oral or written notice to the Contractor without any prior notice or opportunity to cure. In the event of termination under this Article, all finished or unfinished documents, and other materials, prepared by Contractor under this Agreement shall become the sole and exclusive property of County.

In the event of such termination, the County may purchase or obtain the supplies or services elsewhere, and Contractor shall be liable for the difference between the prices set forth in the terminated order and the actual cost thereof to the County. The prevailing market price shall be considered the fair repurchase price. Notwithstanding the above, Contractor shall not be relieved of liability to County for damages sustained by County by virtue of any breach of this Agreement by Contractor, and County may withhold any reimbursement to Contractor for the purpose of off-setting until such time as the exact amount of damages due County from Contractor is determined.

If, after notice of termination of this Agreement under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, the rights and obligations of the parties shall, if this Agreement contains a clause providing for termination for convenience of the County, be the same as if the notice of termination had been issued pursuant to such clause.

7.2 Damages for Delay. If Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as shall ensure its completion within the time specified in this Agreement, or any extension thereof, or fails to complete said work within such time, County will be entitled to the resulting damages caused by the delay. Damages will be the cost to

**Ex. G - 448**

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

County incurred as a result of continuing the current level and type of service over that cost that would be incurred had the Agreement segments been completed by the time frame stipulated and any other damages suffered by County.

7.3 Underline County Exemption from Liability. In the event there is a reduction of funds made available by County to Contractor under this or subsequent agreements, the County of San Diego and its Departments, officers and employees shall incur no liability to Contractor and shall be held harmless from any and all claims, demands, losses, damages, injuries, or liabilities arising directly or from such action.

7.4 Full Cost Recovery of Investigation and Audit Costs. Contractor shall reimburse County of San Diego for all direct and indirect expenditures incurred in conducting an audit/investigation when Contractor is found in violation (material breach) of the terms of the Agreement.

At the sole discretion of the County, and subject to funding source restrictions and federal and State law, County may (1) withhold reimbursement for such costs from any amounts due to Contractor pursuant to the payment terms of the Agreement, (2) withhold reimbursement for such costs from any other amounts due to Contractor from County, and/or (3) require Contractor to remit a check for the total amount due (or a lesser amount specified by the County) to County within thirty (30) days of request by County. Alternatively, at the County's sole discretion, County and Contractor may enter into a written repayment plan for the reimbursement of the audit/investigation costs.

7.5 Termination for Convenience. The County may, by written notice stating the extent and effective date terminate this Agreement for convenience in whole or in part, at any time. The County shall pay the Contractor as full compensation for work performed in accordance with the terms of this Agreement until such termination:

7.5.1 The unit or pro rata price for any delivered and accepted portion of the work.

7.5.2 A reasonable amount, as costs of termination, not otherwise recoverable from other sources by the Contractor as approved by the County, with respect to the undelivered or unaccepted portion of the order, provided compensation hereunder shall in no event exceed the total price.

7.5.3 In no event shall the County be liable for any loss of profits on the resulting order or portion thereof so terminated.

7.5.4 County's termination of this Agreement for convenience shall not preclude County from taking any action in law or equity against Contractor for:

7.5.4.1 Fraud, waste or abuse of Agreement funds, or

7.5.4.2 Improperly submitted claims, or

7.5.4.3 Any failure to perform the work in accordance with the Statement of Work, or

7.5.4.4 Any breach of any term or condition of the Agreement, or

7.5.4.5 Any actions under any warranty, express or implied, or

7.5.4.6 Any claim of professional negligence, or

7.5.4.7 Any other matter arising from or related to this Agreement, whether known, knowable or unknown before, during or after the date of termination.

7.6 Suspension of Work. The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this Agreement for the period of time that the Contracting Officer determines appropriate for the convenience of the Government. County reserves the right to prohibit, without prior notice, contractor or contractor's employees, directors, officers, agents, subcontractors, vendors, consultants or volunteers from 1) accessing County data systems and County owned software applications, including websites, domain names, platforms, physical files, 2) treating County's patients, clients, or facility residents, or 3) providing any other services under this Agreement.

7.7 Remedies Not Exclusive. The rights and remedies of County provided in this article shall not be exclusive and are in addition to any other rights and remedies provided by law, equity, or under resulting order.

## ARTICLE 8
## COMPLIANCE WITH LAWS AND REGULATIONS

8.1 Compliance with Laws and Regulations. Contractor shall at all times perform its obligations hereunder in compliance with all applicable federal, State, County, and local laws, rules, and regulations, current and hereinafter enacted, including facility and professional licensing and/or certification laws and keep in effect any and all licenses, permits, notices and certificates

Ex. G - 449

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

as are required. Contractor shall further comply with all laws applicable to wages and hours of employment, occupational safety, and to fire safety, health and sanitation.

8.2   Contractor Permits and License. Contractor certifies that it possesses and shall continue to maintain or shall cause to be obtained and maintained, at no cost to the County, all approvals, permissions, permits, licenses, and other forms of documentation required for it and its employees to comply with all existing foreign or domestic statutes, ordinances, and regulations, or other laws, that may be applicable to performance of services hereunder. The County reserves the right to reasonably request and review all such applications, permits, and licenses prior to the commencement of any services hereunder.

8.3   Equal Opportunity. Contractor shall comply with all federal, State and local equal opportunity laws and regulations, including but not limited to the provisions of Title VII of the Civil Rights Act of 1964, in that it will not discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment nor shall Contractor discriminate in any way that would deprive or intend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee because of such individual's race, color, religion, sex, national origin, age, handicap, medical condition, sexual orientation or marital status.

8.4   Affirmative Action. Each Contractor of services and supplies employing fifteen (15) or more full-time permanent employees, shall comply with the Affirmative Action Program for Vendors as set forth in Article IIIk (commencing at Section 84) of the San Diego County Administrative Code, which program is incorporated herein by reference. A copy of this Affirmative Action Program will be furnished upon request by COR or from the County of San Diego Internet web-site (www.co.san-diego.ca.us).

8.5   Non-Discrimination. Contractor shall ensure that services and facilities are provided without regard to ethnic group identification, race, color, nation origin, creed, religion, age, sex, physical or mental disability, political affiliation or marital status in accordance with applicable laws, including, but not limited to, Title VI of the Civil Rights Act of 1964 (42 U.S.C 2000d), Section 162 (a) of the Federal-Aid Highway Act of 1973 (23 U.S.C 324), Section 504 of the Rehabilitation Act of 1973, The Civil Rights Restoration Act of 1987 (P.L. 100-209), Executive Order 12898 (February 11, 1994), Executive Order 13166 (August 16, 2000), Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e), the Age Discrimination Act of 1975 (42 U.S.C. 6101), Article 9.5, Chapter 1, Part 1, Division 2, Title 2 (Section 11135, et seq.) of the California Government Code, Title 9, Division 4, Chapter 6 (Section 10800, et seq.) of the CCR and California Dept of Social Services Manual of Policies and Procedures (CDSS MPP) Division 19.

8.6   AIDS Discrimination. Contractor shall not deny any person the full and equal enjoyment of, or impose less advantageous terms, or restrict the availability of, the use of any County facility or participation in any County funded or supported service or program on the grounds that such person has Human Immunodeficiency Virus (HIV) or Acquired Immune Deficiency Syndrome (AIDS) as those terms are defined in Title 3, Division 2, Chapter 8, Section 32.803, of the San Diego County Code of Regulatory Ordinances.

8.7   American with Disabilities Act (ADA) 1990. Contractor shall not discriminate against qualified people with disabilities in employment, public services, transportation, public accommodations and telecommunications services in compliance with the Americans with Disabilities Act (ADA) and California Administrative Code Title 24.

8.8   Political Activities Prohibited. None of the funds, provided directly or indirectly, under this Agreement shall be used for any political activities or to further the election or defeat of any candidate for public office. Contractor shall not utilize or allow its name to be utilized in any endorsement of any candidate for elected office. Neither this Agreement nor any funds provided hereunder shall be utilized in support of any partisan political activities, or activities for or against the election of a candidate for an elected office.

8.9   Lobbying. Contractor agrees to comply with the lobbying ordinances of the County and to assure that its officers and employees comply before any appearance before the County Board of Supervisors. Except as required by this Agreement, none of the funds provided under this Agreement shall be used for publicity or propaganda purposes designed to support or defeat any legislation pending before State and federal Legislatures, the Board of Supervisors of the County, or before any other local governmental entity. This provision shall not preclude Contractor from seeking necessary permits, licenses and the like necessary for it to comply with the terms of this Agreement.

8.10  Religious Activity Prohibited. There shall be no religious worship, instructions or proselytization as part of or in connection with the performance of this Agreement.

8.11  RESERVED

**Ex. G - 450**

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

8.12 <u>Board of Supervisors' Policies</u>.  Contractor represents that it is familiar, and shall use its best efforts to comply, with the following policies of the Board of Supervisors, available on the County of San Diego website:

8.12.1 Board Policy B-67, which encourages the County's Contractors to offer products made with recycled materials, reusable products, and products designed to be recycled to the County in response to the County's requirements; and

8.12.2 Board Policies B-53 and B-39a, which encourage the participation of small and veteran owned businesses in County procurements; and

8.12.3 <u>Zero Tolerance for Fraudulent Conduct in County Services</u>.  Contractor shall comply with County of San Diego Board of Supervisors Policy A-120 "Zero Tolerance for Fraudulent Conduct in County Services." There shall be "Zero Tolerance" for fraud committed by contractors in the administration of County programs and the provision of County services. Upon proven instances of fraud committed by contractors in connection with their performance under the Agreement, said contractor shall be subject to corrective action up to and including termination of the Agreement; and

8.12.4 <u>Interlocking Directorate</u>.  In recognition of Board Policy A-79, available on the County of San Diego Website, not-for-profit Contractors shall not subcontract with related for-profit subcontractors for which an interlocking relationship exist unless specifically authorized in writing by the Board of Supervisors; and

8.12.5 <u>Drug and Alcohol-Free Workplace</u>. The County of San Diego, in recognition of individual rights to work in a safe, healthful and productive work place, has adopted a requirement for a drug and alcohol free work place, County of San Diego Drug and Alcohol Use Policy C-25, available on the County of San Diego website.  This policy provides that all County-employed Contractors and Contractor employees shall assist in meeting this requirement.

8.12.5.1 As a material condition of this Agreement, the Contractor agrees that the Contractor and the Contractor employees, while performing service for the County, on County property, or while using County equipment:

8.12.5.1.1 Shall not be in any way impaired because of being under the influence of alcohol or a drug.

8.12.5.1.2 Shall not possess an open container of alcohol or consume alcohol or possess or be under the influence of an illegal drug.

8.12.5.1.3 Shall not sell, offer, or provide alcohol or an illegal drug to another person; provided, however, that the foregoing restriction shall not be applicable to a Contractor or Contractor employee who as part of the performance of normal job duties and responsibilities prescribes or administers medically prescribed drugs.

8.12.5.2 Contractor shall inform all employees who are performing service for the County on County property or using County equipment of the County objective of a safe, healthful and productive work place and the prohibition of drug or alcohol use or impairment from same while performing such service for the County.

8.12.5.3 The County may terminate for default or breach this Agreement, and any other agreement the Contractor has with the County, if the Contractor, or Contractor employees are determined by the Contracting Officer not to be in compliance with the conditions listed herein

8.11.4 When requested by County, Contractor's employees working on County property shall be subjected to drug testing at Contractor's expense.

8.13 Contractor represents that it is familiar, and shall use its best efforts to comply, with the following policies of the Board of Supervisors, available on the County of San Diego website:

8.13.1 Upon proven instances of fraud committed by independent <u>Zero Tolerance in Coaching Medi-Cal or Welfare Clients (Including Undocumented Immigrants)</u>.  The County of San Diego in recognition of its unique geographical location and the utilization of the Welfare and Medi-Cal systems by foreign nationals who are not legal residents of this county or country, has adopted a Zero Tolerance policy and shall aggressively prosecute employees and Contractors who coach Medi-Cal or Welfare clients (including undocumented immigrants), to obtain services for which they are not otherwise entitled.

As a material condition of this Agreement, Contractor agrees that the Contractor and Contractor's employees, while performing service for the County, on County property or while using County equipment shall not:

Ex. G - 451

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

    (a)   in any way coach, instruct, advise, or guide any Medi-Cal or Welfare clients or prospective clients who are undocumented immigrants on ways to obtain or qualify for Medi-Cal assistance, for which they are not otherwise entitled.

    (b)   support or provide funds to any organization engaged directly or indirectly in advising undocumented immigrants on ways to obtain or qualify for Medi-Cal assistance, for which they are not otherwise entitled.

Contractor shall inform all employees that are performing service for the County on County property or using County equipment of County's Zero Tolerance Policy as referenced herein.

County may terminate for default or breach this Agreement and any other agreement Contractor has with County, if Contractor or Contractor employees are determined not to be in compliance with the conditions stated herein.

8.14   Cartwright Act. Following receipt of final payment under the Agreement, Contractor assigns to the County all rights, title and interest in and to all causes of action it may have under Section 4 of the Clayton Act (15 U.S.C. Sec. 15) or under the Cartwright act (Chapter 2) (commencing with Section 16700) of Part 2 of Division 7 of the Business and Professions Code), arising from purchases of goods, materials, or services by the Contractor for sale to the County under this Agreement.

8.15   Hazardous Materials. Contractor shall comply with all Environmental Laws and all other laws, rules, regulations, and requirements regarding Hazardous Materials, health and safety, notices, and training. Contractor agrees that it will not store any Hazardous Materials at any County facility for periods in excess of ninety (90) days or in violation of the applicable site storage limitations imposed by Environmental Law. Contractor agrees to take, at its expense, all actions necessary to protect third parties, including, without limitation, employees and agents of the County, from any exposure to Hazardous Materials generated or utilized in its performance under this Agreement. Contractor agrees to report to the appropriate governmental agencies all discharges, releases, and spills of Hazardous Materials that are required to be reported by any Environmental Law and to immediately notify the County of it. Contractor shall not be liable to the County for the County's failure to comply with, or violation of, any Environmental Law. As used in this section, the term "Environmental Laws" means any and all federal, state or local laws or ordinances, rules, decrees, orders, regulations or court decisions (including the so-called "common law"), including, but not limited to, the Resource Conservation and Recovery Act, relating to hazardous substances, hazardous materials, hazardous waste, toxic substances, environmental conditions or other similar substances or conditions. As used in this section the term "Hazardous Materials" means any chemical, compound, material, substance or other matter that: (a) is a flammable, explosive, asbestos, radioactive nuclear medicine, vaccine, bacteria, virus, hazardous waste, toxic, overtly injurious or potentially injurious material, whether injurious or potentially injurious by itself or in combination with other materials; (b) is controlled, referred to, designated in or governed by any Environmental Laws; (c) gives rise to any reporting, notice or publication requirements under any Environmental Laws, or (d) is any other material or substance giving rise to any liability, responsibility or duty upon the County or Lessee with respect to any third person under any Environmental Laws.

8.16   Clean Air Act and Federal Water Pollution Control Act.

    8.16.1  Contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq. Contractor agrees to report each violation to the USDA and the appropriate EPA Regional Office.

    8.16.2  Contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Federal Water Pollution Control Act as amended (33 U.S.C. §§ 1251 et seq.). Contractor agrees to report each violation to the USDA and the appropriate EPA Regional Office.

8.17   Debarment, Exclusion, Suspension, and Ineligibility.

    8.17.1  Contractor certifies that, to the best of its knowledge, and except as disclosed to County and acknowledged in writing by County prior to the execution of this Agreement, Contractor, its employees, directors, officers, agents, subcontractors, vendors, consultants, and volunteers:

        8.17.1.1  Are not presently debarred, excluded, suspended, declared ineligible, voluntarily excluded, or proposed for debarment, exclusion, suspension or ineligibility by any federal, state, or local department or agency; and

        8.17.1.2  Have not within a 3-year period preceding this Agreement been convicted of, or had a civil or administrative judgment rendered against them for, the commission of fraud or a criminal offense or civil action in connection with obtaining, attempting to obtain, or performing a public (federal, State, or local) transaction; violation of federal or State anti-trust statutes or commission of embezzlement, theft, forgery,

Ex. G - 452

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

bribery, falsification or destruction of records, making false statements, receiving stolen property; physical, financial or sexual abuse or misconduct with a patient or client, or medical negligence or malpractice;

8.17.1.3  Are not presently indicted or otherwise criminally, civilly or administratively charged by a government entity (federal, State, or local) with commission of any of the offenses enumerated in the paragraph above; and

8.17.1.4  Have not within a 3-year period preceding this Agreement had one or more public transaction (federal, State, or local) terminated for cause or default.

8.17.2  Contractor shall have an ongoing duty during the term of this Agreement to disclose to the County any occurrence that would prevent Contractor from making the certifications contained in this Section 8.16 on an ongoing basis. Such disclosure shall be made in writing to the COR and the County Office of Ethics and Compliance within five (5) business days of when Contractor discovers or reasonably believes there is a likelihood of such occurrence.

8.17.3  Contractor invoices shall include the following language:

I certify, under penalty of perjury under the laws of the State of California, that the deliverables and/or services invoiced were delivered and/or performed specifically for this Agreement in accordance with and compliance to all terms and conditions set forth herein.

8.18  Display of Fraud Hotline Poster(s). As a material term and condition of this Agreement, Contractor shall:

8.18.1  Prominently display in common work areas within all business segments performing work under this Agreement County of San Diego Office of Ethics and Compliance Ethics Hotline posters;

8.18.2  Posters may be downloaded from the County Office of Ethics and Compliance website at: http://www.sandiegocounty.gov/content/sdc/cao/oec.html. Additionally, if Contractor maintains a company website as a method of providing information to employees, the Contractor shall display an electronic version of the poster(s) at the website;

8.18.3  If Contractor has implemented a business ethics and conduct awareness program, including a reporting mechanism, the Contractor need not display the County poster;

8.18.4  In the event Contractor subcontracts any of the work performed under this Agreement, Contractor shall include this clause in the subcontract(s) and shall take appropriate steps to ensure compliance by the subcontractor(s).

8.19  False Claims Act Training. Contractor shall, not less than annually, provide training on the Federal False Claims Act (31 USC 3729, et seq. or successor statutes) and State False Claims Act (California Government Code 12650, et seq. or successor statutes) to all employees, directors, officers, agents, subcontractors, consultants or volunteers providing services under this Agreement. Contractor shall maintain verification of this training. Contractor shall retain verifications in accordance with the Agreement requirement for retention of records. For the purposes of this section, "Subcontractor" shall include any entity, other than County, that furnishes to Contractor services or supplies relevant to this Agreement other than standard commercial supplies, office space, and printing services.

8.20  Code of Ethics. As a material term and condition of this Agreement, Contractor shall develop and implement a Code of Ethics or similar document and maintain it during the term of this Agreement. Additionally, Contractor shall train all employees and volunteers on the Code of Ethics, and all employees, volunteers, directors, officers, and agents shall certify that they have received training and have been provided an opportunity to ask questions of their employer regarding the Code of Ethics. Contractor shall retain these certifications in accordance with the Agreement's provision regarding retention of records. Contractor shall pass this requirement down to its subcontractors in its entirety. For purposes of this section, "Subcontractor" shall mean any entity, other than County, that furnishes to Contractor services or supplies relevant to this Agreement other than standard commercial supplies, office space, and printing services.

8.21  Compliance Program. Contractors with an agreement that exceeds more than $250,000 in value annually shall establish, and maintain for the duration of this Agreement, a compliance program that meets the standards of Federal Sentencing Guidelines section 8B2.1 and 42 CFR 438.608, regardless of funding source or services.

8.22  Investigations. Unless prohibited by an investigating government authority, Contractor shall cooperate and participate fully in any investigation initiated by County relative to this Agreement. Upon County's request, Contractor shall promptly provide to County any and all documents, including any and all communications or information stored digitally, and make available for interviews any employee(s) of Contractor identified by County. Contractor further agrees to immediately notify County if any employee, director, officer, agent, subcontractor, vendor, consultant or volunteer of Contractor comes under

Ex. G - 453

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

investigation by any federal, State or local government entity with law enforcement or oversight authority over the Agreement or its funding for conduct arising out of, or related to, performance under this Agreement.

Contractor shall promptly make available to County all internal investigative results, findings, conclusions, recommendations and corrective action plans pertaining to the investigation in its possession as requested by the County, unless otherwise protected by applicable law or privilege.

8.23  CORI/CLETS Compliance. Without limiting anything in this Article 8, Contractor shall comply with Exhibit D, CORI/CLETS Requirements, attached hereto and made a part hereof by this reference.

### ARTICLE 9
### CONFLICTS OF INTEREST; CONTRACTOR'S CONDUCT

9.1  Conflicts of Interest. Contractor presently has no interest, including but not limited to other projects or independent agreements, and shall not acquire any such interest, direct or indirect, which would conflict in any manner or degree with the performance of services required to be performed under this Agreement. The Contractor shall not employ any person having any such interest in the performance of this Agreement. Contractor shall not hire County's employees to perform any portion of the work or services provided for herein including secretarial, clerical and similar incidental services except upon the written approval of County. Without such written approval, performance of services under this Agreement by associates or employees of County shall not relieve Contractor from any responsibility under this Agreement.

9.1.1  California Political Reform Act and Government Code Section 1090 Et Seq. Contractor acknowledges that the California Political Reform Act ("Act"), Government Code section 81000 et seq., provides that Contractors hired by a public agency, such as County, may be deemed to be a "public official" subject to the Act if the Contractor advises the agency on decisions or actions to be taken by the agency. The Act requires such public officials to disqualify themselves from participating in any way in such decisions if they have any one of several specified "conflicts of interest" relating to the decision. To the extent the Act applies to Contractor, Contractor shall abide by the Act. In addition, Contractor acknowledges and shall abide by the conflict of interest restrictions imposed on public officials by Government Code section 1090 et seq.

9.2  Conduct of Contractor.

9.2.1  Contractor shall inform the County of all Contractor's interests, if any, that are, or that Contractor believes to be, incompatible with any interests of the County.

9.2.2  Contractor shall not, under circumstances that might reasonably be interpreted as an attempt to influence the recipient in the conduct of his duties, accept any gratuity or special favor from individuals or organizations with whom the Contractor is doing business or proposing to do business, in accomplishing the work under this Agreement.

9.2.3  Contractor shall not use for personal gain or make other improper use of confidential information acquired in connection with this Agreement. In this connection, the term "confidential information" includes, but is not limited to, unpublished information relating to technological and scientific development; medical, personnel, or security records of individuals; anticipated materials requirements or pricing actions; and knowledge of selections of Contractors or subcontractors in advance of official announcement.

9.2.4  Contractor, its employees, directors, officers, agents, subcontractors, vendors, consultants, and volunteers shall not offer, directly or indirectly, any unlawful gift, gratuity, favor, entertainment, or other item(s) of monetary value to an employee or official of the County.

9.2.5  Referrals. Contractor further covenants that no referrals of clients through Contractor's intake or referral process shall be made to the private practice of any person(s) employed by the Contractor.

9.3  Prohibited Agreements. As required by Section 67 of the San Diego County Administrative Code, Contractor certifies that it is not in violation of the provisions of Section 67, and that Contractor is not, and will not subcontract with, any of the following:

9.3.1.  Persons employed by County or of public agencies for which the Board of Supervisors is the governing body;

9.3.2.  Profit-making firms or businesses in which employees described in sub-section 9.3.1, above, serve as officers, principals, partners, or major shareholders;

Ex. G - 454

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

9.3.3.    Persons who, within the immediately preceding twelve (12) months came within the provisions of the above sub-sections and who (1) were employed in positions of substantial responsibility in the area of service to be performed by the Agreement, or (2) participated in any way in developing the Agreement or its service specifications; and

9.3.4.    Profit-making firms or businesses, in which the former employees described in sub-section 9.3.3 above, serve as officers, principals, partners, or major shareholders.

9.4    <u>Limitation of Future Agreements or Grants.</u> It is agreed by the parties to the Agreement that Contractor shall be restricted in its future contracting with the County to the manner described below. Except as specifically provided in this clause, Contractor shall be free to compete for business on an equal basis with other companies.

9.4.1    If Contractor, under the terms of the Agreement, or through the performance of tasks pursuant to this Agreement, is required to develop specifications or statements of work and such specifications or statements of work are to be incorporated into a solicitation, Contractor shall be ineligible to perform the work described within that solicitation as a prime or subcontractor under an ensuing County agreement. It is further agreed, however, that County will not, as additional work, unilaterally require Contractor to prepare such specifications or statements of work under this Agreement.

9.4.2    Contractor may not apply for nor accept additional payments for the same services contained in the Statement of Work.

**ARTICLE 10**
**INDEMNITY AND INSURANCE**

10.1    <u>Indemnity.</u> County shall not be liable for, and Contractor shall defend and indemnify County and the employees and agents of County (collectively "County Parties"), against any and all claims, demands, liability, judgments, awards, fines, mechanics' liens or other liens, labor disputes, losses, damages, expenses, charges or costs of any kind or character, including attorneys' fees and court costs (hereinafter collectively referred to as "Claims"), related to this Agreement or the work covered by this Agreement and arising either directly or indirectly from any act, error, omission or negligence of Contractor or its Contractors, licensees, agents, servants or employees, including, without limitation, Claims caused by the sole passive negligent act or the concurrent negligent act, error or omission, whether active or passive, of County Parties. Contractor shall have no obligation, however, to defend or indemnify County Parties from a Claim if it is determined by a court of competent jurisdiction that such Claim was caused by the sole negligence or willful misconduct of County Parties. Additionally, with respect to any Claim, Contractor shall have no obligation to defend or indemnify County Parties from liability in excess of Contractor's insurance limits (as described in Exhibit B) except to the extent such liability arises from any act, error, omission or negligence of Contractor or its Contractors, licensees, agents, servants or employees. The defense and indemnification obligation of this section shall only apply to Claims related to the services described in this Agreement, and for the avoidance of doubt shall not apply to liability to the extent such liability is determined by a court of competent jurisdiction to be caused by the actions of County custodial officers. Consideration related to Contractor's limited indemnification and insurance of County employees is included in the Contractor's base price, and will be reviewed annually by the Parties and revised as appropriate by mutual agreement of the Parties.

10.2    <u>Insurance.</u> Prior to execution of this Agreement, Contractor must obtain at its own cost and expense, and keep in force and effect during the term of this Agreement, including all extensions, the insurance specified in Exhibit "B," "Insurance Requirements," attached hereto.

**ARTICLE 11**
**AUDIT AND INSPECTION OF RECORDS**

The County shall have the audit and inspection rights described in this section.

11.1    <u>Audit and Inspection.</u> Contractor agrees to maintain and/or make available within San Diego County accurate books and accounting records relative to all its activities under this Agreement. Authorized federal, State or County representatives shall have the right to monitor, assess, or evaluate Contractor's performance pursuant to this Agreement, said monitoring, assessments, or evaluations to include but not limited to audits, inspection of premises, reports, and interviews of project staff and participants. Contractor assertions of confidentiality shall not be a bar to full access to the records.

At any time during normal business hours and as often as County may deem necessary, Contractor shall make available to County, State or federal officials for examination all of its records with respect to all matters covered by this Agreement and will permit County, State or federal officials to audit, examine and make excerpts or transcripts from such records, and to make audits of all invoices, materials, payrolls, records of personnel, information regarding clients receiving services, and

**Ex. G - 455**

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

other data relating to all matters covered by this Agreement. If an audit is conducted, it will be done in accordance with generally accepted government auditing standards as described in "Government Auditing Standards," published for the United States General Accountability Office or the institute of Internal Auditors International Standards for the Professional Practice of Internal Auditing.

If any services performed hereunder are not in conformity with the specifications and requirements of this Agreement, County shall have the right to require the Contractor to perform the services in conformity with said specifications and requirements at no additional increase in total Agreement amount. When the services to be performed are of such nature that the difference cannot be corrected, County shall have the right to (1) require Contractor immediately to take all necessary steps to ensure future performance of the services in conformity with requirements of the Agreement, and (2) reduce the Agreement price to reflect the reduced value of the services performed. In the event Contractor fails to perform the services promptly or to take necessary steps to ensure future performance of the service in conformity with the specifications and requirements of the Agreement, County shall have the right to either (1) by agreement or to otherwise have the services performed in conformity with the Agreement specifications and charge to Contractor any cost occasioned to County that is directly related to the performance of such services, or (2) terminate this Agreement for default as provided in the Termination clause.

11.2    <u>External Audits</u>. Contractors will provide the following to the COR:

11.2.1    Contractor shall provide COR a copy of all notifications of audits or pending audits by federal or State representatives regarding contracted services identified in this Agreement no later than three (3) business days of Contractor receiving notice of the audit.

11.2.2    Contractor shall provide COR with a copy of the draft and final State or federal audit reports within twenty four (24) hours of receiving them (Health and Human Services Agency (HHSA) Contractors shall also provide electronic copies to Agency Contract Support (ACS) at ACS.HHSA@sdcounty.ca.gov).

11.2.3    Contractor shall provide COR a copy of the contractor's response to the draft and final State or federal audit reports at the same time as response provided to the State or federal representatives.

11.2.4    Unless prohibited by the government agency conducting the audit, Contractor shall provide COR a copy of all responses made by the federal or State audit representative to the contractors' audit response no later than three (3) business days of receiving it. This will continue until the federal or State auditors have accepted and closed the audit.

11.3    Cost or Pricing Data. If the Contractor submitted cost or pricing data in connection with the pricing of this Agreement or any change or modification thereto, unless such pricing was based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities of the general public, or prices set by law or regulation, the Contracting Officer or his representatives who are employees of the County or its agent shall have the right to examine all books, records, documents and other data of the Contractor related to the negotiation pricing or performance of such Agreement, change or modification, for the purpose of evaluating the accuracy, completeness and currency of the cost or pricing data submitted.

11.4    Availability. The materials described above shall be made available at the office of the Contractor, at all reasonable times, for inspection, audit or reproduction, until the expiration of three (3) years from the date of final payment under this Agreement, or by section 11.4.1 and 11.4.2, below:

11.4.1    If this Agreement is completely or partially terminated, the records relating to the work terminated shall be made available for a period of three (3) years from the date of any resulting final settlement.

11.4.2    Record that relate to appeals under the "Disputes" clause of this Agreement, or litigation or the settlement of claims arising out of the performance of this Agreement, shall be made available until such appeals, litigation, or claims have been disposed of, or three years after Agreement completion, whichever is longer. County shall keep the materials described above confidential unless otherwise required by law.

11.5    Subcontract. The Contractor shall insert a clause containing all the provisions of this Article 11 in all subcontracts hereunder except altered as necessary for proper identification of the contracting parties and the contracting officer.

**ARTICLE 12**
**INSPECTION OF SERVICE**

12.1    Subject to Inspection. All performance (including services, materials, supplies and equipment furnished or utilized in the performance of this Agreement, and workmanship in the performance of services) shall be subject to inspection and test by

**Ex. G - 456**

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

the County at all times during the term of this Agreement. Contractor shall cooperate with any inspector assigned by the County to permit the inspector to determine whether Contractor's performance conforms to the requirements of this Agreement. County shall perform such inspection in a manner as not to unduly interfere with Contractor's performance.

12.2  Specification and Requirements. If any services performed by Contractor do not conform to the specifications and requirements of this Agreement, County may require Contractor to re-perform the services until they conform to said specifications and requirements, at no additional cost, and County may withhold payment for such services until Contractor correctly performs them. When the services to be performed are of such a nature that Contractor's cannot correct its performance, the County shall have the right to (1) require the Contractor to immediately take all necessary steps to ensure future performance of services conforms to the requirements of this Agreement, and (2) reduce the Agreement price to reflect the reduced value of the services received by County. In the event Contractor fails to promptly re-perform the services or to take necessary steps to ensure that future performance of the service conforms to the specifications and requirements of this Agreement, the County shall have the right to either (1) without terminating this Agreement, have the services performed, by agreement or otherwise, in conformance with the specifications of this Agreement, and charge Contractor, and/or withhold from payments due to Contractor, any costs incurred by County that are directly related to the performance of such services, or (2) terminate this Agreement for default.

**ARTICLE 13**
**USE OF DOCUMENTS AND REPORTS**

13.1  Findings Confidential. Any reports, information, data, etc., given to or prepared or assembled by Contractor under this Agreement that the County requests to be kept as confidential shall not be made available to any individual or organization by the Contractor without the prior written approval of the County.

13.2  Ownership, Publication, Reproduction and Use of Material. All reports, studies, information, data, statistics, forms, designs, plans, procedures, systems, and any other material or properties produced under this Agreement shall be the sole and exclusive property of County. No such materials or properties produced in whole or in part under this Agreement shall be subject to private use, copyright or patent right by Contractor in the United States or in any other country without the express written consent of County. County shall have unrestricted authority to publish, disclose, distribute and otherwise use, copyright or patent, in whole or in part, any such reports, studies, data, statistics, forms or other materials or properties produced under this Agreement.

13.3  Confidentiality. Contractor agrees to maintain the confidentiality of and take industry appropriate and legally required measures to prevent the unlawful disclosure of any information that is legally required to be kept confidential. Except as otherwise allowed by local, State or federal law or regulation and pursuant to this Section 13.3, Contractor agrees to only disclose confidential records where the holder of the privilege, whether the County, or a third party, provides written permission authorizing the disclosure.

13.4  Public Records Act. The California Public Records Act ("CPRA") requires County to disclose "public records" in its actual or constructive possession unless a statutory exemption applies. This generally includes contracts and related documents. If County receives a CPRA request for records relating to the Agreement, County may, at its sole discretion, either determine its response to the request without notifying Contractor or notify Contractor of the request. If County determines its response to the request without notifying Contractor, Contractor shall hold County harmless for such determination. If County notifies Contractor of the request, Contractor may request that County withhold or redact records responsive to the request by submitting to County a written request within five (5) business days after receipt of the County's notice. Contractor's request must identify specific records to be withheld or redacted and applicable exemptions. Upon timely receipt of Contractor's request, County will review the request and at its sole discretion withhold and/or redact the records identified by Contractor. Contractor shall hold County harmless for County's decision whether to withhold and/or redact pursuant to Contractor's written request. Contractor further agrees that its defense and indemnification obligations set forth in Section 10.1 of this Agreement extend to any Claim (as defined in Section 10.1) against the County Parties (as defined in Section 10.1) arising out of County's withholding and/or redacting of records pursuant to Contractor's request. Nothing in this section shall preclude Contractor from bringing a "reverse CPRA action" to prevent disclosure of records. Nothing in this section shall prevent the County or its agents or any other governmental entity from accessing any records for the purpose of audits or program reviews if that access is legally permissible under the applicable local, State or federal laws or regulations. Similarly, County or its agent or designee may take possession of the record(s) where legally authorized to do so.

13.5  Maintenance of Records. Contractor shall maintain all records relating to its performance under this Agreement, including all records of costs charged to this Agreement, and shall make them available within San Diego County for a minimum of five (5) years from the ending date of this Agreement, or longer where required by funding source or while under dispute

**Ex. G - 457**

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

under the terms of this Agreement, unless County agrees in writing to an earlier disposition. Contractor shall provide any requested records to County within two (2) business days of request.

13.6  Custody of Records. County, at its option, may take custody of Contractor's client records upon Agreement, termination, expiration, or at such other time as County may deem necessary. County agrees that such custody will conform to applicable confidentiality provisions of State and federal law. Said records shall be kept by County in an accessible location within San Diego County and shall be available to Contractor for examination and inspection. Notwithstanding the foregoing, Contractor may maintain custody of records where legally required.

13.7  Audit Requirement.

(a) Contractor shall annually engage a Licensed Certified Public Accountant licensed to perform audits and attests in the State of California to conduct an annual financial audit of the organization. Contractors that expend $750,000 or more of federal grant funds per year shall also have an audit conducted in compliance with Government Auditing Standards, which includes Single Audit Act Amendments and the Compliance Supplement (2 CFR part 200 App. XI). Contractors that are commercial organizations (for-profit) are required to have a non-federal audit if, during its fiscal year, it expended a total of $750,000 or more under one or more HHS awards. 45 CFR part 74.26(d) incorporates the threshold and deadlines of the Compliance Supplement but provides for-profit organizations two options regarding the type of audit that will satisfy the audit requirements. Contractor shall include a clause in any agreement entered into with an audit firm, or notify the audit firm in writing prior to the audit firm commencing its work for Contractor, that the audit firm shall, pursuant to 31 U.S.C. 7503, and to the extent otherwise required by law, provide access by the federal government or other legally required entity to the independent auditor's working papers that were part of the independent auditor's audit of Contractor. Contractor shall submit two (2) copies of the annual audit report, the audit performed in accordance with the Compliance Supplement, and the management letter to the County fifteen (15) days after receipt from the independent Certified Public Accountant but no later than nine (9) months after the Contractor's fiscal year end.

(b) Contractor shall immediately notify County upon learning that Contractor's independent Certified Public Accountant may or will issue a disclaimer of opinion due to substantial doubt of Contractor's ability to continue as a going concern.

13.8  Reports. Contractor shall submit reports required in Exhibit A and additional reports as may be requested by the COR and agreed to by the Contractor. Format for the content of such reports may be developed by County. The timely submission of these reports is a necessary and material term and condition of this Agreement and Contractor agrees that failure to meet specified deadlines will be sufficient cause to withhold payment. Contractor shall submit to County within thirty (30) days of the termination of this Agreement a report detailing all work done pursuant to this Agreement by Contractor.

13.9  Evaluation Studies. Contractor shall participate as requested by the County in research and/or evaluative studies designed to show the effectiveness and/or efficiency of Contractor services or to provide information about Contractor's project.

**ARTICLE 14**
**INFORMATION PRIVACY AND SECURITY PROVISIONS**

14.1  Recitals. This Article is intended to protect the privacy and security of County information that Contractor may create, receive, access, store, transmit, and/or destroy under this Agreement. In addition to the below Responsibilities, contractor shall be in compliance with the following rules, regulations, and agreements, *as applicable*:

14.1.1  Health Insurance Portability and Accountability Act, specifically, Public Law 104-191, the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005, 42USC section 17921 et seq., and 45CFR Parts 160 and 164, collectively referred to as "HIPAA;"

14.1.2  County agreements with the State of California, collectively referred to as "State Agreements" and posted on the County's website at www.cosdcompliance.org, including:

14.1.2.1  The Medi-Cal Privacy and Security Agreement Between the California Department of Health Care Services (DHCS) and the County;

14.1.2.2  The Medi-Cal Behavioral Health Services Performance Agreement between DHCS and the County;

14.1.2.3  The San Diego County Alcohol and Drug Program Administrator Agreement between DHCS and the County

14.1.2.4  The Refugee Health Agreement between the California Department of Public Health (CDPH) and the County;

14.1.2.5  The HIV/AIDS Case Reporting System Data Use Agreement between CDPH and the County;

14.1.2.6  The Childhood Lead Poisoning Prevention Program between CDPH and the County;

Ex. G - 458

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

14.1.2.7    The Standard Agreement between the County and the California Department of Aging; and

14.1.2.8    The Agreement for Whole Person Care Pilot Program for San Diego County with DHCS.

14.1.3    Title 42 Code of Federal Regulations, Chapter 1, Subchapter A, Part 2.

14.1.4    California Civil Code 1798;

14.1.5    California Senate Bill 1386.

14.2    <u>Definitions</u>. Terms used, but not otherwise defined, in this Article shall have the same meaning as defined by HIPAA.

14.2.1    "Breach" of Protected Health Information (PHI) shall have the same meaning given to the term "breach" under HIPAA and "breach" of Personal Information (PI)/Personally Identifiable Information (PII) shall have the same meaning as given to it under the State Agreements.

14.2.2    "Business Associate," when applicable, shall mean the Contractor.

14.2.3    "County PHI" shall have the same meaning as PHI under HIPAA, specific to PHI under this Agreement.

14.2.4    "County PI/PII" shall have the same meaning as PI/PII under the State Agreements, specific to PI/PII under this Agreement.

14.2.5    "Covered Entity," when applicable, shall mean the County.

14.2.6    "Security incident" shall have the same meaning as defined by the State Agreements.

14.3    <u>Responsibilities of Contractor</u>.

14.3.1    <u>Use and Disclosure of County PHI/PI/PII</u>. Contractor shall use the minimum County PHI/PI/PII required to accomplish the requirements of this Agreement or as required by Law. Contractor may not use or disclose County PHI/PI/PII in a manner that would violate HIPAA or the State Agreements if done by the County.

14.3.2    <u>Safeguards</u>. Contractor shall develop and maintain a HIPAA-compliant information privacy and security program to prevent use or disclosure of County PHI/PI/PII, other than as required by this Agreement.

14.3.3    <u>Mitigation</u>. Contractor shall mitigate, to the extent practicable, any harmful effects caused by violation of the requirements of this Article, as directed by the County.

14.3.4    <u>Subcontractors</u>. Contractor shall ensure that any agent, including a subcontractor, to whom it provides County PHI/PI/PII, imposes the same conditions on such agents that apply to Contractor under this Article.

14.3.5    <u>Cooperation with County</u>.

14.3.5.1    Contractor shall provide access to County PHI/PI/PII, as well as internal practices and records related to County PHI/PI/PII, at the written request of County within ten (10) calendar days.

14.3.5.2    Contractor will assist County regarding individual's access, copy, amendment, accounting of disclosure, and other such requests for County PHI/PI/PII in the time and manner designated by County.

14.3.6    <u>Breach Reporting</u>. Contractor shall report breaches and suspected security incidents to County, to include:

14.3.6.1    <u>Initial Report</u>.

14.3.6.1.1    Contractor shall email County Contracting Officer's Representative (COR) and County Chief Compliance and Privacy Officer (CCPO) immediately upon the discovery of a suspected security incident that involves data provided to County by the Social Security Administration, as per the State Agreements.

14.3.6.1.2    Contractor shall email COR and CCPO immediately of breaches and suspected privacy incidents involving 500 or more individuals.

14.3.6.2    <u>Investigation Report</u>. Contractor shall immediately investigate such suspected security incident or breach and provide the County a complete report of the investigation within seven (7) working days.

14.3.6.3    <u>Notification</u>. Contractor will comply with County's request to notify individuals and/or media and shall pay any costs of such notifications, as well as any costs associated with the breach. County shall approve the time, manner and content of any such notifications before notifications are made.

14.3.7    <u>Designation of Individuals</u>. Contractor shall designate a Privacy Official and a Security Official to oversee its privacy and security requirements herein.

14.3.8    <u>Data Security</u>. Contractor shall comply with, as applicable, data privacy and security requirements specified by HIPAA and the State Agreements, which may include, but are not limited to:

**Ex. G - 459**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

14.3.8.1    Workforce members, including employees, interns, volunteers, subcontractors, etc., with access to applicable County PHI/PI/PII shall:

14.3.8.1.1    Complete privacy and security training to include a signed certification within thirty (30) days of hire, and at least annually thereafter; and

14.3.8.1.2    Sign a confidentiality statement, prior to access to such PHI/PI/PII; and

14.3.8.2    Computer warning banners for all systems containing applicable County PHI/PI/PII

14.3.8.3    Comprehensive, annual security risk assessments

14.3.8.4    Policies and internal controls to ensure secure transport and storage of County PHI/PI/PII in cars, airplanes, trains, and buses.

14.3.8.5    Sufficient administrative, physical, and technical controls in place to protect County PHI/PI/PII

14.3.9    Termination. Upon termination of the Agreement for any reason, Contractor shall return or destroy all County PHI/PII/PI, except County PHI/PII/PI necessary for Contractor to continue its proper management and administration or to carry out its legal responsibilities, as mutually agreed upon by the Parties. If the Parties mutually agree that return or destruction of County PHI/PII/PI is infeasible, Contractor shall extend the protections of this Article to such County PHI/PII/PI for so long as Contractor maintains such County PHI/PII/PI.

ARTICLE 15
DISPUTES

Notwithstanding any provision of this Agreement to the contrary, the Contracting Officer shall decide any dispute concerning a question of fact arising out of this Agreement that is not otherwise disposed of by the parties within a reasonable period of time. The decision of the Contracting Officer shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, capricious, arbitrary or so grossly erroneous as necessarily to imply bad faith. Contractor shall proceed diligently with its performance hereunder pending resolution by the Contracting Officer of any such dispute. Nothing herein shall be construed as granting the Contracting Officer or any other administrative official, representative or board authority to decide questions of law, or issues regarding the medical necessity of treatment or to pre-empt any medical practitioners' judgment regarding the medical necessity of treatment of patients in their care. The foregoing does not change the County's ability to refuse to pay for services rendered if County disputes the medical necessity of care.

ARTICLE 16
GENERAL PROVISIONS

16.1    Assignment and Subcontracting. Contractor shall not assign any interest in this Agreement, and shall not transfer any interest in the same (whether by assignment or novation), without the prior written consent of the County; County's consent shall not be unreasonably withheld. The Contractor shall make no agreement with any party for furnishing any of the work or services herein contained without the prior written consent of the COR, pursuant to Paragraph 1.4.

16.2    Contingency. This Agreement shall bind the County only following its approval by the Board of Supervisors or when signed by the Purchasing and Contracting Director.

16.3    Entire Agreement. This Agreement, together with all Exhibits attached hereto and other agreements expressly referred to herein, constitute the entire agreement between the parties with respect to the subject matter contained herein. All prior or contemporaneous agreements, understandings, representations, warranties and statements, oral or written, including any proposals from Contractor and requests for proposals from County, are superseded.

16.4    Sections and Exhibits. All sections and exhibits referred to herein are attached hereto and incorporated by reference.

16.5    Further Assurances. Parties agree to perform such further acts and to execute and deliver such additional documents and instruments as may be reasonably required in order to carry out the provisions of this Agreement and the intentions of the parties.

16.6    Governing Law. This Agreement shall be governed, interpreted, construed and enforced in accordance with the laws of the State of California.

16.7    Headings. The Article captions, Clause and Section headings used in this Agreement are inserted for convenience of reference only and are not intended to define, limit or affect the construction or interpretation of any term or provision hereof.

Ex. G - 460

## COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

16.8 <u>Modification Waiver</u>. Except as otherwise provided in Article 6, "Changes," above, no modification, waiver, amendment or discharge of this Agreement shall be valid unless the same is in writing and signed by both parties.

16.9 <u>Neither Party Considered Drafter</u>. Despite the possibility that one party may have prepared the initial draft of this Agreement or played the greater role in the physical preparation of subsequent drafts, neither party shall be deemed the drafter of this Agreement and that, in construing this Agreement in case of any claim that any provision hereof may be ambiguous, no such provision shall be construed in favor of one party on the ground that such provision was drafted by the other.

16.10 <u>No Other Inducement</u>. The making, execution and delivery of this Agreement by the parties hereto has been induced by no representations, statements, warranties or agreements other than those expressed herein.

16.11 <u>Notices</u>. Notice to either party shall be in writing and personally delivered; sent by certified mail, postage prepaid, return receipt requested; or emailed to the County's or Contractor's designated representative (or such party's authorized representative). Any such notice shall be deemed received by the party (or such party's authorized representative) on the earliest of the date of personal delivery, three (3) business days after deposit in the U.S. Mail, or upon sending of an email from which an acknowledgement of receipt has been received other than an out of office, unavailable, or undeliverable reply.

16.12 <u>Severability</u>. If any term, provision, covenant or condition of this Agreement is held to be invalid, void or otherwise unenforceable, to any extent, by any court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby, and each term, provision, covenant or condition of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

16.13 <u>Successors</u>. Subject to the limitations on assignment set forth in Clause 16.1 above, all terms of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective heirs, legal representatives, successors, and assigns.

16.14 <u>Time</u>. Time is of the essence for each provision of this Agreement.

16.15 <u>Time Period Computation</u>. All periods of time referred to in this Agreement shall be calendar days, unless the period of time specifies business days. Calendar days shall include all days of the week, including holidays. Business days shall be Monday through Friday, excluding County observed holidays.

16.16 <u>Waiver</u>. The waiver by one party of the performance of any term, provision, covenant or condition shall not invalidate this Agreement, nor shall it be considered as a waiver by such party of any other term, provision, covenant or condition. Delay by any party in pursuing any remedy or in insisting upon full performance for any breach or failure of any term, provision, covenant or condition shall not prevent such party from later pursuing remedies or insisting upon full performance for the same or any similar breach or failure.

16.17 <u>Third Party Beneficiaries Excluded</u>. This Agreement is intended solely for the benefit of the County and its Contractor. Any benefit to any third party is incidental and does not confer on any third party to this Agreement any rights whatsoever regarding the performance of this Agreement. Any attempt to enforce provisions of this Agreement by third parties is specifically prohibited.

16.18 <u>Publicity Announcements and Materials</u>. All public announcements, including those issued on Contractor letterhead, and materials distributed to the community shall identify the County of San Diego as the funding source for contracted programs identified in this Agreement. Copies of publicity materials related to contracted programs identified in this Agreement shall be filed with the COR. County shall be advised at least twenty four (24) hours in advance of all locally generated press releases and media events regarding contracted services identified in this Agreement. Alcohol and Drug Prevention Services Contractors shall notify COR or designee at least five (5) business days in advance of all Contractor generated media releases and media events regarding contracted services identified in this Agreement.

16.19 <u>Critical Incidents</u>. Contractor shall have written plans or protocols and provide employee training for handling critical incidents involving: external or internal instances of violence or threat of violence directed toward staff or clients; loss, theft or unlawful accessing of confidential client, patient or facility resident Personal Information (PI), Personally Identifiable Information (PII) and/or Personal Health Information (PHI); fraud, waste and/or abuse of Agreement funds; unethical conduct; or violation of any portion of San Diego County Board of Supervisors Policy C-25 "Drug & Alcohol Use" while performing under this Agreement. Contractor shall report all such incidents to the COR within one business day of their occurrence. However, if this Agreement includes Article 14, Contractor must adhere to the timelines and processes contained in Article 14.

16.20 <u>Responsiveness to Community Concerns</u>. Unless prohibited by applicable State or federal law, Contractor shall notify County within one business day of receipt of any material complaints including but not limited to complaints referring to

Ex. G - 461

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

issues of abuse or quality of care, submitted to Contractor orally or in writing, regarding the operation of Contractor's program or facility under this Agreement. Contractor shall take appropriate steps to acknowledge receipt of said complaint(s) from individuals or organizations. Contractor shall take appropriate steps to utilize appropriate forums to address or resolve any such complaints received. Nothing in this provision shall be interpreted to preclude Contractor from engaging in any legally authorized use of its facility, property or business as approved, permitted or licensed by the applicable authority.

16.21 <u>Criminal Background Check Requirements</u>. Contractor shall ensure that criminal background checks are required and completed prior to employment or placement of any employee, director, officer, agent, subcontractor, consultant or volunteer who will be providing any services, accessing County or client data, or receiving compensation under this Agreement. Background checks shall be in compliance with any licensing, certification, funding, or Agreement requirements, including the Statement of Work, which may be higher than the minimum standards described herein. Furthermore, for any individuals identified above who will be assigned to sensitive positions funded by this Agreement, background checks shall be in compliance with Board of Supervisors Policy C-28, available on the County of San Diego website. Sensitive positions are those that: (1) physically supervise minors or vulnerable adults; (2) have unsupervised physical contact with minors or vulnerable adults; and/or (3) have a fiduciary responsibility to any County client, or direct access to, or control over, bank accounts or accounts with financial institutions of any client. If this Agreement includes Article 14, Contractor must also adhere to requirements contained in Article 14.

Contractor shall have a documented process for reviewing the information and determine if criminal history demonstrates behavior that could create an increased risk of harm to clients or risk to services to be performed under Agreement. Contractor shall document review of criminal background findings and consideration of criminal history in the selection of such persons listed above in this section.

16.21.1 Contractor shall utilize a subsequent arrest notification service during the term of this Agreement for any employee, director, officer, agent, subcontractor, consultant or volunteer who will be providing any services under this Agreement. Contractor shall keep the documentation of their review and consideration of the individual's criminal history on file in accordance with paragraph 13.4 "Maintenance of Records."

16.21.2 <u>Definitions</u>

A. <u>Minor</u>: Individuals under the age of eighteen (18) years old.

B. <u>Vulnerable Adult</u>: (1) Individuals age eighteen (18) years or older, who require assistance with activities of daily living and who may be put at risk of abuse during service provision; (2) Individuals age eighteen (18) years or older who have a permanent or temporary limited physical and/or mental capacity that may put them at risk of abuse during service provision because it renders them: unable to make decisions for themselves, unable to physically defend themselves, or unaware of physical abuse or other harm that could be perpetrated against them. Activities of daily living are defined as the basic tasks of everyday life, such as eating, bathing, dressing, toileting, and transferring.

C. <u>Volunteer</u>: A person who performs a service willingly and without pay.

16.22 <u>Health Insurance</u>. Contractors providing direct services to the public shall ask if the client and any minor(s) for whom they are responsible have health insurance coverage. If the response is "no" for client or minor(s) the Contractor shall refer the client to Covered California at <u>https://www.coveredca.com/</u> or to 1-800-300-1506.

16.23 <u>Survival</u>. The following sections or articles of this Agreement shall survive the expiration or earlier termination of this Agreement: Sections 8.1, 8.13, 8.14, 8.15, 8.21, 10.1, 11.1, 11.2, and 11.4, and Articles 7 and 13.

/
/
/

Ex. G - 462

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

## SIGNATURE PAGE

**AGREEMENT TERM.** The initial term of this Agreement shall begin on June 1, 2022, and end on May 31, 2027, for an Agreement period of approximately five (5) years ("Initial Term").

**OPTION TO EXTEND.** The County shall have the option to extend the term of this Agreement for five (5) increments of one-year each for a total of five (5) years beyond the expiration of the Initial Term, not to exceed May 31, 2032, pursuant to Exhibit C Payment Schedule or other applicable pricing provisions of this Agreement. Unless County notifies Contractor in writing not less than thirty (30) days prior to the expiration date that the County does not intend to extend the Agreement, the Agreement will be automatically extended for the next option period.

Options to Extend for One to Six Additional Months at End of Agreement. County shall also have the option to extend the term of this Agreement, in one or more increments, for a total of no less than one (1) and no more than six (6) calendar months ("Incremental Options"). The County may exercise each Incremental Option by providing written notice to Contractor no fewer than fifteen (15) calendar days prior to expiration of this Agreement. The rates in effect at the time an Incremental Option is exercised shall apply during the term of the Incremental Option.

**COMPENSATION**: Pursuant to Exhibit C, Article 4, and other applicable provisions of this Agreement, County agrees to pay Contractor a sum not to exceed Six Hundred Twenty Million, Seven Hundred Seventy-Eight Thousand, Two Hundred Sixty-One Dollars and Sixty-Five Cents ($620,778,261.65) ("Maximum Agreement Amount"). Furthermore, compensation for the Initial Term and any Option Periods shall not exceed the amounts shown for the Initial Term or that Option Period shown below.

| | | | | | |
|---|---|---|---|---|---|
| Initial Term (Year 1) | 06/01/2022 - 05/31/2023 | $54,527,938.00 | First Option Period | 06/01/2027 - 05/31/2028 | $62,742,422.89 |
| Initial Term (Year 2) | 06/01/2023 - 05/31/2024 | $56,075,173.78 | Second Option Period | 06/01/2028 - 05/31/2029 | $64,536,093.20 |
| Initial Term (Year 3) | 06/01/2024 - 05/31/2025 | $57,668,826.63 | Third Option Period | 06/01/2029 - 05/31/2030 | $66,383,573.66 |
| Initial Term (Year 4) | 06/01/2025 - 05/31/2026 | $59,310,289.09 | Fourth Option Period | 06/01/2030 - 05/31/2031 | $68,286,478.50 |
| Initial Term (Year 5) | 06/01/2026 - 05/31/2027 | $61,000,995.40 | Fifth Option Period | 06/01/2031 - 05/31/2032 | $70,246,470.50 |

**COR.** The County has designated the following individual as the Contracting Officer's Representative ("COR")

Keith Spears, Manager
Sheriff Contracts & Grants Divisions
9625 Ridgehaven Court, San Diego, CA 92123
Phone (858) 974-2236 Email keith.spears@SDSheriff.org

**CONTRACTOR'S REPRESENTATIVE.** The Contractor has designated the following individual as the Contractor's Representative.

Brad McLane, Chief Executive Officer
NaphCare, Inc.
2090 Columbiana Road, Suite 4000, Birmingham, AL 35216
Phone (205) 536-8532 Email brad.mclane@naphcare.com

IN WITNESS WHEREOF, County and Contractor have executed this Agreement effective as of the date of the last signature below.

**NAPHCARE, INC**

By: _____

BRAD McLANE, Chief Executive Officer

Date: 4/19/2022

**COUNTY OF SAN DIEGO**

By: _____

JOHN M. PELLEGRINO, Director
Department of Purchasing and Contracting

Date: 4-26-22

Ex. G - 463

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

1. BACKGROUND/PURPOSE

1.1. The San Diego Sheriff's Department (SDSD) Detention Services Bureau (DSB) Medical Services Division (MSD) currently provides comprehensive primary and specialty health care services, oral care services, mental health services, and related ancillary services to incarcerated individuals at various detention facilities throughout the County. Hospital services and additional ancillary services are also utilized for the incarcerated individuals when services or treatment cannot be provided within the detention facility. Incarcerated individuals are defined as individuals who are booked and in the custody of the SDSD or have been arrested by the SDSD and awaiting booking.

1.2. Currently, SDSD utilizes a hybrid model of care consisting of SDSD employees and multiple contracted services. SDSD intends to enhance this model by contracting with a single contractor for services. The overarching goal is to provide for a robust, comprehensive, and integrated health care delivery system in the best interest of patient care. It is the intent of SDSD to preserve all current and future SDSD staff positions thereby maintaining a hybrid model.

2. SCOPE OF WORK/GENERAL REQUIREMENT

2.1. CONTRACTOR REQUIREMENT

2.1.1. Contractor must provide NCCHC-compliant policies and procedures to provide intake receiving screenings and health assessments, sick call triage and nursing clinics, and medication administration. SDSD will continue to provide nursing services at all SDSD facilities. Contractor's Program Manager/Health Services Administrator will serve as a point of contact and coordination between Contractor, the SDSD Director of Nursing, and the respective nursing staff.

2.1.2. Contractor will coordinate with SDSD nursing staff to create a seamless and centralized system of care between all levels of onsite clinicians including nurses, medical and mental health providers, while having simultaneous access to a patient's record. This coordination and use of TechCare between all vendors, across all disciplines, will be valuable in communication and delivery of quality patient care.

2.1.3. NCCHC-compliant policies and procedures for care are programmed into TechCare and provide automated processes that guide nurses through a course of care. Contractor has developed nursing protocols that enable healthcare staff to readily deal with common ailments and has built these protocols into TechCare for ease of access, ease of use, and ease of documentation. SDSD nurses can access the protocols through TechCare while treating patients. The protocols ensure that patients are treated in an effective, efficient manner by the nursing staff, and they allow nursing staff to distinguish minor ailments more easily from emergent medical needs. These protocols are integrated into the TechCare system at all SDSD facilities, which enables nursing staff to implement the same processes for uniformity of care across all sites. Traditionally, as the current provider of TechCare for the County, SDSD nurses are already familiar with these protocols in the system, enabling continuity of care and ease in transition.

2.1.4. Contractor shall work with SDSD management to continue to utilize and work in close coordination with the SDSD Director of Nursing, SDSD Supervising Registered Nurses, Registered Nurses, Licensed Vocational Nurses, Mental Health Director, Clinical Director, Behavioral Health Program Coordinator, Chief Mental Health Clinicians, Mental Health Clinicians, Pharmacy Technicians, Health Information Management Staff, and other county-employed staff at all SDSD facilities.

Ex. G - 464

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.2. ON-SITE SERVICES

2.2.1. Contractor and SDSD shall provide comprehensive health care services for incarcerated individuals at the following facilities.

2.2.1.1.     San Diego Central Jail (SDCJ) (Booking Facility)
1173 Front Street,
San Diego, CA 92101
Phone: (619) 615-2454 Fax: (619) 615-2450

2.2.1.2.     Las Colinas Detention & Reentry Facility (LCDRF) (Booking Facility)
451 Riverview Parkway,
Santee, CA 92071
Phone: (619) 258-3200 Fax: (619) 258-3100

2.2.1.3.     Vista Detention Facility (VDF) (Booking Facility)
352 S. Melrose Drive
Vista, CA 92081
Phone: (760) 940-4473 Fax: (760) 940-4842

2.2.1.4.     George Bailey Detention Facility (GBDF)
446 Alta Road, Ste. 5300
San Diego, CA 92158
Phone: (619) 661-2620 Fax: (619) 661-2611

2.2.1.5.     East Mesa Reentry Facility (EMRF)
446 Alta Rd., Ste. 5200
San Diego, CA 92158
Phone: (619) 661-2608 Fax: (619) 661-2722

2.2.1.6.     Facility (FAC8)
446 Alta Rd., Ste. 5200
San Diego, CA 92158
Phone: (619) 661-2731 Fax: (619) 661-2680

2.2.1.7.     Rock Mountain Detention Facility (RMDF) (This facility is not open at the time of the contract start date)
446 Alta Road, Suite 5400
San Diego, CA 92158
Phone: (619) 672-2299

2.2.1.7.1.     The parties agree to meet and negotiate appropriate staffing and compensation to meet the needs of the County at this facility. Current pricing and staffing do not encompass any staffing or services provided at RMDF at this time.

Ex. G - 465

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.2.1.8.    South Bay Detention Facility (SBDF)
500 Third Avenue
Chula Vista, CA 91910
Phone: (619) 591-4810 Fax: (619) 691- 4445

2.2.1.9.    Medical Services Division, Admin Office
5530 Overland Avenue Suite 370
San Diego, CA 92123
Phone: (858) 974-5971 Fax (858) 974-5870

2.2.1.10.    Additions and changes to the designated facilities may occur in the future as necessary
and as agreed by both the Sheriff's Department and the Contractor.

## 2.3. COMPREHENSIVE HEALTH CARE SERVICES

2.3.1. Receiving Screening and Assessment Process

2.3.1.1.    SDSD nursing staff shall be responsible for performing a receiving screening and assessment as
defined by NCCHC Standards. Contractor shall provide telehealth support from a midlevel
provider 24/7 to the booking nurses through the STATCare service and provide appropriate
support and training to SDSD nursing staff regarding the receiving screening and assessment
process as defined in the NCCHC standards. All completed Receiving Screenings shall be
maintained in TechCare for providers' review. Patients with chronic illnesses will be identified
during the Receiving Screening and enrolled in a chronic care clinic. All chronic care clinic visits
will be scheduled and tracked within TechCare.

2.3.2. Initial and Ongoing Health Assessments

2.3.2.1.    Contractor and SDSD shall implement policies and procedures to ensure SDSD health staff
complete a comprehensive Health Assessment, including a physical examination, as required by,
and defined in NCCHC Standards. This Health Assessment will typically be completed during the
intake process for each patient and will always be completed within 14 days. All Health
Assessments are reviewed and electronically signed by a provider.

2.3.2.2.    Contractor and SDSD health staff shall ensure the receiving screening processes includes rapid
intervention to stabilize patients and identify and treat existing medical, mental health and
substance abuse conditions as early as possible. This includes starting medications, managing
chronic conditions, and initiating withdrawal protocols.

2.3.2.3.    Contractor and SDSD shall screen all patients for active tuberculosis via a chest x-ray for
clearance into the general population. TB screening, evaluation, and treatment will be in
accordance with NCCHC and CDC recommendations and treatment guidelines.

2.3.2.4.    Patients referred for follow-up shall be seen by the appropriate healthcare professional, and
referrals shall be documented in TechCare. Patients are evaluated based on the medical

Ex. G - 466

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

information obtained during the Receiving Screening as to the medical necessity of conducting a health assessment by a provider.

2.3.2.5.   Contractor and SDSD staff shall provide annual health assessments and track these assessments in TechCare to ensure their completion. All patients' most recent screenings shall be recorded in TechCare with a date set for the next required annual screening. Patients requiring screenings shall be listed according to the date on the TechCare calendar and provide their annual screening at the appropriate time.

2.3.3. Transfer Screening Process

2.3.3.1.   SDSD nursing staff shall implement a transfer screening process for incarcerated individuals who are either moved internally or transferred outside of the SDSD facilities. This process should ensure the safe, effective implementation of infection control measures and provide continuity of health services.

2.3.3.2.   Contractor shall utilize TechCare to manage all patient healthcare records from the point of intake to release. Patients who are transferred from one facility to the next shall have their patient history and record of care readily available within TechCare.

2.3.4. Discharge Planning

2.3.4.1.   Contractor and SDSD shall implement a system of discharge planning per the NCCHC standard.

2.3.4.2.   Contractor and SDSD shall have shared responsibility for discharge planning. The discharge planning process shall begin at intake. Patients identified with mental health concerns are flagged and referred by healthcare staff screener to mental health staff for further evaluation and stabilization. This information is entered into the patient's medical record and their discharge information starts being compiled based on the evolution of their identified conditions and needs throughout treatment. Mental health staff shall assist in the referral of mental health patients to community agencies prior to or upon their release from the facility.

2.3.4.3.   Contractor and SDSD shall have a policy and procedure for discharge planning that covers the following:

2.3.4.3.1.   Information gathered during the receiving screening necessary for the development of a discharge plan that accounts for the patient's needs.

2.3.4.3.2.   The development of a plan to address key issues such as continued medical and mental healthcare, housing, medical insurance, transportation, Social Security Disability, and employment.

2.3.4.3.3.   As part of the Receiving Screening, SDSD staff shall gather information that shall be needed by discharge planners, and disposition choices include referrals for case management and comprehensive team planning for patients with complex healthcare issues.

Ex. G - 467

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.4.3.4.     Once aware of potential release, case managers and Contractor and SDSD mental health professionals arrange an appointment prior to release.

2.3.4.3.5.     A caseworker coordinates the patient's anticipated medical and mental healthcare needs to include resource numbers and resource access to care according to their demographics in collaboration with mental health and healthcare staff to facilitate ongoing reintegration care.

2.3.4.3.6.     The patient is provided educational information, regarding their specific illness and the importance of follow-up appointments and medication continuity, from a healthcare provider. The patient also receives a comprehensive packet that contains essential community resources to include the following:

2.3.4.3.6.1.     Social Security Administration (SST) office
2.3.4.3.6.2.     Veteran's Administration resources
2.3.4.3.6.3.     Local free clinics
2.3.4.3.6.4.     Local Health Department
2.3.4.3.6.5.     Homeless shelters
2.3.4.3.6.6.     Hospitals
2.3.4.3.6.7.     Outpatient day treatment programs
2.3.4.3.6.8.     Resources listed by city or town
2.3.4.3.6.9.     Dual diagnosis programs
2.3.4.3.6.10.    SUD programs

2.3.4.4.     Contractor and SDSD shall utilize TechCare to assure all relevant information are instantly available and easily provided (after signed release of information/patient consent) to community providers. If an entire medical record is requested, Contractor will deposit a Summary of Records (Release Summary) with the most recent activity as a cover page along with the entire medical record within the NaphCare Cloud, Contractor's data storage cloud, within 24 hours/next business day.

2.3.4.5.     Contractor shall pursue partnerships with community resource providers, local resources available, and with community providers in San Diego County and the surrounding areas.

2.3.4.6.     Contractor shall ensure the continuity of medication after release. As part of discharge planning, case managers, medical, and mental healthcare professionals shall help arrange follow-up appointments for the patient.

2.3.4.7.     Contractor shall prescribe medication in a manner consistent with nursing and pharmacy practice acts in California.

2.3.4.8.     Contractor and SDSD shall ensure all discharge planning activities are documented using TechCare. The Release/Discharge Summary screen shall be used to provide medical information to the patient, medical facility, or another state prison system. The specific items that pertain to the patient's care shall automatically populate to this summary to advance the patient's release and help with the reintegration planning. All active medications, with time and dose of last administration, are listed for print and shall be given with their medications at release. Any follow-up care or specialist appointments that should be addressed either by the patient or the receiving facility are listed on the summary for continuity of care.

Ex. G - 468

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.5. Incarcerated Individual Worker Screening

2.3.5.1.  SDSD nursing staff shall conduct a health care screening for incarcerated individual worker candidates which shall include a medical history and screening assessment, health questionnaire, vaccination review, screening for infectious disease, mental health review and medication review in accordance with NCCHC standards.

2.3.5.2.  SDSD nursing staff shall provide a customized medical clearance process for all incarcerated individual workers. The medical clearance process shall be initiated within 24 hours of receiving the list of incarcerated individuals to be cleared. The need for laboratory testing may increase the time required to provide medical clearance.

2.3.6. Mental Health Screening

2.3.6.1.  Contractor and SDSD staff shall provide mental health screening, care, and related services as defined in the NCCHC standards and SDSD policy. Mental health screening is performed to ensure urgent mental health needs are met. Mental health screening shall be performed as soon as possible from the time of intake but no later than 14 days after admission. Mental Health screening may be conducted by qualified mental health professionals or qualified health care professionals with appropriate training.

2.3.6.2.  All incoming patients shall receive a mental health screening assessment at intake and evaluation by a qualified mental health professional within 14 days after admission as indicated. Any patient screening positive in the initial mental health screening shall receive the mental health assessment and evaluation immediately or as soon as possible to protect the patient and address any urgent mental health needs. Screening and comprehensive mental health assessments (MHEs) will be completed by SDSD Staff with support from Contractor staff pursuant to mutually agreed upon policies and procedures.

2.3.6.3.  Mental health assessments shall comply with NCCHC standards and compliance indicators.

2.3.6.4.  Contractor and SDSD staff shall ensure a process and provide for a rapid response to any need for an evaluation or mental health intervention whether identified at intake or later through staff identification of need or Sick Call request.

2.3.6.5.  Psychiatric providers and mental health professionals shall coordinate with the facility leadership on recommendations regarding housing placement, monitoring, and other operational issues. Mental health referrals shall be received, documented, and processed through the scheduling system in TechCare.

2.3.6.6.  Contractor and SDSD shall ensure all patients who are determined to need additional mental health services are flagged in the TechCare and scheduled for further evaluation by mental health professionals as clinically indicated.

2.3.6.7.  Contractor and SDSD shall ensure all screenings and evaluations identify patients with suicidal and homicidal tendencies, as well as acute and chronic behavioral health issues. All mental health encounters shall be documented in TechCare.

2.3.6.8.  Contractor and SDSD shall adopt the Columbia Suicide Severity Rating Scale (C-SSRS) to facilitate the ability of mental health professionals or non-mental health professionals to screen

Ex. G - 469

Case 3:20-cv-00406-AJB-DDL     Document 796-2     Filed 01/21/25     PageID.34460
Page 207 of 546
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

incarcerated individuals who may be at risk for suicide behavior and ensure appropriate precautions are initiated and timely mental health referrals are made.

2.3.6.9.     Contractor's corporate STATCare Team includes mid-level providers that are available to always consult with onsite staff to ensure any potential flags are identified during the Mental Health Screening and Evaluation and treatment is begun immediately to stabilize the patient.

2.3.7. Mental Health Delivery System

2.3.7.1.     Contractor shall operate and manage a comprehensive mental health delivery system in collaboration with SDSD staff. This should include, but is not limited to, utilizing County Mental Health Clinicians and Contractor psychologists and other qualified mental health professionals to perform on-site, face-to-face mental health clinics as well as psychiatry clinics. Contractor may provide these services directly or subcontract for mental health services.

2.3.7.2.     Contractor and SDSD staff shall ensure a process and provide education and instruction to patients on how to access mental health services through self-referral, the mental health sick call process, or by contacting staff for any urgent issues.

2.3.7.3.     Mental health referrals shall be received, documented, and processed through the scheduling system in TechCare, to provide instant, up-to-date information accessible to all providers.

2.3.7.4.     Mental health staff shall also respond to family and other outside sources of referral for patient mental health services through coordination with the facility leadership.

2.3.7.5.     Mental health patients shall have access to individual therapy such as Cognitive Behavioral Therapy as well as Solution Focused Brief Therapy. They also shall have access to psychological education groups and treatment that fit individual needs and mental health issues such as:

2.3.7.5.1.     Male Veterans Group
2.3.7.5.2.     Impulse Control
2.3.7.5.3.     LGBTQ Support
2.3.7.5.4.     Anger Management
2.3.7.5.5.     Women's Anger Management
2.3.7.5.6.     Life Skills groups

2.3.7.6.     Patients with chronic mental health conditions shall be seen by a psychiatric provider and/or SDSD mental health professional every 90 days or sooner as indicated by the stability of the patient's symptoms. Individualized treatment plans and discharge plans shall be developed and updated. SDSD mental health professionals shall monitor the chronic mental health population through individual contacts, counseling, groups, and routine mental health rounds. Patients enrolled in chronic mental health clinics shall have the opportunity to participate in groups that focus on life skills and discharge planning. Examples of life skills and discharge planning groups include: Mental Health Awareness, Sleep Hygiene, Anger Management, Medication Education, and Re-Entry Preparation.

2.3.7.7.     Contractor shall consistently evaluate the mental health program for efficacy and introduce new and innovative approaches to improve services and the mental health outcome of patients.

2.3.7.8.     Contractor shall meet monthly with the onsite Mental Health Director and the SDSD Mental Health Director to discuss clinical issues, mental health processes and systems, exchange valuable information, and discuss the latest mental health trends.

Ex. G - 470

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.7.9.    Contractor and SDSD Staff shall develop a Suicide Prevention Plan consistent with NCCHC standards. The key components of the plan are as follows:

2.3.7.9.1.    Staff Training – intensive training of all medical, and mental health staff
2.3.7.9.2.    Screening and Identification of High-Risk Patients
2.3.7.9.3.    Proactive and thorough assessment through the Receiving and Mental Health Screenings.
2.3.7.9.4.    Alerts in TechCare assist the evaluator in decision making and notifying sworn and mental health personnel of a patient in need of urgent services.
2.3.7.9.5.    Referral, Evaluation, Housing
2.3.7.9.6.    Patients at risk of suicide are quickly referred to appropriate housing and mental health services.
2.3.7.9.7.    Patients at risk of attempting suicide or self-harm shall be placed on Suicide Watch in appropriate housing located within the facility and shall be monitored as clinically indicated based on their level of acuity.
2.3.7.9.8.    Once discharged from watch they remain in the mental health caseload and have regular follow up until released from custody.

2.3.8. Lanterman-Petris-Short Act (LPS) Units

2.3.8.1.    From admission to discharge, members of the interdisciplinary treatment team shall ensure all patients transferring through the LPS units receive high-quality care that is in accordance with the Lanterman-Petris-Short Act. Recognized as Acute Psychiatric Units by the California Department of Health Care Services, the two Lanterman-Petris-Short Act (LPS) units offer onsite psychiatric stabilization and treatment that is commensurate with inpatient psychiatric care. To achieve this hospital level of care, an interdisciplinary treatment team - which consists of psychiatrists, psychiatric nurse practitioners, psychologists, qualified mental health providers (QMHPs), and psychiatric nurses – will coordinate care for patients residing on the 32-bed unit at PSU and the 30-bed unit at WPSU.

2.3.8.2.    Upon admission to the LPS unit, all patients regardless of their admission status (Voluntary, 5150 hold, PC 1370.01 etc.) will receive information about patient rights and responsibilities.

2.3.8.2.1.    44.1    Each patient shall meet with members of the interdisciplinary treatment team for intake assessments.
2.3.8.2.2.    44.2    Within 24 hours of admission, the patient shall meet with a psychiatric provider for a comprehensive evaluation to determine clinical impressions and medication needs.
2.3.8.2.3.    44.3    Within 5 days of admission, the patient shall meet with a QMHP to conduct a comprehensive psychosocial assessment.

2.3.8.3.    Treatment team members and sworn staff shall meet on a weekly basis to review, discuss, create, and modify each patient's treatment plan.

2.3.8.4.    Team members shall be responsible for documenting and implementing clinical interventions.

2.3.8.5.    Treatment team members and sworn staff shall meet daily to review and discuss patient progress towards their goals and discuss plan of action for the day.

2.3.8.6.    At least one SDSD or Contractor team member shall have one-to-one contact with each patient at least once per shift.

Ex. G - 471

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.8.6.1.   48.1   QMHP shall be responsible for documenting daily interactions under progress notes and QMHP Progress Note once per week.

2.3.8.7.   To ensure patient rights are upheld and clinically appropriate treatment is offered in the least restrictive manner possible, team members shall remain involved throughout the medicolegal process and provide transparent, clear communication with the court, the patient, and other stakeholders.

2.3.8.8.   Contractor and SDSD team members shall be responsible for the following activities within his or her scope of practice:

2.3.8.8.1.   50.1   Providing crisis stabilization services
2.3.8.8.2.   50.2   Prescribing and managing psychotropic medications
2.3.8.8.3.   50.3   Intervening in urgent behavioral/medical situations
2.3.8.8.4.   50.4   Offering psychosocial interventions via individual and group formats

2.3.9. Jail Based Competency Treatment

2.3.9.1.   San Diego County Sheriff's Department has in its custody individuals with felony charges and who have been declared by the California Superior Courts to be Incompetent to Stand Trial (IST). Contractor shall manage the Jail Based Competency Treatment Program.

2.3.9.2.   To address this shortage of beds at the state hospitals, DSH has contracted with several counties and established the JBCT which would provide restoration of competency treatment services like those provided in state hospitals.

2.3.9.3.   The SDSD requires Contractor to administer a JBCT program to restore individuals to competency using clinical treatment in accordance with the current treatment guidelines and program elements established by DSH. Contractor may elect to provide this service directly or utilize a subcontractor.

2.3.9.4.   The objectives of this program are to reduce the number of County IST incarcerated individuals waiting for treatment at a state facility, allow incarcerated individuals to begin restoration of competency treatment faster, and significantly decrease the time these individuals remain incarcerated due to a faster adjudication of their criminal charges.

2.3.9.5.   The County shall provide Contractor and staff access to the San Diego Central Jail (SDCJ), to allow contractor to provide the clinical programming which may restore competency to IST incarcerated individuals. The Contractor shall provide Jail Based Competency Treatment to IST incarcerated individuals incarcerated at SDCJ in accordance with the respective duties and responsibilities as outlined below. The county does not currently have a JBCT program for incarcerated individuals housed at the Las Colinas Detention and Re-entry Facility (LCDRF) but reserves the right to develop and implement a program if requested to do so by DSH and/or SDSD management. The parties agree to meet and negotiate an amendment in the event the JBCT program is expanded to the LCDRF.

2.3.9.6.   Duties of the San Diego County Sheriff's Department:

Ex. G - 472

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.9.6.1.    To provide a minimum of twenty-five (25) beds and up to thirty (30) if needed, for incarcerated individuals who are ordered into the treatment program. Those beds shall be located on the 6th floor of San Diego Central Jail (SDCJ) at 1173 Front Street, San Diego, CA 92101. The SDSD reserves the right to change the location if needed.

2.3.9.6.2.    To provide adequate security to protect Contractor's staff while they are providing services in the facility. The deputies assigned to the JBCT program housing area shall generally be Crisis Intervention Team (CIT) trained deputies.

2.3.9.6.3.    To provide full access to and full utilization by Contractor staff of the Jail's Medical Records System during the term of this agreement and for seven (7) years thereafter, as well as access as required by the State of California or any other governmental or judicial entity, to all medical information of all individuals who have participated in the program, to the extent authorized by law.

2.3.9.6.4.    To provide a representative at meetings conducted at the jail of all stakeholders as agreed upon to include at the minimum the Contractor Program Manager, Sheriff's Medical Services Administrator, Sheriff's Chief Medical Officer (CMO), Facility Commander or his designee, and others such as Department of State Hospitals, Public Defenders, DA, and courts as needed.

2.3.9.6.5.    To notify Contractor in advance of any inspections or review by any appropriate inspecting or reviewing entities.

2.3.9.6.6.    To comply with all federal and state laws pertaining to the administration of the jails and keeping of incarcerated individuals. County shall provide the incarcerated individuals participating in the restoration program with all items, services and supplies which are supplied to all incarcerated individuals in San Diego Central Jail.

2.3.9.6.7.    Contractor shall not be charged with, billed for, or otherwise expected to provide incarcerated individuals with the items the Sheriff is required to provide.

2.3.9.6.8.    To provide and dispense psychotropic medications as prescribed by authorized Contractor staff.

2.3.9.7.    Duties of the JBCT program Contractor:

2.3.9.7.1.    To provide, utilizing its own staff or subcontracted staff, restoration of competency treatment services to IST incarcerated individuals participating in the JBCT Program at San Diego Central Jail, and adhere to the same existing treatment guidelines and program elements established and administered at DSH hospitals as outlined in Exhibit A-1 PROGRAM ELEMENTS AND TREATMENT PROTOCOL of this agreement.

2.3.9.7.2.    To coordinate incarcerated individual's transfer and admission with DSH facility for those incarcerated individuals unable to be restored to competency under the program. This coordination may include working with the courts and attorneys for a new commitment order or stipulation to Patton State Hospital. Contractor is not financially responsible for any costs associated with competency restoration performed at Patton State Hospital or other offsite facility. Additionally, Contractor is not financially responsible for any mental health offsite costs. Any mental health offsite costs incurred

Ex. G - 473

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

by Contractor will be billed back to the County for one hundred percent (100%) reimbursement of same.

2.3.9.7.3.    To provide licensed clinical staff, who shall work approximately forty (40) hours per week during mutually agreed upon hours, and who shall provide restoration to competency services for the incarcerated individuals placed in the restoration program consistent with CA DSH as it relates to said services.

2.3.9.7.4.    Staff shall comply with all standards per CA Title 15 and correctional community standards for mental healthcare as per the National Commission on Correctional Health Care (NCCHC).

2.3.9.7.5.    To adhere to all the rules, policies, and regulations of the jail.

2.3.9.7.6.    To appoint an individual, or designee, who shall be available twenty-four (24) hours per day, seven (7) days per week, as a liaison to communicate with County on matters relating to this Agreement.

2.3.9.7.7.    To provide treatment services consisting of mental illness management, to prescribe psychotropic medications from the County formulary, competency restoration, physical stimulation, mental/social stimulation, and other components of the treatment program in compliance with applicable state law and regulations.

2.3.9.7.8.    To provide quality control indicators from program data which shall be reported to the Stakeholder's Board.

2.3.9.7.9.    To submit significant suggested changes in policies and procedures to the stakeholder's board for review by appropriate jail staff.

2.3.9.7.10.    To comply with applicable state law and the terms of the contract for this program between the Sheriff and Contractor.

2.3.9.7.11.    Contractor staff shall remain in compliance with all applicable state and/or federal licensing requirements applicable to mental health providers and show proof of such licensing compliance to County upon request.

2.3.9.7.12.    Notwithstanding anything set forth above, San Diego County may terminate or reduce the size of the JBCT program at any time upon written notice to Contractor in the event its contract with CA-DSH is terminated or reduced.

2.3.9.7.13.    If funding for any fiscal year for the JBCT program is reduced or deleted by State's Budget Act for purposes of this program, and the State exercises its option to either cancel its agreement with the County, the County shall have the option to either cancel the JBCT program with no liability occurring to the County or offer an agreement amendment to Contractor to reflect the reduced amount. In the event JBCT services are deleted or reduced, Contractor will not be responsible for providing JBCT staffing services as identified in Contractor's staffing matrix. Any reduced funding amounts by the state will result in negotiations between parties for appropriate JBCT staffing and pricing adjustments.

2.3.9.8.    Treatment Team

Ex. G - 474

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.9.8.1.    Contractor shall use an interdisciplinary approach to offer a range of specialized skills and expertise in the delivery of comprehensive restoration treatment services to JCBT participants.

2.3.9.8.2.    To promote efficient and effective delivery of competency restoration treatment, the Treatment Team comprised of the Contractor staff listed below shall convene weekly to review each JBCT defendant:

2.3.9.8.2.1.    Program Director – Licensed psychologist shall provide oversight of the JBCT program, including ensuring compliance with County, DSH, and Contractor standards and expectations. The Program Director reviews DSH Patient Management Unit (PMU) referrals to determine program suitability, provides clinical oversight to the JBCT as needed, and liaises with the DSH, the Superior Court, and legal personnel as needed. Ensures data deliverables required by DSH are accurate and timely submitted.

2.3.9.8.2.2.    Psychiatric Provider – Completes a comprehensive assessment of each JBCT participant within 72 hours of admission to the program. Based on the thorough work-up, the psychiatric provider prescribes psychotropic medication (as appropriate) to treat symptoms that interfere with trial competency. Thereafter, the psychiatric provider monitors the defendant's response to pharmacological interventions by meeting weekly with individuals to discuss potential side effects of prescribed medications, make medication adjustments as needed, and consider alternative medications if necessary. Psychiatric Services are overseen by the JBCT Chief Psychiatrist.

2.3.9.8.2.3.    Psychologist – Performs forensic evaluations of trial competency to inform treatment planning and provide statutorily required status reports/forensic evaluation reports to San Diego County Superior Court and its designated officials. Congruent with NCCHC guidelines, the psychologist who conducts forensic evaluations does not deliver clinical services (e.g., treatment, intervention). Rather, the psychologist's role on the team is to gather data about the JBCT participant's progression in the restoration process and acquires information about other team members' interactions with program participants as part of the ongoing competency evaluation process. After initial assessment of competency upon admission to the JBCT, psychologists re-assess competency at least every 30 days. Psychologist also submit formal written reports to the court when an individual is opined restored, when a person is believed to not be restorable within a reasonable period or maximum allowable period, or when statutorily require updates are due.

2.3.9.8.2.4.    Social Worker/Mental Health Clinician – Performs admission assessment to determine clinical, psychosocial, and discharge needs. Delivers group and individual mental health interventions. In addition, the licensed social worker/mental health clinician serves as the treatment team coordinator to ensure team documentation (e.g., progress notes, treatment plans) is accurate and current. In addition, social worker/mental health clinicians coordinate re-entry and discharge plans to ensure continuity of care.

2.3.9.8.2.5.    Mental Health Rehabilitation Specialist – Provides rehabilitation and recreational group activities and offers support to the social worker/mental health clinician and forensic restoration specialist as needed.

Ex. G - 475

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.9.8.2.6.    Forensic Restoration Specialist – Conducts competency education/training sessions in individual and group formats and documents progress in ForensicCARE. Consult with treatment team members to discuss participants' progress, areas in need of attention, and insights about behavioral observations.

2.3.9.8.3.    During weekly meetings, the Treatment Team shall review the effectiveness of treatment interventions, determine if additional treatment elements should be incorporated into the treatment plans and discuss if a JBCT participant is under consideration for discharge or transfer to state hospital

2.3.9.8.4.    Treatment Team discussions shall be documented in ForensicCARE to memorialize treatment plan modifications, team decisions, etc.

2.3.9.8.5.    Keeping with best practices, professionals involved in the competency restoration treatment and evaluation process shall be specially trained to work with a forensic population. Such training shall involve cross- discipline education about the practices other disciplines use and the issues other disciplines must manage during the competency restoration treatment and evaluation process.

2.3.9.9.    Group Curriculum

2.3.9.9.1.    Day programming shall be incorporated with the intent of providing education about the criminal justice system and processes, as well as promote skills that lend to competency restoration (e.g., attention, problem- solving, stress management, behavioral control). Each participant shall receive a program handbook containing handouts, journal logs, out-of-group activity sheets, and other resources that is theirs to keep as a reference upon completion of the JBCT program.

2.3.9.9.2.    Competency Education

2.3.9.9.3.    Educational treatment shall involve use of multiple learning formats to facilitate the treatment modules. Competency educational training shall be provided through informative lectures, visual/instructional aids (e.g., handouts, white boards), group discussion, vignettes, review and discussion of relevant videos, role- playing, and other novel teaching strategies.

2.3.9.9.4.    When planning competency restoration activities, the group facilitator shall consider an individual's readiness for education training, learning style, cultural influences, and level of educational achievement.

2.3.9.9.5.    Twice daily, defendants shall attend competency education groups. The morning group shall focus on gaining factual knowledge about the legal system primarily through lecture-based learning supported by visual aids, while the afternoon session shall be an applied group that promotes learning through discussion about vignettes, mock trials, and other hypothetical scenarios.

Ex. G - 476

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.9.10.    Incentivized Treatment Participation

2.3.9.10.1.    Individuals mandated by the court to undergo competency restoration treatment may be reluctant to comply with mental health interventions. To promote cooperation and compliance with treatment, Contractor shall use an incentive program whereby defendants can earn privileges and access to certain items in exchange for positive/prosocial behavior and treatment compliance. JBCT staff shall be specifically trained in operating a token economy to promote consistent delivery of incentives. Collaboration with San Diego Central Jail leadership shall be made to determine the specific parameters of this program to maintain facility safety and security.

2.3.9.11.    Discharge and Re-Entry Planning

2.3.9.11.1.    It is imperative that restoration gains be maintained once individuals begin to transition out of the JBCT unit. The JBCT team shall coordinate care with receiving mental health providers. Contractor shall ensure seamless coordination at this point and enhance continuity of care.

2.3.9.11.2.    If the individual requires transfer to a DSH facility for further restoration services, the JBCT team shall compiles relevant data and forwards that information to the DSH PMU for processing.

2.3.9.11.3.    In the event an individual is discharged to the community, the JBCT team shall ensure the discharge plan and coordination includes, if clinically, indicated appropriate mental health counseling appointments, medication management, services for chemical dependency, and overall health/wellness activities.

2.3.9.11.4.    The assessment shall be completed electronically in TechCare module ForensicCARE, and all results are documented and stored in the patient's electronic health record. JBCT records will be maintained in TechCare module, ForensicCARE, as a separate clinical from forensic files.

2.3.9.11.5.    SDSD nursing staff shall ensure a review of all incarcerated individuals health records is conducted prior to transfer to coordinate medication distribution and continuity of care.

2.3.10.  Oral Care Services

2.3.10.1.    SDSD staff shall provide oral hygiene instruction and preventive oral education at intake.

2.3.10.2.    Contractor shall be the prime provider for oral care services and shall provide dental staffing. Contractor oral care services shall comply with NCCHC standards by which patients receive dental treatment, not limited to extractions. Contractor may provide dental services directly or utilize a subcontractor.

2.3.10.3.    Treatments shall include any other services deemed necessary by the contracted dentist. Contractor shall ensure that patients' serious dental needs are met in compliance with NCCHC, and other applicable standards.

Ex. G - 477

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.10.4.   Contractor shall establish dental services in accordance with guidelines for dental evaluation and treatment. A priority system shall be used to guide treatment decisions, and proper infection control procedures are utilized for all oral treatment procedures.

2.3.10.5.   Documentation shall be standardized in TechCare to better document dental health conditions and treatment and, thereby, enhance communication among healthcare staff.

2.3.10.6.   Contractor's oral care program shall provide the following services for patients:

2.3.10.6.1.   Training and Support of SDSD Nurses in providing Health Assessment, which includes a Dental Screening and Hygiene Examination Dental Assessments for patients who request dental services for urgent/emergent needs:

2.3.10.6.1.1.   Emergency and routine dental care
2.3.10.6.1.2.   Temporary fillings
2.3.10.6.1.3.   Incision and drainage
2.3.10.6.1.4.   Control of bleeding
2.3.10.6.1.5.   Necessary emergency surgery
2.3.10.6.1.6.   Clinically indicated extractions
2.3.10.6.1.7.   Referral to dental specialist if needed
2.3.10.6.1.8.   Medically necessary dental-related prescriptions

2.3.10.7.   The oral care program shall begin at the Receiving Screening, administered by a SDSD healthcare professional who is specifically trained by the contracted dentist. The results of this screening are relayed to the dentist for review and referral, if clinically indicated.

2.3.10.8.   A patient can be referred to the dentist any time during incarceration. Treatment services provided by the onsite dentist reflect contracted services identified by the SDSD.

2.3.10.9.   Contractor shall provide an appropriate and timely response to requests for dental services and institute periodic performance measurements to ensure patients have timely access to dental care.

2.3.10.10.   Dental emergencies shall be addressed immediately. Emergency dental services shall be available 24 hours a day either onsite or offsite.

2.3.10.11.   Patients with urgent dental needs shall be seen at the initial sick call.

2.3.10.12.   Non-urgent or routine dental services shall be provided during regular clinic hours.

2.3.10.13.   Contractor shall coordinate appropriate offsite referrals for patients requiring dental care outside the capabilities of the facility.

2.3.10.14.   All dental services shall be delivered according to proper universal precautions, defined from Centers for Disease Control (CDC) Infection Control Guidelines, measures and shall be documented in the patient's medical record.

2.3.10.15.   Contractor shall not be required to perform cosmetic dental services.

2.3.10.16.   The following equipment and supplies shall be available in each onsite dental treatment area:

Ex. G - 478

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.10.16.1.    Handwashing facilities.
2.3.10.16.2.    Dental examination chair.
2.3.10.16.3.    Examination light.
2.3.10.16.4.    Sterilizer.
2.3.10.16.5.    Instruments.
2.3.10.16.6.    Biohazard and non-hazard trash containers.
2.3.10.16.7.    Personal protective equipment; and,
2.3.10.16.8.    Stool or alternative seating for dentist.
2.3.10.16.9.    A dental operatory shall require, at a minimum:

2.3.10.16.9.1.    An x-ray unit with developing capability.
2.3.10.16.9.2.    Blood pressure monitoring equipment; and,
2.3.10.16.9.3.    Oxygen.

2.3.11. Chronic Care Program

2.3.11.1.    Contractor shall implement a chronic care program. Incarcerated individuals with chronic diseases shall be identified and treated accordingly.

2.3.11.2.    Contractor's chronic care program shall incorporate principles of case and disease management for complex cases and promote maximum progress and healing.

2.3.11.3.    Patients shall receive timely follow-up, evaluation, treatment, and education about the preventive activities available for those requiring chronic or convalescent care. This policy ensures all patients are screened, identified, and monitored in a manner consistent with national clinical guidelines established for the care and treatment of chronic illnesses.

2.3.11.4.    Chronic Care Management and preventive care shall begin at Receiving Screening when patients are classified into the appropriate chronic care clinic and scheduled for follow-up treatment.

2.3.11.5.    All chronic care clinic visits shall be scheduled and tracked in TechCare. At a minimum, the database shall include the following:

2.3.11.5.1.    Each patient enrolled in a chronic care clinic.
2.3.11.5.2.    Each occasion when an enrolled patient is seen at a chronic care clinic.
2.3.11.5.3.    Patient refusals for a chronic care visit.

2.3.11.6.    Contractor's process shall ensure compliance with standards established for the care and treatment of chronic illnesses. If clinically indicated during the receiving screening, the following procedures shall be followed:

2.3.11.7.    If the patient's responses during intake indicate that he or she requires additional medical care, the patient's medical record is electronically flagged for follow-up; their chronic issues are addressed by the provider during the initial health assessment.

2.3.11.8.    Contractor and SDSD staff shall maintain continuity for patients on pharmacologic therapy including by SDSD nursing staff reviewing SureScripts and obtaining orders from STATCare or onsite provider as clinically indicated.

Ex. G - 479

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.11.9.   Patients whose chronic conditions are unstable at booking shall be refused and sent directly to a hospital pursuant to SDSD policies and procedures. In any case where SDSD nursing staff require guidance as to whether a patient may be safely admitted the matter will be immediately referred by nursing to STATCare or onsite provider for consideration of refusal versus onsite management.

2.3.11.10.   In the case where a patient's chronic disease is stable, he/she shall be scheduled for a first chronic disease visit in approximately one month.

2.3.11.11.   Contractor shall collaborate with jail and sworn staff to reduce interruption of chronic care medications or appointments when patients with chronic disease are transferred between institutions or moved for housing, court, or release.

2.3.11.12.   Contractor shall ensure patients enrolled in chronic care clinics are seen by a qualified healthcare professional at appropriate intervals, or more frequently if clinically indicated. Newly diagnosed patients shall be seen for the first clinic within 45 days of diagnosis and then scheduled for follow-up as clinically appropriate.

2.3.11.13.   Individual Treatment Plans: Individual treatment plans are developed by the evaluating provider according to guidelines set by the responsible physician. The plan includes directions to healthcare personnel regarding their roles in the care and supervision of the patient.

2.3.11.14.   Contractor shall provide education about chronic diseases to chronically ill patients. Disease-specific information is selected from a list in TechCare and printed to give the patient the knowledge to help care for themselves.

2.3.11.15.   Within TechCare, the pharmacy team analyzes profiles of patients with chronic care medications, identifies chronic care patients who may not have been identified yet, and updates the patient medical record. If a patient has been incarcerated for more than 30 days and has been receiving a chronic care medication but has not been flagged as a chronic care patient, the pharmacy shall send out a second request for the patient to be re-assessed. Patients in need of chronic care shall be enrolled in the proper clinic and ensured they receive the appropriate labs and scheduled follow-ups. Contractor shall regularly provide this quality assurance activity as part of the Proactive Care Model.

2.3.12.   Comprehensive Substance Use Disorder Management Program

2.3.12.1.   Contractor shall implement a medically supervised withdrawal and MAT program. Such program should have at a minimum the following:

2.3.12.1.1.   A medically supervised withdrawal and treatment program.
2.3.12.1.2.   Medication assisted treatment processes.
2.3.12.1.3.   Substance counseling/therapy.
2.3.12.1.4.   Community collaboration and integration.

2.3.12.2.   Contractor shall ensure incarcerated individuals who are intoxicated or undergoing withdrawal are managed and treated as clinically indicated. This includes but is not limited to alcohol, opioid, and benzodiazepines. This includes protocols and treatments managed by a physician or other

**Ex. G - 480**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

medical professional trained in withdrawal treatment. Incarcerated individuals should receive evidence-based care during confinement and linked to care upon release as described in NCCHC Standards for discharge planning. To complete this function, Contractor requires an observation unit prior to start-up, due to the increased risk of detox patients housed throughout the County facilities, higher risk patients, and limited modalities of identifying patients at greater risk. Said observation unit will lessen movement requirements to conduct CIWA-COWS checks, as well as reduce County and Contractor staff movement throughout the facility to assess detoxing patients.

2.3.13. Withdrawal and Treatment Program

2.3.13.1. For patients at risk of withdrawal, Contractor shall take the following actions:

2.3.13.1.1.    Enrollment in the Detox Monitoring dashboard within TechCare
2.3.13.1.2.    Treatment orders for comfort medications for nausea, diarrhea, and generalized pain
2.3.13.1.3.    Treatment orders for vitamin supplements and electrolyte replacement hydration (e.g., Gatorade)
2.3.13.1.4.    Treatment with buprenorphine and benzodiazepines per provider order as clinically indicated for those with significant withdrawal symptoms.

2.3.13.1.5.    Enrollment in an ongoing assessment and treatment protocol specific to the substance causing withdrawal:

2.3.13.1.5.1.    Clinical Institute Withdrawal Assessment (CIWA-Ar)
2.3.13.1.5.2.    Clinical Institute Withdrawal Assessment Benzodiazepines (CIWA-B)
2.3.13.1.5.3.    Clinical Opiate Withdrawal Scale (COWS)

2.3.14. Medication Assisted Treatment (MAT) Treatment Program

2.3.14.1.    Patients who are enrolled in a methadone maintenance program shall be evaluated for continuation while in the facility. Contractor shall partner with community agencies to provide treatment. Contractor shall establish and secure agreements from community partners to bring limited doses of methadone onsite for in-jail treatment. Alternately, Contractor and SDSD may elect to work toward licensure as an Opioid Treatment Program, in which case Contractor may provide methadone directly from its pharmacy.

2.3.14.2.    Contractor's onsite leadership shall perform Quality Assurance studies, to monitor the efficacy and consistency of the drug and alcohol withdrawal program. Contractor pharmacists shall work with the STATCare telehealth team to actively monitor patients under alcohol and withdrawal protocols. Review and Quality Assurance performed by Contractor pharmacy and STATCare team members will typically be performed by Contractor staff working offsite and remotely reviewing patient records in TechCare and interacting remotely with onsite nursing and clinical staff.

2.3.14.3.    Contractor shall implement a Medication Assisted Treatment (MAT) program. The MAT program shall include but not be limited to:

Ex. G - 481

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.14.3.1.    Induction – upon request of incarcerated individual or patients identified at withdrawal, as well, as those currently residing in custody.  MAT Induction shall be initiated within six months of the effective date of the contract.

2.3.14.3.2.    Maintenance – sustainment from community providers, as well as continuity of care during incarceration.

2.3.14.3.3.    Discharge planning – coordination with community resources to continue treatment upon release from Sheriff's custody.

2.3.14.4.    Contractor shall continue providing specialty staffing for onsite MAT services. In addition, coordination shall be made with local community partners to support the SDSD MAT Program.

2.3.14.5.    The developed approach to a comprehensive MAT program shall include:

2.3.14.5.1.    Multidisciplinary involvement to include, medical and mental health practitioners.

2.3.14.5.2.    Multimodal treatment with a combination of medication and counseling.

2.3.14.5.3.    Multiphasic, within the jail and in the community post- release.

2.3.14.5.4.    Some combination of approved MAT medications, including naltrexone (Vivitrol), buprenorphine and methadone, as appropriate and available.

2.3.14.6.    Contractor or SDSD staff shall conduct an initial screening for admission to the MAT program.

2.3.14.7.    Contractor shall assign patients to a MAT medication based on continuity of care or appropriate treatment for induction.

2.3.14.8.    Contractor shall partner with community providers to connect patients to comprehensive MAT and behavioral therapy upon release.

2.3.14.9.    Patients who are confirmed through testing to be pregnant and opioid addicted shall be treated with opioid maintenance medications.

2.3.14.10.    Contractor shall utilize appropriate community partners (e.g. Acadia HealthCare or another similar local provider or providers) for services and support for the SDSD MAT program. The community partner(s) will provide psychiatric and chemical dependency services. The community partner(s) shall have comprehensive treatment centers in the local area.

2.3.15.    Women's Health and Obstetric Services

2.3.15.1.    Contractor shall implement a program for women's health. This shall include, but is not limited to, preventative services, contraception, gynecologic care, and management.

2.3.15.2.    Contractor shall provide female healthcare in accordance with NCCHC and other generally accepted professional standards.

2.3.15.3.    Contractor shall directly employ a provider or utilize a subcontractor to provide 12 hours of weekly coverage by a Gynecological Provider (GP/NP) to provide regular access to care for the female patient population at the Las Colinas Detention and Reentry Facility.

2.3.15.4.    All females of childbearing age (15-54) shall receive a pregnancy test at the time of booking. Those with a positive pregnancy screening shall be referred by nursing to StatCare or an onsite

Ex. G - 482

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

provider for initial orders after their arrival to the facility to ensure continuity of care. Referrals shall be prioritized based on risk factors. Contractor shall ensure each new intake on their next scheduled workday. Should volume warrant as determined by Sheriff, Contractor shall provide onsite OB services via telemedicine and shall expand services with an Obstetrician onsite for scheduled clinics.

2.3.15.5.    During the comprehensive health assessment, clinical staff shall take note of the following information for female patients:

    2.3.15.5.1.    Menstrual cycle
    2.3.15.5.2.    Unusual bleeding
    2.3.15.5.3.    Current use of a contraceptive medication
    2.3.15.5.4.    Presence of an I.U.D.
    2.3.15.5.5.    Breast masses
    2.3.15.5.6.    Nipple discharge
    2.3.15.5.7.    Pregnancy history
    2.3.15.5.8.    Gynecological history to include menstrual problems, STDs and risk factors, most recent pap smear and any history of irregular pap smear results

2.3.15.6.    If deemed medically necessary, a pelvic and breast examination shall be performed within a reasonable amount of time.

2.3.15.7.    Contractor policy shall comply with NCCHC standards and all other laws and statutes of the state. Contractor shall ensure women receive appropriate contraceptive services as clinically indicated.

2.3.15.8.    Contractor shall provide emergency contraception as clinically indicated, and contraception shall be made available upon request to females upon release.

2.3.15.9.    Contractor shall implement a program for both on/off-site obstetric care and services. Such a program should be comprehensive (prenatal through postpartum) and shall include provisions for community specialty care and maternal delivery at a community facility.

2.3.15.10.    Contractor shall facilitate comprehensive obstetric care and services. Onsite providers shall be responsible for ordering appropriate labs, ultrasounds, and consults with an Obstetrician per protocol.

2.3.15.11.    Contractor shall use appropriate provider for OB consulting, offsite deliveries, and urgent OB offsite needs.

2.3.15.12.    Contractor shall provide health care to address the unique needs of female patients regarding family planning, pregnancy, prenatal care, and postpartum care while incarcerated.

2.3.15.13.    Contractor shall ensure that pregnant patients receive appropriate prenatal care, obstetrical services for labor and delivery, and postpartum care.

2.3.15.14.    Contractor shall provide all pregnant patients with timely and appropriate prenatal obstetrical care consistent with the community standards of care.

2.3.15.15.    Contractor shall provide all pregnant patients with active opioid use disorder receive evaluation upon intake, including offering and providing medication-assisted treatment (MAT) with methadone and buprenorphine.

Ex. G - 483

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.15.16.  Female patients presenting at any time with signs or symptoms of pregnancy shall be offered a urine pregnancy test by Contractor.

2.3.15.17.  Contractor shall ensure emergency delivery kits are available in the facility.

2.3.15.18.  The advanced clinical provider shall evaluate the pregnant patient within seven days of notification of a positive pregnancy test.

2.3.15.19.  Contractor shall ensure pregnant women are given comprehensive counseling and assistance from either the medical/mental health staff or a community agency in accordance with their expressed desires regarding their pregnancy and whether they elect to keep the child, use adoption services, or have an abortion.

2.3.15.20.  Pregnant women with serious mental illness shall be offered specialized psychosocial and psychopharmacological monitoring by the mental health staff.

2.3.15.21.  Mental health providers shall consult with medical staff regarding any psychotropic medication use during pregnancy.

2.3.15.22.  When obstetrical care is provided by an outside contractor (e.g., OB/GYN physician), copies of pertinent diagnostic results and evaluations shall be requested and filed in the medical record.

2.3.15.23.  Contractor shall order appropriate preventive interventions, including the prescribing of prenatal vitamins and a pregnancy diet, for pregnant patients. The orders should continue throughout the postpartum period and during the period of lactation for those expressing breastmilk while in custody.

2.3.16.  Hospital Care Management

2.3.16.1.  Contractor shall manage hospital level care as needed. Hospital care includes but is not limited to concurrent review, utilization review and discharge planning as defined in the Glossary, Section 4.29.

2.3.16.2.  Contractor shall provide high quality healthcare onsite. This shall be accomplished through the creation and development of onsite general practice (urgent care) clinics, onsite ward rounds/bedside rapid consultation services, and onsite specialty clinics, advanced infirmary level care, specialty consult services, and telehealth in addition to hospital step-down, infirmary, and assisted living/managed care facilities onsite.

2.3.16.3.  This process shall include review and tracking of offsite care, to ensure that all care provided offsite is medically necessary. The process shall be managed within TechCare. When offsite care is required, Contractor's UM team shall collaborate daily with health services staff and offsite providers to ensure medically necessary and appropriate usage of healthcare services. The following shall be considered during the review process:

2.3.16.3.1.  Whether offsite trip is necessary or whether onsite care is more effective
2.3.16.3.2.  Medical necessity based on industry standards, and NCCHC Standards
2.3.16.3.3.  Maximization of onsite capabilities
2.3.16.3.4.  Care consistent with community standards, contractual, or legal mandates

Ex. G - 484

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.16.4. The following services shall be reviewed by Contractor's UM team for all requests:

2.3.16.4.1. Hospitalizations—scheduled inpatient and observation
2.3.16.4.2. Outpatient surgical or non-surgical procedures
2.3.16.4.3. Specialty office visits and procedures
2.3.16.4.4. Diagnostics, durable medical equipment, and prosthetics
2.3.16.4.5. Course of outpatient treatment—physical therapy, dialysis, chemotherapy, radiation

2.3.16.5. Contractor's On-site Medical Director, designated site staff, Chief Medical Officer or designee, and a dedicated utilization nurse shall review and discuss proposed non-emergent services to determine the most appropriate and medically sound approach to care. Resulting outcomes and planned courses of action shall be shared with the On-site Medical Director or designee and progress notes are documented in TechCare.

2.3.16.6. Contractor and SDSD shall collaborate to provide Case Management and Utilization Review for hospitalized patients. Case management team expected to have one or more points of contact (POC) to interact/engage with community facilities/providers and assist with the following components:

2.3.16.6.1. Assistance with direct admissions
2.3.16.6.2. Assistance with community transfers (hospital to hospital movements)
2.3.16.6.3. Coordination of patient transfers to CDCR/DSHs
2.3.16.6.4. Coordination of hospital/community provided medication provision and release
2.3.16.6.5. Establishment of collaborative long & short-term goals for treatment 2.3.16.6.6. Discharge planning/ repatriation to facilities
2.3.16.6.7. Establishment of collaborative long and short-term goals for treatment
2.3.16.6.8. Optimization of medical unit beds
2.3.16.6.9. On-site SDSD nursing staff expected to be involved with the optimization of medical unit beds and 'medical step down' components as needed. If hospital medications are not available/provided, then on-site staff would need to obtain discharge notes/plans and coordinate follow up with a health care provider.

2.3.16.7. Contractor's Utilization and Case Management team shall closely monitor patients diagnosed with chronic and complex illness. TechCare shall be utilized in this process by tracking the number of offsite visits by way of a watch list. Patient acuity level will be based on the severity of illness and subsequent offsite treatments.

2.3.16.8. Contractor shall develop and implement a behavioral health/mental health acuity rating scale. This scale shall be utilized to assist in providing guidance for housing patients with mental health concerns.

2.3.16.9. Emergency cases shall be immediately referred offsite and reviewed after the fact. For continuity of care, the Program Manager or designee shall submit notification immediately to the NaphCare corporate office utilization management team and site leadership. Upon return from an emergency room visit, including psychiatric visits, the appropriate Advanced Clinical Provider or designated staff shall schedule information and treatment recommendations, and issue follow-up orders as clinically indicated.

2.3.16.10. Documentation of ED visits are tracked and monitored by site nurse via TechCare to identify site UM Request and further ensure continuity of care. Retrospective review occurs on all ED trips and for any questions or concerns that may arise regarding the quality and appropriateness of a patient's care. UM nurses and Contractor's Chief Medical Officer, or designee, review all emergency room visits and monitor the On-site Medical Director's appropriate use of the onsite resources.

Ex. G - 485

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.16.11.    Contractor shall provide the following offsite reports routinely:

2.3.16.11.1.    Daily Hospitalization Report—including reason for admission and length of stay
2.3.16.11.2.    Monthly Detailed Utilization report—including detailed time frames for each process of the review
2.3.16.11.3.    Biweekly Inpatient & Outpatient statistical report by service and location
2.3.16.11.4.    Biweekly Specialty Services report—consults, procedures, and diagnostic services
2.3.16.11.5.    Biweekly ED Trips report—by service and location
2.3.16.11.6.    Monthly Utilization Review report—by disease classification

2.3.16.12.    Contractor's utilization management team shall conduct a monthly Utilization Management Meeting to identify and implement quality initiatives such as the readmission review process. Research is performed and shared with the committee, resulting in implementation of quality improvement processes. When necessary, cases are referred to the Chief Medical Officer for peer review and further recommendations for quality improvement. Utilization Management education shall be an ongoing process throughout the life of the contract.

2.3.16.13.    Individuals returning to the detention facility following offsite treatment encounters shall be evaluated by a registered nurse. Patients returning from an inpatient hospital stay shall be evaluated prior to placement in the general population. These patients shall see an onsite provider as soon as possible to ensure appropriate orders and follow-up.

2.3.17.    Emergency Care and Access to Emergency Department Services

2.3.17.1.    Contractor shall communicate and coordinate with sworn staff the need for emergency department (ED) services for incarcerated individuals. Per SDSD policy, sworn staff can initiate a response from EMS when they deem necessary. Sworn staff will facilitate and manage emergency transport.

2.3.17.2.    Contractor Network Management Department shall contract with local hospitals to ensure access to their emergency departments for any SDSD patients requiring hospital and ED services.

2.3.17.3.    Contractor shall build a robust Hospital Network for the SDSD Detention Facilities, which may include, but is not limited to, the following:

2.3.17.3.1.    Tri-City Medical Center/ Palomar Medical Center
2.3.17.3.2.    UC San Diego Health - Hillcrest
2.3.17.3.3.    Sharp Chula Vista Medical Center
2.3.17.3.4.    Sharp Grossmont Hospital
2.3.17.3.5.    Alvarado Hospital
2.3.17.3.6.    Scripps Memorial Hospital (La Jolla)
2.3.17.3.7.    Sharp HealthCare
2.3.17.3.8.    Sharp Memorial Hospital (Grossmont)
2.3.17.3.9.    Scripps Mercy Hospital San Diego
2.3.17.3.10.    Scripps Mercy Hospital Chula Vista
2.3.17.3.11.    Sharp Mary Birch Hospital for Women & Newborns
2.3.17.3.12.    Kindred Hospital San Diego
2.3.17.3.13.    Paradise Valley Hospital
2.3.17.3.14.    UC San Diego Medical Center
2.3.17.3.15.    Sharp Coronado Hospital

Ex. G - 486

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.17.3.16.    Palomar Medical Center
2.3.17.3.17.    Psychiatric Hospital of San Diego County
2.3.17.3.18.    Tri-City Medical Center
2.3.17.3.19.    Vibra Hospital of San Diego

2.3.18.  Secure Locked Hospital/Ward

2.3.18.1.    Contractor shall procure and utilize a secure locked hospital/ward section specifically for inpatient hospitalization of incarcerated individuals. This shall include procedures for transfer of incarcerated individual patients from non-secure hospital beds to contracted secure hospital bed.

2.3.18.2.    Contractor shall maximize the use of secure medical units (e.g., Tri-City Medical Center, Alvarado Hospital), and transfer patients to the contracted hospital(s) as soon as logistically possible and medically safe to do so.

2.3.18.3.    Contractor shall put measures in place to coordinate timely patient transports to hospitals.

2.3.19.  Onsite and Offsite Specialty Care Services

2.3.19.1.    Contractor shall implement and manage an on-site and off-site specialty care services program. Specialty care services refers to specialist-provided health care as defined in the Glossary. This should include telemedicine options as well as off-site consultations.

2.3.19.2.    Contractor will provide onsite specialty services in the following specialties: Optometry, Cardiology, OBGYN, Infectious Disease, STD and HIV clinics, and Ultrasound. Should volume warrant as determined by Sheriff, Contractor shall provide onsite services via telemedicine and shall expand services onsite for scheduled clinics.

2.3.20.  eConsults – Specialty Care Consultations

2.3.20.1.    When onsite specialty clinics are not medically or economically feasible, Contractor shall use eConsults to engage a digital network of clinical specialists for consultation, clinical review, and assessment of necessity of care to inform offsite referral decisions. eConsults shall enable broader range of specialist care. eConsults shall be provided in conjunction with the comprehensive Utilization Management program.

2.3.20.2.    All eConsults specialists are active, board-certified clinicians who conform to NCQT (National Committee for Quality Assurance) guidelines. Board-certified specialists answer requests in less than 24 hours, and all consultations are documented in the patient's health record in TechCare.

2.3.20.3.    eConsults shall give providers access to more than 70 specialties and sub-specialties, including:

2.3.20.3.1.    Addiction Medicine
2.3.20.3.2.    Cardiology
2.3.20.3.3.    Endocrinology
2.3.20.3.4.    ENT
2.3.20.3.5.    Gastroenterology
2.3.20.3.6.    Hepatology

Ex. G - 487

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| 2.3.20.3.7. | General Surgery |
| 2.3.20.3.8. | Hematology |
| 2.3.20.3.9. | Geriatric Medicine |
| 2.3.20.3.10. | Infectious Diseases |
| 2.3.20.3.11. | Internal Medicine |
| 2.3.20.3.12. | Nephrology |
| 2.3.20.3.13. | Neurology |
| 2.3.20.3.14. | OB/GYN |
| 2.3.20.3.15. | Oncology |
| 2.3.20.3.16. | Ophthalmology |
| 2.3.20.3.17. | Orthopedic Surgery |
| 2.3.20.3.18. | Psychiatry |
| 2.3.20.3.19. | Pulmonary Medicine |
| 2.3.20.3.20. | Rheumatology |
| 2.3.20.3.21. | Urology |
| 2.3.20.3.22. | Vascular Surgery |

2.3.21. Onsite Dialysis Services

2.3.21.1. Contractor agrees to provide and manage onsite dialysis services at the San Diego Central Jail as part of the comprehensive healthcare program. Contractor shall provide effective management, skilled clinicians, and state-of-the-art nephrology arrangements, while also providing professional staffing and strong management support from the corporate office. Contractor may provide the service directly or contract with other provider for onsite dialysis services. In the event the UCSD or other provider is unable to provide onsite dialysis or the contract with the UCSD is terminated for any reason, Contractor will provide the service onsite.

2.3.21.2. Contractor shall have an established quality assurance program for Nephrology and Dialysis services that assists in maximizing clinical outcomes in accordance with KDOQI (Kidney Disease Outcomes Quality Initiative) guidelines. Each month, the following core quality data, consistent with community providers, shall be gathered, analyzed, and evaluated for quality improvement:

| | |
|---|---|
| 2.3.21.2.1. | Dialysis Treatment Adequacy |
| 2.3.21.2.2. | Anemia Management |
| 2.3.21.2.3. | Nutrition Management |
| 2.3.21.2.4. | Bone Management |
| 2.3.21.2.5. | Dialysis Access Management (Fistulas, Grafts, Catheters) |
| 2.3.21.2.6. | Infection Control and Vaccination |
| 2.3.21.2.7. | Clinical Variances, Incidents, and Grievances/Complaints and timely responses |
| 2.3.21.2.8. | Hospitalization |

2.3.21.3. Contractor's corporate office shall have available experienced professionals in correctional dialysis, including Contractor's Chief Operating Officer for Dialysis and Corporate Nephrologist, and shall be available to provide support and consultations for SDSD dialysis services if needed. Contractor's Chief Operation Officer-Dialysis and Director of Dialysis Operations, or designee, will be available 24-7 to answer any questions or concerns related to onsite dialysis.

2.3.22. Telemedicine Capabilities

Ex. G - 488

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.22.1.    Contractor shall provide telemedicine services for specialty consultation and referral and have such access available at all detention sites/facilities. Specialty telemedicine services shall include, but are not limited to, the disciplines of endocrinology, nephrology, psychology/psychiatry, orthopedics, urology, and infectious diseases.

2.3.22.2.    SDSD staff shall be trained by Contractor in all areas of telemedicine, to include patient confidentiality and HIPAA compliance, use of technology, scheduling, and procedures for patient care.

2.3.22.3.    Medical staff shall be thoroughly trained in the telemedicine services and the appropriate means to support/conduct a remote patient encounter. Training will include scheduling processes, equipment usage, patient preparation, as well as encounter documentation. Sheriff Managed care staff and/or individual medical providers will determine candidacy for remote/tele medicine services. In the event of triage/change in clinical presentation, facility staff will work with the managed care team to facilitate the change to an in-person medical assessment.

2.3.22.4.    Contractor shall provide telepsychiatry services to the SDSD facilities seven days per week when back-up psychiatric services are needed. Contractor has licensed staff members at the corporate offices who can provide telepsychiatry with simultaneous access to TechCare. Use of telepsychiatry shall not be a replacement for the onsite team or onsite care. The use of telepsychiatry, on-site coverage, and psychiatric provider on call coverage shall ensure Psychiatrist or Psychiatric Nurse Practitioner coverage is always available to SDSD patients.

2.3.23.  Long-term or Hospice Care

2.3.23.1.    Contractor and SDSD shall implement a program for rehabilitative services, long term care/assisted living support or hospice care as defined in the Glossary, Section 4.33.

2.3.23.2.    Contractor shall ensure SDSD nurses are specifically trained to handle patients that require convalescence, medical observation, and skilled nursing care. Contractor and SDSD nursing staff shall provide the necessary level of care needed to provide any long-term care in the SDSD facilities' medical units. Contractor shall ensure long-term care in a safe and sanitary manner. Contractor shall maintain all necessary equipment and supplies needed to provide care to all patients requiring extended care.

2.3.23.3.    Individualized treatment plans shall be developed for these patients, to be adjusted as needed, as they move to recovery or into a higher level of care. The long-term care patients shall be categorized by unique 'Long-Term Care' flags within TechCare so that patients within this group can be easily managed and monitored.

2.3.23.4.    Contractor shall collaborate with the SDSD to develop and implement an onsite and offsite hospice program. Contractor shall collaborate with the SDSD and community partners to identify potential candidates for hospice care, and allow for appropriate housing options, both in and outside of custody. Contractor will work with case management functionaries (SDSD, HHSA and 3rd party community partners) to assist with medical probation and compassionate program releases. The policy and procedure for hospice care shall include the establishment of policies addressing criteria for admission to the hospice program, special privileges for terminally ill patients, requirements for housing in palliative care settings, "do not resuscitate orders," and coordination with existing community hospice resources.

2.3.23.5.    Staff working in the hospice program shall be qualified healthcare professionals with training in basic hospice theory and techniques. The On-site Medical Director shall approve all transfers to

Ex. G - 489

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

the hospice unit. The Hospice Program offers comprehensive multidisciplinary services to terminally ill patients. Specific core services are made available to every hospice patient and family where applicable regardless of age, color, creed, gender, nationality, sexual orientation, or handicap. These core services include:

| | |
|---|---|
| 2.3.23.5.1. | Physician services. |
| 2.3.23.5.2. | Nursing services. |
| 2.3.23.5.3. | Mental health services. |
| 2.3.23.5.4. | Pastoral care. |
| 2.3.23.5.5. | Bereavement counseling. |
| 2.3.23.5.6. | Security services. |
| 2.3.23.5.7. | Classification services. |
| 2.3.23.5.8. | Volunteer services. |
| 2.3.23.5.9. | Pharmacy services; and |
| 2.3.23.5.10. | Other services as dictated by patient needs. |

2.3.24. Patient Health Education

2.3.24.1. Contractor and SDSD shall ensure health education in all aspects of patient care and treatment. This should include health counseling and education on condition, findings, treatment plan, and potential outcomes of compliance vs. non-compliance with recommended course of action given by providers. This also includes discharge planning as described in NCCHC Standards.

2.3.24.2. In accordance with NCCHC standards, general education resources shall be available to all patients, and specific health education shall be provided to patients with serious health conditions.

2.3.24.3. Contractor Program Manager shall coordinate with the County to determine any special needs and ensure that handouts are developed to meet such needs.

2.3.24.4. Contractor's health improvement and disease prevention educational topics shall include, but are not limited to, the following:

| | |
|---|---|
| 2.3.24.4.1. | Medical Services/Resources |
| 2.3.24.4.2. | Diet and Nutrition |
| 2.3.24.4.3. | Management of Chronic Diseases |
| 2.3.24.4.4. | Self-examination |
| 2.3.24.4.5. | Communicable Diseases |
| 2.3.24.4.6. | Management of Medication |
| 2.3.24.4.7. | Family Planning/Contraception Counseling |
| 2.3.24.4.8. | Personal Hygiene |
| 2.3.24.4.9. | Substance Abuse |
| 2.3.24.4.10. | Sexually Transmitted Diseases, HIV/TIDS, and Hepatitis |
| 2.3.24.4.11. | Smoking Cessation |
| 2.3.24.4.12. | Diabetes Management |
| 2.3.24.4.13. | Stress Management |
| 2.3.24.4.14. | Anger Management |

2.3.25. Infectious Disease Prevention and Control Program

Ex. G - 490

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.25.1.    Contractor shall implement an infectious disease prevention and control program as required by Title 15, NCCHC Standards, and SDSD policy. This should include but not limited to a comprehensive institutional program of surveillance (active and passive), prevention, contact investigation, epidemiological assessment, management of communicable diseases, and consultation and collaboration with the local health department.

2.3.25.2.    The program shall be based on universal precautions recommended by the Centers for Disease Control (CDC), the Occupational Safety and Health Administration (OSHA), the Association for Practitioners in Infection Control, and other nationally recognized infection control organizations.

2.3.25.3.    The Infection Control Program shall be implemented throughout the SDSD facilities to establish a comprehensive system of programming for surveillance and treatment of infectious diseases within the correctional environment.

2.3.25.4.    The Program Manager in coordination with the SDSD Infection Control Nurse shall oversee and implement infection control measures to monitor the incidence of infectious and communicable diseases, ensure proper handling and disposal of biological waste, and provide education to patients, correctional staff, and clinical staff on control, treatment, and prevention of infection. Infection control activities shall be monitored by the CQI committee.

2.3.25.5.    Contractor's Chief Medical Officer and Corporate Medical Directors shall be available to provide doctor-to-doctor consultations and guidance in establishing Infection Control Program Policies and Procedures.

2.3.25.6.    At a minimum, the Infection Control Program includes written policies, procedures, and practices to:

2.3.25.6.1.    Provide care and treatment to patients with communicable diseases, including the recommendation for special housing/isolation when medically indicated.
2.3.25.6.2.    Implement Bloodborne Pathogen Program.
2.3.25.6.3.    Monitor compliance with treatment regimens and continuity of care for patients with communicable diseases.
2.3.25.6.4.    Ensure confidentiality.
2.3.25.6.5.    Define decontamination of medical equipment and proper disposal of sharp instruments and biohazard wastes.
2.3.25.6.6.    Define strict adherence to universal precautions by all Contractor/Contracted staff to minimize the risk of exposure to blood and body fluids of patients
2.3.25.6.7.    Provide reports to designated authority of infectious diseases and nosocomial infections (infections that originate or occur in a hospital) in accordance with local, state, and federal laws and regulations.

2.3.25.7.    Contractor shall ensure quarterly meetings, or whenever an infection control issue requires immediate or continuing attention. A licensed healthcare provider is designated to serve as the Infection Control Coordinator. The infection control committee shall consist of the following members:

2.3.25.7.1.    On-site Medical Director or Physician.
2.3.25.7.2.    Dentist or representative, if applicable.
2.3.25.7.3.    Program Manager.
2.3.25.7.4.    SDSD Director of Nursing.
2.3.25.7.5.    Infection Control Coordinator.
2.3.25.7.6.    SDSD representative; and

Ex. G - 491

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.25.7.7.  Any other representatives, depending on issues for discussion as designated in conjunction with the Program Manager or Contractor Corporate Office.

2.3.25.8.  Contractor shall support SDSD COVID-19 protocols. Contractor shall follow CDC guidance to add or modify supplemental screening forms in TechCare as they relate to COVID-19.

2.3.25.9.  All staff members will receive a comprehensive introduction and overview of the infection control program. All new SDSD employees will receive the introduction during their orientation period, all current employees will receive training during on-site Inservice training, via NaphCare's training module, Contractor University. In addition, Contractor shall provide annual review and competency training of the infection control program for all site staff via Contractor University as well as onsite in-service training. Infectious disease education includes, but is not limited to blood-borne pathogens, air-borne pathogens, post-exposure management, proper hand washing technique, bio-hazardous waste handling, and MRSA. Contractor shall also provide patient education handouts that address MRSA, HIV/TIDS, and Hepatitis C for use in the facilities.

2.3.25.10.  SDSD staff shall document all vaccinations within the EHR as administration is completed. TechCare includes the capability to automatically submit vaccination administration to the California Immunization Registry (CAIRS) in addition to determining vaccination status of patients from CAIRS. Should SDSD not utilize that automation, or if alternative processes are required, SDSD staff shall manually complete such required reporting.

2.3.25.11.  As part of Contractor policy and procedure for Infection Control, delousing procedures shall be implemented in accordance with NCCHC standards. Patients entering the facility are examined and treated, if indicated, for ectoparasites to prevent possible institutional infestation.

2.3.26.  Continuous Quality Improvement (CQI) Program

2.3.26.1.  Contractor shall implement and manage a Continuous Quality Improvement (CQI) program in collaboration with the SDSD. Contractor shall, at a minimum, establish and maintain a CQI department which monitors provider performance metrics, clinical efficiency evaluations and provides ongoing monitoring of administrative and health care delivery programs in the facility. A committee shall be established that meets to discuss various topics related to the improvement of care delivery. This committee shall meet monthly and the SDSD Chief Medical Officer shall be the chairperson of the committee. Additional SDSD staff shall be part of this committee including but not limited to the SDSD Director of Mental Health and SDSD Director of Nursing. The Contractor shall at a minimum make their On-site Medical Director and mental health representative part of this committee. Findings from this committee shall be reported to SDSD management following each meeting. This committee shall meet all compliance indicators of NCCHC standards.

2.3.26.2.  Components of Contractor's CQI Program shall include the following:

2.3.26.2.1.  Credentialing and reappointment of healthcare staff,
2.3.26.2.2.  Peer review,
2.3.26.2.3.  Utilization management review,
2.3.26.2.4.  Health record review,
2.3.26.2.5.  Patient satisfaction surveys,
2.3.26.2.6.  Risk management activities,

Ex. G - 492

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.26.2.7.    Mortality review, and
2.3.26.2.8.    Staff development.

2.3.26.3.    Contractor shall be responsible for conducting chart reviews of all licensed/credentialed providers on a semi-annual basis (every 6 months). Each provider will have a quantity (fixed amount or percentage to be discussed) of charts evaluated by the contracted clinical medical director. Results/findings to be discussed and shared with SDSD in a protected forum.

2.3.26.4.    Contractor shall institute a Medical Audit Committee (MAC). The committee includes a multidisciplinary team to incorporate medicine, nursing, dental, mental health, substance abuse, and facility administration, as well as any other client designated representatives. The committee shall be chaired by Contractor's designee. SDSD committee members shall include SDSD CMO, Director of Nursing, Mental Health Director, Chief Mental Health Clinicians, and facility supervising registered nurses. Contractor shall keep meeting minutes and distribute them with an agenda prior to all meetings. Minutes and copies of reports reviewed shall be submitted to all committee members. The quality improvement committee shall evaluate patient complaints and grievances. The Onsite Medical Director shall attend the MAC meeting monthly.

2.3.26.5.    Contractor shall coordinate with SDSD representatives to include sworn facility administration to meet monthly to conduct MAC meetings. Reports shall be tailored to include all information requested by the administration. To ensure contract compliance and the quality of healthcare provided in the facilities, these joint meetings shall be held to monitor performance and make recommendations for improvement. Chaired by Contractor's Program Manager, the meeting shall foster open communication and cooperative efforts between SDSD personnel and our personnel. Contractor's Program Manager shall review trends and internal findings with the appropriate jail leadership. Contractor personnel shall conduct quarterly medical audits to include:

2.3.26.5.1.    Chart Reviews
2.3.26.5.2.    Occurrence Screens
2.3.26.5.3.    Indicator-Driven Reviews
2.3.26.5.4.    Drug Usage Evaluations
2.3.26.5.5.    Morbidity and Mortality Reviews

2.3.26.6.    Ongoing Quality Assurance activities shall focus on the following goals: 2.3.26.6.1.

Monitoring utilization, resource consumption and clinical practice patterns.
2.3.26.6.2.    Ensuring appropriate admissions to internal or external skilled nursing facilities, including community hospitals, with adequate justification for length of stay.
2.3.26.6.3.    Ensuring the timely collection and reposting of accurate information for clinical and financial decision making.
2.3.26.6.4.    Implementing discharge-planning efforts to streamline hospitalizations.
2.3.26.6.5.    Identifying high-risk patients.
2.3.26.6.6.    Providing quality care; and
2.3.26.6.7.    Recommending quality issues that may be appropriate for clinical updates, policy and/or procedure change.

2.3.26.7.    The CQI Program shall be comprised of the following reviews and studies:

Ex. G - 493

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.26.7.1.    Independent Review: The evaluation of a healthcare professional's compliance with discipline- specific and community standards, including an analysis of trends in a practitioner's clinical practice.

2.3.26.7.2.    Peer Review: A process wherein, at set intervals or by special requests, the medical practices and management of a given practitioner are reviewed by another practitioner at the same or higher level. The clinical performance of the facility's primary care providers is reviewed annually. The On-site Medical Director shall provide oversight and quality chart checks every six months.

2.3.26.7.3.    Process Quality Improvement Study: Examines the efficiency of the healthcare delivery process. Primary focus of a study may be on "high-volume," "high-risk," or "problem-prone" services of care. One example of an annual process study that Contractor performs is the process of documentation on the electronic medication administration record (eMAR) in TechCare. The expected process is for the nurse to enter documentation on the eMAR for every scheduled medication administration (without exception).

2.3.26.7.4.    Outcome Quality Improvement Study: Examines whether expected outcomes of patients' healthcare were achieved. Primary focus of a study may be on "high-volume," "high-risk," or "problem-prone" services of care. For example, Contractor is currently conducting outcome studies regarding our patients with diabetes to track the positive effect of mandated interventions on blood sugar values.

2.3.26.8.    Pharmacists shall perform a comprehensive medication review to identify, resolve, and prevent medication-related problems, including adverse drug events.

2.3.26.9.    Duplicate Therapy Avoidance: Contractor pharmacy staff shall be trained to promptly report unanticipated problems involving risk to patients. Pharmacists shall identify possible duplicate therapy orders and prevent prescribing medications of the same class for those patients.

2.3.26.10.    Dosing Recommendations: Contractor pharmacists shall provide dosing recommendations and medication information to ensure that patients' medications are given effective doses that are appropriate for the patient and the condition being treated, in order to prevent doses that are not therapeutic or may be toxic to the patient.

2.3.26.11.    Drug Interaction Avoidance: Through its prescription profiling activities, Contractor shall identify potentially severe or life-threatening reactions that could result from the actions of some medications when used together. Upon identification of possible adverse effects, the pharmacy staff shall notify the site staff within 24-hours.

2.3.26.12.    Continuous Monitoring of Medicated Patients: Through its CQI system, Contractor shall monitor patients' blood-pressures during drug administration. Contractor shall notify providers of all patients with elevated blood pressure or blood glucose readings, and ensure appropriate clinical action is taken. The pharmacy shall alert the onsite medical staff when immediate action needs to be taken to proactively promote patient safety of individuals that are being closely monitored through Contractor's medical records system.

2.3.26.13.    Identification of Chronic Care Patients: Using TechCare, the pharmacy staff shall analyze profiles with chronic care medications, identify chronic care patients who may not have been identified yet, and update the patient medical record, in order to ensure that patients are receiving adequate chronic care. Additionally, if a patient has been incarcerated for more than 30 days and has been receiving a chronic care medication but has not been flagged as a chronic care patient in the

**Ex. G - 494**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

medical record system, the pharmacy shall send out a second request for the patient to be re-assessed.

2.3.27. Peer Review

2.3.27.1.    Contractor shall ensure quality performance through a peer review process, random chart checks, and the utilization of the Focused Professional Practice Evaluation (FPPE) and the Ongoing Professional Practice Evaluation (OPPE).

2.3.27.2.    Contractor's procedures for Clinical Performance Reviews (Peer Reviews) shall comply with NCCHC Standards. The clinical performance enhancement process shall evaluate the appropriateness of the services provided by the facilities' contracted direct health care providers as defined in the Glossary, Section 4. The following provides a thorough description of Contractor's clinical performance reviews (also known as peer reviews), which are performed on required staff at least annually. Initial peer reviews on new staff occur within one year of their start date and no sooner than six (6) months from their date of hire. County employee peer reviews shall be conducted by designated county supervision.

2.3.27.3.    Clinical performance enhancement reviews are performed in the form of peer reviews and should include the name of the staff member being reviewed, the name and credentials of the reviewer, confirmation that the review was shared with the reviewed staff member, and a summary of the findings and corrective action, if necessary.

2.3.27.4.    All documentation regarding peer review activities is confidential and should be stamped "Peer Review" and filed in a secure place.

2.3.27.5.    A peer review log shall be maintained by the Program Manager and shall include the name of the individual being reviewed with credentials; the date of the last peer review; the initials and credentials of the person performing the review; and if a Corrective Action Plan (CAP) is required, the date that the CAP was done and when the CAP was completed.

2.3.27.6.    Reviews shall be documented on appropriate peer review forms, copies of which shall be held at the corporate office. The reviews shall determine compliance in areas such as:

2.3.27.6.1.    Completeness of necessary documentation.
2.3.27.6.2.    Appropriateness and thoroughness in addressing the health complaint.
2.3.27.6.3.    Documentation and appropriateness of the physical findings.
2.3.27.6.4.    Laboratory and diagnostic data and thoroughness of the care plan which should address all abnormal findings.
2.3.27.6.5.    Documentation of the need for consultations or other referrals to a higher level of care, where applicable.

2.3.28. Provider Competency and Compliance

2.3.28.1.    Contractor will be responsible for conducting clinical evaluations, providing oversight and review over subcontracted staff and providers, and will ensure the appropriateness of medical care. Contractor shall ensure medical treatments provided are commensurate with the community standard of care. Contractor in collaboration with the SDSD CMO shall implement procedures aimed to improve the health care provider's competence, when necessary.

Ex. G - 495

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.28.2.    Contractor shall work in collaboration with the SDSD to develop and implement key metrics and performance indicators. These key metrics and performance indicators shall include all health care related items required by this statement of work. Examples include but are not limited to:

2.3.28.2.1.    Timeliness of care
2.3.28.2.2.    Triage response time
2.3.28.2.3.    Specialty referral response time
2.3.28.2.4.    Chronic care management
2.3.28.2.5.    Preventative care
2.3.28.2.6.    Grievance types and response types
2.3.28.2.7.    Suicide and self-harm
2.3.28.2.8.    Behavioral health
2.3.28.2.9.    ED send outs
2.3.28.2.10.   Medication errors
2.3.28.2.11.   Infectious disease
2.3.28.2.12.   Health care compliance

2.3.28.3.    Contractor shall provide means of verifying/ensuring health services provider's competency and ongoing compliance with established policy and procedure in keeping with community standards. This shall include hands on and knowledge-based competency testing.

2.3.29.  Key Metrics and Performance Indicators

2.3.29.1.    Contractor shall monitor and meet all the areas of performance as set forth by the SDSD. Contractor shall ensure compliance at all SDSD detention facilities through the following:

2.3.29.1.1.    TechCare
2.3.29.1.2.    Policies and Procedures
2.3.29.1.3.    Quality Assurance Studies
2.3.29.1.4.    Contract Compliance Reports. This monthly report consists of the following data:
2.3.29.1.5.    Completed reception screens.
2.3.29.1.6.    Health assessments.
2.3.29.1.7.    Sick calls.
2.3.29.1.8.    TB tests.
2.3.29.1.9.    Yearly evaluations.
2.3.29.1.10.   Chronic care clinics.
2.3.29.1.11.   Off-site referrals.
2.3.29.1.12.   Pharmacy report.
2.3.29.1.13.   Lab reports.
2.3.29.1.14.   Diagnostic reports.
2.3.29.1.15.   Suicide watch.
2.3.29.1.16.   Medical Unit care.
2.3.29.1.17.   Detoxification numbers; and
2.3.29.1.18.   Other data requested by the SDSD.

2.3.29.2.    The Contract Monitor shall have access to offsite referral data, files, and data during the term of the agreement to monitor contract compliance. This data shall be readily available in a web-

**Ex. G - 496**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

accessible format, in which patient healthcare information can be viewed instantly. The Contract Monitor shall be notified of all patients who are receiving off-site care. TechCare captures all patient data, which allows reports to be modified should the SDSD's criteria change. Contractor shall submit statistical daily reports pertaining to medical services rendered, and a monthly contract compliance report to the Contract Monitor, to assist management with the efficient and direct correlation of contract compliance indicators.

2.3.29.3.    Standard management reports are a defined record of the status of workload, productivity, and patient activity in each facility. Contractor software implementation team shall work to configure these daily reports to meet the needs of the County. These reports can be viewed on a report dashboard within TechCare and/or sent securely to the management team via email on a scheduled basis. By default, the standard management reports shall contain the following details:

2.3.29.3.1.    Active patient counts
2.3.29.3.2.    Intakes completed
2.3.29.3.3.    Quantity and percentage of patients receiving care/medications for certain diagnosis
2.3.29.3.4.    Visits/Sick Call appointments/Chronic Care for Medical/Mental Health and Dental Care
2.3.29.3.5.    Scheduled by specialty and level of care (Provider, Nurse, etc.)
2.3.29.3.6.    Completed by specialty and level of care (Provider, Nurse, etc.)
2.3.29.3.7.    Medications
2.3.29.3.8.    Quantity ordered by category
2.3.29.3.9.    Quantity administered by category
2.3.29.3.10.    Quantity of missed or refused medications
2.3.29.3.11.    Quantity of non-formulary orders (approved and not approved)
2.3.29.3.12.    Diagnostic Labs/Radiology
2.3.29.3.13.    Quantity ordered/received/reviewed
2.3.29.3.14.    Quantity of non-formulary orders (approved and not approved)
2.3.29.3.15.    Quantity abnormal results
2.3.29.3.16.    Offsite/Hospitalization
2.3.29.3.17.    Quantity of patients hospitalized
2.3.29.3.18.    Offsite appointments scheduled for the day/town trips
2.3.29.3.19.    Patients sent to Emergency Room
2.3.29.3.20.    Observation/Medical Housing/Mental Health Housing
2.3.29.3.21.    Quantity of patients admitted/discharged to medical unit or observation
2.3.29.3.22.    Quantity of patients admitted/discharged to medical or mental health housing
2.3.29.3.23.    Average length of stay calculated by medical/mental health housing unit
2.3.29.3.24.    Productivity reports by facility, user, and user role.

2.3.29.4.    The information gathered and stored as part of these daily management reports shall be aggregated to form monthly, quarterly, and annual reports that clearly show trends and drive decision making.

2.3.29.5.    Statistical Daily Reports pertaining to medical services rendered are submitted to Administration, and a monthly healthcare compliance report to the Contract Monitor, administrators, and/or their designees, to assist management with the efficient and direct correlation of contract compliance indicators, including:

2.3.29.5.1.    Completed intake screens
2.3.29.5.2.    Sick calls
2.3.29.5.3.    TB tests
2.3.29.5.4.    Chronic care clinics

Ex. G - 497

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| 2.3.29.5.5. | Off-site referrals |
| 2.3.29.5.6. | Pharmacy report |
| 2.3.29.5.7. | Lab reports |
| 2.3.29.5.8. | Diagnostic reports |
| 2.3.29.5.9. | Suicide watch |
| 2.3.29.5.10. | Medical Unit care |
| 2.3.29.5.11. | Detoxification numbers |
| 2.3.29.5.12. | Other data requested by the facility |

2.3.29.6.    Contractor shall provide full availability of information to all interested parties. The Contractor will utilize their chosen technical aid (TechCare EHR) to generate reports to address both operational and administrative concerns. The Contractor will directly contact the selected county representative for urgent operational concerns. Examples to include, but are not limited to:

| | |
|---|---|
| 2.3.29.6.1. | Missed medical and mental health screenings based on the population every 24 hours. |
| 2.3.29.6.2. | Abnormal blood pressure and blood glucose readings. Warnings are sent to the charge nurse for follow-up. |
| 2.3.29.6.3. | Medication exceptions are sent to the charge nurse for follow-up. |
| 2.3.29.6.4. | Changes in clinical presentation – patients with chronic care disease |
| 2.3.29.6.5. | Missing TB CXR or TST |

2.3.29.7.    The Contractor will use TechCare to create automated reports and will coordinate with the QA/QI representatives and committee for administrative concerns. Examples to include, but are not limited to:

| | |
|---|---|
| 2.3.29.7.1. | Sick Call trends and issues, and timely completion of sick calls |
| 2.3.29.7.2. | Evaluation of ER send outs/hospital visits |
| 2.3.29.7.3. | Evaluation of the other statistical daily reports (SDR) |

2.3.29.8.    Contractor shall coordinate with local hospitals, medical centers, and other on-site/residential community facilities to provide regular individualized updates on patient care and treatment. Examples to include, but are not limited to:

| | |
|---|---|
| 2.3.29.8.1. | Daily Hospitalization Report—including reason for admission and length of stay. |
| 2.3.29.8.2. | Regular progress notes for hospitalized patients |
| 2.3.29.8.3. | Detailed Monthly Utilization Report—including detailed time frames for each process of the review. |
| 2.3.29.8.4. | Inpatient and Outpatient Statistical Report—by service and location. |
| 2.3.29.8.5. | Specialty Services—consults, procedures, and diagnostic services. |
| 2.3.29.8.6. | ER Trips—by service and location. |
| 2.3.29.8.7. | Utilization Review—by disease classification. |

2.3.29.9.    The SDSD can build reports within TechCare without having to contact Contractor separately. Contractor shall connect facility administrators with the medical team through TechCare, which provides full transparency and keeps SDSD informed of services throughout the detention facilities.

Ex. G - 498

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.30.  Onsite Medication Administration and Pharmaccutical Operations

2.3.30.1.  Contractor shall develop and implement procedures for on-site medication administration and the management of comprehensive pharmaceutical operations. Contractor pharmaceutical operations shall include but are not limited to:

2.3.30.1.1.  Immediate access to prescription medications for incarcerated individuals in SDSD custody from floor stock (non-patient specific) formulary medications, as well as provide timely filling (within 72 hours) of patient specific medications. The contractor will provide solid patient specific medications in blister pack packaging. The contractor will provide liquid, intravenous and injectable medications that include the necessary fluids and equipment for intravenous therapy.

2.3.30.1.2.  Provide Twenty-four (24) hours seven days a week consultative services by a licensed pharmacist by phone.

2.3.30.1.3.  Maintain accurate documentation and reporting pursuant to all current and new regulations pertaining to handling of all pharmaceuticals e.g., procurement, dispensing, packaging/repackaging, return/disposals, chain of custody as well as the operational deployment(prescribing/ordering/administering) of medications/pharmaceuticals.

2.3.30.2.  Contractor will provide all necessary equipment, supplics, medication, and labor toward fulfillment of the services, pharmaceuticals, and other durable medical goods requirements.

2.3.30.3.  Contractor will collaborate with SDSD Chief Medical Officer (CMO) for program design. Contractor's On-site Medical Director and corporate Chief Pharmacist shall be specific points of contact and coordination between Contractor and the SDSD CMO for program design of pharmaceutical operations.

2.3.30.4.  SDSD will conduct daily medication inventory to include stock, controlled and medication carts.

2.3.30.5.  Nursing staff will perform medication distribution functions at all sites in accordance with approved distribution schedules (e.g., 0800 hours and 2000 hours for BID dosing) or as otherwise prescribed by a licensed, credentialed health care provider. Distribution shall be conducted by SDSD Staff.

2.3.30.6.  Contractor and SDSD will provide for accurate documentation and reporting pursuant to all current and new regulations pertaining to handling of all controlled substances and pharmaceuticals associated with the treatment/management of substance use disorders (e.g., MAT). Contractor shall be responsible for the procurement, dispensing, packaging/repackaging, turn/disposals, licensing, and the chain of custody associated with these products.

2.3.30.7.  Contractor and SDSD shall develop and adhere to protocols for bridging medications (providing means of transitioning from stock medications to patient specific medications).

2.3.30.8.  Continuity of care services - vendor shall demonstrate a means of identifying/verifying and restarting patient specific community prescribed medications through the use of SureScripts, CURES, San Diego Health Connect (or subsequent replacement) or through other means. Validated medications need to be restarted within 12 hours unless the use of specialized

Ex. G - 499

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

pharmacies is required. Any delay in starting medications should be due to the validation process, not identifying/routing the request to a provider.

2.3.30.9.   Self-Administration and Keep-On-Person (KOP) Medication Services: Contractor shall collaborate with SDSD CMO with establishing and maintaining a self-dosed KOP medication program for all incarcerated individuals at all facilities who meet the criteria.

2.3.30.10.   All patients are eligible for participation in KOP Medication Services, except the following:

2.3.30.10.1.   Any patient identified as ineligible by the health care staff for reasons including, but not limited to, non-adherence despite counseling; hoarding medication; exchanging medications with another patient; possession of an expired medication; possession of another patient's medication; abuse of self-administration guidelines; or any other reason which would interfere with the self-administration of medication or compliance with treatment plans.

2.3.30.10.2.   Patients who have chronic or episodic symptoms of psychosis, significant and/or ongoing behavior patterns of self-injury, serious mood disorders, or impulse disorders affecting judgment.

2.3.30.10.3.   Infirmary level care patients; and

2.3.30.10.4.   Patients in segregation who are assessed to be at risk for self-injury.

2.3.30.11.   Stable patients receiving mental health treatment may self-administer non-psychotropic medication only with the documented order/consent of the treating mental health provider and approval of the On-site Medical Director if the mental health provider is not a Contractor employee.

2.3.30.12.   Documentation of the mental health provider's consent to self-administration of medications shall be listed on the patient problem list, along with the rationale explained in a progress note or mental health chart form.

2.3.30.13.   If applicable to the facility, the appropriate flag shall be assigned allowing or disallowing participation in the KOP Program. If no flag is available, then a treatment order shall be placed on the eMAR.

2.3.30.14.   The decision to allow self-administration of medication shall immediately be reversed should the patient become self-injurious. If the decision is reversed, "not Eligible for SAM (self-administered medication)/KOP program" shall be entered on the problem list. Appropriate flag and/or treatment order should be added/removed.

2.3.30.15.   Medications excluded from the self-administration program include, but are not limited to, the following:

2.3.30.15.1.   Psychotropic medications (regardless of whether prescribed for mental or physical health reason(s).

2.3.30.15.2.   Controlled substances.

2.3.30.15.3.   Liquid and injectable medications.

2.3.30.15.4.   Anti-retroviral medications.

2.3.30.15.5.   INH and other tuberculosis medications.

2.3.30.15.6.   Any situation where the On-site Medical Director or public health authority believes that directly observed therapy (DOT) is warranted; and

Ex. G - 500

Case 3:20-cv-00406-AJB-DDL   Document 796-2   Filed 01/21/25   PageID.34491
Page 238 of 546
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.30.15.7.    Any other medication identified as causing potential harm or abuse within the individual facility as determined by the On-site Medical Director.

2.3.30.16.    All patients who are given self-administered medication must be asked to read and sign the Informed Consent-KOP form found in TechCare and on Contractor online under informed Consent-KOP. All paper consents shall be scanned into the health record. A copy of the consent shall be given to the patient to keep with the medication to show security if the need arises.

2.3.30.17.    All medications for self-administration shall be blister packaged except for some medications where blister packaging is determined by Sheriff to be unnecessary, such as nitroglycerin and medication received from a local approved source (i.e., health department). Efforts shall be made to have these medications blister packed if possible.

2.3.30.18.    All inhalers, ophthalmic or optic preparations, topical creams, ointments, soaps, etc. shall be dispensed in their original container with proper labeling for self-administration.

2.3.30.19.    Patients may request a refill of medication when current package is within five days of completion. The patient may possess up to a thirty-day supply of each medication in addition to the remaining five days' supply in the previous packages. After the patient receives the refill, and the remaining five-day supply is finished, the empty package shall be returned. If the remaining medication is for greater than five days, the patient shall be instructed to complete the medication and then exchange the package for the refill.

2.3.30.20.    Nursing staff shall review medication refill requests and determine whether the medication is a chronically administered medication (i.e., Hypertension) and shall consult with an advanced clinical provider regarding the renewal order.

2.3.30.21.    If the medication refill request is clearly not one to be renewed the request shall be returned to the patient with instruction to return to sick call to discuss medication renewal.

2.3.30.22.    SAM/KOP medications shall be provided during regular medication pass times. Medical staff shall sign the eMAR indicating that the medication has been provided.

2.3.30.23.    Medical staff shall determine whether the patient is segregated or has been released or transferred. Any KOP medication not picked up within three days shall be returned to the medication room and properly disposed of following mutually agreed upon policies and procedures.

2.3.30.24.    Contractor shall conform to applicable state and federal regulations regarding prescribing, dispensing, administering, procuring, and disposing of pharmaceuticals.

2.3.30.25.    Contractor's pharmacy management policies and procedures shall ensure the following:

2.3.30.25.1.    Efficient, accurate pharmaceutical ordering – ensures adequate and appropriate supplies & minimal use of emergency ordering.

2.3.30.25.2.    Storage & security of drugs, syringes, needles, dispensing instruments, & instruments.

2.3.30.25.3.    Close monitoring of drug prescribing patterns.

2.3.30.25.4.    Maintenance of patient profiles at the pharmacy with drug allergies & drug interaction alerts noted.

2.3.30.25.5.    Control inventory.

2.3.30.25.6.    Renew prescriptions to avoid any interruption or delay in drug dispensing.

Ex. G - 501

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.30.25.7.   Develop and utilize quality improvement tools to monitor psychotropic drug usage and poly-pharmacy issues.

2.3.30.25.8.   All prescriptions shall be labeled in accordance with applicable state and federal regulations. Contractor shall provide for electronic submission and prescriptions tracking.

2.3.30.25.9.   Routine reporting of current prescriptions that shall expire within five days, unless the prescription was specified as a one-time prescription, and

2.3.30.25.10.   Proper disposal of all unused drugs.

2.3.30.26.   Contractor pharmacists shall provide a thorough clinical review of drug orders as new prescriptions are electronically sent to the Contractor Pharmacy.

2.3.30.27.   Contractor will verify real-time prescriptions for safe dosage, allergies, specified length of time, need for drug, and duplications.

2.3.30.28.   Clinical Pharmacist Quality Assurance Management Process: Contractor shall provide clinical and administrative pharmacy support, to include all stated NCCHC standards and criteria for facility/site inspections.

2.3.30.29.   When incarcerated individuals first enter the detention facility, onsite Contractor staff shall identify any current or needed medications as part of the Receiving Screening. Medication orders are entered into the TechCare eMAR, ensuring that all medication activities are tracked.

2.3.30.30.   When the provider reviews and approves orders in the TechCare eMAR, the Pharmacy Quality Assurance Management Process shall begin. Contractor's pharmacists shall review all orders for accuracy. All activities that compose the Clinical Pharmacist Quality Assurance Management Process shall be completed within 24 hours of when the order is entered into TechCare Mondays through Friday and within 48 hours for orders entered into TechCare Saturday and Sunday.

2.3.30.31.   Contractor shall assign a dedicated pharmacy team to each facility. This team shall be available to assist with clinical questions, make medication recommendations, monitor psychiatric and chronic care medication compliance, and assist the on-site staff with any medication-related questions or requests.

2.3.30.32.   Contractor shall adhere to a comprehensive drug formulary allowing medical practitioners and psychiatrists to follow generally accepted clinical practice patterns in their medical management of incarcerated individual patients.

2.3.30.33.   A formulary of drugs shall be made available, inclusive of psychiatric drugs and drugs for the treatment of HIV.

2.3.30.34.   Records of non-formulary requests and responses shall be maintained for the term of the contract for trending and analysis purposes.

2.3.30.35.   Contractor shall actively participate and assist in maintaining and enforcing drug formulary, protocols, policies & procedures and shall work to manage the formulary to control costs and ensure effective clinical care. Clinical experts shall share information regarding the 'best practices' in formulary management techniques based on experience with clients and healthcare organizations. Where non-formulary medications are requested, Contractor's pharmacy reviews the order to determine whether the non-formulary medication is justified. The pharmacy either approves the non-formulary medication or refers the order to a physician to discuss with the prescribing provider. Contractor typically approves non-formulary orders.

Ex. G - 502

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.30.36.    Contractor and SDSD shall develop an efficient, structured medication pass process for the SDSD facilities that uses electronic medication administration record (eMAR) and complies with NCCHC standards. Medication Administration, including refusals, disbursement of KOP medications, and re-ordering medications shall be accomplished utilizing the eMAR.

2.3.30.37.    Contractor's eMAR is included within TechCare as part of Agreement 558056.

2.3.30.38.    Contractor and SDSD shall develop policies and procedures for provision of medications to patients leaving the jail facilities upon discharge for continuity of care, and Contractor will provide discharge medications accordingly. Contractor will provide discharge medications at its costs up to a total annual cost of $108,000 per year. Any cost of discharge medications in excess of this cost will be billed back to the County at Contractor's cost without addition of markup or fees.

2.3.31.  Diagnostic Services

2.3.31.1.    Contractor shall provide and utilize diagnostic services when clinically indicated and ordered by a provider. This shall include the provision of all necessary onsite and off-site diagnostic services for patient care and make provisions for the interpretation and support of imaging studies and lab support. This will include staff training for Point of Care Testing (POCT) as defined in the Glossary, Section 4.

2.3.31.2.    Contractor shall ensure each SDSD facility operates in accordance with the California Department of Health, Division of Radiation Safety and Environmental Management (DRSEM). This includes all regulatory requirements as it pertains to the following:

2.3.31.2.1.    Radiation Safety: Develop, document, and implement a radiation protection program with the use of X-ray machines to ensure compliance with regulations.

2.3.31.2.2.    Inspections/Audits: Maintain documentation of required physicist testing and calibrations of each X-ray producing unit.

2.3.31.2.3.    Licensure: Submit required applications to possess radiation producing equipment, such as X-ray machines.

2.3.31.2.4.    Quality Control/Assurance Management: Maintain documentation required daily testing of each Radiation producing equipment.

2.3.31.3.    The following details the workflow process within TechCare, the Picture Archiving Communication System (PACS), and the Contractor Portal to achieve the full life cycle of an image diagnostic and result:

2.3.31.3.1.    Order Placement: Like the laboratory diagnostic order process followed by the County, Contractor shall update the TechCare application to better manage the initial order of radiology and ultrasound studies.

2.3.31.3.2.    Order Management: All image diagnostic orders shall be managed on this dashboard which shall allow for action to be taken on the status of the order such as approving orders placed by a non-provider. This workflow can be customized to the County's process.

Ex. G - 503

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.31.3.3.    Schedule: Approved orders shall be automatically sent to the PACS system including scheduling details, modalities, and other details pertinent to the study.

2.3.31.3.4.    Acquisition: County staff shall use PACS to manage the acquisition of studies and to store the images.

2.3.31.3.5.    Update: PACS shall inform the TechCare system when studies have been acquired and shall allow for automated alerting and reporting of the radiology staff.

2.3.31.3.6.    Read: Using the Contractor Secure Portal, radiology staff shall review the studies and provide results in the PACS system.

2.3.31.3.7.    Results: Results shall be automatically sent to TechCare from PACS and stored directly in the patients' chart and the provider dashboard for review and sign-off following the County's workflow.

2.3.31.4.    To accomplish the above workflow, Contractor has implemented an interface between PACS and TechCare.

2.3.31.5.    As a part of included services for the interface and workflow described, Contractor shall provide the following additional items:

2.3.31.6.    Real-time, 24/7 Monitored Interface – Contractor shall proactively monitor the interface between TechCare and the PACS system and address issues before they impact care.

2.3.31.7.    Single Point of Contact – As the maintainer of the TechCare system, Contractor shall be the single point of contact for all items related to the provision of radiology services. Contractor shall work directly with PACS should the need arise.

2.3.31.8.    TechCare Upgrade – The contractor shall provide necessary system upgrades to the TechCare EHR system as it relates to Radiology Services and image diagnostic management within TechCare. This module shall be customized for the County without additional cost and shall be a part of ongoing services. This includes:

2.3.31.8.1.    Smart Approval Dashboard
2.3.31.8.2.    Direct discussion/alerts with ordering provider
2.3.31.8.3.    Simple view of full audit trail
2.3.31.8.4.    Efficient Review Process

2.3.31.9.    Contractor's laboratory services will be provided by Quest Laboratories or a similar vendor to provide offsite routine and STAT diagnostic labs.

2.3.31.10.    Contractor shall procure and provide the facilities with access to point of care testing. County and/or contracted staff will provide the function for the following:

2.3.31.10.1.    COVID Antigen Testing (when availability allows)
2.3.31.10.2.    Pregnancy
2.3.31.10.3.    Drug Testing
2.3.31.10.4.    Fentanyl Testing
2.3.31.10.5.    PT/INR Testing
2.3.31.10.6.    Hemoglobin (Hgb)Testing
2.3.31.10.7.    Blood Glucose Testing
2.3.31.10.8.    Hgb A1C Testing
2.3.31.10.9.    Urine Dip Testing

Ex. G - 504

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.32. Vaccinations and Immunization Program

2.3.32.1.    Contractor shall implement and provide an immunization program. Vaccinations shall be offered and provided as clinically indicated in compliance with the Center for Disease Control (CDC) immunization schedule guidelines. SDSD infection control nurse is responsible for this program currently.

2.3.32.2.    Contractor shall coordinate with the SDSD infection control staff and other county public health entities as needed or required (HHSA, PHL, epidemiology, etc.). The immunization program shall follow CDC guidelines and includes the following actions:

2.3.32.2.1.    Flu shots are administered seasonally, first to all high-risk individuals, then to the general population as the vaccine is available.

2.3.32.2.2.    Tetanus immunizations are updated with any injury as clinically indicated.

2.3.32.2.3.    Pneumococcal vaccinations are offered to high-risk patients after evaluation with a provider during chronic care clinics, as clinically indicated.

2.3.32.2.4.    All other vaccinations to include COVID vaccines shall be offered and discussed during the intake process. All others shall be offered and discussed as clinically appropriate during a clinical encounter or during their annual preventative visit with a provider. Contractor shall not be financially responsible for providing the COVID vaccine and/or booster.

2.3.32.2.5.    Immunization documentation shall take place in the patient's EHR in TechCare and in the San Diego Immunization Registry (SDIR).

2.3.32.3.    Any other vaccinations or immunization programs requested after the initial execution of contract shall be through an amendment process and costs will be negotiated between Contractor and SDSD.

2.3.33. Health Care Clinics

2.3.33.1.    Contractor shall operate and manage onsite face-to-face health care clinics. This shall include SDSD nursing clinics and provider clinics.

2.3.33.2.    Contractor and SDSD shall implement site-specific sick call throughout the SDSD detention facilities. The daily sick call process shall meet the amended NCCHC 2018 standards, which require nursing face-to-face triage with the patient within 24 hours of receipt of a healthcare request. Furthermore, the daily sick call process shall meet any subsequent amendment of NCCHC standards that may occur in the future.

2.3.33.3.    Contractor shall provide flexible and timely scheduling services, to allow for the triage of sick call services ensuring same day response to urgent patient requests for health care services.

2.3.33.4.    Nursing sick call is conducted seven days a week, and physician sick call is conducted according to a set schedule agreed upon by Contractor and the facility. If a patient's custody status precludes attendance at sick call, then onsite health staff shall consult with sworn staff to make access to healthcare services possible.

Ex. G - 505

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.34. Vision Services Program

2.3.34.1.    Contractor shall implement a comprehensive vision services program. This shall include a comprehensive eye examination at the annual physical examination. Diagnostic and therapeutic plans for each problem area shall be developed and patient referred to specialty care services as clinically indicated.

2.3.34.2.    In the case of ophthalmological/ocular emergencies (lacerations, mechanical injuries, retinal detachment, chemical injury, or other trauma), Contractor shall refer the patient to ophthalmology, other physicians, or specialty services for care.

2.3.34.3.    Contractor's subcontracted provider is Institutional Eye Care (IEC) for the provision of prescription eyeglasses and onsite optometry services for the SDSD. Contractor may elect in the future to utilize a different subcontractor or otherwise arrange for the provision of onsite optometry and prescription eyeglass services consistent with all applicable contract requirements.

2.3.35. Radiology

2.3.35.1.    Contractor will provide on-site radiology services for incarcerated individuals in the custody of the SDSD consistent with the existing terms of Contract 563996, including continued use and maintenance of existing software interfaces.

2.3.35.2.    Contractor shall provide digital x-ray services at the designated detention facilities, cited in section 2.4, in accordance with x-ray clinic schedules.

2.3.35.3.    Additions and changes to the designated facilities may occur in the future and shall be provided to Contractor with advance 30-day notice. Additions and changes shall be at the sole discretion of the Sheriff's Department.

2.3.35.4.    Contractor shall provide coverage at pre-scheduled times and days at the designated facility. Additionally, Contractor shall have staffing available as replacement for unscheduled absences of regular staffing so as to not disrupt regularly scheduled facility x-ray clinics.

2.3.35.5.    Contractor's staff must be available for STAT requests on an as needed basis. STAT in this case means an x-ray exam that is required to be performed immediately (within 4 hours of requested time) as ordered by an attending physician.

2.3.35.6.    Contractor shall coordinate with medical staff that is responsible for scheduling the incarcerated individuals for examinations.

2.3.35.7.    Concurrent notification of all results shall be made to the Sheriff's Health Information Management Unit (HIM) staff and authorized medical staff to view all examination results, as well as download and print to CD or paper, the individual positive or negative results.

2.3.35.8.    Contractor shall administer and process x-ray exams on-site and transmit the images to an authorized diagnostic radiologist who will read the x-rays and provide diagnostic reports with the objective of obtaining a response within five minutes of examination. Reports and images shall be transmitted electronically via secured internet site for access by authorized medical staff.

2.3.35.9.    Workload and Schedule

Ex. G - 506

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.35.9.1.  Contractor shall provide services on the schedules that are outlined in Section 2.3.35.9.3. Strict compliance to the published schedules is required.

2.3.35.9.2.  Contractor shall provide and maintain up-to-date Points of Contact information which includes a central phone number and designated staff name(s) that shall function as scheduler, coordinator, and trainer to respond to Sheriff's staff inquires during any equipment failure or any non-conformance to required clinic schedules. Response times in these cases shall be within the hour.

2.3.35.9.3.  Contractor shall provide radiology services based on the average number of exams (based on January 1, 2019, to December 31, 2019, average exams) administered in the table below and according to the schedule below:

| ON SITE DIGITAL X-RAY SERVICE CLINIC SCHEDULE (ALL TIMES IN 24-HOUR CLOCK) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **FAC** | **MON** | **TUE** | **WED** | **THU** | **FRI** | **SAT** | **SUN** |
| **SDCJ** | 0800-1700 | 0800-1700 | 0800-1700 | 0800-1700 | 0800-1700 | 0800-1500 | 0800-1500 |
| | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 |
| **VDF** | 0800-1700 | 0800-1700 | 0800-1700 | 0800-1700 | 0800-1700 | 0800-1500 | 0800-1500 |
| | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 |
| **LCDRF** | 0800-1700 | 0800-1700 | 0800-1700 | 0800-1700 | 0800-1700 | 0800-1500 | 0800-1500 |
| | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 | 2000-0300 |
| **GBDF** | 0700-1200 | NONE | 0700-1200 | NONE | NONE | NONE | NONE |
| **SBDF** | NONE | NONE | NONE | 0700-1200 Every Other Thursday Only | NONE | NONE | NONE |

| Facility | Estimated Monthly Ave # of Exams |
|---|---|
| **EMRF/FAC8** | **Included with GBDF Estimate** |
| **GBDF** | 139 |
| **LCDRF** | 633 |
| **SBDF** | 9 |
| **SDCJ** | 1745 |
| **VDF** | 842 |
| **FORENSIC EXAMS** | 334 |
| **TOTAL ESTIMTED MONTHLY AVERAGE** | 3,702 |

Notes:

SDCJ: San Diego Central Jail

VDF: Vista Detention Facility

LCDRF: Las Colinas Detention and Reentry Facility

GBDF: George Baily Detention Facility (included EMRF & FAC 8)

SBDF: South Bay Detention Facility

Ex. G - 507

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

**SDCJ, LCDRF, and VDF are designated booking facilities. Schedules vary by facility.**

**STAT REQUESTS MAY BE REQUESTED AND SHALL BE PROVIDED WITHIN THE TIME FRAME SPECIFIED IN THE STATEMENT OF WORK (Contract Number 563996).**

*\*All X-Ray clinic schedules (includes weekends and holidays) are daily except when indicated. Schedules may only be changed as necessary and shall be at the sole discretion of the Sheriff's Department. Schedules for the three booking facilities (SDCJ, VDF, and LCDRF) are quite rigid and do not allow too much flexibility for changes and deviations.*

2.3.35.10.   Reports

2.3.35.10.1.   Contractor shall provide complete statistical reports monthly to the Contracting Officer's Representative ("COR") or his/her representative. Statistics shall include the number, type of all x-ray exams provided, including results (Positive/Negative), for each facility.

2.3.35.10.2.   A copy of this report shall also be attached to the monthly invoices sent to the Sheriff's Department and is subject to verification prior to payment.

2.3.35.10.3.   Contractor shall have in place a Quality Assurance (QA) review process which shall include measurement of accuracy of radiologist readings and must provide a QA written report to the Sheriff upon request.

2.3.35.10.4.   All radiology reports prepared and submitted by Contractor shall be subject to quality review by the Sheriff's Chief Medical Officer (CMO) or his designee. The Sheriff's CMO may at any time (at least on quarterly basis) request from the Contractor a quality review meeting to discuss and evaluate radiology reports previously submitted for accuracy.

2.3.35.10.5.   Dosimeter Reports shall be submitted to the COR or designated representative on a quarterly basis electronic means for all facilities. If an outside company has been delegated by the contractor to perform dosimeter readings, the Sheriff's COR must be notified of the company's information and results of dosimeter readings shall be furnished upon request at no cost.

2.3.35.10.6.   Contractor shall provide any other special reports pertaining to utilization/results upon request as required by the Sheriff at no additional cost to the County. This shall include individual request by Sheriff's medical staff and other parties (only as specifically authorized by the Sheriff) for retrieval of specific x-ray exam result(s) and digital image(s) downloaded onto CD/DVD or any other acceptable computer media.

2.3.35.11.   Maintenance of Files and Close-Out

2.3.35.11.1.   Contractor shall store and maintain within the State of California all radiographic records, both hardcopy and electronic, for a period of at least eight (8) years after the date of last radiographic examination performed under this contract and shall make these records available upon request.

2.3.35.11.2.   Contractor shall provide ready access to all archived reports and examination results to authorized medical staff via internet or downloaded files onto appropriate media (e.g. CD, DVD, flash drives) at no additional cost.

Ex. G - 508

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.35.11.3.   On completion or termination of contract, Contractor shall return all records to the COR or his/her representative within ten (10) working days all material constituting or containing confidential information. Contractor shall not thereafter use, reproduce, or disclose such information to any third party.

2.3.35.12.   Additional Service Agreements

2.3.35.12.1.   Contractor shall administer digital x-rays of any body part on an incarcerated individual on an as needed basis upon request by authorized law enforcement staff from the Sheriff's Detention Investigation Unit (DIU) in connection with forensic investigations.

2.3.35.12.2.   The request for forensic x-ray exam shall be originated by staff for the Sheriff's DIU Unit. Forensic x-ray exams shall be performed during existing regularly scheduled x-ray clinics within the respective detention facility on an as needed basis.

2.3.35.12.3.   The forensic x-ray exam reports shall be identified as such in the monthly reports and invoice documentations.

2.3.36.   Patients with Disabilities and Americans with Disabilities Act (ADA) Requests

2.3.36.1.   Contractor shall implement a program that identifies and provides services for patients with disabilities as defined by the Americans with Disabilities Act (ADA). This would include processes for the administration, issuance and use of durable medical equipment.

2.3.36.2.   Contractor shall work closely with the County and its facilities to ensure patients protected under the ADA have access to medical services, programs, and activities and do not suffer discrimination related to their disability.

2.3.36.3.   Contractor understands that compliance with accrediting bodies such as NCCHC does not guarantee compliance with ADA requirements. Staff training programs, treatment guidelines, and policies and procedures shall address ADA requirements and incorporate them into the health services programs to ensure the needs of patients with disabilities are met and services under this Agreement comply with the ADA.

2.3.36.4.   Contractor shall communicate special needs patient issues and needs to the SDSD through participation in a Special Needs Committee, as part of routine multidisciplinary meetings, and any other agreed upon method of communication.

2.3.36.5.   Contractor shall ensure the MAT program developed for and with the SDSD fully meets any ADA requirements to provide substance use treatment to patients with an opioid use disorder as found by the courts in these decisions.

2.3.36.6.   Contractor shall be required to respond to all ADA requests from the California Department of Corrections and Rehabilitation and attorneys representing ADA complainants. Contractor shall respond to patient and family requests as necessary.

Ex. G - 509

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.36.7.   Contractor shall provide access to medical and mental health care 24 hours per day, seven (7) days per week at all facilities via on-site providers when necessary, STATCare, telemedicine, and on-call services. This shall include the use of SDSD staff.

2.3.36.8.   Contractor shall provide interpreting over the phone in more than 240 languages, as well as video remote interpreting for the deaf and hard of hearing.

2.3.37.  24/7 Access to Care

2.3.37.1.   Contractor shall provide 24 hour/seven days a week coverage by licensed and/or certified health care professionals at all detention facilities.  24 hour/seven days a week coverage by licensed and/or certified health care professionals will be required at EMRF and SBD once SDSD vacancies are filled for those facilities.

2.3.37.2.   Contractor personnel shall be in good standing and maintain unencumbered licenses, certifications and registrations required by the State of California to perform services.

2.3.38.  Coordination and Communication with SDSD Employees

2.3.38.1.   Contractor shall coordinate and communicate with designated SDSD employees to ensure cross-discipline collaboration, coordination, and integration of all requirements detailed in the Statement of Work. This shall include case planning, training, facility operations, and any other operationally significant activity. This shall also include coordination, communication, and collaboration with San Diego County Health and Human Services Agency as directed by the SDSD.

2.3.38.2.   Contractor shall identify personnel who shall work collaboratively with sworn personnel in implementing the plan of care safely, timely and consistent with security regulations described in SDSD policy. Contractor's staff shall coordinate closely and communicate regularly with facility administration and security. Contractor's staff shall participate in regular Multidisciplinary Collaboration Team (MCT) meetings that include sworn administration, classifications, housing officers, medical administration, mental health providers and staff, and infection control personnel.

2.3.38.3.   Contractor shall establish a daily communication protocol with SDSD administrative staff and coordinate closely with the administrative and sworn staff in the facilities regarding sick call, off-site appointments, medication distribution and other medical services.

2.3.38.4.   Contractor's onsite Program Manager shall serve as a point of contact for sworn personnel in coordinating services. The Program Manager shall coordinate with the SDSD on facility security workflows for clinical operations.

2.3.38.5.   Contractor shall work with the SDSD to establish a system of regular communication and collaboration. Examples include the following:

2.3.38.5.1.   Regularly scheduled overall Service Delivery Meetings with tangible metrics and clear follow-up action items.

2.3.38.5.2.   Recurring Domain-specific Meetings (i.e., Radiology, Mental Health, JBCT) aimed at areas of opportunity for advancement.

Ex. G - 510

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.38.5.3.   Consultation and support to SDSD (i.e., NCCHC Preparation, PLO Auditing, etc.)

2.3.38.5.4.   Joint recruiting efforts and events to include nursing, medical care, mental health care, corrections, etc.

2.3.38.5.5.   Joint employee events with Contractor and the SDSD to build team unity and boost morale.

2.3.38.5.6.   Joint training opportunities and events (Contractor, sworn staff, Nursing, Mental Health Crisis).

2.3.38.6.   Contractor shall attend SDSD meetings when requested to understand goals, directives, and needs from the SDSD for consolidated healthcare services. Contractor shall participate in SDSD committees as requested.

2.3.38.7.   Likewise, Contractor shall ensure appropriate SDSD representation is requested for participation in required meetings and committees to include the following:

2.3.38.7.1.   CQI Committee
2.3.38.7.2.   Infection Control Committee
2.3.38.7.3.   Medical Audit Committee
2.3.38.7.4.   Morbidity and Mortality Committee
2.3.38.7.5.   Special Needs Committee

2.3.38.8.   Contractor's onsite program leadership shall serve as liaisons with SDSD to ensure coordination and communication across onsite services.

2.3.38.9.   Contractor's onsite leadership includes the following positions:

2.3.38.9.1.   Program Manager
2.3.38.9.2.   Medical Director
2.3.38.9.3.   Mental Health Director

2.3.39.   Unimpeded Access to Health Care

2.3.39.1.   Contractor shall provide health care to patients in a timely manner and with privacy while practicing within the scope of each employee's professional licensure, remaining in compliance with NCCHC Standard J-A-01, Access to Care.

2.3.39.2.   The Program Manager/designee shall notify the corporate office of any potential barriers to access of care.

2.3.39.3.   Contractor shall work with sworn staff to address any access to care issues, including centralizing patients undergoing withdrawal, to the extent possible.

2.3.40.   Responsibility for Costs Associated with Provision of Comprehensive Health Care

Ex. G - 511

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.40.1.    Contractor shall be responsible for all costs associated with the provision of comprehensive health care to individuals in the custody of San Diego Sheriff's Department except for the following:

2.3.40.1.1.    County shall be responsible for all costs associated with SDSD staff including, but not limited to, the costs of salary, benefits, and overtime.

2.3.40.1.2.    Contractor shall not be responsible for any costs incurred prior to booking of individuals into the SDSD facilities. Costs, prior to booking, will be assumed by the patient's insurance company or corresponding hospital who admitted patient.

2.3.40.1.3.    Should the annual cost of providing discharge medications exceed $108,000 per year, Contractor will bill back to the County any costs above $108,000 for reimbursement at Contractor's actual cost without any added markup or fees.

2.3.40.1.4.    County will reimburse Contractor for the cost of any COVID testing or COVID vaccinations or the cost of any additional testing or vaccinations required by the Health Department or the County.

2.3.40.1.5.    Contractor will not bear any financial responsibility for mental health offsite hospitalization including any costs incurred for mental health hospitalization at a State of California, Department of State Hospitals facility.

2.3.40.1.6.    Contractor will provide medical records for secure download electronically from the NaphCare cloud.

2.3.40.1.7.    Contractor will continue to bill SDSD for the Electronic Health Record System pursuant to the terms of Agreement 55806 and all amendments thereto, which will remain in full force and effect.

2.3.40.1.8.    Contractor will continue to bill the County for radiology services consistent with the terms of existing Contract No. 563996 and all amendments thereto, the terms of which are fully incorporated into this agreement, such that on the effective date of this Agreement, the existing Agreement No. 563996 will no longer be in effect and its relevant terms and conditions will be fully incorporated and reflected in this agreement as set forth below.

2.3.40.1.9.    Contractor will not be responsible for costs associated with the non-emergency transportation of incarcerated individuals. Contractor will not be financially responsible for transplants and/or experimental procedures. Contractor will be financially responsible for the maintenance of patients who have had transplants prior to custody. Contractor will not be financially responsible for the provision of elective medical care to incarcerated individuals. Contractor will not be responsible, financially or otherwise, for providing health care services to an infant following birth.

2.3.40.2.    Payment for the services performed under this Agreement shall be in accordance with Exhibit C, unless other payment methodologies are negotiated and agreed to by both Contractor and County. Contractor shall submit approved invoices monthly to the Contracting Officer's Representative ("COR") for work performed in the monthly period, accordingly. Contractor's monthly invoices shall be completed and submitted in accordance with written COR instruction.

Ex. G - 512

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.40.3.   County agrees to pay Contractor in arrears only after receipt and approval by COR of properly submitted, detailed and itemized original invoice referencing the Agreement number pursuant to Exhibit C. Invoice will be based on the unit price for each line item as set forth in Exhibit C. Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

2.3.40.4.   Contractor shall be entitled only to compensation, benefits, reimbursements, or ancillary services specified in this Agreement. Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

2.3.41.  Financial Responsibility for Equipment or Facility Damage

2.3.41.1.   Contractor shall assume the responsibility for current SDSD equipment and supplies and become the sole comprehensive healthcare provider related to the delivery of healthcare services. This shall include information about procurement, maintenance, and replacement of health care equipment. Contractor shall not be financially responsible for the purchase of any equipment or supplies from the County.  Contractor will accept full financial responsibility for maintenance and repair of all County-owned equipment, and such equipment will continue to be the property of the County until such time as it is replaced. Contractor understands that all equipment utilized by the current medical, mental health and dental vendors is owned by the County.  Contractor understands that medication carts are currently owned by the County's current pharmacy vendor. Contractor will either purchase medication carts from the pharmacy vendor or purchase new carts. Contractor will accept full financial responsibility for purchase of any new equipment as needed to replace County-owned equipment that has reached the end of its useful life, and Contractor shall maintain ownership of any new equipment purchased at Contractor's expense. Contractor shall maintain an inventory of equipment and the ownership status of each item.  See Contractor's Cost/Price Exhibit, submitted under separate cover for details and line-item pricing.

2.3.42.  Quality, Cost-Effective Healthcare Services

2.3.42.1.   Contractor shall provide quality, cost effective health care services to all incarcerated individuals in custody of the SDSD as outlined in their Technical Exhibit, price narrative, and line-item pricing charts.

2.3.42.2.   Contractor shall work with SDSD management and staff to ensure all patients have access to health care for medical, dental, and mental health needs in a timely fashion to include treatment for opioid and other substance use disorders as clinically indicated.

2.3.43.  Operational Space Needs

2.3.43.1.   Contractor shall coordinate with the SDSD regarding operational space needs, availability, and limitations. The SDSD has final authority for space needs.

2.3.44.  Operational Changes

Ex. G - 513

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.44.1.    The SDSD reserves the right to change the current location, configuration, and population of incarcerated individuals at each facility utilized by SDSD. Should there be a significant change or modification to state or federal laws or regulations, incarcerated individuals census, standards of care, scope of services, or the number of correctional facilities, coverage of such changes are not included in Contractor's proposal will be mutually negotiated between parties.

2.3.45.  Responsibility and Maintenance for Equipment and Supplies

2.3.45.1.    Contractor shall be financially responsible for all equipment or facility damage caused by their employees, subcontractors, or volunteers.

2.3.45.2.    In accordance with NCCHC J-D-03, Contractor shall ensure that supplies, equipment, and space allocations are sufficient to deliver all health care. The SDSD health care clinic areas shall be equipped and maintained to allow adequate private examination of patients and appropriate space for patients waiting for healthcare services.

2.3.45.3.    The Program Manager or designee shall be responsible for establishing supply and equipment inventories, reordering supplies as necessary, arranging equipment repair, conducting monthly checks of health care areas, and conducting weekly monitoring of the major inventory of sharps and tools.

2.3.45.4.    The following equipment and supplies shall be available in each treatment area (at a minimum):

2.3.45.4.1.    Hand-washing facilities or an alternative means of hand sanitizer.
2.3.45.4.2.    Examination tables, including the ability and supplies to perform a pelvic exam if females are housed on-site.
2.3.45.4.3.    Examination light (goose neck).
2.3.45.4.4.    Scales.
2.3.45.4.5.    Thermometer (manual and/or electronic).
2.3.45.4.6.    Sphygmomanometer.
2.3.45.4.7.    Stethoscope.
2.3.45.4.8.    Ophthalmoscope.
2.3.45.4.9.    Otoscope.
2.3.45.4.10.   Wheelchair, cane, walker, crutches, stretcher, etc.
2.3.45.4.11.   Oxygen.
2.3.45.4.12.   Automated external defibrillator.
2.3.45.4.13.   Pulse oximeter.
2.3.45.4.14.   Transportation equipment (e.g., wheelchair, stretcher).
2.3.45.4.15.   Biohazard and non-biohazard trash containers; and,
2.3.45.4.16.   Personal protective equipment.
2.3.45.4.17.   Medical and nursing manuals shall be available at each facility to all staff.

2.3.45.5.    Contractor shall be responsible for equipment and supplies needed to provide the services outlined in this Statement of Work at all facilities. Computers, printers, copy machines, fax machines, or peripherals that connect to the SDSD network are EXCLUDED from this requirement. For infrastructure security reasons, these items shall be supplied by the SDSD.

2.3.45.6.    Contractor partners with Edge Biomed, a national biomedical service company, to perform annual maintenance and calibration of medical equipment at manufacturer recommended intervals. Contractor shall utilize EDGE Biomed to perform equipment inventory, and regularly scheduled

Ex. G - 514

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

inspections and calibrations of all the medical equipment. In the event that Edge Biomed is unavailable, Contractor shall obtain a replacement company to perform inspections, maintenance, calibration, and inventory of medical equipment.

2.3.46. Software Compatibility

2.3.46.1.    Contractor shall ensure all software is 100% compatible with all current generation releases of the Operating System, Security Software, and Standard Computer Images within 90 days after the public release of the Operating System, Security Software, and 90 days after the first release of any new Desktop Computer Image (including Operating System, Security Software and Standard Office Applications) produced by the SDSD Data Services Division for general release within the SDSD Infrastructure. SDSD data services has final authority regarding installation and use of software.

2.3.47. Unexpected Situations and Critical Incidents

2.3.47.1.    Contractor shall implement procedures to deal with unexpected situations and/or critical incidents. Contractor shall immediately notify designated SDSD staff of any unusual or extraordinary health event at the SDSD facilities including but not limited to an incarcerated individual's death, serious injury that may lead to death, or other serious health condition that might impact Contractor's staff or SDSD incarcerated individual(s).

2.3.47.2.    Contractor shall have a reporting system in place for staff to report incidents, occurrences, and near misses in a non-punitive, non-judgmental manner. Contractor's Policy and Procedure shall outline requirements for the following:

2.3.47.2.1.    Incident Reporting – events such as staff, patient, or visitor injury, emergency patient transports
2.3.47.2.2.    Occurrence Reporting – includes sentinel events such as patient death, serious illness or injury, serious suicide attempts
2.3.47.2.3.    Medication Variance Reports – medication errors, adverse medication reactions

2.3.47.3.    Contractor shall provide parallel oversight and corporate committees that are actively involved in Patient Safety. Committee functions shall include:

2.3.47.3.1.    Morbidity and Mortality
2.3.47.3.2.    Infection Control
2.3.47.3.3.    Environmental Safety
2.3.47.3.4.    Continuous Quality Improvement
2.3.47.3.5.    Compliance

2.3.47.4.    All patient deaths shall require the performance of a thorough clinical mortality review.

2.3.47.5.    Contractor shall conduct a formal mortality review process at both the site and corporate level wherein all relevant clinical aspects and treatment are reviewed by the site and corporate committees. Contractor shall meet NCCHC standards in all mortality reviews; policy and

Ex. G - 515

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

procedure for Patient Deaths has been developed and written in compliance with NCCHC Standard J-A-09, Procedure in the Event of an Incarcerated Individuals Death.

2.3.47.6.    Patient deaths that occur under unusual circumstances shall also be investigated in accordance with state and local regulations. Contractor shall ensure accurate information and timely reporting and investigation of any patient death that occurs within the detention facility as well as ascertain appropriateness of clinical care and identify any trends requiring further study.

2.3.47.7.    Contractor's Mortality Review process shall include a review of the incident and preceding treatment, a root cause analysis, review of relevant procedures and documentation, pertinent service reports, and recommendations for corrective action. The goal is to identify, evaluate, and improve the quality and efficiency of health care; ensure accurate and timely reporting; and reduce morbidity and mortality.

2.3.47.8.    Contractor shall complete a Clinical Mortality Review within 30 days of an incarcerated individual's death. The review shall provide a summary of the facts surrounding the patient's death to determine compliance with Contractor's standard of care and to identify any deficiencies, training, and/or policies that may have contributed to the patient death.

2.3.47.9.    Sentinel events shall be identified and reported from the site level to the corporate office as per the Patient Safety policy. Incident statements shall be received from all involved staff members as soon as possible and prior to the employee leaving the facility.

2.3.47.10.    At the corporate level, sentinel events shall be tracked and monitored for identifiable trends and are subject to Root Cause Analysis to determine what, if any, actions can be taken to prevent future occurrences. At the site level, these occurrences shall also be tracked and, in conjunction with the corporate group, analyzed for corrective action.

2.3.47.11.    In the event of a patient death, the medical record shall be closed. Any final documentation for the health record not in the file at the time of death must be placed in the record by the Program Manager, along with the date and time of placement and signature. The Program Manager is responsible for ensuring appropriate and complete documentation is entered into the health record as soon as possible after a patient death, ideally within 24 hours. This record shall then be locked by placing the "Inmate Death" flag. Once a record has been locked, no additional information can be entered into the record. The record cannot be unlocked at the site level once the flag has been set.

2.3.47.12.    The advanced clinical provider in the patient's overall treatment shall complete a "Death Summary – Physician" within seven business days of the death. The death summary shall review the clinical care received by the patient and make any suggestion for improvement in retrospect. The advanced clinical provider shall review the patient's medical record as well as any other documents during the review process. Once completed, the report shall be sent to the corporate office.

2.3.47.13.    Contractor shall perform a systems-based "Root Cause Analysis" review, through which a thorough analysis attempts to identify fundamental problems that led to the immediate issue. The goal for critical incident analysis is to solve problems before they escalate and prevent future problems through promotion of a risk avoidance attitude among the healthcare staff.

2.3.47.14.    In the event of a patient death, the first responsibility of site staff is to cooperate with and notify appropriate authorities, including jail command staff and the Medical Services Division Executive Team. Contractor site leadership and corporate staff shall also be notified. Involved staff shall complete incident reports, and the On-site Medical Director shall prepare a case

Ex. G - 516

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

summary and analysis of the care, with any recommendations for improvement. In the event of a suicide, the mental health director shall prepare a psychological autopsy.

2.3.47.15.    Analysis in the local committee shall take place in two stages. If a concern with the emergency response or immediate care is voiced, a first meeting shall be held as soon as practical and always within 30 days of the event, to allow for rapid correction of identified issues. A second meeting may be held at a future time once all relevant documentation, such as hospital records and autopsy reports, is available.

2.3.47.16.    Critical Incident Debriefing – Any staff who have been negatively affected by the self-harm, suicidal act or in-custody death shall be aided by trained mental health professionals in a timely manner.

2.3.48.    Health Insurance Coverage

2.3.48.1.    Contractor shall identify all incarcerated individuals with health insurance coverage, including Medi-Cal, using information provided by SDSD or information obtained in the intake process or health screening procedure.

2.3.49.    Utilizing Private Health Insurance Providers

2.3.49.1.    Contractor shall utilize private health insurance providers, including Health Maintenance Organizations (HMOs), when applicable for health services.

2.3.50.    Administrative Services Organization
2.3.50.1.    Contractor shall operate and manage an Administrative Services Organization as a prime or through a subcontract for the SDSD Medical Services.

2.3.51.    Administration of Services Related to Health Services Program

2.3.51.1.    Contractor shall perform the day-to-day administration of specific services related to each of the health service programs covered in this contract including but not limited to the following:

2.3.51.1.1.    Acting as the fiscal intermediary for SDSD health care programs described in this request
2.3.51.1.2.    Administrating and managing of data collection and analysis
2.3.51.1.3.    Enrolling and eligibility verification
2.3.51.1.4.    Processing claims and finances
2.3.51.1.5.    Responding to complaints, grievance and appeals as required by law or SDSD policy
2.3.51.1.6.    Managing provider reimbursement funds
2.3.51.1.7.    Documenting service delivery and utilization
2.3.51.1.8.    Maintaining of provider networks to ensure network adequacy and access
2.3.51.1.9.    Providing utilization management

2.3.52.    Uninsured Incarcerated Individuals

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.52.1.   Contractor shall address uninsured incarcerated individuals. Current State Law allows the use of Medi-Cal for in-custody incarcerated individuals admitted to hospitals for acute care services (in-patient), and for incarcerated individuals in a detention facility awaiting adjudication previously eligible for Medi-Cal.  Contractor shall assist the County in ensuring that eligible in-patient hospital care is billed directly to the California Department of Health Care Services. Contractor shall work to enroll uninsured incarcerated individuals for Medi-Cal – either through the assistance of the hospital or onsite staff.

2.3.53.  Medi-Cal Enrollment Assistance

2.3.53.1.   Contractor shall provide Medi-Cal enrollment assistance for eligible incarcerated individuals. Any assistance provided shall not lead to a conflict of interest regarding payments received for medical care or violate any local, State, or Federal law or regulation. SDSD does not currently bill for Medi-Cal. Contractor shall work with contracted hospitals for enrollment of eligible inpatients. If the hospital does not assist with enrollment, discharge planning staff shall be available to assist patients with Medi-Cal enrollment.

2.3.54.  Medi-Cal County Inmate Program (MCIP)

2.3.54.1.   The County participates in the Medi-Cal County Inmate Program (MCIP). Contractor shall work with the SDSD regarding the Medi-Cal County Inmate Program (MCIP). This program provides federal Medicaid funds for eligible in-patient services. Under MCIP, Medi-Cal service providers are paid directly by the California Department of Health Care Services (DHCS) for eligible in-patient services and County reimburses DHCS for the nonfederal share of the MCIP costs as well as a proportionate share of the administrative costs of the program.

2.3.55.  Health Care Waste Disposal

2.3.55.1.   Contractor shall be responsible for health care waste disposal and associated costs. Contractor shall meet the responsibility of gathering and containing all trash and garbage generated by the medical/oral care and mental health services program including biohazard waste. Medical/oral care and mental health waste shall be handled according to pertinent waste disposal regulations and contained in appropriate and labeled containers that are provided by Contractor. At times, sworn staff may deem items as biohazard waste and utilize Contractor's waste containers. If Contractor or SDSD determines the usage of Contractor's waste containers by sworn staff materially impacts Contractor's budget, County shall reimburse Contractor for additional costs. Waste containers shall always be kept in a clean and satisfactory condition and emptied as often as necessary by Contractor to maintain sanitary conditions. Contractor's Program Manager, or designee, shall monitor and ensure sharps and biohazardous wastes are handled, stored, and disposed of in a safe and sanitary manner consistent with local, state, and federal regulations.

2.3.55.2.   Contractor shall utilize a qualified vendor to come to the facilities on a regularly scheduled basis to pick up and remove all medical, dental, and pharmaceutical waste.

2.3.55.3.   Contractor shall provide for the following at all facilities:

Ex. G - 518

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.55.3.1.  All patient care areas and rooms (medical/dental) shall have a red trash can for disposal of medical waste.

2.3.55.3.2.  All patient care areas and rooms (medical/dental) shall have a red container for disposal of sharps.

2.3.55.3.3.  The pharmacy and medications rooms shall have a special container for the disposal of pharmaceutical waste (Both hazardous and non-hazardous).

2.3.55.3.4.  Dental care areas shall have an additional container for the disposal of any regulated dental waste.

2.3.55.3.5.  All waste containers shall be monitored and emptied or replaced as needed by assigned personnel.

2.3.55.3.6.  Staff shall also receive the required OSHA and Cal/OSHA training as it relates to medical waste management practices.

2.3.56.  Trash Removal

2.3.56.1.  SDSD shall provide for all trash removal except medical/oral care waste.

2.3.57.  Shredding Services

2.3.57.1.  Contractor shall be responsible for shredding services for documents containing protected health information (PHI).

2.3.57.2.  Paper-based PHI is to be rendered unreadable and beyond reconstruction via shredding (P4 cross-cut standard), burning, pulping, or pulverizing.

2.3.57.3.  Electronic PHI on electronic media is to be rendered unreadable by being overwritten, purged, or destroyed via disintegration, pulverization, melting, incineration, or shredding.

2.3.58.  Inspections, Permit Fees, Equipment Calibration

2.3.58.1.  Contractor shall be responsible for any relevant inspections, permit fees, and equipment calibration for health care clinic areas. This includes any environmental inspections. Contractor shall implement a process to remedy any unsatisfactory inspection findings.

2.3.58.2.  Onsite staff shall perform regular environmental inspections to self-identify and correct any areas of non-compliance. If any areas of non-compliance are found on a NCCHC (or other auditing body) inspection, Contractor's corporate team shall develop and implement corrective action plans to remedy any areas of non-compliance.

2.3.59.  Applicable Federal, State, and Local Laws, Regulations, Policies and Procedure

2.3.59.1.  Contractor shall comply with all applicable Federal, State, and local laws, regulations, policies, and procedure, including but not limited to:

2.3.59.1.1.  Title 15, California Code of Regulations, Minimum Standards for Inmate Facilities and Local Detention Facilities.

**Ex. G - 519**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.59.1.2.    Sheriff's Medical Services Policies and Procedures

2.3.59.1.3.    California Penal Code

2.3.59.1.4.    California Welfare & Institutions Code

2.3.59.1.5.    California Government Code

2.3.59.1.6.    California Health & Safety Code

2.3.59.1.7.    Americans with Disabilities Act 2.27.8 42 U.S.C. 1396a

2.3.59.1.8.    HIPAA/HITECH Acts

2.3.59.2.    Should a change in the applicable Federal, State, and local laws, regulations, policies, and procedures cause the costs to provide health care services to increase to Contractor, the parties will meet and confer and adjust contract services, staffing and pricing as necessary.

2.3.60.  NCCHC Accreditation and Certification

2.3.60.1.    Contractor shall ensure services meet all applicable and current compliance indicators and standards for the National Commission on Correctional Healthcare (NCCHC) accreditation. The applicable standard as of the execution date of this contract is the NCCHC's 2018 Standards for Health Services. In the event a change in NCCHC guidelines or state standards (including but not limited to the applicable laws listed in Section 2.27 of RFP # 10827), Contractor and County shall meet and confer to negotiate the revision of services, staffing and pricing as necessary to remain in compliance with the new standards.

2.3.60.2.    Contractor shall cooperate and participate in the NCCHC accreditation process. Contractor's corporate Accreditation Department shall assist all SDSD sites in achieving and maintaining accreditation. The corporate accreditation staff shall maintain accreditation files and documents and shall operate a proactive system of always maintaining all requirements for accreditation. Contractor staff shall monitor each site for upcoming surveys and begin final preparation for the survey six months prior to the NCCHC visit. Preparation steps include an initial mock survey, development of a corrective plan to address all findings, and a final mock survey conducted by corporate employees that are trained NCCHC surveyors. County shall fully cooperate with Contractor and take measures to ensure that County employees follow Contractor recommendations regarding best practices to remain in compliance with all applicable NCCHC standards.

2.3.60.3.    Contractor shall adapt services in compliance with new or amended laws or regulations, changes in the NCCHC accreditation standards, or adoption of new best practices in the health care field mutually agreed upon by the Contractor and the SDSD. Should a change in laws, regulations, standards, or practices result in an increase of costs to Contractor, the parties will meet and confer and adjust contract pricing as necessary.

2.3.60.4.    Contractor shall be required to attain National Commission on Correctional Health Care (NCCHC) accreditation and certification within twelve (12) months of full operational transition. SDSD shall collaborate with Contractor as needed to attain NCCHC accreditation for each facility.

2.3.60.5.    Should a change in the applicable standards cause the costs to provide health care services to increase to Contractor, the parties will meet and confer and adjust contract services, staffing and pricing as necessary.

Ex. G - 520

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.61. Prison Rape Elimination Act

2.3.61.1.    Contractor shall adopt and comply with the Prison Rape Elimination Act of 2003, 42 U.S.C. 15601 et seq. (PREA), any applicable PREA standards (including 28 C.F.R. 115 et seq.), and any related County ordinances or Sheriff's Department policies regarding PREA for preventing, detecting, monitoring, investigating, and eradicating any form of sexual abuse. Such PREA standards require that all volunteers, officers, employees, agents, and subcontractors who have contact with residents under this contract receive training pursuant to 28 C.F.R. 115.332. Contractor shall provide Sheriff with documentation confirming that all volunteers, officers, employees, agents, and subcontractors understand the training they have received. Contractor acknowledges that the County shall monitor Contractor's compliance with PREA, any applicable PREA standards, and County ordinances or Sheriff's Department policies relating to sexual abuse and may conduct announced and/or unannounced compliance monitoring to include "on-site" monitoring. Failure to comply with PREA, including PREA Standards and County PREA policies, may result in termination of the contract.

2.3.61.2.    During the intake process, Contractor shall include a Prison Rape Elimination Act (PREA) question that includes screening for any history of emotional or physical abuse in or out of custody. Those that may qualify as a PREA event will be flagged and referred to both custody for investigation and medical and mental health services as clinically indicated for follow up. During the intake process patients shall be informed of available PREA medical and mental health resources.

2.3.62. Precedence in Disputes

2.3.62.1.    The SDSD Chief Medical Officer, the SDSD Director of Mental Health, or the San Diego County Public Health Officer's determinations shall take precedence in any disputes concerning appropriate health care standards and/or provision of care. This includes interpretation of applicable standards.

2.3.63. Compliance with Applicable Laws and Regulations

2.3.63.1.    Contractor shall implement a program to ensure compliance with all applicable laws and regulations, including but not limited to identifying how Contractor plans to stay updated on new legal requirements.

2.3.63.2.    Contractor's Chief Legal Officer shall be responsible for ensuring legal compliance in the contract with SDSD.

2.3.64. Electronic Health Record System (EHR)

2.3.64.1.    The EHR shall be the single source of health information about an incarcerated individual. The EHR system is the legal medical record and shall contain all elements of the designated record set.

2.3.64.2.    Contractor shall utilize TechCare as the Electronic Health Record System (EHR). Agreement 558056 for TechCare EHR stays separate and unaffected by this agreement.

Ex. G - 521

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.64.3.    Contractor shall coordinate with SDSD to create a seamless system of care between all onsite clinical staff utilizing the electronic health record system.

2.3.64.4.    Contractor shall document all patient care entries and patient related documentation into the EHR as required by SDSD policies and procedures, including the NCCHC Health Records Standard (J-A-08) and Title 15 (CCR § 1205. Health Care Records).

2.3.64.5.    Paper documents shall be digitally scanned and stored in the EHR by the ancillary staff upon receipt.

2.3.64.6.    Contractor shall execute and adhere to the specific health information privacy provisions outlined in the Business Associate Agreement (BAA). SDSD shall represent the Covered Entity, and Contractor shall represent the Business Associate in the BAA.

2.3.64.7.    Contractor shall ensure the use, confidentiality, and access to protected health information by limiting access to role-specific permissions in the EHR.

2.3.64.8.    Contractor shall address health care complaints and grievances in a timely manner and in accordance with SDSD policies and procedures; respective laws; and accreditation requirements. This shall include responses to third party complainants, attorneys, or other government agencies.

2.3.64.9.    Contractor shall document health care complaints and grievance responses/actions into TechCare and ensure designated SDSD staff are aware of all health care complaints and grievances.

2.3.64.10.    Contractor shall develop procedures for documenting patient care in the event the EHR is temporarily offline. These procedures shall include any after outage work that shall be done to upload information into the EHR. This procedure shall be reviewed annually for compliance and feasibility, updating as necessary.

2.3.64.11.    Any future changes to the TechCare EHR system which are requested by County shall be modified by mutual agreement of Parties and follow the process and associated costs defined in Exhibit 16.4 of Agreement 558056. Any future changes to the TechCare EHR system which are requested by Contractor or which support NCCHC accreditation shall be at the sole expense of the Contractor. County agrees to stay on the current version of the application and shall deploy updated versions of the application to County workstations on Contractor's set schedule. SDSD will utilize Contractor's preferred version of the application to meet NCCHC standards and their policies and procedures.

2.3.64.12.    SDSD shall ensure that all applicable Contractor and SDSD staff have simultaneous access to the patient's record within TechCare. SDSD shall provide access to TechCare for all on-site and remote Contractor employees. On-site access of Contractor staff shall be provided via county managed computers with Contractor staff being provided County accounts for access. Remote access of Contractor staff to TechCare shall be provided by Contractor computers located in Birmingham, AL and Las Vegas, NV which have the TechCare EHR application installed and have a static, persistent, secure network path to the production TechCare servers within SDSD. Use of client-based VPNs or other County-provided remote access is not permitted by Contractor. Contractor shall manage TechCare accounts for Contractor Remote staff. SDSD shall manage TechCare and Computer accounts for on-site Staff. This provision is required in order to provide the services herein.

Ex. G - 522

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.65.   Staffing

2.3.65.1.    Contractor and SDSD shall provide staffing levels as set forth in the detailed staffing schedule showing how coverage shall be provided for all required positions in Exhibit C ("staffing matrix"). This schedule includes both contractor and County staff. The schedule is by facility and shows all required shifts, hours they are working and what position are assigned to them. The Schedule also includes all administrative staff. Contractor may, with approval of SDSD, provide staffing that exceed the levels set forth in the staffing matrix. Contractor and SDSD may also, by mutual agreement, alter staffing schedules and levels in the best interest of meeting the patient care needs of the SDSD facilities. For example, with approval of SDSD, Contractor may alter staffing schedules so long as the total staffing levels provided for all facilities, aggregated on a weekly or biweekly basis, meet or exceed the total staffing levels in the matrix. By mutual agreement, the parties may agree to convert onsite hours to telehealth or telemedicine or to convert to telehealth or telemedicine hours to onsite hours. Additionally, by mutual agreement with SDSD, Contractor may substitute physician for midlevel provider time for medical or mental health provider positions, or vice versa, at mutually agreed upon ratios. Unless otherwise agreed, typically any such mutually agreed-upon substitution of physician time for nurse practitioner time, will be at a 1 to 2 ratio, and any such agreed-upon substitution of nurse practitioner time for physician time will typically be at a 2 to 1 ratio.

2.3.65.2.    The Contractor shall implement procedures and notification protocols on the process of Contractor staffs' absences and how vacancies with be covered.

2.3.65.3.    Contractor shall use Relief Staff to cover absences of Contractor's staff when necessary. Contractor shall maintain a team of corporate and site-based nurse practitioners who are licensed in California and able to travel to work hours onsite. Contractor may use PRN staffing or staffing agencies with correctional healthcare experience or staffing agencies with exceptional references.

2.3.65.4.    Contractor shall determine staffing required at each site in collaboration with designated SDSD staff and according to established administrative and operational task requirements, as well as health care needs based on individual facility requirements. SDSD reserves the right to alter or update task requirements as needed.

2.3.65.5.    Contractor staff schedules shall be reviewed and approved by designated SDSD staff. Any changes to the approved staffing schedule shall be approved by designated SDSD staff. The schedule plan shall include a description of coverage to ensure uninterrupted health services for planned and unplanned leave of contract staff.

2.3.65.6.    Contractor shall provide a list identifying all staff working specific assignments during specific time periods daily and at any time when requested by the SDSD.

2.3.65.7.    The County of San Diego and the SDSD value diversity. The Contractor shall strive to ensure a diverse workforce reflective of the population of San Diego County. Contractor shall deliver services in a culturally and linguistically appropriate manner that are reflective of the diverse population of San Diego County. Contractor shall provide health care translation services at its expense to ensure quality health care for patients who do not speak English.

2.3.65.8.    Contractor shall provide up to date copies of all professional licenses, certifications and/or registrations for SDSD review and filing.

2.3.65.9.    Contractor shall ensure that qualified personnel operate within the scope of their license(s), certification(s), and practice.

Ex. G - 523

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.65.10. All personnel shall be required to wear uniforms while on duty at all facilities. Uniforms can be scrub type clothing for clinical personnel and professional attire for other personnel. These uniforms should allow for the easy identification of said personnel. Due to security concerns, uniforms shall not be solid blue, solid green, solid white, or solid tan (since those colors are similar to SDSD incarcerated individual uniforms). SDSD has final approval authority regarding uniforms. Contractor shall provide uniforms to its employees and to all its subcontracted employees at its sole expense.

2.3.65.11. Contractor shall bear the total cost of clinical Personal Protective Equipment and protective clothing (PPE) for all health staff, including Contractor's employees and subcontracted employees. Contractor will provide PPE to SDSD employees upon request and bill the County for the actual cost of providing PPE.

2.3.65.12. At contract onset, Contractor specific personnel, the healthcare services administrator, the program managers for the facilities, and required staff, need to be hired/on-site and ready to be onboarded.

2.3.65.13. Contractor shall appoint a Program Manager who shall serve as the primary point of contact and coordination between Contractor and the SDSD.

2.3.65.14. Contractor shall select an On-site Medical Director who shall be responsible for the overall delivery of health care by Contractor staff or subcontractors at the facilities in accordance with Title 15 and NCCHC standards. The On-site Medical Director shall be a physician as defined in the Glossary, Section 4.46. This On-site Medical Director shall work in collaboration with the SDSD Chief Medical Officer.

    2.3.65.14.1. Contractor's On-site Medical Director shall adhere to the following requirements:
    2.3.65.14.2. Available Monday-Friday during business hours (8:00 am-5:00 pm)
    2.3.65.14.3. Back up Medical Director when primary is unavailable
    2.3.65.14.4. Responsible for the clinical conduct of Contractor employees
    2.3.65.14.5. Responsible for ensuring the completion of all assigned clinics
    2.3.65.14.6. After business hours contact
    2.3.65.14.7. Ensure all medical services follow the requirements of NCCHC, Title 15, and professional medical standards.

2.3.65.15. Contractor shall select a Mental Health Director who shall be responsible for the overall delivery of mental health care by Contractor staff or subcontractors at the facilities in accordance with Title 15 and NCCHC standards. The Mental Health Director shall be a physician, psychologist, or other doctoral level mental health professional. This Mental Health Director shall work in collaboration with the SDSD Director of Mental Health.

    2.3.65.15.1. Contractor's Mental Health Director shall adhere to the following requirements:
    2.3.65.15.2. Available Monday-Friday during business hours (8:00 am-5:00 pm)
    2.3.65.15.3. Back up Mental Health Director when primary is unavailable
    2.3.65.15.4. Responsible for the clinical conduct of Contractor employees
    2.3.65.15.5. Responsible for ensuring the completion of all assigned clinics
    2.3.65.15.6. After business hours contact
    2.3.65.15.7. Ensure all mental health services follow the requirements of NCCHC, Title 15, and professional medical standards.

Ex. G - 524

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.65.16.   The Sheriff's Department reserves the right to request and receive additional professional medical type classifications throughout the term of the contract. Any new staff classifications requested after the initial execution of contract shall be through an amendment process and pricing will be in accordance with initial contract Exhibit C pricing formatting. Pricing shall be based on the median BLS pricing for San Diego Metropolitan area at the time of the amendment.

2.3.66.   Conduct of Contractor's Employees

2.3.66.1.   Contractor shall report any personnel or professional complaints to the SDSD designated COR immediately.

2.3.66.2.   Contractor's employees shall always conduct themselves in a manner consistent with SDSD and County policies and procedures. Contractor's employees shall be courteous to the public, fellow employees, and employees of the SDSD. Contractor's employees shall be tactful in the course of their duties, shall control their tempers, and exercise patience and discretion even in the face of extreme provocation. Contractor's employees shall not use coarse, profane, or violent language. Any breaches in conduct by Contractor's employees, as determined by SDSD staff, shall not be repeated by the offending employees. If in Sheriff's determination the breach is serious enough or continues after the initial breach, access to the SDSD facility may be revoked by the SDSD.

2.3.66.3.   Contractor's employees designated as requiring access to Criminal Offender Record Information (CORI) or California Law Enforcement Telecommunications System (CLETS) information shall successfully complete training in conformance with SDSD policy and all applicable laws and regulations, including Exhibit D to this Agreement.

2.3.66.4.   Contractor's employees shall avoid social contacts with incarcerated individuals, refrain from overfamiliarity with incarcerated individuals, and maintain professional distance from incarcerated individuals. This includes social media platforms. If an incarcerated individual is personally known to Contractor's employee, notification to SDSD is required immediately.

2.3.66.5.   Contractor's employees shall have no correspondence with incarcerated individuals unless approved by designated SDSD staff. Approved correspondence shall be professionally written.

2.3.66.6.   Contractor's employees shall have no unnecessary physical contact with incarcerated individuals.

2.3.66.7.   Contractor's employees shall immediately report improper incarcerated individual conduct to the SDSD staff.

2.3.66.8.   The Sheriff's Department reserves the right to reject any Contractor's staff from working in the detention facilities regardless of satisfactory background results. The Sheriff's Department may remove any Contractor staff for violating Sheriff's Department's Policies & Procedures (P&P) or for not meeting Sheriff's Department's standards and expectations. Contractor shall immediately remove and replace any employee who is determined to be unsatisfactory by the Sheriff's Department.

## 2.4.  MEDICAL RECORDS/HEALTH INFORMATION MANAGEMENT

2.4.1. Contractor shall provide an electronic option for the convenient transfer of protected health information to support and fulfill authorized requests for medical records received by County. Medical records securely

Ex. G - 525

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

uploaded to the Contractor Cloud shall be made available to the authorized requesting party within 24-hours or the next business day, and in compliance with HIPAA Privacy and Security Rules, including applicable state/federal laws and regulations.

2.4.2. Requesting Records: requestor shall sign and submit a County authorization form which is to be received at a County-specific email address to be processed by County employees. Designated County employees shall have access to upload and maintain medical records in the Contractor's Cloud.

2.4.2.1.    Types of Requests: Contractor's Cloud shall accommodate release of information requests both for incoming and outgoing medical record requests. Release of information requests include but are not limited to requests related to continuity of health care; patient's personal use; public benefit claims; and authorized third party requestors. Contractor's Cloud shall be accessible to all respective requestors. Contractor shall provide full support to requestors attempting to access Contractor's Cloud for records.

2.4.3. Record Retrieval: Once a County employee has deposited the requested medical record in the Contractor's Cloud, it shall be available for authorized requestors to download. The record shall be available for thirty (30) days following the date of upload.

2.4.4. The Contractor's Cloud delivery system shall allow for the detailed control of files including the ability to restrict the number of times it is downloaded; restrict forwarding the file; and expiration of the file following download. The cloud solution shall be fully managed by Contractor's Legal Department and with guaranteed uptime metrics. All designated County employees shall be fully trained on its proper usage. Contractor shall provide full support to requestors accessing Contractor's Cloud for records. The Contractor's Cloud delivery system shall be fully compliant with HIPAA Privacy and Security Rules, including applicable state/federal laws and regulations.

2.4.5. Contractor shall obtain copies of all diagnosis, treatments, treatment plans, final medical records, discharge summaries, and other medical record information related to the offsite referral.

2.4.6. When the medical records are received, they are scanned without reasonable delay into TechCare by Contractor. Appropriate personnel can view medical records and print a hard copy for each appointment or medical service provided. As a quality assurance measure, the records stay on the On-site Medical Director's TechCare 'Doctor's Queue' until they are reviewed by the ordering physician. In addition, distribution of hospital reports, discharge summaries, and consult reports ensures compliance with program review requirements.

2.4.7. TechCare ensures security and privacy compliance with all state and federal laws and regulations by utilizing industry standards of security.

2.5. TRAINING

2.5.1. Contractor shall provide a catalog of available training courses, including web-based, on-site (hands-on with equipment such as computers, mobile devices, etc.), and train-the-trainer.

Ex. G - 526

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.5.2. Contractor shall participate in disaster planning training provided by the SDSD.

2.5.3. Contractor shall require all licensed health care providers to receive training commensurate with their licensure. Documentation shall be forwarded to the designated SDSD staff on a quarterly basis.

2.5.4. Contractor shall provide training and education in several forms: written material, formal classroom training, hands-on training, and web-based training via NaphCare University.

2.5.5. Contractor shall provide training and continuing education to County staff and enroll them in the appropriate courses. This includes continuing education and annual and periodic training.

2.5.6. If requested by the SDSD, Contractor shall provide training to sworn staff on topics relating to health care, as appropriate to their duties in accordance with NCCHC standards. A health-related training program may be developed and provided, in collaboration with the Detentions In-Service Training Unit, to non-medical sworn staff at least every two (2) years.

2.5.7. Contractor shall provide a detailed plan on how they shall ensure their staff obtain all required training and maintain their license.

2.5.8. Contractor shall provide a contingency plan and/or business continuity plan for unexpected events. Unexpected events can include, but are not limited to, natural disasters, emergencies, riots, or employee job actions.

2.5.9. Contractor shall provide the SDSD with Surescripts Medication History. Contractor shall provide on-site training to all necessary staff in the use of Surescripts.

2.5.10.  Contractor shall provide StatCare telehealth and all related training to applicable SDSD staff. Contractor shall provide on-site training to all necessary staff in the use of StatCare.

2.5.11.  Contractor shall provide additional mental health training for SDSD health staff and sworn staff, via live training sessions, virtual training, and its website, NaphCare Online. The courses shall provide officers with training on how to recognize a developing or present mental health condition, how to assess for risk of suicide or harm, how to respond and who to notify. Courses include: Suicide Prevention in Jails, Basics and Beyond; Correctional Mental Health Communication; Non-Clinical Jail Suicide; and Hot Topics in Suicide Prevention in Jail Settings. All training content and materials shall be reviewed and approved by SDSD CMO and Mental Health Director.

2.5.12.  Contractor and SDSD Staff shall develop a Suicide Prevention Plan consistent with NCCHC standards. The key components of the plan are as follows:

   2.5.12.1.  Staff Training – intensive training of all medical, and mental health staff on:
   2.5.12.2.  Signs and symptoms to recognize
   2.5.12.3.  Risk Factors

Ex. G - 527

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.5.12.4.   Management of suicidal patients
2.5.12.5.   Review of policies and procedures in dealing with suicidal patients
2.5.12.6.   Ongoing training and annual review of training to keep up to date


## 2.6. OPERATIONS MANUAL REQUIREMENTS

2.6.1. At the onset of the contract, Contractor shall review current policies and procedures and work with sworn staff and facility leadership to tailor a program that fits the needs of the facility.

2.6.2. Contractor shall collaborate with the SDSD in the development of a written Operations Manual that defines the extent to which health care shall be provided at each facility.

2.6.3. All policies and procedures will be reviewed collaboratively by both SDSD and contractual staff on a regular basis. SDSD will have final approval of the policies and procedures.

2.6.4. Such a review process will be performed at least annually, or more frequently if new updates or information is available.

2.6.5. Contractor shall submit policies and procedures to SDSD prior to project implementation and transition.

2.6.6. Operations Manual Committee

2.6.6.1.   Contractor shall participate in monthly SDSD Operations Manual committee meetings. The SDSD CMO, SDSD Director of Mental Health, and SDSD Director of Nursing shall participate as part of the committee.

2.6.7. Business Records Retention

2.6.7.1.   Contractor shall create an Operations Manual section to ensure retention of all business records produced. These records shall be provided to the SDSD for retention in accordance with the County Record Retention Policy.

2.6.8. Operations Manual Maintenance

2.6.8.1.   Contractor shall maintain all Operations Manuals, program      manuals, reports and protocols required by accreditation standards set by NCCHC, Title 15 Guidelines, and the SDSD. An Operations Manual shall be provided for each facility which the Contractor shall review annually.

2.6.9. Provision of Operations Manuals

Ex. G - 528

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.9.1.   Contractor shall provide the designated SDSD staff with updated Operations Manual for all facility sites annually.

2.6.10.  Health Education

2.6.10.1.   Contractor shall develop a written Operations Manual section to assure that age and gender appropriate health education and disease prevention programs are offered to incarcerated individuals. The education program shall be updated as necessary to address current health priorities and meet the needs of the confined population.

2.6.11.  Sick Call

2.6.11.1.   Contractor shall develop and implement an Operations Manual section which provides access to daily sick call for all incarcerated individuals seven days per week, at all facilities unless otherwise indicated by the SDSD. Contractor shall implement a process for regularly retrieving and reviewing all sick call requests. A face-to-face encounter shall be conducted by a qualified health care professional within 24 hours of receipt by health staff. Provision shall be made to ensure that any incarcerated individual requesting medical attention be given such attention by licensed or certified health care personnel appropriate to address the incarcerated individual's health issue. Access to appropriate medical care shall always be unimpeded.

2.6.12.  Refusal of Healthcare Services

2.6.12.1.   Contractor's Operations Manual shall make provision for allowing any competent adult to refuse in writing both emergency and non-emergency health care services. For purposes of this section, a competent adult is an adult whose right to make health related decision has not been removed or limited by statue or court order.

2.6.13.  First Aid and Advanced Life Support

2.6.13.1.   Contractor shall develop and implement an Operations Manual section to assure immediate access to first aid and advanced life support. This includes procedures to ensure timely inspection and upkeep of equipment. Onsite staff shall be trained to immediately initiate a response to emergency health-related situations. The training program shall be conducted on an annual basis.

2.6.14.  Prostheses and Other Orthopedic Devices

2.6.14.1.   Contractor shall develop and implement an Operations Manual section approved by the SDSD to provide medically necessary splints, braces, and prosthetics, including, but not limited to dentures, eyeglasses and hearing aids when medically indicated and ordered by Contractor's medical, oral care, and optometric personnel.

Ex. G - 529

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.15. Pharmaceutical Management

    2.6.15.1.    Contractor shall develop and implement an Operations Manual section for pharmaceutical management, including, but not limited to secure storage, inventory management, controlled administration of all drugs, proper disposal, and clearly defined employee responsibilities including restricted access. Contractor shall provide maximum security for any DEA controlled substances, needles, syringes, and other items. Contractor shall manage pharmaceuticals in accordance with Title 15 and NCCHC Standards or recommendations.

2.6.16. Food Handlers

    2.6.16.1.    Contractor shall develop and implement an Operations Manual section for screening incarcerated individuals assigned to work assignments that have health care implications, such as food handlers. All prospective food handlers shall be screened for vaccinations to include Hepatitis A, influenza and other infectious diseases as directed by the SDSD. All prospective food handlers shall undergo a physical examination to screen for infectious disease.

2.6.17. Vermin Control

    2.6.17.1.    Contractor shall develop and implement an Operations Manual section for the control and treatment of vermin-infested incarcerated individuals, including screening and control of ectoparasites.

2.6.18. Suicide Prevention

    2.6.18.1.    Contractor shall work collaboratively with SDSD to develop an Operations Manual section to include a suicide prevention plan, with language requiring staff to be trained to identify incarcerated individuals who present a suicide risk, appropriately monitor their condition, and ensure access to the necessary housing, referral, treatment, and follow-up. At a minimum, suicide prevention training should be conducted every two years.

2.6.19. Notification of Deaths in the Facility

    2.6.19.1.    Notification of Deaths in the Facility: Contractor, in cooperation with the SDSD, shall develop an Operations Manual section to ensure that there shall be a medical review of in custody incarcerated individual deaths.

2.6.20. SDSD Disaster Planning Training

    2.6.20.1.    Contractor shall prepare an Operations Manual section that ensures compliance with SDSD safety and security policies. The SDSD Facility Commanders are the final authority regarding facility safety and security for their respective sites.

Ex. G - 530

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.20.2.    Contractor shall prepare an Operations Manual section for the handling of medical emergencies within the detention facilities. Emergency care shall be provided by appropriately trained clinical staff. Staff care shall be to respond in a clinically indicated manner. Contractor staff shall also respond immediately to medical emergencies involving SDSD employees or visitors within the detention facilities. An Emergency Services Response Plan shall include the following:

2.6.20.2.1.    Health aspects of the emergency plan will be approved by the responsible health authority and facility administrator, and will include:

2.6.20.2.1.1.    Responsibilities of health staff;
2.6.20.2.1.2.    Procedures for triage for multiple casualties;
2.6.20.2.1.3.    Predetermination of the site for care;
2.6.20.2.1.4.    Emergency transport of the patient(s) from the facility;
2.6.20.2.1.5.    Use of an emergency vehicle;
2.6.20.2.1.6.    Telephone numbers and procedures for calling health staff and the community emergency response system (e.g., hospitals, ambulances);
2.6.20.2.1.7.    Use of one or more designated hospital emergency departments or other appropriate facilities;
2.6.20.2.1.8.    Emergency on-call physician, dental, and mental health services when the emergency healthcare facility is not nearby;
2.6.20.2.1.9.    Security procedures for the immediate transfer of patients for emergency care;
2.6.20.2.1.10.    Procedures for evacuating patients in a mass disaster;
2.6.20.2.1.11.    Alternate back-ups for each of the plans elements;
2.6.20.2.1.12.    Time frames for response; and
2.6.20.2.1.13.    Notification for the patient that is legally responsible.

2.6.20.3.    At least one mass disaster drill will be conducted annually so that over a three-year period each shift, to include mental health staff, has participated.

2.6.20.4.    The disaster drill is critiqued using the Emergency Response Critique Form and shared with staff. Critiques are documented in the staff meeting minutes and scanned into the respective NCCHC electronic folder. Recommendations for health staff are acted upon.

2.6.20.5.    A man-down drill will be practiced annually per shift where health staff are regularly assigned. All training of staff for these drills will be documented on the Education Log.

2.6.20.6.    All man-down drills will be documented using Contractor's Medical Emergency Code Report.

2.6.20.7.    All man-down drills are critiqued using the Man Down Drill Critique Form and shared with staff.

2.6.20.8.    Critiques are documented in the staff meeting minutes and scanned into the respective NCCHC electronic folder. Recommendations for health staff are acted upon.

2.6.21.    Provider/Staff Training

2.6.21.1.    Contractor shall develop and implement an Operations Manual section to ensure staff receive training as designated by their licensure or SDSD requirement. Staff training shall include annual onsite instruction and return demonstrations of emergency response. Contractor shall provide remediation training for staff that do not meet the standards of practice and advise the SDSD via

**Ex. G - 531**

Case 3:20-cv-00406-AJB-DDL    Document 796-2    Filed 01/21/25    PageID.34522
Page 269 of 546
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

the submittal of training documentation identifying the type of training, the type of remediation training completed, and the result. This shall be forwarded to the designated SDSD staff monthly.

2.6.22. Compliance for Informed Consent, Health Information Privacy Rights, and Protection of Inmate Rights

2.6.22.1.   Contractor shall develop NCCHC-compliant policies and procedures for all services carried out by SDSD nursing and mental health clinician staff.

2.6.22.2.   Contractor Operations Manual shall ensure compliance with all laws, regulations, and approved SDSD policies and procedures.

2.6.23. Preventing Lapses in Medical Coverage

2.6.23.1.   Contractor shall develop and implement an Operations Manual section to ensure that there are no lapses in required medical coverage including backup for licensed or certified medical staff for vacation, sick leave, holidays, labor actions, disruptions in public transportation (i.e., a disaster plan), unusually heavy caseload demands, or other operational situations.

2.6.24. Notification for Disruption in Services

2.6.24.1.   Contractor shall develop an Operations Manual section requiring immediate notification to the affected facility watch commander and the designated SDSD MSD staff of any potential disruption in normal services.

2.6.25. Continuity of Operations Plan

2.6.25.1.   The SDSD has determined the continuity of health care services in SDSD detention facilities are vital and necessary during a state of emergency. Contractor shall prepare a written Continuity of Operations Plan (COOP) within sixty (60) days of contract execution to ensure that clinical staff remains in or are available to respond to the impacted facility or facilities to continue to provide health care during unexpected events. The Contractor shall consult with the SDSD to help ensure that Contractor's COOP is consistent with the disaster plan for the SDSD facilities. Contractor's COOP shall designate a COOP point of contact at each facility with at least one backup. On an annual basis no later than January 1st, Contractor shall submit an updated COOP to the SDSD for approval.

2.6.26. Project Implementation and Transition Plan

2.6.26.1.   Contractor shall provide on-site project management support to include the following:

2.6.26.1.1.   Ancillary Services

2.6.26.1.1.1.   Initial Approach

Ex. G - 532

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.1.1.2.    Establish oxygen vendor
2.6.26.1.1.3.    Determine large equipment needs, and place order
2.6.26.1.1.4.    Order medical, dental, office supplies, copiers, printers, MFPs
2.6.26.1.1.5.    Recruitment, Community Networks, and Policy
   2.6.26.1.1.5.1.    Ensure that Lab training and supplies are on schedule
   2.6.26.1.1.5.2.    Track supply deliveries & any backorders
   2.6.26.1.1.5.3.    Coordinate scrub & embroidery RQMT's / Order
   2.6.26.1.1.5.4.    Establish shredding services
   2.6.26.1.1.5.5.    Establish waste removal services
   2.6.26.1.1.5.6.    Establish translation services

2.6.26.1.1.6.    On-Boarding and Training
   2.6.26.1.1.6.1.    Finalize HSA Purchasing Manual
   2.6.26.1.1.6.2.    Verify that all ancillary agreements are finalized and fully executed
   2.6.26.1.1.6.3.    Track supply deliveries/receive in Inventory Management System

2.6.26.1.1.7.    Final Site Preparation
   2.6.26.1.1.7.1.    Distribute Purchasing Manual
   2.6.26.1.1.7.2.    Send scrubs out to site

2.6.26.1.1.8.    Transition Closeout
   2.6.26.1.1.8.1.    Confirm all supplies available, supply chains operating correctly
   2.6.26.1.1.8.2.    Confirm performance of all ancillary providers

2.6.26.1.2.    Human Resources

2.6.26.1.2.1.    Initial Approach
   2.6.26.1.2.1.1.    Complete eVerification on New Employees, add to HR and Payroll Systems, enter Benefit elections
   2.6.26.1.2.1.2.    Create Personnel Files, Initiate Tracking and Automated Notice of Missing Information
   2.6.26.1.2.1.3.    Obtain EE documents and provide to Corporate HR for Processing
   2.6.26.1.2.1.4.    Send "Welcome to NaphCare" communication to all hired staff with critical information

2.6.26.1.2.2.    Recruitment, Community Networks, and Policy
   2.6.26.1.2.2.1.    Hiring, recruitment, credentialing of current and new staff
   2.6.26.1.2.2.2.    Staff orientation package distribution (benefits, 401K, insurance, etc.)

2.6.26.1.2.3.    On-Boarding and Training
   2.6.26.1.2.3.1.    NaphCare University user setup, notification, and training
   2.6.26.1.2.3.2.    HR and Administration Training

2.6.26.1.2.4.    Final Site Preparation
   2.6.26.1.2.4.1.    Complete UM training for AA, HSA
   2.6.26.1.2.4.2.    NaphCare University user setup, notification, and training

2.6.26.1.2.5.    Transition Closeout
   2.6.26.1.2.5.1.    Audit Clearance and Training Processes
   2.6.26.1.2.5.2.    Formalize HR and Onboarding Processes for Post-Transition Hires

2.6.26.1.3.    Information Technology

Ex. G - 533

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.1.3.1.     Initial Approach
    2.6.26.1.3.1.1.   Complete network design for connectivity between County and NaphCare Corporate Offices
    2.6.26.1.3.1.2.   Conduct onsite visit for new hardware placement & design as needed
    2.6.26.1.3.1.3.   Initiate contact with new interface vendors (pharmacy, Lab)
    2.6.26.1.3.1.4.   Place order for any external connectivity or internal connectivity needed
    2.6.26.1.3.1.5.   Set up TechCare Training Environment for New Employees

2.6.26.1.3.2.     Recruitment, Community Networks, and Policy
    2.6.26.1.3.2.1.   Configure and test network connectivity between County and NaphCare Corporate Offices
    2.6.26.1.3.2.2.   Coordinate equipment placement at Jails with onsite IT contact
    2.6.26.1.3.2.3.   Review TechCare Application Changes necessary for NaphCare Operations
    2.6.26.1.3.2.4.   Set up TechCare access for NaphCare Corporate team members

2.6.26.1.3.3.     On-Boarding and Training
    2.6.26.1.3.3.1.   Complete follow-up on-site visits to each jail
    2.6.26.1.3.3.2.   Complete necessary TechCare Changes needed by NaphCare Operations
    2.6.26.1.3.3.3.   Confirm any application or interface changes are completed, tested, and ready for activation

2.6.26.1.3.4.     Final Site Preparation
    2.6.26.1.3.4.1.   Deploy Corporate Connectivity Solution (as permitted)
    2.6.26.1.3.4.2.   Establish on-site IT Transition Team for support during transition of services
    2.6.26.1.3.4.3.   Set up NaphCare Corporate Users in TechCare
    2.6.26.1.3.4.4.   Work with County IT to create new staff user accounts for TechCare based on roles

2.6.26.1.3.5.     Transition Closeout
    2.6.26.1.3.5.1.   Establish IT Monitoring in Compliance with County IT Policies
    2.6.26.1.3.5.2.   Provide On-Site Support and TechCare Assistance

2.6.26.1.4.     Medical

2.6.26.1.4.1.     Initial Approach
    2.6.26.1.4.1.1.   Attend meetings with key hospitals and physician groups
    2.6.26.1.4.1.2.   Confirm with Information Technology all Computers, Access Methods to EHR are Suitable for Environment
    2.6.26.1.4.1.3.   Interview & hire qualifying physicians, NPs, Dentist, and psych providers
    2.6.26.1.4.1.4.   Logistically Review all Intake Areas for Implementation of NaphCare Processes
    2.6.26.1.4.1.5.   Meet with all Physicians, NPs, Dentists and MH Providers to discuss NaphCare Proactive Philosophy
    2.6.26.1.4.1.6.   Meet with County Medical Director
    2.6.26.1.4.1.7.   Review current nursing protocols and medical templates/forms for potential updates
    2.6.26.1.4.1.8.   Review mid-level provider prescribing and scope of practice laws

2.6.26.1.4.2.     Recruitment, Community Networks, and Policy
    2.6.26.1.4.2.1.   Attend meetings with key hospitals and physician groups to review operational processes and address concerns
    2.6.26.1.4.2.2.   Confirm off-site provider network information is loaded into internal systems.

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.1.4.2.3.  Continue interviewing & hiring providers

2.6.26.1.4.3.  On-Boarding and Training
2.6.26.1.4.3.1.  Begin provider training in UM procedures
2.6.26.1.4.3.2.  Confirm previously scheduled off-site appointments are accurately loaded Offsite Management Billing System
2.6.26.1.4.3.3.  Meet with NaphCare and County Medical Directors
2.6.26.1.4.3.4.  Start provider training in TechCare, Formulary, and Off-Site Request processes
2.6.26.1.4.3.5.  Train providers in the NaphCare medical care philosophy, P&P

2.6.26.1.4.4.  Final Site Preparation
2.6.26.1.4.4.1.  Complete Final Provider Training Sessions
2.6.26.1.4.4.2.  Identify patients in need of special/urgent medical attention upon assumption of care: infirmary, high acuity, etc.
2.6.26.1.4.4.3.  Reassess potential nursing and provider educational gaps following standard training plan execution
2.6.26.1.4.4.4.  Review current medication usage

2.6.26.1.4.5.  Transition Closeout
2.6.26.1.4.5.1.  Audit Review of all Intakes, High Acuity Patients to Ensure Care Protocols Followed
2.6.26.1.4.5.2.  Continue on-site Provider Training

2.6.26.1.5.  Mental Health

2.6.26.1.5.1.  Initial Approach
2.6.26.1.5.1.1.  Document plans for NaphCare MH model implementation with Corrections
2.6.26.1.5.1.2.  Meet with all MH staff and discuss NaphCare MH philosophy
2.6.26.1.5.1.3.  Review any MH housing units, access needs, workflow changes
2.6.26.1.5.1.4.  Review Intake Areas for MH Considerations, Detox, Observation, etc.

2.6.26.1.5.2.  Recruitment, Community Networks, and Policy
2.6.26.1.5.2.1.  Identify community mental health resources to begin discharge planning and re-entry programs
2.6.26.1.5.2.2.  Review and ensure consistency between Jail and NaphCare P&P

2.6.26.1.5.3.  On-Boarding and Training
2.6.26.1.5.3.1.  Begin MH provider and professional training in TechCare
2.6.26.1.5.3.2.  Perform MH Provider and professional training in NaphCare P&P, Formulary
2.6.26.1.5.3.3.  Train MH professionals and providers in NaphCare mental health philosophy

2.6.26.1.5.4.  Final Site Preparation
2.6.26.1.5.4.1.  Finalize MH Provider Training Sessions
2.6.26.1.5.4.2.  Identification of patients in need of MH intervention upon assumption of care

2.6.26.1.5.5.  Transition Closeout
2.6.26.1.5.5.1.  Continue on-site Provider Training

2.6.26.1.6.  Operations

2.6.26.1.6.1.  Initial Approach

Ex. G - 535

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

    2.6.26.1.6.1.1.   Conduct Final Stage Interviews & Complete Hiring of Management Staff
    2.6.26.1.6.1.2.  Identify Jail facility operational Needs, Concerns, and Integrate into Plan
    2.6.26.1.6.1.3.  NaphCare and Facility contact information exchanged
    2.6.26.1.6.1.4.  Obtain Jail Facility Clearances for NaphCare Staff
    2.6.26.1.6.1.5.  Schedule re-occurring onsite meeting with Jail Leadership

2.6.26.1.6.2.    Recruitment, Community Networks, and Policy
    2.6.26.1.6.2.1.  Data Collection: HSR reports & identification of reports required by Jail
    2.6.26.1.6.2.2.  Exchange Jail & NaphCare P&Ps, develop site-specific LOPs
    2.6.26.1.6.2.3.  Finalize TechCare Updates (ex: forms, nursing protocols, receiving screen, sick call)
    2.6.26.1.6.2.4.  Review sick call, intake, and all other onsite critical medical processes
    2.6.26.1.6.2.5.  Training: NCCHC, TechCare, off-site management, QA, HR, Admin

2.6.26.1.6.3.    On-Boarding and Training
    2.6.26.1.6.3.1.  Identify and implement narcotic and key exchange procedures
    2.6.26.1.6.3.2.  Orientation of NaphCare staff, P&P, website access, Proactive Care Plan
    2.6.26.1.6.3.3.  Re-occurring onsite meeting with essential staff for weekly updates

2.6.26.1.6.4.    Final Site Preparation
    2.6.26.1.6.4.1.  Identify and implement safety procedures (e.g. sharps count)
    2.6.26.1.6.4.2.  Off-site Operations: TechCare Online training completed, start-up manual provided, support staff assignments made and relayed to Jail
    2.6.26.1.6.4.3.  Purge Jail of Historical forms, P&P, and ensure that NaphCare's material is available to all staff

2.6.26.1.6.5.    Transition Closeout
    2.6.26.1.6.5.1.  Continue on-site Training
    2.6.26.1.6.5.2.  Deploy NaphCare SWAT Transition Team 2 Days Prior to Cutover
    2.6.26.1.6.5.3.  Formalize Ongoing Meetings/Communications with Jail, County, Sheriff Leadership
    2.6.26.1.6.5.4.  Operations Corporate Leadership Remain On-Site with SWAT to Ensure Stability, Care Continuity

2.6.26.1.7.    Pharmacy

2.6.26.1.7.1.    Initial Approach
    2.6.26.1.7.1.1.  Coordinate transfer of existing drug inventory to enable continued care to patients
    2.6.26.1.7.1.2.  Identify professional consultant licensed by the state to serve the Jail
    2.6.26.1.7.1.3.  Initiate Transition with existing provider, Meetings
    2.6.26.1.7.1.4.  Schedule Onsite Transition and Training Plan
    2.6.26.1.7.1.5.  Setup NaphCare Pharmacy Software, Including Interface with TechCare

2.6.26.1.7.2.    Recruitment, Community Networks, and Policy
    2.6.26.1.7.2.1.  Identify locations of local back-up and specialty providers
    2.6.26.1.7.2.2.  Obtain Pharmacy license and DEA number
    2.6.26.1.7.2.3.  Pharmacy P&P, design procedures & logs for narcotic utilization & inventory, medication room supplies
    2.6.26.1.7.2.4.  Secure prescription storage system for initial stock of meds
    2.6.26.1.7.2.5.  Set up back-up pharmacy process. InMedRx Information

2.6.26.1.7.3.    On-Boarding and Training

Ex. G - 536

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.1.7.3.1.  Assess utilization requirements. Examine stock on hand, intentions of current provider, current refill process
2.6.26.1.7.3.2.  Estimate drugs required for floor stock based on current usage
2.6.26.1.7.3.3.  Formalize the Process for Patients' Personal Medications including Storage and Documentation
2.6.26.1.7.3.4.  Implement dispensing requirements upon discharge
2.6.26.1.7.3.5.  Obtain shipping address and confirm the Jail's receiving process
2.6.26.1.7.3.6.  Prepare Pharmacy Training Manual, Forms, Instructions, Logs, and Documents

2.6.26.1.7.4.    Final Site Preparation
2.6.26.1.7.4.1.  Complete hiring and training of pharmacist consultant
2.6.26.1.7.4.2.  Initial drug shipment sent to secure site 48 hours prior to start date
2.6.26.1.7.4.3.  NaphCare Pharmacy given orders for initial fill 4 days prior to start date
2.6.26.1.7.4.4.  Provide in-service training for on-site RN and Pharmacy Teams 2.6.26.1.7.4.5. Record control drug inventory with exiting provider and record into NaphCare control drug books
2.6.26.1.7.4.6.  Review all supplies and medications to identify remaining needs prior to go-live date

2.6.26.1.7.5.    Transition Closeout
2.6.26.1.7.5.1.  Monitor Inventory, Prescribing, Site Specific Protocols
2.6.26.1.7.5.2.  Provide On-Site Support

2.6.26.1.8.      Utilization Management

2.6.26.1.8.1.    Initial Approach
2.6.26.1.8.1.1.  Contact all providers with outstanding appointments to discuss transition plan, continuity of care
2.6.26.1.8.1.2.  Develop off-site network needs initiated prior to bid submission
2.6.26.1.8.1.3.  Draft LOA compliant with site contract and for approval by legal
2.6.26.1.8.1.4.  Secure preferred provider listing from site for contracting
2.6.26.1.8.1.5.  Secure site contract sheet/information from NaphCare legal department

2.6.26.1.8.2.    Recruitment, Community Networks, and Policy
2.6.26.1.8.2.1.  Continue network development for preferred hospitals, physician groups, & ancillary partners
2.6.26.1.8.2.2.  Make corporate-based assignments for UM, Scheduling and Medical Records
2.6.26.1.8.2.3.  Off-site management, provider information is loaded into internal systems, in-person meeting with hospitals to review operational processes and services
2.6.26.1.8.2.4.  Prepare hospital manual for meetings

2.6.26.1.8.3.    On-Boarding and Training
2.6.26.1.8.3.1.  Conduct hospital in-service orientation (use hospital manual as a guide)
2.6.26.1.8.3.2.  Create and Finalize Provider Directory for Site and Corporate Staff
2.6.26.1.8.3.3.  Review off-site process with UM, Scheduling and Contracting

2.6.26.1.8.4.    Final Site Preparation
2.6.26.1.8.4.1.  Assist schedulers with consultation requests related to network gaps
2.6.26.1.8.4.2.  Conduct web-based training for TechCare Online for AA, HSA
2.6.26.1.8.4.3.  Continue network development

2.6.26.1.8.5.    Transition Closeout
2.6.26.1.8.5.1.  Audit all Off-Site Encounter Processes to Ensure Continuity of Transition

**Ex. G - 537**

Case 3:20-cv-00406-AJB-DDL    Document 796-2    Filed 01/21/25    PageID.34528
Page 275 of 546
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.2.     Contractor is responsible to ensure Health Services Administrator is an active participant for SDSD training and is readily available for on-site or virtual on-boarding support.

2.6.26.3.     Contractor shall provide on-site training personnel for first 90 days of operation; online training may be administered with the approval of SDSD.

## 3. SDSD BACKGROUND CHECK

3.1. Contractor shall ensure all onsite contracted, subcontracted, and volunteer staff submit to a SDSD background check, which shall be completed within fourteen (14) working days, at the Contractor's expense (e.g., any related travel and incidental costs). County will not charge Contractor for background checks. For Contractor remote staff, Contractor will conduct its own background checks in accordance with County's standards for access to the EHR system.

3.2. All Contractor staff who perform services at any County Detention Facilities will be required to undergo background checks with favorable results before they can perform such services. The background check shall be administered by the Sheriff's Department. The cost of the background check and Livescan shall be borne by the County. Prior to clearing the background process, Contractor's staff will not be allowed to attend start up training or orientations at Sheriff's Facilities. Post clearance staff will attend training at Medical Services Administration and then will be allowed to attend facility orientations and fill shifts.

## 1. GLOSSARY

| | |
|---|---|
| Access to Care: | A patient is seen by a qualified health care professional, is rendered a clinical judgment and receives care that is ordered in a timely manner. |
| Accreditation: | The National Commission on Correctional Healthcare (NCCHC) has determined and certified that all standards and compliance indicators for accreditation are met. |
| Ancillary Services: | Professional services in a hospital or other inpatient/outpatient health program. These may include x- ray, drug, laboratory, or other services. |
| Behavioral Health: | The blending of prevention and treatment for substance use, sexual, and mental health disorders for the purpose of providing comprehensive services. |
| Care Management: | A collaborative process that assesses, plans, implements, coordinates, monitors, and evaluates the options and services required to meet the patient health and human service needs. |
| Chronic Care: | An integrated care approach to managing illness which includes screenings, check-ups, monitoring and coordinating treatment, and patient education. As defined by NCCHC. |
| Clinically Indicated: | Involving or relating to the direct medical treatment or testing of patients. Relating to objective findings (either through physical examination, testing or laboratory study) that would aid in the determination of a care or treatment plan. |
| Clinical Practice Guidelines: | "Clinical practice guidelines are systematically developed statements to assist practitioner and patient decisions about appropriate health care for specific clinical circumstances." (Institute of Medicine, 1990) |

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

|   |   |
|---|---|
| | These statements are issued by third-party organizations and define the role of specific diagnostic and treatment modalities in the diagnosis and management of patients. The statements contain recommendations that are based on evidence from a rigorous systematic review and synthesis of the published medical literature. For practical purposes they are commensurate with the establishment of the community standard of care. |
| Concurrent Review: | A review of medically necessary decisions made while the patient is currently in an acute or post- acute setting. However, concurrent reviews happen during active management of a condition, be it inpatient or ongoing outpatient care. The focus of concurrent review is to ensure that the patient is getting the right care in a timely and cost- effective way. |
| Communicable Disease: | Those diseases that are capable of being transmitted from one person or species to another. |
| CQI Program: | A Comprehensive Quality Improvement program to improve both service and access to patients. It is designed to monitor and evaluate the quality and safety of healthcare services delivered in a clinical setting through outcome measurements and reporting criteria. |
| Contractor: | The entity who enters into a contract with the County of San Diego to provide all services as described in the Request for Proposal. |
| Dental Examination: | Includes the taking or review of the patient's dental history, charting of teeth, examination, and x- rays if needed for diagnosis. |
| Discharge Plan: | Planning and referral for patients with serious health needs. The patient's proposed treatment, medications, and other important information is to be provided to a contact in the community upon the release of the patient. |
| Dispensing of Medication: | System of delivery and storage of, and accounting for drugs from the source of supply to the facility drug rooms or to the point of storage at which they are administered to the patient. |
| Ectoparasites: | A parasite that lives on or in the skin but not within the body. |
| Electronic Health Records (EHR) System: | A database that collects patient health information including, but not limited to; patient demographics, progress notes, problem lists, medications, vital signs, past medical history, immunizations, health assessments, and more data which creates an electronic repository to store information. |
| Emergency Care: | Care for an acute illness or unexpected health care need where the absence of immediate medical attention could reasonably be expected to result in (1) Placing the patient's health in serious jeopardy; (2) Serious impairment to bodily functions; (3) Serious dysfunction of any bodily organ or part. |
| Evidence Based Practices (EBP): | Therapeutic interventions for which there is consistent scientific evidence that shows improvement in patient outcomes. |
| Full Operational Transition: | Is accomplished when Contractor has assumed all operational and administrative functions required by executed contract. |
| Forensic Imaging: | An x-ray of the body of an incarcerated individual to detect effectively and quickly contraband hidden within a human body cavity. |

Ex. G - 539

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| Grievance: | A verbal or written complaint or protest of an action or inaction. This is the process in which a patient appeals an action or decision related to their health care. |
| Health Assessment: | The process whereby the health status of a patient is evaluated. The extent of the health assessment, including medical examination after obtaining health history contains at least the items noted by NCCHC standards. |
| Health Care: | The sum of all actions, preventive and therapeutic, taken for the physical and mental well-being of a population. Health Care includes all services provided under the Statement of Work and any other services that are medically necessary. |
| Health Care Provider: | Any individual that provides, or assists in the provision of, health care, including but not limited to a physician, nurse practitioner, qualified health care professional, qualified mental health care professional, or Mid-Level Provider. This term also includes a health care facility. |
| Hospice: | A program designed to provide palliative care, counseling, and emotional support to the terminally ill with the goal of maintaining quality of life. |
| Hospital: | An institution separate and outside of a detention facility that is built, staffed, and equipped for the diagnosis of disease, treatment, both medical and surgical of the sick and injured; and for their housing during this process. |
| Hospital Level of Care: | Individual, inpatient care and treatment, physically within or housed inside a community medical facility or center. Care and treatment determined or conducted by a medical provider who is responsible for a localized anatomic or physiologic area or region. Typically serves in the role of a consultant or advisor to the primary care provider or physician and does not actually assume care or responsibility for the patient as a whole. |
| Initial Health Assessment: | The first health assessment whereby a patient's individual health status is evaluated, meeting minimum requirements as specified by NCCHC. |
| Keep-On-Person (KOP) Medications: | Medications that patients will be given the privilege of being responsible for themselves by order of a physician, mid-level provider, or registered nurse. |
| Lab Support: | A clinical licensed laboratory equipped for running tests on samples from the human body (such as fluids, tissues, or cells) for the purpose of providing information on diagnosis, prognosis, prevention, or treatment of disease. |
| Long Term Care: | A variety of services designed to meet a person's health and personal care needs for those patients with such medical or psychologic conditions who are unable to perform such services on their own. |
| Medication Administration: | The act in which a single dose of a prescribed medication or biological is given by application, injection, inhalation, ingestion, or any other means to an incarcerated individual by an authorized person in accordance with all laws and regulations governing the administration of medications and biologicals. Also refers to guidelines that healthcare professionals follow in medication management, ensuring that drugs are administered safely and legally. |
| Medication Assisted Treatment (MAT): | Use of medications in combination with counseling and behavioral therapies to provide a "whole patient" approach to treatment of substance use disorders. |

Ex. G - 540

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| Medication Services Program: | Medications are administered or delivered to the incarcerated individual in a timely and safe manner. Prescription medications are given only by order of legally authorized individual. Maintenance of a formulary with a documented process for obtaining nonformulary medications in a timely manner as well as all other minimum requirements defined by NCCHC. |
| Mental Health Treatment: | The evaluation and treatment for a mental disorder. |
| Mental Health Screening: | Performed by qualified mental health professionals or qualified health professionals. Includes but not limited to structured interview with inquiries into medication history, substance abuse, suicidal behavior, victimization, sexual abuse, etc. as outlined in NCCHC standards. |
| Medically Necessary: | Services or supplies that are proper and needed for diagnosis, or treatment of a medical condition, are provided for the diagnosis, direct care, and treatment of a medical condition that meets the standards of health care practice in the health care community of a local area; and are not mainly for the convenience of the patient or physician. |
| Special Needs: | Patients with health conditions that require development of an individualized treatment plan. |
| Supervised Withdrawal and Treatment: | Medical management of patients under the influence of or undergoing withdrawal from alcohol, sedatives, opioids, and/or other substances. |
| Medical Ward: | An area established within the confines of a correctional facility in which organized healthcare and services are maintained and operated to accommodate patients for purpose of providing skilled nursing care for persons who are not in need of hospitalization but require health care provider monitoring and specialized services. |
| Mid-level Provider: | Health care workers with training less than that of a physician but greater than that of nurses and other medical assistants. |
| Oral Care Services: | Includes instruction in oral hygiene, examination, and treatment of dental problems. |
| Oral Hygiene: | Clinical procedures taken to protect the health of the mouth and chewing apparatus, minimum compliance is met by instruction in the proper brushing of teeth. |
| Oral Screening: | Part of the initial health assessment which includes visual observation of the teeth and gums. |
| On-site Medical Director: | Specific point of contact and coordination between NaphCare and the SDSD CMO. |
| On-site Services: | All health care services performed inside of a detention facility. |
| Off-site Services: | Health care services performed in the community setting, which include hospital, medical clinic, laboratory, or physical therapy/gym. |
| Palliative Care: | The medical and therapeutic management of the symptoms and incurred side effects of a terminal disease and its treatment. |

Ex. G - 541

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| Pharmaceutical Operations: | An operation in compliance with applicable state and federal regulations regarding prescribing, dispensing, administering, procuring, and disposing of pharmaceuticals as defined by NCCHC. |
| Physical Examination: | An objective, hands-on evaluation of an individual. It involves inspection, palpitation, auscultation, and/or percussion of a patient's body to determine the presence or absence of physical signs of illness. |
| Phlebotomy Services: | The drawing of blood (as by venipuncture) for diagnostic testing and the completion of all requisitions required by the outside laboratory. |
| Physician: | A person who is legally qualified to practice medicine and has earned a corresponding medical degree. |
| Point of Care Testing (POCT): | Diagnostic patient testing activities provided outside the physical facilities of the clinical laboratory. |
| Policy: | A written official position on a particular issue related to an organization's operations. |
| Procedure: | Describes in detail, sometimes in sequence, how a policy is to be carried out. |
| Program Manager: | Point of contact and coordination between NaphCare and the SDSD Director of Nursing and nursing staff. Contractor may give the title of Health Services Administrator or other appropriate title to the Program Manager position. |
| Protocols: | Written instructions for physicians and nurse practitioners which have been approved by a state regulatory board or by the responsible health care authority for the prison system. |
| Qualified Health Care Professional: | Includes physicians, nurse practitioners, nurses, psychiatrists, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the medical health needs of the patient. |
| Qualified Mental Health Professional: | Includes clinical social workers, licensed mental health clinicians, psychologists, nurse practitioners, psychiatrists, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. |
| Quality Improvement Committee: | A multi-disciplinary group of health care providers working at the facility (the responsible physician and representatives of other departments) who meet to share the information collected, aggregated, analyzed, and presented to representatives of the organization. Committee is responsible for defining, prioritizing, overseeing, and monitoring the performance improvement activities, including patient and environmental safety, within the detention setting. |
| Rehabilitative Services: | Rehabilitation is the action of restoring someone to health or normal function through training and therapy after injury, addiction, or illness. Services would include physical therapy and occupational therapy, and specialized referral services (e.g. speech, vestibular therapy) as needed. |
| Release of Information (ROI): | A statement signed by the patient authorizing a specified entity to divulge the patient's healthcare information to a different specified entity. |

Ex. G - 542

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| Receiving Screening: | A system of structured inquiry and observation designed to prevent newly arrived patients who pose a health or safety threat to themselves or others from being admitted to the facility's general population and to identify those newly admitted patients in need of health care. This process is also referred to as initial or intake health screening. |
| Serious Mental Illness: | A mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities. |
| Sick Call: | On-site health care services rendered to a patient with health care complaints that are evaluated and treated during regularly scheduled appointment times. |
| Specialty Care Services: | Healthcare services, consultations, procedures, or other treatments that require special clinical skills and results in appointments both on-site and off-site with higher level of health care providers. |
| Substance Use Disorder: | A disease that affects a person's brain and behavior and leads to an inability to control the use of a legal or illegal drug or medication. |
| Treatment Plan: | A therapeutic strategy that may incorporate patient education, dietary adjustment, an exercise program, drug therapy, and the participation of nursing and allied health professionals. Treatment plans are especially important in the optimal management of complex or chronic illnesses. |
| Utilization Review: | A set of formal techniques designed to monitor the use of or evaluate the clinical necessity, appropriateness, efficacy, or efficiency of health care services, procedures, or settings. |
| Ultrasound Services: | On-site diagnostic or screening imaging tool to confirm medical disorders or to assist in the performance of medical procedures. |
| Vision Services: | Services necessary to habilitate or rehabilitate the effects of (visual) sensory impairment. Includes optometry as well as ophthalmology. |
| Women's Health Services: | Organized medical services to manage the effect of gender on disease and health that encompasses a broad range of biological and psychosocial issues, to include general practice, reproductive health and obstetrical care and services. |
| Radiology Services: | Screening or diagnostic imaging studies with interpretive consultation component performed for the purpose of medical evaluation and patient care and treatment. |

Ex. G - 543

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

**EXHIBIT A-1 STATEMENT OF WORK**

1.  PROGRAM ELEMENTS

   1.1. Referral Document Collection Prior to Admission

   1.1.1. The DSH Patient Management Unit (PMU) shall coordinate with the committing court to ensure all required documents listed under Penal Code section 1370, subdivision (a)(3) is provided by the court for all male patient incarcerated individuals upon admission.

   1.2. Referrals Determined to be Not Suitable for Admission

   1.2.1. Should Contractor determine, based on clinical or custodial considerations, that a male felony 1ST referral is not suitable for admission into the JBCT program, Contractor shall inform the DSH Contract Manager and the PMU immediately in writing or by phone.

   1.3. Removal of Patient Incarcerated individuals No Longer Clinically Suitable

   1.3.1. Upon admission, Contractor shall assess each male Patient Inmate to ascertain if trial competence is likely and medical issues would not pose a barrier to treatment. At the discretion of the DSH Contract Manager, and if requested in writing, Contractor shall review and agree upon new male Patient Incarcerated individuals being forwarded for admission and/or retention into the JBCT program, which may contraindicate fast-track jail treatment.

   1.3.2. Should Contractor determine, based on clinical considerations or other factors, that a male Patient Inmateadmitted into the JBCT program is no longer clinically suitable for participation in the program, Contractor shall contact the DSH Contract Manager to discuss treatment options. Contractor agrees that the decision to remove such a Patient Inmate from the JBCT program is at the sole discretion of the DSH,and the DSH shall not unreasonably withhold such permission.

   1.3.3. Should Contractor and the DSH determine a male Patient Inmate should be removed from the JBCT program, Contractor shall continue to provide treatment until arrangements are made to admit the male Patient Inmate to a state hospital. Within seven days of making this determination, Contractor shall alsoprovide the following additional documents to the PMU including, but not limited to:

   | | |
   |---|---|
   | 1.3.3.1. | Transfer Notification Letter |
   | 1.3.3.2. | Court Reports, if due or submitted |
   | 1.3.3.3. | 90-Day Progress Report, if due or submitted |
   | 1.3.3.4. | Psychiatry Intake Assessment |
   | 1.3.3.5. | The three most recent Psychiatry Progress Notes |
   | 1.3.3.6. | Psychology Intake Assessment |
   | 1.3.3.7. | 30-Day Psychologist Competency Reassessments |
   | 1.3.3.8. | Social Work/Clinician Intake Assessment |
   | 1.3.3.9. | Nursing Intake Assessment. |
   | 1.3.3.10. | Informed Consent |

Ex. G - 544

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

1.3.3.11.    Medication Orders
1.3.3.12.    Laboratory Results, if any
1.3.3.13.    Discharge Summary

1.4. Psychological Assessment Protocol

1.4.1. Contractor shall administer a battery of individualized psychological assessments and testing upon admission. Standardized and semi-structured psychological tests shall be utilized to complete a preliminary assessment of the male Patient Inmate's current functioning, likelihood of malingering, and current competency to stand trial. Impediments to trial competency shall be ascertained using the following preliminary assessment instruments including, but not limited to:

1.4.1.1.    Clinical Interview. The psychologist shall obtain information pertaining to the male Patient Inmate's psychosocial, psychiatric, and legal history as well as barriers to competency. *The Mental Status Exam* (MSE) shall also be included in the interview.
1.4.1.2.    Assessment of Malingering (as clinically indicated). Miller Forensic Assessment o/Symptoms (M•FAST).
1.4.1.3.    Assessment of Trial Competence. Evaluation of Competency to Stand Trial-Revised (ECST-R), the MacArthur Competence Tool - Criminal Adjudication (MacCAT-CA), and/or the Competence Assessment/or Standing Trial/or Defendants with Mental Retardation (CAST-MR); and
1.4.1.4.    Severity of Psychiatric Symptoms. Brief Psychiatric Rating Scale (BPRS).

1.4.2. Contractor shall complete additional malingering-specific assessments, integrating additional observable data reported by various disciplines on a 24/7 basis if preliminary assessment suggests presence of malingering. If the screening instruments administered during the preliminary assessment raise suspicion that the primary barrier to trial competency is malingering, the following may also be utilized including, but not limited to:

1.4.2.1.    Structured Interview of Reported Symptoms  Second Edition (SIRS-2)
1.4.2.2.    Test of Memory Malingering (TOMM)
1.4.2.3.    Georgia Atypical Presentation (GAP)
1.4.2.4.    Structured Inventory of Malingered Symptomatology (SIMS)
1.4.2.5.    Inventory of Legal Knowledge (ILK).

1.4.3. Contractor may administer further cognitive assessments based on the specific cognitive deficit identified during the preliminary assessment. If the screening instruments administered during the preliminary assessment raise suspicion that the primary barrier to trial competency is cognitive deficits, the following may also be utilized including, but not limited to:

1.4.3.1.    Repeatable Battery for the Assessment (Neuropsychological Status (RBANS)
1.4.3.2.    Wide Range Achievement Test -I (WRAT-1)
1.4.3.3.    Montreal Cognitive Assessment (MoCA).

1.4.4. Contractor may administer additional instruments assessing personality to complete further assessment of psychological functioning including, but not limited to:

Ex. G - 545

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

1.4.4.1.    Personality Assessment Invent01y (PAI)
1.4.4.2.    Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

1.4.5. Contractor shall administer follow-up assessments of the male Patient Inmate's current competency to stand trial at 30-day intervals or more frequently as needed using any of the following including, but notlimited to:

1.4.5.1.    Evaluation of Competency to Stand Trial-Revised (ECST-R)
1.4.5.2.    Revised Competency Assessment Instrument (R-CA/)
1.4.5.3.    MacArthur Competency Assessment Tool-Criminal Adjudication (MacCAT-CA); or
1.4.5.4.    Competence Assessment for Standing Trial for Defendants with Mental Retardation (CAST-MR)

1.5. Individualized Treatment Program

1.5.1. Contractor shall identify specific deficits that result in incompetence to stand trial upon admission. Each deficit shall be listed on the individualized treatment plan and shall be targeted in the male Patient Inmate's treatment. Contractor shall use current standardized competency assessment tools, such as the MacArthur Competency Assessment Tool, after considering the totality of clinical and forensic circumstances.

1.5.2. Contractor shall provide an individualized restoration program according to the treatment approach subscribed to by the individual treatment teams and indicated by the male Patient Inmate's psychiatric condition, level of functioning, and legal context.

1.5.3. Contractor shall tailor individualized treatment regimens to the male Patient Inmate's specific barrier(s) to trial competency. Deficits identified in the competency assessment upon admission to the JBCT program shall be listed in the individual treatment plan and addressed by specific treatment interventions.

1.5.4. Contractor shall conduct case conferences weekly or as needed to reassess male Patient Incarcerated individuals' progresstoward restoration of competence to allow the treatment teams to measure whether their treatment interventions are working, and whether additional treatment elements need to be incorporated into male Patient Incarcerated individuals' treatment plans.

1.6. Multi-modal, Experiential Competency Restoration Educational Experience and Components

1.6.1. Contractor shall provide educational materials presented in multiple learning formats by multiple staff to each male Patient Inmate, e.g., a simple lecture format may be replaced with learning experiences involving discussion, reading, video, and experiential methods of instruction, such as role-playing or mock trial.

1.6.2. Contractor shall address the following elements in the education modalities of the competency

Ex. G - 546

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

restorationprogram including, but not limited to:

1.6.2.1.    Criminal charges
1.6.2.2.    Severity of charges, namely Felony vs. Misdemeanor
1.6.2.3.    Sentencing
1.6.2.4.    Pleas including, Guilty, Not Guilty, Nolo Contendere and Not Guilty by Reason of Insanity
1.6.2.5.    Plea bargaining
1.6.2.6.    Roles of the courtroom personnel
1.6.2.7.    Adversarial nature of trial process
1.6.2.8.    Evaluating evidence
1.6.2.9.    Court room behavior
1.6.2.10.   Assisting counsel in conducting a defense
1.6.2.11.   Probation and Parole
1.6.2.12.   Individualized instruction as needed

1.6.3. Contractor shall provide additional learning experience through increased lecture time, as well as individual instruction to male Patient Incarcerated individuals who are incompetent due to specific knowledge deficits caused by low intelligence, but who may be restored to competence with additional exposure to the educational material.

1.7. Medication Administration and Consent

1.7.1. Contractor shall obtain proper authorization (e.g., informed consent for treatment, medication issues) from the male Patient Inmate as soon as possible in accordance with professional standards of care and court practices.

1.7.2. Contractor shall provide strategies to promote and incentivize voluntary psychotropic medication compliance.

1.7.3. If involuntary psychotropic medication is not ordered by the court at time of commitment of a male patient to the JBCT program and the treating psychiatrist determines that psychotropic medication has become medically necessary and appropriate, Contractor shall request that the court make an order for the administration of involuntary psychotropic medication.

1.7.4. Contractor shall administer involuntary psychotropic medication utilizing the San Diego Sheriff's Department Pharmacy formulary when medically necessary and appropriate upon the issuance of the court order.

1.8. Data Deliverables

1.8.1. The DSH shall provide a standardized data collection template. Contractor shall complete and submit this data collection to the DSH on a weekly basis with a deadline to be determined by the DSH. The template includes, but is not limited to, the following data elements:

Ex. G - 547

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

| Term | Definition |
|------|-----------|
| Patient Name: | Last and First name of patient |
| Case number: | Court assigned case number for each individual court case. It can typically include letters and numbers. |
| Booking number: | Number that county jail issues to an individual (per Forensics) |
| Gender: | Male or Female or Non-binary |
| Date of Birth: | Birthdate, Age can be determined using this date |
| Ethnicity: | Type of social group that has a common national or cultural tradition. *Caucasian/White, African American/Black, American Indian/Alaska Native, Asian, Native Hawaiian/Other Pacific Islander, Hispanic, Other* |
| Language Spoken: | Type of language spoken |
| Interpretative Services Utilized (YES/NO) | Was Interpretive services utilized? Yes or No |
| Referring County: | County of referral and/or commitment |
| Commitment Date: | Date of Commitment |
| Packet Received Date: | Date Packet received (including incomplete required documents) |
| Packet Completed Date: | Date Packet completed (including all completed required documents) |
| Reason for Ongoing Pending Status: | Provide a detailed reason why the delay of admission |
| Screening Evaluation Completed Date: | Date Screening Evaluation was completed |
| Screening Outcome: | Outcome results of patient screened. Accepted or Rejected |
| Reason for Screening Rejection: | Detail regarding reason for screening rejection. Bypassed/Triaged, Non-Roc, Medication, Substance-Related, Higher Level-of-Care, Other |
| Admission Date: | Date of Admission |
| Involuntary Medication Order (YES/NO): | Is there a current court order IMO in place? Yes or No |
| IMO Effective Date: | Date IMO was effective on, this is the same as their 1370 commitment date |
| Medication Adherence: | Whether patient takes their medications as prescribed. Fully Adherent, Intermittently Adherent, Refusing. (If applicable to program) |
| Did I/P receive involve meds (YES/NO): | Was involuntary medication administered |
| Disposition of Discharge/Transfer: | Final determination of patient's status. Restored or DSH |
| Reason for Discharge/Transfer: | Detail regarding reason for patient's discharge or transfer |
| Date Referred to DSH for Transfer: | Date of Discharge and or Date of Transfer |
| Discharge/Transfer location: | Location where patient will be discharged to. Jail, Atascadero SH, Coalinga SH, Metropolitan SH, Napa SH, Patton SH, Other: Must update notes with specific location |
| Reason for delayed Discharge: | Provide a detailed reason why the delay of discharge |
| Date ROC Certificate submitted to Court: | Date that ROC Certificate was submitted to Court |
| Primary diagnosis at Admission: | Patients primary Diagnosis at time Admission |
| Diagnosis at Discharge: | Patients primary Diagnosis at time of Discharge |
| Diagnosis of Malingering? (YES/NO) | Did patient have a Malingering Diagnosis at any point during their stay in JBCT? (YES/NO) |

1.8.2. Contractor shall submit daily census reports to the DSH upon the first male Patient Inmate admission, unless otherwise requested by the DSH.

1.8.3. Contractor shall submit a summary performance report within 30 days of the end of the contract term

Ex. G - 548

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

toinclude, but not be limited to, the information stated above and:

- 1.8.3.1.  The total number of individuals restored to competency
- 1.8.3.2.  The average number of days between program admission and discharge
- 1.8.3.3.  The total cost of the program by budget category: personnel, operating expenses, administrative expense, custody and housing, and other direct operating costs as well as overall cost per male Patient Inmate treated and the costs for those found to be malingering
- 1.8.3.4.  The cost per cycle of treatment
- 1.8.3.5.  A description of all implementation challenges
- 1.8.3.6.  Special incident reports and notification to the DSH of emergencies

1.9. Reporting Requirements

1.9.1. Contractor shall submit a written report to the court, the community program director of the county or region of commitment, and the DSH Contract Manager concerning the male Patient Inmate's progress toward recovery of trial competence within 90 days of a commitment. The report shall include a description of any antipsychotic medication administered to the male Patient Inmate and its effects and side effects, including effects on the male Patient Inmate's appearance or behavior that would affect the male Patient ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner.

1.9.2. Contractor shall verbally report any escape within 24 hours to the court that made the commitment, the prosecutor in the case, the Department of Justice, and the DSH Contract Manager, with a written report to follow within five business days.

1.9.3. Contractor shall file a certificate of restoration with the court that made the commitment when the Program Director or their designee determines that the male Patient Inmate has regained trial competence.

2. TREATMENT PROTOCOL

2.1. JBCT is an intensive, milieu-based treatment program that quickly facilitates competency through a combination of group and individual therapy.

2.2. Group therapy is central to the restoration process, and Contractor shall provide treatment daily to male patient. Group content should include one of the four group treatment domains: competency education, understanding and management of mental illness, physical exercise, and mental/social stimulation. Many group topics can be assimilated into the groupings, e.g., mock trial, music-based competency treatment, etc.

2.3. Contractor shall provide individual sessions per day to each male. Individual sessions may be used to check-in with male Patient Incarcerated individuals and/or discuss key legal elements of the individual's case that may be too sensitive for group discussion. Specific competency issues can best be addressed individually, e.g., a male patient understands court proceedings but struggles to apply the knowledge to their individual case.

2.4. Contractor's psychiatrist shall see each male patient weekly. A psychiatric assessment is a component of the admission process, and more frequent appointments shall be available as needed.

Ex. G - 549

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-I – JAIL BASED COMPETENCY TREATMENT PROGRAM

2.5. Together on a weekly basis, the multi-disciplinary treatment team shall review:

    2.5.1. Progress of all male incarcerated individuals admitted within (30 days)
    2.5.2. At subsequent 14-day intervals thereafter
    2.5.3. When a male is under consideration for discharge

2.6. The multi-disciplinary treatment team shall be responsible for providing the committing court progress reports pursuant to Penal Code section 1370 subdivision (b)(1).

Ex. G - 550

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT B – INSURANCE REQUIREMENTS

**INSURANCE REQUIREMENTS FOR CONTRACTORS**

Without limiting Contractor's indemnification obligations to County, Contractor shall provide at its sole expense and maintain for the duration of this contract, or as may be further required herein, insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the work hereunder and the results of the work by the Contractor, his agents, representatives, employees or subcontractors.

**1. Minimum Scope of Insurance**

Coverage shall be at least as broad as:

    A.  Commercial General Liability, Occurrence form, Insurance Services Office form CG0001.

    B.  Automobile Liability covering all owned, non owned, hired auto Insurance Services Office form CA0001.

    C.  Workers' Compensation, as required by State of California and Employer's Liability Insurance.

    D.  Medical and Hospital Professional Liability (Errors & Omissions) insurance appropriate to the Contractor's Profession, including, but not limited to medical administration, counseling and legal services.

    E.  Improper Sexual Conduct including sexual harassment, sexual abuse and sexual misconduct applying to bodily injury, property damage or personal injury arising out of the actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of the insured or as a result of the negligent employment, investigation, hiring & supervision or the reporting or failure to report to proper authorities of a person for whom any insured is or ever was legally responsible.

    F.  Cyber/Information Security Liability shall cover all of Contractor's employees, officials and agents. Coverage shall be sufficiently broad to respond to the duties and obligations as is undertaken by Contractor in this agreement and shall apply to any dishonest, fraudulent, malicious or criminal activities that affect, alter, copy, corrupt, delete, disrupt or destroy a computer system or to obtain financial benefit for any party; to steal, take or provide unauthorized access of either electronic or non-electronic data, including publicizing confidential electronic or non-electronic data; causing electronic or non-electronic confidential electronic data to be accessible to unauthorized persons; transfer of computer virus, Trojan horse, worms or any other type of malicious or damaging code; and for Third-Party Liability encompassing judgments or settlement and defense costs arising out of litigation due to a data breach and data breach response costs for customer notification and credit monitoring service fees.

**2. Minimum Limits of Insurance**

Contractor shall maintain limits no less than:

    A.  Commercial General Liability including Premises, Operations, Products and Completed Operations, Contractual Liability, and Independent Contractors Liability: $5,000,000 per occurrence for bodily injury, personal injury and property damage. The General Aggregate limit shall be $10,000,000.

    B.  Automobile Liability: $1,000,000 each accident for bodily injury and property damage.

    C.  Employer's Liability: $1,000,000 each accident for bodily injury or disease. Coverage shall include waiver of subrogation endorsement in favor of County of San Diego.

    D.  Medical and Hospital Professional Liability (Errors & Omissions): $5,000,000 per claim with an aggregate limit of not less than $10,000,000. Coverage shall include contractual liability coverage. This coverage shall be maintained for a minimum of three years following termination or completion of Contractor's work pursuant to the Contract.

    E.  Improper Sexual Conduct: $1,000,000 per claim with an aggregate limit of not less than $2,000,000.

    F.  Cyber/Information Security Liability. $2,000,000 per claim with an aggregate limit of not less than $2,000,000.

If the contractor maintains broader coverage and/or higher limits than the minimums shown above, the County requires and shall be entitled to the broader coverage and/or higher limits maintained by the Contractor. As a requirement of this contract, any available insurance proceeds in excess of the specified minimum limits and coverage stated above, shall also be available to the County of San Diego.

**Ex. G - 551**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT B – INSURANCE REQUIREMENTS

**3. Self-Insured Retentions**

Any self-insured retention must be declared to and approved by County Risk Management. At the option of the County, either: the insurer shall reduce or eliminate such self-insured retentions as respects the County, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers; or the Contractor shall provide a financial guarantee satisfactory to the County guaranteeing payment of losses and related investigations, claim administration, and defense expenses.

**4. Other Insurance Provisions**

The insurance policies are to contain, or be endorsed to contain, the following provisions:

A.  Additional Insured Endorsement

The County of San Diego, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers of the County, individually and collectively are to be covered as additional insureds on the Medical and Hospital Professional Liability (Errors & Omissions) and General Liability policies with respect to liability arising out of work or operations performed by or on behalf of the Contractor, or that should have been performed by or on behalf of the Contractor, including, without limitation, materials, parts, or equipment furnished in connection with such work or operations and automobiles owned, leased, hired or borrowed by or on behalf of the Contractor. General Liability coverage can be provided in the form of an endorsement to the Contractor's insurance (at least as broad as ISO from CG 2010 11 85 or **both** CG 2010, CG 2026, CG 2033, or CG 2038; **and** CG 2037 forms if later revisions used).

B.  Primary Insurance Endorsement

For any claims related to this Contract, Contractor's insurance coverage, including any excess liability policies, shall be primary insurance at least as broad as ISO CG 20 01 04 13 as respects the County, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers of the County, individually and collectively. Any insurance or self-insurance maintained by the County, its officers, employees, or volunteers shall be excess of the Contractor's insurance and shall not contribute with it.

C.  Notice of Cancellation

Each insurance policy required above shall state that coverage shall not be canceled, except with notice to the County.

D.  Severability of Interest Clause

Coverage applies separately to each insured, except with respect to the limits of liability, and that an act or omission by one of the named insureds shall not reduce or avoid coverage to the other named insureds.

### General Provisions

**5. Qualifying Insurers**

All required policies of insurance shall be issued by companies which have been approved to do business in the State of California by the State Department of Insurance, and which hold a current policy holder's alphabetic and financial size category rating of not less than A, VII according to the current Best's Key Rating guide, or a company of equal financial stability that is approved in writing by County Risk Management.

**6. Evidence of Insurance**

Prior to commencement of this Contract, but in no event later than the effective date of the Contract, Contractor shall furnish the County with a copy of the certificates of insurance and amendatory endorsements effecting coverage required by this clause. Renewal certificates and amendatory endorsements shall be furnished to County within thirty days of the expiration of the term of any required policy. Contractor shall permit County at all reasonable times to inspect any required policies of insurance.

**7. Failure to Obtain or Maintain Insurance; County's Remedies**

Contractor's failure to provide insurance specified or failure to furnish certificates of insurance and amendatory endorsements or failure to make premium payments required by such insurance shall constitute a material breach of the Contract, and County may, at its option, terminate the Contract for any such default by Contractor.

**8. No Limitation of Obligations**

The foregoing insurance requirements as to the types and limits of insurance coverage to be maintained by Contractor, and any approval of said insurance by the County are not intended to and shall not in any manner limit or qualify the liabilities and obligations otherwise assumed by Contractor pursuant to the Contract, including, but not limited to, the provisions concerning indemnification.

**9. Review of Coverage**

Ex. G - 552

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT B – INSURANCE REQUIREMENTS

County retains the right at any time to review the coverage, form and amount of insurance required herein and may require Contractor to obtain insurance reasonably sufficient in coverage, form and amount to provide adequate protection against the kind and extent of risk which exists at the time a change in insurance is required.

**10. Self-Insurance**
Contractor may, with the prior written consent of County Risk Management, fulfill some or all of the insurance requirements contained in this Contract under a plan of self-insurance. Contractor shall only be permitted to utilize such self-insurance if in the opinion of County Risk Management, Contractor's (i) net worth, and (ii) reserves for payment of claims of liability against Contractor, are sufficient to adequately compensate for the lack of other insurance coverage required by this Contract. Contractor's utilization of self-insurance shall not in any way limit liabilities assumed by Contractor under the Contract.

**11. Claims Made Coverage**
If coverage is written on a "claims made" basis, the Certificate of Insurance shall clearly so state. In addition to the coverage requirements specified above, such policy shall provide that:

    A.   The policy retroactive date coincides with or precedes Contractor's commencement of work under the Contract (including subsequent policies purchased as renewals or replacements).

    B.   Contractor will make every effort to maintain similar insurance during the required extended period of coverage following expiration of the Contact.

    C.   If insurance is terminated for any reason, Contractor shall purchase an extended reporting provision of at least three years to report claims arising in connection with the Contract.

    D.   The policy allows for reporting of circumstances or incidents that might give rise to future claims.

**12. Subcontractors' Insurance**
Contractor shall require and verify that all subcontractors maintain insurance meeting all the requirements stated herein, and Contractor shall ensure that County is an additional insured on insurance required from subcontractors. Such Additional Insured endorsement shall be attached to the certificate of insurance in order to be valid and on a form at least as broad as ISO from CG 2010 11 85 or both CG 2010, CG 2026, CG 2033, or CG 2038; and CG 2037 forms if later revisions used. Licensed professionals providing medical services must have Professional Liability insurance in an amount of not less than $1,000,000 each occurrence and $3,000,000 aggregate. If any sub contractor's coverage does not comply with the foregoing provisions, Contractor shall defend and indemnify the County from any damage, loss, cost, or expense, including attorneys' fees, incurred by County as a result of subcontractor's failure to maintain required coverage.

**13. Waiver of Subrogation**
Contractor hereby grants to County a waiver of their rights of subrogation which any insurer of Contractor may acquire against County by virtue of the payment of any loss. Contractor agrees to obtain any endorsement that may be necessary to affect this waiver of subrogation. The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the County for all work performed by the Contractor, its employees, agents and subcontractors.

**Ex. G - 553**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE

| Line Item Description | RFP Reference | Technical Proposal Reference | Occurrence | Base Year 1 | Optional Year 1 | Optional Year 2 |
|---|---|---|---|---|---|---|
| Personnel Expense (Salary, Benefits) | Attachment A-1 | 2.2, Staffing Plan | Continuous | $ 21,236,526.00 | $ 21,873,621.78 | $ 22,529,830.43 |
| Medical Supplies Expense | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 500,000.00 | $ 515,000.00 | $ 530,450.00 |
| Pharmaceutical Expense | Attachment A, 2.2.27 | 2.2.27, Pharmacy | Continuous | $ 7,600,000.00 | $ 7,828,000.00 | $ 8,062,840.00 |
| Offsite Expense | Attachment A, 2.2.18 | 2.2.18, Offsite | Continuous | $ 17,000,000.00 | $ 17,510,000.00 | $ 18,035,300.00 |
| Onsite Diagnostic Services | Attachment A, 2.2.28 | 2.2.28, Diagnostic Services | Continuous | $ 424,000.00 | $ 436,720.00 | $ 449,821.60 |
| Onsite Specialty Services (Dialysis, Physical Therapy, Vision Services, etc.) | Attachment A, 2.2.18 | 2.2.18, Onsite Specialty Care Services | Continuous | $ 575,000.00 | $ 592,250.00 | $ 610,017.50 |
| Medical Equipment and Maintenance | Attachment A, 2.8 | 2.13, Equipment and Supplies | Continuous | $ 150,000.00 | $ 154,500.00 | $ 159,135.00 |
| Office Supplies | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 25,000.00 | $ 25,750.00 | $ 26,522.50 |
| Healthcare Waste Disposal | Attachment A, 2.23 | 2.23, Health Care Waste | Continuous | $ 100,000.00 | $ 103,000.00 | $ 106,090.00 |
| Start Up Expenses | Attachment A, 2.35.23 | 2.35.23, Transition | Continuous | $ 110,000.00 | $ 110,000.00 | $ 110,000.00 |
| Insurance Expense | Exhibit B | Section 5 - Insurance Requirements | Continuous | $ 1,200,000.00 | $ 1,236,000.00 | $ 1,273,080.00 |
| Taxes and Licenses | Attachment A-1, Section 1 | 2.27-28, Licenses, Certifications, Registrations | Continuous | $ 100,000.00 | $ 103,000.00 | $ 106,090.00 |
| Administrative Overhead Expense | Attachment A, 2.18 | 2.19, Administration of Services | Continuous | $ 1,678,000.00 | $ 1,728,340.00 | $ 1,780,190.20 |
| Margin | | | Continuous | $ 986,000.00 | $ 1,015,580.00 | $ 1,046,047.40 |
| Additional Insurance* | | | Continuous | $ 2,843,412.00 | $ 2,843,412.00 | $ 2,843,412.00 |
| | | | Total | $ 54,527,938.00 | $ 56,075,173.78 | $ 57,668,826.63 |

*This line item will be reviewed annually by the Parties and revised as appropriate by mutual agreement of the Parties.

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE

| Line Item Description | RFP Reference | Technical Proposal Reference | Occurrence | Optional Year 3 | Optional Year 4 | Optional Year 5 |
|---|---|---|---|---|---|---|
| Personnel Expense (Salary, Benefits) | Attachment A-1 | 2.2, Staffing Plan | Continuous | $ 23,205,725.35 | $ 23,901,897.11 | $ 24,618,954.02 |
| Medical Supplies Expense | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 546,363.50 | $ 562,754.41 | $ 579,637.04 |
| Pharmaceutical Expense | Attachment A, 2.2.27 | 2.2.27, Pharmacy | Continuous | $ 8,304,725.20 | $ 8,553,866.96 | $ 8,810,482.96 |
| Offsite Expense | Attachment A. 2.2.15 | 2.2.18, Offsite | Continuous | $ 18,576,359.00 | $ 19,133,649.77 | $ 19,707,659.26 |
| Onsite Diagnostic Services | Attachment A, 2.2.28 | 2.2.28, Diagnostic Services | Continuous | $ 463,316.25 | $ 477,215.74 | $ 491,532.21 |
| Onsite Specialty Services (Dialysis, Physical Therapy, Vision Services, etc.) | Attachment A. 2.2.14 | 2.2.18, Onsite Specialty Care Services | Continuous | $ 628,318.03 | $ 647,167.57 | $ 666,582.59 |
| Medical Equipment and Maintenance | Attachment A, 2.8 | 2.13, Equipment and Supplies | Continuous | $ 163,909.05 | $ 168,826.32 | $ 173,891.11 |
| Office Supplies | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 27,318.18 | $ 28,137.72 | $ 28,981.85 |
| Healthcare Waste Disposal | Attachment A, 2.23 | 2.23, Health Care Waste | Continuous | $ 109,272.70 | $ 112,550.88 | $ 115,927.41 |
| Start Up Expenses | Attachment A, 2.35.23 | 2.35.23, Transition | Continuous | $ 110,000.00 | $ 110,000.00 | $ 110,000.00 |
| Insurance Expense | Exhibit B | Section 5 - Insurance Requirements | Continuous | $ 1,311,272.40 | $ 1,350,610.57 | $ 1,391,128.89 |
| Taxes and Licenses | Attachment A-1, Section 1 | 2.27-28, Licenses, Certifications, Registrations | Continuous | $ 109,272.70 | $ 112,550.88 | $ 115,927.41 |
| Administrative Overhead Expense | Attachment A, 2.18 | 2.19, Administration of Services | Continuous | $ 1,833,595.91 | $ 1,888,603.78 | $ 1,945,261.90 |
| Margin | | | Continuous | $ 1,077,428.82 | $ 1,109,751.69 | $ 1,143,044.24 |
| Additional Insurance* | | | Continuous | $ 2,843,412.00 | $ 2,843,412.00 | $ 2,843,412.00 |
| | | | Total | $ 59,310,289.09 | $ 61,000,995.40 | $ 62,742,422.89 |

*This line item will be reviewed annually by the Parties and revised as appropriate by mutual agreement of the Parties.

Ex. G - 555

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE

| Line Item Description | RFP Reference | Technical Proposal Reference | Occurrence | Optional Year 6 | Optional Year 7 | Optional Year 8 | Optional Year 9 |
|---|---|---|---|---|---|---|---|
| Personnel Expense (Salary, Benefits) | Attachment A-1 | 2.2, Staffing Plan | Continuous | $25,357,522.64 | $26,118,248.32 | $26,901,795.77 | $27,708,849.64 |
| Medical Supplies Expense | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 597,026.15 | $614,936.93 | $633,385.04 | $ 652,386.59 |
| Pharmaceutical Expense | Attachment A, 2.2.27 | 2.2.27, Pharmacy | Continuous | $ 9,074,797.45 | $9,347,041.38 | $9,627,452.62 | $ 9,916,276.20 |
| Offsite Expense | Attachment A. 2.2.15 | 2.2.18, Offsite | Continuous | $20,298,889.04 | $20,907,855.71 | $21,535,091.38 | $22,181,144.13 |
| Onsite Diagnostic Services | Attachment A, 2.2.28 | 2.2.28, Diagnostic Services | Continuous | $ 506,278.17 | $ 521,466.52 | $ 537,110.51 | $ 553,223.83 |
| Onsite Specialty Services (Dialysis, Physical Therapy, Vision Services, etc.) | Attachment A. 2.2.14 | 2.2.18, Onsite Specialty Care Services | Continuous | $ 686,580.07 | $ 707,177.47 | $ 728,392.80 | $ 750,244.58 |
| Medical Equipment and Maintenance | Attachment A, 2.8 | 2.13, Equipment and Supplies | Continuous | $ 179,107.84 | $184,481.08 | $ 190,015.51 | $ 195,715.98 |
| Office Supplies | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 29,851.31 | $30,746.85 | $ 31,669.25 | $ 32,619.33 |
| Healthcare Waste Disposal | Attachment A, 2.23 | 2.23, Health Care Waste | Continuous | $ 119,405.23 | $ 122,987.39 | $ 126,677.01 | $ 130,477.32 |
| Start Up Expenses | Attachment A, 2.35.23 | 2.35.23, Transition | Continuous | $ 110,000.00 | $ 110,000.00 | $ 110,000.00 | $ 110,000.00 |
| Insurance Expense | Exhibit B | Section 5 – Insurance Requirements | Continuous | $ 1,432,862.76 | $ 1,475,848.64 | $ 1,520,124.10 | $ 1,565,727.82 |
| Taxes and Licenses | Attachment A-1, Section 1 | 2.27-28, Licenses, Certifications, Registrations | Continuous | $ 119,405.23 | $ 122,987.39 | $ 126,677.01 | $ 130,477.32 |
| Administrative Overhead Expense | Attachment A, 2.18 | 2.19, Administration of Services | Continuous | $ 2,003,619.75 | $ 2,063,728.35 | $2,125,640.20 | $2,189,409.40 |
| Margin | | | Continuous | $ 1,177,335.56 | $ 1,212,655.63 | $ 1,249,035.30 | $1,286,506.36 |
| Additional Insurance* | | | Continuous | $ 2,843,412.00 | $ 2,843,412.00 | $ 2,843,412.00 | $ 2,843,412.00 |
| | | | Total | $ 64,536,093.20 | $66,383,573.66 | $68,286,478.50 | $ 70,246,470.50 |

*This line item will be reviewed annually by the Parties and revised as appropriate by mutual agreement of the Parties.

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: JBCT PRICING

| | *Allocated - Minimum 25 Beds | | | | | | |
|---|---|---|---|---|---|---|---|
| **Base Year** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 181.65 | x | 25 | x | 365 | = | $ 1,657,556.25 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 181.65 | x | 5 | x | 365 | = | $ 331,511.25 |

| **Total Base Year** | $ 1,989,067.50 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | | |
|---|---|---|---|---|---|---|---|
| **Option Year 1** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 187.10 | x | 25 | x | 365 | = | $ 1,707,282.94 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 187.10 | x | 5 | x | 365 | = | $ 341,456.59 |

| **Total Option Year 1** | $ 2,048,739.53 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | | |
|---|---|---|---|---|---|---|---|
| **Option Year 2** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 192.71 | x | 25 | x | 365 | = | $ 1,758,501.43 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 192.71 | x | 5 | x | 365 | = | $ 351,700.29 |

| **Total Option Year 2** | $ 2,110,201.71 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | | |
|---|---|---|---|---|---|---|---|
| **Option Year 3** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 198.49 | x | 25 | x | 365 | = | $ 1,811,256.47 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 198.49 | x | 5 | x | 365 | = | $ 362,251.29 |

| **Total Option Year 3** | $ 2,173,507.76 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | | |
|---|---|---|---|---|---|---|---|
| **Option Year 4** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 204.45 | x | 25 | x | 365 | = | $ 1,865,594.16 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | | **Total** |
| | $ 204.45 | x | 5 | x | 365 | = | $ 373,118.83 |

| **Total Option Year 4** | $ 2,238,712.99 |
|---|---|

Ex. G - 557

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: JBCT PRICING

| | *Allocated - Minimum 25 Beds | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Option Year 5 | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 210.58 | x | 25 | x | 365 | | = | $ 1,921,561.99 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 210.58 | x | 5 | x | 365 | | = | $ 384,312.40 |

| Total Option Year 5 | $ 2,305,874.38 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Option Year 6 | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 216.90 | x | 25 | x | 365 | | = | $ 1,979,208.85 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 216.90 | x | 5 | x | 365 | | = | $ 395,841.77 |

| Total Option Year 6 | $ 2,375,050.62 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Option Year 7 | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 223.41 | x | 25 | x | 365 | | = | $ 2,038,585.11 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 223.41 | x | 5 | x | 365 | | = | $ 407,717.02 |

| Total Option Year 7 | $ 2,446,302.13 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Option Year 8 | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 230.11 | x | 25 | x | 365 | | = | $ 2,099,742.67 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 230.11 | x | 5 | x | 365 | | = | $ 419,948.53 |

| Total Option Year 8 | $ 2,519,691.20 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Option Year 9 | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 237.01 | x | 25 | x | 365 | | = | $ 2,162,734.95 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | | Total |
| | $ 237.01 | x | 5 | x | 365 | | = | $ 432,546.99 |

| Total Option Year 9 | $ 2,595,281.93 |
|---|---|

*Contractor will invoice a fixed monthly amount for 25 beds as described above. If the bed count increases by up to 5 beds, Contractor will invoice County a fixed additional monthly amount per bed for up to the additional 5 beds as set forth above

Ex. G - 558

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: RADIOLOGY PRICING

| # | DESCRIPTION | UNIT OF MEASURE | ESTIMATED QUANTITY PER YEAR | BASE TERM Date of Award - 6/30/2021 UNIT PRICE | 1ST OPTION YEAR 7/1/2021-4/30/2022 UNIT PRICE | 2ND OPTION YEAR 6/1/2022-5/31/2023 UNIT PRICE | 3RD OPTION YEAR 6/1/2023-5/31/2024 UNIT PRICE | 4TH OPTION YEAR 6/1/2024-5/31/2025 UNIT PRICE |
|---|---|---|---|---|---|---|---|---|
| 1 | X-RAYS PROCESSING | EA | 44,424 | $11.22 | $11.56 | $11.90 | $12.26 | $12.63 |
| 2 | X-RAY TECHNICIAN | HOUR | 17,758 | $49.12 | $50.59 | $52.11 | $53.67 | $55.28 |
| 3 | STAT | EA | 120 | $100.00 | $103.00 | $106.09 | $109.27 | $112.55 |

Notes:  NUMBERS ARE ESTIMATES ONLY AND NOT GUARANTEED.

| # | DESCRIPTION | EXTENDED PRICE BASE TERM | EXTENDED PRICE 1ST OPTION YEAR | EXTENDED PRICE 2ND OPTION YEAR | EXTENDED PRICE. 3RD OPTION YEAR | EXTENDED PRICE 4TH OPTION YEAR |
|---|---|---|---|---|---|---|
| 1 | X-RAYS PROCESSING | $498,437.28 | $513,541.44 | $528,645.60 | $544,638.24 | $561,075.12 |
| 2 | X-RAY TECHNICIAN | $872,272.96 | $898,377.22 | $925,369.38 | $953,071.86 | $981,662.24 |
| 3 | STAT | $12,000.00 | $12,360.00 | $12,730.80 | $13,112.40 | $13,506.00 |
|   | TOTAL | $1,382,710.24 | $1,424,278.66 | $1,466,745.78 | $1,510,822.50 | $1,556,243.36 |

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| **San Diego Jail NaphCare Staffing Support** | | | | | | | | | | |
| STATCare Nurse Practitioners (Telehealth) | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| STATCare Auditors (Quality Assurance) | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| RN Trainers | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Pharmacy Team at Corporate (Manage detox patients) | NaphCare | 4.000 | 4.000 | 4.000 | 4.000 | 4.000 | | | 20 | 0.500 |
| Psych Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Medical Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Mental Health Program Director | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Administrative Assistant | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| **Night Shift** | | | | | | | | | | |
| STATCare Nurse Practitioners (Telehealth) | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |

**Total FTEs    13.700**

Ex. G - 560

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| San Diego Central Jail - SDCJ NaphCare Staffing - ADP 721 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | | |
| **Position Title** | **Staff Provider** | **Mon** | **Tues** | **Wed** | **Thurs** | **Fri** | **Sat** | **Sun** | **Hours** | **FTE** |
| Program Manager (Over all sites) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Medical Director (Over all sites) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| General Clinic Provider | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| NP/CIWA/MAT/General Clinic | NaphCare | 10.000 | 10.000 | 10.000 | 10.000 | 10.000 | | | 50 | 1.250 |
| Health Info. Mgmt Tech | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | | | 120 | 3.000 |
| Medical Director | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Office Assistant | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | | | 240 | 6.000 |
| Pharmacy Technician | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Mental Health Clinician | County | 64.000 | 64.000 | 64.000 | 64.000 | 64.000 | | | 320 | 8.000 |
| Mental Health Clinician (CF) | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| LVN | County | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | 32.000 | 32.000 | 264 | 6.600 |
| RN | County | 112.000 | 112.000 | 112.000 | 112.000 | 112.000 | 80.000 | 80.000 | 720 | 18.000 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psychologist | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Psychiatrist - General | NaphCare | 10.000 | 10.000 | | | | | | 20 | 0.500 |
| Psychiatrist - PSU | NaphCare | | | 10.000 | 10.000 | | | | 20 | 0.500 |
| Psych NP/PA | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych Behavioral Tech - PSU | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Dentist | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| Dental Assistant | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| **Evening Shift** | | | | | | | | | | |
| LVN | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 168 | 4.200 |
| RN | County | 104.000 | 104.000 | 104.000 | 104.000 | 104.000 | 80.000 | 80.000 | 680 | 17.000 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Behavioral Tech - PSU | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| **Night Shift** | | | | | | | | | | |
| LVN | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 168 | 4.200 |
| RN | County | 104.000 | 104.000 | 104.000 | 104.000 | 104.000 | 80.000 | 80.000 | 680 | 17.000 |

**Total FTEs        103.350**

Ex. G - 561

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| Las Colinas Detention and Reentry Facility - LCDRF NaphCare Staffing - ADP 494 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | | |
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
| General Clinic Provider | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| NP/CIWA/MAT/General Clinic | NaphCare | 10.000 | 10.000 | 10.000 | 10.000 | 10.000 | | | 50 | 1.250 |
| Health Info. Mgmt. Tech | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Occupational/Physical Therapist | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Office Assistant | County | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | | | 200 | 5.000 |
| Pharmacy Technician | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Recreational Therapist | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Mental Health Clinician | County | 56.000 | 56.000 | 56.000 | 56.000 | 56.000 | | | 280 | 7.000 |
| Mental Health Clinician (CF) | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| LVN | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 224 | 5.600 |
| RN | County | 88.000 | 88.000 | 88.000 | 88.000 | 88.000 | 88.000 | 88.000 | 616 | 15.400 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychologist | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Psychiatrist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist | NaphCare | 10.000 | 10.000 | | | | | | 20 | 0.500 |
| Psych NP/PA | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Behavioral Tech - PSU | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Dentist | NaphCare | | 8.000 | | | | | | 8 | 0.200 |
| Dental Assistant | NaphCare | | 8.000 | | | | | | 8 | 0.200 |
| **Evening Shift** | | | | | | | | | | |
| LVN | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 32.000 | 32.000 | 184 | 4.600 |
| RN | County | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 504 | 12.600 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Behavioral Tech - PSU | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| **Night Shift** | | | | | | | | | | |
| LVN | County | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 112 | 2.800 |
| RN | County | 64.000 | 64.000 | 64.000 | 64.000 | 64.000 | 64.000 | 56.000 | 440 | 11.000 |

**Total FTEs**    **83.050**

**Ex. G - 562**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| George Bailey Detention Facility - GBDF/Facility 8 NaphCare Staffing - ADP 1,270 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | | |
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
| General Clinic Provider | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| General Clinic - Addition/Adseg Provider | NaphCare | | | | 8.000 | | | | 8 | 0.200 |
| Health Info. Mgmt. Clerk | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Health Info. Mgmt. Tech | County | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Sr. Health Info. Mgmt. Tech | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Office Assistant | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | | | 160 | 4.000 |
| Pharmacy Technician | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Mental Health Clinician | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | | | 240 | 6.000 |
| LVN | County | 32.000 | 32.000 | 40.000 | 32.000 | 32.000 | 32.000 | 32.000 | 232 | 5.800 |
| RN | County | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 504 | 12.600 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychologist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist | NaphCare | | | | | | 8.000 | | 8 | 0.200 |
| Psych NP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Tech | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Discharge Planner | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Dentist | NaphCare | 8.000 | | | 8.000 | | | | 16 | 0.400 |
| Dental Assistant | NaphCare | 8.000 | | | 8.000 | | | | 16 | 0.400 |
| **Evening Shift** | | | | | | | | | | |
| LVN | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 224 | 5.600 |
| RN | County | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 64.000 | 64.000 | 488 | 12.200 |
| Psych NP | NaphCare | 8.000 | 8.000 | | 8.000 | 8.000 | | 8.000 | 40 | 1.000 |
| **Night Shift** | | | | | | | | | | |
| LVN | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 224 | 5.600 |
| RN | County | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 64.000 | 64.000 | 488 | 12.200 |

**Total FTEs    79.700**

Ex. G - 563

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

## East Mesa Reentry Facility - EMRF
### NaphCare Staffing
#### Day Shift

| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| General Clinic Provider | NaphCare | | 8.000 | | | 8.000 | | | 16 | 0.400 |
| RN | County | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | 280 | 7.000 |
| Psych NP | NaphCare | | 8.000 | | 8.000 | | | | 16 | 0.400 |
| Dentist | NaphCare | | | | | 8.000 | | | 8 | 0.200 |
| Dental Assistant | NaphCare | | | | | 8.000 | | | 8 | 0.200 |

**Total FTEs    8.200**

## South Bay Detention Facility - SBDF
### NaphCare Staffing
#### Day Shift

| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| General Clinic Provider | NaphCare | | | 8.000 | | | | | 8 | 0.200 |
| RN | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | | | 120 | 3.000 |

**Total FTI s    3.200**

Ex. G - 564

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Vista Detention Facility - VDF**<br>**NaphCare Staffing** | | | | | | | | | | |
| **Day Shift** | | | | | | | | | | |
| **Position Title** | **Staff Provider** | **Mon** | **Tues** | **Wed** | **Thurs** | **Fri** | **Sat** | **Sun** | **Hours** | **FTE** |
| General Clinic Provider | NaphCare | 14.000 | 14.000 | 14.000 | 14.000 | 14.000 | 8.000 | 8.000 | 86 | 2.150 |
| Health Info. Mgmt. Clerk | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Office Assistant | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | | | 160 | 4.000 |
| Mental Health Clinician | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | | | 240 | 6.000 |
| LVN | County | 24.000 | 16.000 | 24.000 | 16.000 | 24.000 | 16.000 | 16.000 | 136 | 3.400 |
| RN | County | 56.000 | 56.000 | 56.000 | 56.000 | 48.000 | 48.000 | 48.000 | 368 | 9.200 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychologist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych NP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Tech | NaphCare | | | | | | | | 0 | 0.000 |
| Dentist | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| Dental Assistant | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| **Evening Shift** | | | | | | | | | | |
| LVN | County | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 112 | 2.800 |
| RN | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 336 | 8.400 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| **Night Shift** | | | | | | | | | | |
| LVN | County | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 112 | 2.800 |
| RN | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 336 | 8.400 |

**Total FTEs    55.150**

**Ex. G - 565**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS

1. **ACCESSING ADULT CRIMINAL JUSTICE INFORMATION**.

In accordance with the Federal Bureau of Investigations' (FBI) Criminal Justice Information Services (CJIS) Security Policy, Title 28, Code of Federal Regulations, Part 20, and the California Department of Justice's California Law Enforcement Telecommunications System (CLETS) Policies, Practices and Procedures Manual (PPP), the following must be completed and agreed to by both parties:

1.1. Purpose. CONTRACTOR requires access to criminal offender record information as defined by California Penal Code section 11075 and 13102, including local summary criminal offender record information (collectively, "CORI"), or a facility that maintains CORI or CLETS while carrying out its duties under this Agreement of providing medical and mental health services for jail inmates for the COUNTY. CORI may also include information from the California Law Enforcement Telecommunications System ("CLETS"). CORI and CLETS shall collectively be referred to as Criminal Justice Information Systems ("CJIS")

1.2. Reserved.

1.3. Fingerprint Background Check.  All persons of CONTRACTOR having direct or indirect access to information from a CJIS database must complete a fingerprinting background check by the Sheriff per CJIS section 5.12 and PPP section 1.9.2 prior to allowing unescorted access to CJIS , including but not limited to research staff, IT staff, and system administrators;

    1.3.1. Security Control:  COUNTY has the ability to set, maintain and enforce Standards for the selection, supervision and termination of personnel.  This does not grant hiring/firing authority to County, only the authority to grant the CJIS access to personnel who meet these standards and deny it to those who do not.

1.4. Training. All persons having access to information from the CJIS, must be trained in the operation, policies and procedures of each file that may be accessed or updated within six (6) months of employment or assignment.  Training can only be provided by the CLETS subscribing agency's certified CLETS/NCIC trainer, and must meet all the CLETS training requirements per CJIS section 5.2 and PPP section 1.8.2. Biennially, provide retesting and reaffirm the proficiency of all the CORI and CLETS operators, if applicable.  CONTRACTOR shall complete Attachment 1 Training Request and send to Sheriff;

    1.4.1.  Maintenance of Training Records.  CONTRACTOR shall maintain records of all training testing and proficiency affirmation in accordance with section 1.8.3.A.3 of the PPP and shall be made available for inspection, upon request by COUNTY. An individual computerized or written log must be maintained on each full access operator.  Such logs may be destroyed three years after the operator is separated from the agency.  Training records for less than full access operators, practitioners, administrators and other sworn/non-sworn law enforcement personnel shall be maintained on a computerized or written group log.  Less than full access operator group logs shall be retained indefinitely by the agency.  The examinations may be discharged upon entry of the required information in the appropriate log.

1.5. Employee/Volunteer Statement Form:  Pursuant to PPP section 1.5.1, all contractor, employees, agents,

**Ex. G - 566**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS

volunteers and subcontractor personnel with direct or indirect access to CJIS shall sign the Employee/Volunteer Statement Form (Attachment 2) and return to Sheriff;.

1.6. <u>Private Management Control Agreement</u>. In order to access facilities and areas in which CJIS and its information are contained, CONTRACTOR shall sign the Private Management Control Agreement, incorporated into this agreement, (Attachment 3).

1.7. <u>Security Addendum</u>. The FBI CJIS Security Addendum shall be signed and incorporated into this agreement. (Attachment 4)

1.8. <u>Changes to Access</u>. CONTRACTOR shall notify Sheriff of any changes in writing when employees, agents, volunteers or subcontractors assigned to this Agreement are added or removed within thirty days of assignment or termination.

1.9. <u>Security Controls</u>. CONTRACTOR must take reasonable precautions to protect CJIS from unauthorized access. CONTRACTOR is required to submit to Sheriff a detailed plan of the security measures in place to guard against unauthorized access of hard copies or electronic files containing CJIS. It is incumbent upon CONTRACTOR to prevent disclosure of CORI from unauthorized users throughout the duration of this Agreement and to immediately report any security breach to Sheriff.

    1.9.1. Policies governing the operation of computers, access devices, circuits, hubs, boundary protection devices and other components that make up and support a telecommunications network and related CA DOJ criminal justice databases used to process, store or transmit criminal justice information, guaranteeing the priority, integrity and availability of service needed by the criminal justice community.

    1.9.2. Security control includes, but is not limited to, the supervision of applicable equipment, systems design, programming and operating procedures associated with the development, implementation and operation of any computerized message-switching or database systems utilized by the served law enforcement agency or agencies. Computer sites must have adequate physical security to protect against any unauthorized viewing or access to computer terminals, access devices or stored/printed data.

    1.9.3. <u>Reporting Requirements for Unauthorized Access</u>. It is incumbent upon CONTRACTOR to prevent disclosure of CORI from unauthorized users throughout the duration of this Agreement and to immediate report any security breach to Sheriff.

1.10. <u>Penalties for Misuse</u>. CJIS and related data, by its very nature, is very sensitive and has potential for great harm if misused. Access to criminal offender record information and related data is therefore limited to the purpose(s) provided for in this Agreement. Misuse of the system by, among other things: accessing it without authorization; accessing it by exceeding authorization; accessing it for an improper purpose; using, disseminating or secondary dissemination of information received as a result of this contract for a purpose other than that envisioned by the contract, may subject persons to administrative criminal penalties. *Such exposure for misuse includes, but is not limited to, suspension or termination of this Agreement and prosecution for state and federal crimes.*

1.11. <u>Record Retention of CORI</u>. CONTRACTOR must destroy any information and records received

**Ex. G - 567**

Case 3:20-cv-00406-AJB-DDL    Document 796-2    Filed 01/21/25    PageID.34558
Page 305 of 546
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS

from CJIS, in accordance with California Code of Regulations (CCR) section 708(a) of Chapter 7 of Division 1 of Title 11 after the research project is completed. When the CJIS is furnished in an electronic format, the CJIS must be deleted from any electronic storage medium in which it was stored after the research project is completed. The medium, by which the information was furnished, such as disc or tape, must be destroyed or disabled so that any access to the information is not possible. Any hard copies made from electronic records must be destroyed in accordance with section 708(a) of Chapter 7of Division 1 of Title 11 of the CCR.

1.12.    Audit Right. COUNTY has the responsibility and authority to monitor, audit and enforce the implementation of this agreement. Periodic unannounced site inspections and scheduled audits may be performed by Sheriff to ensure compliance with the CJIS and PPP policies and regulations.

1.13.    Publication: When data derived from CJIS is used or referenced in any publication, a copy of that publication must be furnished to each party of this Agreement. Under Penal Code section 13202, any disclosure of information received from CJIS shall not contain any identifying information.

1.14.    Application:  In order to ensure the safety of program offenders and the integrity of this program, this section 1, Access to Adult Criminal Justice Information, shall apply to all employees, volunteers, interns and subcontractors with access or potential access to CJIS.  Direct, indirect or potential access to CLETS and CORI, can be in the form of hardcopy documentation, verbal communication, or other forms of information sharing, as well as unescorted access to County facilities where CLETS and CORI is created, stored, processed, handled, transmitted, or discussed.

**2.    USE OF COUNTY DATA/INFORMATION**
Contractor staff assigned to this contract may have access to County information systems.  The County of San Diego requires all Contractor staff to read, sign, and comply with the "Summary of Policies Regarding County Data/Information and Information Systems." These policies include the County Administrative Manual Items 0400-11 (COUNTY DATA/INFORMATION – CLASSIFICATION, PROTECTION LEVEL, AND PROPER SECURITY), 0400-01 (COUNTY INFORMATION SYSTEMS – MANAGEMENT AND USE), and 0400-07 (TELECOMMUNICATIONS SYSTEMS – MANAGEMENT AND USE.  Contractor shall obtain these policies from the COR

2.1  Contractor shall require its staff assigned to this contract to read and sign the "Summary of Policies Regarding County Data/Information and Information Systems" (Attachment 5).

2.2  Contractor shall maintain documentation of compliance with requirement.

2.3  Contractor shall require its staff assigned to this contract to comply with the County procedures and regulations cited in the "Summary of Policies Regarding County Data/Information and Information."

**3.    PRISON RAPE ELIMINATION ACT (PREA)**
Contractor shall adopt and comply with the Prison Rape Elimination Act of 2003, 42 U.S.C. 15601 et seq. (PREA), any applicable PREA standards (including 28 C.F.R. 115 et seq.), and any related County ordinances or Sheriff Department policies regarding PREA for preventing, detecting, monitoring, investigating and eradicating any form of sexual abuse.  Such PREA standards require that all volunteers, officers, employees, agents and subcontractors who have contact with residents under this contract receive training pursuant to 28 C.F.R. 115.332.  Contractor shall provide Sheriff with documentation confirming that all volunteers, officers, employees, agents, and subcontractors understand the training they have received.  Contractor acknowledges that the County will monitor Contractor's compliance with PREA, any applicable PREA standards, and County ordinances or Sheriff

Ex. G - 568

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS

Department policies relating to sexual abuse, and may conduct announced and/or unannounced compliance monitoring to include "on-site" monitoring. Contractor agrees that it will pay any and all evaluation and treatment costs arising from sexual abuse of offenders and as a result of confinement during the term of this agreement, as required by applicable laws and regulations including, but not limited to, Title 28 of the Code of Federal Regulations, sections 115.282 and 115.283. Failure to comply with PREA, including PREA Standards and County PREA policies, may result in termination of the contract. If the County determines that a PREA violation contributes to the curtailment of an essential service or poses an immediate threat to life, health or property, County may terminate the contract immediately upon issuing oral or written notice to the Contractor without any prior notice or opportunity to cure.

Ex. G - 569

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS
ATTACHMENT 1 – CORI TRAINING REQUEST FORM

**Criminal Offender Record Information (CORI) Training Requirement:**

Penal Code Section 11075 and 11077(d) requires the County to ensure that only a certified CLETS/NCIC trainer initially trains all sworn/non-sworn, non-criminal justice, **volunteer and contractor personnel**, with "physical and logical access" to CLETS, NCIC and CORI within six months of assignment. CORI training has to be scheduled within 30 days of assignment.

**Contract Staff Information:**

Request to Enroll the Following Staff in CORI Training: ☐ Contract  ☐ VIP  ☐ Other: _____

First and Last Name (Print): _____

Staff E-mail Address (Print): _____

Program Name: _____

Date Assigned to Program: _____

Work Address: _____

Contractor or VIP Group: _____

If Contract Staff is Replacing Someone, Print First & Last Name: _____

Contract Supervisor First and Last Name _____

Contract Supervisor Signature:    x _____    Date: _____

Contract Supervisor E-mail Address _____

**Sheriff COR/Designee:**

Type of CORI Training: ☐ 1½ Hour  ☑ 4 Hour

Contract Analyst First and Last Name (Print): _____

COR/Designee First and Last Name (Print): _____

COR/Designee Signature:  x _____    Date: _____

**Contractor:** *Please forward to COR/County Designee*

Ex. G - 570

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS
ATTACHMENT 2 – EMPLOYEE/VOLUNTEER STATEMENT



STATE OF CALIFORNIA
HDC 0009
(Orig. 09/2001, Rev. 03/2010)

DEPARTMENT OF JUSTICE
PAGE 1 of 1

**CLETS EMPLOYEE/VOLUNTEER STATEMENT**

**Use of information from the California Law Enforcement Telecommunications System (CLETS)
and the Department of Motor Vehicles record information**

As an employee/volunteer of _____ , you
may have access to confidential criminal records, the Department of Motor Vehicle records or other criminal justice information, much of which is controlled by statute. All information from the CLETS is based on the "need-to-know" and the "right-to-know" basis. The misuse of such information may adversely affect an individual's civil rights and violates the law and/or CLETS policies.

Penal Code (PC) section 502 prescribes the penalties relating to computer crimes. PC sections 11105 and 13300 identify who has access to state and local summary criminal history information and under which circumstances it may be released. PC sections 11141-11143 and 13302-13304 prescribe penalties for misuse of state and local summary criminal history information. Government Code section 6200 prescribes the felony penalties for misuse of public records and information from the CLETS. California Vehicle Code section 1808.45 prescribes the penalties relating to misuse of the Department of Motor Vehicle record information.

Penal Code sections 11142 and 13303 state:

> **"Any person authorized by law to receive a record or information obtained from a record who knowingly furnishes the record or information to a person not authorized by law to receive the record or information is guilty of a misdemeanor."**

Any employee/volunteer who is responsible for the CLETS misuse is subject to immediate dismissal from employment. Violations of the law may result in criminal and/or civil action.

*I HAVE READ THE ABOVE AND UNDERSTAND THE POLICY REGARDING MISUSE OF ALL INFORMATION FROM THE CLETS.*

_____        _____
Signature                              Print Name

_____
Date

Ex. G - 571

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS
ATTACHMENT 3 – PRIVATE MANAGEMENT CONTROL AGREEMENT



STATE OF CALIFORNIA
HDC 0004B
(Orig. 11/2005; Rev. 03/2010)

DEPARTMENT OF JUSTICE
PAGE 1 of 2

### CLETS PRIVATE CONTRACTOR
### MANAGEMENT CONTROL AGREEMENT

Agreement to allow California Law Enforcement Telecommunications System (CLETS) access by

_____ , _____
(Public law enforcement/criminal justice agency)                    (ORI)

to _____
(Private Contractor)

to perform _____ services on its behalf.
(Type of service)

------------------------------------------------------------------------------------

Access to the CLETS is authorized to public law enforcement and criminal justice agencies (*hereinafter referred to as the CLETS subscribing agency*) only, which may delegate the responsibility of performing the administration of criminal justice functions (e.g., dispatching functions or data processing/information services) in accordance with the Federal Bureau of Investigation's (FBI) Criminal Justice Information Services (CJIS) Security Addendum to a private contractor. The private contractor may access systems or networks that access the CLETS on behalf of the CLETS subscribing agency to accomplish the above-specified service(s). This agreement must be received by the California Department of Justice (CA DOJ) prior to the subscribing agency permitting access to the CLETS. The performance of such delegated services does not convert that agency into a public criminal justice agency, not automatically authorize access to state summary criminal history information. Information from the CLETS is confidential and may be used only for the purpose(s) for which it is authorized. Violation of confidentiality requirements or access authorizations may be subject to disciplinary action or criminal charges.

Pursuant to the policies outlined in the *CLETS Policies, Practices, and Procedures (PPP)* and the Federal Bureau of Investigation's (FBI) *CJIS Security Policy*, it is agreed the CLETS subscribing agency will maintain responsibility for security control as it relates to the CLETS access. Security control is defined as the ability of the CLETS subscribing agency to set, maintain, and enforce:

1. Standards for the selection, supervision, and termination of personnel. This does not grant hiring/firing authority to the CLETS subscribing agency, only the authority to grant CLETS access to personnel who meet these standards and deny it to those who do not.

2. Policies governing the operation of computers, access devices, circuits, hubs, routers, firewalls, and other components that make up and support a telecommunications network and related CA DOJ criminal justice databases used to process, store, or transmit criminal justice information, guaranteeing the priority, integrity, and availability of service needed by the criminal justice community.

Security control includes, but is not limited to, the supervision of applicable equipment, systems design, programming, and operating procedures associated with the development, implementation, and operation of any computerized message-switching or database systems utilized by the served law enforcement agency or agencies. Computer sites must have adequate physical security to protect against any unauthorized viewing or access to computer terminal, access devices, or stored/printed data.

**Ex. G - 572**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS
ATTACHMENT 3 – PRIVATE MANAGEMENT CONTROL AGREEMENT



STATE OF CALIFORNIA
HDC 0004B
(Orig. 11/2005; Rev. 03/2010)

DEPARTMENT OF JUSTICE
PAGE 2 of 2

### CLETS PRIVATE CONTRACTOR
### MANAGEMENT CONTROL AGREEMENT

Additionally, it is the responsibility of the CLETS subscribing agency to ensure that all private contractors receiving information from the CLETS meet the minimum training, certification, and background requirements that are also imposed on the CLETS subscribing agency's staff. The minimum requirements are applicable also to staff having access to record storage areas containing information from the CLETS. The minimum requirements include, but are not limited to:

1.  Prior to allowing the CLETS access, train, functionally test, and affirm the proficiency of all the CLETS computer operators to ensure compliance with the CLETS and the FBI's National Crime Information Center (NCIC) policies and regulations, if applicable. Biennially, provide testing and reaffirm the proficiency of all the CLETS operators, if applicable.

2.  State and FBI criminal offender record information searches must be conducted prior to allowing access to the CLETS computers, equipment, or information. If the results of the criminal offender record information search reveal a record of any kind, access will not be granted until the CLETS subscribing agency can review the matter to decide if access is appropriate. If a felony conviction of any kind is found, access shall not be granted.

3.  Each individual must sign a CLETS Employee/Volunteer Statement form (HDC 0009) prior to operating or having access to CLETS computers, equipment, or information.

In accordance with CLETS/NCIC policies, the CLETS subscribing agency has the responsibility and authority to monitor, audit, and enforce the implementation of this agreement by the private contractor. The private contractor agrees to cooperate with the CLETS subscribing agency in the implementation of this agreement and to accomplish the directives for service under the provisions of this agreement. The CLETS Management Control Agreement (HDC 0004B) shall be updated when the head of either agency changes or immediately upon request from the CA DOJ.

By signing this agreement, the vendors and private contractors certify they have read and are familiar with the contents of (1) the FBI's CJIS Security Addendum, (2) the NCIC 2000 Operating Manual, (3) the FBI's CJIS Security Policy, (4) Title 28, Code of Federal Regulations, Part 20, and (5) the CLETS PPP and agree to be bound by their provisions. Criminal offender record information and related data, by its very nature, is sensitive and has potential for great harm if misused. Access to criminal offender record information and related data is therefore limited to the purpose(s) for which the CLETS subscribing agency has entered into the contract. Misuse of the system by, among other things: accessing it without authorization; accessing it by exceeding authorization; accessing it for an improper purpose; use, dissemination, or secondary dissemination of information received as a result of this contract for a purpose other than that envisioned by the contract, may subject me to administrative and criminal penalties. Accessing the system for an appropriate purpose and then using, disseminating, or secondary dissemination of information received for another purpose other than execution of the contract also constitutes misuse. Such exposure for misuse includes, but is not limited to, suspension or loss of employment and prosecution for state and federal crimes.

| | |
|---|---|
| Signature (CLETS Subscribing Agency Head) | Signature (Private Contractor Agency Head) |
| Print Name and Title | Print Name and Title |
| Date | Date |

Ex. G - 573

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D –– CORI / CLETS REQUIREMENTS
ATTACHMENT 4 – CJIS SECURITY ADDENDUM

STATE OF CALIFORNIA
HDC 0012
(Orig. 02/2009; Rev. 04/2016)



DEPARTMENT OF JUSTICE
PAGE 1 of 1

**FEDERAL BUREAU OF INVESTIGATION
CRIMINAL JUSTICE INFORMATION SERVICES
SECURITY ADDENDUM**

PRINT    RESET

### CERTIFICATION

I hereby certify that I am familiar with the contents of (1) the Security Addendum, including its legal authority and purpose; (2) the NCIC Operating Manual; (3) the CJIS Security Policy; and (4) Title 28, Code of Federal Regulations, Part 20, and agree to be bound by their provisions.

I recognize that criminal history record information and related data, by its very nature, is sensitive and has potential for great harm if misused. I acknowledge that access to criminal history record information and related data is therefore limited to the purpose(s) for which a government agency has entered into the contract incorporating this Security Addendum. I understand that misuse of the system by, among other things: accessing it without authorization; accessing it by exceeding authorization; accessing it for an improper purpose; using, disseminating or re-disseminating information received as a result of this contract for a purpose other than that envisioned by the contract, may subject me to administrative and criminal penalties. I understand that accessing the system for an appropriate purpose and then using, disseminating or re-disseminating the information received for another purpose other than execution of the contract also constitutes misuse. I further understand that the occurrence of misuse does not depend upon whether or not I receive additional compensation for such authorized activity. Such exposure for misuse includes, but is not limited to, suspension or loss of employment and prosecution for state and federal crimes.

_____          _____
Printed Name/Signature of Contractor Employee                              Date

_____          _____
Printed Name/Signature of Contractor Representative                       Date

_____
Organization and Title of Contractor Representative

Ex. G - 574

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D — CORI / CLETS REQUIREMENTS
ATTACHMENT 5 – SUMMARY OF POLICIES REGARDING COUNTY DATA/INFORMATION
AND INFORMATION SYSTEMS

 **COUNTY OF SAN DIEGO**

**Summary of Policies**
*Regarding County Data/Information and Information Systems*

To aid in the performance of their regular job assignments and duties, County employees, volunteers, agents and contractors are provided access to many County tools and resources. In the electronic age, these tools and resources include County "data/information" in various formats (e.g. on electronic media, paper, microfiche) and County "information systems" (e.g. computers, servers, networks, Internet access, fax, telephones and voice mail), whether owned, provided or maintained by or on behalf of the County.

The County has established policies and procedures based on best business practices to support the performance of the County's business and to protect the integrity, security and confidentiality of the County's data/information and information systems. Users[1] of these resources play a critical role. By carrying out their regular assignments and duties in compliance with all applicable County's policies and procedures, best practices are maintained.

This summary helps users know their responsibilities by highlighting important aspects of policies that govern access to and use of County data/information and information systems. The policies themselves provide further detailed information governing the use of County data/information and information systems and should be reviewed. Most notably, the County Chief Administrative Officer (CAO) Policy *Acceptable Use of County Data/Information* provides additional guidance on protecting County data/information; the CAO Policy *County Information Systems – Management and Use* provides guidance in controlling and using County information systems; and the CAO Policy *Telecommunications – Management and Use* provides guidance in using desktop and cellular telephones.

Access to County data/information or information systems is necessary to the performance of regular assignments and duties. Failure to comply with these policies and procedures may constitute a failure in the performance of regular assignments/duties. Such failure can result in the temporary or permanent denial of access privileges and/or in discipline, up to and including termination, in accordance with Civil Service Rules.

1. County data/information in all formats and information systems are for authorized County use only. Personal use of County information systems is prohibited unless specifically authorized by the Appointing Authority.

2. As part of their regular assignments and duties, users are responsible for protecting any data / information and information systems provided or accessible to them in connection with County business or programs.

3. Users cannot share data/information with others outside of their regular duties and responsibilities unless specifically authorized to do so.

4. Users have no expectation of privacy regarding any data/information created, stored, received, viewed, accessed, deleted or input via County information systems. The County retains the right to monitor, access, retrieve, restore, delete or disclose such data/information.

---

[1] *For purposes of this summary, the term "user" shall refer to any person authorized to use County data/information and information systems to perform work in support of the business, programs or projects in which the County is engaged. It also applies to users accessing other networks, including the Internet, through County information systems.*

(Rev 7/01/08)

**Ex. G - 575**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D — CORI / CLETS REQUIREMENTS
ATTACHMENT 5 – SUMMARY OF POLICIES REGARDING COUNTY DATA/INFORMATION
AND INFORMATION SYSTEMS

5. Attempts by users to access any data or programs contained on County information systems for which they do not have authorization will be considered a misuse.

6. Users shall not share their County account(s) or account password(s) with anyone, use another's account to masquerade as that person, or falsely identify themselves during the use of County information systems.

7. The integrity and security of County data/information depends on the observation of proper business practices by all authorized users. Users are requested to report any weaknesses in County information system security and any incidents of possible misuse or violation of County IT policies to the appropriate County representative.

8. Users shall not divulge Dial-up or Dial-back modem phone numbers to anyone.

9. Users shall not make copies of system configuration files (e.g. password files) for their own unauthorized use or to provide to other people/users for unauthorized uses.

10. Users shall not make copies of copyrighted software or information, except as permitted by law or by the owner of the copyright.

11. Users shall not engage in any activity that harasses, defames or threatens others, degrades the performance of information systems, deprives an authorized County user access to a County resource, or circumvents County security measures.

12. Users shall not download, install or run security programs or utilities that reveal or exploit weaknesses in the security of a County information system. For example, County users shall not run password cracking or network scanning programs on County information systems.

Misuse of workplace tools and resources, including County data/information and/or County information systems, will be reported to a user's management. Misuse may constitute a failure to perform regular duties and assignments. Such failure may result in short-term or permanent loss of access to County data/information or information systems and/or disciplinary action in accordance with Civil Service Rules, up to and including termination. For non County employees, including volunteers and employees of County contractors, misuse may result in a suspension or withdrawal of your access rights, termination of your participation in County programs, or appropriate against the contractor under the contract's terms, or any combination of all or some of the above consequences.

**Acknowledgement:**
I have received and read the County of San Diego's Summary of Policies Regarding County Data/information and Information Systems.

Print Name:

_____

Signature:                                              Date Signed:

_____

Supervisor / Manager / Witness:                         Date Signed:

| ALL SIGNERS: | Keep a copy of this summary for your reference. |
|---|---|
| COUNTY SIGNERS: | Department Personnel Representative --- file the original of this form in the authorized user's agency or department personnel file. |
| NON-COUNTY SIGNERS: | Contract administrator --- file the original form along with the contract |

(Rev 7/01/08)

Ex. G - 576

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT E – TRANSITION PLAN

**Transition plan dated March 1, 2022**

**Ex. G - 577**

# EXHIBIT H

COUNTY OF SAN DIEGO – DEPARTMENT OF PURCHASING AND CONTRACTING
AMENDMENT
CONTRACT 566117, MODIFICATION 01
Effective Date: Date Signed by Department of Purchasing and Contracting

Contractor: Naphcare, Inc.
Agreement Title: Consolidated Health Care Delivery

**Contractor and County of San Diego ("County") enter into this amendment ("Amendment") to modify the above-referenced contract ("Agreement") as described herein.**

1. Agreement Terms and Work:
1.1. Replace, Staffing Matrix Schedule with the attached Staffing Matrix Schedule marked Modification 01 with changes noted below and additions marked with a line in the right-hand margin.
1.1.1. Corporate Staffing Support is modified as follows.
1.1.1.1. The following positions are added to the Day Shift.
1.1.1.1.1. One (1) Training and Compliance Coordinator
1.1.1.2. The following positions are removed from the Day Shift.
1.1.1.2.1. Two (2) RN Trainers
1.1.1.2.2. One (1) Mental Health Program Director
1.1.1.2.3. One (1) Administrative Assistant
1.1.2. San Diego Central Jail Staffing is modified as follows.
1.1.2.1. The following positions are added to the Day Shift.
1.1.2.1.1. One (1) Mental Health Program Director
1.1.2.1.2. One (1) Administrative Assistant
1.1.2.1.3. Two (2) Nurse Practitioners - MAT
1.1.2.1.4. One (1) Nurse Practitioner (Medical)
1.1.2.1.5. One (1) Nurse Practitioner (Psychiatry)
1.1.2.1.6. (0.5) Psychiatrist – General
1.1.2.1.7. (0.9) Psychiatrist – PSU
1.1.2.1.8. One (1) Psych Nurse Practitioner
1.1.2.1.9. Two (2) Discharge Planners
1.1.2.2. The following positions are removed from the Day Shift.
1.1.2.2.1. One (1) Psychologist
1.1.2.2.2. One (1) Psych Behavioral Tech – PSU
1.1.2.3. The following positions are removed from the Evening Shift.
1.1.2.3.1. One (1) Psych Behavioral Tech – PSU
1.1.3. Las Colinas Detention Facility Staffing is modified as follows.
1.1.3.1. The following positions are added to the Day Shift.
1.1.3.1.1. (0.3) OB/GYN Clinic
1.1.3.1.2. (0.2) Psychiatrist – PSU
1.1.3.1.3. One (1) Discharge Planner
1.1.3.2. The following positions are removed from the Day Shift.
1.1.3.2.1. One (1) Psychologist
1.1.3.2.2. One (1) Psych Behavioral Tech – PSU
1.1.3.3. The following positions are removed from the Evening Shift.
1.1.3.3.1. One (1) Psych Behavioral Tech – PSU
1.1.4. George Bailey Detention Facility Staffing is modified as follows.
1.1.4.1. The following positions are added to the Day Shift.
1.1.4.1.1. (0.6) Psych Nurse Practitioner
1.1.4.1.2. Two (2) Qualified Mental Health Professionals (QHMP)
1.1.4.1.3. Two (2) Dental Hygienist
1.1.4.2. The following positions are removed from the Day Shift.
1.1.4.2.1. (0.2) Psychiatrist – General
1.1.4.2.2. One (1) Psych Behavioral Tech – PSU
1.1.4.2.3. Two (2) Discharge Planners
1.1.5. East Mesa Reentry Facility Staffing is modified as follows.
1.1.5.1. The following positions are removed from the Day Shift.
1.1.5.1.1. (0.15) Psych Nurse Practitioner
1.1.6. Rock Mountain Detention Facility Staffing is modified as follows.
1.1.6.1. The following positions are added to the Day Shift.
1.1.6.1.1. One (1) General Clinic Provider
1.1.7. Vista Detention Facility Staffing is modified as follows.

**Ex. H - 579**

      1.1.7.1.  The following positions are added to the Day Shift.
         1.1.7.1.1.  One (1) Discharge Planner
      1.1.7.2.  The following positions are removed from the Day Shift.
         1.1.7.2.1.  (0.8) Psychiatrist - General

2.   Compensation: As a result of the Amendment, Contractor's Compensation is increased by an amount of $24,302,372, resulting in a new Maximum Agreement Amount of $645,080,634.
 2.1. Add, Exhibit C – Payment Schedule Expenses Pricing Summary marked Modification 01 as attached.

3.   Term of Agreement: The contract term remains unchanged.

**All other terms and conditions remain in effect.**

IN WITNESS WHEREOF, County and Contractor have executed this Amendment effective as of the Effective Date set forth above. This Amendment is not valid unless signed by Contractor and County Contracting Officer. The person(s) signing this Agreement for Contractor represent(s) and warrant(s) that they are duly authorized to bind Contractor and have the legal capacity to execute and deliver this Agreement.

**CONTRACTOR:**

By: *Brad McLane*
    Brad McLane (Feb 1, 2024 14:52 CST)

Name:  Brad McLane
Title:  CEO
Email:  brad.mclane@naphcare.com
Date:  Feb 1, 2024

By electronically signing this document, all parties accept the use of electronic signatures.

Adobe Acrobat Sign Transaction Number: CBJCHBCAABAAUsJr_8tOhrV8zd5vGbvkf81jOvt_5dkI

**COUNTY OF SAN DIEGO:**

Department Review and Recommended Approval:

By: *Dane Gapuz*
   Dane Gapuz (Feb 1, 2024 09:04 PST)
Name:  Dane Gapuz
Title:  Sheriff's Contract Manager
Dept.  Sheriff
Date:  Feb 1, 2024

**APPROVED:**

JOHN M. PELLEGRINO,  Director
Department of Purchasing and Contracting

By: *John M. Pellegrino*
Name:  Jack Pellegrino
Title:  Director
Date:  Feb 5, 2024

**Ex. H - 580**

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**
**EXHIBIT C - PAYMENT SCHEDULE - MODIFICATION 01**
**EXPENSES PRICING SUMMARY**

| Term | Date Range | Amount |
|---|---|---|
| Initial Term (Year 1) | 06/01/2022 - 05/31/2023 | $54,527,938.00 |
| Initial Term (Year 2) | 06/01/2023 - 10/31/2023 | $23,364,655.74 |
| Initial Term (Year 2) | 11/1/2023 - 05/31/2024 | $34,174,810.10 |
| Initial Term (Year 3) | 06/01/2024 - 05/31/2025 | $60,250,381.74 |
| Initial Term (Year 4) | 06/01/2025 - 05/31/2026 | $61,965,324.55 |
| Initial Term (Year 5) | 06/01/2026 - 05/31/2027 | $63,731,715.63 |

| Term | Date Range | Amount |
|---|---|---|
| First Option Period | 06/01/2027 - 05/31/2028 | $65,551,098.42 |
| Second Option Period | 06/01/2028 - 05/31/2029 | $67,425,062.70 |
| Third Option Period | 06/01/2029 - 05/31/2030 | $69,355,245.94 |
| Fourth Option Period | 06/01/2030 - 05/31/2031 | $71,343,334.65 |
| Fifth Option Period | 06/01/2031 - 05/31/2032 | $73,391,066.04 |

**Grand Total**     **$645,080,633.51**

**Ex. H - 581**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C - PAYMENT SCHEDULE: STAFFING MATRIX - MODIFICATION 01

| Corporate NaphCare Staffing Support | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE's |
| STATCare Nurse Practitioners (Telehealth) | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| STATCare Auditors (Quality Assurance) | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Training and Compliance Coordinator | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Pharmacy Team at Corporate (Manage detox patients) | NaphCare | 4.000 | 4.000 | 4.000 | 4.000 | 4.000 | | | 20 | 0.500 |
| Psych Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Medical Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Night Shift | | | | | | | | | | |
| STATCare Nurse Practitioners (Telehealth) | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |

**Total FTE's   10.700**

**Ex. H - 582**
MODIFICATION 01

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C - PAYMENT SCHEDULE: STAFFING MATRIX - MODIFICATION 01

## San Diego Central Jail - SDCJ
## NaphCare Staffing - ADP 721

### Day Shift

| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE's |
|---|---|---|---|---|---|---|---|---|---|---|
| Program Manager (Over all sites) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Medical Director (Over all sites) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| General Clinic Provider | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| NP/CIWA/MAT/General Clinic | NaphCare | 10.000 | 10.000 | 10.000 | 10.000 | 10.000 | | | 50 | 1.250 |
| Mental Health Program Director | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Administrative Assistant | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Nurse Practioner - (MAT) | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Nurse Practitioner (Medical) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Nurse Practitioner (Psychiatry) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Qualified Mental Health Professional (QHMP) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psychologist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist - General | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist - PSU | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Nurse Practitioner | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Discharge Planner | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Dentist | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| Dental Assistant | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| **Evening Shift** | | | | | | | | | | |
| Qualified Mental Health Professional (QHMP) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| **Night Shift** | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

*Staff may float between facilities based on operational needs*

**Total FTE's    21.750**

**Ex. H - 583**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C - PAYMENT SCHEDULE: STAFFING MATRIX - MODIFICATION 01

## Las Colinas Detention and Reentry Facility - LCDRF
### NaphCare Staffing - ADP 494

**Day Shift**

| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE's |
|---|---|---|---|---|---|---|---|---|---|---|
| General Clinic Provider | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| NP/CIWA/MAT/General Clinic | NaphCare | 10.000 | 10.000 | 10.000 | 10.000 | 10.000 | | | 50 | 1.250 |
| OB/GYN Clinic | Naphcare | | | | 6.000 | 6.000 | | | 12 | 0.300 |
| Psychologist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist - General | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist - PSU | NaphCare | 4.000 | 4.000 | 4.000 | 4.000 | 4.000 | 4.000 | 4.000 | 28 | 0.700 |
| Psych Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Qualified Mental Health Professional (QHMP) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Discharge Planner | Naphcare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Dentist | NaphCare | | 8.000 | | | | | | 8 | 0.200 |
| Dental Assistant | NaphCare | | 8.000 | | | | | | 8 | 0.200 |
| **Evening Shift** | | | | | | | | | | |
| Qualified Mental Health Professional (QHMP) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| **Night Shift** | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

*Staff may float between facilities based on operational needs*

**Total FTE's   11.550**

**Ex. H - 584**
MODIFICATION 01

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**
**EXHIBIT C - PAYMENT SCHEDULE: STAFFING MATRIX - MODIFICATION 01**

| George Bailey Detention Facility - GBDF/Facility 8 NaphCare Staffing - ADP 1,270 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | | |
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE's |
| General Clinic Provider | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| General Clinic Provider | NaphCare | | | | 8.000 | | | | 8 | 0.200 |
| Psychologist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych Nurse Practitioner | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 10.000 | 10.000 | 80 | 2.000 |
| Qualified Mental Health Professional (QHMP) | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Dentist | NaphCare | 8.000 | | | 8.000 | | | | 16 | 0.400 |
| Dental Assistant | NaphCare | 8.000 | | | 8.000 | | | | 16 | 0.400 |
| Dental Hygienist | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| **Evening Shift** | | | | | | | | | | |
| Psych Nurse Practitioner | NaphCare | 8.000 | 8.000 | | 8.000 | 8.000 | | 8.000 | 40 | 1.000 |
| **Night Shift** | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

*Staff may float between facilities based on operational needs*                    **Total FTE's   11.100**

**Ex. H - 585**
**MODIFICATION  01**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C - PAYMENT SCHEDULE: STAFFING MATRIX - MODIFICATION 01

## East Mesa Reentry Facility - EMRF
## NaphCare Staffing

### Day Shift

| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE's |
|---|---|---|---|---|---|---|---|---|---|---|
| General Clinic Provider | NaphCare | | 8.000 | | | 8.000 | | | 16 | 0.400 |
| Psych Nurse Practioner | NaphCare | | | | 10.000 | | | | 10 | 0.250 |
| Dentist | NaphCare | | | | | 8.000 | | | 8 | 0.200 |
| Dental Assistant | NaphCare | | | | | 8.000 | | | 8 | 0.200 |

*Staff may float between facilities based on operational needs*                    **Total FTE's     1.050**

**Ex. H - 586**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C - PAYMENT SCHEDULE: STAFFING MATRIX - MODIFICATION 01

| Rock Mt.Detention Facility - RMDF NaphCare Staffing | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Day Shift | | | | | | | | | | |
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE's |
| General Clinic Provider | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| | | | | | | | | | | |

*Staff may float between facilities based on operational needs*       **Total FTE's   1.000**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C - PAYMENT SCHEDULE: STAFFING MATRIX - MODIFICATION 01

| South Bay Detention Facility - SBDF NaphCare Staffing | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | | |
| **Position Title** | **Staff Provider** | **Mon** | **Tues** | **Wed** | **Thurs** | **Fri** | **Sat** | **Sun** | **Hours** | **FTE's** |
| General Clinic Provider | NaphCare | | | 8.000 | | | | | 8 | 0.200 |
| | | | | | | | | | | |

*Staff may float between facilities based on operational needs*          **Total FTE's   0.200**

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C - PAYMENT SCHEDULE: STAFFING MATRIX - MODIFICATION 01

## Vista Detention Facility - VDF
### NaphCare Staffing

**Day Shift**

| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE's |
|---|---|---|---|---|---|---|---|---|---|---|
| General Clinic Provider | NaphCare | 14.000 | 14.000 | 14.000 | 14.000 | 14.000 | 8.000 | 8.000 | 86 | 2.150 |
| Psychologist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist - General | NaphCare | 8.000 | | | | | | | 8 | 0.200 |
| Psych Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Qualified Mental Health Professional (QHMP) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Discharge Planner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Dentist | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| Dental Assistant | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| **Evening Shift** | | | | | | | | | | |
| Qualified Mental Health Professional (QHMP) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| **Night Shift** | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

*Staff may float between facilities based on operational needs*          **Total FTE's    8.350**

**Ex. H - 589**
MODIFICATION 01

# EXHIBIT I

JUSTICE POLICY CENTER



**RESEARCH REPORT**

# Incarcerated People's Perceptions of Reproductive Health Care in a San Diego County Women's Jail

**Interview Findings from an Exploratory Study**

*Evelyn F. McCoy*          *Azhar Gulaid*
*December 2024*



**Ex. I - 591**



## ABOUT THE URBAN INSTITUTE

The Urban Institute is a nonprofit research organization that provides data and evidence to help advance upward mobility and equity. We are a trusted source for changemakers who seek to strengthen decisionmaking, create inclusive economic growth, and improve the well-being of families and communities. For more than 50 years, Urban has delivered facts that inspire solutions—and this remains our charge today.

Copyright © December 2024. Urban Institute. Permission is granted for reproduction of this file, with attribution to the Urban Institute. Cover image by Tim Meko.

# Contents

Acknowledgments                                                                    v

**Executive Summary**                                                          **vi**

  Findings                                                                      vi

    Preventive Care                                                      viii

    Menstruation Support                                                 viii

    Contraceptive Care and Abortion                                      viii

    Pregnancy and Postpartum Care                                          ix

    Reentry Preparation                                                    ix

  Recommendations for Improving Care Access and Delivery                       x

  Limitations                                                                    x

**Incarcerated People's Perceptions of Reproductive Health Care in a San Diego County Women's Jail**                                                        **1**

  Background on Reproductive Health Care in Jails                               2

    Reproductive Health Needs of People in Jail                             3

    Preventive Care in Jails                                                4

    Menstruation in Jail and Access to Menstrual Products                   5

    Access to Contraceptives and Abortion in Jails                          6

    Pregnancy in Jail                                                       7

    The California Legislative Landscape                                     9

    The Study Location: Las Colinas Detention and Reentry Facility          12

  Methodology                                                                   13

    Interviews with Incarcerated People                                    13

  Demographics of the Study Participants                                        16

    Personal Identity                                                      16

    Indicators of Socioeconomic Status                                     17

    Incarceration Experiences                                              19

    Reproductive Health Characteristics                                    20

  Findings                                                                      22

    Types of, and Access to, Reproductive Health Care Services             22

    Challenges across All Types of Reproductive Health Care Services       24

    Specific Reproductive Health Care Areas                                31

  Limitations of This Study                                                     48

  Conclusion and Recommendations                                               49

**Appendix A. Interview Questions for People Who Are Not Pregnant and Never Been Pregnant in LCDRF**                                                                                52

**Appendix B. Interview Questions for People Who Are Currently or Previously Have Been Pregnant in LCDRF**                                                                              56

**Notes**                                                                                                                                                                              62

**References**                                                                                                                                                                         64

**About the Authors**                                                                                                                                                                  69

**Statement of Independence**                                                                                                                                                          70

Ex. I - 594

# Acknowledgments

This report was funded by the Robert Wood Johnson Foundation. We are grateful to them and to all our funders, who make it possible for Urban to advance its mission.

The views expressed are those of the authors and should not be attributed to the Urban Institute, its trustees, or its funders. Funders do not determine research findings or the insights and recommendations of Urban experts. Further information on the Urban Institute's funding principles is available at urban.org/fundingprinciples.

We would like to thank all the incarcerated people who took the time to speak with us and share their experiences for this study. We are incredibly grateful for their willingness to share their stories and trust us to tell them. We also thank the San Diego County Sheriff's Department and Las Colinas Detention and Reentry Facility staff and leadership who helped facilitate this study and provided us access to their jail. We would also like to extend our special thanks to David Pitts, Lisa Dubay, and Emily Wright for providing review and feedback on this report. Lastly, we thank the following people who served on our community advisory board and provided invaluable insight on this study: Patrice Clark (Las Colinas Detention and Reentry Facility), Maricela Clayson (Planned Parenthood of the Pacific Southwest), Cynthia Gutierrez (University of California, San Francisco), Stephanie Lumsden (University of California, Los Angeles), Amika Mota (Sister Warriors), Faride Perez Aucar (ACLU of Northern California), Adrienne Spires (Black Women for Wellness), Carolyn Sufrin (Johns Hopkins University School of Medicine), Nakia Woods (California Coalition for Reproductive Freedom), and Lorena García Zermeño (California Latinas for Reproductive Justice).

# Executive Summary

People in jail have specific and significant reproductive health needs. Most incarcerated people are in their peak reproductive years and have experienced physical and/or sexual violence. Yet research shows that people who are incarcerated often face significant barriers to accessing basic reproductive health care. These barriers include a lack of services, high costs associated with seeking services, poor quality of care, and bureaucratic difficulties.

Many states have passed legislation to improve reproductive health, health care access, and health outcomes for incarcerated people. However, these policy areas remain understudied aspects of corrections policy and legislation. To begin to fill this research gap, the Urban Institute interviewed people incarcerated in a California women's jail to hear about their perceptions of access to and the quality of reproductive health care in the jail.

In September 2020, California Assembly Bill 732 was signed into law, increasing reproductive health care access and quality for people incarcerated in state prisons and county jails. Our qualitative study is the first to explore A.B. 732 in a California jail and one of the few to examine incarcerated people's perceptions of reproductive health care access and quality in jail.

We are grateful for our partnership with the San Diego County Sheriff's Office and Las Colinas Detention and Reentry Facility (LCDRF) leadership and staff who permitted access to incarcerated people in their jail. We are also grateful to our community advisory board, which consists of 10 representatives from advocacy organizations, service providers, and academia who work at the intersection of reproductive health care, incarceration, race, and gender and sexuality, for advising on this study.

## Findings

Between March and June 2023, we conducted individual, in-person interviews with 34 incarcerated people at Las Colinas Detention and Reentry Facility in Santee, California. Because our methodological approach relies on the perceptions and reports of the incarcerated people we interviewed, the findings below only reflect their experiences and views.

We found one recurrent story across all the types of reproductive health care services examined in this study: **incarcerated people reported experiencing significant barriers in requesting care and**

**lengthy delays in receiving care.** Table ES.1 summarizes interviewees' main concerns when accessing and receiving care.

TABLE ES.1

**Primary Challenges with Accessing and Receiving Care in Las Colinas Detention and Reentry Facility Reported by Interviewees**

| Challenges requesting & accessing care | Challenges with delivery of care |
|---|---|
| ▪ Amount of time between requesting services and receiving services<br>▪ Dismissiveness of medical staff<br>▪ Needing to exaggerate medical requests as emergencies to receive care<br>▪ Unresponsiveness to multiple medical requests<br>▪ Needing to justify all requests | ▪ Medical staff inexperienced in basic medical procedures<br>▪ Discussion of private medical information in jail common spaces<br>▪ Presence of officers at medical appointments<br>▪ Inconvenient timing of procedures<br>▪ Discomfort and lack of safety while receiving medical services<br>▪ Little to no follow-up or information provided after procedures<br>▪ Bias or pressure from medical staff around reproductive decisions |

**Source:** Urban Institute analysis of transcripts of interviews of people incarcerated at Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.

People who received care reported that they were not satisfied with the care provided and, in some cases, felt they experienced mistreatment and punishment from medical staff. This made them hesitant to request further care, which they indicated further worsened their medical conditions as they continued without proper treatment or diagnosis. This cycle, depicted below, was aggravated by a general lack of awareness and communication around reproductive health care services available to them.



These challenges led to half of interviewees reporting not feeling comfortable or safe receiving services from jail medical staff and nearly one-third of interviewees reporting issues with bias or

Ex. I - 597

pressure about reproductive decisions, including about newborn placement, abortion, pregnancy testing at intake, and family counseling.

Interviewees also reported concerns related to preventive care, menstruation support, contraceptive care and abortion, pregnancy and postpartum support, and reentry specifically.

## Preventive Care

Many participants received preventive services, such as pap smears, STD/STI tests, breast exams, ultrasounds, mammograms, pelvic exams, and menopause support. Although they were able to access these services, they also shared concerns about a lack of regular checkups with an ob-gyn and needing to self-advocate to receive basic preventive care.

Though most people we interviewed indicated that their needs were being met, most shared that they had never been given general information about reproductive health services offered in the jail. Those who had been made aware of those services learned about them from other incarcerated people in the jail.

## Menstruation Support

All participants shared that pads and tampons are provided free of charge by the jail but had mixed feelings about the quality and quantity of the pads and tampons provided. Some shared no concerns whereas others indicated that the quality was not sufficient for heavy periods. In addition, a little over half reported challenges accessing menstrual supplies in the jail. Many reported concerns about accessing clean clothes if they bled on their clothing because they were being issued four pairs of underwear and one set of clothing per week.

## Contraceptive Care and Abortion

We found that the jail provided different contraceptive options (pills, intrauterine devices, etc.), which interviewees appreciated. However, they indicated that contraceptives were provided mainly when someone had a heavy period or hormone imbalance or was looking to prevent pregnancy after giving birth. More than half were unsure whether abortion was available in the jail, but some mentioned that this was communicated clearly. They shared that information about other reproductive health care services was not being consistently provided.

**Ex. I - 598**

## Pregnancy and Postpartum Care

Nearly a third of interviewees (31 percent) had been pregnant at the jail, and 20 percent of them had given birth while in jail. At the time of our data collection, 13 percent of interviewees were pregnant. Jail policy indicates that pregnant people receive an ultrasound within two weeks of booking and an ob-gyn appointment within the following week. Interviewees shared they had received initial ultrasounds but experienced long delays seeing the ob-gyn. Although follow-up ob-gyn appointments with the local hospital were automatically scheduled, people indicated that they were not able to go as often as they preferred. Participants also noted that they received prenatal vitamins and regular check-ins from a jail nurse practitioner, but they felt the care lacked specialization for their specific needs and reported that only a "generic" regimen was offered. Pregnant people were provided with accommodations such as extra mattresses, different-sized clothing, and additional snacks, but they reported these accommodations were provided inconsistently.

The jail provides counseling services during pregnancy for parenting preparation, birth and delivery planning, and determining placement options for newborns. Interviewees' experiences with that counseling differed. Some found the assistance in navigating open adoption very helpful and positive, whereas others felt it did not meet their unique needs. According to the participants, postpartum care and support was limited. However, the jail will store people's breast milk in a freezer for up to three days to be picked up by family members or another designated person.

## Reentry Preparation

We found significant gaps in reentry preparation related to reproductive health care. Some participants knew about reproductive health care resources available to them in the community but a few expressed concerns about not receiving their reproductive medical records while in jail or upon release. Because of this, they felt unequipped to seek care in the community and properly communicate the treatment they received in the jail. They wanted parenting classes about reentry resources and support with arranging housing, receiving medical records upon release, and preparing for family reunification.

# Recommendations for Improving Care Access and Delivery

The experiences of the people we spoke with at LCDRF suggest the following changes could improve service provision and better inform people of the availability of reproductive services:

- Regularly inform incarcerated people about the full range of reproductive health services available, using communication channels that are accessible to them.

- Implement systems that reduce delays between requests for reproductive care and the delivery of services.

- Improve the quality, quantity, and accessibility of menstrual supplies, including by providing sufficient clothing and undergarments.

- Provide clear information on the availability and use of contraceptive options and abortion services.

- Provide timely access to specialized ob-gyn care, expand prenatal and postpartum services, and ensure accommodations such as extra mattresses, appropriate clothing, and additional snacks are provided consistently to pregnant people.

- Ensure that medical consultations and procedures take place in private settings.

- Establish clear protocols for follow-up appointments and communication after procedures to ensure incarcerated people are properly informed and cared for.

- Develop comprehensive reentry programs that address reproductive health needs, including access to medical records, housing support, family reunification resources, and continuity of care.

# Limitations

This study sheds light on the perceptions of incarcerated people on accessing reproductive health care but has the following limitations:

- Our study sample consists of people from one jail. The findings are from that jail only and are not generalizable to the LCDRF population or representative of access to reproductive health care in jails across the United States.

- We were unable to incorporate health records in the analysis.

- We did not interview stakeholders who work with incarcerated people.

- We were unable to compare people's perceptions before and after A.B. 732 was implemented.

**Ex. I - 601**

# Incarcerated People's Perceptions of Reproductive Health Care in a San Diego County Women's Jail

People in jail—especially women, nonbinary people, and transgender people[*]—have specific and significant reproductive health needs. Most incarcerated people are in their peak reproductive years and have histories of experiencing physical and/or sexual violence. Yet research shows that they often face significant barriers to accessing basic reproductive health care during incarceration, including a lack of services, high costs associated with seeking services, poor quality of care, and bureaucratic difficulties (Friedman, Burr, and Sufrin 2021). As there has been increased attention on and awareness about the rights of incarcerated people and their reproductive rights specifically, many states have passed legislation to improve reproductive health, health care access, and outcomes. Despite this, reproductive health and health care for incarcerated people, as well as policies implemented to improve these areas, are an understudied aspect of corrections policy.

Our exploratory study aimed to understand the state of reproductive health care access and quality in a jail in California after early stages of the implementation of Assembly Bill 732 (A.B. 732).[1] A.B. 732 was signed into law in September 2020 in California with the goal of increasing reproductive health care access and quality for incarcerated people and pregnant incarcerated people in state prisons and county jails. With in-depth interviews with incarcerated people at the Las Colinas Detention and Reentry Facility (LCDRF) in Santee, California, we aimed to reach our goal. This report summarizes our findings.

First, we provide background on reproductive health and health care access in jails from existing research. Second, we present our methodology and background information on the participating jail. Third, we review the study's major findings. Lastly, we review limitations, recommendations, and overall conclusions.

---

[*] In this report, we often use gender-inclusive language (e.g., "pregnant person") to acknowledge the experiences of people of all gender identities who may be incarcerated in designated women's jails and prisons, and that the policies and practices in these facilities also impact nonbinary people and transgender men. To accurately reflect the research we are citing, however, we sometimes use "women." We recognize that the research on gender-nonconforming people in jails is limited.

# Background on Reproductive Health Care in Jails

Though we do not have comprehensive statistics on how many people need reproductive health care in jail, we know that of the 172,700 women and girls incarcerated in the United States (Kajstura and Sawyer 2023), 44 percent, or 76,000 women, are held in local jails. Furthermore, national statistics indicate that in 2021, more than 1.2 million people admitted to jails were women.[2] As a whole, millions of people are booked into jails a year, and thousands are incarcerated in them on any given day.[3] State prison systems hold twice as many incarcerated people as jails; on any given day, however, more incarcerated women are held in jails than in state prisons. Women's incarceration has grown at twice the rate of men's incarceration in the past few decades, and much of that growth has been in local jails (Kajstura and Sawyer 2023). According to Bureau of Justice Statistics data, the number of women in local jails increased 22 percent from 2020 to 2021 (Zeng 2022).

Data on pregnancy among this population are often outdated and, when available, limited to prevalence and births and not inclusive of pregnancy-related health outcomes and prenatal care (Bronson and Sufrin 2019). Although many incarcerated women are of childbearing age, little is known about prenatal care during incarceration, and there is little systemic data on pregnancy-related health outcomes. Indeed, much of the research base on this topic is based on data from at least 20 years ago, limiting our ability to identify current best practices in reproductive health care in prisons and jails.

Jails are important settings in which to study reproductive needs because of the "revolving door" involving frequent short custody stays in jail and community reentry. With approximately 3 percent of women admitted to US jails being pregnant, nearly 55,000 pregnant people are admitted to US jails each year (Sufrin et al. 2020). This may be an underestimation, however, because pregnancy testing and reporting are not standardized across facilities (Clarke and Adashi 2011). Furthermore, the average length of stay in US jails is 33 days (Zeng 2022), meaning that more than a million people a year will menstruate while in jail custody and need access to essential menstrual supplies, in addition to medication that some might need to treat abnormal periods or bleeding. Incarcerated people also experience high rates of trauma exposure, victimization, and violence before their incarceration (Beck et al. 2013; Browne, Miller, and Maguin 1999; Lynch, Fritch, and Heath 2012; Wolff et al. 2014), which can affect their health needs while in jail.

Persistent systemic inequities that have led to racial and ethnic disparities in jail populations across the country have also limited access to reproductive health care in community settings. Racial and ethnic disparities in access and outcomes for several areas of reproductive health, including contraceptive use, care for sexually transmitted infections (STIs), reproductive cancers, and maternal

mortality, have persisted for decades in the United States (Sutton et al. 2021). Many people incarcerated in jail also experience poverty before incarceration, and many may be coming from already medically underserved communities. Barriers to accessing reproductive health services while incarcerated can delay treatment for issues these populations already experience in the community setting, exacerbate already undetected and unaddressed health issues, and lead to missed reproductive health issues that arise during incarceration.

## Reproductive Health Needs of People in Jail

People enter jail with more significant reproductive health care needs than the general population. Incarcerated people are more likely than the general population to have STIs, human immunodeficiency virus (HIV), and viral hepatitis (Hotelling 2008; Maruschak 2008)—conditions that interact with a person's sexual and reproductive health.[4] Furthermore, the very experiences that often result in the criminalization of women and in their legal system involvement, including poverty, addiction, domestic violence, sexual violence, and sex work, also put them at risk of contracting HIV (Kraft-Stolar, Vasandani, and Williams 2015). In addition, rates of cervical and breast cancer are higher among incarcerated women than nonincarcerated women (Brousseau, Ahn, and Matteson 2019; Pickett et al. 2018). People entering jail have unique health needs that are important to address while they are incarcerated (particularly if they are incarcerated for significant periods) and when they reenter the community or are transferred to prison if sentenced.

Incarcerated people also may experience irregular menstrual cycles related to circumstances preceding incarceration, such as exposure to foster care, exchanging sex for drugs or money, living with someone with a drug or alcohol problem, and experiencing physical and sexual abuse, and these irregular cycles can be worsened by unsanitary conditions in jail.[5] Other factors, such as abstinence from drugs and cessation of contraceptives used before incarceration (most jails do not provide access to contraceptives or only do so to address menstrual issues), can also cause irregular menstruation in custody (Allsworth et al. 2007). It is well known that physical and emotional stress can affect a person's menstrual cycle (Nagma et al. 2015), and any period of incarceration can affect a person's physical and emotional well-being. One study found that in a sample of 446 incarcerated women between the ages of 18 and 45, 9 percent reported amenorrhea and nearly 33 percent reported that their menstrual cycles were irregular—a share twice as high as in similarly matched control groups in the community and three times as high as in the general population (Allsworth et al. 2007). Not only do incarcerated people have particular needs for regularly accessible and appropriate menstrual

supplies because of preexisting health and socioeconomic factors, but these needs are particularly important in carceral environments.

One data limitation is that national statistics on gender in incarceration do not go beyond "female" and "male," or sex assigned at birth. Therefore, we do not have accurate statistics on how many transgender and nonbinary people are incarcerated. Research indicates, however, that lesbian, gay, bisexual, transgender, and queer/questioning (LGBTQ+) people are incarcerated at approximately three times the rate of non-LGBTQ+ people, and that more than one in five transgender women are incarcerated during their lifetimes (Frazer et al. 2023; Grant et al. 2011; Meyer et al. 2017). In 2022, Lambda Legal, in partnership with Black and Pink National, administered a survey to LGBTQ+ people living with HIV involved with the criminal legal system, including 421 people who were currently incarcerated in jail or prison. Of the 421 currently incarcerated respondents, 55.3 percent were transgender, gender nonconforming, and/or nonbinary. Regarding their experiences in detention, 64.6 percent of those who took medication reported interruptions of two weeks or longer in receiving their medication, including missing hormone replacement therapy, HIV treatment, and other medications (Frazer et al. 2023).

## Preventive Care in Jails

Gaining access to medical care while incarcerated can be a complicated process. Though health care differs across carceral facilities, it is typically provided reactively, meaning in response to a specific medical need (for instance, when someone requests medical attention for a condition). Incarcerated people often do not get access to routine care provided by gynecologists and other practitioners, as shown in a survey of women incarcerated in the New York State Department of Corrections and Community Supervision; 54 percent of respondents reported they could not see a gynecologist when necessary (Kraft-Stolar 2015). Access to medical professionals is integral for quality and routine reproductive health care, including routine preventive gynecological exams and screenings for sexually transmitted diseases and cervical and breast cancer.

Though there is not much research on access to reproductive health services in jails specifically, the American College of Obstetricians and Gynecologists advises that reproductive health care for incarcerated people should be provided according to the same guidelines and recommendations for those who are not incarcerated, "with attention to the increased risk of infectious diseases and mental health conditions common to incarcerated populations" (ACOG 2021, e27). It recommends discussing people's reproductive and sexual histories as part of medical intake screenings, screening for STIs,

conducting age-appropriate breast screenings, administering vaccinations for human papillomavirus infection according to standard guidelines, and providing reproductive health and preventive health education, in addition to other guidance on providing reproductive health care in carceral settings using trauma-informed care approaches.

Access to gynecological services can be difficult to provide in jails—particularly if there are no medical personnel on site who specialize in addressing reproductive health concerns, who can include obstetrician-gynecologists (ob-gyns), nurse practitioners, and physician assistants. Whereas prisons usually have on-site infirmaries with independent or contracted staff, jails often partner with local health providers that come to their facilities to provide services (Gates, Artiga, and Rudowitz 2014). And these local health providers (which may be private corporations or nonprofit providers) might have limitations on when they can provide services in jails. A lack of providers and limitations in schedules can contribute to long wait times for incarcerated people seeking care.

## Menstruation in Jail and Access to Menstrual Products

People in jail often face significant barriers to safely accessing menstrual care, including the cost and availability of supplies and power dynamics between them and the staff they need to request supplies from. Only 24 states have passed legislation requiring the provision of free menstrual supplies to incarcerated people.[5] While there have been no comprehensive studies about the availability, cost, or quality of menstrual supplies offered in jails, some advocates argue that they are often low-quality and uncomfortable, and though alternative options might be available through a facility commissary, supplies are often at an inflated, unaffordable price (ACLU 2019). Many incarcerated people come from low-income backgrounds and cannot cover the costs of menstrual supplies in addition to other important expenses, such as other hygiene necessities (like toothpaste), legal fees, medical care costs, or simply the costs of phone calls to speak with family members (Kajstura and Sawyer 2023).

In addition, there have been many documented accounts of egregious and harmful practices regarding menstrual health and access to supplies for people in jail. Some people are not given access to menstrual supplies at all and are forced to use toilet paper to manage menstrual flow, increasing the risk of bleeding through uniforms (ACLU 2019). There have been multiple reports of correctional officers withholding menstrual supplies to coerce incarcerated people to have sex with them, punish them, or get them to comply with abuse.[6] In dire situations, people may be forced to create tampons or use other items, like bedsheets and mattress stuffing, to control bleeding. Limited menstrual supplies lead some people to bleed through their clothes and bedding, which can create a health

**Ex. I - 607**

hazard for others, or to reuse supplies or use them for longer than is recommended, which can place them at risk for serious complications, such as toxic shock syndrome, other infections, and even infertility.[7]

## Access to Contraceptives and Abortion in Jails

People may already be taking contraceptives before entering jail. This can be for a variety of reasons in addition to preventing pregnancy, including regulating their periods, mitigating pain during their menstrual cycles, and relieving symptoms of endometriosis, polycystic ovary syndrome, or other health concerns. Sudden discontinuation of oral contraceptives and removal of implants can lead to unwanted side effects, in addition to interrupting an incarcerated person's medical care.

Other incarcerated people may not have had access in the community to contraceptives they needed. Evidence shows that offering people contraceptive services during incarceration in addition to connecting them to services upon release can lead them to initiate contraceptive use at higher rates after reentering the community than solely connecting them to contraceptive services upon reentry (Clarke, Rosengard, and coauthors 2006). This can owe to increased knowledge about contraceptive options and readiness to seek care in the community and can help fill a gap in access for marginalized populations. Furthermore, Meyers and coauthors (2021) found that in an urban jail in Utah, 73 percent of survey participants had an interest in accessing contraceptives while in jail. Access to emergency contraceptives is also particularly important to prevent unwanted pregnancies during incarceration. Anecdotal evidence shows that emergency contraceptives are not widely available in prisons, which is a critical gap in part because sexual violence is often a significant problem in those facilities (Beck 2014).

There is little data on access to contraceptives in jails. Research suggests that even where contraceptives are permitted, formal policies may not be in place. In a survey of 22 state prison systems and 6 county jails about policies for women's contraception, 50 percent of the prison systems and 83 percent of the county jails reported allowing permanent contraception but had no written policies at the time, and 27 percent of the prison systems provided access to "permanent but not reversible" contraception (Pan et al. 2021). Coercive permanent contraceptive practices have a long history in the United States, particularly in carceral settings (Gulaid and McCoy 2022), making it imperative not only to provide access to reversible contraceptive options but to guard against coercive practices.

Although federal and state courts have upheld incarcerated people's right to abortion access post–*Roe v. Wade* (Kasdan 2009), many barriers to abortion care have persisted, including costs to incarcerated people, restrictive policies, and bureaucratic challenges. (The US Supreme Court's overturning of *Roe v. Wade* in June 2022 has also exacerbated such challenges and restrictions, with laws regarding abortion care changing in several states.)[8] In a 2021 study of abortion policies in US jails and prisons, researchers found that four of the six jails participating in the study allowed abortions in the first and second trimesters, with one of those jails requiring the incarcerated woman to pay for the procedure (Sufrin et al. 2021). In 2017, the national average cost of a surgical abortion was $549 at 10 weeks, and the median cost at 20 weeks was triple that at $1,670; the cost of the procedure differs significantly by state, ranging from $410 to $5,386 (Witwer et al. 2020). In their 2021 study, Sufrin and coauthors reported that many prisons and jails have restrictive policies and that many have few written policies addressing abortion care. A 2008 investigation of policies for the provision of health care specific to women in New York State county jails found that fewer than half of the 52 counties with incarcerated women in their custody had an abortion policy, and only 23 percent of those counties unambiguously guaranteed access to abortion services (NYCLU 2008). Many jails have no official written policies informing people of how to request an abortion or instructing staff on how to address requests.

A lack of information can also be a major barrier to abortion. Incarcerated people may be required to identify abortion providers themselves without assistance from staff, but they may not have consistent or stable internet access in their facilities. On a survey of correctional health providers conducted in 2006–07, 68 percent of respondents indicated that incarcerated people could obtain elective abortions, but only 54 percent affirmed that correctional health providers helped arrange appointments, whereas the remainder reported that people had to schedule their own appointments (Sufrin, Chang, and Creinin 2009). Furthermore, facilities may have multiple layers of paperwork that incarcerated people might find challenging to fill out because of their literacy levels, limited access to personal identification documents during incarceration, and/or a lack of money for stamps to mail paperwork (Roth 2011). Such bureaucratic requirements can put abortions out of reach for incarcerated people without their rights ever being explicitly denied and can contribute to misconceptions among incarcerated people about whether they can access abortions.

## Pregnancy in Jail

With approximately 3 percent of women admitted to US jails being pregnant, nearly 55,000 pregnant people are admitted to US jails each year (Sufrin et al. 2020). Given that most incarcerated women are

of childbearing age, defined as up to 44 years old (Sufrin et al. 2019), and were heterosexually active before arrest without using effective contraception (Clarke, Hebert, and coauthors 2006; Larochelle et al. 2012), it's reasonable to expect some people to enter jail pregnant. But little is known about pregnancy during incarceration, access to prenatal care, or birth and maternal health outcomes in jail.

Health organizations including the American College of Obstetricians and Gynecologists, the American Public Health Association, and the National Commission on Correctional Health Care have created standards on prenatal health care, yet there is significant inconsistency between these standards and the reality pregnant people face in jail. Prenatal care for incarcerated pregnant people is often of poor quality and insufficient for meeting their needs (Lipnicky et al. 2023). A national scan of policies for incarcerated pregnant women found that most states do not have policies for adequate prenatal care for incarcerated people (Rebecca Project for Human Rights and NWLC 2010), despite evidence that incarcerated women often have higher-risk pregnancies (Hotelling 2008). That scan found that 43 states do not require medical examinations as a component of prenatal care, 34 do not screen people for high-risk pregnancies, and 41 do not have policies requiring prenatal nutrition or prenatal nutrition counseling for incarcerated pregnant women (Rebecca Project for Human Rights and NWLC 2010).

Accessing prenatal care can be challenging for incarcerated people and prenatal policies vary widely across states and facilities (Kramer et al. 2023). In a study of accommodations and medical procedures followed by regional jails for pregnant women across the United States, almost all facilities reported that they provide a bottom bunk, food supplements, and prenatal vitamins, but about 60 percent of people were provided fluid supplements and 51 percent were provided healthy food options. Furthermore, only 44 percent of facilities reported providing ultrasounds to pregnant people (Kelsey et al. 2017), meaning that many people were going without ultrasounds during their pregnancies in jail. In addition, almost half of the jails reported that pregnant women addicted to opioids went through withdrawal without the use of symptom alleviators (e.g., suboxone). Only 38 percent allowed pregnant people to remain on methadone maintenance therapy if it was prescribed before they entered the jail, and 22 percent reported that they would start methadone maintenance therapy if it had not been previously prescribed (Kelsey et al. 2017). Experts in obstetrics have recommended medication-assisted treatment with agonist medications (medications that reduce cravings and withdrawal symptoms, such as methadone and buprenorphine) as the standard treatment for opioid use disorder during pregnancy, as opposed to medically supervised withdrawal, which is associated with higher rates of relapse (ACOG 2021; Saia et al. 2016).

Furthermore, research indicates that incarceration may have negative impacts on perinatal outcomes. While there is very little recent research on this topic, older work suggests that common complications for incarcerated pregnant people have included miscarriages, preterm deliveries, spontaneous abortions, low-birth-weight infants, and preeclampsia (Fogel 1993; Kyei-Aboagye, Vragovic, and Chong 2000). Pregnancies can also be exacerbated by poor and unsafe conditions in jails and by limited access to medical care (Goodman, Dawson, and Burlingame 2016). The only study to focus on jail-based pregnancy outcomes (Sufrin et al. 2020) found that 18 percent of pregnancies that ended in jail were miscarriages (85 percent of which occurred during the first trimester), and 15 percent of pregnancies that ended in jail were induced abortions. Some jails in the study had high rates of miscarriages of up to 33 percent, and other jails had high rates of preterm births of up to 20 percent (Sufrin et al. 2020). Additional research is needed to better understand perinatal outcomes in jails.

Labor and delivery in jail can be traumatizing, especially as many pregnant people are shackled during the process. According to analysis by Advocacy and Research on Reproductive Wellness of Incarcerated People,[9] 40 states and Washington, DC, restrict the use of restraints during labor and delivery, while 15 states restrict the use of restraints during pregnancy, labor, delivery, postpartum, and transportation to a medical facility. The American Medical Association indicates that the use of restraints during or after childbirth can worsen mental health issues related to pregnancy and postpartum symptoms (AMA 2015; Harner et al. 2015). Furthermore, shackling during labor and delivery can lead to injuries for the parent and infant, such as blood clotting (AWHONN 2012; Sufrin 2014). Shackling can also make the birthing process more difficult by restricting movement; the ability to move during labor can lead to a shorter and less painful labor, reduces the need for medication, and promotes successful cervical dilation and delivery (ACOG 2011; AWHONN 2012; Goshin et al. 2019). Postpartum care is limited for people in jail, and breastfeeding policies vary across facilities and states (Asiodu IV, Beal, and Sufrin 2020)

## The California Legislative Landscape

The State of California passed two widescale state-level sentencing reforms that led to significant changes in the prison and jail populations. First, the Public Safety Realignment Act (A.B. 109) was enacted in 2011 in response to a federal court order to reduce prison overcrowding.[10] A.B. 109 *realigned* or transferred people convicted of low-level offenses that are not sexual, violent, or serious out of state prisons to serve the remainder of their sentences in county jails or under probation supervision (Lofstrom and Martin 2015). Though this reform substantially reduced the prison

Ex. I - 611

population, jail populations increased 15 percent by September 2014, marking substantial growth just a few years after the implementation of A.B. 109. Jails experienced issues with overcrowding and were serving a population of people who had higher needs and longer sentences. Before realignment, the maximum jail sentence was one year, but as a result of realignment, thousands of people in jail were serving sentences of more than five years (Lofstrom and Martin 2015).

Second, the Safe Neighborhoods and Schools Act (Prop 47) was enacted in 2014 and reclassified certain offenses from felonies to misdemeanors that have a maximum sentence of one year in jail, which helped reduce the jail population (Bird et al. 2016). These reforms were impactful not only in adjusting and reducing overall incarceration numbers in the state of California, but in increasing attention to the conditions of jails, as people who would previously have been incarcerated in prisons (who serve longer sentences and usually have higher needs during incarceration) were now being incarcerated in jails. A 2016 report estimated that the proposition had resulted in a 9 percent decline in the overall jail population in the year after its passage and further that there had been a 50 percent decline in the number of people held for offenses impacted by Proposition 47 (Bird et al. 2016).[11] Overall, people with more serious offenses made up a larger share of the jail population after the passage of Prop 47.

Multiple recent reforms have impacted conditions of confinement in California's jails, particularly those that have aimed to reduce the state's prison population and improve conditions of confinement in the state's carceral facilities. A.B. 109 ensured that people sentenced for certain nonviolent offenses would earn good-time credits faster than they would have in state prisons. It also ensured that people sentenced for certain nonviolent offenses could get split sentences comprising jail and community-supervision terms (Lofstrom and Raphael 2016). Before the national Prison Rape Elimination Act standards were issued in 2009, California adopted the Sexual Assault in Detention Elimination Act (Goodman, Dawson, and Burlingame 2016). Furthermore, in 2014, the state passed multiple laws to improve conditions of confinement for people in jails: Senate Bill 1391 increased access to education for people in California jails by improving reimbursements for community colleges providing courses in jails (Mukamal, Silbert, and Taylor 2015); Proposition 47, in addition to reducing the charge levels for certain nonviolent offenses, allowed people in jails and prisons to request resentencing (Grattet and Bird 2018); and a third law prohibited sterilization of incarcerated people for purposes of birth control (with exceptions only for medically necessary procedures). A.B. 2507, passed in 2018, required policies to be designed regarding breastfeeding for lactating individuals who are incarcerated.

Aligned with this larger movement of jail-condition reforms, A.B. 732 was signed into California law in September 2020 with the goal of increasing reproductive health care access and quality for incarcerated people and increasing protections for pregnant people incarcerated in the state's prisons and jails.[12] Before A.B. 732, California's Code of Regulations required that pregnant people receive "a balanced, nutritious diet, prenatal and postpartum information, and childbirth and newborn care information" (Women's Foundation California 2019, 1). Furthermore, advocates for reproductive justice and state representatives identified significant gaps in protections and accommodations not just for pregnant people but for incarcerated people with reproductive needs more generally (Goodman, Dawson, and Burlingame 2016).

ASSEMBLY BILL 732

A.B. 732 is a comprehensive legislative change that creates basic standards of care for the reproductive needs of incarcerated people (see table 1 below for details about the bill). Whereas other states have enacted legislation on specific topics, such as providing free access to menstrual hygiene products and banning shackling during pregnancy, A.B. 732 is a unique statewide law in that it outlines comprehensive and holistic reproductive health care for incarcerated people. In our review and analysis of A.B. 732, we identified changes in the following dozen distinct categories of reproductive health care:

- preventive care

- menstruation support

- parenthood planning services and counseling

- contraceptive care and counseling

- abortion access and services

- pregnancy testing

- prenatal care

  » pregnancy services and counseling
  » medication-assisted treatment during pregnancy

- protections and care during labor and childbirth

- postpartum care

- newborn care and placement

Ex. I - 613

- adapted custodial practices (such as restricting use of force) for incarcerated pregnant people

- reentry support

TABLE 1

**Legislative Details on California Assembly Bill 732**

| Timeline | Sponsors | Authors |
|---|---|---|
| • February 19, 2019: bill introduced<br>• March 26, 2019: approved by Assembly Public Safety Committee<br>• January 23, 2020: approved by Assembly Appropriations Committee<br>• January 27, 2020: passed the assembly<br>• July 31, 2020: approved by Senate Public Safety Committee<br>• August 20, 2020: approved by Senate Appropriations Committee<br>• September 30, 2020: approved by governor<br>• January 1, 2021: goes into effect | • ACLU of California<br>• California Latinas for Reproductive Justice<br>• Women's Policy Institute of the Women's Foundation of California<br>• Young Women's Freedom Center | • Assemblymember Rob Bonta (author)<br>• Assemblymember Monique Limón (coauthor)<br>• Assemblymember Shirley N. Weber (coauthor)<br>• Senator Holly Mitchell (coauthor) |

**Sources:** A.B. 732, 2019–2020 Sess. (Ca. 2020); "Strengthen Reproductive Care for People in Jails (AB 732)," ACLU of Southern California, accessed November 20, 2023, https://www.aclusocal.org/en/protect-reproductive-dignity.

## The Study Location: Las Colinas Detention and Reentry Facility

The Las Colinas Detention and Reentry Facility (LCDRF) in Santee, California, is the primary intake facility for incarcerated adult women in San Diego County. Constructed in 2014, LCDRF has a rated capacity of up to 1,280 people and employs about 400 staff members.[14] It is a Type II facility, which means it can house people at all security levels, from minimum to maximum, as well as people with medical needs. It uses a direct supervision approach, meaning deputies are stationed in the areas where people are housed rather than enclosed observation posts.[15] As of August 2023, the jail housed 525 people, accounting for 13 percent of the total jailed population in San Diego County.[16]

Ex. I - 614

# Methodology

This study is the first to study A.B. 732 in a California jail. We relied solely on interviews with incarcerated people at LCDRF with the goal of understanding access to and the quality of reproductive health care for incarcerated people in the jail under A.B. 732. Given the lack of research on this topic, our research is exploratory in nature and designed to understand the environment against which A.B. 732 was implemented. Our approach relies notably on the perceptions and reports of those who are incarcerated, and for a variety of reasons—chief among them confidentiality and the scope of the study—we did not triangulate interview data with medical records, department policy, or perceptions of jail officials. As a result, these findings only reflect the experiences and views of those with whom we spoke.

## Interviews with Incarcerated People

We conducted individual, in-person interviews with 34 incarcerated people at LCDRF to learn about their experiences accessing and receiving reproductive health care since the passing of A.B. 732. The interviews were semistructured, meaning they were based on a predetermined set of questions but allowed for individualized follow-up questions if important, unforeseen topics were introduced in the course of the session. Interviews with incarcerated people occurred in person between March and June 2023 and lasted between 30 minutes and 1 hour. We interviewed two subgroups of incarcerated people: (1) people who were not pregnant and had never been pregnant while incarcerated in the jail of focus, and (2) people who had been pregnant (before or after implementation of A.B. 732) or were currently pregnant while incarcerated in the jail of focus. We developed two different interview protocols (see table 2 for domains) to focus on topics relevant to each population.

Ex. I - 615

TABLE 2

**Interview Protocol Domains for the Two Subgroups of People Incarcerated in Las Colinas Detention and Reentry Facility**

| Domains | Subgroup 1: Not pregnant and never pregnant in LCDRF | Subgroup 2: Currently or previously pregnant in LCDRF |
|---|:---:|:---:|
| Warm-up / opening questions | X | X |
| Preventive care | X | |
| Menstruation support | X | |
| Contraceptive care and counseling | X | |
| Abortion access and services | X | X |
| Pregnancy services and counseling | | X |
| Parenthood planning services and counseling | X | |
| Pregnancy testing | X | |
| Prenatal care | | X |
| Adapted custodial practices pertaining to pregnant people | | X |
| Protections and care during labor and childbirth | | X |
| Postpartum care | | X |
| Newborn care and placement | | X |
| Reentry support | X | X |
| Closing questions | X | X |

**Source:** Interview protocols used by the authors during semistructured interviews of people incarcerated in LCDRF conducted between March 2023 and June 2023.
**Note:** LCDRF = Las Colinas Detention and Reentry Facility.

During the interviews, we collected perspectives and reflections following the framework of a dozen distinct categories of reproductive health care covered in A.B. 732. Topics covered in the interviews included preventive care, menstruation support, contraceptive care and counseling, abortion access and services, pregnancy testing, prenatal care, parenthood planning services and counseling, pregnancy planning services and counseling, custodial practices specifically for pregnant people, protections and care during labor and childbirth, postpartum care, newborn care and placement, and reentry. We did not cross-reference the data obtained in interviews with administrative jail records, so all of the findings reported below—demographics, health status, etc.—are drawn from interviewees' self-reports.

**Ex. I - 616**

To guide the study, we developed a community advisory board[†] composed of 10 representatives from advocacy organizations, service providers, and academia who work at the intersection of reproductive health care, incarceration, race, and gender and sexuality. We engaged members of this board throughout the study to solicit their feedback on the initial design and research methods, analysis of findings, and dissemination activities. The board included representation from organizations that sponsored A.B. 732, advocacy groups based in California, formerly incarcerated people, and subject-matter experts across the United States.

We recruited interview participants by visiting LCDRF housing units identified by facility staff (including a unit specifically housing pregnant people)[‡] and drawing from an interest sheet that a reentry counselor had circulated in the facility.[17] While visiting the housing units, the research team distributed flyers describing the study and invited people to sign up for interviews. Counseling staff had also discussed the interviews with some incarcerated people before our site visit and had a list of people who expressed interest in being interviewed. To mitigate preselection by jail staff, we opened up registration for interviews to everyone we visited during the tour.

We administered informed-consent procedures before all interviews, and all interview participants provided consent to be interviewed. Because of the sensitive subject matter, we took several precautions to minimize distress, including (1) disclosing in all recruitment flyers the content that would be discussed so participants understood the types of questions that would be asked; (2) visiting housing units before beginning the interviews so people could ask questions and get to know the research team; (3) pausing between sections of the interview protocol to ask participants whether they wanted to continue; and (4) employing best practices in trauma-informed interviewing to maximize participants' comfort. We held the interviews in the professional visit rooms at LCDRF, spaces that are routinely used for legal visits. We audio-recorded the interviews with the participants' permission, and we took notes during each interview so we could follow up and ask for clarifications.

After each interview conducted during the first site visit, participants also filled out an anonymous, voluntary 22-question demographics survey. This survey was designed to help the research team understand the personal identities, incarceration experiences, and basic reproductive health

---

[†] The community advisory board is separate from the Institutional Review Board, which reviews all research projects to ensure sufficient human-subject protections are taken.

[‡] LCDRF created this housing unit during the COVID-19 pandemic to protect the health of individuals who were pregnant.

Ex. I - 617

characteristics across interview participants. After collecting the data, we transcribed all interviews and uploaded them to NVivo, a qualitative-analysis software program. We coded the interviews based on a coding scheme derived from the study's interview protocols designed for the two subgroups of interest. We also manually inputted the postinterview demographic survey data into an Excel spreadsheet and analyzed those data using STATA, a statistical software for data manipulation, visualization, statistics, and automated reporting.

# Demographics of the Study Participants

Thirty-four people incarcerated at the Las Colinas Detention and Reentry Facility in San Diego County, California, participated in individual interviews. Thirty-two of those interviewees agreed to complete a postinterview demographics survey. We describe their characteristics below.

## Personal Identity

Sixty-one percent of the people who participated in an individual interview and completed the postinterview demographics survey were 36 or younger. The oldest person who completed the survey was 55, and the youngest was 20. Eighty-four percent of people who completed the survey were of childbearing age, meaning between 18 and 44 (Sufrin et al. 2019).

We asked respondents about their personal racial identities (table 3). Most respondents (84 percent) self-identified as one race, and 16 percent self-identified as more than one race. We allowed people to select all race categories that they identify with. Fifty-three percent of respondents self-identified as white, while 41 percent identified as Latino/Latina/Latinx or Hispanic. Sixteen percent self-identified as Black or African American, 6 percent as Native American/American Indian or Alaskan Native, and 3 percent for each of the following categories: Asian, Middle Eastern, Native Hawaiian or Pacific Islander, and "prefer to self-describe."

We also asked respondents about their ethnicities (table 3), recognizing that this is different from race. Eighty-four percent of respondents self-identified as one ethnicity, and 16 percent self-identified as more than one ethnicity. Half of respondents self-identified as white and half as Latino/Latina/Latinx or Hispanic. Nine percent self-identified as Black or African American, 6 percent as Native American/American Indian or Alaskan Native, and 3 percent for each of the following categories: Caribbean/West Indian, Middle Eastern, Native Hawaiian or Pacific Islander, and East Asian.

TABLE 3

**Racial and Ethnic Characteristics of Our Study Participants**

*According to demographic survey of interview participants (N=32)*

|  | Frequency | Percentage |
|---|---|---|
| **Racial group** | | |
| White | 17 | 53% |
| Latino/Latina/Latinx or Hispanic | 13 | 41% |
| Black or African American | 5 | 16% |
| Native American/American Indian or Alaskan Native | 2 | 6% |
| Asian | 1 | 3% |
| Middle Eastern | 1 | 3% |
| Native Hawaiian or Pacific Islander | 1 | 3% |
| Prefer to self-describe | 1 | 3% |
| **Ethnic and/or cultural group** | | |
| White | 16 | 50% |
| Latino/Latina/Latinx or Hispanic | 16 | 50% |
| Black or African American | 3 | 9% |
| Native American/American Indian or Alaskan Native | 2 | 6% |
| Caribbean/West Indian | 1 | 3% |
| Middle Eastern | 1 | 3% |
| Native Hawaiian or Pacific Islander | 1 | 3% |
| East Asian | 1 | 3% |

**Source:** Urban Institute analysis of postinterview demographic survey of people incarcerated in Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.

Most respondents (97 percent) who completed the survey self-identified as women when provided with the survey options of woman, man, nonbinary/third gender, or prefer to self-describe. No participants identified as transgender. Fifty-three percent of participants self-identified as heterosexual or straight, while 33 percent self-identified as bisexual, 7 percent preferred to self-describe, 3 percent self-identified as gay or lesbian, and 3 percent self-identified as asexual.

## Indicators of Socioeconomic Status

We also asked respondents about preincarceration experiences that might reflect their socioeconomic status, including the highest educational level they had reached. Twenty-eight percent of respondents had received a high school diploma, 3 percent had received a GED, and 13 percent had completed less than high school. Twenty-eight percent of respondents had attended some college, while 6 percent had completed vocational training or certification. Twenty-two percent of respondents had a higher-education degree, whether from a 2- or 4-year college or graduate school (figure 1).

Ex. I - 619

FIGURE 1

**Highest Educational Levels Reached by People Incarcerated in Las Colinas Detention and Reentry Facility**

*According to demographic survey of interview participants (N=32)*



**Source:** Urban Institute analysis of postinterview demographic survey of people incarcerated in Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.

Prior to incarceration, half of respondents were making less than $19,999 annually from formal and informal sources of income, which is below the federal poverty threshold when considering the modified adjusted gross income for a one-person-family household.[14] We know, however, that a little more than half of respondents had children under the age of 18 and may have been living with them before incarceration. The maximum annual salary provided to us was above $100,000, and the minimum annual salary was less than $5,000. Before incarceration, 66 percent of respondents were employed full-time (44 percent), part-time (13 percent), or were self-employed (9 percent). Thirty-one percent of respondents were either unemployed (9 percent) or had odd jobs/several jobs (22 percent) (figure 2).

FIGURE 2

**People's Employment Statuses before Their Incarceration in Las Colinas Detention and Reentry Facility**

*According to demographic survey of interview participants (N=32)*



**Source:** Urban Institute analysis of postinterview demographic survey of people incarcerated in Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.

Ex. I - 620

Most respondents (42 percent) lived in a rental apartment or house before incarceration, while 16 percent owned their own place and 16 percent lived with their family in a place they owned. Thirteen percent experienced unsheltered homelessness, and 10 percent indicated that their living situation did not fit into any of these categories (figure 3).

FIGURE 3

**People's Housing Situations before Their Incarceration in Las Colinas Detention and Reentry Facility**
*According to demographic survey of interview participants (N=31)*



**Source:** Urban Institute analysis of postinterview demographic survey of people incarcerated in Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.

## Incarceration Experiences

To understand respondents' incarceration experiences, we asked a few questions. Sixty-one percent were sentenced, 26 percent were detained and awaiting trial, and 10 percent were in jail for a violation of supervision conditions (figure 4).[§] Regarding how long participants had been incarcerated at LCDRF, 63 percent entered the jail in 2023, followed by 28 percent in 2022, 3 percent in 2021, and 6 percent in 2019. Most respondents (53 percent) were housed in general population units. Twenty-five percent were in the highest security level in the jail. Nineteen percent were in the unit dedicated to people with high-risk medical needs, including people who are pregnant.[19] Lastly, 3 percent shared

---

[§] These reflect responses by individual incarcerated people and were not cross-referenced with official jail records.

Ex. I - 621

that they were in a trustee unit,[**] meaning they were given certain additional privileges given their status as incarcerated workers.

FIGURE 4
**People's Statuses in the Las Colinas Detention and Reentry Facility**
*According to demographic survey of interview participants (N=31)*

- 🔵 Detained, awaiting trial
- ⬛ Sentenced
- ⬜ Violation of supervision conditions
- 🟨 Do not know



**Source:** Urban Institute analysis of postinterview demographic survey of people incarcerated in Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.

## Reproductive Health Characteristics

Lastly, we asked people about some basic reproductive health characteristics. Sixty-nine percent of respondents had children, while the remaining 31 percent did not. Of the 53 percent of respondents who had children younger than 18, most (53 percent) had either one child (29 percent) or two children (24 percent). It appears, however, that on average respondents had been pregnant many more times than the number of children they had.[16] Nearly all of the respondents had been pregnant at least once. Of those who had been pregnant, 48 percent had been pregnant four or more times, while 17 percent had been pregnant three times, 21 percent had been pregnant twice, and 14 percent had been pregnant once. Nearly a third (31 percent) of respondents had been pregnant in LCDRF, 90 percent once and 10 percent twice. Thirteen percent were pregnant at the time of their interview. Among the people who

---

[**] LCDRF no longer uses the term "trustee," but it remains in popular use among the incarcerated population.

Ex. I - 622

had been pregnant during incarceration, 20 percent had given birth while incarcerated at LCDRF (table 4).

In terms of contraceptives, 69 percent of respondents did not use contraceptives before incarceration, while 31 percent did. Twenty-two percent of respondents reported being able to continue their contraceptives at LCDRF. Lastly, 25 percent of respondents reported that they or others they knew had sought an abortion at LCDRF. Given the recent overturning of *Roe v. Wade* by the Supreme Court and stigma that people often feel around seeking an abortion (Biggs et al. 2020), we felt it was important to ask whether respondents *or someone else* sought an abortion.

TABLE 4

**Histories of Children and Pregnancies among People Incarcerated in Las Colinas Detention and Reentry Facility**

*According to demographic survey of interview participants*

|  | Frequency | Percentage |
|---|---|---|
| **Children (*N*=32)** | | |
| Does not have children | 10 | 31% |
| Has children | 22 | 69% |
| **Pregnancy history (*N*=31)** | | |
| At least once | 29 | 94% |
| **Number of times pregnant (*N*=29)** | | |
| 1 time | 4 | 14% |
| 2 times | 6 | 21% |
| 3 times | 5 | 17% |
| 4 or more times | 14 | 48% |
| **Experienced pregnancy at LCDRF (*N*=32)** | | |
| No | 22 | 69% |
| Yes | 10 | 31% |
| **Number of times pregnant at LCDRF (*N*=10)** | | |
| 1 time | 9 | 90% |
| 2 times | 1 | 10% |
| **Currently pregnant (*N*=32)** | | |
| No | 28 | 88% |
| Yes | 4 | 13% |
| **Given birth at LCDRF (*N*=10)** | | |
| No | 8 | 80% |
| Yes | 2 | 20% |

**Source:** Urban Institute analysis of postinterview demographic survey of people incarcerated in Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.
**Note:** LCDRF = Las Colinas Detention and Reentry Facility.

Ex. I - 623

# Findings

In this section, we share the qualitative findings from our analysis of 34 interviews with people incarcerated at Las Colinas Detention and Reentry Facility.

## Types of, and Access to, Reproductive Health Care Services

Las Colinas Detention and Reentry Facility offers a wide range of reproductive health care services, according to incarcerated people. These range from basic preventive care to menstrual supplies to pregnancy support. In table 5 we show those types of reproductive health care services, categorized by type of service.

Ex. I - 624

TABLE 5

**Types of Reproductive Health Care Services Provided at Las Colinas Detention and Reentry Facility**

| Preventive care | Menstruation support | Contraceptive care | Pregnancy, labor, and delivery | Postpartum care | Emergency care | Misc. |
|---|---|---|---|---|---|---|
| ▪ Breast exam<br>▪ Hormonal treatment for menopause<br>▪ Mammogram<br>▪ Nutrition support and vitamin supplement<br>▪ Pap smear<br>▪ Pelvic exam<br>▪ Physical exam<br>▪ Pregnancy testing<br>▪ Testing for sexually transmitted diseases and sexually transmitted infections<br>▪ Ultrasound | ▪ Non-steroidal anti-inflammatory drugs, upon request<br>▪ Pads<br>▪ Tampons | ▪ Abortion<br>▪ Birth control<br>▪ Emergency contraception | ▪ Balanced diet<br>▪ Identification of support person during labor and delivery<br>▪ Initial pregnancy exam<br>▪ Information regarding childbirth and infant care<br>▪ Labor and delivery support<br>▪ Medication-assisted treatment<br>▪ Pregnancy counseling<br>▪ Prenatal care visits at the University of California San Diego Medical Center<br>▪ Prenatal vitamins<br>▪ Referral to specialists for plan of care<br>▪ Ultrasound | ▪ Lactation services<br>▪ Newborn placement planning and counseling<br>▪ Placement in Medical Observation Unit<br>▪ Postpartum medical support<br>▪ Reentry family planning | ▪ Emergency room visit | ▪ Medical record transfer |

**Source:** Urban Institute analysis of transcripts of interviews of people incarcerated at Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.

Ex. I - 625

To access reproductive health care in LCDRF, a person uses a written medical request form that is made available within each pod or unit in the jail. The form is made available on a table in the pod or unit, and if not, incarcerated people can access it by asking a deputy working their unit or a medical nurse. The jail has recently changed its medical request form to have three layers of paper that create three carbon copies: one for the incarcerated person, one for the doctor, and one for the sick call nurse, who is the first to receive the request. While incarcerated people receive pregnancy tests at booking into the jail, some interviewees perceived that reproductive health care more broadly must be requested, and incarcerated people may not know what they can request or sometimes even what they need. One person incarcerated at LCDRF said,

> They don't just offer it to you or anything like that. You have to request all of that. Which I mean, if I'm being completely honest, a lotta the people that come through these doors are not gonna think to do that when they come in here. But I'm like, I know I'm gonna be here for a couple months and I didn't have insurance for like three years or something, so I was like, "I might as well get it done when I'm here." But a lot of other people aren't gonna think like that.

## Challenges across All Types of Reproductive Health Care Services

We found one recurrent story across all the types of reproductive health care services examined in this study, whether preventive care or support during pregnancy: that incarcerated people reported experiencing significant barriers in requesting care and lengthy delays in receiving care. When received, incarcerated people reported that they were not satisfied with the care provided, and in some cases, people even felt they experienced mistreatment and punishment from medical staff. This made incarcerated people hesitant to request further care, which they indicated further worsened their medical conditions as they continued without proper treatment or diagnosis. All of this was aggravated by a general lack of awareness and communication around reproductive health care services available to incarcerated people.

**Ex. I - 626**



**REQUESTING AND ACCESSING CARE**

Nearly all of the incarcerated people we interviewed described barriers to requesting and accessing reproductive health care services. Delays between requesting care and receiving care, which ranged from a few days to several months, were by far the most frequent challenge incarcerated people cited. Furthermore, incarcerated people reflected that their needs are often overlooked or dismissed and that the lack of timeliness in responding to requests can result in severe consequences if they are detoxing from drugs, having miscarriages and experiencing excessive bleeding, or having suicidal ideations. One person incarcerated at LCDRF shared,

> I just had my STD test done last week—the blood test—and it was just the month before that I finally got a Pap smear swab done. I've been asking since I first got in here. I actually had to write a grievance to the sergeant about the STD test and finally they came and did it. I had to complain about it to a higher station to get them to come and actually get the blood test done. I'd asked three times, and then I wrote and complained about it.

The main barriers incarcerated people described included the following:

- the amount of time between requesting services and receiving services

- being dismissed by medical staff when elevating an issue and requesting services

- needing to exaggerate medical requests as emergencies to receive the requested care, or as some people described, "going Hollywood"

- nonresponsiveness to multiple medical requests, and feeling the need to submit a grievance to receive the requested care

- needing to justify all requests

Ex. I - 627

*I get it because they can't have everybody on gluten-free if everybody's trying to be healthy because the food's not great here, but then on the flip side, they're gonna give me a pregnancy test blood test and I tell them that I bled for two hours, and then they don't give it to me. I'm just like, "What are they really spending their money on? Do you care about our well-being?" I don't know. —Incarcerated person at LCDRF*

DELIVERY OF CARE

Not only is requesting and accessing reproductive health care services challenging; as incarcerated people we interviewed also noted, the delivery of care involves significant challenges. These include the following:

- concerns about the experience of medical staff providing care

- talking about private medical information in common spaces of the jail

- the presence of deputies at medical appointments[††]

- inconvenient timing of procedures

- discomfort and a perceived lack of safety while receiving medical services

- limited follow-up after procedures and limited information provided on medications and procedures received

- bias and perceived pressure from jail staff around reproductive decisions

First, **incarcerated people noted that medical staff sometimes appeared to be inexperienced with basic medical procedures such as blood draws.** Four incarcerated people shared that medical staff either seemed not to know how to perform the required procedure or explicitly shared that they were still learning or needed additional practice.

---

[††] LCDRF policy requires deputies to be present for the safety of medical staff.

**Ex. I - 628**

*I think it was just a phlebotomist at first, but she was really young. I think she was inexperienced because she was nervous about doing it, so she went and got the nurse lady, the nurse practitioner, I believe, to come and do it because she was scared she would hurt me. I'm like, "It's not going to hurt. Let's just freaking do it," but I'd rather have somebody who's not nervous and shaking. —Incarcerated person at LCDRF*

Incarcerated people reflected on the confusion and concern they felt around receiving certain services, especially when they did not receive services they had asked for. One incarcerated person shared that they consistently requested STD testing after entering the facility, but instead received other tests. Because of the lack of communication, she was unsure whether her request was fulfilled. People also shared that some medical staff made inaccurate estimates about how far along people may have been in their pregnancies. One person shared,

> One of my friends came in, and he was saying that she was five months [pregnant], and when she went off-clinic, which takes about almost a month or two months for you to even go off-clinic. She was eight months, so she was already about to pop, literally.

Another challenge respondents reported was that **medical staff discussed private medical information with incarcerated people in common spaces in the jail.** Incarcerated people interviewed for this study reflected that it was uncomfortable to have their personal medical information talked about in a common space in front of security staff and other incarcerated people. For many respondents, this was especially uncomfortable because they had sensitive reproductive health care needs they were looking to address—for example, many people in the jail sought STD/STI testing because of infidelity in relationships or sexual assault they experienced before coming to the jail. This aligns with an earlier 10-year study in Los Angeles County that identified high positivity rates of STDs/STIs for women in jail, including chlamydia, gonorrhea, early syphilis, and HIV (Javanbakht et al. 2014). Furthermore, this may lead incarcerated people to not be fully honest about their medical issues, especially when asked about stigmatized issues like STDs/STIs. One person incarcerated at LCDRF said,

> It was fine except when I came back with chlamydia after the smear thing, and they told me right there in the day room. I was kind of upset about that. Plus, I'm uncomfortable that the guard's having to stand right there. They don't have to because they've gone out of the room before when I was talking to medical. I'm not comfortable with everybody knowing my medical business. That irritated me....They came to my door to ask about it because I was raped...they're asking all these questions right at my door when we were all locked down. My roommate's

Ex. I - 629

there. And I'm just like, "Really? If I cared to share it with everybody, I'd be telling everybody about this." It's really irritating that your medical business is out there. They're just really nonchalant. They don't care.

Incarcerated people also shared that **officers were often present for medical appointments, including procedures that were more physically invasive or required undressing, such as Pap smears.** Incarcerated people described the presence of an officer at a medical procedure as uncomfortable, even if the officer was their same gender. LCDRF policy requires deputies to be present during medical appointments for the safety of medical staff. Furthermore, some incarcerated people shared that they do not share certain medical information, such as symptoms they may perceive as embarrassing, with medical providers when an officer is present for fear the officer may disclose that information to other officers. A person incarcerated at LCDRF shared,

> I feel embarrassed that there's someone else listening. Why can't they do it like right here or have someone outside the room at least or something—I don't know. I don't agree with that….That's my business. It's confidential. She could go and say whatever she wants to the deputies or—I don't know. I just don't like it. There's a lot of stuff that I don't say because of the fact that they're standing right there. It's embarrassing.

**The timing of procedures was often inconvenient and incarcerated people were not made aware of procedures until shortly before they were happening.**[‡‡] Many people shared that blood draws were conducted in the middle of the night between midnight and two o'clock in the morning, which disturbed people's sleep in an already difficult environment for sleeping.

---

*I feel like they feel like, because we're incarcerated, that we're not human or something. We're just a number. It's like, they really just don't care. They get to go home at the end of the day. We don't. It's like, I feel like they treat us as if we're just not very important or like they just don't care at times. —Incarcerated person at LCDRF*

---

**Half of study participants shared that they did not feel comfortable or safe receiving services from jail medical staff.** Incarcerated people shared that it would be helpful to choose the gender of the medical staff member conducting a procedure. Some procedures, such as the STD/STI testing and

---

[‡‡] LCDRF policy indicates that off-site clinic visits cannot be shared beforehand due to security concerns.

**Ex. I - 630**

Pap smears, were conducted by men, which made the incarcerated people we interviewed uncomfortable. This can be traumatizing, especially considering the high rates of sexual violence and abuse incarcerated people experience before incarceration (Ervin et al. 2020). A person incarcerated at LCDRF shared,

> Maybe two weeks in, I saw somebody for an ultrasound here. It was a male. You don't get to choose whether it's a male or a female. I, personally, was uncomfortable because of that, just because. It's kinda hard to talk to someone that can't get pregnant about pregnancy. That's just my personal opinion. Because he was disregarding anything I was saying, or questions and concerns.

Two incarcerated people discussed times when they experienced severe anxiety and panic attacks and medical staff did not appear to believe them or accused them of faking their symptoms. Incarcerated people even shared that medical staff had made inappropriate sexual comments. One person shared,

> He [a medical staff member] was telling another girl in front of me in line, "The wetter the better," and laughing. I felt uncomfortable to ask him about my medication or anything because then I was, "Oh, my gosh." Yeah. I just left it alone....Both incidents were woah. If that would've happened at a job, that's sexual harassment for sure. I work in HR. I was, "Woah." Especially for a professional.

Some also cited incidents when they felt that staff punished incarcerated people who may have unknowingly broken a facility rule. In some cases, interviewees reported that this had resulted in people being put on lockdown and/or not being given their medication. Importantly though, nearly half of respondents did cite positive experiences with staff. For example, when asked about positive experiences with medical providers in the jail, people shared,

> I like the ob-gyn. It's been the same chick the whole entire time. I don't know if there's another one, or if she's literally the one person for the whole jail. She's the only one I ever see when they do, because they'll come around and talk to people in the interview room. It's always her. She's really cool. She's really nice. She doesn't make it—I was actually really surprised at how that went because you see those like jail TV shows or movies and those kinds of appointments are always like, "Oh my God," but it was totally fine.

> Yeah, they were very hospitable. She informed me of exactly what was gonna happen, and I didn't feel any kinda harassment, any kinda hostility, from that nurse.

> Very professional. I really like—I don't know her name again, though, but the doctor that did— that I was initially gonna see. I like the lady, the nurse practitioner or whatever she is, that now works there, too.

Interviewees shared positive experiences with counselors at the jail who they described as supportive and sometimes went above and beyond to help them.

> I've heard the counselors are really good, here. They do a lot for us. It's not just there's a huge array of things that they help us with. Down to that kinda stuff, all the way down to sending us pages to color with. They go on the internet and print out stuff for us, which is kinda cool. I've heard the counseling is not that bad. I've never heard, really, too many complaints about it.
>
> I mean, I know there's a lotta people here. The counselors are really cool here, and I really do feel like the counselors actually care about what happens to us and stuff like that. There's just a lotta people here and I know that they have busy schedules.

The result of these challenges in requesting access to care and in delivery of care is that incarcerated people are less willing to seek the help they need for fear of punishment or mistreatment. This can lead to medical issues worsening as they go undiagnosed and untreated.

---

*I'm not gonna continue to push this issue if they're telling me that I'm crazy or that I'm not or whatever and then get put in a cell when I don't need to be in a cell. —Incarcerated person at LCDRF*

---

**Another challenge was that after procedures, incarcerated people felt they did not receive much follow-up or information on the medications or procedures they received.** The mantra interviewees frequently cited was "if you don't hear from us, it's good news." But people we interviewed (especially people who were preparing to reenter the community soon) expressed concern about not knowing what medications they were provided or the potential side effects. One person shared,

> I feel like another thing, I take what they give me because I know that it must fall back in line of something that I requested. I would like for them to give us a printout of what we're taking. Because I noticed I'll go to take my medicine, and I'll take what they give me. Then I'll be feeling like, "I don't even know what I took." Ya know? I would like to know because I know every medicine has side effects. I feel like that's something important that I need to know. They don't do that.

**Lastly, nearly a third of study participants indicated that they had experienced issues with bias from jail staff or felt they had been pressured by them regarding their reproductive decisions.** People reported that they had experienced this bias and pressure across types of reproductive health care services, including newborn placement decisions, abortion, pregnancy testing at intake, and family counseling. Jail leadership, however, shared with us that staff are prohibited from influencing any decision pertaining to a pregnant patient.

Policies regarding adoption and newborn placement vary by state and facility. We learned that in LCDRF, decisions around adoption and newborn placement typically occur in collaboration with the counselor. A.B. 732 required that incarcerated people receive counseling during pregnancy. In interviews, people who had been pregnant while in custody shared different experiences with the counseling they received and different perceptions about how newborn placement and adoption are discussed in the facility. One person who was currently pregnant shared concerns about the counselors forcing a closed adoption:

> [Incarcerated people] don't get the option to have open adoption. They're always looking to be a closed adoption, so it's like, now you can never really find that child if you wanted to. I don't like hearing a lot of girls that come back in the unit talking about it and crying about it because it's like, they didn't know what they were gonna do. It's a different feeling once you push that baby out and then you hold that baby for those few seconds. Then it's like, you're like, damn. I should have thought about this before I did—would say I don't want to see my baby no more. That is a big pet peeve that I have, when girls tell me that they're trying to—the counselor's telling them about adoption options and stuff, or because we can't—they don't have family or somebody to come in and take the baby for them until they get out of jail. We don't have programs and stuff here to help us with that type of stuff.

Table 6 summarizes the challenges with accessing and delivering care at LCDRF.

TABLE 6

**Primary Challenges Raised by Incarcerated People around Reproductive Health Care Services in Las Colinas Detention and Reentry Facility**

| Challenges requesting and accessing care | Challenges with delivery of care |
|---|---|
| ▪ Amount of time between requesting services and receiving services<br>▪ Dismissiveness of medical staff<br>▪ Needing to exaggerate medical requests as emergencies to receive care<br>▪ Nonresponsiveness to multiple medical requests<br>▪ Needing to justify all requests | ▪ Medical staff inexperienced in basic medical procedures such as blood draws<br>▪ Discussion of private medical information in jail common spaces<br>▪ Presence of officers at medical appointments<br>▪ Inconvenient timing of procedures<br>▪ Discomfort and lack of safety while receiving medical services<br>▪ Little to no follow-up or information provided after procedures<br>▪ Bias or pressure from medical staff around reproductive decisions |

**Source:** Urban Institute analysis of transcripts of interviews of people incarcerated at Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.

## Specific Reproductive Health Care Areas

In this section we share the qualitative findings from our analysis of 34 interviews with incarcerated people specific to five major reproductive health care areas: (1) preventive care, (2) menstruation, (3)

Ex. I - 633

contraceptive care and abortion, (4) pregnancy and postpartum care, and (5) reentry preparation, including parenting support.

## PREVENTIVE CARE

Incarcerated people shared their experiences with a wide range of preventive reproductive health care services they received at LCDRF. In table 7, we show how many and what percentage of study participants received specific services.

TABLE 7

**Reproductive Health Care Services People Incarcerated at Las Colinas Detention and Reentry Facility Had Received**

*According to interviews (N=34)*

|  | Frequency | Percentage |
|---|---|---|
| **Service** | | |
| Pap smear | 10 | 29% |
| STD/STI testing | 7 | 21% |
| Breast exam | 4 | 12% |
| Ultrasound | 4 | 12% |
| Mammogram | 3 | 9% |
| Pelvic exam | 3 | 9% |
| Multivitamins | 2 | 6% |
| Menopause support | 1 | 3% |

**Source:** Urban Institute analysis of transcripts of interviews of people incarcerated at Las Colinas Detention and Reentry Facility, conducted March 2023 to June 2023.
**Notes:** STD = sexually transmitted disease. STI = sexually transmitted infection.

During interviews, incarcerated people shared that regular checkups with an ob-gyn are not offered or automatically scheduled unless you are pregnant in the jail. Interviewees who reported being able to access reproductive health services, such as appointments for pelvic exams, mammograms, and testing, often had specific health concerns they wanted to address and advocated for themselves to receive care. As shown in table 7, of the 34 people interviewed for this study, 29 percent (*n*=10) indicated they had received a Pap smear while in LCDRF. Some shared that their Pap smear was administered by the medical staff, whereas others shared that it was self-administered.[§§]

---

[§§] LCDRF protocol does not allow individuals to self-administer Pap smears or STD/STI tests. Urban stands by the data obtained from interviews but is unable to verify these accounts.

**Ex. I - 634**

*They gave me a long Q-tip to go to my bathroom and take care to do it myself and put back in the packaging and bring it back down to the medical [area]. —Incarcerated person at LCDRF*

Twenty-one percent of study participants (*n*=7) indicated that they had received STD/STI testing while in LCDRF. As with Pap smears, some reported that this testing was self-administered. Incarcerated people also indicated having received breast exams (12 percent, *n*=4), mammograms (9 percent, *n*=3), pelvic exams (9 percent, *n*=3), ultrasounds (12 percent, *n*=4), and multivitamins (6 percent, *n*=2). One person indicated that they had received a shot for excessive bleeding related to menopause.

*Back then, it was dreadful. This time, when I arrived and I talked to the doctor, she was like, "Well, you're probably going through menopause soon." Because I was concerned, because I basically need diapers, it was so bad. I forget the name of what it is, where you just don't stop bleeding for days. She put a shot or a pill or something I could take in case that happened, which they had never offered me that before. —Incarcerated person at LCDRF*

**Whether reproductive needs are met.** Thirteen people indicated that their reproductive needs were being met, although they again elevated extensive challenges with having their medical requests filled, limited information made available on the types of reproductive health care services offered in the jail, and a lack of sufficient medical personnel to meet the needs of people incarcerated. The 8 people who indicated that their reproductive health needs were not being met wanted to see an ob-gyn off site, more treatment and medication options to choose from, and more comprehensive care.[***] One shared, "It took me like five months to get an appointment with a gynecologist. They don't do follow-up…I said

---

[***] LCDRF policy allows individuals to see off-site doctors at their own expense. It is unclear the extent to which incarcerated people are aware of this policy and make use of it.

Ex. I - 635

I wanted a full pelvic. They said okay, but then they just waited months...probably six months before they allowed me to get to a doctor." Another reported, "I've had symptoms of a yeast infection, you know, and so I put it in [a medical request] every day...they just tell me to, 'Drink water. Drink water.' Finally, today, this morning, I was able to talk to a nurse about it in detail so I can get an appointment to see the doctor." This person also reported that the wait to see the doctor is "kind of discouraging...especially when your symptoms start to get worse, and there's not so much we can do...It's not like we can shower often. I have to birdbath or whatever or drink water or try to find things to help the symptoms while we have it...we have to wait until we see the doctor, and the doctor has to prescribe it."

Though most people's needs were being met, a large majority of people incarcerated at LCDRF shared that they had never been given general information about reproductive health services offered in the jail. If someone had been made aware of accessible services, it had been through learning from other incarcerated people in the jail. Interviewees shared that if they were interested in receiving information about reproductive health care, they would request specific resources through a counselor or a medical request. A few mentioned an informational health class on sex education that Planned Parenthood provided to incarcerated people at the jail. One shared their experiences with that class:

> It's every month, I believe. I go to every single one of them. I like it. The girl that comes, she's great. Every single question—I learn a lot there...I mean, there was a lot of things that I didn't know...I didn't know anything about tampons. I didn't know anything about none of that until I got here. She's like, "No, it's not a bad thing." I learned a lot from her, so it's a very great class. I recommend it to all the girls that get here.

***Pregnancy testing.*** From our analysis of interview transcripts, we found that most incarcerated people shared that they were tested for pregnancy when booked into LCDRF. The jail appears to test for pregnancy more than other jails across the United States. One study found that fewer than half of the jails in the study (37.7 percent) gave pregnancy tests to all women who entered their facilities; most (45.3 percent) relied on women's self-reports of pregnancy status and then performed tests to confirm pregnancy (Kelsey et al. 2017). Some people incarcerated in LCDRF said the pregnancy test was optional, whereas others said that it was mandatory. One shared, "I just feel like it's an obligation that comes when you're arrested. You come, and you're forced to do whatever they tell you to do."

Interviewees and facility leadership cited a few reasons (other than A.B. 732) why the jail was conducting pregnancy testing at intake. These included that some people may not know they are pregnant, COVID-19 policies required pregnant people to be in a unit separate from the general population, and all incarcerated people are put through a body scanner X-ray machine upon booking

(and staff need to ensure people are not pregnant before using that machine). Importantly, some incarcerated people expressed skepticism that the pregnancy test was for pregnancy and not drug use.

Medical staff administered the pregnancy test, whether at intake or during incarceration, and although most incarcerated people indicated that they had privacy during pregnancy testing at intake, they shared there was less privacy if they requested a test at another time. Incarcerated people also perceived the pregnancy tests to be of low quality and that some people received false negative results. One person discussing the experience of another shared,

> She had to have five done before she came up pregnant. She came up pregnant the day before she was being released. It's just a urine test. She knew she was pregnant, so they moved her the day before she got released. She had to grieve it a couple of times to get an additional one. They kept telling her, "You're not pregnant. You're not pregnant." She was like, "I know I'm pregnant."[†††]

## MENSTRUATION SUPPORT

All incarcerated people interviewed for this study shared that pads and tampons are provided free of charge by LCDRF. The jail provides standard-sized pads and tampons with two different absorbency levels (regular and super). Both free tampon options have cardboard applicators, but if someone would like to use tampons with plastic applicators, they can purchase them at the jail's commissary. From our analysis of interview transcripts, we found that incarcerated people shared mixed feelings about the quality of the supplies. Though some expressed no concerns about the pads or tampons, 10 shared that there were not enough for people with heavy periods. Some shared that they often needed to double or triple up pads in their underwear to provide enough coverage. Though there is no set minimum number of pads or tampons that need to be provided at a time to an incarcerated person, and no maximum number allowed, four people indicated that they did not receive as many pads or tampons as they needed.

---

[†††] To "grieve," in the jail or prison context, means to submit a grievance through a formal process to supervisory staff and leadership at a facility.

*I bleed a lot, so I double up at night. I just made that observation that they have regular and super options for tampons, so they should have that for pads. There's only the one size that doesn't do anything. I've always had heavy bleeding. —Incarcerated person at LCDRF*

A little over half of study participants indicated that they experienced challenges in accessing menstrual supplies in the jail, whereas the others indicated that they had no such challenges. Access to pads and tampons varies according to a person's unit, the time of day, and the discretion of staff on duty. Incarcerated people shared that they can access pads and tampons in two ways: by picking them up themselves in a central area in their unit during the day before evening lockdown, and by asking a deputy who has supplies behind their desk.

*I feel like it's different with every deputy. Some deputies will only give you two of each, and others will give you four, five. —Incarcerated person at LCDRF*

If their unit is locked down, either for the evening or for a security issue, incarcerated people have to request menstrual supplies from staff as they make rounds on the unit. Depending on the staff, requests might be filled quickly or might be delayed until the next set of rounds. Six people raised this as a challenge during interviews. One shared,

> I remember I woke up to—I felt myself bleeding, and I pressed the button. I was like, "Can I get pads?" They're like, "On our next walk." I'm like, "I'm bleeding," you know what I mean. They only give us one-ply toilet paper, so that doesn't help. I literally had to wait an hour in my bloody clothes because I was wearing my gown and my blues, so they just bled through.

Incarcerated people also highlighted struggles maintaining personal and menstrual hygiene. One uniform and four pairs of underwear are provided per person a week, and laundry can be washed once a week. If someone bleeds through their underwear or clothes, it is not guaranteed they can receive a change of clothes. When asked whether someone could change clothes if they were to bleed through their underwear or clothes, one incarcerated person reflected, "The option is, you better hope you have a really nice deputy that understands." Another shared,

**Ex. I - 638**

> You don't wanna be sitting in the day room, bleeding in the chair, and not be able to do anything. Then, also, if you did have some clothes you could change into, you can't have them...You can't have them, because you'll get written up and maybe even locked down for extra clothing, which is ridiculous. We're women. Do they wear one pair of—one set of clothing all week?

Lastly, incarcerated people shared that pain relievers for menstrual cramps were largely inaccessible. Six shared issues accessing pain relievers during their cycles. To access any medication, including pain relievers such as ibuprofen or acetaminophen, they have to submit a formal medical request, which, as previously discussed, can take days, weeks, or even months to fulfill depending on the request. Incarcerated people shared that by the time they received the requested pain relievers, their periods were often over. One person shared,

> I feel like they should be more considerate when we are on our period, that it's normal that if we have really bad cramps, or really bad body pains, that we should [have] access to Tylenol or ibuprofen during those times at least...if I were to ask for something on my second day, I wouldn't get it until I'm off of my period.

Only four people we interviewed were incarcerated in LCDRF before A.B. 732 was implemented. This small group reported that before that law, some menstrual supplies had to be purchased from the facility's commissary, and they also experienced challenges getting as many pads or tampons as they needed during their menstrual cycles. We do not have enough study participants, however, to draw conclusions on access to and the quality of reproductive health care before A.B. 732 was implemented.

---

*Sometimes it was pretty hard to get enough pads [before A.B. 732] because they think you're just hoarding them or something...Now it seems to be a little bit better. It's nice that you don't have to sit and wait for pads; that you can just help yourself for the most part. It's definitely better. I mean, I'm not gonna lie, the quality of the pads could be a little better, but they're free. —Incarcerated person at LCDRF*

---

## CONTRACEPTIVE CARE AND ABORTION

Three-quarters of incarcerated people we interviewed discussed types of contraceptive options (pills, intrauterine devices, etc.) provided at LCDRF. The reasons birth control had been provided seemed to vary and included reducing heavy periods and cramping, preventing pregnancy, balancing hormones,

Ex. I - 639

and preventing subsequent pregnancy after giving birth. Of this group of respondents, nearly half indicated that several options are made available to incarcerated people. These include the following:

- birth-control pills (including different options)
- the birth-control implant Nexplanon
- intrauterine devices (IUDs)
- the birth-control shot Depo-Provera
- Plan B (the morning-after pill)

While LCDRF policy specifies that birth control is made available to the incarcerated population, nine people were unsure whether it was available in the jail and four were under the impression that it was *not* available. As with accessing other reproductive health care services, incarcerated people shared that information on what is available is not consistently provided and that you need to ask staff for it explicitly.

---

*They don't say, "If you want this, or if you want birth control, ask the nurse." They don't tell you to ask the nurse. You gotta ask for everything here. —Incarcerated person at LCDRF*

---

Interviewees did not cite many challenges around accessing contraceptive care. One incarcerated person shared that birth control is only made available for people who have irregular periods, and she felt the need to lie about her periods in order to access birth control:

> I put in for birth control, and they came to see me—the nurse came to see me and said they don't provide birth control. They provide it only if you are [having] irregular periods, which I have had...I still haven't seen the doctor, but she said as long as it's irregular, so I'm just gonna say it's irregular, to get birth control, so when I walk out, I'm set. That would be the best thing to do for any woman. Remember being incarcerated, I'm having dreams of my boyfriends. It's pretty insane. It's not helpful that it has to be irregular. You have to have a problem. We're women, we've been dealing with this forever. Forever trying not to be pregnant, or whatever, keeping it contained, you know what I mean? It's just really upsetting to know that "oh, I have to go through—I have to lie."

Another incarcerated person raised logistical considerations with respect to accessing certain types of birth control. In the case of the implant Nexplanon, a person may need to be taken off site to

**Ex. I - 640**

have the local anesthetic agent applied, which can result in staff overtime and transport costs. This aligns with what we know from national research on challenges in accessing reproductive health care (Gulaid and McCoy 2022).

Of the people who discussed abortion during interviews, more than half shared that they did not know whether abortions were conducted for incarcerated people in the jail, or how to access one. This share is larger than that in another study of jails, which found that upon confirmation of pregnancy, fewer than 30 percent of the surveyed facilities informed women of their options, such as adoption or termination (Kelsey et al. 2017). In our study, eight people shared that abortion is made available to people in LCDRF in the following ways:

- via flyers or notifications in the dorm room

- at intake during pregnancy testing

- during prenatal and pregnancy exam medical visits

- via medical request

There were contradictory views, however, about what flyers around the jail dorms instructed. One person reported that flyers explicitly state abortion is not provided, whereas another shared that informational flyers reminded people about their right to an abortion while in jail.

*When I saw the nurse practitioner, she already offered when I told her I thought I was three months. She was like, "You want an abortion? We have those services here." She let me know straight up. I wasn't interested, I said no, so I wouldn't have even had to really ask, because they offer it to you in the beginning. —Incarcerated person at LCDRF*

Three incarcerated people mentioned significant challenges they or others had had receiving abortions in Las Colinas, including needing to wait a long time to get the abortion and not receiving proper medical treatment after the procedure. One person discussing the experience of another shared,

> Certain deputies were not very nice to her when they found out that she had an abortion, and they just kind of left her to deal with it on her own. They weren't very nice to her. She didn't get any painkillers or anything, so, but other than that. She didn't speak any English, so she

Ex. I - 641

didn't have very good communication. They didn't really explain the process to her or anything. I know that not all deputies are like that. I think it was just the deputies that were on duty that day. When she came into intake, she found out she was pregnant and then she requested to have an abortion when she was here. They put her in the pregnancy dorm, and then they took her to the hospital to conduct the abortion. Then from the hospital the doctor requested she stay for a day for observation, they said, "No." They brought her right back to the jail...They just left her in her cell with no painkillers.

Another person shared the pressure they experienced from medical staff to make a decision about an abortion:

That's one thing I didn't like is that I didn't know if I wanted to keep the baby or not, and I felt like I was being—it was very overwhelming to me. If I tell you that I don't know what decision I'm going to make and they keep coming, like, "So, did you decide yet? Did you decide? Did you decide? Do you want to keep your baby? Do you want to kill your baby?" Over and over again to the point it made me feel overwhelmed. If I know that I'm going to have an abortion, trust me, I will tell you. I will tell you. You don't need to come and ask me like twice a day almost for a week, two weeks. I was like, "Whoa." It really hurt me, actually, because it's not something that's an easy topic to talk about or even a decision to make. It's very hard. It's heart-crunching, you know? It's painful. The more they keep shoving down my throat, the more you're causing me pain. I didn't like that. They're almost pressuring me to get an abortion. That's what it felt like. I do not like it at all. Part of the reason why I'm not going there is because of the fact that I don't like that they're—it seems so forceful. Yeah. I was so—you can see how far along I am, and when I got here—I was barely six weeks—so I'm like, "What the hell's the rush?" I have time here to make this decision, like, "Hold up."

## PREGNANCY AND POSTPARTUM CARE

As the primary intake facility for incarcerated adult women in San Diego County, LCDRF provides medical care, counseling, and certain accommodations to people who are pregnant during their incarceration in the jail. Moreover, per A.B. 732, if a person delivers a newborn while in custody, they are entitled to postpartum care following the delivery. According to our postinterview demographics survey, nearly a third (31 percent, $n$=10) of study participants had been pregnant in LCDRF, 90 percent of them once ($n$=9) and 10 percent twice ($n$=1). Furthermore, 13 percent ($n$=4) of study participants were pregnant at the time of their interview. Out of the people who had been pregnant during incarceration, 20 percent ($n$=2) had given birth while incarcerated at LCDRF.

***Experiences with prenatal care.*** When a pregnant person is booked into LCDRF, an ultrasound is ordered for them shortly after intake and a confirmed pregnancy test. Six people shared that they received an ultrasound within two weeks of being booked into the jail. Jail leadership at LCDRF indicated that a technician in the jail performs the initial ultrasound, where an expected due date is provided. That initial ultrasound is followed up by an appointment with an ob-gyn at a medical center

affiliated with the University of California San Diego Medical Center, which is supposed to happen within seven days.

---

*That first week that I was here I got an ultrasound, and then they found out I was actually more like seven months pregnant. They then just did everything that they would do for you at that point in time in pregnancy, like, referring you to the ob-gyn outside and getting ultrasound and doing blood work and checking me...I didn't have prenatal care before I got here either, because I didn't know I was that far along. —Incarcerated person at LCDRF*

---

Although incarcerated people indicated that their initial ultrasounds were performed quickly, not all were able to visit an ob-gyn for their initial pregnancy exams in a timely manner. This has important implications for the information incarcerated people receive about their pregnancies: an initial ultrasound can help determine the progress of an incarcerated person's pregnancy, but more detailed health information is not made available to them until an appointment with a qualified medical practitioner. Three incarcerated people shared challenges accessing an ob-gyn at the University of California San Diego Medical Center that included never receiving an initial pregnancy exam and waiting between one to two months for the exam.

---

*[The ultrasound technician] basically, said that the baby's growing good. Her heart rate's good, but any other information that they had wasn't given to me...just based off me and knowing I'm gonna have a C-section, which is another reason why I want to frequently see an ob-gyn. —Incarcerated person at LCDRF*

---

Follow-up visits to the ob-gyn at the University of California San Diego Medical Center were scheduled automatically with varying frequencies depending on how far along people were in their pregnancies. One incarcerated person, however, described an incident where they did not receive prenatal vitamins because of a scheduling oversight on the part of the jail and were later penalized for not raising the issue:

> They switched me to a certain housing unit. I don't remember which one it was. They didn't—I didn't receive no iron pill, no vitamin pill, but they say you're supposed to follow up with that when you find out you're pregnant. It's neglect, or something like that. I got in trouble with that...for not following up with a doctor for my baby when I was pregnant.

Between these appointments, prenatal care and related services are primarily provided by a nurse practitioner at the jail who delivers medications and vitamins and conducts regular check-ins. Incarcerated people shared a desire for more frequent meetings and communication with the ob-gyn. One person incarcerated at LCDRF shared, "It would be cool if they [medical staff] would come once a week and ask how are you doing or how you're feeling, some type of—like in the real world, real world, the free world, you can go to the doctor if you feel like something's not right or something. If we're here, they don't care enough, I guess."

Although people who were currently pregnant reported receiving reproductive health information, visiting an ob-gyn, and accessing care more frequently than the general population of study participants, they still experienced delays in care. Interviewees attributed these delays to high demand for services and a perceived shortage of medical personnel. They also highlighted a lack of choice regarding medication, food, and medical providers as a particular challenge. Six interviewees shared concerns about the prenatal care provided by the jail. These included that the care they were receiving was of a lower quality than the care they received before their incarceration; that they were waiting a long time for medical appointments, and that those appointments were infrequent; and that they were often unable to access the medications and doctors they had before their incarceration. According to incarcerated people, a "generic" regimen is provided for prenatal care, which might not be responsive to a person's needs. Those needs might include a specific type of vitamin or medication or even specialized counseling. One person shared,

> You don't get options to take care of yourself in a certain manner if you would like to, because it's a jail...it's very challenging to deal with when you're in here and you're—you are very specific to how you would like to take care of yourself and you're just told, "No, you can't. You can't have that vitamin," or, "You can't eat that." It is tough when you are trying to take care of another child inside of you.

Lastly, although one of the A.B. 732 policies is to allow pregnant people to see their preferred medical providers, this does not appear to apply to people who receive health care through California's Medicaid program (Medi-Cal). One respondent shared that they were unable to see the provider they had before their incarceration at LCDRF and indicated that they had received care under Medi-Cal before their incarceration. The State of California is currently working with all counties to adopt CalAIM, which would allow Medi-Cal to provide services to incarcerated people for up to 90 days prior to their release and address some of these integration issues.

**Ex. I - 644**

***Accommodations during pregnancy.*** During the COVID-19 pandemic, pregnant people were housed in a separate unit because they were considered medically vulnerable to COVID-19. However, interviewees indicated that this seemed to be inconsistently applied. One interviewee incarcerated during that period shared that they were placed in a high-security unit with the general population while pregnant. The interviewee reported that pregnant people were unable to leave the unit and participate in programming and work opportunities as much as the general jail population. Perceived limitations to their ability to work and participate in programming while pregnant were highlighted as a major concern across interviewees. Incarcerated people shared that these limitations led to feelings of alienation and idleness. One shared,

> I want to go to school. I cannot because I'm pregnant. I want to work. I cannot because I'm pregnant. I want to exercise. I cannot because I'm pregnant. I want to clean. I cannot because I'm pregnant. I cannot serve food because I'm pregnant. I cannot stand up or walk because I'm pregnant. Yeah, it's really frustrating because you're just sitting in jail and literally wasting your time in here doing nothing.

Two pregnant incarcerated people also shared that being housed with other pregnant people provided comfort and support. As one told us, "We grow as a family in [the pregnancy unit] once we're all in there, like we all know each other. We all know each other's problems, struggles, and what we're going through. You're able to talk to each other and help each other get through certain things." Importantly though, LCDRF has expanded pregnant people's access to programming and they are no longer housed in a separate unit, given the CDC's changing guidance on COVID.

According to some incarcerated people, pregnant people at LCDRF are supposed to receive the following accommodations: an extra mattress, different-sized clothing throughout their pregnancies with red lettering instead of white, and snacks with their meals. But others indicated that pregnant people are not allowed to have certain accommodations, like extra linens for comfort. Whether people actually received these accommodations and the quality of these accommodations varied greatly.

Regarding the quality of food, incarcerated people felt that neither the meals nor the extra snacks they were provided were appropriate for a prenatal meal plan. They noted that these "snacks" consisted of extra servings of the standard meals, which included fruit and peanut butter.[§§§] When asked about prenatal care, incarcerated people shared they felt that the food provided was of low

---

[§§§] LCDRF has a dietician on staff.

Ex. I - 645

quality and how they felt this impacted their pregnancies. One person who was pregnant (and had been when they were booked into LCDRF) shared,

> When I had all the things planned, especially nutrition, and then you come to jail, you're given poor nutrition, it raises a concern. I'm definitely stressed out about it, just because it's not a real pregnant diet. I mean they give you extra peanut butter for calories. I laugh because it's pretty comical...It shouldn't substitute what you should really get as a whole balanced diet, with fruits and vegetables. It's too much grains, too much carbs, processed soy meats, no real meats. There's a couple for lunch, but that's like once or twice a week.

Lastly, one incarcerated person shared that they received medication-assisted treatment for opioid use during their pregnancy in jail.

***Pregnancy planning services and counseling.*** In LCDRF, counseling services are provided by staff employed by the San Diego County Sheriff's Department. Counselors work with pregnant people to discuss placement options for the babies, provide educational resources on parenting, and identify "support people" (people who could be present and provide support in the hospital during labor and delivery). All but one of the six people interviewed who were currently pregnant or had recently been pregnant at LCDRF stated that they received some form of counseling during their pregnancies. Some described positive experiences with the counseling. One person who pursued an open adoption noted that after she requested information on adoption, the counselor shared profiles of prospective parents for her to review and facilitated conversations with the adoption agency to process the adoption. She further shared,

> I got to pick the couple...which is nice, I like that...[the counselor] helped me with looking at the profiles. She brought the profiles because they were faxed to her from the place, because she couldn't send them to me. I don't have in-person visits from that unit, so it was done through the counselor here—for me to look at the profile while meeting with her. The rest, she—and then they would communicate sometimes, too, to help the process moving along. I would talk to the director of the place on the phone and now I just talk to the couple that has the baby.

Incarcerated people discussed wanting more options for pregnancy counseling, particularly with community-based providers and those who could better understand their situation of being pregnant in jail. The incarcerated people we interviewed shared the sentiment that they were not being treated as people with varying experiences and that standard counseling might not always be appropriate. One shared that she was repeatedly asked to provide the contact information for a support person for her birth, despite her release being scheduled before delivery. Another shared that when she had asked for resources on parenting, her counselor provided her with a packet on substance abuse. Being incarcerated while pregnant can be a source of immense stress (Friedman, Kaempf, and Kauffman 2020; Mukherjee et al. 2014; Wolfrey 2021), and people we interviewed shared that they had

experienced depression and anxiety and had limited avenues for expressing their concerns around the care they were receiving.

*They don't understand what we go through and how we feel about not knowing, the unknowing if you're gonna have your baby here or not...That's a big deal. As far as the counselor, she's a good counselor, but I just feel like we probably need other options. —Incarcerated person at LCDRF*

**Delivery and postpartum care.** Four people who were currently pregnant or had recently been pregnant indicated that they did not discuss a specific birthing plan with their assigned counselor, beyond identifying a support person to be present during labor and delivery. Only one study participant was able to speak about their postdelivery experience. In her case, she was able to hold the newborn, stay with them, and breastfeed for a few days, and she was transferred to the medical observation unit for about a week postdelivery. One incarcerated person, however, shared that her friend in the jail experienced barely any postpartum care and that after delivery she was sent to a different unit rather than the pregnancy unit.

We also learned during interviews that the jail will store someone's breast milk in a freezer for up to three days to be picked up by one of the person's family members or another designated person, but only one person we interviewed used this service. This person shared that they experienced challenges finding a place to pump and had to resort to using the bathrooms or showers to relieve her pain. When a deputy was available, she was able to be escorted to a private room within medical services to pump.

*If you have someone that can come pick [the breast milk] up, then they provide the storage bags, and they put them in the refrigerator. They have to pick them up in a certain amount of time, but they do that, so that's nice. —Incarcerated person at LCDRF*

Of the small group of incarcerated people we interviewed who had been pregnant at LCDRF after the implementation of A.B. 732, no one had been shackled during their pregnancy. One shared that she had been mistakenly handcuffed behind her back before being transferred to court, but the officer was corrected by a deputy from LCDRF.

Interviewees who had experienced pregnancy and delivery before the implementation of A.B. 732 reported much different experiences, although this was a small group of four people. One, who had been pregnant during her incarceration before 2020, reported that her feet had been chained when she was transferred to her prenatal visits outside the jail and cuffed to the hospital bed during her birth. She also shared that because there had been no protocol to designate a support person then, the jail had not been able to disclose where she was giving birth and her family had to locate the hospital themselves:

> My family called the entire—every single hospital. They ended up finding out where I was, and they came. They tried to come into the room. The deputy didn't let them come into the room, but they did let my aunt call the room, in the postpartum room...That, I think, was at the discretion of the deputy, really. I don't think he was allowed—that wasn't allowed then. Some of the deputies, they do have compassion and I'm very grateful for that.

### REENTRY PREPARATION AND PARENTING CLASSES

Eleven people we interviewed felt prepared from a reproductive health care standpoint to be released from LCDRF and reenter the community, and four felt unprepared. Several others raised serious concerns about the limited resources related to reentry and reproductive health care in the jail and community. Of the people who discussed reentry, about a third were knowledgeable about reproductive health care resources available to them in the community after their release. They shared that the jail provides the following reentry services related to their reproductive health:

- support finding community placements where they can live with their children

- enrollment in Medi-Cal services

- a reentry job fair that features prospective employers, child protective services, and Medi-Cal, among other services

- continuation of birth control prescriptions

- Plan B as emergency contraception

Incarcerated people also highlighted challenges around the reentry support provided at LCDRF related to reproductive health care. These included the following:

Ex. I - 648

- limited information from jail staff on types of services available

- lack of clarity around who supports reentry at the jail

- needing to self-advocate to get needs met

- gaps in housing services between leaving the jail and receiving support in the community

- medical health records not being shared upon release

One incarcerated person suggested that pregnant people should be prioritized for housing support in the community and reflected on their experience accessing different types of reentry information:

> If I didn't go out of my way and pull the counselor aside, I would not have received them. I had to advocate for myself, and not everybody knows how to do that. They kind of rely on the courts to do that. I was like, "Hi, I would like housing assistance information, inpatient information and college—something about schooling and work-related stuff"...I was like, "I don't have a place to live after this because while I've been in here, my fiancé moved out of our place and is looking for another one." I was like, "I don't wanna go have to live in a motel or hotel when I get out of here for"—there should be some kind of option, especially, again, pregnant...We should be on a priority list, because then they would be providing a safe place for you and your baby, and that's all I want.

While LCDRF policy dictates that medical records may be sent to an incarcerated person's physician after release at no cost, a few study participants expressed concerns about not receiving their reproductive medical records while in jail or upon release. They saw this as a challenge because they were not equipped with the information to ensure a smooth transition of care and properly communicate with their community-based medical provider about the types of care they received in the jail. One person shared,

> Even upon my release, then I would assume, okay, in my release, they're gonna give it [the medical records] to me because a lotta people will say they give it to you during your release. In my paperwork, it wasn't even there, either. I thought maybe I'd have an envelope from the doctor saying, blah, blah, blah, blah. Nothing there, either.

We were also interested in learning what kinds of parenting-related support were available to incarcerated people. Twelve of our study participants said they had not taken any classes related to parenting. Five had taken or were currently taking a parenting class delivered in the jail and three had video recordings of themselves reading a book sent to their children. It appears, however, that some parenting classes and services are only made available to people with open cases with child protective services. Incarcerated people noted challenges accessing parenting classes, including limited spots, a lack of clarity on enrollment processes (such as not knowing where the signup sheet was posted or

Ex. I - 649

whether a counselor referral was required), and conflicting information provided by the jail counselors about availability of classes. One person who discussed the classes shared,

> It's like a raffle...They get picked and choose classes, and then they'll come. They'll put up one of these papers. Then it has numbers from 1 to 20 or something like that. Yeah, like 20. Only like 7 or 10 people are allowed to participate max. They come, and they put it on the showers. It sucks because they don't even notify us when they put it, one. Then two, not everybody's able to participate.

Importantly though, some incarcerated people shared that they were not interested in taking these classes because their jail stays were short, they were about to be released, or they did not want to interact with jail staff. One person, when asked if they had accessed parenting and family planning services at LCDRF, responded, "No. I wouldn't really ask here. It's not really a friendly place for that. They don't have that. It's not friendly here. Most people are not gonna be here for a long time, so they're not gonna have those kinds of questions."

# Limitations of This Study

This study has four limitations. First, because our study sample (which consisted of the 34 people we interviewed at LCDRF) is from one jail, the findings are not generalizable to the LCDRF population or other jails and are not representative of access to reproductive health care in jails across the United States. Our sample only includes people who volunteered to speak with us and therefore may naturally be skewed toward people who were more comfortable discussing their reproductive health or had had strong experiences (positive or negative) that they wanted to share. Second, as mentioned previously, we originally intended to study the extent to which A.B. 732 has increased access to and the quality of reproductive health care for incarcerated people and advanced racial equity in health and well-being. But we faced significant challenges accessing administrative data from the San Diego County Sheriff's Department and were ultimately unable to do so. As a result, we were unable to perform the planned analysis of trends in incarcerated people's reproductive health care access over time or by race and ethnicity. Therefore, we do not have findings or conclusions around potential racial/ethnic and gender disparities in access to reproductive health care in LCDRF. We also cannot draw conclusions about whether the law has increased access or is effective. Third, we only interviewed incarcerated people and not stakeholders working with incarcerated people, who may have different perspectives. We did not interview other stakeholders because we felt it was important to focus on the experiences of incarcerated people in the jail and their perceptions of their access to care and its quality. In retrospect, it would have been worthwhile to include other stakeholders'

perspectives for a more comprehensive view. We indicate throughout the report where LCDRF policy appears to deviate from the reports of interviewees, but we are ultimately unable to verify the information reported during interviews. Lastly, only four people we interviewed were incarcerated in LCDRF before A.B. 732 was implemented. Because of this and our generally small sample, we cannot draw conclusions on access to and the quality of reproductive health care before the implementation of that law.

# Conclusion and Recommendations

This study is the first of its kind to study the state of reproductive health care access and quality in a jail in California after early stages of the implementation of A.B. 732. Our findings fill a critical knowledge gap for the field and for practitioners working with incarcerated people to meet their reproductive needs. We look forward to doing more research in this area to help improve the reproductive health of incarcerated people, their families, and the communities where they will return.

In this study, we examined the many categories of reproductive health covered in A.B. 732 to understand perceived access to and the quality of reproductive health care after that legislation's implementation. Multiple reproductive services and supplies are made available at LCDRF, including preventive care (e.g., Pap smears); menstruation support (e.g., free tampons); contraceptive care (e.g., birth control and abortion); pregnancy, labor, and delivery care (e.g., prenatal vitamins); and postpartum care (e.g., lactation services). Many of the incarcerated people we interviewed reported being grateful for these services, and several noted that they tried to access as many services as possible while incarcerated. Half of the interviewees reported that they had positive experiences receiving reproductive health care at LCDRF. Based on other research, it seems that reproductive health care in LCDRF is largely better than that in other jails across the United States that provide no or limited menstrual supplies, contraceptive care, abortion access, and preventive care.

Several barriers were apparent, however, and seemed to frustrate and "wear down" incarcerated people so that they became hesitant to request further care. One story was highlighted by most of our participants: they encountered significant barriers in requesting care and lengthy delays in receiving it. Many reported being unhappy with the care they did receive, and in some cases they felt that they even experienced mistreatment and punishment from medical staff. All of this was aggravated by a general lack of awareness and communication around reproductive health care services available to incarcerated people. We have identified two deterrents that affect incarcerated people's willingness to request care: the amount of time it takes to receive services after requesting them, and a lack of

awareness or understanding among incarcerated people regarding how to access or request services. This hesitancy to request further care worsens medical conditions as they continue without proper diagnosis and treatment.

Only four people we interviewed reported having been incarcerated in LCDRF before the implementation of A.B. 732. Though this group shared that access to reproductive health care improved after A.B. 732, we do not have a large enough sample to draw conclusions on reproductive health care access and quality before the implementation of that legislation.

Based on this study's findings, we have identified several areas of service provision that could be improved, as well as ways people incarcerated at LCDRF could be better informed of their access to reproductive services. We make the following recommendations for improving access to and delivery of reproductive health care in LCDRF:

- Communication about medical services:
  - » Develop an informational packet for incarcerated people at LCDRF that summarizes types of available reproductive health care services and/or provides basic reproductive health information.

- Delivery of medical services:
  - » Shorten waiting times between requesting reproductive health care services and receiving them.
  - » To make incarcerated people feel more comfortable and safer during procedures, allow them to select the gender of their medical provider. While this may be difficult to accomplish given organizational constraints, it is important to consider given that many incarcerated people have histories of sexual abuse and trauma.
  - » Adjust policies around medical appointments and interactions with medical staff to allow for privacy. While jail policy dictates that a deputy be present during exams for the security of the medical staff, a privacy curtain or similar measure may be an effective compromise.
  - » Provide trauma-informed training for staff to reduce bias or pressure they may be placing on incarcerated people regarding reproductive decisions.

- Preventive care:
  - » If someone is incarcerated for over a year, schedule them a regular check-up with an ob-gyn.

Ex. I - 652

» Increase universal STD/STI testing at the jail.

- Menstruation support:

  » Provide more types of free pads and tampons to better support people with heavy menstrual flows.
  » Reduce barriers to accessing pads and tampons, such as needing to request supplies from a deputy.
  » Provide more pairs of underwear to incarcerated people so they can change them every day and have backup pairs during menstruation.

- Pregnancy care and postpartum care:

  » Improve the quality of prenatal care, including around prenatal diet and housing accommodations. While LCDRF does have housing for pregnant individuals and a nutritionist on staff, increasing awareness of these resources or augmenting their reach may enhance the experiences of those who are incarcerated.
  » Increase postpartum care and support services.

- Reentry support:

  » Increase reentry preparation around reproductive health by providing information on resources in the community and planning family reunification.

# Appendix A. Interview Questions for People Who Are Not Pregnant and Never Been Pregnant in LCDRF

**A. Warm Up/Opening Questions**

1. How long have you been here at Las Colinas?

2. During your time at Las Colinas, what has been your experience with accessing reproductive healthcare services?

3. What kinds of information are you given regarding reproductive health at Las Colinas?

**B. Preventative Care**

Now we'd like to ask you about your experiences with preventative care related to your reproductive health.

4. Do you have access to a medical professional providing reproductive healthcare here at Las Colinas? If yes, what kind of care do you receive?

   a. *Probes: Do you see someone on an as needed basis? Regular check-ups? What services are offered? Mammograms, Pap Smears, STD/STI testing? Who is administering these exams and services?*

5. What is the process of accessing a medical professional for reproductive healthcare here?

   a. *Probes: Did you receive notice of services being offered? Do you have to ask? If so, who did you ask? How quickly are you able to get an appointment? Do you pay for these appointments? If so, what is the cost?*

6. What challenges, if any, do you experience in receiving reproductive healthcare?

   a. *Probes: Have these challenges changed during your period of incarceration?*

**C. Menstrual Products**

Next, we'd like to ask you about menstrual products.

**Ex. I - 654**

7. What types of menstrual products (sanitary pads, tampons, etc.) are available to you? How many are made available, and how often?

   a. *Probes: Are you provided any pain relief and/or heating pads related to menstruation?*

8. What is the process of accessing menstrual products?

   a. *Probes: Who do you ask? How quickly are you able to get the products? Do you have to wait longer for certain products than others? Do you need to request menstrual products on a monthly basis or are they available to you any time? Do you pay for these products? If so, what is the cost?*

9. Are you able to get the types of products you prefer? Do you get enough products for what you need?

   a. *Probes: If not, why not? What else do you need that you are not provided?*

10. What challenges, if any, do you experience in accessing menstrual products?

**D. Parenthood Planning Services and Counseling**

Next, we'd like to ask about parenthood planning services and counseling, meaning services and counseling that helps you plan a family in the future.

11. What is the process of accessing family planning services and counseling?

    a. *Probes: Who do you ask? Who provides those services? Are there costs associated with receiving services? If so, who pays for these costs?*

12. Have you met with a social worker to discuss family planning?

*If yes, proceed to Q13...*

*If no, proceed to Section E...*

13. What types of services did you receive? Did it meet your needs? Were there services you needed or wanted but were unable to get?

14. How long did you wait to receive the requested services?

15. Did you experience pressure during your family planning services and counseling? If so, can you explain how?

**Ex. I - 655**

16. Did you feel comfortable receiving services? Could you explain why or why not? Do you think the services match what you need based on your identity?

    a. *Probes: Language barriers? Responsive to your needs? Responsive to your family structure? To your sexual orientation and gender?*

17. Did you feel safe receiving services? If so, can you explain how?

18. What challenges, if any, did you experience in receiving parenthood planning services and counseling? If so, can you explain how?

**E. Contraceptive Care and Counseling**

19. What types of contraceptive (pill, IUD, etc.) options are provided to you at Las Colinas?

20. What is the process of accessing contraceptives here?

    a. *Probes: Were you asked at intake if you were currently using contraceptives and would like to continue? Did you request it or was it offered to you? If requested, who do you ask? How quickly do you get the contraceptives? Do you need to undergo examination or provide justification? Do you pay for these products? If so, what is the cost?*

21. Did you feel any pressure to take contraceptives in general or a particular type of birth control product? If so, can you explain how?

22. What challenges, if any, did you experience any challenges in receiving access to contraceptives, if you wanted them? If so, can you explain how?

23. If you are on contraceptives, does it meet your needs? Why or why not?

**F. Abortion Access and Services**

Next, we'd like to ask about abortion access and services.

24. What is the process of accessing abortion?

    a. *Probes: Who do you ask? Who do you have this conversation with? What resources are provided as you think about this decision? If requested, how quickly can you get the abortion? Is it necessary to undergo examination or provide justification? Are there costs involved? If so, who pays for these costs? Did you receive any counseling related to requesting and/or receiving an abortion?*

25. What challenges, if any, did you or others experience in requesting and/or receiving an abortion here?

26. Have you or others you know felt pressured to get an abortion at this jail? If so, can you explain how?

   a. *Probes: Do you feel like you had a choice?*

**G. Pregnancy Tests**

Next, we'd like to ask about access to pregnancy tests.

27. Were you offered a pregnancy test when you entered the jail?

   a. *Probes: When were you offered a test? Do you pay for these tests? If so, what is the cost?*

28. Did you experience any pressure to take a pregnancy test? If so, can you explain how?

29. What is the process of requesting a pregnancy test?

   a. *Probes: Who do you ask? How quickly do you get the pregnancy test? Do you need to provide justification? Do you pay for the pregnancy test? If yes, how much does it cost? Are you given privacy while taking the test? How do you find out the results? Do you have to disclose the results?*

30. Who administered your pregnancy test? Was it medical or nursing personnel, or someone else?

**H. Closing Questions**

To wrap up our conversation, we have some more general questions that we'd like to ask.

31. Do you think that any of your reproductive health needs are not met? If so, in what ways?

32. Do you feel prepared for reentering the community when it comes to your reproductive healthcare needs?

Is there anything else we didn't ask you today that you'd like to share with us?

**Ex. I - 657**

# Appendix B. Interview Questions for People Who Are Currently or Previously Have Been Pregnant in LCDRF

**A. Warm Up/Opening Questions**

1. How long have you been here at Las Colinas?

2. Are you currently pregnant, or were you pregnant during another incarceration at Las Colinas Jail?

   a. If currently pregnant: *How far along are you?*
   b. When did you learn you were pregnant? *If you learned in jail, who told you?*

3. During your time at Las Colinas, what has been your experience with accessing reproductive healthcare services?

4. What kinds of information are you given regarding reproductive health at Las Colinas Jail?

**B. Prenatal Care**

Next, we'd like to ask you questions around the prenatal care you've received while in custody.

5. Did you receive a medical exam for your pregnancy after being incarcerated in Las Colinas Jail?

6. [If yes to Q5] What was included in the medical exam?

   a. *Probes: Were you provided an estimated due date? Did you receive a plan of care? What was in your plan? Did you receive any prenatal labs or diagnostic studies? Was your hope to get an abortion or to continue on with the pregnancy until birth? Did the provider share information about the development and/or health of the fetus? Were you told if you had a high-risk pregnancy? Did they ask about your medical history?*

7. What is the process of accessing prenatal care at Las Colinas Jail?

   a. Probes: Do you have to ask or did they automatically schedule you? Who do you ask? Who provides those services?

**Ex. I - 658**

8. What type of prenatal care visits have you received?

   a. *Probe: What type of provider did you see? How often did you see a provider? Do you see the same one each time? Were there costs for the prenatal care visits? If yes, how much did they cost? Who paid? Were any of your visits off-site or were they all in the jail?*

9. Were you provided access to prenatal vitamins?

   a. *Probes: How often were these vitamins provided? Did you pay for the prenatal vitamins? If yes, how much did they cost?*

10. Were you moved to a lower tier housing when you were identified as pregnant?

11. Were you moved to an assigned lower bunk when you were identified as pregnant?

12. Were you provided items that made you feel more comfortable, such as changing the size of your clothing over time, or extra pillows?

13. Were you provided any additional food or food at different frequencies during your pregnancy?

14. Did you feel comfortable receiving services? Could you explain why or why not? Do you think the services match what you need based on your identity?

    a. *Probes: Language barriers? Responsive to your needs? Responsive to your family structure? To your sexual orientation and gender?*

15. Did you feel safe receiving services? If so, can you explain how?

16. What, if any, challenges did you face in receiving prenatal care?

17. Have you been shackled during your pregnancy?

18. We understand that some people receive medication assisted treatment for opioid use during pregnancy. Do you have a history of using opioids (e.g., Vicodin, oxycontin, morphine) and do you receive this treatment?

*If yes, proceed to Q19…*

*If no, proceed to Section C…*

19. What was the process for accessing [methadone/buprenorphine]?

Ex. I - 659

a. *Probes: Was this offered to you when you entered the jail? Were you receiving [methadone/buprenorphine] before coming to the jail? Are you paying for this treatment? If yes, how much does it cost?*

20. Do you feel that the treatment meets your needs?

**C. Abortion Access and Services**

Next, we'd like to ask about abortion access and services.

21. What is the process of accessing abortion?

a. *Probes: Who do you ask? How quickly do you get the abortion? Is it necessary to undergo examination or provide justification? Are there costs involved? If so, who pays for these costs? What type of abortion was provided (pill/surgical)?*

22. Are there challenges in requesting and/or receiving an abortion here?

23. Have you or others you know felt pressured to get an abortion at this jail? If so, can you explain how? Alternatively, did you feel pressured to not get an abortion?

**D. Pregnancy Planning Services and Counseling**

Next, we'd like to ask you about any pregnancy planning services and counseling that you received in this jail.

24. When you found out you were pregnant, were you offered the option to request medical services?

a. *Probes: Did you have a choice on what type of provider you met with?*

25. Did you receive counseling during your pregnancy to help you plan for the future?

a. *Probes: Who provided the counseling? What types of options were you presented? (Abortion, adoption, temporary custody with someone other than you, prenatal health care, etc.) Were you able to discuss baby placement post-birth if you're still in custody?*

26. Do you think the counselor was trying to push you towards a certain decision? How so?

27. Did you feel comfortable receiving services? Could you explain why or why not? Do you think the services match what you need based on your identity?

a. *Probes: Language barriers? Responsive to your needs? Responsive to your family structure? To your sexual orientation and gender?*

**Ex. I - 660**

28. Do you feel that your needs were met by the counseling you received?

29. What, if any challenges did you face in receiving counseling?

**E. Protections and Care During Labor and Childbirth**

30. [If still pregnant and expect to deliver in jail] Do you have a birthing plan?

    a. *Probes: Do you have a support person identified? Have you discussed a plan for birth? Do you know where you will give birth?*

*If someone has given birth at Las Colinas, proceed to Q31...*

*If not, proceed to Section F...*

We'd now like to ask you a series of questions about your birthing experience while you were in custody at Las Colinas Jail.

31. Where did you give birth?

32. When you were transported to that location, were you shackled?

33. Was your requested medical professional provided?

34. Were you allowed to have a support person present during labor and childbirth? Who was your support person?

    a. *Probe: Who was your support person? Doula, family member, co-parent?*

35. To what extent were you provided privacy during labor and childbirth? Was correctional staff in the room and what was the gender of the custody staff present?

36. Were you shackled during labor and childbirth?

37. Did you feel treated with respect during the process?

38. How were your interactions with medical staff during labor and childbirth?

39. After childbirth, were you allowed to hold the newborn if you wanted to? Were you able to breastfeed, if you wanted to?

    a. *Probes: For how long were you able to hold the newborn? Was there an opportunity to pump and a safe place to do so? Was there a place to store the milk?*

**Ex. I - 661**

40. How much time did you stay in the birthing center/hospital before being transported back to jail? Were you able to see the newborn the entire time, if you wanted to, or did you have to surrender the baby during your stay?

41. Did you pay for the childbirth medical costs? If so, how much did it cost?

42. Is there anything else about the birthing process or the care you received during it that you would like to share with us?

**F. Post-Partum Care**

Next, we'd like to ask you about the postpartum care you received. Postpartum care involves physical care following labor and delivery, including care for vaginal tears and c-section wounds, and also mental health care.

43. What is the process of accessing postpartum care?

   a. *Probes: Who do you ask? How long did you wait before getting postpartum care?*

44. What types of postpartum care did you receive?

   a. *Probes: Who provided that care? How long did you receive postpartum care for? How often? Did you receive supplies, such as pads and appropriately fitted clothing?*

45. Did you feel comfortable receiving services? Could you explain why or why not? Do you think the services match what you need based on your identity?

   a. *Probes: Language barriers? Responsive to your needs? Responsive to your family structure? To your sexual orientation and gender?*

46. What challenges, if any, did you face in receiving postpartum care?

47. Did you pay for the postpartum care costs? If so, how much did it cost?

   a. *If you were on [methadone/buprenorphine], did you continue to receive that post-partum?*

48. Were you able to breastfeed postpartum? What lactation services were available to you?

**G. Newborn Care**

Next, we'd like to ask you about the newborn care provided to your baby.

49. Did you work with a social worker to discuss options for placement of your baby?

50. How were your interactions with the social worker?

**Ex. I - 662**

  a. *Probes: Were the services provided helpful and were your needs met? Did you pay for these services? If so, how much did they cost?*

51. Did your baby require and undergo any special care?

52. What challenges did you face in getting care for your baby?

**H. Closing Questions**

Lastly, we have some more general questions that we'd like to ask.

53. What kinds of information are you given regarding reproductive health at Las Colinas?

54. Do you feel like any of your reproductive health needs are not met? Are there any gaps in services?

55. Is there anything else we didn't ask you today that you'd like to share with us?

# Notes

1   California Assembly Bill No. 732, Chapter 321,
    https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB732.

2   Federal Bureau of Investigation Uniform Crime Reporting Program ("Crime in the U.S., Arrest Data, 2021;
    accessed May 2023), https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/ucr.

3   Wendy Sawyer and Peter Wagner, "Mass Incarceration: The Whole Pie 2023," Prison Policy Initiative, March
    14, 2023, https://www.prisonpolicy.org/reports/pie2023.html.

4   "Persons in Correctional Facilities," Centers for Disease Control and Prevention, page last reviewed September
    21, 2022, https://www.cdc.gov/std/treatment-guidelines/correctional.htm.

5   "'Community Insights on California Jails' Survey: Summary of Findings," Board of State and Community
    Corrections, accessed August 19, 2024, https://www.cjcj.org/media/import/documents/commmunity_
    insights_on_california_jails_survey_findings_8.11.2021.pdf.

5   "Reproductive Health Care Legislation for Incarcerated People," Advocacy and Research on Reproductive
    Wellness of Incarcerated People, last updated November 2022, https://arrwip.org/wp-
    content/uploads/2023/01/ARRWIP-Reproductive-Health-Legislation-for-Incarcerated-People-.pdf.

6   Gabrielle A. Perry, "In prison, having your period can put your life in danger," *Washington Post*, March 25, 2022,
    https://www.washingtonpost.com/opinions/2022/03/25/prison-period-danger-health-risks-sexual-abuse/.

7   Kimberly Haven, "Why I'm Fighting for Menstrual Equity in Prison," American Civil Liberties Union, November
    8, 2019, https://www.aclu.org/news/prisoners-rights/why-im-fighting-for-menstrual-equity-in-prison.

8   This study was funded before *Roe v. Wade* was overturned in June 2022, but data collection occurred after,
    between March and June 2023. Nevertheless, the State of California already recognized abortion rights under
    the constitution before *Roe v. Wade*, and a November 2022 proposition that was voted on resulted in abortion
    and contraception rights being added to the state constitution. "After Roe Fell: Abortion Laws by State:
    California," Center for Reproductive Rights, accessed November 29, 2023,
    https://reproductiverights.org/maps/state/california/.

9   "Reproductive Health Care Legislation for Incarcerated People," Advocacy and Research on Reproductive
    Wellness of Incarcerated People.

10  California Assembly Bill No. 109, Chapter 15,
    https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201120120AB109.

11  The offenses impacted by Proposition 47 included drug possession, receiving stolen property, theft, shoplifting,
    writing bad checks, and check forgery. "Proposition 47: The Safe Neighborhoods and Schools Act," California
    Courts memo, May 2017, https://www.courts.ca.gov/documents/Prop-47-Information.pdf.

12  The full text of Assembly Bill 732 is available at
    https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB732.

14  "Las Colinas Detention and Reentry Facility," San Diego County Sheriff's Department, accessed August 30,
    2024, https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/105/.

15  "Las Colinas Detention and Reentry Facility," San Diego County Sheriff's Department.

16  "Daily Population Report," San Diego County Sheriff's Department, accessed August 2023,
    https://apps.sdsheriff.net/Inmatepopulation/.

Ex. I - 664

[13] Because of the COVID-19 pandemic, LCDRF's communal food hall was closed. This space would have been a recruitment space for people from multiple units.

[14] "2023 Federal Poverty Guidelines," California Department of Public Health, last updated June 20, 2023, https://www.cdph.ca.gov/Programs/CID/DOA/Pages/OA_ADAP_Federal_Poverty_Guideline_Chart.aspx.

[15] This unit was established during the COVID-19 pandemic, and was in operation until June 2023.

[16] We did not ask people about whether these pregnancies resulted in miscarriage, stillbirth, adoption, or abortion. Therefore, we do not know exactly why it appears that people were pregnant many more times than the number of children they reported having.

Ex. I - 665

# References

ACLU (American Civil Liberties Union). 2019. "The Unequal Price of Periods: Menstrual Equity in the United States." Washington, DC: ACLU.

ACOG (American College of Obstetricians and Gynecologists). 2011. "Health Care for Pregnant and Postpartum Incarcerated Women and Adolescent Females." Committee on Health Care for Underserved Women Opinion No. 511.

———. 2021. "Reproductive Health Care for Incarcerated Pregnant, Postpartum, and Nonpregnant Individuals." ACOG Committee on Health Care for Underserved Women Opinion No. 830.

Allsworth, Jenifer E., Jennifer Clarke, Jeffrey F. Peipert, Megan R. Hebert, Amy Cooper, and Lori A. Boardman. 2007. "The Influence of Stress on the Menstrual Cycle among Newly Incarcerated Women." *Women's Health Issues* 17 (4): 202–09. https://doi.org/10.1016/j.whi.2007.02.002.

AMA (American Medical Association). 2015. "An 'Act to Prohibit the Shackling of Pregnant Prisoners' Model State Legislation." Chicago: AMA.

Asiodu IV, Ifeyinwa, Lauren Beal, and Carolyn Sufrin. 2021. "Breastfeeding in Incarcerated Settings in the United States: A National Survey of Frequency and Policies." *Breastfeeding Medicine* 16 (9). https://doi.org/10.1089/bfm.2020.0410.

AWHONN (Association of Women's Health, Obstetric and Neonatal Nurses). 2012. "Shackling of Incarcerated Pregnant Women: AWHONN's Position." *Nursing for Women's Health* 16 (1). https://doi.org/10.1111/j.1751-486X.2012.01705.x.

Beck, Allen J., Marcus Berzofsky, Rachel Caspar, and Christopher Krebs. 2013. "Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12." Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Beck, Allen J. 2014. "Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables: Prevalence of Sexual Victimization among Transgender Adult Inmates." Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Biggs, M. Antonia, Katherine Brown, and Diana Greene Foster. 2020. "Perceived Abortion Stigma and Psychological Well-Being over Five Years after Receiving or Being Denied an Abortion." *PLos One* 15 (1). https://doi.org/10.1371/journal.pone.0226417.

Bird, Mia, Sonya Tafoya, Ryken Grattet, and Viet Nguyen. 2016. *How Has Proposition 47 Affected California's Jail Population?* San Francisco: Public Policy Institute of California.

Bronson, Jennifer, and Carolyn Sufrin. 2019. "Pregnant Women in Prison and Jail Don't Count: Data Gaps on Maternal Incarceration." *Public Health Reports* 134 (1_suppl): 57S–62S. https://doi.org/10.1177_0033354911812088.

Brousseau, Erin C., Susie Ahn, and Kristen A. Matteson. 2019. "Cervical Cancer Screening Access, Outcomes, and Prevalence of Dysplasia in Correctional Facilities: A Systematic Review." *Journal of Women's Health* 28 (12): 1,661–669. https://doi.org/10.1089/jwh.2018.7440.

Browne, Angela, Brenda Miller, and Eugene Maguin. 1999. "Prevalence and Severity of Lifetime Physical and Sexual Victimization Among Incarcerated Women." *International Journal of Law and Psychiatry* 22 (3–4): 301–22. https://doi.org/10.1016/s0160-2527(99)00011-4.

Clarke, Jennifer G., and Eli Y. Adashi. 2011. "Perinatal Care for Incarcerated Patients: A 25-Year-Old Woman Pregnant in Jail." *Journal of the American Medical Association* 305 (9): 923–29. https://doi.org/10.1001/jama.2011.125.

Ex. I - 666

Clarke, Jennifer G., Megan R. Hebert, Cynthia Rosengard, Jennifer S. Rose, Kristen M. DaSilva, and Michael D. Sterm. 2006. "Reproductive Health Care and Family Planning Needs Among Incarcerated Women." *American Journal of Public Health* 96 (5): 834–39. https://doi.org/10.2105%2FAJPH.2004.060236.

Clarke, Jennifer G., Cynthia Rosengard, Jennifer S. Rose, Megan R. Hebert, Jeffrey Peipert, and Michael D. Stein. 2006. "Improving Birth Control Service Utilization By Offering Services Prerelease Vs Postincarceration." *American Journal of Public Health* 96 (5): 840–45. https://doi.org/10.2105/AJPH.2005.062869.

Ervin, Storm, Jahnavi Jagannath, Janine Zweig, Janeen Buck Willison, Kierra B. Jones, Katy Maskolunas, Chafica Agha, and Benjamin Cajarty. 2020. *Addressing Trauma and Victimization in Women's Prisons: Trauma-Informed Victim Services and Programs for Incarcerated Women*. Washington, DC: Urban Institute.

Fogel Catherine I. 1993. "Pregnant Inmates: Risk Factors and Pregnancy Outcomes." *Journal of Obstetric, Gynecological and Neonatal Nursing* 22 (1): 33–39. https://doi.org/10.1111/j.1552-6909.1993.tb01780.x.

Frazer, Somjen, Richard Saenz, Andrew Aleman, and Laura Laderman. 2023. *Protected and Served? 2022 Community Survey of LGBTQ+ People and People Living with HIV's Experiences with the Criminal Legal System*. New York City: Lambda Legal, and Omaha, NE: Black and Pink National.

Friedman, Emmeline, Eliza Burr, and Carolyn Sufrin. 2021. "Seeking Recognition through Carceral Health Care Bureaucracy: Analysis of Medical Care Request Forms in a County Jail." *Social Science & Medicine* 291: 114485. https://doi.org/10.1016/j.socscimed.2021.114485.

Friedman, Susan Hatters, Aimee Kaempf, and Sarah Kauffman. 2020. "The Realities of Pregnancy and Mothering While Incarcerated." *Journal of the American Academy of Psychiatry and the Law Online* 48 (3). http://doi.org/10.29158/JAAPL.003924-20.

Gates, Alexandra, Samantha Artiga, and Robin Rudowitz. 2014. "Health Coverage and Care for the Adult Criminal Justice-Involved Population." San Francisco: Henry J. Kaiser Family Foundation, Kaiser Commission on Medicaid and the Uninsured.

Goodman, Melissa, Ruth Dawson, and Phyllida Burlingame. 2016. *Reproductive Health Behind Bars in California*. California: American Civil Liberties Union of California.

Goshin, Lorie S., Gina Sissoko, Grace Neumann, Carolyn Sufrin, and Lorraine Byrnes. 2019. "Perinatal Nurses' Experiences with and Knowledge of the Care of Incarcerated Women During Pregnant and the Postpartum Period." *JOGNN* 48: 27–36. https://doi.org/10.1016/j.jogn.2018.11.002.

Grant, Jaime M., Lisa A. Mottet, Justin Tanis, Jack Harrison, Jody L. Herman, and Mara Keisling. 2011. *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

Grattet, Ryken, and Mia Bird. 2018. "Next Steps in Jail and Prison Downsizing." *Criminology & Public Policy* 17 (3): 717–26. https://doi.org/10.1111/1745-9133.12383.

Gulaid, Azhar, and Evelyn F. McCoy. 2022. "Reproductive Health Care in Carceral Facilities: Identifying What We Know and Opportunities for Further Research." Washington, DC: Urban Institute.

Harner, Holly M., Mia Budescu, Seth J. Gillihan, Suzanne Riley, and Edna B. Foa. 2015. "Posttraumatic Stress Disorder in Incarcerated Women: A Call for Evidence-Based Treatment." *Psychological Trauma: Theory, Research, Practice, and Policy* 7 (1): 58–66. https://doi.org/10.1037/a0032508.

Hotelling, Barbara A. 2008. "Perinatal Needs of Pregnant, Incarcerated Women." *The Journal of Perinatal Education* 17 (2): 37–44. https://doi.org/10.1624%2F105812408X298372.

Javanbakht, Marjan, Melina Boudov, Laura J. Anderson, Mark Malek, Lisa V. Smith, Michael Chien, and Sarah Guerry. 2014. "Sexually Transmitted Infections Among Incarcerated Women: Findings from a Decade of Screening in a Los Angeles County Jail, 2002–2012." *American Journal of Public Health* 104 (11): e103–e109. https://doi.org/10.2105/AJPH.2014.302186.

Ex. I - 667

Lipnicky, Ashlyn, Sierra Stites, Carolyn Sufrin, Jennifer K. Bello, Rebecca Shlafer, Patricia J. Kelly, and Megha Ramaswamy. 2023. "Jail Provision of Pregnancy and Sexual Health Services in Four Midwestern States." *General Pediatrics and Adolescent Health* 33 (1): 97–104. https://doi.org/10.1016/j.whi.2022.07.004.

Kajstura, Aleks, and Wendy Sawyer. 2023. *Women's Mass Incarceration: The Whole Pie 2023*. Northampton, MA: Prison Policy Initiative.

Kasdan, Diana. 2009. "Abortion Access for Incarcerated Women: Are Correctional Health Practices in Conflict with Constitutional Standards." *Perspectives on Sexual and Reproductive Health* 41 (1): 4. https://doi.org/10.1363/4105909.

Kelsey, C. M., Nickole Medel, Carson Mullins, Danielle Dallaire, and Catherine Forestell. 2017. "An Examination of Care Practices of Pregnant Women Incarcerated in Jail Facilities in the United States." *Maternal and Child Health Journal* 21: 1,260−266. https://doi.org/10.1007/s10995-016-2224-5.

Kraft-Stolar, Tamar. 2015. *Reproductive Injustice: The State of Reproductive Health Care for Women in New York State Prisons*. New York City: Correctional Association of New York.

Kraft-Stolar, Tamar, Jaya Vasandani, and Andrea B. Williams. 2015. *HIV Services for Women in New York State Prisons*. New York City: Correctional Association of New York, Women in Prison Project.

Kramer, Camille, Karenna Thomas, Ankita Patil, Crystal M. Hayes, and Carolyn B. Sufrin. 2023. "Shackling and pregnancy care policies in US prisons and jails." *Maternal and Child Health Journal* 27: 186–96. https://doi.org/10.1007%2Fs10995-022-03526-y.

Kyei-Aboagye, Kwabena, Olivera Vragovic, and Deborah Chong. 2000. "Birth Outcome in Incarcerated, High-Risk Pregnant Women." *Journal of Reproductive Medicine* 45 (3): 190–94.

Larochelle, F., Cynthia Castro, Joe Goldenson, Jacqueline P. Tulsky, Deborah L. Cohan, Paul D. Blumenthal, and Carolyn B. Sufrin. 2012. "Contraceptive use and barriers to access among newly arrested women." *Journal of Correctional Health Care* 18 (2): 111–19. https://doi.org/10.1177/1078345811435476.

Lofstrom, Magnus, and Brandon Martin. 2015. *Public Safety Realignment: Impacts So Far*. San Francisco: Public Policy Institute of California.

Lofstrom, Magnus, and Steven Raphael. 2016. "Incarceration and Crime: Evidence from California's Public Safety Realignment Reform." *The ANNALS of the American Academy of Political and Social Science* 664 (1). https://doi.org/10.1177/0002716215599732.

Lynch, Shannon, April Fritch, and Nicole Heath. 2012. "Looking Beneath the Surface: The Nature of Incarcerated Women's Experiences of Interpersonal Violence, Treatment Needs, and Mental Health." *Feminist Criminology* 7: 381–400. https://doi.org/10.1177/1557085112439224.

Maruschak, Laura M. 2008. *Medical Problems of Prisoners*. Washington, DC: US Department of Justice, Bureau of Justice Statistics.

Meyer, Ilan H., Andrew R. Flores, Lara Stemple, Adam P. Romero, Bianca D. M. Wilson, and Jody L. Herman. 2017. "Incarceration Rates and Traits of Sexual Minorities in the United States: National Inmate Survey, 2011-2012." *American Journal of Public Health* 107 (2): 267–73.

Meyers, Kyl, Cristen Dalessandro, Claudia Geist, and Carolyn Sufrin. 2021. "Jail as a Point of Contraceptive Care Access: Needs and Preferences Among Women in an Urban Jail." *Journal of Midwifery & Women's Health* 66 (6): 787–94. https://doi.org/10.1111/jmwh.13270.

Mukamal, Debbie, Rebecca Silbert, and Rebecca M. Taylor. 2015. *Degrees of Freedom: Expanding College Opportunities for Currently and Formerly Incarcerated Californians*. Stanford, CA: Stanford Law School, Stanford Criminal Justice Center, and Berkeley: University of California Berkeley School of Law, Chief Justice Earl Warren Institute of Law and Social Policy.

Ex. I - 668

Mukherjee, Soumyadeep, Dudith Pierre-Victor, Raed Bahelah, and Purnima Madhivanan. 2014. "Mental Health Issues among Pregnant Women in Correctional Facilities: A Systematic Review." *Women & Health* 54 (8): 816–42. https://doi.org/10.1080/03630242.2014.932894.

Nagma, Shahida, Garima Kapoor, Rekha Bharti, Achla Batra, Aruna Batra, Abha Aggarwal, and Aanchal Sablok. 2015. "To Evaluate the Effect of Perceived Stress on Menstrual Function." *Journal of Clinical and Diagnostic Research* 9 (3): QC01–QC3. https://doi.org/10.7860/JCDR/2015/6906.5611.

NYCLU (American Civil Liberties Union of New York). 2008. *Access to Reproductive Health Care in New York State Jails.* New York City: NYCLU.

Pan, Y. Linda, Lauren Beal, Kareen Espino, and Carolyn B. Sufrin. 2021. "Female permanent contraception policies and occurrences at a sample of U.S. prisons and jails." *Contraception* 104 (6): 618–22. http://www.doi.org/10.1016/j.contraception.2021.08.005.

Pickett, Michelle L., Molly Allison, Katelyn Twist, Jennifer R. Klemp, and Megha Ramaswamy. 2018. "Breast Cancer Risk among Women in Jail." *BioResearch Open Access* 7 (1): 139–44. https://doi.org/10.1089/biores.2018.0018.

Rebecca Project for Human Rights and NWLC (National Women's Law Center). 2010. *Mothers Behind Bars: A State-By-State Report Card and Analysis of Federal Policies on Conditions of Confinement for Pregnant and Parenting Women and the Effect on their Children.* Washington, DC: National Women's Law Center.

Roth, Rachel. 2011. "Abortion Access for Imprisoned Women: Marginalized Medical Care for a Marginalized Group." *Women's Health Issues* 21 (Suppl.): S13–S15. https://doi.org/10.1016/j.whi.2011.01.011.

Saia, Kelley A., Davida Schiff, Elisha M. Wachman, Pooja Mehta, Annmarie Vilkins, Michelle Sia, Jordana Price, Tirah Samura, Justin DeAngelis, Clark V. Jackson, Sawyer F. Emmer, Daniel Shaw, and Sarah Bagley. 2016. "Caring for Pregnant Women with Opioid Use Disorder in the USA: Expanding and Improving Treatment." *Current Obstetrics and Gynecology Reports* 5 (3): 257–63. https://doi.org/10.1007/s13669-016-0168-9.

Sufrin, Carolyn. 2014. *Pregnancy and Postpartum Care in Correctional Settings.* Chicago: National Commission on Correctional Health Care.

Sufrin, Carolyn, Lauren Beal, Jennifer Clarke, Rachel Jones, and William D. Mosher. 2019. "Pregnancy Outcomes in US Prisons, 2016—2017." *American Journal of Public Health* 109 (5): 799–805. https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2019.305006?role=tab.

Sufrin, Carolyn B., Judy C. Chang, and Mitchell D. Creinin. 2009. "Incarcerated Women and Abortion Provision: A Survey of Correctional Health Providers." *Perspectives on Sexual and Reproductive Health* 14 (1): 6–11. https://doi.org/10.1111/j.1931-2393.2009.4110609.x.

Sufrin, Carolyn, Rachel K. Jones, Lauren Beal, William D. Mosher, and Suzanna Bell. 2021. "Abortion Access for Incarcerated People: Incidence of Abortion and Policies at U.S. Prisons and Jails." *Obstetrics and Gynecology* 138 (3): 330–37. https://doi.org/10.1097/AOG.0000000000004497.

Sufrin, Carolyn, Rachel K. Jones, William D. Mosher, and Lauren Beal. 2020. "Pregnancy Prevalence and Outcomes in U.S. Jails." *Obstetrics and Gynecology* 135 (5): 1,177–183. https://doi.org/10.1097/aog.0000000000003834.

Sutton, Madeline Y., Ngozi F. Anachebe, Regina Lee, and Heather Skanes. 2021. "Racial and Ethnic Disparities in Reproductive Health Services and Outcomes, 2020." *Obstetrics and Gynecology* 137 (2): 225–33. https://doi.org/10.1097/AOG.0000000000004224.

Witwer, Elizabeth, Rachel K. Jones, Liza Fuentes, and S. Kate Castle. 2020. "Abortion service delivery in clinics by state policy climate in 2017." *Contraception: X* 2: 100043. https://doi.org/10.1016/j.conx.2020.100043.

Ex. I - 669

Wolff, Nancy, Jessica Huening, Jing Shi, and Christopher B. Frueh. 2014. "Trauma Exposure and Posttraumatic Stress Disorder among Incarcerated Men." *Journal of Urban Health: Bulletin of the New York Academy of Medicine* 91 (4): 707–19. https://doi.org/10.1007/s11524-014-9871-x.

Wolfrey, Nicolette. 2021. "Incarceration Harms Moms and Babies." Moms & Babies Series. Washington, DC: National Partnership for Women & Families.

Women's Foundation California. 2019. "AB 732 (Bonta) – Reproductive Dignity for Incarcerated People Act." San Francisco: Women's Foundation California.

Zeng, Zhen. 2022. "Jail Inmates in 2021—Statistical Tables." Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Ex. I - 670

# About the Authors

**Evelyn F. McCoy** is a senior manager in the Justice Policy Center at the Urban Institute, where she leads projects on the experiences of people incarcerated in jails and prisons, including reproductive health, sexual abuse, parenting, and trauma, as well as alternatives to incarceration. McCoy has expertise in mixed-methods research, policy analysis, and technical assistance and has worked with criminal legal agencies, community-based organizations, and people involved in the criminal legal system and their families.

**Azhar Gulaid** is a policy associate in the Justice Policy Center, where she conducts qualitative research and provides technical assistance. Her research focuses on analyzing conditions of confinement, addressing behavioral health needs, and reducing the use of jails.

Ex. I - 671

## STATEMENT OF INDEPENDENCE

The Urban Institute strives to meet the highest standards of integrity and quality in its research and analyses and in the evidence-based policy recommendations offered by its researchers and experts. We believe that operating consistent with the values of independence, rigor, and transparency is essential to maintaining those standards. As an organization, the Urban Institute does not take positions on issues, but it does empower and support its experts in sharing their own evidence-based views and policy recommendations that have been shaped by scholarship. Funders do not determine our research findings or the insights and recommendations of our experts. Urban scholars and experts are expected to be objective and follow the evidence wherever it may lead.



500 L'Enfant Plaza SW
Washington, DC 20024

*www.urban.org*

# EXHIBIT J

12/26/24, 3:54 PM    Despite years of warnings, local jails confined mentally ill men together. One recent unreported death highlights the risks. – San Di…

Case 3:20-cv-00406-AJB-DDL    Document 796-2    Filed 01/21/25    PageID.34665
Page 412 of 546

NEWS

# Despite years of warnings, local jails confined mentally ill men together. One recent unreported death highlights the risks.

The attack on Eric Van Tine in a cell shared with two other men raises questions about how San Diego County jails house the people in its custody — including its continued practice of triple-bunking.



Walt Mehran speaks with public defender Avery Webb during a preliminary hearing at the Central Courthouse in Downtown San Diego on Friday, Dec. 20, 2024. (Photo by Sandy Huffaker for The San Diego Union-Tribune)

Ex. J - 675

12/26/24, 3:54 PM    Despite years of warnings, local jails confined mentally ill men together, one recent unreported death highlights the risks. – San Di…

Page 413 of 546

Case 3:20-cv-00406-AJB-DDL    Document 796-2    Filed 01/21/25    PageID.34666



By **KELLY DAVIS** | kellydaviswrites@gmail.com

UPDATED: December 22, 2024 at 5:01 AM PST

For years, San Diego County jails have been triple-bunking people in cells designed for no more than two. State regulators have repeatedly told the Sheriff's Office to stop the practice, and the department itself has acknowledged that it's dangerous and violates state code.

A three-person cell is where Walt Mehran is accused of attacking Eric Van Tine on Dec. 2, 2023.

The men's cellmate told sheriff investigators that Van Tine had threatened Mehran. The cellmate thought the two had settled the argument, but after Van Tine fell asleep, Mehran dragged him from his bunk and beat him unconscious.

Van Tine suffered a traumatic brain injury and spent four months in a coma. When he awoke, he was unable to feed or bathe himself and struggled to communicate.

In October, he developed a severe lung infection and ended up on life support. His family chose to withdraw care on Nov. 6.

The death raises more questions about how people are housed in San Diego jails — especially those, like Van Tine and Mehran, who struggle with serious mental illness.

That history should be a consideration, said Julia Yoo, an attorney representing Van Tine's family. The family has filed a claim against San Diego County, the precursor to a lawsuit.

"Here, it appears they placed at least two seriously mentally ill people in a tiny triple cell with at least two of them in an acute and agitated state," she said. "The failure to place them in a unit where they could be monitored and stabilized was reckless."

The Sheriff's Office did not respond to questions about what role a person's mental health history plays in jail housing decisions, citing pending litigation.

Mehran, 23, has been charged with attempted murder. District Attorney spokesperson Steve Walker said that charge could be upgraded depending on findings from Van Tine's autopsy.

**Ex. J - 676**

12/26/24, 3:54 PM    Despite years of warnings, local jails confined mentally ill men together after recent unreported death, highlighting risks. – San Di…

Case 3:20-cv-00406-AJB-DDL    Document 796-2    Filed 01/21/25    PageID.34667
Page 414 of 546

### 'Likely to cause conflict'



It's not clear when the Sheriff's Office started triple-bunking people. But the earliest red flag was raised about the practice in a 2016 report by the county's civil grand jury, which described triple-bunking as "excessive" and "a configuration likely to cause conflict."

An undated Sheriff's Office document related to jail construction, obtained by The San Diego Union-Tribune through a public records request, acknowledges that triple-bunking creates "an unsafe environment for both staff and inmates."

Multiple times state regulators told the Sheriff's Office to stop the practice.

Eric Van Tine is pictured at the coast before his arrest. (Matthew Van Tine)

"All items of noncompliance have been corrected with the exception of the continued use of triple bunks that are not supported by the current infrastructure of your jail facilities," reads a 2021 inspection report from the Board of State and Community Corrections.

The department told inspectors that triple-bunking would cease with the completion of the Rock Mountain Detention Facility, which opened in July 2023.

But even as beds were added and the county's jail population fell to historic lows, triple-bunking continued.

Scott Frakes, the former director of the Nebraska Department of Correctional Services who now consults on correctional facility design and management, said confining three people in one 75-square-foot cell should be done on an emergency basis only.

"Even when done on an emergency basis, there must be some type of vetting process to reduce the risk of predator-victim situations and to identify mental health issues," he said via email.

In an interview with the Union-Tribune in October, Sheriff Kelly Martinez said the practice of triple-bunking had stopped. A spokesperson said in a Dec. 6 email that triple bunks were "being phased out."

Ex. J - 677



San Diego County Sheriff Kelly Martinez is shown Oct. 2 in her department's headquarters in San Diego. (Ana Ramirez / The San Diego Union-Tribune)

On Dec. 1, 2023, Mehran, then 22, was arrested by San Diego police for assault and vandalism. He was booked into the Central Jail the following day.

Van Tine, then 40, was arrested by San Diego police on Dec. 2 and charged with assault and making a criminal threat. He was also booked into the Central Jail.

The men and a third person were housed in a cell on the jail's fifth floor. At just under 75 square feet — 58 square feet smaller than the average U.S. bedroom — the cell held three stacked bunks, a metal toilet/sink combination and a metal desk with a bolted-down stool.

## 'Please get this person … help'

Both Mehran and Van Tine had been in the Central Jail before. On Aug. 3, 2023, Van Tine had been arrested after he stood outside the window of a Mission Beach condo, brandished a BB gun and threatened to kill a vacationing family inside.

He was granted probation in October 2023, after agreeing to attend an anger management class and Alcoholics Anonymous meetings and stay away from the condo. He was also referred to the county's behavioral health services unit.

It's unclear from court records whether Van Tine sought out any services or what he did to get his probation revoked, but in less than two months, he was back in jail.

Originally from Arizona, Van Tine had struggled with schizophrenia, his brother, Matthew, said. He was stable when he decided to move to San Diego to start a new life for himself.

Ex. J - 678

12/26/24, 3:54 PM  Despite years of warnings, local jails confined mentally ill men together, one recent unreported death highlights the risks. – San Di…

Case 3:20-cv-00406-AJB-DDL    Document 796-2    Filed 01/21/25    PageID.34669
Page 416 of 546



Eric Van Tine, right, is seen with his mother Carole, older brother Brian and Brian's husband Josh. (Matthew Van Tine)

"Eric knew the area pretty well, since he had been coming there almost every year since he was 8 years old," Matthew Van Tine said.

Matthew said the Mission Beach condo his family would rent is next door to the condo where his brother was arrested.

Members of the family Van Tine threatened sent emails to the judge in his case, urging him to require Van Tine to get treatment for his mental illness.

"Please get this person the help he is in desperate need of," one email says.

Mehran had also been on probation when he was arrested.

Court records show that he was charged with assaulting his girlfriend in May 2020. He was granted probation, was re-arrested for violating an order to stay away from the victim and then struggled to comply with the order that he enroll in a domestic-violence prevention program.

His probation was revoked in August 2023, and he was arrested on a new assault charge just over three months later.

His attorney, Avery Webb, told the Union-Tribune that it was clear Mehran's mental health had deteriorated.

Ex. J - 679

12/26/24, 3:54 PM Despite years of warnings, local jails confined mentally ill men together, one recent unreported death highlights the risks. – San Di…

Case 3:20-cv-00406-AJB-DDL Document 796-2 Filed 01/21/25 PageID.34670 Page 417 of 546

Mehran was found incompetent to stand trial and spent several months at a psychiatric hospital in Los Angeles. At a hearing this week, he was wearing a green jail uniform, identifying him as having a psychiatric disorder.

## 'Failed to provide a safe environment'

In 2021, the family of Lyle Woodward won a $400,000 settlement in a lawsuit they filed after his death in the Central Jail.

Woodward's history of mental illness was well-documented in jail records. But instead of being placed on the psychiatric floor, he had been put in a three-man cell. One of those men, Clinton Thinn, strangled Woodward on Dec. 3, 2016.

Thinn had attacked other people in the jail prior to being placed in a cell with Woodward. In an interview with a homicide investigator that became part of the family's lawsuit, Deputy Curtis Stratton said he had tried to get Woodward housed on the psychiatric floor, but getting anyone assigned there was "a feat of strength."

Woodward and Thinn ended up in the same cell, Stratton said, "because everyone else kind of corralled them, the two crazy guys together."

Over the last five years, six incarcerated people have been killed by a bunkmate, not including Eric Van Tine. In at least five of those cases, either the victim or the alleged attacker had a previously diagnosed mental illness.

Earlier this year, John Medina pleaded guilty to second-degree murder for the Dec. 29, 2021, slaying of 38-year-old Dominique McCoy. Medina, who turned 18 less than two weeks prior to McCoy's death, was in jail on suspicion of assault with a deadly weapon and felony animal abuse.

McCoy was in custody for allegedly violating the terms of his probation, but his probationary period — stemming from two misdemeanor drug-possession counts — had ended, court records indicate. A week after his arrest, a judge ordered him released.

While processing that order, deputies placed McCoy in a cell with Medina. The cell had three bunks but only one mattress. According to court records, Medina and McCoy got into a fight over the mattress.

Medina told homicide investigators that he was hearing voices that told him to kill McCoy.

McCoy's family has filed a wrongful death lawsuit, alleging that Medina's history of violence meant he should not have been placed with McCoy.

And earlier this year, the county's Citizens' Law Enforcement Review Board ruled that deputies "failed to provide a safe environment for McCoy."

**Ex. J - 680**

Case 3:20-cv-00406-AJB-DDL Document 796-2 Filed 01/21/25 PageID.34671 Page 418 of 546

"Based on Medina's documented propensity towards violence, the department failed to implement reasonable measures to prevent him from doing harm to others, shortcomings that contributed to McCoy's death," the oversight panel said.



This past January, 24-year-old Brandon Yates was tortured to death by a cellmate. Yates repeatedly pressed the panic button inside the cell, but no one came, according to testimony at defendant Alvin Ruis' preliminary hearing.

Yates' father, Dan, said his son struggled with mental illness and homelessness, despite his family's attempts to get him help. Yates' behavior annoyed his first pair of cellmates, who demanded he be removed, his father said. A deputy placed him in a cell with Ruis.

Brandon Yates, 24, was tortured and killed by his cellmate in the Men's Central Jail earlier this year. Yates repeatedly pressed the panic button inside the cell, but no one responded. Photo courtesy of family. (Yates family)

Court records show Ruis, who had been charged with spousal battery and cruelty to a child, was struggling with mental illness. On Dec. 28, 2023, less than three weeks before Ruis killed Yates, Ruis' father sent an email to the court, pleading for help for his son.

"We need medical and mental (health) attention before he kills himself … or someone else," the letter says.

## 'Jail-attributable deaths'

The Sheriff's Office did not report Van Tine's attack or subsequent death to the media. But it acknowledged in an email this month, in response to questions from the Union-Tribune, that it should have.

"It is of public interest and it should have been reported due to the severity of the injuries sustained during Mr. Van Tine's time in custody," a sheriff's spokesperson said via email.

The charges against Van Tine were dropped — meaning when he died, he was no longer in sheriff's custody.

Because of this, the Sheriff's Office did not report the death to the state. Once a person is released from custody, sheriff departments are not required to report the death.

The sheriff's spokesperson said the department was not notified that Van Tine had died.

Ex. J - 681

Case 3:20-cv-00406-AJB-DDL  Document 796-2  Filed 01/21/25  PageID.34672
Page 419 of 546

Julia Yoo, his family's attorney, shared with the Union-Tribune an email she sent to a sheriff's official on Nov. 8, notifying them of Van Tine's death.

Yoo believes his death should be considered an in-custody death — or what correctional health experts call a "jail-attributable death," meaning something that happened in the jail contributed to the death.

"Any other reading of 'in-custody death' is strained and tortured logic," Yoo said.

*Originally Published: December 22, 2024 at 5:00 AM PST*

**2024** › **December** › **22**

Ex. J - 682

# EXHIBIT K

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

DATE: May 12, 2023

| | |
|---|---|
| **CONTRACTOR NAME: Naphcare**<br><br>**PROJECT NAME(S):  Comprehensive Healthcare Services**<br><br>**CONTRACT NUMBER(S):566117** | **CONTRACTING OFFICER'S REPRESENTATIVE (COR):**<br>**Dane Gapuz**<br><br>**CONTRACTOR'S REPRESENTATIVES:**<br>**Brad T. McLane** |

**FINDINGS:**

This is a follow up Corrective Action Notice to the one I sent you on April 28, 2023.

We received your response dated May 5, 2023, but it did not address some deficiencies or provide a plan for correcting some of those that were addressed.   In responding to this Corrective Action Notice please provide a detailed plan including a timeline for correcting all contract deficiencies.  We have added additional comments under the "County Additional Comments" Section for each item where we require additional information.

This notice is to inform you that Naphcare is in non-compliance of your contract No. 566117, for which you began services June 1, 2022, to provide the County Sheriff's Department with Comprehensive Healthcare Services.  Your company is in non-compliance of the following Exhibit A – Statement of Work requirements.

**ARTICLE 4 COMPENSATION:**
**4.1.3:** Payments
**4.1.5:** Prompt Payment for Vendors and Subcontractors
**4.1.5.1.1:** Unless otherwise set forth in this paragraph, Contractor shall promptly pay its vendors and subcontractors for satisfactory performance under its subcontract(s) to this Agreement.  Such prompt payment shall be no later than thirty (30) days after Contractor receives payment for such services from County and shall be paid out of such amounts are paid to Contractor under this Agreement.

The Sheriff has an obligation to pay for invoices for offsite hospital services rendered when incarcerated patients are admitted to participating hospitals. As of April 17, 2023, there are $9.3 million dollars of unpaid bills due to hospitals. Of the total outstanding claims, $4.6 million dollars are past due the 30-day threshold. Due to lack of payment, community some providers do not want to see or accept our patients, which include, but not limited to:
- Podiatry (Oxford)
- Alvarado
- Vibra
- Kindred

**Additional County Comments**

- In your response you indicated that "with San Diego's uniquely strict firewall requirements representing a significant challenge." Our Data Services Staff confirmed that there should be no issues and all Naphcare employees have had access since summer of 2022.  Please provide examples of where you were denied access. These examples have been requested in the past but not produced.
- Provide examples of where misspelled names were an issue and explain how you are going to resolve this issue in the future.
- Provide an updated claims list showing all outstanding claims which includes disputed claims and /or alleged MediCal supported cases and your proposed payment plan.
- NaphCare has agreed to provide monthly accounting of their claim's payment. The most recent report did not contain detailed information, so we have asked for new report.

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

- 95% of all claims will be paid within 30 days from receipt of invoice with the remaining ones paid within 60 days from receipt of invoice.
- NaphCare staff have been given access to JIMS which will allow them to check for name issues.
- NaphCare has also agreed to pay the claim after confirming the ICP was in custody at the time of the services.  Other issues will be resolved later.

## 2.3 COMPREHENSIVE HEALTH CARE SERVICES

**2.1.1 Contractor must provide NCCHC-compliant policies and procedures to provide intake receiving screenings and health assessments, sick call triage and nursing clinics, and medication administration. SDSD will continue to provide nursing services at all SDSD facilities. NaphCare's Program Manager/Health Services Administrator will serve as a point of contact and coordination between NaphCare, the SDSD Director of Nursing, and the respective nursing staff.**

Contractor's Program Manager does not consistently serve as the point of contact for general operations, projects and/or resolution of issues. Role doesn't provide timely responses in follow up to operational issues, requests, and guidance. Program Manager shifts issue resolution to Sheriff Nursing staff, relying on their knowledge and experience, rather than learning detentions operations. SDSD staff works directly with Contractor's corporate support in-lieu of coordination between Contractor, the SDSD Director of Nursing, and the respective nursing staff. Guidance is lacking and solutions are left to be developed by SDSD staff, with minimal Contractor involvement.

Contractor has yet to provide NCCHC compliant policies and procedures to provide intake receiving screenings and health assessments, sick call triage and nursing clinics, and medication administration. SDSD began submitting NCCHC compliant policies and procedures for review for Contractor's approval bi-weekly, as per their request, beginning in October 2022, with the final submission being in February 2023. As of date, the Contractor has failed to provide approved SDSD policies and procedures. Program manager was a participant in the SDSD policy and procedure meetings and was aware of the planned incremental submission of policies and procedures for concurrent review.

**Additional County Comments**

- In your response you stated: "At this time, our accreditation and compliance team members are actively revising the policies and procedures, as well as preparing site-specific addenda that will be submitted to the County by June 5, 2023".
- SDSD had notified NaphCare Program Manager directly at the 4.10.23 Bi-Weekly NaphCare Transition Meeting that Sheriff Attorney Advisor was averse to the prospect of adding SD site specific additions to the end of the NaphCare policies and that an integrated policy is recommended. Confirm you understand this and provide a detailed plan for moving forward on the approval of these policies. SDSD is required to post all policies and procedure per statute, and this has delayed our ability to comply with State law.
- This has been identified as primary a communication issue. Naphcare will work on ensuring their local staff is informed of all decisions made by cooperate staff.
- <span style="color:red">**NaphCare and County staff are working on polices.  Polices have been provided in draft format.  The County is reviewing them.**</span>

**2.3.2.4 Patients referred for follow-up shall be seen by the appropriate healthcare professional, and referrals shall be documented in TechCare. Patients are evaluated based on the medical information obtained during the Receiving Screening as to the medical necessity of conducting a health assessment by a provider.**

Contractor dental providers fail to properly document referrals in our Electronic Healthcare Records (TechCare). Follow-ups are continually being rescheduled without proper treatment done, which can ultimately lead to a patient

**Ex. K - 685**

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

not being seen by the dental staff or referred healthcare professionals/specialists. There have been occurrences of patients being dropped from TechCare due to inability to properly record specialist referrals in TechCare. [Concerns are also addressed in section 2.3.10 Oral Care Service, later in this document]

**Additional County Comments**

- Provide a detailed plan on how referrals including dental will be processed so they are in compliance with the statement of work and NCCHC Standards. Include any approval timelines.
- Explain what benefits deploying NaphCare's standard Dental TechCare model instead of staying with the current version are? What are the differences in the programs? How are service hours being tracked for all dental work being completed including annual cleanings?

**2.3.4.5 Contractor shall pursue partnerships with community resource providers, local resources available, and with community providers in San Diego County and the surrounding areas.**

Contractor has severed contractual relationships with community resource providers in San Diego County and the surrounding areas (i.e. Alvarado Hospital, Tri-City Medical Center), with no intent or motive to rejuvenate partnerships.

**Additional County Comments**

- Provide updates on your negotiations with local hospitals and other providers (Long Term Care Facilities etc.) including anticipated contract dates.
- Confirm you understand the charges hospitals are allowed to collect under Penal Code 4011.10 in absence of a contract and that NaphCare is responsible for the payment of those charges?
- NaphCare has contracted with Tri City, Paradise Valley and Alvarado.

In accordance with Section 1.4.3 of the contract please provide the county with copies of all subcontracts you have entered into for performance of work under this agreement. Any new subcontracts are to be provided within 30 days of execution. In accordance with Section 1.4.4 the county has the right to approve any subcontractor agreement over $50,000.

- NaphCare has provided copies of current subcontracts. New subcontracts will be provided within thirty (30) days of execution.

**2.3.7.1 Contractor shall operate and manage a comprehensive mental health delivery system in collaboration with SDSD staff. This should include, but is not limited to, utilizing County Mental Health Clinicians and Contractor psychologists and other qualified mental health professionals to perform on-site, face-to-face mental health clinics as well as psychiatry clinics. Contractor may provide these services directly or subcontract for mental health services.**

Qualified Mental Health Professionals (QMHP) that Contractor has hired are unlicensed in California. Per Department P&P and Medical Services Division (MSD) Operations Manual, a QMHP is defined as either a Psychologist, Psychiatrist, Licensed Mental Health Clinician (LMHC), Psychiatric Nurse Practitioner, or Sheriff Psychiatric Registered Nurse. Existing Contractor staff are not equivalent to the positions listed.

**Additional County Comments**

- Provide verification that all your QMHP have a valid California License. If any are pre-licensed, please identify them and indicate and provide documentation on how they would be supervised and who is responsible for their oversight toward completion of license requirements.

NAPHCARE034747

**Ex. K - 686**

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

- NaphCare has provide a list of the QMPH and who is supervising their pre-licensed individuals.

**2.3.10 Oral Care Services**
**2.3.10.3 Treatments shall include any other services deemed necessary by the contracted dentist. Contractor shall ensure that patients' serious dental needs are met in compliance with NCCHC, and other applicable standards.**
**2.3.10.9 Contractor shall provide an appropriate and timely response to requests for dental services and institute periodic performance measurements to ensure patients have timely access to dental care.**
**2.3.10.13 Contractor shall coordinate appropriate offsite referrals for patients requiring dental care outside the capabilities of the facility.**

Contractor fails to provide timely response to requests regarding annual cleanings. Contracted dental staff does not have a process in place to effectively respond to annual/periodic cleanings, as many incarcerated patients have missed appointments and have been forgotten due to the inability of dental staff to schedule referrals or follow-up appointments. Routine dental care is a compliance metric for NCCHC accreditation. Contractor is not authorizing Root Canals or performing routine cleanings, hygienic care or other additional services in accordance with NCCHC Standards which is a contract requirement.

**Additional County Comments**

- Provide examples of how NaphCare Corporate Staff will perform monitoring and oversite of dental services
- The Sheriff is interested in staff efficiency not -documented hours a dental provider may be on site. Reports should include the number of patients seen by dental staff each shift. Chart reviews should not be included in these calculations. Please indicate how often you will be providing these reports.
- Provide how NaphCare ensures the community standard of care is applied as related to general dentistry procedures, such as root canals.

**2.3.14   Medication Assisted Treatment (MAT) Treatment Program**
**2.3.14.3 Contractor shall implement a Medication Assisted Treatment (MAT) program. The MAT program shall include but not be limited to:**
**2.3.14.3.1 Induction – upon request of incarcerated individual or patients identified at withdrawal, as well, as those currently residing in custody.  MAT Induction shall be initiated within six months of the effective date of the contract.**

MAT induction was not initiated within six months of the effective date of the contract.

**Additional County Comments**

- There are currently 78 MAT Participants not the 14 listed in your response.  18 of them are in the MAT Module at Vista Detention Facility.
- Please clarify your policy regarding diversion and "Zero Tolerance".  The County cannot support "Zero Tolerance" due to ADA issues.
- Explain the reason for and the content of the training you stated would be provided in your response.
- Confirm that you understand you are to provide and pay for induction and continued medications.
- NaphCare will provide induction and continued medications.
- NaphCare understands that "Zero Tolerance" cannot be absolute due to ADA Concerns.

**2.3.15 Women's Health and Obstetric Services**
**2.3.15.3 Contractor shall directly employ a provider or utilize a subcontractor to provide 12 hours of weekly coverage by a Gynecological Provider (GP/NP) to provide regular access to care for the female patient population at the Las Colinas Detention and Reentry Facility.**

NAPHCARE034748

**Ex. K - 687**

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

---

**2.3.15.4 All females of childbearing age (15-54) shall receive a pregnancy test at the time of booking.**
**2.3.15.7 Contractor policy shall comply with NCCHC standards and all other laws and statutes of the state. Contractor shall ensure women receive appropriate contraceptive services as clinically indicated.**

As of March 9th, there was no Gynecological Provider (GP) at Las Colinas and no replacement was present, up to the last day of the existing GP. The Sheriff's Department utilized an existing locum tenens contract for relief coverage while Contractor sourced and hired another GP.

Contractor refused to pay for abortions, as they deemed it "elective". Section 2.3.15.7 states that Contractor shall comply with NCCHC standards and all other laws and statues of the State. AB732 mandates for these types of services and Contractor was dismissive of this State mandate.

**Additional County Comments**

- The County is still providing Gynecological Services with another contractor. Please provide an update on your recruitment for this position and when you anticipate having it filled. Please confirm that NaphCare understands that until the position is filled the county will continue to claim on a credit on the monthly invoice for the cost of this service. The County can increase the number of hours if NaphCare requests.
- Provide the date you will be providing 12 hours a week of OBGYN services as required by the contract. If contracting out the services, explain how you will cover vacation, sick leave and other absences.
- Provide a detailed plan on how you will provide OBGYN services within five (5) days of booking as required under AB 732.
- Confirm you are all women between the ages of 15 and 54 are receiving a pregnancy test at the time of booking
- Confirm that you understand that state law requires the county to provide abortions to patients who request them.
- Please explain why you are not bundling OB Services. This creates an increased workload and delays for services. This can impact patient care especially for late term individuals.
- NaphCare has hired an OBGYN and contracted for a PRN to provide full coverage for LCDRF. Additional hours can be arranged if needed.
- NaphCare confirmed they are providing pregnancy tests and abortions as required in the contract.
- <span style="color:red">08/14-18/2023 – Both FTE and PRN not scheduled. No relief coverage provided or offered by Naphcare.</span>

**2.3.16  Hospital Care Management**
**2.3.16.11 Contractor shall provide the following offsite reports routinely:**
**2.3.16.11.1 Daily Hospitalization Report—including reason for admission and length of stay**
**2.3.16.11.2 Detailed Monthly Detailed Utilization report— including detailed time frames for each process of the review**
**2.3.16.11.3 Biweekly Inpatient & Outpatient statistical report by service and location**
**2.3.16.11.4 Biweekly Specialty Services report—consults, procedures, and diagnostic services**
**2.3.16.11.5 Biweekly ED Trips report—by service and location**

No reports have been established or routinely provided by Contractor.

**Additional County Comments**

- In your response you indicated you had problems accessing the County version of TechCare. Our Data Services staff confirmed that several NaphCare employees have that access, and they were not aware of any additional requests by NaphCare. Provide specific examples of Naphcare employees not being able to access the County system.

NAPHCARE034749

Ex. K - 688

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

**2.3.18 Secure Locked Hospital/Ward**
**2.3.18.1 Contractor shall procure and utilize a secure locked hospital/ward section specifically for inpatient hospitalization of incarcerated individuals. This shall include procedures for transfer of incarcerated individual patients from non-secure hospital beds to contracted secure hospital bed.**

Contractor has severed contractual relationships with community resource providers in San Diego County and the surrounding areas (ig. Alvarado Hospital, Tri-City Medical Center), with no intent or motive to rejuvenate partnerships. These actions have presented risks in losing the ability to utilize a secure locked hospital/ward, or Hospital Guard Unit (HGU), at participating hospitals such as Alvarado.

Deputy Safety is affected without contract because we cannot upgrade infrastructure without contract. Infrastructure upgrades include:
- Radio communications (dead spots in certain areas)
  - Sheriff's Department has already produced scope of work, but the Sheriff's Department will not invest in upgrades without contractual agreement.
- Computer access
- Use of locked unit (economies of scale)

**Additional County Comments**

- Provide your plan for obtaining a locked hospital/ward
- Provide you plan for transferring incarcerated individual patients from non-secure hospital beds to contracted hospital beds
- NaphCare has secured contracts with Tri City, Alvarado, and Paradise Valley Hospitals.  Tri City and Alvarado have locked wards.

**2.3.19 Onsite and Offsite Specialty Care Services**
**2.3.19.2 Contractor will provide onsite specialty services in the following specialties: Optometry, Cardiology, OBGYN, Infectious Disease, STD and HIV clinics, and Ultrasound. Should volume warrant as determined by Sheriff, Contractor shall provide onsite services via telemedicine and shall expand services onsite for scheduled clinics.**

See sections: 2.3.10 Oral Care Services and 2.3.15 Women's Health and Obstetric Services.

**2.3.20 eConsults – Specialty Care Consultations**
**2.3.20.3 eConsults shall give providers access to more than 70 specialties and sub-specialties, including:**

Telemedicine network has not been established by the Contractor, thus, limiting the capability to providing specialized services to incarcerated patients.

- This service has not been mentioned as relief, but is in the contract

**Additional County Comments**

- What is the purpose of eConsult?
- What are your protocols that trigger the use of eConsult.
- Confirm that all your providers on eConsult are licensed to practice in California.
- The County understands that e-Consult is peer to peer system that allows physicians to consult with other physicians and does not provide patient care.  The providers do not need to be licensed in California since they are not treating patients.

NAPHCARE034750
Ex. K - 689

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

**2.3.22 Telemedicine Capabilities**
**2.3.22.1 Contractor shall provide telemedicine services for specialty consultation and referral and have such access available at all detention sites/facilities. Specialty telemedicine services may shall include, but are not limited to, the disciplines of endocrinology, nephrology, psychology/psychiatry, orthopedics, urology, and infectious diseases.**

Telemedicine network has not been established by the Contractor, thus, limiting the capability to providing specialized services to incarcerated patients.

- Tri City Medical Center (TCMC)
  - o Only have Telehealth with TCMC for specialty care
  - o We have their equipment (COWS/Bio Equipment)
  - o No contract as far as we know, therefore, equipment is not secure

- Alvarado
  - o No contract for telehealth
  - o No outpatient specialty care

- Contractor has Endocrinologist via telehealth (TEAMS only)
  - o No diagnostic equipment
  - o 4 appointments total

**Additional County Comments**
- The County is in the process of developing its own telemedicine system that may serve to assist in providing patient access to outpatient specialty care with NaphCare's contracted healthcare providers in the community."
- Provide your plans for implementing telemedicine once equipment is in place. Will there be a set schedule for telemedicine?
- NaphCare will work with the County when its new Telehealth system becomes available.

**2.3.23 Long-term or Hospice Care**
**2.3.23.4 Contractor shall collaborate with the SDSD to develop and implement an onsite and offsite hospice program. Contractor shall collaborate with the SDSD and community partners to identify potential candidates for hospice care, and allow for appropriate housing options, both in and outside of custody. Contractor will work with case management functionaries (SDSD, HHSA and 3rd party community partners) to assist with medical probation and compassionate program releases. The policy and procedure for hospice care shall include the establishment of policies addressing criteria for admission to the hospice program, special privileges for terminally ill patients, requirements for housing in palliative care settings, "do not resuscitate orders," and coordination with existing community hospice resources.**

Contractor has failed to secure a contractual agreement with Long Term Acute Care (LTAC) facilities. Individualized patient agreements have been requested from our long-standing partner, Vibra, in response to Contractor's failure to process payments timely.

**Additional County Comments**

- Provide the details of your contract for hospice services including in hospital care. This includes patients who will require extended care in the hospital.
- Provide details of your contract for Long Term Care Services
- NaphCare has not contracted for Long Term Care or Hospice Care.
- NaphCare has not provided contracts for Long Term Care and hospice services.

NAPHCARE034751
Ex. K - 690

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

**2.3.25.7** Contractor shall ensure quarterly meetings, or whenever an infection control issue requires immediate or continuing attention. A licensed healthcare provider is designated to serve as the Infection Control Coordinator. The infection control committee shall consist of the following members:
**2.3.25.7.1** On-site Medical Director or Physician.
**2.3.25.7.2** Dentist or representative, if applicable.
**2.3.25.7.3** Program Manager.
**2.3.25.7.4** SDSD Director of Nursing.
**2.3.25.7.5** Infection Control Coordinator.
**2.3.25.7.6** SDSD representative; and
**2.3.25.7.7** Any other representatives, depending on issues for discussion as designated in conjunction with the Program Manager or Contractor Corporate Office.

No quarterly meetings have been set or established.

**Additional County Comments**

- Provide a detailed plan for starting these meetings

**2.3.26 Continuous Quality Improvement (CQI) Program**
**2.3.26.1** Contractor shall implement and manage a Continuous Quality Improvement (CQI) program in collaboration with the SDSD. Contractor shall, at a minimum, establish and maintain a CQI department which monitors provider performance metrics, clinical efficiency evaluations and provides ongoing monitoring of administrative and health care delivery programs in the facility. A committee shall be established that meets to discuss various topics related to the improvement of care delivery. This committee shall meet monthly and the SDSD Chief Medical Officer shall be the chairperson of the committee. Additional SDSD staff shall be part of this committee including but not limited to the SDSD Director of Mental Health and SDSD Director of Nursing. The Contractor shall at a minimum make their On-site Medical Director and mental health representative part of this committee. Findings from this committee shall be reported to SDSD management following each meeting. This committee shall meet all compliance indicators of NCCHC standards.
**2.3.26.4** Contractor shall institute a Medical Audit Committee (MAC). The committee includes a multidisciplinary team to incorporate medicine, nursing, dental, mental health, substance abuse, and facility administration, as well as any other client designated representatives. The committee shall be chaired by Contractor's designee. SDSD committee members shall include SDSD CMO, Director of Nursing, Mental Health Director, Chief Mental Health Clinicians and facility supervising registered nurses. Contractor shall keep meeting minutes and distribute them with an agenda prior to all meetings. Minutes and copies of reports reviewed shall be submitted to all committee members. The quality improvement committee shall evaluate patient complaints and grievances. The Onsite Medical Director shall attend the MAC meeting monthly.

No quarterly meetings have been set or established.

**Additional County Comments**

- Provide a detailed plan on how you will schedule and coordinate these meetings. Include how agenda items will be selected and the topics to be discussed. The County wants reports on efficiencies included.

**2.3.27 Peer Review**
**2.3.27.1** Contractor shall ensure quality performance through a peer review process, random chart checks, and the utilization of the Focused Professional Practice Evaluation (FPPE) and the Ongoing Professional Practice Evaluation (OPPE).

NAPHCARE034752

**Ex. K - 691**

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

---

Not being done.

**Additional County Comments**

- Provide a detailed plan on how you will perform these reviews.  The County expects a 100% completion rate. Peer reviews completed by County-on-County staff are in compliance and currently being shared with Naphcare.  Please explain how Naphcare will share their Peer Reviews with County MSD.
- Explain your process for clinical oversite for Nurse Practitioners and Psych Nurse Practitioners
- Explain your process for privileging and credentialing providers
- NaphCare confirms that peer reviews have been completed and will be completed on new and current employees as required.  A list will be provided to Medical Administration.

**2.3.29 Key Metrics and Performance Indicators**
**2.3.29.2 The Contract Monitor shall have access to offsite referral data, files, and data during the term of the agreement to monitor contract compliance. This data shall be readily available in a web-accessible format, in which patient healthcare information can be viewed instantly. The Contract Monitor shall be notified of all patients who are receiving off-site care. TechCare captures all patient data, which allows reports to be modified should the SDSD's criteria change. Contractor shall submit statistical daily reports pertaining to medical services rendered, and a monthly contract compliance report to the Contract Monitor, to assist management with the efficient and direct correlation of contract compliance indicators.**
**2.3.29.3 Standard management reports are a defined record of the status of workload, productivity, and patient activity in each facility. Contractor software implementation team shall work to configure these daily reports to meet the needs of the County. These reports can be viewed on a report dashboard within TechCare and/or sent securely to the management team via email on a scheduled basis.**

Not being done.

**Additional County Comments**

- Provide a detailed plan for providing these metrics and performance indicators.  Include a list of what will be included and how it will be evaluated.

**2.3.30 Onsite Medication Administration and Pharmaceutical Operations**
**2.3.30.1.2 Provide Twenty-four (24) hours seven days a week consultative services by a licensed pharmacist by phone.**
**2.3.30.8 Continuity of Care Services - vendor shall demonstrate a means of identifying/verifying and restarting patient specific community prescribed medications through the use of SureScripts, CURES, San Diego Health Connect (or subsequent replacement) or through other means. Validated medications need to be restarted within 12 hours unless the use of specialized pharmacies is required. Any delay in starting medications should be due to the validation process, not identifying/routing the request to a provider.**

Contractor pharmacy is not available twenty-four hours, seven days a week for consultation services. Contractor has failed to restart medications for patients reassigned from the California Department of State Hospital (DSH).

**Additional County Comments**

- It is the County's expectation that a live person answers the phone seven days a week, 24 hours a day.  That is not happening now as staff is being asked to leave voice messages.
- Provide a detailed plan on how you will make sure all phone calls are answered by a live person.
- NaphCare has instituted a new phone system that will insure someone answers the phone 24 hours a day, seven days a week.

NAPHCARE034753

**Ex. K - 692**

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

**2.3.35 Radiology**
**2.3.35.4 NaphCare shall provide coverage at pre-scheduled times and days at the designated facility. Additionally, NaphCare shall have staffing available as replacement for unscheduled absences of regular staffing so as to not disrupt regularly scheduled facility x-ray clinics.**
**2.3.35.12.2 The request for forensic x-ray exam shall be originated by staff for the Sheriff's DIU Unit. Forensic x-ray exams shall be performed during existing regularly scheduled x-ray clinics within the respective detention facility on an as needed basis.**

To date, Contractor has repeatedly failed to timely notify the Sheriff's Department of unscheduled absences. There have been occasions that X-Ray Technicians have arrived late and left the facilities early before the required end times as required by contract. Contractor has repeatedly been advised when incidents, such as missing weekend coverage, occurs that it is not acceptable to the Sheriff's Department. San Diego Central Jail (SDCJ), Las Colinas Detention/Reentry Facility (LCDRF), and Vista Detention Facility (VDF) are booking facilities and the hours agreed upon reflect the need for technicians to be present at each site. Incidents have occurred at VDF, where technicians leaving before the end of the shift and to be on time on their scheduled shifts. It is the Sheriff's Department's expectation that X-Ray Technicians remain on site for the entire shift unless alternate arrangements have been made and the Contractor has communicated the changes to the County in advance.

Summary of gaps in service:
- Lack of staffing and relief factor
- No weekend coverage at intake facilities (SDCJ/VDF)
- No communication to appropriate Sheriff staff

04.03.2023
VDF Lieutenant indicated that lobby check-in log, for the VDF radiology tech, denotes respective staff exiting prior to expected end-of-shift times). VDF requested like assurances that radiology will receive adequate coverage.

03.25-26.2023
VDF fourth week of missing radiology coverage; no communication by Contractor regarding schedule. VDF Lieutenant expressed concerns as the lack of coverage on nightshift is disruptive to operations for the line sworn staff.

03.18-19.2023
SDCJ Captain requested for relief staff, from LCDRF, for weekend night shift coverage, but was denied due to Contractor's agreement with X-Ray Technician. SDCJ Captain expressed again the need for a solution to X-Ray Technician coverage for the weekend.

VDF third week of missing radiology coverage; no communication by Contractor regarding schedule.

03.11-12.2023
VDF second week of missing radiology coverage; no communication by Contractor regarding schedule.

03.04-05.2023
VDF missing radiology coverage; no communication by Contractor regarding schedule.

01.27-29.2023
SDCJ third weekend of missing radiology coverage; no communication by Contractor regarding schedule.

01.20-22.2023
SDCJ second weekend of missing radiology coverage; no communication by Contractor regarding schedule.

NAPHCARE034754
Ex. K - 693

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

---

01.13-15.2023
SDCJ missing radiology coverage; no communication by Contractor regarding schedule.

**Additional County Comments**

- The county is still experiencing shifts not being covered
- Provide a detailed explanation on how you plan to cover all available radiology shifts and the date you will have all shifts covered
- NaphCare has agreed to schedule 100% of the shifts and to ensure that 95% of all shifts are covered.
- NaphCare understands that the must immediately addresses any facility that is incurring uncovered shifts out of proportion with their schedules and at all booking facilities.   This will be reviewed in August 2023 for compliance.

**2.3.41 Financial Responsibility for Equipment or Facility Damage**
**2.3.41.1 Contractor shall assume the responsibility for current SDSD equipment and supplies and become the sole comprehensive healthcare provider related to the delivery of healthcare services. This shall include information about procurement, maintenance, and replacement of health care equipment. Contractor shall not be financially responsible for the purchase of any equipment or supplies from the County.  Contractor will accept full financial responsibility for maintenance and repair of all County-owned equipment, and such equipment will continue to be the property of the County until such time as it is replaced. Contractor understands that all equipment utilized by the current medical, mental health and dental vendors is owned by the County.  Contractor understands that medication carts are currently owned by the County's current pharmacy vendor.  Contractor will either purchase medication carts from the pharmacy vendor or purchase new carts. Contractor will accept full financial responsibility for purchase of any new equipment as needed to replace County-owned equipment that has reached the end of its useful life, and Contractor shall maintain ownership of any new equipment purchased at Contractor's expense.  Contractor shall maintain an inventory of equipment and the ownership status of each item.  See Contractor's Cost/Price Exhibit, submitted under separate cover for details and line-item pricing.**

**2.3.45 Responsibility and Maintenance for Equipment and Supplies**
**2.3.45.5 Contractor shall be responsible for equipment and supplies needed to provide the services outlined in this Statement of Work at all facilities. Computers, printers, copy machines, fax machines, or peripherals that connect to the SDSD network are EXCLUDED from this requirement. For infrastructure security reasons, these items shall be supplied by the SDSD.**

Contractor has been dismissive of requests to repair and/or replace existing medical equipment (ig. hospital gurney, medical beds). There have been tendencies of the initial approval of replacement/repair being revoked by Contractor's corporate staff, thus, impacting operations and the workflow of how the Sheriff's Department conducts business.

**Additional County Comments**

- Confirm that NaphCare is aware they are responsible for the procurement, repair and replacement of all equipment required to perform the services under this contract.  This includes equipment provided by the County other than the items being excluded in 2.3.45.5. The County DON should not be included as the individual to vet all requests. Any requests for equipment have already been vetted by appropriate county leadership.
- The County has provided NaphCare with an e-mail address where all requests for equipment replacement and repair will be sent.  The County will review the requests to make sure there are no duplicates and send them on to NaphCare who will be responsible for procurement and payment.

NAPHCARE034755

**Ex. K - 694**

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

<u>**2.3.51**</u> **Administration of Services Related to Health Services Program**
<u>**2.3.51.1**</u> **Contractor shall perform the day-to-day administration of specific services related to each of the health service programs covered in this contract including but not limited to the following:**
<u>**2.3.51.1.1**</u> **Acting as the fiscal intermediary for SDSD health care programs described in this request**
<u>**2.3.51.1.3**</u> **Enrolling and eligibility verification**
<u>**2.3.51.1.4**</u> **Processing claims and finances**
<u>**2.3.51.1.7**</u> **Documenting service delivery and utilization**

- Managed Care/Utilization Management
  - Services written in the contract and deliberated over Contractor's provisions of the services.
  - Meeting with Contractor's CEO finally settled the question and they agreed to provide services.
  - Services are still pending, but are in the works

<u>**2.3.58**</u> **Inspections, Permit Fees, Equipment Calibration**
<u>**2.3.58.1**</u> **Contractor shall be responsible for any relevant inspections, permit fees, and equipment calibration for health care clinic areas. This includes any environmental inspections. Contractor shall implement a process to remedy any unsatisfactory inspection findings.**

Sheriff's Department is currently paying for inspections and permit fees provided by environmental agencies.

**Additional County Comments**

- The County will provide Naphcare the requested information on all fees.  Please provide an explanation on how those fees will be paid by Naphcare.
- The County has provided NaphCare with a list of the items requiring inspection and NaphCare has agreed to arrange and pay for these inspections.

<u>**2.3.64**</u> **Electronic Health Care Records System**

Contractor is currently releasing new TechCare builds without providing advanced notice of the changes or training to County Clinical Staff.  In some cases, county staff is faced with screens and cues they no nothing about and have no idea how to complete.  This can lead to information being entered into the system that is not followed up creating protentional liability to the county

**Additional County Comments**

- Provide a detailed plan on how you are going to notify county clinical and administrative staff about upcoming changes to TechCare and provide the appropriate training. Include a process for the County to decline a change if they do not want to implement it.
- Confirm that the County is not charged for changes that NaphCare makes to TechCare that were not requested by the County
- NaphCare and the County will from an IT Subcommittee to review TechCare changes prior to them being released.  The Count will be given an option to decline changes.

<u>**2.3.65**</u> **Staffing**
<u>**2.3.65.3**</u> **Contractor shall use Relief Staff to cover absences of Contractor's staff when necessary. Contractor shall maintain a team of corporate and site-based nurse practitioners who are licensed in California and able to travel to work hours onsite. Contractor may use PRN staffing or staffing agencies with correctional healthcare experience or staffing agencies with exceptional references.**
<u>**2.3.65.6**</u> **Contractor shall provide a list identifying all staff working specific assignments during specific time**

NAPHCARE034756

**Ex. K - 695**

**COUNTY OF SAN DIEGO
SHERIFF'S DEPARTMENT
CORRECTIVE ACTION NOTICE (CAN)**

periods daily and at any time when requested by the SDSD.

- Psychiatry
  - Las Colinas Detention/Reentry Facility (LCDRF)
    - No General/Outpatient Psychiatry
    - Dr. Anderson covers PSU and Outpatient with no relief factor

  - San Diego Central Jail (SDCJ)
    - No PSU weekend coverage for Psychiatry

  - All Facilities
    - No General Psychiatry Oversight for Nurse Practitioners (NP)
    - No NPs for LCDRF (only Dr. Anderson)

  - Currently, shifted Qualified Mental Health Practitioner (QMHP) from LCDRF to Vista Detention Facility (VDF), leaving LCDRF short 1.0 FTE for 6 weeks with no relief plan.

  - Psych Sick Call Backlog
    - As of April 17, 2023, there are 785 pending appointments
    - Periodic blitzes are done 3-4 months, with no solution to maintain the rising number of sick calls

- Medical - California Healthcare Partners (CHP)
  - Unprecedented staff separation since Contractor awarded
    - CHP stated they are currently overstaffing their contract with you at their expense. They are going to be ending that practice and staff that leave will not be replaced. This could contribute to an MDSC backlog

  - OBGYN NP
    - Gap created in OBGYN services by not hiring timely (6 weeks) for a departing employee; SDSD has had to hire a contractor (UNI) who continues to provide the service

- Onsite Specialty Services - Dental
  - Onsite hours provided do not match staffing matrix

  - Not providing care/treatment on initial appointment
    - Scheduling treatment for follow-up
    - Follow up and care may not be scheduled due to following reasons:
      - Follow up in Prison
      - Upon release, follow-up with private DDS
      - Patient to create new sick call in-lieu of follow up being scheduled at that appointment

  - Standard of Care
    - Regular cleanings and annual oral examinations are not being completed consistently large in-part
    - Staff is not referring patients for specialized care (including Root Canals) as required under NCCHC Standards

**Additional County Comments**

NAPHCARE034757

**Ex. K - 696**

**COUNTY OF SAN DIEGO
SHERIFF'S DEPARTMENT
CORRECTIVE ACTION NOTICE (CAN)**

---

- Explain how you will provide clinical oversite for the women's health provider if they are not a Medical Doctor?
- Explain how you are addressing the backlog for Psyc Sick Calls?  Include details about how you will accomplish this including the use of out to state providers and blitzes. When the County expect the backlog to be reduced?
- Is StatCare available for Telemedicine? At the onsite of the contract, telemedicine was used infrequently and mostly for mental health. County staff was advised by Dr. Farrier that Naphcare wanted to limit telemedicine for mental health appointments and encourage more face-to-face visits.  Some email responses from Naphcare indicated Statcare could be used for telemedicine.  From the onset of the contract Statcare has been used only as a communication platform between County health staff and on call physicians during intake or when futher assessment is needed related to patient care.  The patient/IP has never communicated with a physician via StatCare.   This was never listed as an option.  More clarification is needed on this issue.

---

| REFERENCE | CORRECTIVE ACTION REQUIRED | DUE DATE |
|---|---|---|
| The Following Sections Exhibit A – Statement of Work Sections as listed in Findings | Contractor to work directly with the contract COR or designee to submit to the County a **written plan and timelines for correcting your non-conformance** items with the contract agreement terms and conditions as outlined above.<br><br>**PLEASE NOTE**:  Failure to respond and abide by or make progress satisfactory to the County on this Corrective Action Notice, and any reoccurrence of the same non-compliant incidents reported above in the future could lead to further actions including Termination by Default under the provisions outlined in <u>Article 7</u> of Terms and Condition of this Contract 566117. | |
| **Article 4** | - Claims report submission gap (no report was provided for June 2023 and July 2023); Report submission required within first week of every month.<br>- Along with the unpaid claims, include all <u>paid</u> claims in a given contract year.<br>- For monitoring purposes, standardize the fields to keep claims report consistent month over month. | **Sept. 8, 2023** |
| **2.1.1** | Naphcare and SDSD are working on policies; policies are planned to be distributed for review to Naphcare on a weekly basis. | **On-Going (TBD)** |
| **2.3.4.5** | See CAN - Attachment A for subcontracts collected by SDSD.<br>- Submit contract document for UCSD.<br>- Review and update list for any new providers subcontracted. | **Aug. 25, 2023** |
| **2.3.10** | July 2023 Dental Audit submission required; the expectation is to have this report periodically submitted during the first week of every month. | **Sept. 8, 2023** |
| **2.3.15** | Hire additional FTE or PRN, of the existing 2 Naphcare staff, to fulfill service gaps for OBGYN services. Provide list of candidates to SDSD. | **Aug. 25, 2023** |
| **2.3.22** | Written plan and timeline of telemedicine services for specialty consultation and referral for the intake facilities. | **Aug. 25, 2023** |
| **2.3.23** | Written plan and timeline of contracting with local Long Term Acute Care facilities. | **Sept. 25, 2023** |

NAPHCARE034758

**Ex. K - 697**

**COUNTY OF SAN DIEGO**
**SHERIFF'S DEPARTMENT**
**CORRECTIVE ACTION NOTICE (CAN)**

| | | |
|---|---|---|
| **2.3.35** | Hire additional FTE or PRN, of the existing Naphcare staff, to fulfill service gaps for Radiology services. Provide list of candidates to SDSD.<br><br>Section 2.4.3 (from Naphcare Radiology Contract): Contractor shall provide coverage at pre-scheduled times and days at the designated facility.  Additionally, Contractor shall have staffing available as replacements for unscheduled absences for regular staffing so as not to disrupt regularly scheduled facility x-ray clinics. | **Sept. 25, 2023** |

_____          _____

Dane Gapuz, Contracting Officer's Representative                              Date


**\*\* COUNTY Use Only \*\***

Date Corrective Action Notice Mailed to Contractor:
Date Corrective Action Plan Returned to County:

Date of Compliance Verification:

Date Corrective Action Closeout Mailed to Contractor:
          **(COR must date and initial verification)**

NAPHCARE034759
**Ex. K - 698**

# EXHIBIT L

Case 3:20-cv-00406-AJB-DDL    Document 796-2    Filed 01/21/25    PageID.34690
Page 437 of 546

# News List
# Death Investigation

**Post Date:**                01/10/2025 12:42 PM

On January 10, 2025, around 4:10 a.m., Sheriff's Homicide investigators were notified a 68-year-old male in Sheriff's custody, passed away at a local hospital.

On January 10, 2025, at around 1:09 a.m., medical staff at the San Diego Central Jail were performing their routine hourly rounds when they discovered the individual inside his cell exhibiting signs of medical distress. Upon observing the situation, medical staff promptly requested the assistance of deputies. Deputies and medical staff, including a medical doctor, entered the cell to evaluate the man's condition. While being assessed, it was determined he needed to be transported by ambulance to the hospital. During preparation for transport, the man became unresponsive, and CPR was started.

Emergency medical personnel from Falck Ambulance and the San Diego Fire Department arrived and took over life saving measures. Falck Ambulance transported the man to the hospital. Despite their efforts, the individual was later pronounced deceased at the hospital at 4:02 a.m..

This individual had been in custody since July 8, 2024, facing multiple drug-related charges, including Transportation, Sales, and Possession of Controlled Substances. He was placed in the Medical Observation Unit due to chronic medical conditions and his refusal to accept treatment for certain issues.

The identity of the deceased is currently withheld pending family notification. A Sheriff's Family Liaison Officer has been assigned to support the family during this difficult time.

The Citizen's Law Enforcement Review Board (CLERB) has been notified regarding the incident. As part of standard protocol for all in-custody deaths, the Sheriff's Homicide Unit has responded and is leading a thorough investigation. The cause and manner of death will be determined by the Medical Examiner's Office.


Media Contact: Michael Krugh, Lieutenant
michael.krugh@sdsheriff.org
Homicide Unit / 858-285-6330



Investigación de la muerte

Muerte bajo custodia – Cárcel Central de San Diego

El 10 de enero de 2025, alrededor de las 4:10 a.m., los investigadores de homicidios del Alguacil fueron ...s de que un hombre de 68 años bajo custodia del Alguacil falleció en un hospital local.

**Ex. L - 700**

El 10 de enero de 2025, alrededor de la 1:09 a.m., el personal médico de la Cárcel Central de San Diego estaba realizando sus rondas de rutina cada hora cuando descubrieron que el individuo dentro de su celda mostraba signos de angustia médica. Al observar la situación, el personal médico solicitó de inmediato la asistencia de los oficiales. Los oficiales y el personal médico, incluido un médico, ingresaron a la celda para evaluar la condición del hombre. Mientras era evaluado, se determinó que necesitaba ser transportado en ambulancia al hospital. En preparación para el traslado, el hombre dejó de responder y se inició la reanimación cardiopulmonar.

El personal médico de emergencia de Falck Ambulance y el Departamento de Bomberos de San Diego llegó y se hizo cargo de las medidas para salvar vidas. La ambulancia de Falck transportó al hombre al hospital. A pesar de sus esfuerzos, el individuo fue declarado fallecido en el hospital a las 4:02 a.m.

Este individuo había estado bajo custodia desde el 8 de julio de 2024, enfrentando múltiples cargos relacionados con drogas, incluidos Transporte, Ventas y Posesión de Sustancias Controladas. Fue ingresado en la Unidad de Observación Médica debido a sus condiciones médicas crónicas y a su negativa a aceptar tratamiento para ciertos problemas.

La identidad del difunto se mantiene en reserva a la espera de la notificación a la familia. Se ha asignado un oficial de enlace familiar del alguacil para apoyar a la familia durante este momento difícil.

La Junta Ciudadana de Revisión de la Aplicación de la Ley (CLERB, por sus siglas en inglés) ha sido notificada sobre el incidente. Como parte del protocolo estándar para todas las muertes bajo custodia, la Unidad de Homicidios del Alguacil ha respondido y está llevando a cabo una investigación exhaustiva. La causa y la forma de la muerte serán determinadas por la Oficina del Médico Forense.

Para Más Información: Teniente Michael Krugh
michael.krugh@sdsheriff.org
Unidad de Homicidios del Departamento del Alguacil (858) 285-6330

*Return to full list >>*

## SUBSCRIBE

Subscribe to receive updates.

| Email ⌄ |
| Email Address |

SUBMIT

Ex. L - 701

# EXHIBIT M

Addendum:

---

**Shannon Jupena-Garibay RN POSTED ON 11/11/2024 5:21:40 AM PST**                                    Type: RN NOTE

24 Hr Face to Face completed within 24 hrs: yes

Date of Receipt: 11/10

Date of completion: Addressed on 11/10

Chief complaint: "I'm diabetic with extra feet can you please refill a&d ointment for a few weeks

Disposition: MDCC scheduled

Addendum:

---

**Whitley Wells RN POSTED ON 11/13/2024 11:08:51 AM PST**                                    Type: RN NOTE

No 2.0 glasses currently in stock. Informed patient that we could order them for him. He stated that he needed something "for right now." Allowed him to try 1.75. Patient stated that they worked just fine. 1.75 reading glasses given.

Addendum:

---

**Nicholas Kahl NP POSTED ON 11/13/2024 4:01:11 PM PST**                                    Type: NP NOTE

MDCC: Pt requesting refill on A&D ointment

> Vitamin A&D - reordered

Addendum:

---

**Christine Padilla NP (CHP) POSTED ON 11/16/2024 5:41:21 PM PST**                                    Type: NP NOTE

MDCC cc: Please review TCMC urology clinic note 10/22/2024

Offsite Urology f/u referral ordered for procedure bilateral hydrocelectomy, flexible cystoscopy, expedited per urology request.

Addendum:

---

**Patrick Evangelista NP POSTED ON 11/17/2024 11:30:14 AM PST**                                    Type: NP NOTE

11/17 Pending Urology referral

Addendum:

---

**Michelle Mata NP (CHP) POSTED ON 11/17/2024 12:23:00 PM PST**                                    Type: NP NOTE

mdcc: [MDCC: Urology Referral]

recommendation: "Assessment/Plan
1. Acquired hydrocele N43.3
Please authorize for bilateral hydrocelectomy, flexible cystoscopy. Discussed
risks of the procedure including bleeding, infection, pain, recurrence of hydrocele,
need for drain, and any other indicated risks. Patient agreed with the plan was to
proceed at this time.
Please get stat authorization for this as he would like to get this done prior to
leaving facility"

---

CLARK, JAMES HAROLD  100040464 (24730879)                                    **Ex. M - 703**

# EXHIBIT N

***DUNSMORE V. COUNTY OF SAN DIEGO SHERIFF'S DEPARTMENT***
**EXPERT WITNESS DENTAL REPORT OF SCOTT E. REINECKE, D.D.S.**

## Section 1: Experience and Qualifications

I am a regionally licensed general dentist based in Texas.  I have considerable expertise in correctional healthcare, with 30 total years of experience in dentistry.  Specifically, for the past 26 years, I have worked for the University of Texas Medical Branch (UTMB) Offender Health Services Program.  I currently serve as the Region IV Dental Director for Correctional Managed Care and the Youth Health Services Dental Director for the Texas Juvenile Justice Department (TJJD).  I am responsible for ensuring the provision of all dental services for approximately 18,000 adult incarcerated persons in the Texas Department of Criminal Justice (TDCJ) state jails and prisons, as well the delivery of such services to juvenile offenders in TJJD facilities.  I oversee a staff of 50 employees located at 18 correctional facilities throughout the state of Texas.

Before joining UTMB in 1998, and through June 2023, I also owned three private practices around San Antonio, served as a policy development contributor with the Texas Oral Health Coalition, and lectured on dental diagnostics, oral surgery, and pathology.  My curriculum vitae is attached as **Appendix A**.

## Section 2: Materials Reviewed

A list of the documents and materials reviewed in preparation of this report is attached as **Appendix B**.  In addition, the dental records for each SDSO incarcerated person (IP) discussed in this report have been personally reviewed.

A review of Assistant Sheriff Theresa Adams's deposition from April 17, 2024, was completed.  This deposition specifically referenced the timing for treatment, preventive measures (cleanings), and root canals (endodontics), which was one of the referred procedures.  The deposition of Jon Montgomery, M.D., Medical Director for the SDSO, taken on April 24, 2024, was also reviewed.  This deposition addressed the fact that arbitrary delays in care, as demonstrated by root canal therapy, had been resolved.   Dr. Montgomery also stated that NaphCare is reviewing staffing levels, utilization, charting, documentation, and hygiene services.

## Section 3: Overview

The seven facilities of the San Diego Sheriff's Office (SDSO) maintain a process whereby incarcerated persons have ready access to on-site dental care through NaphCare, the SDSO's contracted healthcare provider.  At the time of my visit to the facilities, there were four total dentists, two hygienists, and two dental assistants in place to provide care to approximately 4000 incarcerated persons.  Routine requests for care generally are seen within 7-14 days of sick call receipt.  Urgent and emergent requests are dispositioned within 24 hours by nursing staff and then routed for appropriate treatment, either on site or via the referral process to an external provider.  Services include preventive, restorative, endodontic, fixed and removeable prosthetics, and oral surgery.  These services are part of a comprehensive multi-disciplinary team effort to deliver consistent and meaningful care to the incarcerated population.  Clinic hours are 6:30 AM to 3:00 PM, Monday through Friday, and some dental staff also provide coverage on weekends.  In cases that are deemed outside the realm of standard services, a referral process is in place to ensure that all necessary care is provided in a timely manner.  Two general practice groups and two oral surgery groups are under contract for these referrals.  NaphCare's Dental Director, Dr. Kuntal Pandit, completes monthly chart reviews on every

**Ex. N - 705**

system.   A thorough review of a random selection of dental records provides insight as to the accuracy and completeness of what is being reported by healthcare staff and to validate quality metrics used in the system.

A random review of 10 dental patient records from a pool of 27 was performed across all SDSO facilities.  This sampling approach is likely to have yielded a reasonable representative sample, according to Dr. Jacques Baillargeon, the Director of Epidemiology and Outcomes Research in the Division of Correctional Managed Care and a Senior Epidemiologist in the Office of Biostatistics at UTMB.  Consultation with an epidemiologist regarding sampling methodology is relied upon by experts.

The dental records were reviewed and evaluated in three areas:
- Quality of Documentation
- Quality and Continuity of Care
- Timeliness of Care

Each chart entry was evaluated considering all three factors.  While care may not have been perfect in all instances, the intended review was to determine if fluidity and continuity of care was the norm.  Dental chart reviews can be found in **Appendix C**.


## Section 7: Summary of Findings

Chart audits revealed that while documentation was present, it was typically not comprehensive in nature, nor did it represent a fluid sequence of assessment, diagnosis, and treatment.  This may be a result of a charting system that is not full-spectrum, relies too much on a "check the box" format, or is not user-friendly.  Overall, entries were succinct, but they would benefit from more detail.  Referrals and refusals were documented but would also benefit from more detail.  There were inherent time gaps of approximately 5 to 65 days between triage/screening and definitive diagnosis and/or treatment.  While continuity of care appeared to be documentable, it is difficult to follow.  A referral system is in place, but there is not consistency with transfer or return documents available for each off-site specialty visit.


## Section 8: Quality Assurance

It is imperative that quality monitoring be in place to ensure that dental care being delivered is both timely and appropriate.  Additionally, the dental care must result in the desired health outcome.  Dr. Pandit explained in our interview that he completes monthly chart audits and an annual quality outcome audit on each provider.


## Section 9: Plaintiffs' Allegations

The response for each allegation is as follows:

1. *Jail Defendants maintain insufficient numbers of dental professionals to provide minimally adequate care.*

Response: **FALSE**

Ex. N - 706

# EXHIBIT O

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3    DARRYL DUNSMORE, ANDREE              )
     ANDRADE, ERNEST ARCHULETA,           )
4    JAMES CLARK, ANTHONY EDWARDS,        )
     REANNA LEVY, JOSUE LOPEZ,            )
5    CHRISTOPHER NORWOOD, JESSE           )
     OLIVARES, GUSTAVO SEPULVEDA,         )
6    MICHAEL TAYLOR, and LAURA            )
     ZOERNER, on behalf of themselves     )
7    And all others similarly situated,   )
                                          )
8                    Plaintiffs,          )
                                          )
9         v.                              )
                                          )
10   SAN DIEGO COUNTY SHERIFF'S           )
     DEPARTMENT, COUNTY OF SAN            )
11   DIEGO, SAN DIEGO COUNTY              )
     PROBATION DEPARTMENT, and DOES       )
12   1 to 20, inclusive,                  )
                                          )
13                   Defendants.          )

14   Case No. 3:20-cv-00406-AJB-DDL

15

16          DEPOSITION OF SCOTT E. REINECKE, DDS

17

18               DATE: November 8th, 2024

19               TIME: 9:00 a.m.

20         LOCATION: Via Zoom Video Conference

21

22

23

24

25

Ex. O - 708

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1    assess?

2           A.    I really wasn't given specific guidance on

3    that.  I believe my perspective was to be as fresh as

4    possible.

5           Q.    Did you have any impression about dental

6    care at the San Diego County jails before you were

7    retained in this case?

8           A.    Absolutely not.

9           Q.    So we -- you said you visited facilities

10   and you reviewed charts.  Did you review policies or

11   procedures?

12          A.    I did not.

13          Q.    Why not?

14          A.    They were not provided to me.

15          Q.    Did you ask for them to be provided to you?

16          A.    I did.

17          Q.    Did you review any other documents?

18          A.    Besides charts, you mean?

19          Q.    Correct.  Besides charts.

20          A.    No.

21          Q.    You reviewed the dental schedule that was

22   sent this week that was produced to us earlier today, is

23   that right?

24          A.    Yes.

25          Q.    Is that the first dental schedule that

1      Q.   Yes.

2      A.   Okay.  We are past that by about 20 years.

3   Our ratios were set probably before I was hired.

4        Has there been a change over time?  To be honest

5   with you, I would say we have hovered in the median of

6   expectations over 28 years that I've been here.  There's

7   never been a great change.  And I would chalk that up to

8   experience, if nothing else.

9      Q.   So those ratios that were set before you

10  arrived, what are they?

11     A.   This is approximate.  But I want to say it

12  was one dentist per 5,000 inmates and one hygienist.

13  I'm sorry -- one hygienist per 5,000 and one dentist per

14  2,500.  But, again, that's here -- different system,

15  different circumstances, different health.

16     Q.   So when you say different system, different

17  circumstances, do you mean you do not think the one

18  dentist to 2,500 ratio should apply to San Diego?

19     A.   I'm saying -- well, that's not for me to

20  decide because I don't know enough about their system.

21  It would be a guess.  I mean, I always thought that

22  that's a good starting point, but it's not set in stone.

23     Q.   And when you say one dentist and one

24  hygienist in the current system, are you talking about

25  like one full-time dentist who works 40 hours a week?

**Ex. O - 710**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1    A.   Yes, so we call them FTEs.  You're familiar

2  with that acronym?  Okay.  I call it -- it's an

3  initialism, not an acronym.  Yes, so that's what I'm

4  referring to.

5        So how many inmates are in the San Diego Jail

6  County system?  I forgot.  Is it 6,000?  I'm just asking

7  for reference because I can't remember.

8        Q.   Usually between four and five.

9        A.   Oh, okay.  Got you.  Thank you.

10       Q.   So and FTEs -- why is it important to

11  consider FTEs as part of this calculation?

12       A.   Hours per week of available coverage.  So

13  the standard 40, yeah.  So 1.0 equals 40.

14       Q.   Okay.  So and considering FTEs is important

15  because if you have one person, but they only work one

16  day a week, that's a different.  It's essentially a

17  different ratio, is that what you mean?

18       A.   It's a 0.2 FTE, yes.

19       Q.   Right.  And so it clearly -- I'm just

20  trying to understand.  So an FTE -- talking about FTEs

21  matters because the number of individual humans doesn't

22  necessarily matter if they're not all working every day,

23  for example.

24       MS. COLEMAN:  Objection, vague, incomplete

25  hypothetical.

**Ex. O - 711**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1    THE WITNESS:  That is true, there is one

2    qualification.  And I don't know -- again, comparative

3    analysis here with the facilities in and around San

4    Diego, there is some travel time involved, and that's

5    obviously the case in Texas.

6         So that travel time is part of the 1.0 FTE, when

7    you have one individual going to multiple facilities.

8    So that would be called downtime because obviously you

9    can't treat a patient while you're on the road.

10        That's why I'm saying that the ratios are kind

11   of -- they're kind of a guess, and you can adjust; but

12   when you get down to it, it's a guess.

13        Q.   So on this travel time point, it seems like

14   if you have one person that's expected to go, for

15   example, to two very far apart facilities in the same

16   day, then their travel time sort of deducts from the

17   actual treatment clinical time that they have.  Am I

18   understanding correctly?

19        A.   That's not necessarily true.  And, again, I

20   can't speak to San Diego.  For us, we have what's called

21   a home-work ID, which means if you're paid from a

22   facility, you don't get paid to travel to that facility.

23   So I don't -- I can't speak to how San Diego does it, so

24   I can't answer that.

25        Q.   Let's go back to -- so we were talking

1      But he would say, for example, Dr. Polanco works

2   Monday, Wednesday, Friday, 7:30 to 4, or 7:30 to 5, or

3   something along those lines, right?  And I don't know

4   why I didn't write that here.

5      So, in that discussion, I'm sure I added up the

6   hours of coverage, which is where this came from.

7      Q.   So your understanding of the staffing plan

8   was that there were four FTE dentists at the jail?

9      A.   No, that's incorrect.

10     Q.   So how many FTE dentists did you think were

11  at the jail?

12     A.   At the time of this writing, I honestly

13  don't recall.  I know it was more than one.  It was

14  probably closer to 1.8, which would give us -- remember

15  we discussed earlier the ratio of dentists to patients

16  at 1 to 2,500.  If there's 4,000 inmates inside this

17  system, that's appropriate staffing.

18     Q.   So, 1.8 FTE dentists for this system is

19  the number that you think is appropriate dental

20  staffing?

21     A.   As with any system, more is better.

22     Q.   I'm going to introduce this as Exhibit 6.

23          (Exhibit No. 6 was marked for

24          identification.)

25  BY MS. CHARTOFF:

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1   the San Diego County Jail?

2        A.   When we say 1.8 --

3        MS. COLEMAN:  Object to vague as to time.

4        THE WITNESS:  Sorry.

5        MS. COLEMAN:  Are we still talking about the

6   time when he visited or just generally?

7   BY MS. CHARTOFF:

8        Q.   Does it change --

9        A.   The times --

10       Q.   You can tell us your question.

11       A.   Yeah, at the time that I visited, and

12  again, it's based on memory, because I literally don't

13  know exactly.  But I would say 1.8 would be an

14  appropriate staffing of a dentist to that population --

15  1.8 FTE.

16       Q.   I'm going to introduce as Exhibit 6, the

17  dentist staffing plan schedule that you shared this

18  morning.  And you previously testified, this is the

19  first schedule -- written schedule, you have seen?

20       A.   Yes.

21       Q.   Okay.  And how many FTE dentists appear in

22  this schedule?

23       A.   This appears to be 1.4 FTE, and I do not

24  see Dr. Patel on here, so I don't know if maybe she's

25  not working there.

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1      Q.   So your understanding -- I know you're just

2   looking at this for the first time, but this 1.4

3   dentist -- excuse me -- FTEs, that's lower than the 1.8

4   dentist FTEs that we just spoke about as being

5   sufficient.  So does this change your opinion on whether

6   dentist staffing is sufficient at the San Diego County

7   Jail?

8      A.   No, it does not, because this is simply one

9   week in a given month.  So I would have to look at an

10   expanded window, at least one month, to determine an

11   actual FTE allocation.

12      Q.   Did you ask for staffing plans reflecting a

13   month?

14      A.   I did not.

15      Q.   And in your report -- just a moment.

16      In your opinion, I want to ask about the role of

17   dental assistants now.  So what does a dental assistant

18   do generally?

19      A.   That's going to add some time, so I'm going

20   to try to abbreviate as best as possible.

21      They do everything, with the exception of the

22   delivery of direct dental care, because legally they

23   cannot.  So some things -- they assist the dentist,

24   obviously; chairside procedures; take radiographs; set

25   up and take down instrumentation; sterilize instruments

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1    So I saw evidence of referrals and it may have not been

2    for crown and bridge.  It may have been for endo, which

3    is root canal or prosthodontics, which is dentures.  But

4    I did see evidence of referrals being entered and taking

5    place.

6         Q.   But you can't recall at this moment,

7    whether any of the referrals you reviewed were actually

8    for crown and bridge?

9         MS. COLEMAN:  Objection, vague.  Do you mean the

10   charts you reviewed?  Because you said referrals.

11   BY MS. CHARTOFF:

12        Q.   You can still answer, Doctor.

13        A.   So referrals, I don't recall.  No.

14        Q.   And did you do anything else to verify

15   Dr. Pandit's statement that those services are provided?

16        A.   Besides looking at charts?  No.

17        Q.   Okay.  Because you didn't look -- you

18   didn't have an opportunity to look at the policies and

19   procedures, right?

20        A.   Correct.

21        Q.   And did you see any evidence of periodontal

22   diagnosis being done at the jail?

23        A.   Yes.

24        Q.   What evidence did you see of that?

25        A.   I saw it in the charting in the odontogram

**Ex. O - 716**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1   for me to comment.

2   BY MS. CHARTOFF:

3           Q.   So, based on this document, you're not able

4   to comment on whether the staffing -- dental staffing at

5   the jail, more broadly, is adequate?

6           A.   That is correct.

7           Q.   So I want to talk about quality assurance

8   now.  We spoke hours and hours ago now, it seems, about

9   the quality assurance processes that are employed at the

10  UTMB-CMC system.  Are those all necessary quality

11  assurance processes in your view?

12          A.   Yes.

13          Q.   And that's -- just to go back through them,

14  those are site audits and chart audits and peer review

15  and monthly reports on timeliness.  And is there

16  anything else I'm missing that you think is a necessary

17  quality assurance process?

18          A.   Okay.  So both questions, yes, I think that

19  that's necessary.  And second, I don't think there's

20  anything missing.

21          Q.   And turning to San Diego, your opinion is,

22  as I understand it, is that the quality monitoring at

23  the San Diego County Jail facilities is appropriate,

24  correct?

25          A.   My response was based on what Dr. Pandit

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

```
 1   told me, because I did not see any evidence of that.  So

 2   he reported he did annual reviews.  If that's true, then

 3   that's a component.

 4        And, again, you can't really compare what we do

 5   here to what they do there, but that's a component.  So

 6   if that's true, it could be considered adequate if it's

 7   comprehensive enough.

 8        Q.   And did you ask to see those documents?

 9        A.   I did not.

10        Q.   And I want to talk about records management

11   also.  I'm looking for the section in the report, the

12   report you provided today to direct you to.  Is your

13   opinion -- so actually I'll just direct now I finally

14   found the page.  Thanks for bearing with me.  I'm on

15   page 13, PDF page 13.

16        A.   Okay.  I don't have a page 13, do I?  Do I

17   have a 13?  Oh, I do.  Okay.  Hold on.  13 -- 16.

18        Q.   The paragraph below, it says, "Summary of

19   Findings," right above "Section 4, Quality Assurance".

20        A.   Got it.

21        Q.   Start at the second sentence, which starts

22   at the very end of line 2.  "This may be a result of a

23   charting system that is not full spectrum, relies too

24   much on a check-the-box format, or is not user

25   friendly."
```

**Ex. O - 718**

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1          Q.   Makes sense.  So more narrative format

2    writing for the dentist to do?

3          A.   In my opinion, yes.

4          Q.   And how would a better charting system,

5    more interactive or more narrative, how would that help

6    in your opinion?

7          A.   It would enhance the descriptive nature of

8    the patient interactions.  You know, the written word is

9    a good thing when used appropriately.

10         And when you rely on the boxes, you're limited.

11   There's four boxes.  You're limited to four boxes.

12   Whereas with adjectives and adverbs, you can expand on

13   what you see and your differential diagnostics.  It's an

14   enhanced way for you to document a patient interaction.

15         Q.   We talked about records management.  Is

16   there something that maybe could be improved?  Is there,

17   as you sit here today, is there anything else that you

18   think the San Diego Jail's dental care system could

19   improve on?

20         A.   I would like to know where they are right

21   now.  Obviously, my visit was a long time ago and I know

22   that there have been some improvements in staffing and

23   then also in other departments, significantly, actually,

24   in some of the other departments.

25         I would like to know where they are right now.

Ex. O - 719

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

1    I would -- I mean, definitively, I think an expanded

2    policy manual would be very helpful.  Just from a

3    documentation standpoint, kind of exploding that a

4    little bit, like we just talked about.

5         We don't rely on that box check system.  It gets

6    things done faster, but it's not necessarily as good as

7    just writing.

8         We touched on equipment earlier, and if they do

9    still have equipment that is down, I'd like to know if

10   it's been repaired or replaced, ideally.  That's all

11   that comes to mind right now.

12        Q.   You referred to improvements in staffing

13   and in other departments.  What do you mean improvements

14   in other departments?

15        A.   I overheard a conversation about -- and I

16   couldn't even begin to tell you the specifics, but that

17   there has been a drastic improvement in, I believe it

18   was medical.  But like I said, I was listening to other

19   people talking.  So I just heard him say, it's much

20   better.  This was planned and it's been implemented.

21   It's much better.  That's what I heard, basically.

22        Q.   And that was while you were doing your site

23   inspections, that conversation you're referring to?

24        A.   No, no.  This was recent and I couldn't

25   even tell you where I was.

```
1           Q.   So since you've submitted your report --

2           A.   Yes.

3           Q.   -- the conversation --

4           A.   I'm sorry.  I didn't mean to answer before

5    you were finished.

6           Q.   All good.  Getting to the end of the day.

7    I know how it gets.

8           So based on conversations that you've had since

9    August 21st, and I won't press you to remember who

10   they're with, you have heard there have been

11   improvements in staffing and other departments?

12          A.   I would say that's loosely accurate, yes.

13   I'm not 100 percent sure if it was just staffing --

14          Q.   Okay.

15          A.   -- that contributed.

16          Q.   If you had a magic wand and you could fix

17   something with regard to dental care at the San Diego

18   County Jail system right now, what would be your top

19   priority?

20          A.   If I had a magic wand, I would be the

21   onsite director.

22          Q.   What would you do in that role?

23          A.   Everything we've talked about today.

24   Starting with a policy manual to make sure that

25   everything was addressed and that there was essentially
```

SCOTT E. REINECKE, DDS
NOVEMBER 08, 2024

JOB NO. 1220598

 1  policy and procedures in place so that everybody could

 2  easily follow along, maintain the quality assurance

 3  program.

 4         I mean, I'd have to comprehensively review it to

 5  see exactly what's happening and then assess what was

 6  good or what needed to be improved; assess all the

 7  equipment; assess staffing, of course.

 8         But, yeah, top to down -- top to bottom, you

 9  can't -- I mean, look at it as a CEO going to another

10  company.  You really look at a top-down type of

11  assessment of all processes to figure out what's working

12  well and what needs to be improved, and based on my

13  experience, what could I bring?  You know how that

14  process works.  So that's why I say that answer.  I feel

15  my experience is strong enough.

16         Q.   And who's currently the onsite dental

17  director?

18         A.   Well, there isn't an onsite dental

19  director.  Dr. Pandit is -- I don't even think he's in

20  California.  I don't think.  I'm not 100 percent sure.

21  But it wouldn't have to be him, it's just that somebody

22  should be -- I mean, I would say Dr. Polanco is the

23  senior, I'm guessing.

24         Q.   But -- so Dr. Polanco is a practicing

25  dentist at present?

**Ex. O - 722**

```
 1              REPORTER'S CERTIFICATION

 2         I, Katherine Lenti, Certified Shorthand Reporter and

 3   Notary Public for the State of Illinois, do hereby certify

 4   the following:

 5         That the foregoing is a correct transcript of

 6   the digitally-recorded audio of the deposition of

 7   SCOTT REINECKE, DDS, in the above-entitled matter;

 8         That the amount of time used by each party at the

 9   deposition is as follows:

10         Ms. Hannah Chartoff      - 04:45
           Ms. Susan Coleman        - 00:00
11         Mr. Aaron Fischer        - 00:00

12           That pursuant to information given to the

13   deposition officer at the time said testimony was taken,

14   the following includes all parties of record.

15           I further certify that I am neither counsel for,

16   related to, nor employed by any of the parties or attorneys

17   in the action in which this proceeding was taken, and

18   further that I am not financially or otherwise interested

19   in the outcome of the action.

20           Certified to by me this 9th day of December, 2024.

21

22   _____

23   KATHERINE LENTI
     Illinois CSR 084.004958
     Expiration Date:  05/31/25
24   Steno Agency
     Concierge@steno.com
25   (888) 707-8366
```

**Ex. O - 723**

# EXHIBIT P

1              UNITED STATES DISTRICT COURT

2                        FOR THE

3              SOUTHERN DISTRICT OF CALIFORNIA

4
    DARRYL DUNSMORE, et al.          )
5                                    )
              Plaintiff,             )   CONTAINS CONFIDENTIAL
6                                    )   PORTIONS
    vs.                              )
7                                    )   Case No.
    SAN DIEGO COUNTY SHERIFF'S       )   3:20-CV-00406-AJB-DDL
8   DEPARTMENT, et al.               )
                                     )
9              Defendants.           )
    _____ )
10

11

12

13

14          DEPOSITION OF DR. PETER JAY FREEDLAND

15                 SAN DIEGO, CALIFORNIA

16                    June 12, 2024

17

18

19   REPORTED BY:   MICHELLE NEUENSWANDER, CSR
                    Certified Shorthand Reporter
20                  License No. 12508

21

22

23

24

25

Ex. P - 725

1       A.    Okay.

2       Q.    -- on the record in court criticizing the

3    capabilities of TechCare, and so I'm asking whether you

4    have any critiques of TechCare?

5       A.    I have not heard of county council critiquing

6    TechCare.  I think there's a lot of good medical EMRs

7    out there that could potentially benefit the system more

8    so than TechCare.

9       Q.    And what have you encountered as far as

10   challenges with TechCare?

11      A.    As the physician, TechCare is very -- I'm not

12   sure how it was created.  There is a not a lot of ease

13   of use.  You have to hand type a chart in, like, I mean

14   literally type in, unless you create a template to make

15   your chart easier.

16          It just -- from a physician perspective --

17   I've had a lot of physicians say, can we put a dictation

18   system in.  It just seems -- there's a burden, for

19   whatever reason, and I'm not a tech kind of guy, but as

20   a physician, I felt like there was a lot of typing to

21   do; whereas, an emergency department, or even other

22   offices, there was more templates that were -- not that

23   the templates weren't an avoidance to not document.

24          But it seems like the core things.  Like if

25   they have chest pain, there would be an algorithm to

1   where that's what I would like to have happen.

2   BY MS. GRUNFELD:

3       Q.   There's this thing called StatCare.  You're

4   aware of that, right?

5            Does CHP have any oversight currently over the

6   StatCare providers?

7       A.   We do not.

8       Q.   Does CHP interact with those providers?

9            MS. COLEMAN:  Objection.  Vague.

10           THE WITNESS:  I don't know.

11  BY MS. GRUNFELD:

12      Q.   Would Dr. Rafi know that?

13           MR. DAILEY:  Objection.  Calls for

14  speculation.

15           THE WITNESS:  I don't know.  I -- it's not

16  that there isn't -- I just don't know if StatCare does

17  something -- we tell a nurse and then the nurse -- I

18  believe it's a nurse-to-nurse system --

19           MR. DAILEY:  If you don't know, you don't

20  know.

21           THE WITNESS:  I don't know.

22  BY MS. GRUNFELD:

23      Q.   You don't know anything about who it is or

24  what it is or what -- what are you saying?

25      A.   They're --

DR. PETER JAY FREEDLAND
JUNE 12, 2024

JOB NO. 1016621

```
 1              REPORTER'S CERTIFICATION

 2

 3        I, Michelle Neuenswander, do hereby certify:

 4   That I am a licensed Certified Shorthand Reporter, duly

 5   qualified and certified as such by the State of

 6   California.

 7        That prior to being examined, the witness named in

 8   the foregoing deposition was duly sworn to testify under

 9   oath.

10        That the preceding deposition was recorded

11   stenographically by me at the time and place herein

12   mentioned; and that the preceding pages constitute a

13   complete and accurate record of the testimony given by

14   the aforementioned witness.

15        That I am a neutral party, in no way interested in

16   the outcome of said action, and that I am not related to

17   or otherwise connected with any of the parties involved

18   with this matter or their respective counsel.

19        DATED:  June 13th, 2024.

20

21

22        _Michelle Neuenswander_

23        Michelle Neuenswander, CSR No. 12508

24

25
```

Ex. P - 728

# EXHIBIT Q

```
 1              UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2                3:20-CV-00406-AJB-DDL

 3                     - - -

 4
    DARRYL DUNSMORE, ANDREE ANDRADE, :
 5  ERNEST ARCHULETA, JAMES CLARK,   :
    ANTHONY EDWARDS, REANNA LEVY,    :
 6  JOSUE LOPEZ, CHRISTOPHER NORWOOD,:
    JESSE OLIVARES, GUSTAVO          :
 7  SEPULVEDA, MICHAEL TAYLOR, and   :
    LAURA ZOERNER, on behalf of      :
 8  themselves and all others        :
    similarly situated,              :
 9                                   :
           Plaintiffs,               :
10                                   :
           vs.                       :
11                                   :
    SAN DIEGO COUNTY SHERIFF'S       :
12  DEPARTMENT, COUNTY OF SAN DIEGO, :
    SAN DIEGO COUNTY PROBATION       :
13  DEPARTMENT, and DOES 1 TO 20,    :
    inclusive,                       :
14                                   :
           Defendants.               :
15  _____

16     DEPOSITION OF OWEN J. MURRAY, D.O., MBA
    _____
17
    DATE TAKEN:       Tuesday, November 12, 2024
18
    TIME BEGAN:       9:12 a.m. Pacific
19
    TIME ENDED:       5:31 p.m. Pacific
20
    LOCATION:         Conducted via videoconference
21

22  REPORTED BY:      Cherie J. Anderson, RMR, RPR, CRR
                      Steno
23                    315 West 9th Street, Suite 807
                      Los Angeles, CA  90015
24                    (310) 573-8380
                      NV FIRM# 108F
25
```

**Ex. Q - 730**

 1    "problematic."

 2         Go ahead.

 3    A    I guess, you know, it's not uncommon.  I've

 4  seen it in other jails and other state prison

 5  systems.  And so I think it adds a higher degree of

 6  complexity when you've got three different groups

 7  each providing service.  And, as I said, I think

 8  hopefully what ties all of them together is the new

 9  set of policies and procedures that the County is

10  going to say that this is how we function as a group.

11         But, as I said, I've seen this; and, other

12  than some additional complexity, you know, I don't

13  necessarily have a problem with it.

14    Q    Have you seen an organizational chart for the

15  jail as -- for the jail medical services -- for the

16  jail's medical system as currently constituted?

17    A    I don't -- I don't remember if I saw a chart.

18  Maybe I did if one exists.

19    Q    With your understanding of the system, who

20  is -- who is in charge of the system right now?

21    A    Well, my -- my take would be the County is in

22  charge of the system:  Dr. Montgomery and -- and his

23  group as well as the County officials who are

24  monitoring these contracts.

25    Q    And that's because the County is contracting

1  with NaphCare and CHP.  Is that right?

2      A    Correct.

3      Q    Does that mean Dr. Freedland reports to

4  Dr. Montgomery?

5      A    I don't know -- I'm not sure how I would see

6  that in a reporting relationship.  I guess I would

7  see that more from an entity perspective.  And I

8  would see -- as I said, I -- I don't see him

9  necessarily reporting because he doesn't necessarily

10  have a chain of command to him, but -- but, as I

11  said, I think ultimately the County has

12  responsibilities to both parties.

13          And, whether that's Dr. Montgomery or other

14  contracting entities, I don't know what that looks

15  like, but -- but, as I said, ultimately, the County

16  is responsible.

17      Q    Did you talk to Dr. Montgomery in the course

18  of your review?

19      A    I did.

20      Q    How long did you talk to him for?

21      A    He's got maybe an hour and a half or two

22  hours.

23      Q    And was that with your whole group there?

24      A    It was, but not everyone -- it was only myself

25  that went in and spoke with him.  It was only me.

1    I'm sorry.

2       Q    I'm sorry.  I didn't quite understand that.

3       A    No.

4       Q    [Inaudible].

5       A    That was it.

6       Q    It was just you and Dr. Montgomery in a room?

7       A    Yeah.  Correct.  It was just me and

8    Montgomery.

9            MS. COLEMAN:  Dr. Murray, he's trying to get

10     you to speak one at a time.

11      Q    You just said a few moments ago that clear

12   reporting structures are important.  Right?

13      A    Correct.

14      Q    Who do the STATCare providers report to?

15      A    They report to -- through NaphCare.

16      Q    So they do not have a reporting structure that

17   is within the jail.  Is that right?

18      A    I guess to the extent NaphCare is in the jail,

19   I mean, I don't know.  What do you mean by "in the

20   jail"?

21      Q    Well, who exactly do they report to?  They

22   report to a STATCare supervisor or to a NaphCare

23   supervisor within the jail?

24      A    I thought STATCare was NaphCare.

25      Q    I believe it's a part of -- it's a part of

Ex. Q - 733

OWEN J. MURRAY, D.O., MBA
NOVEMBER 12, 2024

JOB NO. 1220572

1    NaphCare.  Right?

2    A    Yes.  I guess I didn't really see the

3    difference between -- I thought STATCare was

4    something NaphCare was providing as -- as part of

5    NaphCare's services.

6    Q    Well, why don't you describe for me your

7    understanding of what STATCare is.

8    A    To me, it's a -- kind of a telehealth,

9    telemedicine, telephonic triage group of midlevel

10   providers that I think primary goal was to ensure

11   medication continuity when patients came through the

12   jail.  And that -- that I thought they were --

13   whether they were a subsidiary or owned by NaphCare

14   or run by NaphCare, as I said, I just assumed that

15   they were part of NaphCare.  I didn't realize --

16   Q    They're not located in the jail.  Right?

17   A    No.  No.  No.  They're off-site.

18   Q    Do you know if the STATCare providers who

19   provide services to the San Diego County Jail only

20   provide services to the San Diego County Jail?

21   A    I don't know.  As I said, I didn't do any

22   research into STATCare specifically.

23   Q    Let's talk a little bit about staffing.  Okay?

24   We talked about it a little bit with the CHP

25   contract, but let's do some more.

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1                        CERTIFICATE OF REPORTER

2

3              I, Cherie J. Anderson, Registered Merit
   Reporter, Registered Professional Reporter, Certified
4  Realtime Reporter, and Notary Public for the State of
   North Carolina at Large, do hereby certify:
5              That the foregoing deposition was taken
   remotely before me on the date and at the time and
6  location stated on page 1 of this transcript; that the
   deponent was duly sworn to testify to the truth, the
7  whole truth, and nothing but the truth; that the
   testimony of the deponent and all objections made at
8  the time of the examination were recorded
   stenographically by me and were thereafter
9  transcribed; that the foregoing deposition as typed is
   a true, accurate, and complete record of the testimony
10 of the deponent and of all objections made at the time
   of the examination to the best of my ability.
11             I further certify that I am neither related
   to nor counsel for any party to the cause pending or
12 interested in the events thereof.
               Witness my hand, I have hereunto affixed my
13 official seal on this 12th day of November 2024, at
   Wilmington, New Hanover County, North Carolina.

14

15

16

17

18

19

20

21

22                        _____
                          Cherie J. Anderson, RMR, CRR
23                        My Commission expires
                          December 22, 2026
24

25

Ex. Q - 735

# EXHIBIT R

```
 1              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2                  3:20-cv-00406-AJB-DDL

 3                       - - -

 4
    DARRYL DUNSMORE, ANDREE ANDRADE, :
 5  ERNEST ARCHULETA, JAMES CLARK,   :
    ANTHONY EDWARDS, REANNA LEVY,    :
 6  JOSUE LOPEZ, CHRISTOPHER NORWOOD,:
    JESSE OLIVARES, GUSTAVO          :
 7  SEPULVEDA, MICHAEL TAYLOR, and   :
    LAURA ZOERNER, on behalf of      :
 8  themselves and all others        :
    similarly situated,              :
 9                                   :
            Plaintiffs,              :
10                                   :
           vs.                       :
11                                   :
    SAN DIEGO COUNTY SHERIFF'S       :
12  DEPARTMENT, COUNTY OF SAN DIEGO, :
    SAN DIEGO COUNTY PROBATION       :
13  DEPARTMENT, and DOES 1 TO 20,    :
    inclusive,                       :
14                                   :
            Defendants.              :
15  _____

16      DEPOSITION OF HENRIETTA L. PETERS
    _____
17
    DATE TAKEN:        Wednesday, October 30, 2024
18
    TIME BEGAN:        9:03 a.m. Pacific
19
    TIME ENDED:        5:21 p.m. Pacific
20
    LOCATION:          Conducted via videoconference
21

22  REPORTED BY:       Cherie J. Anderson, RMR, RPR, CRR
                       Steno
23                     315 West 9th Street, Suite 807
                       Los Angeles, CA  90015
24                     (310) 573-8380
                       NV FIRM# 108F
25
```

Ex. R - 737

10:41:07  1  relates to EHS.

10:41:16  2      Q    Okay.  And, so by February 23rd, would you

10:41:20  3  say that you had agreed by that point to do that type

10:41:26  4  of independent consulting work for San Diego County?

10:41:32  5      A    Yes, sir.

10:41:32  6      Q    Okay.  And then what did you do, and what

10:41:37  7  was -- what were the next steps after

10:41:40  8  February 23rd?  What were you asked to do?

10:41:46  9      A    Do a site visit, come to San Diego to do a

10:41:49 10  site visit to look at the facilities and give

10:41:52 11  recommendations on ways that they could improve some

10:41:56 12  of the concerns that were addressed.  So I was

10:42:04 13  escorted throughout each one of the facilities and

10:42:08 14  various areas.

10:42:10 15          I didn't know where the previous expert

10:42:15 16  witness had went for the plaintiffs' side, so we

10:42:19 17  looked at -- they said, well, she did come in this

10:42:22 18  area, and then I looked in other areas.  So it wasn't

10:42:25 19  just -- I didn't follow the other individual's path,

10:42:28 20  but we looked at some of those areas, and I looked at

10:42:31 21  various other areas that I thought was important.

10:42:35 22      Q    I'm going to -- and we'll get into the details

10:42:38 23  of those inspections in a bit, but I first just want

10:42:41 24  to ask some more questions in general about the

10:42:46 25  nature of your work at the time.

**Ex. R - 738**

10:42:51  1        So you were asked to do those inspections; you

10:42:53  2   did those inspections.

10:42:55  3        What -- what happened after those inspections?

10:42:57  4   What were you asked to do next?

10:43:00  5     A   I put together some things that I felt that

10:43:03  6   they would need:  training, information, standards or

10:43:12  7   protocols as it relates to an area with barbershops.

10:43:18  8   If I felt like that, oh, yeah, you did a good job

10:43:20  9   here, but there could be some reinforced training,

10:43:23 10   here's some training that's available either free,

10:43:25 11   for a charge, either -- here's a PowerPoint

10:43:28 12   presentation that you could include; there are some

10:43:33 13   documents that you can make sure that your IP

10:43:37 14   barbers -- make sure that they remember.

10:43:40 15        Just items that either reinforce training,

10:43:45 16   additional documents.

10:43:49 17     Q   Did you send -- I'll just start with

10:43:51 18   documents.  Did you send any documents to anyone in

10:43:58 19   connection with those recommendations?

10:44:00 20     A   I sent it to the attorney.

10:44:04 21     Q   And when you say "the attorney," who are you

10:44:06 22   referring to?

10:44:07 23     A   Oh, sorry.  The attorneys for the defense.  Is

10:44:12 24   that a good way -- or do I need to state the name

10:44:15 25   each time?  The defense.

11:06:11  1      Q   Okay.  And, when you provided recommendations

11:06:16  2   to the jail, did that have anything to do with this

11:06:20  3   litigation or was that just about being a consultant

11:06:26  4   to help the jail improve conditions?

11:06:31  5      A   I thought it was as -- to improve the

11:06:34  6   conditions in the jail and you give them an insight

11:06:37  7   of how to correct some things --

11:06:39  8      Q   Okay.

11:06:43  9      A   -- that may have stemmed from the litigation.

11:06:46  10     Q   Understood.  And you mentioned that you sent

11:06:48  11  in documents in relation to that.  Right?  You

11:06:54  12  uploaded some documents with the intention of those

11:06:57  13  going to correctional staff in order to help them

11:07:02  14  improve some of the environmental health conditions

11:07:05  15  you had observed.  Is that correct?

11:07:06  16     A   That is correct.

11:07:07  17     Q   Okay.  Thank you.  Before this case or before

11:07:14  18  this -- you were retained in connection with this

11:07:17  19  work, had you had any interactions with San Diego

11:07:20  20  County before?

11:07:22  21     A   No.  I just moved to this side of the -- of

11:07:26  22  the country in 2021.  So I really have never been to

11:07:32  23  San Diego.

11:07:34  24     Q   Until those inspections?

11:07:35  25     A   Yes.

HENRIETTA L. PETERS
OCTOBER 30, 2024

JOB NO. 1258427

| | | |
|---|---|---|
| 11:07:35 | 1 | Q    Okay.  Have you been to San Diego since those |
| 11:07:37 | 2 | inspections or is that the only time? |
| 11:07:40 | 3 | A    That's the only time.  I was going to give |
| 11:07:42 | 4 | them enough time to do some corrective actions, |
| 11:07:44 | 5 | implement some procedures, and then do some |
| 11:07:47 | 6 | follow-ups afterwards. |
| 11:07:48 | 7 | Q    Do you plan to do follow-ups still? |
| 11:07:51 | 8 | A    Yes. |
| 11:07:52 | 9 | Q    Okay.  And what would be the purpose of those |
| 11:07:58 | 10 | follow-ups? |
| 11:08:00 | 11 | A    To provide assistance as a consultant to make |
| 11:08:03 | 12 | sure that they understand -- it was my understanding |
| 11:08:08 | 13 | that there was a position maybe at one point in time, |
| 11:08:11 | 14 | and a person may have retired.  And so just giving an |
| 11:08:18 | 15 | outsider view of verifying if they're on the right |
| 11:08:22 | 16 | track, what I call "fresh eyes." |
| 11:08:26 | 17 | Because sometimes it's good to have another |
| 11:08:28 | 18 | person to come in, even if -- I would always invite |
| 11:08:33 | 19 | someone else in.  That's why OSHA comes in to see |
| 11:08:35 | 20 | things that maybe I have seen so many times that I |
| 11:08:39 | 21 | overlook.  And so I always think of it as fresh eyes |
| 11:08:42 | 22 | when you come in to help them to say, yeah, you're on |
| 11:08:44 | 23 | the right track or, hey, let's pivot this way and |
| 11:08:47 | 24 | make it better. |
| 11:08:48 | 25 | Q    And would you -- let's say this litigation |

11:08:53  1    settled tomorrow.  Would you still -- and so there

11:09:00  2    was no litigation.  Would you still go do that, plan

11:09:04  3    to do those follow-up inspections?

11:09:06  4         A    If it was requested of me, yes.

11:09:08  5         Q    Okay.

11:09:09  6         A    I -- I left an open door for them to contact

11:09:15  7    me if they would like to, you know --

11:09:18  8         Q    Okay.

11:09:18  9         A    -- ask questions.

11:09:19  10        Q    Okay.  But there's not any -- those aren't

11:09:23  11   planned at the moment?

11:09:23  12        A    No.

11:09:24  13        Q    Okay.  When was the last time that you made a

11:09:30  14   recommendation that was intended to, you know, assist

11:09:39  15   San Diego County in their environmental health and

11:09:42  16   safety conditions?

11:09:46  17        A    Can I look at my email again?

11:09:47  18        Q    Well, before you do -- yeah.  So, before you

11:09:50  19   do, is it -- can you just describe in general what

11:09:53  20   you're thinking of?  Are you thinking of an email

11:09:56  21   where you said, hey, I just thought you should do

11:09:58  22   this thing or --

11:09:59  23        A    Yes.  I gave labeling recommendations.  They

11:10:03  24   asked me some questions about, hey, we wanted to see

11:10:07  25   how we would go forward on getting some labeling for

| | | |
|---|---|---|
| 11:10:10 | 1 | secondary containers -- |
| 11:10:13 | 2 | Q   Uh-huh. |
| 11:10:13 | 3 | A   -- to keep in compliance with the global |
| 11:10:15 | 4 | harmonized system. |
| 11:10:19 | 5 | Q   Okay. |
| 11:10:20 | 6 | A   And so I gave some recommendations. |
| 11:10:22 | 7 | Q   Okay.  Then, yes, please check your email and |
| 11:10:25 | 8 | just give me some details on what you're looking at. |
| 11:10:28 | 9 | Please just let me know the date of that email that |
| 11:10:32 | 10 | included that recommendation. |
| 11:10:42 | 11 | A   May 16th. |
| 11:10:43 | 12 | Q   May 16th.  Okay.  So what do you consider |
| 11:11:18 | 13 | your area of expertise? |
| 11:11:28 | 14 | A   Other than a general overview of environmental |
| 11:11:31 | 15 | health and safety -- are you asking me what specific |
| 11:11:33 | 16 | area of environmental health and safety or are you |
| 11:11:36 | 17 | just saying -- I'm not -- |
| 11:11:39 | 18 | Q   Do you consider yourself an expert in the |
| 11:11:41 | 19 | general area of environmental health and safety? |
| 11:11:43 | 20 | A   Yes, sir. |
| 11:11:44 | 21 | Q   Okay.  I'll leave that there for now.  So do |
| 11:11:53 | 22 | you understand that you've been retained as an expert |
| 11:11:58 | 23 | witness in connection with this litigation?  And by |
| 11:12:01 | 24 | "this litigation," I mean the Dunsmore v. San Diego |
| 11:12:05 | 25 | County case. |

| | | |
|---|---|---|
| 14:07:27 | 1 | "deliberately indifferent." |
| 14:07:30 | 2 | They weren't doing it -- I didn't see anyone |
| 14:07:34 | 3 | preventing offenders from having the items that they |
| 14:07:38 | 4 | needed to clean, have clean clothes, sanitary items |
| 14:07:45 | 5 | for females.  They had everything that they would |
| 14:07:48 | 6 | need or had opportunity to ask for it. |
| 14:07:55 | 7 | There was no locked areas where chemicals were |
| 14:07:58 | 8 | stored that the offenders couldn't get what they |
| 14:08:01 | 9 | needed.  There were chemicals provided to them.  Now, |
| 14:08:04 | 10 | was it always in the right containers?  No.  And I |
| 14:08:08 | 11 | did make those statements. |
| 14:08:11 | 12 | They were given items -- cleaning items -- |
| 14:08:15 | 13 | clean clothes on a regular basis.  If they needed |
| 14:08:19 | 14 | additional items, there were procedures in place for |
| 14:08:22 | 15 | them to get that. |
| 14:08:25 | 16 | People that were the HSAT and culinary workers |
| 14:08:29 | 17 | were given a daily exchange of clothes. |
| 14:08:35 | 18 | The laundry service was adequate to the point |
| 14:08:39 | 19 | where they were doing clothing exchanges every day |
| 14:08:45 | 20 | almost to the point where they had -- you know, that |
| 14:08:47 | 21 | truck was moving constantly. |
| 14:08:49 | 22 | I just -- there was no deliberate exclusion of |
| 14:08:59 | 23 | them getting the items that they needed. |
| 14:09:01 | 24 | Q   Okay.  So deliberate indifference is when |
| 14:09:05 | 25 | staff purposefully prevent -- |

14:27:08  1    And you mentioned this before, but you recommend here

14:27:10  2    that that program be expanded beyond Central and

14:27:14  3    George Bailey.

14:27:20  4         Did you discuss that recommendation with staff

14:27:22  5    at the time of your inspections?

14:27:23  6      A    Yes.

14:27:23  7      Q    You did.  And who specifically did you make

14:27:25  8    that recommendation to, if you remember?

14:27:31  9      A    So I was walking around with Amanda, and, like

14:27:33  10   I said, she was taking notes, and she was the point

14:27:35  11   of contact that would refer the information back to

14:27:40  12   San Diego County Sheriff's.  That's their in-house

14:27:43  13   legal representation.

14:27:44  14     Q    Okay.  So you recommended to Amanda

14:27:48  15   Kamphoefner?

14:27:50  16     A    Yeah.

14:27:50  17     Q    That the HSAT program be extended beyond

14:27:57  18   Central and George Bailey?

14:27:59  19     A    Well, I suggested that she suggest that to the

14:28:01  20   Sheriff's Department.

14:28:05  21     Q    Has the HSAT program been extended to

14:28:08  22   facilities other than Central and George Bailey since

14:28:11  23   that time?

14:28:12  24     A    Not that I'm aware.  I just do my

14:28:14  25   recommendations; I don't actually implement any

14:28:19   1    corrective actions.

14:28:23   2        Q    By the time you filed your expert report on

14:28:27   3    August 21st, had you done anything to follow up

14:28:30   4    on -- to see if that recommendation had been

14:28:32   5    implemented?

14:28:32   6        A    No.

14:28:33   7        Q    Okay.  And then I'm going to move down from

14:28:35   8    there to garbage compacter areas.  A similar question

14:28:49   9    here -- actually, I'd like to start -- you said the

14:28:52  10    garbage compacter areas should receive a more

14:28:55  11    detailed cleaning.

14:28:56  12        Which garbage compacter areas were -- did

14:28:59  13    you -- sorry.  Which garbage compacter areas did you

14:29:03  14    observe that should receive a more detailed cleaning?

14:29:11  15        A    I'm sorry.  I'm going to my notes.  So the

14:29:14  16    Central Jail compacter is emptied once a month --

14:29:21  17    Monday, Wednesday, Friday.  Excuse me.  And the one

14:29:26  18    at Vista is emptied three times a week, also.

14:29:30  19        It was the one at George Bailey on the

14:29:36  20    outside.  But when I suggest something, I suggest it

14:29:42  21    to all of them.  When they're all removed, the

14:29:49  22    garbage compacter, they should take time to clean up

14:29:52  23    underneath them to prevent pests and vermin from --

14:30:00  24    because trash gets caught up underneath it.

14:30:02  25        So, if I saw it at one, I just suggested it

| | | |
|---|---|---|
| 14:30:06 | 1 | for all of them. |
| 14:30:06 | 2 |     Q   Why is it important not to -- not to attract |
| 14:30:11 | 3 | pests and vermin to a correctional facility? |
| 14:30:16 | 4 |     A   We always say deny, deny, deny.  Deny them |
| 14:30:20 | 5 | harborage, deny them entrance, and deny them food, |
| 14:30:24 | 6 | and that's one way to prevent infestation is by |
| 14:30:27 | 7 | denying them food; and if food gets trapped from the |
| 14:30:31 | 8 | garbage, it can become one of those open vessels that |
| 14:30:34 | 9 | they continuously come. |
| 14:30:35 | 10 |       Because they're creatures of habit, and if |
| 14:30:38 | 11 | this is an area where they can always get food, then |
| 14:30:40 | 12 | it will be a constant thing.  They'll always come in |
| 14:30:42 | 13 | that area. |
| 14:30:43 | 14 |     Q   So, from like an environmental health and |
| 14:30:48 | 15 | safety perspective, why is it important that pests |
| 14:30:51 | 16 | not show up at a correctional facility? |
| 14:30:56 | 17 |     A   Pests have the tendency to breed disease, and, |
| 14:31:00 | 18 | especially with mice and rodents, they have the |
| 14:31:10 | 19 | tendency to poop and pee when they run, and so you |
| 14:31:14 | 20 | don't want those to become airborne once they dry and |
| 14:31:20 | 21 | become airborne and get into respiratory issues. |
| 14:31:23 | 22 |       So it could be a respiratory; it could be a |
| 14:31:26 | 23 | bacteria; it could be a plague.  That's how plague |
| 14:31:29 | 24 | was spread.  Birds are the same way with |
| 14:31:34 | 25 | histoplasmosis.  They cause respiratory illnesses and |

| | | |
|---|---|---|
| 14:31:37 | 1 | diseases. |
| 14:31:38 | 2 | So you want to prevent them from preventing |
| 14:31:41 | 3 | disease spread.  That's rodents.  Squirrels could |
| 14:31:43 | 4 | even fall in the rodent family.  Birds, pests, all of |
| 14:31:47 | 5 | those things. |
| 14:31:50 | 6 | Q   And, Ms. Peters, I'm going to show you |
| 14:31:52 | 7 | Exhibit 16 again.  This is an exhibit I briefly |
| 14:31:56 | 8 | introduced before.  These are the notes we received |
| 14:32:02 | 9 | at lunch. |
| 14:32:02 | 10 | I'm just going to scroll to the very bottom, |
| 14:32:04 | 11 | where it says the Central Jail trash compacter |
| 14:32:11 | 12 | emptied once a month, Vista three times a week.  Is |
| 14:32:13 | 13 | this what you were just referring to when you were |
| 14:32:15 | 14 | answering my question about garbage compacters? |
| 14:32:18 | 15 | MS. PAPPY:  Objection.  Hang on.  Objection. |
| 14:32:19 | 16 | Misstates the document.  I think you just |
| 14:32:21 | 17 | accidentally said trash compacter emptied one time |
| 14:32:24 | 18 | a month. |
| 14:32:26 | 19 | A   And that's what I was trying to correct. |
| 14:32:27 | 20 | Q   Okay.  Yeah. |
| 14:32:28 | 21 | A   So the trash was emptied three times a week. |
| 14:32:30 | 22 | The grease bins are -- or the grease bins outside are |
| 14:32:36 | 23 | once a month, and those are usually cleaned out by |
| 14:32:38 | 24 | the hide and tallow companies. |
| 14:32:43 | 25 | Q   Okay.  So this is the document you were |

14:32:45  1    looking at?

14:32:46  2         A    Yes.

14:32:46  3         Q    Okay.  Thank you.  I'm going to scroll up on

14:32:50  4    the same page just while we're on the topic of pests.

14:32:53  5    There's a note here, "Bird entry at George Bailey

14:32:56  6    caused by the IPs intentionally or unintentionally

14:33:00  7    feeding birds while out in the caged area.

14:33:02  8    Suggestions to reduce bird entrance."  And then you

14:33:05  9    list some suggestions.

14:33:07  10        What was your understanding about the presence

14:33:08  11   of birds at George Bailey when you were writing this

14:33:14  12   expert report?

14:33:19  13        A    Birds are a little difficult because of the

14:33:22  14   bird migratory law.  There could be birds and

14:33:28  15   nesting, but if they are a protected species, you

14:33:31  16   can't remove them.  So you have to deter their

14:33:35  17   entrance to certain areas, and some deterrents would

14:33:40  18   be, don't feed them.  And that's why I said

14:33:43  19   intentionally or unintentionally if they're doing it.

14:33:46  20        A lot of times offenders -- birds are pets;

14:33:49  21   it's something different, and so they want to have a

14:33:53  22   pet.  So they may feed bread or apples.  Just prevent

14:33:58  23   that or strongly recommend to the offenders not to

14:34:02  24   feed the stray animals or birds.

14:34:07  25        I gave them also ways of deterring the birds

14:34:11  1    if they are under the Migratory Bird Act and we can't

14:34:19  2    remove the nest.  These are some ways to prevent them

14:34:23  3    from entering areas.

14:34:25  4         And there's a -- the walkways are -- the birds

14:34:30  5    have actually nested in these walkways.

14:34:33  6    Q    What was your opinion as to whether or not

14:34:36  7    birds in housing units was an issue affecting the

14:34:40  8    health of incarcerated people at George Bailey -- or

14:34:42  9    what is your opinion?

14:34:43  10   A    I did not visually see any birds inside the

14:34:48  11   areas, but I did see the ability of how they can

14:34:53  12   enter in these areas.

14:34:57  13   Q    Did anyone tell you they had seen birds in the

14:34:59  14   housing areas at George Bailey?

14:35:01  15   A    I didn't speak to any offenders on those cases

14:35:04  16   of asking them questions of that nature, but in

14:35:08  17   the -- in the site visit while I was being escorted

14:35:13  18   around, that was one of the comments that they said

14:35:16  19   the previous expert witness had observed.

14:35:22  20        But, during my observation, I did not see

14:35:23  21   that, but I could understand how they could get in,

14:35:27  22   and that's why I made these recommendations.

14:35:31  23   Q    And did you make these recommendations during

14:35:34  24   your inspection?

14:35:36  25   A    Yes.  And the reason why I made them was

14:41:18  1    tight -- it's not tight wood.  It needs to be

14:41:20  2    sealed -- I mean sealed properly.

14:41:25  3         And I think it was just some of the wooden

14:41:27  4    benches that were in that area at Vista in the -- in

14:41:31  5    the intake.  Excuse me.  Intake of that area.  The

14:41:34  6    rest of them were mainly not wood, either metal

14:41:38  7    benches, of that sort.  It was just that was the

14:41:41  8    wooden ones that I observed.

14:41:43  9    Q    Did you recommend to staff on the date of the

14:41:47 10    inspection to replace those wooden benches or

14:41:49 11    properly seal them?

14:41:50 12    A    Yes, to seal.  But I don't -- I don't -- I

14:41:54 13    tell them not -- I don't suggest anybody to buy or

14:41:58 14    replace anything.  I always work with what is there

14:42:02 15    because I don't know funding levels of how people --

14:42:06 16    how things are funded.  I can't recommend.

14:42:10 17    Q    And then after that inspection, by the time

14:42:12 18    you filed your expert report, did you have any

14:42:15 19    understanding as to whether those wooden benches were

14:42:17 20    still present in those -- in those areas?

14:42:21 21    A    I cannot tell you that, no.  I don't know.

14:42:28 22    Q    Okay.  I'm going to move on to grease bins.

14:42:33 23    So, in your expert report, you noted that you

14:42:38 24    observed grease bins that required more frequent

14:42:41 25    cleaning.  And I'm actually going to introduce an

14:42:43  1    exhibit here.  I'm going to show you what -- Debbie

14:43:01  2    Graham's report again.  Just give me one moment.

14:43:23  3         Okay.  So I am showing you Debbie Graham's

14:43:25  4    initial expert report.  I'm going to go ahead and

14:43:28  5    zoom in.  I'm showing you two photos on the bottom of

14:43:34  6    page 57 of her report.

14:43:38  7         Do you know what -- could you describe what

14:43:40  8    these photos are?

14:43:42  9    A    Those are the grease bins that are -- majority

14:43:46  10   located either outside loading dock or back area of

14:43:51  11   culinaries.

14:43:53  12   Q    Okay.  Have you seen this grease bin -- I'll

14:43:57  13   represent these are the same grease bin.  Have you

14:43:59  14   seen this grease bin specifically?

14:44:02  15   A    Yes.

14:44:02  16   Q    Okay.  Did you see this grease bin during your

14:44:04  17   inspection of Vista?

14:44:07  18   A    Yes.

14:44:08  19   Q    Okay.  And just looking at this image here --

14:44:13  20   and this is from Debbie's inspection, but do you see

14:44:17  21   issues with this grease bin?  I can zoom in.

14:44:21  22   A    Oh, no.  I understand what it is.  Yes.

14:44:25  23   Q    Okay.  Do you see problems with it from an

14:44:28  24   environmental health and safety perspective?

14:44:31  25   A    Yes.  And I did also give them options on how

| | | |
|---|---|---|
| 14:44:36 | 1 | to create a containment for ease of cleaning when |
| 14:44:43 | 2 | these spills happen. |
| 14:44:48 | 3 | Q   But can you just help me understand, what |
| 14:44:51 | 4 | about the grease bin, as it's pictured here, is a |
| 14:44:56 | 5 | problem? |
| 14:44:58 | 6 | A   So there is a containment, but the grease is |
| 14:45:01 | 7 | still visible, and there should -- you can clean it |
| 14:45:07 | 8 | this way, but I recommended -- I suggested to them |
| 14:45:11 | 9 | that they create a containment around it with sand so |
| 14:45:16 | 10 | that when the sand -- the sand can absorb the grease, |
| 14:45:20 | 11 | and then, that way, it can be considered solid waste |
| 14:45:24 | 12 | and placed in the trash. |
| 14:45:27 | 13 | Q   Does this grease bin need to be cleaned? |
| 14:45:29 | 14 | A   Yes. |
| 14:45:30 | 15 | Q   Okay.  And, well, I'll just ask this unfairly, |
| 14:45:37 | 16 | but I'll show you another image of it on the next |
| 14:45:40 | 17 | page that's clearer.  What are the risks that, you |
| 14:45:42 | 18 | know, having an unclean grease bin like this are from |
| 14:45:47 | 19 | an environmental health and sanitation perspective? |
| 14:45:51 | 20 | A   Once again, it would attract pests.  One of |
| 14:45:54 | 21 | those things again, we said deny.  That would be |
| 14:45:56 | 22 | denying them food.  And this would be an option of |
| 14:45:59 | 23 | having food. |
| 14:46:02 | 24 | I did not observe rodents around the grease |
| 14:46:06 | 25 | bin, but I did observe the same situation, and I gave |

14:46:11  1    them options on how to clean properly and with ease

14:46:16  2    so that it would prevent this in the future.

14:46:18  3        Q    Okay.  And just -- what in this photo -- what

14:46:26  4    should be cleaned?  How should this grease bin look?

14:46:31  5             MS. PAPPY:  You mean without the rat?

14:46:35  6             MR. HOLSTON:  Other than the rat.  To avoid

14:46:39  7        attracting the rat.

14:46:40  8        A    Here's the thing:  And this is now 24 years of

14:46:46  9    experience.  This is typical on a lot of restaurants

14:46:51 10    in the back of culinary areas.  They spill grease.

14:46:56 11    When grease is spilled, you will have these things,

14:46:59 12    and that's why we suggest having containment.

14:47:04 13             And there was a containment there to keep the

14:47:06 14    grease contained, but unfortunately, there's no way

14:47:09 15    to clean it after it's been contained.  It's

14:47:14 16    partially right, but it's partially wrong.

14:47:19 17        Q    Okay.  So I'm going to stop sharing these

14:47:23 18    images from Debbie Graham's inspection, which was in

14:47:29 19    January 2024.  I'm going to introduce as

14:47:43 20    Exhibit 18 -- so this photograph was -- is titled

14:47:57 21    Image 0226.JPEG.

14:48:01 22             Ms. Peters, do you know what this photograph

14:48:03 23    is?

14:48:03 24        A    Yes.  It's the same image from the previous

14:48:07 25    expert witness.

15:22:26  1   picture.

15:22:26  2       Q   Okay.  When you inspected Central Jail, did

15:22:28  3   you see any sewer flies?

15:22:32  4       A   Not Central Jail, no.

15:22:34  5       Q   Okay.  And are "drain flies" another name for

15:22:41  6   sewer flies?

15:22:42  7       A   Yes.

15:22:43  8       Q   And you did see sewer flies at Vista.  Is that

15:22:45  9   correct?

15:22:45  10      A   That is correct.

15:22:46  11      Q   Okay.  And what was your recommendation, if

15:22:49  12  you had one, that you made to staff during the

15:22:51  13  inspection about sewer flies at Vista?

15:22:58  14      A   I offered several recommendations, starting

15:22:59  15  with the next time that the grease trap is cleaned

15:23:02  16  that they have the lines jetted up to 100 feet in and

15:23:07  17  out.  Also made recommendations of an enzyme cleaner

15:23:13  18  and if they could jet certain lines.

15:23:16  19      Q   And who did you make those recommendations to?

15:23:19  20      A   To the staff there.  I could tell you their

15:23:26  21  name because he walked with us.  So it would have

15:23:34  22  been -- but I did make the recommendation, and Amanda

15:23:42  23  took notes to give after the fact.

15:23:44  24          So it would have been -- well, I made the

15:24:06  25  recommendation.  We can move on and I can tell you

15:24:08  1    later or we can just wait until I find it.

15:24:10  2        Q   I guess my other question about it would be,

15:24:13  3    in general, was that a recommendation as to Vista

15:24:16  4    specifically or was that a more general

15:24:19  5    recommendation as to this is how you keep drain flies

15:24:22  6    out in general?

15:24:24  7        A   In general, it was how to keep drain flies

15:24:27  8    out, after I observed them at Vista, explaining that,

15:24:31  9    as facilities age, there's going to be more deposits

15:24:39 10    on the drain lines inside of them, and they would

15:24:43 11    have to be cleaned regularly and the treatment over a

15:24:47 12    period of time.  It's not a one and done.  It doesn't

15:24:52 13    get solved in one day.

15:24:53 14        It would take about a couple of days to

15:24:55 15    correct it, maybe a couple of weeks.  But it is a

15:24:59 16    continuous process.  Especially as facilities age,

15:25:02 17    sewer flies are almost a given.

15:25:06 18        Q   Okay.  For the -- actually, where specifically

15:25:17 19    in Vista did you see the sewer flies?

15:25:20 20        A   Unit 4, segregation.  I believe that's it.

15:25:26 21    Yeah.  East 4 administration separation.  Admin

15:25:30 22    separation.

15:25:32 23        Q   And then, after you saw the sewer flies in

15:25:36 24    that specific unit, how -- how soon should they be

15:25:41 25    cleaned up, in your opinion?

15:37:21  1    provided for me to see if one will effectively answer

15:37:24  2    your question.

15:37:36  3        Q    Really, what I'm asking for is a policy that

15:37:38  4    you had in mind when you wrote, "There are issues

15:37:40  5    that can be corrected with additional training, but

15:37:43  6    based upon my observations and discussions with

15:37:45  7    staff, the existing policies and practices provide a

15:37:47  8    solid foundation."

15:37:54  9        A    So I'm looking.  I can't find it right now.

15:38:20  10       Q    We can move on.

15:38:25  11           I just want to cover a couple other --

15:38:30  12   actually, I want to talk a little bit about chemical

15:38:33  13   labeling.  So, in your expert report, you discuss

15:38:42  14   chemical labeling; and then in those documents that

15:38:48  15   we went over that were in the Google Drive folder, I

15:38:52  16   noticed there seemed to be a fair amount of documents

15:38:54  17   about chemical labeling, a presentation about

15:38:58  18   chemical labeling.

15:38:59  19           Can you just describe what recommendations you

15:39:03  20   made over time regarding chemical labeling during and

15:39:08  21   after your inspection?

15:39:16  22       A    So secondary containment falls outside of the

15:39:19  23   original containers had to be properly labeled, and

15:39:22  24   there were labeling issues where they were not

15:39:26  25   standardized to the global harmonized system.  So

| | | |
|---|---|---|
| 15:39:30 | 1 | that's what I put in there. |
| 15:39:32 | 2 | The ones that I did not -- if I saw a safety |
| 15:39:35 | 3 | data sheet -- if I saw a chemical, I included it in a |
| 15:39:40 | 4 | safety data sheet.  Not knowing if they had it or |
| 15:39:43 | 5 | not, I did review -- I did spot checks on their SDS |
| 15:39:48 | 6 | books, but I also added -- every chemical that I saw, |
| 15:39:52 | 7 | I added a safety data sheet as part of what I |
| 15:39:56 | 8 | observed.  Not saying that they didn't have it; it's |
| 15:40:00 | 9 | just what I observed to make sure that they had the |
| 15:40:02 | 10 | proper one. |
| 15:40:04 | 11 | I did the training so much so for the fact |
| 15:40:07 | 12 | that I saw bottles that were not properly labeled as |
| 15:40:11 | 13 | part of the sanitation side. |
| 15:40:16 | 14 | Q   Did you -- you said you did the training.  Did |
| 15:40:19 | 15 | you do a training for San Diego County staff or did |
| 15:40:23 | 16 | you just, like, send in training materials? |
| 15:40:25 | 17 | A   I sent in training materials. |
| 15:40:28 | 18 | Q   Do you know if the County has used those |
| 15:40:32 | 19 | training materials since you sent them in? |
| 15:40:35 | 20 | A   I do not know.  I just provided the |
| 15:40:37 | 21 | information. |
| 15:40:39 | 22 | Q   I'm just going to briefly introduce an |
| 15:40:41 | 23 | exhibit.  This is one of the emails that we were |
| 15:40:43 | 24 | provided at lunch.  This is Exhibit 19. |
| 15:40:58 | 25 | Let me -- and so -- this is an email thread. |

15:41:00  1    The most recent email is May 17th, from Amanda

15:41:04  2    Kamphoefner to Ms. Peters, cc'ing counsel from --

15:41:12  3    outside counsel and then Heidi Williams from the

15:41:15  4    sheriff's office.

15:41:16  5         Ms. Peters, could you just -- and it's dated

15:41:19  6    May 17th, if I didn't mention that.

15:41:21  7         Ms. Peters, can you just recommend what you

15:41:23  8    did in response -- not recommend -- could you

15:41:25  9    describe what you did in response to this email?

15:41:28  10   A    So she asked an example of what the labels

15:41:31  11   should look like, and so I gave her a sample of a

15:41:34  12   generic label of what they could look like, something

15:41:38  13   similar to that.  I didn't specifically say, this is

15:41:41  14   the only kind that you can use.  I just gave an

15:41:44  15   example.

15:41:45  16        And that these can be purchased through a

15:41:49  17   vendor, and this is what they look like, to go

15:41:57  18   forward as part of the PowerPoint -- and it

15:42:00  19   referenced the PowerPoint -- well, the PowerPoint

15:42:02  20   referenced labels that look like this.  It gave

15:42:05  21   several examples of labels.

15:42:06  22   Q    And then, after May 17th -- let's just say

15:42:12  23   after May in general -- did you have any

15:42:16  24   communication regarding whether the Sheriff's

15:42:21  25   Department had changed the labels on these bottles?

| | | |
|---|---|---|
| 15:42:27 | 1 | A    No. |
| 15:42:36 | 2 | Q    I just wanted to work through a few specific |
| 15:42:41 | 3 | questions.  So, on page 6 of your report, I believe |
| 15:42:52 | 4 | you recommended a more frequent cleaning schedule. |
| 15:43:00 | 5 | Give me one moment.  I apologize. |
| 15:43:07 | 6 | I apologize.  On page 7 of your report, at the |
| 15:43:09 | 7 | very top, you recommended a more frequent removal |
| 15:43:12 | 8 | schedule for recyclable products to avoid attracting |
| 15:43:17 | 9 | pests. |
| 15:43:18 | 10 | Is this a recommendation you made during the |
| 15:43:20 | 11 | inspections? |
| 15:43:24 | 12 | A    Yes. |
| 15:43:24 | 13 | Q    Okay. |
| 15:43:24 | 14 | A    I did not see any pests, but I made a |
| 15:43:26 | 15 | recommendation to keep recyclables in certain areas |
| 15:43:29 | 16 | to prevent attracting pests. |
| 15:43:36 | 17 | Q    Same questions as normal:  Who did you make |
| 15:43:38 | 18 | that recommendation to? |
| 15:43:46 | 19 | A    All my recommendations went through Amanda. |
| 15:43:48 | 20 | Q    Okay.  In the future then, I'll just ask if |
| 15:43:49 | 21 | they went to anyone other than Amanda. |
| 15:43:52 | 22 | A    And whatever staff was able to overhear or |
| 15:43:55 | 23 | glean that information. |
| 15:43:55 | 24 | Q    Okay.  Understood.  After those inspections, |
| 15:44:01 | 25 | do you have any understanding as to whether -- did |

| | | |
|---|---|---|
| 15:44:04 | 1 | you become aware as to whether that recommendation |
| 15:44:07 | 2 | was implemented? |
| 15:44:08 | 3 | A    No. |
| 15:44:17 | 4 | Q    Okay.  So, on page 7 of your report, you |
| 15:44:26 | 5 | recommended that general surface cleaning be |
| 15:44:31 | 6 | performed daily when areas are empty, with a focus on |
| 15:44:38 | 7 | highly soiled areas, such as toilet areas. |
| 15:44:41 | 8 | Why did you make that recommendation?  What |
| 15:44:43 | 9 | was the -- what did you see that prompted you to make |
| 15:44:47 | 10 | that recommendation? |
| 15:44:49 | 11 | A    So, when areas were emptied, I would take -- |
| 15:44:53 | 12 | if there was a holding cell that was empty and I took |
| 15:44:55 | 13 | a black light and I saw areas that were soiled, |
| 15:44:58 | 14 | that's when I made those recommendations. |
| 15:45:01 | 15 | Q    Okay.  So that sort of -- at like -- |
| 15:45:07 | 16 | A    I'm going to say Los Colinas. |
| 15:45:09 | 17 | Q    Yeah. |
| 15:45:09 | 18 | A    They were empty.  There was one person in -- |
| 15:45:12 | 19 | there was one individual in one of the holding cells. |
| 15:45:15 | 20 | Two of the other holding cells were empty, but I |
| 15:45:18 | 21 | wasn't aware of how long they had been emptied or if |
| 15:45:23 | 22 | they were just empty or they had just moved this one |
| 15:45:27 | 23 | offender from that area to another one. |
| 15:45:31 | 24 | She was pretty intoxicated, so I'm not sure if |
| 15:45:34 | 25 | they had just moved her.  She was pretty loud at the |

15:45:38  1   time.  But it looked as if -- once it's cleaned, I

15:45:44  2   said that there should be a period of time that we

15:45:48  3   made available cleaning for those areas once they're

15:45:52  4   emptied.

15:45:55  5       Q   Do you have an understanding as to whether

15:45:57  6   the, you know, general surface cleaning is performed

15:46:02  7   daily in areas that are emptied in the San Diego

15:46:10  8   County Sheriff's Department facilities?

15:46:12  9       A   No, I cannot say that.  I strongly recommend

15:46:14 10   that they are done.  They said that they're done

15:46:16 11   daily, and I recommend that as people are moved out

15:46:21 12   that they clean before another group comes in.

15:46:27 13       Q   And then that reminded me, actually:  You

15:46:30 14   mentioned earlier that, during your inspection of

15:46:32 15   South Bay, you had a strong recommendation.  What was

15:46:37 16   that recommendation?

15:46:39 17       A   At South Bay?

15:46:41 18       Q   Yeah.  Am I remembering that correctly?  If

15:46:44 19   I'm not --

15:46:45 20       A   [inaudible] South Bay.

15:46:46 21       Q   Okay.

15:46:47 22       A   South Bay was -- because that's the court

15:46:48 23   holding facility where court is upstairs.

15:46:52 24       Q   Uh-huh.

15:46:52 25       A   That one was rather -- very clean, but they

15:46:55   1   don't really hold as many in that area because

15:46:58   2   they're coming from another detention facility there.

15:47:08   3        Q    Okay.  Turning to air quality -- and I'll just

15:47:10   4   focus- -- actually, I'm going to get a little bit

15:47:13   5   more into the vent covering, but I'll just start

15:47:19   6   regarding this:  The first paragraph in the Air

15:47:22   7   Quality section, where you noted that there was

15:47:26   8   occasional water damage possibly from leaks or HVAC

15:47:32   9   condensation.  You recommended those be addressed

15:47:35  10   through remediation efforts, including leak repairs.

15:47:39  11        Are those recommendations you made during the

15:47:42  12   inspections?  Is that just something you put in the

15:47:45  13   report?

15:47:45  14        A    No.  All recommendations were made during the

15:47:47  15   inspections.

15:47:48  16        Q    So, in regards to those recommendations in the

15:47:50  17   first paragraph, do you recall which facilities you

15:47:53  18   were at when you made those recommendations?

15:47:55  19        A    Pretty much said that for all because it was

15:47:57  20   observed, especially with the vents -- if there were

15:48:01  21   leaks, I just said, hey, let's fix the leaks as soon

15:48:04  22   as possible.  If there were airflow ventilation

15:48:08  23   issues, hey, let's fix those as soon as possible.

15:48:11  24   Let's try to inform the IPs to not cover vents, not

15:48:19  25   to restrict airflow.

15:48:24  1          So, if I made a recommendation, it was for

15:48:28  2   everything.

15:48:29  3      Q   Okay.  And then, turning to the -- the issue

15:48:32  4   with incarcerated people covering vents with paper

15:48:36  5   items, am I recalling correctly, is that also an

15:48:42  6   issue that you've come across in your work in Nevada?

15:48:45  7      A   Nevada, Alabama.  Yeah.

15:48:49  8      Q   It sounds like that's a pretty persistent

15:48:51  9   issue across facilities.  Do you know, in general,

15:48:55 10   why -- like, what causes that issue with people

15:48:59 11   covering their vents?

15:49:00 12      A   People have personal preference.  I may be a

15:49:04 13   cold person and I don't want the air blowing on me.

15:49:07 14   I may be a hot person and I want more air.  I may

15:49:10 15   not -- they may have the heat on and I feel like

15:49:12 16   it's -- it's too hot.  So it's always personal

15:49:17 17   preference.

15:49:18 18          And, when you get people with different

15:49:23 19   conditions that they would like to become -- their

15:49:27 20   own personal comfort, things like this can occur.

15:49:30 21      Q   So, I mean, is it correct that it's not ideal

15:49:38 22   for incarcerated people to solve that issue by

15:49:41 23   covering the vents with paper items or whatever else?

15:49:44 24   I mean, does that cause problems?

15:49:46 25      A   Yes.  It restricts airflow so the proper air

15:49:50  1   exchange is not completed.  By not completing the

15:49:57  2   airflow, you can have extra condensation, water

15:50:02  3   starting to condensate, in certain areas.  Yes.

15:50:06  4       Q   So, in your professional experience, as these

15:50:11  5   issues have come up before, have you ever come across

15:50:17  6   a solution that's been effective at stopping people

15:50:19  7   from doing that?  Is there anything that works?

15:50:21  8           Or reducing it, I guess.

15:50:25  9       A   You can clean it and educate the offenders,

15:50:28  10  but they're going to make themselves as comfortable

15:50:32  11  in the conditions that they're in at their current

15:50:34  12  time.  And I am a cold person.  I would love to block

15:50:39  13  my air vent.  It's freezing in here.  But I know that

15:50:43  14  it is going to cause a problem down the line, so I

15:50:46  15  don't do it.

15:50:47  16          But other people only think of how do I feel

15:50:50  17  comfortable at my point in time in my space, so they

15:50:54  18  do what makes them comfortable.

15:50:56  19      Q   In your opinion, could offering something like

15:50:58  20  an additional blanket reduce that problem?  Yeah.

15:51:06  21      A   There are other options that you can give, but

15:51:08  22  if the standard procedures are everybody gets one

15:51:12  23  blanket or everyone gets two blankets, one for a

15:51:16  24  cover and one for the other one, you have to follow

15:51:19  25  the policies.  Then, if we gave everybody extra

| | | |
|---|---|---|
| 15:51:21 | 1 | blankets, then they'll probably run out of blankets |
| 15:51:24 | 2 | and then nobody would have a blanket. |
| 15:51:25 | 3 | So you try to keep the standard of -- like I |
| 15:51:29 | 4 | said, I'm cold.  I just wear an extra jacket. |
| 15:51:33 | 5 | Medical reasons, ADA, we'll give an extra blanket if |
| 15:51:36 | 6 | the inmate has medical issues or that sort.  Yeah, |
| 15:51:41 | 7 | you'll make accommodations for that.  But, if we make |
| 15:51:45 | 8 | accommodations for everybody in a prison facility -- |
| 15:51:48 | 9 | it's just not Holiday Inn, I always tell people. |
| 15:51:52 | 10 | I'm sorry.  I go through this every day.  It's |
| 15:51:56 | 11 | not Holiday Inn; you don't have to be here. |
| 15:52:01 | 12 | But we do try to make people comfortable if |
| 15:52:03 | 13 | their medical needs to be taken care of.  We do not |
| 15:52:09 | 14 | discriminate on that, and I'm sure San Diego County |
| 15:52:11 | 15 | is the same way.  If someone has a medical issue or |
| 15:52:14 | 16 | an ADA accommodation that they need to make, yes. |
| 15:52:17 | 17 | But we do not tell them to block their air |
| 15:52:20 | 18 | vents.  It does cause problems down the line. |
| 15:52:25 | 19 | Q   Ms. Peters, I just -- just because I have to, |
| 15:52:27 | 20 | because you said you're sure San Diego is the same |
| 15:52:34 | 21 | way in terms of not discriminating on medical issues, |
| 15:52:37 | 22 | is that an opinion you're offering as an expert in |
| 15:52:39 | 23 | this case? |
| 15:52:40 | 24 | A   No.  It is my own personal opinion. |
| 15:52:42 | 25 | Q   Okay.  Thank you.  Just need to clarify just |

15:52:46   1   to be thorough.

15:52:49   2        Okay.  I just have one more before we take

15:53:02   3   what will probably be our last break.  Did you make

15:53:16   4   recommendations at what -- during your inspections

15:53:18   5   regarding the laundry carts?

15:53:22   6     A    I did.

15:53:22   7     Q    Okay.  And could you describe what those

15:53:24   8   recommendations were?

15:53:28   9     A    So one of the facilities, Los Colinas, has a

15:53:32   10  laundry cart automated washer.

15:53:36   11    Q    Uh-huh.

15:53:37   12    A    And I made the recommendation of how often we

15:53:40   13  clean the carts, and they told me; and I noticed that

15:53:42   14  there were still some grime and evidence that they

15:53:45   15  probably had not been properly cleaned.  So I said,

15:53:48   16  hey, you have this great hot laundry cart washing

15:53:53   17  machine; it probably would be beneficial if we just

15:53:56   18  started a process where you grab some carts from one

15:54:02   19  facility, take it through the laundry washing and

15:54:05   20  move it around.

15:54:06   21        When I spoke to the laundry manager about it,

15:54:09   22  she was very receptive, and she was like, we have to

15:54:11   23  go to each facility anyway, and we make rounds; it

15:54:15   24  would be easy for us to implement.

15:54:17   25        Now, I made the recommendation.  If they

15:54:19  1   implement it and how they implement it is on them.

15:54:23  2   But for them to have this device that could easily

15:54:28  3   resolve making sure -- and that could easily ensure

15:54:33  4   that carts are washed properly, they took that as a

15:54:38  5   great idea, and they said that they would work on

15:54:41  6   implementation.

15:54:43  7      Q   And do you have any understanding as to

15:54:46  8   whether that implementation has happened since then?

15:54:50  9      A   I don't know.

15:54:50 10      Q   Have you asked?

15:54:56 11      A   Once again, it's my job to advise.  I just --

15:55:00 12   I mean, if they do it, great.  If they don't, it's

15:55:03 13   still my ability [sic] to advise.

15:55:08 14      Q   Well, it's also your job to offer an expert

15:55:11 15   opinion in this case, and you did, and part of that

15:55:16 16   opinion was that, you know, jail staff are

15:55:22 17   responsive, open, and accepting of best practices.

15:55:26 18          And so my question is, you know, if -- if

15:55:30 19   there's no recommendation that you made in March that

15:55:33 20   by the time you issued your expert report in August

15:55:37 21   you knew whether or not it had been implemented, then

15:55:41 22   on what basis can you conclude that jail staff were

15:55:45 23   being responsive to those recommendations?

15:55:54 24      A   Their reception while I was there was a

15:55:57 25   willingness and openness to comply and understand

15:56:01   1   some of the observations that I had.  They were not

15:56:08   2   combative, aggressive, or they didn't block me or, as

15:56:14   3   I would say, they didn't put up a stone wall as if I

15:56:18   4   was a hindrance to giving them options or

15:56:22   5   suggestions.

15:56:24   6        So I took that as being positive and receptive

15:56:28   7   of some of these ideas, as some of them was like, you

15:56:31   8   know what, I didn't even think about that; that's a

15:56:34   9   good idea.

15:56:36   10       Was it a farce?  I don't believe it was.  I

15:56:40   11  have seen people stonewall me, and that was not my

15:56:43   12  opinion of what they were doing.

15:56:46   13  Q   So I understand the basis for that opinion at

15:56:50   14  the time of your inspections, but why did you not

15:56:55   15  check between those inspections and August, when you

15:56:59   16  filed this expert report, as to whether those

15:57:01   17  recommendations had been implemented?

15:57:06   18  A   Unfortunately, I was not able to get back to

15:57:09   19  San Diego County, and I'm still not able to at this

15:57:12   20  time because of my current workload.  But I plan on

15:57:16   21  getting back out there as soon as I can.  Currently,

15:57:19   22  I'm under four OSHA inspections right now, four

15:57:22   23  different facilities.  I've got to stay where I am.

15:57:25   24  I've got to stay here.

15:57:26   25       MR. HOLSTON:  Okay.  I think we can take a

17:17:08  1          Go ahead, Henrietta.

17:17:16  2      A   So, in reviewing the areas, I verified that

17:17:18  3  based on federal recommendations if they met minimum

17:17:22  4  standards.  If they didn't, I noted that, such as the

17:17:28  5  labeling of the chemicals.  They did not meet

17:17:32  6  standards; thus, I made those recommendations.

17:17:40  7          So that they did not meet standards on certain

17:17:41  8  things.  That's how I complete minimum standards.

17:17:47  9  Did they meet the minimum standards?

17:17:49 10          In labeling, there were some areas that they

17:17:52 11  did not, so they did not meet minimum standards, so

17:17:56 12  that could be considered below average.

17:17:59 13      Q   Ms. Peters, anywhere in your report do you

17:18:01 14  identify those federal standards that you said you

17:18:06 15  applied?

17:18:09 16          MS. PAPPY:  Objection.  Asked and answered.

17:18:10 17   Instruct not to answer.  You're now repeating all

17:18:12 18   of the same questions and just arguing with her.

17:18:15 19   You asked her this morning.  She answered it.  And

17:18:17 20   the answer was "no" if you want to go back in the

17:18:20 21   record.

17:18:22 22      Q   Are you going to follow the instruction not to

17:18:24 23  answer, Ms. Peters?

17:18:27 24      A   Yes.

17:18:28 25          MR. HOLSTON:  Okay.

1          CERTIFICATE OF REPORTER

2

3          I, Cherie J. Anderson, Registered Merit
   Reporter, Registered Professional Reporter, Certified
4  Realtime Reporter, and Notary Public for the State of
   North Carolina at Large, do hereby certify:
5          That the foregoing deposition was taken
   remotely before me on the date and at the time and
6  location stated on page 1 of this transcript; that the
   deponent was duly sworn to testify to the truth, the
7  whole truth, and nothing but the truth; that the
   testimony of the deponent and all objections made at
8  the time of the examination were recorded
   stenographically by me and were thereafter
9  transcribed; that the foregoing deposition as typed is
   a true, accurate, and complete record of the testimony
10 of the deponent and of all objections made at the time
   of the examination to the best of my ability.
11         I further certify that I am neither related
   to nor counsel for any party to the cause pending or
12 interested in the events thereof.
           Witness my hand, I have hereunto affixed my
13 official seal on this 30th day of October 2024, at
   Wilmington, New Hanover County, North Carolina.

14

15

16

17

18

19

20

21

22  _____
    Cherie J. Anderson, RMR, CRR
23  My Commission expires
    December 22, 2026

24

25

# EXHIBIT S

CERTIFIED COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, et al.,       )
                               )
                               )
            Plaintiffs,        )   Case No. 3:20-cv-
                               )   00406-AJB-DDL
                               )
      VS.                      )
                               )
                               )
SAN DIEGO COUNTY SHERIFF'S     )
DEPARTMENT, COUNTY OF SAN      )
DIEGO, SAN DIEGO COUNTY        )
PROBATION DEPARTMENT, and      )
DOES 1 to 20, inclusive,       )
                               )
                               )
            Defendants.        )
_____ )

DEPOSITION OF MATTHEW B. ROSS

TAKEN ON

THURSDAY, OCTOBER 17, 2024

DONNA TIERNEY, CSR NO. 13159

**Ex. S - 773**

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4      DARRYL DUNSMORE, et al.,        )
                                       )
5                                      )
                Plaintiffs,            )  Case No. 3:20-cv-
6                                      )  00406-AJB-DDL
                                       )
7          VS.                         )
                                       )
8                                      )
       SAN DIEGO COUNTY SHERIFF'S      )
9      DEPARTMENT, COUNTY OF SAN       )
       DIEGO, SAN DIEGO COUNTY         )
10     PROBATION DEPARTMENT, and       )
       DOES 1 to 20, inclusive,       )
11                                     )
                                       )
12              Defendants.            )
       _____)

13

14

15

16         Deposition of MATTHEW B. ROSS, taken on behalf of

17     the Defendants, utilizing ZOOM Cloud platform to host

18     all participants from their respective locations,

19     commencing at 9:00 A.M., on Thursday, October 17, 2024,

20     before DONNA TIERNEY, CSR No. 13159, for the State of

21     California, pursuant to Notice.

22

23                        --OOO--

24

25

                                                            2

Ex. S - 774

1    the economic status of the residents?

2        A.   Of which area?  What location are you talking

3    about?  Are you just talking about generally in the

4    United States?

5        Q.   Yeah, generally.  I mean, in San -- I mean, I

6    could -- I don't know if you've been to San Diego, which

7    was subject constitute of your report in this case.

8             Have you been to San Diego?

9        A.   I have.

10       Q.   Okay.  So, for example, La Jolla is one of the

11   more affluent areas in San Diego; right?

12       A.   Yes.

13       Q.   Okay.  And then there are some areas, maybe

14   San Ysidro or National City, which are close to the

15   border, that are less affluent areas or poorer areas;

16   right?

17       A.   Yes.

18       Q.   Okay.  Have you looked at whether it's actually

19   tied -- whether the socioeconomic status of the area has

20   anything to do with the crime rate?

21       A.    If you're asking whether I ran a correlation

22   between the socioeconomics of a particular location and

23   the crime rate associated with that location in

24   San Diego, the answer is no.

25            However, if you're asking whether I controlled

                                                    17

Ex. S - 775

1    for the fact that -- in my report whether I controlled

2    for the fact that there are differences in both crime

3    rates and socioeconomic status across different areas,

4    the answer is yes.

5         Q.   Is it generally true that poorer areas have

6    more crime?

7         A.   I would say that -- that is it generally true,

8    yes.

9         Q.   And have you -- is there any correlation based

10   on your studies and your research and experience between

11   predominantly minority areas and the economic status of

12   the area?  In other words, whether it's more poor, more

13   affluent, is there any relationship between those?

14        A.   You know, I don't study the income distribution

15   and demography, but, yeah, I've read, you know, numerous

16   other studies that show that there's a correlation

17   between race and socioeconomic status.  So, yeah, I

18   think that's a generally known fact.

19        Q.   For example, maybe La Jolla's less diverse in

20   its racial makeup than -- and somewhere like that we

21   talked about San Ysidro or Chula Vista areas near the

22   border, National City, having more minorities in those

23   areas that also happen to be less affluent; right?

24        A.   Yes.

25        Q.   In your CV, you have two publications related

                                                          18

**Ex. S - 776**

1    go off the record for five minutes while I find this

2    cite here.  Return at 2:23.

3            (A break was taken.)

4    BY MS. COLEMAN:

5        Q.   Referring to your report at page 69 and your

6    table A2 --

7        A.   Okay.  Okay.  I'm looking at it.

8        Q.   -- and referring to the time times year FE,

9    what does that measure?

10       A.   It is a time by year fixed effect.  That's what

11   the FE stands for, fixed effect.  It's control variable,

12   an independent variable.

13       Q.   Time times year what?  Fixed?

14       A.   Time by year fixed effect.

15       Q.   Fix event?

16       A.   Fixed effect.

17       Q.   Effect.

18       A.   It's a general terminology for a specific type

19   of control variables.  It's ubiquitous in the social

20   science literature.  They're also referred to as fixed

21   effect or aggressions.

22       Q.   What does "fixed effect" mean?

23       A.   It's control variable.  It's a way of

24   controlling for different temporal or geographic factors

25   to control.  It's an independent variable.

                                                189

**Ex. S - 777**

1          I, DONNA TIERNEY, a Certified Shorthand Reporter

2     for the State of California, do hereby certify:

3          That the foregoing proceedings were taken before me

4     at the time and place herein set forth; that any witness

5     in the foregoing proceedings, prior to testifying, was

6     administered an oath; that a record of the proceedings

7     was made by me using machine shorthand which was

8     thereafter transcribed under my direction; that the

9     foregoing transcript is a true record of the testimony

10    given.

11         Further, that if the foregoing pertains to the

12    original transcript of a deposition in a Federal Case,

13    before completion of the proceedings, review of the

14    transcript was requested.

15         I further certify that I am neither financially

16    interested in the action nor a relative or employee of

17    any attorney or any party to this action.

18         IN WITNESS WHEREOF, I have this date subscribed my

19    name.

20    Dated: November 1, 2024

21

22

23    *Donna Tierney*

24    _____

25    DONNA TIERNEY
      CSR NUMBER 13159

233

**Ex. S - 778**

# EXHIBIT T

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3    _____
                                             )
 4    DARRYL DUNSMORE, ANDREE                ) Case No. 3:20-cv-00406-
      ANDRADE, ERNEST ARCHULETA,            )          AJB-DDL
 5    JAMES CLARK, ANTHONY EDWARDS,         )
      LISA LANDERS, REANNA LEVY,            )
 6    JOSUE LOPEZ, CHRISTOPHER              )
      NELSON, CHRISTOPHER NORWOOD,          )
 7    JESSE OLIVARES, GUSTAVO               )
      SEPULVEDA, MICHAEL TAYLOR, and        )
 8    LAURA ZOERNER, on behalf of            )
      themselves and all others             )
 9    similarly situated,                    )
                                             )
10              Plaintiffs,                  )
                                             )
11    vs.                                    )
                                             )
12    SAN DIEGO COUNTY SHERIFF'S            )
      DEPARTMENT, COUNTY OF SAN             )
13    DIEGO, SAN DIEGO COUNTY               )
      PROBATION DEPARTMENT, and DOES       )
14    1 to 20, inclusive,                    )
                                             )
15              Defendants.                  )
      _____)

16

17          DEPOSITION OF SERINA ROGNLIEN-HOOD,

18    commencing at the hour of 9:08 AM PST on Wednesday,

19    February 14, 2024, at 501 West Broadway, Suite 1600,

20    San Diego, California, before Gina Marie De Luca,

21    Certified Shorthand Reporter No. 6973, RMR, CRR, in and

22    for the State of California

23

      Steno
24    Concierge@Steno.com
      (888) 707-8366

25
```

**Ex. T - 780**

SERINA ROGNLIEN-HOOD
FEBRUARY 14, 2024

JOB NO. 865805

09:37  1   believe that there's standards that women -- that we

09:37  2   have at women's health.  Even annual checkups, we all

09:37  3   go -- well, we -- well, no.  We are all offered an

09:38  4   annual physical through our health care.  I believe that

09:38  5   that's something that we should be having routinely in

09:38  6   our facilities.

09:38  7           There's also certain tests that are done based

09:38  8   on your age, your gender.  Just those types of things I

09:38  9   feel we should -- those preventative health measures

09:38  10  that we do out in the community should translate into

09:38  11  our facilities.

09:38  12      Q.   And in your time as director of nursing, what,

09:38  13  if anything, did you do to try to address this issue of

09:38  14  preventative care?

09:38  15      A.   We started doing health assessments by nurses

09:38  16  within 14 days of someone being booked into custody, and

09:38  17  then that has to be followed up with a physical at the

09:38  18  year mark by a provider.

09:38  19           I know we have started with a dental hygienist

09:39  20  seeing our incarcerated population.  We've started

09:39  21  reviewing women's health to make sure that the -- the

09:39  22  incarcerated population that's been in custody over a

09:39  23  year are offered an appointment for women's health.

09:39  24           So we're making strides to try to get those

09:39  25  preventative health maintenance stuff completed.

09:39  1      Q.   Were all of those changes made during your time

09:39  2  as director of nursing?

09:39  3      A.   Yes.

09:39  4      Q.   The health assessments within 14 days and

09:39  5  physical within or at the year mark -- when did that go

09:39  6  into practice in the jails?

09:39  7      A.   I believe it was March 16th-ish, in March-ish

09:39  8  of last year.

09:39  9      Q.   And currently is that happening for all

09:39 10  individuals in the jail?

09:39 11      A.   Yes.

09:39 12      Q.   Is there a system in place to review or audit

09:40 13  to ensure that this new policy is -- is being put into

09:40 14  practice properly?

09:40 15      A.   Yes.

09:40 16      Q.   And what does that audit or review process look

09:40 17  like?

09:40 18      A.   I -- there's a report you can run of how long

09:40 19  someone's been in custody and who is missing that 14-day

09:40 20  health assessment.  It will -- so we can run that

09:40 21  report.  There's also the one that will let you know who

09:40 22  has missed the year one.  So there's reports we can run

09:40 23  for checks and balances.

09:40 24      Q.   And are those reports run routinely?

09:40 25      A.   Yes.

09:40  1     Q.   By who?

09:40  2     A.   I require all the facility supervisors to run

09:40  3   them daily.  I run them weekly.

09:40  4     Q.   Are they run through TechCare?

09:41  5     A.   Yes.

09:41  6     Q.   And in your weekly reviews, how often do you

09:41  7   see individuals who have missed either of those two

09:41  8   markers, either the 14-day health assessment or the

09:41  9   physical within or at the year mark?

09:41 10     A.   So the physical at the year mark -- it's hard

09:41 11   to judge that one just because it looks at everybody in

09:41 12   custody, and since we just started in March, there would

09:41 13   be that -- a large population that would have missed

09:41 14   that year mark.

09:41 15         So I'm more focused on the 14-day mark and

09:41 16   who's been in custody since we implemented this.  So

09:41 17   when I review the ones for the 14-day mark, there's very

09:41 18   few that are missed.  I do investigate each and every

09:41 19   one that is missed.

09:41 20     Q.   Do you save these reports somewhere?

09:41 21     A.   No.

09:42 22     Q.   Were you aware that in February of 2022, the

09:42 23   State auditor issued a report about the jail?

09:42 24     A.   Yes.

09:42 25     Q.   How did you learn about that?

11:51  1   symptom such that it requires a 24-hour face-to-face?

11:51  2       A.   A registered nurse.

11:51  3       Q.   And so then is it your testimony that the

11:51  4   jail's policy changed from responding to sick calls in a

11:51  5   timely manner to now requiring a 24-hour face-to-face

11:51  6   for clinical symptoms?

11:51  7       A.   Yes.

11:51  8       Q.   And does the 24-hour face-to-face for clinical

11:51  9   symptoms always happen as a matter of practice?

11:51 10       A.   No.

11:51 11       Q.   How often -- approximately how often is that

11:52 12   policy not complied with?

11:52 13            MS. COLEMAN:  Calls for speculation.  Lack of

11:52 14   foundation.

11:52 15            THE WITNESS:  That varies per facility.  I

11:52 16   don't have the numbers off the top of my head.  George

11:52 17   Bailey has the highest population in -- for incarcerated

11:52 18   persons.  So as for the 24 hours being met there, that's

11:52 19   the facility that doesn't meet it the most where other

11:52 20   facilities are able -- due to the population are -- have

11:52 21   a better track record of doing it in 24 hours.

11:52 22   BY MS. KAUL:

11:52 23       Q.   So at George Bailey, how frequently is that

11:52 24   policy not complied with?

11:52 25            MS. COLEMAN:  Calls for speculation.  Lack of

**Ex. T - 784**

11:52  1  foundation.  Overly broad.

11:52  2         THE WITNESS:  I don't -- I wouldn't know.

11:52  3  BY MS. KAUL:

11:52  4     Q.  Who would know?

11:52  5     A.  We would have to run reports, and those reports

11:52  6  are not easily ran and how to do that just because of

11:53  7  the way TechCare is set up.

11:53  8     Q.  Does anyone run those reports routinely?

11:53  9     A.  We run them occasionally.

11:53 10     Q.  How occasionally?

11:53 11     A.  I would say the facility supervisors run them

11:53 12  twice a month, if not more, and I try to run them once a

11:53 13  week, depending on my workload as well or monthly.  It's

11:53 14  very time-consuming.

11:53 15     Q.  When was the last time you ran one of those

11:53 16  reports?

11:53 17     A.  I --

11:53 18         MS. COLEMAN:  For George Bailey?

11:53 19         MS. KAUL:  For any facility.

11:53 20         THE WITNESS:  I ran one for George Bailey just

11:53 21  probably last week.

11:53 22  BY MS. KAUL:

11:53 23     Q.  And what did that report show in terms of how

11:53 24  frequently that 24-hour face-to-face was not complied

11:53 25  with?

12:06  1    of these issues?"  "Concerns?"

12:06  2         It's a general physical of overall general

12:06  3    health.

12:07  4    Q.   I think you testified earlier that you also run

12:07  5    reports to determine whether the 14-day assessment is

12:07  6    happening on a timely basis; is that right?

12:07  7    A.   Yes.

12:07  8    Q.   And how often is that not happening?

12:07  9    A.   We're doing our 14-day health assessments

12:07 10    probably at 80 to -- 80 to 98 percent success rate.

12:07 11    Q.   Do those head-to-toe health assessments ever

12:07 12    occur within 48 hours of someone entering the facility?

12:07 13    A.   They can, yes.

12:07 14    Q.   How often does that happen?

12:07 15    A.   It depends on the facility.  For example,

12:08 16    Vista, the way their flow is set up, sometimes it's

12:08 17    easier to do that health assessment while they're still

12:08 18    in intake compared to at Las Colinas.  It's also easier

12:08 19    for them to do.

12:08 20         As you know, Las Colinas has an open lobby.

12:08 21    It's a little slower.  So if there's a patient that

12:08 22    was -- that was booked, a nurse can do that health

12:08 23    assessment right then and there.  At CJ, just the

12:08 24    dynamics of it, the flow of it, sometimes it's a little

12:08 25    bit more difficult to do it right at intake or even on

02:20  1  never any denials of off-site treatment as he wrote in

02:21  2  this email?

02:21  3      A.   I can't say if there was ever a denial or not,

02:21  4  yes.

02:21  5      Q.   Do you recall -- strike that.

02:21  6           Were you involved in any meetings at which the

02:21  7  issue of high numbers of deferrals was raised?

02:21  8      A.   Yes.

02:21  9      Q.   Were those meetings between the County and

02:21 10  NaphCare?

02:21 11      A.   Yes.

02:21 12      Q.   And when did those meetings -- when was this

02:21 13  issue first raised at any meetings?

02:21 14      A.   This issue was first raised when the case

02:22 15  managers for the County were having issues getting

02:22 16  people scheduled for their OB appointments.  And then

02:22 17  that's how we started talking about referrals to the UM

02:22 18  queue.  So that's how this all -- the whole -- looking

02:22 19  into the UM queue in depth and deferrals and all that

02:22 20  came up kind of through this process.

02:22 21      Q.   And so the issue started to come up around the

02:22 22  time of late 2022?

02:22 23      A.   Yes, before the -- no one brought it to my --

02:22 24  you know, raised any red flags about deferrals.

02:22 25      Q.   And was the issue of high numbers of deferrals

02:24  1  custody, while I respect you can go to a different

02:24  2  provider to do other treatment options, we're limited --

02:24  3  we are -- we are a correction facility.

02:24  4       So if someone needs PT or OT and try and tell

02:24  5  them to do certain exercises in a detention facility may

02:24  6  not be feasible -- who's teaching them that -- those --

02:24  7  that's -- while I think it's great and I know it happens

02:24  8  in health care, things get deferred.

02:24  9       I just think sometimes we don't look at the

02:24 10  whole picture, that this person may not know these

02:25 11  exercises.  Who's going to teach them these exercises?

02:25 12  Are they going to be able to do these exercises in our

02:25 13  facility?  You know, just stuff like that.

02:25 14       We're a little different than the community,

02:25 15  what we can do and cannot do per se in our facilities.

02:25 16  BY MS. KAUL:

02:25 17   Q.   Other than PT, are there other examples where

02:25 18  these high numbers of deferrals concerned you as it

02:25 19  related to patients getting what was best for their

02:25 20  care?

02:25 21       MS. COLEMAN:  Objection.  Vague.  Asked and

02:25 22  answered.

02:25 23       THE WITNESS:  Not that I can think of, no.

02:25 24  BY MS. KAUL:

02:25 25   Q.   During your time as director, were there any

04:22  1  information is now in TechCare.

04:22  2      Q.   What's your opinion of TechCare in terms of its

04:22  3  utility for health care services in the jail?

04:22  4           MS. COLEMAN:  Objection.  Overly broad.

04:22  5           THE WITNESS:  I think TechCare overall is a

04:22  6  good system.  And there's some improvements that can be

04:22  7  made, but it was better than -- better than JIMS.

04:22  8  BY MS. KAUL:

04:22  9      Q.   What improvements would you make?

04:22 10      A.   Partly how we schedule patients.  That's one

04:22 11  thing I would -- I would change, the way we -- the way

04:22 12  it -- it holds -- while it holds a lot of information,

04:22 13  sometimes finding that information is not user friendly.

04:23 14  You'll get it but it's -- I think it could be better.

04:23 15  So those little types -- those little types of tweaks.

04:23 16      Q.   And what would you improve about scheduling?

04:23 17      A.   Right now scheduling -- when you go to schedule

04:23 18  a patient, it's either "priority" or "routine."

04:23 19  "Priority" is in 24 hours.  "Routine" is in seven days.

04:23 20  Yes, a nurse can go put a manual date in there, but

04:23 21  sometimes when you get to typing, you get in a routine,

04:23 22  and I wish it would force a nurse or a person to put a

04:23 23  date in there and not just automatically schedule them.

04:23 24      Q.   It automatically schedules folks for either

04:23 25  priority or routine?

04:49  1  receiving screen.  So I don't know.  If you were to ask

04:49  2  me, "Well what is this report picking up?  To say

04:49  3  they're doing receiving screenings?" I couldn't tell

04:49  4  you.

04:49  5      Q.   There's a row that says, "Positive PPD."

04:49  6           Do you see that?

04:49  7      A.   Yes.

04:49  8      Q.   What does "PPD" refer to?

04:49  9      A.   That's a way to do tuberculosis screening.

04:49 10      Q.   Then there's a row that says, "Patient

04:49 11  grievances submitted."

04:49 12           Do you see that?

04:49 13      A.   Yes.

04:49 14      Q.   And do you have an understanding of whether

04:49 15  these numbers are accurate in terms of grievances

04:50 16  submitted?

04:50 17      A.   I cannot speak upon their accuracy.

04:50 18      Q.   Do you think they're inaccurate?

04:50 19      A.   Yes.

04:50 20      Q.   Because they're not capturing all of the

04:50 21  grievances that were likely submitted; right?

04:50 22      A.   Yes.

04:50 23      Q.   Was this report generated out of TechCare?

04:50 24           MS. COLEMAN:  Calls for speculation.

04:50 25           THE WITNESS:  From my understanding, yes, that

SERINA ROGNLIEN-HOOD
FEBRUARY 14, 2024

JOB NO. 865805

04:50   1    he pulls it from TechCare.

04:50   2    BY MS. KAUL:

04:50   3        Q.   Under Chronic Conditions, do you know what the

04:50   4    "other" refers to there at the bottom of that section?

04:50   5        A.   No.

04:50   6        Q.   Was this document discussed at the MAC meeting?

04:50   7        A.   Yes.

04:50   8        Q.   And were questions raised about the accuracy of

04:51   9    the report?

04:51   10       A.   Yes.

04:51   11       Q.   And what was the general response?

04:51   12       A.   He will get that information for us.

04:51   13       Q.   What information?

04:51   14       A.   What the questions that we had of how

04:51   15   they're -- like, that was a question I asked is:  "Where

04:51   16   do we get 'other' from?"  And he would get with IT and

04:51   17   report that information to us.

04:51   18       Q.   Did he?

04:51   19       A.   No.

04:51   20       Q.   Did you follow up to ask about that?

04:51   21       A.   Yes.

04:51   22       Q.   How many times?

04:51   23       A.   At least three.  Because every MAC meeting we

04:51   24   had, I brought it up.

04:51   25       Q.   And the response was the same?

04:51   1        A.   Yes.

04:51   2        Q.   If you could turn to the next page, there's a

04:52   3   row that says, "Call for Immunizations."

04:52   4             Do you know what that means?

04:52   5        A.   Yes.

04:52   6        Q.   What does that mean?

04:52   7        A.   It is the -- it's a queue of people that are

04:52   8   scheduled to get some type of vaccine.

04:52   9        Q.   Does the jail offer COVID vaccines?

04:52  10        A.   Yes.

04:52  11        Q.   And is --

04:52  12             MS. COLEMAN:   And the flu.

04:52  13   BY MS. KAUL:

04:52  14        Q.   And is everyone who asks for a COVID vaccine

04:52  15   provided with one?

04:52  16        A.   Yes.

04:52  17        Q.   There's a row that says, "Chronic Care."

04:52  18             Do you know what that refers to?

04:52  19        A.   Let me get there.

04:52  20        Q.   It's the third row down.

04:52  21        A.   Yes.

04:52  22        Q.   Do you know what that refers to?

04:52  23        A.   From my understanding, it's the chronic care

04:52  24   sick call appointments that were conducted in that

04:53  25   quarter for chronic care conditions.

SERINA ROGNLIEN-HOOD                                          JOB NO. 865805
FEBRUARY 14, 2024

1                    CERTIFICATE OF REPORTER

2           I, Gina Marie De Luca, a Certified Shorthand

3    Reporter, licensed by the State of California, being

4    empowered to administer oaths and affirmations remotely

5    pursuant to Section 2093(b) of the Code of Civil Procedure,

6    do hereby certify:

7           That the foregoing proceedings were taken remotely

8    before me at the time and place herein set forth; that any

9    witness in the foregoing proceedings, prior to testifying,

10   were placed under oath; that a verbatim record of the

11   proceedings was made by me using machine shorthand which

12   was thereafter transcribed under my direction; further,

13   that the foregoing is an accurate transcription thereof.

14          I further certify that I am neither financially

15   interested in the action nor a relative or employee of any

16   attorney or any of the parties.

17          Further, that if the foregoing pertains to the

18   original transcript of a deposition in a Federal Case,

19   before completion of the proceedings, review of the

20   transcript [  ] was [ X ] was not requested.

21          In witness whereof, I have this date subscribed my

22   name.

23   Dated:  February 29, 2024

24   _____

25                    Gina Marie De Luca, CSR No. 6973

# EXHIBIT U

```
 1                 UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3                        ---o0o---

 4   DARRYL DUNSMORE, ANDREE        )Case No.
     ANDRADE, ERNEST ARCHULETA,     )3:20-cv-00406-AJB-DDL
 5   JAMES CLARK, ANTHONY EDWARDS,  )
     LISA LANDERS, REANNA LEVY,     )
 6   JOSUE LOPEZ, CHRISTOPHER       )
     NELSON, CHRISTOPHER NORWOOD,   )
 7   JESSE OLIVARES, GUSTAVO        )
     SEPULVEDA, MICHAEL TAYLOR, and )
 8   LAURA ZOERNER, on behalf of    )
     themselves and all others      )
 9   similarly situated,            )
                                    )
10               Plaintiffs,        )
                 vs.                )
11                                  )
                                    )
12   SAN DIEGO COUNTY SHERIFF'S     )
     DEPARTMENT, COUNTY OF SAN      )
13   DIEGO, SAN DIEGO COUNTY        )
     PROBATION DEPARTMENT, and DOES )
14   1 to 20, inclusive,            )
                                    )
15               Defendants.        )
     _____ )
16

17

18        Deposition of Jon Montgomery, MD, PMK, Volume II, at

19   501 West Broadway, Suite 1600, San Diego, California,

20   commencing at 9:05 A.M., PST on Friday, April 26, 2024 before

21   Nicole O'Neil, Certified Shorthand Reporter 10774, in and

22   for the State of California.

23

24   STENO
     Concierge@Steno.com
25   (888)707-8366 APPEARANCES VIA STENO CONNECT
```

Ex. U - 795

1    within 14 days of a person being booked in the jail.

2        A.    Could you restate the question?

3        Q.    Does the sheriff's department require that there

4    be a complete health assessment of every individual

5    within 14 days of the person being booked into the jail?

6        A.    Thank you.  I would certainly agree that it is

7    the NCCHC standard is that there's two different

8    algorithm directions.  You can evaluate everyone within

9    three days.  You can evaluate a section of the population

10   within 72 hours, or you can evaluate everyone remaining

11   within custody within 14 days.  That's NCCHC standards.

12   That's the department's intent.  I don't believe it has

13   been made a requirement in the policies and procedures

14   yet.

15       Q.    What does that 14-day health assessment entail?

16   Just generally speaking, what kind of physical exam is

17   it?  Assuming it's only a physical/medical exam.  Can you

18   describe for me what's involved in that assessment?

19       A.    It's my understanding that it does constitute a

20   hands on -- a physical examination.  It goes through the

21   preventative medicine screening questionnaires and also

22   involves a brief dental examination -- dental for

23   purposes of triage.

24       Q.    And understanding that this isn't yet required

25   as a matter of policy, is this happening in practice in

1  the jail?

2       A.   Yes.  We have been implementing that.  It's a

3  great standard.  It provides great care for our patients.

4       Q.   When did this implementation begin?

5       A.   I can't say exactly for dates and times.  This

6  has always been a goal.  I believe we have been able to

7  implement these kinds of exams starting in 2023.  Whether

8  or not it's actually made it into official policy or how

9  frequently we're able to do it remains to be seen.

10      Q.   Approximately what percentage of health

11  assessments are completed within the first 14 days?

12           MS. COLEMAN:  May call for speculation.  Lack of

13  foundation.  Also vague as to time.

14           THE WITNESS:  Uncertain, again, about the dates

15  and times.  This has always been a goal for us.  In prior

16  meetings, I remember hearing that we are getting close to

17  doing everybody.  I can't state how -- what the

18  percentage actually is now.

19  BY MS. KAUL:

20      Q.   Greater than 75 percent?

21      A.   Within 14 days it may vary by facility.  I would

22  agree that, that would be a rough estimate.

23      Q.   And I'm sorry.  Rough estimate being 75 percent?

24      A.   Being 75 or greater.  That would vary by

25  facility and our goal is to be -- to increase.

1                         CERTIFICATE OF REPORTER

2                              ---o0o---

3            I, the undersigned, a Certified Shorthand

4    Reporter, Licensed by the State of California, being

5    empowered to administer oaths and affirmations do hereby

6    certify:

7            That the foregoing proceedings were taken at the

8    time and place herein set forth; that any witness in the

9    foregoing proceedings, prior to testifying, were placed

10   under oath; that a verbatim record of the proceedings was

11   made by me using machine shorthand which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof.

14           I further certify that I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney or any of the parties.

17           Before completion of the deposition, review of

18   the transcript [  ] was [ X ] was not requested.  If

19   requested, any changes made by the deponent (and provided

20   to the reporter) during the period allowed, are appended

21   hereto. (Fed. R. Civ. P. 30(e)).

22           IN WITNESS WHEREOF, I have this date subscribed

23   my name.

24   DATED: 6th of May, 2024.

25                         _____
                           Nicole O'Neil, CSR No. 10774

# EXHIBIT V

Tony Williams and I visited George Bailey, East Mesa, Vista, and Las Colinas on March 27, 2024, and the Central Jail, South Bay, and Rock Mountain on March 28, 2024. The plaintiff's attorney rounded with us at all facilities.

George Bailey has six housing units, two of which are dorms. There is an Ad Seg area. The unit has an infirmary on-site. Housing Unit 6 is under renovation. Dorm capacity is approximately 320. No hospital beds…they are located at Central Jail. There is one dental treatment room. A dentist was not present. The dental hygienist, Claudia Pascua, was there and spoke with me for about 10 minutes. She said she had only been working there for a short period but enjoyed it.

Vista has a capacity of 886, with an average daily count of 663. There are 123 sworn staff and 125 professional staff. There are wellness checks every Tuesday and Wednesday on alternating weeks. No dentist was present at Vista but the clinic was well-maintained and spacious.

Dr. Patel was present at Las Colinas. She was busy treating a patient when I was there, but she did speak to me for about 10 minutes when finished. She told me the pano was currently not working. She also said that she hoped to have an expanded policy manual.

The Central Jail clinic has two treatment rooms. I briefly spoke with the hygienist there, Edward Belandres. He said he enjoyed working there and was hoping to have another hygienist hired soon.

Rock Mountain is under renovation and has no dental clinic yet, although there were certain items, i.e. a dental chair and unit, that were present.

East Mesa and South Bay did not have dental clinics.

# EXHIBIT W

# Homicide, In-Custody Deaths, Officer Involved Shootings

## Homicides by Year



Chart showing the number of homicides from 2015-2025.

# Homicides (2025)

No incidents to report.

Table with victim and suspect information relating to 2024 homicides.

# Deputy Involved Shootings by Year



Chart showing the number of deputy involved shooting from 2015-2025.

# Deputy Involved Shootings (2025)

No incidents to report.

Table with information relating to 2025 deputy involved shootings.

 *Deputy race/ethnicity has been excluded due to laws governing employee personnel files

## In-Custody Deaths by Year

**Ex. W - 802**



Chart showing the number of in-custody deaths from 2015-2025.

# In-Custody Deaths (2025)

| Incident Date | Incident Location | Subject Name | Subject Age | Subject Race | Subject Gender | Custody Status | Location Where Death Occurred | Manner of Death | Cause of Death |
|---|---|---|---|---|---|---|---|---|---|
| 1/10/2025 | SDCJ | Duckett, Donell | 68 | Black | Male | Sentenced | Local hospital | Natural | Cardiovascular disease, cerebral disease, hypertensive, end stage renal disease, atherosclerotic |

Table with information relating to in-custody deaths.

*Data reflects in-custody deaths within detention facilities. Custody status is defined as the custody status of the subject immediately preceding death (process of arrest, in transit, awaiting booking, booked-no charges filed, booked-awaiting trial, sentenced, out to court, other)

Last Reviewed: 01/17/2025

# Major Crimes Report Archives

## Major Crimes Archive by Year

2024 Major Crimes Data

## Major Crimes Archive by Year

Major Crimes | 2023

## Major Crimes Archive by Year

Major Crimes | 2022

## Major Crimes Archive by Year

Ex. W - 803

# EXHIBIT X

Case 3:20-cv-00406-AJB-DDL    Document 796-2    Filed 01/21/25    PageID.34795
Page 542 of 546




Give Now

☰

🔍 **Have a tip for KPBS' Investigations Team? Click here to submit an anonymous tip or share documents**

# Advocates claim Sheriff's Office underreported jail deaths in 2024

By **Katie Hyson** / Racial Justice and Social Equity Reporter
Contributors: **Mike Damron** / Video Journalist

Published December 31, 2024 at 4:50 PM PST



**LISTEN** • 1:16

KPBS

**Ex. X - 805**


Advocates claim Sheriff's Office underreported jail deaths in 2024

California requires the San Diego County Sheriff's Office to report deaths of individuals in its custody.

That number doesn't have to include deaths as a result of jail incidents if the person is no longer in custody when they die.

The death of 46-year-old Bobby Ray Patton, reported Monday, brought their number for this year to nine.

Advertisement

Become a KPBS sponsor

Advocates — including the director of Saving Lives in Custody California, Yusef Miller — argue that number should be 10.

Eric Van Tine was allegedly beaten unconscious by his cellmate last December.

KPBS

**Ex. X - 806**

The San Diego Union Tribune reported their cell was designed for two people, but held three.

The sheriff's office released him for medical treatment. He spent months in a coma, and later died.

"Mr. Van Tine passed away while in Missouri," the sheriff's office's media relations director Kimberly King said in a statement. "The Medical Examiner/Coroner of the affected county has not made a determination yet as to his cause of death."

King said they're still investigating his death locally and can't comment.

They didn't include Van Tine in their reported deaths for this year.

"With Mr. Tine, he goes unreported and we didn't know unless we already had an inside scoop," Miller said. "Now how many other people that we didn't have an inside scoop died this year? We have no idea."

The sheriff's office doesn't legally have to report deaths like Van Tine's, but Miller says they should.

"So we can have a true picture of what we're facing," he said. "And only with this kind of transparency will we have a real solution that we can develop."

KPBS

**Ex. X - 807**

# Number of in-custody deaths reported by the San Diego County Sheriff's Office each year since 2014

The reported number is decreasing, but advocates say the true total is unknown.



A graph shows the number of in-custody deaths reported by the San Diego County Sheriff's Office each year since 2014. The reported number is decreasing, but advocates say the true total is unknown.

The number of reported deaths is trending down since 2022.

Sheriff Kelly Martinez said in a statement earlier this month the decline is due to policy changes her office made. Those changes include stricter intake screening that extends to her own staff, routine wellness checks and expanded treatment for people experiencing drug withdrawals.

Miller said she shouldn't take credit for the decline in jail deaths.

He argued most of those changes were mandated by the state, and numbers have been going down across southern California.

KPBS

**Ex. X - 808**

The sheriff's office did not give KPBS a response to this claim.

**Tags**   Racial Justice and Social Equity      Law Enforcement      San Diego



### Katie Hyson

Katie Hyson reports on racial justice and social equity for KPBS. She moved here from Gainesville, Florida, where she reported on the same beat. Prior to journalism, she advised immigrants, administered an organic farm, and offered nonprofit assistance to sex workers. She loves sunshine, adrenaline and a great story.

See stories by Katie Hyson

# Sign up for our newsletters!

Keep up with all the latest news, arts and culture, and TV highlights from KPBS.

**Email address ***

☐ **Today's Top Stories**

KPBS

**Ex. X - 809**