GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:    (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>        Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF JEFFREY M. KELLER, M.D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:  Hon. Anthony J. Battaglia<br><br>Date:    March 6, 2025<br>Time:    2:00 p.m.<br>Crtrm.:  4A |

[4621590.2]

## DECLARATION OF JEFFREY E. KELLER, M.D.

I, Jeffrey E. Keller, M.D., declare that if called upon I could and would testify competently to the information contained below, including in my expert reports, which is based on my own personal knowledge:

1.      I am a physician licensed to practice medicine in the State of Idaho, with a particular focus on correctional medicine.  I am also a businessperson with significant knowledge about the private correctional healthcare industry.  I am currently the President of the American College of Correctional Physicians.  I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment ("Motion").

2.      Attached as **Exhibit 1** is a true and correct copy of my August 21, 2024 report ("Report"), which accurately represents my opinions in this case.  Exhibit 1 does not include the index of documents I reviewed.

3.      Attached as **Exhibit 2** is a true and correct copy of my November 2, 2024 rebuttal report ("Rebuttal"), which accurately represents my opinions with respect to the report of Owen Murray in this case.  Exhibit 2 does not include the index of documents I reviewed.

4.      I have reviewed the portions of Defendants' Motion for Partial Summary Judgment pertaining to medical care, as well as the supporting declarations of Dr. Owen Murray, Dr. Jon Montgomery, Dr. Peter Freedland, and Ms. Serina Rognlien-Hood.

5.      The Motion and supporting declarations assert that the Jail has further increased medical provider/practitioner staffing levels.  However, I still have not seen any evidence that Defendants have conducted a staffing analysis to determine whether the number of medical practitioners at the Jail is sufficient to provide adequate care.  Such a staffing analysis could help determine the number of practitioners, the breakdown of mid-level practitioners versus doctors, and where and when those practitioners should be staffed in order to ensure that all required

tasks are completed by medical staff each day.  Absent such a staffing analysis, the mere assertion that staffing has been increased is far from an opinion that staffing at the Jail is adequate.

6.      The Motion and supporting declarations also assert that Defendants have instituted a "pilot program," through which some, but not all, incarcerated people are seen by a "medical provider" as part of the booking process.  Murray Decl. ¶ 84.  That program purports to operate 14 hours per day and sees, on average, 25 patients in each 14-hour period.  *Id.* ¶ 85. According to the Sheriff's Office website, 51,905 people were booked into the Jail in 2024, meaning that approximately 142 people are booked each day.  The "pilot program" therefore reaches only about 18% of the Jail's population.

7.      The Motion and supporting declarations assert that "medical staff are now utilizing" a long-acting insulin, *id.* at ¶ 82, which, as I explained in my Report (at pp. 87-89), Defendants previously had refused to provide, placing incarcerated people at great risk.  In particular, I explained in my Report, that a NaphCare form specifically instructed StatCare remote practitioners to "substitute[]" any long-acting insulin prescription with another medication, Novolin N BID, during the booking process.  Report at 88-89.  The Murray Declaration's assertion that "medical staff are now utilizing" long-acting insulin does not specify *which* medical staff prescribe insulin and therefore does not address my concerns that StatCare automatically discontinues long-acting insulins at booking.  Specifically, I understand Dr. Murray's statement to refer to the Jail's on-site medical practitioners, who are contractors hired by CHP.  But those practitioners have no oversight of StatCare practitioners.  *See* Report at 130.  If StatCare practitioners continue their policy of discontinuing long-acting insulins, and incarcerated people must wait until they are seen by an on-site practitioner to have their long-acting insulin re-prescribed, incarcerated people will remain at risk of serious harm.

8.      The Motion and supporting declarations claim Defendants provide

1  adequate specialty care, relying on the number of referrals to sub-specialists that

2  Defendants have completed in the last 13 months, as well as the number of glasses

3  provided.  But those numbers, alone, do not establish that incarcerated people are

4  receiving the specialty care they need; critically, there is no indication of the number

5  of requests for referrals that were denied over the same time period.  In addition, I

6  have seen no indication that Defendants have relationships with providers for

7  referrals of critical specialties, such as rheumatology and physical therapy.

8      9.    The Motion and supporting declarations assert that CHP has developed

9  some disease management guidelines for certain medical conditions.  However,

10 there is no indication that those disease management guidelines will be employed by

11 NaphCare staff who provide care at the Jail, in particular, the StatCare remote

12 practitioners, who frequently provide initial direction at the Jail before or instead of

13 on-site CHP practitioners.  *See* Report at 127-33.  The disease management

14 guidelines will not be truly implemented at the Jail unless *all* of the Jail's

15 practitioners and health staff follow them—regardless of which contractor they work

16 for.  In addition, I have not seen any evidence that Defendants or their contractors

17 have provided new guidance for hepatitis C, diabetes, hernias, or latent tuberculosis,

18 all of which were discussed in my Report.  *Id.* at 154-77.

19     I declare under penalty of perjury under the laws of the United States of

20 America that the foregoing is true and correct to the best of my knowledge, and that

21 this declaration is executed at Idaho Falls, Idaho this 17th day of January, 2025.

22

23

24 _____

25 Jeffrey E. Keller, M.D.

26

27

28

# EXHIBIT 1

1  GAY C. GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  ERIC MONEK ANDERSON – 320934
   HANNAH M. CHARTOFF – 324529
3  BEN HOLSTON – 341439
   ROSEN BIEN
4  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
5  San Francisco, California 94105-1738
   Telephone: (415) 433-6830
6  Facsimile: (415) 433-7104
   ggrunfeld@rbgg.com
7  vswearingen@rbgg.com
   eanderson@rbgg.com
8  hchartoff@rbgg.com
   bholston@rbgg.com
9
   AARON J. FISCHER – 247391
10 LAW OFFICE OF
   AARON J. FISCHER
11 1400 Shattuck Square Suite 12 - #344
   Berkeley, California 94709
12 Telephone: (510) 806-7366
   Facsimile: (510) 694-6314
13 ajf@aaronfischerlaw.com

14 Attorneys for Plaintiffs and the
   Certified Class and Subclasses

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

15

16                     UNITED STATES DISTRICT COURT

17                   SOUTHERN DISTRICT OF CALIFORNIA

18  DARRYL DUNSMORE, ANDREE            Case No. 3:20-cv-00406-AJB-DDL
    ANDRADE, ERNEST ARCHULETA,
19  JAMES CLARK, ANTHONY EDWARDS,     **EXPERT REPORT OF**
    LISA LANDERS, REANNA LEVY,        **JEFFREY E. KELLER, M.D.**
20  JOSUE LOPEZ, CHRISTOPHER
    NELSON, CHRISTOPHER NORWOOD,      Judge:      Hon. Anthony J. Battaglia
21  JESSE OLIVARES, GUSTAVO           Magistrate: Hon. David D. Leshner
    SEPULVEDA, MICHAEL TAYLOR, and
22  LAURA ZOERNER, on behalf of       Trial Date: None Set
    themselves and all others similarly situated,
23                  Plaintiffs,
24         v.
    SAN DIEGO COUNTY SHERIFF'S
25  DEPARTMENT, COUNTY OF SAN
    DIEGO, SAN DIEGO COUNTY
26  PROBATION DEPARTMENT, and DOES
    1 to 20, inclusive,
27                  Defendants.

28

[4448212.31]

# TABLE OF CONTENTS

**Page**

EDUCATION AND QUALIFICATIONS .................................................... 1

SUMMARY OF OPINIONS ................................................................ 3

METHODOLOGY ............................................................................ 6

BACKGROUND .............................................................................. 8

I.    Multiple Expert Entities Have Reported on the Inadequate Healthcare
      at the Jail .......................................................................... 8

II.   The Sheriff's Department's Contracts with Multiple Private Companies
      to Provide Healthcare at the Jail ......................................... 17

      A.    Background on NaphCare ............................................ 17

      B.    NaphCare's 2022 Contract with San Diego County ............ 21

      C.    The Sheriff's Department Continued to Work With, and Pay,
            NaphCare, Despite Knowing That NaphCare Was Not Living Up
            to Its Contractual Obligations ..................................... 21

      D.    The Sheriff's Department Recently Contracted with Correctional
            Healthcare Partners to Provide Additional Health Care Staff ...... 24

OPINIONS ................................................................................... 25

I.    Inadequate Medical Care at the Jail Has Resulted in Preventable Deaths ...... 26

      A.    The Jail's Flawed Mortality Review Process .................... 28

      B.    NaphCare's Flawed Mortality Review Process ................. 30

      C.    Case Studies of Deaths at the Jail Demonstrate Substandard Care ...... 35

            1.    Patricia Adamson (23706155), Died May 3, 2023 .......... 36

            2.    Raymond Dix (22737506), Died September 13, 2022 ........ 42

            3.    Vianna Granillo (22728152), Died July 13, 2022 .......... 45

            4.    Abdiel Sarabia (21118298), Died July 22, 2022 .......... 48

            5.    Aaron Bonin (22736636), Died November 1, 2022 ........ 51

            6.    Roselee Bartolacci (23713442), Died May 29, 2023 ....... 54

            7.    Erica Wahlberg (22726497), Died July 2, 2022 ............ 60

      D.    Repeated Root Causes of Death in These Case Studies .......... 64

E.    Additional Deaths in the Jail ................................................. 65

II.    The Sheriff's Department's Inadequate Screening and Intake Process Fails to Identify and Treat Medical Care Problems of Newly Arriving Incarcerated People, Placing Them at Substantial Risk of Significant Harm ................................................. 69

A.    Step One:  Medical Clearance ................................................. 71

B.    Step Two:  Receiving Screening ................................................. 72

C.    Step Three:  Second Stage Nursing Evaluation ................................ 73

D.    Step Four:  14-Day Health Assessment ....................................... 74

III.    The Sheriff's Department Fails to Continue Medically Necessary Medications and Treatments for Incarcerated People Upon Their Arrival at the Jail or Transfer Between Jail Facilities, Placing Them at Substantial Risk of Serious Harm ................................... 82

A.    Continuing Medical Necessary Medications After Booking ............... 82

B.    Continuing Medically Necessary Treatment After Booking .............. 89

IV.    The Sheriff's Department Does Not Provide Incarcerated People with a Reliable and Timely Way to Alert Health Care Staff of Their Medical Needs, Placing Them at Substantial Risk of Serious Harm ....................... 93

A.    The Sheriff's Department Lacks an Effective Process for Submission, Tracking, and Scheduling of Sick Calls ..................... 95

B.    Even When Medical Requests Received and Processed, They Are Often Not Timely or Adequately Addressed ............................ 101

C.    Grievances Are Often Ignored or Not Answered Satisfactorily ......... 105

D.    The Sheriff's Department Lacks an Effective Alert System for Medical Emergencies ................................................. 108

E.    The Sheriff's Department Lacks a Working System for Ensuring that People with Mental Illness or Other Communication Difficulties Receive Medical Care ............................................. 111

V.    The Sheriff's Department Improperly Documents "Refusals" of Medical Care, Resulting in the Denial of Care to Incarcerated People, and Placing Them at Substantial Risk of Serious Harm ....................... 113

VI.    The Sheriff's Department Routinely Attempts to Provide Medical Care Without Examining Patients or By Asking Medical Staff to Operate Outside Their Scope of Practice, Placing Incarcerated People at Substantial Risk of Serious Harm ................................................. 124

A.    The Jail Misuses STATCare, Employing Midlevel Practitioners in Remote Locations to Cover for, Supplement, and Replace On-Site Medical Practitioners. ................................................. 127

B.   Jail Medical Practitioners Provide Care to Incarcerated Patients Without Proper Examination. .............................................. 133

C.   Registered Nurses Operate Outside Their Scope of Practice at the Jail ............................................................................................... 134

VII.   The Sheriff's Department Lacks Sufficient Contracts with Hospitals and Offsite Providers and Lacks Proper Referral Processes to Provide Adequate Medical Care to Incarcerated People, Placing Them at Substantial Risk of Serious Harm ................................................. 136

VIII.   The Sheriff's Department Fails to Provide Adequate Diagnostic and Chronic Care to Incarcerated People and Provides Inadequate Treatment for Several Common Medical Conditions, Placing Them at Substantial Risk of Serious Harm ................................................. 148

A.   Diagnostic Care ................................................................. 149

B.   Chronic Care ..................................................................... 152

C.   Inadequate Treatment of Common Medical Conditions .................... 154

1.   Hepatitis C ("HCV") ............................................... 155

2.   Type 2 Diabetes ...................................................... 160

3.   Hernias ................................................................... 168

4.   Latent Tuberculosis ("LTB") ................................... 175

5.   Sexually Transmitted Infections ("STIs") ................ 177

6.   Asthma ................................................................... 182

IX.   The Sheriff's Department Fails to Provide Medically Necessary Vision Care ................................................................................................. 188

A.   The Sheriff's Department Fails to Screen or Evaluate People for Eye Diseases, Even Those Who Self-Identify as High Risk .............. 188

B.   The Sheriff's Department Fails to Timely and Adequately Address Incarcerated People's Visual Acuity Problems ................. 190

1.   There Are Numerous Barriers Preventing People From Timely Receiving Eye Glasses ................................... 190

2.   The Jail Lacks Adequate Policies and Procedures to Ensure IPs Have Access to Distance Glasses ........................ 191

X.   Custody Staff Interfere with the Provision of Care by Health Care Staff in the Jail, Including by Compromising Patient Confidentiality, Which Puts Patients at Substantial Risk of Serious Harm ......................... 197

XI.   The Sheriff's Department Fails to Maintain Adequate, Accurate, and Complete Medical Records, Which Compromises the Delivery of Care ..... 203

XII.    The Sheriff's Department Fails to Provide Necessary or Adequate
Follow-Up Medical Treatment to Incarcerated People ................................ 210

XIII.   The Sheriff's Department Fails to Provide Adequate Discharge
Planning Services and Medication for Incarcerated People Being
Released from the Jail ................................................................................ 216

        A.      Coordinating Ongoing Medical Care with Outside Agencies ........... 219

        B.      Discharge Medications ...................................................................... 221

        C.      Patient Instructions ......................................................................... 223

        D.      Documentation and Information Transfer. .......................................... 224

XIV.    The Sheriff's Department Fails to Maintain Adequate Quality
Assurance/Quality Improvement Processes to Ensure Appropriate and
Timely Medical Care .................................................................................... 225

        A.      The Jail's Policies Are Not Sufficiently Clear, Allowing Staff to
Escape Accountability ...................................................................... 228

        B.      The Sheriff's Department Does Not Provide Adequate Training,
Meaning that Some Staff May Not Know the Governing Policy ....... 230

        C.      The Sheriff's Department Does Not Track or Analyze the Right
Data to Ensure that Adequate Medical Care Is Provided ................. 231

        D.      The Sheriff's Department's Peer Review Process for Medical
Staff Is Inadequate .......................................................................... 233

XV.     The Sheriff's Department Systematically Fails to Maintain Sufficient
Numbers of Health Care Professionals, Resulting in Deficient Care ........... 234

        A.      The Jail Has Experienced a Shortage of Healthcare Staff for
Several Years ................................................................................... 234

        B.      The New Contract with CHP Will Not Solve the Jail's Problems ..... 240

                1.      Ongoing Nursing Shortage ..................................................... 241

                2.      Instability Created by Private Correctional Healthcare
Providers ................................................................................ 242

                3.      Siloed Medical Care Between NaphCare and CHP ................. 246

                4.      Deficiencies in New CHP Contract .......................................... 247

CONCLUSION ............................................................................................... 249

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I, Jeffrey E. Keller, M.D., declare:

1.     I am a physician licensed to practice medicine in the State of Idaho, with a particular focus on correctional medicine.  I am also a businessperson with significant knowledge about the private correctional healthcare industry.  I am currently the President of the American College of Correctional Physicians ("ACCP").  The ACCP is the only international membership organization committed to the professional development and fellowship of doctors and mid-level practitioners who practice in the field of correctional medicine—*i.e.*, providing medical care to patients incarcerated or confined in jails, prisons, and juvenile facilities.  A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit A**.  My background and experiences relevant to my expert testimony in this proceeding are set forth below.

**EDUCATION AND QUALIFICATIONS**

2.     I received my medical degree from the University of Utah in 1985.  I began my career as a residency trained emergency physician.  I practiced for 25 years at an Emergency Department in a busy Level-2 Trauma Center.  The majority of my professional medical career has been focused on correctional healthcare, including both the clinical and business aspects of providing medical care to incarcerated persons confined in jail and prison facilities.

3.     I have significant business experience in the private correctional healthcare industry.  When I use the term private correctional healthcare industry, I am referring to profit-seeking companies, like NaphCare, Inc. and its many competitors, whose business model centers on contracting with states, counties, and other municipalities to provide healthcare to incarcerated or confined citizens in return for money from which the companies endeavor to earn profits for their owners.

4.     From 1997 to 2021, I was the President and Medical Director of a company called Badger Medical PA.  Badger Medical PA was a for-profit jail

medical company that provided medical and mental health services to people incarcerated in 17 Idaho jails and juvenile facilities. As CEO and Medical Director of this company, I was responsible not only for overseeing medical care to incarcerated people but also for overseeing all business components of the company, including gaining and keeping contracts, making budgets, overseeing and controlling costs, and running the company with the goal of maintaining a profitable business while, at the same time, providing quality correctional healthcare that met the company's contractual commitments. I also supervised all medical care, wrote policies and procedures, oversaw quality improvement programs, and provided direct clinical care to patients in jails until I retired from clinical practice in 2021.

5.      I am also the former Chief Medical Officer ("CMO") of a correctional company called Centurion, LLC. I was CMO of Centurion from 2013 to 2018. Centurion is one of the nation's largest for-profit correctional medical companies. As CMO for Centurion, I supervised medical services for tens of thousands of incarcerated people in Massachusetts, Tennessee, Minnesota, Mississippi, Vermont, Florida, and New Mexico where Centurion had contracts. As CMO for Centurion, I also supervised Centurion's Quality Assurance Program, wrote medical guidelines for people incarcerated in prisons in states serviced by Centurion, and regularly interacted with Centurion upper-level management about issues relating to budgeting and other matters relating to Centurion's obligations to provide quality correctional healthcare and fulfilling the company's contracts while, at the same time, seeking to maintain profitable operations.

6.      I am currently a consultant in the correctional medical industry. I consult with both public entities and private entities on issues that include setting and maintaining realistic budgets for providing acceptable healthcare for incarcerated people. Throughout my experience, up to and including the present time, I have regularly interacted with upper managers of private correctional healthcare companies. I am very familiar with the industry as a whole based on my

personal business experience and my regular interaction with leaders and managers of these companies.

7.    The opinions set forth in this report are based on my own training, research, and experience as a Board-Certified Emergency Medicine Physician and as a long-standing correctional physician.

8.    I am Board Certified in Emergency Medicine through 2028.  I have been elected to be a Fellow of the American College of Emergency Physicians.  I have also been elected to be a Fellow of the American College of Correctional Physicians.  As noted above, I currently serve as the President of ACCP.  I have lectured and published frequently on the practice of Correctional Medicine, including a book entitled *The Best of Jail Medicine:  An Introduction to Correctional Medicine*.

## SUMMARY OF OPINIONS

9.    It is my opinion, based on a reasonable degree of certainty, that inadequate medical care at the Jail has resulted in preventable deaths and will continue to result in preventable deaths, because the Jail does not have adequate mortality and morbidity review procedures.

10.    It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department's screening and intake process is inadequate and fails to identify and treat medical care problems of newly arriving incarcerated people.  This systemic failure, which in my opinion is a root cause of the Jail's high mortality and morbidity rates, places incarcerated people at substantial risk of serious harm.

11.    It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department fails to continue medically necessary medications and treatments after people are booked into the Jail, placing incarcerated people at a substantial risk of serious harm.  The Sheriff's Department also fails to ensure continuity of care after patients return from off-site hospitalizations and medical visits, placing incarcerated people at substantial risk of serious harm.  This systemic

1  failure is, in my opinion, a root cause of the Jail's high mortality and morbidity

2  rates.

3       12.    It is my opinion, based on a reasonable degree of certainty, that the

4  Sheriff's Department does not provide incarcerated people with a reliable and timely

5  way to alert health care staff of their medical needs—whether emergent, urgent, or

6  routine—placing incarcerated people at a substantial risk of serious harm.  This lack

7  of communication with incarcerated people in need of medical care is particularly

8  challenging and dangerous for people with serious mental illness and developmental

9  disabilities, who are more even more likely to have their medical needs neglected

10  and suffer serious harm, including death.  This systemic failure is, in my opinion, a

11  root cause of the Jail's high mortality and morbidity rates.

12       13.    It is my opinion, based on a reasonable degree of certainty, that the

13  Sheriff's Department improperly documents "refusals" of medical care, resulting in

14  the denial of care to incarcerated people and placing them at a substantial risk of

15  serious harm.  This systemic failure is, in my opinion, a root cause of the Jail's high

16  mortality and morbidity rates.

17       14.    It is my opinion, based on a reasonable degree of certainty, that the

18  Sheriff's Department does not provide adequate examination of patients before

19  prescribing treatments, either because the practitioners providing care are

20  exclusively remote (rather than on-site) or because on-site practitioners do not

21  perform physical examinations, placing incarcerated people at a substantial risk of

22  serious harm.  In addition, it is my opinion that the Sheriff's Department relies on

23  nurses to operate outside their scope of practice to provide care, also placing

24  incarcerated people at a substantial risk of serious harm.  This systemic failure is, in

25  my opinion, a root cause of the Jail's high mortality and morbidity rates.

26       15.    It is my opinion, based on a reasonable degree of certainty, that the

27  Sheriff's Department uses inappropriate processes to refer or deny outside medical

28  appointments and lacks sufficient contracts with outside providers for specialty

1  medical care, placing incarcerated people at a substantial risk of serious harm.

2      16.    It is my opinion, based on a reasonable degree of certainty, that the

3  Sheriff's Department provides inadequate diagnostic and chronic care to

4  incarcerated people and provides inappropriate care for a number of common

5  medical conditions, placing incarcerated people at a substantial risk of serious harm.

6  This systemic failure is, in my opinion, a root cause of the Jail's high mortality and

7  morbidity rates.

8      17.    It is my opinion, based on a reasonable degree of certainty, that the

9  Sheriff's Department fails to provide medically necessary vision care, placing

10  incarcerated people at a substantial risk of serious harm.

11      18.    It is my opinion, based on a reasonable degree of certainty, that custody

12  staff routinely interfere with the provision of healthcare, including by denying

13  incarcerated people confidentiality in their interactions with healthcare providers,

14  which places incarcerated people at a substantial risk of serious harm.

15      19.    It is my opinion, based on a reasonable degree of certainty, that the

16  Sheriff's Department fails to maintain adequate, accurate, and complete medical

17  records, compromising the delivery of healthcare and placing incarcerated people at

18  a substantial risk of serious harm.

19      20.    It is my opinion, based on a reasonable degree of certainty, that the

20  Sheriff's Department does not provide adequate discharge planning to people being

21  released from custody, placing incarcerated people at a substantial risk of serious

22  harm.

23      21.    It is my opinion, based on a reasonable degree of certainty, that the

24  Sheriff's Department does not conduct adequate continuous quality improvement

25  programs, meaning that critical errors (including but not limited to those described

26  in this Report) go unaddressed, placing incarcerated people at a substantial risk of

27  serious harm.

28      22.    It is my opinion, based on a reasonable degree of certainty, that the

1   Sheriff's Department has failed to maintain adequate levels of healthcare staff

2   relative to the incarcerated population, placing incarcerated people at a substantial

3   risk of serious harm.  This systemic failure is, in my opinion, a root cause of the

4   Jail's high mortality and morbidity rates.

5                              **METHODOLOGY**

6          23.    I was asked by the attorneys representing the Plaintiffs in this case to

7   render an opinion as to the health care system, the general medical conditions, and

8   the adequacy of the medical care offered to the people incarcerated at the San Diego

9   County Jail (the "Jail").

10         24.    Prior to visiting three of the Jail facilities, I reviewed documents

11  pertinent to my objective.  These included the sections of the Third Amended

12  Complaint dealing with medical care, previous audits and inspections done of the

13  jail since 2017, contracts negotiated by San Diego County dealing with medical

14  care, and various other reports dealing with CQI, contract compliance, etc.

15         25.    I visited the Jail on February 6 through 8, 2024.  During the visit, I

16  toured the Central Jail, George Bailey Detention Facility ("George Bailey"), and Las

17  Colinas Detention and Reentry Facility ("Las Colinas").  At these facilities, I visited

18  medical housing units, intake units, medical clinics, a pharmacy, lab and storage

19  areas, and other housing units.  During the three days, I was able to speak briefly

20  with approximately 50 patients.  I also reviewed over 500 photographs taken during

21  the tour.  However, I was unable to interview many of the medical staff members

22  that I would have liked to.  Three different nurses at the Jail told me that "I was told

23  by my supervisor not to answer any of your questions," or "I was told not to talk to

24  you."

25         26.    After the tour, I reviewed 80 patient charts chosen by Defendants as

26  being representative of the following medical categories:  patients with opioid use

27  disorder (5), patients on opioid withdrawal protocols (5), patients with alcohol

28  withdrawal protocols (5), patients with HIV (5), patients with Hepatitis C (5),

patients with Type 2 Diabetes(5), patients with hypertension(5), patients with cancer (5), patients who received gynecological care (5), emergency room referrals (5), patients who had submitted five or more requests for medical care (5), patients housed in medical overflow segregation cells (5), patients on dialysis (5), patients receiving orthopedic care (5), and optometry referrals (5).  I also reviewed seven patient charts of individuals with whom I spoke during my inspection of the Jail. Many of the charts I received had technical issues that made them difficult to read. In particular, the records, which were in some cases thousands of pages long, were not text searchable, even after attempts to OCR them.  In addition, the charts were generally missing all lowercase letter Is and Ls.  I was unable to review a complete set of grievances (and their associated responses) relating to medical care, though some grievances were produced within the charts described above.

27.    A complete list of the materials I reviewed is attached hereto as **Exhibit B**.

28.    I compared and contrasted my findings with accepted standards of correctional medical care found in the following published guidelines and source material:  the National Commission on Correctional Health Care ("NCCHC"); published guidelines from nationally recognized medical specialty groups, such as The American Society of Addiction Medicine, the American Diabetic Association, American Association for the Study of Liver Diseases, and the Infectious Diseases Society of America; standard medical textbooks, such as *Uptodate*; and San Diego specific reports, including the NCCHC "Technical Assistance Report" commissioned by the Jail in 2017 and Dr. Homer Venters' "Review of Best Practices for Jail Operations for San Diego County" commissioned by the Jail in 2020.

29.    I also relied on my own training, research and experience.

30.    I am receiving compensation at a rate of $250.00 per hour plus expenses for this work.

31.    My opinions have a reasonable degree of medical certainty based on

the evidence outlined above.  The information contained in this report and the accompanying exhibits are a fair and accurate representation of the subject of my anticipated testimony in this case.  I reserve the right to modify my opinions in the light of new, additional information.

## BACKGROUND

I.    **Multiple Expert Entities Have Reported on the Inadequate Healthcare at the Jail**

32.    The San Diego Sheriff's Department ("Sheriff's Department") has been on notice for several years that people in its custody are not receiving adequate healthcare.  Multiple reports issued by organizations with expertise in correctional medicine have documented practices in the Jail which fall below accepted standards and jeopardize the health and safety of incarcerated people.  I found the following reports and findings to be especially significant.

33.    In January of 2017, the Sheriff's Department received a technical assistance report from the NCCHC.  NCCHC Report, January 2017, DUNSMORE0260620.  The NCCHC is a leading nonprofit organization that publishes correctional healthcare standards and accredits jails or prisons that meet those standards.  DUNSMORE0260621.  Jails and prisons often seek technical assistance from the NCCHC as a preliminary step towards accreditation.  A team from the NCCHC visited four Jail facilities in San Diego:  Central Jail, George Bailey, Las Colinas, and Vista Detention Facility.  DUNSMORE0260620.  During its audit, the NCCHC documented dozens of failures to meet what it describes as "essential" or "important" standards for the delivery of medical care to incarcerated people.  DUNSMORE0260621-22.  Seven years after this report, the Jail is still not accredited by the NCCHC.  The most important NCCHC findings and recommendations are described below.

34.    First, the NCCHC documented that people who arrived at a Jail facility with significant health conditions were often not identified or treated in a timely

1  manner.  For example, individuals booked into Central Jail sometimes did not

2  receive a full medical screening for several hours, placing those with unidentified

3  conditions at risk of a health "crisis."  DUNSMORE0260636.  None of the facilities

4  conducted initial health assessments during the first two weeks of incarceration to

5  further identify individuals in need of treatment.  DUNSMORE0260637, 0260671,

6  0260704, 0260738.  And auditors found little evidence that medical staff were

7  reviewing the charts of incarcerated people transferred from one jail facility to

8  another to ensure continuity of care.  DUNSMORE0260637, 0260670, 0260704,

9  0260738.

10       35.    Second, incarcerated people who themselves requested medical

11  attention were not seen and treated in a timely matter.  The NCCHC described

12  understaffing at the Jail and a resulting "serious" backlog of hundreds of medical

13  requests which had not been answered with a face-to-face evaluation by a medical

14  professional.  DUNSMORE0260658, 0260672-73, 0260706.  Nurses attempted to

15  manage this backlog by assigning triage levels to patients based only on the

16  symptoms they reported on their sick call slips.  DUNSMORE0260639, 0260672-

17  73, 0260706, 0260739-40.  The NCCHC warned that this is a dangerous practice

18  because seemingly minor symptoms may signify an urgent condition which would

19  not be identified without a face-to-face assessment.  *Id.*  The average wait time for

20  such an assessment far exceeded the NCCHC standard of 48 hours.  *Id.*  Patients

21  were waiting an average of eight days to see a nurse (with some waiting 12-18 days)

22  and an average of five days to see a physician (with some waiting 8-12 days).  *Id.*

23  Further delays occurred in some instances when there were not enough deputies to

24  escort patients to appointments.  DUNSMORE0260640, 0260672-74.  And even

25  after patients were seen and treatments were prescribed, there were delays in

26  administering essential medications to those who were new to the facility or who

27  were on lockdown.  DUNSMORE0260623, 0260633-34, 0260657, 0260667-68,

28  0260700-01.

36.    Third, the NCCHC documented that care was too often delivered by nurses acting outside the scope of their license.  Nurses were called on to make diagnoses, create care plans, prescribe medications, and administer prescription-strength doses of over-the-counter medications without physician oversight.  *See, e.g.*, DUNSMORE0260634, 0260636, 0260640-41, 0260667, 0260678, 0260701, 0260707.  Nurses were even tasked with diagnosing and ordering medications for some chronic diseases, which the NCCHC described as "not an acceptable practice." DUNSMORE0260643.  The NCCHC also noted that the way nurses administered medications—by pulling the doses from larger stock bottles without pharmacist or provider oversight—was a "serious and a violation of the Nurse Practice Act." DUNSMORE0260634.

37.    Fourth, patients with both acute and chronic conditions received sporadic care, often only seeing medical staff for follow-up appointments and monitoring of their condition if they themselves initiated a visit. DUNSMORE0260641, 0260674, 0260708, 0260741-42.  This is problematic because providers—not incarcerated people—are in the best position to know when and how a chronic condition should be monitored.  There were no guidelines in place to ensure consistent and quality treatment of patients with any chronic disease besides hypertension.  DUNSMORE0260643, 0260676, 0260710, 0260743-44. And there was little to no documented discharge planning for individuals with known release dates to ensure that they understood how to receive the medical care they needed in the community.  DUNSMORE0260641-42, 0260675, 0260708, 0260742.

38.    Fifth, the Jail lacked systems which would allow medical staff to identify and correct deficiencies with individual providers or the system of care as a whole.  Medical grievances were mixed in with other grievances, making it difficult to identify trends in complaints.  DUNSMORE0260627, 0260661, 0260694, 0260728.  Health staff were not informed of the results of death reviews.

DUNSMORE0260627, 0260661, 0260694, 0260727-28.  And there was no peer review process whereby the work of individual clinicians could be reviewed by others trained in their field.  DUNSMORE0260630, 0260664, 0260697 0260730.

39.    Other deficiencies also resulted in incarcerated people receiving substandard care.  Clinical encounters often occurred in non-confidential spaces, which the NCCHC warned could lead to less thorough and accurate assessments.  DUNSMORE0260626-23, 0260661, 0260693-94, 0260727.  There was no policy ensuring that healthcare staff were present for refusals of care so that they could counsel patients appropriately about the consequences of not attending a medical appointment.  DUNSMORE0260650, 0260684, 0260717-18, 0260751.  And nurses did not adequately document the condition of incarcerated people whom they checked on in segregation.  DUNSMORE0260640, 0260673, 0260706-07, 0260740-41.

40.    In short, the NCCHC report made clear that the Sheriff's Department failed to meet standards that were essential for accreditation and, more importantly, for the provision of adequate healthcare to those in its custody.

41.    On March 20, 2020, three years after the NCCHC documented significant issues with the healthcare system at the Jail, Darryl Dunsmore filed his lawsuit, which he later amended to allege that the medical care he received at the Jail was not constitutionally adequate.  *See Dunsmore v. California, et al.*, Case No. 3:20-cv-00406-AJB-WVG, Dkt. No. 19.  In his First Amended Complaint, Mr. Dunsmore asserted that his medical diet and diabetic insulin injections had been discontinued when he transferred to the Jail from the California Health Care Facility.  *See id.* at 3.  Mr. Dunsmore's complaint as well as the ongoing high death rate illustrated that many of the deficiencies which the NCCHC described had gone uncorrected, placing the health and lives of incarcerated people at risk.

42.    On March 30, 2020, Dr. Homer Venters, then president of the nonprofit technical assistance organization Community Oriented Correctional Health Services,

1   provided the County of San Diego (the "County") with further recommendations on

2   ways to improve healthcare delivery at the Jail.  Venters Report, March 30, 2020,

3   SD_215361.  This document was prepared at the County's request for the express

4   purpose of "reduc[ing] the rate of mortality and morbidity in the San Diego Jail

5   system."  SD_215379.  Dr. Venters conducted a literature review and met with staff

6   at the jail before preparing his recommendations.  SD_215362.

7          43.    Dr. Venters' report reiterated the importance of several best practices,

8   such as identifying health conditions early through a thorough intake, making

9   immediate referrals to providers for further evaluation when an urgent issue is

10  identified, SD_215369-72, and ensuring that medications are ordered by a physician

11  or mid-level provider and delivered in a timely manner, SD_215374.  Other

12  recommendations addressed the need for monitoring the effectiveness of the

13  healthcare system.  Dr. Venters suggested using an electronic medical record to

14  track and evaluate performance, reviewing "sentinel events" such as "deaths,

15  injuries, and self-harm," "surveying staff and patients about their engagement with

16  the correctional health service," including enforceable performance standards in

17  contracts with vendors, and possibly enlisting independent agencies to further

18  monitor performance.  SD_215364-67.

19         44.    As the Venters Report shows, the County was aware of a need to

20  reduce morbidity and mortality and was advised four years ago of several ways to

21  accomplish this goal.

22         45.    On February 3, 2022, the California State Auditor issued a report of its

23  investigation into the alarming number of deaths that occurred in the Jail from 2006

24  to 2020.  California State Auditor Report ("State Audit"), February 2022,

25  SD_174794.  The State Audit confirmed that the Jail had a higher rate of suicides

26  and natural deaths (which can include deaths where deficient medical care is a

27  factor) than jails in any other comparable county in the State.  SD_174812-13.  This

28  remained true even taking into account adjustments based on jail population size and

number of bookings. *Id.* The State Audit showed that the Jail's mortality rate remained high even after the NCCHC's 2017 warning of serious deficiencies in the Jail's healthcare system. SD_174811.

46.    The State Audit also included an in-depth review of 30 in-custody deaths, with an emphasis on cases that occurred between 2016 and 2020. SD_174815. It concluded that "deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals" had "likely contributed to in-custody deaths" and that the Sheriff's Department had "not consistently taken meaningful action when such deaths have occurred." SD_174794. I discuss some of the more specific State Audit findings below.

47.    First, the State Audit found that "[i]n at least eight of the 30 cases … individuals had serious medical or mental health needs that heath staff did not identify or communicate to detention staff at intake." SD_174816-17. Possibly as a result, "[f]ive of these individuals died within four days of their arrest." *Id.*

48.    Second, the State Audit found that medical staff failed to respond appropriately to some incarcerated persons' repeated requests for help during the weeks preceding their deaths. SD_174818. In two illustrative cases, individuals reported worsening symptoms "over the course of one to three weeks" but were only evaluated by a nurse and not a physician. *Id.* These individuals eventually died of the conditions that jail staff failed to adequately assess and treat. *Id.* The State Audit also observed that some individuals were not receiving essential care because they refused appointments. SD_174820-21. Like the NCCHC, it recommended that health staff be present for refusals so that they could counsel patients. *Id.*

49.    Third, the State Audit identified cases where sworn and medical staff failed to appropriately respond to medical emergencies. Deputies often conducted cursory safety checks on the jail population and therefore potentially missed signs of medical distress. SD_174821-23. Oftentimes, incarcerated people were dead for several hours before a deputy realized something was wrong. *Id.* In several

1    instances where deputies did realize that a person was unresponsive or otherwise in

2    distress, they "did not perform or delayed lifesaving measures" like CPR.

3    SD_174824.  Medical staff also took too long to arrive and assist deputies.

4    SD_174824-25.  The State Audit emphasized that minutes can make a difference to

5    survival during a medical emergency, SD_174283-84, and noted that a fifteen

6    minute delay in one case was "detrimental to the individual's likelihood of

7    survival."  SD_174825.

8        50.    Finally, the State Audit found that following these deaths, "[t]he

9    Sheriff's Department has not responded … in a manner that demonstrates its

10   commitment to improving health and safety at its detention facilities."  SD_174830.

11   For example, although the Sheriff's Department had a policy requiring that its top

12   medical staff review all deaths "to determine the appropriateness of clinical care"

13   that the decedent had received, "the Sheriff's Department did not sufficiently

14   document the results or recommendations from its 30-day medical reviews."

15   SD_174831.  The Sheriff's Department's Critical Incident Review Board ("CIRB")

16   did not examine any deaths deemed "natural" by the medical examiner to determine

17   whether deficient medical care could have been a factor.  SD_174834.  And

18   although the internal affairs unit has the power to investigate both sworn and

19   medical staff, it looked into only four of the thirty cases the State Audit reviewed.

20   SD_174835.  This was despite "a number of potential violations or concerns in some

21   of the other 26 cases that could justify further investigation."  *Id.*  The lack of

22   internal review mechanisms was particularly concerning because the County's

23   Citizen Law Enforcement Review Board ("CLERB") has been stymied in its efforts

24   to independently gather evidence about deaths at the jail.  SD_174839-44.

25       51.    In response to the State Audit, the Sheriff's Department attacked the

26   report's death count methodology and claimed that there was no evidence its

27   policies or practices contributed to high mortality in its facilities.  San Diego

28   Sheriff's Preliminary Comment on State Audit, January 14, 2022, SD_174883-84,

174893-97.  The Sheriff's Department implied that deaths were inevitable without acknowledging the role of longstanding issues highlighted by the State Audit, like the inappropriate use of nurses to direct patient care.  SD_174893-94.  The Sheriff's Department also disputed the qualifications of the auditors, comparing their expertise unfavorably to that of the NCCHC, while failing to mention that the NCCHC had raised similar concerns in its own audit five years earlier.  SD_174889-92.  After disputing the State Audit's findings, the Sheriff agreed that it should implement many of the Audit's key recommendations, but provided few details on when or how this would occur.  SD_174902-09.

52.    On February 9, 2022, Mr. Dunsmore was joined by seven other individuals in filing the Second Amended Class Action Complaint for Declaratory and Injunctive Relief ("SAC") in this case, Dkt. No. 81, converting the individual case into a class action.  The class action complaint asserted, among other things, that the Jail failed to provide adequate medical care in violation of the 8th and 14th Amendments of the United States Constitution and Article 1, Sections 7 and 17 of the California Constitution.  At the time the SAC was filed, Defendants were managing their healthcare system through Correctional Healthcare Partners, Inc. ("CHP") and Tri-City Medical Center.  The SAC alleged a number of deficiencies in the provision of medical care, including the failure to maintain sufficient numbers of adequately trained healthcare professionals, the ability of custody staff to interfere with and undermine the healthcare professionals, inadequate screening and intake processes, inadequate care of people with substance use disorders and those experiencing withdrawal, the failure to continue medically necessary medications and treatments upon arrival, the lack of any timely or reliable way to alert healthcare staff of medical needs, the failure to maintain adequate, accurate, and complete medical records, the lack of sufficient contracts with community providers for outside medical care, the lack of confidential spaces for medical care and adequate diagnostic care, the lack of referrals to outside specialists when necessary, the lack

of medically necessary eyeglasses, inadequate follow-up healthcare, inadequate discharge instructions and medication, and the failure to maintain an adequate quality assurance and quality improvement process. *See* SAC at pp. 29-65. The operative Third Amended Complaint, filed November 18, 2022, Dkt. No. 231, has similar allegations to the SAC. I understand that this case was later certified into a class action on behalf of all adults who are or will be incarcerated in any of the San Diego County Jail facilities.

53.    A few months after the SAC was filed, that the County entered into a contract for Jail medical care with the private medical provider NaphCare. I have reviewed the June 2022 NaphCare contract and its February 2024 amendment as part of my work in this case and discuss them later in this report.

54.    In February 2023, the Sheriff's Department released its Progress Report Update on the State Audit. The Sheriff's Department claimed to be making changes in response to the State Audit's findings and recommendations. Progress Report: Update on State Jail Audit, February 2023, SD_184480-82. But the Sheriff's Department has in fact failed to implement many policies and practices which the State Audit advised could reduce mortality in the jail. For example, the Sheriff's Department claimed that nurses were conducting face-to-face evaluations within 24 hours of receiving a request for medical services as of December 2022. *Id.* SD_184484. The Sheriff's Department also claimed that it was requiring medical staff to counsel patients who refused a medical appointment and sign off on the refusal. SD_184485. However, as discussed elsewhere in this report, a review of medical records produced by the Jail shows that staff are not implementing either of these changes.

55.    In sum, multiple experts and entities—the NCCHC, Dr. Venters, and the State Audit—have pointed out the systemic failures in the Jail's healthcare system. As explained throughout this Report, it is my opinion that those problems and others persist.

## II.    The Sheriff's Department's Contracts with Multiple Private Companies to Provide Healthcare at the Jail

56.    In the face of the many deaths, the State Audit, and this class action, the County decided to change private healthcare providers.  On April 26, 2022, the County signed a contract with NaphCare to provide healthcare at its seven jail facilities.  County Contract No. 566117, April 26, 2022, NAPHCARE000001.  The contract is for five years with another five-year renewal term, for an amount not to exceed $620,778,261.65.  *See* NAPHCARE000023.

### A.    Background on NaphCare

57.    NaphCare signed its first contract to provide comprehensive health care services in Alabama in 2001.  NaphCare currently provides medical services to more than 100,000 incarcerated persons in 32 states.[1]  The company has more than $300 million in annual revenues and 2,000-plus employees.[2]

58.    In 2020, a Reuters investigation revealed that jails where NaphCare provided health care had the highest death rates in the nation over a three-year period.[3]  Since then, according to federal court records, NaphCare has been sued for medical neglect over 100 times.[4]  While some government entities have renewed

---

[1] *See* John Washington, *Pima County has docked NaphCare $3.1 million for jail medical deficiencies* ("Pima County Docking NaphCare"), ARIZONA LUMINARIA, Aug. 9, 2023, https://azluminaria.org/2023/08/09/jail-deaths-pima-county-docking-naphcare/.

[2] *See* Erica Wright, *Humble Beginnings for Local Firm that Offers Correctional Health Care*, THE BIRMINGHAM TIMES, May 28, 2020, https://www.birminghamtimes.com/2020/05/humble-beginnings-for-local-firm-that-offers-correctional-health-care/.

[3] *See* Jason Szep et al., *Special Report: U.S. Jails Are Outsourcing Medical Care—and the Death Toll Is Rising* ("Special Report"), REUTERS, Oct. 26, 2020, https://www.reuters.com/article/us-usa-jails-privatization-special-repor/special-report-u-s-jails-are-outsourcing-medical-care-and-the-death-toll-is-rising-idUSKBN27B1DH/

[4] Chamian Cruz, *Fulton Extends Contract with Jail's Medical Provider Amid Allegations of Medical Neglect* ("Fulton Extends Contract"), WABE, Jun. 28, 2023, https://www.wabe.org/fulton-extends-contract-with-jails-medical-provider-amid-allegations-of-medical-neglect/.

contracts with NaphCare despite the lawsuits and deaths, others have terminated their contracts.

59.     Alabama is one such example.  In 2001, when Alabama's correctional facilities healthcare provider raised the bill from $26 million per year to $38-$46 million per year, the state sought bids for another provider.  NaphCare won the contract with a bid of $30 million.  NaphCare had never before provided comprehensive care to a state prison system, so "[c]ritics immediately questioned how NaphCare could possibly provide adequate health care for 25,000 prisoners for $30 million and still make a profit."[5]

60.     Numerous lawsuits followed.  Incarcerated individuals at Alabama's Tutwiler Prison for Women named NaphCare as a defendant in a class action suit, alleging long delays in health care services, dangerous lapses in providing prescription medication, and a severe shortage of qualified medical personnel. Another lawsuit challenged the medical care NaphCare provided to incarcerated persons with HIV at Alabama's Limestone facility, where the death rate among incarcerated persons with HIV was twice the national rate.  *Id*.  Another class action suit challenged the health care provided to individuals with serious mental illness; "[a]mong the most serious complaints in the suit include prisoners lying in beds unable to control their bowels that sometimes go for hours without being changed or cleaned." *See* NaphCare in Alabama.

61.     In 2003, an Alabama state audit concluded that NaphCare was supplying "dangerous and extremely poor quality health care." *Id*.  Amid the lawsuits, the audit, and $6.9 million in cost overruns caused by off-site medical visits, Alabama canceled NaphCare's contract in 2003.[6]

---

[5] *See* Lonnie Burton, *The Deadly Health Services of Naphcare in Alabama* ("NaphCare in Alabama"), PRISON LEGAL NEWS, October 15, 2023, https://www.prisonlegalnews.org/news/2003/oct/15/the-deadly-health-services-of-naphcare-in-alabama/; *see also* Special Report; Fulton Extends Contract.

[6] *See* Casey Turner, *Sick for a Decade: Alabama's Prison Health Care Continues to Face Scrutiny*, AL.COM, Nov. 22, 2014,

62.     A similarly dire outcome occurred in Gwinnett County Jail in Lawrenceville, Georgia.[7]  And in 2022, after at least three deaths in 15 months, the Onondaga County Jail decided not to renew its contract with NaphCare.[8]

63.     NaphCare is still providing health care to the Arizona prison system which has been the subject of extensive litigation and found to be unconstitutional. *See Jensen et al. v. Thornell et al.*, No. CV-12-00601-PHX-ROS, 2023 WL 2838040 (D. Ariz. April 7, 2023).  NaphCare has also been roundly criticized for its staffing shortages and medical request backlogs at the Pima County Jail in Arizona.  For example, a former NaphCare employee at Pima County jail said they were often behind in responding to "kites" (medical requests).  The employee said, "it got to the point where we were from 300 to 1,800 deep in the queue."[9]

64.     As described above, NaphCare got its first contract in Alabama correctional facilities by bidding ridiculously low.  Whereas the average state spent $2,500 to $3,000 per incarcerated individual per year in 2001, under the terms of NaphCare's bid, Alabama was going to spend a little over $1,000.  *See* NaphCare in Alabama.

65.     Relatedly, in 2015, weeks after winning the renewal bidding process for a contract with Suffolk County, NaphCare claimed it had underbid and wanted to

---

https://www.al.com/news/2014/11/sick_for_a_decade_alabamas_inm.html.

[7] *See* Randy Travis, *Lawsuit: Jail Medical Contractor Ignored Treatable Illness that Led to Inmate's Death*, FOX 5 ATLANTA, Apr. 17, 2023, https://www.fox5atlanta.com/news/deion-strayhon-gwinnett-county-jail-death-lawsuit.

[8] *See* Chris Libonati, *Onondaga county jail gets different health care provider after report finds 'serious' issues*, CENTRAL CURRENT, Dec. 21, 2022, https://centralcurrent.org/onondaga-county-gets-different-health-care-provider-after-report-finds-serious-issues/.

[9] John Washington, *Medical care in Pima County jail is dangerously delayed as pleas for help are ignored and mismanaged, say inmates and employees* ("Medical Care in Pima County Dangerously Delayed"), ARIZONA LUMINARIA, Apr. 19, 2023. https://azluminaria.org/2023/04/19/medical-care-in-pima-county-jail-is-dangerously-delayed-say-inmates-and-employees/.

1  renegotiate its contract—the sheriff's office denied the request.[10]

2       66.    In June 2021, NaphCare agreed to pay nearly $700,000 to settle a False

3  Claims Act case the United States government brought against NaphCare, alleging

4  that the company submitted inflated claims for evaluation and management services

5  at BOP's Terre Haute, Indiana, facility between January 2014 and June 2020.  The

6  United States alleged that when certain physicians did not indicate the type of

7  service performed on onsite visit sheets, NaphCare charged the government for

8  higher-level services than were provided.[11]

9       67.    The 2022 contract with Arizona allowed NaphCare a profit of $1.095 in

10  the prisoner per day cost.  "A 25,000 prisoner population would therefore generate

11  an annual profit for NaphCare of $9,991,875."[12]

12       68.    NaphCare has faced staffing shortages.  For example, in Pima County

13  from February 2022 to April 2023, NaphCare was understaffed for hundreds of

14  hours for medical care positions, including for Registered Nurse Supervisor (271

15  hours short), Licensed Practical Nurse (2,463 hours short), Psychiatric Nurse

16  Practitioner (114 hours short), and Psychiatric Registered Nurse (653 hours short).

17  *See* Pima County Docking NaphCare.

18       69.    Consistent with concerns about understaffing, I have also been made

19  aware of a number of claims that NaphCare provided substandard medical care.  For

20  example, in February 2022, Pima County's audits found that NaphCare had

21

22  [10] *See* Beth Healy and Christine Willmsen, *Pain And Profits: Sheriffs Hand Off
    Inmate Care To Private Health Companies* ("Jail Health Companies Profit"),

23  WBUR, March 24, 2020, https://www.wbur.org/news/2020/03/24/jail-health-
    companies-profit-sheriffs-watch.

24  [11] *See* U.S. Department of Justice, *Prison Health Care Provider Naphcare Agrees to
    Settle False Claims Act Allegations*, June 25, 2023,

25  https://www.justice.gov/opa/pr/prison-health-care-provider-naphcare-agrees-settle-
    false-claims-act-allegations.

26  [12] *See* Jimmy Jenkins, *Health Care Company Expects to Earn Nearly $10 Million in
    Annual Profits from AZ Prisons Contract*, ARIZONA REPUBLIC, June 2, 2022,

27  https://www.azcentral.com/story/news/local/arizona-health/2022/06/02/correctional-
    health-care-company-expects-earn-nearly-10-million-annual-profits-arizona-

28  prisons-contr/7491553001/.

1    "appropriately managed" only one of the 22 people who were undergoing

2    withdrawal.  That same month, the county gave NaphCare a score of 5%, or five on

3    a scale of 100, for dealing with withdrawals.  *See* Pima County Docking NaphCare.

4    One former staff member said "the NaphCare standard is to supply opioid addiction

5    medication for a maximum of three days, if it's given at all."  *See* Medical Care in

6    Pima County Dangerously Delayed.

### B.    NaphCare's 2022 Contract with San Diego County

8    70.    Notwithstanding the problematic incentives of privatized correctional

9    medical care in general, San Diego chose NaphCare to provide comprehensive

10    healthcare services at the Jail.  *See* Contract No. 566117.  Under the contract,

11    NaphCare receives approximately $60 million per year and is supposed to provide

12    comprehensive mental and medical health care, medication assisted treatment

13    ("MAT"), dental care, discharge treatment training, specialty services and outside

14    referrals, and discharge planning to people incarcerated at the Jail.  NaphCare

15    subcontracted physicians, physician's assistants, and nurse practitioners to the

16    previous medical contractor, CHP.[13]  *See* Contract, NaphCare of San Diego LLC

17    Agreement with Correctional Healthcare Partners, Inc. for on-site Physician and

18    Mid-Level Provider Staffing, effective June 1, 2022, NAPHCARE040868-040878.

### C.    The Sheriff's Department Continued to Work With, and Pay, NaphCare, Despite Knowing That NaphCare Was Not Living Up to Its Contractual Obligations

21    71.    The underbidding, understaffing, and requests for more money that

22    have characterized NaphCare's operations elsewhere, as detailed above, have hurt

23    NaphCare's performance in San Diego as well.  Beginning in 2023, the Sheriff's

24

25    [13] The history of private contractors at the Jail is complex.  For example, Coast
Correctional Management Group ("Coast") used to provide physicians and mid-
26    levels, followed by CHP, and then NaphCare—now this is done by a combination of
NaphCare and CHP plus County nurses.  When asked how many of the
27    approximately 30 prisons and jails NaphCare serves have a similarly hybrid model
in which nursing is separately managed, NaphCare representative Angela Nix
28    replied that only one other did.  Nix II Tr. at 74:11-15.

Department issued a series of Corrective Action Notices ("CANs") to NaphCare pointing out multiple failures in its delivery of health care to incarcerated people. In total, I am aware of several CANs being issued and updated before discovery in this case closed. NaphCare responded to these, and CAN meetings were held in an attempt to solve the problem. Freedland Tr. at 156-160. However, NaphCare's Rule 30(b)(6) witness, Angela Nix, testified that the Sheriff's Department has never approached NaphCare about a reduction in payment for its contractual violations, Nix II Tr. at 62-63, notwithstanding that the contract allows the withholding of funds for failure to perform.[14]

72.     As far as I can tell, the CANs begin on April 28, 2023; as of that date the County criticized NaphCare for having $9.3 million of unpaid bills due to hospitals, with $4.6 million of that past the 30-day threshold. *See, e.g.*, SD_120686. According to the CAN, "Due to a lack of payment, some community providers do not want to see or accept our patients." Among the many other deficiencies noted by the CANs are the following: a lack of gynecologists at Las Colinas, failure to provide MAT, relying on unlicensed staff, failing to replace or repair medical equipment, understaffing of medical and dental providers, failure to create policies and procedures that comply with NCCHC standards, and the lack of M&M and CQI review. *See* SD_1572154; *see also* Freedland Tr. at 161:4-169:10. The lack of adequate obstetrical and gynecological care at Las Colinas was of particular concern to Dr. Montgomery. *See* SD_120627.

73.     Dr. Montgomery acknowledged in a May 26, 2023 email to Sheriff's Department administrators that "[i]t has been shown that far more staff members are needed than [NaphCare] initially estimated" to "meet the clinical demand."

---

[14] *See* NaphCare Contract § 4.1.7, NAPHCARE000007; *see also* Jeff McDonald, *Repeated failures by San Diego County jail health provider prompt sheriff to order it to fix deficiencies*, SAN DIEGO UNION-TRIBUNE, April 2, 2024, https://www.sandiegouniontribune.com/2024/03/31/repeated-failures-by-san-diego-county-jail-health-provider-prompt-sheriff-to-order-it-to-fix-deficiencies/.

Dr. Montgomery further suggested that NaphCare had been staffing at an "arbitrary level." SD_227522. He stated: "Naphcare has gone through the RFP process … not once, but twice. They have familiarity with California, as they have already been engaged with several Counties. They have been performing services in San Diego for a year. They know, or should have known, that the number of pro-offered staff positions would be inadequate to meet the clinical demand … a fact that has been borne out by the growing MH/BH clinical backlog." SD_227522. Dr. Montgomery also said: "The staffing model is wrong and requires fixing. It appears that we can either force Naphcare to hire staff to meet demand, do it ourselves (carve out clinical services from the contract), or find more money to pay for the services." SD_227522.

74.    Dr. Montgomery further stated: "My point is … the staffing matrix needs to be elevated as a significant point of contention in the CAN/CURE process in order to elicit some form of response or action. We can discuss how we wish to proceed internally, but I think we need to elevate it to the Friday meetings and introduce the concept that Naphcare is responsible for clinical performance and completion, not staffing to an arbitrary level." SD_227522.

75.    In these internal discussions and in CAN meetings with and notices to NaphCare, the County expressed increasing frustration with its new contract. Concerns included a lack of radiology staffing, sick-call backlogs associated with CHP departures, and failures to get outside specialty care for patients. By the end of 2023, the County decided to put out a new bid for medical services—even though it had signed what should have been a comprehensive five-year contract with NaphCare in April 2022. Dr. Freedland testified that he was forced to provide a physician at Rock Mountain without any pay for months. Freedland Tr. at 115:17-120:18. He also testified that, in the summer or fall of 2023, many staff left his employ due to stress. *Id.* at 102:6-103:16.

76.    While the bids for the new medical services contract were pending,

1    NaphCare negotiated an increase in funding for itself.  Contract, County of San

2    Diego – Department of Purchasing and Contracting, Amendment, Contract 566117

3    with NaphCare, Inc. Modification 01, February 1, 2024 (NAPHCARE040852-

4    040862).  This contract amendment added over $24 million in payments to

5    NaphCare.  Nix II Tr. at 59:25-61:5.  I discuss the cycle of bidding low and then

6    renegotiating more payments in more detail below.

7          **D.      The Sheriff's Department Recently Contracted with Correctional
               Healthcare Partners to Provide Additional Health Care Staff**

8

9          77.     In around April or May 2024, I learned that the County had awarded a

10   new medical services contract to CHP—the very entity that was subcontracting with

11   NaphCare for medical services.[15]  The new contract increases the County's annual

12   spending on physicians and nurse practitioners in the Jail from approximately $8.3

13   million to $22.6 million per year, though I understand that Dr. Freedland's bid asked

14   for $27 million worth of medical care providers.

15         78.     CHP was founded by Peter J. Freedland M.D., a former executive at

16   Coast Correctional Medical Group (sometimes referred to as "Coast").  Coast was

17   the County's previous medical provider.  Coast had been sued multiple times while

18   delivering healthcare services to the Jail, including in connection with the tragic

19   preventable deaths of Elisa Serna and Michael Wilson.  Coast was replaced by CHP

20   through a contract with the Sheriff in 2020—a $24 million deal that spanned three

21   years; this contract was later superseded by the NaphCare-CHP subcontract.  I have

22   some concerns that the very entity that has been providing substandard medical care

23   at the Jail for the last four years is somehow supposed to bring it into constitutional

24   compliance now.

25         79.     The contract that the Sheriff's Department recently negotiated with

26   CHP is specific in what its objective is:  "Contractor shall provide the services

27   _____

28   [15] I did not receive a copy of this contract, which states it is effective June 28, 2024,
      until July of this year.

described herein to accomplish the following goal: provide on-site Health Care Providers for primary care and urgent care at specified County detention facilities." *See* CHP 2024 Contract, p. 20. The contract increased physician and midlevel staffing at the Jail facilities by almost 300%. For example, medical practitioner staffing at the Central Facility increased from 124 hours a week to 336 hours a week. Las Colinas staffing increased from 84 hours a week to 242 hours per week. And staffing at the George Bailey facility increased from 84 hours per week to 196 hours per week. While this is good news for the incarcerated patients at the Jail, this increase in staffing alone will not, in my opinion, be sufficient to solve the Jail's medical problems.

## OPINIONS

80.    Seven years after the NCCHC Report finding the Sheriff's Department policies and practices put the health and lives of incarcerated people at risk, two years after the State Audit concluded that the "Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody," and scores of deaths and poor outcomes later, the Sheriff has failed to take sufficient corrective action necessary to prevent further unnecessary suffering or death in its jails.

81.    In light of the State Audit's damning conclusion, I would have expected the Sheriff's Department to have done its own detailed internal medical investigation into the excessive deaths in an attempt to find one or more other root causes of this problem. I have seen no evidence that the Sheriff's Department made any such investigation or came to any conclusions about potential root causes.

82.    In fact, testimony from the medical contractors who provide healthcare at the Jail indicates that the Sheriff's Department has not discussed with them any need to reduce in-custody deaths or asked them their opinions about ways to reduce in-custody deaths. Dr. Peter Freedland, the Chief Executive Officer at CHP, which staffs the onsite medical practitioners at the Jail, stated in his deposition: "I've

heard that there was an audit, but I have not read it." Freedland Tr. at 47:11-12.
When asked, "Have you been asked to make any recommendations to the County
about how to lower the death rate, medically, at the jail?" Dr. Freedland responded,
"No one has asked me specifically, how do we do this." *Id.* at 74:2-3. Similarly,
Angela Nix, testifying as a Rule 30(b)(6) witness on behalf of NaphCare, testified
that she had met with Sheriff Kelly Martinez on approximately three or four
occasions to discuss the NaphCare contract, but could not recall discussing the need
to reduce the high death rate at the Jail. Nix II Tr. at 18:18-22.

83.     This is astounding to me. Why would the Sheriff's Department not
immediately launch an "all hands on deck" investigation into the causes and
potential solutions of this critically important high death rate after the State Audit so
publicly pointed it out? Why not publish the results of an extensive internal
investigation along with a detailed plan on how to reduce the death rate?

84.     In February of 2023, the Sheriff's Department did publish a response to
the State Audit entitled "Progress Report: Update on State Jail Audit." In it, the
Sheriff's Department indicated that it disagreed with the conclusions of the Audit in
some respects but claimed to be attempting to implement the changes recommended
within the original Audit.

85.     In my opinion, the Sheriff's Department has failed to implement most
of the changes mentioned in their Progress Report, and it has failed to address the
many flaws in its healthcare delivery system that have been pointed out repeatedly
in the last several years, by the NCCHC and Dr. Venters, in addition to the State
Audit. As a result, people incarcerated in the Jail have died preventable deaths, and
those still in the Jail are subjected to risk of serious harm from the denial of
appropriate healthcare.

**I.     Inadequate Medical Care at the Jail Has Resulted in Preventable Deaths**

86.     It is my opinion, based on a reasonable degree of certainty, that
inadequate medical care at the Jail has resulted in preventative deaths and will

1   continue to result in preventative deaths, in part because the Jail does not have

2   adequate mortality and morbidity review procedures.

3       87.    It is important here not to "miss the forest because of the trees."  The

4   conclusion of the initial State Audit was that the San Diego Jail has an excessively

5   high death rate among its incarcerated population.  In determining how the Sheriff's

6   Department is doing in response to the State Audit report, we need to look at the

7   incarcerated death rate since the Audit was released.

8       88.    In fact, the death rate among people incarcerated at the San Diego jail

9   has significantly *increased* since the time period discussed in the report.  The State

10  Audit reviewed statistics from 2006 to 2020 and determined the overall death rate at

11  the Jail to be **2.39 deaths per 1,000 people**, with the rates in individual years

12  ranging of a low of 1.57 in 2012 to a high of 3.0 in 2014.  SD_174856.  Since then,

13  from January 2021 through December 2023, the Jail has reported 50 in-custody

14  deaths.[16]  The Jail reported an Average Daily Population ("ADP") of 3,984 during

15  these three years, which calculates to a death rate of **4.18 deaths per 1,000 per**

16  **year**.  Broken down by year, the death rate was **4.5 deaths per 1,000 in 2021** (18

17  deaths, with ADP 3,987), **4.75 deaths per 1,000 in 2022** (19 deaths, with ADP

18  4,055), and **3.27 deaths per 1,000 in 2023** (13 deaths, with ADP 3,971).

19      89.    In fact, all three years exceed not only the average for the years 2006 to

20  2020, but also exceed the death rate of the worst year, 2014, which was 3.0 deaths

21  per 1,000 ADP.

22      90.    Based on my review of documents, including but not limited to medical

23  records and mortality reviews, my inspections of Jail facilities, and interviews with

24  patients and providers, it is my opinion that the healthcare delivery system at the Jail

25  harms many patients and places all incarcerated people at a substantial risk of

26  serious harm.  The Sheriff's Department clearly has not taken significant steps to

27

28  [16] The ADP and in-custody death numbers are pulled from:
    https://www.sdsheriff.gov/resources/transparency-reports.

1   reduce the death rate; the Jail death rates have gotten worse since the State Audit.

2   The problems with the Jail's healthcare system have resulted in permanent harm to

3   patients, including avoidable deaths.

4        91.    The starting place in any attempt to reduce the Jail's astounding death

5   rate would be an analysis of *every* death to see if certain patterns emerge that point

6   to serious shortcomings in the Jail's healthcare system leading to excessive deaths

7   so that appropriate reforms of the system can be undertaken.  However, the Jail's

8   mortality review process is so flawed that no such reforms are likely to be

9   implemented.  And, unsurprisingly given these failures, people have continued to

10  die avoidable deaths in the San Diego County Jail.

11       **A.    The Jail's Flawed Mortality Review Process**

12       92.    All hospitals and most large medical practices have a mechanism for

13  review of deaths of patients in their care, known as Mortality and Morbidity

14  ("M&M") committees.  M&M committees investigate deaths (mortality) and also

15  investigate unexpected severe adverse events that do not lead to death but

16  nevertheless cause unexpected harm, suffering, and/or permanent problems

17  (morbidity).[17]

18       93.    The goal of an M&M program is to identify medical errors that led to

19  the adverse outcome, so that those errors can be avoided in the future.  In any

20  individual M&M review, the most important of these identified errors is termed the

21  "root cause."  The root cause can be either a human error, *e.g.*, when an individual

22  physician or nurse makes a significant medical mistake, or a systemic problem, *e.g.*,

23  technical problems in the medical record, lack of appropriate policies and

24  procedures, etc.  When human error is identified, an M&M committee can direct

25  that medical professionals be trained and incompetent performers dismissed.  When

26  systemic issues are identified, an M&M committee can direct that policies and

27  ─────────────────────

28  [17] These unexpected negative outcomes are also sometimes termed "Sentinel
    Events."

1   procedures be updated and improved.  The overall goal, of course, is to learn from

2   past mistakes in order to prevent future bad patient outcomes.

3       94.     M&M reviews typically occur in two stages.  First, a standing

4   committee of physicians, nurses, and administrators identifies and analyzes all

5   deaths and adverse outcomes and prepares important cases, such as all unexpected

6   deaths, for presentation.  Second, a meeting occurs where the standing committee's

7   findings are discussed *with the medical staff who were involved in care of the*

8   *patient*.  M&M reviews usually result in some type of action plan to improve patient

9   care.

10      95.     The NCCHC Technical Assistance Report, Venters Report, and State

11  Audit each directed the Sheriff's Department to improve its M&M process.

12  NCCHC emphasized that "[t]reating and general health staff *must* be informed of

13  [mortality] review findings," which reportedly had not been occurring at the time of

14  their investigation.  DUNSMORE0260627.  Dr. Venters directed that:  "The review

15  of sentinel events including deaths, injuries and self-harm is also an important best

16  practice in reducing mortality and morbidity in jail settings, and these reviews and

17  their corrective action plans can be included in the service-wide quality meetings."

18  SD_215365.  And, the State Audit concluded that the Sheriff's Department's

19  "reviews of in-custody deaths have been insufficient and have not consistently led to

20  significant corrective action."  SD_174794.

21      96.     When Dr. Montgomery was asked in his deposition:  "So following an

22  in-custody death there's still some type of review done by medical, nursing, and

23  sworn.  Is that accurate?"  He answered "Yes."  Montgomery I Tr. at 16:4-7.  He

24  clarified that he himself does the medical review, the Director of Nursing (Serina

25  Rognlien-Hood at the time) does a separate nursing evaluation, and one of the jail

26  Lieutenants does a review of the actions of sworn staff.  *Id.* at 16:18-19:1.  Per

27  Dr. Montgomery, all of these are independent and uncoordinated.  They also are

28  informal, in that there is no written record that summarizes all of these reviews and

1   what conclusions were reached.

2        97.    The Sheriff's Department does have a standing Critical Incident

3   Review Board ("CIRB") that reviews in-custody deaths, but these reviews are

4   prepared and presented by a non-medically trained security officer to the largely

5   non-medically trained people who sit on the committee.  Based on the documents I

6   reviewed, it appears that no physician involved in the care of the patient is even in

7   attendance.  There is no significant critique of the medical decision making and

8   identification of medical mistakes presented to the CIRB.  And the CIRB does not

9   appear to make suggestions for improvement of the medical program at the Jail.

10        98.    As an example, the CIRB met on September 20, 2023 to review the

11   death of Raymond Dix (Mr. Dix's death is discussed in detail below).  SD_1030408.



12   SD_1030412.[18]

13

14   "  SD_1030409.

15   SD_1030409-1030410.

16

17   *Id.*

18

19

20   After the presentation, "

21   "  SD_1030410.  Clearly, the

22   CIRB reviews, which lack any meaningful medical evidence or analysis, are not a

23   substitute for legitimate M&M.

24   **B.**    **NaphCare's Flawed Mortality Review Process**

25        99.    Instead, the Sheriff's Department has contracted the main responsibility

26

27   [18] As discussed in more detail later in this Report, the term "medical practitioner"

28   applies to doctors and nurse practitioners, but it does not include nurses, including
Director of Nursing Ms. Rognlien-Hood who did attend this meeting.

for M&M reviews to NaphCare.  NaphCare's contract requires NaphCare to conduct a "thorough clinical mortality review" for "[a]ll patient deaths," including "a review of the incident and preceding treatment, a root cause analysis, review of relevant procedures and documentation, pertinent service reports, and recommendations for corrective action."  County Contract No. 566117, §§ 2.3.47.4, 2.3.47.5, 2.3.47.7. The contract also calls for NaphCare to establish the process for identifying Sentinel events and performing a Root Cause Analysis for Sentinel Events.  *Id.*, §§ 2.3.47.9, 2.3.47.10.  "The goal for critical incident analysis is to solve problems before they escalate and prevent future problems through promotion of a risk avoidance attitude among the healthcare staff."  *Id.*, § 2.3.47.13.

100.   On their face, this contract complies with the recommendations of the State Auditor, the NCCHC, and Dr. Venters.  In addition, NaphCare has a policy, called A-09, Procedure in the Event of Patient Death.  NAPHCARE000735 *et seq*.

101.   However, it is my opinion that NaphCare does not fulfill those obligations in practice, based on my review of the NaphCare mortality reviews and minutes from the 2022 and 2023 M&M committee meetings.

102.   For one thing, death summaries, by contract, are supposed to be compiled by "[t]he advanced clinical provider in the patient's overall treatment." County Contract No. 566117, § 2.3.47.12.  However, the death summaries in the reviews I saw were prepared by CHP's medical director, Dr. Nas Rafi, and NaphCare's Health Services Administrator ("HSA"), Michael Farrier, neither of whom directly interacted with the majority of these patients.  The cases are then reviewed by Dr. Elliott Wade, NaphCare's Regional Medical Director of the Western States.  Dr. Wade is based in Las Vegas.  Dr. Wade's review and recommendations are then sent to the NaphCare Clinical Mortality Review Committee.

103.   The Clinical Mortality Reviews are held in Birmingham, Alabama by the NaphCare M&M Review Committee.  No members of NaphCare M&M Review

Committee are from the San Diego Jail.  The attendees instead are from NaphCare

corporate.  Dr. Freedland testified that he has never participated in the M&M

reviews for the San Diego Jail, although he would be a logical choice to be on such

a committee, as would the Sheriff's Department's Chief Medical Officer, Dr. Jon

Montgomery.  The CHP Medical Director of the Jail, Dr. Rafi, prepares death

summaries but otherwise does not participate in death reviews.  Freedland Tr. at 73.

104.   As one example, the NaphCare M&M committee that convened in

Birmingham, Alabama on October 16, 2023 consisted of the following NaphCare

employees:  Dr. Rita Armitage, Physician/Ophthalmologist; Crystal Alexander,

Director of Utilization Management; Dr. Jeffery Alvarez, Chief Medical Officer;

Justin Barkley, Chief Legal Officer; Hannah Burgess, Vice President of Psychiatric

Services; Marsha Burgess, Senior Vice President, Clinical Operations; Brad Cain,

CEO NCF, Inc.; Jane Dickerson, Director of Pharmacy – 3rd Party Operations;

Dr. Emily Feely, Corporate Nephrologist; Darrelle Knight, Chief Pharmacist;

Dr. Jerry McLane, Corporate Medical Director, Eastern States; Candice Sherman,

Senior Corporate Counsel – Litigation; Dr. Amber Simpler, Executive Director of

Behavioral Health Research; Hannah Stokes, Corporate Counsel; Seetal Tejura,

General Counsel – Litigation; Dr. Stuart Tieszen, Chief Medical Officer, Behavioral

Health; Dr. Elliot Wade, Corporate Medical Director, Western States; Honey Lee

Walker, Legal Nurse; and Kayla Washington, Corporate Counsel – Operations.

Based on my review of the documents, these attendees appear to be typical.  No one

from the Sheriff's Department or CHP attends.

105.   Notably, at each of these Committee meetings, the committee reviews

deaths from NaphCare contracts around the country.  San Diego cases are a small

fraction of those considered.  For example, on October 16, 2023, twelve cases were

discussed, only one was from San Diego.  NAPHCARE041856-041859.

106.   When a San Diego case is considered, the M&M Committee usually

simply notes Dr. Wade's conclusions and does not review the death in detail.  This

1  may be a time consideration since they are reviewing cases from all over the

2  country.  Occasionally, the committee will review a San Diego death in detail.  In

3  these cases, a detailed timeline of the patient's medical and psychiatric care is

4  presented in a series of slides.  Based on my review of the documents, I am not sure

5  how these cases are chosen.  Notably, the cases reviewed in detail do not necessarily

6  include those in which Dr. Rafi or Dr. Wade made recommendations; some of the

7  detailed reviews are for cases where Dr. Wade has concluded that "[n]o action

8  recommended."

9      107.   By far the most common conclusion from the NaphCare M&M

10  committee on the San Diego deaths was "No action recommended."  This happens

11  even when Dr. Rafi has recommended something in her death summary.  The

12  NaphCare M&M committee routinely disregards Dr. Rafi's recommendations.  In

13  fact, based on my review of the documents, I am not sure they are aware of them.

14      108.   The case of Keith Galenbach, who died in the Jail on September 28,

15  2023, is informative in this regard.  Notably, the NaphCare M&M committee did not

16  do a detailed review (of the type I described above) of Mr. Galenbach's death.

17      109.   Dr. Nas Rafi and HSA Michael Farrier each prepared a death summary

18  about Mr. Galenbach.  Dr. Rafi concluded:



23  NAPHCARE041867.  HSA Michael Farrier did a separate Death Summary the next

24  day, including different pertinent details about the case than Dr. Rafi.  Michael

25  Farrier made no recommendations.  NAPHCARE041862.

26      110.   Yet, Dr. Wade, despite allegedly reviewing these summaries,

27  recommended "no quality improvement measures."  NAPHCARE041854.  He

28  apparently disagreed with Dr. Rafi's conclusions or, alternatively, did not read them.

111.    The NaphCare M&M Committee reviewed the case on October 16, 2023.  This was not one of the few cases presented in detail, meaning there was a single slide in the presentation for that date, with minimal information.  The slide stated:  "This event was reviewed by Dr. Elliot Wade, and no quality improvement measures are/were recommended."  *Id.*  Based on this presentation, it appears that Dr. Rafi's recommendations were also not seen by the NaphCare M&M Committee.

112.    If Dr. Rafi's recommendations were seen, they were apparently disregarded, as the M&M Committee's conclusion does not reference them.  Rather, the M&M committee's conclusion regarding the Galenbach case was: "Though not related to this patient's death, it has come to the committee's attention that specific policies on management of insulin pumps need to be established by San Diego County and communicated to STATCare, so they can be prepared to address patients with these medical devices."

113.    Notably, I did not find any reference to updates in the NaphCare Policies and Procedures, the County Operations Manuals, any Medical Directive Bulletins, or any training for medical staff relating to insulin pumps.  This may be because, when Dr. Wade recommends no further action, NaphCare does not share its conclusions about San Diego deaths with the Jail.  This was admitted in deposition testimony by NaphCare's Chief Legal Officer Justin Barkley on March 20, 2024.  Barkley Tr. at 29:24-30:6.

114.    Nor does it appear that any of the internal analyses conducted by Sheriff's Department staff such as those done by Dr. Montgomery and Ms. Rognlien-Hood were communicated to the NaphCare M&M Committee.

115.    While the M&M Committee meetings about deaths (mortality) at the San Diego County Jail are inadequate, it is worth noting that the morbidity analyses—*i.e.*, analyses of adverse outcomes or sentinel events—do not appear to be happening *at all*.  I also saw no tracking of sentinel events in CQI reports.

116.    Importantly, the only mention of M&M in the new contract that the

County negotiated with CHP occurs at section 7.5: "Contractor shall designate a Physician … to collaborate with the Sheriff's CMO, or Sheriff's designee, in the following areas: … 7.5.1.3. Morbidity and Mortality (M&M)." SD_1579723. In other words, the M&M review process will continue to be managed by NaphCare, as the "Sheriff's designee."

117. In summary, the Sheriff's Department—either on its own or through its contractor—is not performing M&M reviews in a manner that complies with the standard of care done in the community, or with the recommendations of the NCCHC, Dr. Venters, or the State Audit.

118. A proper M&M review at the Jail would have the following characteristics:

- The Sheriff's Department would track Deaths but would also track other serious medical bad outcomes (Sentinel Events) via the CQI program. This is not being done presently.

- Death summaries would be prepared within seven days by an "advanced clinical provider in the patient's overall treatment," as required in the NaphCare contract.

- Deaths and Sentinel morbidity events would be investigated by a multidisciplinary M&M committee based in San Diego and consisting of San Diego Jail practitioners, nurses and security staff. There would be no need for separate uncoordinated investigations.

- Sheriff's Department M&M Committee conclusions would be shared with medical staff involved in the care of the patient in question.

- Sheriff's Department M&M Committee would make and carry out recommendations for improvements in Jail Policies and Procedures.

**C.     Case Studies of Deaths at the Jail Demonstrate Substandard Care**

119. The below section of this report presents several case studies that show both how the Sheriff's Department's medical failures led to avoidable patient deaths and how the Jail's inadequate mortality review process failed to make needed changes following those deaths.

120. I selected this particular subset of deaths to review because the NaphCare M&M Committee minutes for each of these cases reflect that a more

1  detailed review, *i.e.*, more than a single slide presentation, was conducted.[19]  I also

2  reviewed these cases to determine whether these deaths were preventable and, if so,

3  what the root cause(s) of these deaths were.  In this section, I compare my

4  impressions of these deaths with the official reports from the NaphCare M&M

5  Committee.

### 1.    Patricia Adamson (23706155), Died May 3, 2023

#### (a)    Events Preceding Death

8  121.    Patricia Adamson was booked February 13, 2023 at the age of 63.  She

9  was placed in a sobering cell but was uncooperative.  On February 15, 2023, she

10  was noted to be vomiting dark brown emesis—the brown color is usually caused by

11  blood.  Dr. Ram appropriately sent her to the hospital, where she was admitted for

12  two days.  SD_705053.

13  122.    At the hospital, she was confirmed to have hematemesis (vomiting

14  blood) and anemia.  Her initial Hemoglobin blood count was 15; the next day, it was

15  11.9, probably indicative of substantial blood loss.  SD_356707.  Hematemesis is

16  most commonly caused by a bleeding duodenal ulcer (an erosion in the lining of the

17  intestine just past the stomach).  The normal course of action at this point would be

18  to do an EGD,[20] also called an "endoscopy," which means using a scope to look into

19  the stomach and duodenum and cauterizing the ulcer (if one is found) to prevent

20  further bleeding.  The gastroenterologist at the hospital did not want to do this,

21  which I believe was a medical mistake.  In my clinical experience as an emergency

22  physician for 25 years, essentially all cases of hematemesis with substantial blood

23  loss result in an EGD being performed.  Instead, Ms. Adamson was sent back to the

---

[19] This report does not address deaths caused by homicide (*e.g.*, Raymond Vogelman), overdose/withdrawal (*e.g.*, Joshua Fosbinder, Lazaro Alvarez, William Schuck), or suicide (*e.g.*, Pedro Ornejas).  I leave these deaths to Plaintiffs' other experts to address in their reports.  However, I note that I have overseen the care of many patients with withdrawal in jails, and it is my opinion that no one should die of withdrawal.

[20] EGD stands for EsophagoGastoDuodenoscopy.

1  Jail with a prescription for Protonix, a medication to reduce stomach acid and help

2  heal ulcers.

3      123.   Once back at the Jail, Dr. Christensen reviewed the hospital records on

4  February 20, 2023 but did not summarize them, did not see Ms. Adamson

5  personally, and created no ongoing care plan including no plan for check-ups.

6  SD_705067.  NP Lacey Beaston did a brief summary of the hospital records in a

7  chart note on February 23, 2023.  She specifically noted the anemia and the hospital

8  plan to transfuse Ms. Adamson if her hemoglobin fell too much.  NP Beaston also

9  noted the hospital discharge prescription of Protonix.  However, NP Beaston made

10  no other treatment plan for Ms. Adamson.  She ordered no labs to check hemoglobin

11  levels, and no scheduled check ups.  SD_705124.  Ms. Adamson was also diagnosed

12  by Jail psychiatry as having schizoaffective disorder.  SD_705005.

13      124.   According to the Jail's records, Ms. Adamson repeatedly refused her

14  Protonix and other medications and also refused to sign the refusal form at least

15  sixty-nine (69) times.  SD_705730–SD_705799.  These refusals were only signed

16  by security staff and were not witnessed by the nurse as required by the Sheriff's

17  Department Medical Services Division Operations Manual ("MSD Operations

18  Manual") or NaphCare's Policies and Procedures ("NaphCare P&P").  *See* MSD

19  Operations Manual, No. D.1.1.B; *see also* NaphCare P&P, Nos. D.02.3 and 4

20  (NAPHCARE001141).

21      125.   Ms. Adamson repeatedly requested a liquid diet because she stated that

22  eating solid foods made her feel ill.  SD_705205, 705403, 705476.  She complained

23  intermittently of abdominal pain.  SD_705302, SD_705537.  On April 4, 2023,

24  Psychiatrist Lauren Anderson noted:  "She endorses early satiety, bloating, and

25  nausea.  She states "I am trying to eat more of the solid foods but it is difficult."

26  SD_705529.  Dr. Anderson submitted a referral asking if a medical practitioner

27  would see Ms. Adamson to "consider GI referral."

28      126.   On April 12, 2023, in response to Dr. Anderson's request,

1  Ms. Adamson was seen by NP Teresa Hurley for "ongoing early satiety, bloating,

2  and nausea when eating solid foods; consider GI referral."  SD_705537.

3  Ms. Adamson also told NP Hurley she had rectal bleeding which she assumed was

4  from hemorrhoids.  NP Hurley diagnosed constipation and abdominal bloating.  NP

5  Hurley did no examination, including no examination to confirm the presence of

6  hemorrhoids and/or rectal bleeding.  NP Hurley noted that Ms. Adamson had had a

7  GI consult during her recent hospitalization, but not the fact that GI had declined to

8  do an endoscopy nor that Ms. Adamson was anemic from blood loss at the time of

9  discharge.  NP Hurley did not order any labs and did not refer Ms. Adamson to a GI

10  specialist.  SD_705537.

11      127.  Ms. Adamson continued to complain of abdominal symptoms.  She was

12  seen again by a Sonya Megert, NP, on April 29, 2023 for "ongoing early satiety,

13  nausea, and bloating" that had been going on for "months."  NP Megert saw

14  Ms. Adamson for this complaint at her cell rather than in the medical area, checked

15  no vital signs, did no abdominal examination, and ordered no labs or x-rays—

16  despite the fact that this was an elderly woman who had been hospitalized for

17  similar symptoms two months before.  NP Megert instead ordered Fiberlax, having

18  evidently made the diagnosis of constipation but not documenting any basis for this

19  diagnosis.  SD_705690.

20      128.  On May 2, 2023, a "STATCare Progress Note" stated:  "Pt. complained

21  of vomiting since after breakfast.  Requesting medication for vomiting."  The

22  STATCare practitioner performed "No clinical assessment … on this patient" but

23  ordered the antinausea drug Zofran.  SD_705692.

24      129.  The next day, May 3, 2023, Doreen Marasigan RN asked for

25  Ms. Adamson to be sent to medical "for report of vomiting."  The RN was told that

26  "[t]here is no deputy to assist me at this time."  SD_705692.

27      130.  About an hour later, psychiatrist Lauren Anderson found Ms. Adamson

28  severely ill.  Deputies took her to the shower, where she vomited blood and became

1    unresponsive.  During resuscitation attempts, a "constant stream of coffee ground

2    (bloody) emesis was coming from her mouth."  Resuscitation attempts were

3    unsuccessful, and Ms. Adamson died on May 3, 2023.  SD_705692.  I have not seen

4    an autopsy report for Ms. Adamson.

**(b)    Jail's Analysis of This Death**

6        131.   Dr. Rafi noted in her death summary of this case: "███████████████

7    ██████████████████████████████████████████████████

8    ██████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████

10   ██████████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ██████████████████████████████████████████████████

13   ██████████████████."  NAPHCARE041694.  In other words, Dr. Rafi ████████

14   ██████████████████████████████████████████████████

15   ████████████████████.  I agree with this summary, as far as it goes.  Of course,

16   there was nothing stopping the medical staff at the Jail from ordering an outpatient

17   endoscopy, appropriate follow up labs and other after-care plans themselves.

18       132.   The NaphCare M&M presentation reported that ████████████████

19   ████████████████████████████████████████████████████

20   ███████████████.  NAPHCARE041667, pp 7-12.  However, Ms. Adamson had

21   several interactions in this time that were important, such as the visit with a Nurse

22   Practitioner on April 13, 2023 with the specific question of whether a GI consult

23   (for an endoscopy) should be ordered.  Her repeated complaints of inability to eat

24   solid foods, bloating, and abdominal pain should have triggered a more thorough

25   work up especially considering the fact that Ms. Adamson was a frail elderly

26   woman.

27       133.   After reviewing this case, the NaphCare M&M Committee wrote

28   "████████████████████████████████████████

1 ██████████" NAPHCARE041678.

2         **(c)    My Analysis of This Death**

3     134.  I strongly disagree with the M&M Committee's assessment. ████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████

6 ███████████ .

7     135.  I find numerous gross medical errors in the medical care provided to

8 Ms. Adamson once she returned to the Jail. This was an elderly woman who had

9 had a two-day stay at the hospital for vomiting blood along with documented

10 anemia, indicating significant blood loss. Upon her return to the Jail, she should

11 have been automatically seen face-to-face by a medical practitioner and had an

12 ongoing care plan established. This did not happen.

13     136.  While Dr. Rafi is correct that ████████████████████

14 ████████████████ , there was nothing preventing the Jail physicians from

15 arranging an outpatient endoscopy upon Ms. Adamson's return to the Jail and

16 creating a treatment plan with follow-up evaluations and labs, especially when she

17 repeatedly complained of ongoing symptoms. The Jail medical staff should have

18 (a) advocated on her behalf in the hospital to have the endoscopy done before she

19 was discharged or (b) arranged the endoscopy and follow-up care plan themselves.

20 They did neither. They should have scheduled medical wellness checks and done

21 follow up labs. Moreover, ████████████████████████████████████

22 ████████████████████████████████████ .

23     137.  The nurse practitioner who saw Ms. Adamson on April 12, 2023,

24 specifically to "consider GI referral" did no physical examination even though

25 Ms. Adamson complained of rectal bleeding from hemorrhoids. Rectal bleeding can

26 also be caused by a bleeding duodenal ulcer. Let's say that the NP had done a rectal

27 exam and found no hemorrhoids but did find obvious rectal bleeding. Would that

28 have been important information? Of course it would, which is why it is essential to

1  do a physical examination in such patients.

2      138.   The NP also did not review the medical records from Ms. Adamson's

3  recent hospitalization thoroughly enough to note that Ms. Adamson had had a

4  significant documented blood loss.  She ordered no blood test to determine if the

5  anemia from blood loss was ongoing, especially in light of the fact that

6  Ms. Adamson was complaining about bleeding from the rectum.  The NP had been

7  prompted to refer Ms. Adamson to a GI specialist for an endoscopy but declined to

8  do so.  This NP made several serious medical mistakes including not doing a

9  physical examination, not reviewing medical records thoroughly, making diagnoses

10  (constipation) without basis, and not realizing that Ms. Adamson should see a GI

11  doctor for an endoscopy even when this was pointed out.  In my opinion, this

12  interaction violated the medical standard of care.

13      139.   The nurse practitioner who visited Ms. Adamson at her cell on

14  April 29, 2023 also violated the medical standard of care.  This nurse practitioner

15  did not take vital signs, performed no examination, and performed no diagnostic

16  tests.  The medical standard of care for an elderly woman, recently hospitalized for

17  hematemesis and now with similar abdominal complaints, must include the taking of

18  vital signs, an abdominal examination, and diagnostic studies, such as labs and

19  imaging studies.  The nurse practitioner did none of this and instead appeared to

20  diagnose Ms. Adamson with constipation without documenting any basis for

21  making this diagnosis.

22      140.   When Ms. Adamson continued to complain of vomiting, STATCare

23  ordered anti-nausea medications again without any examination or labs.  All of this

24  was poor medical care.

25      141.   Finally, the registered nurse who wanted to see Ms. Adamson on

26  May 3, 2023 was told "No" because of no deputy availability—in other words,

27  security short-staffing negatively impacting medical care.  These issues were

28  ignored by CHP's Dr. Rafi and the NaphCare Corporate death review.

142.   Ms. Adamson's death was, in my opinion, preventable.  Had she received appropriate evaluation and care at the Jail, she more likely than not would have survived.

### 2.   Raymond Dix (22737506), Died September 13, 2022

#### (a)   Events Preceding Death

143.   Raymond Dix was booked on September 6, 2022, at the age of 56.  He had a medical history that included congestive heart failure, chronic atrial fibrillation, hypertension, COPD, and others.  He was taking multiple medications for these conditions.  He was sent to the hospital for a clearance prior to incarceration, but returned the same day.

144.   On September 7, 2022, during his medical screening, Mr. Dix was noted by the nurse to have "profuse sweating."  Mr. Dix asked to see a medical practitioner about his history of atrial fibrillation and what he felt were abnormal vital signs.  He was not scheduled to see a practitioner.  SD_002714.

145.   On September 8, 2022, Katrina John, MD reviewed Mr. Dix's admission chest x-ray because it was abnormal, showing an enlarged heart.  The physician noted that this was "consistent" with Mr. Dix's cardiac history and wrote: "Patient needs to see a medical provider if he is experiencing chest pain, dizziness, shortness of breath, altered mental status."  The physician did not see Mr. Dix herself and did not note that Mr. Dix had already requested to see a practitioner. SD_002715.

146.   On September 9, 2022, a nurse practitioner reviewed Mr. Dix's September 6, 2022 hospital record, but did not see Mr. Dix personally.  SD_002715.

147.   On September 10, 2022, a nurse practitioner went to Mr. Dix's cell. The totality of the physical exam was "Pt. seen moving arms and legs in bunk. Unlabored respiratory effort."  The nurse practitioner did not check vital signs, and did no examination of Mr. Dix's lungs, heart, or anything else.  Mr. Dix reportedly refused an examination, probably related to the fact that the security staff had to

1    wake him up for the nurse practitioner visit.  SD_002715.

2    148.   From September 7 through September 13, Mr. Dix reportedly refused

3    some of his medications.  SD_002841, SD_002840, SD_002842, SD_002844.

4    These refusals, along with the refusal to sign the refusal form, were witnessed only

5    by security staff, not nurses, and Mr. Dix received no counselling about these

6    refusals of essential medications.  *See* SD_002746-002761.[21]

7    149.   On September 12, 2022, Mr. Dix complained of being dizzy and was

8    seen in the medical clinic by a registered nurse.  Mr. Dix thought that his dizziness

9    was due to a low blood sugar, however, his blood sugar was normal at 127.  He did

10   have an abnormally low heart rate of 59, especially taking into consideration his

11   history of atrial fibrillation, which typically causes rapid heart rate.  The registered

12   nurse did not call a medical provider about his symptoms despite the instructions of

13   the medical doctor on September 8, 2022 that Mr. Dix was to see a medical provider

14   if he reported dizziness.  The nurse treated him by giving him a snack and some

15   water and told him to keep drinking water.  In other words, the registered nurse

16   made a diagnosis that Mr. Dix's dizziness was due to dehydration or not eating and

17   had nothing to do with his heart.  SD_002716.

18   150.   Five days later, on September 13, 2022, Mr. Dix was found down.

19   Resuscitation was attempted but was unsuccessful.  He was pronounced dead at the

20   hospital.  SD_002717.  An autopsy determined that Mr. Dix had died of

21   "Atherosclerotic and Hypertensive Cardiovascular Disease."  SD_050219.

22   **(b)    Jail's Analysis of This Death**

23   151.   I have not seen the death summary prepared by Dr. Rafi.  However, I

24   reviewed a summary prepared by Dr. Montgomery.  Dr. Montgomery noted that two

25   of Mr. Dix's medications, Farxiga and Anoro Ellipta, had been determined to be

26

27   _____

28   [21] I critique the Jail's approach to reported refusals in more detail later in this
Report.

1 nonformulary by NaphCare and therefore not approved for his use.

2 Dr. Montgomery also noted that Mr. Dix had been identified as having alcohol

3 abuse disorder but had never been monitored with alcohol withdrawal scoring or

4 offered treatment for this.  I agree with Dr. Montgomery that these both were serious

5 problems with the care that Mr. Dix had received at the Jail.  SD_055188.

6      152.   As far as I can tell, Dr. Montgomery's observations were not shared

7 with the NaphCare M&M Committee.  After reviewing the case, the NaphCare

8 M&M committee had no critique and no recommendations.  NAPHCARE041499-

9 041507.

10            **(c)    My Analysis of This Death**

11      153.   To my review, Mr. Dix's death was preventable.  There are four glaring

12 problems with the medical management that may have contributed to his death at

13 the Jail.

14      154.   First, two of Mr. Dix's medications were inappropriately discontinued

15 at booking because they were non-formulary.  Farxiga is a drug used to treat both

16 Type 2 Diabetes and congestive heart failure.  Anoro Ellipta contains two

17 bronchodilators used to treat chronic lung disease (COPD).  Requests for

18 authorization of these non-formulary medications were sent in.  *See* SD_055186.

19 Mr. Dix received one dose of  Farxiga seven days after he was booked; he never

20 received the Anoro Ellipta prescription.  In my opinion, not receiving those

21 medications for six days may have contributed to his death on September 13, 2022.

22 I also note that arbitrarily discontinuing those medications simply because they were

23 non-formulary violated NaphCare's contractual obligations: "the formulary shall

24 allow medical practitioners and psychiatrists to follow generally accepted clinical

25 practice patterns in their medical management of incarcerated individual patients,"

26 and, "[c]ontractor typically approves non-formulary orders."  Contract § 2.3.30.35,

27 SD_125283.

28      155.   Second, Mr. Dix was never examined by a Jail medical practitioner

during his incarceration even though he had a significant heart history, asked to see a doctor and had concerning symptoms. The visit by a nurse practitioner to his cell is problematic in several ways—including, but not limited to, her failure to take vital signs. In the end, no practitioner ever did a significant medical evaluation of Mr. Dix during his incarceration.

156. Third, Mr. Dix's multiple "refusals" of critical heart medications were not witnessed by an RN, and he was not counselled about his refusals of critical heart medications as required by MSD Operations Manual No. D.1.1.

157. Fourth, the registered nurse who evaluated Mr. Dix on September 12, 2022 acted as if they were a practitioner. But registered nurses have a different, more limited scope of practice than practitioners. The registered nurse did not fill out one of the Nursing Evaluation Protocol forms. And, in fact, there is no form for nurses to do an evaluation of "dizziness" in the setting of heart disease and dysrhythmias. Given his medical history and symptoms, Mr. Dix should have been seen urgently by a practitioner. He should have had a medical work up including an EKG and labs. If this could not be done at the jail due to understaffing, Mr. Dix should have been sent to the Emergency Room on September 12, 2022. Had this happened, more likely than not, Mr. Dix would have survived.

158. The NaphCare M&M committee apparently ignored each of these problems when they stated that they had no recommendations from this review.

### 3. Vianna Granillo (22728152), Died July 13, 2022

#### (a) Events Preceding Death

159. Vianna Granillo was booked on July 8, 2022, at the age of 25. At booking, she reported suffering from opioid use disorder and diabetes. She was started on opioid withdrawal three days after she was booked; in other words, she had untreated opioid withdrawal for three days. She was checked by a registered nurse on July 11, 2022 and reported to the registered nurse that she felt "like shit." "I've been here for days and I only got these meds (buprenorphine) now."

1    SD_003469.  On July 12, 2022, she was found unresponsive.  This was initially

2    assumed to be due to opioid overdose, and she received nine doses of Narcan with

3    no effect.  CPR and bag ventilation with oxygen were started 12 minutes after she

4    was found unresponsive and pulseless.

5        160.   At the hospital, Ms. Granillo was found to have a large amount of air in

6    her abdomen (pneumoperitoneum).  SD_249171.  She died shortly after arrival at

7    the hospital.

8        161.   An autopsy performed July 4, 2022 concluded that Ms. Granillo died of

9    "septic shock, due to pneumoperitoneum with spillage of gastric/enteric contents

10   due to perforated prepyloric ulcer."  SD_061710.

11       162.   Gastric (stomach) ulcers are caused by stomach acid and bacteria eating

12   the lining of the stomach near where it connects to the intestines.  Most patients with

13   gastric ulcers have symptoms of "heartburn" and upper abdominal pain.  Untreated

14   gastric ulcers can sometimes erode through the entire thickness of the stomach and

15   perforate into the abdominal cavity.  This is a devastating complication because

16   stomach acid, bacteria, and other bowel contents spill into the pristine environment

17   of the abdominal cavity causing peritonitis (inflammation of the lining of the

18   abdominal cavity).  *Peritonitis is an intensely painful condition.*  Over time, the

19   peritonitis worsens, the gastrointestinal system stops functioning, and other organs,

20   such as the kidneys, fail.  Patients with bowel perforation and peritonitis typically

21   have severe pain.  Over time, as they get sicker, such patients can develop

22   abdominal infections and, eventually, low blood pressure and septic shock.

23       163.   There is always a period of time, usually days, between the rupture of

24   the ulcer into the abdominal cavity and death, during which the patient experiences

25   severe pain.

26               **(b)    The Jail's Analysis of This Death**

27       164.   In her death summary, Dr. Rafi █████████████████████████████

28   ██████████████████████████████████████████████████

1  ████████. SD_055302. Dr. Montgomery noted that Ms. Granillo already exhibited

2  rigor mortis and livor mortis when found, indicating that she had been dead for

3  some time before she was found. Dr. Montgomery also noted two errors in the

4  resuscitation attempt: that no AED was used and that there was a delay in O2

5  delivery. *Id.*

6      165.  ████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████" NAPHCARE041420. However, I do not see why nine (9)

10  doses of Narcan was insufficient in Ms. Granillo's resuscitation attempt or how

11  Narcan education would have saved Ms. Granillo.

### (c)  My Analysis of This Death

13     166.  I have the following observations based on my review of this case.

14  First, ███████████████████████████████████████████

15  ████████████████████████████████████  ████████████

16  ████████████████████████████████████████████████

17  ████████████████. As with Mr. Galenbach's death review, I am again forced to

18  wonder whether Dr. Rafi's recommendations were reviewed by the committee at all.

19     167.  Second, the NaphCare M&M Committee is supposed to reconsider

20  death cases once the autopsy report is available if the autopsy sheds new light on the

21  patient's death, such as in this case. *See* Barkley Tr. at 24:23-25. However, I have

22  seen no record that the M&M committee reviewed Ms. Granillo's autopsy report.

23     168.  Since a rupture of a gastric ulcer invariably causes intense pain and

24  since there is a length of time, usually days, between the rupture and the

25  development of infection, septic shock and death, it is likely that Ms. Granillo knew

26  that something catastrophic had happened to her. Most likely, she would have

27  attempted to notify staff of her distress. However, as discussed later in this Report,

28  the emergency intercom buttons in the Jail frequently do not work.

### 4.    Abdiel Sarabia (21118298), Died July 22, 2022

#### (a)    Events Preceding Death

169.    Mr. Sarabia was booked on May 24, 2021, at the age of 35.  During booking, staff noted that he had hypertension and opioid use disorder.  Lisinopril, a medication to treat hypertension, was prescribed for him the next day without any practitioner seeing him.  He was not scheduled for blood pressure checks or hypertension chronic care visits.

170.    On July 8, 2021, nurse practitioner Frederick Wycoco "cancelled" Mr. Sarabia's diagnosis of hypertension.  "Reason: not on meds, BP normotensive," meaning his blood pressure was normal.  SD_011457.  However, Mr. Sarabia was taking lisinopril for blood pressure and continued to take it until he died. SD_011907.  Also, Mr. Sarabia's blood pressure was not normal.  His blood pressure was elevated at 141/84 on June 3, 2021, and it was elevated again at 153/77 on June 18, 2021.  SD_011588; SD_011487.

171.    On October 16, 2021, blood labs were drawn on Mr. Sarabia, which showed a markedly elevated level of triglycerides at 932 (normal is less than 150), elevated cholesterol test of non-HDL cholesterol at 157 (therapeutic goal of less than 100), and an elevated Thyroid Stimulating Hormone (TSH) indicating the possibility of hypothyroidism.  Mr. Sarabia had other abnormal labs, too, such as elevated liver tests indicating liver damage.  SD_011629.

172.    No one reviewed these labs until a psychiatric Nurse Practitioner noted the elevated triglyceride and TSH levels *four months later* and notified the medical practitioners to look at the labs.  SD_011546.  At that point, Joseph Molina, MD, reviewed the labs on February 8, 2022 and ordered fenofibrate, a medication for high triglyceride levels.  Dr. Molina did not address the abnormal thyroid test, although it was mentioned on the task list in TechCare.  He did not address the other lipid abnormalities or elevated liver enzymes.  He also did not see Mr. Sarabia in person.  SD_011551.  In fact, no Jail medical practitioner ever saw Mr. Sarabia to

1    discuss any of this.

2      173.    Mr. Sarabia's medical records document at least forty eight (48)

3 refusals of prescribed medications over the course of his incarceration. None of his

4 refusals (or his refusals to sign the refusal form) were witnessed by a nurse. *See*

5 SD_011655-011703. I see no evidence that he was counselled about these refusals

6 in accordance with the MSD Operations Manual or NaphCare P&P. *See* MSD

7 Operations Manual No. D.1.1.B; *see also* NaphCare P&P Nos. D.02.3 and 4,

8 NAPHCARE001152.

9      174.    On May 20, 2022, Mr. Sarabia was seen by a registered nurse due to

10 the complaint of "hard time breathing." His shortness of breath was so intense that

11 he used another person's albuterol inhaler despite not having a history of asthma.

12 Vital signs at this visit included an abnormally high blood pressure of 157/104 and

13 an abnormal heart rate of 125. SD_011583.

14      175.    The same day, he was seen by nurse practitioner Frederick Wycoco.

15 NP Wycoco did not repeat Mr. Sarabia's vital signs. NP Wycoco did an EKG that

16 he interpreted as "sinus tachycardia." (I cannot find this EKG in the records). NP

17 Wycoco noted "Elevated BP without diagnosis of HTN" (hypertension), despite the

18 fact that the diagnosis of hypertension was in Mr. Sarabia's history. NP Wycoco

19 attributed Mr. Sarabia's elevated BP and heart rate to "Likely albuterol induced." In

20 other words, NP Wycoco thought these symptoms were caused by the fact that

21 Mr. Sarabia had used someone else's inhaler. NP Wycoco diagnosed a muscle

22 strain and muscle spasm and prescribed Flexeril and "Deep breathing exercises."

23 SD_011584.

24      176.    On May 21, 2022, Mr. Sarabia was seen at his cell by Joseph Molina,

25 MD to reassess "HR elevated during (last) assessment." Dr. Molina did not repeat

26 any vital signs, including the heart rate. He did no examination. SD_011585.

27      177.    Mr. Sarabia was not seen again by any other medical personnel before

28 his death.

178. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████. NAPHCARE041401.

179. An autopsy concluded that Mr. Sarabia died of "Hypertensive Cardiovascular disease" and that a contributing factor was "hypothyroidism." SD_001362.

### (b)    The Jail's Analysis of This Death

180. ███████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

### (c)    My Analysis of This Death

181. I disagree. I believe that this was a potentially preventable death. Potential contributing "root causes" include the following:

- Mr. Sarabia had hypertension. It was uncontrolled by 5mg of Lisinopril once a day. This is a tiny dose; the typical minimal dose given to an adult hypertensive patient is at least 10 mg a day. Nevertheless, this dose failed to control his blood pressure as evidenced by high blood pressure readings on many occasions and especially on May 20, 2022.

- NP Wycoco discontinued Mr. Sarabia's diagnosis of hypertension even though he had multiple high blood pressure readings and was on a blood pressure medication. That led NP Wycoco ten months later to write that Mr. Sarabia had a high blood pressure without a diagnosis of hypertension—not true.

- Mr. Sarabia's medical record contains forty-eight refusal forms, all of which say that Mr. Sarabia not only refused his medication but also refused to sign the refusal form. None of these was witnessed by a nurse. I question whether this is credible. Did Mr. Sarabia really refuse all of these medications when offered? Did he really refuse to sign the form when offered the opportunity to do so? Or was something else going on here? Nobody from medical ever took the time to ask why he was refusing medications (if this was even true) or to counsel Mr. Sarabia that his medications were important.

- The medical staff failed to confirm that Mr. Sarabia's elevated blood pressure and heart rate on May 20, 2022 ever improved back to normal. I suspect that they did not.

- NP Wycoco wrote that taking albuterol (an inhaler) caused Mr. Sarabia's high blood pressure and heart rate. In my experience as an emergency physician, this is extremely unlikely.

- NP Wycoco and Dr. Molina failed consider that Mr. Sarabia's chest pain and shortness of breath while exercising on May 20, 2022 might well have been anginal-type heart pain. Had they considered this, they would likely have done a work up consisting of an EKG and repeat vital signs and observation or simply have sent Mr. Sarabia to the emergency room.

- The opportunity to diagnose and treat Mr. Sarabia's hypothyroidism— which the autopsy determined to be a contributing factor in his death— presented itself on October 16, 2021 in the form of an abnormal thyroid test. It was never investigated or treated either then or four months later when a psychiatric nurse practitioner alerted the medical staff of their oversight. The abnormal blood test was simply ignored.

- A very high "non-HP lipid" level was evident in Mr. Sarabia's October 16, 2021 labs. High lipid levels such as these increase the risk of cardiovascular disease. The lab form itself indicated the need to treat this abnormality. Mr. Sarabia should have been treated with a statin lipid lowering medication that would have reduced his risk for atherosclerotic heart disease. However, like the abnormal thyroid test, this abnormal lab test was ignored, and the opportunity to treat Mr. Sarabia with a statin drug was lost.

182. Most people who have a cardiac event like the one that killed Mr. Sarabia have severe crushing chest pain and shortness of breath for minutes or even hours before they succumb. It is likely that Mr. Sarabia knew that he was having a medical crisis before he died but likely had no way to alert security or medical staff of this emergency because the emergency intercom buttons in the cells do not work. I note that he was not found after his death until lividity had set in—a process that usually takes hours, indicating that no one checked on him for a prolonged period of time.

183. In my opinion, more likely than not, had Mr. Sarabia received appropriate medical care while he was incarcerated in the Jail, he would not have died on July 22, 2022.

### 5. Aaron Bonin (22736636), Died November 1, 2022

#### (a) Events Preceding Death

184. Aaron Bonin was booked on September 1, 2022, at the age of 43. After

booking, he was immediately admitted to the medical observation unit for multiple medical and psychiatric problems, most notably end stage renal failure requiring dialysis.  He was also taking medications to treat HIV infection.

185.   Mr. Bonin reportedly refused to take his many medications on at least 21 occasions (see, for example, the Medication Administration Record for Darunavir, an anti-HIV drug).  He also reportedly always refused to sign the refusal form.  No nurse ever witnessed these refusals.  SD_002267-002287, SD_002293.  Per the MSD Operations Manual No. D.1.1, he should have been counselled for these refusals of essential medications.  However, I see no indication that these counselling sessions occurred.

186.   On October 20, 2022, Mr. Bonin was found to have a critically high potassium level (hyperkalemia).  SD_002075, SD_002237-39.  This is important because potassium is a critical element in heart function.  High potassium levels can cause the heart to suddenly stop beating effectively (called fibrillation) which leads to death.  Mr. Bonin's potassium level was rechecked the following day, when it was even higher; so high, in fact, as to be immediately life threatening. *Id.*  This was noted by a medical doctor, who discussed the need for immediate full dialysis to reduce the potassium to a normal level with the dialysis nurse.  However, the dialysis nurse discontinued dialysis early:  "Pt strongly insisted to stop the treatment."  SD_002504.  From that moment until his cardiac arrest two days later, Mr. Bonin was not seen by a practitioner or any other medical staff member to ask why he was refusing full dialysis and discuss why that dialysis session was particularly important.  SD_002075-76.  His potassium level was never rechecked after the aborted dialysis.  Mr. Bonin had a cardiac arrest on October 24, 2022, determined at the hospital to be due to very high potassium levels.  He died one week later, on November 1, 2022.

187.   Mr. Bonin's autopsy report concluded that Mr. Bonin had died of "End stage renal disease" and "Hypertensive and atherosclerotic cardiovascular disease."

1   However, the immediate cause of the initial cardiac arrest was clearly hyperkalemia,

2   as was evidenced by the EMT records and the emergency department resuscitation.

3   This fact was not mentioned in the autopsy.  SD_055144.

### (b)    The Jail's Analysis of This Death

5       188.   Dr. Montgomery's evaluation noted the concern with Mr. Bonin's

6   dangerously high potassium levels on October 20 and October 21, 2022 and the

7   abnormally short dialysis on October 22, 2022.  SD_055139-055141.

8   Dr. Montgomery also noted that the hospital had diagnosed the cause of Mr. Bonin's

9   cardiac arrest as being hyperkalemia.  Dr. Montgomery was also concerned about

10  Mr. Bonin's multiple refusals of dialysis.  SD_055143.  I have not seen the review

11  completed by Dr. Rafi or the NaphCare Health Services Administrator Mr. Farrier.

12      189.   ██████████████████████████████

13  ████████████████████████████████████

14  ████████████████████████████████████

15  ████████████████████████████████████

16  ██████████"  NAPHCARE041630.  I do not see why ████████████████ would

17  be considered important in Mr. Bonin's death.

### (c)    My Analysis of This Death

19      190.   In my opinion, this was a preventable death.

20      191.   Mr. Bonin experienced the initial cardiac arrest due to hyperkalemia

21  (high potassium levels).  Hyperkalemia is a condition that all dialysis patients are at

22  risk to develop.  The treatment for life-threatening hyperkalemia in someone with

23  kidney failure is immediate dialysis.  However, Mr. Bonin's dialysis was

24  discontinued early, and his potassium level was not checked again until after his

25  cardiac arrest.

26      192.   The root causes of Mr. Bonin's preventable death included:

27      •    Mr. Bonin's medical record contains at least twenty-one (21) refusal
         forms, all of which say that Mr. Bonin refused his medications and also
28       refused to sign the refusal form.  None of these was witnessed by a

nurse.  I question whether this is credible.  Did Mr. Bonin really refuse all of these medications when offered?  Did he really refuse to sign the form when offered the opportunity to do so?  Or was something else going on here?  Nobody from medical ever took the time to ask Mr. Bonin why he was refusing or to counsel Mr. Bonin that his medications were important.

- Dr. Montgomery noted several refusals of dialysis that were not appropriately documented in the medical record.

- Lack of adherence to the policy of a face-to-face interaction with a practitioner following a refusal of a critical medical therapy.  The dialysis on October 21, 2022 was such a critical therapy because Mr. Bonin's Potassium level was so high.  Mr. Bonin may not have understood how important that particular dialysis was.  Had that counselling session occurred, Mr. Bonin more likely than not would have survived.

- Lack of communication between medical professionals.  Since the dialysis nurse knew that that dialysis was critical due to Mr. Bonin's dangerously high potassium level, when the dialysis was terminated early, the nurse should have communicated that fact to the physician.  Had that been done, Mr. Bonin likely would have survived.

- A repeat potassium level should have been done either the same day or the day after the aborted dialysis to determine what Mr. Bonin's potassium level was.  That potassium level should have been obtained even if Mr. Bonin had had a complete dialysis but especially more so after an aborted dialysis.

- Had that level been drawn, Mr. Bonin likely would not have died.

### 6.     Roselee Bartolacci (23713442), Died May 29, 2023

#### (a)     Events Preceding Death

193.  Ms. Bartolacci was booked April 6, 2023, at the age of 32.  At admission, she weighed 250 pounds.  SD_711592.  Ms. Bartolacci had severe mental illness that resulted in a lack of self-care, as described on April 11, 2023 by this psychiatric admission note: "she is seen in her cell, which is dirty and littered with trash.  Shaking while sitting naked on the cell floor, sucking on her finger.  Her clothes are scattered on the floor and appear to be covered in her feces."  This is corroborated by several nursing notes describing her appalling lack of self-care.  One example:  Registered Nurse Dennis DelRio documented on April 14, 2023 "Dried feces on her body and face.  Blankets are soaked with urine."  SD_711687.

194.  Ms. Bartolacci's main medical problem was that she ate and drank very

little.  She also was noted on several occasions to be vomiting.  *See, e.g.*, SD_711704.  Dr. David Christensen prescribed the anti-nausea medication Zofran for her on April 14, 2023 without seeing her.  SD_711698.

195.   NP Teresa Hurley went to Ms. Bartolacci's cell on April 15, 2023 and noted her to be "naked/dirty" and actively vomiting.  SD_711703.

196.   Ms. Bartolacci reportedly "refused" a medical doctor evaluation from Dr. Connie Orem on April 18, 2023 at her cell.  Dr. Orem noted that she had done only a "[l]imited exam due to evaluation from cell door per request of deputy for personal safety."  SD_711732.  No vital signs were done.  Notably, multiple notes in Ms. Bartolacci's records from this time period state that "she is **not** physically aggressive."  SD_711778; *see also* SD_711715 ("verbally aggressive but not physically aggressive towards staff").  I therefore do not understand why Dr. Orem could not enter Ms. Bartolacci's cell "for personal safety" reasons.

197.

198.   On April 26, 2023, the psychiatrist noted that "Pt has been lethargic, laying on the floor of cell with minimal po (oral) intake," *i.e.*, she had little intake of food or water.  The psychiatrist (*not the medical staff*) initiated a transfer to the hospital, where Ms. Bartolacci was diagnosed with acute renal failure with tubular necrosis (which is caused by severe dehydration), severe protein calorie malnutrition, sepsis, and cardiac rhythm problems, among others.  Importantly, at the hospital, Ms. Bartolacci weighed 217 pounds, SD_712599, representing a weight loss of 33 pounds in 20 days.  Ms. Bartolacci was very sick; sick enough to require a two week stay at the hospital to recover.

199.   Ms. Bartolacci returned to the Jail on May 10, 2023.  NP Lacey Beaston reviewed her hospital records the day before.  NP Beaston noted that Ms. Bartolacci had been anemic at the hospital and recommended "repeat labs to ensure (hemoglobin) levels are not dropping."  SD_711873.  However, repeat labs were never drawn at the Jail

200.   One day after she returned from the hospital, Ms. Bartolacci was noticed again to be vomiting and not eating.  Dr. Christensen ordered the anti-nausea medicine Zofran.  SD_711886.

201.   On May 11, 2023, a registered nurse "noted bilateral hand/feet swelling.  Reported this to nurse practitioner Hurley."  SD_711887.  I do not see any indication that a practitioner ever addressed this concern.

202.   On May 18, 2023, Ms. Bartolacci was seen by Dr. Orem, who noted "poor po intake, concern for dehydration renal failure, electrolyte abnormality." SD_711906.  Dr. Orem sent Ms. Bartolacci back to the emergency room due to concerns about "possible hydration and nutrition."  "Pt has not ate or drank fluids for the past 48 hours.  Refusing all care.  Has a foul smelling urine that is dark brown."  SD_299696.

203.   The ER doctor noted that Ms. Bartolacci was "covered in urine and feces" SD_595490.  CT scan and labs were normal.  Ms. Bartolacci was not weighed at the emergency room.  Because her labs at that time were normal, she was discharged from the hospital back to the Jail the same day, May 18, 2023.

204.   On May 24, 2023, a progress note from Dr. Christensen stated "Given my inability to examine the patient, obtain vital signs or follow reliable I/O [intake out], I am unable to assess her hydration status.  If patient is 5150 and unable to refuse care, then obtaining (labs) would be helpful."  "I will order above labs.  It will be incumbent upon the psychiatry team to determine if UOF [use of force] is indicated to obtain them."  SD_711982.  I see no evidence that the mandate for the psychiatry team to determine whether a use of force should be initiated for the purpose of obtaining labs was ever communicated to the psychiatry team.

205.   On May 24, 2023, Ms. Bartolacci was "force medicated" and "required use of force by tac team."  SD_711988; *see also* SD_711983.  This would have been a great time to draw the labs that Dr. Christensen wanted, but no labs were drawn, probably because the psychiatry team had never been told of Dr. Christensen's

1   order.

2      206.  On May 25, 2023, a dietician recommended weighing Ms. Bartolacci,

3   stating, "IP has no current weight since bk weight.  Please consider weight check."

4   SD_711989.  This recommendation was ignored.  No attempt was made to weigh

5   Ms. Bartolacci.  SD_711988.

6      207.  On May 29, 2023, Ms. Bartolacci was found unresponsive and without

7   a pulse.  CPR and other resuscitation efforts failed, and she was declared dead.[22]

8             **(b)**    **The Jail's Analysis of This Death**

9     208.  ███████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████████████████████.

13     209.  ████████████████████████████████████

14 ████████████████████████████████████████████

15

16 _____

[22] An autopsy was done on Ms. Bartolacci by Debra Berry, MD on May 30, 2023.
Her death was determined to be "Complications of dilated cardiomyopathy" with
the contributing factor of "obesity."  The diagnosis of dilated cardiomyopathy was
based on "Dilatation of the right (5.6 cm) and left (5.5 cm) ventricles of the heart."
The term "obesity" was based on a weight at death of 210 pounds.  This is a
troubling autopsy result for a couple of reasons.

First, when Ms. Bartolacci was hospitalized one month before her death, she had a
cardiac work up including an echocardiogram done on May 1, 2023.  The
echocardiogram showed no dilated cardiomyopathy.  Specifically, the
echocardiogram report states "The left ventricle is normal size" and "The right
ventricle is normal size."  SD_595140.  The cardiologist who reviewed this noted
"The echocardiogram is reassuring.  SD_595140.  If Ms. Bartolacci did not have
dilated cardiomyopathy on May 1, 2023, but died of it on May 29, 2023, how did
she develop this lethal medical problem in four weeks?  I suspect that Dr. Berry did
not know that Ms. Bartolacci had been hospitalized for two weeks within a month of
dying or that she had had a cardiac work up at that time.

Second, Dr. Berry did not note in her autopsy report that Ms. Bartolacci had
weighed 250 pounds when she was booked on April 6th.  She therefore had a
documented weight loss of 40 pounds in less than two months.  Could that have
contributed to her death?  Dr. Berry does not say, probably because she did not
know about the profound weight loss.

In my opinion, the autopsy result does not excuse the medical management errors
made by the Jail medical team, as I describe here.

1 ████████████████████████████████████████████████

2 NAPHCARE041728.

3      210.   The NaphCare M&M committee reviewed this case in detail on

4 June 19, 2023.  NAPHCARE041703.  I do not know if they saw either death review;

5 if they did, they did not mention it.  The only recommendation of the NaphCare

6 M&M Committee was Quality Improvement Plan: "Seetal Tejura, Dr. Wade, and

7 Dr. Kelly to participate in a meeting with HSA & possibly San Diego County

8 corrections regarding documentation and monitoring of patients receiving ████

9 injections."  NAPHCARE041718.

10      211.   Although documentation and monitoring of patients receiving ████

11 injections is important, I do not see how this was a Root Cause or even an important

12 factor in Ms. Bartolacci's death.

13                    **(c)    My Analysis of This Death**

14      212.   In my opinion, Ms. Bartolacci's death was preventable.  In fact, I find

15 Ms. Bartolacci's case to be is a particularly egregious case of medical neglect.  All

16 the elements of collective neglect and inaction are present.

17      213.   First, the failure to track her weight.  No one noted that Ms. Bartolacci

18 had lost 33 pounds between the time she was admitted to the jail and when she was

19 admitted to the hospital 20 days later.  She was never weighed again at the Jail after

20 returning from the hospital on May 10, 2023, despite the recommendation of the

21 dietician that she be weighed.  Had this been done, Ms. Bartolacci's ongoing

22 starvation may have been noticed.  If it had been and a corrective care plan

23 incorporated into her overall treatment plan, Ms. Bartolacci may have survived.

24      214.   Second, the lack of communication between the medical and mental

25 health teams.  Caring for complex patients with both psychiatric and medical

26 problems is difficult and requires communication, usually at a weekly case

27 conference to discuss the difficult patient and create a comprehensive care plan.

28 This was never done for Ms. Bartolacci.  As an important example, Dr. Christensen

1 never communicated with the attending psychiatrist on May 24, 2023 that he needed
2 lab work to be drawn to evaluate Ms. Bartolacci's medical status.  I note that the
3 hospital ERs never had any difficulty drawing any needed labs or obtaining needed
4 imaging studies like a head CT.  Likely, no psychiatrist ever read Dr. Christensen's
5 note that "It will be incumbent upon the psychiatry team to determine if UOF is
6 indicated to obtain" labs.  Had that note been read or if Dr. Christensen had called
7 the psychiatrist to discuss the case and need for labs, those labs would have been
8 drawn, abnormalities noted, and Ms. Bartolacci may have survived.

9        215.   Third, the failure to advise or intervene following refusals of necessary
10 care.  To refuse necessary medical care, patients must be cognitively able to
11 understand why the medical test was ordered, and what the potential risks are of not
12 having that test.  In my opinion, Ms. Bartolacci was clearly unable to meet this
13 cognitive hurdle.  I again note that the emergency room personnel did not have any
14 problems obtaining necessary diagnostic labs.

15       216.   Fourth, the failure to examine the patient.  During Ms. Bartolacci's
16 entire stay, no medical practitioner ever examined her.  Medications like Zofran
17 were prescribed for her without any examination.  This violated the medical
18 standard of care.

19       217.   Fifth, the lack follow-through.  For example, on May 10, 2023, NP
20 Beaston recommended "repeat labs to ensure (hemoglobin) levels are not dropping."
21 This was never done.  On May 11, 2023, a registered nurse "noted bilateral
22 hand/feet swelling."  Bilateral hand and feel swelling can be an important finding
23 and a "red flag" of a serious underlying hydration or electrolyte problem.  However,
24 although the abnormal swelling was reported to a Nurse Practitioner, no practitioner
25 ever examined Ms. Bartolacci or even addressed this finding in any way.

26       218.   Overall, the medical staff documented her medical decline and death
27 without significantly intervening—with the exceptions of sending Ms. Bartolacci to
28 the hospital in April and on May 18, 2024.  In my opinion, this was death by

1   medical neglect.

2      219.   Ms. Bartolacci's death is particularly disturbing in light of the

3   similarities to the death of another patient, Lonnie Rupard, who died at the San

4   Diego Central Jail on March 17, 2022.  *See* SD_025987-026008.  Mr. Rupard was a

5   46-year-old male, booked at the San Diego Central Jail on December 19, 2021.

6   During intake, his weight was 165 pounds.  His initial psychiatry sick call

7   evaluation progress note reported that he had a history of unspecified Schizophrenia

8   and other psychotic disorders.  Mr. Rupard's weight at autopsy was 105 pounds and

9   the forensic pathologist described him as "cachectic," meaning affected by extreme

10  weight loss and muscle wasting.  This indicates that Mr. Rupard had lost 60 pounds

11  from the time of arrest until his death three months later.  The medical examiner's

12  report also documents that malnutrition and dehydration in the setting of neglected

13  Schizophrenia as contributing factors in Mr. Rupard's death.  Despite Mr. Rupard's

14  mental health problems, he was permitted to remain in his cell without any medical

15  intervention while he lost 60 pounds between the time of his arrest and date of

16  death.  It is unclear if medical/mental health staff even observed that he was losing

17  weight between December 19, 2021, and their last progress/sick call note on

18  February 22, 2022.  According to medical records, Mr. Rupard was not seen by

19  medical/mental health staff between February 23, 2022, and his date of death,

20  March 17, 2022.  In the autopsy report the medical examiner wrote, "Ultimately this

21  decedent was dependent upon others for the care; therefore, the manner of death is

22  classified as homicide."

23      220.   Mr. Rupard's case is clearly very similar to Ms. Bartolacci's case.  Yet

24  the Jail apparently learned no lessons from Mr. Rupard's case—as they allowed

25  another patient, Ms. Bartolacci, to die under similar circumstances.

26          **7.    Erica Wahlberg (22726497), Died July 2, 2022**

27             **(a)    Events Preceding Death**

28      221.   Erica Wahlberg was booked into the Jail on June 27, 2022, at around

3:00 p.m., at the age of 41.  Ms. Wahlberg had a past history of uncontrolled hypertension, known from previous Jail stays.

222.    At her Medical Clearance, Ms. Wahlberg was found to have a blood pressure of 169/119.  Her urine drug screen was positive for fentanyl, methamphetamine, and MDMA (Ecstasy).  SD_014720.  MSD Operations Manual No. E.2.1 ("Receiving Screening") states that an "Elevated diastolic blood pressure of (equal or greater than) 120" will result in a gate refusal, which means the person must be sent to the emergency room without being admitted into the Jail. Ms. Wahlberg's diastolic blood pressure was recorded at 119, just one point under the cut-off for a gate refusal.  SD_014683.  In other words, had Ms. Wahlberg's blood pressure been one point higher, she would have been sent immediately to the emergency room.

223.    Later the same day, Ms. Wahlberg was seen by a registered nurse whose evaluation "noted elevated blood pressure but asymptomatic, also with multiple positive drug test results."  This RN did not remeasure Ms. Wahlberg's blood pressure, though this is standard in any medical setting to see how the blood pressure is trending over time.  SD_014704.

224.    Just over an hour after she was booked, a STATCare nurse practitioner ordered five days' worth of blood pressure checks and "Clonidine 0.1mg po BID." Clonidine is a medication used in this circumstance to treat high blood pressure. SD_014707.  Ms. Wahlberg reportedly refused to take any of her evening medications, including clonidine, when they were offered to her at 8:26 p.m. SD_014708.  The refusal form leaves blank the reason for the refusal.  SD_014740.

225.    On June 28, 2022 at 12:32 a.m., Ms. Wahlberg's blood pressure was 164/107.  A STATCare Corporate physician's assistant ordered Buprenorphine but no other treatment for hypertension and did not address high blood pressure. SD_014708.

226.    On June 28, 2022 about 2:15 a.m., Ms. Wahlberg's blood pressure was

1  higher at 174/121, and she was noted to be "sweating, drowsy but arousable."  She

2  was given buprenorphine and clonidine.  The nurse did not contact a practitioner.

3  SD_014710.

4    227.   Later that day, Ms. Wahlberg's blood pressure was higher still at

5  171/136 (SD_014714), and it was noted that "the patient has further decompensated

6  with altered mental status."  A STATCare nurse practitioner authorized a transfer to

7  the emergency room at around 3:55 a.m.  SD_014712.

8    228.   At the hospital, Ms. Wahlberg was noted to be "significantly

9  hypertensive" and had admitted methamphetamine use.  She was treated with Ativan

10  and a labetalol drip for her hypertension (Labetalol given by intravenous drip is a

11  medication used to treat blood pressures so high as to constitute a medical

12  emergency).  SD_014751.  At around 5:35 a.m., Ms. Wahlberg went into cardiac

13  arrest.  SD_014753.  She was transferred to the ICU.  Despite efforts at treatment in

14  the ICU, she deteriorated over several days and was declared dead on July 2, 2022.

15    229.   On June 30, 2022, Dr. Christensen reviewed Ms. Wahlberg's blood

16  pressure readings: "BP reviewed.  Essential HTN.  Lisinopril ordered."  However, at

17  that time, Ms. Wahlberg was dying in the ICU.  SD_014713.

18    230.   Ms. Wahlberg's autopsy report listed the cause of death as "Acute

19  Fentanyl … and methamphetamine intoxication."  SD_050229.

**(b)    The Jail's Analysis of This Death**

21    231.   ███████████████████████████████████

22  ███████████████

23    232.   ███████████████████████████████████

24  ██████████████████████████.

**(c)    My Analysis of This Death**

26    233.   In my opinion, Ms. Wahlberg's death was preventable.  Several

27  mistakes in medical management were made.  These mistakes should have been

28  identified by the M&M Review process and acted on to ensure that they would not

1   be repeated in the future.

2       234.   First, Ms. Wahlberg should have been sent to the ER at 2:15 a.m., when

3   her blood pressure was 174/121, and she was "sweating" with an altered mental

4   status.  This blood pressure and presentation at booking (less than 12 hours

5   previously) should have resulted in a Gate Refusal.  However, the nurse did not

6   contact a practitioner at that time or at 2:15 a.m.  This was a medical mistake.  Since

7   time is important in resuscitating patients like Ms. Wahlberg, it is possible that she

8   may have survived had she been sent to the Emergency Room at 2:15 a.m. rather

9   than approximately two hours later.

10      235.   Second, Ms. Wahlberg's very high blood pressure readings were

11  medically mismanaged.  Ms. Wahlberg had a very high blood pressure at booking

12  and throughout her time at the Jail.  The therapy prescribed for this, clonidine 0.1mg

13  po BID was clearly ineffective in lowering her blood pressure.  This is not

14  surprising since clonidine is a poor blood pressure medication.  The hypertension

15  guidelines of the America Heart Association do not recommend clonidine as a first

16  line option for treating hypertension or even a second line option.  It is a "last line"

17  agent.  *See* Guideline-Driven Management of Hypertension, An Evidence-Based

18  Update.  American Heart Association, p. 44.  There are several reasons that

19  clonidine is a poor choice for blood pressure management, but one especially

20  important reason in the case of Ms. Wahlberg is that clonidine has a short half life.

21  If used as a blood pressure medication, it needs to be given four times a day.  Giving

22  it twice a day results in its effects wearing off at around four to six hours—resulting

23  in rebound hypertension for the next six hours until it is given again.  First line

24  medications for high blood pressures are (1) Calcium channel blockers like

25  amlodipine, (2) ACE inhibitors/ARBs like lisinopril or losartan , and (3) Thiazide

26  diuretics like Hydrochlorothiazide (HCTZ).  With especially high blood pressures

27  like Ms. Wahlberg's, proper medical therapy would be to begin two of these three,

28  such as lisinopril and HCTZ, which are conveniently packaged together in a single

1  pill that is on the NaphCare formulary.  NAPHCARE037056.

2      236.   Third, no medical practitioner ever examined Ms. Wahlberg at the Jail

3  face-to-face.  She was clearly very sick, barely missing the criteria for a Gate

4  Refusal by 1 point (her diastolic blood pressure was 119, where 120 would have

5  mandated a gate refusal).  There was a practitioner on-site at that time (3:00 p.m.).

6  That practitioner should have seen Ms. Wahlberg.  However, the Jail's practice is to

7  rely on remote STATCare practitioners rather than those practitioners who are on

8  site.  As discussed later in this Report, I believe that the Jail over-relies on

9  STATCare to the detriment of some patients, like Ms. Wahlberg.

10     237.   Finally, Dr. Christensen reviewed Ms. Wahlberg's blood pressures and

11 ordered lisinopril for her on June 30, 2022.  However, Ms. Wahlberg had been

12 hospitalized for two days at that point.  This points to communication problems

13 within the electronic medical records, TechCare.  How is it that Dr. Christensen was

14 not automatically notified that Ms. Wahlberg was in the hospital?  This was not a

15 factor in her death, but it did point to a weakness in the electronic medical record

16 that could have been identified by the M&M Committee and potentially fixed.

17     **D.    Repeated Root Causes of Death in These Case Studies**

18     238.   I identified several root causes that appear again and again in these

19 seven cases.  These include:

20         a.    Patients who were clearly ill were not ever examined by a

21 medical practitioner during their stay at the Jail.

22         b.    Practitioners do medical evaluations at the patient's housing cell

23 instead of seeing the patient in the medical clinic.  As a result, the practitioners do

24 inadequate evaluations.

25         c.    Practitioners order medications and diagnose medical conditions

26 without seeing or examining the patient.

27         d.    Reported refusals are a big problem in the Jail that leads to

28 inadequate medical care.  Nurses do not witness refusals when the patients allegedly

1   refuse to sign the refusal form.  They rely on security staff, in violation of Sheriff's

2   Department Policies and Procedures.  Medical staff accept refusals from patients

3   who are not competent to refuse necessary medical care and do not follow the Jail's

4   own policies and procedures regarding counselling patients who refuse necessary

5   medical care.

6           e.     Communication errors have resulted in unnecessary medical

7   deterioration of patients.  This includes communication errors between nurses and

8   practitioners, between practitioners and other practitioners, between medical and

9   mental health staff, between medical staff and security staff.

10          f.     When patients go to the hospital and return, the Jail medical staff

11  do not adequately review the hospital records, and do not create a care plan for the

12  returning patient based on the hospital findings and recommendations.

13      239.   Notably, many of these observations are not new.  For example, the

14  Jail's problem of inappropriately documenting refusals has been noted by multiple

15  experts and entities in reports since 2017.  However, the Jail still has not fixed this

16  problem, nor do they even appear to register it as a root cause of these deaths.  As a

17  result of the Jail's persistent failures to address these known problems, preventable

18  deaths continue to occur.

19      **E.     Additional Deaths in the Jail**

20      240.   In addition to the deaths I studied and described above, I am aware of a

21  number of deaths at the Jail reported in the press and to the Citizens Law

22  Enforcement Review Board.[23]

23          a.     In March 2023, **Hayden Schuck**, age 22, died in Central Jail

24  approximately five days after his booking.  Although his blood pressure and pulse

25  rate were abnormally high at intake, Mr. Schuck was placed in a temporary holding

26  cell for nearly five days without medical attention.  He was removed for his

27

28  ────────────────

[23] These summaries are based on the news articles cited herein, not on my own
analysis of the medical records.

1  arraignment, during which Mr. Schuck was unable to confirm his name or date of

2  birth and fell to the floor multiple times.  Nevertheless, upon return to the jail, he

3  was placed in a single occupancy cell and found unresponsive the following

4  morning.  Mr. Schuck's family has filed a lawsuit.[24]

5          b.      In February 2023, **Gilbert Gil** died in a holding cell at Vista

6  Detention Facility within 20 hours of intake.  Mr. Gil was arrested on suspicion of

7  being under the influence.  His family says early on-set dementia and diabetes

8  caused his erratic behavior.  At intake, Mr. Gil was unable to sign paperwork.  His

9  blood sugar was found to very high.  He was given insulin and placed in a holding

10  cell because the sobering cell was occupied.  No one checked on him in the fourteen

11  hours between when he was given the insulin and when he was found unresponsive

12  in his cell.  His daughters filed a wrongful death lawsuit in May 2023.[25]

13          c.      In April 2022, **Jarrell Lacy** died in Central Jail.  Mr. Lacy was

14  suffering shortness of breath in his cell for 30 to 45 minutes before deputies

15  responded.  A nurse was in the process of alerting medical staff of the need for an

16  emergency room transport, but Lacy was instead returned to his cell via wheelchair

17  and found unresponsive minutes later.[26]

18          d.      In July 2021, **Saxon Rodriguez**, age 22, died at Central Jail four

19

20  [24] Kelly Davis, *What happened before Hayden Schuck, 22, died in San Diego jail?
    Family's lawsuit says warning signs were missed*, SAN DIEGO UNION-TRIBUNE,
21  May 4, 2023.  https://www.sandiegouniontribune.com/news/watchdog/story/2023-
    05-04/hayden-schuck-death-lawsuit-jail.

22  [25] Kelly Davis, *Despite known medical problems, 67-year-old was ignored for hours
23  before he died in Vista jail, lawsuit argues*, SAN DIEGO UNION-TRIBUNE, May 19,
    2023.  https://www.sandiegouniontribune.com/news/watchdog/story/2023-05-
24  19/despite-known-medical-problems-67-year-old-was-ignored-for-hours-before-he-
    died-in-vista-jail-lawsuit-argues.

25  [26] Jeff McDonald, *Minutes before dying in jail, man was sent back to cell instead of
26  ER, independent probe finds*, SAN DIEGO UNION-TRIBUNE, October 17, 2023.
    https://www.sandiegouniontribune.com/2023/10/17/minutes-before-dying-in-jail-
27  man-was-sent-back-to-cell-instead-of-er-independent-probe-
    finds/#:~:text=Minutes%20before%20dying%20in%20jail,jail%20in%20Downtown
    %20San%20Diego.&text=Minutes%20before%20Jerrell%20Dwayne%20Lacy,the
28  %20results%20of%20his%20electrocardiogram.

1 days after his arrest. The CLERB report concluded "there is no doubt that

2 Rodriguez, while as an incarcerated person in the custody and under the care of the

3 Sheriff's Department, acquired and took fentanyl and methamphetamine, which

4 resulted in his death." One to two hours elapsed between when deputies last saw

5 Mr. Rodriguez alive and when he has found unresponsive in his bunk. According to

6 the autopsy report, medical staff believed there was a chance he could have been

7 revived.[27]

8          e.      In January 2021, **Omar Moreno Arroyo** died at Central Jail

9 hours after his arrest. During booking, Arroyo underwent a body scan to determine

10 if he had ingested anything improper. The results of the scan appeared to show an

11 anomaly, but the deputy did not appear to review the results, nor did he order a

12 secondary scan. Had the material been identified as an illicit substance, Arroyo

13 would have been placed under closer observation. Instead, Arroyo was placed in a

14 cell where more than an hour elapsed between when he collapsed and when deputies

15 found him. The autopsy revealed he died from an airway obstruction with acute

16 methamphetamine intoxication as a contributing factor. His family filed a wrongful

17 death lawsuit.[28]

18          f.      In February 2019, 32-year-old **Michael Wilson** died in the

19 custody of the San Diego Sheriff's Department. Despite the Sheriff's Department's

20 undisputed awareness of his medical condition, and Mr. Wilson's need for four

21 necessary heart medications, Mr. Wilson died of congestive heart failure after Jail

22 staff failed to administer the required medications to Mr. Wilson. *See Estate of*

23

24 ⎯⎯⎯⎯⎯⎯⎯⎯⎯

25 [27] Kelly Davis, *Oversight Board Blames Overdose Death on Sheriff's Department Failure to Keep Drugs out of Jails*, SAN DIEGO UNION-TRIBUNE, Dec. 15, 2022.
https://www.sandiegouniontribune.com/news/watchdog/story/2022-12-15/saxon-rodriguez-jail-death-drugs-clerb.

26

27 [28] Kelly Davis and Jeff McDonald, *Four sheriff's deputies faulted in San Diego County jail death*, SAN DIEGO UNION-TRIBUNE, March 8, 2022.
https://www.sandiegouniontribune.com/news/watchdog/story/2022-03-08/four-sheriffs-deputies-faulted-in-san-diego-county-jail-death-l.

28

*Michael Wilson v. County of San Diego*, S.D. Cal. No. 3:20-cv-00457-RBGM-DEB.

g.     In November 2019, **Elisa Serna** died at Las Colinas Detention Facility.  Upon booking, Ms. Serna reported that she was addicted to heroin and alcohol and that she had used drugs two hours prior.  Initially, despite vomiting for multiple consecutive days, Ms. Serna was not placed on withdrawal protocol.  Four days after booking, she was transferred to a medical observation bed and given medication for her withdrawal.  Two jail personnel watched as she suffered a seizure, struck her head and fell unconscious onto the floor of her cell.  They left the cell without providing any medical treatment.  Ms. Serna died shortly thereafter.

h.     Ms. Serna's death was the subject of two unsuccessful criminal prosecutions.  Her family's wrongful death lawsuit resulted in the largest wrongful death settlement ever approved by the San Diego County Board of Supervisors, $15 million, plus promises by the County to change the way it addresses withdrawal.[29]

241.   Multiple other lawsuits are still pending against the Jail seeking damages for deliberate indifference, including by the families of Roselee Bartolacci, Brandon Yates, Michael Wilson, and Lonnie Rupard.[30]

242.   As these individual deaths illustrate, despite being the subject of scrutiny for several years, the Jail's system for the delivery of medical care is still broken.

/ / /

/ / /

/ / /

---

[29] *See* Jeff McDonald, *San Diego County settles Elisa Serna jail death lawsuit for $15 million, and limited federal oversight*, SAN DIEGO UNION-TRIBUNE, July 2, 2024 https://www.sandiegouniontribune.com/2024/07/01/san-diego-county-settles-elisa-serna-jail-death-lawsuit-for-15-million-and-limited-federal-oversight/.

[30] Jeff McDonald, *After record $15 million settlement, San Diego County still confronts a slew of other jail-death lawsuits*, SAN DIEGO UNION-TRIBUNE, July 7, 2024 https://www.sandiegouniontribune.com/2024/07/07/after-record-15-million-settlement-san-diego-county-still-confronts-a-slew-of-other-jail-death-lawsuits/.

**II.    The Sheriff's Department's Inadequate Screening and Intake Process Fails to Identify and Treat Medical Care Problems of Newly Arriving Incarcerated People, Placing Them at Substantial Risk of Significant Harm**

243.   It is my opinion that the Sheriff's Department fails to timely and adequately identify and treat the medical issues of newly arriving incarcerated people during the screening and intake process, and it fails to adequately train or supervise intake staff to do the same.

244.   The accepted *minimum* standard for the evaluation of the health needs of newly booked incarcerated people is laid out in the NCCHC's *Standards for Health Services in Jails*.

245.   These standards require first: a medical evaluation of patients at booking to establish whether they are medically able to be incarcerated and what urgent health care needs they have.  Second, a more thorough Health Assessment should be done within 14 days of incarceration at the latest.

246.   It is worth emphasizing that these are minimal standards designed for small jails that do not have medical personnel on site 24/7.  Large jails that have medical personnel onsite 24/7 should aspire to do more than the minimal standards designed for small jails.  In particular, it is my opinion that waiting 14 days to do a health assessment is not appropriate and constitutes substandard care in a jail with medical staff onsite 24/7.

247.   Unfortunately, the San Diego Jail has consistently failed to comply with even the bare minimal requirements of the Standard of Care.

248.   There are three sets of policies and procedures for intake screening and health assessments in the Jail: the MSD Operations Manual on "Receiving Screening" (No. E.2.1); the Sheriff's Department Detention Services Bureau policies and procedures on "Receiving Screening" (DSB P&P M.9); and NaphCare's policies and procedures on "Receiving Screening" and an "Initial

1   Health Assessment."  NaphCare  P&P E-02, E-04.[31]

2        249.   The NaphCare Contract has similar provisions.  Section 2.3.2.1 of that

3   contract states: "This Health Assessment will typically be completed during the

4   intake process for each patient and will always be completed within 14 days."  But

5   based on my chart review, as discussed below, the Health Assessment is never

6   completed during the intake process and is regularly not completed within 14 days

7   around of the time.  Section 2.3.2.4 of the contract refers to some patients having a

8   Health Assessment completed by a medical practitioner.  This does not ever happen

9   per my review.  The NaphCare contract, section 2.3.1.1, also states:  "Patients with

10  chronic illnesses will be identified during the Receiving Screening and enrolled in a

11  chronic care clinic."  This rarely happens based on my review of charts.

12       250.   As explained above, the fact that different policies and procedures

13  apply to different Jail staff, and that there is confusion as to whether or how these

14  policies and procedures conflict, contributes to significant dysfunction in the Jail's

15  health care system.  For example, the Detention Services Bureau policy states that

16  "[c]ertain types of medications" that someone has with them at the time of their

17  arrest "may be allowed into the detention facility with prior approval from health

18  staff."  DUNSMORE0039683.  However, the Medical Services Division policy does

19  not provide *any* indication that medications in the arrestee's possession might be

20  allowed into the facility, or what standards healthcare staff should apply when

21  deciding whether to approve a medication; the policy states only:  "An inventory of

22  the individual's prescription medication (if any) will be completed by the RN and

23  stored in the individual's property."  MSD Operations Manual No. E.2.1, November

24  4, 2022, SD_027121.  Similarly, although the NaphCare policy requires that a

25  patient's receiving screening include "[o]bservation of … lesions, jaundice, rashes,

26

27  ───────────────
[31] Some versions of NaphCare's "Health Care Policy & Procedure Manual,"
    including the version as of August 30, 2023, omit Policy E-02 ("Receiving
28  Screening").

infestations, bruises, scars, tattoos, and needle marks or other indications of drug abuse," NaphCare P&P E-02, February 23, 2022, NAPHCARE001178, the Medical Services Division policy requires "observation and a physical assessment" only "if necessary." MSD Operations Manual No. E.2.1, Section II.B, May 11, 2022, SD_367461.

251.   The documents I reviewed show that the medical intake process at the Jail in practice can be divided into four parts. Three of the four have a corresponding form in TechCare consisting mainly of check boxes. I found problems with the Sheriff's Department's practices at each step of the process.

### A.   Step One:  Medical Clearance

252.   The first part of the intake process is "medical clearance," in which an RN evaluates the incoming arrestee to see if they are medically able to be admitted to the jail. The Sheriff's Department Operations Manual Medical Services Division defines "Medical Clearance" as "a documented clinical assessment of medical, dental, and mental status before an individual is admitted into the facility." MSD Operations Manual, No. E.2.1, November 4, 2022, SD_000343. The Operations Manual lists several conditions and findings (such as abnormal vital signs) that must be sent to the hospital emergency department before further evaluation is done. SD_000344. This process is guided by the short "medical clearance" form in TechCare that the RN on duty fills out. NaphCare P&P, A-08, May 29, 2023, NAPHCARE000715. In that form, the RN must measure vital signs and ask about specific incidents which would trigger a need for an ER visit prior to incarceration. If the RN determines that the patient must go to the hospital ER first for an urgent evaluation of a medical condition, this is called a "gate refusal."

253.   The RN also has the option of referring the patient directly to a sobering cell or to the Inmate Safety Program ("ISP") before the patient proceeds to a receiving screening. While there are written guidelines in the MSD Operations Manual and the NaphCare policies and procedures about when to issue a "gate

refusal," I have seen no specific policies and procedures about the criteria that must be met for a patient to skip the receiving screen and go directly to a sobering cell or ISP. This, evidently, is left to the discretion of nursing.

**B.    Step Two:  Receiving Screening**

254.   If the patient passes the medical clearance, the same RN who did the medical clearance performs a "receiving screening."  The receiving screening consists of more questions about the patient's medical history, mental health history, and medications.  The patient's answers are documented by checking boxes on the "receiving screening" form in the electronic medical record.  The receiving screening does not entail any significant physical examination.  At the end of the receiving screen, the RN can refer the patient for a "second stage nursing evaluation," send the patient to a sobering cell, or "clear to classification."  I have seen no specific policies and procedures about what triggers each of these outcomes; the decision appears to rely mostly on the RN's discretion.

255.   The reliance on nursing discretion in the first two steps of the intake process is problematic.  It is problematic because anything that is left solely to discretion without adequate training or guidance in written policy invariably leads different nurses to make different decisions.  This in turn leads to patients who should receive the same care instead receiving different care depending on who happens to see them.  It can harm patients when certain nurses exercise poor judgement, whether because they have not been adequately trained, have no guidance in written policy, or are just having a bad day.  In addition, I have seen no mechanism set forth in policies and procedures to track the performance or decisions of nursing staff.

256.   Further, the referral for a second stage nursing evaluation is made by simply checking a box on the "receiving screening" form.  I saw nothing on the form requiring nurses to identify exactly why a second stage evaluation had been ordered, which will lead to a lack of sufficient documented information for nurses

1  conducting second stage evaluations.  A haphazard system of communication like

2  this can lead to confusion about why the patient needs to be seen, and so lead to

3  poor medical care.

4      **C.    Step Three:  Second Stage Nursing Evaluation**

5      257.   After the receiving screen, some patients go through the "second stage

6  nursing evaluation."  This typically is conducted by a different RN than the one who

7  completed the medical clearance and receiving screen, and who is supposed to have

8  more time to ask follow up questions about positive answers to the receiving

9  screening, such as details about medications and medical problems.  The second

10 stage nurse *may* conduct a physical examination, but is not required that they do so.

11 The second stage nurses do not consistently document why a patient is referred for a

12 second stage evaluation, nor is there a TechCare form for RNs to complete at this

13 stage.  Rather, the nurse completing the second stage evaluation documents the

14 evaluation in a SOAP note.

15     258.   The "Second Stage Nursing Evaluation" is not mentioned by name in

16 the Sheriff's Department Operations Manual, but may be referenced in E.2.1.V

17 NURSE ASSESSMENT PROTOCOL.  MSD Operations Manual, No. E.2.1,

18 Section V, November 4, 2022, SD_000348.  However, the Nurse Assessment

19 Protocol requires that the nurse "[p]erform a focused physical assessment based on

20 the individual's clinical presentation," and this happens rarely in Second Stage

21 Nursing Evaluations.

22     259.   For example, my review of the records showed that RN Maria Tamayo

23 did the Receiving Screening on patient ███████ on ███████ 2023.  San Diego

24 County Sheriff's Department, Receiving Screening, ███████ 2023, SD_747298.

25 RN Tamayo referred Mr. ██████ for a Second Stage Nursing Evaluation, but there is

26 no indication of why this referral was made.  *Id.*  SD_747321.  Whatever the reason

27 was, the Second Stage Nursing Evaluation did not occur because it was "cancelled

28 due to earlier scheduled appointment."  *Id.*

260.   The second stage nurse is also responsible for communicating with a practitioner to get medications approved.  This is exclusively done electronically via STATCare using remote practitioners elsewhere in the country.  If contacted, the remote STATCare practitioner fills out a "STATCare Intake Assessment and Orders" form.  This form has dropdown menus with checkboxes for orders for various conditions.  At the end of the second stage evaluation, medical patients are sent to a sobering cell or other housing.  At this point, the nurse may schedule the patient on for a future evaluation by a practitioner (*e.g.*, a doctor, nurse practitioner or physician assistant), or not, at the nurse's discretion.

### D.    Step Four:  14-Day Health Assessment

261.   The fourth stage of the intake process is the "health assessment."  This evaluation is also done by an RN.  The minimal standard of care under the NCCHC standards requires that the Health Assessment be done within 14 days *at the latest*.  However, that 14-day grace period is meant for small jails without 24/7 medical personnel.  In my opinion, jails with 24/7 availability of medical personnel should not delay the full Health Assessment for 14 days.

262.   The NCCHC Technical Assistance Report recommended that the Jail take either a "full population assessment" approach, which requires a health assessment within 14 days, or an "individual population assessment" approach, which requires a health assessment within two days of the initial booking.  NCCHC Technical Assistance Report, DUNSMORE0260637-0638.  Dr. Homer Venters acknowledged that these two approaches were available, but noted that "jail systems that take a public health approach" conduct an assessment "routine[ly] for every newly admitted patient at the time of intake."  Venters Report, SD_214372.  He further explained that "wait[ing] up to 14 days" for this full assessment "generally results in at least half of all people admitted to the jail leaving without this encounter."  SD_215361.  I agree that performing an individual health assessment for every incarcerated person as part of the initial booking would be a far superior

process to ensure adequate care for incarcerated people, who, as a group, are more likely to have medical issues that require provider intervention than the general population.

263.    When I was a jail medical director, we conducted the health assessment as soon as possible, usually within one to three days in the larger facilities and within seven days in the small facilities.

264.    Other jails comparable in size to the San Diego Jail do the health assessment at booking.  One example is the Salt Lake County jail in Salt Lake City, Utah.

265.    However, the Sheriff's Department has chosen not to take the "public health approach" outlined by Dr. Venters and instead to defer a full health assessments for 14 days.  This is not a best medical practice.  I cannot imagine a reasonable medical basis for the Sheriff's Department's decision to wait for 14 days (or longer) before doing a health assessment.  In my opinion, that decision more likely than not was not made for cost-saving reasons.

266.    Unfortunately, the Sheriff's Department has failed to adequately meet even this minimal 14-day standard.  The NCCHC Technical Assistance Report emphasized the importance of the timeliness of a full health assessment, stating that it "will typically be completed during the intake process and will *always* be completed within 14 days."  This sentence is repeated verbatim in the County's contract with NaphCare, NAPHCARE000567, and Dr. Montgomery confirmed it is a "great standard" that "provides great care for [] patients."  Montgomery II Tr. at 146:2-3.

267.    The Sheriff's Department has failed to implement this standard properly.  Although it is the Jail's "goal" to try to complete the health assessment within 14 days of booking, this is not set forth in any written policies and procedures.  Montgomery II Tr. at 145:15-146:9; Rognlien-Hood Tr. at 26:12-28:21.  Further, health care staff frequently fail to perform a health assessment within 14

1  days after a patient is booked in the Jail, and, of course, many patients are released

2  before they receive a full health assessment. Ms. Rognlien-Hood testified that when

3  she became the Director of Nursing, she made it a priority to try to get the health

4  assessments done within 14 days. This emphasis began, per her testimony, in March

5  of 2023. Rognlien-Hood Tr. at 27:4-8  Dr. Montgomery confirmed that it "remains

6  to be seen" how frequently the Sheriff's Department is able to timely complete the

7  health assessments. Montgomery II Tr. at 146:4-9. Ms. Rognlien-Hood and

8  Dr. Montgomery could not provide clear estimates of how frequently the health

9  assessments in fact are completed within 14 days, but suggested the compliance rate

10  could be as low as 75 – 80 percent. (Rognlien-Hood Tr. at 100:4-10; Montgomery

11  II Tr. at 146:10-25).

12      268.   This means many patients are being missed. My review showed cases

13  where health assessments were completed after the 14-day mark, for example: ███

14  ███ was booked ███████ 2023, and staff did not complete her initial health

15  assessment until ███████ 2023. SD_781311. ████████████ was booked on

16  ███████ 2023, and staff did not complete his initial health assessment until

17  ███████ 2023. SD_759408. ██████████ was booked on ██████████ 2021, and

18  staff did not complete his *initial* health assessment until ███████ 2023, more

19  than two years later. SD_776280.

20      269.   As with many aspects of the deficient health care in the Jail,

21  understaffing appears to be a significant reason for the failure to complete health

22  assessments within fourteen days. Ms. Rognlien-Hood communicated to her

23  supervisors on February 22, 2023 that "[m]eeting this standard [for 14-day health

24  assessments] will … just take the manpower," including sworn staff "be[ing]

25  efficient." Email from Serina Rognlien-Hood to Carl Darnell et al., February 22,

26  2023, SD_375921-23. The Jail has been developing a "workflow" to meet this

27  standard since at least 2022 and still routinely fails to meet it. SD_375922.

28      270.   There are several problems with this multi-step intake process. First,

even under the Sheriff's Department's "goal" program of completing a health assessment within 14-days—which is not currently happening—at no point is every incarcerated person examined by a practitioner as part of the intake process.  Rather, at each step of the assessment described above, the examination is conducted by an RN.  Almost all practitioner involvement in intake is done electronically through STATCare.

271.    The NCCHC Technical Assistance Report recommended that nurses complete the initial Health Assessment on all patients "soon after booking" as part of the Second Stage Nursing evaluation.  SD_060170-71.  Dr. Venters similarly recommended that all patients with a significant medical history (in other words, all patients currently referred for a second stage evaluation) be seen in person by a medical practitioner.  SD_215371-72.  I agree with this recommendation, but that is not what the Jail does as a matter of policy or practice.  According to the County's contract with NaphCare, patients are to be evaluated based on medical information obtained during the receiving screening as to the medical necessity of conducting a health assessment by a provider.  Contract No. 566117, § 2.3.2.4, NAPHCARE000567-68.  In the approximately 80 charts I reviewed, I did not see a single instance of a medical practitioner doing an in-person examination of a patient during intake.  I also identified several patients who should have been seen face-to-face by a medical practitioner based on their medical problems and complaints, but were not seen.  One example is Raymond Dix (22737506), who was admitted to the Jail on September 6, 2022.  Mr. Dix had a medical history that included congestive heart failure, chronic atrial fibrillation, hypertension, COPD and others.  He died in custody on September 13, 2022.  He never had a full Health Assessment done.  He was never examined by a medical practitioner.  A second example is ████████ (████████  who was booked on ████████ 2023.  Despite a history of type 2 diabetes and being inappropriately placed on insulin, Mr. ████ was never examined by a medical practitioner.

1    272.   Rather, as explained, the only involvement of medical practitioners

2 during the intake process in the vast majority of cases is electronic, relying on

3 STATCare practitioners working elsewhere in the country.  Experts from the

4 NCCHC, Dr. Venters, and now I, agree that this intake system is sub-optimal.

5    273.   Medical practitioners who actually see and talk to incoming patients

6 with medical problems would be able to assess problems and prescribe appropriate

7 treatment and formulate a treatment plan with a degree of competency and thor-

8 oughness that is lacking in the current system.  Nurses do not have the training or

9 expertise to provide comprehensive care in this context, and the STATCare practi-

10 tioners elsewhere in the country cannot act with the required degree of competence

11 since they never talk to their patients or examine them.  They rely instead on drop-

12 down menus in TechCare that often are not a good fit for the individual patient

13 under consideration.  It is no wonder that so many mistakes are made that would not

14 be made if on-site practitioners talked to and personally examined their patients just

15 as is done everywhere in medical practice outside of the Jail.

16    274.   Second, although the second stage nurse evaluation is the *de facto* final

17 step in the intake process (given that the 14-day health assessment is not occurring

18 as planned, nor is it described in any policy), I did not identify anything in the Jail's

19 policies and procedures setting forth how the second stage evaluations should be

20 done.  These are treated like a Nurse Sick Call clinic visit.  But a second stage

21 evaluation is not a nurse sick call clinic, nor do the nurses treat it as such.  For

22 example, they do not typically fill out a Standardized Nursing Procedure Form.

23 Instead, the Second Stage Evaluation is an opportunity to take more time to delve

24 more deeply into a patient's medical history, by doing a more detailed history and

25 conducting a physical examination.  The fact that a patient can go through this entire

26 process and never have a physical examination done, no matter how significant their

27 medical problems are, is a significant lapse.  Dr. Venters gives an example of how a

28 patient with asthma should have an examination of the lungs and a peak flow test

done as part of the booking process.  SD_215361.  This is not done now as part of the Jail booking process.

275.   A Second Stage Nursing Evaluation should not be documented on a SOAP note.  Many patients referred for a Second Stage Evaluation have multiple medical issues that need to be evaluated.  A SOAP note is designed to document a response to one problem or complaint.  The Second Stage Evaluation should be guided by both a formal Policy and Procedure in the Sheriff's Department's MSD Operations Manual and a specific form that guides the evaluation process.  Neither exist at present.

276.   Third, in my review of presentations from CQI meetings, I did not identify any CQI data on Second Stage Evaluations.  This suggests to me that there is no significant training for or supervision over this important process.  Supervision is critical because Second Stage Evaluations, which are done on patients with significant health problems, are performed by nurses, not medical practitioners.  Since the Sheriff's Department chose to ignore Dr. Venters' advice to have these patients seen face-to-face by a practitioner, practitioners should supervise the process and CQI should closely follow the functionality of the Second Stage program, but neither occurs now.  It is important to note here that although STATCare practitioners sometimes participate in the Second Stage Evaluations, they do NOT supervise this process.

277.   The failure to timely complete these initial health assessments poses a significant risk of harm to incarcerated individuals and falls below the standard of care.  For example, the Sheriff's Department's substandard care at intake has resulted in deaths of incarcerated people and high costs for San Diego taxpayers.  As just one example, in May 2024, the family of Ronnie Sandoval was awarded $1.8 million from a federal jury that faulted Sheriff's Department's nursing staff for failing to prevent Mr. Sandoval from a fatal overdose in February 2014.  The jury found that Mr. Sandoval was sweating profusely through an hours long booking

1    process, but the Jail's nurses did not properly respond to his condition.  Jeff

2    McDonald, *Jury Awards $1.8 Million to Family of Man Who Died in San Diego*

3    *County Jail 10 Years Ago*, SAN DIEGO UNION-TRIBUNE, May 3, 2024.

4        278.    The practice of delaying a full Health Assessment to 14 days or longer

5    carries with it substantial risks of harm to incarcerated patients.  It is inevitable that

6    the cursory history and minimal physical exam done at the Receiving Screening will

7    miss substantial medical problems, both acute and chronic.  Some patients are then

8    referred for a Second Stage Evaluation, but this is unstandardized and sporadic.  At

9    its best, the Second Stage Evaluation will also miss or underestimate the presence of

10   medical problems that a thorough Health Evaluation would find.  Dr. Venters'

11   description of how asthma should be handled during the booking process is a great

12   example.  SD_215361.

13       279.    Medical problems missed by a substandard booking process and a

14   delayed full health assessment will inevitably get worse and only be realized later

15   when the patient's health deteriorates.

16       280.    Delaying a complete health assessment for 14 days would never happen

17   in any outside medical institution.  Patients newly admitted to a hospital, a nursing

18   home, or a psychiatric hospital do not have to wait 14 days (and longer) for a full

19   health assessment.  It is not hard to speculate on what would happen to their

20   mortality and morbidity statistics if these institutions did delay a full health

21   assessment for two weeks or longer!

22       281.    The only advantage to delaying the full health assessment for 14 days is

23   that the Sheriff's Department then must do fewer of them—*i.e.*, because "at least

24   half of all people admitted to jail leav[e] without" an assessment since they are

25   booked and released after fewer than 14 days—and therefore the Sheriff's

26   Department saves the time and money required to do a Health Assessment on these

27   patients.  *See* Venters' Report, SD_215372.  However, delaying the health

28   assessments saves little time or manpower in reality because the Sheriff's

1   Department already does an abbreviated health evaluation during the receiving

2   screen and the second stage evaluation.  To add the few extra questions and exam

3   required to complete a full health assessment would require less incremental

4   resources than the Sheriff's Department now expends on tracking and transporting

5   patients 14 days after intake, as well as the cost of "catching up" programs when the

6   County falls behind, and patients are missed.  There are also high medical costs of

7   missing potential diagnoses and treatments of short-term detainees.

8       282.   Moreover, many individuals return to the Jail repeatedly.  From a

9   medical perspective, not doing a full health assessment on individuals incarcerated

10  for even short periods of time is a missed opportunity to find and treat medical

11  problems before the patient returns to the Jail later with worse medical problems.  In

12  the long run, this missed opportunity will create more difficulty for the Sheriff's

13  Department when they must play catch-up later.  Even if not re-incarcerated, these

14  individuals are members of the San Diego community and may place demands on

15  community resources like emergency rooms and clinics if their health concerns are

16  not addressed sooner rather than later.

17      283.   In summary, the Sheriff's Department's does not currently have a

18  functioning system that ensures all incarcerated people receive a health assessment

19  within fourteen days.  And, even if the medical intake system were functioning as

20  the Sheriff's Department claims it should—*i.e.*, with an assessment conducted by an

21  RN within fourteen days, that system would still fall below the standard of care and

22  place incarcerated people at risk.  The Sheriff's "goal" for the system is insufficient

23  because the ideal time for an incoming patient to receive a full face-to-face medical

24  assessment by nurses and medical practitioners is during the booking process, not

25  later.  The NCCHC Technical Report and Homer Venters both emphasized this.

26      284.   This is important:  In my opinion and based on a reasonable degree of

27  certainty, if the Sheriff's Department instituted a health assessment at booking

28  utilizing nurses and medical practitioners as the NCCHC and Dr. Venters

recommended, the mortality and morbidity at the Jail would decrease.  The systemic

inadequacy of health assessments is, in my opinion, one Root Cause of the Jail's

high Mortality and Morbidity problem.

### III.    The Sheriff's Department Fails to Continue Medically Necessary Medications and Treatments for Incarcerated People Upon Their Arrival at the Jail or Transfer Between Jail Facilities, Placing Them at Substantial Risk of Serious Harm

285.   "Continuity of medical care" means that an incarcerated patient's

prescribed medications and treatments are continued without interruption at each

stage of that person's incarceration.  In particular, continuity of care requires that,

when a patient is booked into the jail, the medications and treatments they had been

receiving in the community should be continued.[32]

286.   Continuity of prescribed medications can be of critical importance to a

person's health.  Missing doses of essential medications can harm fragile patients.

As Dr. Venters stressed in his report, "[a]ccess to appropriate medications in a

clinically appropriate timeframe" helps "reduc[e] mortality and morbidity in jail

settings," and it is therefore a best practice to "provide several tools for ensuring

continuity of medications in jail," "start[ing] with … health staff who screen

patients before entry to the jail."  SD_215374.

287.   Plaintiffs have alleged in their Third Amended Complaint that the

Sheriff's Department fails to provide continuity of medical care to people after they

are booked into the Jail.  Dkt. 231 ¶ 58.  As explained in more detail below, I agree.

### A.    Continuing Medical Necessary Medications After Booking

288.   The basic principle of continuity of prescribed medications is this:  All

medications that patients were receiving before their arrest and incarceration should

be continued at a minimum until they are seen face-to-face by a medical

---

[32] These principles also apply when a patient returns from the hospital to the jail and when a patient is discharged from the jail, so that they can receive medication and therapy in the community.  Those issues are discussed later in this Report.

1   practitioner.  These medications "bridge" the gap between a patient's arrival and the
2   first time they see a medical provider face-to-face and so are often called "bridge
3   medications."  Once a medical practitioner sees the patient face-to-face, the
4   prescribed medications can be changed as per the practitioner's medical judgment.
5   NaphCare's policy manual for San Diego acknowledges this principle: "Patients
6   entering the facility on prescription medication continue to receive the medication in
7   a timely fashion as prescribed, or acceptable alternative medications are provided as
8   medically indicated unless contraindicated by their medical condition."
9   NAPHCARE000843.  But, as explained in more detail below, that does not appear
10  to happen in practice.

11      289.   The biggest problem many jails have during the process of continuing
12  medications is verifying what are (and are not) current prescriptions, because they
13  must contact outside pharmacies to request faxed copies of active prescriptions.

14      290.   The Jail does not have this problem due to the availability of
15  Surescripts.  Nurses at the Jail can instantly verify current prescriptions within the
16  state of California by accessing this database.  The Jail also has the advantage of
17  having an in-house pharmacy at its intake facilities so that most verified medications
18  can be dispensed immediately.

19      291.   In its contract with NaphCare, the Sheriff's Department laid out a
20  standard for continuing medication of a newly booked incarcerated person:
21  "Validated medications need to be restarted within 12 hours unless the use of
22  specialized pharmacies is required.  Any delay in starting medications should be due
23  to the validation process, not identifying/routing the request to a provider."  Contract
24  No, 566117, § 2.3.30.8, SD_125280-125281.  Since the Jail has Surescripts and an
25  in-house pharmacy, the 12-hour standard is generous.  For the vast majority of
26  patients and medications, it should take less than 12 hours to access a currently
27  prescribed medication list, send this list to the in-house pharmacy, and have the
28  medications filled and dispensed.

292.    In practice, based on my review of records, NaphCare mandates two additional steps between the verification of outside medications via Surescripts and the filling of those prescriptions by the in-house pharmacy: First, the prescriptions are sent to a STATCare practitioner for approval.  Second, if the patient has been taking medications not on the NaphCare formulary, these must be approved via the NaphCare non-formulary process before they are filled.

293.    These steps are not required by the NaphCare contract (which states only that this "validation" process must not delay the process of med continuity over 12 hours).  *Id*.  This extra step of requiring the review and approval of a STATCare practitioner and the non-formulary approval are also not mentioned in either the Sheriff's Department MSD Operations Manual or in NaphCare's Health Policies and Procedures for San Diego.

294.    However, these steps can be a problem if used inappropriately to enforce the NaphCare formulary and therefore deny people needed medications that fall outside the formulary.  A "formulary" is a list of medications that are preauthorized to be prescribed.  Formulary medications tend to be inexpensive.  "Non-formulary" medications require authorization before they can be prescribed.  Non-formulary medications tend to be expensive.  The process of seeking authorization for a non-formulary medication is similar to the Utilization Management process for seeking permission for an offsite consultation, discussed later in this Report.  In order for a patient to receive a non-formulary medication, the prescribing practitioner, including STATCare practitioners, must fill out a non-formulary medication authorization form and send it in for approval or denial.  The person who approves or denies authorization for non-formulary drugs can be a pharmacist, a physician, a midlevel practitioner, or even an RN.  The practitioner asking for approval for a non-formulary drug typically does not know who is making the yes-or-no decision.  The prescribing practitioner and the person approving or denying the request generally do not collaborate.  Evidently, this

1   approval process for non-formulary medications is enforced even for medications
2   the patient was taking prior to being booked.  In my experience, the number one
3   reason for a formulary in most medical systems is to save money.  Non-formulary
4   drugs are usually expensive drugs.

5        295.   Even if non-formulary meds are eventually approved, the verification
6   process can take days during which time the patients are not receiving these
7   medications.  This delay can and does harm patients.

8        296.   The Sheriff's Department, through its contract with NaphCare, requires
9   NaphCare to "maintain[] and enforc[e]" a drug formulary, which shall "allow[]
10  medical practitioners and psychiatrists to follow generally accepted clinical practice
11  patterns in their medical management of incarcerated individual patients." *Id.* at
12  §§2.3.30.32, 2.3.30.35, SD_125283.  The contract also requires that NaphCare
13  "typically approve[] non-formulary orders." *Id.* at § 2.3.30.35, SD_125283.
14  Finally, under the contract, "[r]ecords of non-formulary requests and responses shall
15  be maintained," *id.* at § 2.3.30.34, SD_125283, and reported in "Standard
16  Management Reports," *id.* at § 2.3.29.3, SD_125278.

17       297.   While there are legitimate reasons to substitute less expensive drugs for
18  more expensive drugs if the two drugs are therapeutically equivalent, jail drug
19  formularies should not prohibit the use of any legitimate medication simply based
20  on its cost.  Miraculous new medications that represent a huge improvement in
21  medical care are always expensive.  A good example are the new antiviral agents
22  used to treat hepatitis C.  They are miraculous—curing hepatitis C in greater than
23  95% of patients with minimal side effects in just a few weeks.  However, they are
24  expensive.  Antivirals used to treat Hepatitis C are not included in the NaphCare
25  2023 formulary.  *See* NAPHCARE037047.  Expense cannot be a reason to deny
26  incarcerated patients medically indicated medications.

27       298.   Documents I reviewed reveal that, in practice (and likely because of
28  this formulary "extra step") the Sheriff's Department is not continuing incarcerated

people's medications in a timely manner and not continuing legitimately prescribed medications.

299.   The Sheriff's Department knows this is a problem.  In fact, the Sheriff's Department mentioned this very practice in the Corrective Action Notice ("CAN") sent to NaphCare, dated April 28, 2023, which stated that NaphCare had "failed to restart medications for patients reassigned from the California Department of State Hospitals."  NAPHCARE034831.  However, as of the December 8, 2023 CAN response, NaphCare had still not provided any specific information regarding medications for patients reassigned from the California Department of State Hospitals.  SD_1572354.  As of the March 4, 2024 CAN response, the most recent one I have seen, there is a general statement that "Naphcare has appeared to resolve pharmacy and discharge medication issues," but no details about the Department of State Hospitals patient issue.  SD_1572610.

300.   The documents I reviewed include examples of incarcerated patients who were harmed by the Jail's failure to continue their medications after booking.  One example is Raymond Dix, who, as discussed in detail above, was booked on September 6, 2022 and died on September 13, 2022.  Mr. Dix had a medical history that included congestive heart failure, chronic atrial fibrillation, hypertension, chronic lung disease (COPD), and others.  SD_055186.  Mr. Dix was taking multiple medications, and Surescripts confirmed that he was compliant in the community taking his medications.  SD_055188.  When the STATCare practitioner reviewed Mr. Dix's medication list, two were determined to be non-formulary and were not ordered: Farxiga and Anoro Ellipta.  SD_055186.  Farxiga is a drug used to treat both Type 2 Diabetes and congestive heart failure.  Anoro Ellipta contains two bronchodilators used to treat COPD.  Requests for authorization of these non-formulary medications were sent in.  *Id.*  Mr. Dix received one dose of Farxiga seven days after he was booked; he never received the Anoro Ellipta prescription during his incarceration.  SD_002836-002838.  An autopsy showed that Mr. Dix

died on September 13, 2022 of "[a]therosclerotic and hypertensive cardiovascular disease," SD_050219, also called a heart attack.

301.    As explained above, not receiving those medications for six days may have contributed to Mr. Dix's death.  I also note that arbitrarily discontinuing those medications simply because they were non-formulary violated NaphCare's contractual obligations: "the formulary shall allow medical practitioners and psychiatrists to follow generally accepted clinical practice patterns in their medical management of incarcerated individual patients," and "[c]ontractor typically approves non-formulary orders."  Contract No. 566117, § 2.3.30.35, SD_125283.

302.    Another patient who experienced this problem is ███████████ (███████████), who was booked on ███████████ 2023.  Mr. ████ reported during his receiving screening that he was a diabetic.  SD_791079.  Surescripts showed an active prescription for Mounjaro, a medication used to treat Type 2 Diabetes.  SD_791379.  Nh Ngoc Da, Corp PA, did a remote STATCare review of a "Nurse Alert" which stated "Surescripts pt was taking Mounjaro (a GLP-1 diabetic medication) injections for DM, please advise."  SD_791100.  PA Ngoc Da responded:  "[T]h[i]s med [i]s nonformu[l]ary. w[ill] order [i]nsu[li]n s[li]d[i]ng sca[l]e."  *Id.*  Insulin is not a direct substitute for Mounjaro.  It is a totally different medication with a different mechanism of action and different indications for prescription.  There is no indication that Mr. ████ had ever been on insulin before.  *See id.*  PA Ngoc Da ordered this without knowing a history or any labs, such as an A1C.  *Id.*  Nobody told Mr. ████ why his Mounjaro prescription had been discontinued or why insulin had been ordered.  *See id.*  According to a note from NP Chr[i]st[i]ne Su[lli]van on ███████████ 2023, Mr. ████ had been on Mounjaro weekly, but it was "NA [not available] wh[il]e [i]ncarcerated."  SD_791102.  He, rightly, complained.  *E.g.*, SD_791631, SD_791635 (Sick Call Requests).  On ███████████ 2023, as a result of his request to speak with a doctor about his diabetes, Mr. ████ was seen by Frederick Wycoco NP.  SD_791116.  NP Wycoco

1  wrote, "He [i]s ask[i]ng for mounjaro…. He sa[i]d he does not want [i]nsu[li]n ….

2  W[ill] order g[li]p[i]z[i]de 5mg qd …. Mounjaro [i]s not formu[l]ary." *Id.*

3  Glipizide is also a totally different medication with a different mechanism of action,

4  different indications for prescription and also not appropriate as a direct substitution

5  for Mounjaro. In my opinion, Mr. ▮▮▮▮ case was mismanaged to the point of

6  medical malpractice. I discuss Mr. ▮▮▮▮ case and the standard of care of diabetes

7  in more detail in another section of this report. Suffice it to say here that

8  discontinuing a legitimate outside prescription without seeing the patient and

9  without a medical indication violates continuity of care and is in violation of

10 NaphCare's contract. Further, in my opinion, substituting sliding scale insulin for

11 Mounjaro constituted medical malpractice.

12     303.   Another example is ▮▮▮▮▮▮▮▮ (▮▮▮▮▮▮), a diabetic who had

13 been prescribed the long-acting insulin Lantus before coming to jail. Ms. ▮▮▮▮

14 was booked on ▮▮▮▮▮ 2024. On the day of her booking, 2024, a STATCare

15 Intake Assessment and Orders form was completed for her by NP Juancho Trinidad.

16 SD_790711. This form explicitly prohibits the continuation of long-acting insulins,

17 such as Lantus, with the following language: "**All long-acting insulins will be**

18 **substituted with Novolin N BID at an equivalent dose unless there is**

19 **documented evidence that the patient cannot or should not be transitioned**."

20 SD_790712 (emphasis in original). Accordingly, NP Trinidad discontinued

21 Ms. ▮▮▮▮ Lantus prescription and instead ordered short acting insulin dosed

22 according to a sliding scale. *Id.* In my opinion, this mandate to substitute any long-

23 acting insulin for Novolin N BID contravenes the term of NaphCare's contract,

24 which states that NaphCare must "typically approve[] non-formulary orders."

25 Contract No. 566117, § 2.3.30.35, SD_125283. NaphCare's contract also states that

26 any substitution of a formulary medication for a non-formulary medication shall

27 "follow generally accepted clinical practice patterns in their medical management of

28 incarcerated individual patients." *Id.* The wholesale discontinuation of long-acting

insulins by substituting short acting insulin on a sliding scale is not a "generally accepted clinical practice pattern."  *See Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association*, 47 DIABETES CARE 544-555 (2024).

### B.     Continuing Medically Necessary Treatment After Booking

304.   Besides medications, many newly booked patients have prescribed medical therapies and treatments scheduled in the community, which also should be honored during incarceration as part of continuity of care.  Examples include dialysis, cancer chemotherapy, infusion therapy for autoimmune disease, previously scheduled surgeries (even if they are elective), physical and occupational therapy, and other previously scheduled follow-up appointments and consultations.

305.   All of these medical obligations should be honored by the jail medical services.  One of the duties of the RNs who do the receiving screening is to find out about these medical obligations.  Patients who have pending medical appointments and therapies should then be quickly referred to a medical practitioner and to scheduling to arrange for patient transportation to these appointments.  The care plan to continue these off-site obligations should also be discussed with the patient so she/he understands what is happening.

306.   While I understand that there are security requirements surrounding these offsite visits, security concerns do not negate the Jail's obligations to continuity of medical care.

307.   Unfortunately, this Jail abrogates its responsibility for this type of continuity of care.

308.   As one example, retired FBI Agent ▬▬▬ contacted the Sheriff's Department in ▬▬ 2021 about his incarcerated son, ▬▬▬▬, who "suffer[ed] from diabetes induced retinopathy" and required "medically prescribed weekly laser treatments," which if missed would "certainly result in vison loss." SD_118455.  According to ▬▬ father, from his ▬▬ 2021 booking at the Jail

1  to ███████ 2021 (between seven and eight weeks), █████ had "already missed

2  eight required appointments with his retina specialist since the beginning of the

3  current incarceration." *Id.* "Thus far, █████ has not had any laser surgeries since his

4  incarceration. Would you consider this to be an appropriate standard of care?"

5  SD_118456. As Mr. █████ implies, this conduct falls well below the standard of

6  care.

7      309.   Another example of the Jail's failure to provide continuity of care for

8  medical treatments is the case of ████████████ (████████). In the fall of

9  2022, Mr. ████████ had been diagnosed with a malignant carcinoid tumor of his

10  right lung. Medical Records of ██████████ as of ████████2023, p. 109

11  of 595. He was scheduled to have surgery to have the cancer removed on ██████

12  2023. *Id.* at p. 407. Mr. ████████ was booked into the San Diego Jail on

13  ████████ 2022. *Id.* at p. 11. ████████████ 2022, Mr. ████████ wife and

14  brother both called the jail to inform them that Mr. ████████ had cancer and "is

15  scheduled for an important surgery at Kaiser in January." *Id.* at p. 551. The same

16  day (████████ 2022) Mr. ████████ medical records from Kaiser were

17  received by the Jail, with the diagnosis of "malignant carcinoid tumor of the right

18  lung" printed in bold font on the first page. *Id.* at p. 109. A TechCare task was

19  entered for a medical practitioner to review these records. *Id.* at p. 533. On

20  ████████ 2022, Mr. ████████ was seen by Nurse Practitioner Nicholas Kahl,

21  who wrote:

22      h/o lung cancer (pt unsure of which type) and due have
        surgery at Kaiser today (████) but was booked on █████
23      Need to f/u on ROI and reestablish cancer care as he will
        be incarcerated for a year.

24

25  *Id.* at p. 552. NP Kahl obviously did not review the medical records that had

26  already been received. Those records, and the report from Mr. ████████ wife

27  already recorded in Mr. ████████ medical record, should have been enough for

28  NP Kahl to see that the surgery was not that day but was instead scheduled the next

1  month.  In any case, NP Kahl's plan was "ROI for Kaiser sent, waiting for records

2  to arrive for review." *Id.* On ███████████ 2022, Dr. Joseph Molina wrote:

3  "[K]aiser records reviewed.  [R]eferral placed for surgery reevaluation." *Id.* at p.

4  555.  Dr. Molina wrote no summary of the medical records in the medical record.

5  *Id.* He did not comment on the already scheduled surgical date of ███████ 2023.

6  *Id.* On ███████ 2023, Mr. ███████ was again seen by Dr. Molina. *Id.* at p. 557.

7  Dr. Molina noted that "R lung confirmed via biopsy (Kaiser records scanned for

8  reference)" and that Mr. ███████ was supposed to have surgery in ██████ 2023.

9  *Id.* However, Dr. Molina wrote that the referral he had requested two weeks earlier

10 was still "pending authorization." *Id.* at p. 558.  On ████████ 2023, the Jail

11 received a "COURT ORDER for Defendant to be seen by Jail MD regarding

12 medical condition." *Id.* at p. 559.  As a result of this court order, Mr. ████████

13 was seen on ████████ 2023 by Nurse Practitioner Frederick Wycoco.  *Id.*  NP

14 Wycoco wrote a reasonably good summary of Mr. ███████ Kaiser medical

15 records, in which he noted that Mr. ███████ had had a complete work up and had

16 been scheduled for surgery to remove the tumor on that very day, ████████ 2023.

17 *Id.* at pp. 559-561.  Mr. ███████ was admitted to the MOB ████████ 2023, *Id.* at

18 p. 459.  NP Wycoco noted that all of the records, including "surgeon consult, and

19 PFT" (pulmonary function testing) results had been "sent to Naphcare for review for

20 thoracic surgeon." *Id.* at p. 561.  NP Wycoco also asked NaphCare Utilization

21 Management (who is responsible for offsite referrals, described in more detail later

22 in this Report) to "expedite" the review. *Id.*[33]

23

24 [33] ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████

28 ████████████████████████████████████████ .

310.   On ██████ 2023, Mr. ████████ was seen again by court order: "COURT Order- Defense request to be released from Custody to have surgery without objection is denied.  Defendant is to be evaluated by jail medical regarding condition with conditions before next hearing." *Id.* at pp. 570-571.  At this meeting, NP Wycoco informed Mr. ████████ that "he has a pending scheduling appt with surgery (requested expedited thoracic surgery since ██/2023 for this medically necessary surgery)." *Id.* at p. 571.  On ████████ 2023, NP Wycoco responded to a Court Order to "review records form Kaiser per Court Order scanned on ███23." *Id.* at p. 576.  NP Wycoco noted he had already reviewed those records on ████████ 2023 and "pt already referred to specialists." *Id.*  On ████████ 2023, NP Wycoco recorded that "UCSD is requesting referral for pulmonology." *Id.*  NP Wycoco submitted an inquiry about the referral to "case management." *Id.* p. 576.  On ████████ 2023, Mr. ████████ was seen by Dr. Molina again by court order. *Id.* at pp. 576-577.  Mr. ████████ was "wondering when he will see the surgeon regarding his tumor." *Id.* at p. 577.  Dr. Molina again documented that "specialist evaluation upcoming …  I notified patient I have little to no control regarding specialist follow ups." *Id.*  In the end, Mr. ████████ finally had the surgery to remove his cancer on ██████ 2023.  Medical Records of ████████ ████████ as of ████████ 2023, p. 814 of 2164.  By then, the tumor had grown considerably and Mr. ████████ had a documented weight loss of 39 pounds. *Id.* at pp. 819, 1442.  The surgery finally occurred only after the direct intervention by the Chair of the San Diego County Supervisors, Nora Vargas, in ████ 2023, SD_652956-652959, and after the San Diego Union Tribune published an article about Mr. ████████ case on July 23, 2023.[34]

311.   In my opinion, the delay of this critical surgery was entirely

---

[34] Jeff McDonald, *"'I'm in a little disbelief': Diagnose with a tumor just before going to jail, La Mesa man fights for long-delayed surgery,"* SAN DIEGO UNION-TRIBUNE (July 23, 2023).

1 unnecessary, likely subjected Mr. ███████ to unnecessary pain, and placed him at

2 a great risk of harm—given that his tumor had grown considerably over the six

3 months he waited and that he had lost nearly 40 pounds.  Of course, the larger the

4 tumor is, the harder it is to remove surgically and the greater the likelihood of

5 complications.  The surgery would have been less difficult to perform and would

6 have had less likelihood of complications had it been done when originally

7 scheduled.

8        312.   What should have been done in Mr. ███████ case is clear.

9 Mr. ████████ arrived at the Jail a month before his scheduled surgery.  That is

10 plenty of time to arrange for continuity of that essential care.  Soon after

11 Mr. ███████ arrived at the Jail, someone from the Sheriff's Department (perhaps

12 the Jail Medical Director or Dr. Molina) should have called Dr. ████████

13 surgeon directly to coordinate care.  Mr. ███████ should have had his surgery, as

14 scheduled, on ████████ 2023.  If the surgery had to be rescheduled because of

15 security concerns, it should have been shortly thereafter and with the knowledge and

16 approval of his surgeon.  No Corporate Utilization Management system was needed.

17 In fact, given that Mr. ███████ was a Kaiser (HMO) patient, his surgery had

18 surely already been vetted by the outside UM program associated with his care.

19        313.   In summary, the Jail fails to continue medically necessary medication

20 and treatment for people after they are booked into the Jail, in violation of the

21 standard of care.  This places incarcerated people at risk of harm, including death,

22 (such as Raymond Dix) and unnecessary pain and suffering (such as ████████

23 ████████).

24 **IV.    The Sheriff's Department Does Not Provide Incarcerated People with a
      Reliable and Timely Way to Alert Health Care Staff of Their Medical**

25 **Needs, Placing Them at Substantial Risk of Serious Harm**

26        314.   It is my opinion that the Sheriff's Department lacks adequate policies

27 and practices to reliably and timely respond to incarcerated people who alert health

28 care staff of medical needs, which is a necessary component of any correctional

1  medical system.  Absent such a functioning system, the Jail's medical system
2  inherently falls below the accepted standard of care.

3      315.  To meet standards of care in a jail system like this one, incarcerated
4  people must be able to communicate their medical needs to health care staff—
5  including routine, urgent, and emergent medical issues—and be assured that those
6  needs will be addressed in a timely manner.  Due to the size of the Jail population,
7  and therefore the expected volume of medical requests, the Sheriff's Department
8  must have robust, functioning systems for (a) collecting and triaging incarcerated
9  person medical requests; (b) conducting timely in-person nursing evaluations of
10  people requesting medical care; (c) reviewing and responding to grievances
11  incarcerated people submit about their medical care; (d) identifying and responding
12  to medical emergencies in the Jail; and (e) identifying and communicating with
13  people with mental illness who may be unable to advocate for their own medical
14  care.

15      316.  The Sheriff's Department's own policies and procedures regarding
16  "Access to Care" require that incarcerated people "have access to care for their
17  serious medical … needs."  MSD Operations Manual, A.1.1.  According to that
18  policy:  "*Access to care* means that, in a timely manner, a patient is seen by a
19  qualified health care professional, is rendered a clinical judgment, and receives care
20  that is ordered."  *Id*.  These procedures further provide examples of "unreasonable
21  barrier[s]" to care, including "[b]eing [an] understaffed or poorly organized system
22  whereby care cannot be provided in a timely manner" and "[h]aving a utilization
23  review process that inappropriately delays or denies specialty care."  *Id*.

24      317.  Based on my review of Jail policies and procedures, my review of
25  charts and other documents, and my conversations with incarcerated patients, it
26  appears that the Jail has four ways for patients to alert health care staff of their
27  medical needs:  (i) emergency buttons or intercoms; (ii) sick calls; (iii) grievances;
28  and (iv) face-to-face interactions with health care or custody staff.

318.    In policy and practice, it is apparent to me that these do not function to respond to the needs of people incarcerated in the Jail.  My review of documents and my interviews with Jail staff and incarcerated patients during my inspection of the Jail showed many substantial problems with the Jail's system for requesting medical care.  This places incarcerated people at risk of serious harm.  Clearly, if an incarcerated patient is unable to effectively notify staff of a medical problem, that problem will not be addressed, or will be addressed belatedly, and the patient could suffer harm as a result.

### A.    The Sheriff's Department Lacks an Effective Process for Submission, Tracking, and Scheduling of Sick Calls

319.    Incarcerated people must be able to request medical care via requests that are processed, tracked, and scheduled for appointments in an organized and effective manner.

320.    In the community, people have multiple ways to seek medical attention for themselves or others.  If they think they have an emergency, they can call for an ambulance or go directly to a hospital emergency room.  If they have an urgent medical condition, they can go to an urgent care clinic or a walk-in clinic at a doctor's office that does not require an appointment.  If they have a non-urgent medical condition, they can make an appointment with a medical practitioner.[35]

321.    Jails should provide incarcerated patients with the same opportunities. Since incarcerated patients cannot go themselves to a hospital, call an ambulance, or make an appointment at an outside doctor's office, the standard of care requires that jails provide incarcerated patients the following functional mechanisms to alert staff

---

[35] People in the community may also be scheduled for regular check-ups even if they are feeling well, especially if they have chronic medical conditions such as diabetes or are elderly. Many screening lab tests and x-rays are done at such check-ups.  People in the Jail with chronic medical problems should also receive scheduled check-ups where routine monitoring labs, x-rays, and examinations are performed and medication is renewed—even if the patient feels well.  I discuss the standard of care for chronic care appointments and the Jail's failure to meet that standard later in this Report.

based on the urgency of their medical needs:

322.   First, when incarcerated patients have a medical emergency, such as a seizure, a severe fall, a stroke or a heart attack, they must have a way to immediately notify staff of this emergency.  This is usually accommodated by having an emergency call button in each patient's cell or housing unit.  (I discuss the Jail's emergency response system in more detail in a later subsection).

323.   Second, when incarcerated patients have acute medical issues, such as rashes, vomiting, headache, etc., they must be able to notify medical staff of their symptoms and the urgency of their medical need.  Jails commonly ask patients to fill out a medical request form when they have non-emergency medical symptoms or issues.  Since written medical requests include both urgent and nonurgent issues, these must be triaged by medical staff in a timely manner and urgent complaints evaluated in a timely manner (usually within 24 hours).[36]  Jail policies and procedures must take into account the fact that many incarcerated patients have difficulty or are unable to communicate their medical needs in writing, *e.g.*, those with developmental or mental health disabilities or those who do not speak English or Spanish, to communicate their medical needs.  This should include the ability to verbally request medical care from custody or medical staff, who will then enter the request into the medical system and initiate the 24 hour face-to-face evaluation.

324.   Third, custody and other jail staff, including mental health staff, must be able to submit requests for medical care on behalf of patients they are concerned about.  These should be entered into the system as if the patient had made the request themselves, and should initiate a 24 hour face-to-face evaluation just like a patient-generated medical request.  This is particularly important, for example, for

---

[36] Many jails now allow incarcerated people to submit such requests electronically, *e.g.*, through a tablet, which may be preferable because medical requests written on paper can be easily lost or misplaced and it is harder to document when such a written request has been triaged or when the patient was seen for this particular complaint by a medical practitioner.  Electronic submission of these requests automatically keeps track of all requests and when the requests were attended to.

1   developmentally disabled patients, patients with dementia, and severely mentally ill

2   patients.  These patients, by nature of their illness, may have impaired reasoning,

3   diminished insight into their medical condition, and/or paranoia that leaves them

4   less able to communicate their medical needs.  Jails are likely to have many such

5   patients, they must therefore have systems in place to check on those individuals.

6        325.   Fourth, family members, attorneys, and other interested parties also

7   must be able to initiate medical evaluations of incarcerated people.  These requests

8   must be considered as equivalent of the patient herself submitting the request and so

9   also immediately trigger the 24 hour face-to-face evaluation.

10       326.   The San Diego County Sheriff's Department policies provide a

11  minimal description regarding the medical request process.  Medical Services

12  Division Operations Manual section MSD.S.3 first provides general guidance that

13  "[a]ny patient with a medical, dental, mental health or developmental disability may

14  be identified by self, deputy, medical staff, family, attorney or advocate referral."  In

15  terms of how a request is made, it states that:  "Patients shall request routine sick

16  call by completing one (1) Sick Call Request Form" which are then placed by the

17  patient into a "locked medical (red) box."  MSD.S.3 Procedure Part III.  These

18  forms are to be gathered "daily by designated health staff" and reviewed; each

19  patient is to be seen face-to-face by an RN within 24 hours "of receiving requests."

20  *Id.*

21       327.   Section MSD.S.3 further states that, "[i]n the event a RN refers a

22  patient to sick call, there will be documentation in the electronic medical record

23  substantiating the reasons for the referral."  *Id.*  However, there is no guidance

24  regarding how to document referrals by security staff, clergy, family, LVNs, and

25  any number of other people who may want to make such a referral.

26       328.   Regarding non-written requests for medical care, the MSD Operations

27  Manual explains that "[p]atients with an urgent medical complaint may be referred

28  to health staff at any time."  *Id.* at Part IV.  However, there is no guidance regarding

1  how patients who have difficulty in writing, *e.g.*, those with cognitive disabilities

2  and those with mental health issues, can submit non-urgent requests for medical

3  care.

4      329.   Detention Services Policy M.15 (for custody staff) is similar, it

5  explains that "[s]ick call requests are deposited by the incarcerated person into the

6  secure medical mailbox," and that "health staff is responsible for collecting the sick

7  call request … each night."  Notably, Policy M.15 does not include a 24-hour face-

8  to-face requirement.

9      330.   Based on my interviews with Sheriff's Department staff during my

10  inspection of the Jail, I understand that, in practice, the Sheriff's Department still

11  requires incarcerated people to submit all in writing.  Patients who report medical

12  problems are told to fill out a medical request form.  The incarcerated person must

13  fill out the medical request form (Form J-212) and place it in a box located in the

14  housing unit.  Of course, not all of them do so—perhaps because they struggle with

15  writing or have a mental health issue—meaning that opportunities to treat medical

16  problems are then lost.

17      331.   Once submitted, the requests are picked up by a medical staff member

18  (usually an LVN) and taken to the medical offices.  The requests are then reviewed

19  by a registered nurse, who time stamps them and sorts and triages them, to the

20  extent possible.  A nurse I interviewed during my inspection reported that

21  sometimes she was not able to complete her triage of all requests the same day

22  because there are so many.  The stack of that day's medical requests is then

23  transferred to the RN responsible for doing a Face-to-Face assessment with each

24  patient within 24 hours.  After seeing the patient, this nurse makes a follow-up

25  appointment for sick call, if the RN deems it necessary.

26      332.   This process has several problems and inefficiencies that make it

27  inadequate to provide incarcerated people with care that meets medical standards.

28      333.   First, many incarcerated people have difficulty with a system requiring

written requests.  This includes those who do not speak English or Spanish, those with cognitive disabilities, mentally ill patients, and many others.  I was unable to find this issue addressed (at all) in either the MSD Operations Manual or NaphCare's Policies and Procedures.  Similarly, submission of a physical written request form can be daunting for patients who are only allowed out of their cells for a small amount of time daily.

334.    Documents I reviewed suggest that some staff refuse to accept requests for medical care unless they are written.  For example, in July 2022, a member of Sheriff's Department staff named Alejandra Carbajal reported to the head of mental health, Melissa Quiroz, that she had "seen [nursing staff] with [her] own eyes, give a [sick call] to an [incarcerated person] [complaining of] an annal [sic] infection willing to show the nurse on the spot … and the nurse just continued to hand [her] the [sick call] slip."  SD_194081.  Because of this practice, Ms. Carbajal believed that nursing staff was "doing [the] bare minimum for inmates." *Id.*  I tend to agree with Ms. Carbajal in this regard.  In my opinion, the limitation of requiring a physical, written request is a major oversight, which could result in some incarcerated people being unable to request medical care.

335.    Second, the MSD Operations Manual does not explain how medical care referrals from custody staff or from others outside the Jail, *e.g.*, family members or attorneys, should be documented and processed.  For example, if a family member calls and states that a particular patient has an unmet health care problem, how is this documented in the medical record?  Who takes this information and enters it into the system as an official medical request that will trigger a face-to-face evaluation?  The MSD Operations Manual is silent on this, and without a policy on how a family concern turns into a formal request for medical care, family member concerns can and are ignored, resulting in their frustration in trying to get health care for their oved ones.  This also can result in harm to the patient, who does not receive the necessary health care that the family is trying to arrange.

336.    According to patients I interviewed during my inspection of the Jail, incarcerated people sometimes attempt to inform the nurses who pass out medication about an urgent medical problem.  However, those patients report that, rather than promptly contacting the sick call nurses or physicians on duty, medication pass nurses often dismiss the person's request and instruct them to fill out a sick call request, which delays their access to care.  Similarly, I was told that when incarcerated people inform custody staff about a medical problem, custody staff again often dismiss the person's request and instruct them to fill out a sick call request rather than notifying medical immediately about an urgent problem.

337.    Third, the medical request process is not standardized across the various Jail facilities.  As an example, during my tour of the Jail, I learned that some facilities keep a copy of the medical requests in a binder whereas others do not.  This discrepancy in practices makes it difficult to track systemwide trends through CQI; medical requests that are kept organized are amenable to CQI review, while unorganized medical requests are not.  This lack of standardization across facilities would be remedied if the policies were more explicit.  Similarly, it appeared to me that there was confusion about when precisely in the triage process the medical request form was scanned and placed within the patient's chart.  Again, this lack of clarity may lead to errors, including the possibility of some sick call requests falling through the cracks.  For example, if a request is scanned into the chart too early, does that mean the appointment has already been completed?  If different staff have different expectations for when a request form is supposed to be scanned, this can lead to confusion.

338.    Fourth, according to the interviews I conducted during my tour of the Jail, some nurses doing triage eliminated sick call requests that they felt were redundant.  In other words, if the nurse believed that a patient had already submitted a request on a particular issue, they would simply eliminate that request.  This, again, creates a risk of health care needs slipping through the cracks, for example, if

the issue was not exactly the same as the prior request.  Also, repeated written requests often indicate the urgency of the problem.  The patient may be indicating, via repeated requests, that this is an urgent matter that should be dealt with promptly.

339.   Fifth, according to my interviews, sometimes, nurses responded to the requests in writing at the bottom of the J-212 medical request form, returned the form to the patient, and that was the end of the matter.  This results in no clinical encounter with the patient, which is what the patient asked for, and is outside of normal process of recording patient interactions in SOAP notes in the electronic medical record.

340.   Finally, as noted above, my interviews of Jail staff indicated that it was common for there to be so many sick call requests that it was not possible to triage them in a single day, leading to backlogs.  As of her deposition, Ms. Rognlien-Hood testified that there was a backlog of 300 medical requests.  Rognlien-Hood Tr. at 196:16-23.

341.   In summary, the Jail system for patients to request medical care works as intended only some of the time.  Other times, the request is lost in the paper shuffle of hundreds of requests a day, is never acted on, is not entered into the system, etc.  Many of the incarcerated patients I interviewed expressed frustration with the inefficiency of this system.  And, depending on what complaint "falls through the cracks," this system certainly can cause medical harm.

**B.    Even When Medical Requests Received and Processed, They Are Often Not Timely or Adequately Addressed**

342.   Once a request for medical care is received by the Jail, the person complaining of a medical problem should be seen face-to-face, so that health care staff can decide whether the patient has a medical issue that is urgent (for example, bladder or sinus infections or a painful rash like shingles) or not-urgent (for example, longstanding musculoskeletal pain or a non-painful skin lesion).

343.   At this face-to-face meeting, as in any medical encounter, vital signs should be taken.  They give vital information needed to properly triage "urgent" from "non-urgent" requests.  As an example, a patient complaining of a headache with a very high blood pressure of 190/120 should be triaged as urgent.  Without the blood pressure, a complaint of a headache may be triaged non-urgent.  Similarly, a patient complaining of back pain with a very high heart rate of 130 should be triaged as urgent.  Without the heart rate, a complaint of back pain may be triaged as non-urgent.  Vital signs take literally about a minute to perform, during which time the nurse could be conversing with the patient.

344.   In response to the State Audit's February 2022 conclusion that the "San Diego County Sheriff's Department … has failed to adequately prevent and respond to deaths of individuals in its custody," the Sheriff's Department announced that it was implementing a process of "doing face-to-face assessments (of patients) within 24-hours of receipt of a request for medical services at the (jail) facilities." SD_184484; Rognlien-Hood Tr. 87:6-10, 87:24-88:4.  Similarly, NaphCare recommended that when patients submit sick calls complaining of clinical symptoms, nursing staff see them face-to-face within 24 hours to triage the request. Rognlien-Hood Tr. 87:6-10, 87:24-88:4.

345.   The MSD Operations Manual requires that, as part of the triage process, patients who submitted sick calls should be seen face-to-face by an RN within 24 hours of the request being received.  MSD.S.3.

346.   However, in actual practice, the Jail gives the nurses 24 hours from the time of receipt to triage medical requests and another 24 hours to do the face-to-face evaluation from the time the request was triaged.  This timeline is laid out in a September 2023 CQI report conducted at Central Jail in which 10 charts were reviewed for the "following key indicators:" "1. The sick call slip is initialed and dated with the date that it was received. 2. Sick call is triaged within 24 hours of receipt. 3. A Face-to-Face assessment is conducted within 24 hours of triage. 4. A

1  referral is made for sick calls that require further evaluation." SD_729828. The

2  compliance for the face-to-face assessment in this study was 10%. The overall

3  compliance 50%.

4      347. Neither the MSD Operations Manual nor NaphCare's Policies and

5  Procedures define how face-to-face evaluations should be conducted, *e.g.*, whether

6  vital signs should be taken.

7      348. It should be noted that as of 2017 the NCCHC requirement was "that a

8  qualified health professional has a face-to-face encounter with the patient within 48

9  hours of receiving requests with a clinical symptom." DUNSMORE0260639.[37]

10  Thus, the Sheriff's Department set an ambitious standard for itself with its 24-hour

11  face-to-face requirement in its policies, but in actual practice, according to the CQI

12  indicator above, is trying to achieve a 48 hour standard.

13      349. However, the Sheriff's Department has not been able to meet either the

14  24-hour standard or 48-hour standard for face-to-face assessments. Rognlien-Hood

15  Tr. 87:11-14, 88:8-10, 90:15-92:18. Ms. Rognlien-Hood testified: "Q. And does

16  the 24 hour face to face for clinical symptoms always happen as a matter of

17  practice? A. No." *Id.* at 89:8-10.

18      350. This testimony is confirmed by documents I reviewed. A QA/QI report

19  from July 2023 stated that at George Bailey, with regard to the "[t]imeliness of 24

20  face to face," the Sheriff's Department was "averaging 45-50% of the threshold of

21  90%." SD_114412. Timeliness of sick call responses at Central Jail was no better,

22  with the Sheriff's Department reporting that "[c]ompliance indicators have slowly

23  been declining since implementation. Overall compliance has fallen from 76% to

24  50%." SD_114467. The Sheriff's Department was well-aware of the lack of timely

25  sick call responses, stating in that July 2023 QA/QI presentation that its corrective

26  action plan would include "continu[ing] to work on triaging sick call slips" and

27  _____

28  [37] As of 2018, the NCCHC updated this guidance so that a 24 hour face-to-face is
required.

1 "[a]nswer[ing] in a timely manner."  SD_114467.  Nevertheless, based on

2 Ms. Rognlien-Hood's testimony, it appears that the delays persisted.

3     351.   At least part of the problem appears to be the lack of sufficient nursing

4 staff to complete these face-to-face assessments.  Ms. Rognlien-Hood wrote in 2023

5 that "24-hour face to face is hard to accomplish due to the sheer volume and

6 manpower needed to accomplish this both on the medical and sworn side."

7 SD_375922.

8     352.   After being seen by the nurse, incarcerated patients must then wait even

9 more to be seen by a medical practitioner.  The average wait to see a medical

10 practitioner is around 15 days according to Sheriff's Department data from July

11 2023.  SD_114495.  Notably, this is over twice as long as the NCCHC reported in

12 2017.  And, of course, half of all incarcerated people who need to see a practitioner

13 wait *longer* than 15 days, and sometimes much longer.  Patients I interviewed

14 commonly told me about waiting for weeks to be seen for serious medical concerns.

15 When they put in a second or third request raising their medical concerns again and

16 asking why the process is taking so long, they report that those requests are often

17 ignored by nurses.  This was confirmed by a nurse assigned face-to-face duty at

18 Central Jail, with whom I spoke during the inspection.  She stated that repetitious

19 medical requests were ignored, in an attempt to make the face-to-face task list more

20 manageable.  In my review of patient charts, I found many examples of requests for

21 medical care that were not triaged by a nurse for many days or, in some cases,

22 weeks.  As one example of this, ██████████ submitted a grievance on ███████ 2022

23 that stated:  "I [have] been requesting some kind of treatment for the fungi I have on

24 my feet for more than 6 weeks and haven't gotten any response back."  SD_817006.

25 Of course, a delay of well over a month to treat an infection can certainly allow that

26 infection to fester and worsen and even potentially spread.  Delay always increases

27 the likelihood of some medical conditions getting worse and patients suffering as a

28 result.

353.    NaphCare has exacerbated the Sheriff's Department's failures to respond to sick call.  According to a February 22, 2023 email and attachment from Ms. Rognlien-Hood, NaphCare's training regarding 24 hour face-to-faces created "confusion."  SD_375922.  Specifically, when training Sheriff's Department staff, NaphCare's Vice President of Nursing "stressed … that vitals must be done for all medical concerns during the face to face," but NaphCare's Chief Medical Officer separately wrote that this was not necessarily the case, although he "would not [] give us direction on when to do them and not do them." *Id.*  This is poor training.

354.    In summary, the Jail set a standard for itself of having an RN see each patient within 24 hours of the receipt of a request for medical care.  At some point, they began to allow 24 hours for triage of medical requests and another 24 hours for a face-to-face encounter.  Either way, the Jail has not been able to meet its own standard.  The Jail has attempted to cover this inadequacy with various questionable measures, such as not taking vital signs, but, in the end, the program does not work, leaving patients at risk of harm.

**C.    Grievances Are Often Ignored or Not Answered Satisfactorily**

355.    Unlike patients in the community, incarcerated patients are unable to choose a medical care provider on their own.  Incarcerated patients similarly are unable to switch medical providers if they feel that their medical needs are not being met.  Their only alternative is to make a formal complaint in the form of a grievance.  The grievance process is an opportunity for the patient to point out what they perceive as deficiencies in their medical care and an opportunity for the jail medical staff to improve medical care by learning about problems that may have fallen through the cracks or been unaddressed due to deficiencies within the medical system.

356.    For that reason, grievances are an essential part of medical care for the incarcerated.  As the NCCHC Technical Assistance Report stated:  "The goal [of the grievance program] is to solve patient complaints … as soon as they become

1  known." DUNSMORE0260627. Grievances about medical care should, like simple

2  medical requests, also usually be addressed with a face-to-face evaluation. In fact,

3  in my opinion, a face-to-face discussion of medical grievances is essential to a

4  satisfactory resolution.

5       357.  The MSD Operations Manual has a lengthy section on "Grievance

6  Procedures," which emphasizes that grievances should be responded to in writing

7  within seven days. MSD.G.1. Under that policy: "The staff member delivering the

8  response to the inmate will have the inmate sign and date one copy of the response."

9  If the patient is not satisfied with the response, "the staff will be directed in writing

10  by the patient through successive levels of command until resolution is obtained, or

11  the Medical Administrator reviews the grievance." Each of these levels must be

12  completed within ten days. "The decision of the administrator is final."

13       358.  The next section of the Grievance Procedures discusses how patient

14  grievances may be administratively relabeled as "Personnel Complaints." The

15  Detention Services Bureau (custody-side) grievance policy, No. N.1, is similar,

16  though it also lists further ways a grievance can be administratively relabeled, for

17  example, as a "request." Importantly, if a grievance is relabeled as a "request,"

18  "[n]o entry in JIMS is required."

19       359.  The Sheriff's Department's grievance forms also contain a box in the

20  response area that states, "This is not a grievance." Other than discussing the

21  difference between a medical grievance and a personnel complaint or request, the

22  Sheriff's Department's policies does not provide guidance for the frequent practice

23  of relabeling a grievance as "not a grievance." For example, Policy N.1 states that a

24  grievance can address "Medical/Mental Health care," but does not explain in what

25  circumstance a grievance about medical care should be relabeled as a request. Since

26  there is no written guidance on when to do this, it is left to the reviewing RNs

27  judgment (or whim) as to when to do this.

28       360.  In practice, I understand that, in the Jail, grievances are often ignored or

not answered satisfactorily. During my inspection of the Jail, I interviewed many patients who told me that they have received no response to medical grievances they submitted. No response, of course, violates the MSD Operations Manual, which includes detailed instructions and timelines for grievances.

361.  Further, the Sheriff's Department's CQI reports provide little meaningful information about grievances other than listing the ostensible number of grievances per quarter. *See, e.g.*, MSD QA/QI Meeting, July 18, 2023, SD_114475. CQI data on grievances should contain: (a) the average length of time before a response is issued to the patient; (b) how many grievances were answered late; (c) what percentage escalated to each level up to the Medical Administrator; and (d) what the resolution was for each grievance. But none of this information is contained in the Sheriff's Department CQI reports on grievances. *See id.*

362.  There are several problems with the grievance system in both policy and practice. First, the Sheriff's Department Operations Manual Section MSD.G.1 requires no face-to-face interaction with the patient who wrote the grievance. Written grievances contain only a short summary of what the patient thinks the problem is. Seeing the patient in person allows the patient to voice their concerns in more detail. It also allows the person responding to explain medical issues that perhaps the patient does not understand.

363.  Second, grievances should never be arbitrarily relabeled as something else except by the patients themselves. This also makes grievance statistics unreliable since it is not known how many were arbitrarily relabeled as not a grievance. Relabeling grievances is also potentially a mechanism to manipulate statistics to make them appear more favorable than they really are. Not allowing grievances to be relabeled removes this bias. In the Jail, however, patients often receive responses with the "this is not a grievance" box checked. Ms. Rognlien-Hood admitted that this happens in her deposition. Rognlien-Hood Tr. 206:12-24. While most grievances were not included in the patient records sent to me, several

1  were included and marked as "This is not a grievance."  As one example, ███████

2  ███████ wrote a grievance attempting to contest the discontinuation of his suboxone

3  medication on ████████████ 2022.  SD_820924.  In response, the Jail checked the

4  boxes for "This submission is not a grievance" and "It is an inmate request … (No

5  entry in JIMS …)."  *Id.*

6      364.   This practice appears to artificially deflate the number of grievances

7  received the Jail.  As an example, ██████████████████████████████████████

8  ████████████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████████

10  ████████████████.  NAPHCARE031601.  In my experience, this is not credible and

11  is more likely the result of arbitrarily relabeling grievances as something else.

12      365.   Third, the Jail's failure to analyze grievances substantively during the

13  CQI process means that the Jail does not know how many of the grievances were

14  justified and pointed out true deficiencies in medical care or Jail medical processes.

15  The grievance process should be viewed as an opportunity for improvement, not as a

16  nuisance to be swept under the rug.  It should allow patients to point out problems of

17  medical care that they see from their end.

18      366.   Finally, during my tour of Central Jail, a nursing supervisor there told

19  me that patient grievances are taken directly to the nursing supervisors.  The nurses

20  and the practitioners are not informed of them even if they are named.  In my

21  opinion, this is wrong.

22      367.   In summary, the Jail grievance system does not work as it should.

23  Some grievances are ignored, in violation of policy.  Many grievances are arbitrarily

24  relabeled as "not a grievance."  Grievances are not tracked in a meaningful manner

25  by the CQI process.

26      **D.**    **The Sheriff's Department Lacks an Effective Alert System for**
          **Medical Emergencies**

27

28      368.   Outside of jail, people who have a medical emergency can either call an

1  ambulance (which usually responds in minutes) or go themselves to a hospital

2  emergency department.  Incarcerated patients cannot do either.  Jails must have

3  some other system that allows incarcerated patients to get emergency medical care.

4  This involves two steps: (1) ensuring that incarcerated people can effectively notify

5  security staff that they are experiencing a medical emergency, and (2) ensuring that

6  the jail security and medical staff will respond in order to get emergency care to the

7  patient.

8      369.  Incarcerated people must have a reliable way to alert security and

9  medical staff when they experience medical emergencies, so that staff can respond

10  immediately.  Failure to provide an emergency alert mechanism—and to ensure that

11  staff respond immediately—can lead to preventable in-custody deaths.  As

12  explained above, the February 2022 State Audit identified cases in which where

13  deputies did realize that a person was unresponsive or otherwise in distress and

14  therefore "did not perform or delayed lifesaving measures" like CPR.  SD_174824-

15  25.

16      370.  I understand that Plaintiffs' other expert(s) will opine in greater detail

17  about emergency buttons and intercoms.  However, because this issue is critical to

18  the provision of medical care in the Jail, I also address it here, with a focus on the

19  medical perspective, in particular, the MSD Operations Manual regarding

20  emergency medical communications from patients using the intercom in their cells.

21      371.  Most correctional facilities I am aware of have emergency buttons and

22  intercom in the cells and housing units, which incarcerated people can use to alert

23  staff of medical emergencies.  Jail policies should also explain—for various types of

24  medical emergencies—exactly what response should occur, by whom, and within

25  what time frame.  Such common medical emergencies include:  "I think I'm having

26  a stroke!"; "I can't wake my cell mate up!"; "My cell mate fell and hit her head.  It

27  looks bad."; "I can't breathe!"; and "My cell mate is having a seizure!"

28      372.  Yet, the MSD Operations Manual does not contain any guidance

regarding emergency medical communications from patients using the intercom in their cells. The Operations Manual does contain MSD.M.1 "Medical Emergencies." Although MSD.M.1 contains much information about what security and medical staff should do when notified of an emergency, it does not address how incarcerated people notify staff of an emergency and nothing about the need for functional emergency call buttons.

373.    In practice, the "emergency" buttons and intercoms in the cells at the Jail also frequently do not work. During my inspection of the Jail, three different patients demonstrated this fact to me by pushing the buttons in their cells with no effect. I observed many other emergency buttons to be always fully depressed and so clearly not in working order. This is a serious issue in that a patient experiencing an emergency medical condition cannot alert security or medical personnel, nor can their cell or dorm mates.

374.    For example, the July 2022 death of Abdiel Sarabia, who, as noted above, appears to have been dead for some time before his body was discovered in the Jail, suggests that the Sheriff's Department is unable to identify people experiencing a medical emergency. It is probable that Mr. Sarabia and many others knew that they were having a medical emergency for some time before they died but were unable to notify staff because of non-functioning emergency buttons.

375.    Documents I reviewed suggest that the Sheriff's Department fails to train staff properly regarding physician responses to emergencies. In an email dated February 22, 2023, then Director of Nursing Rognlien-Hood, reported that "ER training has confused the staff" because NaphCare stated in one training that STATCare should be used for emergent issues, and stated in another training that on-site providers should be used." SD_375921. Ms. Rognlien-Hood claimed the later procedure, if followed, would burden on-site providers." *Id.* Confusion about who should respond to an on-site emergency (seizures, trauma, unconsciousness) can certainly harm incarcerated patients if an essential medical provider fails to

1  show up, thinking "STATCare has it!"  Examples include patients needing life-

2  saving airway placement or patients needing life-saving medications administered

3  immediately.

### E. The Sheriff's Department Lacks a Working System for Ensuring that People with Mental Illness or Other Communication Difficulties Receive Medical Care.

6  376.  The problems described above are even more significant for

7  incarcerated people with mental illness.  Mentally ill patients get the same medical

8  problems as anyone else.  Mentally ill patients have heart attacks.  Mentally ill

9  patients get cancer.  Mentally ill patients get infections.

10  377.  Mental illness and medical problems interact in important ways.  First,

11  because of difficulty with thought processes, paranoia, and other aspects of mental

12  health disability, mentally ill patients sometimes lack insight into their own medical

13  needs and also do not communicate well when they are having medical symptoms,

14  even severe symptoms.  More effort is often necessary to make medical diagnoses in

15  the mentally ill.

16  378.  A second way that mental illness can affect medical problems occurs

17  because psychiatric medications frequently have side effects that manifest as

18  significant medical problems.  For example, haloperidone frequently causes

19  disabling muscle stiffness; risperidone is notorious for occasionally causing

20  gynecomastia (breast growth in men); olanzapine increases the risk for diabetes.  All

21  incarcerated mentally ill patients should be followed by the medical team because

22  mental health professionals do not have the training or experience to recognize

23  significant medical side effects from psychiatric medications.

24  379.  Third, mental illness itself can lead to medical problems.  Severely

25  mentally ill patients may become sick from not eating or from eating inappropriate

26  things.  Mentally ill patients may harm themselves and cause injury.  Mentally ill

27  patients can develop skin lesions from lack of self-care.  These problems need to be

28  recognized and treated by the medical team.

380.   Finally, medical problems can mimic mental illness and vice versa.  For example, infections can cause a disordered mental state that can be confused with psychosis.  Sometimes it can be difficult to determine whether an incoherent patient is acutely psychotic or rather is delirious from an infection, meth intoxication, or substance withdrawal.  For all these reasons, it is impossible to totally separate medical issues from mental health issues.

381.   The medical standard of care requires that medical personnel and mental health personnel at a jail communicate with each other, to ensure that mentally ill patients do not have their other—*i.e.*, physical—medical problems neglected.  Specifically, **jails must have a clear plan for the addressing the healthcare needs incarcerated patients who are not fully able to communicate those needs on a formal medical request.**  A system to ensure medical care for patients such as these has three components.

382.   First, such patients must be identified.  This can be done by placing these patients on a "Chronic Care" or "Special Needs" list such as those used to identify other patients with chronic health needs (*e.g.*, diabetics or those with physical disabilities).

383.   Second, jails must have a policy or guideline in place that details what special care will be provided to these patients.  These guidelines must include "wellness checks" by both medical and mental health professionals.  Such patients should not be required to write their requests for medical care.  Referrals to the medical clinic can be made verbally, by any staff member who is concerned about the patient, and by family members.

384.   In fact, such patients must receive extra scrutiny and care at every stage of incarceration.  Since they sometimes cannot or will not give medical information at intake, information may need to be gathered from other sources, such as old records, outside providers, or family.  Since such patients sometimes do not care for themselves properly, custodial and medical staff need to be vigilant that these

1  patients bathe, eat, and sleep properly.  Since such patients often do not

2  communicate well that they are having medical symptoms, medical staff must

3  frequently check on them and specifically ask about their well-being.

4      385.    As a rule, patients who are unable or unwilling to advocate for

5  themselves must receive **more** frequent medical checkups, not **fewer**.

6      386.   It is clear that this Jail does not provide sufficient medical checkups for

7  people with mental illness and communication challenges.  One needs to look no

8  further than the deaths of Lonnie Rupard and Roselee Bartolacci, described above,

9  as evidence of this.  The Forensic Pathologist who performed the autopsy on Lonnie

10 Rupard opined that he died due to medical neglect and ruled the death a homicide.

11 Ms. Bartolacci's case was strikingly similar to Mr. Rupard's.  Both patients had

12 significant mental illness that impacted their ability to request and accept medical

13 care.

14 **V.    The Sheriff's Department Improperly Documents "Refusals" of Medical**
15 **Care, Resulting in the Denial of Care to Incarcerated People, and Placing**
   **Them at Substantial Risk of Serious Harm**

16     387.   It is my opinion that the Sheriff's Department does not appropriately

17 document refusals of medical care by incarcerated people.  In fact, based on my

18 review of documents in this case, it is my opinion that Sheriff's Department staff

19 frequently record that a patient has "refused" to attend a medical appointment, even

20 though the patient was never informed or offered the opportunity to attend the

21 appointment in the first place.  This practice has the effect of denying medical care

22 to incarcerated people and therefore places them at a risk of serious harm.

23     388.   In general, Jail patients have the right to refuse medical care.  However,

24 such refusals must be appropriately documented.  As the NCCHC Technical

25 Assistance Report explains:  "[t]he standard practice is that all refusals need to be

26 made with a health staff in attendance to counsel the patient as to the possible health

27 outcomes of a refusal of care.  A deputy can be the second witness signature when

28 the inmate refuses to sign the refusal form."  DUNSMORE 0260650.

389.   Of course, it should go without saying that staff should not sign a form indicating that an incarcerated patient has refused a medical appointment unless and until the patient has been informed about their appointment, has been counseled on the possible risks of refusing care, and has affirmatively stated that they do not want to receive that care.

390.   The State Audit identified the Sheriff's Department policies on refusals as a potential factor in the extraordinarily high death rate at the Jail: "we identified several instances in which sworn staff were the only witnesses when incarcerated individuals refused to sign the refusals.  Because follow-up care is important, it is critical that the desire to refuse care be shared with health staff who are in a better position to ask appropriate questions, explain the adverse consequences to health that may occur as a result of the refusal, and assess whether an individual has critical health needs that should be addressed." SD_174820-21.  The Audit recommended that the Sheriff's Department "[r]evise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care." SD_174851.

391.   When the Sheriff's Department responded one year later, their Progress Report: Update on State Jail Audit stated that they were complying with the Auditor's recommendation about refusals: "In the event a patient refuses prescribed medication, the nurse will counsel them on the potential impact and try to convince them to take the prescribed medication." SD_184485.  In the case of refusals of a medical appointment, "[t]he patient will be counseled by medical staff, which may include a provider or nurse, regarding the potential effects on their health of missing the appointment and try to convince them to attend." *Id*.

392.   However, after reviewing medical records and hundreds of medication refusal forms, I can state confidently that the Sheriff's Department does not meet this standard in either policy or practice.

393.   MSD Operations Manual Policy D.1.1 states that a patient who refuses

1  either medication or treatment is required to "sign a refusal form … including the

2  medication/dose or treatment and witness signature."  However, "[i]f Patient refuses

3  to sign Refusal form, two (2) witnesses, i.e. licensed nursing personnel and Deputy

4  shall sign the Refusal form …."  *Id.*  And, "[a]fter three (3) consecutive refusals of

5  all other medication(s)/treatments, patients are counseled by licensed nursing

6  personnel and scheduled for provider chart check to determine if

7  medication/treatment will continue to be offered."  *Id.*  I note that this policy differs

8  from what the Sheriff's Department stated that they were doing in their Update to

9  the Audit.

10      394.   On its face, this procedure falls below the standard of care because it

11  does not require health care staff to be present until a patient has refused care three

12  consecutive times.  Instead, the policy would allow for any two witnesses—

13  including two deputies—to witness the patient's refusal.  Allowing a refusal to be

14  documented without a healthcare staff member present is problematic because it

15  means that the incarcerated patient does not receive an appropriate advisal of the

16  risks of refusal before refusing.  By requiring the patient to refuse three times before

17  receiving any counsel about the risk of refusals, incarcerated people may end up

18  refusing without full awareness of the benefits of the medication, and, as a result, be

19  delayed in receiving necessary medical care.

20      395.   Notably, there is a separate policy governing the refusal of offsite and

21  specialty clinic appointments, which *is* adequate.  Under MSD Operations Manual

22  Policy MSD.R.5, a patient who refuses an offsite or specialty clinic appoint is

23  provided a "risk and benefit counseling … by nursing staff as soon as possible

24  following notification of patient's refusal."  And, the refusing patient's physician is

25  instructed to "discuss" with the patient "the reason for the off-site referral and …

26  include the benefit to them versus the medical risk of not going to the appointment."

27  *Id.*

28      396.   If patients are not properly counseled regarding refusals of offsite care,

it can compromise medical care in several ways.  The Jail's health care staff should make referrals for offsite care only when clinically-indicated, and the failure to ensure the patient receives this care can and will have a detrimental effect on patient health.  Further, in my experience, cancelling appointments can strain the Jail's relationship with offsite specialists, who usually must make special arrangements for such visits and cannot see other patients in the time set aside for the patient who refuses.  It is in the best interest of current and future patients in the Jail that refusals are kept to a minimum.

397.   However, as explained in more detail below, this policy does not appear to be followed.  My review of documents indicates that, even if the Sheriff's Department's policies for refusals were appropriate, in practice, the Sheriff's Department does not appropriately document refusals.

398.   After reviewing hundreds of medication refusal forms, I can state confidently that custody staff alone are involved in almost all patient refusals of medications, lab draws, clinic visits, and off-site visits.  Nurses are rarely present for these interactions.  Rather, custody staff state that they have spoken to the patient, the patient refused care, and also has refused to sign the refusal form.  Then, a nurse and the custody officer (or two custody officers) sign the refusal form, even though the nurse did not personally witness the refusal.

399.   As just one example of many, the medication refusal form for a patient named ███████████ (███████████), dated ███████████2023, and signed by custody and nursing staff, simply states that a medication was "'refused' per deputy."  In other words, this notation indicates that the supposed patient refusal was communicated only to the deputy, and the nurse who signed the refusal form was told *by the deputy* that Ms. ███████████ had refused the appointment.  *See* SD_781379.

/ / /

/ / /

/ / /

**I understand this can lead to serious consequences, including the possibility of death.**

☐ I hereby refuse to accept prescr bed d et for my a ergy. I understand th s can ead to ser ous consequences, nc ud ng the poss b ty of death.

**I understand that I am taking this action against medical advice and I have been informed of the risk to my health as a result of my action. I accept the full consequences of my action that is contrary to the recommendation of the medical, psychiatric or dental staff treating my case. I hereby release the San Diego County Sheriff's Department Detention Facilities Medical Services from all responsibility for any unfavorable or ill results which I understand may happen as a consequence of my refusal to accept this medical treatment.**

Reason for Refusa :

"Refused" per Deputy

S gnature of Pat ent / F rma de pac ente:

☑ Pat ent refused to sgn th s form / E pac ente se negó a f rmar este formu ar o

400.   Most of the refusal forms I reviewed looked like this—with the "per deputy" notation indicating that a deputy had stated that the patient refused. In my experience, this is problematic. Deputies are busy and sometimes infer that patients are refusing their medications when in fact, they are not.

401.   A second example involves a patient named ████████ (████████). On ████████ 2022, Ms. ██████ was seen at her cell by Dr. Rana Ram in response to complaints of dizziness for the prior two weeks. Dr. Ram ordered labs. SD_748165. Later that day, a nurse made the following note: "Patient call for blood draw. Per deputy #0474 patient refused." SD_748165. On ████████ 2022, Ms. ██████ was seen at her cell by Dr. David Christensen to "re-evaluate dizziness/fatigue." Dr. Christensen ordered an EKG in addition to the labs. SD_748164. Ms. ██████ then reportedly refused to go to medical for the EKG three times. The first time, a nursing note stated: "Called Pt at the housing but refused to come to Medical Clinic. Refusal form signed by the Pt. herself without any reason." SD_748164. The second time, a nursing note stated, "Pt was called for EKG, declined and also declined to sign refusal form witnessed/signed by

Dep. #4122 & Dep.#0395." The third time, a nursing note stated: "Called housing deputy to bring pa. to medical for EKG. Per deputy, pt. refused. Refusal witnessed by deputy 3454. Refused 3X already." SD_748163. Later that day, a Nurse Practitioner wrote, "pt may refuse recommended medical treatment," and discontinued the lab and EKG orders. SD_748163. In violation of the Sheriff's Department's policies and procedures, no medical personnel witnessed any of these refusals or counseled the patient. This has the potential to adversely affect medical care because the labs and EKG ordered were important in elucidating the cause of Ms. ███████ symptoms. Dizziness and fatigue can be symptoms of serious medical pathology, including (to give just two examples), heart problems and cancer. Moreover, the notes makes little sense. Why would Ms. ███████ refuse lab tests and a simple EKG test three times without providing a reason? Medical personnel should see patients like Ms. ███████ to assess her condition and the reason for any refusal.

402.  A third example involves ███████████████ (███████ whose case is discussed in more detail in the section on diabetic care. As explained there, Mr. ██████—who is not supposed to receive insulin—was nonetheless prescribed insulin and refused it for months. Health care staff did not provide him with counseling despite his many months' worth of refusals:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

| Patient: ▮▮▮▮▮ | ▮▮▮▮▮ | | Class:3 |
|---|---|---|---|
| DOB:▮ | Sex:M | | Race:B |
| Housing ▮▮▮▮ | Court Date: | | Type: |
| Status:ACTIVE | Booking Date:▮ | | Proj. Rel:▮▮▮▮ |

NovoLIN R Injection 100 UNIT/ML Solution ▮▮▮2023 3:00:00 PM - ▮▮2023 2:59:00 PM Mo ina, Joseph MD
Inject 1 unit(s) twice a day for diabetics subcutaneous y for 30 day(s). Dispense 60 so ution. 2 Refi (s). *Insu in S iding Sca e Standard.
Profi e On y
A ergies:

A erg es:

No Known Drug A ergy, No Known Food A ergy

| Hours | Jan 12 | Jan 13 | Jan 14 | Jan 15 | Jan 16 | Jan 17 | Jan 18 | Jan 19 | Jan 20 | Jan 21 | Jan 22 | Jan 23 | Jan 24 | Jan 25 | Jan 26 | Jan 27 | Jan 28 | Jan 29 | Jan 30 | Jan 31 | Feb 1 | Feb 2 | Feb 3 | Feb 4 | Feb 5 | Feb 6 | Feb 7 | Feb 8 | Feb 9 | Feb 10 | Feb 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0330 | | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R |
| 1500 | R | R | R | R | R | R | R | R | R | R | | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | |

*See* SD_815346.

403.  A string of refusals like this can adversely impact health care in the Jail simply by occupying time, both from health care and custody staff, who are supposed to fill out a refusal form after each refusal.  Further, insulin is an important medication.  If insulin is essential to this patient's health, health care staff must follow clinical standards of care, and visit with the patient often to see why he is refusing and to assess how he is doing medically despite the refusals.  If insulin is not essential to this patient's medical care (as was the case here), then a medical practitioner should have discontinued it and documented this appropriately.

404.  Another example involves a patient named ▮▮▮▮▮▮ (▮▮▮▮▮▮). A refusal form showed that he refused a blood pressure check on ▮▮▮▮▮ 2022. SD_816935.  The reason for refusal states "refused to come take am med and to sign refusal with no given reason."  *See* SD_816936.  There is no evidence Mr. ▮▮▮▮ knew he was refusing a blood pressure check and not just his morning medication. Many other allegedly refused blood pressure checks in Mr. ▮▮▮▮ records were documented "per deputy."  On ▮▮▮▮▮ 2023, a deputy "entered the module to inform patient … [and] returned and reported patient refused BP check." SD_816292.  The same reason for refusal was written on ▮▮▮▮▮ 2024 and

1    ███████████ 2024.  *See* SD_816282, SD_816278.  In all, at least 90 of Mr. ███████

2    refusals of blood pressure checks and medication were "per deputy."

3        405.   Another example involves a patient named ██████████████

4    (████████).  He allegedly refused medication "per deputy" on at least ten occasions.

5    For example, he allegedly refused to take his Lexapro on ██████████ 2023, and

6    the reason for refusal simply states "'Refused' per Deputy … assisting med. pass."

7    SD_759457.  He allegedly refused Lexapro again on ██████████ 2023, and the

8    reason for refusal was "Per deputy 4338 patient refused medication."  SD_759462.

9    On ██████████ 2023 he allegedly refused to take Lexapro and "refused to see

10   nurse per deputy."  *See* SD_759471.  No actual reason for Mr. ██████████ alleged

11   refusals was written.

12       406.   Still another example is the tragic death of 32-year-old Michael Wilson

13   at the Jail.  According to documents I received regarding *Estate of Michael Wilson*

14   *v. County of San Diego*, Case No. 3:20-cv-0457 (RDR-BMD), Mr. Wilson died in

15   custody February 14, 2019 due to acute congestive heart failure, causing fluid to

16   accumulate in his body.  Mr. Wilson was on four medications for his heart condition

17   and was admitted to the Jail with a Court Order that medical staff pay special

18   attention to his medical needs.  Mr. Wilson also had a history of bipolar

19   schizophrenia.  Dr. Freedland in his deposition stated that the patient declined an

20   examination.  Given the patient's serious health conditions including his mental

21   illness, more should have been done to examine the patient and ensure he received

22   life-saving heart medications.

23       407.   In addition, the testimony of multiple named plaintiffs in this case

24   suggests that at least some of the refusals documented in patients' medical records

25   are inaccurate.  For example, named Plaintiff Ernest Archuleta, in response to a

26   question about the medication refusals in his medical records, stated:  "[I]f you

27   weren't your cell and [medical staff] pass by, they would call that a refusal… I don't

28   remember ever signing anything to refuse my meds."  Archuleta Tr. at 187:16-20;

1    *see also id.* at 188:9-22 ("I wouldn't refuse [my medication]."). Similarly, named

2    Plaintiff Michael Taylor, when asked about a grievance response that purportedly

3    said he had "refused to go to an optometrist appointment," responded: "I would

4    never have denied to go to an optometrist appointment." Taylor Tr. at 210:10-16;

5    *see also id.* at 252:15-253:3 (Q: "Did you refuse visual acuity assessments during

6    housing rounds?" … A: "No … I would have never refused. … I would have never

7    refused an optometrist or any kind of vision anything.").

8        408.   Documents produced by the Sheriff's Department about offsite medical

9    appointments are similarly concerning in regards to refusals. ███████████

10   ████████████████████████████████████████████████████

11   ██████████████████████████████████. *See*

12   NAPHCARE026024.

13       409.   In my experience, that almost 20 percent of all patients scheduled for

14   offsite medical appointments would refuse to go is astounding—and not credible. In

15   my 25-year career practicing medicine in jails, I cannot recall any patients who

16   refused to go to an offsite appointment—zero. Something is thus deeply wrong with

17   the Sheriff's Department statistics.

18       410.   The Sheriff's Department's policies and procedures require that each of

19   these patients who refuse offsite transport to be counseled face-to-face by a

20   physician. The Sheriff's Department said that they were doing counselling in such

21   cases in their Progress Report: Update on State Audit. SD_184485. However, I see

22   no documentation in the medical records I reviewed that such face-to-face physician

23   counseling occurred for most of these refusals. I also did not review any evidence

24   showing that the extremely high rate of refusals of offsite care was formally

25   investigated by the Sheriff's Department.

26       411.   Refusals of medical care are particularly concerning when the

27   incarcerated patient is someone with mental illness or an intellectual or

28   developmental disability. As explained above, mental illness can lead to people

1  lacking insight into their medical condition and also being unable to communicate

2  their medical needs.  Critically, because of paranoia and difficulty with

3  communication, mentally ill patients sometimes refuse appropriate and even

4  essential medical care.  When mentally ill patients do refuse necessary medical care,

5  serious efforts should be made to:

6      a.    Find out why the patient is refusing.  Sometimes, the reason for

7  the refusal is simple to deal with (for example, a patient who does not want to take a

8  medication in the morning because it makes him sleepy, but will take it willingly in

9  the evening).

10      b.    Determine whether the mentally ill patient is competent to make

11  the refusal.

12      c.    Plan for follow up.  Mentally ill patients are often ambivalent,

13  which means that if they refuse necessary medical care today, they may not refuse

14  tomorrow.

15      412.  The MSD Operations Manual does not adequately address the special

16  needs of patients with cognitive disabilities or mental health problems that might

17  impact their ability to withhold consent.  The NaphCare Policy and Procedure

18  Manual does mention this issue in general terms in D-02 Medication Services—

19  Refusal or Non-adherence:  "Patient refusal of medication and treatment requires

20  additional intervention and education by treating staff and take into account the

21  medical and mental health status of the individual patient."  This implies rather than

22  states the truth that patients with cognitive or mental health disabilities need *more*

23  care and attention, not *less*.

24      413.  In practice, the Jail does not ensure that patients with these kind of

25  mental health or developmental disabilities are in fact receiving care.  This failure

26  has led to preventable deaths, including the death of Roselee Bartolacci as described

27  above.  An additional example is Teresita Tuazon, a type 2 diabetic who was booked

28  on September 4, 2021.  SD_337258.  Ms. Tuazon also had severe mental illness,

1   which led her at times to severe self-neglect, requiring admission into the

2   Psychiatric Stabilization Unit.  *See* CLERB Report, SD_050607.  She died on

3   September 28, 2021 from "complications of Diabetes Mellitus."  *See* Autopsy

4   report, SD_055072.  A contributing factor to her death was the fact that she had

5   refused to take her prescribed insulin or other diabetic medications for three days

6   prior to her death and six of the last ten days.

| Patient: TUAZON, TERESITA M | #:400257958 (21134134) | Class:4 |
|---|---|---|
| DOB:████1960 (Age=62) | Sex:F | Race:F |
| Housing: - - - - | Court Date: | Type: |
| Status:NOT ACTIVE | Booking Date:9/4/2021 4:49:31 PM PDT | Release:9/28/2021 8:10:00 PM |

**Lantus Subcutaneous 100 UNIT/ML Solution** 9/11/2021 9:00:00 PM - 10/10/2021 11:59:59 PM Ram, Rana DO
Inject 10 unit(s) beneath the skin DIABETIC BEDTIME for 30 day(s). Dispense 300 solution. 0 Refill(s) *ATE Profile Only
Allergies:
Penicillin

| Hours | Sep 11 | Sep 12 | Sep 13 | Sep 14 | Sep 15 | Sep 16 | Sep 17 | Sep 18 | Sep 19 | Sep 20 | Sep 21 | Sep 22 | Sep 23 | Sep 24 | Sep 25 | Sep 26 | Sep 27 | Sep 28 | Sep 29 | Sep 30 | Oct 1 | Oct 2 | Oct 3 | Oct 4 | Oct 5 | Oct 6 | Oct 7 | Oct 8 | Oct 9 | Oct 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2100 | X | X | X | X | X | X | X | R | X | R | X | X | X | R | X | R | R | R | | | | | | | | | | | | |

Not Administered - Refused - Doreen Marasigan RN - 9/27/2021 9:00:00 PM
Not Administered - Refused - Shannon Keene RN - 9/26/2021 9:00:00 PM
Not Administered - Refused - Ana Adraneda RN - 9/25/2021 9:00:00 PM
Administered - Ana Adraneda RN - 9/24/2021 9:00:00 PM
Not Administered - Refused - Espergene Manalo LVN - 9/23/2021 10:56:37 PM
Administered - Grace Leonor RN - 9/22/2021 10:27:28 PM
Administered - Julie Baliwan RN - 9/21/2021 8:26:44 PM
Not Administered - Refused - Julie Baliwan RN - 9/20/2021 9:00:00 PM
Administered - Johana Guansing RN - 9/19/2021 7:59:36 PM
Not Administered - Refused - Hazel Camama RN - 9/18/2021 9:50:58 PM

19   *See* CLERB Report SD_050607.

20         414.   From my review of her medical records, Ms. Tuazon received no extra

21   attention, care, or counselling because of these refusals.  This was a preventable

22   death.

23         415.   In conclusion, how the Sheriff's Department deals with refusals of

24   medical care in actual practice (1) violates their own Policies and Procedures, (2) is

25   different than what was promised in the 2023 Progress Report:  Update on State

26   Audit,  and (3) violates the medical standard of care.  The Sheriff's Department's

27   poor performance on patient refusals has led to patient harm and even deaths.  In my

28   opinion, the Sheriff's Department's flawed response to patient refusals of medical

1  care is one of the root causes of the exceptionally high death rate the Jail has.

2  **VI.**   **The Sheriff's Department Routinely Attempts to Provide Medical Care Without Examining Patients or By Asking Medical Staff to Operate Outside Their Scope of Practice, Placing Incarcerated People at Substantial Risk of Serious Harm**

5      416.   It is a basic principle of medicine that, before providing treatment, a physician must examine her patient.  In particular, a medical practitioner must conduct a physical examination of the patient including the area of complaint, checking the patient's vital signs, and, if appropriate, ordering lab tests and imaging studies.

10     417.   Without the physical examination or checking the vital signs, the practitioner is missing essential information needed to be accurate and provide appropriate treatment and is, essentially, "flying blind."  Inevitably, a practitioner who omits the patient's medical evaluation will make critical mistakes.  As an example, when a patient complains of shortness of breath, it makes a difference whether the practitioner finds wheezing or stridor (airway obstruction) or rales (fluid in the lungs) or if there is little air movement at all.  Each finding requires a different medical response.  Without an exam, practitioners can harm patients by assuming the wrong cause of a symptom and prescribing the wrong treatment.

19     418.   Based on that examination, labs, and patient history, the medical practitioner will make a diagnosis and care plan.

21     419.   Critically, the term "medical practitioner" means a physician, nurse practitioner ("NP"), or physician assistant ("PA").  PAs, while practitioners, still must be supervised by a physician licensed in the relevant state and must conduct only those tasks formally delegated by the supervising physician.

25     420.   Other medical staff, including registered nurses ("RNs"), licensed vocational nurses ("LVNs"), and medical assistants are not "practitioners."  Although they assist practitioners by gathering data (like histories, vital signs, etc.), they cannot make diagnoses, prescribe medication, or make ongoing treatment

1    plans.  Those activities are beyond their scope of practice.

2       421.   There are two special instances in the community where a practitioner

3    will not see or examine a patient in person during the medical encounter.  The first

4    is when practitioners are on-call.  The second is during a telehealth visit.  Both are

5    worth discussing in more detail.

6       422.   In the community, hospitals, nursing homes, and other residential

7    medical centers may not have medical practitioners on site 24/7.  When a

8    practitioner is not on site, there may be one on-call, whereby they receive phone

9    calls from nurses whenever patients experience medical problems that cannot wait

10   until the practitioner returns to the facility in the morning.  Calls to an on-call

11   practitioner are typically made via a telephone, and the case is discussed.  In these

12   instances, nurses should have a specific policy to rely on that states what

13   information to have available for the practitioner.  The nurse then asks the necessary

14   questions, and the practitioner answers the questions.  This exchange must then be

15   documented in the medical record.  In almost all cases, the practitioner will then see

16   the patient face-to-face when they are next in the facility again.

17      423.   Telehealth is another example of remote medical practice.  In

18   telemedicine, the patient and the practitioner interact with each other via video

19   conferencing, telephone, or other electronic method.  In a telehealth visit,

20   practitioners must meet the same standard of care that they would if they were

21   seeing the patient face-to-face in their office.  Generally, that means that an

22   appropriate prior examination would have occurred by a practitioner (even if not the

23   one meeting the patient via telehealth).  And, critically, during a telehealth

24   appointment, the patient and provider are able to communicate *directly* about the

25   patient's symptoms and concerns.  In other words, unlike the on-call practitioner

26   example, there is no nurse acting as an intermediary.  All practitioners of telehealth

27   should possess the necessary licenses required to practice medicine in the patient's

28   state.  This includes the appropriate medical license and a DEA license if the

1 practitioner prescribes controlled substances, like narcotics or benzodiazepines.

2    424.    In contrast to on-call and telehealth practices, which require a patient

3 examination, is the inappropriate practice of internet prescribing.  This is when a

4 person who wants a certain medication (for example, Viagra) fills out a form online

5 which is then sent to a medical practitioner who writes the prescription.  The

6 practitioner has never seen the patient, nor is there a direct conversation between the

7 patient and practitioner.  The only interaction has been the electronic form that the

8 patient filled out.  The patient does not even know who the practitioner authorizing

9 the prescription is.  In this instance, there has been no "appropriate prior

10 examination."

11    425.    Nurses are often involved in both on-call practitioner and telehealth

12 encounters.  It may be tempting for the remote practitioner to allow the nurse who is

13 physically present with the patient more latitude than he should have.  As an

14 example, a nurse could contact the practitioner in a telehealth encounter and say,

15 "this patient has a UTI and should get a prescription for the antibiotic Bactrim."  A

16 practitioner who simply says "OK" and writes the Bactrim prescription engages in

17 the practice of "delegation."  The practitioner has inappropriately delegated to the

18 nurse her authority to diagnose and prescribe.  This would be, in effect, the nurse

19 again acting outside the scope of practice.

20    426.    Based on my review of documents, it is my opinion that the Sheriff's

21 Office fails to uphold each of these principles.  Medical care at the Jail is routinely

22 provided without sufficient examinations by practitioners located off-site who

23 cannot examine the patients themselves, or by nurses or other professionals acting

24 outside of the scope of their practice.  The PAs who routinely conduct remote care at

25 the Jail via STATCare are not adequately supervised by a Jail physician.  Each of

26 these practices places incarcerated people at a substantial risk of harm, and in fact

27 has harmed many.

28

A.    **The Jail Misuses STATCare, Employing Midlevel Practitioners in Remote Locations to Cover for, Supplement, and Replace On-Site Medical Practitioners.**

427.    "STATCare" is a NaphCare program in which nurses at the Jail communicate with and receive orders from a mid-level medical practitioner employed by NaphCare.  STATCare practitioners consist of NPs and PAs, but as far as I can tell, no physicians.  *See* Barkley Tr. at 56:16-25.  STATCare practitioners never physically practice at the Jail (in contrast to an on-call physician at a hospital, for example, who practices in person during the week, but is on-call over the weekend).  Indeed, STATCare providers are usually not even physically present in California—they reside elsewhere in the country, *e.g.*, Nevada and Alabama.  STATCare practitioners respond to medical questions from nurses at NaphCare facilities all over the country, not just the Jail.  In effect, STATCare attempts to fill the role of an on-call medical provider without ever appearing in person.

428.    The NaphCare Health Care Policy & Procedure Manual—Full San Diego Policy Manual (*With Site Addendums*) June 1, 2022, hardly mentions STATCare.  *See* NAPHCARE001541.  The MSD Operations Manual mentions STATCare only in relation to the treatment of patients experiencing alcohol withdrawal.  *See* § MSD.A.3.  Neither manual defines the appropriate (or inappropriate) use of STATCare practitioners, leaving unanswered questions like: When should Jail nurses call them?  When should they instead talk to practitioners physically present at the Jail?  As a general matter, the P&P manuals do not say.  The absence of guidance in the P&P manuals is surprising given the ubiquitousness of STATCare in the medical records.  STATCare practitioners were involved in every medical chart I reviewed, usually multiple times.

429.    While nurses on the ground at the Jail can talk to a STATCare provider by phone, I understand that, in practice, nurses typically rely on instant messaging or email-like communications with STATCare providers via NaphCare's electronic medical record system, TechCare.  Ms. Rognlien-Hood described STATCare

1  interactions as basically "a messenger system."  Rognlien-Hood Tr. at 62:10-12.

2      430.   Ms. Rognlien-Hood described STATCare's duties as including:

3  (1) ordering medications at intake for newly booked patients, and (2) addressing

4  urgent medical concerns, like an infection, that need to be started on antibiotics

5  immediately.  Rognlien-Hood Tr. at 233:13-34:2.  These are two typical functions

6  for any on-call medical provider.

7      431.   In practice, STATCare is actually used for many other medical

8  indications, as well, not typically handled by on-call practitioners.  These include:

9          a.      Reviewing patient medical records from a hospital visit.  Medical

10  Record of Rosalee Bartolacci, May 10,  2023 SD_711881, 711885.

11          b.      Chronic care management of a patient with chronic hepatitis C

12  and cirrhosis who had been booked six months earlier.  Incident Review, Death of

13  Robert Vogelman, SD_055946.

14          c.      Determining if patients have type 1 or type 2 diabetes.

15  Montgomery II Tr. at 233:3-8.  (In fact, it is often difficult to determine whether

16  patients have type 1 or type 2 diabetes and a remote midlevel clinician certainly

17  does not have that ability.)

18          d.      Acting as gatekeepers to face-to-face evaluations with on-site

19  medical practitioners.  Montgomery II Tr. at 148:9-49:25, 230:14-32:5.

20          e.      Evaluating patients for HIV and sexually transmitted diseases

21  Medical Record of ▮▮▮▮▮▮▮▮ for Booking ▮▮▮▮ ▮▮▮▮▮▮ 2024, at p.

22  489.

23          f.      Evaluating complaints of hernia and ordering a truss.  Medical

24  Record of ▮▮▮▮▮▮▮▮ for Booking ▮▮▮▮ ▮▮▮▮ 2022, at p. 151.

25          g.      Evaluating a complaint of hemorrhoids and ordering hemorrhoid

26  medication.  Medical Record of ▮▮▮▮ ▮▮▮▮ 2023, SD_791105.

27          h.      Deciding whether patients can be admitted to the MOB or

28  housed elsewhere.  Medical Record of ▮▮▮▮, ▮▮▮▮ 2022, SD_746366.

1           i.     Interpreting EKGs.  SD_754746, SD_754764. (EKG

2  interpretation is tricky even for a Board-certified emergency physician.  I do not

3  know what training, if any, STATCare midlevels have had on the subject or how

4  good they are at this skill.)

5         432.   Each of the above decisions made by a remote STATCare practitioner

6  is a medical evaluation, which instead should have been done by an on-site

7  practitioner.  It may be the case that this overreliance on STATCare is due to the

8  absence of P&P to guide appropriate use of STATCare.  However, documents I

9  reviewed suggest that the Sheriff's Department has a policy of pushing nurses to use

10  STATCare instead of turning to onsite practitioners.  A February 3, 2023 email and

11  attachment from Sheriff's Department staff member Travis Anderson to

12  Ms. Rognlien-Hood contains an "audit" of the medical doctor sick call waiting list,

13  focused on identifying examples that, according to policy, "should have" gone to

14  STATCare instead.  SD_320376-320382.  For example, ▮▮▮▮▮▮▮▮▮▮

15  (▮▮▮▮▮▮), who had recently returned from the emergency room for a rash, was

16  seen by a nurse who noted:  "Rash getting larger and with some clear discharge.

17  Moved to L eye and pt had vision changes to blurry."  SD_320377.  According to

18  the auditor, who appears to have made notes in highlighted in yellow, "StatCare

19  should have been notified and not a MDSC."  *Id.*  An examination of the face and

20  eye of the patient is critical in a case such as this.  STATCare cannot do such an

21  examination.

22         433.   STATCare evaluations of Jail patients are necessarily limited compared

23  to what an on-site practitioner could do.  Because they are remote, STATCare

24  providers plainly cannot conduct a physical examination prior to providing

25  treatment.  Nor do they ever speak or communicate directly with the patient, unlike

26  in a telehealth visit.  STATCare providers have access to whatever Jail medical

27  records are present in TechCare, but little else.  Yet, the Sheriff's Department's

28  nurses use STATCare rather than calling the local on-call medical practitioner

employed by CHP.  In fact, the nurses contact the remote STATCare practitioners even when there are medical practitioners present at the Jail.  Rognlien-Hood Tr. at 62:6-63:3, 76:17-77:19.

434.    Troublingly, not all of the STATCare practitioners who have provided care to patients at the Jail had appropriate California and DEA licenses.  This became an issue (of course) when this was discovered by the Sheriff's Department administration at which time NaphCare was instructed to get appropriate licensure for STATCare practitioners.  A May 26, 2023 email from Dr. Montgomery to Christopher Miedico states:  "It is worth noting that SDSD initiated the conversation regarding staffing, and inquired about the licensure and registry of NaphCare employees.  We are relieved that NaphCare has followed through to ensure that their employees are now registered with the State."  SD_227522.  Based on Dr. Montgomery's email, it appears that there is ineffective Sheriff's Department oversight of STATCare practitioners to ensure that they are correctly licensed; this is left to NaphCare to do.

435.    Dr. Montgomery's email from May 2023 also mentions the fact that Sheriff's Department administrators were unsure about who actually supervises STATCare practitioners:  "there is some discussion about who would actually be serving as their [STATCare's] supervisor."  *Id.*  It appears that there is no Sheriff's Department oversight of the STATCare practitioners or STATCare activities.  Each STATCare practitioner has a supervising physician within the NaphCare corporate structure.  *See* NAPHCARE034704.  For example, STATCare NP Juancho Trinidad's supervising physician is Dr. Elliott Wade, the NaphCare regional medical director for Western States.  *Id.*  The STATCare program is supervised overall by NP Martha Burgess, the NaphCare Senior Vice President of Clinical Operations.  Freedland Tr. at 183:15-23.  Similarly, Dr. Freedland testified that CHP's new contract with the county provides no oversight of the STATCare practitioners, even by the CHP Medical Director at the Jail.  *Id.* at 178:5-7.

1      436.   Similarly, neither the Sheriff's Department nor CHP appear to have

2  oversight of the medical policies and procedures that guide STATCare practitioners.

3  Instead of providing guidance regarding how to address various medical conditions,

4  they allow STATCare practitioners to rely on drop-down menus to see medical

5  options for the various medical conditions, such as hypertension and diabetes.  I

6  discuss the guidelines in these drop down menus in more detail later, but suffice it to

7  say here that they are questionable medically and certainly not in concordance with

8  the medical practice of the CHP practitioners.

9      437.   STATCare activities are also not tracked in any meaningful way by the

10  Sheriff's Department CQI monitoring.  For example, how often were STATCare

11  practitioners called about chronic care issues?  How many labs did they order?  How

12  many times did STATCare review medical records of patients sent off site?  Does

13  anyone evaluate the accuracy of their EKG interpretation?  Based on my review of

14  CQI documents, these metrics (or any other STATCare metric) are not monitored

15  and evaluated as part of the Sheriff's Department CQI program.

16      438.   Unless they need someone who can perform the normal functions of an

17  on-call practitioner, *i.e.*, to be available when there is no practitioner present at the

18  Jail, it makes little sense for a nurse to contact a STATCare midlevel practitioner

19  who lives in, say, Alabama, about an acutely ill patient at the Jail, rather than call a

20  practitioner (who may be a physician) who is physically present at the Jail.  There is

21  no way that a STATCare midlevel practitioner contacted electronically can be as

22  effective as an on-site practitioner, because plainly a remote practitioner is

23  completely unable to conduct a physical examination of the patient and must rely

24  solely on the information transmitted via TechCare versus seeing and hearing the

25  patient.

26      439.   Given these challenges, remote practitioners inevitably will make

27  mistakes.  Indeed, the problem of remote STATCare practitioners making medical

28  mistakes comes up over and again in my review of medical charts.  A particularly

1  bad example is the deficient care that STATCare provided to ███████████.

2  Mr. ██████████ is a type 2 diabetic, who, after a second stage nursing evaluation,

3  was referred to Juancho Trinidad, a STATCare Nurse Practitioner based in Las

4  Vegas.  *See* SD_815566.  On ███████████ 2022, NP Trinidad reviewed this

5  message from the onsite nursing evaluation:  "NIDDM, BS 293, asymptomatic,

6  reports last dose of metformin last night."  *Id.*, SD_815587-89.  Without any other

7  history, labs, and certainly without examining Mr. ███████████ NP Trinidad

8  ordered "Insulin Sliding scale (Regular) TID x 15 days."  SD_815587-89.  NP

9  Trinidad also ordered "Provider chart review for glucose readings in 5 days."  *Id.*

10  There was no referral for an in-person evaluation by a site-based medical provider.

11  *See id.*  As discussed further in the section on diabetic care, the STATCare provider

12  incorrectly prescribed insulin to this type 2 diabetic.  The treatment provided to

13  Mr. ██████████ was incompetent, inappropriate on many levels—including that his

14  medication was changed without any labs, examination, or discussion with MR.

15  ███████████ and potentially life-threatening.

16      440.   Because STATCare practitioners are not accountable to the Jail's

17  medical director, gross medical mistakes such as those that occurred with

18  Mr. ██████████ are not noticed, not addressed, and not corrected.  STATCare

19  practitioners who make such mistakes will continue to make them in the absence of

20  oversight and corrective action.

21      441.   In my opinion, the Sheriff's Department has likely embraced the use of

22  STATCare rather than onsite practitioners as a way to save on costs and to reduce

23  the work-load of onsite practitioners, who are overworked due to understaffing.

24  However, this practice has seriously compromised patient care.  Although the

25  Sheriff's Department has signed a new contract to expand the numbers of

26  practitioners available onsite, there is no indication that the Sheriff's Department

27  will cease its inappropriate use of STATCare.  As a result, there is no guarantee that

28  the Sheriff's Department will end this dangerous practice.

**B.    Jail Medical Practitioners Provide Care to Incarcerated Patients Without Proper Examination.**

442.    Even when patients are treated by on-site practitioners at the Jail, my review of the records indicates that there is no guarantee that on-site practitioners will see or examine the patient before providing treatment. This practice falls below the standard of care.

443.    For example, my review of the records indicates that cell-side clinical encounters commonly omitted vital signs. Examples abound in the records I reviewed. Here are just a few: NP Sonia Megert's ████████ 2024 evaluation of ████████ SD_814760-61; MD Joseph Molina's ████ 2023 evaluation of ████████ SD_816437; MD Joseph Molina's ████ 2022 evaluation of ████████ SD_798727; and NP Teresa Hurley's ████ 2023 evaluation of ████████ SD_813216-17.

444.    The practice of omitting vital signs during patient evaluations is so ubiquitous that one can pick any almost any patient chart, search for "MD note," "NP note," or "RN note," and the vital sign section of the encounter notes will often be blank. This is poor medical practice that does not occur during patient encounters in the community. Vital signs are called "vital" for a reason. Vital sign abnormalities are often the earliest signs of a gravely ill patient. Not taking vital signs does not save very much time, either. It takes only around 60 second to obtain a set of vital signs during which time one can continue to converse with the patient.

445.    My review of the records indicates that practitioners also often fail to obtain a full patient history and fail to perform an adequate physical exam, for example of an abdomen or heart. Such practices may save time, but fall below the standard of care and could lead to serious risks of harm. Inevitably, the missing information can be critical to making a correct diagnosis and therefore providing correct treatments. If the condition is life threatening, this omission could lead to an avoidable death.

446. One example is ▮▮▮▮▮ (▮▮▮▮). Mr. ▮▮▮▮ complained of having a hernia and requested that he be referred to a surgeon for repair. He was seen at his cell on ▮▮▮▮ 2023 by a NP who did not conduct an examination of the hernia but nevertheless informed Mr. ▮▮▮ that "as long as it is reduc[e]able, it is not emergent even if it will not remain reduced." SD_787868-69. Later the same day, Mr. ▮▮▮ submitted a medical request stating "I would like a second opinion about my hernia from a Doctor, not a Nurse. Thank You." SD_788163. He was seen at his cell on ▮▮▮ 2023 by NP Stacy Thompson. SD_787871. NP Thompson also did not perform a physical examination of the hernia (writing "GU deferred due to location") but approved a truss for Mr. ▮▮▮ *Id.*

447. There is no indication in the records I have that any medical practitioner ever examined Mr. ▮▮▮ hernia. This is concerning because, as explained in more detail below, hernias should generally be treated with surgery and can cause debilitating pain if left untreated for too long. For a practitioner to provide "treatment" for a hernia without examining it is below the standard of care.

## C. Registered Nurses Operate Outside Their Scope of Practice at the Jail

448. In my review of the records, I found numerous examples of registered nurses performing outside the scope if their practice, *e.g.*, ordering labs or making diagnoses. This is below the standard of care and may even be against the law.

449. One example is patient ▮▮▮▮ (▮▮▮▮ Ms. ▮▮▮ was a ▮▮-year-old woman with documented heart disease. SD_754291. On ▮▮▮▮ 2023, Ms. ▮▮▮ was seen by RN Maria Germono for complaints of chest pain. SD_754076-80. RN Germono filled out a "Chest Pain (Non-Acute)" form, which documented that Ms. ▮▮▮ had the cardiac risk factors of age and hypertension and was hypertensive at that moment. *Id.* RN Germono documented that Ms. ▮▮▮ had moderate left sided chest pain with nausea/vomiting. *Id.* RN

Germono performed an EKG. RN Germono sent the EKG to STATCare practitioner Nh Ngoc Da PA, who wrote "EKG similar to ███23 EKG," but did not document that the EKG was, in fact, not normal or in what ways it was not normal. SD_75746. PA Da did not interact with RN Germono in any other way about this case; he only commented on the EKG. RN Germono diagnosed "acid reflux" and "anxiety." SD_754079. RN Germono did not immediately refer Ms. ███ to an on-site medical practitioner. RN Doreen Marasigan similarly did a chest pain evaluation of Ms. ███ including an EKG with STATCare interpretation, on ███ 2023. SD_754099-103. This could have been a catastrophic outcome. Here is a patient with known heart disease complaining of chest pain. Almost all such patients should go to the ER for a cardiac work up. The RNs collectively misjudged Ms. ███ risk for a bad outcome, did work-ups outside of their scope of practice that they were not competent to do, made inappropriate diagnoses, and provided inadequate follow-up.

450. A second similar example is ███ (███) who was seen by RN Ju_e H_aro (letters missing in medical record) on ███ 2021 for complaints of chest pain and shortness of breath. SD_785880-81. The RN documented normal vital signs, normal heart sounds, and normal chest sounds. *Id.* The RN did an EKG which she interpreted as "normal; sinus rhythm." *Id.* The RN diagnosed "muscular strain" and gave Mr. ███ ibuprofen for discomfort. *Id.* She did not refer Mr. ███ to be seen by a medical practitioner and, as far as I could determine in his medical record, Mr. ███ was never evaluated by a medical practitioner for this complaint. The RN should have immediately referred this case to a practitioner. In this case, RN H_aro did a physical examination of the heart and lungs, ordered a, EKG diagnostic test, interpreted that test, made a diagnosis, and prescribed a treatment. Ordering and interpreting diagnostics tests and making diagnoses are outside the scope of nurse's practice and therefore did not meet the medical standard of care.

451.   In summary, the regular practices of the medical staff at the Jail include practices that do not conform to the medical standard of care and, over time, can and do lead to patient harm.  These include (1) using STATCare midlevel practitioners in roles that they are not suited to, since they are remote and cannot interact with patients; (2) allowing STATCare practitioners to practice separately from the rest of the Jail medical practitioners, utilizing different leadership, oversight and protocols; (3) failing to ensure that on-site jail practitioners take vital signs and perform complete examinations of patients; and (4) allowing nurses to practice above and outside of their scope of practice.  It is my opinion that these practices place incarcerated people at a substantial risk of serious harm.

## VII.  The Sheriff's Department Lacks Sufficient Contracts with Hospitals and Offsite Providers and Lacks Proper Referral Processes to Provide Adequate Medical Care to Incarcerated People, Placing Them at Substantial Risk of Serious Harm

452.   It is my opinion that the Sheriff's Department's entire system for providing incarcerated people with adequate offsite health care falls below medical standards.  Specifically, the Sheriff's Department also does not ensure that its contractors apply appropriate utilization management ("UM") processes to secure care for all patients who need it.  In addition, the Sheriff's Department fails to maintain sufficient contracts with community medical providers to allow Jail medical providers to refer incarcerated people with chronic and emergent medical needs to those community providers when the Jail medical units are full or do not have the resources to provide necessary treatment.

453.   Offsite medical treatment is essential to the healthcare of a large number of incarcerated patients with complex medical needs that cannot be met with onsite medical services.  The list of examples is large but broadly falls into four categories.

454.   **Surgery.**  Many incarcerated medical patients need surgical care. Incarcerated patients suffer from the same diseases and ailments requiring surgery

1    as patients in the outside community, ranging from complex brain surgeries to

2    simpler, but still necessary, hernia repairs, appendectomies, and orthopedic

3    procedures.  Surgeons must often be consulted to determine the proper role of

4    surgery in a particular patient's care.  Surgeons must be allowed to follow up after

5    surgery in a manner that they deem proper.

6        455.  **Medical specialties.**  Many patients have complex medical problems

7    that require the expertise of medical specialists such as oncologists, neurologists,

8    cardiologists, rheumatologists, and many others.  General practice physicians and

9    midlevel NPs and PAs simply do not have the training or practice expertise to be

10   able to, say, prescribe cancer chemotherapy or therapy for a myriad of other

11   complicated medical patients.[38]  Just as is done in outside medicine, referrals to the

12   specialist are essential to optimal medical care.  When the advice of a specialist is

13   sought, it is important that that advice be followed.

14       456.  **Diagnostics**.  The list of diagnostic procedures that must be done off-

15   site includes MRIs, cardiac stress tests, PET scans, and many others.

16       457.  **Medical therapies.**  Physical and occupational therapy are excellent

17   examples of the type of medical therapy that is often not available within a

18   correctional facility but is necessary to the medical well-being of a patient.  Other

19   examples include providing cancer chemotherapy, radiation therapy, and

20   rheumatological infusion therapy that must be done off-site.

21       458.  Before an incarcerated patient can be seen for any one of the above

22   outside appointments at the Jail, their request must be approved through NaphCare's

23   UM process.  UM arose in the context of Health Maintenance Organizations

24   ("HMOs") and health insurance companies (I term this "Corporate UM").  The

25

---

26   [38] Note that the category of prescribing specialty care is distinct from the actual
     giving of specialty treatments.  For example, a patient with cancer may need to go to
27   both an oncologist, who will prescribe the best chemotherapy, and to separate
     appointments for the chemotherapy infusions.  Those are two distinct, but equally
28   important, outside referrals.

purpose of Corporate UM is to control medical costs. UM does this by requiring pre-approval from the HMO or insurance company before they will pay for certain expensive medical procedures or medications. HMOs and insurance companies approve or deny medical requests based on a set of evidence-based guidelines.[39] HMOs and insurers most commonly use nurses to evaluate incoming medical requests, who compare the requests to the company's guidelines, then either approve or deny each request.

459.    Corporate UM has been criticized on the following grounds.

a.    HMOs and insurance companies have a financial incentive to deny requests. The UM department of an HMO or a medical insurance company is a substantial part of the corporate structure with hundreds of employees and the requisite offices, computers, technology, etc., meaning that it is very expensive to administer. It only makes sense to pay all of this money if the Corporate UM program can deny or inhibit enough medical requests to make the endeavor worthwhile.

b.    In many cases, Corporate UM creates barriers to good medical care rather than encouraging good medical care.

c.    The UM process of submitting a request and waiting for a reply is time-consuming. Filling out the requisite paperwork to request permission for a medical claim takes a great amount of time from the medical practitioner and her staff. Waiting for a reply can take literally weeks. This process imposes a large financial burden on the medical practices submitting these claims.

d.    Denials are often perceived as nonsensical. And, once again, it takes a great deal of time to submit a request to reconsider.

e.    The process is bureaucratic and opaque. When a request is

---

[39] The most used sets of guidelines are propriety products called Interqual and the Milliman Care Guidelines. Because they are propriety, they are not easily available for outside review.

1   denied, it is often hard for the requesting practitioner to know why.

2      460.   Correctional facilities, such as the Jail, do not belong to an HMO and

3   do not use traditional health insurance companies to pay for health care for their

4   incarcerated populations.  Nevertheless, many companies that provide medical

5   services to correctional facilities (like NaphCare) have adopted the system of

6   Corporate UM.  The ostensible reason is to control medical costs.  They often hire

7   nurses with experience in Corporate UM to set up correctional UM programs

8   modelled after a typical HMO.

9      461.   There are problems with this, though, because Corporate UM is

10  designed for a system and patients who are quite different from incarcerated

11  patients.  One important difference is that a patient in the free world with an

12  HMO—unlike an incarcerated patient—has the opportunity to seek the medical care

13  they need outside the HMO.  If the HMO denies, say an MRI or a particular

14  medication, the patient has the right to get the MRI or the medication anyway and

15  pay for it personally.  An incarcerated patient has no such option; if a jail's UM

16  process denies a patient a procedure or a medication, then the patient simply will not

17  get that care.

18     462.   Another important difference is the scale of operation.  HMOs and

19  health insurance companies may have millions of members and tens of thousands of

20  medical practitioners.  Communications in such a large system must be written and

21  formal.  For example, if a primary care practitioner (one of tens of thousands in the

22  program) wants to order an MRI for one of her patients, she must submit paperwork

23  to the patient's insurance company explaining the need for the procedure.  Days or

24  weeks later, someone—most likely a nurse—will review the request (along with

25  thousands of other requests that arrived at the same time) and either approve or deny

26  payment for the procedure based on the HMO's pre-established guidelines.

27  Critically, the medical practitioner and the UM reviewer do not know each other.

28  They are unable to discuss the request or collaborate in any way.  If the practitioner

1    does not understand the reason behind a denial, she is unable to ask the UM nurse

2    for clarification.  In fact, she will never know which of the many UM nurses

3    employed by the insurance company handled her request.  In the end, Corporate UM

4    processes are impersonal, anonymous, and bureaucratic.  The entire process can take

5    days or weeks.  It is expensive on both ends.  The practitioner submitting the request

6    must bear the cost of the time and salaries of her and her employees to write out,

7    submit and keep track of these UM requests.  The HMO or insurance company, on

8    their end, has to pay the salaries of all of their reviewers plus the necessary

9    technology.

10        463.   In contrast, the Jail only has approximately 4,000 patients, (relatively)

11    few medical practitioners, and only one Medical Director.  In such a small setting, it

12    makes little sense to use the bureaucratic, anonymous, opaque and expensive

13    Corporate UM model.  Instead, the UM process in a jail should be local and

14    collaborative, with the goal of ensuring that patients receive appropriate medical

15    treatment in a timely manner.  A primary care practitioner at the Jail who wants to

16    order an MRI for one of her patients should not have to fill out a formal request

17    form and send it to Alabama to be approved or denied by an anonymous reviewer.

18    Instead, requests for an MRI or anything else should be reviewed by a supervising

19    physician at the Jail who the ordering practitioner knows, such as the Jail's medical

20    director or a physician assigned to UM duty.  The ordering practitioner and the

21    reviewer at the Jail should be able to talk the case over.  If the UM reviewer at the

22    Jail thinks an MRI is not warranted, she should discuss the case with the ordering

23    practitioner, explain why, and jointly create a reasonable care plan for that patient.

24    In other words, the UM process at a correctional facility should be a collaboration

25    between colleagues to ensure that appropriate medical care is provided.

26        464.   The Sheriff's Department has instead chosen to use the bureaucratic

27    method of Corporate UM by sending requests for medical care to NaphCare's

28    Corporate UM Department.  In my opinion, this is time consuming, wasteful of

1  resources, and expensive, and it results in inappropriate denials of medical care that

2  harms patients.  MSD Operations Manual No. MSD.R.2 spells out how the UM

3  process works in the Jail:

4        a.    Site practitioners must complete an "Off-Site/Consult Request"

5  form.

6        b.    The requests are then reviewed for approval or denial by the

7  Managed Care Group  "and a disposition for appropriateness will be determined by

8  a physician reviewer utilizing evidence-based criteria."  (Although the Operations

9  Manual specifies that these reviews are done by a physician, my understanding is

10 that, like other corporate UM systems, nurses do the majority of the UM work, only

11 referring to a mid-level practitioners to authorize a denial.  Physicians are not a

12 regular part of the NaphCare UM Team, but may be consulted for "particular

13 patients."  Nix I Tr. at 223:5-24.

14       c.    And, whether the referral is approved or not "will be

15 communicated to the referring provider."

16     465.   This is a Corporate UM model.  It is anonymous, opaque, bureaucratic,

17 time consuming, expensive, wasteful, and unnecessary.  As Ms. Rognlien-Hood

18 described it:  "[W]e're at the mercy of whoever NaphCare has contracted with to

19 get" outside appointments.  Rognlien-Hood Tr. at 36:4-5.

20     466.   Based on my experience with similar programs, I anticipate that, as

21 with any Corporate UM program, NaphCare's program is resource intensive and

22 therefore expensive.  It only makes financial sense for NaphCare to run such a

23 program if they deny more medical treatments than the cost of running the program.

24 From the perspective of the Sheriff's Department, the cost of nurses and

25 practitioners submitting these forms and keeping track of hundreds of replies is also

26 time consuming and expensive.

27     467.   The MSD Operations Manual's explanation of the UM process is not

28 entirely consistent with the County's contract with NaphCare, which envisions a

1   "discuss[ion]" of non-emergent service requests among the NaphCare onsite

2   medical director, designated site staff, the Chief Medical Officer or designee, and a

3   "dedicated utilization nurse," as well as "progress notes documented in TechCare."

4   County Contract No. 566117, § 2.3.16.5.  The MSD Operations Manual does not

5   provide for any such "discuss[ion]," and I have seen no evidence of those meetings

6   in progress notes of the charts I reviewed.

7       468.   In my opinion, by utilizing a method of Corporate UM administered by

8   NaphCare, the Sheriff's Department's policy for referring patients to offsite

9   providers is inadequate to treat the needs of patients and therefore places

10  incarcerated people at risk of serious harm.

11      469.   This UM structure violates other directives of MSD Operations

12  Manual, in particular, No. A.1.1 ("Access to Care"), which prohibits "[h]aving a

13  utilization review process that inappropriately delays or denies specialty care" and

14  "[p]ermitting unreasonable delays before patients are seen by prescribing providers

15  or outside consultants to obtain necessary diagnostic work or treatment for their

16  serious health needs."

17      470.   In practice, the NaphCare UM program denies requests for offsite care

18  at an unacceptably high rate—so much so that the County began raising concerns

19  about the denial rate as early as late 2022.  Rognlien-Hood Tr. at 158:6-22.  For

20  example, Ms. Rognlien-Hood testified that people who need physical or

21  occupational therapy were frequently denied outside appointments and directed

22  instead "to do certain exercises."  *Id.* at 160:4-13.  However, she explained, it was

23  often not possible for the patient to complete those exercises while they were

24  incarcerated, both due to limitations in the facility and the lack of anyone "to teach

25  [the patient] these exercises."  *Id.*  This practice—denying an outside appointment

26  but failing to provide a feasible alternative plan—is not commensurate with the

27  standard of care.

28      471.   Even when outside referrals are approved by NaphCare, the inefficient

UM system creates delays in patients receiving care. Rognlien-Hood Tr. at 115:20-116:12. As Ms. Rognlien-Hood testified, prior to contracting with NaphCare, if an outside referral was recommended, "it happened. It got approved." *Id.* at 115:15-16. In contrast, the system now includes "a lot of steps that [Ms. Rognlien-Hood] think[s] are unnecessary"; describing these many steps, Ms. Rognlien-Hood stated that there is a lot of "approved, authorized, pending scheduling." *Id.* at 115:16-19. As Ms. Rognlien-Hood stated in a February 22, 2023 email: "Case management ha[s] been a disaster," "due to the process change to get appointments approved." Email and attachment from S. Rognlien-Hood to C. Darnell et al., February 22, 2023, SD_375922.

472. This concern was echoed by Physician Connie Orem, who I interviewed while touring the Las Colinas facility. When I asked Dr. Orem, "if you could make one change to improve healthcare [at the Jail], what would it be?" She replied, "more funding" so that the Jail could pay for therapy she would like to provide to patients. In her experience, "referrals take forever or are not approved."

473. An example of a bureaucratic problem that resulted in delayed care is the case of ███████████. During Mr. ██████████ ████ 2023 receiving screening, a nurse noted that Mr. ████████ had a "deform[i]ty at upper [l]eft side of mouth, teeth po[i]nt[i]ng [i]nward" following an assault. SD_873245. On ████ ██ a nurse noted that Mr. ████████ was in pain and having difficulty chewing and swallowing due to the injury. SD_873259-60 (Progress Note). According to the email correspondence between the Sheriff's Department and NaphCare, an expedited referral to an oral surgeon was submitted, which indicates that the request was "approved" by "Corp UM" on ████████ 2023, and "authorized" on ████████, 2023, with an "appointment pending." Email from E. Arroyo to OMS Scheduler et al., ████████ 2023, SD_351217. The reason for the expedited referral is stated as: "infection and loss of jaw use." *Id.* However, the emails show that no progress was made on this request for weeks, with repeated emails from the Sheriff's Department

1    to NaphCare asking for update.  SD_351210-16.  As the Supervising Detention's

2    Nurse stated in a ███ 2023 email:  "This patient has been waiting for surgery

3    since ███ and seeing as it is now ███ we have been waiting several months for

4    this patient to receive his care.  I really don't want this to come back to us as a delay

5    in care."  Email from B. Rafail to E. Arroyo et al., ███ 2023, SD_351209.

6    Mr. ███ finally received surgery for his facial injury on ███ 2023.

7    SD_873962.  I agree with Supervising Nurse Ms. Rafail that this constitutes an

8    unacceptable delay in medical care.

9        474.    Another example is patient ███ (███).  Before

10   Ms. ███ was incarcerated on ███ 2023, she had had a complete evaluation

11   of spinal stenosis in her neck by a neurosurgeon.  She had received spinal injections

12   for pain and was scheduled to discuss surgical options.  Ms. ███ informed the jail

13   that she needed a neck fusion on ███ 2023:  "I was told by my lawyer to

14   request an operation that is necessary.  My neck needs fusing."  SD_755507.  "I'm

15   in chronic pain."  A request to have Ms. ███ see a neurosurgeon, sent on ███

16   ███ 2023, was denied.  SD_755889.  Dr. David Christensen resubmitted a request for

17   a neurosurgical consult on ███ 2023.  SD_755893.  Ms. ███ had a repeat

18   MRI of her neck done on ███ 2023, and a CT on ███ 2023.  SD_755667.

19   Yet another neurosurgical consult was submitted on ███ 2023.

20   SD_755916.  Ms. ███ was scheduled for neurosurgery in ███ of 2024.

21   SD_755917, but was released from the Jail before then.  In my opinion, this delay of

22   medical care was unnecessary and unacceptable.  What should have been done:

23   when Jail medical personnel learned on ███ 2023 that Ms. ███ had been

24   seeing a neurosurgeon and was at the stage of having surgery, someone from the Jail

25   (the Medical Director or Dr. Christensen, perhaps) should have called her outside

26   neurosurgeon to coordinate care and facilitate whatever medical care had already

27   been scheduled.  Starting over with a new neurosurgical consult (denied the first

28   time) and a new work up just served to delay a necessary surgery by nine months,

1    and subjected Ms. ██████ to unnecessary pain.

2    475.   In addition to the delays in patient care from the UM system, it is

3    apparent from the documents that I reviewed that, since NaphCare began its

4    operations in the Jail and assumed responsibility for outside referrals, the Jail has

5    suffered a loss of medical contracts and strained relationships with outside medical

6    specialty groups and hospitals.  That strain on relationships with outside providers

7    poses a serious risk of harm to incarcerated people.  As Ms. Rognlien-Hood testi-

8    fied, the Sheriff's Department used to "have a good rapport with our local hospitals,

9    and then NaphCare did things a little different …."  Rognlien-Hood Tr. at 116:15-

10   17.  Those "hiccups"—as Ms. Rognlien-Hood put it—may harm patients, because

11   "community partners [may] get frustrated and not see our patients."  *Id.* at 117:4-7.

12   476.   Indeed, that is exactly what happened when NaphCare took over.  In its

13   Corrective Action Notice ("CAN") to NaphCare, the Sheriff's Department

14   explained:  "As of April 17, 2023, there are $9.3 million dollars of unpaid bills due

15   to hospitals.  Of the total outstanding claims, $4.6 million dollars are past due the

16   30-day threshold.  ***Due to lack of payment, some community providers do not want***

17   ***to see or accept our patients***, which include, but not limited to:  Podiatry (Oxford),

18   Alvarado, Vibra, Kindred."  SD_1572586 (emphasis added).

19   477.   In a May 26, 2023 email, Dr. Montgomery indicated that he had yet to

20   receive confirmation that the issue was resolved:  "We need documentation from the

21   community facilities/hospitals showing claims/bills paid."  Email & Attachment

22   from J. Montgomery to C. Miedico et al., May 26, 2023, SD_227523; *see also*

23   SD_227524 ("Need some proof regarding resolution with hospitals").

24   Dr. Montgomery also noted that NaphCare's failures were particularly problematic

25   for high risk patients, for whom NaphCare had no plan "for risk

26   mitigation/housing."  SD_227526.  He explained that NaphCare had completely

27   failed to address "long term care sites" and would "do everything possible to avoid

28   placing patients in a LTAC."  *Id.*

478.   Documents from late October 2023 suggest that the relationships with outside providers had not been fully repaired nearly six months later, despite assertions that the contracts had been fully paid, *see* Rognlien-Hood Tr. at 150:9-10. For example, in email correspondence about an incarcerated person at Kindred— one of the providers referenced in the original CAN as having hesitations about treating Jail patients—the Sheriff's Department Medical Services Administrator, Christopher Miedico, referenced the possibility of a "contractual dispute" between NaphCare and Kindred.  Email from C. Miedico to J. Montgomery et al., October 31, 2023, SD_335430.  Moreover, Dr. Montgomery expressed concern that the patient may have been delayed in receiving a PEG tube, which, according to Dr. Montgomery, "was a needed procedure a week ago."  *Id.*; *see also* SD_335431 ("This has gone on too long."); SD_335434 ("This most recent email seemed to indicate some issue regarding PEG tube placement… which should have been handled several days ago.").

479.   PEG tubes are feeding tubes that are surgically implanted so that the tube comes out of the abdomen.  They are used to feed patients who, for many possible reasons, cannot swallow or use their esophagus.  PEG tubes must receive regular maintenance to make sure that they remain clean and do not get clogged up with feeding liquids.  They must be replaced periodically.  Not performing appropriate care and not replacing PEG tubes when necessary can certainly harm patients who are dependent on their PEG tube for nutrition.

480.   Nor had these relationships been repaired by late November 2023. Email correspondence about another patient's referral to a gastroenterology clinic reveals substantial confusion about where the patient could be evaluated.  Although the referral was submitted on November 15, 2023, NaphCare and Sheriff's Department staff were still attempting to figure out whether an appointment could be scheduled as of November 29, 2023.  Email from D. Williams to M. Farrier et al., November 29, 2023, SD_350248-350254.  Although the appointment was

apparently scheduled for Alvarado Hospital, the appointment had to be canceled because the hospital did "not have a contract with NaphCare," which apparently was a "surprise[]" to those scheduling the appointment. Email from B. Nelson to MSD Managed Care Group, November 29, 2023, SD_350243. NaphCare then responded to state that this was "a misunderstanding," and they were "in contact with the hospital" to correct it. SD_350241. Despite multiple emails on November 30, the day the appointment was supposed to be scheduled, NaphCare and the Jail were unable to make the appointment happen. SD_350232-350238. Sheriff's Department staff instead discussed bringing the patient to the emergency department instead, but again confusion reigned. SD_350226-350227 ("This is not what we were told. Maybe we should just hold off …"). In her deposition, Ms. Rognlien-Hood explained that the patient was brought to the emergency room to see a different doctor, but that doctor "would not admit her," so the patient had to be returned to the Jail. Rognlien-Hood Tr. at 148:20-149:4. The patient ultimately did not receive treatment until either January or February of 2024—over a month later. *Id.* at 149:5-8 (treatment was within 45 day of Ms. Rognlien-Hood's February 14, 2024 deposition). As Ms. Rognlien-Hood put it: "This is a mess!!!!!!" Email from S. Rognlien-Hood to M. Farrier, November 29, 2023, SD_349895.

481. It is also worth noting that the Sheriff's Department's CQI program (discussed in more detail later in this Report) does not contain adequate information about the progression and health of the off-site referral process. When a CQI program considers specialty consultations and off site medical care, the CQI reports should contain analysis and information about gaps in current contracted off-site specialists; the UM process, including the average time taken to get UM approval and the percentage not approved, broken down by specialty; the average wait times for appointments with each particular specialist; and problems encountered in making and keeping these appointments, such as the reason for all missed or rescheduled appointments.

1    482.   However, none of this information is contained in the Sheriff's

2  Department CQI reports that I reviewed.  Instead, these reports give only bland

3  statistics of how many off-site appointments were completed in a given month, and

4  occasionally how many were cancelled due to refusals, discharges, etc.  These CQI

5  statistics are gravely limited and suggest to me that the Sheriff's Department does

6  not itself have a clear picture of the health of its offsite referral process and how it

7  can be improved.

8    483.   To be sure, the off-site referral process is one of the more challenging

9  aspects of carceral medical care, but it can also be of critical importance to patient

10  health.  That is why CQI analysis is essential.  Without proper CQI, there is no

11  opportunity to find and fix problems before they impact patient care and patients are

12  harmed.

13    484.   In summary, the system of off-site referrals at the Jail is broken.  The

14  UM process is wasteful and inefficient.  The essential relationships between the

15  County and community health providers has been strained.  The Jail does not

16  appropriately evaluate these problems in its CQI program.  And, as a result of these

17  many systemic failures, incarcerated people's medical care is delayed and denied,

18  placing them at risk of serious harm.

19  **VIII.  The Sheriff's Department Fails to Provide Adequate Diagnostic and
       Chronic Care to Incarcerated People and Provides Inadequate
20       Treatment for Several Common Medical Conditions, Placing Them at
       Substantial Risk of Serious Harm**

21

22    485.   In their Third Amended Complaint, Plaintiffs allege that the Sheriff's

23  Department fails to order medically necessary diagnostic care in a timely manner,

24  resulting in an unreasonable risk of harm to incarcerated people.  Dkt. 231 at ¶ 104.

25  Based on my review of the documents and as described in more detail below, I

26  agree.  It is also my opinion that the Sheriff's Department does not have an adequate

27  system for chronic care and provides inadequate care—including but not limited to

28  diagnostic and chronic care—for several of the medical conditions that are most

common among the incarcerated population.

## A.    Diagnostic Care

486.    Diagnostic care refers to those laboratory tests and imaging studies that must be done to accurately diagnose and assess patient medical conditions. Examples of commonly ordered laboratory tests are complete blood counts, urinalyses, and comprehensive metabolic panels that include tests to measure electrolytes (such as potassium and sodium), kidney function, liver function, and nutritional status.  Examples of commonly ordered imaging studies are chest x-rays, extremity x-rays, computerized tomography (CT) scans, and electrocardiograms (EKG).

487.    Diagnostic tests are needed to accurately diagnose many acute medical complaints, such as infections and heart problems.  Diagnostic tests are also needed for chronic care, such as routine chronic care labs to check the status of diabetes or the progression of kidney disease.  Diagnostic tests are critical to patient health. They are often essential to making timely, accurate diagnoses and to monitoring the progression of chronic diseases.

488.    The appropriate process of using diagnostic tests in the medical process includes several steps, all of which should be documented in the medical record. First, diagnostic tests must be ordered by a *medical practitioner*; this responsibility should not be delegated to nurses.  Second, the test must be completed, *e.g.*, blood in drawn, x-rays are run, etc.  Third, the test result must be interpreted by a medical practitioner (preferably by the practitioner who ordered the test); again, this responsibility should not be delegated to a nurse.  Fourth, the practitioner must determine what changes, if any, will be made in the patient's overall care plan based on the diagnostic test results.  Finally, the patient must be informed of the test results and the changes in care, if any.

489.    Each of these steps is important.  If necessary diagnostic tests are not ordered, findings and diagnoses will be missed and patients will be harmed.  If

diagnostic tests are ordered but not reviewed—or reviewed but the significance of the labs are not noticed—again, findings and diagnoses will be missed and patients will be harmed.

490.    The policies and procedures of the Jail should address the proper way to order, interpret, and document the results of diagnostic tests.  The MSD Operations Manual is silent on this subject except for addressing patient refusals of lab tests.  *See* MSD Operations Manual No. MSD.R.5.VII (2022).  NaphCare's Policy and Procedures address this by stating that "[d]iagnostic tests will be reviewed by the clinician in a timely manner," without defining "timely," NaphCare P&P, E-9.8; "[t]reatment plans are to be modified as clinically indicated by diagnostic tests," *id.*, E-9.9; at that the tests and plans will be "discussed with the patient," *id.*, E-9.9.  NAPHCARE 031275.  NaphCare's P&P Manual does not discuss minimal standards for documentation.

491.    The NCCHC Technical Assistance Report found the Jail deficient in reviewing diagnostic studies, recording them in the chart, and communicating results with the patients.  DUNSMORE 0260641 (discussing lack of compliance with NCCHC standard J-E-12).

492.    My review of patient records also shows that critical study results are not reviewed.  One example is ██████████ (██████████).  Mr. ██████████ asked to be tested for sexually transmitted diseases.  RN Jamee Barrera wrote that the "STD labs completed" on ██████ 2022.  SD_782038.  On ██████ 2022, the lab results returned, showing that Mr. ██████ had tested positive for syphilis.  SD_782079.  But there is no indication that a medical practitioner ever reviewed the positive syphilis test.  *Id.*  Mr. ██████ was released from the Jail on ████████ 2022, SD_1575334, without this positive test being addressed or communicated to him.  Mr. ██████ was rebooked into the Jail ten months later, in ██████ of 2023.  *Id.*  On ██████████ 2023, NP Frederick Wycoco finally addressed the positive syphilis screen.  SD_782042.  RN Maria Ugaban had noted the day prior that Mr. ██████

1  syphilis test was positive on ▮▮▮▮ 2022 "but syphilis was not addressed at that

2  time because pt was released." *Id.* Had Mr. ▮▮▮▮▮ not returned to the Jail, that

3  positive test would never have been noted and dealt with; in the interim,

4  Mr. ▮▮▮▮ could have suffered negative health effects and spread the disease to

5  others.

6      493.   Another example is Abdiel Sarabia (21118298), a patient who died on

7  July 22, 2022 of "Hypertensive cardiovascular disease," with hypothyroidism as a

8  contributing factor.  Autopsy Report, SD_001362.  On October 16, 2021, blood labs

9  were drawn on Mr. Sarabia which showed a markedly elevated level of triglycerides

10 at 932 (normal is less than 150), elevated cholesterol test of non-HDL cholesterol at

11 157 (therapeutic goal of less than 100) and an elevated Thyroid Stimulating

12 Hormone indicating the possibility of hypothyroidism.  SD_011633-34.  Mr. Sarabia

13 had other abnormal labs, too, such as elevated liver tests indicating liver damage.

14 *Id.*  No one reviewed these labs at the time.

15     494.   *Four months later*, on February 1, 2022, a psychiatric nurse practitioner

16 noted the elevated triglyceride and TSH levels and referred Mr. Sarabia to medical.

17 SD_011546-47.  Once notified, Joseph Molina, MD, reviewed the labs on February

18 8, 2022 and ordered fenofibrate, a medication for high triglyceride levels.  However,

19 Dr. Molina still did not address the abnormal thyroid test, the other lipid

20 abnormalities, or the elevated liver enzymes.  He did not discuss the results with

21 Mr. Sarabia in person.  SD_011551.  Mr. Sarabia's abnormal thyroid levels—which

22 the autopsy determined were a contributing factor in his death—were never

23 addressed over the several months Mr. Sarabia was incarcerated.

24     495.   ▮▮▮▮ ▮▮▮▮▮ (▮▮▮▮▮) blood test results dated ▮▮▮▮▮

25 2023 showed an extremely low platelet levels among other lab abnormalities

26 associated with chronic hepatitis C infection.  SD_814796.  I can find no note that

27 anyone reviewed those labs or noted his particularly low platelet level.

28     496.   The fact that lab reviews are not documented properly and discussed

with patients was corroborated by a CQI review, which reported, "This quality improvement study focuses on provider follow-up after ordering of labs, diagnostic studies or specialty consults/referrals to identify whether results are being reviewed by providers and discussed with patients.  In May [2023], SBDF achieved 28% overall compliance.  In June, compliance was 16%."  CQI Review PowerPoint, July 18, 2023, SD_114489.  This is an abysmally low compliance rate.

497.   The Sheriff's Department's failure to review diagnostic testing places incarcerated people at risk of serious harm, because it allows their medical conditions to worsen.  The consequences of this can include death, as it was for Mr. Sarabia.

## B.    Chronic Care

498.   Inside and outside the correctional setting, people have conditions that require regular medical visits, even if they are not experiencing any acute or urgent symptoms caused by the underlying medical condition.  One example is diabetes. People with diabetes should be evaluated by a medical professional at regular intervals for a check-up in order to confirm that their condition is being managed appropriately.  These chronic care appointments are distinct from any urgent medical care a person might need if they begin to experience acute symptoms from their underlying condition.

499.   The medical standard of care for the frequency of chronic care appointments and what should happen at those appointments (*i.e.*, what labs should be checked) are set forth by well-recognized medical guidelines issued by medical specialist societies.[40]

500.   Even though a chronic care appointment does not necessarily treat an urgent or acute problem, it is nonetheless important to a patient's health, and failing

---

[40] As one example, *see* Daniel L. Larber et al., *Diabetes Management in Detention Facilities:  A Statement of the American Diabetes Association*, 47 DIABETES CARE 544 (2024).

to provide such appointments can place a patient at a serious risk of harm. These clinics have the specific goal of monitoring a patient's condition over time. Often, even though a patient feels well, their condition has deteriorated in a way that should be addressed with a new medical treatment plan. For example, consider a hypothetical patient with type 2 diabetes. Although she feels well, she may be suffering from diabetic retinal disease, which is asymptomatic at first, but could lead to blindness, if untreated. Absent a chronic care appointment, she would miss a referral to an ophthalmologist for treatment.

501.    The Jail has a long history of failing to provide appropriate chronic care for its patients. The NCCHC Technical Assistance Report listed numerous criticisms of aspects of chronic care. The NCCHC noted that the Jail lacked chronic care guidelines for several chronic diseases, including seizures, diabetes, asthma, and many others. DUNSMORE 0260643 (discussing lack of compliance with NCCHC standard J-G-01). They stated that "[c]hronic disease services must be developed," and patients with chronic diseases "monitored according to [a] protocol" developed based on accepted national standards. *Id.*

502.    Perhaps in response to negative assessment, the 2022 contract that the Sheriff's Department negotiated with NaphCare devoted an entire section of the Statement of Work to a "Chronic Care Program" that required NaphCare to establish chronic care protocols and chronic care clinics. Contract No. 56117, § 2.3.11, NAPHCARE000580-81. These chronic care clinics must comply "with standards established for the care and treatment of chronic illnesses." *Id.* § 2.3.11.6. These clinics were to be scheduled for each patient with a chronic disease, at a minimum, within "approximately one month" of admission. *Id.* § 2.3.11.10. In addition, TechCare lists several of recommendations for chronic care at the end of its Health Assessment form. *See* NAPHCARE034787-88.

503.    However, in practice, NaphCare has not met this obligation of their contract as far as I can tell. The Jail's provision of chronic care falls below the

standard of care.  Testifying on behalf of the Sheriff's Department, Dr. Montgomery explained that as of the date of his deposition, there is no separate chronic care clinic.  Montgomery II Tr. at 119:15-18.  Instead, the Jail was "using an acute care setting to manage chronic appointment types."  *Id.* at 119:19-20.  According to Dr. Montgomery, this practice of "using chronic appointments in an acute-care setting would certainly be less efficient and could potentially reduce the speed or effect a delay in getting a patient aligned with the community."  *Id.* at 121:20-22.  It is my impression that some chronic care appointments are occurring, but many of the charts I reviewed show patients are not scheduled appropriately for chronic care.

504.    Dr. Montgomery also testified that one of the goals of the Sheriff's Department's new contract with CHP was to "create a separate chronic care clinic," which in turn would "allow for a longer time frame for the patient/physician encounter to accommodate all chronic-care needs and requests."  Montgomery II Tr. at 119:22-120:8.  However, this is not expressly laid out in the new CHP contract, which merely states, under the definition of "Clinic":  "Provisions are made for both scheduled appointments for addressing chronic care issues and same-day appointments for acute issues."  Contract No. 571418, Agreement With Correctional Healthcare Partners Inc § 5.5.8, SD_1579719.  For his part, Dr. Freedland stated in his deposition that he was "aware" of the NCCHC requirement for chronic care clinics but was unable (or unwilling) to state which national standards he would follow in developing chronic care guidelines.  Freedland Tr. at 171:9-15.

505.    From this testimony, and the relative lack of chronic care appointments in the charts I reviewed, it is my opinion that the chronic care system at the Jail remains inadequate, putting incarcerated people at risk of harm.

### C.    Inadequate Treatment of Common Medical Conditions

506.    My review of documents also revealed inadequacies in treatment of multiple conditions that are common in the incarcerated population:  hepatitis C, type 2 diabetes, hernias, latent tuberculosis, sexually transmitted infections, and

1  asthma.

2        **1.    Hepatitis C ("HCV")**

3        507.   HCV is a virus that infects liver cells.  HCV is an infectious disease

4  spread blood-to-blood, most commonly by sharing needles between persons

5  injecting heroin, meth, or other drugs of abuse.  Up to 85% of people infected by

6  HCV develop chronic infections.  These people never clear the virus from their

7  blood and so are infectious to other people for the remainder of their lives or until

8  they are treated and cured.  Over time, HCV causes liver disease (termed fibrosis)

9  and the death of liver cells (termed cirrhosis); it can ultimately lead to liver cancer

10 (hepatocellular carcinoma), the need for liver transplant, or death.

11       508.   Although most patients with chronic HCV infection are asymptomatic

12 until their liver disease has progressed to a moderate-severe stage, those patients

13 remain infections and can transmit the virus to other individuals in the community.

14 Diagnosis of chronic HCV infection is made through simple lab tests.

15       509.   Chronic HCV can be treated with antiviral drugs, which will totally

16 eradicate HCV in over 95% of patients, essentially curing them of the disease

17 (although the liver damage they have already sustained may not be entirely

18 reversible).  HCV antiviral drugs are remarkable in that they are easy to administer

19 as pills taken once a day for 8-12 weeks, and they cause very few side effects.

20 There is no need for lab monitoring during therapy.  There is no need for

21 consultations with infectious disease specialists or liver specialists in most patients.

22       510.   The standard of care for HCV in correctional facilities includes the

23 following key points.[41]  First, jails should implement opt-out testing for HCV,

24 

25 ───────────────
   [41] The standard of care for patients suffering from chronic HCV infection can be
   found in several places, including standard medical textbooks (such as the online

26 textbook Uptodate) and guidelines published by specialty organizations.  Probably
   the most cited and respected of these guidelines is *HCV Guidance:*

27 *Recommendations for Testing, Managing, and Treating Hepatitis C* published
   jointly by the American Association for the Study of Liver Diseases (AASLD) and

28 the Infectious Diseases Society of America (IDSA). This guideline contains a
   section that specifically addresses care for incarcerated patients: *HCV Testing and*

meaning that incarcerated people are automatically tested for HCV unless they choose not to be. The opposite is "opt-in" testing, in which people must request a test. Second, all people who test positive for HCV and are expected to be in the Jail for at least 10 weeks should receive the (essentially curative) antiviral treatment noted above. Ideally, even people who may be released sooner than 10 weeks should receive antiviral treatment and, if necessary, be connected to a community healthcare provider who can continue the treatment after release. In any case, treatment should not be dependent on the patient's level of liver damage. Finally, people with HCV should receive counseling about the infection and be provided linkage to follow-up community healthcare for evaluation of liver disease and treatment upon release.

511.   However, my review of patient charts and my interviews of incarcerated patients during my jail tour show that the Jail is not following this guidance.

512.   The Jail does not do opt-out testing for HCV infection, despite having a large percentage of patients with risk factors for HCV infection. The Jail instead does only opt-in HCV testing. Opt-in testing is dependent on patients knowing that they might have Hepatitis C and that they have the right to request the test. However, the Jail does not adequately inform incarcerated patients that HCV testing is available to anyone who wants it. Of course, patients who do not know about HCV testing will not request it. Choosing to test patients for HCV infection only when they request testing and failing to inform patients of their right to ask for this test does not make any sense from a medical perspective. It only makes sense as a way of minimizing the number of HCV cases found in order to save money by not having to treat them. By choosing this method of screening, the Jail is missing many patients who have chronic HCV infections that could be cured by treatment.

---

*Treatment in Correctional Settings* (Dec. 19, 2023)  [hereinafter *HCV Treatment in Corrections*], https://www.hcvguidelines.org/unique-populations/correctional.

1  Since they were not discovered and not treated, these patients will continue to

2  deteriorate over time and continue to infect others.

3      513.   The Jail also denies treatment to many patients who they know are

4  suffering from HCV, based on the misguided principle that only patients with at

5  least moderate liver damage should receive treatment.  I understand that the Jail has

6  a document referred to in medical records as "Physician's Treatment Guide [PTG]

7  for Hepatitis C," also known as "PTG.H.9."  *See, e.g.*, Medical Record of ███

8  ███████ SD_781828.  Although I understand that Plaintiffs' counsel asked for all

9  Jail policies, including those governing medical care, I have not seen PTG.H.9 and

10  am not aware that the Sheriff's Department provided it.  In fact, the "PTG" is barely

11  referenced in the MSD Operations Manual, and it appears that at least some portion

12  of section H of the PTG has been "archived" since at least November 2022.  *See*

13  Policy MSD.H.14 (noting that PTG.H.3 has been archived).  Practitioners in the Jail

14  should not be providing care based on an archived treatment guide.

15      514.   However, in at least some cases, medical practitioners appear to rely on

16  this PTG and, consistent with that guidance, provide treatment for HCV only if

17  patients have at least a moderate to severe degree of liver damage.  This was the

18  case, for example, with ████████████, whose treatment was deferred on

19  █████████ 2023, SD_754905, and ████████████, whose treatment was

20  deferred on ██████ 2023 and ██████ 2023, despite his request to resume HCV

21  medications and his statement that he was receiving HCV treatment at another

22  facility, SD_782060-61.  As far as I can tell, unless a patient has advanced liver

23  fibrosis, the Sheriff's Department will refuse to provide HCV treatment.

24      515.   This makes no sense medically.  Modern antiviral treatment for HCV

25  will cure greater than 95% of patients, does not take very long (8 weeks), has few

26  side effects, and requires minimal monitoring.  Treatment also does not usually

27  require consultation with a liver or infectious disease specialist.  Treatment is so

28  simple and so effective that the CDC encourages primary care doctors to treat most

HCV patients themselves rather than referring to a specialist.  *See, e.g.*, Richard R. Andrews, *Family Physicians Can Manage Adults with Hepatitis C*, 98 Am. Fam. Physician 413, 413 (2018).

516.   Denying patients with chronic HCV infection a cure until they get sicker (and can infect more people) unquestionably violates the standard of care, which is to treat everybody who will be incarcerated for "sufficient time" (approximately ten weeks or longer).  *See HCV Treatment in Corrections*, *supra* at 2.  Denying infected patients a cure until their liver is more damaged only makes sense if the goal is to save money by denying necessary medical care.

517.   I have also seen no evidence that the Jail meets the other standard of care elements:  HCV patients not given counseling while they are in the Jail, nor are they connected to community healthcare providers upon their release.  Ideally, the Jail would have identified a specific community partner who has the funding and resources to treat discharged Jail patients with HCV infection, including planning for patients who are uninsured.  The Jail could and should work with San Deigo County Health and Human Services to create a plan for HCV patients without insurance who are discharged without treatment.  However, I have not seen any evidence that such a community partner has been identified.

518.   Examples of patients who were denied medical treatment for chronic HCV infection contrary to the medical standard of care include:

519.   ███████ (███████) was seen on ███████ 2023 by Nas Rafi MD, who wrote, "pt. requesting hep c treatment.  His fib4 is 0.69 indicating low level fibrosis, so no indication for tx [treatment] based on county guidelines."  Medical Record of ███████ from Booking ███████, at p. 483.  Mr. ███████ was seen again during the same incarceration on ███████ 2023 by NP Nicolaus Rosete, who wrote, "30 yo [year old] male pmhx [past medical history of] Hep C, reports having diagnosis for 13 years, he is requesting treatment … FIB4 calculation is 0.98.  Informed patient he is unlikely to have advanced liver fibrosis based on

1   score" and denied Mr. ███████ treatment.  *Id.* at pp. 484-85.  NP Rosete did not

2   address the fact that Mr. ███████ Fib-4 score (which measures the degree of liver

3   damage) had worsened from 0.69 to 0.98 in two months.  This indicates that

4   Mr. ███████ had rapidly progressing liver damage due to his HCV infection.

5   Denying him appropriate care meant that his liver would continue to deteriorate and

6   that he would remain infectious to other people.

7       520.   ███████████ (████████) was seen on ████████ 2023 by

8   NP Frederick Wycoco, who wrote "Fib4 score = 0.51 High likelihood of low stage

9   fibrosis.  Per SDSD policy PTG.H9: Defer Hepatitis C treatment at this time."

10  SD_754905.

11      521.   ███████████ (████████) requested treatment for HCV infection

12  and was seen on ██████ 2023 by NP Ozoma Enworom, who wrote "Informed IP

13  FIB score 0.60 and that per SD Sheriff current guidelines treatment is deferred."

14  SD_782061.

15      522.   ███████████ (████████) submitted a sick call request for

16  treatment for HCV infection on ████████ 2023.  SD_772844.  A handwritten

17  response on Section 2 of the Sick Cal form states "Per provider, your level did not

18  meet the criteria for treatment."  *Id.*

19      523.   ███████████ (████████) was seen on ████████ 2022 by David

20  Christensen MD because for HCV infection counseling.  Medical Record,

21  SD_800289.  Dr. Christensen wrote "I discussed the patient's labs with her.  Her

22  FIB4 = 0.37.  She does not meet Hep C treatment criteria."  *Id.*

23      524.   In essence, the Jail medical providers are telling these patients:  "We

24  have a medication that could cure you of your deadly HCV infection quickly and

25  easily.  But we have decided that we will not give it to you until more of your liver

26  is diseased and you are sicker."  It is important to keep in mind that each of these

27  patients is infectious and can transmit this deadly disease to others.  In the end, the

28  Sheriff's Department is deliberately withholding treatment for patients with a

1    serious medical illness that could be quickly and easily cured.

2        525.   This policy of denying treatment to patients who the Jail knows have a

3    serious progressive disease contrary to the medical standard of care, apparently

4    because they are not sick enough, places these patients at a risk of serious harm.

5                    **2.    Type 2 Diabetes**

6        526.   The Jail fails to provide patients with type 2 diabetes with care

7    consistent with national standards.

8        527.   Type 2 diabetes is a progressive disease in which patients develop

9    resistance to the effects of the hormone insulin that they produce.  In contrast to type

10   1 diabetes, in which patients produce no insulin and must be given insulin to

11   survive, patients with type 2 diabetes initially have plenty of insulin—their insulin

12   levels may indeed be abnormally high.  Their problem is insulin resistance, meaning

13   that their insulin does not work as effectively as it should.  The result of insulin

14   resistance is abnormally high blood sugars.  Over time, the elevated blood sugar

15   causes many serious health problems, including kidney failure, heart disease,

16   neuropathy (nerve damage), retinal disease, and many more.

17       528.   The treatment of type 2 diabetes differs considerably from that of type

18   1 diabetes.  Insulin is usually not used to treat type 2 diabetics early in their disease

19   for two reasons:  (1) patients with type 2 diabetes have plenty of their own insulin

20   (their insulin levels may even be high), and (2) they are insulin resistant, meaning

21   that giving them more insulin has little effect.  After about 20 years of having this

22   disease, type 2 diabetics' insulin levels tend to fall below normal levels and, at that

23   time, insulin therapy should begin.  Before that, there are many other medications

24   that can be used effectively to treat type 2 diabetes.  An appropriate diet is also

25   important in the management of type 2 diabetes.

26       529.   The standard of care for type 2 diabetes in correctional facilities

27

28

1  includes the following key elements.[42]  First, type 2 diabetics should have a

2  complete medical history taken, as well as a comprehensive intake physical

3  examination, including a retinal exam, cardiac exam, peripheral pulses, foot exam,

4  and neurological exam.  They should also have a number of labs taken as part of

5  intake, including but not limited to a Hemoglobin AIC blood test ("A1C"), which is

6  the most important diagnostic test to follow the progress and status of type 2

7  diabetes.  Second, as noted above, insulin is not the primary medication required for

8  many adults with type 2 diabetes.  Insulin should generally be used only for people

9  with an AIC of over 10%.  And, when insulin is necessary, so-called "sliding scale"

10 insulin is expressly discouraged.  Finally, patients with type 2 diabetes should

11 receive dietary and lifestyle counselling.

12      530.   My review of patient charts and my interviews of incarcerated patients

13 during my inspection show that the Jail is not following this guidance and is,

14 instead, providing poor medical care to diabetic patients.  In particular:  the Jail does

15 not conduct recommended physical exams or labs in a timely manner; discontinues

16 long-acting insulins as a matter of course and instead prescribes sliding scale

17 insulin; changes patients' medications without consulting them; and provides

18 minimal, if any, diabetic counselling to type 2 diabetic patients.

19      531.   One particularly troubling fact is that the Jail's formulary does not

20 include (and therefore essentially prohibits the use of—see discussion of formularies

21 earlier in this Report) some legitimate diabetic drugs and encourages irresponsible

22 substitutions.  In particular, the Jail requires STATCare practitioners to irresponsibly

23

24 [42] The standard of medical care for patients suffering from Type 2 DM can be found
25 in several places, including standard medical textbooks (such as the online textbook
   Uptodate), and guidelines published by specialty organizations. Probably the most
   cited and respected of these guidelines for DM is the American Diabetes
26 Association, *Standards of Care in Diabetes* (2023) [hereinafter *ADA Standards of
   Care*], https://diabetesjournals.org/care/issue/46/Supplement_1. The American
27 Diabetes Association recently released guidelines specific to management of
   diabetes in correctional settings. Larber, *Diabetes Management in Detention
28 Facilities*, *supra*.

1  discontinue long-acting insulins on newly admitted patients taking them.  The

2  STATCare Intake and Order Form contains this statement:  "**All long-acting

3  insulins will be substituted with Novolin N BID at an equivalent dose unless

4  there is documented evidence that the patient cannot or should not be

5  transitioned**."  *E.g.*, SD_790712.  Novolin N (a short acting insulin) is given

6  exclusively via a sliding scale.  The STATCare Intake and Order Form allows

7  STATCare practitioners only one way to prescribe it:  "Insulin Sliding Scale

8  (Standard) BID x 30 days."

9      532.   All of this deviates so severely from the guidelines of the American

10  Diabetic Association, that, in my opinion, it constitutes medical malpractice.

11      533.   The records I reviewed suggest that the Sheriff's Department has good

12  reason to know that this guidance for treatment of diabetes is inadequate and

13  dangerous.  In September 2021, two people with type 2 diabetes died in the Jail:

14  John Wright, died September 16, 2021, Autopsy Report, SD_001427; and Teresita

15  Tuazon, died September 28, 2021, Autopsy Report, SD_055905.  Both Mr. Wright

16  and Ms. Tuazon died of type 2 diabetes complications that take days to develop,

17  meaning Jail staff should have noticed their abnormal blood sugar levels over that

18  period and intervened to save their lives.

19      534.   Those two preventable diabetic deaths within two weeks of each other

20  no doubt led Dr. Montgomery to, on December 3, 2021, issue "Medical Directive:

21  #7 – Internal Transition of Care for the Management of All Patients with Diabetes."

22  SD_169026-27.  This Medical Directive required:  "All identified diabetic patients

23  will be scheduled for an in-person assessment by a qualified healthcare practitioner

24  (Physician/clinician) within 72 hours."  *Id.*  "Nursing staff will request dietary

25  consultation in Techcare and order a STAT basic chemistry panel and HgA1c to

26  have test results available at the medical encounter."  *Id.*  "Medical clinicians are

27  expected to initiate a treatment plan, to include considerations for medications,

28  periodicity of glucose checks, and provision for continued evaluation/additional

encounters for chronic care follow up." *Id.* And, a "sliding scale is used for initial stabilization, but the sliding scale is not designed or intended for ongoing clinical management." *Id.*

535.   In my opinion, each of these is excellent clinical practice that conforms to the medical standard of care as set forth by the American Diabetic Association.

536.   However, nine months later, on August 16, 2022, Dr. Montgomery issued Medical Directive 7A, which **rescinded** Medical Directive 7. SD_375927. Medical Directive 7A basically put diabetic management in the hands of the STATCare practitioners, leading the Jail to its current, inadequate treatment as described above.

537.   With the stroke of a pen, in-person evaluations with on-site practitioners were out and remote diabetic management by STATCare was in. Sliding scales were again permitted for "ongoing clinical management." Treatment plans for diabetics were optional. And (per the STATCare mandates noted above) all long-acting insulins were to be discontinued at booking. Further, the NaphCare guidance cited in Directive 7A contains no information about proper management of Type 2 Diabetes. All of this was a departure from the American Diabetic Association Guidelines and failed to meet the standard of care.

538.   In his deposition, Dr. Montgomery stated that the "reason" he rescinded the excellent provisions in Medical Directive 7 "was due to NaphCare's arrival" and the "introduction of StatCare," which is no excuse for abandoning the appropriate standard of care. Montgomery II Tr. at 229:16-21.

539.   The following cases exemplify the Jail's mismanagement of type 2 diabetes:

540.   ███████████ (██████) is a type 2 diabetic. At his ██████ 2022 booking, RN Elizabeth Miller noted that Mr. ████████ had non-insulin dependent diabetes mellitus with "BS 293, asymptomatic, reports last dose of metformin was last night." SD_815566. This case was referred to

1   STATCare NP Juancho Trinidad, who reviewed RN Miller's message and, without

2   any other history, labs, and certainly without examining Mr. ███████ ordered

3   "Insulin Sliding scale (Regular) TID x 15 days." SD_815587-89. NP Trinidad

4   made no referral for an in-person evaluation by a site medical provider. *Id.*

5   Mr. ████████ was rightfully confused about why he had been prescribed insulin.

6   On ███████ 2022, Mr. ██████████ wrote "I've never had insulin injection

7   before." SD_815922. He was seen by RN Grace Ceclio, who noted that she

8   "[e]xplained importance of getting insulin, made aware of risk and benefits of

9   refusing insulin. Pt. refused. IP requesting to see a medical provider." SD_815922.

10  On ████████ 2023, NP Frederick Wycoco reviewed Mr. ██████████ blood

11  sugars in the medical record and noticed that Mr. ████████ had been refusing his

12  blood glucose checks. NP Wycoco made no attempt to see Mr. ████████ and did

13  not schedule him to be seen by another medical practitioner. SD_815922. On

14  ████████ 2023, Mr. ██████████ refused to allow a blood draw for a Hemoglobin

15  A1C. SD_815923-24.

16      541.  Because he had refused his A1C lab test, on ████████ 2023, Jospeh

17  Molina MD saw Mr. ████████ at his cell. Dr. Molina wrote, "Patient states he

18  just does not want to take medications. He knows he has diabetes. He doesn't have

19  continuous follow up with a doctor on the outside. He does not know what an A1C

20  is. He was prescribed metformin previously and it was a discharge medication from

21  the hospital." *Id.* Dr. Molina did no vital signs and no physical examination, noting

22  only that Mr. ████████ appeared to have a "normal affect." Dr. Molina did not

23  explain to Mr. ████████ why insulin had been prescribed for him. Instead, he

24  noted "I advised patient to take medications—patient understands. Continue

25  offering medications." Mr. ████████ then simply began refusing insulin. He

26  refused insulin the rest of the time he was at the jail. *See* SD_815924-36. The

27  LVNs had to fill out a refusal form every time, which was a monumental waste of

28  their time. When he was discharged from the jail on ████████ 2023, he was given

1  a prescription for needles and for insulin that he had never taken, did not want, and

2  should never have been prescribed in the first place.  *See* SD_815605.

3      542.  Mr. ███████ treatment fell below the standard of care in

4  numerous ways:  he was inappropriately prescribed insulin without a medical

5  indication; he was inappropriately prescribed short acting insulin and placed on a

6  sliding scale; he was not seen or examined by the practitioner who put him on

7  insulin; he never received an appropriate physical examination or lab studies; and he

8  was not allowed to have informed consent and input into his own therapy.

9      543.  ███████ (███████) was booked on ███████ 2023.

10  SD_791077-84.  At his receiving screening, done by RN Wenyon Boyd, he stated

11  that he was a diabetic.  *Id.*  No blood sugar was checked, and he was not referred for

12  a second stage nursing evaluation.  *Id.*  The same day, Nh Ngoc Da, Corp PA, did a

13  remote STATCare review of a "Nurse Alert" which stated "Surescripts pt claims

14  taking Mounjaro [a GLP-1 diabetic medication] injection for DM, please advise."

15  SD_791100.  PA Ngoc Da responded: "[T]his med is nonformulary.  Will order

16  insulin sliding scale." *Id.*  There is no indication that Mr. ████ had been on insulin

17  before.  PA Ngoc Da ordered this without reviewing a medical history or any labs,

18  such as an A1C.  *Id.*  NP Nicholas Kahl then did a provider chart review on

19  ███████ 2023.  SD_791101.  NP Kahl did not see Mr. ████ but did order

20  diabetic labs.  *Id.*  Mr. ████ labs showed an A1C of 6.1, which is too low for a

21  diagnosis of diabetes.  SD_791179.  (A diagnosis of type 2 diabetes cannot be made

22  until the A1C is greater than 6.5.  An A1C of 5.7 or below is normal.  A1Cs between

23  5.8 – 6.5 are termed "pre-diabetes," which is usually treated with diet, exercise, and

24  weight loss—not drugs.)  NP Stacey Thompson reviewed Mr. ████ labs on

25  ███████ 2023 and wrote "Labs reviewed."  SD_791102.  NP Thomson did not

26  mention the A1C result.  *Id.*  On ███████ 2023, NP Christine Sullivan also

27  reviewed Mr. ████ labs:  "Reviewed labs done ███████ 2023 and A1C 6.1

28  in PRE-DM [pre-diabetes mellitus] range so for now his metformin 1000 mg/day is

fine." SD_791102. NP Sullivan evidently did not notice that Mr. ████ had been prescribed insulin on a sliding scale. Mr. ████ labs were repeated on ████████ 2023, and his Hemoglobin A1C was 6.2, still too low to justify a diagnosis of diabetes. SD_791181.

544. On ████████ 2023, as a result of his request to speak with a doctor about his diabetes, Mr. ████ was seen by NP Frederick Wycoco. NP Wycoco wrote, "He is asking for Mounjaro. … He said he does not want insulin. … Will order glipizide 5mg qd. … Mounjaro is not formulary." SD_791117. NP Wycoco evidently did not notice that Mr. ████ had been prescribed and was receiving insulin on a sliding scale. Glipizide, in any case, was an inappropriate prescription for a patient with an A1C below 6.5. Mr. ████ continued to ask for resumption of his Mounjaro prescription. On ████████ 2024, Mr. ████ was seen by Joseph Molina MD, who wrote "pt is wondering why he can't get mounjaro." SD_791123. "Reviewed labs with patient, reassured pt with order f/u [follow up] A1C glucose checks ordered." *Id.* This A1C was drawn on ████████ 2024 and was 6.0, well below the threshold of 6.5 for a diagnosis of type 2 diabetes and near normal (5.7 and below). SD_791186. Despite his objections, Mr. ████ continued to be offered insulin injections as late as January 2024. SD_791659.

545. Mr. ████ treatment was below the standard of care reveals the following failures: his verified prescription for Mounjaro was discontinued because it was not on the Jail formulary; he received no significant diabetic counselling; he had no blood sugar test done at his receiving screening; he was inappropriately prescribed short-acting insulin without a medical indication; he was inappropriately placed on a sliding scale; he never received an appropriate physical examination; and he was not allowed to have informed consent and input into his own therapy.

546. Mr. ████████ (████████) is a type 2 diabetic who reported during her receiving screen on ████████ 2024 that she was taking Lantus 15 units once a day. SD_790711. That same day, STATCare NP Juancho Trinidad

discontinued the prescription for Lantus and substituted short-acting insulin via a sliding scale, as the STATCare Intake Assessment and Orders required him to do. SD_790712. NP Teresa Hurley reinstated appropriate long-acting insulin orders on ███████ 2024 after a chart review disclosed that Ms. ███████ blood sugars were very high. SD_790691. NP Hurley did not examine Ms. ███████ at this time or schedule her for a chronic care visit. *Id.*

547. Ms. ███████ treatment was below the standard of care in the following ways: the records I have for Ms. ███████ indicate that no A1C or other labs were ever ordered or drawn, *see* SD_790687-790695; no practitioner ever did an appropriate physical examination; Ms. ███████ received no diabetic counselling; her verified Lantus prescription was discontinued; and she was placed inappropriately on a sliding scale of short acting insulin.

548. The Sheriff's Department also does not provide diabetic patients with medically required retinal examinations.[43] As noted above, patients with type 2 diabetes should be given a retinal examination.

549. If annual exams show no evidence of retinopathy and blood glucose levels are at goal, screenings can be done every 1–2 years. However, if any level of diabetic retinopathy is detected, yearly examinations are essential, and more frequent exams are needed if retinopathy progresses or poses a threat to vision.

550. My review of the charts of several diabetic patients shows that none of this is being done. *E.g.,* ███████ (███████); ███████ (███████); ███████ (███████); ███████ (███████); and ███████ (███████).

551. In conclusion, the care of type 2 diabetic patients in the Jail does not meet the standard of care set forth by the American Diabetes Association. Diabetics

---

[43] The standard of eye care for patients with type 2 diabetes is also laid out in the American Diabetic Association Guidelines. *See* Larber, *Diabetes Management in Detention Facilities*, *supra.*

are not evaluated and examined by a health care practitioner at intake or during the health assessment.  Prescribing is done, rather, by midlevel practitioners working remotely who are contacted electronically.  This failure to meet the standard of care has caused patient harm in the past and will continue to cause patient harm in the future.

### 3.  Hernias

552.   The Sheriff's Department routinely fails to diagnose and treat incarcerated patients with inguinal (groin) hernias in compliance with the medical standard of care and recognized published treatment guidelines.

553.   Inguinal hernias arise when the muscular wall of the abdomen weakens and allows the underlying abdominal contents to bulge out.  When hernias are small, only abdominal fat bulges out of the hernia.  However, without treatment, hernias get larger over time.  As they get bigger, more abdominal tissue can bulge through the opening, and it becomes harder to push the abdominal contents back into the abdomen (called "reducing" the hernia).  Sometimes, abdominal contents cannot be reduced.  This is termed "incarceration" of the hernia and is a surgical emergency, because the bulging abdominal contents can be squeezed by the hernia opening so tightly that the tissue dies, causing serious harm to the patient.  "Uncomplicated" hernias are small and cause no significant problems for the patient.  "Complicated" hernias do cause problems, such as debilitating pain or interference with daily life.

554.   The standard of care for hernia patients requires that patients be given the option for surgical treatment of the hernia.[44]  Delaying a surgical repair is

---

[44] The standard of medical care for patients with inguinal and/or umbilical hernias can be found in many places, including standard medical textbooks as well as guidelines published by surgical specialty organizations.  I referred to two such references as establishing the medical standard of care for hernias.  The first was HerniaSurge Grp.. *International Guidelines for Groin Hernia Management*, 22 HERNIA 1 (2018).  The second was the medical textbook UPTODATE. David C. Brooks, *Overview of Treatment for Inguinal and Femoral Hernia in Adults*, *in* UPTODATE (Michael Rosen et al eds), https://www.uptodate.com/contents/overview-of-treatment-for-inguinal-and-femoral-hernia-in-adults.

appropriate *only* if (a) the hernia is asymptomatic or minimally symptomatic *and* the patient, after having been counseled of the risks of delaying surgery, choses to do so; or (b) the patient is pregnant.

555.    *Uptodate* provides the following flowchart:



556.    Although a truss, or hernia belt, may be helpful in certain situations, their use is generally discouraged, because there is insufficient evidence to prove their efficacy.  In addition, inappropriate use of a truss may harm abdominal contents in a hernia sac or complicate subsequent surgical repair.

557.    Neither the Sheriff's Department policies and procedures manual nor the NaphCare policy manual contains any guidance regarding the treatment of hernias.  *See MSD Operations Manual*, *supra*; NaphCare Policy & Procedure Manual, September 2022, NAPHCARE 031065-373.

558.    In practice, my review of patient charts and my interviews with incarcerated patients during my inspection of the Jail show that the Sheriff's

1    Department is following none of the guidance outline above.  First, based on my

2    review of individual medical records, it is my opinion that the Jail has an unwritten

3    institutional policy to deny surgical treatment of hernias, even in severe cases.

4    Indeed, the records reflect that Sheriff's Department medical staff have told patients

5    that hernias are not repaired by policy on multiple occasions from 2017 to 2023.  It

6    is my understanding that surgery for hernias is never approved or even considered

7    unless the patient has a surgical emergency.  Even patients with persistent

8    debilitating pain from hernias are refused surgical repair of their hernias.  Second,

9    practitioners routinely diagnose and prescribe treatment for hernias without ever

10   examining the hernia.  Third, practitioners in the Jail frequently prescribe trusses for

11   patients with hernias without examining them and irrespective of whether the

12   patients find the trusses helpful.

13        559.   In fact, during my inspection of the Jail, I observed two patients with

14   hernias who stated the Jail medical staff refused to repair them.  One was ████

15   ████ (DOB ████ 1955).  Although sitting in a wheelchair, Mr. ████ had a

16   basketball sized right inguinal hernia visible beneath his clothes.  Mr. ████ stated

17   he had submitted multiple requests and grievances but "they're not helping me."

18   The second was ████████ (DOB ████ 1972), who lifted up his shirt to show

19   me a grapefruit-sized umbilical hernia.  He said, "They won't repair that."  I later

20   learned that Mr. ███ was booked on ████ 2023, meaning that he had been in the

21   Jail for about seven months when I saw him.

22        560.   The following are examples of patients whose records I reviewed and

23   who were denied appropriate care for their hernias:

24        561.   **Michael Taylor** (17122758), a named plaintiff in this case, informed

25   the Jail medical staff that he has a right sided inguinal hernia when he was booked

26   on April 11, 2017.  Medical Record, DUNSMORE 0071323.  The next day, medical

27   staff noted, "IP with groin hernia for 1 month.  IP looking to have surgery ASAP."

28   DUNSMORE 0071347.  He was seen by a medical practitioner, on April 16, 2017

1   who noted that Mr. Taylor was already scheduled to have the hernia repaired at

2   Scripps Mercy Hospital.  DUNSMORE 0071348.  However, the medical plan was

3   for Mr. Taylor to "notify medical" if the hernia got worse.  *Id.*  Mr. Taylor told a

4   nurse that his hernia was "increasing in size and discomfort" on April 18, 2017.

5   DUNSMORE 0071350.  The nurse told him "this nurse would schedule pt to see

6   MD." *Id.*  However, the MD did not see him, and instead asked to get his outside

7   medical records. *Id.*  On May 25, 2017, Mr. Taylor reported that "[m]y hernia has

8   gotten so bad I can no longer poop."  DUNSMORE 0071358-59.  He was given an

9   "athletic supporter" and a prescription for a laxative.  *Id.*  Although he continued to

10  complain of hernia pain and associated constipation throughout his period of

11  incarceration, he was never offered surgical repair of his hernia.  This violated the

12  standard of care.

13          562.    ████████ (████): On ██████████ 2019, Mr. ████████

14  reported to a nurse that he was experiencing nausea and had vomited repeatedly and

15  that he had suffered an inguinal hernia a year prior.  Medical Record of ███

16  ████████ at p. 166 of 1072.  The nurse also documented that Mr. ████████ experienced

17  "10/10 shooting pain when moving and during palpation." *Id.*  On ██████████

18  2019, Registered Nurse Cesar Felarca completed an ER Referral form, noting that

19  Mr. ████████ had a "right inguinal hernia with increased swelling and episodes of

20  vomiting x 10 since" the night before and sending him to the hospital.  *Id.* at p. 88.

21  Dr. Montgomery was the referring practitioner.

22          563.    At the hospital, the ER doctor was able to reduce the hernia.  When

23  Mr. ████████ returned to the Jail, he reported, "They manually pushed it back in and

24  gave me a shot." *Id.* at p. 170.  "They said it had a knot and if I didn't get it pushed

25  in I would have died."  (I do not have a copy of the ER report.)  On ██████████

26  2019, Registered Nurse Shirley Equipado wrote that Mr. ████████ was "[r]equesting

27  to see the MD to be evaluated re: hernia problem, R groin." *Id.* at pp. 173-74.  On

28  ██████████ 2019, Mr. ████████ again requested to have his hernia evaluated by a

doctor. *Id.* at p. 58. On ████████ 2020, Mr. ██████ once again requested to be seen, noting: "Hernia sticking out bad. Hurts. Already went to the hospital here." *Id.* at p. 328.

564. On ████████ 2020, Mr. ████████ was finally seen by a doctor in the Jail about his hernia for the first time. Dr. Nas Rafi wrote that Mr. ████████ was "requesting [an] inguinal hernia repair." *Id.* at pp. 180-81. However, Dr. Rafi did not examine Mr. ████████ hernia. *Id.* Instead, she wrote "discussed that there is no Indication for hernia repair in the setting of asymptomatic reducible hernia." *Id.* This ignored the fact that Mr. ████████ had been sent to the hospital for an incarcerated hernia and had complained of hernia pain multiple times in the previous four months, including after his return from the hospital.

565. Mr. ████████ continued to complain of pain, including in a sick call request form dated ████████ 2020, in which he stated: "Need a hernia belt / get it checked out." *Id.* at p. 329.

566. On ████████ 2020, NP Rodalyn Ulep-Brown approved a hernia belt for Mr. ████████ without seeing or examining him. *Id.* at pp. 184-86. Mr. ████████ never did receive surgery repair of his hernia while incarcerated.

567. ████████ (████████): On ████████ 2023, Mr. ████████ was scheduled to be seen by a Sheriff's Department practitioner after he complained that he had a hernia in his right groin for one month, with a pain level of 5 out of 10. Medical Record, SD_787864. Mr. ████████ was seen that day by NP Lacey Beaston, who made the following notes: "Pt states his main concern is that he wants to get his hernia repaired," and "he states it will no longer stay reduced when he pushes it back in." SD_787869. NP Beaston did not examine Mr. ████████ hernia but informed him that "as long as it is reducable it is not emergent even if it will not remain reduced." *Id.* She denied Mr. ████████ request for surgery. *Id.*

568. Mr. ████████ subsequently wrote: "I would like a second opinion about my hernia from a doctor, not nurse. Thank you." SD_788163. He received no

1  response to this request.

2      569.  On ████ 2023, Mr. ████ requested pain medication due to

3  "extreme pain [in his] groin area" from the hernia.  SD_787870-71.  That day, NP

4  Stacy Thompson wrote that Mr. ████ was "requesting a truss for his right

5  inguinal hernia" since no repair had been offered.  *Id.*  NP Thompson approved this

6  request despite not examining Mr. ████  *Id.*

7      570.  On ████ 2023, health care staff notified STATCare that

8  Mr. ████ was having abdominal pain from his hernia.  SD_787843-44.

9  Katherine O'Neal Corp NP, responded, "Determine if family is able to bring truss

10  for support," despite the fact that Mr. ████ already had a truss.  *Id.*  Otherwise,

11  NP O'Neal approved Tylenol and Ibuprofen for Mr. ████  *Id.*

12      571.  On ████ 2023, RN Pooja Mita saw Mr. ████ for "several

13  complaints regarding having a hernia and not receiving his psych meds."

14  SD_787874-95.  Mr. ████ was upset that his hernia complaints were being

15  ignored.  *Id.*  RN Mita "re-educated pt regarding importance of wearing truss."  *Id.*

16      572.  Mr. ████ was never referred for a surgical evaluation of his hernia.

17  *See id.*  SD_787945-46 (discharge summary prepared ████ 2023).

18      573.  ████ (████): Mr. ████ complained of bilateral

19  inguinal hernias throughout several incarcerations beginning in 2020 and continuing

20  into 2024.  He was seen by a nurse on multiple occasions, but never received

21  adequate treatment for his condition.  For example, Mr. ████ was seen by RN

22  Andrea Medina on ████ 2022, who wrote that Mr. ████ reported his

23  "hernia really hurts.  I should get surgery on it."  Medical Record of ████

24  from Booking ████, at pp. 151-52.  RN Medina noted a "large left inguinal

25  hernia" and alerted STATCare.  *Id.*

26      574.  In response, STATCare NP Juancho Trinidad wrote that Mr. ████

27  had complained of "excruciating pain to left lower [abdomen]; claiming to have a

28  hernia….  No clinical assessment performed on this patient."  *Id.*  NP Trinidad only

1  ordered an "IBU, colace, and hernia belt/scrotal support." *Id.* NP Trinidad

2  performed no examination of Mr. ████████ and did not know if his hernia had any

3  complicating factors. *Id.*

4      575.   On ████████2022, NP Nicholas Kahl visited Mr. ████████ at his cell

5  due to complaints of abdominal pain from a distended abdominal hernia. NP Kahl

6  wrote "bring pt to clinic for exam and to attempt manual reduction of the hernia."

7  *Id.* at p. 153.

8      576.   The next day, Mr. ████████ was seen at the clinic by NP Emiliza

9  Comejo. *Id.* at pp. 154-55. However, NP Comejo did not examine the hernia and

10 did not attempt any manual reduction. Instead NP Comejo only noted that

11 Mr. ████████ had "bulging" in his "[l]eft groin." NP Comejo wrote that she

12 "encouraged him to use [a] [t]russ," but Mr. ████████ reported that this made him

13 more uncomfortable. *Id.* In the end, NP Comejo told Mr. ████████ to notify

14 medical if he became worse and did nothing else. *Id.*

15     577.   Mr. ████████ continued to complain of hernia pain. As just one

16 example, he was seen by RN Matthew Duenskie on ████████2022 for hernia

17 pain that RN Duenskie incorrectly documented on a "Musculoskeletal pain/strain"

18 form. Medical Record of ████████ from Booking ████████, at p. 61.

19     578.   Mr. ████████ has continued to have hernia problems throughout 2023

20 and into 2024, which were treated only with hernia belts.

21     579.   These four examples demonstrate patients who have hernias that met

22 the medical standard for surgical intervention, but were not properly evaluated or

23 treated in the Jail. None of these patients (except Mr. Taylor in 2017) was examined

24 by a medical practitioner. All the patients' requests for surgery were denied. The

25 patients' complaints of pain and disability were ignored. Hernia belts (trusses) were

26 prescribed by practitioners who had never examined the patient. Neither the

27 Sheriff's Department nor NaphCare has any written guidelines or policy for hernia

28 evaluation and treatment—at least, that I have seen. However, there appears to be

1   an unwritten policy that patients with hernias are not to be referred to a surgeon.

2   This violates the medical standard of care, and incarcerated patients have suffered as

3   a result.

**4.      Latent Tuberculosis ("LTB")**

5   580.    The Jail fails to provide appropriate screening and treatment for people

6   infected with LTB.

7   581.    Tuberculosis is an infection with a more complicated course than most

8   other infections.  Patients usually are exposed to tuberculosis by breathing the

9   infectious agent into their lungs.  After a brief illness like a chest cold, the

10  tuberculosis organism goes into a latent state.  After a period that can last years, the

11  tuberculosis organism reemerges and becomes an active infection.  Patients with

12  active tuberculosis are seriously ill and can infect others by coughing out

13  tuberculosis organisms that other people inhale into their lungs.  Tuberculosis is a

14  serious illness that can cause debilitation and death.

15  582.    The Jail has a program in place to find patients with *active* tuberculosis

16  infections by doing a chest x-ray, which will show typical tuberculosis lesions in

17  patients with active tuberculosis.  Patients then can be isolated and treated.

18  583.    However, the CDC recommends that jails should also have a program

19  in place to diagnose *latent* tuberculosis infection in patients at high risk for LTB,

20  such as injection drug users.  The goal is to find and treat patients with LTB and

21  cure them before the disease becomes active, causing serious illness and infecting

22  other people.

23  584.    Screening high risk patients for LTB is relatively simple.  Screening

24  can be done as a two-step skin test or a simple one-step blood test.

25  585.    In addition, the CDC recommends that jails should test for LTB

26  annually for all employees and for anyone incarcerated in the jail for greater than

27

28

1   one year.[45]

2       586.   Dr. Venters recommended that the Jail begin testing for latent TB

3   infection in 2020.  SD_215390.

4       587.   The NaphCare contract requires NaphCare to provide "TB screening,

5   evaluation and treatment … in accordance with NCCHC and CDC

6   recommendations," which would include screening for LTB.  Contract No. 566117,

7   *supra* § 2.3.2.3.  My review of patient charts and my interviews of incarcerated

8   patients during my inspection show that the Jail is following neither of these

9   recommendations.

10       588.   I found no instance in the cases I reviewed where a high-risk patient

11   was tested or treated for LTB.  High risk patients include injection drug users, which

12   includes most patients treated by the Jail for opioid withdrawal.

13       589.   Per CDC guidelines, the Jail should do LTB testing in high risk

14   individuals at booking and every year thereafter.  However, the Jail, by policy, does

15   not even consider doing testing for LTB until the patient has been incarcerated for a

16   minimum of two years (*see* the TechCare Health Assessment, which states that LTB

17   screening frequency is "every two years.").

18       590.   It makes no sense medically to ignore the CDC guidelines for testing

19   high risk patients for LTB, especially since the test (especially the one-step blood

20   test) is quick and easy.  It only makes sense to ignore these CDC guidelines if the

21   goal is to save money by not providing appropriate medical care.

22

23   [45] The Standard of Care for the screening and treatment of tuberculosis in

24   incarcerated populations can be found in several places, including standard medical
       textbooks (such as the online textbook Uptodate), and guidelines published by
       specialty organizations. Probably the most cited and respected of these guidelines

25   for tuberculosis is Centers for Disease Control, *Prevention and Control of*
       *Tuberculosis in Correctional and Detention Facilities:  Recommendations from*

26   *CDC* (2006), (https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5509a1.htm.  This
       guideline  has been endorsed by the National Commission on Correctional Health

27   Care (NCCHC), the American Correctional Association, and the Advisory Council
       for the Elimination of Tuberculosis.  According to this guideline, the San Diego Jail

28   would be categorized by the CDC as a "nonminimal TB risk facility."

591.   When LTB is identified, the standard of care is to treat these patients with appropriate antibiotics to eradicate the infection.  However, according to its policy, the Jail does not do this.

592.   The MSD Operations Manual Tuberculosis (TB) Program states that treatment for LTB will be offered to patients only if "[e]xpected length of stay 6 months or greater."  MSD Operations Manual § MSD.T.3 VI(B).  The Manual does not state why the County would not treat everyone with a positive test for LTB.  *Id.* It makes no medical sense to not treat these patients who have a serious infection.  It only makes sense if the goal is to save money by not providing necessary medical care.

593.   MSD.T.3 allows patients who do have LTB to remain undiagnosed and untreated.  This policy violates the medical standard of care and has undoubtedly led to cases of active TB that could have been prevented had the Jail followed the CDC recommendations.

### 5.    Sexually Transmitted Infections ("STIs")

594.   It is my opinion that the Sheriff's Department fails to screen for STIs commensurate with national standards.

595.   It is important to screen and treat STIs.  STIs are communicable diseases that can easily spread from person to person through sexual contact.  Many jail patients do not have easy access to regular healthcare services outside of the jail. They also may not be aware that they are infected.  Undiagnosed and untreated STIs can lead to serious health complications, such as infertility, pelvic inflammatory disease, and HIV.  Screening and treating STIs in the jail would improve the overall health of patients.[46]

596.   As explained above in the section on HCV, jails can adopt either an

---

[46] Of course, the Sheriff's Department's screening and treating STIs in jail patients would have the additional benefit of preventing the spread of these infections in the broader San Diego community when patients are released.

"opt-out" screening program, in which all patients are automatically screened unless they refuse, and an "opt-in" screening program in which screening is performed only if the patient requests it. Although STI screening guidelines vary depending on gender and sexual activities, key recommendations include:[47]

597. **Syphilis.** Screen for syphilis in all patients (men and women) at increased risk (history of incarceration, transactional sex work, geography, race/ethnicity, methamphetamine use).

598. **HIV.** Screen annually if at risk. Test if patient is seeking evaluation and treatment for STIs.

599. **Hepatitis C.** Screen everyone at least once and repeat test for high-risk individuals. Screen all pregnant women.

600. **Chlamydia/Gonorrhea**. For men, conduct routine screening in correctional settings because they are high-prevalence settings. For women, screen annually if sexually active and under 25. For those over 25 screen if at increased risk (prior infection, more than one sexual partner in the past year, suspicion that a recent partner had concurrent partners, new sexual partner in past three months, illicit drug use, or transactional sex in the past year, among other factors). Rescreen for reinfection approximately three months after treatment.[48]

601. My review of documents, including patient charts and my interviews of incarcerated patients during my inspection of the Jail show that the Sheriff's

---

[47] The medical standard for screening for sexually transmitted diseases (STDs) can be found in several places, including standard medical textbooks (such as the online textbook UpToDate), and guidelines published by specialty organizations. The California Department of Public Health has published an excellent guideline that conforms with the U.S. Preventive Services Task Force. Infectious Disease Society of America, and California Department of Public Health (CDPH) Sexually Transmitted Diseases Control Branch (STDCB); *see also* Cal. Dep't of Pub. Health, *California Sexually Transmitted Infections*, CA.gov (Nov. 17, 2023), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/California-STI-Screening-Recommendations.aspx.

[48] *See California Sexually Transmitted Infections (STI) Screening Recommendations 2021*, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/California-STI-Screening-Recommendations.aspx.

1    Department is not compliant with that standard of care.

2        602.    The Sheriff's Department conducts STI screening on an opt-in basis.

3    This is clear from the Preventative Screening section of the Health Assessment form

4    in TechCare states explicitly that STD screening is done "upon request" only.

GENDER: Male and Female

AGE: All

PREVENTATIVE SCREENING: STD Screening

PROVIDER ORDERS:

FREQUENCY: Upon request

9        603.    However, "opt-in" programs cannot be effective unless patients are

10   informed of their right to have STI screening done.  I have seen no evidence of any

11   effort to inform patients of this program.

12       604.    Choosing to only screen patients for STIs when they request screening

13   and then failing to inform patients of their right to request screening does not make

14   any sense from a medical perspective.  It only makes sense as a way of minimizing

15   the number of STI screens done in order to save money by not doing them.

16       605.    In addition, Jail practitioners do not do physical examinations of

17   patients requesting screening for STIs—even when patients request a physical

18   examination.  Without a physical examination, medical practitioners cannot find

19   critical evidence of STIs that can only be found by examination, such as herpes,

20   genital warts, trichomonas, syphilitic ulcers, discharge, swollen lymph glands,

21   ectoparasites (like pubic lice), and rashes.  Since the practitioners are not doing

22   these exams, they are not finding these infections.  As a result, not only are patients

23   being harmed by not being treated, other people are also at risk of being harmed by

24   being infected by these patients.  Not doing a physical examination of patients

25   complaining of STIs violates the medical standard of care and causes harm to

26   patients and others.

27       606.    Examples of this substandard care include:

28       607.    ████████ (████████):  On ████████ 2024, PA Juancho Trinidad

1  posted a STATCare note that Mr. ████ had "concerns [about] sexually transmitted

2  disease(s) and request[ed] further work-up."  Medical Record of ████████ from

3  Booking ████████, at p. 463.  He then wrote that "[n]o clinical assessment [was]

4  performed on this patient. … Check for GC/Chlamydia, syphilis, hepatitis and HIV.

5  FU [follow up] MDSC [MD sick call] prn [as needed]."  *Id*.  Mr. ████ tests were

6  all normal.  *Id*. at pp. 474-75.  However, as he acknowledged in his note, NP

7  Trinidad did not talk to Mr. ████ and did no examination looking for signs of other

8  potential STDs.  No other practitioner ever saw Mr. ████ face-to-face as a result of

9  this request.  This violated the medical standard of care.  I saw no documentation

10  indicating that anyone ever reviewed the STI lab tests or communicated the findings

11  to Mr. ████  In fact, two weeks after his negative tests, Mr. ████ made another

12  request for STD testing, suggested he was unaware of the results.  *Id*. at p. 874.

13      608.   ████████████ (████): On ████████ 2024,

14  Ms. ████ wrote a medical request asking for an HIV test and STI panel.  Medical

15  record of ████████████ from Booking ████████, at p. 896.  The next day, NP

16  Daniel Swink wrote a STATCare note that reiterated that Ms. ████ had "concerns

17  [about] sexually transmitted disease(s) and request[ed] further workup."  *Id*. at p.

18  489.  NP Swink ordered laboratory tests for GC/chlamydia, syphilis, and HIV.  *Id*.

19  "If suspect trich or BV, treat empirically."  *Id*.  NP Swink did not talk to

20  Ms. ████ or perform an exam, *id*., which violated the medical standard of care.

21  NP Swink's order delegated diagnosis and treatment of "trich or BV,"  though such

22  delegation is inappropriate, as explained earlier in this Report.  Trichomonas

23  infection (trich) and bacterial vaginosis (BV) are usually diagnosed during a pelvic

24  examination.  I cannot find any record of Ms. ████ having a pelvic examination

25  or testing for BV or trich.  I cannot find in Ms. ████ chart any lab test results for

26  HIV, syphilis, gonorrhea or chlamydia.  (Ms. ████ did have lab tests that

27  confirmed that she had chronic HCV infection.  *Id*. at p. 518.).  I cannot find any

28  refusal form or mention of a refusal for these tests.  It appears that they were never

drawn.  For all of these tests not to have been done and then for no one to notice that they were not done violated the medical standard of care.

609.  ███████████ (██████): On ████████ 2022, Mr. ████████ requested an evaluation for "bumps on penis."  SD_781892.  On ████████ 2022, Mr. ███████ again requested STD testing.  *Id.*  NP Nicholas Kahl ordered an STD screen but did not examine Mr. ████████  SD_782037.  On ████████ 2022, Mr. ██████ was seen for the "bumps on penis" complaint by RN Romeo DeGuzman.  *Id.*  RN DeGuzman wrote "C/O (complaining of) penile wart.  'I want the doctor to see it.'"  *Id.*  But RN DeGuzman did not refer Mr. ████████ to see a practitioner.  *Id.*  He wrote instead "Encouraged good hygiene and proper hand washing.  Instructed to notify staff for any changes."  *Id.*  No medical practitioner ever examined Mr. ████████ for this complaint.  This violated the medical standard of care.  Genital warts are treatable.  The standard of care would have been to treat Mr. ██████ for this.  Genital warts are also transmissible to others.  By not treating Mr. ███████ genital wart, other people may have contracted genital warts from Mr. ██████

610.  On ████████ 2022, RN Jamee Barrera wrote "STD labs completed" for Mr. ████████  SD_782038.  However, there is no note that these labs were ever reviewed by a practitioner.  In fact, the labs were positive for positive for syphilis.  *Id.*, SD_782079.  The positive syphilis result was dutifully reported to the Health Department on ████████ 2022, *id.*, but no medical practitioner documented the results of Mr. ████████ positive test for a syphilis infection.  Since the syphilis infection was never noted, no one from the Jail made any attempt to contact Mr. ██████ (who had been released) to inform him of his positive syphilis test.

611.  Mr. ████████ returned to the Jail in ████████ 2023.  On ████████, 2023 and again on ████████ Mr. ████████ requested STD testing.  *Id.* at SD_781893.  On ████████ 2023, a positive RPR Syphilis screen returned. SD_782087.  On ████████ 2023, NP Frederick Wycoco finally addressed the

positive syphilis screen.  SD_782042-43.  A nurse noted that Mr. █████ syphilis test was positive on █████ 2022 "but syphilis was not addressed [at] that time because pt was released."  *Id.*

612.   In conclusion, the Jail does not follow the standard of care set out by the California Department of Public Health for the screening of STIs.  Instead of the recommended opt-out screening, the Jail offers opt-in screening, but without informing patients of their right to request STI screening.  Positive screening results are sometimes ignored.  This violates the standard of care and harms patients.

### 6.     Asthma

613.   It is my opinion that the Sheriff's Department fails to treat asthma consistent with the standard of care, placing patients at a substantial risk of serious harm.

614.   Asthma is an episodic disease of the lungs in which an environmental trigger causes constriction of lung passages and increased production of mucous, both of which restrict air movement.  Asthma causes wheezing and shortness of breath, and it ranges in severity from mild and easy to treat to severe enough to cause death.[49]

615.   Providers can diagnose asthma through a combination of patient history, physical examination, and bedside tests, the simplest of which is a handheld peak flow meter.  A diagnosis of probable asthma can be made based upon history alone, provided the patient has typical symptoms that respond promptly and completely to therapy.  However, bedside handheld instruments for evaluating asthma complaints should be readily available at the Jail and should be used each and every time an asthma patient is evaluated by a Registered Nurse or a

---

[49] The standard of care for patients suffering from asthma can be found in several places, including standard medical textbooks (such as the online textbook Uptodate), and guidelines published by specialty organizations. For the sake of simplicity, I chose to refer to standards of care laid out by the medical textbook UPTODATE. *See Asthma*, UPTODATE, https://www.uptodate.com/contents/table-of-contents/allergy-and-immunology/asthma.

practitioner. This was recommended by the NCCHC Technical Support document in 2017. DUNSMORE 0260635. Importantly, because of the episodic nature of asthma—*i.e.*, an asthmatic patient might not have symptoms all the time, but might still require medication—providers should not dismiss a diagnosis simply because a patient is asymptomatic at the time of examination.

616. The treatment of asthma depends on the severity of the patient's symptoms in the past and current examination and beside testing. The simplest treatment is a "rescue inhaler," usually albuterol, that patients use when they have an asthma attack. All patients with asthma should have immediate access to such an inhaler. When patients have many asthma attacks, other medications are added in stepwise fashion, including inhaled steroids, long-acting bronchodilators, and others. Well respected guidelines discuss the proper way to prescribe each of these therapies in a step-wise fashion along with guidance on when to refer to a pulmonologist, how frequently to schedule chronic care visits, etc.

617. Finally, effective asthma management requires a preventive approach, with regularly scheduled chronic care visits during which symptoms and pulmonary function are assessed, control of exposure to asthma triggers and impact of comorbid conditions reviewed, medications adjusted, and ongoing education provided.

618. Both the 2017 NCCHC Technical Assistance Report and Dr. Venters' 2020 Best Practices identified problems with asthma diagnosis and therapy provided to incarcerated patients at the Jail. The NCCHC noted: "Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients." DUNSMORE 0260635. NCCHC also found that besides for hypertension there were "no other chronic disease guidelines to guide providers," including no guidelines for asthma as would be required by the NCCHC. DUNSMORE 0260643. Dr. Venters recommended that during health assessments, patients should

1  "have some brief or focused physical examination also performed, such as

2  auscultation of lungs and peak flow testing for patients who report asthma."

3  SD_215371.

4      619.   Despite the recommendation from the NCCHC in 2017 that the Jail

5  have an asthma guideline for medical providers, it still to this date has no adequate

6  written asthma guideline for practitioners.  The Sheriff's Department does have a

7  guideline for nurses to assess patients reporting acute asthma attacks.  Sheriff's

8  Department, *Standardized Nursing Procedure* § SNP.A.6 (2020).  In the

9  community, patients reporting to an ER, urgent care center, or practitioner's office

10  complaining of difficulty breathing due to asthma would always be seen by a

11  medical practitioner.  However, SNP.A.6 allows nurses to decide who is sick

12  enough to refer to a practitioner and who is not.  They act as gatekeepers to

13  practitioner access.  For patients with "acute respiratory distress," SNP.A.6 allows

14  the nurses to administer an inhaled bronchodilator.  Nurses may call a practitioner if

15  they think the call is warranted.  Such calls are made more-or-less exclusively to

16  remote STATCare practitioners who are not able to examine the patient.

17      620.   STATCare practitioners have a dropdown menu of options they are

18  allowed to prescribe for asthma.  The STATCare treatment options are nebulized

19  albuterol or albuterol multi-dose inhaler.  However, besides the bronchodilator

20  albuterol, there are other essential therapies for asthma, including inhaled steroids,

21  long acting bronchodilators, and MAST cell stabilizing drugs.  These options are not

22  available to the STATCare practitioners, who cannot examine asthma patients

23  anyway since they live remotely.  STATCare practitioners may refer patients to be

24  seen by onsite medical practitioners.  STATCare practitioners also have the option

25  of discontinuing asthma treatments and even eliminating the diagnosis of asthma

26  entirely from a patient's medical record if they wish.

27      621.   I have seen no other guidelines for asthma care for medical

28  practitioners at the Jail, whether remote STATCare practitioners or onsite

practitioners.  This is curious, because such guidelines are readily available in medical textbooks like UpToDate and from specialty organizations whose guidance is available online.[50]  This is a problem because asthma is a complicated disease and most practitioners cannot remember the appropriate tests, treatments, and follow-up recommendations for various patients.  Without guidelines, asthma patients tend to be under evaluated, undertreated and many are harmed.

622.   In the end, my review of documents, including patient charts and my interviews of incarcerated patients during my inspection of the Jail, show that the Sheriff's Department does not comply with the standard of care for asthma therapy:

623.   █████████ (█████████):  Mr. █████ reported a history of asthma at his receiving screening on █████████ 2023. SD_749433.  The history of asthma was referred to PA Nhi Ngoc Dai via STATCare.  PA Dai ordered an albuterol inhaler for Mr. █████ use but did not examine Mr. █████ nor did he or anyone else perform any bedside tests, such as a peak flow meter reading. SD_749447-48.  The next day, NP Stacy Thompson discontinued the diagnosis of asthma and Mr. █████ access to an albuterol inhaler: "Pt with no documented hx of asthma and has no meds noted in community.  Albuterol dc'd."  SD_749444.  NP Thompson did not talk to Mr. █████ examine him, perform any bedside diagnostic testing, or schedule Mr. █████ for any future assessments prior to the discontinuation.  Asthma is an episodic disease and jail patients may not have had easy access to medical care in the community.  To discontinue an inexpensive rescue inhaler and further to eliminate the diagnosis from a patient's chart without an examination or bedside pulmonary tests violated the standard of medical care.

624.   █████████ (█████████):  Mr. █████ reported a history of asthma when he was booked on █████████ 2022.  Mr. █████ was seen on

---

[50] *See, e.g.*, Nat'l Heart, Lung, and Blood Inst., *Asthma Management: Updated Guidelines from the National Heaty, Lung, and blood Institute*, 104 AM. FAM. PHYSICIAN 531 (2021), https://www.aafp.org/pubs/afp/issues/2021/1100/p531.pdf.

1  ███████ 2022 by NP Nicholas Kahl.  NP Kahl noted the history of asthma and

2  that Mr. ███████ was requesting access to a rescue inhaler.  NP Kahl prescribe a

3  Xopenex inhaler that Mr. ███████ was allowed to keep with him at all times.

4  SD_782035.  A task for a chronic care visit for asthma was scheduled for ███████,

5  2022, but had not been completed as of his release in ████  During a subsequent

6  booking, Dr. Rafi did not see Mr. ███████ examine him, or do any asthma testing.

7  Instead she wrote a note stating:  "Asthma cancelled … Reason no [history of]

8  active asthma requiring recent md use in community."  Mr. ███████ prescription

9  for a rescue inhaler was discontinued.  SD_781893.  There is no indication that

10  Mr. ███████ was scheduled for any future asthma assessments.

11      625.  On ███████ 2023, Mr. ███████ submitted a sick call request for an

12  "emergency inhaler," stating that he had asthma, was "having trouble breathing,"

13  and had already requested an inhaler once before.  SD_781893.  RN Vanessa

14  Rimando referred this request to STATCare without obtaining any history, doing

15  any physical examination or doing bedside testing.  *Id.*  On the same day,

16  STATCare PA Juancho Trinidad ordered a "formulary equivalent" to Xopenex

17  which was the generic bronchodilator albuterol.  SD_782044.  PA Trinidad did not

18  talk to Mr. ███████ do any physical examination, or perform any bedside tests.

19  *Id.*  NP Trinidad also did not schedule Mr. ███████ for any future chronic care

20  clinics.

21      626.  ███████████████ (███████):  On ███████ 2024, Mr. ███████

22  submitted a sick call request stating that he had "bad asthma" and "need[ed] [an]

23  inhaler.  SD_837817.  There is no indication that Mr. ███████ was seen by a nurse or

24  a practitioner for this complaint or that an asthma inhaler was ordered before he was

25  released from the Jail 10 days later.

26      627.  Jail policy requires a face-to-face visit from an RN within 24 hours of

27  submitting a medical request, such as this one.  This did not occur.  The medical

28  standard of care requires any patient stating that they have a disease that can cause

1  sudden death, like asthma, to be seen as soon as possible by a medical practitioner.

2  This did not happen either.

3      628.  ████████████ (████████):  On ████████ 2023, a Registered

4  Nurse completing Mr. ████████ receiving screen wrote that he had asthma and

5  was using an albuterol inhaler.  An albuterol inhaler was subsequently ordered for

6  him.  SD_991335.  One month later, on ████████ 2023, the diagnosis of asthma and

7  the albuterol prescription were both cancelled by NP Frederick Wycoco, with the

8  stated reason being "no use of md, no [history of] asthma, no record in surescript."

9  *Id.*  There is no indication that NP Wycoco talked to Mr. ████████ examined him,

10  or did any testing prior to issuing this order.

11      629.  Each of these examples falls below the standard of care and places the

12  patient a risk of harm.  Acute asthma attacks can be sudden and severe.  Sometime,

13  patients do not have time to submit a medical request form.  Without appropriate

14  therapy already prescribed, patients can be harmed and even die from untreated

15  asthma attacks.

16      630.  The fact that three different practitioners (including the Jail Medical

17  Director, Dr. Rafi), discontinued albuterol prescriptions on three different patients

18  indicates to me that this was an unwritten practice of NaphCare to decrease the

19  number of albuterol inhalers prescribed.  I suspect, but have no direct evidence, that

20  these three practitioners were told not to authorize asthma treatment for patients who

21  stated that they had asthma but had no current asthma prescriptions in the

22  community.  This practice makes sense if the goal was to save NaphCare money, but

23  it does not make sense medically.

24      631.  In conclusion, the Jail fails to provide appropriate asthma screening and

25  treatment to their incarcerated patients, placing them at substantial risk of serious

26  harm.  NaphCare appears to have inappropriately instructed practitioners not to

27  prescribe asthma treatment for patients who stated that they had asthma but had no

28  current asthma prescriptions in the community.  The Sheriff's Department has failed

1  to create guidelines asthma chronic care.  The Sheriff's Department's guidelines for

2  acute asthma care (SNP.A.3) is inappropriate and does not meet the community

3  standard of care.

4  **IX.    The Sheriff's Department Fails to Provide Medically Necessary Vision**
   **Care**

5

6      632.   In my opinion, the Sheriff's Department fails to: (1) screen and

7  evaluate patients for eye disease (even for patients at increased risk for eye disease);

8  and (2) timely provide incarcerated people with medically necessary eyecare and

9  prescribed eyeglasses.  These failures result in substandard care of those with vision

10  care needs.

11      **A.    The Sheriff's Department Fails to Screen or Evaluate People for**
           **Eye Diseases, Even Those Who Self-Identify as High Risk**

12

13      633.   Many incarcerated patients have medical conditions of the eye that

14  require medical evaluations and care.[51]  Examples include cataracts, glaucoma,

15  keratoconus, and diabetic retinopathy.  The Jail has an obligation to evaluate and

16  treat eye diseases in accordance with national standards and with the standard of

17  care in the community.  However, the Jail appears to ignore the eye health of its

18  patients who have eye diseases or are at risk for eye disease.

19      634.   Glaucoma is the most common cause of irreversible blindness

20  worldwide.  Many patients with glaucoma are asymptomatic early in the course of

21  disease, given the often slowly progressive nature of the condition.  Therefore,

22  screening of higher-risk patients is essential to minimize vision loss and prevent

23

24  _____

25  [51] A note about definitions:  Optometrists are eye doctors who evaluate and treat
    most eye diseases.  Optometrists evaluate vision deficits and prescribe glasses to
26  correct those deficits.  Ophthalmologists are eye surgeons.  Ophthalmologists
    usually do not prescribe eyeglasses; rather, they take care of more complex eye
27  problems.  At the Jail, almost all of the referrals for eye/vision evaluations should be
    to an optometrist first, unless the patient has a known surgical problem.  I refer to
28  optometrists in this report except when it is clear that an ophthalmologist must be
    involved.

blindness.[52]  The standard of care for glaucoma screening is that people with diabetes, a family history of glaucoma, or African American and/or Hispanic people should be screened at age 40, and that all people age 55 and older should be screened annually.[53]

635.   All people receive a screening eye exam to look for glaucoma, cataracts, retinopathy and other eye diseases beginning at age forty and every 1 to 3 years after age 55.  People with known eye disease such as keratoconus or diabetic retinopathy should continue any previously scheduled specialist appointments and screening examinations that had been recommended by their outside vision specialist before they became incarcerated.

636.   Unfortunately, the Jail does not provide any recommended eye screening, even for patients who are at high risk of eye disease and request screenings and/or exams.  There is no mention eye health in the MSD Operations Manual or NaphCare's Policies and Procedures.  The NaphCare Health Assessment Form lists several Preventative Screening considerations at the end of its Health Assessment Form for consideration by the RN doing the exam.  However, there is no reference to preventative or comprehensive eye exams based on age or other risk factors as there should be per national standards.

637.   The Sheriff's Department fails to provide eye evaluations even to patients who notified Jail staff about their glaucoma.  For example, ██████████ (████████), reported glaucoma and cataracts at booking.  SD_802998.  I searched his 3,707 page medical chart using keywords such as cataract, glaucoma, optometrist, retina, and Snellen.  It appears that Mr. ██████ was never evaluated for

---

[52] Elaine Han et al.. *Community Vision Screening*. Glaucoma Today 28. 28 (January 2019), https://assets.bmctoday.net/glaucomatoday/pdfs/0119GT_SF_Lee.pdf..

[53] *Primary open-angle glaucoma suspect PPP 2020*.  American Academy of Ophthalmology. (2021, October 6).  Retrieved August 15, 2024, from https://www.aao.org/preferred-practice-pattern/primary-open-angle-glaucoma-suspect-ppp.

1  glaucoma or cataracts by a medical provider. His vision was never tested using the

2  standard Snellen Eye Chart. He was never referred to an optometrist for a

3  comprehensive eye exam. This violated the standard of medical care for these

4  conditions.

5     638. And, as explained in the section above regarding diabetes care, the

6  Sheriff's Department also fails to provide diabetic patients with appropriate eye

7  exams.

8     **B.    The Sheriff's Department Fails to Timely and Adequately Address**
       **Incarcerated People's Visual Accuity Problems**

9

10    639. Visual acuity problems are another area of deficiency within the Jail.

11  There are two type of visual acuity problems. People with farsightedness

12  (hyperopia) can see distant objects well but have difficulty with close vision, *e.g.*,

13  reading. People with nearsightedness (myopia) can see close objects but have

14  difficulty with more distant vision. Many patients, especially the elderly, have both

15  problems.

16    **1.    There Are Numerous Barriers Preventing People From**
       **Timely Receiving Eye Glasses**

17

18    640. Some vision acuity problems can be addressed with simple,

19  inexpensive reading glasses. Reading glasses are important for incarcerated patients

20  so that they have the ability to read: (1) legal documents; (2) the many forms and

21  signs that the Jail requires them to attend to; (3) educational materials that the Jail

22  provides, for example, the many handouts available in the medical department; and

23  (4) other materials for program participation, education, and recreation. Reading

24  glasses improve the quality of incarcerated life for those who need them.

25    641. In the community, people who need reading glasses do not have to see

26  a health care professional. Anyone can buy reading glasses of various strengths at

27  any drug store or grocery store. The proper reading glasses are those that make

28  reading most comfortable for the person. In other words, the person needing

1  reading glasses participates in choosing the correct strength for themselves.

2      642.   However, the Jail requires patients who need reading glasses to submit

3  a medical request.  Such patients are then scheduled to see a nurse, who acts as a

4  "gatekeeper" to decide who may receive reading glasses and who may not.  It may

5  take days or even weeks for this visit to occur.  I have not seen a policy or procedure

6  that lays out what should occur at this meeting, or what the criteria are for the nurse

7  to say approve or deny reading glasses or what strength reading glasses they

8  approve.  In practice, leaving these decisions to nurses' discretion leads to some

9  people waiting long periods to receive reading glasses, and other people receiving

10  the wrong level for their needs.

11      643.   The arbitrariness of this system is exemplified by patient ███████

12  ████████ (█████████).  On ████████████ 2022, RN Ellen Lastrella approved 3.0

13  reading glasses for Mr. ███████████ SD_797036.  But on ████████████ 2023, a

14  different nurse, RN Arlene Edusada, approved much weaker 1.5 reading glasses for

15  the same patient.  SD_797016.

16      644.   Besides taking an unnecessarily long time for a patient who needs

17  reading glasses to get them, this system is a waste of the RNs time.  When RNs

18  cannot complete everything they are supposed to do in a shift (like complete all of

19  the 24 hour face-to-face assessments), why are they wasting time being gatekeepers

20  for reading glasses?  Reading glasses are quite inexpensive.  I suspect that if the Jail

21  performed a time-cost analysis they would find that the cost of a pair of reading

22  glasses is much less expensive than the cost of paying the nurses' salary to see a

23  patient who has requested reading glasses.

24          **2.     The Jail Lacks Adequate Policies and Procedures to Ensure
           IPs Have Access to Distance Glasses**

25

26      645.   Glasses to improve distance vision are a different matter than simple

27  reading glasses because they require a prescription based on the evaluation of an

28  optometrist using sophisticated equipment to measure visual deficits and provide the

1  right compensation in the glasses.  At every visit, optometrists should routinely

2  screen for all of the medical conditions mentioned earlier, such as glaucoma,

3  cataracts and retinal problems.

4       646.   Distance correction is important for many jail patients for many

5  reasons, including the ability to: (1) read the signs the Sheriff's Department posts on

6  the walls and expects incarcerated people to abide by; (2) see what is happening in a

7  dorm area or exercise area for safety and in order to avoid trouble; (3) see facial

8  expressions of fellow incarcerated people, security staff and medical personnel for

9  important non-verbal communication; and (4) see chalkboards, television programs,

10  and other far away media for recreation and education.  Distance vision glasses

11  dramatically improve the quality of incarcerated life for those who need them.

12       647.   On the outside, patients who need distance correction can themselves

13  make an appointment with an optometrist.

14       648.   There are several substantial problems in the system for providing

15  incarcerated patients with needed distance eyeglasses at the Jail.

16       649.   First, neither the Sheriff's Department nor NaphCare has any written

17  policies or procedures specifically related to vision complaints, eye complaints, how

18  and when to provide glasses, or when to refer a patient to an optometrist.  Neither

19  the MSD Operations Manual or the NaphCare P&P Manual give the nurses any

20  instructions on how they should evaluate these patients or what the criteria are for a

21  nurse to approve the referral to the optometrist.  Therefore, the nurses, who are

22  acting as gatekeepers, have no written guidance.  They also have no oversight.  No

23  one (as far as I could tell) ever reviews and critiques nursing eye assessments.  Eye

24  assessments are not followed in any meaningful way in the Jail CQI statistics.

25       650.   Second, the RN evaluation usually consists of the nurse administering a

26  Snellen test for distance vision.  Based on the Snellen results, the nurse can approve

27  the referral to an optometrist or deny it based on their own discretion or whim.

28  However, the Snellen test is not a good way to deny someone access to an

optometrist for the following reasons: (1) patients can artificially improve their scores by squinting, leaning, or simply knowing the letters on the chart; (2) Snellen results are also influenced by lighting, distance, and distractions (while patients may have a good Snellen score because the lighting was perfect and there were no distractions in the medical clinic, they may need glasses in their dimly lit housing unit); (3) many patients with a perfect Snellen score (those over the age of 40, with hypertension, or with diabetes) may still need to see an optometrist for a screening exam; (4) penalizing patients for having a good Snellen score (*i.e.*, not allowing them to see an optometrist) encourages patients to give unreliable Snellen results; (5) failing to provide guidance to gatekeeper nurses ensures uneven results; and (6) Snellen tests take nursing time that could be put to better use filling in other yawning gaps in nursing performance, such as 24-hour face-to-face evaluations. In the end, nurses and even primary care medical providers do not have the expertise to evaluate the validity of distance vision complaints. Optometrists do. Therefore, in most cases, incarcerated people complaining of distance vision issues should be referred to an optometrist without the need for this arbitrary gatekeeper screening test.

651. Third, there are substantial delays built into the process of obtaining eyeglasses. At the outset, when an incarcerated patient asks for glasses or asks to see the optometrist, they are required to fill out a medical request form. They are then scheduled to see an RN. This wait can be days or weeks based on my chart review; the Jail does not track this specific statistic in their CQI reports. Notably, this does not happen in the community. If the gatekeeper nurse does approve a visit to the optometrist, the wait to see an optometrist is often several weeks, and sometimes the referral is never completed. Such waits were at times exacerbated by the fact that NaphCare had problems contracting with an offsite optometry group. As explained earlier in this Report, due to NaphCare's failure to pay outside providers, the Jail's relationships with some outside providers were strained.

SD_1572585.

652.   Fourth, NaphCare required all referrals to an optometrist to go through their UM review process, resulting in additional delays and irrational denials.  By practice, all optometry referrals were sent to the UM nurses in Alabama, who either approved the referral or denied it.  Many of the denials contained this as a reason for denial:  "Patient is not in custody for a year.  Resubmit after a year."  Rognlien-Hood Tr. at 158:25-159:11.  Where this requirement came from is a mystery to me.  In my opinion, if a patient has a medical or accommodation need for eyeglasses at one year, they had that same need at day one.  NaphCare's Policy and Procedure manual lists eyeglasses as an "Aid to Impairment" along with crutches and wheelchairs.  NAPHCARE001877.  Yet when a patient needs a wheelchair, NaphCare does not deny the request because "patient is not in custody for a year."  In order to work around this problem of optometry referrals being inappropriately denied by NaphCare, the Sheriff's Department eventually hired its own optometrist separate from its contracted services with NaphCare.  Rognlien-Hood Tr. at 156:2-5.  This program is new enough that I have no data on what impact this has had on the problem of vison evaluations, vision care, and eyeglass prescription.

653.   Finally, there are additional and substantial delays between the prescription of eyeglasses by an optometrist and the receipt of the eyeglasses by the patient.  Most jails have a contractual relationship with a company that specializes in providing glasses to incarcerated patients.  In my experience, such companies take only a couple of weeks between the receipt of a prescription and the delivery of eyeglasses.  I have seen nothing that indicates which entity the Sheriff's Department/NaphCare has contracted with to actually create the prescribed eyeglasses, or any timeline that they must abide by.  Notably, the Sheriff's Department's CQI process does not track the average length of time between an optometry appointment and the receipt of the prescribed eyeglasses, and makes no effort to improve its performance.

654.   There is substantial evidence of delays in providing vision glasses to patients who need them.  The Sheriff's Department contracted with NaphCare in June 2022 for the provision of optometry services.  County Contract No. 566117, § 2.3.19.2.  In its April 28, 2023 Corrective Action Notice, the Sheriff's Department stated that NaphCare was out of compliance with this provision of the contract, highlighting an "eye glass backlog," but for months, allowed the problem to go unresolved.  On September 13, 2023, the Sheriff's Department's Medical Services Administrator, Chris Miedico, wrote to NaphCare's Health Services Administrator, Dr. Michael Farrier, about a "████████████████████████████████████████████████████████████████████████████" NAPHCARE039577.  I agree with Mr. Miedico that this turn-around time is "████████████████████████."  *Id*.  Dr. Farrier acknowledged that ████████████████████████████████████. *Id*.  On November 9, 2023, Mr. Miedico again wrote to Dr. Farrier asking ████████████████████████████████████. NAPCHARE039575.

655.   Prescribed eyeglasses and/or contact lenses are a medical necessity for many incarcerated people, which means the denial of such optometry services can have a serious and widespread negative impact on incarcerated people in the Jail.  I found many examples of this in the patient charts I reviewed.

656.   One example is ████████████ (████████), an incarcerated person who submitted a request for optometry care on ████ 2023, stating "I would like to please be seen by optometrist due to poor vs [vision] keep bumping into things." SD_782225.  The request was stamped "received" almost six weeks later, on ████ 2023.  Mr. ████████ was seen by a nurse and then an NP for this request on ████ 2023 and stated that he could not see any letters at a distance of 20 feet. SD_782054-782055.  Mr. ████ was seen again by a Registered Nurse and Nurse Practitioner on ████ 2023, when he again raised concerns about his poor

vision.  SD_782064.  He was finally examined by an optometrist on ████ 2023.
SD_782239.  The optometrist diagnosed astigmatism and myopia.  *Id.*
Mr. ████ received prescribed eyeglasses on ████ 2023, more than five
months after his request for medical care for his vision.  SD_782064.

657.   As another example, on ████ 2023, ████
(████) submitted a request for a vision check:  "I need seeing plz and thank
you."  SD_747797.  A note on the request form states, "patient with pending RNSC
to eval for glasses."  *Id.*  It does not appear that there was any face-to-face
evaluation in response to this request.  SD_747539-40.  On ████ 2023,
Mr. ████ submitted another medical request: "I would like to have my eyes
checked and get glasses please and thank you."  SD_747787.  Again, there was no
face-to-face evaluation.  *See* SD_747538-39.  On ████ 2023, Mr. ████
submitted a grievance stating that he had been waiting for an optometry appointment
but it had not been scheduled.  SD_747780.  On ████ 2024, Mr. ████
stated on a medical request form that he needed an eye exam because he "ha[d] a
stigmatism in one [eye] and … [is] near sighted."  SD_747772.  On ████
2024, three months after he first submitted a grievance regarding his vision needs,
RN Marissa Barisan administered a near-vision acuity test to Mr. ████ gave
him 1.5 reading glasses, and the matter was considered settled.  SD_747537.  This,
however, is not what Mr. ████ initially asked for.  Mr. ████ mentioned
astigmatism and nearsightedness, which were never evaluated since his distance
vision was never checked and he was never referred to an optometrist.  Further, this
delay in the provision of even over-the-counter reading classes indicates substandard
care, as they should be readily available and freely provided to individuals like
Mr. ████.

658.   In summary, the Jail program for giving necessary vison correction to
incarcerated patients is in disarray and the Jail fails in its duty to provide these
necessary services to its patients.  Several recommendations flow from this finding.

1  The Jail should have specific policies and procedures on how vision evaluation,

2  optometry referrals, and eyeglass prescriptions will happen.  Nurses and corporate

3  UM officers should not be gatekeepers who deny patients access to vision care from

4  an optometrist based on bogus criteria.  Patients must be able to see an optometrist

5  in a timely manner, and prescription glasses should be delivered in a timely manner.

6  **X.   Custody Staff Interfere with the Provision of Care by Health Care Staff
    in the Jail, Including by Compromising Patient Confidentiality, Which
7   Puts Patients at Substantial Risk of Serious Harm**

8  659.   The NCCHC requires that health care staff have "autonomy" from

9  custody staff when it comes to patient care.  In particular, the NCCHC standard

10  requires health care staff and the institutional authority address any policies and

11  procedures that deny direct medical orders, including ones that interfere with the

12  delivery of, the access to, or the quality of health care services deemed necessary by

13  the Health Services Administrator and/or the advanced clinical provider.  *Id.*

14  660.   It is my opinion that the Jail fails to meet this standard.  In particular,

15  custody staff as a matter of course deny incarcerated people the opportunity to meet

16  confidentially with health care providers, either by requiring that patient meetings

17  take place outside the clinic or by requiring custody staff to be present during

18  clinical appointments.

19  661.   The Jail's policies and procedures provide that health care providers

20  must have "autonomy … in clinical decision making."  MSD Operations Manual

21  No. A.3.1 Medical Autonomy.  Qualified health care professionals are to

22  "collaborate with custody staff in implementing the plan of care safely and timely"

23  "[a]s needed," but the Jail's procedures are clear that "[u]ltimately, the qualified

24  health provider is responsible for the appropriate management of the patient."  *Id.*

25  Custody staff must "support[] the implementation of clinical decisions and aid[] in

26  facilitating necessary housing transfers."  *Id.*

27  662.   While these policies and procedures generally are appropriate, in

28  practice, custody staff regularly violate the Jail's policies and procedures requiring

1   autonomy in clinical decision-making and patient access to health care.  Both

2   Dr. Montgomery and Ms. Rognlien-Hood confirmed that custody staff frequently

3   interfere with the provision of health care in the Jail.  Dr. Montgomery stated that he

4   "agree[d]" with Plaintiffs' allegations in this case that custody staff "work[] out[side

5   the] scope" of their duties, impeding on the work of health care staff, and provided

6   myriad examples: custody staff arbitrarily cancelled the quarantining of incarcerated

7   people at intake during the COVID-19 pandemic; get involved in decision-making

8   processes between the Jail's medical clinic and the courts; prevent medical staff

9   from providing medications to incarcerated people during lockdowns; and tried to

10  force the Sheriff's Department to accept NaphCare's policies and procedures

11  without question in an attempt to indemnify the County.  SD_120011, SD_120015.

12  Dr. Montgomery reported to Sheriff's Department staff that there was a "large

13  disconnect between sworn and health staff" with respect to the use of body scanners,

14  observing that sworn staff order x-rays of patients without consulting with medical

15  staff.  SD_212920, SD_212921.  I agree with Dr. Montgomery that this practice is

16  problematic, because it results in a lack of proper evaluation, documentation, and

17  follow-up for patients who are at high risk of negative outcomes due to potential

18  abnormalities in their body scans.  *Id.*

19      663.   Ms. Rognlien-Hood provided testimony about custody staff interfering

20  in nursing staff's provision of care to incarcerated people, confirming that custody

21  staff at times deny health care staff to see particular patients who they deem too

22  dangerous.  Rognlien-Hood Tr. at 143:1-5.  This is problematic for several reasons.

23  First, patients deemed hostile and uncooperative commonly have medical or

24  psychiatric issues that are causing or exacerbating their behavior.  Examples from

25  my own experience include patients who are delirious from infections or

26  withdrawal; patients cranky due to pain, shortness of breath, or other medical

27  symptoms; and patients who have had strokes.  Second, hostile, uncooperative

28  patients become ill just like any other group of patients and may need medical

1   attention for important medical problems.  In my experience, patients sometimes are

2   hostile to custody staff but not to medical personnel who they perceive as wanting to

3   help them.  Often, a patient hostile to custody staff is cooperative when receiving

4   medical care.  Finally, there are ways of safely restraining uncooperative patients to

5   allow medical evaluation.  If custody staff think a patient is potentially dangerous to

6   medical staff, the proper course of action is to create an action plan for how to get

7   necessary medical care to the patient.

8       664.   Ms. Rognlien-Hood also was asked in her deposition whether any

9   health care staff had expressed having issues with the involvement of custody staff

10  in the health care administration or decision-making.  Ms. Rognlien-Hood answered

11  affirmatively and offered as an example that health care staff may want to put a

12  patient into the "detention safety program" and "sworn won't put them in there,"

13  and vice-versa.  *Id*. at 140:8-19.  Another example cited by Ms. Rognlien-Hood was

14  the process for "send outs," or when a patient is sent out of the Jail for medical care.

15  *Id*. at 141:17-24.  She testified that "[a] nurse will say 'I need this patient to go out,'

16  and sworn doesn't feel they need to go out."  *Id.*  These examples impede patients'

17  access to care, placing them at risk.

18      665.   Custody staff's involvement in health care decisions at the Jail is

19  particularly pronounced when it comes to confidentiality of medical encounters.  It

20  is my opinion that the Sheriff's Department categorically do not provide

21  incarcerated people with adequate confidentiality during medical encounters.

22      666.   It is a tenant of the medical profession that patients have a right to

23  reasonable privacy and confidentiality during their encounters with health care

24  professionals.  This standard is important because it facilitates sharing of important

25  medical information between patients and providers regarding concerns, symptoms,

26  behaviors, diagnoses, and treatment—details that patients might be embarrassed or

27  unwilling to share if they were to be overheard by someone else.

28      667.   In the community, confidentiality is achieved by having medical

1    encounters occur in a room specifically designed for private medical encounters.

2    Another important way that medical professionals in the community ensure

3    confidentiality is by excluding any extraneous people from witnessing or

4    overhearing the medical encounter.

5        668.    Incarcerated patients are no different than patients on the outside, who

6    may be reluctant to discuss intimate details of their medical problems in front of

7    non-medical staff.  Indeed, the possibility that patients might be unwilling or

8    embarrassed to describe their medical concerns outside a confidential environment

9    is likely even higher in the correctional setting, where patients may have the

10   impression that, if other incarcerated people know about their medical concern, they

11   could be perceived as weak, subject to ridicule, or even at risk of violence or other

12   victimization.  In my experience, incarcerated patients may be at risk of violence if

13   other incarcerated people know that they have certain medical issues, such as HIV,

14   or issues perceived as being transmittable, such as infections and rashes.  They may

15   be at risk of victimization if they are perceived as weak or have private information

16   that they do not want shared with others.

17       669.    The NCCHC 2018 Standards for Health Services in Jails addresses

18   confidentiality and privacy in section J-A-07, Privacy of Care.  This standard

19   provides "[i]t is essential that in nonemergency situations all protected health

20   information be protected from discovery or access.  This means that no

21   conversations concerning a patient's health status, diagnosis, or treatment should be

22   conducted in areas where they can be overheard by other inmates, staff, or

23   visitors….  Health stuff must ensure that all encounters with exchanges of health

24   information, starting with the receiving screening, remain private and that a patient's

25   dignity is protected.  Such efforts foster necessary and candid conversation between

26   the patient and health staff."

27       670.    NCCHC's 2017 Technical Assistance Report regarding the Jail's

28   compliance with NCCHC's standards found that the Jail was not in compliance with

NCCHC's privacy and confidentiality standards: "The areas of privacy and confidentiality of care need to be addressed. … procedures [must] be put in place to assure confidentiality when health care is being delivered and discussed." DUNSMORE0260627.

671.   Although the Sheriff's Department has a goal of complying with NCCHC's standards, and assuring appropriate privacy and confidentiality of incarcerated patients would seem to me to be "low hanging fruit" that would be relatively easy to implement, as far as I can tell, the Jail has made no effort to comply with the NCCHC's privacy standards.

672.   While the Sheriff's Department must consider security concerns related to the administration of health care, the need for security does not take away the obligation to ensure privacy and confidentiality for the patient.

673.   The San Diego Sheriff's Department routinely compromises the confidentiality of incarcerated patients.  Based on my review of charts and discussions with incarcerated people during my inspections of three Jail facilities, it is evident that most clinical encounters take place in or near the patient's cell-front rather than in private medical rooms designed for this purpose.  For example:

674.   ███████████ (███████) was examined by a nurse practitioner at his cell door on ███████2022 for testicular pain, SD_821714-15, and again on ███ ███ 2023 when he was seen at his cell door for painful urination, SD_821689.

675.   ███████████████ (████████) was examined by a nurse practitioner at his cell door on █████████2024 for a hand infection, SD_772666.

676.   ██████████████ (███████) was examined by a nurse practitioner at his cell door on ██████████ 2023 for a headache, SD_749590.

677.   ███████████████ (████████) was examined by a nurse practitioner at his cell door on █████████ 2022 for shoulder pain, SD_796606-07.

678.   ████████████ (████████) was examined by a nurse practitioner at his cell door on █████████2023 for a complex foot infection, SD_788746.

679.   And, ████████ (████████) was examined by a nurse practitioner at his cell door on ████ 2022 for hip pain, SD_773765.

680.   I could go on and on.  The practice of doing most medical evaluations in the patient's housing unit rather than in the medical suite is pervasive.

681.   Performing a medical evaluation at a patient's cell door means numerous other people, including other incarcerated people and staff, can see and/or hear the encounter.  Many patients will not feel comfortable speaking openly with health care staff or participating in such necessary physical exams for fear of embarrassment, abuse, or retaliation by those who can see and hear the encounter.

682.   According to the Sheriff's Department's policies, deputies are also present "when incarcerated persons are being evaluated and/or treated by facility health staff or contract providers."  DSB Policy M.15, II.C.  Email correspondence between Serina Rognlien-Hood and Christopher Miedico confirms that incarcerated people are not asked for their consent to have a deputy present during their medical evaluations.  SD_375953-375954.

683.   Deposition testimony also establishes that, even when incarcerated people are escorted to the medical clinic for an appointment, custody staff are *in the room* for the entire appointment.  Rognlien-Hood Tr. at 259:21-260:3.  She confirmed that custody staff can see a patient while they are being treated and can hear the substance of conversations during these appointments.  *Id.* at 259:21-260:7.  She also agreed that this can compromise patient privacy with respect to health care.  *Id.* at 260:8-261:1.  Similarly, Dr. Peter Freedland of CHP, with whom the County just signed another contract for additional medical services, testified that "there's always a deputy" present during medical appointments, even in the medical clinic.  Freedland Tr. at 113:1-3.

684.   In my opinion, there is no reason that appointments for *every* patient— regardless of security classification level—must be attended by a deputy.  Many other jails have privacy policies and procedures that protect incarcerated patient's

1    rights while also ensuring security.

2       685.    One common way that other jails ensure privacy is by having at all

3    times at least two medical professionals in the medical exam room with the patient,

4    such as a practitioner and a nurse, or an RN and an LVN.  Security is nearby but out

5    of earshot of normal volume conversations, so that they can respond quickly if staff

6    raises their voice to indicate there is a problem.  Jail policies and procedures can lay

7    out different security procedures for those patients who Jail staff have individually

8    identified as having special security issues warranting custody staff being within a

9    closer proximity to the medical encounter.

10      686.    In conclusion, the Sheriff's Department knows that they are not

11   complying with NCCHC or industry standards to preserve patient privacy and

12   confidentiality.  This can harm patients by making them fearful to disclose

13   potentially embarrassing medical complaints in front of security staff and other

14   incarcerated people.

15   **XI.    The Sheriff's Department Fails to Maintain Adequate, Accurate, and
         Complete Medical Records, Which Compromises the Delivery of Care**

16

17      687.    In my opinion, the Sheriff's Department lacks adequate recordkeeping

18   processes, which undermines care for incarcerated people.

19      688.    The standard of care requires that meticulous medical records be kept

20   on every patient and of every encounter with medical personnel.  Medical records

21   can be handwritten, but most medical systems now use electronic medical records

22   ("EMR").  The essential attributes of an EMR are (i) simplicity, (ii) efficiency,

23   (iii) confidentiality, (iv) searchability, and (v) report generation.  Of course, it is also

24   essential that information input into the EMR is both accurate and complete.

25      689.    The NCCHC 2018 Standards for Health Services in Jails discusses the

26   minimal standards for medical records in "Health Records" (J-A-08).

27      690.    The EMR serves an important function in any system that delivers

28   medical care.  Complete, accurate, easy to access medical records are a necessary

component to ensure that an individual receives consistent care.  For example, it enables a practitioner who is seeing a patient for the first time to learn what care the Jail previously provided to the patient or why the patient was referred to the practitioner in the first place.  A functioning EMR also enables practitioners to monitor an individual patient's health trends overtime, *e.g.*, whether someone's blood pressure has increased since they were booked into the Jail.  The EMR is also a critical tool for tracking systemwide trends within the Jail.

691.  The Sheriff's Department maintains an EMR for incarcerated people using a system called "TechCare."  TechCare is a proprietary product of NaphCare, and the primary method for medical recordkeeping in the Jail.  I am aware that Plaintiffs' counsel sought for me to inspect TechCare, but I was not able to do so.  Nevertheless, it is my opinion based on the documents I have reviewed that the system has many problems.

692.  Leaving aside the wisdom of using the technology of a company that recently lost a portion of its medical contract with the County, my review of records has shown serious deficiencies in TechCare's functionality.

693.  TechCare lacks simplicity and efficiency because, among other issues, it has no list of all medical events (including but not limited to sick calls, lab draws, etc.) by date and does not list discharge dates or many other important events related to an incarcerated person's health.  These features are important because they allow medical staff to quickly and easily know exactly what is going on with a particular patient, such as the patient had an x-ray but the reading has not returned or the practitioner saw the patient but not everything she ordered has been done yet, etc.

694.  TechCare also is lacking in searchability.  Ms. Rognlien-Hood testified that "sometimes finding … information [in TechCare] is not user friendly."  Rognlien-Hood Tr. at 231:13.  Searchability is important because medical records can be long and dense, sometimes many thousands of pages long.  It may be important to know, for example, if a patient has had a certain vaccine, or what a test

done last month showed, or what the patient's weight was the last time they were in jail. Without a functioning search tool, it can take a lot of time to find very important information. If that important information cannot be found, medical care can suffer and patients can be harmed. As an example, if I cannot find out what a patient weighed the last time he was in jail, I might not realize that he has gained 75 pounds in 8 months, which should be investigated medically.

695. As one example, ███████████ came to the Jail directly from the UCSD hospital, where he was for two days prior to his incarceration. SD_873242-49. In the receiving screening form for Mr. ██████ a nurse noted: "rece[i]ved paperwork from UCSD." *Id.* However, in a Progress Note written only two days later, a nurse noted: "No d[i]scharge paperwork from UCSD ava[il]ab[l]e." SD_873259.

696. Another example is that of ██████████, discussed in detail above. Even though Mr. ████████ medical records had been received from Kaiser on █████ 2022, and a TechCare task for review of those records had been created, when a nurse practitioner saw Mr. ███████ on ██████████ 2022, he documented a plan to send an "ROI for Kaiser … waiting for records to arrive for review. Medical Records of ██████████ as of ██████ 2023, pp. 109, 533, 552 of 595. An easy to use record system would make it obvious that those records had already been received.

697. Another example is the case of ██████████, also discussed in detail above. On ██████ 2022, Dr. Christensen completed a task in TechCare to review Ms. ████████'s blood pressures. He did so and prescribed a medication for hypertension. However, at that time, Ms. ██████ had been hospitalized in the Intensive Care Unit for two days. That fact should have been apparent to Dr. Christensen in the EMR.

698. Further, TechCare's reporting capabilities also appear to be substandard. Ms. Rognlien-Hood admitted that some TechCare reports cannot be

1    run "easily … because of the way TechCare is set up." *Id*. at 89:8-90:7. This

2    impacts the provision of care. Ms. Rognlien-Hood testified that the frequency with

3    which she runs certain critical reports regarding health care operations depends on

4    her workload because running the reports is "very time consuming." *Id*. at 90:8-14.

5    When reports are run, they are often inaccurate, possibly because TechCare pulls

6    information from sources that are not being used by staff to document patient

7    information. *Id*. at 248:13-249:5.

8        699.   Dr. Freedland also testified that he is not a fan of TechCare: "I think

9    there's a lot of good medical EMRs out there that could potentially benefit the [Jail]

10   system more so than TechCare." Freedland Tr. at 32:6-8. Dr. Freedland stated "I'm

11   not sure how it [TechCare] was created. There is a not a lot of ease of use." *Id*. at

12   32:11-13.

13       700.   The Sheriff's Department was aware of serious issues with TechCare

14   that would impede the provision of proper health care in the Jail, but these issues

15   went unresolved for months if not years. The Sheriff's Department also raised

16   issues with NaphCare at various meetings. For example, Sheriff's Department staff

17   raised questions about inaccuracies in TechCare reporting at Medical Audit

18   Committee meetings, and NaphCare representatives repeatedly stated that they

19   would get answers, but did not do so. Rognlien-Hood Tr. at 244:10-246:1.

20   Additional TechCare issues were raised in the Corrective Action Notices issued to

21   NaphCare by the Sheriff's Department. The Corrective Action Notice issued May

22   12, 2023 stated that NaphCare was "releasing new TechCare builds without

23   providing advanced notice of the changes or training to County Clinical Staff,"

24   resulting in some county staff being "faced with screens and cues they [know]

25   nothing about and have no idea how to complete." NAPHCARE034756. This,

26   according to the Sheriff's Department, "can lead to information being entered into

27   the system that is not followed up [on] creating potential liability to the county." *Id*.

28   I agree that this problem of information being entered into a medical record without

1   clear steps for follow up can have serious consequences for patient care, and should

2   have been addressed immediately.  Instead, the issue appeared in Correct Action

3   Notices for months, and the most recent one I have reviewed simply says NaphCare

4   is "responsive to all related IT concerns" without further detail.  SD_1572607.

5        701.   Similarly, I found multiple examples in the medical record of abnormal

6   study results being neglected by the Jail's healthcare staff.  The standard of care

7   when any study is ordered is for a medical practitioner (usually the one who ordered

8   the study) to interpret the results (normal/not normal), create a care plan based on

9   the interpretation (if necessary), and communicate the results and the new care plan

10   to the patient.  All three steps should be documented in the medical record.  And, in

11   a good medical recordkeeping tool, these follow-ups would be triggered

12   automatically.  However, it is clear these follow-ups are not occurring; the Sheriff's

13   Department did a CQI study to determine whether this standard of care was being

14   met and found abysmal compliance ranging from 16% to 36% between May 2023

15   and September 2023.  SD_114411.

16        702.   The discussion of diagnostic care earlier in this Report highlights

17   several examples of abnormal test results that were ignored, but which should have

18   been followed up on as a matter of course—and which a robust EMR would have

19   required such a review.

20        703.   In addition to the problems with TechCare's functionality—which the

21   Sheriff's Department has failed to correct despite knowing about them for months—

22   medical records and other documents produced by the Sheriff's Department suggest

23   that staff do not always provide complete documentation of encounters with

24   incarcerated people.

25        704.   For example, Aaron Bonin, whose in-custody death is discussed in

26   detail above, was an incarcerated patient on dialysis for end-stage kidney failure.

27   Before going into cardiac arrest due to his very high potassium level on October 24,

28   2022,  Mr. Bonin was noted as having high potassium levels on October 20 and

1  October 21.  SD_002075, SD_002237-39.  The treatment for someone, like

2  Mr. Bonin, who has kidney failure and high potassium is dialysis.  However, a nurse

3  the Jail discontinued the dialysis Mr. Bonin's dialysis early, writing: "Pt strongly

4  insisted to stop the treatment."  SD_002504.  Troublingly, the Jail's analysis of

5  Mr. Bonin's death, which I understand was written by Dr. Montgomery, notes that

6  the recordkeeping about Mr. Bonin's dialysis treatment was poor.  SD_055143.

7  Dr. Montgomery wrote:  "Appears that approximately 10 events that were not

8  scanned in/recorded … Unclear if the lack of documented treatment record could be

9  considered a refusal.  While the patient has a recorded history of frequently refusing

10 medications, there are not that many instances of a recorded refusal of dialysis."  *Id.*

11 From the moment that Mr. Bonin supposedly refused dialysis until the cardiac arrest

12 that ultimately killed him, Mr. Bonin was not seen by a practitioner or any other

13 medical staff member to ask why he was refusing dialysis and to inform him why

14 that dialysis session was particularly important.  *See* SD_002075-76.  In addition,

15 according to Dr. Montgomery, it is not even clear from his medical record whether

16 Mr. Bonin had in fact refused dialysis.  Had these incidents more clearly

17 documented, and if the Jail's recordkeeping system had the ability to flag critical lab

18 results and require practitioner sign-off on refusal of critical treatments, Mr. Bonin's

19 death could have been prevented.

20      705.   As another example, which is alleged in the Third Amended

21 Complaint, Plaintiff Andree Andrade suffered multiple concussions while in the Jail,

22 both from falling out of his upper bunk and from being assaulted.  After an initial

23 fall from his bunk in June 2022, he was sent to the hospital and informed by medical

24 staff at the hospital that he sustained a concussion.  His discharge instructions also

25 include a highlighted section for "concussion" under "injury specific instructions."

26 DUNSMORE0065484-95.  However, Andrade's progress notes make no reference

27 to the concussion.  DUNSMORE0065226-28.  A concussion is a brain injury that is

28 not trivial.  It is very important that concussion patients be treated according to

standard concussion protocols whether they are high school football players or patients in a jail. What should have happened when Mr. Andrade returned from the hospital was for a practitioner to have reviewed the hospital discharge diagnosis and create a treatment plan. A robust EMR would force this to happen. Similarly, only days after his first hospital visit, Mr. Andrade was assaulted and again taken to the hospital, where hospital staff again noted that his chief complaint was "concussion/head pain" and again provided him with specific discharge instructions for "concussion." DUNSMORE0065533-42. Again, Mr. Andrade's progress notes make no reference to the possible concussion. DUNSMORE0065233-34. Based on my review of the records, it appears that no one properly reviewed the hospital notes and no one created an ongoing treatment plan. This was essential medical history that was ignored.

706.   Complete and accurate reporting in TechCare is particularly important for patients who are transferred between Jail facilities. Both the MSD Operations Manual and NaphCare's Policies and Procedures indicate that the Jail relies almost exclusively on TechCare for continuity of care when an incarcerated person is transferred between two facilities within the Jail. *See* MSD Operations Manual MSD.M.4, Part V (outlining procedures "[i]n the event that a paper record exists"); NaphCare P&P, E-03, NAPHCARE031248 ("A Transfer Summary form should be completed if continuity is not clearly maintained within TechCare from one facility to the next."). And, based on the charts I have reviewed, in practice, transfer summary forms are rarely filled out.

707.   As explained above, there are substantial flaws with TechCare and the Sheriff's Department's completion of TechCare documentation, leading to likely gaps in care. Without appropriate documentation, when a patient moves to a new facility, the new nurses and medical practitioners have to reconstruct the patient's history by reading the patient's entire chart. This takes time and effort, and invariably, important things will be missed in some patients during the handoff.

708.    Sheriff's Department nursing staff also have voiced concerns about "receiv[ing] transfers with no or inadequate follow-up or second stage [medical evaluation] scheduled." SD_213483. Health care staff at intake facilities should initiate care at the time of screening, so that when patients are transferred to other facilities, which I understand can happen frequently and with little notice, the receiving facility can properly treat them. Otherwise, the failure to initiate proper care at intake can have ripple effects and interfere with continuity of care.

## XII.    The Sheriff's Department Fails to Provide Necessary or Adequate Follow-Up Medical Treatment to Incarcerated People

709.    In my opinion, the Sheriff's Department fails to provide follow-up care to incarcerated people who are sent for medical care outside the Jail—either to the emergency room or for a specialist appointment—thus placing incarcerated people at a substantial risk of serious harm.

710.    Appropriate medical care often requires follow-up—in both the community and the correctional setting. Jail patients are frequently sent for medical care and evaluation outside of the jail. Examples include: being admitted to the hospital; being sent to the emergency department for some type of urgent evaluation; being sent for a consultation with a medical specialist outside of the jail, such as an orthopedist, a cardiologist or a neurologist; being sent for some type of diagnostic study that cannot be done in the jail, such as an MRI, echocardiogram or EEG; or being sent for some type of treatment or therapy that cannot be done as the jail, such as physical therapy, infusions for autoimmune disease or radiation treatments for cancer.

711.    When jail patients return from any of these off-site appointments, the findings and recommendations made during the off-site appointment must be incorporated into the patient's medical record and the overall medical treatment plan at the jail. This process is often termed "medical follow-up." The following hypothetical cases are given as examples.

1        a.      A patient returns from the emergency department having been

2    diagnosed with a broken arm and the recommendation that the patient see an

3    orthopedist within two weeks so that proper healing of the fracture can be assessed.

4        b.      A patient returns after having an CT done, which showed a brain

5    mass.  The radiologist recommends an MRI be done.

6        c.      A patient returns from being hospitalized for dehydration and

7    renal failure and is recommended to have follow-up labs and monitoring.

8        d.      A patient returns from an appointment with a rheumatologist,

9    who would like to see the patient again in one month.

10   712.   "Follow-up" means assuring that these recommendations are followed

11   and that necessary communications with the outside entity occur.

12   713.   The underlying principles and processes for follow-up care are similar

13   to intake and continuity of care issues, discussed earlier in this Report.  Patients

14   return from outside medical visits with new diagnoses, new medications, and new

15   recommendations for medical treatment.  Therefore, just as a jail must evaluate an

16   incarcerated person's medical condition at booking so that the jail can be sure the

17   patient's care is continued, the jail must ensure that all important findings,

18   diagnoses, and recommendations from off-site visits are entered into the medical

19   record and incorporated into the patient's health care plan.

20   714.   The first (and perhaps most essential) part of follow-up after an outside

21   medical visit is to review the medical records from the outside visit and summarize

22   the important findings into the patient's medical record.  This is essential because

23   outside medical records may be hundreds of pages long and often not easily

24   assessed or read by other medical professionals at the jail.  This review and

25   summary of outside medical records should contain the following basic information:

26       a.      Who reviewed the records (usually a medical practitioner).

27       b.      What were the discharge diagnoses and major findings.

28       c.      What studies were done and what did they show.

1          d.     Are any diagnostic studies or treatments recommended for the

2  future? Who will schedule these?

3          e.     When will the patient be seen by jail medical staff?

4      715.   In addition, a jail medical professional should speak with the patient

5  face-to-face to ascertain their understanding of the important findings and what

6  should be scheduled in the future.

7      716.   However, the MSD Operations Manual Medical Division says nothing

8  about the appropriate steps to take when patients return after receiving offsite care.

9  NaphCare's Health Care Policy and Procedure Manual No. A-08 says only that

10  "[o]ff-site health care and emergency treatment referral and discharge summaries"

11  should be contained within the patient's health record in TechCare.

12  NAPHCARE001577.

13      717.   In my opinion, this lack of guidance on what is expected of Jail medical

14  staff when patients return from offsite care leads to inadequate documentation and

15  poor medical care that can (and does) harm patients.

16      718.   In my review of medical records, I found that the basic principles of

17  documentation of outside medical records, continuity of care, and appropriate follow

18  up simply do not occur very often at the Jail.

19      719.   Many times, no review of the outside medical records was recorded at

20  all.  For example, patient ██████████ was sent to the ER when she had a seizure

21  during a court proceeding on ████ 2023.  SD_810597.  There is no indication that

22  her ER record was even reviewed, and it was never summarized in her records.

23      720.   In other cases, the records were simply noted as "reviewed," but none

24  of the essential information outlined above was entered into the medical record.

25      721.   The deaths of Patricia Adamson and Roselee Bartolacci, described in

26  more detail earlier in this Report, are tragic examples of these failings at the Jail.

27      722.   Ms. Adamson was hospitalized for two days from February 15, 2023 to

28  February 17, 2023 due to hematemesis, *i.e.*, throwing up blood, which is most

commonly caused by an ulcer in the stomach or duodenum.  SD_705066.  Dr. David Christensen wrote in Ms. Adamson's progress notes on February 20, 2023 that "[h]ospital records [were] reviewed," SD_705067, but made no summary of the medical care provided at the hospital and created no ongoing care and treatment plan for hematemesis/ulcers.  NP Lacey Beaston did a brief summary of the hospital records in a chart note on February 23, 2023.  SD_705124.  She specifically noted the anemia and the hospital plan to transfuse Ms. Adamson if her hemoglobin fell too much.  *Id.*  NP Beaston also noted the hospital discharge prescription of Protonix.  *Id.*  However, NP Beaston made no other treatment plan.  She ordered no labs to check hemoglobin levels, and no scheduled check ups.

723.    Perhaps because there was no easily accessible summary of the medical records and no treatment plan, when Ms. Adamson began shortly thereafter to have other abdominal symptoms commonly associated with ulcers ("early satiety, nausea and bloating") the nurse practitioner who saw her on April 29, 2023 did not mention her hospitalization two months previously and did not consider the possibility of an ulcer.  SD_705537.  Four days later, Ms. Adamson died of a perforated gastric ulcer.

724.    In my opinion, not appropriately reviewing Ms. Adamson's medical record and not developing a medical care plan based on her hospital findings were important contributing factors in her death.  She went to the hospital due to the complications of ulcers.  She died three months later from the complications of ulcers that had been ignored at the Jail in the intervening three months.

725.    Ms. Bartolacci was hospitalized for thirteen days from April 26, 2023 to May 10, 2023, with serious, life-threatening problems, including malnutrition, dehydration, acute renal failure, sepsis, hypokalemia, anemia, cardiac dysrhythmias, and more.  SD_711885.  While she was in the hospital, many diagnostic studies were done, including ultrasounds, cardiac studies, and x-rays, many of which were abnormal.  SD_712354-56.  Ms. Bartolacci also had severely abnormal metabolic labs, such as a critically low potassium level.  She was so sick that she required 13

1   days in the hospital to recover.

2       726.   However, when she returned to the Jail on May 10, 2023, a STATCare

3   practitioner, Chelsea Lowery, Corp NP, wrote only "Hospital d/c summary

4   reviewed." SD_711885.  She wrote nothing else.  None of the essential elements of

5   several days of hospitalization was summarized.

6       727.   NP Lowery did schedule an MD Sick call visit for Ms. Bartolacci, but,

7   when that visit occurred two days later, Dr. David Christensen appears not to have

8   seen the hospital records at all.  He wrote nothing about them.  Instead,

9   Dr. Christensen, wrote that the patient "refused provider eval." *Id.* at p. 298.

10  Nothing further was scheduled.  There was certainly no treatment plan incorporating

11  what was learned about Ms. Bartolacci's frail medical condition during her 13 days

12  in the hospital.  Ms. Bartolacci died approximately two weeks later.

13      728.   In my opinion, not appropriately reviewing Ms. Bartolacci's medical

14  record after her 13-day stay at the hospital and not developing a medical care plan

15  based on this review were important contributing factors in her death from the same

16  problems that had been treated at the hospital, namely malnutrition, dehydration,

17  and hypokalemia.

18      729.   Another example is ████████ (████████), a ██ year old woman

19  with a documented history of coronary artery disease, who had, as a result, been

20  treated with a coronary stent.  SD_754185-88.  At her booking on ████████ 2023,

21  Ms. ██████ was sent to the hospital.  She refused evaluation at the hospital but was

22  nevertheless cleared and returned to the Jail the same evening.  SD_754188.  On

23  ████████ 2023, Dr. David Christensen noted "Scripps ████ after visit summary

24  reviewed," but he did not provide a summary of what had occurred.  SD_754732.

25  On ████████2023, Ms. ██████ was again sent to the hospital for chest pain.

26  SD_754219-20.  She was admitted and had EKGs (all abnormal), SD_754213; a

27  cardiac stress test done (that was interpreted as "nondiagnostic"), SD_754212; and

28  labs which showed "stage 3 chronic kidney disease," SD_754208.  The discharge

1  papers sent back to the Jail with Ms. ███ included the findings of her

2  echocardiogram: "Conclusion Left ventricular systolic function is severely

3  decreased. LVEF [left ventricular ejection fraction] is 25%"—anything below 30%

4  is severely abnormal—"Moderate to severe mitral regurgitation. Severe tricuspid

5  regurgitation. There is severe pulmonary hypertension." SD_754215. In other

6  words, Ms. ███ had been diagnosed with severe, life-threatening heart disease

7  and moderate kidney disease.

8      730.   She returned to the Jail on ███████ 2023. The next day, NP Lacey

9  Beaston noted that Ms. ███ "had a cardiac work up including labs and an echo"

10  but evidently did not look at the echocardiogram report nor did she note the

11  diagnosis of stage three kidney disease. SD_754738. Ms. ███ continued to

12  complain of chest pain thereafter and was evaluated by nurses, who sent EKGs to

13  STATCare midlevel practitioners for interpretation. SD_754746, SD_754739. The

14  severely abnormal echocardiogram was finally noted four weeks later, on ███████

15  ██ 2023, by NP Beaston. SD_754749. It took another month to get UM

16  permission for a cardiology consult, which finally occurred via telemedicine on

17  ███████ 2023. SD_754755. Ms. ███ was finally sent to the hospital for a

18  cardiology evaluation on ███████ 2023, SD_754764, and ███████ 2023.

19  SD_754772. At the ███████ 2023 visit, the hospital conducted another

20  echocardiogram and determined that the first echocardiogram was actually not

21  Ms. ███ but had been mistakenly included in her chart. The severely abnormal

22  echocardiogram attributed to Ms. ███ should have been identified far sooner than

23  three weeks later. Had it been a real finding, Ms. ███ could easily have died

24  within those three weeks.

25      731.   In summary, the Sheriff's Department has no Policy or Procedure for

26  ensuring appropriate follow-up and continuity of care after Jail patients return from

27  outside medical appointments. Because of this, appropriate follow-up and

28  continuity of care does not occur. This leads to patient harm, including death.

**XIII.  The Sheriff's Department Fails to Provide Adequate Discharge Planning Services and Medication for Incarcerated People Being Released from the Jail**

732.    In my opinion, the Sheriff's Department lacks adequate discharge planning services to ensure the health care of individuals being released from the Jail.  Discharge planning from a jail is essential because these patients, who suddenly have no or limited options for medical care once released, are liable to have their health seriously deteriorate without that care.  Without care, many of these people will return to the Jail.  Without community resources for medical care, they will return to the Jail in worse shape than they were before.  From a public health perspective, these patients return to the larger San Diego community.  Their problems receiving proper health care will result in worsening community problems, ranging from transmission of communicable diseases that were not treated to overburdening first responder and emergency room resources in the community because they have nowhere else to go.  For those of us who have practiced jail medical care, the problem of slow deterioration of incarcerated and formerly incarcerated patient health over time due to lack of resources is a common experience.

733.    The standard of care for discharge planning in a jail is similar, if not identical, to the standard for discharge planning in the community.  In the community, there is a standard of care as to the responsibilities of the medical staff when a patient is being discharged from a hospital, a nursing home, or any other inpatient facility.  The medical staff has the responsibility to ensure *continuity of medical care* after the patient leaves the facility.  One can find the essentials of this standard of care in many places.  For the purposes of this report, I used the online medical textbook *Uptodate*, and specifically, the chapter "Hospital discharge and readmission" written by E. Alper, et al.  *Uptodate* states that "[d]ischarge planning is the development of an individualized discharge plan for the patient, prior to leaving the hospital, to ensure that patients are discharged … with provision of

adequate post-discharge services." Based on my experience practicing medicine in carceral settings, this is the appropriate standard of care in the Jail as well.

734. Per *Uptodate*, elements of discharge planning include "[p]lanning and coordinating with whatever entity will take over medical care after discharge." This includes "communication between the [facility] and the clinic or medical practitioner that will take over care after discharge"; ensuring the "clinic or medical provider [] receive[s] the jail medical record"; considering whether the patient "ha[s] a family or other sources of medical support"; "[m]edication reconciliation, which includes determining what medications the patient is to take after discharge and how the patient will get them"; and providing the patient with instructions about their main medical problems, as well as what to do and who to see if these problems arise. *Uptodate*, Hospital Discharge and Readmission, Alper, et al., Feb 3, 2023. Based on my own knowledge and experience, this is an appropriate standard of care.

735. The Jail has a poor track record with regard to discharge planning. In 2017, the NCCHC Technical Assistance Report concluded that "there was no evidence of [discharge planning] in the medical records we reviewed [at the Jail]." DUNSMORE0260675.

736. The Jail's policies regarding discharge planning are minimal, providing guidance only about providing medication upon release. NaphCare Policy & Procedure Manual, E-10 Discharge Planning, June 1, 2022, SD_073589; MSD Operations Manual D.1.1, Pharmaceutical Operations § IX. Discharge Medications.

737. This lack of adequate policies and procedures relating to discharge planning guarantees failure of the program. As with every other Department function, the Sheriff's Department must lay out the standards of discharge planning that they expect from their employees and contractors. Discharge pharmaceuticals is just one part of the discharge process. Discharge planning must take into account, for example, disabilities. Alarmingly, I understand the Sheriff's Department released a person with a mobility disability from Central Jail at close to midnight on

May 31, 2024 without his wheelchair, underscoring the harm that can occur if specific discharge planning policies are not in place.  Declaration of James Clark, June 12, 2024.  Discharge planning must also consider ongoing medical treatments.  How will the patient continue cancer treatments after release?  If a patient is released before receiving a scheduled surgery, what does that patient need to do now? Having no policies about these and many other discharge considerations means that Jail patients will inevitably be harmed when necessary medical and social needs are not met.  The medication discharge policy is also insufficient, as explained in more detail below.

738.    Rather, the Sheriff's Department attempted to rectify its poor performance regarding discharge planning by hiring NaphCare as the primary provider of health care services in June 2022.  Specifically, the County's contract with NaphCare states that the County and NaphCare "shall implement a system of discharge planning per the NCCHC standard."  Contract No. 566117, , NAPHCARE000568.  It also says the County and NaphCare must "ensure all discharge planning activities are documented using Techcare," and moreover, the "Release/Discharge Summary screen shall be used to provide medical information to the patient, medical facility or another state prison system." NAPHCARE000569.

739.    I understand that the Sheriff's Department is renegotiating much of its contract with NaphCare, and, as of July 1, 2024, and contracted with CHP for provision of on-site medical care, including "Discharge of Patients."  Contract No. 571418, SD_1579722.  However, Dr. Freedland testified that "We're [CHP] not typically involved in the discharge process."  Freedland Tr. at 149:19-20.  It appears that NaphCare will remain fully in charge of the discharge planning program.

740.    My review of documents has demonstrated that the Sheriff's Department has not implemented a comprehensive system of discharge planning, it failed to ensure that NaphCare implement such a system, and it has not taken

1  sufficient steps to remedy those flaws in its new contract with CHP.  The Sheriff's
2  Department thus fails to meet the standard of care regarding discharge planning.

3  **A.    Coordinating Ongoing Medical Care with Outside Agencies**

4  741.   The County is responsible for ensuring that there is a system in place to
5  plan and coordinate continued patient care with outside agencies.  As noted above,
6  however, there are no San Diego County policies requiring that any such
7  coordination occur.

8  742.   The County's contract with NaphCare provides that "[a]s part of
9  discharge planning, case managers, medical and mental healthcare professionals
10 shall help arrange follow-up appointments for the patient."  Country Contract No.
11 566117, NAPHCARE000569; *see also id.* ("Case managers and Contractor [will]
12 arrange an appointment prior to release."); NAPHCARE000568 ("[D]isposition
13 choices include referrals for case management[.]"); *id.* (requiring "[t]he
14 development of a plan to address key issues such as continued medical and mental
15 healthcare, housing, medical insurance, transportation, Social Security Disability,
16 and employment").

17 743.   NaphCare employs two discharge planners for the Jail, but the scope of
18 their duties had yet to be determined as of June 2024—two years after the contract
19 was signed.  In her June 7, 2024 deposition, Angela Nix, testifying on behalf of
20 NaphCare, stated that the job duties of the two discharge planners were "currently
21 [being] develop[ed]."  Nix II Tr. at 78:6-7.  In particular, "we are working with the
22 County to decide how those particular positions are going to function, if it's going to
23 be a clinical discharge planner, or someone that is more of a clerical or
24 administrative [sic]."  *Id.* at 77:18-22.  Ms. Rognlien-Hood similarly testified that
25 implementation of discharge planning in conjunction with NaphCare was "still a
26 work in progress."  Rognlien-Hood Tr. at 250:2-7.  Dr. Montgomery echoed these
27 sentiments, testifying, "I'm unclear what NaphCare's discharge planners are
28 actually doing."  Montgomery II Tr. at 265:25-266:1.

744.    To the extent that the NaphCare discharge planners' work—if they have even started—is be governed by NaphCare's existing policies and procedures regarding discharge planning, those fall far short of what is required in the contract. Notably, the policies and procedures imply that incarcerated patients must specifically ask for discharge planning in order to receive it, stating that "[p]atients who are aware in advance of their release date may inform health staff" who will then begin discharge planning, such as a provider "review[ing] the medications and determin[ing] which medications need to provided and for what duration." NaphCare Policy & Procedure Manual, E-10 Discharge Planning, NAPHCARE000932. The NaphCare policies and procedures also state that appointments and resource information are not provided to everyone, but rather, are "made available to the patient upon his/her discharge from the facility and appointments made when possible." *Id.* The term "when possible" seems to allow NaphCare an excuse anytime they fail to provide appropriate discharge planning. Given that there are only two discharge planners in comparison to thousands of people that are discharged every month (the Jail's average daily population is approximately 4,000 people, but the Jail regularly books that many people or more each month), it is likely that it will frequently not be "possible" for the two discharge planners to arrange continuity of care for everyone.

745.    The NaphCare policies and procedures fall short of the standard of care. There is no mention of any forward planning of continuity of medical or mental health care for patients who need this upon release. There is no plan to coordinate medical care with community clinics that would be willing to see former Jail patients. There is no consideration of their obligations toward patients with disabilities when these patients leave the Jail. Instead, the Jail has put the onus on the patient to inform the Jail staff that they would like help coordinating their medical care after discharge. No outside entity requires this. No hospital will fail to do discharge planning because the patient did not ask for it. Again, requiring

1  patients to ask for discharge planning seems to be a subtle way to deny them this
2  service and to excuse the fact that NaphCare did not provide this service.

3      746.   Nor does it appear that CHP will be taking over the discharge planning
4  function at the Jails.  Although the new contract generally states that CHP will be
5  responsible for "Discharge of Patients," SD_1579722, there is no language in the
6  CHP contract requiring them to set up a discharge system, as there is in NaphCare's
7  contract.  And, as Dr. Freedland testified in his deposition, "we're not typically
8  involved in the discharge process."  Freedland Tr. at 149:19-20.  In other words,
9  CHP is unlikely to have an already developed discharge planning model that could
10 be implemented in San Diego.

11     747.   In practice, discharge planning is, in fact, not occurring at the Jail.
12 Dr. Montgomery confirmed this at his deposition, testifying that the Sheriff's
13 Department does not have policies or practices for systematically providing
14 incarcerated individuals with comprehensive discharge planning related to their
15 health care.  Montgomery II Tr. at 254:17-257:7.  Rather, such care—which
16 includes things like referring individuals to offsite clinics for continued care or
17 connecting individuals with community health resources—may occur on an ad hoc
18 basis if Dr. Montgomery or Ms. Rognlien-Hood happen to be notified by another
19 agency like the County's probation office.  *Id.* at 257:3-7.

20     **B.**    **Discharge Medications**

21     748.   With respect to discharge medication, the Sheriff's Department's
22 policies and procedures require that incarcerated people receive only a 10-day
23 supply of medication, and only for certain limited medications, defined vaguely as
24 "critical medications."  MSD D.1.1 § IX(A).  Although Dr. Montgomery testified
25 that the Jail provides individuals of 30-day supplies of all medications now, this is
26 not set forth in official policy.  Montgomery II Tr. at 259:22-24.

27     749.   The fact that there is no official policy requiring provision of 30-day
28 supply is important because the Sheriff's Department cannot hold people

1  responsible if they fail to adhere to it.  In addition, without a formal policy, actual
2  practice can eventually devolve to the discretion of whether the clinician that sends
3  the prescription personally thinks a certain medication is "critical."  NaphCare's
4  policies and procedures demonstrate the haphazard nature of the discharge
5  medication policy in the Jail, stating that "[p]atients who are aware in advance of
6  their release date may inform health staff.  The provider will then review the
7  medications and determine which medications need to provided and for what
8  duration."  NaphCare P&P, E-10 Discharge Planning,  NAPHCARE000932.
9  Without written guidance as to what is or is not a "needed" medication, different
10  providers will inevitably make different decisions so that some patients will receive
11  certain medications upon discharge and others will not.  The language also indicates
12  that the provider only has to do this if the patient requests this in advance.

13      750.   As recently as December 29, 2023, ███████████████████████
14  ████████████████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████████████████
16  ████.  MSD Leadership Meeting, Agenda, December 29, 2023,
17  NAPHCARE037026.

18      751.   The Sheriff's Department also had problems ensuring continuation of
19  Suboxone prescriptions for individuals receiving MAT upon discharge.  In
20  November 2023, for example, pharmacies required "prior authorization" from a
21  physician to release 30-day prescriptions to discharged individuals due to a
22  disagreement with NaphCare, resulting in medication delays.  Email from Kelly
23  Donahue to Kathy Myers et. al., November 30, 2023, SD_661566.

24      752.   For patients requiring medication following release, these issues can be
25  very harmful.  For example, on ███████████ 2023, Sheriff's Department medical
26  staff requested a MAT medication for ███████████████, who was scheduled to
27  be released on ███████████ 2023.  Email from RN Stephen Yi to Dr. Elliot Wade and
28  Dr. Nas Rafi, ███████████ 2023, SD_364617-18.  However, no prescription had

1  been issued by the date of Mr. ████████ release, causing him to miss a dose and go

2  into withdrawal.  SD_364617.

3     753.   More importantly, real discharge planning would attempt to address the

4  problem of how patients will get their medications *after* 10 or 30 days.  If a patient

5  has no prescriber to reorder prescriptions and no insurance or money to pay for

6  prescriptions, giving them 10 or 30 days' worth of medications is just kicking the

7  can down the road.  Inclusive discharge planning thinks of what will happen later.

8  The Sheriff's Department does not come close to doing so with respect to discharge

9  medications.

10     **C.     Patient Instructions**

11     754.   The County is responsible for ensuring that NaphCare complies with its

12  contractual obligations to provide patients at discharge with "educational

13  information regarding their specific illness and the importance of follow-up

14  appointments and medication continuity, from a healthcare provider."

15  NAPHCARE000569.  The patient also should "receive[] a comprehensive packet

16  that contains essential community resources."  *Id.*  However, NaphCare policies and

17  procedures state that this only occurs "[s]hould the health care staff be notified prior

18  to a patient's discharge."  NaphCare P&P, E-10 Discharge Planning,

19  NAPHCARE000932.

20     755.   In practice, judging by the lack of documentation in the dozens of

21  records I reviewed of individuals who had been discharged from the Jail at least

22  once, few patients receive any packet providing information about community

23  resources.  Even if they do, and the practice is just not documented, I am not aware

24  of any evidence regarding exactly how any patient can access these resources if they

25  lack money, insurance, the ability to travel, disabilities that would interfere with

26  reading the material, etc.  In the end, simply handing an information packet to some

27  (but not all) incarcerated people at discharge is not adequate discharge planning.

28

1       **D.    Documentation and Information Transfer.**

2       756.   NaphCare's policies and procedures further state that "[a]ll discharge

3  planning, including medical and mental health referrals, is to be documented in the

4  patient's health record." NaphCare P&P, E-10 Discharge Planning,

5  NAPHCARE000933. I found no record of any discharge planning in the patient

6  records I reviewed. This means that either no discharge planning occurred, or the

7  Jail failed to comply with policies and procedures regarding documentation.

8      757.   With respect to information transfer, NaphCare's policies and

9  procedures simply state that a "release summary is available in Techcare for

10  assistance in discharge planning, especially in those patients discharges to another

11  correctional facility." NAPHCARE000933. The County's contract with NaphCare

12  goes further as to what is required, stating that the "Release/Discharge Summary

13  screen shall be used to provide medical information to the patient, medical facility,

14  or another state prison system." County Contract No. 566117, NAPHCARE000569.

15  I saw this screen completed in only a few (no more than 10 percent) of the charts I

16  reviewed. Where this summary screen was completed, there was no indication why

17  it was generated in those cases but not others, or who the summary was sent to. The

18  County's contract with NaphCare states that the summary screen "shall be used to

19  provide medical information to the patient," but there is no explanation as to how a

20  departing patient requests a copy or how it is provided when requested. *Id.* There is

21  also no mention in the policies and procedures of how an outside medical clinic

22  should request a copy of this summary screen.

23      758.   The evidence I reviewed also shows a clear lack of training on how to

24  prepare for discharge of incarcerated people with serious medical concerns so that

25  such individuals can continue their medical care without dangerous interruption.

26  There is often complete confusion among staff leading up to a discharge. Emails

27  from April and May of 2023 regarding discharge medications for an incarcerated

28  person with diabetes demonstrate that even Dr. Montgomery, Ms. Rognlien-Hood,

and Brandy Rafail, a Supervising Detentions Nurse, were ignorant about the Sheriff's Department's policies related to discharge medication. Emails between Brandy Rafail, Serina Rognlien-Hood, and Jon Montgomery et. al., April 28, 2023 to May 1, 2023, SD_371720-22. The emails indicate that Ms. Rognlien-Hood had previously told providers that the Sheriff's Department did not and could not provide critical medications except for "ones that ask," and after confirming that she was supposed to provide the medications to all incarcerated people, Ms. Rafail responded with surprise. SD_371720.

759. Another example of harm stemming from the Jail's inadequate discharge planning policies and practices is an incarcerated person named ████ ███████, who was kept in custody for an extra week because the Jail could not provide him with an inhaler at discharge. Email from Christopher Miedico to Charles Cinnamo et al., March 9, 2023, SD_555896.

760. Discharge statistics are not tracked in the SDSD's CQI program as they should be. As one example, I have seen no statistics on how many discharge prescriptions are actually picked up by the patient versus how many patients never pick up their discharge prescriptions.

*  *  *

761. The Jail's lack of adequate discharge planning policies and practices places incarcerated people at a substantial risk of harm.

## XIV. The Sheriff's Department Fails to Maintain Adequate Quality Assurance/Quality Improvement Processes to Ensure Appropriate and Timely Medical Care

762. Continuous Quality Improvement ("CQI") is the process of ensuring that medical care within a particular system is adequate, appropriate, and meets the medical standard of care.

763. A robust CQI program is critical to any healthcare institution— especially one with hundreds of staff working in tandem every day. The point of CQI is to allow leadership in a large institution to ensure that all the different actors

1   in the system are following policy and that those policies are working toward the

2   goal of providing appropriate medical care.  In a large institution, having adequate

3   policies is necessary to ensure that healthcare is provided consistent with the

4   standard of care; however, good policies are not sufficient to ensure good care.  In

5   addition, the institution must ensure that staff are trained on those policies.  It must

6   ensure that statistics are kept on whether those policies are being followed.  It must

7   analyze those statistics to understand where medical care has fallen short of the

8   standard.  And, it must implement changes, including by holding staff accountable,

9   when the standard of care is not met.

10   764.   All hospitals and other large outside medical programs, like HMOs,

11   have a CQI program.  Likewise, NCCHC considers a CQI Program "essential" for

12   their accreditation.  The NCCHC Standards for Health Services in Jails devotes five

13   full pages to CQI.  *See* J-A-06.  The 2017 NCCHC Technical Assistance Report was

14   critical of the Jail's CQI program.  They recommended establishing "monitoring

15   activities and thresholds for studies," completing both process and outcome studies

16   and evaluating the effectiveness of the CQI program annually.

17   DUNSMORE026025-26.  And, in 2020, Dr. Venters devoted an entire section of his

18   report on his recommendations for improving the Jail's CQI program.  SD_215363-

19   67.

20   765.   The contract that the Sheriff's Department signed with NaphCare in

21   April 2022 requires a CQI program and has a long list of requirements for that

22   program beginning at section 2.3.26.  See NAPHCARE000052.

23   766.   In my experience and in my opinion, CQI should include the following

24   elements:

25   767.   **Policies and Procedures.**  The first part of a CQI program is defining

26   standards for medical practice and what is minimal acceptable care.  This is usually

27   a manual of formal policies and procedures or less formal written guidelines.  The

28   manual should be updated at least yearly.  Clear and precise policies are critical

1  because, without them, it is impossible to hold staff accountable for failing to follow

2  the policy.

3      768.  **Training**.  Medical and security personnel must be trained so that they

4  know how the overall system works and what their role is.  There must be training

5  when the person is hired; periodic ongoing training that covers any changes in the

6  overall health delivery program (such as changes in policies and procedures); and

7  extra training in any weak areas as they are discovered.

8      769.  **Competency Review.**  The CQI program must evaluate the

9  performance of medical employees to ensure competency.  This is usually done by

10 the use of two types of performance reviews.  The first is a peer review.  A peer is

11 someone with the same training performing the same job as the person being

12 reviewed, *e.g.* a physician reviews a physician, a nurse practitioner reviews a nurse

13 practitioner, an LVN reviews an LVN, etc.  The peer reviews a random sampling of

14 patient charts (usually ten) and writes an evaluation of performance.  The second

15 performance review is that of a supervisor evaluating the performance of someone

16 they supervise, *e.g.* the Medical Director evaluates a physician's performance, a

17 Nursing Supervisor evaluates an RN's performance, and a Supervising Physician

18 evaluates a physician Assistant's performance.  Both types of performance reviews

19 should occur at least yearly.

20     770.  **Statistics.**  The CQI program must gather and disseminate meaningful

21 statistics.  These statistics should be reviewed and analyzed periodically (usually

22 monthly) to identify important trends and problems.

23     771.  **Studies.**  The CQI program should do periodic (usually quarterly) pre-

24 defined intensive studies of specific health care issues.  The NCCHC defines two

25 types of CQI studies: Process Studies, in which a health care process is evaluated for

26 efficacy and efficiency, and Outcome Studies, in which a health care outcome (*e.g.*,

27 normal blood pressures in a patient being treated for hypertension) are evaluated.

28     772.  **Investigations.**  Significant bad patient outcomes such as deaths should

1   be formally investigated to try to determine one or more root causes of the bad

2   event. In a hospital, this is the role of the M&M Committee. As discussed above,

3   the Jail likewise should have a committee to investigate deaths and sentinel events

4   to improve health care in the form of training, changes in programs, discipline, etc.

5       773.   My review of the CQI program at the Jail found significant problems.

6   **A.   The Jail's Policies Are Not Sufficiently Clear, Allowing Staff to Escape Accountability**

7

8       774.   There are multiple sets of policies that appear to govern health care at

9   the Jail: the MSD Operations Manual, NaphCare's policies and procedures, plus the

10   dropdown menus in STATCare, just to name a few. It should go without saying that

11   these dueling policies can cause confusion for the individual healthcare provider,

12   who may not know which guidance to follow in a particular situation.

13       775.   For example, the Sheriff's Department contract with NaphCare

14   requires "continuity for patients on pharmacologic therapy," NAPHCARE000039,

15   and states that "Contractor typically approves non-formulary orders,"

16   NAPHCARE00006. However, NaphCare in fact discontinues long-acting insulins

17   at booking as part of the "STATCare Intake Assessment and Orders," which

18   contains this directive to the STATCare practitioners: **"All long-acting insulins**

19   **will be substituted with Novolin N BID at an equivalent dose unless there is**

20   **documented evidence that the patient cannot or should not be transitioned."**

21   *See, e.g.*, SD_790712. These directives are contradictory and therefore confusing.

22       776.   In addition, the existence of multiple competing policies may also make

23   it difficult to hold a staff member accountable who is not following the right policy.

24   For example, if a STATCare practitioner chooses to continue a patient's long acting

25   insulin, in accordance with the Sheriff's Department's directive of continuity of

26   care, will they be subject to discipline from NaphCare for disobeying the directive

27   that "All long-acting insulins will be substituted?"

28       777.   This potential for confusion—and inability to hold staff accountable—

1  is also the reason that an institution's policies need to be updated regularly to reflect

2  actual practice expectations.

3      778.  The Sheriff's Department, however, does not regularly issue formally

4  updated policies.  With the exception of two policy sections regarding pregnant

5  incarcerated people, to my knowledge, the MSD Operation Manual has not been

6  updated since 2022.  One example of a policy that appears not to have been updated

7  appropriately in the Operations Manual is MSD.W.2 Wound Care Management, last

8  updated on January 4, 2022.  This guideline states that "On site collaboration is key

9  to the success of the program and includes the facility physicians, registered nurse

10  practitioners (RNP), nursing supervisor, charge nurses and nursing staff." *Id.*

11  However, from my review of patient charts, it appears that most wound management

12  decisions are made by remote STATCare practitioners based on photographs sent to

13  them.  This guideline does not mention STATCare and so is outdated, since

14  STATCare appears to have taken over most wound management.  Other medical

15  treatment guidelines have been referred to (and relied on) by Jail practitioners which

16  are not included in the copy of the Operations Manual sent to me, such as PTG.H9,

17  which evidently is a Hepatitis C treatment guideline.  SD_754905.

18      779.  As former-Commander of Operations Christina Ralph testified, the

19  Sheriff's Department knows that they need "to update all of the policies and

20  procedures to move towards the NCCHC accreditation."  Ralph II Tr. at 47:10-12.

21  Similarly, the NCCHC Technical Report was critical of the Jail for not having

22  chronic disease treatment guidelines.  DUNSMORE0260676-77.  The Sheriff's

23  Department contract with NaphCare required the development of these guidelines.

24  NAPHCARE000039.  Yet I understand that such guidelines are still not available at

25  the Jail.

26      780.  Instead of revising its Operations Manual, it is the norm for the

27  Sheriff's Department to issue a "training bulletin" (or similar informal

28  announcement) of a new policy.  In effect, the Sheriff's Department then expects

1    staff to know that what is written in the Operations Manual is incorrect and to rely

2    on the Training Bulletin instead.

3        781.   A good example of this is when, in response to two deaths from

4    complications of diabetes within two weeks, Dr. Montgomery issued Medical

5    Directive: #7 – "Internal Transition of Care for the Management of All Patients with

6    Diabetes" on December 3, 2021.  SD_169026.  Dr. Montgomery then rescinded

7    Medical Directive #7 with Medical Directive #7A, issued on August 16, 2022.

8    SD_3759270.  Medical staff were expected to follow these medical directives even

9    though I see no indication that the underlying Operations Manual and Policies and

10   Procedures had changed.

### B.    The Sheriff's Department Does Not Provide Adequate Training, Meaning that Some Staff May Not Know the Governing Policy

13       782.   Dr. Venters stated in his recommendations that:  "Appropriate training

14   of correctional health and security staff represents a best practice for reducing

15   mortality and morbidity among incarcerated people. … [O]ngoing, regular training

16   is also required for health and security staff."  SD_215373.  The NCCHC agrees.

17   Indeed, training was mentioned 166 times in the 2017 Technical Assistance Report

18   with several recommendations for improved training and documentation of training

19   for security and health staff.

20       783.   Despite this, essential training is still not being performed on a

21   consistent basis.  As part of its contract with the County, NaphCare was to provide

22   training to all staff, including County staff and even non-medical staff.  *See* § 2.5,

23   NAPHCARE000086-87.  While NaphCare has produced training materials as part

24   of this case, I do not have specific information showing that nurses, mid-levels, and

25   physicians are being trained regularly and on the correct topics.  *See* Nix II Tr. at

26   28:4-29:10, 37:7-47:4.  In fact, Angela Nix, NaphCare's 30(b)(6) witness, did not

27   "know what [the County's] timeline for training and education is for their staff."  *Id.*

28   at 28:1-2.

784.   Ms. Rognlien-Hood testified in her deposition that NaphCare's new employee orientation "didn't do an adequate job."  *See* Rognlien-Hood Tr. at 121:1-7.  She also stated in an email on February 22, 2023  that:  "Naphcare's training thus far have been pointless"; "[n]o classroom/book training has been given"; and "[t]raining has confused the staff."  SD_375922.

785.   Dr. Freedland, who just won a bid to provide physicians and mid-level providers at the Jail through his company CHP, testified that he did not know if NaphCare's training included a requirement that physicians ask patients if they mind if a deputy is present during their care.  Freedland Tr. at 112:15-18.  Dr. Freedland also testified that once his new contract was in place, he would hire a "full-time trainer … to … make sure the staff was trained properly, and have them sign off they are trained properly."  *Id*. at 133:6-22.  Since the contract did not start until July, I do not have access to any new training that will be provided by the CHP trainer.  But Dr. Freedland said the new training would not include how to handle mentally ill patients who refuse treatment.  *Id*. at 134:2-15.  Given the cases I have seen in this Jail, including but not limited to those described in this Report, that omission is unfortunate.

**C.    The Sheriff's Department Does Not Track or Analyze the Right Data to Ensure that Adequate Medical Care Is Provided**

786.   Statistics are powerful tools to improve the quality of medical care in a system—as long as the right statistics are tracked and the statistics are properly analyzed.  In some cases, the Sheriff's Department does not track the right statistics, as noted throughout this Report.  For example, the CQI evaluation of off-site specialty consultations and other off-site medical care, should contain information about current contracted off-site specialists; the average time taken to get UM approval and the percentage not approved (broken down by specialty); the average wait times for appointments with each particular specialist; and problems encountered in making and keeping these appointments, such as the reason for all

1    missed or rescheduled appointments.

2       787.   However, CQI reports about off-site appointments that I reviewed did

3    not contain this information.  I was able to read only how many off-site

4    appointments were completed in a given month, and occasionally how many were

5    cancelled due to refusals, or discharges, etc.  But, as explained earlier in this Report,

6    these CQI reports did not give me an accurate reading of the health of the off-site

7    program.

8       788.   Another example of a missing basic CQI statistic is the number (and

9    percentage) of patients who fail to pick up their prescriptions from the pharmacy

10   after discharge.

11      789.   The Sheriff's Department CQI program tracks in custody deaths, but as

12   I point out elsewhere in this Report, the Sheriff's Department CIRB process is

13   inadequate, and I have not seen any statistics presented about morbidity events (also

14   called sentinel events, *i.e.*, a serious bad patient outcome that does not result in

15   death).  A good example of a sentinel event that would be tracked at a hospital

16   would be Diabetic Ketoacidosis ("DKA").  DKA is caused by very high blood

17   sugars that cause the diabetic patient to lose water and become profoundly

18   dehydrated and also results in the patient's blood to become seriously acidotic.

19   DKA usually occurs over several days.  If a hospitalized diabetic patient develops

20   DKA, administrators at the hospital would ask themselves "How did this happen?

21   How did we miss this developing for days?"  The DKA is therefore a sentinel event

22   that triggers an investigation.  Similarly, any diabetic who becomes sick enough to

23   need to be admitted to the hospital should be classified as a sentinel event and

24   investigated.  However, I have seen no evidence that DKA or any other sentinel

25   event is tracked in the Jail.

26      790.   Also, the statistics the Jail does collect are not properly analyzed.  One

27   CQI report documented that almost 20 percent of all patients scheduled for offsite

28   medical appointments over a six month period refused to go to the appointment.

NAPHCARE026024.  As explained earlier in this Report, this statistic is not credible on its face, but the point here is that this striking statistic was not flagged for investigation.  The important question is:  why does the Sheriff's Department have a refusal rate of 20% for off-site medical care that the patients themselves supposedly want?  This would be an easy CQI study to do.  Simply pick a random sample of refusals and interview the patients.  But I do not see any evidence that this study has been done.

791.   NaphCare's 30(b)(6) witness Angela Nix stated that she did not "know specific CQI programs at the site level at San Diego."  *See* Nix II Tr. at 34:9-10.  Ms. Nix also did know if CQI is discussed at site level meetings.  *Id*. at 34:14-16.  Ms. Nix further testified that although she had attended 8 to 12 of San Diego's patient care coordination committee meetings, she could not recall any discussion of improvement or recommended changes.  *Id*. at 35:7-13.  Since the NaphCare contract calls for NaphCare to provide CQI and training, this testimony is worrisome.

## D.    The Sheriff's Department's Peer Review Process for Medical Staff Is Inadequate

792.   Peer reviews are an important component for ensuring that medical staff are performing competently.  As the NCCHC 2017 Technical Assistance audit pointed out in 2017, peer reviews should be completed yearly.  DUNSMORE0260697.

793.   Although peer reviews (as well as "Focused Professional Practice Evaluations" and "Ongoing Professional Practice Evaluations") were required by NaphCare's original contract, § 2.3.27.1, NAPHCARE000055, NaphCare has not been reliably completing them.  In a May 26, 2023, email, Dr. Montgomery implied not only that NaphCare had not been doing Peer Reviews as required by their contract, but also that NaphCare did not seem to understand what a Peer Review was.  SD_227522.

794.   Even as of October 17, 2023, it is not clear that NaphCare had implemented a full Peer Review program.  The Sheriff's Department had pointed this out in its Corrective Action Notice.  SD_1572597.

795.   In conclusion, none of the elements that I would expect to see in an adequate CQI program are present in the Jail's medical system at this time.  If CQI is inadequate, mistakes—particularly repeated systemic mistakes like those I have identified throughout this Report—are missed.  That places incarcerated people at risk of harm.

## XV.   The Sheriff's Department Systematically Fails to Maintain Sufficient Numbers of Health Care Professionals, Resulting in Deficient Care

796.   Plaintiffs' Third Amended Complaint alleges that the Sheriff's Department has an "insufficient number of health care professional to provide minimally adequate care to the approximately 4,000 incarcerated people in the Jail." Dkt. 231 at ¶ 42.  Based on my review of the records and inspection of Jail facilities, I agree, and it is my opinion that the Jail's inadequate health care staffing ratios is a major contributing factor to the many failures outlined earlier in this report.  The recently negotiated contract with CHP will not solve these problems.

### A.   The Jail Has Experienced a Shortage of Healthcare Staff for Several Years

797.   The Sheriff's Department's systemic failures to provide adequate medical care to incarcerated people are myriad:  initial health assessments for newly booked incarcerated people are delayed or missed entirely, *supra* at Part II; sick call requests are ignored or responded to days later, *supra* at Part IV; patients are documented as having "refused" appointments without being informed of the appointment or counseled about the risks of refusal, *supra* at Part V; vital signs and other physical examinations are not completed, *supra* at Part VI; and medical care is provided by remote providers or nurses acting outside the scope of their practice, *supra* at Part VI, to name a few.  Chronic understaffing contributes to all of these

problems.

798.   My review of the records in this case shows that the Sheriff's Department knows—and has known—that additional medical staff are necessary to provide adequate care at the Jail.  This chronic staffing shortage persists at all levels: nurses, mid-level practitioners, and physicians.

799.   According to Dr. Montgomery, as of March 30, 2021, the Jail "has experienced a chronic staffing shortage for decades."  SD_172496.  Indeed, a funding "priority list" for the Medical Services Division, dated August 9, 2019, explains that additional funding for 47 full-time equivalent ("FTE") RN positions and 34 LVN positions was needed "to bring MSD to appropriate staffing levels to meet current and future program needs, including for intake, medication coordination, and other critical functions.  FY 20-25 Five-Year Financial Forecast – Priority List, August 9, 2019, SD_057768.  A presentation regarding the FY 2021 – 2022 financials for the Medical Services Division shows that the Sheriffs' Department's own staff had a 39% vacancy rate for budgeted positions, including 92 vacant positions in the nursing unit.  QA/QI Financials Presentation, SD_395977.The Jail's contract with NaphCare in 2022 did not remedy the Jail's persistent staffing problem.  As Dr. Montgomery stated in a May 26, 2023 email: "It has been shown that far more staff members are needed than [NaphCare] initially estimated."  SD_227522.

800.   Administrators for the Sheriff's Department and NaphCare have admitted to these staffing inadequacies.  Ms. Rognlien-Hood spoke extensively in her deposition of the problems the Jail has had with understaffing and shortages in nursing staffing, including listing the many ways that Jail has been forced to try to compensate for those shortfalls:   (1) overtime; (2) nursing supervisors working clinical duties instead of their own supervisory work; (3) having "off-site" personnel help with triage; (4) rotating nurses from facilities less understaffed to facilities more understaffed; and (5) hiring Certified Nurse Assistants ("CNAs").  Rognlien-

Hood Tr. at 55:6-56:20, 67:19-69:5. In the end, the Jail simply has been forced to try to get as much done as possible with fewer nurses. Kenneth Jones also acknowledged understaffing among nurses, admitting that understaffing impacted care, including blood draws and other labs. Jones Tr. at 129:17-133:7. Despite acknowledging understaffing, Mr. Jones could not recall every commissioning a study to evaluate the extent of nursing understaffing. *Id.*

801. As just one example of medical staff shortages in the Jail, a schedule of shifts at Central Jail on July 1, 2023 showed 9 out of 20 nurses assigned to work were absent with "no replacement." SD_726781. The unfilled shifts included two of three RN sick call nurses and both MOB nurses. SD_726781. This was not an unusual situation. On July 16, 2023, 10 of 21 nursing shifts at Central Jail were unfilled, including both receiving nurses, both RN sick call nurses, and both MOB nurses. SD_726809.

802. Ms. Rognlien-Hood also testified that the Jail had approximately 30 RN and 40 LVN vacancies as of February 14, 2024, Rognlien-Hood Tr. at 52:22-53:3, and that historically, the number of vacant nursing staff positions had been in the "high 50s," *id.* at 53:16-22. This testimony is at least consistent with, and may even downplay, the actual number of vacancies evidenced by the documents I reviewed. For example, Sheriff's Department data shows as of November 1, 2023, there were approximately 108 vacant nursing positions across various the Jail facilities. SD_114288. In a presentation regarding the 2021-2022 fiscal year budget for the Medical Services Division, the Sheriff's Department reported 92 vacant positions in its nursing unit. SD_395975. In its fiscal year 2020-2025 financial forecast, the Sheriff's Department admitted there were not "appropriate [nursing] staff levels to meet current and future program needs" and that nurses were required to perform administrative tasks that took them away from their critical job duties. SD_057768. As of November 1, 2023, 32% of the authorized healthcare positions within the Jail were vacant—including nursing vacancies across multiple Jail

1   facilities.  Healthcare, Authorized Positions as of 11/1/2023, SD_114288.

2       803.   Nor has the Jail been able to retain the medical staff that it does have.

3   An internal Sheriff's Office "Naphcare Briefing" dated April 24, 2023 states that

4   there has been "Unprecedented 1 MD separation every month since Naphcare

5   contract awarded."  SD_152275-152276.  In addition, CHP had "Lost 3 NPs

6   already" and "CHP stated (more) layoffs are imminent."  *Id.*  In addition, "Gap

7   created in OBGYN services by not hiring timely (6 weeks), SDSD had to hire locum

8   tenens (UNI) for several weeks."  *Id.*  NaphCare compounded this problem by

9   refusing to provide medical oversight for the UNI nurse practitioner.  Further

10  evidence of <u>excessive</u> turnover is found in CQI staffing reports, which show that the

11  number of nurses leaving employment at the jail exceeds the new hires.  See, for

12  example, SD_114481, which shows a net loss of 8 nurses for the three-month period

13  covered by the study.

14      804.   The Sheriff's Department has tried to compensate for being chronically

15  short staffed at the nursing position by requiring mandatory overtime.[54]  The current

16  system still relies heavily on overtime shifts to cover for being chronically short

17  staffed, as I noticed during my tour of the Central Jail on February 6, 2024.  On that

18  day, the nursing duty board showed around 50% of nursing positions filled with

19  overtime workers.  The habitual use of overtime, whether mandatory or not, is bad

20  in the long run because it eats into home life and can lead to increased anxiety,

21  depression, fatigue and sleeplessness.  In hospitals, nurses working too many hours

22  have been shown to have decreased short-term memory and make more medical

23  mistakes.[55]  Overtime has also been found to increase job dissatisfaction among

---

[54]  It eventually discontinued the use of the word "mandatory" overtime in order to "boost morale."  Rognlien-Hood Tr. at 57:11-17.

[55]  T. Bell et. al. *Fatigue in nurses and medication administration errors: A scoping review.*  J. Clin. Nurs. 2023 Sep.;32(17-18):5445-5460.

M. Watanabe et al., *The effect of quality of overtime work on nurses' mental health and work engagement*, J. Nurs. Manag. 2018 Sep;26(6):679-688.

1  nurses and increase burn-out and turnover.  You can fill staffing shortages with

2  overtime in the short term, but in the long term, overtime will result in more nurses

3  burning out and leaving, which leaves you even shorter-staffed in the long term.

4      805.   The County also tries to compensate for work backlogs caused by short

5  staffing by having nurses in supervisory positions work clinical shifts.  Ms.

6  Rognlien-Hood herself has done this.  *E.g.*,  Health Assessment Form, █████

7  ████  █████ 2023, SD_781311.  This is not a good solution for being short

8  staffed.  If supervisors are working busy clinical shifts, they cannot perform their

9  supervisory jobs and supervisory tasks also do not get done.

10     806.   At one point, the Sheriff's Department even considered having sworn

11  staff fill medical positions to compensate for these staffing shortages.  In a

12  November 22, 2021 memoranda from a lieutenant in the Detention Support Division

13  to now-Sheriff, then-Undersheriff, Kelly Martinez, the Sheriff's Department set

14  forth its dangerous and misguided plan in the event the medical services division

15  suffered a "staffing loss that places services at risk," stating that it might "trigger

16  sworn staff being utilized for the distribution of medication."  SD_651265.  The fact

17  that the Sheriff's Department even felt like she needed to come up with a plan to

18  rescue the nursing staff is itself evidence of serious nursing staffing issues.

19  However, while well intentioned, this is a bad idea.  Officers are not trained, would

20  have no idea what they are doing and would inevitably make serious mistakes

21  resulting in medical harm to patients.  Such a plan would never be considered in a

22  hospital.  No hospital would ever allow any non-medical staff (like security or

23  housekeeping) to pass meds because they were short staffed on nurses.

24     807.   Ms. Rognlien-Hood noted in her deposition that the Sheriff's

25  Department began hiring CNAs around early 2023 in another attempt to ease the

26  burden of RN understaffing.  Rognlien-Hood Tr. at 55:23-56:2.  CNAs are not

27  nurses.  They have little training, and in hospitals and nursing homes, are used for

28  non-medical tasks such as transporting patients, feeding and bathing patients,

changing bedding, etc.  CNAs can indeed have a role in patient care, but they are not qualified to do patient examinations or evaluations like RNs do.

808.   Ms. Rognlien-Hood envisioned CNAs doing jobs that nurses were doing but that did not require nursing skills, such as picking up Medical Request Forms from the lock-boxes.  Rognlien-Hood Tr. at 189:8-13.  However, it is evident from my review that CNAs duties are creeping into duties that are inappropriate for them.  As an example, ███████████ was rounded on by CNAs instead of nurses on ███████████████ 2023.  SD_785988-785989.  CNA Dhameera Fields took vital signs on patient ███████ on ██████████ 2024 and wrote "Abnormal Vitals Signs/Readings Informed Nurse 7404 per protocol.  Pulse 130."  SD_822177. I have not seen the protocol that CNA Fields referred to.  Also, despite using CNAs for various duties in lieu of nurses since early 2023, I have not seen any Sheriff's Department job description for CNAs, nor any policy and procedure on what specific duties the CNAs are taking over from the nurses, who supervises the CNAs, and how using them affects the Staffing Matrix.

809.   In addition, like medical staff, custody staff is chronically short-staffed, which negatively impacts medical operations.  Ms. Rognlien-Hood acknowledged this issue in her deposition, stating that she receives reports from providers that "[c]linic was slow [on a particular day] because they didn't have deputy staff to bring everybody on the list to them."  Rognlien-Hood Tr. at 75:19-21.  Ms. Rognlien-Hood also testified that due to a chronic lack of custody staff during the day, health care staff were forced to change the times of blood draws to the evenings, which is not the ideal time to draw blood.  *Id.* at 70:9-23.  Medical clinics are sometimes outright cancelled due to "sworn availability."  Medical Services Division QA QI Meeting, October 17, 2023, p. 20; *see also* SD_114467 (noting "missed clinic appointments" due to "unavailability of escorts"); SD_278070 ("26 deputies down, no deputy for medical this AM").  The Sheriff's Department's inability to transport incarcerated people to medical appointments due to staffing

1    shortages prevents health care staff from treating patients, which precludes

2    administration of care that meets medical standards.

3        810.   Dr. Montgomery discussed renegotiating NaphCare's contract to

4    increase staffing in February 2024.  Montgomery II Tr. at 285:7-13.  This was

5    apparently unsuccessful, as Dr. Freedland admitted in his deposition that physician

6    and midlevel staffing levels were too low, Freedland Tr. at 162:15-163-4.  I

7    understand that staffing issue to be  the main reason that the Sheriff's Department

8    negotiated a new contract with Dr. Freedland's company CHP to provide

9    significantly more onsite medical practitioner coverage.  As explained below, that

10   contract will not rectify the inadequacies of medical care at the Jail.

### B.    The New Contract with CHP Will Not Solve the Jail's Problems

12       811.   The County's recent contract with CHP is designed to "provide on-site

13   Health Care Providers for primary care and urgent care at specified County

14   detention facilities."  SD_1578715.  Notably, the contract increased physician and

15   midlevel staffing at the Jail by almost 300%.  It also increased the County's annual

16   spending on physicians and nurse practitioners in the Jail from approximately $8.3

17   million to $22.6 million per year.

18       812.   This increase could be beneficial to the class members since it amounts

19   to an almost tripling of the previous annual spend.  It is also an acknowledgment

20   that the County was woefully underspending before and short-staffed previously.

21       813.   However, it is worth notable that that CHP's bid for the new contract

22   envisioned even *more* staff, which Dr. Freedland explained was the amount that he

23   thought would "work" "best."  Freedland Tr. at 126:2-3.  CHP's bid would have

24   added 41.2 full-time equivalent practitioner positions across the seven Jail facilities.

25   SD_1579755-1579760.  The ultimate contract added only 28.4 full-time equivalent

26   "personnel" positions and 2 administration positions.  SD_1579731.

27       814.   Even setting aside this disparity between what Dr. Freedland thought

28   would be enough to "work" and what the Sheriff's Department ultimately agreed to,

based on my knowledge of this Jail and my experience in correctional medicine in general, I have doubts that this new contract will solve the Jail's problems for four reasons. First, the new contract does not address the nursing staff shortage. Second, the very nature of private correctional health contractors leaves them unstable. Third, this contract fractures medical care into silos, each apparently acting independently from each other. Fourth, even on its face, this contract leaves several deficiencies in the Jail's delivery of medical care in place and will accentuate other problems.

### 1.    Ongoing Nursing Shortage

815.    As explained above, it is indisputable that the Jail is facing a nursing shortage. But the new contract with CHP adds no nurses (nurses at the Jail are employed directly by the County), and therefore cannot solve this problem.

816.    Nurses are essential at every stage of a patient's interaction with medical services at the Jail—just as they are essential at every stage in every outside medical clinic, office and emergency department. In the Jail, Registered Nurses do the Receiving Screen and the Intake screen. RNs do the Second Stage Evaluation. RNs do withdrawal assessments. LVNs pass all medications. RNs triage medical requests and do the face-to-face evaluations. RNs are essential for the proper function of sick call. RNs do most of the work when patients are discharged. And I am only scratching the surface. There are few other categories of employees who can step in and assist the nurses with their work when they are short staffed. Security cannot do nursing work.

817.    These nursing shortages have already had serious consequences for patient care. As an example of the pressures that experienced nurses feel due to short staffing, RN Marisol Gomez-Mercado sent an email to Union Representative Jaime Medina on August 7, 2023 with the subject, "Insufficient staff at LCDRF," stating: "I am sure you are aware of the staff shortage at LCDRF, including on 8/6/23…. I am requesting to not be assigned (as M1 or P1) as I recognize the

1  expectations of duties are unrealistic and jeopardize the safety of patients and

2  myself.  Last night I was assigned to cover P1, P2 and Gatekeeping."  SD_235886

3  The response from Union Representative Jaime Medina stated, "[y]es, I am aware of

4  the short staffing issues at the Sheriff's Department."  SD_235886.  He instructed

5  RN Gomez-Medina on how to submit an "Assignment Despite Objection Form."

6  SD_235886.  The pressure of trying to maintain operations while short staffed is

7  very stressful on the health care staff who are working and trying to do the work of

8  two (or three) staff members day after day.  Such stress inevitably contributes to

9  even more turnover.

10     818.   I have seen no indication that additional nurses are being hired for the

11  Jail.  Absent additional nurses, many of the Jail's health care problems will remain.

### 2.  Instability Created by Private Correctional Healthcare Providers

14     819.   As indicated in the section above and described in the Background

15  section of this Report, the healthcare delivery at this Jail has been subject to multiple

16  changing, and at times overlapping and confusing, contracts with private healthcare

17  providers over the past several years.

18     820.   It is my opinion that this kind of instability is a hallmark of the private

19  correctional healthcare industry,[56] particularly in comparison to the business of

20  providing medical care in the United States *outside* the jail or prison context.  This

21  instability has historically resulted in "revolving door" contracts, boom and bust

22  cycles, and frequent corporate failures and bankruptcies.  In my opinion, the only

23  guaranteed way to avoid these revolving door contracts, which risk creating

---

[56] This industry includes a number of large correctional healthcare companies with multi-state operations, as well as mid-size companies with regional operations. These companies have included companies such as Corizon (until recently, one of the largest for-profit correctional healthcare companies) as well as companies known as Wellpath, TurnKey, NaphCare, Advanced Correctional Healthcare, Southern Health Partners, Centurion, and Wexford Health Services, among others. Many smaller companies also exist, whose operations are more geographically limited.

confusion and therefore gaps and potential harm to patients, is for correctional medicine to be run directly by the government.

821.   Unlike healthcare delivery systems outside of prisons and jails, nearly all correctional medical systems (which are run by state and local governments) have a set dollar amount of money budgeted for medical care for incarcerated people.  In order for a private correctional healthcare company to gain a contract with a state or local government, the company must submit a bid, most often through a competitive bidding process in response to a government Request for Proposal, as both NaphCare and CHP did here.  Contracts are generally awarded to the lowest or near-lowest bidder.  Once the contract is obtained, the amount of money that can be charged for the duration of the contract is pre-set.

822.   In order to make a profit, therefore, a correctional healthcare company must create a budget where its anticipated expenses are less than the contractual payments.  The problem, however, is that these budgets are inherently difficult to predict.  If the company's expenses unexpectedly rise  (*e.g.*, unanticipated increased costs for attracting and retaining qualified medical professionals), the company cannot automatically pass these unanticipated expenses on to the County.  It must fulfill the terms of the contract for the contract's duration at a loss—unless it can convince the County to re-negotiate the contract.   This model is unlike the business of providing medical care outside the jail and prison context, where if a hospital has to spend more than anticipated, it can bill that excess to its patients and recover the unanticipated costs.

823.   To win a typical 5-10 year contract to provide medical services in corrections, a company must parse its bid to the lowest feasible amount—and sometimes even an unfeasible amount.  Otherwise, that company will never win any bids.  However, the bidding process is risky.  Medical costs have historically risen faster than inflation.  Unanticipated medical events like the COVID pandemic and the opioid crisis can overwhelm a budget.  A company that tries to mitigate its risk

1   by bidding higher to fully account for the uncertain future will often lose the bid to

2   the company that did not plan for such events and so bid less.  A won contract can

3   easily turn into a long-term money loser for the company.

4        824.   Correctional healthcare companies also must compete for nurses,

5   physicians, and other medical staff with outside hospitals, clinics, and private

6   medical practices.  Correctional medicine is a more difficult job than working at

7   other outside practices and so should be compensated at a substantially higher rate.

8   However, this basic fact has not generally been acknowledged by correctional

9   medicine companies, with the result that they offer salaries too low to consistently

10  attract qualified medical professionals.  Working at an outside hospital or clinic

11  often offers better pay, better working conditions, and less stress.  As a result, most

12  correctional medical companies that I am aware of are seriously short staffed and

13  have high rates of turnover among their medical professionals.

14       825.   In addition, most jails and prisons also have significant staff shortages

15  of correctional officers, and this impacts medical costs.  If there are not enough

16  officers to transport incarcerated people, then medical appointments must be

17  rescheduled, which has significant costs.  Facility wide "lock-downs" similarly

18  impact the delivery of medical care.  Jail and prison overcrowding makes it more

19  difficult to provide medical care and thereby increases costs.  All of this also

20  increases stress and dissatisfaction among the health care staff and leads, again, to

21  turnover and short-staffing.

22       826.   A correctional medicine company that has bid a particular contract too

23  low to be profitable has three options:  invoke the termination clause of the contract

24  and simply walk away; ask for an increase in funding from the county or state; or

25  provide substandard medical care.  Since many (maybe even most, in my

26  experience) initial bids are too low, either from ignorance, bad luck or by design,

27  asking for more money before the end of the contract is very common.  And when

28  the for-profit company asks for more money than their original contract, the implicit

1  threat of just walking away from the contract—leaving a prison or jail without *any*

2  healthcare system in place—hangs over the negotiations.

3      827.   Of course, once the company has been awarded enough money to make

4  the enterprise profitable, other correctional medicine companies will notice and will

5  promise to do the same job for less when given the opportunity.  And the cycle of

6  "bid low, ask for more money, get replaced by a new company" repeats itself.

7      828.   The result has been chronic instability in the for-profit correctional

8  medicine industry.  It is a rare jail or prison that has had a single contracted medical

9  provider for, say, twenty-plus years.  Stability like that is noticed and coveted.

10  There will be no shortage of companies offering to do the same job for less money.

11      829.   More commonly, local and state governments have a revolving door of

12  medical contractors over the years.  My home state of Idaho is a case in point.  Since

13  privatizing medical services in the state in 1996, five separate companies have held

14  the Idaho DOC contract.

15      830.   Instability has also been true at the Jail that is the subject of this case,

16  where, in just a few years, COAST held the medical contract, then CHP, then

17  NaphCare, and now CHP/NaphCare together.  To think that the CHP/NaphCare

18  hybrid will solve the Jail's myriad problems is naïve, in my view.  More likely, the

19  County will, in the future, fire one or both and turn to a different for-profit medical

20  provider, as have many other counties and states before them.

21      831.   This brings up the underlying question:  Why is the San Diego County

22  Sheriff's Department contracting with for-profit companies to provide medical

23  services at all?  Many jails, including large jails, have not privatized their medical

24  services.  The ostensible reason for privatization is this statement at the beginning of

25  both the NaphCare contract and the new CHP contract:  "The Chief Administrative

26  Officer made a determination that Contractor can perform the services more

27  economically and efficiently than the County, pursuant to Section 703.10 of the

28  County Charter."  NAPHCARE000001; SD_1579624.

832.   I am highly skeptical of this statement.  I am not aware of any literature, research, or other evidence that shows that jails using for-profit medical companies operate "more economically and efficiently" than jails that do not.  If there is any written documentation of the Chief Administrative Officer's "determination," I would like to see the logic and research behind this decision.

833.   Although there are advantages and disadvantages of using for-profit correctional medicine companies versus keeping medical care within the County, I believe that, overall, the reverse is true.  The Sheriff's Department could operate the Jail medical program more economically and efficiently itself with the added benefit that medical operations would be more stable.

### 3.     Siloed Medical Care Between NaphCare and CHP

834.   Even setting aside my concerns with the instability of private correctional contractors, the truncated and siloed nature of healthcare delivery at the Jail under this system is likely to create confusion among staff and harm patients.

835.   A well-run healthcare system has clear lines of responsibility and centralized control of all elements of that system.  Clarifying who is in charge of healthcare is an essential step towards San Diego's creation of a healthcare system that provides adequate care for incarcerated persons.

836.   As I understand it, the Jail now has three independent "silos" of healthcare delivery in the Jail:  (1) CHP medical practitioners; (2) NaphCare practitioners (including mental health, dental, medication assisted treatment for opiate use disorder, STATCare) and training; and (3) Sheriff's Department employees, such as the nurses, and medical supervisors such as Dr. Montgomery.

837.   It is not immediately clear to me who is supposed to report to whom in this system.  According to an email from the Sheriff's Department to the *Union-Tribune* newspaper regarding this three-way responsibility:

> **Please explain the division of labor between NaphCare and CHP, and how will the medical director delineate two different contractors?  Who answers to whom, and is that a model any other**

**jail facilities use?**

> a.    NaphCare still has overall responsibility for healthcare of our incarcerated population. CHP will be the exclusive provider for on-site clinical services and licensed healthcare practitioners, including doctors and nurse practitioners. CHP will manage and direct the physicians and nurse practitioners and will be giving clinical direction to our internal nursing staff as part of the comprehensive healthcare model. Naphcare will continue to manage and provide direction to all other services in the jail system. CHP, NaphCare and SDSO staff will continue to work collaboratively to provide comprehensive healthcare services in our jail facilities.

838.    To me, this sounds like gobbledygook. And it fails to resolve critical questions, particularly around the use of STATCare, which I understand will still be in place at the Jail, making diagnoses, ordering tests, and prescribing medications independently from the CHP practitioners. *See* Freedland Tr. at 178:3-7 (CHP has no oversight over STATCare). As explained earlier in this Report, documents I reviewed showed STATCare practitioners repeatedly failing to meet the standard of care for patients in the Jail. The new CHP contract does not make clear how—or even if—CHP's practitioners can correct those errors.

839.    Indeed, some medical records I reviewed suggest that nurses in the Jail contact STATCare asking for *permission* to have an on-site practitioner see patients. *See, e.g.*, ██████████ Medical Record, SD_754743 ("Can I schedule onsite provider to see [Ms. ██████]?"). In effect, NaphCare providers working remotely will have the power to gatekeep patients from CHP practitioners on the ground in the Jail. More clarity is needed for this to be a functioning healthcare system.

### 4.    Deficiencies in New CHP Contract

840.    The new CHP contract also leaves in place several concerning practices highlighted throughout this report.

841.    It does not make any changes to the deficient M&M process, which has thus far largely failed to address the root causes of the many deaths at the Jail, *see supra* at Part I. The new contract does not require CHP to conduct any on-site

1  M&M reviews at the Jail.  Freedland Tr. at 130:16-131:1.

2       842.   The contract does not address chronic care either, *see supra* at Part

3  VIII.  Chronic care is only mentioned once in the contract, in the definition of what

4  "clinic" means.  SD_1579719.   But CHP is specifically not responsible for

5  developing chronic care guidelines defining how often various chronic care clinics

6  should be held and what should be routinely done during chronic care clinic visits.

7  *Id.*  Presumably, NaphCare retains the obligation to develop and implement chronic

8  care guidelines.  Therefore, NaphCare will again decide who is scheduled for CHP

9  practitioners to see.

10       843.   Notably, although CHP is required to provide a full time "Specialty

11  Physician" at Central Jail under the contract, SD_1579716, it does not specify what

12  kind of specialist (endocrinologist? dermatologist? orthopedist?) or if multiple

13  specialists can work part time to fulfill the 40 your per week requirement. There is

14  also no indication  whether this unidentified "specialty physician" will provide a

15  solution for the Jail's persistent failure to provide meaningful chronic care.  *See id.*

16  And, it is not clear whether this specialist will have any authority over STATCare,

17  in order to correct, for example, STATCare's dangerous and substandard treatment

18  of type 2 diabetes.

19       844.   The contract also leaves NaphCare in charge of the medical formulary

20  and Utilization Management ("UM"), the flaws in which are described earlier in this

21  Report, *see supra* at Part VII.  CHP will continue to have no say in formulary and

22  UM processes, despite the fact that CHP practitioners have expressed dissatisfaction

23  with both processes.  *See, e.g.*, Freedland Tr. at 39:19-40:14; Dr. Orem interview

24  during Jail inspection.

25       845.   The contract is also silent about where the clinics will take place and

26  minimum requirements for what should happen at those clinic visits.  It  thus leaves

27  in place the current bad habits of practitioners doing "clinic visits" at the patient's

28  cell and not doing a physical examination or vital signs.  It similarly will not correct

1  the problem of practitioners making diagnoses and prescriptions without examining
2  the patient at all. *See supra* at Part VI.

3      846.   Finally, the contract requires CHP practitioners to attend certain
4  County sponsored training, *e.g.*, orientation, SD_1579722, but it does not require
5  CHP to provide any training to its own employees, nurses, or custody staff.

6      847.   In summary, the CHP contract does not attempt to correct or even
7  address several deficiencies in medical care at the Jail, as raised in this Report.

8                              **CONCLUSION**

9      848.   Based on a reasonable degree of certainty, it is my opinion that the
10 healthcare delivery system in the Jail suffers from a number of systemic flaws,
11 which place incarcerated people at a substantial risk of serious harm. These flaws
12 are not new. The Sheriff's Department has been repeatedly informed of these issues
13 in reports from the NCCHC, Dr. Venters, and the State Audit, going back to at least
14 2017. The Sheriff's Department has nonetheless failed to correct these problems
15 and continually fails even to identify these errors in their M&M and CQI processes.
16 None of the changes the Sheriff's Department has made or claims to be making so
17 far are likely to solve these problems. Therefore, these failures will therefore likely
18 lead to more bad outcomes, including deaths of incarcerated people.

19     The information and opinions contained in this report are based on evidence,
20 documentation, and/or observations available to me. I reserve the right to modify or
21 expand these opinions should additional information become available to me. The
22 information contained in this report and the accompanying exhibits are a fair and
23 accurate representation of the subject of my anticipated testimony in this case.

24

25 Dated: August 21, 2024                    _____

26                                           Jeffrey E. Keller, M.D.

27

28

[4448212.31]                    249                    Case No. 3:20-cv-00406-AJB-DDL
                      EXPERT REPORT OF JEFFREY E. KELLER, M.D.

# EXHIBIT A

Jeffrey E. Keller, MD, FACEP, FACCP



# Jeffrey E Keller MD, FACEP, FACCP

## Curriculum Vitae

## Current Employment

President, American College of Correctional Physicians.

Correctional Medicine Consulting.  My current and former consulting clients include national, regional, state and county entities.

## Past Employment

Medical Director and CEO of Badger Correctional Medicine from 1997-2021. Badger Medical was a jail medicine company that provided medical and mental health services to inmates incarcerated in 17 Idaho jails and juvenile facilities. As Medical Director, I wrote and implemented all medical policies and procedures and supervised all medical care provided to inmates.

Medical Director of the Ada County Jail, a 1200 bed facility in Boise, Idaho from 2009-2013.

Chief Medical Officer of Centurion LLC from 2013-2018.  As Chief Medical Officer of Centurion LLC, I supervised medical services for prison inmates in Massachusetts, Tennessee, Minnesota, Mississippi, Vermont, New Hampshire, Florida, and New Mexico. As Chief Medical Officer, I wrote all medical guidelines for prison inmates in states serviced by Centurion. I also supervised Centurion's Quality Assurance program.

Board Certified Emergency Medicine Physician with 22 years of experience at a Level II Trauma Center, Eastern Idaho Regional Medical Center, Idaho Falls, Idaho. My subspecialty was prehospital Emergency Medical Services (EMS).

> Medical Director of the Idaho Falls Paramedics for 25 years.

> Medical Director of several volunteer rural ambulance services.

> Founded Air Idaho Rescue, a successful air ambulance service.

Medical Director of the Bonneville County (Idaho) Sheriff's office.

Idaho COVID-19 Vaccine Advisory Committee.

**Awards**

2020 Recipient of the **Armond Start Award of Excellence** awarded by the American College of Correctional Physicians "on the basis of adherence to the highest ethical standards and dedication to research, publication, and training."

2023 Recipient of the **B. Jaye Anno Award of Excellence in Communication** awarded by the National Commission on Correctional Health Care for "innovative, well-executed communications that have had a positive impact on the field of correctional health care."

**Certifications**

Current Idaho Medical License.

Board Certified in Emergency Medicine through 2028.

Fellow, American College of Emergency Physicians (FACEP).

Fellow, American College of Correctional Physicians (FACCP).

Certified Corrections Health Professional--Practitioner (CCHP-HP).

**Memberships**

American College of Correctional Physicians.

American College of Emergency Physicians.

Academic Consortium on Criminal Justice Health.

Western American Correctional Health Services Association.

American Medical Association.

Idaho Medical Association.

Bonneville County (Idaho) Medical Association.

**Education**

Brigham Young University 1974-1981.  BS Zoology
    *Graduated Summa Cum Laude and with Highest Honors*

University of Utah Medical School 1981-1985

Emergency Medicine Residency, Akron City Hospital, Akron, Ohio 1985-1988
    *Chief Resident 1987-1988*

**Publications**

***Book***

*The Best of Jail Medicine: An Introduction to Correctional Medicine*. Amazon Kindle Direct Publishing. 2022.

***Blogs***

**JailMedicine** (www.jailmedicine.com/).  I published my personal blog, JailMedicine, between 2012 and 2021, in order to discuss all aspects of medicine practiced in jails, prisons and juvenile detention facilities.  I published over 240 articles and had over two million readers.

**MedPage Today: Doing Time: HealthCare Behind Bars (https://www.medpagetoday.com/blogs/doing-time/71759)**

**CorrectionsOne.com** (https://www.correctionsone.com/writers/columnists/jeff-keller/)

**Corrections.com** (http://www.corrections.com/news/result?keyword=&from=06%2F12%2F2000&to=06%2F12%2F2040&name[id]=132)

***Print publications***

**CorrectCare—a quarterly publication of The National Commission on Correctional Health Care**.

**CorrDocs--the Newsletter of the Society of Correctional Physicians.**

**Dose:  A Publication of Correct Rx Pharmacy Services, Inc.**

**Bring 'em All:  Chaos.  Care. Stories from Medicine's Front Line** by Eugene Richards.

## National Lectures and Presentations I have given many lectures and educational presentations at the following national conventions (detailed list of presentations available upon request)

**The National Commission on Correctional Health Care (NCCHC) National conference.**

**The American Correctional Association (ACA) National Conference**

**Essentials of Correctional Medicine National Conference**

**American College of Correctional Physicians (ACCP) National Conference**

**Maricopa County (Arizona) Correctional Conference**

**Idaho Peace Officer Standards and Training (POST)**

**Idaho Sheriff's Association Conference**

**Utah Sheriff's Association Conference**

**Oregon Department of Corrections Medical Conference**

Jeffrey E. Keller MD FACEP

# Jeffrey E Keller, MD, FACEP, FACCP

## Depositions in the last five years (No trial testimony)

8/20/2020.  Moon v. Reviere, et al. 1:19-cv-00217-JRH-BKE. Augusta, Georgia.

9/17/2020.  Granger v Santiago, et al. 3:19 cv 60. Uncasville, Connecticut.

4/27/2021.  Bost/Estate of Neal v Wexford Health Sources, Inc et al.
1:250cv03278.  Baltimore, Maryland.

9/2/2021. Hoelle v. State of Montana.  Cause No. DV 2020-165.  Missoula,
Montana.

10/11/2021.  Walker v Southern Health Partners.  5:20-cv-00397-DCR.  Madison
County, Kentucky.

8/17/2022. Estate of Bradley Grote vs Kenton County, Kentucky 2:20-cv-101.
Kenton County, Kentucky.

8/31/2023. McDaniel v Southern Correctional Medicine, LLC. 5:22-cv-00140-TES.
Houston County, Georgia.

3/19/2024. Boyer v Advanced Correctional Healthcare,Inc. et. al. 3:20-cv-01123-
SLC. Monroe County, Ohio.

5/20/2024. Estate of Alfonso C. Askew v Trumbull County, et. al. 4:21-cv-12133.
Trumbull County, Ohio.

# EXHIBIT 2

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, Plaintiffs, v. SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, Defendants. | Case No. 3:20-cv-00406-AJB-DDL **REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.** Judge:       Hon. Anthony J. Battaglia Magistrate: Hon. David D. Leshner Trial Date: None Set |

# TABLE OF CONTENTS

**Page**

I.    Dr. Murray has limited experience working in jail settings and has not done so since the 1990s. ................................................................. 2

II.    Dr. Murray offered opinions about the adequacy of the Jail medical system without speaking to incarcerated people. ................................... 3

III.    Dr. Murray offered opinions about the adequacy of the Jail medical system without conducting a substantive review of any in-custody deaths. ................................................................................................. 4

    A.    For the three 2024 deaths I reviewed, one was likely preventable, another may have been preventable, and I lack sufficient information to offer an opinion regarding the third. ............................ 7

        1.    Chase Mitchell – 24724484 ......................................... 8

        2.    Liutoa Vili – 23725430 .............................................. 11

        3.    Majid Almajid – 23751645 ......................................... 13

    B.    Newly available documents regarding two other deaths at the Jail reflect serious problems with the care provided at the Jail and the Jail's reporting of in-custody deaths. ........................ 17

        1.    Keith Bach – 23739381 .............................................. 17

            (a)    Background Regarding Type 1 Diabetes ......................... 18

            (b)    Summary of Medical Care ............................... 19

            (c)    Opinions ............................................. 22

        2.    Jose Cervantes Conejo .............................................. 26

IV.    Dr. Murray's opinions regarding the death rate at the Jail are misleading and unsupported by evidence. ......................................... 28

V.    The audit of chronic care that Dr. Murray's team performed is methodologically and substantively flawed. ....................................... 31

VI.    Dr. Murray's audit of intake and Health Assessments is methodologically and substantively flawed. ....................................... 40

VII.    Dr. Murray's audit of nursing sick calls is methodologically and substantively flawed. ....................................................................... 44

VIII.    Dr. Murray's analysis of the timeliness of lab, x-ray, and test results ignores the Jail's repeated and documented failures to timely review those results ............................................................................. 49

IX.     Dr. Murray agrees with several criticisms of the medical system alleged
        in the *Dunsmore* complaint and found in my report. ......................................50

X.      Dr. Murray does not address the substantial problems in the Jail's
        medical system related to purported refusals of treatment by class
        members. ..........................................................................................................52

XI.     Dr. Murray admits that the County has many nursing vacancies, did not
        offer an opinion on whether the County has sufficient nursing staff, and
        ignored evidence that the County does not. ....................................................53

XII.    Dr. Murray did not offer any opinion on the adequacy of
        provider/practitioner staffing...........................................................................55

XIII.   Dr. Murray acknowledges that some nurses working in the Jail do not
        receive new employee orientation ...................................................................56

XIV.    Dr. Murray does not address how the lack of adequate custody staff
        negatively impacts care for patients. ...............................................................56

XV.     Dr. Murray misrepresents the problems the Jail has with the continuity
        of medically-necessary medications and treatments. ......................................57

XVI.    Dr. Murray's opinion that incarcerated patients have adequate means
        for alerting medical staff of their needs is not consistent with the
        evidence I have reviewed. ................................................................................58

XVII.   Dr. Murray's opinion that the Jail has an adequate system for
        diagnosing and treating infectious diseases is not consistent with the
        evidence I have reviewed. ................................................................................59

XVIII.  Dr. Murray's opinion that the Jail offers sufficient access to specialty care is
        not consistent with the evidence I have reviewed............................................60

XIX.    Dr. Murray's opinion that the Jail maintains confidentiality of patient
        medical encounters is not consistent with the evidence I have reviewed. .......61

XX.     Dr. Murray's opinion that "all" patients receive adequate follow up care
        is not consistent with the evidence I have reviewed. ......................................62

XXI.    Dr. Murray's conclusion that the Jail provides adequate discharge
        planning is flawed ...........................................................................................63

XXII.   The faux-NCCHC evaluation performed by Dr. Murray and his team is
        suspect, does not include adequate explanation of the ratings, and is not
        consistent with the evidence I reviewed..........................................................65

        A.    J-A-02 Responsible Health Authority – *Essential* Standard: The
              responsible health authority (RHA) ensures that the facility
              maintains a coordinated system for health care delivery....................67

        B.    J-A-07 Privacy of Care – *Important* ....................................................68

        C.    J-A-9 Procedure in the Event of an Inmate Death – *Important*............68

D.    J-F-01 Patients with Chronic Disease and Other Special Needs – *Essential* ................................................................................................68

1.     I previously issued a Rule 26 Report, submitted on August 21, 2024.  I make this Rule 26 Rebuttal Report to address certain opinions set forth in the Expert Report of Owen J. Murray, DO, dated August 21, 2024 ("Murray Report").

2.     I am a physician with substantial experience in correctional medicine, both as a medical provider and as the Chief Medical Officer for Centurion, a correctional medical company.  A full description of my experience and my curriculum vitae are included in my initial report.

3.     According to Dr. Murray's report, the San Diego Sheriff's Office ("SDSO") retained Dr. Murray to prepare an expert witness report to evaluate the allegations in the *Dunsmore* class action lawsuit related to medical services at the San Diego County Jail ("Jail").  According to his report, Dr. Murray and a team of several other individuals reviewed medical records and data provided to them by defense counsel, visited seven Jail facilities, and interviewed Dr. Freedland, CEO and Chief Medical Officer of Correctional Health Partners ("CHP"), and Dr. Nas Rafi, Medical Director of CHP operations at the Jail.  Following his review, Dr. Murray opined that all of the Plaintiffs' allegations in *Dunsmore* regarding the problems with the medical system at the Jail are "false."  Murray Report at 41-44. He concluded that "[t]he current SDSO healthcare delivery system is neither indifferent nor insensitive to the medical needs of its [incarcerated person] patients." *Id.* at 44.

4.     As set forth below, I disagree with Dr. Murray's ultimate opinion regarding the adequacy of the medical care provided to incarcerated people in the Jail.  As I set forth in my initial report and as I explain below, the medical system at the Jail places incarcerated people at a substantial risk of serious harm.  Moreover, I disagree with many of the opinions Dr. Murray offered in his report regarding the adequacy of specific parts of the medical system at the Jail.

/ / /

/ / /

1  **I.    Dr. Murray has limited experience working in jail settings and has not done so since the 1990s.**

5.    The ideal qualifications for someone performing a comprehensive survey of a county jail's medical program would be clinical and supervisory experience in a county jail setting.  According to his own description of his experience, Dr. Murray has not worked at a jail since he was an administrator at the Cook County Jail in the 1990s.[1]  Since 2009, Dr. Murray has been a senior administrator within the Texas prison system.  Similarly, none of the other three individuals with resumes included within Dr. Murray's report list jail experience in their resumes.  *See* Murray Report at 146-51.  Kirk Abbott has been a nursing administrator in the Texas Prison system since 2000.  Melanie Roberts has been a staff pharmacist in the Texas Prison system since 2001.  Kelly Coates appears to be an administrator for the medical system for the Texas state prison system, but has never worked in a jail and has no medical training.

6.    While prisons and jails are similar in some respects (both house incarcerated persons), they are also different in many significant ways.  Most patients arriving at a jail enter the jail directly from the community.  Many jail patients have not been receiving regular medical care in the community prior to arriving at a jail.  As a result, jails must evaluate incarcerated people quickly and accurately and be ready to provide immediate treatment for a wide variety of urgent,

---

[1] On his CV, Dr. Murray indicates that, in his role as the Senior Vice President for the Offender Health Services at the University of Texas Medical Branch Correctional Managed Care, he is "[r]esponsible for ensuring the provision of all medical, mental health, and dental services for approximately 100,000 adult offenders in Texas Department of Criminal Justice state jails and prisons."  Murray Report at 45.  My understanding is that the "state jails" to which Dr. Murray refers only confine "adult felony offenders who are sentenced" to those jails.  *See* Texas Department of Criminal Justice, *Prison and Jail Operations*, https://www.tdcj.texas.gov/divisions/cid/prison_jail_ops.html.  As such, though those facilities are referred to as "jails," they are different from the San Diego County Jail and other jails in which I have worked in that they do not confine unsentenced criminal detainees who are coming to the facility straight from the community.

acute, and chronic medical problems, such as withdrawal from alcohol, opiates, and other substances, chronic diseases such as diabetes, infections, and many other medical conditions.  On the other hand, most incarcerated people arriving at a prison are not arriving from the community.  Most have been incarcerated in a jail for some period of time before arriving at the prison.  This distinction is important in a few respects.  First, because individuals arriving at prison have generally already been in a jail, they usually have already had any medical conditions diagnosed and received treatment for those conditions.  As a result, people arriving at prison are much less likely to be suffering from out-of-control chronic or acute medical conditions.  Second, because drugs and alcohol are less available in jails than in the community, individuals arriving at prison are much less likely to be experiencing withdrawal.

7.     Another important difference between jails and prisons is that patients typically stay for a short period of time in a jail—on average around a month— whereas patients in prison typically are incarcerated in a prison for at least a year and usually much longer. Consequently, it is much more important for a jail to maintain communication and continuity of care with outside medical practitioners who were taking care of a patient before they came to jail and will be caring for them again once they leave jail.

## II.    Dr. Murray offered opinions about the adequacy of the Jail medical system without speaking to incarcerated people.

8.     Dr. Murray's report does not indicate that he spoke with any incarcerated people in the Jail.  Plaintiffs' counsel has informed me that Plaintiffs agreed that Defendants' experts, including Dr. Murray, could speak with incarcerated people in the Jail so long as Plaintiffs' counsel was present for the conversations.  The fact that Dr. Murray did not speak with any incarcerated people, despite the opportunity to do so, undermines his opinions.  Such interviews are an essential component of any review of a healthcare system because they provide an understanding of the system from the perspective of patients.  For example, when

1  the National Commission on Correctional Health Care ("NCCHC") evaluates a

2  facility, it interviews a substantial number of incarcerated people.  NCCHC Report,

3  January 2017, DUNSMORE0260623.

4  **III.    Dr. Murray offered opinions about the adequacy of the Jail medical**

5  **system without conducting a substantive review of any in-custody deaths.**

6  9.      As I discussed at length in my initial report, one of the most critical

7  functions of any health care system, but especially a correctional health care system,

8  is to carefully review any in-custody deaths "to identify medical errors that led to

9  adverse outcomes ... so that those errors can be avoided in the future."  Keller

10  Report ¶ 92.  This type of review is especially important for the Jail.  In recent

11  years, the County been the subject of multiple, high profile wrongful death lawsuits

12  and four reports critical of the healthcare system and/or high death rate in the Jail:

13  one by Homer Venters, one by NCCHC, one by the State Auditor, and one by

14  Analytica Consulting.  *See* NCCHC Report; Venters Report, March 2020,

15  SD_215361; California State Auditor Report ("State Auditor's Report"), February

16  2022, SD_174794; Analytica Consulting Report ("Analytica Report"),

17  DUNSMORE0116319.

18  10.     It is my opinion that any systematic review of a correctional health care

19  system must closely review any in-custody deaths, as those adverse outcomes

20  provide important information regarding the adequacy of care.  The existence of

21  preventable deaths, especially multiple preventable deaths, is an important indicator

22  that the health care system is not providing adequate care.  In my opinion, any

23  review of a correctional medical system that does not examine in-custody deaths is

24  foundationally flawed.

25  11.     In my report, I examined a number of deaths that occurred at the Jail

26  and found that problems with the medical system contributed or caused many of the

27  deaths.  Keller Report ¶¶ 86-242.  I discussed seven deaths from 2022 and 2023 at

28  length.  *Id.* ¶¶ 119-237.  I then discussed how the problems I found with the medical

care provided to the decedents reflected numerous systemic problems with the healthcare system at the Jail, including that medical staff failed to examine very sick people, conducted evaluations at cell front, ordered medications and diagnosed patients without seeing them, failed to adequately communicate with each other, and failed to continue care plans when people return from the hospital. *Id.* ¶¶ 238-39. My findings related to these in-custody deaths formed one of the pillars of my overall conclusion that the medical system at the Jail exposes incarcerated people to a substantial risk of serious harm, including death.

12.    Dr. Murray did not offer any opinions regarding any in-custody deaths in his report.  Defendants provided Dr. Murray with medical records for five individuals who died in 2024 while in custody at the Jail from non-homicide/non-suicide causes.  Murray Report at 39.  Dr. Murray claims that "[t]hese medical records were ... reviewed," though he does not indicate by whom. *Id.* at 39. Dr. Murray attached as Appendix Q to his report short summaries for each of the deaths.  Notably, however, Dr. Murray did not provide any analysis regarding whether the medical care provided to these five individuals before they died met the standard of care.  He also did not opine on whether the deaths were preventable, whether any deficiencies in the Jail healthcare system were factors in the deaths, or whether the Jail should have made any changes to its medical system in response to the deaths.

13.    Dr. Murray did not mention, let alone review or analyze, any deaths that occurred prior to 2024.[2]  His Appendix B, which lists all of the materials he was provided for review, also does not list any records for any of the individuals who died in-custody prior to 2024.

---

[2] The only opinion that Dr. Murray offers related to mortality at the Jail is to question whether the data regarding the Jail's mortality rate are accurate.  My response to Dr. Murray's opinions regarding the mortality rate is below. *See* Section IV, *infra*.

14.     Because Dr. Murray did not offer any opinions regarding in-custody deaths at the Jail, it is my opinion that his opinions regarding the adequacy of care in the system are fundamentally flawed and unreliable.  Put simply, any review of any medical system that does not consider whether the system performed adequately in situations where patients died is worthless or nearly so.  It is not possible to understand the strengths and weaknesses of a medical system without understanding what happened when patients being cared for in the system have died.  Dr. Murray's failure to review any of the in-custody deaths at the Jail is particularly egregious given that in-custody deaths are at the very core of the allegations and evidence in this case.  The words "death" and "deaths" appear over 100 times in the Third Amended Complaint.  The State Auditor's Report, which was cited extensively by Plaintiffs in the Third Amended Complaint, concluded, based on a review of 30 in-custody deaths, that "deficiencies with how the Sheriff's Department provides care for ... incarcerated individuals ... likely contributed to in-custody deaths." SD_174794.  Dr. Murray himself acknowledged that in-custody deaths are important, stating in his report that "[i]n-custody mortality is an important metric that should be reviewed in all jail healthcare systems."  Murray Report at 40. Though he wrote this statement in the context of a discussion of the mortality rate at the Jail rather than as part of an analysis of any specific deaths, it shows that he knows that in-custody deaths are central to this case and relevant to the evaluation of the adequacy of healthcare systems.

15.     The Joint Commission of Accreditation of Health Organizations ("Joint Commission"), an organization that evaluates hospitals, provides a model for how to perform investigations into whether poor or inadequate medical care contributed to a death and whether the death was preventable.  The Joint Commission has a guideline for evaluating deaths or other sentinel events called the Framework for Root Cause Analysis and Corrective Actions, which is available at https://www.jointcommission.org/-/media/tjc/documents/resources/patient-safety-

topics/sentinel-event/rca_framework_101017.pdf.  The Joint Commission does not determine whether inadequate medical care contributed to a death by simply looking at hospital systems—for example, determining whether there is an emergency department, whether the inpatient floors are staffed with nurses, or what the average lab turnaround time is.  When investigating deaths, they look in detail at those specific cases to determine whether poor emergency department care, short staffing, lab problems, or any other system failures contributed to the deaths.  To this end, the Root Cause Analysis includes 24 questions, many of which include sub-questions, to determine whether the system contributed to the specific sentinel event, such as a death.

16.     It is my opinion that Dr. Murray and his team cannot opine that the Jail has no systemic problems without evaluating the medical care provided to patients who died while in the Jail.  To have not evaluated the deaths at all is a fatal flaw in Dr. Murray's methodology that negates his entire thesis.

**A.     For the three 2024 deaths I reviewed, one was likely preventable, another may have been preventable, and I lack sufficient information to offer an opinion regarding the third.**

17.     In or around September 21, 2024, Plaintiffs' counsel provided me with the medical records for the five deaths summarized in Appendix Q of Dr. Murray's report.  These records were not available to me at the time I wrote my initial report. A full list of the materials I considered for this report (all of which I reviewed after the disclosure of my initial report on August 21, 2024) is attached hereto as Appendix C.

18.     My understanding is that Plaintiffs' expert on substance use disorders will be offering opinions regarding two of those deaths (the deaths of Eric Wolf and Richard Woodford); I therefore offer no opinion related to Mr. Wolf and Mr. Woodford's deaths.  For the remaining three deaths, I offer the following opinions, explained in more detail below.  First, it is my opinion that Chase Mitchell's death from sepsis was potentially preventable.  Moreover, it is my

opinion that problems with the medical system that I identified in my initial report caused, at least in part, his death.  Second, since I have not been provided with the cause of death for Liutoa Vili, I am unable to opine regarding whether his death was preventable.  That said, the care he received in the days preceding his death for a serious leg infection fell below the standard of care and it is therefore possible that Mr. Vili's death was preventable and caused, at least in part, by the substandard care.  Third, I am unable to offer an opinion regarding the death of Majid Almajid, as his medical records do not include a cause of death.  I can opine, however, that the care he received in the Jail for a back injury did not meet the standard of care.

### 1.    Chase Mitchell – 24724484

19.    Mr. Mitchell's medical records show that he died of sepsis on July 15, 2024, after surgery and treatment at the hospital were unable to address an infected abscess on his back.  In my opinion, Mr. Mitchell's death was likely preventable.

20.    Mr. Mitchell's Medical Clearance was done on June 13, 2024.  His vital signs were normal.  Mitchell Med. Rcd.[3] at 2.  He was reported as being "uncooperative, yelling, not answering questions."  *Id.* at 3.  Most of the Receiving Screening was left blank.  *Id.* at 5.  Mr. Mitchell weighed 150 lbs.  *Id.* at 26.  Mr. Mitchell was reported as refusing a Health Assessment the same day.  *Id.* at 58, 66.  On June 13, 2024, Mr. Mitchell's reportedly refused a Second Stage Nurse Evaluation.  *Id.* at 23.[4]

---

[3] For nearly all of the medical files that I reviewed that Defendants produced for Dr. Murray's report, there was one medical file for each individual.  Throughout this report, I cite to the corresponding records using the person's last name.  The page numbers indicate the page number of the PDF.

[4] Mr. Mitchell's refusals were inappropriately handled.  I discussed the problems with refusals in my report and how the SDSO inadequate and inappropriate refusal policies can and do harm patients.  Mr. Mitchell is another example of this.  When Mr. Mitchell came to the jail on June 13, 2024, he was agitated and uncooperative. In this state, he refused a Health Assessment when it was offered.  However, that does not mean that he would refuse a Health Assessment forever.  In fact, Mr. Mitchell is documented as being cooperative with examinations and medical care as soon as a few days later.  But the medical staff never tried again to do a Health Assessment.  I note that Mr. Mitchell never had a physical examination by a

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.

1    21.    On July 4, 2024, he was diagnosed by mental health care staff as

2    having schizophrenia, though he refused to take medicine.  *Id.* at 34, 39, 41, 53.

3    22.    On July 3, 2024, Jasmine Angel MHC did a wellness check.  *Id.* at 68.

4    She stated "IP was amenable to talk at his cell door."  *Id.*  He appeared well

5    groomed and was eating.

6    23.    On July 7, 2024, Mr. Mitchell "den[ied] health concerns" during a

7    wellness check.  *Id.* at 56.

8    24.    On July 13, 2024 at 11:13 p.m., Kyra Whited, a remote STATCare

9    practitioner, wrote "nurse called with reports of looking clammy by custody staff

10   and responding to que[stions] but not very talkative.  nurse reports BP 96/66 sitting,

11   91/62 standing.  no abnormal findings on neurological exam reported.  does report

12   25 lb wt loss in one month."[5]  *Id.* at 56.  Mr. Mitchell's weight at this visit was 126

13   lbs., confirming his report of weight loss.  This extreme weight loss alone should

14   have set off alarm bells.  After all, Mr. Rupard and Ms. Bartolacci, discussed in my

15   initial report, also died after losing a large amount of weight.  *See* Keller Report ¶¶

16   193-220.

17   25.    On that same day, Martha Burgess, STATCare NP wrote to "keep pt in

18   medical, PO fluids, Boost TID" as well as neuro checks.  *Id.* at 56.  At no point on

19   that date was Mr. Mitchell examined in person by a medical practitioner.

20   26.    On July 14, 2024 at 6:13 a.m., RN Baluca wrote that Mr. Mitchell was

21   transferred to M2 for observation.  *Id.* at 56.

22   27.    On July 14, 2024 (documented at 9:30 a.m., although the encounter was

23   earlier than 9:00 a.m.), RN Anil Kumar saw Mr. Mitchell for a complaint of a

24   headache.  She documented this on a Headache Nursing Protocol form.  *Id.* at 27.

25

26   medical practitioner the entire time he was incarcerated.

27   [5] The nurse who called STATcare did not write any note that appears in

28   Mr. Mitchell's file.

1  She did not record any vital signs.  RN Kumar ordered acetaminophen for

2  Mr. Mitchell.  She appropriately referred Mr. Mitchell to be seen immediately by a

3  practitioner.  *Id.* at 28.

4      28.    At 9:00 a.m., NP Christine Sullivan saw Mr. Mitchell, and noted that

5  he was dyspneic, weak, and tachycardic.  She suspected that Mr. Mitchell was

6  dehydrated and appropriately sent Mr. Mitchell to the hospital.  *Id.* at 57.

7      29.    At the hospital, Mr. Mitchell was noted to have "cellulitis on his back

8  and an abscess that is partially open and actively draining."  *Id.* at 110.  He also was

9  found to have septic shock.  Mr. Mitchell had surgery to drain his abscesses and

10  then was sent to the ICU, but died on July 15, 2024 from sepsis.  *Id.* at 117.

11      30.    **In my opinion, Mr. Mitchell's death was likely preventable**.  The

12  nurse's findings on July 13, 2024—that Mr. Mitchell had lost 25 pounds in a month

13  and was suffering from serious symptoms, including hypotension, after reporting

14  only six days earlier that he had no medical concerns—should have resulted in

15  either an urgent, in-person physical examination by a medical practitioner (which

16  likely would have identified the open and draining abscess on his back and then

17  resulted in emergency transportation to the hospital) or immediate transportation of

18  Mr. Mitchell to the hospital.  Neither of those occurred.  One reason a physical

19  examination did not occur at the Jail is because of the County's reliance on remote

20  STATCare practitioners, who cannot perform physical examinations because they

21  are not present at the Jail.  Here, the RN who identified some of Mr. Mitchell's

22  symptoms contacted a STATCare practitioner, who then entered orders for

23  treatment without examining Mr. Mitchell.  That decision to treat Mr. Mitchell

24  without an evaluation did not meet the standard of care and likely contributed to his

25  death.

26      31.    Because the Jail, on July 13, 2024, neither examined Mr. Mitchell nor

27  sent him to the hospital, the diagnosis of Mr. Mitchell's abscess and related sepsis

28  was delayed by a significant number of hours.  Had the abscess and infection been

1  diagnosed earlier, it is possible that the infection would have responded to surgery

2  and treatment and that Mr. Mitchell would have survived.

3          **2.     Liutoa Vili – 23725430**

4          32.     The medical records for Mr. Vili indicate that, on February 4, 2024,

5  while being wheeled to medical, Mr. Vili slumped over and fell out of his

6  wheelchair.  He was unresponsive, apneic, and pulseless.  Vili Med. Rcd. at 272.

7  CPR was started, as well as ACLS when the paramedics arrived.  *Id.*  Mr. Vili was

8  transferred to the hospital where he was declared dead.  *Id.*  Neither the paramedic

9  transport records nor the hospital records for this event are included in the records

10  provided to me.  I also do not have access to the autopsy report.

11         33.     Without knowing the autopsy results, including the cause of death, I

12  cannot say whether Mr. Vili's death was preventable.  I can, however, opine that

13  much of the care he received for a chronic leg infection, including care in the days

14  leading up to his death, fell below the standard of care.  It is therefore possible that

15  Mr. Vili's death was preventable and caused by substandard care at the Jail.

16         34.     Mr. Vili had chronic venous insufficiency of the legs with skin

17  breakdown and a recurrent infected leg ulcer.  This was a complicated ulcer.  It

18  became infected, was treated with antibiotics and local wound care, improved, then

19  recurred through two cycles leading up to January of 2024.  Vili Med. Rcd. at 232-

20  269.  Mr. Vili was treated with frequent local wound care, wound cultures and

21  antibiotics.  *Id.*  For reasons unclear, this complicated, serious infected leg ulcer did

22  not result in a detailed work up and specialty consultation.  Specifically, no one

23  seems to have considered that Mr. Vili might have a more serious underlying septic

24  process, such as osteomyelitis, deep abscess, or fasciitis.  Further work up that could

25  have been done included 1.  Blood tests:  C-reactive protein (CRP) and Erythrocyte

26  sedimentation rates (ESR) and blood cultures looking for systemic sepsis.  2.

27  Imaging: ultrasound looking for deep fluid collections, plain x-rays and CT/MRI to

28  look for osteomyelitis (bone infection).  Finally, referral to a hospital wound care

1  clinic for more advanced wound care, such as surgical debridement, was never

2  considered.

3      35.     The last cycle of worsening of the infection began about six weeks

4  before Mr. Vili died.  On December 19, 2023, RN Vivona wrote "wounds to left leg

5  healed and scabbed." *Id.* at 264.  Mr. Vili's next wound check occurred on

6  December 28, 2023.  RN Stephanie Yee found that the wounds had again worsened:

7  "Old Band-aids removed.  Areas cleansed with Anasept spray, pat dry, and photos

8  obtained revealing beefy, red, raised wounds, more significant on right calf than

9  left." *Id.* at 266.  RN Yee did local wound care as had been done the preceding four

10  months.

11      36.     On December 29, 2023, RN John Wyatt wrote "Patient has sores to

12  back of lower extremities bilaterally." *Id.*  On December 30, 2023, NP Matthew

13  Wallace reviewed photos of the wounds and ordered wound care. *Id.*  Wound care

14  was done every other day through January 2024. *Id.* at 22.

15      37.     On January 30, 2024, RN Yee wrote that Mr. Vili was brought to clinic

16  for "'trouble breathing,' back pain and chest pain."  She also noted that "while in

17  clinic, [a] foul smelling open wound [was] discovered on left lateral lower leg." *Id.*

18  at 269.  Mr. Vili's vital signs showed him to be hypotensive at 94/70. *Id.* at 38.

19      38.     Dr. James Veltmeyer saw Mr. Vili and wrote that Mr. Vili was "thin,

20  possibly under nourished."  Mr. Vili had a tender 2 cm painful ulcer.  Dr. Veltmeyer

21  assumed "LLE ulcer-likely infected with staph pyogenes vs mrsa" and he started

22  Bactrim (the third course of Bactrim Mr. Vili had taken, *id.* at 242, 262).  Most

23  importantly, Dr. Veltmeyer noted that Mr. Vili was hypotensive but assumed that

24  this was due to hypertension meds and stated "vitals stable." *Id.* at 269.  However,

25  Mr. Vili's low blood pressure was not stable per his blood pressure log, which

26  showed readings of 129/88 and 133/83 on January 25, 2024, but of 94/70 on

27  January 30, 2024. *Id.* at 38.

28      39.     Dr. Veltmeyer's decision not to send Mr. Vili to the hospital was a

medical mistake.  Mr. Vili had multiple co-morbid conditions, including renal insufficiency and venous stasis, and had experienced a recurring leg infection for months.  He presented sick and malnourished and had abnormal vital signs.  He should have been sent to the ER at this point.  At a minimum, his status should have been reassessed and his vital signs remeasured.  Dr. Veltmeyer did write for "daily wound care with wet to dry daily dressings."  *Id.* at 269.  However, there is no note indicating that Mr. Vili was assessed again by medical personnel before he died five days later (other than notes that the dressing changes were "administered" by LVNs through the morning of February 1, 2024).  *Id.* at 29.  Mr. Vili had five subsequent "refusals" of dressing changes, but his dressing was changed the morning of February 4, 2024, about 3 hours before he died.  *Id.*

40.    In my opinion the care for Mr. Vili's leg infection fell below the standard of care in the following ways:

- Mr. Vili had a recurrent infection of his leg.  It did improve with antibiotic treatment, but when it recurred and then recurred a second time, the medical practitioners should have intensified their diagnostic and therapeutic efforts.  They should have considered labs and imaging studies looking for osteomyelitis, fasciitis, or deep abscesses.  Alternatively, they could have referred Mr. Vili to a hospital wound clinic for a consultation, including whether surgical debridement should be done.

- On January 30, 2024, Mr. Vili was found to be ill appearing with a "foul-smelling" wound and he was hypotensive.  He should have either been sent to the hospital or have been reassessed by a medical practitioner with repeat vital signs within a short period of time.  The Jail did neither of those things.  He then died five days later.

### 3.    Majid Almajid – 23751645

41.    The medical records for Mr. Almajid indicate that on May 5, 2024,

1   staff found him unresponsive and pulseless.  Almajid Med. Rcd. at 26, 106.  NP

2   Wycoco wrote: "Skin color appeared to be pale to mottled/purplish/cyanotic on his

3   chest, cold" and "arms/lower extremities were stiff, fingernails cyanotic.  During the

4   CPR, the arms/fingers stayed on their position." *Id.* at 26.  By this description,

5   Mr. Almajid already had rigor mortis and livor mortis indicating he had been dead

6   for some time before he was discovered.

7       42.    Without knowing the autopsy results or the cause of Mr. Almajid's

8   death, I cannot say whether his death was preventable.

9       43.    From my review of his records, however, I can say that the treatment he

10  received for lower back pain fell below the standard of care.

11      44.    Mr. Almajid had his Medical Clearance and Receiving Screening done

12  on December 20, 2023.  *Id.* at 12, 14.  He reported piriformis syndrome (which

13  causes buttock and posterior hip pain) and sciatica as his medical problems.  *Id.*

14  at 17.  He reported no substance abuse issues.

15      45.    Mr. Almajid had a 2nd stage nursing evaluation done the next day,

16  December 21, 2023.  He again reported sciatica treated with a back brace.

17  Mr. Almajid asked for ibuprofen.  *Id.* at 24, 108.  This was the last time Mr. Almajid

18  had his vital signs checked.  *Id.* at 162.

19      46.    Mr. Almajid was scheduled for a doctor chronic care visit on December

20  23, 2023, but on the scheduled day, NP Nicholas Kahl did not see him; instead, NP

21  Kahl requested old records and approved "Motrin & Tylenol prn."  *Id.* at 24, 25.

22  •    NP Kahl should have seen Mr. Almajid in person.  He did not know

23       what Mr. Almajid meant by the term "sciatica."  Sciatica is understood

24       in the medical community to mean pain in the hip and leg caused by

25       compression of a nerve root in the spine.  But the term "sciatica" is also

26       used by lay people to mean "severe back pain."  Either way, this could

27       be a serious medical condition.  It is true that having Mr. Almajid's old

28       records would help.  But doing a thorough physical examination would

1    help more and could be done immediately.  NP Kahl did not know what

2    was going on with Mr. Almajid without an examination.

3    •    There is no evidence that old records were ever ordered, received, or

4         reviewed.  It appears that NP Kahl's order to obtain old records was

5         ignored.

6    47.    On January 3, 2024, Mr. Almajid reportedly refused to have a Health

7    Assessment done.  *Id.* at 91.  However, only one deputy witnessed the refusal and

8    the refusal to sign the refusal form.  *Id.* at 95, 100.  The same day, Mr. Almajid

9    wrote a Health Care Request stating "Sciatica pain and discomfort.  Please help me.

10   I need to see doctor ASAP."  *Id.* at 223.  It makes no sense for Mr. Almajid to

11   request to see a doctor "ASAP" and then refuse a medical evaluation.  I question the

12   legitimacy of this "refusal."  In addition, the Jail appears to have ignored the

13   request, as I see no response to this request in his chart, not even a face-to-face visit

14   with an RN.

15   48.    On January 10, 2024, Mr. Almajid wrote, "My sciatica is getting

16   worse . . . need more pain meds."  *Id.* at 255.

17   49.    On January 15, 2024, NP Frederick Wycoco responded to

18   Mr. Almajid's January 10, 2024 sick call slip simply by renewing his ibuprofen.  *Id.*

19   at 25.  He did not conduct a visit with or examine Mr. Almajid.  NP Wycoco should

20   have seen Mr. Almajid face-to-face and done a thorough physical examination.

21   Again, Mr. Almajid had been using the term "sciatica" ever since he was booked.

22   But did he mean that he had documented compression of a nerve root in his spine, or

23   did he just mean severe chronic back pain?  NP Wycoco did not know.  Nobody had

24   obtained old records.  Nobody had done any medical examination of Mr. Almajid.

25   Worsening symptoms due to a compression of a nerve root in the spine can require

26   urgent surgery.  And back pain can be a symptom of many serious medical

27   problems, such as cancer, aortic dissection, compression fractures, infections, and

28   more.  NP Wycoco could not say that Mr. Almajid did not have any of these serious

problems, because he did not examine him.  This was a serious medical mistake.

50.    On February 6, 2024, Mr. Almajid wrote a Health Care Request that stated, "I want to be removed from the lower bunk chrono." *Id.* at 226.  The Jail scheduled him for a doctor chronic care visit and noted "Pt would like to be removed from lower bunk chrono.  Pt with continuous complaints of back pain.  Pls review chart." *Id.* at 25.

51.    On February 16, 2024, NP Wycoco again failed to meet the standard of care by continuing the lower bunk designation (against Mr. Almajid's request) without conducting a visit with or examining Mr. Almajid.  *Id.* at 25.

52.    On May 5, 2024, Mr. Almajid died in the Jail, as described above.

53.    Collectively, the care provided to Mr. Almajid for his back pain fell below the standard of care.  He arrived at the jail complaining of "sciatica," which is a vague medical term that can mean different things to different people.  No one ever established what work up had been done prior to incarceration, what diagnosis Mr. Almajid had been given, or what therapies had been prescribed in the past.  No one ever conducted a physical examination of Mr. Almajid over the course of 4.5 months despite repeated complaints of worsening and continuous back pain.  All of the following are examples of medical mismanagement in his case:

- NP Kahl did no examination of Mr. Almajid on December 23, 2023 to determine what, exactly, was the source of his chronic back pain.

- NP Kahl ordered old records on December 23, 2023, but this order was ignored.

- On January 3, 2024, Mr. Almajid wrote a Health Care Request that said, "Sciatica pain and discomfort.  Please help me.  I need to see doctor ASAP."  This was ignored.

- On January 10, 2024, Mr. Almajid wrote a Health Care Request that said "My sciatica is getting worse."  No nurse saw him face-to-face. NP Wycoco did no examination.

- On February 16, 2024, NP Wycoco received notification that Mr. Almajid had "continuous complaints of back pain." Again, NP Wycoco did not see Mr. Almajid to find out what was going on nor did he do a physical examination.

- Mr. Almajid refused to have a Health Assessment on January 3, 2024, as reported by security staff. This is not credible since this is the same day that Mr. Almajid wrote "I need to see doctor ASAP."

**B.      Newly available documents regarding two other deaths at the Jail reflect serious problems with the care provided at the Jail and the Jail's reporting of in-custody deaths.**

54.      Below, I provide opinions regarding two additional in-custody deaths. These two deaths, one of which I discussed in my initial report, both reveal extraordinarily serious problems with the medical system in the Jail. I am presenting opinions regarding these deaths now because documents relevant to these deaths have become available since I issued my initial report.

**1.      Keith Bach – 23739381**

55.      Mr. Bach died on September 28, 2023. I previously discussed the death of Keith Bach in my initial report in the context of failures of the Jail's morbidity and mortality reviews. Keller Report ¶¶ 108-114. I opined that the death review conducted by NaphCare was deficient for multiple reasons. *Id.* At the time that I issued my initial report (August 21, 2024), the County had not yet completed its investigation into his death and therefore the autopsy report was not available to me. On September 18, 2024, the Coroner for San Diego County released the autopsy report. Thereafter, Plaintiffs provided it to me.

56.      The information contained in the coroner's report is shocking. As discussed in more detail below, the coroner's report includes information which establishes that Mr. Bach's death was 100 percent preventable. Even more troublingly, the coroner found that the care that the County provided to Mr. Bach was so deficient that the coroner classified the death as a homicide. Bach Coroner's

1  Report at PDF 5, 8.  I offer no opinion on whether the death was, in fact, a

2  homicide.  But, having now reviewed the medical records for Mr. Bach, I fully agree

3  that his death was preventable.

4              **(a)    Background Regarding Type 1 Diabetes**

5              57.    Mr. Bach died from complications related to his Type 1 diabetes.  Type

6  1 diabetics make no insulin and so, unlike Type 2 diabetics, they need insulin to

7  survive.  The Standard of Care for the treatment of Type 1 diabetics is found in

8  Diabetes Management in Detention Facilities:  A Statement of the American

9  Diabetic Association.[6]  Some of the relevant ADA standards pertinent to Mr. Bach's

10  case are:

11       •    Within 24 hours "[i]ndividuals diagnosed with diabetes should

12            promptly undergo a comprehensive medical history review and

13            physical examination by a health care professional" *Id.* at 545 (Intake

14            Screening).

15       •    Individuals with insulin pumps "should retain uninterrupted access to

16            these tools upon their introduction to the detention system." *Id.*  Insulin

17            pumps work by infusing a steady supply of insulin all the time.  This is

18            called the "basal" insulin, which Type 1 diabetics need for their basic

19            metabolism, even if they do not eat.  Patients with an insulin pump can

20            then trigger the pump to give them additional boluses of insulin every

21            time they eat.  This is called "prandial" insulin, meaning insulin needed

22            to metabolize their food.

23       •    If patients are not using an insulin pump, "[p]eople with type 1 diabetes

24            should be treated with a daily injection of long-acting basal insulin plus

25  _____

26  [6] Daniel L. Larber et al., *Diabetes Management in Detention Facilities: A Statement
    of the American Diabetes Association*, 47 Diabetes Care 544 (2024) ("Diabetes in
27  Detention"); American Diabetes Association, *Diabetes Management in Detention
    Facilities: Position Statement* (2021).  The 2024 standards do not differ materially
28  from the 2021 standards as cited in this report.

rapid-acting prandial insulin at mealtimes." *Id.* at 548 (Medications). Type 1 diabetics need long-acting basal insulin even if they do not eat. (Examples of long-acting insulins are Lantus and Semglee. They are usually dosed once a day). The short-acting prandial insulin is only given at mealtimes. The amount of prandial insulin taken by a Type 1 diabetic for each meal varies depending on the amount of carbohydrates in that particular meal. Type 1 diabetics are practiced in calculating the number of carbohydrates in a particular meal and calculating the units of insulin they need to metabolize those carbohydrates. The correct dosage will vary with each meal and will also vary if the patient decides not to eat the entire meal.

- "Insulin omission [in a type 1 diabetic] can lead to severe metabolic decompensation, including DKA [Diabetic Ketoacidosis]." *Id.* at 545 (Intake Screening).

### (b)    Summary of Medical Care

58.    Mr. Bach was booked into the Jail on September 26, 2023 after two trips to the ER to be assessed for hyperglycemia and syncope. His receiving screen was done at 3:12 a.m. SD_711406.

59.    A remote STATCare NP, Katherine O'Neal, did Mr. Bach's STATCare Intake Assessment and Orders at 3:49 a.m. She was informed that Mr. Bach had a continuous Glucose Monitor (CGM), an insulin pump and that his blood sugar was 123. SD_711423. NP O'Neal ordered "continue insulin pump for now." SD_711424. NP O'Neal also wrote an addendum at 4:10 a.m. that stated "Pt. reports his current meds via insulin pump be consumed tomorrow morning around 8:00 AM." SD_711480. The Medical Examiner interprets this to mean that the pump would be empty on September 27, 2023 at 8:00 a.m., but it makes more sense to me if the pump was empty much earlier than this. I believe Mr. Bach meant that his insulin pump would be empty that upcoming morning, September 26, 2023.

60.     On September 26, 2023, at 12:42 p.m., NP Nicholas Kahl visited with Mr. Bach "in Holding Cell."  Mr. Bach requested 12 units of insulin prior to lunch. If Mr. Bach's insulin pump was full, he could have dosed himself with the 12 units of insulin.  Since he asked NP Kahl for insulin, either the pump was already empty or nearly so.  NP Kahl also wrote "records reviewed confirms pt on insulin pump." SD_711487.  However, if NP Kahl had asked Mr. Bach about his insulin pump instead of looking at the medical records, Mr. Bach could have told him the same thing he told others, that his pump was almost empty.  NP Kahl ordered "Novolin R (a short acting insulin)10 units with each meal."  SD_711488.  How NP Kahl chose this dose is puzzling to me.  It is totally inappropriate for a Type 1 Diabetic, since the prandial dose should vary with each meal depending on the amount of carbohydrates in that meal and how many of the carbohydrates are eaten.

61.     Instead, NP Kahl should have done one of two things.  He should have refilled Mr. Bach's insulin pump with insulin (which Mr. Bach could then have used to manage his own diabetes without having to ask the nurses for insulin) or he should have converted Mr. Bach to "a daily injection of long-acting basal insulin plus rapid-acting prandial insulin at mealtimes."  Diabetes in Detention at 548.  He did neither.  NP Kahl did schedule Mr. Bach for an MDCC (Medical Doctor Chronic Care) visit the next day.  SD_711488.  This visit never occurred.

62.     On September 26, 2023 at 6:53 p.m., Ana Gonzalez RN wrote "Blood sugar checked at 1305.  Blood sugar was 128 mg/dl.  Withheld insulin.  NP notified."  *Id.*  This decision, to withhold insulin based on a blood sugar of 123, makes no sense for a Type 1 Diabetic like Mr. Bach.  Type 1 diabetics need short acting insulin boluses when they eat based on the amount of carbohydrates in that meal.  Type 1 diabetic patients need short acting insulin to cover their meals even if their blood sugar is in the normal range.  As I discussed in my initial report, the Jail does not have any Disease Management Guideline for Type 1 Diabetes that a nurse or a NP could refer to in order to understand how to treat a Type 1 Diabetic.

1    63.    On September 27, 2023, at 12:42 a.m., RN Gemechu Bulti wrote

2  "Current BS is 322 mg/dl.  Patient refused the scheduled dose of 10 units of regular

3  insulin and is requesting 20 units instead.  Statcare alert sent." *Id.*  The most likely

4  reason that Mr. Bach's blood sugar spiked so dramatically at this time was that his

5  insulin pump was empty and no longer delivering any basal insulin.

6    64.    NP O'Neal answered this alert at 1:37 a.m.  NP O'Neal wrote "[n]oted

7  patient continues to have insulin pump and checks blood sugars 8 times a day."

8  SD_711427.  However, this cannot be true.  Mr. Bach's insulin pump must have

9  been empty or close to empty at this time, otherwise, he could have bolused himself

10  with insulin in his pump and would not have needed to ask the nurse for insulin.  NP

11  O'Neal refused Mr. Bach's request for 20 units and authorized only 10 instead.  *Id.*

12    65.    RN Bulti gave Mr. Bach those 10 units at 1:51 a.m.  *Id.*; SD_711393.

13  That was the last dose of insulin Mr. Bach received prior to his death.

14    66.    On September 28, 2023 at 4:54 a.m., LVN Evangeline Pedrozo wrote

15  that Mr. Bach refused all his medications.  There are actually three refusal forms in

16  Mr. Bach's medical record.  On September 27, 2023 at 11:34 p.m., Mr. Bach

17  reportedly refused to take the medication atorvastatin and also refused to sign the

18  refusal form as witnessed by two deputies.  SD_711481.  On September 28, 2023 at

19  1:34 a.m., Mr. Bach reportedly refused to allow his blood sugar to be checked and

20  also refused to sign the refusal form as witnessed by two deputies.  SD_711484.  On

21  September 28, 2023 at 4:48 a.m., Mr. Bach reportedly refused to take multiple

22  medications and also refused to sign the refusal form as witnessed by two deputies.

23  SD_711485.

24    67.    These refusal forms are extremely suspicious.  This last refusal form at

25  4:48 a.m. was timestamped forty minutes after Mr. Bach had been declared dead at

26  4:09 a.m.  Bach Coroner's Report at PDF 3.  It therefore is very likely (if not

27  certain) that the deputies completed this refusal form without actually witnessing

28  Mr. Bach refuse care.  The other two refusals from earlier in the night are also

suspicious.  During the very period that the first two refusals allegedly occurred, "[a]ccording to sheriff's investigation, he (Mr. Bach) was reported to have asked multiple deputies on numerous occasions for insulin.  During mealtimes, Mr. Bach gave his food to fellow inmates, as he did not want to eat if he did not have access to insulin.  Additionally, other inmates were attempting to assist Mr. Bach in requesting insulin by pointing out to deputies that the alarm on Mr. Bach's insulin pump was sounding and that the pump was empty."  Bach Coroner's Report at PDF 7.  I therefore find that these refusal forms are not credible because it is unlikely that Mr. Bach was attempting to get medical attention but also refusing his medications.

68.    On September 28, 2023 at 3:40 a.m., Mr. Bach was found unresponsive, not breathing and with no pulse.  *Id.* at PDF 3.  CPR and ACLS resuscitation were attempted but Mr. Bach was pronounced dead at the scene at 4:09 a.m.  *Id.*

69.    An autopsy was performed on September 28, 2023 by Melanie Estrella, DO, Deputy Medical Examiner.  *Id.* at PDF 2-4.  Nearly a year later, Dr. Estrella concluded in the autopsy report that the cause of Mr. Bach's death was "Diabetic Ketoacidosis" and the Manner of Death was "Homicide."  *Id.* at PDF 5, 8.

### (c)    Opinions

70.    In my opinion, Mr. Bach's death was preventable.  Medical staff violated the ADA standards of care for the treatment of Type 1 Diabetes on several occasions.

71.    Mr. Bach never received "comprehensive medical history review and physical examination by a health care professional."  NP Kahl did see him in his holding cell the day he was booked, but did not obtain or document a comprehensive medical history and did not perform a comprehensive physical examination.  Most of the medical decision-making done in the case of Mr. Bach was done by a remote STATCare NP, who also did not perform a comprehensive

medical history review and, of course, did not perform an examination of Mr. Bach.

72.    Mr. Bach was not allowed "uninterrupted access" to his insulin pump. He informed the medical staff that his insulin pump was low and would soon run out of insulin.  According to the Medical Examiner, he repeatedly attempted to notify staff of his need for insulin, with no success.  The correct response would have been to refill the pump with insulin.  This would have been easy to do.  Since it was not done, the insulin pump ran out of insulin sometime before his blood sugar was measured at 322 mg/dl. The pump running out of insulin was the most likely explanation of why Mr. Bach's blood sugar spiked so dramatically.

73.    If the Jail medical practitioners intended to transition Mr. Bach off of his insulin pump and prescribe instead "a daily injection of long-acting basal insulin plus rapid-acting prandial insulin at mealtimes," the correct course of action would have been to do this: Ask Mr. Bach how much total insulin he gave himself using the insulin pump each day, on average. Half of this total daily dose should be given as long-acting insulin.  The other half is given as short-acting prandial insulin divided between three meals.  However, neither the STATCare NP nor NP Kahl at the Jail made any attempt to do this.

74.    Besides allowing Mr. Bach's basal insulin need to go unmet, the Jail practitioners also underdosed his prandial insulin needs.  We know this because Mr. Bach asked for more short-acting prandial insulin on two occasions.  The most important of these was when he asked for 20 units of insulin in the early morning hours of September 27, 2023.  There was no reason to refuse this request.  Mr. Bach had historically done an excellent job of managing his own diabetes (Bach Coroner's Report at 6), which the Jail practitioners would have known had they obtained a "comprehensive medical history."  The other occasion when short-acting prandial insulin was inappropriately withheld was on September 26, 2023, when RN Gonzalez did not give Mr. Bach his scheduled dose of 10 units because his blood sugar was 128 mg/dl.  But Type 1 diabetics need their prandial insulin to metabolize

1   their meals even if their blood sugar is normal.

2   75.     These missteps by the Jail—allowing Mr. Bach's insulin pump to go

3   dry, not giving him any long-acting basal insulin, and underdosing his prandial

4   insulin needs—resulted in "insulin omission" which led to "severe metabolic

5   decompensation, including" diabetic ketoacidosis.  Diabetes in Detention at 545.  In

6   Mr. Bach's case, the diabetic ketoacidosis resulted in his death.  Bach Coroner's

7   Report at 4.

8   76.     In my opinion, an important factor that contributed to Mr. Bach's death

9   was the fact that the Jail did not have any Disease Management Guideline for the

10  treatment of Type 1 Diabetes. Had they had such a guideline, the Jail practitioners

11  and the Jail nurses might have known how to appropriately manage Type 1 Diabetes

12  and not made the many mistakes that resulted in Mr. Bach's death.

13  77.     Had Mr. Bach received medical treatment conforming to the ADA

14  Standards, he, more likely than not, would not have died.

15  78.     In my opinion, the Jail medical practitioners showed gross

16  incompetence in the care of Mr. Bach and violated the medical standard of care.

17  Crucially, as confirmed by the coroner, their failures caused Mr. Bach's death:

18  Review of outpatient medical records clearly indicates that Mr. Bach
    had demonstrable knowledge in managing his diabetes; however, as an

19  inmate, he became reliant on the medical services provided by the jail
    for continued management of his condition.  Following insufficient

20  insulin administration while in custody, Mr. Bach developed diabetic
    ketoacidosis and died.  This occurred despite medical records

21  containing documentation of his medical condition, insulin
    requirements, when his pump would be depleted of insulin, and

22  multiple unanswered requests for insulin by Mr. Bach and fellow
    inmates.  The death is due to complications of a natural disease.

23  However considering the inaction (i.e., neglect) characterizing the
    events leading to inadequate care while incarcerated of Mr. Bach's

24  health conditions and ultimately his death, the manner of death is
    classified as **homicide**.

25

26  Bach Coroner's Report at PDF 8.

27  79.     Though I express no opinion on whether his death was, in fact, a

28  homicide, I agree with the coroner's description regarding how the deficiencies in

1   care caused Mr. Bach's death.  Mr. Bach had a common medical condition.  Had he

2   received minimally adequate care—namely, being provided with insulin—he likely

3   would not have died.  No person in a correctional setting who is willing to comply

4   with care and to accept insulin should ever die from diabetic ketoacidosis.  That

5   Mr. Bach died, despite his efforts to notify medical staff of his need for insulin, is

6   shocking.  In my opinion, any system in which such a death occurred suffers from

7   serious, systemic problems that put incarcerated people at a substantial risk of

8   serious harm.

9       80.    In addition, the new information contained in the coroner's report

10  makes the problems with the morbidity and mortality reporting for Mr. Bach's

11  death, which I discussed in my initial report, even more concerning.  *See* Keller

12  Report ¶¶ 108-114.  Following Mr. Bach's death, the NaphCare M&M Committee

13  wrote:  "Though not related to this patient's death, it has come to the committee's

14  attention that specific policies on management of insulin pumps need to be

15  established by San Diego County and communicated to STATCare, so they can be

16  prepared to address patients with these medical devices."  NAPHCARE041858.

17  First, it is very troubling that the NaphCare M&M Committee, which should be

18  looking critically at all in-custody deaths in order to identify where staff made

19  mistakes (if any), concluded that Mr. Bach's death was not related to the

20  management of his insulin pump.  The coroner found the exact opposite.  This

21  failing of the M&M Committee suggests that it did not conduct a thorough

22  investigation.  Second, given the direct connection between the lack of chronic care

23  guidelines for Type 1 diabetes and Mr. Bach's death, the Jail should have created

24  such guidelines on an urgent basis.  Yet, as of the date of Dr. Murray's report

25  (August 21, 2024), nearly a year after Mr. Bach's death, the Jail still did not have in

26  place any chronic care or disease guidelines.  The County's failure in this respect

27  suggest that it does not take seriously its obligation to care for incarcerated people.

28  / / /

## 2.    Jose Cervantes Conejo

81.    I have also been provided with the outside medical records for Mr. Cervantes Conejo, who died at Palomar Medical Center on April 12, 2024 from facial and head trauma he experienced at the Jail approximately three hours after he was booked on March 29, 2024.[7]  These records were not available to me prior to the issuance of my initial report.  From the medical records provided to me, which do not include Mr. Cervantes Conejo's Jail medical records, it is not possible for me to opine regarding whether Mr. Cervantes Conejo's death was preventable.

82.    What is notable about Mr. Cervantes Conejo's death, however, is that it is not included on the SDSO website listing in-custody deaths.  *See* https://www.sdsheriff.gov/resources/transparency-reports (accessed on October 27, 2024).  The website lists seven in-custody deaths in SDSO facilities in 2024, but does not list Mr. Cervantes Conejo's death.

83.    The fact that Mr. Cervantes Conejo's death is not listed as an in-custody death is troubling and throws into question the Jail's reporting on in-custody deaths, an issue central to the *Dunsmore* lawsuit.  Mr. Cervantes Conejo died from injuries he suffered at the Jail while he was in the custody of the SDSO.  The federal Death in Custody Reporting Act, 34 U.S.C. § 60105, requires states to report to the U.S. Attorney General, "information regarding the death of any person who is detained, under arrest, or is in the process of being arrested, ... or is incarcerated at a municipal or county jail ...."  The Bureau of Justice Assistance of the U.S. Department of Justice has published a document entitled "Death in Custody

---

[7] *See, e.g.*, Cervantes Conejo Government Claim at PDF 62 ("Patient is a 44-year-old male brought from Vista jail where he was intoxicated and subsequently noticed on the ground with several episodes of nausea and vomiting."); *id.* at PDF 80 ("[Patient] presents to the ED as a trauma code activation from jail for evaluation of head injury with vomiting and altered mental status.  Per EMS, patient was intoxicated in his jail cell after being arrested.  He was reportedly verbal and responsive upon arrest.  Three hours into his arrest, police found the patient on the floor with altered mental status and was vomiting, prompting them to activate EMS.").

Reporting Act: Reporting Guidance and Frequently Asked Questions," which was revised in October 2024 and is available at https://bja.ojp.gov/funding/performance-measures/DCRA-Reporting-Guidance-FAQs.pdf. The Guidance includes the following frequently asked question: "If an inmate is transferred to a medical facility and dies there, not in a correctional facility, is that reportable? Yes. If the incarcerated person, absent the medical condition, would have been in prison at the time of death, it counts as a reportable death. Although the person was not physically in a correctional facility at the time of death, the death is still one of an incarcerated individual." *Id.* at 7. Accordingly, Mr. Cervantes Conejo's death should be considered an in-custody death.

84.    The County's failure to count Mr. Cervantes Conejo's death as an in-custody death is problematic in a number of respects. First, it raises the question of whether the County has failed to count other in-custody deaths when people were injured or became ill at the Jail but did not die in the Jail. Second, Dr. Murray opines that the death rate at the Jail is trending in the right direction in 2024. But that rate would be higher if Mr. Cervantes Conejo's death was included in the count of in-custody deaths.

85.    I also have some concerns about the care that Mr. Cervantes Conejo received at the Jail in the few hours he was there. Labs at the ER showed Mr. Cervantes Conejo's blood alcohol to be very high, at 324 mg/dL. Cervantes Conejo Government Claim at PDF 109. Imaging showed a skull fracture, an orbital fracture, and both subarachnoid hemorrhage and subdural hemorrhages around the brain. This was described as a "high complexity comprehensive trauma." *Id.* at 63.

86.    Mr. Cervantes Conejo was admitted to the ICU. Several specialists consulted on his care, including a trauma surgeon, a neurosurgeon, intensive care specialist, and later, a palliative care specialist. *Id.* at 65, 66.

87.    Despite intensive medical care, Mr. Cervantes Conejo died on April 12, 2024. The Summary of his hospital care included this statement: "[p]er trauma and

1  neurosurgery assessment and documentation the extent of injury is not compatible

2  with a simple fall and seemed more traumatic however the events leading to it are

3  unclear" *Id.* at 65, 66.

4      88.    Mr. Cervantes Conejo's medical records from the hospital also raise

5  serious questions about why the Jail accepted him in the first place.  Mr. Cervantes

6  Conejo had a very high blood alcohol level (324 mg/dL) when he arrived at the

7  hospital.  *Id.* at 109.  Blood alcohol levels that high typically indicate that a person

8  may have alcohol poisoning, which is a potentially life-threatening condition.

9  Notably, Mr. Cervantes Conejo's blood alcohol level was likely even higher at the

10  time he was booked into the Jail, as his body processed some of the alcohol in his

11  system in the time between when he was booked and when hospital staff drew his

12  blood to run the test three hours later.  Nursing staff at the Jail also informed the

13  hospital staff that Mr. Cervantes Conejo was "disoriented" when he was booked into

14  the Jail.  *Id.* at 98.  Given this information, it seems to me that the Jail should have

15  refused to accept Mr. Cervantes Conejo and transferred him immediately to the

16  hospital.  Had the Jail done so, he may not have suffered the injuries that appear to

17  have caused his death.

18  **IV.    Dr. Murray's opinions regarding the death rate at the Jail are misleading
        and unsupported by evidence.**

19

20      89.    On February 3, 2022, the California State Auditor issued a report of its

21  investigation into the alarming number of deaths that occurred in the Jail from 2006

22  to 2020.  State Auditor's Report.  The State Auditor's Report confirmed that the Jail

23  had a higher rate of suicides and natural deaths (which can include deaths where

24  deficient medical care is a factor) than jails in any other comparable county in

25  California.  SD_174812-13.  The average death rate at the Jail in those years was

26  2.39 deaths per 1,000 incarcerated persons.  SD_174856.

27      90.    Dr. Murray correctly points out that "[i]n 2022, the San Diego County

28  Citizen's Law Enforcement Review Board ('CLERB') contracted with Analytica

1  Consulting ... to analyze in-custody death data over the prior ten years." Murray

2  Report at 38. Dr. Murray does not discuss the findings of the Analytica report,

3  which corroborated the State Auditor's Report. The findings of the report included

4  that "total deaths in San Diego Jails surpass the deaths expected based on the

5  county's mortality rates," DUNSMORE0116321; that "[t]he number of excess

6  deaths resulting from the actual and expected death difference is the highest in San

7  Diego County" than any other comparable county in California, *id.*; and that "San

8  Diego County is the only county with a statistically significant number of excess

9  deaths," DUNSMORE0116322.

10      91.    Dr. Murray suggests that the findings of the Analytica report may not

11  be accurate because of "some significant potential confounders." Murray Report

12  at 39. Nothing in Dr. Murray's description of his educational and professional

13  background or his CV suggests that he has the expertise to analyze a complex data

14  analysis like the one performed by Analytica. Even assuming he had that expertise,

15  Dr. Murray's short criticisms of the Analytica study make little sense and/or have no

16  basis.

17      92.    First, Dr. Murray states that "[i]t is not clear whether mortality was

18  captured and assessed in a consistent way across all compared county jail systems."

19  *Id.* at 39. The report, however, makes clear that the authors relied on data collected

20  by the California Board of State and Community Corrections ("BSCC") and the

21  California Department of Justice. DUNSMORE0116325, 116331. Dr. Murray has

22  not identified any specific issues with the data collection. His criticism is therefore

23  nothing more than conjecture.

24      93.    Second, Dr. Murray writes that "[i]t is not clear whether county jail

25  population denominators were captured in a consistent way across all systems."

26  Murray Report at 39. Dr. Murray does not identify to what "denominators" he is

27  referring. And again, Dr. Murray's criticism is nothing more than conjecture, as he

28  has not presented any evidence to support that the data was reported or collected

1  inconsistently across counties.

2      94.    Third, Dr. Murray writes that "[i]t is not clear if expected rates for each

3  county jail (based on the county-wide mortality rates) were generated by applying

4  the age, race, gender structure of each county jail population." *Id.* at 39.  But it

5  appears that the Analytica authors did exactly that.  DUNSMORE0116331, 116339.

6      95.    Fourth, Dr. Murray writes that "[a]s the investigators note, data on

7  physical health, mental health, substance use disorder, homelessness were not

8  available.  It is possible that an increased differential (on any of these factors)

9  between the San Diego County jail and the San Diego general population could have

10  partially driven the increased excess deaths observed in San Diego County jail

11  population."  Murray Report at 39.  Dr. Murray is correct that the Analytica authors

12  acknowledge these limitations.  DUNSMORE0116339.  But Dr. Murray has not

13  provided any evidence to suggest that those limitations actually impacted the results

14  of the study.  Moreover, those limitations existed for all of the counties that

15  Analytica evaluated.

16      96.    Lastly, Dr. Murray writes that "[i]n general, it is not clear whether the

17  observed excess deaths in the San Diego County jail system reflect a selection

18  process that resulted in a greater contrast in baseline poor health between the county

19  jail and the general population (compared to the other counties examined) or were

20  related to correctional health care."  Murray Report at 39.  This criticism is accurate,

21  but misses the point and is not supported by any evidence.  The authors of the study

22  concede that they were not attempting to explain why there were disparities among

23  counties.  DUNSMORE0116339 ("While our research has delineated the differences

24  in deaths among county jails, we have yet to explain *why* they are different.").  It is

25  therefore possible, as I interpret Dr. Murray as suggesting, that the jail population in

26  San Diego County has a worse level of baseline health, compared to the population

27  in the community, than the jail populations in other counties.  But again, Dr. Murray

28  has not presented any evidence to support his conjecture.

97.     In my opinion, none of Dr. Murray's criticisms of the Analytica study undermine its conclusion that San Diego County was the only large county in California where the deaths in the jail exceeded expected deaths by a statistically significant amount.

98.     Later in his report, Dr. Murray writes that "[i]n-custody deaths reached a high in 2022 with 19 deaths as SDSO was emerging from the COVID-19 pandemic and have been declining since that time." Murray Report at 40. This statement is misleading. Though deaths in the Jail have declined in 2022 and 2023, they remain at extremely high levels. As discussed above, the California State Auditor found that the Jail's death rate for 2006-2020 of 2.39 per 1,000 incarcerated people was very high. SD_174856. The death rates in the subsequent years have greatly exceeded that average: 4.5 deaths per 1,000 in 2021; 4.75 deaths per 1,000 in 2022; and 3.27 deaths per 1,000 in 2023. Keller Report ¶ 88. Dr. Murray discusses only the trend, not the quantity, which remains high.

99.     Dr. Murray also neglects to mention that the State Auditor's Report did not just examine the death rate. The Auditor also reviewed 30 in-custody deaths, with an emphasis on cases that occurred between 2016 and 2020. SD_174815. It concluded that "deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals" had "likely contributed to in-custody deaths" and that the SDSO had "not consistently taken meaningful action when such deaths have occurred." SD_174794. Accordingly, I disagree with Dr. Murray's opinion that the death rate in the Jail (a) has not been calculated correctly and (b) does not reflect problems with the healthcare system.

V.     The audit of chronic care that Dr. Murray's team performed is methodologically and substantively flawed.

100.     Dr. Murray's team reviewed 81 medical records for incarcerated people "with chronic care conditions ... to assess the quality of care being provided and to determine if the standard of care was met." Murray Report at 14-15. From this

1  review, Dr. Murray concluded that "[o]verall, there was evidence of high-quality

2  care being provided to the IPs in the SDSO." *Id.* at 15.  He further concluded that

3  "[p]rovider chronic care was timely and consistent with a community standard of

4  care." *Id.* at 44.

5      101.   I did not receive the complete set of the 81 records reviewed by Dr.

6  Murray until September 21, 2024. They were quite voluminous and I began

7  reviewing them immediately.  The medical files I reviewed averaged many hundreds

8  of pages long and some files were over a thousand pages.  On average, each file

9  required at least half a day of work to review and write up my analysis.  I had hoped

10 to receive these records directly in TechCare, which I believe would have been more

11 efficient, but was informed I could not have access.  Under the circumstances, given

12 the November 1, 2024, deadline for rebuttal reports, I was able to review 19 of the

13 records.  As described below, this was sufficient to conclude that Dr. Murray's

14 opinions are flawed.

15     102.   In my opinion, Dr. Murray's medical record review of the care

16 provided to patients with chronic illnesses, who are the sickest and most difficult to

17 treat in the Jail, is at the center of his report.  As I explain below, Dr. Murray's

18 purported audit suffers from serious methodological problems.  Moreover, I disagree

19 substantively with the findings of the review that the care provided to 75 of 81 class

20 members (93%) met the standard of care.  Murray Report at 15 & Appendix J.  I

21 therefore also disagree with Dr. Murray's overarching conclusions about the quality

22 of the chronic care at the Jail.  *Id.* at 15, 44.

23     103.   Dr. Murray presents the findings from the review of each of the 81

24 records in Appendix J.  Dr. Murray does not appear to have reviewed the medical

25 files himself; each file includes the name for a "Reviewer" followed by the one of

26 five names:  Stephen Boone, MD. (Patients 1-25); Erin Freeman, PA-C (Patients 26-

27 44); Jennifer Humphreys, FNP (Patients 45-46); Jane Leonardson, MD (Patients 47-

28 60); and John Pulvino, PA (Patients 61-81).  *See Id.* at 164-224.  For each file, the

1    reviewer indicated whether the care provided by the County "Meets Standard of

2    Care," "Does Not Meet Standard of Care," or "Meets Standard of Care – with some

3    reservations."

4        104.   Even before I reviewed some of the 81 medical files, I had concerns

5    regarding the quality of the reviews conducted by the reviewers.

6        105.   First, Dr. Murray did not share the qualifications for the five reviewers

7    who conducted the audit.  It is therefore not apparent that they are generally

8    qualified to determine whether the care provided to a patient met the standard of

9    care or specifically qualified to offer such opinions regarding care provided in a

10   correctional environment.

11       106.   Second, Dr. Murray did not indicate how the 81 files were selected or

12   by whom or with what criteria.

13       107.   Third, it is not clear in all cases what "standard of care" the reviewers

14   used when evaluating the care.  Though some reviewers did include that information

15   for some patients, *see, e.g.*, Patients 30, 31, most of the reviewers did not include

16   reference to any specific standards of care.  The absence of reference to specific

17   standards of care is problematic in at least two respects.  First, the conclusions of the

18   reviewers are not tethered to a documented standard of care and therefore are liable

19   to vary from person to person.  Also, practitioners who are poorly educated or who

20   have not kept up with changes in medical knowledge may provide care outside of

21   recognized appropriate boundaries.  For example, for my report, the Standard of

22   Care for Type 2 Diabetes that I used was *Diabetes Management in Detention*

23   *Facilities: A Statement of the American Diabetes Association* (referred to elsewhere

24   as "Diabetes in Detention").  None of the reviewers stated what standard for diabetic

25   management they were using.  Second, if the reviewers were not using agreed-upon,

26   documented standards of care for their reviews, it becomes more likely that different

27   reviewers would reach different conclusions regarding the care provided to the same

28   patient.

108.   Fourth, since the SDSO does not have Disease Management Guidelines or Chronic Care templates, *see* Murray Report at 15; Keller Report ¶¶ 501-505, the reviewers could not determine whether the County followed its own policies for providing chronic care, as there were no policies to follow.  In my report, I explained why such policies are critical in a correctional environment.

109.   Sixth, it is not clear to me that Dr. Murray's reviewers understand the policies and processes for providing medical care at the Jail.  Accordingly, it is not clear that they evaluated whether the care the Jail provided was consistent with the Jail's policies and processes.

110.   Beyond these methodological problems, I found significant issues with Dr. Murray's reviewers' substantive conclusions regarding whether the care the Jail provided to class members met the standard of care.  I reviewed 19 of the 81 files which, in my opinion, was a sufficient sample to draw conclusions regarding the remaining reviews.  I used the following process to select the files for review.  First, at the time that Dr. Murray submitted his report on August 21, 2024, I already had partial medical files for ▇▇▇ ▇▇▇ (▇▇▇▇▇ and ▇▇▇▇ ▇▇▇▇▇▇▇ (▇ that covered their treatment through ▇▇▇▇ 2023, so I reviewed those two files first.  After Defendants produced the 81 files to Plaintiffs, I first reviewed updated records for Mr. ▇▇▇ and Mr. ▇▇▇▇▇▇ that extended through ▇▇▇ 2024.  I then randomly selected one of the two files reviewed by Jennifer Humphreys, FNP (Patients 45-46).  I then selected 4 files for each of the other 4 reviewers, using a random number generator to determine which of the specific files I would review.

111.   My review of the medical files confirmed my pre-review concerns and revealed other serious problems.  In Appendix A, I have provided detailed analysis of the 19 medical records I reviewed.

112.   First, for nearly all of the files I reviewed, I disagreed with the ultimate conclusion drawn by Dr. Murray's reviewers.  The reviewers concluded that the care

the Jail provided met the standard of care for 18 of the class members.[8]  I only agreed with Dr. Murray's reviewers with respect to the care provided to 2 of those class members.  For the other 16 class members, I concluded that the care provided by the Jail did not meet the standard of care.

113.   These failures by the County to meet the standard of care are very concerning.  In some instances, they resulted in harm to incarcerated people.  The most egregious of these cases include:

- ██████ ██ – When he was booked into the Jail, he was in the middle of a prostate cancer work up.  The Jail failed to provide continuity of care for this critical evaluation for a potentially deadly disease.

- ██████ ██ – The Jail denied him, for months, an essential gastrointestinal medication prescribed by a specialist, despite Mr. ████ protests and deterioration of his condition.

- ██████ ██ – At intake, the Jail failed to continue 2 out of 3 diabetes medications, which caused Mr. ████ diabetic control to deteriorate immediately.  Moreover, the Jail never provided appropriate treatment to Mr. ████ for diabetes.  And the Jail made a serious medical error in judgment when it failed to send him to the hospital, after an incident when he passed out and was incontinent.

- ██ ██████ – The Jail failed to treat appropriately and bring under control his diabetes and hypertension.

My detailed reviews of the medical files for these individuals are in Appendix A.

114.   Even the cases where the failures did not result in tangible, immediate harm to class member reflect serious problems with the system.  Standards of care exist to ensure that medical professionals provide appropriate treatment to patients

---

[8] For one of these class members, ██████ ████ the reviewer concluded that the care provided by the Jail met the standa███ c███ with some reservations." *See* Murray Report at 209.

1  and do not expose their patients to unnecessary risk.  A system that consistently

2  provides care to patients that falls below the standard of care, like the Jail's system,

3  necessarily exposes those patients to a substantial risk of serious harm.  Not every

4  failure to meet the standard will result in harm.  But each failure presents a real risk.

5  Accordingly, it is my opinion that the medical records that Dr. Murray's reviewers

6  reviewed reflect a system that places patients at a substantial risk of serious harm.

7       115.   Second, the reviews conducted by Dr. Murray's reviewers were

8  generally of poor quality, were superficial, and often contained factual errors.  *See,*

9  *e.g.*, Appendix A, ███ (reviewer indicated that a practitioner performed an intake

10  physical when actually an RN performed the physical, which was then

11  countersigned by a doctor); Appendix A, ███ (reviewer indicated that an

12  ultrasound was performed to address a hernia, when it was actually to evaluate gall

13  stones, and that the ultrasound was normal even though the ultrasound report is not

14  in the medical file and the results are not discussed anywhere in the record);

15  Appendix A, ███ (reviewer indicated that doctor changed prescription from

16  metformin to glipizide at the class member's request, but the class member was

17  actually requesting to be placed on a different drug (Mounjaro)); Appendix A,

18  ███ (reviewer indicated that class member refused an appointment when

19  record showed the class member did not refuse, but was at work).

20       116.   Third, because I randomly selected which files to review, it is likely

21  that the same problems I identified—reviewers finding that the standard of care was

22  met when it was not, conducting superficial reviews, and making factual errors—

23  exist in many of the files I did not review.  It is therefore my opinion that the

24  chronic care audit that Dr. Murray included in his report—in which his reviewers

25  concluded that the care the Jail provided met the standard of care in 93% of the

26  cases—is unreliable.  It is therefore also my opinion that any conclusions that

27  Dr. Murray drew from the chronic care audit are also unreliable.

28       117.   Fourth, in reviewing the medical files, I identified problems with care

that were consistent with my findings offered in my initial report. Accordingly, these medical files provide additional evidence of the serious problems with medical care at the Jail. Specifically, the medical files revealed problems with:

- Failures to continue medications class members were taking in the community – *See* Appendix A, ███ (diabetes medications); ███ (same); Wilson (asthma medication); ███ (GERD medication). *See also* Keller Report ¶¶ 285-303. In nearly all of these cases, the Jail removed the class member from a medication he was taking in the community because it was not on the NaphCare formulary and then prescribed a less effective medication.

- Failures to continue treatments that class members were receiving in the community – *See* Appendix A, ███ (treatment for retinal disease, MRI for prostate cancer, colonoscopy); ███ (referred to gastrointestinal specialist for treatment of GERD but was never seen over many months). *See also* Keller Report ¶¶ 304-312.

- Failures of the sick call process to address class members' medical concerns – *See* Appendix A, ███ (no response to request for C-PAP or, in alternative, sleep study for sleep apnea); ███ (substantial delays in responding to health requests). *See also* Keller Report ¶¶ 319-367.

- Alleged refusals of care, including refusals being witnessed only by custody staff and inadequate counseling of class members regarding the risks of refusals – *See* Appendix A, ███ ███ ███ ███ ███ ███ *See also* Keller Report ¶¶ 387-415.

- Failures to conduct any or an adequate physical examinations of patients when necessary to provide them with appropriate treatment, including instances where no examination occurred because STATCare practitioners were providing care remotely – *See* Appendix A,

1    ██████ ██████ ██ ████████ ████ *See also* Keller

2    Report ¶¶ 416-417, 433, 442-47, 541-42, 546-47.

3    •    Nurses providing care outside of their scope of practice – *See* Appendix

4         A, ████████ *See also* Keller Report ¶¶ 448-451.

5    •    Failures to conduct diagnostic testing or to review the results of

6         diagnostic testing – *See* Appendix A, ████ ██████ ████████ *See*

7         *also* Keller Report ¶¶ 486-497.

8    •    Non-existent or incomplete discharge planning – *See* Appendix A,

9         ██████  *See also* Keller Report ¶¶ 732-761.

10   •    Inadequate custody staffing interfering with medical care – *See*

11        Appendix A, ██████  *See also* Keller Report ¶¶ 659-664.

12   •    Failures to perform Health Assessments within 14 days of booking and

13        after a year in the Jail – *See* Appendix A, ██████ ████████ ██████

14        ██████ ████ ████████.  *See also* Keller Report ¶¶ 261-284.

15   •    Lack of confidentiality in medical visits – *See* Appendix A,

16        ██████████  *See also* Keller Report ¶¶ 665-686.

17   •    Failures to gather vitals signs at visits, including visits for hypertension

18        – *See* Appendix A, ██████████ ████████ ██████;  ██████ *See also*

19        Keller Report ¶¶ 416-417, 443-44.

20   •    Failures to conduct a face-to-face interview with a class member within

21        48 hours of submission of a health care request.  *See* Appendix A,

22        ██████████ ██████ ████████  *See also* Keller Report ¶¶ 342-354.

23   •    Failures to provide appropriate follow-up care/chronic care – *See*

24        Appendix A, ████████ (no follow up care to determine whether leg

25        swelling resolved with change of medication); ████████ (no chronic

26        care for hypertension, diabetes over 1.5 years; no follow up A1C every

27        3 months); ████████ (no chronic care or repeat labs for seizures);

28        ████████ (no follow-up A1C; no referral for dilated retinal exam); ████

1    (referred to be seen by a gastrointestinal specialist in ███ 2023, but

2    still had not been seen by the end of the medical record in ███ 2024).

3    *See also* Keller Report ¶¶ 709-731.

4    118.   In his report, Dr. Murray opined that in the cases where his reviewers

5    found the Jail had not met the standard of care, "there were minor deviations from

6    the standard of care."  Murray Report at 15.  I disagree with this opinion from Dr.

7    Murray.  The failures I noted above are serious problems, not "minor deviations

8    from the standard of care."

9    119.   The medical files also reflected serious substantive problems with the

10   care that the Jail provides to class members for many common chronic conditions,

11   including:

12   •   Hypertension – *See* Appendix A, ███████ ██████ ████

13       ███████ ██████ █████ █████ █████; ████████ ███████

14       *See also* Keller Report ¶¶ 181, 235.

15   •   Diabetes – *See* Appendix A, █████ ████████ ██████ ██████

16       ██████.  *See also* Keller Report ¶¶ 526-551.

17   •   Hernias – *See* Appendix A, ███████ *See also* Keller Report ¶¶ 552-

18       579.

19   •   Asthma – *See* Appendix A, ██████ ██████; ████  *See also* Keller

20       Report ¶¶ 613-630.

21   •   Hepatitis-C screening – *See* Appendix A, █████ █████ ██████

22       ██████  *See also* Keller Report ¶¶ 507-525.

23   120.   My detailed findings with respect to my review of the 19 medical files I

24   reviewed are contained in Appendix A to this report.

25   121.   In sum, it is my opinion that the medical files I reviewed serve as

26   strong evidence (in addition to evidence cited elsewhere in this report and in my

27   initial report) that, on a systemic basis, the Jail exposes class members with chronic

28   conditions to a substantial risk of serious harm.

**VI.    Dr. Murray's audit of intake and Health Assessments is methodologically and substantively flawed.**

122.    In his report, Dr. Murray opined:

The intake screening process of newly incarcerated individuals upon arrival to a correctional facility holds significant importance in both clinical and operational contexts. This initial assessment serves as a critical opportunity to gather essential information about the incarcerated individual's medical history, mental health status, and any immediate healthcare needs.  It allows healthcare providers to identify and address acute medical conditions or emergencies promptly, ensuring the safety and well-being of the incarcerated population as well as that of the staff.  Moreover, intake screenings provide valuable insights into chronic health conditions, substance use disorders, and infectious diseases that may require ongoing management or treatment within the correctional facility.  Beyond medical considerations, these assessments also play a pivotal role in identifying mental health issues such as depression, anxiety, and or suicidal ideation, which require specialized care and intervention.  By conducting thorough intake screenings, correctional healthcare providers can establish a baseline for each incarcerated individual's health status, initiate appropriate plans of care, and facilitate continuity of care throughout their incarceration.  This proactive approach not only supports the health and safety of incarcerated individuals but also contributes to the overall management and efficiency of the healthcare delivery system within the correctional setting.

Murray Report at 9.  I agree with Dr. Murray about the critical importance of an adequate medical intake process at a jail.

123.    To evaluate the intake process at the Jail, Dr. Murray's team audited 75 patient charts to determine the time from booking to intake screening, whether patients were "appropriately referred and subsequent evaluations [were] completed," whether "Chronic care/critical meds [were] identified on screening and continued," and whether the Health Assessment was performed within 14 days.  *Id.* at 11-12 & Appendices G, I.  Results are given in a yes/no table with no explanations.

124.    Dr. Murray's audit is methodologically deficient in a number of respects.

125.    First, Dr. Murray did not provide any definition for how he determined whether a patient was, at intake, "appropriately referred and subsequent evaluations completed."

126.   Second, he similarly did not provide a definition for how he determined "whether Chronic care/critical meds identified on screening and continued."  For example, would he consider a medication appropriately continued if, as the County frequently does, a STATCare midlevel practitioner substitutes formulary medications for non-formulary medications without an examination or discussion with the patient?  This is not, in my opinion, an appropriate process.  I identified cases in my report where non-formulary medications were inappropriately withheld pending approval through the non-formulary review process.  Keller Report ¶ 154 (discussing death of Raymond Dix).  I identified in my report cases where inappropriate substitutions of medications were made at booking, including the case of ██████ ████ where sliding scale insulin was inappropriately substituted for the non-formulary medication Mounjaro.  Keller Report ¶¶ 302, 543-45; *see also* Section V, *supra*.

127.   Third, all of the charts reviewed by Dr. Murray for Appendix G (intake) appear to be for people who were booked into the Jail on January 1, 2024.[9] For two separate reasons, it is my opinion that an audit looking only at people booked into the Jail on January 1, 2024 provides little, if any, information regarding whether the intake process functions properly at the Jail.  First, at a basic level, any such audit should examine how the intake process functioned on multiple days, not on a single day.  An audit that looks at a single day will only measure whether the system worked on that day, not whether the system works in general.  Second, in my experience working in jails, January 1 is a very poor day on which to conduct an audit because it is New Year's Day.  The people being booked into a jail on that day

---

[9] Appendix G does not indicate the date on which the 75 listed individuals were booked into the Jail.  Appendix H does, however, list the date on which the 75 listed individuals were booked into the Jail.  All of the people listed in Appendix H were booked into the Jail on January 1, 2024.  The list of people in Appendix H is identical to the list of people in Appendix G.  I therefore believe that the people listed in Appendix G, who are the same as the ones listed in Appendix H, were all booked into the Jail on January 1, 2024.

are not representative of typical days, as they tend to include a higher percentage of people arrested for misbehavior on New Year's Eve, including a higher percentage of people arrested for minor offenses. In addition, because jails know that January 1 will be a day with a high volume of bookings, they tend to staff the jails accordingly. As a result, a jail's success or failure processing intakes on January 1 of any year is not likely to be reflective of its success or failure at other times of the year.

128.    Fourth, it appears that very few of the people whose files Dr. Murray reviewed for the audit of intake screening remained in the Jail for any real period of time. Thirty-six people were released on January 1, 2024, the same day that they were booked into the Jail; 20 were released on January 2, 2024, the day after they were booked into the Jail; and 5 were released on January 4, 2024. Only 14 of the individuals whose records Dr. Murray reviewed remained in the Jail until January 5, 2024 or longer. The short period of time that most of the individuals spent in the Jail undermines Dr. Murray's findings. One of the items that Dr. Murray audited was whether "[a]ll positive screening findings [were] appropriately referred and subsequent evaluations completed." Murray Report at 155. Dr. Murray found that the Jail met this undefined standard for all but one of the 75 individuals. But for the 36 individuals who were released on the same day they were booked and the additional 20 who were released the following day, it is extremely unlikely that any "subsequent evaluations were completed." To conclude that this item was satisfied for these individuals is therefore misleading.

129.    Fifth, Appendix G and Appendix H both indicate that Dr. Murray selected 75 files to review out of a pool of 121 files. Dr. Murray provides no explanation for how the 121 files were selected, how he determined to review only 75 files, or how those 75 files were selected.

130.    Sixth, in Appendix H, Dr. Murray concludes that the County met its obligation to conduct a Health Assessment within 14 days of booking in 73 of the 75

1  case files he reviewed.  This analysis is misleading, as 64 of the individuals were

2  released **before** they spent 14 days in the Jail and therefore the 14-day Health

3  Assessment deadline was not triggered.  For the remaining 11, Dr. Murray

4  concludes that "all required initial health assessments were completed within this

5  time frame." *Id.* at 12.  His own report, however, indicates otherwise, as two of the

6  11 individuals never had a 14-day assessment. *Id.* at 160.  Also, five patients

7  reportedly refused to have a health assessment done (███████ ████ ████████ ████████

8  and ████ █████████  Besides the overarching problem of refusals in the Jail in

9  general, it is inappropriate to count these five refusals as evidence that "all required

10  initial health assessments were completed within this time frame."

11      131.   I discussed in my report that both the 2017 NCCHC team and Homer

12  Venters encouraged the SDSO to do the full Health Assessment at booking.

13  Dr. Venters went further to recommend that any patient with a significant health

14  history be seen be a medical practitioner as part of the intake Health Assessment.

15  SD_215371.  No other resident health facility, such as hospitals or nursing homes,

16  delay doing an initial health assessment for 14 days.  The NCCHC requires prisons

17  to do their initial health assessments within six (6) days.  The fact that the SDSO has

18  chosen to ignore the advice of Dr. Venters is simply bad medical care.  Dr. Murray,

19  by accepting the 14-day deadline, should not excuse this.

20      132.   Seventh, Dr. Murray's results regarding the 14-day Health Assessment

21  are not consistent with medical files I reviewed for my initial report.  Following my

22  instructions, Plaintiffs' counsel entered information from the medical files regarding

23  64 bookings—all lasting at least 14 days—from dates throughout 2023 and 2024.[10]

24

---

25  [10] I instructed Plaintiffs' counsel to use the spreadsheet provided by Defendants at
   SD_1575334, which shows the booking and release dates of incarcerated people
26  whose records were produced to Plaintiffs.  I instructed them to look only at
   bookings between January 1, 2023 and January 15, 2024; the latter limitation is
27  because Plaintiffs initially received medical records only through the end of January
   2024.  After eliminating all bookings shorter than 14 days and those outside that
28  date range, 208 bookings remained.  I then instructed Plaintiffs' counsel to enter
   information for every third entry, excepting the six bookings for which I was unable

1   The results of this analysis are contained in Appendix B to this report.  Of those 64

2   bookings, only 38 (or 59%) were "compliant," meaning they received or were

3   documented as having refused an initial health assessment within fourteen days.  As

4   I stated in my initial report and in this rebuttal report, I have grave concerns about

5   the validity of the Jail's process for refusals.  However, even assuming that the 15

6   refusals in this sample of 64 were valid, the Jail is only in compliance with its 14-

7   day standard 59% of the time.  In addition to these findings, I also found instances

8   of non-compliance with the Health Assessment policy in my review of medical files

9   for class members with chronic illnesses.  *See* Section V, *supra*.

10  **VII.  Dr. Murray's audit of nursing sick calls is methodologically and**
    **substantively flawed.**

11

12  133.    Dr. Murray purported to conduct an audit to "verify the timely access to

13  care for nurse sick call requests" as well as "whether necessary referrals were made

14  based on clinical indications."  Murray Report at 13 & Appendix I.  The audit

15  results are given in a yes/no fashion regarding whether the triage was done within 24

16  hours, whether the face-to-face evaluation was done within an additional 24 hours,

17  and whether "all referrals [were] made as appropriate."  *Id.*, Appendix I.

18  Dr. Murray did not define the standards he used to decide whether a referral was

19  "appropriate."

20  134.    For his audit, Dr. Murray appears to have picked medical files for 25

21  individuals out of a pool of 120 files.  *Id.*, Appendix I.  Dr. Murray does not provide

22  any explanation for how he selected the 25 files for review.  For each of the 25 files

23  Dr. Murray selected, he then reviewed a single sick call slip and related follow up,

24  even though nearly all of the files contained more than one sick call slip.  *Id.*; *see* ¶¶

25  136-139, *infra*.  Dr. Murray does not provide any explanation for how he selected

26

27  to find medical records.  The end result was 64 individual bookings.  After I
28  received the information from Plaintiffs' counsel, I checked it for accuracy.

which sick call slip and related follow up to review. Dr. Murray found that the Jail met the review standards for all but one of the sick call slips he reviewed. Murray Report, Appendix I.

135.   In my opinion, these methodological problems with Dr. Murray's review undermine the results of his audit of the sick call system. In particular, the fact that he only reviewed one sick call slip for each file, without providing any explanation for his process for selecting the sick call slip, is very problematic. Without a pre-defined selection process, it is possible that Dr. Murray cherry-picked sick call slips for which the Jail was compliant with its own procedures. As I discussed in my report, Ms. Rognlien-Hood, the Deputy Director who supervises the Directors of Nursing, testified in February 14, 2024 that the Jail routinely fails to meet the 24-hour face-to-face standard. *See* Keller Report ¶ 349 (citing Rognlien-Hood Tr. 87:11-14, 88:8-10, 89:8-10, 90:15-92:18); *see also* Keller Report ¶ 351 (citing SD_375922, in which Ms. Rognlien-Hood wrote that the face-to-face requirement was "hard to accomplish" because of the medical and custody staffing necessary to meet it). Similarly, the County's own audit in July 2023 found only 45-50% compliance with face-to-face evaluation requirement. *See* Keller Report ¶ 350 (citing SD_114412, SD_114467). The regular failure to meet face-to-face within 24 hours was confirmed to me by a nurse at Central Jail during my inspection.

136.   Indeed, when I reviewed sick call slips and related follow up in the same files that Dr. Murray reviewed, I found substantial delays and non-compliance with the County's own policies.

137.   First, the vast majority of the 25 charts included in Dr. Murray's audit contain multiple sick call requests, not all of which were timely addressed. For example, ███████ submitted a sick call request not included in Dr. Murray's audit that was dated ████████ 2023 and marked received by the Jail on ████████ 2023. In the request, Mr. ████ wrote "very pain much" in his

1    knees and requested a knee brace. ████ Med. Rcd. at 78.  The face-to-face

2    appointment with a nurse did not happen until ████ 2024—a month later.  *Id.*

3    at 201 (████ 2024 1:14:05 p.m. RN Note).  And, in the same RN Note from

4    ████ the nurse noted that she also completed a face-to-face for a sick call

5    request that Mr. ████ had submitted even earlier, on ████ 2023.  *Id.*

6        138.   As another example, an RN note in ████ ████ records states that a

7    sick call request regarding neck and shoulder pain was received by the Jail on

8    ████ 2023,[11] but the complaint was not triaged until ████ 2023—three

9    weeks later. ████ Med. Rcd. at 471 ("24 Hr Face to Face completed within 24

10   hours- No").

11       139.   As another example, ████ ████ submitted a sick call request on

12   ████ 2023 that was not included in Dr. Murray's audit.  The request was

13   marked received by the Jail on ████ 2023, reporting:  "I've been vomiting

14   contin[u]ously today.  I feel dehydrated." ████ Med Rcd. at 125.  According to

15   the bottom (response) portion of the sick call form, Mr. ████ was not seen before

16   his release on ████ 2023.  *Id.*; *see also id.* at 67 (sick call summary, showing

17   triage appointment cancelled due to release).

18       140.   Second, even as to the sick call requests that Dr. Murray did evaluate

19   (one per class member listed on the chart), Appendix I is not accurate.  A review of

20   the records cited in Appendix I shows that, in at least some examples, the sick call

21   requests cited by Dr. Murray as having being triaged and seen face-to-face by a

22   nurse within 24 hours (indicated by a "Yes" in Appendix I) were not actually triaged

23   within 24 hours.  For example, in Row 9 of Appendix I, Dr. Murray concludes that

24   ████ ████ was visited by a nurse within 24 hours of receipt of the sick call

25   _____

26   [11] Although no sick call request appears in Mr. ████ reco██ h█ at
     date, the chart does contain██ e submitt█ .  ████ on ████ b█ the

27   2023, marked received on ████ 2023, stating: "I am ███ once ████ b█ the
     condition of my ████ hou█ ase help.  My health care request went

28   unanswered." ████ Med. Rcd. at 158.

1   request that appears on page 89 of his medical records.  However, Mr. ████

2   medical records say the exact opposite.  Page 319 of his medical records—which

3   Dr. Murray cites as proof of compliance—states:  "24 Hr Face to Face completed

4   within 24 hours:  NO // Date of receipt – ████ 24 // Date of Completion- ████ 24."

5   ████  Med. Rcd. at 319 (████ 2024 2:41:46 p.m. PST RN Note).  As

6   another example, Row 11 of Appendix I states that that Mr. ████ was visited by a

7   nurse within 24 hours of receipt of the sick call request that appears on page 67 of

8   his medical records ("I have an ab[s]cess on my right upper flank.  I need to be seen

9   ASAP and get medications.").  However, that sick call request was marked received

10  by the Jail on ████ 2024, and Mr. ████ was not seen for a face-to-face until

11  ████ 2024.  ████  Med. Rcd. at 67.  Page 196 of his medical records—which

12  Dr. Murray cites as proof of compliance—actually reflects non-compliance:  "Date

13  of receipt: ████ 24 @ 1726 // Date of Completion: ████ 24."

14      141.   Finally, and most troublingly, there are multiple entries in these

15  medical records that state that nursing staff "cancelled" sick call triage appointments

16  simply because no face-to-face appointment had happened within 24 hours.  For

17  example, the sick call summary page of ████ ████ medical records reflect

18  multiple sick call requests (dated received on ████ ████ and

19  ████ 2023), regarding pain in his feet and legs and requesting a different

20  pair of shoes.  ████ Med. Rcd. at 49.  Each of these requests is marked as

21  "Cancelled … Reason: Over 24 hrs" by RN Ellen Tanacio on ████ 2023.

22  *Id.*  Although the original sick call requests do not appear in the chart, there are

23  grievances submitted by Mr. ████ on this topic, in particular:  On ████

24  2023, he submitted a grievance that he's "been in pain for the last several weeks.  I

25  have a pinched nerve …  I'm requesting medical attention," *id.* at 115, and in a

26  grievance marked received on ████ 2023, he stated that he's "been

27  requesting shoes … to no avail. … Why?  What's taking so long?"  *Id.* at 104.

28  Mr. ████ was seen by a nurse (after submitting yet another sick call request on

1    this topic) on █████████ 2023, more than a month after he first requested help

2    with the issue. *Id.* at 325.

3        142.   Another example appears in the sick call summary portion of ██████

4    █████ medical records. A ████████████ 2023 imported sick call triage entry read:

5    "Date of Receipt – ██████████ @ 7:22 Date of Completion – Chief Complaint –

6    thinks he has lice Disposition – Cancelled by ellen.tanacio on ██████ 2023 Reason:

7    Over 24 hrs." ██████  Med. Rcd. at 73.  I do not see a scan of the original sick call

8    request in the chart, nor is there any reference to lice in the RN Progress Notes,

9    suggesting that Mr. ███████ was never evaluated for lice despite his complaint.

10       143.   Another example is ██████ ██████ (Appendix I, Row 16).  Dr. Murray

11   noted with approval that Ms. ██████ ████████████ 2024 sick call request regarding

12   the dosage of her "transgender shots," marked received by the Jail on ████████████

13   2024, was triaged by a nurse the same day.  *See* ████████  Med. Rcd. at 64 (sick call

14   request), 320-21 (████████████ 2024 7:02:08 p.m. RN Note).  However, Ms. ████████

15   had previously submitted multiple other requests regarding the dosage of that

16   medication.  According to the sick call summary portion of Ms. ████████ medical

17   record, the Jail received a request from Ms. ██████ to "increase 'transgender pills'"

18   on ████████████ 2024 at 5:53 p.m.; however, this sick call request was "[c]ancelled"

19   on ████████████ 2024, with the stated reason:  "More than 24 hrs."  *Id.* at 55.  I

20   understand this to mean that the sick call request was deleted—and never even

21   referred to a provider—because the Jail failed to conduct a face-to-face assessment

22   within 24 hours of receipt of the sick call request.  Although no request form dated

23   ████████████ 2024 appears in Ms. ████████ medical records, another request form on

24   the same topic, which is marked received by the Jail on ████████████ 2024, states:

25   "[T]his is the second one I put in."  *Id.* at 65.  This suggests to me that the ████████

26   █, 2024 request form was discarded because it was not triaged within 24 hours.

27       144.   If, as these records suggest, the Jail is disregarding sick call requests if

28   medical staff fail to comply with policy for a face-to-face interview within 24 hours

1   of receipt, that would be extremely troubling.  All sick call requests should be

2   addressed.

3        145.   Lastly, I note one additional issue ignored by Dr. Murray.  He does not

4   mention that the MSD Operations Manual requires this face-to-face assessment

5   within 24 hours, not 48 hours.  SD_065584.  The SDSO reaffirmed this 24-hour

6   standard for a face-to-face assessment in its response to the California Audit.

7   SD_729828, SD_184484.

8   **VIII. Dr. Murray's analysis of the timeliness of lab, x-ray, and test results ignores the Jail's repeated and documented failures to timely review those results**

9

10       146.   Dr. Murray states that his review showed that "[t]he average time from

11  (lab) specimen submission to results returned to the medical record was 1.5 days."

12  Murray Report at 16 . Similarly, he reported that "[t]he average time from (x-ray)

13  study completion to report availability was approximately 23 hours." *Id.* at 17.

14  Dr. Murray opines that these timeframes suggest that the healthcare system is

15  working properly. *Id.*

16       147.   While I agree that those timeframes for obtaining results of labs and x-

17  rays are acceptable, Dr. Murray's analysis ignores another essential step in the

18  process for using diagnostics to treat patients.  Dr. Murray did not look at the

19  amount of time from the receipt of study results to the time that a practitioner

20  interpreted the results and then, if necessary, developed a treatment plan.

21  Dr. Murray also did not assess whether the reviews and interpretation were

22  appropriately documented in the medical record.  Finally, Dr. Murray did not assess

23  how long it took until the study results were communicated to the patients.

24       148.   In fact, the Jail's own internal documentation shows that the review,

25  documentation, and communication of study results has been particularly

26  problematic.  SD_114489.  Moreover, in my report, I discuss a number of cases in

27  which the lack of appropriate review, documentation, and communication of lab

28  results resulted in actual or a risk of serious harm to patients.  Keller Report ¶¶ 150-

152, 180, 207-208.  Lastly, my review of medical files for some of chronic care patients discussed in Dr. Murray's report reveal failures to review test results.  *See* paragraph 117, *supra*.

## IX.    Dr. Murray agrees with several criticisms of the medical system alleged in the *Dunsmore* complaint and found in my report.

149.    Dr. Murray admits that SDSO has no Disease Management Guidelines, including guidelines for Chronic Care.  Murray Report at 15.  Dr. Murray excuses this lapse by saying that Dr. Freedland has promised that "CHP is in the process of developing Disease Management Guidelines (DMG) to help standardize chronic care management."  *Id.*  Additionally, according to Dr. Murray, Dr. Freedland said that the EHR chronic care templates are "being considered for revision to facilitate treatment goals."  *Id.*  This statement ignores the fact that the SDSO has known about the lack of chronic disease guidelines since at least 2017, when the NCCHC Report repeatedly pointed this out.  DUNSMORE0260643, 0260676, 0260710, 0260743-44.  Dr. Murray also does not mention that NaphCare's 2022 contract required NaphCare to develop chronic disease management guidelines, which NaphCare has failed to do.  DUNSMORE0117611-12 (County Contract 566117) ("Naphcare Contract").  Dr. Murray also does not discuss that the contract with CHP does not obligate CHP to create chronic disease management guidelines.  DUNSMORE0118502 (County Contract 563402) ("CHP Contract").  And even if CHP does create chronic disease guidelines (and I am not aware of any evidence that this has yet occurred), CHP has no way to enforce compliance with their guidelines on the NaphCare practitioners, specifically the STATCare midlevel practitioners who are providing remote care.  Also, Dr. Freedland's statement to Dr. Murray that chronic disease templates are "being considered," Murray Report at 15, is an admission that the SDSO does not have such templates now.  As I discussed in my initial report, problems with chronic care treatment were widespread in the medical records I reviewed.  Keller Report ¶¶ 506-631.  In addition, as I discussed

1   above, the medical files regarding chronic care that Dr. Murray's contractors

2   reviewed, some of which I have now reviewed as well, reflect widespread failures to

3   treat the many common chronic conditions, including hypertension and diabetes.

4   *See* paragraph 119, *supra*.  As but one example, Mr. Bach's death may have been

5   prevented had the Jail had in place disease management guidelines for type 1

6   diabetes.  *See* Section III.B.1, *supra*.  In my opinion, the lack of chronic care

7   guidelines at the Jail is one reason why the Jail frequently fails to provide clinically-

8   appropriate chronic care treatment to incarcerated people in the Jail.  These failures

9   place incarcerated people at a substantial risk of serious harm.

10         150.   Dr. Murray notes that the NCCHC Standard J-A-05 requires that

11  "[h]ealthcare policies are reviewed annually by the medical and administrative

12  directors."  Murray Report at 26.  Dr. Murray claims that the SDSO "is in the

13  process of finishing a complete review of its current P&P manual" and that "[t]he

14  timeline for completion of the SDSO health services P&P manual is September

15  2024."  *Id.* at 27.  Dr. Murray states that "[o]nce all policies and applicable

16  procedures reviews are completed, they will remain on an annual review process."

17  *Id.*  Dr. Murray does not provide any basis for this speculation.  He also fails to

18  mention NaphCare's role in this revision, even though generating medical P&Ps is

19  part of their contractual requirements.  *See, e.g.*, DUNSMORE0116596  (NaphCare

20  Contract at 2.1.1), DUNSMORE0117598 (NaphCare Contract at 2.3.2.1).  And,

21  since any Policy and Procedure Manual must include Disease Management and

22  Chronic Care Guidelines, CHP should be involved in any effort to rewrite P&Ps.

23  But Dr. Murray does not mention CHP in this role.

24         151.   Dr. Murray admits that the SDSO CQI program is not compliant with

25  NCCHC requirements.  Murray Report at 32.  As an example, Dr. Murray notes no

26  CQI monitoring of the MOUD program.  *Id.* at 26.  I agree with this assessment.

27  Dr. Murray does not define in exactly what way he feels the CQI program is

28  deficient.  I discuss problems with the SDSO CQI processes in my report.  Keller

1    Report ¶¶ 762-795.

2        152.    Dr. Murray admits that the Receiving Screen being done at the Jail is

3    inadequate.  Murray Report at 35.  As I discuss at length in my initial report, I agree

4    with this assessment.  Keller Report ¶¶ 243-284.  Dr. Murray criticizes the current

5    Receiving Screening for lacking "the screener's personal observations" and

6    "additional process monitoring."  Murray Report at 35.

7        153.    Dr. Murray approvingly quotes Dr. Freedland that the current system of

8    death reviews will be improved because "with CHP ... directly contracting with

9    SDSO, all mortality reviews would be done on site."  *Id.* at 40.  He further quotes

10   Dr. Freedland as stating that "[t]hese on-site reviews will provide the opportunity

11   for better contextual understanding, examination of team dynamics, and immediate

12   access to necessary information," which, of course, implies that the current system

13   of doing death reviews lacks these features.  *Id.*  The problem with Dr. Freedland

14   and CHP fixing a broken Mortality and Morbidity Review system is that CHP's

15   contract does not mention any responsibility for death reviews.  *See generally*

16   SD_1579715-26 (no discussion of responsibility for implementing new M&M

17   review system).  As far as I am aware, NaphCare still has the responsibility for the

18   M&M process at the Jail, per its contract.  *See* DUNSMORE0117647-48 (Naphcare

19   Contract at 2.3.47.5).  Dr. Murray also does not discuss how this future CHP M&M

20   model would work.  I agree that the SDSO's current system of doing remote death

21   reviews is poor.  I discussed this in detail in my report.  Keller Report ¶ 30.

22   **X.    Dr. Murray does not address the substantial problems in the Jail's
23          medical system related to purported refusals of treatment by class
            members.**

24       154.    In my initial report, I wrote at length regarding serious problems at the

25   Jail regarding the policies and processes in place for when incarcerated people

26   refuse medical treatment.  As I explained, "it is my opinion that Sheriff's

27   Department staff frequently record that a patient has 'refused' to attend a medical

28   appointment, even though the patient was never informed or offered the opportunity

to attend the appointment in the first place. This practice has the effect of denying medical care to incarcerated people and therefore places them at a risk of serious harm." Keller Report ¶ 387. I offered this opinion based, *inter alia*, on my review of refusal forms in medical files, nearly all of which were signed only by two custody officers with no indication that any medical personnel informed the class members of the risks of declining treatment and on reports from named plaintiffs and other class members that officers record refusals when class members have not refused treatment. *Id.* ¶¶ 387-426.

155.  In the medical file for Mr. Bach, whose death I discuss in detail above, *see* Section III.B.1, ¶ 67 *supra*, I have now found what appears to be ironclad evidence that staff at the Jail record refusals of treatment when incarcerated people have not actually refused. As I explained above, Mr. Bach's file includes a refusal of medication form timestamped at 4:48 a.m. The form is signed by two deputies, who claim that Mr. Bach refused to sign the form. However, Mr. Bach was pronounced dead at 4:09 a.m., nearly 40 minutes before the officers completed this refusal form. This form therefore strongly suggests that the deputies did not even attempt to determine whether Mr. Bach wanted to take his medication and simply marked him as a refusal.

156.  In his report, Dr. Murray does not address the refusal policy and its problematic implementation. I find this troubling, as the chronic care files his reviewers examined contain many hundreds of refusals that should have been relevant to Dr. Murray's analysis because they have a substantial impact on medical care.

## XI.  Dr. Murray admits that the County has many nursing vacancies, did not offer an opinion on whether the County has sufficient nursing staff, and ignored evidence that the County does not.

157.  Dr. Murray wrote:

When nurses are not overwhelmed by excessive workloads, they can provide comprehensive assessments, implement care plans effectively, and engage in patient education, all of which contribute to better patient

1   outcomes and enhanced recovery.  Moreover, a well-staffed nursing
2   team promotes continuity of care, reduces the risk of medical errors,
    and fosters a supportive environment where nurses can deliver
3   compassionate, personalized care.  By investing in a substantial nursing
    staffing model, healthcare organizations not only prioritize patient
    safety and satisfaction but also support the professional growth and job
4   satisfaction of their nursing staff, ultimately leading to improved
    overall healthcare quality and efficiency.
5

6   Murray Report at 6.  I agree with these statements.

7       158.   In evaluating the adequacy of staffing in a medical system, it is critical

8   to look at two components: (1) the number of authorized positions and (2) whether

9   those positions are filled.

10      159.   Nowhere in his report does Dr. Murray state that the number of

11  authorized nursing staff positions at the Jail are sufficient to ensure adequate care

12  for patients.  Dr. Murray did not conduct any staffing analysis or cite to any staffing

13  analyses conducted by the County.  As far as I am aware, no such analysis of the

14  current nursing staff needs exists—it is sorely needed.  In addition, Dr. Murray did

15  not independently address any of the evidence I cite in my report—including

16  deposition testimony and other evidence—about the inadequate quantity of

17  authorized nursing positions.  *See* Keller Report ¶¶ 799-800, 802, 810.

18      160.   The closest Dr. Murray gets to offering an opinion on whether the

19  County has sufficient authorized nursing positions is to state that, by using overtime

20  and contract nurses, the County "ensure[s] that IPs' care remains uninterrupted, and

21  that the nursing workforce is supported, particularly during periods of increased

22  demand or long-term staff vacancies."  Murray Report at 8.  But if the only way that

23  the Jail can provide adequate care is through overtime and contract nurses, the

24  system is not working properly.  Dr. Murray admits that nurses who are

25  "overwhelmed by excessive workloads"—which would include nurses required to

26  work substantial overtime—have difficulty providing adequate care.  *Id.* at 6.  When

27  staff are "overwhelmed," it results in disrupted and incomplete medical processes,

28  stress on both nursing staff and patients and ultimately, poor medical care, and

1    patient harm.

2        161.   Dr. Murray also admits that, "due to the complexity of the SDSO

3    medical program," the contract nurses are limited in the tasks they can perform.  *Id.*

4    at 8 (the contract nurses "are assigned specific task-oriented roles to minimize

5    orientation time").  The contract nurses therefore cannot be a solution to the Jail's

6    failure to hire and retain adequate nursing staff.

7        162.   Meanwhile, Dr. Murray admits that the Jail has an "average nursing

8    vacancy rate of approximately 25%." *Id.* at 7.  I have not independently verified

9    Dr. Murray's calculations.  As I discuss in my report, however, the vacancy rates

10   have been higher in the recent past.  *See* Keller Report ¶¶ 799, 802 (92 vacant

11   positions in nursing unit as of November 1, 2023, citing SD_114288).  Dr. Murray

12   excuses the 25% nursing vacancy rate he calculated as "generally similar" to other

13   healthcare facilities in Southern California.  Murray Report at 7.  Even if true (and

14   Dr. Murray has not produced any citation to support this assertion), it is irrelevant.

15   A nursing vacancy rate of 25% negatively impacts patient care at the Jail and is a

16   problem that the SDSO could fix if it chose to do so.  Dr. Murray admits as much by

17   explaining that the Jail is required to resort to overtime and contract nurses to fill

18   shifts.

19       163.   It remains my opinion that SDSO has insufficient authorized nursing

20   positions, has too many vacancies in nursing positions, and relies too heavily on

21   overtime and contract staff to fill shifts.  Keller Report ¶¶ 815-18.

22   **XII.   Dr. Murray did not offer any opinion on the adequacy of**
23   **        provider/practitioner staffing.**

24       164.   In his report, Dr. Murray notes that the County has increased its

25   provider/practitioner staffing levels.  Murray Report at 8.  Though Dr. Murray

26   commented on the scope of the increase, Dr. Murray did not opine that these new

27   levels of provider/practitioner staffing are adequate or provide any detail regarding

28   when and where these staff are deployed or their level of licensure (e.g., physician

1  or nurse practitioner).  Dr. Murray did not conduct any staffing analysis or cite to

2  any staffing analyses conducted by the County.  As far as I am aware, no such

3  staffing analysis exists.

4  **XIII.  Dr. Murray acknowledges that some nurses working in the Jail do not
          receive new employee orientation.**

5

6          165.    Dr. Murray opined that a "comprehensive" new employee orientation

7  "is crucial for correctional healthcare professionals particularly transitioning from

8  non-correctional settings to correctional healthcare positions."  *Id.* at 8.  According

9  to Dr. Murray, such a program is also important because it "equips healthcare

10  professionals with the knowledge of legal and ethical considerations inherent to

11  correctional healthcare" and "facilitates the integration of new employees into

12  interdisciplinary teams within correctional facilities."  *Id.*  I agree with Dr. Murray

13  about the importance of a strong new employee orientation program.

14          166.    Crucially, however, elsewhere in his report, he admits that at least some

15  health care staff help to treat patients without receiving the full new employee

16  orientation.  As discussed above, it appears that the contract nurses from United

17  Nursing International Healthcare Recruiters ("UNI") do not receive some or all of

18  the new employee orientation.  *Id.* at 8 (explaining that contract nurses only perform

19  certain tasks "to minimize orientation time").  Having health care staff treat patients

20  without receiving the orientation is concerning for all of the reasons that Dr. Murray

21  stated in his report.

22  **XIV.  Dr. Murray does not address how the lack of adequate custody staff
          negatively impacts care for patients.**

23

24          167.    According to Dr. Murray, Plaintiffs alleged that "[t]he Sheriff's

25  Department's custody staff interfere with and undermine the delivery of care by

26  health care professionals."  *Id.* at 41.  In response, Dr. Murray wrote: "The security

27  and healthcare staff we spoke to indicated that there are occasions when it is

28  necessary for the medical and security departments to discuss the care and custody

of a particular IP." *Id.* This sentence is disingenuous because it implies (1) that these discussions actually take place each and every time there is a conflict between security concerns and medical concerns; (2) that these discussions resolve the disagreement about in the delivery of health care; and (3) that medical has an equal say in these discussions rather than being overruled by custody staff. Moreover, it does not address the evidence that I discuss in my initial report that shows that custody staff routinely interfere with medical care in ways that cause harm to incarcerated people. Keller Report ¶¶ 659-86. I found additional evidence of this problem in the chronic care medical records discussed in Dr. Murray's report. *See* paragraph 117, *supra.*

## XV. Dr. Murray misrepresents the problems the Jail has with the continuity of medically-necessary medications and treatments.

168.   In his report, Dr. Murray discusses the benefits of the Surescripts system, which allows the County to electronically verify class members' prescription medications in the community. Murray Report at 41. Surescripts is a valuable tool. However, Dr. Murray does not address the fact that once medications are verified through Surescripts, the Jail requires two additional steps before any patient receives their medications: The medications must be approved by a STATCare practitioner and then any nonformulary medications must go through the nonformulary review process. *See* Keller Report ¶¶ 292-303. As I discussed in my initial report, these unnecessary processes, which delay care, contributed to the death of Raymond Dix. Keller Report ¶ 154. I also identified problems with continuity of medication and, in particular, approval of non-formulary medications, in my review of the chronic care files. *See* paragraph 117, *supra.*

169.   In addition, Dr. Murray does not address another, equally important component of continuity of care: continuity of medical treatments that patients were undergoing prior to coming to jail. Like requiring use of the non-formulary process before allowing continuity of medications, the SDSO requires review by the

Case 3:20-cv-00406-AJB-DDL   Document 796-3   Filed 01/21/25   PageID.35127
Page 328 of 400

NaphCare Utilization Management (UM) process before allowing scheduled medical treatments to take place. DUNSMORE0117617 (NaphCare Contract at 2.3.16.4). I discussed problems with this in my initial report. Keller Report ¶¶ 309-312, 458-484. I also identified problems with continuity of medical treatment in my review of the chronic care files. *See* paragraph 117, *supra*.

170. Finally, Dr. Murray did not review the process for continuity of care after off-site medical visits. This requires a practitioner to review the off-site medical records and create a treatment plan incorporating the diagnoses, studies and prescriptions from the off-site visit. This does not happen at the Jail, as exemplified by the case of ███████ ███████ which I discuss in my initial report. Keller Report ¶¶ 309-312. Another example is ███████ ███ discussed in Appendix A.

**XVI. Dr. Murray's opinion that incarcerated patients have adequate means for alerting medical staff of their needs is not consistent with the evidence I have reviewed.**

171. Dr. Murray opines that SDSO provides incarcerated people with a reliable and timely way to alert health care staff of their medical needs. Murray Report at 42. I disagree with Dr. Murray's opinion, as the evidence I have reviewed suggests that incarcerated people often cannot obtain timely attention for their medical issues.

172. First, as I explained in my report, incarcerated people must have a way to communicate emergent medical needs, such as a heart attack, a stroke or severe injuries. This is done in many jails by having an emergency button in the housing units. However, as I detailed in my report, these intercoms at the Jail do not always work, leaving incarcerated patients with no way of alerting staff of a medical emergency. Keller Report ¶¶ 370-374. Dr. Murray does not address the problems with these intercoms, which are discussed at length in Plaintiffs' Third Amended Complaint. Dkt. 231 ¶¶ 93, 330-32, 334.

173. Second, as I discussed in my report, the Jail must have a mechanism for patients with disabilities, mental illness and/or language barriers to request and

[4598005.1]                                     58                      Case No. 3:20-cv-00406-AJB-DDL
                              REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.

1    receive medical care. Keller Report ¶ 323. Such patients often cannot effectively

2    utilize a system of written requests. There is ample evidence that the Jail has failed

3    these patients, as exemplified by the case of Roselee Bartolacci. Keller Report ¶¶

4    193-218. Dr. Murray does not address these failings of the system.

5         174.    Third, even the written medical request system used by the jail does not

6    function properly, as evidenced by the Jail's own statistics. These written requests

7    are supposed to be triaged within 24 hours and then each patient is to be seen face-

8    to-face by a nurse within another 24 hours. As I discussed in my report, this system

9    does not work, partly because of the chronic nursing shortage. Keller Report

10   ¶¶ 349-50 (citing SD_114412, SD_114467, Rognlien-Hood Tr. 89:8-10). In my

11   review of the chronic care medical records (which Dr. Murray's consultants

12   purported to review) and in my review of Dr. Murray's sick call audit, I identified

13   additional instances where the Jail failed to respond to sick call requests in a timely

14   manner. *See* Sections VII, *supra.*

15        175.    Fourth, nurses act as gatekeepers to incarcerated patient access to

16   practitioners. If a patient wants to see a medical practitioner about a particular

17   complaint, and would see a medical practitioner in the outside world, the gatekeeper

18   nurse may make the decision to not allow the patient access to the practitioner. I

19   discussed the problems with this system in my initial report. *See* Keller Report ¶¶

20   430(d), 619.

21   **XVII. Dr. Murray's opinion that the Jail has an adequate system for diagnosing
22   and treating infectious diseases is not consistent with the evidence I have
     reviewed.**

23        176.    Dr. Murray states, "[a]s emphasized throughout this document,

24   particularly with their intake processes, the SDSO has implemented all the necessary

25   elements for a thorough and effective infectious and communicable disease

26   surveillance program." Murray Report at 13. Dr. Murray cites no statistics to show

27   that the system is effective. In my report, I cited several infectious diseases for

28   which the SDSO is not screening and is not offering treatment in violation of the

1  standard of care.  These include:

2      177.   Chronic Hepatitis C Infection (Hep C).  The SDSO does not offer opt-

3  out screening for Hep C per national standards and as was recommended by

4  Dr. Venters.  Keller Report at ¶¶ 507-525.  I cite several cases in my initial report

5  where patients with known Hep C infections were denied treatment in violation of

6  national standards of care.  *Id.*

7      178.   Sexually Transmitted Infections (STIs).  As I discussed in my report,

8  NaphCare is required by their contract to have an STI clinic, but they have never set

9  this up.  Keller Report at ¶¶ 594-612.  This

10     179.   Latent Tuberculosis Infection (LTBI).  Dr. Murray opines that "all IPs

11  are screened and tested for tuberculosis (TB)."  Murray Report at 10.  National

12  standards require screening for LTBI in all at risk patients.  The SDSO does not

13  screen for LTBI until patients have been incarcerated for two years.  Then, if a

14  patient with LTBI is identified, the SDSO does not offer treatment unless the patient

15  will be incarcerated for six months.  This violates national standards requiring the

16  screening of at-risk individuals and treating patients identified as having LTBI when

17  found.  Keller Report ¶¶ 581-593.

18  **XVIII. Dr. Murray's opinion that the Jail offers sufficient access to specialty
     care is not consistent with the evidence I have reviewed.**

19

20     180.   In his report, Dr. Murray wrote: "[i]t is evident from the specialty care

21  data provided from the medical record reviews, and corroborated by Drs. Rafi and

22  Freedland, that SDSO has enough contracted sub-specialty, diagnostic care

23  resources, and high acuity medical beds to provide adequate and timely access to

24  specialty care for IPs requiring those services."  Murray Report at 19.

25     181.   The evidence I have reviewed suggests that access to specialists is not

26  timely and adequate.  *See* Keller Report at ¶¶ 470-484.  In addition, the case of Mr.

27  ███   who was referred to a gastrointestinal specialist for treatment of GERD but

28  never saw one over a period of six months, shows substantial delays in access to

1  specialist care.  *See* Appendix A.

2  **XIX.  Dr. Murray's opinion that the Jail maintains confidentiality of patient
        medical encounters is not consistent with the evidence I have reviewed.**

3

4         182.   Dr. Murray opines that the SDSO does provide confidential medical

5  care to "the greatest extent possible."  Murray Report at 43.  He identifies two

6  circumstances—when staff speak with class members cell front because they

7  refused an appointment and where the multi-disciplinary team conducts Wellness

8  Rounds at cell front—to highlight how the County "attempts to balance the need for

9  IP confidentiality and access to care."  *Id.*  He further reports that if any class

10 member expressed confidentiality concerns during those types of encounters, the

11 County would see them in a confidential setting.  *Id.*

12        183.   I disagree with Dr. Murray's opinion that the County properly protects

13 the confidentiality of medical encounters.  Dr. Murray's opinion on this topic does

14 not appear to have involved any review of patients' charts.  In my review of charts, I

15 found most cell-side encounters did not record that the patient gave consent to a

16 non-confidential encounter.  For example, none of the cases of cell-side encounters I

17 mention in my report in paragraphs 675-679 contain any mention of the patient

18 being asked for consent for the cell-side visit.  Moreover, in a system where it can

19 be so difficult for incarcerated people to timely access care, incarcerated people

20 likely feel tremendous pressure to accept non-confidential encounters rather than to

21 lose their opportunity to receive care.  Patients should not be forced to choose

22 between confidentiality and receiving care.

23        184.   My review of charts showed healthcare staff conducting visits for

24 intimate, private medical concerns—such as sexually transmitted diseases, inguinal

25 hernias and hemorrhoids—at patients' cell doors.  Keller Report ¶¶ 675-79.  Even if

26 the patient consented, this is not appropriate.  One example is the case of ███

27 ███████  which I discussed in my report.  Keller Report ¶¶ 567-72.  And my

28 conversations with incarcerated people revealed that much of the healthcare being

1  provided at the Jail occurs at cell front, which is not confidential.

2  **XX.   Dr. Murray's opinion that "all" patients receive adequate follow up care
is not consistent with the evidence I have reviewed.**

3

4       185.   Dr. Murray opines that "the medical record reviews for both nursing

5  and providers indicated that IPs receive timely follow-up care."  Murray Report at

6  43.  As I described in my initial report and in my review of some of the chronic care

7  patients' medical files that Dr. Murray reviewed, the County often fails to provide

8  appropriate follow up care when people return from seeing outside specialists.

9  Keller Report ¶ 304-313; *see* paragraph 117, *supra*.  I therefore disagree with

10  Dr. Murray that the medical records establish that the Jail provides adequate follow-

11  up care.

12       186.   In what appear to be related findings, Dr. Murray explains that

13  Dr. Freedland, according to Dr. Murray, stated that the County "ensures that all

14  patients scheduled for providers are seen that day"; and that "StatCare is available to

15  nursing staff 24/7 for all IPs that may require additional intervention."  Murray

16  Report at 43.

17       187.   It is unclear what Dr. Murray means with respect to his statement about

18  Dr. Freedland or how it relates to follow-up care.  Perhaps Dr. Murray is stating that

19  all patients who see an outside medical specialist are seen by onsite staff on the

20  same day after they return to the Jail.  If so, the medical files do not reflect that this

21  is occurring.  Alternatively, if Dr. Murray is stating that all patients who are

22  scheduled to see a provider at the Jail are seen by a provider on that same day, that

23  has no bearing on whether the Jail provides adequate follow-up care.  In addition,

24  the Jail's own CQI has documented the wait to see a provider as greater than 14

25  days.  SD_114495.  Moreover, as I discussed in my report, CHP practitioners are not

26  in charge of scheduling their own clinics.  The Jail has gatekeepers in place who

27  decide which patients get to see a practitioner and which do not.  The STATCare

28  midlevel practitioners are one level of such gatekeepers.  Nurses contact STATCare

1   "for permission" for an on-site practitioner to see a patient.  *See* SD_754743;

2   Appendix A, ███ ███    Another level of gatekeepers are the nurses themselves.

3   Dr. Murray admits this when he refers to the nurses seeing, diagnosing, and treating

4   patients in accordance with check-box protocols that NaphCare developed.  Murray

5   Report at 30.  Such patients are not scheduled to see a practitioner.

6       188.    The fact that STATCare is available 24/7 could, in theory, assist in

7   ensuring patients receive appropriate follow up care following off-site medical

8   appointments.  However, the medical files I reviewed contained serious problems

9   with follow-up care, notwithstanding the availability of STATCare.

10  **XXI.  Dr. Murray's conclusion that the Jail provides adequate discharge
        planning is flawed.**

11

12      189.    In my report, I discussed the importance of a functioning discharge

13  planning process and the serious problems with Defendants' system.  The many

14  problems include, but are not limited to: a lack of adequate policies regarding

15  discharge planning; the failure of NaphCare—which is obligated, pursuant to its

16  contract with the County, to implement a system of discharge planning that is

17  consistent with NCCHC standards—to actually implement a system more than two

18  years after the effective date of the contract; the failure to create a system that

19  arranges for follow-up appointments for patients; NaphCare's failure to set forth job

20  duties for the two people it has hired as discharge planners; the fact that, given the

21  census in the Jail, two discharge planners are not sufficient to conduct adequate

22  discharge planning; the fact that the system requires incarcerated people to request

23  discharge planning, rather than providing it as a matter of course; the fact that

24  discharge planning is not actually being provided to class members; the fact that the

25  Jail now claims to provide a 30-day supply of discharge medications to class

26  members, but has no official policy to enforce that practice; the failure to provide

27  the vast majority of class members with discharge instructions; and the failure of the

28  Jail to track any statistics regarding the provision of discharge services.

190.    In Dr. Murray's report, he similarly opined that "[m]edical and mental health discharge planning is critical in correctional settings because incarcerated individuals often have complex health needs, including chronic medical conditions, mental health disorders, and substance use issues." Murray Report at 21. He then concluded that the County "ensure[s] that IPs can access social and medical services in the community in a timely manner." *Id.* at 22.

191.    Dr. Murray's opinion is flawed and contradicted by the evidence I reviewed. Dr. Murray does not discuss any of the medical system policies (or lack thereof) related to discharge planning. Instead, he focuses most of his discussion on the Sheriff's Office's Reentry Services Division. But that Division is operated by custody staff and does not and could not perform any medical functions related to discharge planning. He touts the 30-day supply of medication, but does not acknowledge that there are no policies formalizing that practice. He notes that the County sometimes helps people who are receiving MAT or dialysis or have behavioral health needs. But he ignores all of the other conditions that class members have that require effective discharge planning. He does not mention the two discharge planners employed by NaphCare (who still do not have defined job duties), let alone opine regarding whether that staffing level is sufficient given the thousands of people who are discharged from the Jail each month. And his opinion regarding the adequacy of the discharge planning system at the Jail does appear to rest upon the review of any medical records; in contrast, my opinions were based upon my review of many dozens of medical files, which reflected a near-total absence of discharge planning.

192.    In addition, I have been provided with a declaration from class member James Clark that is dated September 2, 2024. In it, Mr. Clark states that on the two occasions he was released from custody at the Jail in 2024, the Jail released him without any prescription drugs or prescription card. He states that, because he was not provided with a prescription medications or a prescription card, "I was unable to

1    obtain the medications I need in the free world."  Clark Declaration ¶ 3.  This

2    declaration suggests that the Jail is not following its own policies regarding

3    providing individuals released from the Jail with access to prescription medications.

4    **XXII. The faux-NCCHC evaluation performed by Dr. Murray and his team is
     suspect, does not include adequate explanation of the ratings, and is not
5    consistent with the evidence I reviewed.**

6        193.   In his report, Dr. Murray stated that his "team, experienced with the

7    NCCHC accreditation process, thought it appropriate to evaluate SDSO's

8    compliance with the current NCCHC 2018 standards for Health Services in Jails."

9    Murray Report at 31.  Dr. Murray's team concluded that SDSO was "compliant with

10   93% (33[sic][12]/39) of the Essential and 100% (20/20) of the Important 2018

11   Standards."  *Id.*  Dr. Murray asserted that his team's findings were based on

12   "information obtained on facility inspections, medical record reviews, interviews

13   with SDSO healthcare and sworn staff, review of healthcare policy procedure,

14   institutional directives, training bulletins, and observation of health care delivery."

15   *Id.*

16       194.   As a starting point, however, Dr. Murray concedes that the Jail would

17   again fail an NCCHC survey, if it was done today, because the Jail did not meet

18   three essential standards.  I agree that the Jail would fail a real NCCHC assessment

19   if it was held right now.

20       195.   In addition, there are a number of serious problems with Dr. Murray's

21   "faux" NCCHC review.

22       196.   First, though he claims his team was "experienced with the NCCHC

23   accreditation process," the CVs for his three consultants do not mention any

24   experience with the NCCHC accreditation process.  Dr. Murray's CV states that he

25   was certified by the NCCHC as a "Correctional Health Professional" from 1996-

26

27   [12] Dr. Murray, in the quoted portion, indicates that the Jail met 33 of 39 Essential
     standards.  In his actual analysis, however, he determined that the Jail complied with
28   36 of 39 Essential standards.  Murray Report at 31-38.

1    2000, but he has no association with NCCHC listed since 2000. Instead,

2    Dr. Murray's experience is with the ACA, the NCCHC's rival in the correctional

3    health care accreditation market.

4        197. Second, Dr. Murray's review did not include a number of essential

5    components of an NCCHC accreditation survey. He and his team did not interview

6    any incarcerated people, even though they had the opportunity to do so. He and his

7    team did not interview the site Health Services Administrator (Angela Nix); the

8    SDSO medical director (Dr. Montgomery); the Deputy Director supervisor of the

9    Directors of Nursing (Serina Rognlien-Hood), or any of the Directors of Nursing

10   themselves. In contrast, when NCCHC conducted its review in 2017 (and found

11   that the County was compliant with only 31% of Essential and 24% of Important

12   standards), it interviewed the staff members occupying those positions.

13   DUNSMORE0260623 (NCCHC Report at 6) ("We interviewed the jail commander,

14   command staff with the sheriff, responsible physician, director of nursing, CQI

15   nurse, infection control/training nurse, psychiatrist, psychologist, mental health

16   clinicians, dentist, medical records clerk, 11 health staff, six COs, and 11 inmates

17   selected at random.").

18       198. Third, Dr. Murray's conclusions regarding each of the standards

19   includes no analysis. He simply states for all but three of the essential standards that

20   the Jail complies with the standard because it meets all of the compliance indicators

21   for each of the standards. But Dr. Murray does not list any of the compliance

22   indicators, nor his basis for concluding that the Jail met the indicators. His

23   conclusions that the Jail complies with various standards are therefore completely

24   untethered from the actual NCCHC standards and the compliance indicators that

25   underlie them. He and his team did not show any of their work, which makes it

26   impossible to determine the basis they had for deciding regarding compliance.

27       199. Because Dr. Murray's faux-NCCHC review is so methodologically

28   flawed, I will not attempt to address each of his purported findings. I can say,

1  however, that some of his findings of compliance are surprising to me given the

2  evidence I have reviewed.  Examples include:

3      **A.**    **J-A-02 Responsible Health Authority – *Essential* Standard: The**
**responsible health authority (RHA) ensures that the facility**
4                    **maintains a coordinated system for health care delivery.**

5        200.   Dr. Murray concluded that the Jail met this standard.  I disagree.  Since

6  the NCCHC found in 2017 that the Jail had not complied with this standard, the

7  SDSO has fragmented health care to the point that there is no longer "a coordinated

8  system for health care delivery."  Instead, the Jail now has three independent "silos."

9  1. The SDSO nurses and medical administrators, including Dr. Montgomery, and

10  Serina Rognlien-Hood.  2. NaphCare, which supplies the STATCare midlevel

11  practitioners, the mental health personnel, and the MOUD practitioners.  NaphCare

12  also has responsibility for the medical Policies and Procedures, Chronic Care

13  Guidelines, enforcement of the non-formulary process and the Utilization

14  Management process, and Mortality and Morbidity committee, among others.  3.

15  Correctional Health Partners, which supplies the on-site physicians and midlevel

16  practitioners, including the Jail medical director.  There is now even less of a

17  "coordinated system for health care delivery" than in 2017 when the Jail failed to

18  meet this standard.

19        201.   From what I can tell, all three silos at the Jail overlap.  CHP

20  practitioners and NaphCare practitioners independently make diagnoses and

21  prescribe treatments to patients.  CHP has no authority to supervise NaphCare

22  practitioners and vice-versa.  In the case of a death, Dr. Montgomery, SDSO

23  security and the SDSO Director of Nursing conduct some kind of death reviews.

24  Separately, NaphCare, by contract, runs the formal Mortality and Morbidity

25  committee.  Dr. Freedland (per Dr. Murray's report) wants CHP to do their own on-

26  site death reviews, all of which are or will be uncoordinated.  Murray Report at 40.

27  As another example of fragmentation, Dr. Murray states that Dr. Freedland is

28  developing Disease Management Guidelines, *id.* at 15, but Dr. Freedland has no

1  authority to enforce those guidelines on the NaphCare practitioners and this project

2  is not included in the scope of work for the CHP contract.

3      **B.      J-A-07 Privacy of Care – *Important***

4      202.    Dr. Murray concludes that the Jail meets this standard, which requires

5  that "[h]ealth care encounters and exchanges of information remain in private." *Id.*

6  at 32.  However, the NCCHC Report in 2017 pointed out that "The areas of privacy

7  and confidentiality of care need to be addressed."  DUNSMORE0260627.  As far as

8  I am aware, the SDSO has not changed *any* of its privacy practices since then.  As I

9  discussed in my initial report and above, much of the care in the Jail is improperly

10 provided in non-confidential settings.

11     **C.      J-A-9 Procedure in the Event of an Inmate Death – *Important***

12     203.    Dr. Murray concluded that the Jail "conducts a thorough review of all

13 deaths in custody in an effort to improve care and prevent future deaths."  Murray

14 Report at 32.  I have pointed out in my initial report that the death review process at

15 the SDSO is seriously flawed.  Keller Report ¶¶ 86-239.  My further discussion of

16 the death of Mr. Bach in this report reinforces my initial opinions; that the Jail took

17 no steps following his preventable death from diabetic ketoacidosis suggests that the

18 CQI process for death reviews at the Jail is profoundly broken.  *See* Section III.B.1,

19 *supra*; Keller Report ¶¶ 108-114.  Dr. Murray implicitly acknowledges problems

20 with the death review process by explaining that CHP will be doing on-site death

21 reviews in the future.  This change suggests that the County recognized that the

22 reviews conducted by NaphCare are not adequate.  I therefore find it not credible

23 that Dr. Murray concluded that the Jail satisfied this standard.

24     **D.      J-F-01 Patients with Chronic Disease and Other Special Needs –
       *Essential***

25

26     204.    Dr. Murray opined that the Jail met this standard, which requires that

27 "[p]atients with chronic disease, other significant health conditions, and disabilities

28 receive ongoing multidisciplinary care aligned with evidence-based standards."

1  Murray Report at 36.  However, the NCCHC criticized the Jail in 2017 for not
2  having chronic disease guidelines or policies and procedures for a chronic disease
3  program.  DUNSMORE0260643-0260644.  Dr. Murray admits in his report that the
4  SDSO still does not have these essential documents.  Murray Report at 15.  In my
5  initial report, I discussed serious inadequacies in how the Jail practitioners deal with
6  Asthma and Type 2 Diabetes.  Keller Report ¶¶ 526-551, 613-631.  I also identified
7  many problems with chronic care, including for asthma, diabetes, and hypertension,
8  in my review of the chronic care files, discussed above.

9       205.  The opinions contained in this rebuttal are based on the documents,
10 evidence, and/or observations made available to me to date.  I reserve the right to
11 revise or expand my opinions should additional information become available to me.
12 Together with my report disclosed on August 21, 2024, the information contained in
13 this report and the accompanying appendices are a fair and accurate representation
14 of the subject of my anticipated testimony in this case.

15
16
17 Dated:  November 1, 2024        _____
18                                 Jeffrey E. Keller, M.D.
19
20
21
22
23
24
25
26
27
28

# Appendix A

**APPENDIX A**

**Reviews of Chronic Care Medical Records**

A.  ▮▮▮ ▮▮▮ – Patient 29[1] – ▮▮▮

1.  PA-C Freedman reviewed the medical record for ▮▮▮ ▮▮▮ and concluded that his care met the standard of care.  She wrote:

> This ▮-year-old male is a complicated patient with multiple comorbidities and nonadherence to medical treatment.  The medical staff at the jail has been attentive to his glucose levels with frequent reviews of his finger-stick readings and subsequent adjustments to his treatment regimen.  This reviewer recommends that a clinician meet with the patient to determine his underlying reasons for treatment refusals.  Nevertheless, the medical staff has followed the standard of care.

Murray Report at 181-82.

2.  I disagree with PA-C Freeman's conclusion.  In my opinion, the care received by Mr. ▮▮▮ did not meet the standard of care.

3.  *Type 2 Diabetes* –  I am comparing the Type 2 Diabetes Treatment provided to Mr. ▮▮▮ with the American Diabetes Association ("ADA") standards for detention facilities.[2]  Mr. ▮▮▮ had his Receiving Screen done on ▮▮▮ 2023, ▮▮▮ Med. Rcd. at 4, and a second level RN evaluation by Stephanie Yee, RN, that stated "Takes Lantus, Novolog, and Januvia," *id.* at 88, 89.  RN Yee verified the exact dose of Lantus (30 units BID), Novolog (6 units with meals) and Januvia (Janumet 50mg/1000mg BID).  *Id.* at 89, 90.  These medications and dosage were reviewed the same day by STATCare NP Emily Mimms.  NP Mimms wrote "Converted Lantus to Novolin N."  *Id.* at 25.  She did this because the STATCare Intake Assessment and Orders form says in bold font: "**\*All long-acting insulins**

---

[1] The patient number refers to the numbering used in Dr. Murray's Appendix J.  *See* Murray Report at 164-223.

[2] Daniel L. Larber et al., *Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association*, 47 Diabetes Care 544 (2024) ("Diabetes in Detention").

1  **will be substituted with Novolin N BID at an equivalent dose unless there is**

2  **documented evidence that the patient cannot or should not be transitioned[.]**"

3  *Id.* at 24.  NP Mimms, then discontinued the Lantus and instead wrote for an insulin

4  sliding scale to be used twice a day instead of the three times a day Mr. ███ had

5  been getting his Novolin before.  *Id.* at 25.  NP Mimms also discontinued (or failed

6  to authorize) the Januvia prescription, probably because it is not on the NaphCare

7  formulary.  NAPHCARE037051 at 5.

8       4.     These decisions were not consistent with the standard of care.

9  Stopping Januvia and Lantus violated the ADA standard of "[m]edications . . .

10 should be continued without interruption upon entry into the detention setting."

11 Diabetes in Detention at 545.  Using the twice a day sliding scale violated the ADA

12 standard that "[t]he sole use of sliding-scale insulin is strongly discouraged." *Id.* at

13 549.

14      5.     Not surprisingly, since 2 of his 3 diabetic medications had been

15 discontinued, Mr. ███ had a string of very high blood sugars over the next

16 several days. ███ Med. Rcd. at 91-97.

17      6.     On ████████ 2023, Mr. ███ labs were checked and his A1C

18 was 7.8.  *Id.* at 209.  Since the A1C reflects the average blood sugar over the

19 previous 3 months or so, this result reflects Mr. ████ level of control on the

20 outside but it does not reflect the care he was receiving in the jail.  Mr. ████

21 should have had another A1C in 3-6 months.  However, diabetic labs were never

22 repeated the rest of the time he was incarcerated (more than 7 months).

23      7.     On ████████ 2023, NP Nicholas Kahl reviewed the outside

24 medical records from Paradise ████ Hospital, where Mr. ████ had been

25 hospitalized in ███ due to a stroke.  NP Kahl noted that Mr. ████ had been

26 discharged taking 35 units of Lantus once a day.  *Id.* at 97.  According to the

27 Medication Administration Record (MAR), a long-acting insulin Semglee

28 (equivalent to Lantus) was started on ████████ 2023. ████ Med. Rcd.

at 1111; NAPHCARE031060, line 248309.  Mr. ████ blood sugars did not improve significantly and, on ██████ 2023, NP Frederick Wycoco increased the Semglee dose to 38 units once a day.  ████ Med. Rcd. at 101.  On ████ 2023, NP Wycoco noted that Mr. ████ diabetes was still "uncontrolled" and started the oral diabetic medication glipizide.  *Id.* at 105.  According to the ADA standard,[3] glipizide was not an appropriate medication.  The Diabetes Standards have several recommendations for adjunctive diabetes medications, but glipizide is not one of them.  *See* Diabetes Standards at S166, S167.  Instead, the Diabetes Standards recommend the addition of "combination therapy with a GLP-1 RA[.]"  *Id.* at S1658.

    8.    The next blood sugar evaluation was done by NP Wycoco on ██████ 2023.  Mr. ████ blood sugars had improved but he had also had several hypoglycemic (low blood sugar) events.  Multiple hypoglycemic events are also a sign of poor diabetic control.  NP Wycoco decreased Mr. ████ Semglee dose.  ████ Med. Rcd. at 148.  On ████ 2024, NP responded to a very high blood sugar of 412 by doubling the dose of glipizide.  *Id.* at 175.  On ████ 2024, NP Wycoco judged Mr. ████ diabetes "mostly controlled."  *Id.* at 187.  Immediately after this, Mr. ████ blood sugars were 291, 307, 377, 427, 347 etc.  I would not judge that to be at all well-controlled.  I would know for sure how well controlled Mr. ████ diabetes was if he had had a repeat A1C done.  Mr. ████ reportedly refused to have repeat labs done but the Jail practitioners made little effort to convince him to have these done.  For example, on ██████ 2023, Mr. ████ was admitted to the MOB.  That would have been a great time to get

[3] American Diabetes Association Professional Practice Committee, *Pharmacologic Approaches to Glycemic Treatment*: Standards of Care in Diabetes–2024, 47 Diabetes Care S158 (2024) ("Diabetes Standards"); American Diabetes Association, *Standards of Medical Care in Diabetes – 2022 Abridged for Primary Care Providers*, 40 Clinical Diabetes 10 (2022).  The 2024 standards do not differ materially from the 2022 standards as cited in this report.

1  labs, but none were ordered.

2      9.    In addition to these deficiencies, the jail medical staff also failed to

3  meet the standard of care as laid out by the American Diabetes Association in the

4  following ways.  First, the ADA requires a physical examination by a medical

5  practitioner within 2 weeks of admission.  *See* Diabetes in Detention at 545.  The

6  first examination by a medical practitioner was by James Joachim, MD on

7  ███████ 2023, six weeks after Mr. █████ arrived at the jail.  ██████ Med. Rcd.

8  at 278.  Also, Dr. Joachim documented no foot examination or a retinal examination

9  as required by the ADA.  Diabetes in Detention at 546.  Second, Mr. █████ was

10  never referred to an optometrist for a dilated retinal exam as required by the ADA

11  Standards.  *Id.* at 550; █████ Med. Rcd. at 8.  Third, no communications with

12  Mr. █████ outside medical provider is documented to facilitate discharge

13  planning.  █████ Med. Rcd. at 11.

14      10.    *Acute care* – On ██████████ 2023, Mr. █████ was admitted to the

15  MOB following an episode where he reported dizziness, "passed out 'couple of

16  seconds[,]'" fell and injured himself, and lost continence of his bowels.  ████████

17  Med. Rcd. at 124, 125.  His vital signs were abnormal and an EKG done soon

18  thereafter was abnormal.  (There are no EKGs included in the records sent to me so

19  I could not review the accuracy of the EKG interpretation).  A STATCare

20  practitioner admitted Mr. █████ to the MOB and ordered Gatorade "for hydration

21  BID," *id.* at 79, evidently after diagnosing Mr. █████ with dehydration despite not

22  having examined him.  This was inappropriate care.  Mr. █████ was an elderly man

23  with known cardiovascular disease, a previous stroke, and poorly controlled diabetes

24  who passed out and lost bowel continence.  In my opinion, he should have been sent

25  to the hospital.  As it was, no labs, imaging, or any other work up was done in the

26  MOB except for observation and the abnormal EKG.  In my opinion, this acute care

27  provided to Mr. █████ did not meet the standard of care.

28      11.    I discussed in my report the immense problems the SDSO has with

1    patient refusals of medical care and how these negatively impact medical care and

2    harm patients.  Mr. ████ has approximately 300 refusal forms in his chart.  There

3    is no evidence of counseling in his medical record.  His refusals clearly negatively

4    impacted his medical care.

5        12.    Lastly, on ████████ 2024, RN Alexis Lagasca posted: "Unable to

6    see patient for diabetic check due to no available deputy per Deputy 4724.  Called

7    multiple times." ██████ Med. Rcd. at 169.  This is another example of security

8    staffing issues negatively impacting patient care.[4]

9    **B.    ████ ████ – Patient 33 – ██████**

10        13.    PA-C Freeman reviewed Mr. ██████ medical record and concluded that

11   his care met the standard of care.  PA-C Freeman wrote:

12       The patient entered the jail with obesity and hypertension.  The NP
         identified the patient as being at risk for diabetes, and his hemoglobin
13       A1C confirmed the diagnosis.  The appropriate treatment was
         prescribed which decreased his A1C to a normal level.  These actions
14       were in line with the standard of care for diagnosing and treating type 2
         diabetes.  However, his obesity, hypertension, and diabetes put him at
15       risk for atherosclerotic cardiovascular disease (ASCVD).  The standard
         of care for primary prevention of ASCVD would be to start at least a
16       moderate-intensity statin; however, this was not done.

17       His hypertension was relatively well-controlled as a diabetic with a
         goal BP of <130/80.  While the majority of his medical management
18       met the standard of care, the patient would have benefited from
         beginning a statin.
19

20   Murray Report at 184-85.

21       14.    I disagree with PA-C Freeman's conclusion.  In my opinion, the care

22   provided to Mr. ████ did not meet the standard of care in certain respects.

23       15.    *Hypertension* – Mr. ████ received his Medical Clearance and Receiving

24   Screening on ██████ 2023.  He reported a history of asthma and hypertension.

25   ████ Med. Rcd. at 15-16.  He was hypertensive at intake and amlodipine (Norvasc)

26

27   _____

     [4] I agree with PA-C Freeman that the care that Mr. ████ received for his
28   hypertension complied with the standard of care.

1  was begun.  *Id.* at 74.  Eventually, amlodipine was increased, and later,

2  HCTZ/lisinopril was added.  *Id.* at 284.  Despite these changes in medications,

3  Mr. ███ blood pressures were never fully controlled.  His blood pressures at each

4  of his chronic care visits was elevated: 153/73 on ███ 2023, *id.* at 275; 159/72

5  on ███ 2023, *id.* at 280; and 142/78 on ███ 2023, *id.* at 29.  Per

6  AHA/ACC guidelines,[5] the target goal for blood pressure is <130/80.  *See, e.g.*,

7  AHA/ACC Guidelines at 1277, 1290, 1304.  Despite not being close to this goal, NP

8  Sonya Megert judged Mr. ███ level of hypertensive disease control as "good."  *Id.*

9  at 292.  I disagree.  The AHA/ACC Guidelines contain strategies for the treatment

10  of persistent hypertension despite triple medication therapy.  AHA/ACC Guidelines

11  at 1298.  The hypertension treatment provided to Mr. ███ did not meet the standard

12  of care since the Jail practitioners never prescribed the next step recommended by

13  the AHA/ACC Guidelines.

14      16.    *Type 2 Diabetes* – The Jail practitioners did well to diagnose Mr. ███

15  with Type 2 Diabetes and appropriately treated him with metformin.  Treatment

16  efficacy was confirmed by falling A1C measurements.  However, the Jail failed to

17  follow a number of the other diabetes standards:

18          a.  "People with type 2 diabetes should be screened for diabetic

19              retinopathy by a comprehensive dilated eye examination at the time of

20              their diabetes diagnosis."  Diabetes in Detention at 550.  This was not

21              done.

22          b.  A comprehensive foot examination was not done.  Diabetes in

23              Detention at 549.

24          c.  I agree with PA Freeman that "The standard of care for primary

25

26  ────────────
[5] ACC/AHA/AAPA/ABC/ACPM/AGS/APhA/ASH/ASPC/NMA/PCNA, *2017*

27  *Guideline for the Prevention, Detection, Evaluation, and Management of High*
   *Blood Pressure in Adults: Executive Summary*, Hypertension 1269 (2018)

28  ("AHA/ACC Guidelines").

prevention of ASCVD would be to start at least a moderate-intensity statin; however, this was not done." Murray Report at 185.

17.    For these reasons, the treatment provided to Mr. ▮▮▮ for his Type 2 diabetes met the Diabetes in Detention standards for glucose control but did not meet the other standards mentioned.

18.    *Torn rotator cuff* – The care the Jail provided to Mr. ▮▮▮ for his torn rotator cuff also did not meet the standard of care. Mr. ▮▮▮ had an MRI that showed a tear in his rotator cuff. ▮▮▮ Med. Rcd. at 436. Such tears are treated either with surgical repair or physical therapy.[6] The Jail did not offer either to Mr. ▮▮▮.

**C.    ▮▮▮ ▮▮▮ – Patient 64 – ▮▮▮**

19.    PA Pulvino reviewed Mr. ▮▮▮ medical record and concluded that the care he received met the standard of care. PA Pulvino wrote:

> Mr. ▮▮▮ was diagnosed with hypertension during intake and he gave a his ▮▮▮ elevated blood pressure in the FW which he treated "naturally." Multiple attempts in chronic care clinics, nursing visits and provider visits throughout his incarceration were made to address his elevated blood pressure. All attempts were met with refusals. He was seen for several acute issues including URI symptoms, swollen ankle, shoulder pain and rashes and treated appropriately. This was a difficult patient to care for however all facility providers and nursing staff continued to encourage compliance during his incarceration without success.

Murray Report at 212.

20.    Mr. ▮▮▮ did not receive appropriate therapy to treat his hypertension. It is true, however, that Mr. ▮▮▮ refusals of care contributed to the problem.

21.    Mr. ▮▮▮ arrived at the Jail on ▮▮▮ 2020 where he was cooperative with a Medical Clearance and a Receiving Screening. He reported that he had hypertension and his blood pressure was high at 161/91. Mr. ▮▮▮

---

[6] UpToDate, *Management of Rotator Cuff Tears*.

Health Assessment was done on ▒▒▒▒ 2023, 3.5 years after he arrived.  I see no evidence in Mr. ▒▒▒▒ records that anyone ever attempted to do a Health Assessment before this.

22.    Lisinopril was ordered to treat Mr. ▒▒▒▒ blood pressure but he refused to take it.  On ▒▒▒▒ 2020, Gerardo Villegas RN documented Mr. ▒▒▒▒ as saying "I don't need medication for high blood pressure, never had.  I treated with natural supplements.  I don't like to take medications for anything at all.  I also don't need blood test nor EKG, cause I feel well."  RN Villegas wrote "Patient was counseled today the risk of non-compliance with HTN treatment, but cont to decline.  He refuses all care with speech/attitude very adamant, as mentioned above."  ▒▒▒▒ Sick Calls at 14.  Mr. ▒▒▒▒ continued to refuse treatment for hypertension throughout his incarceration.  He had several blood pressures documented; some were very high such as 193/107 measured on ▒▒▒▒ 2020. *Id.* at 21.  There is no blood pressure chart for Mr. ▒▒▒▒ in the medical records available for my review.  However, there are many recorded blood pressures that indicate that his blood pressure remained out of control throughout his incarceration.

23.    PA Pulvino is correct that refusals were an important part of Mr. ▒▒▒▒ medical record.  The term "refusal" appears a staggering 1,848 times in his medical record.  There are hundreds of refusal forms.  However, PA Pulvino's statement that "all attempts were met with refusal" is incorrect.  Mr. ▒▒▒▒ did not always refuse medical care.  He allowed labs to be drawn on ▒▒▒▒ 2021.  He was willingly seen for chronic care on ▒▒▒▒ 2020, ▒▒▒▒ 2022, ▒▒▒▒ 2022, ▒▒▒▒ 2023, ▒▒▒▒ 2023, ▒▒▒▒ 2023 and ▒▒▒▒ 2024.  He actually took lisinopril on a couple of occasions.  ▒▒▒▒ MAR Rcd. at 75.

24.    The Standard of Care for hypertension is to improve the patient's blood pressure until it meets the treatment goal.  Mr. ▒▒▒▒ did not receive recommended medical therapy and his blood pressure was not controlled throughout his

1  incarceration.  The reason for this was Mr. █████ persistent refusal of necessary

2  medical therapy.

3      25.    I wrote in my report that refusals of necessary medical care is a major

4  problem in the SDSO and that the failure of the refusal system causes patient harm.

5  Mr. █████ case is another example.

6      **D.    █████████ ███ – Patient 46 – ████████**

7      26.    NP Jennifer Humphreys reviewed the medical record for █████

8  █████████ and concluded that his care met the standard of care.  She wrote:

> The patient has received appropriate treatment for his type 2 diabetes,
> with both oral medication (Metformin and Glipizide), blood glucose
> monitoring, and insulin (short-acting).  He has also received
> appropriate treatment for his hypertension.  His additional medical
> complaints for skin concerns and hernia pain were addressed
> appropriately and in a timely manner.  His medical record reflects that
> the medical staff has been attentive to his medical needs.  Overall, this
> patient is receiving excellent medical care at Vista Detention Facility.

14  Murray Report at 194.

15      27.    I disagree with NP Humphreys's conclusion.  In my opinion, the care

16  received by Mr. ████████ for his diabetes, hypertension, and hernia did not meet

17  the standard of care.

18      28.    *Type 2 Diabetes* – As mentioned above, the standard of care I am

19  applying is Diabetes in Detention.

20      29.    At his receiving screening, Mr. ████████ reported a history of Type 2

21  diabetes.  His initial blood glucose was so high (358) that Mr. ████████ was sent

22  to the Emergency Department.  ████████ Med. Forms[7] at 54.  Upon return, his

23  blood sugar was still very high at 325 (p. 51).  Based on this, the remote STATCare

24  PA ordered an Insulin Sliding scale.  (51) As I mentioned in my report, this violates

25  the ADA standard of care, which states that "[t]he sole use of sliding scale insulin is

---

27  [7] Defendants produced two medical records for Mr. ████████ one with his sick

28  c████████d one with his other medical reco████████ sick call slip file as
"████████ Sick Call" and the other file as "████████ Med. Forms."

1  strongly discouraged." Diabetes in Detention at 549. Instead, "[s]election of

2  medications for treatment of people with type 2 diabetes should be in accordance

3  with the current ADA Standards of Care." *Id.* at 548. The 2024 Abridged ADA

4  Standards of Care for Primary Care Professionals also state that "[t]reatment with a

5  glucagon-like peptide 1 (GLP-1) receptor agonist or a dual glucose-dependent

6  insulinotropic polypeptide (GIP)/ GLP-1 receptor agonist is preferred before insulin

7  therapy[.]"[8] However, none of these agents are available on the NaphCare

8  formulary. If insulin is going to be used for a patient such as Mr. ████████ it

9  should start with the use of a long-acting insulin. If this fails to achieve treatment

10 goals, short acting insulin can be added three times a day with meals. However,

11 NaphCare specifically forbids the use of long-acting insulins by their STATCare

12 midlevel practitioners with this statement printed in bold in the STATCare Intake

13 Assessment and Order form: "**\*All long-acting insulins will be substituted with**

14 **Novolin N BID at an equivalent dose unless there is documented evidence that**

15 **the patient cannot or should not be transitioned[.]**" ████████ Med. Forms

16 at 52.

17      30.    After the initial failure to prescribe appropriate treatment for

18 Mr. ████████ the Jail continued to mismanage and fail to properly evaluate his

19 diabetes. The sliding-scale insulin and the other medications prescribed for him

20 (metformin and glipizide) did not control his diabetes. On ████████ 2022,

21 Mr. ████████ Hemoglobin A1C was measured as 8.4 % (normal < 5.7).

22 ████████ Sick Calls at 61. On ████████ 2022, Mr. ████████ had a chronic

23 care visit with Stacy Thompson NP, who pronounced his level of diabetes control as

24 "good." ████████ Med. Forms at 153. An A1C reading of 8.4% is *not* good

25

26 ─────────────────

[8] American Diabetes Association Primary Care Advisory Group, *Section 9:*

27 *Pharmacologic Approaches to Glycemic Treatment: Standards of Care in*

*Diabetes—2024 Abridged for Primary Care Professionals*, 42 Clin. Diabetes 206

28 (2024) ("Abridged Diabetes Standards").

control of type 2 diabetes. Good control is usually defined as an A1C of <7.0.

31. Although Mr. ███████ remained incarcerated at the Jail for the next year and a half, there are no other follow up labs or chronic care visits in the records I reviewed. These should have been done at least twice in that period. This lapse violates NaphCare's own guideline printed in their Chronic Care form requiring a repeat A1C "every 3 months if HgbA1c > 8.0." ███████ Med. Forms at 154.

32. FNP Humphries states that Mr. ███████ refused labs on ███████ 2024, but I cannot find record of this in the records provided to me.

33. Finally, Mr. ███████ was never referred for a dilated eye exam to check for retinopathy, as required by the ADA standards.

34. Based on these failures, it is my opinion that the care provided for Mr. ███████ Type 2 Diabetes did not meet the standard of care.

35. *Hypertension* – Mr. ███████ high blood pressures were never well controlled during his incarceration at the jail. There is no blood pressure log in the records sent for my review, but he was repeatedly noted to have excessively high blood pressures. Examples include:

- 181/62 on ███████ 2022, ███████ Sick Calls at 56
- Systolic blood pressure of 182 on ███████ 2023, *id.* at 17
- 200/90 on ███████ 2023, *id.* at 15

36. STATCare practitioners ordered clonidine 0.1mg BID for five days on two occasions: ███████ 2022, ███████ MAR Rcd. 133, and ███████ 2023, *id.* at 55. As I have pointed out in my initial report, the use of clonidine is discouraged by the AHA/ACC Guidelines. Keller Report ¶ 235 (citing Robert M. Carey, *Guideline-Driven Management of Hypertension: An Evidence-Based Update*, American Heart Ass'n (2022), at 44 ("AHA Guidelines Update")). Also, by using an *inappropriate* therapy for blood pressure control, the practitioners failed to use the *appropriate* therapies as recommended in the American Heart Association. The "First Line " medications for hypertension are calcium channel blockers, thiazide

1  diuretics and ACE inhibitors/ARBs instead of short-term clonidine (which the

2  American Heart Association calls a "last-line" agent, the Jail practitioners should

3  have started one or even two of the first-line medications).  AHA Guidelines Update

4  at 44.  Based on these failures, it is my opinion that the care provided for

5  Mr. ███████ hypertension did not meet the standard of care.

6      37.  *Hernia* – On ███████ 2023, Mr. ███████ complained of a

7  baseball-sized right inguinal hernia that caused "pain with exertion." ███████

8  Sick Calls at 10.  A remote STATCare practitioner ordered a truss without doing

9  any examination of the hernia.  *Id.* at 10.  An NP saw Mr. ███████ on ███████

10 2023, but also did not examine the hernia.  *Id.* at 9.

11     38.  As I wrote in my report, the standard of care treatment for an inguinal

12 hernia is 1.  To do a physical examination of the patient's hernia, and 2. Obtain a

13 surgical consultation to consider surgery to repair the hernia.  The use of a truss is

14 discouraged because there is no evidence that trusses are effective in the long term

15 and because they can damage the hernia sac.  Accordingly, it is my opinion that the

16 care provided for Mr. ███████ hernia did not meet the standard of care.

17     **E.  ███████ ███████ – Patient 9 – ███████**

18     39.  Dr. Boone reviewed Mr. ███████ medical record.  Dr. Boone

19 noted that Mr. ███████ had hypertension, a seizure disorder, chronic back pain

20 and radiculopathy, chronic knee pain, and a mood disorder.  Murray Report at 168-

21 169.  Dr. Boone opined that the care that the Jail provided to Mr. ███████ over a

22 20-months period (███ 2022-███ 2024) met the standard of care.  *Id.* at 169.

23     40.  Having reviewed Mr. ███████ medical records, I strongly disagree

24 for a number of reasons.

25     41.  First, the Jail made numerous mistakes in treating Mr. ███████

26 hypertension.  The care that Mr. ███████ received deviated substantially from

27

28

the JNC-8 Hypertension Guidelines[9] (which are nearly ten years old and which Dr. Boone applied to determine whether the Jail met the standard of care), as well as more recent guidelines, such as the AHA Guidelines Update.

1. On ▓▓▓ 2022, Mr. ▓▓▓▓▓ had a markedly elevated blood pressure of 181/112 and he was symptomatic with the complaint of dizziness. Nurses appropriately referred Mr. ▓▓▓▓▓ to be seen by a practitioner. NP Nicholas Kahl went to see Mr. ▓▓▓▓▓ for this complaint in his cell rather than in the medical clinic. NP Kahl did not recheck a blood pressure and did no physical examination at this visit. NP Kahl noted that Mr. ▓▓▓▓▓ had already been prescribed the hypertension drug hydrochlorothiazide (HCTZ on ▓▓▓ 2022) but did not prescribe anything further. SD_760686. JNC-8 and AHA Guidelines Update, however, both recommend that patients with very high blood pressures be treated with two drugs, such as HCTZ *plus* another agent. JNC-8 Guidelines at 1-2; AHA Guidelines Update at 45.

2. On ▓▓▓ 2022, STATCare NP Justin Oden was notified about a diastolic blood pressure of 112 (the systolic blood pressure is not recorded). SD_760985; SD_760986. NP Oden diagnosed "uncontrolled hypertension" and prescribed "clonidine 0.1mg BID prn x 5 days." But, as I discussed in my report, the use of clonidine is heavily discouraged by the AHA/ACC Guidelines because it is a poor blood pressure agent and can cause rebound hypertension. Keller Report ¶ 235; AHA/ACC Guidelines at 1289. JNC-8 and the AHA/ACC Guidelines both recommend that rather than prescribing clonidine, providers should increase the dosage of the medications a patient is already taking or add another agent. JNC-8 Guidelines at 1-2; AHA/ACC Guidelines at 1289. As I noted previously, JNC-8 and AHA guidelines both

---

[9] Carrie Armstrong, *JNC 8 Guidelines for the Management of Hypertension in Adults*, 90 American Family Physician (2014) ("JNC-8 Guidelines").

1  recommend that patients with very high blood pressures be treated with two

2  drugs, such as HCTZ *plus* another agent.  NP Oden, then, made two mistakes:

3  (a) He prescribed five days-worth of clonidine, which he should not have

4  done; and (b) he did not do the right thing, which would have been to increase

5  the dose of the antihypertensives Mr. ████████ was already taking, or add

6  another agent, as per guideline recommendations.

7  3.  After these two encounters during which providers failed to follow the

8  relevant guidelines, Mr. ████████ blood pressures remained high.

9  SD_760757.

10  4.  On ████ 2022, NP Comejo started Mr. ████████ on a second blood

11  pressure medication, amlodipine.  NP Comejo appropriately noted that the

12  goal for Mr. ████████ was to reduce his blood pressure to less than 130/80,

13  which is the BP goal recommended by the AHA/ACC Guidelines.

14  SD_760989.

15  5.  On ████ 2022, NP Comejo stopped Mr. ████████ HCTZ because she

16  thought it was causing Mr. ████████ to have dry eyes.  SD_760990.  NP

17  Comejo did not check a blood pressure at that visit.  However, she knew that

18  his blood pressure was not controlled.  SD_760989.  JNC-8 and the AHA

19  Guidelines Update recommend substituting a blood pressure agent from a

20  different class if one is going to stop HCTZ so that the patient with

21  uncontrolled blood pressure remains on dual therapy.  JNC-8 Guidelines at 2;

22  AHA Guidelines Update at 44.  NP Comejo did not do this, and instead

23  simply discontinued the HCTZ.  The next day, on ████ 2022,

24  Mr. ████████ complained "requesting to know why his BP meds have been

25  DC (discontinued)."  SD_760738.  The BP log confirms that after the

26  discontinuation of the HCTZ, his BP increased to 153/107 (very high) on

27  ████ 2022.  SD_760757.

28  6.  On ████ 2022, Mr. ████████ was seen by NP Kahl for a generalized

Chronic Care visit, which included hypertension.  NP Kahl, did not obtain a blood pressure measurement for this visit.  SD_761522.  Nevertheless, NP Kahl stated that his blood pressure was "well controlled," SD_761523, despite the fact that a review of Mr. ███████ blood pressure log shows that it was not well controlled.  SD_760757.

| 8/10/2022 4:44:14 AM | 158 / 99 | 97.5 | 91 | 18 | 0ft 0in | NAlb | 97 | 5 | NA | 0 |
| 8/18/2022 1:28:47 PM | 169 / 95 | 0 | 99 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 119.67 |
| 8/19/2022 10:08:05 PM | 134 / 85 | NA | 86 | 18 | 0ft 0in | NAlb | NA | NA | NA | 0 |
| 8/19/2022 10:08:05 PM | 134 / 85 | NA | 86 | 18 | 0ft 0in | NAlb | NA | NA | NA | 0 |

The next time Mr. ██████████ Blood pressure was checked after this appointment, on ████████ 2022, it was very high at 160/104.

7. On ██████████ 2022, Mr. ██████████ was seen by Jeffrey Kile, MD, for a generalized Chronic Care visit.  Dr. Kile measured Mr. ██████████ blood pressure as 139/76 (goal <130/80) and concluded that control of Mr. ██████████ blood pressure was "good."  SD_761709.  This conclusion ignores that the blood pressure at this very visit was over the goal of 130/80.  Also, the previous two blood pressures reported on Mr. ██████████ blood pressure log, including one reading just two weeks prior, were very high. SD_760758.

| ████ 2022 1:52:31 PM | 163 / 88 | 0 | | 86 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 113 |
| ████ 2022 1:51:18 PM | 166 / 107 | 0 | | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 126.67 |

8. On ████████ 2023, Mr. ██████████ was seen by Katrina John, MD.  His blood pressure on that day was 159/88.  Despite this blood pressure reading being very high, Dr. John described his blood pressure control as "fair" and made no changes in his treatment regimen.  SD_762246.

9. On ██████████ 2023, Mr. ██████████ had a generalized Chronic Care visit with ██████ Molina, MD. Health care staff did not obtain a blood pressure reading for this visit.  Nonetheless, Dr. Molina described Mr. ██████████ blood pressure control as "good."  SD_762448.  Dr. Molina's conclusion is

not consistent with the blood pressure readings taken just prior to this

appointment, which showed Mr. ███████ still had very high blood

pressure:

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ██2023 3:02:59 PM | 144 / 79 | 0 | | 78 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 100.67 |
| █/2023 3:18:56 PM | 158 / 86 | 0 | | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 110 |
| ██2023 1:38:58 PM | 151 / 97 | 0 | | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 115 |

SD_760762.

10. The chart provided to me by Plaintiffs' counsel does not contain a blood

pressure log.  However, Mr. ███████ blood pressure is recorded as being

very high at 163/103 on ███████ 2024, ███████ Med. Rcd. at 8, and

167/95 on ███████ 2024, *id.* at 9.  Mr. ███████ blood pressures were

clearly still not well controlled.

11.  In my opinion, the care that Mr. ███████ received for his hypertension

did not meet the standard of care.  Providers did not follow the JNC-8 and

AHA/ACC Guidelines and never got Mr. ███████ hypertension under

control.  Interestingly, in his analysis, Dr. Boone never says that

Mr. ███████ blood pressure was controlled.

42.    In addition to the inadequate treatment of Mr. ███████

hypertension, Mr. ███████ medical record reflects numerous other systemic

problems in the Jail health care system that I discussed in my report.  Examples

include:

1.  Mr. ███████ requests for medical care seldom resulted in face-to-face

visits within 24 hours.

| complaint | location | Date submitted | Date pleted | difference |
|---|---|---|---|---|
| Legs cramp and go numb | **SD 760755** | ██/24 | ██24 | 11 days |
| Sleepless nights and chronic pain | **SD 760753** | ██23 | ██23 | 57 days |
| Requesting ingrown toenails be clipped. | **SD 760753** | ██23 | ██23 | 69 days |

| | | | | |
|---|---|---|---|---|
| Unable to reach toes due to back disorder | | | | |
| Chronic pain needs are not being met | **SD 760753** | ▓23 | ▓23 | 12 days |
| Chronic itch in genitals | **SD 760743** | ▓22 | ▓23 | 57 days |
| Fell off top bunk and hit head | **SD 760748** | ▓/23 | ▓23 | 50 days |
| Swelling and numbness in legs | **SD 760741** | ▓22 | ▓22 | 19 days |

2. Medical practitioners neglected vital signs and did not do appropriate physical examinations when seeing Mr. ▓▓▓▓  For example, NP Borrajero saw Mr. ▓▓▓ on ▓▓ 2022 for a complaint of abdominal pain.  NP Borrajero did not obtain any vital signs and did not examine Mr. ▓▓▓ abdomen.  SD_760681.

3. Practitioners frequently evaluated Mr. ▓▓▓ at his cell instead of at the medical clinic.  *See* SD_761010; SD_760984.

4. RNs practiced above their scope of practice by doing evaluations for chest pain—which included ordering and interpreting EKGs—and evaluations for abdominal pain without involving medical practitioners.  *See* SD_760876; SD_760902.

5. Nurses did not witness Mr. ▓▓▓ medication and treatment refusals. There are 703 Medication Refusal forms in Mr. ▓▓▓ chart.  Almost all of these are signed by two security officers who also assert that Mr. ▓▓▓ refused to sign the refusal form.  Few were witnessed by a nurse.  On at least one occasion, Mr. ▓▓▓ denied having refused proffered care.  SD_760982.

6. Mr. ▓▓▓ never had a Health Assessment.  Mr. ▓▓▓ was incarcerated from ▓▓ 2022 into ▓▓ 2024.  The Jail should have conducted at least two Health Assessments for Mr. ▓▓▓ one within

1    14 days of ████ 2022 and one after he had been incarcerated for one year.

2    I was unable to find either Health Assessment in the medical record.

3    **F.      ████ ████ – Patient 10 – ████**

4    43.    Dr. Boone reviewed the medical record for Ms. ████ and concluded

5    that the care the Jail provided to him for her many conditions—hypertension,

6    chronic headaches, hypothyroidism, polytrauma and multiple musculoskeletal

7    injuries, chronic back pain, mood disorder, anxiety, stimulant disorder, and PTSD—

8    met the standard of care.  Murray Report at 169.

9    44.    I disagree with Dr. Boone's conclusions.  In my opinion, the treatment

10   that Ms. ████ received for hypertension and for hypothyroidism (which, as I

11   discuss below, she likely did not have) did not meet the standard of care.

12   45.    *Hypertension* - I am comparing the treatment provided to Ms. ████

13   to the AHA/ACC Guidelines.  The treatment goal is a blood pressure less than

14   130/80.  I am attaching as a reference an easy-to-use hypertension treatment chart

15   published by the AHA ("AHA Treatment Algorithm").[10]

16

17   10

18   

Whelton PK et. al. *Hypertension*. 2018;71:e13-e115.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.

46.    Ms. ███████ blood pressure was very high at 172/94 on her Medical Clearance done on ████████ 2023. ███████ Med. Rcd. at 76. She reported that she had hypertension on her Receiving Screening. *Id.* at 80. Despite this, STATCare PA Nhi Ngoc Dai ordered no treatment for hypertension when he did the STATCare Intake Assessment and Orders. *Id.* at 98, 99. This lack of treatment did not meet the standard of care. Per AHA/ACC Guidelines, Ms. ██████ should have been started on hypertension therapy. With a blood pressure as high as 172/94 and a history of hypertension, dual therapy should have been started.

47.    On ████████ 2023, Ms. ███████ complained of chest pain and had a blood pressure of 194/118. *Id.* at 431. She was seen in the medical clinic by NP Lacey Beaston. NP Beaston appropriately referred her to the ER by ambulance. *Id.* at 432. Ms. ███████ blood pressure at the ER was initially 182/101. *Id.* at 197. She was treated there with multiple doses of clonidine and she was discharged with the diagnoses of Hypertensive Urgency and Nonspecific Chest pain. She was discharged with a prescription for the blood pressure medication lisinopril. *Id.* at 199.

48.    Ms. ██████ was seen the next day, ████████ 2023 by NP Beaston, who ordered lisinopril 10mg a day. *Id.* at 434. On ████████ 2023, Ms. ███████ was noted to have a diastolic blood pressure of 105 and was seen by NP Lacey Beaston. NP Beaston doubled the dose of lisinopril to 20mg a day. *Id.* at 435, 436. Three hours later, Ms. ██████ blood pressure was still high, 151/103, and NP Hurley ordered a dose of clonidine and "clonidine 0.1 mg prn with parameter." *Id.* at 437. This care also did not meet the standard of care. According to the ACA/ACC Guidelines, clonidine is an inappropriate agent to be prescribed. Clonidine is a "last line" agent. AHA/ACC Guidelines at 1289; *see also* AHA Treatment Algorithm. An appropriate escalation of therapy would have been to add a second first-line hypertensive agent, such as hydrochlorothiazide (HCTZ), to the lisinopril prescription.

49.   On ████████ 2023, a psychiatric NP prescribed prazosin as a psychiatric medication for Ms. ██████████ Med. Rcd. at 504.  Prazosin is also an hypertension therapy, but is a "second-line" line agent.  On ████████ 2023, In response to continued very high blood pressures, NP Hurley increased the lisinopril dose to 30mg a day. *Id.* at 445.

50.   On ████████ 2023, Ms. ██████ had a hypertension chronic care visit with Hurley.  NP Hurley increased the dose of lisinopril to 40mg a day and judged the degree of blood pressure control as "good." *Id.* at 400, 402.  There is no vital sign log in the record from that visit, but Ms. ██████ herself kept a record of her blood pressures that does not show anywhere close to good control. *Id.* at 231.



51.   On ████████ 2023, in response to ongoing very high blood

pressures, *id.* at 231-232, STATCare NP Jorge-Menjivar doubled the dose of clonidine being given and added the blood pressure medication hydralazine to be given twice a day. *Id.* at 446, 448. According to the AHA/ACC Guidelines, hydralazine is a "second line" agent that causes tachycardia and water retention. It should always be prescribed along with a Beta-blocker and a diuretic pill. NP Jorge-Menjivar prescribed neither. AHA Treatment Algorithm. NP Jorge-Menjivar failed to notice (or failed to document) that he knew Ms. ███ was also taking the anti-hypertensive agent prazosin that had been prescribed by psychiatry. ███ Med. Rcd. at 446.

52.    On ███ 2023, Ms. ███ reported that she had been having hand tremors sever since she started taking hydralazine. NP Hurley stopped the hydralazine and appropriately ordered HCTZ instead. *Id.* at 450, 451.

53.    On ███ 2023, psychiatry doubled the dose of prazosin Ms. ███ was taking. *Id.* at 538. On ███ 2023, psychiatry discontinued prazosin. *Id.* at 562.

54.    On ███ 2024, Ms. ███ was seen by Connie Orem MD in an MD clinic for the complaint of a dry cough. No blood pressure was measured. Dr. Orem acknowledged the possibility that the cough could be caused by lisinopril—a dry cough is a common side effect of lisinopril. Dr. Orem did not change Ms. ███ prescription to an equivalent medication without that side effect. *Id.* at 488.

55.    There is no blood pressure log in the records provided to me. Some of the subsequent blood pressures recorded in the notes were normal and some were high, such as a blood pressure of 167/90 on ███ 2024, *id.* at 492, and 142/85 on ███ 2024, *id.* at 494, that indicate to me that her blood pressure control was not ideal.

56.    On ███ 2024, Ms. ███ had a hypertension chronic care visit. No blood pressure was taken. NP Hurley judged the level of blood pressure control

1    to be "good." *Id.* at 417, 421.  In my opinion, it is not consistent with the standard

2    of care to not take a blood pressure reading for a medical visit intended to address

3    hypertension.

4        57.    Ultimately, Ms. ███ blood pressures came under reasonable

5    control (with exceptions noted above).  However, her treatment did not meet the

6    standard of care because, as noted above:

7    • No medications were prescribed at booking despite a report of

8        hypertension and a very high blood pressure.

9    • Jail practitioners used "second-line" and "last-line" agents, such as

10        clonidine and hydralazine rather than recommended "first-line therapeutic

11        classes." Ms. ███ did not see significant improvement in her blood

12        pressures until the first line medication HCTZ was added to lisinopril.

13    • The STATCare practitioner failed to prescribe the required ancillary

14        medications of a beta-blocker and a diuretic when prescribing hydralazine.

15        58.    *Hypothyroidism* – Dr. Boone stated in his write up for Ms. ███ that

16    "[s]he was continued on levothyroxine for hypothyroidism." Murray Report at 169.

17    This is not true. Ms. ███ did not report hypothyroidism at her Receiving

18    Screening, ███ Med. Rcd. at 80, 81, nor did the STATCare Intake Assessment

19    and Orders mention hypothyroidism or levothyroxine, *id.* at 99. The first time

20    hypothyroidism was mentioned in the chart is on ███ 2023, nearly a

21    month after she was booked into the Jail, when Ms. ███ was seen by NP

22    Beaston, who wrote "Patient is also requesting to have labs to test her thyroid and

23    states she was on levothyroxine prior to coming to jail." *Id.* at 439. The Surescripts

24    report for Ms. ███ did not, however, include any active prescription for

25    levothyroxine. *Id.* at 504.  Nevertheless, instead of waiting for the results of the

26    thyroid screening tests, NP Beaston ordered levothyroxine 75mg a day. *Id.* at 440.

27    Crucially, when the Thyroid Stimulating Hormone (TSH) was drawn 36 hours later,

28

1  on █████████ 2023, it showed that Ms. ██████ did not have hypothyroidism.[11]

2  *Id.* at 630.  The next time Ms. ████████ had labs drawn was ██████ 2024 and no

3  TSH was measured.  *Id.* at 642.  Ms. ████████ continued to take levothyroxine for the

4  entirety of her incarceration.

5      59.    This care fell below the standard of care because it appears that

6  Ms. ████████ was treated with medication for hypothyroidism for many months when

7  she did not, in fact, have hypothyroidism.  Since the Surescripts report did not show

8  any active levothyroxine prescription for Ms. █████████ NP Beaston should have

9  waited for the labs to return before ordering the drug.  And when Ms. █████████ TSH

10  was found to be normal two days later, NP Beaston should have known and then

11  communicated to Ms. ████████ that she did not have hypothyroidism.  NP Beaston

12  also should have discontinued the prescription.  This inaccurate diagnosis gave the

13  Ms. ████████ erroneous belief that she has hypothyroidism with all of the unnecessary

14  concern and anxiety that any chronic medical diagnosis generates. Also, the

15  unnecessary treatment placed Ms. █████████ at risk of experiencing the drug's side

16  effects, which include suppressing the function of her own thyroid gland, weight

17  gain, headaches, leg cramps, change in menstrual cycle, hair loss and others.

18  **G.     ████████ ██████████ – Patient 12 – █████████**

19      60.    Dr. Boone reviewed the medical record for Mr. ██████ and concluded that

20  the care provided met the standard of care.  Dr. Boone found that the Jail provided

21  appropriate treatment for, among other things, Mr. ██████ hypertension, Gastro-

22  esophageal Reflux Disease ("GERD"), abnormal lipids, and mental health issues.

23  Murray Report at 170.

24      61.    I agree that the care provided for Mr. ██████ hypertension and hernia

25

26  ───────────────────────

    [11] When the TSH was drawn, Ms. ██████ had already received two doses of
27  levothyroxine.  However, it usuall █████████ several weeks for levothyroxine to
    stabilize an abnormal TSH.  One and ½ days and two doses of levothyroxine would
28  not be enough to change an abnormal TSH test to normal.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.

1  met the standard of care.  In my opinion, however, the treatment provided to him for

2  GERD and asthma did not meet the standard of care.

3      62.    *GERD* – The Jail failed to provide appropriate and timely treatment for

4  Mr. ██████ GERD, causing him unnecessary pain and suffering.  Surescripts verified

5  that Mr. ████ was prescribed dexlansoprazole (Dexilant) for GERD.  ████ Med.

6  Rcd. at 208.  However, dexlansoprazole is not on the NaphCare formulary, so the

7  STATCare practitioner who reviewed Mr. ██████ current meds in Surescripts

8  discontinued dexlansoprazole and substituted omeprazole.  *Id.* at 1161.  Almost

9  immediately, Mr. ██████ began to complain of GERD symptoms on ████████ 2023,

10  ████ 2023, ██████ 2023.  *Id.* at 841.  In response, Mr. ████ was given Tums

11  antacids to use in addition to omeprazole.  *Id.* at 115.

12      63.    On ██████ 2023, Mr. ████ requested doubling the dose of omeprazole.

13  *Id.* at 841.  This request was denied.  On ██████ 2023, Mr. ██████ complained that

14  GERD symptoms were making it hard for him to sleep.  *Id.* at 841.  Mr. ████

15  continued to complain of unrelenting GERD symptoms.  On ████████ 2023, he

16  requested Dexilant.  *Id.* at 843.  This request was denied by Dr. Rafi.  *Id.* at 857.

17      64.    On ████████ 2023, he requested to see a physician about GERD

18  instead of an NP.  *Id.*  On ████████ 2023, NP Christine Sullivan discontinued

19  omeprazole and ordered pantoprazole and famotidine.  For the first time, records

20  from Mr. ██████ outside GI specialist, Dr. Mathew Viernes, were requested on

21  ████████ 2023.  *Id.* at 844.  On the same day, NP Stacy Thompson wrote a

22  short note about reviewing these records that stated that Mr. ██████ last endoscopy

23  was in 2020 and showed inflammation of the esophagus.  *Id.* at 859.

24      65.    On ████████ 2023, Mr. ████ wrote: "NEED MD

25  APPOINTMENT-PLEASE CONFIRM WHEN AVAILABLE."  He reported that

26  his GERD pain was 10/10.  *Id.* at 844.  On ████████ 2023, a nurse asked

27  STATCare for permission for Mr. ████ to see a physician.  *Id.* at 844.  On

28  ████████ 2023, STATCare stated they had reviewed old medical records (no

1  summary) and gave permission for Mr. ███ to see a physician "regarding severe

2  GERD s/s." *Id.* at 845.

3      66.    On ████ 2023, Mr. ███ asked for two mattresses so he could

4  elevate his head at night to alleviate his GERD symptoms.  This was denied.  *Id.*

5  at 868.  On ████ 2023, Mr. ███ asked when he would get to see a physician.

6  *Id.* at 846.  On ████ 2023, STATCare discontinued pantoprazole and

7  restarted omeprazole.  *Id.* at 863.  On ████ Milk of Magnesia was added to

8  Mr. ███'s GERD treatments.  *Id.* at 864.

9      67.    On ████ 2023, NP Nicholas Kahl reviewed Mr. ███ outside

10  medical records, which confirmed a diagnosis chronic esophagitis, GERD, and

11  Barrett's esophagus. NP Kahl placed a referral for Mr. ███ to see a GI specialist.

12  *Id.* at 864.  Mr. ███ continued to complain of ongoing GERD pain.  On

13  ████ 2023, Mr. ███ requested an extra blanket to elevate his head.  This

14  was approved.  *Id.* at 870.  On ████ 2023, a note stated "worsening

15  abdominal pain due to GERD claimed current treatment regimen are ineffective.  IP

16  is requesting to have extra mattress and demanding to see the doctor right away.  IP

17  was threatening, stating he will go mandown." *Id.* at 870.

18      68.    On ████ 2023, NP Frederick Wycoco switched from

19  omeprazole back to pantoprazole.  *Id.* at 871.

20      69.    On ████ 2023, Dr. Molina approved a second mattress and

21  finally ordered dexlansoprazole. ███ Med. Rcd. at 873.  On ████ 2024,

22  nearly a month later, STATCare NP Sophia Barnes wrote that dexlansoprazole had

23  not yet arrived.  *Id.* at 877.  It was first given on ████ 2024, more than three

24  months after it was ordered. ███ MAR Rcd. at 27)  On ████ Mr. ███ saw

25  Dr. Molina about increasing GERD symptoms at night that Mr. ███ felt were

26  causing asthma attacks.  Dr. Molina wrote to "expedite f/u with gastroenterology."

27  ███ Med. Rcd. at 890.  Mr. ███ had still not seen a gastroenterologist as of

28  ████ 2024, the date the medical records produced to me ended.

70.     In my opinion, the care provided to Mr. ▮▮ for gastro-esophageal disease did not meet the standard of care.

- His outside prescription for dexlansoprazole was discontinued inappropriately at booking.
- Multiple medication trials failed before Mr. ▮▮ was re-prescribed dexlansoprazole seven months later.  Mr. ▮▮ improved on dexlansoprazole, which he should have been on the entire time.
- Outside medical records were not requested for three months.  No one ever called Mr. ▮▮ outside GI specialist to coordinate care.
- A request for Mr. ▮▮ to see a GI specialist was made on ▮▮▮▮ 2023.  Mr. ▮▮ had still not seen a GI specialist as of ▮▮▮▮ 2024.

71.     *Asthma* – Dr. Boone did not opine on the care provided to Mr. ▮▮ for his asthma.  In my opinion, that care did not meet the standard of care.  At intake, staff did not take a peak flow measurement.  Then, even though staff confirmed through Surescripts that Mr. ▮▮ was prescribed a rescue inhaler in the community, the STATCare practitioner who did the Intake Assessment and Orders did not allow Mr. ▮▮ to have a KOP ("keep on person") rescue inhaler.  Instead, the practitioner authorized the nurses to give albuterol nebulizer treatments when requested.  Mr. ▮▮ asked for these treatments three times in the next four weeks and several times in ▮▮ 2023.  To discontinue an active KOP rescue inhaler prescription without an examination of the patient by a medical practitioner violated the standard of care.  Asthma attacks can be sudden and severe enough that patients do not have the opportunity to alert nurses to their distress.  Patients must have the ability to treat themselves in an emergency.

72.     Then, on ▮▮▮▮ 2023, Mr. ▮▮ wrote a medical request "[n]eed inhaler to clear lungs." *Id.* at 861.  He was scheduled to see a practitioner.  However, Nicolaus Rosete NP declined to see Mr. ▮▮ for this request because Mr. ▮▮ had seen Dr. Rafi the day before for a different medical problem. *Id.*

1    at 861.  This makes no sense to me, since Dr. Rafi's note says nothing about asthma.

2    Nevertheless, Mr. ███ request for a rescue inhaler was ignored.

3        73.    On ███ 2024, Mr. ███ had an asthma attack.  RN Kathy Jordan

4    noted wheezing and gave Mr. ███ an albuterol nebulizer treatment.  She also did

5    three peak flow measurements which were markedly abnormal.  *Id.* at 199.  Two

6    days later, on ███ 2024, Mr. ███ was seen by Dr. ███ Molina for an

7    asthma chronic care appointment.  Dr. Molina measured no peak flows.  Dr. Molina

8    finally prescribed a KOP rescue inhaler.  *Id.* at 834, 838.  This was appropriate, but

9    should have been provided when Mr. ███ was booked.  However, per the asthma

10   treatment guidelines I discussed in my report, Dr. Molina should have also

11   prescribed an inhaled steroid.  On ███ 2024, Mr. ███ stated that the rescue

12   inhaler was not helping enough; he was using his inhaler up to ten times a night.  *Id.*

13   at 851.  In the records that I reviewed, which end on ███ 2024, there was no

14   response to this request.

15       74.    It is my opinion that, for the reasons set forth above, the care provided

16   for Mr. ███ asthma did not meet the standard of care.

17   **H.    ███ ███ – Patient 71 – ███**

18       75.    John Pulvino, PA, reviewed Mr. ███ medical file for

19   Dr. Murray.  PA Pulvino concluded that Mr. ███ care met the standard of

20   care.  He wrote:

21   > On ███ 23, Mr. ███ was received at the county jail.  A provider
     > inta███ sessmen ███ mpleted the same day and he was identified as
22   > having chronic hypertension.  He was started ███asc and scheduled
     > for BP checks and a provider follow up.  Mr. ███ was followed in
23   > chronic care clinic as well as frequent provide ███ or BP checks, lab
     > evaluations, and acute complaints.  There was routine attention to his
24   > hypertension treatment including medication changes and adjustments.
     > Acute complaints were addressed appropriately and very timely.

25

26   Murray Report at 216.

27       76.    I disagree with PA Pulvino's conclusion.  Based on my review, the care

28   provided to Mr. ███ did not meet the standard of care.

1. PA Pulvino does not define what medical standard of care he is using to compare Mr. ▮▮▮▮'s treatment to. I am using the AHA/ACC Guidelines.

2. As a starting point, the SDSO should have Chronic Disease Management Guidelines for PA Pulvino to refer to but, despite being recommended by the NCCHC in 2017 and by Dr. Venters, and required by NaphCare's contract with the SDSO, none have yet been developed. These are especially important for midlevel practitioners, like PA Pulvino, who do not have as much training as physicians.

3. PA Pulvino states that "A provider assessment was completed the same day [as Mr. ▮▮▮▮ Receiving Screening, ▮▮▮ 2023] and he was identified as having chronic hypertension." This statement implies that Mr. ▮▮▮▮ was seen face-to-face by a medical practitioner. That was not the case. PA Pulvino was referring to a remote STATCare practitioner (in this case, based in Las Vegas) who ordered the blood pressure medication Norvasc based on Mr. ▮▮▮▮ intake blood pressure. ▮▮▮▮ Med. Rcd. at 65, 66. The medical standard of care requires Mr. ▮▮▮▮ to also receive a complete physical examination with particular attention paid to the cardiovascular system. AHA/ACC Guidelines at 1281; AHA Treatment Algorithm. The STATCare NP could not do this since he was in Las Vegas at the time. A face-to-face examination by a practitioner at the time of booking for all patients with chronic diseases such as hypertension, was recommended by the 2017 NCCHC team and Dr. Venters, but is still not being done.

4. The first time Mr. ▮▮▮▮ saw a practitioner face-to-face was on ▮▮▮▮ 2023, though not for chronic hypertension but instead because Mr. ▮▮▮▮ complained of leg swelling. At that time, Dr. Michael Abbo confirmed bilateral leg swelling but did no other physical examination, such as a heart or lung examination. Dr. Abbo discontinued Norvasc and prescribed losartan for hypertension instead. ▮▮▮▮ Med. Rcd. at 46. Even

1    though Dr. Abbo felt the need to change Mr. ███████ prescription based on

2    his finding of bilateral leg swelling, no medical practitioner ever documented

3    looking at Mr. ███████ legs again to document whether this symptom

4    resolved or not.

5    5.    On ███████ 2023, Dr. James Veltmeyer wrote "HTN well controlled on

6    losartan." *Id.* However, the blood pressure goal for patients with chronic

7    hypertension per the AHA/ACC Guidelines is <130/80. Applying this

8    benchmark, Mr. ███████ blood pressure was not "well-controlled."

| | |
|---|---|
| ██/2023 11:53:43 PM | 154 / 99 |
| ██/2023 1:36:42 PM | 159 / 98 |
| ██/2023 11:35:38 PM | 134 / 84 |
| ██/2023 8:44:15 AM | 136 / 85 |
| ██/2023 11:02:17 AM | 132 / 88 |
| ██/2023 9:03:37 AM | 146 / 83 |
| ██/2023 11:07:32 | 150 / 91 |

17   ███████ Med. Rcd. at 35.

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

6.  In fact, using the AHA/ACC Guidelines, Mr. ██████ blood pressures were never well controlled during his incarceration.

| | |
|---|---|
| ███2024 4:37:59 PM | 141 / 85 |
| ███2024 9:11:34 PM | 158 / 94 |
| ███2024 9:31:52 AM | 153 / 96 |
| ███2024 8:38:37 AM | 142 / 96 |
| ███2024 9:09:01 PM | 158 / 88 |
| ███2024 1:35:56 PM | 126 / 77 |
| █/2024 10:02:17 PM | 133 / 84 |
| █/2024 5:33:15 PM | 160 / 73 |
| █/2024 9:06:44 AM | 134 / 83 |

*Id.*

**I.    ████  ████ – Patient 19 – ████**

77.    Dr. Boone reviewed Mr. ████ medical record and concluded that the care he received met the standard of care.  He concluded, among other findings, that the Jail provided appropriate care for hypertension, allergic rhinitis, and GERD; that the Jail provided appropriate laboratory screening tests that were unremarkable; that the Jail provided appropriate sick call visits; and Mr. ████ "[h]ypertension was well managed with medications."  Murray Report at 175.

78.    I disagree with Dr. Boone's conclusion.  In my opinion, at least some of the care provided to Mr. ████ did not meet the standard of care.

79.    *Hypertension* – Mr. ████ had his receiving screen done on ████ 2021.  His diagnosis of hypertension was identified and his outside prescription of

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| █/2021 4:56:14 PM | 152 / 87 | 98.5 | 77 | 16 | 0ft 0in | NAlb | 98 | NA | NA | 0 |
| █/2021 3:41:11 PM | 157 / 89 | 98.7 | 71 | 18 | 0ft 0in | NAlb | 97 | NA | NA | 0 |
| █/2021 1:56:45 PM | 140 / 84 | 97.8 | 94 | 18 | 0ft 0in | 0 lb | 99 | NA | NA | 102.67 |
| █/2021 5:03:30 PM | 149 / 94 | 98.1 | 66 | 16 | 0ft 0in | 0 lb | 99 | NA | NA | 112.33 |
| █/2021 1:11:32 PM | 177 / 88 | 98.6 | 92 | 16 | 0ft 0in | NAlb | 98 | NA | NA | 112.67 |
| █/2021 1:53:11 PM | 152 / 93 | 0 | 67 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 112.67 |
| █/2021 1:53:42 PM | 152 / 93 | 0 | 67 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 112.67 |
| █/2021 1:54:05 PM | 152 / 93 | 0 | 67 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 112.67 |
| █/2021 1:37:19 PM | 152 / 91 | NA | 80 | 17 | 0ft 0in | 0 lb | NA | NA | NA | 111.33 |

lisinopril was continued without interruption. He did not have good control of his
blood pressure for the first seven months of his incarceration. ██ Med. Rcd.
at 39.

80.    Nobody commented on Mr. ██ elevated blood pressure until he
was seen on ██ 2022 by ██ Molina, MD, because of a complaint of cough.
Dr. Molina correctly noted that chronic dry cough is a common side effect of
lisinopril, stopped the lisinopril and started a different blood pressure medication,
amlodipine. *Id.* at 163, 164. Mr. ██ blood pressures immediately improved.

81.    On ██ 2022, Mr. ██ was seen for his first Hypertension
Chronic Care visit by Stacy Thompson, NP. NP Thompson increased his dose of
amlodipine. *Id.* at 452. Mr. ██ then had a chronic care visit on ██ 2023
(*id.* at 538), ██ 2023 (*id.* at 543), ██ 2023 (*id.* at 557), and
██ 2023 (*id.* at 568). Losartan was added as a second agent for

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ██2022 2:55:11 PM | 104 / 72 | 0 | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 82.67 |
| ██2022 1:39:17 PM | 136 / 84 | 0 | 99 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 101.33 |
| ██2022 1:06:24 PM | 113 / 79 | 0 | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 90.33 |
| ██2022 10:31:43 AM | 122 / 86 | 0 | 79 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 98 |

hypertension on ██ 2023. *Id.* at 326. Mr. ██ had labs drawn on
██ 2022, ██ 2022, ██ 2022, and ██ 2023.

82.    In my opinion, the Jail did not meet the standard of care for
hypertension for the first 11 months of Mr. ██ incarceration. Thereafter, the Jail
met the standard of care.

83.    I discussed Hepatitis C screening in my report. Mr. ██ should have
been screened for Hepatitis C infection when he first had labs drawn unless he
specifically opted out. Not performing this screen violated the standard of care.

84.    I also note that Mr. ██ never received a Health Assessment during
his incarceration..

**J.    ██ ██ – Patient 53 – ██**

85.    Dr. Leonardson reviewed Mr. ██ medical record and concluded

1  that the care he received for hypertension, hyperlipidemia, and diabetes mellitus met

2  the standard of care.  Dr. Leonardson wrote:

> Mr. ███ chronic care diagnoses were well-managed, however, the
> follo ███ bs, fundoscopic exam and foot exam were not done.
> Mr. ███ also was not offered vaccines that are indicated for diabetic
> patie ███ is possible that there was a record of these being up to date
> and that this record is not in the set of records available to me.

6  Murray Report at 201-02.

7      86.    I agree with the problems with Mr. ███ care identified by

8  Dr. Leonardson.  I disagree, however, with Dr. Leonardson's conclusion that the

9  care provided to Mr. ███ for his diabetes met the standard of care.  In some

10  respects, Mr. ███ was treated appropriately; in others, his care did not meet the

11  standard of care.

12      87.    At booking, Mr. ███ only diabetic medication, Metformin, was

13  verified through Surescripts and appropriately continued.  ███ Med. Rcd. at 179.

14  Mr. ███ had a chronic care visit on ███ 2023.  *Id.* at 201.  His A1C on ███

15  2023 was 7.1 (goal of <7.0) which is good control.  *Id.* at 170.  However, since the

16  A1C measures average blood glucose levels over the previous 3 months, and

17  Mr. ███ had only been incarcerated for 6 weeks, this A1C needed to be repeated.

18  This was not ordered.  Dr. Leonardson wrote "Mr. ███ had excellent glucose

19  control . . . while he was incarcerated."  Murray Report at 201.  Without a repeat

20  A1C, it is not possible to know this for sure.  His blood sugar log does, however,

21  show his blood sugar under control for most of his incarceration.  ███ Med. Rcd.

22  at 29.  Nevertheless, I agree with Dr. Leonardson that Mr. ███ was also not

23  offered a foot exam or retinal screening as he should have been.  I agree with

24  Dr. Leonardson that "There is no evidence that he was offered or evaluated for

25  eligibility for other vaccines."  Mr. ███ also did not receive opt-out Hepatitis C

26  screening.

27      **K.    ███ ███ – Patient 54 – ███**

28      88.    Dr. Leonardson reviewed Mr. ███ medical record and concluded

1  that the care the Jail provided to him for a fractured clavicle, hypertension,

2  hyperlipidemia, and opioid use disorder, hypothyroidism, psychiatric illness met the

3  standard of care.  She wrote: "Mr. ███ was a complicated patient who refused

4  his lab work.  This made the management of his hypothyroidism and hyperlipidemia

5  impossible."  Murray Report at 202.

6      89.    I disagree with Dr. Leonardson's conclusion.  In my opinion, the

7  treatment he received for hypertension and the prescription of levothyroxine (a

8  hypothyroidism medication) did not meet the standard of care.

9      90.    *Hypertension* – Mr. ███ was taking no medications at the time he

10  was booked into the Jail on █████ 2023.  Previous diagnoses of

11  hyperlipidemia and hypertension are marked on his Receiving Screening.  ███

12  Med. Rcd. at 15.  The STATCare practitioner who did his Intake Orders wrote to

13  "restart meds from last incarceration."  *Id.* at 244.  There is no documentation as to

14  when the last incarceration was.  The meds restarted were amlodipine, atorvastatin,

15  and levothyroxine.  *Id.* at 375, 377, 381.

16      91.    Mr. ███ was seen for a hypertension chronic care visit on

17  █████ 2023, where Dr. Molina judged his level of hypertension control as

18  "fair."  ███ Med. Rcd. at 277.  Using the American Heart

19  Association/American College of Cardiology hypertension treatment goal of

20  <130/80, Mr. ███ blood pressure was never well controlled during his

21  incarceration.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

| | | |
|---|---|---|
| ███ 2023 2:45:51 PM | 147 / 92 | |
| ███ 2023 11:06:43 AM | 144 / 92 | |
| ███ 2023 1:46:47 PM | 141 / 86 | |
| ██ 2023 2:04:12 PM | NA / NA | |
| ███ /2023 4:32:04 PM | NA / NA | |
| ███ 2023 4:32:25 PM | NA / NA | |
| ██ 2023 10:02:28 AM | 0 / 0 | |
| ██ 2023 2:33:15 PM | NA / NA | |
| ██ /2024 1:52:46 PM | 143 / 83 | |

92.    Because his blood pressure was never at goal, the AHA/ACC Guidelines recommend an escalation of blood pressure medications.  This could have been done by increasing his amlodipine dose from 5mg to 10mg a day, or by adding a second agent, such as HCTZ 12.5 mg.  Neither was done.  For this reason, the treatment provided fell below the standard of care.

93.    *Prescription of levothyroxine* – The Jail prescribed a drug, levothyroxine, for Mr. ███ at intake because, during his most recent prior incarceration, he received the same medication.  It is not clear from my review of his medical record, however, that there was any reason to prescribe the drug for Mr. ███

94.    Levothyroxine is typically used to treat hypothyroidism.  It is, however, sometimes overprescribed.[12]  Levothyroxine can have a number of side effects, including, *inter alia*, chest pain, difficulty breathing, fatigue, fainting, fever, nausea, and tremors, though the dosage prescribed for Mr. ███ was unlikely to cause serious side effects.  In any event, as with any medication, it should not be prescribed for a patient unless it is needed to treat a condition, the benefits of the drug outweigh the risks, and the patient provides informed consent.

---

[12] American Thyroid Association, *Hypothyroidism: Is Levothyroxine Therapy Overused?*, 12:4 Clinical Thyroidology for the Public (2019).

95.    Mr. ███ did not mention hypothyroidism as one of his diagnoses at the receiving screening. ███ Med. Rcd. at 15. The word "hypothyroidism" is mentioned only once in his entire chart in a task for a Medical Doctor Sick Call. *Id.* at 22. (Relatedly, I do not see anywhere in the medical file that a doctor ever saw Mr. ███ I assume that the diagnosis of hypothyroidism was inferred from the fact that levothyroxine was one of the medications started from his past incarceration. However, as I mentioned above, levothyroxine is sometimes overprescribed. From the file, there is no indication that the STATCare practitioner knew why levothyroxine had been prescribed before.

96.    Given this uncertainty and the drug's side effects, the Jail should have, before prescribing levothyroxine, taken steps to determine whether Mr. ███ had a condition warranting administration of the drug. Medical staff could have performed a chart review of the medical records from Mr. ███ last incarceration to determine why levothyroxine was prescribed. Alternatively, the Jail could have performed routine thyroid blood tests. The Jail did neither of these things.[13] Accordingly, by prescribing levothyroxine without confirming whether Mr. ███ had any condition warranting receipt of the medication, the care provided to Mr. ███ did not meet the standard of care.[14]

---

[13] Th██ ██id order such a test approximately thr██████ fter he w██ ked. Mr. ███ reportedly refused the blood test on ███ 2023. ███ Med. Rcd. ███ When asked if the lab draw should be ████ e██, Dr. M████ rote "*Patient has the right to refuse medical evaluation and/or treatment. If patient has signed the refusal form I am comfortable with patient refusing lab wo████ need to reschedule if patient refused.*" *Id.* This was a medical mistake. Mr. ███ did not refuse a lot of medical requests. No one told him why blood labs important. No one asked why he refused this blood draw or if he would be willing to allow his blood to be drawn another time. He may have allowed the blood to be drawn another time, especially if medical staff explained to him the reason for the blood draw.

[14] In addition, Mr. ███ was a heroin/fentanyl user. ███ Med. Rcd. at 37, 305. As mentioned ████ report, the standard of ████████ nt who is at high risk for chronic infectious diseases, such as Mr. ███ is that he should receive opt-out testing for Hepatitis C, HIV, and Latent ████osis infection. This was not done. Nor is there any documentation that Mr. ███ was ever told that he could

**L.**      ███████ ████ – **Patient 41** – ███████

97.    PA-C Erin Freeman reviewed the medical record for ████ ████ and concluded that his care met the standard of care.  She wrote: "Despite having a history of status epilepticus, patient's seizure disorder has remained well-controlled during this incarceration.  He was compliant with his three anticonvulsants with no lapses in therapy."  Murray Report at 190-91.

98.    I agree with PA Freeman that, overall, the care provided for Mr. ████████ seizure disorder met the standard of care.  That said, his care was not without problems.  First, although Mr. ██████ submitted willingly to both the Medical Clearance and Receiving Screening, RN Calderon wrote that Mr. ██████ refused a full Health Assessment the same day. ██████ Med. Rcd. at 205.  This refusal was unwitnessed by another person.  I find this curious and not particularly credible.  In any case, no one ever attempted again to do a Health Assessment even though Mr. ██████ was conveniently housed in the MOB.  Second, Mr. ██████ should have had a chronic care visit including checking on seizure medication levels within six months of seeing a doctor one day after he was booked into the Jail.  Neither the chronic care visit nor the labs were ever done.

**M.**      ███████ ████ – **Patient 77** – ███████

99.    PA Pulvino reviewed the medical record for ██████ ████ and concluded that her care met the standard of care.  He wrote: "Ms. ██████ arrived on ██████ 2023 and was assessed and diagnosed with hypertension and asthma. She was immediately continued on her FW medications and blood pressure checks were ordered.  She was followed regularly for her chronic problems and acute issued were managed timely.  When additional chronic problems were identified they were monitored and treated appropriately.  Overall Ms. ██████ medical care was

_____

have any of these tests done by request.

1  appropriate and timely." Murray Report at 220-21.

2      100.   I disagree with PA Pulvino's conclusion.  In my opinion, the care

3  received by Ms. ███ did not meet the standard of care.

4      101.   *Asthma* – I discussed the Standard of Care for asthma in some detail in

5  my initial report.  The Jail complied with parts of the standard of care by prescribing

6  her an albuterol rescue inhaler and allowing her to keep her rescue inhaler on her

7  person.  However, the standard of care for asthma requires bedside peak flow tests at

8  booking and at each chronic care visit.  The NCCHC Report specifically

9  recommended that these tests be conducted, DUNSMORE0260635, as did the

10  Venters Report, SD_21537.  Such tests did not occur for Ms. ███  I note

11  especially the asthma chronic care visit that Ms. ███ had with Dr. David

12  Christensen on ███ 2024. ███ Med. Rcd. at 303.  The chronic care form

13  has a space for 3 "Peak Expiratory Flow" measurements.  These were left blank. *Id.*

14  at 306.  The vital signs were also left blank.  Finally, the SDSO should have Asthma

15  Chronic Disease Management guidelines but does not.  Accordingly, the asthma

16  care provided to Ms. ███ did not fully meet the standard of care.

17      102.   *Review of ultrasound* – Ms. ███ had an abdominal ultrasound

18  performed on ███ 2023 to look for gall stones (not to evaluate her umbilical

19  hernia as PA Pulvino thought.  This is another example of a factual error in the

20  reports). *Id.* at 31, 32.  PA Pulvino states that this ultrasound was normal.

21  However, the ultrasound report is not present in the records sent to me.  More

22  importantly, I can see no place in the medical record where the ultrasound results

23  were mentioned in a chart note or discussed with Ms. ███  I discussed in my

24  report the problem of study results not being reviewed, interpreted and reported.

25      103.   *Refusals of care* – I discussed in my report the immense problem the

26  SDSO has with patient refusals of medical care and how these negatively impact

27  medical care and harm patients.  Ms. ███ chart provides another example.

28  There are around 290 refusal forms in Ms. ███ chart.  Two in particular are

1  worth mentioning. Ms. ███ was appropriately scheduled for blood labs. She

2  reportedly refused the blood draw on ███ 2023. However, the refusal—as

3  well as the refusal to sign the refusal form—was witnessed only by two deputies.

4  ███ Med. Rcd. at 62. This refusal should have generated a counseling session

5  with a medical provider, and this was scheduled with Dr. Christensen on

6  ███ 2023. However, Dr. Christensen did not see Ms. ███ or perform

7  any counselling. He wrote only "You may cancel the labs." *Id.* at 32. Less than a

8  month later, Ms. ███ was admitted to the MOB due to an episode of Paroxysmal

9  Supra Ventricular Tachycardia (PSVT). *Id.* at 33. (I am unable to verify the

10  diagnosis because the EKGs taken then are not in the records I received.) Staff in

11  the MOB should have spoken with Ms. ███ about the importance of those lab

12  tests and drawn the blood for them, but did not do so. Similarly, PA Pulvino

13  erroneously states that Ms. ███ was counseled about poor medical compliance

14  on ███ 2024. However, this counselling session never occurred. NP Teresa

15  Hurley did not talk to Ms. ███ she simple discontinued a number of prescribed

16  treatments. *Id.* at 40. All of this is another example of how the refusal system at the

17  SDSO is broken.

18      104. *Hypertension* – Ms. ███ outside blood pressure medications were

19  appropriately continued when she was booked. However, her blood pressures were

20  never well controlled compared to the American Heart Association/American

21  College of Cardiology standards, good control being <130/80. As an example, the

22  last three blood pressures recorded in Ms. ███ blood pressure log were:

| | | |
|---|---|---|
| ███ 2024 1:17:12 PM | 143 / 70 |
| ███ 2024 1:31:00 PM | 151 / 75 |
| ███ 2024 1:39:09 PM | 151 / 75 |

27  ███ Med. Rcd. at 46.

28      105. Soon after these three blood pressures, Ms. ███ had a hypertension

1    chronic care visit with Dr. Christensen on ▆▆▆▆ 2024.  *Id.* at 303.

2    Dr. Christensen did not measure a blood pressure at this hypertension chronic care

3    visit.  No adjustments were made to Ms. ▆▆▆▆ blood pressure medications.

4    Dr. Christensen did not discuss the previously missed labs nor reorder them.  In my

5    opinion, since Ms. ▆▆▆▆ blood pressure was never controlled and no effort was

6    made to adjust her medications to improve her blood pressure control, the care

7    provided for Ms. ▆▆▆▆ hypertension did not meet the standard of care.

8        106.   In addition to these problems, I also found no Health Assessment in

9    Ms. ▆▆▆▆ chart.

10       107.   Lastly, there are also multiple examples of long delays between a

11   Health Request and a face-to-face assessment.  Examples include:

12   • Health request for eczema cream submitted ▆▆▆▆ 2023 completed

13        ▆▆▆▆ 2023, ▆▆▆ Med. Rcd. at 22;

14   • Repeat Health request for eczema cream submitted ▆▆▆▆ 2023,

15        completed ▆▆▆▆ 2023, *id.* at 22;

16   • Health request for asthma and hernia submitted ▆▆▆▆ 2023 completed

17        ▆▆▆▆ 2023, *id.* at 22;

18   • Health request "req to be checked for heart disease, waking up gasping"

19        submitted ▆▆▆▆ 2023 completed ▆▆▆▆ 2023, *id.* at 23.

20   **N.    ▆▆▆ ▆▆▆ – Patient 22 – ▆▆▆▆**

21       108.   Dr. Boone reviewed Mr. ▆▆▆ medical record and concluded that the

22   care provided to him met the standard of care.  Dr. Boone found that the care

23   provided to Mr. ▆▆▆ met the standard of care because the Jail obtained and

24   reviewed prior medical records; provided treatment that controlled his diabetes;

25   provided medication for hypertension and hyperlipidemia; properly managed his

26   glaucoma; and appropriately addressed complaints of shoulder pain.  Murray Report

27   at 177.

28       109.   I disagree with Dr. Boone.  In some respects, Mr. ▆▆▆ care met the

1  standard of care, but in other respects, the care provided to Mr. ███ did not meet

2  the standard of care.

3        110.  *Elevated PSA* – The PSA is a screening test for prostate cancer.

4  Dr. Boone did not mention the fact that Mr. ███ had an elevated PSA test result at

5  the Jail on ███ 2024.  This was noted by NP Nicolaus Rosete: "PSA 8.74,

6  reviewed providers notes, persistently elevated with 2 negative biopsies, no new

7  orders."  *Id.* at 33.  It is true that Mr. ███ had had a history of multiple elevated

8  PSAs and was being followed by a Kaiser urologist.  However, what NP Rosete

9  failed to notice (as did NP Stacy Thompson who reviewed the Kaiser records on

10  ███ 2024, *id.* at 32, and NP Nicholas Kahl who reviewed the Kaiser records

11  on ███ 2023, *id.* at 30) is that Mr. ███ Kaiser urologist was so concerned

12  by his persistent elevated PSA and another test that showed that Mr. ███ had a

13  "37% chance of detecting prostate cancer on repeat Bx [biopsy]" that she had

14  ordered an MRI of the prostate on ███ 2022 shortly before Mr. ███ was

15  incarcerated.  *Id.* at 413.  This MRI had not been done before he was incarcerated.

16  *Id.* at 413, 415, 418.  No one from the Jail ever contacted Dr. Cogain to coordinate

17  care nor did anyone schedule the MRI.  The medical care provided to Mr. ███ for

18  his elevated PSA and the possibility that he has prostate cancer did not meet the

19  standard of care and also violated the principle of continuity of care that I discussed

20  in my report.

21        111.  *Glaucoma* – Mr. ███ prescription for Timolol eye drops was

22  appropriately continued when he arrived at the jail.  However, review of his Kaiser

23  Permanente records shows that he had been scheduled for an appointment with his

24  outside ophthalmologist in ███ 2022.  *Id.* at 336.  Not only was this

25  appointment not kept, the Jail never referred Mr. ███ to an ophthalmologist or

26  optometrist for an eye check-up throughout the 15-months he was incarcerated.  The

27  lack of continuity of care and the lack of appropriate follow up care for Mr. ███

28  retinal disease did not meet the standard of medical care.

112.   *Preventative care* – Kaiser Permanente records show that Mr. ▮ was overdue for a colonoscopy to screen for colon cancer.  ▮ Med. Rcd. at 342.  He had been scheduled to see a gastroenterologist to have this done.  *Id.* at 407.  The Jail medical staff did not contact the gastroenterologist to coordinate care, nor did they schedule a colonoscopy or other method of screening for colon cancer.

113.   The jail also did not screen Mr. ▮ for Hepatitis C despite recommendations for opt-out screening of all incarcerated people as well as the fact that Mr. ▮ had elevated liver enzymes when his labs were checked on ▮ 2023 (▮ Med. Rcd. at 85), which was an independent reason to screen him for hepatitis C.  The lack of attention to these two preventative care issues did not conform to the standard of medical care.

114.   *Diabetes* – The Jail performed a receiving screening on ▮ 2022.  ▮ Med. Rcd. at 4.  His only prescription was metformin, which was ordered on ▮ 2022.  *Id.* at 565.  Dr. Rafi also ordered an insulin sliding scale for Mr. ▮ although he had never been on insulin before.  *Id.* at 543.  The sliding scale insulin order violated the standards of care found in Diabetes in Detention:  "The sole use of sliding-scale insulin is strongly discouraged."  Diabetes in Detention at 549.  Mr. ▮ diabetes remained in good control throughout his incarceration, as evidenced by his A1C results, measured on ▮ 2023, ▮ Med. Rcd. at 85, and ▮ 2024, *id.* at 89.

115.   Finally, the Jail never performed a Health Assessment for Mr. ▮ during his incarceration.  This violated the SDSO Operations Manual Policies and Procedures.

**O.**   **▮ ▮ – Patient 24 – ▮**

116.   Dr. Boone reviewed Mr. ▮ medical record.  Dr. Boone noted that Mr. ▮ was a "56-year-old male with medical history of diabetes, hypertension, methamphetamine use disorder, chronic ankle pain s/p ankle fusion, chronic shoulder pain, and prior abdominal hernia repair."  Murray Report at 178.  Among

1  his findings, Dr. Boone wrote:

2       Regarding diabetes mellitus, Mr. ███ was on a weekly GLP1-agonist
         in the community setting which is ███ n-formulary medication.  He was
3       appropriately treated with metformin as first-line therapy, along with a
         statin to reduce the risk of cardiovascular disease per guidelines.
4       Metformin was later changed to glipizide per patient request.  His
         hemoglobin A1C% measurements demonstrated excellent glycemic
5       control.  Hypertension was well managed with losartan monotherapy.

6  *Id.*  Dr. Boone concluded this care met the standard of care.  *Id.*  Dr. Boone does not

7  state what standard of care he used to evaluate Mr. ███ care.

8       117.   I disagree with Dr. Boone.  As I explained in my initial report, the care

9  that Mr. ███ received did not meet the standard of care in a number of respects.

10  *See* Keller Report ¶¶ 271, 302, 543-545.  The problems with his care included the

11  following:

12       1.     Despite his significant medical history, he was never seen by a

13              medical practitioner during the intake process or at his 14-day

14              assessment.  Keller Report ¶ 271.

15       2.     The County discontinued his documented prescription for

16              Mounjaro, a diabetes medication, because Mounjaro was non-

17              formulary.  Instead, a STATCare NP placed Mr. ███ on sliding

18              scale insulin without evaluating him, confirming he had ever

19              taken insulin, obtaining any labs (such as an A1C), or even

20              notifying him of the change in prescription.  When Mr. ███

21              complained, he was treated with metformin, sliding scale insulin

22              and then glipizide.  As I explain in my report, metformin, sliding

23              scale insulin and glipizide are not direct substitutes for and do

24              not have the same mechanisms for action as Mounjaro.

25              Moreover, discontinuing a person's medication simply because it

26              is not on the formulary and especially without evaluating the

27              person is not consistent with the standard of care.  Keller Report

28              ¶ 302, 543.

118.   In addition, Dr. Boone misrepresented the contents of the medical file. Dr. Boone stated that "Metformin was later changed to glipizide per patient request." Murray Report at 178.  But the medical record indicates that Mr. █████ requested that he receive Mounjaro, not metformin. *See* SD_791117.  Mr. █████ continued to complain about not receiving his prescription for Mounjaro well into 2024. █████  Med. Rcd. at 27, 31, 53, 55, 72.  Dr. Molina wrote on █████ 2024 "[M]ounjaro is not formulary so [I] am unable to order it currently." █████  Med. Rcd. p. 75.

**P.**        █████████  █████████  **– Patient 80 –** █████████

119.   PA Pulvino reviewed Mr. █████████ medical record and concluded that the care provided to him for hypertension met the standard of care.  PA Pulvino found, *inter alia*, that "[h]is chronic disease care was uneventful and in reviewing his blood pressure log he was in good control." Murray Report at 222-23.

120.   I disagree with PA Pulvino.  In my opinion, the care provided to Mr. █████████ for his hypertension did not meet the standard of care.

121.   Mr. █████████ is 62 with a history of a stroke.  According to the AHA Guidelines Update, the goal should be for Mr. █████████ to have a systolic blood pressure of <130:  "For older adults with hypertension, intensive treatment with an SBP target 110-130 mmHg substantially lowers the incidence of CVD events over standard treatment with a target 130-150 mm Hg. In addition, intensive BP lowering may prevent or at least partially arrest cognitive decline with aging." AHA Guidelines Update at 56.

122.   Mr. █████████ was noted to be hypertensive, with a blood pressure of 150/88, at his Medical Clearance. █████████  Med. Rcd. at 2.  He reported that he had not been taking his prescribed medications on the outside. *Id.* at 41.  The STATCare practitioner appropriately started Mr. █████████ on amlodipine (Norvasc), atorvastatin and aspirin. *Id.* at 42, 43.  Mr. █████████ was still hypertensive, 141/87, when his Health Assessment was done on █████ 2023. *Id.*

at 44.

123.    Mr. ███████ labs were done on ███ 2023.  *Id.* at 38, 39.  I can see no evidence that anyone ever reviewed or interpreted them.

124.    On ████ 2023, he was evaluated by NP Nicolaus Rosete to work as a trustee in the Jail.  *Id.* at 25.  NP Rosete did not record a blood pressure in his log at that visit, but his trustee assessment form indicates that his blood pressure at that time was 166/99.  *Id.* at 159.

125.    Mr. ███████ was seen for a hypertension chronic care visit on ███████ 2023 by NP Stacy Thompson.  NP Thompson measured a blood pressure of 147/77.  *Id.* at 83.  His blood pressure log showed only one recent blood pressure at goal.

| Date | BP |
|---|---|
| ██/2023 10:37:24 AM | 143 / 99 |
| ██/2023 10:17:20 AM | 175 / 73 |
| ██/2023 9:47:42 AM | 115 / 81 |
| ██/2023 1:39:40 PM | 135 / 74 |
| ██2023 9:27:00 AM | 147 / 77 |
| ██/2023 10:17:49 AM | 147 / 77 |

*Id.* at 31.  Nevertheless, NP Thompson judged Mr. ███████ blood pressure control to be "good."  *Id.* at 86.  Blood pressures after this visit remained high.

| Date | BP |
|---|---|
| ██2023 12:43:54 PM | 143 / 71 |
| ██2023 1:52:53 PM | 150 / 77 |
| ██/2023 2:19:35 PM | 143 / 81 |
| ██2023 2:15:27 PM | 149 / 75 |
| ██2023 10:30:11 AM | 154 / 76 |
| ██/2023 1:21:33 PM | 144 / 78 |
| ██2023 9:31:23 AM | 153 / 81 |
| ██2023 12:52:51 PM | 143 / 77 |

1  *Id.* at 31.  Because of his age and his history of cardiovascular disease,

2  Mr. ███████ should have had an EKG done, but I see no evidence that this

3  occurred.

4          126.  On ███████ 2024, Mr. ███████ requested a cardiac diet.  *Id.*

5  at 27.  He should have, however, been provided a cardiac diet from the beginning.

6          127.  PA Pulvino states that Mr. ███████ "He refused a provider follow

7  up on ██ 24."  This is not true.  Dr. Molina did write "*I witnessed deputy 4552 go to*

8  *patient and ask [if] they would like evaluation by the doctor.  Despite my efforts, the*

9  *patient refused.*"  *Id.* at 28.  However, Dr. Molina followed this with an addendum

10  "*correction.  pt did not refuse.  pt at work --r/s (reschedule) appt.*"  *Id.* at 29.  I

11  cannot find evidence that the appointment was rescheduled.  Mr. ███████ did not

12  see a medical practitioner again.

13          128.  In my opinion, the hypertension care provided to Mr. ███████ did

14  not meet the standard of care.

15      •  Mr. ███████ blood pressures improved over the course of his

16          incarceration but they were never fully controlled.  Because his blood

17          pressure was never at goal, the AHA/ACC Hypertension Standards

18          recommend an escalation of blood pressure medications.  This was not

19          done.

20      •  Mr. ███████ never had an EKG done.

21      •  He was not offered a cardiac diet until he himself requested one on

22          ███████ 2024.

23          129.  PA Pulvino rightly notes the multitude of medication refusals (37, by

24  my count).  I discussed the problem that the Jail has with medical refusals and how

25  this can harm patients.  Mr. ███████ is another example.  Most of his refusals

26  were not witnessed by medical staff:  they were witnessed by security staff only.

27  **Q.      ███ ███ – Patient 59 – ███████**

28          130.  Dr. Leonardson reviewed Mr. ███████ medical file and concluded that

1  the care provided to Mr. ▮▮▮ met the standard of care "with some reservations."

2  Murray Report at 208. She wrote:

3      Mr. ▮▮▮ chronic medical problems identified at SD County Jail
    were ▮▮▮ and HLD. An unverified history of sleep apnea is

4      mentioned in notes, but the asthma and heart disease, which are
    mentioned on the transfer form are no ▮▮▮ ntioned. There is no history

5      taken at the jail to elicit whether Mr. ▮▮▮ had had symptoms or
    histo ▮▮▮ target organ damage (name ▮▮▮ chemic heart disease).

6      Mr. ▮▮▮ was on Aspirin and I believe there shou ▮▮▮ e been some
    inter ▮▮▮ why he was on aspirin. That said, Mr. ▮▮▮ lipids looked

7      well-controlled (although that is not known until ▮▮▮ hs into his
    stay) and his blood pressure was borderline, but uninterpretable, since

8      he often refused his medication.

9      I have another issue with his episodic care. Mr. ▮▮▮ gave a classic
    history of having a kidney stone, yet nobody wh ▮▮▮ him ever

10      mentioned that potential diagnosis. After his pain continued for a
    while, a useless testicular ultrasound was ordered instead of the proper

11      test, which would have been a renal ultrasound. I commend the jail on
    their attention to opioid use disorder and their documentation of

12      refusals.

13  *Id.* at 208.

14      131. I agree with Dr. Leonardson's criticisms of the care provided to

15  Mr. ▮▮▮ namely that there was inadequate chronic care treatment for his

16  hypertension, hyperlipidemia, asthma, and heart disease and that the Jail likely

17  failed to diagnose a kidney stone. I disagree with her ultimate conclusion, however,

18  as it is my opinion that the care provided to Mr. ▮▮▮ did not meet the standard of

19  care.

20      132. Most notably, it is my opinion that the care (or lack thereof) provided

21  to Mr. ▮▮▮ for his potential sleep apnea did not meet the standard of care.

22  Mr. ▮▮▮ was transferred from the Victorville prison facility. During his receiving

23  screen on ▮▮▮ 2023, Mr. ▮▮▮ reported that he had sleep apnea and had been

24  using a CPAP machine at the prison. ▮▮▮ Med. Rcd. at 1154. Mr. ▮▮▮ signed a

25  Release of Information form, *id.* at 198, and the prison records were ordered

26  specifically to check for CPAP prescription, *id.* at 26. On ▮▮▮ 2023,

27  Mr. ▮▮▮ submitted a medical request that stated "I have sleep apnea I was

28  diagnosed at Vista Detention in 2017 or 18 if its not valid I need a sleep study

1  because my apnea is very bad." *Id.* at 23, 1189.  I do not see that Mr. ███ had any

2  face-to-face meeting with a nurse or any practitioner evaluation of this request. ███

3  ███████ 2023, Mr. ██████ submitted another Health Care Request for a sleep

4  study.  *id.* at 1180.  A handwritten response on the bottom of this request states

5  "Duplicate.  Already Sched for Imp sick tri[a]ge."  Again, there was no face-to-face

6  evaluation by a nurse and no practitioner evaluated the request.  On ████████

7  2023, Mr. █████ submitted a third Health Care request that stated "I have sleep

8  apnea & I need a sleep study done.  Please." *Id.* at 1182.  This also is marked

9  "duplicate from ████ 23."  All of these were ignored.  On ████████ 2024, Mr. ███

10 submitted his fourth health care request, which stated "I have sleep apnea & I have

11 previously been prescribed a CPAP."  In the Action Taken section of this health

12 form is written "Sched for Imp triage waiting for prison records" and "refer to

13 provider-sick call." *Id.* at 1190.  Interestingly, Mr. ██████ first health care request

14 dated ████████ 2023 was then also marked as "Triage MDCC ███/2024." *Id.*

15 at 1189.  On ███████ 2024, Dr. █████ Molina wrote a chart note that stated "chart

16 reviewed, Pt requesting for CPAP machine." *Id.* at 37.  Dr. Molina asked to get

17 records (which had already been requested eight months previously) or "schedule

18 patient for overnight sleep study."  The next note was written by a CNA on

19 ████████ 2024 that stated that Mr. █████ refused to sign an ROI form.  Mr. █████ is

20 quoted as saying that there was no need for him to sign an ROI because his original

21 sleep study had been done at the San Diego Jail Vista facility. *Id.* at 38.  In addition,

22 Mr. █████ had already signed an ROI previously, anyway. *Id.* at 198.  This "refusal"

23 ended the matter.  The Jail never provided him with a C-PAP or conducted a sleep

24 study.  This care did not meet the standard of care.  I am using as my standard of

25 care Lewis R. Kline, *Clinical Presentation and Diagnosis of Obstructive Sleep*

26 *Apnea in Adults*, UpToDate (2024).  Like any other medical complaint, the proper

27 course begins with a medical practitioner meeting the patient, obtaining a history,

28 and conducting a physical examination.  In Mr. █████ case, no medical practitioner

1  ever spoke with Mr. ██████ face-to-face about sleep apnea or did a physical

2  examination—over the course of eight months.  Sleep apnea is diagnosed with a

3  sleep study test—the very thing that Mr. ██████ had been requesting.  This is not a

4  difficult test to schedule or conduct.  Since, over the course of eight months, no

5  medical practitioner examined Mr. ██████ or even talked to him, and no sleep study

6  was done even though Dr. Molina ordered one and Mr. ██████ repeatedly requested

7  one, the standard of care was not met in this case.

8      133.  In addition, Mr. ██████ file reflects problems with refusals of care and

9  medication.  I count 933 refusal forms in Mr. ██████ chart.  Almost all of these are

10  signed by two deputies.  I see no counseling as required by SDSO Policy.  I

11  discussed in my report the immense problem that the SDSO has with refusals and

12  how these negatively impact medical care.  Keller Report ¶¶ 387, 388.

13      134.  Finally, Dr. Leonardson's review is not factually accurate.

14  Dr. Leonardson wrote, "On ████.2023, Mr. ██████ underwent the intake physical with

15  the MD."  Murray Report at 207.  This is incorrect.  On ██████ 2023, Mr. ██████

16  had his Health Assessment done by an RN. ██████ Med. Rcd. at 201.  The form was

17  countersigned three hours later by an MD, but the MD was not present.  In fact, I do

18  not see anywhere in Mr. ██████ file that a medical practitioner ever completed a

19  physical examination.  I agree with Dr. Leonardson that the one Chronic Care visit

20  was seriously inadequate.

21  **R.** ███████████ **– Patient 43 –** ██████████

22      135.  PA-C Freeman reviewed Mr. ██████ medical record and concluded

23  that the care provided to him met the standard of care.  She wrote: "The patient has

24  received appropriate treatment for his type 2 diabetes with both oral medication

25  (metformin) and insulin (short-acting and long-acting).  Despite the patient's

26  challenging behavior and refusals of medical care, the medical record reflects that

27  the medical staff has been attentive to his medical needs.  Overall, this patient is

28  receiving excellent medical care at George Bailey."  Murray Report at 192.

136.    I disagree with PA-C's conclusion.  The care provided to him did not meet the standard of care.

137.    *Type 2 Diabetes* – I am comparing the care provided to Mr. ██████ with Diabetes in Detention.

138.    Mr. ████████ received his medical clearance on ████████ 2022.  He informed the nurse performing the Receiving Screening that he had Type 2 Diabetes and took metformin for this.  ████████ Med. Rcd. at 8.  The STATCare practitioner ordered metformin and glipizide to treat diabetes as well as blood sugar checks.  *Id.* at 22.  Mr. ██████ objected to the glipizide prescription and it was quickly discontinued.  *Id.*

139.    Mr. ████████ did have many refusals of proffered medical care, but his primary complaint was with taking metformin.  *Id.* at 2674.  He accepted blood sugar checks frequently enough for the medical staff to know that his blood sugars were not well controlled.  *Id.* at 722-33.

140.    On ████████ 2023, Mr. ████████ allowed staff to draw blood for an A1C.  *Id.* at 749.  The result was high, at 8.7.  *Id.* at 741.  (No other labs were performed on this blood sample, even though the ADA standards of care require other blood tests to assess progression of diabetic kidney disease, among others.)  In response to the high A1C, NP Matthew Wallace began long acting insulin Semglee (10 units once a day) and short acting insulin Novolog using NaphCare's standard sliding scale to determine dosing.  *Id.* at 37-39.

141.    This decision to start Mr. ████████ on insulin was not consistent with the standard of care.  The ADA standards state, "[s]election of medications for treatment of people with type 2 diabetes should be in accordance with the current ADA Standards of Care (see Fig. 9.3 in Section 9, 'Pharmacologic Approaches to Glycemic Treatment).'" Diabetes in Detention at 548.  This standard recommends the introduction of insulin "when A1C or blood glucose levels are very high (i.e., A1C >10% [>85 mmol/mol] or blood glucose ≥ 300 mg/dL [≥ 16.7 mmol/L])."

1  Diabetes Standards at S165.  Mr. ████ A1C was less than 10 and his blood

2  sugars had been less than 300.  Insulin should not have been prescribed at this point.

3      142.  In addition, the ADA standards state, "[r]eliance on insulin sliding

4  scales is ineffective and potentially dangerous, and it is strongly discouraged."

5  ADA Detention Facilities at 549.  NP Wallace's use of a sliding scale violated this

6  standard.  Instead of insulin, the ADA recommendation for a patient such as

7  Mr. ████ is as follows: "In adults with type 2 diabetes, a GLP-1 RA, including a

8  dual glucose-dependent insulintropic polypeptide (GIP) and GLP-1 RA, is preferred

9  to insulin[.]"  Diabetes Standards at S165 (Pharmacologic Therapy for Adults with

10  Type 2 Diabetes, 9.23.).  Glucagon-like peptide 1 receptor agonists (GLP-1s)

11  include several brands, such as Byetta, Wegovy, Ozempic and others.  However,

12  none of these agents are on the NaphCare formulary (NAPHCARE037047 at 5).

13  Per ADA standards, "the use of medications with low potential for hypoglycemia

14  (biguanides, dipeptidyl peptidase 4 inhibitors, glucagon-like peptide 1 receptor

15  agonist, and SGLT2i) is recommended (before insulin)."  Diabetes in Detention at

16  548.  None of these agents are on the NaphCare formulary either, except the

17  biguanide metformin, which Mr. ████ was already taking.  NAPHCARE037047

18  at 5.

19      143.  Jail practitioners increased Mr. ████ Semglee dose on ████ 2023,

20  ████ Med. Rcd. at 66, ████ 2023, *id.* at 98, and ████ 2024, *id.*

21  at 133.  These increases were made despite the fact that Mr. ████ was refusing

22  to take Semglee far more often than he was taking it.  *Id.* at 2493, 2519, 2556, 2568,

23  2589.  His compliance with Semglee did improve markedly in 2024.  *Id.* at 2429,

24  2486.

25      144.  Despite these increases, Mr. ████ blood sugar control worsened

26  over the course of his incarceration.

27  / / /

28  / / /

145.  Early blood sugar log (*id.* at 733):

| | |
|---|---|
| ██2023 10:01:19 AM | 128 |
| ██2022 11:42:26 AM | 156 |
| ██2022 12:23:05 PM | 158 |
| ██2022 11:43:18 AM | 176 |
| ██2022 11:43:03 AM | 176 |

146.  Late blood sugar log (*id.* at 722):

| | |
|---|---|
| ██2024 11:12:58 PM | 315 |
| ██2024 9:04:27 PM | 423 |
| ██2024 3:00:00 PM | 400 |
| ██2024 3:00:00 PM | 305 |
| ██2024 3:00:00 PM | 349 |

147.  Mr. ████ reportedly refused a lab draw ████ 2023. ████ Med. Rcd. at 89.  The only refusal form with that date is blank and signed by two security officers.  *Id.* at 1433.  I see no evidence that anyone ever tried to repeat an A1C otherwise, even in 2024 when Mr. ████ was mostly compliant with his medical treatments.

148.  Mr. ████ was never referred to an optometrist for retinal screening.

149.  In my opinion, the medical care provided to Mr. ████ did NOT meet the standard of care.

- Sliding scale insulin was used, contrary to standards.
- Recommended medications were not offered.
- Only one A1C was obtained and other screening labs were never done.
- Mr. ████ was not referred to optometry for a retinal screening.
- Mr. ████ level of diabetic control worsened during his incarceration. The practitioners should have noticed this worsening trend and increased therapy in a stepwise fashion as laid out in the ADA standards.  Had they done this, Mr. ████ diabetic control likely would not have deteriorated.

1      150.   Lastly, I note that Mr. ████ never received a Health Assessment.  I

2  do not find evidence in his chart that anyone ever attempted to do either an initial

3  Health Assessment nor a Health Assessment at one year.

4      **S.      ████████ – Patient 60 – ████**

5      151.   Dr. Leonardson reviewed Ms. ████ medical record and concluded

6  that the care she received for her hypertension and anemia did not meet the standard

7  of care.  Murray Report at 208, 209.  She wrote:

> Ms. ████ blood pressure has never been controlled during this
> perio██e and the use of short-term clonidine should not be
> protocol. There is no evidence that any effort was made on the part of
> the provider to look at the blood pressure readings, no vital signs
> documented on the provider notes and no evidence that medications
> were being reviewed during provider visits.
>
> The HIV and asthma care were adequate.
>
> █have grave concerns about the attention that was not given to this
> █ y/o woman's worsening microcytic anemia and elevated globulin
>   ction.  The patient should have had a workup for both.  Myeloma is
> certainly a consideration with her persistent complaints of back and
> body pain, as well.
>
> This █y/o patient should also be scheduled for colon cancer screening
> and t█ anemia should be worked up to see if it is due to iron-
> deficiency or chronic inflammation.
>
> I suggest vital signs be taken and documented at every visit.  I suggest
> that a medication list that is accurate should be displayed on every
> patient-related visit.

20      152.   I agree with Dr. Leonardson's conclusion that there were serious

21  problems with the care provided to Ms. ████ I also identified additional

22  problems with the care she received for asthma.  Ms. ████ arrived at the Jail on

23  ████ 2023 taking Wixela for asthma.  ████ Med. Rcd. at 464.  Wixela is a

24  combination product containing a inhaled steroid (fluticasone) and a long-acting

25  bronchodilator (salmeterol). However, Wixela was not continued by the STATCare

26  practitioner who reviewed her transfer medications.  He did order an albuterol

27  rescue inhaler.  *Id.* at 327.  On ████ 2023, Rana Ram MD ordered Wixela, *id.*

28  at 28, but it evidently was denied by the nonformulary review process.  Stopping

1  Wixela at admission before Ms. ███████ had been examined by a medical

2  practitioner violated the medical standard of care.  Rejecting Wixela after it had

3  been ordered by a physician who had examined Ms. ██████ also violated the

4  medical standard of care.  In addition, I discussed in my report that the standard of

5  care for asthma requires a minimum of bedside peak flow testing at admission and at

6  each chronic care visit.  The NCCHC Report emphasized this.  The Jail never

7  performed this test for Ms. ██████

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Appendix B

# APPENDIX B

## Analysis of 14-day Health Assessments from Medical Records

| JIMS | Booknum | Book date | Release date | Health Assessment | Compliant | Bates Number | Comments |
|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | None Found | No | SD_843430 | |
| ▮ | ▮ | ▮ | ▮ | | | | |
| ▮ | ▮ | ▮ | ▮ | None Found | No | SD_753161 | |
| ▮ | ▮ | ▮ | ▮ | | | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_939221 | Refused |
| ▮ | ▮ | ▮ | ▮ | | | | |
| ▮ | ▮ | ▮ | | ▮ | Yes | SD_1003418 | Refused |
| ▮ | ▮ | ▮ | ▮ | | | | |
| ▮ | ▮ | ▮ | | ▮ | Yes | SD_842274 | |
| ▮ | ▮ | ▮ | | | | | |
| ▮ | ▮ | ▮ | ▮ | None Found | No | SD_837236 | |
| ▮ | ▮ | ▮ | | | | | |
| ▮ | ▮ | ▮ | | ▮ | Yes | SD_876917 | Refused |
| ▮ | ▮ | ▮ | ▮ | | | | |
| | | | | | | | Refused in previous booking |
| ▮ | ▮ | ▮ | ▮ | None Found | No | SD_915237 | |
| ▮ | ▮ | ▮ | ▮ | | | | |
| | | | | | | | Assessed in previous booking |
| ▮ | ▮ | ▮ | | None Found | No | SD_832302 | |
| ▮ | ▮ | ▮ | | | | | |
| ▮ | ▮ | ▮ | | ▮ | Yes | SD_822321 | |
| ▮ | ▮ | ▮ | | | | | |
| ▮ | ▮ | ▮ | | ▮ | Yes | SD_1003727 | Refused |
| ▮ | ▮ | ▮ | ▮ | | | | |
| ▮ | ▮ | ▮ | | ▮ | Yes | SD_1025003 | Refused |
| ▮ | ▮ | ▮ | | | | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | No | SD_827395 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | | | | | |
| ████ | ████ | ████ | ██ | None Found | No | SD_801436 | Assessed in previous booking |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | None Found | No | SD_1011685 | Assessed in previous booking |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | None Found | No | SD_899687 | |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | | ██ | No | SD_875817 | |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | ██ | Yes | SD_749422 | |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | ██ | Yes | SD_770622 | Refused |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | None Found | No | SD_953169 | Assessed in previous booking |
| ████ | ████ | ████ | | | | | |
| ████ | ████ | ████ | ██ | None Found | No | SD_979059 | Assessed in previous booking |
| ████ | ████ | ████ | | | | | |
| ████ | ████ | ████ | ██ | None Found | No | SD_947096 | Refused in previous booking |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | None Found | No | SD_861201 | Refused in previous booking |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | ██ | Yes | SD_947096 | Refused |
| ████ | ████ | ████ | ██ | | | | |
| ████ | ████ | ████ | ██ | ██ | Yes | SD_827865 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | ██ | Yes | SD_777718 | |
| | | | | | | | |
| | | | | ██ | Yes | SD_796574 | |
| | | | | | | | |
| | | | | ██ | Yes | SD_784016 | |
| | | | | | | | |
| | | | | None Found | No | SD_1014113 | |
| | | | | | | | |
| | | | | ██ | Yes | SD_899224 | |
| | | | | None Found | No | SD_970129 | Assessed in previous booking |
| | | | | | | | |
| | | | | ██ | Yes | SD_840606 | Refused |
| | | | | | | | |
| | | | | ██ | Yes | SD_924890 | |
| | | | | ██ | No | SD_951075 | Refused |
| | | | | ██ | Yes | SD_754819 | |
| | | | | | NO MED REC FOUND | | |
| | | | | ██ | Yes | SD_779409 | |
| | | | | ██ | Yes | SD_785857 | |
| | | | | ██ | Yes | SD_955818 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | ▅ | ▅ | ▅ | | | | | |
| 2 | ▅ | ▅ | ▅ | ▅ | ▅ | Yes | SD_939221 | |
| 3 | ▅ | ▅ | ▅ | ▅ | | | | |
| 4 | ▅ | ▅ | ▅ | ▅ | ▅ | Yes | SD_1018658 | Refused |
| 5 | ▅ | ▅ | | | | | | |
| 6 | ▅ | ▅ | | ▅ | ▅ | No | SD_843900 | |
| 7 | ▅ | ▅ | ▅ | ▅ | ▅ | Yes | SD_921916 | |
| 8 | ▅ | ▅ | ▅ | | | | | |
| 9 | ▅ | ▅ | ▅ | ▅ | ▅ | Yes | SD_823398 | Refused |
| 10 | ▅ | ▅ | ▅ | ▅ | | | | |
| 11 | ▅ | ▅ | ▅ | ▅ | ▅ | Yes | SD_930404 | |
| 12 | ▅ | ▅ | ▅ | ▅ | | | | |
| 13 | ▅ | ▅ | ▅ | ▅ | | | NO MED REC FOUND | |
| 14 | ▅ | ▅ | ▅ | | | | | |
| 15 | ▅ | ▅ | ▅ | | ▅ | Yes | SD_774452 | Refused |
| 16 | ▅ | ▅ | ▅ | ▅ | | | | |
| 17 | ▅ | ▅ | ▅ | ▅ | | | NO MED REC FOUND | |
| 18 | ▅ | ▅ | ▅ | | | | | |
| 19 | ▅ | ▅ | ▅ | ▅ | ▅ | Yes | SD_801436 | |
| 20 | ▅ | ▅ | ▅ | | | | | |
| 21 | ▅ | ▅ | ▅ | ▅ | ▅ | Yes | SD_923281 | |
| 22 | ▅ | ▅ | ▅ | ▅ | | | | |
| 23 | ▅ | ▅ | ▅ | ▅ | | | NO MED REC FOUND | |
| 24 | ▅ | ▅ | ▅ | ▅ | | | | |
| 25 | ▅ | ▅ | ▅ | | ▅ | Yes | SD_782303 | |
| 26 | ▅ | ▅ | ▅ | ▅ | | | | |
| 27 | ▅ | ▅ | ▅ | ▅ | | | NO MED REC FOUND | |
| 28 | ▅ | ▅ | ▅ | ▅ | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | 4/13/2023 | Yes | SD_914590 | |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | ▮ | Yes | SD_887341 | Refused |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | ▮ | Yes | SD_997358 | Refused |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | 3/28/2023 | Yes | SD_999974 | |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | ▮ | Yes | SD_1025003 | |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | ▮ | Yes | SD_808906 | |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | ▮ | Yes | SD_832302 | |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | ▮ | Yes | SD_915237 | Refused |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | | | ▮ | None Found | No | SD_953169 | Assessed in prior booking |
| ▮ | ▮ | | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | ▮ | No | SD_1021371 | Assessed in future booking |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | None Found | No | SD_897686 | Assessed in future booking |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | None Found | No | SD_788688 | |
| ▮ | ▮ | ▮ | | ▮ | | | |
| ▮ | ▮ | ▮ | | ▮ | None Found | No | SD_931265 | |
| ▮ | ▮ | ▮ | | ▮ | ▮ | No | SD_781065 | |
| ▮ | ▮ | ▮ | | ▮ | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_1006475 | |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_840606 | Refused in future booking |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | | | NO MED REC FOUND | |