GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>    v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>       Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF KELLY S. RAMSEY, M.D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:     Hon. Anthony J. Battaglia<br><br>Date:      March 6, 2025<br>Time:     2:00 p.m.<br>Crtrm.:    4A |

[4621607.3]

1                      DECLARATION OF KELLY S. RAMSEY, M.D.

2       I, Kelly S. Ramsey, M.D. MPH, MA, FACP, DFASAM, declare that if called

3 upon I could and would testify competently to the information contained below,

4 including in my expert reports, which is based on my own personal knowledge:

5       1.     I am a physician licensed to practice medicine in the State of New

6 York, and am board certified in both internal medicine and addiction medicine. I

7 make this declaration based in support of Plaintiffs' Opposition to Defendants'

8 Motion for Partial Summary Judgment ("Motion").

9       2.     Attached as **Exhibit 1** is a true and correct copy of my August 20, 2024

10 report, which accurately reflects my opinions in this case. Exhibit 1 does not

11 include the index of documents I reviewed.

12       3.     Attached as **Exhibit 2** is a true and correct copy of my rebuttal report,

13 which accurately reflects my opinions with respect to the reports of Owen Murray,

14 Joseph Penn, and Lenard Vare in this case. Exhibit 2 does not include the index of

15 documents I reviewed for my rebuttal report.

16       I declare under penalty of perjury under the laws of the United States of

17 America that the foregoing is true and correct to the best of my knowledge, and that

18 this declaration is executed at Olivebridge, New York this 20th day of January, 2025.

19

20

21                                     _____

22                                    Kelly S. Ramsey, M.D.

23

24

25

26

27

28

# EXHIBIT 1

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXPERT REPORT OF KELLY S. RAMSEY, M.D.**<br><br>Judge:      Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

[4447331.33]

Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF KELLY S. RAMSEY, M.D.

# TABLE OF CONTENTS

**Page**

EDUCATION AND QUALIFICATIONS ........................................................ 1

COMPENSATION .................................................................................. 3

METHODOLOGY ................................................................................. 3

SUMMARY OF OPINIONS ..................................................................... 6

OPINIONS ............................................................................................ 7

I.    The Sheriff's Department Fails to Adequately Treat Persons
Experiencing Withdrawal ................................................................. 7

    A.    The Sheriff's Department Does Not Have a Coherent Acute
Withdrawal Management Services Program, Which has Resulted
in Harm to Persons Experiencing Withdrawal ........................ 9

    B.    The Sheriff's Department Does Not Adequately Screen Persons
Entering the Jail at Risk of Withdrawal ................................ 15

    C.    The Sheriff's Department Does Not Adequately Assess Persons
at Risk of Withdrawal ......................................................... 20

        1.    Health Care Staff are Not Adequately Trained to Assess
Persons at Risk of Acute Withdrawal ............................ 24

        2.    Health Care Staff Do Not Use Withdrawal Assessments,
including COWS, CIWA-Ar or CIWA-B, Appropriately
or Frequently Enough, and Do Not Use PAWSS at All ........... 27

        3.    The Sheriff's Department Does Not Take Vital Signs for
Persons Being Assessed for Withdrawal ........................ 29

    D.    The Sheriff's Department Fails to Ensure that Persons in
Withdrawal are Housed Appropriately ................................ 30

    E.    The Sheriff's Department Fails to Deliver Adequate Treatment
for Persons Experiencing Withdrawal ................................. 35

        1.    The Sheriff's Department Does Not Provide Persons in
Withdrawal with Individualized Treatment ................... 40

        2.    The Sheriff's Department Fails to Use Methadone
Appropriately to Treat Withdrawal ............................... 50

        3.    The Sheriff's Department Fails to Provide Adequate
Treatment to Pregnant Persons in Withdrawal ............... 53

        4.    The Sheriff's Department is Not Adequately Engaging in
Innovation in Care. ..................................................... 58

1

II.   The Sheriff's Department Fails to Adequately Treat Persons with
      Substance Use Disorder.................................................................................61

2

3

      A.   The Sheriff's Department's MAT Program Fails to Meet the
           Standard of Care for Persons with Opioid Use Disorder.....................62

4

           1.   The Sheriff's Department's Process for Starting Persons
                with Opioid Use Disorder on MOUD is Inadequate.................64

5

6

           2.   The Sheriff's Department Limits Doses of Buprenorphine,
                Contrary to the Standard of Care...............................................80

7

           3.   The Sheriff's Department Does Not Adequately Use
                Methadone to Treat Persons with OUD .....................................83

8

9

           4.   The Sheriff's Department Fails to Ensure Persons are Not
                Denied Medication for Suspected Diversion.............................86

10

           5.   The Sheriff's Department's Policies, Procedures, and
                Practices for Treating Pregnant Persons with Substance
                Use Disorder (SUD) Fall Below the Standard of Care .............92

11

12       B.   The Sheriff's Department Lacks Policies and Procedures
              Focused on Treating Alcohol Use Disorder and Stimulant Use
              Disorder..................................................................................................96

13

14  III.  The Sheriff's Department's Policies and Practices Regarding
          Overdoses Do Not Adequately Protect Persons at Risk of Overdose.............98

15

16  IV.   The Sheriff's Department Has Inadequate Discharge Planning for
          Incarcerated Persons with SUD....................................................................110

17  V.    The Sheriff's Department's Policies and Procedures Stigmatize Persons
          with Substance Use or SUD Who are Incarcerated, Which Creates a

18        Substantial Risk for Inadequate Care. .........................................................115

19  RECOMMENDATIONS.........................................................................................120

20  I.    Regarding Withdrawal Management ............................................................120

21  II.   Regarding Substance Use Disorder Treatment ............................................122

22  III.  Regarding Overdose Response......................................................................123

23  IV.   Regarding Discharge Planning and Services ...............................................123

24  V.    Regarding Stigmatization .............................................................................124

25

26

27

28

I, Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM, declare:

1.    I am a physician licensed to practice medicine in the State of New York, and am board certified in both internal medicine and addiction medicine.  A true and correct copy of my curriculum vitae is attached hereto as **Exhibit A**.  My background and experiences relevant to my expert testimony in this proceeding are set forth there and below.

## EDUCATION AND QUALIFICATIONS

2.    In 1989, I received a Bachelor of Science in Foreign Service degree in International Politics, Law, and Diplomacy from the Georgetown University's School of Foreign Service in Washington, D.C.  In 1999, I received a Master of Public Health degree in Epidemiology from the University of Illinois at Chicago School of Public Health.  In 2003, I received my Medical Doctor degree from the Case Western Reserve University School of Medicine in Cleveland, Ohio.  In 2004, I received a Master of Arts in Bioethics from the Case Western Reserve University School of Graduate Studies in Cleveland.  From 2003 to 2004, I interned and began my Internal Medicine/Pediatrics residency at the University Hospitals Health Systems (affiliated with Case Western Reserve University) in Cleveland.  I transferred in 2004 to Montefiore Medical Center in the Bronx, New York, where I completed my internal medicine social medicine residency in 2006.

3.    I have spent my career working in addiction medicine in a variety of settings, including an opioid treatment program ("OTP"), in a federally qualified health care setting ("FQHC") practicing addiction medicine, in an addiction policy and regulatory position as the Chief of Medical Services for the New York State Office of Addiction Services and Supports ("OASAS"), the single state agency overseeing the largest continuum of addiction services (prevention, harm reduction, treatment, and recovery) in the United States, and currently as an addiction medicine physician and an addiction medicine and harm reduction consultant.

4.    I am a subject matter expert in addiction medicine, harm reduction,

HIV, and hepatitis C and have served as a faculty member and advisor at several academic institutions and for the New York State Department of Health (DOH) for over 15 years.

5.      I have received several awards including the Laureate Award by the American College of Physicians ("ACP") in 2017, the New York State DOH Commissioner's Special Recognition Award for contributions to drug user health in 2018, the Distinguished Contributions to Behavioral Medicine Award by ACP in 2023, and the Case Western University School of Medicine Alumni Award in 2023. I am a Distinguished Fellow of the American Society of Addiction Medicine ("DFASAM") and a Fellow of the American College of Physicians ("FACP").

6.      I serve on the national Board of Directors of ASAM as the Region 1 Director representing New York State and am the Immediate Past President of the NY Chapter of the Society of Addiction Medicine ("NYSAM").

7.      I am the author of the following relevant publications:  Brief FAQ on Methadone Use to Treat Opioid Use Disorder (OUD) in Carceral Settings Using the Hospital/Clinic Designation, Johns Hopkins University Bloomberg School of Public Health, Health Policy & Management (2024) and the New York State DOH AIDS Institute Clinical Guidelines Program at Johns Hopkins University School of Medicine online Substance Use Disorder Treatment in Pregnant Adults (2021) (the revised guidelines are being reviewed currently).  I have been a co-author on the following relevant publications:  A protocol for a retrospective, longitudinal cohort study for addressing challenges in opioid treatment for transition-age adults (2024), Community-Based Cluster-Randomized Trial to Reduce Opioid Overdose Deaths (2024), Referral to and engagement in substance use disorder treatment within opioid intervention courts in New York:  a qualitative study of implementation barriers and facilitators (2024), The Ways That Stigma Hurts People Who Use Substances and How to Help (2023), ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-

1  potency Synthetic Opioids (2023), Ethnoracial Disparities in Rates of Non-Natural

2  Causes of Death After the 2020 COVID-19 Outbreak in New York State (2023),

3  New York State Technical Working Group's Resuscitation Training in Naloxone

4  Provision Programs 2016 Report (2016).  I was a field reviewer for the Bureau of

5  Justice Assistance's ("BJA") Guidelines for Managing Substance Withdrawal in

6  Jails:  A Tool for Local Government Officials, Jail Administrators, Correctional

7  Officers, and Health Care Professionals (2023).

8        8.     In my previous role at New York State OASAS, I trained New York

9  State prison medical providers at the New York State Department of Corrections

10  Community Supervision ("DOCCS") and New York State juvenile justice center

11  medical providers through the New York State Office of Children's and Family

12  Services (OCFS) in addiction medicine and specifically how to utilize

13  buprenorphine in correctional settings.  My presentation entitled Treating Opioid

14  Use Disorder (OUD) in Correctional Settings:  Medication for Opioid Use Disorder

15  ("MOUD") Reduces Overdoses and Opioid-Related Morbidity has been viewed

16  over 2,500 times on You Tube.

**COMPENSATION**

18        9.     My rate of compensation for this matter is $300 per hour.

**METHODOLOGY**

20        10.    Plaintiffs' counsel asked me to render an opinion as to the adequacy of

21  substance use treatment in the San Diego County jails.

22        11.    In order to provide an opinion, I reviewed numerous documents

23  provided to me by Plaintiffs' counsel, including the Third Amended Complaint.

24  That document claims that the Sheriff's Department fails to provide adequate

25  medical care for incarcerated persons with substance use disorders, and those who

26  entered the jail under the influence of substances.  I also reviewed 25 sets of medical

27  records, records from substance-related deaths in the Jail, and additional

28  documentation relevant to substance use treatment.  A complete list of the materials

1   I received is attached hereto as **Exhibit B**.

2       12.    I compared the evidence from the records that I reviewed against

3   standards promulgated by organizations with expertise in addiction medicine and

4   correctional healthcare.  These organizations include the American Society of

5   Addiction Medicine ("ASAM"), the Substance Abuse and Mental Health Service

6   Administration ("SAMHSA"), the New York State Department of Health AIDS

7   Institute, the Bureau of Justice Assistance ("BJA"), and the National Commission

8   on Correctional Healthcare ("NCCHC").  Each of these organizations, as described

9   below, is an authority on effective treatment of substance use disorders.

10      13.    The American Society of Addiction Medicine ("ASAM") is a leading

11  professional organization of physicians which regularly issues guidelines to promote

12  the evidence-based treatment of substance use disorders.[1]  ASAM's guidelines

13  reflect the standard of care for substance use treatment in the United States.  In

14  preparing this report, I relied in particular on the ASAM National Practice Guideline

15  for the Treatment of Opioid Use Disorder,[2] the ASAM Clinical Practice Guideline

16  on Alcohol Withdrawal Management,[3] and the ASAM/AAAP [American Academy

17  of Addiction Psychiatry] Clinical Practice Guideline on the Management of

18  Stimulant Use Disorder.[4]  All of these guidelines were endorsed by several other

19

20  [1] *See Clinical Guidelines*, Am. Soc. of Addiction Med., https://www.asam.org/quality-care/clinical-guidelines (last visited Aug. 12, 2024).

21
22  [2] Am. Soc. of Addiction Med., *The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder* (2020), https://downloads.asam.org/sitefinity-production-blobs/docs/default-source/guidelines/npg-jam-supplement.pdf?sfvrsn=a00a52c2_4.

23
24  [3] Am. Soc. of Addiction Med., *The ASAM Clinical Practice Guideline on Alcohol Withdrawal Management* (2020), https://downloads.asam.org/sitefinity-production-blobs/docs/default-source/quality-science/the_asam_clinical_practice_guideline_on_alcohol-1.pdf?sfvrsn=ba255c2_0.

25
26  [4] The ASAM/AAAP Clinical Practice Guideline on the Management of Stimulant Use Disorder. Journal of Addiction Medicine 18(1S):p 1-56, May/June 2024. | DOI: 10.1097/ADM.0000000000001299, https://downloads.asam.org/sitefinity-production-blobs/docs/default-source/quality-science/stud_guideline_document_final.pdf?sfvrsn=71094b38_1

27
28

professional organizations with expertise in the treatment of substance use disorders.

I also relied on a literature review and a set of recommendations for treating

individuals who use highly potent synthetic opioids ("HPSO") that I authored for

ASAM alongside other experts in addiction medicine.[5] Finally, I considered

ASAM's Public Policy Statement on the Use of Naloxone for the Prevention of

Opioid Overdose Deaths.[6]

14.    The Substance Abuse and Mental Health Service Administration

("SAMHSA") is an agency within the United States Department of Health and

Human Services which leads the government's public health response to substance

use disorders.  SAMHSA employs panels of experts to issue Treatment

Improvement Protocols ("TIPs"), which are recommendations for clinical practice

based on the most current research in the field.  I relied in particular on SAMHSA's

TIP 63:  Medications for Opioid Use Disorder.[7]

15.    The New York State Department of Health AIDS Institute has

partnered with Johns Hopkins University School of Medicine for decades to issue

evidence-based guidelines for the treatment of both infectious diseases and

substance use disorders.[8]  Committees of medical and public health experts

collaborate on these guidelines.  I was the lead author of the agency's clinical

guidelines publication, titled Substance Use Disorder Treatment in Pregnant

---

[5] *See* Melissa B. Weimer et al., *ASAM's Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids*, 0 J. Addiction Med. 1 (2023), https://downloads.asam.org/sitefinity-production-blobs/docs/default-source/advocacy/letters-and-comments/asam_clinical_considerations__buprenorphine.212-(1).pdf.

[6] ASAM, *Public Policy Statement on the Use of Naloxone for the Prevention of Opioid Overdose Deaths* (Oct. 2016), https://www.asam.org/docs/default-source/public-policy-statements/use-of-naloxone-for-the-prevention-of-opioid-overdose-deaths-final.pdf.

[7] SAMHSA, *TIP 63: Medications for Opioid Use Disorder* (2021), https://store.samhsa.gov/sites/default/files/pep21-02-01-002.pdf.

[8] *Clinical Guidelines Program*, N.Y. State Dep't of Health AIDS Inst., https://www.hivguidelines.org/about/ (last visited Aug. 12, 2024).

Adults.[9]  I considered our committee's research and recommendations on evidence-based practices for this population as I evaluated the San Diego Jail's treatment of pregnant persons with substance use disorders.

16.     The Bureau of Justice Assistance ("BJA") is a component of the United States Department of Justice that conducts research, issues guidelines, and provides technical assistance to local law enforcement.[10]  Along with the National Institute of Corrections ("NIC"), another government agency which provides technical assistance to local jails and prisons, the BJA issued its Guidelines for Managing Substance Withdrawal in Jails in 2023.[11]  The BJA and NIC's perspective is invaluable because these organizations have expertise in the specific healthcare needs of incarcerated persons with substance use disorders.  The guidelines in this report were endorsed by several prominent corrections and correctional healthcare organizations, such as the American Correctional Association, Major County Sheriffs of America, and the National Commission on Correctional Healthcare.

## SUMMARY OF OPINIONS

17.     Substance use poses a substantial risk of serious harm to the health of incarcerated persons in San Diego County jails (the "Jail"), but the Sheriff's Department has failed to provide adequate treatment to protect persons from that risk.  The dangers of substance use are present throughout an incarcerated person's time in custody.  According to the Sheriff's Department, "more than 70 percent of arrestees enter [San Diego County] jail facilities with some type of illicit substance

---

[9] N.Y. State Dep't of Health AIDS Inst., *Substance Use Disorder Treatment in Pregnant Adults* (2021), https://www.hivguidelines.org/wp-content/uploads/2023/03/NYSDOH-AI-Substance-Use-Disorder-Treatment-in-Pregnant-Adults_5-31-2024_HG.pdf.

[10] *About the Bureau of Justice Assistance*, U.S. Dep't of Just.: Off. of Just. Programs, https://bja.ojp.gov/about (last visited Aug. 12, 2024).

[11] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023), https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

in their system."[12]  At intake, the Sheriff's Department must adequately screen incarcerated persons so that Jail staff can identify persons at risk of withdrawal. Once in the Jail, the Sheriff's Department must routinely assess incarcerated persons at risk of withdrawal and provide treatment to persons experiencing acute substance withdrawal, which can result in serious health complications and death.  The Sheriff's Department must also provide treatment for incarcerated persons with substance use disorder ("SUD") throughout their incarceration – including adequate Medication for Addiction Treatment ("MAT") for those with Opioid Use Disorder ("OUD").  Given the unfortunate reality that dangerous illicit substances are available in the jails, the Sheriff's Department must also provide adequate treatment for overdoses.  When persons with SUD are discharged from custody, the Sheriff's Department must provide them with the medications and resources necessary to continue treatment for SUD.  And every step of the way, the Sheriff's Department must ensure treatment is provided without stigmatizing incarcerated persons whose health is at risk from substance use.  Based on the evidence I have reviewed, it is my opinion that the Sheriff's Department has failed on all of these fronts, leaving incarcerated persons in the San Diego County jails vulnerable to a substantial risk of serious harm from substance use.

## OPINIONS

18.     My opinions and the bases for them are as follows:

## I.     The Sheriff's Department Fails to Adequately Treat Persons Experiencing Withdrawal

19.     In the Third Amended Complaint, Plaintiffs allege that the Sheriff's Department "fails to provide adequate withdrawal treatment for incarcerated people who enter the Jail under the influence of alcohol, opi[oids], benzodiazepines, and

---

[12] July 11, 2024 News Release from the San Diego County Sheriff's Department, https://www.sdsheriff.gov/Home/Components/News/News/2836/514.

1  other substances." Dkt. 231 at ¶ 67.  I agree with that allegation, and I am also of

2  the opinion that the Sheriff's Department fails to provide adequate withdrawal

3  treatment to incarcerated persons at risk of withdrawal after they have entered the

4  Jail – even if they did not enter the Jail under the influence.

5         20.    The Bureau of Justice Assistance's Guidelines for Managing Substance

6  Withdrawal in Jails states: "Death and suffering due to withdrawal from opioids,

7  alcohol, and other substances are preventable.  Local government officials, jail

8  administrators, correctional officers, and health care professionals have an

9  opportunity to save lives and promote the wellbeing of individuals in jail, an

10 opportunity bound by legal obligations set forth in the Americans with Disabilities

11 Act and various federal civil rights acts."[13]

12        21.    Persons who are incarcerated in the San Diego County Jails and are

13 experiencing withdrawal from substances are at risk of serious harm, including

14 death.  In order to mitigate that risk, the Sheriff's Department must screen persons

15 entering the jail to identify those at risk of acute withdrawal syndromes, assess

16 incarcerated persons at risk of withdrawal to determine if they are experiencing

17 withdrawal, house persons experiencing withdrawal in a setting where adequate

18 treatment can be delivered, and then deliver that treatment.

19        22.    The current written acute withdrawal management policies are

20 inadequate.  In practice, staff at the Jails have provided insufficient acute withdrawal

21 management.  This pattern of inadequate provision of acute withdrawal management

22 has harmed persons experiencing withdrawal.  Based on this pattern, recent claims

23 by the Jail's Chief's Medical Officer, Dr. Jon Montgomery, about changes to their

24 acute withdrawal management practices do not convince me that the Jail is

25 adequately treating persons experiencing withdrawal.

26

27 [13] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023),
   https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Sub
28 stance_Withdrawal_in_Jails_6-6-23_508.pdf.

**A.    The Sheriff's Department Does Not Have a Coherent Acute Withdrawal Management Services Program, Which has Resulted in Harm to Persons Experiencing Withdrawal**

23.    In order to assess the adequacy of acute withdrawal management in the Jail, it is necessary to understand the policies that govern that treatment.  But the evidence I have reviewed shows that the Sheriff's Department does not have a coherent understanding of its own withdrawal management policies.  It appears that responsibility for acute withdrawal management is spread across multiple organizations in the jails, but it is unclear which policies actually govern acute withdrawal management.  San Diego County staff have a role to play, as does NaphCare, a medical contractor in the jail, as well as Correctional Healthcare Partners ("CHP"), another medical contractor with an evolving role in the Jail.  I reviewed the transcripts of relevant "Person Most Knowledgeable" ("PMK") depositions of San Diego County and NaphCare, as well as the transcript of the deposition of Dr. Peter Freedland, the Chief Executive Officer of CHP, in order to understand how withdrawal is managed in the Jail.  Those transcripts reveal that there is a great deal of confusion across those organizations about how withdrawal is supposed to be managed by policy and how it is actually managed in practice.  That confusion creates a substantial overarching risk that incarcerated persons experiencing withdrawal will not get adequate care.

24.    One major source of that confusion is that multiple policies exist around withdrawal management, and those policies are split between County policies and NaphCare policies.  But those "[p]olicies and procedures are under revision," and some are apparently not followed as written, making it unlikely that correctional and medical staff in the jail are properly following an effective protocol for withdrawal management.  *See* Jon Montgomery Depo. Tr. Vol II at 154:18-155:3. To further complicate matters, the County recently signed a new contract with CHP that expands its role in the jail, moving it from a subcontractor of NaphCare to a direct contractor with the County.  County Contract No. 571418,

1   Agreement with Correctional Healthcare Partners, Inc. for On-Site Clinical Services

2   (the "2024 CHP Contract"); *see* Montgomery Vol. II at 118:13-20. As a

3   subcontractor, CHP was, according to Dr. Freedland, following a "blend" of County

4   policies and NaphCare policies. There, Dr. Freedland said that CHP followed the

5   County's "Medical Services Division policies and procedures" and responded to the

6   question "[d]o you also follow NaphCare's policies and procedures?" by testifying

7   "I don't know how to answer that. Maybe there's a blend and, yeah, it is – I don't

8   know. There seems to be a blend." Freedland Depo. Tr. at 154:1-11. But now that

9   CHP has become a direct contractor, Dr. Freedland testified that "[a]s a company,

10  we intend to create policies and procedures" governing its conduct in the jails. *Id.* at

11  152:25-153:1. I understand that Plaintiffs have not, at the time of writing, been

12  provided with any CHP-specific policies (if they have been created), so my

13  assessment of policies is limited to those provided by NaphCare and by the County.

14      25.    NaphCare's withdrawal policies are set out in three sections of

15  NaphCare's San Diego Health Care Policy & Procedure Manual.

16  NAPHCARE001541. This manual includes two "Medically Supervised Withdrawal

17  And Treatment" policies, one applicable to "Pregnancy Management," and the other

18  to "Medication Assisted Treatment." *See* NAPHCARE001825-001840. Oddly, the

19  generally applicable withdrawal policy, titled "Policy F-04 Medically Supervised

20  Withdrawal and Treatment," does not appear in the primary manual applicable to all

21  San Diego County facilities, but a version of it appears in each of the facility-

22  specific manuals. *See, e.g.,* Policy/Procedure, NaphCare Health Care Policy &

23  Procedure Manual, San Diego Central, Attachment to email from Dyni Brookshire

24  to Seetal Tejura, Kimberly Skelton, Subject: FW: [EXTERNAL_Fwd: SD P&P,

25  September 18, 2023, CONFIDENTIAL (NAPHCARE015465) ("NaphCare Central

26  Jail Manual") pp. 216-221. All three policies were last revised on June 1, 2023.

27      26.    The general "Medically Supervised Withdrawal and Treatment" policy

28  states, "All patients entering the institution will be screened for any history of

1  manifesting symptoms of intoxication or withdrawal from alcohol or other drugs.

2  Patients who may be intoxicated or experiencing withdrawal symptoms will be

3  identified and managed in accordance with their medical needs." NaphCare Central

4  Jail Manual p. 216.  The procedure section notes that "San Diego County Sheriff's

5  Office health staff" (as opposed to NaphCare staff) will obtain "the patient's health

6  history of drug and alcohol use . . . along with obtaining a urine drug screen as

7  clinically indicated." *Id.*  It goes on to explain that "Protocols for intoxication and

8  medically supervised withdrawal are established by the CMO [Chief Medical

9  Officer] and approved by the responsible physician," but it *also* states that

10  "Medically supervised withdrawal will … follow corporate approved protocols." *Id.*

11  The CMO is Dr. Jon Montgomery, who works for the County.  Montgomery Depo.

12  Tr. Vol. I at 11:24-12:4. He testified on April 26, 2024, that the Sheriff's

13  Department has been drafting policies related to withdrawal since at least the middle

14  of 2023, with no estimate as to when those policies would be completed.

15  Montgomery Vol. II at 110:10-112:3. He also testified that NaphCare followed

16  Sheriff's Department policies, which contradicts the NaphCare written policy that

17  medically supervised withdrawal will follow corporate approved protocols. *Id.* at

18  96:4-7.  In any event, neither set of protocols is included in the manual.

19      27.    The Sheriff's Department has its own set of policies regarding

20  withdrawal in its Medical Services Division ("MSD") Operations Manual, both of

21  which were last revised in early November 2022.  One of these policies is titled

22  "Addicted Arrestee Care," and has the stated purpose "To ensure that individuals

23  with substance use disorders are identified during the course of the detention

24  admission process, and to coordinate initial medical care and treatment."

25  SD_027125-27.  The policy includes vague descriptions of the screening and

26  assessment procedures for persons entering the Jail who may be at risk of opioid

27  withdrawal.  It primarily focuses on addressing access to methadone for a person

28  that is admitted to the Jail.  It provides very little insight or oversight to correctional

1  staff regarding appropriate assessment, monitoring, and care for a person with

2  substance use or SUD.  And the name of the policy, "Addicted Arrestee Care,"

3  reflects the stigmatized view towards the person with substance use or SUD.  The

4  policy solely focuses on opioid withdrawal with a brief mention of alcohol and a

5  complete absence of all other substances.

6      28.    Another County MSD policy is titled "Medically Supervised

7  Withdrawal and Treatment," which is similar to the NaphCare withdrawal policy

8  discussed above.  SD_027128-34.  Like the NaphCare policy, it references a

9  screening process for symptoms of intoxication or withdrawal that will be

10  "consistent with nationally accepted guidelines" and "preapproved by the corporate

11  Chief Medical Officer or designated medical staff."  SD_027128.  There is no

12  "corporate Chief Medical Officer," as the CMO is Dr. Montgomery, who is

13  employed by the County, so it is unclear who actually sets the screening procedure

14  which, as with the NaphCare policy, is not actually written out in this MSD policy.

15  It also includes vague guidelines for treating persons with withdrawal, which are

16  inadequate for the reasons discussed in the sections below.

17      29.    My understanding of the roles of various staff within the Jail is as

18  follows:  The nursing staff employed by the County are the clinical staff charged

19  with the primary responsibility for monitoring persons at risk for and in acute

20  withdrawal.  These County clinical personnel conduct intake exams and initially

21  assign or do not assign persons to a "detox dashboard."  The nurses employed by the

22  County use NaphCare's software platform, "TechCare," to complete these intake

23  exams.  The detox dashboard is a list of persons maintained on the TechCare

24  platform that have been identified to be at risk for acute withdrawal syndromes by

25  the nurses employed by the County.

26      30.    NaphCare conducted "withdrawal training, focusing on educating the

27  on-site nursing staff" employed by the County, which included the "processes" for

28  withdrawal screening and "training on use of TechCare."  *See* Nix Depo. Tr. Vol. I

1   at 25:9-26:7, 110:15-111:5.  The Jail's Director of Nursing, Ms.  Rognlien-Hood,

2   criticized NaphCare's on-site acute withdrawal management training as "pointless,"

3   so the Jail also conducted its own training.  Rognlien-Hood Depo. Tr. at 85:17-

4   86:12, 111:3-15, 119:20-121:4.  But the Jail's training still relied on materials

5   provided by NaphCare. *Id.* at 122:15-16 ("The training issue we have now

6   determined that NaphCare will give us the information and we'll train our staff."). I

7   reviewed training materials produced by NaphCare which NaphCare testified were

8   available to San Diego County staff and "typical of what we would do for our

9   NaphCare employees." *See* Nix Depo. Tr. Vol. II at 39:9-18.

10          31.    According to the NaphCare 'Alcohol Detox' training video

11   (NAPHCARE041276), "Depending on the answers to the screening questions,

12   TechCare will automatically prompt CIWA assessments and add patients to the

13   detox dashboard" NaphCare Alcohol Detox training video, at 10:08.  In the same

14   video, the trainer, Dr. Feely, also states, "I cannot stress enough the importance of

15   completing these receiving screens and comprehensive detox screens thoroughly

16   and accurately.  If you do not do that and patients never get placed on our detox

17   protocols, they are at higher risk for having bad outcomes."  NaphCare Alcohol

18   Detox Training video, at 10:08-10:40.  STATCare clinicians get an automatic alert

19   from TechCare when a patient is added to the detox dashboard per the NaphCare

20   'Detox Documentation' training video.  NAPHCARE041281.  The nurses monitor

21   the patients for symptoms of withdrawal by assessing them, typically, once daily.

22   Patients are then referred to "STATCare" clinicians (NaphCare employees located

23   remotely) to do a review of the individual's medical record or conduct a telehealth

24   visit, generally within 2-4 hours of their time placed on the detox dashboard.  Nix

25   Depo. Tr., Vol. I, pp. 106:7-23, 107:6-22.

26          32.    The problems with this system are rife.  As explained in further detail

27   below, the nurses are not trained adequately in assessing individuals with substance

28   use or SUD, are not using validated screening tools to screen individuals, are not

1    trained adequately in monitoring individuals at risk for or in acute withdrawal, are
2    not monitoring individuals frequently enough, are not housing individuals at risk for
3    acute withdrawal in centrally located and consolidated medical units, and are trained
4    by NaphCare, a company which lacks expertise in addiction medicine.

5        33.    After screening, responsibility for withdrawal management shifts to
6    NaphCare, which has demonstrated an alarming inability to provide adequate care to
7    persons experiencing withdrawal in the jails.

8        34.    NaphCare is a private company contracted by the Sheriff's Department
9    that, until the recent contract with CHP, was the primary contractor responsible for
10   the provision of medical care in the Jails.  While CHP's role is expanding with its
11   new contract, NaphCare is going to maintain responsibility for the MAT program.
12   It also appears that NaphCare will continue to provide the withdrawal screening
13   tools used by the County nurses.  NaphCare's future role in clinical care for persons
14   at risk for or in acute withdrawal is less clear, but it has been responsible for clinical
15   care since at least 2022.

16       35.    There have been myriad problems with NaphCare's provision of
17   medical care in the jails, which are illustrated in detail in repeated Corrective Action
18   Notices ("CANs") issued by the County to NaphCare.  *See, e.g.,* Nix Depo. Tr.
19   Exhibit 3, March 4, 2024; Sheriff's Department CAN to NaphCare (SD_1572585-
20   1572611).  The County and NaphCare do not staff enough nurses or other clinicians
21   in the Jail to provide all withdrawal management onsite, so NaphCare uses an
22   internal process that it has labeled "STATCare" to make up the difference.  The
23   word "STATCare" may sound like a technology product, but it is just a process by
24   which NaphCare offloads treatment decisions to remote clinicians who are not
25   physically present in the San Diego County jails – or even in California at all.

26       36.    According to NaphCare's PMK deposition testimony, NaphCare uses
27   STATCare "very frequently" to "make the determination as to what kind of
28   treatment needed to occur as part of the COWS, the CIWA medication order, and

1  such." Nix Depo. Tr., Vol. I, at 237:6-238:1. Essentially, a nurse in the jail sends

2  patient records to an off-site clinician who makes treatment decisions based on those

3  records without actually examining the patient. According to Dr. Montgomery's

4  deposition testimony: "Q. And that individual assessment about whether a physician

5  needs to be involved is made by whom? A. That would be made by StatCare.

6  There's some -- a couple of things that would be helpful to know is that, one, that

7  the patient will be on medication anyway. The COW[S] scoring is monitoring of

8  the severity, if any, of their symptoms. And the nursing staff is relating their

9  findings to the remote provider -- in this case StatCare -- and if the mid-level

10  StatCare is concerned about symptom presentation or is concerned about any

11  changes in vital signs or bladder-reported presentation, they would either take action

12  or refer to one of the onsite providers." Montgomery Depo. Tr. Vol. II at 149:13-25.

13      37.    This process, in general, does not meet the standard of care for

14  withdrawal management because acute withdrawal management is nuanced and the

15  potential harms of unrecognized or underrecognized acute withdrawal symptoms

16  include seizures, delirium tremens, severe dehydration, and death. Relying only on

17  a remote chart review of a person gives an inadequate and incomplete picture of the

18  person. A telehealth visit, if one occurs at all, is inappropriate for these encounters

19  because they require a hands-on physical examination in order to glean critical data

20  that can only be obtained through direct physical contact. It is inappropriate for

21  NaphCare's remote clinicians to rely solely on charts put together by nurses who –

22  for the reasons explained below – are not adequately trained on withdrawal

23  screening. Acute withdrawal management is a clinical situation where telehealth

24  visits are not appropriate. Potentially life-threatening health conditions like acute

25  withdrawal cannot be treated adequately remotely.

26  **B.      The Sheriff's Department Does Not Adequately Screen Persons
        Entering the Jail at Risk of Withdrawal**

27

28      38.    In order to provide adequate withdrawal management, the Jail must

1    first identify persons at risk of withdrawal. The first opportunity to do so is by

2    screening everyone who enters the Jail at intake. The BJA guidelines set the

3    following criteria for identifying persons at risk of withdrawal:

4    "A. Individuals presenting with intoxication should be presumed to be
     at risk for withdrawal until determined otherwise by a qualified health

5    care professional."

6    "B. Individuals who exhibit potential signs and symptoms of
     intoxication or withdrawal, or who appear unwell to a layperson,

7    should be referred for immediate clinical assessment."

8    "C. All individuals should be screened for withdrawal risk immediately
     upon arrival in a jail. The screening administrator should: i) Review

9    recent substance use using a validated tool," which the BJA defines as
     "[h]aving demonstrated empirical evidence for reliability and validity";

10   ii) ask individuals about current SUD diagnoses, iii) ask individuals
     about their risk for substance withdrawal, iv) ask individuals reporting

11   past-week alcohol or sedative use about their history of complicated
     withdrawal (e.g., seizures, hallucinations, delirium, psychosis)."

12
     "D. An individual's report of recent, regular substance use, SUD, or
13   withdrawal risk constitutes a positive screen, even if they are
     asymptomatic." *See* BJA Guidelines at 8 (G-1).

14

15   39.    Once someone screens positive for risk of withdrawal, medical staff

16   must then conduct an assessment to determine if they need withdrawal treatment –

17   that assessment is covered in the following section. Unfortunately, the evidence I

18   have reviewed indicates that the Jail is not adequately screening people in the first

19   instance, meaning some incarcerated persons at risk of withdrawal are not even

20   assessed for withdrawal management.

21   40.    Appropriate screening for substance use and SUD is not being done at

22   intake. The Jail's policies do not presume that persons presenting with intoxication

23   are at risk of withdrawal, nor do they assess an individual's report of recent, regular

24   substance use as a positive screen. Instead, the Jail's policy states, "A patient who

25   appears to be intoxicated or experiencing symptoms of drug or alcohol withdrawal

26   will be referred to health care staff for evaluation of symptoms" without including

27   the presumption that the patient is at risk for withdrawal. *See* NaphCare Central Jail

28   Manual p. 217. This policy also does not require that all persons be screened for

1   withdrawal risk.  Instead, only "[p]atients with a history of significant and/or

2   frequent alcohol," "benzodiazepine," or "opioid use" "will have a Comprehensive

3   Detox Screen completed during the intake process and, if indicated, will be"

4   assessed for withdrawal monitoring.  *Id.* at pp. 218-19.  Limiting screening to only

5   those persons who have a history of significant and/or frequent use violates the

6   standard of care under the BJA Guidelines, which require screening of *all* persons

7   entering the jail.  Moreover, persons who meet the criteria of significant and/or

8   frequent substance use should "constitute a positive screen" under the BJA

9   Guidelines and trigger an assessment.  But under the Sheriff's Department policy,

10  significant and/or frequent use merely qualifies the person to be screened in the first

11  place, meaning not everyone who should be assessed will actually get an

12  assessment.

13      41.     Compounding the problems with the Jail's screening process, the Jail's

14  "Comprehensive Detox Screen" uses random screening questions and not a

15  validated screening tool, as required by the BJA guidelines.  Examples of validated

16  screening tools are Tobacco, Alcohol, Prescription medication, and other Substance

17  use (TAPS), and the Opioid Risk Tool-OUD (ORT-OUD) Chart.[14]

18      42.     The Jail's "Comprehensive Detox Screen" includes the following:

19      43.     **For Alcohol:**  How many days a week do you drink?  How many

20  drinks do you have each time you drink?  When you wake up the day after drinking

21  do you experience [sweating, shaking hands or body, alcohol relieves these

22  symptoms, wanting or needing a drink, none of the above]?  Do you have or are you

23  experiencing [tremors or shakes, sweating related to withdrawal, heart palpitations,

24  headache, nausea or vomiting due to withdrawal, visual or sensory hallucinations,

25  none of the above]?  Have you ever had seizures or hallucinations after periods of

26

27  [14] NIH National Institute on Drug Abuse (NIDA), Screening and Assessment Tools Chart |
    (updated January 6, 2023), https://nida.nih.gov/nidamed-medical-health-
28  professionals/screening-tools-resources/chart-screening-tools.

1    abstaining from dinking?  Do you have any of the following [liver disease, lung
2    disease, heart disease, kidney disease, diabetes, seizure disorder, none of the above]?

3         44.    **For Opi[oid]s:**  Is the patient currently exhibiting withdrawal
4    symptoms?  Last opi[oid] use?  Number of days use per week?  Is the patient
5    pregnant?

6         45.    **For Benzodiazepine:**  Frequency of use; amount of use of
7    Clonazepam, Lorazepam, and Diazepam; Have you ever had seizures or
8    hallucinations after stopping or running out of benzodiazepines?  *See*
9    NAPHCARE039593-39595.

10        46.    This "Comprehensive Detox Screen" amounts to a set of a random
11   questions that have not been validated.  Using a validated tool is necessary because
12   it ensures that, based on empirical evidence, the questions asked will actually assess
13   the risk of substance use and SUD.  Screening tools should be validated for the
14   targeted population, setting, and disorder or diagnosis.[15]  By not using a validated
15   screening tool to assess individuals for substance use and SUD, the Jail cannot know
16   whether their Comprehensive Detox Screen actually identifies individuals with
17   substance use and SUD who are at risk of withdrawal.

18        47.    The Jail's policy does involve a urine drug screen, but a urine drug
19   screen alone is not a screening tool.  A urine drug screen alone is insufficient
20   because it only captures a moment in time for that person.  A positive urine
21   toxicology test does not necessarily mean that a person is at risk for or will
22   experience acute withdrawal.  Conversely, a negative urine toxicology test does not
23   necessarily mean that a person is not at risk for or will not experience acute
24   withdrawal.

25        48.    Despite their claim to have "protocols consistent with nationally

26

27   _____

[15] Urbina J, Monks SM. Validating Assessment Tools in Simulation. [Updated 2023 Jul
24]. In: StatPearls [Internet].  Treasure Island (FL): StatPearls Publishing; 2024 Jan-.
28   Available from: https://www.ncbi.nlm.nih.gov/books/NBK560531/.

1  accepted guidelines," SD_027128, San Diego's policies and procedures do not

2  follow the standard of care set by nationally accepted guidelines and therefore fall

3  short of nationally accepted guidelines.  The Sheriff's Department's screening

4  process at intake is wholly inadequate for identifying persons at risk for developing

5  acute withdrawal symptoms.  As a result, incarcerated persons at risk of acute

6  withdrawal who should screen positive and be assessed for acute withdrawal are

7  never assessed and do not receive any appropriate management.

8      49.    One example of the harm that can occur when someone is not properly

9  screened for risk of withdrawal is the death of Lazaro Alvarez.  According to the

10  Critical Incident Review Board's notes, █████████████████████████

11  █████████████████████  SD_1030381-382. █████████

12  ███████████████████████████████████████

13  ███████████████████████████████████████

14  ███████████████████████████████████████

15  ████████████████████████████████████████

16  ██████████████████████████████████████

17  ████████████████████████████████████

18  ██████████████████████████████████████

19  ██████████████████████████████████████

20  █████████████████████████████████████

21  ████████████████████████████████████████

22  ██████████████████████.

23      50.    █████████████████████████████

24  █████████████████████████████████████

25  ███████████████████████████████████████

26  ███████████████████████████████████████

27  ███████████████████████████████████████

28  ████████████████████████████████████████

1 ██████████████████████████████████████████████

2 ████████████████████.  Had Mr. Alvarez been started immediately on low dose

3 buprenorphine and comfort medications, he could have avoided opioid withdrawal

4 syndrome entirely and likely would have survived his incarceration.

**C.    The Sheriff's Department Does Not Adequately Assess Persons at Risk of Withdrawal**

51.    All incarcerated persons at risk of withdrawal must be regularly

assessed to determine if they are experiencing withdrawal.  The Clinical Opiate

Withdrawal Scale ("COWS"), Clinical Institute Withdrawal Assessment Scale for

Alcohol ("CIWA" or "CIWA-Ar"), Clinical Institute Assessment Scale for

Benzodiazepines ("CIWA-B"), and Prediction of Alcohol Withdrawal Severity

Scale ("PAWSS") are the medical standard of care for identifying and monitoring

individuals withdrawing from opioids, alcohol, and benzodiazepines.

52.    The COWS is an 11-item scale designed to be administered by clinical

personnel – meaning a physician, nurse practitioner ("NP"), physician assistant

("PA"), registered nurse ("RN"), or licensed vocational nurse ("LVN").  This tool

can be used in both inpatient and outpatient settings to reproducibly rate common

signs and symptoms of opioid withdrawal and monitor these symptoms over time.

The summed score for the complete scale can be used to help clinicians determine

the stage or severity of opioid withdrawal and assess the level of physical

dependence on opioids.[16]

53.    The CIWA-Ar is a 10-item scale used to assess severity of alcohol

withdrawal syndrome.  The CIWA-Ar scale is intended to be used by clinical

personnel in inpatient or outpatient settings and requires limited patient cooperation

---

[16] NIH National Institute on Drug Abuse (NIDA), Clinical Opiate Withdrawal Scale,
https://nida.nih.gov/sites/default/files/ClinicalOpiateWithdrawalScale.pdf

1  to evaluate its ten symptoms.[17]

2      54.    The CIWA-B is a 22-item scale used by clinical personnel to assess and

3  monitor the severity of benzodiazepine withdrawal.[18]

4      55.    PAWSS is a 10-item scale of the most relevant clinical factors

5  associated with the development of severe alcohol withdrawal syndrome. "PAWSS

6  consists of three parts: (A) The threshold criteria, whether the patient consumed

7  alcohol during the 30 days prior to admission and/or had a positive blood alcohol

8  level (BAL) on admission, followed by a series of 10 Yes/No questions from (B)

9  patient interview, and (C) clinical evidence, assessing known risk factors for

10  withdrawal and" current clinical status.[19] [20]

11      56.    All of these scales have objective and subjective components and all

12  are intended for use only by clinical personnel trained in addiction withdrawal

13  management. There are subtleties to assessing withdrawal symptoms which could

14  easily be missed by non-clinical personnel or by clinical personnel not trained

15  adequately in substance withdrawal management. All four scales are intended to be

16  used serially because symptoms and severity of withdrawal can change rapidly.

---

[17] Primary Care Notebook, Clinical Institute Withdrawal Assessment for Alcohol (CIWA-A) scale, https://primarycarenotebook.com/pages/psychiatry/clinical-institute-withdrawal-assessment-for-alcohol-ciwa-a-scale

[18] National Centre for Education and Training on Addiction, Flinders University, Clinical Institute Withdrawal Assessment (CIWA-B): description, strengths and knowledge gaps, https://aodscreening.flinders.edu.au/index.php/download_file/force/51/195

[19] José R. Maldonado, Yelizaveta Sher, Judith F. Ashouri, Kelsey Hills-Evans, Heavenly Swendsen, Sermsak Lolak, Anne Catherine Miller, The "Prediction of Alcohol Withdrawal Severity Scale" (PAWSS): Systematic literature review and pilot study of a new scale for the prediction of complicated alcohol withdrawal syndrome, Alcohol, Volume 48, Issue 4, 2014, Pages 375-390, ISSN 0741-8329, https://doi.org/10.1016/j.alcohol.2014.01.004. (https://www.sciencedirect.com/science/article/pii/S074183291400024X).

[20] José R. Maldonado, Yelizaveta Sher, Smita Das, Kelsey Hills-Evans, Anna Frenklach, Sermsak Lolak, Rachel Talley, Eric Neri, Prospective Validation Study of the Prediction of Alcohol Withdrawal Severity Scale (PAWSS) in Medically Ill Inpatients: A New Scale for the Prediction of Complicated Alcohol Withdrawal Syndrome, *Alcohol and Alcoholism*, Vol. 50, Issue 5, Sept./Oct. 2015, pp. 509–518, https://doi.org/10.1093/alcalc/agv043.

57.    The standard of care for identifying and monitoring persons overamping on stimulants or withdrawing from stimulants is more nuanced.  While no tools for diagnosing or assessing stimulant intoxication or withdrawal have been validated in a clinical context, clinical personnel should still conduct an initial assessment to identify any acute issues and complications of stimulant intoxication or withdrawal.  This is necessary because stimulant intoxication and withdrawal can result in acute issues and complications that require urgent medical management.  And, according to Jail data from Q3 of 2023, roughly half of urine drug screens at intake resulted in a positive urine toxicology test for stimulants.  SD_114424.

58.    To assess for stimulant intoxication or withdrawal, clinical personnel should conduct an initial clinical examination involving a basic assessment of vital signs and a focused mental status evaluation to determine the need for urgent or emergent treatment or referral for further medical evaluation.  The extent of a clinical exam and medical workup for stimulant intoxication and withdrawal should be based on the patient's presenting signs and symptoms and severity of intoxication.[21]  This initial clinical examination should identify any acute concerns and complications of stimulant intoxication or withdrawal that would indicate the person requires a higher level of care.  This includes an assessment of hyperadrenergic or overamping symptoms, including tachycardia, hypertension, hyperthermia, and agitation.  The initial clinical examination when evaluating for suspected stimulant intoxication or withdrawal should include a clinical interview, physical examination, observation of signs and patient-reported symptoms, review of any available additional information, and a safety assessment of the patient's risk of harm to self and others.

59.    Individuals are particularly vulnerable to complications of acute

---

[21] Glasner-Edwards S, Mooney LJ.  Methamphetamine Psychosis:  Epidemiology and Management.  CNS Drugs.  2014;28(12):1115–1126.  doi:10. 1007/s40263-014-0209-8.

1  withdrawal, including death, during the first 24 to 72 hours after their last

2  consumption of alcohol, 24 to 96 hours after their last consumption of opioids

3  (depending on the half-life of the opioid consumed), 24 hours to days or weeks for

4  their last consumption of benzodiazepines (depending on the half-life of the

5  benzodiazepine consumed), and 12 to 24 hours after abrupt discontinuation or

6  reduction in stimulant use. The BJA Guidelines for Managing Substance Use

7  Withdrawal in Jails recommends monitoring for alcohol withdrawal at least every 6

8  hours for the first 72 hours after arrival to a facility; for opioid withdrawal at least

9  every 4 hours for the first 72 hours after arrival to a facility; for sedative

10  (benzodiazepine) withdrawal at least every 6 hours for the first week after arrival to

11  a facility; and for stimulant withdrawal at least twice daily for the first 72 hours after

12  arrival to a facility.[22]  Based on my clinical expertise in addiction medicine, the BJA

13  Guidelines for Managing Substance Use Withdrawal in Jails make appropriate

14  recommendations as outlined above to mitigate the risk of harm to incarcerated

15  persons experiencing withdrawal.

16      60.    For individuals with confirmed opioid withdrawal syndrome or the

17  potential for opioid withdrawal syndrome (e.g., anyone using opioids and meeting

18  criteria for opioid tolerance and withdrawal), the best practice is to use the COWS

19  minimally every 6 hours for scores less than 13 and hourly for scores greater than or

20  equal to 13.  For alcohol withdrawal, the best practice is to use the CIWA-Ar

21  minimally every 4 hours initially; for a score less than 8 on three consecutive

22  assessments, monitoring may be spaced to every 8 hours, but for a score greater than

23  8, a patient should be monitored and reassessed every 1-2 hours and medicated as

24  needed.  There are no specific best practices for the frequency of CIWA-B use, but

25  in my clinical experience, the standard of care is to utilize the CIWA-B every 4-6

26

27  ────────────────
    [22] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023),
    https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Sub
28  stance_Withdrawal_in_Jails_6-6-23_508.pdf.

1    hours to assess for acute benzodiazepine withdrawal.

2    61.    For the reasons explained below, it is my opinion that the Sheriff's

3    Department fails to apply the above standards adequately, putting persons in the Jail

4    who are experiencing withdrawal at substantial risk for harmful complications from

5    withdrawal, including death.

6    **1.    Health Care Staff are Not Adequately Trained to Assess
        Persons at Risk of Acute Withdrawal**

7

8    62.    The staff members assessing persons at risk of withdrawal must have

9    the training and skill set to complete the necessary examination and scoring.

10   Improper training or an insufficient skill set of the staff member examining and

11   scoring the patient could have devastating, including fatal, consequences for the

12   patient.  In the Jail, it appears that the examination and scoring falls on nurses

13   employed by the County.  Based on the testimony of Serina Rognlien-Hood (the

14   County's Director of Nursing), Dr. Montgomery, and Ms. Nix (NaphCare's PMK

15   deponent), the Jail does not use certified addiction registered nurses ("CARNs") to

16   monitor and assess persons in acute withdrawal.  Medical providers play a limited

17   role in the acute withdrawal management process, leaving the COWS, CIWA-Ar,

18   and CIWA-B scoring entirely to nurses.  The Jail does not use PAWSS scoring and

19   does not appear to have a separate protocol for stimulant withdrawal.  Based on

20   Ms. Rognlien-Hood's testimony, it does not seem that any specific certification is

21   required of the nurses monitoring and managing patients with the potential for or in

22   acute withdrawal.  *See* Rognlien-Hood Depo. Tr. at 103:21-105:2.

23   63.    As explained above, NaphCare provided the materials used to train the

24   nurses responsible for withdrawal screening and produced videos representative of

25   that training.  To assess the quality of that training, I reviewed the following

26   NaphCare training videos:  Alcohol Detox (NAPHCARE041276), Detox

27   Documentation (NAPHCARE041281), TechCare Training Receiving Screening

28   (NAPHCARE041301), TechCare Session C Training Intake Booking Queue

1   Recording (NAPHCARE041302), and TechCare Training Appointments – Sick Call

2   (NAPHCARE041307).  Based on these training materials, nursing staff are not

3   adequately trained to administer withdrawal screening.

4       64.     The Alcohol Detox video is 15 minutes, 11 seconds long, and from

5   November 1, 2017.  The trainer does not introduce herself (the name of the MP4 file

6   lists Dr. Feely), there is no title slide with her credentials, and she remained off

7   camera.  The medication referenced in the video for acute alcohol withdrawal

8   management is chlordiazepoxide (Librium), which is not utilized currently for

9   alcohol withdrawal management in the Jails nor typically used clinically elsewhere

10  any longer.  While the video stresses the importance of doing the CIWA-Ar on a

11  regular basis and never documenting "pt refused," from deposition testimony

12  previously cited (Rognlien-Hood, Nix, and Montgomery), CIWA-Ar scales are done

13  only once daily.  From my records review, nurses frequently mark scores as "patient

14  refused" or "patient unavailable" or "patient not assessed."  SD_747164-167;

15  SD_747170-171; SD_747174-175; SD_814914-915.  There was also use of

16  stigmatizing language in the video; the terms 'alcohol abuse' and 'alcoholism'

17  instead of alcohol use disorder, 'detox' instead of acute withdrawal management,

18  and 'substance abuse' instead of substance use disorder.  As explained in Section V,

19  below, stigmatizing language such as this is an impediment to adequate care of

20  persons experiencing withdrawal.

21      65.     In the Alcohol Detox training video, the trainer states that the

22  CIWA-Ar should be assessed minimally every 6 hours (scores <=7) and with scores

23  >=8 should be assessed every 4 hours.  But scoring only occurs in the Jail once

24  daily.  References for the training were published between 1983-1997.  There are no

25  guidelines for treating acute alcohol withdrawal referenced.  The ASAM Clinical

26  Practice Guideline on Alcohol Withdrawal Management, considered the standard of

27

28

care in the United States, is 72 pages long and was published in 2020.[23]  It appears nowhere in the video.  This training video is hopelessly inadequate for training anyone on the current standard of care for managing acute alcohol withdrawal.

66.     The Detox Documentation video is 5 minutes, 27 seconds long, and is undated.  The training was conducted by Marsha Burgess, MSN, ARNP-BC, CCHP, Chief Nursing Officer for NaphCare.  There was use of stigmatizing language, 'detox' instead of acute withdrawal management, 'substance abuse' instead of substance use or substance use disorder, and 'abuse' instead of use.  Detox Documentation NAPHCARE041281.

67.     The TechCare Training Receiving Screening video is 16 minutes, 19 seconds long, and it is undated.  The trainer does not introduce herself, there is no title slide with her credentials, and she remained off camera.  Per the training video, "The housing assignment is a recommendation based off of the medical assessment; however, at the end of the day, it is corrections who would determine where that patient would be housed."  TechCare Training Receiving Screening NAPHCARE041301 at13:48-13:56. For the reasons explained below, leaving housing assignments for persons experiencing withdrawal in the hands of custody staff leads to inadequate care.

68.     The TechCare Session C Training Intake Booking Queue and TechCare Training Appointments/Sick Call trainings were unremarkable and did not change my opinion that these trainings were inadequate.

69.     My understanding is that the nursing staff responsible for conducting screening and assessments lack sufficient expertise in addiction or in the management of acute withdrawal because they are not certified addiction registered

---

[23] The ASAM Clinical Practice Guideline on Alcohol Withdrawal Management.  J Addict Med.  2020 May/Jun:14(3S Suppl 1):1-72.  doi: 10.1097/ADM.0000000000000668.  Erratum in: J Addict Med. 2020 Sep/Oct;14(5):e280.  doi: 10.1097/ADM.0000000000000731.  PMID: 32511109.

nurses nor trained adequately, for example, by a CARN.  Nix Depo. Tr. Vol. I at
105:19-22.  Since only LVNs or RNs conduct these screenings and assessments,
based on the NaphCare training videos described above, I have serious concerns that
the staff do not have adequate expertise or training.  Leaving medical decisions to
provider discretion when the medical provider has insufficient expertise in addiction
medicine or acute withdrawal management is risky at best and dangerous in the
worst-case scenario.

### 2.    Health Care Staff Do Not Use Withdrawal Assessments, including COWS, CIWA-Ar or CIWA-B, Appropriately or Frequently Enough, and Do Not Use PAWSS at All

70.    Withdrawal assessments in the Jail are not conducted adequately,
which means that the Jail is failing to identify persons experiencing withdrawal who
need treatment.  By policy, medical staff are supposed to be responsible for
withdrawal assessments, although they do not appear to be trained sufficiently to
conduct withdrawal assessments for the reasons explained above.  Further, there is
concerning evidence that custody staff may be involved in withdrawal assessments.
I reviewed a PowerPoint presentation regarding the Jail's MAT program that stated,
"Sheriff Medical:  Deputies Role:  deputies assigned to module, provide security for
groups, etc.  Additional tasks as needed.  Currently assisting with COWS/CIWA,
will attend more training.  When MAT is up and running, withdrawal meds will fall
back to line staff."  SD_183068.  It is inappropriate for non-medical personnel to be
assessing persons for withdrawal.

71.    Under the operative policies and procedures, only persons placed on the
detox dashboard are assessed by nurses.  Rognlien-Hood Depo. Tr. at 103:5-13;
Montgomery Depo. Tr., Vol. II at 147:23-148:25; Nix Depo. Tr. Vol. I at 108:2-21.
But many other persons in the Jail need to be assessed for withdrawal, including
those in general population or holding cells that may begin exhibiting symptoms of
withdrawal after going through intake.  For those persons, under the current policies,
only non-medical personnel would be available to assess them during welfare

checks.  This very important assessment should be done only by medical and nursing personnel, after receiving proper training.  Persons should be able to alert an officer that they are experiencing withdrawal symptoms, but the assessment should not be done by the officer.

72.     My review of 25 medical records of persons incarcerated in the Jail shows that health care staff have a practice of using the COWS, CIWA-Ar, and CIWA-B scales inconsistently.  There is no mention in any records of using the PAWSS to triage patients who may be at risk of severe alcohol withdrawal.  Many patients whose medical records I reviewed were scored only daily or twice per day.  In some cases, staff made notations like "patient refused" or "patient unavailable," or skipped scoring altogether.  (Examples include:  SD_213158; SD_015459; SD_747136; SD_786571; SD_814890; SD_805883; SD_991969; SD_991335; SD_837758; SD_827155; SD_822556; SD_814925; SD_800036.)  Patient cooperation needed to complete scoring is minimal in most cases.  Failure to score persons with sufficient frequency risks missing symptoms and missing opportunities for intervention (e.g., medical management or medication management) to avert negative outcomes.  Jail staff appear not to recognize the critical role of scoring in managing patients' care.  If the person is located elsewhere at the time they are due to be scored, then the person needs to be tracked down, not the scoring skipped because it is inconvenient.

73.     Persons who are identified as using substances are not always placed on the detox dashboard.  And even when they are on the detox dashboard, they are not monitored consistently.  *See* SD_747164-167; SD_747170-171; SD_747172-175; SD_814912-915.

74.     Director of Nursing Serina Rognlien-Hood's February 14, 2024, deposition testimony supports my findings from the individual medical records.  Ms. Rognlien-Hood testified that the Jails were not using the COWS, CIWA-AR, and CIWA-B scales as intended, with frequent scoring and with symptom-triggered

medication management, as opposed to fixed dose medication management as per their protocols, which is not individualized care. Per her transcript, the Jail medicates patients based on a 'tapered protocol' and not based on COWS, CIWA-Ar, or CIWA-B scores. Rognlien-Hood Depo. Tr. 105:18-107:11. Scoring is only assessed once per day. *Id.* at 105:3-4. This concurs with the deposition testimony by NaphCare's designated witness, Ms. Angela Nix, that patients are assessed once daily. Nix Depo. Tr., Vol. I at 108:24. This is also consistent with Dr. John Montgomery's deposition testimony, in which he stated, "The monitoring is done at a minimum once a day [by a nurse], and this is utilizing the COWS scoring process, but they are seen at least once a day specifically for that, but there are certainly other times during the day that they would be seen for other reasons by other clinicians." Montgomery Depo. Tr., Vol. II at 148:17-21. His transcript also states: "Q. I want to shift to talking about alcohol withdrawal and understand where there may be differences. Once someone is placed into the alcohol withdrawal protocol, how often -- at what intervals are they monitored or checked? A. The -- they would still be placed on the euphemistically termed 'detox dashboard' and would be getting their assessments once a day. Instead of the opioid scale, they would be using the alcohol withdrawal scale. That's CIWA. Q. And they are also checked by either an RN or LVN? A. Yes. Q. And it's also an individualized decision whether they will be seen by a physician? A. Yes. True. Q. And that assessment is also made by a StatCare mid-level? A. I believe so." Montgomery Depo. Tr., Vol. II at 157:7-25.

### 3. The Sheriff's Department Does Not Take Vital Signs for Persons Being Assessed for Withdrawal

75. Whenever a patient at risk of withdrawal is assessed, medical staff should take vital signs. The Sheriff's Department's policies and procedures require health care staff to obtain vitals if an individual is on specific detoxification medications (buprenorphine, diazepam, and methadone), but not if an individual is on comfort medications. SD_027129. This is not best practice. Monitoring patients

using the COWS, CIWA-Ar or CIWA-B scoring—which, as stated, does not happen properly or at appropriate intervals—does not replace a clinical assessment, including collection of a patient's vital signs.  BJA Guidelines at 14 (G-25).

76.     Dr. Montgomery confirms this in his deposition testimony, when asked if individuals on opioid withdrawal protocols have a requirement that vital signs be taken at certain intervals, he responded, "They should be done.  I believe it's not written as required."  When asked how frequently vital signs should be done, he responded, "If you are doing the COWS scoring, that would normally be done every eight hours."  Montgomery Depo. Tr., Vol. II at 152:7-13.  However, from Dr. Montgomery's transcript, documented previously in this report, patients on the detox dashboard are only monitored once daily with the COWS.  Montgomery Depo. Tr. at 148:17-21, 157:12-14.

**D.     The Sheriff's Department Fails to Ensure that Persons in Withdrawal are Housed Appropriately**

77.     It is my opinion that the Sheriff's Department inappropriately houses many individuals in withdrawal, including by placing individuals in acute withdrawal or presumed to be acutely intoxicated in holding cells or dispersing them in housing units throughout the jails where they are not observed adequately.  These housing practices indicate a systemic under recognition of the potential for complications from withdrawal and due to acute stimulant intoxication, such as seizures, hyperthermia, stroke, cardia arrythmias, cardiac arrest, myocardial infarction, and sudden death.

78.     The BJA Guidelines for Managing Substance Use Withdrawal state: "Housing individuals at risk for or experiencing withdrawal in a dedicated unit(s) has several advantages, such as improved monitoring and care (due to the presence of staff with a focused mission), efficiency of operations (*e.g.*, health care staff can make rounds more quickly), and a lower risk of diversion of treatment medications into the general jail population.  These settings may include general housing pods,

1   special observation cells in the health services unit, or other special housing

2   arrangements.  Note:  isolation units or cells are not recommended."[24] The

3   guidelines further state, "Regular and active observation by custody and health care

4   staff is the foundation for an effective withdrawal management process, which

5   begins upon an individual's arrival to the jail."  *Id.*

6          79.    I agree with the BJA Guidelines.  Isolating patients in withdrawal or at

7   risk for withdrawal increases the likelihood that these individuals will not be

8   monitored adequately.  Given their increased risk of self-harm, the symptoms of

9   vomiting and diarrhea which can occur during withdrawal, which can result in

10  dehydration and electrolyte imbalances that may have serious health consequences

11  including death.  Maintaining fluid intake and repletion are essential.[25]

12         80.    The NaphCare Health Policies & Procedures Manual states that

13  medical staff do ***not*** have control over where people experiencing withdrawal are

14  housed because "housing decisions are a custody function and responsibility,"

15  merely suggesting that medical staff "encourage" custody staff to make housing

16  decisions adequate for withdrawal treatment.  The suggestion to "encourage"

17  custody staff to make appropriate housing decisions is inadequate, as evidenced by a

18  July 2023 decision by custody staff to house "COWS and CIWA IPs" in the same

19  module (Vista Lower West 6) as incarcerated persons already in the MAT program.

20  SD_669715.  This decision was made despite "obvious security risks," including

21  that persons experiencing withdrawal may have contraband that would disrupt care

22  for MAT patients and resulted in the decision that the Jail "will not be facilitating

23  new MAT bodies into LW6," although the current MAT program participants

24

25  [24] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023),
    https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Sub
26  stance_Withdrawal_in_Jails_6-6-23_508.pdf).

27  [25] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023),
    https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Sub
28  stance_Withdrawal_in_Jails_6-6-23_508.pdf.

1  remained in the module.  *Id.*

2  81.   The Jail's policy also does not give health staff authority to ensure that

3  people in withdrawal are housed in units where they can be kept under observation,

4  using similar language, "Health staff will encourage that patients be housed in an

5  area that is safe and effective for monitoring of possible withdrawal symptoms."

6  SD_027128.  Dr. Montgomery and Ms.  Rognlien-Hood confirmed that individuals

7  in withdrawal may be placed in housing units across the facility.  Montgomery

8  Depo. Tr., Vol. II at 152:14-25; Rognlien-Hood Depo. Tr. at 107:12-108:11. This is

9  true even if an individual exhibits serious symptoms of withdrawal, as both testified

10  that sworn personnel may override medical concerns as far as placement of patients

11  if there is a perceived security concern.  Montgomery Depo. Tr., Vol. II at 163:18-

12  165:10; Rognlien-Hood Depo. Tr. at 108:7-109:2. Per a NaphCare training video,

13  "The housing assignment is a recommendation based off of the medical assessment;

14  however, at the end of the day, it is corrections who would determine where that

15  patient would be housed."  TechCare Training Receiving Screening

16  NAPHCARE041301 at 13:48-13:56.

17  82.   These policies and procedures are inadequate because individuals at

18  risk for acute withdrawal are not necessarily housed in discrete units that are

19  medically monitored.  All individuals at risk for acute withdrawal from substances

20  are not being identified, and, even when identified, are not necessarily placed on the

21  detox dashboard and may be housed anywhere in the facility, thus making adequate

22  medical and nursing oversight and monitoring unlikely.

23  83.   The Jail's use of holding cells to house people at risk of or experiencing

24  withdrawal for an extended period of time violates the standard of care because the

25  holding cells are not adequately monitored by medical personnel.  One example is

26  the death of Omar Moreno, who died of a stimulant overdose (choking and acute

27  methamphetamine intoxication).  He was arrested for possession of

28  methamphetamine and told staff at intake that he smoked meth "a lot."  This should

1   have triggered an assessment for substance withdrawal, enhanced monitoring, and

2   initiation of withdrawal treatment as needed.  But Mr. Moreno was not assessed—he

3   was instead placed in a holding cell for ten hours.  SD_050607.  Around 9:38 p.m.,

4   Mr. Moreno appeared to put his facemask in his mouth and potentially another

5   object at 9:40 p.m.  SD_050613.  He collapsed to the ground at 9:41 p.m. and

6   stopped moving at 9:42 p.m.  *Id.*  Deputies walked by the cell without noticing

7   Mr. Moreno motionless on the ground at 9:43 p.m.  *Id.*  It was not until a safety

8   check at 10:31 p.m. that Mr. Moreno was discovered by Jail staff.  *Id.*  It was too

9   late to save him.  Had Mr. Moreno been under medical observation, he would have

10  received prompt medical care when he collapsed, and he may not have died.

11       84.    More than a year later, William Hayden Schuck also died in a holding

12  cell of a stimulant overdose (cocaine and MDMA toxicity).  He was housed in a

13  holding cell for six days, with his condition visibly deteriorating over time, leading

14  CLERB to find that "SDSD staff failed to recognize and/or respond to IP Schuck's

15  medical needs."  February 13, 2024, CLERB Final Findings Report.[26]  He told

16  deputies he was taking substances in the jail, his clothes were soaked with sweat, he

17  had bedsores and numerous other symptoms indicative of withdrawal and

18  complications due to stimulant use.  The conduct of custody staff in ignoring

19  Mr. Schuck's medical needs while he appeared to be going through acute

20  withdrawal demonstrates why it is critical that persons experiencing withdrawal be

21  housed such that they can be kept under observation by medical staff.

22       85.    For those who survive the holding cells, leaving housing assignments

23  for persons at risk for or experiencing acute withdrawal to correctional staff creates

24  a substantial risk of serious harm because correctional staff are not medical

25  professionals who can be expected to recognize persons at risk for or experiencing

26

27  _____
    [26] https://www.sandiegocounty.gov/content/dam/sdc/clerb/meetings/old-
28  years/findings/021324%20Final%20Findings%20Report.pdf

symptoms of acute withdrawal.  Persons housed in the general population or essentially anywhere that is not a medical monitoring unit are observed essentially by correctional staff not by nursing or medical personnel.  Correctional staff doing welfare checks are essentially doing proof of life checks and not nuanced assessments designed to determine medical need.

86.    An alarming recent example of the harms that can result from dispersing people in withdrawal to standard housing units is the June 26, 2024, death of Richard Woodford in Central Jail.[27]  I conducted a telephone interview with an incarcerated person who was housed in the same unit (8D at Central Jail) as Mr. Woodford when he died.  That incarcerated person explained that Mr. Woodford entered the housing unit the night before his death.  Mr. Woodford was dry heaving, defecating and urinating on himself, had blankets wrapped around himself, and was generally unable to care for himself.  While I understand that the County has yet to release the results of Mr. Woodford's autopsy, in my clinical experience, these symptoms are consistent with acute withdrawal.  The incarcerated person I interviewed also explained that persons in withdrawal were routinely placed in his general population housing unit and that staff expected other incarcerated persons in the housing unit to provide care for the persons in withdrawal.  Mr. Woodford repeatedly called for help from Jail staff, who eventually took him to the medical unit twice but brought him back into the housing unit each time.  This demonstrates that the Jail did not ensure Mr. Woodford was under observation while he was in the throes of symptoms consistent with acute withdrawal.  After the second time staff returned Mr. Woodford to the unit, he moved to the shower under his own power.  While he was in the shower, he collapsed and started seizing.  Incarcerated persons started yelling "man down" until

---

[27] San Diego County Sheriff's Department, *Update: Death Investigation – San Diego Central Jail*, July 2, 2024, https://www.sdsheriff.gov/Home/Components/News/News/2823/514.

1    staff entered the unit, by which point Mr. Woodford appeared to already be dead.

2    Mr. Woodford died alone in the shower while he was not under any observation

3    from Jail staff.  This is a blatant violation of the standard of care for persons

4    exhibiting symptoms of acute withdrawal, and underscores that the County's policy

5    of distributing persons experiencing withdrawal to housing units throughout the jails

6    violates the standard of care.

7        87.    The Sheriff's Department's policies and procedures provide that an

8    "advanced clinical provider ***may*** keep a patient who is exhibiting mild to moderate

9    symptoms of withdrawal or acute intoxication under observation as deemed

10   necessary."  SD_027129 (emphasis added).  This policy is inadequate because

11   persons at risk for withdrawal or manifesting mild to moderate symptoms of

12   withdrawal are not required to be kept under observation.  Clinical situations can

13   change quickly and symptoms in persons not kept under observation will likely be

14   missed until it is too late to intervene and prevent complications.

15   **E.    The Sheriff's Department Fails to Deliver Adequate Treatment for
         Persons Experiencing Withdrawal**

16

17       88.    The policies and procedures regarding withdrawal, summarized in

18   Section I(A) above, are inadequate to provide the standard of care and have not been

19   followed consistently.  In practice, the Sheriff's Department has consistently failed

20   to meet the standard of care for withdrawal management, leading to a substantial

21   risk that persons in withdrawal will suffer serious harm.

22       89.    The standard of care for withdrawal management is set out in several

23   sources, including BJA guidelines, NCCHC standards, and ASAM guidelines.

24       90.    The BJA's Guidelines emphasize that, "Opioid withdrawal syndrome

25   can be medically complex and, in the absence of appropriate management, life-

26   threatening."  They explain that "Monitoring for and treating opioid withdrawal can

27   prevent serious health outcomes, including death.  Many jails currently subject

28   individuals to opioid withdrawal by either not offering buprenorphine or methadone

1  treatment or not initiating it in a timely manner, such that individuals are subject to

2  withdrawal before treatment is initiated or they are released."[28]

3      91.    From the NCCHC and the National Sheriffs' Association's Jail-Based

4  MAT:  Promising Practices, Guidelines and Resources, "Jails should have protocols

5  in place to identify people who might require medically managed withdrawal

6  services.  It is of equal importance to have a plan to engage them in treatment.

7  Medically managed withdrawal by itself is not treatment.  While in some instances,

8  withdrawal can be a step toward treatment, this is largely not the case in correctional

9  settings, where the risk of death from overdose is extremely high."[29]

10      92.    NCCHC standards further guide that, "While non-life-threatening

11  symptoms can be treated in convalescent or outpatient settings, severe withdrawal

12  symptoms must be managed in hospitals, and medical supervision must be available

13  at all times using valid withdrawal assessment instruments (e.g., COWS, the

14  Objective Opiate Withdrawal Scale, and the CIWAS, Revised)."[30]

15      93.    The ASAM guidelines state, "Assessment of a patient undergoing

16  opioid withdrawal should include a *thorough medical history and physical*

17  *examination* focusing on signs and symptoms associated with opioid withdrawal."[31]

18  The jail does not follow ASAM guidelines because a thorough medical history and

19

20  _____

[28] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023),
21  https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

22  [29] NCCHC and the National Sheriffs' Association. Jail-Based Medication Assisted
23  Treatment: Promising Practices, Guidelines and Resources for the Field, October 2018.
Promising Practice Guidelines for Jail-Based Medication-Assisted Treatment NEW.indd
24  (ncchc.org).

25  [30] Legislative Analysis and Public Policy Association. Model Withdrawal Protocol in
Correctional Settings Act, June 2021. Model Withdrawal Management Protocol in
26  Correctional Settings Act (legislativeanalysis.org).

27  [31] ASAM. The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder,
2020 Focused Update. (The ASAM National Practice Guideline for the Treatment of Opioid Use
28  Disorder – 2020 Focused Update)

1   physical exam do not occur during intake.  The perfunctory screening is done by a

2   nurse without a validated screening tool and no medical provider does a physical

3   examination.  Additionally, they only use scoring tools once daily which is not

4   sufficient.

5       94.     As for benzodiazepine withdrawal management, the following

6   principles outline the standard of care for benzodiazepine withdrawal:

7   - Benzodiazepine withdrawal symptoms are often prolonged and can last weeks;

8   - Benzodiazepine tapers should be slow and reductions in dose are based on symptom assessment (presence and severity of withdrawal symptoms), not by a fixed schedule;

10  - "The safest way to manage benzodiazepine withdrawal is to give benzodiazepines in gradually decreasing amounts.  This helps to relieve benzodiazepine withdrawal symptoms and prevent the development of seizures;"

13  - Care must be individualized;

14  - Psychological symptoms are likely to return as the benzodiazepines are tapered and must be managed;

15  - Benzodiazepine withdrawal can be life threatening; and

16  - Pregnant persons with benzodiazepine withdrawal should be monitored in an inpatient hospital setting with OB/GYN consultation.[32]

18      95.     As for stimulant withdrawal, the BJA Guidelines state: "Treatment for

19

20  _____

[32] Benzodiazepine withdrawal management | SA Health, https://www.sahealth.sa.gov.au/wps/wcm/connect/public+content/sa+health+internet/clinical+resources/clinical+programs+and+practice+guidelines/substance+misuse+and+dependence/substance+withdrawal+management/benzodiazepine+withdrawal+management; Amelia C. Nelson, Joy Kehoe, Jeffrey Sankoff, David Mintzer, Julie Taub, Kevin A. Kaucher, Benzodiazepines vs barbiturates for alcohol withdrawal: Analysis of 3 different treatment protocols, The American Journal of Emergency Medicine, Volume 37, Issue 4, 2019, Pages 733-736, ISSN 0735-6757, https://doi.org/10.1016/j.ajem.2019.01.002. (https://www.sciencedirect.com/science/article/pii/S0735675719300026).; Parr JM, Kavanagh DJ, Cahill L, et al. Effectiveness of current treatment approaches for benzodiazepine discontinuation: a meta-analysis. 2009. In: Database of Abstracts of Reviews of Effects (DARE): Quality-assessed Reviews [Internet]. York (UK): Centre for Reviews and Dissemination (UK): 1995-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK77002/; Fluvau D, Revadigar N, Manobianco BE. Challenges of the pharmacological management of benzodiazepine withdrawal, dependence, and discontinuation. *Therapeutic Advances in Psychopharmacology*. 2018;8(5):147-168.  doi:10.1177/2045125317753340.

stimulant withdrawal typically consists of behavioral management strategies and, when necessary, medications for symptom relief." "Patients experiencing agitation that does not immediately respond to behavioral management strategies (e.g., minimizing environmental stimulation [e.g., noise, bright lights, crowding]; speaking calmly to the patient; taking time to listen to and address concerns where appropriate and feasible) should receive an immediate medical evaluation."[33] The current standard of care for managing stimulant withdrawal focuses on minimizing presenting signs and symptoms and minimizing risks. Behavioral and environmental interventions should be used to create a calming environment. Medications may help reduce signs and symptoms of stimulant withdrawal. Signs and symptoms that may require management with medication include agitation, psychosis, depression, and insomnia. Clinicians should monitor patients until their mental status and other signs and symptoms of acute intoxication or withdrawal have stabilized to minimize and prevent adverse events such as risks for falls, altercations, and other events. Clinicians should monitor for progression of psychiatric symptoms such as breakthrough psychosis, suicidality, and emergence of trauma-related symptoms. Suicidality may increase as intoxication wanes and acute withdrawal begins and should be addressed. When patients present with hyperadrenergic signs and symptoms, clinicians should provide ongoing monitoring and management of vital signs—especially heart rate and blood pressure—to prevent complications.[34]

96.    The Jail's written policies regarding acute withdrawal management are inadequate to meet the standard of care. They are broadly not well informed

---

[33] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023), https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

[34] The ASAM/AAAP Clinical Practice Guideline on the Management of Stimulant Use Disorder. Journal of Addiction Medicine 18(1S):p 1-56, May/June 2024. | DOI: 10.1097/ADM.0000000000001299, https://downloads.asam.org/sitefinity-production-blobs/docs/default-source/quality-science/stud_guideline_document_final.pdf?sfvrsn=71094b38_1

regarding current practices for acute withdrawal management and are overly vague. Discretion is given to clinicians and other staff with respect to monitoring and medicating individuals; however, for the reasons explained above, staff do not appear to be well trained or well-informed regarding addiction medicine. In addition, the Jail's system for withdrawal management is convoluted with no uniform policies and procedures for all staff to follow. Due to the Jail's failure to adequately screen and assess persons for withdrawal, all persons at risk for acute withdrawal from substances are not being identified. Even when identified, they may be housed in holding cells or dispersed throughout the facility, making adequate medical and nursing oversight and monitoring unlikely.

97. The Medical Service's Division's policy on "Addicted Arrestee Care" focuses almost entirely on opioids and opioid withdrawal and does not address acute intoxication, toxidromes, or withdrawal associated with other substances. SD_027125. This policy also does not adequately recognize the serious risks of withdrawal because it provides very little insight or oversight to correctional staff regarding appropriate assessment, monitoring, and care for a person with substance use or SUD. The MSD policy on "Medically Supervised Withdrawal and Treatment" has similar shortcomings.

98. The Jail's failure to meet the standard of care for withdrawal management also increases the risk that persons experiencing withdrawal will commit suicide. The BJA Guidelines explain "Suicide is the leading single cause of death in jails, but the exact role of substance withdrawal in these deaths is difficult to quantify. Risk for suicidal ideation and attempts is increased among individuals in substance withdrawal and those with an SUD. Notably, individuals with OUD have a threefold higher risk for suicidal behavior than those without OUD."[35]

---

[35] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023), https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

99.    Several specific shortcomings are discussed in further detail below.

**1.    The Sheriff's Department Does Not Provide Persons in Withdrawal with Individualized Treatment**

100.    The BJA Guidelines explain that "[w]ithdrawal from opioids, alcohol, and sedatives can be an extremely serious medical condition, but it is very difficult even for trained medical providers to predict withdrawal severity for any particular patient.  As a result, frequent, individualized, clinical assessments should be conducted by qualified health care professionals based on patient-specific orders from the provider."[36]  The Jail's use of fixed protocols which are the same for every patient regardless of their specific circumstances, their risk for concomitant withdrawal syndromes, and their comorbidities, is not the standard of care.  Every patient has a different risk profile and a potentially different presentation of withdrawal symptoms, and a different response to medications.  Using a fixed protocol does not allow for adjustment of the medication dose based on clinical response and clinical reassessment.

101.    In general, the Jail's approach to addressing withdrawal is reactive, rather than proactive, with no indication of individualized care, assessment, or dosing.  It is my opinion that the Sheriff's Department fails to provide persons in withdrawal with individualized care, thereby placing them at risk of serious harm.

102.    The Sheriff's Department has treated patients in opioid, alcohol, or benzodiazepine withdrawal with the same doses of medication for that specific withdrawal syndrome, contrary to the accepted standard of care.  This is demonstrated both by their policies—including the MSD "Addicted Arrestee Care" policy (SD_027125-127) and the NaphCare Medically Supervised Withdrawal and Treatment policy (NaphCare Central Jail Manual at pp. 216-221)—and by review of

---

[36] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023), https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

1  individual patient records.  *See, e.g.,* SD_747136; SD_786571; SD_814890;

2  SD_991969; SD_991335; SD_837758; SD_827155; SD_822556; SD_815265;

3  SD_814999; SD_814925; SD_800036; SD_785315.

4     103.   The Jail has previously implemented a practice of using fixed

5  medication tapers, which means that persons being treated for a withdrawal

6  syndrome were all treated with the same dose of medication which is tapered at the

7  same time interval regardless of the symptoms they are experiencing and their

8  response to said treatment.  That meant clinical assessment and reassessment were

9  not factored into acute withdrawal management in the Jail.  Particularly for opioid

10  use disorder, a taper off medication for opioid use disorder after acute withdrawal

11  management is not appropriate care.  Per the BJA Guidelines, "Opioid withdrawal

12  management without ongoing pharmacotherapy does not treat the underlying OUD

13  and leaves the patient at risk for overdose and death."  Frequently in the reviewed

14  patient charts, medical provider directions were "detox with medication taper"

15  which triggered a fixed clinical course of action for the patient regardless of their

16  clinical response to the medication. *See, e.g.,* SD_213158.  In medicine, that is not

17  how evidence-based care and best practice work.  Patients need constant

18  reassessment using clinical guidelines and treatment tailored to individuals' needs

19  and plans altered based on clinical reassessment and clinical parameters.  The Jail

20  did not regularly reassess patients, as evidenced by SD_747136, pp. 29-32, 35-36,

21  38-40, 43-44, 48, 54-55 and SD_814890, pp. 23-26.

22     104.   Health care staff did not provide symptom-triggered care which means

23  that doses of medication are based on objective clinical parameters and doses are

24  adjusted based on the patient's individualized clinical response to doses of

25  medication.  In other words, a dose may be increased or decreased based on the

26  patient's response.  In fixed dose tapers, there is no accounting for an individual

27  patient's response or lack thereof to a treatment intervention.  Jail staff did not

28  reassess patients based on their responses to given doses of medication and adjust

1  course or dose accordingly.  They also did not typically provide as needed doses

2  (prn doses) for symptoms not addressed by the fixed interval doses and comfort

3  (adjunctive) medications which may treat withdrawal symptoms (*e.g.*, loperamide,

4  an antidiarrheal medication, for diarrhea associated with opioid withdrawal

5  syndrome; or ondansetron, an antiemetic medication, for nausea and vomiting

6  associated with opioid withdrawal syndrome).

7        105.   The Jails do not indicate in their policies and procedures what occurs if

8  acute withdrawal symptoms are not well managed, how and when clinical

9  reassessments are done, and by whom.

10        106.   According to Dr. Montgomery's deposition testimony, dosing of

11  medications, at least with respect to buprenorphine, is now more flexible.

12  Dr. Montgomery sent a message to someone (he speculates that it was to Dr. Rafi)

13  in September 2023, in which he wrote in part, "There was some mention that

14  allegedly docs/providers felt constrained they were only able to prescribe 8/2

15  milligrams for Suboxone (buprenorphine/naloxone)...no more, or no less."  When

16  asked why he sent that message, Dr. Montgomery stated, "The 'Steady state' 8

17  milligrams was just to start, to basically 'tide them over' until they could be seen by

18  a provider.  After that a provider could adjust as needed/they saw fit."  Montgomery

19  Depo. Tr., Vol. II, pp. 278:16-19.

20        107.   Despite this testimony, my opinion that the Jail fails to provide

21  individualized care is not swayed for two reasons:  (1) the policies and procedures

22  still have not been changed, so there is no written directive ensuring jail staff are

23  actually doing what Dr. Montgomery said they would, and (2) based on NaphCare's

24  documented failures to implement adequate substance use disorder treatment

25  previously, and their PMK witness' lack of understanding of acute withdrawal

26  management, NaphCare's apparent control over the management of this program

27  creates a substantial risk that it will not be carried out adequately or effectively.

28

108.   As for alcohol withdrawal,[37] the Jail is not using CIWA-Ar scores consistently to inform their clinical management.  Rognlien-Hood Depo. Tr. at 105:3-24.  As mentioned previously, they are not using the CIWA-Ar consistently or frequently enough and often are not monitoring vital signs.  They use a fixed dose regimen and do not tailor medication doses based on clinical response.  Because the Jail is using a fixed dose front loading regimen, it is especially important that they are doing frequent clinical reassessments to monitor patients for response to management and for side effects.  This is not occurring at the Jail.

109.   The Sheriff's Department also fails to provide individualized care for individuals with opioid use disorder who are experiencing acute opioid withdrawal syndrome, including underdosing buprenorphine for their acute symptoms associated with opioid withdrawal syndrome.  Individuals with opioid withdrawal syndrome often need high doses of buprenorphine to address their symptoms and opioid cravings adequately.  The Jail has consistently underdosed buprenorphine for patients, and, again, has a fixed medication dose and fixed medication taper for all patients regardless of their use before admission to the jail and regardless of their response or lack thereof to the medication.  Queues to get assessed for medication

---

[37] ASAM Clinical Practice Guideline (CPG) on Alcohol Withdrawal Management states: "Diazepam and chlordiazepoxide are the preferred agents for front loading.  This regimen is typically used when rapid administration of a benzodiazepine is required, either because patients are experiencing significant symptoms or are at risk of developing them.  Front loading has been shown to reduce the duration of treatment and incidence of withdrawal seizure and duration of delirium.  This effect is usually attributed to the rapid administration of large amounts of benzodiazepines early in the withdrawal period.  *A front loading regimen can be driven by a withdrawal symptom severity scale (e.g., 10 mg diazepam PO every hour if CIWA-Ar score >10) or according to a fixed schedule (e.g., 20 mg diazepam PO every 2 hours for 3 doses).*  Symptom-triggered front loading has been shown to reduce symptom duration and the amount of benzodiazepine used, the incidence of withdrawal seizures, and the duration of delirium for patients being treated in the ICU. *Fixed-dose front loading can be used in patients for whom it would be difficult to obtain an accurate score on a withdrawal severity scale. While monitoring for signs of oversedation and respiratory depression is important for any dosing regimen, it is particularly important for patients on fixed-dose and front loading regimens.*  Patients receiving fixed doses can become over sedated if the wrong schedule is chosen and front loading doses are rapidly administered."

1   for withdrawal management have been long; individuals often waited days,

2   including ███████████████, ███████████, ███████████████, and ████████

3   ████████

4        110.   Regarding ███████████████, despite a COWS score of 6 on three

5   different assessments, he wasn't offered buprenorphine for another 72 hours. They

6   documented that he refused the buprenorphine because "Those medications make

7   me more sick." Based on this response, he likely had experienced precipitated

8   opioid withdrawal syndrome previously when taking buprenorphine, which occurs

9   from inappropriate timing of dosing. Were the San Diego Jail utilizing a low dose

10  initiation, precipitated opioid withdrawal syndrome could be avoided. *See*

11  SD_991379, SD_991382, and SD_991389.

12       111.   In ███████████████ case, he was on a buprenorphine standard

13  taper, requested to be added to the MAT program on ████████, 2023, but was

14  instead tapered off buprenorphine, until he requested again to be added to the MAT

15  program on ████████, 2023, and finally on ████████, 2023, he was started back

16  on buprenorphine, 7 days after his second request. SD_815165-166. He never

17  should have been tapered off buprenorphine.

18       112.   In ███████████████ case, she informed staff that she had OUD,

19  shared her prior history of being on both buprenorphine and methadone previously,

20  reported using fentanyl the day prior to admission, and still was not started on

21  buprenorphine until she had a COWS score of 6. She also reported to the NP what

22  her dose of buprenorphine had been in the community previously and yet the NP

23  significantly decreased her dose of buprenorphine from 18-24 mg per day in the

24  community to 12 mg daily. SD_800500-502 .

25       113.   ███████████████ waited four days after booking to be approved for

26  medication because the Jail did not contact a provider to initiate a buprenorphine

27  taper until he reached a COWS score of 10.  SD_827304-320.

28       114.   Days-long wait times for medication can place patients at high risk for

1  complications due to withdrawal including return to use, nonfatal or fatal overdose,

2  suicide, or death due to poorly managed withdrawal symptoms (excessive vomiting

3  and diarrhea leading to dehydration, electrolyte imbalances, and fatal arrythmias).

4      115.  In the past, opioid withdrawal syndrome was not even treated in the Jail

5  until a patient had a COWS score of greater than or equal to 6 despite BJA

6  guidelines recommending treatment at a COWS score of greater than or equal to 3.[38]

7  *See, e.g.* SD_213159; Montgomery Depo. Tr. Vol. II, at 167:25-168:3; Exhibit 3,

8  Nix Depo. Tr.; County of San Diego Sheriff's Department, Corrective Action

9  Notice, March 4, 2024 at p. 7).

10     116.  This is another area where Dr. Montgomery claimed in his deposition

11 that the Jail would make changes, but his testimony alone does not convince me that

12 the Jail is now meeting the standard of care.  According to Dr. Montgomery's

13 deposition testimony, "For COWS, in order to safely administer [b]uprenorphine,

14 you need to have them start to go through withdrawals so you don't precipitate

15 anything.  Previously, it was initiating number of six, which is very minor indication

16 of withdrawal.  That has since gone away.  We don't even have a number

17 associated, just any signs of withdrawal is good enough to start [b]uprenorphine,

18 because the intent to is manage, not withdrawal."  Montgomery Depo. Tr. Vol. II, at

19 167:25-168:8.  While it would be an improvement if the Jail were to no longer

20 require a specific score on the COWS to initiate buprenorphine/naloxone,

21 Dr. Montgomery's testimony shows a lack of knowledge regarding initiation

22 strategies with buprenorphine in the current era of dominance of highly potent

23 synthetic opioids ("HPSO"), such as fentanyl and its analogues, in the unregulated

24 drug supply.

25     117.  Dr. Montgomery's testimony reflects a standard or traditional

26

---

27 [38] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023),
https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

28

EXPERT REPORT OF KELLY S. RAMSEY, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  buprenorphine initiation strategy which was utilized in the era before HPSO,

2  dominated by heroin and prescription opioid medication use.  In that era, one did

3  have to wait to initiate buprenorphine until at least moderate opioid withdrawal

4  syndrome was present to avoid precipitating opioid withdrawal syndrome in the

5  person.  However, with HPSO, given their lipophilicity (wide circulation into fatty

6  tissues slowing the metabolism), standard or traditional initiation strategies are often

7  ineffective.  Current initiation strategies, primarily low dose buprenorphine

8  initiation strategies, have proven more effective in the setting of HPSO.

9  Additionally, doing a low dose buprenorphine initiation avoids opioid withdrawal

10  syndrome entirely.  This strategy would be a much safer option in the Jail setting.[39]

11      118.   Once assessed, the standard of care for treating acute opioid withdrawal

12  syndrome and OUD is to stabilize the patient at a buprenorphine dose that prevents

13  both acute symptoms of opioid withdrawal syndrome and opioid cravings as soon as

14  possible, which requires individualized care.  The Sheriff's Department flat-doses

15  and/or historically tapered buprenorphine before considering patients experiencing

16  opioid withdrawal syndrome for the Jails' MAT program. SD_027132.  There is no

17  medical reason for such treatment, and, in fact, this practice puts patients at higher

18  risk for death.  Myriad studies indicate that medication tapers for opioid use disorder

19  increase the risk for death by overdose.[40]

20

---

21  [39] Cohen SM, Weimer MB, Levander XA, Peckham AM, Tetrault JM, Morford KL.  Low
Dose Initiation of Buprenorphine: A Narrative Review and Practical Approach.  J Addict

22  Med. 2022 Jul-Aug 01:16(4):399-406. doi:10.1097/ADM.0000000000000945. Epub 2021
Dec 23.  PMID: 34954746; Sokolski E, Skogrand E, Goff A, Englander H. Rapid Low-

23  dose Buprenorphine Initiation for Hospitalized Patients With Opioid Use Disorder. J
Addict Med. 2023 Jul-Aug 01:17(4):e278-e280.  doi:10.1097/ADM.0000000000001133.

24  Epub 2023 Jan 17.  PMID: 37579112.

25  [40] Chutuape MA, Jasinski DR, Fingerhood MI, Stitzer ML.  One-, three-, and six-month
outcomes after brief inpatient opioid detoxification. Am J Drug Alcohol Abuse.  2001

26  Feb:27(1):19-44.  doi: 10.1081/ada-100103117. PMID: 11373035; Kakko J, Svanborg KD,
Kreek MJ, Heilig M. 1-year retention and social function after buprenorphine-assisted

27  relapse prevention treatment for heroin dependence in Sweden: a randomised, placebo-
controlled trial. Lancet.  2003 Feb 22;361(9358):662-8.  doi: 10.1016/S0140-

28  6736(03)12600-1. PMID: 12606177.

119.   Per the BJA Guidelines, "[A]s discussed in The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder, 'opioid withdrawal management on its own, without ongoing pharmacotherapy, is not a treatment method for opioid use disorder and is not recommended.' For these reasons, it is recommended that individuals with OUD who are at risk for opioid withdrawal be offered initiation of long-term pharmacotherapy for OUD, which should be initiated in a timely manner…"  The BJA Guidelines further recommend the following, "Buprenorphine and methadone are first-line treatments for opioid withdrawal and OUD.  All patients at risk for opioid withdrawal should have rapid access to treatment with these medications."[41]  Opioid withdrawal syndrome could be avoided entirely if the Jail provided low-dose initiations of buprenorphine rather than waiting for patients to experience symptoms of opioid withdrawal syndrome and then starting medication.

120.   The Sheriff's Department's lack of adequate treatment for individuals in withdrawal has caused harm to patients and will continue to do so if not corrected.  The deaths of Gilbert Gil and Vianna Granillo are just two examples of the substantial risk of serious harm that persons experiencing acute intoxication and withdrawal face in the Jail.

121.   The Jail failed to provide adequate acute intoxication management and withdrawal monitoring in the death of Gilbert Gil.  SD_025912-025928; SD 042557.  Mr. Gil died, per the Medical Examiner's report, from hypertensive cardiovascular disease, with contributing factors of diabetes mellitus, methamphetamine toxicity, dehydration, hepatic steatosis and fibrosis, and pulmonary emphysema.  SD_025913.  This evidence demonstrates that Mr. Gil was acutely intoxicated with methamphetamine at the time of his intake, which means

---

[41] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023), https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf).

1  his death was likely preventable.  Potential cardiac complications due to stimulant

2  overamping include arrhythmias, myocardial infarction, stroke, seizure, and cardiac

3  arrest.

4          122.  Video evidence demonstrates that Mr. Gil was clearly having trouble

5  ambulating at admission; to the point that officers had to assist him.  SD_055259-

6  055276.  Staff transported him to the holding cell in a wheelchair, but then took the

7  wheelchair away.  The processing officers at the Jail assumed that all of Mr. Gil's

8  symptoms were due to acute methamphetamine intoxication, apparently based on

9  statements made by the arresting officer, Peter Donaghy.  SD_042557; SD_025912-

10  025928.  Donaghy stated, "I am familiar with the common signs and symptoms

11  displayed by subjects under the influence of various drugs.  I have spoken with

12  dozens of 'self-admitted drug addicts' who have explained the symptoms they

13  display when under the influence.  Since working with EsPD, I have been involved

14  with approximately 10 arrests for drug-related charges."  SD_042557. Jail staff

15  appear to have relied on Donaghy's statement and not to have considered that any

16  other medical conditions were present or that Mr. Gil was at risk of complications

17  from acute methamphetamine intoxication.

18          123.  Mr. Gil stripped off his clothes, defecated, and smeared stool

19  everywhere in the holding cell, which is a clear indication that Mr. Gil was suffering

20  either from more than just acute methamphetamine intoxication or was having

21  severe psychiatric signs and symptoms associated with acute methamphetamine

22  intoxication.  If staff had applied the appropriate standard of care, they would have

23  assessed Mr. Gil for acute or chronic psychiatric issues, acute neurological issues,

24  hypoglycemia, a toxidrome or toxic delirium (including severe psychiatric

25  symptoms) stemming from acute methamphetamine intoxication, or dementia.  The

26  reason that the standard of care required staff to assess Mr. Gil for those conditions

27  is because his clinical symptoms and behaviors were not clearly explained without

28  exploring a significant list of differential diagnoses.  But none of these issues or

EXPERT REPORT OF KELLY S. RAMSEY, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  potential diagnoses were addressed nor even investigated by the Jail's correctional

2  officers or medical staff.  As a result, Mr. Gil died without receiving appropriate

3  care.

4          124.    Another example of the Jail failing to meet the standard of care for

5  acute withdrawal management is the death of Vianna Granillo.  Ms.  Granillo was

6  booked into the Jail on July 8, 2022, which was after NaphCare had become the

7  County's sole contractor for medical care in the Jails (CHP was a subcontractor to

8  NaphCare at the time). SD_003433. At intake around 10 a.m. on July 8, 2024,

9  Ms.  Granillo reported that she used two grams of fentanyl and drank daily, and that

10 she had a history of drug withdrawal.  SD_003441.  She also reported a suicide

11 attempt within "a few weeks" prior to intake.  SD_003439-40.  These were severe

12 risk factors for acute withdrawal that should have resulted in Ms.  Granillo's

13 placement under medical observation if the Jail followed the standard of care.

14 Instead, she was cleared to the Jail Population Management Unit ("JPMU"), which

15 is the custody unit responsible for housing, at intake.  SD_003462.  On the day she

16 was booked, an NP placed her on "comfort medications" (essentially Gatorade),

17 SD_003464, but a STATCare PA did not review her records until two days later.

18 SD_003483-003484. Only then did the STATCare PA order buprenorphine, which

19 she did not receive until July 11, 2022, three days after her intake screening.

20 SD_003464.  On July 11, 2022, she reported feeling "like shit", stating "I've been

21 here for days.  I only got the meds now."  SD_055302.  Despite that statement, she

22 was left in a standard housing cell until she was found unresponsive by Jail staff on

23 July 12, 2022 and unable to be resuscitated.  *Id.*  She had only received one dose of

24 buprenorphine.  Had Ms.  Granillo been started immediately on low dose

25 buprenorphine, in addition to comfort medications, she could have avoided opioid

26 withdrawal syndrome entirely and may not have died.

27 / / /

28 / / /

1

**2.     The Sheriff's Department Fails to Use Methadone
Appropriately to Treat Withdrawal**

2

3      125.    Methadone, like buprenorphine, is a lifesaving medication for persons

4    with opioid use disorder (OUD).  It is associated with approximately a 50% decrease

5    in opioid-related (overdose) mortality and all-cause mortality.  Both methadone and

6    buprenorphine are considered first-line medications for the treatment of acute opioid

7    withdrawal syndrome and long-term treatment of OUD.  Access to methadone is a

8    necessary alternative for some persons with acute opioid withdrawal syndrome who

9    may have a higher opioid tolerance from fentanyl and other HPSO use, and

10   therefore may not receive adequate management from buprenorphine.  Treating

11   persons experiencing withdrawal with methadone eliminates acute opioid

12   withdrawal syndrome entirely without the possibility of precipitated opioid

13   withdrawal syndrome, which can occur with improper buprenorphine timing and

14   dosing.  Methadone is dosed once daily in most cases.  Methadone is administered

15   orally (by mouth) either in diskette (tablet) formulation mixed with water or another

16   liquid or in a liquid methadone formulation.

17      126.    The Jail does not use methadone for acute opioid withdrawal syndrome

18   management.  The Jail is not currently utilizing the hospital/clinic designation from

19   the SAMHSA 42 CFR Part 8 rules, which would allow them to stock and dispense

20   methadone.  In the revised 42 CFR Part 8 rules, issued by SAMHSA in

21   February 2024 and effective as of April 2024, the hospital/clinic designation

22   language is clarified as follows, "If a correctional facility has registered as a

23   hospital/clinic, a physician or authorized staff may administer or dispense narcotic

24   drugs to maintain or manage withdrawal for an inmate as an incidental adjunct to

25   medical or surgical treatment of conditions other than addiction."[42]  The language

26

27   ───────────────────

[42] SAMHSA, 42 CFR Part 8 Final Rule, https://www.samhsa.gov/medications-substance-
28   use-disorders/statutes-regulations-guidelines/42-cfr-part-8

EXPERT REPORT OF KELLY S. RAMSEY, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

was clarified because of underutilization of the rule in non-hospital settings, such as correctional settings and long term care facilities, to expand access to methadone for utilization in treating both acute opioid withdrawal syndrome and long-term management of OUD.  The revised rules clearly and unequivocally state that if a carceral setting has registered as a hospital/clinic, it can treat patients with methadone under the exemption available to hospitals/clinics.  Under this exemption, the hospital/clinic designated facility can dispense methadone for opioid withdrawal syndrome and/or long-term treatment of OUD to patients, provided that they have an additional medical diagnosis besides opioid withdrawal syndrome and/or OUD.  The guidance does not list or otherwise specify the additional diagnoses that are required to use this option, which gives some leeway to the clinician.  There should be clear documentation in the medical record identifying what additional diagnoses the patient has.

127.   The Washington State Department of Corrections has been using the hospital/clinic designation to expand access to methadone in its facilities and has been doing so since before the revision of the 42 CFR Part 8 rules.[43]  John Hopkins University School of Public Health's Bloomberg Overdose Prevention Initiative's team has been providing technical assistance to many states' Department of Corrections and to county jails across the country to increase understanding of and increase implementation of this designation under the 42 CFR Part 8 rules.[44]

128.   Instead of utilizing the hospital/clinic designation, the Jail is relying on

---

[43] Johns Hopkins Bloomberg School of Public Health, Expanding Methadone Access in Correctional Facilities, https://publichealth.jhu.edu/2024/expanding-methadone-access-in-correctional-facilities

[44] FAQ-Methadone-in-Carceral-Settings.pdf (jhsph.edu); Expanding Access to Methadone Treatment for Opioid Use Disorder in Carceral Settings - Opioid Principles (jhsph.edu); Methadone-Fact-Sheet.pdf (jhsph.edu) JHU-026 Methadone White Paper-r1.pdf; Expanding Access to Methadone Treatment for Opioid Use Disorder in Carceral Settings - Justice Community Opioid Innovation Network Coordination and Translation Center (jcoinctc.org).

a relationship with a single community-based Opioid Treatment Programs ("OTP"), Acadia, to provide methadone only to some patients who enter the Jail already on methadone. Dr. Montgomery testified that the Jail "only started working with methadone for about the last month" prior to his April 26, 2024, deposition. Montgomery Depo. Tr. Vol. II at 183:23-24. Acadia is "unable to provide anything in a [jail] facility as in they do not do any in-reach," they just "provide the medications, and they do provide the medical oversight for administration of those medications." *Id.* at 189:23-190:5. The Jail's nascent methadone program is only available to patients who had an existing relationship with Acadia before incarceration. *Id.* at 190:8-12. The shortcomings in this approach are discussed in more detail in Section II(A)(3), below, but the main takeaway for withdrawal management purposes is that if an individual does not enter the Jail already on methadone, there are no opportunities for the patient to access methadone while in the Jail.

129.    The Jail need not, and should not, take such a limited approach to providing methadone. There are three possible options the Jail could pursue to establish a practice of initiating patients on methadone in a correctional setting. The Jail could become an OTP itself, which means that the Jail would need to follow all rules laid out in the 42 CFR Part 8 rules. The Jail can establish a relationship with additional community-based OTPs beyond Acadia, and, with the revision of the 42 CFR Part 8 rules, could now do a telehealth visit with an OTP clinician to have a patient admitted to the OTP while the patient is incarcerated. The Jail would be responsible for doing the admission labs and physical examination for the OTP. In a situation where the patient is at risk for acute opioid withdrawal syndrome, trying to do the admission at the OTP near the time of the intake at the Jail would likely be logistically challenging. The third option for expanding access to methadone in the Jail setting is for the Jail to utilize the hospital/clinic designation as described above.

/ / /

### 3. The Sheriff's Department Fails to Provide Adequate Treatment to Pregnant Persons in Withdrawal

130.   The Sheriff's Department fails to properly treat pregnant persons who may experience acute withdrawal from alcohol, benzodiazepines, opioids, or stimulants.

131.   Pregnant persons and their developing fetuses face unique risk factors when they experience acute withdrawal.  The Jail fails to mitigate those risks by failing to ensure that pregnant persons are monitored adequately and with access to appropriate specialists and subspecialists.

132.   The standard of care for pregnant persons with alcohol withdrawal, benzodiazepine withdrawal, opioid withdrawal, or stimulant withdrawal is inpatient hospitalization at a facility with acute withdrawal management services.  That standard of care includes 24/7 nursing and medical personnel and access to an obstetrician/gynecologist.  The ASAM Clinical Practice Guideline on Alcohol Withdrawal Management for "Patients who are Pregnant" includes the following recommendations, which are necessary to mitigate the risk of serious harm facing pregnant persons experiencing withdrawal:

> "Level of care and monitoring Recommendation VII.27:  Inpatient treatment should be considered for all pregnant patients with alcohol use disorder who require withdrawal management.  Inpatient treatment should be offered to pregnant patients with at least moderate alcohol withdrawal (i.e., CIWA-Ar scores > 10).
>
> Recommendation VII.28:  The CIWA-Ar is an appropriate symptom assessment scale to use with pregnant patients.  Pregnancy is not expected to bias scores on symptom assessment scales.  Clinicians should consider signs and symptoms such as nausea, headache, anxiety, and insomnia to be connected to alcohol withdrawal rather than pregnancy and presume they will abate once the alcohol withdrawal has been effectively treated.
>
> Recommendation VII.29:  During withdrawal management, consult with an obstetrician."[45]

---

[45] The ASAM Clinical Practice Guideline on Alcohol Withdrawal Management.

133.    The BJA's Guidelines state, "Alcohol withdrawal presents significant risks during pregnancy, often requiring care at a hospital with expertise in managing high risk obstetrical cases and with fetal monitoring available."[46]

134.    The Sheriff's Department's policies and procedures provide that "[i]f a pregnant patient is admitted with a history of any alcohol or drug use, an immediate referral will be made to the advanced clinical provider so that the dependence can be assessed and treated appropriately."  SD_027132.  This is unclear and does not give proper procedural guidance to health care staff.  For example, it is not clear from the Jail's policies what constitutes an "advanced care provider" or what experience they are required to have to treat pregnant persons with acute withdrawal.

135.    The NaphCare "Medically Supervised Withdrawal and Treatment – Pregnancy Management" policy states, "Pregnant patients with opioid history will be maintained on appropriate SAMHSA approved medications." NAPHCARE001825.  The procedures section states, "At intake, usual procedures will be followed to identify pregnant patients and obtain a history of drug and/or alcohol use:  1) a) Pregnancy test and urine drug screen; and b) Completion of receiving screen, mental health screen, and Comprehensive Detox Screen. 2) Patients are flagged for Pregnancy in TechCare.  3) Patients are admitted to Detox Dashboard automatically by responses on the intake screening forms." *Id.*

136.    My understanding is that the Jail keeps pregnant persons in the facility rather than sending them to an inpatient setting for appropriate fetal monitoring and OB/GYN consult services.  Pregnant persons in acute withdrawal are not transferred to an inpatient hospital setting where they have access to addiction medicine specialists, OB/GYN specialists, and fetal monitoring.

137.    Ms.  Elisa Serna's case is the most egregious example of the Jail's

---

[46] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023), https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

clinical negligence treating pregnant persons in withdrawal. The Jail's disregard for and indifference to Ms. Serna's welfare and well-being is clearly explained in the First Amended Complaint from *The Estate of Elisa Serna, et al v. County of San Diego, et al*, and thoroughly documented in the video recordings of Ms. Serna in her cell. *See* videos listed in Exhibit B, p. 21. Ms. Serna was clearly ill, unsteady on her feet, fell multiple times and hit her head, exhibited what appeared to be seizure activity, and there was minimal, if any, response from staff in most instances. The patient was accused of faking her symptoms per the document. No one used CIWA-Ar, CIWA-B, or COWS to assess her withdrawal symptoms. Vital signs were taken infrequently. No one seemed to recognize the danger Ms. Serna was in as a pregnant person with polysubstance withdrawal before she died.

138. I understand that the Serna family received the largest wrongful death settlement ever approved by the San Diego County Board of Supervisors, $15 million.[47] As part of the settlement, her family insisted on several changes to Sheriff's Department policies. Among the changes in the Serna Agreement are the following commitments by the County to:

(1) Provide training on compassion to Sheriff's Department detention personnel, including medical personnel;

(2) Provide training on falls to Sheriff's Department detention personnel, including medical personnel;

(3) Provide training on handoff and endorsement practices to Sheriff's Department medical personnel;

(4) Update current policy to memorialize existing practice of checking vitals of incarcerated persons in MOB (medical observation unit) once per shift;

(5) Evaluate the feasibility of providing MOB medical staff access to the existing video monitors showing MOB areas and the feasibility of providing separate monitors to medical staff; and

---

[47] Jeff McDonald, *'We will be watching': After historic settlement, Elisa Serna's parents look to reform deadly jails*, The San Diego Union-Tribune, July 2, 2024, https://www.sandiegouniontribune.com/2024/07/01/san-diego-county-settles-elisa-serna-jail-death-lawsuit-for-15-million-and-limited-federal-oversight/.

(6)   Provide information regarding the operation and frequency of use of scoring scales under the County Sheriff's Department Detention's existing COWS/CIWA protocols, and work cooperatively with Plaintiffs regarding any changes, if necessary, to the protocols.

139.   I have no information on the status of implementation of these reforms. However, it is doubtful to me that they are sufficient to prevent the substantial risk of serious harm that exists for pregnant persons in the Jail.  As previously stated, the standard of care is to place such individuals in the hospital.  Training on falls, compassion and handoff practices are no substitute for the intensive observation and medical monitoring that inpatient care would provide.  In addition, "providing information on the operation and frequency of the scoring scales" is not what is needed to save lives.  Providing information about them is less important than utilizing these assessment tools serially as recommended in current best practice guidelines (e.g., ASAM and BJA) and adjusting treatment based on the scores to ensure that pregnant persons receive the care they need.

140.   The Jail's failure to provide methadone for acute withdrawal management is particularly harmful for pregnant persons who would benefit from methadone.  It is not best practice to change a pregnant person from methadone to buprenorphine during pregnancy.  However, NaphCare's policy and procedure states, "If a patient is confirmed to be receiving methadone in the community and is stable on this medication, the patient should be maintained on methadone for the duration of her pregnancy if possible.  If it is expected to be > 24 hours before the patient can be evaluated by the community methadone prescriber, or if the patient begins to experience significant withdrawal symptoms before the methadone can be dosed, the provider may choose to bridge her with buprenorphine (see Buprenorphine Induction below) or send the patient to the hospital for further evaluation."  NAPHCARE001826.  This is problematic for several reasons.  A pregnant person should not experience any opioid withdrawal, as the fetus likely experiences any withdrawal that the pregnant person experiences.  In the first

1  trimester, this may result in miscarriage, and, in the third trimester, may result in
2  premature delivery.[48] In addition, a person on methadone cannot have treatment
3  substituted with buprenorphine as buprenorphine, being a partial agonist rather than
4  a full agonist at the mu opioid receptor, will precipitate acute opioid withdrawal
5  syndrome in a person on methadone.  While a person may be subjectively
6  experiencing relative opioid withdrawal syndrome, dosing a person who has been on
7  methadone with buprenorphine too early (less than 72 hours after the last dose of
8  methadone) could precipitate acute opioid withdrawal syndrome which could cause
9  the adverse effects previously stated in a pregnant person.

10      141.   The NaphCare policy and procedure further states, "If a patient is
11  confirmed to be receiving methadone in the community but cannot be continued on
12  this treatment in the jail, please contact a corporate provider for assistance with
13  creating an alternative treatment plan with buprenorphine."  NAPHCARE001826.
14  As mentioned previously, it is not the standard of care to switch a pregnant person
15  from methadone to buprenorphine during pregnancy.  I am not confident that a
16  NaphCare corporate provider would have the expertise to advise a clinician in this
17  situation because they have not demonstrated any expertise in addiction medicine,
18  management of SUD or acute withdrawal syndrome, clinical expertise in managing
19  SUD in pregnant persons, nor any clinical knowledge that is nuanced regarding
20  methadone or buprenorphine.  Methadone and buprenorphine are not
21  interchangeable medications and changing from methadone to buprenorphine in a
22  pregnant person could be medically risky and destabilizing for the pregnant person
23  and the fetus.  This could precipitate significant opioid withdrawal and lead to a
24  miscarriage in the first trimester and premature labor in the third trimester.  If this
25  were done at the patient's request, it likely would require an inpatient hospital
26

---

27  [48] Ramsey, KS.  NYS DOH/Johns Hopkins University Clinical Guidelines Program:
    Substance Use Disorder Treatment in Pregnant Adults, 7/2021 (Substance Use Disorder
28  Treatment in Pregnant Adults - Substance Use Care (suguidelinesnys.org)).

1  admission, consultation with an addiction medicine expert, and consultation with an

2  OB/GYN specialist.[49]

3      142.   The Jail is not directly providing methadone as a treatment option for

4  pregnant persons for acute opioid withdrawal syndrome.  The Jail's "Addicted

5  Arrestee Care" policy also has a notable gap in treatment "[i]n the event the

6  pregnant patient comes into custody over a weekend" because it appears to require

7  arranging treatment through "San Diego Health Alliance" but notes "SD Health

8  Alliance has limited hours on the weekends."  SD_027127.  That policy makes it

9  unclear how exactly a pregnant person established with a community-based OTP

10  would obtain their methadone if they were admitted to the Jail over a weekend.  The

11  NaphCare Health Care Policy and Procedure Manual does provide more detail on

12  efforts staff can take to maintain pregnant persons on methadone, but it still gives

13  providers discretion to switch treatment to buprenorphine in the event the pregnant

14  person's community-based OTP is unavailable to provide methadone, which is not

15  the standard of care.  NAPHCARE001827.  Given that the Jail could utilize the

16  SAMHSA 42 CFR Part 8 Rules' hospital/clinic designation and/or the DEA 72-hour

17  Emergency Rule to stock and dispense methadone to patients, there is no reason that

18  methadone should not be available to all pregnant persons who would benefit from

19  it.[50]

20      **4.**     **The Sheriff's Department is Not Adequately Engaging in**
             **Innovation in Care.**

21

22      143.   Even if the Jail were providing adequate withdrawal treatment – which

23  it is not – it would still be necessary to consistently reassess and update its treatment

24

25  [49] Advisory: Evidence-Based, Whole Person Care of Pregnant People Who Have Opioid
Use Disorder | SAMHSA Publications and Digital Products.

26

27  [50] SAMHSA.  42 CFR Part 8 Final Rule, revised 4/2024 (42 CFR Part 8 Final Rule |
SAMHSA); DEA. Rule on Dispensing of Narcotic Drugs to Relieve Acute Withdrawal

28  Symptoms of Opioid Use Disorder, revised 8/2023 (Federal Register :: Dispensing of
Narcotic Drugs To Relieve Acute Withdrawal Symptoms of Opioid Use Disorder).

1   policies, procedures, and protocols to keep up with evolving standards of care.  The

2   reason that innovation in care is necessary is because substances in the unregulated

3   drug supply are constantly changing.  The opioid crisis became significantly more

4   lethal when the amount of fentanyl in the unregulated drug supply dramatically

5   increased.  The Sheriff's Department was unprepared to adjust its substance use

6   treatment practices quickly enough to meet that challenge.  There will be deadly

7   changes in the drug supply again in the future.  When that happens, the Sheriff's

8   Department must be ready to update its treatment policies, procedures, and protocols

9   to protect the incarcerated population.  In order to do that, the Department must

10  exercise control over the policies and practices of health care staff in the Jail.  The

11  existing confusion over whether Department policies, NaphCare policies, or (yet to

12  even be written) CHP policies govern acute withdrawal management in the Jail will

13  prevent the Department from responding to the next crisis.

14      144.   Indeed, the Sheriff's Department has not even updated its current

15  policies and procedures to address the medical needs of the fentanyl crisis that has

16  wreaked havoc in the jails for years now.  Under the applicable policies and

17  procedures, there is no low or high dose initiation for buprenorphine.  Given

18  fentanyl, its analogues, and other high-potency synthetic opioids ("HPSO"), which

19  dominate in the unregulated drug supply, the standard or traditional initiation

20  strategies for buprenorphine used by the San Diego County jails are less effective

21  than they were historically.  If low dose initiation strategies were utilized, opioid

22  withdrawal syndrome could be avoided completely, decreasing patients' risk for

23  poor outcomes.[51]  The policies and procedures have no references more recent than

24  2018, demonstrating they are not keeping current with respect to complex questions

25

26

27

28

---

[51] Weimer MB, Herring AA, Kawasaki SS, Meyer M, Kleykamp BA, Ramsey KS. ASAM
Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals
Using High-potency Synthetic Opioids. J Addict Med. 2023 Nov-Dec 01;17(6):632-639.
doi: 10.1097/ADM.0000000000001202. Epub 2023 Jul 28. PMID: 37934520.

1    in addiction medicine.

2        145.    One major roadblock to the Sheriff's Department's ability to innovate

3    in care is that, going forward, acute withdrawal management remains in the hands of

4    NaphCare, which has proven itself to be unreliable with respect to the quality of

5    care provided for persons who use substances.  Because NaphCare will remain in

6    control of acute withdrawal management, Dr. Montgomery's deposition testimony

7    regarding the Jail's changing practices – changes that are not yet reflected in its

8    written policies and procedures – does not convince me that the Jail will adequately

9    recognize the serious risks of withdrawal going forward.

10        146.    Dr. Montgomery's testimony indicates that the Jail is not well-versed in

11   addiction medicine and is not innovating with respect to the care provided.  For

12   example, Dr. Montgomery testified that NaphCare tapered individuals off

13   buprenorphine from May 2022 until "I think, spring of 2023" (Montgomery Depo.

14   Tr., Vol. II, pp. 100-103), which is clearly counter to the standard of care, per BJA

15   Guidelines.  Dr. Montgomery also testified that the COWS or CIWA-Ar scoring is

16   only done by nurses once daily for individuals on the detox dashboard.

17   Montgomery Depo. Tr., Vol. II, p. 148.  This testimony reflects that the Jail is not

18   well-versed in addiction medicine because the standard of care is to do serial

19   assessments with the COWS, CIWA-A, or CIWA-B scales, not only once daily.

20   Dr. Montgomery acknowledges this is his own testimony, "If you are doing the

21   COWS scoring, that would normally be done every eight hours, but that is a

22   guideline."  Montgomery Depo. Tr., Vol. II, p. 152.  Dr. Montgomery also testified

23   that, "For COWS, in order to safely administer [b]uprenorphine, you need to have

24   them start to go through withdrawals so you don't precipitate anything.  Previously,

25   it was initiating number of six, which is very minor indication of withdrawal.  That

26   has since gone away.  We don't even have a number associated, just any signs of

27   withdrawal is good enough to start [b]uprenorphine, because the intent to is manage,

28   not withdrawal."  Montgomery Depo. Tr., Vol. II, pp. 167-168.  This testimony

reflects that the Jail is not well-versed in addiction medicine because there are newer strategies for buprenorphine initiation that can be utilized so individuals don't need to be in acute opioid withdrawal syndrome in order to initiate buprenorphine.

147.   Until the Sheriff's Department positions itself to innovate in care, the incarcerated population remains unprotected from the next lethal development in the unregulated drug supply.

## II.     The Sheriff's Department Fails to Adequately Treat Persons with Substance Use Disorder

148.   Treating withdrawal is an important first step in treating persons with substance use or substance use disorder ("SUD"), but ongoing treatment for persons with substance use or SUD is needed throughout a person with substance use or SUD's incarceration.  This treatment is necessary for persons with opioid use disorder ("OUD") – which is the focus of the Sheriff's Department's Medication-Assisted Treatment ("MAT") program – as well as for persons with other substance use disorders, including alcohol use disorder and stimulant use disorder.

149.   From LAPPA's Model Access to Medication for Addiction Treatment in Correctional Settings Act, recommended minimum requirements for substance use and SUD treatment in correctional settings include:

(1) Benzodiazepine, stimulant, heroin (and HPSO), alcohol, and opioid withdrawal management;

(2) Access to all forms of medication for addiction treatment to ensure that each program participant receives the particular form found to be the most effective at treating and meeting their individual needs;

(3) Group and individual counseling and clinical support;

(4) Peer support services;

(5) Reentry planning; and

(6) Reentry and transitional support.[52]

---

[52] Legislative Analysis and Public Policy Association. Model Access to Medication for Addiction Treatment in Correctional Settings Act, October 2020.,

150.   The Sheriff's Department has not provided adequate treatment for persons with substance use and SUD during their incarceration and transition from incarceration, which creates a substantial risk of serious harm to incarcerated persons with substance use and SUD.

### A.   The Sheriff's Department's MAT Program Fails to Meet the Standard of Care for Persons with Opioid Use Disorder

151.   In the Third Amended Complaint, Plaintiffs allege that the Sheriff's Department "fails to provide adequate medical treatment for incarcerated people with substance use disorder," including by its "failure to implement a comprehensive MAT program," thereby placing "incarcerated people at risk of serious harm."  Dkt. 231 at ¶¶ 60, 62.  Based on my review of the evidence, I agree. Providing adequate treatment to persons experiencing acute withdrawal syndrome is critical to treating SUD, which, for the reasons explained above, the Sheriff's Department fails to do.  Persons with OUD require far more than just acute withdrawal management.  Incarcerated persons with OUD need medication for opioid use disorder ("MOUD") throughout their incarceration.  The Jail's efforts to provide that treatment through its Medication-Assisted Treatment ("MAT") program have been inadequate, leaving incarcerated persons with OUD at a substantial risk of serious harm.

152.   Persons who are incarcerated in the San Diego County Jails that have OUD are at risk of serious harm, including death, because the Jail's MAT program is inadequate.  The program is inadequate for several overarching reasons.  First, the written policies and procedures fail to ensure the program will be operated to the appropriate standard of care.  Second, in practice, the Jail's MAT program has operated outside of the standard of care.  Third, even though the Jail is shifting

---

https://legislativeanalysis.org/wp-content/uploads/2021/03/Model-Access-to-Medication-for-Addiction-Treatment-in-Correctional-Settings-Act-1.pdf.

1   primary responsibility for several areas of medical care away from NaphCare to

2   CHP, NaphCare is going to remain at the helm of the Jail's MAT program – despite

3   NaphCare's thoroughly documented inability to provide a quality program thus far

4   and their failure to safeguard the welfare of incarcerated persons with SUD.

5   Freedland Depo. Tr. at 152:10-17.  Because NaphCare is retaining full control over

6   the MAT program, Dr. Montgomery's deposition testimony regarding purported

7   changes to the MAT program does not give me confidence that the Jail will run an

8   adequate MAT program going forward.

9        153.   These overall inadequacies are present in each of the key areas of the

10   MAT program, explained in more detail in the following sections.  Those areas

11   include the process for starting persons on MAT, the provision of buprenorphine

12   and methadone, treatment for persons suspected of diversion, and treatment of

13   pregnant persons with OUD.

14        154.   But before getting into those specific areas, it is critical to emphasize

15   that the Jail's decision to leave NaphCare in charge of MAT is dangerous.  Specific

16   evidence of NaphCare's failure to operate an effective MAT program in the Jails is

17   detailed in the sections below, but those failures are perhaps best summarized by

18   one section of Dr. Montgomery's deposition testimony:

19        **Q**. In those conversations [between the Jail and NaphCare] have any of
      them been discussions where you've raised problems with
20    [NaphCare's] execution of responsibilities as part of MAT or MOUD?

21        **A**. Yes. We've expressed our concerns about appropriate operations
      and functions since the contract started.

22        **Q**. As it relates to the provision in MAT and MOUD, what operations
23    and programs are you referring to that you raised with NaphCare?

24        **A**. The provision of induction.  It was a listed item in the contract.  It
      was supposed to be completed within six months of [the] contract['s]
25    start.  It was not.  NaphCare was expected to conduct MAT processes,
      procedures, to actually build a MAT program.  They did not.  Their
26    health services administrator was supposed to be running the MAT
      program meetings, [but] they did not.  They basically refrained from
27    running the meetings and we came up with additional processes
      instead.

28

1   Montgomery Depo. Tr., Vol. II, at 198:14-199:7.

2       155.   The Sheriff's Department is significantly expanding CHP's role in the

3   provision of medical care in the jails, but it has decided to leave NaphCare entirely

4   in charge of the MAT program.  Dr. Freedland testified that "CHP's current role in

5   the MAT program" is "none.  It's NaphCare's program.  They run MAT."

6   Freedland Depo. at 64:2-5.  The Sheriff's Department made this decision even

7   though CHP appeared eager to take over MAT when bidding for the new contract.

8   In its bid responding to the County of San Diego's RFP 446, which ultimately

9   resulted in the new CHP contract, CHP wrote: "For nearly three years, CHP

10  participated in MAT planning and development, and since implementation, CHP has

11  been the exclusive source for MAT continuity across all facilities . . . .  If able, we

12  will continue to ensure MAT services are provided with the appropriate level of

13  care." *See* 2024 CHP Contract at p. 33.

14      156.   The Sheriff's Department's decision to have NaphCare run the MAT

15  program does not give me confidence as to the quality of care that individuals with

16  OUD will receive.  As such, I find claims by Dr. Montgomery in his deposition

17  testimony about changes to the MAT program unreliable without additional clear,

18  supporting evidence that the program has changed, such as new written policies and

19  procedures with clear documentation regarding the number of persons in the MAT

20  program and on MOUD.

21          **1.    The Sheriff's Department's Process for Starting Persons with
                   Opioid Use Disorder on MOUD is Inadequate**

22

23      157.   The standard of care for starting persons on MOUD begins with

24  screening and assessment tools similar to those discussed in Sections I(B) and I(C).

25  Persons should be screened for opioid use and opioid use disorder with a validated

26  screening tool at jail intake.  If they screen positive on the screening tool, then they

27

28

should be assessed for OUD using DSM-5-TR criteria.[53]  If they are identified as having OUD, then they should be offered treatment with first-line medications for the treatment of OUD, either methadone or buprenorphine.  A clinical staff member, either a medical provider (MD/DO, NP, PA) or a nurse should complete the screening and assessment as needed.

158.   Any person who is identified as likely having OUD should be seen by a medical provider immediately to establish a diagnosis and should be started on medication with buprenorphine or methadone, titrated quickly to a therapeutic dose, and continued on a therapeutic dose, with dose adjustments as needed for protracted opioid withdrawal syndrome or for ongoing opioid cravings, from the outset. Individuals with OUD not treated appropriately are more likely to return to use.  The risk of returning to use is all too real in the Jail, as numerous documents that I have reviewed show that access to illicit substances, including highly potent synthetic opioids ("HPSO"), is common in the Jail.

159.   From the BJA's Guidelines, "[e]ffective management of opioid withdrawal involves initiation of long-term buprenorphine or methadone.  When administered in a timely manner, these medications prevent withdrawal and treat OUD.  Opioid withdrawal management without ongoing pharmacotherapy does not treat the underlying OUD and leaves the patient at risk for overdose and death."[54] Unfortunately, tapering individuals off medication, which is not the standard of care, has been the norm historically in the Jail. The Jail has put individuals at risk for overdose and death by tapering them off MOUD.  MOUD is the standard of care for ALL persons with OUD, including in the carceral setting.  As explained below, the

---

[53] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023), https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf) at 95.

[54] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023), https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

Jail's past practices have not met the standard of care, which is to screen, assess, diagnose, and start medication indefinitely (for as long as the individual derives benefit).

160.   The federal prison system is utilizing MAT in all its prisons.[55]  Several states, including Rhode Island and New York,[56] require the use of MAT in all their jails and prisons.  Simply put, access to MAT is the standard of care for all incarcerated persons with OUD.

161.   NaphCare's current written policies and procedures do not meet the standard of care for starting individuals on MOUD or admitting them to the MAT program.  Overall, the written policies reflect an approach to MAT focused more on creating barriers for persons with OUD to access MOUD, rather than ensuring incarcerated persons get the medication they need.

162.   NaphCare's current written policy on MAT states, "NaphCare will participate in Medication Assisted Treatment (MAT) to the extent that the following are met:  (1) the treatment is beneficial to NaphCare's patients; (2) the treatment is within the scope of NaphCare's contractual terms and consistent with policies and procedures of the client jurisdiction:  (3) the treatment is consistent with NaphCare's existing licensures and expertise; and (4) the treatment is consistent with local, state, and federal laws."  NAPHCARE001833.

163.   NaphCare's current written policies and procedures for "initiation or continuation of MAT medication" include the following "conditions":  "an evaluation performed by qualified health staff" to identify "whether the patient: 1)

---

[55] Medication Assisted Treatment for Opioid Use Disorder (bop.gov), Opioid Use Disorder: Diagnosis, Evaluation, and Treatment, Federal Bureau of Prisons Clinical Guidance, August 2021.

[56] Brandeis Opioid Resource Connector, Rhode Island Department of Corrections Implementation of MAT for Inmates, https://opioid-resource-connector.org/program-model/rhode-island-department-of-corrections-implementation-of-mat-for-inmates; NY State Senate Bill 2021-S1795 (nysenate.gov).

Meets criteria for opioid dependence; and 2) Has been dependent on opioids for a minimum of one year;" "there must be a community entity willing to accept this patient upon release that has the ability to provide all of the requisite follow-up care plan called for by the selected MAT therapy;" "Patient populations to prioritized [sic] for initiation of MAT include: 1) Those with a set sentence and known release date, 2) Those with prior history with a MAT program, 3) Those with COWS scores triggering buprenorphine taper, and/or 4) Those initiated in conjunction with drug court order or probation;" "If a patient on opioid based MAT therapy attempts to divert medications or use other substances against their treatment plan, the patient may be disqualified from further opioid based MAT;" "If opioid based MAT medications are discontinued for any reason, the patient may be offered non-opioid based MAT therapy as clinically indicated;" "Any patient not clinically appropriate for placement on MAT will be referred for other appropriate treatment alternatives;" and "Patients will undergo a Urine Drug Screen monthly." NAPHCARE001837-38.

164.   The approach to MAT in NaphCare's written policies and procedures is out of step with the standard of care for providing MOUD because the conditions in the written policies and procedures disqualify people with OUD that need MOUD. Medication should not be denied based on the conditions outlined above.  The procedures' reference to "non-opioid based MAT therapy" is not a substitute for MOUD.  And I question the requirement of a monthly urine drug screen being clinically necessary, which means it is being conducted for punitive reasons to disqualify people with OUD from access to medication.

165.   I recognize that Dr. Montgomery insisted in his deposition that the Jail has not followed these policies and procedures in practice.  But the evidence I have reviewed of the Jail's history of MAT practices – described in detail below – shows that the Jail implemented a convoluted set of protocols by which no one was started on medication that would prevent opioid withdrawal syndrome from occurring in the first place, but rather were placed on observation for opioid withdrawal

1  syndrome, treated with medication after they were in acute withdrawal, were then

2  added to a queue to be assessed for continuation of MAT, may or may not have been

3  placed in the MAT program based on subjective criteria, and, if not, were tapered

4  off medication altogether.

5      166.   The Sheriff's Department has consistently had an uninformed and dated

6  approach to MAT, which has led to the Jail failing to start persons with OUD on

7  MOUD.  This dates back to at least 2021, when the Department was first developing

8  a MAT program.  At that time, Dr. Montgomery explained in an email, "MAT is

9  only one tool that can be used in addressing addiction.  For many years we have had

10 reentry service courses specifically geared toward working with 'addicted'

11 individuals.  Sheriff's Department reentry staff offer evidence-based group classes,

12 individual sessions, and workbooks with an emphasis on addressing substance use

13 interventions.  In addition, individuals are connected to community resources to

14 support their reentry goals upon release."  SD_662118.  This email shows that the

15 Jail thought it was acceptable to offer services other than medication to people with

16 OUD, rather than starting them on MOUD.  There are myriad studies which

17 demonstrate that MOUD, specifically methadone and buprenorphine, is necessary to

18 decrease all-cause and opioid-related (overdose) mortality.[57]  While persons with

19

20 [57] Chutuape MA, Jasinski DR, Fingerhood MI, Stitzer ML. One-, three-, and six-month
   outcomes after brief inpatient opioid detoxification. Am J Drug Alcohol Abuse. 2001
21 Feb:27(1):19-44. doi: 10.1081/ada-100103117. PMID: 11373035: Kakko J. Svanborg KD,
   Kreek MJ. Heilig M. 1-year retention and social function after buprenorphine-assisted
22 relapse prevention treatment for heroin dependence in Sweden: a randomised, placebo-
   controlled trial.  Lancet.  2003 Feb 22:361(9358):662-8. doi: 10.1016/S0140-
23 6736(03)12600-1. PMID: 12606177; Schwartz RP, Gryczynski J, O'Grady KE, Sharfstein
   JM, Warren G, Olsen Y, Mitchell SG, Jaffe JH. Opioid agonist treatments and heroin
24 overdose deaths in Baltimore, Maryland, 1995-2009.  Am J Public Health. 2013
   May;103(5):917-22.  doi: 10.2105/AJPH.2012.301049.  Epub 2013 Mar 14. PMID:
25 23488511; PMCID: PMC3670653; Matthias Pierce, Sheila M. Bird, Matthew Hickman,
   John Marsden, Graham Dunn, Andrew Jones, Tim Millar. Impact of treatment for opioid
26 dependence on fatal drug-related poisoning: a national cohort study in England, First
   published: 09 October 2015, https://doi.org/10.1111/add.13193; Larochelle MR, Bernson
27 D, Land T, Stopka TJ, Wang N, Xuan Z, Bagley SM, Liebschutz JM, Walley AY.
   Medication for Opioid Use Disorder After Nonfatal Opioid Overdose and Association
28 With Mortality: A Cohort Study. Ann Intern Med. 2018 Aug 7;169(3):137-145. doi:

1  OUD may derive additional benefit from individual counseling, groups, and

2  workbooks, those should be available on a voluntary basis to individuals who may

3  want to utilize them *in addition to* medication.  These other services are not a

4  substitute for MOUD, and medication should never be contingent upon engagement

5  in any other services.

6      167.    The Sheriff's Department's alarming disregard for the medical needs of

7  persons with OUD who were denied access to MAT is illustrated by a PRA response

8  to the question, "In the absence of MAT, what options are available for people

9  struggling with addiction?"  The Department responded, "MAT is only one tool that

10  can be used in addressing addiction.  For many years we have had reentry service

11  courses specifically geared toward working with 'addicted' individuals.  Sheriff's

12  Department reentry staff offer evidence-based group classes, individual sessions,

13  and workbooks with an emphasis on addressing substance use interventions.  In

14  addition, individuals are connected to community resources to support their reentry

15  goals upon release."  PRA – Jail Responses to Questions re. MAT, p. 1,

16  DUNSMORE0262187.  None of those alternatives involve medication, which

17  means none meets the standard of care for treating persons with OUD.

18      168.    The Jails' implementation of its MAT program was haphazard, overly

19  complicated, and ultimately inadequate.  A 2022 PowerPoint presentation for the

20  Sheriff's Department stated the following, "Under Housing:  Option 1:  Housing is

---

22  10.7326/M17-3107. Epub 2018 Jun 19. PMID: 29913516; PMCID: PMC6387681;
Wakeman SE, Larochelle MR, Ameli O, et al.  Comparative Effectiveness of Different
23  Treatment Pathways for Opioid Use Disorder. *JAMA Netw Open*.  2020;3(2):e1920622.
doi:10.1001/jamanetworkopen.2019.20622; Watts BV, Gottlieb DJ, Riblet NB, Gui J,
24  Shiner B. Association of Medication Treatment for Opioid Use Disorder With Suicide
Mortality. Am J Psychiatry.  2022 Apr;179(4):298-304.  doi:
25  10.1176/appi.ajp.2021.21070700.  PMID: 35360916; Ajazi EM, Dasgupta N, Marshall
SW, Monaco J, Howard AG, Preisser JS, Schwartz TA. Revisiting the X:BOT Naltrexone
26  Clinical Trial Using a Comprehensive Survival Analysis. J Addict Med. 2022 Jul-Aug
01;16(4):440-446.  doi: 10.1097/ADM.0000000000000931. PMID: 35960214; U.S.
27  Department of Health and Human Services (HHS), Office of the Surgeon General, Facing
Addiction in America:  The Surgeon General's Spotlight on Opioids.  Washington, DC:
28  HHS, September 2018.

the actual program:  anyone outside the housing module is "awaiting placement."
To avoid discrimination/ADA issues, patients would need medications, self-paced
workbooks, and periodic follow-up."  SD_183068.  This is unnecessarily
complicated and seems to imply that medications, self-paced workbooks, and
periodic follow-up were just done for appearances.

169.    At least as of October 30, 2023, the structure of the Jail's MAT
program was woefully inadequate.  Documents SD_332197, SD_332209,
SD_332210, and SD_332212, lay out the elements of the MAT program as of
October 30, 2023.  *See also* SD_332195.  Many of the elements are concerning.

170.    According to SD_332206, SD_332209, SD_332210, SD_332198, and
SD_332197, the MAT program involved separate MAT queues, MAT interest
queues, and a MAT self-study program.  This approach was inadequate because all
persons with opioid use or OUD should be offered long-term MOUD, which is the
standard of care, not some alternative program.

171.    The "process" for MAT assessment was unnecessarily complicated,
which resulted in a failure to identify all persons with opioid use or OUD, a failure
to add all persons at risk for acute opioid withdrawal syndrome to the detox
dashboard, a failure to house individuals at risk for acute opioid withdrawal
syndrome in appropriately medically monitored units, a failure to enroll persons in
the MAT program who needed it, and thus a failure to provide appropriate medical
care for acute opioid withdrawal syndrome and OUD in a timely manner.

172.    In SD_332197, staff roles in MAT, as of October 2023, are outlined.
Nurses were supposed to complete the intake exam and if they identified a person as
having an "active opioid addiction" in TechCare, that person would be added to the
detox dashboard queue, at which point treatment was referred to remote STATCare
personnel.  Those remote personnel wrote orders for comfort medications and for
buprenorphine/naloxone [Suboxone] set to expire in 14 days.  A CHP clinician
(subcontracted with NaphCare at the time) would then see the patient at or about day

1  10 and could continue the buprenorphine/naloxone for another 30 days and add

2  them to the "MAT queue."  Persons also could be added to the "MAT interest

3  queue" for MAT program evaluation.

4      173.   This process was inadequate because it made a simple clinical decision

5  unnecessarily complicated.  The standard of care is to use a validated screening tool

6  to identify opioid use, then use a more comprehensive, validated assessment tool or

7  move to the DSM-5-TR criteria to identify an OUD.  All persons with opioid use

8  and/or OUD should be monitored medically for acute opioid withdrawal syndrome

9  and offered MOUD as an ongoing treatment.  The process at the Jail failed at

10 multiple points in their process to identify opioid use, place persons at risk for acute

11 opioid withdrawal syndrome on the detox dashboard, monitor persons at risk for

12 acute opioid withdrawal syndrome or in acute opioid withdrawal syndrome

13 effectively, or assess persons for, titrate persons, and continue persons on MOUD at

14 therapeutic doses.

15     174.   From there, the process moved to "Phase Two – Induction from

16 COWS," where the inadequacies continued.  At that point, an internal referral would

17 be made to reentry services to assess the person for "a workbook and consideration

18 for the MAT program."  Dr. Montgomery developed flow charts for MAT treatment

19 (SD_332209 and SD_332210) that were unnecessarily complicated and which likely

20 impeded proper administration of care.  In SD_332209, for Phase Two – Induction

21 with COWS, after intake at the Jail, buprenorphine was started at a COWS score >

22 6.  But per the BJA Guidelines, opioid withdrawal syndrome should be treated at a

23 COWS of >= 3.[58] However, management that is less likely to result in harm to

24 persons would be to not wait at all, but to begin either buprenorphine (with a low

25 dose initiation), or methadone before opioid withdrawal syndrome even manifested.

26

27 _____

[58] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023),
https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Sub

28 stance_Withdrawal_in_Jails_6-6-23_508.pdf).

175.   The defective flow chart continued with a fixed dose of buprenorphine (not an individually determined dose) for 14 days with a medical appointment scheduled at 10 days for consideration for the MAT program.  Instead, persons should be started and titrated rapidly to a dose that is effective at eliminating opioid withdrawal syndrome (if any symptoms were present) and diminishing opioid cravings.  Dosing to address opioid cravings will be higher than to address the symptoms of opioid withdrawal syndrome.  Especially in this era with HPSO dominating the unregulated drug supply, higher doses of buprenorphine are likely needed to address severe opioid cravings effectively.[59]  The only exception to that should be if the person did not want to continue the medication after having had a comprehensive discussion with the medical provider regarding the clear benefits of ongoing use of the medication and a nuanced discussion to understand the person's declination of the medication.[60]  In that discussion, the medical provider must assess whether internalized stigma about OUD or MOUD played a role in the person's decision and, if so, make efforts to overcome that stigma.

176.   In Phase Three – Meeting Demand in General Population, a person could be added to the Interest Queue for MAT.  They would then have a "MH/BH assessment for MAT candidacy" (it is unclear who would perform that assessment and what their qualifications to do so are) and could be deemed "not eligible" for the MAT program based on that assessment before they even have an opportunity to see a medical provider.  If they "pass" this screening process, they would then be evaluated by a medical provider who can still deem them "not eligible" for the MAT

---

[59] Weimer MB, Herring AA, Kawasaki SS, Meyer M, Klevkamp BA, Ramsey KS.  ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids.  J Addict Med. 2023 Nov-Dec 01;17(6):632-639.  doi: 10.1097/ADM.0000000000001202.  Epub 2023 Jul 28.  PMID: 37934520.

[60] SAMHSA. Opioid Use Disorder: TIP 63: Medications for Opioid Use Disorder, July 2021.  (TIP 63: Medications for Opioid Use Disorder | SAMHSA Publications and Digital Products).

program.  Essentially, under this process, there were multiple levels of screening and opportunities for persons with OUD to be denied MOUD.  Those who were deemed not eligible for the MAT program were offered a workbook and case management.  Notably, workbooks and case management are not associated with any mortality benefit.

177.   These documents demonstrate a very poor understanding of SUD.  It appears that the Jail created these workflows, MAT queues, and flowcharts to limit the number of individuals on MAT at any given time, not to ensure that everyone in the Jail who needs MAT gets access to MAT.  By creating complex queues and a complex system for medical assessment, persons could wait weeks before being assessed for MAT eligibility.  And persons did, in fact, wait weeks before being assessed.  An October 2023 audit revealed that persons on the list for MAT assessment had been waiting 48-90 days.  SD_670158.  Creating three separate phases for MAT—MAT queues, MAT interest queues, and a MAT self-study program—complicated what should be a straightforward diagnosis of OUD and offer of MOUD.  Offering individual counseling,[61] group counseling,[62] mutual help groups,[63] and peer services[64] [65] all should be offered as part of a comprehensive,

[61] Jhaniee S. Evidence based psychosocial interventions in substance use.  Indian J Psychol Med. 2014 Apr;36(2):112-8. doi: 10.4103/0253-7176.130960.  PMID: 24860208; PMCID: PMC4031575.

[62] SAMHSA. SAMHSA Advisory: Group Therapy in Substance Use Treatment, 2021. Group Therapy In Substance Use Treatment (samhsa.gov).

[63] Stenersen MR. Thomas K. Struble C. Moore KE. Burke C. McKee S.  The impact of self-help groups on successful substance use treatment completion for opioid use: An intersectional analysis of race/ethnicity and sex.  J Subst Abuse Treat.  2022 May;136:108662. doi: 10.1016/j.jsat.2021.108662.  Epub 2021 Nov 20.  PMID: 34840040; PMCID: PMC8940633.

[64] SAMHSA. Peers Supporting Recovery from Substance Use Disorders, Value of Peers Infographics: Peer Recovery (samhsa.gov).

[65] SAMHSA. Incorporating Peer Support into Substance Use Disorder Treatment Services (TIP 64), June 2023.  TIP 64: Incorporating Peer Support Into Substance Use Disorder Treatment Services | SAMHSA

1  voluntary program for SUD treatment.  Compulsory participation should not be

2  required nor should access to medications for addiction treatment be contingent

3  upon participation in any SUD services.

4      178.   There is limited scientific literature evaluating compulsory drug

5  treatment.  Evidence does not, on the whole, suggest improved outcomes related to

6  compulsory treatment approaches, with some studies suggesting potential harms.

7  Given the potential for human rights abuses within compulsory treatment settings,

8  non-compulsory treatment modalities should be prioritized by policymakers seeking

9  to reduce drug-related harms.[66] It is fine to include a self-study component in

10  addition to the above recommended services, but self-study, in and of itself, does not

11  appear to have data to support its efficacy with treating OUD.  Per SAMHSA's TIP

12  63, "Medication is integral to recovery for many people with OUD.  Medication

13  usually produces better treatment outcomes than outpatient treatment without

14  medication.  Supportive counseling environments for clients who take OUD

15  medication can promote treatment and help build recovery capital."[67]

16      179.   Persons waited a significant amount of time to be evaluated for the

17  MAT program.  As mentioned above, results of an audit circulated on October 19,

18  2023, showed patients waiting 42-98 days for MAT evaluation.  Patient ████████

19  ████████  (SD_815265, SD_814999, SD_814925, and SD_814808) was in the jail

20  several times and once was put on a buprenorphine taper but not until he reached a

21  COWS of 8.  He was not assessed for continued buprenorphine until 7 days after he

22  requested a medical evaluation for the MAT program.  Other examples are ████████

23

---

24  [66] Werb D. Kamarulzaman A. Meacham MC. Rafful C. Fischer B. Strathdee SA. Wood E.
25  The effectiveness of compulsory drug treatment:  A systematic review. Int J Drug Policy.
26  2016 Feb;28:1-9.  doi: 10.1016/j.drugpo.2015.12.005.  Epub 2015 Dec 18.  PMID:
   26790691; PMCID:  PMC4752879.

27  [67] SAMHSA. Opioid Use Disorder: TIP 63: Medications for Opioid Use Disorder, July
28  2021.  (TIP 63: Medications for Opioid Use Disorder | SAMHSA Publications and Digital
   Products).

1  ████████, 72 days; ████████████, 76 days; ████████████, 80 days;

2  ███████████████, 98 days; and ████████████, 42 days.  SD_670158.

3      180.  For persons in withdrawal, admission into the MAT program was

4  difficult.  If they were treated with methadone or a low dose initiation of

5  buprenorphine, this would eliminate opioid withdrawal syndrome in most persons

6  and decrease morbidity and mortality related to inadequately managed opioid

7  withdrawal syndrome in the jail setting.  Instead, the Jail put persons on a

8  withdrawal protocol with a fixed dose and a fixed taper and added individuals to a

9  queue to be assessed for the MAT program.  This is not the best practice.  It appears

10  arbitrary who was tapered off medication, which increases their risk for mortality,

11  and who was evaluated for continuation of MAT.

12      181.  After I reviewed the MAT flowcharts from October 2023,

13  Dr. Montgomery testified that the Sheriff's Department's understanding of some of

14  these issues may be evolving.  According to Dr. Montgomery's deposition

15  testimony, the Jail has recognized some of its past MAT practices have been

16  inadequate and is changing those practices, but one critical element of the MAT

17  program that is not changing is the entity responsible for running it—NaphCare.  In

18  fact, the County is now cutting CHP entirely out of the process and relying solely on

19  NaphCare.  The Jail's continued reliance on NaphCare to run the MAT program

20  raises serious doubts that those inadequacies actually will be fixed.

21      182.  Dr. Montgomery's deposition testimony indicating that the Jail intends

22  to make positive changes to its MAT program does not erase the overwhelming

23  evidence that the Jail has failed to operate an adequate MAT program in the past or

24  alleviate the risk that the Jail will continue to operate an inadequate MAT program

25  in the future with NaphCare at the helm.  In the past, the Jail intended to set up the

26  MAT program on a specific timeline and instructed NaphCare to meet certain

27  milestones in establishing the program.  But NaphCare failed to meet those

28  milestones.  The Sheriff's Department contracted with NaphCare in June 2022 for

development of a comprehensive MAT program. Despite this contract, NaphCare was not compliant with the terms of the contract and the County had to initiate a Corrective Action Notice (CAN), a process lasting months. The County, however, did not take any substantive actions against NaphCare for its contractual noncompliance and its failure to implement a comprehensive MAT program within 6 months. It was the County's obligation to ensure the compliance of its contractor, so the County holds responsibility for the repercussions on incarcerated persons by the lack of a comprehensive MAT program.

183. Now, Dr. Montgomery has testified that the Jail intends to make changes to the MAT program and that NaphCare has been instructed to make those changes. But there is a substantial risk that NaphCare will again fail to make those changes. NaphCare's previous failures to establish the MAT program are evidenced by extensive documents and deposition testimony. According to the deposition testimony of Kenneth Jones, MAT initiation ("induction"), per the Sheriff's Department's contract with NaphCare, was supposed to begin in the Jails in December 2022 or January 2023. Kenneth Jones Depo. Tr. at 250:13-16. NaphCare did not comply with the timeline in its contract. According to Mr. Jones' deposition testimony, MAT initiation was only started "5-6 months" prior to his deposition in January 2024. Kenneth Jones Depo. Tr. at 254:3-9. This meant that, prior to the middle of 2023, individuals with OUD but not already on MOUD could not access ongoing lifesaving medication while they were incarcerated. The desperate need for MOUD is illustrated by document SD_670326, which describes a hunger strike that an incarcerated person started in November 2022 because he was denied MAT.

184. Regarding specific changes to the MAT program, Dr. Montgomery testified, "We're not tapering them anymore, we're continuing them on [medication]. Anyone coming into custody that has [a] positive UDS [urine drug screen] -- that has indications on their surveillance on their receiving screening -- would just stay on the medications and then would be starting on MOUD."

1  Montgomery Depo. Tr., Vol. II, at 170:3-8.  That is an improvement over the

2  previous practices, but I am not confident that NaphCare can be entrusted to carry

3  out the changes that Dr. Montgomery described.  The reason that I do not think

4  NaphCare can be trusted is because of the punitive and stigmatizing care they have

5  provided heretofore at the Jail, the inadequate training they have provided to staff

6  regarding SUD, their outdated and inadequate policies and procedures for SUD, and

7  their programmatic deficiencies as documented in the Corrective Action Notices.

8       185.   Dr. Montgomery also testified, "We've kind of changed the definition

9  for MAT is now more for the counseling and therapy, and not that many people

10  want the counseling and therapy.  They just want the meds.  That's how it's

11  oriented."  Montgomery Depo. Tr., Vol. II, at 169:23-170:2.  Again, I acknowledge,

12  per Dr. Montgomery's testimony, that this is a positive development if implemented

13  in practice.  Universal access to MOUD for individuals with OUD should be the

14  norm and ancillary services such as individual counseling, groups, mutual help

15  groups, peer services, and workbooks/self-study still should be offered and available

16  to anyone who may be interested in additional services and supports.  But my

17  concerns about NaphCare's continuing role running the MAT program prevent me

18  from concluding that the MAT program will be adequate going forward.

19       186.   Until last year, the Sheriff's Department did not offer any initiation of

20  MOUD for incarcerated persons.  Instead, it only offered some continuation of

21  MOUD for individuals already on MOUD from the community under limited

22  circumstances, similar to the Department's current inadequate approach to

23  methadone.  Per Dr. Montgomery's deposition testimony, that may have changed:

24  "We can say that as of January 2023 we created the MAT module, which is for a

25  consolidation of all those people in the community that were on MAT.  And we can

26  say that since basically the start of this year, 2024, we have continued with an

27  extended induction that patients coming in that have been identified as being on an

28  illicit substance, an opioid -- typically fentanyl --would be continued on an agonist

medication, particularly [b]uprenorphine, for an extended period of time and would stay on it and would receive access to counseling and therapy.  It's an ongoing program.  It's an evolving program."  Montgomery Depo. Tr., Vol. II, at 154:6-17.  Initiating individuals on to MOUD is not challenging from a clinical lens.  In the carceral setting, there is a concern for diversion which can hinder implementation of universal MOUD; however, there are clear mitigation strategies which can be utilized to decrease the risk of diversion.[68]  If only persons already on MOUD are continued on MOUD, the program will fail to address the scope of opioid use among incarcerated persons.  There are disparities in access to MOUD in the community and those disparities are perpetuated in the jail setting if persons are only continued on MOUD, but not initiated onto MOUD.[69]  Unfortunately,

---

[68] SAMHSA and BJA. Medication-assisted Treatment Inside Correctional Facilities: Addressing Medication Diversion (PEP 19-MAT-Corrections) (Medication-assisted Treatment Inside Correctional Facilities: Addressing Medication Diversion (samhsa.gov)); SAMHSA. Medication Assisted Treatment (MAT) in the Criminal Justice System: Brief Guidance to the States (PEP 19-MATBriefCJS) (MEDICATION-ASSISTED TREATMENT (MAT) IN THE CRIMINAL JUSTICE SYSTEM: BRIEF GUIDANCE TO THE STATES (samhsa.gov)); Evans EA, Pivovarova E, Stopka TJ, Santelices C, Ferguson WJ, Friedmann PD. Uncommon and preventable: Perceptions of diversion of medication for opioid use disorder in jail. J Subst Abuse Treat. 2022 Jul;138:108746. doi: 10.1016/j.jsat.2022.108746. Epub 2022 Feb 23. PMID: 35249789; PMCID: PMC9167208. (Uncommon and Preventable: Perceptions of Diversion of Medication for Opioid Use Disorder in Jail - PMC (nih.gov)); Health Management Associates (HMA). Medications for Opioid Use Disorder Implementation Toolkit, Topic: Medication Administration with Diversion Considerations: The Case for Providing Medication for Addiction Treatment in Jails and Prisons (HMA-Concept-Brief-Medication-Administration-with-Diversion-Considerations.pdf (healthmanagement.com)).

[69] Mark TL. Goode SA. McMurtrie G. Weinstein L. Perry RJ. Improving Research on Racial Disparities in Access to Medications to Treat Opioid Use Disorders.  J Addict Med. 2023 May-Jun 01:17(3):249-257.  doi: 10.1097/ADM.0000000000001104.  Epub 2022 Oct 27. PMID: 37267162; Nguemeni Tiako MJ. Addressing racial & socioeconomic disparities in access to medications for opioid use disorder amid COVID-19.  J Subst Abuse Treat.  2021 Mar:122:108214. doi: 10.1016/j.jsat.2020.108214.  Epub 2020 Nov 24. PMID: 33248862; PMCID: PMC7685132; Lynch, Sean, Katkhuda, Faris, Klepacz, Lidia, Towey, Eldene, Ferrando, Stephen, 2023/02/07, Racial disparities in opioid use disorder and its treatment: A review and commentary on the literature, VL 7, 10.29245/2578-2959/2023/1.1263, Journal of Mental Health & Clinical Psychology; Racial Inequality in Receipt of Medications for Opioid Use Disorder, Michael L. Barnett, Ellen Meara, Terri Lewinson, et al.  The New England Journal of Medicine, Massachusetts Medical Society, May 11, 2023.

NaphCare has demonstrated, repeatedly, that it cannot be trusted to run an effective MAT program that ensures people with OUD will be initiated onto MOUD.

187.    For the reasons described above, NaphCare's written policies and procedures regarding MAT in the San Diego County Jails are inadequate and they have not been updated since June 1, 2023.  NAPHCARE001825.

188.    In practice, NaphCare has applied arbitrary and medically inappropriate criteria to limit access to the MAT program, meaning persons who should be receiving MOUD are not.  NaphCare testified on April 16, 2024, that "[a] lot of different things are considered before a patient is placed on a MAT program, whether it's from detox or a requested induction.  They look at their abuse history, the type of medication or type of illicit drug that they have been known to abuse, their compliance with medication treatment in general.  Do they take their medications regularly? Have they had any previous involvement in a MAT program?  Are they currently enrolled in the MAT program in the community?" Nix Depo. Tr. Vol. I at 109:11-19.  In fact, none of those factors should determine whether someone is "eligible" for the MAT program.  These types of criteria set up a subjective determination regarding who gets into the program and who is prevented access to the program.  Imagine denying a person with any other medical condition their medication based on arbitrary criteria.  Denying MOUD to persons with OUD harms them, risking acute opioid withdrawal syndrome, suicide, return to use, as well as nonfatal and fatal overdoses.[70]  The standard of care is to offer all persons with OUD ongoing medication, not to selectively choose who gets medication based on arbitrary criteria.  The decreased mortality benefit is so significant that not to offer MOUD is blatantly substandard medical care.[71]

---

[70] When Does Denial of Medical Treatment Constitute Medical Malpractice? - Law Offices of Michael L. Oran, Los Angeles Medical Malpractice Attorney - Attorney (californiamedlaw.com).

[71] ASAM.  The ASAM National Practice Guideline for the Treatment of Opioid Use

189.    The fact that NaphCare provided this testimony just ten days before Dr. Montgomery claimed that the MAT program was changing, and that it still has not updated its written policies and procedures outlining similarly arbitrary "conditions" for MAT initiation, leads me to conclude that it will continue to operate an inadequate MAT program that fails to start persons with OUD on MOUD.

190.    Given that treatment with either methadone or buprenorphine decreases opioid-related (overdose) mortality and all-cause mortality by at least 50 percent,[72] it is unethical to withhold lifesaving medication from anyone with opioid use disorder by denying them access to MOUD—not to mention falling below the standard of care for persons with OUD.

## 2.    The Sheriff's Department Limits Doses of Buprenorphine, Contrary to the Standard of Care

191.    The Sheriff's Department's dosing of buprenorphine is outdated and has not been updated to address significant opioid tolerance associated with fentanyl and other highly potent synthetic opioids (HPSO) in the unregulated drug supply.

192.    According to the ASAM Clinical Considerations:  Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids, "[b]uprenorphine dosing during stabilization should be individualized.

---

Disorder, 2020 Focused Update.  (The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder – 2020 Focused Update); FDA.  Information About Medications for Opioid Use Disorder: Advancing Evidence-Based Treatment with MOUD, May 22, 2024.  (Information about Medications for Opioid Use Disorder (MOUD) | FDA); CDC. Overdose Prevention: Opioid Use Disorder: Treating, April 9, 2024 (Opioid Use Disorder: Treating | Overdose Prevention | CDC); SAMHSA. Medication for Substance Use Disorders, April 11, 2024 (Medications for Substance Use Disorders | SAMHSA); SAMHSA. Opioid Use Disorder: TIP 63: Medications for Opioid Use Disorder, July 2021. (TIP 63: Medications for Opioid Use Disorder | SAMHSA Publications and Digital Products).

[72] Larochelle MR, Bernson D, Land T, Stopka TJ, Wang N, Xuan Z, Bagley SM, Liebschutz JM, Walley AY. Medication for Opioid Use Disorder After Nonfatal Opioid Overdose and Association With Mortality: A Cohort Study. Ann Intern Med. 2018 Aug 7;169(3):137-145. doi: 10.7326/M17-3107. Epub 2018 Jun 19. PMID: 29913516; PMCID: PMC6387681.

Although some insurance plans or states may have buprenorphine dose limitations, some patients may benefit from doses higher than 16–24 mg/d.  Higher doses of buprenorphine (≥16 mg daily) appear necessary for rapid stabilization in individuals with HPSO exposure.  Factors such as psychosocial vulnerability, concomitant stimulant use, or mental health conditions may further impede stabilization and necessitate higher doses and a higher level of care.  For highly vulnerable patients, consider the potential lifesaving benefit of using high buprenorphine doses during buprenorphine stabilization (>24 mg daily) and weigh this against potential harms.  Then, document clinical reasoning when patients are prescribed buprenorphine doses >24 mg/d.  Once individuals achieve durable stabilization and have no ongoing full opioid agonist (FOA) use, doses within the range recommended by the ASAM NPG may be effective for long-term treatment."[73]

193.   The ASAM Clinical Considerations continue: "Some patients with high opioid tolerance may require buprenorphine doses above 24 mg/d during treatment stabilization.  [For pregnant persons], physiological changes during pregnancy alter buprenorphine metabolism, necessitating adjusted buprenorphine dose and dosing intervals.  [Providers must also c]onsider dose and frequency adjustments, psychosocial supports, and a higher level of care if individuals are unable to stabilize with buprenorphine.  [They further should c]onsider a reassessment of higher (above 24 mg/d) long-term doses once patients enter long-term treatment without ongoing use of opioids."[74]

194.   According to the operative policies and procedures, the Jail limits doses

---

[73] Weimer MB, Herring AA, Kawasaki SS, Meyer M, Kleykamp BA, Ramsey KS.  ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids.  J Addict Med. 2023 Nov-Dec 01:17(6):632-639.  doi: 10.1097/ADM.0000000000001202. Epub 2023 Jul 28.  PMID: 37934520.

[74] Weimer MB, Herring AA, Kawasaki SS, Meyer M, Kleykamp BA, Ramsey KS. ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids. J Addict Med. 2023 Nov-Dec 01:17(6):632-639. doi: 10.1097/ADM.0000000000001202.  Epub 2023 Jul 28.  PMID:  37934520.

1   of buprenorphine to 16 mg daily, "given lack [of] proven efficacy to buprenorphine

2   doses over 16 mg."  NAPHCARE001835.  This is inaccurate and, increasingly so,

3   with the dominance of HPSO in the unregulated drug supply.  With too low of a

4   dose of buprenorphine, individuals can experience protracted opioid withdrawal

5   syndrome and opioid cravings which risks a return to use and subsequent nonfatal or

6   fatal overdose.

7          195.   Regarding buprenorphine dosing currently at the San Diego Jails, as

8   with other critical elements of the Jail's MAT program, it is unclear what the Jail is

9   actually doing in practice.  NaphCare's current written policy on medically

10  supervised withdrawal and treatment for pregnant persons states "[t]he target dose

11  of buprenorphine lies typically between 8 and 16 mg per day" and "[t]he maximum

12  dose typically required is 24 mg per day secondary to increased metabolism during

13  pregnancy."  NAPHCARE001828.  NaphCare's current written policy on MAT

14  states that buprenorphine 16 mg daily is the maximum dose unless there is a

15  "verified dosage from the community" not to exceed 24 mg.  NAPHCARE001835.

16  It goes on to state, "Doses will be limited to 16 mg daily, given lack of efficacy to

17  buprenorphine doses over 16 mg.  Doses for onsite inductions above 16 mg daily

18  should be discussed with a corporate provider supervisor for approval and split

19  BID."  *Id.*  But most persons using HPSO are very unlikely to be stabilized on a

20  buprenorphine dose of just 16 mg per day or less, especially in pregnant persons.

21         196.   Based on these written policies and procedures, dosing strategies have

22  not improved and kept in sync with the changes in the opioid epidemic.  According

23  to Dr. Montgomery's deposition testimony on buprenorphine, "the medication is –

24  actually has a good half life.  You could certainly dose it once a day easily.  It is

25  certainly easier for administrative and logistical purposes to have it once a day.  The

26  only reason why it had previously -- it could potentially go to twice a day -- is if

27  someone is on a very, very large dose that would potentially need to be broken up

28  into two different dosing components.  You could do up to like, you know, like 12

to 16 milligrams at one time.  If you needed to go to 24 milligrams, then you could consider twice a day." Montgomery Depo. Tr., Vol. II at 186:6-16.  From this testimony, we can glean that the Jail is aware that going up to at least 24 milligrams per day is necessary in some cases.  Although Dr. Montgomery made no mention of the need for higher doses of buprenorphine in the context of the current opioid epidemic.  Dr. Montgomery also described 24 milligrams as a "very, very large dose" which in today's epidemic with HPSO may not even be an adequate dose of buprenorphine.[75]

197.   It appears, per Dr. Montgomery's deposition testimony, that medical providers have some discretion in dosing buprenorphine.  This is appropriate as there should not be a policy with a set limit on dosing, although NaphCare's policy still has a set limit on dosing and has not yet been revised.  Care should be individualized, and medical providers should use their own discretion in dosing based on a patient's needs and response to treatment.  If medical providers lack expertise in addiction medicine and do not keep current in the field of addiction medicine, then they are likely to continue underdosing patients because they are unaware of current innovations in care and clinical recommendations.

### 3. The Sheriff's Department Does Not Adequately Use Methadone to Treat Persons with OUD

198.   Both methadone and buprenorphine should be offered to all persons with OUD.[76]  Broad access to methadone is necessary in order to provide adequate care for persons with OUD.  Access to buprenorphine alone is not enough.  Not

---

[75] Grande LA, Cundiff D, Greenwald MK, Murray M, Wright TE, Martin SA.  Evidence on Buprenorphine Dose Limits: A Review.  J Addict Med. 2023 Sep-Oct 01;17(5):509-516.  doi: 10.1097/ADM.0000000000001189.  Epub 2023 Jun 16. PMID: 37788601; PMCID: PMC10547105.

[76] ER naltrexone also should be available but is a second-line medication for OUD and not associated with a decrease in either opioid-related (overdose) mortality or all-cause mortality, unlike first-line medications buprenorphine and methadone.

everyone with OUD will do well on buprenorphine.  Some persons with OUD and a higher tolerance to opioids due to use of fentanyl and other HPSO may only stabilize clinically with methadone.  In order to provide adequate access to methadone, the Jail could use the DEA 72-hour Emergency Rule to treat individuals for the first 72 hours with methadone to prevent opioid withdrawal syndrome and then connect them with an OTP.  As discussed in Section I(E)(2), the revised 42 CFR Part 8 rules, updated in February 2024 and in effect as of April 2024, clearly allow non-OTP settings to do a physical exam and initial bloodwork for patients to be admitted to an OTP via a virtual visit with an OTP clinician.  Alternatively, the Jails could become OTPs and treat patients with methadone for acute opioid withdrawal syndrome and long-term treatment of OUD.  As of November 2022, all federal prisons in the United States have received provisional certification as OTPs[77] and some county jails and state prison systems in the United States have become OTPs to expand access to methadone.[78]  SAMHSA can approve a facility or system becoming an OTP and NCCHC provides accreditation.[79] The Jail has not utilized any of these options to treat persons with acute opioid withdrawal syndrome with methadone.

199.   Instead, the Jail has only allowed one OTP to give treatment to a small fraction of the jail population that needs methadone.  According to the NaphCare Corrective Action Notice from March 4, 2024, the Sheriff's Department only received the Letter of Agreement ("LOA") between NaphCare and Acadia for the provision of methadone in the Jail on October 11, 2023.  The plan for delivery of

---

[77] FY 2024 Federal Prison System Congressional Submission (justice.gov).

[78] Scott CK, Dennis ML, Grella CE, Mischel AF, Carnevale J. The impact of the opioid crisis on U.S. state prison systems. Health Justice. 2021 Jul 24;9(1):17. doi: 10.1186/s40352-021-00143-9. PMID: 34304335; PMCID: PMC8310396.

[79] Opioid Use Disorder Treatment in Correctional Settings (2021) - National Commission on Correctional Health Care (ncchc.org).

methadone from Acadia to the Jail and the implementation plan and administration plan for methadone in the Jail setting were proposed to the Jail on November 17, 2023.  By December 8, 2023, only one patient in the San Diego County Jails was on methadone.  Exhibit 3, Nix Depo. Tr., County of San Diego Sheriff's Department Corrective Action Notice (CAN), March 4, 2024, at pp. 5-7.  Per Dr. Montgomery's deposition testimony from April 26, 2024, "This is a very new process [the relationship with Acadia for the provision of methadone to the Jail].  We've only started working with methadone for about the last month."  Montgomery Depo. Tr., Vol. II, pp. 182-184.  By June 7, 2024, NaphCare testified that the number of persons receiving methadone treatment was "probably 50 or less," but was unable to provide a firm number.  Nix Depo. Tr., Vol. II, at 66:1-22.  As of that same date, NaphCare testified that a total of "[a] couple hundred" persons were "currently receiving medication-assisted treatment" of some kind.  *Id.* at 66:23-67:2.

200.   NaphCare's inability to provide a firm number of persons receiving methadone in the Jail is just one more example of its broader pattern of providing inadequate care to persons in the Jail.  But whatever the real number is, methadone does not appear to be utilized for acute opioid withdrawal syndrome management nor for methadone initiation in the Jail but rather only for methadone continuation in the Jail.  The Jail's incorporation of methadone into the MAT program is very late, very slow to start, and still administered and managed by NaphCare.  NaphCare has not been able to create and run an effective MAT program with buprenorphine in the Jails and certainly cannot be trusted to administer methadone effectively either.

201.   As mentioned above, the Jail could utilize the hospital/clinic designation from the revised SAMHSA 42 CFR Part 8 Rules to stock methadone and dispense it to individuals for acute opioid withdrawal syndrome management and long-term management of OUD if the patient has an additional diagnosis besides opioid withdrawal syndrome or OUD.  This would eliminate the need for the Jails either to become an OTP or rely on relationships with community-based OTPs

1  (especially on weekends) for methadone dosing.[80]

### 4.  The Sheriff's Department Fails to Ensure Persons are Not Denied Medication for Suspected Diversion

202.  It is to be expected that persons on MAT sometimes divert medications, but that reality does nothing to change whether those persons still need MAT. Despite that, the Jail has previously operated a MAT program with a "zero tolerance" policy for diversion - meaning that a person would be tapered off MOUD and removed from the MAT program if they tried to divert buprenorphine, methadone, or any other medication. *See, e.g.,* NAPHCARE001837; SD_265287; SD_1572590, Exhibit 3 – Nix Deposition:  San Diego County Sheriff's Department Corrective Action Notice (CAN), March 4, 2024, p. 6.  This policy creates a severe risk that persons with OUD will lose their opioid tolerance, become vulnerable to opioid cravings, return to use, and experience nonfatal or fatal overdoses, increasing mortality in the jails.

203.  The Sheriff's Department's policies and procedures require crushing of buprenorphine, stating that it "will be crushed for administration to decrease diversion" and that "[e]fficacy is not changed with crushing buprenorphine." NAPHCARE001835.  Crushing buprenorphine is not best practice and does not occur outside of carceral settings.  There has never been a study assessing the efficacy of crushed sublingual buprenorphine/naloxone tablets compared with administration of uncrushed sublingual buprenorphine/naloxone tablets or sublingual buprenorphine/naloxone films.  That means the Jail is using an untested method of delivering sublingual buprenorphine/naloxone to patients.  Its bioavailability to patients in a crushed delivery mechanism is unknown.  Delivering medication via an untested method violates the standard of care.

---

[80] FAQ-Methadone-in-Carceral-Settings.pdf (jhsph.edu) ; JHU-026 Methadone White Paper-r1.pdf; Methadone-Fact-Sheet.pdf (jhsph.edu); HMA-Issue-Brief-DEA-72-Hour-RuleFinal (rsat-tta.com).

204.   I have identified no relevant studies comparing sublingual administration of crushed buprenorphine/naloxone with uncrushed buprenorphine or uncrushed buprenorphine/naloxone tablets or buprenorphine/naloxone film for the treatment of OUD.[81]  No evidence-based guidelines regarding the administration of crushed buprenorphine or crushed buprenorphine/naloxone for the treatment of OUD were identified.  I have identified no information regarding the effectiveness of the crushed tablet in resolving misuse and diversion issues.[82]  This means that the Jail is using buprenorphine/naloxone crushed tablets which have not been studied at all, violating the standard of care.

205.   There are many mitigation strategies for buprenorphine diversion which could and should be done instead of crushing buprenorphine.  These include counseling patients on the diversion protocol and having patients sign a patient contract that clearly explains the rules and responsibilities of taking MOUD and the consequences of medication diversion; separating medication lines for MOUD; dispensing medications in areas with video surveillance; housing all MOUD patients

---

[81] There has been one randomized controlled trial published out of Finland (2010) that has assessed the bioavailability of crushed buprenorphine – not combined buprenorphine/naloxone, which is what the Jail administers.  In that clinical trial, there was no statistically significant difference (P = 0.95) between crushed and whole buprenorphine tablet groups, with respect to opioid withdrawal as determined using the Short Opiate Withdrawal Scale (SOWS) [sic. COWS in the United States].  There was no statistically significant difference (P = 0.2) between the two groups in opioid cravings.  The dissolution time (i.e. the time that elapsed between placing the tablet in the patient's mouth and the point at which the tablet is no longer visible) was not statistically significantly different between whole and crushed tablets (P = 0.75).  The differences in pharmacokinetic parameters between crushed and whole tablets of buprenorphine were not statistically significant (P values not reported.).  However, the number of patients experiencing adverse events was higher in the crushed tablet group compared to the whole tablet group, although there were no serious adverse events reported in either group.[81]  The findings for the efficacy of crushed buprenorphine are from this single, small (N = 16) study and need to be interpreted with caution.  Based on the limited information available from this one study, definitive conclusions are not possible.

[82] Canadian Agency for Drugs and Technologies in Health.  Rapid Response Report: Summary with Critical Appraisal: Crushed Buprenorphine or Buprenorphine-Naloxone for Opioid Dependency:  A Review of the Clinical Effectiveness and Guidelines, July 18, 2016.  RC0794-Crushed Suboxone Final.pdf (cadth.ca).

together in one housing unit or facility; choosing medications (buprenorphine/naloxone dual formulation instead of buprenorphine mono formulation) and formulations that are more difficult to divert (such as a buprenorphine tablet instead of a film or a methadone diskette mixed with water); requiring patients to drink, eat or talk and open their mouths, in the presence of correctional or health care staff after ingesting medication; conducting random urine drug screenings to confirm persons who are prescribed MOUD are taking it; using automatically unlocking pill boxes that only unlock at pre-set times and only dispense a designated amount of medication; conducting medication inventory weekly, at a minimum; and ensuring procedures are in place to control diversion and accounting of all medications.[83]  Of note, per SD_733277, the Jail has switched from buprenorphine mono formulation to buprenorphine/naloxone dual formulation as of July 14, 2023.  This is a positive step.  Patients in the jail setting should not be denied other medications because of potential diversion when these other diversion mitigation strategies could be done instead.  Withholding medication is not an appropriate response to an administrative or behavioral issue.

206.   NaphCare operated a zero-tolerance policy with respect to diversion at the Jail.  This meant that a person suspected of diverting their buprenorphine was taken off of buprenorphine with no possibility of being reinstated on buprenorphine.  Persons taken off buprenorphine would experience acute opioid withdrawal syndrome, opioid cravings, and, very likely, return to use with risk of nonfatal or fatal overdose.  In my review of documents, I found many examples of improper treatment of persons suspected of diversion.  For example, ███████████ was discontinued from his community provider-initiated buprenorphine for "cheeking"

---

[83] National Council for Mental Well-Being. Medication-Assisted Treatment (MAT) for Opioid Use Disorder in Jails and Prisons: A Planning and Implementation Toolkit, February 2022.  Medication-Assisted Treatment (MAT) for Opioid Use Disorder in Jails and Prisons:  A Planning and Implementation Toolkit - National Council for Mental Wellbeing (thenationalcouncil.org).

1   his buprenorphine.  SD_820631.  Mr. █████ experienced acute opioid withdrawal

2   syndrome, which causes severe physical and emotional distress and

3   symptomatology, and worsening mental health symptoms when taken off his

4   buprenorphine.  Untreated or poorly managed acute opioid withdrawal syndrome

5   can result in death.  From the BJA Guidelines, "Risk for suicidal ideation and

6   attempts is increased among individuals in substance withdrawal and those with an

7   SUD.  Notably, individuals with OUD have a threefold higher risk for suicidal

8   behavior than those without OUD."[84]

9        207.   The written NaphCare policy and procedures still includes a zero

10   tolerance policy for diversion, which is not the standard of care.

11   NAPCHARE001837.  Although Dr. Montgomery disagreed with that policy, he

12   acknowledged that a NaphCare employee had applied that policy in the Jail within

13   the month prior to his April 26, 2024, deposition.  Montgomery Depo. Tr., Vol. II, at

14   102:4-8.

15        208.   In at least one instance, NaphCare has also withheld medication from

16   an incarcerated person for an administrative issue.  SD_259265, Elliott Wade, MD

17   e-mails, pp. 1-4, SD_265287, Elliott Wade, MD emails, p. 1.  This is deeply

18   concerning.  It would be unconscionable to withhold insulin from a person with

19   diabetes due to a behavioral issue.  It is equally unconscionable to withhold MOUD

20   from an individual for the same reason.  Emails from NaphCare Dr. Elliot J. Wade

21   regarding this incident confirm that NaphCare applied a zero tolerance policy to

22   incarcerated persons.  SD_265287.  Dr. Wade wrote about the incarcerated person

23   that "[f]rom chart review, he was diverting his buprenorphine."  SD_265287.  He

24   called this "a serious offense for a patient on MAT inside of a jail, as it threatens the

25   safety and security of the other patients, and potentially puts every other patient on

26

27   [84] BJA, *Guidelines for Managing Substance Withdrawal in Jails* (2023),
https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Sub

28   stance_Withdrawal_in_Jails_6-6-23_508.pdf).

1   MAT in the jail in danger." SD_265287. This language is inflammatory and

2   medically inaccurate. Buprenorphine is a partial agonist at the mu opioid receptor.

3   It only partially activates the receptor and has a ceiling effect on respiratory

4   depression, meaning that if persons who were not opioid tolerant were exposed to it,

5   they would not be harmed and certainly would not overdose on it. Persons who are

6   tolerant to opioids will not feel any euphoria taking buprenorphine. Persons who are

7   not opioid tolerant will feel minimal euphoria and are not at risk for overdose from

8   taking buprenorphine. Buprenorphine is an extraordinarily safe medication, and

9   Dr. Wade's uninformed framing of it as it relates to this person is a cause for serious

10   concern.[85]

11          209.    Dr. Wade's emails reference NaphCare's zero tolerance policy,

12   attaching NaphCare's Health Care Policy and Procedure Manual: F-04: Medically

13   Supervised Withdrawal and Treatment – Medication Assisted Treatment, which still

14   states, "If a patient on opioid based MAT therapy attempts to divert medications, the

15   patient will be **immediately disqualified from further opioid based MAT**.

16   Protocols for medically supervised withdrawal may be instituted for the patient as

17   clinically indicated, along with consideration of a clinically appropriate taper

18   period." NAPHCARE031321 (emphasis added). Dr. Wade further stated that

19   only"[i]f/when the cost of Sublocade [extended-release injectable buprenorphine]

20   improves, it may be an option for some patients. But it would not be for this patient

21   who violated the zero tolerance policy." This application of the zero tolerance

22   policy reinforces NaphCare's, and by extension the Sheriff's Department's, punitive

23

---

24   [85] Walsh SL. Preston KL. Stitzer ML. Cone EJ. Bigelow GE. Clinical pharmacology of
25   buprenorphine: ceiling effects at high doses. Clin Pharmacol Ther. 1994 May;55(5):569-
     80. doi: 10.1038/clpt.1994.71. PMID: 8181201; Dahan A. Yassen A. Romberg R. Sarton
26   E. Teppema L. Olofsen E. Danhof M. Buprenorphine induces ceiling in respiratory
     depression but not in analgesia. Br J Anaesth. 2006 May;96(5):627-32. doi:
27   10.1093/bja/ael051. Epub 2006 Mar 17. PMID: 16547090; Buprenorphine for Opioid
     Use Disorder: Mechanism of Action - Psychopharmacology Institute; Buprenorphine
28   Quick Start Guide (samhsa.gov).

stance towards persons with substance use disorder.  Even when a formulation of the medication is not divertible (e.g., extended-release injectable buprenorphine), it would not be utilized because of the zero tolerance policy.

210.    Dr. Montgomery addressed the zero tolerance policy in his deposition testimony:  "Yes, there was a difference in policy [between NaphCare and the San Diego Sheriff's Department regarding the zero tolerance policy] and, yes, it is true that some patients were subsequently discontinued with medications, but once the [S]heriff's [D]epartment was made aware that such an instance had occurred, th[en] the medications were reinstated."  Montgomery Depo. Tr., Vol. II at 100:20-25. While it is reassuring that Dr. Montgomery does not believe in a zero tolerance policy, NaphCare, unfortunately, is still in charge of the MAT program. NaphCare's pattern of punitive treatment of persons with OUD leads me to believe that punitive treatment will continue.

211.    NaphCare's policy also discontinues incarcerated persons on MOUD at the provider's discretion if a patient has a positive urine drug screen regardless of the substance.  NAPHCARE031318.  This allows for providers to make access to buprenorphine contingent upon abstinence.  Discontinuing treatment because a person on MOUD uses a substance is not the standard of care.  Persons actively using substances while on MOUD are at higher risk for overdose if taken off MOUD (with methadone or buprenorphine).

212.    Additionally, MOUD only treats opioid use disorder, not any other substance use disorder.  We would not necessarily expect other substance use to change because someone is on MOUD, particularly because there is access to substances in the Jail.  *See, e.g.,* Sepulveda Depo. Tr., April 30, 2024 at 135-136; SD_332957:  Eddie Faulkner; SD_337297:  Saxon Rodriguez Case Review; SD_337306:  Saxon Rodriguez Medical Examiner Report; SD_338964:  Omar Ornelas; SD_055681 Omar Ornelas Case Review; SD_055231: Ronaldino Estrada Medical Examiner Report; SD_050647-050652:  Ronaldino Estrada CLERB Report;

1  SD_055160-055169:  John Bousman Medical Examiner Report.  There is

2  overwhelming evidence that illicit substances are available to incarcerated persons

3  throughout San Diego County jail facilities.  I understand that a different expert will

4  opine on the Sheriff's Department's well-documented failure to prevent those

5  substances from entering the jails.

6      213.   The Sheriff's Department is also well aware that persons in its MAT

7  program may use illicit substances while incarcerated, as evidenced by the death of

8  Ryan Thuresson.  Mr. Thuresson was in the MAT program prior to overdosing on

9  fentanyl that he obtained from another incarcerated person in Vista Lower West

10  Module Five.  SD_723628-723631.  If anything, continued opioid use while on

11  MOUD with buprenorphine or methadone likely indicates that the person is not

12  being treated with an adequate dose of medication, underscoring their need to stay

13  on MOUD.  Additionally, if someone with OUD is taken off MOUD and then is

14  released back into the community not on MOUD, their risk of fatal overdose from a

15  return to use is very high.  From the ASAM NPG Guideline on the Treatment of

16  OUD, "Continuation of treatment after release results in a substantial reduction in

17  all-cause and overdose mortality.  Treatment should be individualized, and patients

18  should receive complete information to make informed decisions in consultation

19  with a medical and treatment team."[86]

20           **5.    The Sheriff's Department's Policies, Procedures, and**

21  **Practices for Treating Pregnant Persons with Substance Use Disorder (SUD) Fall Below the Standard of Care**

22      214.   The Sheriff's Department fails to properly treat pregnant persons with

23  substance use disorder and fails to provide appropriate ongoing management with

24  MOUD for pregnant persons with OUD.

25      215.   As explained above, the standard of care for persons with OUD is to be

26

27

28

---

[86] The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder – 2020 Focused Update.

treated with methadone or buprenorphine for as long as they derive benefit. That standard is the same for pregnant persons. What is different is that the risk of fatal overdose increases in pregnancy by trimester and the risk increases even more post-partum, making it even more crucial that pregnant persons with OUD are treated properly.[87] From the ASAM National Practice Guideline on the Treatment of OUD: "Care for pregnant women with opioid use disorder should be comanaged by a clinician experienced in obstetrical care and a clinician experienced in the treatment of opioid use disorder. Hospitalization during initiation of methadone or buprenorphine may be advisable due to the potential for adverse events, especially in the third trimester."[88]

216.  The goal in managing any person with OUD is treating with methadone or buprenorphine at an adequate dose so the person has no opioid withdrawal syndrome and no opioid cravings. This is particularly important for a pregnant person with OUD because symptoms of opioid withdrawal syndrome that the pregnant person experiences could have effects on the pregnant person as well as the fetus, including miscarriage in the first trimester and premature labor in the third trimester. A pregnant person, like any other individual with OUD, who experiences opioid cravings due to an inadequate dose of buprenorphine or methadone, would be at risk for return to use and subsequent overdose risk. The dose must be higher to eliminate opioid cravings than it needs to be to eliminate opioid withdrawal syndrome.

---

[87] Bruzelius E, Martins SS. US Trends in Drug Overdose Mortality Among Pregnant and Postpartum Persons, 2017-2020. JAMA. 2022 Dec 6;328(21):2159-2161. doi: 10.1001/jama.2022.17045. PMID: 36472602; PMCID: PMC9856503; Han B, Compton WM, Einstein EB, Elder E, Volkow ND. Pregnancy and Postpartum Drug Overdose Deaths in the US Before and During the COVID-19 Pandemic. JAMA Psychiatry. 2024 Mar 1;81(3):270-283. doi: 10.1001/jamapsychiatry.2023.4523. PMID: 37991773; PMCID: PMC10918496.

[88] The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder – 2020 Focused Update.

217.   The Sheriff's Department's policies and procedures for treating OUD in pregnant persons are not up to date or informed regarding best practice in treating OUD in pregnant persons.  Despite the current policy being updated in 2023, it does not adequately account for the specific challenges of the current opioid epidemic, most importantly the impact that highly potent synthetic opioids ("HPSO") have on buprenorphine initiation strategies.  NAPHCARE001828.  Opioid withdrawal syndrome could be avoided via a low dose initiation of buprenorphine in pregnant persons.[89]  Dose increases of buprenorphine and methadone, as well as split dosing of medication, may be needed in the second as well as third trimesters due to the physiological changes of pregnancy, including increased blood volume and increased metabolism.[90]  Given the dominance of HPSO in the unregulated drug

---

[89] Coish R, Hardial J. Successful Buprenorphine/Naloxone Low-dose Induction in Pregnancy: A Case Report.  J Addict Med. 2023 Jan-Feb 01;17(1):114-116.  doi: 10.1097/ADM.00000000000f01042.  Epub 2022 Aug 2. PMID: 35916416; PMCID: PMC9897269; Junn S, Tugarinov N, Mark K. Low-dose Induction of Buprenorphine in Pregnancy: A Case Series.  J Addict Med. 2024 Jan-Feb 01;18(1):62-64.  doi: 10.1097/ADM.0000000000001233.  Epub 2023 Oct 20.  PMID:  37862120; Reddy S, Martin CE. Low-dose buprenorphine initiation during pregnancy: a case report.  AJOG Glob Rep. 2024 Jan 11;4(1):100308.  doi: 10.1016/j.xagr.2024.100308.  PMID: 38318265; PMCID:  PMC10839525; Ramsey KS, Cunningham CO, Stancliff S, Stevens LC, Hoffmann CJ, Gonzalez CJ; Substance Use Guidelines Committee. NYS DOH AIDS Institute Clinical Guidelines Program at Johns Hopkins University School of Medicine online publication of "Substance Use Disorder Treatment in Pregnant Adults,"  Baltimore (MD): Johns Hopkins University; 2021 Jul. New York State Department of Health AIDS Institute Clinical Guidelines.  https://www.hivguidelines.org/substance-use/sud-treatment-pregnancy/.

[90] Martin CE. Shadowen C. Thakkar B. Oakes T. Gal TS. Moeller FG. Buprenorphine dosing for the treatment of opioid use disorder through pregnancy and postpartum. Curr Treat Options Psychiatry.  2020 Sep:7(3):375-399.  doi: 10.1007/s40501-020-00221-z. Epub 2020 Jul 28.  PMID:  33585165; PMCID:  PMC7880143; Caritis SN. Bastian JR. Zhang H. Kalluri H. English D. England M. Bobby S. Venkataramanan R. An evidence-based recommendation to increase the dosing frequency of buprenorphine during pregnancy. Am J Obstet Gynecol.  2017 Oct:217(4):459.e1-459.e6.  doi: 10.1016/j.ajog.2017.06.029.  Epub 2017 Jun 29.  PMID: 28669739; PMCID: PMC5614874; Weimer MB. Herring AA. Kawasaki SS. Meyer M. Klevkamp BA. Ramsey KS. ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids.  J Addict Med. 2023 Nov-Dec 01:17(6):632-639.  doi: 10.1097/ADM.0000000000001202.  Epub 2023 Jul 28.  PMID: 37934520; Ramsey, KS. NYS DOH/Johns Hopkins University Clinical Guidelines Program: Substance Use Disorder Treatment in Pregnant Adults, 7/2021 (Substance Use Disorder Treatment in Pregnant Adults - Substance Use Care (suguidelinesnys.org)).

1  supply, doses of buprenorphine could be 32 mg and could even exceed 32 mg per

2  day in pregnant persons.[91]

3      218.   The NaphCare policy and procedure for pregnant and post-partum

4  persons states, "If the patient receiving maintenance treatment gives birth while still

5  incarcerated, medically supervised withdrawal may be carried out as ordered by the

6  advanced clinical provider as indicated" and adds, "No set dosage reduction

7  schedule will be established for all women following birth.  A patient on higher

8  doses of buprenorphine may need a longer period to withdraw than those patients on

9  lower doses."  NAPHCARE001829.  This does not recognize the increased risk for

10  return to use and fatal overdose post-partum nor the ongoing benefits of continuing

11  MOUD.  The policy goes on to state that "Patients expected to remain incarcerated

12  < 30 days after delivery or who otherwise are not felt to be safe to undergo

13  medically supervised withdrawal from opioids may be continued on maintenance

14  therapy per the provider's discretion."  *Id.*  The standard of care is for MOUD to be

15  continued in all persons due to its decreased mortality benefit.  The policy fails to

16  meet the standard of care because it allows for provider discretion.  As discussed

17  above, providers in the jail are not adequately trained in addiction medicine, which

18  creates a substantial risk that an untrained provider will improperly discontinue

19  MOUD.

20      219.   In general, the NaphCare written policy on treatment for pregnant

21  persons with SUD, NAPHCARE001825-1829, is a highly deficient document with

22  recommended care that falls outside the standard of care for pregnant persons with

23  SUD.  It focuses solely on risks of substances to the developing fetus without any

24  focus on risks to the pregnant person, and it focuses solely on benefits to the

---

[91] Weimer MB, Herring AA, Kawasaki SS, Meyer M, Klevkamp BA, Ramsey KS.  ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids.  J Addict Med. 2023 Nov-Dec 01;17(6):632-639.  doi: 10.1097/ADM.0000000000001202.  Epub 2023 Jul 28.  PMID:  37934520.

developing fetus of medication for SUD without any focus on benefits to the pregnant person.  The standard of care is for persons with OUD to be treated with methadone or buprenorphine for as long as they derive benefit.  The risk of fatal overdose increases in pregnancy by trimester and the risk increases even more post-partum.[92]  Despite this, NaphCare imposes a dosing limit for buprenorphine of 24 mg for pregnant persons.  NAPHCARE001828.  The goal in a pregnant person should be no opioid withdrawal syndrome and no opioid cravings.  The dose must be higher to eliminate opioid cravings than it needs to be to eliminate opioid withdrawal syndrome.  This might entail going up to 32 mg or even higher during pregnancy.[93]  NaphCare's policies and procedures do not permit treatment to this standard of care.

## B.    The Sheriff's Department Lacks Policies and Procedures Focused on Treating Alcohol Use Disorder and Stimulant Use Disorder

220.    Once a person is no longer experiencing alcohol or stimulant withdrawal, it is necessary to treat that person's alcohol use disorder ("AUD") or stimulant use disorder while incarcerated to mitigate the risk of return to use.

221.    The standard of care for treating AUD is to offer medication for AUD ("MAUD").  There are three FDA-approved medications for the treatment of AUD, naltrexone (both the oral formulation and the extended-release injectable

---

[92] Bruzelius E, Martins SS.  US Trends in Drug Overdose Mortality Among Pregnant and Postpartum Persons, 2017-2020. JAMA. 2022 Dec 6;328(21):2159-2161.  doi: 10.1001/jama.2022.17045.  PMID: 36472602; PMCID:  PMC9856503; Han B, Compton WM, Einstein EB, Elder E, Volkow ND.  Pregnancy and Postpartum Drug Overdose Deaths in the US Before and During the COVID-19 Pandemic.  JAMA Psychiatry. 2024 Mar 1;81(3):270-283.  doi: 10.1001/jamapsychiatry.2023.4523.  PMID: 37991773; PMCID:  PMC10918496.

[93] Weimer, Melissa B. DO, MCR, DFASAM; Herring, Andrew A. MD; Kawasaki, Sarah S. MD, FASAM; Meyer, Marjorie MD; Kleykamp, Bethea A. PhD; Ramsey, Kelly S. MD, MPH, MA, FACP, DFASAM. ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids.  Journal of Addiction Medicine 17(6):p 632-639, 11/12 2023. | DOI: 10.1097/ADM.0000000000001202.

formulation), acamprosate, and disulfiram.[94]  MAUD is highly underutilized and can improve outcomes for persons with AUD.  There also are several medications (baclofen, gabapentin, topiramate to name a few) that are effective for treating AUD that would be off label use as they are not yet FDA-approved for this indication.[95] Mutual support groups, such as Alcoholics Anonymous, also are effective for the treatment of AUD.[96]  Evidence-based behavioral interventions for AUD include relapse prevention, contingency management, motivational enhancement, couples therapy, 12-step facilitation, community reinforcement, and mindfulness.[97]  As with treatment of other SUD, a menu of services should be offered to individuals with AUD, including group counseling, individual counseling, mutual support groups, and access to a peer specialist.  All these services and supports should be voluntary and access to MAUD should not be contingent on participation in any additional services and supports.

222.  Similarly, the standard of care for treating stimulant use disorder is to consider use of off label medication as well as offering a menu of services, including group counseling, individual counseling, mutual support groups, and

---

[94] McPheeters M, O'Connor EA, Riley S, et al. Pharmacotherapy for Alcohol Use Disorder: A Systematic Review and Meta-Analysis. *JAMA.* 2023;330(17):1653–1665. doi:10.1001/jama.2023.19761

[95] Fischler PV, Soyka M, Seifritz E, Mutschler J. Off-label and investigational drugs in the treatment of alcohol use disorder: A critical review. Front Pharmacol. 2022 Oct 3;13:927703. doi: 10.3389/fphar.2022.927703. PMID: 36263121; PMCID: PMC9574013.

[96] Patel AK, Balasanova AA. Treatment of Alcohol Use Disorder. *JAMA.* 2021;325(6):596. doi:10.1001/jama.2020.2012; New Cochrane Review finds Alcoholics Anonymous and 12-Step Facilitation programs help people to recover from alcohol problems | Cochrane.

[97] Flanagan JC, Jones JL, Jarnecke AM, Back SE. Behavioral Treatments for Alcohol Use Disorder and Post-Traumatic Stress Disorder. Alcohol Res. 2018;39(2):181-192. PMID: 31198657; PMCID: PMC6561400; Carroll KM, Kiluk BD. Cognitive behavioral interventions for alcohol and drug use disorders: Through the stage model and back again. Psychol Addict Behav. 2017 Dec;31(8):847-861. doi: 10.1037/adb0000311. Epub 2017 Aug 31. PMID: 28857574; PMCID: PMC5714654.

access to a peer specialist.  Evidence exists for both non-psychostimulant medications (for cocaine use disorder: bupropion, topiramate; for amphetamine-type stimulant use disorder: bupropion, bupropion and naltrexone, topiramate, mirtazapine) and general psychostimulant medications (for cocaine use disorder: modafinil, topiramate and extended-release mixed amphetamine salts, amphetamine formulations; for amphetamine-type stimulant use disorder: methylphenidate). Effective behavioral interventions for stimulant use disorder include contingency management, community reinforcement approach, cognitive behavioral therapy, and some technology-based interventions.[98]  All these services and supports should be voluntary and access to medication for stimulant use disorder should not be contingent on participation in any additional services and supports.

223.    Based on the documents I reviewed, it does not appear that the Sheriff's Department has a dedicated set of policies to treat AUD or stimulant use disorder after an incarcerated person has stopped experiencing withdrawal.  Developing policies and procedures specific to AUD and stimulant use disorder is necessary to mitigate the risk that incarcerated persons with those disorders will return to use – either while incarcerated or after being discharged.

### III.    The Sheriff's Department's Policies and Practices Regarding Overdoses Do Not Adequately Protect Persons at Risk of Overdose.

224.    In my opinion, the San Diego Jails have not had an adequate or appropriate response to overdoses which have occurred inside the Jails.  As

---

[98] The ASAM/AAAP Clinical Practice Guideline on the Management of Stimulant Use Disorder. Journal of Addiction Medicine 18(1S):p 1-56, May/June 2024. | DOI: 10.1097/ADM.0000000000001299, https://downloads.asam.org/sitefinity-production-blobs/docs/default-source/quality-science/stud_guideline_document_final.pdf?sfvrsn=71094b38_1; Judith Griffin, MD; William Supplee, MD Writing group: Susan D. Whitley, MD; Timothy J. Wiegand, MD, FACMT, FAACT, DFASAM; Sharon L. Stancliff, MD; Brianna Norton, DO, MPH; Christopher J. Hoffmann, MD, MPH, MSc; Charles J. Gonzalez, MD. Clinical Guidance: Stimulant Use (7/16/24) - Substance Use Care (suguidelinesnys.org).

discussed in detail in Sections I and II, the Jail's failure to adequately treat withdrawal and SUD creates a substantial risk that incarcerated persons will return to use and overdose.  When incarcerated persons do overdose, they are at substantial risk of serious harm due to the Jail's inadequate response to overdoses.

225.   The Jail's strategy in responding to overdoses seems to be to just give as many naloxone doses as possible as quickly as possible.  These doses are provided without recognizing that naloxone takes a minimum of 2-5 minutes to work and without recognizing the impact of excessive naloxone use on an individual with opioid dependence in precipitating significant severe opioid withdrawal syndrome.  The Jail does not recognize the impact of the adulteration of the unregulated drug supply on what an overdose looks like and how an individual's response to naloxone may look when other substances are also contributing to the overdose.

226.   Overdose intervention must evolve and change to have an effective response as the unregulated drug supply evolves and changes.  Prior to the advent of fentanyl and other HPSO in the drug supply and the emergence of sedative adulterants (such as xylazine, synthetic benzodiazepines, and medetomidine) in the HPSO supply, overdose reversals were fairly straightforward.  They involved giving naloxone, giving rescue breaths as needed, and watching the person wake up, walk, talk, etc.  During the COVID-19 pandemic, the standard of care for overdose prevention and intervention training was simplified and often eliminated the teaching of rescue breathing because of the fear of COVID-19 transmission and acquisition.  But during that same period, the unregulated drug supply continued to evolve and the HPSO supply increasingly became adulterated with sedative components, which change how a person presents in an overdose situation and what their response looks like after administration of naloxone.

227.   Unfortunately, despite polysubstance use being the most common type of substance use, and, therefore, the most common type of overdose, overdose

1  responders in the San Diego County Jail only address the opioid component of the

2  overdose, and, often, only with naloxone, often given in excessive amounts.  Despite

3  the evidence that additional amounts of naloxone are not necessary even with the

4  dominance of HPSO in the unregulated drug supply, often the only strategy

5  employed by the San Diego County jails in an overdose situation is to continue

6  giving naloxone.

7      228.   Most overdose situations require only 1-2 doses of standard 4 mg

8  intranasal naloxone to reverse the opioid component of the overdose.[99]  The

9  response to naloxone should be normalization of breathing.  Given the ubiquitous

10  presence of sedatives in the HPSO supply, often persons do not wake up, walk, and

11  talk after opioid overdose reversal but rather remain unconscious.  If a person's

12  breathing is normalized, but they remain unconscious, then they should be placed in

13  the recovery position on their side to avoid aspiration if they vomit.  If

14  normalization of breathing does not occur after 2 doses of naloxone, spaced 2-5

15  minutes apart, other measures to support and assess airway, breathing, and

16  circulation should occur.  Those supportive measures may include use of an oral

17

18  [99] Bell A. Bennett AS. Jones TS. Doe-Simkins M. Williams LD.  Amount of naloxone
used to reverse opioid overdoses outside of medical practice in a city with increasing

19  illicitly manufactured fentanyl in illicit drug supply.  Subst Abus.  2019:40(1):52-55.  doi:
10.1080/08897077.2018.1449053.  Epub 2018 Jun 25.  PMID: 29558283; Carpenter J,

20  Murray BP. Atti S. Moran TP. Yancey A. Morgan B. Naloxone Dosing After Opioid
Overdose in the Era of Illicitly Manufactured Fentanyl. J Med Toxicol.  2020

21  Jan:16(1):41-48.  doi: 10.1007/s13181-019-00735-w. Epub 2019 Aug 30.  PMID:
31471760; PMCID:  PMC6942078; Hill LG, Zagorski CM, Loera LJ.  Increasingly

22  powerful opioid antagonists are not necessary.  Int J Drug Policy. 2022 Jan;99:103457.
doi: 10.1016/j.drugpo.2021.103457.  Epub 2021 Sep 21.  PMID: 34560623; PMCID:

23  PMC8454200; NYS DOH Data Brief: Post-Naloxone Symptoms Among People
Administered 8mg vs. 4mg Intranasal Naloxone—New York State (NYS), 2022-23,

24  9/2023; Payne ER, Stancliff S, Rowe K, Christie JA, Dailey MW.  Comparison of
Administration of 8-Milligram and 4-Milligram Intranasal Naloxone by Law Enforcement

25  During Response to Suspected Opioid Overdose — New York, March 2022–August 2023.
MMWR Morb Mortal Wkly Rep 2024;73:110–113.  DOI:

26  http://dx.doi.org/10.15585/mmwr.mm7305a4; Trends-in-Paramedic-Naloxone-
Administration-and-Patient-Outcomes-Throughout-Increased-Fentanyl-Use.pdf

27  (michigan.gov); Lemen, P.M., Garrett, D.P., Thompson, E. *et al.* High-dose naloxone
formulations are not as essential as we thought.  *Harm Reduct J* **21**, 93 (2024).

28  https://doi.org/10.1186/s12954-024-00994-z.

1    airway, a nasal airway, a pulse oximeter, supplemental oxygen administration via a

2    nasal cannula or a mask, a bag valve mask, rescue breathing, CPR, etc.  The main

3    effect in an overdose of opioids and/or sedatives is respiratory suppression.  The

4    urge to breathe is an involuntary activity.  Opioids dull the receptors' response to

5    carbon dioxide in the bloodstream thus suppressing the urge to breathe.  In contrast,

6    most sedatives in the unregulated drug supply are also muscle relaxants and relax

7    the tongue which then blocks the airway not allowing the person to breathe, even if

8    the opioid component of the overdose has been reversed with naloxone.  If the

9    individual remains unconscious due to the sedative effect, they cannot move their

10   own tongue out of the way.  The overdose respondent needs to move the tongue out

11   of the way by use of a head tilt/chin lift maneuver, an oral airway, or placement of

12   the individual in the recovery position.  Failure to support airway and breathing, in

13   addition to giving naloxone, may result in a fatal rather than a nonfatal overdose.

14   Additionally, fentanyl, its analogues, and some other HPSOs have been reported to

15   cause chest wall rigidity in some individuals.  Chest wall rigidity requires

16   intervention with breathing support (with oxygen administration) in addition to

17   administration of naloxone.[100]

18        229.   Given the number of overdoses that have occurred in San Diego

19   County jails, it is quite surprising that the Jail would not utilize all means to

20   decrease the possibility of substances entering the Jail including body scanning all

21   staff, volunteers, and contractors entering the Jail—not just assuming that all

22   substances enter via incarcerated persons, visitors of incarcerated persons, or the

23   mail.  I am citing just a few cases in which overdoses occurred within the Jails:

24   William Schuck (SD_1030579, SD_055802, SD_055823), Eddie Faulkner

25   (SD_332957), Saxon Rodriguez (SD_ 337295, SD_337297, SD_337306,

26

27   _____

28   [100] Coruh. B.. Tonelli. M. R., & Park, D. R. (2013).  Fentanyl-induced chest wall rigidity.
     Chest, 143(4), 1145–1146.

1  SD_055725, SD_050653, SD_055712), James Bousman (SD_337524, SD_055160),

2  Omar Ornelas (SD_338964, SD_055689), Ronaldino Estrada (SD_055231,

3  SD_050647, SD_055222), and Joshua Fosbinder (NAPHCARE041575).  In

4  Mr. Faulkner's case, Jail staff was informed there were substances on the unit but

5  did not find them.  The patient fatally overdosed the same day.  SD_332957.

6          230.   Regarding the Jail's naloxone policies, the appropriate standard of care

7  is for naloxone boxes in all units to be unlocked and available to staff and

8  incarcerated persons.  All staff should carry naloxone on their person.  All

9  incarcerated persons should have naloxone available to them in their cells.[101]

10  According to named Plaintiff Gustavo Sepulveda's deposition testimony,

11  Mr. Sepulveda developed opioid use disorder, while incarcerated, with fentanyl

12  smuggled into the Jail.  Repeatedly, he begged to be placed on the Jail's MAT

13  program as he was afraid of fatally overdosing and could not stop using the

14  smuggled fentanyl, which, apparently, was easy to access within the confines of the

15  Jail.  Because the Jails were not initiating buprenorphine in incarcerated persons at

16  that time, his requests were denied.  Sepulveda Depo. Tr., April 30, 2024, pp. 142-

17  145, 172-174.  The deposition testimony of Mr. Sepulveda is illustrative of the Jail's

18  failure to meet the appropriate standard of care for naloxone:

19          **Q** [O]n June 19, 2022, you requested on a medical inmate request at
        Central Jail, 'I'm requesting two Narcan dispensers that I can keep in
20          my cell.  It's great that we have them available in the dayroom now but
        in the event that I should overdose during lockdown when nobody is in
21          the dayroom those would be no help.  Just like pushing the call box
        button and not getting a response.' When you're on lockdown, does
22          that mean that you cannot get out of your cell?

23          **A** That's correct.

24  The testimony continues:

25          **Q** Okay.  And then the response [from the Jail] is "At this time Narcan
        is only available in the dayroom and in case of emergency.  There
26          should be no opiate overdose as you are not prescribed any."  What, if

27  ───────────────
[101] A-primer-for-implementation-of-OEND-in-jails-and-prisons-Wenger-2019-RTI.pdf
28  (harmreduction.org).

1    anything, "There should be no opiate overdose as you are not
2    prescribed any" mean to you?

3    **A** It means that they're ignoring the fact that fentanyl is abundantly
     available in the jail system.

4    Sepulveda Depo. Tr., April 30, 2024, pp. 172-174.

5    231.    This is an example of an incarcerated person telling the staff that he is

6    using fentanyl in the Jail, wants help, and requests naloxone in his cell because he is

7    afraid of fatally overdosing.  The response he gets is that he is not prescribed an

8    opioid (sic., fentanyl) so he is not at risk of an opioid overdose.  I find it appalling

9    that his risk and self-report of illicit fentanyl use within the confines of the Jail was

10   so callously ignored.  There is no harm to allowing incarcerated persons unrestricted

11   access to naloxone.  Access to and distribution of naloxone does not increase

12   substance use.  Naloxone is inert when opioids are not present in an individual's

13   system.  There are no medical or psychiatric contraindications to the use of

14   naloxone.  It is not possible to misuse naloxone or receive any euphoria from

15   naloxone.  Naloxone is not contraindicated in any population, including pregnant

16   persons.  Giving someone naloxone who has no opioids in their body will not harm

17   them.[102]  There really are no downsides to having unrestricted access to naloxone,

18   which is why the standard of care – which the Jails have not met – is to provide

19   unencumbered access to naloxone for incarcerated persons.

20   232.    There is inadequate training on overdose response in the Jail and they

21

22   _____
     [102] Non-prescription ("Over-the-Counter") Naloxone Frequently Asked Questions |
23   SAMHSA (updated 4/4/23); ASAM. ASAM Public Policy Statement: Public Policy
     Statement on the Use of Naloxone for the Prevention of Opioid Overdose Deaths, 2016
     (use-of-naloxone-for-the-prevention-of-opioid-overdose-deaths-final.pdf (asam.org)): Doe-
24   Simkins M, Quinn E, Xuan Z, Sorensen-Alawad A, Hackman H, Ozonoff A, Walley AY.
     Overdose rescues by trained and untrained participants and change in opioid use among
25   substance-using participants in overdose education and naloxone distribution programs: a
     retrospective cohort study.  BMC Public Health.  2014 Apr 1;14:297.  doi: 10.1186/1471-
26   2458-14-297.  PMID: 24684801; PMCID:  PMC4004504; Siegler A, Huxley-Reicher Z,
     Maldijan L, Jordan R, Oliver C, Jakubowski A, Kunins HV.  Naloxone use among
27   overdose prevention trainees in New York City:  A longitudinal cohort study.  Drug
     Alcohol Depend.  2017 Oct 1;179:124-130.  doi: 10.1016/j.drugalcdep.2017.06.029.  Epub
28   2017 Jul 24. PMID: 28772172.

are not administering naloxone correctly because they are not giving it adequate time to work before giving the next dose (if needed).[103]  As for training, documents SD_041475 (p. 17), SD_1030381, SD_337295, SD_337524, SD_338964, SD_339036, SD_055689 (p. 1), SD_055160 (p. 5), NAPHCARE041423 (p. 1), SD_055886 (pp. 3-4), SD_337297, SD_1030589, SD_117416, SD_055681 (p. 5), SD_055159, and NAPHCARE041575 (p. 3), demonstrate that staff are not trained appropriately to recognize a polysubstance overdose or for an effective code response or overdose intervention, particularly in a polysubstance overdose situation, which is the norm in an overdose situation.  Those training documents state that naloxone doses are given repeatedly, often every minute, without an appropriate interval (2-5 minutes) between doses.[104]  This creates a  risk of precipitating significantly more opioid withdrawal syndrome than necessary with excess naloxone doses.[105]  This risks harming the person experiencing the precipitated opioid withdrawal syndrome, which can be severe, because it leads to an unnecessary and painful experience of acute opioid withdrawal syndrome and makes individuals less likely to want naloxone used on them.[106]  Even with the

---

[103] Strauss DG. Li Z. Chaturbedi A. Chakravartula S. Samieegohar M. Mann J. Nallani SC, Prentice K. Shah A. Burkhart K. Boston J. Fu YA. Dahan A. Zineh I. Florian JA. Intranasal Naloxone Repeat Dosing Strategies and Fentanyl Overdose: A Simulation-Based Randomized Clinical Trial.  JAMA Netw Open. 2024 Jan 2;7(1):e2351839. doi: 10.1001/jamanetworkopen.2023.51839.  PMID: 38261323; PMCID:  PMC10807299.

[104] Strauss DG. Li Z. Chaturbedi A. Chakravartula S. Samieegohar M. Mann J. Nallani SC, Prentice K. Shah A. Burkhart K. Boston J. Fu YA. Dahan A. Zineh I. Florian JA. Intranasal Naloxone Repeat Dosing Strategies and Fentanyl Overdose:  A Simulation-Based Randomized Clinical Trial.  JAMA Netw Open. 2024 Jan 2;7(1):e2351839.  doi: 10.1001/jamanetworkopen.2023.51839. PMID: 38261323; PMCID:  PMC10807299.

[105] HMA-Report-Compassionate-Overdose-Response-Summit_5-1-FINAL.pdf (healthmanagement.com): Yugar B. McManus K. Ramdin C. Nelson LS. Parris MA. Systematic Review of Naloxone Dosing and Adverse Events in the Emergency Department.  J Emerg Med. 2023 Sep;65(3):e188-e198.  doi: 10.1016/j.jemermed.2023.05.006.  Epub 2023 Jun 7.  PMID: 37652808.

[106] Lai JT, Goldfine CE, Chapman BP, Taylor MM, Rosen RK, Carreiro SP, Babu KM. Nobody Wants to Be Narcan'd:  A Pilot Qualitative Analysis of Drug Users' Perspectives on Naloxone.  West J Emerg Med. 2021 Feb 8;22(2):339-345.  doi:

1 prevalence of HPSO in the unregulated drug supply, there is not compelling

2 evidence of additional naloxone being necessary to reverse opioid overdoses.[107] [108]

3     233.   The death of Vianna Granillo demonstrates the problem with the Jail's

4 practice of repeatedly administering naloxone in lieu of other treatment.  As

5 discussed above, Ms.  Granillo likely died of complications from untreated

6 withdrawal, not an overdose.  But naloxone was still administered nine times, while

7 other potentially life-saving treatment was not adequately provided.  SD_055301 (p.

8 2).  In an ensuing lawsuit brought by Ms.  Granillo's family, the Complaint explains

9 the shortcoming of Jail staff's response: "Deputies administered Narcan to no effect.

10 No one placed Ms.  Granillo in a recovery position or administered CPR.

11 Ms.  Granillo went thirteen minutes without medical aid or oxygen" before

12 paramedics eventually arrived and started providing care.  *Estate of Vianna Granillo*

13 *v. County of San Diego, et al.*, 3:24-cv-01201-W-SBC, Dkt. 1 (Complaint) at ¶ 44

14 (July 12, 2024).  This demonstrates that Jail staff are so over reliant on naloxone that

15 they neglect to provide additional, potentially life-saving care.  Not every medical

16 emergency in the Jail is an opioid overdose, as illustrated by Ms.  Granillo's case,

17 and even those that are opioid overdoses still require providing emergent medical

18 care other than deploying naloxone.

19

20 10.5811/westjem.2020.10.48768.  PMID: 33856321; PMCID:  PMC7972385; Bennett AS,

21 Freeman R, Des Jarlais DC, Aronson ID.  Reasons People Who Use Opioids Do Not
Accept or Carry No-Cost Naloxone: Qualitative Interview Study. JMIR Form Res. 2020

22 Dec 23;4(12):e22411. doi: 10.2196/22411. PMID: 33355094; PMCID: PMC7787889.

23 [107] Payne ER. Stancliff S. Rowe K. Christie JA. Dailey MW. Comparison of
Administration of 8-Milligram and 4-Milligram Intranasal Naloxone by Law Enforcement

24 During Response to Suspected Opioid Overdose - New York, March 2022-August 2023.
MMWR Morb Mortal Wkly Rep. 2024 Feb 8;73(5):110-113.  doi:

25 10.15585/mmwr.mm7305a4.  PMID: 38329911; PMCID:  PMC10861201.

26 [108] Rock P. Slavova S. Westgate PM. Nakamura A. Walsh SL.  Examination of naloxone
dosing patterns for opioid overdose by emergency medical services in Kentucky during

27 increased fentanyl use from 2018 to 2021.  Drug Alcohol Depend.  2024 Feb
1:255:111062.  doi: 10.1016/j.drugalcdep.2023.111062.  Epub 2023 Dec 14.  PMID:

28 38157702; PMCID: PMC11057324.

234.   The NaphCare Death Summary for Joshua Fosbinder, NAPHCARE041575-79, ███████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

i███████ "███████████████████████

███████████████████" NAPHCARE041579.  This misses the point.  What NaphCare should have concluded instead was that all staff in the Jail should assess and support airway, breathing, and circulation immediately in any "person down" situation, not just ███████████████.  Oxygen administration should be a standard response in any potential overdose situation.

235.   There are numerous additional examples of Jail staff's overreliance on naloxone during non-fatal overdoses as well.  *See, e.g.* SD_424197 (summarizing five overdoses in various facilities in the same week, including one overdose at Central with seven naloxone deployments [p.2] and one at George Bailey with six [p. 5]); SD_444419 (overdose with six naloxone deployments); SD_422647 (three overdoses at Central on the same day, each with five naloxone deployments); SD_639671 (overdose at East Mesa with four naloxone deployments).

236.   What the evidence discussed above demonstrates is that there is under recognition of polysubstance overdose and a complete reliance on naloxone as the default response.  Instead, the Jail also should be assessing airway, breathing, and circulation and addressing polysubstance overdose with a nuanced response and

utilization of additional tools, such as a pulse oximetry device, oral or nasal airways, and administration of oxygen in addition to giving naloxone.

237.    These shortcomings are reflected in the Sheriff's Department's Detention Services Bureau ("DSB") policy on "Suspected Opioid Overdose."[109] That policy rightly emphasizes administering naloxone when a suspected overdose is occurring, but it does not include any guidance on the number of doses to give or the time interval between doses.  Critically, it does not include any instruction on the additional necessary life-saving measures described above to support and assess airway, breathing, and circulation.  It references another DSB emergency policy on "Life Threatening Emergencies,"[110] but that policy does not include instructions on those life-saving measures either.  What it does include is an entire section on "Misuse of naloxone by incarcerated persons," which involves assessing factors such as an incarcerated person's "history of drug smuggling"—even though, as described above, it is impossible to get any euphoria from naloxone—and requires writing up "an incarcerated person [that] utilizes the naloxone for reasons outside of preventing a suspected overdose" via a report labeled "Offense Code '981158 – ZZ – NALOXONE DESTRUCTION (JAILS ONLY)."  Dedicating a portion of an opioid overdose policy to punishing incarcerated persons that "misuse" naloxone, while failing to provide instructions on life-saving measures, demonstrates that the Jail is more interested in pointlessly punishing incarcerated persons than adequately protecting them.

238.    The Sheriff's Department's Opioid Overdose Prevention policy

---

[109] DSB Policy M.47 (dated December 1, 2022),
https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Det
entions%20Policy%20and%20Procedure%20Sections/Section%20M%20-
%20MEDICAL%20AND%20HEALTH%20CARE%20SERVICES/m47.pdf

[110] DSB Policy M.6 (dated December 1, 2022),
https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Det
entions%20Policy%20and%20Procedure%20Sections/Section%20M%20-
%20MEDICAL%20AND%20HEALTH%20CARE%20SERVICES/m06.pdf

(SD_117416, dated November 4, 2022) is also inadequate.  It only provides a prescription for naloxone for incarcerated persons at release.  And it woefully under identifies persons potentially at risk for opioid overdose by only offering naloxone at release to persons who:

> A. During receiving screening, identify individuals that are potentially at risk for opioid withdrawal including but not limited to:
>
>> 1. History of heroin or opioid abuse.
>>
>> 2. Current prescription of an opioid.
>>
>> 3. Currently presenting with signs/symptoms consistent with opioid withdrawal.
>
> B. During incarceration, individuals may be identified through:
>
>> 1. Observed or witnessed overdose event.
>>
>> 2. Subsequent withdrawal process due to previously undiagnosed or unrecognized substance use disorder.
>>
>> 3. Patient requested based on participation in a medication assisted program (MAT) prior to incarceration.
>>
>> 4. Procedure initiated due to post-operative pain management program

SD_117416 at p. 1.

239.    The above criteria fail to recognize and protect others at risk while incarcerated and after release, including persons who have unidentified opioid use or an unidentified OUD, persons who may initiate opioid use or develop OUD while incarcerated, or persons using other substances who are still at risk for opioid overdose due to adulteration of the unregulated drug supply with HPSO.

240.    In the 121-page San Diego County Sheriff's Department Medical Services Division Standard Nursing Procedures Manual, two pages are devoted to "HEROIN/OPIOID OVERDOSE" (last updated July 23, 2018).  The suggested management is as follows:

> "TREATMENT PLAN
>
>> I.    Start an IV

II.    Normal Saline and running at a rate of 125cc/hour.

*III.    Administer Narcan kit; may repeat in 3 minutes if no improvement.*

IV.    Administer 50cc 50% Glucose IV push (if vein is accessible)

*V.    If patient improves and becomes apneic again, repeat Narcan administration.*

*VI.    Immediately refer to the emergency department (ED) and transport 911 if the patient remains apneic after two doses of Narcan or is unarousable.*

VII.    *NOTE:  Anytime a patient is given Narcan for suspected opioid overdose and a provider is not present to evaluate the individual, the patient shall be transported to an emergency department for further evaluation and treatment*"

San Diego County Sheriff's Department Medical Services Division Standard Nursing Procedures Manual, updated July 23, 2018, pp. 62-63 (emphasis added).

241.   In fairness, this policy appropriately recommends staggering naloxone doses by 3 minutes, which is within the 2-5 minute window from the standard of care.  However, in practice, in the records discussed above, naloxone doses were administered continuously.

242.   The 352-page NaphCare Health Care Policy and Procedure Manual has no overdose prevention or intervention plan or policy and makes no mention of overdose management in its medical emergency policy.  NaphCare's "Emergency Services and Response Plan" does not specifically address overdose response in the Jails.  NAPHCARE031231-32.  Neither does the 395-page San Diego County Sheriff's Department Medical Services Division Operations Manual, which has no overdose prevention or intervention plan or policy, aside from prescribing naloxone for select persons upon release.  The Manual makes no mention of overdose

1 management in its medical emergency and life threatening emergencies code blue
2 policies.[111]

### IV.    The Sheriff's Department Has Inadequate Discharge Planning for Incarcerated Persons with SUD.

243.    The negative health implications of incarceration disproportionately impact persons living with SUD.  The impact of incarceration itself on mental health is compounded for persons who have existing SUD.[112]  The health implications of incarceration can be devastating for persons with SUD.  Many persons living with SUD who are reentering the community face challenges accessing treatment and services (e.g., health care, medication), as well as housing, employment, food, and social supports, which increases their risk for future justice system involvement.[113]

244.    One of the greatest challenges for persons living with substance use disorders is continuity in treatment from incarceration to post-release.  Persons in prisons and jails have traditionally lacked adequate health care due to lack of funding and/or monitoring of and compliance with quality standards.[114]  Long-term recovery and successful reentry outcomes hinge on minimizing a person's time from

---

[111] Medical Services Division Operations Manual, updated November 4, 2022., https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Medical%20Services%20Division/Medical%20Services%20Division%20Operations%20Manual.pdf

[112] SAMHSA. Best Practices for Successful Reentry From Criminal Justice Settings for People Living With Mental Health Conditions and/or Substance Use Disorders (PEP23-06-06-001). 2023.

[113] Substance Abuse and Mental Health Services Administration.  (2017).  *Guidelines for successful transition of people with mental or substance use disorders from jail and prison: Implementation guide*.  https://store.samhsa.gov/product/Guidelines-for-Successful-Transition-of-People-with-Mental-or-Substance-Use-Disorders-from-Jail-and-Prison- Implementation-Guide/SMA16-4998.

[114] Alsan, M., Yang, C. S., Jolin, J. R., Tu, L., & Rich, J. D. (2023). Health care in US correctional facilities—A limited and threatened constitutional right. *New England Journal of Medicine, 388*(9), 847-852.  https://doi.org/10.1056/NEJMms2211252; Gibson, B. R., & Phillips, G. (2016). Challenges and opportunities in correctional health care quality: A descriptive analysis of compliance with NCCHC standards. *Journal of Correctional Health Care, 22*(4), 280-289.  https://doi.org/10.1177/1078345816668863.

1  release to engagement in community-based substance use services.[115] For example,

2  if a person has received MOUD while incarcerated, access to MOUD should be

3  uninterrupted throughout the reentry process.[116]

4      245.   From National Snapshot: Access to Medications for Opioid Use

5  Disorder in United States Jails and Prisons, "Individuals leaving jails and prisons are

6  between 10 and 40 times more likely to die of an opioid overdose than the general

7  population—making them one of the highest at-risk groups for opioid overdose.

8  This risk is especially acute three to four weeks post-release.  Access to MOUD in

9  jails and prisons is one targeted approach that can help decrease risk for overdose

10  death."[117]  Continuity in care is also critical for incarcerated persons who are

11  discharged from a San Diego County facility to a jail or prison in another

12  jurisdiction.

13      246.   Ensuring that persons with OUD have access to MOUD at discharge is

14  an imperative step in providing adequate care.  But incarcerated persons with OUD

15  repeatedly have been discharged from San Diego County custody without clear

16  access to MOUD.

17      247.   Multiple patients did not have buprenorphine in hand when they left

18  the facility, which put those patients at substantial risk for serious harm.  Rather than

19  releasing patients with buprenorphine in hand, several documents showed that the

20  medication would be made available only at a community-based pharmacy, which

21  led to barriers to medication access upon release.  *See, e.g.* SD_352638;

22

---

23  [115] Singer, A. J., & Kopak, A. M. (2021). Jail reentry and gaps in substance use disorder
24  treatment in rural communities. *Corrections*, 1-23.
https://doi.org/10.1080/23774657.2021.1967816.

25  [116] Bureau of Justice Assistance. (2018). *Best practices for successful reentry for people
who have opioid addictions*.  https://csgjusticecenter.org/wp-
26  content/uploads/2020/01/Best-Practices-Successful-Reentry- Opioid-Addictions.pdf.

27  [117] Weizman, S. et al. National Snapshot:  Access to Medications for Opioid Use Disorder
in U.S. Jails and Prisons, O'Neill Institute for National and Global Law, Georgetown Law,
28  2021.

SD_358436; SD_663501.  Patients also were not provided access to continued MOUD treatment when they did not have "a program" to continue MOUD lined up upon release.  *See, e.g.* SD_663908; SD_663558; SD_358436.  The Jail also has operated an unclear discharge process for medications despite a request that NaphCare create one.  *See, e.g.* SD_357641 (dated September 6, 2023); SD_364615.  There have been problems with TechCare appropriately identifying individuals receiving MOUD in the community and confirming doses and linking for appropriate follow-up care.  SD_662106.

248.   In one example from September 2023, the Jail released someone on buprenorphine on a Friday at midnight without buprenorphine in hand.  Instead, the Jail told the incarcerated person that their prescription would be available at a community-based pharmacy.  But the prescription was not available at the community-based pharmacy when the released person went to pick it up.  Per an email from staff at the County's Department of Health and Human Services to Jail staff, the patient "didn't feel like it was fair for the jails to start someone on a medication and then disregard their medical needs after they claim to send them home with access to that medication.  [The patient] "feels that ***with the barriers currently in place people will relapse and die without easy access to these medications***." The [patient] is very self-reliant, had a plan in place after release, had resources, and is very motivated to continue with treatment," yet despite all of this, the person still could not access her medication.  SD_666127 (emphasis added).

249.   There also has been poor coordination between the San Diego County staff and the NaphCare staff regarding discharge medications for MOUD.

250.   In September 2022, Jail staff and NaphCare staff scrambled to fill a MOUD prescription for a patient transferring to another jail, arguing over the appropriate process to fill that prescription, or if it should be filled at all. SD_664776.

251.   In November 2022, Jail staff and NaphCare staff again disagreed on

how – or whether – to get medication to an incarcerated person discharged without medications in hand. Dr. Wade from NaphCare insisted on the patient picking up a prescription at CVS, while Jail staff wanted that prescription canceled because the patient had found their own community provider. Dr. Wade insisted that "From the county side, it actually falls below the standard of care to not provide a patient with this script. Especially with the email chain I have (along with documentation in her chart) that the county was aware of the need prior to her release. Then add in there that there is a MAT coordinator that did not coordinate anything, a pharmacy coordinator that did not coordinate anything…Essentially if her lawyer wants to cause a problem, it will be fairly evident that the ball was dropped. ☹." SD_667926-27.

252.    These same problems persisted one year later. In October 2023, senior Staff at both the Jail and at NaphCare had to get involved in multiple emails in the days immediately before an incarcerated person's discharge in order to arrange a prescription for MOUD. SD_364615-18. This disjointed process led Dr. Montgomery to comment in an email "[t]here does not appear to be any plan or provision for this service," noting that "I think we need to include this in a C[orrective] A[ction] N[otice.]" Id.

253.    In November 2023, Jail staff tried to get an incarcerated person's prescription filled at release "without contacting NaphCare" by sending the prescription directly to CVS, but ran into additional problems when CVS insisted that it needed "prior authorization from a non-Sheriff MD" to fill the prescription. SD_661564-66. Jail staff had to scramble to get the prescription filled by contacting a NaphCare subcontractor for pre-authorization, leading Dr. Montgomery to complain that Jail staff should "not really be involved in the interaction at all." SD_661564. It is unclear whether the person was even able to get their prescription filled. SD_661564-71.

254.    The persistent, haphazard scramble to provide MOUD upon release

indicates that the Jail does not have an adequate system in place for continuity of care at discharge for persons on MOUD.

255.    NaphCare's alarming shortcomings were highlighted in its second PMK deposition, when discussing discharge planning for patients on methadone while incarcerated, NaphCare assumed that the STATCare providers would send a prescription for methadone to the pharmacy.  But methadone for the treatment of opioid use disorder can only be dispensed from an OTP.  Only methadone for the treatment of chronic pain can be prescribed to a community-based pharmacy.  It is actually a felony for a medical provider to prescribe methadone for OUD to a community-based pharmacy for dispensing.[118]  NaphCare's PMK also testified that the company did not know if they paid for MAT prescriptions in the community after release.  Nix Depo. Tr. Vol. II, pp. 71-74.  It is concerning that NaphCare, the company providing MAT services in the San Diego County Jails, would not know this information.  These mishaps, miscommunications, poor coordination, and suspicions create a substantial risk of serious harm to recently released persons who cannot access their medication seamlessly.

256.    With respect to buprenorphine access upon release, the Jail should release incarcerated persons with 72 hours of buprenorphine in hand by utilizing the DEA 72-hour emergency rule in addition to sending a prescription for buprenorphine to a community-based pharmacy.  If the Jail were to use the hospital/clinic designation to stock and dispense methadone, they could utilize the 72-hour emergency rule to dispense 72 hours of methadone in hand to an incarcerated person upon release.  Coupled with the pre-arranged admission to and linkage with an opioid treatment program (OTP), those changes should ensure that

---

[118] Brooner RK, Stoller KB, Patel P, Wu LT, Yan H, Kidorf M. Opioid treatment program prescribing of methadone with community pharmacy dispensing: Pilot study of feasibility and acceptability.  Drug Alcohol Depend Rep. 2022 Jun;3:100067.  doi: 10.1016/j.dadr.2022.100067.  Epub 2022 May 16.  PMID: 35757566; PMCID: PMC9224271.

the person will have adequate time to present to the OTP for further dosing.[119]

## V. The Sheriff's Department's Policies and Procedures Stigmatize Persons with Substance Use or SUD Who are Incarcerated, Which Creates a Substantial Risk for Inadequate Care.

257.    The Jail uses stigmatizing language in its policies and procedures, including stigmatizing ideas about persons who use substances, it assumes incarcerated persons are lying or faking symptoms, and it has demonstrated indifference to the welfare and well-being of incarcerated persons with substance use or SUD.  This stigmatization of incarcerated persons with substance use or SUD creates a substantial risk that they will be denied necessary care to treat their substance use.

258.    Unfortunately, stigma towards persons who use substances is common, including in health care settings and carceral settings.  Despite SUD being a chronic, treatable medical condition, persons with SUD often face stigma and discrimination by others perhaps because they do not understand SUD or know that there are effective medications and other treatment modalities for SUD.  Changes in the brain caused by substance use are associated with compulsive use and concomitant behaviors which may alienate others and reinforce negative stereotypes about persons with SUD.  Commonly used terms referring to persons with SUD often reflect the misconception that their substance use and related behaviors are a choice, rather than a compulsion, and that they are to blame for their medical condition. Studies show that terms like "junkie" and "addict" (as used in the SD Sheriff's Department policy entitled "Addicted Arrestee Care," SD_027125) feed negative biases and dehumanize persons.[120]

---

[119] FAQ-Methadone-in-Carceral-Settings.pdf (jhsph.edu); HMA-Concept-Brief-Options-to-Assure-Access-to-Methadone-for-Treatment-of-OUD-in-Jails.pdf (healthmanagement.com).

[120] Words Matter:  Preferred Language for Talking About Addiction, *National Institute on Drug Abuse*, https://nida.nih.gov/research-topics/addiction-science/words-matter-preferred-language-talking-about-addiction.

259. Stigma affects persons who use substances in myriad ways, including persons who need care may not seek it, persons fear disclosing their substance use, persons receive a poorer quality of care, persons have reduced access to health programs, and persons may increase their substance use as a response to experiencing stigma. Just the stress or anxiety of feeling discriminated against can increase the likelihood that someone will use substances. With respect to MOUD, specifically methadone and buprenorphine, because they must be taken regularly, and because methadone and buprenorphine can produce euphoria (a "high") in people *without* opioid use disorder, these medications often are mistakenly seen as mere substitutes for illegal substances and carry a similar stigma.[121]

260. To avoid stigma in the San Diego Jails, all staff must understand, through mandatory trainings that SUD is a chronic, treatable medical condition. To that end, stigmatizing language should not appear in any written communications

---

[121] Volkow ND. Stigma and the toll of addiction. *New England Journal of Medicine.* 2020:382(14):1289-1290. doi:10.1056/neimp1917360: Volkow ND. Koob GF. McLellan AT. Neurobiologic advances from the brain disease model of addiction. *New England Journal of Medicine.* 2016:374(4):363-371. doi:10.1056/neimra1511480: Volkow ND. Chang L. Wang GJ. Fowler JS. Franceschi D. Sedler M. Gatlev SJ. Miller E. Hitzemann R. Ding YS. Logan J. Loss of dopamine transporters in methamphetamine abusers recovers with protracted abstinence. *J Neurosci.* 21(23):9414-9418. 2001: Volkow ND. Boyle M. Neuroscience of Addiction: Relevance to prevention and treatment. *Am J Psychiatry.* 2018:175(8):729-740. doi:10.1176/appi.ajp.2018.17101174: Muncan B. Walters SM. Ezell J. Ompad DC. "They look at us like junkies": influences of drug use stigma on the healthcare engagement of people who inject drugs in New York City. *Harm Reduct J.* 2020:17(1):53. Published 2020 Jul 31. doi:10.1186/s12954-020-00399-8: Ashford. R.D.. Brown. A. and Curtis. B. Expanding language choices to reduce stigma: A Delphi study of positive and negative terms in substance use and recovery. *Health Education.* 2019: 119(1). 51-62. doi.org/10.1108/HE-03-2018-0017: Kelly JF. Westerhoff CM. Does it matter how we refer to individuals with substance-related conditions? A randomized study of two commonly used terms. *Int J Drug Policy.* 2010:21:202–7. doi.org/10.1016/i.drugpo.2009.10.010: NIDA. Stigma and Discrimination | National Institute on Drug Abuse (NIDA) (nih.gov). June 2022: Wakeman SE. Larochelle MR. Ameli O. et al. Comparative effectiveness of different treatment pathways for opioid use disorder. *JAMA Netw Open.* 2020:3(2):e1920622. doi:10.1001/jamanetworkopen.2019.20622: NIDA. Stigma and Discrimination | National Institute on Drug Abuse (NIDA) (nih.gov). June 2022: Amaro H. Sanchez M. Bautista T. Cox R. Social vulnerabilities for substance use: Stressors. socially toxic environments. and discrimination and racism. *Neuropharmacology.* 2021:188:108518. doi:10.1016/j.neuropharm.2021.108518.

1  (policies and procedures, emails, signage in the Jails, medical chart documentation,

2  etc.).  When stigmatizing language arises in verbal exchanges, staff should be

3  trained to identify and address that language promptly when it occurs.

4        261.  To avoid stigmatization and provide adequate treatment to persons with

5  SUD, treatment must be person-centered, trauma informed, harm reduction

6  informed, nonjudgmental, and individualized with clear goals understood by the

7  patient.  The evidence indicates that the Jails' practices fail to meet this standard of

8  care.

9        262.  SD_259265 demonstrates that staff have a practice of stigmatizing

10  persons by assuming that they lie and make up symptoms.  That document is an

11  email thread in which NaphCare and San Diego County Sheriff's Department

12  medical staff discuss whether or not to provide MAT to an incarcerated person.  The

13  email thread reveals that NaphCare's approach to patient care was stigmatizing and,

14  as a result, punitive rather than therapeutic.  In one email, Dr. Elliott L. Wade –

15  NaphCare's Regional Corporate Medical Director – writes what his response to the

16  prospective MAT patient would be:  "You are no longer a part of drug court, and

17  your past behavior and inability to treat providers and nursing staff with respect is a

18  violation of our zero tolerance policy and thus you are not a candidate for MAT

19  medication, while in custody, and you can be referred to a community provider upon

20  release."  He continues, "I don't think he's clinically appropriate (the stories of

21  multiple overdoses, while possibly true, is something he has mentioned before, and

22  does not change whether or not he's clinically appropriate).  If anything, naltrexone

23  might actually be better, which completely blocks opiates [opioids] (including

24  fentanyl).  But that has no diversion value, since it will only make you sick if using

25  opiates [opioids] illicitly."  This approach is punitive.  This physician wants to

26  withhold medication based on the patient's attitude and behavior towards staff.  This

27  approach is the equivalent of a physician withholding insulin from a person with

28  diabetes because they did not like the way the patient acted.  It is a textbook

example of stigma towards a person with a SUD.  And because this is coming from a physician overseeing NaphCare's administration of MAT in the Jail, it is reflective of NaphCare's broader practice in treating persons with SUD.

263.   This document is also concerning because it shows that Dr. Wade has poor knowledge of the evidence base for MOUD and the fact that buprenorphine is protective against overdose fatality (of which the patient has had several prior nonfatal overdoses and therefore is at high risk for a fatal overdose) and that naltrexone offers no protection from overdose fatality due to the absence of opioid tolerance in a person taking naltrexone.

264.   Finally, Dr. Wade demonstrated in these emails that he did not have a clear understanding of how naltrexone works.  Naltrexone is an opioid antagonist and blocks the mu opioid receptors in the brain.  The blockade can be overridden with use of enough opioids.  A person does not get "sick" if they use opioids while on naltrexone but rather will not feel the effects of the opioids and could overdose if they use enough opioids.

265.   There are additional examples of stigmatization in records following substance-related deaths of incarcerated persons in custody.  In a report on the death of Saxon Rodriguez, who was killed by combined fentanyl and methamphetamine toxicity, Mr. Rodriguez is described as a "Male who lived a homeless lifestyle." SD_337304.  This term was also used in a report on the death of Leonel (aka "Chaz Guy") Villasenor, who died of a fentanyl and methamphetamine overdose and was described as a "a 31-year-old, never married, Hispanic male who appeared to be living a homeless lifestyle in San Diego."  SD_339042.

266.   The use of the term "homeless lifestyle" is concerning evidence of stigmatization because it assumes that Mr. Rodriguez and Mr. Villasenor voluntarily chose to experience homelessness.  This shows a serious disconnect between the Jail staff and the incarcerated persons.  This leads to the conclusion that staff have a broader lack of awareness regarding the social determinants of health, the impact of

histories of trauma, inequities, and services gaps that play a formidable role in shaping individuals' life experiences. The reason that is relevant to substance use is because there is significant intersectionality between the population of persons with substance use, mental health issues (including serious mental illness, PTSD, and trauma histories), and those experiencing homelessness. According to the National Coalition for the Homeless, substance use is more prevalent in persons experiencing homelessness. Substance use can be the cause of but often is the result of the stress of homelessness and can complicate efforts to succeed in finding stable housing. Being homeless is associated with more severe substance use, as well as significantly greater risk of multiple medical comorbidities, and poorer health outcomes, including suicide and other causes of mortality. Having these comorbidities of substance use, mental health issues, and homelessness marginalizes individuals further and subjects them to significant societal stigma, including within the carceral setting.[122]

267.   Another example is From NaphCare's policy regarding pregnancy management, which includes stigmatizing language, such as: "If the patient *claims* to be enrolled in an Opioid Treatment Program;" "If the patient *claims* to be on a prescribed opioid medication;" "If the patient *claims* to be on illicit opioid drugs." NAPHCARE001825-26 (emphasis added). The use of the word "claim," which implies an assertion without proof or an assertion of a truth that is disputed or in doubt, throughout this policy is reflective of how patients are viewed as untruthful

---

[122] Polcin DL.  Co-occurring Substance Abuse and Mental Health Problems among Homeless Persons: Suggestions for Research and Practice.  J Soc Distress Homeless. 2016;25(1):1-10.  doi: 10.1179/1573658X15Y.0000000004.  Epub 2015 Aug 26.  PMID: 27092027; PMCID:  PMC4833089; Duncan McVicar, Julie Moschion, Jan C. van Ours, From substance use to homelessness or vice versa?, Social Science & Medicine, Volumes 136–137, 2015, Pages 89-98, ISSN 0277-9536, https://doi.org/10.1016/j.socscimed.2015.05.005. (https://www.sciencedirect.com/science/article/pii/S0277953615002786); Stablein, G.W., Hill, B.S., Keshavarz, S., Llorente, M.D. (2021).  Homelessness and Substance Use Disorders.  In: Ritchie, E.C., Llorente, M.D. (eds) Clinical Management of the Homeless Patient.  Springer, Cham.  https://doi.org/10.1007/978-3-030-70135-2_12.

1  by default.  The most tragic example of this approach occurred in the

2  aforementioned case of Elisa Serna, who was accused by Jail staff of faking her

3  symptoms.  Using a neutral word choice, such as "report" instead of "claim" would

4  make a significant difference in tone that will reduce the risk that patients will be

5  stigmatized.

6      268.   The practice of stigmatizing and not believing patients established by

7  the above documents is an impediment to providing adequate care because it is

8  necessary to understand what a patient subjectively believes they are experiencing

9  physically, mentally, and emotionally in order to make an appropriate objective

10  diagnosis.  Based on my clinical experience, persons with substance use and SUD

11  have often been dismissed, dehumanized, and humiliated in many of their health

12  care and other experiences.  Their stories are often not heard, listened to, or

13  believed.  In my clinical experience, care delivered when the patient's subjective

14  experience and symptoms are ignored or disbelieved will be substandard with poor

15  outcomes.

16                           **RECOMMENDATIONS**

17  **I.     Regarding Withdrawal Management**

18      a.     Comply with established withdrawal management guidelines, such as

19              the BJA Guidelines and ASAM's CPG and NPG for alcohol

20              withdrawal and opioid withdrawal syndrome, respectively.

21      b.     Nurses monitoring patients for withdrawal symptoms should be

22              Certified Addiction RNs (CARN), or minimally, trained by CARNs.

23      c.     Pregnant persons at risk for withdrawal should be monitored in an

24              inpatient hospital setting where there is access to OB/GYN consultation

25              and fetal monitoring.

26      d.     Persons being monitored for acute withdrawal should be housed

27              together where they can be closely monitored and observed, not

28              dispersed throughout the facilities.  Patients acutely under the influence

1    of substances or at risk for withdrawal should not be housed in holding
2    cells or in isolation cells.

3  e.  All orders for patients at risk of or being managed for acute withdrawal
4    must be individualized.  Medication dosing must be individualized and
5    tailored to patient response to medication determined by frequent
6    reassessment by clinicians.

7  f.  CIWA-Ar, COWS, and CIWA-B must be utilized for all patients at risk
8    for withdrawal and measured at the frequencies recommended in the
9    withdrawal management guidelines described above.  PAWSS is an
10    additional tool that should be utilized to triage individuals who are
11    more likely at risk for severe alcohol withdrawal syndrome.

12  g.  Vital signs for all patients at risk for withdrawal and being monitored
13    for withdrawal must be done at frequent, regular intervals not only
14    daily or twice daily.

15  h.  Medical personnel should be actively involved in the care of
16    individuals at risk for withdrawal and being monitored for withdrawal.
17    They should be hands-on in their assessments and not reliant upon third
18    party assessment of patients.

19  i.  An addiction medicine specialist should be on call and available to jail
20    medical and nursing personnel at all times for any questions related to
21    the management of patients at risk for withdrawal or being monitored
22    for withdrawal.

23  j.  The Jail should receive permission from the DEA to be designated as a
24    hospital/clinic if it hasn't already done so.  The Jail should advise the
25    DEA of their intention to utilize the hospital/clinic designation from
26    SAMHSA's 42 CFR Part 8 rules in order to stock and dispense
27    methadone for the treatment of acute opioid withdrawal syndrome and
28    long-term treatment of OUD.  The Jail should contract with an

addiction medicine physician or other physician knowledgeable in the use of methadone for the treatment of opioid withdrawal syndrome and OUD to train jail medical and nursing staff regarding the utilization of methadone.

k.  Jail medical staff should get up-to-date training regarding buprenorphine dosing and non-traditional buprenorphine initiation strategies in the context of the current unregulated drug supply dominated by HPSO.  The Jail's medical staff has woefully dated information on utilization of buprenorphine.

l.  Policies and procedures should be written for managing stimulant withdrawal and overamping due to acute intoxication with stimulants.

## II.  Regarding Substance Use Disorder Treatment

a.  Screening for opioid use and OUD should be done at intake with a validated screening tool on all persons admitted to the Jail.  ALL individuals with OUD should be offered MOUD.

b.  All individuals entering the Jail should be screened for substance use and SUD using a validated screening tool.

c.  The convoluted MAT program policies and flowcharts should be abandoned and replaced with clearly written policies and procedures. There should be no MAT queues, no waiting for assessment for MAT, etc.  All individuals with OUD should be eligible for the MAT program immediately and started on MOUD immediately.  Starting individuals on a non-individualized flat dose of buprenorphine and then tapering them while waiting to assess them for ongoing MOUD makes no sense. MOUD tapers are associated with increased risk for overdose mortality and are not the standard of care.

d.  The zero tolerance diversion policy discriminates against persons with a disability and is inconsistent with the Americans with Disabilities

1  Act.  Patients should never have their medication withheld because of

2  potential diversion issues.  Diversion is a behavioral issue and should

3  be addressed administratively not punitively medically by withholding

4  lifesaving medication.  Policies and procedures should be updated to

5  reflect that a zero tolerance policy is not in place.

6  e.   Patients should be dosed effectively to eliminate opioid withdrawal

7  syndrome AND opioid cravings.  Dose limits for buprenorphine are

8  arbitrary and not evidence-based.  Dosing should be individualized.

9  f.   The medical providers need education on SUD and particularly on the

10  evidence base for methadone and buprenorphine and the lack of

11  evidence for the efficacy of naltrexone for the treatment of OUD.  They

12  also need education on the mechanisms of action for naltrexone,

13  buprenorphine, and likely, methadone.

14  g.   Specific policies and procedures should be developed to treat alcohol

15  use disorder and stimulant use disorder post-withdrawal. Individuals

16  with AUD should be offered MAUD. Individuals with stimulant use

17  disorder should be offered treatment with off label use of medication in

18  addition to behavioral therapies.

19  **III.  Regarding Overdose Response**

20  a.   There should be updated overdose response training based on evolving

21  standards and innovations in overdose response and particularly

22  regarding recognition of polysubstance overdose.

23  b.   Naloxone should be readily available and accessible to all incarcerated

24  persons and all staff at all times.

25  **IV.  Regarding Discharge Planning and Services**

26  a.   There should be utilization of the DEA 72-hour emergency rule to get

27  buprenorphine or methadone in hand at the time of release for persons

28  on MOUD.

b.    The San Diego County Jails should advise the DEA that they plan to utilize the hospital/clinic designation allowable per SAMHSA's updated 42 CFR Part 8 rules to stock and dispense methadone for the treatment of opioid withdrawal syndrome and long-term treatment of OUD for individuals that have a medical condition besides opioid withdrawal syndrome or OUD.

c.    Once the San Diego County Jails have the hospital/clinic designation and are treating individuals with OUD with methadone, reentry planning should include completing a telehealth appointment with an OTP clinician before release, so the patient is admitted to the OTP before release.  A remote visit with the OTP clinician coupled with a complete physical exam and bloodwork done by the medical staff at the correctional facility are now permissible per the updated 42 CFR Part 8 rules.

d.    At release, MOUD patients should be provided not only with a prescription for naloxone and buprenorphine, as applicable, but also with as many days of buprenorphine or methadone in hand from the Jail's supply as the Jail can provide legally.

e.    Patients with SUD should receive referrals to community-based supports, including community-based clinics and/or substance use disorder treatment programs upon release.

## V.    Regarding Stigmatization

a.    All policies and procedures should be reviewed for stigmatizing language.

b.    All staff should receive anti-stigma training, including the effect that stigma has on persons with substance use disorders.

c.    All staff should receive training regarding implicit bias.

d.    Medical and nursing staff should receive sensitivity training on

1    appropriate response to patients' reports of symptoms.

2    e.    Outside peer review (non-correctional setting peers), including of

3    progress notes, emails pertaining to patients, and video surveillance of

4    interactions with patients should occur on a regular basis with binding

5    corrective action plans (CAP) and performance improvement plans

6    (PIP) where there are deficits.

7    269.    The information and opinions contained in this report are based on

8  evidence, documentation, and/or observations available to me.  I reserve the right to

9  modify or expand these opinions should additional information become available to

10  me.  The information contained in this report and the accompanying exhibits are a

11  fair and accurate representation of the subject of my anticipated testimony in this

12  case.

13

14  Dated: August 20, 2024    _____

15    Kelly S. Ramsey, M.D.

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

## CURRICULUM VITAE

**Name:**          **Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM**

                  **Kelly S. Ramsey Consulting, LLC**

**Contact Information:**   

## Education:

Post-graduate training:

**2004-2006**: Montefiore Medical Center, Bronx, NY, Social Internal Medicine Residency Program, completed residency training June 2006

**2003-2004**: University Hospitals Health Systems (affiliated with Case Western Reserve University), Cleveland, OH, Internal Medicine/Pediatrics dual discipline residency training program, transferred after intern year to Montefiore Medical Center

Graduate:

**2002-2004**: Case Western Reserve University School of Graduate Studies, Cleveland, OH, MA in Bioethics, May 2004

**2001-2003**: Case Western Reserve University School of Medicine, Cleveland, OH, Medical Doctor, May 2003

**1999-2001**: Medical College of Wisconsin, Milwaukee, WI, transferred after second year to Case Western Reserve University School of Medicine

**1998-1999**: University of Illinois at Chicago School of Public Health, Chicago, IL, MPH in Epidemiology, July 1999

Undergraduate:

**1985-1989**: Georgetown University School of Foreign Service, Washington DC, BSFS in International Politics, May 1989

## Professional Employment and Hospital Appointments:

**March 2024-July 2024: Physician, BOOM! Health, Bronx, NY**
Provided direct clinical care via telemedicine in the drug user health hub (DUHH), with a focus on treating opioid use disorder with low threshold buprenorphine.

**January 2024-Present: Lead Physician, St. Ann's Corner of Harm Reduction, Bronx, NY**
Provide direct clinical care in the drug user health hub (DUHH) and on their mobile medical services clinic, with a focus on treating opioid use disorder with low threshold buprenorphine, HCV treatment,

wound care, reproductive health care, vaccinations, and STI testing/treatment. Assist with policy and procedures creation and grant submissions.

**December 2023-Present: Consultant in Addiction Medicine and Harm Reduction Policy, Strategy, Implementation, and Coalition Building**
**Private Consultant, Kelly S. Ramsey Consulting, LLC (LLC formed 2/2024)**
Utilize addiction medicine and harm reduction clinical experience and policy expertise to function as a consultant for local, state, and national entities/organizations in a variety of fields - courts and criminal justice, harm reduction, drug policy, academic centers, research studies, etc. Additional expertise in HCV and HIV. Recent clients have included Mt. Sinai/Clinical Education Initiative (CEI) and the CDC Foundation (in partnership with Hutton Health Consulting). Current select clients include Housing Works and John Hopkins University School of Public Health Bloomberg American Health Initiative/Bloomberg Overdose Initiative. Product created by me, in partnership with CEI and the NYS DOH: Hepatitis C Screening and During Pregnancy Provider Toolkit, published online 4/2024. Products created by me for JHU SPH, published online 3/2024: Brief FAQ on Methadone Use to Treat Opioid Use Disorder (OUD) in Carceral Settings Using the Hospital/Clinic Designation and Expanded Access to Methadone Treatment for Opioid Use Disorder in Carceral Settings.

**December 2023-Present: Medical Director, Community Action for Social Justice (CASJ)**
Serve as the Medical Director of the only harm reduction provider, syringe services provider, and drug user health hub (DUHH) provider on Long Island. Provide clinical supervision for CASJ's nurse practitioners doing low threshold buprenorphine, create policies and procedures for the DUHH, teach CASJ staff on addiction medicine and harm reduction, act as the Clinical Director of CASJ's opioid overdose prevention program (OOPP).

**June 2021-November 2023: Chief of Medical Services**
**NYS OASAS (Office of Addiction Services and Supports)**
OASAS is the single state agency in New York state which regulates and provides guidance for the continuum of addiction care, prevention, harm reduction, treatment, and recovery. There are more than 1600 programs under its purview.
Liaise and collaborate with other NYS agencies and NYC agencies on behalf of OASAS; liaise and collaborate with national agencies on behalf of OASAS; serve on advisory boards for state-based and nationally based organizations and research projects; participate as a principal investigator for clinical research in partnership with academic partners; provide medical supervision to the twelve OASAS state operated ATCs (Addiction Treatment Centers); provide medical expertise in conjunction with the regulatory oversight and expertise of the SOTA to the OTPs; provide clinical medical (including transmissible infections, HIV and HCV) and addiction expertise within and outside OASAS; develop OASAS clinical guidance and assist with policy making; oversee the Office of the CMO at OASAS, including collaboration with and supervision of the Associate Chief of Addiction Psychiatry, the Associate Chief of Addiction Medicine, the Empire State and Excelsior Service Fellows, and the Director of Nursing; be one of the public faces of OASAS with respect to hosting webinars with providers on a variety of topics, recording public facing recorded webinars on addiction medicine topics (https://oasas.ny.gov/learning-thursdays and https://learning.drugfree.org/courses/harm-reduction/), speaking at local, regional, and national conferences, co-hosting the monthly Harm Reduction Office Hours webinar series; cross-collaborate with other partners and work to embed addiction medicine and harm reduction evidence-based practices across NYS, including in systems not under the OASAS regulatory purview, such as child welfare, skilled nursing facilities (SNF)/long term care facilities (LTCF), EMS, emergency departments, criminal justice, and primary care; participate in the OASAS Executive Team; convene the OASAS Medical Advisory Panel (MAP) and oversee publication online of MAP guidance documents

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

(https://oasas.ny.gov/search/clinical_guidance_and_recommendations?f%5B0%5D=filter_term%3A521), other duties as assigned. Expertise in addiction medicine and harm reduction policy, strategy, and implementation. Experience with press interviews (radio, TV, podcasts, print media) as a subject matter expert in addiction medicine.

**June 2020-June 2021: Associate Chief of Addiction Medicine**
**NYS OASAS (Office of Addiction Services and Supports)**
Provide medical supervision to the twelve OASAS state operated ATCs (Addiction Treatment Centers), provide medical expertise in conjunction with the regulatory oversight and expertise of the SOTA to OTPs, provide clinical medical (including infectious disease) and addiction expertise within and outside OASAS, assist with OASAS medical policies and policy making with the Associate Chief of Addiction Psychiatry and the Chief Medical Officer; other duties as assigned.

**September 2011-June 2020**: **Medical Director of Substance Use Disorders**
**Sun River Health, formerly Hudson River Health Care, Inc. (HRHCare)**, a network of community health centers providing comprehensive care in the Hudson Valley, Long Island, and the five boroughs of New York City; internal medicine physician with a focused practice in HIV, HCV, and substance use disorder (including Medication for Addiction Treatment for opioid use disorder and alcohol use disorder); practice in Poughkeepsie; named Clinical Director of Special Programs for HRHCare in 1/2014; named (for HRSA grant purposes) Medical Director of Medication Assisted Treatment (MAT) for HRHCare in 3/2016; Medical Director of the Opioid Overdose Prevention Program, from January 2015; named Project Director of the SAMHSA grant for HRHCare in Long Island in 10/2017; named Medical Director of Substance Use Disorders for HRHCare in 10/2017; Medical Director of HRHCare's MAT program for the treatment of opioid use disorder and alcohol use disorder: supervised MAT teams at ten HRHCare sites (six in the Hudson Valley and four in Suffolk County), including launch of MAT via telemedicine in 2016; teaching and supervision for MAT provision in primary care; oversight of safe opioid prescribing and pain management policies at HRHCare in conjunction with the Chief of Clinical Strategy and Development; development of teaching modules for the residents (family medicine residents and nurse practitioner residents) rotating through HRHCare and for all HRHCare staff on substance use disorder, opioid use disorder, MAT, pain management, safe opioid prescribing, harm reduction, and opioid overdose prevention; Chair of MAT QIS

**July 2006-July 2011**: **Medical Director of the Wellness Center at Port Morris and HIV**
**Medical Director for AECOM DOSA and Montefiore Substance Abuse Treatment**
**Program (SATP) clinics Albert Einstein College of Medicine, Division of Substance**
**Abuse (AECOM DOSA)**, dual appointment (Departments of Psychiatry and Internal Medicine) as an Assistant Professor, Medical Director of Hub 1 Clinic (July 2006-June 2008), Medical Director of the Wellness Center at Port Morris (July 2008-July 2011); primary care practice based in an opioid treatment program (OTP), with a focus on HIV, HCV, women's health, and buprenorphine prescribing; unique program development: Co-Founder of Diabetes Mellitus Group Treatment model, Co-Founder of HCV Group Treatment model, Initiation/implementation of Anal Pap Screening for HIV-Positive Patients, Development of Curriculum for Weekly Didactic Sessions with Port Morris Medical Staff
July 2006-July 2011: Montefiore Medical Center, Attending Physician in Internal Medicine
December 2009-July 2011: HIV Medical Director for AECOM DOSA and Montefiore Substance Abuse Treatment Program (SATP) clinics

**Faculty Appointments and Faculty as a Subject Matter Expert**:

**2022-2023:** Faculty member and subject matter expert for the Medical Society of the State of New

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

York (MSSNY) Pain Course for development of an online course on treating acute pain, chronic pain, opioid misuse, and opioid use disorder; a 3- hour course offered for a fee online to all NYS prescribers to fulfill a NYS mandate

**2021-present:** Faculty member and subject matter expert for Medicus CME's REMS online course on Opioid Analgesic Prescribing; development of curriculum on Acute Pain, Chronic Pain, Opioid Misuse, Opioid Use Disorder, and Overdose Prevention

**June 2020-present:** Faculty member for the Northeast/Caribbean AIDS Education Training Center (AETC) for distance learning on content related to addiction, HIV, and HCV

**September 2019-present:** Faculty member for the Institute for Advanced Medicine/Mount Sinai for their NYS DOH AIDS Institute Center for Excellence, both for their HIV and Primary Care, and HCV and Drug User Health Clinical Education Initiatives; provide in-person and distance learning clinical education programs regarding Drug User Health, HIV, HCV, MAT, PEP, PrEP, and Opioid Overdose Prevention throughout NYS on demand

**March 2018-June 2020**: Faculty member and subject matter expert of the AETC Panning Group to develop an Opioid Toolkit on safer opioid prescribing, recognizing SUD, and MAT

**March 2018-June 2020**: Faculty member, main clinical presenter, and subject matter expert of the Long Island Advisory Committee for OUD/MAT (Suffolk County MAT Learning Collaborative)

**February 2017-June 2020**: Faculty member with PCSS-MAT as a buprenorphine waiver trainer in NYS; lead trainer for buprenorphine waiver trainings coordinated by the NYS DOH and/or County Health Departments throughout NYS (outside NYC)

**July 2016-present**: Faculty member for the NYACP Pain Course Task Force for development of the online and live course, "Managing Pain and Opioid Use: An Educational Program on Compliance with NYS Prescribing Laws", created in conjunction with Boston University's Scope of Pain Course; a 3- hour course offered free or low cost online to all NYS prescribers to fulfill a NYS mandate

**March 2016-September 2019**: HCV Champion for the Capital District for Mount Sinai to provide educational support for CEI (Clinical Education Initiative) HCV funded programs through the NYSDOH; live presentations, webinars, planning initiatives

**February 2014-September 2019**: Faculty member for the Institute for Advanced Medicine/Mount Sinai for their NYS DOH AIDS Institute Center for Excellence in HIV and Hepatitis C grant under the Clinical Education Initiative; provide in-person and distance learning clinical education programs regarding Drug User Health, HIV, HCV, MAT, PEP, PrEP, and Opioid Overdose Prevention throughout NYS on demand

**July 2006-July 2011**: Albert Einstein College of Medicine, Division of Substance Abuse (AECOM DOSA), dual appointment (Departments of Psychiatry and Internal Medicine) as an Assistant Professor

**Board Certification:** Internal Medicine, September 2006, recertified November 2016; Addiction Medicine, January 2021

**Licensure:** New York State

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

**Additional Training:** Buprenorphine DEA waiver, initially received 2004; 275 patient limit (the DEA waiver became moot in 2021)

**Professional Society Memberships:**
ACP (American College of Physicians), NYACP (New York American College of Physicians), ASAM (American Society of Addiction Medicine), NYSAM (New York Society of Addiction Medicine), ISAM (International Society of Addiction Medicine), INHSU (International Society on Hepatitis Care in Substance Users)

**Awards and Honors:**

**October 2023:** Case Western University School of Medicine Alumni Award
**April 2023:** Distinguished Contributions to Behavioral Medicine Award Recipient, awarded by the American College of Physicians (ACP), "This award is bestowed for distinguished contributions to the science of, or care delivery in behavioral medicine as a component of the treatment of internal medicine diagnoses. Awardees should be College members, any class, who have made significant contributions to the science of behavioral approaches to treatment of internal medicine medical illness including substance use disorders, or a College member's practice, practice group, or integrated health system which has developed and integrated innovations related to behavioral health into the practice of internal medicine for their patients."
**April 2022:** appointed to distinguished fellowship by ASAM (DFASAM)
**June 2021:** appointed to fellowship by ASAM (FASAM)
**December 2018:** Recipient of the NYS DOH Commissioner's Special Recognition Award for contributions to drug user health in NYS
**April 2018**: Recipient of the Public Health Partnership Award 2018 for HRHCare's MAT and Opioid Overdose Prevention work in Dutchess County, NY; awarded by the Dutchess County Department of Behavioral and Community Health
**June 2017**: Laureate Award Recipient, awarded by the American College of Physicians (ACP) to "members, who have demonstrated by their example and conduct, an abiding commitment of excellence in medical care, education, or research, and in service to their community, their region, and the ACP"
**2010-2011:** National Health Service Corps, Bethesda, MD, NHSC loan repayment recipient
**September 2010**: elected to fellowship in ACP (FACP); inducted April 2011
**2002-2003:** Case Western Reserve University School of Medicine, Cleveland, OH, elected to Alpha Omega Alpha Honor Medical Society
**1999-2003**: National Health Service Corps, Bethesda, MD, NHSC scholarship recipient, completed service commitment 7/9/10

**Additional Qualifications:**
    **Bilingual/biliterate in**
    **English/Spanish**

**Other Employment Experience** (selected)**:**

**1991-1998**: Santa Cruz Women's Health Center, Santa Cruz,
CA (community-based health center for women and children)
Responsibilities included: acting clinic manager, back office supervisor, case management, patient follow-up, lab coordinator, HIV program coordinator, volunteer program coordinator, patient educational materials coordinator

**Other Professional Activities:**

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

**December 2021-November 2023: NASADAD (National Association of State Alcohol and Drug Abuse Directors, Inc.) Single State Agency (SSA) Medical Director Learning Collaborative:** representing NYS OASAS

**June 2021-November 2023: NASHP (National Academy for State Health Policy) FORE (Foundation for Opioid Response Efforts) Steering Committee Member** representing NYS OASAS

**June 2020-November 2023: collaboration with NYC Agencies:** NYC Rx Stat Overdose Fatality Review Committee Member representing NYS OASAS: Rx Stat is the United States' first public health and public safety partnership aiming to reduce overdose deaths, began in 2012 and established a national model for cross-sector partnership. The partnership aimed to integrate data-driven policing with actionable public health interventions and surveillance to develop and implement cross-sector overdose responses; DOHMH: SMI (Serious Mental Illness) in PWH (People Living with HIV) Committee Member representing NYS OASAS

**2018-present: collaboration with the American Society of Addiction Medicine (ASAM) Board of Directors:** (3/2018-4/2024) Served as an ASAM Mentor for four addiction medicine mentees; (4/2021—present) Elected as the Regional Director for Region 1 (NYS region) to represent NYSAM on the ASAM National Board of Directors and National Chapters Council of ASAM; (6/2023-present) ASAM Constitution and Bylaws Subcommittee Member; (6/2023-present) ASAM Annual Conference Planning Committee Member and Abstract/Session Reviewer; (12/2023-present): ASAM Public Policy Committee Member; (5/2024-present): Selected Member for the ASAM/ACMT Drug Testing Clinical Guideline Committee; (6/2024-present): Selected Member for the ASAM Housing and Addiction writing group

**July 2018-present: collaboration with Sullivan County, NY government:** (7/2018-6/2020) Member of the Sullivan County Perinatal Drug Task Force; (6/2020-present): Member of the Sullivan County Drug Task Force

**May 2018-June 2020: collaboration with Suffolk County, NY government:** (May 2018-June 2020) Member of the Suffolk County Department of Health MAT Workgroup; (May 2018-June 2020) Member of the Suffolk County Department of Health SUD Subcommittee

**May 2018-December 2018**: **collaboration with Orange County, NY government:** (May 2018-December 2018) Member of the Orange County Uniform Assessment Tool Workgroup

**May 2018-October 2019**: Member of the national organization American Association for the Study of Liver Diseases (AASLD) Public Health/Health Care Delivery SIG, Education Subcommittee

**December 2017-November 2020: collaboration with Dutchess County, NY government:** (December 2017-November 2020) Member of the Dutchess Opioid Task Force (at large) and Provider Subcommittee; (March 2018-June 2020) Member of the Dutchess County MaternalChildHealth Initiative Collaborative; (July 2018-December 2018) Member of the Dutchess County Re-entry Task Force; (December 2018-June 2020) Member of the Dutchess County Special Populations Subcommittee

**2015-present: collaboration with the NY Chapter of the American Society of Addiction**

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

**Medicine (NYSAM):** (2/2015-6/2020) Public Policy Committee Member; (2/2018-present) Co-Chair of the Education Committee, 2/2018-12/2020, Chair of the Education Committee 12/2020-5/2022, Co-Chair of the Education Committee 6/2023-present; (2/2018-present) NYSAM Board of Directors Member, (2/2020-present) Elected as President-elect for the NYSAM BOD 2/2020: term 2/2020-4/2022, President of NYSAM: term 4/2022-4/2024, now serving as Immediate Past President of NYSAM and Chair of the Nominations/Membership Committee, 4/2024-4/2026; (2/2020-3/2022) Bylaws Committee Member; (2020-present) Poster Abstract Reviewer for Medical Students, Residents, and Fellows for NYSAM Conferences; (4/2021—present) Elected as the Regional Director for Region 1 (NYS region) to represent NYSAM on the ASAM National Board of Directors and National Chapters Council of ASAM

**2010-present: collaboration with the NY Chapter of the American College of Physicians (NYACP):** (2010-June 2017) Committee Member of the Ethics Committee of NYACP chapter; (May 2013-June 2017) Committee Member of the Quality and Patient Safety Committee of NYACP Chapter; (April 2014-April 2017) ACP Hudson Valley Central District Councilor, office term April 2014-April 2017; (April 2017-April 2021) elected to serve as NYACP Hudson Valley District Councilor at Large, office term April 2017-April 2021; (June 2017-present) Education Committee Member and Health and Public Policy Committee Member; (1/2018-present) Invited to participate in the American College of Physicians' Physician Well Being Champion Training (4/2018), with a term 4/2018-4/2021 as a NYACP Well Being Champion, member of the NYACP Well Being Subcommittee (previously Well Being Taskforce); (9/2019-6/2020) Served as an NYACP mentor for two medical students; (4/2023-present): Hudson Valley Central District Councilor, office term 4/2023-4/2027

**2009-present: collaboration with the NYS Department of Health (DOH):** (2009-present) NY State DOH AIDS Institute Quality of Care Advisory Committee, member, co-chair of QAC Committee June 2011-December 2020; (2009-July 2011) NY State DOH AIDS Institute Substance Use Learning Network, member; (2011-2016) Committee Member of the NYS DOH AIDS Institute's QAC General Indicators Subcommittee; (2011-2016) Committee Member of the NYS DOH AIDS Institute's QAC General Indicators Subcommittee; (2012-2016) Committee Member of the NYS DOH AIDS Institute's QAC Pharmacy Subcommittee; (2012-2016) Committee Member of the NYS DOH AIDS Institute's QAC Deaf and Hard of Hearing Subcommittee; (March 2013-2016) Vice Chair of the NYS DOH AIDS Institute's Committee for the Care of Substance Users with HIV Infections; (March 2013-2016) Chair of the NYS DOH AIDS Institute's QAC Substance Use Indicators Subcommittee; (July 2013-April 2016) Vice-Chair of the NYS DOH AIDS Institute's Technical Working Group on Overdose Prevention in Substance Users; Technical Working Group's Recommendations published as the document: *"New York State Technical Working Group on Resuscitation Training in Naloxone Provision Programs 2016 Report"* by NYS DOH AIDS Institute 4/2016; (September 2014-December 2020) Chair of the NYS DOH AIDS Institute's Tobacco Cessation Subcommittee; (May 2016-June 2020) Vice-Chair for the Substance Use Committee for the HIV Clinical Practice Guidelines, a collaborative between the NYS DOH AIDS Institute and Johns Hopkins University School of Medicine www.hivguidelines.org; (June 2016-June 2018) selected for participation in the NYS DOH AIDS Institute's Stakeholder Workgroup on a Drug User Anti-Stigma/Capacity Building Campaign; Faculty Member for their webinar series; December 2016-present: (12/2016-6/2020) Co-Chair of the NYS DOH AIDS Institute's Office of Drug User Health's NYS Buprenorphine Advisory Workgroup (BWG); member of the Prescribing Practices Subcommittee and member of the Special Populations Subcommittee; (6/2020-11/2023) member of the BWG as an OASAS representative; (11/2023-ongoing) member of the BWG as a community member; (May 2017-July 2017) Invited member of the U=U Focus Group for the NYS DOH AIDS Institute on messaging and rollout of the U=U (undetectable=untransmissible) campaign for HIV in NYS; (June 2017-June 2020) NYS DOH AI HIV Clinical Practice Guidelines Steering Committee Member; (June 2017-2018) Committee Member of the NYS DOH QAC Mortality Subcommittee;

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

(September 2017-2018) HIV/AIDS VBP Measure Feasibility Task Force Sub-team for NYS DOH; (November 2017-June 2020) Member of the NYS DOH AIDS Institute Women Who Use Drugs Workgroup

**2007-July 2011**: Bioethics Committee at Montefiore Medical Center, member

**Volunteer Experience** (selected)**:**

**11/2021-present:** Happy Compromise Farm and Animal Sanctuary Board of Directors Member, Waverly, NY
**9/2021-9/2023:** Catskill Animal Sanctuary Board of Directors Member
**3/2021-10/2023:** Weekly volunteer at Catskill Animal Sanctuary, doing animal care and animal medical care
**7/04-6/06**: Citiwide (community–based social services organization), Bronx, NY
Outreach to HIV positive individuals in single-room occupancy (SRO) hotels in the Bronx, delivering direct health care and providing health information
**9/1999-5/2003:** Leadership role in Medical Students for Choice; Board of Directors Member 2001-2003
**9/98-4/99**: Chicago Department of Public Health, Chicago, IL
Preceptor experience in Medical Epidemiology with the STD/HIV Prevention Program with Carol Ciesielski, MD
**9/97-3/98**: Santa Cruz AIDS Project, Santa Cruz, CA
Community Board of Directors member: Client Services Committee
**1/95-8/97**: Santa Cruz HIV Education and Prevention Project, Santa Cruz,
CA Street outreach/needle exchange to sex workers, youth, and injection
drug users
**1991-1997**: Santa Cruz Women's Health Center, Santa Cruz, CA
Medical Services Committee/Quality Improvement Committee (6/96-9/97); Staff Representative to the Board of Directors (2/93-5/97): meeting facilitator, Fundraising Committee member, Strategic Planning Committee member; Medical Assistant/Health Counselor (2/91-9/91)

**Research Experience:**

**September 2022-September 2023:** Collaboration between NYS OASAS and New York University
**Title: *Leveraging regulatory flexibility for methadone take-home dosing to improve retention in treatment for opioid use disorder: A stepped-wedge randomized trial to facilitate clinic level changes***
Major Goals: Regulatory changes made during the COVID-19 public health emergency (PHE) that relaxed criteria for take-home dosing (THD) of methadone offer an opportunity to improve retention in care with a lifesaving treatment. Black/African American and Latinx clients are disproportionately affected by more restrictive THD rules than non-Latinx White clients. We will develop and test the effects of a data-informed intervention to increase THD best practices in programs that dispense methadone for treatment of opioid use disorders.
Status of Support: Active Project Number: 1R61DA057683-01
**Name of PD/PI: Neighbors, Charles Joseph; Bao, Yuhua, PhD, Ramsey, Kelly, MD (MPI)**
Source of Support: NIH/NIDA Primary Place of Performance: New York University Grossman School of Medicine Project/Proposal Start and End Date: (MM/YYYY) (if available): 09/2022 – 09/2023 Total Award Amount (including Indirect Costs): $598,795 (Total Award) Person Months (Calendar/Academic/Summer) per budget period.

**April 2022-November 2023:** Collaboration between NYS OASAS and New York University
**Title: *Addictions Treatment Organizational Response to COVID-19: Impact on Disparities in Quality of Care***
Major Goals: The COVID-19 pandemic, a national emergency, has exposed societal vulnerabilities and racial and ethnic health disparities in access and quality of healthcare for patients with a substance use disorder (SUD). This study will examine the effects of changes to treatment practice on treatment outcomes at the individual patient and organizational level, with a focus on racial-ethnic minorities. The findings from this study will inform public health responses reduce health disparities in the most vulnerable communities in the long-term.
Status of Support: Active Project Number: 1R01DA054141
Name of PD/PI: Neighbors, Charles
**Co-Investigator: Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM**
Source of Support: NIH/NIDA Primary Place of Performance: New York University Grossman School of Medicine Project/Proposal Start and End Date: (MM/YYYY) (if available): **04/2022 – 02/2027** Total Award Amount (including Indirect Costs): $3,649,549 (Total Award)

**April 2023-November 2023:** Collaboration between NYS OASAS and New York University
**Title: *Organizational factors associated with quality of care for opioid use disorders among transition-age adults in Medicaid***
Major Goals: Transition age adults (ages 18-25) with opioid use disorders are poorly served by the current treatment system for substance use disorders. This study will examine the variation in quality of treatment for opioid use disorders for this age cohort and examine multilevel factors—individual, community, treatment program—associated with higher quality care. The findings from this study will inform clinical decision making by patients and providers as well as public health responses to the rising tide of young adults seeking treatment for OUD.
Status of Support: Active Project Number: R01DA057267
Name of PD/PI: Neighbors, Charles Joseph
**Co-Investigator: Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM**
Source of Support: NIH/NIDA Primary Place of Performance: New York University Grossman School of Medicine Project/Proposal Start and End Date: (MM/YYYY) (if available): **04/2023 – 02/2028** Total Award Amount (including Indirect Costs): $3,566,182 (Total Award)

**September 2023-November 2023:** Collaboration between NYS OASAS and New York University
**Title: *Leveraging regulatory flexibility for methadone take-home dosing to improve retention in treatment for opioid use disorder: A stepped-wedge randomized trial to facilitate clinic level changes***
Major Goals: Regulatory changes made during the COVID-19 public health emergency (PHE) that relaxed criteria for take-home dosing (THD) of methadone offer an opportunity to improve retention in care with a lifesaving treatment. Black/African American and Latinx clients are disproportionately affected by more restrictive THD rules than non-Latinx White clients. We will develop and test the effects of a data-informed intervention to increase THD best practices in programs that dispense methadone for treatment of opioid use disorders.
**Name of PD/PI: Neighbors, Charles Joseph; Bao, Yuhua, PhD, Ramsey, Kelly, MD**
Source of Support: NIH/NIDA Primary Place of Performance: New York University Grossman School of Medicine Project/Proposal Start and End Date: (MM/YYYY) (if available): **09/2023 – 09/2027** Total Award Amount (including Indirect Costs): $4,631,579 (Total Award) Person Months

**2004-2006**: Montefiore Medical Center, Department of Family and Social Medicine, Bronx, NY
Analysis of data from community-based study evaluating access to primary care in HIV positive individuals living in single-room occupancy (SRO) hotels in New York City; specific areas of interest

include patient perception of discrimination in health care services and the impact of substance use on access to health care and health outcomes

**1998-1999**: Chicago Department of Public Health, STD/HIV Prevention Program
**Graduate Thesis: *Descriptive Epidemiologic Profile of Primary and Secondary Syphilis Cases in Chicago, 1998***: an analysis of all cases of primary and secondary syphilis in the city of Chicago during the year 1998 using DPH interviews with cases and contact tracing information

## Research Community Advisory Board Participation:

**May 2022-November 2023:** JCOIN Grant with Columbia University to evaluate MOUD in the carceral system in NYS: representing NYS OASAS on the Community Advisory Board

**May 2023-present:** Long Island Network for Clinical and Translational Science (LINCATS): based at Stony Brook University and is intended to be a Clinical and Translational Science Institute (CTSI) funded by the National Center for Advancing Translational Sciences (NCATS) as part of the National Institutes of Health (NIH) to serve underrepresented groups and communities to address health disparities through the CTSA award for research.

**October 2021-present:** Integrative Management of Chronic Pain and OUD for Whole Recovery Research Center at Montefiore Einstein (IMPOWR-ME): NIH award to Albert Einstein College of Medicine and Montefiore Health System grant to establish a multidisciplinary research center focused on treatments for people with both chronic pain and opioid use disorder (OUD). The Integrative Management of Chronic Pain and OUD for Whole Recovery Research Center at Montefiore Einstein (IMPOWR-ME) will receive $5.1 million for its first two years. The NIH funding is from 10/2021-July 2026.

**June 2019-present:** Invited Member to participate on the NY State Community Advisory Board for the NIDA HEALing Communites Study with Columbia University School of Social Work, 6/2019-6/2020; participated as a state representative for OASAS 6/2020-11/2023; will continue as a community advisor and subject matter expert 11/2023-ongoing

**April 2019-June 2023:** Invited member to participate on the NY State Advisory Committee for OASAS/Shatterproof Addiction Treatment Ratings Pilot Project 4/2019-6/2020; participated as a state representative for OASAS 6/2020-6/2023

## Invited Lectures/Presentations and Interviews:

*I have 14 years of experience giving invited lectures/presentations locally, regionally, and nationally, both in person and virtually. My areas of expertise include all topics related to addiction, harm reduction, special populations and substance use disorder (older adults, adolescents, women, pregnant and parenting persons), HIV, HCV, overdose prevention and intervention, medications for addiction treatment, stigma, engagement and retention in care for people who use drugs (PWUD), disparities in overdoses and MOUD access, methadone and opioid treatment programs, opioid misuse, chronic pain and SUD. I have done about 75-100 presentations per year over the last 3.5 years I was employed at NYS OASAS.*

**Select examples of presentations:**

**Posted enduring content recordings for viewing:** Invited to present for web-based enduring

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

content NYS OASAS Learning Thursdays (number of views updated 8/12/24) on "Substance Use and Substance Use Disorders in Older Adults" (released 7/27/23; https://www.youtube.com/watch?v=bFeuAQ_3DPY&t=2s, 3,066 views), "What to Know About Xylazine and Other Novel Psychoactive Substances" (released 8/7/23; https://www.youtube.com/watch?v=0pf-DoPtWTY, 2,344 views), "Xylazine: An Overview" (released 2/16/23; https://www.youtube.com/watch?v=QfnK-52IKtQ, 12,666 views), "Methamphetamine Use and Methamphetamine Use Disorders" (released 11/1/22; https://www.youtube.com/watch?v=Vt_UAaP9drY, 8,329 views), "Disparities in Overdoses and Access to MOUD" (released 8/26/22; https://www.youtube.com/watch?v=sf6VweqSZTo, 3,227 views), "Substance Use Disorders: Our Colleagues? Ourselves?" (released 8/4/22; https://www.youtube.com/watch?v=xFVaSEF5d3w, 3092 views), "Eating Disorders and Substance Use" (released 7/5/22; https://www.youtube.com/watch?v=y6qVyQXj0sM, 5,998 views), "Treating Opioid Use Disorder in Correctional Settings: Medication for Opioid Use Disorder (MOUD) Reduces Overdoses and Opioid-Related Morbidity" (released 3/31/22; https://www.youtube.com/watch?v=SRtQO-mbsUo, 2,574 views), "Managing Medicolegal Liability for High-Risk Patients" (released 12/2/21; https://www.youtube.com/watch?v=Wze79w3NTFc, 3,098 views), "Addressing the Use of Language and Stigma Towards Persons with Substance Use Disorders in Healthcare Settings" (released 9/2/21; https://www.youtube.com/watch?v=8q0tKjNJCl8, 7,618 views), "Plans of Safe Care (POSC): Developing POSC with a Person-Centered Approach" (released 7/29/21; https://www.youtube.com/watch?v=Ke-Kausu2g8, 3,356 views), "Harm Reduction is Part of the Treatment Continuum: Normalizing Addiction Through Patient-Centered Care to Improve Outcomes and Reduce Overdose Deaths" (released 6/24/21; https://www.youtube.com/watch?v=D7WuzFWFMDk, 12,878 views), "Assessing Readiness for Substance Use Disorder Treatment and Employing Appropriate Harm Reduction" (released 5/13/21; https://www.youtube.com/watch?v=dUE3UplMXnI, 10,530 views), "Treating SUD in the Context of COVID-19" (released 3/30/21; https://www.youtube.com/watch?v=-puatzGrOQ4, 2,559 views), "Hepatitis C and Substance Use: Addressing Screening, Linkage to Care, Treatment, and Stigma" (released 1/26/21; https://www.youtube.com/watch?v=ZDSgguwbiMw, 4,372 views), via recorded webinars

**August 15, 2024:** Invited to present at the American Correctional Association Conference on "Expanding Methadone Access in Carceral Setting Using the Hospital/Clinic Designation", in Nashville, TN

**July 31, 2024:** Invited to present for the Practicing Law Institute's (PLI) conference on Substance Use Disorders and Recovery 2024: Representing the Legal Services, Nonprofit, and Pro Bono Client on the topic of "Substance Use Disorders: Latest Developments and What Legal Services and Pro Bono Attorneys Need to Know About the Science", in person in NYC and via live broadcast

**July 25, 2024:** Invited to present for the Litigation and Policy Convening by Georgetown University O'Neill Institute on "An Overview of SUD", in Washington DC

**July 20, 2014:** Invited to present for the Georgia Chapter of ASAM Annual Conference on "Fentanyl and Other Highly Potent Synthetic Opioids: What To Know About Medical Management and Overdose Prevention and Intervention", in Savannah, GA

**July 16, 2024:** Invited to present for Addiction Policy Forum/NIDA/JCOIN (Justice Community Opioid Innovation Network) on "Expanding Methadone Access in Carceral Setting Using the Hospital/Clinic Designation", via live webinar

**June 20, 2024:** Invited to present for the Midwest AIDS Education and Training Center (AETC)

Conference on "HIV and Substance Use", via live webinar

**June 6, 2024:** Invited to Present for the New Mexico Chapter of ASAM on "Xylazine and Tianeptine", via live webinar

**June 6, 2024:** Invited to present for the US Department of Justice Opioid Litigators on "Expanding Methadone Access in Carceral Setting Using the Hospital/Clinic Designation", via live webinar

**May 16, 2024:** Invited to present for the ASAM Chapters Council Meeting on "Expanding Methadone Access in Carceral Setting Using the Hospital/Clinic Designation", via live webinar

**May 15, 2024:** Invited to present for the CDC Foundation/HIDTA Opioid Response Strategy Annual Conference on "How to Navigate Drug Policy and Legislation", in Dallas, TX

**April 11, 2024:** Invited to present for the NASADAD Single State Agency for Addiction Medical Directors' Learning Collaborative on "Expanding Methadone Access in Carceral Setting Using the Hospital/Clinic Designation", via live webinar

**March 6, 2024:** Invited to present for the Mississippi Chapter of ASAM on "Xylazine and Fentanyl", via live webinar

**February 3, 2024:** Invited to present for the New York Chapter of ASAM Annual Science and Treatment Conference on "Novel Psychoactive Substances", via live webinar

**January 20, 2024:** Invited to present for the Kentucky Chapter of ASAM on "Novel Psychoactive Substances", via live webinar

**December 11, 2023:** Invited to present for the SAMHSA-NIDA-FDA Collaborative Virtual Meeting (national webinar) on High-Dose Buprenorphine on "ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder (OUD) for Individuals Using High-Potency Synthetic Opioids (HPSO)", via live webinar

**December 7, 2023:** Invited to present for a global webinar entitled Illicit Use of Veterinary Drugs: From Ketamine to Xylazine for the World Veterinary Association on "Health Risks and Concerns: Exploring the Potential Dangers Associated with Illicit Xylazine Use [in Humans]", via live webinar

**June 19, 2023:** Invited to present at the College on Problems of Drug Dependence (CPDD), 85th Annual Scientific Meeting, in a session called "The Intersection of COVID-19 and Substance Use Disorders", session chaired by Carlos Blanco, NIDA, and Leonardo Angelone, NIDA, co-presenters: Dr. Christopher Jones, CDC, and Dr. Halden; I presented on "COVID-19 and Substance Use Disorder: Lessons Learned and Where Do We Go From Here?", in person, Denver, CO

**May 6, 2023:** Invited to present at the American Conference for the Treatment of HIV (ACTHIV) 2023 Annual Conference on "Managing Substance Use and Harm Reduction", in person, Phoenix, AZ

**March 18, 2022:** Invited to present for the NAADAC Women in Recovery webinar series on "SUD in Women with a Focus on Pregnant and parenting Persons with OUD", via live webinar

**November 15, 2021:** Invited to present for SUNY Downstate Grand Rounds on "Case Studies on Pregnant and Parenting Persons with OUD", via live webinar

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

**September 3, 2021:** Invited to present as a panelist by ACMT (American College of Medical Toxicology)/ASAM (American Society of Addiction Medicine) for the Addiction Toxicology Case Conference on "Alcohol Use Disorder: Harm Reduction and Ambulatory Detoxification", via live webinar

**August 26, 2021:** Invited to present for St. Barnabas Hospital Grand Rounds on "Opioid Use Disorder (OUD): MOUD (Medication for OUD), Harm Reduction Practices, and Overdose Prevention", via live webinar

**August 6, 2021:** Invited to present as a panelist by ACMT (American College of Medical Toxicology)/ASAM (American Society of Addiction Medicine) for the Addiction Toxicology Case Conference on "Addressing Mistrust in COVID-19 Vaccination [Among Persons with Substance Use Disorder]", via live webinar

**May 4, 2021:** Invited to present for the HEALing Communities Study Columbia County Medical Conference on "Harm Reduction Is Part of the Treatment Continuum: Normalizing Addiction Through Patient-Centered Care to Improve Outcomes and Reduce Overdose Deaths", via live webinar and for enduring content online

**February 5-6, 2021:** Invited to present for the NYSAM Annual Public Policy Day and Science and Treatment Conference on the topics of "COVID-19 and Telehealth Changes" and "Treating SUD on the Context of COVID-19", via live webinar and for enduring content online

**June 28, 2020:** Invited to present for the PSSNY (Pharmacy Society of the State of NY) Conference on the topic of "Best Practices in Pain Management", via live webinar

**June 19, 2020:** Invited to present as a panelist for the ACMT/ASAM Addiction Toxicology Case Conference on the topic of "COVID-19-related Addiction Toxicology Case Conference", via live webinar

**February 8, 2020:** Invited to present by NYSAM at the NYSAM Annual Scientific Meeting on "Clinical Cases Presentation and Discussion" and to present NYSAM's 2020 Honorary Lifetime Achievement Award to Sheila Blume, MD, NY, NY

**February 7, 2020:** Invited to present as a panelist by NYSAM at the NYSAM Annual Public Policy Day for the discussion "Paradise Gained or Paradise Lost: How Can We Help Challenging Patients?", NY, NY

**September 28, 2019:** Invited to present on "Opioids: Impact on the African American Community" by the NCBNA (Northern Connecticut Black Nurses Association) as the Keynote Speaker at their 22nd Annual Scholarship Luncheon, Hartford, CT

**August 9, 2019:** Invited to present on "Drugs in America: A Brief History", "Opioid Use Disorder in Women: Focus on Pregnant Women and Women of Childbearing Age", and as part of a panel on "Innovative Models for Working with People Who Use Drugs" at the CEI-sponsored conference entitled From Stigma to Action: Addressing SUD, Harm Reduction, and Health Care, Syracuse, NY

**June 5, 2019:** Invited to present Grand Rounds for the Department of Medicine at Kings County Hospital, on "The Opioid Epidemic, OUD, and MAT", Brooklyn, NY

**February 21, 2019:** Invited to present for the Chairman's Grand Rounds for the Department of

Medicine at SUNY Upstate Medical University on "The Opioid Epidemic, OUD, and MAT", live and recorded for their Intranet, Syracuse, NY

**February 1-2, 2019:** Invited to present on "HRHCare MAT Data and Quality Metrics" on 2/1/19 and on "Opioid Use Disorder and Pregnancy" on 2/2/19 at the NYSAM 15th Annual Intersection of Science, Treatment and Policy Conference, Manhattan, NY

**December 19, 2018:** Invited to present on "The Opioid Epidemic: OUD and MAT" for Grand Rounds for Medicine at NYC Health and Hospitals, Jamaica, NY

**September 17, 2018:** Invited to a present on "FQHC Health Networks' Integrated Responses to the Opioid Crisis" by Mount Sinai REACH at the conference entitled "The Role of Primary Care in Addressing the Opioid Crisis in New York State", Manhattan

**August 17, 2018:** Invited to present on a panel entitled "Innovative Models for Working with People Who Use Drugs" by CEI at the conference entitled From Stigma to Action: Addressing Substance Use, Harm Reduction, and Healthcare, Manhattan

**June 2, 2018:** Invited to present on "The Opioid Epidemic: Disorder and Treatment" and to facilitate a Roundtable Discussion on "Suicide, Depression, and Drugs" by NYACP at the NYACP Annual Scientific Meeting, Rye Brook, NY

**January 11, 2018:** Invited to present Grand Rounds for the OB/GYN Department at Vassar Brothers Medical Center on "Opioid Use Disorder in Women: Focus on Pregnant and Breastfeeding Women on Medication Assisted Treatment (MAT)", Poughkeepsie, NY

**September 14, 2017**: Invited to present Grand Rounds for the OB/GYN Department at Vassar Brothers Medical Center on "Best Practices: Medication Assisted Treatment (MAT) for Opioid Use Disorder", Poughkeepsie, NY

**July 27, 2017**: Invited to speak for a recorded webinar event for the Centers for Medicare and Medicaid Services Integrated Learning System's *Advancing Practices to Address Opioid-Related Overdoses and Addiction Series* on "Changing the Culture of Prescribing Opioids at Hudson River Health Care", released on the internet for viewing on August 30, 2017

**June 3, 2017**: Invited to present for the NYACP Scientific Meeting on "Naloxone: Preventing Opioid Overdose in the Community", Rochester, NY

**June 17, 2016**: Invited to present for Medical Grand Rounds at Bassett Healthcare Network on "Treatment for Hepatitis C: New Tests, New Drugs & New Recommendations", Cooperstown, NY

**April 6, 2016**: Invited to present for Cobleskill Regional Hospital Grand Rounds on "Treatment for Hepatitis C: New Tests, New Drugs & New Recommendations", Cobleskill, NY

**April 8, 2015**: Invited as a Panel Speaker for the session entitled, "PDMP Track: Prescriber Viewpoint: How Mandating Compliance Is Working: New York State," presented at the 2015 National Prescription (RX) Drug Abuse Summit, Atlanta, GA

**March 20, 2014**: Invited as a Panel Speaker for the session entitled, "Building Capacity to Manage Patients with Sexually Transmitted Infections, HIV, and Hepatitis C," presented at the 2014 NACHC (National Association of Community Health Centers) Policy & Issues Forum, Washington DC

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

**2009-2010**: Presentation of anal Pap data from Wellness Center at Port Morris at community health centers in the Bronx and at the CICERO Group (Montefiore Medical Center affiliated outpatient clinics in the Bronx)

**Podcast Interviews:**

**June 13, 2024: "**Special Conversations with CEI: Best Practices for Hepatitis C and Pregnancy Screening: Advice from a Fellow Clinician" (Special Conversations with CEI: Best Practices for Hepatitis C and Pregnancy Screening: Advice from a Fellow Clinician | Conversations with CEI (podbean.com)**)**

**June 6, 2024: "**Special Conversations with CEI: Best Practices on Working with People Who Use Substances" (Special Conversations with CEI: Best Practices for Working with People Who Use Substances | Conversations with CEI (podbean.com))

**May 30, 2024: "**Special Conversations with CEI: The Impact of Hepatitis C Screening During Pregnancy" (Special Conversations with CEI: The Impact of Hepatitis C Screening during Pregnancy: A Client's Story | Conversations with CEI (podbean.com))

**May 7, 2024:** ASAM's The Treat Addiction Save Lives podcast, "The Changing Landscape of Addiction: A Conversation with Dr. Kelly Ramsey" ((95) The changing landscape of addiction | A Conversation With… Dr. Kelly Ramsey - YouTube)

**April 25, 2024:** ASAM's The Treat Addiction Save Lives podcast, "Special Episode from the 55th Annual ASAM Conference: Dr. Kelly Ramsey" (Special Episode from the 55th Annual ASAM Conference: Dr. Kelly Ramsey • The Treat Addiction Save Lives Podcast (spotify.com))

**November 7, 2023:** NYS OASAS podcast Addiction: The Next Step, "Xylazine Alert" (https://www.buzzsprout.com/2186676/13920742)

**July 30, 2023:** NYACP's Physician Spotlight: "Making Change and Reducing Stigma: A Career in Addiction Medicine" (https://nyacp.buzzsprout.com/1597336/13132979-making-change-and-reducing-stigma-a-career-in-addiction-medicine)

**September 29, 2021:** Invited to present for the ACOG Podcast on "Women's Services at NYS OASAS", recorded podcast

**September 21, 2017**: Interviewed for the podcast, *HarmLess*, on opioid use disorder, the opioid epidemic, MAT, safe opioid prescribing, the NYS 3-hour mandated pain course, and pain management

**Print Interviews (select):**

**June 18, 2024:** NPR News, "She died in a New York jail. Her family still has questions, alleges medical neglect" (A woman died in jail. Her family alleges it was medical neglect : NPR)

**August 29, 2023:** ASAM Blog, "Finding Solutions to a Dangerous Trend"

**June 2, 2023:** MedPage Today, " 'If the Narcan Isn't Working, Give More' and Other Myths About Naloxone Use"

Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM Updated 8/2024

**February 1, 2023:** MedPage Today, "What Doctors Should Know About Xylazine in Fentanyl"

**Summer 2018:** Interviewed by Christopher Ferraris, LMSW and Terri Wilder, MSW, for Family Doctor: A Journal of the New York State Academy of Family Physicians for the article entitled "Addressing Drug Use in Your Practice – Building Confidence to Assess and Treat", published Summer 2018, Volume Seven, Number One, pp. 26-29.

## Advisory Boards:

**May 20, 2016**: invited to an HCV Advisory Board Meeting: post-EASL for Internists and Infectious Disease Specialists treating HCV, by Gilead Pharmaceuticals, Chicago, IL

**May 15, 2015**: Invited to an HCV Advisory Board Meeting for Internists and Infectious Disease Specialists treating HCV, by Gilead Pharmaceuticals, Chicago, IL

## BIBLIOGRAPHY

A.    **Original Communications in Reviewed Journals:**

Aleksanyan J, Choi S, Lincourt P, Burke C, **Ramsey KS**, Hussain S, Jordan AE, Morris M, D'Aunno T, Glied S, McNeely J, Elbel B, Mijanovich T, Adhikari S, Neighbors CJ. Lost in transition: A protocol for a retrospective, longitudinal cohort study for addressing challenges in opioid treatment for transition-age adults. PLoS One. 2024 Aug 14;19(8):e0297567. doi: 10.1371/journal.pone.0297567. PMID: 39141672; PMCID: PMC11324150.

The HEALing Communities Study Consortium (Jeffrey H. Samet, M.D., M.P.H., Nabila El-Bassel, Ph.D., T. John Winhusen, Ph.D., Rebecca D. Jackson, M.D., Emmanuel A. Oga, M.D., M.P.H., Redonna K. Chandler, Ph.D., Jennifer Villani, Ph.D., M.P.H., Bridget Freisthler, Ph.D., Joella Adams, Ph.D., Arnie Aldridge, Ph.D., Angelo Angerame, B.S., Denise C. Babineau, Ph.D., Sarah M. Bagley, M.D., Trevor J. Baker, M.S., Peter Balvanz, M.P.H., Carolina Barbosa, Ph.D., Pharm.D., Joshua Barocas, M.D., Tracy A. Battaglia, M.D., M.P.H., Dacia D. Beard, M.P.H., M.B.A., Donna Beers, M.S.N., R.N.-B.C., Derek Blevins, M.D., Nicholas Bove, M.P.H., Carly Bridden, M.A., M.P.H., Jennifer L. Brown, Ph.D., Heather M. Bush, Ph.D., Joshua L. Bush, Ph.D., Ryan Caldwell, Katherine Calver, Ph.D., Deirdre Calvert, M.S.W., Aimee N.C. Campbell, Ph.D., Jane Carpenter, M.P.H., Rachel Caspar, M.A., Deborah Chassler, M.S.W., Joan Chaya, M.A., Debbie M. Cheng, Sc.D., Chinazo O. Cunningham, M.D., Anindita Dasgupta, Ph.D., James L. David, M.S., Alissa Davis, Ph.D., Tammy Dean, B.S., Mari-Lynn Drainoni, Ph.D., Barry Eggleston, M.S., Laura C. Fanucchi, M.D., M.P.H., Daniel J. Feaster, Ph.D., Soledad Fernandez, Ph.D., Wilson Figueroa, Ph.D., Darcy A. Freedman, Ph.D., M.P.H., Patricia R. Freeman, Ph.D., Caroline E. Freiermuth, M.D., M.H.S., Eric Friedlander, B.A., Kitty H. Gelberg, Ph.D., Erin B. Gibson, M.P.H., Louisa Gilbert, Ph.D., LaShawn Glasgow, Dr.P.H., Dawn A. Goddard-Eckrich, Ed.D., Stephen Gomori, M.S., Dawn E. Gruss, M.Ed., Jennifer Gulley, M.P.H., B.S.N., R.N., Damara Gutnick, M.D., Megan E. Hall, M.P.H., Nicole Harger Dykes, Pharm.D., Sarah L. Hargrove, M.S., Kristin Harlow, Ph.D., Aumani Harris, M.P.H., Daniel Harris, Ph.D., Donald W. Helme, Ph.D., JaNae Holloway, M.S.P.H., Juanita Hotchkiss, M.S.W., Terry Huang, Ph.D., M.P.H., Timothy R. Huerta, Ph.D., Timothy Hunt, Ph.D., M.S.W., Ayaz Hyder, Ph.D., Van L. Ingram, Tim Ingram, M.S., Emily Kauffman, D.O., M.P.H., Jennifer L. Kimball, B.A., Elizabeth N. Kinnard, M.S., Charles Knott, M.P.A., Hannah K. Knudsen, Ph.D., Michael W. Konstan, M.D., Sarah Kosakowski, M.P.H., Marc R. Larochelle, M.D., M.P.H., Hannah M. Leaver, M.B.A.,

Patricia A. LeBaron, M.S., R. Craig Lefebvre, Ph.D., Frances R. Levin, M.D., Nikki Lewis, M.P.H., Nicky Lewis, Ph.D., Michelle R. Lofwall, M.D., David W. Lounsbury, Ph.D., Jamie E. Luster, M.P.H., Michael S. Lyons, M.D., M.P.H., Aimee Mack, M.P.H., Katherine R. Marks, Ph.D., Stephanie Marquesano, J.D., Rachel Mauk, Ph.D., Ann Scheck McAlearney, Sc.D., Kristin McConnell, M.S., Margaret L. McGladrey, Ph.D., Jason McMullan, M.D., Jennifer Miles, C.P.A., Rosie Munoz Lopez, M.P.H., Alisha Nelson, M.B.A., Jessica L. Neufeld, M.P.H., Lisa Newman, M.P.H., Trang Q. Nguyen, M.D., Dr.P.H., Edward V. Nunes, M.D., Devin A. Oller, M.D., Carrie B. Oser, Ph.D., Douglas R. Oyler, Pharm.D., Sharon Pagnano, M.P.H., Theodore V. Parran, M.D., Joshua Powell, M.S., Kim Powers, B.S.W., William Ralston III, M.D., **Kelly Ramsey, M.D., M.P.H.,** Bruce D. Rapkin, Ph.D., Jennifer G. Reynolds, M.P.H., Monica F. Roberts, Pharm.D., Will Robertson, Peter Rock, M.P.H., Emma Rodgers, M.P.H., Sandra Rodriguez, M.P.H., Maria Rudorf, M.A., Shawn Ryan, M.D., Pamela Salsberry, Ph.D., M.P.H., Monika Salvage, M.Ag., Nasim Sabounchi, Ph.D., Merielle Saucier, B.A., Caroline Savitzky, M.S.W., Bruce Schackman, Ph.D., Elizabeth Schady, B.A., Eric E. Seiber, Ph.D., Aimee Shadwick, M.A., Abigail Shoben, Ph.D., Michael D. Slater, Ph.D., Svetla Slavova, Ph.D., Drew Speer, Dr.P.H., Joel Sprunger, Ph.D., Laura E. Starbird, Ph.D., Michele Staton, Ph.D., Michael D. Stein, M.D., Danelle J. Stevens-Watkins, Ph.D., Thomas J. Stopka, Ph.D., M.H.S., Ann Sullivan, Ph.D., Hilary L. Surratt, Ph.D., Rachel Sword Cruz, M.S.W., M.P.H., Jeffery C. Talbert, Ph.D., Jessica L. Taylor, M.D., Katherine L. Thompson, Ph.D., Nathan Vandergrift, Ph.D., Rachel A. Vickers-Smith, Ph.D., Deanna J. Vietze, M.S., Daniel M. Walker, Ph.D., M.P.H., Alexander Y. Walley, M.D., Scott T. Walters, Ph.D., Roger Weiss, M.D., Philip M. Westgate, Ph.D., Elwin Wu, Ph.D., April M. Young, Ph.D., Gary A. Zarkin, Ph.D., and Sharon L. Walsh, Ph.D.). Community-Based Cluster-Randomized Trial to Reduce Opioid Overdose Deaths. NEJM, Published June 16, 2024 DOI: 10.1056/NEJMoa2401177

O'Grady MA, Elkington KS, Robson G, Achebe IY, Williams AR, Cohall AT, Cohall R, Christofferson M, Garcia A, **Ramsey KS**, Lincourt P, Tross S. Referral to and engagement in substance use disorder treatment within opioid intervention courts in New York: a qualitative study of implementation barriers and facilitators. Subst Abuse Treat Prev Policy. 2024 Jan 29;19(1):12. doi: 10.1186/s13011-024-00593-y. PMID: 38287329; PMCID: PMC10826099.

Weimer, Melissa B. DO, MCR, DFASAM; Herring, Andrew A. MD; Kawasaki, Sarah S. MD, FASAM; Meyer, Marjorie MD; Kleykamp, Bethea A. PhD; **Ramsey, Kelly S. MD, MPH, MA, FACP, DFASAM**. ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids. Journal of Addiction Medicine 17(6):p 632-639, 11/12 2023. | DOI: 10.1097/ADM.0000000000001202

Smith TE, Ledneva T, Cohen DE, **Ramsey KS**, Bauer MJ, Carruthers J, Conroy MB, Dreslin SR, Friedrich M, Sun M, Gould MS, Schoenbaum M, Olfson M.AJPM Focus. 2023 Sep 30;2(4):100151. doi: 10.1016/j.focus.2023.100151. eCollection 2023 Dec. Ethnoracial Disparities in Rates of Non-Natural Causes of Death After the 2020 COVID-19 Outbreak in New York State.

Weimer MB, Herring AA, Kawasaki SS, Meyer M, Kleykamp BA, **Ramsey KS**.J Addict Med. 2023 Nov-Dec 01;17(6):632-639. doi: 10.1097/ADM.0000000000001202. Epub 2023 Jul 28. ASAM Clinical Considerations: Buprenorphine Treatment of Opioid Use Disorder for Individuals Using High-potency Synthetic Opioids.

Choi S, O'Grady MA, Cleland CM, Knopf E, Hong S, D'Aunno T, Bao Y, **Ramsey KS**, Neighbors CJ.PLoS One. 2023 Jun 9;18(6):e0286859. doi: 10.1371/journal.pone.0286859. eCollection 2023. Clinics Optimizing MEthadone Take-homes for opioid use disorder

(COMET): Protocol for a stepped-wedge randomized trial to facilitate clinic level changes.

Leibowitz GS, Turner W, Bruckenthal P, Mezzatesta M, **Ramsey KS,** Dyer ME.Public Health Rep. 2023 May-Jun;138(1_suppl):42S-47S. doi: 10.1177/00333549231170216. Lessening the Impact of Opioid Misuse at a Federally Qualified Health Center in New York: Outcomes of an Integrated Workforce Training Program.

Chinazo O. Cunningham, MD, Xuan Li, MS, **Kelly Ramsey, MD, MPH**, and Nancy L. Sohler, PhD, MPH, A Comparison of HIV Health Services Utilization Measures in a Marginalized Population: Self Report Versus Medical Records, <u>Medical Care</u>, Volume 45, Issue 3, pages 264-268, March 2007

**B.     Books, Chapters in Books, and Review Articles:**

US Department of Justice, Office of Justice Programs, Bureau of Justice Assistance, Guidelines for Managing Substance Withdrawal in Jails: A Tool for Local Government Officials, Jail Administrators, Correctional Officers, and Health Care Professionals, **Field Reviewer**, Published June 2023

US DHHS, SAMHSA, Technical Assistance Publication Series, TAP 34: Disaster Planning Handbook for Behavioral Health Service Programs, **Subject Matter Expert**, Updated 2021

**C.     Abstracts, Posters:**

Choi S, O'Grady M, Renteria D, Oules C, Lincourt P, **Ramsey K**, Neighbors C. Uncovering Disparities in Patient-Provider Encounters: Exploring Perspectives from Patients and Providers. Poster presentation at Addiction Health Sciences Research annual meeting, 2023, Roosevelt Island, Oct 18-20.

Brewster M, Jordan AE, Burke C, **Ramsey KS**, Lincourt P, Cunningham CO. Integrating Harm Reduction Services into a State-Wide Substance Use Disorder System of Care. Late breaking research poster presentation, epidemiology and public health research section at: Annual Meeting of the International Network on Health and Hepatitis in Substance Users. October 17-20, 2023; Geneva, Switzerland.

**Kelly S. Ramsey, MD, MPH, FACP**, Anal Paps in HIV-positive Patients: Are the New York State Guidelines Inclusive Enough? ACP Annual Connecticut Scientific Meeting, Tri-State Annual Young Physician Abstract Competition Finalist, poster, November 2010

David Kotlyar MD, Michelle Pasamba BA, Vafa Tabatabaie MD, **Kelly Ramsey MD**, A Case of Angioedema of the Bowel: A rare Adverse Effect of Ace-inhibitors, American College of Gastroenterology Annual Meeting, poster, October 2010

MR Stein MD, I Soloway RPA, K **Ramsey MD, MPH**, N Pagan RPA, K Jefferson RPA, AH Litwin, MD, MS, Group Treatment of Chronic Hepatitis C Infection in a Methadone Maintenance Clinic, Society of General Internal Medicine Annual Meeting, poster, April 2010

Stein MR, Soloway I, **Ramsey K**, et al. Group treatment of chronic hepatitis C infection in a methadone maintenance program. Association for Medical Education and Research in Substance Abuse Annual Meeting, Bethesda, MD, poster, November 2009

**D.    Submissions:**

Jordan AE, **Ramsey K**, Gaynor R, Lincourt P, Meyer G, Burke C, Rosen H,  Puryear L, Cunningham CO. Integrating Medications for Opioid Use Disorder in Carceral Settings in New York State: Real World Considerations. Submitted to AATOD annual meeting as a workshop, Las Vegas, NV. 2024.

**Ramsey K**, Jordan AE, Lincourt P, Gaynor R, Puryear L, Rubinfeld J, Hussain S, Cunningham CO. Looking Ahead to No Stigma: Better Access, Better Integration of Methadone. Submitted to AATOD annual meeting as a workshop, Las Vegas, NV. 2024.

**E.    Guidelines:**

**Ramsey KS**, Cunningham CO, Stancliff S, Stevens LC, Hoffmann CJ, Gonzalez CJ; Substance Use Guidelines Committee. NYS DOH AIDS Institute Clinical Guidelines Program at Johns Hopkins University School of Medicine online publication of "Substance Use Disorder Treatment in Pregnant Adults", Baltimore (MD): Johns Hopkins University; 2021 Jul. New York State Department of Health AIDS Institute Clinical Guidelines. https://www.hivguidelines.org/substance-use/sud-treatment-pregnancy/

**Vice-Chair of the NYS DOH AIDS Institute's Technical Working Group on Overdose Prevention in Substance Users**; Technical Working Group's Recommendations published as the document: "New York State Technical Working Group on Resuscitation Training in Naloxone Provision Programs 2016 Report" by NYS DOH AIDS Institute 4/2016

**F.    Other:**

**Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM**, Hepatitis C Screening During Pregnancy Provider Toolkit, NYS DOH and Mount Sinai/Clinical Education Initiative (CEI), April 2024, published online (HCV_Screening_for_Pregnant_People_Provider_Toolkit_April_2024_for_Posting.pdf (mcusercontent.com)

**Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM**, Brief FAQ on Methadone Use to Treat Opioid Use Disorder (OUD) in Carceral Settings Using the Hospital/Clinic Designation, Johns Hopkins University Bloomberg School of Public Health, Health Policy & Management, March 27, 2024, published online (FAQ-Methadone-in-Carceral-Settings.pdf (jhsph.edu)) (blog post: Expanding Access to Methadone Treatment for Opioid Use Disorder in Carceral Settings - Opioid Principles (jhsph.edu))

Mary Brewster, MSW and **Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM**, The Long History and Bright Future of Harm Reduction in New York State, Behavioral Health News, October 23, 2023, published online (https://behavioralhealthnews.org/the-long-history-and-bright-future-of-harm-reduction-in-new-york-state/)

Pat Lincourt, LCSW and **Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM**, The Ways That Stigma Hurts People Who Use Substances and How to Help, Behavioral Health News, April

18, 2023, published online
(https://behavioralhealthnews.org/the-ways-that-stigma-hurts-people-who-use-substances-and-how-to-help/)


Staff of NYS DOH AIDS Institute HIV Clinical Guidelines Program at Johns Hopkins University School of Medicine in collaboration with Kelly S. Ramsey, MD, MPH, Clinical Director of Special Programs, HRHC, Inc., Commentary on the NYS DOH AIDS Institute's Clinical Guideline on Working With the Active User (WWAU), Medscape, posted online July 22, 2015 (commentary)

# EXHIBIT 2

1   GAY C. GRUNFELD – 121944
    VAN SWEARINGEN – 259809
2   MICHAEL FREEDMAN – 262850
    ERIC MONEK ANDERSON – 320934
3   HANNAH M. CHARTOFF – 324529
    BEN HOLSTON – 341439
4   ROSEN BIEN
    GALVAN & GRUNFELD LLP
5   101 Mission Street, Sixth Floor
    San Francisco, California  94105-1738
6   Telephone:   (415) 433-6830
    Facsimile:    (415) 433-7104
7   ggrunfeld@rbgg.com
    vswearingen@rbgg.com
8   mfreedman@rbgg.com
    eanderson@rbgg.com
9   hchartoff@rbgg.com
    bholston@rbgg.com
10
11  AARON J. FISCHER – 247391
    LAW OFFICE OF
    AARON J. FISCHER
12  1400 Shattuck Square Suite 12 - #344
    Berkeley, California  94709
13  Telephone:  (510) 806-7366
    Facsimile:   (510) 694-6314
14  ajf@aaronfischerlaw.com

15  Attorneys for Plaintiffs and the
    Certified Class and Subclasses

    CHRISTOPHER M. YOUNG – 163319
    ISABELLA NEAL – 328323
    OLIVER KIEFER – 332830
    DLA PIPER LLP (US)
    4365 Executive Drive, Suite 1100
    San Diego, California  92121-2133
    Telephone:  (858) 677-1400
    Facsimile:   (858) 677-1401
    christopher.young@dlapiper.com
    isabella.neal@dlapiper.com
    oliver.kiefer@dlapiper.com

16

17                  UNITED STATES DISTRICT COURT

18                 SOUTHERN DISTRICT OF CALIFORNIA

19  DARRYL DUNSMORE, ANDREE              Case No. 3:20-cv-00406-AJB-DDL
    ANDRADE, ERNEST ARCHULETA,
20  JAMES CLARK, ANTHONY EDWARDS,        **REBUTTAL EXPERT REPORT**
    REANNA LEVY, JOSUE LOPEZ,            **OF KELLY S. RAMSEY, M.D.**
21  CHRISTOPHER NORWOOD, JESSE
    OLIVARES, GUSTAVO SEPÚLVEDA,         Judge:      Hon. Anthony J. Battaglia
22  MICHAEL TAYLOR, and LAURA            Magistrate:Hon. David D. Leshner
    ZOERNER, on behalf of themselves and all
23  others similarly situated,           Trial Date: None Set

24                  Plaintiffs,

25        v.

    SAN DIEGO COUNTY SHERIFF'S
26  DEPARTMENT, COUNTY OF SAN
    DIEGO, SAN DIEGO COUNTY
27  PROBATION DEPARTMENT, and DOES
    1 to 20, inclusive,

28                  Defendants.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................... 1

II. THE MEDICAL RECORDS SUMMARIZED IN THE MURRAY AND PENN REPORTS DEMONSTRATE THAT THE SHERIFF'S DEPARTMENT FAILS TO PROTECT INCARCERATED PERSONS AT RISK OF SERIOUS HARM DUE TO SUBSTANCE USE INTOXICATION, WITHDRAWAL. SUBSTANCE USE DISORDER, AND OVERDOSE ........................................................... 2

III. DEFENDANTS' REPORTS FAIL TO MEANINGFULLY ANALYZE WHETHER THE SHERIFF'S DEPARTMENT ADEQUATELY TREATS PERSONS EXPERIENCING WITHDRAWAL AND THE MEDICAL FILES DEFENDANTS' EXPERTS PURPORTED TO REVIEW SHOW THAT WITHDRAWAL MANAGEMENT FREQUENTLY DID NOT MEET THE STANDARD OF CARE ................. 5

    A. The Jail's intake screening process regularly misses substance use ........................................................................................... 6

    B. When an incarcerated person's substance use is not identified at intake, they generally are not assessed, monitored, and treated for withdrawal from that substance, even if the Jail later identifies that substance use ................................................................... 12

    C. Though the Jail has policies and procedures in place to monitor and treat withdrawal from opioids, alcohol, and benzodiazepines, in practice, it fails to follow those policies and to meet the standard of care ............................................................................ 14

    D. The Jail lacks treatment protocols regarding stimulant intoxication and withdrawal, which generally go untreated ................ 20

    E. The Jail does not provide individualized withdrawal treatment, which often leads to inadequate withdrawal management, including insufficient dosing of medication for opioid withdrawal ............................................................................. 21

    F. The Jail does not appropriately house persons experiencing withdrawal ............................................................................. 23

    G. The Death of Richard Woodford Illustrates the Harm that Can Be Caused by Defendants' Inadequate System for Treating Withdrawal ............................................................................. 24

IV. DEFENDANTS' REPORTS FAIL TO SHOW THAT THE SHERIFF'S DEPARTMENT ADEQUATELY TREATS PERSONS WITH SUBSTANCE USE DISORDER .......................................................... 27

    A. The Sheriff's Department Fails to Meet the Standard of Care for Persons with Opioid Use Disorder ........................................... 28

1.   The Jail fails to promptly diagnose OUD and deliver MOUD once it learns that an incarcerated person likely has OUD .................................................................. 29

2.   The Jail fails to provide adequate care to those with OUD, including by failing to provide sufficient doses of MOUD and failing to ensure MOUD is not discontinued when treatment is still needed ............................................... 33

B.   The Sheriff's Department Lacks Policies and Procedures Focused on Treating, and Therefore Fails to Provide Treatment for, Non-Opioid Substance Use Disorder ............................... 41

V.   DEFENDANTS' REPORTS FAIL TO SHOW THAT THE SHERIFF'S DEPARTMENT ADEQUATELY PROTECTS PERSONS AT RISK OF OVERDOSE .............................................................. 42

VI.  DR. MURRAY'S AND DR. PENN'S OPINIONS ON DISCHARGE PLANNING FAIL TO SHOW THAT THE SHERIFF'S DEPARTMENT HAS ADEQUATE DISCHARGE PLANNING FOR INCARCERATED PERSONS WITH SUD .................................... 46

VII. CONCLUSION ............................................................................ 48

## I.    INTRODUCTION

I, Kelly S. Ramsey, MD, MPH, MA, FACP, DFASAM, declare:

1.    Plaintiffs' counsel asked me to prepare this Rebuttal Expert Report to respond to the opinions regarding substance use management and substance use disorder treatment in the August 21, 2024, reports of Defendants' experts Owen J. Murray (medical, "Murray Report"), Joseph Penn (mental health, "Penn Report")), and Lenard Vare (jail management and operations, "Vare Report") (collectively, "Defendants' Reports").

2.    I have reviewed the analyses, opinions, and conclusions of Dr. Murray, Dr. Penn, and Mr. Vare in Defendants' Reports regarding substance use management and substance use disorder treatment in the San Diego County jails (the "Jail").  Each of those experts opines briefly on some of the elements of substance use treatment detailed in my August 20, 2024 report, but their opinions are strongly contradicted by the evidence I have reviewed, in particular medical records that Dr. Murray and Dr. Penn relied on in their reports.  Those medical records, along with the rest of the evidence I have reviewed, underscore the conclusions in my initial report that the Jail's systems for substance use management and substance use disorder treatment expose incarcerated persons to a substantial risk of serious harm. *See* Expert Report of Kelly S. Ramsey, MD (hereinafter, the "Ramsey Rpt.") at ¶ 17.

3.    Based on the curricula vitae provided by Dr. Murray and Dr. Penn, the physicians have neither specific training nor expertise in addiction medicine or addiction psychiatry, respectively.  Dr. Penn mentions that he has treated persons with substance use disorder in incarcerated settings but does not specify that he ever received any dedicated training to do so.  Dr. Murray does not mention any specific training or experience related to treating substance use or substance use disorder. The fact that neither physician has identified any specific training regarding the treatment of substance use or substance use disorder is concerning.  Most current medical school and residency programs do not include much, if any, substantive

1    training on substance use and substance use disorder.  When Dr. Murray and

2    Dr. Penn received their training in the 1980s and 1990s respectively, medication for

3    addiction treatment for opioid use disorder, other than methadone in opioid

4    treatment programs (OTPs), was not common or widely available.

5        4.    Based on the curriculum vitae and the report of Mr. Vare, it is my

6    understanding that he has no background in medicine, let alone addiction medicine.

7        5.    I find it concerning that none of the experts Defendants have hired to

8    opine on substance use management or substance use disorder treatment specialize

9    in or appear to have much, if any, experience with this area of practice.  As I discuss

10   in more detail below, the opinions they offer regarding the adequacy of the Jail's

11   system for treating substance use and substance use disorder are not consistent with

12   the evidence in this case, including medical records on which they purport to rely.

13   The dissonance between their opinions and the evidence further suggests that they

14   lack the expertise to opine on substance use management and substance use disorder

15   treatment in the Jail.

16   **II.    THE MEDICAL RECORDS SUMMARIZED IN THE MURRAY AND PENN REPORTS DEMONSTRATE THAT THE SHERIFF'S DEPARTMENT FAILS TO PROTECT INCARCERATED PERSONS AT RISK OF SERIOUS HARM DUE TO SUBSTANCE USE INTOXICATION, WITHDRAWAL.  SUBSTANCE USE DISORDER, AND OVERDOSE**

20       6.    Both Dr. Murray and Dr. Penn based certain opinions in their reports

21   on reviews of incarcerated persons' medical records.  Dr. Murray and Dr. Penn did

22   not review the medical records themselves.  Instead, they relied on consultants to

23   review the records for them.

24       7.    Consultants for Dr. Murray reviewed 81 medical records regarding

25   chronic care and drafted summaries of those records that are included in Appendix J

26   to his report.  *See* Murray Rpt. at 14-15, 164-224.  The consultants were either nurse

27   practitioners, physician assistants, or physicians, although Dr. Murray did not

28   provide any curricula vitae or descriptions of the experience for any of these

1   consultants.  It is therefore impossible for me to determine whether these consultants

2   have any experience with addiction medicine, let alone sufficient experience to

3   provide adequate reviews of medical records.  I also could not determine whether

4   they have any experience practicing addiction medicine in a correctional

5   environment.  Each summary includes a conclusion as to whether the care reflected

6   in the medical record met the standard of care.  Dr. Murray concluded that "the

7   standard of care was followed in 93% of cases reviewed," which is 75 of the 81

8   cases.  Murray Rpt. at 15.

9       8.    Dr. Murray also reviewed medical records related to five in-custody

10  deaths in Appendix Q to his report, but he did not provide any opinion as to whether

11  the standard of care was met for those patients.  *See* Murray Rpt. at 39, 253-55.

12      9.    Consultants for Dr. Penn also reviewed 81 medical records regarding

13  mental health care and drafted summaries of those records that are included in

14  Appendix D to his report.  *See* Penn Rpt. at 9, 156-205.  Dr. Penn explained that

15  these consultants were each "correctional forensic psychiatrists" with "recent

16  experience in jail correctional systems as treating psychiatrists," *id.* at 9, which is

17  more information than Dr. Murray provided about his consultants, but Dr. Penn also

18  did not provide any curricula vitae for these consultants or information about

19  whether they have experience in addiction psychiatry.  Thus, I cannot determine

20  whether they have sufficient experience to provide adequate reviews of substance

21  use management and substance use disorder treatment in these medical records.

22  Dr. Penn stated that these experts "assessed through medical record reviews" "the

23  quality of care, access to, and continuity of mental health services for SDSO

24  incarcerated persons" and explained that "[t]heir individual summaries, comments,

25  and findings were reviewed and incorporated into my overall analysis and expert

26  opinions."  *Id.*  For each of the 81 records, either "Yes" or "No" is checked in

27  response to the prompt:  "This incarcerated person had access to care (e.g., *access to*

28  *care means that, in a timely manner, seen by a qualified M[ental] H[ealth]*

1  *professional, is rendered a clinical judgment, and receives M[ental] H[ealth] care*

2  *that is ordered*) for their serious or non-serious medical needs." *See generally* Penn

3  Rpt. at 156-205. "Yes" is checked for 96% of those records, or 78 of the 81 cases

4  reviewed. *Id.*

5       10.     I reviewed the medical records for each incarcerated person whose

6  medical records were summarized in either Dr. Murray's or Dr. Penn's report, and

7  where the summary indicated that the person may have had substance use or

8  substance use disorder. Notably, in the reviews in their reports that mention

9  substance use or substance use disorder, Dr. Murray and Dr. Penn did not identify

10  any problems with the care that incarcerated persons received for substance use or

11  substance use disorder.

12       11.     I did not receive any of these medical records until September 20,

13  2024. I began reviewing them immediately. The files were very large and time

14  consuming to review and write up the issues with substance use care that I

15  identified. My review likely would have gone more quickly if I had been provided

16  access to TechCare, the Jail's electronic medical record system. I was, however,

17  informed that I could not have access to TechCare.

18       12.     I reviewed those medical records to evaluate whether the descriptions

19  and conclusions in those summaries regarding the Jail's treatment of substance use

20  and substance use disorder were reliable and whether Dr. Murray's and Dr. Penn's

21  opinions predicated on those summaries were reliable. I reviewed 24 medical

22  records summarized in Appendix J to Dr. Murray's report regarding chronic care, 3

23  medical records summarized in Appendix Q to Dr. Murray's report regarding in-

24  custody deaths, and 13 medical records summarized in Appendix D to Dr. Penn's

25  report regarding mental health care. In total, I reviewed 39 medical records because

26  Dr. Murray's consultants and Dr. Penn's consultants both reviewed the medical

27  record for ███████████.

28       13.     My review was limited to the care provided for substance use and

substance use disorder.  It is my understanding that the Plaintiffs' other experts will be addressing other components of the medical care provided to the class members whose files Dr. Murray's and Dr. Penn's consultants reviewed.

14.    I drafted my own analysis of each of the medical records I reviewed, which are included in Appendix A and discussed throughout this report.  A list of the materials I reviewed since August 21, 2024 is in Appendix B.  Based on my review of those records, explained in further detail below, I found serious problems with the treatment the Jail provided to class members, including failures to meet the standard of care for treating substance use and substance use disorder.  My review of those records strongly reinforced the conclusions in my initial report, which I describe in each relevant section below.  My conclusions also call into question the reliability of the reviews performed by Dr. Murray's and Dr. Penn's consultants, as well as any of Dr. Murray's and Dr. Penn's conclusions predicated on the relevant consultant summaries.

III.    **DEFENDANTS' REPORTS FAIL TO MEANINGFULLY ANALYZE WHETHER THE SHERIFF'S DEPARTMENT ADEQUATELY TREATS PERSONS EXPERIENCING WITHDRAWAL AND THE MEDICAL FILES DEFENDANTS' EXPERTS PURPORTED TO REVIEW SHOW THAT WITHDRAWAL MANAGEMENT FREQUENTLY DID NOT MEET THE STANDARD OF CARE**

15.    As explained in my initial report, incarcerated persons experiencing withdrawal are at risk of serious harm, including death, but that harm is preventable if the Jail provides adequate care.  Ramsey Rpt. at ¶¶ 20-21.  To provide that care, the Jail "must screen persons entering the jail to identify those at risk of acute withdrawal syndromes, assess incarcerated persons at risk of withdrawal to determine if they are experiencing withdrawal, house persons experiencing withdrawal in a setting where adequate treatment can be delivered, and then deliver that treatment."  Ramsey Rpt. ¶ 21.  I concluded that the Jail failed to adequately screen, assess, house, and treat persons at risk of experiencing withdrawal.

16.    As detailed below, Defendants' Reports do not show that the Jail

1   adequately screens, assesses, houses, or treats persons at risk of experiencing

2   withdrawal.  Instead, the medical records that Dr. Murray and Dr. Penn relied on

3   demonstrate several systemic failures in the Jail's management of withdrawal,

4   which I expand on below.  Those failures are:

- The Jail's intake screening process regularly misses substance use;

- When an incarcerated person's substance use is not identified at intake, they generally are not assessed, monitored, and treated for withdrawal from that substance, even if the Jail later identifies that substance use;

- Though the Jail has policies in place to monitor and treat withdrawal from opioids, alcohol, and benzodiazepines, in practice, it fails to follow those policies and procedures and to meet the standard of care;

- The Jail lacks treatment protocols regarding stimulant intoxication and withdrawal, which generally goes untreated;

- The Jail does not provide individualized withdrawal treatment, which often leads to inadequate withdrawal management, including insufficient dosing of medication for opioid withdrawal; and

- The Jail does not appropriately house persons experiencing withdrawal;

15  17.    These failures, which are well documented in the medical records relied

16  upon by Dr. Murray and Dr. Penn, reinforce my conclusion that the Jail fails to

17  provide adequate withdrawal management.

18  **A.    The Jail's intake screening process regularly misses substance use**

19  18.    As I explained in my initial report, the first step in treating withdrawal

20  is identifying people at risk for withdrawal.  People are at risk for withdrawal if they

21  have a history of using substances that have an associated withdrawal syndrome.

22  Therefore, identifying incarcerated persons at risk for withdrawal requires screening

23  persons entering the Jail to identify their substance use history.

24  19.    The standard of care for identifying substance use is using a validated

25  screening tool.  A validated screening tool is a series of questions that have been

26  empirically tested and shown to reliably identify substance use.  When someone's

27  responses to those questions indicates substance use, the next step is to assess them

28  for withdrawal symptoms using COWS, CIWA-Ar, and other tools.  Screening and

1   assessments are two different elements of withdrawal management.

2       20.    Using a validated screening tool is the standard of care because it

3   increases the likelihood that the Jail will identify substance use at intake. It would

4   of course be unreasonable to expect that using a validated screening tool would

5   result in a 100% success rate in identifying substance use. Screening for substance

6   use necessarily relies on asking someone about their substance use, and there will

7   inevitably be some persons who decline to reveal their substance use for myriad

8   reasons, including fear of being stigmatized within the Jail for their substance use.

9       21.    In my initial report, I concluded that the Jail's intake screening process

10  did not meet the standard of care because the Jail did not use a validated screening

11  tool. Instead, staff asked a series of yes or no questions regarding substance use

12  during booking that have not been empirically tested, so there was no basis to

13  conclude that those questions would reliably identify substance use. The responses

14  to those questions are generally logged in the "Receiving Screening" section of an

15  incarcerated person's medical record. If an incarcerated person gave a response to

16  those questions that indicates they have used substances, or if a urine drug screen

17  tests positive for recent substance use, the Jail would then ask them a second set of

18  questions about substance use. The responses to this second set of questions are

19  generally logged in the "Comprehensive Detox Screen" section of the medical

20  record. Based on the responses to those questions, a decision would be made as to

21  whether or not the person would be assessed for withdrawal. The questions in the

22  "Comprehensive Detox Screen" have not been empirically validated either. *See*

23  Ramsey Rpt. at ¶ 41. Someone will only be assessed for withdrawal based on their

24  responses to that second set of screening questions in the Comprehensive Detox

25  Screen. *Id.* at ¶ 40.

26      22.    This multi-step screening process fails to meet the standard of care

27  because, as I explained in my initial report, by the time a person is asked the

28  questions in the Comprehensive Detox Screen, they have already screened positive

1   for substance use in response to questions in the Receiving Screening or from a

2   urine drug screen.  *Id.*  By that point, the Jail should be assessing that person for

3   withdrawal, not subjecting them to more screening questions that could disqualify

4   that person from a withdrawal assessment.

5          23.    The practical difference between the Jail's two-step screening process

6   and a validated screening tool is that the questions in the validated screening tool are

7   more likely to prompt the respondent to indicate that they have used substances.  I

8   outline this in detail using an example below, but generally speaking, a validated

9   screening tool involves questions that identify dozens of substances by name and

10  asks the incarcerated person if they have used them.  For example, one of the

11  validated screening tools identified in my initial report, the Tobacco, Alcohol,

12  Prescription medication, and other Substance use Tool ("TAPS"),[1] includes specific

13  questions that the Jail's receiving screening lacks.  TAPS includes questions

14  specifically asking the patient if they have used "any drugs including marijuana,

15  cocaine or crack, heroin, methamphetamine (crystal meth), hallucinogens, ecstasy

16  MDMA," if they have used "prescription medications just for the feeling, more than

17  prescribed or that were not prescribed for you," and if they have used "a medication

18  for anxiety or sleep (for example: Xanax, Ativan, or Klonopin) not as prescribed or

19  that was not prescribed for you."  *Id.*

20         24.    In contrast, the Jail's standard intake screening is more general, asking

21  about "use of alcohol, heroin, prescription pain medications or sedatives" and "any

22  other illegal drugs," along with a history of "alcohol or drug withdrawal" and

23  participation in "a detox program or substance abuse treatment program."  ████

24  Med. Rcd. at 7-8.  The vagueness of these questions increases the likelihood that the

25  person answering those questions will not realize that the question is asking about a

26

27  ───────────────
    [1] *See* National Institute of Drug Abuse, TAPS Tobacco, Alcohol, Prescription
    medication, and other Substance use Tool, https://nida.nih.gov/taps2 (last visited
28  Oct. 23, 2024).

1  substance that they use. Those questions also include language that could

2  discourage an incarcerated person from admitting to substance use as they are

3  entering a Jail, including asking them if they use "illegal drugs" as they are being

4  booked into a jail facility.

5       25. The medical records that Dr. Murray and Dr. Penn relied upon

6  demonstrate that the Jail's intake screening questions routinely fail to identify

7  substance use at intake that is identified later in a person's incarceration. [2] This

8  means that persons who should be assessed for withdrawal are instead screened out

9  and receive no monitoring, management, or treatment for withdrawal.

10       26. Dr. Murray and Dr. Penn both opine on the adequacy of the Jail's

11  intake screening process regarding substance use, but they make no effort to

12  evaluate the effectiveness of that screening process in practice. Neither expert even

13  considers the content of the questions the Jail uses in its screening tool. This is

14  somewhat surprising given that Dr. Murray is aware of the importance of using

15  validated tools when it comes to *assessing* people for withdrawal symptoms. *See*

16  Murray Rpt. at 10-11 ("the CIWA is a validated tool used extensively in clinical

17  settings").

18       27. Dr. Murray discusses the intake screening done at the Jails on pages 9-

19  11 and evaluates its effectiveness on page 41 of his report. He opines, "The

20

21  _____



[2] *See* Appendix A, ▓▓▓▓▓▓ e identified, but opioid and methamp▓▓▓▓ (c▓▓▓▓zepine use missed); ▓▓▓▓▓ (opio▓ (metham▓ pioid use missed); ▓▓▓ opioid use missed); ▓ (opioid use mi▓ pioid use identified ▓ nt ▓ e identified but opioid us▓ missed); ▓ (opioid use misse▓ pheta▓ use missed); ▓ issed); ▓ (alcohol use identified but opioi▓ (stimul▓ se, alcohol use, and PCP ▓ol use▓ mine use missed); ▓ use missed); ▓ (opioid use and stimulant ▓ (alcohol and s▓ ed); Eric Wolf (opioid use missed)

28

1  inspection of the current intake and screening process revealed that the SDSO

2  practices meet or exceed an acceptable correctional standard.  The SDSO utilizes the

3  latest in body scanning technology to detect contraband such as drugs" and "IPs

4  identified with substance use histories are evaluated and are monitored using

5  COWS/CIWA."  Murray Rpt. at 41.  I disagree with Dr. Murray's evaluation of the

6  thoroughness of the Jail's intake process with respect to substance use and substance

7  use disorder.

8         28.    Dr. Murray and I agree that intake screening, when done correctly,

9  should "provide valuable insights into . . . substance use disorders . . . that may

10 require ongoing management or treatment within the correctional facility."  Murray

11 Rpt. at 9.  But I disagree with Dr. Murray's opinion that the Jail's intake process

12 "adequately assesses and dispositions IPs entering the jail under the influence of

13 alcohol and drugs."  Murray Rpt. at 41.  Dr. Murray's opinion on the intake process

14 regarding substance use and substance use disorder is not grounded in any

15 discernible methodology.  He appears simply to summarize some of the Jail's

16 policies regarding intake screening, without actually citing to any policies, and then

17 asserts those policies are actually implemented in practice based on his review of 75

18 records without any explanation of which (if any) of those records involved patients

19 screened for substance use or assessed for substance use disorder.  *Id.* at 11-12, 155-

20 61.  But the medical records summarized in Dr. Murray's expert report show

21 repeated failures in the intake screening and assessment process.

22        29.    Dr. Penn discusses the intake screening on pages 13-16 of his report,

23 but he only mentions substance use or SUD in his discussion of the intake process

24 once, "During booking, if any IP exhibits changes in mental status, signs of

25 intoxication, substance influence, psychosis, disorientation, or other acute medical

26 or mental health issues, this information is promptly communicated to the SDSO

27 booking deputies.  The deputies then relay this information to the intake registered

28 nurse."  Penn Rpt. at 14.  Like Dr. Murray, Dr. Penn merely summarizes his

1  understanding of what the Jail's intake screening policies are supposed to be,

2  without actually citing those policies or using any methodology to determine if they

3  are followed in practice.

4     30.    The medical records, however, include numerous examples of persons

5  who were willing to admit to substance use, but the intake screening failed to

6  identify the entirety of their substance use.  Records where the intake screening

7  identified the use of some, but not all, substances show that the Jail's screening

8  process misses substances even when incarcerated persons are willing to admit to

9  substance use.  In those instances, a validated screening tool is more likely to have

10  identified substance use that the Jail's screening tool missed because it ensures that

11  incarcerated persons will be asked specifically about a wide range of substances.

12  There are also records where the intake screening did not identify any substance use,

13  but the incarcerated person readily admitted to substance use shortly thereafter,

14  indicating the problem was the screening tool.

15     31.    For example, ███████████' medical record illustrates how the

16  questions the Jail uses in its standard intake screening can fail to identify substance

17  use that likely would have been identified by a validated screening tool.  The Jail's

18  standard intake screening failed to identify Mr. ██████ cocaine use at booking,

19  although daily cocaine use was identified during an Inmate Safety Program (ISP)

20  follow-up three hours later.  ██████ Med. Rcd. at 7-8 (intake screening conducted on

21  ██████ 2020, at ████ p.m.), 282 (ISP assessment conducted on ██████ 2020, at

22  ████ p.m.).  The following month, medical staff identified a history of

23  benzodiazepine use as well, specifically alprazolam [Xanax].  *Id.* at 1342-43.  The

24  intake screening's failure to identify Mr. ██████ substance use cannot be explained

25  away on the basis that he was unwilling to disclose it because he admitted to cocaine

26  use the night that he was booked and he admitted to benzodiazepine use one month

27  later.

28     32.    Instead, Mr. ██████ medical record indicates that the use of a validated

1  screening tool at intake may have identified his cocaine use and benzodiazepine use.

2  Mr. ████ answered "no" to all the questions on the standard intake screening, but

3  three hours later he confirmed daily cocaine use in response to a more specific

4  question in the ISP assessment that asked about "recent substance use," specifically

5  "amphetamines, THC, EtOH, Opiates, Cocaine, or Other." *Id.* at 282.  And one

6  month later, he confirmed his "past Xanax" use only "[w]hen prompted" by a

7  medical provider. *Id.* at 1343.  This indicates that the Jail's standard intake

8  screening questions may have missed Mr. ████ substance use because they did

9  not specifically mention "cocaine" or "Xanax" by name, instead asking about "other

10 illegal drugs" and "sedatives" more generally.  The validated TAPS tool may have

11 been more effective because its questions identify "cocaine" and "Xanax" by name.

12 The form of the questions also may have made a difference given the note that

13 Mr. ████ only acknowledged benzodiazepine use "[w]hen prompted."  The

14 validated TAPS tool's questions regarding prescription medication use involve

15 detailed prompts identifying various types of prescription medication use that may

16 have caused Mr. ████ to recall his past alprazolam [Xanax] use.

17       **B.      When an incarcerated person's substance use is not identified at**
18               **intake, they generally are not assessed, monitored, and treated for**
                 **withdrawal from that substance, even if the Jail later identifies that**
19               **substance use**

20       33.    Because even validated screening tools cannot be expected to have a

21 100% success rate, it is critical that the Jail have policies and procedures in place to

22 refer people to substance use treatment in the event their substance use is missed at

23 intake but identified later.  A history of substance use indicates that the person may

24 be at risk of withdrawal, return to use, and overdose.  To mitigate that risk, when a

25 history of substance use is identified, it is critical to promptly assess that person for

26 substance use disorder so that treatment can be initiated.  The Jail has policies and

27 procedures in place to refer persons for withdrawal monitoring and substance use

28 disorder treatment when their substance use is identified during the standard intake

1    screening.  But it lacks similar policies and procedures when an incarcerated

2    person's substance use is identified for the first time after the intake screening, even

3    when it is identified on the same day that the intake screening occurred.  The

4    medical records show that the Jail's lack of any policy, procedure, or practice to

5    refer those persons for assessment and treatment for substance use disorder has

6    resulted in the Jail failing to provide timely care – or any care at all – to incarcerated

7    persons that it knows may be at risk of withdrawal, return to use, and overdose.[3]

8        34.    ███████████s medical record is a clear example of the Jail's

9    practice of failing to provide care to patients that medical providers know, or should

10   know, may be at risk for withdrawal, return to use, and overdose.  Mr. ███████'s

11   methamphetamine use was identified during the standard intake screening on

12   ████████ 2023, but his opioid use was missed.  However, his opioid use was

13   identified later that day when Mr. ██████ was referred for an ISP

14   assessment/follow-up for mental health care ("MHC").  ██████ Med. Rcd. at 48-

15   58.  During that follow-up, Mr. ██████'s daily amphetamine and opioid use was

16   identified.  *Id.* at 56.  At this point, Jail medical staff knew that Mr. ██████ used

17   opioids daily and should have started him on opioid withdrawal protocols with

18   COWS assessments, then promptly diagnosed OUD, and provided him with

19   MOUD.  None of that happened.  It appears that, because Mr. ██████'s opioid use

20   was identified outside of the regular intake screening process – even though it was

21   identified on the day that he was booked – the Jail's opioid withdrawal protocols

22   were not initiated.

23   / / /

24   / / /

25   / / /

26

27   [3] ████████████████████████

28   ████████████████████████████████████████ E

**C.** **Though the Jail has policies and procedures in place to monitor and treat withdrawal from opioids, alcohol, and benzodiazepines, in practice, it fails to follow those policies and to meet the standard of care**

35.     As I explained in my initial report, once someone screens positive for substance use, the next step in providing withdrawal management is to assess that person to determine if they are experiencing withdrawal. *See* Ramsey Rpt. at ¶ 51. I described four tools that are the standard of care for withdrawal assessments of the substances for which the Jail has policies and procedures in my initial report, COWS for opioids, CIWA-Ar and PAWSS for alcohol, and CIWA-B for benzodiazepines. *Id.* at ¶¶ 52-55. The Jail uses all those tools except for PAWSS. I also described the standard of care for monitoring stimulant intoxication and withdrawal, which the Jail does not manage or treat and is discussed in greater detail in the following section.

36.     Each of these tools works similarly in practice – a nurse observes a patient and responds to a series of prompts regarding the patient's condition. Each prompt involves an observation of a symptom of withdrawal and has a set of pre-defined responses. Each of those responses is assigned a score. Generally speaking, the higher the score, the more severe the symptom of withdrawal.

37.     Each of these tools is intended to be used by a nurse trained in addiction withdrawal management. *Id.* at ¶ 56. That training is important because the tools assess for withdrawal based on a mix of objective and subjective observations. An example of an objective prompt is the patient's resting heart rate. On the COWS assessment, a resting heart rate of 80 or below scores 0, 81-100 scores 1, 101-120 scores 2, and over 120 scores 4.[4] An example of a subjective prompt is the extent to which a patient has "gooseflesh skin," which has three

---

[4] *See* Clinical Opiate Withdrawal Scale, National Institute on Drug Abuse, https://nida.nih.gov/sites/default/files/ClinicalOpiateWithdrawalScale.pdf.

possible responses: "Skin is smooth," which scores 0; "piloerection of skin can be felt or hairs standing up on arms," which scores 3; or "prominent piloerection," which scores 5. *Id.* That subjective prompt requires training so that the observer can tell the difference between a "piloerection of skin" that scores 3 and a "prominent piloerection" that scores 5. In my initial report, I concluded that the Jail does not use adequately trained nurses to complete these assessments. If the Jail used certified addiction registered nurses ("CARNs") to complete these assessments or used a CARN to train the nurses, I likely would have concluded they were adequately trained because CARNs have to complete an addiction-specific certificate. But the Jail uses registered nurses (RNs) not CARNs, so I reviewed evidence regarding the trainings that those RNs received and concluded the trainings were inadequate. *Id.* at ¶¶ 62-69. Several medical records reviewed for this report support that conclusion because they include COWS and CIWA-Ar assessments that were completed inadequately.

38.    A fundamental component of the standard of care for these assessments is completing these assessments serially at regular intervals. The frequency of the assessments is critical because symptoms of withdrawal can change rapidly, particularly during the several days after their last consumption of the substance when the risk of complications from withdrawal is highest. Ramsey Rpt. at ¶ 59. Often, the first withdrawal assessment is completed while the patient is still intoxicated, or post-intoxication but before withdrawal symptoms have started, leading to a low score. Symptoms of withdrawal begin to present after intoxication wears off (which varies by the substance and its half-life), necessitating frequent assessments to monitor the evolving severity of the withdrawal.

39.    I outlined the standard of care for the frequency of withdrawal assessments in my initial report, explaining the Bureau of Justice Assistance (BJA) Guidelines are "monitoring for alcohol withdrawal at least every 6 hours for the first 72 hours after arrival to a facility; for opioid withdrawal at least every 4 hours for

1  the first 72 hours after arrival to a facility; for sedative (benzodiazepine) withdrawal

2  at least every 6 hours for the first week after arrival to a facility; and for stimulant

3  withdrawal at least twice daily for the first 72 hours after arrival to a facility." *See*

4  Ramsey Rpt. at 22-23, ¶ 59.  I generally agree with these guidelines, although I

5  noted in my initial report that some variance in that timing is appropriate for alcohol

6  and opioid withdrawal.  Ramsey Rpt. at 22-23, ¶¶ 59-60.  CIWA-Ar assessments for

7  alcohol withdrawal should be completed "minimally every 4 hours initially; for a

8  score less than 8 on three consecutive assessments, monitoring may be spaced to

9  every 8 hours, but for a score greater than 8, a patient should be monitored and

10  reassessed every 1-2 hours." *Id.*  COWS assessments should be completed "every 6

11  hours for scores less than 13," but should be completed "hourly for scores greater

12  than or equal to 13." *Id.* at ¶ 60.  The evidence I reviewed in connection with my

13  initial report demonstrated that the Jail did not conduct these assessments with

14  sufficient frequency because it had a practice of conducting these assessments just

15  once every 24 hours.

16      40.    Defendants' expert reports note that the Jail uses COWS, CIWA-Ar,

17  and CIWA-B assessments, but they make no attempt to evaluate whether those

18  assessments were completed adequately.  Dr. Murray notes that the Jail has policies

19  for using COWS, CIWA-Ar, and CIWA-B, but he failed to evaluate whether staff

20  properly use those tools in practice.  Murray Rpt. at 10-11.  Moreover, Dr. Murray

21  acknowledges that the Jails only use COWS and/or CIWA "once daily," which is

22  not the standard of care. *Id.* at 10.  Dr. Penn states "individuals with substance use

23  histories are evaluated and monitored using COWS/CIWA," but also does not

24  attempt to evaluate the adequacy of that monitoring in practice.  Penn Rpt. at 56.

25      41.    The medical records I reviewed for this report show the Jail's practices

26  do not meet the standard of care.  The Jail's practice is to only *attempt* assessments

27  once per day, but those assessments are regularly not completed.  When an

28  assessment is not completed, the Jail's practice does not involve attempting the

assessment again before another 24 hours have passed.  This results in patients regularly going days between completed assessments, including during the pivotal first days after cessation of use, when withdrawal symptoms may emerge and the risk of complications from withdrawal are heightened.

42.    Many of the 39 medical records reviewed in connection with this rebuttal report and summarized in Appendix A contain evidence of the Jail's practice of attempting COWS, CIWA-Ar, and CIWA-B assessments just once per day and actually completing them less frequently.[5] ██████████ medical record is worth breaking down in detail here because all three types of assessments were conducted for Mr. ████ over the course of an eleven-day period in line with the Jail's practice of attempting assessments only once per day, regardless of whether or not they are actually completed.

43.    Mr. ████ was first assessed for opioid withdrawal using COWS on ██████, 2023, at ████████ resulting in a score of 1 and a notation to "[r]eassess in 8 hours."  The next assessment did not come until more than 15 hours later, on ██████, 2023, at ████ a.m., when the score jumped to 14, which indicates he was experiencing moderate opioid withdrawal symptoms and should have been reassessed again within one hour. ████ Med. Rcd. at 199-200.  Instead, that assessment included a notation to "[r]eassess in 6 hours." *Id.* at 199.  But no attempt was made to conduct another COWS assessment until more than 27 hours later on ██████, 2023, at ████ p.m., and that assessment was not even completed. *Id.* at 205-06.  Instead of completing the assessment, a nurse noted Mr. ████ was unavailable due to a court appearance. *Id.*  That incomplete assessment included a

─────────────────

[5] The following summaries in Appen███████e this practice: ██████████
(COWS, C████A-B); ████████(C████Ar); R████ford
(COW████████(C██████); ██████(C████WA-
████████WA-B); ████████OWS); ████████WS);
████████(COW████(COW████r);
████████CIWA-Ar)

1    notation to "[r]eassess in 8 hours." *Id.* at 205.  But it took more than 24 hours (over

2    47 hours since the last completed assessment) before staff attempted to complete

3    another COWS assessment on ████████ 2023, at ████ p.m., at which point the

4    assessment produced a score of 4 with another notation to "[r]eassess in 8 hours."

5    *Id.* at 217.

6    　　　　44.　　From there, the Jail waited over 25 hours to attempt an assessment on

7    ████████ 2023 at ████ p.m., which was completed with a score of 7 and a note to

8    reassess in 8 hours.  *Id.* at 225-26.  The next attempt came more than 25 hours later

9    on ████████, 2023, at ████ p.m., with a score of 3 and a note to reassess in 8 hours.

10   *Id.* at 233-34.  That was followed by multiple unsuccessful attempts to complete

11   COWS assessments, with the next attempt coming more than 21 hours later on

12   ████████, 2023, at ████ p.m. during which Mr. ████ was unavailable and a

13   notation was made to reassess in four hours, *id.* at 239-40, then a delay of more than

14   23 hours until the next attempt on ████████, 2023, at ████ p.m., when he was again

15   unavailable with a note to "[r]eassess in 4 hours."  *Id.* at 245-46.  Medical staff

16   waited more than 24 hours before the next attempt on ████████, 2023, at ████ p.m.,

17   which was successfully completed and resulted in a score of 5 and a note to reassess

18   in 8 hours.  *Id.* at 253-54.  As a result, there was a gap of more than 69 hours

19   between completed assessments.  Staff then delayed nearly 48 hours until the next

20   attempt on ████████, 2023, at ████ p.m., which was completed with a score of 3

21   and a note to reassess in 8 hours.  *Id.* at 259-60.  Staff made a final attempt over 18

22   hours later on ████████, 2023, at ████ a.m., which was completed with a score of 3

23   and note to reassess in 8 hours.  No further COWS assessments were attempted.

24   　　　　45.　　The repeated and substantial delays in assessments fell far below the

25   standard of care.  Moreover, medical staff also were clearly aware that Mr. ████

26   needed to be assessed more frequently—every assessment included a notation to

27   reassess in either 4, 6, or 8 hours—but failed to do so.

28   　　　　46.　　The Jail's failure to conduct Mr. ████s COWS assessments with

adequate frequency exposed him to a substantial risk that he would experience complications from opioid withdrawal, but medical staff would not know and therefore would not be able to provide adequate treatment. This risk was particularly pronounced in the nearly 52-hour period between Mr. ██████'s first completed assessment that scored 14, indicating he was experiencing moderate withdrawal, and his second completed assessment.

47.     The Jail also failed to assess Mr. ██████'s alcohol and benzodiazepine withdrawal with adequate frequency. CIWA-Ar assessments for alcohol withdrawal should be completed every 4 hours until three consecutive assessments produce a score of less than 8, at which point they can be spaced out to every 8 hours. Ramsey Rpt. at 23, ¶ 60. CIWA-Ar scores of more than 8 should prompt reassessment within 2 hours. *Id.* Mr. ██████'s CIWA-Ar assessments were only attempted once per day and actually completed less frequently.[6] The repeated and substantial delays in these assessments fell far below the standard of care.

_____

[6] The CIWA-Ar assessments occurred on the following dates and times:

- ██████████████., completed, score 2, reassess in 8 hours), *id.* at
- ████████(15+ hours later, ████ a.m., completed, score 20, reassess in 95-96;
- ██████, 2023 (25+ hours later, ████ p.m., not completed, reassess in 4 at 201-02;
- ██ust 19, 2023 (24+ hours later, 51+ hours since last completed assessment, completed, score 3, reas____ in 8 hours), *id.* at 209-10;
- ████, 2023 (25+ hours later, ████ p.m., completed, score 5, reassess in 8 at 221-22;
- ████, 2023 (25+ hours later, ████ p.m., completed, score 1, reassess in 8 at 229-30;
- ████ 2023 (21+ hours later, ████ p.m., not completed, reassess in 4 at 235-36;
- ████, 2023 (23+ hours later, ████ p.m., not completed, reassess in 4 at 241-42;
- ████, 2023 (24+ hours later, 69+ hours since last completed assessment, completed, score 0, reas____ in 8 hours), *id.* at 249-50;
- ████, 2023 (47+ hours later, ████ p.m., completed, score 3, reassess in 8 at 255-56;
- ████, 2023 (18+ hours later, ████ a.m., completed, score 1, reassess in 8 . at 263-64.

48.     CIWA-B assessments should be completed at least every 6 hours, *see* Ramsey Rpt. at 23-24, ¶ 60, but Mr. ███'s CIWA-B assessments also were attempted and completed far less frequently.[7]

49.     As with Mr. ███'s COWS assessments, the delays in completing his CIWA-Ar and CIWA-B assessments exposed Mr. ███ to a potential risk of substantial harm from untreated complications of withdrawal.

**D.      The Jail lacks treatment protocols regarding stimulant intoxication and withdrawal, which generally go untreated**

50.     Persons entering the Jail under the influence of stimulants are at risk of harm, but the Jail lacks any defined protocols for treating stimulant intoxication and withdrawal.  That risk of harm includes overamping from stimulant intoxication, which can lead to severe complications including stroke, seizure, and cardiac arrest.  *See* Ramsey Rpt. at ¶¶ 57, 121.  In my initial report, I outlined the "standard of care for identifying and monitoring persons overamping on stimulants or withdrawing from stimulants."  Ramsey Rpt. at ¶ 57-58.  I explained that there are no validated

---

[7] The CIWA-B assessments occurred on the following dates and times:

- ███ (███ p.m., completed, score 0, reassess in 8 hours), *id.* at 197-
- ███, 2023 (15+ hours later, 10:22 a.m., completed, score 19, reassess in *id.* at 203-04;
- ███, 2023 (27+ hours later, ███ p.m., not completed, reassess in 4 at 213-214;
- ███, 2023 (24+ hours later, 51+ hours since last completed assessment, completed, score 4, rea████ in 8 hours), *id.* at 223-24;
- ███, 2023 (25+ hours later, ███ p.m., completed, score 5, reassess in 8 at 231-32;
- ███, 2023 (25+ hours later, ███ p.m., completed, score 3, reassess in 8 at 237-38;
- ███, 2023 (21+ hours later, ███ p.m., not completed, reassess in 4 at 243-44;
- ███, 2023 (23+ hours later, ███ p.m., not completed, reassess in 4 at 251-52;
- ███, 2023 (24+ hours later, 69+ hours since last completed assessment, completed, score 1, reas████ in 8 hours), *id.* at 257-58;
- ███, 2023 (47+ hours later, ███ p.m., completed, score 3, reassess in 8 at 265-66;
- ███, 2023 (18+ hours later, ███ a.m., completed, score 4, reassess in 8

1    tools equivalent to COWS and CIWA for monitoring stimulant intoxication or

2    withdrawal, but that monitoring is still necessary via clinical examination and

3    assessments of several symptoms associated with stimulant intoxication or

4    withdrawal.  *Id.*  I noted that the BJA guidelines on the frequency of withdrawal

5    monitoring state "for stimulant withdrawal at least twice daily for the first 72 hours

6    after arrival to a facility."  *Id.* at ¶ 59.  I also outlined the standard of care for

7    treating stimulant withdrawal, which includes behavioral management and

8    medication when necessary.  *Id.* at ¶ 95.  I concluded that the Jail lacks any

9    "protocol for stimulant withdrawal."  *Id.* at ¶ 62.

10           51.    Defendants' Reports do not include any opinions specific to stimulant

11   intoxication and withdrawal.  But several medical records relied on by Dr. Murray

12   and Dr. Penn show incarcerated persons entering the Jail under the influence of

13   stimulants without receiving any monitoring or treatment for stimulant intoxication

14   and withdrawal.[8]  These records show that the Jail's lack of policies, procedures,

15   and protocols for stimulant intoxication and withdrawal results in the Jail regularly

16   failing to treat stimulant intoxication and withdrawal.

17          **E.     The Jail does not provide individualized withdrawal treatment,
               which often leads to inadequate withdrawal management,**
18          **including insufficient dosing of medication for opioid withdrawal**

19           52.    The standard of care for providing treatment to persons experiencing

20   withdrawal requires "'frequent, individualized, clinical assessments'" with

21   "'patient-specific orders from the provider.'"  Ramsey Rpt. at ¶ 100 (quoting BJA

22   Guidelines).  Individualized withdrawal treatment is necessary because "'it is very

23   difficult even for trained medical providers to predict withdrawal severity for any

24   particular patient.'"  *Id.*  This is particularly important when it comes to dosing

25   medication for withdrawal.  To use an obvious example, a person experiencing

26

27   _____

[8] ███████████████████████████████████████

28   ██████████████████████████████████████████████

opioid withdrawal who had been consuming 2mg of fentanyl per day for three years would likely need a higher dose of medication than a person experiencing opioid withdrawal who had been consuming 1mg of fentanyl per day for three months.

53.    In my initial report, I concluded that "the Jail's approach to addressing withdrawal is reactive, rather than proactive, with no indication of individualized care, assessment, or dosing." Ramsey Rpt. at 40, ¶ 101. I pointed out that the Sheriff's Department "treated patients in opioid, alcohol, or benzodiazepine withdrawal with the same doses of medication for that specific withdrawal syndrome, contrary to the standard of care." *Id.* ¶ 102. I highlighted an email that the Jail's Chief Medical Officer Dr. Jon Montgomery sent in September 2023 in which he wrote "docs/providers felt constrained that they were only able to prescribe 8/2 milligrams for Suboxone (buprenorphine/naloxone) … no more, no less" and detailed why I was not convinced by testimony in his April 26, 2024 deposition (two months before Mr. Woodford's death) in which he stated that buprenorphine/naloxone dosing had become more flexible. *Id.* at 42, ¶¶ 106-07. I concluded that the Jail "fails to provide individualized care for individuals with opioid use disorder who are experiencing acute opioid withdrawal syndrome," in part because of the Jail's practice of using a "fixed medication dose" strategy for all patients, which is inconsistent with the "much safer option" of "low dose buprenorphine initiation strategies." *Id.* at 43, 46, ¶¶ 109, 117. I quoted the BJA guidelines, which state that "[a]ll patients at risk for opioid withdrawal should have rapid access to treatment," and I advised that "[o]pioid withdrawal syndrome could be avoided entirely if the Jail provided low dose initiations of buprenorphine rather than waiting for patients to experience symptoms of opioid withdrawal syndrome and then starting medication." *Id.* at 47, ¶ 119.

54.    Defendants' Reports did not discuss these issues. But the medical records that Dr. Murray and Dr. Penn relied on include several examples of incarcerated persons receiving inadequate withdrawal management under the Jail's

1  standardized withdrawal protocols.  Several persons subjected to the Jail's policy of

2  not starting buprenorphine/naloxone until receiving a COWS score of more than 6

3  either received buprenorphine/naloxone later than they should have,[9] or never

4  received buprenorphine/naloxone at all.[10]  Persons withdrawing from opioids also

5  were generally prescribed buprenorphine/naloxone based on standardized doses

6  rather than individualized assessments.[11]  The serious risks of underdosing

7  buprenorphine/naloxone, including return to use and overdose, are discussed in

8  greater detail in the below section on individualized treatment for opioid use

9  disorder.

10    **F.    The Jail does not appropriately house persons experiencing withdrawal**

11

12    55.    Dr. Murray and Dr. Penn offer brief opinions regarding housing that are

13  worth addressing from a substance use management and substance use disorder

14  treatment perspective.  In the section of his report on intake, Dr. Murray states that

15  "the RN's assessment findings" at intake "ensur[e] that IPs . . . are placed in safe

16  housing based on their health status."  Murray Rpt. at 10.  Dr. Penn notes that

17  custodial staff from the JPMU "determine the most appropriate housing for the

18  individual, whether it be PSU, watch status, EOH, protective custody, general

19  population, or outpatient stepdown."  Penn Rpt. at 50.  He opines that the various

20  "Policies, Procedures, and Standards utilized by SDSO . . . are designed to mitigate

21  risks and ensure the well-being of incarcerated individuals across housing settings."

22  *Id.* at 51.  Neither expert discusses the reality that incarcerated persons are

23  frequently housed in holding cells for extended periods of time while going through

24  the intake process, which I noted in my initial report poses serious risks to

25

26  [9] *See* Appendix A, ████████████████████████████████.

27  [10] *See* Appendix A, ██████████████████████████.

28  [11] *See* Appendix A, ████████████████; Richard Woodford.

1    incarcerated persons with acute intoxication or at risk for experiencing withdrawal.

2    Ramsey Rpt. at 30-35, ¶¶ 77, 83-84, 121-23.  They also fail to acknowledge that

3    custody staff, not medical staff, have ultimate control over housing, *id.* at 31, 32,

4    ¶¶ 80-81, which as noted in the discussion of medical records below has led to

5    patients experiencing withdrawal being placed in unsafe housing units with

6    disastrous consequences, including the death of Richard Woodford in June 2024.

7    **G.    The Death of Richard Woodford Illustrates the Harm that Can Be Caused by Defendants' Inadequate System for Treating Withdrawal**

8

9    56.    Mr. Woodford's death at Central Jail on June 26, 2024, is worth

10   evaluating in detail because it illustrates the catastrophic harm that can result from

11   the Jail's systemic failure to provide withdrawal management.  I discussed

12   Mr. Woodford's death in my initial report based on an interview I conducted with an

13   incarcerated person housed in the unit where Mr. Woodford died.  *See* Ramsey Rpt.

14   at 34-35, ¶ 86.  At the time, Defendants had not made his medical records available.

15   My understanding is that Defendants did not produce the records to the Plaintiffs

16   until September 20, 2024, after which they were provided to me.  The records reveal

17   stunning failures in withdrawal management that likely resulted in Mr. Woodford's

18   death.

19   57.    At intake on the morning of June 25, 2024, Mr. Woodford's fentanyl

20   use and history of withdrawal were identified, *see* Woodford Med. Rcd. at 7-8, and a

21   comprehensive detox screen was completed noting daily recent opioid use, *see id.* at

22   31.  Shortly thereafter, at 10:47 a.m., a STATCare provider ordered "[i]nitiate

23   Suboxone treatment with 8/2mg Suboxone daily starting the day after

24   incarceration."  *Id.* at 21.  In the same note, that STATCare provider wrote "[n]o

25   clinical assessment performed on this p[a]t[ient]."  *Id.*

26   58.    The STATCare provider never assessed Mr. Woodford and did not

27   provide individualized treatment.  Instead, at 10:47 a.m. on June 25, 2024, he

28   ordered the Jail's standard buprenorphine/naloxone 8/2mg dose to be started the

following day at 8:00 a.m., which was more than 21 hours away. *Id.* at 22. A COWS assessment performed just six minutes prior at 10:41 a.m. resulted in a score of 1 based only on Mr. Woodford's pulse, which had it been 1 bpm lower would have resulted in a score of 0. *Id.* at 28-29. This score reflects that Mr. Woodford was not yet experiencing many, if any, symptoms of withdrawal.

59.    The Jail did begin COWS assessments for Mr. Woodford, but those assessments also reflect many of the exact failures that I identified with the Jail's withdrawal assessment policies, procedures, and practices in my initial report. Three COWS assessments were completed by three different nurses while Mr. Woodford was incarcerated. As noted above, the first assessment was conducted by an RN at 10:41 a.m. on June 25, 2024, within minutes of Mr. Woodford's booking and resulted in an overall score of 1. *Id.* at 28-29. As explained above and in my initial report, the standard of care required that the second assessment be conducted within at most 4-6 hours. Ramsey Rpt. at 23, ¶¶ 59-60. The record of the first COWS assessment includes a note to "[r]eassess in 8 hours," which is longer than that standard of care but would have at least ensured Mr. Woodford was assessed again the same day. However, Mr. Woodford's second assessment did not occur until nearly 18 hours later at 4:29 a.m. on June 26, 2024. This assessment resulted in a score of 10. Woodford Med. Rcd. at 41-42. By that point, Mr. Woodford was experiencing symptoms of withdrawal, including "[m]ultiple episodes of diarrhea or vomiting," *id.* at 42, which is consistent with what was described to me by the incarcerated person in Mr. Woodford's housing unit, *see* Ramsey Rpt. at 34-35, ¶ 86. That score prompted a STATCare provider to order "[g]ive morning dose of [S]uboxone now" at 4:37 A.M. and to "[a]lert S[TAT]C[are] with any increase or worsening of symptoms." Woodford Med. Rcd. at 22. This order by the STATCare provider was appropriate. However, if the Jail had followed the standard of care for COWS assessments, Mr. Woodford would have already been assessed at least two additional times by that point (no later than

4:41 p.m. and 10:41 p.m. on June 25, 2024).  Those assessments may have prompted the STATCare provider to order his medication to start sooner.

60.    At 5:16 a.m., an RN noted that Mr. Woodford refused the buprenorphine/naloxone and said he would take it later.  *Id.*  The STATCare provider responded to this note at 6:04 a.m., but did not direct nursing staff on-site to take any action to ensure Mr. Woodford received his withdrawal medication, instead noting the refusal and again writing "[a]lert SC with any changes."  At 10:22 a.m., Mr. Woodford took his first dose of buprenorphine/naloxone 8/2mg.  *Id.* at 52.

61.    That RN also performed a timely COWS assessment at 10:29 a.m.  Unfortunately, this third assessment likely was not performed properly.  *See* Ramsey Rpt. at 24-27 (discussing inadequate training practices for withdrawal assessments).  The third assessment resulted in an overall score of 5.  Murray Med. Rcd. at 45-46.  It notes "[n]o GI symptoms."  But as I discussed in my report, incarcerated persons in the Jail reported that Mr. Woodford was defecating on himself throughout his incarceration.  *See* Ramsey Rpt. 34-35, ¶ 86.

62.    At the same time as the COWS assessment, the RN also took vital signs that showed Mr. Woodford was experiencing potentially dangerous complications of withdrawal, including a sharp dip in blood pressure (from 128/78 at 4:29 a.m. to 98/63 at 10:29 a.m.) that indicated Mr. Woodford was becoming hypotensive.  Murray Med. Rcd. at 24.  He also had an elevated heart rate and rapid respirations, which combined with his low blood pressure indicate he likely had hypovolemia due to excessive vomiting and diarrhea.  This should have prompted an alert from the nurse to the STATCare provider, but there is no record that such an alert was sent.

63.    After the third COWS assessment, the standard of care was to perform another assessment within 6 hours (by 4:29 p.m.).  *Id.*  Mr. Woodford never received another COWS assessment.  He was not seen by medical staff again until a "man down" call at around 5:56 p.m. on June 26, 2024, by which point Mr. Woodford was found breathing but non-responsive.  He died shortly thereafter.

1      64.     The Jail has not provided a medical examiner's report on

2   Mr. Woodford's death at time of writing, so no official cause of death is available

3   yet.  His medical record indicates that Mr. Woodford was experiencing withdrawal

4   symptoms at the time he died.  As noted above, the last vital signs taken about eight

5   hours before his death indicate that he likely had hypovolemia due to excessive

6   vomiting and diarrhea, which are symptoms of withdrawal.  His pupils also were

7   dilated to 5-6mm in the minutes before he died, which is consistent with opioid

8   withdrawal and inconsistent with opioid intoxication.  *Id.* at 23.  He also reported a

9   lengthy history of opioid use at intake.  It is very likely that Mr. Woodford died

10  from inadequately managed withdrawal while in the care of the Sheriff's

11  Department.

12  **IV.   DEFENDANTS' REPORTS FAIL TO SHOW THAT THE SHERIFF'S
        DEPARTMENT ADEQUATELY TREATS PERSONS WITH**
13      **SUBSTANCE USE DISORDER**

14      65.     In my initial report, I concluded that the Sheriff's Department fails to

15  provide adequate treatment for incarcerated persons with substance use disorder

16  ("SUD").  For those with opioid use disorder ("OUD"), the Department does not

17  provide adequate access to medication for opioid use disorder ("MOUD").

18  Defendants' Reports' discussions of OUD, described below, fail to show the

19  Department provides adequate access to MOUD.  For those with alcohol use

20  disorder and/or stimulant use disorder, I concluded the Department did not have any

21  policies or procedures to provide treatment post-withdrawal.  Defendants' Reports

22  offer no conclusions as to alcohol or stimulant use disorder whatsoever.  In fact, the

23  medical records that Dr. Murray and Dr. Penn relied on not only reinforced my

24  opinion as to alcohol and stimulant use disorder, but also prompted me to expand

25  that opinion and conclude that the Department fails to provide treatment for any

26  non-opioid use disorder post-withdrawal.

27  / / /

28  / / /

1    **A.    The Sheriff's Department Fails to Meet the Standard of Care for
2    Persons with Opioid Use Disorder**

3    66.    I repeatedly emphasized in my initial report that the standard of care for

4    treating OUD is providing MOUD adequately.  This is the standard of care because

5    medication is the only treatment that is associated with decreased mortality in

6    persons with OUD.  The most obvious risk from failing to treat OUD is also the

7    most dangerous – that the patient will return to using opioids from the unregulated

8    drug supply, which can result in severe consequences, including overdose and death.

9    MOUD can mitigate that risk, but only if it is provided consistently and at a

10   sufficient dose to address opioid cravings for the patient to avoid returning to use.

11   67.    Defendants' Reports do not show that the Jail is providing adequate

12   treatment for OUD.  Dr. Murray, Dr. Penn, and Mr. Vare all opine that the Jail's

13   treatment of OUD is adequate based largely on the overall number of persons that

14   the Jail claims have received some amount of medication for opioid use at some

15   point.  None of the experts attempted to evaluate whether the provision of that

16   medication was adequate.  But the medical records relied on by Dr. Murray and

17   Dr. Penn show that the Jail systemically fails to treat OUD adequately.  Those

18   failures are discussed in greater detail below, and they include:

19   •    The Jail fails to promptly diagnose OUD and deliver MOUD once it
20   learns that an incarcerated person likely has OUD

21   •    The Jail fails to provide adequate care to those with OUD, including by
     failing to provide sufficient doses of MOUD and failing to ensure
22   MOUD is not discontinued when treatment is still needed

23   68.    Dr. Murray and Dr. Penn both explain that the Jail differentiates

24   between MAT and MOUD.  Dr. Murray and Dr. Penn state that the MAT program

25   involves "patients receiving both medication and counseling/behavioral therapy,"

26   Murray Rpt. at 25, *see also* Penn Rpt. at 59, while they define MOUD as involving

27   "patients receiving medication for OUD but have declined the counseling/behavioral

28   therapy component." *Id.*  Based on those definitions, both Dr. Murray and Dr. Penn

1   claim that on May 7, 2024, there were 193 incarcerated persons in the MAT

2   program and 436 incarcerated persons receiving MOUD who were *not* in the MAT

3   program.  They also each introduced a third category of OUD treatment –

4   "buprenorphine for detox management" – defined as persons receiving

5   buprenorphine/naloxone who were "awaiting a face-to-face visit with a MAT

6   provider."  *Id.*  They disagreed on just how long this waitlist was as of May 7, 2024,

7   with Dr. Murray stating 706 persons were on this waitlist while Dr. Penn stated 77

8   persons were on the waitlist.  *Id.*  Mr. Vare had completely different numbers,

9   claiming that "[t]he numbers of IPs in the MAT program currently are far larger"

10  than "875 per month."  Vare Rpt. at 66.

11          69.     Defendants' experts' reliance on the overall numbers of persons

12  receiving MOUD is an insufficient basis to conclude that the Jail provides adequate

13  treatment for persons on MOUD.  To start, Defendants' experts provide no baseline

14  with which to compare the Jail's data.  Without that context, it is not possible to

15  determine whether the MOUD program is adequate.  More importantly, none of the

16  experts conducted any assessment to evaluate whether the persons purported to be

17  receiving medication via MAT, MOUD, or "buprenorphine for detox management"

18  actually are receiving care consistent with the standard of care.  My review of the

19  medical records that Defendants' experts' consultants reviewed showed that the

20  MOUD program at the Jail is deficient in many aspects that expose incarcerated

21  persons to a substantial risk of serious harm, including overdose and death.

22          **1.      The Jail fails to promptly diagnose OUD and deliver MOUD
                       once it learns that an incarcerated person likely has OUD**

23

24          70.     As explained in my initial report, anyone "identified as likely having

25  OUD should be seen by a medical provider immediately to establish a diagnosis and

26  should be started on medication with buprenorphine or methadone . . . with dose

27  adjustments as needed for protracted opioid withdrawal syndrome or for ongoing

28  cravings, from the outset."  Ramsey Rpt. at ¶ 158.  Diagnosing OUD quickly is

important because "[i]ndividuals with OUD not treated appropriately are more likely to return to use." *Id.* As I explained earlier in this report, the Jail's standard intake screening routinely misses substance use that is identified by Jail medical staff at a later date. But the Jail lacks policies, procedures, and protocols to ensure that when an incarcerated person's substance use is identified for the first time after the receiving screening, that person is promptly referred for diagnosis and treatment of OUD. Several medical records relied on by Dr. Murray and Dr. Penn show Jail medical staff identifying substance use that indicates an incarcerated person likely has OUD but making no attempt to refer that person for diagnosis and treatment of OUD. This can result in lengthy delays (often months or longer) between the Jail becoming aware that someone likely has OUD and that person receiving MOUD – with some instances of the person never receiving any treatment.[12]

71. For example, ████████ had received buprenorphine/naloxone prior to his incarceration, but his history of opioid use was not identified at his intake on ████ 2023. *See* ████ Med. Rcd. at 10-11. The following day, Mr. ████ submitted an inmate request noting that he used fentanyl and wanted to be in the MAT program to keep him safe from "overdosing on fentanyl if it enters the jail." *Id.* at 235. Three weeks after intake, Mr. ████'s partner began calling the Jail asking for Mr. ████ to be placed on the MAT program. Staff repeatedly informed Mr. ████'s partner that he was "on the MAT interest queue" but "there is not a timeframe to be given on how soon he will be seen." *Id.* at 30. Mr. ████'s partner called the Jail at least five times over the course of two weeks from ████ 2023 to ████ 2023, and consistently received the same response. *Id.* at 30-31. Mr. ████ finally was evaluated for the MAT program on

---

12 ████████████████████████████████████
████████████████████████████████████████

1  November 8, 2023, more than one month after his initial request.

2      72.    In another example, ███████████'s methamphetamine use was

3  identified during the standard intake screening, but her opioid use was missed and

4  not identified until a psychiatric evaluation two weeks later. ██████ Med. Rcd. at 54

5  (███████ 2023, receiving screening), 745 (███████████, 2023, psychiatric

6  evaluation).  During that psychiatric evaluation, Ms. ██████ "expresse[d] interest in

7  the MAT program." *Id.*  At that point in time, the standard of care in the Jail should

8  have been to assess and diagnose Ms. ██████'s OUD promptly so she could be

9  started on MOUD immediately.  Instead, it took more than three months before

10 Ms. ██████ eventually was diagnosed with OUD on ███████████, 2023.  *Id.* at 206.

11     73.    In yet another example, on ███████, 2023, ███████████ requested

12 MOUD seven weeks after he was booked into the Jail.  The following day, a

13 psychiatric evaluation identified that Mr. ██████ had daily or every other day

14 opioid use. ███████████ Med. Record at 89-90.  After receiving no response,

15 Mr. ██████ had to request buprenorphine/naloxone again on ███████████ 2023,

16 at which point he was told he was on the MAT interest queue.  Mr. ██████ waited

17 almost two months and again requested buprenorphine/naloxone on ███████████ 2024,

18 at which point he was assessed and diagnosed with OUD on ███████, 2024,

19 which finally led to treatment with buprenorphine/naloxone.  The Jail's four-month

20 failure to treat Mr. ██████'s OUD is a violation of the standard of care and placed

21 him at risk during that time period.

22     74.    One group of persons who likely have OUD that the Jail should have

23 no trouble identifying is persons who are in opioid withdrawal and already receiving

24 buprenorphine/naloxone from the Jail.  Under the standard of care, "[a]ll persons

25 with opioid use and/or OUD should be monitored medically for acute opioid

26 withdrawal syndrome and offered MOUD *as an ongoing treatment*."  Ramsey Rpt.

27 at ¶ 173 (emphasis added).  But the medical records relied on by Dr. Murray and

28 Dr. Penn include multiple instances where the Jail failed to continue incarcerated

1  persons with OUD on MOUD without interruption after they were no longer

2  monitored for withdrawal.[13]

3      75.    On page 28 of his report, Dr. Penn asserts that "StatCare is a

4  specialized division within NaphCare, which currently provides MAT, mental

5  health, and utilization management services to SDSO.  StatCare specifically focuses

6  on offering urgent and emergent healthcare services" and "StatCare provides: **24/7**

7  **Availability**: STATCare operates around the clock, providing immediate medical

8  consultation and support to SDSO facilities whenever urgent care is needed. This

9  immediate support includes medication management for chronic care or MAT

10  patients upon intake or during their time in SDSO."  Penn Rpt. at 28.  From the

11  medical records I have reviewed, including several noted in footnote 14 above and

12  described in the Appendix, STATCare does not provide immediate medical

13  consultation and immediate support for patients with OUD.  *See also* Ramsey Rpt.

14  at 49, ¶ 124.  Patients in the SD Jail often wait days to start buprenorphine for acute

15  opioid withdrawal.

16      76.    On page 26 of Dr. Murray's report, he states, "The SDSO MSD is

17  currently working to draft policies, treatment guidelines, training, standardized note

18  templates, and an improved flagging system.  Recommendations would also include

19  the establishment of a CQI program for monitoring the MAT/MOUD program for

20  ongoing improvement."  I am unaware of any evidence that the Jail has

21  implemented "an improved flagging system" since Dr. Murray's report.  Another

22  reason that I doubt these claims is that NaphCare was supposed to create a CQI

23  program with regularly scheduled quarterly meetings under its contract with the Jail,

24  which was not happening as of April 16, 2024, *see* Nix Depo. Tr. at 146:20-147:4,

25  and is apparently still not happening given that Dr. Murray recommended such a

26  program be created for MAT/MOUD, Murray Rpt. at 26.

27

28  [13] *See* Appendix A, ██████████████████████

77.    Dr. Murray raises one issue in his report relevant to providing MOUD for those the Jail knows likely have OUD that I did not see reflected in the medical records.  He states that patients already "receiving treatment for OUD at the time of incarceration are offered continuation of their medication, often in partnership with their Opioid Treatment Program (OTP) in the community when possible."  Murray Rpt. at 25.  But he provides no data as to how many times this has occurred.  As discussed in my initial report, based on deposition testimony from Dr. Montgomery and NaphCare personnel, the only reliable number available appears to be the "probably 50 or less" patients identified during NaphCare's 30(b)(6) deposition. Nix Depo. Tr., Vol. II, at 66:1-22.

78.    Dr. Murray also states that NaphCare has 7 staff in the MAT program: two NPs, one physician, and four mental health counselors. Murray Rpt. at 25. Group counseling occurs only at two sites.  Only one site has a dedicated MAT housing unit. Given the volume of patients in the Jails with substance use and SUD, I question whether this is an adequate number of personnel to staff the MAT program effectively.  My review of medical records revealed there are often substantial delays in assessing persons for and providing persons with MOUD. These delays strongly suggest that the Jail does not have sufficient personnel to provide incarcerated persons with timely evaluations and treatment for OUD.

**2.      The Jail fails to provide adequate care to those with OUD, including by failing to provide sufficient doses of MOUD and failing to ensure MOUD is not discontinued when treatment is still needed**

79.    As I explained in my initial report, the standard of care for treating OUD is providing opioid agonist medication (with methadone or buprenorphine) at a sufficient dose to address opioid cravings so that the patient does not return to use. Cravings are one of the DSM-5-TR criteria for SUD, which is why the standard of care is to provide a sufficient dose of methadone or buprenorphine to eliminate opioid cravings and prevent the risk that the patient returns to use.

80.     Dosing must be individualized, as "[s]ome patients with high opioid tolerance may require buprenorphine doses above 24 mg/day during treatment stabilization," and that "[h]igher doses of buprenorphine ($\geq$ 16 mg daily) appear necessary for rapid stabilization in individuals with" exposure to highly potent synthetic opioids, such as fentanyl.  Ramsey Rpt. at ¶ 192.  It remains difficult to pin down exactly what the Jail's policies, procedures, and practices are regarding dosing buprenorphine/naloxone.  The operative NaphCare MAT policy "states that buprenorphine 16 mg daily is the maximum dose unless there is a 'verified dosage from the community' not to exceed 24 mg." *Id.* at ¶ 195.  This policy limits the ability of a medical provider in the Jail to provide an adequate dose of buprenorphine/naloxone if their medical judgment is that an incarcerated person needs a dose higher than 24mg but an equivalent community dose cannot be verified.  This verification step risks preventing persons who need that dose but never received MOUD in the community from getting access to an adequate dose. It also blocks persons who did receive such a dose but are unable to get that dose verified for any reason.

81.     In addition, an allegation of diversion should not prevent an incarcerated person from receiving an adequate dose of MOUD.  I noted in my initial report that "persons on M[OUD] sometimes divert medications, but that reality does nothing to change whether those persons still need M[OUD]." *Id.* at ¶ 202.  NaphCare's operative written policy "includes a zero tolerance policy for diversion," *id.* at ¶ 202, which violates the standard of care because it exposes an incarcerated person accused of diversion to the risk of return to use and overdose.  I outlined several mitigation strategies for diversion that do not involve reducing medication.  *Id.* at ¶ 205.  One allegation that an incarcerated person diverted buprenorphine/naloxone should not result in exposing that person to a risk as severe as an overdose, which can (and has) caused deaths in the Jail.  The medical records that Dr. Murray and Dr. Penn relied on show that the Jail's practice is to cut an

incarcerated person's dose of MOUD following an allegation of diversion.  This is a harsh, punitive response that violates the standard of care by preventing an incarcerated person from receiving an adequate dose for their OUD for non-medical reasons.  In my initial report, I outlined several options the Jail could follow to discourage diversion without risking return to use.  *Id.* at ¶ 205.

82.    Several medical records relied on by Dr. Murray and Dr. Penn include evidence of the Jail's failure to provide adequate MOUD, including insufficient dosing,[14] incidents where an incarcerated person's access to MOUD was impacted due to allegations of diversion,[15] evidence of NaphCare's zero tolerance diversion policy specifically being active in the Jail,[16] and incarcerated persons' MOUD being discontinued because of inadequately treated side effects.[17]

83.    ███████████  medical record illustrates the harms that arise from the Jail's failure to provide individualized care for OUD and its punitive response to suspected diversion.  The Jail promptly identified that Mr. ██████ had an active community-based prescription for buprenorphine/naloxone, specifically buprenorphine/naloxone 8/2 mg twice daily (BID), and began providing it to Mr. ██████ the day after he was booked.  ██████ Med. Rcd. at 26.

84.    The Jail started Mr. ██████ on buprenorphine/naloxone 16/4 mg, the dose that he was prescribed in the community, but dosed it once daily rather than split twice daily.  *Id.* at 28.  After three days at this dose, Mr. ██████ submitted a sick call request complaining that the dose was too strong, and he requested to



14 ████████████████████████████████████████████████
████████████████████████████

15 *See* Appendix A, ██████████████████████████████

16 *See* Appendix A, ████████████████████

17 ████████████████,

"taper off slowly" on ███████, 2023.  *Id.* at 18.  Unfortunately, the Jail's typical practice of providing buprenorphine/naloxone at either 16/4 mg or 8/2 mg, with no dosing in between, prevented Mr. █████ from being reduced slowly, and his dose was reduced to 8/2 mg.  *Id.* at 28.  More nuanced dosing, reducing his dose to 14/3.5 mg or 12/3 mg or 10/2.5 mg, were all feasible options that were not utilized. Nineteen days later, on █████, 2023, Mr. █████ submitted another sick call request complaining that the dramatic reduction in his buprenorphine/naloxone led to symptoms of opioid withdrawal, and he requested a small increase "to 10/2.5 or 12/3 mg."  *Id.* at 18.  This request was denied, with progress notes on ████████, 2023, and ████████ 2023, noting that he would be maintained on the "standard dose of 8/2 mg daily."  *Id.* at 30.  Mr. █████ continued to file sick call requests for the next four months because his 8/2 mg dose was insufficient, ultimately requesting that he be returned to his initial 16/4 mg dose, but instead, the Jail maintained Mr. █████ at 8/2 mg.  *Id.* at 19.

85.    The dosing issue came to a head in ██████ 2023.  On █████████ 2023, medical staff finally decided to "increase[] his dose from 8[/2] mg to 16[/4] mg." *Id.* at 37.  But two days later, on ████████, 2023, Mr. ██████ was accused by custodial staff of hoarding buprenorphine/naloxone.  *Id.*  Two days after that, on ████████, 2023, a court ordered the Jail to "address his prescription and medication."  *Id.*  At this point, the medical record makes clear that decisions about Mr. ████████ OUD treatment were no longer solely in the hands of medical staff. On ████████, 2024, in response to the court order, a nurse practitioner assessed Mr. █████'s medical care.  *Id.* at 37-38.  In response to the hoarding allegation, the NP noted, "if I don't have written documentation to back up hoarding, I will increase his dose back to 16[/4] mg. If there is written proof, then I will talk to IP to explain why his dose was cut in half."  *Id.* at 38.  This note is concerning because it indicates the NP's medical judgment was that a 16/4 mg dose was appropriate, but that medical judgment would be overridden, and Mr. █████ would instead be given

1    half the adequate dose if custody staff provided a written report alleging hoarding.

2    Ultimately, custody staff produced a written report alleging that Mr. ███ was

3    caught with methamphetamine and fentanyl, but notably not

4    buprenorphine/naloxone, so the NP ordered his dose increased back to 16/4 mg.

5    She noted, however, that "[o]nce we are presented with proof of hoarding we will

6    cut the dose in half." *Id.* at 39.  One week later, however, a physician reversed that

7    decision and cut Mr. ███'s dose in half on ███, 2023, based on allegations

8    of diversion.  *Id.*

9         86.    This sequence of events is deeply concerning.  I explained in my initial

10   report that "continued opioid use while on MOUD . . . likely indicates that the

11   person is not being treated with an adequate dose of medication, underscoring their

12   need to stay on MOUD."  Ramsey Rpt. at 92, ¶ 213.  The reason that sufficient

13   dosing of MOUD is so critical is that, when persons with OUD do not receive

14   sufficient medication, they are at risk of returning to use and potentially overdosing.

15   Custody staff's allegation that Mr. ███ was caught with fentanyl is evidence of

16   this risk coming to fruition.  At this point, it should have been clear to Jail medical

17   staff that they had failed to provide Mr. ███ with an adequate dose of

18   buprenorphine/naloxone, and they should have sought to protect Mr. ███ by

19   ensuring he received a sufficient dose to prevent his return to use.  But the Jail's

20   policies, procedures, and practices dictated the opposite outcome, leading to a

21   physician cutting Mr. ███'s dose in half and exposing him to the substantial risk

22   of serious harm from returning to fentanyl use.

23        87.    After his dose was decreased, Mr. ███ continued to request that his

24   dose be increased for months.  This request was denied on ███, 2023, based

25   on his "history of cheeking/hoarding his medication."  *Id.* at 45.  Eventually, on

26   ███, 2023, a physician finally "[u]ptitrated patient [S]uboxone to achieve

27   a more therapeutic dose to reduce cravings and prevent fentanyl OD."  *Id.*  This

28   record shows that Jail medical staff knowingly exposed Mr. ███ to a risk of

1    "fentanyl OD" based on alleged diversion for more than three months.  Even once

2    his dose was increased, Mr. ███████ remained at risk of having his medication

3    reduced due to an allegation of diversion, as demonstrated by a ███████, 2024,

4    note in which a physician describes "educating him" about "the ZERO tolerance

5    policy for diversion."  *Id.* at 88.

6        88.    Defendants' Reports make a number of claims regarding the provision

7    of care to persons with OUD that are divorced from the reality in the medical

8    records and other evidence in the case, which I respond to below.  One overarching

9    theme in Defendants' Reports is that their own experts provide different descriptions

10    of the MAT program at the Jail.  In my initial report, I explained in detail my

11    understanding of how the Jail's MAT program evolved over time, including walking

12    through the discrepancies between the MAT program as defined in NaphCare's

13    currently operative policies, Dr. Montgomery's deposition testimony regarding

14    changes the Jail might make to the program in the future, and the evidence of how

15    the MAT program has in fact been operated in the past.  Ramsey Rpt. at ¶¶ 151-97.

16    I ultimately concluded that "it is unclear what the Jail is actually doing in practice."

17    *Id.* at ¶ 195.

18        89.    Defendants' experts submitted reports with fundamentally different

19    descriptions of what the MAT program actually entails.  Dr. Murray's report comes

20    the closest to at least describing the core elements of the standard of care for treating

21    persons with OUD – specifically through MOUD by providing "[m]edications such

22    as methadone, buprenorphine, and naltrexone" to incarcerated persons with opioid

23    use disorder.  He states that incarcerated persons with OUD that "refuse

24    psychosocial treatment" are instead "designated as part of the Medication for Opioid

25    Use Disorder (MOUD) program."  But he does not explain this "MOUD program"

26    in any detail.  It is unclear from Dr. Murray's report what process the Jail uses to

27    start persons on MOUD, the standards the Jail applies to determine doses of

28    buprenorphine/naloxone, and the Jail's practices regarding patients suspected of

1   diversion – all of which are critical elements of providing MOUD.  The medical

2   records on which Dr. Murray relied demonstrated that the Jail is not meeting the

3   standard of care in these areas.  *See also* Ramsey Rpt. at 62-98.

4       90.    Dr. Penn defines the MAT program somewhat differently than

5   Dr. Murray, describing it as "[a] specialized behavioral health treatment

6   programming module for those who meet the DSM-[5] criteria for opioid use

7   disorder," and that it involves "intensive services such as weekly individual therapy,

8   group therapy and medication management."  Penn Rpt. at 34.  He states that the

9   "goal of the program is to mitigate overdose, promote recovery, reduce recidivism,

10  and support a healthy lifestyle."  *Id.*  Based on this definition, Dr. Penn appears not

11  to understand that MOUD, in and of itself, is the standard of care for the treatment

12  of OUD.  Dr. Penn does not engage in any assessment of the Jails' provision of care

13  to persons receiving MOUD who are not enrolled in MAT, other than restating the

14  numbers explained above.  As for the persons in the MAT program, Dr. Penn asserts

15  that the Jail "provides comprehensive MAT treatment," although he does not define

16  his understanding of the standard of care for "comprehensive MAT treatment" other

17  than generally stating it involves both medication and therapy.

18      91.    On page 44 of his report, Dr. Penn evaluates the educational and

19  therapeutic programming in the Jail stating, "[i]deally, individual and group

20  counseling, self-help groups, residential programs, and clinical management are

21  well-coordinated. Policies and procedures clearly define the roles and collaborative

22  areas of the treatment and healthcare teams. Community self-help initiatives, like

23  Alcoholics Anonymous and Narcotics Anonymous, can serve as valuable

24  supplements or alternatives to staff-provided counseling."  Again, at no point in his

25  report does Dr. Penn actually assess the use of MOUD in the Jail. He spends much

26  more time evaluating therapy and educational programming rather than focusing on

27  MOUD, which is the standard of care because it is actually associated with

28  meaningful outcomes for persons with OUD, including decreased mortality.  As

1  with Dr. Murray's report, the medical record summaries that Dr. Penn relied on

2  show inadequate provision of MOUD.

3       92.    Mr. Vare's definition of MAT is far broader than the definitions in

4  Dr. Murray's or Dr. Penn's reports.  He states "Medication-Assisted Treatment

5  (MAT) provides screening of individuals at the time of booking and then provides

6  them with resources through medical providers to alleviate withdrawal symptoms

7  and provide ongoing treatment."  Vare Rpt. at 63.  Mr. Vare appears to think that

8  "MAT" is equivalent to the entire process of providing substance use treatment to

9  persons in the Jail, which is not how Dr. Murray or Dr. Penn (or, indeed, the Jail's

10  own policies) describe the program.

11       93.    Mr. Vare ultimately concludes that "Plaintiffs' claims that the Sheriff's

12  Office failed to provide adequate medical care including medicated assisted

13  treatment for incarcerated persons with substance [ab]use disorders" are inaccurate.

14  I disagree with his conclusion.  Mr. Vare makes his lack of expertise regarding

15  substance use treatment apparent throughout opinion 5 of his report.  Mr. Vare

16  appears to think that screening and assessments are part of the MAT program,

17  stating that  "by implementing the MAT program, the jails are screening individuals

18  at the point of entry through drug testing, body scanners, and assessments for

19  providing medications to help treat those who need medical intervention."

20  Screening and assessment are not part of the MAT program, they are steps in

21  withdrawal treatment that come before patients are placed in the MAT program.

22  Mr. Vare lacks knowledge on what CIWA and COWS are, apparently thinking they

23  are "services" for patients.  They are assessment tools to determine whether a patient

24  is in withdrawal and it needs management, not services themselves.

25       94.    Mr. Vare's analysis of the Jail's MAT program is limited to "copies of

26  several hand-written letters from incarcerated persons who had participated in the

27  MAT program and had positively benefited from the experience."  He includes

28  excerpts from five letters in his report.  Only one letter has a person's name attached

1  to it.  None of the medical charts of these five individuals have been produced by

2  Defendants.  Though three of the letters use the term "MAT," none of the letters

3  reference that the writers received MOUD.  Even assuming these testimonies from

4  unnamed individuals are legitimate, they do not provide substantive, quantitative

5  evidence of the efficacy of the MAT.

6        95.    Mr. Vare states on page 63, "My opinion in this section is not focused

7  on the treatment itself and I have not considered whether MAT is medically

8  necessary or appropriate as I am not a medical expert.  This opinion only considers

9  the existence of treatment programs and whether incarcerated persons have access to

10  such services."  He goes on, however, to opine for seven pages on the MAT

11  program.  To state the obvious, Mr. Vare has no qualifications to provide a reliable

12  opinion on any aspect of the MAT program.  He has no clinical or medical

13  expertise, let alone expertise in addiction medicine.  His opinions regarding the

14  Jail's MAT program are not reliable.

15      **B.**    **The Sheriff's Department Lacks Policies and Procedures Focused**
           **on Treating, and Therefore Fails to Provide Treatment for, Non-**

16             **Opioid Substance Use Disorder**

17        96.    The medical records summarized in Dr. Murray's and Dr. Penn's

18  reports reinforce my opinion from my initial report that the Sheriff's Department

19  lacks policies and procedures focused on treating alcohol use disorder or stimulant

20  use disorder post-withdrawal. [18]  *See* Ramsey Rpt. at ¶ 220-23.  Those medical

21  records also demonstrate that the Jail lacks policies and procedures focused on

22  treating other non-opioid substance use disorders post-withdrawal, including

23  tobacco use disorder ("TUD") and other substance use disorders. [19]  Prompted by my

24



25  [18]                          ulant);          (            ;

26                      (alc           ;            (st
    ulant).

27  [19] *See* App                (diagnosed with TUD);      (history of

28  PCP use);                  PCP use).

1    review of those records, my conclusion now is broader than the conclusion in my

2    initial report.  The Sheriff's Department lacks policies and procedures focused on

3    treating *any non-opioid substance use disorder* post-withdrawal, including alcohol,

4    stimulants, tobacco, and other substances.

5          97.    Tellingly, none of Defendants' experts conducted any analysis of the

6    Jail's policies and procedures for treating non-opioid substance use disorders after

7    withdrawal, because no such policies or procedures exist.  Indeed, the term

8    "stimulant use disorder" appears just once in Murray's report when it is briefly

9    noted in one of the summaries of the medical records in Appendix J.  Murray Rpt. at

10   169 (summary of ███████████ Med. Rcd.).  Similarly, the term "alcohol use

11   disorder" appears just once in Murray's report as a brief note in another summary.

12   Murray Rpt. at 173 (summary of ███████████ Med. Rcd.).  Neither summary

13   includes any discussion of treatment for stimulant use disorder or alcohol use

14   disorder.  Those terms do not appear in Penn's report at all.  And neither report

15   mentions tobacco or other substances.  These disorders are noted in several of the

16   underlying medical records, but those records make clear that the Jail does not have

17   any practice in treating either alcohol use disorder or stimulant use disorder.

18   **V.    DEFENDANTS' REPORTS FAIL TO SHOW THAT THE SHERIFF'S
          DEPARTMENT ADEQUATELY PROTECTS PERSONS AT RISK OF
19        OVERDOSE**

20         98.    All three of Defendants' Reports acknowledge that treating substance

21   use disorder reduces the risk of overdose, a point with which I agree.  Murray Rpt.

22   at 24-25; Penn Rpt. at 34; Vare Rpt. at 58; Ramsey Rpt. at ¶ 224.  The opposite is

23   also true; failure to adequately treat an incarcerated person's withdrawal and/or

24   substance use disorder exposes that person to a risk of return to use and overdose (as

25   I explained in my initial report, the sections above, and in the Appendix below).  If

26   the system fails to adequately treat withdrawal and substance use disorder,

27   incarcerated persons with substance use disorder will remain at risk of serious harm

28   from overdoses, including death.

1    99.    The death of Eric Wolf, summarized briefly in Dr. Murray's report, is a

2    tragic example of the risk of overdose created by the Jail's failure to promptly

3    diagnose and treat OUD.  Mr. Wolf was booked on July 26, 2023, but his substance

4    use was not identified at intake that day.  Wolf Med. Rcd. at 18-19.  His history of

5    opioid, stimulant, and alcohol use was identified during an Inmate Safety Program

6    assessment on July 28, 2023, based on Jail staff's review of his medical records.  *Id.*

7    at 70.  By that point, Mr. Wolf was still at risk of withdrawal, so he should have

8    been referred for COWS and CIWA-Ar monitoring, and then assessed for any OUD

9    and prescribed MOUD.  None of that happened.

10    100.    Mr. Wolf's substance use was identified many additional times during

11    his incarceration.  *See id.* at 74, 92 (July 29, 2023); *id.* at 202 (October 19, 2023); *id.*

12    257 (October 23, 2023, self-reporting that he "wore the drugs," using opioids

13    multiple times per week as well as alcohol and stimulant use daily).  Nevertheless,

14    the Jail never assessed him to whether he met the DSM-5-TR criteria for OUD so he

15    could be provided with MOUD to avoid a return to use.

16    101.    On January 5, 2024, staff found Mr. Wolf face down and unresponsive

17    on the floor of his cell.  *Id.* at 1272.  Staff deployed naloxone ten times with no

18    effect, and Mr. Wolf was pronounced dead shortly thereafter.  *Id.* at 1272-73.  While

19    an official cause of death is still pending, staff found baggies of fentanyl in

20    Mr. Wolf's cell and an autopsy the following day returned a presumptive positive

21    test for fentanyl.  *See* Wolf 3-Day ICD Review at 21.  This evidence strongly

22    indicates that Mr. Wolf died of a fentanyl overdose.

23    102.    Had the Jail acted on his reports of frequent opioid use, assessed him

24    for OUD, and provided him with MOUD, it is possible that Mr. Wolf would not

25    have overdosed fatally on fentanyl.  As I discussed above, one of the purposes of

26    MOUD is to prevent the opioid cravings.  Had Mr. Wolf been receiving an adequate

27    dose of MOUD, he may not have had opioid cravings and sought out opioids in the

28    Jail.  Without MOUD, Mr. Wolf experienced cravings, returned to use, overdosed,

1  and died.

2  103.    The widespread risk of overdose caused by the Jail's failure to

3  adequately treat withdrawal and OUD makes it all the more important for the Jail to

4  provide adequate treatment when incarcerated persons inevitably overdose.  The

5  symptoms of an overdose, and therefore the standard of care for treating overdoses,

6  vary depending on the substance that caused the overdose.  For that reason, the Jail's

7  overdose intervention practices must regularly adapt in response to changes in the

8  substances prevalent in the unregulated drug supply in the Jail.  Ramsey Rpt. at

9  ¶ 226.

10  104.    In my initial report, I reviewed the Jail's written policies as well as

11  records documenting its practices for treatment of persons experiencing overdose,

12  concluding that its policies, procedures, and practices fail to meet the standard of

13  care.  *Id.* at ¶¶ 225-27.  I explained that the Jail has a practice of over-relying on

14  naloxone when providing emergent care.  Deploying naloxone in response to a

15  suspected overdose is part of the standard of care, but it is not the *entire* standard of

16  care.  I explained that the standard of care has changed due to the increasing

17  presence of highly potent synthetic opioids ("HPSOs") in the unregulated drug

18  supply.  Overdoses from the unregulated drug supply require treatment with more

19  than just naloxone because sedatives (such as synthetic benzodiazepines, xylazine,

20  and medetomidine) are frequently added to HPSO.  Naloxone can help normalize

21  breathing in someone who overdosed on HPSO, but the sedatives in the unregulated

22  drug supply can prevent that person from returning to consciousness after naloxone

23  is deployed.  When someone's breathing is normalized but they remain unconscious,

24  the standard of care is not to continue deploying naloxone, but rather to place that

25  person in the recovery position and then engage in additional supportive measures

26  outlined in my initial report.  Ramsey Rpt. at ¶ 228.  I noted how the death of

27  Vianna Granillo illustrated the harms from Jail staff's overreliance on naloxone, as

28  staff repeatedly deployed doses of naloxone long after they could have possibly had

1  any effect while failing to put Ms. Granillo in the recovery position and attempting

2  additional life-saving treatment.  *Id.* at ¶ 233.

3      105.  Defendants' Reports fail to show that the Jail meets the standard of care

4  in providing overdose treatment.

5      106.  Dr. Murray does not evaluate or opine on the adequacy of the treatment

6  that the Jail has provided to incarcerated persons experiencing overdose.  The only

7  notable element of Dr. Murray's report regarding overdose treatment is the medical

8  record of Majid Almajid, one of the deaths summarized in Appendix Q.  *See* Murray

9  Rpt. at 253-254.  That summary notes that "on May 5, 2024, medical was called for

10  a man down.  CPR was in progress upon the medical staff's arrival.  Multiple doses

11  of Narcan were given.  He already had some livor mortis and rigor mortis.  Care was

12  transferred to EMS upon arrival, and the patient was pronounced deceased a few

13  minutes later."  I reviewed Mr. Almajid's medical record because of the naloxone

14  deployment, but the record is mostly irrelevant for purposes of this report.  What is

15  relevant is that the deployment of naloxone here reinforces that the default response

16  to any "man down" situation in the SD Jail is to deploy multiple doses of naloxone

17  even when it is not the most effective treatment.  Mr. Almajid's death is a case

18  where the "man down" had clear signs of death (livor mortis and rigor mortis) that

19  naloxone could never reverse. I would hope that Jail personnel are trained on an

20  appropriate assessment process (assess airway, breathing, circulation) *before*

21  deploying naloxone.  No autopsy was performed in this case and the cause of death

22  and manner of death are pending.  I reserve the right to supplement this report if I

23  receive additional records indicating that substance use played a role in

24  Mr. Almajid's death.

25      107.  Dr. Penn's discussion of overdose treatment is limited to an anecdote

26  about one overdose he purportedly witnessed during an inspection, but he does not

27  identify the patient involved and a lawyer for Defendants later confirmed that "no

28  medical records were pulled" "regarding the person that Dr. Penn witnessed

1  overdose."  September 23, 2024 Email from Counsel for Defendants to Counsel for

2  Plaintiffs re Materials Relied Upon by Experts per Court Order (Dkt. 718)."  This

3  means no medical records have been produced that confirm the overdose, and no

4  urine toxicology report has been produced that demonstrates if substances were

5  indeed present.  Dr. Penn also gives an anecdotal comment from an SDSO physician

6  who described the Jail staff's actions as "spot on."  But the response to one overdose

7  (if it occurred) and one reported comment from a physician are not sufficient to

8  show that the Jail responds to overdoses appropriately.  Given the number of

9  overdose deaths that have occurred in the SD Jail, I do not concur with Dr. Penn's

10 approval of their overdose intervention response.

11        108.   Mr. Vare discusses overdoses at greater length, but he does not have

12 medical expertise, so he does not offer an opinion on the adequacy of the treatment

13 provided to persons who overdosed in the Jail.  Mr. Vare's experience is in

14 operations and security, so his opinion focuses on the Jail's efforts to prevent

15 substances that might cause an overdose from entering the Jail in the first place.  I

16 understand a different expert retained by Plaintiffs will respond to Mr. Vare's

17 opinions regarding overdoses from an operations and security perspective.

18 **VI.   DR. MURRAY'S AND DR. PENN'S OPINIONS ON DISCHARGE
       PLANNING FAIL TO SHOW THAT THE SHERIFF'S DEPARTMENT
19     HAS ADEQUATE DISCHARGE PLANNING FOR INCARCERATED
       PERSONS WITH SUD**

20

21        109.   In my initial report, I explained that "an imperative step in providing

22 adequate care" to incarcerated persons with substance use disorder is "[e]nsuring

23 that persons with OUD have access to MOUD at discharge."  Ramsey Rpt. at ¶ 246.

24 As noted repeatedly above, the risks associated with discontinuing MOUD are

25 severe, including a return to use and overdose.  Those risks do not go away at

26 discharge.  In fact, the risks can be even greater at discharge given the unique

27 barriers persons with SUD face upon reentry.  *Id.* at ¶ 243-45.

28        110.   In that report, I noted numerous instances where an incarcerated person

with OUD was released without MOUD in hand, struggled to access MOUD, and experienced disruption in treatment as a result. The Sheriff's Department's practice for providing MOUD at discharge is to send a prescription to a community-based pharmacy where the patient can then access the medication on their own. *Id.* at ¶¶ 251-53. But this proved difficult for several persons leaving custody, so to address those difficulties, I recommended that the Sheriff's Department provide naloxone, buprenorphine/naloxone, or methadone in hand at discharge. *See id.* at § IV (Recommendations Regarding Discharge Planning and Services).

111. Dr. Murray and Dr. Penn both insist that the Jail provides adequate discharge planning for persons with substance use disorder, but they simply assert that the Jail engages in discharge planning without attempting to assess that the discharge planning is adequate in practice.

112. Dr. Murray mentions that patients are supposed to be given a prescription card at discharge that they can redeem at a local pharmacy for a 30-day supply of medications, along with a voucher for naloxone. Murray Rpt. at 22-23. But he does not assess whether the Jail actually gives those prescription cards out for MOUD in practice. He also states that persons are provided with "a list of community resources" to help facilitate care and that the Jail "attempts to make connections for MAT patients with community-based programs," but he does not assess how frequently those attempts are successful.

113. Further, for patients with substance use other than opioid use disorder, there does not appear to be any meaningful discharge planning. There are missed opportunities to link persons to community-based supports, such as recovery centers, mutual support groups (including non-12-step programs, such as SMART Recovery), peers, and harm reduction programs (such as syringe services programs).

114. Dr. Penn's discussion of discharge planning is nearly identical to Dr. Murray's. He mentions that persons are supposed to receive a voucher for naloxone, a 30-day supply of medications at a community-based pharmacy, and that

1   Jail discharge planners *attempt* to make connections for MAT patients in
2   community-based programs. My responses to Dr. Penn's assertions are the same as
3   those I expressed above with respect to Dr. Murray's assertions.

4       115.   Unlike the elements of substance use treatment discussed above, the
5   medical records I reviewed for this rebuttal report lack information useful to assess
6   the effectiveness of discharge planning for people with SUD. Neither Dr. Murray
7   nor Dr. Penn identified any methodology that they used to evaluate discharge
8   planning for people with SUD in practice. So my conclusion remains unchanged –
9   the Jail should provide MOUD in hand at discharge to the extent legally possible,
10  including using the hospital/clinic designation from 42 CFR Part 8 to stock and
11  dispense methadone and the DEA's 72-hour rule to discharge patients with
12  methadone.

13  **VII.   CONCLUSION**

14      116.   The information and opinions contained in this report are based on the
15  evidence, documentation, and/or observations available to me. I reserve the right to
16  modify or expand these opinions should additional information become available to
17  me. The information contained in this report and the accompanying exhibits are a
18  fair and accurate representation of the subject of my anticipated testimony in this
19  case.

20

21  Dated: November ⎯ , 2024          _____

22                                   Kelly S. Ramsey, M.D.

23

24

25

26

27

28

# Appendix A

██████████

1.     The Jail's provision of withdrawal management to Mr. ████ did not meet the standard of care.  The Jail failed to provide timely assessments of Mr. ████'s withdrawal symptoms.  The Jail also failed to provide individualized treatment by basing the dose of Mr. ████'s medication on a standardized, non-individualized taper regimen rather than basing the dose on the scores of the withdrawal assessments.

2.     Mr. ████'s substance use was identified during the intake screening, which triggered COWS, CIWA-Ar, and CIWA-B assessments.  ████ Med. Rcd. at 9-10.  But these assessments were not performed with sufficient frequency, underscoring the conclusion in my initial report that the Jail fails to meet the standard of care for these assessments by attempting them just once per day, even if the patient is unavailable for the attempted assessment.  Mr. ████'s medical record contains extensive evidence of that practice.  COWS Assessments for opioid withdrawal should generally be completed every 4 hours for the first 72 hours of incarceration, although I noted in my initial report that some variance in that timing is appropriate.  Ramsey Rpt. at ¶¶ 59-60.  COWS assessments can be completed "every 6 hours for scores less than 13," but should be completed "hourly for scores greater than or equal to 13." *Id.* at ¶ 60.  Mr. ████'s COWS assessments were instead attempted just once per day and actually completed even less frequently.

3.     Mr. ████ was first assessed for opioid withdrawal using the COWS on ████, 2023, at ████ p.m., resulting in a score of 1 and a notation to "[r]eassess in 8 hours."  The next assessment did not occur until more than 15 hours later, on ████, 2023, at ████ a.m., when the score jumped to 14, which indicates he was experiencing moderate opioid withdrawal symptoms and should have been assessed again within one hour.  ████ Med. Rcd. at 199-200.  Instead, that assessment included a notation to "[r]eassess in 6 hours."  *Id.* at 199.  But no attempt was made to conduct another COWS assessment until more than 27 hours later on

1  ████████ 2023, at ████ p.m., and that assessment was not even completed.  *Id.* at

2  205-06.  Instead of completing the assessment, a nurse noted Mr. ████████ was

3  unavailable due to a court appearance.  *Id.*  That incomplete assessment included a

4  notation to "[r]eassess in 8 hours."  *Id.* at 205.  But it took more than 24 hours (over

5  47 hours since the last completed assessment) before staff attempted to complete

6  another COWS assessment on ████████ 2023, at ████ p.m., at which point the

7  assessment produced a score of 4 with another notation to "[r]eassess in 8 hours."

8  *Id.* at 217.

9       4.    From there, the Jail waited over 25 hours to attempt an assessment on

10  ████████ 2023, at ████ p.m., which was completed with a score of 7, and a note to

11  reassess in 8 hours.  *Id.* at 225-26.  The next attempt occurred more than 25 hours

12  later on ████████ 2023, at ████ p.m., with a score of 3, and a note to reassess in 8

13  hours.  *Id.* at 233-34.  That was followed by multiple unsuccessful attempts to

14  complete COWS assessments, with the next attempt coming more than 21 hours

15  later on ████████, 2023, at ████ p.m., during which Mr. ████████ was unavailable and

16  a notation was made to reassess in four hours, *id.* at 239-40, then a delay of more

17  than 23 hours until the next attempt on ████████, 2023, at ████ p.m., when he was

18  again unavailable with a note to "[r]eassess in 4 hours."  *Id.* at 245-46.  Nursing staff

19  waited more than 24 hours before the next attempt on ████████ 2023, at ████ p.m.,

20  which was completed successfully, and resulted in a score of 5 and a note to reassess

21  in 8 hours.  *Id.* at 253-54.  As a result, there was a gap of more than 69 hours

22  between completed assessments.  There was then a delay of nearly 48 hours until the

23  next attempt on ████████ 2023, at ████ p.m., which was completed with a score of

24  3 and a note to reassess in 8 hours.  *Id.* at 259-60.  Staff made a final attempt over 18

25  hours later on ████████, 2023, at ████ a.m., which was completed with a score of 3

26  and a note to reassess in 8 hours.  No further COWS assessments were attempted.

27       5.    The repeated and substantial delays in assessments fell far below the

28  standard of care.  Moreover, nursing staff also were clearly aware that Mr. ████████

1  needed to be assessed more frequently—every assessment included a notation to

2  reassess in either 4, 6, or 8 hours—but failed to do so.

3        6.     The Jail's failure to conduct Mr. ███'s COWS assessments with

4  adequate frequency exposed him to a substantial risk that he would experience

5  complications from opioid withdrawal without receiving adequate treatment.  This

6  risk was particularly pronounced in the nearly 52-hour period between Mr. ███'s

7  first completed assessment that scored 14, indicating he was experiencing moderate

8  acute opioid withdrawal, and his second completed assessment.

9        7.     The Jail also failed to assess Mr. ███'s alcohol and benzodiazepine

10  withdrawal with adequate frequency.  CIWA-Ar assessments for alcohol withdrawal

11  should be completed every 4 hours until three consecutive assessments produce a

12  score of less than 8, at which point they can be spaced out to every 8 hours.  Ramsey

13  Rpt. at 23, ¶ 60.  CIWA-Ar scores of more than 8 should prompt reassessment

14  within 2 hours.  *Id.*  Mr. ███'s CIWA-Ar assessments were only attempted once

15  per day, and successfully completed even less frequently.[1]  The repeated and

16  _____

17  [1] The CIWA-Ar assessments occurred on the following dates and times:



1  substantial delays in these assessments fell far below the standard of care.

2      8.    CIWA-B assessments should be completed at least every 6 hours, *see*

3  Ramsey Rpt. at 23-24, ¶ 60, but Mr. ████'s CIWA-B assessments also were

4  attempted and successfully completed far less frequently.[2]

5      9.    As with Mr. ████'s COWS assessments, the delays in completing his

6  CIWA-Ar and CIWA-B assessments exposed Mr. ████ to a potential risk of

7  substantial harm from untreated complications of withdrawal.

8      10.    The Jail also failed to provide individualized treatment to Mr. ████.

9  His medical record reflects the Jail's policy of not initiating buprenorphine/naloxone

10  until the patient reaches a COWS score of at least 6, *see* ████ Med. Rcd. at 126

11  (noting criteria for buprenorphine/naloxone initiation is "score of 6 or greater"), 199

12  (initiating buprenorphine/naloxone once a COWS score went over 6).  Such

13  treatment is not consistent with the standard of care, which as per BJA Guidelines

---

14  

15  [2] The first CIWA-B assessment was comple█████ t █ p █████████ and the
last CIWA-B assessment was completed at ████ a. █ n ██████████ at time, a

16  total of at least 43 assessments should have ████ comple████ e Jail attempted

17  just 11, completing only 8, with gaps of two and three days between completed
assessments.



[4597893.3]

REBUTTAL EXPERT REPORT OF KELLY S. RAMSEY, M.D.

for Managing Substance Withdrawal in Jails, recommends initiating treatment for opioid withdrawal at a COWS of 3.  As I stated in my initial report, using a low dose initiation strategy for buprenorphine/naloxone would eliminate a need for any opioid withdrawal before initiating treatment with buprenorphine/naloxone.  *See* Ramsey Rpt. at 40-47, ¶¶ 102-119.  The Jail also put Mr. ████ on a standardized buprenorphine/naloxone taper defined by a broadly applicable policy, not by Mr. ████'s COWS scores and his individualized symptoms, which should be the basis for individualized dosing of buprenorphine/naloxone.  *Id.*

11.     The Jail also failed to provide adequate treatment for Mr. ████'s OUD after withdrawal.  Once the Jail began providing MOUD to Mr. ████, he repeatedly requested an increase in his buprenorphine/naloxone dose due to opioid cravings for months from ████ 2023 to ████ 2024, indicating that the Jail did not provide a sufficient dose of medication.  *See* ████ Med. Rcd. at 412-17, 421, 422, 424, 426-27, 482, 486, 488-92, 496, 499-500, 504-12, 518, 525.  Instead of increasing his dose, the Jail *decreased* Mr. ████'s buprenorphine/naloxone dose in response to an allegation of diversion.  *Id.* at 412.  As explained in my initial report and discussed in much more detail in the MOUD section above, denying sufficient medication based on allegations of diversion  violates the standard of care and harms patients by denying them the treatment they need.  Without that treatment, they are at increased risk of a return to use, which is a distinct possibility due to the availability of substances in the jail, and overdose.  *See* Ramsey Rpt. at 86-92, ¶¶ 202-13.

████

12.     The Jail did not identify all the substances that Mr. ████ used at intake, and it did not provide adequate treatment for the substance use that was identified.  During intake, a history of alcohol use was identified, and CIWA-Ar assessments were initiated, but they were done only once daily despite notations in Mr. ████'s electronic record that re-assessments were supposed to be completed

every four, six, or eight hours. *See* ███ Med. Rcd. at 18-19, 147, 154, 158, 162, 166, 170, 172, 176. A psychiatrist also eventually identified a history of methamphetamine use as Mr. ███'s substance of choice, indicating that the intake screening process failed to identify Mr. ███'s methamphetamine use. *Id.* at 242-43. As with his alcohol use, no attempt was ever made to treat Mr. ███'s methamphetamine use. Mr. ███'s opioid use disorder also was missed at intake, with an LMFT identifying it seven months later. *Id.* at 34.

13.    There is no indication in the medical record that Mr. ███ was ever offered treatment for alcohol use disorder (medication for alcohol use disorder/MAUD) post-withdrawal or for methamphetamine use disorder once it was identified. This reinforces my conclusion in my initial report, discussed further earlier in this report, that the Jail does not have any policies or procedures for treating alcohol use disorder or stimulant use disorder.

███

14.    The Jail's standard intake screening failed to identify Mr. ███' cocaine use at booking, although daily cocaine use was identified during an Inmate Safety Program (ISP) follow-up three hours later. ███ Med. Rcd. at 7-8 (intake screening conducted on ███ 2020, at ███ p.m.), 282 (ISP assessment conducted on ███, 2020, at ███ p.m.). The following month, medical staff identified a history of benzodiazepine use as well, specifically Xanax (alprazolam). *Id.* at 1342-43. It is concerning that the Jail's standard screening process did not identify Mr. ███' cocaine use given that he disclosed it a few hours later.

15.    Mr. ███' medical record indicates that the use of a validated screening tool at intake may have identified his cocaine use and benzodiazepine use. One of the validated screening tools identified in my initial report, the Tobacco, Alcohol, Prescription medication, and other Substance use Tool ("TAPS"),[3]

---

[3] *See* National Institute of Drug Abuse, TAPS Tobacco, Alcohol, Prescription

1    includes specific questions that the Jail's receiving screening lacks which may have

2    prompted different responses from Mr. ███.  TAPS includes questions

3    specifically asking the patient if they have used "any drugs including marijuana,

4    cocaine or crack, heroin, methamphetamine (crystal meth), hallucinogens, ecstasy

5    (MDMA)," if they have used "prescription medications just for the feeling, more

6    than prescribed or that were not prescribed for you," and if they have used "a

7    medication for anxiety or sleep (for example: Xanax, Ativan, or Klonopin) not as

8    prescribed or that was not prescribed for you."  *Id.*  The Jail's standard intake

9    screening is more general, asking about "use of alcohol, heroin, prescription pain

10   medications or sedatives" and "any other illegal drugs," along with a history of

11   "alcohol or drug withdrawal" and participation in "a detox program or substance

12   abuse treatment program." ███ Med. Rcd. at 7-8.

13       16.    Mr. ███ answered "no" to all the questions on the standard intake

14   screening, but three hours later he confirmed daily cocaine use in response to a more

15   specific question in the ISP assessment that asked about "recent substance use,"

16   specifically "amphetamines, THC, EtOH, Opiates[opioids], Cocaine, or Other." *Id.*

17   at 282.  And one month later he confirmed his "past Xanax" use only "[w]hen

18   prompted" by a medical provider. *Id.* at 1343.  This indicates that the Jail's standard

19   intake screening questions may have missed Mr. ███' substance use because they

20   did not specifically mention "cocaine" or "Xanax" by name, instead asking about

21   "other illegal drugs" and "sedatives" more generally.  The validated TAPS tool may

22   have been more effective because its questions identify "cocaine" and "Xanax" by

23   name.  The form of the questions also may have made a difference given the note

24   that Mr. ███ only acknowledged benzodiazepine use "[w]hen prompted."  The

25   validated TAPS tool's questions regarding prescription medication use involve

26

27   _____

    medication, and other Substance use Tool, https://nida.nih.gov/taps2 (last visited

28   Oct. 23, 2024).

detailed prompts identifying various types of prescription medication use that may have caused Mr. ▮▮▮ to recall his past alprazolam (Xanax) use.

17.    The Jail violated the standard of care again when it made no attempt to diagnose and treat Mr. ▮▮▮ for any stimulant use disorder once his cocaine use was identified, which is unsurprising given the Jail's lack of policies and procedures to treat stimulant use disorder.

**Richard Woodford**

18.    Mr. Woodford's death is an alarming example of the harm that results from the Jail's inadequate provision of withdrawal management.  I discussed Mr. Woodford's death in my initial report based on an interview I conducted with an incarcerated person housed in the unit where Mr. Woodford died.  *See* Ramsey Rpt. at 34-35, ¶ 86.  At the time, Defendants had not made his medical records available. My understanding is that Defendants did not produce the records to the Plaintiffs until September 20, 2024, after which they were provided to me.  The records reveal stunning failures in withdrawal management that likely resulted in Mr. Woodford's death.

19.    At intake on the morning of June 25, 2024, Mr. Woodford's fentanyl use and history of withdrawal were identified, *see* Woodford Med. Rcd. at 7-8, and a comprehensive detox screen was completed noting daily recent opioid use, *see id.* at 31.  Shortly thereafter, at 10:47 a.m., a STATCare provider ordered "[i]nitiate Suboxone treatment with 8/2mg Suboxone daily starting the day after incarceration."  *Id.* at 21.  In the same note, that STATCare provider wrote "[n]o clinical assessment performed on this p[a]t[ient]."  *Id.*

20.    That STATCare note reflects several key failures in the Jail's withdrawal management policies, procedures, and practices that I highlighted in my initial report.  In that report, I explained that "the Jail's approach to addressing withdrawal is reactive, rather than proactive, with no indication of individualized care, assessment, or dosing."  Ramsey Rpt. at 40, ¶ 101.  I pointed out that the

1   Sheriff's Department "treated patients in opioid, alcohol, or benzodiazepine

2   withdrawal with the same doses of medication for that specific withdrawal

3   syndrome, contrary to the standard of care." *Id.* ¶ 102. I highlighted an email that

4   the Jail's Chief Medical Officer Dr. Jon Montgomery sent in September 2023 in

5   which he wrote "docs/providers felt constrained that they were only able to

6   prescribe 8/2 milligrams for Suboxone (buprenorphine/naloxone) …no more, no

7   less" and detailed why I was not convinced by testimony in his April 26, 2024,

8   deposition (two months before Mr. Woodford's death) in which he stated that

9   buprenorphine/naloxone dosing had become more flexible. *Id.* at 42, ¶¶ 106-07. I

10  concluded that the Jail "fails to provide individualized care for individuals with

11  opioid disorder who are experiencing acute opioid withdrawal syndrome," in part

12  because of the Jail's practice of using a "fixed medication dose" strategy for all

13  patients, which is inconsistent with the "much safer option" of "low dose

14  buprenorphine initiation strategies." *Id.* at 43, 46, ¶¶ 109, 117. I quoted the BJA

15  guidelines, which state that "[a]ll patients at risk for opioid withdrawal should have

16  rapid access to treatment," and I advised that "[o]pioid withdrawal syndrome could

17  be avoided entirely if the Jail provided low dose initiations of buprenorphine rather

18  than waiting for patients to experience symptoms of opioid withdrawal syndrome

19  and then starting medication." *Id.* at 47, ¶ 119.

20        21.    The STATCare provider never assessed Mr. Woodford and did not

21  provide individualized treatment. Instead, at 10:47 a.m., on June 25, 2024, he

22  ordered the Jail's standard buprenorphine/naloxone 8/2mg dose to be started the

23  following day at 8:00 a.m., which was more than 21 hours away. *Id.* at 22. A

24  COWS assessment performed just six minutes prior at 10:41 a.m. resulted in a score

25  of 1 based only on Mr. Woodford's pulse, which had it been 1 bpm lower would

26  have resulted in a score of 0. *Id.* at 28-29. This score reflects that Mr. Woodford

27  was not yet experiencing many, if any, symptoms of withdrawal.

28        22.    The Jail did begin COWS assessments for Mr. Woodford, but those

assessments also reflect many of the exact failures that I identified with the Jail's

withdrawal assessment policies, procedures, and practices in my initial report.

Three COWS assessments were completed by three different nurses while

Mr. Woodford was incarcerated.  As noted above, the first assessment was

conducted by an RN at 10:41 a.m. on June 25, 2024, within minutes of

Mr. Woodford's booking and resulted in an overall score of 1.  *Id.* at 28-29.  As

explained above and in my initial report, the standard of care required that the

second assessment be conducted within at most 4-6 hours.  Ramsey Rpt. at 23,

¶¶ 59-60.  The record of the first COWS assessment includes a note to "[r]eassess in

8 hours," which is longer than that standard of care but would have at least ensured

Mr. Woodford was assessed again the same day.  However, Mr. Woodford's second

assessment did not occur until nearly 18 hours later at 4:29 a.m. on June 26, 2024.

This assessment resulted in a score of 10.  Woodford Med. Rcd. at 41-42.  By that

point, Mr. Woodford was experiencing symptoms of withdrawal, including

"[m]ultiple episodes of diarrhea or vomiting," *id.* at 42, which is consistent with

what was described to me by the incarcerated person in Mr. Woodford's housing

unit, *see* Ramsey Rpt. at 34-35, ¶ 86.  That score prompted a STATCare provider to

order "[g]ive morning dose of [S]uboxone now" at 4:37 A.M. and to "[a]lert

S[TAT]C[are] with any increase or worsening of symptoms."  Woodford Med. Rcd.

at 22.  This order by the STATCare provider was appropriate.  However, if the Jail

had followed the standard of care for COWS assessments, Mr. Woodford would

have already been assessed at least two additional times by that point (no later than

4:41 p.m. and 10:41 p.m. on June 25, 2024).  Those assessments may have prompted

the STATCare provider to order his medication to start sooner.

23.    At 5:16 a.m., an RN noted that Mr. Woodford refused the

buprenorphine/naloxone and said he would take it later.  *Id.*  The STATCare

provider responded to this note at 6:04 a.m., but did not direct nursing staff on-site

to take any action to ensure Mr. Woodford received his withdrawal medication,

instead noting the refusal and again writing "[a]lert SC with any changes." At 10:22

a.m., Mr. Woodford took his first dose of buprenorphine/naloxone 8/2mg. *Id.* at 52.

24.     That RN also performed a timely COWS assessment at 10:29 a.m..

Unfortunately, this third assessment likely was not performed properly. *See* Ramsey

Rpt. at 24-27 (discussing inadequate training practices for withdrawal assessments).

The third assessment resulted in an overall score of 5. Murray Med. Rcd. at 45-46.

It notes "[n]o GI symptoms." But as I discussed in my report, incarcerated persons

in the Jail reported that Mr. Woodford was defecating on himself throughout his

incarceration. *See* Ramsey Rpt. 34-35, ¶ 86.

25.     At the same time as the COWS assessment, the RN also took vital signs

that showed Mr. Woodford was experiencing potentially dangerous complications of

withdrawal, including a sharp dip in blood pressure (from 128/78 at 4:29 a.m. to

98/63 at 10:29 a.m.) that indicated Mr. Woodford was becoming hypotensive.

Murray Med. Rcd. at 24. He also had an elevated heart rate and rapid respirations,

which combined with his low blood pressure indicate he likely had hypovolemia due

to excessive vomiting and diarrhea. This should have prompted an alert from the

nurse to the STATCare provider, but there is no record that such an alert was sent.

26.     After the third COWS assessment, the standard of care was to perform

another assessment within 6 hours (by 4:29 p.m.). *Id.* Mr. Woodford never

received another COWS assessment. He was not seen by medical staff again until a

"man down" call at around 5:56 p.m. on June 26, 2024, by which point

Mr. Woodford was found breathing but non-responsive. He died shortly thereafter.

27.     The Jail has not provided a medical examiner's report on

Mr. Woodford's death at the time of writing, so no official cause of death is

available yet. His medical record indicates that Mr. Woodford was experiencing

withdrawal symptoms at the time he died. As noted above, the last vital signs taken

about eight hours before his death indicate that he likely had hypovolemia due to

excessive vomiting and diarrhea, which are symptoms of opioid withdrawal. His

1  pupils also were dilated to 5-6mm in the minutes before he died, which is consistent

2  with opioid withdrawal and inconsistent with opioid intoxication.  *Id.* at 23.  He also

3  reported a lengthy history of opioid use at intake.  It is very likely that

4  Mr. Woodford died from inadequately managed withdrawal while in the care of the

5  Sheriff's Department.

6  ███████████████

7      28.    Mr. ██████'s alcohol use was identified at intake, █████ Med. Rcd. at

8  9-10, and a STATCare provider ordered CIWA-Ar assessments, *id.* at 27, but those

9  assessments were never actually performed.  At ████ p.m. on ██████ 2022, a nurse

10  filled in "Not Assessed" on every line of a CIWA-Ar assessment, *id.* at 350-51, but

11  completed a comprehensive detox screen at the exact same time that noted some of

12  the symptoms that are measured in a CIWA-Ar assessment, including shaking hands

13  and a headache, *id.* at 352-53.  On █████ and ██, 2022, other nurses also filled in

14  "Not Assessed" on every line of the CIWA-Ar assessment, but noted they had seen

15  Mr. ██████ in the "Additional Comments" section, generally claiming he was doing

16  fine.  *Id.* at 358-59, 362-63.  No other CIWA-Ar assessments were attempted.  Three

17  days later, on ██████ 2023, an NP noted "CIWA discontinued, REASON: Patient

18  clinically stable on chart review.  No use of GI comfort meds in the last 24 hours."

19  *Id.* at 34.  The fact that three different nurses on three different days all decided to

20  fill in "Not Assessed" on every line of the CIWA-Ar assessment, and then the

21  assessments were discontinued, indicates that staff had a practice of not performing

22  the CIWA-Ar assessments.  This practice meant that Mr. ██████'s alcohol

23  withdrawal was not monitored adequately, exposing him to a potential risk of harm

24  from complications of withdrawal.

25      29.    Moreover, Mr. ██████ was never offered treatment for alcohol use

26  disorder (medication for alcohol use disorder/MAUD) post-withdrawal, reflecting

27  the Jail's lack of policies and procedures for providing treatment for AUD.

28  / / /

30.    Mr. ███████'s medical record is alarming because it shows multiple medical staff at the Jail neglecting to monitor his withdrawal from opioids and alcohol.  Mr. ███████ was booked on ███████, 2023, at ███ a.m.. ███████ Med. Rcd. at 2.  His opioid and alcohol use the day prior to his booking were identified at intake, *id.* at 8-9, although his methamphetamine use was not identified until the following month during a psychiatric evaluation, *id.* at 116.  A STATCare provider ordered initiation of COWS and CIWA-Ar assessments the day of his intake, *id.* at 192, but assessments were only completed that day.  On ███████, 2023, nurses completed COWS and CIWA-Ar assessments at ███ a.m., *id.* at 240-41, 245-46, and ███ a.m., *id.* at 252-53, 256-57, but no further assessments were completed.  On ███████ 2023 and ███, 2023, nurses did not complete COWS or CIWA-Ar assessments, instead noting on ███████ 2023, that Mr. ███████ "refused to be seen for detox rounds, stated that he was no longer detoxing and was fine, no s[igns]/s[ymptoms] of detox, informed p[a]t[ient] to let staff know if condition changes," *id.* at 258-61, and on ███████, 2023, that he "refused detox assessment and medications.  Refused to come out of cell but replied when called . . . No indications of acute distress," *id.* at 262-65.  No further attempts to assess Mr. ███████ were made, and a physician ordered that the COWS and CIWA-Ar assessments be discontinued on ███████, 2023, *id.* at 193-94.  In the end, Mr. ███████'s risk of withdrawal was monitored adequately for less than 9 hours after he was booked.

31.    Medical staff's failure to conduct assessments of Mr. ███████'s opioid and alcohol withdrawal after the first nine hours of his incarceration demonstrates a practice of alarming disregard for the potential risks of withdrawal.  Two different nurses failed to complete the assessments on ███████ 2023 and ███, 2023 and a physician signed off on ceasing the assessments the following day, meaning three medical staff members all independently decided that the COWS and CIWA-Ar

1  assessments did not need to be completed.  These staff members either did not

2  understand the importance of these assessments, indicating they were trained

3  inadequately, *see* Ramsey Rpt. at ¶¶ 62-69, or they did understand, and they all

4  disregarded the potential risks of harm from failing to monitor an incarcerated

5  person at risk of withdrawal from opioids and alcohol.

6      32.     The Jail also made no attempt to diagnose and treat Mr. ███ for

7  opioid use disorder, alcohol use disorder, or stimulant use disorder.  At no point did

8  any medical professional complete a comprehensive substance use history or

9  attempt to make a diagnosis as to whether Mr. ███ had a substance use disorder.

10  No treatment (MOUD or MAUD) was offered to Mr. ███ for any substance use

11  disorder he may have had.  Ultimately, the Jail ceased efforts to treat Mr. ███'s

12  substance use after just nine hours, at which point he was left to fend for himself,

13  exposing him to a risk of complications from withdrawal, return to use, and

14  potential overdose.

15  ███

16      33.     Ms. ███' primary substance use issue was that she was prescribed

17  Percocet (oxycodone/acetaminophen), a prescription opioid pain medication, prior

18  to her incarceration and then experienced opioid withdrawal and a recurrence of

19  pain when she did not receive that medication in the Jail.  The intake screening from

20  ███, 2023, did not identify any substance use, ███ Med. Rcd. at 9-

21  10, but later that day a STATCare provider learned that Ms. ███ had a recent

22  history of prescribed opioid pain medication use and ordered initiation of COWS

23  assessments, *id.* at 26.  That order noted that the Jail's policy of only initiating

24  buprenorphine/naloxone treatment once a COWS score went higher than 6 was in

25  effect.  *Id.*  Although the standard of care is to complete COWS assessments at least

26  every 6 hours, assessments were attempted just once per day for the next ten days,

27  even if the assessment was not completed successfully, which led to a gap of more

28  than 72 hours between assessments completed on ███, 2023 and ██, 2023.

1   *See id.* at 103-156.  At no point did those assessments reach a score of 6 or higher

2   (the highest score was 3), and Ms. ████ was never ordered

3   buprenorphine/naloxone.  *See id.* at 103-156.  The Jail never attempted to take a

4   substance use history that could have revealed any other substance use that needed

5   treatment, including opioid use disorder.  Ms. ████ also repeatedly complained

6   that the pain management medications the Jail prescribed were not sufficient for the

7   pain she experienced from a prior bilateral hip replacement.  *See id.* at 23-24.

8   Providing buprenorphine/naloxone to Ms. ████ may have been more effective

9   in treating her pain, as well as assisting with her opioid withdrawal and OUD (if she

10  met criteria), but it was never ordered.

11  ████████

12      34.    Mr. ████'s history of alcohol use was identified at intake, ████

13  Med. Rcd. at 19-20, CIWA-Ar assessments were ordered, *id.* at 90-92, but only two

14  CIWA-Ar assessments were ever completed and they were done over 48 hours

15  apart, *id.* at 85-86 ████ 2023, at ████ a.m., one hour after booking), 95-96

16  (████ 2023, at ████ p.m.).  The second CIWA-Ar assessment indicates that an

17  alert was sent to StatCare regarding abnormal vital signs, but there is no indication a

18  StatCare provider ever reviewed the abnormal vital signs.  *Id.* at 96.  On ████,

19  2023, a physician ordered that the CIWA-Ar assessments be discontinued.  *Id.* at

20  192.  This reflects the Jail's inadequate training of medical staff regarding the

21  importance of CIWA-Ar assessments in reducing the risk of complications from

22  withdrawal.

23      35.    Eventually, staff identified that Mr. ████ smoked a pack of

24  cigarettes per day, indicating he likely had tobacco use disorder ("TUD"), *id.* at 131,

25  but no attempt was ever made to diagnose and treat either his alcohol use disorder or

26  his tobacco use disorder, reflective of the Jail's lack of policies and procedures for

27  treating non-opioid substance use disorders.

28  / / /

36.     The Jail's treatment of Ms. ███████'s substance use was inadequate for several reasons.  Her substance use was not identified during intake on June 6, 2023.  █████ Med. Rcd. at 9-10.  Just over two weeks later, on June 22, 2023, a behavioral health assessment indicated that Ms. ██████ had a history of "daily methamphetamine use for the past 25 years," indicating she likely had stimulant use disorder.  *Id.* at 48.  But due to the Jail's lack of policies regarding treatment for stimulant use disorder, there is no indication that she was ever assessed or treated.  On ███████ 2024, three months after intake, Ms. ██████ requested that she be placed in the MAT program.  *Id.* at 35.  That prompted an assessment and diagnosis of OUD ten days later, on ████████ 2024, which was the first time that staff at the Jail completed a full substance use history for Ms. ██████.  *Id.* at 365.

37.     Three days after Ms. ██████'s OUD diagnosis, the Jail provided her with MOUD for the first time, *id.* at 428, but the medical record makes clear that the dose of buprenorphine/naloxone provided to Ms. ██████ was inadequate to treat her OUD.  Ms. ██████ requested an increase in her buprenorphine/naloxone dose multiple times, consistently reporting opioid cravings despite being on buprenorphine/naloxone.  *See id.* at 319, 320, 322-23, 325, 336-37, 34. Ms. ██████'s reports of opioid cravings made sense because she had been prescribed the Jail's standard buprenorphine/naloxone 8/2mg dose, which is quite low for someone with an extensive history of opioid use.  Treating OUD effectively necessitates addressing ongoing opioid cravings with higher doses of buprenorphine/naloxone or methadone, otherwise the patient is at risk of returning to use because of those cravings.  Rather than provide Ms. ██████ with an adequate dose of buprenorphine/naloxone, medical staff told Ms. ██████ that "MAT is to prevent withdrawal and that [her][4] cravings are part of addiction and managing them is a life

---

[4] Ms. ██████ is transgender, the Jail consistently misgenders her in the record.

long process that goes with addiction." *Id.* at 40. That is not effective management of opioid use disorder and does not meet the standard of care for treating opioid use disorder. Buprenorphine/naloxone is meant to do more than just treat opioid withdrawal, it is also meant to minimize or eliminate opioid cravings, which can only be accomplished via a dose that is sufficiently high to address opioid cravings. █████████████

38.    Mr. ████' substance use was not identified at intake on ████ 2023. ████ Med. Rcd. at 66-67. Four weeks after Mr. ████ was incarcerated, he requested MAT and reported an extensive history of five overdoses, including two incidents where he "flat-lined" before being resuscitated. *Id.* at 121, 515. Two weeks after that, he was seen by a licensed clinical social worker ("LCSW"), who took a detailed substance use history noting heavy use of fentanyl every other day that had built up his tolerance over time, resulting in cravings and withdrawal symptoms when he did not use. *Id.* at 123 The social worker determined he "meets criteria for OUD" and scheduled a sick call for a medical provider to diagnose him. The medical provider made that diagnosis one week later and started Mr. ████ on buprenorphine/naloxone at a dose of 8/2 mg daily on ████, 2023. *Id.* at 508. Unsurprisingly considering Mr. ████' extensive history of heavy opioid use, the Jail's standard 8/2mg dose was insufficient, and he had to request an increased dose. *Id.* at 3.

39.    Given his extensive history of opioid use, including several overdoses, Mr. ████ was at a substantial risk of serious harm from return to use and overdose. The standard of care for starting medication after a patient reports opioid use

REBUTTAL EXPERT REPORT OF KELLY S. RAMSEY, M.D.

1  indicative of opioid use disorder is the same day,[5] [6] [7] not two weeks later.  The Jail

2  also failed to provide individualized treatment to Mr. █████ when it started him on a

3  standard buprenorphine/naloxone 8/2 mg dose that was obviously insufficient given

4  his opioid use history.  The notes regarding his MAT treatment are also sparse, with

5  just one note two lines long, which indicates that medical staff were not routinely

6  evaluating Mr. █████ to determine if the treatment was effective.

7  ████████████████

8      40.    Ms. ██████'s substance use was identified at intake, ██████ Med. Rcd.

9  at 9-10, which prompted COWS and CIWA-B assessments, but they only were

10  conducted once daily.  *Id.* at 221.  Ms. ██████ was started on

11  buprenorphine/naloxone initially, which was the correct course of treatment, but her

12  buprenorphine/naloxone was set on a standardized taper (no individualized care).

13  *Id.* at 213.  Instead, Ms. ██████ had to request that her buprenorphine/naloxone be

14  continued and then she was assessed for the MAT program.  *See id.* at 226.  The

15  standard of care is to continue a patient's buprenorphine/naloxone uninterrupted, so

16  the Jail's MAT assessment protocol placed unnecessary barriers to the seamless

17  continuation of Ms. ██████'s treatment.  There also were multiple concerning

18  psychiatric notes in Ms. ██████'s record stating that if she diverts buprenorphine, the

19  psychiatrist would recommend tapering and discontinuation of her

20  buprenorphine/naloxone treatment.  *See id.* at 194.  As explained in my initial report

21  and discussed further in the MOUD section above, this is an inappropriate response

22  to diversion and exposes patients to a substantial risk of serious harm, including

23

24  _____

25  [5] Jakubowski, Andrea MD; Fox, Aaron MD. Defining Low-threshold
   Buprenorphine Treatment. Journal of Addiction Medicine 14(2):p 95-98,
   March/April 2020. | DOI: 10.1097/ADM.0000000000000555

26  [6] The Role of Low-Threshold Treatment for Patients with OUD in Primary Care |
27  The Academy

   [7] SAMHSA Advisory: Low Barrier Models of Care for Substance Use Disorders

1    return to use and overdose.  The record also indicates that Ms. ▮▮▮▮ was not

2    receiving a sufficient dose of buprenorphine/naloxone for four months before her

3    dose was reassessed.  *Id.* at 223.

4    ▮▮▮▮▮▮▮▮

5        41.    The Jail did not identify Mr. ▮▮▮▮' opioid use at intake, ▮▮▮▮ Med.

6    Rcd. at 18-19, despite records from prior incarcerations indicating that he had a

7    history of OUD and use of MOUD.  *Id.* at 233, 235.  Although the Jail ultimately

8    provided MOUD to Mr. ▮▮▮▮, the delay prompted by the failure to identify OUD

9    at intake leads me to disagree with the conclusion in Dr. Penn's report that

10   Mr. ▮▮▮▮ received access to care.

11       42.    Notably, the summary in Dr. Penn's report states that the reviewer was

12   "not assessing MAT," Penn Rpt. at 180, indicating that Dr. Penn's reviewers were

13   not instructed to evaluate MAT while reviewing medical records.  If this is true, then

14   it calls into question why Dr. Penn offered any opinions on the Jail's MAT program,

15   as well as his conclusions regarding the MAT program, which are discussed further

16   in the MOUD section above.

17   ▮▮▮▮▮▮▮▮

18       43.    Opioid use was identified at intake, but Mr. ▮▮▮▮'s stimulant use was

19   not identified at intake.  ▮▮▮▮ Med. Rcd. at 10-11.  That stimulant use was only

20   identified during a later evaluation of Mr. ▮▮▮▮, but he was never offered treatment

21   for stimulant use disorder.  *Id.* at 42.  Overall, substance use was evaluated at

22   Mr. ▮▮▮▮'s intake screening, *id.* at 10-11, his psychiatric evaluation, *id.* at 42, and

23   in a behavioral health assessment, *id.* at 45, but all those evaluations produced

24   different substance use histories.  Those inconsistencies are reflective of the Jail's

25   failure to use a validated screening tool that could provide more consistent and

26   reliable results regarding substance use.

27       44.    While Mr. ▮▮▮▮ ultimately was placed in the MAT program, he asked

28   to be removed from the MAT program so he could be a trustee worker, indicating

1  that the Jail barred people on MAT from being trustee workers. *Id.* at 30. There is

2  no medical reason why someone receiving MOUD would be unable to work on that

3  basis alone. Denying opportunities to someone receiving MOUD indicates that the

4  Jail may be discriminating against persons with substance use disorder.

5  ████████████

6       45.    Mr. ██████'s lengthy medical record spans an incarceration of more

7  than seven years, although the most relevant portion of his medical record does not

8  begin until 2023 when he began requesting MAT. Mr. ████████ informed staff in

9  █████ 2023 that he had been using fentanyl in the Jail, was experiencing opioid

10  withdrawal symptoms, and that he wanted to be placed in the MAT program.

11  ██████    Med. Rcd. at 24. The jail began monitoring Mr. ███████'s opioid

12  withdrawal symptoms, but he was denied MAT because the program was not

13  available at Vista at the time. *Id.* Eventually, it appears Mr. ███████ was started on

14  buprenorphine/naloxone about two months later in ███ 2023. *Id.* at 27-28. That

15  delay did not meet the standard of care and was dangerous because Mr. ████████

16  was using fentanyl at the time, which could have led to an overdose. Because of this

17  months-long delay in providing Mr. ██████ with buprenorphine/naloxone after he

18  reported active fentanyl use, I do not agree with the conclusion in Dr. Penn's report

19  that he had timely access to care.

20       46.    Even if I had not seen Mr. ███████'s medical records, I would not

21  agree with the conclusion that Mr. ████████ had access to care based on the

22  summary in Dr. Penn's report alone. That summary states that Mr. ███████ was

23  prescribed multiple medications at one point that, if he had taken the medications as

24  prescribed, amounted to a "quantity sufficient to cause death." Penn Rpt. at 175.

25  The reviewer concluded that Mr. ██████'s failure to take those medications as

26  prescribed "may have been life-saving." *Id.* Those medications are not related to

27  substance use treatment, and I understand another expert retained by the Plaintiffs

28  will comment on Mr. ███████'s overall treatment. But as a medical professional, I

1  could never conclude that a patient who was prescribed a potentially fatal

2  combination of medications received access to care.  The summary of

3  Mr. █████'s medical care in Dr. Penn's report directly contradicts the conclusion

4  in the report that Mr. ██████ had access to care.  This contradiction makes me

5  highly skeptical of the other conclusions in Dr. Penn's report that patients had

6  access to care.

7  ████████████

8      47.    The intake screening identified Mr. ████'s methamphetamine use, but

9  it missed his opioid use.  ████ Med. Rcd. at 9-10.  The Jail never followed up on

10  Mr. ████'s methamphetamine use to determine if he should be monitored for

11  overamping due to stimulant intoxication or stimulant withdrawal or receive

12  treatment for stimulant use disorder.  As for his opioid use, medical staff eventually

13  identified Mr. █████'s opioid use eight months after intake.  *Id.* at 23.  He was placed

14  in the MAT program and received MOUD for a short period of time, but he began to

15  complain about side effects from buprenorphine/naloxone and his MOUD was

16  discontinued.  *Id.* at 24, 203.

17      48.    The Jail's handling of Mr. ████'s complaints of side effects from

18  buprenorphine/naloxone did not meet the standard of care.  It is to be expected that a

19  patient may experience side effects from buprenorphine/naloxone, particularly

20  constipation, which was Mr. █████'s primary complaint.  But side effects like those

21  Mr. ████ experienced should not lead to discontinuation of MOUD.  Instead, side

22  effects should be addressed at the outset by educating the patient on the potential

23  side effects they may experience.  It is not uncommon for patients on either

24  methadone or buprenorphine to be on a scheduled bowel regimen (not ordered as

25  needed but rather scheduled).  The benefits a patient derives from continued use of

26  MOUD far outweigh the possible risks of its use.

27      49.    The reviewer that drafted the summary in Dr. Murray's report did not

28  apply this standard of care, instead noting that Mr. █████ refused medication without

1  exploring whether the Jail adequately followed up on those refusals.  Murray Rpt. at

2  194-95.  The medical record shows that Mr. ███ refused medication because he

3  was experiencing side effects that were not adequately treated.  Had those side

4  effects been adequately treated, he may not have refused medication and been able

5  to stay on the MOUD that he needed.  I disagree with the conclusion in

6  Dr. Murray's report that Mr. ███'s treatment met the standard of care.

7  ███████████

8     50.    Ms. ███'s medical record was summarized in both Dr. Murray's and

9  Dr. Penn's reports, with each concluding that her treatment met the standard of care.

10 While Ms. ███'s opioid use was identified at intake, ███ Med. Rcd. at 9-10,

11 the Jail waited six weeks to start Ms. ███ on buprenorphine/naloxone.  *Id.* at 25.

12 That delay is too long, and it exposed Ms. ███ to a risk of returning to use given

13 the availability of opioids in the Jail.  The Jail did conduct COWS assessments after

14 identifying Ms. ███'s opioid use, but they were completed only once daily.  *See,*

15 *e.g.*, *id.* at 281, 288, 290, 294, 298.  Ms. ███'s methamphetamine use also was

16 identified at intake, *id.* at 9-10, but there is no evidence the Jail monitored her for

17 overamping due to stimulant intoxication or stimulant withdrawal or offered her

18 treatment for stimulant use disorder.

19 ███████████

20    51.    Mr. ███'s medical record reflects many of the inadequacies in the

21 Jail's MAT program.  Mr. ███ had received buprenorphine/naloxone prior to his

22 incarceration, but his history of opioid use was not identified at his intake on

23 ███ 2023.  *See* ███ Med. Rcd. at 10-11.  The following day, Mr. ███

24 submitted an inmate request noting that he used fentanyl and wanted to be in the

25 MAT program to keep him safe from "overdosing on fentanyl if it enters the jail."

26 *Id.* at 235.  Three weeks after intake, Mr. ███'s partner began calling the Jail

27 asking for Mr. ███ to be placed in the MAT program.  Staff repeatedly informed

28 Mr. ███'s partner that he was "on the MAT interest queue" but "there is not a

1  timeframe to be given on how soon he will be seen." *Id.* at 30.  Mr. ███

2  partner called the Jail at least five times over the course of two weeks from

3  ███ to ███ 2023, and consistently received the same response. *Id.*

4  at 30-31.

5      52.  Mr. ███ finally was evaluated for the MAT program on

6  ███ 2023, more than one month after his initial request, and he was started

7  on buprenorphine/naloxone the following day.  Unfortunately, he was not provided

8  with an adequate dose.  The Jail started Mr. ███ on a dose of just

9  buprenorphine/naloxone 8/2 mg for one month before increasing his dose to

10  buprenorphine/naloxone 16/4 mg on ███ 2023. *Id.* at 31-33.  On ███

11  2024, his dose was increased to buprenorphine/naloxone 20/5 mg.  But Mr. ███

12  repeatedly requested an increase above that dose because he had been on a dose of

13  buprenorphine/naloxone 24/6 mg in the community (12/3 mg in the morning and

14  12/3 mg in the evening) and was still experiencing cravings. *Id.* at 42, 47, 235.

15  Mr. ███ made these requests from at least ███, 2023, through

16  ███ 2024. *Id.*

17      53.  There also was concerning evidence of the Jail's practice of denying

18  medication to those suspected of diversion and stigmatizing persons on MOUD.  On

19  ███ 2024, Mr. ███ filed a grievance because the nurse dispensing

20  medications was threatening to take persons off MOUD if they cheeked medication,

21  despite no evidence that anyone had been cheeking medication.  Rather than

22  addressing the nurse's behavior, the Jail's response to Mr. ███'s grievance was

23  to remind him of the "zero tolerance policy of Naphcare" and request that he

24  "follow our policy and cooperate with [the] medication nurse.  It will be much

25  appreciated." *Id.* at 268.  The behavior of the nurse, and the Jail's response

26  apparently endorsing that behavior, underscore my conclusion in my initial report

27  that the Jail failed to meet the standard of care when it comes to diversion. *See*

28  *generally* Ramsey Rpt. at 86-92, 115-120.

54.    Mr. ███'s treatment failed to meet the standard of care for multiple reasons.  It took the Jail more than one month to start Mr. ███ on buprenorphine/naloxone after he reported prior fentanyl use and prior buprenorphine/naloxone treatment, where the standard of care would have been to start him on the same day as his request.  The Jail also failed to provide adequate individualized treatment for MOUD by taking months to increase Mr. ███'s dose of buprenorphine/naloxone and never providing the dose that he had received in the community, which failed to meet the goal of eliminating Mr. ███'s opioid cravings, thereby exposing him to a risk of return to use and potential overdose. The Jail endorsed stigmatizing behavior by one of its nurses while reinforcing NaphCare's zero tolerance policy for diversion, which does not meet the standard of care.

███

55.    Ms. ███[8] entered the Jail under the influence of substances on ███, 2023, and had numerous medical issues throughout her incarceration, including substance use, which were treated inconsistently.  Some of Ms. ███'s substance use was identified at intake, although the medical record does not include a comprehensive detox screen, which I would expect to see given that use of alcohol/sedatives/opioids was identified at intake.  *See* ███ Med. Rcd. at 1.  The Jail did identify methamphetamine use at intake, but it does not appear any follow-up was done to identify, monitor, and/or treat potential stimulant use disorder.

56.    Four months after entering the Jail, on ███ 2023 and ██, 2023, Ms. ███ reported that "I am a fetty [fentanyl] addict and I need to be placed on the MAT . . . I will do fetty everytime it lands here help me please," and that she had "recently overdose[d] off flently [sic.] by someone else bring[ing it] in[to] SDCJ.  I

---

[8] The medical record indicates that Ms. ███ is transgender and identifies as a woman, but staff at the Jail repeatedly m█████dered her throughout the medical record.

1  [am] having black out withdrawal." *Id.* at 4.  This report of fentanyl use in the Jail

2  immediately should have led to an evaluation for OUD and treatment with MOUD,

3  but instead medical staff informed Ms. ▮▮▮▮ that she was "not qualified" for the

4  "existing MAT program" "at the moment." *Id.* at 1308.  She eventually was

5  assessed for and diagnosed with opioid use disorder more than two months later on

6  ▮▮▮▮▮, 2023.  *Id.* at 718.  It appears she was added to the MAT program and

7  started receiving buprenorphine/naloxone eight days after that diagnosis.  *Id.* at

8  1318.

9       57.    It is difficult to evaluate the effectiveness of Ms. ▮▮▮▮'s treatment

10  once she was in the MAT program and receiving buprenorphine/naloxone because,

11  as the summary in Dr. Penn's report notes, many of the progress notes in the

12  medical records are "cut and paste" notes.  Penn Rpt. at 156.  The medical record

13  does not include any substantive description of her response to

14  buprenorphine/naloxone, although there is no evidence of ongoing opioid use after

15  Ms. ▮▮▮▮ entered the MAT program, so it may have been effective.

16       58.    Ultimately, I disagree with the conclusion in Dr. Penn's report that

17  Ms. ▮▮▮▮ had access to care.  Though she may have received adequate treatment

18  for OUD once she entered the MAT program, the Jail failed to provide access to

19  care in the months prior to Ms. ▮▮▮▮'s enrollment in the MAT program.

20  Ms. ▮▮▮▮ reported having an opioid use disorder and to previously using fentanyl

21  in the Jail but was not assessed for OUD for more than two months after making that

22  report, exposing her to a risk of continued fentanyl use, overdose, and death.  Once

23  she was diagnosed with OUD, it still took the Jail eight days to start her on MOUD,

24  where the standard of care is initiating medication on the same day.  In addition,

25  despite evidence of substantial substance use at intake, the Jail failed to complete a

26  comprehensive detox screen.  And though the Jail identified her as a person who

27  uses methamphetamine, it never assessed, monitored, or treated her for

28  methamphetamine use disorder.

1  ████████████

2      59.    Mr. ██████'s medical record reflects several of the failures in the Jail's

3  treatment for substance use identified in my initial report.  Mr. ██████'s treatment

4  got off to a positive start when his fentanyl use was identified at intake on ██████

5  2023, and COWS assessments were initiated, but his care declined after that.  *See*

6  ██████ Med. Rcd. at 10-11, 304.  Various RNs completed COWS assessments for

7  Mr. ██████ from ██████ 2023 to ██████, 2023.  *See id.* at 301-335.  These

8  assessments were only completed once daily despite each assessment noting

9  "[r]eassess in 8 hours."  The record also reflects the Jail's policy of not starting

10  buprenorphine/naloxone until a patient's COWS score reaches 6, *id.* at 24, which I

11  explained in my initial report is not the standard of care.  Ramsey Rpt. at 45-46.

12  Mr. ██████ never had a COWS assessment that reached a score of 6 or higher, but

13  he did have three assessments that reached a score of 5.  Two of those assessments

14  included categories that the nurse marked "not assessed" – if they had been

15  assessed, it may have increased Mr. ██████'s score to 6 and triggered

16  buprenorphine/naloxone treatment.  ██████ Med. Rcd. at 301-302, 319-320.  In the

17  third COWS assessment with a score of 5, the nurse marked that Mr. ██████'s

18  resting pulse rate was between 101 and 120, which added 2 to the COWS score, but

19  the actual measured pulse on the following page was 125, which should have added

20  4 to the COWS score, raising the overall score to 7 and triggering

21  buprenorphine/naloxone treatment.  *Id.* at 323-24.

22      60.    Even though Mr. ██████ reported extensive fentanyl use at intake, the

23  Jail did not diagnose him with OUD until ██████ 2023.  *Id.* at 376.

24  Unfortunately, once he was started on buprenorphine/naloxone, he was given an

25  inadequate dose of buprenorphine/naloxone 8/2 mg once daily for months.  Jail

26  medical staff repeatedly refused to increase Mr. ██████'s dose despite repeated

27  requests from him for a dose increase because he was still experiencing opioid

28  cravings.  *See id.* at 160, 169, 170, 172, 394, 409.  Opioid cravings are one of the

1  DSM-5-TR criteria for OUD, which is why the standard of care is to provide a

2  sufficient dose of methadone or buprenorphine to eliminate opioid cravings and

3  prevent the risk that the patient returns to use.  But medical staff ignored his

4  requests, instead reminding Mr. ████ that he would face consequences for any

5  diversion of medication, which is the opposite of the standard of care.  *Id.*

6  ████████

7      61.    Mr. ████'s fentanyl, methamphetamine, and PCP use were all

8  identified at intake.  ████████ Med. Rcd. at 19-20.  Consistent with the Jail's

9  lack of policies and procedures regarding substance use treatment outside of opioid

10 use disorder, the medical record does not indicate any follow-up was done to

11 monitor him for or treat his methamphetamine and PCP use.  A comprehensive

12 detox screen was performed, but it only focused on Mr. ████'s opioid use.

13     62.    The Jail provided Mr. ████ with buprenorphine/naloxone six days

14 after intake.  The standard of care for withdrawal management was to start

15 Mr. ████ on buprenorphine/naloxone immediately, but the record reflects that the

16 Jail's policy of only beginning buprenorphine/naloxone after a COWS score of 6

17 prevented initiation of buprenorphine/naloxone for Mr. ████, whose COWS scores

18 were consistently 0 or 1.  *Id.* at 113, 129-145.  Consistent with the Jail's COWS

19 practice, Mr. ████ was only assessed once every 24 hours, despite notations on

20 each COWS assessment to reassess after either 4 or 8 hours.  *Id.*  Once Mr. ████

21 began to receive buprenorphine/naloxone, the record indicates that he responded

22 positively to treatment.

23     63.    Mr. ████'s treatment did not meet the standard of care due to the lack

24 of monitoring and treatment for his methamphetamine and PCP use, the

25 insufficiently frequent COWS assessments, and the delay in starting him on

26 buprenorphine/naloxone.

27 ████████

28     64.    Mr. ████'s substance use was missed at intake and only identified

seven weeks later during a behavioral health assessment.  *See* ████████ Med.
Rcd. at 18-19, 37.  The most notable part of Mr. █████'s medical record from a
substance use treatment perspective was the Jail's handling of an allegation that he
had diverted buprenorphine/naloxone.  On █████████, 2024, a nurse reported that
Mr. █████ had removed powdered buprenorphine/naloxone from his mouth and
placed it in a magazine, which a deputy then inspected and found "a good am[oun]t
of Suboxone wrapped in plastic" in the magazine.  *Id.* at 181.  Fortunately, this
incident did not result in the discontinuation of buprenorphine/naloxone, as
Mr. █████ was instead "counseled regarding Cheeking/Hoarding/Diverting
Suboxone" and his buprenorphine/naloxone was continued "as previously
prescribed."  *Id.* at 182.  However, Mr. █████ was cautioned that
"continued/repeated noncompliance" with medications "may lead to discontinuation
of Suboxone."  *Id.*  Counseling is an appropriate response to diversion rather than
decreasing a patient's dose or discontinuing the medication.
████████████

65.    At intake, Ms. ██████'s methamphetamine use was identified, but her
opioid use was missed and not identified until a psychiatric evaluation two weeks
later. ██████ Med. Rcd. at 54 (█████████, 2023, receiving screening), 745
(█████████, 2023, psychiatric evaluation).  During that psychiatric evaluation,
Ms.██████ "expresse[d] interest in the MAT program."  *Id.*  At that point in time,
the standard of care in the Jail should have been to assess and diagnose Ms. ██████'s
OUD promptly so she could be started on MOUD immediately.  Instead, it took
more than three months before Ms. ██████ eventually was diagnosed with OUD on
█████████, 2023.  *Id.* at 206.

66.    The Jail then started Ms. ██████ on buprenorphine/naloxone but failed
to provide adequate individualized treatment.  Ms. ██████ was started on the Jail's
standard buprenorphine/naloxone 8/2 mg dose on █████████, 2023, but began
complaining of side effects, including constipation, within one month.  *Id.* at 14, 23.

REBUTTAL EXPERT REPORT OF KELLY S. RAMSEY, M.D.

1  Her buprenorphine/naloxone dose then was decreased to just 2/0.5 mg per day on

2  ████████, 2024, which prompted Ms. ████████ to complain that she felt like she was

3  experiencing opioid withdrawal symptoms just eight days later. *Id.* at 23-24.

4  Ms. ████████'s dose was then increased to 4/1 mg per day on ████████, 2024, then

5  6/1.5 mg per day on ████████, 2024, then all the way back to 8/2 mg per day on

6  ████████ 2024. *Id.* at 24. By the following month, Ms. ████████ was complaining

7  of both opioid cravings and constipation, indicating that her dosing was insufficient

8  to treat her OUD and that the Jail failed to adequately treat her side effects. *Id.* at

9  33-34. This roller coaster could have been avoided if the Jail had provided

10 Ms. ████████ with individualized treatment from the outset, including better education

11 about potential side effects when she was started on MOUD, providing medication

12 (a scheduled bowel regimen) early on to address those side effects, and more

13 responsive adjustments to dosing as Ms. ████████ adjusted to

14 buprenorphine/naloxone.

15      67.    Ms. ████████'s treatment did not meet the standard of care due to the

16 months-long delay in starting Ms. ████████ on buprenorphine/naloxone, the

17 inadequate dosing of buprenorphine/naloxone and side effect management once

18 Ms. ████████ began receiving it.

19 ████████████

20      68.    Mr. ████████'s medical record is a clear example of the Jail's practice

21 of failing to provide MOUD to patients that medical providers know, or should

22 know, have symptoms of OUD. Here, Mr. ████████'s methamphetamine use was

23 identified at intake on ████████ 2023, but his opioid use was missed. However,

24 his opioid use was identified on the same day of his intake when Mr. ████████ was

25 referred for an Inmate Safety Program ("ISP") assessment/follow-up for mental

26 health care ("MHC"). ████████ Med. Rcd. at 48-58. During that follow-up,

27 Mr. ████████'s daily amphetamine and opioid use was identified. *Id.* at 56. At this

28 point, Jail medical staff knew that Mr. ████████ used opioids daily and should have

1  started him on opioid withdrawal protocols, with COWS assessments, then promptly

2  diagnosed OUD and provided him with MOUD.  None of that happened.  It appears

3  that, because Mr. ████'s opioid use was identified outside of the regular intake

4  screening process – even though it was identified on the day that he was booked –

5  the Jail's opioid withdrawal protocols were not initiated.  This indicates that the Jail

6  has a practice of medical providers failing to communicate a patient's need for

7  substance use treatment with other medical providers who could provide that

8  treatment.

9      69.    Mr. ████ eventually requested MOUD seven weeks later on

10  ████, 2023.  The following day, a psychiatric evaluation identified that

11  Mr. ████ had daily or every other day opioid use.  *Id.* at 89-90.  But he was not

12  diagnosed promptly with OUD and started on buprenorphine/naloxone, even though

13  a medical provider knew that he had a history consistent with OUD.  Instead,

14  Mr. ████ had to request buprenorphine/naloxone again on ████, 2023,

15  at which point he was told he was in the MAT interest queue.  ████ waited

16  almost two months and again requested buprenorphine/naloxone on ████ 2024,

17  at which point he was assessed and diagnosed with OUD on ████, 2024,

18  which finally led to treatment with buprenorphine/naloxone.

19      70.    The Jail's four-month failure to treat ████'s OUD is a clear-cut

20  violation of the standard of care, but the summary in Dr. Murray's report ignores

21  that delay completely and concludes his treatment met the standard of care.  Murray

22  Rpt. at 202 ("Opioid Use Disorder.  He was enrolled in the MAT program and was

23  compliant.").

24  ████

25      71.    Mr. ████'s substance use was missed at intake on ████, 2023,

26  and he was not monitored with any withdrawal protocols.  ████ Med. Rcd. at 9-

27  10.  About three weeks later, on ████, 2023, Mr. ████ requested to join

28  the MAT program.  *Id.* at 16.  Ultimately, he was diagnosed with OUD and started

1   on buprenorphine/naloxone about one month later on ████████, 2023. *Id.* at 94.

2   From the time he was booked until he was started on OUD more than six weeks

3   later, Mr. ██████ was exposed to a risk of return to use and overdose.

4   ████████████████████████

5       72.    During intake on ██████, 2023, Mr. ████████████'s substance use was

6   initially not identified on the receiving screening, but a comprehensive detox screen

7   was performed anyway. It is unclear from the medical record what prompted this

8   comprehensive detox screen, but it identified opioid withdrawal symptoms and

9   triggered the opioid withdrawal protocol. ████████ Med. Rcd. at 142. Nursing

10  staff then performed COWS assessments over the course of the next 16 days. *See*

11  *id.* at 139-199.

12      73.    There were several issues with the COWS assessments. Consistent

13  with the Jail's general practice, assessments were attempted only once per day,

14  despite notations in the medical record to reassess after four or eight hours. The first

15  COWS assessment was completed on ██████ 2023, at █████ p.m., resulting in a

16  score of 5 and the second COWS was completed roughly twelve hours later on

17  ██████, 2023, at ██████ p.m., with a score of 2. *Id.* at 146. The second assessment

18  noted that Mr. ████████ should be reassessed in eight hours, but no attempt was

19  made to assess him again until ████ p.m. on ██████, 2023, 25 hours later. At that

20  time, no assessment was performed as Mr. ████████ was purportedly

21  unavailable. *Id.* at 148. Because no assessment was performed, the record indicates

22  that Mr. ████████ was supposed to be reassessed in 4 hours, but no attempt was

23  made to reassess until ██████, 2023, at █████ p.m., 22 hours later. That assessment

24  produced a score of 6, which triggered initiation of buprenorphine/naloxone. *Id.* at

25  158. By this point, it had been more than 48 hours since Mr. ████████ was last

26  assessed. He should have been assessed at least 40 hours earlier, and had he been

27  assessed, he may have been started on buprenorphine/naloxone treatment sooner, as

28  his score may have been 6 or higher. Regardless, the Jail's policy of refusing

1  buprenorphine/naloxone treatment until a COWS score of 6 failed to meet the
2  standard of care.  Mr. ███████ should have been started on
3  buprenorphine/naloxone after the first COWS assessment the day he was booked.
4  Instead, buprenorphine/naloxone was not initiated until two-and-a-half days later,
5  which meant Mr. █████████'s opioid withdrawal went essentially untreated during
6  a critical period where the risk of serious harm from opioid withdrawal was
7  heightened.  As a result, Mr. ████████'s substance use treatment did not meet the
8  standard of care.
9  ████████████

10  74.    At intake, Mr. ███████'s history of alcohol use was identified but his
11  opioid use was not identified.  ██████ Med. Rcd. at 9-10.  A comprehensive detox
12  screen was performed for alcohol use only and he was placed on alcohol withdrawal
13  protocols.  *See id.* at 89-106.  Ten weeks later, Mr. ████████ requested MAT and
14  informed staff that he had a history of "years of heroin abuse."  *Id.* at 235.  Four
15  weeks later, on ██████████, 2024, Mr. █████████ had not been assessed for OUD and
16  he submitted a second request to join the MAT program.  Ten days after his second
17  request, a Licensed Marriage and Family Therapist (LMFT) conducted a
18  comprehensive substance use history of Mr. ████████ for the first time since he was
19  incarcerated, diagnosing him with severe OUD, prompting initiation of
20  buprenorphine/naloxone by a medical provider the following day.  *See id.* at 237.
21  Mr. ████████ was started on the Jail's standard buprenorphine/naloxone 8/2 mg dose.
22  He did not receive an individualized assessment as to whether that dose was
23  adequate for nearly two months, when on ████████, 2024, he received a MAT
24  evaluation and reported that he was still experiencing opioid cravings at a level of
25  8/10, at which point, his dose was increased to 12/3 mg.  *Id.* at 79.

26  75.    The Jail's failure to use a validated screening tool does not meet the
27  standard of care, which could have contributed to its failure to identify
28  Mr. ████████'s opioid use at intake.  The Jail also failed to meet the standard of care

1   by waiting more than five weeks to assess Mr. ███ for OUD after he informed

2   the Jail that he had a  long history of heroin use.  Once Mr. ███ was diagnosed

3   with OUD, he was promptly started on buprenorphine/naloxone the next day, but the

4   Jail failed to provide individualized care by waiting nearly two months to assess

5   whether the standard buprenorphine/naloxone 8/2 mg dose was sufficient for

6   Mr. ███.  These delays created a substantial risk that Mr. ███ would return

7   to use with opioids because he was not receiving an adequate dose of

8   buprenorphine/naloxone, so I disagree with the conclusion in Dr. Murray's report

9   that Mr. ███'s treatment met the standard of care.  Murray Rpt. at 217-18.

10 ███

11       76.    During intake on ███ 2021, no substance use was identified.

12 ███ Med. Rcd. at 10-11.  After nearly two years of incarceration in the Jail,

13   Mr. ███ requested buprenorphine/naloxone on ███, 2023, reporting that

14   he was "in the last stage of getting my [suboxone]" during a prior incarceration in

15   state prison.  *Id.* at 25.  Six weeks later, Mr. ███ was assessed for and diagnosed

16   with OUD on ███, 2023.  *Id.* at 26.  He was prescribed the standard dose

17   of buprenorphine/naloxone 8/2 mg per day and instructed "to submit a s[ick ]c[all

18   request] if he reports no improvement in cravings with medication."  *Id.* at 93-94.

19   Mr. ███ went on to request multiple dose increases due to persistent opioid

20   cravings, resulting in an increase to 12/3 mg on ███, 2023, an increase to

21   16/4 mg on ███, 2023, and an increase to 20/5 mg on ███, 2024.

22   *See id.* at 100, 114-15.

23       77.    The progress note written in connection with the ███, 2024,

24   increase to 20/5 mg is notable because it is the first complete substance use history

25   in Mr. ███' medical record and was written by a physician.  *Id.* at 114-15.

26   Thorough, adequate substance use histories such as this are extremely rare in the

27   medical records I have reviewed.  Histories such as this should be taken at the

28   beginning of MOUD treatment to provide adequate, individualized treatment with

1    appropriate dosing based on the patient's medical history.  Unfortunately, this
2    history was not taken until after Mr. ████ had been receiving an insufficient dose
3    of buprenorphine/naloxone for three months.

4    78.    The delay of six weeks between Mr. ████ reporting his history of
5    opioid use, including prior MOUD treatment in prison, did not meet the standard of
6    care.  While Mr. ████ was started on buprenorphine/naloxone promptly after being
7    diagnosed with OUD, it took three months for the Jail to take a comprehensive
8    substance use history and provide Mr. ████ with a sufficient dose of
9    buprenorphine/naloxone.  Throughout those three months, Mr. ████ reported
10   consistent opioid cravings, meaning the buprenorphine/naloxone treatment did not
11   meet the standard of care during that time and exposed Mr. ████ to a risk of return
12   to use due to inadequate dosing.

13   ████

14   79.    Mr. ████'s medical record illustrates the harms that arise from the
15   Jail's failure to provide individualized care for OUD and its punitive response to
16   suspected diversion.  The Jail promptly identified that Mr. ████ had an active
17   community-based prescription for buprenorphine/naloxone, specifically
18   buprenorphine/naloxone 8/2 mg twice daily (BID), and began providing it to
19   Mr. ████ the day after he was booked. ████ Med. Rcd. at 26.

20   80.    The Jail started Mr. ████ on buprenorphine/naloxone 16/4 mg,
21   though dosed once daily rather than split twice daily, the dose that he was prescribed
22   in the community.  *Id.* at 28.  After three days at this dose, Mr. ████ submitted a
23   sick call request complaining that the dose was too strong, and he requested to
24   "taper off slowly" on ████, 2023.  *Id.* at 18.  Unfortunately, the Jail's typical
25   practice of providing buprenorphine/naloxone at either 16/4 mg or 8/2 mg, with no
26   dosing in between, prevented Mr. ████ from being decreased slowly, and his dose
27   was reduced to 8/2 mg.  *Id.* at 28.  More nuanced dosing, reducing his dose to 14/3.5
28   mg or 12/3 mg or 10/2.5 mg, were all feasible options that were not utilized.

Nineteen days later, on ▮▮▮▮ 2023, Mr. ▮▮▮▮ submitted another sick call request complaining that the dramatic reduction in his buprenorphine/naloxone led to symptoms of opioid withdrawal, and he requested a small increase "to 10/2.5 or 12/3 mg." *Id.* at 18. This request was denied, with progress notes on ▮▮▮▮, 2023 and ▮▮▮▮, 2023, noting that he would be maintained on the "standard dose of 8/2 mg daily." *Id.* at 30. Mr. ▮▮▮▮ continued to file sick call requests for the next four months because his 8/2 mg dose was insufficient, ultimately requesting that he be returned to his initial 16/4 mg dose, but instead, the Jail maintained Mr. ▮▮▮▮ at 8/2 mg. *Id.* at 19.

81.    The dosing issue came to a head in ▮▮▮▮ 2023. On ▮▮▮▮ 2023, medical staff finally decided to "increase[] his dose from 8[/2] mg to 16[/4] mg." *Id.* at 37. But two days later, on ▮▮▮▮, 2023, Mr. ▮▮▮▮ was accused by custodial staff of hoarding buprenorphine/naloxone. *Id.* Two days after that, on ▮▮▮▮ 2023, a court ordered the Jail to "address his prescription and medication." *Id.* At this point, the medical record makes clear that decisions about Mr. ▮▮▮▮'s OUD treatment were no longer solely in the hands of medical staff. On ▮▮▮▮, 2024, in response to the court order, a nurse practitioner assessed Mr. ▮▮▮▮'s medical care. *Id.* at 37-38. In response to the hoarding allegation, the NP noted, "if I don't have written documentation to back up hoarding, I will increase his dose back to 16[/4] mg. If there is written proof, then I will talk to IP to explain why his dose was cut in half." *Id.* at 38. This note is concerning because it indicates the NP's medical judgment was that a 16/4 mg dose was appropriate, but that medical judgment would be overridden, and Mr. ▮▮▮▮ would instead be given half the adequate dose if custody staff provided a written report alleging hoarding. Ultimately, custody staff produced a written report alleging that Mr. ▮▮▮▮ was caught with methamphetamine and fentanyl, but notably not buprenorphine/naloxone, so the NP ordered his dose increased back to 16/4 mg. She noted, however, that "[o]nce we are presented with proof of hoarding we will

cut the dose in half." *Id.* at 39.  One week later, however, a physician reversed that decision and cut Mr. ████ 's dose in half on ████, 2023, based on allegations of diversion.  *Id.*

82.    This sequence of events is deeply concerning.  I explained in my initial report that "continued opioid use while on MOUD . . . likely indicates that the person is not being treated with an adequate dose of medication, underscoring their need to stay on MOUD."  Ramsey Rpt. at 92, ¶ 213.  The reason that sufficient dosing of MOUD is so critical is that, when people with OUD do not receive sufficient medication, they are at risk of returning to use and potentially overdosing.  Custody staff's allegation that Mr. ████ was caught with fentanyl is evidence of this risk coming to fruition.  At this point, it should have been clear to Jail medical staff that they had failed to provide Mr. ████ with an adequate dose of buprenorphine/naloxone, and they should have sought to protect Mr. ████ by ensuring he received a sufficient dose to prevent his return to use.  But the Jail's policies, procedures, and practices dictated the opposite outcome, leading to a physician cutting Mr. ████ 's dose in half and exposing him to the substantial risk of serious harm from returning to fentanyl use.

83.    After his dose was decreased, Mr. ████ continued to request that his dose be increased for months.  This request was denied on ████ 2023, on the basis of his "history of cheeking/hoarding his medication."  *Id.* at 45.  Eventually, on ████, 2023, a physician finally "[u]ptitrated patient [S]uboxone to achieve a more therapeutic dose to reduce cravings and prevent fentanyl OD."  *Id.*  This record shows that Jail medical staff knowingly exposed Mr. ████ to a risk of "fentanyl OD" based on alleged diversion for more than three months.  Even once his dose was increased, Mr. ████ remained at risk of having his medication reduced due to an allegation of diversion, as demonstrated by a ████, 2024, note in which a physician describes "educating him" about "the ZERO tolerance policy for diversion."  *Id.* at 88.  I strongly disagree with the conclusion in

1  Dr. Penn's report that Mr. ▮▮▮ had access to care.  Penn Rpt. at 184-85.

2  ▮▮▮▮▮▮

3      84.    Mr. ▮▮▮'s medical record shows that the Jail failed to provide him

4  with an adequate dose of buprenorphine/naloxone for years, and it also reflects how

5  the Jail's punitive approach to allegations of diversion risks interfering with

6  adequate provision of buprenorphine/naloxone.  Mr. ▮▮▮ was transferred from

7  CDCR custody to the Jail on ▮▮▮, 2021.  ▮▮▮ Med. Rcd. at 18.  Mr. ▮▮▮ was

8  prescribed MOUD while in state prison custody, specifically

9  buprenorphine/naloxone at a dose of 16/4 mg per day.  *Id.*  He was incarcerated in

10  the Jail for the next three years (at least until ▮▮▮ 2024, the date the medical

11  records produced to Plaintiffs ends).  During that time, the Jail consistently failed to

12  provide an adequate dose of buprenorphine/naloxone to Mr. ▮▮▮.

13      85.    Mr. ▮▮▮'s medical record reflects numerous problems with the care

14  he received for his OUD.  *See generally id.* at 18-34.  Some of the inadequacies

15  include disruptions in the provision of MOUD when the Jail ran out of

16  buprenorphine/naloxone on ▮▮▮▮ 2021, *id.* at 20; switching Mr. ▮▮▮ to ER

17  buprenorphine [Sublocade] on ▮▮▮▮, 2021, "due to logistical

18  considerations," though that medication was not strong enough to treat his OUD and

19  resulted in swelling of his lower extremities, *id.* at 22-23; providing

20  buprenorphine/naloxone again but denying repeated requests in ▮▮ 2022 to

21  increase his dose, prompting Mr. ▮▮▮ to go on a hunger strike, *id.* at 24-25;

22  denying repeated grievances from Mr. ▮▮▮ to see an outside MAT medical

23  provider due to inadequate care in the ▮▮▮▮ 2022, *id.* at 27; refusing to

24  increase his dose above 16/4 mg in ▮▮▮ 2022 despite "cravings and inability [to]

25  sleep" and instead suggesting he be evaluated for a sleep aid, *id.*; and providing

26  insufficient dosing throughout 2023 and into 2024, *id.* at 29 (request to increase his

27  dose on ▮▮▮ 2023 and ▮▮▮, 2023), *id.* at 32 (request to increase his dose

28  on ▮▮▮, 2023 and ▮, 2023), *id.* at 33 (request to increase his dose on

1   ███████, 2024).

2       86.    The Jail's persistent refusal to provide Mr. █████ with an adequate dose

3   of buprenorphine/naloxone appears to have been influenced by allegations of

4   diversion from the first few months of his incarceration.  On █████ 2021, less than

5   10 days after entering the Jail, custodial staff alleged that Mr. █████ had attempted to

6   give buprenorphine/naloxone to another incarcerated person.  *Id.* at 18.  On

7   ███████, 2021, a nurse reported that Mr. █████ attempted to divert one of his

8   buprenorphine/naloxone strips by dropping it on the floor and covering it with his

9   foot.  *Id.* at 665.  He later begged the nurse not to discontinue his

10  buprenorphine/naloxone as a result.  *Id.*  There is also a vague note from

11  ████████ 2021, indicating "multiple medications found on inmate cell by" two

12  deputies, including "Prilosec" and "Tylenol," but it is unclear if Mr. █████ was not

13  supposed to have those medications.  After those minor incidents, there are no

14  indications in Mr. █████'s medical record of attempted diversion, but the allegations

15  followed him for years.  Following a request to increase his

16  buprenorphine/naloxone, a physician noted that Mr. █████ "has a h[istory] of

17  cheeking so no dose change made at this time."  *Id.* at 662.  Additionally, in a

18  psychiatric progress note from ████████ 2023, Mr. █████ was subjected to an

19  extensive "evaluation for any underlying condition that might result in the diversion

20  of Suboxone," apparently to establish a basis "for tapering and possible

21  discontinuation of Suboxone should Pt divert this medication since there is no

22  underlying psychiatric issue that would cause this behavior."  *Id.* at 609-611.

23      87.    These records demonstrate that the Jail has a practice of deploying

24  punitive measures in response to alleged diversion that risk interfering with the

25  provision of an adequate dose of MOUD.  This prioritization of punishment over

26  care is reflected in the summary of Mr. █████'s medical record in Dr. Penn's report.

27  In that summary, the reviewer erroneously states that the record shows "frequent

28  issues with diversion."  Penn Rpt. at 162-63.  There is no evidence of "frequent

1  issues with diversion," instead there were two, maybe three, minor allegations of

2  diversion in the first few months of Mr. ██████'s incarceration, followed by no

3  evidence of diversion for the remainder of the three years of his medical record.  But

4  the summary goes on to state that Mr. ██████ made "near constant requests for

5  increasing all medications with habituating potential," including

6  buprenorphine/naloxone.  *Id.*  The reviewer's incorrect assertion that Mr. ██████

7  frequently diverted medications clearly informed his opinion as to whether

8  Mr. ██████'s requests to increase his medication were valid.  A thorough review of

9  Mr. ██████'s medical record instead demonstrates that Mr. ██████ requested

10 adjustments to his treatment for OUD because the Jail failed to provide him with an

11 adequate dose of buprenorphine/naloxone.  As a result, I disagree with the

12 conclusion in Dr. Penn's report that Mr. ██████ received access to care.

13 ██████████

14       88.     Mr. ██████ was transferred from CDCR custody to the Jail on

15 ██████, 2023.  He had a prescription for buprenorphine/naloxone 12/3 mg daily

16 while in CDCR custody, which was noted at intake and initially continued. ██████

17 Med. Rcd. at 9-10.  But less than two weeks into his incarceration, a nurse and

18 deputy accused Mr. ██████ of cheeking buprenorphine/naloxone on ██████ 2023.

19 *Id.* at 27.  The Jail's response was harsh, immediately reducing his dose by two-

20 thirds to just 4/1 mg per day starting ██████, 2023.  *Id.*  This punishment violated

21 the standard of care, exposing Mr. ██████ to a risk of return to use due to an

22 inadequate dose of buprenorphine/naloxone in response to one incident shortly after

23 he entered the Jail.  *See* Ramsey Rpt. at 86-92.  This risk lasted for months, as the

24 medical record indicates that Mr. ██████ was still being punished with a "dosage

25 reduced due to cheeking medication" into ██████ 2024. ██████ Med. Rcd. at 1194.

26       89.     I strongly disagree with the summary in Dr. Murray's report, which

27 "commend[s] the jail on their attention to opioid use disorder" in Mr. ██████'s

28 medical record, as well as the conclusion that Mr. ██████'s treatment met the standard

1  of care.  Murray Rpt. at 207-08.

2  ▮▮▮▮▮

3      90.    Mr. ▮▮▮▮'s medical record reflects the Jail's practice of failing to refer

4  incarcerated persons for assessment and treatment of substance use disorder when

5  their substance use is not identified during the standard intake screening but is later

6  identified by Jail staff.  It also reflects the Jail's lack of policies and procedures to

7  treat non-opioid substance use disorders.  Mr. ▮▮▮▮'s substance use was not

8  identified during his intake screening on ▮▮▮▮▮▮▮, 2023.  ▮▮▮▮ Med. Rcd. at 9-

9  10.  His history of methamphetamine use was identified roughly eleven weeks later

10  on ▮▮▮▮▮, 2023, *id.* at 95, during a behavioral health assessment and twelve

11  days after that identifying daily methamphetamine use, *id.* at 104.  Several months

12  later, on ▮▮▮▮ 2024, a psychiatric evaluation noted a more extensive substance

13  use history, including methamphetamine, fentanyl, heroin, PCP, cocaine, and

14  alcohol.  *Id.* at 139.  There is no comprehensive substance use history in the medical

15  record, so it is not possible to determine how recently Mr. ▮▮▮▮ had used these

16  substances or whether he used any of them in the Jail.

17      91.    Mr. ▮▮▮▮'s history of daily methamphetamine use indicated that he

18  likely had stimulant use disorder.  Under the standard of care, "[a]ny person who is

19  identified as likely having [a substance use disorder] should be seen by a medical

20  provider immediately to establish a diagnosis" "using DSM-5-TR criteria."  Ramsey

21  Rpt. at ¶¶ 157-58.  But there is no indication in the medical record that Mr. ▮▮▮▮

22  was referred to a medical provider to be assessed for stimulant use disorder.  (There

23  is also no indication that he was referred to a medical provider to be assessed for a

24  substance use disorder associated with his history of opioid, PCP, cocaine, and

25  alcohol use once that history was identified.)  Mr. ▮▮▮▮ did not receive treatment for

26  substance use disorder as a result.  This exposed Mr. ▮▮▮▮ to a risk of "return to use

27  – either while incarcerated or after being discharged."  *Id.* at ¶ 223.

28  / / /

██████████

92.     Mr. ████'s history of substance use was not identified during his intake screening on ██████████ 2023, *id.* at 9-10, but his history of alcohol and methamphetamine use was noted for the first time roughly two months later on ██████████ 2023, based on his medical records from the Department of State Hospitals ("DSH"), *id.* at 164.  The DSH Psychiatric Discharge Summary that the Jail received indicated that Mr. ████ likely had stimulant use disorder.  *See id.* at 3691-92.  In that summary, a DSH physician who assessed Mr. ████ noted that he "reported he began using methamphetamine between ages 20-21 and used approximately ten times.  However, he also reported using two to three times per day.  Mr. [████] stated he 'went weird' while using methamphetamine and described himself as becoming 'addicted' to it.  He also noted he would do anything to get some.  Based on Mr. [████]'s self-report, it is my opinion he likely has substance use disorder(s) that have caused clinically significant distress and impairment in his functioning." *Id.* at 3691.

93.     It is concerning that this DSH summary was apparently not considered by Jail medical staff until more than two months after Mr. ████ was booked.  It is even more concerning that once this summary was reviewed by Jail medical staff, no action was taken to assess Mr. ████ for substance use disorder and provide treatment.  This violation of the standard of care is consistent with the Jail's practice of failing to assess and treat persons for substance use disorder when substance use is identified for the first time after the intake screening, as well as the Jail's lack of policies and procedures for treating non-opioid substance use disorders.

██████████

94.     Ms. ████'s substance use was not identified during her intake screening on ████████, 2023, ████ Med. Rcd. at 84, but on the same day, she tested positive for methamphetamine and amphetamine on her urine drug screen. ████ Med. Rcd. at 84, 625.  Based on that result, the standard of care was to

1    monitor Ms. ████ for "overamping on stimulants or withdrawing from

2    stimulants," Ramsey Rpt. at ¶¶ 57-58; to assess whether Ms. ████ had stimulant

3    use disorder, *id.* at ¶¶ 157-158; and, if she was diagnosed with stimulant use

4    disorder, to provide treatment, *id.* at ¶ 222.  None of that happened because the Jail

5    does not have policies and procedures in place to monitor for overamping due to

6    stimulant intoxication, stimulant withdrawal, or to treat stimulant use disorder.

7    ████

8        95.    Mr. ████ used multiple substances – including alcohol, opioids, and

9    methamphetamine – and, as a result, his medical record illustrates many of the gaps

10   in the Jail's substance use treatment.  Use of all three of those substances was

11   identified during Mr. ████'s intake screening on ████, 2023. ████ Med.

12   Rcd. at 10.  The standard of care was to monitor Mr. ████ for intoxication and

13   withdrawal from each of those substances, but the Jail only has policies in place for

14   two of them, alcohol and opioids, which meant his potential overamping from

15   methamphetamine intoxication and methamphetamine withdrawal went

16   unmonitored.  Mr. ████ "reported [his] last use of methamphetamine was 'right

17   before I got arrested,'" which meant he was at risk of overamping and stimulant

18   withdrawal, but the Jail did nothing to mitigate that risk.  *Id.* at 30.  Mr. ████ was

19   ultimately diagnosed with methamphetamine use disorder during a psychiatric

20   evaluation on ████ 2023, *id.* at 52, but there is no evidence that the Jail

21   offered treatment for that diagnosis.

22       96.    As for Mr. ████'s alcohol and opioid use, CIWA-Ar and COWS

23   assessments were initiated on the day he was booked, but they were completed less

24   frequently than the standard of care required, including a more than 38-hour gap

25   between the first and second completed assessments.  *See id.* at 147-189.  The

26   COWS assessments were discontinued after three and a half days (████,2023

27   at ████ p.m. to ████, 2023 at ████ a.m.), while the CIWA-Ar assessments

28   were discontinued after five days (████ 2023 at ████ p.m. to ████, 2024

1    at ▇▇ a.m.).  It appears that Mr. ▇▇ never received buprenorphine/naloxone

2    while on the opioid withdrawal protocol, *see id.* at 17, and that he was not offered

3    MOUD at any point during his incarceration.  He also was not offered medication

4    for alcohol use disorder (MAUD) at any point after CIWA-Ar assessments were

5    discontinued.  *Id.* at 18.

6    ▇▇▇▇▇▇

7        97.    Mr. ▇▇▇'s medical record shows several failings in the Jail's

8    withdrawal management and substance use treatment practices and procedures.

9    Mr. ▇▇ entered custody under the influence of multiple substances, but he only

10   was assessed for symptoms of withdrawal for some of those substances, and those

11   assessments were not conducted adequately.  While going through withdrawal,

12   Mr. ▇▇'s buprenorphine/naloxone was inexplicably delayed for days.  And once

13   he was no longer on the withdrawal protocol, Mr. ▇▇ did not receive any further

14   treatment for substance use disorder.

15       98.    Mr. ▇▇ was first brought to the Jail at ▇▇ p.m. on ▇▇ 2023,

16   ▇▇ Med. Rcd. at 55, but he was initially rejected from the Jail following an intake

17   screening and sent to a hospital due to concerns that he had lost consciousness

18   following head trauma, *id.* at 2.  The hospital cleared him, and he returned to the Jail

19   at ▇▇ a.m. on ▇▇ 2023.  *Id.* at 28.  During his second intake screening, he was

20   purportedly non-cooperative and was placed in a sobering cell at ▇▇ a.m..  *Id.* at

21   23.  The record of that sobering cell placement indicates Mr. ▇▇ "admits to being

22   under the influence of . . . Street drugs," but did not specify which substances.  *Id.*

23   Mr. ▇▇ stayed in the sobering cell for about 13 hours until ▇▇ p.m..  *Id.* at 2.

24   Nurses appear to have checked on Mr. ▇▇ roughly every 4 hours while he was in

25   the sobering cell, but they did little more than note he was asleep and still breathing.

26   *See id.* at 8-22.  Staff did not make any attempt to assess or manage his withdrawal

27   until shortly before Mr. ▇▇ was released from the sobering cell, at which point he

28   had been in custody for at least 20 hours and was experiencing symptoms of

1  withdrawal.

2      99.    Shortly before his release from the sobering cell, Mr. ▇▇ reported

3  "recent and/or significant alcohol and opioid use," *id.* at 633-34, and he later stated

4  he was "high on methamphetamine, fentanyl, cannabis, alcohol, and 'a little bit of

5  crack'" when he entered the Jail, *id.* at 639.  A urine drug screen the following day

6  returned positive results for methamphetamine, amphetamine, benzodiazepines,

7  cocaine, THC (cannabis), and fentanyl.  *Id.* at 670.  Consistent with the Jail's lack of

8  policies and procedures for treating stimulant intoxication and withdrawal, Mr. ▇▇

9  was never monitored for overamping or stimulant withdrawal.  Of concern, he also

10  was never monitored for benzodiazepine withdrawal, even though the Jail has a

11  policy of using CIWA-B protocols to assess benzodiazepine withdrawal.  Because

12  benzodiazepine use was identified only in Mr. ▇▇'s urine drug screen, it appears

13  that urine drug screen does not trigger assessments for substance withdrawal.

14      100.   Mr. ▇▇ was monitored for opioid and alcohol withdrawal via COWS

15  and CIWA-Ar assessments for about two weeks, although these assessments were

16  conducted in line with the Jail's practice of attempting only one assessment per day

17  even if the assessment was not completed successfully.  *See id.* at 77-167.  The first

18  assessments were not attempted until 5:14 p.m. on ▇▇ 2023, shortly before

19  Mr. ▇▇ was released from the sobering cell and 20 hours after he was first

20  received at the Jail.  The first CIWA-Ar assessment resulted in a score of 10, *id.* at

21  167, and the first COWS assessment resulted in a score of 12, *id.* at 162, indicating

22  Mr. ▇▇ was experiencing acute alcohol and opioid withdrawal.  Those

23  assessments triggered alerts to STATCare, and, on the same day, a STATCare PA

24  ordered diazepam to treat alcohol withdrawal and initiation of a

25  buprenorphine/naloxone taper.  *Id.* at 632-33.  Mr. ▇▇ was provided diazepam that

26  night, *id.* at 628, but he was not provided buprenorphine/naloxone until six days

27  later, receiving his first dose at 10:59 a.m. on ▇▇ 2023, *id.* at 774-79.  That

28  delay was potentially dangerous, as it meant Mr. ▇▇ went through opioid

1  withdrawal without medication for nearly a week between his last use on ███

2  2023, and his first dose of buprenorphine/naloxone on ████, 2023. Throughout

3  that time, he was at risk of complications from opioid withdrawal, including death.

4  He ultimately received a total of four doses of buprenorphine/naloxone on ██████

5  ███████, 2023. *Id.*

6      101.    After Mr. ████ completed the withdrawal protocol on █████, 2023,

7  there is no evidence that he was ever assessed for opioid use disorder or provided

8  MOUD continuation. Under the standard of care, "[a]ll persons with opioid use

9  and/or OUD should be monitored medically for acute opioid withdrawal syndrome

10  and offered MOUD ***as an ongoing treatment***." Ramsey Rpt. at ¶ 173 (emphasis

11  added). Mr. ████ was given buprenorphine/naloxone for just four days, and no

12  medical provider tried to transition Mr. ████ onto ongoing, longer-term MOUD

13  after that. This exposed Mr. ████ to the risk of return to use and potential overdose

14  while he was in custody.

15  ████████

16      102.    Mr. ███████'s substance use was not identified during his intake

17  screening on █████ 2022, ████████ Med. Rcd. at 16-17, but a behavioral health

18  assessment the following month on ███████, 2022, identified a history of daily

19  opioid and daily methamphetamine use that had been ongoing until his

20  incarceration, *id.* at 33. Once that history was identified, the standard of care

21  required that Mr. ██████ be assessed promptly for opioid use disorder and

22  stimulant use disorder, with medication or treatment started immediately if he was

23  diagnosed with either. But the Jail's practices of failing to assess incarcerated

24  persons for OUD if their substance use is identified after the intake screening and

25  failing to provide treatment for stimulant use disorder at all meant the standard of

26  care was not met. Mr. ██████ was never assessed or provided treatment for

27  stimulant use disorder. It took well over a year for him to be provided with MOUD

28  for his OUD.

103.   On ████████ 2023, more than 15 months after Jail medical staff became aware of Mr. ████████'s history of daily opioid use, he submitted a sick call request to be in the MAT program. *Id.* at 349.  Mr. ████████ was assessed for and diagnosed with opioid use disorder two weeks later, *id.* at 781, and he began receiving buprenorphine/naloxone six days after that on ████████, 2023.  *Id.* at 350.  Unfortunately, Mr. ████████ began experiencing constipation within one month, *id.* at 351, and his MOUD was discontinued after taking it for just two months, *id.* at 359.  Mr. ████████'s side effects could have been managed if the Jail had provided adequate pre-emptive education on those potential side effects when Mr. ████████ started buprenorphine/naloxone and if they had proactively provided medication to treat his constipation with a scheduled bowel regimen.

104.   Mr. ████████ also told medical staff that "he no longer wants to take Suboxone as he wants to be a Trustee" shortly before his buprenorphine/naloxone was discontinued. *Id.* at 158.  This is concerning, as persons on buprenorphine/naloxone can work, and Mr. ████████'s apparent belief that the Jail did not allow persons receiving buprenorphine/naloxone to be trustee workers could reflect a practice of discriminating against persons with substance use disorder and persons on medication for substance use disorder.  If the Jail does not bar persons on MOUD from being trustee workers, then this represents yet another failure to adequately educate Mr. ████████ on his MOUD treatment when it was initiated.

105.   Mr. ████████'s substance use history was not identified during his intake screening on ████████ 2022. ████████ Med. Rcd. at 9-10.  Six weeks later, on ████████ 2022, a behavioral health assessment identified a history of daily alcohol and stimulant use. *Id.* at 35.  There is no indication in his medical record that any effort was made to assess Mr. ████████ for alcohol or stimulant use disorder, nor is there any indication he received treatment for his alcohol or stimulant use.

**Eric Wolf**

106.    The death of Eric Wolf, summarized briefly in Dr. Murray's report, is a tragic example of the risk of overdose created by the Jail's failure to promptly diagnose and treat OUD when it is identified outside of the regular screening process.  Mr. Wolf was booked on July 26, 2023, but his substance use was not identified at intake that day.  Wolf Med. Rcd. at 18-19.  His history of opioid, stimulant, and alcohol use was identified during an ISP assessment on July 28, 2023, based on the Jail staff's review of his medical records. *Id.* at 70.  By that point, Mr. Wolf was still at risk of withdrawal, so he should have been referred for COWS and CIWA-Ar monitoring, and then assessed for any OUD and prescribed MOUD. None of that happened.

107.    Mr. Wolf's substance use was identified many additional times during his incarceration.  *See id.* at 74, 92 (July 29, 2023); *id.* at 202 (October 19, 2023); *id.* 257 (October 23, 2023, self-reporting that he "wore the drugs," using opioids multiple times per week as well as alcohol and stimulant use daily).  Nevertheless, the Jail never assessed him appropriately.  On July 29, 2023, staff again identified Mr. Wolf's history of stimulant, alcohol, and opioid use during both a psychiatric evaluation, *id.* at 74, and in another ISP assessment, *id.* at 92.  A behavioral health assessment on July 31, 2023, identified that same substance use. *Id.* at 95.  But there were no attempts to assess Mr. Wolf for opioid withdrawal or diagnose him with OUD so he could be provided with MOUD.  The medical record shows Jail staff continually noting Mr. Wolf's history of substance use for months, including on October 19, 2023, *id.* at 202, and on October 23, 2023, by which point Mr. Wolf described his substance use during a psychosocial assessment, stating he "wore the drugs," using opioids multiple times per week as well as alcohol and stimulant use daily, *id.* at 257.  Mr. Wolf's description of his own significant substance use history for the first time should have triggered a prompt assessment of whether he met the DSM-5-TR criteria for OUD so he could be provided with MOUD and avoid a

1  return to use and risk of overdose.

2    108.   On January 5, 2024, staff found Mr. Wolf face down and unresponsive

3  on the floor of his cell.  *Id.* at 1272.  Staff deployed naloxone ten times with no

4  effect, and Mr. Wolf was pronounced dead shortly thereafter.  *Id.* at 1272-73.  While

5  an official cause of death is still pending, staff found baggies of fentanyl in

6  Mr. Wolf's cell and an autopsy the following day returned a presumptive positive

7  test for fentanyl.  *See* Wolf 3-Day ICD Review at 21.  This evidence strongly

8  indicates that Mr. Wolf died of a fentanyl overdose.

9    109.   Had the Jail acted on his reports of frequent opioid use, assessed him

10  for OUD, and provided him with MOUD, it is possible that Mr. Wolf would not

11  have overdosed on fentanyl.  As I discussed above, the purpose of MOUD is to

12  prevent the opioid cravings.  Had Mr. Wolf been receiving an adequate dose of

13  MOUD, he may not have had opioid cravings and sought out opioids in the Jail.

14  Without MOUD, Mr. Wolf returned to use and fatally overdosed.

15

16

17

18

19

20

21

22

23

24

25

26

27

28