GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

          Plaintiffs,

      v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

          Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Judge:  Hon. Anthony J. Battaglia

Date:  March 6, 2025
Time:  2:00 p.m.
Crtrm:  4A

[4621596.1]

DECLARATION OF PABLO STEWART, M.D.

I, Pablo Stewart, M.D., declare that if called upon I could and would testify competently to the information contained below, including in my expert reports, which is based on my own personal knowledge:

1.      I am a board-certified Attending Psychiatrist and Clinical Professor at the University of Hawaii, John A. Burns School of Medicine, and have extensive background and experience in the provision of mental health care in detention settings. I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment ("Motion").

2.      Attached as **Exhibit 1** is a true and correct copy of my August 20, 2024 report ("Report"), which accurately represents my opinions in this case. The exhibit does not include the index of documents I reviewed.

3.      Attached as **Exhibit 2** is a true and correct copy of my October 31, 2024 rebuttal report ("Rebuttal"), which accurately represents my opinions with respect to the reports Lenard Vare and Joseph Penn in this case. The exhibit does not include the index of documents I reviewed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Honolulu, Hawaii this 15th day of January, 2025.

_____
Pablo Stewart, M.D.

# EXHIBIT 1

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXPERT REPORT OF PABLO STEWART, M.D.**<br><br>Judge: Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner |

[4541606.8]

Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF PABLO STEWART, M.D.

# TABLE OF CONTENTS

**Page**

EDUCATION AND QUALIFICATIONS.................................................................1

METHODOLOGY ...................................................................................................5

FINDINGS ...............................................................................................................8

I.  FINDING #1: THE SAN DIEGO COUNTY JAIL'S SYSTEM FAILS
    TO ADEQUATELY IDENTIFY AND TRACK INCARCERATED
    PEOPLE WITH SERIOUS MENTAL HEALTH CARE NEEDS..................8

    A.  The Jail's Mental Health Screening System Falls Short with
        Respect to Identifying and Addressing Suicide Risk. ...........................8

    B.  The Jail's Mental Health Screening System Is Deficient and
        Ineffective in Identifying and Ensuring Treatment for *Non-
        Suicide-Related—but Still Very Serious—*Mental Health
        Treatment Needs. ..................................................................................10

    C.  The Jail System Fails to Review and Consider Important
        Information—*Including what Is Maintained by the County
        Itself—*About Newly Arriving Patients. ...............................................13

    D.  It Is a Further and Very Serious Problem that the Jail Lacks an
        Adequate Screening Tool to Assess Incarcerated People for
        Intellectual Disability and to Determine Related Treatment and
        Adaptive Support Needs. ......................................................................14

    E.  There Is Insufficient Confidentiality During the Mental Health
        Screening Process. ................................................................................15

    F.  Patient Examples of Deficient Intake Screening Practices Putting
        People at Substantial Risk of Serious Harm. ........................................16

II. FINDING #2: THE JAIL'S SYSTEM FAILS TO TIMELY AND
    ADEQUATELY PROVIDE ESSENTIAL MEDICATIONS TO
    PEOPLE WITH MENTAL HEALTH TREATMENT NEEDS.....................18

    A.  Psychiatric Prescribing Practices and Supervision in the San
        Diego County Jail System Fall Far Short of the Standard of Care,
        Resulting in Serious Treatment Failures and Putting Patients at
        Substantial Risk of Harm. ....................................................................18

    B.  There Are Serious Systemic Failures to Continue Clinically
        Necessary Medication for People with Mental Health Treatment
        Needs *When They Arrive at the Jail.* ...................................................21

    C.  There Are Serious Systemic Failures in Medication Management
        and Psychiatric Care *During the Period of a Patient's
        Incarceration*..........................................................................................23

    D.  The Jail System Fails to Ensure Adequate Medication Continuity

for Patients *Who Are Being Released from Custody.* ...........................25

E.   Patient Examples of Deficient Psychiatric Practices Putting People at Substantial Risk of Serious Harm. .........................26

III.   FINDING #3: THE SAN DIEGO COUNTY JAIL FAILS TO PROVIDE PEOPLE WITH SERIOUS MENTAL ILLNESS WITH TIMELY ACCESS TO ADEQUATE TREATMENT, CAUSING UNDUE SUFFERING AND PUTTING PEOPLE AT UNNECESSARY AND SUBSTANTIAL RISK OF HARM. ......................34

A.   The Jail's Lack of an Adequate Levels of Mental Health Care System and the Lack of Individualized Treatment Based on Clinical Needs Are Major Deficiencies. ...............................34

B.   The Jail System Fails to Provide Timely or Minimally Adequate Acute, Inpatient Mental Health Care (Psychiatric Services Unit)........39

C.   The Jail System Fails to Provide Minimally Adequate Outpatient Level of Care to Patients, Resulting in Serious and Preventable Decompensation and Other Harms. ......................................48

D.   The Jail System Erects Improper Barriers for Patients to Timely Access Clinically Necessary Mental Health Care and Placement........57

IV.   FINDING #4: THE JAIL'S SYSTEM OF SOLITARY CONFINEMENT PUTS AN EXTRAORDINARILY HIGH NUMBER OF PEOPLE WITH MENTAL HEALTH NEEDS AT UNNECESSARY AND SERIOUS RISK OF HARM. ..................................62

A.   Conditions in San Diego County Jail's Administrative Separation Units Constitute Some of the Harshest, Most Restrictive Forms of Solitary Confinement I Have Ever Witnessed in a Jail System. ......65

1.   Central Jail Administrative Separation.......................................66

2.   George Bailey Administrative Separation.................................68

3.   Las Colinas Administrative Separation ....................................75

B.   People with Serious Mental Illness Are Placed in Administrative Segregation Without Consideration of Mental Health Input, Putting Them at Substantial Risk of Serious Harm. ...........................76

C.   The San Diego County Jail's System, Through Its Deficient Policies and Practices, Places a Disproportionately High Number of People with Serious Mental Illness in Administrative Separation, with Devastating Effects. ....................................83

D.   The San Diego County Jail's System of Administrative Separation and Solitary Confinement-Type Conditions Puts People with Mental Health Needs at a Substantial Risk of Death, Including by Suicide. ..........................................................88

V.   FINDING #5: THE SAN DIEGO COUNTY JAIL'S SYSTEM FOR

SUICIDE PREVENTION IS DEFICIENT, FAILS TO PROTECT PEOPLE WITH SERIOUS MENTAL HEALTH NEEDS, AND CAUSES SERIOUS HARM. ................................................................ 101

A.   The Jail's "Detention Safety Program" Is Inadequate and Dangerously Outside the Norm of Clinically Adequate Jail Systems for Suicide Prevention. ........................................ 102

B.   The San Diego County Jail's Detention Safety Program Placements for Patients in Psychiatric Crisis Are Harsh, Extraordinarily Restrictive, and Often Clinically Counterproductive. ................................................................ 106

    1.   The San Diego County Jail System's Use of "Safety Cells" Is Inhumane and Dangerous. ........................ 106

    2.   The San Diego County Jail System's Use of Enhanced Observation Housing Cells Are Punitive, Clinically Counterproductive, and Dangerous. ........................ 109

    3.   Blanket Custodial Restrictions on Clothing, Bedding, Property, and Privileges for Patients on Suicide Precautions Does Not Meet the Standard of Care and Is Harmful. ........................................................ 113

C.   There Is a Dangerous Lack of Adequate Monitoring and Supervision for People at Heightened Risk of Suicide. ................ 115

    1.   Lack of Constant Observation for High-Risk Suicidal Patients When Clinically Indicated. ........................ 115

    2.   Jail Staff Continue to Conduct Inadequate Safety Checks in Solitary Confinement-Type Conditions, Putting People at Substantial Risk of Serious Harm. ........................ 117

D.   There Remain Grave Concerns about Dangerous "Attachment Points" that Can Be Used for Hanging in High-Risk Housing Areas. ........................................................ 122

E.   The San Diego County Jail's Suicide and Mental Health-Related Death Review and Quality Improvement Processes Are Deficient. ........................................................ 124

VI.   FINDING #6: MENTAL HEALTH CARE STAFFING AND THE SYSTEM'S STAFFING STRUCTURE ARE INSUFFICIENT TO MEET THE MENTAL HEALTH TREATMENT NEEDS OF THE SAN DIEGO COUNTY JAIL'S INCARCERATED POPULATION. ........ 128

A.   There Is Inadequate Staffing to Meet the Mental Health Treatment Needs of the Jail Population. ........................ 128

B.   The Jail System's Mental Health Staffing Structure Is Dysfunctional and Fails to Ensure Adequate Mental Health Treatment Delivery for the Jail Population. ........................ 134

VII.     FINDING #7: THE JAIL FAILS TO PROVIDE NECESSARY
CONFIDENTIALITY FOR MENTAL HEALTH TREATMENT,
UNDERMINING THE DELIVERY OF MENTAL HEALTH CARE........ 142

VIII.    FINDING #8: JAIL CUSTODY STAFF EXERT IMPROPER AND
DANGEROUS CONTROL OVER CLINICAL MENTAL HEALTH
CARE DECISIONS. .................................................................... 146

IX.      FINDING #9: THE JAIL'S SYSTEM IMPROPERLY AND
DANGEROUSLY PUNISHES PEOPLE WITH SERIOUS MENTAL
HEALTH TREATMENT NEEDS OR INTELLECTUAL
DISABILITY............................................................................... 152

X.       FINDING #10: SAN DIEGO COUNTY JAIL OPERATES A
SYSTEM THAT DISCRIMINATES AGAINST PEOPLE WITH
MENTAL HEALTH AND INTELLECTUAL DISABILITIES. ................ 155

XI.      FINDING #11: THE JAIL'S SYSTEM FAILS TO PROVIDE
ADEQUATE MENTAL HEALTH DISCHARGE PLANNING
SERVICES, PUTTING PEOPLE AT RISK OF HARM AND
REPEATED INCARCERATIONS.................................................... 156

XII.     CONCLUSION ........................................................................... 160

I, Pablo Stewart, M.D., declare:

1.     I am a board-certified Attending Psychiatrist and Clinical Professor at the University of Hawaii, John A. Burns School of Medicine.  A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit A**.  My background and experiences relevant to my expert testimony in this proceeding are set forth below.

### EDUCATION AND QUALIFICATIONS

2.     In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland.  In 1982, I received my Doctor of Medicine from the University of California San Francisco (UCSF), School of Medicine.  In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class of the UCSF, School of Medicine.  In 1985-1986, I served as the Chief Resident of the UCSF Department of Psychiatry at San Francisco General Hospital.

3.     Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illness in correctional and other institutional contexts.  In my work, I have specialized in community and correctional treatment programs for individuals with chronic and serious mental illness, as well as substance use and related disorders.

4.     I have extensive experience managing, monitoring, and reforming mental health systems in detention settings.  From 2016 to 2022, I served as the federal court-appointed monitor in *Rasho v. Baldwin* (C.D. Ill.), a class case involving the provision of mental health care to the incarcerated population of the Illinois Department of Corrections.  I have also been the federal court-appointed expert monitor in *Madrid v. Gomez* (N.D. Cal.) and *Gates v. Deukmejian* (E.D. Cal.), two cases that addressed the use of solitary confinement placements and treatment of people with mental health needs in California prison facilities.

5.     Between 1986 and 1990, I was the Senior Attending Psychiatrist for the

Forensic Unit of UCSF, which was located at San Francisco General Hospital. In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco. My duties in that position included advising the San Francisco City Attorney on issues pertaining to forensic psychiatry.

6.      Between July 1998 and February 2004, I served as a psychiatric consultant to the National Council on Crime and Delinquency (NCCD) and subsequently for the Institute on Crime, Justice and Corrections at Washington University (when it took over monitoring responsibilities from NCCD) in their efforts to monitor juvenile detention and treatment facilities operated by the State of Georgia. In that case, I monitored an Agreement between the United States Department of Justice and the State of Georgia designed to improve the quality of care in its juvenile detention facilities. The Agreement encompassed mental health care, medical care, educational services, and treatment programs.

7.      In 2007 and 2008, I prepared expert statements and testified before the court and the three-judge panel in the *Coleman/Plata* overcrowding litigation. My expert report in that case was cited twice in the United States Supreme Court decision upholding the three-judge court's imposition of an order requiring California to reduce overcrowding to address constitutional violations. *Brown v. Plata*, 563 U.S. 493, 519 n.6, 522 (2011). I have served as an expert in several federal court class action cases regarding mental health care in jails and prisons, including *Hernandez, et al. v. County of Monterey* (N.D. Cal.), *Coleman v. Brown* (E.D. Cal.), *Parsons v. Ryan* (D. Ariz.), and *Graves v. Arpaio* (D. Ariz.).

8.      I have designed and taught courses in correctional psychiatry at UCSF. I have also designed and taught courses on the protocols for identifying and treating psychiatric patients and have supervised psychiatric residents in teaching hospitals. I have worked closely with local, state and federal governmental bodies to design and present educational programs about psychiatry, substance use, and preventative

1    medicine.

2        9.    I have presented numerous papers before mental health professionals,

3    prosecuting and criminal defense attorneys, probation officers, and judges, and have

4    published in professional and peer-reviewed journals on topics including prison

5    mental health services, dual diagnosis, mental illness, alcohol and drug use, and the

6    treatment of substance use disorders.  These presentations and publications include:

7    "Alcohol and Other Drugs and the Courts" (2010), "The Mentally-Ill Offender in

8    Reentry Courts" (2010); "Mental Health Aspects of Diminished Capacity and

9    Competency" (2007); "Methamphetamine-Induced Dual Diagnosis Issues" (2006);

10   "Proper Assessment of Drug Court Clients" (2006); "Classification of High Risk

11   and Special Management Prisoners, A National Assessment of Current Practices"

12   (2004); "Cultural Considerations in Working with the Latino Patient" (2002);

13   "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The

14   Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders"

15   (2001); "Managing People of Different Pathologies in Mental Health Courts"

16   (2000); "Model for Health Appraisal for Minors Entering Detention" (2000); "Co-

17   Occurring Disorders: Substance Abuse and Mental Health" (2000); "The Dual-

18   Diagnosed Client" (2000); "Psychiatric Assessment in the Criminal Justice Setting,

19   Learning to Detect Malingering" (1999); "Working With the Substance Abuser in

20   the Criminal Justice System" (1999); "Mental Illness and Drug Abuse" (1999);

21   "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Criminal

22   Justice and Substance Abuse" (1999); "Impulse Control Disorders" (1999); "Major

23   Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder"

24   (1999); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment

25   Planning for the Dually Diagnosed" (1998); "Assessment and Treatment of the High

26   Risk Offender" (1999); "Assessment of Substance Abuse" (1995); "Attention

27   Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues"

28   (1994); and "Psychiatry, Homelessness, and Serious Mental Illness" (1994).

10.     I have been asked to provide my opinion in this case regarding the policies and practices of San Diego County, the San Diego County Sheriff's Department, and their contractors and agents as they relate to the provision of mental health care and practices impacting incarcerated people with mental health needs in the San Diego County Jail system (the "Jail").

11.     I previously submitted expert declarations in this case on specific matters related to the delivery of mental health care and Jail policies and conditions impacting people with mental health and other conditions. Dkt. 119-7, Dkt. 162-4. For those declarations, I reviewed numerous investigation and other reports, Jail policies and procedures, and several people's written testimony, among other things. My findings and opinions in those declarations are incorporated by reference into this declaration and, where appropriate, expanded upon based on the additional information I have gathered since.

12.     In the last four years, I have provided expert testimony at trial or by deposition in the following cases:

- *Parsons, et al v. Shin* (District Court, Phoenix, AZ, November 3, 2021)
- *Ashoor Rasho et al. v. Director John Baldwin* (District Court, Peoria, Illinois, February 1, 2022)
- *Joseph O'Malley v. Hawaii Department of Safety* (Superior Court, Honolulu, HI, February 3, 2022)
- *Barrientos v. Core Civic* (Deposition) (April 14, 2022)
- *State of Missouri v. Marvin Rice* (11DE-CR00590-2) (Superior Court, Clark County, MO, March 31, 2022)
- *United States v. Jason Solatario Brown* (District Court, Guam, January 6, 2023)
- *Daniels v. Jeffreys* (Deposition) (March 1, 2023)
- *Washington v. Essex, Banyas* (Deposition) (November 9, 2023)
- *State of Idaho v. John Cody Hart* (McCall, Idaho, December 4, 2023)

13.     I am charging $400 per hour for my time working on this matter. For deposition or in-court testimony, I have a four-hour minimum with rate of $600 per

hour and a full-day rate of $4,000.

## METHODOLOGY

14.    I visited San Diego Jail facilities on February 6, 7 and 8, 2024.  During the visit, I toured the San Diego Central Jail Facility (Central Jail), the George Bailey Facility (George Bailey) and the Los Colinas Detention Facility (Las Colinas) (collectively, the "Facilities," "Jail Facilities") along with other experts and Plaintiffs' attorneys.  At these Facilities, I visited several housing units, intake areas, health care clinic areas, health care staff work spaces, pharmacy areas, and other locations inside these Jail Facilities.  During the three days, I was able to communicate with scores of patients and spoke with County staff.  Health care contractor staff (e.g., NaphCare) consistently refused to speak with me.  I also reviewed several hundred photographs taken during the tour.  (The photographs are date-stamped as February 2023, but they were taken during my site visit in February 2024.)

15.    Over my career, I estimate that I have conducted well over two hundred inspections of detention facilities, including as a party's designated expert and a court-appointed expert monitor.  My tour activities at San Diego County Jail (hereinafter the "Jail") are generally consistent with the methodology I have used in touring other detention facilities.

16.    After the tour, I reviewed dozens of patient health care charts chosen by San Diego County as being representative of the following categories:

    a.    People who submitted 3 or more sick call requests for mental health care;

    b.    People who requested confidential mental health encounters;

    c.    People who were placed in a safety cell for 24 hours or longer;

    d.    People who were placed in an EOH cell for 48 hours or longer;

    e.    People who were assessed as suicidal at the time they were booked into the jail;

1          f.      People who have been admitted for hospitalization outside of the

2  jail following a suicide attempt/incident of serious self-harm at the jail;

3          g.      People who were housed in the PSU at Central Jail for 48 hours

4  or longer;

5          h.      People who were housed in the PSU at Las Colinas Jail for 48

6  hours or longer;

7          i.      People who were housed in administrative segregation cells for

8  48 hours or longer on the fifth or sixth floors at Central Jail who have also spent

9  time in PSU;

10         j.      People who were housed in administrative segregation cells for

11  48 hours or longer on the fifth or sixth floors at Central Jail who have also spent

12  time in OPSD; and

13         k.      People with the following illnesses: 1) schizophrenia, 2) bipolar

14  disorder, 3) anxiety, and 4) depression.

15     17.    I also reviewed patient records from several incarcerated patients with

16  whom I interacted during my tour of the Jail Facilities.

17     18.    There were significant problems with the health care records I received

18  that made the process of reviewing them more tedious, difficult, and time-

19  consuming.  For example, in some patient records, certain letters were oddly

20  missing.  While I was generally able to discern what was being stated in the records,

21  this made it more difficult and time-consuming for me to complete my review.

22  Likewise, in several records, the file had been formatted in such a way that I could

23  not conduct text searches.  Again, I was generally able to complete my reviews and

24  find specific key records, but the review process was more difficult and time-

25  consuming than my usual expert review processes, where records are text-

26  searchable.

27     19.    In this case, given the enormity of the records, data, and materials to be

28  reviewed, I utilized the assistance of a psychiatrist colleague, who also has

1   experience in jail mental health care, to review records and case materials in this

2   matter.  The reviews conducted by this colleague were all done under my

3   supervision.  I frequently utilize this sort of assistance in conducting large detention

4   mental health care system assessments, as it is helpful to make my review process

5   more efficient and effective.  My analysis is ultimately done independently and all

6   findings contained in this report are my own.

7        20.    The materials I reviewed in preparing my opinions and findings are

8   listed in **Exhibit B**.

9        21.    In forming my opinions and findings, I look to the general (or

10  community) standard of care in the treatment of people with serious mental illness.

11  I also look to the National Commission on Correctional Health Care (NCCHC)

12  standards, which offer useful guidance for a jail health care system seeking to

13  provide appropriate care to patients in custody.  But a jail system's compliance with

14  NCCHC standards, including to warrant NCCHC accreditation, does not

15  automatically demonstrate a system that provides minimally adequate mental health

16  care nor compliance with constitutional requirements.  An expert evaluating

17  conditions, treatment, policies, procedures, and other essential aspects of a detention

18  facility would be remiss if they relied exclusively on NCCHC standards.

19       22.    It is notable, however, that, despite what I understand to be years of

20  discussion by San Diego County Jail leadership about earning NCCHC

21  accreditation, the San Diego County Jail has *not* secured such accreditation.  As

22  discussed in this report, multiple NCCHC recommendations—*dating back to

23  2017*—regarding how to fix deficiencies in the Jail's mental health care system have

24  still not been implemented.  This fact, to be sure, raises concern as to the adequacy

25  of this Jail's mental health care system.

26       23.    My opinions are informed by extensive data, information, and

27  observation, and have a reasonable degree of medical certainty based on the

28  evidence outlined above.  I reserve the right to modify my opinions in the light of

1  new additional information that is provided to me in the future.

2  **FINDINGS**

3  **I.    FINDING #1: THE SAN DIEGO COUNTY JAIL'S SYSTEM FAILS TO
4  ADEQUATELY IDENTIFY AND TRACK INCARCERATED PEOPLE
WITH SERIOUS MENTAL HEALTH CARE NEEDS.**

5  24.    Based on my tour and review of policies, records, and other relevant

6  materials, it is clear that the Jail's current system fails to adequately identify and

7  track incarcerated people with serious mental health care needs.  This systemic

8  deficiency puts incarcerated people at substantial risk of serious harm.

9  25.    I toured the intake health care screening areas and procedures at Central

10  Jail and Las Colinas.  Several aspects raised great concern for me.  I observed a

11  screening process that was not designed to effectively triage and ensure timely,

12  adequate treatment for people with mental health needs.  There are also deficiencies

13  in the system that prevent adequate identification of mental health needs throughout

14  the period of incarcerated people's detention.

15  **A.    The Jail's Mental Health Screening System Falls Short with
Respect to Identifying and Addressing Suicide Risk.**

16

17  26.    There are several deficient aspects of the Jail system's process for

18  identifying and addressing suicide risk.  During our site visit, intake nursing staff

19  shared that she did not know of a standardized suicide risk assessment tool she was

20  supposed to use.  Intake nursing staff noted a few self-populating questions on the

21  screen about suicide risk and suicide history, but they could not explain how the tool

22  is used to trigger a mental health referral.  Nor is there adequate guidance provided

23  to staff on how to use the risk assessment tool (including, when to make a referral)

24  in the San Diego County Sheriff's Department Medical Services Division policies,

25  including *Mental Health Screen and Evaluation* (MSD.E.5.1, SD_117427) and

26  *Suicide Prevention & Patient Safety Program* (MSD.S.10, SD_117715).

27  27.    In 2018, nationally recognized suicide prevention expert Lindsay Hayes

28  in fact "strongly recommended" that the County reconsider its use of the Columbia-

1  Suicide Severity Rating Scale (C-SSRS) during its intake screening process, noting

2  that its "effectiveness remains questionable."  The Jail rejected this recommendation

3  and continues to use the C-SSRS for its mental health intake screening.  San Diego

4  County Response to Lindsay Hayes' Report at 3, DUNSMORE 0117148.  A few

5  additional screening questions have been added, but the result is not an effective

6  screening tool.  What the Jail system needs is a validated suicide risk assessment

7  tool that is appropriately tailored to ensure accurate identification of suicide risk and

8  to facilitate an appropriate response.

9       28.    Based on my tour and review of records and other relevant materials,

10  and even beyond the problematic suicide risk assessment tool, the Jail's mental

11  health screening process fails to ensure timely and adequate treatment for people at

12  risk of suicide.  This failure manifests itself in several ways.  Most significantly, by

13  policy and in the practices I can discern, the identification of a person's elevated

14  suicide risk does *not* lead to any treatment planning or meaningful treatment

15  services.  Remarkably, Medical Services Division policy S.10, *Suicide Prevention &*

16  *Patient Safety Program*, which flows in large part from the mental health screening

17  procedures, makes no mention of any treatment planning and only the most glancing

18  of references to mental health treatment at all.  SD_117715.  (This issue is discussed

19  further in Finding #5, below (Suicide Prevention Failures).)

20       29.    Also of great consequence, by policy and in practice, the mental health

21  screening process is deeply ineffective in ensuring that a patient with serious mental

22  health needs—including someone who may be at heightened risk of suicide— has

23  timely access to psychiatric services (including medication) that are clinically

24  necessary for their well-being.  (This issue is discussed further in Finding #2, below

25  (Psychiatric Care Failures).)

26       30.    At the present time, the Jail system's mental health screening

27  procedures fail to adequately identify and treat patients at risk of suicide, putting

28  patients at substantial risk of serious harm.

**B.**  **The Jail's Mental Health Screening System Is Deficient and Ineffective in Identifying and Ensuring Treatment for *Non*-Suicide-Related—but Still Very Serious—Mental Health Treatment Needs.**

31.     The San Diego County Jail system appears to place extreme focus on people who may be at risk of suicide.  This is in some respects understandable, given that San Diego County Jail has been found to have an exceedingly high rate and number of suicides as compared to other county jail systems, with a suicide rate of more than 1.5 times the national average from 2011 to 2020 (with nearly 40 suicides during that time period), and several more suicides since 2021.  Many outside groups have raised grave concerns about suicides in San Diego County Jail. *See* California State Auditor, *San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody*, Feb. 3, 2022 ("2022 California State Auditor Report"),  DUNSMORE0117710; Lindsay Hayes's *Report on Suicide Prevention Practices Within The San Diego County Jail System*, June 22, 2018 ("2018 Hayes Suicide Prevention Report" or "Hayes Report"), DUNSMORE0117148; Disability Rights, California's *Suicides in San Diego County Jail: A System Failing People with Mental Illness,* April 2018 ("2018 DRC Report" or "DRC Report"), DUNSMORE0124942.

32.     At the same time, based on my review, I have very serious concern about the Jail's system of identifying and providing timely assessment and treatment to patients with serious psychiatric problems but who are *not* a suicide risk.

33.     During my site visit, I asked Jail leadership and intake screening staff about this non-suicidal patient population.  I was informed that the intake mental health screening focuses on suicidality.  If the intake nurse determines that a person is at risk for suicide, they will refer that person to a "gatekeeper."  The "gatekeeper" is a mental health professional (except when it is a nurse because there is not a mental health clinician available) who is supposed to then conduct an initial suicide risk assessment, but *not* a comprehensive mental health assessment.  As confirmed with "gatekeeper" staff with whom I spoke, that initial suicide risk assessment, by

policy and in practice, serves to ensure only evaluation of a patient for placement on suicide precautions (*i.e.*, placement in a safety cell, Enhanced Observation Housing, or the Psychiatric Services Unit's observation cells), *not* for clinically necessary mental health treatment. The "gatekeeper" is, by policy, serving a limited function as crisis intervention specialist for suicidal behavior only. I am not aware of this sort of extremely limited "gatekeeper" role in any other detention system, and based on my review of this system, I find that its design leads to failures in mental health care delivery.

34.    Under Medical Services Division policy E.5.1, patients "who yield positive mental health screenings" at intake "will be required to have a follow up with a [Qualified Mental health Professional] within 30 days when clinically indicated." SD_059881. This policy fails to comply with one of the most basic NCCHC standards—that is, that patients receive a comprehensive mental health intake within 14 days of booking. This deficiency was identified in 2017, but remains unremedied today. NCCHC Report at 20, 53, 87, 121, DUNSMORE0260618. By policy, when intake nursing staff determine at intake that an incarcerated person should be referred for further mental health evaluation, follow-up is only required within *30 days*. It is further a major problem that there is no directive for a much more expedited timeline for clinically urgent cases.

35.    The consequences of the Jail's delays in *comprehensive* mental health screening can be deadly. The 2022 California State Auditor Report identified eight (8) recent in-custody deaths where the individual "had serious medical or mental health needs that health staff did not identify or communicate to detention staff at intake." 2022 California State Auditor Report at 20, DUNSMORE0117710. In one case, an intake nurse referred an arriving incarcerated person for mental health services, and the person made an urgent request for mental health services the next day. That request was denied because a referral was in process. Two days later, the person died by suicide, having never seen a mental health professional. *Id.* at 23.

36.     In my review of records, I observed case after case in which patients with serious and urgent mental health treatment needs did not receive a comprehensive mental health evaluation—and just as serious, did not receive an appropriate psychiatric assessment—for extended periods of time (*i.e.*, several weeks and even months).  This failure to timely address *urgent* non-suicide-related mental health needs when identified puts this Jail system at odds with other detention systems that provide more appropriate mental health care, and puts people in San Diego County Jails at substantial risk of serious harm.

37.     **Overall, I am very concerned about the insufficient and untimely involvement of mental health professionals in the mental health screening process.**  In 2022, the California State Auditor recommended that the Jail "revise its intake screening policy to require mental health professionals to perform its mental health evaluations.  These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody." *Id.* at 54.  This recommendation has gone unheeded.  In 2023, San Diego County published a *Progress Report: Update on State Audit*, in which it acknowledged that this recommendation had not been implemented.  The County noted that it was "moving toward providing 24-hour mental health care in the facilities, including the availability of mental health professionals during the intake process at the receiving facilities."  Progress Report at 5, SD_184479.  But initial mental health screening is still done by non-mental health staff, with referrals to prompt secondary assessment generally done only where the intake nurse identifies a possible suicide risk.  This is an inadequate mental health screening procedure.  It nearly assures that there will be delays in identification and treatment of serious mental health needs, and—based on my review—is causing serious ongoing harm through denials of clinically adequate and timely care.

38.     The Jail's mental health coordinator acknowledged that the Jail does not track or look at how many people actually receive the comprehensive mental

1    health evaluation or on what timeline.  Quiroz PMK Dep. at 46-47.

2        39.    It consistently takes far too long for patients with serious psychiatric

3    medication needs to see a psychiatric prescriber, which is absolutely essential to

4    ensure that appropriate medication is continued or initiated, and that any medication

5    regimen that is implemented meets the patient's clinical situation. Significant

6    improvement is needed to ensure that people with mental health needs (including

7    those who are not current suicide risks) receive timely evaluation and treatment.

8        40.    County leadership appears to share my concern about untimely

9    assessments for newly incarcerated patients.  In May 2024, the Jail's mental health

10   coordinator, Ms. Quiroz, testified about how the County itself identified concerns

11   about the timeliness of psychiatry contacts for patients arriving at the Jail:

> Q: [I]s your team concerned about timeliness of initial psychiatry
> contacts with patients?
>
> …
>
> A: We want them seen as soon as possible, and there's times we may
> feel that it's not soon enough.

16   Quiroz PMK Dep. at 111.

17   **C.    The Jail System Fails to Review and Consider Important
Information—*Including what Is Maintained by the County Itself*—
About Newly Arriving Patients.**

19       41.    The 2022 California State Auditor Report recommended that the

20   County "create a policy requiring health staff to review and consider each

21   individual's medical and mental health history from the county health system during

22   the intake screening process."  DUNSMORE0117710.  This recommendation has

23   gone unimplemented.

24       42.    In 2023, the County responded, "Unlike many other counties, San

25   Diego does not have a coordinated county health system or shared electronic health

26   care records system.  As a result, we cannot meet this recommendation as written."

27   Progress Report at 5, SD_184479.  The Progress Report notes that in April 2021,

28   nearly one year *prior to* the 2022 California State Auditor Report, certain Jail mental

1  health staff were granted "read-only" access to County health system records for Jail

2  patients. *Id.*

3      43.    Ms. Quiroz, the County's Person-Most-Knowledgeable on Jail Mental

4  Health Care issues, confirmed that there remains no policy or written expectation

5  that intake nurses review and consider patients' medical and mental health history

6  from the county health system during the intake screening process, and that it

7  appears that intake nurses continue to rely on self-reporting of mental health history.

8  Quiroz PMK Dep. at 98-99. (The lieutenant with us during my February 2024 site

9  visit stated that he thinks the County is "looking into" this issue, but no changes

10  were anticipated at that time.)

11      44.    Based on my professional experience, this response and the current

12  policy are inadequate.  The State Auditor's recommendation should be fully

13  implemented.  Specifically, to ensure adequate screening and continuity of mental

14  health care, all health care staff conducting intake screening at the Jail must have

15  access to an arriving patient's medical and mental health history that is available in

16  the County health system records, and must be required to review and consider that

17  information during the intake screening process.  Where the County may have

18  relevant treatment information about a patient (as in the County's behavioral health

19  system), it is not sufficient to rely on a patient's self-reporting, or to rely on

20  subsequent mental health staff interactions with a patient that may not timely occur.

**D.    It Is a Further and Very Serious Problem that the Jail Lacks an Adequate Screening Tool to Assess Incarcerated People for Intellectual Disability and to Determine Related Treatment and Adaptive Support Needs.**

24      45.    The San Diego County Jail does not have an adequate system for

25  identifying people with an intellectual disability and related needs.

26      46.    The intake screening has a single question on the topic, asking: "Are

27  you a client of the regional center for the developmentally disabled, or have you

28  been in special educational classes in school?"  Quiroz Dep. Exhibit 2, Exhibit B at

12. (The inquiry itself—which is a compound question—is ironically exactly the sort of question that is inadvisable and ineffective for a person with an intellectual disability.) This screening is insufficient to identify people with intellectual disabilities and their individual treatment or adaptive support needs.

47. I am aware of other California systems, including Orange County Jail, Sacramento County Jail, and California's state prisons, that have a far more thoughtful—and effective—screening procedure for intellectual disabilities. This deficiency has existed in the San Diego County Jail for years, as the 2017 NCCHC Report found the Jail non-compliant with the NCCHC standard to have an adequate screening for intellectual disability. NCCHC Report at 35, 136, DUNSMORE002016. The 2023 death of Roselee Bartolacci, discussed later in this report, speaks directly to how failures in identifying and addressing intellectual disability needs leads to horrific, and preventable, results.

**E.    There Is Insufficient Confidentiality During the Mental Health Screening Process.**

48. In my observation of the intake process, I was concerned to see the lack confidentiality provided for the initial screening. At Central Jail, the health care intake booth requires the patient to sit on one side of a window, several feet from the intake nurse. Several law enforcement staff from the community and the Jail stand approximately five (5) feet behind the patient. While having law enforcement available to *visually* observe an individual during intake health screening makes sense for security, the Central Jail's health care intake screening arrangement fails to provide adequate *auditory* privacy, as law enforcement can hear the patient discuss sensitive health care information with the nurse. This set-up undermines the sharing of important mental health information. It is inconsistent with other detention settings that I am aware of, which provide adequate auditory privacy during the intake process while ensuring appropriate safety and security. Based on my records review, interviews with staff and patients, and the testimony of Jail mental health

1  staff, clinical encounters, including mental health screening, are very frequently

2  conducted without adequate confidentiality such that the validity of the screening is

3  undermined.

4      49.    This deficiency was identified years ago, in the 2017 NCCHC

5  Technical Assistance Report for the San Diego County Jail at 8-9, 43, 109, which

6  found the Jail out of compliance with NCCHC patient confidentiality requirements:

> J-A-09 Privacy of Care (I).  **Clinical encounters and discussion of
> patient information do not always occur in auditory and/or visual
> privacy.  By custody policy, the officers feel they need to be within
> arm's length of a patient in the clinic.  This compromises privacy
> and may prevent a provider or nurse from obtaining an inmate's
> full description of his or her problem to make a diagnosis.**
>
> Recommendations:  **The areas of privacy and confidentiality of care
> need to be addressed.**  [NCCHC Compliance Indicators] require that
> procedures be put in place to assure confidentiality when health care is
> being delivered and discussed.  These are not met.

13  DUNSMORE0260618. The failure to provide adequate confidentiality for intake

14  mental health screening continues today.

15    **F.    Patient Examples of Deficient Intake Screening Practices Putting
            People at Substantial Risk of Serious Harm.**

17      50.    Deficiencies in the mental health intake screening system matter

18  greatly, and many patients at the San Diego County Jail have been put at substantial

19  risk of serious harm as a result.  The recent in-custody suicide death of Pedro

20  Ornelas, who I review in more detail in Section II.E, below, is an egregious

21  example. Following his arrival at the Jail, he repeatedly requested to see a

22  psychiatrist to "get back on my medications"—requests that were *never* addressed

23  through initial screening or subsequent processes.  I offer additional examples here:

24      51.    ███████████    This patient has a psychiatric history of Bipolar

25  Disorder, Anxiety, Adjustment Disorder, and PTSD.  He was initially booked at the

26  Jail in ████ 2023.  He was seen for a nonconfidential mental health assessment

27  *approximately 23 days later*.  Despite his extensive mental health treatment and

28  psychiatric history, he was *never* seen by a psychiatric practitioner during this

1  detention.  He was rebooked at the Jail in ███████ 2024.  Seventeen days later,

2  he submitted a request for psychiatric help, stating "I'[m] having bad anxiety not

3  having no motivation for nothing not even for taking showers."  He finally received

4  a mental health wellness check *21 days after his arrival*, with current symptoms of

5  "depression/anxiety."  Remarkably, he was again not referred to for psychiatric

6  appointment, and there is no indication that even the delayed mental health

7  encounter led to provision of clinically indicated care.  The screening and treatment

8  in this case was delayed and entirely inadequate, and the patient's mental health and

9  well-being were harmed as a result.

10       52.  ████████████    This patient was booked at the Jail in █████ 2023,

11  having a history of mental illness and current treatment needs.  Based on my review,

12  he needed an immediate referral for a comprehensive mental health assessment and

13  psychiatric evaluation.  He instead received a "BH-MH Acuity Level" as

14  "Moderate" several days later.  He was not seen by a psychiatric prescriber for

15  another two weeks after that, and his condition got worse as a result.  Allowing

16  someone to deteriorate makes treating that patient more difficult to treat.  When the

17  prescriber finally saw the patient, he started him on a substantial dose of

18  antipsychotic medication.  The standard of care requires that when such a

19  medication regimen is implemented, the patient should receive a follow-up

20  psychiatric assessment within one (1) week.  In this case, the patient was not seen

21  for five (5) weeks.  (Demonstrating the lack of an adequate system of care, he was

22  then seen by two different psychiatric nurse practitioners on back-to-back days.  It is

23  clear from the record that the second nurse practitioner was not aware that the

24  patient was seen the day before.)  During this extended delay in necessary

25  psychiatric follow-up, the patient had multiple documented incidents of medication

26  non-adherence.  The records indicate that neither the mental health clinicians doing

27  wellness checks (generally at cell-front) nor the prescribers took meaningful steps to

28  address the medication adherence issue.  (It was generally not mentioned at all.)

This case illustrates the frequent deficiencies I observed with respect to screening people with mental illness at intake, excessive delays in mental health and psychiatric evaluations and care, delays in initiating clinically indicated psychiatric care, and untimely, poorly coordinated, and inadequate psychiatric follow-up care.

## II.  FINDING #2: THE JAIL'S SYSTEM FAILS TO TIMELY AND ADEQUATELY PROVIDE ESSENTIAL MEDICATIONS TO PEOPLE WITH MENTAL HEALTH TREATMENT NEEDS.

53.    As a psychiatrist with experience working in and evaluating numerous detention systems, I am extremely concerned about the deficiencies I have observed with respect to the San Diego County Jail's system for provision of essential medications to people with mental health treatment needs. Failures and delays in the provision of medications and psychiatric care put patients in this Jail system at substantial risk of serious harm, including in the following ways.

### A.  Psychiatric Prescribing Practices and Supervision in the San Diego County Jail System Fall Far Short of the Standard of Care, Resulting in Serious Treatment Failures and Putting Patients at Substantial Risk of Harm.

54.    In the San Diego County Jail system, psychiatrists, psychiatric nurse practitioners, and psychologists have for years been hired by private health care contracting companies. They are not County employees. In contrast, most or all mental health clinicians (master's level social workers or marriage/family therapists) are County employees. This odd breakdown—which is exceedingly rare in jail or prison mental health systems—is deeply problematic, as it tends to compromise care coordination across disciplines, cause dangerous disconnects in supervision and quality assurance, and lead to adverse systemic and individual patient outcomes. (This problem is discussed further in Finding #6.B.) I observed each of these sorts of problems in the San Diego County Jail system as it relates to psychiatric care.

55.    Jail mental health staff shared with me during my Jail site visits that psychiatric prescribers have little to no interaction with County-employed clinicians, with the possible exception being in the acute care Psychiatric Service Units. This

1  lack of coordination is an enormous problem.

2       56.    During my site visits, I requested to speak with a psychiatric prescriber

3  at each Jail facility.  Every time, the psychiatric prescribers refused to speak with

4  me.  County staff and legal counsel explained to me that because the psychiatric

5  prescribers were employed by a private health care contractor (NaphCare), the

6  County had no authority to have them speak with me.  This seems to me to be an

7  illustration of one aspect of the deficient mental health system at San Diego County

8  Jail—that is, the convoluted and disconnected staffing structure leads to convoluted,

9  disconnected, and ultimately deficient practices and harmful outcomes for patients.

10       57.    Based on my review of records and interviews with staff and patients, it

11  is beyond question that psychiatric prescribing practices at the San Diego County

12  Jail fall below the standard of care and put patients at substantial risk of serious

13  harm.  I include illustrative examples below; they are a few among many deficiency-

14  ridden cases that I reviewed for this case.

15       58.    Based on my review, the County is well aware of many deficiencies

16  with the system of psychiatric care at the Jail, which remain unresolved.  Examples

17  of deficits that have been identified in recent County documentation, *see* Quiroz

18  PMK Dep. at Exhibit 10, Sheriff's Department Corrective Action Notice, Dec. 1,

19  2023, include the following serious systemic failures that must be remedied:

20      •   **Lack of participation by psychiatry in Continuous Quality Improvement (CQI) meetings and activities.**  CQI activities that

21        consistently include psychiatry are an essential component of operating an adequate jail mental health care system.  Psychiatry providers do not

22        participate meaningfully (and at times, do not participate at all) in CQI meetings and efforts.  This is a major and persistent deficit in this

23        system, as the Jail mental health coordinator acknowledged.  *See* Quiroz PMK Dep. at 187 ("I don't know that it's been fully resolved,

24        but it … [d]oes probably need to work towards improvement."); *id.* at 188 ("Q: Has there been a quarterly meeting where all the necessary

25        NaphCare staff members are present? A. Not consistently.").

26      •   **Lack of documented peer review process for psychiatric prescribers.**  I have observed pervasive deficiencies in patient record

27        review with respect to psychiatric prescribing practices.  Given these deficiencies, it is unacceptable that there are not effective peer review

28        processes in place for psychiatric prescribers.  The Jail Mental Health

coordinator confirms that the County has failed to take steps to ensure that this problem is addressed. *See* Quiroz PMK Dep. at 190-91 ("I can't be for certain that they're not doing peer reviews. It's nothing that they hand back to us. I mean, if they do the peer reviews it's something that they're keeping records of on their own."); *id.* at 100-01 (no County employee or entity responsible for determining whether NaphCare's peer review process is adequate).

- **Lack of clinical oversight of psychiatric prescribers (especially psychiatric nurse practitioners) working at the Jail.** I observed that a substantial proportion of the pervasive deficiencies in psychiatric practices were the result of sub-standard practice among psychiatric nurse practitioners at the Jail. The Jail mental health coordinator confirmed that, in leadership meetings, the Jail's chief medical officer (Dr. Montgomery) has shared concerns about adequacy of clinical oversight for psychiatric nurse practitioners at the Jail and the impact on medication management for the Jail's mental health population. *See* Quiroz PMK Dep. at 192 & 198 ("it's still a concern").

- **Inadequate psychiatric prescriber treatment practices.** Through my review, I observed time and again foundational deficiencies in psychiatric care practices: (1) the lack of appropriate confidentiality during psychiatric appointments, which undermines the exchange of sensitive information necessary to care; (2) untimely psychiatric evaluation; (3) untimely psychiatric follow-up consistent with the standard of care, including when medication is initiated, in cases of medication non-adherence, and when a patient's condition worsens; (4) improperly aggressive prescribing practices (*e.g.*, excessive starting doses, multiple concurrent medication changes, polypharmacy with inadequate attention to patient needs). These deficiencies are noted in my individual case reviews and other sections of this report.

59.    The 2017 NCCHC report criticized the San Diego County Jail's psychiatry care practices and failure to "manage … appropriately" patients who had serious needs but were not presently "psychotic and/or gravely disabled":

A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

NCCHC Report, DUNSMORE0260618 at 35.

60.    This finding, from 2017, is unfortunately consistent with practices that I observed at San Diego County Jail in 2024. I observed many patients with clear histories of serious mental illness and complex psychiatric care whose medication

needs were ignored or insufficiently monitored at the Jail.  These patients in many cases had active psychiatric symptoms but where not presenting as "psychotic and/or gravely disabled."  But after a period of delays and failures in psychiatric care at the Jail, many of them decompensated significantly, even to the point of *becoming* acutely psychotic, gravely disabled, and suicidal.

61.    My review reveals serious failures in psychiatric medication practices at all stages of a patient's detention—upon arrival, during their detention, and as part of discharge planning.  Each stage is discussed in turn below.

**B.    There Are Serious Systemic Failures to Continue Clinically Necessary Medication for People with Mental Health Treatment Needs *When They Arrive at the Jail*.**

62.    The Jail does not reliably or effectively continue necessary psychiatric medication for newly-detained patients who were receiving care in the community prior to their detention.  Any disruption of psychiatric medications can be dangerous for a number of reasons.  First, individuals who take prescribed medication to control their mental illness often decompensate if their medication is interrupted.  This can lead to worsening symptoms and risk of suicide.  Second, a disruption of prescribed psychiatric medication can actually exacerbate the underlying mental illness by altering brain physiology and causing an expansion of foci in the brain of the condition at issue.  This is called the "kindling phenomenon."  Finally, because disruption of medication can cause a worsening of the underlying condition, it can also make it more difficult to treat a patient's mental illness moving forward.

63.    The problem of medication discontinuity for newly arrived patients has been longstanding at San Diego County Jail.  The NCCHC report found, back in 2017, that incarcerated people who enter the Jail with active prescriptions for psychotropic medication "frequently" do not have their medication continued in a timely manner.  The NCCHC Report documents the concern that such failures "result[] in instability and risk for the inmate, for custody staff and for the facility." NCCHC Report at 35.

64.     To this day, patients who were taking prescribed psychiatric medication prior to their incarceration in this system are forced to wait several days, and even weeks, before they are restarted on their medication.  Some patients who are prescribed psychiatric medications at the Jail frequently wait far too long for those medications to arrive and actually be initiated.  Without their medication, incarcerated people decompensate, leading to psychosis, suicide attempts, and incidents of serious self-harm that are preventable.

65.     The County has been well aware of this serious deficiency for some time.  The issue was identified in a Corrective Action Notice (CAN) sent by the County to NaphCare, dated April 28, 2023, stating that NaphCare "failed to restart medications for patients reassigned from the California Department of State Hospital."  NAPHCARE034831.  In the County's March 4, 2024 Corrective Action Notice, no documented corrective action to remedy this deficiency is noted, yet the County states, without analysis: "NaphCare has appeared to resolve pharmacy … medication issues."  SD_1572610.  My records review and site inspection strongly indicate that the problem of failing to continue arriving patients on their medication persists on a wide scale.  Patients ███████████, ███████████ and ███████ ███, which I describe in this report, are all recent cases showing that deficiencies continue to put patients at unnecessary risk of harm.  SD_876917-877210.

66.     The standard of care calls for each person who was taking psychiatric medications in the community or with prescriptions during prior incarcerations to be automatically referred for evaluation by a prescriber, with that evaluation occurring in a timely manner, including on an urgent or emergent basis if clinically indicated.

67.     The failure to continue or timely start a person on clinically necessary psychiatric medications when they arrive at the Jail is exceedingly dangerous and must be remedied as soon as possible.  The 2023 suicides of Pedro Ornelas and Jonathan McDowell, each of which had unacceptable delays in the provision of medication upon arrival, demonstrate the dire consequences of such failures.

**C.**     **There Are Serious Systemic Failures in Medication Management and Psychiatric Care *During the Period of a Patient's Incarceration*.**

68.     I observed numerous examples that the Jail system fails to meet minimally adequate standards with respect to medication management and psychiatric care *during* a patient's period of incarceration, including excessive delays in follow-up by psychiatric prescribers, deficient prescribing practices, quality assurance failures, poor side effect management, and lack of follow-up for patients with poor medication adherence.

69.     The delays in psychiatric care for patients in detention at the Jail remain enormous.  The County is well aware of the problem.  A December 2023 Sheriff's Department Corrective Action Notice to NaphCare, the then-private contractor responsible for psychiatry, documented a persistent psychiatric sick call backlog, resulting in psychiatric care delays.  It noted that "periodic blitzes are done 3-4 months, with no solution to maintain the rising number of sick calls."  In April 2023, there were 785 pending psychiatry appointments.  Despite the corrective action notice issued at that time, there remained 530 psychiatric pending psychiatry appointments in November 2023, with an average wait time of 18 days.  Quiroz PMK Dep. at Exhibit 10, Sheriff's Department Corrective Action Notice, Dec. 1, 2023.

70.     The Jail mental health coordinator testified in May 2024 that delays in access to psychiatry care remain a "key deficiency area":

> Q. [F]rom mental health's side of things what are the key deficiency areas for [the contracted health care provider company]?
>
> A: Psychiatry sick call, that would be key.
>
> Q: Can you say more about what's deficient …?
>
> A: The volume of pending appointments.

Quiroz PMK Dep. at 186.

71.     I share the County's concern regarding the practice of

psychiatric/medication referrals being processed in such a way that a psychiatric prescriber will not timely see a patient when clinically necessary. Repeatedly in the records, I observed Jail patients requiring a psychiatric prescriber appointment, only for no appointment to be conducted—or scheduled—for weeks or even months at a time. In many cases, such a patient with urgent medication management needs will be scheduled only to see a mental health staff member who is not licensed to prescribe. This is a completely inappropriate and dangerous practice, as it means that urgent medication management needs are not timely addressed.

72. The Jail's mental health coordinator states it more bluntly: "[W]e're seeing that they're not scheduling the psych si[ck] call for on-site provider to see them, whereas they schedule for a master's level clinician. And that's our concern, is that I [as a non-prescribing clinician] can't really do anything about the meds." Quiroz PMK Dep. at 114-15.

73. Yet another policy and practice deficiency that urgently requires remediation is the Jail system's failure to act in cases of medication non-adherence—that is, when a patient refuses or misses psychiatric medication doses. Refusals and missed doses demand attention and intervention for people with serious mental illness. Missed medications *cannot* be ignored. Patients may refuse psychiatric medications due to concerns about side effects, efficacy, and a wide range of other reasons that require attention and resolution. Medication non-adherence may also indicate mental health decompensation and the need for other treatment interventions or a higher level of care.

74. Through my patient records reviews and interviews of patients, I found numerous cases where people with serious mental illness missed multiple doses, often over an extended period of time, without adequate notice to and follow up by the psychiatric prescriber. This is a clinically inadequate and dangerous practice. And troublingly, it is a deficient practice that is *consistent* with the current deficient Jail health care policy. MSD Policy C.5.1 (Medication Administration) contains a

1    short, entirely inadequate section on "Missing Medications" (Section VIII). This

2    section states "The medical provider is contacted if a patient misses any doses of the

3    following medications for any reason." But the medication list contains only *one*

4    psychiatric medication (Clozaril) for which a missed medication would trigger a

5    referral to the prescriber. The standard of care requires that a psychiatric provider in

6    a detention setting be alerted (and timely respond) when their patients refuse or miss

7    a wide range of psychiatric medications (and all psychotropic medications)—not

8    just Clozaril. SD_117401.

9        75.    The policy and practice at the San Diego County Jail must change. In a

10   well-functioning jail mental health system, the policy and practice regarding missed

11   psychiatric medications would be roughly as follows: "The psychiatric provider

12   must be alerted if their patient misses three doses in a row and/or three doses over a

13   seven-day period of *any* psychotropic medication [and other identified psychiatric

14   medications]. The psychiatric provider shall immediately schedule an appointment

15   with the patient to determine the reason behind these missing doses and implement a

16   plan to ensure an appropriate medication regimen and medication adherence."

17   Based on the policy and my assessment of practice through records review, San

18   Diego County Jail does not come close to meeting this standard.

    **D.**    **The Jail System Fails to Ensure Adequate Medication Continuity
    for Patients *Who Are Being Released from Custody*.**

21       76.    Medication continuity for patients being released is a critically

22   important component of operating an adequate Jail mental health system. Patients

23   leaving the jail must be provided with discharge planning adequate to ensure that

24   they have access to the medications, linkages, and care they need to avoid gaps in

25   medication and other psychiatric care.

26       77.    The NCCHC standards require that jail discharge planning include

27   mental health staff taking necessary steps to "Arrange for a reasonable supply of

28   current medications" (MH-E-10). In my records review, I observed cases of patients

1   with serious psychiatric medication needs not receiving this sort of discharge

2   planning, and without documentation indicating that they were provided access to a

3   reasonable supply of their medications when released.

4         78.     The County is aware of the deficiency with respect to inadequate

5   discharge planning.  Ms. Quiroz, the County's Person-Most-Knowledgeable on Jail

6   Mental Health Care issues, testified in May 2024 that, with the Jail's current

7   discharge planning staff serving incarcerated persons – including the approximately

8   1,600 (or more) mental health caseload patients – "we do need more" staffing to

9   meet the need.  Troublingly, Ms. Quiroz stated that the County did not have

10  sufficient data to know how many discharge planners were necessary to meet patient

11  needs, noting only that "more is certainly better."  Quiroz PMK Dep. at 171-72.

12        79.     Angela Nix, the vice president of nursing for NaphCare, testified in

13  June 2024 that NaphCare is "developing" a role for discharge planning staff, but

14  things remain quite uncertain with respect to medication.  She stated that NaphCare

15  staff "wouldn't be the ones to call in the medication, and they wouldn't be the ones

16  to give the patient medicines in the jail before they leave. … They wouldn't be

17  responsible for handing off their medications."  She also said that she "do[es]n't

18  know what involvement the [County staff] nurses have to that."  Nix Dep. at 72, 77.

19  (Jail mental health coordinator Melissa Quiroz made no mention in her deposition as

20  to a County nursing role in discharge planning.)  The lack of coordination and the

21  lack of a clear procedure enhance my concern about the inadequate system for

22  discharge planning, particularly as to ensuring that patients have uninterrupted

23  access to their psychiatric medications.

24        80.     My concerns about inadequate discharge planning are discussed further

25  in Finding #11, below.

26  **E.     Patient Examples of Deficient Psychiatric Practices Putting People at Substantial Risk of Serious Harm.**

27

28        81.     Through my interviews with patients at the Jail and patient records

review, I identified several examples illustrating what strongly appears to be systemically deficient system with respect to medication management and psychiatric care. It is apparent to me that these patients were placed at very substantial risk of harm, and in nearly every case was actually harmed by these treatment failures. For example:

82. **Suicide of Pedro Ornelas (June 2023)**: Mr. Ornelas was a 27-year-old man who died by suicide while in custody at San Diego Central Jail, after spending nearly two weeks without necessary attention paid to his obvious psychiatric treatment needs or necessary monitoring. He was booked on June 16, 2023, with the initial screening indicating no mental health history. This was an appalling and consequential screening failure. Records from a previous incarceration at the Jail showed ████████████████████████████████ ████████████████████████ Still, on June 17, 2023, Mr. Ornelas made two separate requests to see a psychiatrist to "get back on my medications," a likely reference to his being on psychotropic medications in the community. These requests were *never* addressed: the staff portion of the forms were never completed, and mental health staff never assessed him.

83. Ten (10) days later, on June 27, 2023, Mr. Ornelas was found hanging by a makeshift noose in his cell with no pulse. Medical staff performed CPR and transferred him to University of California San Diego Medical Center, where he was found to have anoxic brain injury and passed away.

84. Mr. Ornelas' death may have been preventable with access to mental health services for proper evaluation of suicide risk factors and starting (or, more likely, restarting) his clinically indicated psychotropic medications. Furthermore, records indicate that Central Jail Module 4A housed incarcerated persons in pre-arraignment and "as a precaution, incarcerated persons are given the green safety blankets upon being housed," indicating a concern for suicide risk. Yet, there is no indication that further individual screening for additional precautions or enhanced

1    monitoring was done, which would have been appropriate for someone like

2    Mr. Ornelas.

3          85.     In the post-death clinical review, NaphCare's "Recommendations for

4    Modifications in Protocol, Procedure, or Approach to Patient Health Care

5    Management Resulting from this Review," contains only the following phrase:

6    "Closer Psychiatric follow-up/care." NAPHCARE041765-041767;

7    NAPHCARE041768-041772; NAPHCARE041773-041777. For a case where there

8    was *zero* psychiatric care provided despite documented psychiatric history available

9    to Jail staff and multiple requests for such care, this finding is a gross

10   understatement. Even more concerning, in other patient records covering the period

11   since this death, these sorts of deficiencies—failures to check a new patient's

12   history, failures to timely respond to requests for psychiatric care, inadequate

13   psychiatric follow-up, etc.—all persist with extreme frequency.

14          86.                 This patient, who had a history of mood and

15   adjustment disorders and trauma, as well as a suicide attempt in the last six months,

16   requested to see a psychiatrist repeatedly over a multi-week period at the Jail, with

17   substantial and increasing urgency. He arrived at the Jail on ▮▮▮▮▮ 2024. After

18   not being continued on medications following intake, he submitted a string of

19   requests, stating:

20          ▮▮/24: "I would like to see mental health doctor & therapists"

21          ▮▮/24: "Request to see mental health doctor and psych doctor"

22          On ▮▮▮▮▮ 2024, he received a behavioral health assessment from a

23   clinician. The clinician documented that the patient had anxiety and depression,

24   racing thoughts, difficulty concentrating, issues with sleep, trouble falling asleep,

25   and nightmares. The patient "started to tear up and stated 'I am just trying to be

26   better.'" At this time, he was being provided no medications to help him with his

27   mental health symptoms. The clinician referred the patient to psychiatry. But

28   psychiatry did not see him, and so he continued to submit requests:

1   █ /24: "Request to see psych doctor not able to sleep or rest because
2       nxiety and depression at times"

2   █ /24: "Request for therapist check-up (ASAP)"
3

3   █ /24: "Request for psych eval (ASAP) & mental health doc /
4       ession & anxiety is keeping me up.  Cannot sleep"

5   █ /24: "Request to see psych doctor, unable to sleep and deep anxiety"

6   █ /24: "Request to see psych doctor"

7   █ /24: "Request to see mental health doctor"

8   █ /24: "Requesting for psych eval and mental health doc.  Depression
9       anxiety is keeping me up.  Cannot sleep."

9   █ /24: "Request to see psych doctor for diagnoses (ASAP)"
10

11   SD_876917-877210.

12       87.    During this period of time, no psychiatric prescriber made or attempted

13   contact with the patient.  Finally, on ████████, 2024, the patient was seen by a

14   psychiatric nurse practitioner. *What follows illustrates some of the grave concerns I*

15   *have about the psychiatric prescribing practices, and lack of supervision over*

16   *psychiatric nurse practitioners at the Jail.*  At that visit, he was started on four

17   medications (lamotrigine [mood stabilizer] with dose increase every 14 days,

18   buspirone [anxiolytic], hydroxyzine [anxiolytic], and trazodone [antidepressant and

19   sedative]), most of which he had not taken before.  A prudent practitioner would not

20   start more than two new medications simultaneously, as each medication comes

21   with its own side effects and drug interactions that need to be monitored carefully.

22   If such aggressive prescribing is called for, its indication should be clearly

23   documented, but there was no explanation in the records for how or why these

24   medications were selected.  Of equal concern, the patient was scheduled for a

25   psychiatric follow-up in four weeks, which is far too long, especially with the

26   prescribed medications that require close monitoring due to rare but dangerous

27   adverse effects like Stevens-Johnson Syndrome that can result in multiorgan failure

28   and death.  The standard of care under such circumstances calls for psychiatric

1  follow-up in no more than one week.  The Jail violated that standard of care four

2  times over.

3       88.  ███████████  This patient was initially screened as not having any

4  medications during the booking process on ███████ 2023 but informed a nurse

5  two days later that he was prescribed outpatient psychiatric medications.  It took

6  four more days for Jail staff to verify the currently prescribed medications with an

7  outside pharmacy.  Even then, the patient was made to wait approximately four

8  more weeks to be seen for an initial psychiatric evaluation on █████, 2024.

9  During this five-week waiting period, the patient wrote nine (9) mental health sick

10 call requests asking for his medications to be restarted due to his experiencing

11 significant symptoms of anxiety, depression, and difficulty with sleep.  The records

12 review raised additional serious concern as to the psychiatric prescriber (a)

13 assigning what I would consider an arbitrary diagnosis that does not match the

14 documented symptoms, and (b) the unexplained failure to restart the patient on his

15 previous mediation regimen (that was reportedly effective) with a very different

16 medication regimen that was a poor match for the patient's symptoms.

17      89.  ████████████  This patient has a history of serious mood and

18 psychotic disorders and a recent state psychiatric hospital placement.  He arrived at

19 the Jail with symptoms of psychosis and recently prescribed medication.  He was

20 not seen by a psychiatric provider for five (5) days, during which time he had an

21 unacceptable and dangerous break in psychiatric medication.  Of additional concern,

22 there were subsequently excessive and clinically inappropriate delays in psychiatric

23 follow-up appointments, of approximately six (6) and five (5) weeks, respectively.

24 Very nearly all psychiatric and clinical encounters were non-confidential and, based

25 on my review, clinically inadequate to address this patient's treatment needs.

26      90.  █████████  This patient had recently returned from the state

27 psychiatric hospital when I evaluated him in February 2024.  He was on multiple

28 psychiatric medications and was observed to be depressed, anxious and possibly

psychotic. It took four (4) days for him to see a psychiatric prescriber when he arrived at the Jail in ███████ 2023, and he was seen by a psychiatric provider only six (6) times over nearly five (5) months, even as his medications were modified multiple times and his symptoms persisted. Of even greater concern, the psychiatric progress notes from multiple appointments were verbatim identical, including what purportedly occurred during the appointment, what the patient said, and how he presented. In my experience, this is evidence of a "cut and paste" note that ignores the actual current clinical condition of the patient. This is considered an unacceptable and dangerous practice in detention settings where I work and also in the community. This patient put in a psychiatric sick call request in ███████ 2023, and was not seen for nearly four (4) weeks. The records show delays in restarting prescribed medications, a lack of monitoring of medication side effects, improper follow-up regarding medication compliance, and general inadequacy in psychiatric care delivery.

91.    ███████████    This patient was booked at the Jail in ███████ 2023 with a history of community psychiatric treatment, including with prescribed medication. No psychiatric provider saw the patient for more than a month after his arrival at the Jail. At that visit, it was apparent that the medication regimen was not meeting the patient's needs, and the prescriber changed the medications. No follow-up was done for another seven (7) weeks. The standard of care under such circumstances calls for psychiatric follow-up within one week. The Jail exceeded that standard seven times over. Of further concern, the psychiatric follow-ups were repeatedly done at cell-side with a deputy present, which is a violation of confidentiality and, based on my interview with this patient, served to undermine his ability to communicate with the provider about his condition and concerns.

92.    ███████████    This patient expressed to me serious concerns about the lack of mental health care he was receiving. A major complaint was that he is rarely seen by his psychiatric provider even though he is prescribed

1  psychotropic medications.  A review of his record confirms this fact.  Following his

2  "initial psychiatric evaluation" in ▓▓▓▓ 2022, he was not seen by a psychiatric

3  provider for nine (9) months.  When he was finally seen in ▓▓▓ 2023, he was

4  experiencing auditory hallucinations.  Following that psychiatric appointment up

5  until I met with him in February 2024, he was being seen only once every two

6  months, even as his medications were being adjusted to manage active psychiatric

7  symptoms.  These gaps in care greatly exceed multiple standards of care in the jail

8  setting—including the maximum allowable time between *routine* psychiatric visits

9  being 30 days, and the maximum allowable time for psychiatric follow-up after

10 initiation of medication or dose adjustment being one (1) week.

11     93.    ▓▓▓▓▓▓▓▓▓▓▓▓ This young patient has substance use history

12 and several serious psychiatric diagnoses for which he was prescribed psychotropic

13 medications.  Yet, based on the records reviewed, he had not been seen by a

14 psychiatric prescriber in the more than seven (7) weeks he had been in custody at

15 the Jail.  He was being seen only by a clinician who did not have licensure to do

16 medication management.  It is very troubling that the intake screening and mental

17 health tracking system failed to ensure that this high-needs patient would be timely

18 seen by a psychiatric prescriber.

19     94.    ▓▓▓▓▓▓▓▓▓ This female has a history of Schizoaffective Disorder,

20 bipolar type and diabetes which has been controlled by the use of oral agents.  When

21 she arrived at the Jail in ▓▓▓▓ 2024, she was noted to be psychotic.  Her blood

22 glucose levels were consistently elevated over the next several weeks, evidencing

23 difficulty with diabetes management.  For such a patient with psychosis and poorly

24 controlled diabetes, it is critically important that a psychiatric prescriber exercise

25 care in the choice of antipsychotic medication.  In this case, there is no indication in

26 the records that the psychiatric prescriber was aware of or considered this important

27 treatment issue.  She consistently prescribed the antipsychotic, Zyprexa, which is the

28 biggest culprit among all of the second generation antipsychotics for contributing to

problems with elevated blood glucose for people with diabetes. This represents very bad care that does not meet the community standard of care. I was also very troubled to see that, even after this patient required placement in the Psychiatric Services Unit, her contacts with both the clinician and the psychiatric prescriber were consistently at cell-front without appropriate confidentiality. There is no record of meaningful individual or group therapy provided to this patient, despite such treatment being clinically appropriate for her.

95. ████████████ This patient has a history of anxiety, depression, and prior in-custody suicide attempt, but none of this was noted during initial screening when he was booked in ███ 2023. It was not until four weeks after booking that he was finally seen for a behavioral health assessment (only after he requested it) and seen by a psychiatric nurse practitioner. He was prescribed sedating, antidepressant medication, but had no follow-up for another seven (7) weeks. This is far beyond the community standard of follow-up in no more than one week after initiation of a medication. During this time, it was apparent the medication regimen was not meeting the patient's needs: while meeting with a non-prescribing clinician weeks after starting the medications, he reported continued psychiatric symptoms and "restlessness in my legs"—likely restless leg syndrome, a known side effect that warrants attention. It is unclear if this information was ever communicated to the prescriber, and no action was taken until he was finally seen again in mid-October. He was started on another antidepressant medication and had the initial medication adjusted, with again no follow-up until seven (7) weeks later. A prudent prescriber would have discontinued the initial medication given the development of side effects and to reduce drug-drug interactions. Based on pharmacy records, the patient ended up receiving both medications daily; after several weeks of taking the combination, he developed "erections during inappropriate times," which were likely signs of priapism, a dangerous side effect of both these medications that can cause permanent damage to penile tissue. Not only is this evidence of irresponsible

prescribing and poor monitoring, but just as concerning is the lack of documentation or acknowledgement of the risk for priapism after the patient was finally seen again in December.  These failures further illustrate the lack of adequate supervision of nurse practitioner prescribers at the Jail.

### III.    FINDING #3: THE SAN DIEGO COUNTY JAIL FAILS TO PROVIDE PEOPLE WITH SERIOUS MENTAL ILLNESS WITH TIMELY ACCESS TO ADEQUATE TREATMENT, CAUSING UNDUE SUFFERING AND PUTTING PEOPLE AT UNNECESSARY AND SUBSTANTIAL RISK OF HARM.

96.    The San Diego County Jail mental health treatment system is deficient in several significant ways that put patients at substantial risk of serious harm.  As I observed during my site visits and through review of records and other materials, those harms are real, tangible, and ongoing for large numbers of people with mental health needs who are incarcerated at the Jail.

### A.    The Jail's Lack of an Adequate Levels of Mental Health Care System and the Lack of Individualized Treatment Based on Clinical Needs Are Major Deficiencies.

97.    Provision of an effective "levels of care" system, with clinically indicated treatment and services provided for each level of care, is an essential component to ensuring adequate mental health care to Jail patients with mental health needs.  A levels of care system is necessary to assess an incarcerated person's treatment needs and then to provide clinical interventions that match those treatment needs.  Such a system requires the utilization of written, individualized treatment plans for incarcerated patients requiring mental health care.  It also requires the provision of individualized medication management and sufficient, structured therapy and counseling, in individual and group settings as clinically indicated.

98.    Multiple people and entities, inside and outside of the Jail system, have made this clear to San Diego County.  But to date, the Jail has failed to implement an effective levels of care system, failed to provide clinically adequate treatment planning, and failed to deliver clinically necessary treatment services to address

1    patients' needs.

2        99.    The 2018 DRC Report was appropriately critical of the Jail's lack of

3    adequate structured mental health treatment services across the patient population,

4    noting that "only when [incarcerated people] reach the point of engaging in acts of

5    self-harm or having an acute breakdown do they receive an enhanced level of care.

6    Such a system is cruel and counterproductive[.]"  The DRC Report found that

7    incarcerated people "remain in harsh, non-therapeutic settings without adequate

8    treatment until their condition deteriorates."  DRC Report at 17,

9    DUNSMORE0124942-0125012.  The DRC Report recommended that Jail staff

10   prepare and follow a written, individualized treatment plan for each incarcerated

11   person requiring mental health care.  *Id.* at 27.  The DRC Report also found that

12   many people with mental health needs "expressed to us an interest in group or

13   individual out-of-cell therapeutic activities."  One patient asked to discontinue his

14   medication and try counseling, but instead "mental health staff increased his

15   medication dosage and ignored his request for counseling."  *Id.* at 23.

16       100.   The 2017 NCCHC Report similarly found that the Jail's mental health

17   system at the Jail reflects a "disproportionate focus on those with psychotic

18   disorders" and neglect of "other, less severely mentally ill inmates."  NCCHC

19   Report, DUNSMORE0260618 at 35, 67, 101.

20       101.   Dr. Homer Venters, the former medical director at Rikers Island in

21   New York City, recommended a levels of mental health care system to San Diego

22   County in 2020.  *See* Community Oriented Correctional Health Services (COCHS)

23   Report to Dorothy Thrush, Chief Operating Officer Office of Public Safety, San

24   Diego County (Mar. 30, 2020), DUNSMORE0115368-0115394.  Dr. Venters

25   recommended to that the Jail implement a levels of care system to meet the needs of

26   incarcerated people with mental illness:

27       [P]atients with serious mental illness in the jail setting benefit from
         engagement with  multiple types of therapy, including one-on-one talk
28       therapy, psychiatric care with medication management, nursing

support, group therapy, art and movement therapy. These approaches increase engagement in health services and decrease injuries from use of force incidents. Most large jails benefit from more than one level or type of enhanced mental health housing area, and the ability to deliver care on these units relies on clear distinctions about the profile of patients who will be housed on these units, and the training and roles of the health and security staff. For patients who require higher levels of care for mental health crisis, those who are psychotic or acutely suicidal, best practices include assessment for referral to hospital inpatient care. Within the jail setting, two levels of housing are beneficial for patients with signs and symptoms of serious mental illness. A high-level unit that replicates much of the features of inpatient settings, including use of psychiatric technicians, multiple modalities of mental health services (individual, group, art, movement) and nursing and medical support is beneficial for patients with the most serious concerns. A step-down unit that allows for increased support and structure for patients who are more stable, but not able to be safe in general population settings is also important. While these units may be comprised of cell or dorm housing units, neither of them is operated as a lock-in unit, meaning that patients are not to be confined to cells for most of the day. An important feature of these units is that when patients express suicidal thoughts or engage in self-harm, the primary response does not involve them being locked into a cell, whether the cell is labelled as a suicide watch or safety cell.

102. In October 2018, clinical leadership employed at the Jail gave a presentation to Jail command staff proposing a levels of care system for mental health care. Dr. Christine Evans, the then-Jail Medical Director, spearheaded this effort. She rightly describes her "dismay and disappointment" that "the Jail's Command staff declined to implement the proposal I developed, or any other Mental Health and Medical levels-of-care system." Evans Decl. at 2, Dkt. 119-10.

103. Based on my review of records and other relevant materials, the San Diego County Jail system still lacks an adequate levels of mental health care system, still lacks adequate treatment planning, and still lacks provision of clinically necessary care to patients consistent with individual treatment needs.

104. The County's 2023 *Progress Report: Update on State Audit* responded to a similar recommendation from the State Auditor regarding utilization of a "mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody." The County deemed it "not feasible," with no indication that a levels of care system would be implemented.

1    Progress Report, SD_184479 at 5.  Ms. Quiroz, the County's mental health care

2    person-most-knowledgeable, testified that a levels of mental health care system had

3    been "considered" by Jail leadership, and that they were aware that other nearby

4    counties, including Orange and San Bernardino, have implemented such systems.

5    She stated that such a system "could be useful" but that, as of May 2024, there was

6    no "policy or expectation" for mental health staff to assign mental health acuity or

7    care level for patients.  Quiroz PMK Dep. at 87-88.

8        105.   One effect—and apparent *reason*—that the Jail has rejected this

9    repeatedly made recommendation for a levels of mental health care system is that

10   the system does not, and cannot, know the patient population's actual mental health

11   service needs and the Jail's deficit in meeting those needs.  Ms. Quiroz testified that

12   implementation of a mental health "acuity rating system will drastically impact [the

13   Jail Population Management Unit] and highlight the need for hundreds if not

14   thousands of mental health beds."  Quiroz PMK Dep. at 90.

15       106.   I have reviewed the Jail's "Mental Health Acuity Level" form.  The

16   form prompts mental health staff to assign the *MH Acuity Level* for a patient with

17   options of "acute," "severe," "moderately severe," "moderate," "mild," "minimal,"

18   or "none.  There is also a blank field where a clinician may provide clinical

19   recommendations.  The acuity level designations are not standard, not intuitive, and

20   confusing.  The Jail's policies fail to offer guidelines for mental health staff to

21   assign an appropriate *MH Acuity Level*.  The designations are of no apparent utility

22   in planning or providing mental health care.  In my review of individual patient

23   records, I observed great variability in how the form is used and even if it is

24   completed at all.  Quite frequently, no acuity level is marked.  In some cases, the

25   acuity level designation is obviously inappropriate.  In one case, a clinician marked

26   an MH Acuity Level of "minimal " for a patient identified as having symptoms of

27   florid psychosis.

28       107.   The lack of usefulness of the *MH Acuity Levels* form was confirmed by

1  the Jail's mental health coordinator, who testified that, in practice, "there is no

2  [mental health] acuity rating scale right now." Quiroz PMK Dep. at 84-85. She

3  went on:

> Q: Is there a policy or an expectation that those boxes indicating level
> of acuity level be checked by mental health providers?
>
> A: No. That was something that was part of TechCare that kind of just
> came with the package.

7  Quiroz PMK Dep. at 87.

8      108.   Based on my professional experience, the Jail's failure to implement a

9  functional mental health acuity and level of care system, and its failure to accurately

10  assess mental health service needs, are a recipe for continued systemic failure in its

11  mental health system.

12      109.   The lack of individualized treatment planning at the Jail is of similar

13  and serious concern. Jail mental health clinician Aseel Ross, who worked at George

14  Bailey through late 2023, testified that "everybody should have a treatment plan."

15  She described how mental health staff documents as best they can, things like "the

16  way we rescheduled them, what we followed up on … you know, we are going to

17  follow up on coping skills, or we are going to follow up on making sure he showers

18  next time. But we didn't have a specific document that said treatment plan." Ross

19  Dep. at 60-61.

20      110.   Ms. Ross, who was assigned to patients in Administrative Separation

21  units, in fact proposed to Jail mental health leadership (including Ms. Quiroz) that

22  structured individualized treatment plans be implemented for patients; she even

23  submitted a template for such plans. The Jail did *not* implement her proposal, or

24  any other individualized treatment planning for Administrative Separation patients.

25  Ms. Ross testified that, based on her clinical experience, individualized treatment

26  plans should be provided to mental health patients at the Jail, including in

27  Administrative Separation, Outpatient Stepdown Units, and the Psychiatric Services

28  Units. Ross Dep. at 60-65.

111.    Ms. Quiroz, the Jail mental health care coordinator, testified that "it could be helpful" for mental health staff to use an "individualized treatment plan that is a freestanding document." She stated that she had not seen examples from other Jail system that had implemented individualized treatment plans in mental health patients' records, but that "it would be useful to see one." Quiroz PMK Dep. at 258.

112.    Based on my professional experience, the implementation of individualized treatment plans for the mental health population is a critical necessity for the provision of clinically adequate care to incarcerated patients at San Diego County Jail.

### B.    The Jail System Fails to Provide Timely or Minimally Adequate Acute, Inpatient Mental Health Care (Psychiatric Services Unit).

113.    When a patient is experiencing acute psychiatric symptoms for which inpatient care is clinically indicated, it is essential that such care be provided timely, in a clinically appropriate setting, and with clinically indicated services. The San Diego County Jail fails on each of these points.

114.    According to the Jail's policies, the Psychiatric Services Units at Central (for males) and Las Colinas (for females) are intended to provide an inpatient level of care to incarcerated people requiring the most intensive mental health care.

115.    Unlike other psychiatric hospitals in San Diego County (and across the state), the Jail's PSU facilities are *not* a licensed by the State as Section 5150 psychiatric facility; instead, they receive only a County "certification" to operate as they do. Quiroz PMK Dep. at 74-75. It is concerning that there is less State oversight and the absence of accountability through licensure for these PSU facilities, as compared to licensed inpatient psychiatric facilities that exist elsewhere.

116.    In any event, it is my assessment that the Jail's Psychiatric Service

Units fail to provide timely and clinically necessary care to incarcerated patients in need of acute mental health care. Through my direct observations, interviews, and document review, I observed insufficient therapeutic treatment programming, concerning medication management practices, and practices in these units that fall below the standard of care.

117. When we walked through the Central Jail Psychiatric Services Unit ("PSU") during the February 2024 site visit, the dayroom was empty and the unit at first looked completely devoid of staff. (Eventually, the recreation therapist appeared to speak with us. She explained that she is the primary mental health staff member for PSU patients, and is only assigned to the unit four days per week.)

118. The PSU at Central Jail does not resemble a psychiatric hospital in any manner. The standard of care for a psychiatric hospital calls for patients to be seen *daily* by their psychiatrist and clinician. Patients in this PSU receive roughly weekly visits from a psychiatrist and a mental health clinician. By contrast, in the Sacramento County Jail acute psychiatric unit, policy requires that all patients are provided a *daily out-of-cell* contact with a clinician (Licensed Clinical Social Worker) and a *daily out-of-cell* contact with attending psychiatric prescriber. The treatment in the San Diego County Jail PSU falls below minimum standards.

119. In the Central Jail PSU, there are two group therapy sessions (each about one hour) scheduled five days per week. However, approximately half or more of the patients are not permitted to participate in group therapy at all. For some, they are permitted just one hour out of their cell for unstructured time in the dayroom each day. The cells for these patients were in some cases filled with trash and food detritus like empty milk cartons.

120. For patients in one the four PSU "Observation Cells," they are essentially on 24/7 lockdown. These patients receive no meaningful mental health treatment. I observed the four patients in these Observation Cells, and they were all extremely decompensated. The area reeked of urine and feces. Staff in the unit told

1  us that these patients were "too unstable" to receive treatment.  This complete lack
2  of treatment concerns me greatly.



*Inside a Central Jail Psychiatric Services Unit Observation Cell, filled with food trash and debris from
multiple meals, the patient lying on floor covered completely by a blanket (SD_983474)*

15  121.  The structured and group mental health programming in the PSU again
16  falls below minimum standards.  By contrast, in the Sacramento County Jail acute
17  psychiatric unit, policy requires that all patients are offered at least three (3) one-
18  hour group therapy sessions per day, at least five (5) days per week, and at least ten
19  (10) hours of structured out-of-cell activities per week.

20  122.  I am aware of the well-publicized case of Ivan Ortiz, who in 2019 died
21  by suicide in a Central Jail PSU Observation Cell after a deputy, in violation of
22  policy, left a plastic bag in Ortiz's cell.  Mr. Ortiz used the plastic bag to suffocate
23  himself to death.  *San Diego County pays $1M to family in inmate death, pushing*
24  *year's payouts past $14M*, *San Diego Union-Tribune*, June 12, 2021.  It is difficult
25  to discern any enhancements to the delivery of mental health treatment for PSU
26  Observation Cell patients that have been made in the five years since Mr. Ortiz died.

27  123.  The men in these PSU Observation Cells lie on the floor, nearly naked.
28  (The below photograph shows a man deprived of his clothes in the PSU, using a roll

1 of toilet paper to rest his head on the floor.)



*Mental health patient lying on the floor in the inpatient Psychiatric Services Unit*

124.    There are also serious issues regarding treatment in the Women's PSU at Las Colinas.  Dr. Christine Evans, a psychiatrist who ran the Women's Psychiatric Services Unit (WPSU) at Las Colinas, testified about multiple deficiencies she encountered in that unit in 2021, with her efforts to remedy those deficiencies stymied by Jail leadership:

> I had routinely observed our daily Patient-to-Clinical Staff/Nursing ratios significantly exceed the maximum ratios per State regulations, due to staffing shortages.  This problem resulted in our nursing staff being overloaded and increased the risk of critical clinical care oversights and errors.  In addition to staffing shortages on WPSU, the rigid Classification and Housing policies at the Custody level restricted my options for providing safe and appropriate dispositions for my WPSU patients who no longer required inpatient care.  As such, the WPSU unit routinely held more patients than the unit was staffed to safely manage.  I communicated these concerns on multiple occasions to the Chief Clinician at Las Colinas Detention and Re-entry facility, and was informed that no action would be taken.  As such, I determined that I could not continue to be the provider of record under these conditions and tendered my resignation.

Evans Decl. ¶ 11, Dkt. 119-10.

125.    I observed these same sorts of deficiencies in the Women's PSU in 2024.  In my discussion with the mental health clinician assigned to the Women's PSU unit, I found her to be organized, diligent, and well-meaning.  She reported that

she "tries" to see the WPSU patients daily and "attempts" to have a daily group, but system challenges meant that she could not ensure that such clinical interactions occurred on a consistent basis.  She reported that time constraints meant that most of her individual clinical contacts with PSU patients are done non-confidentially at cell-side, and that the one group therapy session she tries to facilitate is often canceled due to custody staff shortages.  She also expressed concern about patients cycling in and out of the PSU, noting that many patients discharge directly to Administrative Separation, only to "get more symptomatic again" and have to return to the PSU. She also reported that custody staff in some cases overrule a clinical recommendation for a PSU patient to discharge to the Outpatient Stepdown (OPSD) unit, instead placing the person in Administrative Separation.

126.    Overall, the Jail system's PSUs provide nothing like the mental health treatment and therapeutic milieu that is provided to in an acute psychiatric hospital. Patients are not provided clinically necessary individual or group treatment, or sufficient and meaningful opportunities for socialization in a therapeutic milieu.

127.    Based on my records review and interactions with patients and staff, I was also troubled to observe that the more acute someone's mental health symptoms, the less treatment (and the more isolation) they seemed to get.

128.    There are further serious problems with the *timeliness* of access to inpatient PSU care in the Jail system.  On the day we toured, the Central PSU psychiatrist reported that there is "always a wait list" of acutely ill patients requiring PSU placement.  The County's Person-Most-Knowledgeable on Mental Health Care confirmed that it continues to be the case that people identified as requiring PSU placement have to wait for the "recommended clinical placement" because there is not capacity in the PSU. Quiroz PMK Dep. at 70-71.  George Bailey mental health clinician Aseel Ross testified that she was aware of patients waiting for a PSU placement *for more than one month*.  During that time, patients are not receiving mental health treatment; she described them as simply being "observed by nurses.

There is more frequent checkups." Ross Dep. at 89-90.  These are dangerous delays in the provision of acute mental health care.

129.   San Diego County Jail incarcerated patients with acute or inpatient *mental health* needs are, by policy and practice, treated with less seriousness and less urgency compared with patients with acute or inpatient *medical* needs.  Jail staff confirmed that there is a process for someone with unmet medical needs that require inpatient care to be sent out to a hospital to get those medical needs addressed.  In contrast, for someone with acute psychiatric symptoms, there is no option for Jail mental health staff to send them out to a licensed inpatient psychiatric facility, to ensure timely provision of care.  Such patients "will just wait until a PSU spot opens" and "sometimes they remain in AdSep until we get availability for a bed." Ross Dep. at 90-91, 163.

130.   Ms. Ross testified that, based on her experience as a clinician treating mental health patients at George Bailey, she believes that the PSU referral process requires improvement: "Whenever I place someone under a 5150 hold … they are supposed to be sent to the PSU. I think it would be beneficial to have a faster track to PSU, no wait to PSU, like a 5150 would be in a community setting."  Ross Dep. at 160. I agree.

131.   The delays and waitlists for PSU placement, and the clinically inadequate treatment and conditions in San Diego County Jail PSUs, are dangerous and do not meet standards of mental health care both in the community and in detention settings.

132.   The PSU deficiencies have direct and profoundly negative impact on individual patient care and outcomes.  For example:

**Death of Roselee Bartolacci (May 2023)**

133.   The horrific and tragic death of Ms. Bartolacci last year illustrates numerous systemic failures in the Jail's mental health system, including in the PSU, which is supposed to provide care to people with acute treatment needs.  Although

the full records of this in-custody death have not been made available to me, I was able to review details about Ms. Bartolacci's condition and course of treatment at the Jail. Sadly, those details are remarkably consistent with the deficient care that I observed in my records review and tour interviews for other acutely ill patients in the Jail's PSUs. Ms. Bartolacci had an extensive history of intellectual disability (functioning at the level of an eight-year-old) and chronic symptoms of schizoaffective disorder that severely limited her ability to care for herself. Yet she appeared to live a healthy, stable life under the care of her mother.

134. On April 6, 2023, she was arrested and booked at the Jail after her family sought help while she was having a psychotic episode. She spent the first several days in solitary confinement, a Las Colinas Administrative Separation cell. She refused psychiatric medications, food, and liquids, and she languished in an isolation cell that was dirty and full of trash. To be sure, this solitary confinement placement was clinically harmful, contraindicated, and likely traumatic. Ms. Bartolacci was unable to communicate her needs given her intellectual disability complicated by untreated psychosis. She was then placed in the Women's Psychiatric Stabilization Unit (WPSU), where she continued to decompensate. Health care and custody staff repeatedly noted that her cell was filthy, malodorous, and covered in food, urine and feces. She continued to refuse food and medication.

135. On or about April 26, 2023, she fainted and hit her head, leading to medical hospitalization, where she was found to be suffering from acute renal failure, hypokalemia (low potassium), hyponatremia (low sodium levels in blood); severe-protein calorie malnutrition, sepsis, transaminitis (elevated liver enzymes), acute metabolic encephalopathy (confusion caused by underlying medical illness), and a urinary tract infection. The admitting emergency room doctor noted that she "had a high probability of imminent or life-threatening deterioration." She was treated at the outside hospital for 14 days, during which her health was reported to improve until she was discharged back to Las Colinas in a stable condition.

136.   Her condition again deteriorated at the Jail, requiring two more hospital visits over the next few weeks.  Confined in a cell with poor conditions and no therapeutic programming, her decline was acknowledged by psychiatry, prompting a referral for temporary conservatorship on May 18, 2023, and discussion about appropriate placement in the community pending court approval.  Unfortunately, without clinically necessary treatment at the Jail, Ms. Bartolacci did not make it to her next court date.

137.   On or about May 23, 2023, she was placed back in the Jail's PSU.  Her condition deteriorated rapidly, and she stopped taking all medications, food and liquids.  Jail staff in the PSU failed to follow even their own policies on caring for such a high-risk psychiatric patient, including failing to conduct vital checks and monitor for weight loss.

138.   Late on May 28, 2023, Ms. Bartolacci was found cold and unresponsive in her filthy PSU cell, and was pronounced dead a few hours later.  In the six (6) weeks between her arrival at the Jail and her death, she had lost more than 40 pounds.

███████████

139.   This ██-year-old female has a history of Schizoaffective Disorder, bipolar type and diabetes.  When she arrived at the Jail in ██████ 2024, she was noted to be psychotic.  She was placed in the Las Colinas Women's Psychiatric Services Unit due to the severity of her psychotic symptoms.  Her diabetes was poorly managed, with her consistently having elevated blood glucose levels.  Of significant concern, and as discussed in Finding #2, medical records indicate that the psychiatric prescriber at the Jail did not consider this information, and prescribed Zyprexa, a second generation antipsychotic medication well known to cause elevated blood glucose levels.  A review of the medical notes shows that the risks of using Zyprexa were not considered for this patient with poorly managed diabetes, evidencing very poor care that does not meet the community standard of care.

140.   Her mental health care in the Women's PSU was scant and generally deficient.  In the weeks after her PSU admission in late ███ 2024, her treatment consisted of only weekly wellness checks, the majority of which were conducted at cell-side without confidentiality.  Psychiatry check-ins were conducted infrequently, without confidentiality, and at cell-side. (The standard of care for such a patient is daily confidential clinical encounters with a psychiatric prescriber.)  The records indicate that no meaningful individual or group therapy was provided.  This case illustrates the inadequacy of the Jail's PSU to deliver clinically indicated and necessary mental health care to patient with acute mental health needs.

█████████

141.   This young woman has an extensive psychiatric history, and in fact was in an inpatient unit at Sharp Grossmont Behavioral Unit, on a Section 5250 involuntary psychiatric hold for grave disability, at the time the police arrested her and booked her at Las Colinas.  Due to her recent history of a suicide attempt, she received a "gatekeeping" assessment from a mental health clinician.  Of note, this assessment documented her inpatient placement prior to arrest, her diagnoses, and treatment needs.  She presented as psychotic and manic, yet the gatekeeper found only: "ISP [Inmate Safety Program] placement not indicated, refer to classification." This is so wrong, and reflected serious systemic dysfunction.

142.   This patient had been hospitalized for grave disability and had active psychotic symptoms.  She should have immediately received a psychiatric evaluation and been placed in the PSU. When she received a psychiatric evaluation, the psychiatrist confirmed her diagnoses and her medications from the community, but did nothing to place her at a higher level of care such as PSU.

143.   Over the next several weeks, she was housed in a General Population overflow unit, and did not receive any mental health care except medication.  A mental health clinician conducted short, non-confidential cell-front check-ins just two times in more than five weeks.  Psychiatry care was also inadequate during this

1  time, with improper delays in follow-up for new medications.

2      144.   When I encountered this patient, she was manifestly ill and in need of

3  acute level of care.  I shared my concerns with Jail staff who were with us during the

4  site visit.  This patient should have been receiving acute inpatient care, and should

5  have been seen far more frequently and in an appropriate, confidential setting.  The

6  Jail failed to provide treatment necessary to meet her mental health needs.

7      **C.    The Jail System Fails to Provide Minimally Adequate Outpatient
         Level of Care to Patients, Resulting in Serious and Preventable**

8      **Decompensation and Other Harms.**

9      145.   In my May 2, 2022 declaration, based on review of policies, reports,

10  and other documents, I found that San Diego County Jail lacks a structured mental

11  health treatment program that delivers an enhanced outpatient level of care, with

12  treatment modalities like confidential individual talk therapy, nursing support, group

13  therapy, art therapy, and recreation therapy, as Dr. Venters recommended to the

14  County in 2020.

15      146.   The recommendation for an effective outpatient mental health program

16  that meets the clinical needs of the incarcerated patient population goes back even

17  further, including to 2018, when Disability Rights California found:

18       The lack of access to mental health treatment activities and appropriate
         levels of care [in San Diego County Jails] violates minimum standards
19       of care for inmates with mental health needs.  The National
         Commission on Correctional Health Care has adopted a standard
20       requiring that "[r]egardless of facility size or type, basic on-site
         outpatient [mental health] services include, at a minimum, individual
21       counseling, group counseling and psychosocial/ psychoeducational
         programs" (citing NCCHC Standards for Health Services in Jails
22       (2014), Standard J-G-04.39).

23  DRC Report, DUNSMORE0124942 at 23.  The DRC Report, based on subject

24  matter expert findings and recommendations, urged San Diego County to implement

25  an effective outpatient mental health program:

26       Specifically, the DRC Experts recommend creation of an
         "intermediate" level of mental health care, with sufficient capacity to
27       ensure timely access for those individuals who need enhanced
         treatment programming.  The program would serve patients "stepping
28       down" from Safety Cell, EOH, or PSU admissions, as well as patients

> with a mental health condition that makes it difficult for them to function in a general population jail setting.  The program would require a substantial increase in mental health clinician staffing to provide a structured treatment program that includes individual and group therapy to meet the clinical needs of the inmate population.
>
> …
>
> DRC strongly encourages the County to implement an enhanced and structured outpatient treatment program.  It would have enormous benefit with respect to the safety and well-being of inmates, jail operations, and reentry efforts.  The Intensive Outpatient Program at Sacramento County Jail offers one useful model.

DRC Report at 24-25.

147.   Today, six years later, the San Diego County operates a few Outpatient Step Down (OPSD) units.  When I reviewed declarations and policies about these units in 2022, I discerned that the OPSD "does not appear to provide an adequate structured treatment program to patients."  May 2, 2022 Stewart Decl. ¶ 54.

148.   I conducted site visits of the OPSD units at Central Jail and Las Colinas in February 2024.  Having now conducted an in-person observation of the OPSD units, interacted with OPSD patients and staff, and reviewed additional records, it is even more clear to me that San Diego County Jail has failed to implement an enhanced and structured outpatient mental health treatment program with sufficient capacity or staffing to provide clinically necessary treatment to the mental health population.  This failure puts an exceedingly large number of incarcerated patients at substantial risk of serious harm, including decompensation, worsening psychiatric symptoms, psychosis, self-harm, and suicide.

149.   In the OPSD units at Central Jail, the levels of acuity and treatment needs are staggeringly high, and the OPSD "program" is grossly insufficient to meet the clinical needs of the patient population.

150.   In Central Jail's 6C OPSD unit, patients reportedly get more out-of-cell time in the dayroom than patients in the other two OPSD units at the Jail.  They had recently started being provided two one-hour group therapy sessions on Fridays.  I was informed that a psychiatric prescriber conducts monthly, generally non-

1  confidential cell-front visits with the OPSD patients.  Patients and staff shared with

2  me that individual clinical appointments, especially confidential ones, are quite rare.

3      151.   In the 6C OPSD unit, I interviewed approximately nine (9) patients.

4  All of them were very ill with major mental illnesses such as Schizophrenia, Bipolar

5  Disorder and Schizoaffective Disorder.  Many of the patients showed symptoms of

6  acute psychosis.  Each of them clearly needed a higher level of mental health than

7  what they were getting in this unit.

8      152.   In the 6B OPSD unit, custody staff did not allow me to interview

9  patients in the dayroom, telling us that everyone was "too unstable."  This was

10  inconsistent with how I have interacted with patients in other detention system's

11  outpatient mental health units, where I regularly meet with patients face-to-face,

12  unless individualized security concerns require otherwise.  I attempted to engage and

13  observed several chronically mentally ill patients who were responding to internal

14  stimuli and showing overt signs of serious mental illness, including paranoia,

15  delusional thinking, and mood instability.  Again, each of them clearly needed a

16  higher level of mental health care than what they were getting in this unit.

17      153.   During the OPSD 6B/6C unit visits, we spoke with a deputy who had

18  been assigned to the OPSD for the last few years.  He seemed committed to helping

19  the OPSD patient population as best he could.  He shared that he never received

20  specialized training on working with people with serious mental illness.  He said, "I

21  just learn from watching, and talking to people like Jennifer Alonso," the clinician

22  who worked in OPSD until 2022 and has provided testimony in this case.  The

23  deputy stated that he thought it would be good for OPSD deputies to get additional

24  specialized training to help them do their jobs in that unit. (This was concerning to

25  hear, including given that the Jail's mental health coordinator, Ms. Quiroz, claims

26  that deputies assigned to OPSD are supposed to receive additional specialized

27  mental health training.  Quiroz PMK Dep. at 266.)

28      154.   Additional specialized mental health training for deputies assigned to

1  mental health units is essential, and to my knowledge, relatively common practice in

2  other Jail systems.  It should absolutely be done in in this Jail system, too.

3      155.  In the 7C OPSD unit, I was shocked to find one of the most acutely

4  psychotic jail populations I have ever seen outside of an inpatient care unit; nearly

5  everyone in the unit had manifest psychosis.  Staff and patients confirmed that there

6  is no treatment programming in the unit, and that each patient is permitted out of his

7  cell, by himself, for just one hour per day.

8      156.  The cells and the general unit areas of Central Jail OPSD units were filthy,

9  unsanitary, and filled with debris.  The below photographs from Central Jail's OPSD,

10  taken a few years ago, demonstrate how these cells are often covered in trash and not fit

11  for human habitation, let alone for incarcerated people with grave mental health needs.

 

*Inside Cells from Outpatient Stepdown Unit for People with Serious Mental Illness*

20      157.  We took additional photographs of the same OPSD units during our

21  February 2024 site visit, with conditions as bad as or worse as compared with the

22  images from a few years earlier.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*The Central Jail Outpatient Stepdown Unit (Module 7C) floor outside of Jail cells,
with trash and debris covering the floor (SC_983498)*



*Inside a filthy Jail cell in the Central Jail Mental Health Outpatient Stepdown Unit (Module 7C), with the
patient-detainee completely under a blanket on the top bunk. The detainee has no personal items in his
cell, which is completely barren except for some food trash.*

*Inside a Central Jail Mental Health Outpatient Stepdown Unit (Module 7C) cell with food trash and rolled up mattress. There is clothing or a towel in the toilet.*

158.    This is *not* a therapeutic mental health program unit—it operates as a solitary confinement unit specifically designated for people with serious and active mental illness.  I have previously discussed the now widely accepted fact that people with mental illness placed in solitary confinement-type conditions are distinctively vulnerable to deterioration and decompensation that worsen their mental health condition, intensify symptoms, and put them at substantial risk of psychosis, self-harm, and suicide. 5/2/22 Stewart Decl. Dkt. 119-7, ¶¶ 24-33. Such concerns strongly apply to these OPSD units.

159.    In all, the lack of meaningful treatment and harsh conditions of confinement in the male OPSD units at Central are shockingly bad—no better (and in some respects even worse) than the description of the unit provided by long-time OPSD clinician Jennifer Alonso in 2022:

> Many patients in OPSD experience hallucinations, delusions, and other symptoms of mental illness.…
>
> As a mental health clinician for the OPSD units at Central Jail, I carried a caseload of between approximately 140 and 160 patients.  This patient caseload was so large that it was impossible to deliver anything remotely close to adequate mental health care given the needs of this population.  Based on my experience and clinical knowledge, I believe a caseload of no more than approximately 60-70 patients would be appropriate for clinicians providing care to the OPSD population.

When I started as a mental health clinician for the OPSD units, I was told that I would have the opportunity to develop a program with multiple treatment modalities, including structured therapeutic group programs and individualized one-to-one therapy. However, given the overwhelming caseload, lack of resources, and lack of confidential treatment space, it was never possible for me, or any other clinician, to provide these sorts of care on a consistent basis or to meet the clinical needs of our patients.

. . . On April 23, 2022, I worked my last day as a mental health clinician at the Jail. My decision to stop working at the Jail was one of the hardest decisions of my life. I care deeply for my patients. I have observed my patients decompensate, suffer in what can only be described as filthy, inhumane conditions, and in some cases, die by suicide. My patients were subjected to terrible conditions and put at risk of great harm every day, and I felt powerless to give them the care they need and deserve.

Alonso Decl., Dkt. 119-11, ¶¶ 9-13.

160.   I also visited the female OPSD unit at Las Colinas, and was again troubled by the inadequate treatment provided there. The clinician on that unit was impressive both in her clinical skills and her commitment to her patients. She explained that the patients in the unit receive a weekly, non-confidential clinical visit, and that one group session is provided to a maximum of ten (10) patients. That meant that if there were more than ten (10) patients housed in the OPSD unit at Las Colinas, some women could not participate in the one weekly group session due to capacity limitations. Higher-security OPSD patients ("green banders") were not permitted to attend group sessions unless sufficient custody staff were available to provide security; the clinician shared that custody staff unavailability was a frequent problem that negatively impacted mental health care programming.

161.   I asked the OPSD clinician at Las Colinas if any improvements were needed with respect to her program. She responded, "We need more ways of bringing people in. . . I don't get many referrals." She shared that given what she knows about the female patient population's mental health needs, "we should have a full unit" (roughly 22 patients) all the time. This fact is concerning, both because it reflects the recognition that there are women who need placement in a structured

1   mental health program that are not in OPSD *and also* because the current OPSD

2   program is not equipped to provide structured mental health programming sufficient

3   to meet patient needs.

4       162.   More than six years after Disability Rights California recommended a

5   structured outpatient treatment program, with sufficient mental health staffing

6   resources for individual and group treatment, to meet the clinical needs of the Jail

7   patient population, San Diego County Jail has not implemented that

8   recommendation.  But it is essential to patient well-being, and it absolutely can be

9   done.

10      163.   In fact, Jail staff have a model they can use *from inside their own jail*

11  *facilities.*  The California Department of State Hospitals funds and oversees a Jail

12  Based Competency Treatment (JBCT) program for up to 30 people in the 6D unit at

13  the San Diego County's Central Jail.  I spoke extensively with the JBCT program

14  director.  Unlike the County's OPSD units, the DSH-funded and -overseen JBCT

15  program operates more like a true clinical outpatient mental health unit.  All the

16  patients in the unit are out of their cells engaging in normal socialization activities

17  during the day.  Tables had puzzles laid out, some of which the patients had

18  successfully completed together.  JBCT patients get approximately ten (10) hours of

19  programming *per day* (structured and unstructured), including four (4) hours of

20  structured group treatment.  There are 2.5 FTE psychiatrists assigned to the unit,

21  with confidential psychiatry appointments for all patients at least weekly.  Two

22  clinicians assigned to the unit (with caseloads less than one-quarter as compared to

23  the OPSD units) meet with every patient individually every day, with a structured

24  confidential session at least weekly.  Additional educators and psych nurse staffing

25  resources support the treatment program as well.  There are two assigned deputies

26  who have received specialized mental health training.  The JBCT program director

27  stated it to me simply: "The program works."  The County is well aware of the

28  positive results of the program, as mental health coordinator Melissa Quiroz

1   testified:

2       Q.   Is it your impression that JBCT participation for some patients
        reduces suicidality?

3       A.   Addressing the mental health concerns, for sure.

4       Q.   And JBCT participation leads to improvement in patients' daily
5       functioning and activities of daily living?

5       A.   Yes.

7       …

8       Q.   [T]here's many aspects of that JBCT unit that is [] general mental
        health care-type activities?

9       A.   Yes.  They have those.

10

11  Quiroz PMK Dep. at 238-39.

12      164.   Sadly, staff at Central Jail were also aware that patients discharging

13  from the JBCT program (as when the criminal court finds them "restored" and

14  therefore competent to stand trial) return to other San Diego County Jail units—

15  including OPSD units—where the treatment program is a tiny fraction of what is

16  provided in the JBCT. Staff shared that it was not uncommon for patients recently

17  "restored" in JBCT to decompensate in the OPSD or other Jail units, with a new

18  onset of psychiatric symptoms and even a new finding that they are "incompetent to

19  stand trial" (essentially *undoing* the success of the JBCT program).

20      165.   Other jail and prison systems do far better in providing this necessary

21  level of outpatient mental health care.  For example, Sacramento County Jail

22  implemented an "Intensive Outpatient Program" in 2017, which has expanded since

23  that time to better meet the treatment needs of the Jail system's mental health

24  population.  The services provided in those programs include at least weekly one-to-

25  one, out-of-cell clinical contacts, ten (10) hours per week of structured therapeutic

26  activities, multi-disciplinary team meetings, care coordination with treatment

27  partners, treatment planning, crisis intervention, psychiatric medication

28  management, psychoeducation, and increased collaboration with custody to address

housing challenges, discipline and other issues. Outcome studies to assess efficacy of the program have been remarkable. In one study looking at 100 patients served, the County found that its Intensive Outpatient Program resulted in:

- A 61% decrease in disciplinary write-ups
- A 64% decrease in emergent referrals
- A 67% decrease in Acute Inpatient admissions

166. I am aware that other county jail systems have also implemented, or are implementing, enhanced outpatient mental health programs with positive results. Examples includes Alameda County, Orange County, and Santa Barbara County. This sort of programming is long overdue—and desperately needed—in San Diego County Jail.

**D.    The Jail System Erects Improper Barriers for Patients to Timely Access Clinically Necessary Mental Health Care and Placement.**

167. One of the most basic principles with respect to the standards of care for provision of mental health care, including in the Jail setting, is that a person should be provided mental health care placement and treatment consistent with their individual *clinical* needs. The San Diego County Jail system fails terribly in enacting this basic principle, in ways that are unsupportable, dangerous, and outside the norms I have observed in other Jail systems.

168. In my May 2022 declaration, I described my very serious concerns about the Jail's custodial blanket ban policy against Outpatient Step Down Program (OPSD) placement for people classified as "protective custody" with mental health housing needs. 5/2/22 Stewart Decl., Dkt. 119-7, ¶¶ 51-65. Jail mental health staff, including Dr. Evans and Ms. Alonso, have raised urgent concerns about this Jail's policy preventing people classified as "protective custody" from OPSD housing units. While the OPSD can and must provide more and better treatment for patients who need enhanced outpatient treatment, such a blanket exclusion is unjustifiable and unconscionable.

169.   The 2022 death of Derek Baker is an example of how this policy causes the worst of harms, as Ms. Alonso describes:

> Mr. Baker had mental illness and was found clinically appropriate for OPSD housing. However, because he was also deemed "Protective Custody," custody staff did not allow him to be housed in one of the OPSD housing units at the Jail. Instead, he was put in a cell with another Protective Custody individual who did not have serious mental illness (that is, he did not meet OPSD clinical criteria) and was in custody based on allegations that he had assaulted and critically injured an elderly store clerk. The cellmate violently assaulted Mr. Baker, who died from those injuries on March 29, 2022.

Alonso Decl., Dkt. 119-11, ¶¶ 38; *see also id.* ¶¶ 39-40 ("I, along with my mental health staff colleagues, had asked that Jail Command staff change their policy so that people like Mr. Baker could be placed in the OPSD unit, which is safer and clinically appropriate for them. … At least one Command-level staff member stated that the circumstances leading up to Mr. Baker's death concerned him. But the Command staff told me that they had no plan to change policy or practice on this issue.").

170.   Another incarcerated person who was in the unit when Mr. Baker was killed offers a chilling description of what happened to Mr. Baker. Gustavo Sepulveda recalls in his declaration:

> I heard an altercation in cell 5 through the wall in my cell. It sounded like the two guys were fighting. A little while later, I heard someone in the cell next to me say "man down, man down" …. It was silent for a bit longer, and then I heard grunting and the sound of impact over and over again. It sounded like a person's body or head being hit against an object like the ground or wall over and over again. The sound was bone-chilling. The sound stopped for a bit, and then resumed. After a few more minutes, I heard [the man] call to another incarcerated person in the dayroom, and say something like, "go tell the cops that I killed my cellie."

171.   More than two years later, the policy remains unchanged, even as the Jail's mental health coordinator has found that such change in policy would be "useful" and "good." Quiroz PMK Dep. at 64-65 (Quiroz: … "there is not an identified outpatient step-down PC mod per se. There is not that." Q: "Do you think that that sort of module would be useful to have?" A: "It would be useful." Q:

1   And the objective of it would be to ensure that people who both need outpatient

2   step-down and are designated as protective custody can get that level of service?" A:

3   "That would be good.").   Jail clinician Aseel Ross also has observed multiple

4   protective custody patients who were excluded from the outpatient mental health

5   unit, and stated that this was something that needs to change:

6       Q. [T]he mental health unit identified someone who was protective
        custody and said that person will not be allowed to receive placement
7       in the outpatient stepdown unit?

8       A. Yes.

9       Q. Do you have an example of your -- in your head of a patient who
        needed at least that level of care who didn't receive it as a result of that
10      decision?

11      A. Yes.

12      Q. More than one?

13      A. Yes.

14      Q. Any other examples of policies and procedures related to the mental
        health system at the jail that, based on your experience, you think
15      needed improvement?

16      A. The same thing.  Access to care for OP stepdown, PSU.

17  Ross Dep. at 172-73.

18      172.   Based on my site visit and review of materials in this case, it is clear

19  that there are numerous "Protective Custody"-designated incarcerated people for

20  whom structured outpatient mental health programming is clinically necessary.  I

21  note here that many people with intellectual disabilities are commonly designated as

22  Protective Custody.  It is extremely concerning that these individuals are, by policy

23  and practice, generally excluded from enhanced outpatient mental health treatment

24  and placement.  At least one patient with an intellectual disability shared with us

25  during the Jail inspections that staff informed him that he was being held in

26  Administrative Separation indefinitely because of his intellectual disability.

27      173.   The Jail must revise its policies, procedures, practices, and training to

28  ensure that mental health staff have primary authority in determining the placement

of an incarcerated person with mental illness in a mental health-designated program or housing unit, including Outpatient Step Down (OPSD), without any custodial blanket exclusions or other interference with clinical judgment.

174.    Another improper systemic barrier preventing patients from receiving clinically necessary mental health treatment is the Jail system's decision to exclude patients classified as Administrative Separation from accessing structured outpatient program placement, including OPSD.

175.    It bears emphasizing that Administrative Separation units in this Jail system are filled with people with serious mental illness and manifest psychiatric symptoms.  The clinical need for treatment among these individuals is overwhelming.  Meanwhile, the solitary confinement-type conditions contribute to further mental health deterioration and decompensation and put people with serious mental illness at substantial risk of psychosis, self-harm, and suicide.

176.    Making the problem even worse is that the Jail system essentially blocks access to structured outpatient mental health treatment for people designated as Administrative Separation.  Aseel Ross, the mental health clinician assigned to the George Bailey Administrative Separation units until late last year, recommended that structured treatment programming be provided in the Administrative Separation units, starting with at least two hours per day for each person.  She explained that the programmatic goals of this treatment program included to "reduce the risk of decompensation, "increase people's stability with respect to their mental health condition," "increase socialization opportunities," "help prepare patients to step down out of the AdSep setting," and "prepare patients for successful reentry upon release from the jail."  At the time she left her job at the Jail in late 2023, the proposal had gone nowhere.  Ross Dep. at 122-27.

177.    There remains almost no structured mental health programming in the Administrative Separation units, which based on my review, clearly do not have conditions conducive to a structured treatment housing unit.  When asked whether it

1  could be useful to create such a unit to serve this patient population, the mental

2  health coordinator testified that her team had explored the issue and determined that

3  it "is something that is worth doing." Quiroz PMK Dep. at 68-69.

4      178.   During my jail visits, I learned that there is now a group session offered

5  about once per week to a very small group of incarcerated persons in Administrative

6  Separation at George Bailey, conducted with each participant placed alone in side-

7  by-side cages outside the housing unit. At Las Colinas, a psychiatric technician

8  recently began providing a single treatment group to female incarcerated persons in

9  Administrative Separation at Las Colinas either weekly or biweekly, with

10  individuals remaining alone in their cells and forced to participate through an open

11  food port slot in the door. These sessions do not meet the standard of care for the

12  patient population in Administrative Separation I observed, given (among other

13  things) the infrequency, the limited number of patients served, and the requirement

14  that participation be from inside a cell or cage, with no opportunity for normal social

15  interaction.

16      179.   In my review of individual patient cases and records, I found other

17  examples of improper barriers to the provision of clinically necessary care. For

18  example, I encountered patients who reported that they were excluded from certain

19  placements, including OPSD, because they were deemed "jumper risks." (The

20  men's OPSD units, for example, have two tiers.) One man with serious mental

21  health needs was moved to a medical dorm after he stated a plan to jump from the

22  second tier (Michael Strausbaugh). Based on my assessment of his records and in-

23  person presentation, he required structured mental health treatment, which was not

24  available or provided to him in the medical dorm.

25      180.   Another patient, ███████████████ had complex treatment needs

26  that can be met with clinically appropriate care, but that were quite clearly not being

27  met by the Jail's mental health system. This transgender woman had a history of

28  self-harm and suicidal ideations associated with poor distress tolerance and

1  emotional dysregulation.  I have overseen treatment for patients with a similar

2  profile in jail settings.  Key elements of treating this sort of patient include setting

3  boundaries, developing a behavioral and/or safety plan, and structured

4  psychotherapy, carried out with a *consistent* treatment team.  For this patient, mental

5  health records show that she had seven (7) different psychiatric prescribers (1 MD, 6

6  NPs) across 8 psychiatry encounters. There is no evidence that she ever received

7  consistent therapy tailored to addressing her specific mental health needs.  She was

8  not placed in OPSD, possibly due to her transgender status, and instead was housed

9  in a highly restrictive setting where the isolation served to exacerbate her symptoms

10  further.  She was extremely reactive with limited engagement each time she met

11  with a new provider, diverted medications, and went on a hunger strike.  These

12  behaviors can be addressed with clinically adequate care, which she did not receive.

13     181.   *Ultimately, these improper barriers to clinically necessary mental*

14  *health treatment do **not** allow for an effective or proactive treatment system, but*

15  *rather a **crisis-response system***, where large numbers of patients are denied

16  essential care until they reach the point that they decompensate and become acutely

17  psychotic, suicidal, and/or gravely disabled.  Only then are mental health staff

18  provided the authority and resources to provide (at least in some cases) clinically

19  indicated treatment.  The result to incarcerated patients with unmet mental health

20  needs is serious and preventable harm to incarcerated patients, and the risk of such

21  harm constantly looming.

22  **IV.   FINDING #4: THE JAIL'S SYSTEM OF SOLITARY CONFINEMENT**
    **PUTS AN EXTRAORDINARILY HIGH NUMBER OF PEOPLE WITH**
23  **MENTAL HEALTH NEEDS AT UNNECESSARY AND SERIOUS**
    **RISK OF HARM.**

24     182.   In my previous declaration in this case, I described the now widely

25  accepted reality that people with mental illness placed in solitary confinement-type

26  conditions are exceedingly vulnerable to deterioration and decompensation of their

27  mental health condition, intensify their symptoms, and put them at substantial risk of

28

psychosis, self-harm, and suicide.  May 2, 2022 Stewart Decl., Dkt. 119-7, ¶¶ 24-33.

183.   I am informed that not long ago, the San Diego County Jail renamed its "Administrative Segregation" (or "Ad Seg") units to be called "Administrative Separation" (or "Ad Sep") units.  Other than changing the word "segregation" to "separation" in policy, I can discern no meaningful change in conditions or operations in these units since the name change.  Neither can mental health staff working in those units.  *See* Ross Dep. at 121 ("Q: And do you know the reason for the change in the name? … A: No, I don't.  Q: … Were you aware of any policy changes with respect to those units that went with the change of the name? A. No, not that I'm aware of.  No."); Alonso Decl. ¶ 19.  Accordingly, in this declaration, I use "Administrative Segregation" and "Administrative Separation" interchangeably.

184.   Having reviewed declarations, policies, reports, and other relevant documents provided to me, and also having visited several Administrative Separation housing units in the San Diego County Jails, I can confirm that these units constitute solitary confinement-type conditions, including as has been defined by the United States Department of Justice (U.S. DOJ).  *Report and Recommendations Concerning the Use of Restrictive Housing* at 3 (Jan. 2016), available at https://www.justice.gov/archives/dag/file/815551/download (restrictive housing-type segregation is characterized by (1) "Removal from the general inmate population, whether voluntary or involuntary"; (2) "Placement in a locked room or cell, whether alone or with another inmate"; and (3) "Inability to leave the room or cell for the vast majority of the day, typically 22 hours or more").

185.   Such conditions can cause serious psychological and other harms to any person, and they are exceedingly dangerous for people with mental health conditions.  The United States Department of Justice has recommended that "Generally, inmates with serious mental illness (SMI) should not be placed in restrictive housing."  *Id.* at 99-100.  It provides detailed guidance as to the rare circumstances under which a person with serious mental illness may be placed in

segregation-type housing:

- An inmate with SMI should not be placed in restrictive housing, unless:

  - The inmate presents such an immediate and serious danger that there is no reasonable alternative; or

  - A qualified mental health practitioner determines:

    - That such placement is not contraindicated;

    - That the inmate is not a suicide risk;

    - That the inmate does not have active psychotic symptoms; and

    - In disciplinary circumstances, that lack of responsibility for the misconduct due to mental illness or mitigating factors related to the mental illness do not contraindicate disciplinary segregation.

- Inmates with SMI who are diverted from restrictive housing should be placed in a clinically appropriate alternative form of housing, such as a secure mental health unit or other residential psychology treatment program.

*Id.* at 99-100.

186.   The U.S. DOJ's guidance is consistent with the practices I have observed in well-functioning detention systems.  Mental health staff in a functioning jail system are required by policy and practice to screen people in advance of a prospective placement in solitary confinement-type housing, to identify those people for whom such placement is clinically contraindicated, and to prevent such placement if such confinement is clinically contraindicated.

187.   I am deeply troubled by San Diego County Jails' widespread use of solitary confinement-type housing for incarcerated persons with serious mental illness, with conditions that are extraordinarily restrictive, harsh, and damaging to a person's mental health—particularly for someone with preexisting serious mental illness.  San Diego County Jail's system does not come close to complying with the guidance set forth by the U.S. DOJ, NCCHC standards, or recommendations that have been made repeatedly by parties inside and outside of the County.  My inspection of the Jail system's solitary confinement-type units, my interactions with

1    incarcerated persons with serious mental illness in those units, and my review of

2    records and documents all point to the conclusion that the San Diego County Jail's

3    system of Administrative Separation has caused, and currently is causing, serious

4    and unjustified harm on a broad scale.

A.    **Conditions in San Diego County Jail's Administrative Separation Units Constitute Some of the Harshest, Most Restrictive Forms of Solitary Confinement I Have Ever Witnessed in a Jail System.**

7    188.    I must begin with a description of the conditions I observed during my

8    recent in-person visit to the San Diego County Jail Administrative Separation units.

9    There was striking commonality in Administrative Separation units across all Jail

10   Facilities.  The conditions were consistently harsh and restrictive in ways that put

11   people with mental health needs at substantial risk of serious harm.  The units failed

12   to provide mental health treatment or supports that were urgently and clearly

13   necessary to meet the needs of what is a remarkably mentally ill population.  The

14   experience of people in these units was one of severe isolation, with inadequate

15   access to recreation, socialization, and out-of-cell time.

16   189.    With respect to out-of-cell time, the units I visited do not come close to

17   complying with California state law regulations regarding minimum out-of-cell

18   time.  State law regulations require that jails ensure "policies and procedures for a

19   minimum of 10 hours of out of cell time distributed over a period of seven days to

20   include: (1) an opportunity for three hours of exercise.  And (2) an opportunity for

21   seven hours of recreation."  Cal. Code Regs. tit. 15, § 1065. (The vast majority of

22   people in San Diego County Jails' Administrative Separation are placed there

23   indefinitely for "administrative" reasons, though some are there serving a

24   disciplinary sanction.)  San Diego County Jail Administrative Separation units I

25   observed do *not* meet this requirement.  It is important to note that even this

26   regulatory minimum constitutes solitary confinement-type conditions according to

27   U.S. DOJ and other standards.

28   190.    Other Jail systems provide significantly more out-of-cell opportunities

1   and other activities (such as electronic tablets with programming) that reduce the

2   level of isolation. San Diego County Jail should provide more out-of-cell and other

3   activities, including electronic tablets, across its system to provide some relief to the

4   serious mental health risks associated with this level of isolation.

5        191.   For people with mental health needs in particular, the extreme level of

6   isolation and restriction in San Diego County Jail solitary confinement units is

7   exceedingly dangerous.

8                    **1.    Central Jail Administrative Separation**

9        192.   At Central Jail, the Administrative Separation units I observed

10  generally had no incarcerated person outside of their cells in the dayroom.  Every

11  cell door was closed shut.  No staff were in the units to monitor or engage with the

12  segregated population.  Due to the time constraints of our Central Jail visit, I was

13  unable to interview individuals housed in these units.  Central Jail mental health

14  clinician Jennifer Alonso has described the horrifically unsanitary, debris-filled cells

15  in these units.  Such conditions strongly evidence that (a) individuals in these cells

16  have a mental health condition and potentially other disabilities that prevent them

17  from taking care of their own basic daily needs, and (b) neither Jail mental health

18  staff or custody staff are providing necessary monitoring, treatment, and supports

19  for these individuals.

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Filthy, trash-filled Central Jail Ad-Seg cell that housed patient with mental illness*



*Central Jail Ad-Seg cell holding patient with no property, trash strewn across floor*

## 2.    George Bailey Administrative Separation

193.    At George Bailey, conditions in the Administrative Separation units were shocking. The units were filled with people with serious mental illness and active symptoms.  In Administrative Separation Module 5C, I met with approximately nine (9) detainees.  All of them were very ill with major mental illnesses such as Schizophrenia, Bipolar Disorder and Schizoaffective Disorder. Many of the patients were acutely psychotic and very agitated.  They all required a higher level of mental health care than what was available in this unit.  I spoke with a deputy who explained that he has been working in the unit for a long time.  The detainees knew him well, and he knew several of them well.  When we asked him if he had observed people with mental health needs, he told us quite frankly, "people here are very sick."

194.    Through my conversations with individual detainees, the Administrative Separation deputy, and other staff, I learned that conditions in this unit (as in the other Administrative Separation units) were extraordinarily restrictive and isolating.  Individuals in this unit were allowed outside their cell once every other day—for a period of less than 60 minutes. (Most reported that, on the days they got out of their cell at all, it was for 45 minutes or less.)  Individuals have no normal human contact with any other person, even when they are allowed out of their cell.  In fact, the incarcerated people reported, and the unit deputy confirmed, that the Administrative Separation dayroom (*i.e.*, the large area with tables and seating inside the unit) is *not* used at all.  Each person comes out, by themselves, and is escorted (in handcuffs, as a blanket rule and regardless of their recent or current behavior) to a small caged area, about 12-feet-by-12-feet, that is adjacent and connected to a small shower area and another cell that is essentially identical to their own cell.  The caged area has a hands-free phone and is otherwise completely empty.  Because no one is allowed in the dayroom, a person cannot even converse with another incarcerated person through their cell door; the lack of human contact

is extreme.  To be sure, this level of restriction and isolation is outside the norms of even the most restrictive solitary confinement units I have seen in other systems.

195.   In my experience, this sort of arrangement, with the restrictive housing dayroom going essentially unused, and with a makeshift caged area being the only "out-of-cell" area in the housing unit, is exceedingly rare.  The below photographs, taken in February 2024, show this caged area and a portion of the Administrative Separation dayroom at George Bailey:





EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**



196.    Many people explained to me that they decline this "out-of-cell" time in the small caged area, as it offers no space or opportunity for exercise, socialization, or other meaningful activity.  For these people, this means that they are locked alone in their small cell 24 hours per day, every day.  Many people had not showered for extended periods.  Their mental health was suffering immensely. People arrived in this unit with serious mental health needs that were not being met, and their conditions were worsening, with symptoms such as paranoia, delusional thinking, and mood instability.  Aseel Ross, the mental health clinician assigned to the George Bailey Administrative Separation units, confirmed seeing incarcerated persons decompensate due to these conditions.  Ross Dep. at 55, 58-59.

197.    Inside many Administrative Separation cells, there was food detritus and debris that had accumulated over several days.  In my experience, the accumulation of such debris indicates that a person's psychological and/or cognitive condition may be deteriorated and require clinical attention.  It also creates unsanitary living conditions, as food rots, for example.  Two illustrative photographs of George Bailey Administrative Separation cells are below:





198.    There are multiple Administrative Separation units at George Bailey (including Modules 5A, 5B, and 5C).  I observed and learned about operations in

1  each of them.  Each unit had similar conditions, and each one was extraordinarily

2  harsh, restrictive, and isolating in ways that put people detained there at

3  unacceptable risk of harm.

4        199.    Access to "recreation" for people in the George Bailey Administrative

5  Separation units ranges from extremely limited to non-existent.  There is one

6  concrete recreation "yard" serving multiple Administrative Separation units housing

7  scores of people, with no more than ten (10) permitted to go there at a time.  And

8  when they do go there, they are each placed alone inside another cage, once again

9  preventing them from engaging in any sort of meaningful exercise and social

10  activity.  Photographs of the George Bailey Administrative Separation recreation

11  "yard" are below:



27
28  *George Bailey Administrative Separation recreation "yard" - Incarcerated people are not permitted in the central area, and are instead placed alone in individual cages along the perimeter, both for "recreation" and "group therapy."*





*Inside an Administrative Separation Outdoor "Yard" Cell, where people are placed alone for "outdoor recreation" and "group therapy."*

200.    Only a fraction of people in the unit ever actually go to the recreation "yard." One man with serious mental illness had been placed in the Administrative Separation unit following what was almost certainly a psychotic episode, during which he flooded his living area and then ran around in circles in the dayroom. When I met with him, he had been in Administrative Separation for three (3) weeks. When I asked him if he had gotten to the recreation yard, he said: "I didn't even know there was a rec yard for this housing unit." He reported that he had had one shower in the last three weeks.

201.    ███████  spoke cogently with me about his experience in the Administrative Separation unit. He said access to the recreation area was offered no

more than one or two times per week, and not at all some weeks (if there is rain, or a custody staffing shortage, for example) He shared that he used to go to the yard, but now mostly refuses because he hated the recreation yard cages.  He compared them negatively to even the most restrictive settings in the California state prison system, where he said that the caged yards allowed for access to sunlight.  Here, "you can't even get the sun on you" because the cages are fully covered.  He saw no physical, psychological, or other benefit to going from his small cell to a small covered cage in the concrete "recreation yard" area.

202.    During my February 2024 visit, I learned that mental health treatment was nearly non-existent in the George Bailey Administrative Separation units. There are two clinicians assigned to the Administrative Separation units—a recent increase from one clinician.  Policy requires that they conduct only a weekly cell-front visit to each person for people in these units. (People returning from the state psychiatric hospital get one additional clinical contact each week, I was told.)

203.    The mental health clinician assigned to the Administrative Separation units explained to me that confidential, out-of-cell clinical contacts were rare.  She estimated that she did about 5-7 out-of-cell clinical contacts per week, and that they generally occur only if a patient requests it *and* the recreation yard is open *and* a custody escort is available so that they can use one of the cages as the setting for the appointment.  She explained that the vast majority of mental health contacts were at cell-front, and entailed just a few questions about how a person was sleeping, feeling, etc.—what she called "quick things."  She acknowledged that many people were sick, and doing poorly, stating plainly that her "patients don't do well when they are isolated."

204.    Structured treatment in the Administrative Separation units was extremely minimal and, based on my observation of the population, does not come close to meeting basic clinical needs.  I was told that, about six weeks before my visit, a psychiatric technician had started doing one group therapy session every

other week in one of the Administrative Separation units, with each patient participating from inside their own cell, with the food slot open. The mental health clinician reported that she conducts a group therapy session one day per week for another of the units, with each participating patient placed alone in a cage on the unit's recreation yard. (The session was cancelled the week of my visit.) No more than ten (10) patients are permitted to participate. Based on my experience with group therapy in the detentions setting, it is clear that this is a very clinically inadequate treatment setting. The clinician must use a microphone so that patients can hear her from inside their individual cages. There is no way that patients can hear each other speak from one cage to another or appreciate non-verbal cues, undermining the process of group therapy. Most patients reported little benefit to attending the sessions. In fact, the clinician acknowledged that they had reduced this group session offering from two cohorts to one cohort, with attendance usually no more than seven (7) patients. She explained, "it's hard to motivate patients to come." In my experience, such low participation reflects deficiencies in the treatment setting and structure. In other jail systems with group treatment conducted in a more therapeutic milieu, participation is much higher.

### 3.     Las Colinas Administrative Separation

205.   Conditions for women in Las Colinas's Administrative Separation unit were similarly restrictive and problematic. The unit is filled with people with mental illness, who receive little out-of-cell time and almost no treatment. A psychiatric technician provides a weekly non-confidential, cell-side visit that entails only the most rudimentary check-in about the patient's symptoms, whether they are eating, whether they are showering, and/or how medications are working.

206.   Structured treatment is extremely limited in the Las Colinas Administrative Separation housing areas. There is no regular clinical contacts with qualified mental health providers unless there is a specific mental health referral submitted. I was informed that the psychiatric technician runs a weekly or biweekly

group therapy session, with all Administrative Separation patients remaining in their own cells with food ports open, negatively affecting the opportunity for meaningful interaction during the sessions. The psychiatric technician shared with us that it is "challenging" to have everyone in their cell for the sessions: "I have to yell pretty loud." The photographs below show the Administrative Separation unit and the area where staff indicated these group therapy sessions occur.

**B.** **People with Serious Mental Illness Are Placed in Administrative Segregation Without Consideration of Mental Health Input, Putting Them at Substantial Risk of Serious Harm.**

207. In my May 2022 declaration, I noted a major deficiency stemming from San Diego County Jail's written policies that give custody staff sole authority regarding placement of people in Administrative Segregation, a housing status where people are confined to their cells for nearly the entire day with conditions that constitute solitary confinement. I found that the Jail's policy and practice was



*Women's Administrative Separation unit Las Colinas*



*Women's Administrative Separation cell with window of cell door shattered.*



*Inside an empty cell, Las Colinas*

"inconsistent with NCCHC and other modern correctional mental health standards in ways that put patients at substantial risk of serious harm." May 2022 Stewart Decl., Dkt. 119-7, ¶ 39.

208.    The NCCHC Standards for Mental Health Services in Correctional Facilities' Standard MH-E-07 (Segregated Inmates) makes clear, for example, that for a patient being placed in segregation, it is necessary that "mental health staff reviews the inmate's mental health record to determine ***whether existing mental health needs contraindicate the placement*** [in segregation] or require accommodation" (emphasis added).

209.    Since my May 2022 finding that San Diego County Jail's policy on this issue was "grossly deficient" (May 2022 Stewart Decl., Dkt. 119-7, ¶ 34), the San Diego County Sheriff's Department revised its Detention Services Bureau (DSB) Policy J.3 (Separation: Definition and Use) in November 2023, including to change all usages of "Segregation" to "Separation." (This, once again, is a cosmetic change, with no apparent substance behind it.) The policy revision does nothing meaningful to remedy the problem I identified. The policy still fails to require mental health clinical input to decide whether a person with mental illness or risk factors for suicide may safely be placed in Administrative Separation units. The

policy, then and now, states only:

> Upon placement of an inmate into administrative segregation housing or pre-disciplinary housing, sworn staff shall notify the facility charge nurse of the placement. A qualified health care professional will review the inmate's health record. If existing medical, dental or mental health needs require accommodation, sworn staff will be notified.

DSB Policy J.3 § II(E).

210. It is worth noting that the policy specifically omits any reference to a mental health clinical determination as "whether existing mental health needs contraindicate the placement" in segregation, as specifically required by NCCHC standards.

211. As I noted in May 2022, San Diego County Jail's "policy fails to protect people who would be placed at substantial risk of serious harm in Administrative Segregation housing, for several consequential reasons: (1) the policy fails to direct that the treating clinician (who knows the patient) provide input; (2) it fails to direct the patient's *current* mental health condition be considered (relying only on a record review); and most importantly, (3) it makes no mention of a clinical assessment as to whether Administrative Segregation is contraindicated or whether the patient would be at heightened risk of suicide or other harm in segregation. The clinician's role is extremely and inappropriately limited." May 2022 Stewart Decl., Dkt. 119-7, ¶ 34. "The decision about a person's Administrative Segregation placement lies exclusively with custody staff." *Id.*

212. The November 2023 policy revision includes a passage that seems to acknowledge the grave risks that people with serious mental illness (and intellectual disabilities) face in these solitary confinement units:

> If after placement in separation, mental health or medical staff determine that an individual has serious mental illness or an intellectual disability, they shall be removed from disciplinary separation immediately upon this determination.

DSB Policy J.3 § II(G)

213. But this passage does *not* address my concern or the grave risks that

1 people in San Diego County Jails face today.

2    214.   <u>First</u>, the standard of care is for such a clinical determination to be

3 made *before* someone is placed in solitary confinement-type housing.  This policy

4 amounts to a directive of "solitary confinement now, assessment for mental illness

5 later."

6    215.   <u>Second</u>, the passage covers only "disciplinary separation" for reasons I

7 cannot understand.  By policy, Administrative Separation is used for "incarcerated

8 persons who are classified for safety and/or security reasons, are pending

9 disciplinary action or for investigative purposes."  Only a small number of people I

10 observed in Administrative Separation were there for documented "disciplinary"

11 purposes.  Most were there indefinitely for vague "safety or security" reasons.

12 Again, the standard of care, including as recognized by the U.S. DOJ, is that, as a

13 general matter, *no* person with serious mental illness should be placed in these sorts

14 of units.

15    216.   <u>Third</u>, and most significantly, based on my visit to the Jail

16 Administrative Separation units and my related review, it is abundantly clear that

17 this policy has been implemented in a way that mental health and custody staff all

18 understand—and *expect*—that people with serious mental illness will be placed—

19 and *remain*—in these solitary confinement-type units.  As noted above, a custody

20 deputy assigned to the George Bailey Administrative Separation units shared with

21 me that "people here are very sick."  We asked the Chief Mental Health Clinician at

22 George Bailey if she had data showing how many people with serious mental illness

23 were currently housed in Administrative Separation.  She checked, and reported that

24 there were 19 people identified as having serious mental illness in Administrative

25 Separation that day.  (A clinician assigned to the units acknowledged that there were

26 still more people with "symptoms we need to watch.")  No staff member seemed to

27 believe that the Jail's policy required removal of people with identified serious

28 mental illness from Administrative Separation.

217.   During my February 2024 visit to several of the Jail's Administrative Separation units, I interviewed many people who were very sick and psychologically deteriorating.  My on-site interviews and subsequent review of patient records indicated that staff were not taking necessary action to help these individuals.  I spoke with one incarcerated person, ████████████ in Administrative Separation who shared with me that he was extremely suicidal.  I had to alert staff to his situation; this man was moved to Enhanced Observation Housing, where I saw him a few hours later.

218.   The Jail's Medical Services Division Policy G.2.1 (Segregated Inmates) was also updated since my May 2022 declaration criticized its content. The current version (revised November 2022) remains entirely deficient. SD_0117443-0117444.  The policy continues to direct that custody staff place people in the Administrative Separation units prior to any assessment by mental health staff.  Custody staff must only notify a nurse about such a placement, with health staff (not mental health staff, as NCCHC standards require) then performing a chart review to determine if the individual requires an "accommodation." SD_0117443.  This does not meet the standard of care and clinically appropriate practice in detention settings.  People with a history of mental illness or suicide risk should be evaluated by mental health staff *before* such placement, including with a *face-to-face* evaluation, to determine if their current condition and profile makes such a placement clinically contraindicated and dangerous.

219.   Even when a patient is actively deteriorating in Administrative Separation, the policy directs only that "Health staff will promptly identify and inform custody staff of inmates who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health."  SD_0117444.  As I have previously described, the most favorable reading of the policy is that clinical staff only take any action when a person is noticeably "deteriorating" and their health is "failing" to warrant an emergency acute mental health or medical

placement.  Without *preventative* protections, this is a dangerous and inappropriate jail mental health care practice: adequate Jail mental health care requires processes to *prevent* avoidable decompensation and other harms, not merely to respond to mental health crises that may have been caused by the isolation conditions.

220.   Jail Medical Policy G.2.1 ("Segregated Inmates") continues to contain a notation that it is "in compliance with" National Commission on Correctional Health Care (NCCHC) standards (citing NCCHC J-G-02).  This notation is misleading, as the policy fails to comply with NCCHC *Standard MH-E-07 (Essential): Segregated Inmates*, which requires that mental health staff take steps to "determine ***whether existing mental health needs contraindicate the placement*** [in segregation]."  That is to say, the Sheriff's Department health care policy (like its custody policy) does *not* meet NCCHC standards regarding consideration of a patient's mental health prior to solitary confinement placement.  The Jail's policy instead creates substantial risks of serious harm to vulnerable people, including those with mental health and intellectual disabilities.

221.   This deficiency was identified long ago.  In January 2017, the NCCHC's Technical Assistance Report for the San Diego County Sheriff's Department ("NCCHC Report") found that the Jail's "mental health staff does not [] screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement."  NCCHC Report, DUNSMORE0260618 at 101; *see also id.* at 36, 68, 102, 136.

222.   The 2018 Hayes Suicide Prevention Report also recommended that the Jail act to prevent the placement of people with mental health conditions in Segregation housing when clinically contraindicated.  Mr. Hayes wrote: "Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, ***it is strongly recommended that medical personnel review the medical section of [the Jail Information Management System] to determine whether existing medical***

1    ***and/or mental health needs contraindicate the placement*** or require

2    accommodation."  2018 Hayes Suicide Prevention Report, DUNSMORE0117148 at

3    70-71 (emphasis added).  His report notes that this recommendation is consistent

4    with NCCHC Standards.  *Id.* at 20.

5          223.   The Sheriff's Department's public response to Mr. Hayes' report on

6    this topic was disappointing: "Business processes are being developed, and policies

7    are being updated, to provide for real time notification to Qualified Mental Health

8    Providers so assessments can be accomplished in a timely manner."  *Id.* at 6.  The

9    response completely ignores Mr. Hayes' recommendation (and the NCCHC

10   standard) that clinicians should provide input as to whether an Administrative

11   Segregation placement (or housing with similar restrictions) is contraindicated for a

12   patient due to mental health or other needs.

13         224.   Ms. Alonso, who worked at the Jail for three years up until April 2022,

14   testified that the Jail's mental health co-coordinator made a "specific

15   recommendation to the Sheriff's Department to stop putting people with mental

16   illness in the solitary confinement-type Ad-Seg units," but that "Sheriff's

17   Department Command staff refused to implement this recommendation."  Alonso

18   Decl., Dkt. 119-11, ¶ 21.  She described how custody staff dictate solitary

19   confinement placement without consideration of a person's mental illness or

20   whether such placement is clinically contraindicated:

21         I received an email from custody staff about one of my patients who
             was experiencing significant psychiatric symptoms.  The email stated
22         that the line custody staff thought my patient should be transferred to
             Ad-Seg housing.  No reason was provided.  The placement appeared
23         arbitrary and more for the custody staff's convenience than the security
             or well-being of anyone.  No one asked me for my clinical input;
24         custody staff simply directed me to modify the patient's record
             (removing the patient's OPSD status) so that custody could move the
25         man into Ad-Seg.  Similar incidents happen multiple times each month.
             My fellow mental health colleagues and I have been conditioned
26         through our interactions with custody staff not to question such custody
             directives.

27

28   Alonso Decl., Dkt. 119-11, ¶ 23.

225.   Likewise, Dr. Evans, the former Medical Director and Chief Psychiatrist at the Jail, describes how clinical input was regularly ignored, and how she "saw many people being placed into Administrative Segregation when clinicians knew and made known that such a placement would be harmful."  Evans Decl. ¶ 20.

226.   It is clear that this dangerous practice, of placing—and retaining—people in solitary confinement-type Administrative Separation units without consideration of whether their current mental health condition and needs contraindicate the placement, continues today.  *See* Quiroz PMK Depo. at 250-51 (noting there is still no mental health clinical assessment done for a person being placed in Administrative Separation, with clinical issues something that can be discussed at staff meetings that occur every two weeks); Ross Dep. at 43 ("Q: … Have there been examples in your experience where you made a recommendation that somebody be removed from AdSep based on their mental health where classification says, no, they need to remain in AdSep and they so remain? A. Yes. Q. Do you have any examples that come to mind? A. Yeah."). I strongly recommend that this policy and practice be changed to align with modern standards.

**C.     The San Diego County Jail's System, Through Its Deficient Policies and Practices, Places a Disproportionately High Number of People with Serious Mental Illness in Administrative Separation, with Devastating Effects.**

227.   While the above-described failure of the San Diego County Jail System to prevent the dangerous placement of Administrative Separation placement when clinically contraindicated is a grave concern, the systemic deficiency runs even deeper.  In my review of policies, practices, and patients' actual experiences, I observed a deeply disturbing trend of people with serious mental illness being placed in Administrative Separation at a disproportionately high rate, with devastating effects on their mental health, safety, and well-being.  Several policies and systemic practices contribute to this problem.

228.   **People with serious mental illness are placed in Administrative**

1  **Separation based on behaviors from the past (including manifestations of their**
2  **mental illness), not based on their actual current behavior and profile.**  This
3  practice puts people at unnecessary risk of serious harm.  For example:

4  █████████████

5      229.   During my February 2024 visit to the George Bailey Administrative
6  Separation unit, I encountered a patient with serious mental illness who was in acute
7  distress.  He had been involved in a physical altercation during a previous jail
8  detention, leading to an Administrative Separation placement until his release from
9  custody in ████ 2023.  When he returned to custody in ████ 2024, he was
10  automatically placed back in Administrative Separation. (This fact was confirmed
11  by staff with us during the tour.)

12      230.   Mr. ██████ had been in Administrative Separation unit for a few
13  weeks when I met with him.  The Jail had failed to continue him on psychiatric
14  medications he was taking prior to his arrest.  Based on my interactions with him, it
15  was apparent that he had decompensated greatly in Administrative Separation, was
16  in very acute distress, and was suicidal.  I promptly informed staff with us on our
17  tour about my observation and grave concern.  Later that day, I again encountered
18  Mr. ██████, who had been moved to an Enhanced Observation Housing unit.  Mr.
19  ██████ begged not be put back in Administrative Separation, saying with
20  desperation "I am going to be good from now on.  I'm trying to be cool, be good.  I
21  miss my family.  I can't be in Ad Sep anymore."

22      231.   A lieutenant with us on the tour intervened and told us that he would
23  work to have Mr. ██████ reclassified so that he would not be put back in
24  Administrative Separation.  The lieutenant confirmed that it is "not uncommon for
25  initial placements to be in Ad Sep" based on Administrative Separation placements
26  during past jail detentions, regardless of current behaviors or mental health needs.
27  This was quite worrying to hear.

28      232.   When I later reviewed this man's mental health records, I was deeply

concerned to see that, within a couple days of this incident, the Jail had in fact
returned this patient to Administrative Separation. (The records had no mention of
any new security issue; he appears instead to have been returned to Administrative
Separation simply because that was his already-assigned housing.) This was
shocking and outrageous from a clinical perspective. This is an enormously high-
risk patient to place in solitary confinement. According to the records, right before
he was returned to solitary confinement, a clinician saw him at cell-front, noting:

> "[H]e presents as tearful and apologetic, stating, 'I want to behave, I
> want to do well, can you take me out of Adsep?' [Patient] endorsed
> feelings of depression related to being in custody, and requested to
> meet with the psychiatrist, 'I think I need stronger meds.' ... 'I want to
> shower, can you call my probation officer[]? Tell her that I don't want
> to be here.' [Patient]'s concerns were processed and validated."

233. Mr. ▓▓▓▓ was later seen by a psychiatric provider, who documented
that he had a history of suicide attempts, had signs and symptoms of "depression
'yes' 10/10, persistent low feeling, lonely, hopeless, low energy, anhedonia,
worthless 'kinda', feeling of guilt," of "mania/hypomania racing thoughts,
distractibility," and "anxiety yes! 10/10." He was noted as being "mildly unkempt,"
with his cell being "messy" with "debris scattered about."

234. Neither the clinician nor the psychiatric provider documented any
consideration as to whether Administrative Separation placement is clinically
contraindicated, or whether an alternative treatment setting was appropriate. This is
a striking demonstration of a Jail mental health system that ignores patients'
treatment needs and obvious risks of harm, including suicide.

235. A week later, Mr. ▓▓▓▓ was still in Administrative Separation,
seemingly getting worse, and still at enormous risk of further decompensation and
suicide. The clinician did a non-confidential cell-front check-in, and wrote:

> [Patient] walked toward his door to meet with the writer and
> repeatedly stated, 'I don't want to be in Adsep.] [Patient] seems to lack
> understanding about the reasons that led to his Adsep placement, he
> claimed to be struggling with the isolation and being lockdown most
> part of the day. ... [Patient] proceeded to report, "I miss my mom, I

1

2

3

*don't want to be here" while he broke down crying when he mentioned
missing his mother. [Patient] reported he had court yesterday and was
not satisfied with the outcome, "the judge wants to send me to
prison...can you take me out of Adsep ... can you pray for me?" ...*

*At the end of the encounter, [Patient] was informed that he might or
might not be considered for an alternate placement in OPSD, SDCJ,
contingent upon his psychiatric and behavioral history being reviewed.*

236.   As I continued reviewing this patient's records, I saw *no* documentation that an "alternate placement in OPSD" was considered, or even that his "psychiatric and behavioral history" was reviewed for such consideration.  Instead, a week later, he received his next cell-side visit, where the mental health staff person noted:

*[Patient] endorsed feelings of sadness and loneliness related to being
in Adsep/custody ... [Patient] voiced his feelings of frustration after
learning he will not be admitted into a different program in CJ.
[Patient]'s concerns were processed and validated, and he was
informed he will continue to receive supportive services as needed and
per his request.*

237.   The treatment "plan" for this patient read, in full: *"Continue to be monitored cellside."*

238.   This patient was at an extreme risk of serious harm, including suicide, when I observed him during my visit.  Despite reassurance from Jail staff that the issue would be addressed (including through a more appropriate, *non-*Administrative Separation placement), it was not.  And the records strongly indicate that there was no clinical justification for the continued Administrative Separation placement or the lack of meaningful therapeutic intervention.  The Jail system's policy and practices placed—and kept—this patient in a situation where he was at extraordinary and unjustifiable risk of harm.

239.   I met with this patient with a history of serious mental illness who had been held in Administrative Separation for the approximately four months since he was booked at the Jail.  He was last at San Diego County Jail ten years earlier, in 2013.  That year, staff reportedly found him with something they considered to be a

1  weapon, and placed him in Administrative Segregation, where he remained for a

2  few weeks before transferring to California state prison to serve a sentence of seven

3  (7) years.  In state prison, Mr. ███ reportedly was housed in mainline general

4  population.  He had been released and living in the community for about three years,

5  until this detention began.  He was having a very difficult time coping in

6  Administrative Separation, and was not getting psychiatric medications that he had

7  long been taking by prescription.

8      240.   I can discern no legitimate justification for keeping this patient in

9  Administrative Separation.  My review strongly indicates that he was placed at

10  unnecessary risk of mental health decompensation and harm as a result.

11      241.   I encountered many people with serious mental illness who were placed

12  directly into Administrative Separation after stays in a psychiatric hospital or the

13  Jail's acute care Psychiatric Services Unit, even when they had a history of

14  decompensation in Administrative Separation.  This deficient practice serves to

15  undermine the treatment and stabilization provided to that patient in the hospital or

16  acute care setting.  It commonly leads to a cycle of decompensation and puts people

17  at substantial risk of serious harm.  For example:

18  ████████████

19      242.   ████████████ has diagnosed serious mental illness for which she

20  takes medication.  When she first came into custody, she was put in Administrative

21  Separation at Las Colinas.  Her mental health worsened there, and she spent an

22  extended period in the acute care Psychiatric Services Unit.  Having been deemed

23  Incompetent to Stand Trial in her criminal case, she was then transferred to the state

24  psychiatric hospital, where she received treatment in a therapeutic setting allowing

25  her to interact with others and participate in structured treatment daily.  She

26  described that she did well and "liked being able to talk to [hospital] staff and other

27  patients," and her psychiatric condition improved.

28      243.   When I met with her, she had just a few days earlier been returned to

San Diego County Jail. The Jail had placed her *back* in Administrative Separation, where she had previously decompensated and where she now was again feeling isolated and having a difficult time coping. She was demonstrating active signs of psychosis. Based on my review, the Administrative Separation placement was clinically contraindicated and likely to cause unnecessary harm to this patient.

244.    ████████'s placement in Administrative Separation was similarly problematic. She reported that she had spent the last approximately eight years in a state psychiatric hospital while designated as Not Guilty by Reason of Insanity in her criminal court case. At the state psychiatric hospital, she was housed in a five-woman dorm setting, where she did well interacting with others, and her mental health condition was generally stable.

245.    She had recently been returned to San Diego County Jail for court proceedings, and was placed directly into Administration Separation. She was being held in a severely isolated setting, confined to her cell all day except one hour when she was allowed out of her cell all alone. Her condition seemed quite fragile and I had concern as to whether she was experiencing psychotic symptoms in this highly restrictive unit. She described to me how difficult it was to be there, saying: "They are longer days here."

**D.    The San Diego County Jail's System of Administrative Separation and Solitary Confinement-Type Conditions Puts People with Mental Health Needs at a Substantial Risk of Death, Including by Suicide.**

246.    The enormously elevated risk of suicide for people—particularly, people with mental health needs—in solitary confinement units is well-established. The San Diego County Jail's system of Administrative Separation and solitary confinement-type conditions is among the most dangerous examples I have ever seen. The significant number of suicides and other deaths that have occurred in these units demonstrate the exceedingly high risk to which the Jail system exposes

people with mental health needs.  And it is important to note that those deaths represent just the *tip of the iceberg* in terms of the scope of the harms and risks of harm resulting from the Jail system's current policy and practices, as demonstrated by some of the case examples described above.

247.   Yet the issue of suicides and other deaths in San Diego County Jail Administrative Separation units demands attention and action.  The problem has been going on for years.

248.   The DRC Report found that at least six people killed themselves at the Jail between 2014 and 2016 while in segregation units.  The DRC Report described one person who committed suicide after spending six consecutive weeks in administrative segregation, and four months overall.  The person's medical record indicated that staff failed to notice the significant mental health issues the person developed while in segregation and took no action to address the risk.  Another person with mental illness committed suicide in administrative segregation after waiting days to see mental health staff and being denied out-of-cell time.  DRC called for the Jail "take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances."  DRC Report, DUNSMORE0124942 at 32.

249.   Suicide prevention expert Lindsay Hayes also noted "the strong association between inmate suicide and segregation housing" and urged the San Diego County Jail to ensure that mental health staff timely evaluate whether solitary confinement placements are contraindicated based on the person's individual mental health needs, and to act against such dangerous placements.

250.   In 2018, the DRC Report and the Hayes Suicide Prevention Report offered meaningful and important recommendations for how San Diego County Jail should address the large number of deaths in the solitary confinement units.  I would urge the County to implement those recommendations in full.  Having reviewed

EXPERT REPORT OF PABLO STEWART, M.D.

policy and practices, patient records, and other materials in this case, it is beyond question that, as of now, a staggeringly high number of people with serious mental illness are being placed at unacceptable risk of suicide through imposition of the unnecessary and brutally harsh conditions in Administrative Separation.

251.   I provide a review here of only a small sample of deaths that have occurred in those Administrative Separation units.  Some of these deaths were deemed as suicides, but all of them illustrate the unacceptable risk of harm that these units create for people with mental illness.  These cases are particularly horrific in their outcomes, but the circumstances and Jail practices involved in these cases are pervasive in the San Diego County Jail system.

**Suicide of Matthew Settles, July 2023 (Administrative Separation)**

252.   Mr. Settles had long history of serious mental illness and died by suicide while in custody at San Diego County Jail, having been denied minimally adequate treatment of his psychosis and while housed under solitary confinement-type conditions in the Administrative Separation unit at George Bailey.  In that unit, Jail staff's monitoring of his condition and safety was entirely inadequate, which directly contributed to his death.  Mr. Settles' mental illness and instability were described by his mother, who said that he was the "kindest most gentle and helpful young man and then rapidly becomes very frightening," specifically when he was struggling with medication adherence.  He had a history of several near-fatal suicide attempts and often required conservatorship and inpatient psychiatric treatment to stabilize his condition.

253.   On June 3, 2022, while in inpatient care at the San Diego County psychiatric hospital, Mr. Settles impulsively attacked another patient.  He was arrested and booked into San Diego Central Jail.  Despite his complex history and psychiatric hospitalization immediately prior to his arrival at the Jail, he did not receive a psychiatric evaluation and was instead placed in Enhanced Observation Housing without being restarted on antipsychotic medications.  A few days later, he

1  was housed with two cellmates.  The next day, a roommate tied a towel around

2  Mr. Settles' neck and slammed his head against the ground multiple times.

3  Mr. Settles sustained significant head injuries requiring 49 stitches and

4  hospitalization for several days.  At this stage, Mr. Settles should have been housed

5  in a safe, inpatient setting with greater supervision and proper psychiatric care.  This

6  did not occur.  He was discharged from the outside hospital and returned to the Jail.

7  Two weeks later, he was *still* waiting for a psychiatric evaluation and clinically

8  indicated medication.  Showing symptoms of psychosis and decompensation, he got

9  into an altercation with a deputy.  He was placed in Administrative Separation

10 housing, where he remained until he died by suicide a few weeks later.

11     254.   Mr. Settles *finally* received an *initial* psychiatric evaluation at the Jail

12 on July 23, 2022, almost seven weeks after his booking date.  This is an

13 unacceptable delay that negatively impacted his condition.  Mr. Settles was then

14 confined in an intensely isolated Administrative Separation setting.  He was offered

15 no therapeutic programming and remained in his cell essentially around the clock.

16 His condition worsened greatly: he became socially withdrawn, disheveled and

17 disorganized, had poor hygiene, demonstrated impaired judgment, and repeatedly

18 refused medications.

19     255.   As I discussed in my May 2022 declaration (at Paragraphs 85-105),

20 inadequate safety checks are a major deficiency in this Jail's system.  The safety

21 checks on the day of Mr. Settles death (more than a year after my declaration) were

22 notably out-of-compliance even with the Jail's existing safety check protocols,

23 which Suicide Prevention expert Lindsay Hayes, the State Auditor, and Disability

24 Rights California had all found were themselves dangerously inadequate even when

25 followed.  Mr. Settles was found with a shirt wrapped around his neck, hanging

26 from the top bunk of his cell.

27     256.   It is hard to overstate just how deficient the Jail's mental health

28 treatment was or how dangerous the conditions were leading up to Mr. Settles'

1  suicide.  Again, Mr. Settles was receiving *inpatient psychiatric care* immediately

2  prior to his arrival, had a history of self-harm and suicide attempts, and was showing

3  obvious signs of worsening psychotic symptoms.  He should *not* have been housed

4  in the solitary confinement-type conditions of Administrative Separation.  The Jail

5  further failed to provide him clinically necessary psychiatric care, therapeutic

6  treatment, and monitoring for safety, culminating in his suicide.  This death was

7  foreseeable and preventable, and demonstrates both the mental health system

8  failures of San Diego County Jail and the extraordinary danger of its Administrative

9  Separation housing practices for people with serious mental illness.

10       257.   Just as concerning was the lack of post-suicide debriefing with the

11  mental health team or necessary corrective action after Mr. Settles' death.  George

12  Bailey mental health clinician Aseel Ross confirmed that no one from leadership

13  ever reached out to her to debrief the situation, that there were no corrective action

14  plans that she was aware of, and that there no revisions to the Administrative

15  Separation policies or procedures that resulted in the wake of Mr. Settles death.

16  Ross Dep. at 136-137.

17  **Suicide of Jonathan McDowell, July 2023 (Administrative Separation)**

18       258.   Mr. McDowell was found hanging in his cell in Administrative

19  Separation (George Bailey) on July 19, 2023, five months after he arrived at the Jail

20  on February 20, 2023.  He was found unresponsive and pulseless in his solitary

21  confinement cell; medical personnel revived him enough to send him out to a

22  community hospital, where was pronounced dead a few days later.  When he arrived

23  at the Jail, there were numerous identified indicators that he had serious mental

24  health treatment needs.  He had a history of a "mood disorder" for which he had

25  been receiving treatment in the community.  █████████████████████████████

26  ████████████████████████████████.

27       259.   At intake, Mr. McDowell reported feeling hopeless/helpless but denied

28  suicidality.  Within a few days, he reported to staff that he was experiencing anxiety,

1  depression, insomnia, and hopelessness, and fearing the onset of a "mental

2  breakdown."  Yet it still took nearly three weeks for the Jail to provide

3  Mr. McDowell a full behavioral health assessment.  By this time, he was reporting

4  experiencing auditory hallucinations.  He was referred for a psychiatric evaluation

5  on March 10, 2023, but the first time a psychiatric provider attempted to see him

6  was not until the end of April.  Records show that Mr. McDowell did not see the

7  provider at that time, however, and did not get any psychiatric evaluation at the Jail

8  until June 2, 2023, three and a half months after he came into custody.  This is an

9  unacceptable delay in psychiatric care for this sort of patient.

10      260.   Mr. McDowell then finally started receiving medications—a complex

11  combination of mood stabilizer, tranquilizer, and antidepressant Duloxetine.  He

12  was scheduled for a psychiatric follow-up two months later (in August 2023).  Such

13  a timeline for follow-up is clinically unacceptable; a psychiatry follow-up should

14  have happened within one week for this patient.  The medication regimen was

15  clearly not working for him, and he refused medications at least 40 times between

16  June 2 and his suicide attempt on July 19.  No follow-up occurred: Mr. McDowell

17  had died by suicide before the scheduled psychiatry follow-up date arrived.  With

18  respect to other mental health interventions, he was being seen only once per month

19  by a clinician, with no meaningful treatment provided.

20      261.   Mr. McDowell's condition deteriorated further, and on or about July 9,

21  2024, custody staff changed his placement to Administrative Separation, putting him

22  on a "Lockdown/Disciplinary Separation" status, according to records.  A mental

23  health clinician met with him, and he reported a very high stress level, stating: "I'm

24  stressed to the gills."  He said that he had been trying with his psychiatric

25  medication but that "it's not working out."  His description was specific and deeply

26  concerning, explaining that the medications caused him to see lights and stars that

27  were "like an electrical storm."  The clinician's final assessment was shocking in its

28  disregard for Mr. McDowell's well-being and need for urgent psychiatric care,

1  stating only "Pt will continue to receive weekly wellness checks while in
2  Disciplinary Separation."  He was seen by a mental health clinician just a few more
3  times over the next approximately six (6) weeks, including on the day he hanged
4  himself.

5       262.   On July 19, 2023, a clinician who reportedly had never interacted with
6  Mr. McDowell before, conducted a cursory and inadequate cell-front wellness
7  check.  She documented that she could not observe the cell's condition because
8  "food port open thus unable to see fully into cell," and that McDowell "declined
9  services when asked if he had any MH questions/concerns ('no' and gestured hand
10 in 'no' fashion)."  She noted that "[Patient] is not fully compliant with medications,
11 more refusal than administrations."  No follow-up treatment or planning is
12 documented.  In fact, the line for the next mental health clinician visit is noted as
13 "7/18/23" (which was in the past).

14      263.   Mr. McDowell was found hanging in his cell, with torn clothing tied
15 around his neck, later that July 19 morning.

16      264.   This is a very egregious case.  The patient had to wait for over three
17 months to be seen by a psychiatric provider despite clear and documented indicators
18 showing that this was an urgent case.  I have grave concerns about the complex
19 medication combination that was prescribed, and even graver concerns that there
20 was no psychiatric follow-up to see how the patient was doing.  He was doing very
21 poorly, with concerning side effects, continued symptoms, and problems with
22 medication adherence; nobody did anything about it.  The patient was placed in a
23 dangerously restrictive solitary confinement setting, where he further deteriorated
24 and did not receive clinically necessary monitoring or treatment.  Based on my
25 review, this was a preventable death where the mental health treatment fell below
26 the standard of care, and the solitary confinement conditions imposed an
27 unacceptable risk.

28      265.   The post-death review of this suicide is deeply troubling, insofar as it

1   fails to identify, or seek to address, the many systemic failures involved in this case.

2   For example, in the NaphCare clinical review of McDowell's death, under

3   "Recommendations for Modifications in Protocol, Procedure, or Approach to

4   Patient Health Care Management Resulting from this Review," it states only the

5   following: "Closer Psychiatric follow-up/care."  I could find nothing in the post-

6   death investigation by the County or NaphCare that suggested a recognition that the

7   Administrative Separation placement for this man was dangerous or problematic, or

8   that necessary corrective action would be taken.  These sorts of tragic outcomes will

9   almost certainly continue to occur, unnecessarily, until the deficiencies I (and

10  others) have identified are remedied.

11  **Death of Lonnie Rupard, March 2022 (Administrative Separation)**

12      266.   This 46 year old man with serious mental illness died a horrible death

13  in a Central Jail Administrative Separation unit.  According to the findings of the

14  Medical Examiner, the cause of death was pneumonia, malnutrition and dehydration

15  in the context of ***neglected schizophrenia***.  Quite notably, the manner of death is

16  listed as ***Homicide***.  This patient had a long history of a psychotic-level mental

17  disorder which had a documented response to medications in the past.  The patient

18  did not receive any psychiatric medications for the three months he spent at the Jail

19  leading up to his death.

20      267.   Mr. Rupard was arrested on December 19, 2021.  The autopsy report

21  stated that he was to be seen for a psychiatric sick call the next day, although I could

22  not locate this note in the medical record.  The autopsy report, however, states

23  "patient refused psychiatric evaluation."  This does not meet the standard of care for

24  this sort of patient.  The psychiatric provider is still obligated to evaluate the patient

25  whether the patient is cooperative or not.  (In fact, I found many clinical encounter

26  records where mental health staff noted only "Unable to Assess.")  A skilled

27  psychiatrist or clinician can glean a lot of information about the patient by

28  observation and through the nature of the patient's refusal.  They can (and should)

observe the hygiene of the patient and the cell, as well as speak with custody and nursing staff that have interacted with the patient. Simply documenting "refusal" is unacceptable. The following week, two more initial psychiatric evaluations were scheduled and canceled (December 24 and 28) for Mr. Rupard, with the following note: "Patient was scheduled for an initial evaluation on (SIC), however due to time constraints, patient was unable to be seen. Patient will be rescheduled for psychiatric sick call." This further delay is also unacceptable.

268.    Finally, on December 29, 2021, Mr. Rupard was seen at cell front. The patient was described as being shirtless in his cell, irritable and surrounded by empty food trays. He rambled incoherently, and was yelling and verbally aggressive. The psychiatric provider noted in the record "no signs/symptoms of patient being a danger to self/danger to others." I agree that the patient was not overtly an immediate danger to self. There was much evidence, however, that he was gravely disabled and required urgent treatment intervention, which did not occur.

269.    The next psychiatric appointment was scheduled for more than a month later, on February 2, 2022. The note indicates that the patient "refused" and was rescheduled for February 16, 2022, 16 days later. (The record shows that he was not seen until February 22, when there is only a cursory evaluation done at cell-front.) There is a troubling lack of urgency, even as the records indicate that this patient's condition was greatly decompensated and worsening.

270.    On March 14, 2022, the patient was seen by a court-ordered psychiatrist to assess his competency to proceed with his criminal case proceedings. That psychiatrist noted that the patient's cell was dirty with trash on the floor as well as feces in the toilet. There were food containers thrown about the cell. The patient was emaciated. The psychiatrist recommended that the patient receive involuntary psychiatric medications. Still, there is no indication of any action being taken.

271.    On March 17, 2022, Mr. Rupard was found unresponsive in his cell. Resuscitation efforts were employed unsuccessfully. The autopsy found that he had

1    lost fifty pounds during his three-month stay at the Jail.

2        272.   Jail clinician Jennifer Alonso testified as to how Mr. Rupard ended up

3    in solitary confinement ("Ad-Seg") housing despite her raising serious concerns

4    about his situation and well-being:

> Another patient who died after being moved to Ad-Seg by custody staff without input from myself or other mental health clinicians was Lonnie Rupard.  Mr. Rupard had a mental health condition that had made him psychotic and erratic.  He had been placed on my OPSD caseload.  After he tried to sharpen an object to that could be used as a weapon, I told custody staff that I was concerned about the situation.  Custody staff then moved him into an Ad-Seg "overflow" unit at the Jail.  (Ad-Seg units are frequently filled to capacity, leading to custody staff operating other housing units as Ad-Seg "overflow" units.)  Although I did have concern about his remaining in the OPSD unit with my other OPSD patients, I did not believe that Ad-Seg was a clinically appropriate placement for him.  However, I knew that custody staff had exclusive authority regarding the Ad-Seg placement and that I could not advocate for another housing option.  Really, Mr. Rupard needed placement in a structured therapeutic outpatient setting that provided sufficient security; such a unit does not exist at Central Jail.
>
> Once he was in Ad-Seg, Mr. Rupard was no longer on my OPSD caseload.  I recall that the clinician assigned to the Ad-Seg unit was so overwhelmed with her caseload and other clinical duties that she was unable to see Mr. Rupard as frequently as was needed.  My understanding is that Mr. Rupard refused his medications and food while in Ad Seg.  Feces were present all over his cell and the toilet, and food trays and trash were strewn everywhere.
>
> Mr. Rupard died while still in Ad-Seg, having lost a significant amount of his body weight and in a medically compromised condition, about two months after he was placed there.  **Custody staff never consulted with me about whether solitary confinement would put Mr. Rupard at risk of harm.  I knew that, by policy and practice, I had no authority or avenue to recommend against his Ad-Seg placement.**
>
> Mr. Rupard's experience as a person with mental illness held in the Jail's Ad-Seg housing units is not unusual.  I have observed many people with mental illness decompensate in Ad-Seg.  They smear feces on the walls and cell door windows, and their cells become horrifically filthy.  Custody staff regularly stand by and watch this happen.

25   Alonso Decl., Dkt 119-11, ¶¶ 27-30.

26        273.   Instead of working to prevent placement of people with mental illness

27   or at risk of decompensation in Administrative Segregation (or Administrative

28   Separation) unless absolutely necessary, the Jail places patients like Mr. Rupard in

solitary confinement-type setting without regard to mental health-related risks and without critically necessary treatment.  This practice is outside the accepted norms of the correctional mental health care community, and places people at substantial risk of serious harm.

274.   The lack of treatment provided to Mr. Rupard is staggering.  He was placed in solitary confinement despite clear clinical contraindications and need for a higher level of care.  He was never taken out of his cell for any of his mental health or psychiatric contacts.  All encounters were done cell-side.  The psychiatric staff never considered or took steps to use involuntary psychiatric medications while this man was starving to death.  Based on my review, this was an avoidable death if proper psychiatric care had been provided in an appropriate treatment setting.

**Suicide of Lester Marroquin, May 2021 (Administrative Separation)**

275.   Mr. Marroquin was a 35-year-old man with schizophrenia spectrum disorder who died by suicide after drowning himself in the toilet of his Central Jail Administrative Separation cell.  He struggled with severe auditory hallucinations telling him that his mother was in danger.  Throughout his incarcerations, he was frequently placed in safety cells and enhanced observation for self-harm and aggression driven by these symptoms.  When he arrived at the Jail in December 2020, Mr. Marroquin was visibly tormented and yelling "I know what you are doing to my mom.  I know that you have her.  I heard her."  His mother called the jail to warn them about his suicidality and the importance of restarting his medications. Mr. Marroquin had an extensive history of suicidality; during his incarceration in the Jail, he was placed in safety cells 11 times and had been housed in the Jail's Enhanced Observation Housing (EOH) unit 17 times.

276.   On December 22, 2020, Mr. Marroquin choked himself related to concern for his mother, prompting a psychiatric evaluation during which he expressed, "I don't know what's wrong, I'm hearing my mom calling my name, I'm just not feeling safe."  He went on to engage in numerous self-harm behaviors,

including biting himself and head-banging.  Speaking with his mother on the phone was very grounding and therapeutic for him, but this was regularly denied to him when he was placed in safety cells and Enhanced Observation Housing, where phone calls are prohibited or heavily restricted.  In other words, the Jail's response to his decompensation and suicidality included further or complete *restriction* on a key therapeutic intervention known to help him.

277.    Mr. Marroquin's mother communicated concerns to the Jail about how the denial of phone calls added to her son's psychological distress, and stated that his current behaviors were decompensated compared to how he was in the community.  Based on the records, it is unclear why such an ill individual was not promptly transferred to a higher level of care where he would be provided closer monitoring, therapeutic engagement with the care team, and other interventions to address his symptoms and immediate safety concerns.

278.    After three months of this, during which time he was placed in Administrative Separation, Mr. Marroquin was finally admitted to the Psychiatric Stabilization Unit (PSU) on March 28, 2021.  He remained paranoid and focused on self-harm, shifting primarily to submerging his head in the toilet.  On April 5, 2021, he was discharged from the PSU and sent back to the same Administrative Separation unit where he had done so poorly.  He continued his pattern of self-harm, frequently transitioning between Administrative Separation, safety cells, and Enhanced Observation Housing—in none of these settings did he receive meaningful mental health treatment or support.  He remained consumed by his auditory hallucinations urging him to drown himself and drink toilet water or his mother would die, and staff noted multiple incidents of seeing him placing his head in the toilet.

279.    On May 28, 2021, Mr. Marroquin reported suicidal ideations and was placed in a safety cell with step down to Enhanced Observation.  On the morning of May 30, 2021, staff sent him back to Administrative Separation, without any

1   consultation with psychiatric team members who were familiar with his recent

2   behavioral patterns.  This re-placement in Administrative Separation was clinically

3   contraindicated, and it was inappropriate that it would occur without mental health

4   consultation.  He was placed on hourly safety checks (which is standard practice in

5   this Jail system, despite numerous recommendations that safety checks be done

6   twice as often in Administrative Separation).  Given his recent active self-harming

7   behaviors, there was significantly high risk for suicide and these safety checks

8   should have been more frequent for him.  He was last noted alive at 3:05PM, then

9   found unconscious during the next safety check at 3:59PM. He died from water

10  intoxication likely caused by drowning in the toilet of his cell.

11          280.   Jail clinician Jennifer Alonso testified to her first-hand experience with

12  Mr. Marroquin and the circumstances of his death, which matches my assessment of

13  this case:

14          I have seen how these Ad-Seg placements, with no clinical input from
         mental health staff and no mechanism for clinicians like me to protect
15       our at-risk patients, have deadly consequences.

16       For example, my patient, Lester Marroquin, died by suicide in an Ad-
         Seg cell on May 30, 2021.  Mr. Marroquin had a significant history of
17       mental illness and had repeatedly attempted suicide and engaged in acts
         of serious self-harm.  He had decompensated while held in an Ad-Seg
18       placement to the point that staff placed him on suicide precautions in a
         psychiatric observation cell.  I was asked to meet with him while he
19       was being held in the psychiatric observation cell, which I did several
         times.  (Those clinical contacts were done at cell-front, with other
20       patients in cells just a few feet away.)  He was struggling a great deal.
         He had fears about being sent to prison, was hearing voices, was
21       smearing his own feces in his cell, and was sticking his head in the
         toilet.  On Sunday, May 30, a day I was not working, Mr. Marroquin
22       was removed from the psychiatric observation cell, and custody staff
         moved him back into Ad-Seg.  No one informed me about custody staff
23       moving Mr. Marroquin back into the Ad-Seg housing where he had
         previously decompensated, and I was not consulted about whether it
24       was clinically safe for him to be returned to Ad-Seg following his
         removal from psychiatric observation.  That same day, Mr. Marroquin
25       banged his head several times, placed his head in the toilet of his Ad-
         Seg cell, and finally died of acute water intoxication.  I still cry when I
26       think about what happened to Mr. Marroquin; he should not have died.

27  Alonso Decl. ¶¶ 27-30.

28          281.   Mr. Marroquin's death was manifestly foreseeable and, with

appropriate mental health treatment and placement in an appropriate, non-isolation treatment setting, his death could also have been prevented.  In my experience, this sort of egregious case would (and should) lead to a Jail system making significant changes to its policy and practices with respect to use of solitary confinement for people with serious mental illness or suicide risk.  I can discern no such significant changes in the San Diego County Jail system in the wake of, or any time since, Mr. Marroquin's death.

**Suicide of Matthew Godfrey, November 2019 (Administrative Separation)**

282.    Matthew Godfrey, a man with serious mental illness, died in a Central Jail Administrative Segregation cell that was filthy. He was found with torn clothing around his neck and a rope in his pants.  The harmful effects of isolation on Mr. Godfrey's mental health were manifest from the condition in which he died.  He was wearing five pairs of underwear and three pairs of socks.  Although Jail medical staff initially reported Godfrey's death as a suicide, the medical examiner determined he died from a heart condition.  According to the medical examiner's report, Godfrey's cell "was dirty and unkempt with paper waste and food debris strewn along the walls and floor."

283.    Whatever the true or official cause of death, there can be no doubt that the isolating and terribly harsh solitary confinement conditions combined with the lack of treatment played a significant and even determinative role in Mr. Godfrey's death.

**V.    FINDING #5: THE SAN DIEGO COUNTY JAIL'S SYSTEM FOR SUICIDE PREVENTION IS DEFICIENT, FAILS TO PROTECT PEOPLE WITH SERIOUS MENTAL HEALTH NEEDS, AND CAUSES SERIOUS HARM.**

284.    I am aware that San Diego County Jail has received much attention for the high number of suicides and mental health-related deaths over the last fifteen years, including from the California State Auditor in its February 2022 report, from Analytica Consulting for the San Diego Citizens' Law Enforcement Review Board

in its April 2022 report, from Disability Rights California in its April 2018 report, from national suicide prevention expert Lindsay Hayes in his 2018 report, from the San Diego Union-Tribune in its *Dying Behind Bars* reporting series in 2019, and more.

285.   I am aware of what is an extraordinarily high number of suicides and mental health-related deaths that have occurred in San Diego County Jail over the last several years.  My assessment for this case, however, does not rely on the quantity of such deaths, but rather the Jail's policies, practices, and procedures, including those that relate to suicide prevention.  It is my assessment that those policies, practices, and procedures are deficient in ways that have contributed to many in-custody deaths and that continue to put large numbers of incarcerated people at substantial and unnecessary risk of suicide.

286.   It must first be said that, until the deficiencies identified elsewhere in this report are remedied, these risks to incarcerated people will remain unacceptably high.  For instance, an adequate jail suicide prevention system requires: an effective mental health screening system (Finding #1), appropriate and timely psychiatric medication management practices (Finding #2), clinically appropriate inpatient and outpatient mental health treatment programming with system capacity to meet the needs of the population (Finding #3), and the elimination of the dangerous use of solitary confinement-type conditions that put people at risk of decompensation and suicide (Finding #4).

287.   Below I address additional suicide prevention-related deficiencies identified through my assessment of the San Diego County Jail system.

**A.    The Jail's "Detention Safety Program" Is Inadequate and Dangerously Outside the Norm of Clinically Adequate Jail Systems for Suicide Prevention.**

288.   In Finding #1, I describe deficiencies in the Jail's initial mental health screening system with respect to identifying and addressing suicide risk.  But even in cases where the general mental health screening or referral system do identify

1  potential suicide risk in a person in San Diego County Jail, there are significant

2  deficiencies in how that person is then treated.

3      289.   The Jail's "Detention Safety Program" (also referred to as "DSP" or

4  "Inmate Safety Program" or "ISP") begins with the use of a "gatekeeper," who is

5  (usually) a mental health professional charged with conducting an initial suicide risk

6  assessment for people that other staff identify as being a potential suicide risk.

7  During my Jail Facilities visit, I spoke with staff who serve in this "gatekeeper" role.

8  I learned that the "gatekeeper" evaluations are *not* comprehensive mental health

9  evaluations. The "gatekeeper" assessment, by policy and practice, serves only to

10  evaluate a person for placement on suicide precautions, *not* to determine clinically

11  indicated mental health treatment. It focuses on whether a patient is suicidal and

12  requires placement in a Detention Safety Program unit – specifically, a "safety cell,"

13  Enhanced Observation Housing (EOH), or a Psychiatric Services Unit Mental

14  Health Observation cell. Notably, as discussed elsewhere in this report, meaningful

15  mental health treatment is not provided in *any* of these placements. This is a serious

16  deficiency, as addressing suicidality effectively *requires* providing clinically

17  indicated treatment.

18      290.   The gatekeepers whom I interviewed acknowledged that they generally

19  play no role in identifying treatment and mental health program placement needs.

20  One clinician stated that he cannot provide a "direct route" to the Outpatient

21  Stepdown Unit unless the patient had previously been housed there. Such a policy

22  is deeply undermining of the objective to keep people at risk of suicide safe. A

23  person coming off of suicide precautions should be promptly transitioned to the

24  appropriate mental health placement and level of care. But what I saw, time and

25  again, were patients who had become suicidal in a particular placement (commonly,

26  Administrative Separation), then spent a period of time on suicide precautions, only

27  to be discharged back to the same placement where they had become suicidal, with

28  no adjustment in their treatment plan or program. This is a recipe for disaster for

1 people at elevated risk of decompensation, self-harm, or suicide.

2     291. The "gatekeeper" assessment is meant to determine "Current Suicide

3 Risk Acuity"— using a "high" or "low" designation—which seems to carry great

4 weight in determining whether a particular suicide precautions placement is needed.

5 In my review of records, I found great variability in the extent to which

6 "gatekeeper" staff discussed the reasoning for a "Current Suicide Risk Acuity"

7 determination, and a lack of documentation sufficient to ensure consistency and

8 quality of these assessments. My records review revealed that people were placed

9 on, or cleared from, suicide precautions in the Detention Safety Program without

10 sufficient clinical justification.

11     292. A lack of guidance – or, more specifically, circular guidance – in the

12 Jail policy (MSD.S.10 – Suicide Prevention & Patient Safety Program) likely

13 contributes to this problem. The policy states:

14     Suicide risk designation is defined as follows:

15         1. Acute low risk – the patient is currently deemed at low
imminent risk of suicide ….

16

17         2. Acute high risk – the patient is currently deemed at imminent
high risk for suicide …

18 MSD.S.10, SD_117715.

19     293. Both the Hayes report and the DRC Report make important

20 recommendations on how to address deficiencies in this Detention Safety Program

21 system, including removal of the vague low/high risk designations and replacement

22 with a more appropriate observation system. Many of those recommendations were

23 not implemented or only partially implemented by the San Diego County Jail

24 leadership.

25     294. For example, Mr. Hayes recommended that a person's initiation or

26 continuation on suicide precautions should be based on *current* suicide risk

27 (Recommendation #23). The Jail declined to implement this recommendation, and

28 policy and practice continue to require that a person receive "two consecutive low

1   risk designations," spaced out over as long as 24 hours, in order to be removed from
2   Detention Safety Program suicide precautions.  As discussed below, suicide
3   precaution placements in safety cells or Enhanced Observation Housing are
4   extremely restrictive. To keep a person in such placements beyond the period their
5   level of risk warrants is clinically problematic: doing so sends a message to a patient
6   that if they report suicidality, they will face restrictive conditions for extended
7   periods and in ways that seem punitive.  What I heard from patients again and again
8   is that they refrain from reporting suicidal thoughts for fear of punitive-feeling
9   restrictions and conditions in the Detention Safety Program.  This increases rather
10  than decreases suicide risk and detainee safety.

11      295.   It is also problematic that there is no policy expectation that
12  "gatekeeper" suicide risk assessments be done confidentially.  Quiroz PMK Dep. at
13  167 ("It does not specifically state in the policy that [the suicide risk assessment]
14  must occur in a confidential location.").  In reviewing the mental health records
15  system, I observed that there is no place on the "Gatekeeper" clinical form to
16  document whether a suicide risk assessment was done confidentially, and I generally
17  saw no such information documented.  To ensure an adequate suicide risk
18  assessment, it is essential that they be done confidentially, absent specific
19  circumstances where it is not possible based on current individualized security
20  concerns.

21      296.   Inadequate supervision and treatment after a patient is discharged from
22  suicide precautions is another major concern.  Again, the "gatekeeper" who removes
23  a person from suicide precautions generally plays no role in facilitating clinically
24  indicated supervision and treatment after that.  Clearance from suicide precautions
25  should come with a thorough clinical assessment to guide implementation of an
26  individualized treatment plan.  This San Diego County Jail's failure to do this, by
27  policy and practice, puts people at substantial risk of serious harm.

28      297.   Take the recent case of ███████████ a man with a psychiatric and

suicide attempt history. He arrived at the Jail in ███ 2023, at which time the "gatekeeper" found him to be extremely distressed, tearful, endorsing suicidal thoughts, and withdrawn when asked about how he might hurt himself. He was placed in the Detention Safety Program, in an Enhanced Observation Housing unit. He was cleared from suicide precautions by mental health staff the next day when he reported that his symptoms had resolved. He was referred to custody classification staff for housing, without a clear treatment plan in place. Follow-up with mental health was recommended to occur within 24 hours, but based on my review, no such follow-up occurred. Given Mr. ███'s initial level of distress, rapid turnaround, and other factors in his psychiatric history that put him at elevated risk, it would have been prudent to implement enhanced monitoring and prompt clinical assessment, but this did not occur. Within a couple days of being cleared from suicide precautions, and without mental health treatment in place, Mr. ███ jumped off the top tier of his housing module, fell an estimated 20 feet, landed on the cement floor, and was found in a pool of his own blood. He was transported to the hospital with extensive injuries, including pelvic, facial, and rib fractures, kidney, liver, and lung lacerations, and traumatic brain injury. SD_965918-966805.

**B.** **The San Diego County Jail's Detention Safety Program Placements for Patients in Psychiatric Crisis Are Harsh, Extraordinarily Restrictive, and Often Clinically Counterproductive.**

**1. The San Diego County Jail System's Use of "Safety Cells" Is Inhumane and Dangerous.**

298. In 2018, Disability Rights California described the conditions and procedures of "safety cells" as follows:

These Safety Cells are extraordinarily harsh settings. They are small, windowless rooms with rubberized walls. There is no furniture or bedding, leaving the individual to sit or lie on the floor. Safety Cell doors contain a food slot and a small viewing window that faces a hallway. Cells have a ceiling light that is illuminated 24/7, and a camera for remote observation by custody staff.

The cells are completely barren, with no sink, toilet, or running water. Inmates defecate and urinate in a grate on the ground. In June 2017, a

Grand Jury evaluation of jail conditions found a "very strong" smell of urine surrounding the Safety Cells.

Inmates placed in these Safety Cells are stripped naked and given only a "safety smock" made from heavy tear-free material fastened with straps or Velcro. The garment is open at the bottom, and no underwear is provided. Inmates receive no books or any other personal property while in a Safety Cell.

Placements in a Safety Cell are approved by the Watch Commander, in consultation with medical staff. An initial medical assessment must be done within 30 minutes after medical staff is notified. Department policies require observation of inmates placed in Safety Cells by custody staff at least twice every 30-minute period and by medical staff every four (4) hours. The jail's policy is for a mental health consultation to occur within 12 hours of placement, and a medical evaluation every 24 hours.

There is no time limit for how long an inmate may be kept in a Safety Cell.

DRC Report at 19, DUNSMORE012942.

299. The DRC report recommended that the Jail "[g]reatly reduce the use of 'Safety Cells' for individuals with mental health needs. Inmates placed in Safety Cells as a result of behaviors related to mental health symptoms should not be housed there for longer than six (6) hours. At that point, if there is no less restrictive housing appropriate, they should be considered for placement in inpatient care (including the PSU)." *Id*. at 32. Mr. Hayes concurred in the six-hour time limit recommendation. Hayes Report at 71, DUNSMORE0117148. The County declined to implement this, or any other, time limit on safety cell placement.

300. Little has changed since 2018. Safety cell conditions appear the same. Although the County reports that safety cell use has decreased in recent years, I observed many cases of people being placed in safety cells, sometimes for extended periods of time. The policy on safety cell use has not meaningfully changed since the 2018 DRC Report. There is still no time limit. I strongly urge the Jail to implement the DRC and Hayes recommendation that no one be held in a safety cell beyond six (6) hours. If a patient is still an acute risk of suicide at that time, they should be moved to an inpatient placement where clinically indicated treatment and

1  supervision are provided.

2      301.  Safety cell conditions remain very concerning.  During my site

3  inspection, I observed the safety cells at Central Jail.  In three cells, there was

4  standing water in the bottom of the grate in the floor (where people must defecate

 

*San Diego County Central Jail "Safety Cell"
for People at High-Risk of Suicide*

*Central Jail Safety Cell floor grate
(with standing liquid not drained),
where people in crisis must urinate and defecate*

19  and urinate); it appeared that they were not draining properly, creating a real

20  sanitation concern.  Photos taken from my observation are provided here.

21      302.  Conditions are so harsh in the safety cells that people deny having

22  suicidal thoughts to avoid being placed in them, or to get out of them.  The Jail

23  mental health coordinator stated that the safety cells "don't lend themselves well to

24  a therapeutic environment."  Quiroz PMK Dep. at 68.  I agree, and would add that

25  the conditions in these safety cells are in general *counter*-therapeutic.

26      303.  The recent case of ███████████████ illustrates how damaging and

27  counter-therapeutic a safety cell placement can be for a patient in San Diego County

28  Jail.  This young woman, with a well-known history of serious mental illness, was

1  placed in a safety cell soon after being booked in ███ 2024, due to disorganized

2  behaviors and agitation secondary to uncontrolled psychosis.  For approximately 48

3  hours, she remained in the safety cell naked, smearing feces and menstrual blood on

4  the walls.  While some of her behaviors were attributed to psychosis, when staff

5  interviewed her through the food flap in the cell door, she emphasized distress from

6  needing "to be let out to shower, use the bathroom, and be with other people."  Staff

7  documented that she was "naked standing facing the wall dancing, making

8  incoherent statements.  Her cell was messy, she sm[ea]red her drink, water or

9  menstrual blood because it was red all over, her food was smeared on the floor.  She

10  did not eat anything.  She refused her breakfast and did the same thing with lunch.

11  She continues to seem[] to be manic, unable to follow directions.  Refusing to eat or

12  drink, refusing meds, refusing to vouch for her safety. [P]er sworn, she is getting

13  worse … she pee[d] o[n] the floor all over her cell."  Even after this observation, she

14  remained isolated in the safety cell for more than 24 additional hours.  When she

15  was finally transferred to the Psychiatric Services Unit, she described how "I was in

16  the safety cell for several days on my period so I am dirty and I have not been able

17  to shower.  They kept giving me water which affects my period but I was trying to

18  hold it in."  Ms. ███████ 's treatment needs were not met while the was in the

19  safety cell, and she should have promptly been provided an acute inpatient level of

20  care instead.

21            **2.      The San Diego County Jail System's Use of Enhanced**
               **Observation Housing Cells Are Punitive, Clinically**
22            **Counterproductive, and Dangerous.**

23            304.   Both Lindsay Hayes and DRC expressed concerns about the Enhanced

24  Outpatient Housing (EOH) units in San Diego County Jail in 2018.  The DRC

25  Report described these units in 2018 like this:

26            Even though EOH inmates, in contrast to inmates in Safety Cells,
               generally have access to a toilet, they too endure conditions of extreme
27            isolation and deprivation.

28            We observed and met with several inmates in EOH units.  Consistent

with County policy, all clothes and underwear are taken away, and inmates receive a safety smock, two blankets, and shower shoes. However, we reviewed multiple records documenting that EOH inmates were left naked, with no safety smock, and in some cases not even provided a blanket. Some are forced to sleep on a thin mat placed on the floor. Many inmates complained about being cold, even with the smock and blankets.

Inmates have no access to personal property, television, recreation yard time, or visits from family. Inmates in the EOH units eat from paper trays and a paper safety spoon, and in some cases are restricted to eating without any utensil.

Inmates in the EOH units with individual cells complained about extremely limited time outside their cell and excessive isolation.

Mental health staff appear to recognize the extreme conditions in the EOH units. In one inmate's chart we reviewed, a psychiatrist recommended that the facility "discontinue EOH as the isolation is inhumane and likely to compromise [this inmate] Women's EOH Cell in Medical Isolation (Las Colinas) psychologically." We learned that some inmates deny having suicidal thoughts so they can get out of the EOH unit, or avoid placement there, given the harsh conditions.

DRC Report at 21-22, DUNSMORE01249242-0125012.

305.   Little has changed in the EOH units since 2018. Conditions in these units remain defined by extreme isolation and deprivation. Everyone in the unit is stripped of their clothes and made to wear a safety smock, the heavy garment that is open at the bottom and provides little modesty. (Thankfully, we observed some people in the EOH units having access to a book, and we saw one man in EOH (photo below) who was permitted to use the phone to speak with his loved ones.) There was no sign that patients had any opportunity for normal human in-person interactions with others; they were completely isolated.

1
2
3
4
5
6
7
8
9
10
11
12
13



*Man in "Safety Smock" in Central Jail's Enhanced Observation Housing" Unit for People at Risk of
Suicide, Alone in the Dayroom, Sitting on the Floor and Talking to Loved One on the Phone.*

14   306.   Suicide prevention expert Lindsay Hayes criticized these conditions in

15   2018, calling them "overly restrictive and seemingly punitive" and "harsher than for

16   those [people] on segregation status." He stated that isolation "not only escalates

17   the inmate's sense of alienation, but also further serves to remove the individual

18   from proper staff supervision." He noted "the real possibility that [EOH] measures

19   were contributing to an inmate's debilitating mental illness." He also observed that

20   visits with mental health staff were non-confidential and cell-side. 2018 Hayes

21   Report at 40-42, DUNSMORE0115368.

22   307.   On the day of our visit at Central Jail, there were four (4) patients in the

23   EOH unit. The floor staff told me that "several people were cleared" shortly before

24   we arrived. A deputy who worked regularly in the unit told me there is an average

25   of 7-to-8 people in the EOH unit on a given day. He told me the EOH census

26   reaches as high as 14 patients with some frequency.

27   308.   I spoke with two patients in the EOH unit. Each man showed signs of

28   very serious mental illness. They reported that they were receiving medications but

no other forms of mental health treatment, which was clearly clinically indicated.

309.    My review of other individual cases with extended EOH placements revealed significant concerns regarding access to necessary care.  One transgender patient, ███████████ had numerous episodes of self-harm and suicidal ideations while at the Jail, partly due to poor distress tolerance but exacerbated by the poor conditions and isolation in custody.  She was repeatedly placed on extensive lockdowns and in safety cells and EOH cells, where she had no access to out-of-cell activities or opportunities to interact with others.  Records show that she frequently endorsed suicidal ideations knowing it would trigger additional mental health assessments that might provide her with space to express her frustrations and even to "get out of my cell a little."  She shared with mental health staff that she made suicidal statements "so that they will let me talk to somebody."  This patient's experience speaks strongly to the need to provide meaningful mental health treatment, rather than further isolation and restriction as seen in the EOH units and safety cells.

310.    Another man, ███████████ was placed in EOH and referred to the Detention Safety Program in ██████ 2024, based on various factors including this being his first time in jail, past trauma, and other stressors.  He disclosed intermittent passive suicidal thoughts but no specific plan or desire to harm himself, and he did not exhibit dangerous behaviors.  He did not demonstrate imminent risk to self or others, but a decision was still made to place him in the highly restrictive EOH unit.  This decision was not clinically justified, and the automatic, extreme restrictions that come with EOH placement, such as removal of clothing and loss of out-of-cell activities, almost certainly served to further exacerbate his distress.

311.    During my site visit, I met with ███████████ a patient in an EOH unit at Las Colinas. (Unlike the Central EOH unit's celled housing, this was a small dorm setting, with a couple of women in the unit on the day I visited.)  She reported how she was previously put in a safety cell, where she lay in a pool of her

1   own urine for a period of time.  She was upset about her highly restrictive and harsh

2   EOH and safety cell placements, and also about not receiving psychiatric care

3   despite her history of taking psychiatric medication.  According to her records, she

4   was not seen by a psychiatric provider for ten (10) days after she arrived at the Jail.

5   (I met with her on Day 6.)  During this 10-day period, she bounced between EOH, a

6   safety cell, and a community hospital emergency department for swallowing a

7   staple.  She engaged in other suicidal gestures as well.  While she clearly needed a

8   high level of supervision for suicide precautions, it is unacceptable that she did not

9   see a psychiatric provider for so long while she presented in this way.  When she

10  finally saw a provider, she was started on psychiatric medications, according to the

11  records.  It is my assessment that her suicidality could have been avoided or

12  mitigated if she had received timely psychiatric care.  Yet the Jail's system imposed

13  exceedingly harsh restrictions to prevent suicide while also *delaying* the psychiatric

14  care necessary to actually treat her condition.

### 3. Blanket Custodial Restrictions on Clothing, Bedding, Property, and Privileges for Patients on Suicide Precautions Does Not Meet the Standard of Care and Is Harmful.

17          312.   Blanket custodial restrictions that harm people with serious mental

18  health needs are pervasive in the San Diego County Jail system.  This is particularly

19  true, and harmful, in the context of the Jail's suicide prevention-related policies and

20  practices. I discuss this issue further in Finding #8, below.

21          313.   As the Jail mental health coordinator confirmed, the provision of

22  regular clothing and bedding for people on suicide precautions is based entirely on

23  custodial policy, with no consideration given to individualized clinical judgment.

24  Quiroz PMK Dep. at 146, 153-54.  Ms. Quiroz confirmed that the denial of "routine

25  privileges" like family visits, telephone calls, and recreation, are entirely the

26  purview of custody staff.  Quiroz PMK Dep. at 156 ("That all happens outside of the

27  clinical world. … [T]hat's in the very custody world if -- when somebody is

28  allowed a visit, when somebody is allowed phone calls, recreation and how those

1  happen throughout the facility.").

2      314.   Remarkably, Jail leadership are well aware that the standard of care is

3  for these clothing, bedding, property, and privilege decisions *to be based on clinical

4  judgment*, not custodial directives.  A draft policy, dated June 2022, that Ms. Quiroz

5  described as an "attempt of merging a Naphcare policy with existing San Diego

6  policy," lays out a procedure on this topic that is generally consistent with the

7  standard of care for treatment of people at risk of suicide in the Jail setting.

8  (Ms. Quiroz stated that the policy "is not in place at this time" at the Jail, and that no

9  County staff have been trained on it.)  Quiroz PMK Dep. at 151-52.  Still, quoting

10 from this *unimplemented* policy here is useful, as it provides a starting point for San

11 Diego County Jail to remedy its deficient practices and to provide clinically

12 appropriate care and conditions to people placed on suicide precautions:

13     *Suicide Precautions:*

14     …

15     **b) All clinical decisions regarding the removal of a patient's clothing,
       bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and
16     privileges shall be commensurate with the level of suicide risk as
       determined on a case-by-case basis by a qualified mental health
17     professional and documented in TechCare.**  *This does not apply to
       custody-ordered restrictions, only clinically ordered restrictions.*

18

19     **c) If a qualified mental health professional determines that a
       patient's clothing needs to be removed** *for reasons of safety, health
20     staff will not restrict the use of a safety smock and safety blanket.*

21         **1) Restoration of clothing and other items are clinically
           assessed by the mental health professional** *with each evaluation
22         completed at least every 24 hours.*

23 Quiroz PMK Dep. Ex. 8 (B-05 Suicide Prevention and Intervention) (emphases

24 added).

25     315.   A review of patient ███████████'s records illustrate the harm

26 of custody-driven, blanket-restriction-based policies that fail to consider

27 individualized clinical information.  When Ms. ████████ came into custody in

28 ██████ 2022, she was placed on medical observation for substance withdrawal.  Two

[4541606.8]                              114                    Case No. 3:20-cv-00406-AJB-DDL
                        EXPERT REPORT OF PABLO STEWART, M.D.

days later, she was seen standing on her sink, which prompted concern from deputies. When they checked on her, she attempted to leave the cell which resulted in use of force and being placed on green-bander (high restriction) status. She was moved to a safety cell and then Enhanced Observation Housing, where she tried to jump off a sink four days later. When asked about her behaviors, she shared having suicidal thoughts and worsening depression primarily driven by the restrictive nature of her environment, including physical isolation, no regular access to showers ("I want to take a shower and be able to wear clothes"), and not being able to call her mother who was her main support ("I was upset because I have not been allowed to make a phone call. I want to call my mom."). While the basis for the medical observation, safety cell, and EOH placements was to ensure this patient's safety, the restrictions that came with these settings were counterproductive, as they led to exacerbation of her suicidality and mental health symptoms.

316. The provision of clothing, bedding, possessions, and privileges for people on suicide precautions should be commensurate with their current condition and suicide risk, as determined by individualized clinical judgment (with custodial input as appropriate). Suicide prevention expert Lindsay Hayes and Disability Rights California each made detailed recommendations on this topic in their 2018 reports about San Diego County Jail. Hayes Report Recommendations 17 & 18, DUNSMORE0117148; DRC Report Recommendation 12, DUNSMORE0124942. These recommendations, along with the other recommendations in those comprehensive reports, should be *fully* implemented without delay to address the very serious and harmful policies and practices that persist in the Jail to this day.

### C. There Is a Dangerous Lack of Adequate Monitoring and Supervision for People at Heightened Risk of Suicide.

#### 1. Lack of Constant Observation for High-Risk Suicidal Patients When Clinically Indicated.

317. It is well established that some people at acute and high suicide risk will require *constant* observation for a period of time to ensure their safety. Suicide

1  prevention expert Lindsay Hayes "strongly recommended" that the San Diego
2  County Jail provide this level of observation whenever clinically indicated.  Hayes
3  Report Recommendation 20, DUNSMORE0117148.  The 2018 DRC Report found
4  that "the [San Diego County Sheriff's] Department's policies lack sufficient clarity
5  about the levels of risk and the levels of observation specified for each level of risk.
6  The policy should provide for **constant observation** of inmates at high risk
7  whenever clinically indicated."  DRC Report at Appx. A, p.17,
8  DUNSMORE0124942.  The 2017 NCCHC Report (at 100) also criticized the Jail's
9  system's "extremely limited use of one-on-one monitoring, or what is identified as
10  constant watch in NCCHC standards."  DUNSMORE0260618.

11      318.   Today, according to staff, constant observation for acutely suicidal
12  patients is available only in the Psychiatric Services Units observation cells at
13  Central Jail and Las Colinas.  And as one Central Jail psychiatrist shared with me,
14  there is "always" a waitlist for those observation cells.  This was also confirmed by
15  Jail mental health clinician Aseel Ross, who observed patients waiting as long as a
16  month after being referred for placement in the Psychiatric Services Unit.  Ross Dep
17  at 89-90.  The policy and practice in this Jail must be for constant observation to
18  readily and promptly provided for patients across the system whenever clinically
19  indicated.

20      319.   The risk of harm to incarcerated people with acute suicidality when
21  adequate monitoring and supervision are not provided is substantial.  In 2018, DRC
22  "observed video footage of one troubling suicide attempt in an Enhanced
23  Observation Housing (EOH) Unit … . Inmates are monitored by overhead video
24  camera and per Department policy, should receive in-person checks at least once
25  every 15 minutes.  The video shows the inmate standing naked on the cell's desk,
26  praying and preparing to jump, for over 14 minutes.  He then dove head-first onto
27  the floor.  Four more minutes passed before custody staff appeared and summoned
28  emergency medical care."  2018 DRC Report at 15, DUNSMORE0124942.

### 2. Jail Staff Continue to Conduct Inadequate Safety Checks in Solitary Confinement-Type Conditions, Putting People at Substantial Risk of Serious Harm.

320.   In my May 2022 declaration (¶¶ 33-40), I described a key deficiency with respect to the provision of safety checks to monitor and ensure the safety and well-being of incarcerated people at heightened risk of harm, particularly in the Administrative Separation and other solitary confinement-type units.

321.   It is well established that, given the high incidence of suicide attempts and other medical or mental health emergencies in the jail setting, the practice of conducting appropriate "safety checks" is essential to protect human life.  Safety checks entail direct observation of each individual to ensure that they are alive and to check for signs of medical or psychiatric distress.

322.   The standard of care for safety checks is also well established, specifically for solitary confinement-type housing units like those I observed at San Diego County Jail Administrative Separation units.  In recognition of the risks posed to people in solitary confinement-type units, it is the standard that safety checks in such units occur twice every hour at intervals no longer than 30 minutes at unpredictable and intermittent times.  The American Correctional Association advises the practice that "[a]ll special management (segregation) inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule" Standard 4-ALDF-2A-52, American Correctional Association (2004), Performance-Based Standards for Adult Local Detention Facilities, 4th Edition, Lanham, MD.

323.   The San Diego County Jail has failed to implement this basic, common-sense practice that can save lives.  Pursuant to San Diego Sheriff's Department policy I.64, custody staff conduct safety checks in Administrative Separation just once every hour, the same frequency as occurs in general population housing units, and half as often as the recommended frequency.

324.   The San Diego County Jail policy for conducting safety checks in

1  Administrative Separation only hourly, rather than at least every 30 minutes at

2  staggered intervals, places people in great danger, especially people with mental

3  illness, at risk of suicide, or with risk factors for drug/alcohol withdrawal or

4  overdose.

5      325.    Having visited the Jail facilities and several Administrative Separation

6  units, my concerns have now multiplied.  First, these units are among the harshest,

7  most restrictive solitary confinement units I have ever observed.  *See* Finding #4,

8  above.  The suicides of Mr. McDowell and Mr. Settles demonstrate that these units

9  remain exceedingly dangerous.  Second, I observed several deputies conducting

10  their hourly (not twice-hourly) safety checks, and those checks were far too rapid,

11  cursory, and insufficient to serve their purpose – to meaningfully observe a person

12  to ensure they are alive and safe.  These checks must be frequent and they must be

13  done right.

14      326.    Other outside evaluators have, over and over and over again, found that

15  the safety check policies and practices in San Diego County Jail are out of

16  compliance with minimum standards, in ways that put people with serious mental

17  illness at substantial risk of serious harm.

18      327.    First, **Lindsay Hayes, national suicide prevention expert who**

19  **reviewed the Jail's system in 2018:** "Given the strong association between inmate

20  suicide and segregation housing and consistent with national correctional standards,

21  it is strongly recommended that [San Diego County Jail] DSB officials give strong

22  consideration to increasing deputy rounds of such housing units from 60-minute to

23  30- minute intervals."  Hayes Report, DUNSMORE0117148-0117247, at 57 (citing

24  American Correctional Association standard).  The Sheriff's Department rejected

25  the recommendation: "This recommendation has been implemented," it wrote, *but*

26  *only* insofar as the "Sheriff Department has given strong consideration to increasing

27  deputy rounds of restricted housing units from 60 minutes to 30 minute intervals.

28  However, given the challenges regarding the physical layout of jail facilities, the

1  numbers of inmates, and care necessary to properly conduct these checks, the

2  Department has determined that it would not be feasible at this time to make this

3  change." County Response to Hayes Report at 12.

4      328.  Second, **the California State Auditor, February 2022**: "Sworn staff

5  did not always adequately check on incarcerated individuals.  Some individuals

6  were found hours after their deaths, negating the opportunity for lifesaving

7  measures" California State Auditor Report at 19. "Based on our review of video

8  surveillance footage, we observed multiple instances of sworn staff who spent no

9  more than one second glancing into an individual's cell, sometimes without

10 breaking stride as they walked through the housing module …. Staff later

11 discovered individuals unresponsive in their cells, some with signs of having died

12 several hours earlier, as detention staff described some of these individuals as stiff

13 and cold to the touch. … In another example, the Sheriff's Department's records

14 indicate that a deputy did not perform a required safety check in a housing area, in

15 part because of poor communication between this deputy and the station deputy.

16 One hour after the deputy should have performed this check, sworn staff found an

17 individual in this housing area unresponsive after attempting suicide.  A physician

18 pronounced this individual deceased at the scene after staff and paramedics were

19 unsuccessful at saving the individual's life. …  [A] safety check that does not

20 involve any meaningful observation of an individual is ineffective and

21 inadequate. … The assistant sheriff of detentions indicated that the department has

22 an informal process for assessing the quality of safety checks, which can include

23 watching video footage.  However, the Sheriff's Department has not documented

24 this assessment process in its policy, and establishing an informal practice does not

25 ensure that each facility's management team will consistently verify the quality of

26 safety checks." *Id.* at 25-26.

27     329.  Third, the **San Diego County Citizens' Law Enforcement Review**

28 **Board (CLERB), regarding Death of Joseph Carroll Horsey, December 24,**

1    **2017:** CLERB's investigation revealed that, during the initial body examination at

2    the scene, Mr. Horsey's body had undergone postmortem changes that suggested

3    that he had been dead for hours before he was discovered. Resuscitative efforts

4    were impractical as rigor mortis and livor mortis had already set in when his body

5    was found by staff. In this case, a custody deputy documented that all safety checks

6    were logged. However, the jail surveillance video recordings showed sworn staff

7    and nursing personnel walking by the module, versus physically entering the unit to

8    observe each inmate for obvious signs of medical distress. Jail surveillance video

9    recordings did not reveal any deputy entering the module to conduct safety checks

10   as required.

11       330.    And again, the **San Diego County Citizens' Law Enforcement**

12   **Review Board (CLERB), regarding Death of Blake Edward Wilson, January**

13   **26, 2020**: CLERB reviewed jail surveillance video, and found that the custody

14   deputy looked into the cell of Mr. Wilson for approximately one second during a

15   safety check. CLERB found the safety check prior to Mr. Wilson's body being

16   discovered "was not sufficient or long enough" to adequately conduct a safety

17   check.

18       331.    <u>Fourth</u>, **Disability Rights California, April 2018**: DRC reviewed

19   video footage of individuals who died in custody. The DRC clinical experts

20   described their findings: "Inadequate security/welfare checks (also known as 'proof

21   of life checks') were observed via video review in a number of cases in which

22   inmates died by suicide. In at least one case, hourly safety checks were not

23   completed pursuant to Jail policy during the time period the inmate died by suicide.

24   In video and record reviews of at least three inmates who died, checks were

25   completed inadequately – either not completed timely or in manner that failed to

26   meaningfully assess the welfare of the inmate. For instance, in one case, the video

27   showed two deputies enter the housing unit and separate to allow one to check the

28   upper tier and one the lower. The deputies completed their checks of 40 cells in 17

1   seconds, far too quickly to complete meaningful checks.  The deputy checking the

2   upper tier did not stop except at the first cell and did not appear to take enough time

3   to establish that the inmates in each cell were alive and safe." DRC Report,

4   DUNSMORE0124942-0125012, Appendix A at 15-16.

5        332.   These findings by other entities were noted in my May 2022

6   declaration in this case.  And yet, the deficient policy and practices persist today.  In

7   August 2022, six months after the State Auditor Report's scathing findings on

8   inadequate safety checks, **Matthew Settles** – a man who was arrested at an inpatient

9   psychiatric hospital and soon thereafter placed in an Administrative Separation cell

10  at the Jail, where he severely decompensated – died by suicide, with the Jail's own

11  findings that at the time a deputy discovered his body hanging in his cell, it had been

12  *more than 1 hour and 15 minutes* since the last safety check (as confirmed by post-

13  mortem video surveillance review).  Emergency medical staff arrived too late to

14  conduct life-saving measures for Mr. Settles.

15       333.   I am aware that other county jail systems have committed to conducting

16  safety checks for all people in solitary confinement-type housing at least every 30

17  minutes, at staggered intervals, with timely documentation and regular auditing by

18  supervisory staff for quality assurance purposes.  Examples include Los Angeles

19  County, Sacramento County, Santa Barbara County, and Orange County, among

20  others.  California Department of Corrections and Rehabilitation (CDCR)

21  segregation housing has also implemented this practice.

22       334.   Quality assurance audits with appropriate accountability measures must

23  also be in place to ensure that Jail staff are conducting meaningful observation of

24  each incarcerated person.  The Jail must track when a unit's safety checks start and

25  when they are completed as part of its quality assurance protocols.

26       335.   San Diego County Jail's policy and practices relating to safety checks

27  remain deficient, people have died as a result, and more people will remain at risk of

28  death and other serious harm until this deficiency is remedied.

**D.    There Remain Grave Concerns about Dangerous "Attachment Points" that Can Be Used for Hanging in High-Risk Housing Areas.**

336.    As part of an adequate suicide prevention program in jail system, it is important to remove and address physical plant hazards that may facilitate a person's suicide, particularly in high-risk settings like solitary confinement units, acute and outpatient mental health units, and mental health observation units.  I understand that Lindsay Hayes and others have strongly encouraged San Diego County to address this issue, including by retrofitting housing areas to remove "attachment points" that a suicidal person can use to hang oneself.  During my site visits, I observed the product of several such retrofits to remove attachment points that can be used for self-hanging in certain housing areas.  This is a positive development.

337.    I did, however, observe high-risk housing areas that appear to have features that can be used as attachment points for hanging.  Often, this was due to uncompleted maintenance and the poor conditions of the facility.  Maybe most notably, I observed old metal panels on the ceiling of the safety cells at Central Jail that have become separated from the ceiling surface.  In my experience, these gaps can be – and have been – used by suicidal detainees trying to hang themselves.

338.    I strongly urge San Diego County to conduct an audit – including an update of any audits previously completed – to ensure that there are not dangerous attachment points in housing areas that can be used for hanging oneself, particularly in high-risk areas of the Jail facilities.  Suicide prevention expert Lindsay Hayes has developed guidance for completion of such an audit, which may be used as a starting point.



*Panels separated from ceiling of Central Jail Safety Cell,
creating potential "attachment point" suicide hazards.*

339.   I further have concern that San Diego County Jail has not implemented important recommendations from its own Critical Incident Review Board.  Take the May 2020 death of **Joseph Morton**, a man who made suicidal statements on several occasions after being taken into custody.  He was placed in the Enhanced Observation Housing unit and was subsequently returned to general population housing.  Five days later, he was found hanging in his cell, having used a blanket that was tied around the upper bunk of his cell.  The Critical Incident Review Board reviewed the case and recommended ████████████████████████ ████████████████████████████████████████████ The County declined to implement the recommendation, ████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

340.   While recognizing ████████████████████████████████ ████████, this response is deeply concerning.  The response does nothing to

1  address the real (and, in Mr. Morton's case, realized) fatal risk of people discharging

2  from suicide precautions.  The Jail commander makes no mention that clinical

3  judgment would or should be used to ensure safe housing placements for people

4  discharging from suicide precautions.  And as I have previously discussed, it is very

5  concerning that the Jail commander's response accepts as a seemingly immutable

6  fact that administrative segregation housing is "█████████████████████████

7  ████████████████."

### E. The San Diego County Jail's Suicide and Mental Health-Related Death Review and Quality Improvement Processes Are Deficient.

10    341.    A well-functioning jail mental health care system must have a quality

11  improvement program designed to identify problems, implement and monitor

12  corrective action, and study its effectiveness.  This includes meaningful and

13  coordinated review of in-custody suicides and mental health-related deaths.  The

14  death review process at San Diego County Jail, including for suicide and mental

15  health-related deaths, has significant gaps and repeated failures in documentation

16  and in substance.  This deficiency dates back several years, as noted in the 2018

17  DRC Report, which found that the Jail system "does not have a functioning quality

18  improvement program. … there is a need for improved quality improvement

19  processes regarding mental health/suicide risk screening, clinical assessments,

20  individual suicide and suicide attempt reviews, and other aspects of a correctional

21  mental health care and suicide prevention program."  DRC Report,

22  DUNSMORE0124942-0125012  at Appx. A p.24.  Such deficiencies persist.

23    342.    Mr. Barkley, a NaphCare Person-Most-Knowledgeable witness,

24  recently testified that autopsies are not always completed.  Barkley NaphCare Dep.

25  at 23-24.  He acknowledged that portions of psychological autopsies that should

26  have been filled out for recent San Diego County Jail suicides were left blank.  *Id.* at

27  20-47.  Such gaps in death review procedures are consistent with my findings in

28  reviewing suicide and mental health-related death reviews.

343.   There is a lack of an effective quality improvement process relating to suicide prevention and other issues regarding in-custody deaths.  Assistant Sheriff Theresa Adams-Hydar confirmed as much:

> Q: Was there a specific discussion about bringing down the in-custody deaths and how to do that? Was there, for example, a task force or a committee designed to come up with that approach?
>
> A: A task force?  No.  A committee?  No.  Just we're running our bureau.  There wasn't any group focused specifically on in-custody deaths.

Adams-Hydar Dep. at 49.

344.   The mental health-related death of **Lonnie Rupard,** described earlier in this report, offers insight into the lack of commitment to sufficient quality improvement in the wake of in-custody deaths.  After his death, Jail leadership described implementing a "multidisciplinary" wellness check practice for high-risk detainees: "They go to – cell by cell by cell and, essentially, knock on the cell, talk to the incarcerated person:· 'Hey, how are you doing? How are you feeling? Do you -- would like to see a nurse today? Do you want to see a mental health professional? Is there anything that you have going on?'" Adams-Hydar Dep. at 47-48.  This practice has some promise, but has never made its way into Jail policy or quality assurance processes.  Adams-Hydar explained why the Jail leadership chose not to do so:

> Adams-Hydar: So it's not in policy.  It's something that was a directive and above and beyond.  It's not even a Title 15 requirement for the State.  It's something very unique to San Diego Sheriff's Department that we started to take care of our population.
>
> Q: Why was it not ensconced in a policy?
>
> A: Because it's above and beyond the requirement for what we need to do.
>
> …
>
> Q: Is there a log of wellness checks that's kept?
>
> A: As far as I know, they're putting them in our JIMS, or Jail Information Management System.  And I think the drop-down is "Wellness Check."

> Q: And are those being audited to ensure that the wellness checks are actually conducted?
>
> A: There's no need for an audit because they're not mandated by state law or policy and procedure.

Adams-Hydar Dep. at 83-84.  In my experience, this sort of remedial action—without policy or auditing to ensure implementation—is not an effective method to correct systemic deficiencies related to something as serious as the issue of suicide prevention.

345.   Nor does the independent Civilian Law Enforcement Review Board (CLERB) in-custody death review process effectively and comprehensively identify deficiencies for Jail suicides, and thus cannot be relied upon to facilitate necessary improvements.  This stems in substantial part from the limited jurisdiction of CLERB—most obviously, the fact that health care staff, operations, and records are all beyond CLERB's investigative jurisdiction.  CLERB's review, as designed, looks only at custody staff conduct and custodial operations.  What this means is that CLERB is, by its own design, missing half the story in every death.  Meaningful identification and remediation of systemic deficiencies behind in-custody suicides and other mental health-related deaths is therefore impossible.

346.   The recent suicide of Mr. Ornelas, discussed earlier in this report, illustrates this well.  In CLERB's investigative findings, it found that "there was no evidence to indicate that either Ornelas, nor his cellmates, nor anyone else had informed jail staff that Ornelas was suicidal.  It was unknown to jail staff that Ornelas was struggling with mental health issues … it did not appear that staff was aware of his current suicidal ideations."  But Ornelas in fact submitted two separate health care requests for mental health support, including to get back on psychiatric medications.  Jail *health care* staff thus almost certainly knew, and certainly should have known, about Mr. Ornelas's mental health issues and struggles.  Further, my records review reveals that mental health staff failed to complete a comprehensive behavioral health assessment for Mr. Orneles, and the assessment that was done

1  overlooked his psychiatric history, his history of a suicide attempt, and current

2  apparent distress.  The failure to complete an adequate mental health assessment is a

3  major deficiency related to this case, and one that CLERB lacks jurisdiction to

4  explore.

5      347.  I am not the first to recognize that CLERB oversight, in its current

6  design, is unable to identify and remediate serious problems at the Jail.  Following a

7  2020 CLERB investigation that found "no evidence" of custody staff misconduct in

8  the mental health-related death of Paul Silva, based on its very curtailed access to

9  relevant records and data, a federal judge found that "although [San Diego County]

10  has established a board to investigate the widely known problem of in-custody

11  deaths, it has also failed to enable the board to carry out its stated responsibilities."

12  *Lawsuits prompt questions about civilian oversight of San Diego Sheriff's*

13  *Department*, *San Diego Union-Tribune*, Apr. 11, 2021.  CLERB's long-time

14  executive director, Paul Parker, stated that CLERB's lack of jurisdiction over jail

15  health care operations made it "difficult for CLERB to thoroughly investigate deaths

16  and transparently report on deaths."  He stated publicly, "Our hands are tied."

17  Sheriff's Review Board Reverses Course, Finds Deputy Violated Policies in Inmate

18  Death, *San Diego Union-Tribune*, Feb. 11, 2021; Lawsuits prompt questions about

19  civilian oversight of San Diego Sheriff's Department, *San Diego Union-Tribune*,

20  Apr. 11, 2021.

21      348.  Maybe most concerning is that the San Diego County Jail mental health

22  leadership does *not* consider CLERB in-custody death reviews or findings.  *See*

23  Quiroz PMK Dep. at 124-25 ("Q: I'm just asking if county jail mental health

24  leadership have a practice of considering CLERB reviews of in-custody deaths? A:

25  No.").

26      349.  Based on my experience, a jail system without adequate death review

27  and quality improvement processes related to suicide prevention is destined to see

28  the same failures recur time and again, with more deaths and serious harms

resulting.  The San Diego County Jail is currently one of those jail systems.

350.   Throughout this report, I provide my analysis of several in-custody suicides and mental health-related deaths, including for Mr. Settles, Mr. Ornelas, Mr. Marroquin, Mr. McDowell, Mr. Rupard, and Ms. Bartolacci, among others. These deaths, and the many others that have been reviewed by outside experts and organizations, demonstrate that the same deficiencies in suicide prevention are being repeated in case after case.  I strongly recommend that San Diego County Jail fully implement the expert recommendations that have been made over the years regarding suicide prevention, and ensure that effective oversight and quality improvement mechanisms are in place.

## VI.    FINDING #6: MENTAL HEALTH CARE STAFFING AND THE SYSTEM'S STAFFING STRUCTURE ARE INSUFFICIENT TO MEET THE MENTAL HEALTH TREATMENT NEEDS OF THE SAN DIEGO COUNTY JAIL'S INCARCERATED POPULATION.

351.   I have serious concerns about the lack of sufficient mental health care staffing to meet the treatment needs of the San Diego County Jail population.  I have further serious concerns about what strongly appears to be a dysfunctional and ineffective staffing structure that serves to impede systemic improvements to the mental health care delivery system.

### A.    There Is Inadequate Staffing to Meet the Mental Health Treatment Needs of the Jail Population.

352.   In a jail system like this one that is so lacking in adequate treatment programming to meet the needs of the population, one nearly always sees severe staffing deficits, both in custody staff and health care professional staff.  Such staffing deficits in San Diego County Jail contribute greatly to the existing deficiencies in mental health care delivery.

353.   Adequate custody staff is necessary to provide, for example, escorts of patients to appropriate treatment spaces where they can receive confidential and clinically indicated care.  In San Diego County Jail, my records reviews and

1    discussions with patients and staff reveal that the exceedingly high rate of non-

2    confidential clinical contacts is substantially the result of inadequate custody staff

3    available for escorts.

4         354.   Adequate custody staff is also necessary to facilitate structured

5    treatment programming – such as group therapy and other recreational or

6    socialization activities.  I heard from mental health staff and patients about mental

7    health programming commonly being canceled or curtailed due to lack of available

8    custody staff as well. *See, e.g.*, Paragraph 125, above.

9         355.   There is further a very large deficit in mental health staff given the

10   number of incarcerated patients with serious treatment needs and the acuity of their

11   conditions in this system.

12        356.   Former Jail clinician Jennifer Alonso testified to the overwhelming

13   patient caseload she was required to carry, and how that prevented her from

14   providing adequate clinical contacts and the sort of structured treatment she knew

15   was needed for her patients:

16        As a mental health clinician for the OPSD units at Central Jail, I carried
          a caseload of between approximately 140 and 160 patients.  This
17        patient caseload was so large that it was impossible to deliver anything
          remotely close to adequate mental health care given the needs of this
18        population.  Based on my experience and clinical knowledge, I believe
          a caseload of no more than approximately 60-70 patients would be
19        appropriate for clinicians providing care to the OPSD population.

20        When I started as a mental health clinician for the OPSD units, I was
          told that I would have the opportunity to develop a program with
21        multiple treatment modalities, including structured therapeutic group
          programs and individualized one-to-one therapy.  However, given the
22        overwhelming caseload, lack of resources, and lack of confidential
          treatment space, it was never possible for me, or any other clinician, to
23        provide these sorts of care on a consistent basis or to meet the clinical
          needs of our patients.

24

25   Alonso Decl., Dkt. 119-11, ¶¶ 10-11.

26        357.   Administrative Separation clinician Aseel Ross explained that she

27   could provide individual clinical care to an absolute "max" of 13 patients on a given

28   day, and less than that if any of the patients had more acute mental health needs.

Ross Dep. at 16-17. Ms. Ross proposed to implement a treatment program in Administrative Separation units – specifically, two hours of structured therapeutic activity each day. She spoke with supervisory staff about the program, including the need for additional mental health staffing resources for implementation. *Id.* at 123-24. While her supervisor supported the program and plan, it was not approved by leadership, and had not been implemented when she left her job at the Jail in late 2023. *Id.* at 125-26 ("[T]he leadership is what we were waiting for . . . . I didn't get a response.").

358. When I visited the Jail in February 2024, there remained a lack of clinically appropriate treatment programming across the system, including in the Administrative Separation units, the Outpatient Stepdown units, and the Psychiatric Services Units. As discussed in Finding #3, above, I learned of a few hours of treatment programming that had very recently been added in outpatient units (*i.e.*, 1-2 hours *per week* for a small fraction of patients in certain units). Staff repeatedly told me that they recognize the need to add more treatment programming to meet the needs of the patient population, something that could not happen without more staffing resources.

359. The Department of State Hospitals-run Jail Based Competency Treatment (JBCT) Program at the Jail, discussed in Finding #3, offers a far more appropriately staffed program, delivering ten (10) hours of programming *per day* (structured and unstructured), including four (4) hours of structured group treatment. That unit, with up to 30 patients, is covered by 2.5 full-time-equivalent psychiatrists, two clinicians (with caseloads less than one-quarter as compared to the OPSD units), additional educators and psychiatric nurse staffing resources two assigned duties who have received specialized mental health training. As noted earlier, the JBCT program director told me that "the program works." The contrast between this Department of State Hospitals-overseen JBCT program and the many other Jail housing units where I saw acutely (and essentially untreated) mentally ill patients,

1  was stark.  A key distinction was the level of staffing in JBCT as compared with

2  everywhere else in the Jail system.  That is to say, San Diego County should be well

3  aware of a staffing model for a mental health unit that can meet patient treatment

4  needs; there is one in their own Jail Facilities.  It is true that this JBCT program is

5  operated by the California Department of State Hospitals, but there is no reason that

6  similar staffing and program resources cannot be provided to patients with mental

7  illness across the Jail system – including in the Administrative Separation units, the

8  Outpatient Stepdown units, and the Psychiatric Services Units.  In fact, based on my

9  review, that sort of staffing and program resources is *essential* to providing adequate

10  mental health care to the Jail population.

11      360.   I am far from the first to identify this deficiency.  In 2017, the NCCHC

12  found that NCCHC Standard J-G-04 (Basic Mental Health Services) was not being

13  met in the San Diego Jail system.  Its report explained: "Mental health does not

14  provide adequate individual counseling or group counseling, and does not

15  coordinate mental health, medical and substance abuse treatment."  It went on:

16  "There is an insufficient number of mental health professionals in the facility to

17  meet the needs of those who are mentally ill, but do not have what is classified as a

18  severe and persistent mental illness (such as bipolar disorder or schizophrenia).  The

19  number of mental health clinics in the facility is insufficient to meet the needs, and

20  individual or group therapy rarely occurs due to the shortage of therapists."  2017

21  NCCHC Report, DUNSMORE0260618 at 35-36.

22      361.   In 2023, the San Diego County Grand Jury found that "[t]here is an

23  insufficient number of mental health clinicians to provide appropriate basic on-site

24  mental health services, as defined by NCCHC accreditation standards."  The

25  Sheriff's Department "disagree[d] partially" with this finding, stating that "[i]t is a

26  true statement that the San Diego Sheriff's Department does not currently meet

27  accreditation standards as it applies to mental health" while stating that "this is not

28  attributable to the fact that there is an insufficient number of staff providing

services."  The Department did state that it "is seeking to hire more mental health professionals in order to streamline workloads and provide proactive mental health programs for our population."  Quiroz Dep. Ex. 9, *2022/2023 Grand Jury Response - Crisis in Treatment Access for Incompetent to Stand Trail Incarcerated Persons in the County Jails* at 8-9, July 10, 2023.

362.    Yet another major issue area is the delays in responding to mental health care service requests.  When a patient with mental illness feels their symptoms worsening or requiring additional treatment, they are told to submit a health care (or sick call) request form.  Because they are incarcerated, they cannot simply go to a hospital or mental health clinic, or even call their treatment provider. They must rely on the Jail's "sick call" system to respond to their requests in a timely and adequate manner.  In my records review and interviews, I found repeated examples of patients submitting mental health care service requests and receiving no response for weeks.  I reviewed County records showing long wait times for patients to be seen for a mental health concern.  Patients submit repeated, and increasingly desperate, requests for care.  Patients are at risk of decompensation, and even suicide, when these sorts of delays occur.

363.    Jail mental health coordinator Ms. Quiroz wrote in July 2023 about how the sick call request backlog and treatment delays in the Jail's system, and she testified in May 2024 about how such delays "illustrate that we have an overwhelmed system and we need help."  Quiroz PMK Dep. at 270-71 & Ex. 14.  A Jail system like this one, which has chronic sick call request backlogs and treatment delays, may try to address such problems through a periodic "blitz" effort to reduce the backlog.  In my experience, such "blitz" efforts, at best, only temporarily mitigate the problem.  The San Diego County Jail system will continue to see backlogs for mental health care until staffing is commensurate with the Jail population's treatment needs.

364.    The resulting harms are significant, and appear in many of the case

reviews provided in this report.  One example is Mr. Ornelas, who submitted multiple written requests to see psychiatric staff and get back on his medications; these requests were never processed or addressed.  Mr. Ornelas died by suicide before mental health staff ever came to see him.

365.    Based on my review of the Jail's mental health population, current conditions, and currently available treatment services, it is my strong opinion that understaffing is a major contributor to dangerous failures to provide clinically necessary mental health care to meet existing needs.

366.    Another major mental health staffing deficit is in psychiatry.  In Finding #2, I discussed my grave concerns about deficiencies in psychiatric care and medication management for incarcerated patients with mental illness.  A significant contributor to these deficiencies is severe understaffing of psychiatric prescribers (psychiatrists and psychiatric nurse practitioners) who, unlike the Jail's clinicians (e.g., social workers and marriage family therapists (MFTs)), are hired and employed by a private health care contractor (*i.e.*, NaphCare or Correctional Healthcare Partners).

367.    Jail leadership has issued corrective action notices to the contractor Naphcare regarding psychiatric care untimeliness, noting hundreds of pending psychiatry appointments and wait times of several weeks.  Ms. Quiroz testified that delays in access to psychiatry care remain a "key deficiency area," noting that the "volume of pending appointments" is a problem.  Quiroz PMK Dep. at 186.

368.    Where patients face barriers to clinically necessary mental treatment, a jail's mental health care system operates as a *crisis-response system.*  When – as is the case in San Diego County Jail – there is insufficient staffing to provide clinically indicated treatment services, to ensure timely responses to mental health requests and referrals, and to provide timely psychiatric care, patients are placed at substantial risk of preventable and serious harm.  Patients will often decompensate and become acutely psychotic, suicidal, and/or gravely disabled.  At that point,

1   already-strapped staffing resources must be diverted to provide emergency

2   interventions.  This results in a kind of doom loop, where insufficient staffing and

3   resources to meet patient needs leads to higher acuity in the population and greater

4   treatment needs, which leads to further failure to deliver needed treatment.  And on

5   and on.

6   369.   Based on my assessment, I strongly recommend that San Diego County

7   Jail conduct an independent and comprehensive mental health treatment needs and

8   staffing assessment.  The assessment must be based on a service delivery model that

9   includes provision of clinically necessary treatment services and programming at all

10  levels of mental health care.

**B.     The Jail System's Mental Health Staffing Structure Is Dysfunctional and Fails to Ensure Adequate Mental Health Treatment Delivery for the Jail Population.**

13  370.   A well-functioning jail mental health care system requires effective

14  coordination across all staff and health care disciplines.  San Diego County Jail is, in

15  several respects, uniquely dysfunctional in this regard.  I strongly recommend that

16  San Diego County take proactive steps to address this structural deficiency that is

17  negatively impacting patient care and creating impediments to important systemic

18  improvements.

19  371.   First, as I discussed in my previous declaration, the San Diego County

20  Jail's organizational chart reveals a foundational deficiency in the delivery of mental

21  health care (and health care more generally).  The organizational chart for Jail

22  operations makes clear that mental health (and medical) leadership report directly to

23  a Jail Captain and the Sheriff's Command team.  This organizational structure is

24  inconsistent with modern correctional psychiatric practices and is extremely

25  problematic.

26  372.   Clinical staff and leadership should have their own, separate chain of

27  supervision, allowing them to work *side-by-side* with custody staff and leadership.

28  The majority of medium-to-large California county jail systems of which I am aware

have adopted a structure whereby mental health (and medical) staff do not report directly to custody leadership; rather, they report to medical and mental health leadership. Such a structure is essential to operating an adequate jail mental health care system in which health care professionals have ultimate authority over health care policy, and can work collaboratively with sworn staff to ensure that patients' clinical needs are met. As the chart below shows, San Diego County is an outlier with respect to its organizational structure by putting Sheriff's Command staff above (and not in partnership with) Mental Health Care staff.

**Examples of Health Care Agencies Operating the Jail Mental Health Care System Alongside the Sheriff's Department, Not as a Sheriff's Department "Medical Services Division" that Reports to Sheriff's Command Staff**

| County Jail System | Agency Overseeing Provision of Jail Mental Health Care |
| --- | --- |
| Contra Costa County | Contra Costa County Health Services |
| Los Angeles County | Department of Health Services |
| Orange County | Orange County Health Care Services |
| Riverside County | Public Health and Behavioral Health |
| Sacramento County | Department of Health Services |
| San Francisco County | Department of Public Health |
| Santa Clara County | County of Santa Clara Health System |
| San Diego County | *San Diego Sheriff's Department* (Medical Services Division) |

373. Based on my review, it is apparent that the San Diego County Jail's structure with the Sheriff's Department employing, supervising, and directing mental health care staff, policies, and procedures has contributed to several of the systemic deficiencies I have identified. This includes the custody-dominated Administrative Separation practices where large numbers of people with serious mental illness are being put at risk (Finding #4), the many ways that Jail custody

staff exert improper control over clinical mental health care decisions (Findings #5, #8), and the lack of mental health input in disciplinary procedures (Finding #9).

374.   Second, the San Diego County Jail's mental health staffing structure itself creates bizarre and self-defeating barriers to operation of a functional mental health care delivery system.  The Jail has an unusual staffing structure, where disciplines like nurses and mental health clinicians (*e.g.*, social workers and marriage family therapists (MFTs)) are employed by the Sheriff's Department, while disciplines like psychologists, psychiatrists, and psychiatric nurse practitioners are employed by an outside contractor (*e.g.*, NaphCare or Correctional Healthcare Partners).  More significant than it being unusual, this structure is very problematic.

375.   Based on my interviews and review of records and policies, I am extremely concerned about the lack of supervision and coordination in this Jail's mental health care system.  For example, the County-employed clinicians (social workers and MFTs) should be – but are not – supervised by higher-level mental health care professionals like psychologists or psychiatrists.  Quiroz PMK Dep. at 26-27.  This is inconsistent with the standard of care for a mental health care system.

376.   One long-time Jail clinician told me during my Jail visit that clinicians' interactions with psychiatrists and psychologists are extremely limited, with the possible exception of in the Psychiatric Services Unit (PSU).  Clinicians are generally supervised by other clinicians.  For example, the Las Colinas Chief Mental Health Clinician who supervises all clinical staff is an MFT. The two chiefs at Central Jail are an MFT and master's-level correctional counselor.  Ms. Quiroz, the system's Jail mental health coordinator, is also an MFT.  In my conversations with clinician staff, it was apparent that they have insufficient communications with psychologists or psychiatric prescribers, including because those contracted staff members operate outside County supervision. (The NaphCare staff uniformly refused to speak with me during my Jail site visits.)  Again, this structure creates significant gaps in supervision and coordination of care.  All mental health staff

1   should be working hand-in-hand to ensure appropriate treatment planning and

2   delivery.  In this system, clinicians and prescribers are far too siloed, contributing to

3   delayed care, inadequate care, and adverse patient outcomes like the many detailed

4   in this report.

5       377.   With the artificial separation between, on the one hand, psychiatric

6   prescribers and mental health clinicians (who, by licensure, cannot prescribe

7   medications or do medication management), there are significant gaps in treatment.

8   Staff shared with me, and Ms. Quiroz testified about (Quiroz PMK Dep. at 194-96),

9   concerns regarding how patients needing medication management are being

10  scheduled to see non-prescribing clinicians, which creates unnecessary work and

11  dangerous delays in accessing psychiatric care.

12      378.   The structural division of mental health care staff across Sheriff's

13  Department and private contractor staff also contributes to inconsistent training on

14  policies and procedures.  This is a major problem: all mental health care staff should

15  be required to receive the same training on a Jail's policies and procedures, to

16  ensure consistency and coordination of care.  But NaphCare-employed

17  psychologists, psychiatrists, and psychiatric nurse practitioners are not required to

18  participate in mental health training that is provided to Sheriff's Department-

19  employed mental health staff, as Ms. Quiroz explained:

20      Q. Do the Naphcare staff that we've been talking about receive that
        eight-hour [Sheriff's Department mental health] training?

21
        A. I don't know that any have been completed for sure, but they are
22      invited.  They are not excluded from those training.

23      Q: Are they required to attend?

24      …

25      A: I don't know that Naphcare requires them to attend our training, but
        we offer it to them.  We want them to be there.  It's available to them.
26
        Q: It's available.  The county doesn't require  it; the county makes it
27      available.  Is that a correct statement?

28      …

1    A: Yeah.  I -- I don't have a way to – I  don't supervise them, so I guess
2    the county does not – they'd probably have to write that into the
     contract or something.  I don't know that it's written in the contract.

3    Quiroz PMK Dep. at 52-53.

4        379.    Correctional Healthcare Partners (CHP), which I understand contracts

5    with the County to provide additional health care staff at the Jail, do not provide

6    mental health care training to the Jail staff it employs.  The CHP president Peter

7    Freedland, testified that, under the current contract with the County, there were

8    plans to do further training of contractor medical staff, but when asked whether

9    there would be a mental health component to the training, he responded, "We don't

10   do mental illness.  So I would probably say no."  Freedland Dep. at 133-34.  Once

11   again, this shows how the fractured the San Diego County Jail system, with so many

12   different entities often working in siloes, contributes to a dysfunctional and

13   ineffective system of mental health care delivery.

14       380.    Even on something as consequential as suicide prevention procedures,

15   it appears that Sheriff's Department-employed mental health clinicians and

16   NaphCare-employed mental health providers are not trained to be on the same page:

17   Q: How are the Naphcare staff trained on the [San Diego County Jail's]
     inmate safety program?
18
19   A: I believe they have their own suicide detection/prevention type of
     courses within Naphcare University.  I personally have not seen that.  I
     don't have access to that part.
20

21   Quiroz PMK Dep. at 48.

22       381.    A related major concern relates to coordination in mental health policy

23   and its implementation.  I understand that NaphCare was retained as a San Diego

24   County Jail contractor more than two years ago, in 2022.  I further understand that

25   there was an expectation that NaphCare and San Diego County would work to

26   coordinate and align and their policies as applied to San Diego County Jail's mental

27   health care system (and health care system more generally).  More than two years

28   later, this still has not occurred, as Ms. Quiroz explained:

> We were hoping that when we brought on Naphcare that they would have that for us, and they do have their policies, and they are written to the standards. The challenge becomes that we're a hybrid model because we have county employees and Naphcare employees. The policies don't interchange as seamlessly as we thought they might.

Quiroz PMK Dep. at 132. The County still has no "firm date" as to when policy alignment might be completed. *Id.*

382.   During my review, it was confusing to read the Sheriff's Department's mental health-related policies and also the NaphCare policies that the County produced. In some respects, the NaphCare policies, as written, better align with the standard of care for Jail mental health care – for example, as to suicide observation protocols (*see* Finding #5.B.3). My interviews with County-employed clinicians, however, clarified that they have received no training on the NaphCare policies. What remains deeply concerning is that it is unclear whether and how NaphCare-employed Jail mental health staff are trained. The Jail mental health coordinator's testimony added to my concern:

> Q: Is anybody trained on this [NaphCare] policy at the jail? Naphcare staff?
>
> [Defendants' counsel]: Calls for speculation as to Naphcare.
>
> A: Yeah. I don't know if they are.
>
> Q: Do any county employees get trained on this policy?
>
> A: No, no.
>
> …
>
> Q: Are any of these mental health-related policies from Naphcare in place[,] fully implemented at the jail?
>
> A: No.

Quiroz PMK Dep. at 152-53.

383.   It is absolutely essential that policies and training be consistent across all mental health care disciplines. The structural barriers between Sheriff's Department-employed mental health staff and contractor-employed mental health

staff must be addressed, with the objective of a coordinated system for mental health delivery that aligns with the standard of care.

384.   Finally, I found the quality review and quality improvement processes in San Diego County Jail's mental health system to be lacking.  The National Commission on Correctional Health Care (NCCHC) provides a clear statement on the importance of these processes:

**NCCHC Standard  MH-A-06 (essential) – Continuous Quality Improvement Program**

**Discussion:** The intent of this standard is to ensure that a facility uses a structured process to find areas in the mental health care delivery system that need improvement, and that when such areas are found, staff develop and implement strategies for improvement.  One of the benefits of a successful CQI program is that problems can be identified early and strategies developed for their resolution before they worsen. All mental health care delivery systems, regardless of size, can benefit from a well-designed CQI program.

One essential element of quality improvement is the monitoring of high-risk, high-volume, or problem-prone aspects of mental health care provided to patients.

Areas to be studied can also be identified using the data that are regularly monitored (see MH-A-04 Administrative Meetings and Reports) and patient safety systems (see MH-B-02 Patient Safety). Success in compliance with this standard is not measured by the number of studies done but by the relevance of the studies and effectiveness of corrective action.

NCCHC Standards for Mental Health Services in Correction Facilities Standard MH-A-6.

385.   The County's December 2023 Corrective Action Notice identifies continuous quality improvement as a problem area as related to NaphCare and mental health care at the Jail; it states simply: "No quarterly meetings have been set or established."  SD120696.  The Jail mental health coordinator confirms that this remains an issue that "need[s] work toward improvement."  Quiroz PMK Dep. 187-88 (Quiroz: "As far as the – making sure that [NaphCare staff are] there, you know, just making sure that they're present for the meeting to make sure that they're engaging.  That would be, you know, the desire of the county.  We want to make

sure that they're engaging with us.  Q: Has there been a quarterly meeting where all the necessary Naphcare staff members are present? A: Not consistently.").

386.   Relatedly, as described in Finding #2, above, there are serious problems related to inadequate supervision of psychiatric nurse practitioners, and a lack of quality improvement mechanisms to address deficient medication management practices.  Many individual cases I reviewed strongly indicate that dangerously inadequate prescribing practices recur again and again in this system.  Jail health care leadership share this current and ongoing concern about insufficient  clinical oversight.  Quiroz PMK Dep. at 192.

387.   It is also apparent that there is a problematic peer review process for NaphCare-employed staff, with insufficient oversight by the County.  As Ms. Quiroz explained:

> Q: [W]hat is the status of peer review by Naphcare?
>
> A: Yeah.  I can't be for certain that they're not doing peer reviews.· It's nothing that they hand back to us [the County]. I mean, if they do the peer reviews it's something that they're keeping records of on their own.  No, it's not necessarily, here's what we did.

Quiroz PMK Dep. at 190; *see also* 12/1/23 Sheriff's Department Corrective Action Notice to NaphCare, SD_120697 (Peer Reviews are "Not being done.").

388.   Ultimately, the structural and staffing deficiencies in the San Diego County Jail mental health care system must be addressed in order to achieve an adequate system of care.  Private contractors like NaphCare, Correctional Healthcare Partners, or any other for-profit jail health care services company may have a role in such a system, but this system will remain dangerously inadequate until a coordinated structure with adequate, transparent oversight is implemented. In short, without effective quality assurance procedures, the system will continue to repeat its past failures and deficiencies.

## VII.  FINDING #7: THE JAIL FAILS TO PROVIDE NECESSARY CONFIDENTIALITY FOR MENTAL HEALTH TREATMENT, UNDERMINING THE DELIVERY OF MENTAL HEALTH CARE.

389.   In my May 2022 declaration (¶¶ 77-84), I relied on staff and patient testimony, along with multiple external reports, in finding that the lack of confidentiality during the vast majority of clinical mental health contacts in the San Diego County Jail undermines mental health care for incarcerated patients in the system.  Having now conducted an extensive review of patient records and additional materials in this case, interviewed dozens of incarcerated people with serious mental illness at multiple San Diego County Jail facilities, and conducted my on-site observations of Jail operations, I am even more concerned about how this deficiency prevents the delivery of adequate mental health care and puts people at substantial risk of serious harm every day.

390.   As I have previously described, patient candor is an essential aspect of effective clinical interaction.  A patient cannot reasonably be expected to communicate openly when clinical interactions occur in a non-private, non-confidential setting where other people can hear what is being discussed.  Clinical contacts conducted in such a setting, including mental health assessments in which patients are asked to communicate sensitive and personal information to the mental health clinicians, are likely to be incomplete and inadequate because of the patient's understandable reluctance to speak candidly.  Many incarcerated patients I interviewed raised this very concern with me, and explained how they did not fully communicate with mental health staff about their symptoms, suicidality, medication side effects, and other clinical issues because they did not want custody staff or other incarcerated people to hear these things.

391.   Confidential mental health contacts are the standard of care, both in the community and in detention settings.  The failure to provide sufficient confidential treatment puts people at substantial risk of serious harm by hindering their ability to share information and to receive adequate treatment.  An adequate system of care in

1   the jail setting requires the provision of a private, confidential setting for patients to

2   communicate openly with their clinician or other care provider.

3       392.   A general policy and practice to provide private, confidential clinical

4   assessments and treatment does *not* mean compromising the safety of staff or

5   anyone else.  To be sure, the provision of adequate treatment of serious mental

6   illness (with appropriate confidentiality) will serve to *increase* safety: good care

7   serves to reduce psychosis-induced behaviors and to keep patients' conditions more

8   stable.  And in a jail system where confidential clinical contacts are the expectation,

9   there will be appropriate safeguards, including the use of *individualized* assessments

10  – based on both clinical and custodial input – to determine when a particular patient

11  cannot safely be seen in a confidential setting.  Such circumstances can, and must,

12  be appropriately documented, reviewed for quality assurance purposes, and inform

13  treatment planning and delivery moving forward.  In short, a jail system should not

14  choose between necessary confidentiality and safety.  They go hand in hand.

15      393.   As I noted in my May 2022 declaration, the Sheriff's Department has

16  been aware of this deficiency for years.  The January 2017 NCCHC Technical

17  Assistance Report for the San Diego County Sheriff's Department contains findings

18  on the lack of confidentiality in clinical encounters that are highly critical:

19

20  J-A-09  Privacy of Care (I).  **Clinical encounters and discussion of
    patient information do not always occur in auditory and/or visual
    privacy.  By custody policy, the officers feel they need to be within
    arm's length of a patient in the clinic.  This compromises privacy
    and may prevent a provider or nurse from obtaining an inmate's
    full description of his or her problem to make a diagnosis.**  Health
    staff understands that a patient's security status may require the
    presence of a custody officer.  But when a patient is cooperative,
    privacy should be maintained.  **Mental health staff mentioned that
    they often conduct interviews through the glass windows in doors,
    and they can be overheard by staff or other inmates.**

25  …

26  Recommendations: **The areas of privacy and confidentiality of care
    need to be addressed.** [NCCHC Compliance Indicators] require that
    procedures be put in place to assure confidentiality when health care is
    being delivered and discussed.  These are not met.

1

2   NCCHC Report, DUNSMORE0260618 at 8-9 (emphases added); *see also id.* at 43,

3   109.

4        394.   Based on my assessment, I am aware of no meaningful improvements

5   in this area in the seven (7) years since the NCCHC issued its finding about

6   inadequate confidentiality for mental health contacts at San Diego County Jail.

7        395.   In my review of patient records, I identified a very problematic policy

8   and practice deficiency that makes this issue even worse – that is, the use of the

9   label "Semi-Confidential."  I observed an area of the mental health care chart (called

10  "Encounter Setting") where mental health staff are supposed to indicate whether a

11  particular mental health appointment was done in a confidential setting.  One check

12  box is "Confidential" and another is "Non-Confidential."  But there is also a third

13  check box labeled "Semi-Confidential."

14       396.   "Semi-Confidential" is *not* a clinical term I am familiar with, and it is

15  not consistent with the standard of care.  Yet, it appears frequently in Jail patient

16  records.  Through my review of records and interviews of Jail mental health staff

17  and patients, I learned that "Semi-Confidential" is often selected for clinical contacts

18  conducted at cell-front (where a deputy and other detainees in neighboring units can

19  overhear), or in areas where one or more deputies are standing a few steps away and

20  able to hear the conversation.  Confidentiality is absolute; it either exists or it does

21  not – there is no middle ground.  These so-called "Semi-Confidential" encounters

22  breach patient privacy and are, in effect, *Non*-Confidential.

23       397.   I randomly selected a patient (                    with documented

24  psychosis, depression, and other mental health diagnoses with whom I met in

25  February 2024 while he was housed in an OPSD unit at Central Jail.  In his records,

26  I observed 24 mental health staff encounters.  In the record for 18 of those

27  encounters (75%), staff marked that the encounter was "Semi-Confidential."  The

28  other 6 (25%) were marked as "Non-Confidential."  Zero encounters were marked

as "Confidential." I then reviewed notes for the "Semi-Confidential" encounters, a sample of which follows:

- "QMHP [Qualified Mental Health Provider] met with IP [Inmate-Patient] cell side and a deputy [] was present and stood behind QMHP."

- "Met with IP cell side. Deputy [] was behind QMHP. Cellside interaction due to module lockdown."

- "[Patient] seen at med window in 3A housing unit with Deputy [] present."

- "[Patient] seen at med window with Deputies [ ] and [ ] present."

398. Again, these encounters are in no way confidential clinical contacts. And they are not "Semi-Confidential" clinical contacts (a concept that does not exist in mental health practice standards). These are *Non-Confidential* clinical contacts.

399. The jail mental health coordinator's testimony confirms that the Jail system's leadership recognizes that "Semi-Confidentiality" is not an accepted, or acceptable, concept, yet it remains in the Jail's daily practices:

Q. … What does semi-confidential mean?

…

A. Maybe the doors – I'm speculating. … There's no definition as what that means.

Q. Is there any guidance provided to clinicians as to when to check the semi-confidential contact box [in the clinical note]?

A: No. … So the clinicians sometimes check that I believe, but there's no definition that – it's really the determination of what they believe is semi-confidential. There's not a definition.

Quiroz PMK Dep. at 249-250.

400. The case of Patient ▮▮▮▮▮▮▮ offers a helpful illustration of how non-confidential clinical encounters harm patients. This young woman came in to San Diego County Jail detention without a previously documented psychiatric history, but she was presenting with new onset psychosis. Prior to her arrest, her family noted that she was guarded and paranoid, likely a manifestation of psychosis.

This paranoia persisted throughout her time in custody and contributed to suspicion towards the mental health team that made it difficult to build rapport and engage with her. Her mental health visits were consistently documented as being "Semi-Confidential" or "Non-Confidential" – generally, at the cell door with custody staff present. Ms. ███ was already extremely paranoid due to uncontrolled psychosis, and she refused to engage with the care team during cell-front visits with custody staff present, which likely further contributed to her feeling watched or monitored. Such violation of clinician-patient confidentiality in this sort of case adds a layer of complexity that impairs a clinician's ability to engage with the patient. Ms. ███ in fact requested to speak privately during a mental health visit in ███ 2023 and was informed it could be arranged, but it does not appear this ever happened; no subsequent mental health visits were marked as confidential. Ms. ███'s lack of engagement with mental health staff due to paranoia persisted, which ultimately delayed and impaired her receiving necessary psychiatric care.

401.    To address this clinically deficient policy and practice, the Sheriff's Department must ensure that all mental health clinical contacts and intake interviews between incarcerated people and mental health professionals, including mental health clinicians, psychologists, and psychiatrists, are conducted in a confidential setting.

## VIII. FINDING #8: JAIL CUSTODY STAFF EXERT IMPROPER AND DANGEROUS CONTROL OVER CLINICAL MENTAL HEALTH CARE DECISIONS.

402.    In my May 2022 declaration, I identified multiple practices by which Jail custody staff improperly control and direct the placement and treatment of people with serious mental health needs, in ways that are inconsistent with the standard of care and that put people at substantial risk of serious harm. May 2022 Decl., Dkt. 119-7, ¶¶ 17-76. As discussed in this report, none of those issues have been remedied. See, for example, Finding 3.D (continued improper custodial blanket ban policies preventing access to Outpatient Step Down Program (OPSD));

EXPERT REPORT OF PABLO STEWART, M.D.

1    Finding 4.B (continued custody-driven placements in solitary confinement units
2    without necessary consideration of mental health input).  These policies and
3    practices continue to put people with mental illness at substantial risk of serious
4    harm.

5        403.  As another example, the 2018 DRC Report found that custody staff
6    "unilaterally place patients in the PSU's 'observation units,' which amount to a
7    solitary confinement setting without access to the PSU's treatment programming"—
8    even when mental health staff make contrary clinical recommendations.  DRC
9    Report, DUNSMORE0124942-0125012 at 20-21.

10       404.  I found that custody staff in this Jail system improperly exercise control
11   over a range of decisions for which clinical input is necessary but ignored.  The
12   continued placement of patient ███████████ in Administrative Separation, (*see*
13   Finding 4) despite clear clinical contraindications, and the string of custody-
14   controlled decisions on the placement and conditions of Lester Marroquin leading
15   up to his horrible suicide in a solitary confinement cell (where he banged his head
16   several times, placed his head in the toilet, and finally died of acute water
17   intoxication) offer just two examples.

18       405.  The use of restraints on people with serious mental illness offers
19   another example of the improper control of custody staff where clinical input is
20   needed.  During my site visits, staff explained to me that a practice in this Jail
21   system is to place an actively self-harming patient in a restraint chair that is located
22   inside of a safety cell.  I was shown where this occurs.

23       406.  A restraint chair is a device in which a person is strapped down, with
24   locking mechanisms on multiple parts of the body (*e.g.*, wrists, ankles, torso, lap).
25   While some detention systems use this sort of device, it is essential that it be used
26   only with appropriate clinical input and in ways that minimize trauma to the patient
27   and maximize preservation of the patient's dignity.

28       407.  I was informed that, at San Diego County Jail, a patient's placement in

the restraint chair and their eventual removal from the restraint chair are exclusively "custody decisions."  The Jail mental health coordinator confirmed that placement of psychiatric patients in a restraint chair is entirely a custody function, testifying to clinical staff's lack of a role in such processes:

> Quiroz: I mean, we've witnessed people in a restraint chair.  We're not necessarily the ones determining when they're getting out of that chair.  You know, we're not -- they're not calling us for that reason, to say, should this person be removed.
>
> [I]t's not common that we see somebody -- that we are going to assess somebody in a [restraint] chair.  It is not common.
>
> Q: … [D]o you think it's important for clinicians to be involved when a restraint like a restraint chair is used on somebody who may be manifesting mental illness?
>
> A: Although I think it's important for a clinician, I think a psychiatrist should be -- I mean, if somebody's in a restraint chair I think we should probably get an M.D. level involved.
>
> …
>
> Q: You're not aware of any policy right now for an M.D. level staff member to get involved in a certain way when someone is placed in a restraint chair by custody?
>
> A: No.

Quiroz PMK Dep. at 72-74.

408.    The essentially complete control by custody staff over restraint chair placement and removal decisions, in policy and in practice, is a dangerous prospect for people with serious mental illness.  The consequence is that custody staff are likely managing many urgent or emergent mental health cases through use of restraints and without appropriate clinical involvement.  This is a problem that must be fixed, and that suggests a culture and policy of custody staff exerting improper control in mental health cases. (The March 2024 in-custody death of Abdul Kamara highlights the potentially deadly risks of custody-driven uses of restraints for people with serious medical and/or mental health needs.  According to law enforcement reporting, Mr. Kamara, a 29-year old man, was found crawling around a parking lot

with no shirt and no shoes after leaving a hospitalization. Sheriff's Department staff placed him in a restraint device called the "WRAP" soon after his arrest, which was followed by a sudden medical emergency that ended with Mr. Kamara's death. *See* News Release, Update on San Diego Sheriff In-Custody Death Investigation, Mar. 11, 2024.)

409. Through my review, it is clear that custody staff make all sorts of decisions without clinical input – and in many cases, *in spite of* contrary clinical input. I spoke with mental health leadership and staff during my site visits, and consistently heard that custody staff have complete control over decisions like where a patient is housed after a period on suicide precautions or in the acute mental health care unit. One supervisory mental health clinician stated directly that mental health staff play no role in such decisions, neither assessing nor sharing clinical contraindications for certain housing like Administrative Separation. One clinician told me that she was aware of cases in which custody "overrule" clinical referrals of her patients to mental health housing (*e.g.*, Outpatient Stepdown Unit).

410. Mental health staff who spoke with me acknowledged that custody staff commonly override clinical decisions, stating that they are left to do the best they can to provide whatever treatment they can in such a setting. Some were troubled by this fact while others seemed resigned to it as an unchangeable reality.

411. The inappropriate control of custody staff over placement and other decisions impacting patients' health care needs showed up in several individual case reviews. For example:

███████████████████

412. This patient had symptoms of psychosis as well as an intellectual disability. His psychosis was sometimes complicated by exaggeration of symptoms, which added a layer of complexity to his care that Jail mental health care staff struggled to manage. The failure to adequately control his psychiatric symptoms also complicated provision of medical care for a serious hand wound that he

1  sustained during his arrest.  When he was arrested, custody staff placed him in a

2  "sobering cell," noting that he was "under the influence of unknown substance" due

3  to erratic and uncooperative behaviors.  The mental health team was never consulted

4  to determine whether this clinical placement was clinically appropriate; in fact, a

5  psychiatric evaluation would have revealed that these behaviors were likely due to

6  psychiatric illness rather than substance intoxication.  The absence of substances in

7  the patient's system was later confirmed through drug screening done when he was

8  sent to the hospital for treatment of his hand wound; the hospital care team made

9  note of his active psychosis.  Yet after discharge from the hospital, custody staff put

10  this patient *back* into a sobering cell due to disorganized behaviors and poor

11  engagement that they continued to perceive as a result of active substance use.

12  Clinical input should have been gathered and utilized to ensure adequate treatment

13  of this patient's mental health condition; this did not occur.

14       413.  My concern for Mr. ███████'s care increased when reviewing his

15  hospitalization at Scripps Mercy Hospital for a suicide attempt.  Custody staff

16  accompanying him pulled the trauma service physician aside to ask, "why patient

17  was still in the hospital and being transferred to an inpatient psych facility when

18  [George] Bailey has a psych department," stating that the patient was faking his

19  symptoms to get into a specific housing.  First, it is inappropriate for custody staff to

20  intervene in treatment in this manner.  Based on my review, there is no

21  documentation that establishes that Mr. ███████ was malingering here.  But even

22  if it were a factor, the custody staff's commentary shows a dangerous lack of

23  understanding that malingering in patients with serious mental illness is often a

24  manifestation of their psychiatric condition that should be treated and not dismissed.

25       414.  The inappropriate control of custody staff over what should be

26  clinically driven decisions in this Jail system extends to its suicide prevention

27  policies and practices.  As suicide prevention expert Lindsay Hayes, Disability

28  Rights California, and others have urged, decisions about what property and

privileges can safely be provided to people identified as at risk of self-harm should be informed substantially by individualized *clinical* judgment. *See* Finding #5.B.3. Yet San Diego County Jail persists in its policy and practice that anyone placed on suicide precautions in the Enhanced Outpatient Housing unit or a safety cell be, for example, denied all clothing and placed in safety smock. Quiroz PMK Dep. at 145-50. The Jail mental health coordinator, Ms. Quiroz, acknowledged that implementing an individualized clinical assessment regarding denial of clothing for a person at risk of suicide was something that does not occur in this system but "could be considered." *Id.* She confirmed that other important privileges are also managed "outside of the clinical world" even for people at risk of suicide or self-harm:

> Q: For people in the safety program, in an EOH or safety cell, are they able to have family visits based on individualized clinical assessment that it's safe?
>
> A: That all happens outside of the clinical world. … [T]hat's in the very custody world if -- when somebody is allowed a visit, when somebody is allowed phone calls, recreation and how those happen throughout the facility.

Quiroz PMK Dep. at 156.

415.    Based on my experience and expertise, the Jail's policy and practice of custody controlling these decisions must change immediately, for several reasons, including: (1) patients are deterred from reporting suicidality if they know that they will face automatic punitive deprivations if they do; (2) good clinical care and basic human dignity require that patients be treated in the least restrictive setting appropriate to their needs, particularly when they are at heightened risk; and (3) a jail system where custodial policies subvert clinical judgment is one where people with mental health needs are placed at undue and substantial risk of serious harm.

416.    As just one example, the suicide of Mr. Marroquin, discussed above, demonstrates the extraordinary harm done when there are blanket custodial policies that apply to people with mental illness or at risk of suicide. In that case, when

Mr. Marroquin was placed on suicide precautions (safety cell or Enhanced Observation Housing), the basic provision of family phone calls were heavily restricted and even prohibited for him, due to the blanket custody protocols. But contact with his mother had well-documented clinical benefit, including to reduce suicidality. The custody-driven denial of family contact in this case illustrates why a jail's response to suicide risk should be clinically driven based on individualized assessments, not based on custody-dominated protocols. As Mr. Marroquin's mental health decompensated, the custody-driven restrictions served only to make things worse in the period leading up to his suicide.

417. A custodial blanket denial of property, privileges, or clothing – without individualized clinical assessment and input – has no place in a minimally adequate jail suicide prevention or mental health care system. Having custody staff make decisions about mental health care places incarcerated people at risk of serious harm. In this system, custody operations and administrative convenience trump the clinical judgment of mental health professionals in ways that are very dangerous.

IX.  **FINDING #9: THE JAIL'S SYSTEM IMPROPERLY AND DANGEROUSLY PUNISHES PEOPLE WITH SERIOUS MENTAL HEALTH TREATMENT NEEDS OR INTELLECTUAL DISABILITY.**

418. When I review a detention system's mental health-related policies and procedures, I pay careful attention as to whether and how the system imposes its disciplinary procedures on people with mental illness. There are many reasons why this is a critically important issue.

419. First, a person with mental illness and/or with an intellectual disability should not be punished for behaviors that are a manifestation of their mental illness or disability. For example, a person should not be punished for self-harming behavior when they are suicidal, nor for behaviors that technically violate jail rules when they are a product of the person's psychosis, paranoia, delusions, or other psychiatric symptoms. A person should not be punished for failing to follow directions or rules when such failure is related to their intellectual disability or

1  cognitive limitations.  Such practices are unfair, clinically misguided,

2  discriminatory, and ultimately harmful.

3  420.  Second, a person with mental illness and/or with an intellectual

4  disability should not be subjected to punishments that are clinically contraindicated

5  or potentially harmful based on their particular clinical or disability needs.  A person

6  with mental illness should not be denied an activity that is an important aspect of

7  their treatment.  For some, access to phone calls or visits from loved ones is

8  clinically important to their coping or general mental health condition; such access

9  should not be taken away as punishment, absent extraordinary circumstances.  For

10  many, placement in isolating conditions can increase suicidality and do great harm

11  to their mental health condition; such a placement should not be used for

12  punishment where this is the case.

13  421.  It is important to note that these principles do *not* mean that

14  incarcerated people with mental illness and/or an intellectual disability cannot be

15  subject to disciplinary measures; they do not get a free pass, and safety need not be

16  compromised.  What these principles do mean is that there must be appropriate

17  clinical input gathered, documented, and meaningfully considered in situations

18  where such a person may face discipline.

19  422.  Mental health clinicians must have meaningful and timely input into

20  the disciplinary process.  A licensed mental health professional should evaluate a

21  person with mental illness and/or an intellectual disability, or a person showing

22  signs suggesting potential mental illness.  This must include a records review and a

23  face-to-face assessment, as close to the incident as possible.  The role of the licensed

24  mental health professional is to determine whether there are mental health- or

25  disability-related factors contributing to the alleged misbehavior, the efficacy of

26  disciplinary measures versus alternative interventions, whether certain punishments

27  are clinically contraindicated, and whether adjustments to the person's treatment

28  plan are necessary.  Many systems do this effectively, with a licensed mental health

professional documenting clinical input that classification or disciplinary staff meaningfully consider. Such input must be considered prior to any disciplinary action being imposed. There must also be appropriate accommodations and assistance provided to a person with mental illness and/or an intellectual disability during all disciplinary procedures that take place, to ensure their due process rights and a meaningful opportunity to participate in those procedures.

423. Based on my review of policy and other materials in this case, it is clear that the San Diego County Jail has failed to implement policies and procedures to ensure that clinical input is gathered, documented, and meaningfully considered in disciplinary or classification procedures involving violations of jail rules. The Jail mental health coordinator confirmed that there is no such policy, practice, or documentation system in place. Quiroz PMK Dep. at 179.

424. In systems that fail to implement such policies and procedures, it is exceedingly common to see a high proportion of people with mental illness and/or an intellectual disability end up in administrative segregation and other highly restrictive settings. This is consistent with what I have observed in the San Diego County Jail system. As discussed in Finding #4, such over-representation of this population in Administrative Separation and isolation-type settings is dangerous and deeply concerning. The case of ███████████ is illustrative of this systemic deficiency in San Diego County Jail.

███████████

425. Mr. ████████ has a history of serious mental illness. Upon his arrival in ████████ 2024, it was apparent he was quite mentally ill. He was uncooperative with the intake staff and difficult to manage due to his increased energy, grandiose delusions, and rapid speech which are all signs of mania likely due to uncontrolled symptoms of his mental illness. Deputies described him as "very up and down", "yelling and hostile," and with "random mood swings … unpredictable as he goes from calm to aggressive." While I agree that these behaviors are concerning, they

1  were indicative of worsening mental illness and need for an urgent psychiatric

2  evaluation.  Instead, the deputies confined him to his cell.  He was also placed in

3  disciplinary seclusion by deputies on three (3) occasions in ████ and ████

4  2024 for "disrespecting staff."  Although details about these seclusions are not

5  clearly documented in the records, based on my review of other records around that

6  time, his behaviors were very likely driven by uncontrolled mental illness.  It was

7  not until one month after his arrival—and being placed in conditions consistent with

8  solitary confinement where his symptoms persisted—that he finally received a

9  psychiatric evaluation and started receiving treatment.  This patient's behavior

10  should have received a clinical response. Instead, it was met with custody-driven

11  disciplinary action that was likely harmful and counterproductive given this

12  patient's treatment needs.

13    426.   On the matter of imposing discipline for people with mental health

14  needs and/or intellectual disabilities, San Diego County Jail is far behind other jail

15  and prison systems in California, including Alameda County Jail, Contra Costa

16  County Jail, Orange County Jail, Sacramento County Jail, San Bernardino County

17  Jail, Santa Barbara County Jail, Yuba County Jail, and the CDCR state prison

18  system.  The San Diego County Jail system should implement policies and

19  procedures consistent with what is described above immediately.

20  **X.    FINDING #10: SAN DIEGO COUNTY JAIL OPERATES A SYSTEM**

21  **THAT DISCRIMINATES AGAINST PEOPLE WITH MENTAL HEALTH AND INTELLECTUAL DISABILITIES.**

22    427.   The San Diego County Jail operates a system that unfairly and

23  harmfully discriminates against people with mental health and intellectual

24  disabilities. I provide a few examples of this below.

25    428.   As discussed in Finding #4, people with these disabilities are over-

26  represented in Administrative Separation or other isolation settings, which raises

27  very serious concerns that: (1) they are *not* being held in the least restrictive setting

28  appropriate to their individual needs and circumstances; (2) they are held in more

restrictive setting *because of* their disability; and (3) they are being denied access to services, programs, and activities that similarly situated, non-disabled individuals receive – including classes, recreation, job opportunities, and more.

429.    As discussed in Finding #9, people with mental health and intellectual disabilities face unfair and discriminatory treatment in the disciplinary procedures at the Jail, in many resulting their being punished for behaviors that are a manifestation of their disability.  The disciplinary procedures and practices at the Jail also fail to provide necessary accommodations to people with mental health or intellectual disabilities, both during the disciplinary process and in the administration of punishments.

430.    Based on my review, including my Jail site visits and interviews with staff and incarcerated persons, I have found that people with mental health and intellectual disabilities are denied opportunities and meaningful access to a range of programs, services, and activities across the system.  People in Outpatient Stepdown units, for example, do not have access to program and work opportunities that they would if they did not have a mental health disability.  This restricted access is based on blanket rules (*e.g.*, restrictions in the OPSD units), not individualized assessments to ensure meaningful access to opportunities consistent with individual clinical and security needs.  I understand that the Jail system has recently begun to reform its disability accommodations system, and emphasize that any reforms must include people with mental health and intellectual disabilities.

## XI.    FINDING #11: THE JAIL'S SYSTEM FAILS TO PROVIDE ADEQUATE MENTAL HEALTH DISCHARGE PLANNING SERVICES, PUTTING PEOPLE AT RISK OF HARM AND REPEATED INCARCERATIONS.

431.    In a functional jail mental health care system, there will be discharge planning staff and services sufficient to meet the needs of incarcerated people upon their release. Such discharge planning services must to ensure medication and treatment continuity, linkages to community-based service providers, and resources

1  to prevent people with mental health needs from a substantial risk of serious harm

2  upon release.

3      432.   As discussed in Finding #2.D, there are serious deficiencies in ensuring

4  adequate discharge planning for people with mental illness, specifically related to

5  ensuring adequate medication continuity.

6      433.   Deficiencies in the area of discharge planning go back years.  In 2017,

7  the NCCHC Technical Assistance Report found that NCCHC Discharge Planning

8  standards are "Not Met for Mental Health" at the San Diego County Jail.  The

9  NCCHC Report (at 23) stated that the "discharge planning process varies, depending

10 on the patient and the community services [that] are identified.  There is no formal

11 plan documented in the chart for prison inmates.  Mental health patients who need a

12 community referral are instructed to have the community pharmacy coordinate with

13 the jail so that the patient is provided with a 10-day prescription."  The NCCHC

14 Report recommended improvements to discharge planning, including that "Mental

15 health staff … should document their plans for discharge" (at 24).  The NCCHC

16 Report's finding (at 36) makes the deficiency plain: "Mental health does not provide

17 discharge planning and it was reported that there is insufficient discharge planning

18 for all inmates."

19     434.   As discussed earlier in this report, the County is well aware of this

20 deficiency, and it has not taken the necessary steps to fix the problem.  Ms. Quiroz,

21 the Jail mental health coordinator, acknowledged that the County needs more

22 staffing to meet the discharge planning needs for the mental health population at the

23 Jail.  She testified that the Jail has not done a "needs assessment to determine what

24 staffing resources are necessary people with these disabilities to meet discharge

25 planning needs of the [seriously mentally ill] population."  She stated that "we do

26 need more" mental health discharge planning staffing resources, but when asked

27 whether she was confident that the Jail's staffing plans will be sufficient to meet the

28 needs of the discharging mental health population, she responded that "it's

1  challenging without the data to know," but "more is certainly better."  Quiroz PMK

2  Dep. at 171-72.

3      435.  This testimony, along with my review of policies, records, and other

4  relevant materials, make clear that the Jail has not allocated adequate resources or

5  attention to discharge planning for the Jail's incarcerated mental health population.

6  This failure means that patients being released from the Jail will reenter the

7  community without the services, medications, and other linkages they need, and thus

8  be put at substantial risk of serious harm.

9      436.  My review of patient records confirms that discharge planning remains

10  an area of serious deficiency.  While the mental health encounter forms do contain a

11  check box referencing "Discharge Planning/Resources" as an "intervention," and

12  have a few other discharge-related check boxes, the records I reviewed consistently

13  show that mental health staff are not providing or documenting substantial, or even

14  minimally adequate, discharge planning services.

15      437.  Take the case of ████████████  a high-needs mental health patient

16  discussed earlier in this report.  Records show that in ██████ 2023, he requested

17  discharge planning assistance at least twice in the weeks prior to his release from the

18  Jail.  The discharge (or reentry) services provided, according to the records, fall far

19  short of the standard of care.  In ████ 2023, Mr. ██████ requested discharge

20  planning assistance.  A mental health encounter note checks "Discharge

21  Planning/Resources" but documents only that "[clinician] to provide re-entry packet

22  later through sworn staff."  In ██████ 2023, a few days before his projected release

23  date, the patient again requested help preparing for discharge.  The mental health

24  encounter note is again disturbingly sparse on such discharge planning assistance,

25  stating only: "[Inmate-Patient] requested and was provided MAT program

26  information for El Cajon.  IP was aware of pending status with RCC and current

27  Medi-Cal."  There is no indication that a community-based follow-up psychiatric

28  appointment was arranged.

438.   Of additional concern, this patient had a history of being treated with multiple psychiatric medications.  The last time he was seen by a psychiatric prescriber prior to his ███████ 2023 discharge was in █████ 2023, when the prescriber noted that they discussed "potential complications as a result of an abrupt cessation once a certain dose has been reached for certain meds, the need to continue routine meds even if pt. starts to feel better, and to report any questions/concerns."  I could discern nothing in the records to indicate that psychiatric staff met with the patient again prior to his discharge or took necessary steps to ensure that he would have timely access to clinically appropriate medications when he was released.  This patient was back in custody just a few months later, with active mental health symptoms and reporting that "I have thoughts of wanting to hurt myself."  (As discussed earlier in this report, despite all of this, this patient was placed in Administrative Separation—an exceedingly dangerous placement for him.)  This case is one among the many I reviewed where adequate discharge planning was nowhere to be seen.

439.   As a mental health system, it is counterproductive, harmful, and dangerous to have insufficient discharge planning staff, services, and resources in place to meet the needs of the mental health population.  Other jail and prison systems have implemented far better discharge planning systems for their mental health population.  As one point of comparison, the California prison system has long provided people with a 30-day supply of medication and recently increased that to a 60-day supply of medication at release.  Other county jail systems provide coordinated discharge planning processes with steps to better ensure medication continuity and service linkages upon release.  San Diego County Jail must significantly improve this aspect of its mental health care system to meet basic patient needs.

//

//

# XII. CONCLUSION

440. In my more than 35 years evaluating and working in detention facilities, I have come across very few, if any, mental health care systems so lacking in effective systems and levels of care to meet the needs of the incarcerated mental health population and protect people from serious harm. In light of the problems discussed above, concerted remedial action by the County is urgently needed.

441. The information and opinions contained in this report are based on evidence, documentation, and/or observations available to me. I reserve the right to modify or expand these opinions should additional information become available to me. The information contained in this report and the accompanying exhibits are a fair and accurate representation of the subject of my anticipated testimony in this case.

Date: AUGUST 19 , 2024

Pablo Stewart, M.D.

# EXHIBIT A

<u>CURRICULUM VITAE</u>

***PABLO STEWART, M.D.***



<u>Personal Statement:</u>   As evidenced in my CV, my psychiatric career is based on several guiding principles. These include, but are not limited to, a commitment to diversity at all levels of medical education, including medical students, residents and faculty members. Also, I have always believed that health care is a right and not a privilege. I have demonstrated this fact by my passion for social justice and health equity for everyone.

<u>Language Competency:</u>   Fluent in both Spanish and English.

<u>EDUCATION:</u>   University of California, San Francisco, Teaching Certificate in General Medical Education, 2017

University of California, San Francisco, School of Medicine, Department of Psychiatry, Psychiatric Residency Program, 1986

University of California, San Francisco, School of Medicine, M.D., 1982

United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry

<u>LICENSURE:</u>   California Medical License #GO50899
Hawai'i Medical License #MD-11784
Federal Drug Enforcement Administration #BS0546981
Hawaii Controlled Substances Certificate of Registration #E14341
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

<u>ACADEMIC APPOINTMENTS:</u>

September 1, 2021-
Present   <u>Academic Appointment:</u> Clinical Professor/Psychiatrist, Queens University Medical Group (QUMG), University of Hawaii, John A. Burns School of Medicine.

July 1, 2019-
August 31, 2021   <u>Academic Appointment:</u> Clinical Professor/Psychiatrist, University Health Partners (UHP), University of Hawaii, John A. Burns School of Medicine.

| | |
|---|---|
| February 22, 2018-<br>June 30, 2019 | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of Hawaii, John A. Burns School of Medicine. |
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco. School of Medicine. |
| July 1995 -<br>August 2006 | <u>Academic Appointment:</u> Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u> Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u> Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| July 2019-<br>Present | Attending Psychiatrist John A. Burns School of Medicine, Department of Psychiatry, University of Hawaii. Current duties include supervising psychiatric residents in their provision of acute and chronic care to the mentally ill inmate population housed at the Oahu Community Correctional Center. In this capacity I was also involved with local agencies in formulating the jail's response to Covid-19. I present a lecture series to the psychiatric residents regarding Forensic Psychiatry. I also serve as an Attending Psychiatrist in the Emergency Department, the Psychiatric Inpatient Unit and the Medical and Surgical Units at the Queens Medical Center. |
| December 1996-<br>Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry. |
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities Project.</u> Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court  Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center, Department of Veterans Affairs Medical Center, San Francisco.</u> Overall responsibility for the medical and psychiatric services at the Homeless Center. |

| | |
|---|---|
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community-based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco.</u>  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts, admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 - | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u> |

| | |
|---|---|
| July 1985 | Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 - November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA.</u>   Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982- July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u> Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 - July 1978 | <u>Infantry Officer - United States Marine Corps.</u> Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Officer in Charge of a Vietnamese Refugee Camp. Received an Honorable Discharge.  Highest rank attained was Captain. |

<u>HONORS AND AWARDS:</u>

| | |
|---|---|
| June 2024 | Recognized by the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii as the recipient of the 2023-2024 Excellence in Teaching Award-Psychiatry. |
| June 2020 | Recognized by the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii as the recipient of the 2019-2020 Excellence in Teaching Award-Psychiatry. |
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |

| | |
|---|---|
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students at the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.  The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship.  One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry.  Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |

| | |
|---|---|
| July 1992 - June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 - June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 - January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000- April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001- September 2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002- June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003- April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003- January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004- June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004- January 2006; February 2017- October 2018 | Member of Human Services Commission, City and County of San Francisco. |
| February 2006- January 2007; April 2013- January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007- March 2013; February 2015- 2017 | President, Human Services Commission, City and County of San Francisco. |
| January 2019- present | Death Doula and Medical Aid In Dying practitioner. In these roles, I attend to dying patients to help them achieve a dignified, painless death. |

<u>UNIVERSITY SERVICE:</u>

| | |
|---|---|
| June 2020-<br>Present | Member of the John A. Burns School of Medicine, University of Hawaii Scholarship Committee. |
| June 2020-<br>Present | Member of the resident selection committee for the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing. Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine. Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine. Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine. Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee. Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine. Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

## TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2019-present | Present a lecture series to the psychiatric residents of the Department of Psychiatry, JABSOM, University of Hawaii on forensic psychiatry and Medical Aid In Dying. Psychotherapy supervisor and career mentor Department of Psychiatry, JABSOM, University of Hawaii. |
| December 2018-May 2019 | Lecturer, Department of Psychiatry, JABSOM, University of Hawaii. |
| September 2016-June 2018 | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014-June 2018 | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003-June 2018 | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002-January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001-June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999-April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 - November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| September 1990-December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 - June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 - February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |

| | |
|---|---|
| February 1994 - February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 - June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991- Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 - February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - | Clinical supervisor, Psychology interns/fellows, |

| | |
|---|---|
| August 1990 | San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatry Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| February 2019- Present | Forensic psychiatric consultant to the British Charity, Reprieve. In this role, I have conducted postconviction, capital mitigation assessments. I have done this work in Indonesia and Malawi. |
| May 2016- July 2022 | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |
| June 2015- May 2017 | Senior Fellow, University of California, Criminal Justice & Health Consortium. |
| April 2014- October 2018 | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012- December 2021 | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007- Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. |

The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners.  My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order.  *See Brown v. Plata*, ___ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011).

July/August 2008-
July 2016

Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.)  This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails.

February 2006-
December 2009

Board of Directors, Physician Foundation at California Pacific Medical Center.

June 2004-
September 2012

Psychiatric Consultant, Hawaii Drug Court.

November 2003-
June 2008

Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services.

June 2003-
December 2004

Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD).  This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit.

October 2002-
August 2006

Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section.

July 1998-
June 2000

Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project.  This Project aids programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities.

July 1998-
February 2004

Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities.  NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs.  NCCD ceased to be the monitoring agency for this project in June 1999.  At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency.  The work remained unchanged.

| | |
|---|---|
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign<br>Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance<br>Abuse Treatment, Substance Abuse and Mental Health Services<br>Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer<br>Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc.<br>Review all research protocols for the clinic per Department of<br>Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic.<br>Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Responsible for<br>directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of<br>California, in the case of Madrid v. Gomez, No. C90-3094-TEH.<br>Report directly to the Special Master regarding the implementation<br>of constitutionally mandated psychiatric care to the inmates at<br>Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of<br>California, in the case of Gates v. Deukmejian, No. C1V S-87-<br>1636 LKK-JFM.  Report directly to the court regarding<br>implementation and monitoring of the consent decree in this case.<br>This case involves the provision of adequate psychiatric care to the<br>inmates at the California Medical Facility, Vacaville. A major<br>portion of this consent decree also involved establishing a program<br>for the identification and treatment of inmates with Mental<br>Retardation (currently referred to as Intellectual Disability.) |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Direct<br>medical/psychiatric management of project clients; consultant to<br>staff on substance abuse issues. Special emphasis on dual<br>diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services,<br>Hospitality House, San Francisco, CA.  Advised youth services<br>staff on client management.  Provided training on various topics<br>related to adolescents. Facilitated weekly client support group. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the<br>Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>June 2002 | Soccer Coach, Convent of the Sacred Heart Elementary<br>School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance<br>Abuse issues to the student body, Hidden Valley Elementary<br>School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26.     American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

27.     Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.     International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.     Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

30.     Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31.     Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.     Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.     DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34.     The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35.     The California Council of Community Mental Health Agencies Winter Conference, Keynote Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36.     American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.     "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc. sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38.     "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.     Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40. Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41. Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42. "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44. Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45. "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46. 9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47. Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48. Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51. California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52. California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53. Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54.    1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55.    "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56.    Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57.    "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58.    Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender." (2/17/99)

59.    American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999). Entry Level Process Group Leader.

60.    "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61.    "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62.    "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63.    "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64.    Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66.    "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67.    California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68.    "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69.  State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70.  "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71.  11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72.  The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73.  "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74.  "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75.  15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76.  "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77.  "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78.  "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79.  "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.  "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81.  "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82.  "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83.  "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.    1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering."  La Jolla, California.  (8/3/99)

85.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center.  Kahului, Maui.  (8/23/99)

86.    "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.    "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.    "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.    "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.    "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.    "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.    "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.    "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.    "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.    "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.    "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.    "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.    "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.    "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

101.    "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California. (5/15/00)

102.    National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California. "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California. (6/9/00)

104.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California. (6/29 & 7/27/00)

105.    "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106.    "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California. (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey. "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111.    "Wasn't One Problem Enough?" Mental Health and Substance Abuse Issues. 2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114.    "Dual Diagnosis-Assessment and Treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115.   Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116.   National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."   I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117.   Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118.   Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120.   First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas."   El Centro, California. (1/28/02)

121.   The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122.   Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123.   3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124.   New Mexico Department of Corrections, "Group Psychotherapy Training."   Santa Fe, New Mexico. (8/5/02)

125.   Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126.   California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127.   Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128.   Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.   "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130.   "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131.    "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132.    Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.    San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134.    "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135.    "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University. San Francisco, California. (8/13/05)

136.    Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse." San Francisco, California. (10/24/05)

137.    Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse." Woodland, California. (1/25/06), (6/23/06)

138.    "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.    Lecture tour of Japan (4/13-4/23/06). "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness." Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.    "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference. Sacramento, California. (4/25/06)

141.    "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.    "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference. Sacramento, California. (4/27/07)

143.    "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network. Medford, Oregon. (5/10/07)

144.    "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar. San Francisco, California. (8/2/07)

145.    "Capital Punishment," Human Writes 2007 Conference. London, England. (10/6/07)

146.    "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California. (10/30/07)

147.    "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.    "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.    "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.    "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.    Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.    2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.    Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally Ill Offender in Reentry Courts," (9/15/2010)

154.    Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.    2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.    2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.    Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.    Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.    "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.    San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161.    Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for

Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162.    "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.

163.    Mental Health & Death Penalty Training, Community Legal Aid Institute (LBH Masyarakat), Jakarta, Indonesia, February 12 -16, 2019.

164.    Mental Health & Death Penalty Training, Blantyre, Malawi, October 6, 2023.

PUBLICATIONS:

1)    Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients.* Hospital and Community Psychiatry, 39, 437-439.

2)    Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3)    Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)    Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)    Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)    Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)    Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)    Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)    Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)    Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.*  Chapter in the book, <u>*Uppers, Downers, All Arounders, Fifth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

11)    James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* <u>National Institute of Corrections</u>, Accession Number 019468.

12)    Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as <u>AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)    Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.*  Chapter in the book, <u>*Uppers, Downers, All Arounders, Sixth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

14)    Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, <u>*Uppers, Downers, All Arounders, Seventh Edition,*</u> CNS Publications, Inc., Ashland, Oregon.

15)    Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16)    Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17)    Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)*    Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

*19)*    Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Plaintiff-Appellant Edgar Quintanilla v. Homer Bryson, Commissioner, State of Georgia's Department of Corrections, et al., On appeal from the United States District Court for the Southern District of Georgia, Case No. 6:17-cv-00004-JRH-RSB in the United States Court of Appeals for the Eleventh Circuit, No. 17-14141.

# EXHIBIT 2

1
GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809

2
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934

3
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439

4
ROSEN BIEN
GALVAN & GRUNFELD LLP

5
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

6
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104

7
ggrunfeld@rbgg.com
vswearingen@rbgg.com

8
mfreedman@rbgg.com
eanderson@rbgg.com

9
hchartoff@rbgg.com
bholston@rbgg.com

10

11
AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER

12
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709

13
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314

14
ajf@aaronfischerlaw.com

15
Attorneys for Plaintiffs and the
Certified Class and Subclasses

16

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

17
UNITED STATES DISTRICT COURT

18
SOUTHERN DISTRICT OF CALIFORNIA

19
DARRYL DUNSMORE, ANDREE
ANDRADE, ERNEST ARCHULETA,

20
JAMES CLARK, ANTHONY EDWARDS,
REANNA LEVY, JOSUE LOPEZ,

21
CHRISTOPHER NORWOOD, JESSE
OLIVARES, GUSTAVO SEPULVEDA,

22
MICHAEL TAYLOR, and LAURA
ZOERNER, on behalf of themselves and all

23
others similarly situated,

              Plaintiffs,

24
        v.

25
SAN DIEGO COUNTY SHERIFF'S
DEPARTMENT, COUNTY OF SAN

26
DIEGO, SAN DIEGO COUNTY
PROBATION DEPARTMENT, and DOES

27
1 to 20, inclusive,

              Defendants.

28

Case No. 3:20-cv-00406-AJB-DDL

**REBUTTAL EXPERT REPORT
OF PABLO STEWART**

Judge:       Hon. Anthony J. Battaglia
Magistrate: Hon. David D. Leshner

Trial Date: None Set

[4571315 3]

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.    RESPONSE TO THE REPORT OF LENARD VARE ............................... 1

    A.    Mr. Vare's Opinion Suggesting that the Jail's Suicide Prevention
        Policies and Procedures Are Appropriate Is Incomplete and Ill-
        Informed. ................................................................................. 1

    B.    Mr. Vare's Opinion Dismissing Serious Concerns About
        Improper Custody Staff Interference with Mental Health Care
        Decisions Is Incomplete and Based on Irrelevant Analogies. ............... 5

    C.    Mr. Vare's Opinion that There are No Deficiencies with Respect
        to Safety Checks Ignores the Repeated Findings of Deficiencies
        by Multiple Independent Factfinders. ...................................... 10

    D.    Mr. Vare's Opinion Regarding the Outpatient Step-Down
        (OPSD) Program's Exclusion of Protective Custody Patients
        Misses the Point and Ignores County Leadership's Recognition
        of this Deficit. ....................................................................... 12

III.    RESPONSE TO THE REPORT OF JOSEPH PENN .............................. 14

    A.    Dr. Penn's Review Completely Ignores Jail Suicides and Mental
        Health-Related Deaths that Have Occurred in San Diego County
        Jail, which Is a Fundamental Flaw in His Methodology. .................... 15

    B.    Dr. Penn's Methodology, Findings, and Opinions Are Confusing
        and Unreliable Due to His Use of "Copy-and-Paste" Passages
        from His Reports from Other Cases and Correctional Mental
        Health Systems. ..................................................................... 17

    C.    Dr. Penn's Opinion that the Jails' Practices and Policies Ensure
        that Patients in Need of Mental Health Care Are Appropriately
        Identified and Tracked Is Not Supported By Facts. ........................... 20

    D.    Dr. Penn's Opinion that the San Diego County Jail System
        Maintains Adequate Mental Health Staff to Meet the
        Incarcerated Population's Needs Ignores Well-Established and
        Readily Acknowledged Facts that the System Does *Not* Have
        Sufficient Staffing Resources. ................................................. 25

    E.    Dr. Penn's Opinion that San Diego County Jail Custody Staff Do
        Not Interfere with Mental Health Care Staff's Clinical Decisions
        Is Not Supported by the Facts. ................................................. 30

    F.    Dr. Penn's Opinion that San Diego County Jail Has an Adequate
        Psychiatric Medication System to Meet Patient Needs Is Not
        Supported by the Facts, Including Those in His Own Report. ............. 34

G.  Dr. Penn's Opinion that San Diego County Jail Provides Patients with Timely Access to Mental Health Care and a "Robust Mental Health Delivery System" Ignores the Realities of this Extremely Inadequate System. ................................................................ 42

1.  There Are Serious Deficiencies with Respect to the Timeliness of Mental Health Care at the San Diego County Jail. ................................................................ 42

2.  There Are Serious Deficiencies with Respect to the Adequacy of Mental Health Care and Treatment Programming at the San Diego County Jail. ........................... 46

H.  Dr. Penn's Opinion that San Diego County Jail "Provides Opportunities for Confidential Mental Health Care Encounters in Adequate Physical Spaces" Is Contradicted by the Facts, Including Statements by the Sheriff Herself. ........................... 51

I.  Dr. Penn's Opinion that San Diego County Jail Does Not House Patients at Risk of Suicide in Punitive Isolation and that "Strategies Are Employed to Avoid Unnecessary and Undue Risk of Decompensation and Harm" Is Not Supported by the Facts of the Jail's Operations. ................................................................ 56

J.  Dr. Penn's Opinion that the San Diego County Jail System Has an Adequate Suicide Prevention System Is Inconsistent with the Facts, and His Analysis Omits Critical Information. ........................... 65

K.  Dr. Penn's Opinion that the Sheriff's Department Does Not Discriminate and Unfairly Punish People with Mental Illness Is Contradicted by the County's Own Staff and Its Own Experts. ........... 72

L.  Dr. Penn's Opinion that the "Sheriff's Department Provides IPs with Adequate Mental Health Discharge Planning and Resources" Is Not Supported by the Facts and Is Contradicted by the County's Own Jail Mental Health Coordinator. ........................... 73

IV.  CONCLUSION ................................................................ 75

# I.    INTRODUCTION

I, Pablo Stewart, declare:

1.    I was asked to review and analyze the opinions and conclusions expressed in the August 21, 2024, Expert Reports of Joseph Penn and Lenard Vare, and to opine whether those reports cause a change in my opinions or conclusions as set forth in my August 19, 2024 expert report in this matter (hereinafter "Stewart Report"), and to provide my opinions as to those reports.

2.    I have reviewed and analyzed the opinions in the expert reports noted above.  Neither the opinions nor conclusions outlined in those reports cause me to change any of the opinions or conclusions stated in my expert report dated August 19, 2024.

3.    The opinions expressed in this rebuttal report are based on information that has been made available to me.  Should new information become available to me in the future, I reserve the right to analyze that information and revise my opinions and/or conclusions.

# II.    RESPONSE TO THE REPORT OF LENARD VARE

4.    I reviewed Defendants' expert Lenard Vare's report, dated August 21, 2024.  As set forth below, I strongly disagree with many of the opinions Mr. Vare offers in his report (hereinafter "Vare Report").

### A.    Mr. Vare's Opinion Suggesting that the Jail's Suicide Prevention Policies and Procedures Are Appropriate Is Incomplete and Ill-Informed.

5.    Mr. Vare writes that the "suicide prevention policies as well as policies related to managing suicidal individuals at San Diego County jails are appropriate in identifying and addressing the concerns related to incarcerated persons."  Vare Report at 19-40 (Opinion 1). I strongly disagree with this opinion, and note a few important ways that Mr. Vare's analysis is incomplete and ill-informed.

6.    Mr. Vare's opinion does not mention, and appears not to be informed by, critically important sources of data—including the findings and

1   recommendations of suicide prevention expert Lindsay Hayes and the findings and

2   recommendations of the clinical and investigative team that issued Disability Rights

3   California's report, *Suicides in San Diego County Jail:  A System Failing People*

4   *with Mental Illness*, among other detailed reports on suicide prevention-related

5   deficiencies as I set forth in my report.  Stewart Report ¶¶ 284-350.

6       7.      Nor is Mr. Vare's assessment based on analysis of any of the

7   approximately 40-plus suicides that have occurred among incarcerated people at San

8   Diego County Jail in recent years.  In determining the adequacy of a jail system's

9   suicide prevention policies and practices, it is essential to look at individual critical

10  incidents – including completed suicides and serious suicide attempts – and to

11  explore whether and to what extent systemic deficiencies are in evidence.  I engaged

12  in such an assessment in my August 2024 report; Mr. Vare has not done so.

13      8.      I was surprised and troubled to see the statistical data that Mr. Vare

14  relies upon to support his opinion that the San Diego County Jail's suicide

15  prevention policies and practices are "appropriate."  Specifically, he includes this

16  chart (Vare Report at 27):

| Year | Total Self-Harm Incidents including Attempted Suicides | Attempted Suicides Only |
|------|--------------------------------------------------------|-------------------------|
| 2021 | 299 | 56 |
| 2022 | 272 | 41 |
| 2023 | 286 | 22 |

23      9.      The County has stated to DRC that it began utilizing new definitions

24  for "Suicide Attempt" and "Non-Suicidal Self Injury" in 2017.  Under these

25  definitions, the County determined that just 10 of the 73 incidents reported as

26  "Suicide Attempts" were in fact suicide attempts under the new definition.  DRC

27  Report at 5.

28      10.     Mr. Vare writes that, during the 2021-2023 time period, there were five

[4571315 3]                                    2                 Case No. 3:20-cv-00406-AJB-DDL

1  (5) completed suicides in San Diego County Jails.  He then contrasts that number

2  with the "857 individuals" reflected in the above chart's "Total Self-Harm Incidents

3  including Attempted Suicides" column who "were prevented from further harming

4  themselves or completing their suicidal intent over the three-year period."  Vare

5  Report at 27.  This statement is nonsensical and a misrepresentation of this data.

6        11.    To begin with, Mr. Vare's statement is factually incorrect.  There are

7  individuals almost certainly reflected on this chart who in fact *did* further harm

8  themselves and even committed suicide during this three-year period.  Take, for

9  example, Mr. Marroquin, whose May 2021 suicide I describe in detail in my report.

10 Stewart Report ¶¶ 275-281.  Mr. Marroquin was placed in safety cells and enhanced

11 observation cells for serious self-harm incidents resulting from auditory

12 hallucinations and other acute psychiatric symptoms in the early months of 2021.

13 Mr. Marroquin was then placed in a clinically inappropriate and dangerous solitary

14 confinement cell, where he died by suicide.  His self-harm/suicide attempt incidents

15 in 2021 are (or should be) reflected on Mr. Vare's chart.  Mr. Vare's claiming that

16 those incidents are evidence of an adequate jail suicide prevention system is deeply

17 wrong-headed.  Mr. Marroquin's death was a terrible failure with respect to both

18 mental health treatment and suicide prevention.  His earlier suicide attempts and

19 self-harm incidents do not demonstrate success; they underscore the system's

20 deficiencies.

21       12.    Mr. McDowell's egregious case is another example of a suicide attempt

22 in 2023 and was followed by his placement in solitary confinement without

23 necessary psychiatric treatment for several weeks leading up to his suicide, is

24 another example.  Stewart Report ¶¶ 258-265.  Mr. Vare's statement would have

25 one consider Mr. McDowell's suicide attempt to be evidence of systemic success

26 (notwithstanding that the Jail then put Mr. McDowell in even greater danger and

27 denied him care, leading to his completed suicide).  It is in fact the opposite –

28 evidence of a system that places people with serious mental illness at grave and

1    unacceptable risk.

2    　　　13.    The goal of an adequate suicide prevention system is not merely to

3    prevent people who engage in self-harm or attempt suicide from dying.  The goal

4    must also be to proactively identify and treat serious mental illness and suicide risk,

5    to reduce suicidality, and to *prevent* self-harm and suicide attempt incidents.  In this

6    three-year span, in addition to the completed in-jail suicides, the chart shows that at

7    least 119 people attempted suicide, and at least 857 people engaged in self-harm,

8    including the suicide attempts.  **This finding of such a large number of**

9    **incarcerated people engaging in self-harming behavior in this Jail is very**

10    **significant, and serves only to increase my concern.**  These data highlight the

11    desperate need for improved psychiatric care and mental health treatment as well as

12    more clinically appropriate settings for people who are now clearly at great risk in

13    the San Diego County Jail.

14    　　　14.    The numbers of attempted suicides in 2021, 2022, 2023, as reflected in

15    Mr. Vare's chart, are substantial, and appear to be significantly higher as compared

16    to a few years earlier – in 2017, another year for which the County has provided

17    suicide attempt data.  In Disability Rights California's 2018 report on suicides in

18    San Diego County Jail, the County reported that there were ten (10) incidents

19    meeting the Jail's definition of "Suicide Attempt" between January 2017 and mid-

20    September 2017 (8½ months), or about one per month.  DRC Report at 5.

21    Mr. Vare's data show that by 2021, there were 56 attempted suicides over a 12-

22    month period (almost 5 suicide attempts per month), a huge increase that continued

23    at least through 2022 (41 attempted suicides over a 12-month period, or 3½ suicide

24    attempts per month).

25    　　　15.    Mr. Vare's discussion of the plaintiffs in this case offers no evidence

26    that the Jail's suicide prevention policies and practices are appropriate.  In fact,

27    Mr. Vare's own descriptions of the plaintiffs' experiences raise serious concern.  For

28    example, the case of Plaintiff Olivares is extremely alarming with respect to suicide

1  prevention protocols, as Mr. Vare recounts:

> Olivares decided to stop eating and go on a hunger strike in January 2022. He was seen by a mental health professional and the mental health staff determined that Olivares should be placed in the Inmate Safety Program. He was interviewed in a medical clinic room, and he informed mental health staff that he was not going to change his mind about his decision. He even reported that he had told his family and friends and made peace with them. He was then placed in an EOH cell. . . . Olivares was again placed into EOH in February 2022 after he informed staff that he was on his second hunger strike.

7  Vare Report at 35-36.

8  16.    The County's response to this patient's decision to go on a hunger

9  strike makes no sense. In Enhanced Observation Housing (EOH), all patients are

10  denied clothing, placed in a safety smock, and denied various personal belongings

11  and activities (*e.g.*, family visits). None of these deprivations address Mr. Olivares'

12  clinical needs related to an intended hunger strike. (Removal of clothing and

13  placement in a safety smock is clinically indicated when a person demonstrates a

14  risk of hanging themselves of strangling themselves with their clothing. A safety

15  smock is not indicated for a potential hunger strike.) In my experience, placing

16  someone with serious mental health needs in a highly restrictive setting with such

17  deprivations in this kind of situation is clinically countertherapeutic and can feel

18  punitive. It does not serve to treat or meaningfully address a patient's suicidality or

19  mental health needs.

20  17.    Nothing in Mr. Vare's discussion of suicide prevention policies and

21  practices directly addresses, or changes, the detailed findings of systemic

22  deficiencies in my August 2024 report.

23  **B.    Mr. Vare's Opinion Dismissing Serious Concerns About Improper Custody Staff Interference with Mental Health Care Decisions Is Incomplete and Based on Irrelevant Analogies.**

25  18.    Mr. Vare writes that Plaintiffs' allegations that "custody staff

26  improperly controls clinical mental health care decisions" are "completely without

27  merit." Vare Report at 40-43 (Opinion 2). Mr. Vare's opinion is remarkably

28  incomplete and relies on irrelevant analogies regarding other government systems.

19.     Mr. Vare first dismisses the real and consequential structural deficiency in the Jail's organizational structure, whereby San Diego County Jail health care staff and leadership report directly to a Jail Captain and the Sheriff's Command team.  I describe in my report how San Diego County Jail's organizational structure is inconsistent with modern correctional psychiatric practices and is extremely problematic, especially when contrasted with the organizational structures that exist in other medium and large county jail systems in California where jail medical and mental health care staff are overseen by the county's respective health services agencies – including in the Counties of Los Angeles, Orange, Riverside, Sacramento, San Francisco, and Santa Clara.  *See* Stewart Report ¶¶ 370-388. Mr. Vare's dismissal of this concern is confusing and off-topic, as he states:

> In city governments, the elected mayor supervises the chief of police even though the mayor is not a peace officer.  In state governments, the governor is the commander of the state national guard even though the governor is not a member of the armed forces.  The governor's cabinet in California includes directors of Health and Human Services, and the mental health facilities operated by the Department of State Hospitals. Governor Gavin Newsom is neither a physician nor a psychiatrist, yet he is elected by the people of the state to provide leadership to numerous public agencies including those that provide medical and mental health services.

Vare Report at 40-41.

20.     These supposed analogies offer no insight on this important issue. Mr. Vare then offers his background as a former state prison warden, noting that the medical and mental health directors in the state prison system would "send me requests for vacation," among other things.  This analogy is also not relevant to a local jail system like San Diego County's, *where there are numerous examples of custody staff and leadership making policy and practice decisions that should be in the purview of mental health professionals and clinical leadership* – including as to improper custodial blanket ban policies preventing access to the Outpatient Step Down Program (OPSD) for patients when clinically indicated (Stewart Report Finding 3.D.) and improper custody-driven placements in solitary confinement

1    without consideration of mental health input (Stewart Report Finding 4.B).

2    21.    Mr. Vare then states that "there is no evidence that medical or mental

3    health personnel are not making medical and mental health decisions

4    independently."  Vare Report at 42.  But the County's own witnesses demonstrate

5    that it *is* the case that custody staff, by policy and practice, are making what should

6    be clinical determinations without clinicians' involvement.

7    22.    For example, take San Diego County Jail's policies and procedures

8    regarding placement of patients in a restraint chair inside a safety cell.  The

9    placement and removal of a patient with mental illness in a restraint chair *should* be

10   based on clinical, not custody, determinations.  But it was made very clear to me

11   that such decisions in this Jail system are exclusively "custody decisions."  *See*

12   Stewart Report ¶¶ 405-408.  The Jail's own mental health coordinator (Ms. Quiroz)

13   testified that she thinks it is important that mental health professionals be involved

14   in these uses of a restraint chair, and *that they are not:*

15   Ms. Quiroz: I mean, we've witnessed people in a restraint chair. We're not
16   necessarily the ones determining when they're getting out of that chair. You
     know, we're not -- they're not calling us for that reason, to say, should this
17   person be removed.

18   …

19   [I]t's not common that we see somebody -- that we are going to assess
     somebody in a [restraint] chair.  It is not common.

20   Q: … [D]o you think it's important for clinicians to be involved when a
21   restraint like a restraint chair is used on somebody who may be manifesting
     mental illness?

22   A: Although I think it's important for a clinician, I think a psychiatrist should
23   be -- I mean, if somebody's in a restraint chair I think we should probably get
     an M.D. level involved.

24   …

25   Q: You're not aware of any policy right now for an M.D. level staff member
26   to get involved in a certain way when someone is placed in a restraint chair by
     custody?

27   A: No.

28   Quiroz PMK Dep. at 72-74.

23.     As a second example, take the San Diego County Jail's failure to follow U.S. DOJ guidance making clear that a person with serious mental illness "should not be placed in restrictive housing [like the San Diego County Jail's Administrative Separation units], unless:

- The inmate presents such an immediate and serious danger that there is no reasonable alternative; or

- A qualified mental health practitioner determines:

- That such placement is not contraindicated;

- That the inmate is not a suicide risk;

- That the inmate does not have active psychotic symptoms; and

- In disciplinary circumstances, that lack of responsibility for the misconduct due to mental illness or mitigating factors related to the mental illness do not contraindicate disciplinary segregation."

Stewart Report ¶¶ 184-186 (quoting and discussing U.S. DOJ guidance); *see also* NCCHC Standards for Mental Health Services in Correctional Facilities' Standard MH-E-07 (Segregated Inmates) (For a patient being placed in segregation, it is necessary that "mental health staff reviews the inmate's mental health record to determine ***whether existing mental health needs contraindicate the placement*** [in segregation] or require accommodation" (emphasis added)).

24.     Based on my on-site observations, patient interviews, and review of individual records, it is beyond question that the dangerous practice of placing – and retaining – people in solitary confinement-type Administrative Separation units without consideration of whether their current mental health condition and needs contraindicate the placement, is pervasive in the San Diego County Jail system. Stewart Report ¶¶ 207-226.  Jail leadership and staff testimony confirm that this is true.  *See* Quiroz PMK Depo. at 250-51 (noting there is no mental health clinical assessment done for a person being placed in Administrative Separation, with clinical issues something that can be discussed late at staff meetings that occur every two weeks); Ross Dep. at 43 ("Q: … Have there been examples in your experience

1  where you made a recommendation that somebody be removed from AdSep based

2  on their mental health where classification says, no, they need to remain in AdSep

3  and they so remain?  A: Yes.  Q: Do you have any examples that come to mind?  A:

4  Yeah.").

5      25.    A third example, also unaddressed by Mr. Vare in his report, is the

6  blanket *custodial* restrictions on clothing, bedding, property, and privileges for

7  patients on suicide precautions.  By policy and in practice, there is no clinical

8  judgment or input that goes into making these decisions in the San Diego County

9  Jail – a considerable deviation from modern correctional standards.  Stewart Report

10  ¶¶ 312-316; *see also* Quiroz PMK Dep. at 156 ("That all happens outside of the

11  clinical world. … [T]hat's in the very custody world.").

12      26.    On this topic, Mr. Vare in fact misrepresents the testimony of Jail

13  mental health director Melissa Quiroz.  Mr. Vare writes that Ms. Quiroz testified

14  that "[c]linicians also determine that the individuals must be placed in safety

15  smocks" (p. 42).  This is *not* accurate.  *See* Quiroz PMK Depo. at 145 ("Q: You're

16  confident that the practice is that ***there's no clinical judgment exercised as to***

17  ***whether a person is placed in a safety smock*** once they go into a safety cell or an

18  EOH?  **A: Yeah**.")  (emphasis added).

19      27.    A draft policy that would help to remedy this serious deficiency was

20  considered by Jail leadership more than two years ago, but the County has declined

21  to implement it.  Stewart Report ¶ 314 (quoting draft policy and citing Ms. Quiroz's

22  testimony that the policy "is not in place at this time").

23      28.    In my patient chart reviews and individual interviews, I found repeated

24  instances where custody staff, by policy and in practice, improperly interfere with

25  important clinical determinations regarding treatment, placement, and conditions for

26  incarcerated people with serious mental illness in the San Diego County Jail.  *See,*

27  *e.g.*, the alarming case of Patient ████████████ an illustrative but by no means

28  outlier case.  Stewart Report ¶¶ 229-238.  Such instances put patients at substantial

1   risk of serious harm, including needless suffering and even death.

2       29.     I strongly disagree with Mr. Vare's opinion that there is no improper

3   custody staff interference with mental health clinical decisions in the San Diego

4   County Jail system.  His opinion is not rooted in fact, and it is at odds with Jail

5   leadership's own testimony and policies.  Nothing in Mr. Vare's report changes my

6   detailed findings and opinions on the Jail's systemic deficiencies in this area.

7       **C.     Mr. Vare's Opinion that There are No Deficiencies with Respect to
            Safety Checks Ignores the Repeated Findings of Deficiencies by
8            Multiple Independent Factfinders.**

9       30.     Mr. Vare writes that "safety checks are done appropriately" in the San

10  Diego County Jail system, and that "there is an adequate process for the safety

11  checks to be audited and lapses in checks are addressed appropriately."  Vare Report

12  at 89-94 (Opinion 8).  I strongly disagree.  Mr. Vare appears to ignore entirely the

13  repeated findings that inadequate safety checks are a major deficiency in this Jail's

14  system, by nationally recognized Suicide Prevention expert Lindsay Hayes, the

15  California State Auditor, Disability Rights California, and the San Diego County

16  Citizens' Law Enforcement Review Board (CLERB).  *See* Stewart Decl. ¶¶ 320-

17  335.

18      31.     It was puzzling to see that Mr. Vare found that the County's auditing

19  system for safety checks was "thorough and transparent" (Vare Report at 90) based

20  on review of "an Excel spreadsheet provided to me which showed several

21  supervisory audits that were conducted *during 2021*" (emphasis added).  It was in

22  2022 that the California State Auditor found terrible deficiencies both in the

23  observed safety check practices themselves ("Based on our review of video

24  surveillance footage, we observed multiple instances of sworn staff who spent no

25  more than one second glancing into an individual's cell, sometimes without

26  breaking stride as they walked through the housing module . . . .") and in the

27  adequacy of auditing those checks ("The assistant sheriff of detentions indicated that

28  the department has an *informal process* for assessing the quality of safety checks,

1  which can include watching video footage.  However, the Sheriff's Department has
2  not documented this assessment process in its policy, and *establishing an informal*
3  *practice does not ensure that each facility's management team will consistently*
4  *verify the quality of safety checks*.") (emphases added).  2022 California State
5  Auditor Report at 25-26.

6      32.  Mr. Vare says nothing of the many in-custody deaths that have
7  occurred where subsequent findings revealed inadequate safety checks that very
8  likely contributed to the deaths (including Mr. Horsey (2017), Mr. Wilson (2020),
9  and Mr. Settles (2022)).  *See* Stewart Report ¶¶ 329-332.  In my experience working
10  in and monitoring jail and prison systems, a *single* in-custody death involving
11  deficient safety check procedures would lead to concerted corrective action to
12  ensure that such deficiencies do not recur.  The San Diego County Jail system has
13  had *multiple* in-custody deaths with deficient safety check findings, along with
14  numerous outside experts and investigating bodies issuing strong recommendations
15  to address the issue.  Yet the deficiencies persist.  Mr. Vare's stamp of approval in
16  this area, without any reference to these facts, is disturbing and wrong.

17      33.  Mr. Vare also provides no opinion regarding another key deficit in the
18  San Diego County Jail's safety check policies and procedures – that is, the need to
19  align with the modern practice of 30-minute (rather than hourly) checks in
20  Administrate Separation-type housing units.  *See* Stewart Decl. ¶ 322 (citing the
21  American Correctional Association's standard on this point), ¶ 327 (Suicide
22  Prevention expert consultant Lindsay Hayes "strongly recommended" that San
23  Diego County Jail implement 30-minute checks), ¶ 333 (citing other California jail
24  systems that have implement 30-minute checks in solitary confinement-type
25  housing), ¶ 279 (Marroquin suicide by water intoxication, body found after 54
26  minutes between Administrative Separation safety checks), ¶ 332 (Settles suicide,
27  body found after 75 minutes between Administrative Separation safety checks).

28      34.  My opinion remains that the Jail staff and system currently conduct

1  inadequate safety checks, and that the County continues (in policy and procedure) to

2  fail to conduct the appropriate 30-minute safety checks in Administrative

3  Separation, all of which place people at substantial risk of serious harm, including

4  death.

5      35.    Nothing in Mr. Vare's discussion of safety check policies and practices

6  directly addresses, or changes, my detailed findings of deficiencies on this topic.

7      **D.    Mr. Vare's Opinion Regarding the Outpatient Step-Down (OPSD)
        Program's Exclusion of Protective Custody Patients Misses the

8      Point and Ignores County Leadership's Recognition of this Deficit.**

9      36.    Mr. Vare writes that "Plaintiffs' allegation that the Sheriff's Office

10  excludes people designated as protective custody from housing in the Out-Patient

11  Step Down ('OPSD') unit lacks merit because it does not consider the complexity of

12  classification related issues in managing the safety and security of individuals in

13  protective custody."  Vare Report at 105-110 (Opinion 10).  Mr. Vare has missed

14  the point here entirely, and even ignores the County's own person-most-

15  knowledgeable (its Jail mental health coordinator) on this subject.

16      37.    It is a basic principle with respect to mental health standards of care,

17  including in the jail setting, that a person should be provided mental health care

18  placement and treatment consistent with their individual *clinical* needs.  In a

19  functioning jail mental health care system, a patient with serious mental illness is

20  not provided safety *or* adequate mental health care.  They are provided safety *and*

21  adequate mental health care.

22      38.    San Diego County Jail fails in this regard.  Through its blanket ban

23  policy, the Jail excludes people designated as Protective Custody from OPSD

24  placement, the *only* mental health program available across the Jail population

25  outside of the inpatient Psychiatric Services Unit, which is reserved for people who

26  are acutely psychotic and meet Section 5150 involuntary hospitalization criteria.

27      39.    It is a common practice for a jail system to override classification

28  designations like "General Population" or "Protective Custody" when a person

1  requires a mental health treatment bed. (San Diego County itself appears to do this
2  once a person is so acutely ill that they require inpatient PSU level of care.) In other
3  jail systems, custody staff continue to conduct appropriate housing assessments to
4  ensure against an unsafe placement, and they do so based on individualized security
5  assessments, not simply based on a patient's existing classification designation. San
6  Diego County Jail does *not* follow this practice, which has the effect of preventing
7  Protective Custody-designated patients from accessing OPSD care. This policy-
8  driven denial of care is dangerous and concerning.

9       40.    But even in a jail system where a re-classification to "mental health"
10 does not occur for patients with serious mental illness, enhanced mental health
11 outpatient placements can and must be provided to all patients who need them, both
12 among the General Population and the Protective Custody population. This is
13 accomplished rather simply. In San Diego County Jail, there would be enhanced
14 mental health units designated as OPSD-General Population, and separate enhanced
15 mental health units designated as OPSD-Protective Custody. *There is, in short, no*
16 *excuse for a system that denies enhanced mental health program placement to all*
17 *Protective Custody patients.*

18      41.    Mr. Vare is also wrong to emphasize only the risk of placing a
19 Protective Custody patient in a mental health unit with General Population patients.
20 It is also unacceptably dangerous to *exclude* Protective Custody patients with
21 serious mental illness from the appropriate mental health placement, both because
22 they are denied clinically necessary treatment and also because they may be
23 vulnerable to harm and victimization being housed with people who do not have
24 mental illness. The risks can be deadly, as I recount in my report regarding the
25 brutal death of **Derek Baker**, a man with serious mental illness who was found
26 clinically appropriate for OPSD housing in San Diego County Jail but excluded
27 because he was "Protective Custody." He was then violently murdered by another
28 Protective Custody individual who did not have serious mental illness. Stewart

1  Report ¶¶ 169-170.

2  42.    It is quite disturbing that Mr. Vare has no concern about this systemic

3  deficiency, even as the Jail system's own mental health coordinator has stated that

4  the creation of an OPSD-Protective Custody unit would be "useful" and "good."

5  Quiroz PMK Dep. at 64-65 (Quiroz: … "there is not an identified outpatient step-

6  down PC mod per se.  There is not that."  Q: "Do you think that that sort of module

7  would be useful to have?"  A: "It would be useful."  Q: "And the objective of it

8  would be to ensure that people who both need outpatient step-down and are

9  designated as protective custody can get that level of service?"  A: "That would be

10  good.").  This remains a systemic deficiency that is harming people with serious

11  mental illness, and it must be addressed.

12  **III.    RESPONSE TO THE REPORT OF JOSEPH PENN**

13  43.    I have reviewed the Defendants' expert Joseph Penn's report, undated

14  and unsigned, but produced on August 21, 2024 (hereinafter "Penn Report").

15  44.    In Dr. Penn's report, he states that a "random selection methodology"

16  was used to conduct a review of psychiatric and mental health records.  Penn Report

17  at 9.  He does not explain what this methodology was, and so I am not clear as to

18  how these patient records were selected.  He writes that he enlisted three practicing

19  correctional forensic psychiatrist consultants (Natasha Cervantes, M.D., Joseph

20  Baskin, M.D., and Ariana Nesbit Huselid, M.D.) to review these records.  *Id.*

21  Dr. Penn states that he reviewed their case summaries and incorporated their

22  evaluations into his analysis and opinions.  *See* Penn Report Appendix D (at 156-

23  205).

24  45.    These three designated reviewers provided summaries for more than 80

25  past or current San Diego County Jail patients.  Almost *none* of them were patients

26  whose records were provided to me for my previous report.  I am informed that the

27  records previously provided to me were chosen by San Diego County as being

28  representative of particular categories that I developed consistent with my

1   methodology in this case.  *See* Stewart Report ¶ 16.

2       46.    To complete my rebuttal report, it was important that I have the

3   opportunity to conduct my own assessment of the case records that were reviewed

4   by Dr. Penn's three designated reviewers.  The County did not produce, and I

5   therefore did not receive, these records until approximately September 21, 2024, one

6   month after the initial expert reports were produced in this case.

7       47.    These records are voluminous, and required extensive time and effort to

8   review.  As with my previous report, I utilized the assistance of a psychiatrist

9   colleague who has experience in jail mental health care, to review patient records.

10  The reviews conducted by this colleague were done under my supervision, as is my

11  frequent practice when conducting large detention mental health care system

12  assessments.  My analysis is ultimately done independently and all findings

13  contained in this report are my own.

14      48.    I cannot discern how Dr. Penn incorporated the findings of his three

15  designated reviewers (Appendix D) into his report.  He does not reference a single

16  patient record review in his own report narrative.

17      49.    More importantly, as discussed throughout this report, I observed that

18  many findings by Dr. Penn's three designated reviewers are in direct contradiction

19  with Dr. Penn's opinions and conclusions.

20      50.    As set forth below, I disagree with the opinions that Dr. Penn has

21  offered in his report.  Nothing in his report changes any of my findings or

22  conclusions.  In many respects, his report only raises my concerns about the

23  systemic failures and inadequacies of the San Diego County Jail's mental health

24  care system.

25      **A.    Dr. Penn's Review Completely Ignores Jail Suicides and Mental
26          Health-Related Deaths that Have Occurred in San Diego County
            Jail, which Is a Fundamental Flaw in His Methodology.**

27      51.    In my decades of experience evaluating correctional mental health care

28  systems, a core component of my work is to look closely at sentinel events (*i.e.*,

incidents that result in death or severe harm to a patient) – most specifically, suicides and other mental health-related deaths.  Such a review is foundational and essential to doing a proper assessment as to the adequacy of a correctional mental health care system.

52.    I was thus shocked to see that, as confirmed in Dr. Penn's Report Appendix C ("Materials Reviewed"), Dr. Penn did not review records from any suicides or other mental health-related deaths.  Nor did his designated reviewers provide any mention or analysis of any of such deaths.  This is a glaring omission in Dr. Penn's methodology as a mental health professional claiming to assess the functioning of a mental health system.  This is especially relevant in this case, where San Diego County Jail has had scores of suicides and other mental health-related deaths in recent years.  It is critical to examine those cases, to identify any individual deficiencies or recurring problems that indicate a need for systemic remedial action.  Remarkably, Dr. Penn's assessment does not include a specific analysis of any completed suicide and other mental health-related death.  The failure to do so falls below what I understand to be accepted practice for the evaluation of a jail's mental health care and suicide prevention system.

53.    Dr. Penn includes only a chart listing ten in-custody suicides at the Jail, dating from March 2019 to July 2023.  Penn Report at 49-50.  I reviewed the records and reports of several of those deaths, providing detailed analyses in my previous report.  Dr. Penn did not provide analysis on a single one.

54.    I similarly found it puzzling and troubling that Dr. Penn gave a passing grade to the County and its health care contractor NaphCare on their suicide death review processes.  Penn Report at 50 ("In the rare event of a suicide, SDSO conducts psychological autopsies, administrative suicide reviews, and morbidity and mortality reviews to assess contributing factors and enhance prevention practices.  I confirmed that both the county and the contracted health NaphCare conduct independent suicide and medical, natural deaths, or substance use related death

1  reviews, morbidity and mortality reviews, and these are conducted in a timely

2  manner.").  Dr. Penn's "Materials Reviewed" list (Appendix C) does not appear to

3  contain a single psychological autopsy, administrative suicide review, or morbidity

4  and mortality review.  He does not discuss the details of any suicide death review in

5  his report.  I cannot tell how Dr. Penn reached his conclusion as to appropriate

6  timeliness, much less quality, of these death reviews.

7      55.    In contrast, my analysis included extensive records from many San

8  Diego County Jail suicides and mental health-related deaths.  I provide specific

9  examples of deficiencies in the post-death review processes.  *See, e.g.*, Stewart

10  Report ¶ 265 (McDowell suicide); *id.* ¶¶ 341-342 (NaphCare PMK witness

11  testimony that psychological autopsies are not always completed, with portions

12  often left completely blank); *id.* ¶ 348 (San Diego County Jail mental health care

13  leadership concedes that they do *not* consider CLERB in-custody death reviews or

14  findings at all).

15      56.    Reviewing sentinel events – such as deaths in custody – is not only

16  standard practice but also a vital step in evaluating a system's effectiveness in

17  ensuring the safety and welfare of both incarcerated people and staff.  This is why

18  my assessment includes a detailed review of these events – to gain insight into the

19  system's strengths and weaknesses.  In contrast, Dr. Penn listed a few such incidents

20  in a chart but does not address any of them further.  His omission raises serious

21  concerns about the depth of his analysis and the accuracy of his conclusions.

22      **B.    Dr. Penn's Methodology, Findings, and Opinions Are Confusing
          and Unreliable Due to His Use of "Copy-and-Paste" Passages from
23         His Reports from Other Cases and Correctional Mental Health
          Systems.**

24

25      57.    As should be clear by the discussion below, my findings and opinions

26  are starkly different from those of Dr. Penn.  I emphasize that my findings and

27  opinions are based on a specific analysis of *this* San Diego County Jail system.

28  Upon close review, however, it is apparent that Dr. Penn's findings and opinions

1    may not be.  I am familiar with Dr. Penn's expert work from other litigations,

2    including in the statewide Arizona prisons class litigation (*Jensen v. Shinn*), where I

3    have served as plaintiffs' class expert and Dr. Penn served as defendants' expert.

4    My experience in that case provides me some insight regarding Dr. Penn's San

5    Diego County Jail report, which copy-and-pastes significant findings and opinions

6    from his Arizona report in ways that are inapplicable at best and, more often,

7    factually inaccurate.

8         58.    For example, I was confused to read this finding on involuntary

9    antipsychotic medications and clinical restraints from Dr. Penn's report:

10        During numerous interviews with nursing and mental health care staff
          across the state, and also as spelled out in NaphCare SDSO policy, I
11        learned that if and when there is a clinical question involving the
          clinical necessity, consideration of the clinical necessity and/or
12        appropriateness of forced antipsychotic medications, or the need to
          begin to pursue this process with due process protections for IP patients
13        who may be subjected to involuntary administration of psychotropic
          mediations (when clinically indicated as a means of treating psychiatric
14        illness or urgently reducing harm, dangerousness, or severe violence
          towards self or others), that the NaphCare treating psychiatrists who
15        have offices near the Psychiatric Stabilization Unit (PSU) are readily
          available to discuss by phone, or alternatively, an on call psychiatrist or
16        psychiatric provider is available 24 hours per day, 365 days per year,
          even afterhours and on weekends.  **I understand this same process to**
17        **be in place for orders of emergency clinical seclusion or restraint.**

18    Penn Report at 41 (emphasis added).

19         59.    I was confused by Dr. Penn's factual finding that clinical restraints use

20    at the Jail entail significant involvement of clinical and psychiatric staff.  As I

21    learned during my tours and as was confirmed by Ms. Quiroz, this is not the case at

22    San Diego County Jail.  Quiroz PMK Dep. at 72-74 ("Ms. Quiroz:  I mean, we've

23    witnessed people in a restraint chair.  We're not necessarily the ones determining

24    when they're getting out of that chair.  You know, we're not -- they're not calling us

25    for that reason, to say, should this person be removed.  [I]t's not common that we

26    see somebody -- that we are going to assess somebody in a [restraint] chair.  It is not

27    common.  Q: … [D]o you think it's important for clinicians to be involved when a

28    restraint like a restraint chair is used on somebody who may be manifesting mental

1  illness?  A: Although I think it's important for a clinician, I think a psychiatrist

2  should be -- I mean, if somebody's in a restraint chair I think we should probably

3  get an M.D. level involved. … Q: You're not aware of any policy right now for an

4  M.D. level staff member to get involved in a certain way when someone is placed in

5  a restraint chair by custody?  A: No.").

6       60.    I notice that Dr. Penn's first sentence states that he based his opinions

7  on "numerous interviews with nursing and mental health care staff **across the**

8  **state**."  Penn Report at 41.  This "across the state" reference makes no sense in the

9  context of an expert assessment of San Diego *County* Jail.  I then looked back at

10  Dr. Penn's testimony in the Arizona statewide prisons case, and found that Dr. Penn

11  had made this exact factual finding, with the same wording (changing only the name

12  of the detention system and mental health system provider):

13       220. During numerous interviews with nursing and mental health care
        staff **across the state**, and also as spelled out in Centurion and Arizona
14      DOC policy, I learned that if and when there is a clinical question
        involving the clinical necessity, consideration of the clinical necessity
15      and/or appropriateness of PMRB, or the need to begin to pursue this
        process with due process protections for inmate patients who may be
16      subjected to involuntary administration of psychotropic mediations
        (when clinically indicated as a means of treating psychiatric illness or
17      urgently reducing harm, dangerousness, or severe violence towards self
        or others), that Dr. Carr (or his designee) are readily available to
18      discuss by phone, or alternatively, an on call psychiatrist is available 24
        hours per day, 365 days per year, even afterhours and on weekends.  **I**
19      **understand this same process to be in place for orders of seclusion**
        **or restraint.**

20

21  Joseph Penn Expert Report, *Jensen v. Shinn*, No. 2:12-cv-00601-ROS (D. Ariz.),

22  Dkt. 4172 at 76 (¶ 220) (emphasis added).  (Note that both passages also misspell

23  "medications" as "mediations.")  Dr. Penn's asserted finding in the context of the

24  San Diego County Jail system is inconsistent with the facts and evidence.

25       61.    This is not the only example of what appears to be Dr. Penn's "copy-

26  and-paste" from another report regarding a separate and very different correctional

27  mental health care system.  In Dr. Penn's report in this case, he states:

28       The following are examples of specific mental health policies,

procedures, and practices that I have observed and confirmed during my tours, interviews with staff, and review of existing policies, and additional verification with mental health leadership:

- mental healthcare
- mental healthcare staffing
- medical record organization
- medication system
- monitoring of prisoners taking psychotropic medication
- monitoring of psychotropic medication therapeutic levels and side effects
- access to medical and mental healthcare
- mental health programming
- inpatient care
- treatment plan
- **heat precaution**
- suicide prevention
- confinement of prisoners with mental illness
- **use of chemical agents with prisoners with mental illness**
- use of telepsychiatry
- monitoring and oversight
- overall access to mental health services

Penn Report at 51 (emphasis added).

62.     This list is *identical* to the list of areas he claimed to have reviewed in the Arizona state prisons litigation.  Joseph Penn Expert Report, *Jensen v. Shinn*, No. 2:12-cv-00601-ROS (D. Ariz.), Dkt. 4172 at 34-35 (¶ 103).  But this list makes little sense in the context of San Diego County Jail's system, where to my knowledge, there are no policies or procedures regarding topics like "heat precaution" or "use of chemical agents with prisoners with mental illness."  Dr. Penn's "copy-and-paste" practice of presenting an expert's methodology and conclusions, across substantially different cases and correctional mental health systems, makes it difficult for one to know what in this report actually relates to San Diego County Jail and what has been mechanically copied from other cases.

63.     Nevertheless, I am able to critically assess Dr. Penn's opinions and conclusions, and present my strong disagreement with them, as set forth below.

**C.     Dr. Penn's Opinion that the Jails' Practices and Policies Ensure that Patients in Need of Mental Health Care Are Appropriately Identified and Tracked Is Not Supported By Facts.**

64.     Dr. Penn opines that any claim that the "Sheriff's department fails to

identify and track IPs in need of mental health care . . . is refuted by the established practices and policies at SDSO facilities, which I observed and corroborated through interviews with custody, nursing, medical, and mental health staff during my onsite tours." Penn Report at 13-14. He goes on to state that various staff members explained to him how things are supposed to work, including through intake screening, "gatekeeping," mental health "flags," and "trip sheets." None of his discussion changes my strong opinion that San Diego County Jail's system fails to adequately identify and track incarcerated people with serious mental health needs.

65. Remarkably, Dr. Penn states that he formed his opinion based only on his observations and staff interviews "during [his] onsite tours." Penn Report at 14. He makes no reference to considering any individual patient assessments or records review. The only individual patient mentioned in this entire section of the report is a man who he observed experiencing an apparent opioid overdose. *Id.* at 18.

66. In my report, I describe horrific examples of identification and tracking failures, some of which led to a patient's avoidable death. For example, take **Roselee Bartolacci**, whose intellectual disabilities were not identified, contributing to her May 2023 in-custody death after she was placed in solitary confinement and lost more than 40 pounds in just six (6) weeks, without appropriate intervention or treatment. Stewart Report ¶¶ 133-138. Or another example, the suicide of **Pedro Ornelas** in June 2023. Mr. Ornelas's initial screening inexplicably identified no mental health history, despite records from a previous incarceration at the Jail showing prior mental health diagnoses, a considerable medication history, and past treatment in the community. His requests to "get back on my medications" went unanswered, and he died by hanging ten days after he arrived at the Jail. These identification failures are staggering and demand systemic remedial action. Stewart Report ¶¶ 82-85.

67. Failures in *tracking* people with serious mental health treatment needs are also pervasive in the San Diego County Jail system. In my report, I describe one

1  patient who was prescribed psychotropic medications and then not seen by a

2  psychiatric provider *for nine (9) months*. When he was finally seen in ███ 2023, he

3  was experiencing auditory hallucinations. This is a significant, consequential, and

4  harmful failure in tracking and follow-up for a patient with serious mental illness.

5  *See* Stewart Report ¶ 92. I found that, by policy and practice, the San Diego County

6  Jail system consistently fails to meet the standard of care for tracking and follow-up

7  with people requiring psychiatric treatment – including extreme violations of the

8  maximum allowable time between *routine* psychiatric visits (30 days), and the

9  maximum allowable time for psychiatric follow-up after initiation of medication or

10  dose adjustment (one week). *See* Stewart Report ¶¶ 86-87, 91-92, 95, 260

11  (individual examples of such failures).

12       68.    I also examined records from the individual patients whose Dr. Penn's

13  designated reviewers looked at, as he appends to his report (Appendix D). There are

14  multiple examples in those patient records of very similar identification and tracking

15  failures:

16       69.    ███████████ (Penn Report at 189-190): The psychiatric reviewer

17  stated that her "primary concern is regarding several medication expirations." She

18  described how the Jail system lost track of the patient's prescribed medication

19  needs, leading to the patient "being without his psych meds for 15 days" due to the

20  systems tracking deficiency.

21       70.    ███████████ (Penn Report at 159): This patient had an extensive

22  history of psychiatric treatment needs, and presented as psychotic with

23  hallucinations and delusional thought content while in jail. Psychiatric staff first

24  engaged in grossly inadequate follow-up with the patient when he had poor

25  medication adherence. When he was prescribed an antipsychotic medication, he

26  showed consistent compliance with the medication for five days, until records show

27  he stopped receiving it simply because "Medication was not available." The

28  documentation provided by the various mental health staff did not meet the standard

1  of care.  The clinical notes failed to identify a diagnosis, demonstrated a failure to

2  coordinate between the clinicians and psychiatric prescribers, and evidenced no

3  effort to track and improve medication adherence.  All of these issues are systemic

4  in nature and place this patient and others at substantial risk of serious harm.

5      71.      ████████ (Penn Report at 165-166): This patient had a history

6  of a severe traumatic brain injury (TBI) when he was a young teenager, with

7  subsequent diagnosis of a seizure disorder.  The designated reviewer (Dr. Baskin)

8  correctly summarizes that the "1st mention of this [TBI history and seizure disorder]

9  by psych provider is his 5th (NP Anthony) who does an excellent and thorough

10  review, makes good recs, and never sees patient again.  The NP who followed made

11  no mention of those recs and proceeded on own plan of care (not inappropriate, but

12  lacking continuity)." This is a remarkable failure.  Mr. ████ 's very serious

13  medical and mental health history was not identified until he was seen by a *fifth*

14  psychiatric provider at the Jail.  This provider was the first to adjust the patient's

15  medications to address the risk of seizures.  Records review shows that this did not

16  occur until the patient had been at the Jail *for eight (8) months*.  And, as Dr. Baskin

17  notes, the *sixth* psychiatric provider then *ignored* this critical diagnostic information

18  and "proceeded on own plan of care" which was "lacking continuity." These are

19  gross failures of both identification *and* tracking that put this patient at enormous

20  risk of irreparable harm from medication-induced seizures.

21      72.      ████████ (Penn Report at 170): This patient was treated with

22  two different antipsychotics over a period of nearly two years at the Jail, and as

23  Dr. Penn's designated reviewer Dr. Cervantes notes, he was "never seen by a

24  psychiatrist." Dr. Cervantes notes that there was "unclear verification or record

25  request to verify [his diagnosis]." And she is appropriately critical of the fact that

26  the nurse practitioners who saw him failed to identify or properly address the serious

27  risks of the medication regimen.  I agree with her finding that this patient "likely

28  experienced metabolic syndrome as a side effect" and that "[a]n evaluation by a

1  psychiatrist and/or more collateral information may have clarified actual treatment

2  needs." These failures of identification and proper tracking led to care that fell well

3  below any acceptable standard of care, in ways that placed the patient at

4  extraordinary risks, including of a diabetic crisis and a myocardial infarction. The

5  deficient care of this patient over nearly two years screams out for immediate

6  systemic intervention.

7         73.    Dr. Penn's report does not contain a specific analysis of the Jail's

8  mental health screening system or protocols. My report provides detailed findings

9  that the screening policies and procedures are deficient in identifying patients'

10  mental health care needs. Stewart Report ¶¶ 26-47.

11         74.    I am, of course, not the first person to identify alarming deficiencies in

12  this area. The 2022 California State Auditor Report identified eight (8) recent in-

13  custody deaths where the individual "had serious medical or mental health needs

14  that health staff did not identify or communicate to detention staff at intake." 2022

15  California State Auditor Report at 20, DUNSMORE0117735.

16         75.    The County itself has acknowledged that its system falls short in this

17  area, and it is strange that Dr. Penn simply ignores that fact. The 2022 California

18  State Auditor Report recommended, in order to address systemic problems with the

19  Jail's mental health need identification system, that the County "create a policy

20  requiring health staff to review and consider each individual's medical and mental

21  health history from the county health system during the intake screening process."

22  DUNSMORE0117769. The County publicly confirmed in 2023 that this deficit

23  exists, and acknowledged that other county jail systems have taken the necessary

24  steps to implement such a practice, stating: "*Unlike many other counties, San Diego*

25  *does not have a coordinated county health system or shared electronic health care*

26  *records system. As a result, we cannot meet this recommendation as written*."

27  Progress Report at 5, SD_184479 (emphasis added); *see also* Quiroz PMK Dep. at

28  98-99 (noting that the County has no "policy or written expectation that intake

1  nurses review the [County behavioral health] system as part of the intake process,

2  instead "relying on self-reporting by the new arrival").  The failure to address this

3  deficiency puts patients at risk of harm every day.

4      76.    Based on my personal observations, discussions with staff, review of

5  testimony, policies, and reports, and my review of individual patient records, it

6  remains my strong opinion that the Jail's system fails to adequately identify and

7  track incarcerated people with serious mental health care needs, in ways that are

8  systemic and that put incarcerated people at substantial risk of serious harm.

9      **D.    Dr. Penn's Opinion that the San Diego County Jail System
        Maintains Adequate Mental Health Staff to Meet the Incarcerated**
10     **Population's Needs Ignores Well-Established and Readily
        Acknowledged Facts that the System Does *Not* Have Sufficient**
11     **Staffing Resources.**

12     77.    Dr. Penn opines that "mental health and psychiatric provider staffing

13  levels at [San Diego Sheriff's Office] are sufficient and comport with the

14  correctional standard of care."  Penn Report at 26 (with narrative at 19-26).  I

15  strongly disagree with this opinion, which is contradicted by well-established and

16  readily acknowledged facts that the system does *not* have sufficient mental health

17  staffing resources.

18     78.    Even when Dr. Penn acknowledges staffing shortages, including 14

19  mental health clinician vacancies, he states blithely (and without analysis of the Jail

20  population's mental health service needs):  "Despite these staffing vacancies, there

21  were no discernible delays in care nor any identifiable impediments in SDSO IP

22  patients' access to and continuity of mental health care."  Penn Report at 21.  Given

23  the Jail's recent overall count of 26 mental health clinicians, *see* Quiroz PMK Dep.

24  at 30, the 14 unfilled positions amount to a vacancy rate of approximately 35%.

25  This is notable, consequential, and points to insufficient staffing to deliver necessary

26  mental health care.

27     79.    Instead of looking at what treatment programming is needed for the

28  population and what staffing is required to meet that need, Dr. Penn relies on

1  abstract and ephemeral language that is of little use in assessing whether the Jail

2  system has sufficient staffing resources to provide adequate mental health care for

3  its population.  He writes:

4      Staffing levels in correctional settings should be evaluated based on the
   clinical determination of whether adequate mental health services are

5      provided by the available staff.  This means that the adequacy of
   staffing is determined by whether the care meets established standards

6      rather than by adhering to a specific numerical ratio.  According to the
   NCCHC Standards for Health Services in Jails, 2018 Jail Standard, J-

7      C-07, page 60, "Staffing," is defined, the responsible health authority
   (RHA) ensures sufficient numbers and types of health staff to care for

8      the incarcerated person population.

9      There are no universally accepted or empirically validated staffing
   plans, ratios, or recommendations for mental health and psychiatric

10     staff within correctional settings.  Staffing decisions should be made
   based on the clinical needs of the population served, considering the

11     unique requirements of each facility, county, or state.

12 Penn Report at 20.

13     80.    In my report, I relied on San Diego County Jail *system-specific* findings

14 that point directly to staffing deficits that negatively impact the delivery of clinically

15 necessary mental health treatment for the San Diego County Jail's patient

16 population.  Stewart Report ¶¶ 351-388, 432-435.

17     81.    I agree with Dr. Penn that the Jail must come up with an adequate

18 staffing plan to meet the specific clinical needs of its mental health population and

19 unique requirements of its system.  However, as discussed in my report, the San

20 Diego County Jail has failed to conduct and implement an appropriate mental health

21 program needs assessment.  Given the Jail's mental health population, current

22 conditions, and currently available treatment services, it is my strong opinion that

23 understaffing is a major contributor to dangerous failures to provide clinically

24 necessary mental health care to meet existing treatment needs.

25     82.    There are still additional findings of mental health staffing deficiencies,

26 *confirmed by San Diego County itself*.  For example:

27     ➢    In 2023, the San Diego County Grand Jury found that "[t]here is an
   insufficient number of mental health clinicians to provide appropriate

28     basic on-site mental health services, as defined by NCCHC

accreditation standards."  The Sheriff's Department "disagree[d] partially" with this finding, stating that "[i]t is a true statement that the San Diego Sheriff's Department does not currently meet accreditation standards as it applies to mental health" while stating that "this is not attributable to the fact that there is an insufficient number of staff providing services."  The Department did state that it "is seeking to hire more mental health professionals in order to streamline workloads and provide proactive mental health programs for our population."  Quiroz Dep. Ex. 9, *2022/2023 Grand Jury Response-Crisis in Treatment Access for Incompetent to Stand Trail Incarcerated Persons in the County Jails* at 8-9, July 10, 2023.

➢ A December 2023 Sheriff's Department Corrective Action Notice documented a persistent psychiatric sick call backlog, resulting in significant psychiatric care delays.  It noted that "periodic blitzes are done 3-4 months, **with no solution to maintain the rising number of sick calls**."  Quiroz PMK Dep. Ex. 10, at 17 (emphasis added).

➢ The Jail mental health coordinator Ms. Quiroz wrote in July 2023 about the sick call request backlog and treatment delays in the Jail's system, and she testified in May 2024 about how these things "illustrate that **we have an overwhelmed system and we all need help**."  Quiroz PMK Dep. at 270-71 & Ex. 14 (emphasis added).

➢ Jail leadership have issued corrective action notices to the contractor NaphCare regarding psychiatric care untimeliness, noting hundreds of pending psychiatry appointments and wait times of several weeks.  Ms. Quiroz testified just recently that **delays in access to psychiatry care remain a "key deficiency area," noting that the "volume of pending appointments" is a problem**.  Quiroz PMK Dep. at 186.

➢ Ms. Quiroz testified that the Jail's current discharge planning staff does not meet the needs of the approximately 1,600 (or more) mental health caseload patients in the Jail system, noting **"we do need more" staffing resources** and that the County did not have sufficient data to know how many discharge planners were necessary to meet patient needs, noting only that "[m]ore is certainly better."  Quiroz PMK Dep. at 171-72 (emphasis added).

83. Dr. Penn's statement that he could find "no discernible delays in care nor any identifiable impediments in SDSO IP patients' access to and continuity of mental health care" (Penn Report at 21) is simply not supported by the facts, as set forth in my report.  *See* Stewart Report ¶¶ 69-95 (discussion of clinically inappropriate delays in psychiatric care, including many examples), ¶ 254 (lengthy delay for initial psychiatric evaluation for **Mr. Settles**, who subsequently died by suicide in 2022); ¶ 259 (unacceptable delay in psychiatric care for **Mr. McDowell**, who subsequently died by suicide in 2023); ¶ 267

1  (**Mr. Rupard**'s initial mental evaluation canceled two times with note that "due

2  to time constraints, patient was unable to be seen," which was followed by

3  acute psychiatric decompensation that ended with his starving to death without

4  Jail health care staff's intervention).

5      84.    Still more examples of insufficient mental health staffing having

6  serious negative impacts on mental health care delivery can be drawn from the

7  patient cases summarized by the designated reviewers in Dr. Penn's own report:

8      85.    ▇▇▇▇▇▇▇ (Penn Report at 191-192):  Dr. Huselid describes a

9  delay in access to care for Mr. ▇▇▇, who had a history of suicide attempts, had

10  endorsed suicidal ideations, and was being housed in Administrative

11  Separation.  She noted that Mr. ▇▇▇ wrote a health care request stating:  "I

12  need to speak to a mental health counselor."  This request was not even logged

13  for 4 days, then scheduled to be seen 14 days later, and then "pushed back" for

14  another 6 days.  She found of this 24-day wait to see a mental health clinician:

15  "I think this is a reasonable (~2-3wk) but not ideal delay, given that we did not

16  know why he needed to see a mental health counselor, and given his history of

17  suicide attempts."  Based on my experience as a jail psychiatrist, this delay was

18  far more serious than "not ideal."  For this sort of patient with serious mental

19  health needs housed in an exceedingly high-risk Administrative Separation

20  setting, it is dangerous and unacceptable.  Based on my review in this case,

21  staffing shortages play a substantial role in these access-to-care delays, which

22  put patients at substantial risk of serious harm.

23      86.    There is a further and troubling staffing-related deficiency that comes

24  up repeatedly in the record reviews conducted by Dr. Penn's designees.  That is, the

25  lack of continuity of care with a treatment provider.  Dr. Baskin notes that this is an

26  issue in many cases.  Penn Report at 158 ("There is a lack of continuity with the

27  psych providers.  This patient saw 5 different prescribers. . . . [T]here are inherent

28  problems with this approach such as failure to spot patterns, slow rapport process,

1   and limit splitting"); *id.* 159 ("I again make mention of the many providers which

2   breaks continuity.  IP had no insight, so verbal reports not accurate.  The same

3   provider over time can mark this better and develop better interventions."); *id.* at

4   160 ("again, the handoffs to several different providers causes continuity of care

5   issues"); *id.* at 165-166 (5 different providers caused "inconsistency" and failures to

6   track and address TBI and seizure disorder).  Dr. Cervantes identified the same

7   systemic issue and how it negatively impacts care.  *Id.* at 174-175 ("it appeared that

8   because there were at least 10 different prescribers assigned to the IP, and it is

9   possible that they were unfamiliar with his history," medication orders were

10  deficient).

11          87.    In my experience, a major contributing factor to this kind of

12  inconsistency in mental health and psychiatric treatment for patients is staffing

13  deficiencies – usually a combination of structural deficiencies and staffing

14  shortages.  Both are clearly on display in San Diego County Jail's mental health care

15  system.

16          88.    Dr. Penn makes an additional finding that is factually misleading (if not

17  wholly incorrect) and warrants mention.  He found that the Jail system requires that

18  all mental health professionals be licensed (Penn Report at 18, italics mine):

19          With regard to licensing of mental health staff, all qualified mental
            health professionals (QMHP) serving as mental health clinicians must
20          be fully independently licensed professionals according to California's
            licensing entities, such as the Board of Psychology, the Board of
21          Marriage and Family Therapists, the Board of Professional Counselors,
            or the Board of Social Workers.  They cannot be pre-licensed or in a
22          master's-level training phase.

23          89.    I am uncertain as to Dr. Penn's basis for this finding, but it is

24  inaccurate based on my review.  The Jail mental health coordinator,

25  Ms. Quiroz, recently testified that there are at least 10 mental health staff

26  members who are "prelicensed" and working as "mental health clinical case

27  managers."  When asked what these pre-licensed staff members' duties entail,

28  Ms. Quiroz testified, "They're similar to a clinician."  Quiroz PMK Dep. at 30-

1    31; *see also id.* at 42 (noting that there is a pre-licensed psychologist working at

2    the intake screening at Las Colinas).  Dr. Penn's finding that mental health staff

3    "cannot be pre-licensed" in this Jail system is factually incorrect.

4         90.    It is strange that Dr. Penn finds that mental health clinicians

5    "cannot be pre-licensed or in a master's-level training phase" at the San Diego

6    County Jail  and subsequently contradicts himself in a nearby section of his

7    report, where he includes a mental health program description that specifically

8    mentions that a "pre-licensed MH clinician" is in charge of facilitating

9    treatment groups on the Fourth floor at the Central Jail.  Penn Report at 37.  His

10   assessment methodology and analysis of the facts here are quite problematic.

11        91.    While the use of pre-licensed mental health staff can be clinically

12   impactful in a Jail system, there must be adequate supervision and other

13   processes.  Dr. Penn clearly has not done the necessary analysis of how these

14   pre-licensed staff are utilized or supervised.  My report, however, raises

15   extremely serious concerns regarding the lack of supervision during delivery of

16   mental health care in this Jail system.  *See* Stewart Report ¶¶ 54-61 (inadequate

17   supervision of psychiatric nurse practitioner); *id.* ¶ 375 ("I am extremely

18   concerned about the lack of supervision and coordination in this Jail's mental

19   health care system.  For example, the County-employed clinicians (social

20   workers and MFTs) should be – but are not – supervised by higher-level mental

21   health care professionals like psychologists or psychiatrists. . . . This is

22   inconsistent with the standard of care for a mental health care system.").

23   **E.    Dr. Penn's Opinion that San Diego County Jail Custody Staff Do**
     **Not Interfere with Mental Health Care Staff's Clinical Decisions Is**
24   **Not Supported by the Facts.**

25        92.    Dr. Penn opines that the Jail's "custody staff does not control mental

26   health care staff's clinical decisions and it assists in the delivery of care by mental

27   health professionals."  Penn Report at 26.  He acknowledges that "there may have

28   been isolated cases in the past" where such interference occurred, *id.*, but brushes

off those cases without discussion.

93.     This section of Dr. Penn's report runs about half of a page, but it does require a response.  He relies solely on custody staff interviews ("sworn officers, captains, lieutenants, and JPMU personnel") to "confirm[] that custody staff do not attempt to override or improperly control health care decisions."  Penn Report at 27.  While he mentions that "various mental health and nursing staff consistently denied any instances where custody staff interfered with, impeded, or improperly controlled clinical decision-making related to incarcerated persons with mental health needs" (*id.* at 26), he does not indicate that he conducted interviews with mental health care staff as he did with custody staff.  In fact, as discussed below, mental health care staff and leadership consistently acknowledge such custodial interference.

94.     Dr. Penn's statement that he "verified that health care input is actively included and considered in [1] classification, [2] disciplinary reviews, and [3] SPFRT (safety cell placements)" is factually inaccurate and quite incomplete. *See* Penn Report at 27.  I address each claim in turn.

95.     First, Dr. Penn ignores that nearly every Jail mental health staff member who has provided testimony in this case reports that the practice of custody staff overruling clinical staff regarding **housing and classification decisions** occurs with frequency:

➢  **Jail Clinician Aseel Ross (Dep. at 43):**

> *Q: ... Have there been examples in your experience where you made a recommendation that somebody be removed from AdSep based on their mental health where classification says, no, they need to remain in AdSep and they so remain?*
>
> *A. Yes.*
>
> *Q. Do you have any examples that come to mind?*
>
> *A. Yeah.*

➢  **Jail Psychiatrist and Medical Director Christine Evans (Decl. ¶ 20, Dkt. 119-10):**

> *I saw many people being placed into Administrative Segregation when*

*clinicians knew and made known that such a placement would be harmful.*

➢ **Jail Clinician Jennifer Alonso (Decl. ¶¶ 21, 23, Dkt. 119-11)**

*[T]he Jail system's mental health co-coordinator (who hired me to work in the OPSD units) made a specific recommendation to the Sheriff's Department to stop putting people with mental illness in the solitary confinement-type Ad-Seg units, given the risks to their psychological and physical well-being there. My understanding is that the Sheriff's Department Command staff refused to implement this recommendation.*

*I received an email from custody staff about one of my patients who was experiencing significant psychiatric symptoms. The email stated that the line custody staff thought my patient should be transferred to Ad-Seg housing. No reason was provided. The placement appeared arbitrary and more for the custody staff's convenience than the security or well-being of anyone. No one asked me for my clinical input; custody staff simply directed me to modify the patient's record (removing the patient's OPSD status) so that custody could move the man into Ad-Seg. Similar incidents happen multiple times each month."*

➢ **Jail Mental Health Coordinator (and County's Person-Most-Knowledgeable) Melissa Quiroz (PMK Dep. at 59)**

*Q: [H]istorically has there been a problem in the San Diego County Jail for deputies to overrule clinicians on housing placements for people with mental illness?*

*A: I don't have the exact language, but I can think of times when there may have been some tension between, you know, a clinician trying to advocate for what they felt was recommended and a sworn staff member having a difference of opinion.*

*Q: Have clinicians come to you with those concerns?*

*A: Yes.*

*Q: Sounds like that's something that you care about deeply and want to have addressed, is that correct?*

*A: Yes, absolutely.*

96. Further findings on custodial interference with housing and program placements for people with serious mental illness are discussed in my previous report. Stewart Report ¶¶ 167-181.

97. Second, Dr. Penn is simply wrong that mental health staff provide input regarding **disciplinary reviews**. *See* Stewart Report ¶¶ 427-430. The Jail's own

1  person-most-knowledge confirmed that there are no policies or procedures at the Jail

2  for mental health care staff to provide input regarding disciplinary processes.

3  Quiroz PMK Dep. at 178-79 ("Q: Does mental health staff play any role in the

4  administration of discipline for people with serious mental illness?  A:No, [they] do

5  not.").  And another of the County's own experts who looked closely at this issue

6  made a finding directly in contradiction to Dr. Penn's statement on this point:

7      **The SDCSO does not have a process for a clinician to provide his/her**
       **professional recommendations** (e.g., whether the incarcerated person

8      fully understood the nature of his/her actions at the time of the
       disciplinary charge and alleged actions) **to the hearing official so they**

9      **can give consideration to the recommendations prior to ruling on the**
       **charge and issuing any sanctions.**  The SDCSO should develop

10     policies and a process for clinicians to provide their professional
       recommendations regarding the incarcerated persons understanding of

11     their actions and for the hearing official to consider the clinical input of
       sanctions that should be avoided based on the clinician's assessment.

12

13  Defs.' Expert Report of Julian Martinez at 75 (emphasis added).

14      98.    Third, Dr. Penn is wrong that mental health staff provide input

15  regarding critical aspects of **safety cell placements and suicide precaution**

16  **processes.**  In fact, mental health staff fail to provide such clinical input on these

17  matters in ways that are *not* consistent with the standard of care and represent a

18  considerable deviation from modern correctional standards.  Stewart Report ¶¶ 312-

19  316.  The Jail's mental health coordinator confirmed this fact.  Quiroz PMK Dep. at

20  156 (noting that restrictions clothing, bedding, property, and privileges for patients

21  on suicide precautions "all happens outside of the clinical world. . . . [T]hat's in the

22  very custody world.").

23      99.    Again, the patient cases discussed in Dr. Penn's own report contradict

24  his own finding that custody practices do not interfere with the provision of mental

25  health treatment.  For example, in my review of patient ███████ (discussed

26  in Penn Report at 196-197), I found repeated instances when this patient was denied

27  access to appropriate clinical care.  To provide just a few examples: (1) in ███

28  2023, a nurse notes that they could not perform an EKG "d/t [due to] security

1    reason"; (2) in ▮▮▮▮ 2024, the day of a reported medication overdose by

2    Mr. ▮▮▮▮, a nurse notes that they were "unable to perform healthcare assessment

3    at this time due to patient's housing situation. Per floor deputy, due to safety

4    concerns, patient cannot come out of the cell"; (3) in ▮▮▮▮ 2024, a telepsychiatry

5    appointment was not performed due to "security risk." In each instance, there is *no*

6    documented explanation as to any individualized safety or security concern that

7    would justify the denial of clinically indicated treatment. In at least one instance,

8    the denial of an appointment due to a vague "security risk" is (inaccurately) marked

9    as a patient "refusal." Based on my review of this patient's experience and my other

10   observations in this system, it is very likely that blanket custodial policies and

11   practices caused these custodial interferences with the provision of necessary care.

12       100.   My opinion that Jail custody staff exert improper and dangerous control

13   over clinical mental health care decisions, as stated in Finding #8 in my report

14   (¶¶ 402-417) and in Section II.B., above, is unchanged.

15       **F.    Dr. Penn's Opinion that San Diego County Jail Has an Adequate
             Psychiatric Medication System to Meet Patient Needs Is Not
16           Supported by the Facts, Including Those in His Own Report.**

17       101.   Dr. Penn opines that the Jail "maintains an effective medication

18   management system across its facilities" and that its "systems for identifying

19   incarcerated persons who were recently prescribed psychotropic medications, as

20   well as for administering and distributing these medications, meet or exceed both

21   correctional health and community standards of care." Penn Report at 29-30. These

22   conclusions are inconsistent with the available evidence, including factual findings

23   and cases reviewed in Dr. Penn's own report.

24       102.   First, I take strong issue with Dr. Penn's statement that there is no

25   evidence of "delays in the prescribing or delivery of psychotropic medications, nor

26   in the provision of mental health treatment for new intake incarcerated persons at

27   SDSO." Penn Report at 29.

28       103.   In my review of patient records, I identified numerous cases where

1  psychiatric medications were delayed for newly arrived incarcerated patients, where

2  medications were interrupted due to systemic failures (and without exercise of

3  clinical judgment), and where there was inadequate follow-up by psychiatric

4  providers for people on medication.  I provide many individual case examples in

5  Finding #2 of my August 21, 2024 report.  Stewart Report ¶¶ 53-95.

6      104.  Dr. Penn does state:  "I acknowledge that occasional missed doses of

7  psychotropic medication can occur."  Penn Report at 29.  But his own expert

8  reviewer Dr. Huselid, determined that the issue was far more than "occasional,"

9  stating in Dr. Penn's report:  "I've seen many [] examples of expiring medications in

10 [patient] charts, **there does seem to be a systems issue."**  *Id.* at 189 (emphasis

11 added).

12     105.  The Sheriff's Department's Corrective Action Notices and other reports

13 from just this past year identify serious, pervasive, and persistent deficiencies with

14 respect to the Jail's system for provision of psychiatric medication to the

15 incarcerated population.  Ms. Quiroz, the Jail's mental health coordinator, has

16 confirmed that these deficiencies remain, including:

> **There is a persistent psychiatric sick call backlog, resulting in psychiatric care delays.**  The Sheriff's Department's Corrective Action Notice documented that "periodic blitzes are done 3-4 months, with no solution to maintain the rising number of sick calls."  Quiroz PMK Dep. Ex. 10 at 17 (Sheriff's Department Corrective Action Notice, Dec. 1, 2023); *see also* Quiroz PMK Dep. at 186 (as of May 2024, describing delays in access to psychiatry care as a "key deficiency area" given the high "volume of pending appointments).

> **Psychiatry providers do not participate meaningfully (or at all) in essential Continuous Quality Improvement (CQI) activities.**  Quiroz PMK Dep. at 187 ("I don't know that it's been fully resolved, but it … [d]oes probably need to work towards improvement.").

> **There is no documented peer review process for psychiatric prescribers.**  Quiroz PMK Dep. at 190-91 ("I can't be for certain that they're not doing peer reviews.  It's nothing that they hand back to us.  I mean, if they do the peer reviews it's something that they're keeping records of on their own."); *id.* at 100-01 (there is no County employee or entity who is responsible for determining whether NaphCare's peer review process is adequate).

> **There is insufficient clinical oversight of psychiatric prescribers**

**(especially psychiatric nurse practitioners).**  Quiroz PMK Dep. at 192 & 198 (confirming that the Jail's chief medical officer, Dr. Montgomery, has shared concerns about adequacy of clinical oversight for psychiatric nurse practitioners at the Jail and the impact on medication management for the mental health population, and stating "it's still a concern").

➢ **The Jail regularly fails to provide *timely* psychiatric evaluations for newly incarcerated patients.**  Quiroz PMK Dep. at 111 ("Q: [I]s your team concerned about timeliness of initial psychiatry contacts with patients? … A: We want them seen as soon as possible, and there's times we may feel that it's not soon enough.").

106.   Second, I strongly disagree with Dr. Penn's statements that there is "no evidence indicating that any isolated incidents of missed psychotropic medication doses at SDSO led to immediate or delayed clinical decompensation or further issues" and that there are "no documented instances of undue delays resulting in self-harm, suicide attempts, completed suicides, or serious harm to incarcerated persons due to these medication delays."  Penn Report at 29.

107.   I have discussed in detail the horrific and preventable suicides of **Pedro Ornelas** and **Jonathan McDowell** in 2023.  Stewart Report ¶¶ 82-85 (Mr. Ornelas, a man with an extensive mental health and medication history who twice submitted requests to see a psychiatrist to "get back on my medications" but was never seen or started on medications in the nearly two weeks leading up to his suicide); *id.* ¶¶ 258-265 (Mr. McDowell, a man with history of psychiatric medication needs, who reported that he feared he was having a "mental breakdown" and auditory hallucinations, yet was not started on his psychiatric medication for three and half months, then received no clinical follow-up despite reporting that "I'm stressed to the gills" and that his medication regimen was "not working out" and that he was seeing lights and stars "like an electrical storm," and was instead placed in solitary confinement and never again seen by a psychiatric prescriber over the next six weeks leading up to his suicide).

108.   Even beyond the cases where people have died after being denied clinically necessary psychiatric treatment, it is my assessment that a very large

1    number of people are being made to suffer needlessly due to widespread delays and

2    failures in with respect to psychiatric medication practices in this Jail system.  The

3    case of ███████████ who was made to wait for three desperate weeks to see a

4    psychiatric prescriber even as he submitted at least 10 requests for help and reported

5    increasingly alarming symptoms and, according to one clinician, "started to tear up

6    and stated 'I am just trying to be better,'" is one such example.  (Mr. ██████'s case

7    illustrates extremely serious problems with psychiatric prescribing practices, and the

8    lack of supervision over psychiatric nurse practitioners, at the Jail.)  Stewart Report

9    ¶¶ 86-87.

10        109.    Further remarkable is that individual cases in *in Dr. Penn's own report*

11   reveal systemic psychiatric treatment deficiencies that contradict Dr. Penn's

12   opinions.  For example:

13        110.    ███████████ (Penn Report at 186-187):  Dr. Penn's designated

14   reviewer, Dr. Huselid, found "several lapses" related to Mr. █████'s psychiatric

15   medication needs, such that he did not have "access to care (e.g., access to care

16   means that, in a timely manner, seen by a qualified MH professional, is rendered a

17   clinical judgment, and receives MH care that is ordered) for [his] . . . mental health

18   needs."  I have also now reviewed Mr. ██████'s records, and agree that the care

19   was deficient.  Mr.██████, who had a history of psychosis, submitted multiple

20   requests to get psychiatric help for hallucinations and anxiety.  However, he was not

21   seen for an initial evaluation until nearly three weeks after his arrival, when he was

22   prescribed a medication regimen that was very problematic.  According to

23   Dr. Penn's designated reviewer, Dr. Huselid, the prescription was "*a high dose of*

24   *haloperidol to start someone on . . . and without knowing what doses they have*

25   *previously taken.*"  Penn Report at 186.  The treatment prescribed carried an

26   unreasonable risk of serious side effects, which in fact manifest in the weeks that

27   followed, including jerking involuntary movements, tongue protrusion, and

28   vomiting.  These side effects prompted an emergency hospital visit where dystonia

1   (a known side effect of the medication) was suspected.  When he was sent back to

2   the Jail, it was very important to monitor him closely and discontinue haloperidol, a

3   request that Mr. ███████ made himself in a sick call request asking that his

4   medication be modified "because [it] causes twist tongue, can't breath [sic]."  Yet

5   he was continued on the *same* medication and had no psychiatric appointment for

6   two months, during which period (as noted by Dr. Huselid) he submitted no less

7   than "nine health care requests/grievances about needing to see a psychiatrist."

8   Dr. Huselid concluded:  **I am very concerned that he didn't see a prescriber for**

9   **more than two months** and was continued on haloperidol—ESPECIALLY without

10  standing Cogentin/Benadryl—after his ER trip for dystonia."  Penn Report at 187

11  (bold added).  This case indicates not just poor clinical decisions by psychiatric

12  prescribers (who, as noted above, do not receive adequate supervision) but also a

13  dangerous failure to respond when dangerous side effects and clearly articulated

14  concerns are raised.  This case raises alarming systemic – and not just individual –

15  issues with treatment in this Jail system.

16          111.  ███████  (Penn Report at 205):  This man with diagnosed

17  schizophrenia was a state psychiatric hospital returnee whose condition had been

18  stabilized on antipsychotic medication.  As described by Dr. Huselid, Dr. Penn's

19  designated reviewer, his prescription expired without any action take for nearly four

20  weeks, which she found to have been concerning "given that [the patient] had just

21  returned from Napa State Hospital for competency restoration, [as] this could have

22  been very consequential (if he deteriorated and had to go back)."  This medication

23  failure stems from systemic tracking and follow-up deficiencies, and puts patients at

24  entirely unnecessary and inexcusable risk of harm.

25          112.  ███████  (Penn Report at 167-169):  Dr. Penn's designated

26  reviewer, Dr. Cervantes, identified several deficiencies in the psychiatric care of this

27  patient.  She noted that the "starting dose and escalation rate" of the antipsychotic

28  medication (Remeron) was "too rapid and increased risk for side effects, particularly

1  when there isn't even a well-defined diagnosis."  She noted the failure to conduct

2  baseline lab tests and weight checks, which were clearly clinically indicated due to

3  the patient's high Body Mass Index.  My review of this patient's records confirm

4  these failures and the serious risks to the patient.  When lab tests were done and

5  revealed abnormal results, there is no indication of medication review or

6  modification, indicating serious deficiencies in medication management and

7  psychiatric follow-up.  This patient's course of treatment did not meet the standard

8  of care.

9       113.     ██████████ (Penn Report at 174):  Dr. Penn's designated reviewer,

10  Dr. Cervantes, strongly criticized the psychiatric nurse practitioners who treated

11  Mr. ████.  I agree with Dr. Cervantes's assessment, and note that this again speaks

12  to the systemic failure to appropriately supervise psychiatric nurse practitioners

13  who, based on my review of many patient cases, provide horribly inadequate

14  psychiatric care.  Here, Dr. Cervantes found that the medication regimen was

15  "wholly unnecessary in this case and generally poor choices of meds" given the

16  patient's presentation.  This case is especially egregious insofar as this patient was

17  unnecessarily subjected to the potentially serious side effects of the antipsychotic

18  medication prescribed without clinical justification.

19       114.     ██████████ (Penn Report at 160-161):  Dr. Penn's designated

20  reviewer, Dr. Baskin, noted significant concerns with the prescribing practices in

21  this case.  He noted that the patient "goes for one year without medications, then

22  rapidly grows to 5 different meds including 2 sleepers (quetiapine/trazodone)."  He

23  noted that the Jail's psychiatric providers allowed for an "inappropriate confound

24  and layer of complexity" and that this is "an instance where a single provider

25  developing rapport might have proved more valuable to IP in giving meds longer

26  trials and avoiding polypharmacy."  I also reviewed this case, and I agree with the

27  concerns about the poor treatment provided.  I was in fact shocked by what I found.

28  This was a dangerous polypharmacological situation that does not come close to

1  meeting the standard of care.  The Jail's psychiatric providers started multiple

2  medications without an appropriate evaluation of what this patient actually required.

3  I also note that a treating psychiatrist failed to take steps to remove this patient from

4  Administrative Separation housing after it became clear that the conditions there

5  were contributing to her mental breakdown.  (This, of course, is another systemic

6  problem I have previously discussed and discuss further later in this report.)  In all, I

7  have not encountered anything like this case in my over 40 years of work as a

8  correctional psychiatrist.  This case is a giant red flag calling for systemic remedial

9  action.

10      115.  ██████████ (Penn Report at 171-172):  This case, reviewed by

11  Dr. Cervantes, reveals serious and consequential deficiencies in the provision of

12  psychiatric care.  Dr. Cervantes noted several serious problems with the psychiatric

13  treatment provided to this patient, including:  (1) the use of psychiatric medication

14  in the absence of legitimate clinical indication; (2) the provision of potentially

15  abusable and divertible medications without clinical justification; and (3) the use of

16  medication for opiate withdrawal in the absence of a history of opiate use.  These

17  are serious lapses in the psychiatric standard of care and place patients at substantial

18  risk of serious harm.  This case, including Dr. Cervantes's findings, further confirms

19  my opinion that there is an unacceptable lack of supervision of psychiatric nurse

20  practitioners in this Jail's system, leading to pervasive and dangerous deficiencies in

21  the provision of care.

22      116.  ██████████ (Penn Report at 187-188):  This case, reviewed by

23  Dr. Huselid, reveals repeated instances of essential psychiatric medications being

24  allowed to expire without timely reordering, causing unacceptable gaps in treatment,

25  including as recently as ██████ 2024, when, as documented by Dr. Huselid, the

26  patient "submits a Health Care Request, 'Medication expire [sic],'" which was

27  followed by a further 19-day gap in treatment before his medication was restarted

28  (for a total of 3 weeks without provision of clinically indicated medication).

117.   Dr. Penn's reviewers found even more problems with psychiatric care,
including "continuity of care issues," "inappropriate and dangerous prescribing,"
"risky medication change," and more:

> ███████████████ (Penn Report at 160):  "[T]he handoffs to several
ders causes continuity of care issues."

> ███████████████ (Penn Report at 176):  "Overall, this chart is
ppropriate and dangerous prescribing of psychiatric
medications without appropriate monitoring."

> ███████████████ (Penn Report at 179):  Psychiatric Nurse Practitioner
edication change which *could* have resulted in psychotic
symptoms re-emerging."

> ███████████████ (Penn Report at 182):  Psychiatric Nurse Practitioner
practices in choosing her treatment in a correctional
setting" for several listed reasons, and failed "to order regular weight
checks (only three weights were d███████████ uring the incarceration
time frame examined).  In fact, by ████████ 2023, IP had gained an
additional 16 lb. and was now 313█████ Seroquel and Depakote
are all known to contribute to weight gain and metabolic syndrome.
The risks and side effects of these medications in this IP likely
outweighed any benefit."

118.   The number of cases with deficient psychiatric care that Dr. Penn's
own designated reviewers found in their record reviews, combined with the
pervasive deficiencies I found in my assessment, amount to unambiguous alarm
regarding the systemic failures in psychiatric care in the San Diego County Jail
system.  I simply cannot understand how Dr. Penn can opine that this Jail "maintains
an effective medication management system across its facilities" or that there are
"no documented instances of undue delays resulting in self-harm, suicide attempts,
completed suicides, or serious harm to incarcerated persons due to these medication
delays."  *See* Penn Report at 29.  **Again, Dr. Penn's *own* report states that there
are "many [] examples of expiring medications in [] charts" such that "there
does seem to be a systems issue."** *Id.* at 189.

119.   Records directly contradict Dr. Penn's finding that there are "no
documented instances of undue delays" resulting in harm.  Take the case of
███████████████ a patient I reviewed as part of my assessment in this case.

1  Mr. ███ was denied his psychiatric medication for two months after his

2  prescription was allowed to expire, during which time he became very delusional

3  and unable to have a coherent conversation.  A psychiatrist treating him documented

4  that Mr. ███ had "decompensated in the context of medications expiring after

5  last visit."  This is a clear and documented example of a patient denied clinically

6  appropriate medication management who suffered needlessly as a result.  Dr. Penn's

7  finding is troubling in its disregard of this case and many others like it.

8      120.  This is a systemic failure that demands action.  The preventable deaths

9  of Mr. Ornelas, Mr. McDowell, and Mr. Rupard, all of whom decompensated after

10  being denied clinically appropriate psychiatric care until they died by suicide

11  (Ornelas, McDowell) or starvation (Rupard), represent what I consider to be the tip

12  of the iceberg regarding the serious harm that patients at this Jail have faced and

13  continue to face.

14      **G.    Dr. Penn's Opinion that San Diego County Jail Provides Patients
        with Timely Access to Mental Health Care and a "Robust Mental
15      Health Delivery System" Ignores the Realities of this Extremely
        Inadequate System.**
16

17      121.  I strongly disagree with Dr. Penn's opinions that "incarcerated persons

18  presenting with current mental health needs are promptly referred to and receive

19  timely mental health services," and that the Jail provides a "robust mental health

20  delivery system and is able to provide timely access to care and mental health

21  treatment to [patients] with ongoing mental illness."  Penn Report at 30-43; *see also*

22  *id.* at 50-52 (Dr. Penn's opinion that "The Delivery of Mental Health Care Within

23  SDSO is not Systemically Deficient.").

24      **1.    There Are Serious Deficiencies with Respect to the
        Timeliness of Mental Health Care at the San Diego County
25      Jail.**

26      122.  With respect to the *timeliness* of mental health services, Dr. Penn

27  simply ignores the extensive evidence, and the County's own documentation, that

28  the system is defined by large mental health care backlogs and unacceptable delays

in access to clinically necessary care.  Examples include the following:

123.    First, the County documented a **persistent psychiatric appointment backlog**, resulting in psychiatric care delays.  The County noted that "periodic blitzes are done 3-4 months, with no solution to maintain the rising number of sick calls."  In April 2023, there were 785 pending psychiatry appointments.  Despite the County's corrective action notice issued at that time, there remained 530 psychiatric pending psychiatry appointments in November 2023, with an average wait time of 18 days.  Quiroz PMK Dep. Ex. 10 (Sheriff's Department Corrective Action Notice, Dec. 1, 2023).  The Jail mental health coordinator identified this is as "key deficiency area" as recently as May 2024.  Quiroz PMK Dep. at 186.

124.    Second, the County has documented **severe sick call request backlogs** and treatment delays, with the Jail mental health coordinator explaining that such delays "illustrate that we have an overwhelmed system and we all need help."  Quiroz PMK Dep. at 270-71 & Ex. 14.

125.    Third, Dr. Penn's *own* designated reviewers identify (again, as set forth in his own expert report) a large number of cases with **unacceptable delays in the provision of mental health and psychiatric care**.  *See, e.g.*:

> ➢  Penn Report at 187 ("**I am very concerned that [patient] didn't see a prescriber for more than two months** and was continued on haloperidol—ESPECIALLY wit____standing Cogentin/Benadryl—after his ER trip for dystonia on ____/2022.") (emphasis added).

> ➢  Penn Report at 195 (patient "sends multiple requests [over 2 ½ month period] asking why someone reduced h__ medications and begging for them to be restarted.  For example, on ___/23, he indicates that he is sending his fifth request and says, '___edicine to help me sleep please.  How many requests?'  On ___/23 he writes, 'Need to see psych doc for meds, no appointment sinc__ month or more and you reduced my meds why?'  **It is my opinion that this gap in care (given medication change without communication to the patient) is too long.**") (emphasis added).

> ➢  Penn Report at 190 (**"My primary concern is how long it took him to see a psychiatric prescriber for the first time. . . .** [The psychologist] indicates that he should be referred to Psych SC in one week.  However, [patient] is not seen by a psychiatric prescriber [for more than one month].  In the me_____re requests/grievances (dated _____

requesting—then begging—to see a prescriber. . . . he writes, **'I'm feeling scared and dangerous because I need my meds…Please Help Urgent!'**") (emphasis added).

➤ Penn Rep____ 203 ("In a LMFT note dated ▆/22, the clinician notes that Mr. ▆▆ should be 'refer[red] to Psyc▆ D for PS__ eval.' However ▆▆ not seen by a prescriber (Psych NP) until ▆/23. . . . **[It] doesn't look good.**") (emphasis added).

126.   Fourth, my report details the evidence of **dangerously untimely access to inpatient (PSU) mental health care** in the Jail system.  This deficiency was confirmed by a PSU psychiatrist, who told me during my site visit that there is "always a wait list" of acutely ill patients requiring PSU placement.  Stewart Report ¶ 128.  Ms. Quiroz also confirmed this fact.  Quiroz PMK Dep. at 70-71.  Aseel Ross, who served as an Administrative Separation clinician, testified that she was aware of patients waiting for a PSU placement *for more than one month*.  Ross Dep. at 89-90.  The lack of timely access to an inpatient level of care placement is well established, and it puts patients at substantial risk of serious harm, including further decompensation, self-harm, and suicide.

127.   My records review confirms the persistence of these extreme access-to-care delays for patients who need acute mental health placement and care.  As additional examples:

▆▆▆▆▆▆

128.   This patient with serious mental illness was placed at Central Jail after receiving inpatient treatment at the Department of State Hospitals.  Without the continued level of care he needed (and that had helped him to stabilize on medication at the state hospital), he became nonadherent to medications at the Jail and was placed in Administrative Separation, where he continued to decompensate in that highly restrictive setting where meaningful mental health treatment is essentially non-existent.  A psychiatry team saw him in ▆▆▆ 2023, and observed him talking to himself, naked in his cell, and unable to engage in conversation.

129.   He continued to decompensate to the point of grave disability as demonstrated by him being, as documented in the record, "**constantly fully naked inside his cell and eating his own feces … flooding his cell with water mixed with fecal materials … neglecting self-care, and persistent symptoms of paranoid delusions**."   A full 11 days after the psychiatry team saw him, he was finally referred to the PSU for acute level of care.  But there was no PSU bed available.  The patient was kept in Administrative Separation, where his symptoms continued to worsen, for another 20 days until he was finally placed in the PSU. This is an enormous, harmful, and dangerous delay in the provision of a clinically indicated acute mental health care placement.

130.   This patient with serious mental illness and a severe movement disorder arrived at the Jail in ████████ 2023 and was placed in Administrative Separation—an isolation placement that is extremely dangerous for a person with this patient's mental health profile and needs.  When he was seen for an initial psychiatric evaluation, he was clearly decompensated, appearing "labile and unpredictable … avoidant, impulsive, bizarre, paranoid, suspicious," "disheveled and unkempt."  Further adding to the concern, the psychiatric nurse practitioner who performed this evaluation recommended follow-up in four weeks, which is far too long for a patient this acutely ill and with such poor insight.  Fortunately, another psychiatric provider recognized several days later that this patient needed a higher level of care and recommended transfer to the PSU.  But no PSU beds were available.

131.   Mr. ███ remained in Administrative Separation for several more weeks.  Mental health staff observed his continued decompensation and poor self-care ("he is very disheveled with food on his face, his clothes, his bed, etc."; "[he is] disorganized, agitated … paranoid and lacks any insight into his current psychiatric condition") until he was placed in the PSU in ████████ approximately 30 days

1  after inpatient care was clinically indicated.  This is another example of an

2  unacceptable, harmful, and dangerous delay in the provision of a clinically indicated

3  acute care placement.

4          **2.    There Are Serious Deficiencies with Respect to the Adequacy**

5  **of Mental Health Care and Treatment Programming at the San Diego County Jail.**

6          132.   With respect to Dr. Penn's opinion that the San Diego County Jail has a

7  "robust mental health delivery system" that is "not systemically deficient," his

8  discussion is incomplete and does not in any way change my conclusion that this

9  system denies people with serious mental illness access to **adequate mental health**

10  **treatment**, causing undue suffering and putting people at unnecessary and

11  substantial risk of harm.  I provide examples of Dr. Penn's problematic findings

12  below.

13          133.   Dr. Penn's assessment that "Mental Health Group Therapies" and other

14  clinical activities are provided consistent with the treatment needs of the Jail

15  population ignores critical deficiencies, and is at odds with the assessments of the

16  Jail's mental health coordinator and the Sheriff herself.  Dr. Penn's report does

17  confirm that PSU clinicians provide as little as "one psycho educational group per

18  week" and just one clinical "meeting with every patient individually" each week.

19  Penn Report at 37.  This exceedingly limited amount of treatment is inadequate for

20  the needs of this population.

21          134.   I am also aware that approximately half or more of the patients in the

22  Central PSU are not permitted to participate in any group therapy *at all*, with several

23  patients essentially on 24/7 lockdown with no meaningful mental health treatment at

24  all.

25          135.   Dr. Penn's statement on PSU treatment ("The weekly schedules

26  provided reflect that IPs in the PSU are actively involved in creative and

27  recreational therapy, not merely confined to their cells" (Penn Report at 33)) does

28  not account for the reality that these activities are extremely limited, are not

1   facilitated by clinicians (but rather a recreational therapist), and completely exclude

2   a substantial proportion of PSU patients who are in fact confined to their cells.

3       136.   In contrast, Sacramento County Jail's acute inpatient psychiatric unit's

4   policy and program schedule is designed to provide what more closely approximates

5   clinically appropriate clinical care, with clinician-facilitated treatment group offered

6   for at least three (3) hours per day, along with a daily out-of-cell contact with a

7   clinician and a daily out-of-cell contact with a psychiatric prescriber.  *See* Stewart

8   Report ¶ 118.

9       137.   The same major deficiencies exist in the Outpatient Stepdown units,

10  which Dr. Penn's report acknowledges provide no more than two group treatment

11  hours per week (Penn Report at 37), though I was informed on my site visit that

12  some of these units do not receive any group treatment programming at all (and are

13  on nearly round-the-clock isolation lockdown).  Dr. Penn does not provide any

14  analysis that would support his finding that OPSD treatment is clinically adequate.

15      138.   In my report, I discuss in detail how, given the staggeringly high levels

16  of acuity and treatment needs among the OPSD population, OPSD treatment

17  programming is grossly insufficient to meet the clinical needs of the patient

18  population.  *See* Stewart Report ¶¶ 145-161.

19      139.   In addition to the insufficient programming in OPSD units, there is also

20  terribly inadequate capacity – that is to say, there are not enough OPSD program

21  spots to meet the needs of the seriously mentally ill population.  Ms. Quiroz

22  estimated that, if an appropriate mental health acuity rating system was implemented

23  at the jail, it would "highlight the need for hundreds if not thousands of mental

24  health beds."  Quiroz PMK Dep. at 90-93 & Ex. 4.

25      140.   San Diego County Sheriff Martinez also recently acknowledged the

26  deficits with respect to mental health treatment programming.  On October 2, 2024,

27  she presented at the San Diego County Citizens' Law Enforcement Review Board

28  meeting, stating:  "We also think that group therapy is useful in some instances and

1  some other things that we don't always have accommodations for currently in our

2  structure." Sheriff Martinez, CLERB Regular Meeting, Oct. 2, 2024 (video at

3  1:01:00, available at https://youtu.be/4vXcub2VXTc?t=3640).

4       141.   The San Diego County Jail's failure to provide adequate mental health

5  treatment to patients with serious mental illness puts patients at risk and causes

6  unnecessary harm. One case assessed by Dr. Penn's designated reviewer offers

7  considerable insight here.

8  ███████████

9       142.   Dr. Huselid finds that the Jail failed to provide this patient "access to

10  care" for his mental health needs, including "lapses" in the provision of treatment.

11  Penn Report at 197-198. I also reviewed this patient's records. Mr. ████ has

12  diagnosed serious mental illness. He was stabilized through treatment and a

13  complex medication regimen to manage his severe psychotic symptoms in the Jail

14  Based Competency Treatment (JBCT) Program that is run by the Department of

15  State Hospitals (DSH). As I discussed in my previous report, the JBCT unit has a

16  mental health program with robust staffing and treatment programming, and it

17  shows positive results. The problem, as I stated, is that once a patient discharges

18  from the DSH-run JBCT program and is placed in other San Diego County Jail units

19  (where the treatment program is a tiny fraction of what is provided in the JBCT),

20  patients are denied the care they need and decompensate as a result, with a new

21  onset of psychiatric symptoms and even a new finding that they are "incompetent to

22  stand trial" (essentially *undoing* the success of the JBCT program). Stewart Report

23  ¶¶ 163-164. Mr. ████ appears to be one such example.

24       143.   After being discharged from the JBCT program, Mr. ████'s auditory

25  and visual hallucinations worsened, with voices urging him to do things or making

26  negative statements, as noted by a psychologist. Despite these signs of

27  decompensation, the psychiatric prescribers were not notified, with a many-month

28  gap in psychiatric follow-up that should have occurred much sooner. Mr. ████'s

1  care was further complicated when, in his decompensated state, he started refusing

2  clinical contacts and medications over a seven-month period.  Shockingly, during

3  this seven-month period, he had only had two psychiatric appointments.  As

4  Dr. Huselid notes, "one of my concerns is how long this patient went at times

5  between seeing any mental health practitioner."  She found that "he had been

6  refusing his psychotropic medications and reporting paranoia about his food.  I am

7  concerned that no one attempted to see him cellside."  Penn Report at 198.

8  Mr. ▮▮▮▮ finally resumed his medications but continued to have uncontrolled

9  auditory and visual hallucinations.

10      144.   Earlier this year, there was another very significant gap in care for

11  Mr. ▮▮▮, when mental health staff documented that Mr. ▮▮▮ should be seen "in 2

12  weeks (priority due to acuity)," yet he was lost to follow-up for almost three months.

13  Penn Report at 198.  These gaps in care highlight systemic issues in tracking and

14  providing clinically necessary psychiatric care for patients.  The contrast between

15  how Mr. ▮▮▮'s mental illness was managed in the DSH-operated JBCT program

16  (with its daily mental health programming and frequent psychiatric care) and how he

17  decompensated so severely in San Diego County Jail's system after discharging

18  from JBCT makes plain the serious inadequacy of the Jail's mental health care

19  system, and the harm such inadequacy causes.

20      145.   The evidence of severe mental health programming deficits in this

21  system, combined with the statements by Jail leadership and the Sheriff herself,

22  directly contradict Dr. Penn's conclusion that there is "widespread availability of

23  educational and therapeutic programming" in this system.  Penn Report at 42.  There

24  is nothing close to enough mental health treatment beds and program capacity to

25  meet the mental health population's treatment needs.  It is troubling that Dr. Penn

26  ignores all the evidence and statements pointing at this reality.

27      146.   I further strongly disagree that this Jail system conducts adequate

28  multidisciplinary treatment team meetings and provides "ongoing multidisciplinary,

[4571315.3]

1    individualized treatment planning." Penn Report at 32, 38-39. I discuss the basis

2    for my opinions on this subject in detail in my report. Stewart Report ¶¶ 97-112.

3        147.   Individual case records that I reviewed consistently demonstrate that

4    the Jail's mental health system fails to ensure that patients receive clinically

5    appropriate, individualized treatment planning that includes appropriate level of care

6    determinations, provision of individualized medication management, and structured

7    therapy and counseling as clinically indicated. In fact, mental health staff testimony

8    confirms that individualized treatment planning with an appropriate level of care or

9    acuity rating system does not exist. (Again, Ms. Quiroz testified that the County

10   was reluctant to do this because it would "highlight the need for hundreds if not

11   thousands of mental health beds." Quiroz PMK Dep. at 90.)

12       148.   Ms. Ross, the clinician assigned to patients in Administrative

13   Separation units, proposed to Jail leadership the implementation of a structured

14   individualized treatment planning process for patients; she testified that such a

15   practice "was not implemented." Ross Dep. at 64. Ms. Quiroz testified that "it

16   could be helpful" for mental health staff to use an "individualized treatment plan

17   that's a freestanding document" but such a practice was not in place. Quiroz PMK

18   Dep. at 258.

19       149.   It is curious that Dr. Penn concluded that the treatment planning

20   process in the San Diego County Jail system is adequate. His finding is quite

21   specific in its language, but it is in fact copied nearly verbatim from his Arizona

22   state prisons expert testimony (with only the name of the detention system changed).

23   Here is what he opined in his Arizona expert report:

24       **Treatment Plans & Timely Communication:** In preparation of this
         report, I reviewed numerous ADCRR inmate medical records. In my
25       view, ADCRR provides comprehensive treatment plans, timely
         communication, and multidisciplinary coordinated care between
26       psychiatric and mental health staff, nursing staff, medical providers,
         and custody staff. Such records are kept in accordance with the
27       correctional standard of care. This significantly reduces the risk of an
         inmate's risk of harm to self or others."

28

1    Joseph Penn Expert Report, *Jensen v. Shinn* (D. Ariz.), Dkt. 4172 at 55 (¶ 152).

2        150.   Here is what he opined in his San Diego County Jail expert report:

3    **Treatment Plans & Timely Communication.**

4    In preparing this report, I reviewed numerous medical records for
     individuals in custody at SDSO.  The records demonstrate that SDSO
5    provides comprehensive treatment plans, ensures timely
     communication, and coordinates multidisciplinary care among
6    psychiatric and mental health staff, nursing staff, medical providers,
     and custody staff.  This level of care is consistent with correctional
7    standards and significantly mitigates the risk of harm to
     individuals . . . .

8

9    Penn Report at 38.

10       151.   Nothing in Dr. Penn's analysis changes my opinion that the San Diego

11   County Jail's mental health system fails to provide timely, clinically adequate, or

12   appropriately individualized mental health treatment to patients with serious mental

13   illness.

14       **H.    Dr. Penn's Opinion that San Diego County Jail "Provides
             Opportunities for Confidential Mental Health Care Encounters in**
15           **Adequate Physical Spaces" Is Contradicted by the Facts, Including
             Statements by the Sheriff Herself.**
16

17       152.   Dr. Penn states that "[i]n my professional opinion, SDSO IPs are

18   provided private meeting spaces to maintain confidentiality during mental health

19   encounters."  Penn Report at 43-44.  As I have described, the lack of confidentiality

20   during clinical mental health contacts at the San Diego County Jail is pervasive and

21   undermines the provision of mental health care for patients.  Nothing in Dr. Penn's

22   report changes my opinion.

23       153.   Dr. Penn's discussion on this topic is very short, and provides little

24   insight into how he reached his conclusion.  More importantly, this opinion is

25   directly contradicted by (1) Dr. Penn's own designated reviewers, (2) the Jail's

26   mental health coordinator and person-most-knowledgeable on these topics, and

27   (3) the San Diego County Sheriff herself.

28       154.   First, Dr. Penn's designated reviewer, Dr. Huselid, finds evidence that

1   confidential clinical contacts are not provided at the San Diego County Jail *by*

2   *policy*.  She discusses this in some detail in the review of patient ███████████

3   Penn Report at 196-97.  She documents that a recent instance in which the clinician

4   documents that Mr. ██████ "asks to meet confidentially but [the clinician] says that

5   she is unable to due to AdSep 'regulations/restrictions.'"  Two weeks later,

6   "Mr. ██████ once again asks to meet in a confidential setting for privacy, but [the

7   clinician] writes that her 'Plan' is, 'continue to be monitored cellside.'"  The expert

8   reviewer states, "I question this blanket requirement to see incarcerated persons

9   cellside when they are in AdSep," noting that when she worked as a jail clinician,

10  she would see such patients confidentially.  She further notes that "as far as I can

11  tell, Mr. ██████ had been in good behavioral control."  Based on his mental health

12  needs, including a medication overdose that occurred soon after these non-

13  confidential contacts, Dr. Huselid concludes that "**it doesn't look great that the jail**

14  **was unable to meet his request to be seen confidentially**."  Penn Report at 197

15  (emphasis added).  I agree with Dr. Huselid's assessment and conclusion.

16          155.   I repeat here what I state in my previous report about how the provision

17  of appropriate confidentiality for mental health care does *not* mean compromising

18  the safety of staff or anyone else:

19          To be sure, the provision of adequate treatment of serious mental
            illness (with appropriate confidentiality) will serve to *increase* safety:
20          good care serves to reduce psychosis-induced behaviors and to keep
            patients' conditions more stable.  And in a jail system where
21          confidential clinical contacts are the expectation, there will be
            appropriate safeguards, including the use of *individualized* assessments
22          – based on both clinical and custodial input – to determine when a
            particular patient cannot safely be seen in a confidential setting.  Such
23          circumstances can, and must, be appropriately documented, reviewed
            for quality assurance purposes, and inform treatment planning and
24          delivery moving forward.  **In short, a jail system should not choose**
            **between necessary confidentiality and safety.  They go hand in**
25          **hand.**

26  Stewart Report ¶ 392 (bold emphasis added).

27          156.   My patient reviews confirm the very serious and consequential

28  deficiency of failing to provide adequate confidentiality for clinical contacts.

Stewart Report ¶¶ 397-401.  As a further example:

157.    ███████    This man arrived at the Jail in ████ 2023.  The intake screening failed to identify chronic mental health needs and his suicide risk history. A review of records from his previous incarceration, however, would have clearly revealed a history of mental illness that included suicidal ideations.  About one week after his arrival at the Jail, he received a behavioral assessment in which the clinician stated:  **"IP reported history of past suicide attempts but was not asked for details due to not being able to offer a confidential setting."**  (He was not seen for nearly three more weeks for an initial psychiatric evaluation.)  This is very serious, unacceptable, and dangerous.  The clinician documents here that the patient reported a history of suicide attempts, and that more information could not be gathered because the Jail was not "able to offer a confidential setting" to discuss such sensitive information.  This is a glaring example of the failure to provide for confidential mental health contacts, but it is by no means unusual in San Diego County's Jail system.

158.    Dr. Penn's designated reviewers found still more examples where mental health patients were not provided confidentiality consistent with the standard of care.  In addition to the widespread and even (as Dr. Huselid describes) "blanket" restrictions on confidential contacts in some settings at the Jail, there were examples where the failure to provide appropriate language interpreters led to the denial of confidentiality and appropriate care.  *See, e.g.*, Penn Report at 171 (**Patient** ███: "Several of the mental health counselors noted that they used a deputy to help interpret, as IP was Spanish-speaking.  This is not usually considered best practice."); *id.* at 177-78 (**Patient** ███: "[M]any of the NP notes (at least ███/23, ███/23, ███/23, ███/23, ███/23, 1███/23) indicate that deputies were used to translate for the encounters for this Spanish speaking patient.  Using deputies to translate/interpret for patients is generally discouraged but was routinely done here."); *id.* at 180-81 (**Patient** ███: psychiatric provider documents that

1  another incarcerated person being called to "help communicate" and noting that

2  using another incarcerated person "to interpret . . . would not be best practices as it

3  does not keep the interview confidential and accuracy cannot be ensu[r]ed").

4    159.   Let me be clear:  the use of custody staff for translation for a patient's

5  mental health care contacts is strictly prohibited under the standard of care, absent

6  the most serious of emergencies.  This practice breaks the core principles of

7  confidentiality.  If the jail does not have mental health staff who can communicate

8  with a patient in their preferred language, then a confidential interpretation service

9  *must* be utilized.

10    160.   Second, Jail mental health coordinator Melissa Quiroz has agreed in her

11  testimony that maximizing auditory privacy for clinical contacts is an important

12  goal.  Quiroz PMK Dep. at 78.  And she acknowledged that clinicians working at

13  the Jail have "expressed concern about [the] lack of confidentiality with cell-front

14  interactions with their patients." *Id.* at 77.  She further confirmed that it remains the

15  case to this day that clinical contacts occur at cell-front and in spaces where custody

16  deputies can overhear the conversation, while dismissing the concern because in her

17  "experience usually they're not interested." *Id.* at 78-79.  She did, however, agree

18  that the patients could have concern about the presence of custody deputies when

19  they are meeting with a mental health staff member:

20      Q: [J]ust from the patient's standpoint do you think that they may still
        have the concern that a deputy is standing nearby and can overhear
21      what they're saying to their clinician?

22      …

23      A: I think a patient could possibly feel that way, but I don't know -- no
        patient has told me, hey, make that person go away.  I think that they
24      understand that that deputy can't go away.

25  *Id.* at 79.

26    161.   Ms. Quiroz also confirmed that additional space and staffing resources

27  to provide confidential clinical contacts would be helpful:

28      Q: If there were more space and staffing resources, would the jail

mental health [staff] be providing more one-to-one clinical contacts in confidential settings?

A: Phrased in that way, having more deputy assistance and having more clinical space, we would definitely be utilizing it.

*Id.* at 80-81.

162.   Third, San Diego County Sheriff Martinez acknowledged that there is a lack of confidential clinical space in the San Diego County Jail system, less than one month ago.  On October 2, 2024, she presented at the San Diego County Citizens' Law Enforcement Review Board (CLERB) meeting.  When asked about what improvements the Jail needs to work on regarding people with mental health needs, she stated:

> One of the auditor recommendations which we agree with is that **there's not enough private spaces at intake for people to share personal information or have those private conversations with a mental health professional**.  We've expanded that a little bit at the Vista Jail that was where we had the largest problem and we hope with new construction and some of the other improvements to our facilities, we can build spaces where there's more safe space and treatment areas for individuals who have, who have that need.
>
> …
>
> Where we're at now, what's left really of the implementation of the audit recommendations are infrastructure … the one thing, the therapeutic space for mental health, a lot of that's going to take infrastructure and funding for the construction work.

Sheriff Martinez, CLERB Regular Meeting, Oct. 2, 2024 (video at 1:01:00 and 1:09:00, available at https://www.youtube.com/watch?v=4vXcub2VXTc).

163.   Dr. Penn's opinion that the San Diego County Jail provides confidential mental health care in adequate physical spaces is at odds with my findings, his own designated reviewers' findings as stated in his report, the County's Jail mental health coordinator's testimony, and the Sheriff herself.  This is a systemic deficiency that must be remedied, through appropriate policies and procedures, specific training, allocation of adequate clinical and custody/escort staffing, and provision of adequate clinical space.

/ / /

**I.    Dr. Penn's Opinion that San Diego County Jail Does Not House Patients at Risk of Suicide in Punitive Isolation and that "Strategies Are Employed to Avoid Unnecessary and Undue Risk of Decompensation and Harm" Is Not Supported by the Facts of the Jail's Operations.**

164.    Dr. Penn provides numerous statements about the Jail's systemic use of solitary confinement housing for people with mental illness.  Penn Report at 44-46. It is very difficult to tell what specific facts or information he relies on in reaching his opinions, as all are set forth in conclusory fashion.  For purposes of this rebuttal report, I provide examples where Dr. Penn's statements are factually incorrect and/or extremely misleading.

165.    First, Dr. Penn asserts:  "To mitigate risks while housed in Ad Sep, there are robust medical and mental health safeguards in place."  Penn Report at 45. He states that health care staff are asked to "to check for any medical or mental health contraindications for an IP being housed in Ad Sep. . . .  This ensures that all potential medical or mental health concerns are addressed promptly, contributing to the overall safety and appropriateness of housing decisions."  *Id.*  This finding is inaccurate, both in terms of policy and actual practice.  *See* Stewart Report ¶¶ 207-226.

166.    The National Commission on Correctional Health Care (NCCHC) evaluated San Diego County Jail and specifically found that the Jail's "mental health staff does not [] screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement."  *Id.* ¶ 221.  The Jail's policy continues to omit the practice standard required by the NCCHC, *id.* ¶ 210, and the Jail mental health coordinator confirmed that it remains the policy and practice that there is no mental health clinical assessment done for a person being placed in Administrative Separation to identify whether there are mental health contraindications for a person being housed in Administrative Separation.  Quiroz PMK Depo. at 250-251.  Dr. Penn's report is factually incorrect in this regard.

167.    Dr. Penn further ignores the many examples of people with serious

1  mental illness being placed and retained in Administrative Separation despite clear

2  evidence that such placement was clinically contraindicated and dangerous,

3  including several deaths that resulted.  *See, e.g.*, Stewart Report ¶¶ 266-274 (Rupard

4  death, determined to be a "homicide" due to "neglected schizophrenia" after patient

5  was placed and retained in Administrative Separation despite clinical

6  contraindications), ¶¶ 275-281 (Marroquin death following re-placement in isolation

7  after suicide precautions, with no clinical input considered), ¶¶ 282-283 (Godfrey

8  death following manifest deterioration in isolation).  I provide several additional

9  individual examples in my report, all of which entail enormous and undue harm to

10 patients.  *Id.* ¶¶ 229-238 (■■■), ¶¶ 239-241 (■■), ¶¶ 242-243 (■■■).

11       168.  Dr. Penn also provides a confusing discussion as to whether and when a

12 qualified mental health professional (QMHP) will see a patient placed in

13 Administrative Separation.  He writes that the policy is for a QMHP to see the

14 patient "not longer than one week after placement into Ad Sep."  Penn Report at 45.

15 He then states that Ms. Quiroz told him that the "average duration is within two

16 days."  Without providing any data or case examples to confirm Ms. Quiroz's

17 statement, he then misrepresents the statement by concluding:  "In summary, IP's

18 placed into Ad Sep are evaluated by a QMHP within 24-48 hours of any IPs'

19 placement into the unit."  *Id.*

20       169.  To be clear, this makes no sense.  The basis of this conclusion is a

21 general policy that states such an evaluation must occur within one week, and a staff

22 member's unverified statement that the "average" time is two days (meaning that,

23 for some number of people, the actual time is longer than two days).  Dr. Penn's

24 conclusion then introduces a new "fact" that the evaluation is actually completed

25 "within 24-48 hours" of Administrative Separation placement.

26       170.  To be sure, even Dr. Penn's misrepresented "fact" about the San Diego

27 County Jail's practice (evaluation 24-48 hours after isolation placement) puts this

28 Jail system in a state of non-compliance with United States Department of Justice

1    standards and the generally accepted standard of care for a jail system's placement
2    of people with serious mental illness in isolation, which require that a clinician
3    assess a patient with serious mental illness **before** they are placed in Administrative
4    Separation to prevent undue risk and actual harm.

5        171.   I have found repeated examples of patients placed in extraordinarily
6    harsh, isolating, and punitive-feeling settings that harmed their mental health and
7    resulted in serious harm, including suicides and other deaths.

8    **Administrative Separation**

9        172.   I have previously discussed the staggeringly high number of patients
10   with serious mental illness being housed in the enormously restrictive and anti-
11   therapeutic Administrative Separation. *See* Stewart Report ¶¶ 182-283 (harmful
12   conditions and consequences for patients in Administrative Separation/solitary
13   confinement).  Here is yet another example, from Dr. Penn's own report.

14   ███████████████ **(Penn Report at 157-158)**

15       173.   Dr. Penn's designated reviewer provides an extremely brief assessment,
16   noting that a clinician "took steps to improve very poor hygiene" on one day in
17   █████ 2024," finding this to be a "[v]ery difficult case, managed well," and
18   indicating that this patient "had very poor insight and [was] quite sick."  Having
19   reviewed this patient's records, my strong assessment is that this case's challenges
20   stem from systemic treatment failures and the long-term placement of an extremely
21   mentally ill patient in solitary confinement **for more than four years** without
22   anything close to clinically adequate mental health treatment.  This patient reported
23   intermittent psychotic symptoms, such as hallucinations and paranoia, which appear
24   to have complicated and prolonged his criminal legal proceedings.  He was
25   hospitalized twice at Patton State Hospital related to competency proceedings.

26       174.   While at the Jail, he spent more than four years in the solitary
27   confinement conditions of Administrative Separation, where he was not managed
28   with the appropriate level of psychiatric treatment, monitoring, and assessment.

175.  I found no evidence in his records showing development and implementation of a treatment plan with multidisciplinary collaboration, which is essential for addressing a patient with this level of complexity.  Much of his psychiatric care was delivered by nurse practitioners with inadequate supervision given the complexity of this case.  Due to these various factors, he received unnecessary treatments based on his self-reported symptoms.  For instance, he was started on medication for "mood and energy" with no evidence of a diagnoses to support this treatment.  Another time, his antipsychotic dosage was increased after he reported psychotic symptoms to a telepsychiatrist who had seen him only once, despite a psychologist familiar with his history finding no signs of psychosis in a recent assessment.  A psychiatrist, Dr. Badre, stated that this patient "would be best served by staying in the state hospital during his proceedings … to prevent the erroneous accumulation of notes by providers who are not familiar with his history." Instead, he remained in a solitary confinement setting – again, for more than four years – where he did not receive clinically appropriate treatment.

176.  It is very difficult to understand how Dr. Penn's report, which claims to consider the experience of this person with serious mental illness, subjected to more than four years in Administrative Separation without meaningful or clinically necessary mental health treatment, can conclude that "it is my professional opinion that SDSO effectively minimizes prolonged restrictive housing for IPs with mental disorders."  Penn Report at 46.  I strongly disagree with Dr. Penn's finding, and nothing in his report changes my opinions on this topic.

**"Wellness Rounds" in Administrative Separation**

177.  Dr. Penn describes the "Wellness Rounds" that the Jail has reportedly begun to implement.  These are described as a "weekly practice" by which "a multidisciplinary team enters a specific Ad Sep restrictive housing pod" and "walks individually to each IP's cell, engages with the IPs, and asks if they need any assistance.  They encourage the IPs to exit their cells if appropriate and oversee the

cleaning of cells by trained IPs, performing additional cleaning as needed.  The team assesses the IP's cell condition, mental status, clinical functioning, and daily living activities."  Penn Report at 52.  It is my assessment that this reported practice does *not* address the very serious harms and risks of harm inflicted on people with serious mental illness who are housed in the Jail's Administrative Separation units.

178.   Dr. Penn states that the "Wellness Rounds" practice has been in place for two years, but it is oddly not memorialized or described in the Jail's health care policy regarding Administrative Separation patients (Medical Services Division MSD Policy G.2.1).  *See* Quiroz PMK Dep. at 259 (confirming that MSD Policy G.2.1 is the only "policy document[] or directive[] that [is] foundational to understanding MSD's policies for segregated inmates" and that no NaphCare policy regarding segregated inmates has been implemented).  Without any written policy or directive regarding Wellness Rounds, any such *ad hoc* practice gives me little confidence in its efficacy to ensure adequate evaluation, treatment, and supervision of people with serious mental illness in Administrative Separation units.

179.   I am glad to hear that Wellness Rounds, even as an unwritten practice, might be something happening in the San Diego County Jail system.  Given the extraordinary acuity of mental illness I observed among so many patients in the Administrative Separation units, the level of isolation there, and the overall lack of meaningful activity and treatment, *any* additional observation of and engagement with these patients is a good thing.

180.   But to be clear, these "Wellness Rounds" do *not* mitigate my grave concerns about the harmful conditions and lack of treatment in Administrative Separation units.  These "Wellness Rounds" do *not* provide for clinician-patient confidentiality, are *not* a meaningful clinical contact, are *extraordinarily limited* in their use as a mental health evaluation tool, and do *not* constitute meaningful treatment.  By their design and in their implementation, these Wellness Rounds do *not* provide the mental health treatment and clinical interventions that the patients

1    with serious mental illness so clearly need.

2        181.    Based on my in-person observations and review of records, Wellness

3    Rounds – to the extent they are occurring – are not achieving the stated goal of

4    ensuring appropriate cleanliness in people's cells.  I observed Administrative

5    Separation cells housing people with serious mental illness that were extremely

6    filthy and cluttered with trash in the cell.  Many cells reeked of urine and feces.

7    Two years of Wellness Rounds do not seem to have addressed this serious issue,

8    which is both inhumane and unacceptable from a basic sanitation perspective.

9        182.    In my review of patient records, I analyzed the documentation of

10   Wellness Rounds.  In the aggregate, the Wellness Rounds are superficial in the

11   issues that they address and clinically unhelpful.  I did not find evidence of

12   meaningful multidisciplinary collaboration.  There is also great variability in the

13   way Wellness Rounds are documented, which is a reflection of this being an *ad hoc*

14   practice. Attendance of different disciplines is quite variable.  Significantly, the

15   privately contracted (NaphCare) mental health staff (*i.e.*, psychologists, nurse

16   practitioners, psychiatrists) do not participate in these rounds – that is, the one

17   consistency that I do see is that psychiatry is not involved.

18       183.    The Wellness Rounds, as documented, provide no clinically significant

19   interventions.  Often, they are simply an opportunity for a patient to complain about

20   the long waits they are facing to be seen by a psychiatric provider, a reflection of the

21   very problematic backlogs for psychiatry appointments and mental health sick call

22   requests.  Patient records of the Wellness Rounds do not include meaningful

23   assessment or clinical interventions.

24       184.    Despite Dr. Penn's assertion that the Wellness Rounds team

25   "encourage[s] the IPs to exit their cells if appropriate and oversee the cleaning of

26   cells by trained IPs, performing additional cleaning as needed," I found that the

27   documentation consistently makes no reference to patients exiting their cells or

28   being assisted with necessary cell cleaning.

185.   As one example, ███████████ who I discuss earlier in this report, was provided a Wellness Round in ██████████ 2023.  As noted in my earlier discussion of this patient, during this time period, Mr. ████ was clearly decompensated, appearing "labile and unpredictable … avoidant, impulsive, bizarre, paranoid, suspicious," "disheveled and unkempt."  At the time of this Wellness Round, he was in fact waiting for a placement in the acute care Psychiatric Services Unit.  The documentation of the Wellness Round states:

> Writer participated in wellness rounds with multidisciplinary team members including CNA, facility admin sworn staff, and reentry services correctional counselors.  IP reported he has been eating.  This writer tried to engage IP in conversation and IP continued to shake his head and finger.  Writer observed empty food trays and debris in his cell.  IP denied to clean his cell.  IP did not want new clothes when writer asked and walked away from cell door yelling.

186.   This brief note illustrates the extremely limited purpose and impact of Wellness Rounds.  The clinician observes that the patient's cell is filled with debris and that the patient is demonstrating symptoms of mental illness.  This Wellness Round was entirely unhelpful for a patient who had been identified as being very decompensated and requiring a higher level of care.  It is remarkable that the Wellness Round team does not acknowledge that this patient was waiting for an acute care bed, and that it took no apparent steps to expedite such a placement.

187.   In sum, it is my strong opinion that "Wellness Rounds" do not address the harsh, dangerous, and countertherapeutic conditions in Administrative Separation units that put large numbers of patients with serious mental illness at risk every day.

**EOH, Safety Cells, and PSU Observation Cells**

188.   I have discussed at length the exceedingly harmful conditions and clinically inappropriate use of Enhanced Observation Housing (EOH) cells, safety cells, and PSU Observation Cells in the San Diego County Jail system.  Stewart Report ¶¶ 288-316 (EOH and safety cells); *id.* ¶¶ 120-123 (PSU Observation Cells).

189.   Dr. Penn's report has very little to say regarding the exceedingly harsh

1 conditions in and practices around these extremely restrictive placements, other than

2 to conclude – without analysis – that "Watch cells and Enhanced Observation

3 Housing (EOH) are not punitive isolation units but are designed for short-term,

4 closely monitored care of IPs who are at imminent risk of self-harm or suicide.

5 Their use is strictly for maintaining safety and preventing severe harm, not for

6 punishment." Penn Report at 68. I strongly disagree with Dr. Penn's finding that

7 these exceedingly harsh and punitive-feeling placements are clinically appropriate,

8 much less effective at "preventing severe harm." Below are additional examples of

9 patients I reviewed who were placed at unacceptable risk and in fact harmed by

10 placement in these settings.

11 ████████████████████

12     190. This patient had a near-fatal suicide attempt while in custody at the Jail

13 in ████. His records show that, due to this history, custody staff frequently made

14 the unilateral decision (without appropriate clinical input) to place him in

15 observation cells with severe restrictions on his property, privileges, and daily

16 activities. Mr. ████████ himself expressed, "I don't deserve to be treated like this,

17 this is totally unfair" as he denied any suicidal ideations. At other times,

18 Mr. ██████ did require enhanced monitoring, as when he engaged in self-harm

19 triggered by poor distress tolerance and other signs of mental illness. He would be

20 placed in the safety cell or EOH cell to ensure his physical safety, but these

21 environments were so isolating and restrictive, and devoid of any meaningful

22 therapeutic treatment, that it is no surprise that Mr. ██████ perceived these

23 placements as punishment, which only led to further agitation and poor engagement

24 with the care team.

25     191. In my professional opinion, more therapeutic treatment settings and the

26 provision of meaningful treatment would have been far more effective in treating

27 this patient's mental illness, addressing his self-harming behaviors and psychiatric

28 symptoms, and mitigating unnecessary distress and harm to him in the process.

192.   This patient has a psychiatric history of serious mental illness, and experienced multiple traumatic and harmful medical and psychiatric incidents at the Jail that could have been prevented if he was provided timely access to mental health services and was placed in a more therapeutic setting.  Instead, he was subjected to what amounted to punitive and anti-therapeutic conditions of confinement that made things far worse, not better, for him.

193.   When he arrived at the Jail in ▮▮▮ 2023 with a significant psychiatric history, he was not seen by a psychiatric provider for approximately one month. Before he ever received a psychiatric evaluation, he tried to hang himself in his cell, requiring overnight hospitalization.  Subsequent evaluation found that his suicide attempt was driven by command-type auditory hallucinations that instructed him to hurt himself.  This suicide attempt could have been prevented if the patient was assessed sooner and received appropriate treatment for his psychosis.

194.   After ▮▮▮▮'s suicide attempt and return from the hospital, he was placed in EOH, the extremely restrictive setting that I criticized in my previous report.  Stewart Report ¶¶ 304-311.  In that setting, he reported trouble breathing and lethargy requiring closer medication monitoring.  He was moved to a medical observation cell, but was irritable due to feeling like his reported physical symptoms were misinterpreted by nursing team which led him verbalizing expletives towards staff.  In response, the medical team moved the patient back to EOH.  (It was later determined that the patient had COVID, which likely contributed to his shortness of breath and agitation.)  This move seemed punitive as there were no behaviors indicating an imminent risk to self or others.  Further suggesting that this placement to the extremely restrictive EOH unit was punitive rather clinically-based, the Detention Safety Program clinical team was not even informed or called to assess the patient to determine the safest housing option.  After he tested positive for COVID, he was placed in medical isolation, where he did not receive any visits

1  from the mental health team.  Within a few days, he was found in his cell with a
2  noose around his neck, and again requiring overnight hospitalization.  Upon his
3  return to the Jail, he reported to a psychiatric provider that the source of his distress
4  was primarily driven by feeling stigmatized for his mental health symptoms and the
5  punitive environment in EOH.

6       195.   I found it deeply troubling to then see that, when Mr. ███████ was next
7  booked at the Jail in ████████ 2023 for a parole violation, he disclosed his history
8  of hanging himself but (according to the records) did not indicate any current
9  suicidal ideations with plan or any other behaviors suggesting imminent safety
10  concerns.  Despite the fact that there was no clinical indication for it, he was placed
11  back in EOH, the enormously restrictive and punitive-feeling setting that had
12  contributed to the increased distress culminating in his last suicide attempt at the
13  Jail.

14       196.   These cases, and so many others I have reviewed, illustrate how the
15  San Diego County Jail's system denies clinically appropriate care, imposes
16  clinically contraindicated, punitive-feeling, unduly harsh conditions for people with
17  serious mental illness, and imposes avoidable harm and risks of harm to patients'
18  physical safety and psychological well-being.

19       **J.     Dr. Penn's Opinion that the San Diego County Jail System Has an
                Adequate Suicide Prevention System Is Inconsistent with the Facts,
20              and His Analysis Omits Critical Information.**

21       197.   Dr. Penn opines that the "SDSO Sheriff's Office [sic] has adequate
22  policies and procedures to identify, treat, track, and supervise IPs at risk for suicide
23  and provides clinically appropriate mental health and psychiatric services to SDSO
24  IPs who are potentially suicidal and/or engaging in self-harm."  Penn Report at 46-
25  50.  I strongly disagree with this opinion and have grave concerns about Dr. Penn's
26  analysis and methodology in reaching such an opinion.

27       198.   First, it must be reiterated that Dr. Penn did not review materials
28  pertaining to *any* in-custody suicide or mental health-related death.  His analysis is

1    limited to extremely general data that offers little insight into the adequacy of the

2    suicide prevention system at the San Diego County Jail.  Penn Report at 46 ("All

3    individuals who completed suicides were male."; "Nine of these suicides were

4    carried out by asphyxiation, while one was completed through water intoxication.";

5    "The distribution of these incidents across facilities shows that two occurred at the

6    George Bailey Detention Facility, two at the Vista Detention Facility, and six at the

7    Central Jail.").

8        199.   Dr. Penn makes the factually inaccurate statement that "there has been

9    no concentration of completed suicides at any particular SDSO Complex (or custody

10   level)."  Penn Report at 49.  This appears to be another example of a direct copy-

11   and-paste finding from Dr. Penn's Arizona prisons case expert testimony, where he

12   stated:  "There is no concentration of completed suicides at any particular ADCRR

13   Complex (or custody level)."  Joseph Penn Expert Report, *Jensen v. Shinn*, No.

14   2:12-cv-00601-ROS (D. Ariz.), Dkt. 4172 at 83 (¶ 233).  His finding is identical in

15   the two cases (with only the name of the detention system changed from "ADCRR"

16   to "SDSO").

17       200.   This finding may have been accurate in the Arizona prison system, but

18   it is *not* accurate in this case.  Dr. Penn's own report (at 46, 49-50) indicates that,

19   across San Diego County's 7 jail facilities, since 2019, **60% of completed suicides**

20   **have occurred at Central Jail.**  His data does not include still other horrific and

21   most certainly mental health-related deaths at Central Jail during that time period.

22   *See, e.g.*, Stewart Report ¶¶ 266-274 (Rupard death by pneumonia, malnutrition, and

23   dehydration in the wake of extreme and untreated psychiatric decompensation at

24   Central Jail, ruled a "homicide" due to "neglected schizophrenia"); *id.* ¶¶ 169-170

25   (Baker death by homicide at Central Jail, after he was excluded from clinically

26   appropriate mental health placement and was instead housed in a cell with a violent

27   cellmate without mental illness).  Dr. Penn's finding here is inconsistent with the

28   facts, and even his own data.

**Inadequate Suicide Risk Screening**

201.   I strongly disagree with Dr. Penn's finding that "the Sheriff's department adequately screens and identifies IPs at risk for suicide." Penn Report at 46. Here, it is notable that Dr. Penn does not consider the findings of deficiency that have been documented by other independent parties about San Diego County Jail's suicide prevention policies, procedures, and practices. Stewart Report ¶¶ 26-30 (describing my own findings of deficiency regarding suicide risk screening and findings made by nationally recognized jail suicide prevention expert Lindsay Hayes); DRC Report Appendix A at 6 ("Of the twelve (12) San Diego County Jail inmates who died by suicide from December 2014 through 2016, we identified a number of problems with the initial suicide risk screening and referral process. . . . One particularly troubling case stood out. The inmate had a diagnosis of bipolar disorder and was screened, but even though he demonstrated signs and symptoms of florid psychosis and mania, he was not referred for evaluation and admission to the Psychiatric Security Unit. He was placed in a Safety Cell, was later released to general population, and died on Day Six of his confinement while still floridly psychotic and manic, despite a request to custodial staff earlier in the day for safety cell placement. Jail staff did not complete a separate assessment of suicide risk despite this inmate's extreme mental state and need for evaluation and treatment.").

202.   Through my assessment, I considered these previous findings of deficiencies by other reviewers. I concluded that these deficiencies have not been remedied and remain prevalent in this Jail system.

203.   Dr. Penn does not consider these findings at all. Dr. Penn's designated reviewers *did* find deficiencies in suicide risk screening, a fact with which his report's findings and opinions do not engage. *See, e.g.*, Penn Report at 186 (Designated expert reviewer finding "I did not notice much difference among all the suicide risk assessments, suggesting a 'cut and paste' for much of the documentation.").

**Inadequate Monitoring of Patients at Risk of Suicide**

204.    I strongly disagree with Dr. Penn's opinion that "the Sheriff's Department adequately monitors IPs at risk of suicide." Penn Report at 47. The primary basis for this finding, according to Dr. Penn's discussion, appears to be that incarcerated people are "informed that they could alert custody staff of any developing suicidal ideation by pressing the intercom button in their cell" and are "encouraged to communicate any mental health concerns or urgent requests for mental health involvement by pressing the button, informing custody staff, or submitting a written sick call request." *Id.* These practices do not remotely constitute an adequate system of monitoring patients at high risk of suicide in a jail setting. Numerous case examples and systemic deficiencies inform my strong disagreement with Dr. Penn's conclusion.

205.    Here, Dr. Penn's choice not to review any of the suicides or mental health-related deaths that have occurred in the San Diego County Jail is notable. For example, take the horrific death of Ivan Ortiz, who died by suicide in a Central Jail PSU Observation Cell. In Mr. Ortiz's case, a deputy left a plastic bag in Ortiz's cell and staff failed to adequately monitor him despite his placement in what the Jail system considers to be its *most intensive* level of mental health observation. *See* Stewart Report ¶ 122.

206.    Deficiencies in the monitoring of high-risk suicidal patients persist to this day. The San Diego County Jail has refused to implement the repeatedly recommended practice of "constant observation" for high-risk suicidal patients. *See* Stewart Report ¶¶ 317-319 (describing how this practice was recommended by national suicide prevention expert Lindsay Hayes following his assessment of the Jail in 2018, Disability Rights California's similar recommendation to the Jail in 2018, and NCCHC's criticism of the Jail on this topic in 2017).

207.    Dr. Penn's opinion is also wrong insofar as it ignores the serious deficiencies in the Jail's system of "safety checks" for patients in settings known to

house patients at elevated risk of suicide. These deficiencies have been documented repeatedly by outside auditors, consultants, and investigating bodies, and have been shown to have played a role in multiple suicides that have occurred in the San Diego County Jail system. Stewart Report ¶¶ 320-335. This is a notable omission in Dr. Penn's assessment.

**Inadequate Mental Health Follow-up for Patients at High Risk of Suicide**

208.   I strongly disagree with Dr. Penn's opinion that "the Sheriff's Department provides adequate mental health follow-up care for IPs released from suicide precautions." Penn Report at 47.

209.   Here again, Dr. Penn's choice not to review any of the suicides or mental health-related deaths that have occurred in the San Diego County Jail skews his assessment. There are multiple suicide deaths that strongly indicate deficiencies with respect to mental health follow-up care. *See e.g.*, Stewart Report ¶¶ 82-85 (Ornelas 2023 suicide where Jail health care contractor NaphCare's death review asserts need for "Closer Psychiatric follow-up/care"); *id.* ¶¶ 258-265 (McDowell 2023 suicide in which patient reporting "mental breakdown" and having auditory hallucinations not seen by psychiatric provider for 3 ½ months, with no follow-up done in the six weeks leading up to his suicide Jail health care contractor NaphCare's death review asserts need for "Closer Psychiatric follow-up/care"); *id.* ¶ 297 (patient placed in Enhanced Observation Housing unit, cleared from suicide precautions with recommendation for mental health follow-up within 24 hours, but patient is not seen for two days, at which time he jumped off the top tier of his housing module, fell an estimated 20 feet, landed on the cement floor, and was found in a pool of his own blood, suffering pelvic, facial, and rib fractures, kidney, liver, and lung lacerations, and traumatic brain injury).

210.   Patient cases reviewed by Dr. Penn's own designated reviewers illustrate similar and further systemic deficiencies in the San Diego County Jail's system for identifying, monitoring, treating, and conducting necessary follow-up for

1  patients at high risk of suicide.  For example:

2  ████████████ **(Penn Report at 188-189)**

3        211.   Mr. █████'s case illustrates several aspects of the Jail's deficient suicide

4  prevention and mental health care system, including delays in psychiatric care,

5  failures to order timely suicide risk follow-up, failures to even timely complete the

6  untimely scheduled follow-up, and medication continuity failures.  Dr. Penn's

7  designated reviewer, Dr. Huselid, notes "significant lapses/concerns" with the care

8  that this patient received, concluding that the Jail failed to provide him "access to

9  care" for his mental health needs and suicide risk.

10       212.   When this patient arrived at the Jail, he reported suicidal ideations with

11  a plan.  The booking nurse scheduled a psychiatric appointment and was referred to

12  the Detention Safety Program.  The psychiatric appointment did not occur for five

13  weeks.  I agree with Dr. Huselid's finding here:  "[O]ver a month to see a prescriber

14  is too long for someone this high risk."  When he was discharged from the Detention

15  Safety Program, a follow-up appointment was ordered for one week later.  Again,

16  Dr. Huselid accurately concludes:  "I think that this [one-week follow-up] is too

17  long given his risk of suicide."  But the actual follow-up was much worse than even

18  the inappropriately ordered follow-up, with the patient going almost *four weeks* until

19  he was seen again.  Timely follow-up for a person discharging from suicide

20  precautions in a jail setting is essential.  This is an example of an unacceptable and

21  dangerous delay for such follow-up.

22       213.   Dr. Huselid further found that this patient's psychiatric medications

23  expired at least twice.  She noted that this was not an isolated incident:  "[G]iven

24  that I've seen many other examples of expiring medications in other charts, there

25  does seem to be a systems issue."

26  ████████████ **(Penn Report at 196-197)**

27       214.   The care of this patient, who I discuss elsewhere in this report

28  regarding other significant treatment failures, illustrates the alarming failures in the

suicide prevention system in the San Diego County Jail system. This patient was started on antidepressant medication that must be taken consistently, and it is standard practice to ensure adherence to medications before adjusting dosage. He initially adhered to taking the medication, but began refusing in ██████ 2023. His care was deeply complicated by being seen by five different nurse practitioners across six appointments, who appear to have different assessment styles and prescribing practices. This negatively impacts continuity of care and clinical engagement, particularly for this kind of patient.

215. The lack of monitoring culminated in an incident on in ██████ 2024, when the patient overdosed on pills and needed to be sent to the emergency room for medical evaluation. Shockingly, and as noted by Dr. Penn's designated reviewer, Dr. Huselid, there was minimal documentation and insufficient clinical intervention upon his return to the Jail. A prudent psychiatric prescriber would urgently follow up with this patient to address the overdose and ensure appropriate medication management moving forward. The only action taken was a psychiatrist chart review several days after the incident, and an order that medications be crushed. The patient was not seen by a psychiatric prescriber until a full month after his overdose. This is an unacceptable and dangerous failure to follow up with a patient with a high suicide risk, and a case example where the Jail did not meet the standard of care.

216. Dr. Penn does not address the serious deficiencies in treatment and suicide prevention in these patient cases, or in any other patient cases. He fails to review, and ignores altogether, critical incidents like in-custody suicide deaths and serious suicide attempts. This is a consequential and glaring omission, as the above examples demonstrate. Nothing in his report changes my opinion on this topic. The patient cases assessed by Dr. Penn's designated reviewers only elevate my concern about the systemic suicide prevention-related failures in this Jail system.

/ / /

**K.    Dr. Penn's Opinion that the Sheriff's Department Does Not Discriminate and Unfairly Punish People with Mental Illness Is Contradicted by the County's Own Staff and Its Own Experts.**

217.    I strongly disagree with Dr. Penn's opinion that the "Sheriff's Department does not discriminate and unfairly punish IPs with mental illness in housing placements." Penn Report at 52. His analysis does not reference any data, records review, or other specific materials on which such an opinion should be based.

218.    As mentioned earlier in this report, Dr. Penn's opinion on this topic is directly contradicted by the Jail's own mental health leadership, who confirm that there are no policies or procedures at the Jail for mental health care staff to provide input regarding disciplinary processes. *Compare* Penn Report at 58 ("When an individual shows acute mental health deterioration, potentially linked to a disciplinary infraction, SDSO custody staff collaborate closely with mental health care staff" *with* Quiroz PMK Dep. at 178 ("Q: Does mental health staff play any role in the administration of discipline for people with serious mental illness? A:No").

219.    The involvement of mental health staff in disciplinary procedures for people with mental health needs is an essential practice for any jail system to avoid the wrongful discrimination and unfair (and potentially dangerous) punishment of people with mental illness for behaviors that are manifestation of their mental health disability. San Diego County Jail fails to have such a policy, procedure, or practice.

220.    As I have noted, the County's own expert on disability discrimination issues looked closely at this issue, and made a finding directly in contradiction to Dr. Penn's statement on this point:

> ***The SDCSO does not have a process for a clinician to provide his/her professional recommendations*** (e.g., whether the incarcerated person fully understood the nature of his/her actions at the time of the disciplinary charge and alleged actions) ***to the hearing official so they can give consideration to the recommendations prior to ruling on the charge and issuing any sanctions.*** The SDCSO should develop policies and a process for clinicians to provide their professional recommendations regarding the incarcerated persons understanding of their actions and for the hearing official to consider the clinical input of

1    sanctions that should be avoided based on the clinician's assessment.

2    Defs.' Expert Report of Julian Martinez at 75 (emphasis added).

3    221.   Nothing in Dr. Penn's report changes my strong opinion that the San

4    Diego County Jail improperly and dangerously punishes people with serious mental

5    health treatment needs or an intellectual disability.  Stewart Report ¶¶ 418-424.

6    222.   An additional note is warranted here.  During my on-site tours of the

7    San Diego County Jail facilities, I observed very clearly that the Administrative

8    Separation isolation units are filled, to an overwhelming extent, with people who

9    showed signs of serious mental illness.  My review of records strongly indicates that

10    people with serious mental illness are placed into Administrative Separation

11    isolation units for reasons directly related to their mental illness and the symptoms

12    of their illness.  This practice directly contravenes the standard of care, along with

13    the guidance of the United States Department of Justice on this topic.  Stewart

14    Report ¶¶ 184-186 (discussing DOJ guidance that an "inmate with [serious mental

15    illness] should not be placed in restrictive housing" except in specific exceptional

16    circumstances).

17    **L.    Dr. Penn's Opinion that the "Sheriff's Department Provides IPs**
      **with Adequate Mental Health Discharge Planning and Resources"**
18    **Is Not Supported by the Facts and Is Contradicted by the County's**
      **Own Jail Mental Health Coordinator.**
19

20    223.   Dr. Penn's opinion that the Jail has implemented adequate discharge

21    planning services is not supported by the facts in this case.  Penn Report at 53-54.

22    My report describes in some detail the deficiencies with respect to this aspect of the

23    Jail's inadequate mental health care system.  Stewart Report ¶¶ 431-439.

24    224.   Most significantly, the Jail's mental health coordinator agrees that "we

25    do need more" mental health discharge planning staffing resources to meet the needs

26    of the Jail mental health population.  She testified that the County has not done a

27    "needs assessment to determine what staffing resources are necessary" to meet

28    discharge planning needs of the seriously mentally ill population, and that while

1  "it's challenging without the data to know," she could say that "more [discharge

2  planning staff] is certainly better." Quiroz PMK Dep. at 171-172.

3      225.  My review of patient records revealed that discharge planning services

4  are extremely limited to the point that the basic clinical needs of the Jail's seriously

5  mentally ill population are not being met. There is insufficient discharge planning

6  to ensure that patients have continuity of psychiatric medications and mental health

7  services, with appropriate and effective linkages to community service providers –

8  which are essential to adequate discharge planning in a jail system.

9      226.  The example of patient ████████████ is an illustrative one. His

10  discharge planning records indicate that he "was provided [Medication Assisted

11  Treatment] program information," and was "aware of pending status with RCC

12  [Rehabilitation Care Coordination] and current Medi-Cal." There is *no* indication of

13  proactive efforts to ensure actual and timely linkages to community service

14  providers or access to care upon release. Stewart Report ¶¶ 437-438. This is

15  inadequate and constitutes a failure in the provision of care.

16      227.  I can discern no meaningful involvement of the County's Behavioral

17  Health Services or Public Health Services agencies in discharge planning of

18  incarcerated patients at San Diego County Jail. This is in stark contrast to

19  comparable and nearby County systems—like that of Orange County, Los Angeles

20  County, and Santa Barbara County—in which the county mental health and public

21  health agencies play a significantly more active role in discharge planning for

22  patients in jail detention. Effective coordination between a jail system and the

23  county mental health and public health agencies on the subject of discharge planning

24  for people with serious mental illness is a critically important practice, to ensure that

25  people have timely and meaningful access to the services they need when they are

26  released from detention. This is an area on which San Diego County must improve

27  through multi-agency collaboration and coordination.

28  / / /

1 | **IV.    CONCLUSION**

2 |    228.   The information and opinions contained in this report are based on

3 | evidence, documentation, and/or observations available to me.  I reserve the right to

4 | modify or expand these opinions should additional information become available to

5 | me.  The information contained in this report is a fair and accurate representation of

6 | the subject of my anticipated testimony in this case.

7 |

8 | Dated: October **31,** 2024

Pablo Stewart, M.D.