GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, <br><br> Defendants. | Case No. 3:20-cv-00406-AJB-DDL <br><br> **DECLARATION OF DEBRA GRAHAM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:   March 6, 2025 <br> Time:   2:00 p.m. <br> Crtrm:  4A <br> Judge:  Hon. Anthony J. Battaglia |

[4621635.7]

## DECLARATION OF DEBRA GRAHAM

I, Debra Graham, declare:

1.    I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify.  I make this declaration based in support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment or, in the Alternative, for an Order Treating Specified Facts as Established.

2.    I have been retained by the Plaintiffs' counsel in this class action as an environmental health and safety expert to review and inspect environmental health and safety conditions at the San Diego County Sheriff's Office (Sheriff's Office) jail facilities in San Diego, California.  My review and inspections focused on the core principles of public health and safety for staff, visitors, and especially the incarcerated people who live in the Sheriff's Office jail facilities.

3.    Attached hereto as Exhibit 1 is a true and correct copy of my August 7, 2024 expert report, which accurately represents my opinions in this case.  Exhibit 1 does not include the index of documents I reviewed.

4.    Attached hereto as Exhibit 2 is a true and correct copy of my October 1, 2024 rebuttal expert report, which accurately reflects my opinions with respect to the reports of Henrietta Peters and Owen J. Murray in this case.  Exhibit 2 does not include the index of documents I reviewed for my rebuttal report.

5.    I have reviewed the Defendants' Motion for Partial Summary Judgment ("Motion"), specifically Sections II(C) (4th Claim for Inadequate Sanitation, pages 8 – 11) and III(D) (Fourth Claim Cause of Action for Failure to Ensure Adequate Environmental Conditions, pages 24 – 26), the Declarations in support of Defendants' Motion from Sergio Sanchez (Assistant Manager of Sheriff's Food Service, San Diego County Sheriff's Office) (App. 6 to the Motion), Lieutenant Mike Binsfield (Detention Support Division, San Diego County Sheriff's Office) (App. 10), Henrietta Peters (Environmental Expert for the Defendants) (App. 13),

1  and Susan E. Coleman (Attorney for Defendants) (App. 14).

2      6.    Some Sheriff's Office policies were attached to Lt. Mike Binsfield's

3  declaration (App. 10, Ex. A-Q). I reviewed the policies in Exhibits K-Q of the

4  declaration. I reviewed and addressed some of these same policies in my expert

5  reports. In the course of preparing my expert reports, I reviewed more than 80

6  policy documents, including all of those reviewed by Henrietta Peters, covering

7  vermin control, lice, laundry/clothing, infection control, medical waste, sanitation

8  and hygiene inspections, mattresses, housekeeping, trash removal, hazardous waste,

9  and other environmental issues. Some of the policies included in Exhibits K-Q of

10  Lt. Binsfield's declaration, however, appear to have an "Effective Date" that post-

11  dates the issuance of my reports. However, as far as I can discern, none of the

12  policies are materially different from the policies I reviewed and analyzed, some

13  were the same policies with no updated effective date, some had minor changes and

14  a new updated effective date, and some simply had a new effective date with no

15  changes. None of the policies attached to Lt. Binsfield's declaration change any of

16  my opinions in my expert reports about the deficiencies in Defendants' policies.

17      7.    In their Motion, Defendants assert that "Ms. Graham claimed a few

18  toilets she photographed showing unflushed sewage were evidence of substandard

19  conditions and yet she never bothered to try to flush the toilets to see if they worked

20  and had no idea how long the sewage had been in the toilet." MPSJ, pp.25:10-13.

21  That statement is inaccurate. There are 59 toilets referenced in my expert report of

22  August 7, 2024, of which 47 were unclean.

23      I declare under penalty of perjury under the laws of the United States of

24  America that the foregoing is true and correct to the best of my knowledge, and that

25  this declaration is executed at Prattville, Alabama this 21st day of January, 2025.

26

27                                            *D. Graham*
                                          Debra Graham

28

# EXHIBIT 1

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00406-AJB-DDL  **EXPERT REPORT OF DEBRA GRAHAM**  Judge:        Hon. Anthony J. Battaglia Magistrate: Hon. David D. Leshner |
| Plaintiffs, | |
| v. | |
| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, | |
| Defendants. | |

[4452002.19]

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     EDUCATION AND QUALIFICATIONS ............................................... 1

III.    PRIOR EXPERT REPORTS ................................................................... 2

IV.     COMPENSATION .................................................................................. 2

V.      METHODOLOGY ................................................................................... 2

VI.     STANDARDS .......................................................................................... 3

VII.    INSPECTION PARTICIPANTS ............................................................. 5

VIII.   INSPECTION EQUIPMENT .................................................................. 6

IX.     OPINIONS ............................................................................................... 6

    A.   The San Diego Jail Facilities I Inspected Fail to Meet Standards
       for Cleanliness and Sanitation .................................................... 8

        1.   Housekeeping.................................................................. 8

        2.   Medical & Dental Facilities.......................................... 41

        3.   Medical Reports and Documentation Reviewed ...................... 45

        4.   Food Service (Kitchens) ............................................... 54

        5.   Cleanliness and Sanitation Conclusion ..................................... 70

    B.   Unsafe Physical Plant Conditions ........................................... 76

        1.   Plumbing....................................................................... 76

        2.   Electrical ....................................................................... 78

        3.   Lighting......................................................................... 80

        4.   Air Ventilation, Quality, and Temperatures ................................ 81

        5.   Unsafe Physical Plant Conclusion ............................................. 85

    C.   Other Observations .................................................................. 86

        1.   Chemical Control........................................................... 86

        2.   Policies, Procedures and Training ............................................. 90

        3.   Other Observations, Conclusion ................................................. 92

1    X.      RECOMMENDATIONS ................................................................. 94

2            A.      Cleanliness and Sanitation ................................................. 94

3            B.      Unsafe Physical Plant Conditions ...................................... 97

4            C.      Other Observations ............................................................ 98

5    CONCLUSION ........................................................................................ 99

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

I, Debra Graham, declare:

1.    I have been retained by the Plaintiffs' counsel in this class action as an environmental health and safety expert to review and inspect environmental health and safety conditions at the San Diego County Sheriff's Department (Sheriff's Department) jail facilities in San Diego, California.  My review and inspections focus on the core principles of public health and safety for staff, visitors, and especially the incarcerated people who live in the Sheriff's Department jail facilities.

2.    My background and experiences relevant to my expert testimony in this proceeding are set forth below.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify.

# II.    EDUCATION AND QUALIFICATIONS

3.    I am a registered dietitian, licensed dietitian/nutritionist, registered environmental health specialist/registered sanitarian, certified jail manager, and a certified professional food manager.

4.    I have over thirty years' experience in governmental service.  I managed food service operations in the Miami-Dade Corrections & Rehabilitation Department in Miami-Dade County, Florida for twenty-eight years, and directed departmental compliance for two-and-a-half years before my retirement in September 2019.  I have also investigated and evaluated environmental health conditions as a consultant for the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security.

5.    I am a member of the Academy of Nutrition and Dietetics, National Environmental Health Association, American Diabetes Association, American Jail Association, American Correctional Association, Florida Academy of Nutrition and Dietetics, and the Alabama Academy of Nutrition and Dietetics.

6.    I received a bachelor's degree in Business from Barry University in Miami, Florida.  I received a master's degree in Dietetics from Eastern Michigan

University in Ypsilanti, Michigan.  I also received my Hazard Analysis Critical Control Point Certification at the International HACCP Alliance.  I became a *ServSafe* Certified Professional Food Manager from the National Restaurant Association Educational Foundation.  I am also a *ServSafe* Certified Food Safety instructor and a Registered *ServSafe* Examination Proctor for the National Restaurant Association's Educational Foundation.

7.      Further information regarding my qualifications is detailed in my *curriculum vitae*, a true and correct copy of which is attached hereto as **Exhibit A**.

## III.    PRIOR EXPERT REPORTS

8.      I have been retained as an expert, and provided expert reports, in four cases in the past four years.  Those expert reports are available at the following citations:

- *Michael Amos, et al., v. Pelicia E. Hall, et al.*, 2020 WL 6131630, No. 20-CV-00007 (N.D. Miss. June 9, 2020) (expert report on environmental health and safety conditions at the Mississippi State Penitentiary – Parchman)

- *Vladimir Stojcevski v. County of Macomb, et al.*, 2021 WL 5337008, No. 15-11019 (E.D. Mich. May 16, 2021) (expert report on conditions at the Macomb County, Michigan jail that contributed to the death of an incarcerated person)

- *Byrd v. Hobert et al.*, 2021 WL 8343429, No. 16-CV-01241 (C.D. Ill. July 1, 2021) (expert report on environmental health and safety conditions at the Pontiac Correctional Center)

- The United States Department of Justice investigation into the Fulton County Jail pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997 et seq, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 et seq. (DOJ , Civil Rights Division, July 2023) (DOJ Expert Consultant report on environmental health and safety and nutrition at the Fulton County Jails in Fulton County, Georgia)

## IV.    COMPENSATION

9.      My rate of compensation for this matter is $300 per hour, and one half my hourly rate for travel time.  I am also reimbursed for related travel expenses.

## V.    METHODOLOGY

10.      The basis of this report includes document reviews, tours of the

1  Sheriff's Department jail facilities, visual observations, including photographs, and

2  environmental measurements.  The findings contained in this report are solely those

3  of the author.  The report cites specific examples and photographs of conditions

4  observed onsite during this particular review; however, they should not be

5  considered as all-inclusive of all conditions.  Photographs may depict a single issue

6  or multiple issues in one photograph.  Therefore, certain photographs may be

7  referenced more than one time in this report.  Consideration was given to

8  Performance Based Standards and Expected Practices for Adult Local Detention

9  Facilities, 5th Edition, published by the American Correctional Association (ACA);

10  State of California, Board of State and Community Corrections – Title 15 Minimum

11  Standards For Local Detention Facilities (Crime Prevention and Corrections) and

12  Title 24 Minimum Standards for Local Detention Facilities (Part One and Part

13  Two); the U.S. Food and Drug Administration (FDA) Food Code 2022 and the

14  California Department of Public Health, California Retail Food Code; Centers for

15  Disease Control and Prevention (CDC) Guidelines; Occupational Safety and Health

16  Administration (OSHA) Standards; and California Division of Occupational Safety

17  and Health (Cal/OSHA) Hazardous Communication (Hazcom) Regulation, Title 8,

18  Section 5194.  Many of these standards are designed to protect the health and safety

19  of incarcerated persons, and some of these standards are designed to protect the

20  health and safety of the general public, including incarcerated persons.

21  **VI.    STANDARDS**

22        11.    *American Correctional Association Performance-Based Standards for*

23  *Adult Local Detention Facilities*, 5th Edition.[1]  The ACA standards are nationally

24  recognized performance-based standards to guide operations in every area of the

25  facility or agency.  ACA standards have served to establish a fundamental

26  operational structure for facilities and agencies that have implemented them.  Secure

27  _____

28  [1] https://www.aca.org/ACA_Member/ACA/ACA_Member/Standards_and_Accreditation/StandardsInfo_Home.aspx?hkey=7c1b31e5-95cf-4bde-b400-8b5bb32a2bad

1  facilities such as jails and prisons must operate effectively as self-contained

2  communities in which all necessary goods and services are provided in a safe,

3  secure, and controlled manner.

4       12.    State of California, Board of State and Community Corrections (BSCC)

5  – Title 15 Minimum Standards For Local Detention Facilities (Crime Prevention

6  and Corrections)[2] and Title 24 Minimum Standards for Local Detention Facilities

7  (Part One and Part Two).[3] Title 15 Minimum Standards For Local Detention

8  Facilities is part of the California Code of Regulations. It outlines the minimum

9  standards governing the operation of correctional facilities in California and the

10  regulations for the safety of the local jail facility, staff, incarcerated people, and the

11  public. Title 24 Minimum Standards for Local Detention Facilities is also part of

12  the California Code of Regulations, which contains guidelines and standards

13  designed to promote the efficiency of operations, sustainability, energy

14  conservation, and safety of the local jail facility, staff, incarcerated people, and the

15  public.

16       13.    The Food and Drug Administration's (FDA) Food Code 2022 and the

17  California Department of Public Health, California Retail Food Code. The FDA

18  Food Code has been recognized since the 1930s and originated from the Federal

19  Food, Drug, and Cosmetic Act of 1938. The Food Code represents best practices

20  regarding safe food storage, handling, and preparation, and is the basis for state

21  and/or local food regulatory policy. California Title 15, Article 12, §1245 requires

22  compliance with the standards outlined in the Health and Safety Code, Division 104,

23  Part 7, Chapters 1-13 of the California Retail Food Code.[4] The California Retail

24

25  _____

26  [2] https://www.bscc.ca.gov/wp-content/uploads/2024/06/Title-15-Adults-2024-Effective-7.1.2024.pdf

27  [3] https://www.bscc.ca.gov/wp-content/uploads/2024/07/Adult-Title-24-SOUL-Effective-07.01.2024-1.pdf

28  [4] https://www.cdph.ca.gov/Programs/CEH/DFDCS/Pages/FDBHSCodes.aspx

1  Food Code contains the structural, equipment, and operational requirements for all

2  California retail food facilities.  The purpose of the California Retail Food Code is

3  "to safeguard public health and provide to consumers food that is safe,

4  unadulterated, and honestly presented through adoption of science-based standards."

5  *Id.* at § 113703.

6        14.    The Centers for Disease Control and Prevention (CDC).  The CDC is

7  the United States health protection agency, aimed at protecting people from health

8  threats.  *See* CDC, "About CDC," https://www.cdc.gov/about/cdc/index.html.  The

9  CDC provides information and guidelines and acceptable levels for promoting

10  healthy and safe behaviors, communities, and the environment.

11        15.    The Office of Safety and Health Administration (OSHA) and California

12  Division of Occupational Safety and Health (Cal/OSHA) Hazardous

13  Communication (Hazcom) Regulation, Title 8, Section 5194.[5]  OSHA provides

14  standards for healthful and safe working environments for men and women in the

15  workforce. *See* Occupational Safety and Health Administration, "About OSHA,"

16  https://www.osha.gov/aboutosha.  Incarcerated persons work throughout the

17  Sheriff's Department jail facilities, for example, in the kitchens, laundry,

18  maintenance, and cleaning/sanitation.  The Cal-OSHA Hazcom Regulation is

19  aligned with federal OSHA's 29 CFR 1910.1200 regulation designed to address

20  providing and maintaining a safe and healthful workplace.

21  **VII.   INSPECTION PARTICIPANTS**

22        16.    During all on-site inspections, I was accompanied by counsel for the

23  Plaintiffs, counsel for the Defendants, and various Sheriff's Department

24  representatives and jail staff.  In January 2024, I was also accompanied by a subject

25  matter expert on the Americans with Disabilities Act and a subject matter expert on

26  jail conditions of confinement—both of whom were also retained by Plaintiffs'

27

28  [5] https://www.dir.ca.gov/title8/5194.html

counsel.  In May 2024, I was the only subject matter expert present during the

inspections.  During each facility inspection, due to time constraints, I observed a

limited number of areas.  Therefore, some specific units, cells, or areas in each

facility may not be covered in this report, and I am unable to opine on the

condition(s) of those unobserved areas.  Our jail inspections were planned long in

advance with ample time for Defendants to conduct cleanup operations prior to each

inspection.  I nonetheless observed serious, unsafe, and unsanitary conditions at all

six facilities I inspected.

## VIII.  INSPECTION EQUIPMENT

- LED flashlight
- UV flashlight
- Probe thermometer
- Temperature/humidity meter
- Digital Lux Meter (for inspections of Central and South Bay only)
- Digital Camera

## IX.   OPINIONS

17.   My opinions and the bases for them are as follows.

18.   *Executive Summary:*  The Sheriff's Department fails to meet minimum

environmental health and safety standards in their jail facilities.  Cleanliness and

sanitation standards designed to ensure that basic human needs are met for

incarcerated persons are not met in key areas of the facilities, such as the housing

units, intake and holding areas, medical facilities, and food service areas.  The

failure to meet minimum standards results in the exposure of incarcerated persons to

a substantial risk of harm to their health and safety.  The physical plant conditions

are unsafe, including the plumbing, electrical, lighting, and ventilation systems.

Chemicals in the jails are not sufficiently controlled to protect incarcerated persons

from exposure to harmful substances.  In addition, the Sheriff's Department policies

and procedures for the jails are inadequate to ensure that the basic human needs of

1   incarcerated persons are met, including a safe and healthy environment, and

2   protection from exposure to harm.  Sheriff's Department jail officials are aware of

3   these conditions that fail to meet minimum standards observed during my

4   inspections and, in my observation, have failed to take adequate steps to address

5   them.

6       19.    I was provided with a number of documents related to this case.

7   Attached hereto as **Exhibit B** is a list of the documents I reviewed to prepare my

8   opinions in this case.  I paid special attention to the allegations of Plaintiffs' Third

9   Amended Complaint which alleges that Defendants fail to ensure adequate

10  environmental conditions, placing incarcerated people at undue risk of harm to their

11  health and safety.  *See* Third Amended Complaint ("Complaint"), Dkt. 231 at ¶¶

12  295-307.  The Complaint's allegations of filthy, overcrowded, and unsanitary

13  conditions, including piles of trash, rotting food, human waste, vermin, black mold,

14  dirty air vents, and electrical and plumbing hazards are consistent with the

15  conditions I observed during my inspections.

16      20.    I also conducted on-site inspections of the Jail facilities.  On

17  January 16, 2024, I inspected the George Bailey Detention Facility (George Bailey)

18  for approximately seven and one-half hours.  On January 17, 2024, I inspected the

19  Vista Detention Facility (Vista) for approximately seven and one-half hours.  On

20  January 18, 2024, I inspected the Las Colinas Detention and Reentry Facility (Las

21  Colinas) for approximately eight hours.  On January 19, 2024, I inspected the East

22  Mesa Reentry Facility (East Mesa) for approximately six hours.  On May 15, 2024, I

23  inspected San Diego Central Jail (Central Jail) for approximately four hours and the

24  South Bay Detention Facility (South Bay) for approximately four hours.  During and

25  after these inspections, I spoke with incarcerated people about their experiences in

26  the jail facilities.

27      21.    During the inspections, Plaintiffs' attorneys and I were allowed to take

28  photographs.  These photographs were provided to me after the inspections with

1  bates-stamps on each one.  I have placed some of the photographs in the body of this

2  report.  All of the photographs referenced in this report are attached at **Exhibit C**.

3  Some photographs have dates printed on them which are incorrect because the date

4  setting on the camera was not programmed to the date of the inspection.  Any dates

5  printed on photographs should be disregarded.

6      22.    The information contained in this report summarizes the scientifically

7  based health principle(s) and the rationale(s) for the basis and foundation of each of

8  my findings, as well as information concerning the health and/or safety risk posed

9  by each deficiency.  The information and opinions contained in this report are based

10  on evidence, documentation, and/or observations available to me.  I reserve the right

11  to modify or expand these opinions should additional information become available

12  to me.

13    **A.    The San Diego Jail Facilities I Inspected Fail to Meet Standards for
       Cleanliness and Sanitation**

14

15        **1.    Housekeeping**

16      23.    *Housekeeping Health and Safety Principle*:  The institution's sanitation

17  and hygiene program is meant to protect the health and safety of staff and

18  incarcerated persons.

19      24.    *Housekeeping Health and Safety Rationale*:  Correctional facilities

20  must be kept clean and in good repair as a necessary part of providing incarcerated

21  persons with humane living conditions.  Living conditions are humane when they do

22  not deprive incarcerated people of basic needs including food, water, shelter,

23  sanitation, health, and safety.  To that end, specific sanitation practices must be

24  completed when required, such as in food service, as well as regularly scheduled

25  general cleaning and disinfecting tasks in the carceral setting to keep the facility

26  clean.  Failure to adhere to appropriate housekeeping practices contributes to the

27  growth of disease-causing microorganisms and the spread of disease.  In addition,

28  inadequate housekeeping practices promote the deterioration of a facility's physical

1   plant.[6]  A well-maintained and sanitary living environment for incarcerated persons

2   allows for good personal hygiene practices and stimulates better physical and

3   emotional health.

4        25.    *Housekeeping Inspection Findings*:  In general, cleanliness and

5   sanitation in multiple housing units, temporary holding cells, personal hygiene

6   areas, intake areas, medical and dental facilities, and kitchens were observed to be

7   inadequate at the Sheriff's Department jail facilities.  Conditions at Las Colinas were

8   observed as generally cleaner, as well as some areas of other facilities; however, in

9   numerous areas as outlined in this report, conditions found were dirty, unsanitary,

10  inadequately maintained, and in some cases contained dirt and grime beyond the point

11  of filth, thus involuntarily subjecting incarcerated persons to inhumane conditions that

12  posed a severe risk of harm to their health, safety, and well-being.

13        26.    Sinks, toilets, urinals, and showers were observed to be unclean

14  indicating that proper cleaning practices are not being performed.  *See* Exhibit C at

15  SD_742870, SD_742973, SD_743174 and SD_1579295.  Showers lack proper

16  cleaning as evidenced by visible soap scum, dirt, mold, and in some cases insect

17  infestations in the drains.  Shower walls and ceilings were dirty and contained mold,

18  peeling paint, and water stains.  Shower curtains were improperly hung mostly by a

19  string (*id.* SD_742833), a potential security/safety risk, and other showers had doors

20  hung that contain soap scum and/or mold.  Many toilets were also found unclean,

21  with varying degrees of dirt, mold, and/or filth.  *Id.* SD_742695 and SD_1579296.

22  At Vista, clothing items were observed in the toilet in the male holding cell named

23  "Male Phone."  *Id.* SD_743258.  Some toilets and showers were so filthy that even

24  someone untrained in cleanliness and sanitation practices will know that the

25  conditions are unacceptable and cleaning is needed:

26

27  ───────────────

[6] The term "physical plant" is used in the correctional field to refer to the jail
28  building itself and all of the systems inside supporting the functions of the building.




SD_743258 – Vista                SD_742683 – George Bailey



SD_742823 – George Bailey

27.    Floors were observed in disrepair in bathrooms (*id.* SD_742958) and housing units (*id.* SD_743606, SD_743748 and SD_1579424), which presents ample space for the breeding/growth of bacteria, and in many areas, floors were visibly dirty as well.  Wall paint in housing units (*id.* SD_743622), around telephones (*id.* SD_743280, SD_743763 and SD_1579036), and in showers (*id.*

SD_745256) was chipped and peeling, also providing ample space for bacterial growth, spread of disease, and fungal infections. Ceilings, ceiling tiles, and air vents in many housing units, especially at George Bailey were filthy, with an excessive amount of dirt and dust on them. Cell air vents were rusted and contained dust, many with debris covering the vent(s).

28.    Drains in showers, padded cells, and individual sinks were found in need of cleaning. *See id.* at SD_742831, SD_743148 and SD_743307. Drain flies were observed at George Bailey in medical observation number 102, at Central Jail, and at South Bay. Debris and dirt were also found in drains inside some padded cells. The Sheriff's Department's apparent unwillingness to keep these areas clean is illustrated by the experience of Plaintiff Darryl Dunsmore, who was "forced to sleep among his own feces and other trash" in an Enhanced Observation Housing ("EOH") cell while incarcerated. Plaintiff Darryl Dunsmore's Response to Defendants' Special Interrogatory No. 10.

29.    Mattresses were observed in several housing units and were found mostly intact, although some were found torn. *Id.* SD_742856. At George Bailey in housing unit 1B, a torn mattress was observed at bunk numbers 41 and 42. Torn or breached mattresses cannot be cleaned and disinfected properly, allowing for the transfer of bacteria, viruses, and/or fungus, and may also allow for hiding places for contraband.

30.    At both Central Jail and South Bay, cells designed for double occupancy were observed with triple bunks, and three incarcerated persons occupied many of these cells. The square footage of the floor space in these locations at either of these facilities does not support housing three incarcerated persons. It is, therefore, a direct violation of BSCC Title 24, § 1231.2.7 Double Occupancy Cells. At Central Jail, Unit 4B had triple bunked cells occupied by three incarcerated persons. *Id.* SD_1579659 Module 4B (cell B18). At South Bay, double occupancy housing units had triple bunks with anywhere from one to three occupants per cell.

1  *Id.* SD_1579030.  I observed triple bunks with three occupants in double occupancy

2  cells at South Bay in housing units 3B and 2A and at George Bailey in House 6C.

3      31.    Housing three incarcerated persons in a cell designed for a maximum of

4  two occupants heightens the risks to the incarcerated persons' health and safety and

5  increases the risk of spreading infections, fungus, bacteria, and disease.  These

6  double occupancy cells contain one triple bunk, one desk, one stool, and one

7  sink/toilet combination unit.  The space in which these incarcerated persons are

8  living is extremely confined, and the unencumbered space is too small for the

9  number of occupants.  There is barely room for the incarcerated persons to move

10  about within the cell.  Those assigned to triple-bunked cells are required to share the

11  one toilet and one sink available inside the cell, with no other toilet or sink available

12  to them.  Incarcerated persons report they struggle with keeping their cell clean,

13  especially with such limited space shared amongst three people.  They report they

14  are not provided with sufficient cleaning supplies, and some incarcerated persons

15  reported there are no cleaning supplies provided at all.

16      32.    Documentation from the Board of State and Community Corrections

17  (BSCC) 2023 – 2024 Comprehensive Inspection completed on June 7, 2023, and

18  September 6-13, 2023, notes Central Jail, South Bay, and George Bailey were all

19  observed with triple bunking in double occupancy cells.  In addition, the inspection

20  report documents single occupancy cells used as double occupancy cells at Vista,

21  and additional bunks over the rated capacity inside dormitories at East Mesa and

22  Vista.  Documentation from the BSCC 2020 – 2022 Biennial Inspection completed

23  between November 3-11, 2021, notes triple bunking in a double occupancy cell was

24  also found at Central Jail, George Bailey, South Bay, and Vista.  These deficiencies

25  during BSCC inspections and the same triple bunking in double occupancy cells

26  observed during my inspections indicate to me that this is a regular practice by the

27  Sheriff's Department.

28

1    *George Bailey Detention Facility (George Bailey)*

2    33.    In George Bailey, in incarcerated persons' areas, sinks and toilets were

3    observed as stainless-steel sink/toilet combination units or stainless-steel toilets, and

4    separate stainless-steel sinks, and urinals are available as separate units.  Many of these

5    units throughout George Bailey were observed dirty as evidenced by stains, soap scum,

6    and dust/dirt in and on sinks (*id.* SD_742665 – Holding number107), and stains, scum,

7    excrement, and filth in and on toilets.  *Id.* SD_742695 – Holding number 102,

8    SD_742663 – Holding number 107, SD_742682, SD_742860 and SD_742871.  A

9    filthy urinal was observed in the bathroom of Module 1B covered with a dirty towel.

10   Drain flies were also observed in this urinal once the towel was lifted:



SD_742974 – George Bailey          SD_742957 – George Bailey

19   34.    Showers were observed to be dirty, many in need of scrubbing and

20   repairs, as evidenced by accumulated soap scum, dirt, mold, and peeling paint.  *Id.*

21   SD_743054, SD_743088, SD_743114, SD_743146, SD_742779, SD_742823 and

22   SD_742963.  In some areas, shower curtains were improperly hung, some in a

23   makeshift manner such as by a string and were dirty, contained soap scum, and were

24   moldy.  *Id.* SD_742832, SD_742834, SD_742929 and SD_742962.  Shower drains

25   were dirty and clogged, indicating a lack of routine cleaning, scrubbing, and

26   flushing.  *Id.* SD_743148, SD_742829, SD_743089 and SD_743110.  Drain flies

27   were observed crawling in and about the shower drain and on the floor in Medical

28   Observation number 102.




SD_742831 – George Bailey          SD_742830 – George Bailey

35.     Multiple pest inspection reports completed by jail staff note the presence of drain flies, including a September 23, 2022 report from Central Jail (*see* SD_1470985) and April 3, 2023, June 27, 2023, and December 6, 2023 reports from Las Colinas.  *See* SD_1471129, SD_1471157 and SD_1471329.

36.     Drain flies are small flies, often also referred to as sink flies, sewer flies, or moth flies.  Drain flies thrive in moist areas, feed on organic and decaying materials, and lay their eggs in moist organic materials such as the slime buildup in drains.  Drain flies do not fly well, but rather jump from surface to surface or fly very short distances.  They are found most often close to their feeding and breeding location.  Drain flies may cause health issues because they can carry pathogens from contaminated areas such as drains to areas that need to be kept clean.  It is important to properly clean drains, which includes the removal of slime and buildup on drain surfaces and inside drains on a routine basis as part of a well-implemented cleaning and disinfecting plan.

37.     At George Bailey, towels and/or blankets were observed outside of showers, sometimes under or on top of mats.  *Id.* SD_743051 and SD_743085.  This is an unsanitary practice, as the wet towels and blankets can harbor and promote bacteria and fungus growth.  Several shower areas were observed with shower walls containing pictures classified as contraband in Sheriff's Department Policy No. P.3,

Incarcerated Person Mail,[7] and a violation of Policy O.3, Rules and Regulations of Incarcerated Persons.[8]  *Id.* SD_742762 and SD_742775.  From an environmental standpoint, the pictures can be a mechanism for the growth of bacteria and/or fungus due to the moisture present in the shower environment keeping the picture paper damp or wet.

38.    Walls in multiple areas were observed to be dirty and with peeling paint (*id.* SD_742743, SD_742759, SD_742872, SD_742943, SD_743059 and SD_742911).  Walls that contain peeling paint cannot be cleaned properly.  In some areas, such as around mop sinks, walls contain mold (*id.* SD_742944 and SD_743045) a clear indication that the area needs cleaning.  In George Bailey housing unit 1A, the wall behind the dayroom mop sink was dirty, the mop sink and utility sink needed scrubbing, multiple filthy towels were observed hanging over the side of the utility sink, and what appeared to be clean towels were sitting in a stack on the floor against the dirty wall between the mop sink and utility sink.  *Id.* SD_742904.

39.    Floors were observed in disrepair in some areas, some with the floor surface peeling, and some with cracks and holes.  *Id.* SD_742706, SD_742960,

---

[7] San Diego County Sheriff's Department Detention Service Bureau – Manual of Policies and Procedures, Policy #P.3, Incarcerated Person Mail, Section II. Periodicals and Books, A.6.  "Incarcerated persons are prohibited from possessing or receiving materials that show nudity of either gender or portray sexual activity. Any personal photographs, drawings, periodicals and/or pictorials displaying nudity or sexual activity delivered to any detention facility or jail, in possession of an incarcerated person or found during routine cell searches will be treated as contraband.  Contraband as described in this section will be handled by either disposing of or mailing the item(s) at the expense of the incarcerated person."

[8] San Diego County Sheriff's Department Detention Service Bureau – Manual of Policies and Procedures, Policy #O.3, Rules and Regulations of Incarcerated Persons, Paragraph VI. Rules and Regulation Numbers and Definitions (English) Section, Section 700 – Facility Security/Safety, #703, "Incarcerated person(s) shall not use any item or device to alter the view through any bar, window, door flap, camera device, etc., Section 706, Incarcerated person(s) shall not cover vents, intercoms, lights, windows, etc., and Section 710, Incarcerated person(s) shall not tape or affix any item to walls, vents, intercoms or other structures within the facility."

SD_742959 and SD_743175.  Floors that are not smooth with the floor surface intact allow for the harboring and breeding of bacteria and fungus, as they cannot be cleaned properly.

40.    Ceilings at George Bailey were observed particularly dirty throughout the facility, including inside and outside of housing units.  *Id.* SD_742898, SD_742900 and SD_743124.  Individual air vents were observed rusted and blocked with paper or towels (*id.* SD_742935, SD_742936, SD_742952 and SD_742966) and some had spoons lodged in the vent.  *Id.* SD_742942.  Air vents and returns were dirty and blocked (*id.* SD_743048), indicating that air handler filters are not changed routinely and when needed.  Ceilings showed evidence of dirty air vents with dirt and dust above, below, and beside air vents and evidence of dirt being blown across the ceilings (*id.* SD_742892), and on overhead air ducts and piping (housing unit 1B – *id.* SD_745593) from dirty air vents.  Multiple individual cells were observed with a towel at the base of the cell door.  When I asked incarcerated persons inside the cell why there was a towel at the base of the door, they responded that the towel was intended to stop the excessive amounts of particles in the air from coming under the door into their cell.

41.    Birds were observed flying around in housing units 1A (*id.* SD_742914), AD-SEG (*id.* SD_743094), 5C (*id.* SD_743163), and 6A.  Bird feces were observed on the AD-SEG television screen (*id.* SD_743094) and the floor in housing unit 5C (*id.* SD_743165).  This is unsanitary, a health hazard, and an unacceptable scenario, as birds carry many diseases, spread bacteria, and defecate anywhere at any time.  I asked staff about how the birds are getting into housing units, and staff responded that when doors are opened, birds can get into the building.  Staff did not appear concerned that this was happening, nor was there any evidence that exclusion measures were considered, notwithstanding an October 2023 complaint filed with the Citizens Law Enforcement Review Board.  *See* SD_450449 - SD_450453.

42.     On July 5, 2024, I spoke via telephone with an incarcerated person concerning environmental conditions experienced at George Bailey.  The incarcerated person told me he has been at George Bailey since September 2023 and has been assigned to housing units in "House B."  The incarcerated person described conditions of mold in multiple housing units in "House B," which he stated has been there the entire time he was assigned there.  He described what he referred to as "black mold" on cell walls, on the walls in the showers reaching from the ceiling almost to the floor, and there is a musty, stagnant smell in the shower areas.  In addition, he stated that the bathrooms have drain flies, and those flies are now all over the housing units, hundreds of them.  In addition, ants are a problem.

43.     The incarcerated person stated that in housing unit 104, the light bulbs were changed to extremely bright lights, the floor was cleaned, and the facility staff painted the walls in the showers right over the existing mold without cleaning the mold from the walls first.  The incarcerated person stated that he suspected these tasks were completed before an inspection because shortly after this work was completed people were seen inside that unit walking around.  Now the mold is coming through the paint.  In housing unit 204, no cleaning or painting of the shower walls has occurred.  The incarcerated person stated that the housing units are supposed to get a cleaning cart once per day, but due to restricted movement, they do not get the cart once per day.  When they do get cleaning supplies, the supplies consist of a bucket with liquid that is supposed to have cleaner already diluted in the water, a brush, and a broom.  The supplies are usually available for a short time, maybe 20 minutes.  The incarcerated person stated that restricted movement occurs almost every day.  While on restricted movement, the staff provide meals on a "grab and go" basis, where incarcerated persons are to get their meal and go back to their cell to eat.  The staff is delayed in providing garbage bags so incarcerated persons can dispose of their meal trays and other trash, and consequently, trash builds up in the corner of the bathroom.  The incarcerated person stated that they repeatedly ask

1   for a trash bag, and maybe they will see one around 11 p.m., hours after their dinner

2   meal.  In the meantime, they have no appropriate way to dispose of their trash.

3       44.    The incarcerated person stated that he has filed grievances due to the

4   housing conditions; however, only one of the multiple grievances filed has been

5   returned with "received" stamped on it, but no responses to the grievances have

6   been provided.  When asked about the air temperature in the housing unit, the

7   incarcerated person stated that last week it was cool, before that it was hot, and

8   currently it is "freezing" at night.  Last week there was dust all over the floor, which

9   the incarcerated person believed must have started in an air conditioning unit with

10  the air blowing causing dust to blow out from the vents all over the floor.  The

11  incarcerated person also stated, "A staph infection has been going around in the

12  housing unit, and now I have it."

13      *Vista Detention Facility (Vista)*

14      45.    In incarcerated persons' areas, sinks and toilets were observed as

15  stainless-steel sink/toilet combination units or stainless-steel toilets and separate

16  stainless-steel sinks.  Many of these units throughout Vista were observed dirty as

17  evidenced by stains, soap scum, and dust/dirt in and on sinks.  Toilets were found

18  with stains, scum, excrement, and filth in and on toilets.  In some areas, toilets were

19  clogged, sometimes with clothing.  *Id.* SD_743331 – holding cell number 3.

20      46.    Toilets in the Intake areas were observed to be filthy, particularly in

21  holding cells.  *Id.* SD_743261 – "male phone" holding, SD_743284 – holding cell

22  number 1, SD_743378 – release dress out, SD_743409 – holding cell number 11

23  and SD_743445 – female holding cell number 9.  The photographs below illustrate

24  the conditions described above.

25  / / /

26  / / /

27  / / /

28  / / /



SD_743288 – Vista          SD_743308 – Vista

47.     Observed showers at Vista were stainless steel units or tiled floors/walls.  The showers were observed to be dirty and in need of scrubbing and repairs, as evidenced by accumulated soap scum, dirt, and mold inside and outside of the showers and on shower doors.  *Id.* SD_743490 – LW3, SD_743506 – LW2, SD_743521 – LW1, SD_743629 – South House Module 3, SD_743659 and SD_743660 – Upper West Module 2, SD_743741 – East House E3, SD_743768 – East House E2 and SD_743842 – Medical Observation.

48.     Walls in multiple areas were observed dirty and with peeling paint.  Walls that contain peeling paint cannot be cleaned properly.  *Id.* SD_743301 – Holding cell number 2, SD_743333 – Holding cell number 3, SD_745574 – LW1, SD_743528 – LW1, SD_743549 – South House Module 4 shower, SD_743695 – Upper West Module 4 and SD_743733 – East House E3.  In multiple areas, I observed walls had been damaged and stained, and walls also had peeling paint under waterlines, mostly outside of shower stalls.  *Id.* SD_743487 – LW3, SD_743503 – LW2, SD_743574 – Module 5 and SD_743763 – East House E2.

49.     Floor/door thresholds were observed with accumulated dirt across the door threshold, at the bottom of door frames, and in the corners of door frames.  *Id.* SD_743242, SD_743251, SD_743267, SD_743294, SD_743321, SD_743403, SD_743590, SD_743824 – Dental and SD_743866 – kitchen.  Door frames were also observed dirty, rusted, and with peeling paint.  *Id.* SD_743243, SD_743300 and

1 SD_743347. This problem is due to a lack of attention to these areas and improper

2 floor cleaning and mopping practices. In addition, in many areas, floors were

3 observed dirty and in disrepair as well. *Id.* SD_743290 – holding cell number 1,

4 SD_743386 – Release Dress Out, SD_743745 – East House E3, SD_743749 – East

5 House E3, SD_743753 – East House E3, SD_743754 – East House E3 and

6 SD_743836 – medical observation.

7        50.    Ceilings at Vista were observed to be dirty throughout the facility. Air

8 vents were consistently observed dirty, leaving a trail of dust and dirt on ceilings in

9 the direction of airflow. *Id.* SD_743572 – Module 5, SD_743579 – Module 5,

10 SD_743698 – Upper West Module 5, SD_743713 – Upper West Module 3 and

11 SD_743865 – Kitchen. In Upper West Module 3 (*id.* SD_743711 and SD_743713),

12 the air vent has blown a long trail of dust and dirt along the ceiling wall to the side

13 of the air vent. *Id.* SD_743714. In the Release Dress Out, an air vent was observed

14 dirty with mold spots on the ceiling around the vent. *Id.* SD_743383. These

15 examples are a strong indication that air handler filters are not changed routinely

16 and when needed, and air vents and returns are not cleaned properly, if at all.

17 Individual air vents were also observed blocked with dust and debris. *Id.*

18 SD_743550. Mold was observed on ceilings in multiple areas of housing units,

19 including inside individual cells. *Id.* SD_743531 – LW1, SD_743581 – Module 5

20 and SD_743655 – Upper West Module 2. In Upper West Module 2, cell number 35,

21 mold was observed on the walls and ceiling. *Id.* SD_743663. An incarcerated

22 person in cell number 35 ran his hand across the wall in my presence and then

23 showed me his fingers (*id.* SD_743665) to demonstrate the mold accumulation on

24 the walls. In Upper West Module 3, another incarcerated person told me that, in his

25 experience, staff simply paint over mold in the cells when it is found. In some

26 cases, condensate was visible on the ceiling, such as in cell number 43 (*id.*

27 SD_743678 and SD_743679 – Upper West Module 2), and there was mold along

28 the ceiling in a corner of the cell (*id.* SD_743680). Paper was also observed stuck to

1 ceilings.  *Id.* SD_743532 – LW1.

2      51.    In the holding area, drains inside safety cells numbers 1 and 2 and

3 holding cells numbers 1 and 2 were observed with standing water and debris.  These

4 drains should be cleaned routinely to avoid unsanitary conditions and the

5 accumulation of debris.

6      52.    Throughout my inspection, Vista was observed with trash cans without

7 liners.  *Id.* SD_743566 – South House Module 5, SD_743594 – South House

8 Module 2, SD_743617 – South House Module 3 and SD_743686 – Upper West

9 Module 3.  This is an unsanitary practice and a predictable means for harboring

10 bacteria, viruses, and/or fungi.  Some trash cans did contain liners but they were full

11 and needed to be emptied.  *Id.* SD_743315 – clothing exchange, SD_743385 –

12 Release dress out.

13      53.    Multiple incarcerated people at Vista stated that they had seen vermin,

14 including rats and roaches, in the housing units.  Two people demonstrated to me

15 that they put towels on the bottom of their cell doors in an effort to keep roaches out

16 of their cells.

17      *Las Colinas Detention & Reentry Facility (Las Colinas)*

18      54.    Housing areas at this facility have large atrium-style dayrooms.  Cells

19 are located in two tiers, a lower and upper level.  *Id.* SD_744315.  Specific to this

20 observation, Las Colinas has some environmental health and safety deficiencies.

21      55.    In incarcerated persons' areas, sinks and toilets were observed as

22 stainless-steel sink/toilet combination units or stainless-steel toilets and separate

23 stainless-steel sinks.  While toilets and sinks at Las Colinas were observed cleaner

24 than George Bailey, Vista, or Central Jail, some were observed to be unsanitary as

25 evidenced by stains, scum, garbage, and/or filth in and on sinks and/or toilets.  *Id.*

26 SD_744048 – Sobering Cell number 2, SD_744116 – Medical Ward 3, SD_744261

27 – Unit 5A and SD_744570 – Triage.  There was also a systemic issue with feminine

28 sanitary pads being stuck to stainless steel toilet seats.  *Id.* SD_744101 – Safety Cell

1   Step Down, SD_744117, SD_745565 – Unit 5A, SD_744384 – Unit 4A and

2   SD_744499.  Toilets were also observed with sanitary pad adhesive still stuck to

3   them (*id.* SD_743983 – Intake and SD_744603), even though the sanitary pad had

4   been removed.  This indicates covering toilet seats with sanitary pads is a common

5   practice.  In some cases, the adhesive was observed dirty, which is evidence that it

6   had been stuck to the toilet seat for some time and was not easily removed.  *Id.*

7   SD_744455.  Adhering sanitary pads to toilet seats is a very unsanitary practice, as

8   the toilet seat cannot be properly cleaned and disinfected while sanitary pads and/or

9   adhesive are stuck to them.

 

SD_744384 – Las Colinas          SD_744499 – Las Colinas

17        56.      During the on-site visit at Las Colinas, I asked a female incarcerated

18  person why she had sanitary pads on the toilet seat.  She told me she had been

19  incarcerated at this facility at a prior time; during her prior incarceration she

20  acquired an infection on the back part of her thigh, and she suspected the infection

21  started from sitting directly on an unsanitary toilet seat.

22        57.      Observed showers were clean in most areas of Las Colinas.  However,

23  there were some instances where showers contained soap scum and dirt, in need of

24  cleaning and disinfecting.  *Id.* SD_744488 – Unit 3C and SD_744544 – Unit 3F.

25        58.      Walls were observed dirty in Intake around telephones and holding

26  cells.  *Id.* SD_743960, SD_744121, SD_744014 – Holding Cell number 1 and

27  SD_744041 – Sobering Cell number 2.

28        59.      Ceilings were observed to be clean in many areas.  However, food and

1  paper were observed on the ceiling in the Safety Cell Step Down. *Id.* SD_744104

2  and SD_744106.  Ceiling and wall air vents were also observed to be covered with

3  paper. *Id.* SD_744288, SD_744289 – Unit 5B, SD_744319 – Unit 4B and

4  SD_744390 – Unit 4A.  Some air vents were observed to be dirty and/or rusted. *Id.*

5  SD_744421, SD_744470 – Unit 3B, SD_744493 – Unit 3C and SD_744504 – Unit

6  3C.

7       60.    One incarcerated person at Las Colinas told me she had observed a rat

8  in the vent of a safety cell, and there was also blood and feces on the wall at the time

9  she was placed in that cell.

10      *East Mesa Reentry Facility (East Mesa)*

11      61.    East Mesa houses incarcerated persons assigned to work programs,

12  such as the kitchen or laundry.  Housing units at East Mesa are individual buildings

13  labeled by a letter, such as House B (*id.* SD_744830), and number, such as B2. *Id.*

14  SD_744833.  Inside individual buildings, the housing areas contain a large dayroom,

15  two dorm-style sleeping areas (*id.* SD_745461), and a shared bathroom containing

16  sinks, toilets, urinals, and showers.

17      62.    Observed sinks, toilets, and urinals in Houses A, B, C, and D at East

18  Mesa are porcelain and are all separate fixtures.  In House 4 (currently closed) the

19  bathroom fixtures are stainless-steel single units.  In Houses A, B, C, and D, the

20  sinks, toilets, and urinals were observed clean (*id.* SD_745247 and SD_744848),

21  demonstrating that the Sheriff's Department does have the capability and capacity to

22  ensure clean sinks, toilets, and urinals.

23      63.    In the housing areas, showers are large areas with multiple shower

24  heads.  These showers were consistently observed with dirty walls, stained walls,

25  soap scum, and mold on both shower walls and floors. *Id.* SD_744891 – D1,

26  SD_744950 – D2, SD_745235 – A1, SD_745242 – A1, SD_745299 – A2,

27  SD_745302, SD_745316 – A2 and SD_745440 – C2.  Shower drains were observed

28  in need of cleaning, some contained scum and debris and some were observed with

1    mold. *Id.* SD_744893 – D1, SD_745349 – C1, SD_745241 – A1, SD_745310 – A2,

2    SD_745315 – A2, SD_745442 – C2 and SD_745443 – C2.  Some shower walls

3    were in disrepair as well, with peeling paint and uneven surfaces.  *Id.* SD_745256 –

4    A1, SD_745346 – C1, SD_745348 – C1, SD_745444 – C2 and SD_745447 – C2.

5    Shower walls and floors in disrepair allow for the harboring and growth of bacteria

6    and fungus.  In addition, shower walls, floors, and drains that are dirty, contain soap

7    scum, and/or are moldy can spread disease and cause respiratory issues.  These

8    photographs illustrate some of the shower conditions described above:



SD_745242 – East Mesa Reentry Facility        SD_745447 – East Mesa Reentry Facility



SD_745241 – East Mesa Reentry Facility

27    64.    The bathrooms at East Mesa contain a window at the entrance wall of

28    the shower area in each housing area.  Towels and pictures were observed hanging

in these windows presumably to give privacy to the shower area. *Id.* SD_744844 – B2, SD_744952 – D2, SD_745243 – A1, SD_745304 – A2, SD_745352 – C1 and SD_745446 – C2. However, this is a very unsanitary practice. The towels and pictures hang in and around the window in a very damp environment, and may even become wet and dirty during showering. This allows for the harboring and growth of bacteria, fungi, and mold, not only on the towels and pictures but also on the window and window frame. *Id.* SD_745449 – C2.

65.     Allowing moist or wet towels to hang in the window holds moisture in the window frame and walls around the window, which will in time cause rust and deterioration of the frame around the window glass and deteriorate the walls.

66.     Walls at East Mesa were observed to be stained mostly near telephones (*id.* SD_745292), at the end of bunks (*id.* SD_745268 – A1), and around utility sinks in the dayrooms. The walls of the housing areas are a porous material that resembles brick. This material is hard to clean and disinfect because it is absorbent. However, the San Diego County jails need to ensure these areas are cleaned and disinfected routinely and properly. Consulting with their chemical vendor to discuss this challenge may be a beneficial way to find the appropriate cleaning mechanism and chemical(s) to use to accomplish the task.

67.     Water fountains were observed in several areas with mold and calcification around the waterspout. *Id.* SD_744838. In housing unit C1, the water fountain contained a straw in the waterspout (*id.* SD_745336) presumably to extend the water flow from the spout. Water fountains need to be kept clean and sanitary because they are a direct line of water consumption. There should be no mold or calcification anywhere on the fountain, and nothing should be inserted into the spout. Having a straw inserted into the waterspout is a very unsanitary practice and a mechanism for harboring bacteria, viruses, and fungi, and a means for bacterial and/or fungus growth.

68.     Throughout observations in housing areas at East Mesa, trash cans were

observed without a liner, some containing trash. *Id.* SD_744840 – B2, SD_744886 – D1, SD_744946 – D2, SD_745233 – A1 and SD_745290.  In housing unit C2, a trash can was observed full of laundry. *Id.* SD_745437.  To avoid allowing garbage to dirty the trash can and avoid bacterial growth, trash cans should contain a liner.  It is an unsanitary practice to place garbage directly into trash cans.  Trash cans should be kept clean and free from dirt, debris, mold, food, clothing, and towels.

69.    A gap was observed in multiple areas at the base of doors.  *Id.* SD_744947 – D2, SD_745260, SD_745296 – A2, SD_745339 – C1 and SD_745462 – C2.  Towels were placed along the bottom of the doors in most cases. *Id.* SD_744920 – D1, SD_744969 – D2, SD_745278, SD_745280 – A1 and SD_745320 – A2.  In housing unit C1, in the dorm area, masking tape was observed along the door threshold plate covering a noticeable gap and then a towel was placed on top of the threshold plate. *Id.* SD_745368.  When I asked about the towels at the base of the doors, incarcerated persons reported that the towels are there to cover the gap and help keep ants and spiders out.  Multiple incarcerated people stated they had observed infected spider bites on people at East Mesa, including one bite that an incarcerated person believed was caused by a black widow.  A gap at the base of a door can be mitigated by installing a door sweep at the base on the door.

70.    Air vents and areas around air vents were observed to be dirty and clogged in housing units, some containing mold. *Id.* SD_744853, SD_744854 – B2, SD_744892 – D1, SD_745237 – A1, SD_745305 – A2, SD_745344 – C1 and SD_745441 – C2.

*San Diego Central Jail (Central Jail)*

71.    Central Jail is the primary intake facility for incarcerated males in San Diego County.  This facility has 11 floors and 17 levels when the mezzanine levels and the basement are included.

72.    In incarcerated persons' areas, sinks and toilets were observed as stainless-steel sink/toilet combination units or stainless-steel toilets and separate

1  stainless-steel sinks.  Throughout Central Jail, the sinks and toilets were observed

2  dirty as evidenced by stains, soap scum, dust, dirt, and trash in and on sinks.  *Id.*

3  SD_1579355 – PSU and SD_1579621 – Holding.  Stains, scum, excrement, and

4  filth were observed in and on toilets.  The majority of toilets observed in this facility

5  were filthy.  *Id.* SD_1579304 – Court Holding number 4, SD_1579309 – Court

6  Holding number 8, SD_1579354 – PSU and SD_1579433 – D04.  The photographs

7  below illustrate some of the sink/toilet conditions described above:



SD_1579309 – Central Jail          SD_1579354 – Central Jail

18      73.     It was unfortunately rare to find a toilet that was not filthy.  However,

19  some individual clean toilets were observed in Module 6E, Cell E01 (*id.*

20  SD_1579511, and Module 8C (*id.* SD_1579560), indicating that the Sheriff's

21  Department does have the capability and capacity to keep toilets clean.

22      74.     Showers were observed to be dirty, and in need of scrubbing as

23  evidenced by accumulated soap scum, dirt, and mold.  *Id.* SD_1579369 – PSU,

24  SD_1579373 – PSU, SD_1579472 – Module 8A, SD_1579541 – Module 8C,

25  SD_1579577 – Module 8C, SD_1579637 – Module 5A and SD_1579655 – Module

26  4B.  Showers were also observed in disrepair, with peeling paint, damage to walls,

27  and ceilings that are rusted, dirty, and contain mold.  *Id.* SD_1579420 – Module 7D,

28  SD_1579468 – Module 8A, SD_1579494 – Module 6E, SD_1579540 – Module 8C,

1  SD_1579578 – Module 8C, SD_1579639 and SD_1579656 – Module 4B.  Shower

2  drains were observed dirty, with hair and debris on drain grates, and debris and

3  slime inside drains.  *Id.* SD_1579371 – PSU, SD_1579376 – PSU, SD_1579470 –

4  Module 8A and SD_1579581 and SD_1579583 – Module 8C.  Drain flies were

5  observed crawling in and about sink and shower drains and on walls in multiple

6  areas of Central Jail.  *Id*. SD_1579485 (sink) – 6th Floor Holding, SD_1579486

7  (wall) – 6th Floor Holding, SD_1579544 – Module 8C, SD_1579554 – Module 8C

8  and SD_1579641 – Module 5A.  In the Psychiatric Stabilization Unit (PSU), drain

9  flies were observed in the shower drain and the drain had a strong foul smell.  In

10  Module 8C, many live dark worms (drain fly larvae) in various stages of maturity

11  were observed crawling in and around a dirty drain and in pooled water outside of

12  the showers on the upper tier.  *Id.* SD_1579564, SD_1579566, SD_1579568 and

13  SD_1579571.  The below photographs illustrate some of the shower and drain

14  conditions described above:



SD_1579486 – Central Jail

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

2

3

4

5

6

7

8



SD_1579564 – Central Jail

9

10

11

12

13

14

15

16

17

18



SD_1579571 – Central Jail

19   75.    Incarcerated persons in multiple areas of Central Jail reported that

20  showers are not cleaned regularly although they are supposed to be cleaned by

21  trustee workers once per week.  One incarcerated person reported he has been in the

22  same housing unit at Central Jail since May 1, 2024, and the showers have not been

23  cleaned at all during his time at Central Jail.  In another module, incarcerated

24  persons reported it had been at least a month during which time showers had not

25  been cleaned, although they also reported that showers are supposed to be cleaned

26  by trustees once per week.

27   76.    Towels and/or bed linens were observed on the floor in bathroom areas,

28  in individual cells, and at cell doors to absorb water from showers, leaking sinks and

1  toilets, leaks from ceilings, or leaks from walks outside of the cell.  *Id.* SD_1579442

2  – Module 7D (cell D08), SD_1579456 – Module 7D (cell D17), SD_1579548 –

3  Module 8C, SD_1579552 – Module 8C, SD_1579562 – Module 8C, SD_1579593 –

4  Module 8C and SD_1579670 – Module 4B (cell B20).  This is an unsanitary

5  practice, as wet towels or linens can harbor and promote bacteria and fungus

6  growth.  In Module 7D, on the upper level, the walkway outside of the cells had

7  standing water across the entire area.  *Id.* SD_1579449.  An incarcerated person

8  stated to me on the day of my inspection (May 15, 2024), that the incarcerated

9  person assigned to cell D16 floods his cell every day and the water from his cell

10  floods the entire walkway outside of all the upper-level cells.  The same incarcerated

11  persons reported the water remains on the floor, no one cleans it up, and disinfectant

12  is never used on the floor.

13       77.     Walls and ceilings in multiple areas were dirty, stained, contained

14  mold, were marked with graffiti, and had peeling paint.  *Id.* SD_1579519 – Module

15  6E, SD_1579644 – Module 5A, SD_1579653 – Module 4B and SD_1579671 –

16  Module 4B.  In Module 6E (cell E03), the cell door was covered with debris stuck to

17  the inside of the door window, which appeared to be food thrown at the window that

18  had not been cleaned off.  *Id.* SD_1579509.  In Safety Cell number 2, there were

19  stains on the wall and a strong feces smell in the cell.  *Id.* SD_1579324.  Ceilings

20  were of particular concern; many are metal panels that appear rusted and contain

21  mold.  *Id.* SD_1579299 – Court Holding number 9, SD_1579330 – Safety Cell

22  number 1, SD_1579431 – Module 7D and SD_1579596 – Module 8C.  Air vents

23  were observed dirty, rusted, and in many cases blocked with dust or paper.  *Id.*

24  SD_1579300 – Court Holding 9, SD_1579306 – Court Holding 4, SD_1579428 –

25  Module 7D, SD_1579505 – Module 6E (cell E04), SD_1579535 – Module 8C and

26  SD_1579626 – 5th Floor Holding.

27       78.     In incarcerated persons' areas, the floors at Central Jail were worn

28  down to the bare concrete.  It appears the floors may have at one time had a painted

layer that is still visible in some areas.  However, in most areas that painted layer has since been worn off and the concrete floor is exposed.  The floors are dirty, stained, in disrepair, and appear rarely cleaned properly.  *Id.* SD_1579423 – Module 7D (cell D05), SD_1579427 – Module 7D (cell D04), SD_1579437 – Module 7D (cell D09), SD_1579450 – Module 7D (cell D08), SD_1579484 – 8th floor Holding and SD_1579660 – Module 4B (cell B18).  It is more difficult to clean a bare concrete floor that lacks a sealant because any wetness is somewhat absorbed into the floor instead of remaining on top of a sealed layer.  This allows for the absorption of fluids and dirt, allows for staining, bacteria, and/or fungus growth, and requires greater effort and more steps to clean the floor properly.

79.     Inside safety cells numbers 1 and 2 and padded cell number 2095, the floor drains, the drain grate, and the area around the floor drains were observed to be dirty and the floor drains contained standing water.  In safety cell number 2, bread was lying on the drain grate.  *Id.* SD_1579326 – safety cell number 2 (at right), SD_1579329 – safety cell number 1 and SD_1579321 –  padded cell number 2095.  In addition, two biohazard containers were observed inside padded cell number 2094 with an open roll of toilet paper on top of one container.  *Id.* SD_1579315.  Biohazard containers should not be stored inside a padded cell, even if the cell is not currently being used.

80.     Incarcerated persons' living and holding areas were observed cluttered, trash was on floors and outside receptacles, filthy trash cans with no liner containing trash, towels, and linens were on floors, and food containers from previous meals that still contained food were observed in multiple cells.  *Id.* SD_1579308 – Court Holding number 8, SD_1579439 – Module 7D (cell D10), SD_1579441 – Module 7D (cell D08), SD_1579623 – 8th Floor Holding, SD_1579447 – Module 7D and

1    SD_1579555 – Module 8C.  The photographs below illustrate the conditions

2    described above.



SD_1579439 – Central Jail



SD_1579447 – Central Jail

23    81.    In Module 7D, some incarcerated persons reported that trash is

24    supposed to be picked up on Monday, Wednesday, and Friday.  However, they have

25    observed trash not being picked up for more than a week.  The majority of desks,

26    stools, and bunks inside cells were observed with peeling paint, worn-off paint, and

27    rust.  *Id.* SD_ 1579516 – Module 6E.  These items cannot be cleaned properly due to

28    worn and rusted areas and peeling paint.  I did observe one cell (cell E01) in Module

6E where the desk, stool, and bunk were in much better shape than the majority of others observed, and it appeared that these items may have recently been painted. *Id*. SD_1579512. PSU 2 was observed with one incarcerated person sleeping under a blanket on one of two metal single bunks, and trash was observed throughout the entire area on the floor and under the bunks:



SD_1579380 – Central Jail

82.    Module 8C at Central Jail is an ADA unit. Incarcerated persons in this unit may utilize walking canes, walkers, and/or wheelchairs to assist with mobility. Incarcerated persons in this unit reported that due to the nature of physical disabilities in this unit, some incarcerated persons may have an unintentional incident, such as getting feces on the floor. Incarcerated persons reported when this does happen, Central Jail does not provide anyone, including staff or trustees, to assist with cleaning up the mess. Incarcerated persons housed in Module 8C reported they are expected to clean and are not provided with sufficient cleaning supplies, including proper chemical cleaners and disinfectants.

83.    In Module 8C, one incarcerated person reported that he slept on the floor for seventeen days because there were no bunks available. He was provided with only a mattress and blanket while sleeping on the floor, and two days before my visit to Central Jail he finally was provided access to a bunk. Multiple incarcerated persons have signed declarations regarding personal knowledge of either themselves or other incarcerated persons having to sleep on a mattress on the

1   floor in ADA housing units (8A – 8D) at Central Jail.  One incarcerated person

2   wrote, "There are often people sleeping on mattresses on the floor.  Sometimes I

3   have observed the same person sleeping on the floor for as long as two weeks before

4   he obtains a regular bed assignment."  He also stated that on the morning of May 15,

5   2024, the day of my inspection of Central Jail, he was present in 8C, and "that

6   morning, Sheriff's Department staff moved the mattresses that had been on the floor

7   out of the way."  *See* Declaration of Plaintiff James Clark dated May 24, 2024.  In a

8   subsequent declaration, this same incarcerated person wrote that he was released

9   from jail on May 31, 2024, and was arrested on June 4, 2024.  He stated, "I slept on

10  the floor of a holding cell for a few hours.  I was transferred to my housing unit, 8C,

11  on or around June 6, 2024.  When I got there, there were no available lower bunks

12  for me to sleep on.  I slept on the floor on a mattress.  After another person was

13  released, I was able to get a lower bunk."  *See* Declaration of Plaintiff James Clark

14  dated June 12, 2024.

15      84.     In another declaration, an incarcerated person stated that he is in

16  Module 8D and he has witnessed people who use wheelchairs sleep on a mattress on

17  the floor of the lower level in Module 8D.  He also stated, "I have slept on a

18  mattress on the floor on the second level of Module 8D because there were no bunks

19  that I could sleep in.  During this current incarceration, I also slept on a mattress on

20  the floor for two to three days up arriving in 8D in April 2024."  *See* Declaration of

21  Plaintiff Devin Meyers dated May 30, 2024.

22      85.     In another declaration, an incarcerated person stated that when he was

23  wheeled into Module 8C by staff he was given a mattress but staff did not ensure

24  access to a bunk.  He was told by other incarcerated people that he would need to

25  sleep upstairs.  Because he could not climb the stairs, two incarcerated people

26  carried him up the stairs.  He also stated, "Unable to come back downstairs, I slept

27  on a mattress on the floor of the upper level of Module 8C for about a week.  For at

28  least the first two days, I was not able to eat because nobody brought me food.

1   After about a week of sleeping on the floor on the upper level of Module 8C, a bunk

2   on the lower level was finally made available to me." *See* Declaration of Plaintiff

3   Michael DeVito dated May 30, 2024.  Other incarcerated persons also wrote that

4   they have either slept on a mattress on the floor and/or have witnessed others sleep

5   on a mattress on the floor in the ADA modules.  *See* Declaration of Plaintiff Ronald

6   Hillman, Plaintiff Robert Sarnie, and Plaintiff Robert Duarte, all dated May 30,

7   2024.

8          86.    Sleeping on a mattress on the floor is an unacceptable and unsanitary

9   practice.  Allowing a mattress and bed linens to come into contact with the floor

10  increases the risks of an incarcerated person being exposed to bacteria and fungi, or

11  being bitten by crawling insects, thereby substantially increasing the risks of

12  infection and disease.

13         87.    On July 9, 2024, I spoke via telephone with an incarcerated person

14  concerning environmental conditions experienced at Central Jail.  At the time of our

15  call, he had been at Central Jail for approximately 6-7 months and was assigned to

16  an ADA housing unit, 8D.

17         88.    Prior to being assigned to the ADA housing unit, the incarcerated

18  person stated that he was first assigned to a non-ADA unit for one month, where he

19  was assigned to a cell that he shared with two other incarcerated persons, and his

20  wheelchair also had to be inside the cell.  He was unable to shower due to no ADA

21  shower in the unit, so he described bathing using the sink for the month he was

22  assigned there.  The incarcerated person stated that the facility staff refused to move

23  him to the medical unit to accommodate him.  He also stated that while assigned to

24  this non-ADA unit, he observed green and black mold caked on the ceiling.

25         89.    When he was first assigned to the ADA unit, 8D, he was provided only

26  a mattress and blanket and told to find a bed.  There were no beds available.  This

27  person also stated that facility staff were causing arguing amongst incarcerated

28  persons by telling them to "find a bed" when there were not any available.

1  Consequently, he had to sleep on the floor for the first night.

2      90.    This same incarcerated person also described conditions where

3  incarcerated persons are asked to take care of other incarcerated persons in the

4  housing unit, including some who are currently in withdrawal.  The incarcerated

5  person described conditions and stated, "These folks are in pain, they need

6  assistance getting water to their mouth, they are in their own filth, and they can't

7  shower."  The incarcerated person described situations where he told the nurse about

8  an incarcerated person who had feces on him and needed a doctor.  The incarcerated

9  person I spoke with stated that the nurse just handed him a diaper and no gloves,

10 expecting him to put the diaper on the incarcerated person who had feces on him.

11     91.    The incarcerated person stated that there is no real cleaning in the 8D

12 ADA housing unit.  Currently, there is mold all over in the bathroom, on the floor,

13 and in the showers.  The staff and incarcerated workers come in with bleach and tell

14 the incarcerated persons assigned to the ADA housing unit to clean.  It is unrealistic

15 to expect incarcerated persons who have disabilities to complete the tasks required

16 to appropriately clean a housing unit, the bathroom, and shower areas.

17     92.    The incarcerated person also stated that the drain in the shower area of

18 8D is clogged and does not drain.  The incarcerated person stated that the drain was

19 "snaked" once about 2-3 weeks ago and it is again clogged right now.  There are

20 worms and flies (drain flies) all over the shower area and flies all over the housing

21 unit.

22     93.    In a Citizen Law Enforcement Review Board (CLERB) Complaint, *see*

23 SD_399432-399441, dated April 3, 2023, Allegation No. 2 references a roach

24 infestation that Central Jail failed to address.  Incarcerated persons Sowle and Apan

25 alleged that roaches were in the commissary food, property bags, and clothes.

26 Incarcerated person Apan stated he told multiple Central Jail staff about this

27 problem, but no one had done anything about it.  The CLERB complaint findings

28 reference Central Jail's Green Sheet L.13.C.1, Pest and Vermin Control, dated

1   March 4, 2022, which states, "Monthly vermin and pest control inspections will be
2   conducted by licensed (County/Contracted) professionals or appropriately trained
3   staff.  Any identified conditions, including the presence of insects, rodents, or
4   vermin, shall be eradicated under the direction of the Integrated Pest Control
5   Program with the Department of Agriculture, Weights and Measures.  All requests
6   for pest control service outside of the monthly inspections will be submitted to the
7   operations deputy.  The operations deputy will make notifications and coordinate
8   any additional services."  The CLERB finding also states, "Per an email from
9   CLERB Liaison, Sergeant Bracy, Vector Control does routinely visit the facility for
10  pest eradication, however, this is not something that is tracked or archived."

11      94.    All pest control services should be tracked and no facility should wait
12  until there is a pest control complaint or infestation as a means of pest control.
13  Successful and appropriate pest control is always a proactive system of pest
14  management and not a reactive system of control.  A proactive system of pest
15  management will always assist the facility in avoiding pest infestations and reduce
16  the amount of control measures that must be taken to control an infestation.  If a pest
17  issue is found, the problem should be addressed immediately, not wait until the
18  routine monthly service.  Unfortunately, this allegation was dismissed due to
19  CLERB lacking jurisdiction to investigate the issue further.  This is unfortunate
20  because this problem can persist when staff do not address the problem and
21  allegations are not able to be investigated which could result in a resolution.

22      *South Bay Detention Facility (South Bay)*

23      95.    South Bay is a non-booking facility consisting of two detention levels
24  located beneath the South Bay Regional Justice Center.  This facility also manages
25  the incarcerated population's court appearances where incarcerated persons are
26  brought to this facility and wait in holding areas for their court appearance and their
27  return to their housing facility after their court appearance is completed.

28      96.    During my inspection of this facility, I observed the court holding

1 areas, multiple housing units (modules), the loading dock, and the recreation area.

2 Recreation at the South Bay facility is only conducted indoors.

3      97.    In incarcerated person's housing areas, there is an open day room with

4 fixed tables and seating.  Cells are located in two tiers, a lower and an upper level.

5 Many cells in this facility were noted triple bunked, which creates cleaning and

6 hygiene issues as discussed in this report.

7      98.    In incarcerated persons' areas, sinks and toilets were observed as

8 stainless-steel sink/toilet combination units.  Except for a few exceptions, such as in

9 Module 2A (*id.* SD_1579238 (cell 10), SD_1579243 – (cell 13) and SD_1579259 –

10 (cell 24)), these units were observed clean.

11      99.    Showers are a shared area with multiple shower heads within the

12 shower space.  The floor and walls (to the height of the shower head) are tiled, and

13 the wall is painted above the shower head.  *Id.* SD_1579012.  Most of the showers

14 contain rubber mats to avoid slips and falls.  Some showers were observed fairly

15 clean.  *Id.* SD_1579199.  However, other showers were observed to be dirty and

16 contained soap scum, walls had peeling paint, and ceilings contained peeling paint

17 and mold.  *Id*. SD_1579018 – 3A, SD_1579019 – 3A, SD_1579057 – 1B,

18 SD_1579058 – 1B and SD_1579269 – 2B.  Shower drains were observed dirty, with

19 debris on and around the drain grates and debris and scum on the inside of the

20 drains.  *Id.* SD_1579020 – 3A, SD_1579045 – 4A, SD_1579056 – 1B, SD_1579201

21 – 3B and SD_1579266.

22      100.   Walls in multiple areas were observed to be dirty and contained

23 excessive dust, and in some areas, walls were damaged.  *Id.* SD_1579102 – 1B,

24 SD_1579114 – 1B and SD_1579236 – 2A.  The walls around telephones were

25 especially dirty.  *Id.* SD_1579009 – 3A and SD_1579036 – 4A.  In CT2, the walls

26 are metal and are rusted and in disrepair.  *Id.* SD_1579133.  In the current condition,

27 these metal walls cannot be cleaned properly.

28      101.   Ceilings were observed dirty, had peeling paint, and accumulated dust

across ceilings from dirty air vents.  *Id.* SD_1579084 – 1B, SD_1579054 – 1B, SD_1579246 – 2A, SD_1579274 – 2B and SD_1579291 – 4A.  Air vents were also observed rusted, moldy, clogged, or blocked.  *Id.* SD_1579021 – 3A, SD_1579116, SD_1579130 – CT2, SD_1579250 – 2A (cell 21), SD_1579260 – 2A (cell 24), SD_1579270 – 2B and SD_1579271 – 2B.  In housing unit 2A (cell 13), a screw meant to secure the air vent was sticking partially out of the wall and air vent.  *Id.* SD_1579245.  The photographs below illustrate some of the ceiling observations.



SD_1579054 – South Bay



SD_1579246 – South Bay

/ / /

/ / /

/ / /



SD_1579245 – South Bay

102.  Throughout South Bay, cells were observed cluttered and dirty, containing excessive amounts of food items, food trays that contained old food from previous meals, and self-made clotheslines with towels and clothing items hanging from them.  *Id.* SD_1579080 – 1B (cell 2).  Many cells were observed with excessive amounts of books and papers.  In Unit 1B (cell 1), there was so much clutter, books, papers, meal trays, food, etc., that the cell was a fire hazard.  *Id.* SD_1579067, SD_1579070 and SD_1579076.  In Unit 3B, unlined trash cans were observed with trash, food items, and fluid inside.  *Id.* SD_1579194 and SD_1579196.

 

SD_1579194 – South Bay          SD_1579196 – South Bay

1    103.    Floors inside cells were observed to be dirty, stained, in disrepair,

2    worn down to the bare concrete, and lacking upkeep. *Id.* SD_1579030 – 4A (cell

3    11), SD_1579034 – 4A (cell 9) and SD_1579240 – 2A (cell 10).  As described for

4    Central Jail, *see* paragraph 79, it is more difficult to clean a bare concrete floor that

5    lacks a sealant.

6                      **2.    Medical & Dental Facilities**

7    104.    *Medical and Dental Facilities Health and Safety Principle*:  Standards

8    for health services in jails require that incarcerated persons receive health care in a

9    clean, safe, and healthy environment.[9]

10    105.    *Medical and Dental Facilities Health and Safety Rationale*:  The spread

11    of disease in an institutional/correctional setting is minimized through the

12    implementation of practices that include screening, preventative measures,

13    treatment, control, and monitoring.  Measures must be taken to ensure occupational

14    and environmental safety in all health services areas.

15    106.    *Medical & Dental Facilities Inspection Findings*:

16    *George Bailey Detention Facility*

17    107.    In the medical area, an exam table cushion was observed to be torn

18    with dirty tape covering the torn areas.  *See* Exhibit C at SD_743203.  This is an

19    unsanitary practice, as the cushion cannot be cleaned and disinfected properly and

20    the tape can harbor dirt, bacteria, viruses, and fungus.  In the exam room, a bottle of

21    saline eye wash was observed next to the sink without a cap (*id.* SD_743207) and

22    with an expiration date of January 2023, one year prior to the inspection.  *Id.*

23    SD_743205.  In the dental area, paper towels were sitting in the open on top of the

24    paper towel holder, rather than inside the paper towel holder (*id.* SD_743214), no

25    saline bottle was at the eye wash station (*id.* SD_743217), and the dental sink was

26

27    _____

28    [9] National Commission on Correctional Health Care (NCCHC), Standards for
Health Services in Jails 2018, Standard J-B-02.

1  dirty. *Id.* SD_743215 and SD_743216.

2  *Vista Detention Facility*

3  108.  Medical and dental areas at Vista were observed to be in need of

4  immediate cleaning, organizing, and repairs.  In medical clinic number 1, the hand

5  sink was blocked by equipment, and a biohazard container was improperly placed

6  under the sink with a pan on top. *Id.* SD_743800.  An open plastic sharps container

7  was also improperly placed under the sink behind the biohazard container. *Id.*

8  SD_743803.  The hand sink was dirty, the drain cover was rusted, and there was rust

9  on the sink around the drain. *Id.* SD_743805.  There were dirty plastic containers

10  placed next to the sink with various medicine bottles inside. *Id.* SD_743804.  The

11  cabinet doors were in disrepair (*id.* SD_743806), and there was duct tape holding an

12  electrical cord across the entire front of the cabinet and at the plug receptacle. *Id.*

13  SD_743807.  The floor was dirty and debris was observed along walls and in

14  corners of the room. *Id.* SD_743809.

15  109.  In medical clinic number 2, the hand sink is operated by a pedal

16  control.  The pedal control box under the sink was rusted and cannot be cleaned

17  properly. *Id.* SD_743814.  Hand soap bottles were sitting on the sink, and the floor

18  under the sink was dirty. *Id.* SD_743814.  The paper towel holder was located on

19  the wall opposite the sink, rather than next to or above the sink.  A biohazard

20  container with multiple pans on top was located under the paper towel holder. *Id.*

21  SD_743815.

22  110.  The dental room is of particular concern.  The door threshold into the

23  dental room was very dirty. *Id.* SD_743834.  The dental room floor was dirty as

24  well, multiple boxes were sitting on the floor, and various tubing was also lying on

25  the floor. *Id.* SD_743826 and SD_743828.  There was a bucket sitting on the floor

26  with unknown contents and a dirty biohazard container sitting next to the bucket.

27  *Id.* SD_743829.  The instrument cleaning/washing sink was dirty, a filthy molded

28  drain tubing was lying in this sink, and brushes were lying in the open on the back

1  of the sink:



SD_743831 – Vista

There was no separate handwashing sink noted in the dental room.

111.   In medical observation, the floor was in disrepair (*id.* SD_743837 and SD_743839), and a dirty mop bucket was observed along with a dustpan and brush on the floor.  The pipe chase door was very rusted, with rust stains on the wall under the pipe chase door.  The observation unit garbage can contained a liner but had no lid.  *Id.* SD_743839.

*Las Colinas Detention and Reentry Facility*

112.   In Medical Ward 3, the floor was in disrepair.  *Id.* SD_744113 and SD_744114.  Floors that are in disrepair allow for bacteria and fungus on the surface and under areas where the floor is not smooth and intact.  A floor in disrepair cannot be cleaned properly.

113.   In the bathroom, wrapped rolls of toilet paper and a brown bag containing feminine products were all sitting directly on the floor next to the toilet. *Id.* SD_744117.  This is an unsanitary practice.  The toilet paper and the brown bag should not be directly on the floor.  Tubes of toothpaste were sitting on the paper towel holder (*id.* SD_744115) instead of being kept in the incarcerated person's belongings.  It is important to note that toothpaste should never be shared in the incarcerated environment.  The sink in the bathroom was also dirty.  *Id.* SD_744116.

1    *San Diego Central Jail*

2    114.   In the medical area, the Dental Operatory, Medical Exam Room C,

3    Medical Dialysis 2, and the incarcerated person restroom in the PSU were observed.

4    The Dental Operatory was observed clean and well-organized.  In Medical Exam

5    Room C, the sink was dirty and there was clutter around the sink.  *Id.* SD_1579337.

6    115.   In Medical Dialysis, the dialysis machines had run-off stains on the

7    front, the floor in front of the machines was dirty, and one cart was noted with

8    masking tape at the bottom and rust above the wheels.  *Id.* SD_1579340 and

9    SD_1579341.  The floor in one area was stained and contained a green fluid, and the

10   wall was dirty.  *Id.* SD_1579343.  Also observed were rusted handcuffs lying on the

11   floor next to one of the dialysis chairs.  *Id.* SD_1579342.

12   116.   Multiple emails related to dialysis, which occurs only at Central Jail,

13   *see* SD_342504-342507, SD_376055-376060 and SD_376264, starting

14   September 5, 2023, were reviewed.  These emails document the lack of disinfection

15   and servicing of the dialysis machines and the lack of proper documentation for

16   these tasks.  Per the emails, disinfection is required by NaphCare's policy to be

17   completed weekly, however, as an example, an email, *see* SD_376059, written on

18   Tuesday, September 5, 2023, from the Inpatient Acute Dialysis Manager at UC San

19   Diego Health System notes, "the last time that any documentation was done for

20   disinfecting the machines was on 8/7 by staff…not UCSD.  We have not had a pt

21   [patient] at the jail since 7/7 and there is no documentation of the machine being

22   disinfected until our biomed staff went on 7/28 for the monthly RO disinfection."  In

23   addition, these emails contain information concerning the lack of proper

24   maintenance of the dialysis machines, and the failure to keep the machines ready for

25   dialysis treatments.

26   117.   Due to the nature of the dialysis process, it is extremely important that

27   all equipment be thoroughly cleaned and disinfected, dialysis machines are

28   disinfected and serviced per established policy and service intervals, and all room

1  areas and furnishings be thoroughly and routinely cleaned.

2      118.   The incarcerated person restroom in the PSU was observed with a dirty

3  sink and toilet.  *Id.* SD_1579351 and SD_1579352.  Central Jail staff reported that

4  this restroom is not used.  However, lack of use is not a valid excuse for this

5  restroom or any other restroom to be unclean.

6      *South Bay Detention Facility*

7      119.   The medical holding cell and medical exam room were observed, and

8  both were found clean.  In the medical exam room, the floors and walls were clean,

9  the cabinets and countertops were clean, and the exam table cushion was intact.  *Id.*

10  SD_1579139.  This level of cleanliness demonstrates that the Sheriff's Department

11  does have the capability and capacity to keep medical areas clean.

12          **3.     Medical Reports and Documentation Reviewed**

13      120.   Several Sheriff's Department Medical Services Division reports and

14  documentation described herein were reviewed pertaining to environmental

15  conditions.  The Medical Services Division (MSD) Weekly Update for

16  November 22, 2019 (*see* SD_060006) contains a section on "Body Lice," and the

17  following information is included: "There were 8 inmates at SDCJ Housing 6C who

18  were found to have body lice.  Inspection mobilized quickly and nurses inspected

19  every inmate in Housing 6C and 6D for body lice.  4 inmates were identified as

20  having body lice.  Inspection of 7D also occurred and 2 inmates were identified.  All

21  14 inmates were treated, clothing, linens, and mattresses were replaced.

22  Dr. Montgomery advised as follow-up treatment to ensure hygiene precautions like

23  shower, clean clothes, and mattress check/cleaning should resolve as well as treat

24  head lice (if any) with medication.  Isolation would not be necessary."

25      121.   In cases where lice are found confined to a particular housing unit

26  and/or cells, treatment and hygiene precautions as instructed by Dr. Montgomery

27  may be enough.  However, it should be noted that an incarcerated person found with

28  lice during the intake process should not be introduced into a housing unit or cell

that does not have lice until proper treatment has been conducted and hygiene precautions, showering, change of clothing, etc. have been completed. Follow-up rechecks and treatments as needed should also be conducted.

122. It is understood that the information in the MSD Weekly Update is a reporting out of information for incidents that occurred, however, the information should include the date the incarcerated persons were found to have body lice, the date they were checked in 6C, 6D, and 7D, the date of treatment(s), and any refusals of treatment.

123. A report titled: SDCJ NOC EOS Report November 6 – November 7, 2023, *see* SD_352331-352349, and Lice and Scabies Follow-Up October 18, 2023, *see* SD_352338 states, "IPs found on 4th, 5th, 6th, and 7th floors with lice. In addition, 2 IPs found with lice during intake." The information includes the date of lice treatment and states that multiple incarcerated persons refused treatment. The plan for refusal of treatment should be clearly delineated and how to protect others from the spread of lice from untreated incarcerated persons should be described.

124. A review of the Las Colinas Watch Commander's Log for Monday, February 19, 2024, shows an entry at 1200 hours that states: "Misc: Complaints of lice in House 4B, initially health staff agreed to do a check of the entire module, but later charge nurse stated the IP's would need to submit a sick call request." This is an inappropriate response. It is not clear why the charge nurse stated that a sick call request would be needed. A physical check of all incarcerated persons assigned to House 4B needs to be completed as soon as possible so if lice are found, treatment(s) can be started right away. Sick call requests are individual and it is not clear if a sick call request would result in a nurse going to House 4B to check everyone in the housing unit or if the incarcerated person(s) that create a sick call request would be brought to the clinic, which should not happen.

125. Whenever lice or scabies are discovered in housing units, the facility should complete an investigation such as determining if any incarcerated persons

1  found with lice or scabies during the inspections were recently booked at the

2  facility, trace back the intake medical screening of any recently booked incarcerated

3  persons in housing units where lice or scabies are discovered, determine if the

4  medical screening at intake included a physical check as required per the Medical

5  Services Division Policy, MSD.V.1 Vermin Control, and were any identified with

6  lice or scabies recently transferred from any other facility or jurisdiction.  Also,

7  proper handling of all clothing, towels, linens, and blankets in all housing units

8  where lice or scabies are found should be documented as well as a recheck of

9  involved incarcerated persons and other incarcerated persons in the housing units

10  where body lice or scabies were identified.  I have not been provided with a policy

11  from the Sheriff's Department specifically related to the handling of lice discovered

12  outside of the intake process and lice treatments, however, the steps described above

13  should be conducted to ensure proper environmental health and safety precautions.

14      126.   The Sheriff's Department Detention Services Bureau – Manual of

15  Policies and Procedures, Policy M.9, *Receiving Screening*, dated December 29,

16  2023, Section I. Receiving Screening, paragraph A states, "The registered nurse

17  (RN) assigned to receiving screening will complete a comprehensive assessment of

18  the medical, dental, and mental health needs of the individual and record the

19  responses in the individual's health record."  Policy M.9, *Receiving Screening*, notes

20  the policy is in compliance with:  NCCHC J-E-02.  NCCHC J-E-02 (Receiving

21  Screening) states in part, "4.  The form also records reception personnel's

22  observations of the inmate's:  f.  Skin (including lesions, jaundice, rashes,

23  infestations, bruises, scars, tattoos, and needle marks or other indications of drug

24  abuse)."  Sheriff's Department Medical Services Division Policy Number E.2.1,

25  *Receiving Screening*, dated November 4, 2022, Section II. Receiving Screening,

26  Paragraph B. states, "the clinical assessment includes but is not limited to a series of

27  health questions, a review of available past medical history on record, vital sign

28  measurements, observation and a physical assessment (if necessary)," and Policy

1   MSD.V.1, *Vermin Control*, *see* SD_126200, dated January 4, 2022, Section I.A.

2   states, "Patient will be checked for scabies and or lice during Receiving Screening."

3       127.   A Receiving Screening for an incarcerated person booked at Las

4   Colinas on January 5, 2024, was reviewed. *See* SD_837406-837415. The

5   Receiving Screening shows "No" marked for the question, "Does the patient have

6   any active infections or contagious illnesses."  In addition, the box to indicate "Skin

7   lesions, needle marks, abscesses, bruises, rash, jaundice, lice, trauma, scars, [and/or]

8   tattoos" is not checked on the Receiving Screening either.  *See* SD_837411.

9   However, in reviewing the medical notes for this person, it is documented that on

10  January 5, 2024, the patient was given lice treatment "due to a dx [diagnosis] of

11  Lice from hospital prior to incarceration."  *See* SD_837426.  This is the same day

12  the Receiving Screening was completed, yet there is no indication of lice

13  documented on the Receiving Screening form.  The patient received follow-up

14  treatment for lice on January 12, 2024, and then again on January 19, 2024, and

15  January 28, 2024, due to nits (lice eggs) still being observed during a recheck for

16  lice.  *See* SD_837429, SD_8374431 and SD_837432.  More care should be taken in

17  documenting physical checks, including for lice at intake.

18      128.   A Medical Examiner's Report, *see* SD_001183-001186 and an Autopsy

19  Report, *see* SD_001187-001194, from the County of San Diego, Medical

20  Examiner's Department were reviewed for an incarcerated person, █████████

21  █████, who died at Central Jail on █████████, 2021.  *See* SD_001156.  These

22  reports contained the following information:  Mr. █████ was a ██-year-old male

23  (████████████████████), booked at Central Jail on █████████, 2021.  During a

24  routine cell wellness check on █████████ 2021, Mr. ██████ was found unresponsive

25  and despite medical intervention, Mr. █████ was pronounced dead at 1801 hours on

26  █████████, 2021.  Mr. ██████'s cause of death was reported on the Autopsy Report

27  as Hypertensive and Atherosclerotic Cardiovascular Disease, with Obesity as a

28  contributing factor.  The Manner of Death was noted as "Natural."  Although the

1  medical examiner did not find Mr. ████'s cause and manner of death directly

2  related to environmental conditions at Central Jail, during my review of this

3  incident, I found multiple notable environmental health and safety issues.  At

4  Central Jail, Mr. ████ was assigned to module 4A, cell A02.  *See* SD_033229.

5  Cell A02 contained a triple bunk, a stationary desk and stool, and a toilet-sink

6  combination unit.  Mr. ████ was housed in cell A02 with two other incarcerated

7  persons, triple bunked in a cell designed for double bunking.  A review of

8  photographs taken, at the time, of the incident shows a filthy and cluttered cell.  *See*

9  SD_033260.  There is trash, food, and food trays on the desk and in multiple areas

10  of the floor.  *See* SD_033264, SD_033265, SD_033267, SD_033293 and

11  SD_033295.  The toilet was filthy and contained orange peels.  *See* SD_033271.

12  The mattresses were torn in multiple places.  *See* SD_033279 and SD_033285.  No

13  bed linens were covering the mattresses, just a blanket for each incarcerated person.

14  On the upper level of Module 4A, there was trash in multiple areas on the walkway.

15  *See* SD_033327, SD_033328, SD_033334, SD_033337 and SD_033356.  The

16  upper-level trash can was full as well.  *See* SD_033332.

17       129.   As reported in the San Diego County Medical Examiner's Report,

18  Mr. ████ was observed at the scene with "heavy insect activity, appearing to be

19  lice, about his head and beard."  Documented in the External Examination Section

20  of the Autopsy Report in the paragraph "General" it is noted, "There is heavy

21  infestation of hair and skin by lice.  Numerous scars, some of them scabbed, are

22  covering the body surfaces, most prominent on the extremities, consistent with lice

23  activity and/or drug injection sites."  A review of photographs taken in Module 4A

24  shows Mr. ████ had a full head of hair, a mustache, and a beard, *See* SD_033377.

25  The body appears to be unclean, there are scabs on the arms, torso, hips area, *see*

26  SD_033382, on the legs, *see* SD_033399, and on the backside and upper back, *see*

27  SD_033405 and SD_033407, all consistent with lice activity.  Photographs of

28  Mr. ████ after he arrived at the San Diego County Medical Examiner's

1    Department show a heavy lice infestation on his face.  *See* SD_033476 and

2    SD_033480.  In addition, photographs of ████████ body, his backside,

3    shoulders, back, and legs show an unkept and unclean body with numerous wounds

4    and scabs.

5         130.   As stated above, Mr. ██████was booked at Central Jail on ████████

6    2021, and his death occurred on ████████ 2021.  His body was found infested with

7    lice, however, there is no documentation of lice being found on ████████ body

8    during the Receiving Screening.  In fact, the Receiving Screening form shows "No"

9    marked for the question, "Does the patient have any active infections or contagious

10   illnesses."  In addition, the box to indicate "skin lesions, needle marks, abscesses,

11   bruises, rash, jaundice, lice, trauma, scars, and/or tattoos" is not checked on the

12   Receiving Screening as well.

13        131.   Despite the Sheriff's Department and their Medical Service Division

14   both having policies concerning medical screening requirements during Intake,

15   including physical checks specifically for infestations, such as lice or scabies, this

16   requirement was not adhered to during the intake process for ████████

17   ████████ was at Central Jail for three days, clearly not long enough to have

18   acquired the level of infestation with lice that he had from inside of the facility.

19   Based on my review of the photographs, ████████ arrived at the facility with lice

20   and many clearly visible skin sores and scabs; however, the Receiving Screening

21   documentation indicates neither were observed.  Although ████████ cause of

22   death is not directly related to his lice infestation, clearly he did not receive a

23   physical check as required by policy during the Receiving Screening.

24        132.   These above examples of failure to complete required checks during

25   the Receiving Screening indicate that the Sheriff's Department violates its own

26   policies.

27        133.   Lice treatments do occur at the Sheriff's Department; in fact, a search

28   of a redacted report of pharmaceuticals dispensed from June 1, 2022 –

1   December 19, 2023 returns 600 incidences of lice treatments.  *See*

2   NAPHCARE016682-025975.  From the information in this report, it is not possible

3   to determine how many treatments were first-time or follow-up treatments.  It is also

4   not possible to determine how many treatments resulted from lice discovered on

5   incarcerated persons already in housing units either from failure to conduct a

6   physical check during the Receiving Screening as required or from incarcerated

7   persons contracting lice from other incarcerated persons after intake.  However, it

8   does appear that lice is a significant issue for the San Diego County jail system.

9        134.   The failure to properly check incarcerated persons upon arrival to the

10  facility, per established policy, is a potential threat to the environmental health and

11  safety of the facility.  Lice are contagious and can spread quickly in the carceral

12  environment.  While head lice are not known to spread disease, they can contribute

13  to secondary infections and disease mainly due to itching and scratching.  However,

14  body lice are not the same as head lice.  Body lice can carry and spread bacterial

15  diseases and they cause intense itching and scratching, which can also lead to

16  secondary infections.

17       135.   A Medical Examiner's Report and Autopsy Report from the County of

18  San Diego, Medical Examiner's Department were also reviewed for an incarcerated

19  person, Lonnie Rupard, who died at Central Jail on March 17, 2022.  *See*

20  SD_025987-026008.  These reports contained the following information:

21  Mr. Rupard was a 46-year-old (born October 1, 1975) male, who was booked at

22  Central Jail on December 19, 2021.  During intake, his vital signs were recorded as

23  stable, his height was recorded as 6 feet, and his weight was 165 pounds.  In

24  addition, a December 29, 2021, initial psychiatry sick call evaluation progress note

25  reported he had a history of unspecified Schizophrenia and other psychotic

26  disorders.  The autopsy report notes that on February 22, 2022, he was seen cell-side

27  by the psychiatrist and it was documented that "he appeared to be in no acute

28  distress.  His cell room was relatively clean, no flooding/gassing or smearing of

feces.  The toilet was covered with a cloth and the content could not be visualized."
Based on information in the autopsy report, Mr. Rupard was non-cooperative
regarding medical and mental health care, he repeatedly refused medications
prescribed to him, and no progress/sick call notes were documented from
February 23, 2022, until March 17, 2022.  When Mr. Rupard was seen on March 14,
2022, by a court-ordered psychiatrist for examination of mental competency to stand
trial, the psychiatrist noted the cell was dirty with trash throughout.  The toilet was
full of excrement and the room was malodorous.  There was feces on the floor and
food smeared on the walls.  The decedent was described as unkempt and dirty
himself.

136.   The medical examiner performing the autopsy documented a cachectic
(affected by extreme weight loss and muscle wasting) adult male with a body mass
index of 15.5, a height of 69 inches (5'9"), and a weight of 105 pounds.  This
indicates a weight loss of 60 pounds from the time of arrest until his death and
equates to a 36% loss of total body weight in three months.  A BMI of 18.5 – 24.9 is
considered a weight status of "healthy weight."  A BMI below 18.5 is considered
"underweight."  Mr. Rupard's BMI at the time of arrest was 24.4, which is in the
upper part of the healthy weight range.  The ideal body weight for a 46-year-old
male with a height of 69 inches ranges from 125-169 pounds.  At 105 pounds, with a
BMI of 15.5 indicates that Mr. Rupard was underweight and well below a healthy
weight status.

137.   A determination of weight loss, especially unintentional weight loss,
and the period of time in which weight is lost is the standard for determining if there
is a serious medical concern.  Weight change standards are based on Usual Body
Weight (UBW).  This is the amount that the person usually weighs.  A weight loss
of >5% in a one-month timeframe, or >7.5% in three months are both considered
severe.  Therefore, a 36% loss of total body weight in three months is certainly
considered severe.

138.   The medical examiner's report documents that malnutrition and dehydration in the setting of neglected Schizophrenia in addition to pneumonia are the cause of his death, with SARS-COV-2 (COVID-19) viral infection, Pulmonary Emphysema, and Duodenal Ulcer as contributing factors.  Despite Mr. Rupard's mental health disorder(s) and history thereof, he was permitted to remain in his cell without any medical intervention while he lost weight that equated to 60 pounds between the time of his arrest and date of death and he was permitted to lack fluids to the point of dehydration.  Not only was Mr. Rupard allowed to neglect his self-care, but no effective delivery of minimal care that could sustain his well-being resulted in his death as described in the medical examiner's autopsy report.  It is unclear if medical/mental health staff even observed that he was losing weight between December 19, 2021, and their last progress/sick call note on February 22, 2022.  According to medical records, Mr. Rupard was not seen by medical/mental health staff between February 23, 2022, and his date of death, March 17, 2022.  In the autopsy report the medical examiner wrote, "Ultimately this decedent was dependent upon others for the care; therefore, the manner of death is classified as homicide."

139.   Medical documentation concerning another incarcerated person's death (Roselee Bartolacci, age 32) at Las Colinas on May 26, 2023, was also reviewed. News reports and a complaint filed in the United States District Court, Southern District of California, Case Number 24-CV-1156(WQH-JLB), allege she lost 41 pounds during her incarceration in the San Diego County jail system from April 6, 2023 (date of booking) until May 29, 2023, when she was pronounced dead.  If true, the significant weight loss suffered by Lonnie Rupard and Roselee Bartolacci indicates that the Sheriff's Department needs to improve its attention to ensuring that all incarcerated persons receive adequate nutrition.

140.   Similarly, it should be noted, that those in psychiatric distress will need significant assistance with cleaning their living areas and with their own self-care.

1  Incarcerated people with serious medical and/or mental illness such as the three

2  deaths discussed in this report cannot be expected to remove trash and debris, clean

3  their cells and living areas, or self-direct their own self-care.  Jail staff must also

4  ensure self-care tasks, such as regular showering, are completed as well.

5           **4.      Food Service (Kitchens)**

6           141.   *Food Service Health and Safety Principle*:  Meals must be prepared and

7  served in a manner that meets all established governmental health and safety codes

8  and regulations.

9           142.   *Food Service Health and Safety Rationale*:  Meals must contain food

10  that has been prepared following food safety principles, keeping it free from

11  contamination by harmful bacteria and microorganisms, chemical toxins, and

12  physical contaminants.  Unsafe food can contribute to foodborne illness outbreaks

13  ranging from illness to permanent injury and/or death.  Serving food that is

14  wholesome, safe, and meets nutritional values is an essential part of the health and

15  well-being of incarcerated persons.

16           143.   *Food Service Inspection Findings*:  Food service operations were

17  observed at Vista on January 17, 2024, at East Mesa on January 19, 2024, and at

18  Central Jail and South Bay on May 15, 2024.

19           *Vista Detention Facility*

20           144.   At Vista, unacceptable and unsanitary conditions were observed

21  throughout the food service operation.  Floors were in disrepair in the food

22  preparation areas of the kitchen (*id.* SD_743852) making it impossible to ensure the

23  floors are cleaned properly.  The FDA Food Code 2022 outlines surface

24  characteristics for indoor floor, wall, and ceiling surfaces.[10]

25

26  ───────────────

[10] FDA Food Code 2022, Chapter 6 Physical Facilities, 6-101.11 Surface

27  Characteristics,  "Must be smooth, durable, and easily cleanable where food
establishment operations are conducted."

28  https://www.fda.gov/media/164194/download?attachment .

145.   Floors, door thresholds, and floors/walls behind racks and equipment were dirty. *Id.* SD_743866 and SD_743867.  Food storage racks were observed to be dirty as well. *Id.* SD_743867.

146.   The condition of the kitchen dumpster area was unacceptable and unsanitary.  Everything about the loading dock and dumpster areas was filthy with accumulated trash, debris, food, and filth all around the dumpster area, the wall of the loading dock, the stairs from the loading dock to the lower ground level, and between the loading dock and the dumpster.  There is a trench drain running the length of the base of the loading dock that was also filthy, with debris on and in the drain, and standing water in the drain.  The trench drain grate needed scrubbing as well.  *Id.* SD_743871, SD_743872, SD_743873, SD_743876, SD_743877, SD_743880 and SD_743881.  These photographs illustrate the conditions observed at Vista loading dock and dumpster area:



SD_743872 – Vista (Kitchen dumpster ground area)

/ / /

/ / /

/ / /



SD_743873 – Vista (Kitchen dumpster ground area)





SD_743884 – Vista (Kitchen loading dock)         SD_743877 – Vista (Kitchen loading dock)



SD_743880 – Vista (Kitchen loading dock)

147.    The grease bin/trap was filthy and was standing in water.  The entire area around this bin was also filthy.  *Id.* SD_743885 and SD_743886.  The ground was full of old grease and was in disrepair.  The walls were also filthy, with old grease, and were in disrepair, with peeling paint at the upper levels.  *Id.* SD_743888.

148.    The grease bin/trap was observed with a dead rat lying on top of the bin.  *Id.* SD_743887.  This entire area was unacceptable, unsanitary, and a huge attractant for rodents, cockroaches, and other pests.  The photographs below show the conditions observed around the grease bin/trap:



SD_743885 – Vista (Kitchen loading dock)



SD_743886 – Vista (Kitchen loading dock)

/ / /

/ / /

/ / /



SD_743887 – Vista (Kitchen loading dock)

149.   The janitorial section of the loading dock was observed to be disorganized and dirty, with a mop head stored in a dirty mop bucket, another mop head was lying directly on the ground, a hose was lying on the ground, the mop sink was dirty and contained mold, and there was a dirty trash can top and dirty mat lying on the ground. *Id.* SD_743889, SD_743890, SD_743891, SD_743892 and SD_743893.

150.   Inside the kitchen, in the cooking areas, two bottles of oil were observed sitting between a very dirty gas stove and a grill. *Id.* SD_743894. This can be a dangerous setup, as the bottles may melt if the side of the grill gets hot enough, and if the stove is being used, a flame would be present from the gas stove.

151.   Cooking equipment was also observed dirty, with accumulated grime and old food splattered on the side of an oven. *Id.* SD_743898. This is unsanitary, an example of the lack of cleaning and sanitation practices in this kitchen and a violation of the FDA Food Code 2022.[11]  The below photograph provides an

---

[11] FDA Food Code 2022 – Chapter 4, Paragraph 4-601.11 C, Nonfood-contact surfaces of equipment shall be kept free of an accumulation of dust, dirt, food residue, and other debris.

1  example of dirty cooking equipment observed in the kitchen at Vista:



SD_743898 – Vista (Kitchen)

*East Mesa Reentry Facility*

152.   The food service operation at East Mesa is a centralized kitchen operation, preparing food and meals for all of the Sheriff's Department jail facilities. As such, this is the most important kitchen in the jail system.  The East Mesa kitchen was found with multiple food code violations and unsanitary conditions. Food service areas always have the potential to introduce a foodborne illness outbreak.  Therefore, these areas must be routinely cleaned in all areas, and food contact surfaces must be cleaned and sanitized in accordance with food safety regulations.

153.   Inside the kitchen, mold was observed on equipment and walls.  *Id.* SD_744817 and SD_744818.  Cooking equipment, areas behind cooking equipment, and floors around cooking equipment were observed to be dirty with accumulated grime and debris (*id.* SD_745527, SD_745528, SD_745530 and SD_745531), a clear indication that these areas are not cleaned routinely as required for proper food safety.  Under dishwashing sinks, floors were in disrepair and were filthy, and sink floor drains were dirty.  *Id.* SD_745532.  Floor drains in cooking areas were also observed to be dirty, some with insects crawling in and around them.  *Id.*

SD_745521.



SD_744818 – East Mesa (Kitchen)





SD_745527 – East Mesa (Kitchen)          SD_745528 East Mesa (Kitchen)

/ / /

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11



SD_745532 – East Mesa (Kitchen)

12    154.    Oven racks were covered in grease buildup, an indication that these

13  racks were not cleaned properly or at frequent intervals. *Id.* SD_745542.

14    155.    Ceilings were dirty and spotted with mildew in many areas, ceiling

15  supports were dirty and rusted, and air vents were dirty. *Id.* SD_744819,

16  SD_745534 and SD_745538.  These conditions violate food safety standards since

17  dirt, dust, and debris can fall from these areas and/or become airborne and

18  contaminate food and food contact surfaces.

19    156.    Walls were also observed in some areas in disrepair, such as with

20  peeling paint. *Id.* SD_745540.  This is also a food safety violation.  Walls must be

21  smooth and cleanable.  Peeling paint restricts the ability to clean a wall properly.

22    157.    An open bottle of concentrated dishwashing detergent was observed

23  unattended next to cooking equipment, between the kettle and skittle.[12]  *Id.*

24  SD_745522.  In addition, a chemical bottle was observed unattended sitting inside

25  of a bucket and a second bucket with unknown white fluid was observed.  Both

26

27  ───────────────

[12] A "skittle" is a multi-functional piece of cooking equipment that can be used as a
28  deep fryer, steamer, griddle, skillet, stock pot, etc.  It is also known as a "tilt skillet."

1   buckets were sitting on the floor.  *Id.* SD_745523.

2   158.   The loading dock and dumpster area of this kitchen are of great

3   concern.  The dumpster and entire dumpster area were observed beyond filthy, with

4   accumulated trash, food, debris, and filth around the dumpster, and between the

5   loading dock and dumpster.  *Id.* SD_745510 and SD_745515.  East Mesa is failing

6   to keep its dumpster area clean and is in direct violation of Chapter 5[13] of the FDA

7   Food Code 2022, and Chapter 7[14] of the California Department of Public Health,

8   California Retail Food Code.  The excessive amount of accumulation of trash, food,

9   debris, and filth indicates that the dumpster area is not maintained at an acceptable

10  level for proper food safety.  These photographs illustrate the conditions observed at

11  East Mesa kitchen dumpster area:



SD_745510 – East Mesa Kitchen (Dumpster area)

---

[13] FDA Food Code 2022, Chapter 5. Water, Plumbing, and Waste, 5-501.15 Outside Receptacles, "(B) Receptacles and waste handling units for REFUSE and recyclables such as an on-site compactor shall be installed so that accumulation of debris and insect and rodent attraction and harborage are minimized and effective cleaning is facilitated around and, if the unit is not installed flush with the base pad, under the unit."

[14] California Department of Public Health, Division 104 Environmental Health, Part 7.  California Retail Food Code, Chapter 7, Article 4. Refuse, 11445.5 "Receptacles and waste handling units for refuse and recyclables shall be installed so that accumulation of debris and insect and rodent attraction and harborage are minimized and effective cleaning is facilitated around and, if the unit is not installed flush with the base pad, under the unit."

1
2
3
4
5
6
7
8
9
10
11
12
13



SD_745511 – East Mesa Kitchen (Dumpster area)

14
15
16
17
18
19
20
21
22
23
24
25
26



SD_745512 – East Mesa (Dumpster area)

27
28



SD_745513 – East Mesa (Dumpster area)



SD_745514 – East Mesa (Dumpster area)

SD_745515 – East Mesa (Dumpster area)

159.    Food racks and pans were observed on the loading dock covered in bird feces.  Bird feces was observed on the ground of the loading dock under and around the racks and pans.  *Id.* SD_745517 and SD_745518.  This observation indicates that the racks and pans have been located in this area for some time.  This is a very unsanitary situation, as birds carry many diseases and they defecate anywhere, at any time.  This is also a direct violation of the FDA Food Code 2022, Chapter 6,[15] and the California Department of Public Health, California Retail Food Code, Chapter 8.[16]  It should be noted the FDA Food Code 2022 and the California Retail Food Code may allow for live animals in certain situations, e.g., fish aquariums, shellfish or crustacea on ice, patrol dogs for police matters, service animals, or fish for bait.  Birds are not included as allowed on the premises of a food establishment. Staff informed me that the racks containing bird feces are no longer used.  In this case, they should be removed as specified by food safety regulations.  This photograph illustrates the observation of the loading dock:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[15] FDA Food Code 2022, Chapter 6, Physical Facilities, 6-501.114 Maintaining Premises, Unnecessary Items and Litter,  "The PREMISES SHALL BE FREE OF: (A) Items that are unnecessary to the operation or maintenance of the establishment such as EQUIPMENT that is nonfunctional or no longer used; and (B) Litter; AND 6-501.115 Prohibiting Animals. (A) Except as specified in (B), (C), and (D) of this section, live animals may not be allowed on the premises of a food establishment."

[16] California Department of Public Health, Division 104 Environmental Health, Part 7.  California Retail Food Code, Chapter 8, Article 5. Premises and Facilities, 114257 "All premises of a food facility shall be kept clean fully operative, and in good repair; AND 114257.1 The premises of a food facility shall be free of litter and items that are unnecessary to the operation or maintenance of the facility, such as equipment hat is nonfunctional or no longer used: AND 114259.5 (a) Except as specified in this section, live animals may not be allowed in a food facility."

1

2

3

4

5

6

7

8

9

10



SD_745518 – East Mesa (Loading dock)

*San Diego Central Jail*

160.   The kitchen at Central Jail is located on the 9th floor.  This kitchen is utilized to warm incarcerated persons' pre-packaged meals and bags of soup from the central kitchen at East Mesa and to cook for staff at Central Jail.  Pre-packaged meals for incarcerated persons arrive at Central Jail in crates, are stored in refrigeration, and are then warmed in ovens before meal service.  *Id.* SD_1579385.  Bags of soup are boiled in kettles to warm the soup before meal service.  I was not provided with any information concerning the actual transport of food items from the East Mesa facility, therefore, I am not sure if food safety requirements are adhered to, such as keeping food items at proper temperatures.

161.   While the main kitchen was observed fairly clean, some sanitation and safety issues were observed.  There is a sign above the fire alarm pull that states, "PLEASE KEEP THIS AREA CLEAR FOR ACCESS TO FIRE ALARM.  Thank you SDCJ." *Id.* SD_1579387.  However, food and supply storage racks were blocking the pull mechanism for the fire alarm.  *Id.* SD_1579386.

162.   The kitchen ceiling was observed to be dirty, with mold spots and dirty, rusted drop ceiling supports outside of the rack ovens.  *Id.* SD_1579392.  The floor mixer and the floor around the floor mixer were both observed to be dirty.  *Id.*

1  SD_1579394.  The sink drain was observed to be dirty, debris was on the drain

2  grate, the drain grate was not secured and was missing part of the grate top, and the

3  floor around the drain was dirty and molded.  *Id.* SD_1579398.  The faucet on the

4  sink was calcified and was leaking causing constant dripping from the sink into the

5  floor drain.  *Id.* SD_1579400.  A kitchen door was being held open with dirty and

6  torn plastic bags.  *Id*. SD_1579413.  The incarcerated person bathroom in the

7  kitchen was observed with a dirty sink and floor, an unlabeled chemical bottle was

8  sitting on the sink, paper towels were on top of the paper towel dispenser rather than

9  inside, and the bathroom had an overpowering smell of bleach.  *Id.* SD_1579415

10  and SD_1579416.

11        163.    The officer's dining room (ODR) is adjacent to the main kitchen.

12  While the ODR is not part of this case, this area was of great concern, as multiple

13  food safety and sanitation violations were observed.  The ODR needs immediate

14  intervention, with targeted cleaning and sanitation measures to mitigate the filthy

15  conditions observed in this area.  The top and sides of the cooking equipment had

16  food debris and stains, and the floor in front of and between the cooking equipment

17  was dirty, as was the wall behind the cooking equipment.  *Id.* SD_1579407,

18  SD_1579410 and SD_1579411.  The floor under the cooking equipment was beyond

19  filthy, with food debris, grease, dirt, grime, and mold under all of the cooking

20  equipment.  *Id.* SD_1579403, SD_1579405 and SD_1579406.  A preparation table

21  had an upside-down pie plate on the filthy floor under the front leg that was also

22  filthy.  *Id.* SD_1579409.  The floor drain, drainpipe, and floor around the floor drain

23  were filthy and molded.  *Id.* SD_1579412.  Based on the filthy conditions observed

24  in the ODR, I have serious concerns about adherence to required cleanliness and

25  sanitation measures in kitchen areas that I did not have sufficient time to completely

26  inspect, but where incarcerated persons' meals are exposed to.  The photographs

27  below illustrate the conditions observed in the ODR.

28

1

2

3

4

5

6

7

8

9

10

11



SD_1579411 – Central Jail

12

13

14

15

16

17

18

19

20

21

22



SD_1579405 – Central Jail

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1
2
3
4
5
6
7
8
9
10
11
12



SD_1579412 – Central Jail

13    *South Bay Detention Facility*

14    164.   The kitchen at South Bay is utilized to warm incarcerated persons' pre-

15  packaged meals and bags of soup that arrive from the central kitchen at East Mesa

16  and also to prepare meals for staff at South Bay.  In the same manner as Central Jail,

17  pre-packaged meals for incarcerated persons arrive at South Bay in crates, are stored

18  in refrigeration (*id.* SD_1579174), and are then warmed in ovens before meal

19  service.  *Id.* SD_1579153.  Bags of soup are boiled in kettles to warm the soup

20  before meal service.  *Id.* SD_1579158.

21    165.   This kitchen was observed fairly clean.  However, some food safety

22  and sanitation issues were observed.  The floor under the cooking kettles was

23  observed to be dirty.  *Id.* SD_1579161.  A floor drain was observed dirty and moldy,

24  and the floor and wall base around the drain were dirty.  *Id*. SD_1579165.

25    166.   The following safety concerns were observed in the kitchen at South

26  Bay.  The eyewash station contained one bottle of saline eyewash that had expired

27  in June 2023.  This bottle should be replaced immediately.  The electrical outlet

28  used for the kettles was accessible on the back wall next to the kettles.  *Id.*

1    SD_1579159.  This outlet was not secured, was not tamper-proof, and did not

2    contain any protective covering even though water is used inside and around the

3    kettle in close proximity to the outlet.  A mop and squeegee were stored sitting on

4    the floor next to a sink.  *Id.* SD_1579166.  Allowing this equipment to sit on the

5    floor is improper storage because, from a sanitation perspective, it risks exposing the

6    equipment to possible dirt, grime, and fungus on the floor.  It is also a safety

7    concern because someone could use these items to injure another person.

8        167.    The loading dock for South Bay is enclosed underground.  There was

9    no trash compactor.  However, trash for South Bay was contained in multiple

10   covered dumpsters in the loading dock area.  *Id.* SD_1579178.  According to staff,

11   the dumpsters are removed and emptied every Monday, Wednesday, and Friday.

12   The dumpster area was clean.  However, the wall behind the dumpsters was

13   damaged and had peeling paint, and the wood bumper was damaged, making the

14   wall area porous and hard to keep clean.  *Id.* SD_1579180.  It is important to keep

15   any area where trash is stored clean to avoid bacterial growth and attracting pests

16   and vermin.  This wall should be scrubbed, a sealant and good-quality paint applied

17   to make the wall easy to clean, and the wall should be kept in good repair.  The

18   dumpsters were observed full and an excessive amount of flying insects was

19   observed in and around the dumpsters.  Two insect glue traps were observed on the

20   loading dock; one was soiled enough to need changing, and the other had a few

21   insects.  *Id.* SD_1579181 & SD_1579184.  The glue traps should be dated to

22   determine how many insects are trapped in a given period, and what insects are in

23   the area.  The grease bin/trap and the area surrounding the grease bin/trap were

24   observed clean and in good repair.

25        **5.    Cleanliness and Sanitation Conclusion**

26        168.    It is a common practice for correctional organizations to complete self-

27   inspections and/or pre-audits and address deficiencies in preparation for inspections

28   conducted from outside their organization.  It is reasonable and likely that the

1   Sheriff's Department jail facilities completed cleanup/cleaning details before my

2   arrival for each inspection.  Multiple incarcerated people at George Bailey and

3   Central Jail, for example, told us that the facilities were power-washed the day

4   before our inspection and extra cleaning details had occurred.  Further, documents

5   produced by San Diego County in this litigation show that staff routinely prepare for

6   facility inspections by third parties weeks in advance.  *See* SD_430262 (beginning

7   preparations, including "[f]acility cleanliness/housekeeping" and "[i]dentifying

8   inoperable equipment" one month prior to the 2023 BSCC inspection); *see also*

9   SD_654104 (preparing for a 2022 ACLU inspection one month in advance by

10  making cleaning carts accessible to incarcerated people and providing them "the

11  opportunity to clean as requested," emptying trashcans, and deep cleaning certain

12  areas of the jail).  Yet, the conditions observed during the on-site visit to the

13  Sheriff's Department jail facilities from January 16-19, 2024, and May 15, 2024,

14  were in many areas dirty, unsanitary, and lacking proper maintenance.  These

15  conditions place incarcerated people, as well as staff, visitors, and volunteers, at

16  substantial risk of harm to their health and safety.  Incarcerated persons must rely on

17  jail staff to ensure their safety and security and therefore they are involuntarily

18  subjected to unsanitary and unsafe conditions about which they have no real means

19  of remedying.

20      169.   The Sheriff's Department Policy L.2, *Sanitation and Hygiene*

21  *Inspections*, dated July 3, 2018 states, "[e]ach facility will have a weekly hygiene

22  inspection conducted by designated staff members.  The staff members will inspect

23  and have deficiencies corrected and reported to the facility commander."  Multiple

24  Module Inspection Rating Sheets from various facilities were reviewed.  *See*

25  DUNSMORE0064977-0065024, DUNSMORE0231875-0231876,

26  DUNSMORE0234050-0234134, DUNSMORE0060539-0060619,

27  DUNSMORE0060855-0060905, DUNSMORE0061076-0061172,

28  DUNSMORE0062097-0062191, DUNSMORE0062786-0062818,

1   DUNSMORE0063301-0063344 and SD_654067- SD_654068.  These forms are

2   presumed to be used for the hygiene and sanitation inspections as required by Policy

3   L.2, *Sanitation and Hygiene Inspections*.  The forms are not uniform or consistent

4   for all facilities and vary in information to be captured.

5        170.   The form for Central Jail, notes in Section 1 – "Day Room," the walls,

6   windows, floors, stairs, and check for contraband are noted to be inspected.  In

7   Section 2 – "Cells," the form does not note any criteria for giving a pass/fail.  There

8   are no specifics concerning what should be inspected, i.e. toilets, sinks, showers,

9   lighting, air vents, trash, clutter, mattresses, etc.  The forms are standardized for use

10  in all areas of Central Jail but do not apply well to all areas, and deputies conducting

11  the inspections are not consistent in completing the forms.  For example, some

12  housing areas, such as 8A – 8D are dorm-style, but the form is set up for individual

13  cell inspections.  Deputies inspecting housing units 8A – 8D on February 5, 2022,

14  wrote on the form, "Dorm Housing, Intercom Checks OK."  Deputies inspecting 8A

15  and 8B on February 12, 2022, wrote on the form "Dorm Housing," circled "PASS"

16  on the form for CELL# 01 – 20, and drew a line through "OK" in the INTERCOM

17  STATUS section.  Deputies inspecting 8C and 8D on February 12, 2022, also wrote

18  on the form "Dorm Housing," but drew a line through the CELL# and INTERCOM

19  STATUS."   There are no specifics noted on any of the inspections for these housing

20  units, 8A – 8D on either February 5, 2022 or February 12, 2022, as to what exactly

21  was inspected concerning sanitation and hygiene.  It was also noted that multiple

22  forms have the same date and time for the inspection, although the module being

23  inspected is different.  This gives the appearance that the forms are completed at one

24  time rather than during an actual visual inspection of the areas.  On most forms, one

25  deputy is shown on the form to be "completing the form" and multiple deputies are

26  listed as "Inspecting."  It is unclear if all deputies conduct the inspections together in

27  each area, or if each deputy inspects an individual area.  It is also unclear what the

28  "inspections" consist of or address.

171.   Multiple Module Inspection Rating Sheet forms used by South Bay were also reviewed.  This form has scoring between 0-3, where 0 is the unit is on lockdown, 1 – a deficiency or deficiencies are noted, 2 – pass, 3 – one extra hour of dayroom on date of inspection.  On the form, Section 1 – "Day Room," the categories of dayroom/tables, floors and stairs, and shower areas are listed to be inspected.  This scoring sheet suggests that when a unit is on lockdown an inspection is not completed, which will contribute to any deficiencies not being identified and possible unsanitary conditions left unchecked.

172.   In Section 2 of the form – "Cells," multiple items (clothes, laundry, vents, windows, walls, graffiti, trash, food checked, intercom, toilet, sink) are listed with a check box next to each item.  It is unclear if the check box is supposed to be marked if the item was checked only, checked and found sufficient to pass, or checked and found with a deficiency.  The score is cumulative for each cell across all categories.  The Scoring Section of the form shows an explanation of how scores are calculated.  Inspection forms were found with the same inspection date and time for multiple housing areas, such as the inspection in 4A and 4B both show an inspection date of January 6, 2022, with the time as 2000 hours (8:00 p.m.).   It is unclear how both modules were inspected on the same date and time—likely both were not.

173.   The Module Inspection Rating Sheet form used by George Bailey is very similar to the form used by South Bay.  It has scoring between 0-3, where 0 is the unit is on lockdown, 1 – is a deficiency or deficiencies are noted, 2 – is pass, and 3 – is one extra hour of dayroom time on date of inspection.  For Section 1 – "Day Room," the dayroom/tables, floors and stairs, and shower area are checked.  In Section 2 – "Cells," multiple items (clothes, laundry, vents, windows, walls, graffiti, trash, food checked, intercom box operational Yes No) are listed with a check box next to each item.  There is no section to mark a check of the sinks or toilets, which is a problem.  It is unclear if the check box is supposed to be marked if the item was

1   checked only, checked and found sufficient to pass, or checked and found with a
2   deficiency.  It appears that a box is marked if there is a deficiency found for that
3   category.  The score is cumulative for each cell across all categories.  The Scoring
4   Section of the form shows an explanation of how scores are calculated.  Multiple
5   inspection forms for George Bailey were reviewed.  As with other forms, inspection
6   forms have the same date and time for inspections that are noted in different
7   modules, suggesting that the forms were not completed while the inspection was
8   underway.

9       174.   Based on the conditions observed during my inspections, it is doubtful
10  if meaningful sanitation and hygiene inspections are occurring and/or if any
11  meaningful corrective actions and follow-up measures are conducted.  In my review
12  of the Module Inspection Rating Sheet forms, I noted that information documented
13  on the forms by deputies conducting the inspections is mostly related to
14  maintenance deficiencies.  Very little related to sanitation and hygiene is
15  documented.

16      175.   Policy L.2, *Sanitation and Hygiene Inspections*, dated July 3, 2018,
17  needs to be revised.  It is vague and does not delineate appropriate steps for
18  inspecting facilities, ensuring corrective actions are taken, or any follow-up
19  measures, nor does the policy set provisions for accountability.  Despite the policy
20  being vague and lacking clear instructions, a policy is in place and does require
21  weekly sanitation and hygiene inspections.  It is perplexing to me how such filthy
22  conditions can accumulate and continue without active intervention and corrective
23  measures when deplorable conditions in some areas are so obvious.

24      176.   In addition, Sheriff's Department Policy L.5, *Trash Removal*, dated
25  May 13, 2022, states that trash will be removed from housing areas at least twice per
26  day.  However, multiple incarcerated persons reported that trash is removed only on
27  Mondays, Wednesdays, and Fridays, while some reported that trash is not removed
28  regularly from the housing units.

1      177.   The inhumane conditions are clearly observable to incarcerated people

2  and staff.  Plaintiff Anthony Edwards observed "mold and bugs in the showers and

3  cells."  Plaintiff Anthony Edwards Response to Defendants' Special Interrogatory

4  No. 12.  Plaintiff James Clark "also observed black bugs emerging from the sinks

5  and toilets at Central Jail."  Plaintiff James Clark Response to Defendants' Special

6  Interrogatory No. 10.  Plaintiff Ernest Archuleta observed that the Sheriff's

7  Department failed to remedy "a toxic environment" at Central created when

8  incarcerated people "sometimes defecated and urinated in the shower and smeared

9  feces on the walls."  Plaintiff Ernest Archuleta Response to Defendants' Special

10  Interrogatory No. 10.  Plaintiff Jesse Olivares went on a hunger strike, in part,

11  because of "broken toilets" and "clogged showers" in the jail, leading to staff

12  retaliating by throwing his food onto the dirty floor of Mr. Olivares's cell.  Plaintiff

13  Jesse Olivares Response to Defendants' Special Interrogatory No. 10

14      178.   Conditions are particularly dirty in the psychiatric units at Central Jail

15  according to photographs in the TAC.  See TAC at ¶¶_215, 217.  Additional TAC

16  photographs of debris and trash piled in cells are consistent with my observations

17  during the inspections.  *Id.* at ¶¶_296-99.

18      179.   Jail staff are failing to ensure the environment at the jails is maintained

19  at an acceptable level of cleanliness, repair, and safety to provide humane living

20  conditions, even when conditions are so dirty and unsafe that the named plaintiffs

21  and whistleblower, untrained in cleaning and sanitation practices, know the

22  conditions are not acceptable.  Examples of this include the filth observed in toilets,

23  the excessive accumulation of garbage around the kitchen dumpster area, the

24  indifference to the presence of birds and bird feces in multiple housing areas at

25  George Bailey, the kitchen loading dock at East Mesa, and the extreme and

26  inexcusable filth observed in the ODR at Central Jail.  Therefore, it is my opinion

27  that the San Diego County Jail Defendants fail to ensure adequate environmental

28  conditions for the health and safety of incarcerated persons, depriving them of their

1    basic human needs.  It is also my opinion that the Defendants know of or disregard

2    these conditions and their effect on the Dunsmore Class.

3    **B.    Unsafe Physical Plant Conditions**

4    **1.    Plumbing**

5    180.    *Plumbing Health and Safety Principle*:  Operable toilets and wash

6    basins must be accessible to incarcerated persons 24 hours per day.  Incarcerated

7    persons must be able to utilize a toilet and wash basin without staff assistance when

8    they are confined to their cell/room.  These are basic conditions of confinement

9    necessary for humane living conditions and a reasonable degree of safety.

10    181.    *Plumbing Health and Safety Rationale*:  Plumbing fixtures must

11    operate effectively to ensure that incarcerated persons and staff can perform basic

12    health and hygiene practices and are not exposed to waste materials and

13    contamination.  Lack of functioning sinks and/or toilets in housing areas, especially

14    where incarcerated persons are confined or mostly confined to cells/rooms, exposes

15    them all to risk of harm.  The expectation that waste materials, dirt, grime, and filth

16    can remain in a sink or toilet, or leaks can go unaddressed allowing continual

17    standing water on floors, substantially increases the risks of health and safety issues

18    and deprivation of basic human needs.  These conditions present perfect scenarios

19    for the growth of bacteria, fungi, and exposure to harmful microorganisms, which

20    also creates a risk of serious health safety issues.  In addition, standing water creates

21    an environment where slips and falls can occur.

22    182.    *Plumbing Inspection Findings*:  Plumbing leaks and malfunctions were

23    observed during the on-site visits, as well as dirty pipe chases with leaking and

24    corroded pipes.  At George Bailey, a very dirty pipe chase was observed with

25    leaking and corroded pipes.  *See* Exhibit C at SD_743127, SD_743128 and

26    SD_743129.  At Vista, in Upper West – Module 2, a leak inside of the pipe chase

27    was causing standing water inside of the pipe chase and seepage through the wall in

28    the housing unit.  *Id.* SD_743671, SD_743672 and SD_743673.  Bed linens were on

1  the floor in front of the pipe chase door (*id.* SD_743675) to collect the leaking

2  water.  However, the cause of the wet floor in the housing unit was not discovered

3  until I requested that staff open the pipe chase.  Also, at Vista, in Upper West –

4  Module 3, another pipe chase was found with standing water and a pipe leak.  *Id.*

5  SD_743720 and SD_743721.

6       183.   At Vista, a consistent issue with a leaking water line in housing units

7  was observed, as evidenced by the stained walls under these lines, indicating the

8  leaking is continual and has occurred for some time.  *Id.* SD_743487.  In housing

9  unit LW2, the waterline was dripping, causing water to run down and stain the wall,

10  and was keeping the floor under the water line wet.  Based on the condition of the

11  wall, it was apparent that the water had been dripping for some time.  *Id.*

12  SD_743505.  This creates a slip-and-fall hazard on the floor.  The same condition

13  was also discovered in South House – Module 5 (*id.* SD_743573) and in Module 3.

14  *Id.* SD_743625.

15       184.   Sinks and toilets were observed with continuous leaks in various areas.

16  At Central Jail, filthy toilets were found leaking causing puddling on the floor in

17  Court Holding numbers 4 and 8.  At South Bay in Module 1B (cell number 15), a

18  sink/toilet combination unit was observed leaking at the bottom onto the floor.  At

19  Vista in the male holding unit called "Male Phone" and at Central Jail in Module 6E

20  (cell number E07), the sinks were continuously leaking from the spout.  *Id.*

21  SD_743257 and SD_1579522.

22       185.   Further, incarcerated people at multiple facilities demonstrated that

23  their toilets were not properly functioning, or explained prior instances where they

24  were forced to use non-functioning toilets for an extended period of time.  In George

25  Bailey House 3C, two cellmates demonstrated for me that their toilet would not

26  flush when they pushed the button.  They explained that they were forced to scrape

27  waste out of the toilet themselves in order to dispose of it.  In Las Colinas, an

28  incarcerated person in House 4 stated that, while housed in Administrative

Separation, her toilet became non-functional and staff would not allow her to use the restroom outside of her cell, which forced her to defecate on the floor.

186.    To the extent that the Sheriff's Department blames incarcerated people for toilets becoming non-functional, that is no excuse.  The Sheriff's Department is responsible for maintaining access to functioning toilets, even if incarcerated persons interfere with those toilets by attempting to flush heavy solids.  And there are solutions to address such plumbing issues in correctional facilities, such as the "Muffin Monster," which is an industrial grinder that can break down "[s]hoes, jumpsuits, bedsheets, keys, rocks," and other items that incarcerated people may place in a toilet.  *See* Corrections, JWC Environmental, "Lock Down Jailhouse Clogs Due to Inmate Sabotage," https://www.jwce.com/application/corrections/.

## 2.    Electrical

187.    *Electrical Health and Safety Principle*:  The facility shall conform to all applicable federal, state, and local fire safety codes, and ensure procedures and practices do not create threats to the safety of incarcerated persons, staff, or visitors.  Any variances or exceptions to fire safety codes shall be approved by the jurisdiction's authority.

188.    *Electrical Health and Safety Rationale*:  Electrical standards are designed to protect against exposure to electrical dangers or injuries such as electric shock, burns, or fires.  To avoid electric dangers, measures such as tamper-proof receptacles, enclosures, grounding, protective devices, and safe work practices should be used by the facility.

189.    *Electrical Inspection Findings*:  The Sheriff's Department does not ensure appropriate measures are taken to avoid incarcerated persons from access to electrical hazards.  Electrical outlets were observed to be open and unsecured, where incarcerated persons could insert objects or wires into the plugs creating a safety hazard, such as electrocution, fires, or using outlets to make "stingers" used to light fires or smoking materials.  In fact, Plaintiff Nelson alleges that he was repeatedly

1   shocked when he rested his arm on a metal table connected to the telephones in his

2   housing unit at Central Jail.  The shocks caused blister-like sores to form on Plaintiff

3   Nelson's arm which became infected.  *See* Third Amended Complaint at ¶ 305.

4       190.   At Las Colinas, electrical outlets were observed to be open and

5   unsecured.  For example, in Medical Ward 3, multiple electrical outlets were

6   accessible along the wall labeled with bed numbers.  *Id.* SD_744120.  At East Mesa,

7   accessible electrical outlets were observed in housing units.  *Id.* SD_744915 – D1.

8       191.   Electrical outlets were observed in housing units at Vista under the

9   faucet of the housing unit water line.  In many housing units, the faucets were

10  leaking and water was running down the wall, next to and over the outlet.  *Id.*

11  SD_743505 and SD_743574.  It is unclear if these electrical outlets are active or

12  tamper-proof.

13      192.   In medical clinic number 1 at Vista, duct tape was holding an electrical

14  cord along a cabinet and also into an electrical outlet:



SD_743806 (Clinic)

25      193.   At George Bailey, in House 5 – Module 5A, wires from the telephone

26  cord were exposed at the telephone (receiver) connection.  *Id.* SD_743133.  These

27  are potentially dangerous conditions that must be addressed.

28

### 3.    Lighting

194.    *Lighting Health and Safety Principle*:  Adequate levels of lighting must be provided and maintained for the health and well-being of both incarcerated persons and staff.  In addition, lighting levels must be sufficient to support appropriate hygiene and sanitation practices.  Lighting in incarcerated persons' rooms/cells and personal grooming areas should be at least 20 foot-candles at desk level.[17]

195.    *Lighting Health and Safety Rationale*:  Appropriate and sufficient lighting levels promote adequate performance of cleaning and sanitation tasks and appropriate personal hygiene.  Appropriate and sufficient lighting levels are required for safety and to reduce the potential for accidental injuries.  Furthermore, adequate lighting in housing units, dayrooms, cell locations, restroom areas, and showers contributes to an incarcerated person's overall well-being.

196.    *Lighting Inspection Findings*:  Lighting levels were measured in housing unit dayrooms, bathrooms, and at the desk level in individual cells during the May 15, 2024, visits to Central Jail and South Bay.  At both facilities, lighting levels in these areas were found below the standard required by BSCC Title 24 §1231.3.6, which is "no less than 20 footcandles."[18]  At Central Jail, seventeen lighting measurements were taken.  Lighting levels ranged from a low of 4.4 foot-candles found in the bathroom in Module 8C to a high of 18.3 foot-candles found in the dayrooms of Modules 8A and 8C.  The average of all measurements at Central Jail was 13.67 foot-candles.  At South Bay, five lighting measurements were taken.

---

[17] A foot-candle is "a unit of illuminance on a surface that is everywhere one foot from a uniform point source of light of one candle and equal to one lumen per square foot." *Merriam-Webster*, Dictionary, https://www.merriam-webster.com/dictionary/foot-candle.

[18] Board of State and Community Corrections (BSCC), Title 24 – Minimum Standards for Local Detention Facilities, 1231.3 Design criteria for furnishing and equipment, §1231.3.6 Lighting – "Lighting in housing units, dayrooms and activity areas must be sufficient to permit easy reading by a person with normal vision, and shall not be less than 20 foot-candles (215.2 lux) at desk level and in the grooming area."

1  Lighting levels ranged from a low of 1.34 foot-candles found in Module 3B (cell

2  number 2) to a high of 12.81 foot-candles found in the dayroom of Module 3B.  The

3  average of all measurements at South Bay was 3.79 foot-candles.  This issue must

4  be addressed at these two facilities; San Diego should also test the lighting at its

5  other five facilities.

6           **4.    Air Ventilation, Quality, and Temperatures**

7           197.    *Air Ventilation, Quality, and Temperatures Health and Safety*

8  *Principle*:  Air ventilation, flow, and circulation must comply with applicable clean

9  air standards and local codes.  Mechanical systems for control of air temperatures

10 should be capable of raising or lowering air temperatures to comfortable levels.  Air

11 quality must be maintained in a manner to ensure a healthy environment for

12 incarcerated persons and staff.

13          198.    *Air Ventilation, Quality, and Temperatures Health and Safety*

14 *Rationale*:  Good indoor air quality is an important part of a healthy and comfortable

15 indoor environment.  Ambient temperature and humidity control are important for

16 thermal comfort and healthy living.  Problems with indoor air quality can be caused

17 by one or many factors, such as poorly operating/maintained air-conditioning,

18 heating and ventilation systems, moisture incursion, dampness, aerosol products,

19 cleaning/disinfecting chemicals, overcrowding, and/or outside air pollutants.  Poor

20 indoor air quality can lead to a multitude of health issues, such as eye, sinus, and

21 throat irritation, headaches, allergy symptoms, dizziness, and/or fatigue.  Long-term

22 exposure to poor indoor air quality can cause more serious health issues such as

23 respiratory diseases, asthma, heart disease, and/or cancer.

24          199.    Dampness and moisture in buildings can lead to the growth of bacteria

25 and fungi, especially mold.  Whenever and wherever moisture is present, the

26 potential for mold growth exists.  Mold can adversely affect the health of those

27 exposed causing respiratory issues, asthma symptoms, cough, and/or sinus

28 problems.  Bacteria growth can cause many health issues including infections,

1   disease, adverse reactions, and permanent harm.

2       200.   *Air Ventilation, Quality, and Temperatures Health and Safety*

3   *Inspection Findings*:  The San Diego County jails staff are not providing housing

4   environments that have good air quality, and are therefore subjecting incarcerated

5   persons to an environment that may cause health issues or harm as evidenced by the

6   dirt, dust, and/or mold on air vents, ceilings, walls, and air returns.  While some air

7   quality concerns are previously covered in this report under Section IX.A.5

8   (Cleanliness and Sanitation Conclusion), I have an overall concern about the lack of

9   appropriate air quality and the health effects these conditions may cause.

10  Additionally, the San Diego County jails are not maintaining housing units with

11  livable temperatures, which exacerbates the ventilation problems by prompting

12  incarcerated people to block vents in their cells in order to stay warm.

13      201.   Inside incarcerated persons' housing units, ceilings, ceiling tiles, and

14  walls around, above, and below air vents are beyond filthy with accumulated dust,

15  dirt, and grime.  Air vents blow dust and debris into the air, sometimes directly

16  where incarcerated persons sleep, and onto the ceiling tiles and walls, resulting in

17  excessive accumulation around air vents and across the entire ceiling and on walls.

18  Air return vents in many cases were observed dirty and blocked with excessive dust

19  accumulation.  These circumstances are a clear indication that air filters are not

20  changed routinely and/or when they become dirty.  These photographs illustrate

21  some examples of air vents observed during our visits:

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1
2
3
4
5
6
7
8


SD_742935 – George Bailey


SD_742938 – George Bailey

9
10
11
12
13
14
15
16
17


SD_743579 – Vista

SD_744319 – Las Colinas

18  202.  During the observations at George Bailey, I asked to view the air filters

19 on the air handlers.  The air handlers are on the roof, and when I was able to view

20 them later in the day, the air filters were very clean and looked new.  I asked how

21 often air filters are changed and was told quarterly.  I asked when the last time the

22 air filters I was viewing had been changed and was told, "Today."  Based on the

23 number of dirty air vents and air returns observed in the facility, I question the

24 actual scheduled replacement of air filters, even quarterly.  Maintenance activity

25 such as changing air filters should be logged.  I was not provided with any

26 documentation or logs of air filter changes and I do not know if they exist.

27  203.  As for temperature, incarcerated people at all facilities that I inspected

28 in January complained that temperatures were too cold.  In George Bailey,

1   incarcerated people in House 3C, House 5A, and House 5B all complained that their

2   cells were cold, with one describing it as "freezing."  These incarcerated people told

3   me that they attempted to cover their vents because their cells would get so cold,

4   particularly at night.  In Vista, incarcerated people in Module 5 and Upper West 2

5   complained about the cold air from vents in their cells, with another person again

6   describing the conditions as "freezing."  One person estimated that the temperature

7   in their unit had been raised by about 20 degrees immediately before the inspection.

8   In Las Colinas, an incarcerated person in House 3C complained about the "freezing

9   cold" from the vent in her cell.  At East Mesa, an incarcerated person in House C1

10  explained that incarcerated people put towels by the doors in an effort to create

11  insulation because it would get so cold at night.

12      204.   At South Bay, Joshua Cantor (22726037) reported that overly cold jail

13  temperature is a "big deal."  He recalls that in June 2023, all the jails in San Diego

14  County were cold and no long-sleeved shirts or closed shoes were provided.  He

15  stated that a couple dozen people filed grievances concerning the cold temperatures

16  and the temperatures were made even colder.  Mr. Cantor also stated that two days

17  before the last inspection by Plaintiffs' counsel, the air temperature went up and two

18  days after the visit, the temperature went back down.  Two weeks ago, the

19  temperature went back up again.  Mr. Cantor feels the temperature fluctuations are

20  tied to when inspections are scheduled.

21      205.   During my May 15, 2024, inspection at both Central Jail and South

22  Bay, air temperature and humidity levels were measured.  Air temperatures at

23  Central Jail averaged 75º F, with an average humidity level of 55%.  At South Bay,

24  the air temperature was measured at 71º F, with a humidity level of 57%.  While the

25  temperatures found during the May 15, 2024, visit are considered appropriate for

26  comfort level, fluctuations below 70º F may be too cold when long sleeves or closed

27  shoes are not provided.

28

### 5.    Unsafe Physical Plant Conclusion

206.    Unsafe and uncared-for physical plant conditions were observed in multiple areas during the facility observations.  The environmental conditions within a facility have an overall effect on the institution's ability to operate effectively and affect the overall safety and security of incarcerated persons, staff, and visitors.  Facilities are expected to provide a safe and secure environment and reasonable and appropriate measures must be taken to guarantee safety and reduce substantial risk of harm.  The Sheriff's Department jail facilities have multiple safety and security issues that are putting incarcerated persons, staff, and visitors at immediate and serious risk of harm.  In addition, these safety and security issues jeopardize the physical plant and facilities as a whole.

207.    Plumbing leaks are causing continual standing water, excessive moisture in many areas, wet floors, and puddling of water on floors, all of which allow for the unchecked growth of bacteria and fungus and create clear slip and fall hazards.  Water is permitted to stand on floors in housing units for extended periods.  Leaks are remedied by stuffing a towel under doors and along walls, or spreading towels, blankets, or linens on floors to absorb water, all of which are very unsanitary practices.

208.    Unsecured electrical outlets, exposed wiring, and lack of proper safety precautions at receptacles leave open access to electrical hazards, tampering with electrical outlets, and the potential for accidental or intentional electrocution, burns, or starting a fire.

209.    Lighting is grossly insufficient in some areas, including housing units, bathrooms, showers, and dayrooms, increasing the risk of injuries from accidents and jeopardizing security measures as incarcerated persons cannot see properly and staff cannot monitor incarcerated persons properly.  Lighting levels in some areas are not sufficient to support appropriate personal hygiene and grooming practices or proper sanitation in personal hygiene areas.  In addition, as previously mentioned,

1   multiple individual cells were observed with lighting levels below sufficient levels,

2   such as 1.55 foot-candles at South Bay, Module 3B (cell number 2), and 1.37 foot-

3   candles in Module 2A (cell number 13), both measured at the desk level.  At these

4   lighting levels, it is unreasonable to expect that incarcerated persons are able to

5   easily read materials, see well enough to write, or perform everyday tasks safely.

6       210.   Air quality is continuously at risk due to filthy air vents and air returns.

7   Air vents are so dirty that they project dust, dirt, and filth across ceilings, along

8   walls, and into the open air continuously.  Air returns are blocked with dust, dirt,

9   and filth, and continuously add to an environment with very poor air quality.  Air

10   vents are blocked with paper and various other materials, precluding proper airflow

11   and allowing for the growth and spread of bacteria, viruses, and fungi.  Mold was

12   also observed in multiple areas on walls, ceilings, air vents, and in showers.  The air

13   quality at the Sheriff's Department jail facilities is not maintained in a manner to

14   ensure a healthy environment for incarcerated persons, staff, or visitors, which poses

15   the threat of respiratory issues, asthma, and other serious health issues.

16       **C.**    **Other Observations**

17          **1.**    **Chemical Control**

18       211.   *Chemical Control Health and Safety Principle*:  The institution must

19   ensure that staff, volunteers, contractors, and incarcerated persons are protected

20   from injury and illness.

21       212.   *Chemical Control Health and Safety Rationale*:  Controlling the use of

22   and exposure to chemicals and/or toxic substances is the fundamental method of

23   protecting staff and incarcerated persons**.**  To ensure chemical safety, information

24   about the identities and hazards of the chemicals must be available and

25   understandable to workers.  All employers with hazardous chemicals in their

26   workplaces must have labels and safety data sheets (SDS) for their exposed workers,

27   and train them to handle the chemicals appropriately. *See* Occupational Safety and

28   Health Administration, "Hazard Communication," https://www.osha.gov/hazcom.

213.    *Chemical Control Inspection Findings*:  Throughout observations during on-site visits to the San Diego County jails, chemicals were in multiple areas unsupervised, chemical bottles were open, chemicals were in unlabeled containers, and cleaning carts were often unattended and dirty.  OSHA and Cal/OSHA have very clear guidelines for the use of chemicals and toxic substances, such as requirements for training on the proper use and storage of chemicals, use of personal protective equipment (PPE), and labeling of chemicals, including secondary containers.  These guidelines are developed specifically to protect those who utilize or are exposed to chemicals in the workplace.  Multiple instances of failure to follow these guidelines were observed during my on-site inspections.  In addition, all chemicals should only be accepted by a facility with an affixed label on the product.  When chemicals are transferred to a secondary container, such as a trigger spray bottle, the appropriate label should be affixed to the secondary container. Labels provide information about the chemical and instructions on its proper use, such as dilution ratios, safety precautions, use of PPE, etc.  It should also be noted that sanitizer and disinfectant products used to kill viruses and bacteria are registered with the Environmental Protection Agency (EPA) as antimicrobial pesticides.  Labels on pesticide products are legally enforceable, and all of these labels carry the statement: "It is a violation of Federal law to use this product in a manner inconsistent with its labeling." *See* United States Environmental Protection Agency, "Introduction to Pesticide Labels," https://www.epa.gov/pesticide-labels/introduction-pesticide-labels.  Multiple instances were observed during my inspections of chemical labels not being followed.  Therefore, the Sheriff's Department needs to ensure that chemical product label instructions are followed without exception.

214.    Unlabeled bottles with chemicals inside were observed in housing areas, in bathrooms, under bunks, along windowsills, etc.  *See* Exhibit C SD_742766 – George Bailey, SD_742961 – George Bailey, SD_743006 – George

Bailey, SD_743053 – George Bailey and SD_743840 – Vista Medical Observation. In some areas, there was a large amount of these bottles with unidentified liquid inside. At George Bailey, incarcerated persons reported that these bottles are from shampoo purchased from the commissary that they saved once the shampoo was used so they could collect chemicals for cleaning. Some incarcerated persons reported they are not provided chemicals or supplies for cleaning, so they obtain the chemicals from the mop bucket. Others reported that staff filled the bottles with chemicals for them.

215. This practice is a violation of OSHA's Hazard Communication Standard, 29 CFR 1910.1200(f)(6) *Workplace Labeling* and Cal/OSHA Title 8, Section 5194(f) *Labels and Other Forms of Warning*, which require that all secondary containers containing a chemical have proper labeling for the chemical inside the container. This is also an unsafe practice and a potential for harm to health and safety because these bottles of chemicals are unsupervised, are allowed to be kept in large quantities, present the risk of accidental or intentional exposure, allow for chemicals to be used improperly, and are a potential risk for a chemical spill when so many bottles of chemicals are available.

216. At East Mesa, chemical bottles labeled and unlabeled were consistently observed in housing units in dayrooms and bathrooms, under and around individual bunks, at and under utility sinks, and next to food and beverages. *Id.* SD_744882 – D1, SD_744888 – D1, SD_744944 – D2, SD_744958 – D2, SD_744971 – D2, SD_745291 – A2 and SD_745472 – C2. Some chemical bottles appeared to be retail purchases and therefore may not be chemicals approved or purchased by the Sheriff's Department. *Id.* SD_744884.

217. In dorms at East Mesa, both labeled and unlabeled chemicals were observed stored at bunks, such as in House D1 where chemical bottles were observed sitting on the floor under bunk number 14. *Id.* SD_744912 and SD_744911. When I picked up one of the bottles to look at it, counsel for

1   Defendants stated to me that I should not touch incarcerated persons' personal

2   property.  In a correctional environment, chemicals should never be an incarcerated

3   person's personal property, and chemicals definitely should not be stored at an

4   incarcerated person's bunk.

5        218.   Per Sheriff's Department Manual of Policies and Procedures, Policy

6   No. H.11 – *Storage and Use of Toxic, Caustic Materials*, "to ensure the safety of

7   staff and incarcerated persons all flammable, toxic, or caustic chemicals will be

8   stored and used following Policy H.11."  However, Policy H.11 only specifically

9   covers the kitchen, medical dispensary, and office use.  Policy H.11 states that in the

10  kitchen there are chemicals used that are flammable, toxic, or caustic.  The policy

11  also states, "Kitchen staff will supervise the use of these chemicals until the

12  chemicals are returned to the storage room."  There are no instructions for chemicals

13  used in other areas of the facilities, such as housing units or common areas, despite

14  some of the observed chemicals in these areas having labeling (pictograms)

15  indicating toxicity.

16       219.   At East Mesa, mops and brooms were observed improperly stored

17  under bathroom sinks, along walls, and on floors rather than being hung properly,

18  such as in a janitorial closet.  *See* Exhibit C at SD_744897 – D1 and SD_744946 –

19  D2.  Staff at East Mesa reported that the housing unit janitorial closets are not used,

20  and that chemicals and supplies are obtained for use in the housing unit from the

21  control room at the front of the housing units.  However, when I asked that the

22  janitorial closet in housing unit C1 be opened, I observed a disorganized area with a

23  molded mop head and wet brooms inside a wet and molded mop sink, and a plunger

24  sitting inside a mop bucket with very dirty water.  *Id.* SD_745374, SD_745375 and

25  SD_745376.

26       220.   Cleaning carts were observed unsupervised with multiple improperly

27  labeled open bottles containing chemicals, and some bottles were not labeled at all.

28  *Id.* SD_743471 – Vista LW 3.  Cleaning carts were dirty and contained dirty mop

1  buckets, dirty dust pans, and dirty brushes.  *Id.* SD_743467 and SD_743470 – Vista
2  LW 3.  Used mops with dirty mop heads were observed on the floor and leaning
3  against walls.  *Id.* SD_743468 – Vista LW 3.

4  ### 2.    Policies, Procedures and Training

5  221.  Policies and procedures regarding environmental health and safety
6  requirements are inadequate in content.  They do not provide clear details of what
7  the policy is and what procedures are needed to ensure the policy is effective.  For
8  example, Policy L.4.M, *Housekeeping Plan* dated March 24, 2023, for East Mesa
9  (*see* SD_0115868) contains a Procedure section but lacks any clear description of
10  the required processes or action steps to complete the tasks required.  In addition,
11  this policy provides a bulleted list of responsibilities for the Senior Custodian,
12  Central Rover, and CPC Deputies, with no description or steps on how to complete
13  the responsibilities.  The policy lacks details of exactly what needs to be completed
14  for this policy and the procedure to be effective.

15  222.  Another example is Policy L.4.G, *Housekeeping Plan* dated April 23,
16  2021, for George Bailey.  *See* SD_0116005.  This document also contains a
17  Procedure section but lacks any clear description of the required processes or action
18  steps to complete the tasks required.  The first sentence of this policy states,
19  "Facility staff will maintain a daily cleaning schedule to ensure all areas of the
20  facility are disinfected."  However, all areas of the facility are not included in the
21  actual writing contained in this policy.  The word "clean" is used throughout the
22  policy, but exactly how to clean is not described.  For example, the policy states for
23  Deputy Station, number 5 (Clean and disinfect the sink), number 6 (Clean and
24  disinfect the toilet), number 7 (Wax the floor as needed).  However, there are no
25  instructions or action steps for completing these tasks or what constitutes "as
26  needed."

27  223.  In the policy L.13.G, *Pest and Vermin Control* (*see* SD_0116001)
28  dated January 20, 2023, for George Bailey, the first sentence under Procedure states:

1   "The GBDF Operations Deputy will serve as the Integrated Pest Management
2   Coordinator (IPMC)."  The Procedure also states that the Operations Deputy will
3   "receive a written report detailing any infestation discovered during the monthly
4   inspection" completed by the County Integrated Pest Management technician, and
5   the IPMC will investigate any infestation reported by staff as soon as practical.  The
6   George Bailey Operations Deputy Post Order (*see* SD_108284) dated October 2020,
7   and the updated version (*see* SD_108515) dated April 2022, contain no mention of
8   the IPMC, nor is there any mention of pest management or pest control at all in
9   these post orders.  In my experience, if duties are not described in post orders, they
10  will not be done.  In East Mesa Policy L.13.M., *Pest and Vermin Control* (*see*
11  SD_115865) dated March 24, 2023, the Operations Deputy is referred to as the
12  IPMC, as well.

13      224.   Well-written and detailed policies and procedures are important.
14  Policies and procedures should be clear and concise, but also detailed enough
15  assuming one is not experienced in the particular policy, procedures, or processes.
16  Post orders should spell out the precise responsibilities for each post to allow the
17  Sheriff's Department to create accountability for failures to abide by policies,
18  procedures, and post orders.

19      225.   In the George Bailey *Housekeeping Plan* discussed in paragraph 223
20  above, to "clean" can mean different things to different people, thus the importance
21  of clearly describing the exact steps to properly complete the tasks and to ensure the
22  expectations of the facility are fully described.  During the observations, various
23  areas were found unacceptable, as described in this report.  This is a reflection of
24  policies and procedures that do not fully describe the responsibilities and
25  requirements governed by the policy, and can also be a reflection of inadequate
26  training on the requirements of the policy.

27      226.   As mentioned earlier, OSHA and Cal/OSHA standards require that
28  workers be trained on the proper use and storage of chemicals, use of PPE, and

1  labeling of chemicals, including secondary containers.  I have not received any

2  documents evidencing such training for County employees or incarcerated workers

3  and do not know if such training occurs.  Based on my inspection of the facilities, I

4  am doubtful.

5  ### 3.    Other Observations, Conclusion

6  227.   The use of, and exposure to, cleaning supplies and chemicals is not

7  controlled or secure at the Sheriff's Department jail facilities, resulting in a serious

8  risk of substantial harm to incarcerated persons.  Multiple violations of OSHA

9  Standard 29 CFR § 1910.1200 (Hazard Communication)[19] were observed.

10  Chemicals were observed unsecured, unattended, and unsupervised throughout the

11  inspections.  Chemicals were observed in unlabeled and open bottles, and sitting

12  unsupervised in housing units, in the kitchen, on unattended cleaning carts in

13  multiple areas, and in bathrooms.  Chemicals were also observed at individual

14  incarcerated persons' bunks, a clear safety and security violation.  In some areas,

15  excessive amounts of unlabeled bottles allegedly with a cleaning chemical inside

16  were observed in housing units.  Incarcerated persons often reported in some areas

17  that they obtained cleaning chemicals from mop buckets or staff to put in individual,

18  unlabeled bottles.

19  228.   Cleaning supplies, such as mops, brooms, mop buckets, etc., were also

20  observed unattended and unsupervised, often sitting on floors, against walls, and on

21  cleaning carts.  This is a safety and security risk, as incarcerated persons can use

22  these items to hurt themselves or someone else, destroy property, or damage the

23  physical plant, and these items can be taken apart to make improvised weapons such

24  as a "shank."  In addition, allowing these items to sit directly on the floor is

25  unsanitary, and they should be hung properly without touching the floor.

26  229.   Overall, policies and procedures regarding environmental health and

27

28  [19] https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1200

1  safety and post orders for positions responsible for environmental health conditions

2  lack clear and concise information important to effectiveness.  These policies,

3  procedures, and post orders lack clear and concise details, especially in procedures,

4  and lack step-by-step instructions to ensure the policies can be followed and

5  functions can be carried out effectively.

6      230.  This point may be demonstrated well in an email from Captain Sonia

7  Manning to "GBDF, Lieutenants" on November 30, 2023, at 9:21 AM.  *See*

8  SD_585896-585897.  In this email, Captain Manning requests: "Please continue to

9  reiterate the following to your deputies and sergeants…..  Accountability - what

10  does accountability mean to you?  What does accountability mean to your

11  sergeants?  We were selected to fill a supervisory role and we accepted that role.

12  With that role comes added responsibilities, on making sure things get done day in

13  and day out.  Why am I still seeing IPs without wristbands on?  Why are chow carts

14  not being checked on a consistent basis by the kitchen deputies?  I can go on and on,

15  but I think you all get the point.  Our number one duty is to be observant and

16  address everything that needs corrective action, even small things we may consider

17  'petty'.  Each of you are responsible for policing your Teams and I expect you to

18  address anything that doesn't get completed during your shift.  Deliberate

19  indifference – what does this mean to you?  How do we protect ourselves from this?

20  We have the responsibility to ensure cells are cleaned before another IP occupies a

21  cell.  Title 15 minimum standards – this is NOT optional for us; every single deputy

22  and supervisor in this facility is responsible for ensuring IPs have a mattress,

23  clothes, bedding, access to showers etc.  Supervisors are conducting rounds and not

24  addressing or following up on these things.  I cannot defend anyone that deliberately

25  ignores these things.  This message needs to be explained to our troops, so they

26  understand the 'why's.'  It's not because Captain Manning is requesting these things

27  rather than because it is our duty.  I expect you to ensure your sergeants are

28  completing RVR's in a timely manner.  I expect sergeants to follow-up and make

1    sure deputies are offering showers to those on lockdown, etc.  We must run a tight

2    ship so please work on 100 percent compliance.  Thank you for your support."

3    231.    This message demonstrates that at least some staff are aware of

4    deficiencies that can have negative consequences and that the Sheriff's Department

5    jail facilities have deficiencies that need addressing.  Policies, procedures, and post

6    orders are the backbone of effective operations of the facilities, and training is

7    paramount to ensuring that staff not only know but understand what is expected of

8    them.  Policies, procedures, and post orders that are vague and do not clearly

9    delineate the necessary steps and/or processes required for staff to effectively and

10    efficiently complete their job assignments and responsibilities will in turn render the

11    facility operations ineffective as well.

12    **X.    RECOMMENDATIONS**

13    232.    To correct the deficiencies and violations identified during my

14    inspections and protect the incarcerated persons incarcerated at the Sheriff's

15    Department jail facilities, the following remedial measures, at minimum, should be

16    taken.  The first priority should be the conditions described in this report.

17    **A.    Cleanliness and Sanitation**

18    233.    Update all individual facility L.4 *Housekeeping Plan* policies and

19    procedures to include detailed cleaning and sanitation instructions for all areas of

20    each facility.  The plans should include regular and scheduled cleaning and

21    sanitation for all areas of the facilities, not just common areas.  Step-by-step

22    instructions should also be included for areas where incarcerated persons are not

23    physically and/or mentally capable of cleaning their personal areas or housing

24    unit(s). The Housekeeping Plan should also include detailed instructions regarding

25    cleaning and disinfecting requirements, training requirements, and the use of PPE

26    for cleaning up bodily fluids and/or excrement.  The housekeeping plan should

27    include step-by-step instructions about what, when, and how to clean, chemicals and

28    cleaning supplies to use, and a sign-off of tasks completed for accountability.

234.    Immediately inspect all sinks, toilets, urinals, and shower areas for cleanliness and sanitation, proper functioning, and safety in all facilities. Document deficiencies, establish corrective action(s), assign responsibilities for correcting deficiencies, and conduct weekly, documented follow-up inspections until all tasks are completed.

235.    Although the policies and procedures I reviewed require regular inspections of the facilities, it is unclear what happens next.  These policies and procedures should be amended to require discipline being imposed on staff who fail to follow up on findings of deficiency in the inspection reports.  Inspection results should be logged and tracked by the facility captain and Detention Services Commanders.

236.    Immediately address the drain fly and drain fly larvae issues discussed in this report.  Implement a policy and process for regularly scheduled cleaning, flushing, and sanitizing of drains to remove debris, slime, and organic matter from drains.

237.    Immediately inspect all air vents and air returns.  Clean dirty air vents and returns by vacuuming, clean dirty ceilings, and dirty overhead pipes.  Replace dirty ceiling tiles that cannot be cleaned properly.  Conduct weekly follow-up and documented inspections until all tasks are completed.

238.    Clearly define management's expectations for cleaning and sanitation practices for all sinks, toilets, urinals, and shower areas that include responsibility and accountability for ensuring required cleaning and sanitation tasks are completed.

239.    Review and update all individual facility L.2 *Sanitation & Hygiene Inspections* policies and implement meaningful and documented weekly sanitation inspections for all areas of each facility.  Clearly and definitively document all deficiencies and assign responsibilities to staff for corrective action(s) and follow-up, including a due date, and a sign-off for accountability.

240.    In medical areas, replace all exam table cushions that are torn.  Ensure

1  continual inspection of exam table cushions for torn areas and replace the cushions

2  whenever there is a tear.

3      241.   Inspect all medical exam rooms, clinic areas, and procedure areas,

4  including the dialysis unit, for cleanliness and sanitation.  Immediately clean

5  medical areas and equipment, and correct environmental deficiencies in these areas

6  as outlined in Section IX.A.2 (Medical and Dental Facilities) of this report.

7      242.   Review the Receiving Screening process policies for both Sheriff's

8  Department and the Medical Services Department and implement a process for

9  checks and balances to ensure the medical screening is in accordance with standards

10  for medical screening during intake to a correctional facility, especially regarding

11  lice and scabies.  Ensuring a proper and complete screening during intake assists

12  with the environmental health and safety of the facility, incarcerated persons, and

13  anyone who works or visits the jail facilities.

14      243.   Immediately clean up the trash, debris, food, and filth in the dumpster

15  areas at Vista and East Mesa, and clean up any other dumpster areas at other

16  Sheriff's Department jail facilities.  Implement a policy and procedure to ensure

17  dumpster areas are kept free from trash, debris, food, and filth at all times.  Ensure

18  regularly scheduled scrubbing of dumpster areas for sanitation purposes and to

19  avoid attracting rodents and pests.

20      244.   Ensure trash collection and storage practices in housing units, holding

21  areas, medical facilities, and kitchen areas at all facilities are completed in

22  accordance with established policies and procedures.  Ensure policies and

23  procedures outline how facilities are to ensure there is no accumulation of trash at

24  any time, and update policies and procedures as needed to ensure this requirement is

25  met.

26      245.   Immediately clean the grease bin/trap at Vista.  The bin and all

27  surrounding areas, including the loading dock ground and walls around the bin must

28  be scrubbed.  Ensure the grease trap is emptied on a regular schedule.  Implement a

1  policy and procedure to ensure the grease bin/trap and the surrounding area are kept

2  free of grease, dirt, grime, and filth.  Ensure regularly scheduled scrubbing of the

3  grease bin/trap for sanitation purposes and to avoid attracting rodents and pests.

4      246.  Immediately clean the cooking equipment, under cooking equipment,

5  walls, ceilings, and floors in the ODR at Central Jail.  Inspect all kitchen areas and

6  immediately clean any areas or equipment that violates food safety standards.

7  Develop a cleaning schedule with assigned tasks and responsibilities for ongoing

8  cleaning and sanitation of the ODR and all areas of the kitchens to ensure that food

9  safety standards are adhered to at all times.

10     **B.  Unsafe Physical Plant Conditions**

11     247.  Inspect all pipe chases throughout the Sheriff's Department jail

12  facilities.  Start with housing areas first.  Repair all leaks in all pipe chases.  Clean

13  up debris located in pipe chases.

14     248.  Implement a procedure for routine inspection of pipe chases

15  throughout all of the Sheriff's Department jail facilities on a regular interval, such

16  as weekly.

17     249.  Immediately change all air filters throughout the Sheriff's Department

18  jail facilities.  Implement a process by which all air filters are changed on a regularly

19  scheduled basis and more often when dirty.  Each air filter should be dated when

20  changed so it is clear the last time the filter was changed.  These and other activities

21  must be logged and tracked.

22     250.  Inspect all incarcerated persons' telephones.  Repair any telephones

23  where wires are exposed or are outside of the safety conduit, such as the telephone

24  handset (receiver).

25     251.  Ensure electrical outlets throughout all Sheriff's Department jail

26  facilities comply with all federal, state, and local jurisdiction requirements for

27  location, operation, and maintenance.  Consider security covers, security enclosures,

28  and safety wall plates, especially where incarcerated persons may have access.

1    252.   Upgrade all lighting to ensure a minimum of 20 foot-candles in all

2  cells/rooms and personal grooming areas.  Establish a plan of action and timeline to

3  ensure all areas are assessed for upgrade needs and schedule upgrades are

4  completed.

5    253.   Ensure temperatures are kept at a comfortable level (avoidance of

6  excessively cold or hot temperatures) for incarcerated persons.  Provide blankets to

7  all incarcerated persons as required by California Title 15, §1270, unless there is a

8  documented medical or mental health restriction for these items.  Suitable additional

9  clothing or jackets should be made available to incarcerated persons when

10 temperatures are cold, especially for outdoor assignments, such as work assignments

11 or outdoor recreation.

12    254.   All policies and procedures should be revised to include accountability

13 for failure to conduct adequate cleaning, inspection, and maintenance as outlined in

14 this report.

15    **C.    Other Observations**

16    255.   Review OSHA's Standard 29 CFR § 1910.1200 (Hazard

17 Communication) and Cal/OSHA Hazardous Communication (Hazcom) Regulation,

18 Title 8, Section 5194 for the safe and proper use of chemical products and ensure

19 compliance with the requirements of these guidelines.

20    256.   Update all policies and procedures related to the storage and use of all

21 chemicals, including those that are toxic and caustic materials as well as chemicals

22 used by incarcerated persons throughout the facilities, for example, housing areas,

23 bathrooms, intake/release areas, medical clinics and housing, kitchen, and laundry.

24    257.   Review all policies and procedures related to environmental health

25 and safety.  Update policies and procedures to include specific details of exactly

26 what needs to be completed, step by step, for the policy and the procedure to be

27 effective.  Details should assume that the reader is familiar with the Sheriff's

28 Department jail facilities, but detailed enough to assume the reader is not

1  experienced with the particular policy, procedures, or processes to effectively carry

2  out the requirements of the policy.

3                              **CONCLUSION**

4        258.  The information and opinions contained in this report are based on

5  evidence, documentation, and/or observations available to me.  I reserve the right

6  to modify or expand these opinions should additional information become

7  available to me.  The information contained in this report and the accompanying

8  exhibits are a fair and accurate representation of the subject of my anticipated

9  testimony in this case.

10  Dated: August 7, 2024

11

12

    Debra Graham

13  Debra Graham

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# CURRICULUM VITAE

**Debra Graham, RDN, LD/N, REHS/RS, CJM, CPFM**

 or

## SUMMARY

Detail-oriented professional with over thirty-two years of local government and correctional management experience. Successful background in auditing correctional and detention environments, identifying organizational needs, project management, and creating and implementing change measures. Available to conduct audits, assessments, and investigations, preparation of summaries of findings and recommendations, policy reviews, curriculum reviews, training, and monitoring of progress.

## PROFESSIONAL EDUCATION

> <u>Eastern Michigan University</u>
> Master's Degree – Dietetics

> <u>Barry University</u>
> Bachelor's Degree - Professional Studies – Business

## PROFESSIONAL TRAINING/LICENSES/CERTIFICATIONS

> Registered Environmental Health Specialist/Registered Sanitarian (REHS/RS) – National Environmental Health Association (NEHA) – ID #28360

> Registered Dietitian/Nutritionist – Commission on Dietetic Registration, RD #1048036

> Licensed Dietitian/Nutritionist (LD/N) - State of Florida, ND6716

> Licensed Dietitian/Nutritionist (LD/N) – State of Alabama, #3090

> Certified Jail Manager (CJM) – Jail Manager Certification Commission (JMCC) and American Jail Association (AJA)

> Certified Professional Food Manager (CPFM) – National Restaurant Association Educational Foundation

> HACCP - Hazardous Analysis of Critical Control Points - International HACCP Alliance and Professional Food Safety Ltd.

## QUALIFICATIONS SUMMARY

> Demonstrated ability to perform audits, investigations, inspections, and compliance reviews of various types and capacity levels of correctional or detention facilities, including providing detailed expert reports.

> Thirty-two years of experience in local government operations, including senior-level

DEBRA GRAHAM
Curriculum Vitae Page 2

**QUALIFICATIONS SUMMARY Continued**

management, correctional management, standards and compliance coordination, budget preparation and monitoring, procurement of commodities and capital items, incident command, project management, root cause analysis, action planning, and administrative management.

Chief Compliance Officer directing and coordinating compliance with established laws, regulations, standards, and provisions, including compliance coordination with health care services (medical and mental health), custody and security, and environmental health and safety.

Registered Environmental Health Specialist/Registered Sanitarian credentialed through the National Environmental Health Association. Demonstrated ability in performing compliance inspections and audits in an institutional setting for adherence to established health and safety standards, and conditions of confinement related to environmental regulations.

Registered Dietitian/Nutritionist credentialed through the Commission on Dietetic Registration. Demonstrated ability to develop, plan, and implement various dietary programs including therapeutic and faith-based diet programs. Demonstrated ability to plan and adjust menus to meet efficiency constraints while remaining in compliance with dietary standards.

Certified Jail Manager credentialed through the Jail Manager Certification Commission (JMCC) and the American Jail Association (AJA). Demonstrated knowledge of jail management concepts and current competency in the correctional management field.

Twenty-six years of experience in the operation of a large-scale institutional food service operation, preparing and feeding more than 24,000 meals per day, coordinating and directing the delivery of food and supply items, directing compliance with food safety and sanitation standards, production schedules, and maintaining and controlling a one-million-dollar inventory.

Demonstrated ability to analyze issues of concern and find solutions, write effective plans of action and implement program activities related to the protection of the health and safety of staff and incarcerated individuals, and in the protection of the environment.

Demonstrated ability to direct a large number of staff, including ability to recruit, hire, and train personnel including developing policies, procedures, job descriptions, post orders, workload measures, performance standards, and training programs. Ability to properly delegate work assignments and evaluate performance accordingly.

Demonstrated ability to prepare and administer an annual operating budget in excess of 25 million dollars.

Certified Instructor and Registered Proctor for the National Restaurant Association Educational Foundation's *ServSafe* Food Manager Course.

Working knowledge of computer systems, including personal computers, Local Area Networks, communications, word processing, spreadsheets, databases, and presentation software.

DEBRA GRAHAM
Curriculum Vitae Page 3

**PROFESSIONAL EXPERIENCE**

2016 – present      *ENVIRONMENTAL HEALTH AND SAFETY CONSULTANT*
U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties
DBS Environmental Health and Nutritional Consulting, LLC, Texas

Conduct assessments, inspections, and reviews of environmental health and safety conditions of detention facilities in accordance with the ICE National Detention Standards. Review documents associated with detainee complaints of non-compliance with standards, conduct inspections and assessments, interview detainees and staff, and evaluate the conditions of the facility for compliance during on-site visits. Produce and submit expert reports of findings, noted areas of compliance and non-compliance, and provide recommendations for improvement and attaining compliance with required standards.

2017 – 2019 (retired)  *DIVISION CHIEF, REGULATORY & COMPLIANCE DIVISION*
Miami-Dade Corrections & Rehabilitation Department
Miami, Florida

Chief Compliance Officer with direct leadership for departmental compliance with laws, standards, rules, regulations, provisions, policies and procedures, etc., inspections and auditing of departmental functions, preparation of inspection and audit reports, corrective action plans, and follow-ups. Direct leadership of the departmental compliance office responsible for compliance coordination with statutes, standards, laws, and provisions pertaining to the jail environment, health care services, and conditions of confinement. Direct leadership of departmental food service functions, including inmate meals, staff dining, emergency operations, food safety and sanitation, and catering functions. Responsible for leadership and supervision of departmental data collection, analysis, and reporting, strategic and business planning and directing, performance measurement, root cause analysis, corrective action plans, follow-ups, and monitoring.

1999 – 2017      *COMMANDER, FOOD SERVICES BUREAU*
Miami-Dade Corrections & Rehabilitation
Miami, Florida

Direct leadership over food service operations for the entire correctional system of Miami-Dade County, Florida, including procurement and receiving practices, inventory control, expenditure control, fleet control, delivery management, menu development, and certification, food safety and sanitation practices, and adherence to all statutes, laws, policies and procedures governing an institutional food service operation. Managed cook-chill and cook-serve operations that produced over nine million meals annually within an annual operating budget in excess of seventeen million dollars. Supervised the efficiency of two kitchens and two pantries servicing four correctional facilities, supporting institutional feeding, employee cafeterias, and catering functions.

DEBRA GRAHAM
Curriculum Vitae Page 4

Kitchens feature various rethermalization systems, conventional insulated tray delivery, and disposable tray meal delivery systems.  Supervised over one hundred staff members including supervisors, cooks, sworn staff, and support personnel.

Direct leadership over Miami-Dade Corrections & Rehabilitation Department's Environmental Committee with responsibilities over health and safety standards related to environmental regulations and conditions of confinement. Direct responsibility for compliance inspections and audits for adherence to health and safety standards.  Determined compliance with public health laws, cleanliness and sanitation standards, FDA Food Code, Florida Administrative Code for Food Hygiene, and accreditation standards.  Cited violations of standards, analyzed inspection data, recommended corrective measures, wrote plans of action, and implemented program activities related to health and safety standards.  Worked one-on-one with the Department of Health to investigate any health-related complaints.    Provided vector control inspections, documented violations, made recommendations for improvement and/or wrote plans of action. Wrote specifications for procurement of cleaning and sanitation chemicals, supplies and/or equipment, integrated pest management contracts, and training programs. Organized, planned, and conducted training programs on environmental conditions, cleanliness and sanitation practices, integrated pest management, and cleaning and sanitation processes in an institutional environment.

| | |
|---|---|
| 1997 - 1999 | *C & R FOOD SERVICES SUPERVISOR 2, FOOD SERVICES BUREAU* |
| 1991 - 1997 | *CLERK 4, FOOD SERVICES BUREAU* |
| | Miami-Dade Corrections & Rehabilitation |
| | Miami, Florida |

Direct supervision over the Food Services Bureau Administration office, providing food service for the entire correctional system of Miami-Dade County.  Prepared menus, including special diets, bid specifications, estimated quantities, and supervised staff in all areas of purchasing, scheduling deliveries and production for over 7.5 million meals per year, catering functions, and emergency disaster requests, within an annual operating budget of 11 million dollars.

## PUBLICATIONS

- Graham, D.A.  (2022).  Establishing and Maintaining a Healthy Environment in the Correctional Facility.  *American Jails*, 36(4), 25-31.

- Graham, D.A.  (2022). Food Safety and Sanitation in Correctional Food Service*. American Jails*, 36(3), 13-20.

- Graham, D.A. (2022). Cleaning and Disinfecting in the Correctional Environment. *American Jails*, 36(2), 8-13.

- **Graham, D.A.** & Skipworth, D.B. (2021). Environmental health. In R.B. Greifinger MD (Ed.), *Public health behind bars from prisons to communities* (2nd ed., Chapter 17). Springer Nature.

DEBRA GRAHAM
Curriculum Vitae Page 5

## PROFESSIONAL ACHIEVEMENTS

2019          Successfully completed compliance with all provisions/requirements of the Settlement Agreement between Miami-Dade County, Miami-Dade Corrections & Rehabilitation Department, and the United States Department of Justice.

1998-2008     Successfully managed the first Miami-Dade County Memorandum of Understanding (MOU).  Surpassed budget objective for a total of 4.4 million dollars returned to the Miami Dade County's General Operating Fund over a ten-year period.

2000          COMMENDATION AWARD – Miami-Dade Corrections & Rehabilitation Department, Outstanding Service and Dedication.

1999          Surpassed 1998/99 budget reduction objective by over seven hundred thousand dollars resulting in the implementation of a first-time gain-sharing program for Miami-Dade County and bonus checks awarded to Food Services Bureau staff.

1998          CERTIFICATE OF COMMENDATION – Miami-Dade Corrections & Rehabilitation. Direct involvement in the successful completion of the Efficiency and Competition study and the Memorandum of Understanding, resulting in a budget objective that reduced the Food Services Bureau's budget and saved Miami-Dade County over one million dollars for budget year 1998/99.

1993          UNSUNG HEROINE AWARD - Outstanding Service to the Community Miami-Dade Corrections & Rehabilitation

# EXHIBIT C

# PHOTOGRAPHS REFERENCED IN EXPERT REPORT OF DEBRA GRAHAM

[4535443.1]



SD_742870

[4535443.1]



SD_742973



SD_743174

[4535443.1]



SD_1579295

[4535443.1]



SD_742833

[4535443.1]



SD_742695

[4535443.1]



SD_1579296

[4535443.1]



SD_743258

[4535443.1]



SD_742958

[4535443.1]



SD_743606

[4535443.1]



SD_743748

[4535443.1]



SD_1579424

[4535443.1]



SD_743622

[4535443.1]



SD_743280

14



SD_743763

[4535443.1]



SD_1579036

[4535443.1]



SD_745256

[4535443.1]



SD_742831

[4535443.1]



SD_743148

[4535443.1]



SD_743307

[4535443.1]



SD_742856

[4535443.1]



SD_1579659

[4535443.1]



SD_1579030

[4535443.1]



SD_742665

[4535443.1]



SD_742695

[4535443.1]



SD_742663

[4535443.1]



SD_742682

[4535443.1]



SD_742860

[4535443.1]



SD_742871

[4535443.1]



SD_743054

[4535443.1]



SD_743088

[4535443.1]



SD_743114

[4535443.1]



SD_743146

[4535443.1]



SD_742779

[4535443.1]



SD_742823

[4535443.1]



SD_742963



SD_742832

[4535443.1]



SD_742834

[4535443.1]



SD_742929

[4535443.1]



SD_742962

[4535443.1]



SD_743148

[4535443.1]



SD_742829

[4535443.1]



SD_743089

[4535443.1]



SD_743110

[4535443.1]



SD_743051

[4535443.1]



SD_743085

[4535443.1]



SD_742762

[4535443.1]



SD_742775



SD_742743

[4535443.1]



SD_742759

[4535443.1]



SD_742872

[4535443.1]



SD_742943

[4535443.1]



SD_743059

[4535443.1]



SD_742911

[4535443.1]



SD_742944

[4535443.1]



SD_743045

[4535443.1]



SD_742904

[4535443.1]



SD_742706

[4535443.1]



SD_742960

[4535443.1]



SD_742959

[4535443.1]



SD_743175



SD_742898

[4535443.1]



SD_742900

[4535443.1]



SD_743124

[4535443.1]



SD_742935

[4535443.1]



SD_742936

[4535443.1]



SD_742952

[4535443.1]



SD_742966

68



SD_742942

[4535443.1]



SD_743048

[4535443.1]



SD_742892

[4535443.1]



SD_745593

[4535443.1]



SD_742914

[4535443.1]



SD_743094

[4535443.1]



SD_743163

[4535443.1]



SD_743094

76



SD_743165

[4535443.1]



SD_743331

[4535443.1]



SD_743261

[4535443.1]



SD_743284

[4535443.1]



SD_743378

[4535443.1]



SD_743409

[4535443.1]



SD_743445

[4535443.1]



SD_743490

[4535443.1]



SD_743506

[4535443.1]



SD_743521

[4535443.1]



SD_743629

[4535443.1]



SD_743659

[4535443.1]



SD_743660

[4535443.1]



SD_743741

[4535443.1]



SD_743768

[4535443.1]



SD_743842

[4535443.1]



SD_743301



SD_743333

[4535443.1]



SD_745574

95



SD_743528

[4535443.1]



SD_743549

[4535443.1]



SD_743695

[4535443.1]



SD_743733

[4535443.1]



SD_743487

[4535443.1]



SD_743503

[4535443.1]



SD_743574

[4535443.1]



SD_743763

[4535443.1]



SD_743242

[4535443.1]



SD_743251

[4535443.1]



SD_743267

[4535443.1]



SD_743294

[4535443.1]



SD_743321

[4535443.1]



SD_743403

[4535443.1]



SD_743590

[4535443.1]



SD_743824

111



SD_743866

[4535443.1]



SD_743243

[4535443.1]



SD_743300

[4535443.1]



SD_743347

[4535443.1]



SD_743290

[4535443.1]



SD_743386

[4535443.1]



SD_743745

[4535443.1]



SD_743749

[4535443.1]



SD_743753

120

[4535443.1]



SD_743754

[4535443.1]



SD_743836



SD_743572

[4535443.1]



SD_743579

[4535443.1]



SD_743698

[4535443.1]



SD_743713

126



SD_743865

[4535443.1]



SD_743711

[4535443.1]



SD_743713

[4535443.1]



SD_743714

[4535443.1]



SD_743383

131

[4535443.1]



SD_743550

[4535443.1]

SD_743531

[4535443.1]



SD_743581

[4535443.1]



SD_743655

[4535443.1]



SD_743663

[4535443.1]



SD_743665

[4535443.1]



SD_743678

138



SD_743679

139



SD_743680

[4535443.1]



SD_743532

[4535443.1]



SD_743566



SD_743594

[4535443.1]



SD_743617

[4535443.1]



SD_743686

[4535443.1]



SD_743315

[4535443.1]



SD_743385

[4535443.1]



SD_744315

[4535443.1]



SD_744048

[4535443.1]



SD_744116

[4535443.1]



SD_744261

[4535443.1]



SD_744570

[4535443.1]



SD_744101

[4535443.1]



SD_744117

[4535443.1]



SD_745565

[4535443.1]



SD_744384

[4535443.1]



SD_744499

[4535443.1]



SD_743983

[4535443.1]



SD_744603

[4535443.1]



SD_744455

[4535443.1]



SD_744488

[4535443.1]



SD_744544

[4535443.1]



SD_743960

[4535443.1]



SD_744121

[4535443.1]



SD_744014

[4535443.1]



SD_744041

[4535443.1]



SD_744104

[4535443.1]



SD_744106

[4535443.1]



SD_744288

[4535443.1]



SD_744289

[4535443.1]



SD_744319

[4535443.1]



SD_744390

[4535443.1]



SD_744421

[4535443.1]



SD_744470

174



SD_744493

175



SD_744504

[4535443.1]



SD_744830

[4535443.1]



SD_744833

[4535443.1]



SD_745461

179



SD_745247

[4535443.1]



SD_744848

[4535443.1]



SD_744891

[4535443.1]



SD_744950

[4535443.1]



SD_745235

[4535443.1]



SD_745242

[4535443.1]



SD_745299

[4535443.1]



SD_745302

[4535443.1]



SD_745316

[4535443.1]



SD_745440

[4535443.1]



SD_744893

[4535443.1]



SD_745349

[4535443.1]



SD_745241

[4535443.1]



SD_745310

[4535443.1]



SD_745315

[4535443.1]



SD_745442

[4535443.1]



SD_745443

[4535443.1]



SD_745256

197



SD_745346

[4535443.1]



SD_745348

[4535443.1]



SD_745444

200



SD_745447

[4535443.1]



SD_744844

[4535443.1]



SD_744952

[4535443.1]



SD_745243

[4535443.1]



SD_745304

205



SD_745352

[4535443.1]



SD_745446

[4535443.1]



SD_745449

208