GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>     v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>       Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**PAGES 369-505 OF EXHIBIT 1 AND EXHIBIT 2 TO DECLARATION OF DEBRA GRAHAM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT – VOLUME III**<br><br>Judge:   Hon. Anthony J. Battaglia<br><br>Date:     March 6, 2025<br>Time:    2:00 p.m.<br>Crtrm.:  4A |

[4620326.1]

DECLARATION OF DEBRA GRAHAM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT – VOLUME III



SD_743806

369

[4535443.1]



SD_743807



SD_743809

[4535443.1]



SD_743814

[4535443.1]



SD_743815

[4535443.1]



SD_743834

374



SD_743826

[4535443.1]



SD_743828

[4535443.1]



SD_743829

377

[4535443.1]



SD_743837

378

[4535443.1]



SD_743839

[4535443.1]



SD_744113

380

[4535443.1]



SD_744114

[4535443.1]



SD_744117



SD_744115

[4535443.1]



SD_744116

[4535443.1]



SD_1579337



SD_1579340

386

[4535443.1]



SD_1579341

[4535443.1]



SD_1579343

388

[4535443.1]



SD_1579342



SD_1579351

390



SD_1579352

[4535443.1]



SD_1579139

[4535443.1]



SD_743852

[4535443.1]



SD_743866

[4535443.1]



SD_743867

395



SD_743871

[4535443.1]



SD_743872

[4535443.1]



SD_743873

[4535443.1]



SD_743876

[4535443.1]



SD_743877

400



SD_743880

401



SD_743881

402

[4535443.1]



SD_743885

[4535443.1]



SD_743886

[4535443.1]



SD_743888

[4535443.1]



SD_743887

[4535443.1]



SD_743889

[4535443.1]



SD_743890

[4535443.1]



SD_743891

[4535443.1]



SD_743892

[4535443.1]



SD_743893

[4535443.1]



SD_743894

[4535443.1]



SD_743898

[4535443.1]



SD_744817

[4535443.1]



SD_744818

[4535443.1]



SD_745527

[4535443.1]



SD_745528

417



SD_745530

418



SD_745531

[4535443.1]



SD_745532

420



Sd_745521

421



Sd_745542

422

[4535443.1]



SD_744819

[4535443.1]



SD_745534

[4535443.1]



SD_745538

[4535443.1]



SD_745540

426



SD_745522

427



SD_745523

[4535443.1]



SD_745510

429

[4535443.1]



SD_745515

430



SD_745517

431



SD_745518

[4535443.1]



SD_1579385

[4535443.1]



SD_1579387

434



SD_1579386

[4535443.1]



SD_1579392



SD_1579394

[4535443.1]



SD_1579398

438



SD_1579400

[4535443.1]



SD_1579413

[4535443.1]



SD_1579415

441



SD_1579416

[4535443.1]



SD_1579407

[4535443.1]



SD_1579410

444

[4535443.1]



SD_1579411

[4535443.1]



SD_1579403

446



SD_1579405

[4535443.1]



SD_1579406

448

[4535443.1]



SD_1579409

[4535443.1]



SD_1579412

450



SD_1579174

[4535443.1]



SD_1579153

452



SD_1579158

[4535443.1]



SD_1579161

454



SD_1579165

[4535443.1]



SD_1579159

[4535443.1]



SD_1579166

[4535443.1]



SD_1579178

458



SD_1579180

[4535443.1]



SD_1579181

[4535443.1]



SD_1579184

461



SD_743127

[4535443.1]



SD_743128

[4535443.1]



SD_743129

[4535443.1]



SD_743671

[4535443.1]



SD_743672

[4535443.1]



SD_743673

467



SD_743675

468



SD_743720

[4535443.1]



SD_743721

470



SD_743487

[4535443.1]



SD_743505

[4535443.1]



SD_743573

473



SD_743625

[4535443.1]



SD_743257

[4535443.1]



SD_1579522

476

[4535443.1]



SD_744120

477



SD_744915

478



SD_743505

479



SD_745574

[4535443.1]



SD_743133

481



SD_742766

482



SD_742961



SD_743006

[4535443.1]



SD_743053

485



SD_743840

486



SD_744882

[4535443.1]



SD_744888

[4535443.1]



SD_744944

[4535443.1]



SD_744958

490

[4535443.1]



SD_744971

[4535443.1]



SD_745291

[4535443.1]



SD_745472

[4535443.1]



SD_744884

[4535443.1]



SD_744912

[4535443.1]



SD_744911

496



SD_744897

[4535443.1]



SD_744946

[4535443.1]



SD_745374

[4535443.1]



SD_745375

500



SD_745376

[4535443.1]



SD_743471

502

[4535443.1]



SD_743467

[4535443.1]



SD_743470

[4535443.1]



SD_743468

[4535443.1]

# EXHIBIT 2

1   GAY C. GRUNFELD – 121944          CHRISTOPHER M. YOUNG – 163319
    VAN SWEARINGEN – 259809           ISABELLA NEAL – 328323
2   MICHAEL FREEDMAN – 262850         OLIVER KIEFER – 332830
    ERIC MONEK ANDERSON – 320934      DLA PIPER LLP (US)
3   HANNAH M. CHARTOFF – 324529       4365 Executive Drive, Suite 1100
    BEN HOLSTON – 341439              San Diego, California  92121-2133
4   ROSEN BIEN                        Telephone:  (858) 677-1400
    GALVAN & GRUNFELD LLP             Facsimile:   (858) 677-1401
5   101 Mission Street, Sixth Floor   christopher.young@dlapiper.com
    San Francisco, California  94105-1738  isabella.neal@dlapiper.com
6   Telephone:  (415) 433-6830        oliver.kiefer@dlapiper.com
    Facsimile:   (415) 433-7104
7   ggrunfeld@rbgg.com
    vswearingen@rbgg.com
8   mfreedman@rbgg.com
    eanderson@rbgg.com
9   hchartoff@rbgg.com
    bholston@rbgg.com
10
    AARON J. FISCHER – 247391
11  LAW OFFICE OF
    AARON J. FISCHER
12  1400 Shattuck Square Suite 12 - #344
    Berkeley, California  94709
13  Telephone:  (510) 806-7366
    Facsimile:   (510) 694-6314
14  ajf@aaronfischerlaw.com

15  Attorneys for Plaintiffs and the
    Certified Class and Subclasses
16

17              UNITED STATES DISTRICT COURT

18            SOUTHERN DISTRICT OF CALIFORNIA

19  DARRYL DUNSMORE, ANDREE          Case No. 3:20-cv-00406-AJB-DDL
    ANDRADE, ERNEST ARCHULETA,
20  JAMES CLARK, ANTHONY EDWARDS,    **REBUTTAL EXPERT REPORT**
    REANNA LEVY, JOSUE LOPEZ,        **OF DEBRA GRAHAM**
21  CHRISTOPHER NORWOOD, JESSE
    OLIVARES, GUSTAVO SEPULVEDA,     Judge:      Hon. Anthony J. Battaglia
22  MICHAEL TAYLOR, and LAURA        Magistrate: Hon. David D. Leshner
    ZOERNER, on behalf of themselves and all
23  others similarly situated,       Trial Date: None Set

24              Plaintiffs,          ***Page 21 contains information
                                     designated CONFIDENTIAL &***
          v.                         ***CONFIDENTIAL – FOR***
25                                   ***COUNSEL ONLY***
    SAN DIEGO COUNTY SHERIFF'S
26  DEPARTMENT, COUNTY OF SAN
    DIEGO, SAN DIEGO COUNTY
    PROBATION DEPARTMENT, and DOES
27  1 to 20, inclusive,
28              Defendants.

## I. INTRODUCTION

I, Debra Graham, declare:

1. I have been asked by Plaintiffs' counsel to prepare this Rebuttal Expert Report. I was specifically asked to review and analyze the opinions and conclusions expressed in the August 21, 2024, Expert Report of Henrietta L. Peters (Defendants' Environmental Health and Safety Expert) and the August 21, 2024, Expert Report of Owen J. Murray, D.O., M.B.A. (Defendants' Medical Expert) to decide if their opinions cause a change in my opinions or conclusions and to provide responses to their opinions.

2. I have reviewed and analyzed the opinions in the expert reports noted above. Neither the opinions nor conclusions outlined in their expert reports cause me to change any of the opinions or conclusions stated in my initial expert report dated August 7, 2024.[1]

3. The opinions expressed in this report are based on information that has been made available to me. That information includes documents provided to me, which are listed in Exhibit B to my August 7, 2024 report and Exhibit A to this report. Should new information become available to me in the future, I reserve the right to analyze that information and revise my opinions and/or conclusions.

## II. RESPONSE TO THE REPORT OF HENRIETTA L PETERS

4. I reviewed the Defendants' expert environmental health and safety report ("Peters Rpt."), as well as documents reviewed, inspection notes, and photographs taken during her inspections. From my review, I have discussed several observations in the sections below.

/ / /

---

[1] On August 7, 2024, I submitted an Expert Report where I described my qualifications, experience, compensation, methodology, standards, inspection opinions, recommendations, and conclusions. Specific references to my August 7, 2024, Expert Report are cited in this Rebuttal Report as "Graham Rpt. at  xx, ¶ xx."

**A.    Methodology**

5.    The report provided by Ms. Peters does not contain a section on "Methodology." There are sections such as Assignment, Peters Rpt. at 1, Documents Reviewed, Peters Rpt. at 3, and Background, Peters Rpt. at 3-4, which somewhat assists in learning a methodology for this expert's report. However, other aspects of explaining the methodology are missing, such as the process she used to form her opinions.

6.    Ms. Peters states that her report covers all seven detention facilities operated by the San Diego County Sheriff's Office and the Central Production Center which oversees food processing and laundry services. Peters Rpt. at 3. She does not indicate in her report the specific areas she observed in each facility, such as the particular housing units, medical and dental clinic areas, kitchens, etc. While Ms. Peters does note the types of housing visited, such as Safety Cell/Enhanced Observation Housing, Medical Observation Beds, Single Occupancy Housing, and Mainline Housing, she does not indicate where or in what facility/facilities these areas were observed. Peters Rpt. at 3-4. It appears that Ms. Peters also visited other areas, such as the loading dock, which are not listed or described in her report.

7.    Ms. Peters did not list or describe in her report any standards she used to complete her inspections or compare her findings to, nor did she indicate if she used any inspection equipment, *i.e.*, thermometer, light meter, flashlight, etc., to assist her with a comprehensive inspection of the facilities. Ms. Peters described observations and rendered opinions but failed to include any principles by which she formed her opinions, such as correctional standards, environmental health and safety standards, etc. Without knowing the principles used to form the opinions, they are just opinions without any methodology, such as process, principles, or scientific backing, therefore, lacking a basis on which to demonstrate reliability. In some cases, Ms. Peters provided recommendations, such as a more thorough regimen for cleaning the garbage compactor, more frequent cleaning of the grease bins, or

1  cleaning shower drains because drain flies were observed.  In these examples, Ms.

2  Peters does not describe the issues observed concerning the garbage compactor or

3  grease bins, why they need more cleaning, and what standards back up her

4  observations, opinions, and recommendations.  In the case of the shower drains, Ms.

5  Peters does not explain what causes drain flies in shower drains, why they are a

6  problem, or what can prevent them from breeding or thriving in drain areas.

7      8.    The documents reviewed, inspection notes, and photographs taken as

8  part of Ms. Peters in-person inspections at the San Diego County Sheriff's Office

9  Detention Facilities were provided to Plaintiffs by counsel for the Defendants on

10  September 26, 2024, which I subsequently reviewed.  None of the information in

11  any of the documents, inspection notes, or photographs changes my opinions

12  outlined in my expert report.  However, during my review, I did find some notable

13  issues pertaining to environmental health and safety in some of the photographs that

14  were not addressed in Ms. Peters' report, which I have discussed in relevant sections

15  below.

16      **B.    Issues Noted in Common**

17      9.    Multiple issues noted in Ms. Peters' report were also discussed in my

18  expert report.  However, the issues noted by Ms. Peters were not discussed with any

19  detail.  The following issues were noted in both reports.

20          **1.    Dumpster Areas**

21      10.    In her report, Ms. Peters states, "The garbage compactor areas should

22  receive a more detailed cleaning.  Although some cleaning is evident, I recommend

23  a more thorough regimen."  Peters Rpt. at 5.  In Ms. Peters' description of the

24  garbage compactor areas, she did not explain the reason that she recommended a

25  more detailed cleaning and did not describe that trash was observed around a

26  dumpster as noted in photographs IMG_0172.JPG – IMG_0175.JPG taken during

27

28

1  her inspections.[2]  In addition, in photograph IMG_0176.JPG, an open container with

2  cardboard boxes and bags of trash are seen and appear to be in the food service

3  loading dock area.  If this is the case, Ms. Peters failed to note in her report that this

4  is a violation of the FDA Food Code 2022, Chapter 5,[3] and the California

5  Department of Public Health, California Retail Food Code, Chapter 7.[4]  Ms. Peters

6  also states, "I observed grease bins (outside tallow containers) that require more

7  frequent cleaning to prevent pests attracted by wasted grease."  Peters Rpt. at 6.  It is

8  not clear from this description what garbage compactor area or areas are being

9  referred to.  The garbage dumpster areas I inspected at Vista and East Mesa were

10  clearly in violation of food safety standards and needed extensive cleaning.  Graham

11  Rpt. at 55-57, ¶¶ 146-148 (Vista); 62-65, ¶¶ 158-159 (East Mesa).  The dumpster

12  area at South Bay was in better condition, however, improvements were needed.

13  Graham Rpt. at 70, ¶ 167.

14              **2.    Birds**

15          11.    Ms. Peters notes that birds were seen in the outside courtyard areas and

16  inside fenced walkways, but none were observed inside the housing areas.  Peters

17  Rpt. at 4.  Later in her report Ms. Peters states, "Birds have access to inner

18  walkways, including segregation recreation yards."  Peters Rpt. at 7.  Clearly, if

19

20  _____

    [2] As noted in Exhibit A, photographs from Ms. Peters' inspections were produced
21  with file names ranging from "IMG_0138.JPG" to "IMG_0250.JPG."

22  [3] FDA Food Code 2022, Chapter 5, Water, Plumbing, and Waste, 5-501.15 Outside
    Receptacles, (A) "Receptacles and waste handling units for refuse, recyclables, and
23  returnables used with materials containing food residue and used outside the food
    establishment shall be designed and constructed to have tight-fitting lids, doors, or
24  covers."

25  [4] California Department of Public Health, Division 104 Environmental Health, Part
    7, California Retail Food Code Effective January 1, 2024, Chapter 7, Article 4,
26  Refuse, 114245.1 (a) "All refuse, recyclables, and returnables shall be kept in
    nonabsorbent, durable, cleanable, leakproof, and rodentproof containers and shall be
27  contained so as to minimize odor and insect development by covering with close-
    fitting lids or placement in a disposable bag that is impervious to moisture and then
28  sealed."

1  birds can access inner walkways and recreation yards, they can also enter the

2  facility's interior through the opening of doors.  During my inspection at George

3  Bailey, live birds and bird droppings were observed in housing areas, including

4  segregation. Graham Rpt. at 16, ¶ 41.  Live birds and evidence of bird activity,

5  including bird droppings observed on food service equipment and the loading dock

6  were noted at East Mesa in the loading dock area.  Graham Rpt. at 65, ¶ 159.

### 3.    Drain/Sewer Flies

8  12.    Drain flies or sewer flies refer to the same type of fly.  Ms. Peters notes

9  the presence of sewer flies in the shower areas at Vista and states that the sewer flies

10  suggest a need for drain cleanings, such as enzyme removal or high-power jetting.

11  Peters Rpt. at 8.  She also states that regular maintenance is crucial to prevent

12  infestations.  We are in total agreement on this issue.  However, live drain flies and

13  drain fly larvae were found during my inspections in multiple facilities and areas

14  within a facility.  Graham Rpt. at 11, ¶ 28 (George Bailey); 13, ¶¶ 33-36; and 27-28,

15  ¶ 74 (Central Jail).

### 4.    Air Vent Covering

17  13.    Ms. Peters notes evidence of IPs covering vents with paper items.

18  Peters Rpt. at 8.  This practice was also noted during my inspections.  As Ms. Peters

19  states in her report, this practice can impede air circulation and should be

20  discouraged to maintain proper airflow.

### 5.    Chemical Control/Labeling

22  14.    Ms. Peters states in her report, "I found some secondary containers

23  used by the Incarcerated Population (IP) for chemicals in living areas that were

24  improperly labeled." Peters Rpt. at 9.  She also recites the need for proper labeling

25  of chemicals based on OSHA (Office of Safety and Health Administration)

26  requirements but does not explain or apply the OSHA requirements.  Multiple

27  photographs, i.e., IMG.0142.JPG, IMG_0144.JPG, IMG_0152.JPG, and

28  IMG_0189.JPG were taken during Ms. Peters' inspections that indicate that she

1    observed unlabeled and improperly labeled chemical bottles in multiple areas of the

2    San Diego County jails.  During my inspections, unlabeled bottles containing

3    chemicals were frequently observed, old shampoo bottles were observed containing

4    chemicals with no labels, open chemical bottles were also observed in various areas,

5    and chemical bottles were also observed at individual incarcerated person's bunks,

6    all indicating a lack of proper chemical control at San Diego jails.  A complete

7    explanation and description of the various violations of chemical control can be

8    found in my expert report.  Graham Rpt. at 86-90, ¶¶ 211-220.

9            C.      **Conflicting Issues and Opinions**

10          15.     There are areas of Ms. Peters' report that conflict with my findings and

11   the information provided in my expert report.  The following information outlines

12   the differences.

13                  1.      **Cleanliness and Sanitation**

14          16.     Ms. Peters states in her report, "Overall, all of the facilities were clean,

15   with only minor incidents observed during the site visits."  Peters Rpt. at 4.  She also

16   states, "The facilities were overall hygienic and appropriately sanitized, but I do

17   recommend general surface cleaning be performed daily when areas are empty, with

18   a focus on highly soiled areas such as toilet areas."  Peters Rpt. at 7.  Then, under

19   Pest Management, Ms. Peters states, "I found the facilities to be fairly clean for the

20   most part free of vermin and insects."  Peters Rpt. at 7.  It is confusing whether her

21   opinion is that the facilities were found clean, hygienic and appropriately sanitized,

22   or fairly clean for the most part.  Ms. Peters does not provide any clear descriptions

23   as to what areas she found any of these conditions described, why she noted these

24   observations, or any standards by which she compared her observations or formed

25   her opinions.  Ms. Peters does miss some opportunities to note conditions observed

26   as evidenced by photographs taken during her inspections.  For example, in

27   photograph IMG_0152.JPG, the photograph shows shampoo bottles that contain

28   chemicals, however, Ms. Peters does not include in her report the dirty mop head

1   hanging over the housing unit dayroom sink, the dirty towel on the floor, the dirty
2   sink, and the dirty floor and wall, even though these issues are clear in the
3   photograph.  Another missed opportunity to note conditions is missing from Ms.
4   Peters' report but shown in photograph, IMG.0190.JPG, where a shower is observed
5   dirty, the walls are dirty and have peeling paint, and there is what appears to be a
6   shower curtain hanging on a string.  It is agreed that some areas of some facilities at
7   the San Diego jails are clean and/or cleaner than others.  However, lack of
8   cleanliness and pervasive filth were observed during my inspections in so many
9   areas, that I cannot agree with Ms. Peters that the facilities are "overall" clean,
10  hygienic and appropriately sanitized, or even fairly clean.  There are numerous
11  observations and photographs noted in my report that clearly depict the
12  unacceptable conditions observed during my inspections.  I visited George Bailey in
13  January 2024 before Ms. Peters' visit; however, I visited Central Jail in May 2024
14  after she visited that facility.  I found serious environmental health and safety
15  violations at both facilities.  A complete description of my inspection findings,
16  including photographs, and references to a photograph index concerning cleanliness
17  and sanitation at each facility I inspected can be found in my expert report. Graham
18  Rpt. at 8-76 ¶¶ 23-179.

19          17.     Ms. Peters also notes in her report that she was made aware that the
20  Plaintiffs assert that overcrowding exists in the facilities leading to environmental
21  health issues.  Peters Rpt. at 10.  Ms. Peters also states on the same page of her
22  report, "I did not observe any overcrowding within the detention facilities. Several
23  multiple occupancy areas/mainline housing areas were observed, some with triple
24  bunk bed options but these did not create poor environmental conditions based upon
25  my inspection and observations."  Peters Rpt. at 10.  Unfortunately, Ms. Peters does
26  not describe where (facility and location) she observed the triple bunking.
27  Regardless, triple bunking in San Diego jails is a direct violation of BSCC Title 24,
28  § 1231.2.7 – Double Occupancy Cells.  Triple bunking is not permitted.  San Diego

1  was cited during their BSCC Inspection for 2020-2022 and 2023-2024 for triple

2  bunking.  Cells lack the proper square footage for three occupants.  A complete

3  explanation of triple bunking, where this practice was observed, and why it is an

4  issue for environmental health and safety is outlined in my expert report.  Graham

5  Rpt. at 11-12 ¶¶ 30-32.

6              **2.      Air Quality**

7        18.    Ms. Peters states in her report, "In shower areas, during the inspection

8  no active mold growth was observed, indicated by the absence of outward growth on

9  surfaces such as walls and cellulose ceiling tiles."  Peters Rpt. at 8.  Mold growth

10  was pervasive in shower areas during my inspections.  Not only was mold observed,

11  but showers overall were dirty, contained soap scum, and needed cleaning.  In

12  addition, mold was observed on walls and ceilings, for example, at Vista, wall and

13  ceiling mold was observed in several housing units.  Graham Rpt. at 20, ¶ 50.

14        19.    In her report, Ms. Peters states, "Overall, the filters, sprinkler heads,

15  and other areas prone to dust collection were free of dust."  Peters Rpt. at 8.  Air

16  vents and air returns were not clean during my inspections.  It is possible, but not

17  probable that the issues I observed were corrected before Ms. Peters' visits.  I say

18  not probable because Ms. Peters visited Central Jail before I did and I found the

19  ceilings and air vents at Central Jail dirty, rusted, and/or blocked with dust or paper.

20  Dirty air vents and air returns were found in various areas of all the facilities I

21  inspected and my findings are described completely for each facility in my expert

22  report.

23              **3.      Plumbing/Electrical**

24        20.    In her report, Ms. Peters states, "The plumbing and electrical systems at

25  each of the facilities were not contributing to any health or safety issues based upon

26  my observations."  Peters Rpt. at 11.  It is not clear from her descriptions in her

27  report where she made her observations and why she states that these systems were

28  not contributing to any health or safety issues.  There were numerous plumbing

1  issues, including leaking toilets, water lines, faucets, and water closet/pipe chase

2  leaks observed during my inspections.  The plumbing issues I observed are all

3  described throughout my expert report.

4       21.     Concerning electrical, Ms. Peters states in her report, "I observed the

5  use of one extension cord in one facility, which I was advised was temporary."

6  Peters Rpt. at 11.  She does not, however, indicate which facility, where in the

7  facility this observation was made, or who told her that it was temporary.  During

8  my inspection, I observed multiple electrical safety issues, raising concerns

9  especially in correctional environments.  Graham Rpt. at 78-79, ¶¶ 187-193.  For

10  example, at Vista, duct tape was holding an electrical cord along a cabinet and also

11  into an electrical outlet in the medical clinic, Graham Rpt. at 79, ¶ 192 and

12  photographs.  In addition, electrical outlets were observed unsecured at Las Colinas

13  and in the kitchen at South Bay, Graham Rpt. at 79, ¶ 190, and 69-70, ¶ 166.

14       **D.     Training**

15       22.     Ms. Peters discussed the Healthcare Service Assistant Training (HSAT)

16  Program throughout her report, repeating the same information several times.  Peters

17  Rpt. at 4-6.  In describing the HSAT program, Ms. Peters states, "The HSAT

18  (Health Service Assistant Training) Program is a very thorough training initiative

19  provided by the San Diego County Sheriff's Office.  This program offers extensive

20  training to Incarcerated Person (IP) workers in bio-hazard cleaning and sanitation."

21  Peters Rpt. at 4 & 6.  However, Ms. Peters should have noted in her report the

22  observance of a cleaning cart captured in photograph IMG.0142.JPG that was

23  labeled "HSAT 3 Bathrooms."  This cleaning cart contained multiple unlabeled and

24  improperly labeled bottles containing chemicals.  For a program that Ms. Peters

25  described as thorough with extensive training in bio-hazard cleaning and sanitation,

26  proper labeling of chemical containers should be paramount.

27       23.     The HSAT program is one of the reentry program classes provided at

28  the San Diego jails.  The San Diego County Sheriff's Detention and Reentry

1   Facilities Classes and Programs documentation (see SD_1517575) notes the class

2   for the HSAT program is coordinated through the Grossmont Adult School,

3   providing training on standard medical facility cleaning and on-the-job training in

4   the medical areas of the facility, (see SD_1517577).  According to this

5   documentation, this class is available at East Mesa, George Bailey, Central Jail, and

6   Rock Mountain.  However, Ms. Peters describes this program in her report as being

7   taught at only Central Jail and George Bailey.  She recommends the training be

8   extended to the remaining facilities.  While the HSAT program may contain

9   beneficial training to support a healthy and safe environment, the environmental

10  health and safety of an area is only as good as ensuring that appropriate cleaning and

11  sanitation practices are carried out consistently, and measures for accountability are

12  in place and followed.  I would need a lot more information about this program,

13  including who attends, how often, and the content of the classes, to know if the

14  program is useful in addressing the deplorable conditions I have observed at the San

15  Diego County jails.

16        24.    I also strongly disagree with Ms. Peters' statement, "The two detention

17  facilities with this program exhibit a higher level of cleanliness."  Peters Rpt. at 5.  I

18  found the opposite to be true – Central Jail and George Bailey were two of the most

19  egregiously filthy facilities I inspected with numerous violations of standards for

20  environmental cleanliness and sanitation.  Ms. Peters' conclusion that those two

21  facilities had a higher level of cleanliness is directly contradicted by the conditions

22  described at length, with extensive photographic evidence, in my expert report.

23        **E.    Policies and Procedures**

24        25.    Ms. Peters does not provide any information concerning her review of

25  policies and procedures other than to state that the existing policies and practices

26  provide a solid foundation.  Peters Rpt. at 1.  She does provide a list at the end of her

27  report of the documents she reviewed, which includes policies and procedures,

28  Peters Rpt. at 18, but she does not equate any of these policies and procedures to any

of her observations or opinions in her report.  The policies and procedures for the San Diego jails are insufficient and, in many cases, do not provide any foundation for staff to understand what is expected or to follow the policy.  In many cases, the policies lack clear descriptions of expectations, steps to follow, clear instructions, and sufficient information for the policy to be effective or measure staff performance.  There were numerous instances noted in my expert report with specific examples of policies that need revising so that staff understands what is expected, how to complete tasks required in the policy, and to provide San Diego jails with mechanisms for accountability.  Graham Rpt. at 90-92, ¶¶ 221-226.

**F.    Employment and U.S. Department of Justice (USDOJ) Investigation – Alabama Department of Corrections (ADOC)**

26.    Ms. Peters states in her report that she has a Bachelor of Science in Biology and a Master of Public Administration in Environmental Management.  She also lists several certifications related to environmental health and safety.  Ms. Peters also states, "I was previously employed as an Environmental Manager with the Alabama Department of Corrections (ADOC) for 11 years, where I was the Department's liaison in ensuring that all environmental procedures are conducted in compliance with state, federal and local environmental regulations.  My division was responsible for conducting internal audits of the correctional facilities for environmental health and safety issues for maintenance, food safety and environmental compliance."  Peters Rpt. at 2.  Ms. Peters' resume is attached as Appendix A to her report and shows she was employed with the ADOC from October 2010 to July 2021.  In addition, Ms. Peters was employed by the Alabama Department of Public Health from August 2000 to October 2010.

27.    During Ms. Peters' employment with the ADOC, the United States Department of Justice (USDOJ) opened a CRIPA (Civil Rights of Institutionalized Persons Act) investigation into the conditions in ADOC facilities housing male

1    prisoners.[5]  Site visits by the USDOJ and expert consultants were conducted at four

2    Alabama prisons between February 2017 and January 2018.  On April 2, 2019, the

3    USDOJ provided their report of the investigation at the ADOC.[6]  In this report, the

4    USDOJ and U.S. Attorney's Offices for the State of Alabama found "that there is

5    reasonable cause to believe, based on the totality of the conditions, practices, and

6    incidents discovered that:  (1) the conditions in Alabama's prisons for men  violate

7    the Eighth Amendment of the U.S. Constitution."  Among other violations, the

8    USDOJ found, "ADOC prisons do not provide adequate humane conditions of

9    confinement", citing numerous issues with toilets, sinks, and showers that leak, get

10   stopped up, or are otherwise broken.  Showers were found covered in mold.  Floors

11   were described as so compromised that the concrete subfloor was all that remained.

12   Also described were prisoner complaints of rats and bugs in the kitchen,

13   cockroaches in segregation, leaking from roofs, and lack of heat.  The USDOJ also

14   noted, "Short of new facilities or drastic renovations, there are relatively simple

15   physical plant corrections that could increase safety in the facilities."  Cleaning

16   mold in showers and then painting walls that are not tiled is a good example of a

17   relatively simple physical plant correction.

18       28.    The entire investigation by the USDOJ, inclusive of their findings

19   report, occurred while Ms. Peters was the Environmental Manager for the ADOC.

20   The USDOJ ultimately sued Alabama based on those findings on December 9, 2020,

21   in *United States v. Alabama*, No. 2:20-cv-01971-RDP (N.D. Ala.).  The operative

22   complaint outlines findings from their investigation in which they state that among

23   other issues, "Defendants' systemwide policies, procedures, and practices related to

24   maintenance, safety measures, personal hygiene, and sanitation are not sufficient to

25   provide safe or sanitary conditions at each of the 13 Alabama's Prisons for Men."

26   _____

27   [5] https://www.justice.gov/crt/case-document/file/1149981/dl

28   [6] https://www.justice.gov/crt/case-document/file/1149971/dl

1 | *Id.*, Second Amended Complaint, Dkt. 71. at 4, ¶ 238.[7]

2 | 29. In her resume, Ms. Peters' states that in her role at ADOC she

3 | "Substantially managed 29 State correctional facilities and served as an

4 | interdepartmental liaison to assure that all procedures complied with state, federal,

5 | and local environmental regulations." Peters Rpt., App'x A. She also states that she

6 | has "a proven track record of ensuring adherence to regulatory standards." Peters

7 | Rpt., App'x A. The USDOJ's findings strongly contradict those assertions. Ms.

8 | Peters' belief that the ADOC complied with environmental regulations casts serious

9 | doubt on her opinion as stated in her report, "I believe that the San Diego County

10 | Sheriff's Office Detention Facilities perform at an average level compared to other

11 | adult local detention facilities in terms of environmental health and safety. There

12 | are no systemic issues which demonstrate a callous or indifferent attitude toward

13 | creating a clean and health environment for Incarcerated Persons." Peters Rpt. at

14 | 13.

15 | **G.   Comparison of Subjects Discussed in Each Expert's Report**

16 | 30. The following is a comparison table illustrating the subjects discussed

17 | by each expert in their report.

| Subjects Discussed in Expert Report of Henrietta Peters | Subjects Discussed in Expert Report of Debra Graham |
|---|---|
| Training – HSAT Program | Methodology |
| General and Bio-Hazard Sanitation | Standards |
| Garbage Compactor | Inspection Equipment |
| Grease Bins | Cleanliness and Sanitation |
| HSAT Program | Housekeeping |
| Pest Management | Medical & Dental Facilities |
| Air Quality | Medical Reports and Documentation |

[7] The operative Second Amended Complaint was filed roughly four months after Ms. Peters left the ADOC, however, the facts in that complaint were from the investigation that occurred while she was employed at the ADOC.

| Subjects Discussed in Expert Report of Henrietta Peters | Subjects Discussed in Expert Report of Debra Graham |
|---|---|
| Mold | Kitchens |
| Air vents | Unsafe Physical Plant |
| Hazard Communication/Chemical Sanitation | Plumbing |
| Plumbing Electrical | Electrical |
| Laundry Services | Lighting |
| | Air Ventilation, Quality, and Temperatures |
| | Other Observations |
| | Chemical Control |
| | Policies, Procedures, and Training |
| | Recommendation |
| | Cleanliness and Sanitation |
| | Unsafe Physical Plant Conditions |
| | Other Observations |

31.    As noted, multiple areas were discussed in my report that Ms. Peters did not discuss.  There is no reference to Ms. Peters inspecting any of the medical or dental clinic areas.  There is no mention of the kitchens, other than the dumpster areas, but it is not clear which dumpster areas were visited.  Ms. Peters does not provide any information concerning the conditions and/or operation of sinks, toilets, or showers, or whether she found unsanitary conditions and where.  She does not mention the environmental conditions of the housing units, individual cells, segregation cells, etc.  There were so many instances of unsanitary conditions in multiple facilities during my inspections that it is hard to believe that Ms. Peters could not have experienced at least some of these same conditions.  In addition, Ms. Peters did not discuss in her report lighting or air temperatures in any of the facilities.

/ / /

**H.    Conclusion – Henrietta L. Peters Expert Report Review**

32.    Ms. Peters' report provides information based on her observations while participating in an inspection of San Diego County Sheriff's Office Detention Facilities.  Ms. Peters described observations, formed opinions, and made recommendations, but did not explain her methodology, if any, or the basis for which she formed her opinions.  It is unclear from her expert report exactly what locations in each facility she visited, and exactly what she did inspect.  She fails to describe for the reader of her report exactly what she did find in her observations, why her findings are of issue, and what rationale she used for her findings, opinions, conclusions, and/or recommendations.

33.    Ms. Peters notes in her report that staff demonstrated both knowledge and responsiveness, promptly took corrective actions, and received information openly with positive intent to make necessary corrections, none of which were demonstrated to me during my inspections.  To the contrary, the Defendants' counsel attempted to restrict me where no restriction was warranted.  I was not able to experience staff's demonstration of openness, responsiveness, or positive intent toward taking corrective actions described by Ms. Peters, in part because counsel for Defendants restricted my conversations and interactions with staff.  In her conclusion, Ms. Peters states, "San Diego County Sheriff's Office leadership and staff members have taken an active role in improving the sanitation, which is visible at each facility and were very receptive to my questions, commentary and suggestions during my inspections and after."  The receptiveness of staff to suggestions is an important first step for correcting violations and improving the facilities, however, receptiveness is not enough to ensure that necessary and adequate corrections and improvements are completed and sustained.  Multiple steps must be taken between being receptive to suggestions and opportunities before effective corrective actions have been carried out.  These steps must include, for example, a meaningful corrective action plan that outlines violations and appropriate

1  corrective measures to address those violations, along with, most importantly,

2  accountability for ensuring that violations will not continue or be repeated.  Internal

3  accountability is particularly important in light of the Citizens' Law Enforcement

4  Review Board's (CLERB's) decision to dismiss complaints about environmental

5  conditions inside San Diego County jails stating claims are outside of their

6  jurisdiction and the allegations do not fall within the authority granted to CLERB by

7  the San Diego County Board of Supervisors.[8]  It is also unclear from Ms. Peters'

8  report how she knew that staff have taken an active role in improving the sanitation

9  at San Diego County jails; there is no explanation of how she came to that

10  conclusion.

11      34.    Under the Summary of Opinion, Ms. Peters states, "I found no

12  evidence that the County or its jail staff are deliberately indifferent to the health and

13  safety of incarcerated persons, with respect to the cleanliness and sanitation of the

14  facilities, and to the contrary, I found them to be responsive, open, and accepting of

15  best practices."  Peters Rpt. at 1.  However, Ms. Peters never defines "deliberatively

16  indifferent" or what evidence would or would not indicate deliberate indifference or

17  lack thereof.  I strongly disagree with her overall conclusion regarding deliberate

18  indifference.

19  **III.    RESPONSE TO THE REPORT OF OWEN J. MURRAY, D.O., M.B.A.**

20      35.    I reviewed the Expert Medical Report ("Murray Rpt.") from the

21  perspective of environmental health and safety and have discussed several

22  observations noted from my review in the sections below.

23      **A.    Methodology and Facilities and Materials Reviewed**

24      36.    In Section 4: Methodology, Dr. Murray reports that he reviewed

25  material provided by counsel, spoke with Plaintiffs' medical expert Dr. Peter

26

27  [8] https://www.sandiegouniontribune.com/2024/09/05/unsanitary-unethical-
unprofessional-san-diego-sheriffs-oversight-board-dismisses-complaints-due-to-
28  lack-of-jurisdiction/

1  Freedland on July 5, 2024, and Dr. Nas Rafi, CHP SDSO Medical Director via

2  telephone on August 7, 2024, reviewed the medical records of the named Plaintiffs,

3  participated in a facility inspection conducted on March 18, 19, and 20, 2024, joined

4  by subject matter experts in the areas of nursing services, pharmacy, medical

5  records, and administration, and audited randomly selected medical records.

6  Murray Rpt. at 2.

7       37.    In Section 5:  Facilities, Dr. Murray reports he toured the George

8  Bailey Detention Facility, Las Colinas Detention and Reentry Facility, Vista

9  Detention Facility, San Diego Central Jail, East Mesa Reentry Facility, Rock

10  Mountain Detention Facility, and South Bay Detention Facility.  Dr. Murray states

11  that at each facility he was accompanied by several members of the SDSO (San

12  Diego Sheriff's Office) facility leadership.  Dr. Murray also states, "We did not

13  speak with any incarcerated persons (IPs)."  Murray Rpt. at 3.

14       38.    While the review completed by Dr. Murray includes documents,

15  records, and tours, importantly conversations with incarcerated persons were not

16  included.  The purpose of Dr. Murray's reviews and tours was outlined in Section 3:

17  Overview of his report, which states, "A comprehensive assessment of SDSO was

18  conducted to gather data needed to address the allegations in the Plaintiffs'

19  complaint."  Murray Rpt. at 1.  The Plaintiffs in this complaint are incarcerated

20  persons.  An attempt to speak in person or electronically with any of the Plaintiffs

21  that could be made available should have been completed.  It would have been

22  beneficial for Dr. Murray to speak with incarcerated persons during his tours.  In my

23  experience in conducting audits of correctional facilities, incarcerated persons have

24  a wealth of information about what occurs or does not occur in their incarcerated

25  environment.  It is understood that incarcerated persons provide information from

26  their frame of reference and their reality, and sometimes that information is

27  inaccurate or not truthful, but many times that information is indeed accurate and

28  truthful.  The beauty of an effective audit is to be able to sift through the information

1    provided by the incarcerated persons and information provided by staff and facility

2    documentation to determine where and what the opportunities for improvement are

3    and/or the direct violations of standards, laws, or guidelines.

4         39.    I understand from Plaintiffs' counsel that they gave Defendants'

5    counsel permission for Defendants' experts to interview incarcerated persons during

6    inspections, so long as Plaintiffs' counsel could be present for the interviews.  This

7    was the arrangement that Defense counsel had during my conversations with

8    Sheriff's Department staff during my inspections—I was only allowed to speak with

9    staff if Defendants' counsel was present for the conversation.  It is my

10   understanding that Defendants' counsel scheduled their experts' inspections without

11   informing Plaintiffs' counsel.

12        40.    In Section 2: Materials Reviewed, Dr. Murray states, "The materials

13   provided to me for review can be found in Appendix B," Murray Rpt. at 1, and in

14   Section 4:  Methodology, he states, "I reviewed the material provided by counsel."

15   Murray Rpt. at 2.  In addition, Dr. Murray states in Section 7: Findings, under Intake

16   that "a random selection process was initiated to audit 75 IP health records from a

17   pool of 121 records . . . to evaluate compliance with the SDSO's intake screening

18   process," and those "same 75 IP health records were reviewed to ascertain if the

19   initial health assessment . . . was performed with[sic] 14 days from the initial intake

20   date."  Murray Rpt. at 11-12.  It is not noted in Dr. Murray's report if the materials

21   he reviewed and the pool of records were selected/requested by Dr. Murray, were

22   selected by the SDSO staff,  by medical staff, or were selected by counsel for

23   Defendants.  This is an important point as the records should have been

24   selected/requested by Dr. Murray and not by the facility, medical staff, or counsel

25   for Defendants.  Of the 75 incarcerated persons' health records assessed for initial

26   health assessment within 14 days, only 11 ended up being reviewed because those

27   11 were the only persons who stayed in custody for 14 days or more.

28   / / /

1      **B.    Infection Control**

2          41.    I agree with Dr. Murray's statement in Section 7: Findings, under

3    Infection Control that "Infection control practices are paramount in a jail

4    environment to safeguard the health and well-being of both incarcerated individuals

5    and staff." Murray Rpt. at 13. This should also be broadened to include visitors,

6    volunteers, and anyone who may come into contact with the facilities. Also agreed

7    is Dr. Murray's statement, "Effective infection control measures and timely

8    identification and isolation of infectious cases are crucial in preventing transmission

9    and outbreaks." Murray Rpt. at 13. Importantly, in this statement is the

10   understanding of effective infection control measures, as well as the implementation

11   of an effective infection control program, the consistent adherence to that effective

12   infection control program, measures to ensure adherence, such as step-by-step

13   instructions and inspections, follow-up measures, and accountability provisions.

14         42.    In Dr. Murray's statement, "The SDSO has implemented all the

15   necessary elements for a thorough and effective infectious and communicable

16   disease surveillance program", Murray Rpt. at 13, it is not clear if the infectious

17   disease/communicable disease program is referring to disease transmission, i.e.,

18   tuberculosis, influenza, or COVID-19, or is also inclusive of all of environmental

19   health and safety. In addition, Dr. Murray does not describe what the exact

20   "necessary elements" are for such a program, which makes it impossible to evaluate

21   his claim. This statement by Dr. Murray appears to assume that the infectious and

22   communicable disease surveillance program has been effectively implemented and

23   the staff are consistently following the guidelines and requirements of this program.

24   This may have been concluded from the review of documents, and that may work

25   well if timely identification of infectious diseases, isolation measures, and

26   preventing transmission and outbreaks are the goals. However, when overall

27   environmental health and safety are part of the program, the parts of the program

28   must go beyond document reviews and tours and must include physical checks

specifically for proper cleanliness and sanitation, observations for adherence to proper disinfecting requirements, and thorough and meaningful documented inspections, with follow-ups and accountability.  I do not see any evidence in Dr. Murray's report that he performed any type of physical checks for cleanliness and sanitation or environmental health and safety as outlined above.

43.    Dr. Murray also states that in addition to the infectious and communicable disease surveillance program, further surveillance activities include regular weekly ectoparasite inspections and monthly environmental health inspections conducted by the nursing department.  There is no explanation of exactly what these inspections entail or where and how many locations are inspected.  Dr. Murray does not state if facility staff participate in these inspections in addition to the nursing staff, whether these inspections are documented and, if so, how they are documented, who reviews them, or what measures are in place for corrective actions and accountability.  In addition, Dr. Murray does not state in his report if he reviewed any documentation of these inspections and if so, what his conclusions were.

C.    **Wellness Rounds**

44.    In Section 7: Findings, under Wellness Rounds, Dr. Murray describes a leadership-driven, multidisciplinary team that makes weekly rounds in Administrative Separation (AdSep) called "Wellness Rounds."  Murray Rpt. at 20-21.  It is noted in this description that 2-3 incarcerated trustees are included as part of the team "to remove trash and used items and to sweep the cell."  Murray Rpt. at 20.  This program appears to be limited to AdSep and is only conducted weekly.  No other cleaning functions or frequencies are described.

45.    Other than stating that the facilities and areas were toured in March 2024, there is no reference to actual physical observations made by Dr. Murray that these programs described above are in fact in place and, most importantly, being consistently followed.  Simply stating that the program has been implemented is not

1  enough without a method to actually evaluate that the program is functioning.

2  Without applying any method to evaluate the program, Dr. Murray's report

3  overlooks significant aspects of the program's requirements, adherence to the

4  program, opportunities for improvement, and/or corrections needed.

5      46.    My expert report provides a remarkable quantity of examples of risks to

6  environmental health and safety due to a lack of cleanliness and sanitation, filth, and

7  subpar disinfecting practices, Graham Rpt. at 8-76 ¶¶ 23-179.  I also discussed in

8  my expert report my review of documentation and photographs of the ████████,

9  2021, in-custody death of Mr. ████████████ .  Based on information

10  contained in the Medical Examiner's report and the photographs I reviewed, Mr.

11  ████ had a heavy infestation of hair and skin by lice.  I also reviewed

12  documentation from two additional in-custody deaths as part of my review of

13  environmental health and safety, Mr. Lonnie Rupard and Ms. Roselee Bartolacci.  A

14  complete synopsis of my review of all three of these cases is outlined in my expert

15  report, Graham Rpt. at 48-54 ¶¶ 128-140.  These three cases were not noted as

16  reviewed by Dr. Murray in his expert report.  It is not clear if Dr. Murray visited

17  areas in the San Diego jails in common with areas I also visited.  However, based on

18  observations I made in January and also in May 2024, it is hard to believe that Dr.

19  Murray could not have observed at least some of the environmental health and

20  safety risks that I observed.

21    **D.    Conclusion – Owen J. Murray, D.O., M.B.A. Expert Report**
         **Review**

22

23      47.    Dr. Murray's report lacks any real detail from physical inspections.

24  There is no mention of observations in specific areas of the facilities during the

25  inspections, no information provided by incarcerated persons other than copying

26  information from the complaint, and no details of what was observed to confirm

27  programs discussed above are indeed in place.  More importantly, there is no

28  evidence or explanation that the programs discussed are being followed and

1    corrective actions are being made when violations or discrepancies are found.

2    **IV.    CONCLUSION**

3        48.    The information and opinions contained in this report are based on

4    evidence, documentation, and/or observations available to me.  I reserve the right to

5    modify or expand these opinions should additional information become available to

6    me.  The information contained in this report and the accompanying exhibits are a

7    fair and accurate representation of the subject of my anticipated testimony in this

8    case.

9

10    Dated:  October 1, 2024

Debra Graham