GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:   (858) 677-1400
Facsimile:    (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPÚLVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>    Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF JAMES AUSTIN, PH.D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:      Hon. Anthony J. Battaglia<br><br>Date:       March 6, 2025<br>Time:       2:00 p.m.<br>Crtrm.:     4A |

[4621616.4]

# DECLARATION OF JAMES AUSTIN, PH.D.

I, James Austin, Ph.D., declare that if called upon I could and would testify competently to the information contained below, including in my expert reports, which is based on my own personal knowledge:

1.     I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment ("Motion").

2.     Attached as **Exhibit 1** is a true and correct copy of my August 21, 2024 report ("Report"), which accurately represents my opinions in this case.  This does not include the index of documents I reviewed.

3.     Attached as **Exhibit 2** is a true and correct copy of my October 2, 2024 rebuttal report ("Rebuttal"), which accurately represents my opinions with respect to the report of Lenard Vare in this case.  This does not include the index of documents I reviewed.

4.     As discussed in my Report at pp. 3-24, SDSO fails to adequately classify and assign people at the San Diego County Jail ("Jail") to appropriate housing locations.  This leads to an overclassification of IPs at the Jail, resulting in potentially harmful and more restrictive conditions than are necessary for the safety and security of the facility, its staff, and its incarcerated population.

5.     As discussed in my Report at pp. 24-33, SDSO's mortality and assault rates are extremely high.  I have reviewed the SDSO Data for In-Custody Deaths by Year.  Report at 24.  The data shows nine reported deaths for 2024.  It is my understanding that there was a tenth in-custody death in the Jail this year.  *See* Dkt. 779-4 at ECF p. 288 (Keller Rebuttal Rpt.)[1].  It is my opinion that ten deaths at a jail with an average population of 3,895 amounts to an extremely high mortality rate. Based on the methodology described in my report—the same methodology used by

---

[1] Jose Ramon Cervantes Conejo was booked into Vista jail on March 28, 2024.  The next day he was transported by ambulance to Palomar Medical Center, where he was in a coma for about 2 weeks before passing away on April 12, 2024.

DECLARATION OF JAMES AUSTIN, PH.D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

1  the Bureau of Justice Statistics ("BJS")—SDSO had an in-custody death rate of 257

2  per 100,000 IPs in 2024.  The most recent BJS study (from 2019) showed that the

3  average in-custody jail mortality rate in the United States was 167 per 100,000 IPs.

4  Report at 25.  SDSO's in-custody mortality rate for 2024 is 54% higher than the

5  most recent BJS-calculated national jail average in-custody mortality rate.

6        6.    As discussed in my Report at pp. 21-24 and my Rebuttal report at pp.

7  3-4, the testimony of Defendants' PMK witness Assistant Sheriff Adams-Hydar and

8  SDSO's Below Minimum Staffing Reports show that the Jail is severely

9  understaffed, which contributes to high mortality and assault rates.  Defendants

10  provide no evidence to the contrary in their Motion.

11        7.    Nothing in Defendants' summary judgment briefing changes the

12  opinions in my Report and Rebuttal.

13        I declare under penalty of perjury under the laws of the United States of

14  America that the foregoing is true and correct to the best of my knowledge, and that

15  this declaration is executed at _Camden_, _SC_ this _16_ day of January,

16  2025.

17

18

19                                    _James Austin_

20                                    James Austin, Ph.D.

21

22

23

24

25

26

27

28

# EXHIBIT 1

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>      v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>        Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXPERT REPORT OF JAMES AUSTIN, PH.D.**<br><br>Judge:     Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

I, James Austin, Ph.D., declare:

1.      A true and correct copy of my expert report is attached hereto as **Exhibit A**.

2.      I am employed by the JFA Institute which I founded in 2003. I have previously served as the Director of the Institute of Crime, Justice and Corrections at the George Washington University (1999 to 2003); and as the Executive Vice President for the National Council on Crime and Delinquency (1982 – 1998).  From 1970 – 1975 I was employed by the Illinois Department of Corrections at the Stateville and Joliet prisons as a correctional sociologist.  I received my Ph.D. in sociology from the University of California, at Davis.  A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit B**.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify.

3.      The materials that I reviewed in preparing my opinions and findings are listed in **Exhibit C**.  The information and opinions contained in my expert report are based on evidence, documentation, and/or observations available to me.  I reserve the right to modify or expand these opinions should additional information become available to me.

4.      My primary opinions are as follows:

        a.      1.      The Jail's classification and housing system is inadequate, has not been validated, results in over-classification, is racially driven, results in segregated housing units, and thus puts incarcerated persons at increased risk of harm.

        b.      2.      The out of cell time for incarcerated persons, especially in the restricted housing units, is severely inadequate, constitutes solitary confinement conditions, and thus puts incarcerated persons at increased risk of harm to themselves and others.

1             c.     The various housing units are inadequately staffed and thus place

2 IPs at increased risk of harm by not providing the proper level of supervision.

3             d.     Collectively, the above deficiencies result in the Jail's assault

4 and mortality rates to be unacceptably high.

8 Dated:  August 21, 2024

9           James Austin, Ph.D.

# Exhibit A

James Austin, Ph.D.



## I.    Qualifications

I am employed by the JFA Institute, which I founded in 2003.  I have previously served as the Director of the Institute of Crime, Justice and Corrections at the George Washington University (1999 to 2003), and as the Executive Vice President for the National Council on Crime and Delinquency (1982 – 1998).  From 1970 – 1975 I was employed by the Illinois Department of Corrections at the Stateville and Joliet prisons as a correctional sociologist.  I received my Ph.D. in sociology from the University of California, at Davis.

I have implemented inmate classification systems for juvenile and adult facilities in over 30 local and state correctional systems.  I have also collaborated with corrections officials in Ohio, Mississippi, Colorado, Georgia, Illinois, and New York to reduce the number of prisoners assigned to administrative segregation/restricted housing.

I have served as the project director of the corrections options technical assistance program of the Bureau of Justice Assistance (BJA), an arm of the US Department of Justice that provides a wide variety of assistance to local jails, probation, parole, and prison systems.  I directed two BJA projects that focused on juveniles in adult correctional facilities and a national assessment of adult and juvenile private correctional facilities.

In 1991, I was named by the American Correctional Association as its recipient of the Peter P. Lejin's Research Award.  In 1999, I received the Western Society of Criminology Paul Tappin award for outstanding contributions in the field of criminology.  In 2009, I was the Recipient of the Marguerite Q. Warren and Ted B. Palmer Differential Intervention Award, American Society of Criminology, Corrections and Sentencing Division.

I served as the Chair of the National Policy Council for the American Society of Criminology.  In 2007, I was appointed to the California Department of Corrections and Rehabilitation Expert Panel on Adult Offender Recidivism Reduction Programs.

I am currently working with several jurisdictions as either a court monitor or expert to assist reaching compliance with existing consent decrees governing conditions of confinement and/or the use of restricted housing in Rhode Island,  New York City, Alameda County (California), New Orleans, and Santa Clara County (California).  I recently directed a comprehensive study of the Los Angeles County Sheriff's Department that included a staffing analysis for both the patrol and custody divisions.  That study also included a detailed study of the jail population and a jail population projection.

My current resume is attached to this report.

My compensation for work in this matter is $300 per hour.

**Publications in the Past 10 Years**

James Austin and Richard Rosenfeld.  September 2023. *Forecasting US Crime Rates and the Impact of Reductions in Imprisonment:  1960-2025*.  New York, NY. Harry F. Guggenheim Foundation.

Sarah L. Desmarais, John T. Monahan and James Austin, *The Empirical Case for Pretrial Risk Assessment Instruments*, 49 Criminal Justice & Behavior 807–816 (2022).

James Austin, Todd Clear, and Richard Rosenfeld. September 2020.  *Explaining the Past and Projecting Future Crime Rates*.  New York, NY.  Harry F. Guggenheim Foundation.

**List of All Other Cases in Which, During the Previous 4 Years, the Witness Testified as an Expert at Trial or by Deposition.**

*State of South Carolina, Supreme Court  v. Ricky Lee Blackwell*, Appellate Case No. 2014-000610 (Supreme Court of South Carolina).

*Flores, et al. v. Stanford, et al.*, Case No. 7:18-cv-02468 (VB) (JCM) (S.D.N.Y. 2018).

**Assessment of Allegations in Plaintiffs' Third Amended Complaint**

I have been asked to assess Plaintiffs' allegation in the Third Amended Complaint that "the Sheriff's Department fails to adequately classify and assign people to appropriate housing locations, putting them at grave risk of violence and physical injury."  I have also been asked to evaluate the mortality and assault rate in the San

Diego County Jail system (the "Jail"). I address Plaintiffs' allegations and render my opinion based on the data and analysis contained in this report.

## II. The Sheriff's Department Fails to Adequately Classify and Assign People to Appropriate Housing Locations, Putting Them at Grave Risk of Violence and Physical Injury

### A. Background

At issue is (1) whether the San Diego County Sheriff's Office (SDCSO) is properly classifying and housing incarcerated persons (IPs) within its jail system, (2) whether the conditions of confinement meet minimal jail standards, and (3) whether the jail is sufficiently staffed to provide adequate care to the jail population.

In order to make these assessments, I received documents including the jail classification system and housing plan that currently exist, current staffing levels by facility, Below Minimum Staffing and Mandatory Overtime (MOT) reports from February to September 2023, three jail population snapshot data files (November 30, 2023, November 30, 2023 and January 11,2024), and aggregate assault counts (IP on IP and IP on staff) for 2023. Additional materials that I reviewed in preparing my opinions and findings are listed in the attached index.

From January 16-18, 2024, I inspected three SDCSO facilities (George Bailey, Vista, and Las Colinas). During those tours, I was able to conduct approximately 40 interviews, the vast majority of which were with IPs whom I had randomly selected from the January 11, 2024 snapshot file as provided to me by SDCSO.

From March 25-26, 2024 I toured two additional SDCSO facilities (Central Jail and South Bay). During those tours I was able to conduct interviews with approximately 35 IPs, the vast majority of whom I had randomly selected from the March 22, 2024 snapshot file as provided to me by SDCSO. I did not inspect East Mesa Reentry Facility, a facility with only low-level IPs.

### B. The San Diego County Sheriff's Office's Classification System Overclassifies IPs

The two most frequently used jail and prison classification systems have either (1) the additive point system or (2) the decision tree system. The most frequently used classification system in both state prisons and local jails is the additive point system described in the National Institute of Corrections ("NIC") Objective Jail Classification System publication. *See* James Austin, *Objective Jail Classification*

*Systems: A Guide for Administrators* (1988), https://nicic.gov/resources/nic-library/all-library-items/objective-jail-classification-systems-guide-jail.

In this system, there are initial and reclassification forms that contain a number of scoring factors which are applied to the detainee at booking.  Points are tallied and a custody level is determined by staff trained in the classification system. Approved over-rides (both discretionary and mandatory) can then be applied by the classification staff to reach a final custody level.  The reclassification form, which places more emphasis on the inmate's disciplinary conduct while in custody, is used to determine a person's classification on a regular schedule after the initial classification has been made.  In jail systems, this reclassification event typical occurs every 60 or 90 days.

The decision tree jail classification system was developed by a private company known as Northpointe, which is more commonly known for its development of the COMPAS risk and needs assessment systems.  Northpointe is now managed by the private company known as Equivant.  The SDCSO staff stated during my March inspection that there is no existing contract with Equivant to operate and support the SDCSO version of the Northpointe decision tree clarification system.

The Northpointe jail classification system produces nine separate levels ranging from low to high.  These nine levels can also be collapsed into the three common custody levels of minimum, medium and maximum.  Pursuant to the Northpointe jail classification system, there is a form that is applied at booking and then a separate reclassification form that is applied after the IP has been incarcerated for some period of time.

SDCSO's Policy and Procedure R1 provides that "[t]he Jail Population Management Unit (JPMU) will conduct classification assessments, assign individuals a classification, and assign housing for all incarcerated persons." Detention Services Bureau Manual of Policies and Procedures, Policy R.1, May 11, 2022, SD_065162. The SDCSO classification system is referred to as a decision tree model, SD_065163, but, as described by Policy R1 as well as by staff during the March inspection, it differs significantly from the Northpointe model described above. Instead of nine classification levels, Policy R 3 provides that there are six Classification Levels that JPMU will assign an IP to. Detention Services Bureau Manual of Policies and Procedures, Policy R.3, May 11, 2022, SD_065165-66. These levels are:

> 6 – High Maximum;
> 5 – Maximum;

[4542889.7]                                                                                          4

4 – High;
3 – Medium;
2 – Low; and,
1 – Minimum.

Operationally and according to Policy R1, these six custody levels are then collapsed into three major categories. 065163. IPs with custody levels 1, 2, or 3 can be housed together, while custody levels 4 and 5 can be housed together but not with Levels 1-3.  Level 6 IPs will be housed in Administrative Separation. There are specialized and restricted housing units where SDCSO does not preclude an IP's assignment to that unit based on the IP's Classification Level.  These include Administrative Separation, Protective Custody, Psychiatric Stabilization Unit (PSU), designated medical or psychiatric housing, and the Jail Based Competency Treatment (JBCT) housing unit.  Pursuant to SDCSO policy, IPs classified at Levels 1, 2, 3, 4, and 5 can be mixed in these units. *See* Rita Diaz Dep., May 3, 2024, 53:9-18.

Policy R1 further provides that an IP's initial classification "is determined by their original booking charges, criminal history information, medical and psychiatric issues or additional special conditions, and information obtained from the incarcerated person interview."  SD_065162.

One other major difference between the Northpointe and the SDCSO classification system is that the Northpointe system includes both a reclassification form and a formal reclassification event where the IP is formally re-assessed by the classification unit.  By policy and practice, SDCSO does not have a separate reclassification form. Nor does SDCSO have a Policy and Procedure requiring a formal reclassification at regular specified intervals.  SD_065163-64 (describing reclassification as a process that occurs only when triggered by certain incidents, such as the IP receiving a prison sentence).

My review of the classification of all IPs confined at the Jail shows that SDCSO overclassifies its IP population.  Table 1 below shows the classification levels for the Jail population as of November 30, 2023 by each facility. Spreadsheet of Current In-Custody Population by Booking No. and Classification, Nov. 30, 2023, SD_117762.  Of note, the percentage of the Jail's population that is classified as either High, Max, or Max High is 59%, which is quite high compared to other jail and prison systems.  Likewise,  the percentage of the Jail's population that is classified as Minimum, Low, and Medium totals 42%, which is relatively low compared to other jail and prison systems.  Part of the reason for the higher number of IPs assigned to the higher custody levels in the Jail is due to SDCSO's

classification system design (decision tree versus additive points), the lack of a formal reclassification instrument, and the lack of separate instruments that are normed for males and females.

**Table 1.  San Diego Jail Population Classification Levels by Facility -- November 30, 2023**

|  | Class Level | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 1<br>Min | 2<br>Low | 3<br>Medium | 4<br>High | 5<br>Max | 6<br>High<br>Max | Total |
| Facility | 0 | 1 | 0 | 1 | 2 | 0 | 4 |
| EMRF | 22 | 34 | 74 | 0 | 0 | 0 | 130 |
| GBDF | 9 | 55 | 374 | 347 | 401 | 12 | 1,198 |
| LCDRF -<br>Women | 14 | 90 | 165 | 130 | 105 | 1 | 505 |
| RMDF | 0 | 0 | 0 | 82 | 62 | 0 | 144 |
| SBDF | 0 | 12 | 35 | 216 | 114 | 0 | 377 |
| SDCJ | 18 | 81 | 273 | 258 | 207 | 5 | 842 |
| TCMC | 0 | 0 | 4 | 1 | 2 | 0 | 7 |
| VDF | 7 | 63 | 273 | 149 | 145 | 1 | 638 |
| Total | 70 | 336 | 1,198 | 1,184 | 1,038 | 19 | 3,845 |
| % | 1.8% | 8.7% | 31.2% | 30.8% | 27% | 0.5% | 100% |

### C.    The Initial and Reclassification Process Results in a Significant Amount of Over-Classification of IPs

Objective jail classification systems should have formal initial and reclassification procedures and separate classification and reclassification forms. The initial classification event should be completed within 72 hours of booking and be based on a formal interview with the IP in a confidential or at least a semi-confidential setting.  According to Policy R1, there is no maximum time limit by which JPMU must classify an individual.  Instead, "[i]ncarcerated persons should be classified as soon after booking as possible, but in any event, prior to being assigned to a housing area."  SD_065162; *see also*. Diaz Dep., 28:5-7 ("Q: There's no timeline by which a person must be classified according to policy, is there?  A: No, no."). Approximately 30 percent of SDCSO classification evaluations take more than one day to complete, and 10 percent take longer than two days to complete.  Diaz Dep., 28:8-29:1; 29:24-30:12.

Because people cannot be assigned to a housing unit until they are booked, they remain in holding cells until they are classified. According to SDCSO's person most knowledgeable deponent, keeping people in holding cells for prolonged periods can potentially create an environment where critical incidents can happen. Diaz Dep., at 72: 16-25. During my inspection of Central Jail, I observed numerous people cramped in a holding cell with approximately eight people sleeping on the floor.

The reclassification process should use a separate reclassification form and be undertaken on a regular periodic basis for all IPs. While reclassification generally includes the same factors as the initial classification, it should add and place greater emphasis on the IP's in-custody conduct (disciplinary events, program participation, work details) in computing the adjusted custody level. By practice, JPMU checks every IP's classification every 45 days by running a report and considering changes in charges (dropped or added), sentencing status, institutional behavior, use of force incidents, and other potentially relevant information. *See* Diaz Dep., 46:11-21. JPMU uses the same decision tree classification instrument for reclassification. Diaz Dep., 51:23-24.

Both classification and reclassification instruments should have separate cut-off levels for males and females to take into account differences on misconduct rates. Nowhere in SDCSO's Policies and Procedures is there a provision to account for these differences, and the Department does not have a classification tool designed specifically for females. Diaz Dep., at 45:17-19.

Finally, there should be a number of discretionary and mandatory over-rides that allow the classification staff to make an adjustment to the scored custody level. JPMU deputies have discretion to override the custody level code and assign the IP a higher or lower custody level if the deputy feels that the decision tree result does not truly reflect the custody risk of the IP. Policy R.1, SD_065163. Classification interviews take place at the intake facilities SDCJ, VDF, and LCDRF; however, none of these institutions have dedicated confidential places to conduct classification interviews with IPs. Diaz Dep., 44:8-10 ("Q: There's no designated classification space that's confidential? A: No.").

IPs should either be given a copy of their classification results and/or informed of the results with an explanation of the basis for the classification designation, an appeal process, and notification of the next classification review.

During the five days of my inspections, I was not able observe either a single initial or reclassification process despite making repeated requests to Defendants'

counsel to do so. However, through the IP interviews, a review of relevant documents, and conversations with staff, I am able to make the following observations:

1. Initial classification interviews are not always being conducted in a confidential or semi-confidential setting[1];
2. IPs are not informed of the classification results by the JPMU Classification Staff;
3. There is not a separate reclassification instrument;
4. There are not separate initial and reclassification instruments for males and females; and
5. SDCSO's classification system has not been evaluated in terms of its reliability or validity.

Relative to the last point, none of the JPMU and other administrative staff I spoke with could recall who designed the current system. The only response I received was that it was implemented over 20 years ago in 2002. SDCSO's person most knowledgeable deponent testified that she did not know if the Department ever studied or evaluated the effectiveness of the classification tool, nor whether the Department ever conducted studies to measure whether the infraction rates of those identified by the classification instrument are commensurate with their classification levels. Diaz Dep., at 46:3-10.

Finally, the absence of a reclassification instrument and apparent failures to take into account good in-custody behavior is producing a significant amount of over-classification. It is well-known that most IPs do not become involved in serious misconduct while in custody. The reclassification process should—but apparently does not—allow IPs who demonstrate good behavior to be assigned to a lower custody level during the reclassification process. The interviews with IPs assigned to the South Bay Detention Facility demonstrated this problem. These IPs, in general, have been charged with serious drug offenses and/or have a current charge or prior conviction for a violent crime. However, many of them reported good conduct with no history of assaults toward IPs or staff or other behaviors associated with increased custodial levels. Under a valid classification system, these IPs should be reclassified as Level 3 medium as opposed to Level 4. Being

---

[1] This is despite the fact that there are ample office spaces and/or areas in the booking areas where either confidential or semi-confidential interviews could be conducted by the JPMU staff. At the Central Jail there are several semi-confidential interview rooms that are adequate for conducting an interview

over-classified as a Level 4 as opposed to a Level 3 has negative consequences for the IPs. Level 4 IPs are not allowed to have work assignments and, as discussed below, are assigned to housing units where the out of cell time is significantly restricted.

### D. SDCSO's Housing Plans are Generally Acceptable but Result in Some Inappropriate Mixing of IPs Based on Classification Level

A proper classification system must have a detailed housing plan to ensure IPs are assigned to appropriate facilities and housing units within each facility consistent with their classification level.

Two housing plans were provided to me. The first was a generic policy that serves to determine which classification levels of IPs can be assigned to a specific facility. Detention Services Bureau Manual of Policies and Procedures, Policy R.11, February 7, 2023, SD_065179. What it does not provide is a guide for an internal clarification system that would indicate what types of IPs can be housed within the facility.

The second type of housing plan provided to me were detailed spreadsheets for each facility that list the specific housing units for each facility, the bed capacity, type of beds (cells or dorms) and the IP Classification Levels that can be assigned to the housing area. This more detailed housing plan shows how IPs with conflicting classification levels are to be separated from one another and thus reduce the risk of violence. In general, these internal housing plans are adequate and meet industry standards. The last issue is whether IPs are being housed according to the housing plan.

I was provided spreadsheets produced in discovery for class members incarcerated as of November 30, 2023. SD_117761-64. In reviewing the classification levels of IPs assigned to George Bailey Detention Facility, I did not find many examples of IPs not being housed according to the housing plan. This means that IPs classified for Levels 1-3 are housed together while those classified as Levels 4 and 5 were housed together. For IPs assigned to Area 5 Administrative Separation Unit, five (5) were classified as Level 3 with the vast majority classified as Level 5.

For the women's facility (LCDRF), I found similar results. With few exceptions the Levels 1-3 are housed together while 4-5 are housed in separate units. It is noted again that the percentage of women classified as Level 5 (105) seems high and is related to deficiencies in the classification system design as noted above.

*See* Table 2.  Also note that there were five (5) women at the predominantly male Vista Detention Facility.  This is due to a policy where women who are arrested near that facility are transported to Vista until a SDCSO bus makes a run to the facility and transports the IP to the Las Colinas Detention and Reentry  facility.  It can often take more than 24 hours for this transfer to occur which means the women booked into Vista must remain in the intake unit without a bed for over a day.

**Table 2.  Classification Levels of the Female Population by Facility.
November 30, 2023**

| | Classification Level | | | | | | |
|---|---|---|---|---|---|---|---|
| Facility | 1<br>Min | 2<br>Low | 3<br>Medium | 4<br>High | 5<br>Max | 6<br>High Max | Total |
| SDCJ | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| VDF | 0 | 1 | 1 | 2 | 1 | 0 | 5 |
| Total | 14 | 91 | 166 | 132 | 108 | 1 | 512 |
| % | 3% | 18% | 32% | 26% | 21% | 1%< | 100% |

During my tour of the Vista facility, I observed inappropriate mixing of IPs whose classification levels required them to be separate.  At Vista, there were five women of varying custody levels in the intake unit—meaning that custody levels 4 and 5 were being held in the same intake unit as IPs classified as custody level 3, which is not appropriate.  There was also one woman in the intake unit who was sleeping on the floor and had been there overnight.

For Vista, there were a few other inconsistencies in the mixing of IPs with a Classification Level of 3 with those with Classification Levels of 4 and 5 in the main population housing units.  Administrative Separation units, N1 and N2, had numerous Level 3 IPs on those two units.  *See* Table 3.  One would expect that a person assigned to Administrative Separation for major rules violations and/or assaultive behavior would be classified at least at Level 4 and more likely at Levels 5 or 6.

**Table 3.  Vista Administrative Separation Housing Units by Classification Level**
**November 30, 2023**

| Class Level | N3 | N2 | E4 | E6 | Total |
|---|---|---|---|---|---|
| 2 | 0 | 0 | 1 | 0 | 1 |
| 3 | 5 | 6 | 2 | 1 | 14 |
| 4 | 9 | 8 | 6 | 1 | 24 |
| 5 | 11 | 11 | 5 | 5 | 32 |
| Total | 25 | 25 | 13 | 7 | 70 |

There are Protective Custody units at Vista that comingle in the same housing unit significant numbers of Level 5 IPs and Level 3 IPs.  *See* Table 4.  This practice was confirmed by the facility staff during my January inspection.  SDCSO's person most knowledgeable deponent testified that people of any classification level can be placed in protective custody housing, and that people classified at Levels 1 through 5 may be mixed in the same dorm (non-celled housing) at George Bailey.  Diaz Dep., 52:9-11, 53:2-4.  Level 5 IPs are described in SDCSO's Policies and Procedures as having a history of assaultive behavior, so it is not appropriate for these IPs to be housed together.  *See* Policy R.3, SD_065165 ("This incarcerated person must have a combination of two of the following: current assaultive charges, a prior assaultive history, or are deemed an institutional behavior problem or an escape risk.").

**Table 4. Vista Protective Custody Housing Units by Classification Level**
**November 30, 2023**

| Class Level | E3 | E2 | E5 | Total |
|---|---|---|---|---|
| 3 | 1 | 1 | 11 | 13 |
| 4 | 1 | 6 | 24 | 31 |
| 5 | 11 | 5 | 14 | 30 |
| Total | 13 | 12 | 49 | 74 |

## E.    Cell and Bed Assignments by Line Deputies Results in Segregated Housing, Which Increases Violence at the Jail

The assignment to a particular facility and housing unit within a facility is being properly controlled by the JPMU staff.  But the process by which an IP is assigned to a specific cell or bed is less clear.  Cell assignments within a specific housing

unit need not be controlled by the JPMU, although in several jail systems I am familiar with the classification staff do control that decision, as they have detailed information on each IP which may not be available to the deputies assigned to housing units.

During my March inspection, staff indicated that housing unit deputies make bed and cell assignments.  This was confirmed by SDCSO's person most knowledgeable deponent.  *See* Diaz Dep., 60:11-12 ("[T]he line deputies will assign the cell or the bed").  Line deputies are deployed to a specific housing unit for a period of seven days.  Diaz Dep., 60:14-18, 63:1-6.  There are no written criteria for the deputies to use in determining which beds or cells to assign people who are coming into a housing unit.  Diaz Dep., 61:2-5.  Instead, line deputies use their discretion in making such assignments, which means that deputies are often making bed and cell assignments on Day One of their seven day rotation—without any prior knowledge of the personal relationships or dynamics within a particular housing unit.  Diaz Dep., 61:6-7; 66:3-8.

During the March tour, staff reported that cell assignments are based on the first available bed.  But IPs can influence housing decisions by either (a) requesting a change in cell, or (b) simply moving to another cell and then notifying the security staff of the change.

What is clear is that there is a significant pattern of cell assignments by race.  This can be determined by examining a housing unit that allows for double or even triple celling and measuring the number of IPs assigned to that cell by race.  Those cells that house IPs of the same race or ethnicity are marked as "segregated."  One can then compute the percentage of cells that are segregated.

In making such a computation, one must also take into account that just based on a random assignment process, there would be a significant percentage of cells occupied by people of the same race that had nothing to do with racist housing decisions.  The "expected segregation rate" or "ESR" can be estimated by knowing the proportion of prisoners housed in the particular unit.  Like a deck of playing cards, there is a known probability that two cards randomly drawn will be of the of the suite (spade, diamonds, clubs, or hearts).

Let's assume the deck of cards reflect prisoners of the four major racial/ethnic groups in the Jail–Black, Hispanic, Native American, and White.  The dealer is the SDCSO Officer who makes the housing decision.  Assume the deck of prisoners is equally proportionate to the four racial/ethnicity groups at 25% each.  The first card drawn has a 25% probability of being one of the four racial groups and is

assigned to a two person cell or bunk bed. The second card drawn (with replacement) has the same 25% probability being drawn. The probability of the two cards being drawn are of the same race or ethnic group is the square of the 25% probability, or 6% as shown by the following formula: $(.25) \times (.25) = .0626$ or 6%.

Tables 5, 6, 7, and 8 apply this formula to two housing units at San Diego Central Jail and another two at South Bay Detention Facility. Three of the four housing units are mainline populations while one is a protective custody unit. For all four units the level of actual segregation by race/ethnicity is higher and for the three mainline units they are substantially higher.

The fact that there is substantial cell assignments by race/ethnicity was affirmed in IP interviews. For example, one IP in South Bay stated that Black IPs are generally located in the lower tier while White and Hispanic IPs are generally assigned to the upper tiers. At Central, several Black IPs stated that Black IPs are generally assigned to a portion of the upper tier in their unit.

There is no doubt that some IPs prefer to be housed with a member(s) of their own race and ethnicity. This may be especially true for IPs who are not bilingual. But when I asked more than a dozen IPs at South Bay if they were opposed to being housed with member of another of another race/ethnicity only one indicated in the affirmative.

Clearly, there is no formal written policy of separately celling IPs by race/ethnicity. But the data clearly show a practice of so doing. Such practice, in my opinion, serves to increase rather than decrease levels of violence and conflict. Previous efforts in court cases in Texas, California, Arizona, and Arizona have found that desegregation of housing units did not serve to increase violence. The primary reason why desegregation of cell assignments reduces violence is that it reinforces the control of security over the housing units and IP movement.

**Table 5. Level of Cell Assignment by Race/Ethnicity**
**SOUTH BAY AREA 1 -UNIT A - Mainline**

| CELL | Black | Hispanic | Other | White | Total | Seg? |
|---|---|---|---|---|---|---|
| 1 | 0 | 3 | 0 | 0 | 3 | Y |
| 2 | 0 | 3 | 0 | 0 | 3 | Y |
| 3 | 0 | 0 | 0 | 2 | 2 | Y |
| 4 | 2 | 0 | 0 | 0 | 2 | Y |
| 5 | 2 | 0 | 0 | 0 | 2 | Y |
| 6 | 0 | 1 | 0 | 0 | 1 | NA |
| 7 | 0 | 2 | 0 | 0 | 2 | Y |
| 8 | 1 | 0 | 0 | 0 | 1 | NA |
| 9 | 0 | 2 | 0 | 0 | 2 | Y |
| 10 | 0 | 2 | 0 | 0 | 2 | Y |
| 11 | 2 | 0 | 0 | 0 | 2 | Y |
| 12 | 0 | 0 | 0 | 2 | 2 | Y |
| 13 | 2 | 0 | 0 | 0 | 2 | Y |
| 14 | 0 | 2 | 0 | 0 | 2 | Y |
| 15 | 1 | 0 | 1 | 1 | 3 | N |
| 16 | 0 | 0 | 0 | 2 | 2 | Y |
| 17 | 0 | 3 | 0 | 0 | 3 | Y |
| 18 | 0 | 2 | 0 | 0 | 2 | Y |
| 19 | 0 | 1 | 0 | 0 | 1 | NA |
| 20 | 0 | 2 | 0 | 0 | 2 | Y |
| 21 | 2 | 0 | 0 | 0 | 2 | Y |
| 22 | 2 | 0 | 0 | 0 | 2 | Y |
| 23 | 0 | 3 | 0 | 0 | 3 | Y |
| 24 | 0 | 2 | 0 | 0 | 2 | Y |
| Total | 14 | 28 | 1 | 7 | 50 | |
| % | 28% | 56% | 2% | 14% | 100% | |
| Squared | 8% | 31% | 0% | 2% | 41% | |
| | | | | | | |
| | ESR | 41% | **ACTUAL** | **95%** | | |

**Table 6. Level of Cell Assignment by Race/Ethnicity**
**SOUTH BAY AREA 1 -UNIT B – Mainline**

| CELL | Black | Hispanic | Other | White | TOTAL | SEG? |
|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 2 | 2 | Y |
| 2 | 0 | 2 | 0 | 0 | 2 | Y |
| 3 | 2 | 0 | 0 | 0 | 2 | Y |
| 4 | 0 | 1 | 1 | 0 | 2 | N |
| 5 | 0 | 3 | 0 | 0 | 3 | Y |
| 6 | 3 | 0 | 0 | 0 | 3 | Y |
| 7 | 2 | 1 | 0 | 0 | 3 | N |
| 8 | 0 | 2 | 0 | 0 | 2 | Y |
| 9 | 0 | 2 | 0 | 0 | 2 | Y |
| 10 | 0 | 3 | 0 | 0 | 3 | Y |
| 11 | 0 | 3 | 0 | 0 | 3 | Y |
| 12 | 0 | 0 | 1 | 0 | 1 | NA |
| 13 | 0 | 3 | 0 | 0 | 3 | Y |
| 14 | 0 | 3 | 0 | 0 | 3 | Y |
| 15 | 3 | 0 | 0 | 0 | 3 | Y |
| 16 | 0 | 2 | 0 | 0 | 2 | Y |
| 17 | 3 | 0 | 0 | 0 | 3 | Y |
| 18 | 2 | 0 | 0 | 0 | 2 | Y |
| 19 | 0 | 2 | 0 | 1 | 3 | N |
| 20 | 0 | 0 | 0 | 2 | 2 | Y |
| 21 | 0 | 1 | 0 | 0 | 1 | NA |
| 23 | 0 | 0 | 0 | 1 | 1 | NA |
| 24 | 0 | 0 | 0 | 2 | 2 | Y |
| Total | 15 | 28 | 2 | 8 | 53 | |
| % | 28% | 53% | 4% | 15% | 100% | |
| SQUARE | 8% | 28% | 0% | 2% | 38% | |
| | | | | | | |
| | ESR | 38% | | **ACTUAL** | **85%** | |

**Table 7. Level of Cell Assignment by Race/Ethnicity**
**San Diego Central Jail – Area 5 – Unit A- Mainline**

| CELL | Black | Hispanic | Other | White | Total | Seg |
|---|---|---|---|---|---|---|
| 1 | 0 | 3 | 0 | 0 | 3 | Y |
| 2 | 0 | 2 | 0 | 0 | 2 | Y |
| 3 | 3 | 0 | 0 | 0 | 3 | Y |
| 4 | 1 | 0 | 0 | 2 | 3 | N |
| 5 | 2 | 0 | 0 | 0 | 2 | Y |
| 6 | 0 | 0 | 0 | 2 | 2 | Y |
| 7 | 0 | 0 | 0 | 3 | 3 | Y |
| 8 | 0 | 2 | 0 | 0 | 2 | Y |
| 9 | 1 | 0 | 0 | 2 | 3 | N |
| 10 | 2 | 0 | 1 | 0 | 3 | N |
| 11 | 0 | 0 | 0 | 1 | 1 | NA |
| 12 | 2 | 0 | 0 | 0 | 2 | Y |
| 13 | 0 | 0 | 0 | 2 | 2 | Y |
| 14 | 0 | 0 | 2 | 0 | 2 | Y |
| 15 | 0 | 0 | 0 | 1 | 1 | NA |
| 16 | 0 | 0 | 0 | 3 | 3 | Y |
| 17 | 0 | 0 | 0 | 3 | 3 | Y |
| 18 | 0 | 0 | 0 | 3 | 3 | Y |
| 19 | 0 | 0 | 0 | 3 | 3 | Y |
| 20 | 1 | 1 | 0 | 0 | 2 | N |
| Total | 12 | 8 | 3 | 25 | 48 | |
| | 25% | 17% | 6% | 52% | 100% | |
| Square | 6% | 3% | 0% | 27% | 37% | |
| | | | | | | |
| | | ESR | 37% | **Actual** | **78%** | |

**Table 8. Level of Cell Assignment by Race/Ethnicity**
**San Diego Central Jail – Area 7 – Unit A – Protective Custody**

| Cell | Black | Hispanic | Other | White | Total | Seg |
|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 1 | 1 | NA |
| 2 | 0 | 2 | 0 | 0 | 2 | Y |
| 3 | 1 | 0 | 1 | 0 | 2 | N |
| 4 | 1 | 0 | 0 | 0 | 1 | NA |
| 5 | 2 | 0 | 0 | 0 | 2 | Y |
| 6 | 0 | 1 | 0 | 1 | 2 | N |
| 7 | 1 | 0 | 0 | 1 | 2 | N |
| 8 | 0 | 2 | 0 | 0 | 2 | Y |
| 9 | 0 | 1 | 0 | 1 | 2 | N |
| 10 | 1 | 1 | 0 | 0 | 2 | N |
| 11 | 0 | 0 | 0 | 2 | 2 | Y |
| 12 | 0 | 0 | 0 | 2 | 2 | Y |
| 13 | 1 | 1 | 0 | 0 | 2 | N |
| 14 | 0 | 1 | 0 | 0 | 1 | NA |
| 15 | 0 | 2 | 0 | 0 | 2 | Y |
| 16 | 0 | 1 | 0 | 1 | 2 | N |
| 17 | 1 | 1 | 0 | 0 | 2 | N |
| 18 | 0 | 2 | 0 | 0 | 2 | Y |
| 19 | 0 | 1 | 0 | 1 | 2 | N |
| 20 | 0 | 0 | 1 | 1 | 2 | N |
| Total | 8 | 16 | 2 | 11 | 37 | |
| % | 22% | 43% | 5% | 30% | 100% | |
| Squared | 5% | 19% | 0% | 9% | 33% | |
| | | | | | | |
| | ESR | 33% | | **Actual** | **41%** | |

### F.    SDCSO's Administrative Separation Referral and Placement Process Is Deficient

Another part of the classification system is the establishment of restricted housing units which are designed to house the more difficult to manage and assaultive IPs. All jail and prison systems have several restricted housing units for IPs who cannot be safely managed in the general population.  These are typically listed as follows:

1. Administrative Separation – for IPs who are excessively violent and pose a risk to other IPs and staff;
2. Protective Custody – for IPs who are not excessively violent and aggressive but require protection from other IPs;
3. Acute Mental Health – IPs who have a Serious Mental Illness(es) ("SMI") and whose behavior is unpredictable, possibly self-harming, and/or violent;
4. Medical Care – IPs whose medical condition(s) require constant medical care and must be assigned to a hospital or infirmary.

Assignment to the Acute Mental Health and Medical units must be governed by qualified mental health and medical professionals but in consultation with the classification staff.  However, placement in the Administrative Separation and Protective Custody units should be made by the Classification Unit but in consultation with mental health staff.

SDCSO Policy J.3 is the governing policy.  Detention Services Bureau Manual of Policy and Procedures, Policy J.3, September 27, 2022, SD_064830-35.  It uses the term "administrative separation" in lieu of "administrative segregation."  The policy is overly vague with respect to how an IP is referred to the JPMU, what the specific criteria are for placement in administrative separation, and what the review process is for either retaining or releasing the IP to the general population. SDCSO's  person most knowledgeable deponent testified that the Department reviews administrative separation placements once a week, and only five to seven individuals on average come out of administrative separation each week.  Diaz Dep., 67:4-15; 68:1-13.  This number appears very low relative to the population of people in administrative separation.

The form that is used to assign an IP to administrative separation is the one page J-72 form (reprinted below).  SD_064831.  It provides for a single deputy as opposed to a committee to make the decision by checking one of the nine criteria for administrative segregation of which one is broadly defined as "other."  The IP is expected to receive a copy of the completed form.   The form is also used to assign an IP to Protective Custody using seven criteria.  SD_064833.



## San Diego County
# SHERIFF'S DEPARTMENT

### SEGREGATED HOUSING ORDER

☒ SDCJ ☐ GBDF ☐ FAC3 ☐ EMRF ☐ LCDRF ☐ SBDF ☐ VDF

| INMATE NAME: | Baker, Derek | | | BOOKING #: | 22702128 |
|---|---|---|---|---|---|
| HOUSING UNIT: | JPM/CLA | CLASS CODE: | 3 | INCIDENT #: | 224002518 |
| DEPUTY NAME: | Lopez | | | ARJIS: | 3680 |

### SEGREGATED HOUSING IS ORDERED AS SPECIFIED BECAUSE THE ABOVE INMATE:

☐ **ADMINISTRATIVE SEGREGATION**

☐ Pending a hearing or investigation for a rule violation or criminal act.

☐ Continual failure to adjust and conform to minimum standards.

☐ Propensity for violence towards other inmates and/or staff.

☐ Has paroled from or is anticipated to be housed in a restrictive housing environment.

☐ High profile case or extreme act of violence which jeopardizes public safety.

☐ Demonstrated influence over other inmates,

☐ Suspected juvenile.

☐ Sentenced to death.

☐ Other reason as described per the JPMU Training Manual or JPMU Unit Directives.

☒ **PROTECTIVE CUSTODY**

☐ Developmentally disabled, and requires segregation for the inmate's own safety(e.g., RCC).

☒ By virtue of his/her small size, advanced age, gender nonconformance or other risk factors and characteristics, may be in danger of abuse from inmates in general population.

☐ Nature of charges places the inmate's safety in jeopardy.

☐ Material witness in a high profile case or employment as law enforcement (past or current).

☐ Held on a civil commit order (Sexually Violent Predator).

☒ Has paroled from or is anticipated to be housed in a Protective Custody Environment.

☐ Segregated at request of inmate.

| APPROVED BY: Lopez | ARJIS: 3680 | DATE: 01/17/22 | TIME: 2115 |
|---|---|---|---|
| INMATE'S COPY DELIVERED BY: refused | ARJIS: | DATE: | TIME: |

There is no formal process for a Qualified Mental Health Professionals (QMHP) to assess whether an IP's placement in administrative segregation is contraindicated due to the IP's mental health status.  SD_064831.  All of these procedural

deficiencies can lead to an IP being either inappropriately housed in Administration Separation units or retained too long in such units.

A recent example is the case of Mathew Settles, who was transferred from the county psychiatric hospital to San Diego Central Jail in June 2022. Complaint, Dkt. 1, *Estate of Settles, et al. v. Cnty. of San Diego, et al.*, No. 24-CV-0352 CAB MSB, at *16 (S.D. Cal. Feb. 22, 2024). On July 15th, he was placed in administrative separation by the JPMU after what appears to have been an informal decision-making process that did not include a mental health review to determine if his mental health status contraindicated such a placement. Complaint at *18-19. On July 25, Mr. Settles was transferred from Central to George Bailey, where he was again placed in administrative separation without being seen or evaluated first by medical staff. Complaint at 20. He subsequently committed suicide in his administrative separation cell on August 16, 2022. Complaint at *27.

To better determine how long IPs are spending in Administrative Separation, I requested that the SDCSO audit a random 50 person sample that I selected of the 118 IPs who were assigned to Administrative Separation in the CJ and GBDF facilities as of November 30, 2023. I also asked for copies of the J-72 forms for each of the sampled cases but did not receive them.

My analysis found that all but 8 of the 50 IPs had been released from Administrative Separation (as of May 8, 2024) with an average length of stay in Administrative Separation of 116 days and a median of 95 days. *See* Spreadsheets (Defendants' responsive documents to Special Interrogatory No. 25), SD_1575979-80. Sixteen of the 50 IP sample spent over six months in Administrative Separation. For the 8 that have not been released as of May 8, 2024, their average length of stay in Administrative Separation was 383 days and a median of 307 days. One person has been in administrative separation for 910 days. Given the very limited out of cell time afforded the Administrative Separation populations, these lengthy periods of stay are clearly unacceptable.

In summary the current administrative separation referral and placement is process is deficient for the following reasons:

1. It is not a committee decision;
2. "Other" is used as a criteria for such placement;
3. The IP is not notified in advance of a pending decision to possibly place the IP in administrative separation or the reasons why placement is being considered;

4. The lack of an adequate review process for retaining or releasing IPs from administrative separation results overly long stays in restrictive administrative separation housing;

5. There is no structured review process by a committee where the IP is considered for release from administrative separation based on objective criteria such as compliance with the conduct rules associated with the administrative separation; and

6. A significant number of IPs are spending an excessive amount of time in Administrative Separation during which they have very limited out of cell time which constitutes debilitating conditions of solitary confinement[2]

### G.    Understaffing Harms IPs and Contributes to High Mortality and Assault Rates

Related to the housing of IPs to restricted housing units is the amount of out of cell time one is afforded each day. People assigned to Protective Custody should be offered the same amount of out of cell time as those assigned to the General Population. Based on the January and March tours and the IP interviews, this appears to be the case.

However, it was also noted by staff during the January and March tours that due to staffing shortages, the practice was often to only offer out of cell time to half of the IPs in a given restricted housing unit at a time. What is occurring is a rotation system where one half of the unit (e.g., one tier) is allowed to be out of their cells for three hours and then the second half (or second tier) is allowed to be out of their cells. So, for example, the lower tier is allowed out in the morning from 8am to 11 a.m. In the afternoon, the upper tier is allowed out from 1 p.m. to 4 p.m. In the evening, the lower tier is allowed out of their cells for another three hours. This rotation process means that one mainline tier gets out of their cells for at most six hours per every other day and three hours every other day.

For IPs assigned to administrative separation housing units, Policy J.3 does not specify the minimum standards for out of cell time. SD_064830-35. Solitary

---

[2] Fatos Kaba MA, Andrea Lewis PhD, Sarah Glowa-Kollisch MPH, James Hadler MD, MPH, David Lee MPH, HowardAlper PhD, Daniel Selling PsyD, Ross MacDonald MD, Angela Solimo MS, Amanda Parsons MD, MBA, and Homer Venters MD, MS. March 2014. American Journal of Public Health, March 2014. **Solitary Confinement and Risk of Self-Harm Among Jail Inmates**. Published Online: February 12, 2014. The United Nations Standard Minimum Rules for Treatment of Prisoners, Rule 44.

confinement is generally defined as "22 hours or more a day without meaningful human contact." *See* United Nations*, Standard Minimum Rules for the Treatment of Prisoners* 14 (2015) (Rule 44). Based on interviews with IPs assigned to the administrative separation units, IPs were typically receiving at most one hour of out of cell time per day which amounts to solitary confinement.

Much of these deficiencies in out of cell time are related to severe staffing shortages, which also result in staff not being able to respond to critical incidents in a timely manner. The email shown below (on the next page), SD_556541, details the significant levels of staff shortages which serve to put staff and IPs alike in an elevated level of risk. It also shows that administrative staff are not adjusting staffing levels to address chronic vacancies in some facilities and over-staffing in others.

The high and chronic level of understaffing within the jail system is affirmed by the SDCSO's Below Minimum Staffing and Mandatory Overtime (MOT) reports from February to August 2023. SD_725946, SD_556542. These reports and analysis by the SDCSO staff found that during a typical two-week pay period, shifts that were not fully staffed ranged from 225 to over 400 shifts with the majority of two-week periods in the 300-375 shifts unfilled range. Further the MOT reports show that this policy of holding staff over their assigned shift is not working as intended. In the September 1, 2023 email above, Lt. Jesse Johns makes clear that SDCSO's MOT directives to staff to fill certain shifts "does not seem to have a positive impact." SD_556541.

SDCSO's MOT policy has been to require deputies to work one or two consecutive 12.5 hour shifts per pay period.in order to cover a mandatory post position. Theresa Adams-Hydar Dep., April 17, 2024, 144:24-45:6. While there are limits in term of how often this can occur within a pay period (one MOT shift per pay period but staff can volunteer for more than one in a pay period), the reliance upon such a policy has several negative effects.

As noted in the deposition of Assistant Sheriff Theresa Adams-Hydar, understaffing results in less out of cell time, increased restricted movement (limiting access to day room time and other non-essential activities), safety concerns, less ability to escort IPs to medical appointments, increased IP on IP assaults, delays in safety checks, difficulties in transporting IPs to specialty care providers, and cancellation or reduction in programs for IPs. Adams-Hydar Dep., at 132-33:11, 136:2-140:9. In addition, Assistant Sheriff Adams-Hydar acknowledged that SDCSO's MOT policies can serve to impact employee performance and lower staff morale. Adams-Hydar Dep., at 146:14-23.

From:           Johns, Jesse [Jesse.Johns@sdsheriff.org]
Sent:           9/1/2023 11:34:14 AM
To:             Adams, Theresa [Theresa.Adams@sdsheriff.org]; Bavencoff, Christina [Christina.Bavencoff@sdsheriff.org]; Jones,
                Kenneth [Kenneth.Jones@sdsheriff.org]; Buchanan, Christopher [Christopher.Buchanan@sdsheriff.org]; Soto-Meza,
                Gloria [Gloria.SotoMeza@sdsheriff.org]
Subject:        MOT non-compliance and below minimum staffing info
Attachments:    DSB Below Minimum Staffing 2404.xlsx; MOT Non-Compliance Report PP2404.xlsx

Hello all,

Attached are the Below Minimum Staffing and MOT Non-compliance reports.  This pay period we had 215 DSB deputies
not meet the minimum MOT.  The same trends exist with a fair amount of phase trainees, STC training and scheduled
time off.  In regard to the minimum staffing, we had a total of 346 vacant shift bureau-wide.  162 of those shift were
Saturday and Sunday shifts.  These numbers are all very similar for the past three pay periods.  The change to the MOT
directive regarding working "hard to fill shifts" does not seem to have a positive impact.  If anything, it has caused SDCJ
to have more vacancies during the weekdays as that is where a majority of CSB deputies were working before the
change.

One notable anomaly was SBDF if overstaffed more than they are understaffed.  The overstaffed 12 positions this
deployment and were only short 4 positions.  The positions were assigned as extra rovers and there was no hospital
guard nexus.  The facility may have redeployed to other facilities to assist but I am unable to see that through the
deployments only.

Lastly, we have a MOT workgroup next Tuesday.  If there is anything you would like me to bring up or propose during
this meeting, please let me know.

Respectfully,



**Jesse Johns**
Lieutenant
*Detentions Support Division*
Email: jesse.johns@sdsheriff.org
Phone: 858-974-2023
Mobile: 619-629-2523
www.sdsheriff.net
**SAN DIEGO COUNTY**
**SHERIFF'S DEPARTMENT**



The lack of sufficient staff has a noticeable impact on the lack of presence and
therefor supervision in the housing units.  With the exception of some housing
units in the female facility, it was clear that the only time the security staff had a
credible presence in the housing units was when they were making their hourly
safety cell checks.  Generally, one would expect each housing unit to have an
officer in the housing unit at all times when the IPs are scheduled to be out of their
cells in the large day room areas during the day and evening hours.  The inability

to staff such positions, especially in the Level 4 and 5 units, contributes to the overall high assault and mortality rates reported below.

The absence of staff in the dayrooms also makes it difficult for IPs to submit formal requests for services or to file grievances. Such requests are submitted on a form that is supposed to be stored in the day room. However, at the SDCJ, the forms have been removed. Administrative staff stated that they were removed because IPs were confiscating them in large numbers for other purposes. Regardless, the result is that IPs must request these forms from security staff who only appear on the hourly safety checks.

The absence of security officers in the housing units also restricts the IPs ability to communicate any immediate security issues that may be occurring that cannot be quickly communicated to staff via the intercom system or discovered by the cameras.

## III.    SDCSO's Mortality and Assault Rates Are Extremely High

Collectively, all of the above noted deficiencies contribute to an extremely high level of violence and in-custody deaths. There are two basic measures one can use to assess the overall safety of IPs in a jail system – assault and mortality rates. For the SDCSO, both rates are extraordinarily high.

### A.    SDCSO's In-Custody Death Rate Is More than Twice the National Jail Death Rate

Figure 1 below shows the SDCSO in-custody mortality rates per 100,000 jail population from 2021 to 2023, using publicly reported deaths. The estimated 2024 rate shown below is based on the six deaths that occurred from January 1, 2024 to June 30, 2024, and then extrapolated at the same monthly rate for the remainder of 2024. As shown in Figure 1, the rate for the SDCSO has been two to three times the most recent U.S. jail rate of 167 per 100,000 jail population in 2019 for the last several years.[3]

---

[3] Data from: "They shouldn't have been there at all, an outside review found," San Diego Union-Tribune, January 26, 2024; SDSD In-Custody Deaths, available at https://www.sdsheriff.gov/resources/transparency-reports; Bureau of Justice Statistics, Mortality in Local Jails, 2000–2019 – Statistical Tables.



Both the U.S. and the SDCSO rates are computed by taking the total number of deaths in a year, dividing that number by the average jail population for that year and multiplying that number by 100,000.

The California State Auditor in a 2022 report also found an excessive mortality rate for the SDCSO.  State Auditor Report and Responses, February 3, 2022, SD_174812-13.  It made the following conclusions:

> From 2006 through 2020, 185 people died in San Diego County's jails—one of the highest totals among counties in the State.  The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices.  In fact, our review  identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths.  These deficiencies related to its provision of medical and mental health care and its performance of visual checks

*to ensure the safety and health of individuals in its custody.*
SD_174794.

In its rebuttal to the State Auditor's report, SDCSO did not contest the high
mortality rate per 1,000 jail population.  Rather it claimed that the high rate is due
to large number of bookings, arguing that by having more bookings than other
jurisdictions, one would expect more deaths.  SD_174894-95.

However, in its rebuttal claim, SDCSO uses the below table which ranks fifteen
California counties by their bookings per year to argue there is a correlation
between total bookings and deaths.  SD_174894-95.  Clearly, there is a correlation
between the total number of bookings and the total number of deaths, but that
pattern cannot be used to claim that San Diego's high rate of mortality is solely due
a larger number of bookings.

**Table 1**

| | County Sheriff's Department | Total Number of Bookings | Average Bookings Per Year | Total In-Custody Deaths | Deaths per 100,000 Bookings |
|---|---|---|---|---|---|
| 1 | Los Angeles | 1,970,654 | 131,377 | 421 | 21.36 |
| 2 | San Diego | 1,284,462 | 85,631 | 185 | 14.40 |
| 3 | San Bernardino | 1,027,195 | 68,480 | 124 | 12.07 |
| 4 | Orange | 888,951 | 59,263 | 111 | 12.49 |
| 5 | Riverside | 810,376 | 54,025 | 104 | 12.83 |
| 6 | Alameda | 777,627 | 51,842 | 99 | 12.73 |
| 7 | Sacramento | 733,275 | 48,885 | 62 | 8.46 |
| 8 | Santa Clara | 682,010 | 45,467 | 84 | 12.32 |
| 9 | Fresno | 551,624 | 36,775 | 86 | 15.59 |
| 10 | Kern | 520,074 | 34,672 | 70 | 13.46 |
| 11 | Ventura | 424,978 | 28,332 | 47 | 11.06 |
| 12 | San Joaquin | 392,895 | 26,193 | 34 | 8.65 |
| 13 | Contra Costa | 370,299 | 24,687 | 43 | 11.61 |
| 14 | San Francisco | 353,521 | 23,568 | 39 | 11.03 |
| 15 | Tulare | 333,941 | 22,263 | 26 | 7.79 |

What should be used is the last column that shows the deaths per 100,000
bookings, which is the correct dependent variable to be use.  While Los Angeles
County, which is under a consent decree for unconstitutional conditions, Fresno
County, and San Diego have the highest death rates per 100,000 bookings, seven
of the counties in the above table have rates comparable to San Diego (12 to 16
deaths per 100,000 bookings).  According to SDCSO's own data, Fresno has a

mortality rate per booking that exceeds San Diego's rate and Kern County has a rate that is slightly below San Diego's rate—even though both counties have much lower bookings per year (about 50,000 fewer booking per year).   So, it is erroneous to claim that San Diego's high deaths per bookings mortality rate is solely due to a high number of bookings.

In its response to the State Auditor Report, SDCSO uses the below table to support its claims that the Jail's high mortality rate is also due to the County's higher mortality rate.  SD_174896.  But even a casual review of the table shows that San Diego does not have a significantly higher mortality rate than other California counties.  Rather, there are five counties that have mortality rates that are either comparable to or even above San Diego's rate and have much lower jail mortality rates (including Fresno and Sacramento).

**Table 2**

### Deaths in California Counties From 2006 Through 2020

|  | County | Est. County Population (2020) | Average County Population (2006-2020) | Total Deaths (2006-2020) | Average Deaths Per Year | Deaths per 100,000 Population |
|---|---|---|---|---|---|---|
| 1 | Los Angeles | 10,135,614 | 9,991,660 | 939,073 | 62,605 | 626.6 |
| 2 | San Diego | 3,331,279 | 3,181,752 | 320,562 | 21,371 | 671.7 |
| 3 | Orange | 3,180,491 | 3,084,349 | 292,178 | 19,479 | 631.5 |
| 4 | Riverside | 2,440,719 | 2,251,242 | 224,078 | 14,939 | 663.6 |
| 5 | San Bernardino | 2,175,424 | 2,079,014 | 206,764 | 13,784 | 663.0 |
| 6 | Sacramento | 1,553,157 | 1,457,469 | 170,958 | 11,397 | 782.0 |
| 7 | Santa Clara | 1,945,166 | 1,848,744 | 157,224 | 10,482 | 567.0 |
| 8 | Alameda | 1,663,114 | 1,568,059 | 144,734 | 9,649 | 615.3 |
| 9 | Fresno | 1,020,292 | 955,030 | 104,127 | 6,942 | 726.9 |

This data table reports the annual number of deaths that occurred in each County regardless of the place of residence (by occurrence).

So, it is clear that there is no scientific evidence that SDCSO's high mortality rates are due to larger number of bookings or the county's mortality rate.  Rather, as the State Auditor's Report concluded, SDCSO's high mortality rates are linked to deficiencies in the provision of medical and mental health services as well as proper visual inspection and supervision of IPs by the SDCSO staff.  SD_174794.  Similar to the national data, most of the in-custody deaths in the State Auditor's Report were related to natural causes, followed by suicides and those labeled as "accidental" deaths that include alcohol and drug overdoses.  SD_174814.

The County also retained the services of a consultant with expertise in statistical analysis to rebut accusations of high in-custody death rates. *See* Dkt. 153-1, Ex. I (Andrew Hildreth, Ph.D., from Resolution Economics). Dr. Hildreth confirms the State Auditor's finding that the SDCSO in-custody mortality rate, whether based on the average daily population or the number of bookings, is among the highest in California. Using the average age of the those who died from natural causes by county, he argues that SDCSO's higher natural mortality rate is due to differences in the average age of the San Diego inmates who died in custody. But his own analysis only found two of the thirteen comparison counties had a statistically significant difference in age (they younger by an average age of about five years). And he does not demonstrate a correlation between the average age of people who have died in custody and mortality rates by county.

In Table 9, I perform an analysis of counties that have a "death rate per booking" based on the State Auditor's Report, SD_174857, and average age of the deceased based on Dr. Hildreth's report, Dkt. 153-1, Ex. I, 8. Here, one can see no systemic pattern where the average age of the deceased is correlated with the mortality rate per 100,000 bookings. Figure 2 below graphically shows the same lack of correlation between the two variables. So, the claim by Dr. Hildreth that the age of the deceased explains San Diego's higher mortality rate is not valid.

**Table 9.  Morality Rates Per Booking and
Average Age of the Deceased by County**

| Comparison County | Mortality Rate Per Booking | Average Age of Deaths |
|---|---|---|
| Tulare | 7.79 | 51.56 |
| Sacramento | 8.46 | 54.24 |
| San Joaquin | 8.65 | 46.21 |
| San Francisco | 11.03 | 50.91 |
| Ventura | 11.06 | 56.67 |
| Contra Costa | 11.61 | 52.16 |
| Santa Clara | 12.32 | 53.08 |
| Orange | 12.49 | 50.21 |
| Alameda | 12.73 | 48.65 |
| Riverside | 12.83 | 54.24 |
| Kern | 13.46 | 48.22 |
| San Diego | 14.40 | 53.47 |
| Fresno | 15.59 | 49.00 |

| | Mortality Rate Per Booking | Average Age of Deaths |
|---|---|---|
| Comparison County | | |
| Los Angeles | 21.36 | 50.77 |



Figure 2. Comparison of Deaths per Annual Bookings and Average Age of Deceased By County

## B.    Assaults

Relative to assaults, during my tours, I repeatedly requested updated 2023 and 2024 assault data to update the first ten months of 2023 assault data that was provided in discovery, SD_440237, but SDCSO refused to provide me with that data. I was able to compute 2022 and 2033 annualized assault rates as follows. I took the first ten months of 2022 and 2023—divided the total number to date by ten and multiplying that monthly number by 12. *See* Table 11. This shows an IP on IP assault rate of 33 per 100 jail population in 2023 and 38 per 100 in 2022, which means that if a person remains in the jail for a year, there is a 33-38% chance that he/she will be the victim of an assault. Even though these assaults rates declined slightly in 2023, they remain extremely high.

**Table 10. San Diego Jail Assaults and Other Critical Incidents**

**January – October**
**2022 versus 2023**

|  | 2023 | | | 2022 | | |
|---|---|---|---|---|---|---|
| ADP Population | 4,110 | | | 3,981 | | |
|  | Jan-Oct | Annualized | Rate Per 100 IP | Jan-Oct | Annualized | Rate Per 100 IP |
| IP vs. IP | 1021 | 1,361 | 33 | 1129 | 1,505 | 38 |
| IP vs. Staff | 162 | 216 | 5 | 175 | 233 | 6 |
| IP vs. Non-Staff | 5 | 7 | 0 | 8 | 11 | 0 |
| Drug Incidents | 415 | 553 | 13 | 350 | 467 | 12 |
| Alcohol Incidents | 220 | 293 | 7 | 262 | 349 | 9 |
| Weapons | 78 | 104 | 3 | 84 | 112 | 3 |
| Total | 1,901 | 2,535 | 62 | 1,414 | 2,677 | 67 |

One also notes in Table 10 the high number of drug incidents which I assume means that illegal drugs were interdicted (estimated at over 500 incidents per year in 2023 and increasing from 2022's number of 420). The presence of illegal drugs contributes to the jail's underground economy which contributes to violence within the jail as some IPs and gangs seek to control the distribution of such drugs.

Table 11 provides a review of the Watch Commander Logs for Central Jail from May 1, 2022 to May 21, 2022, SD_704672-35. It shows numerous IP on IP and IP on staff assaults (total of 20), which is consistent with the high overall jail system assault rates as shown in Table 10.

SDCSO's person most knowledgeable deponent did not know whether the Department has conducted studies to determine whether there is more IP violence in San Diego County jails than in other California jails or any other jurisdictions. Diaz Dep., 79:11-14,20-22. JPMU has not evaluated the totality of IP assaults in a given period of time, nor has it conducted any studies to determine whether or not the classification process needs to be changed because of the level of violence in the jails. Diaz Dep., 79:23-25; 80:3-6.

**Table 12. Critical Incidents San Diego Central Jail
Watch Command Reports
May 1- 21, 2022**

| 1. Inmate on Inmate Assaults | 10 |
|---|---|
| 2. Inmate on Staff Assaults | 10 |
| 3. Use of Force | 7 |
| 4. Drug Possession/Digestion | 13 |
| 5. Intercom Not Working | 3 |
| 6. Overdose deaths | 1 |
| 7. Total Incidents | 44 |
| 8. Average Population | 700 |
| 9. Inmate on Inmate rate Per 100 Population | 21 |
| 10. Inmate on Staff rate per 100 Population | 21 |

## C.    Preventable In-Custody Homicides

SDCSO should examine each in-custody death to determine if they could have been prevented.  The following examples of in-custody homicides show breakdowns in the classification and housing operations as well as the lack of sufficient staff in the housing units that contributed to these deaths.

Derek Baker was murdered by his cellmate Patrick Ferncase on March 12, 2022. Based on documents provided by the SDCSO,[4] Mr. Baker, an older man (56 years old) was arrested for failing to register as a sex offender.  Follow Up Investigative Report Case No. 22110952, March 30, 2022, SD_060987.  Mr. Baker was celled with Mr. Ferncase, who had been arrested for attempt murder, assault, and elder abuse causing injury or death.  Both men were classified as Protective Custody (PC) but for very different reasons.  Mr. Baker was classified as PC because he was a registered sex offender who had self-identified as transgender.  *See* Segregated Housing Order, January 17, 2022, SD_060582.  Mr. Ferncase was classified as PC because ███████████████████████████████████ Follow Up Investigative Report, SD_060987.  Clearly, the two people never should have been assigned to the same cell, let alone the same housing unit.  In fact, Mr. Ferncase should not have been classified as PC.  He could have been assigned either to the General Population with a keep separate order in place for

---

[4] *See, e.g.*, Follow Up Investigative Report Case No. 22110952, March 30, 2022, SD 060987-060996; Statement of Patrick Ferncase, March 23, 2022, SD 06144-46; Follow Up Investigative Report No. 22110952, August 5, 2023, SD 061008-15.

███████████ or a restrictive housing program for IPs with a history of in-custody violence.

A second example is the murder of IP Dominique James McCoy that occurred on December 29, 2021 at the Central jail.  Based on documents provided by the SDCSO,[5] Mr. McCoy was in a cell with IP John Medina, who had been arrested for three charges including assault with a deadly weapon.  Review of Incident for Domenique James McCoy, SD_055387.  Mr. McCoy had been arrested on drug possession and drug trafficking charges.  He was returning from court during which he was ordered to be released by the SDCSO.  The deputy who made the cell placement did not see that there was only one mattress in the cell.  A fight ensued that resulted in Mr. McCoy being killed by Mr. Medina by beating his head against the floor.  The deputy who had been on consecutive Mandatory Overtime shifts was disciplined for not ensuring Mr. McCoy had a mattress.  But is also clear that the two IPs should not have been housed together based on their charges and recent institutional conduct and mental health status (Mr. Medina had recently been placed in a safety cell due to his erratic behavior of "banging his head," Review of Incident, SD_055387.).  The investigation of this incident concluded that the heavy workload caused by the MOT policy directly contributed to the Mr. McCoy's death:

> As a tenured deputy with seven years of experience, Deputy ████ is responsible for knowing and following policy and procedures.  Workload or mandatory overtime obligations do not absolve him from this responsibility.   By his own admission, Deputy ████ chose to "cut corners" and failed to perform his required duties as assigned, unfortunately this resulted in the death of an incarcerated person.

A third example also shows the deficiencies of the classification system.  In this case, IP Richard Lee Salyers, age 46, was arrested on a contempt of court order.  Mr. Salyers was murdered by his cellmate, Steven Young, by strangulation on August 22, 2021.  CLERB Report Case No. 21-082, April 4, 2023, SD_050663.  Mr. Young had a history of sexual and assault charges.  SD_050665.  Both were classified as Level 4, Protective Custody, but again for very different reasons.  Mr. Young was classified as PC due to a Keep Separate All order--but it had been removed five days earlier on August 17, 2020.  Mr. Salyers had a PC status assigned to him because he "has paroled from or is anticipated to be house in a Protective Custody environment."  SD_050664  This is not a well-documented

---

[5] *See, e.g.*, Review of Incident for Dominique James McCoy, SD_055387-94 ; Follow Up Investigative Report Case No. 21156504, April 11, 2022, SD 0444733-42.

reason for PC status.  Despite Mr. Young not having a current PC status determination, both were assigned to the same cell.

**Summary of Opinions**

1. The Jail's classification and housing system is inadequate, has not been validated, results in over-classification, is racially driven, results in segregated housing units, and thus puts incarcerated persons at increased risk of harm.

2. The out of cell time for incarcerated persons, especially in the restricted housing units, is severely inadequate, constitutes solitary confinement conditions, and thus puts incarcerated persons at increased risk of harm to themselves and others.

3. The various housing units are inadequately staffed and thus place IPs at increased risk of harm by not providing the proper level of supervision.

4. Collectively, the above deficiencies result in the Jail's assault and mortality rates to be unacceptably high.

# Exhibit B

# James Austin, Ph.D.

## MAJOR POSITIONS HELD

| | |
|---|---|
| 2003 – Present | *Founder, The JFA Institute*, Washington, D.C. |
| 1999 -2003 | *Research Professor and Director, Institute for Crime, Justice, and Corrections*, Department of Sociology, The George Washington University, Washington, D.C. |
| 1982 - 1998 | *Executive Vice President*<br>National Council on Crime and Delinquency<br>San Francisco and Washington, D.C. |
| 1974 - 1982 | *Research Associate*<br>National Council on Crime and Delinquency<br>San Francisco |
| 1970 - 1974 | *Correctional Sociologist*<br>Illinois Department of Corrections<br>Joliet, Illinois |

## EDUCATION

| | |
|---|---|
| B.A. | 1970, Wheaton College, Wheaton, Illinois, Sociology |
| M.A. | 1975, De Paul University, Chicago, Illinois, Sociology |
| Ph.D. | 1980, University of California, Davis, California, Sociology |

## RELEVANT PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2022 – present | *Federal Court Appointed Consultant, NY City Department of Corrections,* to design and implement restricted housing programs and classification systems and policies on Rikers Island to reduce inmate violence. |

| | |
|---|---|
| 2022 – present | *Federal Court Appointed Consultant, Rhode Island Department of Corrections* to design and implement restricted housing program to meet Consent Decree requirements. |
| 2019 – 2023 | *Director*, Cost benefit analysis of the Los Angeles County Jail System to determine how best to lower the county jail population to allow closure of the Men's Central jail facility. (funded by Los Angles County Auditor-Controller). |
| 2019 – 2022 | *Director*, implementation of an objective jail classification system and restricted housing program for the Alameda County Sheriff (funded by Alameda County). In 2021 Dr. Austin was appointed by the Federal Court to monitor compliance with the consent decree in the areas of classification and restricted housing. |
| 2015 – present | *Co-Director,* MacArthur Foundation Safety and Justice Challenge in which JFA is responsible for working with 20 local counties to design and implement plans to lower current jail populations by 15-30%. |
| 2013 - 2014 | *Consultant*, Review and Assessment of the Bureau of Prisons Special Housing Units, completed by CNA and funded by National Institute of Corrections. |
| 2012 - 2020 | *Director,* Orleans Parish Prison Population Projections and Jail Reduction Strategic Plan (City of New Orleans). |
| 2016 – 2019 | *Director,* Maryland Department of Public Safety and Correctional Services, Technical Assistance (Open Society Institute-Baltimore). |
| 2015 | *Director*, Court Services and Offender Supervision Agency  (CSOSA) Best Practices Evaluation. (CSOSA). |
| 2014 - 2018 | *Director,* Validation study of the San Francisco Adult Probation Risk and Needs Assessment System (COMPAS), San Francisco County. |

2

| | |
|---|---|
| 2005 – 2014 | *Director*, Design and Evaluation of the Maryland Department of Public Safety and Corrections (MDPSC) Risk and Case Management System (Parole, Probation and Prison).  MDPSC and Open Society Institute-Baltimore. |
| 2021 – present | *Monitor*, Alameda County Jail System, California. |
| 2022 – present | *Monitor*, U.S. Virgin Islands, St. Thomas Island Jail System. |
| 2011 – 2016 | *Monitor*, Consent Decree, Walnut Group Correctional Facility, Mississippi Department of Corrections (adult and juvenile populations) |
| 2010 – 2014 | *Consultant*. Technical Assistance on Reducing Solitary Confinement in Maryland, New Mexico, and Illinois prison systems. Vera Institute. |
| 2013-2014 | *Director*, Evaluation of the Contra Costa Probation Department's Response to AB 109- Realignment. |
| 2012-2013 | *Director,* Evaluation of Alternatives to Incarceration, San Diego County. |
| 2012 – 2013 | *Director,* Evaluation of the Short-Term Technical Violation Pilot Study. U.S. Parole Commission. |
| 2012 | *Co-Director,* Evaluation of the Oklahoma Administrative Segregation System. Oklahoma Department of Corrections. |
| 2011 - 2012 | *Consultant*, Study of Colorado Administrative Segregation System. Colorado Department of Corrections and National Institute of Corrections, U.S. Department of Justice. |
| 2010 – 2011 | *Director*, Revalidation of the Texas Pardon and Parole Board System. Texas Pardon and Parole Board. |
| 2009 – 2012 | *Director*, Prison Population-Justice Re-investment Initiative. Pew Charitable Trusts. |
| 2010 – 2011 | *Special Consultant*, Jail Population Projection Study, US Department of Justice and Orleans Parish. |

| | |
|---|---|
| 2008 – 2009 | *Special Consultant*, Administrative Segregation/Super Max Parchment Study. Mississippi Department of Corrections and ACLU |
| 1998 – 2011 | *Director,* Correctional Options Program (Bureau of Justice Assistance,  U.S. Department of Justice) |
| 2007 – 2008 | *Director*, Harris County Pretrial Services Re-Validation Risk Assessment Study. (Harris County, Texas). |
| 2006 | *Director,* Evaluation of the District of Columbia Department of Corrections Prisoner Classification System (DC DOC). |
| 2005 – 2008 | *Director,* Montgomery Pretrial Services Risk Assessment Validation Study. (Bureau of Justice Assistance,   U.S. Department of Justice). |
| 2003 – 2006 | *Director*, Assessment of Sexual Assault in the Texas Prison System. (National Institute of Justice). |
| 2003 – 2006 | *Director*, Validation Study of the Alameda County Juvenile Detention Risk Assessment System (Alameda County, California). |
| 2002—2006 | *Independent Expert,* Office of Youth Development, Louisiana Department of Public Safety and Corrections, Jointly Appointed by State of Louisiana and U.S. Department of Justice, Civil Rights Division |
| 2003-2004 | *Director,* Evaluation and Redesign Of Systems For Berks County Pretrial and Sentenced Populations. (Berks County, PA). |
| 2002 – 2003 | *Director*, Validation of the Pennsylvania Parole Guidelines. Pennsylvania Board of Probation and Parole. (Pennsylvania Commission on Crime and Delinquency). |
| 2001 – 2003 | *Director,* Development of the Kentucky Parole Risk Assessment System.  Kentucky Parole and Pardon Board. |

4

| | |
|---|---|
| 1998 – 2004 | *Monitor*, Georgia Juvenile Justice Corrections System, Jointly Appointed by State of Georgia and U.S. Department of Justice, Civil Rights Division. |
| 1997 - 2002 | *Director*, National Technical Assistance Program for External Prison Classification Systems (Oregon, Wisconsin, Virginia, Tennessee, Texas, Oklahoma, and Montana) (National Institute of Corrections) |
| 1996 - 2002 | *Director,* National Technical Assistance Program for Internal Prison Classification Systems (Washington State, Oregon, Missouri, South Dakota, Connecticut, Colorado, and Florida) |
| 1996 - 1999 | *Director*, National Survey of Juveniles in Adult Correctional Facilities (Bureau of Justice Assistance), GWU. |
| 1996 - 1999 | *Director,* National Multi-Site Boot Camp Evaluation (Adult and Juvenile) (National Institute of Justice), GWU. |
| 1995 - 1999 | *Director*, Evaluation of "Three Strikes and You're Out" Laws in California and Nationally, (National Institute of Justice), NCCD |
| 1996 - 1999 | *Director*, National Survey of Privatization in Corrections (adult and juvenile facilities) (Bureau of Justice Assistance), NCCD. |
| 1992 - 1997 | *Director*, Correctional Options Evaluation (National Institute of Justice and Bureau of Justice Assistance), NCCD |
| 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Youth Services Agency (YSA) operations, classification system, staffing levels, physical plant, mental health, information services and program services, (National Institute of Corrections, Bureau of Prisons), NCCD |
| 1992 - 1997 | *Director*, National Structured Sentencing Evaluation (Bureau of Justice Assistance), NCCD |
| 1995 - 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Corrections operations, |

classification system, staffing levels, and physical plant, including, comprehensive cost analysis of long-term options for the Lorton Complex, (National Institute of Corrections, Bureau of Prisons), NCCD

1991 - 1997     *Director*, Design and Implementation of the New York City Department of Corrections Objective Jail Classification System (Consent Decree, New York City Department of Corrections), NCCD

1991 - 1995     *Director*, Philadelphia Prison System Classification and Population Projections Project (Consent Decree, City of Philadelphia), NCCD

1991 - 1994     *Director*, Evaluation of Jail Drug Treatment Programs (National Institute of Justice), NCCD

1991 - 1993     *Director*, Design and Implementation of the Cook County Objective Jail Classification System (Cook County Sheriff's Department), NCCD

1990 - 1991     *Director*, California Assessment of the Overrepresentation of Minority Youth in Juvenile Justice (Office of Criminal Justice Planning), NCCD

1988 - 1992     *Director*, Experimental Test of Electronic Monitoring Program, Oklahoma Department of Corrections (National Institute of Justice), NCCD

1987 - 1992     *Director*, Experimental Test of the Prison Management Classification System (National Institute of Corrections and Washington Department of Corrections), NCCD

1986 - 1990     *Director*, National Jail Classification Project (NIC), NCCD

1984 - 1986     *Co-Director*, Study of Institutional Violence at San Quentin (Consent Decree, California Department of Corrections, NCCD

1982 - 1987     *Co-Director*, Experimental Study of Juvenile Court Probation Services, Salt Lake City, Utah (OJJDP), NCCD

6

| 1983 - 1985 | *Co-Director*, Illinois Department of Corrections Early Release Evaluation (NIJ), NCCD |
| 1980 - 1984 | *Co-Director*, Supervised Pretrial Release Test Program (NIJ/LEAA), NCCD |
| 1981 - 1983 | *Co-Director*, Evaluation of California AB2 Bail Reform Act (OCJP), NCCD |
| 1980 | *Senior Research Associate*, California Alternatives to Incarceration Study (State Legislature), NCCD |

## SPECIAL APPOINTMENTS

| 2006 – 2007 | Expert Panel on Adult Offender and Recidivism Reduction Programming, California Department of Corrections and Rehabilitation |
| 2003 | Advisory Committee, The Little Hoover Commission Report on California Prison System |
| 1999- 2003 | Chair, National Policy Committee, American Society of Criminology |
| 1987 - 1994 | Trustee, Robert Presley Institute of Corrections Research and Training |
| 1991 | Governor's Task Force on Prison Crowding, State of Nevada |
| 1988 | Governor's Task Force on Corrections, State of Oregon |
| 1981, 1986 | National Academy of Sciences, National Panels on Sentencing and Prison Overcrowding |

## EXPERT WITNESS/LITIGATION

| 2022- present | <u>Babu v. Ahern. Case No. 5:18-cv-07677-NC</u><br>Appointed Monitor to assist the Alameda County Sheriff's Office reach compliance with Consent Decree regarding classification and restricted housing programs and policies. |

| | |
|---|---|
| 2022- present | *Carty v. Bryan*<br>Appointed Monitor to assist the U.S. Department of Corrections reach compliance with Consent Decree regarding classification and restricted housing programs and policies. |
| 2022-2023 | *Flores, et al. v. Stanford, et al.*, No. 18-cv-02468 (VB) (JCM)<br><br>Retained by New York State Attorney General to examine the review of juveniles tried as adults by the New York Board of Parole and Pardons. |
| 2016 - 2023 | Stephen Rudisill v. Charles Ryan<br>Appointed as expert to monitor stipulated agreement where the Arizona Department of Corrections agrees to desegregate their inmate population in housing and program assignments. |
| 2019 | Orange County (California) Jail DOJ Investigation<br>Retained by the U.S. Department of Justice Civil Rights Division to conduct an evaluation of the Orange County Jail Inmate Classification System. |
| 2016 - 2019 | Mark Duke, et al., vs. Jefferson S. Dunn<br><br>Expert declaration on behalf of plaintiffs on proper classification of inmates at the St. Clair prison facility (Alabama). Stipulated agreement designated Dr. Austin as expert for the DOC to implement reforms. |
| 2013 - 2014 | Coleman v. Brown<br><br>Expert declaration, deposition and court testimony in support of plaintiff's motion regarding mentally ill inmates in segregation. |
| 2012 | Louis Henderson, et al., v. Kim Thomas<br><br>Expert declaration and testimony on behalf of plaintiffs on the appropriateness of segregating inmates based on HIV status (Alabama). Court ruled in favor of plaintiffs. |

8

| | |
|---|---|
| 2008-2012 | Plato and Coleman v. Schwarzenegger. |
| | Retained by plaintiffs to develop plan to depopulate the California Prison Population. Reports submitted and deposed by defendants, two expert reports submitted and court testimony. |
| 2001 - 2005 | Austin, et al., v. Wilkinson, et al. |
| | Retained by defendants to examine the classification process used to assign inmates to the Ohio State Penitentiary – a high maximum security prison. Expert report but no deposition or testimony. |
| 2001 | Gartrell et al., v. Ashcroft et al. |
| | Retained by plaintiffs to examine if BOP inmates placed in Virginia Department of Corrections are unnecessarily having their expression of religious freedoms unnecessarily restricted? Report submitted but no deposition or court testimony. |
| 1998 - 1999 | Southern Ohio Correctional Facility (Civil Action No. C-1-93-436). |
| | Retained by the Ohio Department of Rehabilitation and Correction to serve as an expert witness on classification issues as they pertain to the Lucasville riot. |
| 1998 - 1999 | Busey et al. v.  Corrections Corporation of America |
| | Retained by CCA to develop an objective classification system for the Youngstown facility and have all inmate's properly classified according to the classification criteria. No expert report, deposition or court testimony. |
| 1998 - 2000 | Holloway, et al., v. King County |
| | Retained by plaintiff's counsel to examine the validity of client's claims that sexual harassment of female correctional officers by male inmates was being |

9

encouraged by male correctional officers and departmental policy. Declaration and deposition.

| | |
|---|---|
| 1997 | <u>Carlos Morales Feliciano v. Pedro Rossello Gonzales</u> Consent Decree, Puerto Rico |
| | Retained by Special Master to conduct a comprehensive assessment of the inmate classification system that was designed and partially implemented by the Administration of Corrections. |
| 1996 | <u>Rentschler v. Carnahan et al.</u> |
| | Retained by Defendants to evaluate the impact of crowding at the Colorado maximum security prison. |
| 1995 - 1996 | <u>Montoya v. Gunter, et al.</u> |
| | Retained by Defendants to determine whether inmate who was killed while incarcerated had been properly classified and housed. |
| 1995 - 1997 | <u>Inmates A,B,C and D v. Illinois Department of Corrections</u> Consent Decree |
| | Appointed by Court to produce evaluation of the level of control of housing and job assignments by gangs. |
| 1995 - 2002 | <u>USA v. Michigan</u> and <u>Cain v. Michigan</u> Consent Decrees |
| | Expert witness retained by Defendants to help Department of Corrections reach compliance with court order regarding classification system. |
| 1995 | <u>International Fidelity Insurance Co. et al. v. Charles Nobel et al:</u> In the United States District Court of the Southern District of Texas, Houston Division. |
| | Expert Witness Retained by Defendants to determine the Failure to Appear rates for defendants released on surety bond versus O.R. |
| 1995 | <u>Sandra Herrera, et al., v Pierce County, et al.</u> |

10

|  | Retained by Plaintiffs to evaluate whether inmates were being properly classified and housed in the local jail. |
|---|---|
| 1991 - 1992 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. The Parish of Orleans Criminal Sheriff's Office</u> |
|  | Expert Witness Retained by Plaintiffs to determine the appropriateness of excluding all females from certain security post positions within the jail. |
| 1991 - 1994 | <u>Calvin R. vs. Illinois Department of Corrections</u>. Consent Decree. |
|  | Appointed by Court to produce evaluation of classification system and to implement internal classification system to reduce inmate violence. |
| 1991 | Office of the Attorney General, State of Texas, <u>Alberti v. Sheriff of Harris County, et al.</u>, No. CA-H-72-1094 |
|  | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1990 - 1991 | Office of the Attorney General, State of Texas, <u>Lamar v. Collins</u> |
|  | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1990 - 1991 | King County (Seattle, Washington) District Attorney's Office, <u>Hammer v. King County</u> |
|  | Expert Witness Retained by Defendants to determine if minority staff was being discriminated against. |

| 1989 - 1991 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. State of Florida: Florida Department of Corrections, et al.</u>, Case No. TCA 86-7330 (N.D. Fla) |
| | Expert Witness Retained by Plaintiffs to determine whether women should be excluded from certain post positions in the DOC. |
| 1987 - 1989 | Office of the Special Masters, <u>Ruiz v. Lynaugh</u>, Evaluation of the TDC Classification System and Inmate Violence |
| | Appointed by Court to produce evaluation report of classification system to determine if inmate violence had been reduced. |

# MAJOR PUBLICATIONS

## **Books**

| 2011 | <u>It's About Time: America's Imprisonment Binge</u> (with John Irwin), 4th Edition, Cengage, Publishing. |
| 1993 | <u>Reinventing Juvenile Justice</u> (with Barry Krisberg), Beverly Hills, CA: Sage Publications. |
| 1978 | <u>The Children of Ishmael: Critical Perspectives on Juvenile Justice</u> (with Barry Krisberg), |

## **Articles**

| 2010 | "Reducing America's Correctional Populations", 2001. Justice Research and Policy, Vol, 12, No. 1, pp,1-32. |
| 2009 | "Prisons and the Fear of Terrorism." August 2009. Criminology and Public Policy. Vol., Issue 3: 641-649. |
| 2009 | "Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs." 2009. Criminal Justice and Behavior. Vol. 36, No. 10: 1025-1037. |
| 2006 | "How Much Risk Can We Take? The Misuse of Risk Assessment in Corrections." 2006. Federal Probation. Vol. 70, No. 2: 58-63. |

2004                         Richards, Stephen C., James Austin, and Richard S.
                            Jones. 2004. "Thinking About Prison Release and
                            Budget Crisis in the Blue Grass State." Critical
                            Criminology: An International Journal, Vol. 12, No.3:
                            243-263.

2004                         Richards, Stephen C., James Austin, and Richard S.
                            Jones. 2004. "Kentucky's Perpetual Prisoner
                            Machine: It's All about Money." Review of Policy
                            Research, Vol. 24, No. 1 (at press).

2003                         "Why Criminology Is Irrelevant", Criminology and
                            Public Policy, Vol. 2, No.3: 557-564

2003                         "Three Strikes Laws", in Current Controversies in
                            Criminology, Ronald Weitzer, ed., Prentice Hall:
                            Upper Saddle River, NJ.

2003                         "The Use of Science to Justify The Imprisonment
                            Binge", Convict Criminology, Jeffrey Ian Ross and
                            Stephen C. Richards, eds., Wadsworth: Belmont, CA.

2003                         "Its About Time:  America's Imprisonment Binge",
                            Punishment and Social Control, Aldine De Gruyter:
                            New York, NY.

1999                         "Are We Better Off? Comparing Private and Public
                            Prisons in the United States", Current Issues in
                            Criminal Justice. Vol. 11 (2): 177-201.

1999                         "The Impact of 'Three Strikes and You're Out'",
                            Punishment and Society, Vol 1(2): 131-162.

1998                         "The Limits of Prison Drug Treatment", Corrections
                            Management Quarterly, Vol. 2, Issue 4, Fall 1998, pp.
                            66-74.

1996                         "The Effect of 'Three Strikes and You're Out' on
                            Corrections" in Three Strikes and You're Out:
                            Vengance as Public Policy, David Shichor and Dale
                            K. Sechrest, eds., Sage Publications: Thousand
                            Oaks, CA.

1996                         "Are Prisons A Bargain? The Case of Voodoo
                            Economics", Spectrum, Spring 1996, pp. 6-24.

13

1995        "The Overrepresentation of Minority Youths in the California Juvenile Justice System:  Perceptions and Realities" in <u>Minorities in Juvenile Justice,</u> Kimberly Kempf Leonard, Carle E. Pope, and William H. Fyerherm, eds., Sage Publications: Thousand Oaks, CA.

1994        "Three Strikes and You're Out: The Likely Consequences".  <u>St. Louis University Public Law Review</u>, 14, 1, pp. 239-258.

1993        "Classification for Internal Purposes: The Washington Experience" (with Chris Baird, and Deborah Nuenfeldt), <u>Classification: A Tool for Managing Today's Offenders</u>, Laurel, MD: American Correctional Association.

1993        "Objective Prison Classification Systems: A Review", <u>Classification: A Tool for Managing Today's Offenders</u>, Laurel, MD: American Correctional Association.

1986        "Using Early Release to Relieve Prison Crowding: A Dilemma in Public Policy," <u>Crime and Delinquency</u> (October):404-501

1986        "Evaluating How Well Your Classification System Is Operating," <u>Crime and Delinquency</u> (July):302-321

1985        "Incarceration in the United States:  The Extent and Future of the Problem," <u>The Annals</u> (March):15-30

1983        "Assessing the New Generation of Prison Classification Models," <u>Crime and Delinquency</u> (October):561-576

1982        "Do We Really Want to Get 'Tough on Crime'?" <u>Corrections Today</u>, Vol. 44, No. 6:50-52

1982        "Bail Reform in California:  The Passage of AB2" (with E. Lemert), <u>Pretrial Services Annual Journal, 1982</u>, Vol V:4-23

1982        "Review of Fatal Remedies:  The Ironies of Social Intervention" (Sam D. Seiber) in <u>Crime and Delinquency</u>, Vol. 20, No. 4:639-641

14

| 1982 | "The Unmet Promise of Alternatives to Incarceration" (with B. Krisberg), <u>Crime and Delinquency</u>, Vol. 28, No. 3:374-409 |
|------|------|
| 1982 | "Promises and Realities of Jail Classification," <u>Federal Probation</u>, Vol. 46, No. 1:58-67 |
| 1981 | "Wider, stronger, and different nets:  the dialectics of criminal justice reform" (with B. A. Krisberg), <u>Journal of Research in Crime and Delinquency</u>, Vol. 18, No. 1:165-196 |
| 1980 | <u>Instead of Justice:  Diversion</u>, Ph.D. Dissertation, University of California, Davis |

# AWARDS

| 2009 | Recipient of the Marguerite Q. Warren and Ted B. Palmer Differential Intervention Award, American Society of Criminology, Corrections and Sentencing Division |
|------|------|
| 1999 | Recipient of the Paul Tappin award for outstanding contributions in the field of criminology, Western Society of Criminology |
| 1991 | Recipient of the Peter P. Lejins Research Award, American Correctional Association |

# EXHIBIT 2

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:   (510) 806-7366
Facsimile:    (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>        Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**REBUTTAL EXPERT REPORT OF JAMES AUSTIN, PH.D.**<br><br>Judge:     Hon. Anthony J. Battaglia<br>Magistrate:Hon. David D. Leshner<br><br>Trial Date: None Set |

[4580143.1]

Case No. 3:20-cv-00406-AJB-DDL
REBUTTAL EXPERT REPORT OF JAMES AUSTIN, PH.D.

1    I, James Austin, Ph.D., declare:

2    1.    A true and correct copy of my expert rebuttal report is attached hereto

3    as **Exhibit A**.

4    2.    I have had the opportunity to review the report of Lenard Vare.  The

5    opinions expressed therein do not change the opinions I expressed in my expert

6    report.

7    3.    The information and opinions contained in my rebuttal report are based

8    on evidence, documentation, and/or observations available to me.  I reserve the right

9    to modify or expand these opinions should additional information become available

10    to me.  The information contained in this rebuttal report are a fair and accurate

11    representation of the subject of my anticipated testimony in this case.

12

13    Dated:  October 2, 2024

      James Austin, Ph.D.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

## Rebuttal Report of James Austin, Ph.D.

**Introduction**

This report reviews the opinions of Lenard Vare listed in his 171 page report as they relate to the classification and custody staffing at the San Diego County Jail facilities. In particular, I focused on pages 1-6, 11-15, 43-50, 95-105, and 110-114 of Mr. Vare's report.

In the opening section at page 6 of Mr. Vare's report, he states the following objectives of his analysis:

> The emphasis of my review in this case is on the appropriateness of the classification process and housing of incarcerated persons at the San Diego County jail facilities, adherence to reasonable safety standards, and compliance with policies and procedures. I will also consider safety and security concerns including appropriate classification and housing of individuals based on risk factors, responses to emergencies, steps taken to address security concerns such as narcotics interdiction, contraband control, and protective custody housing. I will review staff training approaches, professional development, staff adherence to standards of professional conduct, and the measures taken by the agency to ensure that staff are compliant with agency rules and regulations.

**Mr. Vare's Methodology Regarding Classification Is Unreliable**

Mr. Vare's opinions are derived from his experience as a correctional administrator, his review of various depositions, his review of certain Sheriff's Department Policies and Procedures, and interviews with jail administrators during his inspection of jail facilities in April 2024.

Mr. Vare's opinions were based on an evaluation methodology that makes it impossible to offer an objective assessment of the current jail classification system and housing procedures. Specifically, Mr. Vare indicates that he did not conduct any interviews with any Incarcerated Persons (IPs) while he made his tours, did not review the classification instrument documents associated with the 12 named Plaintiffs, did not evaluate the classification records of any other IPs who are currently incarcerated in the jail, did not review records of any other IPs who have recently been assaulted or died in the jail, and did not review any data of the current jail population from which he could have drawn a random sample from which he could evaluate the classification system.

Of note, it appears that Mr. Vare has never designed or implemented an objective jail classification system. It also appears that he has never conducted a formal evaluation of an objective classification system, which would entail, among other things, reliability and

validity statistical tests, direct observations of the initial and reclassification processes, and interviews with incarcerated persons (IPs).

**Mr. Vare's Review of the 12 Named Plaintiffs Is Unreliable**

Pages 46-50 and 102-105 provide his review of the deposition transcripts from the 12 named plaintiffs and his opinion that the SDSO classification system is not misclassifying anyone. Mr. Vare concludes on page 12 that:

> The evidence in this case suggests that all the named plaintiffs met the criteria for maximum custody housing and were appropriately screened and classified.

Mr. Vare uses incomplete information about each of the 12 named plaintiffs to conclude that 1) they are appropriately classified and 2) imply that all of the other IPs are appropriately classified. For his classification analysis of each plaintiff, Mr. Vare appears to rely only on  their criminal charges, prior record, and housing locations. He simply states that they are all maximum or high security levels based on their charges and prior record. Therefore, he concludes the entire classification is not flawed.

Anyone familiar with objective jail and prison classification systems would know that the current charge and prior criminal convictions are only part of the criteria upon which a classification level is determined. In particular, the IPs' prior institutional conduct, current disciplinary conduct, participation in work and rehabilitative services, age, gender, gang affiliation and prior institutional conduct are other factors to be applied. None of this is considered by Mr. Vare. Nor does Mr. Vare provide any other relevant information about how the IPs were scored on the classification system or how they were housed in the San Diego County Jail system—including  with whom while incarcerated. If their conduct while incarcerated has been good and free of disciplinary actions, most if not all of the 12 plaintiffs should be assigned to medium—not maximum—custody.

Having formal reclassification instruments and processes are critical to ensure proper classification of IPs. The reclassification event should place more emphasis on the IPs' recent conduct rather than the current charges and prior convictions. And as noted in my first report, there is no formal reclassification instrument or reclassification process for IPs at the San Diego County Jail. Notably, Mr. Vare did not consider whether any reclassification processes were appropriate as to any of the 12 named plaintiffs.

**Mr. Vare's Opinions Regarding the Jail Population Management Unit Are Unreliable**

Pages 97-105 of Mr. Vare's repot address issues related to the Jail Population Management Unit (JPMU). A positive finding is the establishment of a centralized jail classification unit. However, the number of staff assigned to the unit is not listed.

One of the JPMU staff that Mr. Vare interviewed, Sgt. Diaz, confirmed that there is no confidential workspace to conduct interviews, but that staff at times try to find "secluded" areas. Mr. Vare notes that Sgt. Diaz reported that reclassifications are done every 45 days or sooner, there is no indication that JPMU staff interviews the IP in performing reclassifications.

Other aspects of a valid classification systems, not mentioned above, include whether the IP receives a copy of the new classification instrument and/or if the results are explained to the IP. Mr. Vare does not address these issues. There is also no mention of whether there is a separate instrument used for women.

Mr. Vare forms his opinions by speaking to "various members" of the JPMU, but does not tell us how many staff he talked to, the identities of these staff members, or the list of questions he applied during these interviews.

Mr. Vare seems to simply take some unknown staff members' word as gospel. He provides no other basis for his opinion that comprehensive training has been completed. There is no documentation of the curriculum used for training, staff testing on the classification instrument, or JPMU members' knowledge of other key classification concepts such as over-rides (both discretionary and non-discretionary).

**Mr. Vare's Opinions Regarding Custody Staffing Are Unreliable**

Pages 110-114 of Mr. Vare's report address the issue of insufficient staffing at the jail and its impact on the safety of IPs and staff. His opinion that there are no instances of plaintiffs suffering a loss directly attributable to staffing shortages is based solely on former Assistant Sheriff Adams-Hydar's deposition transcript and no independent review. He states at page 111:

> Adams-Hydar had never witnessed an emergency where there was a lack of deputies and/or medical staff present, as confirmed by her personal experience and video footage from body-worn cameras.

The issues not addressed, as noted below, is how quickly did they respond, and could the incident have been prevented if an adequate number of staff were present in the housing areas.

Mr. Vare also fails to note former Assistant Sheriff Adams-Hydar's other deposition testimony that show many negative effects of staff shortages, including: (1) the implementation of restricted movement protocols, limiting out-of-cell time for incarcerated individuals; (2) safety concerns for both incarcerated individuals and staff members; (3) the inability to escort incarcerated individuals to medical appointments; (4)

3

the cancellation or reduction of programs for incarcerated individuals, which can potentially impact rehabilitation efforts and the overall well-being of the incarcerated population; (5) difficulties in transporting incarcerated people to appointments outside the facility, such as specialty care providers; (6) delays in performing timely safety checks; (7) the potential for increased violence due to understaffing; and (8) staff fatigue and potential burnout. *See* Tr. at pages 132-146.

Mr. Vare apparently made no attempt to review any recent serious incidents (assaults, suicide, suicide attempts, drug overdose) to see (1) how many staff were deployed at the time of the incident, (2) how the incident was detected (e.g., other IPs, cameras, etc., and (3) how long it took for staff to respond to the incident.

Apparently, Mr. Vare did not review video or body-worn camera footage of such incidents to observe how long it took to respond to an incident or how staff were alerted to incident. This is especially critical as any tour of the facilities would have noted that officers rarely can be seen in the housing units except to make routine safety checks, usually hourly.

Mr. Vare made no apparent effort to interview line staff assigned to the housing areas to question them on issues related to staffing shortages. He acknowledges there are shortages but does not quantify them in terms of incidents of assault or other harm, as one could have done using the Watch Commander shifts.

4