GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPÚLVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>    v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>       Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF GARY L. RANEY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:    Hon. Anthony J. Battaglia<br><br>Date:    March 6, 2025<br>Time:    2:00 p.m.<br>Crtrm.:  4A |

[4621623.7]

DECLARATION OF GARY L. RANEY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DECLARATION OF GARY L. RANEY

I, Gary L. Raney, declare that if called upon I could and would testify competently to the information contained below, including in my expert reports, which is based on my own personal knowledge:

1.    I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment ("Motion").

2.    Attached as **Exhibit 1** is a true and correct copy of my August 21, 2024 report ("Report"), which accurately represents my opinions in this case.  This does not include the index of documents I reviewed.

3.    Attached as **Exhibit 2** is a true and correct copy of my October 2, 2024 rebuttal report ("Rebuttal"), which accurately represents my opinions with respect to the report of Lenard Vare in this case.  This does not include the index of documents I reviewed.

4.    Defendants' Motion at ECF p. 18 claims that "[t]here have been significant changes in the last few years."  None of the San Diego Sheriff's Office ("SDSO")'s changes in the last few years alter my opinion that SDSO's policies and practices are insufficient and inadequate in preventing drugs from coming into the San Diego County Jail ("Jail").  Report at 7-25.

a.    SDSO's declarant in support of the Motion claims that CNIT now uses "information led policing" to help locate narcotics inside the jails and in the community.  Declaration of F. Gardiner, Dkt. 782-2 at ECF pp. 139-40. Information led policing can mean a variety of things, so there is not enough information in Sergeant Gardiner's declaration to determine if SDSO's utilization of information led policing is valid or effective.  As stated in my Report, CNIT's cumulative actions are not sufficient to adequately control drug contraband, given the level of drugs that are in the Jail.  Report at 9-12, 20-24.

b.    Sergeant Gardiner states that when an incarcerated person ("IP") accesses Narcan from the Narcan dispenser, it triggers staff to search the IP's

housing unit typically with the use of a canine.  Dkt. 782-2 at ECF pp. 141.  This practice may deter IPs from using Narcan during emergencies for fear of causing a search to be initiated or being caught with contraband, which compromises the safety of IPs in the event of an overdose.  In addition, Sergeant Gardiner's declaration does not state how frequently drug contraband searches are conducted. As discussed in my Report, SDSO's contraband search policy provides insufficient guidance for when cell searches should be conducted.  Report at 19.  The practice described in the Gardiner declaration does not change my opinions on this issue.

   c. On July 29, 2024, SDSO passed Directive 2407-02, which purportedly subjects staff, contractors, vendors, and visitors to potential screenings to be conducted at random.  *Id.* at 23.  As mentioned in my Report, SDSO does not use body scanners to screen staff, contractors, vendors, and visitors—a practice that would be more effective at curbing the introduction of drug contraband into the jail and that has been recommended by the Citizens Law Enforcement Review Board ("CLERB") on multiple occasions.  *Id.*  Defendants' Motion at ECF p. 19 states that "[t]hese screenings are randomized across facilities, with the locations, times and frequency not disclosed."  Defendants submitted no evidence showing that SDSO has provided any guidance as to which individuals are subject to which search methods, nor as to the thoroughness or frequency of the searches.  According to the presentation of Lieutenant Perkins, Inspectional Services Manager, at the December 17, 2024 CLERB meeting, SDSO completed only six searches pursuant to the new policy since its implementation.  December 17, 2024 CLERB Regular Meeting at 1:59:47.  There is no evidence that the screenings of staff and other non-IP individuals who enter the Jail has reduced the amount of drugs or other contraband in the Jail.

   d. Defendants' Motion at ECF p. 19 claims that "the number of overdose incidents has decreased more than 50% in 2024 as compared to 2023." SDSO's PowerPoint Presentation shows the number of overdose cases from January

DECLARATION OF GARY L. RANEY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

2023 through July 2024. Dkt. 782-2 at ECF p. 155. Based on the trends from January to July 2024, SDSO estimates that there would be a total of 34 overdoses at the Jail in 2024, should trends continue. It is curious that SDSO did not provide actual data of overdoses to date through December 2024, given that SDSO is in possession of that information. In any event, a Jail overdose rate of 34 individuals in a year is very high. For example, in the Miami-Dade County Corrections and Rehabilitation Department, where I serve as Independent Compliance Director, there were zero overdoses in 2024. Miami-Dade County has an average daily population ("ADP") of approximately 4,600 IPs, an ADP comparable to that of San Diego County. The evidence of overdoses in the Jail submitted by SDSO suggests that there is a large quantity of drugs in the Jail available to IPs, placing them at substantial risk of serious harm.

5.    As discussed in my Report, the Jail fails to maintain and properly use emergency intercom systems. Report at 40-48. Defendants' Motion at ECF p. 20 states that only one of seven Jail facilities has new intercoms (Rock Mountain); George Bailey is partially complete, and the remaining facilities still have outdated intercom systems despite Defendants contention that the process to upgrade intercoms began "prior to the filing of the complaint in this matter in 2022."

6.    Defendants' Motion at ECF p. 20 makes clear that the only facility with new video cameras is Rock Mountain; George Bailey is partially complete, and the remaining facilities continue to use outdated cameras that prevent staff from effectively monitoring, deterring, and investigating IP violence and other harmful activities in the Jails. Report at 49-56.

7.    I have reviewed the Declaration of Darren Scott Bennett, Dkt. 782-2 at ECF pp. 134-36, in which Mr. Bennett states that upgrades to intercoms, video systems, and elevators are taking place at certain facilities or that there are plans for such upgrades. I am unable to comment on the quality of the alleged upgrades because Defendants have not provided any construction plans, photographs, videos,

1  detailed descriptions, planning schedules, incident reports, or logs regarding the

2  elevators, video systems and/or intercoms at these locations.

3       8.     I have reviewed the Declaration of D. Blackwell regarding the partial

4  deployment of Axon Body Worn Cameras (BWCs) in the Jail.  Dkt. 782-2 at ECF

5  pp. 391-393.  In my opinion, BWCs are insufficient to deter IP on IP violence

6  because staff are generally not stationed in housing units where they can directly

7  observe IPs, and instead only go into housing units on occasion, such as for

8  conducting safety checks.  If staff are not present to begin with, violence among IPs

9  will be more common.  Even when staff are present in the housing units, BWCs

10 capture only a narrow slice of vision and only do so when staff activate the cameras.

11 They are not substitutes for modern, functional video cameras, which typically

12 capture a much wider field of vision and are always recording.

13      9.     As discussed in my Report, the Jail fails to comply with accepted

14 practices to ensure the timeliness and quality of safety checks.  Report at 25-40.

15 Defendants' Motion at ECF p. 21 states that "[s]afety checks are done in the same

16 manner as counts[.]"  This is incorrect.  Pursuant to Policy I.43 Count Procedures of

17 Incarcerated Persons (May 9, 2022), "[a]ll counts require sworn staff to verify each

18 incarcerated person's well-being through 'verbal or physical acknowledgment' from

19 the incarcerated person."  The policy defines "verbal or physical acknowledgment"

20 as "a response from the incarcerated person to sworn staff that proves the

21 incarcerated person is alive, awake, conscious, and responsive.  Verbal

22 acknowledgment includes the use of spoken words, while physical acknowledgment

23 includes actions of the body (i.e., hand gestures, head nod, etc.), in confirmation that

24 the incarcerated person notices and is responding to sworn staff."  As indicated in

25 my Report at pp. 25-40, SDSO's safety check policies and practices are deficient, in

26 part because they do not require staff to verify an IP's proof of life during safety

27 checks.  Indeed, Policy I.64 Safety Checks: Housing and Holding Areas of

28 Incarcerated Persons (September 27, 2022) merely provides that "[s]afety checks of

DECLARATION OF GARY L. RANEY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

1    incarcerated persons consist of looking at the incarcerated persons for any obvious

2    signs of medical distress, trauma or criminal activity." This requirement is far

3    different from the count policy, which requires verification of proof of life by voice

4    or physical acknowledgment.

5         I declare under penalty of perjury under the laws of the United States of

6    America that the foregoing is true and correct to the best of my knowledge, and that

7    this declaration is executed at Boise, Idaho this 17th day of January, 2025.

8

9

10                                    _____

11                                    Gary L. Raney

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GARY L. RANEY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT 1

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXPERT REPORT OF GARY L. RANEY**<br><br>Judge:       Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

[4542700.1]

I, Gary L. Raney, declare:

1. A true and correct copy of my expert report is attached hereto as **Exhibit A**.

2. I am a retired Sheriff from the Ada County Sheriff's Office in Boise, Idaho. I am the President of G.A.R. Inc., which provides policy, practice, and litigation consulting to the Department of Justice, local public safety agencies, and in connection with litigation. I have provided analysis, recommendations, and/or opinions in more than 40 states. In 2023, a federal court appointed me as the Independent Compliance Director for the Miami-Dade Corrections and Rehabilitation Department, responsible for bringing the jail system into compliance with the ten-year-old court orders. The court granted me broad authority over the jail system, allowing me to change policy, the organizational structure, hiring, firing, budget, and other controls. I am a federal court monitor in both the San Bernardino and Santa Clara (CA) county jails to report on their progress in complying with federal consent decrees. A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit B**.

3. The information and opinions contained in this report are based on evidence, documentation, and/or observations available to me. The materials I have reviewed in connection with this report are identified in the index attached hereto as **Exhibit C**. I reserve the right to modify or expand these opinions should additional information become available to me.

Dated: August 21, 2024

_____
Gary L. Raney

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Case No. 3:20-cv-00406

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, Plaintiffs

vs

County of San Diego, et al. Defendants

REPORT OF EXPERT WITNESS GARY RANEY

August 21, 2024

QUALIFICATIONS

I was hired by the Ada County (Idaho) Sheriff's Office in 1983 and served various duties during my career, including jail, patrol, criminal investigations, internal affairs, administrative investigations, training, and other positions. While with the Sheriff's Office, I was a training officer in the jail, patrol, and detective divisions and I created or helped update the training programs in each of these areas. In 1993, I was promoted to sergeant (supervisor) and served in the jail both as a housing supervisor and as the administrative sergeant over the jail. My duties in that position involved reviewing and writing policies and procedures, auditing operations and processes, and conducting detainee hearings. I was later assigned to the patrol division until I was selected by the sheriff as his administrative project manager. During the administrative assignment, I oversaw all training for the agency and rewrote the entire sheriff's office policy manual. I have also had assignments as an internal affairs and risk management investigator, conducting investigations on misconduct and agency liability. I was promoted to lieutenant in 1998 and placed in charge of all patrol operations. I was promoted to captain in 2001 and appointed undersheriff in 2002, overseeing the operation of the entire agency. I was elected sheriff in 2004 and served until I retired in 2015. At the time of my retirement, the Sheriff's Office employed about 660 people and as its elected official, I had the final authority on personnel actions within the agency.

During my time as sheriff, the Governor appointed me to the Idaho Peace Officer Standards & Training (POST) Council and later appointed me the chair. POST is responsible for providing or approving almost all law enforcement and corrections training in Idaho, including legal training

and jail procedures. During part of my time on the Council, I was also the chair of the POST
Hearing/Decertification Board, which reviewed and recommended whether officers should be
decertified. During my time as chair, I was instrumental in updating the rules by which POST
operated and how the Council reviewed and decided disciplinary matters.

The Governor also appointed me to the Idaho Criminal Justice Commission (ICJC), where I
served as the vice chair until I retired. The ICJC existed to identify opportunities for statewide
policy change and bring suggestions to the legislature as to how the criminal justice system could
improve. Additionally, I chaired the Idaho Criminal Justice Grants Council and the Ada County
Critical Incident Task Force Executive Committee. I was a board member of Ada County Drug
Court and Ada County Mental Health Court. In 2010, I was appointed by the U.S. Attorney
General to the board of the National Institute of Corrections (NIC) in Washington, D.C. I am a
past president of the Idaho Sheriffs' Association.

I have provided instruction or presentations to thousands of law enforcement officials across the
United States, including presentations for the National Sheriff's Association, American Jail
Association, American Correctional Association, the Police Executive Research Forum, the
Idaho, Utah, Oregon and Texas Sheriffs' Associations and judicial conferences in Idaho,
Maryland, New Mexico, South Dakota, and St. Croix. Many law enforcement presentations
included objectives on policy, training, organizational accountability, and best practices in jails.

Currently, I am the President of G.A.R. Inc. and work for the U.S. Department of Justice and,
independently, consulting in jail and law enforcement policy and practice. I have provided
analysis, recommendations, and/or opinions in almost 40 states. In 2022, Miami-Dade County
retained me as a consultant to bring the jails into compliance with the long-standing federal court
orders. In February 2023, the federal court formalized my role, appointing me as the Independent
Compliance Director for the Miami-Dade Corrections and Rehabilitation Department (MDCR),
continuing my work to bring the jail system into compliance. The court granted me broad
authority over the jail system, allowing me to change policy, the organizational structure, hiring,
firing, budget, and other controls. MDCR reached sustained compliance on all provisions in
2023. I am a federal court monitor in both the San Bernardino and Santa Clara (CA) county jails
to report on their progress in complying with federal consent decrees.

In 2015, I was contracted by the Idaho Counties Risk Management Program to create a
standardized police policy manual for law enforcement agencies in the state of Idaho. Currently
over 50 agencies are actively using it. I have also created both patrol and jail policy manuals for
two different counties in Illinois. I was contracted to produce training videos for law
enforcement agencies focusing on use of force, driving, and supervision.

I hold Bachelor's and Master's degrees from Boise State University in Criminal Justice
Administration. I am also a graduate of Northwestern University's School of Police Staff &

Dunsmore v San Diego Co Raney Report

2

Command and the FBI schools of the National Academy, Law Enforcement Executive Development Seminar and the National Executive Institute.  I hold Advanced, Supervision, Management, and Executive Certificates from Idaho POST.  I instructed for many years at the Idaho Peace Officer's Academy, Northwestern University's Center for Public Safety and Boise State University.  I began personally consulting for other law enforcement agencies in 2007 and have done so continuously since then.

Along with consulting on law enforcement policy and practice, I also provide services as an expert witness, specializing in the use of force, in-custody death, and jail policy.  In my career, I have been involved in or reviewed thousands of cases involving jail practices as a line staff officer, supervisor, administrator, sheriff and now a jail consultant.

I am being compensated on an hourly basis at the rate of $450 per hour.

In the last ten years, I have authored or co-authored the following publications:

- Bail Reform Restores Basic American Values of Freedom and Justice. Fox & Hounds www.foxandhoundsdaily.com. August 2017.
- *Eyewitness ID – The Importance of Getting it Right* with Jennifer Thompson. Sheriff Magazine. May/June 2015.
- *Here to Help: Taking Better Care of Cops* with Samantha Westendorf. Fraternal Order of Police Journal. Volume 10; Number 1: 2015.
- *Why Sheriffs Should Champion Pretrial Services* with Stan Hilkey, Mesa County CO Sheriff, and Beth Arthur, Arlington County VA Sheriff. Sheriff Magazine. May/June 2014.

In the last four years, I have testified as an expert at trial or by deposition in the following cases:

- Burris v County of Logan (OH). US District Court for the Southern District of Ohio, Eastern Division (2020), Case #2:19-cv-815.
- Deposed: Nelson v Tompkins (Muscogee County) (GA). US District Court for the Middle District of Georgia, Columbus Division (2020), Case #4:20-cv-00213.
- Clubb v Boone County (IL). US District Court the Northern District of Illinois, Western Division (2021), Case #3:18-cv-50017.
- State of Idaho v Arlyn Orr. District Court for the Seventh Judicial District of Idaho (2021), Case #CR30-20-159.
- State of Maine v. Thompson.
- Carrillo v Los Angeles County (CA). US District Court for the Central District of California (2021), Case #2:21-cv-58.

- Munday and Devine v Beaufort County (SC). US District Court for District of South Carolina (2022), Case #9:20-dv-02144.
- Greer v San Diego County (CA). US District Court for the Southern District of California (2022), Case #19-cv-0378.
- Payne v Clay County (TX). US District Court for the Northern District of Texas, Wichita Falls Division (2022), Case # 7:21-cv-0080.
- Luttrell v Santa Cruz County (CA). US District Court for the Northern District of California, San Jose Division (2022), Case #5:19-cv-07300.
- Hepner v Tulare County (CA). US District Court for the Eastern District of California – Fresno (2023), Case #1:19-cv-00774.
- Buxton v Mower County (MN). Minnesota District Court, Third Judicial District. (2023), Case #50-CV-22-1660.
- Hernandez/Zumwalt v Riverside County (CA). US District Court for the Central District of California, Eastern Division (2023), Case #5:21-CV-01791.
- Serna v San Diego County (CA). US District Court for the Southern District of California (2023), Case #20-CV-2096.

Refer to my attached vitae for additional writings, accomplishments, engagements and recognitions.

All the opinions below are based on my education, training, and experience as well as my review of the evidence, documentation, and other information, such as statutes, that may have been considered in the formation of them. My opinions are held to a reasonable degree of professional certainty and I reserve the right to alter my opinions based on any new information that may be provided. Not all instances of evidence reviewed are noted in footnotes or as references.

This report is organized as follows:

INTRODUCTION ................................................................................................................. 7

I.  CONTRABAND CONTROL .......................................................................................... 7

  A.  Contraband Smuggling on or in a Person's Body ................................................. 8

  B.  Contraband Smuggling on Paper and in Envelopes and Packages ..................... 11

  C.  Contraband-Related Policies ............................................................................... 13

  D.  Death Cases ......................................................................................................... 17

  E.  Significant Opinions ............................................................................................ 19

  F.  Conclusion – Contraband Control ....................................................................... 24

II.  SAFETY CHECKS ...................................................................................................... 25

  A.  For Years, Oversight Entities Have Recommended Changes to SDSD's Safety Check
  Policies and Practices ................................................................................................ 26

  B.  Safety Check Policies & Procedures ................................................................... 29

  C.  SDSD's Safety Check Logs and Compliance Reviews of Safety Checks ......... 32

  D.  PMK Testimony Regarding Safety Checks ........................................................ 34

  E.  Death Cases ......................................................................................................... 35

  E.  American Correctional Association Accreditation Standard .............................. 38

  F.  Significant Opinions Regarding Safety Checks .................................................. 38

  G.  Conclusions: Safety Checks ............................................................................... 40

III.  INTERCOMS ............................................................................................................ 40

  A.  SDSD's Policies and Practices Related to Broken, Obsolete, and Muted Intercoms ......... 41

  B.  Intercom Policies & Procedures .......................................................................... 44

  C.  Death Cases ......................................................................................................... 46

  H.  Significant Opinions ........................................................................................... 47

  I.  Conclusions: Emergency Intercoms ..................................................................... 48

IV.  VIDEO SYSTEMS ................................................................................................... 49

  SDSD's Video Systems ............................................................................................. 49

  B.  Video Camera Policies & Procedures ................................................................. 52

  C.  Incident Reports Noting Camera Quality ........................................................... 53

D.  Death Cases ........................................................................................................... 54

J.    Significant Opinions ............................................................................................ 55

K.   Conclusions: Video Systems ................................................................................ 55

Dunsmore v San Diego Co Raney Report

## INTRODUCTION

In July 2024, the law firm of Rosen Bien Galvan & Grunfeld LLP retained GAR, Inc. to provide opinions on San Diego County's policies and practices regarding protecting incarcerated people (IP) from harm, with specific areas including drug contraband control, the performance of safety checks, and the San Diego County Jail's use of intercoms and video cameras.  The San Diego Sheriff's Department jail system is comprised of seven jails:

- San Diego Central Jail (SDCJ)
- Las Colinas Detention and Reentry Facility
- George F. Bailey Detention Facility (GBDF)
- South Bay Detention Facility
- East Mesa Reentry Facility
- Rocky Mountain Detention Facility
- Vista Detention Facility

## I.  CONTRABAND CONTROL

Among the most notable concerns relating to IP safety is the high rate of overdose deaths in the jail system and the San Diego Sheriff's Department's (SDSD) ineffectiveness at preventing drugs from coming into the jail.

The evidence for 2023 showed that by far, the most overdoses occurred at the Central Jail, with 43 for the year, followed by the Vista facility with 22, George Bailey with 10, Las Colinas with 7, and East Mesa with 1.  During the year, there were 25 confirmed overdoses and 58 unconfirmed overdoses, for a total of 83.[1]

The SDSD has strategies to interdict drugs coming into the facilities, but the number of overdoses and deaths show that the efforts are insufficient. There are several options used in other jails that likely would significantly reduce the drug contraband coming into the San Diego County jails.

Excerpts from a 2023 Grand Jury (GJ) report regarding SDSD's failures to control drug contraband in the jails include:

---

[1] SDSD document titled "Suspected Overdoses with Narcan Deployments - CY2023," which includes only incidents that were determined, upon medical review, to be a result of or related to a drug overdose based on the primary medical diagnosis presented by the treating emergency room.

- San Diego County jails have one of the highest death rates among incarcerated persons (IP) in the State of California.[2]
- The San Diego County Sheriff's Department does not currently have any high-tech high-volume scanning equipment for examining incoming mail, small packages, or supplies.[3]

## A. Contraband Smuggling on or in a Person's Body

On May 24, 2021, a San Diego Union-Tribune reporter sent an inquiry to the SDSD asking about the recent rise in overdoses that included a May 18 mass overdose incident at the George Bailey Detention Facility.

On May 26, 2021, SDSD Lieutenant Amber Baggs replied, saying the SDSD had "made investments in equipment and technology, utilizing specialized resources and integrating investigative methods to provide a safe environment for our staff and individuals in our custody." She said known sources were people secreting drugs in their bodies, mail, jail staff who smuggled drugs into the jails, and visitors bringing drugs onto jail property. Regarding their efforts to reduce the contraband, she said SDSD was using canine teams and body scanners.[4]

On May 27, 2022, Captain C. Darnell, who had only been assigned to the jail since January 2021, submitted a declaration. It included:

- Darnell said there were body scanners at each facility that had intake/booking functions.
- If someone refused to be scanned, they would be offered an x-ray that would be read by a radiologist.
- Darnell said deputies were trained to use the body scanner, but he did not say if every deputy who used it was trained.

On May 27, 2022, Captain J. Adamos submitted a declaration that included:

- "If a body scanner is out of service at SDCJ, we do pat-down searches, strip searches, and take the individuals to X-ray their mid-section on the second floor."
- "If an abnormality is seen on the scanner and the person is still in the custody of the arresting officer, they are refused for booking and taken to the hospital. Otherwise, if an abnormality is seen during scanning, the person is sent upstairs for an X-ray, which is read by a licensed radiologist."

---

[2] 2022/2023 San Diego County Grand Jury Report, filed June 6, 2023
[3] 2022/2023 San Diego County Grand Jury Report, filed June 6, 2023
[4] Exhibit NN-944-48

Dunsmore v San Diego Co Raney Report

- "Not every person is scanned during intake because we rely on voluntary compliance. Our current policy states we will not use force to implement the body scanner. We try to gain voluntary compliance with all incoming arrestees, but some people refuse to be scanned. If people refuse to be scanned, they are x-rayed (if they consent). They can also be put on contraband watch (CW), where they are put into an observation room without a flushing toilet until they have a bowel movement, and it can be determined if they excreted any drugs/packaging."

- Adamos also said that deputies were trained to use the body scanner but also did not say whether every deputy who used it was trained.

In the San Diego County Grand Jury report, filed June 6, 2023, the Grand Jury wrote, "Based on data from the California Department of Justice, one IP dies about every month in San Diego jails. Drug overdoses are 89% of deaths in San Diego jails." These statistics cover the years 2010-2020, and this prompted the GJ to take a closer look at the issue." The Grand Jury also wrote that in 2020 and 2021, jail employees responded to 314 incidents of suspected opioid overdose.

The Grand Jury report continued with, "The GJ investigation revealed that common ways drugs enter the jails are when IPs return to the facility from court, medical appointments, work assignments, or any other events that cause them to be removed from a secure area. Contraband can also be exchanged during visits with family, attorneys, or other guests if there is no barrier between the IP and the visitor."

The Detention Investigations Unit report for July 2023 showed that from the first half of 2022 to the first half of 2023 (comparative time frames, not continuous), drug incidents increased by 20%, from 245 to 294 incidents, and weapon incidents increased by 3% from 59 to 61.[5] Most notably, a separate graphic showed that in the same period, fentanyl incidents increased by 11%, methamphetamine incidents increased by 3%, heroin incidents increased by 319% and cocaine incidents by 36%, although the total number of cocaine-related incidents was relatively low.[6]

In its August 7, 2023, response to the Grand Jury findings and recommendations, the SDSD reported recent purchases of body scanners, which allowed at least one scanner at every facility and two at the Central Jail and Court Services Bureau.

The SDSD response to the Grand Jury report also discussed the January 2023 creation of a Contraband Narcotics Interdiction Team (CNIT) at each facility. The response read, "These

---

[5] SD 444210-1
[6] SD 444215

trained deputies conduct body scans, collect actionable intelligence, identify individuals who should be on contraband watch and conduct searches of all intake areas."[7]

The Detention Investigations Unit report for October 2023 showed a year-to-date comparison between 2022 and 2023, with a 16% increase in drug incidents and an 8% increase in weapons.[8]

On May 3, 2024, Lieutenant Brenden Bourgeois was deposed. SDSD designated him as the person most knowledgeable about drug contraband introduction and body scanners in the jail. Months prior, he had been the sergeant in charge of the pilot project for CNIT.

- Bourgeois testified that the interdiction team had stopped about 750 g of fentanyl from coming into the jail.[9]
- Bourgeois testified that he thought the 16% increase in drug incidents from 2022 to 2023 was attributable to the increased number of drug seizures.[10]
- Bourgeois testified that IPs were randomly selected and put through the body scanner when returning from court, but the majority were not scanned.[11]
- Bourgeois testified that most of the drugs that were seized from IPs returning from court were found in their clothing.[12]
- Bourgeois testified that out of 50 to 100 IPs returning from court, 5 to 15 were randomly scanned.[13]
- Bourgeois testified that IPs returning from medical appointments were not typically scanned unless they had been involved in a drug-related incident. Inmates returning from work programs were.[14]
- Bourgeois testified that beginning in January 2023 the CNIT received additional training on body scanners, drug identification, and contraband concealment practices. They primarily worked in the intake areas.[15]
- Bourgeois testified that a "contraband working group" was formed that led to the CNIT, the mail processing center, and investigations and canine teams.[16]

---

[7] SDSD Response to Grand Jury Report, August 7, 2023
[8] SD 440237
[9] Page 9
[10] Page 13
[11] Page 21
[12] Page 22
[13] Page 24
[14] Page 24-5
[15] Page 26
[16] Page 27

- Bourgeois testified that there were about 60 people on the CNIT and 200 to 250 people had been trained on the body scanner, but the body scanners were primarily operated by CNIT staff.[17]
- Bourgeois testified that four detection canines were assigned to the jails.[18]

## B. Contraband Smuggling on Paper and in Envelopes and Packages

The Grand Jury reported visiting the Las Colinas Detention and Reentry Facility, which includes the central Mail Processing Center for all San Diego jails.[19]  The Grand Jury report described that sworn staff opened all suspicious letters and used visual scanning, ultraviolet light, and a TruNarc instrument to detect drugs.

The Grand Jury found that the SDSD lacked the most efficient scanning equipment for mail, packages, or supplies. The SDSD partially disagreed in the response but wrote that they were currently researching updated scanning equipment.[20] It also wrote that the Department was considering scanning incoming mail and using tablets rather than delivering physical mail.

On April 17, 2024, Theresa Adams-Hydar was deposed.  Before her recent retirement, she was the Assistant Sheriff of the Detention Services Bureau.

- Adams-Hydar testified that there were seven detection canines assigned to the jail.[21] [This contradicted Bourgeois, who said four.]
- Adams-Hydar testified that she did not think deputies were bringing drugs into the jail.[22]
- Adams-Hydar testified that she was aware of the repetitive Citizens Law Enforcement Review Board (CLERB) recommendations that everyone passes through a body scanner when entering a jail.  She said, "…it's not reasonable," explaining that it would take too much time and effort.[23]
- Adams-Hydar testified that if there was an anomaly on a body scan, the person would be refused and go to the hospital or put in a dry cell and monitored.[24]
- Adams-Hydar testified that she disagreed with the Grand Jury finding that the SDSD lacked the most effective scanning equipment for mail, packages, and supplies.[25]

---

[17] Page 28-9
[18] Page 32-3
[19] 2022/2023 San Diego County Grand Jury Report, filed June 6, 2023
[20] SDSD Response to Grand Jury Report, August 7, 2023
[21] Page 99
[22] Page 102
[23] Page 105
[24] Page 106
[25] Page 111

- Adams-Hydar testified that the CNIT began in early 2023 and deputies were hand-selected and given additional training to work in the intake areas.[26]
- Adams-Hydar testified new body scanners were purchased for the jails and the old body scanners moved to the courts. [There was no time reference for this other than the discussion of budget correspondence in 2022.][27]
- Adams-Hydar testified that the SDSD used an intelligence-led policing model to develop strategies for drug interdiction; however, she only discussed it being used with IPs and contractors.[28]

On May 16, 2024, Aaron Brown was deposed. He was designated by SDSD as the person most knowledgeable on contraband interdiction, especially mail practices.

- Brown testified legal mail is opened or scanned in front of the IP but all other mail passes through the Mail Processing Center.[29]
- Brown testified that other than department policy P.3 (Incarcerated Persons Mail), there were no other policies or procedures regarding how deputies should inspect mail. He said detectives train the staff who work in the Mail Processing Center and there was a manual on how to inspect the mail for contraband, but he could not recall what was in it.[30]
- Brown testified that the Mail Processing Center had three Air Science Mobile Forensic Evidence Benches with HEPA filters, three CAMAG UV cabinet ultraviolet light stations, NIC testing kits, a Thermo Fisher TruNarc Handheld Narcotics Analyzer and an x-ray machine. None of this equipment was designed or used for high-volume scanning.[31]
- Brown testified that he was unaware of plans to acquire a high-volume mail scanner.[32]
- Brown testified that X-ray machines have never been used, nor were there plans to use them, to scan the personal effects of people who were not IPs.[33]
- Brown testified that SDSD does not currently use technology to scan food deliveries, commissary deliveries, laundry services, or administrative supplies, nor does it plan to do so.[34]

---

[26] Page 114-5
[27] Page 116-7
[28] Page 124
[29] Page 10
[30] Page 10-11
[31] Page 11-2
[32] Page 14
[33] Page 15-6
[34] Page 16-7

- Brown testified that he was unaware of plans to use tablets or digital mail in the jail.[35]

On July 29, 2024, SDSD Undersheriff Rich Williams issued directive #2407-02, which said any person on jail property, including all staff members and visitors, was subject to be chosen at random for a search; however, the searches would not include body scans. The search methods could include canines, x-rays of property, visual screening, and a metal detector.[36]

## C.  Contraband-Related Policies

Department Policy on Strip and Pat Down Searches – I.52, February 7, 2023[37]

*Intake Strip Search:*

- "Individuals shall be strip searched preceding their placement into general jail population housing areas. However, no strip search will be conducted on an incarcerated person until at least one hour after a wants/warrants check has been completed, after fingerprints have been submitted, and a total of at least three hours has elapsed from the time of initial booking into a detention facility (except as provided in subsection G). The clearance of wants and warrants marks the point at which Detention Processing Division (DPD) staff will begin accepting bail bonds. The timeframes outlined within this section will ensure individuals are provided the opportunity to post bail within a reasonable time (not less than three hours) prior to being subject to a strip search."

*In Custody Strip Search:*

- "Incarcerated persons may be strip searched any time there is reasonable suspicion to believe they may be concealing contraband or weapons. Additionally, incarcerated persons are subject to strip search when returning to their housing area or during scheduled or unscheduled housing unit searches, weekly hygiene inspections, laundry exchanges, criminal investigations, etc."

*Strip Search at Any Time (also Section G from above):*

- "Any incarcerated person may be strip searched without completing the waiting period for posting bail under the following circumstances:

---

[35] Page 17
[36] SD 1579786-8
[37] SD 064761-5

- o  If a deputy has reasonable suspicion to believe the individual is concealing contraband or weapons in a manner that would not be detectible by a pat down search."  "Reasonable suspicion may not be based solely on the nature of the arrest and must be based on factors observed by the deputy."

The policy also allowed for force to be used to conduct a mandatory strip search.

*Pat Down Search*

- The policy required pat-down searches of:
  - o  Any IP being transported out of or returning to a facility.
  - o  Prior to or following a professional or social contact visit.
  - o  Prior to leaving or returning to a housing area.

Department Policy on Contraband Watch – J.8, May 24, 2022[38]

The purpose was "to establish guidelines for the monitoring of incarcerated persons suspected of concealing contraband within their body."

- "When it becomes apparent through a body scan, x-ray, emergency department medical examination, direct observation or reasonable suspicion that an incarcerated person has concealed contraband in their body, either physically or through ingestion, the person will be placed on CW in a medical isolation cell."
- "The cell used for CW will contain a toilet, wash basin and drinking fountain in compliance with the California Code of Regulations, Title 24, Minimum Standards for the Design and Construction of Local Detention Facilities. If possible, the controls for the toilet should be located outside of the cell or controlled manually by sworn staff. The incarcerated person will be isolated and un-restrained until the contraband can be retrieved through natural means, voluntarily surrendered or staff are reasonably confident the person is contraband free."
- "The incarcerated person may be removed from CW when it is reasonably believed the contraband has been relinquished or it is determined the person is contraband free after having undergone a body scan or body cavity x-ray."

Department Policy on Cell Searches – I.41, February 8, 2023[39]

The direction that was in the policy complied with generally accepted jail practices, such as not leaving someone's bed or property in disarray, cautions about cross-gender searches, and

---

[38] SD 064849-50
[39] SD_064734-5

prohibiting the reading of privileged content in confidential or legal correspondence. However, the policy failed to provide direction on when cell searches should be conducted. If staff never conducted a cell search, they would comply with the policy.

Department Policy on Body Scanner and X-Rays – I.50, March 15, 2023[40]

The policy included requirements that:

- Staff were required to have successfully completed training before operating a body scanner.
- If an anomaly was identified during a scan, the jail deputy was to ask the person to surrender the contraband if it existed. If the person refused, the watch commander could refuse to accept them.
- "In the event a newly arrested person or incarcerated person refuses to undergo a body scan, sworn staff shall separate them from other individuals and conduct a strip search in accordance with DSB P&P section I.52. Physical force will not be used to compel their cooperation in the body scan process. The incarcerated person shall also be assessed for placement on contraband watch per DSB P&P section J.8."
- "As a proactive measure to reduce contraband from entering the detention facilities, body scan use should be considered for the following:
  1. Incarcerated persons who are returning to the facility from court, clinic runs, temporary out-of-custody, work assignments or any other event that caused them to be removed from the secure area of the facility,
  2. Incarcerated persons returning from social or professional contact visits,
  3. Incarcerated workers returning to their housing unit after performing their assigned duties,
  4. Any incarcerated person based on the recommendation of the Detentions Investigations Unit, or a canine handler, and concurrence of the watch commander or designee."
- X-rays were only used when deemed medically necessary by a healthcare professional.

Department Policy on Facility Security-Housing Units – I.63, May 9, 2022[41]

The only notable provision within this policy is the one that required staff to criminally charge IPs when they were found in possession of illegal narcotics or drugs.

---

[40] SD 064755-57
[41] SD 064777-9

Department Policy on Facility Security – Loading Dock, Kitchen & Storage Rooms – I.67, May 9, 2022[42]

Only IPs with approved security clearances were allowed in the area of the loading dock, and a deputy or authorized professional staff member was required to be present.

Department Policy on Incarcerated Person Mail – P.3, March 11, 2022[43]

- "Incarcerated persons shall be allowed to receive and possess U.S. mail, incoming letters, confidential/legal mail, and mail from official government agencies (as defined below). They may also receive electronic email messages, periodicals, and new books."
- "There shall be no limit on the amount of mail an incarcerated person may send, and no limit on the amount of mail that they may receive, except to the extent that possession of such materials may constitute a fire hazard or pose an unacceptable security risk by providing the means to hide contraband."
- "All incoming non-legal mail will be routed to the Mail Processing Center (MPC) warehouse located at the Las Colinas Detention and Reentry Facility."
- "Upon receipt of incoming U.S. mail, Detentions Processing Division (DPD) staff will sort through the mail and remove any items identified as confidential or legal mail. DPD staff will verify the individual is in custody by utilizing the master card or booking summary screens and forward the confidential/legal mail as outlined in facility-specific green sheets. All other mail will be routed to the MPC for processing."

The only section of the policy that dealt directly with operational contraband interdiction read, "MPC deputies shall inspect and sort all non-legal incoming U.S. mail, subscription periodicals, and electronic mail for contraband, criminal conspiracies, and information regarding facility security. Questionable mail shall be immediately taken to the watch commander or designee. The watch commander or designee may have the material copied and sent to an appropriate authority for investigation or follow-up."

Las Colinas Body Scanner and X-Rays – I.50.L, April 30, 2022[44]

The policy followed generally accepted jail practices regarding people compliant with the scanning process.  It did not discuss refusals.

---

[42] SD 064787-8
[43] SD 065037-45
[44] *Available at*
https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Detention%20Support%20Division/Las%20Colinas%20Detention%20and%20Reentry%20Facility/I.50.L%20Body%20Scans%20and%20X-Rays.pdf

Dunsmore v San Diego Co Raney Report

## D. Death Cases

The following is not intended to represent all death cases related to drugs in that SDSD jail system, only a selected sampling from recent CLERB reports:

On January 26, 2020, Blake Wilson died from acute fentanyl, acetyl fentanyl, butyryl fentanyl, and heroin intoxication. The investigation revealed that he obtained the heroin/fentanyl from another IP while in custody.[45]

On January 6, 2021, Omar Arroyo Moreno died in a holding cell of the Central Jail. The investigation revealed a visible anomaly when he was subjected to the body scanner. Still, the deputy did not properly assess the scan and failed to take action. Had the deputy done so, Moreno should have been assessed by medical staff, and his death may have been prevented.[46]

On April 27, 2021, Jonathan Whitlock died of an overdose in the George Bailey Detention Facility. Inmates told detectives that Whitlock had ingested fentanyl just before his death, and the cause of death was a fentanyl overdose. SDSD staff were unable to locate any physical evidence of the fentanyl. CLERB concluded that he acquired fentanyl while in custody and under the care of SDSD. The CLERB recommended SDSD begin completing body scans on IPs who were transferred between facilities.[47]

On June 9, 2021, Jerry Aleman died of acute fentanyl intoxication in the George Bailey Detention Facility. The investigation found that Aleman accessed the fentanyl while being held in the George Bailey Detention Facility after he was transferred from the Central Jail.

On July 5, 2021, Ronaldino Estrada died of acute fentanyl intoxication in the Vista Detention Facility. The CLERB found that Estrada acquired or possessed the fentanyl while in custody.[48]

On July 20, 2021, Saxon Rodriguez died from a fentanyl and methamphetamine overdose in the Central Jail. CLERB concluded that he acquired fentanyl while in custody and under the care of SDSD. ███████████████████████████████████████████████████████████████████████████████████████.[49]

On March 16, 2022, William Hayden Schuck died from the toxic effects of cocaine and methylenedioxymethamphetamine. CLERB noted that according to the homicide report, the initial body scan showed a 'potential balloon size foreign object' anomaly in Schuck's abdomen

---

[45] CLERB case 20-012, from the board minutes of July 13, 2021
[46] SD 050607-18, expert's personal knowledge from civil litigation evidence
[47] SD 469458-64 on July 5, 2021[47]
[48] CLERB case 21-063, from the board minutes of May 10, 2022
[49] SD1030541-9

area. CLERB found that the evidence indicated that Schuck partook of illicit drugs while he was in custody and under the care of the SDSD.[50]

On April 27, 2022, David Omelas died from the toxic effects of fentanyl and fluorofentanyl, with hemorrhage in anterior neck and conjunctival petechia, uncertain etiology in the George Bailey Detention Facility.  CLERB found that "SDSD records showed on 04-26-22, Ornelas was transported to Vista Court for court proceedings and returned to GBDF later that night. The evidence showed Ornelas was not body scanned after his court proceeding. In interviews with the Detentions Investigation Unit (DIU), IPs made statements that suggested Ornelas' could have possibly acquired drugs at court."[51]

On May 5, 2022, Chaz Guy Young-Villasenor died from acute fentanyl and methamphetamine intoxication in the Central Jail.  He had just been arrested and was in a holding cell waiting for housing. A bag containing fentanyl and methamphetamine was found in the holding cell.[52]

On July 26, 2022, James Bousman died from complications of resuscitated cardiopulmonary arrest due to acute fentanyl intoxication in the Vista Detention Facility.  CLERB concluded that he acquired fentanyl while in custody and under the care of SDSD.[53]

On September 18, 2022, Joshua Fosbinder died from the toxic effects of fentanyl while in jail. CLERB concluded that he acquired fentanyl while in custody and under the care of SDSD.[54]

On February 4, 2023, Ryan Thuresson died from combined fentanyl and fluorofentanyl toxicity in the Central Jail.  CLERB concluded that he consumed illicit drugs while he was in the custody of SDSD.[55]

On April 17, 2023, Eddie Faulkner died from acute fentanyl, trazodone, and gabapentin intoxication, with hypertensive and atherosclerotic cardiovascular disease contributing while in the Vista Detention Facility. CLERB concluded that he consumed illicit drugs while in the custody of SDSD.[56]

While not cited individually above, the CLERB reports increasingly urged the SDSD to acquire additional body scanners and use them for all people entering the jail, including all incarcerated people returning from court. CLERB also recommended that SDSD employ personnel with special expertise and background in both image reading and medical knowledge to conduct and

---

[50] CLERB case 22-026, from the board minutes on February 13, 2024
[51] CLERB case 22-053, from the board minutes on November 28, 2023
[52] CLERB case 22-056, from the board minutes of April 23, 2024
[53] CLERB case 22-096, from the board minutes of October 17, 2023
[54] CLERB case 22-113, from the board minutes of June 27, 2024
[55] CLERB case 23-013, from the board minutes of June 27, 2024
[56] CLERB case 23-042, from the board minutes of April 23, 2024

read body scans at SDSD facilities.  The SDSD declined to scan anyone other than IPs, and then only consistently scanned them at intake.

## E.  Significant Opinions

*SDSD Policies & Procedures are poorly formulated and lack direction.*

The most important purpose of policies is to provide direction to employees doing the work. Policies should be written clearly and concisely so a new deputy can know what to do, what not to do, and if necessary, how to do it.

The SDSD policies in evidence are poorly written and poorly organized. While the entire policy manual was not provided to me, the policies cited above were more difficult to understand than generally accepted jail policies.  It was also more difficult for deputies to track the directives given the many cross-references to other policies. While these problems sound academic, confusing policies directly translate to deputies' poor understanding of them.

Policies should clearly and succinctly inform deputies of the intended goal or purpose, inform the deputy of any prohibitions, and guide the deputy on what to do and when, if applicable. For example, a cell search policy should prohibit deputies from unnecessarily damaging property or leaving a bed and property in disarray. The SDSD policy does this.  The policy should also guide deputies on when cell searches should be conducted.  For example, cell searches should be conducted whenever there is a reasonable suspicion of contraband. They should also be conducted randomly in housing units with increasing frequency triggered by higher custody levels or suspicions of contraband.  The policy should also create accountability, typically with a ranking staff member responsible for organizing and overseeing the searches and ensuring their documentation.  The SDSD policy failed to provide this direction.

There is also a lack of proportionality regarding the importance of policies. For example, the department policy on cell searches is one and a half pages long.  The policy on IP mail is nine pages long.  While both are important, the disproportionate details demonstrate the poor policy formulation.

Other examples of insufficient policy direction to control contraband include:

- The in-custody strip search policy read that IPs may be strip searched under certain conditions, but it failed to direct when strip searches were mandatory, except for initial housing. Generally accepted jail policies often require strip searches of IPs whenever they return from being outside the jail facility.

- The cell search policy failed to ensure regular searches of housing units, especially those with a higher risk of contraband, such as the maximum-security units. Generally accepted jail policies and/or practices require routine but unpredictable searches of these areas.
- The loading dock, kitchen, and storage room security policy only required a staff member to be with the IPs. It failed to require any inspection of food or supplies before they enter the jail or any search requirements of IPs after receiving and storing these items.

*SDSD fails to control contraband adequately*

Generally accepted jail policy, training, and practice recognize the need to prevent unauthorized drugs from entering and moving through jails.  Although heroin, methamphetamine, and other drugs are still prevalent, fentanyl has brought new challenges because its potency means it can be smuggled in smaller volumes, making it less detectable through traditional means. However, its unpredictable potency has contributed to an increase in the number of lethal overdoses in society and jails.

To combat this, generally accepted jail practices rely upon traditional methods but increasingly rely upon technology to detect the drugs coming into the jail systems.  One of the most common methods of bringing drugs into jail is by someone carrying them on their person.  While IPs are scanned at intake, the SDSD seems to fail to recognize that there are many opportunities for IPs to obtain drugs while at court, visiting, unloading or stocking food, linens, supplies, and other items, and while accessing places where drugs could be delivered such as trash cans, recreation yards, etc.  Bourgeois testified that even recently, SDSD only scanned about 10 to 15% of the IPs returning from court.  That is insufficient to curb the problem effectively.

The evidence showed that SDSD is failing to fully deploy basic strategies, let alone technology-based strategies.  In the depositions in evidence, there was no discussion of using disruption tactics like changing IP worker job assignments and other routines like feeding and commissary. It is well known that IPs often rely upon a routine to deliver contraband to the right person in the right place. Disrupting that routine can make the location and timing of a potential delivery unpredictable, increasing the risk to the person delivering the contraband, therefore increasing deterrence.

There was also no evidence of changing housing assignments and housing schedules.  As described above, strategies to make the time and place of a delivery unpredictable can be disruptive to it. Generally accepted jail practices include changing the housing assignment of IPs whom they suspect of controlling contraband, randomizing out-of-cell times, and other routines that help IPs know when and where they will be to receive or deliver contraband.

Dunsmore v San Diego Co Raney Report

While the effective control of contraband in jail requires a multi-pronged approach, the above strategies generally mean the drugs have already entered the secure perimeter. The better goal should be to prevent the drugs from entering the jail and that requires interdiction to occur before entry. Generally accepted jail practices for the detection of contraband at entry points also include strategies such as personal body searches, metal detection devices, body scanners, and canines.  For mail, practices include high-tech equipment to detect substances, using tablets, and scanning mail and delivering copies to the IPs.  While the SDSD has and uses some of the strategies, they are inadequate, as is evidenced by the number of deaths in the jail system.  Even though the review of CLERB minutes may not have revealed all drug-related deaths, at least seven deaths were identified in 2022 and 2023, where the decedent obtained and ingested the drugs while inside the jail. This is a disturbing number and demonstrates SDSD's failure to stop drugs from coming into the facilities.  For comparison, the Miami-Dade Department of Corrections and Rehabilitation, with about 4,700 IPs on an average day (more IPs than San Diego County Jail), only had two overdose deaths in the same two-year period.

*SDSD fails to maximize the use of body scanners and other personal searches*

Body scanners are used throughout many jails in the United States. They are not only effective at detecting and preventing the introduction of contraband into the jail, but equally important; they are a significant deterrent to the introduction of contraband.  Not only do people fear being caught with it, fired, and prosecuted, but another seldom thought of. but an important aspect of their use is providing people an excuse not to deliver contraband to jail. A staff member may be coerced to bring in contraband, but the body scanner allows them to use the excuse to refuse to do it.

The SDSD's response to the Grand Jury recommendations defended its poor processes. By the number of overdose deaths in the jail system, it is clear they are not effective enough. The SDSD mostly relied upon their pat search and strip search policies as evidence of their adequate processes. Pat searches are only somewhat effective in detecting contraband, especially when the person knows they are likely to be searched. The contraband may be secreted in the groin area where the person knows it is unlikely that jail staff will thoroughly search, or the contraband may be secreted internally. There are also places like socks, shoes, underwear, and legal papers where staff often miss the small packets of drugs, especially since fentanyl has become so prevalent.

While the SDSD argued against the increased use of body scanning because of the personnel resource commitment, it used the strip search policy as evidence of their adequate practices. It did not appear to consider that a strip search takes longer and is far more invasive than a body scan.

In the SDSD response to the Grand Jury recommendations, it made two significant, but unsupported assertions:

1. "Contraband interdiction is one of our highest priorities in jail security. As such, the Sheriff's Department believes sworn deputies who are trained in narcotic introduction, investigation, and identification provide the highest level of prevention related to contraband smuggling."
2. "The safety of staff and individuals dictates that a sworn deputy conduct the body scanning and follow up when contraband is present or suspected. Deputies have a primary responsibility of jail security."

There is no evidence supporting the SDSD assertion that a sworn staff member would better detect contraband in body scans. Sworn staff have repeatedly missed abnormalities in body scans where people have overdosed and even died.[57] Sworn staff should conduct the pat search before the body scan, and if the specialized narcotics training existed, the sworn staff might alert the scanner operator that there was a greater likelihood of contraband. Still, it would have no effect on the operation of the scanner. Arguably, a non-sworn staff member operating the scanner would give more time for the sworn deputy to use their specialized training and develop evidence that the individual was concealing contraband. Better training to identify abnormalities is needed for both sworn and non-sworn staff who operate the scanners to identify abnormal scans properly.

Similarly, most jails in the U.S. use non-sworn staff during the intake process. Non-sworn staff often fulfill medical screening, data collection, mugshots, and similar non-contact duties. Operating the body scanner and interpreting the results would be another non-contact function that non-sworn staff could do.

One of the most significant and correctable flaws in SDSD's contraband interdiction approach can be found in the lack of direction in the body scanner policy. The policy only requires a body scan for new IPs assigned to a housing area. A key part of the policy uses the word "considered" for other uses:

• "As a proactive measure to reduce contraband from entering the detention facilities, body scan use should be **considered** for the following:
  1. Incarcerated persons who are returning to the facility from court, clinic runs, temporary out-of-custody, work assignments or any other event that caused them to be removed from the secure area of the facility,

---

[57] SD_440432; SD_444419; CLERB case 22-026 (Schuck death), from the board minutes on February 13, 2024; SD 050607-18 (Moreno death).

2. Incarcerated persons returning from **social or professional contact visits**,
3. Incarcerated **workers returning to their housing unit** after performing their assigned duties,
4. Any incarcerated person based on the recommendation of the Detentions Investigations Unit, or a canine handler, and concurrence of the watch commander or designee." [emphasis added]

These represent obvious opportunities where an IP might have one-on-one contact and receive contraband. These conditions should be mandatory for a body scan.

The Grand Jury framed the practical consideration well when it wrote, "Considering the human and financial costs when someone dies in custody or needs medical attention due to a drug overdose, or to defend and settle lawsuits, the costs of scanners and the investment in people and time to learn how to operate them would seem to be a reasonable investment. Money saved from defending and paying off lawsuits could be better spent by purchasing more scanning machines, enhancing scanning efforts after IP's have jail visits, court visits, or medical appointments, and hiring and training additional sworn and professional staff to operate scanners."

SDSD's July 29, 2024, Directive #2407-02 subjects all staff, contractors, vendors, and visitors to potential searches to be conducted at random. CLERB's repeated recommendation to body scan all staff, contractors, vendors, and visitors would be more effective at curbing the introduction of drug contraband into the jail. Deputies are less likely to use their discretion to "randomly" screen staff who are friends or supervisors. Deputies are also less likely to be as thorough with screening custody staff as they would be with contractors, vendors, and professional visitors with whom they have less frequent contact.

The SDSD deponents seem to disregard the idea that deputies could be responsible for introducing contraband into the jail. This is a dangerous assumption based on personal feelings rather than objective knowledge. Staff, contractors, and vendors may be motivated by several reasons for bringing contraband into the jail. Financial gain, family relationships, blackmail, and even threats of retaliation may cause someone to risk bringing contraband into jail. Deputies are humans and humans can be coerced. Even in 2021, Lt. Baggs recognized the problem when she wrote about jail staff smuggling drugs into the jail. While the likelihood of a deputy introducing contraband is statistically less than healthcare workers and other contractors and visitors, when the contraband problem is as serious as it is in the SDSD jails, all reasonable measures should be taken to save lives. This includes advanced screening of all people who enter the jail.

While the evidence is scattered over time, it showed that SDSD increased its number of body scanners in late 2023. What was missing in the evidence is how much, if any, they increased their use of body scans to detect contraband. Deponent Bourgeois touted that the newly formed (circa 2023) CNIT unit had seized 750 g of fentanyl, and he claimed the 16% increase in drug

incidents was from better seizures. Neither of these assertions was supported with any evidence of whether a more significant proportion of drugs were being seized compared to what existed in the jail.

While the SDSD seems to assert that their use of detection canines has decreased the amount of drugs coming into the jail, there was no evidence to support that. Canines can be an effective tool, but they are limited in the time they can be used to search for drugs, as working dogs tire out quickly and require rest.

*Searches of Mail and Parcels*

Using staff to search for drugs and other contraband in mail and parcels may be consistent with generally accepted jail practices if it were not for the concerning numbers of overdoses and drug-related deaths in the SDSD jail system. If there were no deaths and overdoses in jail, the human-based system may be sufficient. That is not the case in San Diego County.

Not only would the use of technology likely improve the detection of drugs coming into the jail, but it would also be safer for the employees handling the mail. Better technology exists and is in use in other jails and prisons, one of the most advanced being real-time 3-D imaging that can detect liquids, powders, drugs, electronics, drug-laced papers, Suboxone, and other contraband. One manufacturer claims their company's imaging is 300 times more sensitive than an X-ray at detecting small amounts of powders and liquids.[58] SDSD should invest in better technology to interdict contraband drugs that otherwise will and do enter the Jail and subject people to overdoses and deaths.

Drug-laced papers have become a significant problem in jails across the U.S. Some have even resorted to stopping the delivery of all personal mail and only using email through tablets or creating copies of all incoming personal mail. The simplest, fastest, and most efficient opportunity for the SDSD is to use high-tech contraband-detecting scanners.

**F. Conclusion – Contraband Control**

The evidence shows that SDSD has made efforts to decrease the flow of contraband into the jail, especially drugs. Even so, the data shows that those efforts are not sufficient. While some counties may struggle to afford the technology discussed in this report, San Diego County is not one of them. Financial hardship was not among the reasons in the evidence why the SDSD is not using better technology. Instead, the problem appears to be based more on apathy and disbelief

---

[58] https://corrections.raysecur.com/

of what should be obvious – people are bringing drugs into the jail, and not all of those people are IPs.

SDSD Jail Commander Gloria Soto-Meza, said it well in an email when she wrote, "Drug smuggling by staff into jail is a serious issue that needs to be addressed urgently. The presence of drugs within correctional facilities not only compromises the safety and security of IPs but also undermines the effectiveness of rehabilitation programs. To end this illicit activity, it is crucial to implement a comprehensive strategy that includes several key measures." She went on to make several recommendations, but the first one was, "… enhancing the screening process for staff members entering the jail premises is essential. This can be achieved by implementing stricter security protocols, such as mandatory bag checks, body scans, and random drug tests. By conducting thorough and regular screenings, the chances of drugs being smuggled in by staff can be significantly reduced."[59]

While Ms. Soto-Meza did not address all the ideas for reform, she clearly expressed the need for them. Not all deaths in jails are preventable, but too many in the SDSD jails are.


## II.  SAFETY CHECKS

Nothing is more important than timely and attentive safety checks to ensure the safety and well-being of IPs. The deputies conducting safety checks are the only reliable lifeline for an IP who needs help. Inmates may experience medical distress such as cardiac arrest, a stroke or an injury and need immediate medical attention. While most jails also rely on emergency intercom buttons to notify deputies of crises, the SDSD lacks that ability in many areas and, therefore, becomes reliant upon safety checks. Inmates in isolation who suffer medical distress may not have the ability to yell or bang on the door to draw attention. Still, even IPs in open housing areas cannot rely on other IPs to call for help. In the previously discussed death of Omar Arroyo Moreno, he collapsed on the floor and died while other IPs in the holding cell made no effort to summon help.

Jail standards and policies vary slightly across the U.S. for safety check times, but having worked in more than 40 states, I have never seen them exceed 60 minutes for low custody-level IPs. While some states shorten the maximum time between checks, generally accepted jail practices require more frequent checks for higher-risk IPs. Inmates on medical observation, mental health observation, or who have been violently acting out are often required to be checked no more than every 30 minutes. Inmates on suicide watch or other very high-risk situations are often required to be checked no more than every 10 or 15 minutes. Generally

---

[59] SD 547833

accepted jail practices also require all of these checks to be at irregular intervals, meaning the checks should not be only at the time required but staggered variations to make them unpredictable.

Even more important than the timeliness of checks is their quality. Generally accepted jail practices require deputies to see "proof of life," sometimes called "skin and breath." An attentive glance may be adequate if a deputy sees an IP standing at the door. However, another IP in the cell may be sleeping on their bunk. Generally accepted jail practices require the deputy to stop and look at the second IP long enough to ensure they are alive and reasonably well. While California refers to these as safety checks, a more common term nationally is a "well-being check," denoting the importance of ensuring the IP is well.

California Title 15 was updated in 2023 to require more attentive safety checks. The current definitions are:[60]

- "Safety checks" means direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of incarcerated people.
- (a) Safety checks will determine the safety and well-being of individuals and shall be conducted at least hourly through direct visual observation of all people held and housed in the facility. (b) There shall be no more than a 60-minute lapse between safety checks. (c) Safety checks for people in sobering cells, safety cells, and restraints shall occur more frequently as outlined in section 1055 [safety cell checks required twice every 30 minutes with no more than a 15-minute lapse between checks], section 1056 [sobering cell checks required every 30 minutes], and section 1058 [checks on IPs in restraints are "continuous direct observation" at least twice every 30 minutes] of these regulations.

## A. For Years, Oversight Entities Have Recommended Changes to SDSD's Safety Check Policies and Practices

In April 2018, Disability Rights California (DRC), the designated protection and advocacy system charged with protecting the rights of people with disabilities in California, published a report titled "Suicides in San Diego County Jail: A System Failing People with Mental Illness." The report was the culmination of an investigation into conditions at the San Diego County jails that began in 2015. DRC found that inadequate safety checks were observed in several cases in which IPs died by suicide. "In at least one case, hourly safety checks were not completed pursuant to jail policy during the time period the inmate died by suicide. In video and record

---

[60] California Title 15, 2023 version

reviews of at least three inmates who died, checks were completed inadequately – either not completed timely or in a manner that failed to meaningfully assess the welfare of the inmate."[61] The report noted one suicide in which two deputies entered the housing unit and completed their checks of 40 cells in 17 seconds, "far too quickly to complete meaningful checks."[62]  DRC recommended that SDSD provide annual training for sworn staff that includes reminders about the requirement for ensuring the welfare of IPs during security/welfare checks and implement a method to track and audit the timeliness and adequacy of safety checks.[63]

As a result of the findings within the draft DRC report, San Diego's Office of the County Counsel retained Lindsay Hayes, a nationally recognized expert in the field of suicide prevention within jails, to independently conduct an on-site assessment of current suicide prevention practices, as well as offer any appropriate recommendations for the revision of suicide prevention policies and procedures.  Hayes' June 2018 report "strongly recommended" that SDSD consider increasing deputy safety check rounds of segregation housing units and other units where suicidal people are housed from 60-minute to 30-minute intervals.[64]

On December 7, 2021, after sustaining findings that deputies failed to provide emergency medical care to IP Lazaro Alvarez, who died on November 22, 2020 from sudden cardiac arrest due to acute myocardial infarction and methamphetamine and fentanyl toxicity, CLERB recommended that the San Diego Sheriff's Department revise its Detention Policies and Procedures Section I. 64, entitled, "Safety Checks: Inmates, Housing, and Holding Areas," to mandate proof of life verification through visual checks every 60 minutes during the booking process.[65]

On February 10, 2022, SDSD responded by letter to CLERB's findings regarding IP Lazaro Alvarez, Case 20-113.[66]  SDSD's response did not address CLERB's recommendation regarding proof of life verification in safety checks.

In February 2022, the California State Auditor issued Report 2021 109, "San Diego County Sheriff 's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of

---

[61] April 2018 Disability Rights California Report, Suicides in San Diego County Jail: A System Failing People with Mental Illness, Appendix A at 15-16.
[62] April 2018 Disability Rights California Report, Suicides in San Diego County Jail: A System Failing People with Mental Illness, Appendix A at 15-16.
[63] April 2018 Disability Rights California Report, Suicides in San Diego County Jail: A System Failing People with Mental Illness, Appendix A at 16.
[64] June 22, 2018 Lindsay M. Hayes Report on Suicide Prevention Practices within the San Diego County Jail System, p. 57.
[65] CLERB case 20-113, from the board minutes of December 7, 2021.
[66] February 10, 2022 letter from SDSD in response to December 7, 2021 CLERB Policy Recommendation re Case 20-113/Safety Checks, available at: https://www.sandiegocounty.gov/content/dam/sdc/clerb/meetings/2022/2022-agenda/03-2022/Att.G-20-113-Sustained%20Finding%20SDSD%20Response.pdf

Individuals in Its Custody." The Report made numerous findings regarding the inadequacies of SDSD's safety check policies and practices:

- "[I]n our review of 30 in custody deaths, we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours. Although the Sheriff's Department's assistant sheriff of detentions indicated that the department has a process for periodically monitoring whether staff members adequately perform safety checks, it is not documented in policy."[67]

- SDSD's "safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest."[68]

- In almost a third of the deaths it reviewed, the State Auditor found "issues with the response time of sworn staff or medical staff may have resulted in unnecessary delays in performing lifesaving measures."[69]

- "San Diego County contracted with a consultant [Lindsay Hayes] in 2018 to assess suicide prevention practices within the Sheriff's Department's jail system. One of the consultant's recommendations was for the Sheriff's Department to consider increasing safety checks of individuals who are housed in isolated housing units from every 60 minutes to every 30 minutes, given the association between suicide and isolated housing placement. However, the department responded that making this change was not feasible because of the physical layout of its jail facilities, the number of inmates, and the required staffing."[70]

- "[M]any of the lawsuits we reviewed that San Diego County settled have highlighted some of the same problems at the Sheriff's Department that we have identified related to inadequate safety checks…"[71]

In its response to the State Auditor Report, SDSD stated that it would (1) "reevaluate current policy and incorporate best practices," (2) explore "technologies with monitoring a 'proof of life' for all incarcerated individuals with minimal sleep interruption through staff conduct," (3) develop a "more robust facility Wi-Fi system capable of supporting technological advancements

---

[67] February 2022 State Auditor Report, p. 2.
[68] February 2022 State Auditor Report, pp. 24-26.
[69] February 2022 State Auditor Report, pp. 26-27
[70] February 2022 State Auditor Report, pp. 39-40
[71] February 2022 State Auditor Report, p. 41.

Dunsmore v San Diego Co Raney Report

in monitoring the welfare of our population," and (4) integrate "Body-worn Cameras (BWC) into the custodial setting [to] greatly assist in showing the point of view each deputy has during the safety checks."[72]  SDSD also said that its line supervisors conduct electronic line reviews every shift and for supervisors to conduct audits of random safety checks and that SDSD will formalize this into policy.[73]

On December 8, 2022, CLERB issued a report of death investigation in Case No. 21-0169 regarding the death of Saxon Rodriguez at Central Jail.[74]  In sustaining a finding that deputies failed to conduct timely safety checks, CLERB found that 65 minutes and 28 seconds elapsed between the last uneventful direct visualization by SDSD staff and the direct visualization at the time Rodriguez was determined to be unresponsive. CLERB observed that SDSD's practices related to safety checks do not comply with Title 15 and its own SDSD policies requiring the direct visual observation of incarcerated persons with no more than a 60-minute lapse between observations.

CLERB concluded its death investigation of Saxon Rodriguez by making a policy recommendation:  "It is recommended that SDSD take all necessary measures to change its current practice to conform with statute and its own existing policy by mandating that every incarcerated person be directly observed by sworn staff at random intervals not to exceed 60 minutes (30 minutes for Medical Observation Beds and in Psychiatric Stabilization Units and 15 minutes for safety cells), as opposed to simply ensuring the safety checks start within the mandated time-period."[75]

On February 22, 2023, SDSD responded by letter to CLERB's findings Saxon Rodriguez, Case No. 21-0169.[76]  SDSD's response rejected CLERB's recommendation to mandate that every incarcerated person be directly observed by sworn staff at intervals not exceeding 60 minutes.

## B.  Safety Check Policies & Procedures

Safety Checks:  Housing and Holding Areas of Incarcerated Persons – I.64, September 27, 2022[77]

---

[72] February 2022 State Auditor Report, pp. 108-09.
[73] February 2022 State Auditor Report, p. 109.
[74] SD_050653-62.
[75] SD_050661.
[76] February 22, 2023 letter from SDSD in response to December 8, 2022 CLERB Policy Recommendation re Case 21-0169/Safety Checks, available at: https://www.sandiegocounty.gov/content/dam/sdc/clerb/meetings/2023/march-2023/Att.F-21-069-PR%20Response.pdf
[77] SD 064780-84.

*Policy:*

- "Sworn staff will conduct safety checks of incarcerated persons, housing areas, holding areas and vacant cells through direct visual observation (i.e., direct personal view of the incarcerated person/area without the aid of audio/video equipment). Safety checks of incarcerated persons consist of looking at the incarcerated persons for any obvious signs of medical distress, trauma or criminal activity. Safety checks shall be conducted at least once within every 60-minute time period. Safety checks of Medical Observation Beds (MOB) and in Psychiatric Stabilization Units (WPSU/PSU) shall be conducted at least once within every 30-minute time period. The intervals of the safety checks, within the 60 or 30 minute time period, shall vary and must be logged in the Jail Information Management System (JIMS). In addition to observing the safety and welfare of incarcerated persons, sworn staff shall also be attentive to security and maintenance issues as well as environmental factors (e.g., temperature, odors, cleanliness) while conducting safety checks."

*Conducting Safety Checks:*

- "During safety checks in housing locations, sworn staff will physically enter each module and observe each incarcerated person present in the common areas of the module looking for obvious signs of medical distress, trauma, or criminal activity (e.g., dayrooms, showers, exercise areas, holding areas). In cell style housing modules, sworn staff shall stop at or enter each cell and observe each incarcerated person. In dormitory style housing modules, sworn staff shall walk by each bunk in a manner that permits them to observe each incarcerated person."

*Logging of Safety Checks:*

- "At the conclusion of the safety check, an entry may be logged in JIMS using the event type "11-53 Notes," if there was anything encountered during the safety check. Items that necessitate documentation include, but are not limited to:
  1. Incarcerated person in medical distress (e.g., asthma attack, chest pain, etc.),
  2. Incarcerated person suffering medical trauma (e.g., bleeding, ligature marks, etc.),
  3. Criminal activity (e.g., drug usage, fighting, etc.),
  4. Facility damage (e.g., broken fixtures, graffiti, etc.),
  5. Maintenance issues (e.g., clogged toilet, running water),
  6. Different or additional sworn staff conducted the safety check,
  7. Anything that delayed the start or completion of the safety check."

*Compliance Reviews of Safety Checks:*

A. "The Facility Commander will identify a sworn supervisor to review safety checks of housing or holding areas within the facility. The sworn supervisor will review safety checks of one complete shift from each team on an ongoing monthly basis. Each facility will detail in a green sheet a schedule of locations that will be reviewed for compliance and the month the review will take place."

B. "JIMS Area Activity Logs and corresponding video footage shall be utilized for the review of safety checks if/when available."

C. "The completed reviews will be documented and reviewed via chain of command by the facility commander for which the review was conducted. Once reviewed and approved, records of the reviews will be retained at each facility electronically for two years."

D. "Facilities will not be limited on number of reviews they can conduct. Supplemental reviews may be conducted by whichever means the facility commander finds appropriate. Reviews exceeding the requirement listed in this policy and procedure section shall also be reviewed, approved, and retained as outlined above."

Count Procedures of Incarcerated Persons – I.43, May 9, 2022, Policy [78]

*Policy:*

- "All incarcerated persons at each detention facility shall be accounted for. Sworn staff will physically conduct counts of incarcerated persons. All counts require sworn staff to verify each incarcerated person's well-being through "verbal or physical acknowledgment" from the incarcerated person. In addition, sworn staff will look for any obvious signs of medical or physical distress (e.g., asthma attack, chest pain, etc.), trauma (e.g., bleeding, ligature marks, etc.) and/or criminal activity (e.g., drug usage, fighting, etc.). Incarcerated persons away from the facility for authorized reasons (e.g., court, medical appointments, etc.) will be accounted for upon their return."

*Procedure, Definitions:*

- "Verbal or physical acknowledgment – a response from the incarcerated person to sworn staff that proves the incarcerated person is alive, awake, conscious, and responsive. Verbal acknowledgment includes the use of spoken words, while physical acknowledgment includes actions of the body (i.e., hand gestures, head nod, etc.), in confirmation that the incarcerated person notices and is responding to sworn staff."

---

[78] SD 064736-39.

- "Soft Count - a count of the number of incarcerated persons in a facility or housing unit which verifies each incarcerated person's well-being through verbal or physical acknowledgment from the incarcerated person. It also determines if the correct numbers of incarcerated persons are currently in the facility or housing unit."
- "Hard Count – A count which verifies each incarcerated person's well-being through verbal or physical acknowledgment from the incarcerated person AND uses one of the approved methods detailed in Section II(B) of this policy to confirm the identity of every incarcerated person in a facility."

## C.  SDSD's Safety Check Logs and Compliance Reviews of Safety Checks

SDSD produced PDF logs of safety checks from January 1, 2021, to December 31, 2023.[79] Because the report was ordered by "Activity Dt/Tm," safety checks are organized by the time each safety check was started in the entire jail facility, regardless of the housing unit.  Because there are numerous housing units in each jail facility, identifying the time between safety checks in one specific housing unit would be extremely difficult, if not impossible.  To put it another way, instead of having all the checks for Housing Unit 1, then Housing Unit 2, then Housing Unit 3 (etc.), the data shows the first check for Housing Unit 1, the first check for Housing Unit 2, the first check for Housing Unit 3 (etc.), then the second check for Housing Unit 1, the second check for Housing Unit 2, the second check for Housing Unit 3 (etc.).  Had the logs been produced in Excel or native format that could be exported to Excel, one could sort the checks by unit and then compare each successive entry to verify whether checks are occurring at least every 60 minutes (or 30- or 15-minute intervals).

SDSD produced monthly internal audits for safety checks conducted in August, September, and October 2023.   Each audit evaluated the safety checks of five different teams at Central Jail.

The August 2023 audit[80] shows 33 of 75 safety checks were conducted in accordance with established policy and procedure:

- Team 1: "11 of the 13 safety checks were conducted in accordance with established policy and procedure."
- Team 2: "10 of 13 safety checks were conducted in accordance with established policy and procedure, while three safety checks were not."
- Team 3: "One of the 15 safety checks were conducted in accordance with established policy and procedure, while 14 were not."

---

[79] E.g., SD_1090340-1091339.
[80] SD_818778-85.

- Team 4: "One of the 13 safety checks were conducted in accordance with established policy and procedure, while 12 were not."
- Team 5: "10 of 21 safety checks were conducted in accordance with established policy and procedure, while 11 safety checks were not."

The September 2023 audit[81] shows 15 of 63 safety checks were conducted in accordance with established policy and procedure:

- Team 1: "Two of the 14 safety checks were conducted in accordance with established policy and procedure, while 12 were not."
- Team 2: "Five of 13 safety checks were conducted in accordance with established policy and procedure, while 8 safety checks were not."
- Team 3: "Two of the 13 safety checks were conducted in accordance with established policy and procedure, while 11 were not."
- Team 4: "Three of the 14 safety checks were conducted in accordance with established policy and procedure, while 11 were not."
- Team 5: "Three of the 9 safety checks were conducted in accordance with established policy and procedure, while 6 safety checks were not."

The October 2023[82] audit shows 31 of 85 safety checks were conducted in accordance with established policy and procedure:

- Team 1: "None of the 14 safety checks were conducted in accordance with established policy and procedure."
- Team 2: "Six of the 14 safety checks were conducted in accordance with established policy and procedure, while 8 safety checks were not."
- Team 3: "Nine of the 14 safety checks were conducted in accordance with established policy and procedure, while five were not."
- Team 4: "One of the 14 safety checks were conducted in accordance with established policy and procedure, while 13 were not."
- Team 5: "Fifteen of the 29 safety checks were conducted in accordance with established policy and procedure, while 14 safety checks were not."
- In total, the August, September, and October 2023 audits produced in discovery show 79 of 223 safety checks were conducted in accordance with established policy and procedure. Accordingly, SDSD's internal audits show that approximately one-third

---

[81] SD_818786-99.
[82] SD_818642-59.

(35%) of safety check are compliant with SDSD's Policies and Procedures and approximately two-thirds (65%) are not compliant.

## D.  PMK Testimony Regarding Safety Checks

On May 3, 2024, Lieutenant Isaac Alvarado, with the Detention Services Bureau, was deposed as the Sheriff's Department's person most knowledgeable about safety checks.

- Alvarado testified that safety checks are performed for multiple housing units at a time; for example, a safety check on one of the housing floors at Central Jail will include Modules A, B, C, D, and E, and that it often takes longer than 20 minutes to conduct a safety check in a housing unit with five modules.[83]
- Alvarado testified that Jail Information Management System (JIMS) logs when a safety check begins and when the log entry is made.[84]
- Alvarado testified that Safety Check P&P I.64 does not specifically state that safety checks require a proof of life check.[85]
- Alvarado testified that safety checks are conducted every 60 minutes in booking cells.[86]
- Alvarado testified that it is important for the safety and security of both sworn staff and incarcerated people to vary the times of safety checks, but that he was unaware whether there is any guidance as to how much the times should vary.  In practice, the checks vary by a few minutes each check.  SDSD has not conducted training on how often the safety checks should vary.[87]
- Alvarado testified that the only housing units that have safety checks conducted more frequently than once every 60 minutes are MOB, PSU, and EOH units.[88]
- Alvarado testified that sworn staff do not always stop at each cell in cell-style housing and instead sometimes just walk on by during safety checks.[89]
- Alvarado testified that a deputy conducting safety checks has discretion to enter notes into JIMS regarding anything encountered during the safety check, and is not required to log into JIMS observations of medical distress or blood and/or feces on the IP's cell walls if observed during safety checks.[90]

---

[83] Pages 69-70.
[84] Pages 71-72.
[85] Pages 74-75.
[86] Page 77.
[87] Pages 78-80.
[88] Page 80.
[89] Pages 81, 97.
[90] Pages 83-84, 86.

Dunsmore v San Diego Co Raney Report

- Alvarado testified that there is no requirement for a deputy to log a safety check in JIMS within a certain amount of time after completing the safety check.[91]
- Alvarado testified that a safety check can include observations of up to 100 IPs, and that deputies are not required to enter notes of their observations into JIMS.[92]
- Alvarado testified that the lineup training deputies receive on safety checks does not require custody officers to look for proof of life during safety checks.[93]
- Alvarado testified that he is not aware of any plans by SDSD to change the way safety checks are audited.[94]
- Alvarado testified that he was unaware whether CLERB had made any recommendations with respect to ensuring proof of life during safety checks.
- Alvarado testified that he did not know what commanders do with audits or whether the Department analyzed trends in the safety check audits.[95]
- Regarding Sheriff Martinez's statements in March 2022 that the SDSD was investing in better safety checks, Alvarado testified he did not know of any investments having been made.[96]

## E. Death Cases

The following is not intended to represent all death cases related to inadequate safety checks in the SDSD jail system, only a selected sampling from recent CLERB and CIRB reports:

On January 26, 2020, Blake Wilson died from acute fentanyl, acetyl fentanyl, butyryl fentanyl, and heroin intoxication. CLERB sustained a finding. Wilson was last known to be alive at approximately 10:51 PM on January 25, 2020. At 8:22 AM the next morning, Wilson's cellmate alerted a deputy to Wilson's unresponsiveness. The deputy "immediately noticed Wilson's bare foot was very pale" and that "his face and exposed skin looked white." CLERB sustained a finding that a SDSD deputy failed to conduct an IP soft count, observing that the deputy conducting the "proof of life" soft count did not enter the cell, stopped and looked into it for approximately one second, and was unable to confirm that he viewed "signs of life" from the IPs in Wilson' cell.[97]

---

[91] Pages 84-85.
[92] Pages 85-86.
[93] Page 94.
[94] Page 96.
[95] Page 115.
[96] Pages 119-20.
[97] SD_ 468160-70.

On January 6, 2021, Omar Arroyo Moreno died in a holding cell at Central Jail after choking due to airway obstruction caused by ingestion of his cloth Covid-19 mask. CLERB's investigation revealed that on the night of his death, deputies, there was an "incomplete safety check that was started at 9:36 PM." The deputy "never completed his safety check" due to a use of force incident that occurred at approximately 9:38 PM. Video surveillance reviewed after his death showed Moreno appeared to have his mask on at 9:36 PM. He appeared to take his mask off and sit on a bench at 9:37 PM, at which time he slouched down and "appeared to be putting something in his mouth (possibly the mask)." Moreno then stood up at 9:38 PM "and the mask was no longer seen on his face or in his hands." Moreno collapsed onto the floor and had seizure-like activity at 9:41 PM and stopped moving at 9:42 PM. The subsequent safety check was started at 10:31 PM, but the deputy that conducted that safety check "did not check if Moreno was breathing and thought he was sleeping." Deputies discovered that Moreno was unresponsive at 10:49 PM during a hard count.[98]

On March 14, 2021, Louis Gomez died of COVID-19 pneumonia in the Vista Detention Facility. CIRB conducted a death review, in which the homicide detective "███████████████████████████████████████████████████████████████████████"[99]

On July 20, 2021, Saxon Rodriguez died from a fentanyl and methamphetamine overdose in the Central Jail. CLERB's investigation revealed that 65 minutes and 28 seconds elapsed between the last safety check by SDSD staff and the hard count check during which Moreno was determined to be unresponsive. CLERB noted that the late safety check was in violation of SDSD policy and Title 15 and stated that "as it pertains to the safety of incarcerated persons and the prevention of deaths or negative physical or mental health outcomes, every second counts." CLERB concluded that "The presence of drugs in the detention facility via unknown means in conjunction with the untimely check leads to a preponderance of evidence that the death was preventable." In its report of death investigation, CLERB "recommended that SDSD take all necessary measures to change its current practice to conform with statute and its own existing policy by mandating that every incarcerated person be directly observed by sworn staff at random intervals not to exceed 60 minutes (30 minutes for Medical Observation Beds and in Psychiatric Stabilization Units and 15 minutes for safety cells), as opposed to simply ensuring the safety checks start within the mandated time-period."[100] "SDSD responded but failed to adopt CLERB's recommendations."[101]

---

[98] SD 050607–18, expert's personal knowledge from civil litigation evidence.
[99] SD 1030439-45.
[100] SD 050653-62.
[101] CLERB case 21-125, from the board minutes of January 30, 2024.

On November 27, 2021, Robert Moniger died of COVID-19 pneumonia at Central Jail.  A CIRB death review investigation revealed that █████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ ."[102]

On December 1, 2021, Jerry Borunda died after ingesting fentanyl.  Borunda was placed in a safety cell during the booking process for homicidal ideations.  According to Policy and Procedure Section J.1 Safety Cells, every incarcerated person in a safety cell "shall be directly observed by sworn staff at random intervals not to exceed 15 minutes between checks."  Jail surveillance video showed the safety check during which Borunda was found unresponsive was performed 16 minutes and 33 seconds after the last safety check.  CLERB noted that SDSD's practice "is to start safety checks within the mandated time-period but not necessarily to directly visualize each incarcerated person within that time-period, thus resulting in innumerable instances where incarcerated persons are not directly visually observed within statutorily mandated time-periods."  CLERB recommended that SDSD "update its policy, Section J.1 Safety Cells: Definition and Use to read as follows: Every incarcerated person in a safety cell shall be directly observed by sworn staff at random intervals not to exceed 15 minutes between each direct visualization of the incarcerated person. The start time of each security check does not count towards the actual direct visualization of the incarcerated person."[103]

On July 26, 2022, James Bousman died from complications of resuscitated cardial pulmonary arrest due to acute fentanyl intoxication in the Vista Detention Facility.[104]  An internal affairs investigation into safety checks in connection with the death of Bousman found that the deputy responsible for the safety check entered into the JIMS system at 11:44 PM and engaged in insubordination because, as verified by video, the safety check actually occurred 12 minutes later, at 11:56 PM.[105]

On February 4, 2023, Ryan Thuresson died from combined fentanyl and fluorofentanyl toxicity at Vista Detention Facility.  In sustaining a board finding that SDSD "failed to conduct timely safety checks," CLERB's investigation revealed that approximately 61 minutes and 15 seconds elapsed between last direct observation of Thuresson and the direct observation which showed Thuresson was unresponsive.  CLERB again noted that SDSD's current practice "is to start safety checks within the 60-minute time-period but not necessarily to directly visualize each incarcerated person within that time-period, thus resulting in innumerable instances where

---

[102] SD 1030510-15.
[103] CLERB case 21-125, from the board minutes of January 30, 2024.
[104] CLERB case 22–096, from the board minutes of October 17, 2023
[105] SD_652477-87.

Dunsmore v San Diego Co Raney Report

incarcerated persons are not directly visually observed within statutorily mandated time-periods." "CLERB's position is that this delay was in violation of SDSD policy and Title 15."[106]

### E. American Correctional Association Accreditation Standard

The American Correctional Association accreditation standards include a standard for monitoring special management IPs that reads, "All special management (segregation) IPs are personally observed by a correctional officer at least every 30 minutes on an irregular schedule."[107] While these accreditation standards do not create a constitutional obligation, they guide jails and prisons in generally accepted corrections practices.

### F. Significant Opinions Regarding Safety Checks

As stated at the beginning of this section, safety checks are critical to ensuring the safety and well-being of IPs. Modern jail practices encourage "direct supervision" for IPs in housing units, meaning that a deputy is in the housing unit continuously throughout their shift. The SDSD uses direct supervision in very few housing areas, even though this practice has led to notably less violence and improved safety in other jails because the housing deputy can intervene immediately when tensions arise between two IPs, or someone needs help. In most of the jail housing units, the SDSD does not use direct supervision, so the timeliness and attentiveness of safety checks become even more critical.

Generally accepted jail policies and practices recognize that frequent safety checks can the likelihood of problems and save lives. Therefore, standards and administrators set maximum time limits but intend checks to be more frequent. Simply said, the more frequent the safety checks, the safer people in the jail will be. Even with standards of 60 minutes, many jails set policy to require them more often. The evidence shows that the SDSD operating philosophy and practice failed to recognize this concept.

*The SDSD did not comply with Title 15 and generally accepted jail practices regarding the timeliness of safety checks.*

The 2017 and 2023 versions of Title 15 required checks to be made no more than every 60 minutes. The SDSD has wrongly interpreted this to mean that checks should start at least every 60 minutes, regardless of the time lapse between checking individual cells or IPs. One of the

---

[106] CLERB case 23-013, from the board minutes of June 27, 2024.
[107] American correctional Association (2004), Performance-Based Standards for Adult Local Detention Facilities, 4th Edition, Lanham, MD. Standard ALDF 2A 52.

ways of making checks at irregular intervals is to reverse the direction of the check. However, if a deputy begins their check 59 minutes after the prior one but is immediately engaged in an event at the beginning of the check, IPs in the housing unit may go almost two hours without being checked on, which would still comply with SDSD written policy.

This incorrect interpretation suggests the SDSD failed to recognize the importance of frequent and irregular safety checks and instead allowed staff to violate the law and generally accepted jail practices. The evidence showed that only 35% of the safety checks in late 2023 complied with SSD's policy; however, it did not describe what was non-compliant. Given that the policy fails to comply with California Title 15 and generally accepted jail practices, it is clear that the SDSD is not taking reasonable measures regarding the timeliness or attentiveness of safety checks and their importance in reducing harm and increasing safety.

*During safety checks, the SDSD staff failed to comply with generally accepted jail practices regarding dutiful attention to IPs.*

Evidence showed that on various occasions, SDSD staff failed to stop and diligently attend to inmate well-being while conducting safety checks.  The failure of SDSD's policies on safety checks does not eliminate the need for staff to be attentive and ensure IPs are alive and well on each check.  Again, it is the core purpose of a safety check. Jail staff can become complacent about being attentive to safety checks if they do not have good policies and supervision to follow. Both are lacking regarding safety checks in the SDSD jails, allowing the apathetic approach to safety checks and ensuring IPs are alive and well.

*The SDSD failed to comply with generally accepted jail practices regarding other important areas for safety checks.*

Another indication of SDSD's poor approach to safety checks is the lack of policy requiring more frequent checks for higher-risk or higher-need IPs.  Not every IP has the same risk of suicide, self-harm, vulnerability or propensity to physical or sexual violence, or other situations where generally accepted jail practices require more frequent safety checks.  These needs, and the more frequent checks to address them, are widely accepted in other jails.  Most commonly, people on suicide watch are checked every 15 minutes, and those in special housing with an identified risk are checked every 30 minutes.  The evidence suggests the SDSD does not use 30-minute checks outside the medical and psychiatric units for other higher-risk or higher-need IPs, causing them an unnecessary risk of harm.

For all these checks, jail staff should log "unusual occurrences," a common term in safety check policies.  When a deputy sees an IP acting unusually, complaining of a medical concern, refusing to eat, becoming hostile, or behaving in any other manner that other custody staff or medical

and/or mental health staff should know about, it should be logged for those pertinent staff to know about during future contacts. The SDSD safety check policy reads, "If there was anything encountered during the safety check," "an entry **may** be logged…." and lists seven conditions as examples of what could be logged. That is a poorly formulated policy because there's always something encountered during a safety check. More importantly, the policy is permissive regarding a deputy's discretion to log by saying the encounter "may" be logged. These entries should not be discretionary as they sometimes pertain directly to the life and safety of an IP.

Lastly, the evidence shows SDSD logs start times for safety checks but conducts safety checks for multiple cells and/or housing units in that time block, making that time inaccurate. Generally accepted jail practices require logs to show a reasonable close time when each cell or housing unit was checked. Each housing unit should be logged separately to ensure the timeliness of safety checks, facilitate supervisor reviews, and reconstruct timelines after an incident.

### G. Conclusions: Safety Checks

Jails with good safety check practices have good leadership practices that teach and train staff and hold them accountable to policies. However, it is difficult for SDSD to hold its staff accountable to policy when the poor policy fails to comply with generally accepted jail practices to ensure the timeliness and quality of safety checks. SDSD's responses to recommendations suggest it perceives safety checks as tasks to be done rather than opportunities to prevent harm and save lives. This seems to have translated into a similar perspective by staff who are allowed to be late with checks and pay little attention to the IPs in their care. Often, staff will do what is required but may or may not do more. When the policy and supervision of SDSD allow poor safety check practices, it is predictable that the staff will not be diligent.

### III. INTERCOMS

SDSD safety check policies and practices only anticipate a deputy being in direct supervision of most of the IP population roughly once an hour. Emergencies can and do happen during the other 59-plus minutes between safety checks. Cardiac events, strokes, diabetic reactions, injuries, suicide attempts, fights and other life-threatening events occur where IPs need immediate aid from custody or medical staff.

Additionally, IPs commonly believe that staff may listen to their conversations using the intercom, and therefore, they try to defeat it. Inmates often cover the speakers with toilet paper, toothpaste, soap and other substances. The mechanical parts of the intercom may also stop functioning correctly. For these reasons, it is important for jail staff to regularly inspect intercoms and ensure they are in proper working order.

## A. SDSD's Policies and Practices Related to Broken, Obsolete, and Muted Intercoms

On June 13, 2017, after sustaining a finding that, in connection with an in-custody death, a deputy "failed to respond to an IP's attempt to contact him through the jail's intercom system," CLERB made the following recommendations:

- "1. It is recommended that the San Diego Sheriff's Department ensure compliance with Sheriff's Policy I.1, Emergency Alarms Systems that explicitly directs the Control Deputy to dispatch assistance when an inmate emergency alarm is activated. To address an unspecified element of this policy, it is recommended that an addendum to the existing policy be drafted that directs the Control Deputy to immediately check the inmate intercom monitor for visual alerts at the beginning of each shift, and to ensure that the audio alerts on the monitor have not been disabled."
- "2. It is further recommend that policy be drafted that strictly prohibits detention staff from muting or otherwise disabling the audio component of the inmate intercom monitor, or lowering its volume to an inaudible level."[108]

By letter dated July 11, 2017, SDSD responded to the San Diego County Grand Jury's recommendation to "Follow through with the County's CAO Recommended Operational Plan to replace outdated technology systems at George Bailey Detention Facility."[109]  SDSD stated, "This recommendation has not yet been implemented but will be implemented in the future. The scope of work includes replacement and integration of the CCTV camera and video recording systems and all of the security controls (e.g., door and gate controls, fence alarms, **intercoms,** deputy/staff distress systems, inmate housing unit lighting, plumbing flush control valves, etc.). …. The design process for GBDF will begin during CY 2018 with project completed in mid to late CY 2019." (Emphasis added.)

In June 2018, the County's retained expert, Lindsay Hayes, submitted a report stating that "to ensure that IPs placed on suicide precautions are housed in "suicide-resistant" cells, facility officials are strongly encouraged to address the following architectural and environmental issues: … 12) Cells should have an audio monitoring intercom for listening to calls of distress (only as a supplement to physical observation by staff)."[110]

On May 2, 2022, Plaintiffs in this case filed a motion for preliminary injunction in which they alleged that Defendants failed to maintain the intercom system and that their intercom practices

---

[108] CLERB case 16-027, from the board minutes of August 8, 2017 (Dkt. 119-3 at ECF 800-802).
[109] July 11, 2017 SDSD Response to San Diego County Grand Jury Report "Detention Facilities – San Diego County" Dated June 1, 2017.
[110] June 22, 2018 Lindsay M. Hayes Report on Suicide Prevention Practices within the San Diego County Jail System, pages 79-81.

were ineffective.[111]  Plaintiff Dunsmore submitted a supporting declaration stating that no one responded to his emergency intercom calls while he was choking on food.[112]  IPs Dylan Lacroix and Michael Keavney submitted declarations stating that deputies did not respond to their intercom calls to summon medical help for their cellmate who died of Covid-19.[113]  Plaintiff Sepulveda submitted declarations stating that no one responded to his intercom calls when he tried to get help to stop the homicide of one IP and the violent attack of another.[114]  Plaintiff Clark submitted a declaration stating that deputies did not respond to his intercom calls for urgent staff attention.[115]  Plaintiff Zoerner submitted a declaration stating no one responded to her intercom calls when she tried to summon help while experiencing heart palpitations; she "began screaming because I felt like no one was paying attention, and banged my head against the cell window to get attention."[116]

In April 2022, SDSD changed its policies and procedures at Central Jail (not any other of the jail facilities) relating to checking intercoms and ensuring that they are not muted.[117]  Captain Adamos testified that "At the Central Jail, we have implemented a process to check the intercom buttons in the intake process and other holding areas at least twice daily…directing the 1st and 2nd floor emergency call intercoms to be checked each shift during the Sergeant's daily supervisor inspection safety check."[118]  Captain Adamos also testified that "There is a way to temporarily disable calls from a particular cell for a period of 15 minutes; however, this is to be used sparingly if the repeated calls from one cell are impeding safe and effective control position operations and only after floor deputies have verified there is no emergency."[119]

---

[111] Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification, Dkt. 119-1.

[112] Declaration of Darryl Lee Dunsmore ISO Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification (Dkt. 119-17), paragraph 36.

[113] Declaration of Dylan Lacroix ISO Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification (Dkt. 119-20), paragraph 6; Declaration of Michael Keavney ISO Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification (Dkt. 119-31), paragraph 5.

[114] Declaration of Gustavo Sepulveda ISO Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification (Dkt. 119-23), paragraphs 3-5; Reply Declaration of Gustavo Sepulveda ISO Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification (Dkt. 162-11), paragraphs 3-4.

[115] Declaration of James Clark ISO Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification (Dkt. 119-25), paragraph 10.

[116] Reply Declaration of Laura Zoerner ISO Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification (Dkt. 162-14), paragraph 7.

[117] Exhibits B and C to Declaration of J. Adamos in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 153-2 at ECF 9-14).

[118] Declaration of J. Adamos in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 153-2), paragraph 4.

[119] Declaration of J. Adamos in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 153-2), paragraph 6.

In a string of emails dated July 6, 2022, to July 22, 2022, SDSD staff acknowledged that the intercoms at South Bay Detention Facility, Vista, and George Bailey were obsolete.[120]  In the email chain, Darren (Scott) Bennett, a Project Manager for SDSD, stated that the intercom system at South Bay Detention Facility "is not repairable.  This has been a known issue to be coming for some time by all, just like Vista and GB….  [R]epairing the obsolete system is not going to happen.  It could take from a few weeks to several months to devise a plan, figure out how to fund, and more importantly, get a procurement method in place."[121]

In a September 6, 2022 email string, SDSD staff acknowledged that part of the H3 pane of the intercom system at George Bailey has "been obsolete for 10 years" and that there "are no parts for the panel."[122]  As a result, the intercom system does not include the ability to communicate verbal information:  "the panel beeps in the deputy station but the deputies have to go to the cell to check on the IP and see what they need."[123]

On April 24, 2024, Jesse Johns was deposed as the Sheriff's Department's person most knowledgeable about the functionality, testing, and repair/replacement of the Jail's audio surveillance system.  Mr. Johns is a captain at San Diego Central Jail.

- Johns testified that an incarcerated person can get the attention of custody staff during an emergency by using audio intercoms, yelling, and/or demonstrating irregular behavior to capture the attention of a deputy who may be watching CCTV footage.[124]
- Johns testified that all housing units and cells have intercoms in them.[125]
- Johns testified that he did not know whether all of the intercoms at Central Jail were working.[126]
- Johns testified that he did not know of any plan to replace the entire intercom system at Central Jail.[127]
- Johns testified that SDSD is currently in the process of replacing the entire intercom systems at George Bailey and Vista.  However, the project at Vista has not yet started, and Johns did not know the progress of the project at George Bailey.[128]

---

[120] SD_704043-49.
[121] SD_704043-34.
[122] SD_637469-71.
[123] SD_637469.
[124] Pages 90-91.
[125] Page 91.
[126] Pages 92-03.
[127] Page 96.
[128] Pages 96-97.

- Johns testified that it has been known for years that Vista and George Bailey needed new intercom systems.[129]

## B. Intercom Policies & Procedures

Intercom Systems – I.2, May 9, 2022[130]

*Policy:*

- "Intercoms are generally located in areas accessible by incarcerated persons (e.g., dayrooms, cells, classrooms, etc.). Each facility shall maintain an intercom system to be utilized by incarcerated persons for the purpose of providing a means of communication between sworn staff and incarcerated persons. Intercom systems should be primarily used as a means of relaying and or summoning emergency assistance. Intercoms shall not be routinely muted or silenced."

Procedure: Use of Intercom:

- "In the event of an emergency or incident, an incarcerated person is to depress the intercom call button which activates an alarm on the receiving end (e.g., Housing Control, Central Control, etc.). The alarm will alert sworn staff of a possible emergency or incident that necessitates their attention. Sworn staff will answer all intercom calls in an expeditious manner and follow-up on the nature of the call."

Maintenance and Repair:

- "Intercoms shall be kept clear of obstructions and not be covered in any manner. Intercoms should be observed by staff during safety checks and/or hygiene inspections. If an intercom is found to be intermittently operable, it should be reported as soon as practical before it becomes completely inoperable."
- "In the event an intercom is inoperable, sworn staff shall report the issue to their respective administrative deputy or operations deputy. Upon notification of the issue, the administrative deputy or operations deputy will contact the security technician. The security technician will assess the issue and contact the contracted provider to remedy the problem. If the security technician is not available, the administrative deputy or operations deputy will relay the information to the Sheriff's Project Manager."

---

[129] Page 97.
[130] SD_064697-98.

Dunsmore v San Diego Co Raney Report

Policy Facility Security – Central Control – I.61, February 3, 2022[131]

Procedure:

- "Monitoring Systems: As directed in Detentions Policy I.1, I.2 and I.19, Central Control will monitor all systems for facility alarms, radio traffic, intercoms and camera systems. They will be primarily responsible for reporting any malfunctions or failures for repair. Central Control will utilize systems to determine locations in need of assistance or investigation and will direct staff to appropriate location."

San Diego Central Jail Green Sheet – "Facility Security – Control Touch Screen Operation," No. I.61.C.2 – April 15, 2022 (Central Jail only)[132]

Touch Screen Monitor Controls

- "At the start of each shift, or any time you relieve operations on a control touch screen, you must log off the previous user and log in using your own credentials. Once logged into the control touch screen each operator shall check the volume controls on the touch screen monitor and ensure the volume is at a reasonable level where any audible alarms can be heard from your work location. Deputies will not unplug or disable speakers connected to the touchscreen system. Control deputies will create a "10-8 Briefed" log entry. The deputy will note in the description field a volume check and intercom check conducted. If any issues are found, they will note the nature of the issue and what sergeant was notified."

- "Sergeants assigned to the movement or security position will visually inspect each touchscreen once per shift to insure proper function. This will be documented in the notes section of the JIMS Supervisor Log Review entry. Maintenance and SDCJ administrative notification will be required for any intercom found not in working order. If an intercom is found not to be operable, the cell will be placed out of service until the intercom is fixed. 30-minute safety checks will be required if any incarcerated person is placed in a cell with an identified inoperable intercom and the watch commander will be immediately notified."

- "DEPUTIES **SHALL NOT** MUTE THE TOUCH SCREEN VOLUME AT ANY TIME." (Emphasis in original.)

---

[131] SD_064773-74.
[132] Exhibit B to Declaration of J. Adamos in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 153-2 at ECF 9-10).

Touch Screen Linked Intercom

- Deputies operating a control touch screen should ensure their intercom system is operational and they are able to both communicate and receive communications on their intercom box. Any intercom issues or malfunctions should be relayed to the operations deputy as soon as practical.

San Diego Central Jail Green Sheet – "Sanitation and Hygiene Inspections," No. L.2.C.1 – April 26, 2022 (Central Jail only)[133]

Intercom Inspection:

- "Each week during hygiene inspection, deputies on floors 1 through 8 shall perform a check of all intercoms on their respective floors to ensure the intercoms are functioning, cleared of obstructions and confirmed with control that the intercom is in working order. Deputies shall complete a SDCJ Module Inspection Rating Sheet and document the status of every intercom. For all malfunctioning intercoms, the inspecting deputy shall notify the operations deputy."

## C. Death Cases

The following is not intended to represent all death cases in which intercoms at jail facilities did not work, only a selected sampling from recent CLERB reports:

On February 12, 2015, Richard Boulanger died at the jail from suicide. In sustaining a finding that a deputy "failed to respond to an IP's attempt to contact him through the jail's intercom system," Boulanger's cellmate reported that upon discovering the decedent's body hanging from the bunk bed with what appeared to be a rope fabricated from a sheet around his neck, he pressed the intercom button 4-10 times to call for help, but no one answered. Per the cellmate's account, it took approximately 10 to 20 minutes before deputies arrived." CLERB stated that the deputy "reported that sometime prior to his shift; the audio alert function of the IP intercom system had been muted, with the volume turned all the way down. This prevented him from hearing the cellmate's attempted contact. Visual alerts from the decedent's cell, however, had been triggered and were observable on the intercom monitor; but according to Deputy 1, he customarily does not check the monitor until approximately 30 minutes after arriving in the control room, and after

---

[133] Exhibit C to Declaration of J. Adamos in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 153-2 at ECF 11-14).

Dunsmore v San Diego Co Raney Report

performing his pre-check duties. On this particular day, he had not observed the monitor prior to being contacted by housing deputies requesting that he open the decedent's cell door."[134]

On July 13, 2022, Vianna Marissa Granillo died of septic shock.  CLERB's investigation noted that "In the follow up investigation conducted by Homicide detectives, it was discovered there was an apparent intercom issue in House 3C….  There was no way to determine if Granillo called for help using the intercom before discovery due to intercom issues. Furthermore, there was a delay in additional medical support response due to intercom issues and/or direct supervision staffing issues. While there was no one point of failure that led to Granillo's death, she should have never been booked into custody, there was known intercom issues, potential oxygen issues, and the overall evaluation of Granillo when discovered appeared solely reliant on naloxone and smelling salts."[135]

On April 11, 2022, Jerrell Dwayne Lacy died at Central Jail from pulmonary thromboemboli, due to deep venous thromboses of lower extremities, with COVID-19 Infection as contributing. "According to interviews with the Detentions Investigations Unit (DIU), several IPs stated they hit the callbox for an extended period before deputies responded. IP, ███████ said they attempted to get medical attention for 30 minutes before deputies arrived. IP, ████████, stated the callbox didn't work and a group of IPs yelled to get the deputies attention. In an interview with DIU, IP, ██████ stated it took approximately 45 minutes to get deputies to respond."

CLERB has separately fielded multiple complaints from incarcerated people stating that deputies do not respond to intercom calls.[136]

## H.  Significant Opinions

*The SDSD failed to comply with generally accepted jail practices and put IPs at substantial risk of harm by failing to maintain and properly use emergency intercom systems.*

As explained, jail intercom systems are the lifeline for IPs needing help during life-threatening situations. The evidence demonstrated that SDSD's failure to maintain its emergency intercom systems has put IPs at unnecessary risk of harm, including death. While the SDSD implemented a policy in April 2022 for only the Central Jail to ensure the intercoms worked, the evidence is clear that even as of April 2024, there was no confirmation that all the intercoms were working

---

[134] CLERB case 16-027, from the board minutes of August 8, 2017 (Dkt. 119-3 at ECF 800-802).
[135] CLERB case 22-080, from the board minutes of January 30, 2024.
[136] E.g., CLERB case 23-005, from the board minutes of October 17, 2023; CLERB case 23-083, from the board agenda of March 26, 2024; CLERB case 23-133, from the board minutes of June 27, 2024.

Dunsmore v San Diego Co Raney Report

correctly and no plan to replace the system. The overdose evidence showed there were a disproportional number of harmful events in the Central Jail, and overdoses are a classic example of when IPs need emergency medical intervention to reduce the likelihood of death. The SDSD violated generally accepted jail practices by not ensuring the intercom systems worked correctly.

An emergency intercom button is the most common method for IPs to reach jail staff inside their cell. While custody staff may become irritated at nuisance intercom requests, those can be managed, and it is rare when an intercom connection should be disabled. The evidence shows that many cells have no functional emergency intercom or that deputies have silenced the intercom systems. This leaves the IP unable to independently summon custody or medical help in an emergency, putting them at an unreasonable risk.

In the meantime, SDSD staff should inspect intercoms frequently, either through a schedule or by ensuring that the intercom is checked for functionality when an IP is placed into a cell. It is highly concerning that the evidence shows SDSD does not know what intercoms work correctly. Therefore, these mandatory checks and the documentation for repairs are critical, yet it does not occur. Inmates should not be housed in cells without some ability to call for help in an emergency.

Just as importantly, the jail staff must be attentive to the intercom and responsive to requests for emergency aid. Muting the intercom system should only happen when an IP is disrupting the orderly operation of the facility and through a supervisor's approval. The evidence shows that past practices have unnecessarily muted the intercom, cutting off IPs' ability to call for help. While there was policy but no proof of practice regarding not muting the intercom at the Central Jail, the evidence did not include similar policies for the other jail facilities. This policy should be replicated for all secure housing units.

Lastly, the SDSD should apply these generally accepted jail practices to all housing units in the jail system where an IP may need emergency assistance and have no other ability to immediately and reliably summon help.

## I.  Conclusions: Emergency Intercoms

There is no evidence that San Diego County cannot afford to maintain the life-saving emergency intercom systems. The only apparent explanations for the systems' failure are a failure to fund the repairs and upgrades and a failure of policy and supervision to ensure deputies are using them properly. The evidence suggests the County has chosen not to prioritize these lifelines for IPs. Most people cannot imagine not providing emergency 911 communications for the community, but the SDSD fails to provide a similar service to those in their jails.

## IV.  VIDEO SYSTEMS

Video surveillance systems provide three significant benefits in jail systems. First, they allow staff to monitor areas of the jail to ensure its safety and security. Video feeds enable staff to know the location of people inside and immediately outside the facility, monitor what they are doing, and especially monitor and intervene in harmful events.  Staff may only be in a housing unit for a few minutes every hour, but the video system can capture every moment of every day. The systems often help staff recognize when assaults and other disturbances are happening. Still, most of all, they can be used to prevent deaths when staff recognize there is a suicide, homicide or other life-threatening event occurring.

Secondly, they provide a substantial deterrent to crime and disruptive IP activity. When people know they are being video recorded, they are less likely to participate in disruptive activities that may lead to criminal charges or jail rule violations.

Thirdly, they provide a critical source of information for reviewing and investigating events. Many jails use video recordings to review staff activities like verifying that safety checks are done on time and with proper attention to the well-being of IPs.  The recordings have also become a valuable tool for conducting investigations of assaults, sexual misconduct, uses of force and other incidents.

Video systems have been installed in jails for decades, and the more modern digital video systems allow for greater clarity, better audio quality and capabilities like pan/tilt/zoom.  Digital systems also allow for easier data storage, longer record retention times and easier access.

### SDSD's Video Systems

On May 14, 2014, the San Diego County Grand Jury issued a report evaluating the video cameras at South Bay Detention Facility and George Bailey.  At South Bay Detention Facility, the Grand Jury found that "The control room video equipment is old and lacks the ability to zoom in on particular areas of interest."  The Grand Jury also found that "The ability to have close-up views of activities in the modules would improve the ability of staff to determine at close range what caused the situation and how to control it."  For South Bay Detention Facility , the Grand Jury recommended that SDSD "Update the capabilities of the control room video equipment to include the ability for close-up monitoring of activities in the modules."  At George Bailey, the Grand Jury found that "the equipment is antiquated and produces very fuzzy images. The current system also lacks the touch screen enlargement/zoom capabilities found in more modern equipment. The recordings can be maintained for a two-year period or longer, but the image quality is so poor that without significant quality enhancement, it is impossible to look at unfolding events such as a fight and identify the participants."  The Grand Jury concluded that

Dunsmore v San Diego Co Raney Report

"There is an urgent need for updated video surveillance equipment at GBDF to support staff's efforts to monitor the activities occurring at this maximum security detention facility." For George Bailey, the Grand Jury recommended that SDSD "Update digital surveillance system with modern performance features and improved image quality."[137]

On June 1, 2017, the San Diego County Grand Jury issued another report about the video cameras at George Bailey. The Grand Jury "noticed significant repair and maintenance issues, including nonfunctional security cameras at George Bailey Detention Facility." The Grand Jury further observed, "Half of the security cameras throughout the facility appeared nonfunctional as the glass covering the cameras was cloudy, creating a safety and security issue."[138]

On December 6, 2021, SDSD's Kelly Martinez sent an email stating: "The Sheriff's Department is not satisfied in any way with our current camera system or recording capabilities. Our inability to tell the entire story or to be completely transparent when incidents in the jail occur, is unacceptable. The cameras throughout the jail system are aging and are not always reliable. In addition, the coverage they provide is far from optimal in all circumstances. The Sheriff's Department has identified and is exploring system-wide wireless upgrades. This upgrade will allow for a number of technological improvements, including improved camera systems, body-worn cameras for sworn staff, increased operability of computers, among other advancements."[139]

In its February 2022 report, the State Auditor found that: "Another key, recurring recommendation that the Sheriff's Department has not implemented for nearly a decade relates to updating equipment for monitoring the safety of incarcerated individuals. In 2014 the San Diego County Grand Jury recommended that the Sheriff's Department update the surveillance system for monitoring activity at its largest male detention facility, which is a maximum security jail. The San Diego County Grand Jury made a similar recommendation in 2017, but the department has yet to replace the system. Although the department's policies and procedures related to facility maintenance generally align with state standards, we find it concerning that it has not yet replaced the surveillance system, even though its age is a major safety issue. In 2021, the Sheriff's Department indicated that the replacement effort would likely not begin until the summer of 2022. According to the assistant sheriff of detentions, the department did not implement this recommendation sooner because of its prioritization of other projects, such as building a new detention facility. However, we believe that the Sheriff's Department should

---

[137] May 19, 2014 San Diego County Grand Jury report "San Diego County Detention Facilities—Conditions and Management"
[138] June 1, 2017 San Diego County Grand Jury report "Adult Detention Facilities Report."
[139] Exhibit MM to Declaration of Van Swearingen In Support of Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 119-4 at ECF 90).

prioritize implementing or resolving all recommendations intended to keep individuals in its custody safe."

On May 2, 2022, IP Isaiah Glenn submitted a declaration stating that "Fights in the Dome typically last a short time - under thirty seconds - and are conducted in a part of the housing unit that is called 'the Pocket.' There are numerous Pockets within the George Bailey facility. Pockets are spaces where there are no cameras and guards cannot see what is going on. Many fights occur when one racial group wants to discipline one of their members for not following the rules of that group."[140]

On May 31, 2022, SDSD Facilities Superintendent in the Management Services Bureau, M. McArdle, submitted a declaration stating that "the camera system was installed in the San Diego Central Jail in 2011" and that SDSD "is planning to upgrade the camera system at the San Diego Central Jail in the next fiscal year (FY 23/24) to take advantage of the latest technical advances and improve image quality and retention. I am informed and believe the request for proposals has not yet been issued to bid but is scheduled to occur."[141]

On May 31, 2022, D. Blackwell, a Lieutenant in the Detention Services Unit, submitted a declaration stating that "The County Board of Supervisors has approved the Detention Services Bureau to move forward with Axon Body Worn Cameras (BWC) for all deputies working in the jails and transportation."[142]

On May 17, 2023, Darren Scott Bennet, a SDSD Project Manager, submitted a declaration which attached a Central Jail Modernization plan that was last updated on October 24, 2022, by Randall Lamb architects.  The Central Jail Modernization plan indicated that the scope of work included replacing the security cameras in Central Jail: "Replace the existing cameras and cabling with new cameras and Cat 6 cabling. New corner mount cameras to be added in in cells 7102-7111. (Approximately 405)."[143]

On November 15, 2023, Commander Christina Ralph sent an email with an attachment indicating various facilities' needs and costs.  The email stated "The goal is to educate the Sheriff on our current and future position regarding funding (or lack of funding mostly) for

---

[140] Declaration of Isaiah Glenn in Support of Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 119-24), paragraph 8.
[141] Declaration of M. McArdle in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 153-08), paragraphs 3-4.
[142] Declaration of D. Blackwell in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 153-05), paragraph 3.
[143] Declaration of Darren Scott Bennett in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification (Dkt. 312), paragraph 8 and Ex. C.

facility needs and ADA and to highlight our most critical risks."[144]  The attachment noted that SDSD needed "9 million for [Las Colinas] Camera system. 16.5 million for [East Mesa] Camera and CPC roof," and identified the following camera issues: "EMDF Camera system- obsolete in 1-5 years. Replacement cost- 15 million" and "LCDRF Camera system- obsolete in 1-5 years. Replacement cost- 9 million"[145]

## B. Video Camera Policies & Procedures

Security Video Systems – I.19, May 9, 2022[146]

*Policy:*

"Each facility equipped with video cameras, monitors and/or recording devices will ensure proper placement and quality for viewing purposes. This equipment may be used for movement control and monitoring (e.g., general surveillance, activity monitoring, specialized monitoring). Facility staff and supervisors will inspect the security video system equipment each shift to ensure the equipment is functioning properly. All facilities will create a process to audit and track issues and repairs of their security video system equipment."

*Procedure:*

"Sworn staff assigned to areas equipped with security video system equipment will check the equipment at the start of each shift to ensure proper focus and operation. Sworn staff in these areas will log if the security video system equipment is working. This information will be logged in the JIMS Area Checklist completed by sworn staff at the beginning of each shift.

A. Should adjustment or repair be needed to the security video system, the sworn staff member will notify facility administrative staff through email and/or the facility maintenance process.

B. The facility administrative staff will promptly notify the appropriate maintenance/facilities staff to schedule the adjustment or repair."

---

[144] November 15, 2023 email from Commander Ralph to Dorothy Patterson re "Facilities Costs Document (SD_588783).
[145] SD_588784-94.
[146] SD_114289-90.

## C. Incident Reports Noting Camera Quality

SDSD produced a spreadsheet of 7,070 Incident Report logs of IP vs IP Assaults from January 1, 2021, to August 7, 2023. Numerous log entries show in the "narrative" column issues with camera placement and quality. Some of the many examples include:

George Baily Detention Center:

- Row 243, Column F: "Facility surveillance footage was reviewed; however, due to the long-distance recording, in addition to the poor video resolution, and the location of the battery, the attack was not recorded."
- Row 280 Column F: "I reviewed CCTV footage of C Module. Due to poor video quality and the lack of an established timeline, I was unable to identify any suspects."
- Row 501, Column F: "I reviewed CCTV footage of "B" Module Quad 206. Due to poor video quality it provided nothing of evidentiary value."
- Row 754, Column F: "I obtained video footage of the incident and downloaded the video footage onto a compact disc (CD). Due to the poor camera angle I was unable to observe the incident occur."
- Row 868, Column F: "Due to the poor video quality of GBDF surveillance cameras, deputies reviewed video footage but were unable to determine where the assault occurred."
- Row 1382, Column F: "Due to the poor video quality, no parties are explicitly distinguishable. Also, I was unable to see if an altercation occurred."
- Row 3079, Column F: "after reviewing the CCTV footage for House 1 Module C, I was unable to positively identify any of the suspect involved in the incident due to the poor camera quality"
- Row 5041, Column F: "CCTV video surveillance captured the incident but was not clear due to the quality and camera position."
- Central Jail:
- Row 2502, Column F: "I reviewed video footage and was unable to identify a physical altercation due to poor camera angle outside of the cell."
- Row 2782, Column F: "due to the distance and angle of the camera, I am unable to see the incident clearly"
- Row 5219, Column F: "Due to the camera location and video quality, I could not determine the identity of the suspects involved.
- Row 5262, Column F: "I reviewed CCTV footage inside 5th Floor B Module at the time of the incident and due to the limited angel and video quality, I was unable to determine who the suspect was who struck Reid."

Dunsmore v San Diego Co Raney Report

- Row 7048, Column F "Due to the poor camera angle and the location of the assault, it was not recorded on Closed Circuit-Television (CCTV)."
- Las Colinas:
- Row 16, Column F: "Sergeant Bourgeois #7770 attempted to obtain the CCTV footage but was unsuccessful due to the CCTV Operating System not working."
- Row 417, Column F: "Due to the location where the physical altercation took place, I was unable to obtain any video footage."
- Row 436, Column F: "Due to the location where the incident took place, I was unable to obtain video footage of the incident."
- Row 1487, Column F: "I was unable to identify the incident on the recreation yard due to the camera location and poor quality."
- Row 6245, Column F: "Due to the video quality, the exact number of strikes thrown was not visible."
- Vista Detention Facility:
- Row 688, Column F: "Due to the camera quality and location, I was not able to identify what happened inside of the cell."
- Row 1508, Column F: "I reviewed the CCTV but the camera quality was too poor to observe anything of significance."
- Row 2573, Column F: "Due to South House Module 1 being an open dorm environment and not having any cameras inside, VDF's Closed Circuit Television (CCTV) system was not able to capture any video footage of the incident."
- Row 2630, Column F: "In addition to the cell being obscured, the video quality is poor due to low resolution and frame rate. I watched approximately 35 minutes of CCTV video footage after lunch was served. I was unable to see an altercation take place inside the cell."
- South Bay Detention Facility:
- Row 1809, Column F: "A review of video from the CCTV was inconclusive due to the poor camera angle."
- Row 1936, Column F: "Due to the Closed-Circuit Television (CCTV) video quality it was difficult to identify all the suspects involved in the riot."
- Row 2188, Column F: "no video footage was captured because a pillar is blocking the view were the incident took place."

## D. Death Cases

The following is not intended to represent all death cases at Jail facilities in which there were issues with video cameras, only a selected sampling from recent CLERB reports:

Dunsmore v San Diego Co Raney Report

54

On January 6, 2021, Omar Arroyo Moreno died in a holding cell at Central Jail after choking due to airway obstruction by ingestion of his cloth Covid-19 mask.  Video surveillance reviewed after his death showed Moreno appeared to have his mask on at 9:36 PM.  He appeared to take his mask off and sit on a bench at 9:37 PM, at which time he slouched down and "appeared to be putting something in his mouth (possibly the mask)."  Moreno then stood up at 9:38 PM "and the mask was no longer seen on his face or in his hands."  CLERB's investigator noted, "Moreno appeared to grab something off the bench at 9:40 PM, but I was unable to determine what the object was, if an object at all, due to poor video quality."

On July 13, 2022, Vianna Marissa Granillo died of septic shock.  CLERB's investigation noted that "In an interview with homicide detectives, a deputy stated she observed Granillo on the floor outside of her cell in the recovery position when she arrived at approximately 2:04 AM. This was unable to be verified by jail video surveillance and BWC footage due to poor video quality and camera angles."[147]

### J.  Significant Opinions

*The poor video systems in the SDSD jails prevent the jail staff from achieving the three stated major benefits: monitoring, deterring and investigating harmful activities in the jails.*

SDSD's failure to maintain an adequate video surveillance system only compounds the potential harm of excessive contraband, poor safety checks and unreliable emergency intercom systems. A modern video system would greatly benefit the SDSD staff as they monitor and investigate incidents and activities in and around the jails.  Almost every death or harmful event discussed in this report may have benefited from a contemporary video surveillance system, whether by preventing harm or investigating it. Most jail administrators have recognized this for years and prioritized the need for comprehensive and high-quality systems.  It is concerning that the SDSD has not, unnecessarily putting IPs at additional risk.

Additionally, most contemporary video systems include accompanying audio capability for jail staff that enhances the three significant benefits and may facilitate direct communication between IPs and jail staff.

### K.  Conclusions: Video Systems

As with the emergency intercom buttons, video systems reduce harm and improve the safety and security of the facility and the people in it. Once again, it is hard to imagine why San Diego

---

[147] CLERB case 22-080, from the board minutes of January 30, 2024.

County knew its video systems were inadequate ten years ago and failed to make improvements, knowing that the poor systems prevented it from adequately monitoring, deterring and investigating events.

Respectfully submitted:

Gary Raney, President

GAR, Inc.

# Exhibit B

# GARY L. RANEY, SHERIFF (retired)

GAR, Inc. · 7154 West State Street, Suite #260 · Boise, Idaho 83714 · (208) 870-8400
**gary@garyraney.com · www.garyraney.com**

## EXPERIENCE

**2011 TO PRESENT**

### PRESIDENT

GAR, INC. BOISE, ID

Experienced and knowledgeable consultation on jail policy and practice, specializing in cases involving deaths and uses of force. Gary has worked on projects in about 40 states and provided a wide range of services to government officials, attorneys, and prosecutors.

**US Department of Justice**
- Comprehensive jail assessment, United States of America v Fulton County GA (2024)
- Jail operational assessment, Fayette-Lexington County KY (2022)
- Jail system evaluation, Las Vegas NV Metropolitan Police Department (2016)
- Organizational culture assessment, Santa Clara County CA Sheriff's Office (2016)
- Executive leadership training, Oregon Department of Public Safety Standards & Training (2016)
- Organizational culture assessment, Middlesex MA Sheriff's Office (2015)

**Lake County (MT)** – Assessment of constitutional compliance in jail conditions, policy and practices (2023)

**Police Executive Research Forum** – Consultant on de-escalation training. (2022-23)

**City of Louisville (KY)** – Assess six death cases, overall jail operations and the physical facility of the Louisville Metro Department of Corrections (2022)

**State of Arizona Department of Corrections** – Hired by Alvarez and Marsal to consult on court action against the Department of Corrections medical services (current)

**US Conference of Chief Justices** – Member of the National Judicial Task Force to Examine State Courts' Response to Mental Illness (2020-22)

**Allegheny County (PA)** – Provide analysis and education on use of force practices in jails (2021)

**Howard Buffett Foundation / Macon County IL Sheriff's Office**
- Assessment and integration of Illinois law enforcement reform legislation (2021)
- Board member of the Central Illinois Regional Dispatch Center, representing the Macon County Sheriff (2019-2020)
- Comprehensive review and assessment of liability, security and operations (2017 - current)
- Study and recommendations on civil process service (2019)
- Study and recommendations on emergency communication fees (2019)
- Created policing and jail policy manuals (2018 with annual updates)

**Law Enforcement Policy Center, LLC** – License and distribute model policing policies to police and sheriff's agencies in Idaho (2016 - current)

**Howard Buffett Foundation / Christian County IL Sheriff's Office**
- Jail operations and liability assessment and planning (2020-2023)
- Created policing and jail policy manuals (2020 -2023)

**San Luis Obispo CA Sheriff's Office** – Jail staffing analysis (2020)

**Police Executive Research Forum**
- Jail diversion and pretrial strategies (2019)
- Jail mental health solutions (2018)

**Santa Clara County CA Sheriff's Office**
- Leadership planning and development (2018)
- Inmate (3,000 in custody) and jail employee (800 employees) opinion surveys (2018)
- Evaluation of jail reform efforts (2017 - 2018)

**Idaho Counties Risk Management Program**
- Produced training video series on high-risk policing topics (2016 - 2018)
- Created two Idaho statewide standardized policing policy manuals (2015 - 2017)

**San Bernardino County CA Sheriff's Office** – Use of force analysis (2015 - 2017)

**City of Cascade ID / Valley County ID** – Cost analysis of city police services and negotiation of a joint powers' agreement (2017)

**Coeur d'Alene ID Police Department** – Selection process for Chief (2009)

**Strategic Planning / Organizational and Leadership Development**
- Idaho Department of Health & Welfare (2024)
- Meridian ID Police Department Strategic Planning (2023)
- Meridian ID Police Department Leadership Development (2021)
- Supportive Housing and Innovative Partnerships (2021)
- Saint Alphonsus Regional Medical Center ID (2019)
- Pima County AZ Sheriff's Department (2019)
- Idaho Department of Health & Welfare (2017)
- Imperial County CA Sheriff's Office (2017)
- Twin Falls ID County Sheriff's Office (2017)
- Boise County ID Sheriff's Office (2017)
- Pierce County WA Sheriff's Office (2010)

**Federal Court Appointments**
*Independent Compliance Director* – Appointed and given broad authority by the federal court to bring Miami-Dade Corrections and Rehabilitation Department in compliance with a 2013 Consent Agreement.  US District Court for the Southern District of Florida.  13-21570-CIV-BLOOM (2021 ongoing).

*Federal Court Monitor* - Chavez v Santa Clara County Use of Force Consent Decree. US District Court for the Northern District of California, Eureka Division (2019 ongoing)

*Federal Court Monitor -* <u>San Bernardino County Sheriff's Department Use of Force Consent Decree.</u> US District Court for the Central District of California, Eastern Division (2018 ongoing)

*Consultant to the Court Experts –* <u>Armstrong v Newsom cv94-2307</u>.  California Department of Corrections and Rehabilitation Investigation and Disciplinary Process

**Criminal and Litigation Consulting**

<u>Smith v Santa Cruz Co (CA).</u>  US District Court for the
Northern District of California, San Jose Division (2024)

Case #5:21-cv-00421
Jail death

<u>Schomer v Elko Co (NV).</u>  US District Court for the District of
Nevada (2024)

Case #3:23-cv-00390
Jail death

<u>Moreno v San Diego Co (CA).</u>  US District Court for the
Sothern District of California (2024)

Case #21-cv-1956
Jail death

<u>Bohanan v Butler Co (OH).</u>  US District Court for the Sothern
District of Ohio, Western Division (2024)

Case #1:22-cv-00380
Jail death

<u>Peters v City and County of Denver (CO).</u>  US District Court
for the District of Colorado (2024)

Case #23-cv-750
Jail use of force

<u>Lundmark v Beltrami & Clearwater Co (MN).</u>  US District
Court for the District of Minnesota (2024)

Case #22:cv-01493
Jail death

<u>Spriestersbach v Hawai'i.</u>  US District Court for the District of
Hawai'i  (2024)

Case #1:21-cv-00456
Unlawful imprisonment

<u>Doe v Santa Barbara Co (CA).</u>  US District Court for the
Central District of California (2024)

Case #2:20-cv-04334
Sexual misconduct

<u>Stacey v. Madison County (ID).</u>  US District Court for the
District of Idaho.  (2023)

Case #4:23:cv-119
Jail homicide

<u>State of Colorado v Humphrey (2023)</u>

Criminal review of a use of
force

<u>State of Colorado v Adams County jail deputies (2023)</u>

Criminal review of an in-
custody death

**Deposed:**  <u>Serna v San Diego County (CA).</u>  US District Court
for the Southern District of California (2023)

Case #20-CV-2096
Jail death

Abbie v Shasta County (CA).  US District Court for the
Eastern District of California (2023)

Case #2:20-CV-01995
Jail use of force death

**Deposed**: Hernandez/Zumwalt v Riverside County (CA).  US
District Court for the Central District of California, Eastern
Division (2023)

Case #5:21-CV-01791
Use of force death

Hall v Gooding County (ID).  US District Court for the District
of Idaho (2023)

Case #1:22-CV-00277
Use of force

**Deposed**:  Buxton v Mower County (MN).  Minnesota District
Court, Third Judicial District.  (2023)

Case #50-CV-22-1660
Jail medical death

Wilson v San Diego County (CA).  US District Court for the
Southern District of California (2023)

Case #20-cv-0457
Jail medical death

**Deposed**:  Hepner v Tulare County (CA).  US District Court
for the Eastern District of California – Fresno (2023)

Case #1:19-cv-00774
Use of force

Arispe (Alexander) v Riverside County (CA).  US District Court
for the Central District of California. (2023)

Case #5:21-cv-00417
Jail suicide

Smallwood (Robertson) v Anderson County (SC).  US District
Court for the District of South Carolina, Anderson Division
(2023)

Case #0:22-cv-00232.
Use of force death

Wright v Ohio Youth Services (OH).  (2022)

Ohio Claims Case #2021-
00495JD.  In-custody
death.

**Testified:**  Maine v Cochran (ME).  District Attorney (2022)

Criminal review of a use of
force incident

Maine v Becerra (ME).  District Attorney (2022)

Criminal review of a use of
force incident

Estate of Scott Hultman v Ventura County (CA).  US District
Court for the Central District of California - Western Division.

Case #2:21-cv-06280
Jail suicide

Williams v Dixon (Washington D.C.) (2022)

Declaration regarding jail
searches

**Deposed**:  Luttrell v Santa Cruz County (CA).   US District
Court for the Northern District of California, San Jose
Division  (2022)

Case #5:19-cv-07300
Inmate physical and sexual
attack by other inmates

**Deposed:**  Payne v Clay County (TX). US District Court for
the Northern District of Texas, Wichita Falls Division (2022)

Case # 7:21-cv-0080
Jail suicide

Cumberland County (ME). District Attorney (2022)

Criminal review of several use of force events

Campbell v Butler County (OH). US District Court for the Southern District of Ohio (2022)

Case # 1:20-cv-00678
Jail suicide

Yellowbear v Salmonsen (MT). US District Court for the District of Montana, Butte Division (2022)

Case # cv-21-59
Failure to protect

Neville v Forsyth County (NC). US District Court for the Middle District of North Carolina (20212)

Case # 1:21-cv-758
In-custody death, use of force

Little v Nassau County (NY). US District Court Eastern District of New York (2022)

Case # CV-14-125
In-custody death (homicide)

**Deposed:** Greer v San Diego County (CA). US District Court for the Southern District of California (2022)

Case #19-cv-0378
Medical indifference

**Deposed:** Munday and Devine v Beaufort County (SC). US District Court for District of South Carolina (2022)

Case #9:20-dv-02144
Strip searches

State of Idaho v Elias Cerdas (2022)

Officer-involved shooting

***Deposed:*** Carrillo v Los Angeles County (CA). US District Court for the Central District of California (2021)

Case #2:21-cv-58
In-custody jail death.

Perry v Beltrami County (MI). US District Court for the District of Minnesota (2021)

Case #19-cv-02580
In-custody jail death.

 **Testified**: State of Maine v. Thompson. Criminal charges against a correctional officer (2021)

Criminal review: Use of force

Ninth Circuit Solicitor (Charleston, SC). Criminal charging decisions on two law enforcement officers (2021)

Criminal review: In-custody death / use of force

City of Twin Falls / Officer Nikolas Gumeson (ID) (2021)

Personnel action analysis: Use of force

***Court Testimony:*** State of Idaho v Arlyn Orr. District Court for the Seventh Judicial District of Idaho (2021)

Case #CR30-20-159
Criminal case involving the use of force

State of New Jersey / Officer Rahzohn Ford. (2021)

Personnel action analysis: Use of force

Lynn v The GEO Group (CA). Superior Court for the State of California (2021)

Case #37-2020-00031956
Use of force

***Deposed:*** Clubb v Boone County (IL). US District Court the Northern District of Illinois, Western Division (2021)

Case #3:18-cv-50197
Jail suicide

Kaminski v Cuyahoga County (OH). US District Court for the Northern District of Ohio, Eastern Division (2020)

Case #1:19-cv-01954
Excessive force

***Deposed:*** Nelson v Tompkins (Muscogee County) (GA). US District Court for the Middle District of Georgia, Columbus Division (2020)

Case #4:20-cv-00213
Inmate on inmate homicide

Townsend v Santa Cruz County (CA). US District Court for the Northern District of California (2020)

Case #5:19-cvv-00630
Attempted suicide

Binam v Mesa County (CO). US District Court for the District of Colorado (2020)

Case #19-cv-2561
In-custody death

Tyree v Cuyahoga County (OH). US District Court for the Northern District of Ohio (2020)

Case #1:19-cv-01533
Excessive force

Lemuel v El Paso County (CO). US District Court for the District of Colorado (2020)

Case #1:20-cv-01875
In-custody jail death

**Testified at Trial:** DeLaFuente v City of Nampa (ID). District Court of the Third Judicial District of the State of Idaho (2020)

Case #CV14-20-01023
Police pursuit and death

McGovern v County of Lucas (OH). US District Court for the Northern District of Ohio, Western Division (2020)

Case #3:18-cv-2506
Excessive force

Granados v The GEO Group, Inc and the City of Garden Grove (CA). Superior Court of California, County of Orange (2020)

Case #30-2019-01057510
Inmate on inmate attack

***Deposed:*** Burris v County of Logan (OH). US District Court for the Southern District of Ohio, Eastern Division (2020)

Case #2:19-cv-815
In-custody jail death

Chacon v Idaho State Police (ID). US District Court for the District of Idaho (2020)

Case #4:19-cv-00100
Police pursuit and death

***Deposed:*** Woodward v County of San Diego (CA). US District Court for the Southern District of California (2020)

Case #17-cv-2369
In-custody jail death (homicide)

Almeida v City of Long Beach (CA). US District Court for the Central District of California (2019)

Case #2:19-cv-08391
In-custody jail death

*Deposed:* Medina and Martinez v Los Angeles County (CA).
US District Court for the Central District of California (2019)

Case #2:19-cv-03808
In-custody jail death

Larios v Long Beach City (CA). US District Court for the
Central District of California (2019)

Case #2:18-cv-10486
Jail transgender practices

*Deposed:* Jaimes v Cook County (IL). US District Court for the
Northern District of Illinois, Eastern Division (2019)

Case #17-cv-8291
Attempted murder and
suicide by an employee

Traylor v Tazewell County (IL). US District Court for the
Central District of Illinois, Peoria Division (2019)

Case #18-cv-1309
In-custody jail death

Ward v Mendocino County (CA). US District Court for the
Northern District of California (2019)

Case #3:17-cv-00911
In-custody jail death

Hepner v Tulare County (CA).  US District Court for the
Eastern District of California, Fresno Division (2019)

Case #1:18-cv-00774
Use of force

Beck v Power County and Jefferson County (ID).  US District
Court for the District of Idaho (2019)

Case #4:18-CV-89
Jail suicide attempt

*Deposed:* Harmon v City of Pocatello (ID). US District Court
for the District of Idaho (2019)

Case #4:17-CV-00485
Use of force

Fairbanks v Canyon County (ID). US District Court for the
District of Idaho (2018)

Case # 1:17-cv-339
Unlawful arrest and search,
excessive force

Lopez v Kern County (CA). US District Court, Eastern District
of California (2018)

Case 1:17-at-00501
Jail suicide

*Deposed:* Sparks v Natrona County (WY).  Wyoming Seventh
Judicial District (2017)

Case #99912-A
Jail medical care policies

*Deposed:* West v City of Caldwell (ID). US District Court for
the District of Idaho (2017)

Case #1:16-cv-359
SWAT search & seizure

*Court Testimony:* Rose v Nebraska. District Court of
Lancaster County Nebraska (2016)

Case #CI 14-4004
Duty to protect/inmate
classification

Kinkade v City of Weiser (ID). US District Court for the
District of Idaho (2016)

Case #1:16-cv-00194
Use of force

Shannon v New Hampshire Department of Corrections. New
Hampshire Superior Court (2016)

Case #219-2014-CV-00169
Probation officer involved
shooting

| | |
|---|---|
| Martin v City of Nampa (ID). US District Court for the District of Idaho (2015) | Case #1:15-cv-00053 Use of force |
| Raymond v Payette County (ID). Idaho Fourth Judicial District (2013) | Case #CV1503239 Fatal patrol car crash |
| Bridget Nicole Revilla et al v Tulsa County (OK) et al. Oklahoma District Court (2013) | Case # 13-Cv-315 In-custody jail deaths |
| Kody Gambrel v Twin Falls County (ID). US District Court for the District of Idaho (2013) | Case #1:12-CV-00369 Use of force |
| Autumn Pauls v Sheriff Rich Green, Adams County (ID). (2010) | Sexual contact between staff and an inmate |
| Gibbons v Custer County (ID). (2008) | False arrest claim |

## EMPLOYMENT

**2015-current**

### FOUNDER & PRESIDENT

GAR, INC. AND LAW ENFORCEMENT POLICY CENTER, LLC

Law enforcement and jail consulting, specializing in in-custody deaths and the use of force. Major areas of work include:

- Federal court appointments as an Independent Compliance Director (a cooperative receivership), Monitoring and expert services
- Expert witness and litigation consulting
- Jail assessments and investigations.

**2005 – 2015**

### SHERIFF

ADA COUNTY SHERIFF'S OFFICE, BOISE, ID

Elected sheriff in 2004, leading 665 people in a full-service law enforcement agency, including responsibility for:

- All county police services and three contract police departments;
- 1,300 bed jail, recognized by the US Department of Justice and others as a model jail for operation, management and minimal use of force;
- Consolidated emergency dispatch center serving all local law enforcement, fire and EMS agencies in the county; and
- Pretrial services and sentencing alternatives for offenders.

**1983 – 2004**

### DEPUTY TO UNDERSHERIFF

ADA COUNTY SHERIFF'S OFFICE, BOISE, ID

**Undersheriff** (appointed 2002) – Oversaw all aspects of the agency including patrol, the jail, dispatch, policy, planning and all other aspects of administration.

**Captain** (promoted 2001) – Directed the Administrative Services Division that included Finance, Training, Human Resources, Policy, Evidence and other administrative functions of the agency.

**Lieutenant** (promoted 1998) – Patrol Commander responsible for all patrol functions, as well as the SWAT, bomb, canine and traffic teams and supervised the Civil Process Office.  During this time, led the Sheriff's Office expansion from one contract city police department to three.

**Sergeant** (promoted 1993)
- Jail housing sergeant – Supervised jail deputy teams.
- Jail administrative sergeant – Oversaw policy, purchasing and other administrative duties.
- Patrol sergeant – Supervised patrol teams in the field.
- Administrative sergeant – Worked directly for the sheriff on special projects such as policy, budgeting, internal affairs, training, etc.  Rewrote full agency policy manual.

**Deputy**
- Jail deputy and later a jail training officer – Led most of the creation of the first formal jail training program.
- Patrol deputy and later a field training officer – Helped revise / update the training program.
- Detective – Ultimately assigned many complicated and high-profile crimes.


2006 – 2011
## ADJUNCT PROFESSOR
BOISE STATE UNIVERSITY CRIMINAL JUSTICE & PUBLIC ADMINISTRATION DEPARTMENTS

2003 – 2016
## ADJUNCT PROFESSOR AND ADVISOR
NORTHWESTERN UNIVERSITY CENTER FOR PUBLIC SAFETY


# EDUCATION & TRAINING

2001 - 2008
## FBI ACADEMIES AND SEMINARS
- **National Executive Institute** – Prestigious international executive education and exchange course (2008)
- **Law Enforcement Executive Development Seminar** – Quantico, VA (2006)
- **Executive Command College** – (2003)
- **National Academy** – University of Virginia, Quantico, VA GPA: 4.0 (2001)

2006
## NATIONAL SHERIFF'S INSTITUTE
NATIONAL INSTITUTE OF CORRECTIONS (Longmont, CO)

2005

## MASTER'S DEGREE, CRIMIMAL JUSTICE ADMINISTRATION

BOISE STATE UNIVERSITY

- Distinguished Graduate Award for 2008
- Criminal Justice Program Graduate Academic Excellence Award for 2003-2004
- Selected Boise State University Distinguished Alumni
- GPA: 4.0

1997

## SCHOOL OF POLICE STAFF & COMMAND

NORTHWESTERN UNIVERSITY CENTER FOR PUBLIC SAFETY

- GPA: 4.0

1986

## BACHELOR'S DEGREE, CRIMIMAL JUSTICE ADMINISTRATION

BOISE STATE UNIVERSITY

1985

## PEACE OFFICER CERTIFICIATIONS

IDAHO PEACE OFFICERS' STANDARDS AND TRAINING

- Earned Basic, Intermediate, Advanced, Supervisory and Executive Certifications
- Graduated #1 in the police academy

# PROFESSIONAL APPOINTMENTS

- Advisory Board for the National Institute of Corrections, Vice-Chair, appointed by the US Attorney General
- Idaho Peace Officers Standards and Training Council, Chair
- Idaho Criminal Justice Commission, Vice Chair
- Idaho Criminal Justice Grants Council, Chair
- Pretrial Justice Institute (Washington, D.C), Chair
- Idaho Sheriff's Association, President
- National Judicial Task Force to Examine State Courts' Response to Mental Illness, member
- Central Illinois Regional Communications Center Board, Member on behalf of the Macon County Sheriff

- Ada County Critical Incident Task Force, Chair
- Idaho Association of Counties, member and Leadership Award recipient
- Intermountain Regional Computer Forensic Laboratory, Board member
- Family Advocacy Center and Educational Services, Board member
- Ada County Mental Health Court, Board member
- Ada County Drug Court, Board member
- Boise State University think-tank on innovation, Member

## PUBLICATIONS

2017    **Bail Reform Restores Basic American Values of Freedom and Justice.** Fox & Hounds www.foxandhoundsdaily.com. August 2017.

2015    **Eyewitness ID – The Importance of Getting it Right** with Jennifer Thompson. *Sheriff Magazine.* May/June 2015.

2015    **Here to Help: Taking Better Care of Cops** with Samantha Westendorf. *Fraternal Order of Police Journal.* Volume 10; Number 1: 2015.

2014    **Why Sheriffs Should Champion Pretrial Services** with Stan Hilkey, Mesa County CO Sheriff, and Beth Arthur, Arlington County VA Sheriff. *Sheriff Magazine.* May/June 2014.

2013    **Wise Beyond Your Field** with Dr. Nancy Napier, Jamie Cooper, Mark Hofflund, Don Kemper, Bob Lokken, Chris Peterson and John Michael Schert. CCI Press.

2012    **Treating Mental Illness: Jails are Not the Answer.** *The Blue Review.* https://thebluereview.org/treating-mental-illness/

2012    **In Pursuit of Cooperation: Idaho Police Agencies Join Together** with Boise Police Chief Mike Masterson. *FBI Law Enforcement Bulletin.* December 2012.

2012    **Jail Culture and Violence Part I and II.** Two whitepapers written at the request of the Los Angeles County Citizen's Commission on Jail Violence.

2011    **Gang Rules: Creativity in Unexpected Places** with Dr. Nancy Napier, Ron Freeman, Chris Petersen, Jamie Cooper, Don Kemper, Jim Balkins, Charlie Fee, Mark Hofflund, Trey McIntyre, John Michael Schert and Bob Lokken. *People & Strategy.* Vol. 34, Issue 3, 2011.

2008    **Turnaround, in a Good Jail** with Dr. Jeffrey Schwartz. *American Jails.* February 2007.

## PRESENTATIONS

Presentations on organizational behavior and development, the effective use of data, contemporary preferred practices, system reform and other topics to:

- United States Congress
- NASA Launch Services Program Leadership Retreat
- Police Executive Research Forum
- National Center for the State Courts
- American Jail Association
- American Correctional Association

- National Sheriff's Association
- State sheriffs' associations across the US
- Los Angeles Citizen's Commission on the Reduction of Jail Violence
- Community Resources for Justice
- Human Rights Watch

## VOLUNTEER WORK

- Idaho Leaders United, Founder & Board Member

- National Sheriff's Association
- International Association of Chiefs of Police

- Saint Alphonsus Health System Advisory Board
- Saint Alphonsus Regional Medical Center Foundation, Chair
- United Way of Treasure Valley, Chair
- Big Brothers Big Sisters of Southwest Idaho, Chair
- Festival of Trees community-wide fundraising event, Co-chair
- Idaho State Historical Society
- National Executive Institute Associates (FBI)
- Ada County Sheriff's Youth Foundation
- Recipient of the 2012 National Philanthropy Day Honor Roll award

- Police Executive Research Forum
- Boise State University Alumni Association
- Ada County Sheriff Employee's Association, President
- Children's Home Society
- Junior League of Boise

# EXHIBIT 2

1  GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
2  MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
4  ROSEN BIEN
GALVAN & GRUNFELD LLP
5  101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
6  Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
7  ggrunfeld@rbgg.com
vswearingen@rbgg.com
8  mfreedman@rbgg.com
eanderson@rbgg.com
9  hchartoff@rbgg.com
bholston@rbgg.com
10
AARON J. FISCHER – 247391
11  LAW OFFICE OF
AARON J. FISCHER
12  1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
13  Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
14  ajf@aaronfischerlaw.com

15  Attorneys for Plaintiffs and the
Certified Class and Subclasses
16

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

17                    UNITED STATES DISTRICT COURT

18                  SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 19  DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, 20  JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, 21  CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, 22  MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all 23  others similarly situated,<br><br>                Plaintiffs,<br>24<br>              v.<br>25  SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN 26  DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 27  1 to 20, inclusive,<br>                Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**REBUTTAL EXPERT REPORT OF GARY L. RANEY**<br><br>Judge:      Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

28

I, Gary L. Raney, declare:

1.    A true and correct copy of my expert rebuttal report is attached hereto as **Exhibit A**.

2.    I have had the opportunity to review the report of Lenard Vare.  The opinions expressed therein do not change the opinions I expressed in my expert report.

3.    The information and opinions contained in my rebuttal report are based on evidence, documentation, and/or observations available to me.  I reserve the right to modify or expand these opinions should additional information become available to me.  The information contained in this rebuttal report are a fair and accurate representation of the subject of my anticipated testimony in this case.

Dated:  October 2, 2024

Gary L. Raney

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Case No. 3:20-cv-00406

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES
CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ,
CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA,
MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others
similarly situated, Plaintiffs

vs

County of San Diego, et al. Defendants

REBUTTAL REPORT OF EXPERT WITNESS GARY RANEY

October 2, 2024

This report is in response to the expert opinion report submitted by Lenard Vare, dated August
21, 2024. However, this rebuttal only relates to the topics discussed herein and does not reflect
agreement with any other opinions.

Mr. Vare's opinions consistently lacked supporting discussion and justification for his opinions.
For the most part, he read San Diego County Sheriff's Department (SDSD) policies, and listened
to what SDSD staff told him, then deemed the policies and practices adequate. He did not
appear to compare SDSD practices against generally accepted jail practices.


### Specific Opinions of Mr. Vare


**Vare Opinion 4(a): "Plaintiffs [sic] claim that the San Diego County Sheriff's Office fails
to adequately detect and prevent drug contraband within the jail is not supported by facts.
The drug interdiction methods used by the jail are comprehensive and ongoing. The
policies related to drug detection and interdiction are adequate and exceed those of many
correctional facilities."**

Mr. Vare opined that the SDSD body scanner and x-ray policy was "appropriate and
comprehensive" but failed to provide any meaningful analysis. Therefore, there is no need for a
rebuttal.

Mr. Vare failed to support his opinion that the urinalysis testing policy was "appropriate and comprehensive." The urinalysis testing policy I.58 only applies to the East Mesa Reentry Facility, testing and, therefore, cannot be "comprehensive" when it is not implemented to detect illicit drugs in any of the housing facilities that are most associated with in-custody deaths.

Mr. Vare wrote that there was a comprehensive process to prevent and interdict contraband by staff, contractors, and visitors, including narcotics. He discussed a randomized urine testing process but failed to explain what facilities it was used in, how people were selected, how many people were tested, how many people tested positive for an illicit drug, and what those drugs were. All of these are fundamental data points for assessing a urinalysis testing program.

Mr. Vare described different drug detection practices in the SDSD but failed to offer any evidence that they are used effectively and proportionately to decrease the amount of illicit drugs in the jail. He used data from the detention investigation unit showing decreased seizures for certain types of drugs in 2024. However, he did not offer any data on the comparative amount of effort that went into those seizures in 2024. There could easily be fewer drugs seized because fewer searches were made or less effort was put into them.

Perplexingly, Mr. Vare then went on to individually name plaintiffs and their alleged drug use. He wrote, "Many of the incarcerated persons have a history of drug use and/or are addicted and actively drug-seeking, which makes staff efforts to prevent illicit drugs from entering the facilities more difficult."[1] He did not explain why he thinks interdiction efforts are more difficult given these 12 individuals' histories. It is illogical that their personal addictions would somehow affect the staff's contraband reduction efforts.

Mr. Vare did not explain his purpose for discussing the plaintiff's addictions, but it is well known that there is a high rate of drug use and mental illness among the jail and prison populations. A Bureau of Justice Statistics report read, "More than half (58%) of state prisoners and two-thirds (63%) of sentenced jail inmates met the criteria for drug dependence or abuse, according to data collected through the 2007 and 2008-09 National Inmate Surveys."[2] These dependencies and drug-seeking behaviors are why it is so critical for jails to have effective contraband introduction programs. The number of drug-related deaths in the San Diego County jails is self-evident that their efforts are insufficient.

---

[1] P. 62

[2] U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, available at: https://bjs.ojp.gov/content/pub/pdf/dudaspji0709.pdf (revised August 10, 2020)

Dunsmore v San Diego Co., Raney Rebuttal Report

**Vare Opinion 7(a): Plaintiffs' assertion that the Sheriff's Office fails to equip all facilities with body scanners, properly maintain the existing scanners, adequately train staff on their use, or mandate the scanning of everyone entering Jail is inaccurate.**

Mr. Vare was wrong when he wrote, "Plaintiffs assert that the Sheriff's Office's policies for screening incoming individuals and staff for contraband are insufficient. **Plaintiffs have not provided any evidence that substantiates such claims.**" [emphasis added]  The plaintiff's allegations are supported by depositions, reports from the Citizens Law Enforcement Review Board, the Critical Incident Review Board, the California State Auditor, and others.  The fundamental fact that Mr. Vare dismissed is that there are an excessive number of people who die in the San Diego County jails from drug-related causes.  There is no silver bullet to eliminate drug contraband.  Rather, jails have to use multi-prong approaches that include screening, searches and other efforts for inmates and others who can deliver contraband, such as staff, contractors and other visitors.

**Vare Opinion 7(b): There are various steps being taken to control the introduction of narcotics and other contraband into the San Diego County jails. The current process of addressing narcotics detection and interdiction is comprehensive and appropriate.**

Mr. Vare supports his opinion by touting the SDSD practices of:

- The Detention Investigation Unit and the Contraband Narcotics Interdiction team.  Many other jails have similar units but fewer deaths and injuries from drug contraband.  This effort is not sufficiently effective.
- The Mail Processing Center.  Most jails have similar processes, but many do not have the volume of mail the San Diego County jails presumably receive.  The jail system primarily relies upon staff for the initial contraband detection.  However, technology exists for rapid detection with far more accuracy.  One leading company reported, "MailSecur® uses safe T-rays to provide a real-time 3D view of contents concealed in letters, parcels, and other items – without opening them.  It is ideally suited for corrections to detect drugs and contraband in inmate mail.  MailSecur is the only screening solution that can effectively detect all forms of drugs and contraband - the smallest quantity of liquids, powders, drugs, electronics, drug-laced papers, suboxone, sharps, and other suspicious items. MailSecur is also the only desktop mail screening

solution designated as a Qualified Anti-Terrorism Technology (QATT) by the US Department of Homeland Security under the SAFETY Act."[3]

- The use of canines.  Mr. Vare did not clarify the prior conflicting evidence as to how many canines are used in the San Diego County jail system. Regardless, as previously explained, the dogs' ability to search is limited and typically used only in high-probability areas. Searching is a high-energy effort for the dogs and requires frequent periods of rest, which limits their capacity. While they are an important asset, they are a small part of the solution.

Lastly, in his opinion 7(b), Mr. Vare appears to echo the SDSD's statements that sworn staff members could not possibly be the source of contraband.  However, it contradicts what he wrote in an earlier opinion when SDSD Captain Watts clearly acknowledged drugs may be coming in by staff: "Captain Watts was asked by the plaintiffs' counsel about the potential for staff bringing narcotics into the institution. Captain Watts said that the Sheriff's Office attempts to isolate and identify all the possible ways narcotics enter the jail facilities. Both professional and sworn staff could potentially be compromised. The agency developed an informant program using confidential informants from within the incarcerated population. The primary goal of this program is to quickly identify if any staff members engage in smuggling narcotics into the jails." While they are less likely to be carriers than healthcare staff, contractors, and other visitors, sworn staff may be responsible for introducing contraband. If the San Diego County jails had very few problems with drug contraband, it may be arguable that the inconvenience of searching staff merited "free passes."  However, with the overdose and drug-related death rate in the jails, every practical effort of increasing interdiction should be used.


**Vare Opinion 8(a): The San Diego County Sheriff's policies related to safety checks as well as personal observations from my touring of the various jails indicates that the Sheriff's Office has adequate policies and practices to address the safety concerns of incarcerated persons. Safety checks occur in each of the jails and staff respond appropriately to individuals in distress.**

Mr. Vare appears to have reached this opinion based on deposition testimony, limited personal observation, and an Excel spreadsheet of supervisory audits conducted in 2021. First, he failed to address the fundamental issue of the safety check policy and practice not requiring deputies to establish proof of life.  This expectation is essential to generally accepted jail practices but is absent in the SDSD practices and Mr. Vare's analysis.  Second, the spreadsheet that Mr. Vare

---

[3] https://www.corrections1.com/products/contraband-detection/articles/raysecur-is-the-leading-provider-of-mail-security-screening-solutions-and-professional-services-for-the-detection-of-drugs-and-contraband-SpDlyBwbILolLPka/

referred to did not have any record of the timeliness between checks in a given housing unit.
The most important part of the SDSD policy is the timeliness of checks.  Without that data in the
spreadsheet, it is irresponsible to assert that the safety check practices are adequate.


### Conclusions

Mr. Vare's opinions lack support and reference to generally accepted jail practices.  He also
seems to have ignored or dismissed most of the formal reports by well-established entities like
the Citizen's Law Enforcement Review Board and the California State Auditor.  The evidence is
overwhelming that the SDSD policies and practices in question are insufficient.  What remains a
mystery is why some of these simple life-saving measures, like ensuring proof of life during
safety checks, have not been implemented.

Respectfully submitted,

Gary Raney