GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>　　　　　Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF KAREN L. SNELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:　　Hon. Anthony J. Battaglia<br><br>Date:　　　March 6, 2025<br>Time:　　　2:00 p.m.<br>Crtrm.:　　4A |

[4621612.1]

## DECLARATION OF KAREN L. SNELL

I, Karen L. Snell, declare that if called upon I could and would testify competently to the information contained below, including in my expert reports, which is based on my own personal knowledge:

1.    I am a long-time criminal defense and civil rights attorney, member of the national Association of Criminal Defense Attorneys and California Attorneys for Criminal Justice, and former Chairman of the Board of Directors of the Habeas Corpus Resource Center.  I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment ("Motion").

2.    Attached as **Exhibit 1** is a true and correct copy of my August 7, 2024 report ("Report"), which accurately represents my opinions in this case.  This does not include the index of documents I reviewed.

3.    Attached as **Exhibit 2** is a true and correct copy of my October 1, 2024 rebuttal report ("Rebuttal"), which accurately represents my opinions with respect to Opinion 12 of the report of Lenard Vare in this case.

4.    I have reviewed the portions of the Motion and supporting declarations that pertain to access to counsel and the courts, which include Green Sheets that have been updated since I completed my Report.  In particular:

a.    I reviewed George Bailey Detention Facility Green Sheet No. P.15.G ("Professional Contact Visits"), updated September 19, 2024.  This Green Sheet does not change my opinion that in-person visitation at George Bailey is not a reliable, confidential way for incarcerated people to meet with their attorneys.  *See* Report at 38-55.

b.    I reviewed George Bailey Detention Facility Green Sheet No. N.1.G ("Grievance Procedure"), updated September 19, 2024.  This Green Sheet does not change my opinion that the grievance procedure is slow and ineffective, impairing the ability of incarcerated people to exhaust administrative remedies.  *See* Report at 86-89.

1          c.      I reviewed George Bailey Detention Facility Green Sheet No.

2   N.5.G ("Access to Courts/Attorneys/Legal"), updated September 19, 2024.  This

3   Green Sheet, which describes attorney callbacks, does not change my opinion that

4   phone calls are not a reliable, confidential way for incarcerated people to speak with

5   their attorneys.  *See* Report at 55-67.

6          I declare under penalty of perjury under the laws of the United States of

7   America that the foregoing is true and correct to the best of my knowledge, and that

8   this declaration is executed at San Francisco, California this 18th day of January,

9   2025.

10

11

12                                          _Karen L. Snell_
                                            Karen L. Snell

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, Plaintiffs, v. SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, Defendants. | Case No. 3:20-cv-00406-AJB-DDL **EXPERT REPORT OF KAREN L. SNELL** Judge:       Hon. Anthony J. Battaglia Magistrate: Hon. David D. Leshner Trial Date: None Set |

# TABLE OF CONTENTS

**Page**

BACKGROUND AND QUALIFICATIONS ................................................. 1

SUMMARY OF OPINIONS ................................................................. 3

FACTS AND DATA RELIED ON IN FORMING OPINIONS ...................... 4

STANDARDS GOVERNING ACCESS TO COUNSEL ........................... 5

I.     DUTIES OF CRIMINAL DEFENSE ATTORNEYS ...................... 5

    A.     CRIMINAL DEFENSE ATTORNEYS HAVE A DUTY TO
        COMMUNICATE WITH THEIR CLIENTS ........................... 5

    B.     CRIMINAL DEFENSE ATTORNEYS HAVE A DUTY TO
        PROTECT THEIR CLIENTS' CONFIDENCES ...................... 8

II.    STANDARDS FOR ACCESS TO COUNSEL AT DETENTION
    FACILITIES ................................................................. 10

SUMMARY OF VISITS TO SAN DIEGO JAIL  PROFESSIONAL
VISITING AREAS ............................................................... 14

    A.     San Diego Central Jail ........................................ 14

    B.     George Bailey Detention Facility .......................... 21

    C.     Rock Mountain Detention Facility ......................... 26

    D.     East Mesa Reentry Facility .................................. 28

    E.     Vista Detention Facility ...................................... 29

    F.     South Bay Detention Facility ............................... 32

    G.     Las Colinas Detention and Reentry Facility ............ 34

OPINIONS .......................................................................... 35

I.     THE SAN DIEGO SHERIFF'S DEPARTMENT IMPEDES
    ATTORNEY-CLIENT COMMUNICATION .......................... 35

    A.     In-Person Visits ................................................ 38

        1.     San Diego Central Jail. .............................. 45

        2.     George Bailey Detention Facility. ................. 48

        3.     Rock Mountain Detention Facility. ................ 50

        4.     Vista Detention Facility. ............................. 50

5.    South Bay Detention Facility. .................................................... 51

6.    Las Colinas Detention and Reentry Facility ........................... 53

7.    County Courthouses ..................................................................... 53

B.    Telephone Calls ..................................................................................... 55

1.    Failure to Complete Requested Call Backs ............................... 56

2.    Failure to Allow Adequate Access to Phones .......................... 59

3.    Lack of Confidentiality ................................................................ 61

C.    Legal Mail ................................................................................................ 67

D.    Conclusion ............................................................................................... 72

II.    THE SHERIFF'S DEPARTMENT DENIES INCARCERATED
PEOPLE THE ABILITY TO REVIEW ELECTRONIC DISCOVERY
IN THEIR CRIMINAL CASES. ................................................................ 73

III.    THE SAN DIEGO SHERIFF'S DEPARTMENT DENIES PRO PER
INCARCERATED PEOPLE ADEQUATE ASSISTANCE AND
IMPEDES THEIR RIGHT OF ACCESS TO THE COURTS ...................... 74

A.    Pro Per In Current Criminal Case. ........................................................ 74

B.    Pro-Per In Conditions of Confinement Case. ...................................... 80

C.    Grievance Policy and Procedure. ........................................................... 86

D.    Conclusion ................................................................................................ 89

CONCLUSION ......................................................................................................... 90

I, Karen L. Snell, declare:

1.      I have been retained as an expert by the Plaintiffs in this action.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify.

## BACKGROUND AND QUALIFICATIONS

2.      I am an attorney admitted to practice in California.

3.      I received my J.D. from Stanford Law School and my B.A. in Philosophy from Stanford University.

4.      I have specialized in the practice of criminal defense law and civil rights law in federal and California courts for the past forty years.  I have represented numerous criminal defendants and civil rights litigants at the trial and appellate levels, and I have represented parolees and probationers in parole and parole revocation proceedings.  In the course of my work, I have visited scores of incarcerated people in county, state, and federal facilities in California, Arizona, Colorado, and Michigan.

5.      Since 2003, I have been a solo practitioner in the fields of criminal defense, international extradition defense, and civil rights litigation.  For the preceding seven years, I served as founding and named partner in the law firm of Clarence & Snell LLP (now Clarence & Dyer LLP), where I represented criminal defendants and civil rights plaintiffs and defendants in federal and California courts. I was previously an Assistant Federal Public Defender in the United States District Court for the Northern District of California, where I tried cases, handled Ninth Circuit and U.S. Supreme Court appeals, and was charged with supervising and training other attorneys.  For two years before that, I was of counsel to the San Francisco firm Riordan & Rosenthal, where I worked on death penalty appeals and other criminal appeals, tried criminal cases, and represented life incarcerated persons before the Parole Board.  For five years before that, I was an associate in the litigation department of Morrison & Foerster, where I worked on civil and criminal

1  matters, including criminal trials and appeals.  My curriculum vitae is attached

2  hereto as Exhibit A.

3      6.    During my career, I have been an active member of various

4  professional organizations including, but not limited to, the American College of

5  Trial Lawyers (fellow), National Association of Criminal Defense Attorneys,

6  California Attorneys for Criminal Justice, Founder and Board Member of San

7  Francisco Women Lawyers Alliance, and Chairman of the Board of Directors of the

8  Habeas Corpus Resource Center.  I have written and spoken on criminal defense and

9  civil rights issues at conferences organized by the Criminal Justice Act Panel for the

10  Northern District of California, National Association of Criminal Defense

11  Attorneys, California Attorneys for Criminal Justice, California Public Defenders

12  Office, and others.  I have taught in trial practice programs at Stanford Law School,

13  Boalt Hall School of Law, University of California Law San Francisco School of

14  Law, University of San Francisco Law School, and Cardozo Law School and as a

15  faculty member for the National Trial Advocacy Institute and other programs.  I

16  have also served as an Advisor and the General Counsel for the Institute for

17  International Criminal Investigations, a non-profit organization dedicated to training

18  investigators for war crimes tribunals and truth commissions.

19      7.    I was retained as an expert in *L.H., et al. v. Schwarzenegger, et al.*, No.

20  2:06-CV-02042-LKK-GGH (E.D. Cal.), and *Valdivia v. Schwarzenegger,* No. Civ.

21  S-94-0671 (E.D. Cal.).  I have not provided expert testimony in any case in the past

22  four years.

23      8.    I was retained by Plaintiffs' attorneys to be prepared to render opinions

24  regarding Plaintiffs' Eighth Claim for Relief, Denial of Access to Counsel and the

25  Courts in violation of the Sixth and Fourteenth Amendments of the U.S.

26  Constitution and Article I, Sections 7 and 15 of the California Constitution.

27      9.    Prior to commencement of my work, I received and acknowledged the

28  Stipulated Protective Orders signed in this case governing the confidentiality of

specific documents and information.

10.    I received compensation at a rate of $500 per hour, plus reimbursement of travel expenses.

11.    The information and opinions contained in this report are based on evidence, documentation, and/or observations available to me.  I reserve the right to modify or expand these opinions should additional information become available to me.

## SUMMARY OF OPINIONS

12.    The San Diego Sheriff's Department impedes attorney-client visits by forcing attorneys to endure unjustified delays and by failing to provide visiting rooms with the requisite degree of privacy.

13.    The San Diego Sheriff's Department impedes attorney-client communication by failing to provide incarcerated people with access to telephones that allow them to have confidential communications with their attorneys.

14.    The San Diego Sheriff's Department further impedes attorney-client communication by failing to inform incarcerated people that their attorneys have called the jail and requested a call back and by failing to allow incarcerated people to return their attorneys' calls within a reasonable amount of time.

15.    The San Diego Sheriff's Department interferes with communications by mail between incarcerated people and their attorneys by opening and reading mail outside the presence of  incarcerated people.

16.    The San Diego Sheriff's Department impedes confidential mail communication between incarcerated people and their attorneys by failing to send and deliver mail promptly and reliably.

17.    The San Diego Sheriff's Department fails to provide the means for incarcerated people to view electronic discovery and thereby interferes with their ability to participate in their defense.  This problem is particularly harmful to pro per defendants' ability to defend themselves.

18.    The San Diego Sheriff's Department fails to provide pro per incarcerated people with adequate assistance from persons trained in the law and fails to provide them with adequate access to legal resources to prepare their defenses in their criminal cases or to file and litigate civil claims regarding the conditions of their confinement.

19.    The San Diego Sheriff's Department interferes with pro per incarcerated people's access to the courts by making it impossible for incarcerated people to participate in telephonic hearings, resulting in the dismissal of cases, and imposing bureaucratic hurdles that make it impossible for incarcerated people to comply with court deadlines.

## FACTS AND DATA RELIED ON IN FORMING OPINIONS

20.    In forming my opinions, I reviewed the Third Amended Complaint in this case, in which Plaintiffs allege, among other things, that the Sheriff's Department's "practices systematically impede and interfere with" attorney-client communication, including by failing to facilitate confidential phone calls; failing to provide adequate meeting space for attorneys, such that sometimes attorneys are unable to meet with their clients in person; and opening mail from attorneys outside the presence of incarcerated people. Dkt. 231 at ¶¶ 409–20. Plaintiffs also allege that the Sheriff's Department interferes with and lacks adequate policies and procedures for providing legal materials to incarcerated people who are representing themselves in litigation—whether in their criminal case or in civil rights cases. *Id.* at ¶¶ 421–24. For example, Plaintiffs allege that Darryl Dunsmore, who was in the Jail for resentencing, had his legal materials "confiscated" by the Jail, and that he was denied pro per privileges. *Id.* at ¶¶ 422–23.

21.    In forming my opinions, I relied on the California Rules of Professional Conduct ("Rules of Professional Conduct"), my background and experience as a criminal defense and civil rights lawyer, visits to the "professional visit area" of each of the seven San Diego County jails and the downtown courthouse at 1100

Union Street, interviews with thirteen incarcerated people, at least one from each facility, and with five criminal defense lawyers representing people who are incarcerated in San Diego County jails, the Declaration of Hannah Chartoff, included herewith, and documents provided to me by Plaintiffs' counsel, which are listed in Exhibit B to this declaration.

## STANDARDS GOVERNING ACCESS TO COUNSEL

## I. DUTIES OF CRIMINAL DEFENSE ATTORNEYS

### A. CRIMINAL DEFENSE ATTORNEYS HAVE A DUTY TO COMMUNICATE WITH THEIR CLIENTS

22.    Communication between attorneys and their clients is an essential component of any attorney-client relationship.  This is particularly true for attorneys representing criminal defendants.

23.    Criminal defense attorneys generally meet their clients for the first time shortly after the client has been arrested—meaning that the client is under extreme stress, confounded by their situation, and worried about the future.  The criminal defense attorney's job is to explain the charges and let the client know that she is qualified to guide them through what is inherently a scary, stressful situation.  Face-to-face communication is the only effective way to have this conversation and begin to build a relationship of trust between attorney and client.

24.    Criminal defense attorneys are also charged, early in the attorney-client relationship, with helping the client move for a reduction in bail, which involves asking a series of sensitive questions.  Under California law, bail cannot be denied based on financial wherewithal, and the client is entitled to an individualized analysis of his finances by a magistrate within three days.  The court must consider "the protection of the public as well as the victim, the seriousness of the charged offense, the arrestee's previous criminal record and history of compliance with court orders, and the likelihood that the arrestee will appear at future court proceedings." *In re Humphrey*, 11 Cal. 5th 135, 152 (2021).  Therefore, within three days, a

criminal defense attorney needs to find out her client's net worth, ties to the community, and other facts that will convince the court he will appear at future court proceedings.  The ability to speak to the client in a timely manner is essential to this task.  Critically, a criminal defense attorney's willingness to fight for bail often sets the tone for the attorney-client relationship going forward.  In other words, an attorney's ability to meet with the client and gather personal information from him in the earliest days of his incarceration often lays the foundation of trust that is essential to the representation going forward.

25.     Attorney-client communication is also critical after the bail motion. Once the criminal defense attorney has reviewed the discovery and researched any potential defenses to the charges, it is her duty to convey this information to the client and to elicit from the client information that might advance the defense. Motions to suppress evidence based on *Miranda* violations and unlawful search and seizure begin with the client's description of what happened during and after his arrest.  Facts known to the client that might amount to a technical, partial, or absolute defense must be elicited.  This is essential information that is also sensitive and likely not available through other sources.  Gathering it therefore requires careful questioning in a private setting.

26.     After these conversations, the criminal defense attorney will have a good idea of whether the case is headed to trial, and it is her duty to convey impressions and consult with the client as to how he wishes to proceed.  While some tactical decisions in litigation are for the lawyer to make, others must be made *by the client* after consultation with their lawyer, including the plea to be entered, whether to waive jury trial, and whether the client will testify.  Without the ability to communicate, attorneys may be unable to learn underlying facts from the client, to provide the client with counsel on potential courses of action and legal ramifications, to gain the client's trust so that he is willing to listen to the attorney's advice, or to learn from the client how he wants to proceed in the litigation and plan

1    accordingly.

2        27.    Attorneys' legal ethical standards recognize the importance of client

3    communication.  The commentary to the American Bar Association ("ABA") Model

4    Rules of Professional Conduct explains that "[r]easonable communication between

5    the lawyer and the client is necessary for the client effectively to participate in the

6    representation."  ABA Model Rules of Professional Conduct, Rule 1.4,

7    Comment (1).  To ensure this, California law requires that a lawyer "consult with

8    the client about" the case and "inform[]" the client "about significant

9    developments," among other communications.  *See also* Rule 1.2.

10        28.    In some circumstances, attorneys are explicitly required to

11    communicate case updates to their clients "promptly."  Rules of Professional

12    Conduct, Rule 1.4.1.  Rule 1.4.1, Communication of Settlement Offers, makes clear

13    that plea offers and settlement offers are among the things that an attorney must

14    "promptly" communicate:

15        A lawyer shall promptly communicate to the lawyer's client: (1) all
         terms and conditions of a proposed plea bargain or other dispositive
16        offer made to the client in a criminal matter; and (2) all amounts, terms,
         and conditions of any written offer of settlement made to the client in
17        all other matters.

18    *Id.*

19        29.    The duty of communication is particularly critical in the context of a

20    criminal defendant's relationship with her lawyer, given that—unlike in a civil

21    case—the client's right to an attorney is enshrined in the U.S. Constitution.  The

22    Sixth Amendment guarantees:  "In all criminal prosecutions, the accused shall enjoy

23    the right to … have the assistance of counsel for his defense."  U.S. Const., Amend.

24    VI; *see also* Cal. Const. Art. I § 15.  As the Supreme Court has recognized:  "The

25    special value of the right to the assistance of counsel explains why '[i]t has long

26    been recognized that the right to counsel is the right to the effective assistance of

27    counsel.'"  *United States v. Cronic*, 466 U.S. 648, 654 (1984) (quoting *McMann v.

28    Richardson*, 397 U.S. 759, 771 n.14 (1970)).  "Unless the accused receives the

1   effective assistance of counsel, 'a serious risk of injustice infects the trial itself.'"

2   *Id*. at 656 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980)). "'Of all the rights

3   that an accused person has, the right to be represented by counsel is by far the most

4   pervasive, for it affects his ability to assert any other rights he may have." *Id.*

5   (quoting Schaefer, Federalism and State Criminal Procedure, 70 Harv. L. Rev. 1, 8

6   (1956)).

7       30.    Criminal defense attorneys represent clients in some of the most

8   difficult circumstances of their lives.  The outcome of a criminal case—including

9   what evidence is developed and the client's decision to take a plea deal or go to

10  trial—has direct impacts on the client's liberty, their family, and their future.  The

11  difficult circumstances that surround a criminal defense attorney's work make the

12  development of an in-person relationship with the client even more critical.  In-

13  person visits are the most basic way to foster this relationship.

14      31.    Absent a relationship built through listening to the client, promptly

15  conveying information and reliably visiting the client, the client will have no reason

16  to trust the attorney's advice.  As San Diego criminal defense attorney Brian White

17  informed me during my investigation of this case, "If you are trying to persuade

18  someone to give up part of their life, you must build up trust."  Without trust, a

19  criminal defendant cannot be expected to follow his attorney's advice, including but

20  not limited to advice to accept a plea bargain.  This results in unnecessary

21  continuances, jammed court calendars, and a backlog of cases awaiting trial, where

22  the defendant is likely to fare worse than he would have, had he followed his

23  attorney's advice.

24  **B.    CRIMINAL DEFENSE ATTORNEYS HAVE A DUTY TO
        PROTECT THEIR CLIENTS' CONFIDENCES**

25

26      32.    In addition to the duty of communication, attorneys also have a duty to

27  maintain the confidentiality of their communications with their clients.  As

28  California law and attorney professional ethics standards state:  It is the duty of the

attorney to "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client."  Cal. Bus. & Prof. Code § 6068; *see also* Rules of Professional Conduct, Rule 1.6.

33.    Confidentiality is particularly important when the client is an incarcerated criminal defendant.  As described above, criminal defense attorneys are required to gather sensitive information from clients, including names and addresses of family members and potential witnesses; to have hard conversations with the client about the evidence and how to proceed, including whether to cooperate with the prosecution; and, when preparing the client for trial, to ask the client hard questions the client would face on cross examination.

34.    All of those communications—including the substance of what both the client and the attorney says—might place the client in danger if overheard by jail staff or other incarcerated people.  If the client is considering cooperating with the prosecution, he would need to discuss with his attorney what information he could provide, which similarly could place him at risk of violence and retaliation.  If the charge is for a sex crime or is gang-related, mere knowledge of the specific charges poses a risk.  Personal information about the client's mental health or trauma he experienced could also pose a risk that the client will be a target for violence within the jail.  Incarcerated criminal defendants must be able to communicate with their attorneys about these topics confidentially to avoid those risks.

35.    Full disclosure between client and attorney is only possible if the client is assured that his communications with his attorney will remain private absent his consent.  Legal assistance, the Supreme Court has explained, "'can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.'"  *Id.* (*quoting Hunt v. Blackburn*, 128 U.S. 464, 470 (1888)).  Without the client communicating all relevant information to his lawyer, there can be no functioning of the attorney-client relationship and, thus, no functioning of the entire system of justice, as the U.S. Supreme Court has recognized.  *See Upjohn Co. v.*

1    *United States*, 449 U.S. 383, 389 (1981).

2        36.    The importance of confidentiality in attorney-client communications is

3 further codified in statutes establishing a privilege over attorney-client

4 communications. In California, a client has the privilege "to refuse to disclose, and

5 to prevent another from disclosing, a confidential communication between client

6 and lawyer." Cal. Evid. Code § 952. "Confidential communication" is defined as:

> information transmitted between a client and his or her lawyer in the
> course of that relationship and in confidence by a means which, so far
> as the client is aware, discloses the information to no third persons
> other than those who are present to further the interest of the client in
> the consultation or those to whom disclosure is reasonably necessary
> for the transmission of the information or the accomplishment of the
> purpose for which the lawyer is consulted, and includes a legal opinion
> formed and the advice given by the lawyer in the course of that
> relationship.

12 Cal. Evid. Code § 952.

13        37.    California Evidence Code section 912(a) provides that the attorney-

14 client privilege is waived "if any holder of the privilege, without coercion, has

15 disclosed a significant part of the communication or has consented to disclosure

16 made by anyone." Cal. Evid. Code § 912(a). An attorney, therefore, must take

17 further care to ensure that any communications with their clients are not disclosed to

18 anyone, including to those who might overhear conversations between attorney and

19 client.

20        38.    For those reasons, the ability to have confidential communications

21 between attorney and client is critical to the functioning of the justice system.

22 **II.    STANDARDS FOR ACCESS TO COUNSEL AT DETENTION**
23         **FACILITIES**

24        39.    Because the confidentiality of attorney-client communications is

25 critical to the functioning of the justice system, multiple sources recognize that the

26 responsibility for facilitating those conversations when the client is incarcerated lies

27 not only with attorneys, but also with correctional authorities. While this report will

28 later discuss the San Diego Sheriff's Department's policies and procedures

pertaining to attorney-client communication, this section sets forth the mandate and standards for correctional facilities to facilitate confidential communications between incarcerated people and their attorneys, as recognized by California statutes, the American Bar Association, and the U.S. Department of Justice.

40.     California law sets minimum standards for local detention facilities. *See* Cal. Code Regs. tit. 15 § 1068.  In particular, Title 15 requires facilities to develop written policies and procedures to ensure incarcerated people have access to the court and to legal counsel.  It specifies that such access shall consist of "confidential consultation with attorneys."  *Id*.  It provides that "[a]ttorney visits shall be conducted in a confidential area specified by the institution/facility."  *Id*. at § 3178.  It provides that "[c]onversations between an inmate and an attorney and/or attorney representative shall not be listened to or monitored except for that visual observation by staff which is necessary for the safety and security of the institution/facility."  *Id*. at § 3178(m).

41.     Title 15 also provides that incarcerated people are entitled to "unlimited mail" and that jail staff "shall not review inmate correspondence" to or from state and federal courts and any member of the State Bar.  *Id*. at § 1068.  It provides that jail authorities may open and inspect such mail ,only to search for contraband, cash, checks, or money orders and in the presence of the inmate."  *Id*. at § 1063.  Lastly, it states that "[s]taff may open and inspect but shall not read any part of written or printed materials without the expressed consent of the attorney/attorney representative and inmate."  *Id*. at § 3178(n)(2).

42.     The American Bar Association's Treatment of Prisoners Standards are consistent with California law regarding incarcerated person access to counsel and the courts.  The ABA Standard stresses correctional authorities' affirmative duty to "enable" and "implement" and "facilitate" "a prisoner's confidential contact and communication with counsel."  ABA, Treatment of Prisoners Standards, 23-9.4.  It requires that counsel should be allowed to meet with a incarcerated person in a

1  setting where their conversation cannot be overheard by staff or other incarcerated

2  persons.  It requires that meetings or conversations between counsel and a

3  incarcerated person not be audio recorded by correctional authorities.

4       43.    The ABA's Standard for attorney meetings with incarcerated persons is

5  specific in spelling out the facility's obligations.  *Id.* at Standard 23-9.4(c)(ii).  It

6  provides that "counsel should be allowed to have direct contact with a incarcerated

7  person who is a client, prospective client, or witness, and should not be required to

8  communicate with such a incarcerated person through a glass or other barrier." *Id.*

9  It provides that during a meeting with a incarcerated person, "counsel should be

10  allowed to pass previously searched papers to and from the prisoner without

11  intermediate handling of those papers by correctional authorities." *Id.*  It explicitly

12  instructs correctional authorities not to read letters or other documents sent or passed

13  between counsel and a incarcerated person.  *Id.* at Standard 23-9.4(c)(i)(A).

14       44.    The ABA's Standard regarding telephone calls states that "correctional

15  officials should implement procedures to enable confidential telephonic contact

16  between counsel and a prisoner who is a client, prospective client, or witness,

17  subject to reasonable regulations, and should not monitor or record properly placed

18  telephone conversations between counsel and such a prisoner." *Id*. at Standard 23-

19  9.4(c)(iii)(A).

20       45.    In its Report and Recommendations Concerning Access to Counsel at

21  the Federal Bureau of Prisons' ("BOP") Pretrial Facilities, a U.S. Department of

22  Justice ("DOJ") Advisory Group identified problems with access in BOP pretrial

23  detention facilities and recommended ways to address them.  *See* U.S. Dep't of

24  Justice, Report and Recommendations (hereinafter "DOJ Recommendations"),

25  July 20, 2023.  The Advisory Group included representatives from the Attorney

26  General's Office for Access to Justice, BOP, the National Institute of Corrections

27  and the United States Marshals Service.  The Advisory Group found "areas of

28  concern that warrant immediate attention" and identified reforms that can make an

1    immediate difference in promoting access to counsel, as well as "opportunities for

2    long-term change."

3       46.    For example, the advisory group found that BOP had national and local

4    policies in place but should find better ways to communicate them to staff and

5    stakeholders, including attorneys and incarcerated people. *See id*. at 3.  It

6    recommended that the BOP establish a new Legal Access Adviser position within

7    the BOP's Office of General Counsel and consolidate key legal access duties under

8    one full time position in each pretrial facility. *Id*. at 4.

9       47.    It found that attorneys faced challenges with wait times and

10   inconsistent processes for in-person appointments which can complicate the

11   attorney-client relationship and discourage individuals detained pretrial from

12   seeking in-person visits with their counsel.  It recommended that BOP update its

13   policy to permit walk-in legal visits at all pretrial facilities; explore opportunities for

14   providing scheduled in person legal visits; and consider additional protocols to

15   minimize delays when attorneys are waiting for the limited private meeting spaces

16   available for legal visits. *Id*.  It also recommended that BOP should issue guidance

17   to standardize rules for legal visits involving non-attorney staff and expand the

18   availability of virtual meetings to supplement in person legal visits.

19      48.    The DOJ Advisory Group recommended that BOP look into enclosing

20   phones for incarcerated persons to call their attorneys in a confidential booth setting.

21   *Id*.  It also recommended that BOP consider procuring and implementing scheduling

22   software that would facilitate the arrangement of reliable call times with minimal

23   staff resources. *Id*.

24      49.    Regarding legal mail, the Advisory Group recommended adopting

25   protocols for photocopying suspicious or improperly labeled mail, rather than

26   simply opening it outside the presence of the addressee, discarding it, or returning it

27   to sender. *Id*.  It also recommended that BOP explore the possibility of a free,

28   confidential e-mail system for attorney communication with detained clients. *Id*.

1    at 36.

2        50.    The Advisory Group heard repeated concerns that pretrial detainees do

3    not have adequate access to the discovery in their cases.  It recognized that to mount

4    an effective defense, a defendant should have a meaningful opportunity to review

5    the discovery produced in his or her case.  It recommended that the BOP enhance

6    and update its e-discovery technology, including through improvements to its

7    electronic hardware and software, so that it could accommodate the various formats

8    of electronic discovery.  *Id*. at 40-41.

9        51.    Finally, it recommended that BOP set up mechanisms to monitor and

10   promote compliance with its policies.

11              **SUMMARY OF VISITS TO SAN DIEGO JAIL**
                **PROFESSIONAL VISITING AREAS**
12

13       52.    As noted above, this report is based in part on my visits to the

14   "professional visiting areas" of each of the seven San Diego County jail facilities

15   conducted in March 2024.  Below is a brief summary of those visits, as well as a

16   description of the professional visiting areas.

17       **A.    San Diego Central Jail**

18       53.    San Diego Central Jail, located at 1173 Front Street, San Diego, CA.

19   92101, housed 838 incarcerated people on average in June 2024, according to the

20   Sheriff's Department's Daily Population Report.[1]  According to the Sheriff's

21   Department's website, Central Jail was opened in 1998.  Central Jail's population

22   "consists primarily of special handling incarcerated persons"—*i.e.*, "those with

23   serious medical challenges, those under psychiatric care, incarcerated individuals

24   representing themselves in court, as well as defendants facing high profile trials"—

25   as well as "newly booked incarcerated persons awaiting transfer to other facilities[,]

26

27   ─────────────────────
     [1] *See* Jail Population Statistics (June 2024), San Diego Cnty.,
28   https://www.sdsheriff.gov/resources/jail-population-data.

and pre-arraignment incarcerated persons."[2]  Central Jail is also the facility where the County places the majority of its male population who need wheelchairs.  *See* Classification Matrix for Medical & Psychiatric Housing, MSD Policy NSG.C.12, SD_000331.  The fact that the incarcerated population at Central Jail comprises a substantial number of people awaiting trial or currently in trial makes attorney accessibility to this facility particularly important.

54.    According to the San Diego Sheriff's Department's website, "[t]he state-of-the-art facility makes extensive use of touch-screen controls and video surveillance."[3]  The facility is staffed by just over 200 sworn employees and nearly 200 professional staff members.  It has 11 floors, six of which house incarcerated people.  Each of those floors has its own limited number of professional visiting rooms, consisting of one enclosed booth and three open carrels.

55.    Attorneys check in at a window on the ground floor where they are required to provide a driver's license, bar card, their client's name, and their client's booking number.  They are then told whether there is a professional visiting space available.  If no visiting space is available in their client's housing unit, the attorney waits.  There are no chairs in the lobby or restroom.  There is no place to sit or work.  There is no WiFi, and waits of up to three hours were reported by attorneys and incarcerated people I interviewed.[4]

56.    When space is available, the attorney's bags are thoroughly searched by deputies.  The attorney is directed to take an elevator to the floor where the client is

---

[2] San Diego Cnty., Sheriff's Department, Detention Facilities, San Diego Central Jail, https://www.sdsheriff.gov/Home/Components/FacilityDirectory/Facility Directory/58/109

[3] San Diego Cnty, Sheriff's Dept., Visiting https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/5 8/126

[4] Because Public Defenders are County employees and are part of the Public Safety Group, they have WiFi at the jail facilities.  Private counsel do not.

housed.



**Figure 1**

57.    Figure 1, a floor plan of the fourth floor mezzanine, shows the attorney's path of travel from the elevator to the visiting room (path noted in red). Central Jail – Fourth Floor Mezzanine, SD_000437 (excerpted).  The attorney gets off the elevator, then walks through a corridor to the sallyport (highlighted in pink on Figure 1).  In the corridor, there is an intercom button the attorney must push to request that the sallyport be opened.  The sallyport doors are unlocked by someone (presumably a Sheriff's Department deputy) who is not visible to the attorney attempting entry.

58.    Once the door to the sallyport is unlocked and the attorney has entered the sallyport, there is a second intercom button to push to have a deputy unlock the door into the professional visiting area.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13



**Figure 2**

14

15    59.    Figure 2 (another, more magnified display of the Fourth Floor) shows

16  the layout of the professional visiting area.  *Id*. (excerpted).  The door from the

17  sallyport opens into a narrow room, with three library-like carrels to the right

18  (carrels are noted in orange in Figure 2, while the attorney's path of travel is again

19  noted in red).  Each carrel is open to the rest of the room, has a single chair, and

20  faces a metal counter.  Above the metal counter are bars covered by plexiglass.

21  Below the metal counter is a solid wall.  The chairs are separated by dividers that

22  are approximately three feet wide.  Because each carrel is open to the rest of the

23  room, there is no way that visitors in these carrels can avoid hearing one another

24  speak in a normal voice.  The attorney and her client can also clearly view any other

25  incarcerated person and their attorney from the carrel.

26    60.    On the other side of the plexiglass and bars, incarcerated people sit in

27  individual cubicles, with a chair and metal counter, facing the professional visitor

28  carrels.  I understand that the plexiglass between attorney and client was added in

1    response to Covid.

2        61.    The dividers between the incarcerated people have glass or plexiglass

3    windows, allowing them to see as well as hear other incarcerated people during their

4    professional visits.  Figure 3 shows the inside of the incarcerated person visiting

5    space, where the bars (visible on the right side of the picture) separate the

6    incarcerated person from their professional visitor.  Image of Visiting Space,

7    (SD_1579607).[5]



**Figure 3**

21        62.    To avoid being overheard, attorneys and clients would need to whisper.

22    But to be heard through the plexiglass, especially when there are others talking in

23    the visiting area, they need to raise their voices above normal.  Reportedly, when an

24    incarcerated person is left in the visiting area after his visitor has departed, which

25    frequently happens, he can hear everything other incarcerated persons and their

---

[5] I understand that the date appearing on the lower right of this photograph, as well
as others in this report, are incorrect.  All photographs in this report were taken
during Plaintiffs' counsel's January and February 2024 inspections of the Jail.

1    attorneys are saying.

2         63.    At the end of the professional visiting area—after the three carrels—is

3    a single enclosed booth (highlighted in yellow on Figure 4, which is also an excerpt

4    of SD_000437 and shows the attorney path of travel in red).  The professional

5    visitor who uses this space—a defense attorney, a law enforcement officer, a

6    probation officer, etc.—must walk within inches of the other professional visitors

7    and can not help but hear what they are saying.  Inside the booth with the door

8    closed, a visitor can hear voices in the carrel area clearly.  From the carrels, I could

9    hear what was being said inside the booth.  The booth reportedly had soundproofing

10   panels at one time, but they have been torn off, leaving behind globs of beige putty.



**Figure 4**

25        64.    In each carrel there is a small (approximately 1" x 12") vertical slit on

26   the left side of the plexiglass intended for exchanging papers.  A bar runs

27   horizontally through the slit, however, so papers must be folded to fit through, and

28   only a handful of pages can be passed at a time.  This makes it impossible for an

attorney to go over discovery—which can be hundreds of pages—with the client in a meaningful way.

65.    There is an intercom in the hallway immediately to the left as one enters the professional visiting area.  The intercom must be engaged for a professional visitor to exit the visiting area.  Because there is space for four professional visitors at a time, the button is pushed fairly often, as one or another of them gets ready to leave.  A guard spoke to us through the intercom before we had pushed the button, causing me to believe that deputies could overhear our conversation in the professional visiting area.  The attorneys I interviewed reported having similar experiences.

66.    After leaving the visiting room, the attorney reenters the sallyport.  One attorney reported waiting an hour for a deputy to buzz him out.  An immigration lawyer was reportedly left in the sallyport for four hours, sued the Department, and won a cash settlement.  *See Erubey Lopez v. County of San Diego*, Claim for Injuries and Release of Claims, DUNSMORE 0262500 – 0262504.

67.    In addition to its lack of confidentiality, the visiting area I visited was filthy in March 2024.  There was overflowing trash, what appeared to be blood on the metal shelf in front of an incarcerated person waiting to be moved back to his cell, and smears of bodily fluids on the plexiglass I was required to look through while interviewing incarcerated people.  Figure 5 (a photo from an inspection by Plaintiffs' counsel in May 2024) similarly shows food waste in the visiting area (Figure 5,  SD_1579611).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Figure 5**

### B.    George Bailey Detention Facility

68.    George Bailey Detention Center, located at 446 Alta Rd., 5300, San Diego, CA. 92158, is a maximum security facility and the largest of San Diego's seven jails.  It is designed to house 1220 men; in June 2024 it held 1205 people on average.[6]  It is the facility where the incarcerated people facing the most serious charges are housed, unless they use a wheelchair or have serious mental illness.  The more serious the charges, the more time an attorney is likely to spend with their client.  Because of the potential punishment, defendants are reluctant to plead guilty.  These cases are more likely to involve pretrial motions to suppress evidence and statements, pretrial hearings and trial.  Interviewing the client for bail motions, motions to suppress, and motions for discovery is critical and needs to happen in a confidential setting and a timely fashion.

69.    It takes approximately 30 to 45 minutes to drive to George Bailey from downtown San Diego.  George Bailey has six housing units and a medical area.

---

[6] *See* Jail Population Statistics (June 2024), San Diego Cnty. https://www.sdsheriff.gov/resources/jail-population-data.

1   Attorneys can only visit their clients in the one visiting room associated with the

2   client's housing unit.  There is also a video visiting room, shown in Figure 6

3   (SD_661392) below, which is identical to the professional visiting room attorneys

4   are allowed to use except that there is a camera in one corner and there is no

5   plexiglass shield between the attorney's side of the table and the client's.  While

6   George Bailey's policy and procedure states that "[i]f available, the video visit room

7   can be utilized for professional contact visits," George Bailey Detention Facility

8   Green Sheet, No. P.15.G, May 17, 2023, SD_116028, in practice, this is not always

9   the case.  Interviews with attorneys; emails between George Bailey Staff, Feb 3,

10  2022, SD_661389-661391.  Attorneys report that they have been allowed to use the

11  video visit room rarely.  According to Public Defender Abe Genser, public

12  defenders must make appointments to use the video room, and it is regularly booked

13  up.  But private attorneys told me they have been required to wait to see their

14  clients, even when the video room is not in use.

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**Figure 6**

70.   Captain Johns, who testified as the Sheriff's Department's Rule 30(b)(6) witness, did not know how many incarcerated people were in a George Bailey housing unit, but agreed it could be 200.  Johns Depo. at 14:13-15.  Approximately two hundred men facing the most serious charges share one professional visiting room.

71.   The Department's procedure states that "The professional contact visit will be limited to a reasonable length of time.  The amount of time allotted will be based on facility operations and security needs and may not be arbitrary or capricious in the application.  The complexity of the case and individual case situations may also be considered."  SDSD Manual, No. P.15, SD_065657.  In practice, professional visits have no time limits.  If an expert is there to conduct a forensic examination, for example, the next visitor may have to wait three hours before the room is free.  Defense attorneys interviewed said that if you want to visit a client at George Bailey, you must budget half a day.  Every attorney I interviewed said there have been times they had to leave without seeing their client because of the length of the wait.  Incarcerated people reported expecting their attorneys to visit because they said they would, then having them not show up, resulting in frustration and distrust.  Such disappointments are extremely harmful to the attorney-client relationship.

72.   On the day I visited George Bailey, we were told we were second in line, and we ended up having to wait two hours.  There is no WiFi.  Although there are restroom and chairs, there are no tables allowing an attorney to work.

73.   When the room became available, our bags were searched, and we were directed to follow a colored stripe painted on the floor to the correct housing unit.  At the end of a long hallway, we were instructed to push an intercom button to have a deputy open the door to the visiting area, which we did.

74.   The door opens into a vestibule leading to the professional visiting area on one side and the social visiting area on the other.  The social visiting area, shown

in Figure 7 below, is an open room with twelve telephones for twelve visitors to converse with twelve incarcerated people, who are on the other side of a U-shaped plexiglass wall.  Image of Social Visiting Area, SD_742792.  When it is full, the noise level is high and reportedly makes it difficult to hear in the professional visiting room.  As incarcerated people are brought to the social visiting room, they can see who is in the professional visiting rooms, which makes some clients in the professional visiting area extremely uncomfortable, given the danger they might be in if other incarcerated people suspected that they were sharing certain information with their attorneys.



**Figure 7**

75.     Captain Johns testified that, to his knowledge, the Sheriff's Department has never tested or evaluated whether visits can be overheard by other incarcerated people at George Bailey.  Johns Depo. at 79:17.

76.     The professional visiting room is approximately 6' by 10.'  The room is bifurcated by a metal table, as shown in Figure 8 (SD_742801) and Figure 9 (SD_742802) below.  There is a door on one side of the table for attorneys to enter

and a door on the other side for incarcerated people to enter. There is a plexiglass shield welded to the table between the incarcerated person and attorney. *Id.* The incarcerated person is handcuffed to the table. *Id.* There is a one-way mirror behind the incarcerated person through which the guards can look into the visiting area and, presumably, see what the attorney and client are working on without being seen. *Id.*



**Figure 8**

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /



**Figure 9**

77.     There is a separate visiting room for incarcerated people in the medical unit.  When I visited, the door behind the incarcerated person was kept open throughout the interview.  The incarcerated person was handcuffed to the table.  The room has glass windows looking out toward the front desk.  The jail personnel in the front office could look in on our meeting.  In fact, they had to keep an eye on the meeting as there was no functioning intercom and we were told to signal them when we wanted to be let out.  Captain Johns acknowledged that it has been known for years that the intercom systems at Vista and George Bailey need to be replaced.  *Id*. at 97:21-98:25.

**C.     Rock Mountain Detention Facility**

78.     Rock Mountain Detention Facility, located at 446 Alto Road, Ste. 5400, San Diego, CA  92158, housed 166 sentenced male incarcerated people in June 2024.[7]  It is located close to George Bailey and likewise takes 30 to 45 minutes to

---

[7] Jail Population Statistics (June 2024), San Diego Cnty.,

1   reach by car from downtown San Diego.

2       79.   Currently, Rock Mountain is only partially open, with one housing unit

3   in operation.  Rock Mountain's professional visiting rooms are similar to George

4   Bailey's.  The one open housing unit has two professional visiting rooms, one of

5   which is reserved for video visits.  Presumably, the other housing units under

6   construction will be the same.

7       80.   The first time I attempted to visit an incarcerated person at Rock

8   Mountain, we were told that the professional visiting room was in use and the video

9   room was booked for a video visit.  We left and returned approximately two hours

10  later.  The room was still unavailable, and the video room was in use.  Sometime

11  later we were told the room had become available, but we did not have enough time

12  to get in and out of the facility before another appointment and left without meeting

13  with the incarcerated person.

14      81.   The following day we returned.  On this occasion, we were allowed to

15  use the video room for a professional visit.  After our bags were searched, we

16  climbed a stairway then walked down a long hall with signage directing us to the

17  particular housing unit.

18      82.   The video visiting room has glass windows, so attorney-client

19  communications are visible to detention personnel and other visitors and

20  incarcerated people.  We stood outside the room until a deputy arrived with the

21  incarcerated person and unlocked the door.  During this time, we could hear voices

22  coming from the other professional visiting room.

23      83.   Plexiglass separates the attorney from the incarcerated, but unlike

24  George Bailey where it is possible to pass papers around the shield, at Rock

25  Mountain the shield is wall to wall, meaning there is no open air between the

26  attorney and client.  Papers can only be passed through a narrow slit.  The

27

28  https://www.sdsheriff.gov/resources/jail-population-data.

incarcerated person's right hand was handcuffed to the table.  As at George Bailey, there is a one-way mirror behind the incarcerated person separating the visiting area from a guards station, making it possible for guards to observe the meeting without being seen.

### D.    East Mesa Reentry Facility

84.    East Mesa Reentry Facility, located at 446 Alta Road, Ste. 5200, San Diego, CA  92158, houses 153 male incarcerated people as of June 2024.[8]  Its rated capacity is 760.  It is a medium security facility.  Its "mission" is "to operate the reentry services for the Sheriff's Department."[9]

85.    East Mesa is across the parking lot from George Bailey, and likewise takes 30 to 45 minutes to reach by car from downtown San Diego.  After our identification was checked we waited 10 to 15 minutes before being led through the guards' break room and to a visiting room with a plexiglass shield and a small slot for exchanging papers.  As shown in Figure 10 below, the incarcerated person, a trustee, was chained to the floor.  Image of Meeting Room, SD_745190.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[8] Jail Population Statistics (June 2024), San Diego Cnty., https://www.sdsheriff.gov/resources/jail-population-data.

[9] San Diego Cnty., Sheriff's Department, Detention Facilities, East Mesa Reentry Facility, https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/102/109.



**Figure 10**

E.     **Vista Detention Facility**

86.     Vista Detention Facility, located at 325 S. Melrose Dr., #200, Vista, CA  92081, has the capacity to house 825 incarcerated people.  In June 2024, it housed 711 people, on average.[10]

87.     The population at Vista consists "primarily of incarcerated people awaiting court proceedings for North County cases."[11]  In addition, according to the Sheriffs' Department website, Vista houses incarcerated people "with medical

---

[10] Jail Population Statistics (June 2024), San Diego Cnty., https://www.sdsheriff.gov/resources/jail-population-data.

[11] San Diego Cnty. Sheriff's Dept., Detention Facilities, Vista Detention Facility, https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/60/.

1  challenges, those under psychiatric care, an administrative separation unit, [and]

2  defendants facing high-publicity trials."[12]  It also has a Veterans module.

3      88.    It takes approximately 45 minutes to an hour to reach Vista from

4  downtown San Diego.  At Vista, one room is designated for video visits, one for

5  incarcerated people in protective custody, and four for professional visits with

6  incarcerated people who are not in protective custody.  The four "regular"

7  professional visiting rooms—one of which is shown in Figure 11 below—are in a

8  row, each with walls of plexiglass, making it possible for a person in one room to

9  see into all of the other rooms.  Image of Professional Visiting Room, SD_743361.

10  One criminal defense lawyer described the professional visiting area as "a

11  fishbowl."



**Figure 11**

25      89.    Behind the incarcerated people, there is a plexiglass window into a

26  guards' booth.  Attorneys I interviewed reported that these booths are not

---

[12] *Id*.

soundproof.  Captain Johns testified that, to his knowledge, the Sheriff's Department has never tested or evaluated whether sound can transmit between one professional visiting room at Vista and another.  Johns Depo. at 78:6-9.

90.    Incarcerated persons in Protective Custody generally visit their attorneys in a triangular room with windows on two sides and cinderblock walls. That triangular visiting room is shown in Figure 12.  Triangular Visiting Room, SD_743727.



**Figure 12**

91.    The incarcerated person I visited was in Protective Custody.  He was seated on a stool against the wall.  One hand was handcuffed to the wall.  The chain was very short; four to five inches.  It would not have been possible to cuff his other hand, given the length of chain and the placement of the stool.  The chain was too short and the table too small to allow him to take notes without contorting his body into an uncomfortable and unsustainable position.

92.    Cinderblock and glass walls cause voices to echo.  It was very hard on my ears.  It was hard to hear what the incarcerated person was saying.

93.     There is no functioning intercom for attorneys to communicate with jail staff.  Instead, attorneys are instructed to signal to the guards in the office across the hall when they are ready to leave.  Again, this means guards are required to watch the meeting.  Neither visitor nor incarcerated person has an emergency alarm.

94.     After the professional visitor leaves, the deputies are responsible for taking the incarcerated person back to his housing unit.  On March 17, 2023, an incarcerated person was left in a Professional Visit Room at Vista for six hours, during which time he was not provided with water, food, or a bathroom break.  When deputies removed the incarcerated person, "it resulted in the use of force." Peace Officer Records, IA Case 2022-049.1, SD_548198.  The incident was referred to Internal Affairs.  The status is unknown.  This incident—and others like it— dissuade incarcerated people from going to visits with their lawyers, further impeding attorney client communications.

95.     Vista is unique in that it allows attorneys to make an appointment.  Even with an appointment, however, an attorney must wait.  The day I visited we had an appointment but still had to wait 30 minutes.  We asked while waiting if we could see another incarcerated person after we completed our first visit.  We were told we could not until four hours later.  Notably, I observed that the professional visiting rooms were all empty as we were leaving, but because the additional incarcerated person we requested to speak with was in protective custody, we were told we would have to wait four hours.  The person we visited told us that he had occasionally met with his attorney in this area, despite the fact he is in protective custody.  This suggests there are exceptions to the rule and that these regular visiting rooms could be made more available for visits with clients in protective custody.

F.     **South Bay Detention Facility**

96.     South Bay Detention Facility, located at 500 Third Avenue, Chula Vista, CA  91910, housed 350 incarcerated people on average in June 2024,

including incarcerated people charged with sex crimes.[13]  South Bay is about a 20 to 40 minute drive from downtown.

97.  Sex crimes, often sexual abuse of a minor, are a category of cases involving sensitive information and severe consequences to an incarcerated defendant's well-being, should they be disclosed to other incarcerated people. People who are charged with sex crimes, particularly those involving children, are at risk from other incarcerated persons when in the general population.[14]  A lack of privacy in the visiting area is particularly problematic under these circumstances.

98.  South Bay has four professional visiting rooms; two on one side of a short hallway, two on the other.  At the time of my visit, I understood that one room was reserved for Public Defender video calls and another was reserved for Probation.  The rooms are separated by plexiglass windows and it is easy to see from one room into the others.  From a short distance away, deputies are also looking in.

99.  If the rooms attorneys are allowed to use are occupied, the attorney must wait.  In January 2022, an attorney complained of waiting more than two hours, when only one of the professional visiting rooms was in use.  *See* Email to E. Frierson from M. Carter, January 7, 2022, SD_661329.  A deputy explained that from the start of Covid, they had been using only one professional visit room, "due to cross contamination and because the rooms are close in proximity."  Email to R. Williams from K. Buchanan, January 7, 2022, SD_661330.

100.  The individual rooms are small with a narrow table between the incarcerated person and attorney, bifurcated by a plexiglass shield.  I could hear

---

[13] Jail Population Statistics (June 2024), San Diego Cnty., https://www.sdsheriff.gov/resources/jail-population-data.

[14] *See generally* Zoukis Consulting group, "Sex Offenders in Prison | Surviving Prison as a Sex Offender," https://federalcriminaldefenseattorney.com/prison-life/special-tactics/how-sex-offenders-survive.

voices from all three of the nearby rooms.  I could see and hear the speaker on the video screen.  It appeared possible that the two way video camera was transmitting sound from other rooms in the visiting area.[15]  Anyone walking by or standing in an adjoining room could see the documents being reviewed with the client.

101.  Captain Johns testified that, to his knowledge, the Sheriff's Department has never tested or evaluated whether sound can transmit between one professional visiting room at South Bay and another.  Johns Depo. at 78:14-15.

102.  There is an intercom the attorney must engage to be let out.

**G.    Las Colinas Detention and Reentry Facility**

103.  Las Colinas Detention and Reentry Facility, located at 451 Riverview Parkway, Santee, CA. 92071, housed 513 female incarcerated people on average in June 2024.[16]  It has a rated capacity of 1,208 incarcerated people.

104.  It takes approximately half an hour to reach Las Colinas from downtown San Diego.  On the day I visited, we arrived about 2 p.m. and were admitted to a visiting room 20 minutes later.  The first incarcerated person we requested arrived approximately ten minutes after that.

105.  The facility appeared clean.  The visiting room is larger than the rooms at the other jails; about 8' x 10,' and includes chairs on either side of a table.  The visiting room has a camera and possibly other recording equipment in the ceiling, as shown in Figure 13.  Las Colinas Visiting Room, SD_744683.  Attorneys reported that this causes them to question the confidentiality of their client meetings.  Although enclosed, the visiting area is not soundproof as we could hear others talking while waiting for the incarcerated person.  There is a button to push to alert a

---

[15] When asked whether video visits are recorded by the Department, Captain Jesse Johns, the person most knowledgeable about attorney visits, testified he did not know.  Johns Depo.at 50:5.

[16] *See* Jail Population Statistics (June 2024), San Diego Cnty., https://www.sdsheriff.gov/resources/jail-population-data.

1    guard to come let you out.  Here, as at all of the other facilities, the incarcerated

2    person, though a trustee, was handcuffed to the table.



**Figure 13**

16    106.   When we were shown into the room the door was propped open.  When

17    the incarcerated person was shown in through a door on the other side of the room,

18    it too was propped open.  At our request, the doors were closed.

**OPINIONS**

**I.    THE SAN DIEGO SHERIFF'S DEPARTMENT IMPEDES ATTORNEY-CLIENT COMMUNICATION**

22    107.   Plaintiffs alleged in the Third Amended Complaint that the Sheriff's

23    Department's practices "systematically impeded and interfere with" attorney-client

24    communications, in particular by not providing adequate means for such

25    communication in-person, by telephone, or by mail.  Dkt. 231 at ¶¶ 409–20.  Based

26    on my review of documents, interviews, and my visits to the Jail, I agree.

27    108.   It is my opinion that the means provided by the San Diego County

28    Sheriff's Department for attorneys to meet and communicate with their incarcerated

1    clients are insufficient to ensure that confidential attorney-client consultations can

2    occur.  As one San Diego Assistant Public Defender Abe Genser  reported, "there is

3    no way to have a truly privileged conversation" with an incarcerated client in the

4    County of San Diego.  In fact, in my opinion, the Sheriff's Department's policies,

5    procedures, and practices actively impede attorney-client communications.

6    109.    In theory, there are five means through which attorneys can

7    communicate with their clients incarcerated in San Diego County Jails:  in-person

8    visiting, telephone calls, legal mail, video calls, and email.  Video calls are not

9    available to private counsel.   Brown Depo. at 10:12-16; interviews with attorneys.

10   Emails are not confidential as a matter of policy.[17]  This report therefore focuses on

11   in-person visiting, telephone calls, and legal mail—the only means through which

12   all attorneys can hope to communicate confidentially with their incarcerated clients.

13   110.    However, as explained below, none of those means is reliable.  Each

14   one suffers from extreme delays—if an attorney can communicate with their client

15   at all—and all are rife with breaches of confidentiality.

16   111.    The San Diego Sheriff's Department does not have any oversight

17   policy or practice in place that ensures that attorneys can communicate

18   confidentially with their incarcerated clients.  Jesse Johns, Captain of the Central

19   Jail—designated by defendants as the person most knowledgeable about the

20   Sheriff's Department's policies, procedures, and practices relating to the

21   incarcerated persons access to their counsel and courts, including legal mail,

22   confidential phones calls, attorney callbacks, professional visiting spaces, legal

23   forms, library access, and those issues in sections 8A and B of the Complaint, *see*

24

---

25   [17] The Sheriff's Department Manual of Policies and Procedures explicitly states that
     "email messages received via the incarcerated persons email system are not
26   considered confidential/legal mail."  Manual of Policies and Procedures, No. P.3,
     March 11, 2022, SD 065038; *see also* San Diego County Sheriff's Department –
27   Public Information Plan re: Email (SD 602327) ("There is no expectation of privacy
     for e-mail messages; therefore, this system should not be used for legal or
28   confidential mail, or any other privileged communications.").

1   Johns Depo. at 8:13-21—evidenced the Department's lack of oversight of

2   incarcerated people's access to the courts and counsel.  He testified that the Sheriff's

3   Department is aware that attorneys and other professionals can overhear each

4   other's conversations in visiting rooms.  *Id.* at 75:25-76:3.  He testified that the

5   Sheriff has never tested whether incarcerated people in the visiting area can hear one

6   another's communications with their lawyers.  *Id.* at 76:22-77:5.  Christina Ralph,

7   then-Commander of Operations, testified, "I have heard of delays with … attorneys

8   wanting to meet clients," and offered excuses.  Ralph Depo. at 40:13-14 ("there are

9   a number of different incidents that can delay" those visits, including "just the

10   enormity of what's happening business-wise with the facilities.").  Neither Captain

11   Johns nor then-Commander Ralph described any efforts to address these concerns.

12   *See* Ralph Depo. at 41:11.  As defense attorney Melissa Bobrow put it, "there

13   appears to be some level of resentment against defense attorneys."

14           112.   The Sheriff's Department's lack of attention to its responsibility to

15   ensure that attorney-client communications can happen reliably and confidentially

16   was also evidenced by all the things Defendants' person most knowledgeable about

17   incarcerated persons' access to their counsel and courts did not know.  For example,

18   Captain Jesse Johns was unaware that Vista has a telephone reservation system for

19   attorney visits.  Johns Depo. at 12:11-18.  He did not know how many professional

20   visiting rooms there are at George Bailey per house.  *Id.* at 14:16-18.  He was

21   unfamiliar with the Green Sheet policies of jails where he had not personally been

22   assigned.  *Id.* at 15:9-20.  He did not know whether, at George Bailey, incarcerated

23   people are able to use the professional visiting areas in houses in which they do not

24   live.  *Id.* at 16:7-10.  He knew that the time an attorney arrives at the jail is logged

25   into the jail's computer system, but did not know if any other times, *e.g.*, when the

26   visit begins, are entered with respect to attorney visits.  *Id.* at 17:17-19.  He did not

27   know if every facility and every professional room has intercom capabilities.  *Id.* at

28   21:13-22:3.  Other critical information that Captain Johns—the person most

1    knowledgeable about the Department's provision of access to the courts and

2    counsel—did not know is highlighted in the relevant sections below.

3        113.    As will be shown, none of the ways private attorneys have to

4    communicate with their clients in the San Diego County Jails—in-person visits,

5    telephone calls, and legal mail—permits them to communicate reliably and

6    confidentially, thereby depriving incarcerated persons of the effective assistance of

7    their criminal defense counsel.  The Sheriff's Department's failure in policy and

8    practice either to provide such a reliable, confidential means of communication or to

9    enact an oversight mechanism to ensure such communication can occur falls short of

10   its affirmative duty to do so.

11       **A.    In-Person Visits**

12       114.    Plaintiffs alleged in the Third Amended Complaint that the Sheriff's

13   Department does not provide adequate, confidential in-person visiting opportunities

14   for incarcerated people to meet with their attorneys.  Dkt. 231 at ¶ 415.  Based on

15   my review of documents, interviews, and my visits to the Jail, I agree.

16       115.    The San Diego Sheriff's Department's Detention Services Bureau –

17   Manual of Policies and Procedures ("SDSD Manual") states generally that it is the

18   Department's policy to "ensure incarcerated person(s) have access to courts and

19   legal counsel including . . . confidential consultation with attorneys."  SDSD

20   Manual, No. N.5, May 13, 2022, SD_065001.  Section N.5 does not provide any

21   additional detail regarding in-person attorney-client consultations, nor does it

22   provide any detail about how the Department will ensure that incarcerated people's

23   communications with their attorneys are confidential.

24       116.    SDSD Manual Section P.15 describes the Policy and Procedure for in-

25   person visiting by "professionals," including attorneys.  SDSD Manual, No. P.15,

26   May 4, 2022, SD_065056.  According to the "Policy" portion of Section P.15,

27   "[p]rofessional contact visits with incarcerated persons are permitted when such

28   visits are necessary to the administration of justice."  *Id.*  Section P.15 further states

that such visits "will be limited to a reasonable length of time … based on facility operations and security needs and may not be arbitrary or capricious in the application." *Id.* at SD_065057.  The "Procedures" outlined in Section P.15 include only: security guidelines, how to handle property brought into detention facilities, and a definition of "authorized personnel." *Id.* at SD_065063.  Like Section N.5, there is no discussion about how the Department will ensure that incarcerated people's communications with their attorneys are confidential.

117.   Section P.15's definition of "authorized personnel" outlines who qualifies as a "professional," such that they may use the professional visiting areas. *Id*.  That list includes not just attorneys, but law enforcement officers, investigators, probation officers and parole officers, immigration and customs enforcement agents, grand jury members, military personnel, County Department of Health and Human Services Employees, medical, psychiatric and mental health professionals, lab technicians, polygraph operators, individuals working for an attorney who have a "Letter of Authorization," diplomatic and consular officials, clergy, and "other authorized professionals." *Id.* at SD_065056-60.

118.   Each of the seven facilities is physically different, and most have their own additional procedures ("Green Sheets") for professional visits, which will be discussed in more detail below.  Like Sections N.5 and P.15, none of these Green Sheets address how to ensure that incarcerated people's conversations with their attorneys will be private—except to say that they will take place in the "professional visit area." *See id.* at SD_065057.

119.   According to the Sheriff's Department's "Public Information Plan" for the Detention Services Bureau, professional "[v]isit rooms are available on a first-come first-served basis."[18]  They cannot be scheduled on-line at any facility, and

_____

[18] San Diego Sheriff's Department, Public Information Plan, Updated December 2023, available at https://www.sdsheriff.gov/home/showpublisheddocument/7719/6383944022620700

1    only one of the seven jail facilities, Vista, has a telephone reservation system.  In

2    contrast, "[s]ocial in-person visit reservations can be scheduled online.  The San

3    Diego Sheriff's eVisit System may be accessed through the Who's in Jail website."[19]

4    Telephone requests for social visit reservations are also accepted.[20]  That Vista

5    Detention Facility accepts scheduled attorney visits and all facilities accept

6    scheduled social visits suggests that the Sheriff's Department has the technical

7    capacity to schedule attorney visits.

8        120.   The Sheriff's Department's policy on in-person attorney-client visits is

9    flawed on its face, because, by its text, it permits Sheriff's Department staff to deny

10   incarcerated people in-person visits with their attorneys if, in a staff member's

11   opinion, the visit is not "necessary to the administration of justice" or if the

12   attorney's visit time is not "reasonable."  *See* SDSD Manual, No. P.15, May 4,

13   2022, SD_065056.  Such discretion—especially when attorney visits are lumped in

14   with other professionals and no specific direction regarding attorney visits is

15   provided—is inappropriate and insufficient to safeguard the rights of incarcerated

16   people.

17       121.   In practice, the San Diego County jails simply do not have enough

18   professional visiting rooms to meet the needs of the County's incarcerated

19   population.  The lack of sufficient space for attorney-client meetings is exacerbated

20   by the fact that the professional visiting areas are used not only by attorneys, but

21   also by law enforcement officers, investigators, probation and parole officers,

22   immigration and customs enforcement agents, clergy, forensic examiners and

23

24   _____

     00

25   [19] *See* Visiting, San Diego Cnty. Sheriff's Department

26   https://www.sdsheriff.gov/bureaus/detention-services-bureau/visiting.

27   [20] *See id.*  The Sheriff's Department's policy on social visiting allows contact social
     visiting with children only for female incarcerated people.  Men are denied access to
28   contact visiting with their children.  This policy discriminates on the basis of gender.

1    everyone else listed under "Authorized Personnel" in SDSD Manual Section P.15.

2    *See id.* at SD_065058.  (A forensic psychiatric exam, for one, can take three hours.)

3        122.   Due to the lack of sufficient professional visiting space, the defense

4    attorneys I interviewed reported that they routinely face unpredictable, substantial

5    waits to meet with their clients—often as long as three hours.  All of those attorneys

6    described instances in which they had to leave the Jail facility without seeing their

7    client because of the length of the delay.

8        123.   According to Rule 30(b)(6) testimony on behalf of the Sheriff's

9    Department, the Department is aware of long wait times for attorneys to visit with

10   their clients.  Johns Depo. at 18:20-24.  The Department is aware of attorneys

11   waiting several hours to see a client, then leaving the jail in frustration. *Id.* at 19:8-

12   21.  Indeed, one attorney who waited several hours before leaving Central Jail in

13   frustration formally complained to the Captain of the Jail.  The Captain "believed

14   staffing and poor communication played a role."  Email to S. Manning from K.

15   Bibel, October 26, 2023, SD_659605.

16       124.   Another attorney complained to the Sheriff's Department about the

17   wait at South Bay Detention Center.  Email to E. Frierson from M. Carter,

18   January 7, 2022, SD_661329.  She had gone to advise her client of what was to

19   happen in court the next day.  Only one of the four rooms was in use, yet she was

20   told she would have to wait.  She asked to use a social visiting room but was denied.

21   The deputy drafting the memo about this incident explained that this was because of

22   the Department previously was found to have recorded attorney-client meetings in

23   that area. *Id*. at SD_661330.  The attorney waited more than two hours before she

24   was able to meet with her client.

25       125.   Despite its knowledge of these problems, the Sheriff's Department does

26   not appear to be taking any remedial measures to minimize the delays in attorney-

27

28

1   client visiting times.  *See* Ralph Depo 40:25-41:12.[21]

2       126.   Delays are also caused by the Department's faulty intercom system.  At

3   some facilities, such as South Bay and Vista, attorneys are required to bang on the

4   window, or wait to catch a Deputy's eye, to be let out of the visiting room because

5   the intercoms are not operable.  As described below, the Department has known that

6   its intercom systems are "obsolete" and in need of replacement since no later than

7   June 2022.  This issue is not just a matter of convenience.  It is a matter of safety.

8   Intercoms are the only way attorneys and incarcerated people who need help from

9   jail staff can summon them quickly.  While money has been allocated to begin the

10  intercom replacement project, "It just hasn't started yet," according to Christina

11  Ralph, the Commander of the Detention Bureau's Operations.  Ralph I Depo. at

12  103:22-104:5.  And she has no timeline for when it will.  *Id.* at 104:6-7.

13      127.   The defense attorneys I interviewed carry caseloads of 30 to 50 cases.

14  This means they are required to appear in court almost every day, leaving less than

15  20 half days a month to meet with clients, draft pleadings, and prepare for hearings

16  and trials.  It is not feasible to do all of this work and visit clients if each visit takes

17  half a day.  All interviewees agreed that delays getting into and out of the

18  Department's facilities impairs their ability to effectively represent their clients.

19      128.   Attorneys face obstacles meeting with their clients in addition to

20  delays.  Interpreters are required to communicate with many criminal defense and

21  civil rights clients.  Not all criminal defense lawyers are bilingual, and Spanish is

22  not the only language that needs translation.  The Department's Security Guidelines

23  provide that a professional visitor's "[c]learance shall entail checking the reason and

24

25  [21] The Public Defenders' Office reportedly has a rule that attorneys will visit clients
26  in person before the client's first court appearance after their appointment as
    counsel.  If they do not, they must document why.  I was informed that this rule is
27  often broken and that the reason documented is that attorneys cannot do the work
    they need to do to prepare for the preliminary hearing if they are going to be stuck at
28  jail for half a day waiting to see their client.

1   authority for entry and verifying the visitor's identity by photographic identification

2   and a professional identification card."  SDSD Manual, No. P.15, SD_065056.  But

3   then, regarding interpreters, the Guideline provides:

> INTERPRETERS:  All interpreters must be accompanied
> by an attorney, law enforcement officer, probation officer
> or other justice or medical personnel.  If not accompanied
> by a law enforcement officer, the interpreter must be a
> county employee, a licensed court interpreter or
> designated as an interpreter by court order.

8   SD_065059.  In California, there is no such thing as a licensed interpreter.

9   California requires certification for its court interpreters for fifteen specific

10  languages (Arabic, Armenian (Eastern), Armenian (Western)*, Cantonese, Farsi

11  (Persian), Filipino (Tagalog), Japanese*, Khmer, Korean, Mandarin, Portuguese,

12  Punjabi (India), Russian, Spanish, and Vietnamese.) and registration for others.[22]

13  The Department's rule, if uniformly applied, would prevent every professional

14  visitor other than law enforcement officers from employing the services of an

15  interpreter to communicate with an incarcerated person.

16         129.   I am informed staff discretion was exercised to prevent a sign language

17  interpreter from accompanying a member of the plaintiffs' legal team into a

18  confidential attorney visit in November, 2023, at Central Jail.  Jail staff claimed the

19  interpreter must provide a license to enter; the interpreter had a National Interpreter

20  certificate, but that would not do.  According to the Department, the interpreter

21  would have been allowed in if accompanied by an attorney instead of a law clerk.

22  Email exchange between G. Grunfeld and E. Pappy, November 10, 2023.  None of

23  this makes sense; the rule specifically allows law students and law clerks to enter as

24  professional visitors, with a letter from the supervising attorney.  *See* SDSD Manual,

25

26  _____

[22] California Courts. Language Access Services. Become a Court Interpreter.

27  https://languageaccess.courts.ca.gov/court-interpreters-resources/becoming-court-
    interpreter; Orientation Manual for Aspiring Interpreters, United States District

28  Court, Southern District of California, p. 21.

No. P.15, SD_065059.  Because the law clerk could not communicate with the client without the interpreter, the meeting could not take place.

130.   Once an attorney gets in to see her client, she is faced with a professional visiting area that is not confidential.

131.   For one thing, professional visiting areas throughout the Jail facilities are equipped with two-way microphones.  Captain Jesse Johns explained that when a visitor pushes the intercom button, it sends a signal to the control deputies, and once a control deputy touches the touchscreen alert on their panel, it opens up the line of communication.  Johns Depo. at 23:9-17.  When the deputy releases his button, he can hear "everything that's on the other side coming [his] way."  Johns Depo. at 92:20-23.  The line remains opens until the deputy responds to the next alert or silences the intercom.  *Id.* at 23:21-24:6.  The people in the visiting room— *i.e.*, the attorney and her incarcerated client—have no way of knowing whether or not sound continues to be transmitted from the professional visiting room to the control room.  *Id.* at 26:15-28:8.  Although Captain Johns testified that training officers instruct deputies to turn off the line of communication after they respond to the professional visitor's request, he admitted that this is not written down anywhere.  *Id.* at 28:9-30:20.  This is true for all jails that have touchscreen capabilities, which includes Central, George Bailey, Las Colinas, and possibly others.  In sum, throughout the professional visiting areas, there are microphones connecting those rooms to Sheriff's deputies, and attorneys have no way of knowing whether the microphones are on when they meet with clients.  And, according to Captain Johns, there is no documented training instructing deputies not to listen to attorney-client conversations.  *Id.* at 29:23-30:21.

132.   Another concern about confidentiality arose in 2021, when it emerged that the Sheriff's Department recorded dozens of privileged attorney-client conversations between December 2020 and May 2021 and between August 2021 and October 2021.  All of these recordings were available to the district attorney's

1    office, and at least one was used at a trial.[23]  The Department said the problem was

2    with Securas Technologies, the company that provides communication services in

3    the County's jails.  The Department said it was not able to simply disable the

4    recording after it learned of it, but instead had to involve Securas.  It is unclear

5    when, if ever, the recording stopped.  Captain Jesse Johns testified that the

6    Department is "in the process of transitioning" from Securas to a new company.

7    Johns Depo. at 36:13-17.

8        133.    In addition to the possible breaches of confidentiality by microphone

9    and recording, many of the professional visiting areas are not soundproofed,

10   meaning attorney-client conversations can be overheard by other incarcerated

11   people or professional visitors, as explained in more detail below.

12       134.    The following subsections describe the additional, specific flaws with

13   in-person visiting at each of the jail facilities.[24]

14           **1.    San Diego Central Jail.**

15       135.    SDSD Detention Services Bureau-San Diego Central Jail Green Sheet,

16   No. P.15.C.1, on "Professional Contact Visits" explains that "professional visits will

17   be conducted in the professional visit area of each housing unit."[25]  Those visiting

18

19   _____

20   [23] Jeff McDonald, "Sheriff's deputies recorded jail conversations between inmates
     and their lawyers," San Diego Union-Tribune, November 6, 2021,
21   https://www.sandiegouniontribune.com/2021/11/06/sheriffs-deputies-recorded-jail-
     conversations-between-inmates-and-their-lawyers.

22   [24] Of the seven jail facilities, East Mesa was the only one in which the wait time was
     minimal and the visiting space seemed to be truly confidential.  Notably, East Mesa
23   houses the fewest number of incarcerated people, and all of its residents have
     already been sentenced, suggesting they are relatively less likely to require meetings
24   with their criminal defense counsel.

25   [25] *See* Central Jail Green Sheet,  Green Sheet P.15.C.1 also references an "Interview
     Room located on the 9th Floor."  No criminal defense attorney I interviewed
26   reported being taken to a separate professional visiting room or of hearing of such a
     room.  In addition, when I visited Central Jail, we asked if there was a separate
27   visiting room with more space, so that the client we were interviewing could look at
     documents.  We were told that the only visiting rooms for professional visits were
28   the ones described above.

1  areas, described in detail above, are subject both to lengthy delays and lack of

2  confidentiality.

3      136.   Attorneys attempting to meet with clients at the Central Jail face delays

4  at multiple stages of the process, including both entering and exiting the

5  professional visiting area.  First, an attorney must wait in the lobby for a

6  professional visiting space to be available.  As noted above, there are no chairs in

7  the lobby, nor is there any WiFi, which would enable an attorney to continue her

8  work while she waits.  Nor is there any restroom available to attorneys in this

9  facility.  Second, once the attorney is told there is a visiting room available, the

10  attorney must wait to get buzzed through a sallyport to enter the professional

11  visiting area, which requires a Sheriff's deputy located remotely to open two doors.

12  While they wait to be buzzed into the sallyport, there are similarly no chairs—there

13  is only an empty hallway.  Attorneys have reported waiting close to half an hour for

14  the door to the sallyport to open.  Third, after the attorney completes the interview,

15  she must press the intercom button to inform deputies that the visit is complete, then

16  wait to be buzzed out of the sallyport again.  Attorneys have reported waiting an

17  hour or more to be released through the sallyport.

18      137.   Such delays at Central Jail are not new.  In 2013, an attorney sued the

19  County of San Diego after he was locked in a Central Jail visiting room for hours.

20  The County settled the claim for $4,000.  DUNSMORE 0262500.

21      138.   Yet, the delays persist.  The attorneys I interviewed reported that the

22  routine delays both entering and exiting the professional visiting area at Central Jail

23  at times dissuade them from visiting clients there.  For example, an attorney

24  reported that he cannot visit clients past a certain point in the mid-afternoon, for fear

25  that he would face the hour-long delay leaving the professional visiting area and

26  miss daycare pickup.  Similarly, despite the proximity between Central Jail and the

27  downtown courthouse, defense attorneys cannot reliably plan to visit clients before

28  an afternoon court appearance, for fear that they would miss a hearing while locked

in the professional visiting area.

139.   Class counsel in this case has also reported to me that they had to wait many hours to interview their clients.  In 2023, they sent a letter to attorneys for the County requesting to discuss ways to streamline and expedite attorney visits.  This request was immediately rejected by emailed response.

140.   Attorneys' difficulty in getting in and out of the professional visit areas for client meetings is further complicated by the fact that Central Jail does not allow attorneys to begin professional visits at certain time periods during the day.  For example, during my visit to Central Jail, I was told that we would not be allowed to start a client meeting between 11:00 a.m. and noon because deputies would be eating lunch at that time.

141.   The professional visiting areas are also not confidential.  As explained above, the visiting rooms are equipped with two-way microphones, which do not indicate to the incarcerated people or their attorneys whether they are transmitting sound to deputies.

142.   In addition, on each floor, only one of the four spots for professional visitors has a door that closes.  The other three visiting areas are connected, with no wall separating the professional visitors from each other.  During my visits with incarcerated people at the Central Jail, I was able to overhear the conversations of other attorneys meeting with their clients at the same time—even when I was in the so-called "private" visiting room that was separated from the other three visiting areas by a door.

143.   During his deposition, Captain Johns testified that the Sheriff's Department is aware that attorneys and other professionals can overhear the conversations of other professionals in the professional visiting area at Central Jail. Johns Depo. at 75:21-76:23.  As noted above, the list of "professionals" authorized to use the professional visiting area/room includes law enforcement officers, probation officers, and others whose interests are not aligned with those of the

1    client.  In essence, Captain Johns has admitted that the Sheriff's Department knows

2    it is not ensuring that incarcerated people can have privileged communications with

3    their attorneys at the Central Jail.

### 2.    George Bailey Detention Facility.

5    144.    As explained by the George Bailey Detention Facility Green Sheet No.

6    P.15.G ("Professional Contact Visits):

> There are two professional visit rooms in each of the six
> main housing units.  An additional professional visit room
> is located in the medical visiting area.  One of the rooms in
> each house is designated for video conferencing, which is
> considered a professional visit.  If available, this room can
> be utilized for professional contact visits; however,
> priority will be given to scheduled video conferences. . . .

11    145.    As noted above, there are approximately 1,200 people incarcerated at

12    the George Bailey Detention Facility, across "six main housing units," plus the

13    medical area.  Thus, there are at most two professional visiting rooms available for

14    each housing unit of approximately 200 incarcerated people.  Of those two

15    professional visiting rooms, only one is consistently available for in-person visiting.

16    The other "is designated for video conferencing." Although the Green Sheet

17    indicates that the visiting room that is "designated for video conferencing … *can* be

18    utilized for professional conduct visits," it does not routinely happen.  *Id.* (emphasis

19    added).  As noted above, public defenders must make appointments to use the video

20    room, and it is regularly booked up.

21    146.    The criminal defense attorneys I interviewed explained that they were

22    sometimes, but not always, allowed to conduct an in-person interview in the video

23    conferencing room, when no video conference was ongoing.  Documents produced

24    by the Sheriff's Department establish the same, including an email in which Tonya

25    Benjamin, then the Administrative Lieutenant at George Bailey, reported that staff

26    "would *sometimes* use the VCON [video conferencing] room" for in person

27    meetings.  Email from T. Benjamin, February 3, 2022, SD_660644 (emphasis

28    added).

147.   As a result of the limited number of professional visiting areas—which, as noted above, are used not only by attorneys, but also by other professionals—attorneys report multi-hour delays in attempting to meet with their clients.  For example, Plaintiffs' counsel in this litigation reported waiting over three and half hours to meet with incarcerated clients at George Bailey.  The criminal defense attorneys I interviewed reported multi-hour delays being so consistent at George Bailey that they find it essentially impossible to visit clients in-person during regular business hours.  Instead, they exclusively go to George Bailey on the weekend, in the early morning, or in the evening.

148.   I similarly experienced delays when attempting to meet with incarcerated people during my March 2024 visit to George Bailey.  We initially asked to meet with an incarcerated person in medical housing at approximately 9:15 a.m.  We were told that the one professional visiting room for people housed in medical was full, but were able to meet with incarcerated people in other housing units instead.  By the time we finished those meetings, it was approximately 10:50 a.m., and we returned to the lobby to wait for the medical housing professional visiting area.  We waited until approximately 1:00 p.m., when we were finally called to visit the client in medical housing.  Therefore, we were not able to meet with the client in medical housing for well over three and a half hours after originally requesting to see him.  Although we were able to meet with other clients in other housing units for some of that time, over two hours of the time we were just sitting and waiting, in a professional visiting room with no WiFi and very minimal telephone service.

149.   When our visit in the medical professional visiting area was completed, we were locked in the visiting room.  Although we pressed the intercom button and banged on the door of the visiting room, it took several minutes before staff noticed, and we were released from the visiting area.

150.   In addition to the concerns with delay, the attorney visiting rooms at

George Bailey also suffer from limited confidentiality.  The concerns with two-way microphones described above also exist at George Bailey.  In addition, as noted above, incarcerated people walking into the social visiting room pass by a window directly into the attorney visiting area.  And there is a one way mirror allowing guards to see into the visiting area without being seen.

### 3.    Rock Mountain Detention Facility.

151.    As noted above, the layout of Rock Mountain is similar to that of George Bailey.  It is therefore subject to the same constraints regarding the availability of professional visiting rooms.  As of June 2024, 166 people were incarcerated there on average, and there were only two visiting rooms, one of which was used for video conferencing.

152.    I am not aware of any Green Sheets regarding operations at Rock Mountain, and none are posted online.

153.    The first time I attempted to visit Rock Mountain, both professional visiting rooms were in use.  One of the rooms opened approximately an hour and twenty minutes after we requested the interview.  However, because of another appointment, we were unable to wait to complete the interview that day.  Instead, we left and were required to come back the next day.

### 4.    Vista Detention Facility.

154.    As noted above, Vista is the only one of the San Diego Jail facilities that accepts phone reservations for attorney-client meetings.  According to Vista Detention Facility Green Sheet No. P.15.V ("Professional Contact Visits"), "[t]here are six rooms which are designated for confidential communication between inmates and professional visitors."  Four, which are downstairs, are directly adjacent to each other and are separated only by walls of plexiglass; two are upstairs, for use by protective custody and some other incarcerated people.  Attorney-client meetings in either meeting space suffer from failures of confidentiality and reliability.

155.    Despite the existence of Vista's reservation system, attorney-client

meetings still suffer from delays, which can be unpredictable.  For example, the day that I went to Vista, our scheduled client meeting did not start until 30 minutes after the appointment start time.

156.   In addition, attorneys who are unable to make an advance appointment—*e.g.*, because there is an urgent reason that they need to meet with the client—face substantial delays.  For example, during the same visit to Vista, we requested to meet with another client, who we did not have an appointment to see.  We were told that we would need to wait two and a half hours to see him.

157.   In certain visiting rooms at Vista, attorneys experience extreme delays in exiting the visiting room—similar to the experience at Central Jail described above.  Attorneys I interviewed described needing to bang on the windows to get the attention of deputies and being forced to wait 20 minutes or more until a deputy happened to be walking by to be allowed to exit.

158.   In addition to the delays described above, the downstairs Vista visiting rooms—which are adjacent to each other—suffer from a lack of confidentiality.  Those rooms are separated by walls that are half plexiglass, and incarcerated people visiting in the rooms can clearly see each other meeting with their attorneys or other professional visitors.  One attorney reported her client was fearful and unable to proceed with their meeting while another incarcerated person, whose attorney had departed, remained in a nearby booth.

159.   And, even if the rooms were soundproof, the existence of substantial plexiglass means that incarcerated people who communicated via sign language can be "overheard."

### 5.     South Bay Detention Facility.

160.   Although South Bay Detention Facility has a Green Sheet governing professional visiting, it states only that "incarcerated individual Professional Visits will be conducted in compliance with the guidelines set forth in Detention Policy and Procedure, Section P. 15" and provides minimal guidance about movements of

1    people in protective custody.  South Bay Green Sheet, No. P.15.S, September 6,

2    2023, SD_0116353.

3        161.    In June 2022, a power spike to the building "took out the memory of

4    the Alphacom main control intercom."  Email from C. Murphy to S. Roberts, July 8,

5    2022, SD_704059.  Two weeks later Chris Murphy, Electronic Security, wrote that

6    due to the equipment's antiquated nature, it was no longer serviceable, and it was

7    time to upgrade the system.  *See* Email from C. Murphy to M. McArdle at al.,

8    July 8, 2022, SD_704058.  Two weeks after that, Lieutenant Kelly Buchanan wrote:

> I wanted to see if there is an update on this.  Our intercoms are not
> consistently working and none of our professional visit room ones are
> working at all.  This is a huge liability.  Yesterday we had an IP
> defecate in a pro-visit room because the call box did not work for him
> to notify anyone that he needed out.  This is unacceptable.
> Additionally, two weeks ago, an attorney was stuck in the room with an
> IP for almost an hour because she had no way to communicate the visit
> was over. … [I]t was known these intercoms have been down for
> almost a month.

14    Email from K. Buchanan to Staff, July 21, 2022, SD_704056-704057.  On July 22,

15    Darren (Scott) Bennett writes, "Yes, the system is not repairable.  This has been a

16    known issue to be coming for sometime by all, just like Vista and GB ("George

17    Bailey")."  Email from S. Bennett to Staff, July 22, 2022, SD_704054.  On July 31

18    the Lieutenant was told that "repairing the obsolete system is not going to happen.

19    This could take from a few weeks, to several months to devise a plan, figure out

20    how to fund and more importantly, get a procurement method in place."  *Id.* at

21    SD_704056.  During my visits there were several rooms with intercoms that did not

22    appear to be working.

23        162.    Attorney visits at South Bay suffer from lack of confidentiality for

24    many of the same reasons highlighted above.  As in Vista, each of the professional

25    visiting rooms is separated from another professional visiting room by only a wall of

26    plexiglass, which is not soundproof.  Incarcerated people I interviewed reported that

27    they could easily overhear conversations going on in other professional visiting

28    areas while meeting with their attorneys.

163.   In addition, the South Bay visiting rooms also include the two-way microphones described above, and therefore suffer from the same concerns about deputies being able to hear attorney-client conversations.

### 6.    Las Colinas Detention and Reentry Facility.

164.   The visiting rooms at the Las Colinas Detention and Reentry Facility suffer from the same confidentiality concerns about two-way microphones raised above.  In addition, each of the visiting rooms is equipped with a very visible camera, the functioning of which is unclear.

165.   And, although the wait times at Las Colinas are currently manageable, it is worth noting that that facility houses less than half its rated capacity at present. It is not clear that wait times would be similarly short if Las Colinas were at full capacity.

### 7.    County Courthouses

166.   Nor is the lack of reliable, confidential visiting space for attorney-client meetings at the San Diego County Jails made up for by appropriate visiting space at the County's courthouses.  Despite its policy that "all efforts shall be made to ensure attorney/client confidentiality," San Diego County Sheriff's Department, Court Services Bureau, Policies and Procedures Manual, No. E.9, the facilities for attorney visits with incarcerated clients at the San Diego County courthouses are not confidential.

a.    At San Diego County Central Courthouse, located at 1100 Union Street, San Diego, which opened in late 2017, there is a door on the east side of each courtroom that leads to an area where attorneys can speak to clients who are in custody before their court appearances.  The area consists of a hallway with three carrels and one closed room.  Each carrel has a stool, a counter and a glass window. The incarcerated people are on the other side of the glass in open carrels of their own.  Attorneys must talk to their clients on a phone and must raise their voices to be heard.  The incarcerated people's wrists are cuffed to a waist chain, with two

links between the cuff and the waist chain, requiring them to contort their bodies to use the phone.  Everyone can hear what each other is saying, even in the closed room.  As one attorney put it and all whom I interviewed agreed, "It is absolutely not confidential."

        b.     At the East County Courthouse, located at 250 East Main Street, El Cajon, an incarcerated person must talk to her lawyer while sitting on a bench, handcuffed to the wall, in a hallway with deputies walking back and forth.  Multiple incarcerated persons and attorneys can hear one another.

        c.     At the North County Courthouse, located at 325 South Melrose Drive, Vista, an attorney must go into the holding tank to talk to their client.  There are other incarcerated people in there and may be other attorneys as well.  It is noisy.  There is one private room but it is only for clients charged with sex offenses.

        d.     At the South County Courthouse, located at 500 Third Avenue, Chula Vista, attorneys can sometimes have a private room, but other times they are required to speak to the client in a holding cell with three or four other people present.

167.   Because the courthouses do not have facilities for private consultations, clients are forced to waive the attorney client privilege and talk to their attorney in front of other incarcerated people or request a continuance, prolonging their time in jail and potentially forfeiting their chance to accept a plea deal that had been offered for a day.

168.   In summary, it is my opinion that the Sheriff's Department—by policy and practice—impedes attorney-client visits by forcing attorneys to endure unjustified delays and failing to provide professional visiting rooms with the requisite degree of privacy.  In several facilities, conversations in the professional visiting areas can be overheard by other incarcerated people and professional visitors, making the visits non-confidential.  Notably, these professional visiting areas are not only used by other defense attorneys, but also by probation officers and

1   other law enforcement officials.  Therefore, on the rare chance an attorney has the

2   opportunity even to meet with their client in-person—in light of the delays noted

3   above—the client and the attorney understand they can be overheard, impeding their

4   communications and undermining the privilege.

5       169.   Moreover, the Sheriff's Department is aware of these problems, but has

6   failed to undertake any remedial measures to correct them.

7       170.   These unjustified delays and denial of confidential spaces limit

8   attorneys' ability to fulfill their duties of communication and confidentially to their

9   clients.  Such impairment of attorneys' duties threatens the entire system of justice.

10  The Sheriff's Department's failures in this regard mean that it falls short of its duties

11  to facilitate attorney-client communications.

### B.    Telephone Calls

13      171.   Confidential legal telephone calls are an important alternative to in

14  person visits when time-sensitive legal issues arise, or when attorneys are

15  geographically distant from their clients.  In San Diego, it is not uncommon for

16  defense attorneys to have clients housed at several different County jails.  Defense

17  lawyers I interviewed had clients from Vista to South Bay, Central to George

18  Bailey, and sometimes all of the above.  For the reasons stated above, driving from

19  one Jail to another then waiting to get in is time consuming, sometimes prohibitively

20  so.  When a minor issue can be addressed in an attorney-client telephone call, it is in

21  the interest of all of the stakeholders to facilitate the call.

22      172.   The Sheriff's Department's policies and procedures for attorney-client

23  telephone calls fails to address this need.  It is neither reliable nor confidential.  As

24  explained in more detail below, the Jail does not provide a functioning system for

25  attorneys to schedule phone calls with their incarcerated clients or otherwise to

26  request and receive a call from their clients.  In addition, incarcerated people's

27  phone calls with their attorneys are never confidential, because they take place in the

28  dayroom or the yard, where the incarcerated person is surrounded by other people,

1 recording devices, and cameras.

### 1. Failure to Complete Requested Call Backs

3   173.   Plaintiffs alleged in the Third Amended Complaint that the Sheriff's
Department fails to inform incarcerated people that their attorneys have requested
callbacks and, as a result, "[a]ttorneys repeatedly place calls for their incarcerated
clients that are never returned."  Dkt. 231 at ¶¶ 411–12.  Based on my review of
documents, interviews, and my visits to the Jail, I agree.

8   174.   Some of the Department's detention facilities have written procedures
for how staff are to handle calls from attorneys requesting a "callback" from their
clients.  Pursuant to the written procedures, when an attorney requests a call back,
the Jail is to notify the appropriate housing floor or send an attorney call back slip to
the designated control Deputy.  The "Deputy shall make an entry into the
[incarcerated person's] history in JIMS [the Jail Information Management System],
documenting the delivery of the call back request to the individual.  The log shall
include if the incarcerated person was provided the opportunity to complete the call
back, or the reason the incarcerated person's call back could not be completed, e.g.
facility wide lockdown etc.  *See, e.g.*, Central Jail Green Sheet No. N.5.C.1,
SD_116501; George Bailey Green Sheet No N.5.G, SD_116030; Las Colinas No.
N.5.L, SD_116211.  As far as I am aware, East Mesa, Rock Mountain, Vista, and
South Bay do not have relevant Green Sheets.

21   175.   As the Central and Las Colinas Procedure provides, callbacks are only
logged when a deputy receives a callback request and delivers it to the incarcerated
person.  In other words, as Captain Johns confirmed, callback requests that are not
delivered to the incarcerated person are not logged.  *See* Johns Depo. at 40:2-4
(Sheriff's Department logs only "the attorney callbacks that are given to"
incarcerated people).  There is currently no tracking mechanism for attorney
callback compliance.  *Id.* at 40:11-13.

28   176.   These policies are insufficient on their face to ensure that incarcerated

1   people are able to communicate with their attorneys.  As an initial matter, four of the

2   Jail's seven facilities do not appear to have explicit policies setting forth the attorney

3   callback procedure.  The lack of any explicit policy requiring attorney callbacks to

4   be passed along to incarcerated people, completed, and logged affords deputies too

5   much discretion (*i.e.*, to not communicate the callback requests or not allow an

6   incarcerated person to make the call).

7       177.   Notably, although one of Plaintiffs' attorneys attempted to request call

8   backs (through a paralegal) from incarcerated people at East Mesa in the week

9   before our visit, Plaintiffs' office was unable to reach anyone at East Mesa by

10  phone, despite repeated attempts.  The lack of any policy governing callbacks

11  suggests that there is not an organized system in place for attorneys to request

12  callbacks at that facility.

13      178.   The failure of the Jail's tracking of attorney callbacks is supported by a

14  review of the callback log Defendants produced.  *See* Callback Log, 2023,

15  SD_727548.  This log includes 2,459 entries, which are dated from August 25, 2023

16  to November 28, 2023.  The entries span multiple jail facilities and are not limited to

17  callback requests, but also include "pro contact visits," *e.g.*, 8/25/23 11:00 a.m.

18  entry, 11/27/2023 6:49 a.m. entry, and "social phones," *e.g.*, 9/15/23 11:11 a.m.

19  entry.  Even assuming that all 2,459 entries represent a callback request, that

20  averages fewer than 40 callback requests per week day.[26]  That number seems

21  unrealistically low for an average daily population of 3,971 people in 2023, many of

22  whom have active cases underway.[27]  Moreover, the callback log produced at

23  SD_727548 includes only four callback requests over that period from Plaintiffs'

24  counsel in this action, which is not consistent with Plaintiffs' counsel's recollection

25

26  ---
    [26] There are approximately 64 non-holiday weekdays between August 25 and
    November 28.

27  [27] *See* Jail Population Statistics (June 2024), San Diego Cnty.,

28  https://www.sdsheriff.gov/resources/jail-population-data

1  of the same time period.   Exhibit C, Declaration of Hannah Chartoff.

2      179.   Critically, the Sheriff's Department is aware that there are incidents in

3  which attorney callbacks have not been completed.  Johns Depo. at 40:14-16.  Yet, it

4  fails to provide Green Sheets for some facilities and fails to revise the vague Green

5  Sheets for others. *See id.* at 40:25-41:3 ("Q: An other than individual talks with –

6  and/or training with deputies, is there anything else being done to address [failure to

7  complete callbacks]?  A: No.").

8      180.   In practice, the Sheriff's Department's callback system rarely functions

9  as intended.  Attorneys I interviewed referred to the callback system as a "joke" and

10 "a crap shoot."  They reported only a 10-20% chance that a client will get the

11 message.  One of the plaintiffs alleges his attorney placed one dozen callback

12 requests and none of them was communicated to him.  Another alleges his attorney

13 placed six calls that were not communicated to him.

14     181.   Anthony Edwards, one of the named Plaintiffs in this litigation, further

15 testified:  "There was actually one time where the attorney call[ed] for me … and

16 the deputy told me 'oh, I forgot to give it to you.'  He had the message.  But he just

17 forgot to give it to me.  That happened … quite a few times."  Edwards Depo at

18 164:11-13.  Similarly, Plaintiff Jesse Olivares testified that he was not always

19 "notified of attorney callbacks."  Olivares Depo. at 151:5-14.

20     182.   The week before I visited the jails, one of Plaintiffs' attorneys had her

21 assistant request callbacks from the incarcerated people we were planning to visit

22 for three days in a row.  When we met with the incarcerated people, we learned that

23 most of them had received no more than one of the three callback requests, and

24 generally not the first one.  All of the incarcerated people and lawyers interviewed

25 reported call back requests that were made to the jails but were not passed on by jail

26 staff to the client.

27     183.   The Sheriff's Department—through their attorneys—essentially

28 confirmed that their attorney callback system is inadequate to accommodate a

sufficient number of calls between incarcerated people and attorneys as of June 2024.  In late May, I understand that Plaintiffs' counsel was investigating a situation in a particular housing unit of Central Jail and as a result placed approximately 20 call back requests for individuals in that module.  In response, Defendants, through their counsel, asserted that Plaintiffs' counsel was "intentionally interfering" with Jail operations and threatened to restrict Plaintiffs' counsel's ability to place callback requests to only five individuals in the Jail per day.  Email from E. Pappy to G. Grunfeld et al., June 10, 2024 ("Please be advised that only 5 [attorney callbacks] will be processed per day as you are intentionally interfering with operations, ability process these requests along with all of the other call backs requests they get, and other IP's ability access phones during available time for their own attorney call backs relating to their pending criminal matters.").  I understand that, during a June 18, 2024, meet and confer about this issue, Defendants' counsel stated that it was difficult for the Jail to accommodate multiple callback requests at Central Jail in a single day.  Given that there are approximately 900 people incarcerated at Central Jail, many of whom are currently in trial or are preparing for trial, the fact that only a small fraction of them per day can speak to their attorneys is extremely concerning.

## 2. Failure to Allow Adequate Access to Phones

184.  Plaintiffs alleged in the Third Amended Complaint that the Sheriff's Department denies incarcerated people access to phones to call their attorneys, *e.g.*, by "refus[ing] to release [them] from [their] cells" when attorneys have requested a callback.  Dkt. 231 at ¶ 412.  Based on my review of documents, interviews, and my visits to the Jail, I agree.

185.  In addition to the problems with communicating attorney callback requests to incarcerated people, the Sheriff's Department further limits incarcerated people's phone access by forcing them to wait until their time in the dayroom to return the call.  This means that the attorney does not get a return call within a

1  reasonable amount of time, maximizing the chance that attorney and client will not

2  connect, and ensures that the call will not be private.  While there are some

3  exceptions, as discussed below, they are rare and the Department's policies and

4  procedures do not encourage them.

5      186.   It is Sheriff's Department written policy that, "[a]ll incarcerated people

6  have the availability of unlimited collect telephone use for communication with their

7  attorneys."  SDSD Manual, No. N.5, May 13, 2022, SD_065001.  It is Sheriff's

8  Department procedure that "telephones will be located in areas accessible to

9  incarcerated persons during dayroom or recreation time when they are allowed

10 outside of their assigned calls or dorm living units."  SDSD Manual, No. P.2,

11 May 4, 2022, SD_065036.  These policies do not provide any direction regarding

12 how an incarcerated person can have a confidential conversation with his attorney

13 when the rest of the module is in dayroom.

14     187.   In addition, the telephones incarcerated people are given access to in

15 order to call their attorneys are only available during the limited time incarcerated

16 people are allowed to use the dayroom.  Different housing units have different

17 dayroom schedules.  According to the incarcerated people I interviewed at Central

18 Jail, for example, incarcerated people are in the dayroom from 7 a.m. to 11 a.m. and

19 1 p.m. to 4:30 p.m., but the schedule changes and the jail is sometimes locked down.

20 Let us assume criminal defense attorneys get to the office at 8:30 a.m. or 9:00 a.m.

21 The criminal calendar at the downtown Courthouse is called at 10:00 a.m. (which

22 means the attorney must leave the office by 9:30 a.m. and will return around 11:30

23 a.m.) and at 1:30 p.m. (which means the attorney must leave the office at 1:00 p.m.

24 and will return around 3:00 p.m. or later).  And then there is lunch.  Attorneys are

25 only available by phone for a fraction of the time incarcerated people have access to

26 a phone.  If attorneys and clients had the ability to schedule a call in a private

27 setting, this problem would disappear.

28     188.   The only time an incarcerated person can have a confidential phone call

1    with their attorney is when, miraculously, (1) the attorney places a callback request

2    that is delivered to the incarcerated client; (2) when the dayroom is not currently

3    being used by other people; and (3) the deputy on duty exercises his or her

4    discretion to let the incarcerated person out of his or her cell to return the call.

5    There is no policy encouraging deputies to make this accommodation and it

6    reportedly happens very rarely.  And, even then, the incarcerated person is still

7    speaking on the phone with his attorney from the dayroom, and may or may not be

8    overheard by recording devices or people who are nearby.

9        189.   Another problem is that when an incarcerated person calls and their

10   attorney is unavailable, they are unable to leave a message for the attorney.   The

11   Sheriff's Department's phone system disconnects unless a person answers the

12   phone.  Like many criminal defense attorneys I know, San Diego criminal defense

13   attorney Melissa Bobrow is a solo practitioner who does not have a receptionist or

14   an answering service.  Instead, she relies on the voicemail feature of her mobile

15   phone.  Because an incarcerated person cannot leave a message on voicemail, and

16   all calls from the jails come from the same phone number, she does not know which

17   client has called.

18              **3.    Lack of Confidentiality**

19       190.   Plaintiffs alleged in the Third Amended Complaint that the Sheriff's

20   Department "often fails to protect the confidential attorney-client relationship" when

21   incarcerated people speak to their attorneys on the phone.  Dkt. 231 at ¶ 414.  Based

22   on my review of documents, interviews, and my visits to the Jail, I agree.

23       191.   Sheriff's Department policy and practice denies incarcerated people

24   access to confidential phone calls with their attorneys.  The Sheriff's Department

25   breaches its duty to provide confidentiality in two ways: first, by failing to provide

26   any confidential space for the incarcerated person to be in while he is on the phone

27   with his attorney, and second, by failing to implement a system that ensures that

28   phone calls with attorneys are not recorded.

192.   As explained above, the phones available for use by incarcerated people are in the middle of the dayroom.  *See* SDSD Manual, No. P.2, May 4, 2022, SD_065036; *see also* Johns Depo. at 42:2-4 (confirming that callback requests are completed in the dayroom).  By placing the telephones in that public area and setting aside no private room or enclosed soundproof booth where incarcerated people can speak to their attorneys, the Sheriff's Department ensures that incarcerated people cannot have confidential calls with their attorneys.

193.   Indeed, a sign posted near the phones warns:  "The phones in this area may be monitored or recorded.  You have no expectation of privacy when speaking on the telephones in this area."  East Mesa Signage, April 16, 2024, SD_744942.



194.   Incarcerated people hardly have to be told this, given that the multiple phones in the housing unit are located very close together, and there are always other incarcerated people using the telephones or in line waiting to use a telephone during their limited time in the dayroom.  Photographs of the telephones incarcerated people must use to call their attorneys are below.

/ / /

/ / /

/ / /

/ / /

195. In Central Jail: (SD_1525891)



196. In George Bailey: (SD_745556, SD_743040, SD_745560)

 



197. In East Mesa: (SD_745221, SD_744962, SD_744943)

 



198.   In Vista:  (SD_745574, SD_743634)[28]



199.   In South Bay:  (SD_1525981, SD_1525995)



---

[28] I understand from Plaintiffs' counsel that there are telephone booths in the booking area at Vista, which incarcerated people can use to contact counsel while going through booking.  However, it is my understanding that those phones are not used by incarcerated people once they have been moved into the housing units at Vista.

200.   And in Las Colinas:  (SD_744461, SD_744410)

 

201.   As these photographs show, some housing units have phones lined up along a wall within a few feet of one another.  Other housing units have kiosks with four phones or six phones on each side, one or two of which are video phones.  The dayrooms—including the areas around the phones—are regularly filled with both guards and other incarcerated people.  There are tables and chairs nearby.  I am informed by class counsel who have inspected the jails that there is often a television blaring, meaning that anyone speaking on the phone must raise his or her voice to be heard.  There is a video camera visible near some of the phones. *See, e.g.*, South Bay Facility Photo (SD_1525995).

202.   As the incarcerated people I interviewed expressed, they know that when they talk on the phone, "all the other inmates can hear you.  There is no confidentiality."  "Everyone can hear each other."

203.   Yet Captain Johns testified that, despite knowing that callback requests are completed in the dayroom, at times with other incarcerated people next to them, the Sheriff's Department has never considered providing a confidential space to incarcerated people to complete their attorney callbacks.  Johns Depo. at 42:2-13.

204.   The Sheriff's Department should implement procedures to enable confidential telephonic contact between counsel and a incarcerated person who is a client, prospective client, or witness, and should not monitor or record properly placed telephone conversations between counsel and such a incarcerated person.

205.   Other confidentiality concerns arose from the Sheriff's Department's chosen phone provider and their policy regarding recording incarcerated person phone calls.  The Department's policy, "Monitoring Telephone Calls/Visits/Mail," makes clear that unless and until an attorney's number has been entered into the "Do Not Record" database, an incarcerated person's calls with his attorney will be recorded:

> All telephone calls made by incarcerated persons will be recorded unless the call is made to a number that has been verified by the Detention Investigations Unit (DIU) as registered to an attorney, physician or religious advisor; and entered into the "Do Not Record" database of telephone numbers.  All in-person and video social visits, with the exception of contact visits, will be recorded using the incarcerated person telephone system.  Incarcerated person telephone calls, social visits, emails, and U.S. mail will be provided to law enforcement personnel upon request.

SDSD Manual, No. P.17, May 4, 2022, SD_065061.  As previously noted, recordings of telephone calls were provided to the District Attorney and used against incarcerated people in 2021.  *See supra*.

206.   Even if that practice has been discontinued, the Jail's policy means that any call the incarcerated person makes to a lawyer before the lawyer is retained and added to the "Do Not Record" list will be recorded.  Additionally, incarcerated people described difficulties having their private counsel added to the "Do Not Record" list.  One incarcerated person reported that he has been trying for months to have the New York lawyer he hired to help him retain his medical license added to the list.  Since the Department has not added him, their calls are being recorded. Another incarcerated person reported that it took at least six months for his private attorney to be added to the Do Not Record list.  Given that unless and until an attorney's number is added, the recorded calls with his or her client "will be provided to law enforcement personnel upon request," these delays are unacceptable.

207.   A number of problems arose from the Department's recent shift in telephone providers.  I understand that the current provider is Smart

1  Communications, a Florida company, and it is a Florida area code that appears when

2  an incarcerated person calls someone.  Attorneys I interviewed reported that lawyers

3  representing incarcerated people had to be re-authorized before their calls with their

4  clients were not recorded.  For several weeks, when incarcerated people called their

5  lawyers, they heard a notice that by continuing they were consenting to having the

6  call recorded.

7       208.   One of the incarcerated people I interviewed reported that when he

8  attempted to return Plaintiffs' attorney's callback request, he was not able to

9  connect.  He called back several times.  In other cases, it was reported that phone

10 lines had been crossed.  One attorney reported hearing an incarcerated person who

11 was not his client speaking to someone else on another line.  Others reported that

12 calls are frequently rejected, calls get cut off, they can hear the caller, but the caller

13 cannot hear them; it sometimes sounds like the person you call is shouting and the

14 voice quality is bad.  It is hoped that the system can be fixed, but to my knowledge

15 that has not happened yet.

16                              *      *      *      *

17      209.   In sum, the lack of confidentiality, incarcerated persons' difficulty

18 connecting with their attorneys given the limited hours they have access to phones,

19 and the jail's failure to deliver attorney callback requests render telephones an

20 inadequate way for attorneys to communicate with their clients in the San Diego

21 County jails.

22      **C.    Legal Mail**

23      210.   The Sheriff's Department's final means of attorney-client

24 communication, legal mail, is neither reliably timely nor confidential.  Plaintiffs

25 alleged in the Third Amended Complaint that the Sheriff's Department interferes

26 with incarcerated people's legal mail.  Dkt. 231 at ¶¶ 418–19.  Based on my review

27 of documents, interviews, and my visits to the Jail, I agree.

28      211.   The SDSD Manual, No. P.3, Incarcerated Person Mail, provides that all

correspondence, except for confidential/legal mail "is subject to being scanned, copied and read." *Id.* at SD_065037. As for confidential legal mail,

1. Incarcerated persons may correspond confidentially with the state and federal courts [and] any member of the State Bar. . .

2. Attorneys are required to take measures to safeguard the confidentiality of communications with their clients. For attorney mail, it shall be the sender's responsibility to identify confidential/legal mail on the front of the envelope with the words "legal mail," "confidential mail," or another similar descriptor.

3. *All incoming U.S. mail within the purview of confidential/legal mail shall be opened and inspected for contraband in the presence of the individual it is addressed to.* Absent any security concerns, the mail shall then be given directly to the individual.

4. Upon receipt of incoming U.S. mail, Detentions Processing Division (DPD) staff will sort through the mail and remove any items identified as confidential or legal mail. DPD staff will verify the individual is in custody by utilizing the master card or booking summary screens and forward the confidential/legal mail as outlined in facility-specific green sheets. All other mail will be routed to the MPC for processing.

5. Electronic email messages received via the incarcerated persons email system are not considered confidential/legal mail.

6. *Incarcerated persons will seal outgoing mail that comes within the purview of confidential/legal mail in the presence of a deputy after the deputy has inspected the envelope to ensure there is no contraband in it.* Under no circumstances will a deputy accept a piece of sealed confidential/legal mail from an incarcerated person. If there is reasonable suspicion as to the confidentiality of the sealed outgoing mail, the deputy should contact the watch commander for a determination on a course of action.

*Id.* at SD_065037-065038 (emphasis added).

212. In practice, several incarcerated people reported that deputies do not follow this procedure. Incarcerated people—and even attorneys, when they dropped off documents for a client—reported seeing deputies read legal mail. Several incarcerated people reported that they had received legal mail that had been opened outside their presence. One witness cited in the Complaint alleges he sent an envelope containing documents to Plaintiffs' counsel. Dkt. 231 at ¶ 418. It arrived empty and opened.

213.   As another example, Named Plaintiff Michael Taylor received legal mail that had been opened outside his presence and submitted a grievance regarding the issue, which was denied, and he further appealed.  Taylor Grievance Report, May, 17, 2022, SD_073941.  The responses to the grievance and appeal are contradictory.  The initial grievance response states:  "I spoke to the Deputy who handed you the mail and he stated that the mail had already been opened prior to him receiving it and that is the reason he handed it to you opened already."  *Id.* at SD_073942.  The appeal response, on the other hand, states:  "[A]n interview with the deputies working that night was conducted ….  All three deputies remember the grievant and his complaint.  However, they did not open the mail item nor could they recall the condition of the mail item when they distributed the mail."  *Id.* at SD_073943.

214.   This treatment of legal mail appears to be due in part to the ambiguity of the term "inspect."  One Sergeant, concerned that his staff was not "inspecting" legal mail closely enough, instructed them in an email not to interpret the term narrowly:

> Just wanted to remind everybody to search and inspect legal mail prior to giving it to an incarcerated person.  It's ok to go through everything and not just skim through the pages.  You can take the papers out of the envelope.  You're not "reading" it.  You're inspecting the contents for drugs and contraband. …

Email from B. Bourgeois to All Sworn Staff, March 23, 2023, SD_640255.  Captain Johns confirmed that this memo conforms with Department policy.  Johns Depo. at 46:5-47:8.

215.   "Skim" is defined in the Oxford American Dictionary as "to read quickly, only noting the chief points."  The Sergeant's instruction above to "not just skim through the pages" is clearly an instruction to read them.  Any argument that a closer inspection is required to detect drugs is undermined by Captain Johns' testimony that at the mail processing center they do not open legal mail but "they have machines that basically detect narcotics to make sure that [legal mail is] safe to

open whenever it does get to its designation." Johns Depo. at 43:19-21.

216.   Further evidence that legal mail is not confidential is found in George Bailey Detention Facility's Green Sheet P.3.G, Inmate Mail, which draws no distinction between confidential and regular mail, instructing deputies:

> (B) At the beginning of the shift, the assigned night shift deputies will pick up all the mail from their respective housing mail drawers. The deputies will take the mail to the housing unit and sort it by module. While sorting the mail, deputies will conduct a secondary screen for drugs, sexually explicit material, and/or contraband.
>
> …
>
> All outgoing mail should be collected nightly by the deputies assigned to each housing unit. **The mail should be thoroughly screened and inspected.**

George Bailey Green Sheet No. P.3.G, March, 10, 2023, SD_0116030 (emphasis added).

217.   In addition to the confidentiality concerns, legal mail at the Jails is slow. Most of the incarcerated people and attorneys I interviewed who had sent or received legal mail reported occasions when legal mail sent by an attorney was never received by the incarcerated person. In the best cases, it took one to two weeks for legal mail to travel one way. According to one interviewee, legal mail from Plaintiffs' attorneys' firm took two weeks to reach him.

218.   A draft memorandum from a Detention Captain to an Assistant Sheriff dated October 30, 2023, offers one explanation for the delay. Draft Inter-Departmental Correspondence from D. Patterson to T. Adams-Hydar, October 30, 2023, SD_655458-76. Detention Captain Dody Patterson, speaking on behalf of several facility commanders, advocates for "mail distributed" and "mail collected" to be restored to the Deputy Activity log's drop-down menu in JIMS. She explains, "facility commanders have expressed concern that the elimination of the listed area activity log entries has resulted in the actions not being completed." *Id.* at SD_655459. She continues: "Anecdotally, it is believed that the removal of the area Activity drop down options has resulted in the actions no longer being performed on

1    a consistent basis." *Id*.

2    219.    "Mail distributed" and "mail collected" were removed from the drop-

3    down menu of the JIMS Deputy Activity log in 2016.  Email from Deputy Webster

4    to Assistant Sheriff Miller, February 18, 2016, SD_655467.  Other items that were

5    removed at that time include "Visits," "Attorney Call Back,' and "Law Library."  *Id*.

6    at SD_655469.  The rationale for removing these tasks from the menu at that time

7    was that "deputies and supervisors alike have become increasingly more dependent

8    on the checklist and at times neglect any task not included on the checklist. . . . And

9    too often log entries are being made for events that did not happen or were not

10   scheduled for that day."  *Id*.  Notwithstanding the concerns expressed in Plaintiffs'

11   complaint and noted by the Detention Captain above, I am aware of no effort to

12   restore "Visits," "Attorney Call Back" and "Law Library" to the drop-down menu.

13   From the documents I have reviewed, it does not appear that any additions to the

14   drop-down menu, including those recommended for mail, have been authorized to

15   date.

16   220.    Another explanation for the mail delivery problems is the Byzantine

17   process involved.  Here is one example, the Green Sheet for East Mesa:

18          All incoming U.S. mail for EMRF (East Mesa Reentry Facility)
       will be received, sorted, and forwarded to the Mail Processing Center
19     (MPC) located at the Las Colinas Detention and Re-Entry Facility
       (LCDRF) for processing.  The MPC will be responsible for printing all
20     incarcerated persons e-mails.  [Redacted in produced copy.] and scan
       all incoming mail (except for legal mail).  Sheriff's Transportation Unit
21     (STU) will be responsible for the pick-up and drop-off of the mail to
       EMRF and LCDRF.

22     •      Detentions Processing Division (DPD) will receive incoming
23            mail each day from CPC.  After separating out legal mail,
              incoming mail, periodicals, books, parcels, etc., the mail will be
24            placed in large PURPLE plastic bags and placed in the pick-
              up/drop-off point in Processing Mail going to the MP must be
25            ready for pick up by the STU (first busses and last busses of the
              day).
26
       •      DPD will place the sorted legal mail [Redacted in copy
27            produced.] for distribution by deputies.

28   East Mesa Green Sheet, P.3.M, January 23, 2022, SD_0115887; *see also* Las

Colinas Green Sheet, P.3.L, , July 7, 2023, SD_0116211; South Bay Green Sheet,
P.3.C, September 6, 2023, SD_0116352; Vista Green Sheet, June 7, 2023, P.3.V.

221.   When asked how long it takes from receipt of legal mail by the jail to
ultimate delivery to the incarcerated person, Captain Johns responded, "To give you
an exact date, it wouldn't be fair."  Johns Depo. at 44:12-15.  While the mail
processing center logs the date it receives mail and the date it sends it out, the
Department does not track how long it takes for the mail to be delivered to the
incarcerated person. *Id.* at 44:21-45:7.

222.   Attorneys I interviewed report little confidence that mail will arrive
promptly.  I understand from Plaintiffs' counsel that incarcerated people have
reported the same.  Similarly, I understand from Plaintiffs' counsel that mail sent to
the Jail and later returned as undeliverable to counsel's office—*i.e.*, because the
recipient has been released from custody—can take a considerable amount of time.
And, in at least in one case, mail sent from the U.S. District Court for the Southern
District of California to a person incarcerated in the Jail was returned as
undeliverable.  Dkt. 556.

223.   The lack of confidentiality, unreliability, and lengthy delays render
legal mail an inadequate means for an attorney to communicate with her clients in
the San Diego County jails.

### D.   Conclusion

224.   The San Diego Sheriff's Department does not provide adequate rooms
for confidential meetings, telephones that afford privacy to the incarcerated person,
or mail that is confidential, reliable, and prompt.  As a result, incarcerated people are
deprived of their right to fully disclose the facts to their lawyer "free from the
consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. at
470.  Their lawyers are unable to perform their duties to communicate promptly
with their clients about developments in their cases and maintain the confidences of
their clients.  The clients cannot see the evidence and therefore cannot participate in

1  their defense or make decisions that will impact their future.  Under these

2  circumstances, it is impossible for attorneys to fulfill their duties to their clients and

3  effectively represent them.

4  **II.  THE SHERIFF'S DEPARTMENT DENIES INCARCERATED**
   **PEOPLE THE ABILITY TO REVIEW ELECTRONIC DISCOVERY**
5  **IN THEIR CRIMINAL CASES.**

6  225.  As the 2023 DOJ report recognized, "a defendant should have a

7  meaningful opportunity to review the discovery produced in his or her case,"

8  including e-discovery.  DOJ Recommendations at 37.  The San Diego County Jail

9  does not provide the clients of private attorneys the same access to their e-discovery

10  as those of the public defender's office because it does make WiFi available to all

11  attorneys.  Additionally, incarcerated people who are not pro per in their criminal

12  case have no access to computers to review the electronic discovery.

13  226.  At the San Diego Jail facilities, private attorneys do not have access to

14  WiFi.  In addition, attorneys report that certain Jail facilities and locations within

15  those Jail facilities—*e.g.*, the George Bailey Detention Facility and the attorney

16  visiting area of the Vista Detention Facility—are places where cell phone service,

17  and therefore the ability to use cellular data to access the internet—is weak.

18  227.  Since private attorneys do not have access to WiFi, they are sometimes

19  unable to show their clients electronic evidence at all if the file is too big to

20  download.  Video evidence fits in this category, and it often constitutes the most

21  important evidence in the case.  Denial of access to electronic discovery evidence in

22  a defendant's case interferes with the defendant's ability to participate in his

23  defense.

24  228.  Even in situations where it is possible for the attorney to download

25  electronic evidence, such as video, the lack of privacy makes it impossible for

26  attorneys to show it to the client, especially in sensitive cases, as everyone in and

27  around the visiting area could see and hear it.  Absent confidential visits, attorneys

28  cannot share the sensitive information that may be dispositive in their case.

## III.  THE SAN DIEGO SHERIFF'S DEPARTMENT DENIES PRO PER INCARCERATED PEOPLE ADEQUATE ASSISTANCE AND IMPEDES THEIR RIGHT OF ACCESS TO THE COURTS

### A.  Pro Per In Current Criminal Case.

229.  Plaintiffs allege in the Third Amended Complaint that the Jail "interfere[s] with incarcerated people's legal materials" and fails to provide sufficient legal materials to pro per litigants.  Dkt. 231 at ¶¶ 422–24.  Based on my review of the documents and interviews, I agree.

230.  While the number fluctuates, as of May 30, 2024, there were 18 incarcerated men representing themselves in the San Diego County Jails.  Brown Depo. at 12:7-11.  All of them were housed at Central Jail.  As Plaintiffs alleged in the Third Amended Complaint, named plaintiff Michael Taylor attempted to represent himself pro per, before he was denied prescription glasses and therefore forced to abandon his pro per status.  Dkt. 231 at ¶ 424.

231.  The right to self-representation necessarily includes and is premised upon the right of the defendant to prepare a defense.  *Milton v. Marris*, 767 F.2d 1443, 1445 (9th Cir. 1985).  Time to prepare and some access to materials and witnesses are fundamental to a meaningful right of representation, which extend to people who wish to represent themselves.  *Id*.

232.  The SDSD Manual provides that incarcerated people representing themselves in a current criminal case are entitled to certain "privileges," SDSD Manual, No. N.7, May 13, 2022, SD_065005, including, as discussed in more detail below, certain materials like paper, access to the legal research area of the Jail, and, if approved, investigative support.  As explained below, the Sheriff's Department's policies are insufficient to provide an incarcerated person with what he needs to defend himself in his criminal case.

233.  Male incarcerated people who are pro per on current criminal matters are generally housed at Central Jail.  *Id*. at SD_065008.  They "will generally be given three hours per week of legal research area time, subject to reduction if

1   increases in the Pro Per incarcerated person population requires that the hours be

2   reduced in order to accommodate the increased population." *Id*. Females housed at

3   Las Colinas "will be given a minimum of three hours per week access to the legal

4   research area." *Id*. at SD_065009.

5        234.   The policy that pro per people housed at Central Jail will "generally"

6   be given three hours per week of legal research time is vague on its face—and

7   therefore flawed. Indeed, the Sheriff's Department's own Rule 30(b)(6) deponents

8   gave conflicting testimony on this score. Deputy Brown testified that pro per

9   individuals are "required" to have a "minimum" of three hours per week of time in

10   the law library. Brown Depo. at 12:23. In contrast, Captain Johns testified that

11   there is no minimum number of hours that the Department guarantees to pro per

12   incarcerated people for legal research area time. Johns Depo. at 56:17-20. He

13   testified that this is because that minimum time might fluctuate, based on how many

14   people are considered to be pro per in the facility. *Id.* at 56:22-25. Additionally,

15   there might be security issues in the facility that might prohibit the Department from

16   being able to produce access to the law library area. *Id.* at 56:25-57:7. It could be

17   that people get less than three hours a week. *Id.* at 57:5-7. He testified that Central

18   Jail and Las Colinas are the only jails that have a legal research area. *Id.* at 58:20-

19   25. The law library at Central, where the 18 pro per males are housed, "is only

20   sized" for five individuals at any given time. Brown Depo. at 13:7-16. It is only

21   open from 7:00 a.m. to 3:00 p.m., Monday through Thursday. *Id.* at 13:17-19.

22        235.   In addition to the flaws in the vague policy, in my opinion, even three

23   hours per week is an insufficient amount of time to prepare for a felony trial,

24   especially given the limitations of the legal research area. In the Central Jail legal

25   research area, there are four kiosks containing some legal research services. There

26   are also a handful of computers, which have Word and PowerPoint. These are the

27   computers a pro per incarcerated person must use to prepare a pleading. A pro per

28   incarcerated person reported to me that certain discovery can only be opened on Cell

1    Bright and only one of the computers has this program.  He said that none of the

2    computers can open an Excel file, a format I would expect to appear frequently in

3    discovery documents in a criminal case.  Nor can a pro per defendant print a case or

4    any other document while using the legal research area.  Or copy text from a case

5    pulled up on the legal research kiosk and paste it into a Word document.

6    Incarcerated people instead need to conduct their legal research, handwrite whatever

7    quotation they want to include from the case law onto a piece of paper, then later

8    type that text into a Word document for use in their pleading.  That technical hurdle

9    adds substantial time to the work process, making the already limited time in the

10   legal research area more precious.  Three hours a week to do legal research, review

11   discovery, prepare pleadings, and get ready for trial is not enough.  In my

12   experience, a bare minimum of 80 hours preparation is required for even a simple

13   felony trial.  At the very least, a pro per defendant is forced to waive his Speedy

14   Trial right if he wants to have a fighting chance.

15         236.   The Department's rules provide that an incarcerated person who is

16   granted pro per status by court order in a current criminal case will, "at the

17   discretion of the correctional counselor," be given, in reasonable quantities, pleading

18   paper, ruled legal pads, standard legal-size envelopes, golf pencils, erasers, one legal

19   size accordion file, and 9 x 12 manila envelopes (for prepared mailings only).  *Id*. at

20   SD_065005-065006.  Access to ball point pens will be provided through the

21   correctional counselor for signature purposes only.  *Id*.  "Any supplies that are in

22   addition to what is supplied by the Sheriff's Department must be accompanied by a

23   court order . . . ."  *Id*.  Captain Jesse Johns testified that there are no standards that

24   govern how the correctional counselor determines the validity of an incarcerated

25   person's request.  Johns Depo. at 53:2-5.  Deputy Sheriff Eric Stephen Brown, who

26   also testified as a Rule 30(b)(6) witness on behalf of the Sheriff's Department,

27   explained that, when it comes to requests for supplies by pro per incarcerated

28   people, the policy simply "states … what they're given."  Brown Depo. at 16:7-8.

1    237.    The Pro Per Starter Kit informs incarcerated people that the Office of

2    Assigned Counsel ("OAC"), which is a unit within the Public Defender's Office,

3    "has been appointed by the Court as a Legal Runner in your Pro Per case."  Pro Per

4    Starter Kit, February 8, 2019, p. 2.  The pamphlet explains that OAC will not

5    provide legal advice or talk to the incarcerated person about the case and that

6    communications between the incarcerated person and OAC are not privileged.  To

7    communicate with OAC, the incarcerated person must use the non-confidential

8    telephone in the day room, or submit a request to a member of the Department, the

9    Correctional Counselor in the law library, who will e-mail the request to OAC.

10   Brown Depo. at 17:4-18:1.

11   238.    According to the pamphlet, an incarcerated person cannot hire an

12   investigator or other provider to work on his case.  Pro Per Starter Kit at p. 6.  "[I]f

13   appropriate, an investigator, mental health expert, and/or other expert witness can be

14   provided to [the incarcerated person] without cost."  However, the incarcerated

15   person must fill out an Ancillary Service Request ("ASR") form including a

16   justification for the request, the names, addresses, phone numbers and other contact

17   information, and write a few sentences for each listed witness justifying why the

18   witnesses should be interviewed.  "Need for trial," or "need for my defense," are not

19   sufficient.  *Id*. at p. 5.  If approved, the incarcerated person is told, "you can rest

20   assured that your investigator and/or other provider have been notified and the work

21   has commenced."  If necessary, OAC will prepare an "admit letter" to allow the

22   investigator, psychologist, and or other provider entry into the jail to meet with the

23   pro per individual.  "Generally, however, 'face time' with your investigator is not

24   allowed."  Pro Per prisoners are instructed, "Please use ASR forms to communicate

25   with your investigator and/or providers."

26   239.    The Department's Manual makes clear that if the incarcerated person is

27   approved to have a legal assistant, investigator, or other expert, and a jail visit is

28   necessary, that jail visit will be recorded and available to the District Attorney's

1   Office.  Visits between the incarcerated person and legal assistant "will be

2   conducted utilizing the social visit phone system."  SDSD Manual, No. N.7,

3   May 13, 2022, SD_065007.  "All social visits . . . are recorded by the incarcerated

4   person telephone system."  SDSD Manual, No. P.17, May 4, 2022, SD_065062.

5   Recorded conversations will be available to law enforcement personnel upon

6   request.  *Id*.

7       240.   Similarly, pro per incarcerated people are instructed to "use the phones

8   in their housing areas to place calls concerning their cases."  *Id*.  Unless special

9   accommodation is made for a call to a court or an attorney, the calls will be

10  recorded.  All calls to witnesses, potential experts, the incarcerated person's

11  investigator or aid will be recorded and made available, upon request, to law

12  enforcement.

13      241.   Incarcerated people are given one flash drive and can save their work

14  on it, but the flash drive must be left with the Correctional Counselor and is

15  therefore not confidential.  If they wish to submit discovery with a motion they can

16  submit it to the court on their flash drive, but they will not be given another one.

17  This means they will be unable to save future research, notes and drafts.

18      242.   The lack of confidentiality impairs a pro per defendant's ability to

19  mount a defense to the charges against him, as it gives the prosecution a front row

20  seat to observe the defendant's case strategy.

21      243.   In addition to the breach of confidentiality described above, there are

22  many delays built into the process.  Discovery and pleadings from the prosecution

23  are sent to OAC.  OAC forwards the documents to the person's Correctional

24  Counselor.  The Counselor passes them to the incarcerated person.

25      244.   Frequently, discovery is provided in digital format.  Incarcerated

26  persons are informed that the discovery can be viewed on the legal research area

27  computer during the time they are allowed to visit the legal research area.  Thus, a

28  pro per incarcerated person's three hours a week in the legal research area must be

1  divided between reviewing discovery, legal research, drafting pleadings and
2  preparing for trial.  As a trial lawyer there is no doubt in my mind that this is not
3  enough time to prepare a defense.

4       245.  To file a motion, the incarcerated person must send a "Written Request
5  to File Motion" form, along with the motion, to OAC at least five business days
6  before the motion cut-off-date.

7       246.  Correctional counselors will print one copy of an incarcerated person's
8  final legal work product from their flash drive when the pleading is ready to mail.  If
9  an incarcerated person needs more than one copy, which they will, to serve the DA
10  and retain a copy for the file, the incarcerated person must submit an "ancillary
11  service request" to OAC.  Or, the incarcerated person must write out the pleading
12  twice and serve one of these handwritten copies on the District Attorney, which is
13  likely to be the only option if service is to be accomplished in accordance with local
14  rules.

15       247.  The delays built into this process pose a particular problem when seen
16  in the context of the local rules.  Under San Diego Superior Court rules for criminal
17  matters,

> 1. All moving papers must be filed and served on the opposing party at least 15 court days before the time appointed for the hearing. 2. All papers opposing the motion must be filed and served at least five court days before the time appointed for the hearing. 3. All reply papers must be filed and served at least two court days before the time appointed for the hearing. 4. Proofs of service of the moving papers must be filed no later than five calendar days before the time appointed for hearing.

23       248.  Pro per incarcerated people are "housed in regular housing that is
24  compatible with their classification status."  SDSD Manual, No. N.7, May 13, 2022,
25  SD_065009.  This means they have cellmates who have access to their legal
26  materials when they leave their cells.  A pro per incarcerated person I interviewed
27  reported that the Sheriff's Department puts many different people through his cell.
28  While he is at the library or in court, cellmates can read his papers, then claim he

admitted X or Y.  Based on this policy, his legal materials are not private, and he is at risk of being falsely accused.

249.   An incarcerated person's pro per privileges can be revoked for violations of the jail's rules after a hearing by jail staff.   SDSD Manual, No. N.8, SD_065010.  The Department's Rules and Regulations of Incarcerated Persons includes vague and subjective offenses such as failing to treat facility staff "in a civil fashion," taking part in "boisterous activity," and possessing too much property that can be grounds for discipline, and therefore revocation.  SDSD Manual, No. O.3, May 4, 2022, SD_065023.  Revocation of pro per privileges is permanent.  SDSD Manual, No. N.8, SD_065010.

**B.      Pro-Per In Conditions of Confinement Case.**

250.   Plaintiffs, in the Third Amended Complaint, allege that the Jail fails to provide sufficient resources to people representing themselves in civil cases about conditions in the Jail.  Dkt. 231 at ¶ 424.  Based on my review of documents and interviews, I agree.

251.   Incarcerated people who are trying to represent themselves in other lawsuits—including individual civil cases about the conditions of their confinement—receive even less access to legal resources than incarcerated people who are pro per in their criminal cases.  Indeed, pursuant to the Department's policy and procedure, an incarcerated person who wishes to file a civil rights lawsuit receives no resources whatsoever.  SDSD Manual, No. N.6.

252.   By its text, Section N.6, "Conditions of Confinement Status," is granted only after "[c]ounty counsel [] send[s] a copy of the first page of the court filing which [] identif[ies] the plaintiff (incarcerated person)…."  *Id.*  In other words, Conditions of Confinement Status is granted only once an incarcerated person has already succeeded in filing a complaint, and the Jail has been served with the court order by the County Counsel, as Deputy Brown appeared to confirm.  Brown Depo. at 19:25-20:1.  Thus, the Sheriff's Department does not provide any support to

incarcerated people who are trying to file, but have not yet filed, a complaint against the Jail.

253.   Even after they have been granted pro per status by a court, Conditions of Confinement Status does not provide an incarcerated person the same accommodation as those representing themselves in a current criminal case. *Compare* SDSD Manual, No. N.6, May 13, 2022, SD_065002 (policy re: conditions of confinement status), *with* SDSD Manual, No. N.7, SD_065005 (policy re: other pro pers).  For one, incarcerated people representing themselves in a civil case are not allowed time in the legal research area.  Instead, these litigants must rely on requests through Legal Research Associates ("LRA"), a private company the County contracts with to provide legal research to incarcerated people.  As explained below, that process is woefully insufficient, as it suffers from substantial delays and limitations.

254.   To access LRA, incarcerated people who have been granted Conditions of Confinement status must submit an Incarcerated Persons Request Form to their Correctional Counselor requesting an LRA Request Form.  Correctional Counselors shall provide the LRA request forms "as needed."  *Id.* at SD_065200.  "The counselor *may*: (A) Explain to the incarcerated person the availability, rules and protocol for accessing the off-site legal research service; [and](B) Ensure the appropriate and timely use of the off-site legal research service, include documentation and delivery of responses."  *Id.* at SD_065205 (emphasis added). The "may" in this rule is important.  Deputy Sheriff Eric Brown, designated by the Department as the person most knowledgeable about access to courts and counsel by incarcerated people, testified that he is not aware of anything done by the Sheriff's Department to inform incarcerated people about this service.  Brown Depo. at 26:5-18.

255.   Should they learn about the service nonetheless, incarcerated people *without* Conditions of Confinement status are allowed to submit only one LRA

request per month; people with Conditions of Confinement status may submit two requests per month.  *See* SDSD Manual, No. N.6, SD_065002.  In each request form, incarcerated people can request at most five cases or questions.   The results incarcerated people receive are limited to 50 pages in total (25 double-sided pages). Email from M. Aquinaldo to R. Cardenas et al., November 2, 2023, SD_1572825. In other words, incarcerated people may not request six documents, each of which is three pages in length, even though that would result in only 18 pages of documents. Similarly, if they request a case that is 60 pages long, they will receive only the first 50 pages of the document.  They would need to wait for the final 10 pages until allowed to send a second request.

256.   Documents obtained from the Department establish that these limits are contractual.  "The LRA contract would need to be amended to accommodate more requests per month or total number of pages allowed.  The contract is paid for out of [a general fund]." *Id.*

257.   Incarcerated people report that this process is subject to substantial delays.  It might take multiple days to receive the LRA form itself after submitting an incarcerated person request for it.  And, once they submit the LRA form, it can take 30 days to receive the legal research requested.  As an example, one incarcerated person I interviewed in late March 2024 reported that he still had not received a response to the LRA request he submitted in February 2024.

258.   This slow and limited process is insufficient for a person attempting to file a complaint in court about an injury they suffered in the Jail due to staff misconduct or mistreatment, or constitutional or ADA violations.  Imagine a person without any formal legal training attempting to do such research on such a delayed schedule.  He would, in his first request, need to ask LRA to provide a list of statutes under which he might be able to bring a claim.  In his second request, a month or more later (depending upon any delays in getting a response to his first request), he would ask LRA to provide the text of the five most important of those statutes.  In

his third request, he would need to ask for a list of cases analyzing whichever statutes seemed most important (assuming there were not more statutes whose text he was still waiting to read).  In his fourth request, he would need to ask for the text of some of those cases—again limited to only five cases or 50 pages.  In other words, this person would need to wait four months before receiving even a single case to read.  Such a legal research process is unreasonably burdensome and slow, and may—considering the six-month Government Claims deadline and the two-year statute of limitations potentially governing such claims—ultimately have the effect of prohibiting that person from filing his complaint at all.

259.   Even if a person is able to file a complaint and obtain Conditions of Confinement status, the twice per month LRA request process is insufficient.  For example, consider someone who has filed a civil conditions of confinement complaint, to which the County demurred or moved to dismiss.  An incarcerated person drafting an opposition to that document would likely want to read the cases cited within the defendant's motion, then do additional legal research on their own.  The five-item, fifty-page, twice-per-month limitation would make that near impossible to do in a meaningful time frame.  It might take the incarcerated person three or four LRA requests (across two months) to even read all the cases cited in the defendant's briefing, plus the additional LRA requests the person would need to conduct their own research to support an opposition.

260.   Assuming the incarcerated person filed his conditions of confinement in the Southern District of California, Rule 7.1(e), provides that hearings must by noticed no less than 28 days before the hearing date, and opposition papers are due 14 days before the hearing.  With these deadlines, the Jail's LRA system is useless.

261.   Incarcerated people I interviewed report that the video phones in housing unit dayrooms appear to have a "law library" function, but it does not work, *i.e.*, nothing happens when they click on the "law library" icon on the phone.

1    Indeed, Captain Johns testified that law library access is not available on the

2    videophones, and he does not know if the Sheriff's Department is intending to make

3    it available.  Johns Depo. at 64:8-22.  The County has not provided tablets either,

4    despite issuing a Request for Proposal in early 2023.  As a result, the insufficient

5    LRA process described above is incarcerated people's only option to access legal

6    materials.

7        262.   The Sheriff's Department's policy on Conditions of Confinement

8    status, No. N.6, also provides some minimal additional resources to incarcerated

9    people who are pro per in conditions of confinement cases.  SD_065002.  However,

10   the policy merely highlights how little the Jail does to provide incarcerated people

11   access to the courts.

12       263.   Incarcerated people who are pro per in civil conditions of confinement

13   cases are entitled to purchase a ruled legal pad, standard size envelopes, golf pencils,

14   lead black, and erasers.  *See id.*  Indigent people with conditions of confinement pro

15   per status "may receive these supplies upon written request to the correctional

16   Counselor. . . . The correctional counselor will determine the validity of the request

17   and furnish the appropriate supplies."  Conditions of Confinement Notice,

18   SD_652078.  Captain Johns could not explain why conditions of confinement

19   incarcerated people are entitled to fewer supplies than those who are pro per in

20   current criminal cases.  Johns Depo. at 69:21-70:5.

21       264.   "The correctional counselor will keep a log for each conditions of

22   confinement incarcerated person.  The log will have a list of supplies furnished (if

23   determined to be indigent), LRA requests and responses, and special requests

24   approved."  SD_652078.  Once again, the Department's written policy provides the

25   opposing party direct access to the pro per plaintiff's work product.

26       265.   SDSD Manual Section T.1 also states that people on Conditions of

27   Confinement Status should receive from correctional counselors "'reasonable

28   assistance,' which consists of supporting an incarcerated person on how to operate

1   the electronic research kiosks and how to formulate queries for such research."

2   SDSD Manual, May 18, 2022, SD_065200.  However, because there are no

3   electronic research kiosks available to people on Conditions of Confinement Status,

4   this offer of "reasonable assistance" is meaningless.  *Id.*

5        266.   Another source of frustration for pro per litigants in the Jail's failure

6   to make required Judicial Council forms available in a timely manner.  Pro per

7   incarcerated people I interviewed reported that the California Judicial Council

8   requires that pro per incarcerated people use specific forms for various pleadings.

9   I understand that, in at least one case, a court clerk rejected a pro per litigants'

10  pleading because it was not on the proper form.  An incarcerated person must

11  request the necessary form by submitting a written Inmate Request Form to his

12  Correctional Counselor.  Incarcerated people report that it can take weeks to get a

13  copy of the requested form.  One pro per incarcerated person interviewed reported

14  that the Sheriff's Department will not give him the forms he needs, saying the

15  court can provide them.  But the court does not provide them.  Thus, he is stuck in

16  limbo.

17       267.   Notably, Section N.6 does not provide pro per litigants in civil cases

18  any additional telephone privileges.  *See id.* at SD_065002.  The Manual provides

19  people on Conditions of Confinement Status  "may use the phones in their housing

20  areas to place calls concerning their cases."  *Id.*  The lack of confidentiality as well

21  as the limited availability of these phones is discussed above.

22       268.   These litigants are "authorized to mail all correspondence necessary for

23  their lawsuit, at their own expense."  "Only that correspondence which meets the

24  confidential/legal mail definition will be handled as such."  *Id.* at SD_065003.

25  Indigent incarcerated people are required to submit their legal correspondence to the

26  correctional counselor who will affix the needed postage or mail it through county

27  messenger mail.  *Id.*  One incarcerated person alleges that the exhibits to his habeas

28  petition are languishing in the mail room.  He alleges that he was not provided with

1  paid postage for legal mail to petition the courts.

2      269.   The policy provides that cell or property searches of conditions of

3  confinement incarcerated person's "legal" materials will be carried out in

4  compliance with DSB P&P section 1.41 regarding privileged communications.  One

5  conditions of confinement pro per incarcerated person who has been subjected to

6  searches of his materials alleges that this has resulted in "staff [] actively attempting

7  to confiscate petitioner's legal mail."  Pedro Rodriguez, filed August 7, 2023, Dkt.

8  379 at 4.  Such seizures render pursuing a case virtually impossible.

9      270.   An additional way in which the Department fails to provide access to

10  the courts is that its phone system does not allow incarcerated people to participate

11  in telephonic hearings.  An incarcerated person I interviewed, who had obtained a

12  court order for the Department to produce him for a small claims court hearing, was

13  told to use the phone in the recreation yard for the hearing.  He was unable to

14  participate, however, because when the clerk placed him on hold prior to his case

15  being called, he was disconnected.  Because he did not appear, his case was

16  dismissed.

17      271.   Relatedly, I understand from Plaintiffs' counsel that incarcerated

18  people have been denied the opportunity to review the Third Amended Complaint in

19  this case, despite their requests to do so.

20      **C.    Grievance Policy and Procedure.**

21      272.   If a Correctional Counselor or other jail staff denies a pro per

22  incarcerated person's request for assistance, the remedy is for the incarcerated

23  person to file a grievance.  SDSD Manual, No. N.1, May 13, 2022, SD_064991.

24  The grievance process is slow and ineffective.

25      273.   Incarcerated people "may submit written grievances directly to deputies

26  or other employees at any time when they are in a place, they have permission to be.

27  Absent exigent circumstances, any deputy or other staff member who is presented

28  with a written grievance will accept it."  *Id*. at SD_064992.  The deputy or other

1  employee who initially receives a grievance will print their name, the date and time

2  on the form and give the second page of the form "immediately" to the incarcerated

3  person "as a signed receipt for the grievance." *Id.*

4      274.  "As an alternate means for submitting grievances, secured boxes may

5  be provided for incarcerated person(s) to deposit their grievances into." *Id.* "A

6  sergeant or designee will collect grievances from the grievance boxes at least once

7  per shift." *Id.* at SD_064993.  Any grievance retrieved from one of these boxes

8  "will be signed by the sergeant or designee who collected it," and the signed second

9  page of the J-22 form will be returned to the incarcerated person "as soon as

10  practical." *Id.*

11      275.  In practice, incarcerated people report that deputies are unwilling to

12  accept written grievances when they try to submit them directly, presumably

13  because the deputy or staff person who "receives" the grievance is primarily

14  responsible for resolving it.  It is the Department's Grievance policy that

15      > [i]nformal resolution of an issue is both desirable and
         recommended.  Furthermore, written grievances can often
16      > be resolved without the intervention of a supervisor, and
         every effort should be made by a deputy or staff member
17      > who receives a grievance to handle it at their level.

18  *Id.* at SD_064991.  To avoid taking on this task, deputies tell the incarcerated people

19  to put their grievance in the grievance box.  Based on my interviews, I understand

20  that incarcerated people do not want to put them in the box, because they will not

21  get a receipt proving they filed the grievance "immediately."  Instead, under the

22  Department's rule, they will get it "as soon as practical," which in some cases,

23  incarcerated people report, means never.  They have no receipt and they get no

24  response, making it impossible to prove they have "completely exhaust[ed] the

25  Department's internal grievance and administrative processes prior to filing any

26  complaint with any state board or federal court." *Id.* at SD_064992.

27      276.  The Department's timeline for responding to grievances makes the

28  process useless as a remedy to a person involved in litigation.  If the responding

1  deputy or staff member accepts the grievance, reads it, and decides that it alleges

2  that the incarcerated person has been prevented "effective

3  communication/participation in any court or administrative hearing," the responding

4  deputy must respond within four calendar days.  If the deputy or staff member

5  determines that it does not fall into this category, their response is due in seven days.

6  If the incarcerated person is not satisfied, he must appeal "in writing through

7  successive levels of command until a resolution is obtained, or until the facility

8  commander reviews the grievance." *Id*. at SD_064994.  The grievance review

9  officer has 10 calendar days to respond.  *Id*. at SD_064995.  The facility commander

10  then has 10 calendar days to respond.  *Id*.  The decision of the facility commander is

11  final.  *Id*.  Even if these timelines are timely met, approximately a month would pass

12  between the submission of a grievance and its resolution, potentially making it

13  impossible for the incarcerated person to obtain relief for issues being considered in

14  active litigation.

15      277.   Additionally, the facility commander can determine that a person is a

16  "vexatious grievance writer" whose grievances may be denied without a hearing or

17  any right of appeal for 90 days.  *Id*. at SD_064996.

> An incarcerated person may be considered a vexatious
> grievance writer if they have filed repetitive grievances
> that are frivolous in nature or concern an established
> policy or practice of the Sheriff's Department that the
> incarcerated person claims violate their rights, when no
> good faith legal argument exists that the policy or practice
> amounts to a violation of the incarcerated person's
> statutory or constitutional rights.

23  *Id*.  If an incarcerated person files a grievance that the commander deems frivolous

24  during the 90-day period, the 90-day period shall be reset "and a new 90-day period

25  shall commence."  *Id*. at SD_064997.  This means that an incarcerated person who

26  files a grievance against the Sheriff's Department concerning "an established policy

27  or practice of the Sheriff's Department that the incarcerated person claims violate

28  their rights" can have his grievance denied without a hearing and without the right to

1    appeal if the potential defendant Department believes the claim is brought in "bad

2    faith," making it impossible to exhaust administrative remedies.

3         278.    Another way the Sheriff's Department deprives incarcerated people of

4    their right to have their grievances adjudicated is by deeming the matter "not a

5    grievance."  Inmate Grievance, January 31, 2023, SD_841287.  The Inmate

6    Grievance of ██████████ is a case in point.  On the proper form, ██████████

7    described his grievance as follows:

> I would like to know why I'm not getting [adequate]
> proper treatment – Medication when all my MediCal file is
> in your hands.  The denial of Lyrica and Tramadol is
> causing me to think I'm being treated with cruel and
> unusual punishment.

11   *Id.* (spelling corrected).  He alleges that this is being done in retaliation for his

12   obtaining a doctor's order that the Department provide him with a shower and new

13   clothes a few days before.  *Id.*  This fits squarely within the definition of a

14   grievance, which includes "incarcerated person complaints related to any aspect of

15   condition of confinement that directly and personally affect the incarcerated person

16   grievant, including . . . "Medical/Mental Health care."  SDSD Manual, No. N.1,

17   SD_064991.[29]  Two weeks after ██████████ submitted his Inmate Grievance form,

18   a Deputy (whose name is not printed and whose signature is illegible) checked the

19   box on the Grievance form marked:  "This submission is not a grievance."

20   SD_841287.  And that was that.  According to Commander Ralph, "Grievances" not

21   being handled as a grievance are not logged anywhere.  Ralph I Depo. at 222:1-24;

22   *see also* SDSD Manual No. N.1 (when "This is not a grievance" box checked, "[n]o

23   entry in JIMS is required").

24        **D.    Conclusion**

25        279.    The San Diego Sheriff's Department makes it next to impossible for an

---

[29] There is a more recent version of this policy available on the Sheriff's Department
website, but this provision is unchanged.

1  incarcerated person to represent himself or herself in a criminal case by denying
2  them reasonable access to legal materials and assistance, denying them reasonable
3  access to computers that are necessary to view electronic discovery and to prepare
4  pleadings, by denying them assistance from investigators and experts that is
5  confidential, and by imposing myriad other road blocks preventing them from
6  effectively representing themselves.

7      280.   The San Diego Sheriff's Department makes it even more difficult to
8  represent oneself in a conditions of confinement case.  The Department delays
9  incarcerated people's access to materials, such as legal forms, that they are required
10  by the court to use for pleadings, and imposes unreasonable limits on legal research
11  assistance.  It denies incarcerated people access to functional telephones for court
12  hearings.  By creating an obstacle course incarcerated people must navigate to file a
13  pleading, building in delays that make it difficult if not impossible to meet filing
14  deadlines, the San Diego Sheriff's Department interferes with incarcerated people's
15  ability to appeal to the courts when they have been injured by the Jail.

16      281.   My investigation of particular cases is continuing as the population of
17  the Jail is constantly changing.  At the present time, I am aware of at least three pro
18  per incarcerated people, one who is in a current criminal case and two who have
19  filed conditions of confinement claims, who allege they suffered actual harm in their
20  cases as a result.  Based on my visits to the facilities, review of policies and
21  procedures, and interviews with counsel and incarcerated people, I believe that
22  many more incarcerated people have been harmed in their pursuit of claims.

## CONCLUSION

24      282.   The information and opinions contained in this report are based on
25  evidence, documentation, and/or observations available to me.  I reserve the right
26  to modify or expand these opinions should additional information become
27  available to me.  The information contained in this report and the accompanying
28  exhibits are a fair and accurate representation of the subject of my anticipated

1  testimony in this case.

2

3  Dated: August _7_, 2024

_Karen L. Snell_
Karen L. Snell

# Exhibit A

**KAREN L. SNELL**
Attorney at Law



San Francisco, California 94117

## EDUCATION

STANFORD LAW SCHOOL
J.D., 1981

STANFORD UNIVERSITY
Bachelor of Arts, Philosophy, 1977

## BAR MEMBERSHIPS

State Bar of California (Bar No. 100266)
Northern, Eastern, Central, Southern Districts of California
Ninth Circuit Court of Appeals
Fifth Circuit Court of Appeals
United States Supreme Court

## PROFESSIONAL EXPERIENCE

**Law Offices of Karen L. Snell**                                    February 2003-Present
*Solo Practitioner*

Constitutional litigation, including civil rights, criminal defense,
international extradition and complex civil litigation.

**Clarence, Snell & Dyer LLP**                                    April 1996- February 2003
*Partner*

Founding partner of five attorney AV rated firm emphasizing federal and
state litigation in the areas of civil rights, criminal defense, international
extradition, labor, and complex torts.

**Office of the Federal Public Defender**                        March 1989-March 1996
*Supervisor*

Assistant Federal Public Defender representing federal criminal defendants in the Northern
District of California. Supervised and trained trial and appellate attorneys. Handled
international extradition matters.

**Riordan & Rosenthal**                                January 1987-March 1989
*Of Counsel*

Federal and state criminal defense, trial and appellate.  Handled
death penalty, habeas corpus, interstate extradition, federal felony trials
and appeals, parole revocation proceedings.

**Morrison and Foerster**                           December 1981-January 1987
*Litigation Associate*

Federal and state criminal trial experience, media defense, established pro
bono program to provide representation to battered women, significant
experience in various areas of civil litigation.

**Equal Rights Advocates, Inc**.                    September 1980-June 1981
*Law Clerk*

Assisted in litigation of sex discrimination claims in employment and
education contexts.

**Stanford Law School**                                  June 1980-June 1981
*Labor Law Research Assistant*

Research assistant to labor law Professor William Gould.

## PROFESSIONAL ASSOCIATIONS

**Institute for International Criminal Investigation**          2003-Present
*Member of Board of Advisors*
**American College of Trial Lawyers**                          2003-Present
*Fellow*
**Bar Association of San Francisco**                           1981-Present
*Member, Served on Judiciary Committee*
**California Attorneys for Criminal Justice**                  1987-2015
*Chair, Federal Practice Committee, Author of Expert*
*Witness Manual*
**Habeas Corpus Resource Center**                             1997-2003
*Chairman of Board of Directors (Appointed by Chief Justice, Cal. Sup. Ct.)*
**Multi-jurisdictional Practice Implementation Comm.**        2002
*Committee Member (Appointed by Cal. Sup. Ct.)*
**National Association of Criminal Defense Lawyers**          1987-2015
*Member*

# Exhibit C

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF HANNAH CHARTOFF**<br><br>Judge:       Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

1    I, Hannah M. Chartoff, declare:

2    1.    I am an attorney duly admitted to practice before this Court. I am an

3    associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record

4    for Plaintiffs and the Certified Class and Subclasses. I have personal knowledge of

5    the facts set forth herein, and if called as a witness, I could competently so testify.

6    2.    I have reviewed the document produced by Defendants in this litigation

7    at Bates Number SD 727548, which is a spreadsheet with three columns:

8    "CREATE_DT," which includes dates and times; "NOTIFY_TYPE," which

9    includes the word "GENERAL" in every row; and "NOTIFY_REASON."

10    3.    The dates in the "CREATE_DT" column range from August 25, 2023

11    to November 28, 2023.

12    4.    The "NOTIFY_REASON" column contains information mostly

13    appearing to relate to attorney callback requests. For example, an entry will state

14    "PRO CALL BACK ATTY," then include a name and phone number, followed by

15    another name and booking number. I understand this information to reflect the

16    name and contact information of the attorney placing the callback request, as well as

17    the name and booking number of that attorney's incarcerated client.

18    5.    As part of my review of this spreadsheet, I conducted searches for the

19    name of all attorneys in my office who have worked on this case, as well as searches

20    for our office phone number. I identified only four requests for callbacks from my

21    office on this spreadsheet: two for me, placed on October 27, 2023, and two for my

22    colleague Eric Monek Anderson, placed on October 5 and October 11, 2023.

23    6.    Based on my recollection of that time period and my review of records,

24    this spreadsheet is not an accurate reflection of the callback requests placed by my

25    firm between August 25, 2023 and November 28, 2023. In particular, my office

26    placed callback requests for people incarcerated at the San Diego County Jail in

27    September 2023. However, no September call back requests from my office are

28    reflected in this spreadsheet.

1     I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct, and that this declaration is executed

3  at San Francisco, California this ___ day of August, 2024.

4

5                                        _____

6                                             Hannah M. Chartoff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, <br><br> Defendants. | Case No. 3:20-cv-00406-AJB-DDL <br><br> **REBUTTAL EXPERT REPORT OF KAREN L. SNELL** <br><br> Judge:      Hon. Anthony J. Battaglia <br> Magistrate: Hon. David D. Leshner <br><br> Trial Date: None Set |

[4562183.6]

I, Karen L. Snell, declare:

1.      I have been asked by Plaintiffs' Counsel to prepare this Rebuttal Expert Report.  Specifically, I was asked to review and analyze the opinions and conclusions expressed in Opinion 12 of the August 21, 2024 Expert Report of Lenard Vare (hereinafter, "Vare Report") to decide if that opinion caused a change in my opinions and conclusions and to provide a response to that opinion.  A list of all documents that I reviewed and relied on to draft this Rebuttal Expert Report and that are not listed in my initial report is attached hereto as **Exhibit A**.

2.      I have reviewed and analyzed the opinion in Mr. Vare's report, and it does not change any of the opinions that I expressed in my initial report dated August 7, 2024 (hereinafter, "Snell Report").

3.      The opinions expressed in this report are based on information that has been made available to me.  Should new information become available to me in the future, I reserve the right to analyze that information and revise my opinions and/or conclusions.

**A.      There Is Ample Evidence That the Sheriff's Department Unreasonably and Unjustifiably Denies Incarcerated People Access To Confidential Communications With Their Attorneys**

4.      Mr. Vare's Opinion 12, subpart a), states: "There is no evidence that the Sheriff's Office unreasonably and unjustifiably denied incarcerated people access to confidential communications with their attorneys."  Vare Report, p. 114. Mr. Vare discusses only attorney-client telephone communications in this section of his Report, but elsewhere he addresses in person attorney-client communications, so I will respond to both.   It remains my opinion, as set forth in the Snell Report, that people incarcerated in the San Diego County Jail ("Jail") are denied confidential in person, telephone, and mail communications with their attorneys.

5.      **Telephone Communications.**  Mr. Vare admits that "there are no separate phones for attorney calls.  The same phones are used for both regular and

REBUTTAL EXPERT REPORT OF KAREN L. SNELL

1  attorney calls." Vare Report, p. 115. The photographs included in the Snell
2  Report show these telephones and confirm that incarcerated people must call their
3  attorneys from day rooms where other incarcerated people and guards are present
4  and can overhear their conversations. Snell Report, ¶¶ 192-201. Incarcerated
5  people are allowed to make these calls during the limited time their housing unit
6  has access to the day room. Other incarcerated people are competing for the
7  telephones and are often, according to the incarcerated people I interviewed, lined
8  up close by. There are tables and chairs occupied by other incarcerated people, as
9  well as vending machines, within a few feet of the phones. Telephone
10  conversations are limited to 15 minutes.

11      6.    Based on my review of the evidence, but for the rare exception, the
12  San Diego Sheriff's Department ("Sheriff's Department"), also known as the "San
13  Diego Sheriff's Office,"[1] provides no telephones where clients can call their
14  attorneys and have a confidential conversation.

15      7.    Mr. Vare cites a regulation from the San Diego County Sheriff's
16  Department Policy & Procedures Manual , SD_175612, et seq., in support of his
17  opinion that it is Department policy not to eavesdrop on attorney-client
18  conversations. Vare Report, p. 115. This citation is unpersuasive for two reasons.

19      8.    First, Mr. Vare cites an outdated version of this document; the current
20  version of the manual (dated June 4, 2024 and available online[2]) omits the
21  language that Mr. Vare relies on. According to the Vare Report, section 6.105 of

---

[1] According to the San Diego Union-Tribune, this Defendant has not made any public announcement regarding a change in its name, but "quietly begun referring to itself as the San Diego County Sheriff's Office" as of July 2024. Jeff McDonald, "San Diego County's Largest Law Enforcement Agency Takes a New Name," San Diego Union-Tribune, August 30, 2024, *available at* https://www.sandiegouniontribune.com/2024/08/30/san-diego-countys-largest-law-enforcement-agency-takes-a-new-name/.

[2] Available at: https://www.sdsheriff.gov/home/showpublisheddocument/8298/638554489635070000

1  this "Policy & Procedures Manual" reads, in part:

2      "Department employees shall not eavesdrop on or record any
       confidential communications between a person in custody, and his/her
3      attorney, doctor, or clergy."

4  Vare Report, p. 115.  Although the document Mr. Vare relies on is not dated, it

5  appears to be from 2022 at the latest.  The third page of the document includes an

6  "Executive Order" signed by "William D. Gore, Sheriff."  SD_175611.  Mr. Gore

7  resigned as Sheriff in 2022.

8      9.      In contrast, in the June 4, 2024 version of this document, section 6.105

9  reads, in its entirety:

10     With the advances in technology, Department employees have greater
       access to audio/video equipment.  The Department supports the use of
11     such equipment however the equipment must be used in an ethical and
       responsible manner.
12
       All personnel using any audio/video equipment, (e.g. Apple iOS
13     devices, all cellular phones, Smartphones, and other wireless electronic
       devices, pen camera, digital record, video recorder) to record
14     conversations or contacts with the public shall adhere to all applicable
       privacy statutes, case law, legal updates, Department training and
15     procedures.  (04-21-15)

16     10.     Therefore, even it were true that this provision once prohibited deputies

17 from listening to conversations between incarcerated people and their attorneys, the

18 current version of the document does not include that express language.

19     11.     Second, even if it were operative, the document Mr. Vare cites

20 appears to relate more generally to investigations conducted by the law

21 enforcement and investigations bureaus of the Sheriff's Department—not the

22 Detentions Services Bureau, which operates the Jail and has a separate policy and

23 procedure manual.  In fact, the Detention Services Bureau's own policies and

24 practices appear to conflict with the instructions cited by Mr. Vare.

25     12.     While the line Mr. Vare quotes from the earlier version of the

26 regulation  appears applicable to all Department employees, the remainder of that

27 regulation makes clear that 6.105 is directed at the Investigations and Patrol

28 divisions and not the Detentions division of the Department.  SD_175964-175965.

1  For example, it states, "Department employees should activate the recorder as soon
2  as possible, consistent with officer/personal safety and prudent field tactics.  Once
3  activated, the recorder shall remain on for the duration of the contact.  NOTE:  If
4  the contact is interrupted, i.e., deputy returns to the car to run a warrant check,
5  write a citation, etc. and there will be no contact with the person for several
6  minutes, the recorder may be turned off …."  SD_175965.

7       13.    More broadly, the manual cited by Mr. Vare is listed separately on the
8  Sheriff's Department's website from the "Detention Policies and Procedures."  The
9  Snell Report cites to the latter policy and procedure manual, given that that is the
10  manual specific to running the Jail.  The section in the non-detention-specific
11  manual that is cited by Mr. Vare, Section 6.105, Audio/Video Use Requirements,
12  is in the Operations section of the document, sandwiched between "Controlled Tire
13  Deflation Device Deployment" (6.104), and "Release of Narcotics from Sheriff's
14  Evidence for Training" (6.106).  It is **not** included in the  non-detention-specific
15  manual's "Critical Policies and Procedures" that "[a]ll members of this
16  Department will read, will adhere to and will be held accountable for …."
17  SD_175619.  It is also **not** listed in the Index under "Attorney," "Lawyer,"
18  "Confidential," "Privacy," or "Recording."  SD_175619, 175621.  It can only be
19  found if one looks up "Tape Recording."  SD_175622.  There is no evidence
20  Detention deputies are specifically trained on this section.

21       14.    If they were, they would immediately see a contradiction between this
22  regulation and the Jail's practices.  The part of regulation 6.105 Mr. Vare relies
23  on reads:

24        "Department employees shall not eavesdrop on or record *any*
         confidential communications between a person in custody, and his/her
25        attorney, doctor, or clergy."

26  Vare Report, p. 115 (emphasis added).  But, as Mr. Vare admits, calls between
27  incarcerated people and their attorneys are "monitored" unless the number has been
28  "submitted to the detention investigations unit to be entered into a system that

1   ensures these communications remain private." Vare Report, pp. 115-116. And as I

2   described in the Snell Report, this process is plagued with months-long delays.

3   Snell Report, ¶¶ 205-208. Thus, while it sounds good, the regulation is regularly

4   violated by the Department.

5         15.   **In Person.** Mr. Vare appears to agree that attorney-client visits must

6   be private. He writes approvingly,

> Commander Ralph was asked if the spaces provided for attorneys to
> meet with their clients were private if the visits were held in an area
> that had an incomplete wall between two visiting rooms. She
> responded that it would depend on whether any other people were
> present in the area.

10  Vare Report, p. 119. Presumably, Mr. Vare would agree that if there are "any other

11  people present in the area," the visit is not private.

12        16.   Mr. Vare asserts that the important point is that the meeting is private,

13  not that it is held in a visiting room of specific dimensions. I would agree. But in

14  the San Diego County Jail, attorney client meetings are held in rooms that are not

15  private rooms where other incarcerated people and even other law enforcement

16  personnel can overhear the conversations between incarcerated people and their

17  lawyers. Mr. Vare does not even attempt to justify this, nor does he provide any

18  explanation of how the specific attorney visiting areas at this Jail, including the

19  Central Jail facility, are conducive to holding a confidential meeting.

20        17.   Mr. Vare acknowledges that "the Sheriff's Office does not keep

21  reports on … the wait times for attorneys after checking in to see their clients."

22  Vare Report, p. 116. His argument that wait times are not a problem is based

23  instead on the fact that he has "not seen evidence in this case from a group of

24  attorneys not connected with this case who have made any complaints regarding

25  this issue." *Id.*, p. 117.

26        18.   The fact that Mr. Vare has not seen the evidence does not mean it does

27  not exist. I was provided with complaints from attorneys not connected with this

28  case about wait times and other problems related to in person visiting in the Jail.

1    *See* Snell Report, ¶¶ 123-124.

2    19.    One email produced by Defendants refers to an attorney who waited

3    several hours before leaving Central Jail in frustration and then formally

4    complained to the Captain of the Jail.  The Captain "believed staffing and poor

5    communication played a role."  Email to S. Manning from K. Bibel, October 26,

6    2023, SD_659605.  Another email concerns an attorney complaint about the wait

7    at South Bay Detention Center.  Email to E. Frierson from M. Carter, January 7,

8    2022, SD_661329.  The attorney wanted to advise her client of what was going to

9    happen in court the next day.  When she arrived at the jail, only one of the four

10   professional visiting rooms was in use, but she was required to wait for two hours

11   before she was allowed to see her client.  *Id*. at SD_661330.

12   20.    A third email, from Lieutenant Kelly Buchanan, describes an attorney

13   being stuck in a visiting room for over an hour because the jail's intercom system

14   was broken and she could not alert the guards that she wanted to leave:

15   Our intercoms are not consistently working and none of our
     professional visit room ones are working at all.  This is a huge liability.
16   Yesterday we had an IP defecate in a pro-visit room because the call
     box did not work for him to notify anyone that he needed out.  This is
17   unacceptable.  Additionally, two weeks ago, an attorney was stuck in
     the room with an IP for almost an hour because she had no way to
18   communicate the visit was over.  ... [I]t was known these intercoms
     have been down for almost a month.

19

20   Email from K. Buchanan to Staff, July 21, 2022, SD_704056-704057; Snell Report,

21   ¶ 161.

22   21.    In addition, I was provided with the deposition of the Sheriff's

23   Department's person most knowledgeable about attorney visiting, Captain Johns,

24   who testified that the Department is aware of long wait times for attorneys to visit

25   with their clients.  Johns Depo. at 18:20-24.  Captain Johns testified that the

26   Department is aware of attorneys waiting several hours to see a client, then leaving

27   the jail in frustration.  *Id*. at 19:8- 21.  He testified that the Department is aware

28   that attorneys and other professionals can overhear the conversations of other

1   professionals in the professional visiting area at Central Jail.  *Id.* at 75:21-76:23.

2         22.    Finally, I was provided with publicly available evidence that in 2013,

3   an attorney sued the County of San Diego after he was locked in a Central Jail

4   visiting room for hours and that the County settled the claim by paying him

5   $4,000.  Snell Report, ¶ 137.

6         23.    Clearly, the Department is aware of the problems attorneys face when

7   attempting to visit their clients.  It simply gives them such low priority that they

8   have not been systemically addressed.

9   **B.    There Is Ample Evidence That The Sheriff's Department**
       **Frequently Fails To Notify Incarcerated People About Professional**
10     **Callback Requests From Their Attorneys**

11        24.    Mr. Vare's Opinion 12, subpart b), states: "Plaintiffs' allegation that

12  the Sheriff's Office staff frequently fails to notify incarcerated people about

13  professional call requests from their attorneys is not supported by evidence."  Vare

14  Report, p. 116.

15        25.    Mr. Vare acknowledges that the San Diego Sheriff's Department does

16  not log the callback requests that come in, Vare Report, p. 116, and thus lacks any

17  evidence to refute Plaintiffs' claim that a substantial number of the callback

18  requests attorneys make are not delivered to their clients.

19        26.    The sworn testimony of two named plaintiffs, Anthony Edwards and

20  Jesse Olivares, Complaint, pp. 193-194; Anthony Edwards Depo. at 164:11-13;

21  Jesse Olivares Depo. at 151:5-14, provides solid evidence to support Plaintiffs'

22  claim.  The evidence I collected in the course of my investigation further supports

23  this claim.  *See* Snell Report, ¶¶ 172-183; Declaration of Hannah Chartoff (Ex. C

24  to Snell Report).  In addition, I understand from counsel for Plaintiffs in this case

25  that these problems continue, as named plaintiff James Clark has reported not

26  receiving multiple callback requests placed by his attorneys in this case.

27        27.    In the absence of Department records of the number of attorney

28  callback requests that come in, Mr. Vare bases his opinion that it would be "an

1  unnecessary burden to have to write down each of the phone calls" on the number

2  *he calculates* come in per day, taking into account the Jail's annual booking rates

3  and assuming that each person booked receives just one callback request from an

4  attorney.  Vare Report, pp. 116-117.  According to Mr. Vare, the Department

5  likely receives 132 attorney requests for a callback per day.  There are seven jails.

6  This works out to less than 20 callback requests per jail per day.  This is not an

7  onerous number.

8       28.    It is interesting to compare Mr. Vare's calculation of the total number

9  of attorney callback requests the Department receives to the number of callback

10 requests delivered by a deputy to an incarcerated person, as reflected on

11 Defendant's log, SD_727548.  As I explained in the Snell Report, according to

12 Defendant's 2023 Callback Log, all of the jails combined logged fewer than 40

13 callback requests delivered to incarcerated people per week day.  *See* Snell Report,

14 ¶ 178.  That is substantially fewer than the 132 callback requests that Mr. Vare

15 estimates the Jail could, at minimum, expect on a daily basis.

16      29.    Mr. Vare also asserts that, "It would be unreasonable to require that

17 the Sheriff's Office staff log each of [the 20 attorney] phone calls [received]

18 without even knowing that the call originated from an attorney's office."  Vare

19 Report, p. 116.  But he forgets that in order to have an unmonitored telephone call

20 with an incarcerated person, the attorney's number must be pre- "designated as

21 private" or "privileged" by the Sheriff's Office.  *Id*., p. 117.  The Sheriff's staff

22 can simply consult this list and log those calls.  It chooses not to, presumably

23 because the results would not be favorable to the Department.

24  **C.    Mr. Vare Admits Access to Law Library Services "Could Be
        Improved"**

25

26      30.    Mr. Vare's Opinion 12, subpart c), states: "I find that access to law

27 library services could be improved and the current process of using the services of

28 Legal Research Associates (LRA) should be enhanced to provide additional

access; however, they meet constitutional and title 15 standards." Vare Report, p. 119.

31.     Mr. Vare notes that the Department has "logs that track access to the law library by incarcerated individuals." Vare Report, p. 116.  Having reviewed this evidence, he agrees with me that additional access should be provided.  Vare Report, p. 120.  He states that he has "been informed that the county is open to considering changes to this process to allow greater access to LRA requests." *Id*., p. 120.  He does not set forth what changes he thinks should be made.

32.     Mr. Vare does not provide the reasoning for his (probably inadmissible) conclusion that, despite its shortcomings, the access the Department provides meets "constitutional and title 15 standards." Vare Report, p. 120.  In contrast, I can attest, as a criminal defense attorney who has prepared for many hearings and trials, and a civil rights attorney who has drafted many complaints, that it is not possible to prepare a case or a defense within the statutory and court imposed deadlines limited to two written legal research requests per month, with results limited to 50 printed pages per request.

33.     Mr. Vare explains the security concerns that have led many jails to use offsite law library services rather than allowing incarcerated people to visit the jails' law libraries in recent years.  Vare Report, p. 119-120.  While safety and security are important, they cannot override constitutional rights.  Neither the Department nor Mr. Vare appear to have given much thought to how to ensure that incarcerated people continue to have access to law books.  Sometimes it takes some digging to figure out the question you want to ask.  With only two requests per month allowed, it would take months to access the information necessary to mount a defense or draft a complaint.  Current access is clearly insufficient.

34.     Both Mr. Vare's concerns and mine would be alleviated if incarcerated people were given sufficient timely access to computer tablets programmed to allow them to conduct legal research.  This functionality is

available in the tablets provided by a number of correctional communication companies, including (according to their websites) Smart Communications,[3] GTL,[4] Securus,[5] and Pay Tel.[6]  Incarcerated people should also have access to technology that allows them to save the results of their research, draft pleadings, and print sufficient copies to comply with the rules of the court.

35.    The information and opinions contained in this report are based on evidence, documentation, and/or observations available to me.  I reserve the right to modify or expand these opinions should additional information become available to me.  The information contained in this report and the accompanying exhibits are a fair and accurate representation of the subject of my anticipated testimony in this case.

Dated:  October 1, 2024

_____
Karen L. Snell

---

[3] Available at: https://www.smartcommunications.us/kiosks-and-tablets.cfm.

[4] Available at: https://www.gtl.net/gtl-tablet-solutions/.

[5] Available at: https://www.securustablet.com/.

[6] Available at: https://www.paytel.com/interested-facilities/products-and-services/inmate-tablets/.

1  available in the tablets provided by a number of correctional communication

2  companies, including (according to their websites) Smart Communications,[3] GTL,[4]

3  Securus,[5] and Pay Tel.[6] Incarcerated people should also have access to technology

4  that allows them to save the results of their research, draft pleadings, and print

5  sufficient copies to comply with the rules of the court.

6        35.    The information and opinions contained in this report are based on

7  evidence, documentation, and/or observations available to me. I reserve the right

8  to modify or expand these opinions should additional information become

9  available to me. The information contained in this report and the accompanying

10 exhibits are a fair and accurate representation of the subject of my anticipated

11 testimony in this case.

12

13

14 Dated:  October 1, 2024                    _Karen L. Snell_____

15                                           Karen L. Snell

16

17

18

19

20

21

22

23

24

---

[3] Available at: https://www.smartcommunications.us/kiosks-and-tablets.cfm.

25 [4] Available at: https://www.gtl.net/gtl-tablet-solutions/.

26 [5] Available at: https://www.securustablet.com/.

27 [6] Available at: https://www.paytel.com/interested-facilities/products-and-
28 services/inmate-tablets/.