GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF CHRISTINE SCOTT-HAYWARD, PH.D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge: Hon. Anthony J. Battaglia<br><br>Date: March 6, 2025<br>Time: 2:00 p.m.<br>Crtrm.: 4A |

[4621724.3]

I, Christine Scott-Hayward, Ph.D., declare that if called upon I could and would testify competently to the information contained below, including in my expert reports, which is based on my own personal knowledge:

1.      I am a tenured Professor and the Director of the School of Criminology, Criminal Justice, and Emergency Management at California State University, Long Beach.  I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment ("Motion").

2.      Attached as **Exhibit 1** is a true and correct copy of my August 15, 2024 report ("Report"), which accurately represents my opinions in this case.  This does not include the index of documents I reviewed.

3.      Attached as **Exhibit 2** is a true and correct copy of my October 1, 2024 rebuttal report ("Rebuttal"), which accurately represents my opinions with respect to the report of Lenard Vare in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Long Beach, California this _16_ day of January, 2025.

Christine Scott-Hayward, Ph.D

# EXHIBIT 1

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>      v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>       Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXPERT REPORT OF CHRISTINE SCOTT-HAYWARD, PH.D.**<br><br>Judge:    Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner |

[4522606.8]

Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF CHRISTINE SCOTT-HAYWARD, PH.D.

# TABLE OF CONTENTS

**Page**

I. PRIOR EXPERT REPORTS .................................................................. 2

II. COMPENSATION ........................................................................... 2

III. MATERIALS REVIEWED ................................................................ 2

IV. OPINIONS ................................................................................... 2

    A. Summary of Opinions ............................................................. 2

    B. Opinion One: Jails, particularly jails in San Diego County, are dangerous places where medical and mental health needs are high, treatment is lacking, and death rates are high. .......................... 3

    C. Opinion Two: Pretrial jail detention negatively impacts individuals' case outcomes. ..................................................... 9

    D. Opinion Three: Jail detention negatively impacts the financial wellbeing of detained individuals and their families. .................... 13

    E. Opinion Four: The negative consequences of pretrial detention and jail incarceration generally, disproportionately impact people of color. ................................................................................ 15

    F. Opinion Five: San Diego County's pretrial jail population could be reduced in several ways without negatively impacting public safety or reducing appearance rates. .......................................... 18

    G. Opinion Six: The jail population in San Diego County could be reduced by expanding the use of alternative to incarceration programs ................................................................................ 24

    H. The Current State of Alternatives to Incarceration and Reentry Programming in San Diego County ........................................... 31

V. CONCLUSION ............................................................................. 32

I, Christine Scott-Hayward, Ph.D., declare:

1. I am Christine Scott-Hayward. A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit A**. My background and experiences relevant to my expert testimony in this proceeding are set forth below.

EDUCATION AND QUALIFICATIONS

2. I am a tenured Professor and the Director of the School of Criminology, Criminal Justice, and Emergency Management at California State University, Long Beach. Prior to joining CSULB, from 2011-2013, I was an Associate-in-Law and Post-Doctoral Research Fellow at Columbia Law School. Previously, from 2010-2011, I clerked for the Honorable James Orenstein, Magistrate Judge, in the Eastern District of New York. From 2006-2009, I worked as a Research Analyst and Research Associate at the Vera Institute of Justice in New York.

3. I earned my B.C.L. (International), with First Class Honors from University College Dublin School of Law, spending a year studying law at DePaul University School of Law in Chicago, Illinois. I earned my M.A. in Social Sciences in 2000 from the University of Chicago. My thesis was entitled "The Civilizing Process: The Origins of Anti-Death Penalty Discourse in Europe and Britain 1764-1868."

4. I earned my Ph.D. in Law and Society from New York University's Institute for Law and Society. My dissertation was entitled "Parole, Desistance, and Rehabilitation: The Effect of Parole Supervision on Reentry and Reintegration." I have been a member of the New York bar since 2006.

5. I have almost 20 years of experience conducting social science research in the fields of criminal justice and criminal procedure and have published more than 30 books, articles, book chapters, commentaries and reports. My recent research has focused on pretrial justice and sentencing and since 2018, I have more than ten publications on these topics.

## I.    PRIOR EXPERT REPORTS

6.    I previously prepared an expert report and testified in the case of *Urquidi v. City of Los Angeles*, Case No. 22-STC-04044 (Los Angeles County Superior Court) on behalf of plaintiffs challenging the use of pre-arraignment money bail schedules in the City of Los Angeles.  In that case, I was accepted as an expert on pretrial justice and testified on the adverse effects of pretrial detention and money bail on criminal defendants, their families, and communities.

## II.    COMPENSATION

7.    I am being compensated at a rate of $175 an hour for report preparation and $350 an hour for testimony in this case.

## III.    MATERIALS REVIEWED

8.    Attached as **Exhibit B** is an index of the documents I have reviewed. This includes documents produced by Defendants in this litigation, as well as other discovery, including deposition transcripts.  I have also reviewed some publicly available information about Defendants and the programs I discuss herein.  The information and opinions contained in this report are based on evidence, documentation, and/or observations available to me.  I reserve the right to modify or expand these opinions should additional information become available to me.

## IV.    OPINIONS

### A.    Summary of Opinions

9.    My opinions are as follows:

- First, jails, particularly jails in San Diego County, are dangerous places where medical and mental health needs are high, treatment is lacking, and death rates are high.

- Second, pretrial jail detention negatively impacts individuals' case outcomes.

- Third, jail detention negatively impacts the financial wellbeing of detained individuals and their families.

- Fourth, the negative consequences of pretrial detention and jail incarceration generally, disproportionately impact of people of color.

- Fifth, San Diego County's pretrial jail population could be reduced in several ways without negatively impacting public safety or reducing court appearance rates.

- Sixth, the jail population in San Diego County could and should be reduced by expanding the use of alternative to incarceration programs.

**B.    Opinion One: Jails, particularly jails in San Diego County, are dangerous places where medical and mental health needs are high, treatment is lacking, and death rates are high.**

10.    Individuals with health issues, particularly behavioral health issues are disproportionately represented in jails in the United States and in San Diego County. National data from the Bureau of Justice Statistics show that people in jail have serious physical and mental health issues as well as high rates of substance dependence.  Moreover, jail incarceration is associated with negative behavioral health outcomes after release.  In addition, detained individuals can be victims of correctional violence and have higher death rates than the national average.  As discussed below, the death rate in San Diego County's jails is notably high.

11.    **Mental Illness:**  A survey conducted in 2011 and 2012 by the Bureau of Justice Statistics (BJS), a division of the United States Department of Justice, found that about one in four people detained in jail reported having had in the past 30 days "experiences that met the threshold for serious psychological distress."[1] This same survey shows that many incarcerated people suffered from multiple disorders, with 28.5% suffering at least two mental health conditions.[2]  Further, 44% of respondents to that same survey reported that they had been previously diagnosed by a mental health professional with a major depressive disorder.  These rates are

---

[1] JENNIFER BRONSON & MARCUS BERZOFSKY, U.S. DEP'T OF JUSTICE, BUREAU OF JUST. STATISTICS, INDICATORS OF MENTAL HEALTH PROBLEMS REPORTED BY PRISONERS AND JAIL INMATES, 2011–12 (NCJ Rep. No. 250612, June 2017), https://bjs.ojp.gov/content/pub/pdf/imhprpji1112.pdf.

[2] Brandon K. Applegate, Nicola Pasquire, and Heather M. Ouellette, *The Prevalence of Physical and Mental Health Multimorbidity Among People Held in U.S. Jails*, 30(1) J. CORRECTIONAL HEALTH CARE (2024).

higher than the rates for those in prison and the general population.[3]  Similar rates of mental illness are found among people arrested in San Diego County.  For example, a 2022 report by SANDAG based on interviews with a random sample of people booked into three San Diego County jail facilities found that 40% of the sample reported a history of a mental health or psychiatric disorder.[4]

12.     Despite these high rates of mental illness in jails, most detained individuals do not receive adequate care.  In 2015, the Vera Institute of Justice reported that "83% of jail inmates with mental illness did not receive mental health care after admission."[5]  In San Diego County, although some incarcerated people do receive mental health care, a number of reports have highlighted problems with the county's provision of mental health services.  For example, a 2017 report by the National Commission on Correctional Healthcare on the San Diego County jail system noted problems with suicide prevention at all the facilities it visited, as well as insufficient staffing to meet the needs of mentally ill people at 3 of the 4 facilities it reviewed.[6]  Similarly, a 2018 report by Disability Rights California highlighted the over-incarceration of people with mental health needs, deficiencies in suicide prevention, and a failure to provide adequate mental health treatment.[7] Another 2018 report from expert Lindsay Hayes identified deficiencies in the Sheriff's

---

[3] Meghan A. Novisky & Daniel C. Semenza, *Jails and Health in* CHRISTINE S. SCOTT-HAYWARD, JENNIFER E. COPP, STEPHEN DEMUTH (EDS.), HANDBOOK ON PRETRIAL JUSTICE (2021).

[4] SANDAG, 2022 Adult Arrestee Drug Use in the San Diego Region (June 2023) (DUNSMORE100934).

[5] RAM SUBRAMANIAN, RUTH DELANEY, STEPHEN ROBERTS, NANCY FISHMAN, & PEGGY MCGARRY, VERA INSTITUTE OF JUSTICE, INCARCERATION'S FRONT DOOR: THE MISUSE OF JAIL IN AMERICA (2015), http://www.safetyandjusticechallenge.org/wp-content/uploads/2015/01/incarcerations-front-door-report.pdf.

[6] NCCHC RESOURCES INC., TECHNICAL ASSISTANCE REPORT: SAN DIEGO COUNTY SHERIFF'S DEPARTMENT (JAN. 2017) (DUNSMORE0115212).

[7] DISABILITY RIGHTS CALIFORNIA, SUICIDES IN SAN DIEGO COUNTY JAIL: A SYSTEM FAILING PEOPLE WITH MENTAL ILLNESS (APRIL. 2018) (DUNSMORE0125014).

Department's suicide prevention program.[8]  Several years later, a 2022 report by the California State Auditor found that many problems with mental health care still existed, including insufficient health evaluations conducted at intake and inconsistent follow-up care provided.[9]

13.    Moreover, incarcerated people with mental illness are generally at higher risk of violent victimization by correctional staff, as a 2023 study found that they are 2.2 times more likely to be victimized than incarcerated people without mental illness.[10]

14.    The relationship between incarceration and mental illness is complex, in part because of the overlap between childhood determinants of criminal behavior and of psychiatric outcomes.[11]  However, research suggests that all forms of incarceration have a negative impact on behavioral health outcomes.  For example, a study by Schnittker and colleagues that examined data from a national survey conducted between 2001 and 2003 found that incarceration is related to subsequent mood disorders, including major depressive disorder and bipolar disorder.[12] Similarly, Porter and Novisky analyzed data from the National Longitudinal Study of Adolescent Health collected between 1993 and 2008 and found that incarceration was associated with higher rates of depressive symptoms.[13]  In addition, relative to

---

[8] *See* LINDSAY M. HAYES, REPORT ON SUICIDE PREVENTION PRACTICES WITHIN THE SAN DIEGO COUNTY JAIL SYSTEM (JUNE 2018) (DUNSMORE0117162).

[9] CALIFORNIA STATE AUDITOR REPORT 2021-109, SAN DIEGO COUNTY SHERIFF'S DEPARTMENT: IT HAS FAILED TO ADEQUATELY PREVENT AND RESPOND TO THE DEATHS OF INDIVIDUALS IN ITS CUSTODY (Feb. 2022) (SD744691).

[10] Daniel C. Semenza, Jessica M. Grosholz, Deena A. Isom, & Meghan A. Novisky, *Mental Illness and Racial Disparities in Correctional Staff-Involved Violence: An Analysis of Jails in the United States*, 38(3-4) J. OF INTERPERSONAL VIOLENCE (2023).

[11] Jason Schnittker, Michael Massoglia, and Christopher Uggen, *Out and Down: Incarceration and Psychiatric Disorders*, 53(4) J. HEALTH & SOC. BEHAVIOR 448 (2012).

[12] *Id.*

[13] Lauren C. Porter & Meghan A. Novisky, *Pathways to Depressive Symptoms among Former Inmates*, 34(5) JUST. QUARTERLY 847 (2016).

1  prison incarceration, jail incarceration appears to be more harmful to individuals.  A
2  2017 study by Yi and colleagues analyzed data from the Fragile Families and Child
3  Wellbeing study, which is a longitudinal study following the parents of children
4  born between 1998 and 2000.  They found that people held in jails report higher
5  rates of depression after release than those released from prison.[14]

6       15.    **Physical Health:**  Detained individuals also suffer from physical health
7  problems, including chronic health conditions, at high rates.  The 2011-12 BJS
8  survey discussed earlier showed that approximately 45% of detained individuals
9  reported a history of chronic illness, most commonly hypertension or asthma.[15]  As
10 with mental illness, many detained people have suffered from multiple health issues.
11 A recent study using the same 2011-12 data found that 55% of respondents had
12 suffered from at least two physical health conditions.[16]

13      16.    Moreover, multimorbidity is common, with high numbers of detained
14 individuals suffering both physical and mental health conditions.  Applegate and
15 colleagues found that more than half of the 2011-12 surveyed sample had at least
16 one mental health condition *and* one physical health condition.[17]  Notably, women
17 suffered multiple conditions at higher rates than men.  Again, a number of reports
18 have pointed out inadequacies in the provision of medical care in San Diego
19 County's jails.[18]

20      17.    **Substance Use:**  Substance use and services for those with substance
21 use needs is also a major problem in jails.  A 2018 report by the National Sheriff's

---

[14] Youngmin Yi, Kristin Turney, & Christopher P. Wildeman, *Mental Health Among Jail and Prison Inmates*, 11 AM. J. OF MEN'S HEALTH 900 (2017).

[15] LAURA M. MARUSCHAK, MARCUS BERZOFSKY, & JENNIFER UNANGST, U.S. DEP'T OF JUSTICE, BUREAU OF JUST., MEDICAL PROBLEMS OF STATE AND FEDERAL PRISONERS AND JAIL INMATES, 2011-12 (NCJ Rep. No. 248491, Feb. 2015), https://bjs.ojp.gov/content/pub/pdf/mpsfpji1112.pdf.

[16] Applegate, et al., *supra* note 2.

[17] *Id.*

[18] *See* NCCHC RESOURCES INC., *supra* note 6; CALIFORNIA STATE AUDITOR REPORT, *supra* note 9.

1   Association estimated that between one half and two thirds of the national jail

2   population has a substance use problem.[19]  This estimate is consistent with national

3   data from 2007-2009, which found that about two-thirds of people in jail reported

4   drug dependence or abuse.[20]  More recent BJS data from 2019 examine opiate use

5   disorder (OUD) and found that of those screened for the disorder, 14.5% were

6   positive for OUD.[21]  This compares with approximately 8% in the general

7   population.[22]  Although complete data on the prevalence of substance use issues

8   among people incarcerated in San Diego County are unavailable, a 2022 report by

9   SANDAG found that in their sample of people arrested and booked into three San

10  Diego jail facilities, 3 of 4 people tested positive for at least one substance.[23]  In

11  addition, a recent peer-reviewed report by Analytica Consulting concluded that

12  people incarcerated in San Diego County jails had the highest rate of

13  overdose/accidental deaths compared with similar county jails.[24]

14         18.    Death: Data show that the death rate in United States jails is higher than

15  the national average,[25] with suicide being the leading cause of death between 2006

16

---

17  [19] National Sheriffs Association, Special Report: Jail-based medication-assisted
    treatment: Promising practices, guidelines, and resources for the field (2018),
18  https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf.

19  [20] JENNIFER BRONSON, JESSICA STROOP. STEPHANIE ZIMMER & MARCUS BERZOFSKY,
    U. S. DEP'T. OF JUST., BUREAU OF JUST. STATISTICS, DRUG USE, DEPENDENCE, AND
    ABUSE AMONG STATE PRISONERS AND JAIL INMATES, 2007–2009 (NCJ Rep. No.
20  250546, June 2017),  https://www.bjs.gov/content/pub/pdf/dudaspji0709.pdf.

21  [21] LAURA M. MARUSCHAK, TODD D. MINTON, & ZHEN ZENG, U.S. DEP'T OF JUSTICE,
    BUREAU OF JUST. STATISTICS, OPIOID USE DISORDER SCREENING AND TREATMENT IN
22  LOCAL JAILS, 2019 (NCJ Rep. 305179, April 2023).
    https://bjs.ojp.gov/library/publications/opioid-use-disorder-screening-and-treatment-
23  local-jails-2019.

24  [22] Emily Widra, *Addicted to Punishment: Jails and prisons punish drug use far more
    than they treat it*, PRISON POLICY INITIATIVE, (Jan. 30, 2024),
25  https://www.prisonpolicy.org/blog/2024/01/30/punishing-drug-use/.

    [23] SANDAG, *supra* note 4.
26
    [24] ANALYTICA CONSULTING, SAN DIEGO COUNTY IN-CUSTODY DEATH STUDY (April
27  2022) (SD817750).

28  [25] Ryan J. Reilly & Dana Liebelson, *We Wanted to Find Troubled Jails, So We
    Counted The Bodies,* HUFFPOST (Dec. 15, 2016),
    https://www.huffpost.com/entry/jail-deaths-

and 2016.[26]  During this same time period, 185 people died in San Diego County's jails, one of the highest totals in California.[27]  Notably, this high number is not explained by mortality rates in the county at large, with Analytica Consulting concluding that San Diego has the highest number of unexplained deaths compared with other similar counties, and that it has a statistically significant number of excess deaths than what would be projected based on overall county mortality rates.[28]  Although not all deaths are explained, the February 2022 report by the California State Auditor concluded that the Sheriff's Department did not take sufficient steps to prevent the high number of deaths in its jails.[29]  Specifically, it highlighted deficiencies in the provision of medical and mental health care as well as safety and health checks.

19.    In conclusion, people incarcerated in American jails, including San Diego jails, experience high levels of mental health, medical health, and substance use issues.  Notably though, treatment and services for these issues, particularly in San Diego County, appear to be often inadequate, and death rates are concerningly high.  Indeed, the serious mental health issues and high suicide rate in San Diego County's jails were explicitly discussed by San Diego County Supervisor Terra Lawson-Remer as reasons to support expanding alternatives to incarceration in the County.[30]

---

statistics_n_58518e13e4b0ee009eb4f1a9.

[26] E. ANN CARSON, & MARY P. COWHIG, U. S. DEP'T. OF JUST, BUREAU OF JUSTICE STATISTICS, MORTALITY IN LOCAL JAILS, 2000-2016 – STATISTICAL TABLES (NCJ Rep. No. 251921, Feb. 2020).  https://bjs.ojp.gov/content/pub/pdf/mlj0016st.pdf.

[27] CALIFORNIA STATE AUDITOR REPORT, *supra* note 9.

[28] ANALYTICA CONSULTING, *supra* note 24.

[29] CALIFORNIA STATE AUDITOR REPORT, *supra* note 9.

[30] Terra Lawson-Remer, October 19, 2021 Agenda Item: A Data-Driven Approach to Protecting Public Safety, Improving and Expanding Rehabilitative Treatment and Services, and Advancing Equity Through Alternatives to Incarceration: Building on Lessons Learned during the COVID-19 Pandemic (DUNSMORE258288).

1

2

## C.     Opinion Two: Pretrial jail detention negatively impacts individuals' case outcomes.

3      20.     As noted above, all incarceration has negative impacts, but pretrial

4    detention is particularly problematic because it has serious adverse impacts on a

5    detained person's criminal case outcomes.  Decades of empirical research, in a

6    variety of jurisdictions, shows that, compared with people who await trial in the

7    community, detained individuals are less likely to receive charge reductions, more

8    likely to plead guilty, more likely to be convicted, and more likely to receive a

9    sentence of incarceration.[31]  These studies typically rely on high-quality

10   administrative data and use rigorous methods that control for other relevant facts

11   that might impact these outcomes, such as offense type, charge severity, and

12   criminal history.  This research, combined with research showing that many more

13   people can be released from jail while their cases proceed without negative impacts

14   on public safety, supports reducing reliance on incarceration, including in San Diego

15   County.  *See* Opinion Four below.

16      21.     Charge Reductions, Guilty Pleas, and Convictions: Since 2017, four

17   rigorous studies using data from Philadelphia, Harris County (Texas), Miami-Dade

18   County (Florida), and New York City have been published that examine the impact

19   of pretrial detention on charge reductions, guilty pleas, and convictions.  These

20   quasi-experimental studies rely on natural experiments in these jurisdictions, and

21   control for a variety of demographic and offense characteristics; they confirm earlier

22   findings that individuals detained pretrial are less likely to receive a charge

23   reduction and more likely to plead guilty and be convicted.

24      22.     First, Stevenson conducted a study of 300,000 felonies and

25   misdemeanor cases that began between 2006 and 2015 in Philadelphia.  She found

26   _____

27   [31] MARY T. PHILIPS, NEW YORK CITY CRIMINAL JUSTICE AGENCY, A DECADE OF
     BAIL RESEARCH IN NEW YORK CITY (2012); Stacie St. Louis, *The Pretrial Detention*

28   *Penalty: A Systematic Review and Meta-Analysis of Pretrial Detention and Case
     Outcomes*. 41 JUSTICE QUARTERLY 347 (2023).

1  that being detained pretrial led to a 13% increase in the likelihood of conviction,

2  mostly because detained defendants who otherwise might have been acquitted or

3  had their case dismissed pleaded guilty.[32]  Similarly, in 2017, Heaton and colleagues

4  analyzed 380,000 misdemeanor cases that originated between 2008 and 2013 in

5  Harris County, Texas (home to Houston).  Controlling for offense seriousness,

6  criminal history, differences in initial bail amount, and demographics, they found

7  that defendants held in pretrial detention were 25% more likely to plead guilty than

8  similarly situated defendants who were released pretrial.[33]

9      23.    In a third study, Dobbie and colleagues examined more than 400,000

10  cases filed between 2006 and 2014 in Philadelphia County, Pennsylvania, and

11  Miami-Dade County, Florida and found that released defendants were 10.8% less

12  likely to plead guilty than those who were detained, controlling for case-related and

13  demographic differences.[34]  Moreover, released defendants received better plea

14  deals and compared with detained defendants, were more likely to be convicted of a

15  less serious charge and were charged with fewer total offenses.

16      24.    Finally, Leslie and Pope's 2017 study examined almost one million

17  defendants in New York City between 2009 and 2013 and concluded that pretrial

18  detention increased the likelihood of conviction by over 13 percentage points – this

19  was largely a result of guilty pleas.[35]  They also found that compared with released

20  defendants, incarcerated defendants charged with a felony offense were 10

21  percentage points less likely to have their charges reduced.

22

---

23  [32] Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail affects Case Outcomes*, 34 J. L, ECON. & ORG. 511 (2018).

24  [33] Paul Heaton, Sandra Mayson, and Megan T. Stevenson, *The Downstream Consequences of Misdemeanor Detention*, 69 STANFORD L. REV. 711 (2017).

25
26  [34] Will Dobbie, J. Goldin, and Crystal S. Yang. *The effects of pretrial detention on conviction, future crime, and employment: evidence from randomly assigned judges*. 108 AM. ECON. REV. 201 (2018).

27  [35] Emily Leslie & Nolan G. Pope, *The unintended impact of pretrial detention on case outcomes: Evidence from New York City arraignments*, 60 J. LAW & ECON. 529 (2017).

28

25.     These findings are not surprising.  A variety of qualitative studies in the United States and Canada suggest that the deprivation of liberty and conditions of confinement in jails pressures defendants to plead guilty.[36]  It also appears to encourage early guilty pleas.  According to Peterson, detained individuals pleaded guilty 2.86 times faster than released defendants,[37] likely because pleading guilty to a time-served sentence is the quickest way to secure release for defendants who cannot afford to pay bail.[38]  Given the consistency of these findings across jurisdictions, I have no reason to believe that the situation would be different in San Diego County.

26.     **Sentencing:**  The negative impacts of pretrial detention have an even larger effect at sentencing.[39]  Research conducted over the last twenty-five years shows that people who are detained pending trial are more likely to be sentenced to jail or prison than those who are not detained (or who are released before trial).  For example, Lowenkamp and colleagues (2013) analyzed approximately 150,000 cases in Kentucky from 2009 and 2010 and, controlling for age, gender, race, ethnicity, marital status, risk level, supervision status, offense type, offense level, and time at risk, found that people detained pretrial were 4.44 times more likely to be sentenced to jail and 3.32 times more likely to be sentenced to prison than defendants who were released from pretrial custody prior to trial.  A 2022 follow-up study in the same jurisdiction that expanded the data through 2018 confirmed these earlier

---

[36] CHRISTINE S. SCOTT-HAYWARD & HENRY F. FRADELLA, PUNISHING POVERTY: HOW BAIL AND PRETRIAL DETENTION FUEL INEQUALITIES IN THE CRIMINAL JUSTICE SYSTEM (2019).

[37] Nick Petersen, *Do Detainees Plead Guilty Faster? A Survival Analysis of Pretrial Detention and the Timing of Guilty Pleas*, 37 CRIM. J. POL. REV. (2019).

[38] Claire Chevrier, *Why Individuals who are held pretrial have worse case outcomes: How our reliance on cash bail degrades our criminal legal system*, *in* CHRISTINE S. SCOTT-HAYWARD, JENNIFER E. COPP, STEPHEN DEMUTH (EDS.), HANDBOOK ON PRETRIAL JUSTICE (2021).

[39] St. Louis, *supra* note 31.

1  findings.[40]

2      27.    These findings are confirmed by studies in other jurisdictions.  For

3  example, in their study of defendants convicted of felonies in nine counties in

4  Oregon between 2016 and 2017, Campbell and colleagues concluded that those who

5  were detained through their case disposition were more than twice as likely to be

6  sentenced to prison than those who were released, controlling for legal factors such

7  as number of charges, prior criminal history, and the severity of the charge.[41]

8  Similarly, Heaton and colleagues found that defendants detained pretrial in Harris

9  County, Texas were 43% more likely to be sentenced to jail.  For those who were

10  sentenced to jail, their sentence was nine days longer – more than double the

11  sentence length of those released pretrial.[42]

12      28.    These differences are likely because defendants who are released

13  pending trial can build a strong mitigation case at sentencing, demonstrating to a

14  judge for example, that they have been able to maintain a job and stay out of

15  trouble.[43]  Not only can detained defendants not engage in activities that can

16  demonstrate rehabilitation, but they also have more difficulty building and

17  participating in their defense, partly due to "decreased access to defense attorneys

18  [and] barriers to gathering and reviewing evidence."[44]

19      29.    Thus, throughout the case process, from charge reductions to guilty

20  pleas, convictions, and sentencing, pretrial detention negatively affects individuals'

21  case outcomes.  And again, given the consistency of research findings across

22

23  [40] ARNOLD VENTURES, THE HIDDEN COSTS OF PRETRIAL DETENTION REVISITED
     (2022).  https://craftmediabucket.s3.amazonaws.com/uploads/HiddenCosts.pdf.

24  [41] Christopher M. Campbell, Ryan M. Labrecque, Michael Weinerman, and Ken
     Sanchagrin, *Gauging detention dosage: Assessing the impact of pretrial detention*

25  *on sentencing outcomes using propensity score modeling*, 70 J. CRIM. JUST. (2020).

26  [42] Heaton et al., *supra* note 33.

27  [43] Christine S. Scott-Hayward & Connie Ireland, *Reducing the federal prison
     population: The role of Pretrial Community Supervision*. 24 FED. SENT'G REP. 327
     (2022).

28  [44] Chevrier, *supra* note 38.

1    different jurisdictions, I have no reason to believe that the situation is any different

2    in San Diego County.

3        **D.    Opinion Three: Jail detention negatively impacts the financial
              wellbeing of detained individuals and their families.**

4

5        30.    Incarceration also significantly hinders future employment prospects

6    for individuals in large part due to the stigma of a criminal conviction.  Numerous

7    experimental studies have found that having a criminal record reduces the likelihood

8    of a callback after applying for a job.[45]  Notably, one recent study involving more

9    than 2,600 fictitious job applications found that even minor felony convictions have

10   negative effects on employment callbacks.[46]  More recently, a study using the

11   National Longitudinal Survey of youth examined the impact of incarceration on

12   lifetime employment and earnings.  Controlling for factors like race, gender, and

13   education, Gordon and Neelakantan found that first-time incarceration for Black

14   men with a high school diploma reduces expected lifetime earnings by 33 percent

15   and employment by 22 percent.  For high school-educated white men, it reduces

16   expected lifetime earnings by 43 percent and employment by 27 percent.[47]

17       31.    Similarly, of the people in San Diego County with a history of

18   incarceration who responded to a community survey conducted by an Alternatives

19   to Incarceration workgroup in San Diego County in 2022 (discussed in more detail

20   later), three-quarters reported that incarceration had "somewhat" or "very much"

21   impacted their employment or ability to get a job.[48]  Some reported that they simply

22

---

[45] Devah Pager, *The Mark of a Criminal Record*, 108 AM. J. OF SOCIOLOGY 937 (2003); Amanda Agan and Sonja Starr, *The Effect of Criminal Records on Access to Employment*, 107 AM. ECON. REV.: PAPERS & PROCEEDINGS (2017).

[46] Agan & Starr, *supra* note 45.

[47] GREY GORDON & URVI NEELANKANTAN, FEDERAL RESERVE BANK OF RICHMOND, INCARCERATION'S LIFE-LONG IMPACT ON EARNINGS AND EMPLOYMENT (Economic Brief, No. 21-07, March 2021), https://www.richmondfed.org/publications/research/economic_brief/2021/eb_21-07.

[48] SANDAG, A DATA-DRIVEN APPROACH TO PROTECTING PUBLIC SAFETY, IMPROVING AND EXPANDING REHABILITATIVE TREATMENT AND SERVICES, AND ADVANCING EQUITY THROUGH ALTERNATIVES TO INCARCERATION: FINAL REPORT

1   could not get hired.  Not surprisingly 37% reported that they had lost their job

2   because they could not work.

3       32.     Moreover, there is a growing body of research showing that *pretrial*

4   detention particularly negatively impacts both the short- and long-term financial

5   wellbeing of defendants.  This is because pretrial detention, even for just a few days,

6   can cause people to lose their jobs.  For example, one study of defendants under

7   pretrial supervision in Johnson County, Missouri found that people who spent three

8   or more days in jail were nearly 2.5 times less likely to be employed than those who

9   those who were not detained or spent less than three days in jail.[49]  As discussed

10  below, detained people are often among the poorest members of society, and

11  therefore unlikely to be able to use savings to mitigate lost income and pay the fines

12  and fees associated with the criminal legal process.[50]

13      33.     Moreover, recent economic studies show that even a few days of

14  pretrial detention has a negative impact on an individuals' future earnings.  A recent

15  study analyzing cases in Philadelphia and Miami-Dade counties concluded that

16  defendants who were released at or within three days of their bail hearing were

17  11.3% more likely to have employment two years after their bail hearing than those

18  who spent at least three days in pretrial detention.[51]  The authors controlled for a

19  variety of demographic and case characteristics, including criminal history, number

20  of charged offenses, type of crime, and crime severity.  The study also found that

21  three to four years after their bail hearing, the released defendants were 9.4% more

22  _____

23  (March 15, 2023) (DUNSMORE 0115515).

24  [49] ALEXANDER M. HOLSINGER, COMMUNITY RESOURCES FOR JUSTICE, RESEARCH
    BRIEF: ANALYZING BOND SUPERVISION DATA: THE EFFECTS OF PRETRIAL

25  DETENTION ON SELF-REPORTED OUTCOMES (2016),
    http://www.crj.org/assets/2017/07/13_bond_supervision_report_R3.pdf.

26  [50] PATRICK LIU, RYAN NUNN, AND JAY SHAMBAUGH, THE BROOKINGS INSTITUTE
    HAMILTON PROJECT, THE ECONOMICS OF BAIL AND PRETRIAL DETENTION (2018),

27  https://www.brookings.edu/wp-
    content/uploads/2018/12/BailFineReform_EA_121818_6PM.pdf.

28  [51] Dobbie, et al., *supra* note 34.

likely to be employed in the formal labor market and had higher average earnings.

34.     These negative financial impacts of detention extend to families and communities.  For example, a 2014 project surveying people with a history of incarceration and their family members in 14 states found that two-thirds of families had difficulty meeting basic needs, including housing, as a result of a family member's incarceration.[52]

35.     Thus, the negative impacts of incarceration, particularly pretrial jail incarceration extend to economic impacts, with detained people suffering both short- and long-term negative employment and financial consequences.

**E.     Opinion Four: The negative consequences of pretrial detention and jail incarceration generally, disproportionately impact people of color.**

36.     Because Black and Hispanic[53] people are more likely to be arrested and incarcerated, they are more likely to experience all of the negative effects of incarceration described in my opinions above.  In San Diego County, Black and Hispanic people are disproportionately arrested and detained in county jails.  In 2022, although Black people made up just 4% of the county population, they comprised 17% of all arrests; similarly, although Hispanic people made up 31% of the population, they accounted for 41% of arrests.[54]  These disparities were visible across all arrest categories.

37.     The disparities are even greater when it comes to incarceration rates, with Black and Hispanic people overrepresented in the county jail system.  In the first quarter of 2024, Black people made up 21-22% of the jail population and

---

[52] SANETA DEVUONO-POWELL, CHRIS SCHWIEDLER, ALICIA WALTERS & AZEDEH ZOHRABI, ELLA BAKER CENTER, FORWARD TOGETHER, RESEARCH ACTION DESIGN, WHO PAYS? THE TRUE COST OF INCARCERATION ON FAMILIES (2015), https://static.prisonpolicy.org/scans/who-pays%20Ella%20Baker%20report.pdf.

[53] Note: Studies and reports discussed in this report vary in how they describe some ethnic minorities.  Throughout this report I use the terms Hispanic, Latino, and Latinx as they were used in the original study or report.

[54] SANDAG, ARRESTS 2022: LAW ENFORCEMENT RESPONSE TO CRIME IN THE SAN DIEGO REGION, (February 2024).

1  Hispanic people comprised 43-45%.[55]

2       38.     The negative impacts of pretrial detention thus fall disproportionately

3  on non-white people in San Diego.  Given the prevalence of money bail, and that

4  most criminal defendants are not able to pay even small bail amounts and thus are

5  detained pending trial, the negative consequences of pretrial detention described

6  above fall overwhelmingly on low-income people and people of color.

7       39.     Recent studies using zip codes as proxies for income have shown that

8  people from low-income neighborhoods are significantly more likely to be detained

9  pending trial than those from higher-income neighborhoods.[56]  These findings

10  confirm an earlier study showing that most people who cannot pay bail fall within

11  the poorest third of society.[57]

12       40.     A study by the Prison Policy Initiative found that non-white defendants

13  are less likely to be able to pay bail than white defendants.[58]  Moreover, Black and

14  Hispanic defendants are also significantly more likely to be detained pretrial than

15  their white counterparts, and more likely to have a financial bail set.[59]  A recent

16  study using misdemeanor data from Miami-Dade County between 2012 and 2015

17  found that Black defendants, particularly Black Latinx defendants, experienced

18  longer detention and higher bond amounts than white, non- Latinx defendants.[60]  For

19  example, Black Latinx defendants spent 21 percent longer in pretrial detention and

20  had 16 percent higher bond amounts, compared with white non- Latinx defendants.

21  Similarly, in a 2023 article, Casey and colleagues found that Black and Latino

22

---

23  [55] San Diego Sheriff's Department Jail Population Statistics, January to March 2024.

24  [56] Heaton et al., *supra* note 33; Stevenson, *supra* note 32.

25  [57] BERNADETTE RABUY & DANIEL KOPF, PRISON POLICY INITIATIVE, DETAINING THE POOR: HOW MONEY BAIL PERPETUATES AN ENDLESS CYCLE OF POVERTY AND JAIL TIME (MAY, 2016), https://www.prisonpolicy.org/reports/incomejails.html.

26  [58] *Id.*

27  [59] *Id.*

28  [60] Nick Petersen & Marisa Omori, *Is the Process the Only Punishment?: Racial-Ethnic Disparities in Lower-Level Courts*, 42(1) LAW & POL'Y 56 (2020).

defendants were more likely to be required to pay money bail than white defendants (and less likely to be released on their own recognizance).[61]  Further, Black and Latino people were more likely to be detained until their cases were resolved than white people.

41.    Because paying bail is beyond the means of most criminal defendants, some turn to commercial bail bond agencies to obtain release.  The payments that they make to these companies also have a disproportionately negative effect on people and communities of color.  For example, a study of commercial bail in Maryland showed that over five years, Black defendants were charged $181 million in premiums, while defendants of all other races combined were charged $75 million even though only approximately 30% of the Maryland population identified as Black.[62]  Similarly, a 2017 study in New Orleans found that Black residents, who made up 59% of the population, paid 84% of the $6.4 million bond premiums and associated government fees in 2015, and 69% of the $3.8 million in conviction fines and fees.[63]  This study also found significant racial disparities in arrest rates for failure to pay these fees: "Forty-three percent of Black New Orleanians whose sentences in municipal court included fines and fees were ordered arrested for failure to pay or for failing to appear in court for payment, compared to only 29 percent of white New Orleanians who owed fines and fees."

42.    Overall, the racial disparities in arrest and incarceration rates across the United States and in San Diego County in particular, mean that all the negative

---

[61] William M. Casey, Jennifer E. Copp & Stephen Demuth, *Disparities in the Pretrial Process: Race, Ethnicity, and Citizenship*, JUSTICE QUARTERLY (2024).

[62] MARYLAND OFFICE OF THE PUBLIC DEFENDER, THE HIGH COST OF BAIL: HOW MARYLAND'S RELIANCE ON MONEY BAIL JAILS THE POOR AND COSTS THE COMMUNITY MILLIONS (2016), https://opd.state.md.us/_files/ugd/868471_23811682395a4fedacc40dda7fa71124.pdf

[63] MATHILDE LAISNE, JON WOOL, AND CHRISTIAN HENRICHSON, VERA INSTITUTE OF JUSTICE. PAST DUE: EXAMINING THE COSTS AND CONSEQUENCES OF CHARGING FOR JUSTICE IN NEW ORLEANS (2017), https://www.vera.org/downloads/publications/past-due-costs-consequences-charging-for-justice-new-orleans.pdf.

1    consequences of incarceration disproportionately affect Black and Latino/a people.

2    This further highlights the importance of reducing reliance on incarceration in San

3    Diego County.

4            43.    Beyond the impacts of incarceration discussed above, there is further

5    evidence that incarceration has disproportionate negative impacts on Black and

6    Latino/a individuals.  For example, a recent study analyzing the BJS data from

7    2011-12 discussed earlier found that Black incarcerated individuals were about 3.4

8    times more likely to be assaulted by correctional staff compared with white detained

9    individuals, while Hispanic incarcerated individuals were 3.2 times more likely to

10   be assaulted.[64]

11   **F.    Opinion Five: San Diego County's pretrial jail population could be**
12   **reduced in several ways without negatively impacting public safety**
     **or reducing appearance rates.**

13           44.    Given the negative impacts of incarceration, particularly pretrial

14   incarceration, jurisdictions around the country have been working to reduce pretrial

15   jail populations.  In San Diego County, more people arrested could be released to

16   the community rather than booked into the jail without negatively impacting public

17   safety or reducing appearance rates.  Eliminating money bail entirely is the best way

18   to reduce pretrial jail populations,[65] but even with San Diego County's continued

19   reliance on money bail, the pretrial jail population could be reduced by a) decreasing

20   reliance on the CAPA tool in making pretrial release recommendations, and

21   b) releasing more people on their own recognizance and supporting their success

22   through court date reminders.  Moreover, given that Black and Hispanic defendants

23   have disproportionately high arrest rates in San Diego County, and are

24   overrepresented in the jail system (even relative to their arrest rates), the County and

25

26   _____

     [64] Semenza, et al., *supra* note 10.

27   [65] Christine S. Scott-Hayward & Henry F. Fradella, *Abolishing Bail* in JON GOULD &
28   PAMELA METZGER (EDS.), TRANSFORMING CRIMINAL JUSTICE: AN EVIDENCE-BASED
     AGENDA FOR REFORM (2022).

1  Sheriff's Department could reduce racial disparity among the pretrial population in

2  San Diego County's jails by releasing more people to the community.

3      45.    *Pretrial Risk Assessment:* Although judges are the ultimate

4  decisionmakers in the area of pretrial release decisions, the Sheriff's Department

5  plays a major role in helping judges by preparing a pretrial report that includes

6  recommendations for release options and conditions.[66]  Part of this report involves

7  the completion of the California Pretrial Assessment, or "CAPA."  This is a pretrial

8  risk assessment tool that was modeled on the COMPAS tool and designed for and

9  validated in San Diego County by Equivant, Inc. (formerly known as Northpointe

10  Corporation).  As currently implemented, the CAPA provides judges with one risk

11  score that describes the risk of any failure on pretrial release, including both failures

12  to appear and new criminal activity.  New criminal activity is measured by a new

13  arrest.

14      46.    Based on its initial validation study, CAPA is not a particularly precise

15  risk assessment tool.  It was initially validated in 2020, using a standard measure of

16  predictive ability, the Area Under the Curve (AUC).[67]  This method assesses how

17  well a tool separates (or discriminates between) people who experience an outcome

18  of interest, for example, recidivism, and those who do not.  A value of 1 corresponds

19  to a tool's ability to perfectly discriminate and a value of 0.5 corresponds to an

20  inability to discriminate, the equivalent of a coin toss.[68]  In the case of CAPA, the

21

22  [66] SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, SHERIFF'S PRETRIAL SERVICES,
23  https://www.sdsheriff.gov/bureaus/detention-services-bureau/reentry-services/sheriff-s-pretrial-services.

24  [67] NORTHPOINTE, INC., CALIFORNIA PRETRIAL ASSESSMENT (CAPA) VALIDATION
    STUDY: AN OUTCOMES STUDY CONDUCTED FOR THE SAN DIEGO COUNTY SHERIFF'S
25  DEPARTMENT (2020),
    https://www.sdsheriff.gov/home/showpublisheddocument/4663/637781852599670000.
26

27  [68] Jennifer Copp & William Casey, *Pretrial Risk Assessment Instruments in the*
    *United States: A Critical Lens on Issues of Development, Performance, and*
    *Implementation*, in CHRISTINE S. SCOTT-HAYWARD, JENNIFER E. COPP, STEPHEN
28  DEMUTH (EDS.), HANDBOOK ON PRETRIAL JUSTICE (2021).

AUC value represents the probability that a randomly selected person who fails to appear or is re-arrested will have a higher risk score than a randomly selected person who does not. In the criminal justice field, an AUC over 0.7 is considered to be "excellent" and values between .64 and .69 are considered to be "good."[69] The CAPA validation study produced values of 0.699 for new criminal arrests, 0.643 for failures to appear, and a combined AUC for both types of failure of 0.685. What this means is that CAPA is correctly able to discriminate between those who fail on pretrial release and those who do not about 69% of the time. Documents I have reviewed indicate that the Sheriff's Department's CAPA tool was due to be validated again in 2023,[70] but I was unable to find any evidence that the validation occurred.

47.    Although the CAPA is a validated tool with "good" values, that does not mean that it does a particularly good job at predicting the success or failure of an individual who is on pretrial release. First, the AUC values for CAPA's outcomes of interest are below 0.7, which means that "a randomly selected defendant who 'failed' will have a higher risk score than a randomly selected defendant who did not 'fail' slightly more than two-thirds of the time."[71] Second, the assessment of values as good or not is arbitrary and subjective. For example, as noted earlier, informal standards in the criminal justice field deem 0.7 or higher to be excellent; however, in the medical field, 0.9 is the threshold for excellence.[72]

48.    Third, even though the CAPA and other risk assessment tools purport to be race-neutral, in that the AUC values do not vary significantly for different racial or ethnic groups, there is built-in racial bias in the measures that are used as

[69] *Id.*

[70] Email from Christine White to Abigail Torres and Amy Bitner, August 9, 2023 (SD820137).

[71] Copp & Casey, *supra* note 68.

[72] *Id.*

1    part of the tool.  For example, prior convictions and jail sentences are used to predict

2    an individual's risk of failure, but because communities of color are overpoliced,

3    and because of existing bias in the criminal legal system, non-white people tend to

4    have more prior arrests and convictions.  As noted earlier, in San Diego County and

5    across the United States, the arrest and incarceration rates for Black and Hispanic

6    people are higher than those for people of other racial and ethnic backgrounds—

7    even when controlling for other factors.

8        49.    Finally, it is important to note that risk assessment instruments do not

9    purport to predict the future behavior of any particular defendant.  Instead, they

10   identify defendants who share characteristics with other "low-" or "high-risk"

11   defendants, and have a tendency to overpredict risk of failure.[73]  Because of this,

12   making pretrial release recommendations by relying on risk scores will tend to

13   exclude many individuals, particularly Black and Hispanic individuals, who could

14   be released on their own recognizance without negatively impacting public safety or

15   appearance rates.  Moreover, using CAPA scores to determine eligibility for home

16   detention (a program in San Diego County discussed in Opinion Six below) for

17   those who are not released on their own recognizance and who cannot make bail

18   may also unnecessarily limit participation in that program.

19       50.    *Money Bail:* Like many jurisdictions, San Diego relies heavily on

20   secured money bail in making release decisions.  However, secured money bail is an

21   ineffective way to a) ensure a person's appearance in court, or b) protect public

22   safety.  Although this litigation does not challenge San Diego's money bail system, I

23   believe it is important to note that (1) relying on money bail unnecessarily increases

24   pretrial incarceration rates, and (2) relying more on alternatives can reduce

25

26

---

27   [73] Colin Doyle, *All Models Are Wrong, But Are Risk Assessments Useful? in*
     CHRISTINE S. SCOTT-HAYWARD, JENNIFER E. COPP, STEPHEN DEMUTH (EDS.),
28   HANDBOOK ON PRETRIAL JUSTICE (2021).

incarceration without negatively impacting public safety.[74]

51.     There is no evidence that money bail increases appearance rates.  For example, two studies in Colorado compared appearance rates for defendants released on secured money bond with those released on unsecured bonds (personal recognizance bonds with a monetary amount set) and found no statistical differences in appearance rates for the two groups.[75]  More recently, a 2022 study found no increase in failures to appear as a result of the reduction in the use of money bail in Philadelphia, Pennsylvania.[76]

52.     Similarly in Orange County, California, an evaluation of a supervised release program showed that individuals who received supervised release without financial conditions were less likely to fail to appear than those released on cash bail (Barno, et al., 2020).

53.     In addition, there is strong evidence that low-cost court notification programs increase already high appearance rates.  A recent systematic review and meta-analysis of twelve studies concluded that court reminders significantly reduce the odds of failure to appear in court.[77]  Notably, this effect exists regardless of the type of court reminder (*e.g.*, postcard, phone call, or text reminder).  The San Diego County Probation Department, which supervises people who are on supervised own recognizance, currently provides court hearing reminders to those individuals,

---

[74] *See* Scott-Hayward & Fradella, *Abolishing Bail*, *supra* note 65.

[75] CLAIRE M.B. BROOKER, MICHAEL R. JONES, & TIMOTHY R. SCHNACKE, PRETRIAL JUSTICE INSTITUTE, THE JEFFERSON COUNTY BAIL PROJECT: IMPACT STUDY FOUND BETTER COST EFFECTIVENESS FOR UNSECURED RECOGNIZNCE BONDS OVER CASH AND SURETY BONDS (June, 2014), http://www.clebp.org/images/Jefferson_County_Bail_Project-_Impact_Study_-_PJI_2014.pdf; MICHAEL R. JONES, PRETRIAL JUSTICE INSTITUTE, UNSECURED BONDS: THE AS EFFECTIVE AND MOST EFFICIENT PRETRIAL RELEASE OPTION. (2013)

[76] Aurelie Ouss & Megan Stevenson, *Does Cash Bail Deter Misconduct*? 15 AMERICAN ECON. J.: APPLIED ECONOMICS 150 (2023).

[77] Samantha A. Zottola, William E. Crozier, Deniz Ariturk & Sarah L. Desmarais, *Court Date Reminders Reduce Court Nonappearance: A Meta-Analysis*, 22 CRIMINOLOGY & PUB. POL'Y 97 (2023).

1  although no reminders are currently available for people on own recognizance.[78]

2      54.   **Public Safety:**  Notably, there is also no evidence that money bail

3  protects public safety.  I have been unable to find any evidence that money bail,

4  compared with other types of release decisions, keeps the public safer.  By contrast,

5  in his 2013 study of 10 Colorado counties, Jones found no difference in the number

6  of crimes committed during the pretrial release period between defendants released

7  on secured bonds and those released on unsecured bonds.[79]  Similarly, in a study of

8  defendants in New Orleans arrested in 2019, Monaghan and colleagues found that

9  controlling for demographic factors and offense information, being released without

10  money bail did not increase the likelihood of being arrested while awaiting trial.[80]

11      55.   Moreover, jurisdictions that have restricted the use of money bail have

12  not seen increases in pretrial crime.  For example, Ouss and Stevenson found no

13  increase in pretrial crime in Philadelphia, Pennsylvania after comparing cash bail

14  with pretrial supervision.[81]

15      56.   More generally, there is no evidence that lowering jail populations

16  through pretrial justice reforms negatively impacts public safety.  A recent report by

17  the Institute for State and Local Governance at the City University of New York

18  concluded that across 14 cities and counties (including Los Angeles and San

19  Francisco counties), jail reforms that have lowered jail populations since 2020 did

20  not lead to increased violent crime or an increase in returns to jail custody.[82]

21  Similarly, after Los Angeles County implemented its new pre-arraignment bail

22

23  [78] *Dunsmore, et al. v. San Diego County Sheriff's Department, et al.*, Transcript of
Deposition of Abigail Torres, May 7, 2024, 55:12-24.

24  [79] Jones, *supra* note 74.

25  [80] Jake Monaghan, Eric Joseph van Holm & Chris W. Surprenant, *Get Jailed, Jump
Bail? The Impacts of Cash Bail on Failure to Appear and re-Arrest in Orleans
Parish,* 47 AM. J. CRIM. JUST. 56 (2022).

26

27  [81] Ouss & Stevenson, *supra* note 75.

28  [82] CUNY INSTITUTE FOR STATE & LOCAL GOVERNANCE, LOWERING JAIL
POPULATIONS SAFELY BEFORE, DURING, AND AFTER COVID-19: UPDATED FINDINGS
ON JAIL REFORM, VIOLENT CRIME AND THE COVID-19 PANDEMIC (2024).

1    schedule in 2023, which reduced reliance on money bail, it did not see any

2    significant increase in reoffending while on release or a reduction in appearance

3    rates.[83]  These experiences support a 2012 study that suggested that judges could

4    release 25% more defendants while actually decreasing pretrial crime rates.[84]

### G.    Opinion Six: The jail population in San Diego County could be reduced by expanding the use of alternative to incarceration programs.

7    57.    According to the Sheriff's Department's 2023 Annual Report, over

8    50,000 individuals were booked into custody in 2023.[85]  Yet, as discussed below, no

9    more than 200 people participated in Sheriff's Department alternatives to

10   incarceration programs at any one time, and there are several programs that have no

11   participants.  Moreover, the Rule 30(b)(6) witness for the Sheriff's Department

12   testified in his deposition that the Sheriff's Department has concluded that

13   alternative to incarceration programming should be provided *in the jail* as opposed

14   to in the community.[86]  However, that defeats the purpose of alternatives to

15   incarceration, which are designed to divert people from jail so that they do not suffer

16   the litany of adverse effects of incarceration described above.

17   58.    According to the Sheriff's Department, the County Parole and

18   Alternative Custody Unit (CPAC) offers alternative custody programs that are

19   "designed to socially reintegrate offenders through evidence-based practices and

20   proactive supervision measures."[87]  The department's Policy Manual lists ten

---

[83] Josh Cain, *No crime wave caused by new 'zero-bail,' LA court official says, but advocates say rules not evenly applied*, L.A. DAILY NEWS, Apr. 1, 2024 (citing data), https://www.dailynews.com/2024/03/21/no-crime-wave-caused-by-new-zero-bail-la-court-official-says-but-advocates-say-rules-not-evenly-applied/.

[84] Shima Baradaran & Frank L. McIntyre, *Predicting Violence*, 90 TEXAS L. REV. 497 (2012).

[85] San Diego County Sheriff's Department 2023 Annual Report, at 5, https://www.sdsheriff.gov/home/showpublisheddocument/8200/638515391306970000.

[86] April 23, 2024 Deposition of Christopher Buchanan, 34:8-36:23 (stating that "the services that often are needed in the community are more beneficial in the jail").

[87] San Diego County Sheriff's Department Detention Services Bureau Manual of Policies and Procedures, E1, March 11, 2022 (SD1471458).

1  programs that comprise CPAC,[88] but the department appears to track participation in

2  just five of these programs – Fire Camp, Work Furlough, Residential Reentry

3  Center, Home Detention, and County Parole.  I have not seen any documents

4  showing participation rates in the remaining five programs.

5      59.    The number of individuals participating in the tracked programs is

6  exceptionally small for the jail population.  In 2023, more than 50,000 people were

7  booked into custody.[89]  Yet only approximately 200 people participated in CPAC

8  programs at any given time.  For example, at three different timepoints, October 29,

9  2022,[90] November 17, 2022,[91] and September 29, 2023,[92] there were individuals

10  housed in just two of the five tracked programs.  During the first two timepoints,

11  only one individual was identified as participating in Fire Camp.  Across the three

12  timepoints, between 187 and 200 individuals were identified as participating in

13  home detention, well below the stated capacity of 300.  It is not clear why home

14  detention has a capacity of only 300.  There were no individuals under the Sheriff's

15  Department's authority participating in the County Parole program, Residential

16  Reentry Center, or Work Furlough program at any of the three timepoints.

17  According to deposition testimony, since the COVID-19 pandemic, the Sheriff's

18  Department no longer refers people to the Residential Reentry Center or Work

19  Furlough, which is administered by the Probation Department, and instead of

20  expanding existing programs in the community, is focused on expanding

21

22

_____

23  [88] *Id.*

    [89] San Diego County Sheriff's Department 2023 Annual Report, *supra* note 85.

24  [90] Email from SQLAPPVM01_Reports@SDSheriff.org, Subject: Automated

25  Realignment Status Report – 10/29/22 (SD550498) with Attachment: 10/29/22
    System Population Totals (SD550500).

26  [91] Email from SQLAPPVM01_Reports@SDSheriff.org, Subject: Automated
    Realignment Status Report - 11/17/2022 (SD550530) with Attachment: 11/17/22

27  System Population Totals (SD550532).

28  [92] Email from SQLAPPVM01_Reports@SDSheriff.org, Subject: Automated
    Realignment Status Report – 9/29/2023 (SD554581).

1    programming in the jail.[93]

2         60.    Of the CPAC programs, the Sheriff's Department exercises the most

3    control over home detention admissions and it is responsible for developing and

4    implementing eligibility criteria, subject to some state law restrictions.[94]  For

5    example, state law prohibits people who have been screened by a validated risk

6    assessment tool as at a high risk to commit a violent offense, who have a history of

7    escape within the previous 10 years, and who have been convicted of an offense that

8    requires them to register as a sex offender.[95]  Beyond that though, the Sheriff's

9    Department has implemented further limiting criteria and deems ineligible a series

10   of categories of incarcerated people, including people who have a "split sentence,"

11   those who were sentenced by an out-of-county court, and those who have been

12   convicted of a long list of serious offenses.[96]  There is no explanation for why these

13   additional groups have been deemed ineligible.  Overall, eligibility for participation

14   in Home Detention is based on the Sheriff's Department's "criminal history review,

15   institutional behavior review, drug/alcohol history, residence check, as well as a

16   validated assessment of risks and needs."[97]  In addition, CPAC participation is

17   limited to those who agree to supervision requirements, wear a GPS monitoring

18   device, and pay any fees.[98]

19        61.    The Sheriff's Department plays a partial role in County Parole

20   admissions as a representative from the Department is one of three members of the

21

22   [93] *Dunsmore, et al. v. San Diego County Sheriff's Department, et al.*, Transcript of
     Deposition of Christopher Buchanan, April 23, 2024, 15:22-17:3; 34:8-36:23.

23   [94] San Diego County Sheriff's Department, County Parole and Alternative Custody
24   (SD1471452); San Diego County Sheriff's Department Detention Services Bureau –
     Manual of Policies and Procedures, April 29, 2022 – E.3 (Home Detention and
     RRC/WF Criteria) (SD1471468).

25   [95] P.C. 1170.06(d)

26   [96] San Diego County Sheriff's Department Home Detention and RRC/WF Criteria,
27   *supra* note 90.

     [97] County Parole and Alternative Custody, *supra* note 90, at 2.

28   [98] *Id.*

County Parole Board, along with a representative from the Probation Department and a public member appointed by the Presiding Superior Court Judge.[99]  In addition, facility correctional counselors in the jails are responsible for reviewing and forwarding completed applications for county parole to the county parole officer.[100]  According to the documents I have seen, there are currently no participants in County Parole, although it is unclear how many applications have been submitted and denied, and what the reasons for denial are.

62.     The Probation Department also plays a major role in alternatives to jail incarceration, primarily through the Residential Reentry Center/Work Furlough program.  Although participation is part of an individual's sentence, the Probation Department plays a key role in the court's decision by screening potential participants for eligibility and through its presentence investigation report in which it might recommend participation.[101]  People convicted of certain offenses are ineligible for the program but otherwise, admission appears to be holistic and is based on a screening form and the presentence investigation report, which includes a criminal history review.[102]  Once accepted into the program, participants are initially part of the Residential Reentry Center; when they obtain employment, they become part of the Work Furlough program.  In both cases, they reside at a facility in San Diego.[103]

63.     As with home detention, the number of individuals participating in the Residential Reentry Center and Work Furlough is lower than the program's stated capacity.  On the same three dates listed above, the number of people on Work

---

[99] San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, April 29, 2022 – E.8 (County Parole) (SD1471486).

[100] *Id.*

[101] Dunsmore, et al. v. San Diego County Sheriff's Department, et al., Transcript of Deposition of Abigail Torres, May 7, 2024, 84.

[102] *Id.* at 87:14-15; 89:14-93:09.

[103] *Id.* at 80:22-81:7.

Case 3:20-cv-00406-AJB-DDL    Document 796-15    Filed 01/21/25    PageID.37060
Page 33 of 58

1  Furlough ranged from 59 to 82 and the number of people in the Residential Reentry

2  Center ranged from 19 to 25.[104]  According to the Work Furlough and Residential

3  Re-Entry Center Oversight Unit, the programs currently have 129 total beds (102 for

4  men and 27 for women),[105] although the contract calls for up to 225 beds.[106]  When

5  asked about why the programs were below capacity, a Probation Department official

6  testified that currently, "[w]e don't have enough [people] being screened for the

7  programs and enough being ordered into the programs."[107]

8      64.    It is unclear why the number of people participating in CPAC and other

9  alternatives programs is so low, although there are several eligibility criteria that

10  limit participation by people who could benefit from both Home Detention and

11  Residential Reentry Center and Work Furlough services.

12      65.    First, both COMPAS and CAPA risk scores appear to be considered in

13  admission decisions for CPAC programs.  As explained in more detail above, CAPA

14  is a pretrial-risk assessment tool that has been validated in San Diego County, but is

15  not particularly precise and likely overpredicts risk, particularly for non-white

16  defendants.  COMPAS is a widely used tool that has been validated on several

17  populations across the United States.  In San Diego, it appears that COMPAS is

18  used to predict reoffending among people in custody or on probation and in previous

19  validation studies on a variety of populations outside San Diego, its AUC values

20  varied widely and ranged from 0.67 to 0.74.[108]  However, I was unable to find any

21  studies validating COMPAS in San Diego, and so its predictive ability in San Diego

22  County is unclear.  Moreover, using data from the implementation of COMPAS in

---

[104] *See supra* notes 86-89.

[105] Work Furlough (WF) and Residential Re-Entry Center (RRC) Oversight Unit (SD1471558).

[106] Torres Deposition, supra note 97, at 96:23-97:4.

[107] *Id.* at 98:12-20.

[108] Equivant, Practioner's Guide to COMPAS Core, April 14, 2019, https://web.archive.org/web/20240422003116/https://www.equivant.com/wp-content/uploads/Practitioners-Guide-to-COMPAS-Core-040419.pdf

EXPERT REPORT OF CHRISTINE SCOTT-HAYWARD, PH.D.

Broward County, Florida, in 2016, a team of investigators criticized the tool for both its unreliability in predicting crime, particularly violent crime, and its overprediction of risk for Black defendants.[109]  Because neither the Sheriff's Department nor the Probation Department appear to collect data on the reasons why people are rejected or deemed ineligible for program participation, we do not know how many people are rejected based on a risk score.  However, a review of the role played by risk assessment in admissions decision might lead to increased participation in CPAC programs, particularly given how risk assessment tools overpredict risk, especially for people of color.

66.    In addition, CPAC programs consider the charged/sentenced offence as part of their eligibility criteria.[110]  However, there are two issues with this.  First, although the Sheriff's Department does not explain why this is considered, it is likely due to a perception that people charged with or convicted of a serious offense pose a greater risk.  But just because someone is charged with or convicted of a serious offense does not mean that they are likely to commit that same serious offense again, or even to re-offend at all.  The likelihood of reoffending depends on a variety of factors, and it is not necessarily the case that people charged with serious offenses are more likely to fail than those charged with less serious offenses.  For example, in the pretrial context, there is no evidence that the seriousness of criminal charges has any relationship to failure to appear or new criminal activity by people on pretrial release.[111]  Thus barring people charged with (or convicted of) a serious offense likely excludes people who might otherwise benefit from

---

[109] Julia Angwin, Jeff Larson, Surya Mattu and Lauren Kirchner, ProPublica, May 23, 2016, Maching Bias: There's software used across the country to predict future criminals. And it's biased against blacks, https://www.propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing.

[110] San Diego County Sheriff's Department Detention Services Bureau Manual of Policies and Procedures, E3, April 29, 2022

[111] Curtis Karnow, *Setting Bail for Public Safety*, 13 BERKELEY J. CRIM. L. 1 (2008).

1  programming.  In addition, research shows that Black people tend to get charged

2  with and convicted of more serious offenses than white people and so using offenses

3  to exclude people from program participation likely has a racially disparate

4  impact.[112]

5        67.     Notably, despite the low participation numbers in CPAC programs, it

6  does not appear that either the Sheriff's Department or the Probation Department are

7  considering changing the eligibility criteria.[113]  In addition, because neither

8  department appears to track applications, referrals, or reasons for denials, it is

9  impossible to determine whether these programs could or should serve more people.

10 Moreover, data on the race or ethnicity of either applications or program participants

11 are not collected,[114] and so I am unable to ascertain whether eligibility criteria are

12 playing a role in the disparate incarceration rates for Black and Hispanic people in

13 San Diego County.  In order for the Sheriff's Department and County to assess

14 whether they way that they administer alternatives to incarceration programs is

15 contributing to the disparate incarceration of Black and Hispanic people in county

16 jails, it is vital for them to collect data on applications, referrals, acceptance rates,

17 and reasons for denial.

18       68.     Finally, although reentry programming is not an alternative to

19 incarceration, reentry programming can assist incarcerated people as they prepare

20 for a release and is a vital part of any jail system.  Although the Sheriff's

21 Department's Reentry Services Division purports to offer a long list of classes and

22 programs, many of these classes and programs are not consistently offered and

---

[112] ELIZABETH HINTON, LESHAE HENDERSON, & CINDY REED, VERA INSTITUTE OF JUSTICE, AN UNJUST BURDEN: THE DISPARATE TREATMENT OF BLACK AMERICANS IN THE CRIMINAL JUSTICE SYSTEM (2018) (reviewing research), https://www.vera.org/downloads/publications/for-the-record-unjust-burden-racial-disparities.pdf.

[113] Buchanan Deposition, *supra* note 83, at 39:6-21; Torres Deposition, *supra* note 91, at 100:19-22.

[114] Buchanan Deposition, *supra* note 83, at 7:18-21; Torres Deposition, *supra* note 91, at 83:19-21; 123:14-19.

1  available to people in the jail's facilities.  During her Rule 30(b)(6) deposition

2  testimony, the Sheriff's Department's reentry coordinator was unsure if many of the

3  programs were currently operating.[115]  For example, Ms. Ceballos was asked about

4  16 different psychosocial programs, but knew only that five were active, and also

5  testified that educational and vocational programs were not available at all

6  facilities.[116]  In addition, I have reviewed deposition testimony from class

7  representative Reanna Levy indicating that she was unable to participate in any

8  programs while incarcerated in a maximum-security unit at Las Colinas Detention

9  and Reentry Facility.[117]

10      **H.      The Current State of Alternatives to Incarceration and Reentry
             Programming in San Diego County**

11

12      69.      In 2021, San Diego County began a process to study alternatives to

13  incarceration in the County, with the County selecting the San Diego Association of

14  Governments ("SANDAG"), to serve as the independent consultant on this effort.

15  SANDAG issued its final report in March 2023.[118]  The report is based on data

16  analysis, interviews, surveys, and a review of current practices in San Diego County.

17  The report concludes with a series of 52 recommendations on ways to safely reduce

18  jail populations in the county, and better serve at-risk populations.  Many of these

19  recommendations relate to expanding access to alternatives to incarceration at both

20  the pretrial and sentencing phases.  For example, SANDAG specifically

21  recommended expanding eligibility criteria for CPAC programs and the Work

22  Furlough and Residential Reentry Center.[119]

23

24  [115] *Dunsmore, et al. v. San Diego County Sheriff's Department, et al.*, Transcript of
     Deposition of Patricia Ceballos, April 23, 2024, 40:4-54:20.

25  [116] *Id.*, 46:17-54:20.

26  [117] *Dunsmore, et al. v. San Diego County Sheriff's Department, et al.*, Transcript of
     Deposition of Reanna Levy, March 21, 2024, 221:7-223-04.

27  [118] SANDAG, *supra* note 41.

28  [119] *Id.* at 180-81.

70.     In response, the County conducted its own review of local practices, programs, and best practices, considered the report's recommendations, and in May 2023, created a work plan that among other goals, aimed to prioritize alternatives to incarceration.[120]  Notably absent from the work plan was a plan to review and potentially amend the eligibility criteria for the existing programs discussed above.  Moreover, as yet, most of the goals planned for the 2023-24 fiscal year have not been implemented.[121]

V.     CONCLUSION

71.     As explained in Opinions 1 through 4 above, empirical data show that incarceration harms individuals in a variety of ways beyond the deprivation of liberty.  People incarcerated in jails tend to have higher rates of mental and physical health issues, but treatment is lacking and death rates, particularly in San Diego County jails, are far higher than in the community – and than most other California jails.  In addition, jail incarceration harms individuals' financial wellbeing as well as that of their families, and significantly impacts defendants' case outcomes. Worryingly, these harmful effects have an outsized effect on Black and Hispanic individuals.  Despite the large numbers of people incarcerated in San Diego County jails, there are very few people currently participating in alternative to incarceration programs.  Given the disproportionately high incarceration rates of Black and Hispanic people in San Diego's jails, it is my opinion that the lack of alternative to incarceration programs likely perpetuates the adverse effects of jail incarceration on these groups.

72.     The information and opinions contained in this report are based on evidence, documentation, and/or observations available to me.  I reserve the right to

---

[120] Alternatives to Incarceration Work Plan (May 23 Slide – Att D).

[121] Alternatives to Incarceration Work Plan Progress, March 12, 2024, https://www.sandiegocounty.gov/content/sdc/alternatives-to-incarceration/ATI-project-history.html.

1  modify or expand these opinions should additional information become available to
2  me.  The information contained in this report and the accompanying exhibits are a
3  fair and accurate representation of the subject of my anticipated testimony in this
4  case.

5

6  Dated:  August 15, 2024

7                                                    Christine Scott-Hayward, Ph.D.

# Exhibit A

August 2024

# CHRISTINE S. SCOTT-HAYWARD
## *Curriculum Vitae*

California State University, Long Beach
School of Criminology, Criminal Justice, and Emergency Management
1250 Bellflower Boulevard, Long Beach, CA 90840
christine.scott-hayward@csulb.edu

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| August 2022 – present | Director<br>School of Criminology, Criminal Justice, and Emergency Management<br>California State University, Long Beach, CA |
| August 2023 – present | Professor<br>School of Criminology, Criminal Justice, and Emergency Management<br>California State University, Long Beach, CA |
| August 2019 – July 2023 | Associate Professor<br>School of Criminology, Criminal Justice, and Emergency Management<br>California State University, Long Beach, CA |
| August 2013 – July 2019 | Assistant Professor<br>School of Criminology, Criminal Justice, and Emergency Management<br>California State University, Long Beach, CA |
| August 2016 – July 2017 | Supreme Court Fellow<br>Office of the General Counsel, United States Sentencing Commission, Washington, DC |
| July 2011 – June 2013 | Associate-in-Law & Post-Doctoral Research Fellow<br>Columbia Law School, New York, NY |
| August 2010 – July 2011 | Law Clerk<br>The Honorable James Orenstein, U.S. District Court for the Eastern District of New York, Brooklyn, NY |
| August 2009 – May 2010 | Adjunct Lecturer<br>Department of Political Science<br>City College of New York, New York, NY |
| August 2006 – Dec. 2009 | Research Associate<br>Center on Sentencing and Corrections; Prosecution & Racial Justice Project<br>Vera Institute of Justice, New York, NY |

Scott-Hayward CV

## EDUCATION

2011    Ph.D., Law and Society
        New York University, Institute for Law and Society
        Dissertation: *Parole, Desistance, and Rehabilitation: The Effect of Parole Supervision on Reentry and Reintegration*

2000    M.A., Social Science
        University of Chicago, Master of Arts Program in the Social Sciences
        Thesis: *'The Civilizing Process': The Origins of Anti-Death Penalty Discourse in Europe and Britain 1764-1868*

1999    B.C.L. (International) (First Class Honors)
        University College Dublin School of Law
        Study Abroad: DePaul University School of Law, Chicago, IL (1997-98)

*Bar Admissions:* New York State (2007); Supreme Court of the United States (2016)

## PUBLICATIONS

*Note: An asterisk indicates a co-author was a student I mentored in a research project that resulted in publication.

Books:

**Scott-Hayward, C.S.**, Copp, J.E., & Demuth, S. (Eds) (2021) *Handbook on pretrial justice*. Routledge.

**Scott-Hayward, C.S.**, & Fradella, H.F. (2019). *Punishing poverty: How bail and pretrial detention fuel inequalities in the criminal justice system*. University of California Press.
- Reviews
  - *Criminal Law Bulletin* (Jochnowitz, 2020)
  - *Choice Magazine* (Hansen, 2020)
  - *Law & Society Review* (Mayson, 2021)
  - *Criminal Law & Criminal Justice Books* (Oleson, 2021)
  - *Labour/Le Traveil* (Newport, 2021)
  - *Punishment & Society* (Harris, 2022)
- Named a "Best of 2019" by the Vera Institute of Justice

Refereed Articles:

**Scott-Hayward, C.S.**, Fradella, H.F., & Eastwood, G*. (Forthcoming, 2025). The Role of Empirical Scholarship in Fourth Amendment Privacy Jurisprudence. *Florida State Law Review*.

**Scott-Hayward, C.S.**, Wallace, D. & Mavrikos, A. (2024). The federal prison system response to Covid-19. *Criminal Law Bulletin*. *60*(2): 212-229.

Scott-Hayward CV

Binnall, J.M., **Scott-Hayward, C.S.**, Peterson, N. & Gonzalez, R.M.* (2022). Taking roll: College students' perspectives on their formerly incarcerated classmates. *Journal of Criminal Justice Education*, *33*(3), 347-367. https://doi.org/10.1080/10511253.2021.1962932

**Scott-Hayward, C.S.** & Ireland, C. (2022). Reducing the federal prison population: The role of pretrial community supervision. *Federal Sentencing Reporter 34*(5), 327-333.

Page, J., & **Scott-Hayward, C.S.** (2022). Bail and pretrial justice in the United States: A field of possibility. *Annual Review of Criminology 5*, 91-113. https://doi.org/10.1146/annurev-criminol-030920-093024

**Scott-Hayward, C.S.** (2021). Serving a rehabilitative goal: Assessing Judge Jack B. Weinstein's supervised release jurisprudence. *Federal Sentencing Reporter 33*(3)*, 168-172.

Fradella, H.F. & **Scott-Hayward, C.S.** (2020). Advancing bail and pretrial justice reform in Arizona. *Arizona State Law Journal 52*(3), 845-88. https://arizonastatelawjournal.org/2021/01/13/advancing-bail-and-pretrial-justice-reform-in-arizona/

Ottone, S.,* & **Scott-Hayward, C.S.** (2018). Pretrial detention and the decision to impose bail in Southern California. *Criminology, Criminal Justice, Law and Society 19*(2), 2-43. https://ccjls.scholasticahq.com/article/3789-pretrial-detention-and-the-decision-to-impose-bail-in-southern-california

**Scott-Hayward, C.S.**, & Ottone, S.* (2018). Punishing poverty: California's unconstitutional bail schedules. *Stanford Law Review Online 70*, 167-178. https://www.stanfordlawreview.org/online/punishing-poverty/

**Scott-Hayward, C.S.** (2017). Rethinking federal diversion: The rise of specialized criminal courts. *Berkeley Journal of Criminal Law 22*(2), 47-110. https://lawcat.berkeley.edu/record/1127901

**Scott-Hayward, C.S.**, & Williamson, D. (2016). Post-custody supervision in Ireland: From tickets-of-leave to parole? *Irish Probation Journal 13*, 102-118. http://www.probation.ie/EN/PB/WebPages/WP16000177

**Scott-Hayward, C.S.**, Fradella, H.F., & Fischer, R.G. (2015). Does privacy require secrecy? Societal expectations of privacy in the digital age. *American Journal of Criminal Law 43*(1), 19-59.
- Cited in *Love v. State*, 543 S.W.3d 835 (Tex. Crim. App. 2016)

**Scott-Hayward, C.S.** (2013) Shadow sentencing: The imposition of federal supervised release. *Berkeley Journal of Criminal Law 18*(2), 180-229.
- Cited in *United States v. Ka*, 982 F.3d 219 (4th Cir. 2020)
- Cited in *United States v. Thomas*, 346 F.Supp.3d 326 (E.D.N.Y. 2018)
- Quoted in *United States v. Trotter*, 321 F.Supp.3d 337 (E.D.N.Y. 2018)
- Cited in *United States v. Lee*, 888 F.3d 503 (D.C. Cir. 2018) (dissent)
- Cited in *U.S. v. Martinez-Torres*, 795 F.3d 1233 (10th Cir. 2015)
- Cited in *U.S. v. Thompson*, 777 F.3d 368 (7th Cir. 2015)
- Cited in *U.S. v. Siegel*, 753 F.3d 705 (7th Cir. 2014)

Scott-Hayward CV

**Scott-Hayward, C.S.** (2011). The failure of parole: Rethinking the role of the state in reentry. *New Mexico Law Review 41*(2), 421-465.

**Scott-Hayward, C.S.** (2007) Explaining juvenile false confessions: Adolescent development and police interrogation. *Law & Psychology Review 31*, 53-76.
- Cited in *In re Luis P.* 161 A.D.3d 59 (New York, 2018)

Book Chapters:

**Scott-Hayward, C.S.**, & Fradella, H.F. Abolishing bail. (2022). In Gould, J.B., & Metzger, P. (eds), *Transforming Criminal Justice: An Evidence-Based Agenda for Reform* (pp. 97-123). New York University Press.

**Scott-Hayward, C.S.** (2011) Polygraphs. In W. Chambliss (Ed.), *Courts, Law, and Justice* (pp. 201-213). Sage Publications.

Commentaries and Reviews:

**Scott-Hayward, C.S.** (2024). [Review of the book *Profit and Punishment: How America Criminalizes the Poor in the Name of Justice* by Tony Messenger]. *Criminal Law and Criminal Justice Book Reviews*. https://clcjbooks.rutgers.edu/books/profit-and-punishment/

Diaz, M. & **Scott-Hayward, C.S.** (2024). Correctional and Sentencing Law Commentary: Requiring Religion in Recovery. *Criminal Law Bulletin 60*(1): 94-103.

**Scott-Hayward, C.S.** & Ireland, C. (2022). Correctional and Sentencing Law Commentary: COVID-19 and Federal Sentencing. *Criminal Law Bulletin 58*(6): 867-875.

**Scott-Hayward, C.S.** (2021). Correctional and Sentencing Law Commentary: Bail and the right to counsel. *Criminal Law Bulletin 57*(6): 1045-1053.

**Scott-Hayward, C.S.** & Eife E.* (2021). Correctional and Sentencing Law Commentary: Electronic monitoring. *Criminal Law Bulletin 57*(3): 407-422.

**Scott-Hayward, C.S.** (2021). Correctional and Sentencing Law Commentary: Compassionate release, the First Step Act, and COVID-19. *Criminal Law Bulletin 57*(1): 89-97.

**Scott-Hayward, C.S.** (2020). Correctional and Sentencing Law Commentary: Why is prison food still so bad? *Criminal Law Bulletin 56*(5): 1003-1011.

**Scott-Hayward, C.S.** (2020). Correctional and Sentencing Law Commentary: Regulating pregnancy. *Criminal Law Bulletin 56*(3): 553-562.

**Scott-Hayward, C.S.** (2020). Correctional Law Commentary: Recent developments in federal supervised release. *Criminal Law Bulletin 56*(1): 150-160.

**Scott-Hayward, C.S.** (2015) [Review of the book *Cheap on Crime: Recession-Era Politics and the Transformation of American Punishment* by Hadar Aviram]. *Law & Society Review 49*(4): 1034-37.

Scott-Hayward CV

Technical Reports:

**Scott-Hayward, C.S.** (2009). *The Fiscal Crisis in Corrections: Rethinking Policies and Practices*. Vera Institute of Justice.

Rengifo, A.F. & **Scott-Hayward, C.S.** (2008). *Assessing the Effectiveness of Intermediate Sanctions in Multnomah County, Oregon*. Vera Institute of Justice.

Tombs, B., **Scott-Hayward, C.S.**, Roa, C. & Daly, R. (2008). *Assessment of Changes in Inmate Characteristics and Jail Management Processes in Hamilton County, Ohio*. Vera Institute of Justice.

Rengifo, A.F. & **Scott-Hayward, C.S.** (2007). *Promoting Successful Transitions for Disadvantaged Youth*. Vera Institute of Justice.

Other Writing:

**Scott-Hayward, C.S.** (2024). Current Controversy: Should Cash Bail be Abolished? In S.L. Mallicoat & D. Paquette-Boots, *Crime and Criminal Justice: Concepts and Controversies*. (3rd Ed.) Sage Publications.

**Scott-Hayward, C.S.** (2022). Expert Declaration, *Urquidi v. City of Los Angeles* (Los Angeles Superior Court) https://www.publicjustice.net/wp-content/uploads/2023/01/2022-11-14-Declaration-of-Christine-S.-Scott-Hayward-PhD.pdf
- Cited and quoted in Memorandum Decision and Order on Motion for Preliminary Injunction by Judge Lawrence P. Riff, https://www.publicjustice.net/wp-content/uploads/2023/05/Memorandum_Decision_and_Order_on_Motion_for_Preliminary_Injunction_20230516154546.pdf

**Scott-Hayward, C.S.** & Fradella, H.F. (2019, November 13). Confronting Unequal and Unjust Pretrial "Justice" Systems [Blog post]. Retrieved from https://www.ucpress.edu/blog/47718/confronting-unequal-and-unjust-pretrial-justice-systems/

**Scott-Hayward, C.S.** (2019, February 7). The Bail Industry Blocks Reform—Again [Blog post]. Retrieved from https://www.ucpress.edu/blog/41428/bail-industry-blocks-reform-again/

**Scott-Hayward, C.S.** (2018, September 12). Bail Reform in California [Blog Post]. Retrieved from https://robinainstitute.umn.edu/news-views/bail-reform-california

Schrup, S., Kugler, M.B., **Scott-Hayward, C.S.**, Strahilevitz, L. & Tokson, M. (2017). *Brief of Amici Curiae Empirical Fourth Amendment Scholars in Support of Petitioner in* Carpenter v. United States (Supreme Court of the United States). https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3019457

**Scott-Hayward, C.S.** (2017). The Value of Qualitative Courts Research. *Western Criminologist*, Fall 2017:11-12. https://www.westerncriminology.org/documents/newsletter_pdfs/WSC_Newsletter_F17.pdf

**Scott-Hayward, C.S.** (2016). Current Controversy: Is Parole an Effective Correctional Strategy? In S.L. Mallicoat, *Crime and Criminal Justice: Concepts and Controversies*. Sage Publications.
- *Reprinted in 2nd Edition (2019)*

Scott-Hayward CV

**Scott-Hayward, C.S.** (2015) Post-Custody Supervision in the United States: A Review of Best Practices. *Irish Social Work Journal* (Spring 2015: 2-4).

**Scott-Hayward, C.S.** (2012). Parole. In S.M. Barton-Bellessa (Ed.) *Encyclopedia of Community Corrections* (pp. 282-286). Sage Publications.

**Scott-Hayward, C.S.** (2012). The Second Chance Act. In S.M. Barton-Bellessa (Ed.) *Encyclopedia of Community Corrections* (pp. 406-407). Sage Publications.

Works in Progress

Guzman, A.,* **Scott-Hayward, C.S.** & Ireland, C. "Sentencing the forgotten: A qualitative analysis of federal sentencing of women." In Progress.

**Scott-Hayward C.S.** & Hatchette, O.* Pleading guilty while in custody: A study of one California court." In Progress.

**Scott-Hayward, C.S.**, Stubbs, K.,* & Bailey E.* "The impact of *In re Humphrey* on pretrial release decisions in Southern California."

AFFILIATIONS

2014-2017     Member, Advisory Board, Parole and Release Revocation Project (Robina Institute of Criminal Law and Criminal Justice, University of Minnesota)

INTERNAL AWARDS AND GRANTS

- CSULB College of Health & Human Services, Small Faculty Grant (2024-25)
- CSULB College of Health & Human Services, Outstanding Faculty Recognition for Research Mentorship (2022-23)
- CSULB College of Health & Human Services, RSCA Award (2016-17 (declined); 2017-18; 2018-19; 2019-20; 2020-21; 2021-22; 2022-23 (declined))
- CSULB Sabbatical Leave (Fall 2019)
- CSULB School of Criminology, Criminal Justice, & Emergency Management, *Barnes Fellowship* (2019)
- CSULB Professors Around the World Travel Grant (2018)
- CSULB Incentive Award to Internationalize Teaching and Learning (2015)
- City College of New York Skadden Arps Honors Program in Legal Studies Development Grant (2010)
- ICPSR Scholarship/Travel Grant: ICSPR Workshop "Sentencing and Other Federal Case Data Analysis," National Institute of Justice (Summer 2009)
- President's Service Award for Leadership, New York University (2003)
- New York University McCracken Fellowship (2001-06)
- University Partial Tuition Scholarship, University of Chicago (1999-2000)
- Bank of Ireland Bronze Medal in Jurisprudence (1999)
- Royal Insurance Gold Medal for Tort (1996)

Scott-Hayward CV

**EXTERNAL FUNDING**

2019-23    Co-Investigator. **Evaluation of the Guides App**
Co-Investigator: Dr. Dina Perrone
Submitted to: *Long Beach City Prosecutor's Office*
Requested: $36,000 (funded)

**INVITED PANELS, PRESENTATIONS & WORKSHOPS**

**Scott-Hayward, C.S.** (September 2022). Keynote Speaker: Ohio University Constitution Day Lecture, Punishing Poverty: The Constitutionality of Cash Bail, Athens, OH.

**Scott-Hayward, C.S.** (April 2022). Panelist: Hot Topics in Criminal Procedure, *Northern District of California 2022 District Conference*, Napa, CA.

**Scott-Hayward, C.S.** (September 2021). Panelist: University of the Pacific, Conversations in Criminal Justice – Examining the Nature and Practice of Cash Bail [Virtual].

**Scott-Hayward, C.S.** (June 2021). Panelist: Illinois Justice Project Collaborative 2021 – From Policy to Practice: What Lessons Can we Learn from Efforts to Implement Changes to Pretrial Systems Nationally and in Illinois [Virtual].

**Scott-Hayward, C.S.** (October 2020). Proposition 25 Information Session, CSULB [Virtual].

**Scott-Hayward, C.S.** (September 2020). Panelist: The Defund Movement: What it means for the LA County District Attorney's Office [Virtual].

**Scott-Hayward, C.S.** (February 2020). Panelist: Los Angeles District Attorney Election Townhall, Long Beach, CA.

**Scott-Hayward, C.S.** (April 2019). Legal Elites? A Social Network Analysis of Supreme Court Advocates, *UCI Socio-Legal Studies Workshop*, Irvine, CA.

**Scott-Hayward, C.S.** (February 2018). Roundtable: Interdisciplinary Teaching in Law & Criminology, *Western Society of Criminology Annual Conference*, Honolulu, HI.

**Scott-Hayward, C.S.** (September 2017). Rethinking Federal Diversion, *Alternatives to Incarceration Symposium, Southern District of Iowa Probation & Pretrial Services Division*, Des Moines, IA.

**Scott-Hayward, C.S.**  (June 2017). Rethinking Federal Diversion, *Meeting of the Criminal Law Committee of the Judicial Conference of the United States*, San Francisco, CA.

**Scott-Hayward, C.S.** (August 2016). Plenary Session: How High-Profile Cases Impact Sentencing Policy, *National Association of Sentencing Commissions Annual Conference*, Salt Lake City, UT.

**Scott-Hayward, C.S.** (October 2014). Post-Prison Supervision in the United States, *The Probation Service of Ireland, Dublin, Ireland.* (Sponsored by The Irish Association of Social Workers).

Scott-Hayward CV

Daly, R. & **Scott-Hayward, C.S.** (October 2009). Criminal Justice Research and Trends, *Multnomah County Board of Commissioners*, Portland, OR.

**Scott-Hayward, C.S.** (January 2008). Report on Community Corrections Survey, *Alabama Sentencing Commission*, Montgomery, AL.

**Scott-Hayward, C.S.** (April 2005). Juvenile Interrogation: The Central Park Jogger Case, *Goldstock Criminal Law Lunch Series, NYU School of Law*, New York, NY.

CONFERENCE PRESENTATIONS

*Note: An asterisk next to a co-presenter's name indicates the person was a student of mine with whom I presented a paper that the student and I co-authored as part of a thesis, dissertation, or independent study research project.

**Scott-Hayward, C.S.**, & Hatchette, O.* (February 2024). Pleading Guilty while in Custody: A Study of one California Court. *Western Society of Criminology Annual Conference*, Long Beach, CA.

**Scott-Hayward, C.S.** (November 2023). The Impact of *In re Humphrey* in Southern California. *American Society of Criminology Annual Meeting*, Philadelphia, PA.

**Scott-Hayward, C.S.,** & Ireland, C. (November 2022). Pretrial Release, Self-Surrender, and Compassionate Release: The effects of COVID-19 on defendants in one federal district. *American Society of Criminology Annual Meeting*, Atlanta, GA.

**Scott-Hayward, C.S.**, Eastwood, G.*, & Fradella, H.F. (July 2022). The Role of Empirical Scholarship in Fourth Amendment Privacy Jurisprudence. *Law & Society Association Global Meeting on Law & Society*, Lisbon, Portugal.

**Scott-Hayward, C.S.**, & Ireland C. (February 2022). The Role of Pretrial Release at Sentencing: A Qualitative Study. *Western Society of Criminology Annual Conference,* Honolulu, HI.

**Scott-Hayward, C.S.**, Ireland C., & Guzman, A.* (November 2021). "Everyone has family:" Examining the role of caregiving in federal sentencing. *American Society of Criminology Annual Meeting*, Chicago, IL.

Binnall, J., **Scott-Hayward, C.S.**, Peterson, N. & Gonzalez, R.* (May 2021). Taking Roll: College Students' Perspectives on their Formerly Incarcerated Classmates. *Law and Society Association Annual Meeting* (Virtual).

**Scott-Hayward, C.S.** & Fradella, H.F. (November 2019). Author Meets Critics: *Punishing Poverty: How Bail and Pretrial Detention Fuel Inequalities in the Criminal Justice System, American Society of Criminology Annual Meeting*, San Francisco, CA.

**Scott-Hayward, C.S.**, & Malm, A. (June 2019). Legal Elites? A Social Network Analysis of Supreme Court Advocates, *Law and Society Association Annual Meeting*, Washington, D.C.

**Scott-Hayward, C.S.** (November 2018). Roundtable: Developing a Pretrial Research Network within the Criminology Community, *American Society of Criminology Annual Meeting*, Atlanta, GA. (Discussant).

**Scott-Hayward, C.S.** & Ottone, S.* (November 2017). Punishing Poverty: California's Unconstitutional Bail System*, American Society of Criminology Annual Meeting,* Philadelphia, PA.

**Scott-Hayward, C.S.** (March 2017). Rethinking Federal Diversion: The Rise of Front-End Specialized Criminal Courts, *Association for the Study of Law, Culture, and the Humanities Annual Conference*, Palo Alto, CA.

Ottone, S.* & **Scott-Hayward, C.S.** (March 2017). A Qualitative Examination of Factors Influencing the Imposition of Bail, *Association for the Study of Law, Culture, and the Humanities Annual Conference*, Palo Alto, CA.

**Scott-Hayward, C.S.** & Ottone, S.* (November 2016). Examining Judicial Decision-Making in Bail Hearings in Southern California, *American Society of Criminology Annual Meeting*, New Orleans, LA.

**Scott-Hayward, C.S.** (November 2015). Author Meets Critics: *Cheap on Crime*, by Hadar Aviram, *American Society of Criminology Annual Meeting*, Washington, D.C.

**Scott-Hayward, C.S.,** Fradella, H.F. & Fischer, R. (June 2015). What is "Voluntary" Sharing? Examining Expectations of Privacy in Cell-Site Location Information, *Law and Society Association Annual Meeting*, Seattle, WA.

**Scott-Hayward, C.S.,** Fradella, H.F. & Fischer, R. (November 2014) Societal Expectations of Privacy in the Digital Age, *American Society of Criminology Annual Meeting*, San Francisco, CA.

Iacoboni, M.,* **Scott-Hayward, C.S.,** Schug R. & Malm, A. (November 2014). Burbank MHET: An Evaluation, *American Society of Criminology Annual Meeting,* San Francisco, CA.

**Scott-Hayward, C.S.,** Fradella, H.F. & Fischer, R. (June 2014). Does Privacy require Secrecy? Societal Expectations of Privacy in the Digital Age, *Law and Society Association Annual Meeting*, Minneapolis, MN.

**Scott-Hayward, C.S.** & Fradella, H.F. (February 2014). Privacy in the Age of Surveillance: The Impact of *U.S. v. Jones, Western Society of Criminology Annual Conference*, Honolulu, HI.

**Scott-Hayward, C.S.** (November 2012). Supervised Release: The Forgotten Footnote in Federal Sentencing, *American Society of Criminology Annual Meeting*, Chicago, IL.

**Scott-Hayward, C.S.** (November 2011). The Failure of Parole: Rethinking the Role of the State in Reentry, *American Society of Criminology Annual Meeting*, Washington, D.C.

**Scott-Hayward, C.S.** (May 2010). The Failure of Parole: Rethinking the Role of the State in Reentry, *Law and Society Association Annual Meeting*, Chicago, IL.

**Scott-Hayward, C.S.** & Daly, R. (November 2009). Experiencing Parole Violations: Perspectives from Officers and People on Parole*, American Society of Criminology Annual Meeting*, Philadelphia, PA.

Scott-Hayward CV

Rengifo, A.F. & **Scott-Hayward, C.S.** (November 2008). Assessing the Effectiveness of Intermediate Sanctions in Multnomah County, Oregon, *American Society of Criminology Annual Meeting*, St. Louis, MO.

Rengifo, A.F. & **Scott-Hayward, C.S.** (November 2007). Promoting Successful Transitions for Delinquent Youth, *American Society of Criminology Annual Meeting*, Atlanta, GA.

**Scott-Hayward, C.S.** (July 2007). Explaining False Confessions: A Comparative Analysis of the Law on Juvenile Interrogation, *Law and Society Association Annual Meeting*, Berlin, Germany.

**Scott-Hayward, C.S.** & Skolnick, J.H. (November 2004). Interrogating Juveniles: The Central Park Jogger Case*, American Society of Criminology Annual Meeting,* Nashville, TN.

**Scott-Hayward, C.S.** (November 2003). Juvenile Justice in Ireland, *American Society of Criminology Annual Meeting*, Denver, CO.

TEACHING EXPERIENCE & CREDENTIALS

Graduate Courses Taught:   Comparative Introduction to American Law
                           Legal Research, Writing, and Analysis
                           Proseminar and Professional Writing in Criminology and Criminal Justice
                           Law, Justice, and Social Control

Undergraduate Courses Taught:     Constitutional Law
                                  Corrections
                                  Courtroom Environments
                                  Criminal Courts
                                  Criminal Procedure
                                  Internship
                                  Juvenile Justice
                                  Law and Social Change
                                  Research Methods

Teaching Credentials:
- Quality Matters Certification: CRJU 350 – Constitutional Criminal Procedure (2023)
- ACUE Micro-Credential in Promoting Active Learning Online, Association of College and University Educators (2020)
- Introduction to Teaching Online Using QLT, CSU Academic Technology Services (2020)

Pedagogy Activities and Workshops:
- AI Tools for Teaching & Learning, CSU (2024)
- Faculty Formative Feedback Project (Level 1), CSULB (2022)
- Equity Mindedness and Pedagogy Workshop Series, CSULB (2021)

Scott-Hayward CV

**INSTITUTIONAL SERVICE**

**CALIFORNIA STATE UNIVERSITY, LONG BEACH**

University Service
- Member, Curriculum and Educational Policies Council (2024-27)
- Member, Chairs Advisory Council (2023-24)
- Member, University Resource Council (2020-23)
- Chair, Search Committee for the Associate Dean of Graduate Studies (2021-22)
- Juror, Annual CSULB Student Research Competition (2021)
- Member, Academic Senate (2015-20)
  - Member, Nominating Committee (2018-19)
- Member, Faculty Advisory Board, *Rising Scholars* (2018-20)
- Member, Committee on Athletics (2017-18)

College Service
- Member, Retention, Tenure, and Promotion Committee (2024-26)
- Member, Research Committee (2018-19; 2022-24)
- Chair, Awards and Scholarships Committee (2021-22)
- Member, Awards and Scholarships Committee (2020-21)
- Member, Faculty Council (2014-16)

School of CCJEM Service
- Chair, Outreach Committee (2022-23)
- Chair, Search Committee (2021-23)
- Member, Retention, Tenure, and Promotion Committee (2021-22, 2023-24)
- Chair, Lecturer Evaluation Committee (2019-21)
- Member, Graduate Committee (2013-21, 2022-present)
- Chair, Retention, Tenure, and Promotion Committee (2019-20)
- Chair, Curriculum Committee (2017-19)
- Faculty Advisor to *Alpha Phi Sigma*, Criminal Justice Honor Society (2013-16)
- Member, Awards, Banquet, and Scholarship Committee (2013-16)

**NEW YORK UNIVERSITY**
- Student Senator, University Senate (2004-05)
  - Member, Academic Affairs Committee
- President, Graduate School of Arts and Sciences Graduate Student Council (2002-04)

**SERVICE TO THE PROFESSION AND THE COMMUNITY**

**EDITORSHIPS**
*Criminal Law Bulletin*, 2019-present
    Correctional and Sentencing Law Editor
*American Society of Criminology, Division on Corrections & Sentencing Newsletter*, 2018-20
    Editor
*Criminology, Criminal Justice, Law and Society*, 2014-17
    Co-editor

11

Scott-Hayward CV

**EDITORIAL BOARD MEMBERSHIPS**

*ASC Division on Corrections Handbook Series* (2021 – present)
*Criminology, Criminal Justice, Law and Society* (2017 – present)
*Ramapo Journal of Law & Society* (Editorial Advisory Board) (2013 – present)

**PEER/EXTERNAL REVIEWER**

*American Journal of Criminal Justice; Columbia Law Review;* Columbia University Press; *Contemporary Justice Review: Issues in Criminal, Social, and Restorative Justice; Crime & Delinquency; Criminal Justice & Behavior; Criminal Justice Policy Review; Criminology, Criminal Justice, Law & Society, Criminology & Public Policy; Feminist Criminology; Justice Quarterly; Law & Society Review;* Oxford Bibliographies; Oxford University Press; Pew Charitable Trusts; *Punishment & Society*; Sage Publications; *Stanford Law Review; Yale Law Journal*

**PROGRAM REVIEW & ASSESSMENT**

External Reviewer, California State University, Fullerton, Criminal Justice Program Performance Review (2022)

**OTHER PROFESSIONAL SERVICE**

American Society of Criminology
- Sub-Area Program Chair: Pretrial Justice (2024)
- Sub-Area Program Chair: Plea-Bargaining (2021)
- Division on Sentencing and Corrections
  - Mentor, Mentoring for Success Program (2020-22)
  - Vice-Chair (2018-20)
  - Member, Newsletter Committee (2016; 2018)
  - Member, Dissertation Award Committee (2014)

Western Society of Criminology
- Executive Director (2022-present)
- Immediate Past-President (2022-23)
- President (2021-22)
- Director of Social Media (2021-22)
- Vice-President (2020-21)
- Secretary (2017-20)
- Publications Committee (2014-17)
- Annual Conference Program Co-Chair (2014-15)

The Undergraduate Awards (an international pan-discipline academic awards program)
- Judge (2014; 2015)

**COMMUNITY SERVICE**

Wilson High School, Long Beach CA
- Member, Leadership and Public Service Pathway Advisory Board (2022-23)

Cabrillo Academy of Law & Justice, Cabrillo High School, Long Beach, CA
- Mentor (2018-19)

McBride High School, Long Beach, CA
- Member, Criminal Justice Investigation Pathway Advisory Board (2014-16)

The Clemency Project 2014
- Volunteer Attorney (2015-16)

**INTERVIEWS AND MEDIA APPEARANCES**

*Preliminary report shows the new zero-bail policy is effective so far* (LA Public Press, November 2, 2023) (Expert testimony discussed) https://lapublicpress.org/2023/11/preliminary-report-shows-the-new-zero-bail-policy-is-effective-so-far/

*LA Ends Cash Bail* (LAist/89.3 FM, September 30, 3023) (Interviewed) https://laist.com/brief/news/criminal-justice/cash-bail-ends-for-most-low-level-arrests-in-la-county-today [Radio story aired Sep. 30, 2023; Online story Oct.1, 2023)

*The Michael Smerconish Show, Sirius/XM POTUS Channel* (July 31, 2023) (Interviewed and research discussed)

*What it could mean to end cash bail* (Central Time, September 22, 2022) (Interviewed and research discussed) https://www.wpr.org/what-it-could-mean-end-cash-bail

*Doing away with cash bail* (Knowable Magazine, August 11, 2022) (Research discussed) https://knowablemagazine.org/article/society/2022/doing-away-cash-bail

*10th Circuit expands judges' discretion to reduce inmates' sentences* (ColoradoPolitics, April 15, 2021) (Quoted) https://www.coloradopolitics.com/courts/10th-circuit-expands-judges-discretion-to-reduce-inmates-sentences/article_d5be56c0-9e00-11eb-bb5b-7bd2f8211eae.html

*How Cash Bail Reform Could Change The Criminal Justice System* (On Point, March 3, 2021) (Interviewed) https://www.wbur.org/onpoint/2021/03/03/cash-bail-how-eliminating-it-will-change-the-criminal-justice-system

*What Price Cashless Bail?* (American Prospect, October 13, 2020) (Research discussed and quoted) https://prospect.org/justice/what-price-cashless-bail-california-proposition-25/

*CSULB community responds to death of Ruth Bader Ginsburg* (Daily 49er, September 24, 2020) (Quoted)

*The Price of Cash Bail* (This is Hell, October 29, 2019) (Interviewed and research featured)

*Judge Jack Weinstein: Supervised release is too punitive, especially for marijuana users* (Brooklyn Daily Eagle, July 5, 2018) (Research Mentioned)

*The Sister and the Lifers* (Los Angeles Magazine, February 2, 2017) (Quoted)

*Class Acts of 2016: Law – Legal eagles* (UCD Connections – Alumni Magazine) (2017) (Featured)

*Charter Local Edition with CSULB Professor Christine Scott-Hayward* (August 29, 2016) (Featured)

*Scott-Hayward Selected for Fellowship* (Inside CSULB, July 5, 2016) (Featured)

*Student Project Thickens Encryption Debate* (Daily 49er, March 23, 2016 (Quoted)

*About 30 percent of Long Beach homicides go unsolved, analysis shows* (Long Beach Press Telegram, January 24, 2015) (Quoted)

*Return to Prison? Many Will* (Inside CSULB Online, January 15, 2014) (Featured)

Scott-Hayward CV

**STUDENT MENTORSHIP**

Fall 2023 – CSULB Beach Mentor Program
- Completed the Advancing Inclusive Mentoring/Beach Mentor program at California State University Long Beach. This program provides 12+ hours of content and discussion about positive and inclusive mentoring practices and requires the creation of a mentor mentee compact, a best practice in mentoring students.

**DOCTORAL DISSERTATION (NEW YORK UNIVERSITY)**
- External Reader, Ph.D. Dissertation, Russell Ferri, 2015

**MASTERS THESES (CALIFORNIA STATE UNIVERSITY, LONG BEACH)**
- Member, M.S. Thesis Committee, Emilie Whitehouse, 2024
- Member, M.S. Thesis Committee, Jamie Yap, 2024
- Chair, M.S. Thesis Committee, Alejandra Guzman, 2024 (expected)
  - Recipient of 2020 Summer Student Research Assistantship
- Member, M.S. Thesis Committee, Thomas Page, 2023
- Member, M.S. Thesis Committee, Tiffany Pascua, 2023
- Member, M.S. Thesis Committee, Carissa Ellis, 2022
- Member, M.S. Thesis Committee, Patrick Foo, 2022
- Member, M.S. Thesis Committee, Claudia Aguilar, 2019
- Chair, M.S. Thesis Committee, Sarah Ottone, 2018
  - Recipient of the School of CCJEM Outstanding Thesis Award
  - First Place, Behavioral & Social Sciences Division (Graduate Level), 31st Annual CSU Student Research Competition, April 2017
  - Recipient of 2017 Summer Student Research Assistantship
- Member, M.S. Thesis Committee, Xochitl Escutia, 2017
- Chair, M.S. Thesis Committee, Michelle Iacoboni, 2015
  - Recipient of the School of CCJEM Outstanding Thesis Award

**UNDERGRADUATE STUDENT MENTORSHIP (CALIFORNIA STATE UNIVERSITY, LONG BEACH)**
- Faculty Mentor, Summer Student Research Assistantship, Kalani Lopez, 2022
  - First Place, Behavioral & Social Sciences Division, CSULB Annual Student Research Competition, March 2023
  - First Place, Behavioral & Social Sciences Division, 37th Annual CSU Student Research Competition, April 2023
- Advisor, University Honors Thesis, Owen Hammer, 2020
- Advisor, University Honors Thesis, Ruby Gonzalez, 2019

# EXHIBIT 2

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone:   (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:   (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00406-AJB-DDL **REBUTTAL EXPERT REPORT OF CHRISTINE SCOTT-HAYWARD** Judge:   Hon. Anthony J. Battaglia Magistrate: Hon. David D. Leshner Trial Date: None Set |
| Plaintiffs, | |
| v. | |
| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, | |
| Defendants. | |

[4558451.5]

**I.    THE BRIEF DISCUSSION OF REENTRY PROGRAMMING AND
ALTERNATIVES TO INCARCERATION IN THE VARE REPORT
DOES NOT CHANGE THE OPINIONS EXPRESSED IN MY EXPERT
REPORT**

I, Christine Scott-Hayward, Ph.D., declare:

1.      I have had the opportunity to review Opinion 13 in the report of Lenard Vare (pages 120-127 of that report), which primarily focuses on reentry programming.  The opinions expressed therein do not change the opinions I expressed in my expert report.

2.      First, it is not disputed that reentry programming exists in the San Diego jails and is offered to some individuals.  However, based on the Sheriff's Department's own testimony, it remains unclear exactly what programs are offered in which jails, and how frequently they are offered.  *See* Expert Report of Christine Scott-Hayward, Ph.D. ("Scott-Hayward Report"), August 15, 2024, ¶ 68. Moreover, although Mr. Vare refers to a staff estimate of 5,000 individuals participating in some reentry services during a one-year period, Vare at 123, again it is unclear what programs these individuals participated in and in what facilities they were housed.  In addition, Mr. Vare simply asserts that providing services to this number is adequate, without providing any basis for this opinion, even though more than 50,000 individuals were booked into custody last year.  Scott-Hayward Report at ¶ 57.

3.      Second, Mr. Vare's report briefly discusses alternatives to incarceration.  Vare at 126-127.  In that section, he does not dispute the fact that the number of individuals in home detention or on electronic monitoring is exceptionally small for the jail population.  Scott-Hayward Report at ¶ 59.  Further, although Mr. Vare notes the fact that there is "no limit to the number of spots available for home detention or county parole," Vare at 126, he does not acknowledge the Sheriff's Department's discretion over criteria for participation in those programs or discuss the participation numbers in those programs.  Moreover,

Case 3:20-cv-00406-AJB-DDL   Document 796-15   Filed 01/21/25   PageID.37084
Page 57 of 58

1   although it may certainly be the case that fewer individuals might meet eligibility

2   criteria for Fire Camp participation than for other CPAC programs, it remains the

3   case that over three timepoints between October 2022 and September 2023, just one

4   individual was identified as participating in Fire Camp.  Scott-Hayward Report at

5   ¶ 59.

6          4.    Finally, Mr. Vare claims as follows:  "The Sheriff's Office also uses an

7   alternative-to-custody program referred to as the County Parole and Alternative

8   Custody (CPAC) program.  According to Commander Christopher Buchanan,

9   incarcerated individuals are approved or disapproved for programs by the county

10  parole board."  Vare at 126.  To the extent Mr. Vare is suggesting that the county

11  parole board approves all participants in CPAC programs, including home detention,

12  this is not true.  In fact, the Sheriff's Department is primarily responsible for

13  developing criteria for admission into home detention, as discussed in my report.

14  Scott-Hayward Report at ¶ 60.  Moreover, the county parole board includes a

15  representative from the Sheriff's Department.  *Id.* at ¶ 61.

16  **II.    CONCLUSION**

17         5.    In conclusion, I remain confident in the opinions I stated in my expert

18  report dated August 15, 2024.

19         6.    The information and opinions contained in this report are based on

20  evidence, documentation, and/or observations available to me.  I reserve the right to

21  modify or expand these opinions should additional information become available to

22  me.  The information contained in this report and the accompanying exhibits are a

23  fair and accurate representation of the subject of my anticipated testimony in this

24  case.

25

26  Dated:  October 1. 2024

27                                         Christine Scott-Hayward, Ph.D.,

28

[4558451.5]                                    2                    Case No. 3:20-cv-00406-AJB-DDL
REBUTTAL EXPERT REPORT OF CHRISTINE SCOTT-HAYWARD

**Index of Documents Reviewed by Christine Scott-Hayward Since August 21, 2024**

Excerpt of Expert Report of Lenard Vare (August 21, 2024)

Transcript, Deposition of Patricia Ceballos – San Diego County Sheriff's Department Rule 30(b)(6), April 23, 2024

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4561219.2]