GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE
ANDRADE, ERNEST ARCHULETA,
JAMES CLARK, ANTHONY EDWARDS,
REANNA LEVY, JOSUE LOPEZ,
CHRISTOPHER NORWOOD, JESSE
OLIVARES, GUSTAVO SEPÚLVEDA,
MICHAEL TAYLOR, and LAURA
ZOERNER, on behalf of themselves and all
others similarly situated,

        Plaintiffs,

        v.

SAN DIEGO COUNTY SHERIFF'S
DEPARTMENT, COUNTY OF SAN
DIEGO, SAN DIEGO COUNTY
PROBATION DEPARTMENT, and DOES
1 to 20, inclusive,

        Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**REPLY DECLARATION OF
VAN SWEARINGEN IN
SUPPORT OF PLAINTIFFS'
MOTION TO EXCLUDE
OPINIONS OF DEFENDANTS'
EXPERTS**

Judge: Hon. Anthony J. Battaglia

Date: March 27, 2025
Time: 2:00 p.m.
Crtrm.: 4A

[4642781.1]

I, Van Swearingen, declare:

1.    I am an attorney duly admitted to practice before this Court. I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP ("RBGG"), counsel of record for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this reply declaration in support of Plaintiffs' Motion to Exclude Opinions of Defendants' Experts.

2.    Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the transcript of the November 18, 2024 deposition of Dr. Joseph Penn.

3.    Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the transcript of the November 4, 2024 deposition of Mr. Lenard Vare.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 3rd day of February, 2025.

*/s/ Van Swearingen*
Van Swearingen

**Daubert Reply Brief Table of Contents**

| Exhibit | Name | Pagination |
|---------|------|------------|
| Exhibit A | Penn Deposition Excerpts | 1-6 |
| Exhibit B | Vare Transcript Excerpts | 7-29 |

[4643156.1]

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3                    -   -   -
      DARRYL DUNSMORE, ANDREE    )
 4    ANDRADE, ERNEST            ) Case No.
      ARCHULETA, JAMES CLARK,    ) 3:20-cv-00406-AJB-DDL
 5    ANTHONY EDWARDS, TEANNA    )
      LEVY, JOSUE LOPEZ,         )
 6    CHRISTOPHER NORWOOD,       ) REMOTE VIDEOTAPED
      JESSE OLIVARES, GUSTAVO    ) DEPOSITION OF
 7    SEPULVEDA, MICHAEL         ) JOSEPH V. PENN, M.D.,
      TAYLOR, and LAURA          ) CCHP-MH, LFAPA
 8    ZOERNER, on behalf of      )
      themselves and others      ) Filed on Behalf of the
 9    similarly situated,        ) Plaintiffs
                                 )
10                               ) Counsel of Record For
           Plaintiffs,           ) This Party:
11                               )
                                   Aaron J. Fischer, Esq.
12                                 Law Offices of Aaron J.
                                   Fischer
13         -vs-                    1400 Shattuck Square
                                   Suite 12 - #344
14                                 Berkeley, CA 94709

15
      SAN DIEGO COUNTY
16    SHERIFF'S DEPARTMENT,
      COUNTY OF SAN DIEGO,
17    SAN DIEGO COUNTY
      PROBATION DEPARTMENT,
18    and DOES 1 to 20,
      inclusive,
19

20         Defendants.

21

22

23                    -   -   -

24    REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
      WITHOUT AUTHORIZATION FROM THE CERTIFYING
25    AGENCY
```

Ex. A - 2

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                        JOB NO. 1220564
NOVEMBER 18, 2024

1    interview any or evaluate any of the -- either

2    the named Plaintiffs or the class of

3    individuals in the San Diego County Jail.

4           And then I would also have asked --

5    and I applied this methodology to be able to

6    have a statistically significant sample, a

7    random sample of inmate chats to review to look

8    at the quality of care.  And then based on all

9    of that, it's possible I would ask for

10   additional supplemental information.

11          But that's the same methodology that

12   I applied in the Arizona litigation as I

13   applied in this San Diego case.

14      Q.    Okay.  Are there -- who told you

15   that you were prohibited from speaking with

16   patients at the jail?

17      A.    I'm sorry.  When you say patients,

18   I'm not sure --

19      Q.    Incarcerated patients at the jail.

20      A.    So as I understand it, everyone in

21   the jail is an incarcerated individual.  But if

22   they're under care and treatment, they would

23   become a patient.  So that's -- sorry.

24          I don't mean to quibble.  I just

25   want to make sure I can answer your question

```
 1   using the right terminology.
 2        Q.   I think you kind of need to quibble,
 3   Doctor.  Let me ask it a different way.
 4                 ATTORNEY COLEMAN:  Move to
 5   strike counsel's commentary.
 6                 Aaron, you guys sent us a letter
 7   saying that no one was allowed to speak to your
 8   clients.
 9                 ATTORNEY FISCHER:  I don't
10   think that that's correct, Ms. Coleman.
11                 ATTORNEY COLEMAN:  I have a
12   copy of the letter.
13                 ATTORNEY FISCHER:  Okay.  I
14   suggest that you reread it.
15   BY ATTORNEY FISCHER:
16        Q.   Dr. Penn, who told you that you
17   could not speak with the Plaintiffs in this
18   case?
19        A.   I believe I was directed by two
20   different individuals; one, Amanda
21   Kamphoefner -- Mandy -- she's, I believe, the
22   attorney for the San Diego Sheriff.  And then
23   also by Ms. Susan Coleman, the attorney that
24   retained John Allen and our group in this
25   matter.
```

Ex. A - 4

```
 1  that you think should be a focus of continuous
 2  improvement efforts at the San Diego County
 3  Jail?
 4                  ATTORNEY COLEMAN:  Objection,
 5  overly broad.  Calls for a narrative.
 6                  THE WITNESS:  One thing that I
 7  think the jail is doing a tremendous job and I
 8  think it requires more analysis because the
 9  county jail has only had a handful of suicides
10  over the last five years.  And I'm sure that
11  many other jails and prisons across the country
12  would like to get a better handle on how they
13  were able to do that.
14          So I think it would be more of a
15  functional analysis of how did they do such a
16  great job at preventing and mitigating suicide
17  risk in a population that every other county
18  jail and prison in the United States is
19  struggling with.
20          So I think they're doing an amazing
21  job, considering their staffing and their
22  resources, to have only a handful of suicides.
23  That's amazing.  And a handful of adverse
24  outcomes.  It's really -- it's really notable
25  to me.
```

Ex. A - 5

```
 1   COMMONWEALTH OF PENNSYLVANIA         )
                                          ) SS
 2   COUNTY OF ALLEGHENY                  )

 3                  CERTIFICATE

 4        I, Michelle L. Goehring, a notary public
     in and for the Commonwealth of Pennsylvania, do
 5   hereby certify that the witness, JOSEPH V.
     PENN, M.D., CCHP-MH, LFAPA, was by me first
 6   duly sworn to testify the truth, the whole
     truth, and nothing but the truth; that the
 7   foregoing deposition was taken at the time and
     place stated herein; and that the said
 8   deposition was recorded stenographically by me
     and then reduced to typewriting under my
 9   direction, and constitutes a true record of the
     testimony given by said witness.
10
          I further certify that the inspection,
11   reading and signing of said deposition were
     waived by counsel for the respective parties
12   and by the witness.

13        I further certify that I am not a
     relative, employee or attorney of any of the
14   parties, or a relative or employee of either
     counsel, and that I am in no way interested
15   directly or indirectly in this action.

16        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 4th day
17   of December, 2024.

18
19
     Michelle L. Goehring, Notary Public
20   Court Reporter
     My Commission Expires: July 12, 2025
21   Commission No. 1317058.

22

23

24

25
```

Ex. A - 6

# EXHIBIT B

```
 1           UNITED STATES DISTRICT COURT

 2                    for the

 3         SOUTHERN DISTRICT OF CALIFORNIA

 4

 5   Darryl Dunsmore, et al.   )Case No.:
                               )3:20-cv-00406-AJB-DDL
 6                             )
             Plaintiffs,       )
 7                             )
                               )
 8   vs.                       )
                               )
 9                             )
     San Diego County Sheriff's)
10   Department, et al.        )
                               )
11                             )
             Defendants.       )
12   _____)

13

14           VIRTUAL EXAMINATION BEFORE TRIAL of

15   LENARD VARE, an Expert Witness, retained by the

16   Defendant, taken by the Plaintiffs, pursuant to a

17   Subpoena commencing at 9:21 a.m. Pacific Time on

18   Monday, November 4th, 2024, before DARA SANOFF, a

19   Certified Court Reporter and Notary Public for and

20   within the State of New York.

21

22

23

24   STENO
     Concierge@Steno.com
25   (888)707-8366
```

Ex. B - 8

```
 1                    L. VARE
 2   groups based on their ethnicity and gangs if they
 3   say I absolutely cannot get along with someone of
 4   that race or that gang.  If you put them together
 5   it's -- it's a big risk.
 6        Q.    Do you have an opinion as to whether
 7   the sheriff's department has sufficient staff to
 8   cover custody positions?
 9        A.    I -- I think they were dealing with some
10   staff shortages.  There was some mandatory overtime
11   that I know that they were forced to deal with
12   mandatory overtime and then over time they changed
13   some of that process to where deputies that work on
14   patrol were allowed to also cover positions in the
15   jail which has sort of alleviated the need for
16   mandatory overtime, so things have improved.  Also
17   during COVID there was a lot of staff that were
18   falling sick so there was A period when there were
19   staffing shortages, yes.
20        Q.    Are there currently staffing shortages?
21        A.    I mean in a jail there's always going
22   to be some level of staffing shortage.  Just those
23   are very difficult positions to fill.  I don't know
24   if they're a hundred percent staffed right now, but
25   I know that the use of mandatory overtime, at least
```

**Ex. B - 9**

```
 1                       L. VARE
 2   recently I heard that they were no longer forcing
 3   overtime.
 4        Q.   Okay.  How many custody staff positions
 5   have been allocated to the jails?
 6        A.   I don't know the number.
 7        Q.   Do you have an estimate?
 8        A.   No, I don't.
 9        Q.   Do you have an estimate of what percent
10   of allocated custody staff positions are currently
11   filled?
12        A.   I don't know.
13             MS. COLEMAN:  Calls for
14        speculation, lack of foundation.
15        Q.   Do you have any estimate of the percent
16   of custody staff positions that have been allocated
17   that are currently filled?
18        A.   No, I don't.
19        Q.   Historically over the past four years
20   has the jail ever filled all of its allocated custody
21   staff positions?
22             MS. COLEMAN:  Objection,
23        relevance.  Lack of foundation.
24        A.   I don't know if historically they have
25   done that.  I know that historically there were
```

```
 1                         L. VARE
 2    periods when mandatory overtime was called for so
 3    it stands to reason all -- during all that duration
 4    they weren't fully staffed.
 5          Q.    Do you have any knowledge whether the
 6    San Diego Sheriff's Department efforts at recruitment
 7    and retainment over the past two years have been
 8    successful at increasing the total number of custody
 9    staff at the jail?
10          A.    I think one of the conversations I had
11    with the staff was that the staffing situation had
12    improved from when they were in the height of COVID.
13    You know, obviously some people felt safe, but then
14    there was also vacancies.  But things had improved.
15    As of late I don't know what that looks like.
16          Q.    Do you know -- sounds like you don't know
17    what it improved from and what it improved to?
18                MS. COLEMAN:  Objection.
19           Compound, argumentative.
20          A.    You're right, I don't know the answer to
21    that.
22          Q.    Your report at page 110 states that
23    there's a minimum staffing policy that states that
24    each facility must have a minimum staffing level
25    that is defined, right?
```

```
 1                          L. VARE
 2          A.    Yes.
 3          Q.    And let me just bring that up at page 110.
 4     I'm going back to Exhibit 1 which is your expert
 5     report.  In your report it states that, "Policy C-1
 6     is the minimum staffing policy quote, "which states
 7     that each facility has a minimum staffing level
 8     that is defined and considers operational requirements
 9     to maintain safety and security."  Is that correct?
10          A.    Yes.
11          Q.    Do you have any opinions about Policy
12     C-1, minimum staffing?
13          A.    As in -- is the policy appropriate?  Is
14     that what you're asking?
15          Q.    Yeah, is the policy appropriate?
16          A.    Sure.  It's sort of in line with the
17     policies that I've seen related to defining that
18     there's a minimum staffing and if you go below that
19     minimum staffing you should be able to hire
20     overtime or fill those positions in some fashion.
21          Q.    Do you agree that minimum staffing levels
22     are necessary to maintain safety and security at
23     the jail?
24          A.    Yes.
25          Q.    Do you have an opinion whether the
```

Ex. B - 12

```
                        L. VARE
```

1

2      sheriff's department appropriately defines the

3      minimum staffing levels at each of its jails?

4           A.    My conversations with some of the staff

5      there I understand that the staff was based on the

6      number of units, the number of positions that are

7      required to carry out the basic functions in the

8      facility so, you know, you may need two transportation

9      deputies Monday through Friday.  You may not need

10     them on a Saturday or Sunday for example because

11     there may not be a code transportation so those

12     kinds of factors play into what's minimum staffing.

13     So I think along those lines having the minimum

14     staffing identified is what my understanding is how

15     they come up with the number.

16          Q.    Did you do any of your own analysis to

17     identify whether the minimum staffing levels

18     identified at each jail are appropriate?

19          A.    I did not.

20          Q.    Do you know the minimum staffing levels

21     at any of the jails?

22          A.    No.

23          Q.    Do you know for example at Central Jail

24     whether the minimum staffing level is over 20

25     deputies?

```
1                         L. VARE
2          A.    That, I don't know.
3          Q.    What percent of shifts at San Diego
4     County jails are staffed above minimum staffing
5     levels?
6          A.    I think it depends on the day of the
7     week, if people call in sick, if people are out on
8     vacation, if people are out on training so I don't
9     know how I'd answer that.  Generally when you build
10    a shift you're supposed to have the minimum staffing
11    or the appropriate levels of staffing to manage all
12    functions of the jail, but then when someone calls
13    in sick you're going to be below that.
14         Q.    Sure.  So it varies from shift to shift?
15         A.    Yes.  I think that's -- that's what I was
16    trying to say.
17         Q.    So over the past year, let's say for
18    the calendar year 2024, approximately what percent
19    of shifts at the jails have been staffed above minimum
20    staffing levels?
21         A.    I do not know.
22         Q.    For any --
23              MS. COLEMAN:  I'm sorry, are
24         you asking above as opposed to at?
25              MR. SWEARINGEN:  I'll ask the
```

Ex. B - 14

```
 1                      L. VARE
 2       same question with at.
 3       Q.    For the year 2024 do you know what
 4  percentage of shifts are staffed at minimum staffing
 5  levels?
 6       A.    I do not.
 7       Q.    Do you have an estimate?
 8       A.    I do not.
 9       Q.    For any time period do you have an estimate
10  as to what percent of shifts were staffed at or above
11  minimum staffing levels?
12       A.    So I think the reason they're using forced
13  overtime or mandatory overtime is to get to the
14  minimum staffing.  It's -- so that's the basic level
15  that they need to get to.  So to answer that question
16  if they're using mandatory overtime, then they're
17  achieving minimum staffing, but through the use of
18  mandatory overtime.  Today -- I'm sorry?
19       Q.    Please finish.
20       A.    But today they are not requiring mandatory
21  overtime because people are voluntarily filling up
22  positions that -- that come up vacant.  Again, they're
23  bringing it up to the minimum staffing required to
24  run the facility.  So to maybe answer the clearly I
25  believe they're getting minimum staffing on more
```

Ex. B - 15

```
1                        L. VARE
2    occasions that not.  Like, a majority of the time
3    they're doing minimum staffing by using the overtime
4    as a mechanism to deal with shortages.
5         Q.    Currently?
6         A.    Well, historically because it was mandated
7    and it was compulsory for staff to do overtime so
8    that they did not fall below minimum so my response
9    is that they're using mandatory overtime to achieve
10   minimum staffing and they were doing that previously,
11   but now they're not having to make it mandatory.
12        Q.    So it's your testimony that with overtime
13   the jail has always been at or above minimum staffing
14   levels?
15        A.    I don't want to say a hundred percent of
16   the time, but I would say that that is the goal to
17   -- to meet the minimum staffing by forcing overtime.
18        Q.    Okay.  So over the past four years
19   approximately what percent of shifts have been at
20   or above a minimum staffing level including staff
21   who are using overtime?
22             MS. COLEMAN:  Objection.
23         Compound, overly broad and irrelevant
24          as to past.
25        A.    I don't know the answer specifically.
```

Ex. B - 16

```
 1                          L. VARE
 2        Q.    Is there any period of time that you
 3   know the jail has been staffed at or above minimum
 4   staffing levels including with the use of overtime?
 5        A.    I don't know specific, but I -- I don't
 6   know yes or no.
 7        Q.    Okay.  Did you review any below minimum
 8   staffing reports?  When I say "below minimum staffing
 9   reports," below minimum and staffing are all
10   capitalized.  Did you review any below minimum
11   staffing reports produced in discovery?
12        A.    I don't recall.  I may have.  I don't
13   recall.
14        Q.    Did you ask to see any reports about
15   staffing levels with respect to minimum staffing
16   levels?
17        A.    I do not recall.
18        Q.    Is there a reason you don't recall
19   whether or not you -- strike that.
20   Did you review any data at all with respect to custody
21   level staffing?
22        A.    Not -- not -- not like day-by-day data.
23   Again, when I was doing my jail tours, I asked
24   about minimum staffing and what happens when there
25   aren't enough staff to cover the shift and I was
```

```
 1                    L. VARE
 2   informed that they were using mandatory overtime to
 3   make up the deficiencies.
 4         Q.    And who told you that?
 5         A.    Various staff that -- that I toured with.
 6   I don't know the specific names of the one individual.
 7         Q.    Do you know any of their positions?
 8         A.    There were captains and lieutenants who
 9   knew about shifts.
10         Q.    I'm asking specifically of the person
11   who told you that the jail used overtime to fill
12   minimum staffing levels.  Do you know the position
13   of the person who told you that?
14         A.    I don't specifically know.
15         Q.    Did you do anything to independently
16   verify that?
17         A.    No.
18         Q.    Did you request any data to look at to
19   see whether or not shifts are being filled at or
20   above minimum staffing levels?
21         A.    No.
22         Q.    Why not?
23         A.    Because I have no reason to believe that a
24   facility when they're using mandatory overtime.  The
25   whole purpose of doing mandatory overtime is to bring
```

Ex. B - 18

```
 1                      L. VARE
 2   it to the minimum level.
 3        Q.   Okay.  When did the jail have a mandatory
 4   overtime policy?
 5             MS. COLEMAN:  Objection, vague.
 6        Q.   Strike that.  Over the past four years
 7   when has the jail had a mandatory overtime policy?
 8        A.   They had it for some -- some -- some
 9   amount of time.  I know that when I went for my
10   jail tours they said it was recent that they were
11   not having to do mandatory overtime, that people
12   were voluntarily signing up for shifts.  So I would
13   say the preceding year to two years, especially
14   because it was COVID going on, I would assume staffing
15   was shortage.  There was staffing shortages.
16        Q.   I don't want you to assume or speculate.
17   Based on your knowledge are you aware of any time
18   period in which the jail had a mandatory overtime
19   policy?
20        A.   Well, that's what I said.  It's my --
21   my -- my recollection of my conversation was that
22   it ended somewhere around the time that I was doing
23   the tour.  Prior to that we were using mandatory
24   overtime.
25        Q.   Okay.  Has the jail had a single mandatory
```

```
 1                    L. VARE
 2    overtime policy or more than one mandatory overtime
 3    policy?
 4              MS. COLEMAN:  May call for
 5         speculation.
 6         A.    I don't know.  Depends on each of the
 7    jails.  There may be a requirement at one of the
 8    jails that is different from another jail.  I don't
 9    know.
10         Q.    Do you think that the jail had different
11    mandatory policies for different jail facilities?
12              MS. COLEMAN:  Calls for
13         speculation.
14         A.    It's possible based on classification.
15    If it's a lower custody facility the -- the -- the
16    way you manage a lower custody facility would be
17    different than a higher custody facility.
18         Q.    Do you know whether or not the sheriff's
19    department had a mandatory overtime policy that was
20    different depending on which facility the deputy
21    worked at?
22         A.    I -- I don't know.
23         Q.    What did the jails mandatory overtime
24    policy require?
25         A.    I think there were supposed to be two
```

Ex. B - 20

```
 1                      L. VARE
 2    overtime shifts that people needed to work every
 3    other pay period.  That's -- that's what I recollect.
 4         Q.    And how long is a shift?
 5         A.    I think they were 12-hour shifts or some
 6    shift are 12 hours.
 7         Q.    Did you ask to review the mandatory
 8    overtime policy?
 9         A.    No.
10         Q.    Why not?
11         A.    I had no reason to.
12         Q.    Did you in fact review the mandatory
13    overtime policy?
14         A.    I might have.  I don't recall.
15         Q.    What percent of staff participated in
16    mandatory overtime?
17         A.    I don't have a percentage.
18         Q.    Did you review any materials regarding
19    whether there were staffing problems caused by
20    mandatory overtime policies?
21         A.    No.
22         Q.    Why not?
23         A.    Didn't come up.
24         Q.    Did you review any reports about
25    mandatory overtime at the jail?
```

```
 1                    L. VARE
 2        A.    I might have seen something.  I don't
 3   remember specifics.
 4        Q.    Did you ask to see any reports about
 5   mandatory overtime at the jail?
 6        A.    No.
 7        Q.    Why not?
 8        A.    I didn't -- it didn't -- it didn't come
 9   up at least in my head.
10        Q.    Did you review any emails discussing
11   the jails mandatory overtime policy?
12        A.    I think I might have seen an email or
13   two related to the mandatory overtime, but unless I
14   see it I can't verify.  But I think I recall seeing
15   something along those lines.
16        Q.    Did the email form your opinion in this
17   case?
18        A.    Maybe.  I don't know.
19        Q.    Do you have any knowledge of whether or
20   not the jails mandatory overtime policy resulted in
21   staff fatigue and potential burnout?
22             MS. COLEMAN:  Objection.
23        Compound, calls for speculation, lack
24         of foundation.
25        A.    I didn't talk to staff specifically
```

```
 1                      L. VARE

 2    about whether or not that was something that staff

 3    was experiencing or complaining about.  I don't

 4    recall having a conversation about that.

 5         Q.    Did you ask for any information about

 6    the jails mandatory overtime policy and whether or

 7    not it had affect on staff moving around?

 8         A.    No.

 9         Q.    Was the mandatory overtime policy

10    successful?

11         A.    Successful in what regard?  They filled

12    positions that needed to be filled, but what do you

13    mean by successful?

14         Q.    In bringing the jail at or above

15    minimum staffing levels in all instances?

16         A.    I don't know about all instances, but I

17    think the goal was to get the jail staff into at

18    least a minimum staffing by mandating overtime.

19         Q.    And did the mandatory overtime policy

20    result in the jail hitting minimum staffing levels

21    for all shifts in the facility?

22         A.    Again, I can't tell you a hundred percent

23    of the time if that occurred, but that was the reason

24    for doing the mandatory overtime.

25         Q.    Did it occur 90 percent of the time?
```

Ex. B - 23

```
 1                          L. VARE
 2          A.    I -- I don't know what percentage.  I
 3    haven't looked at it t1 tell you with any certainty
 4    about percentages on that.
 5          Q.    Your report at pages 110 to 111 states
 6    that, quote, "The facilities' commander or their
 7    designee is responsible for ensuring that there are
 8    always sufficient staff on duty capable of responding
 9    promptly in the event of an emergency."
10          A.    I'm going into my report so I could
11    remember what you're saying.
12          Q.    Sure, I'll bring it up right here.
13          A.    Actually, I prefer to look at it on my
14    screen because it's very hard to see on the screen.
15          Q.    Okay, well we're looking at pages 110
16    and 111.
17          A.    Okay, got it.
18          Q.    The beginning of the last sentence on
19    page 110 through the end of that paragraph.
20          A.    Okay, I'm with you.  Yes.
21          Q.    What is the basis for this statement?
22          A.    That is based on the policy itself.
23    The minimum staffing policy that's -- that I read
24    from that.
25          Q.    Did you do any independent evaluation
```

```
 1                      L. VARE
 2    to see whether or not that fact occurred?
 3         A.    Other than speaking to the -- the staff
 4    that was giving the tours with me, I did not do any
 5    other independent evaluation.
 6         Q.    And do you remember any of the staffs'
 7    names who you talk to in making that statement?
 8         A.    In my notes I have the names of all the
 9    staff that I spoke with that are identified in my
10    notes.  I don't know the names of specific
11    individuals.
12         Q.    Right, but your notes contain several
13    different names, and I'm asking which of those names
14    are the ones that informed you of that?
15         A.    I would say the command staff so at least
16    the captain or lieutenant at various facilities that I
17    was touring, I would ask them about staff and the use
18    of mandatory overtime and so it could have been more
19    than one person that was telling me sort of
20    consistently that they use mandatory overtime.
21         Q.    But you don't know which person that was?
22         A.    Right.
23         Q.    What is the average salary of custody
24    staff who work in the jails?
25                MS. COLEMAN:  Objection.
```

```
 1                      L. VARE
 2          Relevance, calls for speculation,
 3          lack of foundation and it's publicly
 4          available information.
 5          A.    In San Diego I -- I -- I don't know,
 6    but I know annual salary and benefits possibly over
 7    $70,000.
 8          Q.    Okay, do you know the range of salary
 9    for custody staff who work in the jails?
10          A.    No.  The only reason I know that number
11    was because I was comparing it for my own county
12    and I recall that salary from years ago.  We were
13    trying to compare different counties.
14          Q.    Do you know that staff pay is not the
15    primary issue for staff shortages?
16              MS. COLEMAN:  Objection.
17          Vague, calls for speculation.
18          A.    I -- well, I know that staff pay may not be
19    the reason for that in certain California counties.
20    San Diego may be one of them.  But my experience is
21    in corrections pay is a key factor for many agencies.
22          Q.    Do you know whether in San Diego staff
23    pay is a primary issue for staffing shortages?
24              MS. COLEMAN:  Calls for
25          speculation.
```

```
 1                       L. VARE
 2        A.    I -- I don't know and all I have is
 3   anecdotal information from conversations with -- it
 4   doesn't indicate to me that pay was really the --
 5   the primary factor.
 6        Q.    Do you know approximately how many custody
 7   staff quit because of COVID related reasons?
 8        A.    I do not.
 9        Q.    Do you know approximately what percent of
10   custody staff quit because of COVID related reasons?
11             MS. COLEMAN:   Objection.
12         Assumes facts.
13        A.    No.
14        Q.    Do you know what percent of custody staff
15   tended to not show up during -- to work during the
16   COVID pandemic?
17             MS. COLEMAN:   Calls for
18          speculation.
19        A.    Staff not showing up to work because
20   they were sick?
21        Q.    For COVID related illnesses, yes.
22        A.    No, I don't know how many -- how many
23   staff did not go to work because of COVID.
24        Q.    Do you know the percent of staff?
25        A.    I do not.
```

```
1                        L. VARE

2        Q.    Do you have an estimate?

3        A.    No.

4        Q.    Do you have any knowledge about the nursing

5   staff levels at the jail over the past three years?

6        A.    No.

7        Q.    I'm going to move on to a different topic.

8   On page 114 of your report, and I'll bring it back up.

9              MS. COLEMAN:  Mr. Vare, you can

10         look at your version if it's easier.

11       A.    Okay, I'm at 114.

12       Q.    Your opinion states in bold, "There's

13  no evidence that the sheriff's office unreasonably

14  and unjustifiably denied incarcerated people access

15  to confidential communications with their attorneys."

16             Sitting here today is that your opinion?

17       A.    Yes.

18       Q.    What information did you request regarding

19  request to review regarding people's access to their

20  attorneys?

21       A.    I spoke with the staff that was there.

22  I looked at the areas where attorney visiting takes

23  place.  I asked questions regarding whether calls

24  are monitored or not.  I was informed that the phone

25  number is entered and there's a way that those calls
```

Ex. B - 28

LENARD VARE                                                    JOB NO. 1262129
NOVEMBER 04, 2024

```
 1                        L. VARE

 2               C E R T I F I C A T E

 3

 4   STATE OF NEW YORK        )
                              :  SS.:
 5   COUNTY OF RICHMOND       )

 6

 7        I, DARA SANOFF, a Notary Public for

 8   and within the State of New York, do hereby

 9   certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 7th day of December 2024.

21

22

23        _____

24             DARA SANOFF

25
```

Ex. B - 29