1 | GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809

2 | MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934

3 | HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439

4 | ROSEN BIEN
GALVAN & GRUNFELD LLP

5 | 101 Mission Street, Sixth Floor
San Francisco, California 94105-1738

6 | Telephone: (415) 433-6830
Facsimile: (415) 433-7104

7 | ggrunfeld@rbgg.com
vswearingen@rbgg.com

8 | mfreedman@rbgg.com
eanderson@rbgg.com

9 | hchartoff@rbgg.com
bholston@rbgg.com

10 |

11 | AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER

12 | 1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709

13 | Telephone: (510) 806-7366
Facsimile: (510) 694-6314

14 | ajf@aaronfischerlaw.com

15 | Attorneys for Plaintiffs and the
Certified Class and Subclasses

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

16 |

17 | UNITED STATES DISTRICT COURT

18 | SOUTHERN DISTRICT OF CALIFORNIA

19 | DARRYL DUNSMORE, ANDREE
ANDRADE, ERNEST ARCHULETA,

20 | JAMES CLARK, ANTHONY EDWARDS,
REANNA LEVY, JOSUE LOPEZ,

21 | CHRISTOPHER NORWOOD, JESSE
OLIVARES, GUSTAVO SEPULVEDA,

22 | MICHAEL TAYLOR, and LAURA
ZOERNER, on behalf of themselves and all

23 | others similarly situated,

Plaintiffs,

24 | v.

25 | SAN DIEGO COUNTY SHERIFF'S
DEPARTMENT, COUNTY OF SAN

26 | DIEGO, SAN DIEGO COUNTY
PROBATION DEPARTMENT, and DOES

27 | 1 to 20, inclusive,

Defendants.

28 |

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF GAY
CROSTHWAIT GRUNFELD IN
SUPPORT OF PLAINTIFFS'
MOTION FOR INTERIM FEES
AND COSTS**

Judge: Hon. Anthony J. Battaglia

Date: March 27, 2025
Time: 2:00 p.m.
Crtrm.: 4A

[4571297.9]

# TABLE OF CONTENTS

Page

I.      BACKGROUND AND RELEVANT EXPERIENCE OF RBGG
        ATTORNEYS AND PARALEGALS .................................................. 2

II.     COURTS HAVE REGULARLY APPROVED RBGG'S HOURLY
        RATES .............................................................................................. 7

III.    PLAINTIFFS' COUNSEL'S LODESTAR IS REASONABLE IN
        LIGHT OF THE COMPLEX AND DIFFICULT CHALLENGES
        POSED BY THIS CASE ..................................................................... 12

IV.     RBGG INVESTED THE TIME NECESSARY TO BRING SAN
        DIEGO'S JAIL SYSTEM INTO COMPLIANCE WITH THE ADA .......... 17

        A.      Defendants Have Long Been on Notice of Their Failure to
                Comply with the ADA and Related Law ................................ 17

        B.      Plaintiffs' Counsel's Investigation of and Initial Litigation
                Regarding ADA Violations at the Jail. .................................. 18

        C.      Early Attempts at Resolution Failed ....................................... 20

        D.      Expedited Discovery on Disability Access Issues Yields
                Additional Evidence of ADA Violations ................................ 21

        E.      Plaintiffs' Offer to Resolve ADA Issues without Litigation Fails
                Again ..................................................................................... 25

        F.      Second Preliminary Injunction Motion Regarding Disability
                Access .................................................................................... 25

        G.      The First ADA Settlement ...................................................... 27

        H.      Negotiations and Litigation Regarding Defendants' Proposed
                ADA Plan ............................................................................... 29

        I.      Enforcement of the 2023 ADA Order and Defendants' Amended
                ADA Plan. .............................................................................. 31

        J.      Litigation and Negotiations Regarding the Remainder of
                Plaintiffs' Third Claim for Relief ........................................... 36

        K.      Plaintiffs' Counsel's Lodestar is Reasonable, Especially in Light
                of the Challenges Faced in this Litigation and the Outstanding
                Result Obtained ...................................................................... 39

V.      PLAINTIFFS' COUNSEL'S COSTS AND EXPENSES WERE
        REASONABLY INCURRED AND NECESSARY TO ACHIEVE
        RESOLUTION OF THEIR THIRD CLAIM FOR RELIEF ......................... 40

VI.     TIME SPENT BY PLAINTIFFS COUNSEL ON THE FEES MOTION
        WAS NECESSARY AND REASONABLE ................................................. 42

I, Gay Crosthwait Grunfeld, declare:

1.     I am an attorney duly admitted to practice before this Court.  I am the managing partner in the law firm of Rosen Bien Galvan & Grunfeld LLP ("RBGG"), counsel of record for Plaintiffs and the Certified Class and Subclasses.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration based in support of Plaintiffs' Motion for Interim Fees and Costs.

2.     RBGG is lead counsel in this case.  RBGG jointly represents the Plaintiff Class and Subclasses with other appointed Class Counsel, the Law Office of Aaron J. Fischer and DLA Piper (US) ("DLA Piper").  RBGG, like other civil rights firms that handle complex litigation, routinely co-counsels with other large firms, *e.g.*, DLA Piper, and firms with certain areas of expertise, *e.g.*, Law Office of Aaron J. Fischer, to expand their impact, increase litigation resources, and spread the risk of taking on important and precedent-setting cases.  In this case, RBGG approached DLA Piper in light of our prior co-counsel relationship in the constitutional and Americans with Disabilities Act challenge to the policies and practices of the Nebraska Department of Corrections in *Sabata et al. v. Nebraska Department of Correctional Services et al.* (D. Neb. No. 4:17-cv-3107-RFR-MDN), as well as their knowledge, as a local San Diego firm, of procedures and practices in the Southern District of California and their ability to visit incarcerated people in the San Diego County Jail system (the "Jail") without substantial travel costs.  RBGG approached the Law Office of Aaron J. Fischer in light of Mr. Fischer's work on a 2018 Disability Rights California report about mental health care at the Jail, as well as his experience working on cases, including as an associate at RBGG, seeking to end disability discrimination (including against those with mental illness) in California's prisons and jails.  DLA Piper's Christopher Young and Mr. Fischer are submitting declarations herewith regarding their firms' work on the Third Claim for Relief.

I.    **BACKGROUND AND RELEVANT EXPERIENCE OF RBGG ATTORNEYS AND PARALEGALS**

3.    RBGG was formed in 1990.  Since then, RBGG has frequently been recognized nationally and within California for its prisoner rights, disability, employment, and consumer class action work.  The firm specializes in complex class action lawsuits seeking to improve conditions in correctional systems.  The firm was co-counsel in *Brown v. Plata*, 563 U.S. 493 (2011), the landmark Eighth Amendment case that required population reduction in California's overcrowded prison system.  The firm is currently lead or co-lead counsel in the following correctional class actions pending in the United States District Court for the Northern and Eastern Districts of California:  *Coleman v. Brown*, E.D. Cal. No. 2:90-cv-00520-KJM-DB (mental health in California prisons); *Armstrong v. Brown*, N.D. Cal. No. C 94-2307 CW (disability access in California prisons); *Hedrick v. Grant*, E.D. Cal. No. 2:76-cv-00162-GEB-EFB (conditions in Yuba County Jail); *Cole v. County of Santa Clara*, N.D. Cal. No. 5:16-cv-06594-LHK (disability access in Santa Clara County Jail); *Hernandez v. County of Monterey*, N.D. Cal. No. 5:13-cv-02354-BLF-NMC (conditions in Monterey County Jail); *Babu v. County of Alameda*, N.D. Cal. No. 5:18-cv-07677-NC (conditions in Alameda County's Santa Rita Jail); and *California Coalition for Women Prisoners v. U.S. Federal Bureau of Prisons*, N.D. Cal. No. 4:23-cv-04155-YGR (sexual assault policies in federal prisons).

4.    Best Lawyers in America placed the firm in the first tier nationally in Appellate Practice, and for San Francisco in Appellate Practice, Commercial Litigation, Employment Law-Individuals, and Civil Rights for 2025 and for many prior years.  All of the firm's partners are AV-rated by Martindale Hubbell, and all are recognized as Super Lawyers and have been for many years.  Four of the partners, including myself, were named Best Lawyers in America for 2025, and also for many prior years.  RBGG attorneys have been honored repeatedly with the

*California Lawyer* Attorney of the Year Award, including me in 2012 and 2015, and Van Swearingen in 2016 and 2022. Eight of the firm's Senior Counsel and associates, including Eric Monek Anderson and Hannah Chartoff, were named Rising Stars by Super Lawyers in 2024.

5. I graduated from Wellesley College with highest honors and as a member of Phi Beta Kappa in 1981. I received my juris doctor from Columbia Law School in 1984 as a Harlan Fiske Stone Scholar and Articles Editor of the *Columbia Law Review*, after which I clerked for the Honorable Jack B. Weinstein of the United States District Court for the Eastern District of New York. My law practice focuses on complex civil litigation, with an emphasis on civil rights, employment, and business litigation. I have spent over 19 years litigating and monitoring issues related to enforcement of the Americans with Disabilities Act, the Rehabilitation Act, and California statutory protections against disability discrimination ("ADA"). I currently serve as one of the lead counsel in *Armstrong*, a class action on behalf of thousands of California prisoners and parolees with disabilities, and *Hedrick*, a class action on behalf of hundreds of prisoners in the Yuba County Jail. I was approved as class counsel by U.S. District Judge Gilliam in *Stiner v. Brookdale Senior Living, Inc.*, 665 F.Supp.3d 1150 (N.D. Cal. 2023); San Francisco Superior Court Judge Kahn in *Smith v. Shorenstein Hays-Nederlander Theatres LLC*, San Francisco Cty. Super. Ct. No. CGC-16-554905; by U.S. District Judge Breyer in *Ramirez v. Ghilotti Bros, Inc.,* N.D. Cal. No. 3:12-cv-04590-CRB; by U.S. District Judge Orrick in *Quinby v. ULTA Salon, Cosmetics & Fragrance, Inc.*, N.D. Cal. No. 3:15-cv-04099-WHO; by then-U.S. Magistrate Judge Grewal in *Hernandez v. County of Monterey*, N.D. Cal. No. 5:13-cv-02354-BLF-NMC; by former Alameda County Superior Court Judge Hernandez in *Sunner et al. v. Kenneth R. Turnage II General Contractor, Inc. et al.*, Alameda Cty. Super. Ct. No. RG15772244; and by U.S. District Judge Karlton in *L.H. v. Brown,* E.D. Cal. No. Civ. S-06-2042 LKK/GGH. My work on those cases has established precedent under the ADA and other

1   statutes.  In addition, I have served as lead counsel in other litigation resulting in
2   multi-million dollar settlements.  I have over 30 years of experience practicing
3   before trial and appellate courts at both the state and federal levels.  A true and
4   correct copy of my resume is attached hereto as **Exhibit A**.

5          6.      **Sanford Jay Rosen** is one of the founding partners of RBGG.  He is a
6   1962 graduate of Yale Law School and a 1959 graduate of Cornell University.  Prior
7   to founding RBGG, Mr. Rosen worked as Legal Director of the Mexican American
8   Legal Defense and Education Fund, Assistant Legal Director of the National
9   American Civil Liberties Union, Associate Director of the Council on Legal
10  Education Opportunity, and a tenured law professor at the University of Maryland
11  School of Law.  At RBGG, Mr. Rosen's practice focuses on employment law,
12  complex commercial litigation, civil rights, and matters involving attorneys.  He is a
13  testifying expert on attorneys' fees and related matters.  Mr. Rosen has presented
14  oral argument in the Supreme Court in five cases, in the U.S. Court of Appeals on
15  more than 30 occasions, and before the Supreme Court and Court of Appeal of
16  California and appellate courts in other states at least 15 times.  He has published
17  numerous articles in law journals, CLE materials, and in the *Huffington Post*, and is
18  the co-author of the California Education of the Bar practice guide "Employment
19  Damages and Remedies" Chapter 8 "Attorney Fees and Costs."  Mr. Rosen has been
20  named to the Best Lawyers list for Appellate Practice annually since 2013 and to
21  Lawdragon's 500 Leading Plaintiff Employment Lawyers annually since 2018.  He
22  has been selected as a Super Lawyer every year since the list first appeared in 2004.
23  A true and correct copy of Mr. Rosen's resume is attached hereto as **Exhibit B**.

24         7.      **Van Swearingen** is a partner at RBGG and my co-lead counsel in this
25  case.  He is a 2008 graduate of the University of California, Berkeley School of
26  Law, where he was Executive Editor of the *California Law Review*.  Prior to
27  attending law school, he obtained his Bachelor's degree from the University of
28  Texas at Austin with highest honors and as a member of Phi Beta Kappa.  He also

1    received a Master's degree in Public Policy from the University of California,

2    Berkeley, Goldman School of Public Policy in 2004.  At RBGG, Mr. Swearingen

3    maintains a diverse practice in the areas of complex civil litigation, employment

4    law, business litigation, First Amendment issues, and civil rights.  Mr. Swearingen

5    has extensive trial court experience in both state and federal courts.  He was a key

6    member of the trial and appellate team that obtained an injunction enjoining

7    President Trump's Executive Order 13,943 (August 6, 2020) and its implementing

8    regulations, which would have effectively banned the WeChat social media

9    application.  *See U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912 (N.D.

10   Cal. 2020).  Prior to joining RBGG, he worked as a litigation associate at Sidley

11   Austin LLP.  His legal writings on correctional issues have been published in the

12   *California Law Review*, *Pace Law Review*, *Vital City*, and in the book "Varieties of

13   Legal Order," Thomas F. Burke and Jeb Barnes, Eds. (Routledge, 2017).

14   Mr. Swearingen received the *California Lawyer* Attorney of the Year Award in both

15   2016 and 2022, and has been named a Lawdragon 500 Leading Plaintiff

16   Employment and Civil Rights Lawyer for the past five years.  He has been selected

17   as a Super Lawyer for the past four years and was named a Rising Star every year

18   from 2015 to 2018.  A true and correct copy of Mr. Swearingen's resume is attached

19   hereto as **Exhibit C**.

20        8.    **Michael Nunez**, who assisted with preparation of the fees motion, is

21   Senior Counsel at RBGG and a 2011 graduate of Stanford Law School.  He has

22   significant experience representing people with disabilities and litigating attorneys'

23   fees, including fees on fees.  He was a key member of a legal team that received a

24   2018 California Lawyer Attorney of the Year Award for their work litigating

25   *California Council of the Blind v. County of San Mateo*, N.D. Cal. No. 3:15-cv-

26   05784-CRB, resulting in groundbreaking changes to California law that made San

27   Mateo County's vote-by-mail system accessible to blind voters and paved the way

28   for accessible vote-by-mail across California.  Mr. Nunez also played a central role

1  in *California Council of the Blind v. County of Alameda*, N.D. Cal. No. 3:13-cv-

2  03443-JCS, in which a federal court ruled for the first time that the ADA and

3  Section 504 of the Rehabilitation Act protect the right of blind voters to vote

4  privately and independently.  He represents a class of more than 30,000 incarcerated

5  people with mental health disabilities in *Coleman v. Newsom*, E.D. Cal. No. 2:90-

6  cv-00520-KJM-DB, a class action challenging inadequate provision of mental health

7  treatment in the California prison system.  Mr. Nunez was named a Super Lawyers

8  Rising Star every year from 2016 to 2021.  A true and correct copy of Mr. Nunez's

9  resume is attached hereto as **Exhibit D**.

10      9.      **Priyah Kaul** was Senior Counsel at RBGG from January to May 2024,

11  and an associate at RBGG from 2021-2024.  She is a 2015 graduate of the

12  University of Michigan School of Law.  Prior to working at RBGG, Ms. Kaul was

13  an associate at Gibson, Dunn & Crutcher, LLP.  She clerked for the Honorable

14  Yvonne Gonzalez Rogers in the Northern District of California.  She was named a

15  Super Lawyers Rising Star in 2023.  Ms. Kaul received a B.A. in Business

16  Economics and Political Science from the University of California, Los Angeles.  A

17  true and correct copy of Ms. Kaul's resume is attached hereto as **Exhibit E**.

18      10.     **Eric Monek Anderson** is an associate at RBGG and a 2017 graduate

19  of the University of California, Berkeley School of Law, where he was awarded

20  Order of the Coif and was a Supervising Editor of the *California Law Review*.  At

21  RBGG, his practice includes complex litigation and prelitigation matters in both

22  federal and state court.  Prior to working at RBGG, Mr. Anderson was an associate

23  at Farella Braun + Martel LLP.  Mr. Anderson clerked for the Honorable then-

24  District Judge Lucy H. Koh in the Northern District of California and for the

25  Honorable A. Wallace Tashima on the U.S. Court of Appeals for the Ninth Circuit.

26  He was named a Super Lawyers Rising Star in 2024.  Mr. Anderson received a B.A.

27  in English from St. Olaf College, from which he graduated *magna cum laude*.  A

28  true and correct copy of Mr. Anderson's resume is attached hereto as **Exhibit F**.

11.    **Hannah Chartoff** is an associate at RBGG and a 2018 graduate of Stanford Law School, where she was an executive board member and the Senior Notes Editor of the *Stanford Law Review* and received the Gerald Gunther Prize in Constitutional Law and Immigration Law and Policy.  She was a member of the Stanford Supreme Court Clinic, as well as the Stanford Community Law Clinic.  At RBGG, her practice includes complex litigation, prelitigation, and appellate matters.  Prior to working at RBGG, Ms. Chartoff was an associate at Covington & Burling LLP.  She clerked for the Honorable Andrew D. Hurwitz on the U.S. Court of Appeals for the Ninth Circuit.  She was named a Super Lawyers Rising Star in 2023 and 2024.  Ms. Chartoff was a Fulbright Scholar.  She received a B.A. from Duke University in political science and Arabic, from which she graduated *magna cum laude* and Phi Beta Kappa.  A true and correct copy of Ms. Chartoff's resume is attached hereto as **Exhibit G**.

12.    **Ben Holston** is an associate at RBGG and a 2021 graduate of the University of California, Berkeley School of Law, where he was awarded Order of the Coif.  Prior to joining RBGG, Mr. Holston was a litigation associate at Gibson, Dunn & Crutcher LLP and received a B.A. from Stanford University.  Prior to attending law school, Mr. Holston was the VP of Operations and a founding team member of My90, Inc., a technology startup that provided a platform for local governments to collect and analyze anonymous feedback data regarding law enforcement.  A true and correct copy of Mr. Holston's resume is attached hereto as **Exhibit H**.

13.    **Kedra Chan** is, and **Ellinor Heywood** and **Lindsay Newfeld** were, paralegals at RBGG.  True and correct copies of their resumes are attached hereto as **Exhibit I**.

## II.    COURTS HAVE REGULARLY APPROVED RBGG'S HOURLY RATES

14.    My firm's hourly billing rates are regularly charged to and paid by our

1    clients who pay by the hour.  In accordance with the prevailing market practice, my

2    firm bills clients on a monthly billing basis for work at our hourly rates.

3        15.    As the managing partner of the firm, I participate in setting RBGG's

4    rates at least once per year.  I also engage in discussions with fee paying clients

5    about rates.  In order to help set rates for my firm, I pay special attention to many

6    sources of information regarding the legal marketplace.  The sources upon which I

7    and my partners rely include, but are not limited to:  (1) my own and my partners'

8    involvement in attorneys' fees litigation; (2) discussions of attorneys' fees, billing,

9    and work practices with other attorneys; (3) representing other attorneys who seek

10   fees and/or providing expert declarations regarding fees to other attorneys; (4)

11   obtaining declarations from other attorneys regarding market rates, attorneys' fees,

12   billing, and work practices; (5) reviewing surveys, legal newspapers, reported

13   decisions, and treatises regarding prevailing attorneys' rates, fees, billing, and work

14   practices; (6) reviewing attorneys' fees applications and awards in other cases, as

15   well as unpublished decisions; and (7) reviewing rates charged by, and billing and

16   work practices of, other firms that my firm has retained or with whom it has

17   associated.

18       16.    Every year, when my partners and I set rates for the firm, we consider

19   the information we are able to gather regarding other firms' rates, the work we are

20   performing, and the experience of our attorneys and staff as well as our ongoing

21   communications with our fee-paying clients and potential clients concerning our

22   rates.  This is a careful analysis we perform each year by gathering information from

23   numerous law firms and reviewing articles and other public sources of information,

24   such as fee petitions and awards and the information listed above in paragraph 15, to

25   determine the range of prevailing rates in this area for attorneys and paralegals with

26   similar levels of experience performing work of similar complexity.

27       17.    RBGG bills fee-paying clients at my full hourly rates and the full

28   hourly rates for the senior counsel, associates, and paralegals with whom I work,

1  and our firm is paid those rates.

2      18.    For 2025, my current hourly billing rate is $1,325; the current hourly

3  billing rate of RBGG partner Sanford Jay Rosen is $1,625; that of RBGG partner

4  Van Swearingen is $975; that of RBGG Senior Counsel Michael Nunez is $850; that

5  of former RBGG Senior Counsel Priyah Kaul is $750; that of RBGG associate Eric

6  Monek Anderson is $600; that of RBGG associate Hannah Chartoff is $575; that of

7  RBGG associate Ben Holston is $500; that of former RBGG paralegal Ellie

8  Heywood is $350; that of RBGG paralegal Kedra Chan is $350; and that of former

9  RBGG paralegal Lindsay Newfeld is $350.

10      19.    RBGG's hourly rates are comparable to those of other attorneys and

11  paralegals in the San Francisco Bay Area and San Diego.  They are also the rates we

12  claim in our fee applications in all our fee-shifting cases, both inside and outside the

13  San Francisco Bay Area.  They have been accepted consistently by courts and

14  arbitrators in California, including the following:

15      a.    *Smith v. California Health and Human Services Agency*, N.D.

16  Cal. No. 4:21-cv-07872-HSG (October 21, 2024 Ruling from an Arbitrator on

17  Attorney Fees awarding RBGG's requested 2024 rates, including $1,100 for an

18  RBGG partner (1997 graduate) and $800 for Senior Counsel Michael S. Nunez

19  (2011 graduate).  A true and correct copy of the ruling is attached hereto as

20  **Exhibit J**);

21      b.    *U.S. v. Academy Mortgage Corporation*, No. 3:16-cv-02120-

22  EMC, Dkt. 500 (N.D. Cal. May 31, 2024) (awarding RBGG's requested 2023

23  hourly rates for its fees work, including $1,475 for partner Sanford Jay Rosen (1962

24  graduate), $925 for another partner (2005 graduate), $875 for partner Van

25  Swearingen (2008 graduate), $825 for a senior counsel (2008 graduate), and

26  paralegal rates ranging from $405 to $435);

27      c.    *Prison Legal News v. Ryan*, No. CV-15-02245-PHX-ROS, 2024

28  WL 1195548, at *2 (D. Ariz. Mar. 20, 2024) (awarding RBGG's requested 2023

1  rates, including $1,475 for partner Sanford Jay Rosen (1962 graduate), $750 for

2  Senior Counsel Caroline E. Jackson (2011 graduate), $625 for associates Andrew

3  Spore and Amy Xu (2015 graduates), and paralegal rates ranging from $325 to

4  $435.  A true and correct copy of the Declaration of Sanford Jay Rosen in Support

5  of Plaintiff's Motion for Attorneys' Fees and Expenses describing 2023 rates is

6  attached hereto as **Exhibit K**);

7          d.      *Prison Legal News v. Ryan*, No. 19-17449, 2023 WL 9190364, at

8  *1 (9th Cir. Mar. 21, 2023) (awarding RBGG's requested 2022 rates, including

9  $1,350 for partner Sanford Jay Rosen (1962 graduate), $575 for associate Amy Xu

10  (2015 graduate), and paralegal rate of $400, plus a multiplier);

11          e.      *Andrews v. Equinox Holdings, Inc.*, 570 F. Supp. 3d 803, 806

12  (N.D. Cal. 2021) (awarding RBGG's 2021 rates including $1,250 for partner

13  Sanford Jay Rosen (1962 graduate));

14          f.      *Human Rights Defense Center v. County of Napa*, N.D. Cal. No.

15  3:20-cv-01296-JCS (March 28, 2021 Order approving 2020 hourly rates of $1,100

16  for RBGG partner Sanford Jay Rosen, $950 for an RBGG partner (1981 graduate),

17  $625 for an RBGG senior counsel (2009 graduate), and $350 for an RBGG senior

18  paralegal.  A true and correct copy of the order is attached hereto as **Exhibit L**);

19          g.      *Armstrong v. Brown*, N.D. Cal. No. 4:94-cv-02307-CW

20  (January 10, 2025 Stipulated Order approving RBGG's fees and costs through

21  periodic fee process, including 2024 hourly rates of $1,250 for partner Gay Grunfeld

22  (1984 graduate), $875 for Senior Counsel Michael L. Freedman (2008 graduate),

23  $800 for Senior Counsel Michael S. Nunez and Caroline E. Jackson (2011

24  graduates), $575 for associate Eric Monek Anderson (2017 graduate), $550 for

25  associate Hannah Chartoff (2018 graduate), and paralegal rates of $335 to $450.  A

26  true and correct copy of the order is attached hereto as **Exhibit M**);

27          h.      *National Federation of the Blind of California, et al. v. Uber

28  Technologies, Inc.*, N.D. Cal. 3:14-cv-04086-NC (November 8, 2019 Amended

1  Order awarding RBGG's requested 2019 rates including $525 for Senior Counsel

2  Michael S. Nunez (2011 graduate).  A true and correct copy of the order is attached

3  hereto as **Exhibit N**);

4          i.    *Sunner et al. v. Kenneth R. Turnage II General Contractor, Inc.*

5  *et al.*, Alameda Cty. Super. Ct. No. RG15772244 (February 15, 2017 Order

6  approving our request for fees and costs as part of a class action settlement common

7  fund, as well as an excerpt of court filings showing our 2017 billing rates.  True and

8  correct copies are attached hereto as **Exhibit O**);

9          j.    *Quinby v. ULTA Salon, Cosmetics & Fragrance, Inc.*, N.D. Cal.

10  No. 3:15-cv-04099-WHO (January 18, 2017 Order approving our request for fees

11  and costs as part of a class action settlement common fund, as well as excerpts of

12  court filings showing our 2016 billing rates.  True and correct copies are attached

13  hereto as **Exhibit P**);

14          k.    *National Federation of the Blind of California, et al. v. Uber*

15  *Technologies, Inc.*, N.D. Cal. No. 3:14-cv-04086-NC (December 6, 2016 Order

16  approving RBGG's 2016 rates, noting that the rates are "reasonable in the San

17  Francisco Bay Area market[,]" and Declaration of Michael W. Bien in Support of

18  Plaintiffs' Motion for Fees and Costs describing 2016 rates.  True and correct copies

19  of the order and declaration are attached hereto as **Exhibit Q**);

20          l.    *Hernandez v. Cnty. of Monterey*, N.D. Cal. No. 5:13-cv-02354-

21  PSG (November 9, 2015 Order granting attorney's fees and expenses, and

22  Declaration of Michael W. Bien explaining RBGG's requested lodestar based on

23  RBGG's 2015 market rates, including my then-rate of $710 per hour.  True and

24  correct copies of the order and declaration are attached hereto as **Exhibit R**);

25          m.    *Armstrong v. Brown*, 805 F. Supp. 2d 918, 922 (N.D. Cal. 2011)

26  (compelling defendants to pay RBGG's "reasonable 2010 hourly rates," including

27  my then rate of $575);

28          n.    *Valdivia v. Brown*, 848 F. Supp. 2d 1141, 1143–44 (E.D. Cal.

1    2011) (granting motion to compel payment of fees at RBGG's 2010 rates of $275 to

2    $800 per hour, given finding that these rates are "are in line with prevailing rates

3    charged by other San Francisco Bay Area attorneys of comparable experience

4    working on similarly complex cases");

5            o.    *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th

6    Cir. 2010) (affirming RBGG's requested 2008 rates); and

7            p.    *L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888, 894–95 (E.D. Cal.

8    2009) (awarding full requested hourly rates of $295 to $640 for RBGG attorneys

9    "based on consideration of the 2008 market rates and the skill of the individual

10   attorneys").

11   **III.    PLAINTIFFS' COUNSEL'S LODESTAR IS REASONABLE IN LIGHT**
**OF THE COMPLEX AND DIFFICULT CHALLENGES POSED BY**
12   **THIS CASE**

13        20.    I am familiar with the billing and timekeeping practices of RBGG.

14   Timekeepers at our firm are required to make a record of the work they do at or near

15   the time the work is done, and to either personally enter that information into the

16   firm's timekeeping software or to direct a staff member to do so.  The firm's

17   timekeeping software maintains these records in the regular course of RBGG's

18   business, and making these records is a regular practice of RBGG in furtherance of

19   the practice of law.

20        21.    I am familiar with the skill and experience of all the timekeepers at

21   RBGG who worked on this matter.  As discussed in the Declaration of Van

22   Swearingen, filed herewith, my partner and co-lead counsel on this case,

23   Mr. Swearingen reviewed all of the relevant time entries billed by these timekeepers

24   and applied billing judgment reductions, where appropriate.

25        22.    In order to manage the case effectively and efficiently, I have met

26   regularly with Mr. Swearingen throughout the duration of the case to discuss project

27   assignments and supervision of attorneys and paralegals who work on this matter.

28   In staffing this case, including with regard to ADA issues, consistent with our firm's

usual practice, wherever possible, Mr. Swearingen and I delegated assignments to the lowest cost biller assigned to the case. In particular, we relied on associates like Mr. Anderson and Ms. Chartoff whenever possible. We also divided work between RBGG and co-counsel to ensure that all aspects of this complex litigation were handled appropriately and without duplication of effort.

23.    As explained in more detail below, RBGG attorneys spent substantial time working to resolve Plaintiffs' Third Claim for Relief and preparing the instant fees motion. At all stages of the litigation, we relied on our paralegals to assist in marshalling the facts needed to succeed.

24.    In particular, I reviewed and revised multiple pleadings, including those for expedited discovery, the preliminary injunction motions filed in 2022 and 2023, Plaintiffs' objections to the proposed ADA plan, and the Joint Motion for Preliminary Approval. I represented Plaintiffs in numerous hearings, settlement conferences, and meet and confers on this topic. I closely worked with Plaintiffs' ADA expert in drafting her reports and commenting on policies and procedures and attended the ADA inspections of Central Jail and Rock Mountain that Magistrate Judge David D. Leshner ("Judge Leshner") ordered as part of expedited discovery. I also took some of the Rule 30(b)(6) ADA depositions.

25.    I consulted regularly with my partner Van Swearingen regarding case strategy and the team's division of labor on various projects. Mr. Swearingen reviewed and revised many of the pleadings, including those for expedited discovery as well as the preliminary injunction motions filed in 2022 and 2023, and joint motions pertaining to Plaintiffs' disability claim. Mr. Swearingen regularly attended meet and confers with Defendants' counsel, including as to discovery disputes. Mr. Swearingen reviewed relevant materials, including records regarding whether incarcerated people housed in units for people with mobility disabilities were sleeping on the floor of Central Jail after the parties had resolved the portion of Plaintiffs' claim regarding housing accessibility for people with mobility

1  disabilities.

2        26.     Senior Counsel Priyah Kaul represented Plaintiffs in hearings and meet

3  and confers regarding expedited discovery on ADA issues.  She conducted

4  numerous interviews of incarcerated people with disabilities and assisted with those

5  individuals' declarations in support of Plaintiffs' 2023 Preliminary Injunction

6  Motion.  Ms. Kaul also analyzed and revised drafts of the 2023 Preliminary

7  Injunction Motion briefing.

8        27.     Associate Eric Monek Anderson was the primary drafter of Plaintiffs'

9  motion for expedited discovery on ADA issues and Plaintiffs' objections to

10  Defendants' proposed ADA plan.  He drafted documents in support of Plaintiffs'

11  2023 Preliminary Injunction Motion, including taking the lead role in assisting with

12  declarations by Plaintiffs' expert.  More broadly, he took the lead role in

13  coordinating with Plaintiffs' ADA expert, Syroun Sanossian, including but not

14  limited to accompanying Ms. Sanossian and her assistant at site inspections of all six

15  Jail facilities that she inspected.  Mr. Anderson assisted Ms. Sanossian with the

16  preparation of each site-specific report as well as her Rule 26 expert disclosure

17  reports.  He reviewed and revised discovery requests, and reviewed ADA-related

18  documents produced in discovery and pursuant to the parties' settlement

19  agreements.  Mr. Anderson took multiple depositions of Rule 30(b)(6) witnesses

20  related to ADA compliance.  He conducted many interviews of incarcerated people

21  with disabilities and assisted with those individuals' declarations in support of

22  Plaintiffs' 2023 Preliminary Injunction Motion.  Mr. Anderson represented Plaintiffs

23  in numerous settlement conferences and meet and confers.

24        28.     Associate Hannah Chartoff was the primary drafter of Plaintiffs' 2023

25  Preliminary Injunction Motion and many of its supporting documents, including

26  researching and drafting the Memorandum of Points and Authorities and Reply

27  Brief.  She conducted interviews of incarcerated people with disabilities and assisted

28  with those individuals' declarations in support of the 2023 Preliminary Injunction

1    Motion.  Ms. Chartoff also analyzed and helped form responses to Defendants'

2    initial proposed ADA Plan, following the June 21, 2023 Order.

3        29.    Ms. Kaul, Mr. Anderson, and Ms. Chartoff regularly worked with DLA

4    Piper attorneys to coordinate the subject matter and logistics for interviews with

5    incarcerated persons, which often required the assistance of sign language

6    interpreters and resulted in the drafting and execution of declarations submitted to

7    the Court.  Wherever possible, we asked DLA Piper attorneys, who were local, to

8    interview class members at the Jail.

9        30.    Associate Ben Holston interviewed incarcerated people with disabilities

10   in Central Jail regarding floor sleeping and assisted with those individuals'

11   declarations on the same topic.  He assisted with the representation of Plaintiffs in

12   meet and confers and hearings regarding resolution of the floor sleeping issue.

13       31.    Paralegals Kedra Chan, Ellie Heywood, and Lindsay Newfeld assisted

14   with preparing and e-filing pleadings, reviewing documents for use in pleadings and

15   expert reports, drafting and compiling the expert report indices, communicating with

16   incarcerated people with disabilities, and tracking these communications.

17       32.    RBGG claims 2,339 hours of compensable time for merits work in

18   connection with Plaintiffs' Third Claim for Relief (ADA) through January 20, 2025,

19   after significant billing judgment reductions.  Our claimed merits time, broken down

20   by the principal timekeepers, is as follows:

| Timekeeper | Position | Class | Hours | 2025 Rate/Hour | Total |
|---|---|---|---|---|---|
| Gay Grunfeld | Partner | 1984 | 635.3 | $1,325 | $841,772.50 |
| Van Swearingen | Partner | 2008 | 196.1 | $975 | $191,197.50 |
| Priyah Kaul | Sr. Counsel | 2015 | 99.7 | $750 | $69,790.00 |
| Eric Monek Anderson | Associate | 2017 | 869.5 | $600 | $521,700.00 |
| Hannah Chartoff | Associate | 2018 | 281.7 | $575 | $161,977.50 |

| Timekeeper | Position | Class | Hours | 2025 Rate/Hour | Total |
|---|---|---|---|---|---|
| Ben Holston | Associate | 2021 | 40.6 | $500 | $20,300.00 |
| Ellinor Heywood | Paralegal | - | 65.2 | $350 | $19,560.00 |
| Kedra Chan | Paralegal | - | 58.6 | $350 | $18,166.00 |
| Lindsay Newfeld | Paralegal | - | 92.3 | $350 | $32,305.00 |
| **Total** | | | **2,339** | | **$1,876,768.50** |

33.     Our total merits lodestar for this portion of the case through January 20, 2025, after billing judgment and a 5% across-the-board discount, is **$1,782,930.08**.

34.     Due to RBGG's extensive work on this litigation, our firm has been precluded from taking on many other matters, including both full-rate fee-paying and contingent fee work relating to jail/prison investigations and litigation, disability law, business and employment cases, and legal malpractice matters. I have turned down multiple employment law and other intakes each month in the past two years because I could not devote the time necessary to these potential clients due to the heavy workload in this case.

35.     RBGG began working on this matter nearly four years ago, in early 2021. Despite spending substantial time on this case, RBGG has not received any payment for work performed in this matter. Nevertheless, RBGG has had to pay the salary and benefits of the lawyers, paralegals, and support staff who have worked on this matter as well as the ADA expert costs, expenses for travel to San Diego, and overhead required to support our employees' work (including but not limited to rent, office supplies, computer support, and legal research and telephone charges).

36.     A summary of the key work performed by RBGG and our co-counsel in connection with Plaintiffs' Third Claim for Relief (ADA) through January 20, 2025, is set forth below.

IV. **RBGG INVESTED THE TIME NECESSARY TO BRING SAN DIEGO'S JAIL SYSTEM INTO COMPLIANCE WITH THE ADA**

A. **Defendants Have Long Been on Notice of Their Failure to Comply with the ADA and Related Law**

37.     The Supreme Court held that the ADA applies to prisons in 1998. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998). Defendants have been aware of their responsibilities under the ADA and similar state laws and regulations since that time. And in or around 2012, in the *Armstrong v. Newsom* (N.D. Cal. No. 4:94-cv-02307-CW) lawsuit, the California Department of Corrections and Rehabilitation ("CDCR") was required to issue a County Jail Plan that provided for certain remedies under the ADA. Pursuant to that remedial plan, which I monitor in my capacity as Plaintiffs' counsel in *Armstrong*, CDCR is required to inform California counties on a daily basis of the disability needs of people with disabilities who are incarcerated in county jails under the supervision of CDCR. As Plaintiffs' counsel in *Armstrong*, I receive emails each day at 8:00 a.m. and 9:30 a.m., sent by CDCR to officials at county jails, providing information about people with disabilities being housed in the jail while either (1) out to court from a CDCR facility; or (2) while being revoked from parole supervision. These CDCR emails describe, in some detail, the disability needs of people with physical, developmental, and mental health disabilities, including those who have hearing and mobility disabilities. Many of these emails that I receive are from CDCR to officials in the San Diego County Jail system. CDCR is also required to respond to grievances from parolees and out to court individuals in county jails, as well as to letters from my law firm regarding the accommodation needs of CDCR parolees with disabilities who are incarcerated in county jails.

38.     In addition, as part of our regular monitoring in *Armstrong*, attorneys from my firm interview *Armstrong* class members incarcerated in county jails. After these tours, dating back many years, attorneys in *Armstrong* have issued letters to CDCR and to San Diego County regarding failures to provide disability

accommodations at the Jail. These emails, as well as CDCR grievances and letters from our law firm described in greater detail below, have served as further notice to Defendants that they are covered by the ADA and that persons incarcerated in the Jail have disabilities that need to be accommodated.

39. Defendants' staff further recognized the need to comply with the ADA in a December 16, 2016 memorandum addressed to then-Assistant Sheriff for the Detention Services Bureau of the San Diego County Sheriff's Office, Rich Miller. This memorandum concluded that the Jail was out of compliance with the ADA in multiple respects, including but not limited to its physical plant ("[i]nsufficient or inappropriately designed ADA inmate housing" and ""[s]egregated housing for certain types of disabled inmates") and its policies ("[n]o comprehensive written Policy and Procedure on ADA," "[n]o equal access to programs for qualified ADA inmates," "[n]o streamlined method of tracking our ADA population," "[n]o formal training for all staff in dealing with the ADA inmate population and accommodation requirements," etc.). A true and correct copy of this memorandum, produced by Defendants in this case as SD_104531, is attached hereto as **Exhibit S**.

**B.      Plaintiffs' Counsel's Investigation of and Initial Litigation Regarding ADA Violations at the Jail.**

40. Notwithstanding Defendants' awareness of their ADA obligations, they failed to take steps to meet those obligations and vigorously fought this litigation. As part of our work on the *Armstrong* case, attorneys under my supervision write letters to CDCR describing issues faced by our *Armstrong* clients with disabilities in the Jail, and we provide copies of these letters to the Sheriff's Office (formerly the "Department") and County personnel. For example, on September 3, 2019, and July 28, 2021, attorneys under my supervision wrote to CDCR, copying the Sheriff's Office and County personnel, notifying them of individuals housed in the Jail who have been denied accommodations for their disabilities. The letter dated September 3, 2019 reports that Ernest Archuleta (now a class representative in this

1   case) fell and injured himself while walking down the stairs to his housing unit,

2   which lacked a shower chair and toilet grab bars.  The letter dated July 28, 2021

3   reports that James Clark (now a class representative in this case) had been denied a

4   cane and was "struggl[ing] to get in and out of bed, and is at risk of falling."

5       41.     In March 2021, I learned about the Jail's denials of disability

6   accommodations to Josue Lopez (now a class representative in this case), who is

7   Deaf and communicates primarily through sign language.  Mr. Lopez was confined

8   to the Jail for approximately 19 months and consistently denied sign language

9   interpretation for medical appointments in the Jail, as well as for interactions with

10  Jail staff.  During his initial mental health appointment, Mr. Lopez was handcuffed

11  to a bar during the interaction impeding his ability to use both of his hands to

12  effectively communicate.  In April 2021, my firm assisted Mr. Lopez in filing a

13  grievance over, among other things, the Jail's denials of sign language

14  interpretation, a true and correct copy of which is attached hereto as **Exhibit T**.

15      42.     These accommodation denials led my firm to begin an investigation

16  into conditions at the Jail, including learning about class representative Darryl

17  Dunsmore's pending lawsuit for, among other things, the Jail's denial of

18  accommodations for his mobility disability and confiscation of his assistive devices.

19  As part of my investigation, I reached out to a prominent nonprofit that specializes

20  in jail litigation, and they informed me they did not have the resources to bring this

21  case.  I also reached out to another prominent, large law firm in San Diego, which

22  also declined to be involved.  And the nonprofit that did join our effort later

23  substituted out of the case.

24      43.     On December 13, 2021, Oliver Kiefer, Van Swearingen, Priyah Kaul,

25  Eric Monek Anderson and I filed notices of appearance in this case.  My firm filed

26  the Second Amended Complaint, adding Messrs. Lopez and Archuleta, among other

27  individuals, as named plaintiffs on February 9, 2022.  *See* Dkt. 81.

28      44.     The operative Third Amended Complaint, filed on November 18, 2022,

1  Dkt. 231, asserts claims about Defendants' failures to accommodate Messrs.

2  Dunsmore, Lopez, Archuleta, and Clark as well as other incarcerated people with

3  disabilities under both federal and state law.

4        **C.    Early Attempts at Resolution Failed**

5        45.    Since we filed appearances in this case, we have reached out to

6  Defendants' counsel repeatedly to attempt to work with Defendants toward ADA

7  compliance at the Jail.  For example, about a month after filing the Second

8  Amended Complaint, Mr. Swearingen sent a letter to lawyers at the San Diego

9  Office of the County Counsel seeking agreement on class certification and a

10  proposal for efficient resolution of this matter through retention of neutral, mutually

11  agreed-upon experts to identify systemic ADA and other issues as well as effective

12  remedies that are tailored to San Diego County's system.  A true and correct copy of

13  Mr. Swearingen's March 15, 2022 letter is attached hereto as **Exhibit U**.  That letter

14  indicated that Defendants' agreement with these proposals would not only save the

15  County substantial resources and attorneys' fees, but also support a streamlined

16  framework for identifying and resolving deficiencies at the Jail.  Defendants'

17  counsel did not agree to either of Plaintiffs' proposals at that time, though they

18  finally stipulated to class certification approximately a year and a half later.

19        46.    On May 2, 2022, Plaintiffs filed Motions for Preliminary Injunction

20  and Provisional Class Certification ("2022 Preliminary Injunction Motion"), Dkt.

21  119, which requested remedies as to several unlawful practices at the Jail, including

22  Defendants' denial of access to critical programs, services, and activities by

23  incarcerated people with mobility disabilities.  Plaintiffs' 2022 Preliminary

24  Injunction Motion included a declaration from our ADA expert Syroun Sanossian of

25  SZS Engineering, Dkt. 119-9, a well-regarded, Certified Access Specialist

26  ("CASp") expert whose resume is attached hereto as **Exhibit V**.  Ms. Sanossian

27  pointed out multiple failures in the County's ADA compliance, including their

28  inadequate policies and procedures and lack of accessible features for people with

mobility disabilities.  Finding and retaining Ms. Sanossian was no easy task.  There are a few CASp-certified ADA experts in the state of California with experience assessing correctional systems.  After researching options and reaching out to other potential experts, I was able to retain Ms. Sanossian, who I knew about from her role as a neutral expert in *Hernandez v. County of Monterey*, N.D. Cal No. 5:13-cv-02354-BLF, a conditions case involving the Monterey County Jail.

47.    The 2022 Preliminary Injunction Motion was further supported by declarations from eleven incarcerated people describing Defendants' failures to provide disability accommodations and accessible housing.  Dkts. 119-12, 119-14, 119-16, 119-17, 119-18, 119-19, 119-21, 119-25, 119-28, 119-32, 119-34.

48.    Although the Court denied Plaintiffs' 2022 Preliminary Injunction Motion, its Order indicated that discovery would be helpful.  Dkt. 203 at 10 ("Discovery will no doubt edify the merits of Plaintiffs' claims beyond what currently exists and will assist the Court in understanding the true depths of the problems alleged as well as the remedies available.").

**D.    Expedited Discovery on Disability Access Issues Yields Additional Evidence of ADA Violations**

49.    Almost immediately after the Court's August 15, 2022 Order denying Plaintiffs' 2022 Preliminary Injunction Motion and indicating the need for discovery, Plaintiffs' counsel began discussing and preparing a motion for limited, expedited discovery related to the 2022 Preliminary Injunction Motion.  On September 7, 2022, Plaintiffs filed that motion, after the parties met and conferred and Defendants declined Plaintiffs' request for expedited discovery.  *See* Dkt. 212, Dkt. 212-2.

50.    On September 27, 2022, the day before the hearing on Plaintiffs' expedited discovery motion, the Court clerk informed all counsel of Judge Leshner's tentative order granting in part and denying in part Plaintiffs' request for expedited discovery.  The same day, Judge Battaglia dismissed Plaintiffs' Second Amended

1    Complaint, with leave to amend.  Dkt. 219.  In light of this development, Judge

2    Leshner denied Plaintiffs' motion for expedited discovery as moot.  Dkt. 221.

3           51.    Plaintiffs filed a Third Amended Complaint on November 18, 2022.

4    Dkt. 231.  On December 14, 2022, Plaintiffs moved for limited, expedited discovery

5    only as to ADA issues, after Defendants again declined to provide such discovery.

6    *See* Dkt. 243-1, 243-2.

7           52.    I traveled to San Diego and participated in a lengthy hearing on

8    January 9, 2023 with Judge Leshner and defense counsel regarding expedited ADA

9    discovery.  On January 17, 2023, Judge Leshner issued an order permitting

10   expedited ADA discovery with respect to mobility and hearing disabilities at two

11   Jail facilities, Central Jail ("Central"), located at 1173 Front Street, San Diego,

12   California, and Rock Mountain Detention Facility ("Rock Mountain"), located at

13   446 Alta Road, San Diego, California.  *See* Dkt. 258.  Plaintiffs identified these two

14   facilities based on our understandings that (1) Defendants were, at the time of the

15   motion, clustering incarcerated people with mobility disabilities requiring them to

16   use wheelchairs at Central; (2) Defendants' counsel's representations that Rock

17   Mountain would be an "entirely ADA compliant" facility [August 31, 2022 Hearing

18   Tr. at 17:8-9 (quoting defense counsel)]; and (3) Defendants intended to move all

19   incarcerated people with disabilities to Rock Mountain so that they could "begin

20   retrofitting [C]entral [J]ail" to be ADA compliant [December 7, 2022 Hearing Tr. at

21   9:19-23 (quoting defense counsel)].  *See also* Dkt. 153-8, ¶ 9 (declaration filed by

22   Defendants stating:  "The intent for Rock Mountain is to house all types of

23   physically disabled inmates at Rock Mountain rather than housing them in one

24   module on each floor at Central.").  The Court's January 17, 2023 Order permitted

25   Plaintiffs to submit written discovery, inspect Jail facilities, and conduct depositions

26   of Defendants' Rule 30(b)(6) witnesses.  *See* Dkt. 258.

27          53.    On February 10, 2023, as authorized by the Court's January 17, 2023

28   Order, RBGG associate Eric Monek Anderson and I inspected the Rock Mountain

1    facility with Plaintiffs' ADA experts, Syroun Sanossian and Io Seng Ng of SZS
2    Engineering.  The facility was unoccupied and incomplete, lacking a kitchen, sinks,
3    and other basic features of operation.  We were accompanied during our inspection
4    by Defendants' counsel, Susan Coleman; Defendants' retained ADA expert, Paul
5    Joelson; and a project manager with the Sheriff's Office, Scott Bennett.  After the
6    inspection, Mr. Anderson and I worked with Ms. Sanossian to draft a 237-page
7    report identifying hundreds of barriers to disability access at Rock Mountain.  *See*
8    Dkt. 281-3, Ex. B.

9          54.    On February 27, 2023, Defendants produced documents responsive to
10   Plaintiffs' written discovery, Bates stamped SD_00081 through SD_000431.
11   Defendants produced three grievances related to ADA issues.  Defendants also
12   produced the existing policies and procedures that purported to address people with
13   disabilities in the Jail.  These types of documents are available on the County
14   website or through Public Record Act requests, but occasionally with redactions.  I
15   have been informed and believe that the documents called "policies and procedures"
16   apply throughout Defendants' system, whereas the documents called "green sheets"
17   apply only to a particular jail facility.  Defendants later produced additional
18   documents related to disability access.

19         55.    On March 13, 2023, as authorized by the Court's January 17, 2023
20   Order, Mr. Anderson and I inspected the Central Jail facility with Plaintiffs' ADA
21   experts, Ms. Sanossian and Mr. Ng.  We were accompanied during the inspection by
22   Defendants' counsel, Ms. Coleman, as well as Mr. Bennett.  After the inspection,
23   Mr. Anderson and I worked with Ms. Sanossian to draft a 358-page report identifying
24   hundreds of barriers to disability access at Central Jail.  *See* Dkt. 281-3, Ex. C.

25         56.    Consistent with the Court's January 17, 2023 order, we also conducted
26   Rule 30(b)(6) depositions as to Defendants' policies and practices regarding the
27   accessibility of facilities, housing, programs, services, activities, effective
28   communication, reasonable accommodations, and assistive devices for incarcerated

people with disabilities. Defendants initially designated three witnesses as the persons most knowledgeable on the noticed topic: Matthew Jensen, who was deposed on March 14, 2023, regarding the Video Relay Services ("VRS") system at Central Jail and the disability-related policies and procedures for Rock Mountain; Derek Williamson, who was deposed on March 14, 2023, regarding Defendants' exploration of a new phone system provider; and Kyle Bibel, who was deposed on March 15, 2023, regarding disability accommodations at Central Jail. However, those witnesses were unable to testify regarding critical portions of the topics noticed, in particular, the provision of sign language interpretation and changes and alterations to the physical structure of Central Jail for purposes of disability access. We therefore deposed two additional Rule 30(b)(6) designees, Michael Barragan and Darren Bennett, on April 20, 2023. Associates at RBGG and DLA Piper took each of the depositions, and took the primary roles in preparing for them. I attended and assisted at the first three depositions, in part to prepare for Plaintiffs' second motion for preliminary injunction as to ADA issues.

57. In addition to the discovery outlined above, Plaintiffs' counsel investigated the Jail's failures to comply with the ADA through Public Records Requests and through interviews with incarcerated people, many of whom ultimately submitted written declarations in support of our motions for preliminary injunction. In order to interview and gather declarations from Deaf incarcerated people, we hired sign language interpreters to accompany us to the Jail for interviews. Interviewing interpreters, assessing their availability, confirming their documentation to enter the jail, and coordinating visits to meet with attorneys and incarcerated people at the Jail required considerable time and effort.

58. In order to interview incarcerated people at the Jail, attorneys at my firm and those of our co-counsel, as well as interpreters when necessary, frequently were required to wait at the Jail for multiple hours at a time for an interview room to become available.

59.    On February 8, 2023, my colleague Mr. Swearingen informed Defendants' counsel by letter of the numerous barriers to efficiently interviewing incarcerated people, and requested that Defendants provide a mechanism to schedule remote visits, as provided to attorneys with San Diego County's Office of the Public Defender.  Mr. Swearingen ended by stating:  "We are interested in other cost-saving ideas that you may have."  A true and correct copy of Mr. Swearingen's February 8, 2023 letter is attached hereto as **Exhibit W**.  Defendants did not agree to Plaintiffs' request, nor provide any cost-saving ideas for conducting interviews with incarcerated persons.

**E.    Plaintiffs' Offer to Resolve ADA Issues without Litigation Fails Again**

60.    Following Plaintiffs' inspection of two jails and taking several of Defendants' Rule 30(b)(6) witness depositions, all related to ADA compliance, I sent a letter to Defendants' counsel on April 4, 2023 stating that Plaintiffs would forgo filing their preliminary injunction as to ADA issues on the condition that Defendants agree to an Early Neutral Evaluation that would include the simultaneous mutual exchange of expert ADA reports, the filing of a joint statement identifying points of agreement to be included in a remedial plan and any points of disagreement, and the development of an ADA plan to timely remedy, at minimum, all points of agreement that would result in a stipulated order to be submitted to the Court with Court oversight of the process.  A true and correct copy of my April 4, 2023 letter is attached hereto as **Exhibit X**.  Defendants' counsel did not agree to Plaintiffs' proposal.

**F.    Second Preliminary Injunction Motion Regarding Disability Access**

61.    On April 25, 2023, Plaintiffs' counsel filed Motions for Preliminary Injunction and Provisional Class Certification ("2023 Preliminary Injunction Motion").  Dkt. 281.  The 2023 Preliminary Injunction Motion, which was primarily researched and drafted by associate Hannah Chartoff, addressed two aspects of

Defendants' failure to comply with the ADA:  the lack of sign language interpretation for Deaf people incarcerated throughout the Jail system and the inaccessibility of jail facilities for people with mobility disabilities.  The 2023 Preliminary Injunction Motion was accompanied by, among other things, a declaration from Plaintiffs' expert Ms. Sanossian regarding the two Jail facilities that she inspected and new declarations from over a dozen people with disabilities who were incarcerated in the Jail.

62.     On May 17, 2023, Defendants filed an opposition to the 2023 Preliminary Injunction Motion.  Dkt. 311.  In that opposition, Defendants contended that the issues were moot and argued that many remedies sought by Plaintiffs had either already been implemented or were in the process of being implemented as of the date of filing.  *Id.* at 1.

63.     In light of Defendants' assertion that ongoing changes were occurring at the Jail regarding disability access, RBGG, along with our co-counsel, continued to interview incarcerated people with disabilities regarding conditions at the Jail between May 17, 2023 and May 26, 2023, to gather additional declarations in support of Plaintiffs' reply brief.

64.     On May 24, 2023, the parties, including counsel, party representatives, and the parties' ADA experts, attended an in-person Early Neutral Evaluation led by Judge Leshner.  Dkt. 302.

65.     On May 26, 2023, we filed a reply brief in support of the 2023 Preliminary Injunction Motion, which was accompanied by, among other things, a declaration from Plaintiffs' ADA expert, seven new declarations from incarcerated people, and a declaration from a mental health clinician who worked at the Jail, including with incarcerated persons with disabilities, from April 2019 until April 2022.  Dkt. 320.

66.     A hearing on the 2023 Preliminary Injunction Motion was scheduled for June 29, 2023.  On June 5, 2023, I received a call from the chambers of this

1    Court, asking for clarification regarding Exhibit Z to my declaration in support of

2    the 2023 Preliminary Injunction Motion, Dkt. 284-2.  Exhibit Z comprised two

3    rosters, produced by Defendants in connection with Plaintiffs' inspection of Central

4    Jail, documenting the housing placements of people with disabilities at Central Jail

5    as of February 27, 2023 and March 10, 2023.  The Court clerk asked whether, in

6    column E ("Bed") of the rosters, the entry "T" indicates a top bunk.  I responded

7    that it did.  Notably, Exhibit Z reflected that multiple people with mobility

8    disabilities were housed inaccessibly in the middle and top bunks of three-tiered

9    beds.  *See, e.g.*, Dkt. 284-2 at Z-425.  In other words, people who needed

10   wheelchairs, walkers, and canes were sometimes housed on the top bunk of a triple

11   bunk bed—a dangerous practice in clear violation of the ADA.  As requested by the

12   Court, I filed a supplemental declaration with further explanation of Exhibit Z.  Dkt.

13   329.

14            **G.    The First ADA Settlement**

15        67.    Following the May 24, 2023 in-person Early Neutral Evaluation, the

16   parties continued to engage in settlement talks with the assistance of Judge Leshner.

17   Shortly after the filing of my Court-requested supplemental declaration regarding

18   the bed assignments of wheelchair users at Central Jail, Defendants became serious

19   about settlement, and after substantial meet and confer efforts, an agreement was

20   reached on June 16, 2023.

21        68.    On June 20, 2023, the parties filed a Stipulation and Proposed Order

22   Regarding Accessibility and Central Jail, Effective Communication Policy and

23   Practice, and Provisional Class Certification.  Dkt. 350.

24        69.    Shortly after filing the Stipulation, Susan Coleman, counsel for

25   defendants, emailed the Court and me regarding punctuation in the document that

26   she requested be removed.  Even after I sent a revised version to the Court and

27   Ms. Coleman, she responded that the punctuation Defendants objected to remained.

28   However, that was incorrect; the offending punctuation had been removed.

Attached hereto is **Exhibit Y** is a true and correct copy of multiple emails between the Court, Ms. Coleman and me regarding this issue over the course of at least two hours.  Ultimately, Ms. Coleman admitted that she had misread the document.  This exchange, and others in which Defendants' counsel have failed to use track-changes (as repeatedly requested by Plaintiffs' counsel), have required me and other attorneys on my team to spend extra time on this case than would otherwise be necessary.

70.    As a result of the emails with Ms. Coleman, I withdrew Dkt. 350 and filed a corrected document.  On June 21, 2023, the Court entered an Order approving the first ADA settlement, the Joint Motion and Order re Accessibility at Central Jail, Effective Communication Policy and Practice, and Provisional Class Certification ("2023 ADA Order").  Dkt. 355.  The 2023 ADA Order provided for provisional certification of the following subclass:

> Incarcerated People with Hearing and/or Mobility Disabilities subclass defined as "all qualified individuals with a hearing and/or mobility disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in the Jail.

*Id.* at 2.  The 2023 ADA Order promised numerous remedies related to the provision of sign language interpretation for people with hearing disabilities as well as agreements that Defendants would revise their ADA policies and remedy certain physical features at Central Jail to accommodate people with mobility disabilities. *Id.* at 2–7.  For example, the 2023 ADA Order required Defendants to develop a plan (the "ADA Plan"), which would then be provided to Plaintiffs and ultimately entered as an enforceable order by the Court, to remedy the accessibility and effective communication issues identified in the 2023 Preliminary Injunction Motion.  In addition, the 2023 ADA Order required that, once the ADA Plan was adopted by the Court, Plaintiffs would be allowed to access certain documents as well as to inspect the remediation at Central Jail.  The 2023 ADA Order also required Defendants to retain an independent expert "to ensure timely and

1  appropriate implementation of the plan." Dkt. 355, ¶ 11.

2      71.    Immediately after the Court entered the 2023 ADA Order, the Sheriff's

3  Office issued a press release, available on its public website, announcing the

4  changes that would be implemented at the Jail as a result of the 2023 ADA Order,

5  including construction at Central Jail to provide accessible housing as well as the

6  evaluation of each person entering the Jail to determine if they have a disability

7  requiring effective communication.  https://www.sdsheriff.gov/Home/Components/

8  News/News/2031/514.  The press release states that "Sheriff Kelly A. Martinez is

9  grateful for the work that went into this mutually agreed upon settlement" and that

10  she "and her team are committed to compliance with all the terms." *Id.*  The 2023

11  ADA Order was the subject of an article in the San Diego Union-Tribune, a true and

12  correct copy of which is attached here to as **Exhibit Z**.

13      **H.    Negotiations and Litigation Regarding Defendants' Proposed ADA
          Plan**
14

15      72.    On August 22, 2023, Defendants sent Plaintiffs their proposed ADA

16  Plan to implement the 2023 ADA Order.  On September 5, 2023, I sent Defendants

17  a letter outlining Plaintiffs' concerns with Defendants' proposed ADA Plan and

18  requesting a meet and confer call with Defendants *and* the parties' respective

19  experts, in accordance with the procedures outlined in the 2023 ADA Order.  In that

20  letter, I noted that it would be sensible for Defendants to engage Plaintiffs' expert in

21  the policy revision process in order to avoid disputes and potential litigation on

22  these matters down the road.  A true and correct copy of my September 5, 2023

23  letter is attached hereto as **Exhibit AA**.

24      73.    Counsel for the parties met and conferred regarding Defendants'

25  proposed ADA Plan on September 19, 2023.  Defendants' counsel declined to allow

26  the parties' experts to participate in the meet and confer, contrary to the 2023 ADA

27  Order.

28      74.    The next day, September 20, 2023, Plaintiffs sent a letter providing

1   information that Defendants requested on the meet and confer call and

2   memorializing Plaintiffs' requests for more information and documentation about

3   proposed and/or ongoing changes at the Jail.  A true and correct copy of that letter is

4   attached hereto as **Exhibit BB**.  On October 3, 2023, Defendants responded by

5   email to some but not all questions in the letter.

6       75.    Defendants filed their proposed ADA Plan with the Court on

7   October 5, 2023, incorporating few of Plaintiffs' requested revisions to their plan.

8   *See* Dkt. 409.

9       76.    Because Defendants did not incorporate the majority of Plaintiffs'

10   recommended revisions, Plaintiffs filed an objection to Defendants' proposed ADA

11   Plan on October 20, 2023, which was accompanied by, among other things, a

12   declaration from Plaintiffs' ADA expert.  Dkt. 416.  Plaintiffs' objections included

13   Defendants' failure to include the parties' experts as part of the meet and confer

14   process, which may have obviated the need for litigation on some of these issues.

15       77.    On April 24, 2024, the Court issued an Order agreeing with Plaintiffs'

16   objections to Defendants' proposed ADA plan on all contested issues.  The Court

17   ordered Defendants to issue revised ADA policies and train their staff accordingly

18   by June 1, 2024, instead of the January 1, 2024 date that Plaintiffs had requested, as

19   that date had passed.  Dkt. 620.  In addition, the Court ordered the parties—

20   including their experts—to participate in a further meet and confer process.  *Id.* at 6.

21       78.    On June 3, 2024, in conjunction with broader settlement discussions

22   being overseen by Judge Leshner, the parties conducted a meet and confer in-person

23   at the federal district court with their experts.  As part of that process, Defendants

24   provided plans and specifications for the Central Jail renovations, which Plaintiffs'

25   expert Ms. Sanossian reviewed.  After the meet and confer, on June 7, 2024,

26   Plaintiffs provided Defendants with a list of issues and questions from Plaintiffs'

27   review of the construction drawings for ADA renovations at Central Jail.

28   Defendants provided a response to those issues on June 14, 2024, and the parties

1   engaged in further discussions over the next few weeks.

2        79.    On June 26, 2024, Defendants provided Plaintiffs with their proposed

3   Amended ADA Plan.  On June 28, 2024, Plaintiffs sent Defendants a letter

4   requesting changes to the Amended ADA Plan and identifying aspects of the

5   Amended ADA Plan that failed to comply with either the Court's Order on the

6   objections, Dkt. 620, or the 2023 ADA Order, Dkt. 355.  After further meet and

7   confer, Defendants agreed to implement most of the changes that Plaintiffs

8   requested, and on August 23, 2024, the parties filed a joint motion to approve the

9   Amended ADA Plan.  Dkt. 695.  The Court approved the Amended ADA Plan the

10  same day.  Dkt. 696.

11  **I.     Enforcement of the 2023 ADA Order and Defendants' Amended
         ADA Plan.**

12

13       80.    Even before this Court approved Defendants' ADA plan, Plaintiffs

14  engaged in efforts to enforce the 2023 ADA Order.  For example, every month,

15  beginning September 1, 2023, we received rosters showing the location and

16  accommodations being offered to all persons with mobility and hearing disabilities

17  at Central Jail.  We also interviewed persons reflected on that roster, including Deaf

18  signers.

19       81.    As the Court's June 1, 2024 deadline to revise policies and procedures

20  under the 2023 ADA Order approached, Defendants asked us to comment on their

21  revisions to three of their ADA policies.  We did so via a letter dated May 10, 2024,

22  a true and correct copy of which is attached hereto as **Exhibit CC**.  Defendants

23  made some, but not all, of our requested revisions to these policies.

24       82.    On April 2, 2024, following up on an inspection of Central Jail on

25  March 25, 2024, I wrote to Defendants based on information I received about a Deaf

26  signer who had not received sign language interpretation as required by the ADA

27  Order.

28       83.    On May 15, 2024, as part of Plaintiffs' ongoing litigation on other

aspects of this case, I participated in an inspection of Central Jail. During that inspection, I learned that individuals with disabilities were sleeping on mattresses on the floor of the ADA units at Central Jail, which was concerning to me for multiple reasons, including because Plaintiffs had already litigated the issue of accessible and adequate sleeping facilities for incarcerated people with mobility disabilities at Central Jail and obtained relief under the 2023 ADA Order. I raised my concern about these issues to counsel for Defendants on multiple occasions, including through a letter dated May 21, 2024, a true and correct copy of which is attached hereto as **Exhibit DD**, during a Court-ordered meet and confer on May 22, 2024 and by letter on the same day, a true and correct copy of which is attached hereto as **Exhibit EE**. Counsel for Defendants disputed these reports of floor sleeping. In light of this factual dispute, I requested video footage from the relevant units for April and May 2024, which Defendants declined to produce.

84. In response to my raising these issues, counsel for Defendants asserted, in red font in the parties' Court-ordered meet and confer agenda, that Plaintiffs' counsel had sent an "inaccurate letter" and had engaged in "intentional interference with jail operations putting their clients at risk." The meet and confer agenda further stated that Defendants intended to "request" "Court intervention" on this issue. A true and correct copy of that meet and confer agenda is attached hereto as **Exhibit FF**.

85. During a May 29, 2024 further meet and confer discussion, counsel for Defendants stated on a videorecorded Zoom call that named plaintiff James Clark, who is one of the class members who reported on these issues, had been taped "on body-worn camera talking to a sergeant that he was instructed by your office not to contact the ADA unit and not to tell any deputies that there were issues." Defense counsel further stated that Mr. Clark "is clearly under the understanding, that he is not to tell staff, and he is to let you handle it." I responded that it is not my practice or my firm's practice to instruct clients not to contact Jail staff. I also requested to

1  see the video of the interview; however, Defendants declined to produce it. The

2  contentions made by Defendants' counsel required substantial investigation by

3  Plaintiffs' counsel and meet and confer with Defendants' counsel.

4      86.    On May 30, 2024, counsel for Defendants emailed us stating: "My

5  clients are considering their next steps regarding Mr. Clark's statement which may

6  include application to the judge for a restraining order against any such instructions

7  going forward and an instruction to advise all your clients that they are to bring all

8  issues to staff without any restriction on also conveying that information to your

9  office." A true and correct copy of that email exchange is attached hereto as

10  **Exhibit GG**.

11      87.    On May 31, 2024, Plaintiffs submitted six declarations from *Dunsmore*

12  class members to Judge Leshner's Chambers as part of a broader set of documents

13  in advance of the June 3, 2024 ADA settlement conference. Each of the six

14  declarants stated that they personally observed floor sleeping in two ADA housing

15  units at Central Jail.

16      88.    On June 9, 2024, Plaintiffs again requested, as part of the Court-

17  ordered meet and confer process, to obtain video from the units at Central Jail where

18  floor sleeping had been reported, as well as the interview footage of Mr. Clark. A

19  discovery conference on those requests was held on July 1, 2024. Elizabeth Pappy,

20  counsel for Defendants, stated at that hearing that Mr. Clark had told staff that "the

21  lady lawyer told me not to tell staff [about floor sleeping, but instead to] call counsel

22  first." July 1, 2024 Hearing Tr. at 15:21-24. Following that conference, Judge

23  Leshner ordered production of video footage of three specific nights in May 2024,

24  as well as the interview of Mr. Clark described above. Dkt. 672. These productions

25  were "made subject to paragraph 20 of the Order dated June 21, 2023 [Dkt. 355]

26  pending further order of the Court." *Id.* As such, they cannot be attached to this

27  declaration.

28      89.    My colleagues and I subsequently reviewed the video footage of

Mr. Clark's interview and the three overnights in the ADA units at Central.

90.     In response to Plaintiffs' counsel's advocacy concerning floor sleeping, Defendants issued a policy revision at Central Jail (Green Sheet No. I.43.C.1) that required Jail staff to conduct counts of incarcerated people "at their assigned bunks." The ADA settlement we ultimately reached includes broader protections against floor sleeping. Dkt. 776 ¶¶ 40-41

91.     Throughout the summer of 2023, including between the Court's entry of the 2023 ADA Order, which required Defendants to create an ADA Plan in response to Plaintiffs' 2023 Preliminary Injunction Motion, and the entry of the August 23, 2024 ADA Plan, Plaintiffs continued to monitor Defendants' compliance with the 2023 ADA Order. On August 16, 2023, I wrote to Defendants to propose the names and provide the resumes of two potential neutral experts. Attached hereto as **Exhibit HH** is a true and correct copy of my August 16, 2023 letter, which also set forth the timeline for compliance with the ADA Order. Defendants' counsel rejected both of my proposed neutral experts. On December 12, 2023, I proposed a third CASp-certified expert, Eric McSwain, who was ultimately accepted by Defendants' counsel.

92.     Notably, even after the Court entered an order provisionally certifying the Subclass of incarcerated people with disabilities on June 21, 2023 *and* after the Court entered an order granting class certification on November 3, 2023, Dkt. 435, Defendants would not provide unredacted versions of the disability rosters that Defendants are required to provide under the 2023 ADA Order. As a result, Plaintiffs' counsel was unable to learn the names of all class members identified in the rosters. Resolving this issue required multiple iterations of correspondence with Defendants' counsel and preparation of a letter to invoke the Court's informal dispute resolution procedure. Eventually, Defendants agreed to provide the rosters without redactions to class members' identities. Plaintiffs' monitoring pursuant to the 2023 ADA Order uncovered additional areas of non-compliance with the ADA.

For example, Plaintiffs identified instances in which Defendants failed to provide accommodations to Deaf people who communicate via sign language, including but not limited to by requiring them to wear a handcuff(s) while attempting to use a video-relay service, a practice that significantly impairs their ability to communicate. Plaintiffs submitted letters dated January 5, 2024 and April 2, 2024 and multiple advocacy emails to Defendants about issues with the Video Relay Services ("VRS") system for effective communication at Central Jail.

93.     On September 9, 2024, we wrote to Defendants' counsel requesting access to documents and records relevant to the provision of sign language interpretation to incarcerated people with hearing disabilities. Attached hereto as **Exhibit II** is a true and correct copy of that letter requesting specific documents under the 2023 ADA Order. We did not receive any records until December 11, 2024, and only after multiple follow-up communications to Defendants' counsel.

94.     Also in September 2024, the agreed upon neutral expert Mr. McSwain began his work to evaluate Defendants' progress with the Amended ADA Plan. Mr. McSwain has now conducted three inspections of the ADA renovations at Central Jail and issued two reports. Plaintiffs have responded to Mr. McSwain's detailed questions following his inspections, responded to his first report, and are in the process of responding to his second report. Doing so often requires consultation with Plaintiffs' expert, Ms. Sanossian, and her team.

95.     Under the 2023 ADA Order, Plaintiffs and their expert are entitled to conduct two inspections of the ADA construction renovations at Central Jail to ascertain whether Defendants have adequately modified their housing for people with mobility disabilities. *See* Dkt. 355, ¶ 14. Plaintiffs' expert Io Seng Ng, who works under the supervision of Ms. Sanossian, accompanied by Mr. Anderson, conducted the first such inspection of Central Jail on January 28, 2025. This inspection will inform Plaintiffs' responses to Mr. McSwain's questions and report, as well as provide Plaintiffs the ability to discuss solutions to the accessibility issues

1    that Mr. McSwain and Plaintiffs have identified.

2    **J.    Litigation and Negotiations Regarding the Remainder of Plaintiffs' Third Claim for Relief**

3

4    96.    At the same time as the parties were working to implement the 2023

5    ADA Order and discussing a broader ADA settlement, the parties continued to

6    litigate the remainder of Plaintiffs' Third Claim for Relief.  This included extensive

7    fact and expert discovery.

8    97.    For example, in early 2024, pursuant to a Court order granting

9    Plaintiffs' motion to compel expert inspections of Jail facilities, Dkt. 478,

10    Ms. Sanossian and Mr. Seng or Nadia Pagaduan inspected four additional Jail

11    facilities.  Ms. Sanossian conducted full-day inspections of George Bailey Detention

12    Facility (January 16, 2024), Vista Detention Facility (January 17, 2024), Las

13    Colinas Detention and Reentry Facility (January 18, 2024), and East Mesa Reentry

14    Facility (January 19, 2024).  Ms. Sanossian was accompanied by Mr. Anderson

15    during each of these inspections.  Ms. Sanossian did not inspect South Bay

16    Detention Facility because Defendants represented that it was not accessible to

17    people with disabilities.

18    98.    Defendants provided document productions containing information

19    about their disability policies and practices in late 2023 and the first-half of 2024,

20    and Plaintiffs took additional ADA-related 30(b)(6) depositions prior to the close of

21    fact discovery on May 7, 2024.  These included depositions of Lieutenant Livian

22    Cole, of the Sheriff's Office's ADA Unit, and a second deposition of Scott Bennett.

23    On August 25, 2023 the parties met with Judge Leshner to discuss settlement of

24    class certification.  At Defendants' request, following up on the settlement

25    conference, I wrote a letter describing the elements of a remedial plan to resolve the

26    claims of a disability subclass in the Third Claim for Relief.  On March 6, 2024, the

27    parties resumed settlement discussions regarding the remainder of the Third Claim

28    for Relief.  For each settlement conference, whether held remotely or in person,

1   Plaintiffs' counsel were required to undertake preparatory and follow-up work.  For

2   example, on March 8 and 15, 2024, we provided substantive information under the

3   settlement privilege to Defendants' counsel in response to questions raised at the

4   March 6, 2024 settlement conference.

5          99.    The parties attended another settlement conference by Zoom with

6   Judge Leshner on April 19, 2024.  In advance of the conference, Plaintiffs sent

7   Defendants a summary of issues identified by Ms. Sanossian during her facility

8   inspections, which was the product of discussion between my team and

9   Ms. Sanossian.  After the April 19, 2024 settlement conference, Judge Leshner set a

10  further conference for June 3, 2024.

11         100.   Prior to the June 3, 2024 conference, Defendants sent Plaintiffs a

12  seven-page proposed agreement to resolve the remainder of the Third Claim for

13  Relief.  Plaintiffs prepared and sent a counterproposal that was 34 pages long.  The

14  parties attended the settlement conference with Judge Leshner on June 3, 2024.

15         101.   After the June 3, 2024 settlement conference, the parties continued to

16  engage in settlement conferences regarding the Third Claim for Relief with the

17  assistance of Judge Leshner over the next several months.  The parties participated

18  in settlement conferences on July 3, July 10, July 29, October 9, October 18,

19  October 28, November 4, November 6, November 13, and November 20, 2024.

20  Some of the settlement conferences, like the June 3, 2024 conference, occurred in

21  person in San Diego and occupied all or most of a day.  Other conferences occurred

22  via Zoom.  In addition, counsel for Plaintiffs and counsel for the County, as well as

23  legal counsel from the Sheriff's Office, met several times via Zoom in the summer

24  and fall of 2024 outside the presence of Judge Leshner to discuss settlement of the

25  Third Claim for Relief.

26         102.   Between conferences, Plaintiffs sent letters to Defendants' counsel

27  under the settlement privilege addressing substantive issues raised during the

28  meetings, such as the applicable legal standards governing accessibility and

1    effective communication and information about practices in other jails.  These

2    included letters dated June 28 and July 15, 2024 to Defendants' counsel and

3    October 9, 2024 to Judge Leshner.  In addition, the parties exchanged many redlined

4    versions of the draft ADA settlement agreement, which was about 40 pages or

5    longer during most of the negotiations.  At Judge Leshner's suggestion, the parties

6    explained revisions with citation to authorities if appropriate.  Each round of

7    revisions took considerable effort and coordination with my firm and our co-

8    counsel, Aaron Fischer, although Mr. Anderson took the primary role in reviewing

9    Defendants' redlines and proposing further revisions.  Often, we consulted with our

10   expert Ms. Sanossian about specific provisions of the agreement or questions that

11   arose during negotiations.  After Defendants failed to redline all of their changes to

12   the agreement at one point during the exchange of the agreement, we began running

13   our own redlines to confirm that Defendants had in fact redlined all changes made in

14   the version sent to us.

15          103.   On November 22, 2024, the parties reached a settlement in principle of

16   the remainder of the Third Claim for Relief.  On Defendants' side, the settlement

17   agreement required approval by the San Diego County Board of Supervisors.  The

18   Board of Supervisors approved the settlement agreement in closed session on

19   December 11, 2024.  Pursuant to the Court's instructions, the parties filed a joint

20   status report on December 11, 2024, advising the Court of the settlement agreement.

21   Dkt. 774.  Plaintiffs, as with most joint filings in this case, took the lead on drafting

22   and filing the joint status report.  That same afternoon, the Sheriff's Office issued a

23   press release announcing the settlement agreement, which acknowledged that

24   modifications required by the settlement "will increase access for incarcerated

25   persons with disabilities."  https://www.sdsheriff.gov/Home/Components/News/

26   News/3103/.  The ADA Settlement was the subject of an article in the San Diego

27   Union-Tribune, a true and correct copy of which is attached here to as **Exhibit JJ**.

28          104.   On December 12, 2024, the parties filed the settlement agreement,

which is styled as a joint motion. Dkt. 776. The Court approved the joint motion the same day. Dkt. 777. In that order, the Court ordered the parties to file their motion for preliminary approval of the settlement agreement within 30 days. *Id.*

105. The parties filed their joint motion for preliminary approval on January 10, 2025. Dkt. 792. Plaintiffs took the lead on researching and drafting the motion for preliminary approval and the proposed notice to the subclass, as well as finalizing and filing the motion and supporting papers.

**K.    Plaintiffs' Counsel's Lodestar is Reasonable, Especially in Light of the Challenges Faced in this Litigation and the Outstanding Result Obtained**

106. Having considered the time entries submitted with this fees motion, it is my opinion that the work documented in those time records was reasonably necessary to obtain the relief provided through the above-described settlement agreements and Court orders.

107. This has been a hard fought and contentious litigation. Although Defendants and their experts never claimed the Jail facilities were accessible and they acknowledged their policies and procedures required revision, Defendants' counsel continued to litigate the Third Claim for Relief, including past the deadline for expert disclosures. Based on my extensive experience reviewing billing entries and litigating and monitoring ADA issues, I do not believe we could have achieved such an outstanding result unless we expended the time that we did.

108. This is an excellent result for the class. When Mr. Lopez wrote our firm in March 2021, Defendants had no ADA grievance procedure, no sign language for Deaf signers, inadequate policies and procedures and almost entirely inaccessible facilities. The two ADA settlements together, if properly implemented, contemplate all of this relief and provide for expedited interviews with Subclass members, neutral experts, enhanced program access, checks on floor sleeping, and a host of other remedies. The ADA Settlements should bring the San Diego Sheriff's Office into compliance with the ADA and provide relief for the thousands of

1  persons with disabilities who are incarcerated in the jails yearly.  And relief,

2  especially through construction and renovations, will occur more quickly than if

3  Plaintiffs had won at trial.

4        109.   My colleagues and I will keep a close eye on all compliance efforts as

5  we move forward, as contemplated by the ADA Settlement.  We will be working

6  with Defendants to choose a policy and procedure neutral expert soon.  We will also

7  review correspondence from class members, inspect with the neutral experts,

8  interview Subclass members and raise any disputes with Judge Leshner, if

9  necessary.

10  **V.    PLAINTIFFS' COUNSEL'S COSTS AND EXPENSES WERE
         REASONABLY INCURRED AND NECESSARY TO ACHIEVE
11        RESOLUTION OF THEIR THIRD CLAIM FOR RELIEF**

12        110.   As described above, Plaintiffs relied heavily on their qualified ADA

13  expert, Syroun Sanossian, who is an experienced CASp inspector, and her

14  colleagues.  The ADA and the California Building Code both contain highly

15  technical accessibility standards, about which Ms. Sanossian possesses vast

16  expertise.  Without Ms. Sanossian's expertise, Plaintiffs could not have identified or

17  remedied the inaccessible facilities or revised the inadequate policies.

18  Ms. Sanossian's most time-consuming tasks pertained to inspecting six different jail

19  facilities in February and March 2023 and in January 2024 for compliance with

20  those standards and drafting reports documenting the findings of those inspections.

21  Ms. Sanossian's inspections each involved taking detailed measurements of

22  hundreds of elements required to be compliant with the ADA and California

23  Building Code accessibility standards.  For example, assessing the accessibility of a

24  single toilet—among the many toilets used by incarcerated people in a given

25  facility—requires taking several different measurements.  Each jail facility is large,

26  housing hundreds of individuals and consisting of multiple stories or buildings.

27  Ms. Sanossian was not able to inspect every element during her single-day

28  inspections of each of the six facilities.  To inspect representative portions of these

1    large facilities in the time allotted, Ms. Sanossian was accompanied by a colleague

2    on each of her inspections, who, while Ms. Sanossian took measurements and

3    inspected the facility, assisted with entering notes and data, taking photographs, and

4    at times helping Ms. Sanossian with measurement.  During the inspections,

5    Ms. Sanossian consulted with attorneys, including Mr. Anderson, about key areas of

6    focus and accessibility problems that she identified.

7           111.   After the inspections, Ms. Sanossian prepared detailed site inspection

8    reports for each Jail facility that identified every barrier she identified with citation

9    to the governing standard and a photograph of the issue.  Each report is hundreds of

10   pages.  Ms. Sanossian also provided detailed narratives at the outset of each report

11   to summarize her significant findings for the Court and Defendants.  Mr. Anderson

12   and I worked closely with Ms. Sanossian on these narratives, which are lengthy

13   given the large number of accessibility problems at each Jail facility.

14          112.   Plaintiffs served Ms. Sanossian's expert report on Defendants on

15   August 21, 2024.  The expert report was based in part on her detailed site inspection

16   reports as well as her review of documents and deposition transcripts.

17   Ms. Sanossian's expert report was more than one hundred pages long, and attached

18   the site-specific reports based on her inspections of George Bailey, Vista, Las

19   Colinas, and East Mesa.  The reports regarding Rock Mountain and Central Jail

20   were filed as part of Plaintiffs' Motions for Preliminary Injunction.  Dkt. 281-3,

21   Exs. B and C.  Ms. Sanossian also prepared a rebuttal report, served on Defendants

22   on October 2, 2024, that responded to Defendants' reports from their ADA experts,

23   Paul Joelson and Julian Martinez.  Notably, these reports included agreement that

24   Defendants' facilities were inaccessible and that certain disability-related policies

25   remained deficient.

26          113.   Ms. Sanossian's inspections and detailed reports contributed

27   significantly to the parties' ADA settlement discussions and actual settlement

28   documents, as the ADA construction required in each Court-approved settlement

1  will address many of the problems Ms. Sanossian identified in her reports.

2  Moreover, Ms. Sanossian participated directly in settlement conferences, including a

3  May 2023 conference that preceded the 2023 ADA Order and a June 2024

4  conference in the negotiations leading to the ADA Settlement.  Mr. Anderson and I

5  also frequently consulted with Ms. Sanossian regarding settlement positions and

6  relied on her expertise during the negotiation of both settlements.

7         114.   While negotiating the ADA Settlement, the parties were also preparing

8  for expert depositions.  For this reason, Ms. Sanossian had to prepare for her

9  deposition by reviewing hundreds of pages of her reports going back to early 2023.

10  Mr. Anderson and I met with Ms. Sanossian for several hours for that purpose as

11  well.  In addition, I began preparing an outline of the deposition of one of

12  Defendants' experts, Julian Martinez, and Mr. Anderson began preparing an outline

13  of the deposition of Paul Joelson. Ms. Sanossian's invoices are attached to the

14  Declaration of Van Swearingen, filed herewith.

15         115.   Most of the other costs incurred by Plaintiffs' counsel in connection

16  with Plaintiffs' Third Claim for Relief are routine litigation expenses.  These include

17  flights, hotels, meals, and transportation in connection with site inspections, a court

18  hearing and settlement conferences, as well as sign language interpreter fees and

19  court reporter and travel costs associated with taking depositions.  I have carefully

20  reviewed the costs incurred both as I paid them and for this fee petition.  All of the

21  costs claimed by Plaintiffs were necessarily incurred in the prosecution of Plaintiffs'

22  successful disability claim.  Because I am informed and believe that the members of

23  the Disability Subclass are mostly indigent individuals, Plaintiffs' counsel have

24  advanced all fees and costs in this litigation.

25  **VI.    TIME SPENT BY PLAINTIFFS COUNSEL ON THE FEES MOTION
         WAS NECESSARY AND REASONABLE**

26

27         116.   I have substantial experience litigating fees motions in federal and state

28  courts.  In particular, I have drafted declarations and briefs in support of Plaintiffs'

attorneys' fees in the *Gober v. Ralphs Grocery Co.*, 137 Cal. App. 4th 204 (2006), *L.H. v. Schwarzenegger*, 848 F. Supp. 2d 1141 (E.D. Cal. 2011), and *Armstrong* cases. I also regularly review Plaintiffs counsel's time and costs as part of a periodic fees process established in *Armstrong* and *Hedrick v. Grant*. In that capacity, I frequently reduce time that I believe is excessive or duplicative. I also review Plaintiffs' bills and remove costs that were incurred inappropriately or should be billed to a different matter.

117. Once this Court approved the ADA Plan in June 2024, I began to plan an interim fees motion, given that we had prevailed on significant issues. To prepare the interim fees motion, I regularly met with my partners Sanford Jay Rosen and Van Swearingen to discuss strategy and to coordinate projects. As the likelihood of a larger settlement on the Third Claim for Relief became greater, we delayed the filing of the interim fees motion, believing that one motion regarding both settlements would be more efficient.

118. It was important to include Mr. Rosen in these discussions as he has handled countless fee disputes and claims on behalf of RBGG and many other for-profit and non-profit firms. His experience in attorneys' fees litigation includes extensive negotiation, legal research and pleadings, evidentiary hearings, oral argument, and appellate work in both state and federal court and in arbitration and special master proceedings. *See*, *e.g.*, *Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1993); *Gates v. Rowland*, 39 F.3d 1439 (9th Cir. 1994); *Gates v. Gomez*, 60 F.3d 525 (9th Cir. 1995); *Gates v. Shinn*, Nos. 95-15402-15403 (unpublished Memorandum dated April 8, 1996); *Holland v. Roeser*, 37 F.3d 501 (9th Cir. 1994); *Rebney v. Wells Fargo Bank*, 232 Cal. App. 3d 1344 (1991); *Davis v. California Department of Corrections*, No. A076411 (Cal. Ct. App. 1st Dist. Oct. 31, 1997). Mr. Rosen served as counsel of record on an *amicus curiae* brief in *Perdue v. Kenny A.*, 559 U.S. 542 (2010), in which the Supreme Court held that in appropriate cases, attorneys for civil rights plaintiffs are entitled to enhancement of their fees for

1    quality of representation and results.  Federal and state courts have recognized

2    Mr. Rosen as an expert on attorneys' fees matters, including several United States

3    District Courts in California, Ohio, and Colorado, at least one California Court of

4    Appeal, and several California Superior Courts.  He has published numerous articles

5    and lectured frequently on the subject of statutory attorneys' fees.

6        119.   Mr. Swearingen led the efforts on this interim fees motion and

7    supporting declarations, including by coordinating projects with relevant personnel,

8    reviewing and preparing the time records, and drafting and revising substantial

9    portions of the supporting declarations.  As explained in his supporting declaration,

10   Mr. Swearingen has substantial experience drafting and litigating fees motions.

11       120.   I contributed to the drafting of this declaration as well as the

12   declarations of Mr. Swearingen, and my co-counsel, Mr. Fischer and Mr. Young.  I

13   also revised the memorandum of points and authorities in support of this fees

14   motion.

15       121.   RBGG Senior Counsel Michael Nunez was the primary drafter of

16   Plaintiffs' memorandum of points and authorities in support of our application, and

17   assisted with the preparation of the supporting Richard Pearl, Claudia Center and

18   Shawna Parks declarations, filed herewith.  Mr. Nunez researched the relevant legal

19   cases and secondary sources.  We decided to have Mr. Nunez draft the fees

20   motion—rather than a partner—given his past experience with fees motions and his

21   lower hourly rate.

22       122.   RBGG Associates Hannah Chartoff and Eric Monek Anderson

23   contributed to the drafting of this declaration, given their extensive hands-on

24   experience with the work described above.

25       123.   I have reviewed Mr. Swearingen's declaration as well as the time

26   records submitted in connection with Plaintiffs' counsel's fees work through

27   January 20, 2025 in connection with preparation of the instant motion.  In my

28   opinion, the time spent on the fees motion and supporting declarations was

1   necessary and appropriate given the complexity and scope of the project.

2          I declare under penalty of perjury under the laws of the United States of

3   America that the foregoing is true and correct, and that this declaration is executed

4   at San Francisco, California this 3rd day of February, 2025.

5

6                                          */s/ Gay Crosthwait Grunfeld*
                                           Gay Crosthwait Grunfeld
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

**EXHIBITS TO DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION FOR INTERIM FEES AND COSTS**

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Resume of Gay Crosthwait Grunfeld | A | 1 |
| Resume of Sanford Jay Rosen | B | 8 |
| Resume of Van Swearingen | C | 17 |
| Resume of Michael Nunez | D | 21 |
| Resume of Priyah Kaul | E | 25 |
| Resume of Eric Monek Anderson | F | 29 |
| Resume of Hannah Chartoff | G | 32 |
| Resume of Ben Holston | H | 35 |
| Resumes of Kedra Chan, Kamila Barragan, Ellinor Heywood, and Lindsay Newfeld | I | 38 |
| JAMS Arbitration Ruling, *Smith v. California Health and Human Services Agency*, Case No. 4:21-cv-07872-HSG (N.D. Cal. Oct. 21, 2024) | J | 46 |
| Declaration of Sanford Jay Rosen, *Prison Legal News v. Ryan*, Case No. 2:15-cv-02245-ROS, Dkt. 365-1 (D. Ariz. June 5, 2023) | K | 58 |
| Fees Order, *Human Rights Defense Center v. County of Napa*, Case No. 3:20-cv-01296-JCS, Dkt. 50 (N.D. Cal. Mar. 28, 2021) | L | 81 |
| Stipulated Fees Order, *Armstrong v. Brown*, Case No. 4:94-cv-02307-CW, Dkt. 3650 (N.D. Cal. Jan. 10, 2025) | M | 110 |

[4643455.2]

## TABLE OF CONTENTS

**EXHIBITS TO DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION FOR INTERIM FEES AND COSTS**

| | | |
|---|---|---|
| Amended Fees Order, *Natural Federation of the Blind of California v. Uber Technologies, Inc.*, Case No. 3:14-cv-04086-NC, Dkt. 203 (N.D. Cal. Nov. 8, 2019) | N | 130 |
| Fees Order and Excerpts of Court Filings, *Sunner v. Kenneth R Turnage II General Contractor, Inc.*, Case No. RG15772244 (Alameda Cty. Super. Ct. Feb. 15, 2017) | O | 148 |
| Fees Order and Excerpts of Court Filings, *Quinby v. ULTA Salon, Cosmetics & Fragrance, Inc.*, No. 3:15-cv-04099-WHO, Dkts. 55 (N.D. Cal. Jan. 18, 2017) & 47-1 (N.D. Cal. Nov. 15, 2016) | P | 154 |
| Fees Order and Declaration of Michael W. Bien, *Natural Federation of the Blind of California v. Uber Technologies, Inc.*, Case No. 3:14-cv-04086-NC, Dkts. 139 (N.D. Cal. Dec. 6, 2016) & 119-1 (Sep. 19, 2016) | Q | 160 |
| Fees Order and Declaration of Michael W. Bien, *Hernandez v. Cnty. of Monterey*, Case No. 5:13-cv-02354-PSG, Dkts. 510 (Nov. 9, 2015) & 500-2 (Oct. 2, 2015) | R | 181 |
| Memorandum from County of San Diego; Re: Americans with Disabilities Act Workgroup Findings & Recommendations (Dec. 28, 2016) | S | 228 |
| Grievance by Josue Lopez (Apr. 28, 2021) | T | 236 |
| Letter from Van Swearingen to Office of the County Counsel; Re: Class Certification and Joint Experts (Mar. 15, 2022) | U | 239 |
| Resume of Syroun Sanossian | V | 246 |
| Letter from Van Swearingen to Defendants' Counsel; Re: Attorney Visits and Retaliation (Feb. 8, 2023) | W | 251 |

## TABLE OF CONTENTS

**EXHIBITS TO DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION FOR INTERIM FEES AND COSTS**

| | | |
|---|---|---|
| Letter from Gay Crosthwait Grunfeld to Elizabeth M. Pappy; Re: ADA Preliminary Injunction and Early Neutral Evaluation (Apr. 4, 2023) | X | 255 |
| Emails between Susan E. Coleman and Gay Crosthwait Grunfeld; Re: Stipulation and Proposed Order (June 20, 2023) | Y | 259 |
| Jeff McDonald & Kelly Davis, *San Diego Union-Tribune*, "Sheriff agrees to reforms to improve jail conditions for disabled people in custody" (June 20, 2023) | Z | 278 |
| Letter from Gay Crosthwait Grunfeld to Defendants' Counsel; Re: Plaintiffs' Response to Proposed ADA Action Plan (Sep. 5, 2023) | AA | 282 |
| Letter from Gay Crosthwait Grunfeld to Defendants' Counsel; Re: Meet and Confer on Proposed ADA Action Plan (Sep. 20, 2023) | BB | 289 |
| Letter from Gay Crosthwait Grunfeld to Defendants' Counsel; Re: Plaintiffs' Comments on Three ADA Policies Revised by Defendants (May 10, 2024) | CC | 294 |
| Letter from Gay Crosthwait Grunfeld to Defendants' Counsel; Re: Dangerous and Unsanitary Conditions at Central Jail and South Bay Detention Facility (May 21, 2024) | DD | 316 |
| Response Letter from Gay Crosthwait Grunfeld to Defendants' Counsel (May 22, 2024) | EE | 320 |
| Agenda for May 29, 2024 Meet and Confer (Notes from Defendants' Counsel in Red Font) | FF | 324 |
| Emails between Elizabeth M. Pappy and Van Swearingen; Re: Dunsmore: video footage re sleeping on floor (May 29, 2024 & May 30, 2024) | GG | 327 |

[4643455.2]

## TABLE OF CONTENTS

**EXHIBITS TO DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION FOR INTERIM FEES AND COSTS**

| | | |
|---|---|---|
| Letter from Gay Crosthwait Grunfeld to Defendants' Counsel; Re: Implementation of Joint Motion and Order (Aug. 16, 2023) | HH | 332 |
| Letter from Gay Crosthwait Grunfeld to Defendants' Counsel; Re: Defendants' ADA Plan and Request for Document Production and Information (Sep. 9, 2024) | II | 342 |
| Kelly Davis, *San Diego Union-Tribune*, "Sheriff agrees to make all jails safer for people with disabilities" (Dec. 13, 2024) | JJ | 346 |

[4643455.2]

# EXHIBIT A



**Gay Crosthwait Grunfeld**
(formerly Danforth)

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  ggrunfeld@rbgg.com

---

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP; San Francisco, California**
**Managing Partner**                                                    2018 – Present
**Partner**                                                            2008 – 2017
General and complex civil litigation, with an emphasis on civil rights, employment, business, and attorneys' fees cases, at the trial court and appellate levels.

**Rosen Bien & Galvan, LLP; San Francisco, California**                 2005 – 2007
**Associate Attorney**

**Bryant, Clohan & Baruh, LLP; Palo Alto, California**                  2001 – 2005
**Associate Attorney**
General and complex civil litigation, including jury trial experience, in real estate, business, insurance "bad faith," construction defect, and employment claims and disputes.

**Fenwick & West; Palo Alto, California**                               1996 – 1997
**Associate Attorney**
Represented high-tech companies in employment, commercial, and trade secret disputes, and provided employment counseling and advice.

**State of California, Administrative Office of the Courts**            1993 – 1995
**San Francisco, California**
**Consultant & Editor**
California Judicial Council report, Achieving Equal Justice for Women and Men in the Courts.

**Dickson & Ross; Oakland, California**                                 1989 – 1991
**Associate Attorney**
Employment and environmental litigation in court and in administrative proceedings.

**Altshuler & Berzon; San Francisco, California**                       1985 – 1989
**Associate Attorney**
Represented individuals, labor unions, and non-profit organizations in employment, labor, and environmental matters.

[344250.7]

**Ex. A - 2**



**The Honorable Jack B. Weinstein, Chief Judge**                    **1984 – 1985**
**United States District Court for the Eastern District of New York**
**Law Clerk**

## PUBLISHED CASES

*Armstrong v. Newsom*, 724 F. Supp. 3d 886 (2024)

*Armstrong v. Newsom*, 58 F.4th 1283 (9th Cir. 2023)

*Armstrong v. Newsom*, No. 94-CV-02307 CW, 2021 WL 933106 (N.D. Cal. Mar. 11, 2021),
    *aff'd in part, vacated in part*, 58 F.4th 1283 (9th Cir. 2023)

*Armstrong v. Newsom*, 484 F. Supp. 3d 808 (N.D. Cal. 2020), *aff'd*, 58 F.4th 1283
    (9th Cir. 2023)

*Armstrong v. Newsom*, 475 F. Supp. 3d 1038 (N.D. Cal. 2020)

*Armstrong v. Brown*, 103 F. Supp. 3d 1070 (N.D. Cal. 2015)

*Armstrong v. Brown*, 732 F.3d 955 (9th Cir. 2013), *cert denied*, 134 S. Ct. 2725 (2014)

*Armstrong v. Brown*, 939 F. Supp. 2d 1012 (N.D. Cal. 2013)

*Armstrong v. Brown*, 857 F. Supp. 2d 919 (N.D. Cal. 2012)

*Armstrong v. Brown*, 805 F. Supp. 2d 918 (N.D. Cal. 2011)

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010)

*Olabi v. Neutron Holdings, Inc.*, 50 Cal. App. 5th 1017 (2020)

*Brome v. California Highway Patrol*, 44 Cal. App. 5th 786 (2020)
    *aff'd in part by Stiner v. Brookdale Senior Living, Inc.*, 810 F. App'x 531 (9th Cir. 2020)

*Stiner et al. v. Brookdale Senior Living, Inc. et al.*, No. 17-cv-03962-HSG, 2024 WL 3498492
    (N.D. Cal. July 22, 2024)

*Stiner et al. v. Brookdale Senior Living, Inc. et al.*, 665 F. Supp. 3d 1150 (N.D. Cal. 2023)

*Stiner et al., v. Brookdale Senior Living, Inc. et al.*, 383 F. Supp. 3d 949 (N.D. Cal. 2019)

*Stiner et al. v. Brookdale Senior Living, Inc. et al.*, 354 F. Supp. 3d 1046 (N.D. Cal. 2019)

*Hernandez v. County of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015)

*Hernandez v. County of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015)

*Hernandez v. County of Monterey*, 70 F. Supp. 3d 963 (N.D. Cal. 2014)

*Sassman v. Brown*, 99 F.Supp.3d 1223 (E.D. Cal 2015)

*Sassman v. Brown*, 73 F.Supp.3d 1241 (E.D. Cal. 2014)

*Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197 (N.D. Cal. 2013)

*L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888 (E.D. Cal 2009)

*L.H. v. Schwarzenegger*, 519 F. Supp. 2d 1072 (E.D. Cal. 2007)

*Sacramento Old City Assn. v. City Council*, 229 Cal. App. 3d 1011 (1991)

*AFL-CIO v. Deukmejian*, 212 Cal. App. 3d 425 (1989)

*Patel v. Quality Inn South*, 846 F.2d 700 (11th Cir. 1988)

*International Union, United Automobile, Aerospace and Agricultural Implement Workers v.
    Brock*, 816 F.2d 761 (D.C. Cir. 1987)

*County of Los Angeles v. State of California*, 43 Cal. 3d 46 (1987)

*K & M Glass Co. v. International Brotherhood of Painters*, 121 L.R.R.M. 3005 (N.D. Cal. 1986)



## PUBLICATIONS

"Jobless Californians Harmed by Dysfunction in State Safety Nets," *San Francisco Attorney Magazine* (Winter 2022) (with Cara Trapani)

"Ending involuntary servitude in California," San Francisco *Daily Journal* (March 10, 2022) (with Marc Shinn-Krantz)

"Overcoming *Pitchess* In Workplace Discrimination Suits," *Plaintiff magazine* (January 2022) (with Priyah Kaul)

"A significant blow to firms looking to arbitrate discrimination claims," San Francisco *Daily Journal* (January 21, 2020) (with Cara Trapani)

"Ending Sexual Orientation Discrimination in Employment," *The Recorder* (February 16, 2018) (with Marc J. Shinn-Krantz)

"The Consequences of Not Responding to Sexual Harassment Allegations," *The Recorder* (March 28, 2017) (with Krista Stone-Manista)

"More women lawyers taking pay equality to court," San Francisco *Daily Journal* (October 13, 2016) (with Jenny Yelin)

"Putting parenting on a firm basis," *San Francisco Attorney* (Summer 2015) (with Jenny Yelin)

"Privilege when firms advise themselves," San Francisco *Daily Journal* (April 3, 2015) (with Sarah Poppy Alexander)

"Construction's Wage and Hour Woes," *The Recorder* (November 4, 2013) (with Megan Sallomi)

"Your First Three Years," *The Recorder* (January 7, 2013)

"Enforcing Settlement Agreements," *The Recorder* (November 5, 2012) (with Benjamin Bien-Kahn)

"Challenges to an at-large election system," *The Recorder* (September 24, 2012) (with Blake Thompson)

"Expanding Partnership Liability," *The Recorder* (July 16, 2012) (with Elizabeth Avery)

"Navigating Expert Witness Disclosure in Federal Courts," *The Recorder* (February 20, 2012) (with Blake Thompson)

"Know What Not to Ask," *The Recorder* (November 10, 2011) (with Alyce Perry)

"How Businesses Can Protect Their Valuable Trade Secrets," San Francisco *Daily Journal* (September 26, 2011) (with Aaron J. Fischer)

"Get the Most Out of Your Expert," *The Recorder* (April 27, 2011) (with Blake Thompson)

"A Picture is Worth a Thousand Words," San Francisco *Daily Journal* (March 23, 2011) (with Leslie Thornton)

"No Time To Waste," *The Recorder* (November 16, 2009) (with Amy Whelan)

"Cases of Two Women Illustrate Harm of Mandatory Arbitration Clauses," San Francisco *Daily Journal* (August 7, 2009) (with Nura Maznavi)

"Without Reform, California's Juvenile Justice System Will Condemn Youth To Bleak Future," San Francisco *Daily Journal* (October 8, 2007) (with Michael W. Bien)

"Some Reflections on Conflicts Between Government Attorneys and Clients" 1 Touro L. Rev. 1 (1985) (with Jack B. Weinstein)

"Article III Problems in Enforcing the Balanced Budget Amendment," 83 Colum. L. Rev. 1065 (1983).



## PRESENTATIONS

- Moderator, "What are Potential Solutions to the Homelessness Crisis?" Ninth Circuit Court of Appeals Annual Conference, Portland, Oregon, August 3, 2023

- Testimony before Subcommittee No. 5 of the California Senate Budget and Fiscal Review Committee on CDCR's Court-Ordered Staff Misconduct Remedies. March 2, 2023, Sacramento, California

- Presenter (with Rev. Anna Rossi and Alma Robinson), "Ending Slavery for Good," Grace Cathedral, October 17, 2021, San Francisco, California

- Moderator, "Hot Topics in Wage and Hour Law: What Practitioners Need to Know," California Lawyers' Association, Labor and Employment Section, Webinar, December 9, 2020

- Panelist, "Toot Your Own Horn: Mastering the Art of Self-Advocacy," Federal Bar Association's Women Attorneys Advocacy Project, October 22, 2019, San Francisco, California

- Panelist, "Zero Tolerance: Interrupting Bias using the ABA's Toolkit," California Women Lawyers Annual Conference, September 20, 2019, Sacramento, California

- Moderator, "Women in the Courtroom," *Daily Journal* Women Leadership in Law Conference, November 15, 2018, San Francisco, California

- Moderator, "Women and Diverse Lawyers and Business Development," *Daily Journal* Women Leadership in Law Conference, November 15, 2018, San Francisco, California

- Moderator, "The Opioid Crisis: Its Genesis, National Implications, and Potential Solutions," Ninth Circuit Judicial Conference, July 25, 2018, Anaheim, California

- Panelist, Labor & Employment Roundtable, *California Lawyer*, November 2017

- Moderator, "Best Practices for Promoting Fair Pay," Association of Corporate Counsel Diversity and Inclusion Committee Event Featuring Equal Rights Advocates, September 8, 2016

- Panelist, Labor & Employment Roundtable, *California Lawyer*, May 2016

- "Rule 23(b)(2) Revisited: Institutional Reform Cases," Panel at the Impact Fund's 12th Annual Class Action Conference Agenda, February 28, 2014

- "How to Litigate a Wage and Hour Case: Challenges with Representing Foreign Language FLSA Clients," American Association of Justice Annual Conference, July 26, 2013, San Francisco, California

- "Let's Get Real: From 'Win – Win' to 'Can Live With – Can Live With,'" ABA Section of Dispute Resolution Spring Conference, April 5, 2013, Chicago Illinois

- "Representing Classes with Special Challenges," Impact Fund, 11th Annual Class Action Conference, March 1, 2013, Berkeley, California

**Ex. A - 5**



Gay Crosthwait Grunfeld – Page 5

- "ADA in Jails & Prisons," Workshop at the 2010 Training & Advocacy Support Center of the National Disability Rights Network, P & A/CAP Annual Conference, June 10, 2010, Los Angeles, California

- "Due Process for Juvenile Parolees:  What Comes Next After *L.H. v. Schwarzenegger*?," Administrative Office of the Courts' Beyond the Bench XIX:  Communicating and Collaborating Conference, December 11-12, 2008, San Francisco, California

## EDUCATION

**Columbia Law School, New York, New York**                                     **J.D., 1984**

Articles Editor, Columbia Law Review
Harlan Fiske Stone Scholar, 1982, 1983, 1984
Charles Bathgate Beck Prize in Property
Parker School Recognition in Foreign and; International Law, with Honors
Public Interest Law Foundation
Teaching Fellow in Property

**Wellesley College, Wellesley, Massachusetts**                     **B.A. (Philosophy), 1981**

Phi Beta Kappa
Graduated Durant Scholar (highest honors)

## BAR ADMISSIONS

State Bar of California, No. 121944 (1985)
Supreme Court of the United States
U.S. Court of Appeals for the Ninth Circuit
U.S. District Courts for the Southern, Eastern, and Northern Districts of California

## PROFESSIONAL AWARDS AND HONORS

*Daily Journal* Top 100 Lawyers in California (2014, 2015, 2016, 2020-2024)
*Daily Journal* Top Women Lawyers (2011-2024)
Equal Rights Advocates Gender Justice Honoree (2016)
*Best Lawyers in America*, Employment Law (2016, 2017, 2020-2022)
Northern California "Super Lawyer" in General Litigation (2012-2024) (Top 100) (2012, 2016)
  (Top 50 Women) (2012-2018, 2020, 2021)
*California Lawyer* Attorneys of the Year Award ("CLAY") (2013, 2016)
*The Recorder*, Attorney of the Year (2012)
California Women Lawyers' Fay Stender Award (1995)
Martindale Hubbell AV Peer Review Rated

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

Member, Circuit Executive Committee, Ninth Circuit Court of Appeals (2017 – 2023)
Boiler Room Volunteer, Voter Protection for Nevada Coordinated Democratic Campaign
  (2020, 2022, 2024)
Member, Finance Committee, Biden for President (2020, 2023-2024); Harris Victory Fund
(2024)



Trustee, San Francisco Law Library (2016 – 2020), Vice President (2020 – Present)
Representative, Lawyers Representative Committee, N.D. Cal. (2014 – 2017)
Member, Finance Committee, Clinton for President (2016)
Board of Directors, Equal Rights Advocates (2011 – 2017); Vice Chair (2013 – 2017)
Member, Committee on Gender Equity, California Women Lawyers (2012 – 2014)
Judge *Pro Tempore*, San Francisco Superior Court (2004 – 2007, 2012)
Judicial Arbitrator, Santa Clara Superior Court (2004 – 2005)
Judge *Pro Tempore*, Santa Clara Superior Court (2004 – 2005)
Pro Bono Counsel, Adolescent Counseling Services (2003 – 2004)
Member, Santa Clara County Bar Association (2001 – 2005)
Member, Palo Alto Bar Association (2001 – 2005)
Member, San Mateo County Bar Association (2001 – 2005)
Member, Bar Association of San Francisco (1985 – 1997; 2005 – Present)
Member, San Francisco Chronicle Community Advisory Board (1995)
President, San Francisco Women Lawyers Alliance (1992 – 1993)
President, SFWLA Foundation (1990 – 1993)
Director, SFWLA (1988 – 1993)
Member, Coalition to Prevent Lead Poisoning (1992)
Director, Northern California Service League (1988 – 1990)

# EXHIBIT B



**Sanford Jay Rosen**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  srosen@rbgg.com

**PRESENT:**

Founding Partner in a firm of twenty-seven lawyers specializing in complex litigation.

**LAW PRACTICE:**

My experience includes a wide variety of civil work for plaintiffs and defendants, including class actions and criminal defense work.  I have secured many judgments and settlements of over a million dollars.

I have presented oral argument in the U.S. Supreme Court in five cases, in the U.S. Courts of Appeals for nine of the Circuits more than 30 occasions (more than half of which have been in the Ninth Circuit), and before the California Supreme Court and Courts of Appeal more than 10 times.  I have briefed many more appeals for parties and for *amici curiae*.

I have tried numerous civil cases to jury and bench in federal district courts in California, Colorado, New York, Ohio and Virginia, and in California state courts; misdemeanors in Maryland state courts; and arbitrations and special proceedings in California, Hawaii and the Commonwealth of the Northern Mariana Islands.

I also represent parties in employment contract negotiations and work as a testifying expert witness.  I am also work as an arbitrator, mediator, early neutral evaluator and have been a special master.

**BAR ADMISSIONS:**

1.    Connecticut (August 14, 1962) (inactive), District of Columbia (November 30, 1973) (inactive), California (December 18, 1974)
2.    Supreme Court of the United States (March 1, 1966)
3.    U.S.C.A.'s for all of the Circuits, except the First and Eleventh Circuits
4.    U.S.D.C.'s:  N.D. Cal., E.D. Cal., C.D. Cal., N. D. Ohio, D. Md., D. Conn., S.D.N.Y.

**BAR ASSOCIATIONS (PARTIAL LIST):**

| | | | |
|---|---|---|---|
| 1. | California State Bar | 4. | American Bar Association |
| 2. | Bar Association of San Francisco | 5. | American Association for Justice |
| 3. | District of Columbia Bar Association | 6. | Consumer Lawyers of California |

**EDUCATION:**

Cornell University, A.B., 1959; Yale Law School, L.L.B., 1962.

[253094.8]

**Ex. B - 9**



## BIOGRAPHICAL LISTING AND RATINGS:

1. Martindale Hubbell; A-V rating
2. Northern California Super Lawyers (general civil litigation)(since 2004)
3. *The Best Lawyers in America*, in Appellate Practice (since 2013)
4. Lawdragon 500 Leading Plaintiff Employment Lawyers (since 2018)

## HONORS:

1. Council on Legal Education Opportunity (CLEO) Edge Founders Award 2018
2. CLEO Diversity Pioneer Honoree, 2008
3. NAACP LDF Cooperating Attorney Honoree, 1995
4. Prisoner's Union's Free Person Honoree, 1993
5. Legal Services Honoree, MALDEF, 1987
6. Bouton Law Lecturer, Princeton University, 1971

## PAST LEGAL EMPLOYMENT:

1. Principal, Rosen & Associates, 1990.
2. Partner, Rosen & Phillips, 1986 to 1989.
3. Principal, Law Offices of Sanford Jay Rosen, 1982 to 1985.
4. Partner, Rosen, Remcho & Henderson (after 1980, Rosen & Remcho), 1976 to 1982.
5. Legal Director, MALDEF, 1973 to 1975.
6. Assistant Legal Director, ACLU (National Office), 1971 to 1973; Special counsel, May through August 1970 and 1975 to 1983 (Kent State Litigation Project).
7. University of Texas at Austin, Visiting Professor of Law, 1970 to 1971.
8. Associate Director, Council on Legal Education Opportunity, 1969 to 1970.
9. School of Law, University of Maryland, 1963 to 1971:
    (a) Assistant Professor, 1963 to 1966;
    (b) Associate Professor, 1966 to 1969 (tenured);
    (c) Professor, 1969 to 1971 (tenured).
10. Law Clerk, Chief Judge Simon E. Sobeloff, U.S.C.A. for the 4th Circuit, 1962 to 1963.

## ALTERNATIVE DISPUTE RESOLUTION ACTIVITIES:

1. American Arbitration Association National Employment, Labor, Employee Benefits and Commercial Dispute Resolution Panels.
2. Labor Management Relations Arbitrator, since 1965:
    (a) American Arbitration Association;
    (b) in the past on other specific panels and the Federal Mediation and Conciliation Service for more than 40 years.
3. Early Neutral Evaluator, U.S.D.C., N.D. Cal., 1987-2023.
4. Mediator, U.S.D.C., N.D. Cal., since 1993-2023.
5. Acting Monitor, U.S.D.C., N.D. Cal., *San Francisco Firefighters Case*, 1989.
6. Mediator, Cal. Court of Appeal, 1st Dist., 2004-2013.
7. Pro Tem Judge, Superior Court, City and County of San Francisco, 1990-2018.
8. *Ad hoc* Admin. Law Officer, California's Agricultural Labor Relations Board, 1975-80.
9. Member Dalkon Shield damages arbitration panel for Northern California, 1991 to 1993.

**Ex. B - 10**



**GOVERNMENT BOARDS:**

1. Member, Baltimore, MD Community Relations Commission, 1966 to 1969.
2. Member, State of Maryland's Patuxent Institution Board of Review (a prison parole board), the Patuxent's Advisory Board and its Board of Governors, 1967 to 1969.
3. Member, Mayor of Baltimore's Committee on Administration of Criminal Justice Under Emergency Conditions, 1968.
4. Member, National Advisory Committee [of the U.S. HEW] project to draft a uniform Child Abuse and Neglect Law, 1974 to 1975.

**SELECTED ADDITIONAL PROFESSIONAL ACTIVITIES:**

1. Attorney Delegate from the U.S. D.C. N.D. Cal. to the 9th Circuit Judicial Conference, 1996 to 1998.
2. Permanent Member, Fourth Circuit Judicial Conference, since 1967 now *emeritus*.
3. Member, ABA Litigation Section's Committee to Study Rule 11, 1986 to 1989.
4. Co-chairperson and/or Faculty Member, Practicing Law (PLI) Institute programs on Civil Litigation, Federal Civil Rights Litigation, and/or Attorneys' Fees, 1976 to 1989; Faculty in other federal practice and attorneys' fees programs--most recently in 2004.
5. Faculty, California's Continuing Education of the Bar (CEB), Federal Litigation Program, 1986; Fundamentals of Civil Litigation Before Trial, 1988; (Chair) Litigating Civil Rights Cases in Federal and State Court, 1989, 1992, 1995 and 1996.
6. Faculty, Georgetown University Law Center's CLE § 1983 Civil Rights Litigation Program, 1993.
7. Faculty, ATLA's Civil Rights Section Civil Rights CLE Program, 1992 and 1993 (Moderator), 1996, 1998; Employment Rights Section CLE Program Faculty, 1999; Civil Rights Section and Minority Caucus CLE, 2003.
8. Treasurer, Exec. Committee and Chair of Education Committee of ATLA's Civil Rights Section, 1992 to 1993; 1993 to 1994; Civil Rights Newsletter Editor, 1994 to 1999; Member, Constitutional Litigation Committee, 1996.
9. Faculty, California Employment Lawyers Association CLE Program, 1999.
10. Faculty, Los Angeles Consumer Lawyers CLE Program, 2001.
11. Faculty, California State Bar Labor Section CLE, 2002.
12. Faculty, Lorman CLE on Police Misconduct and Institutional Reform in California, 2005.

**PUBLICATIONS:**

1. *Fair Representation, Contract Breach and Fiduciary Obligations*, 15 HASTINGS L.J. 391 (1964).
2. *The Individual Worker in Grievance Arbitration*, 24 MD. L. REV. 233 (1964).
3. *The Law and Racial Discrimination in Employment*, 53 CAL. L. REV. 279 (1965); *revised and reprinted in* EMPLOYMENT, RACE AND POVERTY (Ross & Hill eds., Harcourt, Brace and World 1966); CORPORATE COUNSEL'S ANNUAL 1966 (Matthew Bender & Co. 1966).
4. Review of *Marshall, The Negro and Organized Labor*, 75 Yale L.J. 682 (1966).
5. *Division of Authority Under Title VII of the Civil Rights Act of 1964: A Preliminary Study in Federal-State and Interagency Relations*, 34 GEO. WASH. L. REV. 846 (1966).



6.    *Contemporary Winds and Currents in Criminal Law, With Special Reference to Constitutional Criminal Procedure*, 27 MD. L. REV. 103 (1967), *revised and reprinted in* SOURCEBOOK FOR PROSECUTORS (PLI 1969).

7.    Review of *Sovern, Legal Restraints on Racial Discrimination in Employment*, 81 HARV. L. REV. 276 (1967).

8.    *Preemption and Exemption Under the National Labor Relations Act: Myths, Long Standing Questions and Recent Developments*, 21 N.Y.U. ANN. CONF. ON LAB. 243 (1969).

9.    *Civil Disobedience and Other Such Techniques:  Law Making Through Law Breaking*, 37 GEO. WASH. L. REV. 435 (1969).

10.   Co-author of Comment on *Powell v. McCormack*, 17 U.C.L.A. L. REV. 58 (1969).

11.   *Equalizing Access to Legal Education:  Special Programs for Law Students Not Admissible by Ordinary Criteria*, 1970 TOLEDO L. REV. 321 (1970).

12.   *The Greening of the Scranton Commission:  Campus Unrest and Change in America*, 71 COLUM. L. REV. 1120 (1971); 57 AAUP BUL. 506 (Dec. 1971).

13.   Co-author of *Your Rights Before the Grand Jury*, ACLU Pamphlet (Feb. 1972).

14.   Co-author of *Your Right to Government Information*, ACLU Pamphlet (Feb. 1973).

15.   Review of several books on Treason, 51 TEX. L. REV. 817 (1973).

16.   *Judge Soboloff's Public School Race Segregation Decisions*, 34 MD. L. REV. 498 (1974)

17.   Co-author of *State and Local Regulation of Religious Solicitation of Funds:  A Constitutional Perspective*, 446 ANNALS 166 (Nov. 1979).

18.   *The Legal Battle:  Finishing Unfinished Business, in* KENT STATE/MAY 4: ECHOES THROUGH A DECADE (Scott L. Bills ed.,1982).

19.   *Seeking Environmental Justice For Minorities and Poor People* (with Tom Nolan), TRIAL MAGAZINE, Dec. 1994.

20.   *Defeating Efforts to Delay Section 1983 cases*, TRIAL MAGAZINE, Aug. 1999.

21.   *Acknowledging a Military Wrong*, TRIAL MAGAZINE, Apr. 2001.

22.   *A Strike Against Qualified Immunity*, co-authored with Geri Lyn Green, THE RECORDER, October 1, 2010

23.   *Attorneys' Fees, Costs and Interest* (with Michael Freedman), in CALIFORNIA EDUCATION OF THE BAR (CEB) EMPLOYMENT LAW PRACTICE GUIDE (Spring 2012).

24.   *Seeking Justice in Their Memory – Victims of the Kent State Shootings*, THE RECORDER, May 4, 2012

25.   *Online Bickel symposium: How I spent my summer of 1961*, SCOTUSblog (Aug. 17, 2012, 12:56 P.M.), *available at* http://www.scotusblog.com/2012/08/online-bickel-symposium-how-i-spent-mysummer-of-1961/.

26.   *Same Sex Marriage: The Time Has Come*, The Recorder, June 28, 2013

27.   *The Rights of Transgender Prisoners*, Daily Journal, June 17, 2015

28.   *SF Jail Housing Policy a Big Step*, Daily Journal, Sept. 21, 2015

29.   *Toward a More Perfect Union: Restoring Felons Who Have Served Their Time to Full Citizenship*, co-authored with Jeffrey Bornstein, Daily Journal, May 10, 2016

30.   *Have You Actually Read the Directive on Use of Restrooms by Transgender Students?*, Daily Journal, May 19, 2016

31.   *Anti-discrimination laws in jeopardy across the board*, , Sept. 25, 2017

32.   *NIFLA v Becerra: folly, fallout and follow-up*, Daily Journal, July 3, 2018



33. New Justices and shifting public opinion make Title VII cases hard to predict, Daily Journal, May 7, 2019

34. The increasing positioning and politicizing of federal courts, Daily Journal, Feb. 23, 2020

35. *Column on overturned conviction is wrong on the facts and the law*, Daily Journal, March 3, 2020

36. "The Kent State Shootings After Nearly 50 Years," in *The Cost of Freedom*, edited by Susan Ehrenich, Kent State University Press, 2020

37. *Bostock Opinions Rewrite the Likely Future of the US Supreme Court*, Daily Journal, June 22, 2020

38. *Take Qualified Immunity Out of the Equation, Daily Journal*, May 4, 2021

39. *Case pits LBGTQ access to public accommodations against vendors' First Amendment rights*, Daily Journal, March 9, 2022 (with Thomas Nolan)

40. Numerous articles in the *Huffington Post*, available at https://www.huffingtonpost.com/sanford-jay-rosen. or https://rbgg.com/attorneys/partners/sanford-jay-rosen/

41. Additional reviews and essays in the Boston College Industrial and Labor Relations Review; the Brooklyn, California Western, George Washington, Maryland (2) and Pennsylvania Law Reviews; The Journal of Legal Education; The Law Library Journal; The Maryland Law Forum (2); The Cornell Industrial and Labor Relations Review; The Baltimore Sun (2); Patterns of Prejudice (2); Civil Liberties (4); and the Kent Left Studies/Left Review.

42. Numerous print and outline articles on federal and state civil practice and procedure subjects, on attorneys' fees, and on employment and civil rights litigation, commencing 1976, up to the present, for the Practicing Law Institute, California's CEB, ATLA (now AAJ), the Georgetown Law Center, the California State Bar Employment Section and other CLE provider organizations.

43. Co-Author with Michael Freedman of Chapter in *Employment Damages and Remedies* entitled "Attorney Fees, Costs and Remedies," California Continuing Education of the Bar, since 2012 with annual updates.

44. Public lectures at Princeton University, the University of Texas (Austin), Kent State University and Emerson College; panel and other presentations at the Yale Law School.

45. Testimony to congressional committees.

46. Author and editor of comprehensive set of materials to guide appointed counsel for indigent prisoners in cases filed under 42 U.S.C. § 1983 for the U.S.D.C., N.D. Cal. (1988; 2nd ed. 1990; 3rd ed. 1992; and 4th ed. (for both the N.D and the E.D.) 1996).

**SELECTED CASES:**

*U.S. Supreme Court:* My first Supreme Court argument was in *Whitehill v. Elkins*, 389 U.S. 54 (1967), in which the Supreme Court declared most of Maryland's loyal-security statute unconstitutional, overruling its previous decision sustaining that law. The four other cases I briefed and argued in the Supreme Court of the United States are: *Connell v. Higginbotham*, 403 U.S. 207 (1971) (in which the Court recognized due process rights of non-tenured public employees); *Socialist Labor Party v. Gilligan*, 406 U.S. 583 (1972) (which the Court dismissed as unripe); *Communist Party of Indiana v. Whitcomb*, 414 U.S. 441 (1974) (in which for the first time the Court applied full blown First Amendment standards to declare unconstitutional a civil

**Ex. B - 13**



disability as opposed to a criminal sanction); and *Collins v. City of Harker Heights*, 503 U.S. 115 (1992) (in which the Court significantly clarified the elements and liability standards for many 42 U.S.C. § 1983 claims and for municipal liability in § 1983 actions).  I also have prepared petitions, briefs and motions in numerous other Supreme Court cases.

*Other Appeals*:  Among the other appeals in which I have been lead counsel and won are: (1) *Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP*, 676 F.3d 1354 (Fed. Cir. 2012), reversing district court orders to hold that equitable tolling extends time to file an actual fraud claim and damages not cut off as a matter of law upon granting of a reissue patent; (2) *Prison Legal News v. Schwarzenegger*, 608 F.3d 446 (9th Cir. 2010), affirming the power of a federal district court to order monitoring to ensure publisher's First Amendment rights to send books and magazines into state institutions; (3) *Mayfield v. Woodford*, 270 F.3rd 915 (9th Cir. 2001) (*en banc*).  I have been representing Demetrie Mayfield for more than 30 years.  Starting in the mid-1980's, I was appointed to represent Mr. Mayfield in his appeal to the California Supreme Court and in his *state habeas* corpus evidentiary hearing.  We were unsuccessful in the California Supreme Court, and other attorneys were appointed to represent Mr. Mayfield in the federal courts.  We submitted an *amicus curiae* brief in the Ninth Circuit supporting reversal of Demetrie Mayfield's conviction and death sentence.  My colleagues and I developed most of the record on basis of which the Ninth Circuit then vacated his death sentence and sent the case back to the California state courts for retrial as to penalty.  Subsequently Mr. Mayfield was sentenced to life without the possibility of parole.  In 2018 I submitted a clemency application for Mr. Mayfield to California Governor Jerry Brown.  He granted that application on December 24, 2018, making Mr. Mayfield eligible for possible parole; (4) *Davis v. California Department of Corrections* (Oct. 31, 1997, Cal. Ct. App. A076411), upholding in unpublished opinion multimillion dollar fee award under the Unruh Act, including a 1.25 multiplier; (5) *Holland v. Roeser*, 37 F.3d 501 (9th Cir. 1994), holding that Rule 68 Offers of Judgment do not cut off fees for making a subsequent fee application unless the offer is unambiguous on the issue (I prepared only the successful Petition for Rehearing/Suggestion of Rehearing *en Banc* that caused the panel to reverse itself); (6) four appeals (one unreported) in *Gates v. Deukmejian*, including 987 F.2d 1392 (9th Cir. 1993), 39 F.3d 1439 (9th Cir. 1994) and 60 F.3d 525 (9th Cir. 1995), a prison conditions case; (7) *Rebney v. Wells Fargo Bank*, 232 Cal. App. 3d 1344 (1991), a consumer class action attorney fee matter; (8) *Lucas Valley Home Owners Ass'n v. County of Marin*, 233 Cal. App. 3d 130 (1991), involving the validity under zoning law and constitutional law of a conditional use permit issued to a synagogue, the real-party-in-interest Chabad of Marin; (9) eight appeals in *Toussaint v. Gomez*, including 926 F.2d 800 (9th Cir. 1990), 826 F.2d 901 (9th Cir. 1987) and 801 F.2d 1080 (9th Cir. 1986), a prison conditions case; (10) two appeals in *EEOC v. Pan American World Airways, Inc*., 796 F.2d 314 (9th Cir. 1986) and 897 F.2d 1499 (9th Cir. 1990), concerning two appeals -- one involving the appeal ability of a decision rejecting on grounds of inadequacy a settlement sponsored by the EEOC that my clients opposed, and the other affirming adoption of the nearly $20 million settlement of this federal Age Discrimination in Employment case that I crafted after a two-month long jury trial; (11) *People v. Mroczko*, 35 Cal.3d 86 (1984), in which the California Supreme Court unanimously reversed my client's capital conviction for murder in a decision establishing the rule in California that each indigent criminal defendant presumptively must be represented by his own appointed attorney; (12) several appeals arising out of the May 4, 1970 shooting of students at Kent State University, including 671 F.2d 212 (6th Cir. 1982) and 570 F.2d 563 (6th Cir. 1977), the civil rights-



wrongful death and bodily injury cases I successfully appealed, retried and settled; (13) *Familias Unidas v. Briscoe*, 544 F.2d 182 (5th Cir. 1976), an appeal overturning discovery sanctions and the First Amendment in a case involving a Texas statute that required disclosure of a civil rights organization's membership list; (14) *Marin City Council v. Marin County Redevelopment Agency*, 416 F. Supp. 707 (N.D. Cal. 1976), involving a complex case where the court rejected a claim that HUD and a developer (my client) had provided insufficient federally assisted low-cost housing in a Marin County housing development.  The decision was affirmed by the Ninth Circuit in an unpublished opinion; (15) *Evergreen v. Foundation Films, Inc. v. Davis*, where I succeeded before the Ninth Circuit on an expedited appeal involving the motion picture rights to Dee Brown's BURY MY HEART AT WOUNDED KNEE; (16) *Vinyl Products Inc. v. Armstrong Asphalt*, in which the California Court of Appeal reversed a JNOV in a negligence and breach of warranty case in an unpublished decision; (17) *United States v. Hawthorne*, 370 F.2d 330 (4th Cir. 1966), which constitutional narrowed the scope of the 1961 Federal Criminal Travel Act on constitutional grounds.  I also participated in the briefing of many other cases including *Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128 (1998) (sexual harassment case); *Greene v. Dillingham Construction NA*, 101 Cal. App. 4th 418 (2002) (attorneys' fees appeal); and *Gober v. Ralphs Grocery Company*, 128 Cal. App. 4th 648 (2005), 137 Cal. App. 4th 204 (2006), and No. D050962 (Cal. App. 4th Dist., Sept. 30, 2008) (unpublished) (punitive damages and attorneys' fees in sexual harassment case).

*Three-Judge District Court*: I won summary judgment motions for plaintiffs before three-judge district courts in the District of Columbia.  *Williams v. Blount*, 314 F. Supp. 1356 (D.D.C. 1970), declaring censorship of Williams' newspaper violated procedural due process of law.  *Hiss v. Hampton*, 338 F. Supp. 1141 (D.D.C. 1972), declaring the "Hiss Act," which denied Alger Hiss and others their U.S. government service annuities, an unconstitutional *ex post facto* law.

*Amicus Curiae Briefs*:  I was Counsel of Record on *amicus curiae* briefs in *Hollingsworth v. Perry*, 570 U.S. 693 (2013), challenging California Proposition 8's ban of same-sex marriages, and in *United States v. Windsor*, 570 U.S. 744 (2013), challenging the federal "Defense of Marriage Act."  I was lead counsel in numerous U.S. Supreme Court cases to vindicate the women's right to choose and those of LGBTQ and disabled people-- *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016)*, Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. — (2018), *NIFLA v. Becerra*, 585 U.S. — (2018), *Bostock v. Clayton County, Georgia*, No. 17-168*; Altitude Express, Inc. v. Zarda*, No. 17-1623 and *R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.*, 590 U. S. — (2020), *Fulton v. City of Philadelphia*, 593 US — (2021) and *303 Creative LLC v. Elenis*, 600 US — (2023).  I was also Counsel of Record on *amicus curiae* briefs in *Perdue v. Kenny A*, 559 U.S. —, 130 S. Ct. 1662 (2010), in which the Supreme Court held that civil rights plaintiffs' attorneys fees can be enhanced for quality of representation and results, *City of Burlington v. Dague*, 505 U.S. 557 (1992), urging the Court to permit enhancements of fee awards above the "loadstar" amount in appropriate cases pursuant to environmental fee shifting statutes, and in *Beard v. Banks*, 548 U.S. 521 (2006) in support of a First Amendment challenge to a Pennsylvania prison policy that denied certain prisoners access to any newspapers, magazines, and photographs.  I was Lead counsel on an *amicus curiae* brief in the California Supreme Court in *County of Santa Clara v. Superior Court (Atlantic Richfield)*, 50 Cal.4th 35 (2010), in which the Court held that public entities can retain private contingent fee lawyers in public nuisance cases.  I was lead counsel on an *amicus curiae* brief in *Ibrahim v.*



*Department of Homeland Security*, 669 F.3d 983 (9th Cir. 2012), in which the court held that plaintiff could challenge her inclusion on watch and no fly lists, and on *amici curiae* briefs in support of California SB 1172, which prohibits sexual reorientation "therapy" to minors in *Welch v. Brown*, and *Pickup v. Brown*,728 F.3d 1042 (9th Cir. 2013), and in support of New Jersey's law in *King v. New Jersey*, 767 F.3d 216 (3d Cir. 2014).

<u>*Representative Additional Trial Work Matters:*</u> <u>I have taken to judgment and settled numerous police and prison misconduct civil rights cases.</u>  For example, in 2014 and 2015, I settled two cases in the U.S. D. C for the District of <u>Hawaii</u> against the Corrections Corporation of America and the State of Hawaii arising out of the killings of two Hawaii inmates in a CCA prison in Arizona. The terms of the settlements are confidential. (*Estate of Nunuha v. State of Hawaii* and *Estate of Medina v. State of Hawaii*).  I tried for two months and then settled a prison conditions case securing an agreement requiring California to improve medical and mental health care, treatment of HIV prisoners, and conditions of confinement for certain California prisoners. See *Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1993), *Gates v. Rowland,* 39 F.3d 1439 (9th Cir. 1994), and Gates v. Gomez, 60 F.3d 525 (9th Cir. 1995).  After a two-month trial, I secured a permanent injunction ending deplorable prison conditions in California's prison segregation units.  See, e.g., *Toussaint v. McCarthy*, 926 F.2d 800 (9th Cir. 1990), 826 F.2d 901 (9th Cir. 1987), and 801 F.2d 1080 (9th Cir. 1986).  I brought to re-trial and then successfully settled the Kent State Civil Damages cases in the United States District Court for the Northern District of Ohio. See *Krause v. Rhodes*. Earlier I had tried to a plaintiff's judgment several students' challenge to sweep searches of the Kent State campus following the May 4, 1970 shootings. <u>Similarly, I have tried and settled numerous high value employment cases.</u>  In *Andrews v. Equinox Holdings, Inc.,* No. 20-CV-00485-SK, 2021 WL 5275822 (N.D. Cal. Nov. 9, 2021), on the verge of trial I settled an age discrimination case for a recovery of just under $2,000,000 for damages and attorneys' fees.  In 2000, I tried *Yarborough v. PeopleSoft* to a jury in Alameda Superior Court, representing a woman who had been discharged by her employer for discriminatory reasons, securing a judgment of $5.45 million.  In *EEOC v. Pan American World Airways, Inc.,* I represented a large group of former Pan Am pilots in a two month jury trial of their age discrimination claims and secured a $20 million dollar settlement. The settlement, which the Ninth Circuit affirmed, was the largest ADEA settlement to date. *See EEOC v. Pan Am. World Airways, Inc*., 796 F.2d 314 (9th Cir. 1986), and 897 F.2d 1499 (9th Cir. 1990). In *Stewart v. County of Sonoma*, I represented a female sheriff's deputy in her successful sexual case before a jury in the U.S. District Court for the N.D. CA.  In *Sergeants for a Fair Lieutenants' Exam vs. City and County of San Francisco* tried in San Francisco Superior Court a challenge to the San Francisco Police Department's promotional exam on behalf of approximately 100 police officers, securing relief for many of my clients as well as attorney's fees.  <u>In addition to successfully prosecuting dozens of attorney's fees claims, I have also tried several attorney's fees matters.</u>  Most recently, in 1999-2000 in *Rotbart v. Feliciano*, I tried to a Special Master in Saipan and then to an arbitrator in Hawaii and secured my client's multi-million-dollar *quantum meruit* attorney's fee for his representation of an heir of DHL founder Larry Hillblom.

# EXHIBIT C



**Van Swearingen**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  vswearingen@rbgg.com

---

<u>**EXPERIENCE**</u>

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California**
Partner                                                      **January 2019 – Present**
Senior Counsel                                   **January 2018 – December 2018**
Associate Attorney                               **March 2014 – December 2017**

Practices in the areas of complex civil litigation, employment law, and civil rights.  Extensive experience handling civil rights class action litigation, first amendment and business disputes, including matters concerning misappropriation of trade secrets, breach of contract, unfair business practices, fraud, and internal investigations.

**Sidley Austin LLP, San Francisco, California**
Associate                                           **October 2008 – February 2014**
Summer Associate                                                              **2007**

Broad experience representing clients in civil and criminal litigation, including drafting pleadings, motions, stipulations, and orders; arguing motions; examining witnesses in court and formal interviews; handling all aspects of discovery; and negotiating with opposing counsel. Practice areas include:  complex commercial litigation; class actions; antitrust; trade secrets; securities investigations; white collar; and regulatory compliance. Significant participation in pro bono activities, including representing a man on Alabama's death row in his Rule 32 hearing proceedings as well as filing a new trial motion for a young man convicted of second-degree murder in Alameda County.

**University of California, Berkeley, School of Law (Boalt Hall)       August 2006 – May 2007**
**Research Assistant to Professor Malcolm Feeley**

Obtained grant to research and coauthor report regarding reducing inmate litigation in California prisons through the adoption of best practices and risk management research.

**Public Defender's Office, City and County of San Francisco                          2006**
**Summer Intern, Felony Division**

Conveyed legal information to clients, assisted with the preparation of legal strategies, interviewed witnesses, drafted legal memoranda, and observed court proceedings.

**Ex. C - 18**



**University of California, Berkeley, Institute for Labor and Employment**     **2003 – 2004**
**Graduate Student Researcher**

Analyzed trends in union participation and pay rates.  Drafted report on labor union employment trends in the cargo-handling sector.

**Congressional Budget Office, Washington, D.C.**     **May 2003 – August 2003**
**Intern**

Estimated the ten-year direct and discretionary spending costs for same-sex benefits legislation. Revised and updated economic forecast models for the nation's pension insurance program.

**The Public Policy Institute of California, San Francisco**     **2000 – 2002; Summer 2004**
**Research Associate**

Performed policy analysis for reports on immigration, criminal justice, housing, poverty, employment patterns, education, and other public policy issues.

**Stanford University, Center for Health Care Evaluation**     **1999 – 2000**
**Research Assistant**

Performed best-practices research using statistical analysis for a variety of health care studies. Involved in survey design, implementation, and data collection.

## EDUCATION

**University of California, Berkeley School of Law (Boalt Hall)**     **J.D., May 2008**
*Honors*:  California Law Review (Executive Editor); National Animal Advocacy Moot Court Competition at Harvard Law School (Best Brief; Second Place overall); Sandy Cohen Fellowship (funding for internship at SF Public Defender's Office)

*Activities*:  Death Penalty Clinic; California Asylum Representation Clinic; Workers' Rights Clinic; Berkeley Journal of Employment and Labor Law

**University of California, Berkeley**
**Goldman School of Public Policy (GSPP)**     **M.P.P., May 2004**
*Honors*:  GSPP Departmental Fellowship (merit-based tuition plus stipend award); Institute for Labor and Employment Master's Thesis Fellowship Award

**University of Texas at Austin**     **B.A., *with highest honors*, Government, May 1999**
*Honors*:  Phi Beta Kappa; Andrew Mellon Foundation Fellowship in Population Studies; Distinguished Scholar Award (University of Texas Honors Day)

## BAR ADMISSIONS

State Bar of California No. 259809 (2008)



## PUBLICATIONS/PRESENTATIONS

*From Plantation Systems to the Modern Era*, *Vital City*, September 24, 2024 (with Malcolm Feeley)

*Devolving Standards: California's Structural Failures in Response to Prisoner Litigation,* VARIETIES OF LEGAL ORDER, Thomas F. Burke and Jeb Barnes, Eds. (Routledge, 2017)

*Imprisoning Rights:  The Failure of Negotiated Governance in the Prison Inmate Grievance Process*, 96 Cal. L. Rev. 5 (2008)

*The Prison Condition Cases and the Bureaucratization of American Corrections:  Influences, Impacts, and Implications*, 24 Pace L. Rev. 433 (2004) (with Malcolm M. Feeley); *reprinted in* LEGALITY AND DEMOCRACY:  CONTESTED AFFINITIES (Stuart Scheingold Ed.), Ashgate Publishing, 2006.  http://digitalcommons.pace.edu/lawrev/4/; *reviewed in* Prison Legal News Vol 17, No. 2 (2006)

*Cost Estimate for H.R. 2426:  Domestic Partnership Benefits and Obligations Act of 2003*, Congressional Budget Office Cost Estimate (2003) (with Geoff Gerhardt), *available at*: http://www.cbo.gov/ftpdocs/44xx/doc4484/hr2426.pdf

*The Classification of Race, Ethnicity, Color, or National Origin Initiative: A Guide to the Projected Impacts on Californians*, Institute of Governmental Studies Policy Papers, University of California, Berkeley (2003) (with Richard Michaelson, Michelle Probert, and Marc Wolf), *available at*:  http://repositories.cdlib.org/igs/igspp/pp2003-1

*Holding the Line?  The Effect of Border Strategy on Unauthorized Immigration*, Public Policy Institute of California (2002) (with Belinda Reyes and Hans Johnson), *available at*: http://www.ppic.org/content/pubs/report/R_702BRR.pdf

*Poverty in California: Levels, Trends, and Demographic Dimensions*, California Counts 3(3) Public Policy Institute of California (2001) (with Deborah Reed), *available at*: http://www.ppic.org/content/pubs/cacounts/CC_1101DRCC.pdf

**Ex. C - 20**

# EXHIBIT D



**Michael S. Nunez**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738

T: (415) 433-6830
F: (415) 433-7104
E: mnunez@rbgg.com

---

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California**     **April 2015 – Present**
**Senior Counsel (January 2022 – Present)**
**Associate Attorney (April 2015 – December 2021)**

Represent clients at hearings in federal court, mediations, and before a special master. Conduct discovery, including deposing witnesses and preparing and responding to discovery requests. Draft litigation-related documents, including dispositive motions and supporting briefs, mediation briefs, and prelitigation demand letters. Conduct legal research and prepare research memoranda on a wide variety of issues including disability law, employment law, federal criminal law, and procedural issues.

**Disability Rights Advocates, Berkeley, California**
**Staff Attorney**                                             **September 2013 – April 2015**
**Wolinsky Fellowship Attorney**                         **September 2011 – September 2013**

Drafted litigation documents, including complaints, briefs, settlement agreements, a motion for preliminary approval of proposed class settlement and supporting papers, fee motions and supporting papers, and written discovery requests. Developed cases through fact investigation, conducting focus groups, and other community outreach. Drafted press releases and media talking points, and participate in case-related interviews with print and broadcast news outlets. Communicated with opposing counsel and clients regarding all aspects of litigation.

**Electronic Frontier Foundation, San Francisco, California**     **March 2011 – June 2011**
**Extern**

Drafted research memoranda on issues including copyright, social media policies, and state public records statutes.

**Winston & Strawn LLP, San Francisco, California**     **June 2010 – August 2010**
**Summer Associate**

Drafted research memoranda analyzing issues in several areas of law including employment, intellectual property, and constitutional law. Received offer of permanent employment.



**U.S. Department of Justice, Washington, D.C.**                    **June 2009 - August 2009**
**Summer Law Clerk, Office of Legal Policy**
Prepared briefing materials for office management on pending cases of interest.  Examined public records, and drafted background memoranda on Federal judicial candidates.

**Lawyers' Committee for Civil Rights Under Law**                    **July 2007 – July 2008**
**Washington, D.C.**
**Project Associate, Fair Housing, Environmental Justice, and Community Development Projects**
Authored resource guides for Gulf Coast communities, congressional testimony, and a manual for internal use.  Conducted factual research and cite checked briefs for a team of multi-disciplinary attorneys.

**U.S. Federal Trade Commission, Washington, D.C.**                    **July 2006 – July 2007**
**Honors Paralegal, Bureau of Competition**
Researched market issues for staff attorneys; cite-checked official Commission reports.  Conducted investigational interviews; summarized deposition transcripts; reviewed document submissions.

## EDUCATION

**Stanford Law School, Stanford, California**                    **J.D., 2011**
*Activities:*  Environmental Law Clinic:  participant (fall, 2009); Stanford Law and Policy Review (2009-2011); Stanford Law and Technology Association:  Vice President of Operations (2010-2011); National Association of Law Students with Disabilities:  CFO (2009-2010); Conference Director (2009).

**Stanford University, Stanford, California**                    **B.A., Economics, 2006**

**Impact Fund Class Action Training Institute**                    **September 2013**
**San Francisco, California**
Completed three-day class action litigation training program.

## BAR ADMISSIONS

State Bar of California No. 280535 (2011)

U.S. Supreme Court

## PUBLISHED CASES

*National Federation of the Blind of California v. Uber Technologies, Inc.*, 103 F. Supp. 3d 1073 (N.D. Cal. 2015)

*Greater Los Angeles Agency on Deafness v. Cable News Network, Inc.*, 742 F.3d 414 (9th Cir. 2014)

[311416.4]

**Ex. D - 23**



*California Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229 (N.D. Cal. 2013)

## PUBLICATIONS/PRESENTATIONS

Ensuring Accessibility in Diversity, Equity, and Inclusion, Employment and Labor Section National Conference, American Bar Association (November 11, 2022).

The Theater – On Stage and at the Movies, Deaf Law Day at the TenBroek Disability Law Symposium (March 21, 2018)

Practicing as a Disability Rights Attorney, Berkeley Disability Law Conference (January 12, 2018)

Protecting Voting Rights in Uncertain Times, Disability Subcommittee, Equality Committee, Bar Association of San Francisco (October 20, 2017)

"Animals as Living Accommodations," Association of American Law Schools, Section on Animal Law (Jan. 6, 2017)

"Disability Rights Laws and the Sharing Economy," American Bar Association (Jul. 14, 2016)

"The Latest on Class Actions and the 'Sharing Economy,'" Impact Fund Class Action Conference (Feb. 19, 2016)

"NFB Litigation Helping to Transform Our Dreams Into Reality," National Association of Blind Lawyers (Jul. 2, 2016)

"Why Anti-SLAPP Does not Belong in Federal Court," The Daily Journal (Aug. 1, 2013)

## HONORS AND AWARDS

Recipient of 2018 California Lawyer Attorneys of the Year award

Named Northern California Rising Star by Super Lawyers in 2016, 2017, 2018, 2019, 2020, and 2021

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

Member, U.S. District Court for the Northern District of California General Order 56 Advisory Committee

Member, Disability Rights Bar Association

Member, Board of Directors, LightHouse for the Blind and Visually Impaired (2015-2024)

[311416.4]

**Ex. D - 24**

# EXHIBIT E



**Priyah Kaul**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T: (415) 433-6830
F: (415) 433-7104
E: pkaul@rbgg.com

---

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California**
**Senior Counsel**                                                                    **January – May 2024**
**Associate Attorney**                                            **November 2020 – December 2023**

Represent clients at hearings in federal court, mediations, and arbitrations.  Conduct evidentiary hearing and discovery, including deposing witnesses and preparing and responding to discovery requests.  Draft litigation-related documents, including dispositive motions and supporting briefs, mediation briefs, and prelitigation demand letters.  Conduct legal research and prepare research memoranda on a wide variety of issues including disability law, employment law, federal criminal law, and procedural issues.

**U.S. District Court, Northern District of California**            **April 2019 – October 2020**
**Oakland, California**
**Law Clerk to the Honorable Yvonne Gonzalez Rogers**

Managed docket of over 85 active cases, from filing to termination.  Drafted orders and memoranda for all manner of cases, at all stages of litigation.  Subjects include: labor and employment, contract, civil rights, consumer and class actions, copyright, ERISA, the APA, and criminal procedure.  Served as primary law clerk for jury trial in Section 1983 case.  Drafted memoranda and advised on cases while judge sat by designation on the U.S. Court of Appeals for the Ninth Circuit.

**Gibson, Dunn & Crutcher, LLP San Francisco, California**
**Associate**                                                               **September 2015 – March 2019**
**Summer Associate**                                                       **June – August 2014**

Represented clients in all aspects of complex civil litigation, including drafting briefs and memoranda, developing litigation strategy, managing discovery, and preparing for and taking expert and lay witness depositions.  Examined witnesses (cross and direct) and successfully argued directed verdict motion in federal court.  Managed team of over 15 associates in multi-state government investigation.  Represented clients seeking asylum in immigration proceedings.  Drafted *amicus* briefs filed with the U.S. Supreme Court.



**U.S. Securities and Exchange Commission**                    **May 2013 – August 2013**
**New York, New York**
**Legal Intern**
Conducted research and drafted memoranda on issues related to enforcement of federal securities laws.  Drafted outlines for and participated in witness interviews and depositions.

**Deutsche Bank, Los Angeles, California**                    **September 2010 – July 2012**
**Analyst**
Analyzed investment portfolios and advised clients, with focus on structured and lending products.  Coordinated onboarding of new clients.

## EDUCATION

**University of Michigan Law School, Ann Arbor Michigan**                    **J.D., 2015**
*Honors:*  Dean's Scholarship, Jenner & Block Diversity Scholarship
*Activities:*  Michigan Journal of Law Reform, Civil Rights Litigation Clearinghouse, Research Assistant to Professor Michael Barr, South Asian Law Student Association

**University of California Los Angeles**          **B.A., Business Economics, Political Science 2010**

**London School of Economics & Political Science**                    **September 2009**
**Summer Program**

## BAR ADMISSIONS

State Bar of California, No. 307956 (2015)

## PUBLICATIONS/PRESENTATIONS

"Overcoming *Pitchess* in Workplace Discrimination Suits" Plaintiff Magazine (January 2022)

"Prison and Jail Grievance Policies: Lessons from a Fifty-State Survey" Michigan Law Prison Information Project (2015)

"Admit or Deny: A Call for Reform of the SEC's 'Neither-Admit-Nor-Deny' Policy" University of Michigan Journal of Law Reform (2015)

"Macroeconomic Effects of the HIV/AIDS Epidemic in Sub-Saharan Africa" UCLA Undergraduate Journal of Economics (2010)

## HONORS AND AWARDS

Named one of Public Law Center's Attorneys of the Year 2017

Awarded State Bar of California Wiley W. Manuel Certificate for Pro Bono Legal Services 2017



## **PROFESSIONAL AFFILIATIONS AND ACTIVITIES**

San Francisco Bar Association's Barristers Diversity and Inclusion Committee

**Ex. E - 28**

# EXHIBIT F



**Eric Monek Anderson**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  eanderson@rbgg.com

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California**

| | |
|---|---|
| **Associate Attorney** | **July 2021 – Present** |
| **Summer Associate** | **Summer 2016** |

General and complex civil litigation, with an emphasis on civil rights, employment, business, and attorneys' fees cases, at the trial court and appellate levels.

**Farella Braun + Martel LLP, San Francisco, California**          **October 2019 – July 2021**
**Litigation Associate**

Represented plaintiffs and defendants in federal and state trial and appellate courts.  Helped prepare witnesses and colleagues for both offensive and defensive depositions.  Drafted reply brief in successful Ninth Circuit appeal of client's habeas petition.  Drafted complaints in real estate, real property, and Administrative Procedure Act matters.  Prepared research memoranda on numerous substantive and procedural issues, ranging from California's Housing Accountability Act to the economic loss rule to the primary rights doctrine.  Managed large document production and review in commercial matter in arbitration, propounded and responded to discovery, and worked closely with clients.

**Honorable Lucy H. Koh, United States District Court**          **2018 – 2019**
**San Jose, California**
**Law Clerk**

Assisted Judge Koh with research, writing, and other chambers tasks. Completed research on motions arising at all stages of federal litigation, including motions to remand, motions to dismiss, motions to approve class notice, motions for class certification, motions for summary judgment, motions in limine, and post-trial motions. Involved with preparations for bench and jury trials and associated motions.

**Honorable A. Wallace Tashima, Ninth Circuit**          **2017 – 2018**
**Pasadena, California**
**Law Clerk**

Assisted Judge Tashima with research and writing related to his appellate caseload. Involved in cases on immigration, sentencing, prisoner litigation, administrative law, attorney's fees, commercial litigation, and constitutional claims.

[408183.2]

**Ex. F - 30**



**American Civil Liberties Union of Northern California**                     **Fall 2016**
**San Francisco, California**
**Litigation Intern**

Wrote legal memoranda evaluating civil rights claims in potential litigation and analyzing extensive California statutory scheme.  Drafted demand letter on First Amendment issue. Conducted fact investigation of potential claims.

**Honorable Donna M. Ryu, United States District Court**              **Summer 2015**
**Oakland, California**
**Judicial Extern**

Completed research and writing projects for Magistrate Judge Ryu and her clerks, including several memoranda.  Attended settlement conference.

## EDUCATION

**University of California, Berkeley School of Law**                     **J.D., May 2017**
**Berkeley, California**

*Honors:*  Order of the Coif; Jurisprudence Award in Contracts, Immigration Law

*Activities:*  Supervising Editor, *California Law Review*; Research Assistant, Professors Russell Robinson and Jeff Selbin; Tenants' Rights Workshop at the East Bay Community Law Center; Policy Advocacy Clinic

**St. Olaf College, Northfield, Minnesoata**       **B.A. in English, *magna cum laude*, May 2010**
**concentration in Media Studies**

*Honors:*  Phi Beta Kappa; Spohn Award

*Activities:*  Executive Editor, *Manitou Messenger*

# EXHIBIT G



**Hannah M. Chartoff**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  HChartoff@rbgg.com

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California          2022 – Present**
**Associate Attorney**
General and complex civil litigation, with an emphasis on civil rights, employment, business, and attorneys' fees cases, at the trial court and appellate levels.

**Covington & Burling LLP, San Francisco, California          October 2019 – March 2022**
**Associate**
Drafted pleadings, motions, and discovery for state and federal trial courts, federal appellate courts, and ADR.  Argued in the U.S. Court of Appeals for the Ninth Circuit.  Represented individuals in immigration and *habeas corpus* proceedings in federal court.  Led negotiations with state agencies.

**U.S. Court of Appeals for the Ninth Circuit          August 2018 – August 2019**
**Phoenix, Arizona**
**Law Clerk to the Honorable Andrew D. Hurwitz**

**Muslim Advocates, Oakland, California          August – September 2017**
**Legal Intern**
Researched development of impact litigation strategy for multi-organization planning meeting. Compiled resources on protestor rights for community distribution.

**Covington & Burling LLP, San Francisco, California          June – August 2017**
**Summer Associate**
Drafted memos and portions of briefs, including a motion for partial summary judgment in a Voting Rights Act case.  Conducted a witness interview and assisted with deposition preparation.

**U.S. Attorney's Office, Northern District of California          June – August 2016**
**San Jose, California**
**Law Clerk, Criminal Division**
Drafted portions of briefs and motions, including responses to petitions for *habeas corpus* and sentencing memoranda.  Represented the government in misdemeanor and infraction proceeding.

**Ex. G - 33**



**The Council on Foreign Relations, New York, New York**     **August 2013 – July 2015**
**Research Associate**
Drafted articles on the Middle East, women's economic empowerment, and girls' education. Edited international development blog.  Coauthored a chapter of *Women and Girls Rising* (Routledge 2015).

**The White House, Washington, DC**     **June – August 2013**
**Intern, Cabinet Affairs Office**
Researched domestic policy issues for senior staff within the office for input in presidential memos and briefings.  Handled administrative tasks of the office coordinating work across the President's cabinet.

## EDUCATION

**Stanford Law School, Stanford, California**     **J.D., June 2018**
*Honors and Awards*:  Gerald Gunther Prizes for Outstanding Performance in Constitutional Law and in Immigration Law and Policy; High *Pro Bono* Distinction

*Activities*:  Senior Notes Editor, *Stanford Law Review*; *Stanford Technology Law Review*; Supreme Court Litigation Clinic, Fall 2017; Community Law Clinic, Spring 2017

**Fulbright Scholarship, Cairo, Egypt**     **August 2012 – May 2013**
Grant for intensive Arabic language study

**Duke University, Durham, North Carolina**     **B.A., *magna cum laude*, May 2012**
**Political Science and Arabic**
*Honors and Awards*:  Phi Beta Kappa, with Departmental Honors

*Thesis*:  "Making History or Celebrating Change? The Role of Twitter in the 2011 Egyptian Revolution"

## BAR ADMISSIONS

State Bar of California, No. 324529 (2018)

**Ex. G - 34**

# EXHIBIT H



**Ben Holston**

101 Mission Street, Sixth Floor                                    T: (415) 433-6830
San Francisco, California 94105-1738                               F: (415) 433-7104
                                                                   E: bholston@rbgg.com

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP**                 **January 2024 – Present**
**San Francisco, California**
**Associate Attorney**
General and complex civil litigation, with an emphasis on civil rights, employment, business, and attorneys' fees cases, at the trial court and appellate levels.

**Gibson, Dunn & Crutcher LLP**                      **September 2021 – January 2024**
**Los Angeles, California**
**Associate Attorney**
Litigation work includes drafting briefs filed in several trial and appellate courts across the country, including the Cal. S. Ct., 9th Cir., C.D. Cal., and N.D. Cal., as well as managing discovery in multiple cases. Regulatory work includes representing a leading technology platform in government investigations by federal and state regulators regarding sensitive data, working closely with engineers to conduct complex data pulls. *Pro bono* work includes representing incarcerated clients in post-conviction litigation and plaintiffs in police misconduct civil rights cases.

**Alameda County Public Defender**                  **January 2020 – May 2020**
**Fremont, California**
**Certified Law Clerk**
Appeared on the record on behalf of clients at arraignments, attorney & plea hearings, and progress reports. Conducted the initial interviews with dozens of clients both in and out of custody. Researched and drafted motions to suppress and motions to dismiss.

**Colorado Supreme Court, Denver, Colorado**         **May 2019 – July 2019**
**Judicial Extern, Chambers of Justice Richard L. Gabriel**
Wrote memos recommending that the court grant or deny petitions for certiorari in criminal and civil cases

**My90, San Francisco, California**                  **August 2016 – July 2018**
**Vice President of Operations**
Founding team member after developing the idea at Stanford's design school. At My90, we were hired by local governments to collect anonymous feedback data from over-policed and



under-policed communities, analyze that data, and make recommendations about how the local police departments could change their practices to improve police-community relationships. Deployed My90's core product with police departments across the U.S. including the San Jose Police Department, Santa Clara P.D., Indianapolis Metro P.D., and Irving P.D.  Conducted user research with hundreds of community members, police command staff, and patrol officers. Conducted data analysis and wrote reports that constituted the company's core deliverable to clients

**Urban Institute, Washington, D.C.**                    **August 2015 – August 2016**
**Research Assistant**
Wrote and published research papers and blog posts on criminal justice, evidence-based policymaking, local government financing, and technology policy

## EDUCATION

**University of California, Berkeley, School of Law**                    **J.D., 2021**
*Honors:*  Order of the Coif

*Activities:*  Death Penalty Clinic, Student Member (experience included drafting a Rule 32 habeas petition filed in Alabama state court on behalf of client on death row); Prisoner Advocacy Network, Co-Leader (experience included drafting a COVID-19 litigation guide for incarcerated people in CDCR prisons in Spring 2020); *Berkeley Journal of African American Law & Policy*, Senior Articles Editor; *Berkeley Journal of Criminal Law*, Articles Editor

**Stanford University, Stanford, California**                    **B.A., Political Science, 2015**
                                                             **Minor in History**

*Activities:*  Undergraduate Senate, Chair (created the agenda for and ran weekly meetings - two terms); Varsity Men's Swim Team, Athlete (competed at the 2012 US Olympic Swimming Team Trials); Stanford Improvisors, Performer

## BAR ADMISSIONS

State Bar of California, No. 341439 (2021)

# EXHIBIT I



**Kedra Chan**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  kchan@rbgg.com

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California**            2021 – Present
**Paralegal**

Assist with management of large class action cases; prepare court filings; conduct legal research; draft and finalize correspondence and pleadings for attorney review/signature; review discovery and court documents and docket as necessary; communicate with clients, opposing counsel, court clerks, etc.

**First Republic Bank, San Francisco, California**            May 2018 – February 2020
**Executive Assistant to Senior Vice President and**
**Associate General Counsel for Legal Lending Team**

Provided administrative support to the team and worked directly with the Senior Vice President and Associate General Counsel to help increase efficiency by providing effective administrative support including interacting with various departments as a liaison for loan teams or management.  Updated outside counsel list of over 250 attorneys by revamping list to allow for selection by region and specialization.  Updated process for onboarding new firms to ensure proper documentation was on file.  Worked with HR and executive team to develop and streamline hiring process by scheduling, tracking, and greeting potential candidates which led to hiring three new colleagues.  Created a welcome packet for new colleagues and provided training on intranet basics and departmental procedures.

**Music in Schools Today, San Francisco, California**            October 2017 – April 2018
**Salesforce Administrator/Consultant**

Designed and integrated grants tracking system using change management best practices and approaches.  Fellowship assignment for successfully completing certification program.

**O'Melveny & Myers, LLP, San Francisco, California**            March 2016 – December 2016
**Executive Assistant**

Executive assistant to three high-level stakeholders for the Intellectual Property & Technology Group and the Trademark Group within US, Asia and Europe.  Managed complex domestic and international travel.  Scheduled individual conference calls with 30+ top level executives in US, Europe and Asia for annual evaluation interview.  Maintained business critical email for over 200 clients utilizing MS Outlook folders.  Prepared conflict reports for new client requests, existing client new matter requests, and new pro bono client requests and submitted for

[3087187.1]

**Ex. I - 39**



approvals. Maintained log of new client/new matter requests. Tracked Continued Legal Education course credit to ensure compliance with practicing law license requirements. Organized and maintained administrative files and case files.

**Bryan Cave LLP, San Francisco, California**              **August 2008 – November 2015**
**Administrative Assistant**
Provided administrative and legal support to attorneys of the Commercial Litigation, Environmental, and Banking & Real Estate groups. Established procedures and processes for newly opened satellite office. accommodate its 200% growth in first year. Managed complex calendars, domestic travel, time entry and expenses. Automated document onboarding process for new State and Federal actions utilizing existing document management system. Consistently prepared documents for e-filing in all levels of State and Federal court, adhering to court's procedures. Successfully completed 8 e-filings in one day in various matters. Created PowerPoint presentations for new business leads. Member for the firm's Annual United Way Koko Challenge Committee to support the effort to eliminate poverty in the Bay Area. Received Koko Challenge Award three years in a row. Coordinated firm-led real estate forum each month for 50+ attendees.

**Skadden Arps LLP, San Francisco, California**              **September 2005 – August 2008**
**Administrative Assistant**
Provided legal and administrative support to two partners and two mid-level associates of the Insurance Defense and Mass Torts groups. Established guidelines and procedures for electronic repository of case-specific documents using Documatrix (search, view and retrieve document(s) from database). Drafted legal documents including pleadings, correspondence and memoranda. Completed timely filing of business-critical documents in Federal and State Courts in all levels. Assisted attorneys with pre-trial and trial documentation including drafting of jury instructions, expert witness designations, dispositive motions and trial briefs, and prepared hearing binders. Managed domestic travel, complex calendars and time entry.

## EDUCATION

**City College of San Francisco**
General Education

Salesforce Administrator Certification, Salesforce

## LANGUAGES

Spanish, Cantonese



**Kamila Barragán**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  kbarragan@rbgg.com

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California**          2024 – Present
**Paralegal Clerk**

Assist with management of large class action cases; analyze incoming client correspondence; draft correspondence and communicate with clients; draft portions of compliance reports for attorney review

**Becker & Lee LLP, Oakland, California**          May-October 2023
**Paralegal**

Supported senior and associate attorneys in removal cases, family-based petitions, waiver cases and employment-based cases.  Maintained communication with clients, prepared forms, transcribed declarations and drafted comprehensive filing packets for immigration relief. Supported in submitting applications to and interacting with USCIS, the NVC and other governmental agencies.

**Law Office of Richard Hobbs, San Jose, California**          November 2021 – May 2023
**Immigration Paralegal**

Engaged in legal research to maximize client's probability of obtaining immigration assistance. Continuously managed relationships with 20+ clients through a variety of processes, ranging from DACA, Adjustment of Status, Asylum, FOIAs, Naturalization, and U-Visas.  Aided clients with preparing and gathering documents needed to receive immigration relief.  Consistently managed over 240 cases, including updating notes, file organization and maintaining office filing system.  Increased workplace efficiency by providing trainings to colleagues on various USCIS procedures.  Worked independently and under attorney supervision to prepare proper applications under the law and jurisdiction of USCIS.

## EDUCATION

**University of California, Merced**          **2020, B.A., Political Science**

*Activities:*  Chief of Staff to Director of Student Advocacy, Associated Students of UC Merced.

## LANGUAGES

Spanish

[3087189.1]

**Ex. I - 41**



**Ellie Heywood**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  eheywood@rbgg.com

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California          2019 – 2022**
**Paralegal**
Assist with management of large class action cases; draft correspondence and communicate with clients; interview class members and potential class members, tour correctional facilities as part of ongoing monitoring of injunctive orders, analyze document productions, and draft portions of compliance reports for attorney review.

**Joseph McKeen Center for Common Good          September 2018-March 2019**
**Alternative Spring Break Service Trip Leader**
Conducted outreach to Puerto Rican non-profits to build a week-long service and learning trip around issues of community health, women's rights, and restoration efforts after hurricane María.  Orchestrated, facilitated, and guided weekly educational seminars for college student participants, deepening the group's knowledge of Puerto Rico's sociopolitical and historical context.  Handled logistical issues of finding housing, transportation, and volunteer opportunities on the island, while accounting for possible health and safety concerns.

**Sexual Assault Response Services of Southern Maine (SARSSM)          June-August 2018**
**and Sexual Assault Support Services of Midcoast Maine (SASSMM)**
**Denning Fellow**
For SARSSM, organized and facilitated workshops for the Latinx survivors of sexual violence in the greater Portland area. Conducted workshops in Spanish, translated documents, and compiled a comprehensive report of findings.  For SASSMM, curated and developed educational and training materials for service providers about sexual violence against older adults. Improved organization's website design and edited pre-existing training manuals.  Wrote and presented a grant proposal for the Forest Foundation (non-profit organization in Boston), as a recipient of Bowdoin College's Denning Fellowship.

**Bowdoin College          Sept. 2016-May 2017**
**Office Gender Violence Prevention and Education**
**Production Manager (V-DAY)**
Facilitated group discussions with V-Day members surrounding topics of consent, sexism, and female empowerment.  Organized, produced, and budgeted "Take Back the Night," and Rise: Untold Stories of Bowdoin Women, fundraising over $2000



**Bowdoin College Admissions**                              **Senior Interview – 2018**
                                                            **Summer Fellow – 2017**

Interviewed and recruited prospective students for the incoming class at Bowdoin College. Offered a measured analysis of the student as a candidate through evaluative reports. Promoted, represented, and synthesized aspects of Bowdoin College to prospective students and their families through personally-tailored tours and informational sessions alongside one of the College's Admissions Counselor. Answered and clarified questions about the administrative, academic, and extracurricular structures of the college via face-to-face conversations, email correspondence, and office telephone calls.

**Bowdoin College's Senior Class Gift Campaign**          **December 2018 – May 2019**
**Class Agent, Alumni Relations**

Engage in outreach efforts to promote philanthropic giving to the college's Alumni Fund. Educate and counsel a cohort of peers to encourage them to make annual donations as alumni.

**Bowdoin College**                                       **November 2018 – May 2019**
**Office for Gender Violence Prevention and Education**
**Student Program Coordinator**

Assisting in the creation, design, and distribution of poster and social media campaigns. Leading and initiating focus-groups with students, faculty, and staff, alongside event-planning and scheduling.

## EDUCATION

**Bowdoin College, Brunswick, Maine**                              **B.A., 2019**
                                         **Government and Legal Studies, Hispanic Studies**

*Honors:* Sarah and James Bowdoin Day Scholar (Dean's List) (2016, 2017); GPA 3.840

**University of Salamanca (IES) Salamanca, Spain**         **Spring 2018**

Intensive Spanish Language and Cultural Immersion Program

**Queen's University Belfast**                            **Fall 2017**
**Belfast, Northern Ireland**

School of Politics and Law, Peace and Conflict

## LANGUAGES

Spanish



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

**Lindsay Newfeld**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  lnewfeld@rbgg.com

---

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California**          **2022 – 2024**
**Paralegal**

Assist with management of large class action cases; draft correspondence and communicate with clients; interview class members and potential class members, tour correctional facilities as part of ongoing monitoring of injunctive orders, analyze document productions, and draft portions of compliance reports for attorney review.

**Regilla Project**                                              **September 2021 – May 2022**
**Stanford Criminal Justice Center at Stanford Law School**
**Research Assistant to Ms. Debbie Mukamal**

Conduct individual case research on women currently incarcerated for murder or manslaughter in California to determine the facts of the case and whether the crime resulted from intimate partner violence.

**Stanford Center on Democracy, Development,**                   **September 2020 – May 2022**
**  and the Rule of Law**
**Research Assistant to Dr. Larry Diamond**

Conduct research on electoral reform and voter suppression in the United States, with a particular focus on the consequences of the 2020 presidential election.  Prepare reports and collect data to inform Dr. Diamond's research.

**Stanford Center for Human Rights and International Justice**     **October 2021 – May 2022**
**Student Assistant**

Provide administrative support to further the research and educational efforts of the Center, including copy editing, citation checks, and content creation for the weekly newsletter and social media.

**Restore Justice Foundation, Chicago, Illinois (Remote)**        **June 2021 – August 2021**
**Policy Research Intern**

Established a new organizational policy objective by compiling a written report detailing recommendations on improving unfair plea bargaining practices in Illinois.  Performed research and operational support for ongoing projects, including a statewide census of women convicted under the felony murder rule and a national analysis of state parole procedures.



**Stanford Center for Philanthropy and Civil Society**    **November 2019 – August 2021**
**Administrative & Operations Intern**

Provided administrative support to further the research and educational efforts of the executive director and program managers.  Specialized in data entry and organization, digital engagement, and event support.

**Alliance for Safety and Justice, Oakland, California (Remote)**    **June 2020 – August 2020**
**Policy Fellow**

Analyzed state statutes pertaining to a number of criminal justice policy areas, including criminal record clearance, earned credit policies for state prisoners, and COVID-19 responses in state prisons.  Produced written reports of these analyses, often including recommendations on how to improve current policies.

**Arizona Justice Project, Phoenix, Arizona**    **June 2019 – August 2019**
**Intake Intern**

Received applications from incarcerated individuals with innocence claims and conducted extensive research on their legal cases.  Drafted memos summarizing the facts of the case along with recommendations on how to proceed and presented these at weekly case meetings with the legal team.

**<u>EDUCATION</u>**

**Stanford University, Stanford, California**    **B.A., Political Science, 2022**

# EXHIBIT J

Hon. Wynne S. Carvill (Ret.)
JAMS, Suite 1500
Two Embarcadero Center
San Francisco, CA  94111
c/o gdittmar@jamsadr.com

# JAMS ARBITRATION
## OIA Arbitration No. 18111; JAMS Ref. No. 1100115944

**SMITH, GRACE ELIZABETH,**
        **Claimant,**

**v.**

**KAISER FOUNDATION HEALTH PLAN, INC.,**
        **Respondent.**

---

## RULING ON ATTORNEY FEES APPLICATION

1.    <u>**Parties & Counsel:**</u> The parties to this arbitration and their counsel are -

| For Claimant Grace Smith | For Respondent Kaiser Foundation Health Plan, Inc. |
|---|---|
| **Disability Rights Education and Defense Fund** | **Sheppard Mullin Richter & Hampton LLP** |
| Claudia Center, Esq. | Robert J. Guite, Esq. |
| Silvia Yee, Esq. | Moe Keshavarzi, Esq. |
| Erin H. Neff, Esq. | John T. Brooks, Esq. |
| 3075 Adeline St., Ste. 210 | Andrew Dane, Esq. |
| Berkeley, CA 94703 | Alexander Kuljis, Esq. |

**Ex. J - 47**

| and | Samuel Brooks, Esq. |
| **Rosen, Bien, Galvan & Grunfeld** | 333 S. Hope St., 43rd Fl. |
| Ernest Galvan, Esq. | Los Angeles, CA 90071 |
| Michael Nunez, Esq. | |
| 101 Mission St., 6th Fl. | |
| San Francisco, CA 94105 | |

   **2.    Arbitrator:** On May 22, 2023, the individual identified below was appointed by the Office of Independent Administrator ("OIA") as the sole arbitrator, and initial disclosures were made on May 24, 2023. No objection has been raised.

   Hon. Wynne Carvill (Ret.)
   JAMS, Suite 1500
   Two Embarcadero Center
   San Francisco, CA 94111
   wcarvill@jamsadr.com

   **3.    Case Manager:**

| For JAMS | For OIA |
|---|---|
| Giana Dittmar | Marcella A. Bell |
| JAMS, Suite 1400 | OIA, Suite #A35 |
| 1925 Century Park East | 635S. Hobart Blvd., |
| Los Angeles, CA 90067 | Los Angeles, CA 90005 |
| Tel. 310-309-6202 | Tel. 213-637-9847 |
| gdittmar@jamsadr.com | oia@oia-kaiserarb.com |

   **4.    Agreement to Arbitrate:**

   This matter came to arbitration pursuant to a federal court order in *Smith v. Watanabe* (N.D.Cal. #21-CV-07872-HSG)("federal action") compelling arbitration and in accordance with the mandatory arbitration provisions of Claimant's membership agreement with Kaiser as reflected in her Evidence of Coverage document ("EOC"). The latter specifies that any claim that "arises from or related to an alleged violation of any duty incident to or arising out of this EOC or a [Member's] relationship to [Respondent]" shall be submitted to binding arbitration.

   **5.    Applicable Law and Rules:**

   The OIA Rules for Kaiser Permanente Member Arbitrations (as amended January 1, 2023) ("Rules") and the substantive law of the State of California apply to this arbitration.

   **6.    Claims and Arbitrability:**

   On or about March 26, 2023, Claimant filed a Demand for Arbitration with the OIA. A Response was filed on or about July 20, 2023. The foregoing claims are arbitrable.

**Ex. J - 48**

## 7.    Attorney Fees Application:

On September 1, 2024, Kaiser filed a dispositive motion, after which there were various discovery disputes, some discovery, and then an opposition filed on April 8, 2024. Kaiser filed a reply on April 26, 2024, and oral argument occurred on May 1, 2024. On May 15, 2024, the dispositive motion was denied in a ruling that observed that, had there been a cross-motion, it would have been granted on the then-existing record ("May 15th Order"). Subsequently, the parties entered into a stipulated resolution, on which a partial award was issued on July 12, 2024. That award provided Claimant with a monetary recovery sufficient to pay for a motorized wheelchair and physical therapy and required a replacement wheelchair every five years under certain conditions.

The only remaining issue is attorney fees. On August 19th, Claimant filed a request for a total award of $1,584,847.93, which consisted of a $725,921.40 lodestar, a multiplier of 2.0, $103,145.95 for post-May 25th work on fees, and costs of $29,859.18. Kaiser's opposition was filed September 23rd, and a reply on October 7th. As the latter contained new evidence,[1] a sur-reply was allowed after the oral argument on October 11th. The issues are whether Claimant is a prevailing party entitled to fees, the appropriate lodestar, whether a multiplier is warranted or even available, and costs.

### A)  Prevailing Party Issue

Both Section 1557 of the Affordable Care Act ("ACA") and Section 504 of the Rehabilitation Act provide for prevailing plaintiff fee awards. (*Religious Sisters of Mercy v. Azar* (D.N.D. 2021) 513 F.Supp.3d 1113, 1123, *aff'd* (8th Cir. 2022) 55 F.4[th] 583; *Armstrong v. Davis* (9th Cir. 2003) 318 F.3d 965, 970.) Claimant argues that she is the prevailing party by securing a court enforceable settlement agreement on the ACA/504 cause of action. (*Richard S. v. Dept. of Developmental Servs.* (9th Cir. 2003) 317 F.3d 1080, 1086, 1088.) Further, while the Unruh Act was not reached in the May 15th Order, she argues that the findings and analysis in that Order would support entry of judgment on that state claim as well, which also provides for prevailing plaintiff fee awards.

Respondent counters that (1) Claimant did not prevail on the ACA/504 claim because there was no cross-motion or a full record to support such a cross-motion, (2) the alternative discretionary grounds based on *Moncharsh v. Heily & Blase* (1992) 3 Cal.4[th] 1 cannot support a fee award, (3) the stipulated partial award does not find any statutory violation, and (4) Claimant only obtained relief for herself and not the broad, class-wide injunctive relief barring enforcement of Kaiser's $2,000 limit on coverage for wheelchairs, which it is argued was her primary litigation objective as reflected in the Demand's requested relief.

To accept Respondent's first three arguments would mean that Claimant should have rejected the Arbitrator's June 3rd suggestion that the parties accept the May 15th

---

[1] New evidence may be received in the discretion of the court/arbitrator provided that a sur-reply is permitted. (*Jay v. Mahaffey* (2013) 218 Cal.App.4[th] 1522, 1538.)

**Ex. J - 49**

Order on the ACA/504 claim and should have continued to pursue her May 22nd motion for summary adjudication and, if necessary, a full arbitration hearing solely for the purpose of preserving her right to prevailing party fees. That would have been a huge waste of resources for both sides because it was clear from the briefing on the first dispositive motion that Claimant would win on her ACA/504 claim and, if required, on ancillary claims such as the Unruh Act. The effect on Respondent would be an additional six-figure sum added to the fee motion. The undersigned rejects the notion that in settling the matter based on the May 15th Order Claimant in effect forfeited her right to fees.[2] Further, that is clearly not the law: a settlement may support a fee award where it results in the plaintiff or claimant obtaining significant relief. (*See, e.g., Richard S, supra*, 317 F.3d at1087, and cases cited therein; *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 153 [plaintiff prevailing party even though she abandoned effort to obtain public benefit via injunctive relief].)

Moreover, Respondent's position does not square with the language of the Partial Award. While that award did not expressly state any statutory basis, it did state that the stipulated "resolution was determined by the Arbitrator to be a reasonable accommodation under the circumstances of this case." The term "reasonable accommodation" is a concept found in the ACA implementing regulations (*e.g.,* 45 C.F.R. §92.15) and repeatedly cited as a program requirement of Section 504. (*Alexander v. Choate* (1985) 469 U.S. 287, 301.) The May 15th Order specifically relied on *Alexander* and the Ninth Circuit's application of that framework in *Doe v. CVS Pharmacy, Inc.* (9th Cir. 2020) 982 F.3d 1204, and the district court on remand. Thus, the Partial Award did in fact have an explicit statutory basis – namely, the requirement that a disabled person be afforded a reasonable accommodation.

As for the fourth argument, *Richard S* and *Graciano* make it clear that a plaintiff can be a prevailing party even where the settlement affords him or her "significantly less" than the relief initially sought. (*See also Hensley v. Eckerhart* (1983) 461 U.S. 424, 433 [plaintiff prevailing if succeeds "on any significant issue…[and] receives some of the benefit sought in bringing the suit"].) The broader relief sought by Claimant was and remains the objective in the pending federal action, in which the motion to compel this individual plaintiff to arbitration was granted. While there was no injunctive or declaratory relief in this arbitration, had Claimant not settled, the failure to provide a "reasonable accommodation" probably would have supported a facially broader award – e.g., a declaration that Kaiser's policies and procedures failed to provide a reasonable accommodation for members requiring a motorized wheelchair in violation of Section 504 of the Rehabilitation Act and Section 1557 of the ACA. Instead of continuing with her own dispositive motion filed on May 22, 2024, to obtain such a declaration, she accepted a settlement, which fairly may be characterized as a "bellwether." The

---

[2] Actually, the risk to Claimant was just the opposite: if she had failed to accept a Kaiser offer to resolve the dispute on the basis of the May 15th Order and continued to litigate the issues to a final award, Kaiser might have argued and the undersigned concluded that post-May 15th fees were not reasonably incurred because the result was available in a Kaiser settlement offer. In light of that risk, it is ironic that Kaiser is using the resolution that saved it further fee exposure to argue that Claimant should be awarded *no* fees. ("No good deed goes …")

**Ex. J - 50**

Disability Rights Education & Defense Fund ("DREDF") has used it in the federal action and in negotiating with various entities.[3] The stipulated award thus has had and will continue to have a broader impact than just her individualized relief. (Center Reply Decl. at ¶¶ 3-5.)

Significantly, *if Claimant had initially just filed an arbitration demand under her membership agreement* – as Respondent maintains she should have – and asserted the ACA/504 and Unruh Act claims to obtain a motorized wheelchair, she would have received the same result and clearly been entitled to fees. (*Religious Sisters*, *supra*; *Armstrong*, *supra*; se*e also Morales v. Whole Foods Mkt., Inc.* (N.D.Cal. July 31) 2013 WL 3967639 *2 [re Unruh Act].) A final award in that scenario would very likely contain a declaration such as that posited above. She should not lose the right to fees she would have had in a stand-alone arbitration just because she attempted to join others in a class action and was then relegated to an arbitration.[4]

In short, Claimant obtained sufficient relief to entitle her to being viewed as the prevailing party in the arbitration and is statutorily entitled to attorney fees incurred in the arbitration as opposed to the federal action.

## B) Lodestar Rates

In the lodestar calculation, one applies reasonable rates in accordance with the prevailing market rates in the relevant community for non-contingent litigation of the same type. (*Ketchum v. Moses* (2011) 24 Cal.4[th] 1122; *Barjon v. Dalton* (9th Cir. 1997) 132 F.3[rd] 496.) Claimant was represented by a private firm (Rosen Bien Galvan & Grunfeld LLP ("RBGG")) and a non-profit legal advocacy group (the DREDF). Both sets of Claimant's attorneys submitted claims based on their usual and customary rates or rates that have been allowed on fee petitions by other Bay Area courts and supported by their own declarations and that of two experts (Richard Pearl and Shawna Parks), which relied in part on rate surveys and fee awards by courts in the Bay Area. Respondent

---

[3] Kaiser sought language that would make the resolution confidential or otherwise limit DREDF's ability to use it as a bellwether. Those efforts were rejected. One may thus expect this award to lead to numerous individual arbitrations commenced against Kaiser and other health insurers with similar policies by members/insured who need motorized wheelchairs. The respondents in such cases may expect to be required to bear the costs of arbitration and subject to prevailing party fee awards in most instances. Thus, the impact will probably be much broader than Ms. Smith's case. The situation is not unlike that faced by employers who have arbitration clauses that bar class actions but result in mass arbitration filings with a total exposure analogous to a class action but with higher transaction costs. In those situations, the first arbitration award often has a ripple effect through the following ones and is the basis for settling the balance.

[4] The terms of the arbitration provisions in the Kaiser membership agreement stating that each side bears their own fees is irrelevant. An arbitration provision cannot override a statutory right to attorney fees where such a claim is otherwise subject to arbitration. (*Castillo v. CleanNet USA, Inc.* (N.D.Cal. 2018) 358 F.Supp.3d 912, 934-39 (to be enforceable arbitration agreements must afford all types of relief otherwise available); *Scott-Ortiz v. CBRE Inc*. (D. Ariz. 2020) 501 F.Supp.3d 717, 727-28 (interpreting "Except as otherwise required by law").)

**Ex. J - 51**

countered with its own counsel's declaration and that of an expert (Gerry Knapton), who relied in part on a well-known survey of legal rates – the Wolters Kluwer Real Rate Report ("Wolters Kluwar Report"). The latter categorizes rates in quartiles where the highest rates are those charged by large firms in complex and high value cases. The crux of Respondent's argument is that the relatively small dollar value of Claimant's individual claim did not justify retention of counsel at the higher rate quartiles being sought on this application.

The undersigned rejects the notion that the fee determination in this case should be based on the dollar value of the individual claim. To begin with, there are numerous cases where a fee award far exceeds the value of an individual claim. For example, in various Labor Code cases, a successful employee recovering wages is entitled to fees under Section 1194(a), and it is not uncommon for the fee award to far exceed the amount of unpaid wages.[5] Similar disparities between a plaintiff's recovery and the attorney fee award are found in Song-Beverly Act and other consumer cases. (*See, e.g.*, *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4[th] 140, 164 [fees not to be limited to a proportion of the consumer's recovery].) The obvious rationale for the statutory fee provision is to incentivize counsel to take on cases that have very low dollar value for the individual, who would not be able to retain counsel if retention was based on either an hourly rate or contingency fee. (*See, e.g., City of Riverside v. Rivera* (1986) 477 U.S. 576-577 [no proportional limitation in civil rights cases because would seriously undermine congressional intent]; *Blackwell v. Foley* (N.D.Cal. 2010) 724 F.Supp.2d 1068, 1075-1077 [discussing policies supporting full fee awards[6]].) *Blackwell* was an individual disability discrimination case exemplifying an award of fees far in excess of plaintiff's monetary recovery.

Further, here the case was an offshoot of a large class action, and it is understandable that class counsel and the putative class representatives had a strong interest in consistency between the positions in the federal action and the arbitration, as a misstep in one could adversely impact the other. Finally, the issues in this case were by no means simple and required expertise in both the underling statutes and the relevant case law, which as noted in the May 15th Order was conflicting. Given that complexity, it is understandable that Claimant would seek highly qualified counsel with expertise in the subject matter.

---

[5] This reality is one of the reasons in the undersigned's experience as a mediator, employers often settle for an amount far in excess of a realistic assessment of the exposure for unpaid wages: it is the potential attorney fees exposure that drives the settlement. No one in that context argues that the possibility of a modest unpaid wages award means that plaintiff's counsel will not be fully compensated for the effort to take the case through trial. *City of Riverside* and *Blackwell* explain the policy reasons supporting such fee awards.

[6] The purpose of these policies, moreover, is to incentivize *quality* counsel to take on such cases. That is why the standard references "usual and customary rates" *without* the additional qualifier of "for cases of this size." Such a qualifier would be counter to the very rationale for statutory fee awards.

Here the fees for the various counsel were well within the range of rates for counsel of similar seniority and experience as reflected in the supporting declarations, which detail their education, experience, and significant successes. RBGG's senior attorney (Galvan) just recently had his 2023 rate of $1050 approved by the court in *Prison Legal News v. Ryan* (D.Ariz. Mar. 20) 2024 WL 1195548 at *2. DREDF's senior attorney (Center) has 25 years of experience in complex class actions and disability rights litigation. The rates sought here ($1,100 and $995, respectively) are well within the range of $810 to $1,725 that Pearl found for attorneys at or near their level of experience and professional stature and consistent with Parks' experience in the market and the rates for her own disability advocacy group in similar litigation. The rates sought for Yee ($880), Nunez ($800) and Neff ($535) are within the range of rates for their experience level. The rates sought for Arulanantham ($575) and Meyers ($490) are in the low range Pearl identified in the market. The record is simply replete with evidence that the rates sought to be approved are within the prevailing market rates in the relevant community for non-contingent litigation.[7]

In short, based on a review of this record, the quality of the advocacy on both sides, the evidence of prevailing rates in the Bay Area, and the undersigned's own experience in reviewing fee petitions in various contexts as both a trial judge and arbitrator in the Bay Area, these rates are deemed reasonable under applicable standards.[8]

## C) Lodestar Hours

The more difficult issue is the appropriate hours attributable to this arbitration, which is an offshoot of a federal class action with some overlapping issues; however, the federal case raised certain unique issues unrelated to the arbitration. The latter, for example, has an organizational plaintiff, which may pose standing issues, and also has a state agency and its director as defendants, which pose Eleventh Amendment issues. None of these are found in the arbitration or relate to the Kaiser claims. It is not easy to sort these differences out in the context of the motion for fees; however, Claimant's counsel have sorted the time they are claiming into six discreet categories, and the parties and their experts have organized their arguments accordingly. That organizational convention is followed below.

---

[7] Defense counsel countered in oral argument with a representation as to his own rate, which is significantly below the rate of Nunez, for example, even though the latter is more junior and significantly less experienced than defense counsel. That may well be true, but it is only one data point and does not show that the ranges discussed by Pearl or shown in the various quartiles of the Wolters Kluwar Report are not "the market." Further, a court or arbitrator is not obligated to consider a lower rate paid to defense counsel. (*Goplin v. BMW of North America, LLC* (2016) 4 Cal.App.5th 462, 474.)

[8] The rates sought to be approved are based on the attorneys' current rates, and yet the work stretches back over time. Given the fact that they were not paid when the work was performed, the use of current rates is an appropriate way to address the delay in payment. (*Prison Legal News v. Schwarzenegger* (9th Cir. 2010) 608 F.3d 446, 454; *Blackwell, supra*, 724 F.Supp.2d at 1078.) The fact that this approach is taken means that the same delay should not be reflected in any multiplier.

**Ex. J - 53**

**1. Case Development:** DREDF claims 15.83 hours, and RBGG 91.0 hours.[9] DREDF states it began investigating Kaiser's practices regarding wheelchairs in October 2019, which is about the time Claimant contacted them, and this work continued through the summer of 2020. The work was mostly by an associate (Myers) and consisted of factual investigation and some legal research. RBGG time records indicate an associate started legal research on the case in February 2021. Both the factual inquiries and the legal research of possible claims would have been necessary whether the eventual decision was to file an individual arbitration or a class action.[10] Respondent does not address this work other than to complain that the entries here and elsewhere have redactions that make it difficult to determine what was done. A review of the redactions leads the undersigned to conclude they do not impair the ability of make a judgment as to whether the work is compensable.[11] This category consists of compensable work developing the case regardless of whether it would be initially filed as a class action or arbitration. Note that there are Myers entries referring to phone calls with other attorneys, and yet the latter time is not included in the claim, which evidences the exercise of billing judgment.

Claimant has carried her initial burden of showing compensable work, and it is not rebutted. Thus, RDEDF is awarded $9,552.30 for 15.83 hours and RBGG $57,522.50 for its 91 hours on this category.

**2. Complaint /Amended Complaint:** DREDF claims 75.61 hours, and RBGG 33.1 hours. This work began in September of 2020 and involved developing the claims and legal theories on which the federal complaint would be based, but also would be the basis for the eventual arbitration demand. The research also encompassed class action issues and the basis for including a state agency in the complaint – both of which would be extraneous to the eventual arbitration. The Galvan Reply Declaration and the Center Declaration make it clear that work on the state agency issues was not included in their time, but the inference is that work on class issues was. It was argued that class action research and drafting was *de minimus*. This may be true, but there should be some further adjustments for the class issues and whatever work may have been done on federal procedural matters and the applicable Local Rules. Undoubtedly, though, the bulk of the work went into framing the substantive federal statutory and pendent state claims that lay at the heart of both the federal case and the arbitration.

---

[9] I use Tables 11 and 15 in Galvan's Reply Declaration, which sought to correct/clarify entries in his original declaration's Exhibit 4.

[10] It is a mystery why Knapton dismisses this entire category. One must ask whether, in his view, the arbitration should have been commenced without any factual investigation or legal research.

[11] For example, the first entry by DREDF reads: "Call with REDACTED and S. Yee re: REDACTED's recent experiences with Kaiser DME denials and appeal." Clearly, this shows factual investigation of Kaiser DME denials, and the redaction of the interviewee's name is irrelevant to the issue of whether the work was related to the arbitration. Kaiser objects that interviews of members other than Claimant are irrelevant; however, a reasonable investigation would include contacting others to see if there was something unique about Claimant's experience.

**Ex. J - 54**

Claimant has carried her initial burden of showing a significant amount of compensable work, but the hours claimed are adjusted downward by 10%. Thus, RDEDF is awarded $41,789.30 for 68 hours, and RBGG $26,775.00 for 28 hours on this category.

**3. Kaiser Motions**: DREDF claims $101,771.65 for 189.37 hours, and RBGG $87,760 for 105.5 hours. This category covers the work opposing the motion to compel arbitration and opposing the motion to dismiss. The former was the focus of DREDF, and the latter was RBGG's responsibility. Respondent argues that the motion to dismiss the federal action was unrelated to the arbitration and that Claimant could not credibly dispute she was subject to the arbitration clause. Claimant counters that her Kaiser claims were part of the motion to dismiss, and that competent counsel owed a duty to the client to see if there was a way around the arbitration clause.

With regard to the motion to dismiss, there were other plaintiffs, including an entity plaintiff, and the defendants included a state agency and its director. Thus, plaintiffs would have had to respond to a motion to dismiss even if Kaiser had never been included as a defendant. The motion to dismiss does not become compensable just because Kaiser was added as a defendant, especially where the claims against it were clearly distinct from the Eleventh Amendment issues posed by the state defendants and the focus of the motion to dismiss. As for the motion to compel arbitration, it is patently clear that under controlling Supreme Court decisions giving the broadest possible scope to the FAA, there was no credible argument for avoiding the Kaiser arbitration provision, which has been around for over 50 years and repeatedly upheld. There was certainly no basis for avoiding the reach of the FAA based on some notion of Congressional intent underlying the ACA. (See Sept. 27, 2022, Order of District Court at pp. 4-5 [noting no case supporting such a theory or the other theories advanced to resist arbitration].) Were Claimant a paying client, it is very doubtful the arbitration clause would have been challenged.[12] The more likely scenario would have been to include Claimant as a plaintiff only on the claims against the state agency and its director.

Claimant has not carried her burden of proof that this work is compensable in the arbitration. Her case should have commenced as an arbitration. Thus, RDEDF and RBGG, which claimed a total of 294.87 hours for this work, are awarded no fees for this category.

**4. Other Federal Litigation Tasks:** DREDF claims 9.84 hours, and RBGG 30.3 hours. Aside from drafting the complaint, there were other tasks related to the federal action such as Rule 26(f) disclosures and a co-counsel agreement. Some of this would clearly be needed for the arbitration (e.g., a counsel agreement) and other work would also overlap with what would be required in an arbitration – for example, Rule 26(f) disclosures are analogous to JAMS Rule 17 disclosures or what would be required in response to initial discovery under the OIA Rules. But not all of the "other" federal litigation tasks would be required in the arbitration or otherwise related thereto.

---

[12] There is an additional issue of allegedly excessive time spent preparing for oral argument on the motion to compel, but this objection is rendered moot by the ruling on the category as a whole.

Claimant has carried her initial burden of showing a significant amount of compensable work, but the hours are adjusted downward by 50%. Thus, RDEDF is awarded $4,202.90 on 4.9 hours, and RBGG $13,820.00 on 15.1 hours for this category.

**5. Arbitration:** DREDF claims 195.58 hours, and RBGG 218.2 hours. The arbitration involved numerous contentious discovery disputes and a complex dispositive motion, which itself involved controversies as to whether it was more akin to a motion to dismiss or summary judgment. There were calls between the parties and Arbitrator on many of these issues. Preparing the declarations, including those of two experts, and fully briefing the complex statutory issues justified the effort reflected in the hours. Clearly, all of this work was necessary for Claimant to develop her claims in arbitration, defeat the dispositive motion, and obtain a ruling that might well have supported a cross-motion for summary judgment but for the procedural posture of the case. Respondent's criticism of these fees is unconvincing. It is true that the fees sought are high, but a defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff in response." (*City of Riverside, supra,* 477 U.S. at n.11; *see also Camacho v. Schafer* (1987) 193 Cal.App.3d 718, 724.) Here the defense was vigorous, and Claimant's efforts were appropriate.

Claimant has carried her initial burden of showing compensable work, and the defense has not credibly challenged any of the claimed fees. Thus, RDEDF is awarded $166,536.60 for 195.58 hours, and RBGG $190,550.00 for 218.2 hours on this category.

**6. Fees Motion:** DREDF claims 30.36 hours, and RBGG 91.7 hours through October 4, 2024. A prevailing party is entitled to "fees on fees." (*Hensley, supra,* 461 U.S. at 429.) The fee motion was heavily contested, with expert declarations submitted by each side, including in reply, and detailed billing records were submitted and contested. As with the arbitration itself, given the tenacity of the defense, the fees incurred by Claimant should not be unexpected. (*See City of Riverside*, *supra*.)

Claimant has carried her initial burden of showing compensable work, and the defense has not credibly rebutted that showing. Thus, RDEDF is awarded $46,528.75 for 52.2 hours, and RBGG $138,592.50 for 165.6 hours on this category through October 4th. In addition, they claim $7,500 as an estimate of their additional work through October 7th. This is a reasonable estimate.

The totals for the above six categories come to $268,609.85 for RDEDF and $427,260.00 for RBGG before any multiplier plus $7,500 to be divided between RDEDF and RBGG.

### D) Multiplier

Respondent argues that a multiplier is appropriate under the federal statutes only in very rare or unusual circumstances because quality of representation, novelty and complexity of the issues, etc. are captured either in the appropriate hourly rate or total hours. (*Perdue v. Kenny A. ex rel Winn* (2010) 559 U.S. 542, 551-554; *Mangold v.*

10

**Ex. J - 56**

*California Pub. Utilities Comm.* (9th Cir. 1995) 67 F.3d 1470, 1478.) While there could theoretically be other factors that may not be captured by the lodestar, Respondent argues there has not been the requisite evidentiary showing. Claimant counters that this is one of the rare cases where *Perdue* would allow a multiplier, and alternatively there were state law claims for which multipliers are generally appropriate for novel or difficult issues, the contingency risk, the quality of the advocacy, etc.

The stipulation and the underlying May 15th Order were entered based on the ACA/504 claim, and the Unruh Act and other state claims were not reached. Nor were the state claims included in Claimant's own dispositive motion of May 25, 2024, and thus there is no basis in the record for finding, in effect, a *de facto* Unruh Act ruling that might support a multiplier under California law. Accordingly, *Perdue* controls. Given the hours and rates allowed above, the undersigned concludes that a multiplier is not available in this case based on a finding of unusual or rare circumstances within the meaning of *Perdue*. There is certainly no evidentiary basis for such an exception.

### E) Costs

After some minor adjustments on the WestLaw costs, Claimant seeks $29,364.42 in costs ($16,273.34 RBGG and $13,091.08 RDEDF). The largest disputed piece of these costs is for expert witness fess. Respondent argues these should be apportioned between the federal case and the arbitration. The apportionment claim is rejected as these experts did submit reports/testimony related to the arbitration. They cannot be "apportioned;" they were considered in their entirety in the arbitration and compensable in full.

Costs of $29,364.42 are awarded.

### F) Conclusion

This is *not* a partial award, but based on the foregoing analysis, the undersigned intends to issue a Final Award that (1) recites the original resolution on the merits and (2) awards fees and costs of $703,369.85 and $29,364.42, respectively. Counsel are invited to *immediately* call attention to any typographical or computational error via an Access email because the Final Award will issue shortly.

DATED: October 21, 2024

_____
Wynne S. Carvill

11

# EXHIBIT K

1  Sanford Jay Rosen – Cal Bar No. 062566*
   Lisa Ells – Cal. Bar No. 243657*
2  Amy Xu – Cal. Bar No. 330707*
   ROSEN BIEN GALVAN & GRUNFELD LLP
3  101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
4  Telephone:    (415) 433-6830
   Facsimile:    (415) 433-7104
5  srosen@rbgg.com
   lells@rbgg.com
6  axu@rbgg.com

7  David J. Bodney – Ariz. Bar No. 006065
   Kennison C. Lay – Ariz. Bar No. 037098
8  BALLARD SPAHR LLP
   1 East Washington Street, Suite 2300
9  Phoenix, Arizona  85004-2555
   Telephone:    (602) 798-5400
10 Facsimile:    (602) 798-5595
   bodneyd@ballardspahr.com
11 layk@ballardspahr.com

12 *admitted *pro hac vice*

13 Attorneys for Plaintiff

14

15                UNITED STATES DISTRICT COURT

16                   DISTRICT OF ARIZONA

17

18 Prison Legal News, a project of the Human    Case No. CV-15-2245-PHX-ROS
   Rights Defense Center,
19                                              **DECLARATION OF SANFORD
                 Plaintiff,                     JAY ROSEN IN SUPPORT OF
20                                              PLAINTIFF'S MOTION FOR
        v.                                      ATTORNEYS' FEES AND
21                                              EXPENSES**
   Charles L. Ryan, et al.,
22                                              Judge:   Roslyn O. Silver
                 Defendants.
23

24

25

26

27

28
   [4295618.13]

Case 2:15-cv-02245-ROS   Document 865-2   Filed 06/05/25   Page 2 of 13
Case 2:15-cv-04006-RDS   Document 657-1   Filed 06/05/25   Page 2 of 13 59592
Page 111 of 402

1       I, Sanford Jay Rosen, declare:

2       1.     I am an attorney duly admitted to practice before this Court. I am a founding

3 partner in the law firm of Rosen Bien Galvan & Grunfeld LLP ("RBGG"), counsel of

4 record for Plaintiff Prison Legal News ("PLN"). I have personal knowledge of the facts

5 set forth herein, and if called as a witness, I could competently so testify. I make this

6 declaration in support of Plaintiff's Motion for Attorneys' Fees and Expenses.

7       2.     This is a First Amendment and due process case. As recited in Paul Wright's

8 Declaration at ¶¶ 10-14, my firm and I have represented and worked with the Plaintiff in

9 twelve other comparable cases, and many other matters, since approximately 2005, and in

10 this matter since approximately March 2015.

11       3.     Considering all the circumstances of the case and as documented in this

12 declaration and the other accompanying papers, I believe this Court should award PLN

13 $2,255,497.65 for counsel's work on the merits in this court and $250,037.55 for work

14 through May 26, 2023 to prepare the attorneys' fee application in this court. *See*

15 **Appendix 1** to Motion (summary chart). As provided by federal fee shifting law, the

16 claim is based on RBGG's and co-counsel's 2023 billing rates in calculating the lodestar.

17 Nothing in this declaration should be construed as constituting a waiver of the attorney-

18 client privilege or work product doctrine protections.

19       4.     After graduating from law school in 1962, I was a law clerk for the Chief

20 Judge of the U.S. Court of Appeals for the Fourth Circuit, a law professor, and a senior

21 attorney at several civil rights organizations before entering private practice in 1976. The

22 first iteration of my firm was a partnership with Thelton Henderson and Joseph Remcho.

23 My present firm is in a manner a descendent of that first iteration.

24       5.     From its formation in 1990, Rosen Bien Galvan & Grunfeld LLP (RBGG)

25 has been a nationally recognized leader in civil rights, employment, consumer, class action

26 and appellate litigation. See our website at www.rbgg.com. Best Lawyers in America

27 places the firm in the first tier nationally in Appellate Practice, and locally in Civil Rights,

28 for 2022 and for many prior years. A copy of my current resume is attached hereto as

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES

**Ex. K - 60**

1   **Exhibit A**.  My online resume is at https://rbgg.com/attorneys/partners/sanford-jay-rosen/.

2        6.      I am an experienced trial and appellate lawyer, arbitrator, mediator, and early

3   neutral evaluator.  I am on the Northern District's ADR Early Neutral Evaluator and

4   Mediator panels.  I am also a testifying expert on attorneys' fees and related matters.

5        (a)      My trial and appellate experience includes a wide variety of civil

6   work for both plaintiffs and defendants, including class actions and some criminal defense

7   work.  I have secured numerous judgments and settlements of over a million dollars.

8        (b)      I have presented oral argument in the U.S. Supreme Court in five

9   cases, in the U.S. Courts of Appeals for ten of the Circuits on more than 30 occasions

10   (more than half of which have been in the Ninth Circuit), and before the Supreme Court

11   and Courts of Appeal of California and appellate courts in other states at least 15 times.

12        (c)      I have briefed scores of other matters in the U.S. Supreme Court and

13   other appellate courts, including on behalf of amici curiae in the U.S. Supreme Court, the

14   Ninth, Fourth, and Third Circuits, and the Supreme Court of California.

15        (d)      I have tried numerous cases to bench and jury in federal district courts

16   in California, Colorado, New York, Ohio and Virginia, and in California and Maryland

17   state courts, and to arbitrators and special masters in California, Hawaii and the

18   Commonwealth of the Northern Mariana Islands.

19        (e)      I have presented scores of attorneys' fees applications, argued appeals

20   in 10 or more attorneys' fees matters, and I am frequently retained as an expert in such

21   matters, including as a testifying expert.

22        **RBGG'S AND MY WORK WITH PLN AND HRDC SINCE 2005**

23        7.      Starting in 2005, I have represented Plaintiff PLN (and its successor Human

24   Rights Defense Center (HRDC)) in numerous cases in California, Arizona, and Nevada to

25   secure their rights, and those of other publishers whose publications have been banned or

26   censored by prison and jail authorities.  The first of these cases is *Prison Legal News v.*

27   *Schwarzenegger (sub nom. Prison Legal News v. Newsom)*, No. C 07-02058 CW (N.D.

28   Cal. 2007) in which a pre-litigation settlement was negotiated in 2006.  The Ninth Circuit

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES         **Ex. K - 61**

1  upheld the district court's award of attorneys' fees in that case, including the district

2  court's approval of my 2008 rate of $740 per hour.  *See Prison Legal News v.*

3  *Schwarzenegger*, No. C 07-02058 CW, 2008 WL 11411620 (N.D. Cal. Dec. 5, 2008), *aff'd*

4  *in part, vacated in part, remanded*, 608 F.3d 446 (9th Cir. 2010).

5      8.    I was counsel of record for PLN and several other publisher, distributor, and

6  reporter organizations on an *amicus curiae* brief in *Beard v. Banks,* 548 U.S. 521 (2006).

7  The Supreme Court framed the issue before it as:  whether "a Pennsylvania prison policy

8  that 'denies newspapers, magazines, and photo-graphs' to a group of specially dangerous

9  and recalcitrant inmates 'violate[s] the First Amendment.'"  Applying *Turner v. Safley*,

10  482 U.S. 78 (1987), and *Overton v. Bazzetta*, 539 U.S. 126 (2003), the Court reversed the

11  Third Circuit and held that Pennsylvania's policy did not violate the First Amendment,

12  with Justices Stevens and Ginsburg dissenting.

13      9.    Since 2005, my firm and I have represented PLN and HRDC in thirteen

14  lawsuits to enforce its right to send publications to prisoners in prison and jail systems

15  throughout California, including *PLN v. Schwarzenegger* cited in paragraph 7 above.  We

16  have represented PLN and HRDC in such cases in the California counties of Ventura,

17  Placer, San Diego, Tulare, Los Angeles, Siskiyou, Tehama, and Napa.  The latest such

18  case, *HRDC v. County of Madera* (E.D. Cal. No. 1:23-cv-00332-ADA-HBK), is pending.

19  Of these cases, only Napa County is within the Northern District of California, and billing

20  rates in Napa County are much lower than in San Francisco.  Moreover, only in Los

21  Angeles County are billing rates comparable to those in San Francisco.  Nevertheless,

22  RBGG has been paid at or based on their San Francisco billing rates in all of these cases.

23  In addition, we represented PLN in *Prison Legal News v. Babeu*, No. CV-11-01761-PHX-

24  GMS (D. Ariz. 2013) (Pinal Cnty. Ariz.), *Prison Legal News v. Corrections Corporation*

25  *of America*, No. CV09-01831-PHX-ROS (D. Ariz. 2009); and *Prison Legal News v. Cox,*

26  No. 3:00-cv-00346 (D. Nev. 2013), consolidated into *Prison Legal News v. Crawford,*

27  No. 3:00-cv-00373 (D. Nev. 2000), and its associated docket number.

28      10.   In addition to these cases, RBGG and I have represented PLN and HRDC in

1   a number of California Public Records Act cases.  We have also worked with PLN and

2   HRDC in preparing to file additional First Amendment publications access cases and

3   Public Records Act case that have been resolved upon receipt by the relevant public

4   entities of California Tort Claims demands or prelitigation settlement demands.  RBGG

5   and I also were lead counsel, with HRDC as co- counsel, in two federal civil rights cases

6   due to prisoner-on-prisoner killings in Saguaro, Arizona, both of which were litigated in

7   the U.S. District Court for the District of Hawaii.  Both settled confidentially.  *See Estate*

8   *of Bronson Nunuha v. State of Hawaii*, No. CV12-00147-DKW-RLP (D. Haw. filed 2012),

9   and *Estate of Clifford Medina v. State of Hawaii*, No. CV12-00340-DKW-RLP (D. Haw.

10  filed 2012).  Further, over the last eighteen years, RBGG and I have been asked by PLN

11  and HRDC to litigate numerous other cases involving a range of potential legal issues of

12  interest to HRDC and classes of prisoners.

13          11.     In eighteen years of working with PLN and HRDC, I have become familiar

14  with the work and skill of HRDC's in-house lawyers and legal staff.  I know them to be

15  highly experienced, efficient and skillful.  I also know that the rates that Plaintiff claims

16  for their work in this case are consistent with the rates we have claimed and been awarded

17  for their work, adjusted to 2023 rates, in other cases in other cases in which we worked

18  together. *See Human Rights Defense Center v. County of Napa*, No. 3:20-cv-01296-JCS,

19  2021 WL 1176640 (N.D. Cal. Mar. 28, 2021) (2020 rates awarded); *Prison Legal News v.*

20  *Newsom,* No. C 07-02058 CW (N.D. Cal.) (2022 rates paid by CDCR for 2022 monitoring

21  work).

22       **RBGG'S AND MY FIRST AMENDMENT AND PRISON LAW EXPERIENCE**

23          12.     RBGG's representation of PLN and HRDC in this and other free speech and

24  due process cases is informed by the firm's and my work as lead counsel in numerous

25  prison and jail conditions class actions in California and other states.  At least three of

26  these prison conditions cases have been litigated in the Eastern District of California, and

27  the fourth, against Madera County, is pending.  With the exception of the ongoing

28  *Coleman v. Newsom* case, fees for which are prescribed by the Prison Litigation Reform

1   Act of 1994 (PLRA), we have always been awarded our San Francisco office rates for our

2   work in these cases.  The same is true of our many jail conditions cases, all of which

3   involve jails outside of the City and County of San Francisco, except as to the portions of

4   those cases that are subject the PLRA's billing rates limits.  When PLRA attorney billing

5   rates apply, we are consistently paid our San Francisco office billing rates for our

6   paralegals' work.

7          13.      My first prison conditions case was *Toussaint v. McCarthy, see, e.g.*, 926

8   F.2d 800 (9th Cir. 1990), which commenced in the early 1970s.  Eventually, I became lead

9   counsel.  I first worked with RBGG co-founding partner, Michael Bien, in the next

10  California prison conditions case, *Gates v. Deukmejian*, *see, e.g.*, 987 F.2d 1392 (9th Cir.

11  1993), starting in 1988.  Mr. Bien was lead counsel for psychiatric services issues.  I was

12  lead counsel for the HIV-infected subclass, and lead fees counsel.  After *Gates* concluded

13  by being merged into the *Coleman v. Newsom* case, I was not counsel in our other such

14  cases, although I have been consulted about them on many occasions and have litigated

15  fees issues as to some of them.

16         14.      My partners have been the lead counsel in RBGG's many other post-*Gates*

17  prison and jail conditions cases.  These include, for example, what is now styled *Coleman*

18  *v. Newsom et al.*, 2:90-cv-00520-KJM-DB (E.D. Cal.), in which Ms. Ells and Mr. Bien are

19  co-lead counsel.  Mr. Bien also was lead co-counsel in the consolidated proceedings,

20  which included *Coleman*, decided by the Supreme Court of the United States affirming a

21  prison population reduction order entered by a statutory three-judge district court.  *Brown*

22  *v. Plata*, 563 U.S. 493 (2011).

23         15.      RBGG partners continue to be or have been lead or co-lead counsel in prison

24  and jail conditions cases both in California, and in other states, such as Nebraska.  *See, e.g.,*

25  *Armstrong v. Brown (sub nom Armstrong v. Newsom)*, No. C 94-2307 (N.D. Cal.);

26  *Hernandez v. County of Monterey,* No. 13-cv-02354-BLF (N.D. Cal. 2013); *Cole v. County*

27  *of Santa Clara*, No. 16-cv-06594-LHK (N.D. Cal.); *Babu v. Ahern,* No. 18-CV-07677-NC

28  (N.D. Cal. Feb. 7, 2022); *Hedrick v. Grant,* No. 2:76-cv-00162-GEB-EFB (E.D. Cal.).

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES                                                    **Ex. K - 64**

Case 3:20-cv-06145-RDS  Document 651-2  Filed 06/05/23  Page 135 of 597
Case 2:15-cv-02245-ROS  Document 365-1  Filed 06/03/25  Page 116 of 402
Page 116 of 402

16.     My free speech litigation started while I was teaching at the University of Maryland and served as lead counsel in a successful challenge to Maryland's public employee loyalty oath.  *Whitehill v. Elkins,* 389 U.S. 54 (1967).  That work has never stopped.  While still a law professor, I successfully represented plaintiffs before a statutory three-judge district court in *Williams v. Blount*, 314 F. Supp. 1356 (D.D.C. 1970), in which I represented both the publisher and a distributor.  The court enjoined the Postmaster General from banning a publication from the United States mails for lack of due process.

17.     My first four (of five) arguments in the Supreme Court of the United States involved First Amendment violations caused by loyalty oaths and encumbrances.  In my fourth, *Communist Party of Indiana v. Whitcomb*, 414 U.S. 441 (1974), the Court was unanimous as to the result.  For the first time ever, Justice Brennan's decision for the Court applied the same First Amendment standards to invalidate a civil encumbrance on free speech that it had for decades when passing on criminal laws.

18.     I have presented oral arguments in the U.S. Courts of Appeals for ten of the Circuits on more than 30 occasions (more than half of which have been in the Ninth Circuit), and before the Supreme Court and Courts of Appeal of California and appellate courts in other states at least 15 times.  I have briefed scores of other matters in the U.S. Supreme Court and other appellate courts.  In recent years I have been counsel of record for amici in numerous cases in the U.S. Supreme Court and U.S. Courts of Appeals addressing difficult and cutting edge constitutional issues.  The most recent such amicus curiae brief was filed at the specific request of the Solicitor General of Colorado.

19.     I have tried numerous cases to juries, bench, special masters, and arbitrators in jurisdictions around the country, including San Francisco, California; Denver, Colorado; Arlington, Virginia; New York, New York; Baltimore, Maryland; Cleveland, Ohio; Honolulu and Kauai, Hawaii, and Saipan (the Commonwealth of the Northern Mariana Islands).

20.     I have represented numerous public entities and officials in various additional litigation and pre-litigation matters ranging from contract to employment law

1   matters.  These include the Dominican Republic; the Public Utilities Commission of the

2   State of California; the General Counsel of the California Agricultural Relations Board; the

3   East Bay Regional Park District; the County of Contra Costa, California; the Ravenswood

4   City Elementary School District; and the Human Rights Commission of the City and

5   County of San Francisco.  I have also been retained on occasion by Bay Area Rapid

6   Transit (BART) to represent supervisory personnel in labor-management matters.  Most

7   recently, at the request of the California Civil Rights Department, I have been representing

8   one if its in-house lawyers and a former in-house lawyer in connection with depositions

9   that the principal defendant is attempting to take in *California Civil Rights Dep't v.*

10  *Activision Blizzard, Inc. et al.*, No. 21ST-CV-26571 (Los Angeles Superior Ct. 2021).

11        21.    I am also active as an arbitrator, mediator, and early neutral evaluator, and

12  have served as a settlement judge pro tem and a special master.  I have facilitated

13  resolution of class actions and other complex matters as a mediator and early neutral

14  evaluator.  I am a mediator and early neutral evaluator for the United States District Court

15  for the Northern District of California.  I have also been an arbitrator selected from the

16  Federal Mediation and Conciliation panel and the American Arbitration Association panel.

17                **MY ATTORNEYS' FEE BACKGROUND**

18        22.    I am highly familiar with billing rates for law firms that have a sophisticated

19  practice involving large, complex class-action cases.  My law firm and I have handled

20  almost countless fee disputes and claims on behalf of RBGG and of many other firms, as

21  well as many co-counsel, civil rights organizations, and law firms—including many major

22  law firms—arising in such cases.  My firm and I have handled numerous appeals of

23  attorneys' fees issues.  I have also served as a mediator in resolving cases that have

24  included substantial attorneys' fees components, and I have decided attorneys' fees issues

25  as an arbitrator.

26        23.    My experience in attorneys' fees litigation includes extensive negotiation,

27  legal research and pleadings, evidentiary hearings, oral argument, and appellate work in

28  both state and federal court and in arbitration and special master proceedings.  *See, e.g.*,

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES                **Ex. K - 66**

1   *Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1993); *Gates v. Rowland*, 39 F.3d 1439 (9th

2   Cir. 1994); *Gates v. Gomez*, 60 F.3d 525 (9th Cir. 1995); *Gates v. Shinn*, Nos. 95-15402-

3   15403 (unpublished Memorandum dated April 8, 1996); *Holland v. Roeser*, 37 F.3d 501

4   (9th Cir. 1994); *Rebney v. Wells Fargo Bank*, 232 Cal. App. 3d 1344 (1991); *Davis v.*

5   *California Department of Corrections*, No. A076411 (Cal. Ct. App. 1st Dist. Oct. 31,

6   1997).  I served as special fees counsel in *Finkelstein v. Bergna*, 805 F. Supp. 1235 (N.D.

7   Cal. 1992).  I am currently lead fees counsel in *United States ex rel. Thrower v. Academy*

8   *Mortgage Corp.* (N.D. Cal. No. 16-CV-02120-EMC).

9         24.   My firm has won or successfully settled several significant additional

10  attorneys' fees cases including: *National Federation of the Blind v. Uber Technologies,*

11  *Inc.*, No. 14-04086, Doc. 203 (N.D. Cal. Nov. 8, 2019); *Cole v. County of Santa Clara*,

12  No. 16-06594 (N.D. Cal. Mar. 21, 2019); *Hendrick v. Grant*, No. 14-16947 (9th Cir.

13  2017); *L.H. v. Brown*, 848 F. Supp. 2d 1141 (E.D. Ca. 2011); *Armstrong v. Brown*, 805 F.

14  Supp. 2d 918 (N.D. Cal. 2011); *L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888 (E.D. Cal.

15  2009); *Prison Legal News v. Schwarzenegger*, 561 F. Supp. 2d 1095 (N.D. Cal. 2008);

16  *Prison Legal News v. Schwarzenegger*, 608 F.3d 446 (9th Cir. 2010); *Armstrong v. Davis*,

17  318 F.3d 965 (9th Cir. 2003); *Greene v. Dillingham Construction Company*, 101 Cal. App.

18  4th 418 (2002); *Lucas v. White*, 63 F. Supp. 2d 1047 (N.D. Cal. 1999).  In several of these

19  cases I was lead or co-lead fees counsel.

20        25.   My firm and I secured court orders approving our firm's 2020, 2021 and

21  2022 billing rates in several recent hotly contested cases, in which I have been lead or co-

22  lead on the fees applications.  Most recently, I was lead fees counsel in the Ninth Circuit

23  appellate fees proceedings in this case (No. 19-17449), in which the Ninth Circuit

24  Commissioner awarded our full 2022 billing rates for work on the appeal performed from

25  2019 to 2022, including my rate of $1,350, Ms. Ells' rate of $850, Ms. Xu's rate of $575,

26  and Ms. Silber's rate of $400.  In *Andrews v. Equinox Holdings, Inc.*, No. 20-cv-00485-

27  SK, 2021 WL 5275822 (N.D. Cal. Nov. 9, 2021), the court approved my firm's 2021

28  billing rates for attorneys and paralegals, including my rate of $1,250 per hour and

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES

**Ex. K - 67**

1  Ms. Harrold's rate of $425 per hour. *Id.* In *Human Rights Defense Center v. County of*
2  *Napa*, No. 3:20-cv-01296-JCS, 2021 WL 1176640 (N.D. Cal. Mar. 28, 2021), the court
3  awarded my firm's 2020 rate for work done that year, including my rate of $1,100.

4       26.    I was counsel of record on an *amicus curiae* brief in *Perdue v. Kenny A.*, 559
5  U.S. 542 (2010), in which the Supreme Court held that in appropriate cases, attorneys for
6  civil rights plaintiffs are entitled to enhancement of their fees for quality of representation
7  and results. I was also counsel of record on an *amicus curiae* brief filed in the Supreme
8  Court in *City of Burlington v. Dague*, 505 U.S. 557 (1992), on behalf of the ACLU, the
9  NAACP Legal Defense Fund, MALDEF, and numerous other pro bono organizations and
10 private law firms. I was lead counsel on an amicus curiae brief in the California Supreme
11 Court in *County of Santa Clara v. Superior Court (Atlantic Richfield)*, 50 Cal. 4th 35
12 (2010), on behalf of a number of leading legal ethics professors. The case involved the
13 question whether public entities can retain private contingent fee lawyers in public
14 nuisance cases.

15      27.    On numerous occasions, my firm and I have been awarded upward
16 enhancements of our and our client's fees lodestar claims. *See e.g.*, *Andrews v. Equinox*
17 *Holdings, Inc.*, No. 20-cv-00485-SK, 2021 WL 5275822 at *810 (N.D. Cal. Nov. 9, 2021)
18 (awarding a contingency risk multiplier of 1.3 in an age discrimination case where Plaintiff
19 accepted the offer of judgment); *Waul v. State Farm Ins. Co.*, No. CGC-02-412248 (San
20 Francisco Sup. Ct. 2007) (awarding my firm's and co-counsel's full 2006 rates, plus a 1.5
21 risk multiplier, in an unfair business practice case involving automobile insurance); *Greene*
22 *v. Dillingham Construction Company*, 101 Cal. App. 4th 418 (2002) (race harassment case
23 with damages award of $490,000 and fees of over $1.7 million including a 1.5 risk
24 multiplier); *Davis v. California Department of Corrections*, No. A076411 (Cal. App., Oct.
25 31, 1997) (upholding multimillion dollar fee award, including a 1.25 multiplier under the
26 Unruh Act). Prior to the *Dague* decision referenced above in paragraph 26, I secured 2.0
27 multipliers in several prison conditions and voting right cases in the Northern and Eastern
28 District Courts of California.

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES                                      **Ex. K - 68**

Case 2:15-cv-04245-ROS  Document 357-2 Filed 06/02/23  Page 120 of 402
Case 2:15-cv-04245-ROS  Document 357-2 Filed 06/02/23  Page 120 of 402
Page 120 of 402

28.    I have published numerous articles and lectured frequently in Practicing Law Institute (PLI), California's Continuing Education of the Bar (CEB), ATLA and State Bar of California Labor Section programs and elsewhere on the subject of statutory attorneys' fees, as well as on the subject of establishing and financing of plaintiffs' civil rights practices.  In the Spring of 2012, the CEB published its practice guide, "Employment Damages and Remedies," which includes a chapter written by me and RBGG senior counsel Michael Freedman on "Attorney Fees and Costs."  We updated that chapter most recently for publication this year.

29.    Federal and state courts have recognized me frequently as an expert on attorneys' fees matters, including at least one California Court of Appeal, several United States District Courts in California, Ohio, and Colorado and several California Superior Courts.  Several times I have testified through depositions as an attorneys' fees expert.  I have testified in court three times—once in a bench trial in the United States District Court in Colorado, once before a Los Angeles Superior Court jury, and once at a bench trial in Alameda County Superior Court—as an expert on attorneys' fees subjects, including reasonable rates, billing practices, and expenditures of time.

30.    I have been retained as an expert on attorneys' fees matters both by proponents and opponents of fees claims.  For example, on the plaintiffs' side, I testified by declarations in support of class counsel's attorneys' fees in a wage and hour case against Apple that had been litigated for more than seven years, including a jury trial. *Felczer, et al. v. Apple Inc.*, No. 37-2011-00102593-CU-OE-CTL (San Diego CA Superior Court).  I also testified by declaration before the EEOC in *Goel v. Robert Wilke Secretary, Dep't of Veterans' Affairs*, EEOC Case No. 560-2017-00302X.

31.    On the defendants' side, I was retained as an expert in a real estate dispute resulting in a Ninth Circuit decision in *Stonebrae, L.P. v. Toll Bros.*, No. 08-0221, 2011 WL 1334444, at *8 (N.D. Cal. Apr. 7, 2011), *aff'd*, 521 F. App'x 592 (9th Cir. 2013).  I was retained as an expert in *Post Properties, LP v. Post Street Renaissance Partners*, No. 12-640048 (San Francisco Superior Court 2012), and testified by way of a declaration

1   opposing a fee claim in that wrongful detainer case.  I was retained and testified at

2   deposition as an expert in support of a fee claim as damages in a tort case in California's

3   Santa Clara Superior Court, *Gagnard v. Campi Properties Inc.*, No. 10-167727.  I was

4   retained to testify at a jury trial on behalf of defendants in San Francisco Superior Court as

5   an expert on quantum meruit fees for a defendant in a legal malpractice matter arising from

6   a law firm's False Claims Act representation.  *Packard, Packard & Johnson v. Hinshaw*

7   *and Culbertson*, No. 16-55441 (San Francisco Superior Court).  After my deposition, the

8   case settled before trial.

9         32.    In 2020, I was paid my full $1,100 per hour rate for my expert declarations

10  in support of plaintiffs' attorneys' fees claim in ERISA class actions in *Ramos v. Banner*

11  *Health, D. Colo.,* No. 15-cv-2556-WJM-NRN, and *Tracey v. Massachusetts Institute of*

12  *Technology, D. Mass.*, No. 16-cv-11620-NMG.  This year I was paid my full 2023 hourly

13  rate of $1,475.00 for my expert declaration in *Ford, et al. v. Takeda Pharmaceuticals*

14  *U.S.A., Inc., et al.*, U.S.D.C., District of Mass., No. 1:21-cv-10090-WGY.

15        33.    In working on my declaration in the three cases referenced in paragraph 32

16  immediately above, I learned that St. Louis-based Schlichter, Bogard and Denton's

17  national market rates have been approved by multiple courts in a class action settlement of

18  an ERISA case involving the defined contribution plan of another higher education

19  institution.  *See Margaret E. Kelly et al. v. The Johns Hopkins University*, No. 16-2835,

20  Doc. 94 at 13 (D. Md. Jan. 28, 2020); *Cassell v. Vanderbilt University*, No. 16-2086, Doc.

21  174 at 3 (M.D. Tenn. Oct. 22, 2019); *Bell v. Pension Comm. of ATH Holding Co., LLC*,

22  No. 15-02062, 2019 WL 4193376, at *5 (S.D. Ind. Sept. 4, 2019) (approving a national

23  hourly fee rate of up to $1,060 as part of a lodestar cross-check); *Clark v. Duke Univ.*,

24  No. 1:16-cv-11620-NMG, 2019 WL 2579201, at *4 (M.D.N.C. June 24, 2019) (approving

25  a national hourly fee rate of up to $1,060 as part of a lodestar cross-check); *Sims v. BB&T*

26  Corp., No. 15-732, 2019 WL 1993519, at *3 (M.D.N.C. May 6, 2019) (approving a

27  national hourly fee rate of up to $1,060 as part of a lodestar cross-check).

28        34.    Continuously since 1976, I have been a senior partner, managing partner, or

[4295618.13]            12           Case No. CV-15-2245-PHX-ROS
DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES           **Ex. K - 70**

1  sole principal of a small law firm.  In these capacities, I have been setting billing rates and

2  practices for more than 48 years.  I also frequently employ other law firms to work for my

3  clients, and thereby become familiar with their rates and practices.

4         35.  I constantly familiarize myself with the rates charged and the billing and

5  work practices of lawyers throughout the nation in a number of additional ways:  (1) from

6  my own involvement in attorneys' fees litigation and expert consultations and testimony;

7  (2) by representing other attorneys seeking fees; (3) by obtaining declarations from other

8  attorneys regarding market rates, attorneys' fees, billing and work practices; (4) by

9  discovering the rates charged by opposing parties' counsel; (5) by discussing attorneys'

10  fees, billing, and work practices with other attorneys; (6) by reviewing surveys, legal

11  newspapers, reported decisions, and treatises regarding prevailing attorneys' rates, fees,

12  billing and work practices; (7) by reviewing attorneys' fees applications and awards in

13  cases throughout the nation, as well as published and unpublished decisions and orders

14  throughout the nation; (8) by reviewing rates charged by, and billing and work practices of,

15  other firms that my firm has retained or associated with; and (9) by conducting research in

16  my preparation for testimony as an expert.

17  **BILLING RATES HAVE INCREASED DRAMATICALLY IN RECENT YEARS**

18         36.  Based on my above-referenced knowledge and experience with trends in

19  attorney fee rates and annual increases, it is particularly important to note the recent year-

20  over-year percentage increases in attorney fee rates across law firms in the United States.

21  These increases have resulted in dramatic increases to attorney rates over recent years.

22         37.  In 2019 and 2020, annual percentage increases in fee rates remained

23  relatively constant at 3.3% and 3.5%.  During and after the height of the COVID-19

24  pandemic, however, rates increased quite dramatically.  Reported increases from the top

25  100 law firms in the country were 5.6% for 2021 and 5.9% in 2022.  Reputable authorities

26  and those I personally consider reliable in this area reported at the end of 2022 that the

27  industry could see 7-8% rate hikes for 2023.  Accordingly, law firm rates for top law firms

28  in the U.S. have, on average, risen almost twenty percent over the past three years.

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES       **Ex. K - 71**

**RBGG'S 2023 BILLING RATES**

38.     RBGG's 2023 hourly rates are well within the range of rates for comparable attorneys and paralegals in the San Francisco Bay Area Market and other major metropolitan markets for legal services in comparable cases to this one.  These rates are the rates RBGG charges and is paid in many fee-for-service matters.  RBGG's rates are consistent with rates charged by and paid to comparable lawyers for comparable work in San Francisco and throughout the United States.

39.     My firm's billing rates are charged to and paid by our many clients who pay by the hour on a monthly billing and payment basis.

40.     RBGG's 2023 hourly rates for attorneys and other legal professionals who worked on this action are wholly consistent with the market rates charged for current payment by comparable attorneys and legal staff in the San Francisco Bay Area for work comparable to that performed in this case.  In fact, RBGG's rates are lower than the rates at many comparable San Francisco Bay Area law firms.  RBGG's billing practices are similarly comparable to those of other attorneys and legal staff in the San Francisco Bay Area.

41.     In numerous matters, RBGG has been awarded its San Francisco rates by courts in cases filed and litigated outside of San Francisco and the Northern District of California.  This includes the Ninth Circuit, which has historically awarded my firm's and my full San Francisco rates in cases that were filed in district courts outside of San Francisco and the Northern District of California, including not only in the appellate portion of this case, but also starting with several decisions in the *Gates* cases, such as *Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1992), and in two cases that arose in the District of Oregon.  *See Holland v. Roeser*, 37 F.3d 501 (9th Cir. 1994) (fees order dated February 22, 1995); *Boots v. Bond*, 9th Circuit Nos. 97-35601 and 97-35641 (Fees including Expenses and Costs due to Frivolous Appeal Order dated January 14, 1998).

42.     RBGG's rates are the rates we claim in our fee applications in all our fee-shifting cases, and that we bill clients and are paid monthly, regardless of where their

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES                                                                      **Ex. K - 72**

1 matters are filed or litigated.  Over the years, our rates have been accepted consistently by

2 courts in California and in the Northern and Eastern Districts of California, including in

3 the following cases:

4   (a)   *Andrews v. Equinox Holdings, Inc.*, Case No. 20-cv-00485-SK, 2021

5 WL 5275822 (N.D. Cal. Nov. 9, 2021) (Order approving 2021 rates of (1) Partner Sanford

6 Jay Rosen of $1,250 per hour, (2) Partner Ernest Galvan, class of 1997 – $875; (3) Senior

7 Counsel Jenny S. Yelin, class of 2010 – $600; (4) Associate Adrienne Harrold, class of

8 2018 – $350; (4) Summer Associates Grace Ann Brew and Alexandra Daniels – $300;

9 (5) Paralegal Cate Johnson – $275; and (6) Paralegal Clerk Adam Dean – $240);

10   (b)   *Human Rights Defense Center v. County of Napa*, No. 20-CV-01296-

11 JCS, 2021 WL 1176640 (N.D. Cal. Mar. 28, 2021) (Order approving 2020 rates of Partner

12 Sanford Jay Rosen of $1,100 per hour, Partner Jeffrey L. Bornstein of $950 per hour,

13 Senior Counsel Benjamin Bien-Kahn of $625 per hour, and Senior Paralegal Linda H.

14 Woo of $350 per hour);

15   (c)   *Neutron Holdings Wage and Hour Cases*, San Francisco Superior Ct.

16 Case No. CJC-19-005044 (July 13, 2021 Order granting request for fees and costs as part

17 of PAGA settlement and May 20, 2021 Tentative Ruling finding RBGG's 2021 rates to be

18 "generally consistent with market rates in the Bay Area and rates … awarded in other

19 cases.");

20   (d)   *Armstrong v. Brown*, N.D. Cal. No. 4:94-cv-02307-CW (Stipulated

21 Order Confirming Undisputed Attorneys' Fees and Costs for the First Quarter of 2021),

22 ECF No. 3283 at 2-3;

23   (e)   *Cole et al. v. County of Santa Clara*, N.D. Cal. No. 5:16-cv-06594-

24 LHK (March 21, 2019 Order Granting Final Approval of Class Settlement and Motion For

25 Attorneys' Fees, approving RBGG's 2018 rates including Ms. Ells's rate of $650), ECF

26 No. 86 at 3-4.

27   (f)   *Sunner et al. v. Kenneth R. Turnage II General Contractor, Inc. et al.,*

28 *Alameda Cnty*. Super. Ct. No. RG15772244 (February 15, 2017 Order approving RBGG's

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND EXPENSES
**Ex. K - 73**

Case 2:15-cv-04245-ROS Document 363-2 Filed 06/02/23 Page 16 of 319
Case 2:15-cv-04245-ROS Document 353-1 Filed 05/03/23 Page 16 of 319
Page 125 of 402

1   request for fees and costs as part of a class action settlement common fund, as well as an

2   excerpt of court filings showing RBGG's 2017 billing rates);

3          (g)    *Quinby v. ULTA Salon, Cosmetics & Fragrance, Inc*., N.D. Cal.

4   No. CV-15-4099 WHO (Order approving RBGG's request for fees and costs as part of a

5   class action settlement common fund, as well as excerpts of court filings showing RBGG's

6   2016 billing rates);

7          (h)    *National Federation of the Blind of California et al. v. Uber*

8   *Technologies*, Inc., N.D. Cal. No. 14-cv-04086-NC (December 6, 2016 Order approving

9   RBGG's 2016 rates, noting that the rates are "reasonable in the San Francisco Bay Area

10  market," and Declaration of Michael W. Bien in Support of Plaintiffs' Motion for Fees and

11  Costs describing RBGG's 2016 rates);

12         (i)    *Hernandez v. Cnty. of Monterey*, N.D. Cal. No. 5:13–cv–02354–PSG

13  (November 9, 2015 Order granting attorneys; fees and expenses, and Declaration of Michael

14  W. Bien explaining RBGG's requested lodestar based on RBGG's 2015 market rates);

15         (j)    *Estate of Prasad v. County of Sutter*, E.D. Cal. No. 2:12-cv-00592-

16  TLN-JFM (July 17, 2013 Order finding the 2013 rate of $445 for former RBGG associate

17  Kathryn G. Mantoan, who graduated from law school in 2005, reasonable);

18         (k)    *Armstrong v. Brown*, 805 F. Supp. 2d 918, 922 (N.D. Cal. 2011)

19  (compelling defendants to pay RBGG's "reasonable 2010 hourly rates");

20         (l)    *Valdivia v. Brown*, 848 F. Supp. 2d 1141, 1143-44 (E.D. Cal. 2011)

21  (granting motion to compel payment of fees at RBGG's 2010 rates of $275 to $800 per

22  hour, given finding that these rates are "are in line with prevailing rates charged by other

23  San Francisco Bay Area attorneys of comparable experience working on similarly complex

24  cases");

25         (m)    *Prison Legal News v. Schwarzenegger*, No. C 07-02058 CW, 2008

26  WL 11411620 (N.D. Cal. Dec. 5, 2008), *aff'd in part, vacated in part, remanded*, 608 F.3d

27  446 (9th Cir. 2010) (affirming RBGG's requested 2008 rates, including my 2008 rate of

28  $740 per hour); and

(n)     *L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888, 894-95 (E.D. Cal. 2009) (awarding full requested hourly rates of $295 to $640 for RBGG attorneys "based on consideration of the 2008 market rates and the skill of the individual attorneys").

### RBGG'S BILLING PRACTICES AND WORK TO PREPARE THIS FEE APPLICATION

43.     I am familiar with RBGG's billing and timekeeping practices. Our billing practices, including our billing judgment reductions, in this case are consistent with both our firm's and the San Francisco Bay Area market's practices. The expenses we are claiming are expenses that are reimbursed to attorneys by their clients in the San Francisco Bay Area.

44.     Timekeepers at our firm are required to make a record of the work they do at or near the time the work is done recorded by tenths of an hour, and to either personally enter that information into the firm's timekeeping software or to direct a staff member to do so. The firm's timekeeping software maintains these records in the regular course of RBGG's business, and making these records is a regular practice of RBGG in furtherance of law practice and matter billing.

45.     To track our efforts on this matter we had a specific matter number in our firm, 979-19, solely devoted to our work on the merits of the district court portion of this case. We separately tracked our time spent working on the instant fees application in matter number 979-19A. Time recorded in each matter was kept contemporaneously.

46.     For logistical reasons, in this Application we are limiting the presentation of Plaintiff's claim for fees to the fees work performed through May 26, 2023. We will supplement and document additional time beyond May 26, if and as appropriate with any reply or at such other time as the Court may direct.

47.     I am serving as lead counsel on the fees portion of this matter given Ms. Ells's other case commitments and my extensive expertise in this area, plus my role serving as lead counsel on the appellate fees proceedings in the Ninth Circuit. I am familiar with the skill and experience of all the timekeepers at RBGG who worked on this

DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES                                              **Ex. K - 75**

Case 2:15-cv-02245-ROS Document 3591-2 Filed 06/02/23 Page 2 of 35
Case 2:15-cv-02245-ROS Document 3591-2 Filed 06/02/23 Page 2 of 35
Page 127 of 402

1  matter.  I conducted the first and principal review of RBGG's time records largely in 2019,

2  because Ms. Ells was fully engaged in other time sensitive matters, and I was available to

3  do that work.  As we would for any client, including clients who are paying fees for

4  services based on periodic bills, we have reduced my $1,475 billing rate for this work in

5  the above time period to Ms. Ells's billing rate of $925.

6       48.     I first vetted our time records to make appropriate billing judgment

7  reductions and to assure that our time records presented to the Court do not disclose

8  attorney client, attorney work product, or any other confidential information.  Ms. Ells then

9  personally reviewed the records and made additional reductions.  Ms. Ells and I carefully

10  reviewed our time entries and reduced the fees claim to account for any possible

11  inefficiency or unnecessary duplication of effort.  It is plain from my review of RBGG's

12  time records that on occasion at least, its lawyers were putting in so much time on this

13  matter that other matters had to be delayed.

14       49.     We have applied liberal billing judgment reductions of the time we actually

15  spent on the merits of the district court proceedings in this matter to eliminate any arguably

16  non-compensable merits work fees.  As shown on the time records, we have written off the

17  time of all timekeepers who billed less than 10 hours over the course of the case.  We have

18  also written down some unnecessary or unduly duplicative time, and to account for any

19  new associate transition work to come up to speed and any work not involving the

20  common core of facts and law in this case that may have been devoted to issues on which

21  Plaintiff did not prevail.  For instance, we have written down all time spent briefing

22  Plaintiff's post-remand request for additional injunctive relief, on which PLN did not

23  prevail.  We also eliminated any entries for work by our paralegal that was purely

24  administrative in nature.  Furthermore, we are making an across-the-board reduction of

25  10% as a billing judgment to account for any other unnecessary or unduly duplicative time.

26       50.     These billing judgment reductions do not include additional reductions not

27  shown on the time sheets.  During this litigation, the primary timekeepers sometimes did

28  not record their time reviewing and responding to emails or for meetings related to the case

[4295618.13]       18       Case No. CV-15-2245-PHX-ROS
DECLARATION OF SANFORD JAY ROSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND EXPENSES       Ex. K - 76

on days when they were engrossed in major case projects. Moreover, we removed entries that were incorrectly entered because they belong to other RBGG accounts, entries that inadvertently duplicated a timekeeper's other entries, and entries that disclosed privileged information that could not be appropriately redacted. We are claiming no compensation for any such time.

51. Attached to this Declaration as **Exhibit B** is a true and correct copy of RBGG's billing records for the merits work as described herein. The records were recorded, reviewed by me and Ms. Ells, and prepared in the same manner as recited above.

52. Attached to this Declaration as **Exhibit C** is a summary chart of RBGG's merits work in the district court. The summary chart identifies all of RBGG's timekeepers in this case, their titles, 2023 rates, billed hours and dollar amounts, and the hours and dollar amounts that were written down. RBGG applied liberal discrete billing judgment reductions of approximately $247,007.50 or approximately 14% of the pre-reduced merits work lodestar in the district court. Additionally, RBGG made a 10% across-the-board reduction that comes to $157,035.60. In total, RBGG is claiming $1,413,320.40 for merits work in the district court.

53. We separately tracked our time spent working on the instant fees application in matter number 979-19A. Attached to this Declaration as **Exhibit D** is a true and correct copy of RBGG's billing records for the fees work through May 26, 2023 as described herein. The records were recorded, reviewed by me and Ms. Ells, and prepared in the same manner as recited above. As described in paragraphs 43-50 above, time recorded in each matter was kept contemporaneously and subjected to the same kinds of review and discrete billing judgment reductions as were made for our merits fees claim.

54. Attached to this Declaration as **Exhibit E** is a summary chart of RBGG's work through May 26, 2023 devoted to the fee motion. The summary chart identifies all of RBGG's timekeepers who worked on the fee petition, their titles, 2023 rates, billed hours and dollar amounts, and the hours and dollar amounts that were written down. RBGG applied liberal discrete billing judgment reductions of approximately $18,832.50 or

approximately 8% of the pre-reduced fees motion work through May 26, 2023. Additionally, RBGG made a 10% across-the-board reduction that comes to $21,271.80. In total, RBGG is claiming $191,446.20 for work on the fees petition in the district court.

55. Attached to this Declaration as **Exhibit F** is itemization and documentation of the expenses expended in litigating both the merits and fees application in the district court. These expenses total $13,626.36 and are detailed in **Exhibit F**. Our statutory costs are the subject of the Cost Bill that is being filed with the fees motion.

56. Attached as **Appendix 1** to the Motion is a summary chart of the attorneys' fees and expenses claimed by RBGG, HRDC, and Ballard Spahr. Plaintiff seeks a total of $2,523,914.00 in attorneys' fees and expenses, which are not included on the Cost Bill that is being separately filed.

## COMPLIANCE WITH LOCAL RULE 54.2(d)(1)

57. We have complied fully with Local Rule 54.2(d)(1), as detailed more fully in **Appendix 2** to the Motion, which is the Statement of Consultation. I and Ms. Ells sought to meet and confer with Defendants in an attempt to resolve Plaintiff's fees claim prior to filing this Motion, but received no response to our final attempt to schedule a personal meet and confer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 5th day of June 2023.

_____
Sanford Jay Rosen

# EXHIBIT C

### *PLN v. Ryan*

**ROSEN BIEN GALVAN & GRUNFELD LLP MERITS FEES**

| Timekeeper | Position | Class | 2023 Rates | Billed Hours | Billed Amount | Write Down Hours | Write Down Value |
|---|---|---|---|---|---|---|---|
| Sanford Jay Rosen (SJR) | Partner | 1962 | $1,475 | 72.1 | $106,347.50 | 55.9 | $82,452.50 |
| Michael W. Bien (MWB) | Partner | 1980 | $1,525 | 0.0 | $0.00 | 1.3 | $1,982.50 |
| Ernest Galvan (EG) | Partner | 1997 | $1,050 | 8.3 | $8,715.00 | 2.3 | $2,415.00 |
| Lisa Ells (LAE) | Partner | 2005 | $925 | 530.5 | $490,712.50 | 50.5 | $46,712.50 |
| Jenny S. Yelin (JSY) | Partner | 2010 | $825 | 49.8 | $41,085.00 | 7.8 | $6,435.00 |
| Krista Stone-Manista | Associate | 2009 | $800 | 154.1 | $123,280.00 | 34.2 | $27,360.00 |
| Benjamin Bien-Kahn (BBK) | Senior Counsel | 2009 | $800 | 0.0 | $0.00 | 0.2 | $160.00 |
| Caroline E. Jackson (CEJ) | Senior Counsel | 2011 | $750 | 43.2 | $32,400.00 | 2.3 | $1,725.00 |
| Blake Thompson (BT) | Associate | 2007 | $750 | 0.0 | $0.00 | 0.9 | $675.00 |
| Jennifer L. Stark (JLS) | Associate | 2009 | $725 | 0.0 | $0.00 | 1.8 | $1,305.00 |
| Jessica L. Winter (JLW) | Associate | 2013 | $675 | 0.0 | $0.00 | 1.5 | $1,012.50 |
| Andrew G. Spore (AGS) | Associate | 2015 | $625 | 1064.1 | $665,062.50 | 23.6 | $14,750.00 |
| Amy Xu (AX) | Associate | 2015 | $625 | 88.5 | $55,312.50 | 46.0 | $28,750.00 |
| Christopher D. Hu (CDH) | Associate | 2013 | $600 | 0.0 | $0.00 | 2.3 | $1,380.00 |
| Mark Shinn Krantz (MSK) | Associate | 2016 | $600 | 0.0 | $0.00 | 0.2 | $120.00 |
| Alex Gourse (AG) | Associate | 2017 | $550 | 0.0 | $0.00 | 3.3 | $1,815.00 |
| Karen Stilber (KES) | Paralegal | | $435 | 27.1 | $11,788.50 | 16.9 | $7,351.50 |
| Linda H. Woo (LHW) | Paralegal | | $435 | 0.0 | $0.00 | 0.7 | $304.50 |
| F. Gail LaPurja (FGL) | Paralegal | | $405 | 0.0 | $0.00 | 5.8 | $2,349.00 |
| Katherine C. Hamilton (KCH) | Paralegal | | $325 | 109.7 | $35,652.50 | 51.8 | $16,835.00 |
| Dylan Verner-Crist (DVC) | Paralegal | | $325 | 0.0 | $0.00 | 3.0 | $975.00 |
| Patrick M. Cano (PMC) | Law Clek | | $285 | 0.0 | $0.00 | 0.5 | $142.50 |
| **RBGG MERITS FEES SUBTOTAL:** | | | | **2147.4** | **$1,570,356.00** | **312.8** | **$247,007.50** |
| **Additional 10% Discount After Discrete Billing Judgments:** | | | | | **$157,035.60** | | |
| **RBGG CLAIMED MERITS FEES:** | | | | | **$1,413,320.40** | | |

Ex. K - 80

# EXHIBIT L

1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    HUMAN RIGHTS DEFENSE CENTER,              Case No.  20-cv-01296-JCS
                    Plaintiff,
8
           v.
9                                              **ORDER GRANTING IN PART AND
     COUNTY OF NAPA, et al.,                   DENYING IN PART MOTION FOR
10                                             ATTORNEYS' FEES, COSTS AND
                    Defendants.                EXPENSES**
11                                             Re: Dkt. No. 37

12

13   **I.      INTRODUCTION**

14         Plaintiff Human Rights Defense Center ("HRDC") asserted claims against Defendants

15   County of Napa and Dina Jose, Director of Napa County Department of Corrections, under both

16   federal and state law.  After four months, the parties entered into a stipulated consent decree

17   ("Consent Decree").  HRDC now brings a Motion for Attorneys' Fees, Costs, and Expenses

18   ("Motion").  The Court finds the Motion is suitable for determination without oral argument,

19   pursuant to Civ. L.R. 7-1(b).  For the reasons stated below, the Motion is GRANTED IN PART

20   and DENIED IN PART.[1]  The Court awards $255,925.00 in attorneys' fees and $808.35 in costs.

21   **II.     BACKGROUND**

22         **A.      Factual and Procedural Background**

23         HRDC publishes and distributes reading material to incarcerated persons, including

24   persons incarcerated at the Napa County Jail.  Complaint (Dkt. 1) ¶ 24–25. According to HRDC,

25   Defendants "adopted and implemented mail policies and practices that unconstitutionally

26   prohibit[ed] delivery of publications and correspondence mailed by [HRDC] to persons

27   ───────────────

28   [1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28
     U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

incarcerated at [Napa County Jail][,]" violating both state and federal law.  *Id.*  ¶ 1. To satisfy state law exhaustion requirements, Plaintiff submitted a state tort claim for damages challenging these policies and practices to Defendant County of Napa on August 20, 2019.  The County of Napa notified HRDC that the tort claim had been rejected in a letter dated September 9, 2019.  *Id.* HRDC filed this action on February 20, 2020.

In its complaint, HRDC asserted the following claims: (1) violation of the right to free speech under the First Amendment and 42 U.S.C. § 1983; (2) violation of the right to due process under the Fourteenth Amendment and 42 U.S.C. § 1983; (3) violation of the right to free speech under the California Constitution, Art. I, Sec. 2; (4) violation of the right to due process under the California Constitution, Art. I, Sec. 7; and (5) violation of the Bane Act, California Civil Code section 52.1.  *Id.* ¶¶ 43–68.  HRDC sought declaratory and injunctive relief, damages, and an award of attorneys' fees and costs "under 42 U.S.C. § 1988 and under other applicable law, including but not limited to California Code § 52.1 and California Code of Civil Procedure § 1021.5."  *Id.* at 15 (Request for Relief).

On February 21, 2020, HRDC filed a motion for preliminary injunction seeking to enjoin Defendants from refusing to deliver HRDC's materials to incarcerated persons.  *See generally* Motion for Preliminary Injunction (Dkt. 8).  The motion was noticed for hearing on April 3, 2020, but the parties stipulated to continuances and the hearing was reset for July 17, 2020.  *See* Dkt. 24. Prior to the scheduled motion hearing, the parties resolved all of their disputes with the exception of attorneys' fees and costs, and on June 11, 2020, the Court approved the Consent Decree.  In the Consent Decree, Defendants agreed to change their mail policies and to pay HRDC $12,500 in damages.  *Id.* ¶¶ 7–8.  The Consent Decree also provides that the parties "agree that, for the purposes of the adjudication of Plaintiff's petition for reasonable attorney's fees and costs, Plaintiff is the prevailing party under 42 U.S.C. § 1988."  *Id.* ¶ 4.

**B.    The Parties' Arguments**

**1.  The Motion**

HRDC seeks an award of attorneys' fees and costs incurred in this case by its own in-house counsel and retained counsel Rosen Bien Galvan & Grunfeld LLP ("RBGG").  In the

1  Motion, HRDC asks the Court to award $190,912.95 in attorneys' fees for work on the merits,

2  which includes a 1.5 multiplier on the base amount of fees incurred on the merits of $127,275.30.

3  Notice of Motion.  In addition, it requests $808.35 in costs for the following costs: (1) $445 for

4  Court filing fees; (2) $356.50 for service of process fees; and (3) $6.85 for the certified mailing of

5  the government tort claim.  Declaration of Jeffrey L. Bornstein in Support of Plaintiff's Motion for

6  Reasonable Attorney's Fees and Expenses ("Bornstein Decl.") ¶ 41 & Ex. E (table of cost

7  disbursements).  Finally, HRDC seeks an award of attorneys' fees for work on the fee motion

8  ("fees on fees").  *Id.*  According to HRDC, at the time the Motion was filed it had incurred

9  $26,350 in fees on fees ($24,465.00 for RBGG's work and $1,950.00 for HRDC's work).  *Id.*;  *see*

10  *also* Supplemental Declaration of Jeffrey L. Bornstein in Support of Plaintiffs' Motion for

11  Reasonable Attorneys Fees and Expenses ("Bornstein Suppl. Decl.") ¶ 2.  As discussed below, the

12  amount of attorneys' fees requested for fees on fees was subsequently revised upward.

13  HRDC argues in the Motion that it is the prevailing party as to both its federal claims

14  under 42 U.S.C. § 1983 and its state law claims and therefore is entitled to an award of attorneys'

15  fees under 42 U.S.C. § 1988 and California Code of Civil Procedure section 1021.5.  Motion at 9.

16  As to the latter, HRDC contends an award of fees is warranted because in addition to prevailing on

17  its state law claims, the requirements of section 1021.5 (discussed below) have been satisfied.  *Id.*

18  at 10-11.   HRDC argues further that the amount it requests in fees is reasonable, first addressing

19  its lodestar and requested multiplier as to work on the merits (including "pre-litigation

20  investigation, the filing of a government tort claim, the near-simultaneous preparation and filing of

21  the complaint and the motion for preliminary injunction . . . extensive and time-consuming

22  settlement negotiations with Defendants, and the drafting of the Consent Decree") and then

23  addressing the reasonableness of the amount requested in fees on fees.  *Id.* at 9-20.

24  As to the merits work, HRDC argues its lodestar should be awarded because the hours

25  expended in the case are reasonable and appropriate and the rates charged are in line with

26  prevailing rates in the community for comparable services.  *Id.*  at 11-12.  It asserts that a 1.5

27  multiplier is warranted "due to the quality and efficiency of Plaintiff's lawyers' work, the

28  excellent results rapidly achieved, and the contingent risk of the case."  *Id.* at 12.

United States District Court
Northern District of California

3

**Ex. L - 84**

United States District Court
Northern District of California

1    HRDC argues the time spent on the case by its attorneys (both in-house and retained) "was

2    both necessary and reasonable given the history of the case, the nature of the litigation, and the

3    settlement negotiations." *Id.* at 12.  It asserts that its time "is fully documented by detailed

4    contemporaneous time records showing discrete entries describing each item of work performed

5    and recorded by tenths of an hour." *Id.* (citing Bornstein Decl. ¶¶ 7, 12, Ex. F; Marshall Decl. ¶ 3,

6    Ex. A).  In addition, HRDC represents that both in-house counsel and RBGG exercised billing

7    judgment, making reductions "based on the same careful review of billing records that is typically

8    conducted prior to sending a bill to a fee-paying client[,]" resulting in reductions of $18,137.20.

9    *Id*. at 13.  According to HRDC, this amount reflected a reduction of fees equal to approximately

10   12.47% of the total hours worked on the merits.  *Id.* at 13.  HRDC further asserts that it staffed the

11   case with "small and efficient teams of attorneys and support staff[,]" and divided the work so as

12   to avoid duplication of effort.  *Id.* at 13-14.

13   HRDC contend that "[m]uch of the work performed by Plaintiff's counsel could have been

14   avoided but for Defendants' choices at critical moments in the case." *Id.* at 14.   For example,

15   according to HRDC "Defendant County of Napa summarily denied Plaintiff's government tort

16   claim and ignored Plaintiff's offer to enter into settlement negotiations prior to the commencement

17   of litigation." *Id.* (citing Bornstein Decl. ¶ 20). HRDC also asserts that the draft Consent Decree it

18   sent to Defendants on March 23, 2020 was "substantially similar in material respects" to the

19   version that the Court approved on June 11, 2020 and yet Defendants "chose to engage in more

20   than two months of protracted settlement negotiations—including multiple conference calls and e-

21   mails, the exchange of draft revisions and definitions, and ultimately a final offer by Plaintiff's

22   counsel—until at last agreeing to terms that are nearly the same as Plaintiff's original settlement

23   proposal[.]"  *Id.*  at 14-15.

24   HRDC points to two similar cases that it filed in February 2020 against Tehama Counties

25   and Placer Counties (the "Tehama and Placer County cases") that were settled more quickly than

26   this case because those counties "had the good sense to negotiate with dispatch[.]"  *Id.* at 15

27   (citing Bornstein Decl. ¶¶ 4, 27-29) (citing *Human Rights Defense Center v. County of Tehama*,

28   No. 20-cv-00359-WBS-DMC (Dkt. 23) (E.D. Cal. May 13, 2020) and *Human Rights Defense*

*Center v. County of Placer*, No. 20-cv-00285-JAM-CKD (Dkt. 22) (E.D. Cal. May 14, 2020));
*see also* Bornstein Reply Decl., Ex. 6 (Placer Consent Decree, reflecting settlement amount of
$100,00 including attorneys' fees and costs), Ex. 7 (Tehama Consent Decree, reflecting damages
of $143,500, including attorneys' fees and costs).

To establish that the rates it seeks are reasonable, HRDC offers the declaration of Richard
M. Pearl, an expert on attorney fees, *see* Declaration of Richard M. Pearl in Support of Motion for
Reasonable Attorney's Fees and Expenses ("Pearl Decl."), and declarations from Plaintiff's
attorneys Jeffrey Bornstein and Daniel Marshall. *See generally,* Bornstein Decl.; Declaration of
Daniel Marshall in Support of Plaintiff's Motion for Reasonable Attorney's Fees and Expenses
("Marshall Decl."). HRDC also contends RBGG's rates "have been upheld as reasonable market
rates by multiple courts in multiple venues, including in this district." Motion at 18 (citing
Bornstein Decl. ¶¶ 33, 35-36). It points to decisions in *National Federation of the Blind v. Uber
Technologies, Inc.*, No. 14-04086-NC; *Cole v. County of Santa Clara*, No. 16-cv-06594-LHK;
*Hernandez v. County of Monterey*, No. 13-cv-02354-BLF; and *Armstrong v. Newsom*, No. 94-cv-
02307-CW. *Id.* at 18-19 (citing Bornstein Decl., Exs. I-M). It argues that its current rates
"incorporate only modest increases" from previous years and are consistent with the attorneys'
additional years of experience and increases in overall Bay Area rates. *Id.* at 18-19

HRDC argues that a 1.5 multiplier on its merits lodestar is appropriate under both federal
and state law. *Id.* at 21. It further contends that "[w]here, as here, a Plaintiff prevails on both
federal and state claims, the Court looks to California law for the factors to consider when
awarding a lodestar enhancement multiplier." *Id.* (citing *Mangold v. Cal. Pub. Util. Comm'n*, 67
F.3d 1470, 1478 (9th Cir. 1995); *Nat'l Fed'n of the Blind v. Target Corp*., Case No. 06-01802
MHP, 2009 WL 2390261, at *6 (N.D. Cal. Aug. 3, 2009) ("When a party prevails under both
federal and state law, the district court may apply the more generous provisions of state law in
calculating a fee award, such as including a multiplier for contingent fee risk.")).

Under California law, HRDC asserts, a multiplier may be awarded based on factors that
include: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in
presenting them, (3) the extent to which the nature of the litigation precluded other employment by

United States District Court
Northern District of California

5

1    the attorneys, [and] (4) the contingent nature of the fee award." *Id.* at 21 (quoting *Ketchum v.*

2    *Moses*, 24 Cal. 4th 1122, 1132 (2001)). HRDC contends federal and state courts in California

3    "often award multiplier enhancements in civil rights cases where one or more of these factors

4    apply." *Id.* (citing *Nat'l Fed'n of the Blind v. Target Corp.*, 2009 WL 2390261, at *9; *Chabner v.*

5    *United of Omaha Life Ins. Co*., Case No. C-95-0447 MHP, 1999 WL 33227443 at *6-7 (N.D. Cal.

6    Oct. 12, 1999); *Ctr. for Biological Diversity v. County of San Bernardino*, 185 Cal. App. 4th 866,

7    897 (2010); *City of Oakland v. Oakland Raiders*, 203 Cal. App. 3d 78, 84 (1988)). Moreover, it

8    argues, these factors support the award of a multiplier here "given the unusual skill demonstrated,

9    the exceptional and speedy results achieved, and the contingent risk of the recovery" in this case.

10   *Id.* It contends the magnitude of the multiplier is "well within the range of recently approved

11   multipliers." *Id.* at 22 (citing cases).

12           HRDC also argues that the 1.5 multiplier it seeks is appropriate under federal law. *Id.*

13   According to HRDC, under federal law a multiplier is appropriate "where necessary to achieve the

14   objective of 42 U.S.C. § 1988 to ensure civil rights litigants can attract competent counsel, and is

15   awarded when counsel's performance was and the results achieved are excellent." *Id.* at 22 (citing

16   *Perdue v. Kenny A. ex. Rel. Winn*, 559 U.S. 542, 554 (2010)). That standard also supports a 1.5

17   multiplier, HRDC contends. *Id.*

18           Finally, as to their fees on fees work, HRDC argues it is entitled to attorneys' fees under

19   both federal and California law. *Id.* at 20. In the Motion, it requests an award of $26,350 for a

20   total of 33.2 hours for work performed by RBGG through July 31, 2020 and by HRDC's in-house

21   counsel through August 3, 2020. *Id.* HRDC contends its attorneys spent 53.8 hours on the Motion

22   but have "written down 20.6 hours," reducing the total hours worked on the fee motion by 40.6%

23   and the total requested fee amount by 32.7%. *Id.*

24                    **2. The Bornstein Supplemental Declaration**

25           Ten days after filing the Motion and before Defendants filed their Opposition brief,

26   HRDC filed a supplemental declaration updating the amount of fees it was seeking to reflect fees

27   on fees work performed between August 1, 2020 and August 15, 2020. Bornstein Supp. Decl. In

28   the supplemental declaration, HRDC requests an additional $52,300 for work on the fee motion by

1    RBGG during this period, bringing its total fees on fees request up to $78,650.00.  *Id.* at 4.

2    According to HRDC's counsel, this amount reflects "discrete billing judgment reductions of

3    $27,675" as well as an additional reduction of $6,000 "to insure that [HRDC is] not claiming

4    unduly duplicative or unnecessary time." *Id.* ¶ 4.

5                    **3.  Opposition**

6            In their Opposition, Defendants do not dispute that HRDC is entitled to an award of

7    reasonable attorneys' fees and costs, including fees on fees, but contend the lodestar amount

8    HRDC requests reflects unreasonable hours and rates and that HRDC is not entitled to a

9    multiplier.  *See generally* Opposition (Dkt. 41).  They further assert that because the parties

10   stipulated only that HRDC was the prevailing party under 42 U.S.C. § 1988, HRDC is not entitled

11   to recover fees for work on  its state law claims and also cannot rely on California law in support

12   of its multiplier request, which is governed exclusively by federal law.  Opposition at 1, 20 n. 7,

13   24.

14           In addressing the reasonableness of HRDC's lodestar amount, Defendants consider the

15   work billed in three discrete stages of the case: 1) the work billed through February 24, 2020,

16   when the complaint and the motion for preliminary injunction were filed; (2) work billed between

17   February 25, 2020 and July 15, 2020, when the parties were negotiating the settlement and

18   Consent Decree;  and 3) work billed on the fee application.  *Id.* at 2; *see also* Declaration of

19   Marshall E. Bluestone in Support of Defendants' Opposition to Plaintiff's Motion for Reasonable

20   Attorney's Fees and Expenses ("Bluestone Decl.") ¶ 9.

21           As to the first period, Defendants request the Court reduce the fees HRDC seeks by fifty

22   percent, to $20,942.  Opposition at 11; *see also* Bluestone Decl. ¶ 30 (finding based on review of

23   HRDC's billing records that it is seeking $41,884.30 in attorneys' fees for 70 hours of work

24   during this period).  First, Defendants argue the time billed is excessive because the complaint and

25   motion for preliminary injunction were "identical or nearly identical" to earlier filings by HRDC

26   in the Placer and Tehama County cases, for which HRDC already received attorneys' fees as part

27   of the settlements in those cases.  *Id.* at 7–8.  Defendants argue that given the similarities in the

28   pleadings of the earlier cases, "[i]t certainly would not take 70 hours of time . . . to alter the

complaint, declarations and motion for the factual differences when the factual differences in mail returned policies were <u>already</u> catalogued in August 2019 by Mr. Marshall and the policy differences had <u>already</u> been researched as reflected in the billing records." *Id.* at 8 (citing Bluestone Decl. ¶ 11). HRDC argues the time billed is excessive in light of the efficiency and expertise HRDC claims in support of their "very high billable rates." *Id.* at 9.

Second, Defendants argue that because the parties did not stipulate that HRDC was the prevailing party on its state law claims, HRDC is not entitled to fees for work on those claims pursuant to any stipulation. *Id.* at 10-11. Moreover, Defendants assert, HRDC's Bane Act claim— which provides one of the grounds for HRDC's request for attorneys' fees under state law—would not have survived a motion to dismiss and therefore would not have given rise to liability. *Id.* In particular, Defendants argue that to prevail on its Bane Act claim, HRDC would have been required to show that Defendants interfered with or threatened to interfere with the rights of the Plaintiff "by threats, intimidation, or coercion" but HRDC did not include any factual allegations to support such a claim. *Id.* at 10. Therefore, Defendants argue, HRDC is not entitled to fees for work on its state law claims, such as the time it spent filing the government tort claim to satisfy the state law exhaustion requirement. *Id.*; *see also* Bluestone Decl. ¶ 33, Ex. S (finding that HRDC billed $875.50 in attorneys' fees for time spent on the state law government claim). Because HRDC does not differentiate in its timesheets between work on state law claims and work on federal law claims (except as to the time spent on the state tort claim), Defendants ask the Court to reduce the requested lodestar for this period by 50%. Opposition at 11.

Defendants also request a 50% reduction of the lodestar as to the second period (the negotiation period) on the basis of "duplication of work by overstaffing," which would result in an adjusted lodestar amount of $43,695 for this period. *Id.* at 12-16. Defendants point to the total time billed for this period (107.5 hours, translating to fees in the amount of $85,391 at HRDC's requested rates) and compare it to the time billed on the direct communications that occurred – a total of 16.1 hours for 13 phone calls, 18 emails, and three letters over a three-month period, translating to $13,578 in fees. *Id.* at 13; Bluestone Decl. ¶ 18. When time spent on all of the direct communications is subtracted out, HRDC seeks fees for an additional 91.4 hours, translating

to $71,813 in fees for this period. *Id.* Defendants argue that this additional time was the result of "numerous secondary communications," review of the same material by up to three additional attorneys and two paralegals, and excessive conferencing, which should not have been necessary given the claimed expertise and efficiency of HRDC's attorneys. *Id.* at 9-10, 14-16; *see also* Bluestone Decl., Ex. N (itemizing time entries involving "secondary communications").

As to the third period, Defendants contend the total time billed through August 15, 2020 (based on the evidence submitted with the Motion and the supplemental declaration supplied ten days later) was 106.4 hours, giving rise to fees on fees in the amount of $78,650, constituting 62% of all fees sought by HRDC for work on the case or 188% of the fees HRDC seeks for investigating and filing the complaint and preliminary injunction papers. *Id.* at 22-23 (citing Bluestone Decl. ¶¶ 29-30). Defendants argue this amount of time is excessive. *Id.* First, Defendants argue HRDC overstaffed and duplicated its work, pointing to twenty hours it contends HRDC's attorneys spent "conferencing" about the fee motion. *Id.* at 23 (internal quotation marks omitted). Second, Defendants again argue that to the extent HRDC relies on state law in the Motion, the time spent on the fee motion should be reduced because HRDC is not entitled to any fees on state law claims, as discussed above. *Id.* at 24-25. Thus, for this period, like the other two, Defendants ask the Court to reduce HRDC's lodestar amount by 50%, to $39,325. *Id.* at 25.

Defendants also object to HRDC's request for fees "for secretarial tasks performed by mainly paralegals at as much as $350 per hour." *Id.* at 16 (citing Bluestone Decl., Ex. O (itemized list of time entries)).[2] Because such clerical work should be included in attorney overhead costs, it should not have been billed, Defendants assert. *Id.*

Defendants also argue that the hourly rates HRDC requests are excessive given that the case settled quickly, before any "active litigation" occurred, and was not complex. Opposition at

---

[2] The time entries identified by Defendants are for three paralegals: 1) F. Gail LaPurja for 9.2 hours of work between February 20, 2020 and June 15, 2020, which according to Defendants was billed at a rate of $320/hour, giving rise to fees in the amount of $2,944.00; 2) Linda H. Woo for 2.2 hours of work between February 21, 2020 and April 24, 2020, which according to Defendants was billed at a rate of $350/hour, giving rise to fees in the amount of $770.00; and 3) Kathy Moses for 5.6 hours of work between March 2, 2020 and May 8, 2020, which according to Defendants was billed at a rate of $260/hour, giving rise to fees in the amount of $1,456.00. Bluestone Decl., Ex. O.

9

Ex. L - 90

17-20.  In contrast, Defendants contend, the cases HRDC and its expert, Mr. Pearl, rely on to show

its rates are reasonable involved drawn-out litigation, complex cases and class actions, and

bankruptcy cases in which counsel had to wait for years to receive compensation.  *Id.* at 17.

In addition to their contention that the lodestar amount HRDC requests is excessive,

Defendants content there is no justification for awarding a multiplier in this case.  *Id.* at 20-22.

They argue that only federal law should be considered in making this determination because the

parties did not stipulate that HRDC was a prevailing party under state law, as discussed above.  *Id.*

at 20 n. 7.  Under federal law, they argue, there is a strong presumption that the lodestar represents

a reasonable fee and that presumption is overcome only in "rare" cases supported by "specific

evidence" and "detailed findings."  *Id*. (citing *Blum v. Stenson*, 465 U.S. 886, 897 (1984); *City of

Burlington v. Dague*, 505 U.S. 557, 562 (1992)).  According to Defendants, "[t]he novelty and

complexity of the litigation, quality of representation, results of the litigation or novelty of the

issues do not justify an upward adjustment."  *Id.* at 20-21 (citing *Blum*, 465 U.S. at 897-900). Nor

does "the contingency of the risk involved justify an upward adjustment[,]" Defendants assert.  *Id.*

at 21 (citing *Dague*, 505 U.S. at 565-566).   To the extent HRDC argues that a multiplier is

warranted because it was able to achieve a quick settlement, Defendants contend there is no

authority to support such an approach, "which would deter prompt settlements like the one entered

into by Defendants."  *Id.*  Defendants also reject HRDC's assertion that it is difficult to find

counsel to represent in these types of cases, arguing that the declarations supplied by HRDC show

that it has been represented by counsel in "dozens of actions over the years." *Id.* (citing Motion at

2; Marshall Decl. ¶ 6). In sum, Defendants assert, this is not a "rare" case and no multiplier should

be awarded. *Id.*  at 22.

### 4.  Reply

In its Reply, HRDC seeks an additional $50,000 in fees on fees, bringing the total amount

sought for fees on fees up to $128,650.  Reply at 13; Jeffrey L. Bornstein Reply Declaration in

Support of Plaintiff HRDC's Motion For Reasonable Attorneys' Fees and Expenses ("Bornstein

Reply Decl.") ¶¶ 48-49.  According to Plaintiffs, the actual amount incurred for work on the fee

motion after August 15, 2020 was $121,554, but it exercised billing judgment as to $20,236 and

1    further reduced the amount requested by 50%, giving rise to the additional fees on fees request of

2    $50,000.  Bornstein Reply Decl., ¶ 48, Ex. O.

3            HRDC acknowledges that the amount it seeks for fees on fees is high, but contends the

4    work on the fee motion was necessary because Napa County "dug its heels in and insisted on

5    litigating the amount of HRDC's fees, despite offers to mediate and fair warning along the way

6    that such a fight would be expensive." *Id.* (citing Bornstein Reply Decl. ¶ 27).  HRDC further

7    asserts that "[t]his is one of those cases in which large fees for fees that are substantial relative to

8    the merits fees should be awarded." *Id.* (citing *Prison Legal News v. Schwarzenegger*, No. C 07-

9    02058 CW, 2008 WL 11411620 at *2, *4 (N.D. Cal. Dec. 5, 2008) (awarding $88,940.29 for

10   223.7 hours of fees work and $48,562.17 for 162.7 hours of merits work), affirmed in part,

11   vacated in part, remanded by 608 F.3d 446, 450 (9th Cir. 2010); *Bernardi v. Yeutter*, 951 F.2d

12   971, 977 (9th Cir. 1991) (awarding $65,641.50 for fees work, 58.2% the size of the merits

13   lodestar); *Prison Legal News v. Schwarzenegger*, 561 F. Supp. 2d 1095, 1101-05, 1107 (N.D. Cal.

14   2008) (granting request for fees with $42,098.38 for fees work, 44.7% the size of the merits

15   lodestar); Pearl, California Attorney Fee Awards § 9.23 at p. 9-30.1 (3d ed. Mar. 2019) ("In

16   *Graham v. DaimlerChrysler Corp.*, [34 Cal. 4th 553 (2004)], a catalyst case, the trial court awarded

17   plaintiffs fees of $762,830, at least 90 percent of which were for fees on fees."); *Lucas v. White*,

18   63 F. Supp. 2d 1046, 1060 (N.D. Cal. 1999) (awarding fees for fees for 394.74 hours for single fee

19   motion, not including reply brief and hearing)).

20           HRDC rejects Defendants' argument that it cannot seek attorneys' fees under state law,

21   arguing instead that it is entitled to its attorneys' fees not only under federal law but also under

22   Cal. Civ. Code section 52.1(i) for prevailing on its well pled California Bane Act claims, and

23   under Cal. Code Civ. Proc. section 1021.5 ("Section 1021.5").  *Id.*  at 3-4 (citing *Rodriguez v.*

24   *County of Los Angeles*, 891 F.3d 776, 808 (9th Cir. 2018) (prevailing plaintiff entitled to fee

25   award on both federal civil rights and Bane Act claims); *Blackwell v. Foley*, 724 F. Supp. 2d 1068,

26   1074 (N.D. Cal. 2010)).  First, HRDC asserts that it did not waive its right to seek attorneys' fees

27   under state law when it entered into the Consent Decree.  *Id.* at 4.   In particular, it contends

28   "[w]aiver of attorney's fees in a settlement agreement must be clear" and under that standard there

United States District Court
Northern District of California

11

1  was no waiver here. *Id.* at 4 (citing *Muckleshoot Tribe v. Puget Sound Power Light Co.*, 875 F.2d

2  695 (9th Cir. 1989)). Instead, it contends, the Consent Decree expressly recognized HRDC's

3  well-pleaded state law claims, as well as the fact that HRDC filed a state tort claim before bringing

4  this action. *Id.*

5  HRDC argues further that it is entitled to fees under California law. *Id.* According to

6  HRDC, under California law a party may seek fees as a prevailing party if the party "successfully

7  obtain[ed] a stipulated injunction entered as a judgment, bringing about a change in the parties'

8  legal relationship." *Id.* (citing *Vasquez v. State of California*, 45 Cal. 4th 243, 259 (2008)).

9  Alternatively, HRDC asserts, a party may be considered the prevailing party under the "catalyst

10  theory" if the underlying claim was not frivolous, unreasonable or groundless. *Id.* (citing *Belth v.*

11  *Garamendi*, 232 Cal. App. 3d 896, 901 (1991)). HRDC contends it is a prevailing party under both

12  theories. *Id.* at 5-7.

13  HRDC rejects Defendants' arguments that the hourly rates it seeks are unreasonable,

14  reiterating its position that those rates are appropriate and argues the rates are "well within the

15  range for billing rates" by comparable Bay Area attorneys and paralegals in comparable cases. *Id.*

16  at 8. As to Rosen's requested rate, HRDC cites *Prison Legal News v. Schwarzenegger*, 608 F.3d

17  446 (9th Cir. 2010), in which the Ninth Circuit approved Rosen's 2008 hourly rate of $740. Reply

18  at 8–9. HRDC further asserts that the Court should reject Defendants' attempt to discredit the

19  opinions of Mr. Pearl, who is "a leading expert on attorney's fees rates and practices." *Id.* at 9.

20  HRDC argues further that the Court should award HRDC its full lodestar rather than

21  making the 50% reductions sought by Defendants. *Id.* at 9. It argues that considerable work was

22  necessary to investigate, research, and prepare the complaint and the motion for preliminary

23  injunction, rejecting Defendants' characterization of this case as "a simple cookie-cutter case" in

24  which HRDC used boilerplate pleadings from the Placer and Tehama County cases. *Id.* at 9–10

25  (citing Bornstein Reply Decl. ¶¶ 10-17, Exs. 1-7 (redlines comparing complaint and preliminary

26  injunction motion in this case to complaints and preliminary injunction motions in the Placer and

27  Tehama County cases)). HRDC further contends that Defendants "force[d] time-consuming

28  negotiations" by refusing to engage in negotiations before filing and refusing to settle, *id.* at 10,

**Ex. L - 93**

United States District Court
Northern District of California

1    and argues "additional conferences and communications among counsel" was necessary to address

2    Defendants' "intransigent negotiation tactics." *Id.* at 11. HRDC also points to the significant

3    billing judgment reductions it has made to ensure that it does not seek fees for duplication of

4    efforts. *Id.* Lastly, HRDC argues that Defendants have not provided a clear roadmap for the

5    Court to award fees, pointing as an example to their request for a 50% reduction in total fees

6    incurred in the negotiation stage of the case even while appearing to acknowledge that the fees that

7    were incurred for direct communications during that stage of the case are valid. *Id.*; Bornstein

8    Reply Decl. ¶ 40.

9         Finally, HRDC asserts that its request for a multiplier should be granted, emphasizing that

10   it is seeking a multiplier "primarily" under state law, which it contends is "more generous" than

11   federal law. *Id.* at 14. It argues that under California law, the requested 1.5 multiplier on merits

12   fees is warranted because of the excellent results it obtained and the contingent risk taken on by

13   counsel in representing HRDC. *Id.* (citing *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001)).

**III. ANALYSIS**

   **A. Legal Standard**

16        Both federal and California courts have adopted the "lodestar" method for determining

17   reasonable attorneys' fees. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (concerning attorneys'

18   fee awards under 42 U.S.C. § 1988); *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084, 1095 (2000) (fee

19   setting inquiry in California ordinarily begins with the lodestar). The lodestar figure is the product

20   of the hours counsel reasonably spent on the case and a reasonable hourly rate. *Jordan v.

21   Multnomah Cty.*, 815 F.2d 1258, 1262 (9th Cir. 1987).

22        "The hourly rate for successful civil rights attorneys is to be calculated by considering

23   certain factors, including the novelty and difficulty of the issues, the skill required to try the case,

24   whether or not the fee is contingent, the experience held by counsel and fee awards in similar

25   cases." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1114 (9th Cir. 2008). Furthermore, to

26   determine whether a party's claimed hours are reasonable, the court must review attorneys' time

27   records to determine whether the hours are adequately documented in a manner that can be

28   properly billed directly to clients. *Hensley*, 461 U.S. at 434; *see also Chalmers v. City of Los*

Ex. L - 94

United States District Court
Northern District of California

1  *Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986) (holding that the fee applicant bears the burden of

2  submitting detailed time records justifying the hours claimed to have been expended).  A fee

3  applicant should "exercise 'billing judgment' with respect to hours worked."  *Hensley*, 461 U.S. at

4  437.  The court must also assess whether the hours claimed are vague, block-billed, excessive or

5  duplicative.  *See Navarro v. General Nutrition Corp.*, No. C 03-0603 SBA, 2005 WL 2333803, at

6  *11, 15 (N.D. Cal. Sept. 22, 2005).

7        The fee applicant bears the burden of producing satisfactory evidence that the requested

8  rates are in line with those prevailing in the community for similar services of lawyers of

9  reasonably comparable skill and reputation.  *Jordan*, 815 F.2d at 1263.  As a general rule, the

10  forum district represents the relevant legal community.  *Gates v. Deukmejian*, 987 F.2d 1392,

11  1405 (9th Cir. 1992).  Fee applicants may provide affidavits of practitioners from the same forum

12  with similar experience to establish the reasonableness of the hourly rate sought.  *See, e.g.,*

13  *Mendenhall v. Nat'l Transp. Safety Bd.*, 213 F.3d 464, 471 (9th Cir. 2000); *Jones v. Metro. Life*

14  *Ins. Co.*, 845 F. Supp. 2d 1016, 1024–25 (N.D. Cal. 2012).  Decisions by other courts regarding

15  the reasonableness of the rates sought may also provide evidence to support a finding of

16  reasonableness.  *See Widrig v. Apfel*, 140 F.3d 1207, 1210 (9th Cir. 1998) (holding that a rate set

17  by the district court based, in part, on the rate awarded to same attorney in another case, was

18  reasonable).

19      **B.**    **Request for Judicial Notice**

20        Defendants request the Court take judicial notice of the following: (1) Declaration of Brian

21  Gearinger in Support of Plaintiff's Motion for Order Awarding Interim Attorneys' Fees and

22  Expenses in *Medina v. Xavier Berrera, et al.*, USDC Case No. 17-cv-03293-CRB; (2) Declaration

23  of John Houston in Support of Plaintiff's Motion for Order Awarding Interim Attorneys' Fees and

24  Expenses in *Medina v. Xavier Becerra, et al.*, USC Case No. 17-cv-003293-CRB; and

25  (3) Declaration of Mari Mayeda in Support of DFEH's Motion for Order Awarding Attorneys'

26  Fees and Costs in *DFEH v. Law School Admissions Council, Inc.*, USDC Case No. 12-1830-JCS.

27  *See* Request for Judicial Notice in Support of Defendants' Opposition to Plaintiffs' Motion for

28  Reasonable Attorneys' Fees and Expenses (Dkt. 44).  HRDC has not objected to the request.  *See*

14

**Ex. L - 95**

*generally* Reply.

Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice of a "fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Under Rule 201, a court may take judicial notice of matters of public record, such as court filings. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports," and other court filings as "they nonetheless are readily verifiable and, therefore, the proper subject of judicial notice"). A court may also take judicial notice of the court's own records in other cases. *United States v. Wilson*, 631 F.2d 118, (9th Cir. 1980). However, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

Because the three documents are matters of public record, including from the court's own records, the Court finds that judicial notice is appropriate. However, as the facts contained within the declarations are subject to reasonable dispute, the Court only takes judicial notice of the fact that the declarations were filed in each matter. *See Gurasich v. IMB Retirement Plan*, No. 14-cv-02911, 2016 WL 3683044, at *6 n.3 (N.D. Cal. July 12, 2016) (taking judicial notice of the fact that declarations were filed in other motions for attorneys' fees).

### C. Whether Plaintiff is Entitled to Fees and Costs Under State Law

The parties devote a significant portion of their briefs to the question of whether Plaintiff is entitled to seek attorneys' fees under California law as well as under federal law. This dispute has potential implications for: 1) whether the Court should award fees for work that was necessitated solely by the state law claims (*e.g.*, the time spent on the tort claim that was filed to satisfy state law exhaustion requirements) to the extent such work can be separated out; and 2) whether the Court should look to California or federal law in determining whether a multiplier should be awarded on the merits work. The Court concludes that HRDC is entitled to seek attorneys' fees and costs under both federal and state law.

First, the Court finds that although the parties did not stipulate in the Consent Decree that

United States District Court
Northern District of California

HRDC would be entitled to fees and costs under California law, HRDC also did not waive the

right to seek such fees and costs.   A "waiver of attorneys' fees may be established by clear

language in the release" or, "if the language in the release is unclear or ambiguous, [by]

surrounding circumstances [that] clearly manifest the intent of the parties that attorneys' fees be

waived." *Muckleshoot Tribe*, 875 F.2d at 698;  *see also Folsom v. Butte County Association of*

*Governments*, 32 Cal. 3d 668, 671 (1982) (declining to bar fees under California Code of Civil

Procedure section 1021.5 where the parties' agreement was silent as to fees). The defendant bears

the burden of showing that the "parties mutually intended the disputed language in the consent

decree to constitute a release of attorneys' fees." *Muckleshoot Tribe*, 875 F.2d at 698 (citing

*Wakefield v. Mathews*, 852 F.2d 484, 484 (9th Cir. 1988)).  Here, the consent decree does not

contain clear language demonstrating that HRDC waived its right to attorneys' fees under state

law. *See id.* at 699 (reiterating the Ninth Circuit's rejection of the "'waiver by silence' rule").  Nor

have Defendants provided the Court with any extrinsic evidence that HRDC intended to waive its

rights to fees under state law.  *See Fitzgerald v. City of Los Angeles*, No. CV 03-01876 DDP

(RZx), 2009 WL 960825, at *6 (C.D. Cal. Apr. 7, 2009) (finding no waiver where defendant

"presented no evidence that its reading of the ambiguous language reflects the intent of the

parties").  Therefore, HRDC did not waive its right to seek attorneys' fees under state law.

Second, the Court finds that HRDC is entitled to attorneys' fees and costs under the Bane

Act and California Civil Code section 1021.5.[3]  Section 1021.5 "codifies the private attorney

general doctrine[,]" providing that "a court may award attorney fees to a successful party in any

action which has resulted in the enforcement of an important right affecting the public interest" if

certain requirements are met.  *Hawkins v. City of Los Angeles*, 40 Cal. App. 5th 384, 397 (2019).

In particular, Section 1021.5 provides in relevant part:

> Upon motion, a court may award attorneys' fees to a successful party
> against one or more opposing parties in any action which has resulted
> in the enforcement of an important right affecting the public interest
> if: (a) a significant benefit, whether pecuniary or nonpecuniary, has

---

[3] Because HRDC is entitled to an award of fees and costs under California law on the basis of its
Bane Act claim, the Court does not reach HRDC's alternative argument that it is also entitled to
seek fees and costs under state law based on its direct constitutional claims.

Ex. L - 97

been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any.

Cal. Code Civ. Proc. § 1021.5.  Defendants have not disputed that the four requirements of this section have been met and the Court finds that they have.  HRDC's action has enforced constitutional rights to free speech and due process by enjoining Napa County's policies and practices related to the receipt of mail by individuals incarcerated in Defendants' facilities.  In doing so, the action has enforced "an important right affecting the public interest" and has conferred a "significant benefit" on "a large class of persons."  The Court further finds that private enforcement and the associated financial burden was necessary and that in "the interest of justice" attorney's fees should not be paid out of the recovery.  The only remaining question is whether HRDC qualifies as a "successful party" under this provision. The Court concludes that it does.

A "successful party" is "the party to the litigation that achieves its objectives."  *Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 567 (2004).  Where a party "successfully obtain[s] a stipulated injunction that was entered as a judgment and thus brought about a judicially recognized change in the parties' legal relationship," it is entitled to attorneys' fees under section 1021.5. *Vasquez v. State of California*, 45 Cal. 4th 243, 260 (2008), as modified (Dec. 17, 2008). Further, "[a] stipulated injunction approved by a court and entered as a judgment is, in effect, a consent decree." *Id.* (noting that "[e]ven the federal courts, which reject the catalyst theory, recognize a consent decree as a sufficient basis for awarding attorney fees.").[4]  Here, HRDC is the "successful party" because it obtained a consent decree and a change in the parties' legal relationship whereby

---

[4] HRDC also argues it is the prevailing party under the "catalyst theory."  Reply at 5.  Under the catalyst theory, an award of attorneys' fees may be appropriate where a plaintiff's lawsuit was "a catalyst to defendant's changed behavior," the lawsuit had merit, and the plaintiff "engaged in a reasonable attempt to settle its dispute with the defendant prior to litigation."  *Graham.*, 34 Cal. 4th at 567.  Under the catalyst theory, a lawsuit has merit if it is not "frivolous, unreasonable or groundless."  *Id.* at 575.  The catalyst theory only applies when "litigation does not result in judicial resolution."  *Id.* at 560.  In *Vasquez*, the California Supreme Court clarified its ruling in *Graham* and held that the catalyst theory is not applicable when a party "successfully obtain[s] a stipulated injunction that was entered as a judgment and thus brought about a judicially recognized change in the parties' legal relationship."  45 Cal. 4th at 260.  As stated above, HRDC obtained a "stipulated injunction that was entered as a judgment" and therefore a "judicially recognized change."  *See id.*  Therefore, the catalyst theory is not applicable here.

17

Ex. L - 98

United States District Court
Northern District of California

the Court retains jurisdiction to enforce the agreement against Defendants.  Moreover, while

Defendants now challenge HRDC's Bane Act claim on the basis that it is insufficiently pled, they

did not bring a motion to dismiss that claim, which was one of the claims that was settled when

the parties entered into the Consent Decree.[5]  Accordingly, the Court finds that HRDC is a

"successful party" under section 1021.5 and therefore entitled to reasonable fees under California

law.

### D.    Lodestar Amount

#### 1.    Reasonable Rates

HRDC seeks the following hourly rates for four attorneys and three paralegals who worked

on the instant action: 1) Sanford J. Rosen (RBGG Partner)—$1,100/hour; 2) Jeffrey L. Bornstein

(RBGG Partner)—$950/hour; 3) Daniel Marshall (HRDC General Counsel)—$650/hour; 4)

Benjamin Bien-Kahn (RBGG Senior Counsel)—$625/hour; 5) Linda H. Woo (RBGG Senior

Paralegal)—$350/hour; 6) Kathy Moses (HRDC Paralegal)—$260/hour; and 7) F. Gail LaPurja

(RBGG Senior Paralegal)—$128/hour.[6]  In support of these rates, HRDC offers the declaration of

Richard M. Pearl, an expert on issues related to court-awarded attorneys' fees, as well as the

declaration of Mr. Bornstein, who is a partner at RBGG and participates in the process of setting

billing rates for his firm each year.  Pearl Decl. ¶ 2; Bornstein Decl. ¶ 34.  In addition, HRDC has

supplied a declaration of its general counsel, Danial Marshall, addressing the reasonableness of the

rates billed by the HRDC timekeepers (Daniel Marshall and Kathy Moses).

As a preliminary matter, the Court places significant weight on the opinion of Mr. Pearl

that the rates charged by all of the timekeepers listed above are reasonable and "'in line with the

rates' charged by law firms that engage in federal civil litigation in the San Francisco Bay Area."

Pearl Dec. ¶ 13. Mr. Pearl has extensive experience in the area of attorney billing rates in this

---

[5] The Court further notes that to the extent Defendants assert HRDC was required to (and did not) allege interference or threats by Defendants beyond the coercion inherent in the violation of the plaintiff's constitutional rights to state a viable claim under the Bane Act, the undersigned has expressly rejected that argument.  *See Watkins v. City of Oakland*, No. 17-cv-06002-JCS, 2018 WL 574906, at *9-13 (N.D. Cal. Jan. 26, 2018).  For the reasons stated in that case, the Court finds Defendants' argument that Plaintiff's Bane Act claim was insufficiently pled unpersuasive.
[6] Although F. Gail LaPurja, Senior Paralegal, generally bills at $320 per hour, Plaintiff requests a discounted rate of $128 to "account for billing judgment discounts."  Motion at 17.

18

United States District Court
Northern District of California

district and has been widely relied upon by both federal and state courts in Northern California

(including the undersigned) in determining reasonable billing rates. *Id.* ¶¶ 5-7 (describing

experience and listing cases in which courts have relied upon Mr. Pearl's opinions).

Further, it is significant to the undersigned that numerous judges in this district have found

that RBGG's rates – including its 2020 rates – are reasonable. *See Hernandez v. County of*

*Monterey,* Case No. 13-cv-02354-BLF, Order Vacating Hearing on Plaintiffs' Motion for

Attorneys' Fees and Expenses; and Granting Motion (Dkt. No. 653) (N.D. Cal. May 1, 2019)

(approving RBGG's fees based on RBGG's requested 2018 rates); *Cole v. County of Santa Clara*,

Case No. 16-CV-06594-LHK, Order Granting Final Approval of Class Settlement and Motion for

Attorneys' Fees (Dkt. No. 86) (N.D. Cal. Mar. 21, 2019) (approving RBGG's fees based on

RBGG's requested 2018 rates); *National Federation of the Blind v. Uber Technologies, Inc*., Case

No. 14-cv-04086-NC, Order Granting Final Approval and Attorneys' Fees (Dkt. No. 139) (N.D.

Cal. Dec. 6, 2016) (approving RBGG's fees based on RBGG's 2016 rates); *Hernandez v. County*

*of Monterey*, Case No. 13-cv-02354-PSG, Order Granting Attorneys' Fees and Expenses (Dkt. No.

510) (N.D. Cal. Nov. 9, 2015) (approving RBGG's requested lodestar based on RBGG's 2015

rates); *Armstrong v. Newsom*, Case No. C-94-02307-CW, Stipulated Order Confirming

Undisputed Attorneys' Fees and Costs for the First Quarter of 2020 (Dkt No. 2968) (N.D. Cal.

June 24, 2020) (approving RBGG's 2020 rates, including a rate of $625 for Mr. Bien-Kahn and a

rate of $1,100 for an RBGG partner who is a 1980 law school graduate); *Armstrong v. Newsom*,

No. C-94-02307-CW, Stipulated Order Confirming Undisputed Attorneys' Fees and Costs for the

First Quarter of 2019 (Dkt No. 2867) (N.D. Cal. May 30, 2019) (approving RBGG's 2019 rates);

*Armstrong v. Brown*, No. 4:94-cv-02307-CW, Stipulated Order Confirming Undisputed

Attorneys' Fees and Costs for the Second Quarter of 2018 (Dkt No. 2772) (N.D. Cal. Sept. 12,

2018) (approving RBGG's 2018 rates); *see also* Bornstein Decl., Exs. I-M.

Below, the Court addresses the reasonableness of the rates sought for each individual.

  a. Rosen

Rosen is a founding partner at RBGG. Bornstein Decl. ¶ 3. He received his LLB in 1962

and was admitted to practice in California in 1974. *Id.* Ex. C. He has extensive experience in

**Ex. L - 100**

1    First Amendment and civil rights litigation and has been recognized as a *Northern California*

2    *Super Lawyer* (2004–19).  *Id.* ¶ 3.  HRDC requests an hourly rate of $1,100.  Motion at 17.

3    Defendants request a reduction to $875/hour.  Opposition at 18.  Based on a review of cases in this

4    district, including those cited in the Bornstein and Pearl declarations, the Court finds that the rate

5    of $1,100/hour requested for Mr. Rosen is reasonable.

6              b.  Bornstein

7         Bornstein is a partner at RBGG.  Bornstein Decl. ¶ 3.  He is a 1981 law school graduate.

8    *Id.* Ex. B (Bornstein's resume).  Prior to joining RBGG, Bornstein was an Assistant United States

9    Attorney for the Northern District of California for almost twenty years and a partner at a law firm

10   for ten years.  *Id.* ¶ 3.  In the instant action, he was lead counsel and led the overall litigation

11   strategy, reviewed and edited the pleadings and moving papers, and handled and directed

12   settlement negotiations.  HRDC seeks an hourly rate of $950/hour for Mr. Bornstein's work.

13   Based on a review of cases in this district, including those cited in the Bornstein and Pearl

14   declarations, the Court finds that that rate is reasonable.

15             c.  Bien-Kahn

16        Bien-Kahn is a senior counsel at RBGG.  Motion at 16.  He is a 2009 law school graduate,

17   *id.*, and completed a one-year clerkship in 2010.  Bornstein Decl. ¶ 3.  He has been named a

18   "Rising Star" by *Northern California Super Lawyers* from 2014 to 2020.  *Id.*  Bien-Kahn was one

19   of three attorneys, including Rosen and Bornstein, who primarily staffed the case.  *Id.*  Plaintiff

20   requests an hourly rate of $625.  As noted above, Judge Wilken found this rate to be a reasonable.

21   *Armstrong v. Newsom*, No. C-94-02307-CW (Dkt. 2968) (N.D. Cal. June 24, 2020).  The

22   undersigned agrees.

23             d.  Marshall

24        Daniel Marshall is the General Counsel and Litigation Director for HRDC.  Marshall Decl.

25   ¶ 1.  He graduated from law school and was admitted to practice in Florida in 2002.  *Id.* ¶ 9.  He

26   was a public defender in Florida before moving into private practice, specifically criminal defense

27   and civil litigation.  *Id.*  Plaintiff requests an hourly rate of $650/hour, which is in line with the

28   rates awarded in this district for attorneys with comparable experience. *See Gonzales v. City of*

United States District Court
Northern District of California

1    *San Jose*, No. 13-cv-00695-BLF, 2016 WL 3011791, at \*4–5 (N.D. Cal. May 26, 2016) (awarding

2    $625 hourly rate for attorney with "nearly twenty years of legal experience"). Defendants also do

3    not object to the hourly rate requested for Marshall. Opposition at 20. Accordingly, the Court

4    finds that rate is reasonable.

5                          e.   Moses, LaPurja, and Woo

6              HRDC seeks fees for three paralegals who worked on this case: Moses (at a requested

7    hourly rate of $260); LaPurja (at a requested hourly rate of $128), and Woo (at a requested hourly

8    rate of $350). Motion at 17. Moses obtained her associate degree in paralegal studies in 1993 and

9    has "nearly 10 years of experience in legal work." Marshall Decl. ¶ 3. Defendants stipulate that

10   the rate sought for Moses is reasonable, *see* Opposition at 20, and the Court agrees. *See Johnson*

11   *v. Fujitsu Technology and Business of America, Inc.*, No. 16-cv-03698-NC, 2018 WL 2183253, at

12   \*7 (N.D. Cal. May 11, 2018) (awarding hourly rate of $250 to paralegals); *Nitsch v. Dreamworks*

13   *Animation SKG Inc.*, No. 14-CV-04062-LHK, 2017 WL 2423161, at \*9 (N.D. Cal. June 5, 2017)

14   (awarding rate of $290 to paralegal). Defendants also do not object to the rate sought by LaPurja,

15   which the Court finds to be well within the range that this Court has found to be reasonable for

16   paralegals. *See Johnson*, 2018 WL 2183253 at \*7; *Nitsch*, 2017 WL 2423161 at \*9. Defendants

17   challenge, however, the rate sought for Woo and request a reduction to $275/hour. Opposition at

18   20.

19             Ms. Woo is a paralegal with a bachelor of science degree and over thirty years of

20   experience providing legal support, including seven years as a paralegal for the United States

21   Attorney's Office for the Northern District of California. Bornstein Decl. ¶ 3. In light of Woo's

22   extensive experience, the Court finds an hourly rate of $350 to be reasonable. *See Armstrong v.*

23   *Newsom,* No. C-94-02307-CW (Dkt. 2968) (N.D. Cal. June 24, 2020) (awarding 2020 rate of

24   $350/hour for work of RBGG senior paralegal).

25                     **2.   Reasonable Time**

26             HRDC has provided timesheets listing each item for which it billed and an exhibit

27   breaking down the total time spent by each timekeeper. The timesheets reflect that HRDC

28   requests compensation for the following time: (1) 177.5 hours for work on the merits (135.1 hours

1    by RBGG timekeepers and 42.4 hours by HRDC timekeepers); *see* Bornstein Decl., Ex. 5;

2    Marshall Decl., Ex. A; Bornstein Reply Decl., Ex. 10; and 2) 218.9 hours for work on fees on fees,

3    of which 3 hours were performed by HRDC timekeepers and the remainder of the work was

4    performed by RBGG timekeepers. *See* Bornstein Decl., Ex. G; Marshall Decl. Ex. B; Bornstein

5    Supp. Decl., Ex. N; Bornstein Reply Decl., Exs. 9-10.  It should be noted, however, that with

6    respect to fees on fees, the hours sought are effectively significantly less than the 218.9 hours that

7    are the basis for HRDC's request because HRDC has deducted a significant flat amount off the

8    total fees on fees sought.  *See* Bornstein Reply Decl., Ex. 10 (reflecting that after billing judgment

9    reductions HRDC also reduced the amount billed for fees on fees by over $56,000).

10        Because Defendants divide the litigation into three distinct phases, the Court does the same

11   in addressing Defendants' challenges.

12            a.  Complaint and Motion for Preliminary Injunction

13       HRDC requests a total of 70.5 hours for time spent on the case through February 24, 2020,

14   when the complaint and motion for preliminary injunction were filed.  Bornstein Decl., Ex. F

15   (reflecting 43.3 hours by RBGG); Marshall Decl., Ex. A (reflecting 27.2 hours by HRDC's in-

16   house counsel).  Defendants argue that the time is excessive because HRDC's filings were nearly

17   identical to the pleadings in the Placer and Tehama County cases, discussed above.  While it may

18   be proper to reduce an attorneys' fee award on the basis that pleadings in the case were "recycled

19   from submissions to other courts," *see Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 950

20   (9th Cir. 2007), such a reduction is not appropriate here.  Contrary to Defendants' assertion that

21   the pleadings in the Placer and Tehama County cases were "almost identical[,]" *see* Bluestone

22   Decl. ¶¶ 11-14, the redline versions of the pleadings supplied by HRDC show that the pleadings in

23   this case are far from identical to the ones filed in those case.  *See* Bornstein Reply Decl., Exs. 1-7.

24   Further, it is undisputed that there were factual differences between this case and the Placer and

25   Tehama that County cases; consequently, HRDC was required not only to tailor the pleadings to

26   the specific facts of this case but also investigate those facts.  Therefore, the Court rejects

27   Defendants' argument based on the Placer and Tehama County cases that the time billed for this

28   stage of the case was excessive.

Ex. L - 103

1    The Court also rejects Defendants' argument that HRDC should not be awarded fees for

2    time it spent on the tort claim that it submitted to exhaust its administrative remedies on the state

3    law claims because, as discussed above, the Court finds that HRDC is entitled to attorneys' fees

4    under both federal and California state law.  Likewise, the Court rejects Defendants' argument that

5    a 50% reduction on HRDC's merits fees is required to account for work on the state law claims for

6    the same reason.

7    Finally, the Court has reviewed the time entries billed by HRDC – as well as the

8    significant reductions based on exercise of billing judgment – and concludes that the hours billed

9    by HRDC are reasonable for this stage of the case.

                            b.   Negotiations

10   HRDC requests a total of 107 hours for time billed from February 25, 2020 through July

11   17, 2020, when the parties were negotiating the Consent Decree.  *See* Bornstein Decl., Ex. F

12   (reflecting 91.8 hours by RBGG); Marshall Decl. Ex. A (reflecting 15.2 hours by HRDC's in-

13   house counsel).  As discussed above, Defendants argue that the time is excessive, pointing out that

14   only a relatively small portion of this time was spent on direct communications with Defendants.

15   According to Defendants, the work billed for this period reflects overstaffing, resulting in

16   duplicative work performed by multiple timekeepers, excessive communications and conferencing

17   between counsel and too much time spent reviewing each other's work.  Given Bornstein's

18   expertise, Defendants contend, it should not have been necessary to have so many attorneys

19   involved in the case at this stage.

21   The Ninth Circuit has cautioned that it is generally improper for the court to "impose its

22   own judgment regarding the best way to operate a law firm, [or] to determine if different staffing

23   decisions might have led to different fee requests."  *Moreno v. City of Sacramento*, 534 F.3d 1106,

24   1115 (9th Cir. 2008).  It is the "difficulty and skill level of the work performed, and the result

25   achieved—not whether it would have been cheaper to delegate the work to other attorneys— [that]

26   must drive the district court's decision."  *Id.*  "The court may reduce the number of hours awarded

27   because the lawyer performed unnecessarily duplicative work."  *Id.* at 1112.  However,

28   "participation of more than one attorney does not necessarily constitute an unnecessary duplication

23

United States District Court
Northern District of California

1   of effort." *Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989) (finding participation by

2   more than one attorney a "reasonable necessity, given the complexity of legal issues and the

3   breadth of factual evidence involved").

4           Based on its review of the timesheets, the Court finds that any duplication of effort that

5   may have resulted from the staffing choices made by HRD's counsel was adequately addressed

6   through the reductions made as an exercise of billing judgment and that the amount of time billed

7   for communications between HRDC's attorneys and reviews of each other's work was reasonable.

8   Further, while the Court need not decide whether Defendants engaged in "intransigent negotiation

9   tactics," as HRDC contends, there is certainly no authority that suggests that the time spent on

10  direct communications with opposing counsel is an appropriate measure of what is reasonable

11  when parties are negotiating a consent decree.  Accordingly, the Court declines to reduce the time

12  billed for this period, which it finds to be reasonable.

13                  c.   Fees on fees

14          Defendants argue that HRDC's lodestar for the fee litigation stage of the case must be

15  reduced because: (1) HRDC "triplicate[ed]" work by including excessive hours spent

16  "conferencing" on the fee motion; and (2) the time spent on the fee motion is unreasonable

17  because it is disproportionate to the time spent on the merits.  The Court rejects both arguments.

18          As discussed above, it is the plaintiff's burden to show that inter-office meetings are not

19  excessive or duplicative.  *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 949 (9th Cir. 2007)

20  (given "[counsel's] failure to provide a persuasive justification for the intra-office meetings, the

21  district court did not err in finding the intra-office conferences to be unnecessary and

22  duplicative").  Here, HRDC has met that burden.  It has provided evidence that it delegated tasks

23  to attorneys with lower billing rates when possible while at the same time assigning tasks to more

24  experienced attorneys when doing so would be more efficient.  That approach entails a certain

25  amount of communication and coordination between counsel.  In light of the thorough and high

26  quality briefs that HRDC filed in connection with its fee request, the Court concludes that

27  HRDC's strategy was reasonable and that the time spent on communication between counsel was

28  not excessive.

Ex. L - 105

The Court also does not agree that the fees for fees request is unreasonable because it amounts to over half of the merits fee request. As a general rule, fees awarded for work on a fee motion should "'bear a rational relation to the number of hours spent litigating the merits of the case.'" *Vallejo v. Astrue*, No. 2:09-CV-03088 KJN, 2011 WL 4383636, at *4 (E.D. Cal. Sept. 20, 2011) (quoting *Spegon v. Catholic Bishop*, 175 F.3d 544, 553–54 (7th Cir.1999)). Nonetheless, courts regularly award fees for work on fee motions that are large in comparison to the fees awarded on the merits. *See, e.g., Prison Legal News v. Schwarzenegger*, No. C 07-02058 CW, 2008 WL 11411620 at *2, *4 (N.D. Cal. Dec. 5, 2008) (awarding $88,940.29 for 223.7 hours of fees work and $48,562.17 for 162.7 hours of merits work), affirmed in part, vacated in part, remanded by 608 F.3d 446, 450 (9th Cir. 2010); *Bernardi v. Yeutter*, 951 F.2d 971, 977 (9th Cir. 1991) (awarding $65,641.50 for fees work, 58.2% the size of the merits lodestar); *Prison Legal News v. Schwarzenegger,* 561 F. Supp. 2d 1095, 1101-05, 1107 (N.D. Cal. 2008) (granting request for fees with $42,098.38 for fees work, 44.7% the size of the merits lodestar). Defendants raised a wide array of objections to HRDC's fee request, which at least partially accounts for the magnitude of the fees on fees relative to the merits work. The Court further notes that where, as here, a case settles early in the litigation, the proportion of time spent on recovering attorneys' fees relative to the time spent on the merits is likely to be larger than it would be if the parties engaged in lengthy litigation. In that context, the Court finds that such a comparison is not necessarily a good measure of reasonableness. Nor does it make sense to take an approach that essentially penalizes a plaintiff for obtaining an early settlement. In sum, the Court finds that the amount sought in fees on fees bears a "rational relation" to the work performed on the merits under the circumstances of this case.

For these reasons, the Court finds that the time HRDC seeks for its fees on fees work is reasonable.

### d. Administrative Tasks

Defendants argue that the Court should reduce HRDC's hours for purely clerical and administrative tasks. The Court rejects Defendants' argument.

In *Missouri v. Jenkins*, the Supreme Court observed that "purely clerical or secretarial

tasks should not be billed at a paralegal [or lawyer's] rate, regardless of who performs them." 491 U.S. 274, 288 n. 10 (1989). Instead, such clerical tasks should be "subsumed in firm overhead." *Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009). The Court is not persuaded by Defendants' argument, however, because HRDC requested a rate for LaPurja that is 60% lower than her normal hourly rate of $320 (a rate that Court finds to be reasonable), which adequately accounts for the administrative tasks Defendants have identified. *See* Bluestone Decl., Ex. O; Bornstein Reply Decl. ¶ 43. With respect to the time identified as administrative for Woo and Moses, HRDC has presented evidence that these tasks were not purely clerical but instead were "functions would have [been] performed by lawyers or at least reviewed by them" if they had not been performed by experienced paralegals. Bornstein Reply Decl. ¶¶ 44-45. Finally, HRDC's fee request includes significant discounts based on billing judgment and additional reductions by flat amounts. The Court therefore concludes it is not appropriate to deduct from the fee award the time Defendants contend was improperly billed for clerical tasks.

### 3. Conclusion

For the reasons stated above, the Court concludes that HRDC's reasonable lodestar amount is $255,925.30, that is, $127,275.30 for merits work and $128,650.00 for fees on fees.

### E. Whether a Multiplier is Warranted

HRDC asks the Court to award a multiplier on its merits lodestar (but not on its fees on fees lodestar) of 1.5. The Court concludes that a multiplier is not warranted under the circumstances of this case.

Under both federal law and California law, the court may award a multiplier and adjust the lodestar upwards or downwards. *Van Gerwen v. Guar. Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000); *Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128, 1176 (1998). Under federal law, there is a strong presumption that the lodestar is reasonable and should only be adjusted in "'rare' or 'exceptional' cases, supported by both specific evidence on the record and detailed findings . . . that the lodestar amount is unreasonably low or unreasonably high." *Van Gerwen*, 214 F.3d at 1045 (internal citation omitted). Under California law, where litigation "involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order

26

1  to approximate the fair market rate for such services," the court may apply a multiplier. *Ketchum*,

2  24 Cal.4th at 1137.  However, the court "should not consider these factors to the extent that they

3  are already encompassed within the lodestar." *Id.* at 1138.  The party seeking a multiplier bears the

4  burden of justifying its request. *Id.* at 1138.  Under both federal and California law, the court has

5  "broad discretion" in determining whether to award a multiplier.  *Id.*; *see also In re Coordinated*

6  *Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 109 F.3d 602 (9th Cir. 1997).

7        Here, HRDC points to the skill of its attorneys, the excellent results it obtained and the

8  relatively quick settlement reached in the case.  These factors are reflected in the lodestar,

9  however, which is based on rates commensurate with what HRDC would have received from a

10  client paying market rates.  Moreover, the rates themselves are a reflection of counsel's

11  qualifications and skill. *See Weeks*, 63 Cal. App. 4th at 1176.  Furthermore, although HRDC's

12  counsel obtained an ideal settlement for its client, it has not established that the case involved

13  novel or complex issues. *See id.* (finding the lack of novelty and complexity "militated *against*

14  enhancing the fee award").  Nor has HRDC demonstrated that the risk associated with the

15  contingent nature of the representation were substantial enough to justify a multiplier.  The Court

16  notes that because of the quick settlement of the case, HRDC was not forced to contend with this

17  risk and work without compensation for a significant period of time.  Therefore, the Court awards

18  the lodestar amount without a multiplier, which it finds to be reasonable in light of all the

19  circumstances.

20      **F.    Costs**

21        Plaintiff requests $808.35 for the following costs: 1) $445 for Court filing fees; 2)  $356.50

22  for service of process fees; and 3) $6.85 for the mailing of the government tort claim. *See*

23  Bornstein Decl. ¶ 41, Ex. E.  Defendants have not objected to any of these requested costs, which

24  the Court also finds to be reasonable. *See* Civil L.R. 54-3; *Cruz v. Starbucks Corp.*, No. C–10–

25  01868 JCS, 2013 WL 2447862 at *10 (N.D. Cal. June 5, 2013) (awarding filing fees and service

26  of process fees); *Garlick v. County of Kern*, No. 1:13-cv-01051-LJO-JLT, 2016 WL 4087057, at

27  *2 (E.D. Cal. Aug. 2, 2016) (awarding cost of preparing and filing government tort claim).

28  Accordingly, the Court awards $808.35 in costs.

27

**Ex. L - 108**

Case 3:20-cv-04011-JCS   Document 607-2   Filed 03/25   Page 162 of 289
Case 3:04-cv-01186-JCS   Document 507   Filed 03/28/21   Page 160 of 402
Page 160 of 402

1    IV.    CONCLUSION

2           For the reasons stated above, the motion is GRANTED in part and DENIED in part.  The

3    Court awards $255,925.00 in attorneys' fees and $808.35 in costs.

4           **IT IS SO ORDERED.**

5

6    Dated:  March 28, 2021

7

8    _____

9    JOSEPH C. SPERO
     Chief Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28

# EXHIBIT M

1 | DONALD SPECTER – 083925
RITA K. LOMIO – 254501
2 | MARGOT MENDELSON – 268583
PRISON LAW OFFICE
3 | 1917 Fifth Street
Berkeley, California  94710-1916
4 | Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704
5 |
MICHAEL W. BIEN – 096891
6 | GAY C. GRUNFELD – 121944
PENNY GODBOLD – 226925
7 | MICHAEL FREEDMAN – 262850
ROSEN BIEN
8 | GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
9 | San Francisco, California  94105-1738
Telephone:    (415) 433-6830
10 | Facsimile:    (415) 433-7104

11 | LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
12 | DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
13 | Berkeley, California  94703
Telephone:    (510) 644-2555
14 | Facsimile:    (510) 841-8645

15 | Attorneys for Plaintiffs

16 |

17 | UNITED STATES DISTRICT COURT

18 | NORTHERN DISTRICT OF CALIFORNIA

19 |

20 | JOHN ARMSTRONG, et al.,            Case No. C94 2307 CW

21 |          Plaintiffs,            **[PROPOSED] STIPULATED ORDER CONFIRMING UNDISPUTED ATTORNEYS' FEES AND COSTS FOR THE THIRD QUARTER OF 2024**

22 |          v.

23 | GAVIN NEWSOM, et al.,

24 |          Defendants.            Judge:   Hon. Claudia Wilken

25 |

26 |

27 |

28 |

[PROPOSED] STIPULATED ORDER CONFIRMING UNDISPUTED ATTORNEYS' FEES AND COSTS FOR THE THIRD QUARTER 2024

[4630279.1]

**Ex. M - 111**

Case 2:90-cv-00520-KJM-DB   Document 8650-2   Filed 01/07/25   Page 159 of 194
Case 4:94-cv-02307-CW   Document 3657-2   Filed 01/02/25   Page 163 of 402
Page 163 of 402

1    On March 26, 1997, the District Court established procedures by which Plaintiffs

2    are to collect periodic attorneys' fees and costs in this case in connection with their work

3    monitoring Defendants' compliance with the Court's Orders and collecting fees.

4    Pursuant to these procedures, on November 22, 2024, Plaintiffs served on

5    Defendants their Third Quarterly Statement for 2024 by electronic transmission.  The

6    parties completed their meet-and-confer process on January 2, 2025 as to the fees and costs

7    incurred on all matters.

8    As a result of the January 2, 2025 agreement, the parties agree to the following:

9    The parties agree to the payment of $3,831,267.19 to resolve all fees and costs

10   incurred during the Third Quarter of 2024, for monitoring and/or litigation activities in the

11   California Department of Corrections of Rehabilitation Division of Adult Operations and

12   Adult Programs (CDCR AOAP) portion of the case.  Attached hereto as **Exhibit A** are

13   charts setting forth the fees and costs claimed by Plaintiffs and the amounts agreed to by

14   the parties to settle these claims.

15   The parties agree to the payment of $133,714.21 to resolve all fees and costs

16   incurred during the Third Quarter of 2024, for monitoring and/or litigation activities in the

17   Board of Parole Hearings (BPH) portion of the case.  Attached hereto as **Exhibit B** are

18   charts setting forth the fees and costs claimed by Plaintiffs and the amounts agreed to by

19   the parties to settle these claims.

20   The parties agree to the payment of $118,560.19 to resolve all fees and costs

21   incurred during the Third Quarter of 2024, for monitoring and/or litigation activities in the

22   Division of Adult Parole Operations (DAPO) portion of the case.  Attached hereto as

23   **Exhibit C** are charts setting forth the fees and costs claimed by Plaintiffs and the amounts

24   agreed to by the parties to settle these claims.

25   The parties agree to the payment of $26,531.25 to resolve all fees and costs incurred

26   during the Third Quarter of 2024, for fees work.  Attached hereto as **Exhibit D** are charts

27   setting forth the fees and costs claimed by Plaintiffs and the amounts agreed to by the

28   parties to settle these claims.

[4630279.1]

[PROPOSED] STIPULATED ORDER CONFIRMING UNDISPUTED ATTORNEYS' FEES AND COSTS FOR THE
THIRD QUARTER 2024

**Ex. M - 112**

1      IT IS HEREBY ORDERED that the amounts set forth above are due and

2  collectable as of forty-five days from the date of entry of this Order.  Interest on these fees

3  and costs will run from January 6, 2025, accruing at the rate provided by 28 U.S.C. § 1961.

4

5

6  DATED: ____1/10/2025____

                                    

7                                     Claudia Wilken
                                     United States District Judge

8

9  APPROVED AS TO FORM:

10

11  DATED: January 10, 2025       /s/Trace O. Maiorino_____
                               Trace O. Maiorino

12                               Deputy Attorney General
                               Attorney for Defendants

13

14

15  DATED: January 10, 2025       /s/Gay Crosthwait Grunfeld_____
                               Gay Crosthwait Grunfeld

16                               Rosen Bien Galvan & Grunfeld LLP
                               Attorney for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

[4630279.1]

Case No. C94 2307 CW
[PROPOSED] STIPULATED ORDER CONFIRMING UNDISPUTED ATTORNEYS' FEES AND COSTS FOR THE
THIRD QUARTER 2024

Ex. M - 113

# EXHIBIT A

### Armstrong v. Newsom
**Third Quarterly Statement of 2024**
**July 1, 2024 through September 30, 2024**

## CDCR/AOAP SUMMARY OF UNDISPUTED FEES AND COSTS

| MATTER | UNDISPUTED FEES | UNDISPUTED COSTS |
|---|---|---|
| CDCR/AOAP MONITORING | $3,718,753.48 | $112,513.71 |
| | **TOTAL UNDISPUTED:** | **$3,831,267.19** |

**Armstrong v. Newsom**
Third Quarterly Statement of 2024
July 1, 2024 through September 30, 2024
*Matter: CDCR/AOAP Monitoring/Merits*

| *Monitoring (581-3)* | Actual | Claimed | 2024 | | Fees Now Owing |
|---|---|---|---|---|---|
| | Hours | Hours | Rates | Total | Based On Negotiated Compromise |
| **ROSEN, BIEN, GALVAN & GRUNFELD** | | | | | |
| Michael W. Bien (MWB) | 2.70 | 2.70 | $1,600 | $4,320.00 | $4,168.80 |
| Gay C. Grunfeld (GCG) | 20.00 | 20.00 | $1,250 | $25,000.00 | $24,125.00 |
| Ernest Galvan (EG) | 0.30 | 0.00 | $1,100 | $0.00 | $0.00 |
| Penny Godbold (PG) | 494.40 | 494.20 | $910 | $449,722.00 | $433,981.73 |
| Thomas Nolan (TN) | 167.20 | 164.00 | $910 | $149,240.00 | $144,016.60 |
| Michael L. Freedman (MLF) | 93.90 | 93.80 | $875 | $82,075.00 | $79,202.38 |
| Ben Bien-Kahn (BBK) | 87.20 | 87.20 | $850 | $74,120.00 | $71,525.80 |
| Kara J. Janssen (KJJ) | 0.80 | 0.00 | $850 | $0.00 | $0.00 |
| Caroline E. Jackson (CEJ) | 180.40 | 178.30 | $800 | $142,640.00 | $137,647.60 |
| Michael S. Nunez (MSN) | 1.80 | 0.00 | $800 | $0.00 | $0.00 |
| Mark Shinn-Krantz (MSK) | 0.10 | 0.00 | $625 | $0.00 | $0.00 |
| Eric Monek Anderson (EMA) | 47.30 | 47.30 | $575 | $27,197.50 | $26,245.59 |
| Hannah Chartoff (HMC) | 10.10 | 10.10 | $550 | $5,555.00 | $5,360.58 |
| Adrienne Harrold (AH) | 0.20 | 0.00 | $550 | $0.00 | $0.00 |
| Benjaim C. Hattem (BCH) | 2.20 | 0.00 | $500 | $0.00 | $0.00 |
| Eric Ho (EAH) | 7.50 | 7.50 | $400 | $3,000.00 | $2,895.00 |
| Karen Stilber (KES) | 66.70 | 65.20 | $450 | $29,340.00 | $28,313.10 |
| Linda Woo (LHW) | 3.40 | 0.00 | $450 | $0.00 | $0.00 |
| F. Gail LaPurja (FGL) | 18.20 | 0.00 | $425 | $0.00 | $0.00 |
| Greg Gonzalez (GZG) | 1.70 | 0.00 | $425 | $0.00 | $0.00 |
| Aidan Loh (ALO) | 236.10 | 163.90 | $400 | $65,560.00 | $63,265.40 |
| Nathalie Welch (NW) | 13.50 | 10.50 | $335 | $3,517.50 | $3,394.39 |
| Fely F. Villadelgado (FFV) | 70.00 | 0.00 | $335 | $0.00 | $0.00 |
| Emma Lower (ERL) | 246.00 | 240.10 | $335 | $80,433.50 | $77,618.33 |
| Victor Corona (VC) | 53.20 | 51.10 | $335 | $17,118.50 | $16,519.35 |
| Darcy Edmundson (DE) | 12.20 | 12.20 | $295 | $3,599.00 | $3,473.04 |
| AJ Alany (AJA) | 17.00 | 17.00 | $295 | $5,015.00 | $4,839.48 |
| Angela Laureano (AL) | 19.80 | 19.80 | $295 | $5,841.00 | $5,636.57 |
| Hazel Stange (HS) | 404.70 | 368.50 | $295 | $108,707.50 | $104,902.74 |
| Isabella Grundseth (IEG) | 19.20 | 17.10 | $295 | $5,044.50 | $4,867.94 |
| Kamila Barragan (KB) | 3.40 | 0.00 | $295 | $0.00 | $0.00 |
| Kedtra Chan (KC) | 5.30 | 0.00 | $295 | $0.00 | $0.00 |
| Riya Matta (RM) | 394.10 | 387.80 | $295 | $114,401.00 | $110,396.97 |
| Simran Surtani (SMS) | 273.10 | 266.00 | $335 | $89,110.00 | $85,991.15 |
| Sherry Zhu (SJZ) (Paralegal) | 4.90 | 4.90 | $335 | $1,641.50 | $1,584.05 |
| Sherry Zhu (SJZ) (Paralegal Clerk) | 12.50 | 12.50 | $295 | $3,687.50 | $3,558.44 |
| **Total Hours:** | 2,991.10 | 2,741.70 | | | |
| **RBGG FEES:** | | | | $1,495,886.00 | $1,443,529.99 |
| | | | | | |
| **PRISON LAW OFFICE** | | | | | |
| Donald Specter | 1.10 | 1.10 | $1,400 | $1,540.00 | $1,486.10 |
| Alison Hardy (AH) | 6.90 | 6.90 | $1,000 | $6,900.00 | $6,658.50 |
| Rita Lomio (RL) | 633.70 | 633.70 | $875 | $554,487.50 | $535,080.44 |
| Daniel Greenfield | 213.60 | 213.60 | $850 | $181,560.00 | $175,205.40 |
| Margot Mendelson (MM) | 20.70 | 20.70 | $825 | $17,077.50 | $16,479.79 |
| Jerrod Thompson | 172.30 | 172.30 | $825 | $142,147.50 | $137,172.34 |
| Rana Anabtawi (RA) | 8.50 | 8.50 | $825 | $7,012.50 | $6,767.06 |
| Lily Harvey (LH) | 15.60 | 15.60 | $750 | $11,700.00 | $11,290.50 |
| Tess Borden (TB) | 153.70 | 153.70 | $700 | $107,590.00 | $103,824.35 |
| Jacob Hutt (JH) | 135.80 | 135.80 | $550 | $74,690.00 | $72,075.85 |
| Marissa Hatton (MH) | 183.70 | 183.70 | $550 | $101,035.00 | $97,498.78 |
| Sophie J. Hart (SJH) | 14.40 | 14.40 | $550 | $7,920.00 | $7,642.80 |
| Patrick Booth (PB) | 108.10 | 108.10 | $500 | $54,050.00 | $52,158.25 |
| Mackenzie L. Halter (MLH) | 64.00 | 64.00 | $475 | $30,400.00 | $29,336.00 |
| A.D. Lewis (ADL) | 45.50 | 45.50 | $475 | $21,612.50 | $20,856.06 |
| Amber Norris (AN) | 267.30 | 267.30 | $435 | $116,275.50 | $112,205.86 |
| Gabriela Pelsinger (GP) | 235.00 | 235.00 | $435 | $102,225.00 | $98,647.13 |
| Ilian Meza Pena (IP) | 229.90 | 229.90 | $435 | $100,006.50 | $96,506.27 |
| Joanna Cardenas (JC) | 274.60 | 274.60 | $435 | $119,451.00 | $115,270.22 |
| Skye Lovett (SL) | 584.60 | 584.60 | $435 | $254,301.00 | $245,400.47 |
| Tania Amarillas (TA) | 300.90 | 300.90 | $435 | $130,891.50 | $126,310.30 |
| Audrey Lim (AL) | 81.00 | 81.00 | $335 | $27,135.00 | $26,185.28 |
| Dewi Zarni (DZ) | 91.90 | 91.90 | $335 | $30,786.50 | $29,708.97 |
| Emilio Bustamante (EB) | 58.60 | 58.60 | $335 | $19,631.00 | $18,943.92 |
| Jenny Aguilar (JA) | 79.00 | 79.00 | $335 | $26,465.00 | $25,538.73 |
| Jessica Shen (JS) | 54.30 | 54.30 | $335 | $18,190.50 | $17,553.83 |
| Joshua Marin (JM) | 100.90 | 100.90 | $335 | $33,801.50 | $32,618.45 |
| Mari Berry (MB) | 84.30 | 84.30 | $335 | $28,240.50 | $27,252.08 |
| **Total Hours:** | 4,219.90 | 4,219.90 | | | |
| **PLO FEES:** | | | | $2,327,123.00 | $2,245,673.70 |
| | | | | | |
| **DISABILITY RIGHTS EDUCATION AND DEFENSE FUND** | | | | | |
| Claudia Center (CC) | 24.09 | 24.09 | $995 | $23,969.55 | $23,130.62 |
| M. Uzeta (MU) | 6.20 | 6.20 | $995 | $6,169.00 | $5,953.09 |
| Case Clerk (H. Min) | 2.10 | 2.10 | $230 | $483.00 | $466.10 |
| **Total Hours:** | 32.39 | 32.39 | | | |
| **DREDF FEES:** | | | | $30,621.55 | $29,549.80 |
| | | | | | |
| **TOTAL CDCR/AOAP MONITORING FEES:** | | | | $3,853,630.55 | $3,718,753.48 |

**Armstrong v. Newsom**
Third Quarterly Statement of 2024
July 1, 2024 through September 30, 2024
**Costs**

*Matter:* **CDCR/AOAP Merits/Monitoring**

| Rosen, Bien, Galvan & Grunfeld (581-3) | Costs | Costs Now Owing Based On Negotiated Compromise |
|---|---|---|
| Photocopying/printing (Outside) | $1,660.57 | $1,602.45 |
| Expert Services | $50,445.65 | $48,680.05 |
| Transcription and Translation | $6,130.00 | $5,915.45 |
| Data storage | $4,158.00 | $4,012.47 |
| Online Research - PACER, Westlaw, articles | $567.38 | $547.52 |
| Postage & Delivery | $597.81 | $576.89 |
| Travel - Mileage, Tolls, Food | $10,365.55 | $10,002.76 |
| **Total RBGG Costs:** | **$73,924.96** | **$71,337.59** |
| **Prison Law Office** | | |
| Translation/interpreting/SLI | $8,859.17 | $8,549.10 |
| Expert Services | $14,357.92 | $13,855.39 |
| Travel - Mileage, Tolls, Food | $18,165.17 | $17,529.39 |
| Postage & Delivery | 1,150.47 | $1,110.20 |
| **Total PLO Costs:** | **$42,532.73** | **$41,044.08** |
| **Disability Rights Education & Defense Fund, Inc.** | | |
| Photocopying (in-house) | $122.40 | $118.12 |
| Postage & Delivery | $14.43 | $13.92 |
| **Total DREDF Costs:** | **$136.83** | **$132.04** |
| **TOTAL CDCR/AOAP MERITS/MONITORING COSTS:** | **$116,594.52** | **$112,513.71** |

Ex. M - 117

# EXHIBIT B

## <u>Armstrong v. Newsom</u>
**Third Quarterly Statement of 2024**
**July 1, 2024 through September 30, 2024**

## BPH SUMMARY OF UNDISPUTED FEES AND COSTS

| <u>MATTER</u> | <u>UNDISPUTED FEES</u> | <u>UNDISPUTED COSTS</u> |
|---|---|---|
| BPH | $132,445.29 | $1,268.93 |
|  | **TOTAL UNDISPUTED:** | **$133,714.21** |

**Armstrong v. Newsom**
Third Quarterly Statement of 2024
July 1, 2024 through September 30, 2024
*Matter: BPH*

| _BPH (581-4)_ | | Actual | Claimed | 2024 | | Fees Now Owing |
|---|---|---|---|---|---|---|
| | | Hours | Hours | Rates | Total | Based On Negotiated Compromise |
| _BPH MONITORING (581-4)_ | | | | | | |
| **ROSEN, BIEN, GALVAN & GRUNFELD** | | | | | | |
| Michael W. Bien (MWB) | | 0.80 | 0.80 | $1,600 | $1,280.00 | $1,235.20 |
| Gay C. Grunfeld (GCG) | | 11.3 | 11.3 | $1,250 | $14,125.00 | $13,630.63 |
| Thomas Nolan (TN) | | 23.70 | 23.70 | $910 | $21,567.00 | $20,812.16 |
| Penny Godbold (PG) | | 0.30 | 0.30 | $910 | $273.00 | $263.45 |
| Benjamin Bien-Kahn (BBK) | | 0.20 | 0.00 | $850 | $0.00 | $0.00 |
| Michael S. Nunez (MSN) | | 2.50 | 2.40 | $800 | $1,920.00 | $1,852.80 |
| Caroline E. Jackson (CEJ) | | 44.90 | 44.60 | $800 | $35,680.00 | $34,431.20 |
| Eric Monek Anderson (EMA) | | 0.50 | 0.00 | $575 | $0.00 | $0.00 |
| Hannah Chartoff (HMC) | | 27.50 | 27.50 | $550 | $15,125.00 | $14,595.63 |
| Karen E. Stilber (KES) | | 1.30 | 1.30 | $450 | $585.00 | $564.53 |
| Nathalie Welch (NW) | | 76.70 | 72.80 | $335 | $24,388.00 | $23,534.42 |
| Kamila Barragan (KFB) | | 1.10 | 0.00 | $295 | $0.00 | $0.00 |
| Kedra Chan | | 0.30 | 0.00 | $295 | $0.00 | $0.00 |
| Riya Matta (RM) | | 2.30 | 2.30 | $295 | $678.50 | $654.75 |
| Sherry Zhu (SJZ) | | 0.40 | 0.00 | $295 | $0.00 | $0.00 |
| Simran Surtani (SMS) | | 12.20 | 11.50 | $335 | $3,852.50 | $3,717.66 |
| | **Total Hours:** | **206.00** | **198.50** | | | |
| **RBGG FEES:** | | | | | **$119,474.00** | **$115,292.41** |
| **PRISON LAW OFFICE** | | | | | | |
| Rita Lomio (RL) | | 0.2 | 0.2 | $875 | $175.00 | $168.88 |
| Rana Anabtawi (RA) | | 21.0 | 21.0 | $825 | $17,325.00 | $16,718.63 |
| Jacob Hutt (JH) | | 0.5 | 0.5 | $550 | $275.00 | $265.38 |
| | **Total Hours:** | **21.70** | **21.70** | | | |
| **PLO FEES:** | | | | | **$17,775.00** | **$17,152.88** |
| **TOTAL FEES FOR BPH WORK:** | | | | | **$137,249.00** | **$132,445.29** |

**Armstrong v. Newsom**
Third Quarterly Statement of 2024
July 1, 2024 through September 30, 2024
**Costs**

*Matter: BPH*

| Rosen, Bien, Galvan & Grunfeld (581-4) | | Costs | Costs Now Owing Based On Negotiated Compromise |
|---|---|---|---|
| Pacer and Westlaw | | $35.46 | $34.22 |
| Travel - Mileage, Tolls, Food | | $1,279.49 | $1,234.71 |
| | Total RBGG Costs: | $1,314.95 | $1,268.93 |
| | TOTAL BPH COSTS: | $1,314.95 | $1,268.93 |

Ex. M - 121

# EXHIBIT C

Ex. M - 122

**<u>Armstrong v. Newsom</u>**
**Third Quarterly Statement of 2024**
**July 1, 2024 through September 30, 2024**

## DAPO SUMMARY OF UNDISPUTED FEES AND COSTS

| <u>MATTER</u> | <u>UNDISPUTED FEES</u> | <u>UNDISPUTED COSTS</u> |
|---|---|---|
| DAPO MONITORING | $115,235.96 | $3,324.23 |

**TOTAL UNDISPUTED:** **$118,560.19**

**Armstrong v. Newsom**
Third Quarterly Statement of 2024
July 1, 2024 through September 30, 2024
*Matter: DAPO Monitoring*

| *DAPO Monitoring (581-9)* | | Actual | Claimed | 2024 | Fees Now Owing | |
|---|---|---|---|---|---|---|
| | | Hours | Hours | Rates | Total | Based On Negotiated Compromise |
| **ROSEN, BIEN, GALVAN & GRUNFELD** | | | | | | |
| Michael W. Bien (MWB) | | 0.10 | 0.10 | $1,600 | $160.00 | $154.40 |
| Gay C. Grunfeld (GCG) | | 3.00 | 3.00 | $1,250 | $3,750.00 | $3,618.75 |
| Penny Godbold (PG) | | 4.60 | 4.60 | $910 | $4,186.00 | $4,039.49 |
| Thomas Nolan (TN) | | 2.20 | 2.20 | $910 | $2,002.00 | $1,931.93 |
| Michael L. Freedman (MLF) | | 0.70 | 0.00 | $875 | $0.00 | $0.00 |
| Benjamin Bien-Kahn (BBK) | | 16.80 | 16.80 | $850 | $14,280.00 | $13,780.20 |
| Caroline E. Jackson (CEJ) | | 2.20 | 2.20 | $800 | $1,760.00 | $1,698.40 |
| Eric Monek Anderson (EMA) | | 16.90 | 16.90 | $575 | $9,717.50 | $9,377.39 |
| Adrienne Harrold (AH) | | 0.20 | 0.00 | $550 | $0.00 | $0.00 |
| Hannah Chartoff (HMC) | | 32.00 | 30.80 | $550 | $16,940.00 | $16,347.10 |
| Benjamin C. Hattem (BCH) | | 19.20 | 18.00 | $500 | $9,000.00 | $8,685.00 |
| F. Gail LaPurja (FGL) | | 0.10 | 0.00 | $425 | $0.00 | $0.00 |
| Gregorioz Z. Gonzalez (GZG) | | 0.90 | 0.00 | $425 | $0.00 | $0.00 |
| Nathalie Welch (NCW) | | 184.00 | 172.00 | $335 | $57,620.00 | $55,603.30 |
| Aiden Loh (ALO) | | 3.70 | 0.00 | $295 | $0.00 | $0.00 |
| | Total Hours: | 286.60 | 266.60 | | | |
| **RBGG FEES:** | | | | | **$119,415.50** | **$115,235.96** |
| | | | | | | |
| **TOTAL FEES FOR DAPO MONITORING WORK:** | | | | | **$119,415.50** | **$115,235.96** |

**Ex. M - 124**

**Armstrong v. Newsom**
Third Quarterly Statement of 2024
July 1, 2024 through September 30, 2024
**Costs**

## *Matter: DAPO Monitoring*

| Rosen, Bien, Galvan & Grunfeld (581-9) | Costs | Costs Now Owing Based On Negotiated Compromise |
|---|---|---|
| Postage & Delivery | $342.21 | $330.23 |
| Travel - Mileage, Tolls, Food | $3,102.59 | $2,994.00 |
| **Total RBGG Costs:** | **$3,444.80** | **$3,324.23** |
| **TOTAL DAPO MONITORING COSTS:** | **$3,444.80** | **$3,324.23** |

Ex. M - 125

Case 3:24-cv-04063-EDL  Document 365-7  Filed 01/02/25  Page 16 of 39
Case 3:24-cv-00406-JB-MDL  Document 66907-2  Filed 01/02/25  Page 16 of 39658
Page 177 of 402

# EXHIBIT D

**<u>Armstrong v. Newsom</u>**
**Third Quarterly Statement of 2024**
**July 1, 2024 through September 30, 2024**

## SUMMARY OF UNDISPUTED FEES WORK AND COSTS

|  | <u>UNDISPUTED FEES</u> | <u>UNDISPUTED COSTS</u> |
|---|---|---|
| FEES WORK (ALL MATTERS) | $26,488.77 | $42.48 |
| **TOTAL UNDISPUTED:** | | **$26,531.25** |

**Ex. M - 127**

**Armstrong v. Newsom**
Third Quarterly Statement of 2024
July 1, 2024 through September 30, 2024
*Matter: All Matters Fees Work*

| Fees (581-2) | | Actual Hours | Claimed Hours | 2024 Rates | Total | Fees Now Owing Based On Negotiated Compromise |
|---|---|---|---|---|---|---|
| **ROSEN, BIEN, GALVAN & GRUNFELD** | | | | | | |
| Gay C. Grunfeld (GCG) | | 7.90 | 7.60 | $1,250 | $9,500.00 | $9,167.50 |
| Karen E. Stilber (KES) | | 11.10 | 10.40 | $450 | $4,680.00 | $4,516.20 |
| Nathalie C. Welch (NCW) | | 0.40 | 0.00 | $335 | $0.00 | $0.00 |
| Aiden Loh (ALO) | | 0.50 | 0.00 | $400 | $0.00 | $0.00 |
| | Total Hours: | 19.00 | 18.00 | | | |
| **RBGG FEES:** | | | | | $14,180.00 | $13,683.70 |
| **PRISON LAW OFFICE** | | | | | | |
| Margot Mendelson (MKM) | | 4.1 | 4.1 | $825 | $3,382.50 | $3,264.11 |
| Tess Bornden (TB) | | 5.90 | 5.90 | $700 | $4,130.00 | $3,985.45 |
| Rana Anabtawi (RA) | | 0.30 | 0.30 | $825 | $247.50 | $238.84 |
| Ashley Kirby (AK) | | 11.40 | 11.40 | $300 | $3,420.00 | $3,300.30 |
| | Total Hours: | 21.70 | 21.70 | | | |
| **PLO FEES:** | | | | | $11,180.00 | $10,788.70 |
| **DISABILITY RIGHTS EDUCATION AND DEFENSE FUND** | | | | | | |
| Linda Kilb (LDK) | | 2.10 | 2.10 | $995 | $2,089.50 | $2,016.37 |
| | Total Hours: | 2.10 | 2.10 | | | |
| **DREDF FEES:** | | | | | $2,089.50 | $2,016.37 |
| **TOTAL FEES FOR ARMSTRONG FEES WORK:** | | | | | $27,449.50 | $26,488.77 |

**Ex. M - 128**

**Armstrong v. Newsom**
Third Quarterly Statement of 2024
July 1, 2024 through September 30, 2024
**Costs**

## Matter: Fees Work in All Matters

| | | Costs Now Owing |
|---|---|---|
| | | **Based On Negotiated Compromise** |
| **Rosen, Bien, Galvan & Grunfeld (581-2)** | **Costs** | |
| Postage & Delivery | $44.02 | $42.48 |
| **Total RBGG Costs:** | **$44.02** | **$42.48** |
| **TOTAL FEES WORK COSTS :** | **$44.02** | **$42.48** |

**Ex. M - 129**

# EXHIBIT N

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, et al., | Case No. 14-cv-04086-NC |
| Plaintiffs, | **AMENDED ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS; DENYING ADMINISTRATIVE MOTION TO SEAL** |
| v. | |
| UBER TECHNOLOGIES, INC., | |
| Defendant. | Re: Dkt. Nos. 185, 189 |

In this class action, plaintiffs National Federation of the Blind ("NFIB") and various disabled individuals accused defendant Uber Technologies, Inc. of failing to accommodate their disabled customers traveling with service animals.  In 2016, the parties settled the class action.  Plaintiffs now bring their second motion for attorneys' fees and costs seeking reimbursement for their efforts monitoring Uber's compliance with the settlement.  *See* Dkt. No. 185.  The Court finds that Plaintiffs are entitled to fees, but certain fees are unreasonable.  Accordingly, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for attorneys' fees and costs.

## I.   Procedural History

In September 2014, Plaintiffs initiated this class action against Uber alleging discrimination against the blind under the Americans with Disabilities Act ("ADA"), 42

United States District Court
Northern District of California

1    U.S.C. § 12101 *et seq.* and various California-law analogues.  *See* Dkt. No. 1.  The parties

2    settled the case in January 2016 (*see* Dkt. No. 70; *see also* Dkt. No. 85-1 ("Settlement"))

3    and the Court granted final approval of the class settlement on December 6, 2016 (*see* Dkt.

4    No. 139).  On December 15, 2016, the Court awarded Plaintiffs attorneys' fees and costs

5    pursuant to the Settlement.  *See* Dkt. Nos. 139, 144.

6         Plaintiffs now seek additional attorneys' fees and costs for resources expended in

7    monitoring Uber's settlement compliance.  *See* Dkt. No. 185.  Plaintiffs voluntarily agree

8    to reduce their claimed amount by 5% across the board.  *See id.* at 19.[1]  Uber opposes,

9    arguing that Plaintiffs are not entitled to additional fees and, even if they were, Plaintiffs'

10   request is unreasonable.  *See generally* Dkt. No. 187.

## II.    Settlement Agreement

12        Certain sections of the Settlement are relevant to this motion.  The Court

13   summarizes those portions below.

14        The Settlement requires Uber to "collect and report to Plaintiffs' Counsel" rating

15   and complaint information for riders with service animals.  *See* Settlement § 6.A.  Uber is

16   required to report the raw data for that information to Plaintiffs' Counsel.  *Id.* § 6.B.1.  In

17   addition, if Plaintiffs' Counsel provides Uber with a documented complaint of

18   discrimination by a rider, Uber is required to verify corresponding data and assign a unique

19   number identifier to the allegedly offending driver.  *See id.* § 6.B.2.

20        NFIB is required to create a "compliance testing program" that uses blind testers

21   with guide dogs using Uber's UberX service to test compliance.  *Id.* § 6.C.  Uber agreed to

22   pay NFIB $225,000 "to support the testing program."  *Id.* § 11.A.  If the Settlement is

23   extended, Uber is required to pay NFIB an additional $75,000 to support the program.  *See*

24   *id.* §§ 7, 11.A.

25        The Settlement also requires an appointment of a third-party Monitor.  *See id.* § 8.

26   Annually, the Monitor is obligated to "review and analyze" all data collected and reported

27   _____

28   [1] All page numbers reference the page numbers automatically generated by ECF unless
     otherwise indicated.

United States District Court
Northern District of California

2

1   by Uber pursuant to Section 6 of the Settlement, in addition to "any other information

2   provided to the Monitor by the Parties." *Id.* The Monitor then reports to the Parties

3   whether Uber substantially complied with the Settlement during the preceding year. *Id.*

4   The Monitor is also required to "propose . . . further modifications to Uber's policies,

5   practices, and procedures" if such policies, practices, or procedures were insufficient to

6   address discrimination. *Id.*

7       Lastly, the Settlement permits Plaintiffs to seek attorneys' fees and costs incurred

8   up through the effective date of the Settlement. *Id.* § 11.C. Uber agreed "not to dispute

9   the entitlement to reasonable Attorneys' Fees incurred up through the Effective Date of

10   [the] Agreement[,]" but reserved the right to dispute the amount of fees requested. *Id.* For

11   fees and costs related to "work performed after the time the Settlement Agreement is

12   signed by all Parties, including for work spent on compliance monitoring, enforcement,

13   and/or work spent securing their fees[,]" Plaintiffs reserved their rights to pursue such fees,

14   but the Settlement acknowledged that "all issues pertaining to any such attorneys' fees,

15   costs, and expenses are unresolved . . . ." *Id.* § 11.C.1. The Parties are required to confer

16   and negotiate as to any fees and costs related to Plaintiffs' Counsel's monitoring efforts

17   before petitioning the Court. *Id.* § 11.C.2.

18       The Court retained jurisdiction. *See id.* § 12; *see also* Dkt. No. 145.

19   **III.  Discussion**

20       **A.  Entitlement to Fees**

21       The parties first dispute whether Plaintiffs are entitled to fees. *See* Dkt. No. 187 at

22   11. According to Uber, the Settlement did not authorize attorneys' fees for monitoring

23   work and the ADA's fee-shifting statute does not allow such fees. *Id.* The Court

24   disagrees.

25       In *Prison Legal News v. Scharzenegger*, 608 F.3d 446 (9th Cir. 2010), the Ninth

26   Circuit reaffirmed that "a party that prevails by obtaining a consent decree may recover

27   attorneys' fees under [42 U.S.C.] § 1988 for monitoring compliance with the decree, even

28   when such monitoring does not result in any judicially sanctioned relief." *Prison Legal*

Ex. N - 133

1    *News*, 608 F.3d at 451 (citing *Keith v. Volpe*, 833 F.2d 850, 855–57 (9th Cir. 1987)).

2    Thus, plaintiffs may recover attorneys' fees for monitoring compliance with a settlement

3    agreement under § 1988. *Id.* at 452; *see also Balla v. Idaho*, 677 F.3d 910, 916 (9th Cir.

4    2012) ("[M]onitoring fees not resulting in additional relief are allowable . . . .").

5        Uber contends that *Prison Legal News* and its progeny are inapposite because those

6    cases concern a different fee shifting statute. But § 1988 and the ADA's fee-shifting

7    statute, 42 U.S.C. § 12205, are virtually identical. *Compare* 42 U.S.C. § 1988(b) ("the

8    court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as

9    part of the costs . . . .") *with* 42 U.S.C. § 12205 ("the court or agency, in its discretion, may

10   allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses,

11   and costs . . . ."). Uber has not identified any principled reason why the Court should

12   interpret the two statutes differently.

13       Moreover, the Supreme Court rejected a similar argument in *Pennsylvania v.*

14   *Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986). There, the court

15   noted that the fee-shifting provisions of the Clean Air Act and § 1988 served "the common

16   purpose of . . . promot[ing] citizen enforcement of important federal policies," such that

17   there was "no reason not to interpret both provisions governing attorney's fees in the same

18   manner." *Id.* at 560. The same is true of the ADA's fee-shifting statute and § 1988. *See*

19   *Buckhannon Bd. & Care Home v. W.V. Dep't of Health & Human Res.*, 532 U.S. 598,

20   629–30 (2001) ("the . . . ADA fee-shifting prescriptions [were] modeled on 42 U.S.C.

21   § 1988 unmodified . . . ."), *superseded by statute on other grounds*.

22       Nor does the language of the Settlement foreclose attorneys' fees for monitoring

23   work. Rather, the Settlement explicitly acknowledges that "all issues pertaining to" fees,

24   costs, and expenses relating to "work performed after the time the Settlement Agreement is

25   signed . . . including for work spent on compliance monitoring [and] enforcement" was an

26   unresolved issue. *See* Settlement § 11.C.1.

27       Accordingly, the Court finds that Plaintiffs are entitled to reasonable attorneys' fees

28   incurred in connection with monitoring Uber's compliance with the Settlement.

4

Ex. N - 134

United States District Court
Northern District of California

**B.      Reasonableness of Fees**

Uber does not contest the reasonableness of Plaintiffs' claimed costs.  *See* Dkt. No. 185 at 27 (requesting costs in the amount of $685.36).  Plaintiffs adequately documented those costs and they appear reasonable.  Accordingly, the Court GRANTS Plaintiffs' requests for costs in the amount of **$685.36**.

Uber also does not challenge Plaintiffs' counsels' claimed rates and the Court previously approved Plaintiffs' counsels' rates.  *See* Dkt. No. 144.  Although Plaintiffs' counsels rates have increased, the increase is modest and the Court FINDS that Plaintiffs' counsels' rates remain reasonable.  *Compare* Dkt. No. 142 at 4 *with* Dkt. No. 185-1 at 21.

Instead, Uber challenges five categories of Plaintiffs' requested attorneys' fees as unnecessary or unreasonable.  *See* Dkt. No. 187 at 14–22.  Uber also argues that Plaintiffs' fees should be further reduced due to vague time entries and block billing.  *Id.* at 22–24.  The Court will first address each category of contested fees, then turn to Uber's objections.  *See* Dkt. No. 185-1, Ex. G (summary of claimed fees).

**1.      Work Related to Conferring with Monitor**

In this category, Plaintiffs claim fees for hours spent (1) analyzing Uber's data reports and (2) for work related to conferring with the Monitor about those reports.  *See* Dkt. No. 185-1 ("Galvan Decl.") ¶¶ 42–43.  Uber concedes that the hours spent analyzing Uber's reports are compensable,[2] but argues that the hours spent for work relating to conferring with the Monitor was unnecessary.  *See* Dkt. No. 187 at 15–16.  According to Uber, such work is not compensable because the Settlement limits Plaintiffs' counsel's involvement with the Monitor's review Uber's data reports.  *Id.* at 15.  Specifically, Uber contends that the Settlement only contemplates review of its reports by Plaintiffs' counsel and "formal analyses . . . or opining with or conferring with the Monitor about Uber's data reports" is outside the scope of the Settlement.  *Id.*

The Court disagrees.  While the Settlement explicitly requires Uber to provide

---

[2] Uber argues that these hours should be reduced as they were block billed.  *See* Dkt. No. 187 at 16.  The Court will address Plaintiffs' block billing below.

**Ex. N - 135**

1    Plaintiffs' counsel with data reports for analysis (*see* Settlement §§ 6.A, 6.B.1), the

2    Settlement does not limit Plaintiffs' counsel's involvement to that of a passive observer.

3    Rather, the Settlement requires the Monitor to consider "any other information provided,"

4    suggesting by implication that Plaintiffs' counsel are permitted to submit their own

5    commentary on Uber's data reports. *Id.* § 8. Accordingly, work conducted by Plaintiffs'

6    counsel relating to conferring with the Monitor is generally compensable.

7         However, the fact that the Settlement permits Plaintiffs to supply their own

8    commentary on Uber's data reports to the Monitor is not a license to bill for wholly

9    unnecessary work that is duplicative of Uber's reports. *See Balla*, 677 F.3d at 919 ("[T]he

10   court [must] exercise discretion [to] assure that the case is not being milked by a monitor

11   after the injunction has been obtained, for fees that are unreasonable in amount, for work

12   not reasonably performed to enforce the relief, or for work not directly related to enforcing

13   the relief."). It is unclear, for example, why Plaintiffs need to draft, review, and submit

14   declarations from individual complaining class members, particularly when there is no

15   indication that Plaintiffs believe Uber's internal data keeping was inaccurate. *See, e.g.*,

16   Galvan Decl., Ex. F, pt.1 at 101 (billing over 6 hours at $400 per hour to review or draft

17   class member declarations), 113 (reviewing and drafting various class member

18   declarations). Further, Plaintiffs' billing records for this category of work contain several

19   vague time entries, some of which have questionable billing value. *See, e.g.*, *id.* at 147

20   (billing 0.8 hours at $275 per hour for "[m]aking a declaration, cover letter, and report

21   accessible"). Most of the hours, however, appear reasonable.

22        Accordingly, the Court will reduce Plaintiffs' counsel's fee for work relating to

23   conferring with the Monitor by 10% in addition to Plaintiffs' voluntary 5% reduction. The

24   Court will not reduce Plaintiffs' counsel's fee for analyzing Uber's data beyond Plaintiffs'

25   voluntary 5% reduction. Thus, Plaintiffs are entitled to **$59,528.90** and **$34,143.95** for

26   these two sub-categories of work, respectively.

27                    **2.    Work Related to Communicating with Class Members**

28        This category contains three sub-categories of work: (1) communicating with class

United States District Court
Northern District of California

6

1    members to address and respond to discrimination complaints; (2) submitting information

2    requests to Uber pursuant to the Settlement's process (*see* Settlement § 6.B.2); and (3)

3    following up with class members who participated in NFIB's compliance testing program

4    (*see id.* § 6.C).  Uber concedes that the second sub-category of work is compensable but

5    argues that the first and third sub-categories are not.  *See* Dkt. No. 187 at 16.

6          As to the first sub-category of work—communicating with class members to

7    address and respond to discrimination complaints—Uber is correct that Plaintiffs should

8    not be compensated to the extent they are merely creating a parallel complaint

9    investigations process.  The Settlement itself already creates a procedure for class

10   members to raise discrimination complaints—a procedure hailed by Plaintiffs as a

11   significant boon for the class.  *See* Dkt. No. 84.

12         This does not mean, however, that Plaintiffs' counsel is required to sit on their

13   hands and rubber-stamp Uber's efforts.  Plaintiffs' counsel's obligations to the class

14   requires them to take an active role in ensuring that the Settlement is working as intended.

15   And communicating with class members regarding Uber's behavior is the core of

16   monitoring efforts.  In *Prison Legal News*, for example, the Ninth Circuit affirmed

17   attorneys' fees for "reviewing and responding to letters from [class members] complaining

18   about" the defendants' failure to comply with the settlement.  *Prison Legal News*, 608 F.3d

19   at 453.  The Ninth Circuit noted that "[w]ithout such correspondence [with class

20   members], it would be difficult for [plaintiffs] to discover or document violations of the

21   terms of the settlement."  *Id.*

22         Upon review of Plaintiffs' records, the Court is persuaded that Plaintiffs'

23   communication with class members regarding their discrimination complaints is limited to

24   compiling information relating to their monitoring efforts and does not create a parallel

25   track for investigating complaints.

26         As to the third sub-category of work—communications with class members who

27   participated in NFIB's compliance testing program—the Court agrees with Uber.

28   Plaintiffs have already been compensated for work related to NFIB's compliance testing

United States District Court
Northern District of California

7

program.  Section 11.A of the Settlement requires Uber to pay NFIB $225,000 "to support the testing program."  Such payments naturally encompass fees and costs incurred in reviewing program data or following up with program participants.  Plaintiffs may not double-dip for the compliance testing program.  Disallowed amounts are listed in the chart below.[3]  Although some of these entries were coded by Plaintiffs as "Settlement Modifications" work, the Court compiles all disallowed NFIB-related hours here:

| Entry Description | Date of Entry | Claimed Time | Claimed Amount | Page Number of Entry |
|---|---|---|---|---|
| Prepare final language for message to intakes and NFB testing participants who reported denials | 2/2/2018 | 0.40 | $216 | 5 |
| Analysis of NFB testing ride data | 2/23/2018 | 1.10 | $385 | 17 |
| Phone call with T Elder re NFB testing and follow up re same | 4/2/2018 | 0.70 | $329 | 26 |
| Reviewing Uber NFB testing data | 4/2/2018 | 1.30 | $611 | 26 |
| Phone call with T Elder and M Nunez regarding additional information sharing, NFB testing, and next steps | 9/14/2018 | 1.00 | $470 | 75 |
| Discussing internal next steps with S Seaborn regarding information sharing and NFB testing | 9/14/2018 | 1.00 | $470 | 75 |
| Case strategy re NFB testing | 9/28/2018 | 0.10 | $47 | 78 |

[3] Entries are drawn from Galvan Decl., Ex. F.  Page numbers reference those included with the exhibit.  Certain entries are block billed.  Because the Court is unable to discern how much time was spent on compliance testing issues, block billed entries are disallowed.

Ex. N - 138

United States District Court
Northern District of California

| | | | | |
|---|---|---|---|---|
| discussion with S Seaborn | | | | |
| Preparing outline re NFB testing | 9/28/2018 | 0.50 | $235 | 78 |
| Correspondence with co-counsel re NFB testing | 10/1/2018 | 0.10 | $47 | 78 |
| Planning NFB testing meeting with T Elder | 10/2/2018 | 0.10 | $47 | 78 |
| Strategy telecon with M Riess, T Elder and M Nunez to discuss parameters for random sample compliance testing and consultant support needed for same | 10/5/2018 | 0.70 | $549.50 | 79 |
| Attending planning call with SS, MR and MN to discuss compliance data and position on pool policy change | 10/5/2018 | 0.70 | $378 | 79 |
| Attend strategy call re next steps re settlement monitoring issues and revising testing program | 10/5/2018 | 0.70 | $367.50 | 79 |
| Preparing notes for call regarding testing and UberPool | 10/5/2018 | 0.20 | $94 | 79 |
| Phone call with M Nunez, T Elder and S Seaborn regarding testing, UberPool policy, and complaint intakes | 10/5/2018 | 0.70 | $329 | 79 |
| Call with consultant re possible changes to testing program, and call with legal team afterward . . . | 10/9/2018 | 1.60 | $840 | 80 |

9

| Correspondence with team re meeting re compliance data and testing | 10/11/2018 | 0.30 | $141 | 82 |
|---|---|---|---|---|
| Phone call re data and compliance testing | 10/11/2018 | 1.50 | $705 | 82 |
| Review class member service issues in NFB tester reports; follow up re same | 11/15/2018 | 0.40 | $100 | 86 |
| Review and respond to questions from SJE re NFB testers | 12/14/2018 | 0.10 | $52.50 | 92 |
| **Total Disallowed** | | | **$6,413.50** | |

Accordingly, Plaintiffs are entitled to attorneys' fees for communicating with class members and submitting information requests to Uber less Plaintiffs' voluntary 5% reduction in fees. This amounts to **$66,357.50**.

### 3. Work Relating to Unwarranted or Abandoned Modifications

In this category, Plaintiffs seek attorneys' fees relating to their efforts to modify the Settlement in three ways: (1) policies relating to Uber's UberPool service; (2) seeking quarterly data extension; and (3) requesting further data sharing provisions. Plaintiffs also seek attorneys' fees for work relating to their settlement modification efforts that were not specifically allocated to a single sub-category. *See* Dkt. No. 185 at 13–14; Dkt. No. 195 at 4–5. Uber concedes that the second sub-category of fees relating to quarterly data extensions are compensable. *See* Dkt. No. 187 at 18, 20. The first and third sub-category, according to Uber, are not compensable because those proposals were unnecessary or not accepted. *Id.* at 18–19. Uber also argues that Plaintiffs' records documenting work relating to unspecified settlement modification efforts is too vague and may hide double-billing. *See* Dkt. No. 200 at 5–6.

10

**Ex. N - 140**

First, the Court rejects Uber's argument that those hours are not compensable because the Settlement has been effective. Disallowing monitoring fees because Plaintiffs were successful in negotiating and crafting a successful settlement would be counter-productive. Monitoring fees are permissible so long as they are not unreasonable and are related to enforcing the settlement. *See Balla*, 677 F.3d at 919.

Second, Uber concedes that Plaintiffs' proposed modifications to its UberPool program and the data sharing provisions of the Settlement have been adopted "in a very limited fashion voluntarily by Uber." Dkt. No. 187 at 19. But Plaintiffs are not required to achieve complete victory nor were they required to obtain a court order or official modification to be entitled to fees. In *Balla*, Ninth Circuit affirmed modification fees even though the plaintiffs' motion to hold the defendant in contempt was denied because plaintiffs' motion practice "played a key role in resolving" the underlying issue. *Balla*, 677 F.3d at 920 (quotations omitted). The Ninth Circuit noted that "[i]f in a battle to take a hill, the adversary flees instead of fighting to a bloody defeat, the taking of the hill makes the battle a victory." *Id.*

Here, although they may not have achieved wholesale adoption of these proposals, Plaintiffs achieved at least some success as to their UberPool, quarterly data extension, and further data sharing proposals. Plaintiffs seek fees connected to those proposals. After reviewing Plaintiffs' records, the billed amounts appear reasonable. Less Plaintiffs' voluntary 5% reduction, Plaintiffs are entitled to **$29,324.61** for work related to these three sub-categories.[4]

As to Plaintiffs' requested fees for unspecified settlement modification work, the Court shares Uber's concern that counsels' records are vague. While the Court is not persuaded that Plaintiffs' counsel double-billed for unspecified settlement modification work related to the three sub-categories discussed in this order, the parties' submissions

---

[4] As mentioned in footnote 3, *supra*, some entries block billed NFIB-testing-program-related work and UberPool work. Because the Court already eliminated those fees—$801 in total—it does not do so again here.

11

make clear that Plaintiffs' counsel spent time working on settlement modification proposals that ultimately went nowhere. *See* Galvan Decl. ¶¶ 45–47; Dkt. No. 187-1 ("Spurchise Decl."), Ex. 2. In particular, Plaintiffs proposed modifications to the Settlement's education provisions in addition to the three sub-categories already discussed. *See* Spurchise Decl., Ex. 2 at 4. Because it is not clear that the wholly abandoned education proposal played any role in their overarching settlement modification efforts, hours expended relating to that proposal is not compensable. *Cf. Balla*, 677 F.3d at 920 (fees expended on efforts that "play[] a key role" are compensable).

Accordingly, the Court will reduce Plaintiffs' counsel's fee for work relating to unspecified settlement modification work by 20% in addition to Plaintiffs' voluntary 5% reduction. This amounts to **$44,689.90** in fees for unspecified settlement modification work. In total, Plaintiffs are entitled to **$74,014.51** for work relating to their settlement modification efforts.

### 4.    Other Direct Monitoring Work

This category of work includes (1) responding to inquiries from the United States Department of Justice regarding the Settlement; (2) investigating Uber's filings with the California Public Utilities Commission, arbitrations of service animal issues, and other similar developments; (3) corresponding with Uber to verify compliance with Settlement requirements; and (4) conferring with a consultant regarding evaluating the efficacy of the Settlement at reducing discrimination against class members.

Here, Uber simply argues that this work is not compensable because these tasks were "[too] attenuated" from the Settlement. Dkt. No. 185 at 21. The Court is not convinced. Corresponding with and investigating actions taken by regulatory bodies responsible for discrimination complaints is well within the scope of monitoring compliance with a discrimination-related settlement. Likewise, Plaintiffs are entitled to reasonable consultant fees to evaluate whether the Settlement is working as intended.

Accordingly, Plaintiffs are entitled to attorneys' fees for their direct monitoring work less their voluntary 5% reduction in fees. This amounts to **$13,130.90**.

Ex. N - 142

United States District Court
Northern District of California

### 5. Fees Relating to Plaintiffs' Unfiled Attorneys' Fee Motion

The next category of fees relates to work expended by Plaintiffs' counsel on an unfiled fees motion. In March 2018, the parties began negotiating Plaintiffs' counsel's attorneys' fees for work conducted in 2017. *See* Galvan Decl. ¶¶ 64–70; Spurchise Decl. ¶¶ 4–5. Under the Settlement, the parties are required to negotiate such fees within 60 days before seeking Court intervention. *See* Settlement § 11.C.2. The parties initially failed to come to an agreement within the 60-day limit, but ultimately settled the dispute by July 2, 2018. *See* Galvan Decl. ¶¶ 67–69; Spurchise Decl. ¶¶ 4–5. The fees motion was thus never filed.

Given the Settlement's requirement that the parties negotiate their fees dispute, it was unreasonable for Plaintiffs to bill for hours preparing a fee motion prior to April 30, 2018—the end of the 60-day negotiation period. Once it became clear that no settlement was forthcoming, however, Plaintiffs were entitled to begin preparing their fees motion and are entitled to fees for time spent accordingly. Thus, the Court disallows all fees billed prior to April 30, 2018, less Plaintiffs' voluntary 5% reduction. Accordingly, Plaintiffs are entitled to **$4,393.75** in fees and costs for their unfiled fees motion. *See* Galvan Decl., Ex. F, pt. 2 at 7–12.

### 6. Fees Relating to This Fees Motion

Finally, Plaintiffs request fees for preparing the instant fees motion. Plaintiffs request $64,019.25 for hours worked from May 14, 2019—the last day of the parties' negotiation period—to August 25, 2019. *See* Dkt. No. 190 at 20. After being given an opportunity to respond, Uber did not oppose Plaintiffs' request for fees relating to the instant fees motion. *See* Dkt. Nos. 199, 200.

Reviewing Plaintiffs' records (*see* Dkt. No. 190-1 at 24–29), the requested hours are well documented and appear reasonable. Accordingly, after accounting for Plaintiffs' voluntary reductions, Plaintiffs are entitled to **$64,019.25** in fees relating to this fees motion.

///

13

Ex. N - 143

### 7.    Specific Challenges to Hours

Uber challenges 13.2 hours as unduly vague and an additional 137.7 hours for impermissible block billing.[5]  The Court first addresses Uber's vagueness challenges before turning to the alleged block-billed hours.

When submitting entries for attorneys' fee awards, attorneys are "not required to record in great detail how each minute of [their] time was expended."  *Hensley v. Eckerhart*, 461 U.S. 424, 437 n.12 (1983).  Attorneys need only "keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed."  *Id.* at 441 (Burger, C.J., concurring); *United Steelworkers of Am. v. Ret. Income Plan For Hourly-Rated Employees of ASARCO, Inc.*, 512 F.3d 555, 565 (9th Cir. 2008).

The Court reviewed the entries Uber identified as vague.  *See* Dkt. No. 187-6.  It agrees as to the following entries:

| Entry Description | Date of Entry | Claimed Time | Claimed Amount |
|---|---|---|---|
| Team phone call | 1/8/2018 | 1.60 | $752 |
| Correspondence regarding proposed changes to settlement | 1/17/2018 | 0.10 | $47 |
| Phone call with D. Kouniaris | 1/19/2018 | 0.30 | $141 |
| Correspondence re meeting and conferring | 1/25/2018 | 0.10 | $47 |
| Prepare Declaration and Exhibit | 2/25/2018 | 0.90 | $315 |
| Team pre-meet and confer phone call | 4/23/2018 | 1.00 | $470 |

---

[5] In accompanying exhibits, Uber appears to argue that certain of Plaintiffs' counsel's billed hours were duplicative or clerical work in disguise.  *See* Spurchise Decl. ¶ 8 & Ex. 3.  Uber's opposition, however, does not challenge those hours.  And, in any case, review of those entries does not suggest that they are duplicative or clerical.

14

United States District Court
Northern District of California

| Drafting declaration and gathering exhibits | 6/5/2018 | 1.60 | $752 |
|---|---|---|---|
| Discuss next steps with team | 10/11/2018 | 0.30 | $105 |
| Preparing for team call | 10/18/2018 | 0.30 | $141 |
| Make stipulation accessible at the request of M. Riess | 12/18/2018 | 0.20 | $55 |
| **Total** | | | **$2,825** |

"Block billing" is "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945 (9th Cir. 2007). Block billing is not per se unreasonable and "has been accepted in this district." *PQ Labs, Inc. v. Qi*, No. 12-cv-00450 CW, 2015 WL 224970, at *3 (N.D. Cal. Jan. 16, 2015) (*citing Stonebrae, L.P. v. Toll Bros., Inc.*, No. 08-cv-00221 EMC, 2011 WL 1334444, at *8 (N.D.Cal. Apr. 7, 2011) ("Block-billing is a typical practice in this district, and blocked-bills have been found to provide a sufficient basis for calculating a fee award.")). However, the block-billing party seeking fees must still meet the basic requirements of "listing his hours and identifying the general subject matter of his time expenditures." *Garcia v. Resurgent Capital Servs., L.P.*, No. 11-cv-01253 EMC, 2012 WL 3778852, at *8 (N.D. Cal. Aug. 30, 2012) (internal quotation marks and citation omitted). Otherwise, the trial court may reduce or outright deny the award. *Fischer v. SJN-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000).

Here, the Court finds that the alleged block-billed entries "contain enough specificity as to individual tasks to ascertain whether the amount of time spent performing them was reasonable." *Garcia*, 2012 WL 3778852, at *8. Because the block-billed entries are adequately detailed to permit the Court to assess the reasonableness of hours expended, the Court finds that plaintiffs' counsel have sufficiently documented their hours; no reduction is necessary on this basis.

15

**Ex. N - 145**

## C. Motion to Seal

Plaintiffs move to seal two exhibits containing a chart and graph detailing the number of service-animal-related complaints received by Uber on a month-to-month basis. *See* Dkt. No. 189-5. Plaintiffs also seek to redact two portions of their reply referencing that information. *See* Dkt. No. 189-4 at 13. Notably, the information sought to be sealed are merely information derived from Uber's data reports, not the reports themselves.

Local Rule 79-5(e)(1) requires the party designating a document as confidential to "file a declaration as required by [Local Rule] 79-5(d)(1)(A) establishing that all of the designated material is sealable" within four days of the filing of the motion to seal. Local Rule 79-5(d)(1)(A) further explains that merely "[r]eferenc[ing] a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." *See also Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (listing grounds establishing "compelling reasons" to seal court files).

Plaintiffs filed their motion to seal and served their motion on Uber on August 30, 2019. *See* Dkt. Nos. 189, 191. Because more than four days have passed since Plaintiffs filed their motion and Uber has not filed a declaration explaining why the derived information contained in the exhibits or the reply is confidential, the Court DENIES the administrative motion to seal without prejudice. Plaintiffs must file the documents in the public record by **October 11, 2019**. *See* N.D. Cal. Local Rule 79-5(e)(2).

## IV. Conclusion

The Court GRANTS Plaintiffs' motion for attorneys' fees and costs. Plaintiffs are entitled to $312,763.76 in attorneys' fees and $685.36 in costs for a total award of **$313,449.12**. Uber must pay the award within 14 days of this order.

The Court DENIES Plaintiffs' administrative motion to seal. Plaintiffs must file the documents in the public record by **October 11, 2019**.

/ / /

/ / /

16

Ex. N - 146

**IT IS SO ORDERED.**

Dated:  November 8, 2019                                    _____
                                                            NATHANAEL M. COUSINS
                                                            United States Magistrate Judge

**Ex. N - 147**

# EXHIBIT O

*14861364*

1   GAY CROSTHWAIT GRUNFELD – 121944
    JENNY S. YELIN – 273601
2   ROSEN BIEN GALVAN & GRUNFELD LLP
    50 Fremont Street, 19th Floor
3   San Francisco, California 94105-2235
    Telephone:    (415) 433-6830
4   Facsimile:    (415) 433-7104
    Email:        ggrunfeld@rbgg.com
5                 jyelin@rbgg.com

6   JENNIFER LIU – 279370
    ASHLEY PELLOUCHOUD – 286049
7   THE LIU LAW FIRM, P.C.
    1390 Market Street, Suite 200
8   San Francisco, California 94102
    Telephone:    (415) 896-4260
9   Facsimile:    (415) 231-0011
    Email:        jliu@liulawpc.com
10                ap@liulawpc.com

11  Attorneys for Plaintiff and the Settlement Class

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                         COUNTY OF ALAMEDA

15

16  MATTHEW SUNNER, on behalf of          Case No. RG15772244
    himself and others similarly situated,
17                                          ASSIGNED FOR ALL PURPOSES TO:
                   Plaintiff,               JUDGE GEORGE HERNANDEZ
18                                          DEPARTMENT 17
          v.
19                                          **COMPLEX CASE; CLASS ACTION**
    KENNETH R. TURNAGE II GENERAL
20  CONTRACTOR, INC., d/b/a K2GC, INC.;    **[PROPOSED] ORDER GRANTING**
    KENNETH R. TURNAGE II; and DOES        **MOTION FOR CLASS**
21  1-10,                                   **REPRESENTATIVE SERVICE**
                                            **AWARD AND ATTORNEY'S FEES**
22                 Defendants.              **AND COSTS**

23                                          Judge:  Hon. George Hernandez
                                            Date:   February 15, 2017
24                                          Time:   2:30 p.m.
                                            Dept.:  17
25                                          Reservation No.: ~~1792476~~ 1822643
                                            Action Filed:  May 29, 2015
26                                          Trial Date:    None Set

27

28

[3085476-2]

                                                                    RG15772244
          [PROPOSED] ORDER GRANTING MOTION FOR CLASS REPRESENTATIVE SERVICE AWARD AND
                             ATTORNEY'S FEES AND COSTS

Received
FEB 0 1 2017

Ex. O - 149

1       Plaintiff's Motion for Class Representative Service Award and Attorney's Fees and

2 Costs came on for hearing before this Court on February 15, 2017.  The Court having

3 considered the pleadings on the motion, the Joint Stipulation of Settlement and Release

4 ("Settlement Agreement"), attached as Exhibit A to the Declaration of Gay Crosthwait

5 Grunfeld in Support of Motion for Final Approval of Class Action Settlement and Motion

6 for Class Representative Service Award and Attorney's Fees and Costs, oral argument at

7 the hearing, and the record in this case, and good cause appearing, hereby ORDERS as

8 follows:

9      1.     A service award is justified in this case in light of the efforts of Class

10 Representative Matthew Sunner to advance the litigation and the interests of the Class.

11 Mr. Sunner has fairly and adequately represented and protected the interests of the Class.

12      2.     Attorney's Fees equal to one-third of the settlement fund ($99,000) are

13 reasonable and justified in this case, due to the risks inherent in the case, the contingent

14 nature of the fee arrangement, the skill of Class Counsel, and the efforts of Class Counsel

15 to litigate the case effectively and pursue a settlement for the Class.

16      3.     The costs advanced by Class Counsel were reasonably incurred in pursuit of

17 the litigation.

18      4.     The Court ORDERS that the following award, fees and costs are reasonable

19 and should be paid pursuant to the schedule set forth in the Order Granting Motion for

20 Final Approval of Class Action Settlement and the Settlement Agreement:

21             a.     $10,000 to Class Representative Matthew Sunner as a service award;

22             b.     $99,000 to The Liu Law Firm, P.C. and Rosen Bien Galvan &

23 Grunfeld LLP for attorney's fees; and

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

2                     RG15772244
[PROPOSED] ORDER GRANTING MOTION FOR CLASS REPRESENTATIVE SERVICE AWARD AND
ATTORNEY'S FEES AND COSTS

Ex. O - 150

1          c.      $13,283.87 jointly to Class Counsel for litigation costs.

2     IT IS SO ORDERED.

3

4  DATED: ___2/15___, 2017

5                                              George Hernandez
                                               Judge of the Superior Court

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3085476-2]

3                                                    RG15772244

[PROPOSED] ORDER GRANTING MOTION FOR CLASS REPRESENTATIVE SERVICE AWARD AND
ATTORNEY'S FEES AND COSTS

1   GAY CROSTHWAIT GRUNFELD – 121944
    JENNY S. YELIN – 273601
2   ROSEN BIEN GALVAN & GRUNFELD LLP
    50 Fremont Street, 19th Floor
3   San Francisco, California 94105-2235
    Telephone:   (415) 433-6830
4   Facsimile:   (415) 433-7104
    Email:       ggrunfeld@rbgg.com
5                jyelin@rbgg.com

6   JENNIFER LIU – 279370
    ASHLEY PELLOUCHOUD – 286049
7   THE LIU LAW FIRM, P.C.
    1390 Market Street, Suite 200
8   San Francisco, California 94102
    Telephone:   (415) 896-4260
9   Facsimile:   (415) 231-0011
    Email:       jliu@liulawpc.com
10               ap@liulawpc.com

11

    Attorneys for Plaintiff and the Settlement Class
12

13

14              SUPERIOR COURT OF THE STATE OF CALIFORNIA

                         COUNTY OF ALAMEDA
15

16

    MATTHEW SUNNER, on behalf of          Case No. RG15772244
17  himself and others similarly situated,
                                          ASSIGNED FOR ALL PURPOSES TO:
18          Plaintiff,                    JUDGE GEORGE HERNANDEZ
                                          DEPARTMENT 17
19      v.
                                          **COMPLEX CASE; CLASS ACTION**
20  KENNETH R. TURNAGE II GENERAL
    CONTRACTOR, INC., d/b/a K2GC, INC.;   **DECLARATION OF GAY
21  KENNETH R. TURNAGE II; and DOES       CROSTHWAIT GRUNFELD IN
    1-10,                                 SUPPORT OF MOTION FOR FINAL
22                                        APPROVAL OF CLASS ACTION
            Defendants.                   SETTLEMENT AND MOTION FOR
23                                        CLASS REPRESENTATIVE SERVICE
                                          AWARD AND ATTORNEY'S FEES
24                                        AND COSTS**

25                                        Judge:  Hon. George Hernandez
                                          Date:   February 15, 2017
26                                        Time:   2:30 p.m.
                                          Dept.:  17
27                                        Reservation No.: 1792476
                                          Action Filed:   May 29, 2015
28                                        Trial Date:     None Set

[3085498-1]
                                                           RG15772244
    DECL. OF GAY CROSTHWAIT GRUNFELD ISO MOTION FOR FINAL APPROVAL OF CLASS ACTION
    SETTLEMENT AND MOTION FOR CLASS REP. SERVICE AWARD & ATTORNEY'S FEES & COSTS

ENDORSED
FILED
ALAMEDA COUNTY

JAN 31 2017

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER, Deputy

| Timekeeper | Position | Class | Hours | 2017 Rate/Hour | Total |
|---|---|---|---|---|---|
| Gay C. Grunfeld | Partner | 1984 | 100.4 | $825 | $82,830.00 |
| Aaron Fischer | Former Associate | 2006 | 49.2 | $625 | $30,750.00 |
| Blake Thompson | Former Associate | 2007 | 106.8 | $600 | $64,080.00 |
| Margot Mendelson | Former Associate | 2009 | 2.8 | $515 | $1,442.00 |
| Jenny Yelin | Associate | 2010 | 273.3 | $500 | $136,650.00 |
| Christopher Hu | Associate | 2013 | 3.4 | 425 | $1,445.00 |
| Linda Woo | Paralegal | N/A | 103 | $325 | $33,475.00 |
| F. Gail LaPuria | Paralegal | N/A | 18.7 | $275 | $5,142.50 |
| **Total** | | | **657.6** | | **$355,814.50** |

27.     The amount sought in fees, 33 1/3% of the common fund, or $99,000, is only

28% of our firm's lodestar. With LLF's fees included, it is a much smaller percentage.

28.     Our firm has been actively involved in every stage of the case since we

joined as co-counsel shortly after the complaint was filed in June 2015. The 657.6 hours

claimed includes the work we did on some of the most significant, time-intensive portions

of this case: drafting discovery requests, including discovery directed to Defendants as

well as third-parties; reviewing documents  produced in response to those discovery

requests; meeting and conferring repeatedly with Defendants regarding their inadequate

discovery responses; researching and drafting the mediation statement, preparing for

mediation, and conducting a nearly-full day mediation with Michael Loeb in December

2015; preparing for and taking the deposition of K2GC's Person Most Qualified, Kenneth

R. Turnage; interviewing witnesses and obtaining declarations in support of the class

certification motion; drafting the class certification motion, which we filed in February

2016, just nine months after the case was filed; negotiating the settlement in the case;

preparing the Motion for Preliminary Approval of the settlement; overseeing the Class

Notice process; and drafting the instant Motions for Final Approval and for a Class

Representative Service Award and Attorney's Fees and Costs.

29.     We expect to spend significant time continuing our work on this case after

the filing of this motion, including preparing for the Final Fairness Hearing on February

DECL. OF GAY CROSTHWAIT GRUNFELD ISO MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND MOTION FOR CLASS REP. SERVICE AWARD & ATTORNEY'S FEES & COSTS

Ex. O - 153

[3085498-1]

# EXHIBIT P

1  GAY CROSTHWAIT GRUNFELD – 121944
   JENNY S. YELIN – 273601
2  ROSEN BIEN GALVAN & GRUNFELD LLP
   50 Fremont Street, 19th Floor
3  San Francisco, California  94105-2235
   Telephone:    (415) 433-6830
4  Facsimile:    (415) 433-7104
   Email:        ggrunfeld@rbgg.com
5                jyelin@rbgg.com

6  JENNIFER LIU – 279370
   THE LIU LAW FIRM, P.C.
7  1170 Market Street, Suite 700
   San Francisco, California  94102-4991
8  Telephone:    (415) 896-4260
   Facsimile:    (415) 231-0011
9  Email:        jliu@liulawpc.com

10 Attorneys for Plaintiffs and the Proposed Class

11

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                SAN FRANCISCO DIVISION

15

16 JAIMIE QUINBY, LINDA GOMES, and         Case No. CV-15-4099 WHO
   ERIC FONTES, on behalf of themselves
17 and all others similarly situated,      **ORDER GRANTING MOTION FOR
                                           CLASS REPRESENTATIVE SERVICE
18              Plaintiffs,                 AWARDS AND ATTORNEYS' FEES
                                           AND COSTS**
19      v.
                                           Judge:  Hon. William H. Orrick
20 ULTA SALON, COSMETICS &                 Date:   January 18, 2017
   FRAGRANCE, INC.,                        Time:   2:00 p.m.
21                                         Crtrm.: 2, 17th Floor
                Defendant.
22                                         Trial Date:    None Set

23

24

25

26

27

28

1        On January 18, 2017, this Court conducted the Final Fairness Hearing, with Rosen

2   Bien Galvan & Grunfeld LLP and The Liu Law Firm, P.C. ("Plaintiffs' Counsel")

3   appearing as counsel for Plaintiffs JAIMIE QUINBY, ERIC FONTES, and LINDA

4   GOMES ("Plaintiffs" or "Class Representatives"), and Littler Mendelson, P.C. appearing

5   as counsel for Defendant ULTA SALON, COSMETICS & FRAGRANCE, INC.

6   ("Defendant").  Based upon the Court's review of Plaintiffs' Motion for Class

7   Representative Service Awards and Attorneys' Fees and Costs, the Memorandum of Points

8   and Authorities in Support Thereof, the Declarations of Jennifer Liu ("Liu Declaration"),

9   Gay Crosthwait Grunfeld ("Grunfeld Declaration"), Jaimie Quinby, Eric Fontes, and Linda

10  Gomes, and the exhibits thereto, the Court finds:

11       1.      Service award payments are justified where the class representatives expend

12  extraordinary effort, bear personal hardship, and risk their current and future livelihood to

13  remedy unfair practices for the benefit of the class.  *See Van Vranken v. Atlantic Richfield*

14  *Co*., 901 F. Supp. 294, 299 (N.D. Cal. 1995).  The Court finds that the service awards are

15  justified here in light of the efforts of Class Representatives Jaimie Quinby, Eric Fontes,

16  and Linda Gomes to advance the litigation and the interests of the class.

17       2.      "[A] litigant or a lawyer who recovers a common fund for the benefit of

18  persons other than himself or his client is entitled to a reasonable attorney's fee from the

19  fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  Courts are

20  directed to "take into account all of the circumstances of the case" when determining what

21  fees to approve (*Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1048 (9th Cir. 2002)), with

22  "[r]easonableness [being] the goal."  *Fischel v. Equitable Life Assurance Soc'y of the U.S.,*

23  307 F.3d 997, 1007 (9th Cir. 2002).  The Court finds that the factors used to assess

24  reasonableness—primary among them, the value of the monetary secured for the class—

25  support the requested fee award of $912,500, equal to 25% of the settlement amount of

26  $3,650,000.  The Court further finds that the costs advanced by Class Counsel were

27  reasonably incurred in pursuit of the litigation.

28       3.      The Class Representatives and Plaintiffs' Counsel have fairly and adequately

**Ex. P - 156**

represented and protected the interests of the class.

4. The Court therefore ORDERS that the following class representative service awards, attorney's fees, and costs are reasonable:

a. $10,000 each to Jaimie Quinby, Eric Fontes, and Linda Gomes as service awards;

b. $912,500 jointly to The Liu Law Firm, P.C. and Rosen Bien Galvan & Grunfeld LLP for reasonable attorneys' fees; and

c. $11,384.67 jointly to Class Counsel for litigation costs.

5. These amounts are to be paid if the Court grants final approval to the settlement according to the schedule in the Joint Stipulation of Settlement and Release, Exhibit A to the Declaration of Gay Crosthwait Grunfeld in support of the Motion for Class Representative Service Awards and Attorneys' Fees and Costs or as directed in the Court's Order Granting Final Approval to the Class Action Settlement.

IT IS SO ORDERED.

DATED: January 18, 2017

William H. Orrick
Judge of the United States District Court

1  GAY CROSTHWAIT GRUNFELD – 121944
   JENNY S. YELIN – 273601
2  ROSEN BIEN GALVAN & GRUNFELD LLP
   50 Fremont Street, 19th Floor
3  San Francisco, California  94105-2235
   Telephone:   (415) 433-6830
4  Facsimile:   (415) 433-7104
   Email:       ggrunfeld@rbgg.com
5                jyelin@rbgg.com

6  JENNIFER LIU – 279370
   THE LIU LAW FIRM, P.C.
7  1170 Market Street, Suite 700
   San Francisco, California  94102-4991
8  Telephone:   (415) 896-4260
   Facsimile:   (415) 231-0011
9  Email:       jliu@liulawpc.com

10 Attorneys for Plaintiffs and the Proposed Class

11

12                     UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                        SAN FRANCISCO DIVISION

15

16 | JAIMIE QUINBY, LINDA GOMES, and | Case No. CV-15-4099 WHO
   | ERIC FONTES, on behalf of themselves |
17 | and all others similarly situated, | **DECLARATION OF GAY**
   | | **CROSTHWAIT GRUNFELD IN**
18 |                Plaintiffs, | **SUPPORT OF MOTION FOR CLASS**
   | | **REPRESENTATIVE SERVICE**
19 |        v. | **AWARDS AND ATTORNEY'S FEES**
   | | **AND COSTS**
20 | ULTA SALON, COSMETICS & |
   | FRAGRANCE, INC., | Judge:  Hon. William H. Orrick
21 | | Date:   January 18, 2017
   |                Defendant. | Time:   2:00 p.m.
22 | | Crtrm.: 2, 17th Floor
23 | | Trial Date:      None Set

24

25

26

27

[3061082-4]   28                                              CV-15-4099 WHO

_____

| Timekeeper | Position | Class | Hours | 2016 Rate/Hour | Total |
|---|---|---|---|---|---|
| Gay C. Grunfeld | Partner | 1984 | 110.6 | $790 | $87,374.00 |
| Jenny S. Yelin | Associate | 2010 | 178.3 | $475 | $84,692.50 |
| Andrew Spore | Associate | 2015 | 21.2 | $380 | $8,056.00 |
| Other Attorneys | N/A | N/A | 20.8 | N/A | $11,889.00 |
| Linda Woo | Paralegal | N/A | 38.9 | $300 | $11,670.00 |
| Other Paralegals | Paralegal | N/A | 4.5 | N/A | $1,224.00 |
| **Total** | | | 374.3 | | $204,905.50 |

26. Our current lodestar amount of $204,905.50, combined with LLF's lodestar of $296,915.00, results in a total lodestar amount of $501,821.00 for Plaintiffs' counsel. The amount sought in fees, 25% of the common fund, or $912,500, would result in a multiplier of 1.82 based on work through November 11, 2016. I believe that the excellent results achieved in this case, coupled with the efficiency with which we reached a settlement with the Defendants, justify this modest multiplier.

27. We expect to spend significant time continuing our work on this case after the filing of this motion, including preparing and filing the Motion for Final Approval, preparing for the Final Fairness Hearing on January 18, 2017, communicating with class members and the Settlement Administrator, and negotiating with Defendants regarding the timing and details of the final distribution of funds. As discussed in more detail below, we will likely spend at least 55 additional hours on this case in the future, so our total amount of fees is likely to be at least $233,603.17.

28. A summary of the key work done and hours incurred by RBGG at each stage of the litigation is set forth below. Upon request, I could submit RBGG's individual, itemized billing records for the Court's review.

# EXHIBIT Q

1

2

3

4

5

6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant. | Case No. 14-cv-04086 NC<br><br>**ORDER GRANTING FINAL APPROVAL AND ATTORNEYS' FEES**<br><br>Re: Dkt. Nos. 119, 128 |

In September 2014, the National Federation of the Blind of California and three individuals sued Uber and its California subsidiaries, alleging that Uber violates state and federal law by discriminating against blind persons when Uber drivers refuse to transport service dogs. In April 2015, this Court denied Uber's motion to dismiss the complaint and found that NFB-CA had associational standing and that Uber is subject to the ADA. The parties then began preparing for trial, while also engaging in settlement discussions.

In January 2016, the parties notified the Court that they had a settlement in principle, so the Court granted their request to vacate the deadlines in the case. In late April 2016, the parties requested preliminary approval of their class action settlement. The Court granted preliminary approval, and the parties now seek final approval of the settlement. In addition, plaintiffs move for $1,589,574 in attorneys' fees and $13,447.14 in costs, with a multiplier of 2.0. Uber agrees that plaintiffs can recover attorneys' fees, but disputes the reasonableness of the fees and costs. The Court held a hearing on the

Case No. 14-cv-04086 NC

1   motions on December 1, 2016, and granted both the motion for final approval and the

2   motion for attorneys' fees.

3          As to the final approval of the settlement, the parties reported that no objections to

4   the settlement were received.  In its order granting preliminary approval of the settlement,

5   the Court summarized the settlement's key components and analyzed the fairness of

6   settlement in detail.  Dkt. No. 112.  The Court now concludes that the settlement is fair,

7   adequate, and reasonable and GRANTS the motion for final approval of the class action

8   settlement.  The Court retains jurisdiction over the settlement for the duration of the

9   settlement agreement.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378

10  (1994).

11         As to the attorneys' fees request, Uber does not dispute plaintiffs' entitlement to

12  attorneys' fees.  Thus, the Court considers (1) the reasonableness of the attorneys' fees,

13  and (2) the appropriate multiplier.

14         Plaintiffs request $1,589,574 in attorneys' fees.  The "lodestar is the product of

15  reasonable hours times a reasonable rate."  *City of Burlington v. Dague*, 505 U.S. 557, 559

16  (1992).  Uber objects to (1) the attorneys' hourly rate; (2) duplicative work done by

17  multiple attorneys in attending hearings and conference calls, and (3) plaintiffs' trial

18  preparation after settlement negotiations had begun.

19         First, the Court finds that plaintiffs have cited sufficient authority that the rates

20  requested have been awarded in this district and are considered reasonable in the San

21  Francisco Bay Area market.

22         Second, the Court finds that plaintiffs' counsel have not unnecessarily duplicated

23  work by structuring their team to have multiple attorneys consulted at key times in the

24  case.  *See Nat'l Fed'n of the Blind v. Target Corp.*, No. 06-cv-01802 MHP, 2009 WL

25  2390261, at *3 (N.D. Cal. Aug. 3, 2009) ("the court may not condition fees on plaintiffs'

26  counsel's conformance to the typical commercial law firm's pyramidal staffing

27  structure.").

28         Third, the parties moved to vacate trial deadlines in January, and the Court made

United States District Court
Northern District of California

1    clear for the following four months that trial dates would be reinstated if a settlement was

2    not promptly entered.  Under those circumstances, the Court finds it reasonable that

3    plaintiffs' counsel continued to prepare for trial after January and even until April when a

4    final settlement was entered on the docket.  Considering all arguments, the Court

5    concludes that plaintiffs' request for fees and costs are reasonable and GRANTS the

6    motion.

7         In addition to reasonable attorneys' fees, plaintiffs request a multiplier of 2.0 under

8    California law.  A multiplier is permitted under California law to allow plaintiffs to be

9    compensated for the real market value of their work, which includes a certain amount of

10   risk absorbed by counsel when working on contingency.  *See Ketchum v. Moses*, 24 Cal.

11   4th 1122, 1136 (2001) ("The experience of the marketplace indicates that lawyers

12   generally will not provide legal representation on a contingent basis unless they receive a

13   premium for taking that risk.").

14        The Court considers the most analogous case cited by the parties: *Nat'l Fed'n of the*

15   *Blind v. Target Corp.*, No. 06-cv-01802 MHP, 2009 WL 2390261 (N.D. Cal. Aug. 3,

16   2009).  In *Target*, plaintiffs sought to make Target's online platform accessible to blind

17   web users.  *Id.* at *1.  There, Judge Patel found that a 1.65 multiplier was appropriate in a

18   case with significant motion practice, including contested motions to dismiss, for

19   preliminary injunction, class certification, and summary judgment.  *Id.* at *9.

20        In this case, the Court finds that plaintiffs' sought to enhance Uber's policies to

21   protect blind riders, which can provide a model for other businesses in the sharing

22   economy.  Additionally, plaintiffs faced a significant hurdle in overcoming the motion to

23   dismiss, and took on the risk associated with raising novel legal issues in complex areas of

24   jurisdictional, employment, and discrimination law.  Thus, the Court finds that here, a

25   multiplier of 1.5 is appropriate to fully award plaintiffs for the fair market value of their

26   work in taking on this case.

27        Plaintiffs must submit an updated proposed order as to the requested fees and costs

28   for the Court's signature in accordance with this order by December 12, 2016.

United States District Court
Northern District of California

Case No. 14-cv-04086 NC          3

**Ex. Q - 163**

1

2      **IT IS SO ORDERED.**

3

4   Dated:  December 6, 2016                    _____

5                                               NATHANAEL M. COUSINS
                                                United States Magistrate Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Case No. 14-cv-04086 NC           4

1  MARY-LEE SMITH – Cal. Bar No. 239086
   JULIA MARKS – Cal. Bar No. 300544
2  DISABILITY RIGHTS ADVOCATES
   2001 Center Street, Fourth Floor
3  Berkeley, California  94704-1204
   Telephone:    (510) 665-8644
4  Facsimile:    (510) 665-8511
   TTY:          (510) 665-8716
5  Email:        msmith@dralegal.org

6  TIMOTHY ELDER – Cal. Bar No. 277152
   TRE LEGAL PRACTICE
7  4226 Castanos Street
   Fremont, California  94536
8  Telephone:    (410) 415-3493
   Facsimile:    (888) 718-0617
9  Email:        telder@trelegal.com

10 MICHAEL W. BIEN – Cal. Bar No. 096891
   MICHAEL S. NUNEZ – Cal. Bar No. 280535
11 ROSEN BIEN GALVAN & GRUNFELD LLP
   50 Fremont Street, 19th Floor
12 San Francisco, California  94105-2235
   Telephone:    (415) 433-6830
13 Facsimile:    (415) 433-7104
   Email:        mbien@rbgg.com
14               mnunez@rbgg.com

15 Attorneys for Plaintiffs

16

17                    UNITED STATES DISTRICT COURT

18      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

19

20 NATIONAL FEDERATION OF THE        Case No. 3:14-cv-04086-NC
   BLIND, NATIONAL FEDERATION OF
21 THE BLIND OF CALIFORNIA,          **DECLARATION OF MICHAEL W.**
   MICHAEL KELLY, MICHAEL            **BIEN IN SUPPORT OF PLAINTIFFS'**
22 HINGSON, and MICHAEL PEDERSON,    **MOTION FOR FEES AND COSTS**

23              Plaintiffs,          Judge:  Hon. Magistrate Nathanael
                                             Cousins
24        v.                         Date:   November 10, 2016
                                     Time:   10:00 a.m.
25 UBER TECHNOLOGIES, INC.,          Crtrm.: D, 450 Golden Gate Avenue, san
                                             Francisco, CA 94102
26              Defendant.

27

28

[3030414-5]

1    I, Michael W. Bien, declare,

2    1.    I am an attorney admitted to practice law in California, a member of the bar

3    of this Court, and a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP

4    ("RBGG"), counsel of record for Plaintiffs. I have personal knowledge of the matters set

5    forth herein, and if called as a witness I could competently so testify. I make this

6    declaration in support of Plaintiffs' Motion for Attorneys' Fees and Expenses.

7    <u>**Plaintiffs' Counsel Achieved Remarkable Results In This Novel Case**</u>

8    2.    This case and the results achieved are immensely important for several

9    reasons:  First, Plaintiffs secured comprehensive relief ensuring that every service animal

10    user in the United States will consistently receive reliable access to the nation's largest

11    door-to-door transportation service.  Under the terms of the settlement, Uber has agreed to

12    provide consistent and clear information to each of its drivers detailing their legal

13    obligation to serve persons with service animals on an equal basis, and will require both

14    new and current drivers to affirmatively confirm their understanding of this obligation.

15    Uber will implement a stringent enforcement policy to remove discriminatory drivers from

16    the platform. Uber will also implement a comprehensive written service animal policy that

17    informs riders of their rights, clarifies driver obligations and discipline, requires improved

18    customer service and complaint responses, and limits cleaning fee charges for service

19    animal users. The settlement also includes robust data-gathering requirements, third-party

20    monitoring, testing by the National Federation of the Blind ("NFB"), and dispute

21    resolution measures.

22    3.    In addition, the Court's order denying Uber's motion to dismiss construed

23    the ADA's public accommodations provisions as specifically applicable to ridesharing

24    services, which heralds the ADA's applicability to sharing economy businesses more

25    generally.  The order also broadly construed associational standing and deterrence standing

26    for disability rights Plaintiffs, opening the door to additional legal challenges to disability

27    discrimination committed by businesses that condition use of services on agreements to

28    arbitrate claims.

4.      This case and its settlement clearly communicate that sharing economy and other businesses that attempt to shield themselves from civil rights liability must take the ADA and other similar antidiscrimination mandates seriously. In addition, as a result of this case and the cases which will rely and build upon it, transportation companies throughout the country that discriminate against people with visual disabilities who use guide dogs will be deterred from continuing their discriminatory practices and will be forced to bring their businesses into conformity with the law.

**My Professional Background**

5.      Upon graduation from Northwestern University School of Law in 1980, I joined the law firm of Brobeck, Phleger & Harrison as a litigation associate. I was elected to partnership at Brobeck in 1987. In December 1990, I left Brobeck and formed the law firm, Rosen, Bien & Asaro (which became Rosen Bien Galvan & Grunfeld LLP in 2012), where I am managing partner. I have worked exclusively in litigation throughout my career. The vast majority of my time has been spent on complex litigation in the state and federal courts, usually involving issues of state and federal antitrust laws, RICO, class actions, unfair competition, civil rights (including disability rights), intellectual property, attorneys' fees or banking law. I have served as plaintiffs' counsel and defense counsel in numerous complex class actions, including nationwide certified classes and MDL proceedings, in the areas of antitrust, securities and banking laws. I have received numerous awards and instances of peer recognition for my litigation work, including but not limited to, Martindale Hubble AV-rating, repeated selection for the Northern California "Super Lawyer" list in Civil Rights, First Amendment, and Business Litigation, and a 2010 CLAY Award. I have been named by the San Francisco and Los Angeles Daily Journal to its list of the Top 100 Lawyers in California several times, including most recently in 2015. I have been recognized by Best Lawyers in America for Commercial Litigation since 2013. A true and correct copy of my resume is attached hereto as **Exhibit A**.

6.     I have been lead or co-lead counsel in numerous cases on behalf of persons or classes of persons with disabilities brought against public and private entities, including prisons.  These cases include:

- *Greener v. Shell Oil Co.*, 3:98-CV-02425-BZ (N.D. Cal.), a national ADA class action brought to ensure physical access for people with disabilities at gas stations that resulted in a comprehensive national settlement;

- *Hernandez v. County of Monterey*, 5:13–CV–2354–PSG (N.D. Cal.) a class action brought under the 8th and 14th Amendments to the United States Constitution, the ADA, the Rehabilitation Act, and state law on behalf of inmates at the Monterey County Jail. The case achieved a comprehensive class settlement to improve access to services for inmates at the Jail;

- *Gates v. Deukmejian*, No. 91-15270 (9th Cir.), a class action under the Eighth Amendment and the Rehabilitation Act on behalf of all prisoners at the California Medical Facility at Vacaville that achieved a comprehensive settlement that included improved access to medical and mental health care and access to programs and services for inmates with HIV;

- *Brown v. Plata/Coleman*, 131 S. Ct. 1910 (2011), a class action under the 8th and 14th Amendments on behalf of all California prisoners with serious mental illness, resulting in statewide injunctive relief after trial, 912 F. Supp. 1282 (E.D. Cal. 1995), and subsequent remedial process including a three-judge court trial ordering population reduction affirmed by the Supreme Court in 2011;

- *Hecker v. California Dep't of Corrections and Rehabilitation*, 2:05-cv-02441-KJM-DAD (E.D. Cal.), an ADA and Rehabilitation Act putative class action lawsuit against the California Department of Corrections and Rehabilitation on behalf of all prisoners with psychiatric disabilities, which achieved a statewide settlement, including several significant statewide policy changes to end discriminatory practices and guarantee equal access to

1    programs and services;

2    •    *Armstrong v. Brown*, 4:94-cv-2307-CW (N.D. Cal.), a class action under the

3         ADA, Rehabilitation Act and 14th Amendment against the State on behalf of

4         California prisoners with disabilities where plaintiffs secured system-wide

5         injunctive relief to end discrimination;

6    •    *L.H. v. Schwarzenegger*, 2:-06-02042-LKK-DAD (E.D. Cal.), a class action

7         under the 8th and 14th Amendments, the ADA, and the Rehabilitation Act on

8         behalf of all juvenile wards and parolees in California's Department of

9         Juvenile Justice that resulted in an agreement from the State to implement

10        practices and procedures to ensure that juvenile parolees receive fair

11        hearings, and;

12   •    *Berkeley Center for Independent Living v. Oakland Coliseum*, 3:96-cv-

13        03649-WHO (N.D. Cal.), a successful federal court ADA action on behalf of

14        a class of individuals with disabilities for damages and injunctive relief

15        against the Coliseum, its public entity owners, and all sports teams and

16        entertainment companies operating there.

17        7.    I also have extensive experience in attorneys' fees litigation. My experience

18   in attorneys' fees litigation includes negotiation, mediation, law and motion, evidentiary

19   hearing, and trial and appellate work in both state and federal courts. I have served as lead

20   counsel or specially-retained fees counsel and have been an expert witness on numerous

21   attorneys' fees issues, including hourly rates, billing, and staffing practices.

22        8.    I have become familiar with the rates charged and the billing and work

23   practices of lawyers in California and the nation in many ways: (1) as a billing partner

24   negotiating rates and discussing bills for legal representation with individual and corporate

25   clients; (2) from my own considerable involvement in attorneys' fees litigation and expert

26   consultations and testimony; (3) by discussing attorneys' fees, billing, and work practices

27   with other attorneys; (4) by representing other attorneys seeking fees; (5) by obtaining

28   declarations from other attorneys regarding market rates, attorneys' fees, billing and work

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES AND COSTS
**Ex. Q - 169**

1 practices; (6) by reviewing surveys, legal newspapers, reported decisions, and treatises

2 regarding prevailing attorneys' rates, fees, billing and work practices; (7) by reviewing

3 attorneys' fees applications and awards in other cases, as well as unpublished decisions;

4 (8) by reviewing rates charged by, and billing and work practices of, other firms that my

5 firm has retained or associated with; and (9) by conducting research in my preparation for

6 testimony as an expert.

7       9.      Over the past thirty years, I have developed considerable expertise in

8 negotiating, developing, monitoring and enforcing complex post-judgment remedial

9 policies and procedures in class action civil rights cases.  I have litigated numerous post-

10 judgment enforcement actions, including evidentiary hearings and trials and contempt

11 motions, and defended orders resulting from these efforts in multiple cases in the appellate

12 courts.  I have expertise in the law and procedures governing Special Masters, post-

13 judgment enforcement of orders and settlements, and effective policy and practice to

14 effectuate institutional reform in complex organizations.

15       **RBGG Has Extensive Experience In Disability Rights Litigation And In**
         **Implementing Complex Remedial Policies**
16

17       10.     The attorneys from Rosen Bien Galvan & Grunfeld LLP, Disability Rights

18 Advocates, and TRE Legal Practice (collectively "Class Counsel") working on behalf of

19 the Plaintiff class bring a substantial amount of experience and expertise in disability rights

20 litigation.  Plaintiffs' Counsel have been repeatedly recognized for their excellence in civil

21 rights, disability rights, and complex class-action litigation.  In their work on this case and

22 in other matters involving similar transportation access issues, Plaintiffs' Counsel have

23 spoken with and corresponded with over one hundred blind persons who travel with guide

24 dogs.

25       11.     From its formation in 1990 as a litigation boutique, one of RBGG's

26 specialties has been complex class-action litigation in trial and appellate courts in the areas

27 of antitrust, employment, civil rights, banking and consumer law, voting rights and

28 disability rights.  RBGG also has experience using structured negotiations to resolve

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES AND COSTS
**Ex. Q - 170**

1  disability access issues outside of court and with representing disability rights and civil

2  rights organizations in litigation as amici.

3          12.     RBGG has the capacity to thoroughly and vigorously prosecute the claims in

4  this case and to properly represent the plaintiff class.  RBGG has committed all necessary

5  resources to do so.

6          13.     RBGG is uniquely well qualified to efficiently and effectively monitor and

7  enforce the settlement in this case.  RBGG has extensive experience monitoring and

8  enforcing compliance with remedial measures in numerous civil rights and disability rights

9  class actions.  For example, to monitor and implement remedial policies in prison and

10 parole cases, RBGG attorneys work with Special Masters and their experts, regularly visit

11 prisons, jails, and parole offices, observe parole revocation proceedings, review files,

12 attend correctional and parole officer training, and interview correctional staff.  Our

13 attorneys are trained to analyze and identify systemic compliance problems and bring them

14 to the attention of the Defendants and the Court, when necessary.

15                        **RBGG's Requested Reasonable Hours**

16         14.     As the managing partner at RBGG, I have supervised all of the legal work

17 performed by RBGG on this matter, including that of associate lawyers, law clerks,

18 paralegals, and secretarial staff, since RBGG joined the case as co-counsel in April 2015.  I

19 have served as the senior partner on this case, and I have coordinated the day-to-day work

20 performed by RBGG attorneys and support staff, at times coordinating this effort with my

21 partner Ernest Galvan.  When associate Michael Nunez joined our firm in April 2015, the

22 National Federation of the Blind of California and Larry Paradis asked our firm to join the

23 legal team as co-counsel so that Mr. Nunez could continue his work on this case.  Mr.

24 Nunez had played a central role on the case at Disability Rights Advocates and was

25 therefore already familiar with the record, the facts, and the relevant law.   RBGG

26 paralegals Karen Stilber and Greg Gonzalez were also assigned to the case.

27         15.     RBGG has been intimately involved in every aspect of this litigation since it

28 joined the case.  RBGG joined the case as settlement negotiations began and as the parties

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES AND COSTS

**Ex. Q - 171**

1    began to prepare for trial.  Over the course of the litigation, I participated in settlement

2    meetings, participated in strategy meetings with the legal team, and revised drafts of briefs,

3    settlement proposals, and the preliminary approval papers.

4          16.    I assigned drafting, research, and other day-to-day case tasks to Mr. Nunez.

5    Mr. Nunez drafted Plaintiffs' mediation brief, drafted discovery requests, was highly

6    involved in revising the settlement agreement, drafted some addendums to the settlement

7    agreement, drafted the motion for preliminary approval and many of the supporting papers,

8    and appeared for Plaintiffs at several hearings including the hearing on Plaintiffs' motion

9    for preliminary approval of class settlement.  Mr. Nunez was also highly involved in

10   revising all of Plaintiffs' written discovery requests, and led several of the discovery meet-

11   and-confer sessions with Defendants.

12         17.    Paralegals were responsible for interviewing blind individuals who reported

13   service animal discrimination by Uber drivers.  Paralegals also conducted factual research

14   and assisted with finalizing and filing case documents.

15         18.    By dividing tasks among three firms, class counsel minimized any

16   duplication of efforts and ensured that the resources necessary to the successful

17   prosecution of this high-impact case were available throughout the litigation.

18         19.    I require all RBGG staff, including myself, to keep contemporaneous and

19   highly reliable time records of the amount of time spent on each activity related to this

20   case. My partner, Ernest Galvan, has reviewed each time entry for every timekeeper in this

21   matter, and has made reasonable billing judgments to eliminate excessive, duplicative, and

22   unnecessary billing entries. In addition, Mr. Galvan reduced to zero all hours spent by any

23   RBGG attorney on this matter who billed fewer than 20 hours on the merits over the

24   course of the case.  Mr. Galvan also zeroed out all merits hours spent by any RBGG

25   paralegal who had spent fewer than 10 hours on the case.  As a result of this discretional

26   reduction, there are five fewer attorneys and two fewer paralegals for whom RBGG is

27   claiming attorneys' fees.  I regularly rely on Mr. Galvan to perform billing judgment

28   reductions to RBGG time entries that my firm submits in support of fees motions.  I have

1   discussed with Mr. Galvan the billing judgment reductions he made to the time entries in

2   this case, and agree with his methodology and judgments.  In calculating the lodestar

3   described below for RBGG timekeepers, Mr. Galvan has made appropriate billing

4   judgment reductions.

5          20.     RBGG expended 872.3 hours on the merits (apart from fees work) case from

6   April 20, 2015 until September 9, 2016.  RBGG has written off a total of 130.4 hours, or

7   approximately 14.9% of the billable hours.  This amounts to $49,766 in billing judgment

8   reductions to ensure that we have accounted for any undue duplication of effort or

9   inefficiency.  After these billing judgment reductions, RBGG claims a total of 741.9 hours

10  of compensable time for a total claimed lodestar of $386,972 for all merits work invested

11  in this case since April 2015.  True and correct copies of RBGG's billing entries indicating

12  the hours worked and the tasks completed by RBGG staff, as well as a summary table of

13  the entries are attached hereto as **Exhibit B**.  Time entries have been redacted where

14  necessary to protect the privacy of individuals who consulted with our firm but did not

15  become named plaintiffs in this action.

16         21.     Mr. Galvan has also reviewed DRA and TRE Legal Practice's time entries.

17  Mr. Galvan worked closely with these co-counsel in making appropriate billing judgment

18  reductions to their time entries in addition to the billing judgment reductions that co-

19  counsel made internally.  I have discussed with Mr. Galvan the billing judgment reductions

20  that he made to DRA and TRE Legal Practice's time entries in this case and agree with his

21  methodology and judgments.  In calculating the lodestar described below for all Plaintiffs'

22  Counsel's timekeepers, Mr. Galvan has made appropriate billing judgment reductions.

23                          **RBGG's Reasonable Hourly Rates**

24         22.     The following table shows RBGG's requested 2016 hourly rates for the

25  attorneys and other staff who worked on this action and for whom compensation is sought.

26         //

27         //

28         //

| Title | Name | Law School Graduation | Rate |
|-------|------|----------------------|------|
| Partner | Michael W. Bien | 1980 | $900 |
| | Ernest Galvan | 1997 | $740 |
| Associate | Michael Nunez | 2011 | $460 |
| Paralegal | Karen Stilber | N/A | $300 |
| | Greg Gonzalez | N/A | $275 |
| Summer Associate | Eric Monek Anderson | N/A | $275 |

23.     RBGG's rates are wholly consistent with the rates charged by comparable attorneys and legal staff in the San Francisco Bay Area and numerous other locales within California for work comparable to that performed in the instant case. (In fact, they are lower than rates at many San Francisco Bay Area firms.) My firm's billing practices are similarly comparable to those of other attorneys and legal staff in the San Francisco Bay Area and elsewhere in California. My firm's billing rates are charged to and paid by our many clients who pay by the hour on a monthly billing basis, in matters arising both inside and outside the State of California. They are also the rates we claim in our fee applications in all our fee-shifting cases, both inside and outside the San Francisco Bay Area. These contain no contingency, delay or preclusion components.

24.     RBGG attorneys are nationally recognized for their excellence in disability law, civil rights litigation, and complex class action litigation. *See, e.g., L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888, 895 (E.D. Cal. 2009) ("observ[ing] that Michael Bien has been recognized as a 'genuine expert in the area of complex, institutional prison reform litigation,' so as to merit exceptional fees") citing *Lucas v. White*, 63 F. Supp. 2d 1046, 1061–62 (N.D. Cal. 1999).  This experience has led courts throughout California and the nation, including the United States District Court for the Northern District of California, to award RBGG fees at its full market rates, in part based on its superior experience and reputation.  *See, e.g., Armstrong v. Brown*, 805 F. Supp. 2d 918, 922 (N.D.

1   Cal. 2011) (compelling defendants to pay RBGG's "reasonable 2010 hourly rates"

2   including $700 for Michael Bien and $560 for Ernest Galvan); *L.H.*, 645 F. Supp. 2d at

3   895 (RBGG partners Bien and Galvan obtaining their 2008 rates: $640 and $450,

4   respectively); *see also Hernandez v. Cnty. of Monterey*, 5:13–CV–2354–PSG (N.D. Cal.)

5   (approving RBGG's requested lodestar based on RBGG's 2015 market rates). Similarly,

6   the rate sought for work performed by paralegals and law students is reasonable and

7   commensurate with prevailing market rates in the Bay Area. *See, e.g., Hernandez*, 5:13–

8   CV–2354–PSG (approving RBGG's requested lodestar based in part on RBGG's 2015

9   rates for paralegals up to $295); *Armstrong*, 805 F. Supp. 2d at 922 (compelling defendants

10  to pay RBGG's paralegals at 2010 rates up to $240 per hour).

11         25.    My partner, Ernest Galvan, has practiced complex civil litigation since 1998.

12  He received his J.D. from Yale Law School in 1997, and clerked in the United States

13  District Court for the Central District of California for the Honorable Dean D. Pregerson.

14  Upon completing his clerkship, he joined my law firm Rosen, Bien & Asaro as an

15  associate. He became a partner of the firm in 2006. Mr. Galvan has led numerous

16  litigation efforts in the *Armstrong* prison disability rights case, as well as in *Coleman v.*

17  *Brown*, 438 Fed. Appx. 743 (9th Cir. 2011) (involving mental health care for a statewide

18  class of prisoners with severe mental illness) and *Valdivia v. Schwarzenegger*, 599 F.3d

19  984 (9th Cir. 2010) (involving parolee rights). Mr. Galvan won a California Lawyer of the

20  Year Award in 2012 for his successful oral advocacy before the California Supreme Court

21  in *Retired Employees Association of Orange County v. County of Orange*. His resume is

22  attached hereto as **Exhibit C**.

23         26.    Associate Michael Nunez received his J.D. in 2011 from Stanford Law

24  School where he was Senior Editor and Symposium Editor for the Stanford Law and

25  Policy Review and participated in the Environmental Law Clinic. Mr. Nunez has

26  substantial experience representing blind and low-vision persons and others with sensory

27  disabilities in disability rights litigation involving access to transportation services,

28  technology, and voting. He represented blind and low-vision persons in *National*

10                                     3:14-cv-04086-NC

1    *Federation of the Blind v. RideCharge, Inc.*, 14-cv-2490 JFW (C.D. Cal.), an action

2    challenging access to touchscreen payment systems in taxis resulting in a settlement

3    wherein RideCharge agreed to make its touchscreen payment systems accessible.  Mr.

4    Nunez also successfully represented a California-wide class of blind and low-vision

5    persons in *Lighthouse for the Blind and Visually Impaired v. Redbox Automated Retail,*

6    *LLC*, C12- 00195 PJH (N.D. Cal.), an action challenging the absence of non-visual access

7    features on Redbox's touchscreen video rental kiosks resulting in a settlement wherein

8    Redbox agreed to modify all of its more than 4,000 kiosks in California to make them

9    accessible to blind persons.  Furthermore, he played a central role in litigating *California*

10    *Council of the Blind v. County of Alameda*, 13–cv–03443–JCS (N.D. Cal. ), wherein a

11    federal court ruled for the first time that the Americans with Disabilities Act and Section

12    504 of the Rehabilitation Act protect the right of blind voters to vote privately and

13    independently.  Prior to joining RBGG, he was a staff attorney at Disability Rights

14    Advocates.  He was named a Rising Star by Northern California Super Lawyers in 2016.

15    His resume is attached hereto as **Exhibit D**.

16         27.    Paralegals at RBGG are college graduates who have worked for at least one

17    year as paralegal clerks under the supervision of RBGG's attorneys.  Paralegal Karen

18    Stilber is a graduate of the University of North Carolina – Chapel Hill, where she earned

19    her B.A. in International Studies, and has worked as a paralegal for over sixteen years.

20    Paralegal Gregorio Gonzalez is a graduate of San Francisco State University, where he

21    earned his B.A. in History, and he has worked as a paralegal since 2014.  Ms. Stilber's rate

22    is $300, which is more than justified by her educational background and her 25-year career

23    in the legal industry.  Mr. Gonzalez's rate is $275, which is well justified by his

24    educational background, and specialized complex litigation experience at my firm.  Copies

25    of the paralegal resumes are attached hereto as **Exhibit E.**

26         28.    RBGG has spent nearly eighteen months litigating and negotiating settlement

27    in this action on a fully contingent basis, receiving no compensation for the duration of the

28    litigation and fronting litigation expenses.  RBGG paid the wages of lawyers and other

1   legal staff over this period to fund the prosecution of this case.  The time and labor

2   required for this case, committed on a contingent basis, precluded Plaintiffs' Counsel from

3   productive work on other class action and complex litigation cases.

4         29.    Based on my experience in managing a law firm for more than 25 years and

5   in practicing law for more than 35 years, and my representation of law firms in  attorneys'

6   fees litigation, consulting and representing clients concerning fee matters, and examination

7   of legal billing practices, I know that plaintiffs' attorneys  cannot take on complex

8   contingent cases like this action without some reasonable expectation of additional

9   compensation beyond market rates in the event of success, because of the risk of loss.

10  Setting the fee to reflect the risk of loss makes contingent risk cases competitive in the

11  legal marketplace and is necessary to ensure that meritorious cases will be brought to

12  enforce important civil rights laws.  Without accounting for contingent risk, plaintiffs

13  seeking to enforce these important laws would face substantial difficulty in obtaining

14  counsel.

15        30.    This case presented many legal issues of first impression as well as unique

16  and nuanced issues to tackle in the settlement negotiations.  To my knowledge, this is the

17  first case in the nation considering the application of the ADA's protections for guide dog

18  users to a "ride sharing" transportation service such as Uber.  At the time this case was

19  filed, there were no published rulings on the application of disability access laws to

20  transportation network companies.  In addition, the parties devoted significant time to

21  developing mechanisms from the ground up to inform all drivers about their legal and

22  contractual obligation to transport riders with service animals within the context of Uber's

23  business model, wherein Uber classifies drivers as independent contractors.  The parties

24  also devoted substantial time to developing effective and reasonable practices to enforce

25  Uber's service animal policy.  We did not and could not maintain separate billing records

26  for work on our claims under the ADA, the Unruh Act, or the Disabled Persons Act.

27  \\

28  \\

12

3:14-cv-04086-NC

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES AND COSTS

**Ex. Q - 177**

1  The legal theories under these three statutes almost completely overlap, and Plaintiffs'

2  Counsel did not treat the case as having distinct ADA, Unruh Act, or Disabled Persons Act

3  components.

**RBGG's Costs and Expenses**

5  31.     RBGG also advanced litigation expenses for this case over the past

6  seventeen months.  Plaintiffs incurred costs and expenses of $1,184.35 in litigating this

7  matter through September 9, 2016.  Below is a summary chart of RBGG's costs and

8  expenses incurred during this time.  Details are provided with the billing statement at

9  Exhibit B of this declaration.  If the Court requires additional backup, such as invoices, I

10  can provide such backup.

| CATEGORY | Total |
|---|---|
| Computerized Legal Research | $672.35 |
| Copying | $219.40 |
| PACER Docket Access Charges | $26.10 |
| Postage and Delivery | $142.40 |
| Transcription | $124.10 |
| Grand Total | $1,184.35 |

16  32.     It is RBGG's consistent practice to bill our clients for computerized research

17  charges, such as Westlaw, as well as interpreters, court reporters, long-distance telephone

18  calls, faxes, investigators, and travel. It would not be appropriate to include these costs in

19  our overhead as to do so would require a major increase in our firm's overall costs and

20  billing rates when these costs are only required by a fraction of our clients and/or only

21  some of the time during their case. This billing practice is consistent with the billing

22  practices of lawyers practicing in the Northern District of California.

**RBGG's Work On This Fee Motion**

24  33.     RBGG attorneys and staff have devoted 58.3 billable hours through

25  September 9, 2016 on recovery of their attorneys' fees and costs, of which we have written

26  down over 11 hours, and are claiming 46.7 hours with this application, in the amount of

27  $26,410.  Attached hereto as **Exhibit F** is a true and correct copy of a summary table of the

28  fees for fees work, as well as RBGG's time records for work performed preparing

1   Plaintiffs' motion for reasonable attorneys' fees and costs and supporting papers.

2   Plaintiffs attempted to negotiate resolution of Plaintiffs' claim for attorneys' fees and costs

3   in this matter but were unable to come to a resolution.

4       34.    By limiting the calculation of Plaintiffs' Counsel's lodestar to work

5   performed through September 9, 2016, Plaintiffs' lodestar does not capture all of the work

6   performed drafting this motion and supporting papers.

7       35.    Plaintiffs' Counsel will need to expend additional time preparing a reply in

8   support of this motion and preparing and presenting oral argument.  Plaintiffs will submit

9   RBGG's time records for additional time devoted to fee recovery work either with

10  Plaintiffs reply in support of this motion, or with the first annual fees application in the

11  process described in the Settlement Agreement at page 23 (Dkt. No. 85-1).

12                          **Co-Counsel Rates and Hours**

13      36.    I have been familiar with the work of the attorneys at Disability Rights

14  Advocates (DRA) for many years, and have more recently become familiar with the work

15  of Timothy Elder.  These attorneys are extremely well qualified, and are uniquely

16  experienced in the area of complex federal litigation concerning the civil rights of persons

17  with disabilities.  The hourly rates in this application for DRA timekeepers and for Mr.

18  Elder are well within, and closer to the low end of, the range of rates commanded by

19  attorneys of similar experience working on matters of comparable difficultly and

20  complexity.  DRA and Mr. Elder worked efficiently on this matter, and incurred only the

21  hours necessary to prevail, and have taken substantial billing judgments to ensure that the

22  fees sought here are reasonable.

23  //

24  //

25  //

26  //

27  //

28

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES AND COSTS

**Ex. Q - 179**

1

**Conclusion**

2          37.      Based on my experience and on negotiations in this case, we have negotiated

3    an agreement with Defendants to obtain the same comprehensive reforms Plaintiffs would

4    be entitled to pursuant to a total victory at trial to be affirmed on appeal. The work

5    described in this declaration was essential to obtaining this superior result for Plaintiffs.

6          I declare under penalty of perjury under the laws of the United States of America

7    that the foregoing is true and correct.

8          Executed this 19th day of September, 2016, at San Francisco, California.

9

10

11                                    By:   */s/ Michael W. Bien*
                                            Michael W. Bien
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES AND COSTS
**Ex. Q - 180**

# EXHIBIT R

1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7      JESSE HERNANDEZ, et al.,                 Case No. 5:13-cv-02354-PSG
8                        Plaintiffs,            **ORDER GRANTING ATTORNEY'S**
                                                **FEES AND EXPENSES**
9                 v.
                                                **(Re:  Docket No. 500)**
10     COUNTY OF MONTEREY, et al.,
11                       Defendants.
12

13           Counsel for Plaintiffs Jesse Hernandez and all others similarly situated moves for an award
14     of $4.8 million for their reasonable attorney's fees and expenses,[1] as agreed by the parties in the
15     Settlement Agreement.[2]  Defendants do not oppose: while Defendants initially objected to
16     Plaintiffs' request for interest,[3] the parties successfully met, conferred and resolved the issue
17     without the court's intervention.[4]
18           The court GRANTS as unopposed Plaintiffs' motion for $4.8 million for reasonable
19     attorney's fees and expenses.  The question of interest is resolved according to the parties'
20     stipulation.[5]

21
22     _____
23     [1] *See* Docket No. 500.
24     [2] *See* Docket No. 494 at ¶¶ 60-65.
25     [3] *See* Docket Nos. 501, 502.
26     [4] *See* Docket No. 508.
27     [5] *See id.*
28

United States District Court
Northern District of California

1    **SO ORDERED.**

2    Dated: November 9, 2015

3                                        *Paul S. Grewal*
                                         _____
                                         PAUL S. GREWAL

4                                        United States Magistrate Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

2

Case No. 5:13-cv-02354-PSG
ORDER GRANTING ATTORNEY'S FEES AND EXPENSES

**Ex. R - 183**

Case 5:20-cv-00406-AB-PBL   Document 500-22   Filed 10/02/25   Page 236 of 443
Case 5:13-cv-02354-PSG   Document 300-2   Filed 08/03/25   Page 1 of 44
Page 235 of 402

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
KRISTA STONE-MANISTA – 269083
SARAH P. ALEXANDER – 291080
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105
Telephone:      (415) 433-6830
Facsimile:      (415) 433-7104
Email:          mbien@rbgg.com
                egalvan@rbgg.com
                ggrunfeld@rbgg.com
                vswearingen@rbgg.com
                mfreedman@rbgg.com
                kstone-manista@rbgg.com
                spalexander@rbgg.com

JAMES EGAR – 065702
Public Defender
DONALD E. LANDIS, JR. – 149006
Assistant Public Defender
OFFICE OF THE PUBLIC DEFENDER
COUNTY OF MONTEREY
111 West Alisal Street
Salinas, California 93901-2644
Telephone:      (831) 755-5806
Facsimile:      (831) 755-5873
Email:          EgarJS@co.monterey.ca.us
                LandisDE@co.monterey.ca.us

ALAN SCHLOSSER – 049957
MICAELA DAVIS – 282195
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone:      (415) 621-2493
Facsimile:      (415) 255-8437
Email:          aschlosser@aclunc.org
                mdavis@aclunc.org

ERIC BALABAN (*admitted pro hac vice*)
CARL TAKEI – 256229
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, D.C. 20005-2302
Telephone:      (202) 393-4930
Facsimile:      (202) 393-4931
Email:          ebalaban@npp-aclu.org
                ctakei@npp-aclu.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 PSG<br><br>**DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES**<br><br>Judge:   Hon. Paul S. Grewal<br>Date:    November 10, 2015<br>Time:    10:00 a.m.<br>Crtrm.:  5, 4th Floor |

1    I, Michael W. Bien, declare:

2    1.    I am an attorney admitted to practice law in California, a member of the bar

3    of this Court, and a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP

4    ("RBGG"), counsel of record for Plaintiffs.  I have personal knowledge of the matters set

5    forth herein, and if called as a witness I could competently so testify.  I make this

6    declaration in support of Plaintiffs' Motion for Attorneys' Fees and Expenses.

7                    **MY RELEVANT PROFESSIONAL BACKGROUND**

8    2.    Upon graduation from Northwestern University School of Law in 1980, I

9    joined the law firm of Brobeck, Phleger & Harrison as a litigation associate.  I was elected

10   to partnership at Brobeck in 1987.  In December 1990, I left Brobeck and formed the law

11   firm, Rosen, Bien & Asaro (which became Rosen, Bien, Galvan & Grunfeld in 2012),

12   where I am now managing partner.  I have worked exclusively in litigation throughout my

13   career.  The vast majority of my time has been spent on complex litigation in the state and

14   federal courts, usually involving issues of state and federal antitrust laws, RICO, class

15   actions, unfair competition, civil rights (including prisoner class actions), intellectual

16   property, attorneys' fees or banking law.  I have received numerous awards and instances

17   of peer recognition for my litigation work, including but not limited to, Martindale Hubble

18   A-V rating, repeated selection for the Northern California "Super Lawyer" list in Civil

19   Rights, First Amendment, and Business Litigation, and a 2010 CLAY Award.  I have been

20   named by the San Francisco and Los Angeles *Daily Journal* to its list of the Top 100

21   Lawyers in California several times, including this year.  I have been recognized by *Best*

22   *Lawyers in America* for Commercial Litigation since 2013.  A true and correct copy of my

23   resume is attached hereto as **Exhibit A**.

24   3.    I have been lead or co-lead counsel in numerous major cases representing a

25   prisoner or classes of prisoners in civil rights actions, including *Brown v. Plata*, 131 S. Ct.

26   1910, 179 L. Ed. 2d 969 (2011).  In each of these cases, I have represented prisoners or

27   classes of prisoners with special needs or vulnerabilities: mental illness, mental retardation,

28   mobility, vision, hearing, learning and developmental disabilities, and victims of sexual

1   assaults.  I also have extensive experience in attorneys' fees litigation.  My experience in

2   attorneys' fees litigation includes negotiation, mediation, law and motion, evidentiary

3   hearing, and trial and appellate work in both state and federal courts.  I have served as lead

4   counsel or specially retained fees counsel and have been an expert witness on numerous

5   attorneys' fees issues, including hourly rates, billing, and staffing practices.

6          4.     I have become familiar with the rates charged and the billing and work

7   practices of lawyers in California and the nation in many ways:  (1) as a billing partner

8   negotiating rates and discussing bills for legal representation with individual and corporate

9   clients; (2) from my own considerable involvement in attorneys' fees litigation and expert

10  consultations and testimony; (3) by discussing attorneys' fees, billing, and work practices

11  with other attorneys; (4) by representing other attorneys seeking fees; (5) by obtaining

12  declarations from other attorneys regarding market rates, attorneys' fees, billing and work

13  practices; (6) by reviewing surveys, legal newspapers, reported decisions, and treatises

14  regarding prevailing attorneys' rates, fees, billing and work practices; (7) by reviewing

15  attorneys' fees applications and awards in other cases, as well as unpublished decisions;

16  (8) by reviewing rates charged by, and billing and work practices of, other firms that my

17  firm has retained or associated with; and (9) by conducting research in my preparation for

18  testimony as an expert.

19  **PLAINTIFFS' COUNSEL HAVE EXTENSIVE EXPERIENCE IN PRISONER
    CLASS ACTION LITIGATION AND THE WORK EXPENDED WAS**
20  **REASONABLE AND NECESSARY FOR THE PROSECUTION OF THIS CASE**

21         5.     The attorneys from a private law firm (RBGG), a government agency (the

22  Monterey County Public Defender's Office), and two non-profit organizations (the

23  American Civil Liberties Union Foundation of Northern California and the American Civil

24  Liberties Union – National Prison Project) (collectively, "Plaintiffs' counsel") working on

25  this case on behalf of the Plaintiff class and subclass bring to bear an extraordinary amount

26  of experience and expertise in prisoners' rights and class action litigation.  *See also*

27  Declarations of Alan Schlosser and Eric Balaban in Support of Plaintiffs Motion for

28  Attorneys' Fees and Expenses, filed herewith.  Plaintiffs' counsel are nationally

1  recognized for their excellence in civil rights, disability law, prisoner rights litigation, and

2  complex class action litigation.  In their work on this and other cases, Plaintiffs' counsel

3  have had extensive contacts with prisoners, including meeting and corresponding with

4  hundreds of Monterey County Jail prisoners regarding their experiences.

5  **Rosen Bien Galvan & Grunfeld LLP**

6  6.  From its formation in 1990 as a litigation boutique, one of RBGG's

7  specialties has been complex class action litigation in trial and appellate courts in the areas

8  of antitrust, employment, civil rights, banking and consumer law, voting rights and

9  disability rights. I personally have been lead or co-lead counsel in a series of successful

10  class action lawsuits for declaratory and injunctive relief against state officials responsible

11  for the adult and juvenile prison and parole departments.  These include:  *Gates v.*

12  *Deukmejian*, E.D. Cal. No. 91–15270, a class action under the Eighth Amendment and the

13  Rehabilitation Act on behalf of all prisoners at the California Medical Facility at Vacaville;

14  *Coleman v. Brown*, E.D. Cal. No. S 90-0520 , an Eighth Amendment class action lawsuit

15  against CDCR on behalf of a class of more than 25,000 prisoners with serious mental

16  illness; *Hecker v. Brown*, E.D. Cal. No. 2:05-cv-2441, an ADA and Rehabilitation Act

17  putative class action lawsuit against CDCR on behalf of all prisoners with mental illness;

18  *Armstrong v. Brown* , N.D. Cal. No. C 94-2307, a class action against the State on behalf

19  of California prisoners with disabilities; *Valdivia v. Davis*, 206 F. Supp. 2d 1068 (E.D. Cal.

20  2002), a class action under the federal Constitution on behalf of all prisoners and parolees

21  challenging California's adult parole revocation system; and *L.H. v. Schwarzenegger*, E.D.

22  Cal. No. S-06-2042, a class action under federal Constitution and the ADA and

23  Rehabilitation Act on behalf of all juvenile wards and parolees in California's Department

24  of Juvenile Justice.  In addition, RBGG has also been lead or co-lead counsel in numerous

25  other cases representing individuals or groups challenging conditions, policies and

26  practices of prisons and jails, including cases for damages based on Constitutional

27  violations resulting in death or injury by suicide, medical neglect and murder due to

28  inadequate custodial practices.

7.      RBGG has the capacity to thoroughly and vigorously prosecute the claims in this case and to properly represent the plaintiff class and sub-class.  RBGG has committed all necessary resources to do so.

8.      As the managing partner of RBGG and the managing partner on this case, I have supervised all of the legal work performed on this matter, including that of associate lawyers, law clerks, paralegals, and secretarial staff.  I have also had overall responsibility, working with our lead co-counsel, James Egar, Alan Schlosser, and Eric Balaban, for major litigation decisions made by the larger Plaintiffs' counsel team. Throughout the course of this matter, I have served in the capacity of senior partner on this case.  I have worked closely with my partners, Gay Grunfeld and Ernest Galvan, to coordinate the day-to-day work performed by RBGG attorneys and support staff.  Collectively, we decided staffing levels as appropriate for each stage of litigation, often changing staffing levels in reaction to Defendants' litigation strategy as well as to account for the maternity and paternity leaves requested by our staff.  For example, pre-filing investigations primarily required work to be completed by a small set of associate attorneys who were able to conduct initial interviews at the Jail and review pertinent documents.  Later, after the Complaint was filed and the parties were engaged in heavily contested discovery, we added significant staffing to account for the intensity of the litigation.  We added paralegal support to, among other things, process, organize, and review the documents produced by Defendants.  At the same time, we relied on additional associate attorneys to review and code hot documents, prepare for and conduct depositions, and to draft and argue discovery motions.

9.      I began working on this matter in March 2012, when I began discussing strategy and co-counseling agreements with the Monterey County Public Defender's Office and later with the ACLU-NPP and ACLU-NC.  Initially, I worked closely with co-counsel to develop strategy for the investigation of the standards and conditions at the Monterey County Jail, to draft a demand letter to County Counsel, and to select and work with the neutral experts who would opine on the conditions at the Jail.  I regularly

1  consulted with my partner, Gay Grunfeld, who took the early lead in this case supervising

2  the day-to-day work of the legal staff, including drafting the complaint, oppositions to

3  Defendants' motions to dismiss, class certification motion, and the motion for preliminary

4  injunction I frequently reviewed drafts and provided strategic advice on these filings.

5  Along with Ms. Grunfeld, I supervised the taking and defending of all depositions in this

6  matter, and I personally participated in the deposition of the neutral medcial expert, Dr.

7  Michael Puisis.  I supervised the preparation of Plaintiffs' experts for jail tours, and

8  attended the tour conducted by custody and disability expert, Wendy Still.  Throughout the

9  case, I took the lead role communicating strategy with my co-counsel and consulting with

10  experts.  I prepared for and attended all settlement conferences, and took the lead in

11  negotiating the final Settlement Agreement, along with my partner, Ernest Galvan.

12  Following settlement, I have participated in the review of Defendants' proposed

13  implementation plans, their discussion with Defendants' counsel, and the drafting of

14  responsive comments.

15        10.     My partner, Gay Grunfeld, graduated from Columbia Law School in 1984 as

16  a Harlan Fiske Stone Scholar and Articles Editor of the *Columbia Law Review*, after which

17  she clerked for the Honorable Jack B. Weinstein of the United States District Court for the

18  Eastern District of New York.  She was admitted to the California bar in 1985.  She serves

19  as one of the lead counsel in *Armstrong v. Brown* (N.D. Cal. No. C 94-2307 CW), a class

20  action against the California Department of Corrections and Rehabilitation ("CDCR") on

21  behalf of more than 10,000 CDCR prisoners and parolees with mobility, hearing, vision,

22  learning, kidney and developmental disabilities, and *Ramirez et al. v. Ghilotti Bros., Inc.*

23  (N.D. Cal. No. 3:12-cv-04590), a class action on behalf of workers denied pay for all hours

24  worked and meal and rest breaks.  She previously served as co-lead counsel in *L.H. v.*

25  *Brown* (E.D. Cal. No. CIV. S-06-2042), a due process and American with Disabilities Act

26  ("ADA") class action on behalf of juvenile parolees, and recently served as local counsel

27  for plaintiffs in the consumer class action *Ferrington v. McAfee, Inc.* (N.D. Cal. No. 5:10-

28  cv-01455).  She was selected to the 2013 list of the Top 100 SuperLawyers in Northern

California, and to the 2014 and 2015 list of Top 50 Women Northern California Super

Lawyers.  Ms. Grunfeld was honored as one of the Top 75 Women Litigators in California

for 2014, 2013, and 2011 by the Daily Journal.  She received the California Lawyer of the

Year award for 2012.  For the past two years, she has been honored by the *Daily Journal*

as one of the Top 100 Lawyers in California.  Her resume is attached hereto as **Exhibit B**.

On this matter, Ms. Grunfeld supervised the daily work conducted by legal staff in this

office that included, among other things:  the initial investigation of potential claims

against Defendants, the assignment of attorneys to obtain documents through public

records act requests, interview clients, and review their prisoner records and other

materials such as the grand jury report; the strategy related to Plaintiffs' demand letter; the

research related to federal and state law claims and the drafting of Plaintiffs' Complaint;

the research and drafting of briefing related to Plaintiffs' opposition to Defendants' motion

to dismiss and prosecution of Plaintiffs' class certification motion; the coordination of

communications with the neutral experts and the analysis of their reports; the coordination

of correspondence with Defendants' counsel, including satisfying Plaintiffs' meet and

confer obligations under Rule 26; the research and drafting of Plaintiffs' mediation brief;

strategy for taking and defending depositions related to Plaintiffs' Motion for Class

Certification; the drafting of Plaintiffs' initial discovery requests; the drafting of Plaintiffs'

preliminary injunction motion; and the research and drafting of Plaintiffs' motions to strike

Defendants' answers.

       11.    My partner, Ernest Galvan, has practiced complex civil litigation since 1998.

He received his J.D. from Yale Law School in 1997, and clerked in the United States

District Court for the Central District of California, for the Honorable Dean D. Pregerson.

Upon completing his clerkship, he joined my law firm Rosen, Bien & Asaro as an

associate.  He became a partner of the firm in 2006.  Mr. Galvan has led numerous

litigation efforts in the *Armstrong* prison disability rights case, as well as in *Coleman v.*

*Brown,* 438 Fed. Appx. 743 (9th Cir. 2011) (involving mental health care for a statewide

class of prisoners with severe mental illness) and *Valdivia v. Schwarzenegger,* 599 F.3d

1    984 (9th Cir. 2010) (involving parolee rights).  Mr. Galvan won a California Lawyer of the

2    Year Award in 2012 for his successful oral advocacy before the California Supreme Court

3    in *Retired Employees Association of Orange County v. County of Orange*.  His resume is

4    attached hereto as **Exhibit C**.  On this matter, Mr. Galvan provided as-needed consultation

5    during the early stages of this litigation, including as to strategy, research, and document

6    drafting.  Mr. Galvan's role in this case increased substantially in late 2014 when other

7    work demands required Ms. Grunfeld to focus the majority of her resources elsewhere.

8    Mr. Galvan worked extensively supervising and coordinating discovery, including

9    resolving e-discovery issues with opposing counsel and outside vendors.  He supervised

10   the research and drafting of motions related to discovery disputes, and argued several of

11   those motions.  He supervised attorney interactions with experts and the drafting of expert

12   reports.  Mr. Galvan was very active in preparing for and conducting the mediation before

13   Magistrate Judge Cousins; in so doing, he spent considerable time reviewing and drafting

14   the settlement agreement and related documents.  Throughout his involvement in the case,

15   he regularly organized and held meetings with co-counsel to discuss case strategy, as well

16   as issues related to discovery, mediation, settlement, and implementation plans.  He

17   supervised briefing related to the preliminary and final settlement, including notice to class

18   and sub-class members, and attended the hearing on final approval.  Mr. Galvan regularly

19   communicated with defense counsel regarding various issues concerning the welfare of

20   prisoners at the Jail.  Along with myself, Mr. Galvan vetted neutral experts to be

21   nominated for monitoring of the Settlement Agreement.

22        12.     Associate attorney Michael Freedman received his J.D. in 2008 from

23   Stanford Law School, where he was Editor-in-Chief and Managing Editor of the *Stanford*

24   *Journal of Civil Liberties and Civil Rights*.  Prior to joining RBGG, he served as a law

25   clerk to the Honorable Marilyn J. Patel of the United States District Court for the Northern

26   District of California and to the Honorable Reginald C. Lindsay of the United States

27   District Court for the District of Massachusetts.  He was named a Rising Star by Northern

28

1  California Super Lawyers in 2013, 2014, and 2015.  His resume is attached hereto as

2  **Exhibit D**.

3       13.    Associate attorney Sarah Poppy Alexander is a 2012 graduate of Harvard

4  Law School, where she served as Editor in Chief of the *Harvard Civil Rights-Civil*

5  *Liberties Law Review* and contributed to multiple *amicus curiae* briefs filed in the United

6  States Supreme Court related to human rights claims pursuant to the Alien Tort

7  Statute.  She obtained her M.A. in Political Science in 2007 from the University of

8  California, Berkeley.  Prior to joining RBGG, she served as a law clerk to the Honorable

9  Martha Craig Daughtrey of the United States Court of Appeals for the Sixth Circuit in

10  Nashville, Tennessee.  Her resume is attached hereto as **Exhibit E**.

11       14.    Associate attorney Krista-Stone Manista is a 2009 graduate of Northwestern

12  University School of Law, where she served as Editor in Chief of the *Journal of Criminal*

13  *Law and Criminology*.  She obtained her M.A. in Teaching from the University of North

14  Carolina at Chapel Hill in 2002.  Prior to joining RBGG, Ms. Stone-Manista was a Legal

15  Fellow for the American Civil Liberties Union of Illinois and served as a law clerk to the

16  Honorable Virginia M. Kendall of the United States District Court for the Northern District

17  of Illinois.  Her resume is attached hereto as **Exhibit F**.

18       15.    Associate attorney Van Swearingen received his J.D. in 2008 from the

19  University of California, Berkeley School of Law (Boalt Hall), where he served as

20  Executive Editor of the *California Law Review*.  He obtained his M.P.P. in 2004 from the

21  University of California, Berkeley, Goldman School of Public Policy.  He was named a

22  Rising Star by Northern California Super Lawyers in 2015.  His resume is attached hereto

23  as **Exhibit G**.

24       16.    Associate attorney Sumana Wolf is a 2009 graduate of the University of

25  California-Los Angeles School of Law, where she served as Chief Comments Editor of the

26  *Asian Pacific American Law Journal* and a Contributing Editor of *Ms. JD at UCLA*.  She

27  left RBGG during the pendency of this litigation.  Her resume is attached hereto as

28  **Exhibit H**.

17.     Associate attorney Aaron Fischer received his J.D. in 2006 from Columbia Law School.  He served as a law clerk to the Honorable Jack B. Weinstein of the United States District Court for the Eastern District of New York and to the Honorable Kimba M. Wood of the United States District Court for the Southern District of New York. Prior to clerking, he completed a Skadden fellowship, through which he developed a new practice area aimed at improving health and education outcomes for children with disabilities and serious medical conditions in Washington D.C.  He was named a Rising Star by Northern California Super Lawyers in 2012, 2013, 2014, and 2015.  His resume is attached hereto as **Exhibit I**.

18.     Associate attorney Laura Boysen-Aragon received her J.D. from Columbia Law School in 2006.  She was a Harlan Fiske Stone Scholar.  She is a graduate of Gonzaga University.  Before joining my firm, she had three years of experience as a litigation associate at Latham & Watkins LLP.  She previously served as Special Assistant Director of Policy to Governor Gray Davis.  She left RBGG during the pendency of this litigation. Her resume is attached hereto as **Exhibit J**.

19.     Associate attorney Sidney Hollar is a graduate of Georgetown University Law Center.  She currently has her own law practice in San Francisco.  She left RBGG during the pendency of this litigation.  Her resume is attached hereto as **Exhibit K**.

20.     Paralegals at RBGG are college graduates who have worked for at least one year as paralegal clerks under the supervision of RBGG's attorneys.  Paralegal Eric Luttrell is a graduate of the University of California, Santa Cruz.  He has served as a litigation paralegal for over 15 years and has worked in law firms for almost 25 years.  He left RBGG during the pendency of this litigation.

21.     Paralegal Rolayn Tauben is a graduate of George Washington University in Washington, D.C., where she obtained an M.A. in Art History and Theory.  She received her Paralegal Studies Certificate in 1981 from San Francisco State University, and has worked at law firms for nearly 35 years, mostly as a paralegal.  She left RBGG during the pendency of this litigation.

22.     Paralegal Abigail Hamilton is a graduate of the University of Leicester and San Francisco State University.  She has worked as a paralegal since 2011.  She left RBGG during the pendency of this litigation.

23.     Paralegal Haruka Roudebush is a graduate of the University of California, San Diego.  He worked as a paralegal at RBGG from 2006-2015.  He left RBGG during the pendency of this litigation.

24.     Paralegal Doris Tseng is a graduate of the San Francisco State University.  She worked as a paralegal at RBGG from 2010-2015.  She left RBGG during the pendency of this litigation.

25.     Paralegal Linda Woo obtained her Bachelor of Sciences from San Francisco State University, and has worked as a paralegal for 16 years.

26.     Paralegal clerk Charlotte Landes is a graduate of Oberlin College.

**The ACLU – National Prison Project**

27.     As discussed more fully in the Declaration of Eric Balaban in Support of Attorneys' Fees and Expenses, filed herewith, the ACLU-NPP has a long track record of successfully litigating prison, jail, and juvenile conditions of confinement, including cases related to the provision of medical and mental health care.  The work performed by Mr. Balaban and the ACLU-NPP was integral to Plaintiffs' success in this case.  Mr. Balaban was actively involved in the strategic decisions in this case, and served as the principal author of the preliminary injunction motion granted by the Court.  Other ACLU-NPP legal staff assisted in preparing the preliminary injunction motion.  Mr. Balaban was also primarily responsible for working with Plaintiffs' medical expert, Robert Cohen, M.D., and worked closely with Dr. Cohen in his review of documents, expert tour, expert report, recommendations for remedies, and review of Defendants' proposed implementation plans.   I have reviewed the rates of ACLU-NPP's timekeepers in this matter.  ACLU-NPP's rates are wholly consistent with the rates charged by comparable attorneys and legal staff in the San Francisco Bay Area and numerous other locales within California for work

1    comparable to that performed in the instant case.  (In fact, they are lower than rates at

2    many San Francisco Bay Area firms.)

3          **The American Civil Liberties Union Foundation of Northern California**

4          28.     As discussed more fully in the Declaration of Alan L. Schlosser in Support

5    of Attorneys' Fees and Expenses, filed herewith, the ACLU-NC is Northern California's

6    regional affiliate of the ACLU, and is dedicated to defending the civil liberties and civil

7    rights guaranteed by the federal and state constitutions.  Mr. Schlosser was involved in the

8    strategy discussions with respect to this case.  He reviewed and extensively commented on

9    the major pleadings, briefed and argued the motion to dismiss the Title III ADA claim, and

10   participated in the first mediation session with Judge Larson.  The ACLU-NC was

11   primarily responsible for interviewing numerous witnesses and potential plaintiffs at the

12   Jail, reviewing medical records, preparing declarations, and drafting Plaintiffs' demand

13   letter to the Defendants as well as letters to the Board of Supervisors on issues of jail

14   population reduction and evidence-based programs.  The ACLU-NC also took the lead in

15   researching and drafting Plaintiffs' successful Opposition to CFMG's motion to dismiss

16   the Title III ADA claim.  I have reviewed the rates of ACLU-NC's timekeepers in this

17   matter.  ACLU-NC's rates are wholly consistent with the rates charged by comparable

18   attorneys and legal staff in the San Francisco Bay Area and numerous other locales within

19   California for work comparable to that performed in the instant case.  (In fact, they are

20   lower than rates at many San Francisco Bay Area firms.)

21               **The Monterey County Public Defender**

22         29.     James Egar has been the Public Defender for the County of Monterey since

23   August 2006.  In that capacity, he supervises an office of approximately 27 attorneys and

24   oversees the conflicts program for the county.  He also manages approximately 16 other

25   employees, including investigators, paralegals, and support staff.  The Public Defender's

26   Office is engaged in both traditional criminal justice courts and treatment oriented

27   therapeutic courts.  The office handles approximately 20,000 cases annually.  Mr. Egar has

28   prepared and implemented over a dozen plenary departmental budgets, and has worked

1    with members of the California Legislature on criminal justice, substance abuse and

2    mental health related issues.  He possesses extensive knowledge of the day-to-day

3    operations at the jail and supervises attorneys who have one-on-one working relationships

4    with the prisoners who are incarcerated at the Jail.  The Office of the Public Defender

5    operates under a statutory obligation to advocate for the interests of their clients both in

6    and outside of the criminal process.  *See* Cal. Gov. Code section 27706(g).

7          30.     Mr. Egar graduated from Loyola University of Los Angeles, School of Law,

8    in 1975.  Mr. Egar has been a California Public Defender since 1978, and a Chief Public

9    Defender since 1996—first in Yolo County (1996-1999), then Santa Barbara County

10   (2000-2006), and now Monterey County.  Mr. Egar has tried hundreds of criminal cases to

11   verdict over his career.  He is a founding member of the American Council of Chief

12   Defenders and participates in numerous other organizations related to criminal justice and

13   trial advocacy.  He is a former Board Member of the Orange County Bar Association and

14   the California Public Defender's Association.  He has participated in the planning and

15   operation of Adult and Juvenile Drug Courts and the Proposition 36 Treatment Court.  He

16   teaches nationally on behalf of the United States Department of Justice, the National Drug

17   Court Institute, and the National Association of Drug Court Professionals.  He has taught

18   on Ethics and Confidentiality for the National Drug Court Institute's Family Courts

19   Program and Tribal Healing to Wellness Courts, and has taught evidence and trial

20   advocacy at three law schools.  In March 2014, Mr. Egar was named Defender of the Year

21   by the California Public Defenders Association.

22         31.     Mr. Egar and the staff of the Public Defender's Office have provided

23   invaluable work in support of the plaintiff class in this litigation.  The Public Defender's

24   Office's day-to-day knowledge of changes and conditions and events at the Jail, and the

25   ability to rapidly communicate with class members and their families, was critical in our

26   successful prosecution of this case.  Mr. Egar and the other attorneys, paralegals,

27   investigators, and support staff at the Monterey County Public Defender's Office are not

28   seeking to recover any attorneys' fees or expenses in this litigation.

**GENERAL CASE BACKGROUND AND WORK THROUGH FINAL APPROVAL**

32.     As explained more fully below, the work performed on this case by Plaintiffs' counsel was reasonable and necessary to secure the results obtained in the Settlement Agreement.  The work performed by Plaintiffs' counsel can be described in six major phases:

a.     Phase 1, from March 2012 through mid-April 2013, involved the early investigation into the conditions of confinement at Monterey County Jail and the preparation of a demand letter and draft Complaint to Defendants.

b.     Phase 2, from mid-April 2013 through late July 2013, involved the formal initiation of this lawsuit, as well as additional negotiations and investigation leading to the stay and the decision to retain neutral experts.

c.     Phase 3, from late July 2013 through February 2014, involved settlement negotiations, working with neutral experts, and continued investigations.

d.     Phase 4, from March 2014 through late October 2014, involved formal and intense litigation, including discovery, briefing and hearings related to Defendants' multiple motions to dismiss and Plaintiffs' class certification and preliminary injunction motions, and the initiation of merits discovery.

e.     Phase 5, from late October 2014 through early May 2015, involved preparation for trial, merits discovery, jail inspections, and post-injunction negotiations before Judge Cousins.

f.     Phase 6, from early May 2015 through the present, involved briefing related to the approval of the Settlement Agreement, meet and confer sessions related to Defendants' implementation plans, the identification and  selection of neutral monitors, and consulting with experts as to the adequacy of the implementation plans.  In addition to investigating and litigating Plaintiffs' claims, counsel routinely responded to emergency events by communicating with prisoners in crises (visiting them when appropriate), and communicating with Defendants' counsel regarding specific emergency needs.

**Phase 1:  Plaintiffs' Counsel Extensively Investigated the Conditions at the Jail Prior to Filing this Action**

33.     In early 2012, I was contacted by James Egar, the Public Defender for the County of Monterey, regarding serious and life-threatening problems his clients were experiencing when incarcerated in the Monterey County Jail (the "Jail").  Mr. Egar had documented problems at the Jail dating from his appointment in 2007, and had been unsuccessful in his efforts to convince the County to remedy the dangerous and unconstitutional conditions through the normal political and budgetary processes.  After meeting with Mr. Egar, my partners Gay Grunfeld, Ernest Galvan and I, conducted an extensive pre-filing investigation.  Working with the Monterey County Public Defender's Office, the ACLU of Northern California, and the ACLU-NPP, we have, among other investigative activities: (1) conducted more than one hundred interviews of former and current prisoners in the Jail; (2) reviewed tens of thousands of pages of medical and custody records for current and former prisoners in the Jail; (3) reviewed documents produced by the County of Monterey (the "County," or "Monterey County") in response to multiple requests for information pursuant to the California Public Records Act ("CPRA"); (4) reviewed evaluations and reports concerning the Jail obtained from CPRA requests to other public entities as well as from other public sources; (5) assisted prisoners in the process of filing grievances with Jail officials; and (6) reviewed hundreds of Monterey County Sheriff's Office ("Sheriff's Office") reports of incidents that occurred in the Jail.

34.     Investigation required several attorneys from RBGG to travel to the Jail to interview dozens of prisoners about their experiences.  During this phase, frequent trips were made by associates Sumana Wolf, Michael Freedman, Krista Stone-Manista, and Sidney Hollar to interview prisoners and document the facts that formed the basis for Plaintiffs' claims.  Laura Boysen-Aragon played a major role in this phase to analyze the evidence being gathered.

35.     On April 15, 2013, RBGG and the Public Defender's Office sent an eleven page demand letter to Monterey County Sheriff Scott Miller and the Monterey County

1  Supervisors.  The purpose of the letter was to develop a framework for resolving Plaintiffs'

2  claims expediently and without litigation.  In that letter, we explained in detail how the

3  County and the Sheriff's Office (collectively, "County Defendants"), through their

4  operation of the Jail, violated the civil rights of prisoners by failing to provide reasonable

5  accommodations to prisoners with disabilities, by failing to operate an adequate medical

6  and mental health care system, and by failing to protect prisoners from violence and injury

7  at the hands of other prisoners.  At the conclusion of the letter, we proposed a framework

8  for remedying the conditions in the Jail and avoiding the expense and delay of protracted

9  litigation.  We sought an agreement on a framework for negotiations by May 16, 2013.  No

10  framework agreement was reached by that date.

11       36.     The professional hours claimed for work in Phase 1 are presented in Table 1:

12  **Table 1, Phase 1**

| | | Start | End |
|---|---|---|---|
| **Investigation Up to Point of Sending Demand Letter** | | 3/29/2012 | 4/15/2013 |
| Class | Name | Actual Hours | After Billing Judgment |
| Partner | Bien, Michael W. | 110.3 | 98.2 |
| | Grunfeld, Gay C. | 83.9 | 80.8 |
| | Galvan, Ernest | 4.5 | 0.0 |
| Associate | Freedman, Michael L. | 414.4 | 408.5 |
| | Stone-Manista, Krista | 164.8 | 158.3 |
| | Wolf, Sumana Cooppan | 66.9 | 65.6 |
| | Boysen-Aragon, Laura | 46.6 | 44.5 |
| | Fischer, Aaron J. | 0.3 | 0.0 |
| Paralegal | Hamilton, Abigail M. | 172.3 | 141.2 |
| | Tseng, Doris | 110.7 | 94.1 |
| | Luttrell, Eric L. | 83.9 | 56.9 |
| | Roudebush, Haruka | 1.6 | 0.0 |
| | Tauben, Rolayn L. | 0.5 | 0.0 |
| Total | | 1,260.7 | 1,148.1 |

**Phase 2: Plaintiffs' Counsel Files the Class Action Complaint**

37.     At the outset of this Phase, Plaintiffs' counsel continued to their investigation by interviewing prisoners and reviewing pertinent records, including individual prisoner's custody and medical records, CPRA-produced records, and publicly-available documents. Plaintiffs' counsel also researched the legal bases for Plaintiffs' claims and drafted the Complaint so that it would be ready to file in the event Defendants were unwilling to reach an agreement regarding a structured framework for resolving Plaintiffs' claims.

38.     On May 23, 2013, we filed this lawsuit on behalf of five prisoners against Monterey County, the Sheriff's Office, and California Forensic Medical Group, Inc. ("CFMG" and, collectively, "Defendants").  *See* Complaint, Dkt. No. 1.  The complaint alleged four primary claims under federal and California law:  (1) that Defendants violate the United States and California constitutions through their failure to keep prisoners safe from violence from other prisoners in the Jail; (2) that Defendants violate the United States and California constitutions through their failure to provide adequate medical care to prisoners in the Jail; (3) that Defendants violate the United States and California constitutions through their failure to provide adequate mental health care to prisoners in the Jail; and (4) that Defendants violate federal and California disability rights laws by failing to provide reasonable accommodations and discriminating against prisoners with disabilities in the Jail.

39.     The professional hours claimed for work in Phase 2 are presented in Table 2:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Table 2, Phase 2**

| | | Start | End |
|---|---|---|---|
| Post-Demand Negotiations And Continued Investigation | | 4/16/2013 | 7/26/2013 |
| Class | Name | Actual Hours | After Billing Judgment |
| Partner | Grunfeld, Gay C. | 109.3 | 103.45 |
| | Bien, Michael W. | 39.2 | 38.68 |
| | Galvan, Ernest | 1.6 | 0 |
| Associate | Wolf, Sumana Cooppan | 181.3 | 180.16 |
| | Freedman, Michael L. | 137.2 | 135.1 |
| | Stone-Manista, Krista | 80.2 | 78.45 |
| | Hollar, Sidney S. | 41.8 | 38.1 |
| Paralegal | Luttrell, Eric L. | 223.1 | 168.8 |
| | Hamilton, Abigail M. | 67.1 | 54.9 |
| | Roudebush, Haruka | 0.9 | 0 |
| | Tauben, Rolayn L. | 0.1 | 0 |
| Total | | 881.8 | 797.64 |

**Phase 3: The Parties Agreed on Four Neutral Experts to Evaluate Plaintiffs' Principal Allegations of Unconstitutional and Illegal Conditions at the Jail**

40.     We entered into negotiations with Defendants almost immediately after filing the lawsuit and offered to stay the litigation pending negotiations.  On July 29, 2013, before any of the Defendants had filed an answer or other responsive pleading, the Court entered a stipulated order staying the action until January 1, 2014.  *See* Dkt. No. 11.  The purpose of the stay was to permit the parties time to "(1) engage in a process of mutually agreeing to experts who will review and analyze the conditions at the Monterey County Jail and issue reports, and (2) to engage in settlement negotiations aimed at achieving mutually agreeable relief."  *See* Dkt. No. 9, at 1.

41.     At the outset of the stay, the parties agreed on four neutral experts—one for each of the primary claims in the Complaint—to assess the allegations of Plaintiffs'

17
DECLARATION OF MICHAEL W. BIEN

CV 13 2354 PSG

**Ex. R - 201**

Complaint.  These experts were:  Michael Hackett, a correctional security expert;

Dr. Michael Puisis, D.O., an expert in correctional medical services; Dr. Richard Hayward,

Ph.D., an expert in correctional mental health care services; and SZS Consulting, an

organization with expertise in disability rights laws and facility evaluation.

42.     During the late-summer and early-fall of 2013, the four neutral experts

conducted their reviews.  Each of the experts conducted at least one site visit to the Jail.

The experts also evaluated a number of documents, including Defendants' policies and

procedures.  The experts completed their reports and produced them to the parties in late

2013 and early 2014.  *See* Dkt. No. 49-1 through 49-7, Exs. D-P.  The neutral experts'

reports revealed serious and systemic constitutional, American with Disabilities Act, and

Rehabilitation Act violations at the Jail.  *See generally id.*

43.     After receiving the neutral experts' reports, the parties engaged in several

rounds of negotiations regarding changes at the Jail, including by exchanging initial ideas

regarding remedial plans for the Jail.  These conferences, conducted by letter and

teleconference, failed to produce an agreement.  The parties concluded that further

negotiations would not be productive.

44.     The professional hours claimed for work in Phase 3 are presented in Table 3:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Table 3, Phase 3**

|  |  | Start | End |
|---|---|---|---|
| Settlement Negotiations, Working with Neutral Experts, Drafting First Round of Remedial Plans, Continued Investigation |  | 7/27/2013 | 2/28/2014 |
| Class | Name | Actual Hours | After Billing Judgment |
| Partner | Grunfeld, Gay C. | 212.1 | 206.7 |
|  | Bien, Michael W. | 84.2 | 84.2 |
|  | Galvan, Ernest | 1.0 | 0.0 |
| Associate | Freedman, Michael L. | 395.1 | 373.1 |
|  | Alexander, Sarah Poppy | 118.0 | 115.4 |
|  | Stone-Manista, Krista | 86.4 | 85.6 |
|  | Hollar, Sidney S. | 56.4 | 56.4 |
| Paralegal | Luttrell, Eric L. | 210.3 | 148.7 |
|  | Tauben, Rolayn L. | 127.8 | 80.6 |
|  | Hamilton, Abigail M. | 19.8 | 15.6 |
|  | Roudebush, Haruka | 2.1 | 0.0 |
| Total |  | 1,313.2 | 1,166.3 |

**Phase 4: The Stay Is Lifted and Litigation Accelerates**

45.     Upon the breakdown of negotiations the stay was lifted and Plaintiffs promptly filed an Amended Complaint.  *See* Dkt. No. 41.  Defendants presented an aggressive defense.  Plaintiffs' efforts to reduce the time and expense of litigating were often contested or simply ignored.  Litigation over each substantive motion – including motions to dismiss, class certification, motions to strike, and preliminary injunction motion – was hotly contested.  Defendants repeatedly put up barriers to Plaintiffs' routine requests to obtain their own medical records, often reinterpreting the intent and substance of the parties' multiple protective orders in this case.

46.     On April 25, 2014, County Defendants filed an initial motion to dismiss, challenging the standing of one plaintiff not in custody when his claim was filed and the mootness of the claims of nine prisoners who were no longer in custody.  *See* Dkt. No. 44. Defendant CFMG filed its own motion to dismiss, joining the County Defendants' motion based on standing and also challenging Plaintiffs' sixth cause of action against CFMG under Title III of the ADA.  *See* Dkt. No. 59.  County Defendants later amended their motion to dismiss by dropping one Plaintiff based on his re-incarceration and adding two others because they had been released from custody.  *See* Dkt. No. 75.  In opposing Defendants' motions to dismiss, Plaintiffs worked under severe time pressure to visit with prisoners at the Jail to prove their incarceration and submitted declarations on behalf of numerous declarants, including prisoners Martha Gomez, Wesley Miller, and Glenda Hunter.  *See* Dkt. Nos. 79, 80, and 93-2.  The Court denied Defendants' motions to dismiss.  *See* Dkt. No. 128.  In doing so, the Court rejected County Defendants' standing and mootness arguments.  *See id.* at 12-16.  The Court noted the novelty of the question of whether Title III of the Americans with Disabilities Act ("ADA") covers a private provider of jail medical services, and found that Plaintiffs had sufficiently alleged that CFMG operates of a place of public accommodation for purposes of Title III.  *See id.* at 1 and 16-20.

47.     Plaintiffs moved for class certification on April 29, 2014.  *See* Dkt. Nos. 48 and 56.  Plaintiffs engaged expert witnesses to study jail conditions at the class certification stage:  Dr. Pablo Stewart, a board-certified psychiatrist and Clinical Professor in the Department of Psychiatry at the University of California, San Francisco with extensive experience in correctional mental health, and Dr. Robert L. Cohen, board-certified medical doctor of internal medicine and an expert in the field of correctional medicine.  Dr. Stewart submitted a 40-page declaration in support of class certification identifying and explaining:  (1) the insufficient staffing of mental health care clinicians, medical clinicians, and custody staff; (2) Defendants' failure to adequately identify prisoners with mental illness during the intake and booking process; (3) Defendants'

1    failure to continue providing the care prisoners were receiving in the community and/or

2    failure to provide the care prisoners require when they arrive at the Jail; (4) how

3    Defendants lack an adequate method for prisoners to request mental health care services;

4    (5) how Defendants' inadequate medication administration and prescription drug renewal

5    processes at the Jail place all prisoners at risk of serious harm; (6) how the group and

6    individual therapy offered to prisoners with serious mental illness is not sufficient to

7    adequately treat the mentally ill population in the jail; (7) how Defendants lack adequate

8    policies and practices for transferring prisoners who require higher levels of psychiatric

9    care to facilities licensed to provide that level of care; (8) how housing prisoners with

10   serious mental illness in administrative segregation places prisoners' mental health In

11   serious jeopardy; (9) the deficiencies in Defendants' suicide prevention program;

12   (10) Defendants' failure to maintain an adequate quality improvement plan for identifying

13   and fixing problems with the delivery of mental health care and especially for responding

14   to completed and attempted suicides; and (11) how the overcrowded nature of the Jail

15   magnifies the above problems.  *See* Dkt. No. 51.

16        48.    Defendants sought and obtained multiple delays of the class certification

17   briefing schedule for their Opposition, and initiated discovery concerning class

18   certification.  Plaintiffs objected to Defendants' repeated delays and attempted, with little

19   success, to streamline and minimize class certification discovery.  During the summer of

20   2014, Defendants deposed Dr. Stewart and Dr. Cohen, all twenty-one named Plaintiffs

21   (Jesse Hernandez, Cain Aguilar, Ha Cobb, Susan Dilley, Connie Dobbs, Sean Esquivel,

22   Ramona Gist, Martha Gomez, George Greim, Dennis Guyot, Jason Hobbs, Glenda Hunter,

23   Albert Key, Brandon Mefford, Wesley Miller, Richard Murphy, Jeff Nichols, Angel Perez,

24   Sarab Sarabi, Clyde Whitfield, and Robert Yancey); and five Jail prisoners who submitted

25   declarations on behalf of Plaintiffs' motions for class certification and preliminary

26   injunction (James Lewis, Robyn Woods, John Diaz, Bradley Buell, and Juan Sanchez).

27   Plaintiffs' counsel informed defense counsel that deposing every named Plaintiff was

28   unnecessary for class certification and would be difficult due to the transitory nature of

1    many of the indigent individual Plaintiffs.  Defendants refused to yield, and at their

2    request, Plaintiffs' counsel made each requested witness available for deposition.  These

3    depositions required considerable effort to identify the whereabouts of several Plaintiffs.

4    The depositions also required a great number of trips to various locations throughout

5    Monterey County to prepare for and conduct the depositions.

6         49.    The parties retained a private mediator in the summer of 2014 in an attempt

7    to negotiate a settlement, but failed.

8         50.    In June 2014, Defendants deposed neutral expert, Dr. Michael Puisis,

9    contesting the bases for his opinions regarding the state of medical care at the jail.

10   Defendants also deposed Pablo Stewart and Dr. Robert Cohen in connection with class

11   certification.  Defendants' Oppositions to class certification focused on the ultimate merits

12   of Plaintiffs' claims and on the individual Plaintiffs' past treatment in the Jail, and argued

13   again that Plaintiffs lacked standing, their claims were moot, and that they failed to meet

14   the Rule 23(a) prerequisites to class actions, that the proposed relief could not satisfy Rule

15   23(b)(2), and that Plaintiffs' expert declarations were inadmissible.  *See* Dkt. Nos. 133 and

16   169.  Defendant CFMG filed evidentiary objections to Plaintiffs' declarations in support of

17   class certification.  *See* Dkt. No. 169.  CFMG also engaged its own expert witnesses who

18   provided detailed declarations in opposition to class certification:  Dr. Jason Roof, a

19   physician board certified in neurology and psychiatry and an Associate Clinical Professor

20   of Psychiatry at the University of California, Davis Medical Center, and Kathryn Wild,

21   R.N., a registered nurse who has worked in the correctional healthcare field for 29 years.

22   *See* Dkt. Nos. 129-3 and 180-1.

23        51.    Plaintiffs deposed Defendants' class certification experts, Dr. Jason Roof and

24   Kathryn Wild, R.N., in September and October of 2014.  Plaintiffs also deposed three Fed.

25   R. Civ. P. 30(b)(6) witnesses who testified as to Defendants' practices, policies, and

26   procedures relevant to Plaintiffs' claims (Elaine Hustedt, Nancy Hatton, and James Bass).

27        52.    Plaintiffs' Reply in support of class certification focused on how Plaintiffs

28   satisfied the Rule 23 requirements and explained the applicability of *Parsons v. Ryan*, 754

1   F.3d 657 (9th Cir. 2014), which held in a similar case that prisoners challenging the

2   constitutionality of health care in the Arizona correctional system satisfied the

3   requirements of Rule 23.  *See* Dkt. No. 355.  Plaintiffs' Reply was supported by

4   declarations from Plaintiffs' experts, Dr. Stewart and Dr. Cohen, both of which were also

5   filed in support of Plaintiffs' motion for preliminary injunction (Dkt. No. 108).

6   Dr. Stewart's 29-page declaration rebutted Dr. Roof's analysis and reiterated concerns

7   about Defendants' policies and practices with respect to mentally ill prisoners.  *See* Dkt.

8   No. 356.  Dr. Cohen's 47-page declaration rebutted Ms. Wild's opinions and explained,

9   with respect to medical practices and policies at the Jail:  (1) how Defendants' tuberculosis

10  program places prisoners at risk; (2) how Defendants lack a reliable system to ensure

11  medication continuity; (3) how Defendants do not adequately identify and treat prisoners

12  for withdrawal; (4) how Defendants' health care request process is flawed; (5) how

13  Defendants' emergency response is flawed; and (6) how Defendants' medical staffing

14  levels are insufficient.  *See* Dkt. No. 360.

15          53.      Prior to resolution of the class certification motion, on August 26, 2014,

16  Plaintiffs moved for a preliminary injunction to address six areas:  (1) tuberculosis

17  screening; (2) medication continuity; (3) drugs and alcohol detoxification; (4) suicide

18  prevention in segregation units; (5) disability access for persons with mobility

19  impairments; and (6) sign language interpreters.  *See* Dkt. No. 108-2.  The motion was

20  supported by extensive briefing and the submission of substantial evidence including

21  declarations by experts for the Plaintiffs, including the Reply declarations of Dr. Cohen

22  and Dr. Stewart, as described above.  In fact, all of the evidence in support of the

23  Preliminary Injunction was also submitted in support of class certification and the two

24  motions were argued before the Court in a single hearing on October 29, 2014.  Several

25  Plaintiff class members either committed suicide or attempted suicide during this phase of

26  the litigation.

27          54.      The professional hours claimed for work in Phase 4 are presented in Table 4:

28

**Table 4, Phase 4**

| | | Start | End |
|---|---|---|---|
| **Motions to Dismiss, Class Certification Briefing and Hearing, Class Certification Discovery, Formal Mediation, Preliminary Injunction Briefing and Hearing** | | **3/1/2014** | **10/29/2014** |
| Class | Name | Actual Hours | After Billing Judgment |
| Partner | Bien, Michael W. | 457.5 | 455.2 |
| | Grunfeld, Gay C. | 412.2 | 410.3 |
| | Galvan, Ernest | 7.8 | 0.0 |
| Associate | Freedman, Michael L. | 1,270.0 | 1,257.5 |
| | Alexander, Sarah Poppy | 895.3 | 884.9 |
| | Swearingen, Van | 407.9 | 404.4 |
| | Stone-Manista, Krista | 190.6 | 190.4 |
| | Fischer, Aaron J. | 181.0 | 167.3 |
| Paralegal | Luttrell, Eric L. | 567.9 | 345.0 |
| | Tauben, Rolayn L. | 475.3 | 278.1 |
| | Roudebush, Haruka | 94.1 | 74.3 |
| | Hamilton, Abigail M. | 2.3 | 0.0 |
| Total | | 4,961.9 | 4,467.2 |

**Phase 5:  Merits Discovery, Continued Litigation, and Additional Jail Inspections**

55.     During this fifth phase, my partner Gay Grunfeld transitioned her responsibilities of the day-to-day oversight of the work on this case to our partner Ernest Galvan.

56.     Merits discovery involved a major effort by Plaintiffs' counsel to collect, analyze, and prepare facts to support trial, which was set for early September 2015. Following discovery on class certification issues, merits discovery began in earnest in the fall of 2014.  During late 2014 and early 2015, Plaintiffs deposed three staff employed by CFMG (Lola Bayer, Charlotte Gage, and Kevin Coolidge), as well as the Jail operations

1   commander employed by the Sheriff's Office (John Mihu).  Additional depositions were

2   scheduled at the time the parties settled.

3          57.     All parties served numerous sets of written discovery.  On Defendant

4   CFMG, Plaintiffs served eight sets of Request for Production of Documents ("RPDs"),

5   comprising 271 individual requests; and six sets of interrogatories on Defendant CFMG

6   (one on behalf of each Plaintiff Jesse Hernandez, Cain Aguilar, Ha Cobb, Susan Dilley,

7   Connie Dobbs, and Sean Esquivel).  Plaintiffs served two sets of interrogatories on County

8   Defendants (one on behalf of Plaintiff Cain Aguilar, another on behalf of Plaintiff Ha

9   Cobb); four requests for inspection (one for each set of operations:  custody and disability,

10  mental health care, medical care, and dental care); and six sets of RPDs, comprising 452

11  individual requests.  County Defendants and CFMG each produced tens of thousands of

12  electronic documents in response.  Plaintiffs also issued third-party subpoenas in

13  furtherance of their discovery, including to CFMG's outside nurse evaluator Barbara

14  Cotton, Natividad Medical Center, Monterey County's jail needs assessment consultant

15  TRG Consulting, the parties' neutral disability access consultant SZS Consulting Group,

16  the Institute for Medical Quality, neutral experts Michael Hackett, and Dr. Richard

17  Hayward, resulting in the production of thousands of additional documents.  CFMG served

18  interrogatories on each named Plaintiff, additional interrogatories on certain named

19  Plaintiffs, one set of RPDs, and subpoenaed medical records from named Plaintiffs.

20  County Defendants served three RPDs on each named Plaintiff, comprising 44 individual

21  requests, and served Interrogatories on numerous named Plaintiffs.  CFMG also served

22  interrogatories, requests for production, and deposition subpoenas on the Public

23  Defender's Office.  Plaintiffs had to review, code, and manage tens of thousands of pages

24  of hard-copy discovery and significant electronic discovery.  Because of Defendants'

25  refusal to produce documents and responses within the discovery response timeframes

26  ordered by the Court, Plaintiffs were also frequently forced to review and manage

27  documents on extremely shortened time-frames in order to adequately use the information

28  during depositions and for court filings.

58.     Discovery was highly contested; the parties brought seven discovery disputes to the Court for decision, including disputes over depositions, privilege and redaction issues, protective order disputes, motions to compel delayed document production, and protocol for jail inspections.  *See* Dkt. Nos. 123, 375, 385, 398, 430, 453, and 466. Discovery was nearly complete when the parties settled; indeed, the fact discovery cut-off was scheduled just one week after settlement.  *See* Dkt. No. 103.

59.     Plaintiffs attempted to avoid protracted litigation.  For example, Plaintiffs sent letters asking Defendants to amend inapplicable and/or insufficient affirmative defenses and withdraw their jury demand on the grounds that juries are not available in injunctive cases.  County Defendants refused to so amend; CFMG simply ignored the letter.   Plaintiffs moved to strike Defendants' Answers to Plaintiffs' Second Amended Complaint on November 4, 2014.  *See* Dkt. Nos. 376, 377.  Following a stipulated agreement that Defendants would modify or delete their affirmative defenses and the subsequent amendments to their answers, Defendants filed amended Answers plagued by the same deficiencies identified in Plaintiffs' initial letters.  Plaintiffs were thus forced to file renewed Motions to Strike Defendants' affirmative defenses on the grounds that a jury trial was not available for claims for declaratory and injunctive relief, and that Defendants' affirmative defenses were insufficiently pled and/or not affirmative defenses.  *See* Dkt. Nos. 391, 392.  Oral argument was held on January 13, 2015.  *See* Dkt. No. 412.  On April 14, 2015, the Court granted Plaintiffs' Motions to Strike, striking County Defendants' request for a jury trial as well as every single affirmative defense asserted by Defendants.  *See Hernandez v. County of Monterey*, 306 F.R.D. 279, 293 (N.D. Cal. 2015) (Dkt. No. 462).  Had Defendants amended their answers as initially suggested by Plaintiffs' counsel, the parties would have avoided multiple rounds of briefing.

60.     The Court certified the class and disability sub-class on January 29, 2015. *See Hernandez v. County of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015) (Dkt. No. 431). The class is defined as "all adult men and women who are now, or will be in the future, incarcerated in the Monterey County Jail."  *Id.* at 164.  The Court also certified a sub-class

1   of "all qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12102,

2   29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are

3   now, or will be in the future, incarcerated in the Monterey County Jail." *Id.*  In certifying

4   the class, the Court found that "Plaintiffs have produced adequate evidence of specific

5   system-wide policies and practices exposing inmates to a substantial risk of serious harm,

6   violating their constitutional or statutory rights; and they have clearly defined the class

7   claims." *See* Dkt. No. 431 at 33.  The Court further noted that "all members of the putative

8   class and subclass have in common their alleged exposure to a substantial risk of serious

9   future harm to which Defendants are allegedly deliberately indifferent, as a result of

10  policies and practices that govern the overall conditions of health care services and

11  confinement.  While results of exposure may vary, ranging from no harm to death, each

12  inmate suffers the same constitutional or statutory injury when exposed to a policy or

13  practice that creates a substantial risk of serious harm." *Id.* at 35.

14      61.    In the weeks before the settlement, Plaintiffs completed four inspections of

15  the Jail.  On March 23, 2015, Dr. Donald Sauter, accompanied by Plaintiffs' counsel,

16  toured the Jail in an inspection of all relevant activities, services, and operations related to

17  dental care.  On March 30-31, 2015, Dr. Pablo Stewart, accompanied by Plaintiffs'

18  counsel, toured the Jail in an inspection of all relevant activities, services, and operations

19  related to mental health care.  On April 1-2, 2015, Dr. Robert Cohen, accompanied by

20  Plaintiffs' counsel, toured the Jail in an inspection of all relevant activities, services, and

21  operations related to medical health care.  On April 6, 2015, correctional operations expert

22  Wendy Still, accompanied by Plaintiffs' counsel, toured the jail in an inspection of all

23  relevant activities, services, and operations related to custodial and operations and ADA

24  compliance.  Plaintiffs had worked extensively with their expert consultants, and were

25  preparing to disclose their testifying experts and their opinions when the case settled.

26      62.    The Court granted Plaintiffs' Motion for Preliminary Injunction on April 14,

27  2015.  *See Hernandez v. County of Monterey*, __ F.3d __, 2015 WL 3868036 (N.D. Cal.,

28  Apr. 14, 2015) (Dkt. No. 460).  The Court concluded that, absent an injunction, Plaintiffs

1  would continue to suffer serious risks from Defendants' practices: "They will remain at

2  heightened risk of contracting TB, or of their TB not being timely detected and treated.

3  Those housed in segregation will remain at unnecessary risk of committing suicide or

4  harming themselves. Those booked into the jail on medications are at unreasonable risk of

5  having those medications stopped and not restarted for weeks and months. Mobility

6  impaired inmates will continue to be denied fresh air and exercise, as well as access to

7  vital programs that could shorten their jail stays, for no reason other than they have a

8  disability. And inmates who use sign language as their primary method of communication

9  will continue to be discriminated against every time they need to communicate with staff at

10  the jail." *See id.* at 39. The Court required Defendants to file a plan by June 13, 2015 that

11  includes, at a minimum, reforms to the following issues: infection control and

12  tuberculosis, detoxification, medication continuity, suicide prevention, disability access,

13  intake screening, safety cells, custody staffing, clinical staffing, medical care, mental

14  health care, dental care, and physical safety. *See id.* at 42-44.

15       63.    The professional hours claimed for work in Phase 5 are presented in Table

16  5:

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**Table 5, Phase 5**

|  |  | Start | End |
|---|---|---|---|
| **Trial Preparation, Merits Discovery, Jail Inspections, Post-Injunction Negotiations** |  | **10/30/2014** | **5/6/2015** |
| Class | Name | Actual Hours | After Billing Judgment |
| Partner | Galvan, Ernest | 452.6 | 449.6 |
|  | Bien, Michael W. | 357.2 | 355.1 |
|  | Grunfeld, Gay C. | 49.7 | 49.1 |
| Associate | Alexander, Sarah Poppy | 691.4 | 669.9 |
|  | Freedman, Michael L. | 525.2 | 508.8 |
|  | Stone-Manista, Krista | 425.9 | 421.6 |
|  | Swearingen, Van | 327.3 | 319.5 |
|  | Fischer, Aaron J. | 9.3 | 0.0 |
| Paralegal | Tauben, Rolayn L. | 368.9 | 165.1 |
|  | Luttrell, Eric L. | 112.2 | 72.1 |
|  | Woo, Linda H. | 59.8 | 59.1 |
|  | Roudebush, Haruka | 25.5 | 19.8 |
| Paralegal Clerk | Landes, Charlotte J. | 311.0 | 270.2 |
|  | Morrison, Kevin J. | 49.1 | 49.1 |
| Total |  | 3,765.1 | 3,409.0 |

## Phase 6: Settlement Negotiations and Agreement, Court Approval, and Implementation Plans

64.     After the Court issued the Preliminary Injunction, and as the Plaintiffs' experts were completing their jail inspections, the parties resumed settlement discussions. The parties participated in eight days of settlement conferences before the Honorable Nathanael M. Cousins, United States Magistrate Judge, from March 30 through May 4, 2015 (on March 30, April 17, April 23, April 27, May 1, May 2, May 3, and May 4, 2015) at which the parties explored and debated many of the determinative issues in the case.

1   The Parties exchanged multiple revisions to the settlement agreements, leading up to the

2   final Settlement Agreement executed on May 11, 2015.  The Court ordered final approval

3   of the Settlement Agreement on August 18, 2015, incorporating the Settlement Agreement

4   into its Order and finding that it has the full force and effect of an order of the Court.  *See*

5   Dkt. No. 494 ¶ 4 & Ex. A.

6          65.     The Settlement Agreement secures significant advantages for the Plaintiff

7   class.  The agreement embodied in the settlement, taken as a whole, addresses each of the

8   constitutional and statutory violations alleged by Plaintiffs.  Among its provisions, the

9   settlement requires sweeping improvements to the Jail's tuberculosis screening program, a

10  process for ensuring prisoners are continued on medications prescribed for them prior to

11  their arrest, and a program to ensure timely access to mental health services.   Prisoners

12  with disabilities will no longer be categorically excluded from a host of programs and

13  services at the Jail.  Prisoners in crisis will not be placed in punitive or unsanitary

14  conditions, and the County will have to remove hanging points from the Jail's segregation

15  units—suicide hazards that have been used by numerous prisoners to commit suicide in

16  recent years.  For the purposes of jurisdiction and enforcement, the Settlement Agreement

17  complies with the requirements of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C.

18  § 3626(a)(1)(A), in that it is narrowly drawn, extends no further than necessary to correct

19  the violation of the Federal right, and is the least intrusive means necessary to correct the

20  violation of the Federal right of the Plaintiffs.  *See* Dkt. No. 494, Ex. A ¶ 45.

21         66.     This settlement resolves all the claims in this case.  The Settlement

22  Agreement requires Defendants to immediately develop Implementation Plans for the

23  improvement of care, services, programs, and activities that relate to security, medical

24  care, mental health care, dental care, and disability accommodations to prisoners in the

25  Monterey County Jail.  The Implementation Plans are intended to ensure that the class is

26  not exposed to substantial risks of serious harm, and that the sub-class is not subject to

27  discrimination on account of disability.  These Implementation Plans will address:  Intake

28  Screening, Infection Control, Detoxification, Safety Cells, Medication Continuity, Custody

30

1   Staffing, Clinical Staffing, Medical Care, Mental Health Care, Dental Care, Safety, and

2   Prisoners with Disabilities.  *See id.* ¶ 31 (describing with specificity content of the

3   Implementation Plans).  The Settlement Agreement describes substantial revisions to

4   Defendants' policies, procedures, and practices.  *See id.* ¶¶ 10, 20, 31.  In the event there

5   are any disputes between the parties regarding the scope or details of the Implementation

6   Plans, those disputes will be submitted to Judge Cousins for resolution.  *See id.* ¶ 33.

7   Thereafter, if the parties are still unable to agree to the content of the Implementation

8   Plans, the parties shall seek redress with the Court.  *See id.*

9       67.    The Settlement Agreement provides sufficient monitoring powers to neutral

10   experts and Plaintiffs' counsel to ensure that the settlement will be enforced.  The

11   settlement provides that five neutral experts will monitor Defendants' compliance with the

12   agreed-upon Implementation Plans with respect to ADA compliance, mental health care,

13   medical care, general conditions of confinement and jail security, and dental care.  *See id.*

14   ¶ 35.  The Settlement Agreement includes provisions such that the monitors will have

15   access to all Jail facilities on reasonable notice as well as to personnel whose duties pertain

16   to the provision of services and/or who work with inmates in the area of the expert's

17   expertise.  *See id.* ¶¶ 39-40.  The designated monitors have full access to County and

18   CFMG documents to monitor Defendants' compliance with the terms of this Settlement

19   Agreement and all Implementation Plans.  *See id.* ¶ 40(b).  At least twice a year,

20   designated monitors for each topic will prepare a written report on the Defendants' efforts

21   to meet the terms of this Settlement Agreement and all Implementation Plans.  *See id.*

22   ¶ 40(e).

23       68.    This settlement provides Plaintiffs with oversight of Defendants' compli-

24   ance.  Under the Settlement Agreement, Plaintiffs are entitled to conduct reasonable and

25   limited monitoring of Defendants' compliance with Settlement Agreement and/or the

26   Implementation Plans, including up to four one-day inspections of Jail operations per year.

27   *See id.* ¶¶ 41-43.  Plaintiffs will also receive from Defendants a monthly report and

28   document production to be used for tracking and monitoring performance under the

1    Implementation plans.  *See id.* ¶ 41.  The parties agreed to meet and confer regarding any

2    disputes regarding the scope and extent of inspections or access to information, and if nec-

3    essary, the parties will seek the involvement of Judge Cousins to resolve disputes.  *See id.*

4        69.    This is a powerful and complete remedial process.  Because the settlement

5    complies with PLRA requirements, the Court has full power to enforce the provisions of

6    the Settlement Agreement and the Implementation Plans therein.  The Settlement

7    Agreement provides a dispute resolution process to resolve enforcement issues and to

8    bring such issues to the Court for decision.  *See id.*  The Settlement Agreement provides

9    for the Court to retain jurisdiction to enforce its terms, as well as the terms of the

10   Implementation Plans for a period of five years, unless Plaintiffs' counsel can demonstrate

11   to the Court through noticed motion that jurisdiction should be retained for a longer period.

12   *Id.* ¶ 47.

13       70.    Plaintiffs' counsel has maintained years-long relationships with the named

14   Plaintiffs, timely informing them of the progress of the case and responding to their

15   questions and needs.  Following settlement negotiations, Plaintiffs' counsel sent letters to

16   each named Plaintiff, and made attempts to discuss the settlement with each named

17   Plaintiff in person or over the phone.  None of the named Plaintiffs had any objections to

18   the substance of the Settlement Agreement.  Plaintiffs' counsel additionally drafted a

19   Notice of Class Action Settlement for posting within the Jail for the benefit of other class

20   and sub-class members.

21       71.    In light of these benefits to the Plaintiff class and sub-class, Plaintiffs

22   submitted with Defendants a Joint Motion for Final Approval of Class Settlement on July

23   28, 2015.  *See* Dkt. No. 489.  On August 18, 2015, the Court ordered final approval of the

24   Settlement Agreement, incorporating the Settlement Agreement into its Order and finding

25   that it has the full force and effect of an order of the Court.  *See* Dkt. No. 494 at ¶ 4 & Ex.

26   A.  Thereafter, Plaintiffs' counsel began to work on the instant fees motion.

27       72.    Pursuant to the settlement, Defendants presented Plaintiffs' counsel with

28   implementation plans regarding specific Jail policies and practices beginning in late July

1  and August, 2015.  Plaintiffs' counsel have reviewed these implementation plans with

2  experts Wendy Still, Dr. Pablo Stewart, Dr. Donald Sauter and Dr. Robert Cohen.

3  Plaintiffs' counsel continue to meet and confer with Defendants' counsel regarding the

4  sufficiency of the implementation plans.

5      73.    The professional hours claimed for work thus far in Phase 6 are presented in

6  Table 6:

7  **Table 6, Phase 6**

| | | Start | End |
|---|---|---|---|
| **Finalizing Settlement, Fairness Hearing, Implementation Plans (ongoing)** | | **5/7/2015** | **9/10/2015** |
| Class | Name | Actual Hours | After Billing Judgment |
| Partner | Bien, Michael W. | 136.1 | 135.5 |
| | Galvan, Ernest | 128.1 | 127.5 |
| | Grunfeld, Gay C. | 4 | 0.0 |
| Associate | Swearingen, Van | 191 | 186.6 |
| | Alexander, Sarah Poppy | 71.9 | 71.8 |
| | Stone-Manista, Krista | 68 | 67.6 |
| | Freedman, Michael L. | 0.8 | 0.0 |
| Paralegal | Tauben, Rolayn L. | 79.3 | 47.1 |
| Paralegal Clerk | Landes, Charlotte J. | 63.1 | 47.1 |
| Total | | 742.3 | 683.2 |

| | Total of All 6 Phases | 12,925.00 | 11,671.4 |
|---|---|---|---|

**NEGOTIATIONS, AGREEMENTS, AND COURT ORDER CONCERNING PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES AND EXPENSES**

74.    Under the Settlement Agreement, Plaintiffs' counsel agreed to cap its fees and expenses incurred through Final Approval of the Settlement Agreement, including approval of all implementation plans, at $4.8 million.  *See id.* ¶ 62.  This cap represents a

1  substantial cut from the reasonable fees that would have been available to Plaintiffs'

2  counsel as a matter of law.  Plaintiffs' counsel agreed to this major cut in fees for the

3  purposes of facilitating settlement and maximizing the scope and speed of the remedial

4  process.  Plaintiffs' attorneys continue to meet and confer with Defendants about the

5  content of the agreed-upon remedies, independently consult with experts as to the

6  adequacy of the implementation plans, communicate with Plaintiff class and sub-class

7  members regarding their current experiences at the Jail, and perform work on all

8  calendared matters, including this Motion.

9       75.     Plaintiffs' counsel also agreed to cap their fees and expenses to enforce the

10  settlement provisions.  The parties' agreement provides that Plaintiffs may petition the

11  Court for an award of no more than $250,000 per year in fees and expenses arising from

12  monitoring work, inspections, negotiations, meet and confer processes, mediation, review

13  of documents, and correspondence with class members, until termination of Court

14  enforcement.  *See* Ex. A ¶ 63.  Based on my experience regarding the professional time

15  and expenses necessary to monitor a remedy of this type, this $250,000 represents a very

16  substantial cut from the hours and expenses that will be necessary.  The settlement also

17  provides that Plaintiffs will not seek fees and expenses in an amount above $150,000 each

18  year on motions to enforce the Settlement Agreement.  *Id.*  There is no cap on fees and

19  expenses plaintiffs incur to oppose any motions brought by defendants, such as a motion to

20  limit or terminate all or part of the Settlement Agreement.  *Id.*

21       76.     These negotiations and the $4.8 million cap agreed to by the parties in the

22  Settlement Agreement satisfies the meet and confer requirement of Local Rule 54-5(b)(1).

23              **PLAINTIFFS' COUNSEL'S REASONABLE ATTORNEYS' FEES**

24       77.     RBGG's rates are wholly consistent with the rates charged by comparable

25  attorneys and legal staff in the San Francisco Bay Area and numerous other locales within

26  California for work comparable to that performed in the instant case.  (In fact, they are

27  lower than rates at many San Francisco Bay Area firms.)  My firm's billing practices are

28  similarly comparable to those of other attorneys and legal staff in the San Francisco Bay

1   Area and elsewhere in California.  My firm's billing rates are charged to and paid by our

2   many clients who pay by the hour on a monthly billing basis, in matters arising both inside

3   and outside the State of California.  They are also the rates we claim in our fee applications

4   in all our fee-shifting cases, both inside and outside the San Francisco Bay Area.  These

5   contain no contingency, delay or preclusion components.  They have been accepted

6   consistently by courts in California and elsewhere.  The 2015 hourly rate for each

7   timekeeper included in RBGG's lodestar calculation is set forth in the Table 7:

8   **Table 7, RBGG Rates**

| Classification | Name | Law Grad Date | Rate |
|---|---|---|---|
| Partner | Bien, Michael W. | 1980 | $840 |
| | Grunfeld, Gay C. | 1984 | $710 |
| | Galvan, Ernest | 1997 | $690 |
| Associate | Boysen-Aragon, Laura | 2006 | $490 |
| | Fischer, Aaron J. | 2006 | $490 |
| | Hollar, Sidney S. | 1984 | $490 |
| | Freedman, Michael L. | 2008 | $470 |
| | Swearingen, Van | 2008 | $470 |
| | Stone-Manista, Krista | 2009 | $440 |
| | Wolf, Sumana Cooppan | 2009 | $440 |
| | Alexander, Sarah Poppy | 2012 | $380 |
| Paralegal | Hamilton, Abigail M. | | $250 |
| | Luttrell, Eric L. | | $295 |
| | Roudebush, Haruka | | $250 |
| | Tauben, Rolayn L. | | $295 |
| | Tseng, Doris | | $250 |
| | Woo, Linda H. | | $290 |
| Paralegal Clerk | Landes, Charlotte J. | | $220 |
| | Morrison, Kevin J. | | $200 |

78.   I require all RBGG staff, including myself, to keep contemporaneous and highly reliable time records of the amount of time spent on each activity related to this case.  My partner, Ernest Galvan, has reviewed each time entry for every timekeeper in this matter, and has made reasonable billing judgments to eliminative excessive, duplicative, and unnecessary billing entries.  In addition, Mr. Galvan reduced to zero all hours spent by any RBGG attorney on this matter who billed fewer than 40 hours over the course of the case.  Mr. Galvan also zeroed out all hours spent by any RBGG paralegal or law clerk who billed fewer than 49 hours over the course of the case.  As a result of this discretional reduction, there are 12 fewer attorneys and 14 fewer paralegals and law clerks for whom RBGG is claiming attorneys' fees, amounting to a reduction of approximately 330 hours, or $108,440 in attorneys' fees.  I regularly rely on Mr. Galvan to perform billing judgment reductions to RBGG time entries that my firm submits in support of fees motions.  I have discussed with Mr. Galvan the billing judgment reductions he made to the time entries in this case, and agree with his methodology and judgments.  In calculating the lodestar described below for RBGG timekeepers, Mr. Galvan has made appropriate billing judgment reductions.

79.   Attached as **Exhibit L** are two tables summarizing RBGG's professional time in this matter.  The first table shows all timekeepers for whom compensation is claimed, after removing attorneys with fewer than 40 hours and paralegals with fewer than 49 hours.  The second table is an overall summary of the billing judgment deductions.  RBGG expended 13,255 professional hours (Exh. L at page 2) during the period from March 2012 through mid-September 2015.  RBGG has written off a total of 1,584 hours, or approximately 12% of the billable hours.  (Exh. L at page 2.)  This amounts to $519,451 in billing judgment reductions to assure that we have accounted for any undue duplication of effort or inefficiency.  (Exh. L. at page 2.)  After these billing judgment reductions, RBGG claims a total of 11,671 hours of compensable time for a total claimed lodestar of $5,630,634 for all work invested in this case through September 10, 2015.  (Exh. L at page

1.) All the work claimed by RBGG was necessary, and was performed by skilled and able counsel, who appropriately organized the work so that most was performed by associates and paralegals. RBGG timekeepers have demonstrated their high levels of skill and have worked to avoid undue duplication of effort or inefficiency.

80.     Mr. Galvan has also reviewed ACLU-NPP and ACLU-NC's time entries. Mr. Galvan worked closely with Mr. Balaban in making appropriate billing judgment reductions to ACLU-NPP's time entries. Similarly, Mr. Galvan worked closely with Mr. Schlosser in making appropriate billing judgment reductions to ACLU-NC's time entries. I have discussed with Mr. Galvan the billing judgment reductions he made to ACLU-NPP and ACLU-NC's time entries in this case, and agree with his methodology and judgments. In calculating the lodestar described below for all Plaintiff's counsel's timekeepers, Mr. Galvan has made appropriate billing judgment reductions.

81.     Attached as **Exhibit M** is a table showing the summary of the total hours expended by all timekeepers from Plaintiffs' counsel – RBGG, ACLU-NPP, and ACLU-NC – before and after billing judgment reductions, as well as the total value of that time at market rates. Before billing adjustment reductions, Plaintiffs' counsel's expended over 15,000 professional hours, or over $7.1 million in fees during the period from March 2012 through mid-September 2015. Plaintiffs' counsel has written off a total of 1,699 hours, or 11% of its billable hours. This amounts to $560,972 in billing judgment reductions to assure that they have accounted for any undue duplication of effort or inefficiency. After these billing judgment reductions, Plaintiffs' counsel claims a total of 13,386 hours of compensable time for a total claimed lodestar of $6,590,144 for all work invested in this case through September 10, 2015. Plaintiffs' counsel's total lodestar fees and expenses through September 10, 2015 amount to $6,900,220. The Settlement Agreement cap of $4.8 million in fees and costs represents reduction of over 30% from the approximately $7 million in compensable time and costs incurred by Plaintiffs' counsel. Plaintiffs' counsel will make their complete time records available to Defendants and the Court, upon request, under the parties' Protective Order (Dkt. No. 401) relating to confidential information.

82.     Plaintiffs' counsel are nationally recognized for their excellence in disability law, prisoner rights litigation, and complex class action litigation.  *See, e.g.*, *L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888, 895 (E.D. Cal. 2009) ("observ[ing] that Michael Bien has been recognized as a 'genuine expert in the area of complex, institutional prison reform litigation,' so as to merit exceptional fees") *citing Lucas v. White*, 63 F.Supp.2d 1046, 1061–62 (N.D. Cal. 1999).  This experience has led courts throughout California and the nation, including the United States District Court for the Northern District, to award the firms that represent Plaintiffs fees at their full market rates, in part based on their superior experience and reputation.  *See, e.g.*, *Armstrong v. Brown*, 805 F. Supp. 2d 918, 922 (N.D. Cal. 2011) (compelling defendants to pay RBGG's "reasonable 2010 hourly rates" including $800 for Sanford Rosen and $700 for Michael Bien); *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (affirming RBGG's requested 2008 rates, including $700 for Sanford Rosen); *L.H.*, 645 F. Supp. 2d at 895 (RBGG partners Bien, Grunfeld, and Galvan obtaining their 2008 rates:  $640, $475, and $450, respectively).  Similarly, the rate sought for work performed by paralegals and law students is reasonable and commensurate with prevailing market rates in the Bay Area. *See, e.g., Armstrong*, 805 F. Supp. 2d at 922 (compelling defendants to pay RBGG's paralegals at 2010 rates up to $240 per hour); *Prison Legal News v. Schwarzenegger*, 561 F. Supp. 2d 1095, 1105 (N.D. Cal. 2008) (awarding "between $160 and $170 for paralegals and law student interns").

83.     Plaintiffs' counsel has spent nearly four years investigating and litigating the conditions at the Jail on a fully contingent basis, receiving no compensation for the duration of the action and fronting significant litigation expenses.  Plaintiffs' counsel paid the wages of lawyers and other legal staff over the course of several years to fund the prosecution of this case.  The time and labor required for this case, committed on a contingent basis, precluded Plaintiffs' counsel from productive work on other class action and complex litigation cases.  The enormous costs and complexity of this litigation could not have been borne by the Plaintiff class and sub-class of indigent prisoners.

84.     The unique intersection of legal issues presented by this case required considerable expertise in the provision of care to disabled individuals (whether medically, emotionally, or mentally disabled) in institutionalized settings to obtain the best outcome for the Plaintiff class and sub-class.  Facts pertaining to these issues formed the common core of the case, and market rates for Plaintiffs' counsel are appropriate for their successful litigation of Plaintiffs' claims.  Plaintiffs' counsel did not maintain separate billing numbers for each claim made by Plaintiffs (*i.e.*, one billing number for ADA-related claims, another for Rehabilitation Act claims, and another for Section 1983 claims). Plaintiffs' counsel challenged the Jail's failures to protect its prisoners  in their entirety, and never treated the case as having distinct, individualized components such as some ADA components and other non-ADA components.  This would be impracticable, given that issues regarding the Jail's provision of disability access, disability programming, medical health care, and mental health care services permeated all aspects of this case. Had Plaintiffs solely claimed violations of the ADA, the Rehabilitation Act, and California Government Code § 11135 (and not their federal or state constitutional claims), Plaintiffs' counsel would have performed the identical, or nearly identical, work.

85.     Counsel's work on the ADA, Rehabilitation, and state law claims (including due process, equal protection, and the prohibitions against discrimination in state programs and cruel and unusual punishment) permeate all aspects of this action and cannot be reasonably divided from claims that would be capped at PLRA rates.  Even if the Court decided on an arbitrary division between market and PLRA rates, it is likely that any reasonable allocation would result in an amount that would surpass the parties' agreed-upon $4.8 million award cap.  For example, if the Court decided to allocate 50% of counsel's claimed time to PLRA rates and the other 50% to market rates, the total fees and expenses award would amount to $5,012,325 before any fee enhancement is taken into consideration

86.     Plaintiffs agreed not to seek fees and expenses from the Court in an amount above $4.8 million, for fees and expenses incurred through Final Approval of the

1   Settlement Agreement, including approval of all Implementation Plans.  Settlement

2   Agreement ¶ 62.  By limiting the calculation of Plaintiffs' counsel's lodestar to work

3   performed through September 10, 2015, Plaintiffs' lodestar does not capture work

4   performed drafting this motion and supporting papers.  Nor does it take into account the

5   work performed by Plaintiffs' counsel evaluating Defendants' proposed Implementation

6   Plans and reviewing them with Plaintiffs' experts.  I approximate that counsel has

7   expended approximately 100 hours (or approximately $50,000) on these activities since

8   September 10, 2015.  Additionally, the parties have yet to agree to a set of Implementation

9   Plans to submit to the Court for its approval.  Based on the amount of time Plaintiffs'

10  counsel has expended to date on the Implementation Plans, including time spent analyzing,

11  reviewing with experts, and meeting and conferring with Defendants, I estimate that

12  Plaintiffs' counsel will expend approximately 800 additional hours (or approximately

13  $400,000) working on this matter prior to the Court's approval of all Implementation

14  Plans.

15          **RBGG'S REASONABLE AND NECESSARY COSTS AND EXPENSES**

16          87.     Plaintiffs' counsel fronted significant litigation expenses over the course of

17  years.  Hundreds of thousands of dollars were advanced by Plaintiffs' counsel for costs and

18  expenses.  Plaintiffs incurred costs and expenses of $310,075 in investigating and litigating

19  this matter through September 10, 2015.  **Exhibit N** includes a summary chart of all of

20  RBGG's costs and expenses incurred through this time.  **Exhibit O** is a summary of all

21  Plaintiff firms' costs and expenses.  These financial outlays include but are not limited to

22  expenses related to copying, court reports, electronic discovery, expert consultants

23  witnesses, interpreters, legal research, telephone calls, postage, service of process, and

24  travel.  I have reviewed the costs and expenses incurred by all Plaintiffs' firms, and believe

25  each of the costs incurred was directly related and necessary to the prosecution of this case.

26          88.     Plaintiffs paid significant costs and expenses associated with outside and in-

27  house copying jobs.  The charges for outside copying costs frequently included charges for

28  other services that were necessary to process and utilize documents, including Bates

1    stamping, coding, uploading, payment for on-site copies of class member records and, in

2    some cases, onsite copy services for Defendant-produced documents.  (On-site copying is

3    charged at $0.20 per page which is lower than the $0.25 per page customarily charged in

4    the San Francisco Bay Area market.)  Plaintiffs routinely sent a copying service to the Jail,

5    for instance, in order to obtain prisoner health records.  Defendants could not or would not

6    copy these documents and records themselves in a timely manner.  Plaintiffs' copying

7    costs for the case also predictably increased during particularly busy times of the litigation.

8    RBGG also advanced other costs as reflected in Exhibit **N,** including travel expenses,

9    telephone charges (including the costs of conference calls), witness fees, and postage.  It is

10   RBGG's practice to bill our fee-paying clients for all of these expenses.  This billing

11   practice is consistent with the billing practices of lawyers practicing in the Northern

12   District of California.  With respect to conference calls, in particular, multi-party calls

13   were essential for meet and confer sessions to discuss overall joint strategy, discovery

14   issues, trial exhibits, pre-trial filings, and other litigation-related issues.  It was also easier

15   and more cost-effective for the multiple Plaintiffs' attorneys to communicate via

16   conference calls rather than in person.  All of these costs were necessary to prosecution of

17   the case.

18          89.     Plaintiffs paid significant costs and expenses associated with expert

19   consultants.  Dr. Pablo Stewart, with extensive experience in correctional mental health,

20   submitted declarations in support of class certification and the motion for preliminary

21   injunction.  Dr. Robert L. Cohen, a board-certified medical doctor of internal medicine and

22   an expert in the field of correctional medicine, also filed  declarations in support of class

23   certification and the preliminary injunction.  Dr. Donald Sauter, toured the Jail in an

24   inspection of all relevant activities, services, and operations related to dental care,

25   including the accessibility of dental services to prisoners with disabilities, and was

26   prepared to testify as an expert at trial.  Wendy Still, accompanied by Plaintiffs' counsel,

27   toured the jail in an inspection of all relevant activities, services, and operations related to

28   custodial and disability operations, and was prepared to testify as an expert at trial.  All of

1   these experts continue to provide services to plaintiffs' counsel, including the review and

2   analysis of the implementation plans created by Defendants pursuant to the Settlement

3   Agreement.

4             90.     It is RBGG's consistent practice to bill our clients for computerized research

5   charges, such as Westlaw, as well as interpreters, court reporters, long-distance telephone

6   calls, faxes, investigators, and travel. It would not be appropriate to include these costs in

7   our overhead as to do so would require a major increase in our firm's overall costs and

8   billing rates when these costs are only required by a fraction of our clients and/or only

9   some of the time during their case. This billing practice is consistent with the billing

10   practices of lawyers practicing in the Northern District of California.

11             91.     It is RBGG's practice to bill electronic discovery processing and database

12   hosting to clients as litigation costs. This billing practice is consistent with the billing

13   practices of lawyers practicing in the Northern District of California. In this case, where

14   Plaintiffs were faced with a huge volume of produced documents and very short time-

15   frames within which to review them, the use of the database was the most efficient and

16   cost-effective way to litigate the case. If Plaintiffs did not utilize such a database, it would

17   have been impossible to review and manage the huge volume of materials in this case,

18   which included tens of thousands of pages of electronically-produced documents. The

19   database allowed many fewer staff hours to review documents because it facilitated a

20   "funnel" of only the most essential information into the eventual designation of deposition

21   exhibits, trial-ready exhibits, and documents used to support motions and other filings.

22   Once staff members reviewed documents, for instance, they could mark them as either

23   useful in some way, pertinent to a particular issue in the case, useless to the case, or

24   duplicative (defendants produced hundreds of duplicative documents). We then used these

25   codes to exclude marked documents that had already been coded from various searches

26   that attorneys and paralegals performed. It would have been impossible to review the huge

27   volume of documents and to funnel information in this way without the document

28   management system.

**FEES AND EXPENSES IN CONNECTION WITH THIS FEES APPLICATION**

92.     Attached hereto as **Exhibit P** is a summary of the fees incurred in connection with this fees application, totaling approximately $55,600 as of September 27, 2015.  I estimate that the completion of this fees application process will require another $20,000 in fees and expenses, for a total of approximately $75,000.

**CONCLUSION**

93.     Based on my experience and on negotiations in this case, we have negotiated an agreement with Defendants to obtain the same comprehensive reforms Plaintiffs would be entitled to pursuant to a total victory at trial to be affirmed on appeal.  The work described in this declaration was essential to obtaining this superior result for Plaintiffs.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 2nd day of October, 2015.


                                        */s/ Michael W. Bien*
                                        Michael W. Bien

# EXHIBIT S



# COUNTY OF SAN DIEGO

### INTER-DEPARTMENTAL CORRESPONDENCE

December 28, 2016

**TO:**    Rich Miller, Assistant Sheriff
            Detention Services Bureau

**FROM:**    Esther MacLyman, Lieutenant
            East Mesa Reentry Facility
            ADA Workgroup Chair

**VIA:**    Chain of Command

### Americans with Disabilities Act Workgroup Findings & Recommendations

**PROBLEM:**

The Americans with Disabilities Act (ADA) was enacted in 1990 with the goal of ending discrimination against individuals with disabilities and included state and local government services. Initially, these regulations encompassed public access, accommodations, and workplace modifications. However, the Armstrong v. Davis, 275 F.3d 849, 879 (9th Cir. 2001) ordered an injunction for the California Department of Corrections and Rehabilitation (CDCR) and mandated the equal treatment and accommodation of disabled inmates in their custody. The ADA was further amended in 2010 to address accommodations in both prisons and jails to include not only physical accessibility but accommodations for programming of disabled inmates.

We have implemented practices over the years to manage and house the ADA inmate population and provided for basic medical care in our facilities. We also addressed some adaptive services through our Reentry Services Division (RSD) on a case by case basis. Additionally, there were some references to these practices in both the Detention Services Bureau (DSB) and Medical Services Division's (MSD) Policy and Procedures but it has not been a comprehensive procedure in either.

After extensive research, we identified several aspects of the ADA legislation that we have not been in compliance with. Those shortcomings are listed below but are not limited to the following:

- No comprehensive written Policy and Procedure on ADA
- No equal access to programs for qualified ADA inmates
- Insufficient or inappropriately designed ADA inmate housing
- Segregated housing for certain types of disabled inmates
- Lacking an ADA Coordinator or Unit
- No method of validating ADA accommodations especially as it pertained to the developmentally delayed population

**SD 104531**
**Ex. S - 229**

- No streamlined method of tracking our ADA population
- Internal communication was lacking between divisions as it relates to ADA inmates
- Classification interview questions did not trigger any action by anyone to follow-up
- No formal training for all staff in dealing with the ADA inmate population and accommodation requirements.

## ASSUMPTIONS:

Over the past several years, the rights of disabled inmates and their challenges as it relates to equal access to facilities, programs and services have become highly litigious. Our detention facilities can have upwards of 400+ inmates that could potentially be classified as ADA. Not every inmate that has an identified ADA qualified disability requires accommodations. However, for the focus of this study, we will address those inmates that due to their disability are not able to independently conduct one or more activities of daily living. We estimate our ADA inmate population to be closer to 150; with the majority being housed at the San Diego Central Jail (SDCJ) and the Las Colinas Detention and Reentry Facility (LCDRF).

With the enactment of the California Criminal Justice Realignment Act of 2011 (AB-109), the increase of local prison commits and post release community supervision violators, we have experienced increased requests for ADA accommodations from inmates who would have previously been sentenced to and accommodated at CDCR facilities because of the Armstrong V. Davis.

Our practices, policies and procedures were not updated to address the growing ADA population nor did we anticipate the number of complaints and requests for accommodation we would be receiving. These complaints and requests for accommodations are routinely addressed via the MSD Nursing Director, Nancy Booth, as a collateral duty. In addition to MSD, RSD, our facilities and the Jail Population Management Unit also experienced the impact of the complaints.

Another major assumption we have made in regards to accessibility, is the physical design of our facilities. As a practice county wide, it was assumed that once built to the standards that were in place at the time of construction is what we were held to. Meaning any accessibility design or lack thereof would be grandfathered in and hence we would be compliant; which is not the case. ADA accessibility guidelines are updated at least every three years, many of our facilities may potentially be out of compliance.

## FACTS:

The ADA workgroup has addressed many of the practices that were established over the years and developed a comprehensive update to the DSB and MSD's Policy and Procedures. These updates are currently being reviewed by the aforementioned P & P Committees. Once approved, the Detention In-Service Training Unit will coordinate the release of training material to coincide with the publishing of the updated policy revisions. All of the affected divisions consulted on these revisions will address the ADA impacts to their divisions internally.

Nancy Booth has case managed all inmates requiring ADA accommodations. Her role in case managing this population has become increasingly burdensome. Her duties have included but have not been limited to the following:

- Responding to CDCR grievances for accommodations,
- Referring inmates for assessment by a physician or nurse

- Reviewing findings and implementing recommendations
- Researching inmate complaints of non-compliance
- Responding to legal complaints of non-compliance
- Record retrieval
- Notifications to internal and external resources
- Record management

The responsibility of ADA monitoring and compliance affects many divisions and should be a shared role between sworn and professional staff.

An ADA accessibility review of all our detention facilities has been conducted, with a team from the San Diego County Department of General Services Facilities Management office. A separate presentation will be made to address the observations made at the ADA accessibility review.

**DISCUSSION:**

Our workgroup was not only challenged with the volumes of ADA regulations but identifying the impact each division would face fulfilling these directives. Through our research, we learned bureau wide, there was a lack of knowledge as it relates to the accommodation requirements of the ADA inmate. ADA compliance is not as simple as identifying a disabled person and treating their impairment but is technical and very complex. We also did not know what each of our divisions was doing internally to address ADA issues. Although questions were asked during medical intake screening and during the classification interview, the information gathered did not trigger automatic notification to anyone regarding the inmates' needs for accommodation or accessibility. At times this left a huge lapse in services that were available to the disabled inmate population.

In synopsis, as it applies to detention facilities, the ADA legislation prohibits discrimination solely on the design of the facilities and it's inaccessibility to those with disabilities. Knowing that inmates have disabilities we have to provide access to programming and visitation. ADA also mandates that our policies and physical modifications to cells provide for safe and appropriate housing.

The spectrum of disabilities covered under ADA is very wide reaching. Disabilities can range from mobility issues, mental health, intellectual disabilities, etc. Not every inmate with a disability fits one particular accommodation; they are as varied as every individual that comes into our custody.

The single most important factor in evaluating how we identify and house inmates with disabilities is establishing their ability to perform the basic activities of daily living. Activities of daily living include but are not limited to such functions as caring for oneself, reading, communicating, performing manual tasks, walking, seeing, hearing, speaking, and thinking, etc. Many of the inmates that have a disability do not necessarily require housing accommodations; they may just need adaptive services to be able to participate in programming or merely to navigate the administrative system inside the detention facilities.

The ADA workgroup developed policies and procedures to identify and address the housing and programming needs of inmates with disabilities. (See attached draft copies) Those procedures include but are not limited to the following:

- Placement criteria
- Assessing incoming population
- Identifying inmates within existing population
- Notifications

SD 104533

- Accommodations
- Access to Programs and Services
- Designated ADA housing
- Staff Training
- ADA Case Manager responsibilities

As we researched ADA throughout the state of California it became increasingly clear that we need dedicated staff to address all the different challenges posed by ADA regulations. As required by the Americans with Disabilities Act Title II Regulations, Part 35 Nondiscrimination on the Basis of Disability in State and Local Government Services states in part.

> *§ 35.107 Designation of responsible employee and adoption of grievance procedures*
> *(a) Designation of responsible employee. A public entity that employs 50 or more persons*
> *shall designate at least one employee to coordinate its efforts to comply with and carry*
> *out its responsibilities under this part, including any investigation of any complaint*
> *communicated to it alleging its noncompliance with this part or alleging any actions that*
> *would be prohibited by this part. The public entity shall make available to all interested*
> *individuals the name, office address, and telephone number of the employee or employees*
> *designated pursuant to this paragraph.*

We reached out to several agencies throughout California for feedback on how they handled this part of the legislation which refers to the ADA Coordinator. We received varied answers. The overwhelming majority did not have an ADA Coordinator or Unit. Of the agencies that did have an employee or unit assigned to this responsibility they were very diverse in how they operated this function. Some counties have an entire unit comprised of sworn and professional staff; others only have a couple of sworn staff assigned, yet others operate this function as a collateral duty or they hired consultants.

The County of San Diego does have a designated ADA Coordinator through the county's Human Resources Department. However they would not handle an inmate generated complaint. Their focus is primarily personnel related or public access compliance.

The workgroup has determined in order to effectively implement the aforementioned subsection of the ADA we should also have an ADA Unit. This unit would be comprised of at least two full time sworn supervisory positions and one full time registered nurse position to begin with. The recommendation is for the unit to be overseen by the Medical Services Division Nursing Director.

ADA Lieutenant/Sergeant responsibilities but not limited to the following:

- Inform MSD's ADA Coordinator of new ADA inmate arrivals
- Interview inmates regarding their booking experience and obtain all necessary information
- Ensure inmate receives a copy of the ADA information brochure
- Upload audio interview and type interview and store in inmate's ADA file
- Confirm inmate is housed in an appropriate housing location
- Audit JIMS inmate history for appropriate entries documenting accommodations
- Communicate to housing staff any special accommodations/restrictions
- Review Inmate with ADA/ADL Hazards report to ensure compliance
- Collect all documents for inmate's file, including grievances, correspondence, etc…
- Audit all logs for compliance and accuracy
- Collaborate with MSD's ADA Coordinator to develop discharge plan
- Conduct monthly ADA inmate interviews

- Address any compliance issues or medical issues
- Audit all inmate Classification reviews content to ensure accuracy
- Notify Sheriff's Legal and County Counsel of any issues pertaining non-compliance, discrimination or other violations
- Re-evaluate ADA legislation and implementation as necessary
- Research and develop housing plan to ensure our department complies with accessibility codes

ADA Registered Nurse responsibilities but not limited to the following:

- Maintain current information regarding state and federal laws
- Ensure ADA related information is readily available for staff
- Ensure P&P's remain current as it relates to changes in state and federal laws
- Acts as ADA liaison to families by responding to Public Website questions
- Ensure ADA violations do not occur and are remedied if they do occur
- Ensure that appropriate processes are in place for prompt resolution of complaints
- Respond to CDCR grievances for accommodations
- Refer inmates for assessment by a physician or nurse
- Review findings and implementing recommendations
- Research inmate complaints of non-compliance
- Respond to legal complaints of non-compliance
- Record retrieval
- Notifications to internal and external resources
- Record management

Although there are several ADA Coordinator certification courses available throughout the United States, not all of the training material on ADA relates to the detention field. It would be beneficial to have this unit attend an ADA course specifically designed for our needs. This would enable the unit to be thoroughly versed in the topic and know how to effectively implement ADA policies, guidelines, programming and accessibility. We were able to find a resource in California that is both capable and willing to develop a curriculum. More research in this matter will be needed but it may be in our best interest to assist in the development of this training and offer it to other agencies in the region as well.

## COSTING INFORMATION

Estimated salary and benefits for the following positions:

### FY 16-17

| Class Code | Class Name | Average of Total |
|---|---|---|
| 4548 | Sheriff's Detentions Nurse | $ 156,779 |
| 5767 | Sheriff's Detentns Lieutenant | $ 209,575 |
| 5781 | Sheriff's Sergeant-Detentions | $ 172,376 |



**FY 17-18**

| Class Code | Class Name | Average of Total |
|---|---|---|
| 4548 | Sheriff's Detentions Nurse | $ 157,936 |
| 5767 | Sheriff's Detentns Lieutenant | $ 216,194 |
| 5781 | Sheriff's Sergeant-Detentions | $ 177,870 |

**CONCLUSION:**

We believe our workgroup has tackled many of the practices, policies and procedures that impact our ADA inmate population. The next hurdle will be to ensure proper programming and accessibility at our facilities. ADA updates will be an ongoing, ever evolving regulatory endeavor that will require knowledgeable, ADA trained and dedicated staff.

**RECOMMENDATION:**

Approve and fund the ADA Unit sworn and professional staff positions.

**Esther MacLyman, Lieutenant**
**East Mesa Reentry Facility**
**ADA Workgroup Chair**

**ATTACHMENTS:**

DSB and MSD P&P Current and Updated Sections:

M.39   Disabled Inmates
M.9     Intake Medical Screening
T.21    High School Equivalency and Educational Programs
P.11    Hearing Impaired Inmates
R.3     Inmate Classification Code-Descriptor Definitions
MSD I.3   Intake Receiving/Screening Assessment

EM: em

**SD 104536**
**Ex. S - 234**

Americans with Disabilities Act Workgroup Findings & Recommendations
December 28, 2016

_____    Date: 3-23-17 [ ✓ ] Approved    [ ] Disapprove
James Madsen, Captain
Detention Support Division

Comments: _____

_____

_____

_____    Date: 3-2-17    [ ✓ ] Approved    [ ] Disapprove
Michael Hernandez, Commander
Detention Operations-Area 3

Comments: _____

_____

_____

_____    Date: 3-15-17    [ ✓ ] Approved    [ ] Disapprove
Rich Miller, Assistant Sheriff
Detention Services Bureau

Comments: THE FUNDING NEEDS TO BE
INCLUDED.  FIVE YEAR FORECAST.
CAN THE POSITION BE A PROFESSIONAL STAFF MEMBER.?

# EXHIBIT T



# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
### *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☐ SDCJ  ☑ GBDF  ☐ EMRF  ☐ LCDRF  ☐ SBDF  ☐ VDF  ☐ FAC8

From: *Lopez, Josue*
De:   Name (Last, First, Middle)   Booking Number  Housing Unit
      *Nombre (Apellido, Primero, Segundo)*   *Número de ficha*   *Unidad de alojamiento*

Booking Number: 19763409   Housing Unit: M/085/102

Grievance is about: ☑ Jail Procedures  ☑ Jail Conditions  ☑ Medical  ☐ PREA  ☑ Other *ADA conditions*
*La queja es acerca:* *Procedimientos de la Cárcel*  *Condiciones de la Cárcel*  *Médico*  *Otro*

Date and Time of Incident / *Fecha y hora del incidente:* *October 2019 — Present*

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

The conditions in the jail place me and other inmates at a substantial risk of harm. I am deaf and my primary method of communication is American Sign Language. The jail consistently refuses to accommodate my hearing disability. The dangerous policies and practices that place me and other inmates at a substantial risk of serious harm include, but are not limited to, insufficient custody staff to help assist people with disabilities, inadequate supervision of individual's disability-related needs, an inadequate system for inmates to grieve ADA issues, inadequate screening and intake procedures, insufficient medical and custody staff training on how to interact with people who have disabilities; insufficient supply of

Inmate Signature / *Firma de Preso* *Josue Lopez*   Date / *Fecha* 4/28/21 7:45pm

---

THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

Received by: _____ Signature of receiving staff member  ARJIS # _____ Date 4/28/21  Time _____

Entered in JIMS: Date _____ Time _____ JIMS Grievance Number _____

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐ The inmate's health or safety is unfairly impacted by a condition of confinement
☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
☐ It is an appeal of discipline—JIMS Incident # _____ JIMS Appeal Hearing # _____
☐ It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request: FORWARDED TO MEDICAL/ADA CASE MANAGER.

J-22 (Rev 1/15)   Original goes to booking jacket   Copy goes to inmate after being signed by staff member

Ex. T - 237

ADA- accessible accomodations (such as video tablets, functioning Telecommunication Device for the Deaf, TTY phones, confidential rooms for attorney and family phone calls, video visits, social visits, etc.). For example, I can only use the TTY machine to communicate with my wife, loved ones and personal attorney. Sometimes the TTY has a poor signal and takes a lot of time to work. Many deputies at the jail become frustrated with me when I ask to use the TTY phone. They either deny me access to it, rush me when I am using it, or say they are "too busy" or short staffed to escort me to the TTY phone and supervise me. Some deputies also do not know I am deaf. A lot of them often rely on other inmates to write down responses for me to read. This places me at a substantial risk of harm because some of my confidential information could be released to these inmates during their conversations with staff. I also cannot trust that other inmates will write own accurate information. The jail does not provide a sign language interpreter during interactions with nursing and medical staff. I have to rely on lip reading and written notes to understand complex medical issues. Please, fix the conditions listed above so that I am no longer at a substantial risk of harm. Please also allow me to access the TTY phone when requested, or provide me with a video phone tablet so I can communicate with my family and personal attorney.

In addition, the medical care at the jail is inadequate and places me and all other inmates at substantial risk of harm. The jail's dangerous policies and practices include, but are not limited to, an inadequate system for inmates to request care, delays in providing timely access to care, inadequate identification of and provision of care to inmates with chronic illness, failure to continue medications for inmates who were taking medications before being arrested, inadequate staff training, inadequate maintenance of medical records, and inadequate medication administration. For example, I was arrested on October 8, 2019, and did not received my medication to treat my kidney transplant for about 4 or 5 days. I take the following medications: cyclosporine, mycophenolate and prednisone. Please, fix these issues so that I am no longer at a substantial risk of serious harm.

There are still other conditions at the jail that place my and other inmate's safety and survival at risk, including but not limited to: insufficient staff to safely monitor all inmates, overcrowded facilities that make it impossible to safely house all inmates and inadequate training of officers. For example, on February 14, 2021, when I and others asked for grievance forms, a deputy told us, "Whoever you want to write up, don't do it" and tried to threat that something bad would happen if we file grievances. Please fix the safety issues listed above so that I and others are no longer at a substantial risk of serious harm. Please, do not retaliate against me for filling this grievance.

Ex. T - 238

# EXHIBIT U



**ROSEN BIEN**
**GALVAN & GRUNFELD** LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Van Swearingen
Email: vswearingen@rbgg.com

March 15, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>
Fernando Kish
Ronald Lenert
Matthew O'Sullivan
Office of the County Counsel
County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2437
Fernando.Kish@sdcounty.ca.gov
Ronald.Lenert@sdcounty.ca.gov
Matthew.O'Sullivan@sdcounty.ca.gov

        Re:    *Dunsmore v. San Diego County Sheriff's Department, et al.*
               S.D. Cal. Case No. 3:20-CV-00406-AJB-WVG
               <u>Our File No. 1730-1</u>

Dear Messrs. Kish, Lenert, and O'Sullivan:

        As you have now seen in our class action complaint on behalf of Daryl Dunsmore
and seven other individuals, we allege that the County of San Diego and the San Diego
County Sheriff's Department violate the civil rights of people incarcerated at the San
Diego County Jail by failing to provide reasonable accommodations to prisoners with
disabilities, failing to operate an adequate mental health, medical, and dental care system,
failing to ensure adequate safety and security for people in custody, subjecting
individuals to unsanitary and inhumane conditions of confinement, and denying people
access to legal counsel and the courts. The County, the Sheriff's Department, and the
Probation Department further violate the rights of people with mental health and other
disabilities and/or people who are Black and/or Latinx, through policies and practices that
illegally and wrongly result in the over-incarceration of these groups. The conditions in
the Jail cause very real harm to the more than 4,000 people regularly incarcerated in the
Jail.

        We greatly appreciated the opportunity to meet in person with Mr. Kish and Mr.
O'Sullivan on March 10, 2022. From that conversation, we observed two important

[3875815.3]

**Ex. U - 240**

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 2

objectives that the parties share – first, to proactively address serious problems within the County's carceral system, and second, to focus resources on practical solutions, including by narrowing the issues in dispute and avoiding costly, protracted litigation as much as possible.

The other defendants named in this action – each of which provide services subject to contract with the County – are also responsible and liable for certain aspects of the unlawful and unconstitutional systemic deficiencies set forth above and in our complaint.  However, the County is ultimately responsible for *all* policies, practices, and conditions that illegally harm Plaintiffs and the putative class and subclass.  *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) (state prison defendants cannot shirk their obligations to plaintiffs under federal law by contracting with a third party).  We are therefore sending the following proposal to you prior to sharing it with other defendants.

Plaintiffs' counsel have extensive experience litigating class action cases addressing unlawful and unconstitutional conditions of confinement in jails and prisons. These experiences demonstrate that there are meaningful opportunities for the parties in such cases to proceed in ways that are most cost-effective and solutions-oriented while protecting the rights and interests of all parties.

To be clear, Plaintiffs' intention is to seek and secure an adequate and durable remedy – in the form of injunctive relief – for the legal and constitutional violations set forth in the complaint, with meaningful federal court oversight of implementation.  In similar cases, this has been achieved through court orders and/or court-approved settlements.

We provide below a two-pronged proposal, with an eye towards the shared goals we discussed, addressing (1) class certification and (2) neutral, mutually agreed-upon expert assessments.  The proposal would require a mutual good faith effort towards an expeditious and efficient resolution of this matter.  If the County is amenable to such a proposal, we suggest that we together share it with the other defendants.  Coordination across all parties will undoubtedly result in greater efficiencies and cost-savings.

## I.    Class Certification

In every significant jail system class action case filed in California's federal courts in recent years, class certification has been granted.  The appropriateness of class certification in a matter such as this one is beyond reasonable dispute, as made clear by the Ninth Circuit in *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014).  That case, now cited by numerous federal courts in California, makes clear that class certification is appropriate where, as here, plaintiffs seek to challenge systemic policies and practices that allegedly expose incarcerated people to a substantial risk of harm.  *See, e.g.*,

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 3

*Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015); *Gray v. Cnty. of Riverside*, No. EDCV 13-00444-VAP, 2014 WL 5304915 (C.D. Cal. Sept. 2, 2014); *Jewett v. California Forensic Med. Grp., Inc.*, No. 213CV0882MCEACP, 2017 WL 931886 (E.D. Cal. Mar. 9, 2017), report and recommendation adopted sub nom. *Jewett v. California Forensic Med. Grp., Inc.*, 2017 WL 1356054 (E.D. Cal. Apr. 5, 2017).

More recently, California counties have avoided costly and time-consuming discovery and motion practice on class certification either by stipulating to class certification, *see, e.g., Mays v. County of Sacramento*, E.D. Cal. Case No. 2:18-cv-02081-TLN-KJN (Joint Motion for Class Certification granted 12/28/18); *Babu v. County of Alameda*, N.D. Cal. Case No. 5:18-cv-07677-NC (Joint Motion for Class Certification granted 1/21/20), or by submitting a statement of non-opposition to certification, *see, e.g., Murray v. County of Santa Barbara*, C.D. Cal. Case No 2:17-cv-08805-GW-JPR (Unopposed Motion for Class Certification granted 5/31/18).

In each of these cases, the County realized substantial cost-savings on a procedural matter that was not in reasonable dispute.

Class certification brings an additional benefit for the County, protecting it from additional suits for systemwide injunctive relief. Resolution of a case of this sort through a class proceeding facilitates efficiency and finality both in terms of adjudication of complex legal issues and any resulting legal remedies. With the extensive attention that the San Diego County Jail has received, including from the State Auditor, in the media, from non-profit and governmental organizations like Disability Rights California the United States Department of Justice, and through numerous individual lawsuits, the County faces substantial risk of additional legal proceedings. There is substantial value to all parties to narrow and resolve the matters raised in the *Dunsmore* case through a single, class-wide adjudicatory process.

As part of the this proposal, we ask that the County agree to class certification in the form of a stipulated order that would be filed with the Court no later than April 29, 2022. Counsel for Plaintiffs will be working on a motion for class certification during the pendency of this proposal. In the event that the County does not agree in principle with this proposal by April 1, 2022, Plaintiffs' counsel will accelerate their work on this motion.

## II.    Retention of Neutral Mutually Agreeable Experts

Given the parties' shared goals, we propose the use of neutral, mutually agreed-upon subject matter experts to assist the parties in the identification of systemic issues and effective remedies that are tailored to San Diego County's system.

A case like this one entails substantial fact discovery and expert input. A coordinated, streamlined process for information-sharing and expert involvement will put

[3875815.3]

**Ex. U - 242**

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 4

the parties in the best position to identify and implement adequate solutions to the problems raised, with the parties realizing cost-savings and efficiencies wherever feasible.

For these and other reasons, several California counties have used, or are using, neutral experts in this sort of process, including (for example) Sacramento, Santa Clara, Santa Barbara, Monterey, Fresno, Riverside, San Bernardino, and Alameda. Where the parties have engaged in good faith negotiations, the outcome has been the achievement of – or significant progress towards – constitutional and legal compliance.

The most successful procedure, in our experience, is for the County to retain mutually agreed-upon experts with subject matter expertise on the relevant case issues, which in this case will include: (a) mental health care and suicide prevention, (b) medical care, (c) dental care, (d) eye care, (e) environmental sanitation, health, and safety conditions, (f) custodial operations, (g) compliance with the Americans with Disabilities Act ("ADA"), and (h) county carceral and alternatives-to-incarceration practices impacting people with mental health or other disabilities and/or people who are Black and/or Latinx.

Through this process, the County (and other defendants, as appropriate) would work with us and these experts on the following terms:

➢ By June 1, 2022, the County will retain mutually agreeable experts for the purpose of preparing reports and recommendations regarding the above subject matters. Plaintiffs' counsel will provide recommendations as to available experts for the parties to discuss and will consider your proposed experts.

➢ The experts will have access to all people incarcerated at the Jail, records, and staff as needed to prepare their reports and recommendations.

➢ Within 100 days of the appointment of the experts, they would issue reports proposing recommendations and remediation for conditions found to be below the minimum federal and state standards.

➢ The expert reports and recommendations will be public and admissible in any litigation that may occur, including in the event that (a) the parties negotiate a class-wide remedial plan and settlement, or (b) negotiations are not successful in whole or in part.

Assuming the parties are able to proceed in good faith with negotiations for a class-wide settlement, these neutral expert reports and recommendations would provide a distinctively useful guide to negotiations and the drafting of a remedial plan, to be filed with the federal court, that satisfies constitutional and legal requirements.

[3875815.3]

**Ex. U - 243**

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 5

The expert reports and recommendations may assist in narrowing certain issues – where the mutually agreed-upon experts appropriately find that a systemic component is working well and is constitutionally or statutorily adequate, such an issue need not be the subject of litigation or a remedial plan – and will identify discrete issues that require remedial steps in this County.

Assuming the parties successfully negotiate a resolution through this structured process, it must ultimately result in a class settlement agreement filed with and approved by the court and over which the court retains continuing jurisdiction. The agreement would require that the County, where necessary to comply with state and federal law, revise policies and procedures, implement remedial plans, institute a system for quality assurance, and permit external monitoring of implementation and compliance. Furthermore, the County would agree not to oppose payment of reasonable attorneys' fees on the same terms as if Plaintiffs' counsel had fully litigated the case through a trial resulting in injunctive relief orders. The reasonableness of attorneys' fees would of course be a subject of negotiation and if necessary, dispute resolution processes.

## III.    Addressing Critical Issues

As discussed during our recent conversation, in a case of this nature and scope, it will be necessary to address certain issues on an expedited basis. There are issues in this case that require prompt attention. Specifically, there are systemic issues putting our clients and putative class members at extraordinary risk of serious harm right now; such issues cannot wait. Likewise, there are certain remedial actions that, if implemented in the near term, would lay a meaningful foundation for addressing other issues in the case in an efficient, cost-effective, and results-oriented way.

We will provide further detail on the critical issues that we consider essential for the County and other defendants to address without delay. The County's position on the proposal in this correspondence will assist in our presenting those issues and a procedure for addressing them.

We request that the County consider our proposals regarding (1) class certification and (2) the use of neutral, mutually agreeable subject matter experts, and provide us with its position as soon as possible, and no later than **April 1, 2022**. Agreeing to these proposals will not only save the County substantial resources and attorneys' fees, but also support a streamlined framework for identifying and resolving deficiencies at the Jail. Doing so will benefit incarcerated people, those who work at the Jail, and the County as a whole. If the County declines our proposals, we will accelerate our efforts to move for class certification as well as ask the Court for early discovery including the opportunity to inspect the Jail with our own experts.

[3875815.3]

**Ex. U - 244**

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 6


      We are of course available to meet and confer about these proposals.  Thank you for your attention, courtesy, and continued efforts.

                        Sincerely,

                        ROSEN BIEN
                        GALVAN & GRUNFELD LLP

By:  *Van Swearingen*


                        LAW OFFICE OF AARON J. FISCHER

By:  *Aaron J. Fischer*


                        DLA PIPER LLP US

By:  *Christopher M. Young*


                        ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES

By:  *Bardis Vakili*

[3875815.3]

**Ex. U - 245**

# EXHIBIT V

**SYROUN SANOSSIAN, CASp**

Syroun is the founder and principal of SZS Engineering Access, Inc. She has over 25 years of experience in disability access evaluation and consulting, including 20 years as the principal of her own firm. She has extensive experience in conducting CASp inspections and preparing reports to ensure compliance with the Americans with Disabilities Act ("ADA") and California's Unruh Act for ADA Title III public accommodations including retail establishments, medical and dental facilities, law offices, auto service centers, and restaurants. She is authorized by the California Department of State Architects ("DSA") to act on their behalf as a Certified Access Specialist ("CASp"), where designated for the California State University, and served as the first Disability Compliance Officer for the California Administrative Office of the Courts, Office of Court Construction and Management. She is a member of the American Society of Mechanical Engineers and serves as a voting member of the ASME A18 National Standards Committee which promulgates the model code for North America governing wheelchair lifts. She is also a member of the Certified Access Specialist Institute, among other professional affiliations. She has prepared ADA self-evaluations and transition plans, master access plans and CASp inspection reports for numerous public entities including counties, municipal agencies, large public universities, community colleges and numerous ADA Title III entities including national retail franchises, healthcare entities as well as local mom and pop shops, restaurants and grocery stores.

### EDUCATION

Architecture and Civil Engineering, Graduate Studies (Vor/Hauptdiplom) 1992 – 1997
- Technische Hochschule Darmstadt (TUD); Darmstadt, Germany
- Rheinische Westfalische Technische Hochschule (RWTH), Aachen, Germany
Graduate Studies, Architecture; University of Utah, Salt Lake City, UT    1990 – 1992
B.S. Political Science/Pre-Architecture, University of Utah    1990

### PROFESSIONAL AFFILIATIONS

DSA Certified Access Specialist (CASp) No. 69
American Society of Mechanical Engineers (ASME)
Voting Member, ASME A18 National Standards Committee
International Code Council (ICC), member
Certified Access Specialist Institute (CASI), member
Association of Pedestrian and Bicycle Professionals (APBA), member
Association on Higher Education and Disability (AHEAD), member
International Association of Accessibility Professionals (IAAP), member
National Association of Women in Construction (NAWIC) Oregon
Commissioner, San Mateo County Commission on Disabilities, 2021 - 2024

### RELEVANT PROJECT EXPERIENCE

<u>SUBJECT MATTER EXPERT SERVICES</u>

Hanson Bridgett LLC: Projects involve privileged and confidential work for ADA Title II entities. Expert opinion, CASp inspections and reporting.

Hart Wagner LLC: Assisting legal counsel for the defense in Moore et. Al vs. City of Eugene



involving temporary traffic control efforts in the public rights-of-way (PROW). Expert opinion, CASp inspections, training and construction monitoring.

Rosen Bien Galvan Grunfeld LLC and Prison Law Office (PLO): Assisting legal counsel for the plaintiffs in Armstrong vs. Newsom, which involves monitoring a settlement agreement on disabled access pertaining to the California state correctional system. Dunsmore work involves CASp inspections, plan review, peer review and construction monitoring.

US v. County of Humboldt, California. Acted as approved Independent Licensed Architect (ILA) for Project Civic Access case in US v. County of Humboldt CA involving CASp inspections, reporting to US DOJ on 210 facilities and 1,200 miles of roadway.

CASp Mentoring Program – City of Fresno CA: Providing training for city staff, including mentoring, peer review and guidance on specific ADA access compliance topics.

**DETENTION, CORRECTIONAL AND COURTHOUSE PROJECTS**

Gordon D. Schaber Sacramento County Courthouse – SZS performed a CASp inspection of designated floors as part of an interior remodeling process. Work was performed in conjunction with the Judicial Council of California.

Chatsworth Courthouse, Los Angeles County Superior Court, North County - SZS provided CASp inspection services, and plan review for six (6) courtrooms and ancillary spaces on the third floor of the Courthouse. Work was performed in conjunction with the Judicial Council of California.

Edmund E. Edelman Children's Court, Monterey Park CA – SZS provided CASp inspection services, and plan review for parking, path of travel upgrades and ancillary spaces on the fourth floor of the Courthouse. Work was performed in conjunction with the Judicial Council of California.

San Bernardino County Justice Center, San Bernardino CA – SZS provided CASp inspection and plan review services for two new Courtrooms, associated clerical space and a lobby security expansion to an existing 32,052 SF one-story, four courtroom Juvenile Courthouse. Work was performed in conjunction with the Judicial Council of California.

Solano County Superior Courthouse, Fairfield, CA - SZS provided CASp inspection and plan review services for two new Courtrooms, associated clerical space and a lobby security expansion to an existing 32,052 SF one-story, four courtroom Juvenile Courthouse. Work was performed in conjunction with the Judicial Council of California.

Butte County, CA Juvenile Court Replacement - SZS provided CASp inspection services for site evaluations and plan review for the replacement of an existing county courthouse. Work was performed in conjunction with the Judicial Council of California.

Rio Cosumnes Correctional Facility – SZS provided CASp inspection services for site evaluations and plan review for renovation of an existing wing to reduce inmate overcrowding and increase the number of accessible cells.

Sacramento County Courthouse – Sacramento County retained SZS to perform an ADA/Access Compliance building assessment that was used in the design and construction documents provided by county-designated architects. SZS also performed plan review.



Sacramento County Coroner's Office - Sacramento County retained SZS to perform CASp plan review and complaint resolution for this new construction project.

Lorenzo Patiño Hall of Justice (Sacramento County Main Jail) – Sacramento County retained SZS to perform an ADA/Access Compliance building assessment as part of the update to the existing ADA Transition Plan for Sacramento County. This assessment was performed in conjunction with the ADA/Access Compliance assessment of the Gordon D. Schaber Sacramento County Courthouse performed the same year.

Gordon D. Schaber Sacramento County Courthouse - Sacramento County retained SZS to perform an ADA/Access Compliance building assessment as part of the update to the existing ADA Transition Plan for Sacramento County.

Sacramento County Juvenile Courthouse - Sacramento County retained SZS to perform ADA/Access Compliance plan review and construction monitoring for this new construction project.

Sacramento County Juvenile Detention Center - Sacramento County retained SZS to perform an ADA/Access Compliance building assessment as part of the update to the existing ADA Transition Plan for Sacramento County.

Sacramento County Boy's Ranch - Sacramento County retained SZS to perform an ADA/Access Compliance building assessment as part of the update to the existing ADA Transition Plan for Sacramento County.

Carol Miller Justice Center - Sacramento County retained SZS to perform an ADA/Access Compliance building assessment for this facility as part of the update to the existing ADA Transition Plan for Sacramento County.

Folsom State Prison (FSP) - A facility assessment including an ADA assessment was performed for this facility in 2002 on behalf of 3D/International under the direction of the California State Department of Corrections and Rehabilitation (CDCR).

Numerous ADA/Access Compliance building assessments at local police stations have been performed for clients as part of ADA Transition Plan projects. Each of these projects involved holding cells, interrogation areas and other elements common to detention facilities and jails. Further information can be provided upon request.

## US DEPARTMENT OF EDUCATION – OFFICE OF CIVIL RIGHTS (OCR)

California State University, Stanislaus – Assisting the university with a compliant regarding digital kiosk use by blind and visually disabled individuals brought by the US Department of Education, Office of Civil Rights (OCR)

California State University (CSU), Office of the Chancellor – Multiple cases included the provision of an accessible campuswide as part of ongoing alterations projects. SZS worked with the design and construction division to develop a process to implement Master Access Plans in the pedestrian facility to establish a single accessible route through each campus leading to one accessible entrance per building. SZS collaborated with the office to develop accessibility design guidelines for new construction and alterations and assisted with the development of the systemwide CASp inspection program.



San Diego State University – OCR Case involving the accessible route throughout campus and sanitary facilities provided for public use throughout campus.

California State University, San Luis Obispo – OCR Case involving accessible parking, accessible route and amenities required to be accessible, which were provided at Spanos Stadium.

Fresno State University – Multiple OCR cases including Bulldog Stadium, accessible parking in multiple locations, farm access during tours to farm units and academic departments, and the accessible route throughout campus.

Sacramento State University – Multiple OCR cases involving accessible parking and the accessible route to specific facilities on campus.

Chico State University - OCR Case involving the accessible route to specific facilities on campus.

Humboldt State University - OCR Case involving the accessible route to specific facilities on campus.

CSU Northridge – OCR Case involving accessible parking and the accessible route to a specific facility on campus.

Additional project information available upon request



# EXHIBIT W



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Van Swearingen
Email: vswearingen@rbgg.com

February 8, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Susan E. Coleman
Elizabeth M. Pappy
BURKE, WILLIAMS & SORENSEN, LLP
scoleman@bwslaw.com
epappy@bwslaw.com

Re:    *Dunsmore et al. v. San Diego County Sheriff's Department et al.*, S.D. Cal.
No. 3:20-cv-00406-AJB-WVG
<u>Our File No. 1730-01</u>

Dear Susan and Beth:

We write to request a streamlined process for Plaintiffs' counsel to speak with incarcerated people at the San Diego County Jail, as well as to ensure that Jail staff do not retaliate against people for filing grievances and/or participating in this lawsuit.

<u>Streamlining Jail Visits</u>

Plaintiffs' counsel have experienced numerous delays and obstacles to meeting with incarcerated people at the Jail. These include, but are not limited to:

- Having to wait multiple hours to visit with an incarcerated person, in part due to the Jail's practice of allowing only one professional visit at time per housing unit. Especially lengthy delays occur when another attorney is presently visiting a client from that housing unit and other attorneys are already waiting in line for the opportunity to meet with their clients from the same housing unit. Defendants must make available adequate confidential space for attorney-client and other professional meetings.

- Being told that Plaintiffs' counsel could not visit with an incarcerated person on the day counsel showed up because the backup in the visiting area was too long.

[4231285.1]

**Ex. W - 252**

Susan E. Coleman
Elizabeth M. Pappy
February 8, 2023
Page 2

- Having to wait approximately eighty minutes to be released from a professional visit after the visit was completed, due to various delays asserted by custody staff.

- Being trapped for almost a half hour in the locked vestibule between the professional visiting area and the hallway leading to the elevators in Central Jail.

- Waiting approximately an hour to be let into the visiting room, while waiting in the hallway leading to the elevators in Central Jail.

- Jail staff refusing to permit Plaintiffs' counsel to visit with incarcerated people on the grounds that Plaintiffs' counsel is not the attorney of record in the incarcerated person's criminal case.

- Jail staff not communicating call back requests to incarcerated people or otherwise not allowing incarcerated people to call back during business hours.

These delays interfere with Plaintiffs' right to effective assistance of counsel under the United States and California constitutions. *See, generally*, Third Amended Complaint, Section VIII. Plaintiffs' counsel ask that Defendants remedy the above-identified obstacles to ensuring timely attorney visits.

The delays also waste party resources. At times, Plaintiffs' counsel travels from the Bay Area to meet with incarcerated people. When we experience substantial delays and cannot meet with everyone on our itinerary, we are forced to reschedule another costly trip to San Diego to complete our meetings. Even when travelling from other areas within San Diego, delays caused by Defendants' visiting policies and practices necessarily mean that counsel must bill time to waiting or returning another day. This is inefficient, and may ultimately result in a greater financial cost to Defendants than if there was a streamlined process.

We understand that attorneys from the San Diego County Public Defender Office can schedule meetings with incarcerated people using MS Teams, and that the Jail provides confidential meeting spaces for incarcerated people to attend these meetings. We request a similar process for this case, which will save considerable party resources. We also ask that we create a process whereby we can schedule in-person visits at the Jail to avoid lengthy delays. We are interested in other cost-saving ideas that you may have.

Susan E. Coleman
Elizabeth M. Pappy
February 8, 2023
Page 3

<u>Preventing Unlawful Retaliation</u>

It is unfortunately common in jail/prison litigation for incarcerated people to be
retaliated against for complaining about something that happened in the jail or
participating in a lawsuit challenging the institution's policies and practices. *See
Armstrong v. Newsom*, 475 F.Supp.3d 1038 (2020).

In this case, at least one individual has already experienced unlawful retaliation.
In December 2022, we informed you by email about an incarcerated person's urgent need
for a seizure helmet due to a progressive seizure disorder. We understand that a nurse
subsequently told this person that his appointment with an outside neurologist, originally
scheduled for early January 2023, was postponed and/or cancelled because he had both
filed grievances and spoken with attorneys who were "messing with" the Jail.
Defendants in this case have an obligation to ensure such retaliation does not occur.
Please ensure that all Jail staff are properly informed that it is illegal to retaliate against
incarcerated people for filing a grievance and/or participating in the legal process.

Thank you for your attention to these matters. We look forward to your response.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Van Swearingen*

By:  Van Swearingen

[4231285.1]

**Ex. W - 254**

# EXHIBIT X



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

P.O. Box 390
San Francisco, California 94104-0390
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email:  ggrunfeld@rbgg.com

April 4, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Elizabeth M. Pappy
Burke, Williams & Sorensen, LLP
60 South Market Street, Suite 1000
San Jose, CA  95113-2336
epappy@bwslaw.com

Re:     *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
         S.D. Cal. No. 3:20-cv-00406-AJB-DDL
         ADA Preliminary Injunction and Early Neutral Evaluation
         <u>Our File No. 1730-01</u>

Dear Beth:

This letter seeks to respond to your representation to the Court during yesterday's informal discovery conference that you were unaware of Plaintiffs' intent to file a preliminary injunction motion under the Americans with Disabilities Act ("ADA") and related federal and state disability discrimination law.

Contrary to your representation, Defendants have been on notice of Plaintiffs' intent to move again for a preliminary injunction since we moved for expedited ADA discovery on December 14, 2022.  That motion stated that Plaintiffs were seeking discovery "in anticipation of a renewed motion for preliminary injunctive relief." Dkt 243-1 at 1.  Moreover, in our March 20, 2023 letter we stated:  "we are preparing a motion for preliminary injunction."  Your email of the same date acknowledged that Plaintiffs' "stated reason" for document requests was "emergency or need for an injunction."

Since the Court granted the motion for expedited discovery in January, we have repeatedly met and conferred with you about the scope of our discovery requests, the dates for the inspections and person-most-knowledgeable depositions, and the inadequacy of your response to our request for production of documents and PMK designations.  We have now spent four full days with you and your co-counsel, inspecting two jails and

[4264751.1]

**Ex. X - 256**

Elizabeth M. Pappy
April 4, 2023
Page 2

taking three depositions.  During all of these interactions, we have repeatedly stressed the need for prompt and thorough discovery in support of our view that the County is failing to comply with the ADA and related statutes and must immediately take action to end the harm to our clients.  At no time during these interactions did you or your co-counsel acknowledge any ADA failings or offer to enter into negotiations to address our concerns with the County's ADA compliance.

Regarding the possibility of an early neutral evaluation on ADA issues, Plaintiffs have repeatedly attempted to engage and work with you towards ADA compliance.  For example, we reached out to Defendants over a year ago about possible neutral expert evaluations.  At that time, we proposed that Defendants "retain mutually agreed-upon experts with subject matter expertise on the relevant case issues," including "compliance with the Americans with Disabilities Act."  V. Swearingen Letter to F. Kish et al. (Mar. 15, 2022) at 4.  We tried again in a meeting with Susan Coleman on April 21, 2022.  Defendants failed to provide any substantive response, essentially rejecting our proposal.  We were rebuffed again shortly before the August 11, 2022 hearing on our motion for preliminary injunction.  In December 2022, we again encouraged Defendants to use mutually agreed-upon neutral experts with ADA subject matter expertise (Dkt. 249); again Defendants rejected our proposal.

We understand that Defendants have retained Paul Joelson and potentially others to evaluate their compliance with the ADA.  However, we have received no information regarding Defendants' position on ADA compliance.  You instructed Defendants' Rule 30(b)(6) witnesses not to answer questions about your experts' work, and you withheld all expert analysis from production, citing the work-product and attorney-client privileges.

Based on the serious and urgent nature of ADA violations established by discovery to date, Plaintiffs will be seeking a preliminary injunction focused on two of the most egregious areas of the County's noncompliance:  Defendants' failure to provide in-person sign language interpretation to deaf incarcerated people, and their lack of safe and accessible housing for people with mobility disabilities.

In order to avoid litigation on these important issues, please let us know no later than **April 10, 2023** if Defendants will agree to an ENE process that includes the simultaneous mutual exchange of expert reports, the filing of a joint statement identifying points of agreement to be included in a remedial plan and any points of disagreement, and the development of a plan to timely remedy, at minimum, all points of agreement that will result in a stipulated order to be submitted to the Court with Court oversight of the process.

[4264751.1]

Ex. X - 257

Elizabeth M. Pappy
April 4, 2023
Page 3


        Please do not hesitate to call me if you have questions about our proposal or the
scope of the County's ongoing failures to comply with the ADA and related statutes.

        As always, we appreciate your courtesy and cooperation in this matter.

                                        Very truly yours,

                                        ROSEN BIEN
                                        GALVAN & GRUNFELD LLP

                                        */s/ Gay Crosthwait Grunfeld*

                                        By:  Gay Crosthwait Grunfeld

GCG:cg
cc:  Susan Coleman
     Co-counsel

**Ex. X - 258**

# EXHIBIT Y

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, June 20, 2023 6:16 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

Remote, virtual. Anyhow the parentheses at issue are gone. Thanks!

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Tuesday, June 20, 2023 6:15 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL]

I did, though "virtual" was never in there.  Are you sure you are looking at what I sent?

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, June 20, 2023 6:10 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Subject:** Re: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

I sent you the language from 7(a)1 - (or virtual as appropriate) - and you said you would remove the parentheses.

Sent from my iPhone

On Jun 20, 2023, at 6:03 PM, Gay C. Grunfeld <GGrunfeld@rbgg.com> wrote:

[EXTERNAL]

Ex. Y - 260

I thought we were discussing line 11.  Could you please call me at 415-260-5683?

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, June 20, 2023 5:57 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Subject:** Re: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

This still has the parentheses in 7(a)1 that you agreed to remove.

Sent from my iPhone

On Jun 20, 2023, at 5:52 PM, Gay C. Grunfeld <GGrunfeld@rbgg.com> wrote:

[EXTERNAL]

---

Resending as I am getting a bounce back from Ms. Coleman's email address.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Gay C. Grunfeld
**Sent:** Tuesday, June 20, 2023 5:42 PM
**To:** 'CASDdb_efile Battaglia' <efile_Battaglia@casd.uscourts.gov>;
'scoleman@bswlaw.com' <scoleman@bswlaw.com>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

We filed a Notice of Withdrawal of Docket No. 350.  We then filed

2

**Ex. Y - 261**

the revised version of the Stipulation and Proposed Order removing the parentheses as Docket No. 354. Attached is a word version of the Docket No. 354. Thank you.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

**From:** Gay C. Grunfeld
**Sent:** Tuesday, June 20, 2023 4:15 PM
**To:** 'CASDdb_efile Battaglia' <efile_Battaglia@casd.uscourts.gov>; scoleman@bswlaw.com
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

We will do so shortly. Thank you.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

**From:** CASDdb_efile Battaglia <efile_Battaglia@casd.uscourts.gov>
**Sent:** Tuesday, June 20, 2023 4:13 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; scoleman@bswlaw.com
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

Please withdraw, doc. No. 350, since the order has been changed.

Thank you

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Tuesday, June 20, 2023 3:49 PM
**To:** 'Coleman, Susan E.' <SColeman@bwslaw.com>; Kedra Chan <KChan@rbgg.com>;

CASDdb_efile Battaglia <efile_Battaglia@casd.uscourts.gov>

Ex. Y - 262

**Cc:** Van Swearingen <VSwearingen@rbgg.com>; Hannah Chartoff
<HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron
Fischer <ajf@aaronfischerlaw.com>; Christopher Young
<christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver
Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul <pkaul@rbgg.com>; Pappy, Elizabeth
M. <EPappy@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>;
Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-
DMS.FID55015]

==**CAUTION - EXTERNAL:**==

Dear Chambers of Judge Battaglia:

Plaintiffs e-filed the version of the Stipulation and Proposed Order
approved by counsel for Defendants.  In response to the County's
current request, Plaintiffs will agree to the removal of the
parentheses in p. 4 line 11 (section 7.a.i.).  Plaintiffs do not agree to
any additional punctuation in that provision or other possible
changes.

We again thank the Court and counsel for their assistance in this
matter.

Respectfully, Gay Grunfeld
Attorney for Plaintiffs and the Putative Class

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, June 20, 2023 2:39 PM
**To:** Kedra Chan <KChan@rbgg.com>; efile_battaglia@casd.uscourts.gov
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen
<VSwearingen@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek
Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>;
Christopher Young <christopher.young@dlapiper.com>; Isabella Neal
<isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul

Ex. Y - 263

<[pkaul@rbgg.com](mailto:pkaul@rbgg.com)>; Pappy, Elizabeth M. <[EPappy@bwslaw.com](mailto:EPappy@bwslaw.com)>; Inman, Steven <[Steven.Inman@sdcounty.ca.gov](mailto:Steven.Inman@sdcounty.ca.gov)>; Fernando Kish <[Fernando.Kish@sdcounty.ca.gov](mailto:Fernando.Kish@sdcounty.ca.gov)>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

The County does not agree to one particular part of this provision.  Under 7(a)i., which reads ==Defendants will provide Sign Language Interpretation via in person (or remote technology as appropriate)==, the parentheses should be removed. The County would prefer no additional punctuation but would be amenable to commas if needed in lieu of the parentheses.

Best,

Susan

**From:** Kedra Chan <[KChan@rbgg.com](mailto:KChan@rbgg.com)>
**Sent:** Tuesday, June 20, 2023 2:35 PM
**To:** [efile_battaglia@casd.uscourts.gov](mailto:efile_battaglia@casd.uscourts.gov)
**Cc:** Gay C. Grunfeld <[GGrunfeld@rbgg.com](mailto:GGrunfeld@rbgg.com)>; Van Swearingen <[VSwearingen@rbgg.com](mailto:VSwearingen@rbgg.com)>; Hannah Chartoff <[HChartoff@rbgg.com](mailto:HChartoff@rbgg.com)>; Eric Monek Anderson <[EMonekAnderson@rbgg.com](mailto:EMonekAnderson@rbgg.com)>; Aaron Fischer <[ajf@aaronfischerlaw.com](mailto:ajf@aaronfischerlaw.com)>; Christopher Young <[christopher.young@dlapiper.com](mailto:christopher.young@dlapiper.com)>; Isabella Neal <[isabella.neal@dlapiper.com](mailto:isabella.neal@dlapiper.com)>; Oliver Kiefer <[oliver.kiefer@dlapiper.com](mailto:oliver.kiefer@dlapiper.com)>; Priyah Kaul <[pkaul@rbgg.com](mailto:pkaul@rbgg.com)>; Pappy, Elizabeth M. <[EPappy@bwslaw.com](mailto:EPappy@bwslaw.com)>; Coleman, Susan E. <[SColeman@bwslaw.com](mailto:SColeman@bwslaw.com)>; Inman, Steven <[Steven.Inman@sdcounty.ca.gov](mailto:Steven.Inman@sdcounty.ca.gov)>; Fernando Kish <[Fernando.Kish@sdcounty.ca.gov](mailto:Fernando.Kish@sdcounty.ca.gov)>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL]

Hon. Judge Battaglia,

Please see attached the correct document e-filed today as Document 350 in the above referenced matter.

Best,

Kedra

**From:** Gay C. Grunfeld <[GGrunfeld@rbgg.com](mailto:GGrunfeld@rbgg.com)>
**Sent:** Tuesday, June 20, 2023 2:22 PM
**To:** Kedra Chan <[KChan@rbgg.com](mailto:KChan@rbgg.com)>; [efile_battaglia@casd.uscourts.gov](mailto:efile_battaglia@casd.uscourts.gov)
**Cc:** Van Swearingen <[VSwearingen@rbgg.com](mailto:VSwearingen@rbgg.com)>; Hannah Chartoff <[HChartoff@rbgg.com](mailto:HChartoff@rbgg.com)>; Eric Monek Anderson <[EMonekAnderson@rbgg.com](mailto:EMonekAnderson@rbgg.com)>; Aaron Fischer <[ajf@aaronfischerlaw.com](mailto:ajf@aaronfischerlaw.com)>; Christopher Young <[christopher.young@dlapiper.com](mailto:christopher.young@dlapiper.com)>; Isabella Neal <[isabella.neal@dlapiper.com](mailto:isabella.neal@dlapiper.com)>; Oliver Kiefer <[oliver.kiefer@dlapiper.com](mailto:oliver.kiefer@dlapiper.com)>; Priyah Kaul <[pkaul@rbgg.com](mailto:pkaul@rbgg.com)>; Pappy, Elizabeth M. <[EPappy@bwslaw.com](mailto:EPappy@bwslaw.com)>; Susan E. Coleman ([scoleman@bwslaw.com](mailto:scoleman@bwslaw.com)) <[scoleman@bwslaw.com](mailto:scoleman@bwslaw.com)>; Inman, Steven <[Steven.Inman@sdcounty.ca.gov](mailto:Steven.Inman@sdcounty.ca.gov)>; Fernando

Ex. Y - 264

Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

Dear Chambers of Judge Battaglia:

The Word version submitted below has the correct name but includes content from another case.  We apologize for this error and will address it shortly.

Respectfully, Gay Grunfeld
Attorney for Plaintiffs

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Kedra Chan <KChan@rbgg.com>
**Sent:** Tuesday, June 20, 2023 2:00 PM
**To:** efile_battaglia@casd.uscourts.gov
**Cc:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul <pkaul@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Susan E. Coleman (scoleman@bwslaw.com) <scoleman@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

Hon. Judge Battaglia,

Please find attached the stipulation and proposed order re accessibility at Central Jail, Effective Communication Policy, and Practice and Provisional Class Certification , e-filed today as Document 350 in the above-referenced case.

Thank you.

**Kedra Chan** [she/her]
Practice Assistant

**Ex. Y - 265**

**Rosen Bien Galvan & Grunfeld LLP**
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
kchan@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at kchan@rbgg.com.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**Ex. Y - 266**

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, June 20, 2023 6:15 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

Confirmed this version doesn't have the parentheses either.  I must have unknowingly accessed the prior one, sorry.

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Tuesday, June 20, 2023 5:52 PM
**To:** 'CASDdb_efile Battaglia' <efile_Battaglia@casd.uscourts.gov>; Coleman, Susan E. <SColeman@bwslaw.com>
**Subject:** FW: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

**[EXTERNAL]**

Resending as I am getting a bounce back from Ms. Coleman's email address.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

**From:** Gay C. Grunfeld
**Sent:** Tuesday, June 20, 2023 5:42 PM
**To:** 'CASDdb_efile Battaglia' <efile_Battaglia@casd.uscourts.gov>; 'scoleman@bswlaw.com' <scoleman@bswlaw.com>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

We filed a Notice of Withdrawal of Docket No. 350.  We then filed the revised version of the Stipulation and Proposed Order removing the parentheses as Docket No. 354.  Attached is a word version of the Docket No. 354. Thank you.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

Ex. Y - 267

**From:** Gay C. Grunfeld
**Sent:** Tuesday, June 20, 2023 4:15 PM
**To:** 'CASDdb_efile Battaglia' <efile_Battaglia@casd.uscourts.gov>; scoleman@bswlaw.com
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

We will do so shortly.  Thank you.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

**From:** CASDdb_efile Battaglia <efile_Battaglia@casd.uscourts.gov>
**Sent:** Tuesday, June 20, 2023 4:13 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; scoleman@bswlaw.com
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]
Please withdraw, doc. No. 350, since the order has been changed.

Thank you

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Tuesday, June 20, 2023 3:49 PM
**To:** 'Coleman, Susan E.' <SColeman@bswlaw.com>; Kedra Chan <KChan@rbgg.com>; CASDdb_efile Battaglia <efile_Battaglia@casd.uscourts.gov>
**Cc:** Van Swearingen <VSwearingen@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul <pkaul@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

**CAUTION - EXTERNAL:**

Dear Chambers of Judge Battaglia:

Plaintiffs e-filed the version of the Stipulation and Proposed Order approved by counsel for Defendants.  In response to the County's current request, Plaintiffs will agree to the removal

of the parentheses in p. 4 line 11 (section 7.a.i.).  Plaintiffs do not agree to any additional punctuation in that provision or other possible changes.

Ex. Y - 268

We again thank the Court and counsel for their assistance in this matter.

Respectfully, Gay Grunfeld
Attorney for Plaintiffs and the Putative Class

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, June 20, 2023 2:39 PM
**To:** Kedra Chan <KChan@rbgg.com>; efile_battaglia@casd.uscourts.gov
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul <pkaul@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

The County does not agree to one particular part of this provision.  Under 7(a)i., which reads ==Defendants will provide Sign Language Interpretation via in person (or remote technology as appropriate)==, the parentheses should be removed. ==The County would prefer no additional punctuation but would be amenable to commas if needed in lieu of the parentheses.==

Best,

Susan

---

**From:** Kedra Chan <KChan@rbgg.com>
**Sent:** Tuesday, June 20, 2023 2:35 PM
**To:** efile_battaglia@casd.uscourts.gov
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul <pkaul@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Coleman, Susan E. <SColeman@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL]

Hon. Judge Battaglia,

3

**Ex. Y - 269**

Please see attached the correct document e-filed today as Document 350 in the above referenced matter.

Best,

Kedra

---

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Tuesday, June 20, 2023 2:22 PM
**To:** Kedra Chan <KChan@rbgg.com>; efile_battaglia@casd.uscourts.gov
**Cc:** Van Swearingen <VSwearingen@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul <pkaul@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Susan E. Coleman (scoleman@bwslaw.com) <scoleman@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

Dear Chambers of Judge Battaglia:

The Word version submitted below has the correct name but includes content from another case.  We apologize for this error and will address it shortly.

Respectfully, Gay Grunfeld
Attorney for Plaintiffs

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Kedra Chan <KChan@rbgg.com>
**Sent:** Tuesday, June 20, 2023 2:00 PM
**To:** efile_battaglia@casd.uscourts.gov
**Cc:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul <pkaul@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Susan E. Coleman (scoleman@bwslaw.com) <scoleman@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

Ex. Y - 270

Hon. Judge Battaglia,

Please find attached the stipulation and proposed order re accessibility at Central Jail, Effective Communication Policy, and Practice and Provisional Class Certification , e-filed today as Document 350 in the above-referenced case.

Thank you.

**Kedra Chan** [she/her]
Practice Assistant



**Rosen Bien Galvan & Grunfeld LLP**
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
T: (415) 433-6830  ▪  F: (415) 433-7104
kchan@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at kchan@rbgg.com.

<mark>**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.</mark>

**Ex. Y - 271**

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, June 20, 2023 6:14 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

Agree they are not in this version.

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Tuesday, June 20, 2023 6:13 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Subject:** FW: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]
**Importance:** High

[EXTERNAL]

Susan, I do not see parentheses in line 11 on p. 4—could you please clarify or call me? Thank you, Gay

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, June 20, 2023 5:57 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Subject:** Re: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

This still has the parentheses in 7(a)1 that you agreed to remove.

Sent from my iPhone

On Jun 20, 2023, at 5:52 PM, Gay C. Grunfeld <GGrunfeld@rbgg.com> wrote:
[EXTERNAL]

Ex. Y - 272

Resending as I am getting a bounce back from Ms. Coleman's email address.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Gay C. Grunfeld
**Sent:** Tuesday, June 20, 2023 5:42 PM
**To:** 'CASDdb_efile Battaglia' <efile_Battaglia@casd.uscourts.gov>; 'scoleman@bswlaw.com' <scoleman@bswlaw.com>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

We filed a Notice of Withdrawal of Docket No. 350.  We then filed the revised version of the Stipulation and Proposed Order removing the parentheses as Docket No. 354.  Attached is a word version of the Docket No. 354. Thank you.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Gay C. Grunfeld
**Sent:** Tuesday, June 20, 2023 4:15 PM
**To:** 'CASDdb_efile Battaglia' <efile_Battaglia@casd.uscourts.gov>; scoleman@bswlaw.com
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

We will do so shortly.  Thank you.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile
**From:** CASDdb_efile Battaglia <efile_Battaglia@casd.uscourts.gov>

2

Ex. Y - 273

**Sent:** Tuesday, June 20, 2023 4:13 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; scoleman@bswlaw.com
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

Please withdraw, doc. No. 350, since the order has been changed.

Thank you

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Tuesday, June 20, 2023 3:49 PM
**To:** 'Coleman, Susan E.' <SColeman@bswlaw.com>; Kedra Chan <KChan@rbgg.com>; CASDdb_efile
Battaglia <efile_Battaglia@casd.uscourts.gov>
**Cc:** Van Swearingen <VSwearingen@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek
Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher
Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer
<oliver.kiefer@dlapiper.com>; Priyah Kaul <pkaul@rbgg.com>; Pappy, Elizabeth M.
<EPappy@bswlaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Fernando Kish
<Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

**CAUTION - EXTERNAL:**

Dear Chambers of Judge Battaglia:

Plaintiffs e-filed the version of the Stipulation and Proposed Order approved by
counsel for Defendants.  In response to the County's current request, Plaintiffs
will agree to the removal of the parentheses in p. 4 line 11 (section
7.a.i.).  Plaintiffs do not agree to any additional punctuation in that provision or
other possible changes.

We again thank the Court and counsel for their assistance in this matter.

Respectfully, Gay Grunfeld
Attorney for Plaintiffs and the Putative Class

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone

Ex. Y - 274

(415) 433-7104 facsimile

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, June 20, 2023 2:39 PM
**To:** Kedra Chan <KChan@rbgg.com>; efile_battaglia@casd.uscourts.gov
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Hannah
Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer
<ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal
<isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul
<pkaul@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Inman, Steven
<Steven.Inman@sdcounty.ca.gov>; Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

---

[EXTERNAL MESSAGE NOTICE]

The County does not agree to one particular part of this provision.  Under 7(a)i., which reads Defendants
will provide Sign Language Interpretation via in person (or remote technology as appropriate), the
parentheses should be removed. The County would prefer no additional punctuation but would be
amenable to commas if needed in lieu of the parentheses.

Best,

Susan

---

**From:** Kedra Chan <KChan@rbgg.com>
**Sent:** Tuesday, June 20, 2023 2:35 PM
**To:** efile_battaglia@casd.uscourts.gov
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Hannah
Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer
<ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal
<isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul
<pkaul@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Coleman, Susan E.
<SColeman@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Fernando Kish
<Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

[EXTERNAL]

Hon. Judge Battaglia,

Please see attached the correct document e-filed today as Document 350 in the above referenced
matter.

Best,

Kedra

---

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Tuesday, June 20, 2023 2:22 PM
**To:** Kedra Chan <KChan@rbgg.com>; efile_battaglia@casd.uscourts.gov

**Ex. Y - 275**

**Cc:** Van Swearingen <VSwearingen@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek
Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher
Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer
<oliver.kiefer@dlapiper.com>; Priyah Kaul <pkaul@rbgg.com>; Pappy, Elizabeth M.
<EPappy@bwslaw.com>; Susan E. Coleman (scoleman@bwslaw.com) <scoleman@bwslaw.com>;
Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** RE: 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

Dear Chambers of Judge Battaglia:

The Word version submitted below has the correct name but includes content
from another case.  We apologize for this error and will address it shortly.

Respectfully, Gay Grunfeld
Attorney for Plaintiffs

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Kedra Chan <KChan@rbgg.com>
**Sent:** Tuesday, June 20, 2023 2:00 PM
**To:** efile_battaglia@casd.uscourts.gov
**Cc:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Hannah
Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer
<ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal
<isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Priyah Kaul
<pkaul@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>; Susan E. Coleman
(scoleman@bwslaw.com) <scoleman@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>;
Fernando Kish <Fernando.Kish@sdcounty.ca.gov>
**Subject:** 3:20-cv-00406-AJB-DDL - Stipulation and Proposed Order [IMAN-DMS.FID55015]

Hon. Judge Battaglia,

Please find attached the stipulation and proposed order re accessibility at Central Jail, Effective
Communication Policy, and Practice and Provisional Class Certification , e-filed today as Document 350
in the above-referenced case.

Thank you.

**Kedra Chan** [she/her]
Practice Assistant

**Ex. Y - 276**

**Rosen Bien Galvan & Grunfeld LLP**
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
T: (415) 433-6830  ▪  F: (415) 433-7104
kchan@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at kchan@rbgg.com.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**Ex. Y - 277**

# EXHIBIT Z

☰ Sections

Padres    Podcasts    Things to do    Crossword    Sign up for news alerts

WATCHDOG

# Sheriff agrees to reforms to improve jail conditions for disabled people in custody



San Diego County Sheriffs downtown central jail (U-T)

The agreement comes days before a planned court hearing on a request by people now or once incarcerated in the county's jails seeking to force changes.

BY JEFF MCDONALD, KELLY DAVIS
JUNE 20, 2023 5:04 PM PT



San Diego Sheriff Kelly Martinez has agreed to a series of reforms to better protect disabled people in department custody, days before a federal court hearing on efforts to improve their living conditions in county jails.

The Sheriff's Department announced the agreement with plaintiffs' lawyers Tuesday afternoon, saying, among other things, that it will modify showers, toilets and beds in county jails to comply with the Americans with Disabilities Act.

Sheriff's officials also will update the booking process to help make sure people being locked up are housed in appropriate settings.

"Disability rights are civil rights and the sheriff holds the rights of all individuals in county jails as paramount," the department said in a prepared statement. "The San Diego County Sheriff's Department has taken significant steps to increase awareness for persons with disabilities."

The county was sued last year by disability-rights attorneys who represent some 15 people who are currently or formerly incarcerated in San Diego County jails.

The complaint accuses the sheriff of violating the Americans with Disabilities Act by placing people with mobility issues in upper bunks, failing to provide sign-language interpreters and not adhering to other rules regarding detainees with special needs.

"Plaintiffs and incarcerated people with disabilities have suffered loss of dignity and physical injuries as a result of defendants' policies and practices, and they are at ongoing risk of future harm," the plaintiffs' legal team wrote in a court filing.

**Ex. Z - 279**

The plaintiffs sought an injunction in late April, seeking an order that the Sheriff's
Department to do more to serve disabled people incarcerated in the county's jail
system.

A hearing on the request was scheduled for June 30, a hearing date that apparently
helped secure the settlement.

Attorneys representing the 15 plaintiffs said they were pleased with the agreement
and predicted it will help stop needless injuries and suffering in county jails.

"Under the stipulation, the county will begin reducing its reliance on triple bunks and
will undertake long overdue disability renovations at Central Jail," attorney Gay
Grunfeld said in a statement.

"The county will also revise its ADA policies to ensure safe and accessible housing
and effective communication for incarcerated people with disabilities," Grunfeld said.

Plaintiffs' lawyers said they will monitor the Sheriff's Department to make sure it
fully implements the terms of the stipulated agreement. They also said they would
continue to work with sheriff's officials to improve other conditions for incarcerated
people with disabilities.

Grunfeld said when they sought the injunction that it was needed because the
Sheriff's Department had resisted making improvements for too long.

"Some things could be done at no cost at all," Grunfeld told The San Diego Union-
Tribune in April. "We're asking them to come up with a plan that provides safe,
accessible housing."

More specifically, Grunfeld said sheriff's officials could use video technology to
provide sign-language interpreters in real time during the booking process and at
other times to communicate with deaf people in custody.

The department also could do a better job of assigning housing to people when they
are booked into custody, the lawsuit alleged. Too many detainees, like Nierobi
Kuykendall, were placed in bunks they could not access, it added.

Kuykendall relies on a wheelchair due to a prior back injury. In a sworn declaration,
he said he was almost always assigned to a bunk he could not get into and was often
forced to sleep on the floor of the downtown jail.

"I asked if I could speak to a sergeant to explain that I needed my wheelchair ... but
no one came to talk to me," he wrote.

In addition to agreeing to upgrade bathrooms and beds, the settlement requires the
Sheriff's Department to provide sign-language interpreters — either live or remotely.
Officials also will do a more thorough job evaluating disabled people during the
booking process.

The department also agreed to amend its policies and procedures manual to codify
deputies' responsibilities for handling men and women with disabilities who are
housed in county jails.

"We have plans in place and are committed to making much needed improvements to
county jails that will incorporate renovations to aging facilities and anticipated
changes that will improve healthcare and reduce returns to custody," the sheriff's
statement said.

The lawsuit was first filed in 2020 by Darryl Dunsmore, who represented himself in
the initial complaint.

Three separate law firms have now joined in the case, which also had added a cluster
of current and former detainees. The legal complaint seeks to impose wholesale
changes across the Sheriff's Department in how it treats disabled people in custody.

In court papers, lawyers for the county denied the allegations in the lawsuit and
sought to dismiss it. Earlier this year, a judge rejected that motion, saying there

**Ex. Z - 280**

appeared to be enough to proceed.

San Diego County has about 4,000 people in custody at any given time, a significant percentage of whom are disabled.

The jail system has been plagued with the highest mortality rate among California's largest counties, recording more than 225 deaths since 2006. Twenty people died in custody last year, including one man who was compassionately released hours before dying in a local hospital.

Six other people have died in San Diego County jails so far this year, Sheriff's Department records show.

The stipulated agreement does not end the legal dispute.

Lawyers for the plaintiffs have until late November to ask the court for class certification, meaning the claims could be broadened to include many more plaintiffs than the current group of current and former detainees.

The legal team also is in the process of evaluating additional evidence through the process of discovery and will continue to inspect county jail facilities for ADA compliance.

WATCHDOG   LATEST   TOP STORIES   PUBLIC SAFETY

---

 Get our essential investigative journalism

Sign up for the weekly Watchdog newsletter for investigations, data journalism and more.


SIGN ME UP

You may occasionally receive promotional content from the San Diego Union-Tribune.

 Jeff McDonald
🐦 Twitter   ✉ Email   f Facebook

 Kelly Davis
🐦 Twitter   ✉ Email

Show Comments

Support our journalism          Submit a story tip          Report a problem with this story

**Ex. Z - 281**

# EXHIBIT AA



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email: ggrunfeld@rbgg.com

September 5, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Susan E. Coleman
Burke Williams & Sorensen, LLP
501 West Broadway, Suite 1600
San Diego, California 92101-8474
scoleman@bwslaw.com

Elizabeth M. Pappy
Burke, Williams & Sorensen, LLP
60 South Market Street, Suite 1000
San Jose, California 95113-2336
epappy@bwslaw.com

Re:    *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
S.D. Cal. No. 3:20-cv-00406-AJB-DDL
Plaintiffs' Response to Proposed ADA Action Plan
<u>Our File No. 1730-01</u>

Dear Susan and Beth:

Pursuant to Paragraph 8 of the June 21, 2023 Joint Motion and Order Regarding Accessibility at Central Jail, Effective Communication Policy and Practice, and Provisional Class Certification, Docket No. 355 ("ADA Order"), we write to provide Plaintiffs' response to Defendants' August 21, 2023 "ADA Action Plan" ("Plan"), as supplemented with additional exhibits on August 22, 2023.

Plaintiffs have identified the following issues and questions with regard to the proposed Plan,[1] to be discussed at our forthcoming court-ordered conference:

1.    **Policy Revision Deadline.**  The Plan indicates that the new policies will not be "update[d]" or "memorialize[d]" until July 1, 2024 (pp. 5, 8-9).  Plaintiffs object to this time frame as excessive, particularly in light of Defendants' prior representations (including in the Bavencoff Declaration filed in opposition to Plaintiffs' preliminary injunction motion, Dkt. 311-16, as well as the stipulation leading to the ADA Order) that draft policies were already in the works.  In addition, Plaintiffs seek clarification

---

[1] Plaintiffs are still reviewing the Plan and reserve the right to raise additional concerns at the conference or through objections, especially after receiving additional information including construction documents and specifications.

[4345936.1]

**Ex. AA - 283**

Susan Coleman
Elizabeth Pappy
September 5, 2023
Page 2

regarding whether the policies attached as exhibits to the Plan are final, and if so, how
they are different from prior policies (*i.e.*, through a redline).  Plaintiffs also seek
information about how those policies intersect with the proposed policies to be
memorialized on July 1, 2024, and the specific new ADA-related policies will ultimately
be issued.

      Plaintiffs have identified several gaps and deficiencies in the policies appended to
the Plan. [2]  It would be sensible for Defendants to engage Plaintiffs' counsel and relevant
experts in the policy revision process in order to avoid disputes and potential litigation on
these matters down the road.

      2.    **Training Content and Schedule.**  Plaintiffs seek to review and comment
on all training materials as soon as possible and well in advance of training being
administered.  Training should occur in the near term—not in the summer of 2024, as the
Plan states—and must occur prior to implementation of the new policies and practices.
Training should be mandatory for all custody and medical staff and attendance should be
documented.

      3.    **Provision of In-Person Sign Language Interpretation.**  The Plan
includes details regarding what technological or virtual sign language services
Defendants intend to employ, but provides no explanation of what in-person sign
language interpretation ("SLI") service will be used.  The in-person SLI service provider
and contract should be specified in the Plan.  Please provide a copy of all contracts with
providers who are used to provide effective communication, including the SLI in-person
contract.

      The Plan should also state that some individuals will require and must receive in-
person SLI, including those who are low vision or who have cognitive or other
communicative disabilities that make video SLI ineffective.  Like the ADA Order, the
Plan should provide for Sign Language Interpretation, and not be limited to American
Sign Language Interpretation (p. 5)—there are other versions of SLI and those must be
made available to those who need it.  See https://www.interpretcloud.com/blog/a-guide-
to-different-types-of-sign-language/.  Relatedly, some Deaf individuals require a Sign
Language Interpreter and Certified Deaf Interpreter in order to ensure effective
communication.  More information at: Use of Certified Deaf Interpreter,
https://www.courts.ca.gov/partners/documents/2011SRL4aDeaf.pdf.

---

[2] For example,  as we have previously informed you, California's definition of
"disability" controls and is broader than the "substantially limits" language used under
the ADA.

**Ex. AA - 284**

Susan Coleman
Elizabeth Pappy
September 5, 2023
Page 3

    4.    **Wi-Fi at all facilities to allow Video Relay Services, Video Remote Interpreting, tablets, and other devices.**  The Plan lists various remote communication assistive devices that will be deployed by January 1, 2024 (pp. 3-5).  At the time the ADA depositions were taken earlier this year, there was no Wi-Fi or other Internet connectivity at any San Diego County jail facility except the first and second floors of Central.  Please provide detailed information about the current status of Internet connectivity on each floor of each of the jail facilities, now and as planned for the future, with timetables, contracts, and information about whether Internet connectivity will affect implementation of the ADA Order.

    5.    **Tracking Systems.**  Defendants are committing to track effective communication and mobility needs and accommodations in JIMS and TechCare (pp. 3, 7).  Plaintiffs request that the training of custody and medical staff include training on identification and tracking and that Plaintiffs be allowed a demonstration of how the tracking will be accomplished in these systems.

    6.    **Limitations on Effective Communication Devices.**  The Plan states that "[e]ach facility will have at least one type of communication assistive device for due process interactions and at least one type of communication device for visits[.]" (*Id*. at 3).  There is no indication as to why this number of devices will be sufficient (i.e., how many people with hearing disabilities are housed at each facility on a given day), how Defendants will ensure that the incarcerated person's method of communication is used, and what will be used for other encounters, such as medical and mental health encounters, booking, and available structured programming.  The Plan and relevant policies must make clear all services, programs and activities for which effective communication devices must be available for those who use them.

    Plaintiffs request that each use of each device be logged and that we have the opportunity to review those logs periodically.  *See* Dkt. 355 at ECF 8.

    Plaintiffs also request additional information about how the new technological systems are being chosen and tested.  We request the opportunity to observe training and how the systems work in practice.

    7.    **Housing of Incarcerated People with Hearing Disabilities.**  On page 5, the Plan references "all San Diego County jail facilities that house people with hearing disabilities …."  Plaintiffs seek clarification on whether Defendants intend to house people with hearing disabilities at only a subset of the Jail facilities, or whether all seven facilities will house people with hearing disabilities.  Clustering of people with hearing disabilities is prohibited by the 2010 ADAS.  *See generally* 28 C.F.R. § 35.151(c) Appendix (k); 28 C.F.R. § 35.152(b)(2).  The Plan states Plaintiffs will

[4345936.1]

**Ex. AA - 285**

Susan Coleman
Elizabeth Pappy
September 5, 2023
Page 4

receive rosters of people with a hearing disability only for Central Jail; Plaintiffs need
such rosters for all facilities where people with hearing disabilities are housed.

8.    **Construction Plans and Specifications.**  Plaintiffs request that Defendants
provide drawings of construction plans and specifications in advance of the court-ordered
conference.  Construction documents should be approved by the County and State Fire
Marshal prior to the commencement of construction.  A list of concerns from Plaintiffs'
expert about the description of the work promised by September 19, 2023 (pp. 6-7) is
attached hereto as Appendix A.  Similar construction documents and specifications
should be produced prior to each phase of remediation.  (pp. 9-13).

9.    **"Feasibility" Standard in Housing Policy.**  The proposed policy changes
related to people with mobility disabilities introduce a "feasibility" or "availability"
standard.  (p. 8).  Plaintiffs object to any "feasibility" or "availability" standard as
inconsistent with the ADA Order and governing law.

10.   **Housing of Intermittent Wheelchair Users.**  Plaintiffs object to the
limitation allowing people who use wheelchairs intermittently to be housed in triple
bunks.  (p. 8).  There is no such limitation in Judge Battaglia's June 21, 2023 Order.  *See*
Dkt. 355.  And because of the current lack of accessible housing at Central, there may be
incentives to classify people with disabilities as "intermittent" wheelchair users when in
fact they need them full-time.

11.   **Inadequate Accessible Housing.**  If the average daily housing population
is 720 at Central, do Defendants intend to continue using triple bunks, contrary to the
BSCC's recommendation?  Do Defendants intend to house all incarcerated people who
need wheelchairs at Central Jail and Rock Mountain?  If so, the planned 48 wheelchair
accessible beds at Central and 42 at Rock Mountain (p. 13) may not be sufficient,
including for those in MOB, PSU, OP Stepdown and JBCT (pp. 14-15).  Under the ADA,
people who qualify for dorm housing (i.e., low-security classifications) cannot be placed
at Rock Mountain which is only celled housing.  And when will the 12 somewhat
modified but not ADA accessible cells planned for Central be available?  (p. 13).

Thirty-five accessible beds now and 48 over the longer term may not be sufficient
even for Central.  The Mobility-Related Population Statistics attached to the Plan suggest
that there have been days with 50 wheelchair users at Central.  The data do not disclose
how many times that has happened in the first half of 2023.  More information is needed.

The Plan fails to identify "the maximum number of incarcerated people with
disabilities that can be safely housed in each unit."  *See* Dkt. 355 at ECF 6.  This should
be added.

[4345936.1]

**Ex. AA - 286**

Susan Coleman
Elizabeth Pappy
September 5, 2023
Page 5

12.     **Incomplete Rosters.**  Defendants' Plan indicates that it will not provide rosters of "intake, release or temporary holding."  (p. 2).  Plaintiffs request information about individuals who come into the jail needing mobility assistive devices be included on the rosters, as it will help guide the construction remediation in those areas (pp. 9-10), as well as planning for meeting ADA-related needs.

13.     **Inappropriate Scope.**  The Plan fails to address accessible routes, slopes and signage.  Since you are altering the facility, barriers such as these—described in detail in SZS's report on Central—must be addressed.

14.     **Inadequate Plan for Interim Accommodations.**  The Interim Accommodation Plan is inadequate.  The Plan admits there are only five wheelchair accessible beds at Rock Mountain (p. 11), and they are in cells, which may be a higher security level.  The Plan is vague as to what will happen to people who are displaced during construction.  The five beds at Rock Mountain will not be enough for the potentially 50 wheelchair users who are admitted to Central.  Nor is it enough to say these individuals "will be provided with a compliant bed and a portable shower chair." Where will the compliant beds be?  How will these individuals use the toilet?  Do the portable shower chairs fit in the current showers at Central?

We look forward to discussing revisions to the Plan.  Please let us know when you and your experts are available for a conference regarding these issues.  Pursuant to Paragraph 8 of the ADA Order, the conference must occur no later than September 20. We can make ourselves available from September 13-20.

As always, thank you for your courtesy and cooperation in this matter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s Gay Crosthwait Grunfeld*

By:   Gay Crosthwait Grunfeld

GCG:kc
Enclosure
cc:    Fernando Kish
       Steven Inman
       Co-counsel

[4345936.1]

**Ex. AA - 287**

**SZS**
ENGINEERING

**September 5, 2023**

## Appendix A

September 19, 2023 Plan for 8C and 8D Modifications: We need to review all of this on site after construction, but before construction we must have construction documents and specifications which are first approved by the County and State Fire Marshal. Information in document is incomplete, and concerning. Priorities are:

Construction documents approved by County building officials and State Fire Marshal provided for review. Concerns in this laundry list are:

1. Grab bars in showers? Saloon doors? Door thresholds? Dressing area bench?
2. 60" turnaround space? What/where is this? Is it parallel transfer space adjacent to a bed? This was made clear in the meeting with the judge. Does not seem to be the case here.
3. Shower chairs? No grab bars to transfer safely? If grab bars are in place, do they obstruct the wall above the seat?
4. Sink alterations dimensions look incomplete. 29" from and to what?
   a. Side grab bar dimensions, assumed to be for the side bar, are not complete. Min. 24" from front rim must be added.
5. Rear grab bar? How are they being installed?
6. 60" clear space (p.7 line 3) – where is it?
7. Dayroom (p.7 line 3): Table dimension stated is one of many that must comply. Need more info and an on-site inspection.
   a. For instance, knee clearance has min. 3 dimensions, toe clearance has 2, table surface has 1.
8. Mailboxes, etc. – still protruding?

# EXHIBIT BB



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email: ggrunfeld@rbgg.com

September 20, 2023

VIA ELECTRONIC MAIL ONLY

Susan E. Coleman                          Elizabeth M. Pappy
Burke Williams & Sorensen, LLP           Burke, Williams & Sorensen, LLP
501 West Broadway, Suite 1600            60 South Market Street, Suite 1000
San Diego, California 92101-8474         San Jose, California 95113-2336
scoleman@bwslaw.com                      epappy@bwslaw.com

Re:   *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
      S.D. Cal. No. 3:20-cv-00406-AJB-DDL
      Meet and Confer on Proposed ADA Action Plan
      Our File No. 1730-01

Dear Ms. Coleman and Ms. Pappy:

On September 19, 2023, pursuant to the ADA Order (Dkt. 355), Plaintiffs' counsel met via Zoom with Ms. Coleman for approximately one hour, regarding Defendants' August 21, 2023 "ADA Action Plan" ("Plan"), as supplemented with additional exhibits on August 22, 2023. This letter follows from that meet and confer call.

We were disappointed that Defendants declined our proposal for them to meet with our ADA expert. The Order contemplates robust coordination between the experts as the policies and procedures are drafted and the remediation occurs. As Mr. Fischer said yesterday, measure twice, cut once. An early exchange of views will avoid costly mistakes and time-consuming disputes later on.

On the call, we discussed Plaintiffs' written response to the Plan served September 5, 2023 and Defendants' reply served September 19, 2023. Both parties committed to following up and looking into gathering certain information. Below, we provide additional information responsive to Defendants' questions in their reply and set forth our understanding of the items Ms. Coleman will be addressing with your clients.

Please let us know by September 27, 2023, whether Defendants will be revising the ADA Action Plan to provide more detail and address the concerns identified in our response and on the call yesterday. Plaintiffs' deadline to object to the Plan is 15 days

[4362905.3]

**Ex. BB - 290**

Susan Coleman
Elizabeth Pappy
September 20, 2023
Page 2

from the date that Defendants file the Plan.

We understand that Ms. Coleman committed to looking into the following questions and issues:

- Any checklist or list of ADA policies and procedures that the Sheriff's Department plans to change to comply with the ADA Order, and the timeline for finalizing these policies and procedure, which we request occur as soon as possible and long before July 1, 2024. Plaintiffs' position is that November 1, 2023 is an appropriate deadline.

- Whether Defendants will provide interim and/or draft policies and procedures to Plaintiffs' counsel. As discussed on the call, the parties share an interest in ensuring the policies and procedures are implemented correctly at the outset. Permitting Plaintiffs to review and provide feedback on draft policies and procedures at an earlier juncture will help the parties avoid costly disputes and adjustments down the road.

- Whether Defendants will provide draft training materials for Plaintiffs to review and comment on and allow Plaintiffs' counsel to observe training.

- Whether custody staff and medical/mental health staff are jointly trained on the ADA, and what separate trainings are provided to them.

- The status of the Wi-Fi rollout at each facility and where remote sign language interpretation is currently functional (including at George Bailey).

- Additional detail to be included in the Plan about options for in-person sign language interpretation (SLI) and the SLI providers available (including current contracts, etc.).

- Whether Defendants are logging and tracking requests for and use of devices utilized for remote sign language interpretation.

- The standard used to differentiate an intermittent wheelchair user from a permanent wheelchair user (such as, for example, based on the person being able to walk a certain number of steps) and the plan for intermittent wheelchair users' housing in triple bunks. (Plaintiffs' counsel respectfully requests that the ADA Action Plan and jail policy reflect that this group will *not* be placed in a triple bunk.)

[4362905.3]

**Ex. BB - 291**

Susan Coleman
Elizabeth Pappy
September 20, 2023
Page 3

- How JIMS and TechCare have been (or will be) modified to facilitate implementation of the ADA Order.

- The Jail's intended policy requirements with respect to the maximum number of wheelchair users and/or people with mobility disabilities requiring accessible housing who may be housed in particular units.

- Whether and in what form the Sheriff's Department keeps data on admissions of people who use wheelchairs and their stays in intake and holding areas, so as to inform the discussions around remediation to intake and holding areas.

- Whether the Sheriff's Department will agree to provide construction documents and plans in advance of alterations, rather than waiting until the time for inspections. Allowing for Plaintiffs' input in advance of alterations will be more efficient and cost-effective than potentially having to later *redo* physical plant remediation to comply with the ADA and the Court's order.

- The number of full-time wheelchair users in each housing unit who will move to Rock Mountain during the renovations of their respective housing units at Central Jail. We request notification when people in a given housing unit are moved to Rock Mountain. We also request information on whether Rock Mountain has been renovated beyond the alterations on the exterior pathways between housing units that Ms. Coleman discussed.

We also agreed to provide more information on certain issues related to the Plan:

Our expert's positions on gaps and issues in the Sheriff's Department's ADA policies and procedures, as they existed at the time, are set forth in her declarations filed at Dkts. 119-9, ¶¶ 15-29; 281-3, ¶¶ 16-18, 26-28, 33-34, 36; and 320-2, ¶¶ 27-33. We again request that Defendants consider and integrate Ms. Sanossian's feedback as they amend policies and procedures in compliance with the ADA Order. As noted, allowing us to review and provide feedback on draft revisions to policy will help to ensure an efficient and successful implementation process.

Potential providers of in-person sign language interpretation for people at the Jail are Deaf Community Services of San Diego, https://deafcommunityservices.org/, and Network Interpreting Service, https://networkinterpretingservice.com/.

Our expert's Central Jail report identifies numerous issues with slope, signage, and accessible routes. *See* Dkt. 281-3, Ex. C. Please bear in mind that our expert was not permitted to inspect and assess every area in Central Jail, so the report and barriers identified are not comprehensive. Other slope, signage, and accessible route issues

[4362905.3]

**Ex. BB - 292**

Susan Coleman
Elizabeth Pappy
September 20, 2023
Page 4

likely also exist.

When the Sheriff's Department fixes an element (such as a toilet), it should ensure that all elements of the accessible route to that toilet are also compliant. Plaintiffs' position is that the ADA and California law require the Sheriff's Department to remedy all barriers at Central Jail, including those identified in our expert's report. Defendants should ensure that people with mobility disabilities can access all programs, services, and activities at the Jail. Without waiving that position, at your request, we list certain barriers (as identified in the expert report) that are especially harmful to our clients and that merit priority: 13O, 38H, 41A, 44B, 49A, 55K, 58A, 58G, 64A, 66M, 67A, 67F, 68E, 71F.

On the September 19 call, we pointed out that the ADA Order requires Defendants to produce rosters beginning within 90 days of the ADA Order and ending 12 months from the date the Court issues an order adopting the Plan. *See id.* at ¶ 13. The current version of the Plan states that Defendants will stop producing rosters to Plaintiffs on September 2, 2024. *See* Plan at 2:11-15. That does not comply with the ADA Order. No order adopting the Plan has issued, so the end date of Defendants' obligation to produce rosters is not yet determined. Defendants must revise the Plan to state that Defendants will produce rosters to Plaintiffs continuously through 12 months from the date the Court issues an order approving the Plan.

Finally, the ADA Order requires Defendants to provide "at least 25 accessible beds and toileting . . . as soon as possible and no later than 90 days from the date" of the Order. *See id.* at ¶ 7.b.ii. The Plan indicates that Defendants intended to have 30 such beds ready by September 19, 2023, in two dormitory housing units. Plan at 6:14-15. Please confirm that Defendants have completed this requirement of the ADA Order and provide us with as-built plans so our expert can review.

As always, thank you for your courtesy and cooperation in this matter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Gay Crosthwait Grunfeld*

By:   Gay Crosthwait Grunfeld

GCC:kc
cc:   Fernando Kish
      Steven Inman
      Co-counsel

[4362905.3]

**Ex. BB - 293**

# EXHIBIT CC



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email: ggrunfeld@rbgg.com

May 10, 2024

<u>VIA ELECTRONIC MAIL ONLY</u>

Susan Coleman
Elizabeth M. Pappy
Burke, Williams & Sorensen, LLP
60 South Market Street, Suite 1000
San Jose, California 95113-2336
scoleman@bwslaw.com
epappy@bwslaw.com

  Re: Plaintiffs' Comments on Three ADA Policies Revised by Defendants
    *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
    S.D. Cal. No. 3:20-cv-00406-AJB-DDL
    <u>Our File No. 1730-01</u>

Dear Susan and Beth:

  Pursuant to the Court's Order of April 24, 2024, Dkt. 620, Defendants have until
June 1, 2024 to issue revised policies and train staff on the new policies and processes
consistent with the Americans with Disabilities Act, Rehabilitation Act, and Government
Code section 11135 ("ADA"). *Id.* at 3. On May 1, 2024, you provided three policies that
Defendants have updated since they issued their ADA Plan on October 5, 2023.

  Plaintiffs appreciate the opportunity to comment on the three revised policies. We
accepted your redlines and made additional redlines to two of the enclosed draft policies,
although these policies would need to be revised again in accordance with our comments
below before we could fully redline them.

**I. General Comments**

  Overall, the draft policies contain some improvements, but they still fall short,
especially in light of the need for an integrated system for ADA compliance and
accountability. Often, the draft policies include narrowing language that will lead to the
violation of class members' rights and expose Defendants to further liability.

[4485879.3]

**Ex. CC - 295**

Susan Coleman
Elizabeth M. Pappy
May 10, 2024
Page 2

We disagree with Defendants' concept that people with mobility disabilities serious enough to require mobility assistive devices (e.g., walker, cane, crutches) and "intermittent" wheelchairs should ever be placed on the top of a bunk bed. The current draft policies suggest that such placements may be appropriate and even the default for this sub-group of people with mobility disabilities.

As we previously commented when reviewing the draft Telephone and Effective Communication policies, language that provides a vague or undefined exception to providing the accommodation should be removed – e.g., "as feasible"; "as necessary and available"; etc.—as inconsistent with the ADA, its implementing regulations, and California law. *See* Pls. Comments on Draft EC and Telephone Policies (March 15, 2024) (henceforth, "March 15 Letter").

Further, Defendants did not provide corresponding Medical Services Division (MSD) policies. The draft policies provided, particularly I.22 and M.39, refer to numerous decisions and actions that healthcare staff take. It is impossible to fully assess these policies without reference to the policies and standards guiding healthcare staff.

Finally, both M.39 and I.22 permit line staff to assess whether an accommodation (see I.22, p. 4; M.39, pp. 8, 10) constitutes a "fundamental alteration" or "undue burden." As explained previously, this language violates the ADA and should be stricken from these and any other policies. *See* March 15 Letter at 3.

## II.    M.39 – Incarcerated People with Disabilities Policy

As an initial matter, this policy is missing any information about discrete ADA policy areas, none of which are covered in the other ADA policies Defendants have so far provided for Plaintiffs' review, including: orientation, jobs/work opportunities, other program access requirements, search/restraint accommodations, transportation, training requirements, and quality assurance and quality improvement processes for the ADA Unit.

As noted above, this policy highlights the need for the County to develop, and for Plaintiffs to review, a complementary MSD policy (or policies) on ADA/disability-related procedures and systems. This policy delegates to MSD staff procedures for intake, entering ADA medical instructions, updating the "ADA list," and more.

Certain of the definitions have been impermissibly narrowed. In addition, the policy lacks any discussion of individuals with speech impairments, who have a communication disability. The policy lacks any definition of the vague term "ADA Medical."

[4485879.3]

**Ex. CC - 296**

Susan Coleman
Elizabeth M. Pappy
May 10, 2024
Page 3

This policy lacks any procedures for coordination between healthcare staff and custody staff.

Regarding the removal of assistive devices, the term "equally effective alternative" is not defined, and the policy does not specify who determines what an "equally effective alternative" is. Medical staff must play a primary role in any such determination.

Any denial of an accommodation or removal of an assistive device should require review/written approval from the Watch Commander and healthcare director-level staff.

Regarding the "ADA Functional Performance assessment," the policy includes no timeline for when "during the booking process" this assessment will occur. The policy must specify a prompt timeline. We have not yet been provided an opportunity to comment on the assessment, which will be a key component of an effective system. The assessment should include a review of the incarcerated person's prior medical records in your system, as well as emails from CDCR describing disability needs and accommodations.

The policy is missing any process for (1) interim accommodations; and (2) ensuring an expedited process for critical or urgent accommodation needs.

The policy lacks information about the creation and distribution of the "ADA List." This is a document ostensibly imported from the Orange County Jail practices, but unlike the Orange County policy, Defendants have not indicated in their policy how the process in fact functions – e.g., who is responsible for creating and updating the ADA List and what action would follow its review and by whom.

The section titled "Exclusion of Accommodations" should be stricken in its entirety. Much of the new language in M.39 is adapted from Orange County; however, Orange County's policy has no such "exclusion" language. This section is problematic for a number of reasons. For example, the determination of what accommodation is reasonable and appropriate for an individual person requires an interactive process. This policy language suggests that Jail staff offer an accommodation, which is then accepted or refused by the individual. This is inconsistent with requirements under disability antidiscrimination law. In addition, the passages on "undue burden" and "fundamental alteration" are likely to lead to confusion and improper denial of accommodations. These are determinations that cannot be made by line staff, but require higher level consideration, leadership-level review and approval, consideration of alternative methods of accommodation, and documentation of the process. The Jail system would be wise to

Susan Coleman
Elizabeth M. Pappy
May 10, 2024
Page 4

define and implement such procedures, but the current version short-circuits those
processes and will be counterproductive for the system.

## III.    I.22 – Lower Bunk/Tier Policy

There remain fundamental problems with this policy.

Throughout the policy, the term "lower" should be changed to "accessible lower."
Not all lower bunks observed on inspections are accessible, as set forth in
Ms. Sanossian's prior reports.  Only bunks that are 17"-19" measured from the floor are
accessible to persons with mobility disabilities.

The policy contains no discussion of any quality assurance or quality improvement
process to assess whether the Sheriff's Department has sufficient accessible lower bunks
and lower tier housing.  In fact, Defendants have conceded that they lack sufficient
accessible housing in their current system.  The language "as feasible" in Section III.A of
the policy implies that Defendants do not have sufficient accessible lower bunks.  The
language "as feasible" must also be defined; otherwise, it could negate the requirement to
provide accessible housing.  The Court's recent order (Docket No. 620 at 4) directly
addresses why "as feasible or available" language is unacceptable in this context.

If people are being denied accessible housing for lack of availability, Defendants
need to have a systematic process to address that issue and provide interim
accommodations.  They must also expeditiously act to provide additional accessible
lower bunks.

As written, the policy is both restrictive and vague about categories of incarcerated
persons guaranteed accessible lower tier housing.  It is troubling that only people
apparently deemed to be "full-time" wheelchair users are guaranteed lower bunk/lower
tier housing.  People who have ambulatory disabilities requiring the use of canes,
walkers, crutches, etc., and "intermittent" wheelchairs must be on the lower tier and
lower bunk as well.  Under Defendants' policy, a person using a walker could
permissibly be housed in a top bunk on the top tier, which violates the ADA, is
dangerous, and exposes the County to further liability.

This language reinforces the need for Plaintiffs to review any corresponding
revisions to MSD policies and standards on evaluating people for accessible housing, and
how medical staff must document their assessments.  In general, it should be rare for a
person with an ambulatory disability to be lower bunk or lower tier only; such individuals
should be housed on a lower bunk and lower tier, with few exceptions.

[4485879.3]

**Ex. CC - 298**

Susan Coleman
Elizabeth M. Pappy
May 10, 2024
Page 5

In Section I.A.1., we have made redlines to better clarify the list of accessible housing features.

Regarding Section I.A.2., a request for accessible housing should be dealt with on an expedited timeline, regardless of whether made via sick call request, incarcerated person request form, or grievance. No timeline is provided in the policy. Subsection (e) should provide that, when notified of new medical instructions requiring accessible housing, deputies must promptly act to house the person in accordance with those requirements and provide interim accommodations.

In Section IV, the procedure should clarify that when resolving discrepancies, sworn staff may not move a person assigned an accessible lower bunk to another bunk assignment. The policy should also specify what JPMU deputies must do when "notified" that more people require accessible beds than are available.

In Section V, there is insufficient guidance for line staff on housing decisions during "ADA housing renovations." We are particularly concerned with V.B.b: "While the ADA housing renovations are in process accessible housing will be provided as available." Here again, the Court addressed the issue of provided sufficient guidance and interim measures during the physical plant improvement process (Docket No. 620 at 5). The Court ordered: "Defendants to address specific interim measures . . . including where Defendants will house people during construction and/or retrofits, and explain how that housing solution mitigates significant safety issues for incarcerated people." More development of policy and procedure is necessary here.

## IV.    H.3 – Evacuation Plans Policy

As drafted, the new policy language addressing disability is too vague to redline. The only disability-related change is the addition of III.D, a single sentence simply documenting that each facility must develop its own procedures for evacuation of incarcerated people with disabilities. It is impossible for Plaintiffs to assess the adequacy of Defendants' actual procedures for each facility (if they yet exist) without reviewing the green sheets or referenced "EOMs" for each facility.

Defendants must provide those green sheets to Plaintiffs or significantly revise this policy and procedure to identify, inter alia, the paths of travel for wheelchair riders, the procedures to notify and assist incarcerated people with vision, hearing, or cognitive disabilities of emergencies, and the location and quantity of all stair lifts for facilities with more than one floor.

[4485879.3]

**Ex. CC - 299**

Susan Coleman
Elizabeth M. Pappy
May 10, 2024
Page 6


We look forward to receiving revised draft policies and to working with you to bring the County and Sheriff's Department into full compliance with state and federal disability law.

As always, we appreciate your courtesy and cooperation in this matter.

Very truly yours,

ROSEN BIEN                           LAW OFFICES OF
GALVAN & GRUNFELD LLP                 AARON J. FISCHER

*/s/ Gay Crosthwait Grunfeld*        */s/ Aaron J. Fischer*

By:   Gay Crosthwait Grunfeld       By:   Aaron J. Fischer

GCG:AJF:cg
Enclosure

[4485879.3]

**Ex. CC - 300**

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| DATE: | APRIL 30, 2024 |
| NUMBER: | I.22 |
| SUBJECT: | LOWER BUNK / LOWER TIER AND MEDICAL INSTRUCTION ASSIGNMENT |
| RELATED SECTIONS: | I.21; M.9; M.39 |

PURPOSE:

To establish minimum standards for the assignment and review of medical instructions for housing requirements for incarcerated persons.

POLICY:

Medical instructions for housing requirements (e.g., lower bunk and/or lower tier requirements) are determined by Sheriff's health staff due to physical impairments or mobility issues due to a disability, medical condition or drug/alcohol withdrawal. Sworn staff will review and resolve any discrepancies in housing/bunk assignments due to medical instructions for housing requirements.  A lower bunk and/or lower tier placement is required when input by health staff.

PROCEDURE

I.    ASSIGNING MEDICAL INSTRUCTIONS FOR HOUSING REQUIREMENTS

A.    Sheriff's health staff will determine and document what housing accessibility features an incarcerated person with a physical impairment or disability requires for their safety and appropriate housing assignment.

1.    Accessible housing features may include, but are not limited to:  ADA cell with ADA-compliant bed surface height and clearance space, toilets with clearance space, ADA seat height/centerline, and grab bars; ADA shower with no curb at entry, a shower seat, grab bars, and shower spray unit on hose or adjustable lower fixed showerhead; or dormitory sleeping area with ADA-compliant bed surface height and clearance space, toilets with clearance space, ADA seat height/centerline, and grab bars.  , ADA shower, bed location, clearance space, toilet grab bars, shower grab bars, shower bench/chair, lower bunk, lower tier, or lower bunk and lower tier

2.    Lower bunk and/or lower tier

a.    The lower bunk and/or lower tier placement will be determined by health staff and entered into the incarcerated person's medical instructions.  It is a requirement when input by health staff.

b.    The health staff's order for lower bunk and/or lower tier housing is considered a housing requirement to minimize the risk of injury to the incarcerated person or accommodate a disability.

     c.  Incarcerated persons without a medical instruction for lower bunk and/or lower tier may submit a Sick Call Request (J-212) form to request this type of bed assignment. A medical evaluation is required to determine the need to establish or reinstate an instruction for lower bunk and/or lower tier.

     d.  If health staff determines a need for a lower bunk and/or lower tier housing requirement during the intake process, Jail Population Management Unit (JPMU) deputies will notate such housing requirement on the incarcerated person's face card.

     e.  If lower bunk and/or lower tier medical instructions are determined after the incarcerated person has been housed, health staff will notify the housing deputies of the requirement.

C.   Medical instructions for housing requirements may fulfill a request for accommodation by an incarcerated person with a disability or be assigned as a precautionary measure for the safety and/or welfare of an incarcerated person.

## II.   MEDICAL INSTRUCTIONS FOR HOUSING REQUIREMENTS

A.   Medical instructions for housing requirements are viewable in JIMS as Medical Instructions, if applicable, in the incarcerated person's "Photo & Instructions" pop-up window.

B.   Lower bunk and/or lower tier housing requirements are defined as follows:

     1.  "LOWER BUNK" indicates a lower bunk requirement without tier restriction.

     2.  "LOWER TIER" indicates a lower tier requirement.

     3.  "LOWER BUNK/LOWER TIER" indicates a requirement for a bottom bunk on the lower tier. Note: A middle bunk in a triple bunk does not qualify as a bottom bunk.

C.   Medical instructions for "ADA MOBILITY" and "ORTHOPEDIC DEVICE – WHEELCHAIR" have additional housing requirements, as follows:

     1.  Incarcerated persons with the "ADA MOBILITY" medical instruction shall not be assigned to the top bed of a triple bunk.

     2.  Incarcerated persons with the "ORTHOPEDIC DEVICE – WHEELCHAIR" medical instruction shall be assigned a bottom bunk on the lower tier and cannot be assigned to any bed in a triple bunk.  They shall be housed in ADA accessible housing.

     3.  Incarcerated persons with "INTERMITTENT WHEELCHAIR" medical instruction or other mobility disabilities shall be individually assessed for accessible housing accommodation needs. With the exception that incarcerated persons with the "ADA MOBILITY" and "INTERMITTENT

WHEELCHAIR" medical instruction shall not be assigned to any bed in a triple bunk.

    a.  People with mobility disabilities will be assigned to accessible housing based on their accessibility needs, which may include accessible beds, grab bars, clearance space, and low bunk or low tier.

    b.  People with mobility disabilities will be provided accessible toileting based on their accessibility needs, which if appropriate shall have 2010 ADAS-compliant grab bars and other features.

    c.  People with mobility disabilities will be provided accessible showers based on their accessibility needs which if appropriate shall have 2010 ADAS-compliant grab bars and shower chairs.

III.    PROVIDING HOUSING REQUIREMENTS

    A.  All incarcerated persons who have been screened and determined to have a disability will be housed in a facility with the appropriate accommodations, ~~as feasible~~ unless the accommodation would result in a fundamental alteration, direct threat or safety and security risk, undue financial or administrative burden, or during an emergency situation.

    B.  Housing deputies will be responsible for assigning incarcerated persons with medical instructions for housing requirements the appropriate housing bed.

    C.  Housing bed assignments and changes should be reflected in the housing unit's JIMS Observation Status Board (OSB).

IV.    LOWER BUNK AND/OR LOWER TIER DISCREPANCIES

    A.  At the beginning of each shift, the watch commander or designee will review the "LOWER BUNK / LOWER TIER DISCREPANCIES" report in JIMS.

        1.  The watch commander or designee shall direct housing deputies to resolve any discrepancies.

        2.  Bunk and/or housing moves may be required to accommodate incarcerated persons with a lower bunk and/or lower tier designation.

        3.  In the event the number of incarcerated persons requiring a lower bunk and/or lower tier placement is greater than the beds available, JPMU deputies will be notified and must take action as set forth below in Section V.

        4.  Housing deputies will log the report review and reconciliation in the JIMS Area Activity Log utilizing the "LOW BUNK/TIER REVIEW" drop-down. Any discrepancies that remain unresolved due to an incarcerated person not being present in the housing area (e.g., court, medical appointment, etc.) will be noted in the "Notes" section of the log entry and the watch commander shall be notified.

B.    Incarcerated persons shall accept bunk assignments as directed by staff. Incarcerated persons are not entitled to bunk location of choice and shall be subject to disciplinary action in accordance with Detention Services Bureau Policies and Procedures section O.1 for refusing a bunk assignment, including any lower bunk and/or lower tier assignment.

V.    EXCLUSION OF HOUSING ACCOMMODATIONS

A.    If sworn staff is unable to accommodate disability related housing requirements, sworn staff shall confer with JPMU and health staff to determine appropriate housing options.

B.    Incidents where disability related housing accessibility accommodations cannot be provided shall be documented in a JIMS Incident Report with the type code: "ADA – Americans with Disabilities Act."

a.    The individual will be provided accessible housing as soon as it becomes available for the individual.

b.    While the ADA housing renovations are in process, accessible housing will be provided as available.

a.    A single bunk or a bottom bunk of a double shall be provided to all Iincarcerated persons with wheelchairs or with a mobility disability that medical staff determines require lower bunk/lower tier placementshall be provided a single bunk or a bottom bunk of a double. Portable shower chairs will be provided as an interim solution if an ADA compliant shower is not available.

VI.    REFUSING MEDICAL INSTRUCTIONS FOR HOUSING REQUIREMENTS

A.    If health staff determines a need for lower bunk and/or lower tier housing requirements or accommodation, and an incarcerated person refuses to accept such as medical care or treatment, health staff will have the incarcerated person sign a Refusal to Accept Medical Care/Treatment (J-223) form, documenting their reason for refusing medical treatment.

1.    Health staff should must provide counseling to the incarcerated person about the importance of medical instructions for housing requirements.

2.    In the event the incarcerated person refuses to sign the J-223 form, health staff shall sign the form documenting the reason for the refusal. Every effort should be made to obtain a second health staff witness to sign form; however, if a second health staff member is not present to witness the refusal, a sworn staff member may sign the second witness line.

B.    Incarcerated persons with an "ADA MOBILITY" instruction may refuse to accept applicable housing accommodations.

1.     The ADA Unit, or designee, shall interview the person in an attempt to resolve any concerns regarding the ~~provide them with~~ accessible housing assignment. Staff will document the interaction via a Body Worn Camera (BWC), as available.

2.     If the incarcerated person still refuses the accommodated housing assignment after the interview, health staff will ask the person to sign a Refusal to Accept Medical Care/Treatment (J-223) form, documenting their reason for refusing medical treatment.

3.     In the event the incarcerated person refuses to sign the J-223 form, health staff shall sign the form documenting the reason for the refusal. If a second health staff member is not present to witness the refusal, a sworn staff member may sign the second witness line.

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| DATE: | APRIL 30, 2024 |
| NUMBER: | M.39 |
| SUBJECT: | INCARCERATED PERSONS WITH DISABILITIES |
| RELATED SECTIONS: | C.1, H.2, I.22, M.9, N.1, P.2, P.11, Q.7, Q.55, R.11, CCR TITLE 15, SEC, 1057, CA Penal Code 2656, Americans with Disabilities Act |

PURPOSE

To establish uniform procedures to ensure compliance with the Americans with Disabilities Act (ADA) of 1990, as amended, Section 504 of the Rehabilitation Act, 29 USC § 794 and related state regulations for San Diego County Sheriff's Department in-custody programs, services, and activities.

POLICY

The San Diego County Sheriff's Department does not discriminate on the basis of disability. Incarcerated persons with disabilities are entitled to the same rights, privileges, and services as other incarcerated persons of the same classification level. No qualified incarcerated person with a disability, that meets all essential eligibility requirements, shall be excluded from participation in or denied the benefits of any in-custody program, service, or activity based upon their disability.

An incarcerated person is covered by the ADA when the incarcerated person has a physical or mental impairment that substantially limits one or more major life activities, has a record or history of such an impairment, or is regarded or perceived as having such an impairment.

The Sheriff's Department shall provide the reasonable accommodations needed for qualified incarcerated persons with a disability to have an equal opportunity to participate in and benefit from in-custody programs, services, or activities, as feasible unless the accommodation would result in a fundamental alteration, direct threat or safety and security risk, or undue financial or administrative burden, or during an emergency situation.

ADA DEFINITIONS

DISABILITY - A physical or mental impairment that substantially limits one or more major life activities of an individual; a record or history of such an impairment; or being regarded as having such an impairment.

MAJOR LIFE ACTIVITIES - Activities which include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

PHYSICAL OR MENTAL IMPAIRMENT - Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular,

[4481740.4] M.39 INCARCERATED PERSONS WITH DISABILITIES

Page 1 of 10

#23/06

**Ex. CC - 306**

reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine. Any mental or psychological disorder such as organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term also includes, but is not limited to, contagious and noncontagious diseases and conditions; orthopedic, vision, speech, and hearing impairments; cerebral palsy; epilepsy; muscular dystrophy; multiple sclerosis; cancer; heart disease; diabetes; intellectual or developmental disability; HIV disease, whether symptomatic or asymptomatic; tuberculosis; drug addiction; and alcoholism.

MOBILITY DISABILITY - A broad term to describe the range of disabilities that impact the movement or full use of one or more body parts, as well as standing and walking. Persons with "mobility disabilities" may require use of accessible features in facilities (e.g. grab bars, lower bunk, or lower tier), or mobility aids or assistive devices, such as wheelchairs, walkers, or braces to perform activities that require movement, balance, and stability. The "ADA Mobility" JIMS Medical Instruction flag identifies incarcerated persons who require accommodations for a mobility disability.

INTERMITTENT WHEELCHAIR - As defined by the Sheriff's Department, describes an incarcerated person who does not have or use a wheelchair in housing and is only provided a wheelchair for assisted transport or long-distance movement.

COGNITIVE DISABILITY – A broad term used to describe disabilities affecting types of mental tasks such as understanding or processing information, solving problems, or responding to stimuli. Intellectual disabilities, pervasive developmental disabilities, acquired brain injuries, neurodegenerative disease, and learning disabilities may also fall into the category of cognitive disability.

COMMUNICATION DISABILITY - Communication-related disabilities are disabilities that impact a person's ability to receive, process, or convey information to another person, including but not limited to, vision, hearing, speech, learning, or cognitive disabilities. Note: For vision related impairments, if the individual has no substantial limitation to a major life activity while wearing "ordinary eyeglasses or contact lenses", and the individual is in possession of such lenses, then the individual's vision impairment is not a disability for the purpose of this policy.

QUALIFIED INDIVIDUAL - An individual with a disability who, with or without reasonable accommodation, meets the essential eligibility requirements for the receipt of services or the participation in programs, services, or activities provided by a public entity.

REASONABLE ACCOMMODATION - Any modification or adjustment that is effective in enabling a qualified individual with a disability to participate in and receive the same benefits from a program, service, or activity. This may include changes in the facility, policies, procedures, or the manner in which tasks are completed. Reasonable accommodation does not require fundamental alteration of the nature of a program or activity.

UNDUE BURDEN – A significant difficulty or expense incurred by the agency. This decision must be made by the head of the public entity or Watch Commander after considering all resources available, and must be accompanied by a written statement of the reasons for reaching that conclusion. Factors to be considered in determining an "undue burden" include the financial and administrative operations involved and the impact on employees and operations, including safety or security.

DIRECT THREAT - A significant risk to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. Determining whether an individual poses a "direct threat" is based on an individualized assessment of the nature of the risk, the probability that the potential injury will actually occur, and whether reasonable accommodations will mitigate the risk.

[4481740.4] M.39 INCARCERATED PERSONS WITH DISABILITIES

#23/06

FUNDAMENTAL ALTERATION – A change to such a degree that the essential purpose, function, or desired outcome of a program, service, or activity is no longer the same.

PROCEDURE

I.    SCREENING AND IDENTIFICATION OF DISABILITY ACCOMMODATIONS AT INTAKE

    A.    All incarcerated persons shall be screened by a Registered Nurse (RN) during the intake process to identify disabilities and reasonable accommodations. Identifying disabilities and accommodations is an interactive process to ensure the incarcerated person can participate in and benefit from in-custody programs, services, and activities, of which they are qualified to participate.

        1.    Incarcerated persons with communication disabilities and effective communication needs shall be handled according to Detention Services Bureau (DSB) Policy and Procedure (P&P) Section P.11.

        2.    If an incarcerated person is identified to have a disability that requires an accommodation, the RN will update the person's health record and collaborate with sworn staff to ensure the person is appropriately accommodated through the booking process.

            a.    The Booking Intake / Personal Property Inventory (J-15) form will be stamped, as appropriate, to advise staff of the incarcerated person's accommodations.

            b.    The face card of the incarcerated person will be notated to reflect the appropriate accommodations.

            c.    Persons with mobility disabilities who require accessible accommodations, including but not limited to those who use a wheelchair, who require wheelchair accessible accommodations, will be placed in accessible holding cells and assisted through the booking and intake process as necessary.

            d.    Incarcerated persons with personal assistive devices shall be permitted to keep their devices during the booking process and throughout their time in custody unless the device poses a direct threat or safety and security risk. An equivalent County device may be issued instead of a personal assistive device.

                i.    All personal assistive devices are subject to search for contraband and inspection for safety and security interests.

                ii.    In the event an incarcerated person's personal assistive device is removed from the individual due to safety or security interests, an equally effective alternative shall be provided to the incarcerated person to use while in custody.

[4481740.4] M.39 INCARCERATED PERSONS WITH DISABILITIES

Page 3 of 10

#23/06

**Ex. CC - 308**

        i.   Sworn staff shall make the determination that a device poses a direct threat or safety and security risk.  If a device is removed from the individual, it shall be documented in a JIMS Incident Report with the type code: "ADA – Americans with Disabilities Act."

        iii.   Personal devices that are excluded due to safety and security interests shall be placed into storage.

B.    Incarcerated persons who have been preliminarily screened and identified to have a disability shall receive an ADA Functional Performance assessment during the booking process.  The assessment will be provided by health staff.

    1.   Incarcerated persons screened by RNs ~~and~~ should have JIMS Medical Instructions added for ADA Vision, Hearing, Medical, or Mobility will be scheduled for a sick call with the medical provider within 3 days.  Interim accommodations should be provided immediately as warranted.

    2.   Incarcerated persons who are identified as having or suspected of having a cognitive, intellectual, or developmental disability shall be evaluated and screened by a Qualified Mental Health Provider (QMHP) within 7 days of booking. The QMHP shall determine if the ADA Cognitive/Learning JIMS Medical Instruction is added to the incarcerated person's record, document any necessary accommodations (e.g. adaptive supports), and schedule the incarcerated person for follow-up based on their individual needs.

    3.   The shift charge nurse, or their designee, will inform the Jail Population Management Unit (JPMU) of any incarcerated person with medical instructions that impact housing requirements.  At a minimum, this is done using Medical Instruction flags in TechCare that populate into JIMS and the ADA List included in the JIMS Web Floor Count (Updated) report (or the unit equivalent list containing ADA information).

        a.   Health staff will document what housing accessibility features the person requires. See DSB P&P Section I.22.

C.    The JPMU classification system screens, assesses, and houses incarcerated persons in a manner that protects the safety of the community, staff, and other incarcerated persons. The classification interview of incarcerated persons with disabilities includes screening for unreported disabilities that require accommodations.

    1.   If JPMU identifies that an incarcerated person has a disability that requires accommodation that is not identified in their ADA Medical Instructions, the incarcerated person shall be referred to Sheriff's health staff for assessment.

II.    IDENTIFICATION OF DISABILITY ACCOMMODATIONS AFTER INTAKE

[4481740.4] M.39 INCARCERATED PERSONS WITH DISABILITIES

Page 4 of 10

#23/06

**Ex. CC - 309**

A.   The identification of disabilities or requests for reasonable accommodations may occur at any time during an individual's incarceration (e.g., staff observation, incarcerated person request, reported by third parties such as family, etc.).

    1.   If at any point during an individual's incarceration a staff member identifies that an incarcerated person has a disability that requires accommodation that is not identified in their JIMS Medical Instructions, the incarcerated person shall be referred to Sheriff's health staff for assessment.

        a.   The staff member who routed the incarcerated person to health staff shall document the incident in an Incident Report within JIMS with the primary incident type code: "ISR, Inmate Status Report".

        b.   Health staff shall notify JPMU if the incarcerated person has added JIMS Medical Instructions that impact their housing needs.  At a minimum, this is done using Medical Instruction flags in TechCare that populate into JIMS and the ADA List included in the JIMS Web Floor Count (Updated) report (or the unit equivalent list containing ADA information).

    2.   Incarcerated persons can submit requests for ~~new reasonable~~ accommodations via the Healthcare Request form and process or by filing a grievance.

III.   TRACKING INCARCERATED PERSONS ~~WITH~~ AND PROVIDING ACCOMMODATIONS

A.   At the beginning of each shift, staff shall review the ADA List included in the JIMS Web Floor Count (Updated) report, for the areas in which they are assigned to work. The ADA List details notes for identified accommodations.

    1.   Staff shall familiarize themselves with incarcerated persons in their assigned areas that require accommodations and/or are assigned assistive devices.

    2.   Staff ~~conducting business~~overseeing or interacting with incarcerated persons shall review the ADA List (or the unit equivalent list containing ADA information) to identify if the incarcerated person(s) whom they are ~~conducting business~~overseeing or interacting with requires accommodations, prior to ~~conducting business~~overseeing or interacting with incarcerated persons. See DSB P&P Section P.11 for Effective Communication Policy.

B.   Sheriff's Correctional Counselors shall conduct "ADA Checks" on incarcerated persons with newly assigned JIMS Medical Instructions for ADA Mobility, Vision, Hearing, and/or Cognitive/Learning, in order to provide information on how to access or request accommodations for in-custody personal recreation and structured programming managed by DSB's Re-Entry Services Division.

    1.   Accommodations for an incarcerated person~~'s personal recreation~~ with effective communication needs include, but are not limited to, large print books, magnifiers, Braille material, audio books, VRI, VRS, screen reading software, ASL, hearing aids, pocket talkers, reading documents aloud, and scribing (e.g., request forms, grievances, etc.).

Ex. CC - 310

2. Accommodations for structured programming shall vary on a case-by-case basis, depending on the needs of the incarcerated persons and the activities involved or required to participate in an in-custody program.  See DSB P&P Section P.11 for Effective Communication Policy.

C.  Incarcerated persons with an ADA Mobility, Hearing, or Vision JIMS Medical Instruction flag will be reviewed, including through an in-person meeting, by the ADA Unit or designee and the ADA Unit's registered nurse(s) or designee as follows: 1) within 7 days of the initial flag placement; 2) 60 days after the first ADA interview; 3) every 6 months following the second ADA interview. Based on the re-evaluation, the documented accommodations or housing assignment may change. Incarcerated persons may submit a request regarding accommodation needs at any time, and the ADA Unit will meet with the person in-person to address the issue.

a.  Incarcerated persons with an ADA Medical flag will be reviewed by health staff as needed based on the medical necessity.

b.  Incarcerated persons with an ADA Cognitive/Learn flag will be reviewed by mental health staff as needed, and based on each person's individualized support/treatment plan. based on the medical necessity.

IV.  PROVIDING REASONABLE ACCOMMODATIONS

A.  The Sheriff's Department shall provide the reasonable accommodations needed for qualified incarcerated persons with a disability to have an equal opportunity to participate in and benefit from in-custody programs, services, or activities, as feasible unless the accommodation would result in a fundamental alteration, direct threat or safety and security risk, undue financial or administrative burden, or during an emergency situation.

B.  Accommodations for telecommunication and effective communication with incarcerated persons with communication disabilities shall be handled according to DSB P&P Section P.11.

C.  Accommodations for in-custody accessible housing shall be provided as prescribed by health staff. This policy incorporates the requirements identified in DSB P&P Sections I.22 and R.11.

1.  All incarcerated persons who have been screened and determined to have a disability will be housed in a facility with the appropriate accommodations, as feasible unless the accommodation would result in a fundamental alteration, direct threat or safety and security risk, undue financial or administrative burden, or during an emergency situation.

D.  Accommodations shall be provided to ensure incarcerated persons with disabilities have equal access to participate in and benefit from medical and mental health services.

1.  Access to care shall be handled according to DSB P&P Section M.1.

2.  Sick call requests shall be handled according to DSB P&P Section M.15.

E.   Accommodations shall be provided to ensure incarcerated persons with disabilities have equal access to participate in and benefit from in-custody programs, services, and activities.

   1.   Staff shall provide reasonable modifications to jail rules, policies, and practices based on the incarcerated person's documented ADA instructions to provide equal opportunity incarcerated persons with disabilities to participate in the services, programs, and activities offered to other incarcerated persons of the same classification level.

      a.   This includes but is not limited to visitation, dayroom and recreation, transportation, communication systems (e.g. forms, telecommunications, etc.) and structured programming, including vocational and work positions.

F.   Assistive Devices and Durable Medical Equipment (DME) shall be furnished to incarcerated persons with disabilities that have been identified by health staff to require such accommodations.

   1.   Incarcerated persons with personal assistive devices or DME that are brought into custody are subject to search and inspection for safety and security interests.

      a.   Personal assistive devices or DME that are safe for use within custody settings may be permitted to remain with the incarcerated person. An equivalent County device may be issued instead of a personal assistive device. Personal devices and DME remaining with incarcerated persons shall be documented in JIMS.

      b.   If an incarcerated person's personal assistive device or DME requires replacement due to maintenance issues or because the personal device or equipment is determined to be a safety or security risk for in-custody use, then an equally effective alternative shall be provided to the incarcerated person within one business day. The incarcerated person's personal device or equipment shall be placed into their secured property.

         i.   Sworn staff shall make the determination that a personal assistive device poses a direct threat or safety and security risk, but only after consulting medical staff to determine alternative accommodations. Medical staff or sworn staff shall make the determination that a device requires replacement due to maintenance issues. If a device is removed from the individual, it shall be documented by sworn in a JIMS Incident Report with the type code: "ADA – Americans with Disabilities Act" or by medical in TechCare.

   2.   All assistive devices and DME (personal and jail-issued) are subject to search and inspection. Staff may search or inspect any assistive device or DME for functionality, damage, contraband, and/or to confirm proper assignment.

[4481740.4] M.39 INCARCERATED PERSONS WITH DISABILITIES

#23/06

      a.   Incarcerated persons found to damage, destroy, or manipulate assistive devices for use other than it is intended are subject to discipline.

      b.   Staff shall ~~refer~~ defer to health staff to determine if the authorized assistive device or DME is an appropriate accommodation for the incarcerated person.

3.   Staff shall not confiscate an incarcerated person's authorized assistive device or DME unless the device or DME presents a direct threat to the safety and security of others.

      a.   A sworn supervisor and health staff must be consulted prior to removing an authorized assistive device for a direct threat, unless there is an immediate safety and security concern.

          i.   In situations involving immediate safety and security concerns, staff may remove the device and then consult with a sworn supervisor and health staff to determine if the device be returned or an alternative accommodation provided.

      b.   Sworn staff shall confer with health staff to determine if a different assistive device or DME can be used by the incarcerated person to accommodate a disability.

      ~~b.~~c.   Removal of an assistive device based on safety and security concerns will be documented and approved by the Facility Commander.

Formatted: Indent: Left: 2", No bullets or numbering

4.   The possession of unauthorized assistive devices or DME is considered contraband. Incarcerated persons are not permitted to have in their possession any assistive devices or DME that is not ~~actively~~ authorized by health staff.

      a.   Sworn staff shall confer with health staff or the ADA Unit to determine if an incarcerated person is authorized to keep an assistive device or DME as an accommodation for a disability~~, or if it needs to be surrendered by the incarcerated person.~~

~~V.     EXCLUSION OF ACCOMMODATIONS~~

~~A.    Incarcerated persons may refuse reasonable accommodations and shall not be required to accept aids, services, or benefits provided under the ADA.~~

~~1.   Incarcerated persons with disabilities shall not be required to accept accommodations or participate in programs, services, and activities separate from those provided to those without disabilities when such alternatives are provided.~~

~~2.   Refusals of reasonable accommodations by an incarcerated person for in-custody programs, services, or activities shall be documented when it results in the exclusion of a qualified incarcerated person from participating in or benefiting from the program, service, or activity. The staff member who identified the~~

**Ex. CC - 313**

~~refusal shall document the incident in their appropriate records management system.~~

~~B.    Accommodations are not considered reasonable, and can be denied if such accommodation would do any of the following:~~

- ~~be, or not mitigate, a significant risk or "direct threat" to the health or safety of the individual or others;~~

- ~~cause a "fundamental alteration" to the nature of in-custody programs, services, or activities; and/or~~

- ~~create an "undue burden" to the Department, due to financial or administrative allocation of resources and personnel, or impact on jail operations.~~

~~Note: Accommodations that are reasonable may become unreasonable if the context or circumstances changes.~~

~~C.    Any incident that results in the exclusion of a qualified incarcerated person with a disability from participating in or benefiting from the program, service, or activity shall be documented in a JIMS Incident report.~~

~~1.    The Incident report should have a primary type code: "ADA – Americans with Disabilities Act" and shall document any pertinent information that led to the exclusion of an incarcerated person from participating or benefiting from the in-custody program, service, or activity.~~

~~2.    The ADA Unit shall be notified via email of the incident.~~

~~VI.~~V.   ADA RELATED GRIEVANCES AND COMPLAINTS

A.    An incarcerated person with a disability may contact the ADA Unit regarding the provision of their reasonable accommodations to access programs, services, and activities by using the Incarcerated Person Request form.

B.    An incarcerated person with a disability may grieve alleged discrimination due to a disability <u>or seek an accommodation</u> by using the Incarcerated Person Grievance form.

C.    Grievances from incarcerated persons will be handled according to DSB P&P Section N.1. Any grievances related to the provision of medical services shall be forwarded to a MSD supervisor or designee. All ADA related grievances will be forwarded <u>within one business day</u> to the ADA Unit for processing.

D.    Complaints submitted on behalf of an incarcerated person to the County or Department ADA Coordinator shall be handled according to County policies and procedures.

~~VII.~~VI. EMERGENCY PREPAREDNESS

A.    Each detention facility shall maintain an Emergency Operations Manual (EOM) as required by DSB P&P Section H.2. Staff shall provide assistance to incarcerated persons

with disabilities during the evacuation process, ~~as necessary~~ based on the incarcerated person's reasonable accommodation needs and disability.

B.    In the event of an emergency or critical event, the facility commander, or designee, of an affected area has the authority to temporarily suspend standards or requirements herein the entirety of this DSB P&P section, if applying such standard or requirement would compromise the efforts to maintain the safety of the facility, its employees and/or visitors, or if public safety is threatened.

~~VIII.~~VII.     ADA COORDINATOR

A.   The Captain of the Sheriff's ADA Unit shall be the designated Sheriff's Department ADA Coordinator, who is responsible for the coordination of the Department's efforts to comply with Title II of the ADA and related state law for in-custody programs, services, and activities.

   1.   The ADA Coordinator and ADA Unit duties shall include:

      a.   Coordinating staff training related to ADA policies and providing reasonable accommodations to incarcerated persons with disabilities.

      b.   Assisting the facilities and medical with reviewing and accommodating incarcerated persons with disabilities~~, as needed~~.

      c.   Ensuring all complaints of alleged discrimination on the basis of disability are investigated and resolved in a timely manner.

      d.   Reviewing non-medical ADA-related requests.

      e.   Reviewing and responding to ADA-related grievances in a timely fashion.

      f.   Conducting ADA interviews and reviews of incarcerated persons with ADA Mobility, Hearing, or Vision JIMS Medical Instruction flags.

      ~~f.~~g. Implementing a quality assurance/quality improvement plan for the ADA Unit.

**Formatted:** Indent: Left: 1.75", No bullets or numbering

# EXHIBIT DD



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email: ggrunfeld@rbgg.com

May 21, 2024

<u>VIA ELECTRONIC MAIL ONLY</u>

Susan Coleman
Elizabeth M. Pappy
Burke, Williams & Sorensen, LLP
60 South Market Street, Suite 1000
San Jose, California  95113-2336
scoleman@bwslaw.com
epappy@bwslaw.com

Re:    Dangerous and Unsanitary Conditions at Central Jail and South Bay
Detention Facility
*Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
S.D. Cal. No. 3:20-cv-00406-AJB-DDL
<u>Our File No. 1730-01</u>

Dear Susan and Beth:

On May 15, 2024, Plaintiffs' counsel inspected Central Jail and South Bay
Detention Facility with our environmental expert, Debbie Graham.  Ms. Graham noted
extensive issues during these inspections, which her forthcoming expert report will
discuss in detail.

The purpose of this letter is to bring to your attention the urgent need for
remediation in three areas that are causing immediate and irreparable harm to the
members of the *Dunsmore* class.

First, Units 8C and 8D at Central are subject to the ADA Order, Dkt. 355.  Some
renovations and changes have occurred since Plaintiffs brought the motion for
preliminary injunction on April 25, 2023, see Dkt. 281.  We look forward to discussing
Defendants' progress in bringing Units 8C and 8D into compliance with the ADA Order
at our meeting with the Court on June 3, 2024.

However, we have received disturbing reports that class members with disabilities,
including wheelchair riders, have had to sleep on the floor while in 8C and 8D because

**Ex. DD - 317**

Elizabeth M. Pappy
May 21, 2024
Page 2

there were no lower bunk, lower tier beds available.  This is unacceptable under the ADA
and constitutional standards.  No one should be sleeping on the floors.  We expect to
discuss this issue with the Court at the June 3 settlement conference.

Second, we observed a large number of drain fly larvae crawling from the drain in
the restroom on the upper tier of 8C.  Named plaintiff James Clark informed you of this
problem in his interrogatory responses dated February 21, 2024.  He also testified about
this in his deposition of March 20, 2024.  The enclosed photographs demonstrate how
serious and disturbing the situation is, especially in light of the vulnerable and elderly
population housed in 8C.  Ms. Graham informs us that the larvae can be removed by
scrubbing and flushing the drains using drain cleaners recommended by your pest control
vendor.  In order to eliminate the underlying conditions in which the larvae thrive, it is
imperative that the slime, debris and organic material be removed from in and around the
drain.

Third, we observed multiple cells during the inspections crammed with three men,
particularly in Module 4B at Central and Unit 2B at South Bay.  The BSCC has
repeatedly informed Defendants that this practice violates Title 15.  We have also
requested repeatedly that it stop.  See MPA ISO Motion for PI, Dkt. No.  281-1 at 17.
The ADA Order prohibits use of triple bunks for people with mobility disabilities.

The environmental consequences of triple bunking are dire:  toilets used by three
men over time are filthy.  Air quality in such a small space is poor.  The crowding is ripe
for the spread of disease.  And the triple bunks, including the lowest level of the three,
cannot be safely accessed by individuals with mobility disabilities.

Defendants' decision to triple bunk is particularly disturbing given the large
numbers of empty cells observed during the inspection of South Bay.  Defendants have
additional empty cells at Rock Mountain and entire housing units at East Mesa that are
empty.

We request that Defendants take immediate steps to (1) sanitize the drains and
restrooms in 8C, (2) ensure that there are sufficient safe, accessible beds for all
incarcerated people with mobility disabilities housed at Central Jail, and (3) stop triple
bunking.

Please provide photographs, maintenance reports, and rosters showing these
conditions have been remediated within ten days of today's date.  As noted above, the
ADA issues of people sleeping on the floor and the continuing use of triple bunks will be
part of our conference with the Court on June 3.  If Defendants fail to address these
conditions after meet and confer, we will consider seeking the assistance of the Court.

[4502050.2]

**Ex. DD - 318**

Elizabeth M. Pappy
May 21, 2024
Page 3

       As always, we appreciate your courtesy and cooperation in this matter.

Very truly yours,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Gay Crosthwait Grunfeld*

By:  Gay Crosthwait Grunfeld

GCG:cg
Enclosure
cc:    Co-counsel

[4502050.2]

**Ex. DD - 319**

# EXHIBIT EE



ROSEN BIEN
GALVAN & GRUNFELD LLP

P.O. Box 390
San Francisco, California 94104-0390
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email:  ggrunfeld@rbgg.com

May 22, 2024

<u>VIA ELECTRONIC MAIL ONLY</u>

Susan E. Coleman                          Elizabeth M. Pappy
Burke Williams & Sorensen, LLP            Burke, Williams & Sorensen, LLP
501 West Broadway, Suite 1600             60 South Market Street, Suite 1000
San Diego, California 92101-8474          San Jose, California 95113-2336
scoleman@bwslaw.com                       epappy@bwslaw.com

     Re:     Response to Your Comments and Email of May 22
             *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
             S.D. Cal. No. 3:20-cv-00406-AJB-DDL
             <u>Our File No. 1730-01</u>

Dear Counsel:

     I write to follow up on today's meet and confer and to respond to Ms. Pappy's email of May 22, 2024 with three areas of inquiry.  They are reproduced below with our response.

     1.     You observed larvae that hatch and grow within 24 hours of the eggs being laid on May 15th.  At no time on May 15th and not until last night at 6:04 p.m. did you advise anyone at the jail or my office.  You told me that it was our job to hover over you and your expert throughout the inspection to observe everything you were observing and that you had no obligation to alert anyone at the time.

     We disagree with your characterization of our letter of May 21, 2024 ("May 21 Letter").  Defendants were informed by Plaintiffs about this problem as early as Mr. Clark's interrogatory responses dated February 21, 2024.  Defendants and their counsel were with us for the entire tour of Central, including our inspection of the upper tier of 8C.  We were standing over a drain taking photographs for several minutes with an environmental expert.  Drain flies were clearly visible there and throughout the facility, including in other housing units and holding cells.  It should not fall to Plaintiffs to make

[4504880.1]

Susan E. Coleman
Elizabeth M. Pappy
May 22, 2024
Page 2

Defendants aware of these readily apparent environmental hazards at Defendants' own jail.   I hope remediation is underway as described and requested in the May 21 Letter.

2.      You first said you were told by Mr. Clark that mobility disabled IP's were being forced to sleep on the floor, then claimed your conversation with Mr. Clark was confidential, and then said you could not notify Ms. Kamphoefner or Ms. Coleman at the inspection because you needed to investigate.  There is nothing in your letter telling us what information you obtained in this "investigation" that would allow my client to investigate.  When I asked you in our meeting to provide the names of all the folks you interviewed you refused.  Please provide their names by the end of the day so that my client can review security footage of the living spaces your witnesses are housed in to see if we can determine if any IP's are being forced to sleep on the floor.  We consider this allegation to be very serious and your refusal to help us address it is contrary to your ethical obligation to your clients who are apparently being forced to sleep on the floor as we speak.

We again disagree with your characterization of the May 21 Letter and our discussion on Zoom this morning.  The first time I heard an allegation of floor sleeping at Defendants' jails was on May 15.  Upon returning to the office, I conducted a factual and legal investigation of this allegation and by yesterday considered it appropriate to bring this to your attention.

My current understanding is that floor sleeping has been a regular occurrence in 8C and has occurred as recently as May 16, 2024.  I believe it also occurred in 8D on or around April 28 or 29, 2024.  As I informed you this morning, I did not personally observe any mattresses on the floor.  I did observe a rolling cart with mattresses on the eighth floor near the control center.

I hope you will pull and share with us the video footage for each night in April and May 2024 for Units 8C and 8D.  These are open dorm units; it is not necessary for us to break attorney-client privilege in order for you to review video footage of those units to determine if people can be observed sleeping on the floor.

3.      There is no law disallowing triple bunks.  Please send me the specific section of the law upon which you rely.  In addition, the empty cells you observed were out of service for maintenance issues.  Are you suggesting that these individuals should be put in unsafe cells?  In addition, some of the individuals in triple bunk cells you observed, requested to be together.

[4504880.1]

**Ex. EE - 322**

Susan E. Coleman
Elizabeth M. Pappy
May 22, 2024
Page 3

Are you suggesting that their preference should be ignored because of what you want?

The BSCC has repeatedly instructed Defendants to stop triple bunking, as have we. The legality of the practice depends on a number of factors. As stated in the May 21 Letter, there are serious consequences of triple bunking in cells of the size Defendants are using. This practice raises ADA, environmental, and safety and security concerns. We look forward to learning Defendants' plans for remediating this condition.

I will not at this time respond to the personal attacks leveled on me in the Zoom today and in the May 22 email, except to say that the Court has enjoined us to abide by the highest standards of professionalism and ethics. I believe my conduct meets these standards.

As always, we appreciate your ongoing courtesy and cooperation in this matter.

Very truly yours,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*s/Gay Crosthwait Grunfeld*

By:   Gay Crosthwait Grunfeld

GCG:bf

cc:    Co-counsel

[4504880.1]

**Ex. EE - 323**

# EXHIBIT FF

**Agenda for Sixteenth Meet and Confer on May 29, 2024, 9:00 a.m.**

1.    Ongoing settlement negotiations and ADA Order

    a.    Defendants provided a framework for resolution of physical access issues on May 23, 2024.  Plaintiffs will share an initial response at the meet and confer and hope to have a written response before this Friday. The parties and their experts will meet with Judge Leshner on June 3 all day starting at 9 am to discuss settlement of the Third Claim for relief and compliance with the ADA Order.

    b.    [Text]

2.    Plaintiffs' queries regarding compliance with ADA Orders and constitutional standards

    a.    Plaintiffs seek to discuss their ongoing concerns about conditions observed during the May 15 inspections as described in letters dated May 21 and 23, 2024.  Plaintiffs also seek information about the Revised ADA Plan due June 1.

    b.    <span style="color:red">Defendants will discuss the facts leading up to the inaccurate letter sent by Plaintiffs' counsel and Plaintiffs' counsels intentional interference with jail operations putting their clients at risk.  Court intervention will be requested.</span>

3.    Class notice

    a.    Plaintiffs seek a more durable form of posting class notices in cages and assurance that notice is available throughout the jails, per email from G. Grunfeld dated May 16, 2024.  Plaintiffs were recently informed the kiosk notice flashes too quickly to obtain class counsel's phone number.

    b.    <span style="color:red">Plaintiffs continue to add this item to the agenda as if they were not asked to and agreed to provide specifics about more permanent forms of posting. Plaintiffs have refused to provide any such information.  There is nothing to discuss until Plaintiffs provide the information requested 3 weeks ago. Plaintiffs' must provide a specific video kiosk location (facility and module) so that the kiosk can be checked. Without specific information, it is impossible to investigate.</span>

**Ex. FF - 325**

4.    Access to Third Amended Complaint

    a.    Plaintiffs' counsel has received a report that staff are providing the Third Amended Complaint, as is required by the order approving class certification, to class members--but only for a couple days at a time. Plaintiffs wish to confirm whether this is indeed Defendants' practice.

    b.    This topic will not be discussed unless and until Plaintiffs provide the names of specific individuals who claim they were not provided enough time to review the complaint, the dates of the requests and return, and a specific indication of how much time is being requested by the individuals.

5.    RFP Set Six

    a.    The Sheriff's Department data produced May 20 did not include latitude/longitude.

    b.    This will not be discussed.  Plaintiffs counsel was informed that the information does not exist.  You cannot squeeze blood from a turnip.

6.    Further need for meet and confer since all discovery issues are resolved.

    a.    Defendants intend to request that the Court relieve the parties from their obligation to continue with the meet and confers since there are no discovery issues remaining.

**Ex. FF - 326**

# EXHIBIT GG

| From: | Pappy, Elizabeth M. |
|---|---|
| To: | Van Swearingen |
| Cc: | Gay C. Grunfeld; Eric Monek Anderson; Aaron Fischer; Coleman, Susan E.; Rivard, Deann R. |
| Subject: | RE: Dunsmore: video footage re sleeping on floor [IMAN-DMS.FID55015] |
| Date: | Thursday, May 30, 2024 1:00:01 PM |

**[EXTERNAL MESSAGE NOTICE]**

Van, you can "renew" your requests all you want but we are not prepared to do or agree to anything at this point.

There is no need for you to send anymore emails telling me you disagree.  I know.  As I just said in my last email to you, this is exactly why continuing the weekly meetings for anything other than discovery was objectionable to my clients.

My clients are considering their next steps regarding Mr. Clark's statement which may include application to the judge for a restraining order against any such instructions going forward and an instruction to advise all your clients that they are to bring all issues to staff without any restriction on also conveying that information to your office.  We were so shocked by his statements that we too are trying to get our arms around how to handle this most unique of circumstances. You are obviously free to talk to Mr. Clark anytime you want in the meantime and ask him what he said.

We take this situation very seriously and will move forward appropriately.

Thank you.


**Elizabeth M. Pappy | Partner**
Pronouns: she, her, hers
60 South Market Street, Suite 1000 | San Jose, CA  95113
d - 408.606.6305 | t - 408.606.6300 | f - 408.606.6333
epappy@bwslaw.com | vCard | bwslaw.com



The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Van Swearingen <VSwearingen@rbgg.com>
**Sent:** Thursday, May 30, 2024 12:16 PM

**Ex. GG - 328**

**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Coleman, Susan E. <SColeman@bwslaw.com>; Rivard, Deann R. <DRivard@bwslaw.com>
**Subject:** RE: Dunsmore: video footage re sleeping on floor [IMAN-DMS.FID55015]

<mark>[EXTERNAL]</mark>

Beth,

Again, we respectfully disagree with your statements that we have been instructing our clients to interfere with jail operations and that we lack concern for our clients' wellbeing. We also disagree with your statements to the effect that we have refused to engage in settlement and resolution efforts.

On yesterday's M&C call, you offered to provide the body worn camera footage involving named Plaintiff James Clark. We renew our request for that video as well as of video of Module 8C during nights (from 10pm to 6am) on May 1 -17. If we cannot resolve this dispute—especially video of Mr. Clark— we may seek the Court's assistance, including with the reopening of discovery. Please preserve and do not destroy any of the video we have requested. We, too, will be discussing these issues with the Court on Monday.

Thank you.
Van

---

**From:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Sent:** Wednesday, May 29, 2024 12:01 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Coleman, Susan E. <SColeman@bwslaw.com>; Rivard, Deann R. <DRivard@bwslaw.com>
**Subject:** RE: Dunsmore: video footage re sleeping on floor [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

You will not be provided the footage, and our clients may speak to whomever they wish. You cannot and will not interfere with Jail Operations as you have apparently been instructing your clients to do.

You will also not be receiving any video footage for anything. Discovery is closed.

You have refused all reasonable efforts by my clients to address issues in real time and choose instead to fight, block my clients' ability to do their jobs, prevent my clients from addressing issues immediately, and thus there will be no two way street.

**Ex. GG - 329**

We again express serious concern about your handling of this case and the lack of concern for your clients' wellbeing. Your conduct will be brought to the attention of the Court on Monday along with your refusal to engage in any type of settlement process to get issues addressed in real time.

Thank you.

**Elizabeth M. Pappy | Partner**
Pronouns: she, her, hers
60 South Market Street, Suite 1000 | San Jose, CA 95113
d - 408.606.6305 | t - 408.606.6300 | f - 408.606.6333
epappy@bwslaw.com | vCard | bwslaw.com



The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Van Swearingen <VSwearingen@rbgg.com>
**Sent:** Wednesday, May 29, 2024 11:56 AM
**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>
**Subject:** Dunsmore: video footage re sleeping on floor [IMAN-DMS.FID55015]

[EXTERNAL]

Beth,

On today's M&C call, you stated that Sheriff's Department staff spoke to class representative James Clark while recording his statements on body worn camera. You informed us that Mr. Clark told Department staff that his lawyer instructed him to not contact the ADA unit. Please send us this footage. Additionally, please do not interview class representatives about this litigation without first providing Plaintiffs' counsel an opportunity to be present.

We are currently collecting evidence regarding people sleeping on the floors in Central Jail Modules 8C and 8D in April and May of 2024. We will provide you evidence of these practices by the end of this week. Without prejudice to us seeking a broader period of time, please provide us with video footage of Module 8C during nights (from 10pm to 6am) on May 1 -17.

Ex. GG - 330

Thank you,
Van


Van Swearingen
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830
VSwearingen@rbgg.com


CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

# EXHIBIT HH



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email: ggrunfeld@rbgg.com

August 16, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Susan E. Coleman                    Elizabeth M. Pappy
Burke Williams & Sorensen, LLP      Burke, Williams & Sorensen, LLP
501 West Broadway, Suite 1600       60 South Market Street, Suite 1000
San Diego, California 92101-8474    San Jose, California 95113-2336
scoleman@bwslaw.com                 epappy@bwslaw.com

Re:    *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
       S.D. Cal. No. 3:20-cv-00406-AJB-DDL
       Implementation of Joint Motion and Order Re Accessibility at Central Jail,
       Effective Communication Policy and Practice, and Provisional Class
       Certification
       <u>Our File No. 1730-01</u>

Dear Susan and Beth:

        We are very pleased that the parties reached agreement on, and the Court signed,
the Joint Motion and Order Re Accessibility at Central Jail, Effective Communication
Policy and Practice, and Provisional Class Certification ("ADA Order"), Dkt. No. 355.

        We hope preparation of the ADA Remedial Plan is going smoothly, and we look
forward to receiving it on August 21, 2023. We also look forward to confirmation that
the 25 accessible beds are in place at Central by September 19, 2023, as required by the
ADA Order.

        In the meantime, we wanted to propose two potential neutral experts to be
considered. They are:

        •      Susan R. Moe
               Access Compliance Consulting
               Telephone: (916) 833-6479
               Email: susan@smoearchitect.com
               https://www.consultforaccess.com/about

[4319266.3]

**Ex. HH - 333**

Susan E. Coleman
Elizabeth M. Pappy
August 16, 2023
Page 2

- Stephen Twist
  Stephen Twist Consulting, Inc.
  Telephone: (530) 333-5118
  Email: stwist@stci.hush.com
  www.stephentwist.com

Their resumes and rate sheets are enclosed.  We look forward to discussing these individuals and any proposals for neutral experts you have in the near future.

To ensure we are on the same page, we also wanted to share with you our calculation of some of the Order's deadlines.[1] Please let us know if Defendants disagree with any of these calculations, as we would like to ensure a common understanding as to expectations moving forward.

- August 21, 2023:  Last day for Defendants to provide Plaintiffs with ADA Remedial Plan

- September 5, 2023:  Last day for Plaintiffs to provide feedback on Defendants' proposed ADA Remedial Plan (within 15 days of Plaintiffs' receipt of Defendants' ADA Remedial Plan)

- September 19, 2023:  Last day for Defendants to complete ADA renovation on 25 accessible beds/toilets

- September 19, 2023:  Defendants to provide daily ADA housing rosters for the preceding month to the Court and Plaintiffs, marked as Attorney's Eyes Only, reflecting the disability needs of every person incarcerated at Central Jail who have been identified as having a mobility or hearing disability, including information sufficient to describe their mobility disability (if any), hearing disability (if any), effective communication needs (fi any), housing unit, bed assignment (including top, middle, or lower bunk), and whether the person's cell or housing unit has 2010 ADAS-compliant toilet grab bars, shower grab bars, and shower seat (the "rosters").  The rosters shall be provided monthly for 12 months, up to and including September 19, 2024.

---

[1] Other deadlines are triggered by anticipated future Court orders and so cannot be determined yet.

[4319266.3]

**Ex. HH - 334**

Susan E. Coleman
Elizabeth M. Pappy
August 16, 2023
Page 3

- September 20, 2023:  Last day for Parties and experts to confer re Defendants' proposed ADA Remedial Plan (within 15 days of Defendants' receipt of Plaintiffs' comments on Plan)

- October 5, 2023:  Last day for Defendants to submit proposed ADA Remedial Plan to the Court (within 15 days of Parties' meet-and confer)

- October 20, 2023:  Last day for Plaintiffs to submit objections to the Court re Defendants' proposed ADA Remedial Plan (withing 15 days of Defendants' filing of Plan)

- December 23, 2024:  Last day for Defendants to complete all ADA renovations except PSU/OPSD/JBCT

- June 22, 2026:  Last day for Defendants to complete all ADA renovations on PSU/OPSD/JBCT

As always, thank you for your courtesy and cooperation in this matter.

Very truly yours,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Gay Crosthwait Grunfeld*

By:   Gay Crosthwait Grunfeld

GCG:cn
Enclosures
cc:    Fernando Kish
       Steven Inman
       Co-counsel

[4319266.3]

**Ex. HH - 335**

# Susan R. Moe, Architect + CASp



 916-833-6479

 susan@smoearchitect.com

 Sacramento, California

 LinkedIn

 Consultforaccess.com

## A B O U T   M E

*I established Access Compliance Consulting in August of 2021 to use my twenty-five-plus years of experience to provide training, consulting, and publications focusing on accessibility in the built environment.*
*I am a sole proprietor, and a woman owned business.*

## E X P E R I E N C E

**Access Compliance Consulting**
Architect, CASp
2700 D Street, Sacramento, CA
August 2021 – Present
As a sole proprietor, I have:

- I established a consulting firm that uses my experience to provide consulting services, training, and publications.
- Worked closely with a designer to create a website where I could showcase my expertise and maintain contact with my network of fellow professionals and code users.
- Obtained AIA CES Provider status to provide AIA LU/HSW.
- Developed and delivered online webinars for Federal and state accessibility housing regulations.
- Conducted plan review consulting services for multi-family housing projects to ensure compliance with Federal and state regulations and codes.

***Division of the State Architect***
Senior Architect, CASp
*1102 Q Street, Sacramento, CA*
*January 2011 – July 2021*
Transferred to the Division of the State Architect, Headquarters Office, Access Code and Policy Unit in 2011 from the Department of General Services, Professional Services Branch. Duties included the following:

- Team member that participated in the rulemaking for the 2013 California Building Code. During that rulemaking cycle, the 2010 ADA Standards for Accessible Design became the model code for Chapter 11B. That required a complete rewrite and reformatting of Chapter 11B.
- Participated in subsequent rulemaking cycles where I focused on the federal housing-related regulations to bring Chapter 11B in alignment with those regulations.
- Developed training sessions for the DSA Academy and delivered in-person and online training. The in-person training consisted of four one-day sessions, including plan review, public housing, housing at a place of education, and updates to Chapter 11B.
- Revised and maintained the *California Access Compliance Advisory Manual.*
- Authored the *Guide to Public Housing Regulated by Chapter 11B of the California Building Code.*
- Authored the code change that completed the separation between Chapters 11A and 11B.

Ex. HH - 336

# Susan R. Moe, Architect + CASp



## E X P E R I E N C E

**E. M. Kado Associates – AIA, Inc.**
Project Manager
1661 Garden Highway, Sacramento, CA
January 1991 – October 2006
Project management duties required working as a team member and independently on projects from preliminary design to construction documents through contract administration.

- Work required knowledge of local government agency procedures (i.e., developing relationships with building and planning departments to obtain building permits and variances).
- Successful completion of projects necessitated developing working relationships with clients, consultants, contractors, and code officials.

**Projects**

- UC Davis Health Systems, Spine Center and Dermatology – Plastic Surgery Clinic, Cannery Business Park, Sacramento, California
  Lead designer for a 12,000 square floor clinic interior renovation in a restored warehouse building. The space's style, age, and seismic constraints presented a unique design challenge requiring creative floor plans and detailing.

- The Money Store, West Sacramento, California
  Lead designer supervising three staff for a tenant improvement in a ten-story 425,000 square foot office building. Building spaces included a cafeteria, auditorium, board room, training rooms, and exercise facilities. Duties included programming, space planning, contract documents, building permit submittal, and project closeout.

- California State Board of Equalization, Sacramento, California
  Team member assisting project architect for a 525,000 square foot tenant improvement. Primary duties included space planning, selecting interior finishes, and developing typical furniture workstations.

## S K I L L S  &  A W A R D S

- Attended various seminars to improve skills to develop and deliver online and in-person training.

- Used research and analysis experience to learn the rulemaking process related to the development of building code language.

- Improved my customer service skills during public meetings and responded to code users' questions.

- Participated as a Subject Matter Expert in the CASp Exam question development sessions.

- Designed the first of the open book exams for the CASp examination.

- Received the DGS Values Award in 2013 as part of the Division of the State Architect Access Compliance Team.

Ex. HH - 337

# Susan R. Moe, Architect + CASp



## TEACHING EXPERIENCE

Designed and delivered the following training sessions:

**Access Compliance Consulting Webinars**

- In-depth scoping for Accessible Housing
- Accessible Housing Site Elements and Facilities
- Common Areas within Accessible Housing Facilities
- Accessible Housing Dwelling Units
- Highlighting Accessibility Amendments in the 2022 California Building Code
- Circulation paths, Detectable Warnings, and Vehicular Traffic
- Accessible Residential Unit Kitchens
- Accessible Residential Dwelling Unit Toilet and Bathing Rooms
- LAHD Development Team and Architect Training

**DSA Academy in-person one-day sessions**

- Code Update California Building Code, Chapter 11B
- Public Housing
- Access Compliance Plan Review
- Housing at a Place of Education and Transient Lodging

**Created sessions specifically at the request of the following clients**

- City of Oroville
- City of Palo Alto
- City of Sacramento
- City of San Jose
- Pacific ADA Center
- University of California
- The California State University
- National ADA Symposium
- American Institute of Architects, Fresno
- Certified Access Specialist Institute
- City of Cupertino
- City of Petaluma

## TRAINING & EDUCATION

Apprenticeship
***E.M. Kado Associates – AIA, Inc.***
Ed Kado fostered an environment that allowed me to gain the knowledge and experience to prepare for the exams necessary to become a licensed architect.
I developed a plan of action for independent study and research to meet that goal and achieved licensure in September 2007

**Associate Degree/Interior Design**
*Weber State College, Ogden Utah*
1985-1987
Multiple Continuing Education Courses

## LICENSES & CERTIFICATES

Architect C 31311

Certified Access Specialist # 392

## MEMBERSHIPS

International Code Council

Certified Access Specialist Institute

California Building Officials

American Institute of Architects

Accessibility Professionals Association

Ex. HH - 338

# Susan R. Moe, Architect + CASp

2700 D Street
Sacramento, CA 95816
916-833-6479
Susan@smoearchitect.com



## C O N S U L T A N T   R A T E S

**Plan Review and Construction Administration Services**

| | |
|---|---|
| Construction Documents Phase | $250.00 per hour |
| Construction Administration Phase | |
| Building Permit Plan Check Comment Response | $250.00 per hour |
| Site Visit (Does not include travel expenses) | $250.00 per hour |

**Research and Consulting**

| | |
|---|---|
| Research, Opinion Letters, and Consulting | $250.00 per hour |

**Expert Witness Services**

| | |
|---|---|
| Deposition | $450.00 per hour |
| Trial Testimony | $450.00 per hour |

**Site Visits and Assessment**

The site visit fee is based on one eight-hour day.
Travel expenses are not included.                    $2,000.00

**Access Compliance Training Design and Delivery**

The presenter is approved to provide the following continuing education credits:
- AIA LU/HSW
- Division of the State Architect CASp recertification
- California Architects Board License Renewal

On-demand Webinars per Person (predetermined topic)  $95.00 - $150.00

Fees for developing specialized training on topics requested by an organization are quoted based on the training session's topic, length, and location.

# Stephen Twist Consulting, Inc.
## 4640 Tracy Lane, Garden Valley, CA  95633
## (530) 333-5118
### stwist@stci.hush.com   www.stephentwist.com

**OBJECTIVE:**
•     Providing Plan Review, Code Consulting and Casp consulting, services and inspections.

**CERTIFICATIONS:**
•     ICC Certified Plans Examiner (#5218650-60) with numerous continuing education certificates.
•     Certified Access Speacialist (CASp #393) with numerous continuing education certificates.

**CAREER HIGHLIGHTS:**
**Carlton Engineering, Inc.**
      •    Commercial Plan Review:
      ▪    Holiday Inn Express, El Dorado Hills, CA
      ▪    Kovar Karate Studio, Placer County, CA
      ▪    Mercedes Benz, El Dorado Hills, CA
      ▪    Town Center East, El Dorado Hills, CA
      ▪    Mercy Housing Project, El Dorado Hills, CA
      ▪    El Dorado Hills Auto Lube & Car Wash
      ▪    Residential Plan Review:
      ▪    Fire, Life and Safety & Structural:  El Dorado, Placer, Sacramento County and City of Sacramento

**EMPLOYMENT HISTORY:**
•     <u>Stephen Twist Consulting, Inc. 2/2016 - Present</u>
•
•     <u>Bureau Veritas – Plans Examiner, CASp 5/2009 to 1/2016</u>

•     <u>Twister's Design – Desiger / Drafter 4/2008 to 5/2009</u>

•     <u>Willdan Inc. 6/2007 – 3/2011</u>

•     <u>City of Folsom – Plans Examiner II  2/2008 – 6/2008</u>
     Commercial Plan Review, CASp

•     <u>Twister's Design   2/2007 – 2/2008</u>
     Design, Plan Review, Permit Expediting

•     <u>4 Leaf, Inc. – Plan Review Consultant for the City of Sacramento, 2/2006 – 2/2007</u>
     Plan Review, Permit Counter, Permit Issuance

•     <u>Carlton Engineering. Inc.- Certified Plans Examiner, 2002-2006</u>
     Plan Review, Marketing, Seminar Presentation, Business Development

•     <u>Steve's Tractor Service-Owner Operator, 1989-2002</u>
     Equipment Operator, Estimates, Sales, Marketing, Data Entry, Data Base Set-up, Personnel, Quick Books

**EXPERIENCE:**
•     Construction, Excavation Contractor, Owner/Operator, Plans Examiner, Proposal/Bids, Billing, Accounting
•     Job Skills:  Plan Review, Accessibility , Fire, Life and Safety, PM&E, Structural
•     Business Management:  Promotional Marketing, Production Management, Customer Relations, Maintenance Marketing, Accounts Receivable

**EDUCATION:**
•     Continuing education towards certifications
•     "On the job" education as a heavy equipment operator
•     Hands On Computer Learning Center, Rohnert Park, CA, Certified Computer Technician, 8/98
•     Santa Rosa Junior College, Dean's List (3.8 GPA)

**REFERENCES AVAILABLE UPON REQUEST**

**Ex. HH - 340**



Fee Schedule

Certified Access Specialist, (CASp) Services
    Consultation
        Phone call questions and quick answers        $210.00 per hour
    Investigations, review of documents, etc.          $300.00 per hour
    Plan Review        $300.00 per hour
    Inspections
        Varies from project to project but based on        $210.00 per hour
    Expert Witness        $375.00 per hour

California Building Code
    Consultation
        Phone call questions and quick answers        $210.00 per hour
    Plan Review        $300.00 per hour
        Varies from project to project but based on        $300.00 per hour
    Expert Witness        $375.00 per hour

Professional Letters    ($500.00 Minimum)        $300.00 per hour

Ex. HH - 341

# EXHIBIT II



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email: ggrunfeld@rbgg.com

September 9, 2024

<u>VIA ELECTRONIC MAIL ONLY</u>

Elizabeth M. Pappy                          Susan E. Coleman
Burke, Williams & Sorensen, LLP             Burke, Williams & Sorensen, LLP
60 South Market Street, Suite 1000          501 West Broadway, Suite 1600
San Jose, CA  95113-2336                    San Diego, CA 92101-8474
epappy@bwslaw.com                           scoleman@bwslaw.com

      Re:    Defendants' ADA Plan and Request for Document Production
              and Information
              *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
              S.D. Cal. No. 3:20-cv-00406-AJB-DDL
              <u>Our File No. 1730-01</u>

Dear Beth and Susan:

      With Defendants' ADA Plan now approved, "Plaintiffs shall be allowed access to relevant documents and records in Defendants' custody and control relevant to the provision of Sign Language Interpretation to incarcerated people with hearing disabilities." ADA Order, Dkt. No. 355 at 8.

      According to the September 1, 2024 Rosters ("August Rosters"), as of August 31, 2024, there were 8 persons with hearing disabilities who use sign language to communicate incarcerated in San Diego's jail system.

      With respect to each of these individuals, we request that Defendants produce the following documents and records:

- JIMS tracking mechanisms or logs that relate to "effective communication needs, including as to Sign Language Interpretation[]" (Dkt. 355 5).

- Documentation of the provision of sign language interpretation to these individuals and others who need it in all "medical and mental health encounters, booking classification proceedings, available structured

[4556447.2]

**Ex. II - 343**

Elizabeth Pappy
Susan Coleman
September 9, 2024
Page 2

programming, … investigative purposes and disciplinary proceedings."
(*Id.* at 4; *see also* policy P. 11 at 7).

In addition, we request:

- All Incident Reports in JIMS documenting when staff identify an incarcerated person's effective communication need not in that person's JIMS Medical Instructions (*see* P.11, p. 4).

- All Auxiliary Aid Device Logs (*see* P.11, p. 9)

The August Rosters also showed that 8C remains closed for construction, meaning wheelchair users are moved to other units where they lack the same accessible features. In addition, we continue to see multiple individuals who use wheelchairs housed in the celled units on the seventh floor, when only one cell in each unit is designated as accessible. The construction in 8C appears to be exacerbating this issue by forcing even more people with mobility disabilities into those units. Could you please provide an update on when 8C will be reopened and what interim accommodations individuals who have been moved from 8C are being provided while housed in cells on the seventh floor?

We appreciate the production of the Facility Handbook on September 5, 2024, Bates SD_1579793. We are pleased that the ADA has now been included as a topic in that document, albeit cursorily and without listing available accommodations. According to the new Handbook, grievances now have the ADA box to check. Could you please confirm that the Facility Handbook is final and being given to incarcerated people? Could you also please confirm that the grievance form has been updated to include an ADA box?

We are glad that Eric McSwain has now been retained as the neutral expert, and that you are in the process of providing him access to Central Jail. As you saw last week, we sent Mr. McSwain the August Rosters, the Order re Plaintiffs' Objections to Defendants' ADA Plan (Dkt. No. 620), and the Joint Motion to Approve San Diego Sheriff's Office Amended Action Plan for the County Jails (Dkt. No. 695).

We would appreciate receiving the documents and information requested here within two weeks of this letter.

Elizabeth Pappy
Susan Coleman
September 9, 2024
Page 3


       As always, we appreciate your courtesy and cooperation in this matter.

                          Very truly yours,

                          ROSEN BIEN
                          GALVAN & GRUNFELD LLP

                          */s/ Gay Crosthwait Grunfeld*

                    By:  Gay Crosthwait Grunfeld

GCG:bf
cc:    Co-counsel

**Ex. II - 345**

# EXHIBIT JJ

# Sheriff agrees to make all jails safer for people with disabilities

**U-T** sandiegouniontribune.com/2024/12/13/sheriff-agrees-to-make-all-jails-safer-for-people-with-disabilities

Kelly Davis                                                                                  December 13, 2024



Eduardo Contreras / The San Diego Union-Tribune
All of San Diego County's jails — including the George Bailey Detention Facility, pictured Thursday, May 25, 2023 — will get upgrades to comply with disabilities law under a new settlement. (Eduardo Contreras / The San Diego Union-Tribune)



By Kelly Davis | kellydaviswrites@gmail.com
UPDATED: December 13, 2024 at 3:22 PM PST

San Diego County Sheriff Kelly Martinez has agreed to make significant changes to San Diego jails to better accommodate people with disabilities.

The agreement follows nearly 18 months of negotiations with a group of civil rights attorneys who sued to force the sheriff to comply with the Americans with Disabilities Act.

Ex. JJ - 347

The lawsuit, filed in February 2022, argued that none of the county's jails met ADA standards and that the Sheriff's Office had engaged in "systemic and willful discrimination against, and failure to provide reasonable accommodations in, programs, services, and activities to incarcerated people in the Jail who have disabilities."

Plaintiffs included a deaf man who, despite struggling with thoughts of suicide, was never provided a sign language interpreter.

Other plaintiffs with mobility issues said they suffered falls and injuries while struggling to use toilets or showers that weren't outfitted with grab bars or shower seats, or while trying to hoist themselves onto bunk beds.

The lawsuit was filed days after the release of a state audit concluding that conditions in San Diego County jails were so unsafe that legislation was needed to force reforms.

Among other changes, the Sheriff's Office has promised to modify showers, toilets and beds to meet ADA standards.

The settlement also requires that people with intellectual, learning and developmental disabilities be given appropriate support and that people who require assistive equipment — like wheelchairs, walkers or CPAP machines — be allowed access to it.

Seven other causes of action remain to be litigated in the class-action lawsuit, but attorneys say the partial settlement is a significant step in the right direction.

"This agreement provides a blueprint for ensuring the County's compliance with the law and meaningful improvements to how our clients with disabilities are treated," said Aaron Fischer, one of the lawyers representing plaintiffs.

The settlement follows an initial agreement reached in June 2023 that focused on modifications to the San Diego Central Jail, the sheriff's main intake facility, and providing sign language services.

Ex. JJ - 348



Entrance to the sheriff's intake at San Diego Central Jail in downtown San Diego. (Nelvin C. Cepeda / The San Diego Union-Tribune)

Since that initial agreement, the Sheriff's Office has created an ADA unit consisting of three deputies, one sergeant, one lieutenant and a nurse. The unit also gets support from a mental health clinician.

"The custody, medical and mental health staff members within and supporting the ADA unit shall have staffing, resources and authority necessary to ensure that incarcerated people with disabilities timely receive reasonable accommodation and equal, meaningful access to programs, services, and activities," the settlement says.

Gay Grunfeld, one of the plaintiffs' attorneys, described the ADA unit as doing an "outstanding job" ensuring that staff receive training on complying with the federal disability law.

"We look forward to working with the Sheriff's Office to bring the jails into full compliance as rapidly as possible, including through enhanced access to programming for people with disabilities," she said.

Under the agreement, two independent experts will be appointed to determine, through twice-yearly reports, whether the Sheriff's Office is complying with the terms of the settlement.

Ex. JJ - 349

In a news release announcing the settlement, the Sheriff's Office said it had "taken significant steps to increase access for persons with disabilities in county jails."

In addition to establishing the ADA unit, the Sheriff's Office created a process to better identify people with disabilities and make sure they get whatever accommodations they need.

"Sheriff Kelly A. Martinez is grateful for the work that went into this mutually agreed upon settlement," the department said in a statement. "While this settlement agreement is not a consent decree, the Sheriff's Office is committed to compliance with all the terms."

The agreement still requires approval by Judge Anthony Battaglia, who will oversee its implementation.

"The court shall retain jurisdiction to enforce the terms of this ADA settlement agreement and order, including through specific performance and all other remedies permitted by law or equity," he said in an order issued on Thursday.



In Feb. 2018, Frankie Greer had a seizure and fell from the top of three jail bunks, suffering a serious brain injury. (Courtesy of Julia Yoo)

Over the years, San Diego County has paid out tens of millions of dollars in legal settlements to people gravely injured in jail and to the families of those who died there.

Ex. JJ - 350

This includes nearly $8 million paid to Frankie Greer — a U.S. Army veteran, musician and artist who was ordered to sleep at the top of a three-tier bunk bed despite having a medically diagnosed seizure disorder.

Deputies confiscated his medication and did not provide a suitable alternative, his lawsuit alleged. Greer experienced a seizure, fell from the bunk and suffered a serious brain injury.

Earlier this year, the Sheriff's Office was sued by the family of Roselee Bartolacci, a 32-year-old developmentally disabled woman with schizoaffective disorder. By the time she died in sheriff's custody weeks after booking, she had lost 44 pounds from refusing medication, food and water, her lawsuit alleges.

"They left Roselee in her cell crying and moaning and sucking her thumb, speaking in gibberish and sitting in her own urine," the family's attorney, Julia Yoo, told The San Diego Union-Tribune.

The remaining causes of action in the class-action case accuse the Sheriff's Office of failing to provide adequate medical and mental health care, failing to ensure the safety of people in custody, failing to provide adequate dental care and wrongly denying access to legal counsel.

Grunfeld said she expects those claims to go to trial as soon as this coming spring, "unless the county agrees to resolve them before then."

Originally Published: December 13, 2024 at 2:41 PM PST

**Ex. JJ - 351**