| | |
|---|---|
| 1 | Susan E. Coleman (SBN 171832)<br>E-mail: scoleman@bwslaw.com |
| 2 | Deann Rivard (SBN 177482)<br>drivard@bwslaw.com |
| 3 | Martin Kosla (SBN 247224)<br>E-mail: mkosla@bwslaw.com |
| 4 | BURKE, WILLIAMS & SORENSEN, LLP<br>501 West Broadway, Suite 1600 |
| 5 | San Diego, CA 92101-8474<br>Tel: 619.814.5800  Fax: 619.814.6799 |
| 6 | |
| 7 | Elizabeth M. Pappy (SBN 157069)<br>E-mail: epappy@bwslaw.com |
| 8 | BURKE, WILLIAMS & SORENSEN, LLP<br>60 South Market Street, Ste. 1000 |
| 9 | San Jose, CA 95113-2336<br>Tel: 408.606.6300  Fax: 408.606.6333 |
| 10 | Attorneys for Defendants |
| 11 | COUNTY OF SAN DIEGO, SAN DIEGO<br>COUNTY SHERIFF'S DEPARTMENT and |
| 12 | SAN DIEGO COUNTY PROBATION<br>DEPARTMENT |

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 16 | DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF JOHN O'CONNOR IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS**<br><br>*Filed concurrently with Defendants' Opposition and Declaration of Elizabeth Pappy* |
| | Plaintiffs, | |
| | v. | **Date:** March 27, 2025<br>**Time:** 2:00 p.m.<br>**CTRM:** 4A |
| | SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, | Judge: Anthony J. Battaglia<br><br>Magistrate Judge David D. Leshner |
| | Defendants. | |

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 3:20-cv-00406-AJB-DDL
DECL. OF JOHN O'CONNOR ISO OPP TO
ATTYS' FEES AND COSTS MOTION

# DECLARATION OF JOHN D. O'CONNOR

I, John D. O'Connor, do hereby declare as follows:

## I. EDUCATION, EXPERIENCE AND WORK HISTORY

1. I am an attorney licensed to practice law in all courts in the State of California and have been so licensed since December 1972. I am currently the principal of O'Connor and Associates, a law firm consisting of myself and several associates specializing in commercial litigation. I have fifty-two years of significant trial experience, including current jury trial experience. In addition to my litigation practice, I have been retained as an attorney fee expert on approximately three hundred occasions and have served as a consulting expert on many more occasions.

2. The following is a summary of my background and qualifications.

3. I attended The University of Notre Dame in South Bend, Indiana, where I graduated *magna cum laude* in 1968. In 1972, I graduated *cum laude* from the University of Michigan Law School, where I was a member of the *Order of the Coif* and Associate Editor of the Michigan Law Review. I was admitted to the California bar in 1972.

4. After being admitted to the California bar, I held numerous positions at private law firms where my practice focused on trial litigation. In 1972 and 1973, I was an associate with the trial firm of Belli, Ashe, and Choulos, where I assisted Mr. Melvin Belli in the trial of several large cases and tried three cases on my own. From January 1974 through December 1979, I was an Assistant United States Attorney for the Northern District of California in San Francisco. In that capacity, I tried white-collar criminal cases as well as a variety of civil matters. Much of my civil work with the U.S. Attorney's office involved employment discrimination cases brought against Government facilities, including one class action race and discrimination case, which involved negotiating fees for thirteen lawyers. In 1980 and 1981, I was a senior associate at the prominent San Francisco firm of Brobeck, Phleger, and Harrison.

1        5. From 1982 through 2001, I was a principal and managing partner of the law firm of Tarkington, O'Connor & O'Neill, where our clients were mainly insurance companies, corporate risk management departments, and governmental entities, such as the FDIC, FSLIC, RTC, NCUA, and the United States government.

      6. From 2001 through 2006, I was Special Counsel and a Director (equivalent in a legal corporation to a partner) for the Howard Rice firm, now merged with Arnold and Porter, practicing within the litigation department. At Howard Rice, I pursued a high-stakes litigation practice, including the defense of R. J. Reynolds Tobacco Company and intellectual property disputes. At Howard Rice, I was designated as chief trial counsel in two major "soft IP" litigations, each case involving the scope of rights transferred under specific contractual arrangements, one representing an e-commerce platform provider and another representing Vivendi regarding the scope of rights to license video games in internet café settings.

      7. Since July 2006, I have practiced on my own with several associates under the name of O'Connor and Associates. My practice focuses on complex business litigation, with some personal injury work for both plaintiff and defense, including an active trial practice. In my career, I have tried over seventy civil and criminal cases in state and federal jurisdictions throughout the country. Approximately one-third of my time has been spent as a consultant and expert witness in attorney fee disputes. In such disputes, I have assisted parties seeking fees and those seeking to oppose or reduce them.

      8. In 1982, I began managing the Tarkington office, and as our firm quickly grew to over eighty lawyers, I regularly kept abreast of billing standards in the community and regularly subscribed to specialized publications geared to law firm management, such as the Altman and Weil annual reports and the monthly published Partners' Report. I also regularly reviewed more widely published legal periodicals.

      9. As written billing guidelines became in vogue for institutional clients in the mid-eighties, I participated heavily in working with our institutional clients in government,

**DECLARATION OF JOHN D. O'CONNOR**   2

insurance, and other large businesses to establish and implement practical billing standards. I regularly consulted with these clients about their perception of the positive and negative in our billings and, where appropriate, remedied the same.

10. I have kept abreast of the billing rates in both Northern and Southern California, and generally throughout the country since 1982. Because we represented clientele in different business and governmental sectors, it was important to me to be conversant about rates throughout the litigation field ranging from premium to lower, more commoditized rates.

11. Because our practice at the Tarkington firm often involved coverage, legal malpractice, and reinsurance and excess monitoring work, we reviewed the billings of a wide variety of firms in our regular practice, including premium-rate billings, lower, highly negotiated insurance defense charges, and standard business litigation charges with rates falling between these two groups.

12. Although I have been involved in a significant amount of legal fee review, negotiation, and litigation since 1977, my involvement in legal fee dispute work increased significantly in 1989. In that year, I was the Tarkington partner in charge of our work with failed and failing financial institutions on behalf of the FDIC, FSLIC, RTC, and NCUA. At that time, we had performed extensive work in connection with the failed Golden Valley Bank, Turlock, California (then in Receivership under the aegis of the FDIC). The insurance carrier for the bank insisted that we advise the government to release the insurance carrier from its defense obligations with a nominal payment. After our refusal, the insurance company subjected the Receiver and our firm to numerous audits in an unsuccessful attempt to force the government to release the carrier from its obligations. At this point, I necessarily became immersed in the various billing standards prevalent in the community.

13. During these years of legal fee disputes, I spent much of my time dealing with the developing field of legal "auditing" and related litigation. As a result, I gained a wide knowledge of auditing practices, prevailing billing standards, and approaches employed by

1  legal fee experts, auditors, and litigators.

2      14.    Due to my growing expertise in legal fee and auditing issues, during the years 1991 through 2001, I consulted with numerous law firms throughout the country who were seeking my advice on audit criticisms leveled against their practices, almost invariably involved in large fee disputes. I also consulted on numerous occasions with fee payors in fee disputes. I continue this work as a subspecialty of my litigation practice through the present time.

    15.    I have been retained as an attorney fee expert on approximately three hundred occasions and have served as a consulting expert on many more occasions. A significant portion of those cases have been large and complex.

    16.    In total, I have testified as an expert or handled litigation in approximately twenty states. I regularly review published rate surveys, generally broken down by location, fields of practice, firm size, and lawyer status. For the past several years, I have also been consulting and lecturing nationwide through the auspices of the National Association of Legal Fee Analysis ("NALFA"). In addition to lecturing myself, I have attended numerous lectures of legal fee analysts, expert witnesses, and general counsel on fee matters. I have been named by NALFA the "nation's top attorney fee expert" since 2017.

    17.    I have experience defending "access" ADA claims and have opined as a fees expert in several such cases.

    18.    In rendering my opinion, I have reviewed the following: Third Amended Complaint; Motion for Preliminary Injunction and Class Certification; the Court's February 14, 2024, Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel; Plaintiffs' Motion for Attorney Fees and Costs with accompanying Declarations and MPA; and Briefing Schedule on Plaintiffs' Motion for Interim Attorneys Fees and Costs. I have also had multiple discussions with Elizabeth Pappy concerning the procedural history and settlement negotiations.

DECLARATION OF JOHN D. O'CONNOR    4

1    19.    My *Curriculum Vitae* is attached hereto as **Exhibit A**.

2    20.    As a result of the foregoing, I believe I am competent to render expert opinions
3    about the reasonableness of the billings in this case.

4    **II.    SUMMARY OF OPINIONS**

5    21.    Plaintiffs herein request 2,717.86 hours for $2,269,565.21 in fees, comprised of
6    2,553.41 hours for $2,111,562.63 in fees for merits and 164.45 hours for $158,002.58 in fees
7    related to the instant Motion for Attorneys' Fees. I have attached hereto as **Exhibit B** a chart
8    summarizing Plaintiffs' requested lodestar. I note that I have applied Plaintiffs' 5% deduction
9    to each entry on a pro rata basis to calculate Plaintiffs' requested lodestar, and that all figures
10   herein relate to Plaintiffs' requested lodestar.

11   22.    This case, while styled a class action, did not have the complex issues involved
12   in most class actions, and, indeed, as soon as the County saw the ADA issues were real,
13   immediately agreed to talk settlement and did not oppose class treatment, a natural outcome of
14   facility-wide ADA issues.

15   23.    Contrary to the moving papers, this case is not at the same level of complexity as
16   *Bloom v. City of San Diego* 2024 U.S. Dist. LEXIS 18751817 (S.D. Cal. No. cv-02324-AJB-
17   DEB Oct. 15, 2024), a highly complex action litigated before this Court with most of the
18   difficult issues normally litigated in class actions.

19   24.    While the Declaration of Shawna Parks notes high rates were awarded by the
20   Court in *Bloom*, the published case reflects that the City of San Diego stipulated to $2,950,000
21   in fees and costs. In granting Plaintiffs' motion, the Court noted that the fee requested
22   represented over a 50% reduction of Plaintiffs' total lodestar. Even if these fees and constituent
23   rates were actually awarded by the Court without stipulation, that case is far different from this
24   case in terms of the complexity of the issues and skill needed to litigate them.

25   25.    The rates here awarded should reflect those awarded in other ADA barrier/access
26   cases, as opposed to complex civil rights actions. A failure to have a grab bar for a toilet in a

27

**DECLARATION OF JOHN D. O'CONNOR    5**

private facility is the same issue as not having a grab bar for a toilet in a prison. To be sure, the remediation and monitoring plans were aided by senior counsel's familiarity with prisons and other similar processes and, therefore, deserve a modestly higher rate than single business ADA access cases.

26. Accordingly, the rates here should be pegged off an ADA fee scale, not fees awarded in complex class actions or to large firms in complex litigation, but with some enhancement for the above-added factors.

27. The top end of the rate scale should be $760 per hour, a rate to be awarded to Ms. Grunfeld and Mr. Fischer. Because of his prominence, Mr. Rosen should be awarded a good rate, but one that is high, $725, for drafting fee motions. Other rates should be pegged downward from these top rates.

28. In short, the rates of petitioning counsel should not reflect rates awarded either to them or to other law firms in entirely different cases with different degrees of difficulty, in different geographical markets. Indeed, other issues to be litigated in this case in the future may be far more complex than the ADA issues, and perhaps alternative fee scales should be employed at such point.

29. In this case, the fees for this particular motion, over $158,000, are excessive in the extreme. Mr. Rosen, prominent and highly respected though he is, did not come to prominence by drafting fee motions, which junior partners or senior associates typically prepare. A rate of $1,625 per hour for drafting a fee motion is excessive in the extreme, and has no precedent in any case where a high-rate lawyer's only participation in a case is drafting a motion.

30. The case law clearly mandates that market rates in the forum market apply unless prevailing party carries its burden to establish that there are no capable lawyers in the area. This motion has not shown that no capable ADA lawyers in the San Diego area were willing to take this case.

**DECLARATION OF JOHN D. O'CONNOR** 6

31. The hourly rates for lawyers in the Southern District of California are modestly below those of the Central and Northern District. However, the main driver of rates here is not so much locality as it is the market rates for straightforward ADA "access" cases, with perhaps some enhancement.

32. While petitioning counsel has claimed that they only seek compensation for ADA work and have excised non-ADA time (including excising time with only partial ADA work), this claim does not appear to be the case.

33. The first Motion for Preliminary Injunction and Class Certification – which was denied – only glancingly dealt with ADA issues. Out of a 35-page brief, for example, less than two pages (p. 26, l. 10-p. 28, l. 1) dealt with ADA issues, and at that only generally.

34. There appears to have been substantial work not involving ADA issues in this initial stage for which petitioning counsel is seeking fees. Once the County, after investigation, realized there were ADA deficiencies, it promptly wrote Plaintiffs' counsel on several occasions in early 2023, seeking settlement talks on ADA issues. The County was thereby admitting that there were ADA problems, which necessarily also meant that treatment of them would be appropriate on a class basis, and, accordingly, the County never opposed class treatment.

35. If there were complex issues of class certification, as in *Bloom v. City of San Diego*, *supra*, such would add an element of complexity to this litigation, but at least as to ADA issues, there was no such complexity.

36. It appears that while the Plaintiffs' counsel was ignoring imprecations by the County's counsel to begin ADA settlement talks, they were feverishly drafting a Motion for Preliminary Injunction and Class Certification, work for which they are here seeking full fees. The only possible benefit of making such a formal motion was creating a justification for fees. Because the County would do exactly what it did with or without that Motion, it is not clear that the time spent drafting this Motion was necessary and deserving of full compensation.

**DECLARATION OF JOHN D. O'CONNOR**     7

37. Since the motivation for the Motion itself was not necessarily the public interest but, rather, more likely for private gain, I opine that much of the time should not be compensated unless, and to the extent that any of the work in preparing such Motion was useful for the subsequent settlement talks. Remarkably, fourteen timekeepers billed during this period.

38. From the preparation of this second Motion forward, the Plaintiffs' counsel could have reasonable certainty that their efforts could be compensated, which in turn could incentivize overstaffing and unneeded work.

39. Whether compensation was a motive, or simply inefficiency born of excitement over a pending victory, the overstaffing, redundancy, and duplication of the services rendered became palpable and substantial.

40. The rates I assign to successful counsel are at the highest levels charged by firms in the broad market, generally firms under 25 lawyers. Indeed, they are somewhat higher than one normally sees in the broader market for these firms.

41. It is my opinion, to be sure, that smaller firms can deserve large firm rates in certain types of cases such as complex civil rights litigation. But those rates are not applicable where there are not truly complex class or substantive issues. There was no true class certification litigation here, and the underlying issues of ADA mobility access are somewhat common. Issues such as grab bars in toilet stalls and wheelchair access to various locations are not arcane or difficult issues.

42. In addition to assigning rates topping out at $760 per hour, I will calculate the number of hours that are reasonably spent on the work involved.
In this case, at least regarding the ADA portion of the case, there was an unusually high number of lawyers working on what would appear to be a relatively straightforward set of issues involving access and barriers. To the extent any work here was overstaffed or any project inefficiently pursued because of duplication or simply excessive time, I will recommend appropriate adjustments.

**DECLARATION OF JOHN D. O'CONNOR**     8

III. **DISCUSSION**

**Reasonable Rates for RBGG and Fischer Lawyers**

43. "In determining hourly rates, the court must look to the 'prevailing market rates in the relevant community.' The rates of comparable attorneys in the forum district are usually used." (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1009 [citations omitted.]) To obtain higher, home market rates, fee petitioner must make "a sufficient showing … that hiring local counsel was impracticable." (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1244). The *Nichols* Court found that, unlike *Horsford*, wherein "plaintiff submitted a declaration showing extensive efforts to find local counsel that were wholly unsuccessful," plaintiff's "concerns that she would be unable to find adequate representation" were insufficient. (*Id.* at 1243-1244.) Plaintiffs submitted no declaration to support their claims of unavailability of local counsel, instead relying on conclusory statements by Plaintiffs' counsel. As such, I opine that the relevant market herein is San Diego, and that rates awarded in other jurisdictions are irrelevant herein. I note that the rates that a San Diego office of the top national law firm purportedly charge for unspecified work are not probative of reasonable rates herein, nor are the rates awarded to Plaintiffs' law firms in jurisdictions across the nation. It goes without saying that the approval of a law firm's rates in one jurisdiction does not render all of the law firm's rates for all matters litigated nationwide reasonable.

44. ADA lawyers specializing in access and/or barriers, such as involving wheelchair access, do not command high rates in the marketplace, and reviewing courts have so affirmed that the rates to be applied are more or less in the middle of the small firm litigation market rate range.

45. For example, Potter Handy, a leading firm in California pursuing plaintiffs' claims of mobility access, has offices in San Diego. Potter Handy has had great difficulty obtaining rates above $500 per hour for a partner, and I do not believe I have seen a Potter Handy rate awarded at $600 or above.

**DECLARATION OF JOHN D. O'CONNOR** 9

46. I personally have defended "access" ADA claims for a single site, which are fairly cut-and-dry cases. There are applicable rules and principles about, for example, wheelchair access and grab bars, which skilled litigators cannot alter. Practical remediation can be an issue, to be sure.

47. In any event, the rates of Potter Handy are certainly yardsticks by which to measure rates in this case, although I hasten to add that this case had the added complication of a remediation plan and limited oversight by Plaintiffs counsel across several sites, which required some knowledge of jails and jail procedures as well as oversight protocols.

48. It is my view that the ADA rates should be enhanced, but because this case is not a complex substantive case or complex class action case, large firm, complex case rates are simply not applicable. At the same time, the highest part of the regular broader market is a suitable comparator for rates to be awarded to the supervising lawyers in this case. The yeoman lawyers in the case should be compensated at modest market rates.

49. In the 2022 Southern District case of *Schutza v. Costco* (S.D.Cal. Mar. 29, 2022, No. 19-CV-00990 DMS (WVG)) 2022 U.S.Dist.LEXIS 57745, a classic ADA "access" case brought by Potter Handy, the firm sought rates of $400-$650 per hour. The Court awarded partner Russell Handy $525 per hour and experienced counsel James Boyd $500 per hour as the top rates. In *Langer v. Four Stars Enter. Inc.* (S.D.Cal. Aug. 22, 2022, No. 19-cv-01058-AJB-LL) 2022 U.S.Dist.LEXIS 248739, a smaller 2022 Southern District ADA case without extensive fee litigation, the Court found rates at $400-$650 per hour to be appropriate, although the lack of litigation as to rates, and the modest hours makes this precedent not as definitive.

50. More impressively, in the Central District in 2024, in *Duarte v. Flores* (C.D.Cal. July 11, 2024, No. LA CV18-00484-JAK (PJWx)) 2024 U.S.Dist.LEXIS 128234, Potter Handy was awarded rates ranging from $400-$595 per hour, which I consider to be at the top of ADA access rates for the entirety of California. I am familiar with rates in the Eastern District, which

are far lower, and the Northern District rates, which are somewhat more modest than those in the Central District.

51. So, rates that top out at $595 per hour accurately characterize the market for ADA access lawyers. Here, the ADA issues are of similar, modest difficulty found in most ADA access cases, but as noted above, there is the added burden of a sound remediation plan and limited oversight thereof, as well as knowledge of the prisons involved. Accordingly, these rates should be enhanced.

52. The broader market in San Diego reaches its top stratum at approximately $650 per hour. I have attached as **Exhibit C** the National Association of Legal Fee Analysis ("NALFA") survey data cut for the San Diego area. The NALFA survey is the most reliable and depicts the entirety of the legal market. It is valuable because it is not focused on regional and national firms, like other surveys, such as the Real Rate Report ("RRR").

53. But even in the Real Rate Report ("RRR"), data cuts for San Diego (attached hereto as **Exhibit D**), the "median" litigation partner rate is $400 per hour, an extremely low rate. The third quartile rate is $902 per hour, a very large and odd jump from the median in comparison to the median of the market. The average litigation partner rate is $568. The median litigation associate rate is $250, the third quartile rate is $343, and the average litigation associate rate is $315. However, I note that San Diego litigation rates are substantially lower that Plaintiffs' requested rates and the evidence proffered in support thereof. This wide gap between the median and the third quartile is evidence of a market that is very modest, except for high rates in large firms. So, I look to the NALFA survey, which shows various striations in the market so as to fairly slot the lawyers here, somewhere between these two extremes.

54. Because the NALFA survey breaks down the market into various strata, one can discern from NALFA where the broader, market-driven sector ends and the large national firm sector begins, usually at the 70th percentile, more or less, of the rates depicted in the NALFA

DECLARATION OF JOHN D. O'CONNOR    11

1  survey. Per **Exhibit C**, only 2.15% of San Diego attorneys bill in excess of $1,300 per hour, and only 12.4% of San Diego attorneys bill in excess of $950 per hour.

55. I acknowledge that Mr. Fischer has great experience in various case issues, perhaps more in the mental health area than the average practitioner. Ms. Grunfeld is obviously experienced in civil rights litigation. Therefore, I assign the top rate of $760 per hour to Mr. Fischer and Ms. Grunfeld. This rate is between the 68th and 73rd percentile of lawyers practicing in San Diego. Those charging higher would be for the most part partners in large national or regional firms. This rate is higher than I would impute to be the top of the ADA access market at approximately $600 per hour.

56. As noted above, as skilled as Mr. Rosen is at civil rights litigation, there is no showing that he has expertise in drafting fee motions. But, nonetheless, because of his stature and general experience in civil rights litigation, I will assign him a rate of $725 per hour, perhaps a bit on the high side for an attorney drafting a fee motion, but we will assume his excellence in such drafting. A rate of $725 is between the 60th and 68th percentile of San Diego attorneys.

57. I am familiar with the San Diego market and know that fine litigators cannot charge $760 per hour with any regularity in the broad market. The San Francisco Bay Area and the Los Angeles metropolitan area have higher rates than the rest of the state, and those are two areas in which I practice regularly. My rate for practice in these areas is $635 per hour, perhaps a bit low for the market, but I do sense a reluctance in the market in which I practiced when rates reach about $700 per hour. Accordingly, the rates I assign to the three leading lawyers in this case are quite generous even for San Francisco Bay Area and Los Angeles markets.

58. Mr. Swearingen, a 16-year lawyer, deserves a rate of $675 per hour; Mr. Nunez, a 13-year special counsel, deserves a rate of $625 per hour; Ms. Kaul, a 9-year special counsel, deserves a rate of $575 per hour Mr. Anderson, a 7-year lawyer, deserves a rate of $500 per hour; Mr. Chartoff, a 6-year lawyer, deserves a rate of $465 per hour; and Mr. Holston, a 3-year

DECLARATION OF JOHN D. O'CONNOR     12

1  lawyer, deserves a rate of $300 per hour. I note that a rate of $675 is between the 52nd and 60th

2  percentile; a rate of $625 is between the 44th and 52nd percentile of San Diego attorneys; a rate

3  of $575 is between the 36th and 44th percentile; a rate of $500 is between the 27th and 36th

4  percentile; and a rate of $465 is between the 18th and 27th percentile.

5     59.    RBGG requests rates of $300 to $350 for paralegals, which I opine is high for the

6  San Diego market. I opine that a rate of $250 is reasonable for paralegals herein.

### Reasonable Rates for DLA Piper Lawyers

8     60.    The rates of DLA Piper are greatly inflated and inappropriate for this type of

9  case. DLA has shown no expertise in the particular field and, moreover, was unwilling to

10 devote sufficient resources to the case. Its role is mainly as a facilitating local counsel. I assign

11 a modest rate of $450 for Mr. Young and $350 for DLA Piper associates I assign a modest rate

12 of $350 per hour. I saw no unusual or unique value to the DLA Piper work here, although I

13 applaud the lawyers for being involved in a case that would likely be considered a *pro bono*

14 case for DLA Piper, which is useful in attracting associates to the practice.

### Reasonable Hours

16    61.    It is well settled that "a trial court may not rubberstamp a request for attorney

17 fees but must determine the number of hours *reasonably* expended." (*Donahue v.

18 Donahue* (2010) 182 Cal.App.4th 259, 271; *see also*, *Baxter v. Bock* (2016) 247 Cal.App.4th 775,

19 793 [prevailing party is "not entitled to compensation for … work merely because it was

20 performed."].) "'Reasonably spent' means 'padding' in the form of inefficient or duplicative

21 efforts is not subject to compensation." (*Rey v. Madera Unified School Dist.* (2012) 203

22 Cal.App.4th 1223, 1243 [citing *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132].) "A reduced

23 award might be fully justified by a general observation" that a case was "overlitigated."

24 (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 101.)

25    62.    This case is broken down into three stages.

DECLARATION OF JOHN D. O'CONNOR    13

63. The first stage involved the period up through the denial of the first Motion for Preliminary Injunction and Class Certification in which the prevailing counsel seeks 153.14 hours for $106,295.50.

64. The second stage involved the period from August 6, 2022, through June 21, 2023, when the successful Motion was made in which counsel seek compensation for 14 lawyers for 1,320.025 hours for $1,047,286.65.

65. The third stage, from June 22, 2023, involved the period from the ultimate successful resolution during which compensation is sought for 1,244.69 hours for $1,115,983.05.

66. I have attached hereto as **Exhibit E** a series of charts reflecting Plaintiffs' billings by phase, including a summary of billings by firm (**Exhibit E-1**) and a chart reflecting each law firm's billings by timekeeper for each phase (**Exhibits E-2 to E-4**). I distinguish these three stages because each has different characteristics that pertain to the reasonableness of the hours charged.

67. I have reviewed and analyzed Plaintiffs' invoices and I have prepared a series of exhibits, attached hereto as **Exhibit F**, including a summary (**Exhibit F-1**); Phase 1 tasks (**Exhibit F-2**), Phase 2 tasks (**Exhibit F-3**), and Phase 3 tasks (**Exhibit F-4**). Using **Exhibit F**, I have also prepared a chart reflecting each timekeepers hours billed per task, which I have attached hereto as **Exhibit G**.

### Stage 1: Beginning – August 15, 2022

68. In the first stage, largely unsuccessful, I do note that Plaintiffs have charged for hours that only partially or glancingly refer to the ADA success ultimately achieved, and are interwoven with the other issues involved. Because of this interweaving, it is difficult to isolate those hours from this time which can be said not to relate to ADA issues.

69. Per **Exhibits F-1, F-2 and G**, Phase 1 activities included RBGG's and Mr. Fischer's case intake and development activities as well as activities related to the first Motion

DECLARATION OF JOHN D. O'CONNOR     14

for Preliminary Injunction. In total, Plaintiffs request 65.93 hours for $40,693.25 in fees for case intake and development activities and 87.21 hours for $65,602.25 in fees related to the first Motion for Preliminary Injunction.

70. That said, Plaintiffs' counsel have made an effort to excise other time, and the total amount billed during this stage is not overwhelmingly excessive. I would estimate that somewhere between 20% and 40% of this time relates to matters other than ADA issues given the scope of the claims for relief in the Third Amended Complaint. Because of the difficulty in so determining, I recommend to the Court that 20% of the 153.14 hours be discounted for purposes of compensation. I will reflect an across-the board cut in attached exhibits.

### Stage 2: August 16, 2022 – June 21, 2023

71. The second stage, beginning August 16, 2022, is somewhat more problematic. In early 2023, it is very clear that the Defense had determined the same thing that the Plaintiffs had determined, to wit, that there were ADA issues that needed to be addressed. Following the Motions for Expedited Discovery, the first Phase 2 entries related to the second Motion for Preliminary Injunction were recorded by Messrs. Grunfeld and Anderson who billed for discussing factual development for a potential renewed Motion for Preliminary Injunction. (*See*, **Exhibit F-3**.) Defense counsel informed Plaintiffs' counsel in early 2023 of the desire of the County to resolve the ADA issues. Instead of immediately sitting down to resolve the matter and form a plan such as that was ultimately employed and stipulated, Plaintiffs' counsel essentially ignored Defense counsel and spent many hours drafting the second Motion for Preliminary Injunction and Class Certification. As I noted above, this is somewhat troubling, because of the inference that the Plaintiffs' counsel was at least partially motivated by private gain in pursuing a lengthy and complex motion and using 14 lawyers to do so.

72. Per **Exhibits F-1**, **F-3**, and **G**, Plaintiffs request 255.27 hours for $187,740.43 in fees for Phase 2 case development and management activities, 474.24 hours for $397,480.95 for discovery activities, and 590.52 hours for $462,065.28 in fees for Motion for Preliminary

DECLARATION OF JOHN D. O'CONNOR   15

Injunction activities, for a total of 1,320.03 hours for $1,047,286.65 in fees for Phase 2. These activities belied any desire to engage in meaningful resolution until a great amount of needless hours had been spent on unnecessary motion and discovery work. The Court first brought up ENE, to which the parties expressed assent, on December 7, 2022, but Plaintiffs showed no serious settlement attitude until finally engaging in an ENE and seeing its completion on June 21, 2023. In my opinion, this lack of enthusiasm was seemingly designed to delay the litigation unnecessarily.

73. A majority of the Phase 2 case development and management fees related to "ADA Class Development" activities, which include in person interviews and other communications with incarcerated people, review of the records of incarcerated people, and ancillary activities. **Exhibits F-1**, **F-3**, and **G**, 12 timekeepers billed a total 185.44 hours for $126,420.30 in fees for these class development activities.

74. Plaintiffs' discovery activities included both Motions for Expedited Discovery and related drafting of discovery requests and meeting and conferring, post-discovery motion written discovery and meeting and conferring, two rounds of PMK depositions, and facility inspections.

75. Per **Exhibits F-1**, **F-3**, and **G**, Plaintiffs request a combined 133.48 hours for $115,740.88 for the two Motions for Expedited Discovery, with 62.32 hours for $51,585 in fees for the first motion and 71.15 hours for $64,155.88 in fees for the second motion. Plaintiffs request a total of 104.5 hours for $78,482.35 in fees for PMK Deposition Preparation and 58.52 hours for $56,779.13 fees for PMK deposition attendance, with 140.41 hours for $120,809.60 related to the March 14 and 15, 2023, PMK depositions, and 22.61 hours for $14,451.88 fees related to the April 20, 2023, PMK deposition. As such, Plaintiffs request a total of 163.02 hours for $135,261.48 in fees for Phase 2 PMK deposition activities.

76. Per **Exhibits F-1**, **F-3**, and **G**, Plaintiffs request a total of 123.31 hours for $103,479.70 in fees related to facility inspections, included drafting requests for inspection,

preparing for and conducting inspection, and for expert reports concerning the same during Phase 2.

77. Per **Exhibits F-1**, **F-3**, and **G**, Plaintiffs request 590.52 hours for $462,065.28 in fees for the second Motion for Preliminary Injunction, consisting of 324.52 hours for $233,308.13 in fees relating to the motion, 174.52 hours for $132,486.52 in fees for the Reply, 55.25 hours for $54,883.88 in fees relating to the Early Neutral Evaluation, 5.51 hours for $3,393.88 in fees preparing for the hearing, and 33.73 hours for $37,992.88 in fees relating to the Stipulated Order. 12 timekeepers billed for work for the Motion, while 11 timekeepers billed for work on the Reply.

78. During this period, the number of timekeepers working on this case was stunningly high. Even if each timekeeper was arduously pursuing success with appropriate motivation, this many cooks spoil the broth and are tremendously inefficient.

79. In my opinion, about half of the 1,320.025 hours logged between August 16, 2022, and June 21, 2023, are and were unnecessarily spent when this matter could have been immediately put in mediation and settled. While all Phase 2 activities are excessive, Plaintiffs' discovery billings are particularly excessive, given the expansive discovery sought that was ultimately narrowed by the Court. Three attorneys – Messrs. Grunfeld, Anderson, and Kiefer - attended the March 14 and 15 PMK depositions. After expending 729.5 hours for $585,221.38 in fees relating to case development and discovery, one would expect more efficient briefing for the second Motion for Preliminary Injunction, yet Plaintiffs request almost 500 hours drafting the Motion and Reply.

80. However, having said that, precision in estimating the excess hours is difficult. I also note that with 14 lawyers participating, such a number of lawyers was not required in order to achieve the ultimate result of a stipulation to remediate and oversee ADA issues. And as noted, the drafting work was unneeded after early January 2023.

81. Accordingly, I opine that about forty percent (40%) of these hours should be discounted and not compensated.

**Stage 3: June 22, 2023 - End**

82. I make the same recommendation, although for different reasons, for the third stage of this litigation from June 22, 2023, forward, where 1,244.69 hours were billed by 16 separate timekeepers, which includes 1,080.25 hours for $957,980.48 in fees for merits activities and 165.45 hours for $158,002.58 in fees for the instant fee motion. In both stages of Phase 3, there is an excessive amount of duplication. I note that the defense was able to participate in these sessions with only two lawyers, but that the Plaintiffs' team needed 16.

83. Per **Exhibits F-1**, **F-4**, and **G**, Plaintiffs request 80.18 hours for $64,648.90 in fees related to case development and management activities; 208.91 hours for $166,608.15 in fees related to discovery activities; 102.79 hours for $91,297.38 hours related to floor sleeping disputes, related IDCs, and development of a potential Motion for Preliminary Injunction concerning the same; 460.27 hours for $417,099.40 in fees related to negotiations through filing of the Amended Action Plan, and a further 228.1 hours for $214,326.65 in fees related to further negotiations thereafter; and 164.45 hours for $158,002.58 in fees related to the instant Motion for Attorneys' Fees.

84. I note that out of the 164.45 hours related to the instant Motion for Attorneys' Fees billed through January 20, 2025, Plaintiffs request 6.27 hours for $7,139.25 in fees for stipulations concerning the briefing schedule; 41.61 hours for $47,932.25 in fees for fee motion communications; 40.47 hours for $39,073.50 in fees for work relating to reviewing invoices to allocate ADA fees; and 76.1 hours for $63,857.58 in fees for drafting the Motion. Nine different timekeepers billed for work related to the Motion for Attorneys' fees. Almost $48,000 in fees for co-counsel and expert communications is clearly excessive, especially given RBGG's significant fee-shifting civil rights experience. The excessive fee motion

DECLARATION OF JOHN D. O'CONNOR    18

communications are emblematic of the excessive co-counsel communications that permeated all three phases.

85. Again, for the third stage, it would be reasonable to say that the hours billed were approximately twice those that should have reasonably been logged. But certainly thirty percent (30%) of the time is excessive if for no other reason than duplication and unnecessary communication and coordination arises because of the excessive staffing.

IV. **CONCLUSION**

86. Looking at this case from 35,000 feet, it became clear in late 2022 that there were obvious ADA access issues, including mobility issues and communication for the hearing impaired. 2,500 hours by lawyers who tout their sophistication and experience in this area screams out as being excessive. I have attached hereto as **Exhibit H** a chart reflecting the calculations of my opinion discussed above.

87. Per **Exhibit H**, applying my recommended rates and reductions to hours results in an award of 1,556.41 hours for $877,255.70 in fees for RBGG; 145.3 hours for $110,429.90 in fees for Mr. Fischer; and 84.09 hours for $29,699.85 for DLA Piper, for a total award of 1,785.81 hours for $1,017,385.45 in fees.

88. I recommend that the rates stated above be applied to the hours as discounted for excessiveness.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of March 2025 in Marin County, California.

John D. O'Connor